**Federal Register**

Vol. 89, No. 111

Friday, June 7, 2024

**Presidential Documents**

---

**Proclamation 10773 of June 3, 2024**

**Securing the Border**

**By the President of the United States of America**

**A Proclamation**

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID–19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID–19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken—and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS

to manage conditions on the southern border, as well as funding for critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

   (a) over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

   (b) over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

   (c) 100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

   (d) shelter and critical services for newcomers in our cities and States; and

   (e) 1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.

While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118–47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final

decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity. The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility. However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system—the result of outdated laws and inadequate resources—has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the

United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1.** *Suspension and Limitation on Entry.* The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**Sec. 2.** *Applicability of Suspension and Limitation on Entry.* (a) The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

(b) Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

(c) For purposes of subsection (a) and subsection (b) of this section, unaccompanied children (as defined in section 279(g)(2) of title 6, United States Code) from non-contiguous countries shall not be included in calculating the number of encounters.

**Sec. 3**. *Scope and Implementation of Suspension and Limitation on Entry.* (a) The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

(b) The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

   (A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c) An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d) The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e) Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**Sec. 4.** *Definitions.* (a) The term "encounter" refers to a noncitizen who:

(i) is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

(ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

(iii) is determined to be inadmissible at a southwest land border port of entry.

(b) The term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c) The term "southwest land border" means the entirety of the United States land border with Mexico.

(d) The term "southern border" means the southwest land border and the southern coastal borders.

**Sec. 5.** *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held

to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 6.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

[FR Doc. 2024–12647
Filed 6–6–24; 8:45 am]
Billing code 3395–F4–P