**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, et al.

      *Plaintiff*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.

      *Defendants,*

and

STATE OF TEXAS,

      [Proposed] *Intervenor-Defendant.*

No. 1:24-cv-01702

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Table of Authorities ...................................................................................................iii

Introduction ................................................................................................................1

Background ................................................................................................................ 2

   I.    The Crisis at the Southern Border. ..................................................... 2

   II.   The President's Failure to use Existing Tools to Secure the Border................... 6

   III.  The IFR ....................................................................................... 9

   IV.  Procedural History ..................................................................... 11

Argument .............................................................................................................. 11

   I.    Texas has a right to join this suit. ...................................................... 11

     A.   Texas' intervention is timely........................................................12

     B.   Texas has a legally protected interest that would be impaired if Plaintiffs prevail. 12

     C.   Defendants cannot adequately represent Texas' interests............................16

   II.   Texas should be allowed to intervene permissively. ............................................21

Conclusion ....................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Acree v. Republic of Iraq*, 370 F.3d 41, 49 (D.C. Cir. 2004), *abrogated by Republic of Iraq v. Beaty*, 556 U.S. 848 (2009) ................................................................................. 22

*Ariz. v. City & Cnty. of San Francisco*, 142 S. Ct. 1926, 1928 (2022) (Roberts, C.J., concurring) ....................................................................................................... 19

*Ariz. v. City & Cnty. of San Francisco*, No. 20-1775 (U.S.) ..................................... 18, 19

*Arizona v. City & Cnty. of S.F., Cal.*, 596 U.S. 763 (2022) ...................................... 19, 20

*Arizona v. City & Cnty. of San Francisco*, 142 S. Ct. 417 (2021) ................................ 19

*Arizona v. Mayorkas*, 143 S. Ct. 1312 (2023) ............................................................. 21

*Arizona v. Mayorkas*, 143 S. Ct. 478 (2022) ........................................................ 20, 21

*Arizona v. United States*, 567 U.S. 387, 397 (2012) ..................................................... 15

*Biden v. Texas*, 597 U.S. 785, 791 (2022) .................................................................... 7

*City & Cnty. of San Francisco v. USCIS*, 992 F.3d 742, 745 ............................... 17, 18, 19

*Commonwealth of Pennsylvania v. President U.S. of Am.*, 888 F.3d 52, 57 n.2 (3d Cir. 2018).......... 12

*Conkright v. Frommert*, 556 U.S. 1401, 1402 (2009) (Ginsburg, J., in chambers).......................... 18

*Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1010 ........................................................... 17

*Crossroads Grassroots Pol'y Strategies v. Fed. Election Commn.*, 788 F.3d 312, 314 (D.C. Cir. 2015) ................................................................................................. 1, 16, 21

*Dep't of Homeland Sec. v. New York*, 141 S. Ct. 1370 (2021) ........................................ 17

*DHS v. New York*, 140 S. Ct. 599 (2020) ...................................................................... 18

*Env't Integrity Project v. Wheeler*, No. 20-cv-1734, 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021) ......................................................................................................... 12

*Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ....................................................................... 14

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023), *appeal dismissed,* No. 23-11528, 2023 WL 5212561 (11th Cir. July 11, 2023)............................................. 8, 9

*Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 13 (D.D.C. 2016) .......................... 12

*Foster v. Gueory*, 655 F.2d 1319, 1325 (D.C. Cir. 1981) ................................................ 13

*Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003)...................................... 13, 21

*Huisha-Huisha v. Mayorkas*, 642 F.Supp. 3d 1 (D.D.C. 2022) ...................................................... 20

*Huisha-Hushia v. Mayorkas*, 2022 WL 19653946 (D.C. Cir. Dec. 16, 2022) ............................... 20

*Kane Cnty., Utah v. United States*, 928 F.3d 877, 887, 887 n.12 (10th Cir. 2019) ........................12

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) .................................................................................................................................... 11

*Louisiana v. Centers for Disease Control & Prevention*, 603 F.Supp.3d 406 (W.D. La. 2022) ........ 20

*Melone v. Coit*, 100 F.4th 21, 28.........................................................................................................12

*Nuesse v. Camp*, 385 F.2d 694, 704................................................................................................... 22

*Plyler v. Doe*, 457 U.S. 202, 225 (1982) ........................................................................................... 15

*Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers*, 338 F.R.D. 1, 6 (D.D.C. 2021) ......................................................................................................................... 13

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 14 (D.D.C. 2019)............. 22

*SEC v. Prudential Sec. Inc.*, 136 F.3d 153 ........................................................................................ 11

*State of Texas v. U.S. Dep't of Homeland Sec.*, No. DR-23-cv-00055, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.) .............................................................................5, 8

*Texas v. Biden*, 589 F. Supp. 3d 595, 607 (N.D. Tex. 2022)............................................................ 13

*Texas v. Department of Homeland Security*, 88 F.4th 1127 (5th Cir. 2023)...................................1, 5

*Texas v. United States (DACA)*, 50 F.4th 498, 517 ........................................................................... 15

*Texas v. United States*, 40 F.4th 205, 218 (5th Cir. 2022) (per curiam) .......................................... 8

*The Prize Cases*, 67 U.S. 635, 668 (1862) ...........................................................................................1

*Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017) ................................................... 11

*Trump v. Hawaii*, 585 U.S. 667 (2018) ..................................................................................... 1, 6, 14

*United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980).................................. 16

*United States v. Texas*, 599 U.S. 670, 676 (2023) ........................................................................... 13

*United States v. Texas*, No. 1:24-cv-8, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) ................... 16

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 20 (D.D.C. 2019) .................................................................................................................................... 14

*Wolf v. Cook County*, 140 S. Ct. 681 (2020)................................................................................... 18

## Constitutional Provisions & Statutes

5 U.S.C. § 551(5) ................................................................................................18

8 U.S.C. § 1101 ................................................................................................... 6

8 U.S.C. § 1158(a)(1) ...................................................................................... 6, 14

8 U.S.C. § 1158(a)(1) ...................................................................................... 6, 14

8 U.S.C. § 1158(b)(2)(C) ................................................................................. 6, 14

8 U.S.C. § 1182(f) ........................................................................................... 6, 14

8 U.S.C. § 1185(a)(1) ...................................................................................... 6, 14

8 U.S.C. § 1225(b)(2)(A) .....................................................................................5

8 U.S.C. § 1226(d)(1) ..........................................................................................5

8 U.S.C. § 1231(a)(1)(A) ......................................................................................5

8 U.S.C. § 1601(2)(B) ........................................................................................15

## Rules & Regulations

Fed. R. Civ. P. 24(a)(2) ............................................................................10, 11,13

Fed. R. Civ. P. 24(b)(1)(B) .................................................................................21

42 C.F.R. § 435.406(b) .......................................................................................15

84 Fed. Reg. 41292 (Aug. 14, 2019) ...................................................................16

Fed. R. Civ. P. Rule 24(b) ..............................................................................2, 21

86 Fed. Reg. 14,221, 14,221 (Mar. 15, 2021) ......................................................18

86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021) ........................................................12

89 Fed. Reg. 48,710 (June 5, 2024) ...................................................................1, 9

89 Fed. Reg. 48,715 .........................................................................................9, 10

89 Fed. Reg. 48,737 ...........................................................................................10

## INTRODUCTION

The southern border of the United States is in crisis. The President has the duty "to resist" this crisis. *The Prize Cases*, 67 U.S. 635, 668 (1862). He wields "broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 585 U.S. 667 (2018). But the Biden Administration has stood idle, and Americans are paying the price. The State of Texas has stepped up to shield its citizens from the border crisis—only to face relentless opposition from Defendants. For years, Defendants have allowed illegal immigration to run rampant. Now, the Biden Administration has taken tepid steps to secure the border. *See* Interim Final Rule with Request for Comments: "Securing the Border," 89 Fed. Reg. 48,710 (June 5, 2024), Agency/Docket No. USCIS-2024-0006 (the "IFR"). Despite its flaws, the IFR is a legitimate use of executive power to limit the flow of migrants into the United States. But this Administration's sudden shift is cold comfort to Texas. Time and again, Texas has tried to protect its people, only to have Defendants thwart its efforts. Texas seeks to intervene as a defendant in this case because, if past is prologue, Defendants cannot be trusted to defend this Nation's borders—let alone Texas' interests. Simply put, Defendants are "doubtful friend[s]" in defending the basis of authority for the IFR. *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm.*, 788 F.3d 312, 314 (D.C. Cir. 2015) ("'[A] doubtful friend is worse than a certain enemy.'") (quoting Aesop).

Defendants' attempts to hinder Texas from safeguarding its citizens are well-documented. *See generally Texas v. Department of Homeland Security*, 88 F.4th 1127 (5th Cir. 2023). Texas is a key entry point for migrants. *Id.* at 1130. To secure its border and assist the U.S. Border Patrol, Texas deployed concertina wire at high-traffic illegal border crossings. *Id.* at 1130. Defendants not only opposed this measure but destroyed Texas' property—cutting the wire down. *Id.* at 1131. Even after the district court granted Texas a temporary restraining order, Border Patrol agents cut holes in the wire and provided a climbing rope for migrants, seemingly to facilitate further inland crossings. *Id.*

Texas should be allowed to intervene as a matter of right in this case because it stands to suffer if the IFR is vacated on grounds that would dimmish presidential authority. Defendants have

shown no interest in using their broad executive powers to stem the border crisis. For the same reasons, this Court should—at minimum—allow permissive intervention.

BACKGROUND

The southern border is in chaos. Encounters have skyrocketed, sparking a crime wave and human trafficking surge. Since President Biden took office, border crossings have overwhelmed Border Patrol. Dangerous criminals and terrorists slip through, worsening the crisis. A flood of deadly fentanyl flows through the porous border, deepening the opioid epidemic. These alarming trends scream for tough border security. Yet the current administration's actions ignore these threats, actively undermining national security by neglecting immigration laws and blocking Texas' efforts to secure the border.

## I.   The Crisis at the Southern Border.

There is a "crisis at our border."[1] And Texas is ground zero. Since the Biden Administration took office, there have been more than 9.7 million encounters nationwide[2] and more than 7.9 million encounters at the Southwest Border.[3] Southwest border encounters exceeded 170,000 in May 2024, including 117,906 apprehensions by Border Patrol agents between ports of entry.[4] While running for President, Joe Biden called for migrants to "surge" to the border.[5] The message was clear: encounters at the Southwest border have exceeded 170,000 for the last 11 months—adding

---

[1] House Hearing on Immigration and Border Security, June 14, 2023, *Testimony of former Border Patrol Chief Rodney Scott*, https://www.c-span.org/video/?528717-1/house-hearing-immigration-border-security (38:40 - 39:10).

[2] U.S. Customs and Border Prot., *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters (last visited July 8, 2024).

[3] U.S. Customs and Border Prot., *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited July 8, 2024).

[4] *Id.*

[5] *Candidate Biden Calls On Illegal Immigrants to Surge the Border*, YouTube (Apr. 5, 2021), https://www.youtube.com/watch?v=rYwLYMPLYbo.

2

up to 2,377,428 total encounters during that timeframe.[6] For comparison, Customs and Border Patrol (CBP) recorded *fewer* total encounters (1,952,638) at the Southwest border from Fiscal Years (FY) 2017-2020 *combined*.[7]

 *Crime.* This influx of migrants brings crime. In FY 2024 alone, CBP has arrested over 26,000 migrants with criminal convictions or outstanding warrants nationwide.[8] Between 2021 and 2024, Border Patrol has apprehended nearly 2,000 gang members and encountered 372 individuals on the terrorist watchlist.[9] From FY 2021 to now, CBP has arrested 174 migrants who were convicted of murder; 4,388 who were convicted of assault, battery, or domestic violence; and 1,305 who were convicted of sexual offenses.[10]

 These stark numbers don't tell the full story. According to the Texas Department of Public Safety (DPS), between June 1, 2011 and June 30, 2024, 308,000 migrants were charged with more than 533,000 criminal offenses which included arrests for 997 homicide charges; 68,104 assault charges; 9,643 burglary charges; 62,459 drug charges; 1,245 kidnapping charges; 26,900 theft charges; 41,616 obstructing police charges; 3,056 robbery charges; 6,744 sexual assault charges;

---

[6] Supra note 3.

[7] U.S. Dep't of Homeland Sec., 2021 Yearbook of Immigration Statistics (Mar. 2023), at 96, Table 35, https://www.dhs.gov/ohss/topics/immigration/yearbook/2021 (last visited July 8, 2024).

[8] U.S. Customs and Border Prot.,, CPB Enforcement Statistics, *Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited July 8, 2024).

[9] U.S. Customs and Border Prot., CPB Enforcement Statistics, *Gang Affiliated Enforcement,* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited July 8, 2024); U.S. Customs and Border Prot.,, CPB Enforcement Statistics, *Terrorist Screening Data Set Encounters,* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited July 8, 2024).

[10] U.S. Customs and Border Prot., Criminal Noncitizen Statistics, *Total Criminal Convictions by Type*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics (last visited July 8, 2024).

7,763 sexual offense charges; and 6,560 weapon charges.[11]

Yet this Administration refuses to enforce the law. Comparing ICE criminal data from FY 2017–2019 with FY 2021–2023, under President Biden: arrests of criminal migrants are down 57-percent; at-large arrests are down 68 percent; (3) detainer requests are down 44 percent; deportations are down 67 percent; and DOJ immigration-related prosecutions are down 55 percent.[12]

**Unaccompanied Minors and human trafficking.** Lax border policies have hit the most vulnerable. Since 2021, unaccompanied migrant children at the southern border have "remained at record-high levels."[13] Indeed, the number of unaccompanied minors skyrocketed from 15,381 in 2020 to 118,938 in 2023[14]—a 673% increase in just three years. In May 2024 alone, CBP encountered 8,642 unaccompanied migrant children.[15] Most cross through "very dangerous, not-nice, human smuggling networks that transport them through Central America and Mexico to the United States." *Vice President Joe Biden, Remarks to the Press* (June 20, 2014), https://tinyurl.com/4fbb9v6k. Human smuggling has grown into a "multi-billion-dollar international business." Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar*

---

[11] Texas Department of Public Safety, *Texas Criminal Illegal Alien Data*, https://www.dps.texas.gov/section/crime-records/texas-criminal-illegal-alien-data (last visited July 8, 2024).

[12] *Three Years of Biden Immigration Policies Have Benefitted Criminal Migrants*, Ctr. for Immigr. Stud. (Jan. 9, 2024), https://cis.org/Report/Three-Years-Biden-Immigration-Policies-Have-Benefitted-Criminal-Aliens

[13] *Increase Numbers of Unaccompanied Children at the Southwest Border*, Cong. Research Serv. (June 28, 2023), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://crsreports.congress.gov/product/pdf/IN/IN11638.

[14] U.S. Dep't of Health & Hum. Servs., Unaccompanied Children Bureau, Fact Sheet, *Admin. for Child. & Fams.* (July 5, 2024), https://www.acf.hhs.gov/orr/fact-sheet/programs/uc/fact-sheet.

[15] U.S. Customs and Border Prot., Southwest Land Border Encounters, *UC/Single Minors* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited July 8, 2024).

*Business*, N.Y. Times (July 25, 2022), https://tinyurl.com/487kykkh. Cartels "have increasingly acquired a transnational dimension," and may now be Mexico's fifth-largest employer. Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico*, 381 Science 1312 (2023). President Biden acknowledged in his State of the Union address that "people pay these smugglers $8,000 to get across the border" because lax enforcement makes the investment worthwhile. *Transcript of President Joseph Biden's State of the Union Address*, Associated Press (Mar. 8, 2024), https://tinyurl.com/ypsxhuju. Recognizing the need for stronger security, he stated "it's highly unlikely that people will pay that money and come all that way knowing that they'll be. . . kicked out quickly." *Id.*

**Drugs**. Cartels exploit the infrastructure built for human smuggling to ship drugs, notably fentanyl. "Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." *State of Texas v. U.S. Dep't of Homeland Sec.*, No. DR-23-cv-00055, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.). Because fentanyl is a highly addictive opioid, smuggling it into "the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.*. In FY 2023, CBP seized 240,000 pounds of drugs at the southwest border[16]—including an estimated 1.1 billion doses of fentanyl.[17] Forty-four percent of total drug seizures and 99 percent of fentanyl seizures occurred at the southwest border.[18]

---

[16] *Drug Seizure Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited July 9, 2024).

[17] *Drug Dosage, Value, and Weight Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/cbp-drugs-dosage-value-and-weight (last visited July 8, 2024).

[18] Per CBP data, in FY 2023, out of 549,000 pounds of drugs seized, 240,000 pounds were seized at the southwest land border; out of 27,000 pounds of fentanyl of seized, 26,700 pounds were seized at the southwest land border. *Drug Seizure Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited July 8, 2024).

## II.    The President's Failure to use Existing Tools to Secure the Border.

The President claims he's done "all [he] can do"[19] to secure the border and that he just needs the tools from Congress. But he already has them. Congress has enacted laws that could help curb the surge of crime and violence at the southern border. Immigration statutes allow the federal government to (among other things): detain certain migrants pending removal proceedings, 8 U.S.C. §1225(b)(2)(A); aid state and local authorities in identifying aggravated felons, *id.* §1226(d)(1); apprehend and deport migrants within 90 days of being finally ordered removed, *id.* §1231(a)(1)(A); and enforce "the immigration laws of the United States . . . vigorously and uniformly," Immigration Reform and Control Act of 1986, Pub. L. No. 99-603 §115, 100 Stat. 3359, 3384. Yet as shown by the figures above, Defendants refuse to use the tools at their disposal to stem the tide of illegal crossings and the associated crime.

Beyond that, the President does not need a new act of Congress to secure the border. He has the inherent authority to end these dangerous and illegal border crossings that undermine national security. *See* 8 U.S.C. §§ 1182(f), 1185(a)(1); *see also Trump*, 585 U.S. at 684. He also has the authority to order the expedited removal of inadmissible arriving migrants, INA[20] § 235(b)(1) and to detain them. *See id.* § 236(a) (discretionary alien detention), *id.* § 236(c) (mandatory alien detention).

In the same way, the Executive Branch has broad discretion to regulate an alien's eligibility for asylum. Congress has conferred on the Executive Branch authority to adopt limitations on asylum eligibility. "[A]ny alien" who arrives in the United States "*may apply*" for asylum "whether or not [the alien arrives] at a designated port of arrival." 8 U.S.C. § 1158(a)(1) (emphasis added). And federal law permits the grant of asylum to a migrant who meets the definition of a

---

[19] Greg Norman, *Biden Claims 'I've Done All I Can Do' to Secure the Border*, FOX News (Jan. 30, 2024), https://www.foxnews.com/politics/biden-claims-done-all-can-secure-border.

[20] Immigration and Nationality Act, Pub. L. No. 82-414, § 101, 66 Stat. 163, 167 (1952) (codified as amended at 8 U.S.C. § 1101).

"refugee" and authorizes the Attorney General to "establish" by regulation "additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C). In other words, the plain text and structure of the asylum statute separates the requirements and procedures for *applying* for asylum (*id.* § 1158(a)(1)), from the *granting* of asylum (*id.* § 1158(b)(2)(C)). Simply put, while allowing "any alien" to apply for asylum with little limitation, Congress affords the Executive Branch extensive authority to regulate who *receives* asylum so long as that regulation is "consistent with" the rest of § 1158. *Id.* § 1158(b)(2)(C).

But rather than use these tools, the President has done the opposite. On his first day in office, he paused deportations of migrants and halted all construction on the southern border wall.[21] And he did away with 89 previously successful border policies within his first year in office.[22]

For example, he ended Title 42, a policy instituted during the pandemic that allowed the U.S. to turn away more than 60 percent of migrants at the southern border, amounting to nearly 2 million people over a two-year span.[23] And he terminated the highly effective "Remain in Mexico" program that required "certain non-Mexican nationals arriving by land from Mexico [to] be returned to Mexico to await the results of their removal proceedings." *Biden v. Texas*, 597 U.S. 785, 791 (2022); *see id.* at 819 (Alito, J., dissenting) (observing that DHS "found that total border

_____

[21]*Biden Suspends Deportations, Stops 'Remain In Mexico' Policy,* (Jan. 21, 2021) https://www.npr.org/sections/president-biden-takes-office/2021/01/21/959074750/biden-suspends-deportations-stops-remain-in-mexico-policy; *Biden halts border wall building after Trump's final surge* (Jan. 22. 2021) https://apnews.com/general-news-political-news-bc664278ac096e6ff878116034ec06bb.

[22] Migration Policy Institute, *Biden Executive Actions on Immigration in First Year*, MIGRATION POLICY INSTITUTE (Jan. 20, 2022), https://www.migrationpolicy.org/news/biden-executive-actions-immigration-first-year.

[23] Pew Research Center, *Key Facts About Title 42, the Pandemic Policy That Has Reshaped Immigration Enforcement at U.S.-Mexico Border*, PEW RESEARCH CENTER (Apr. 27, 2022), https://www.pewresearch.org/short-reads/2022/04/27/key-facts-about-title-42-the-pandemic-policy-that-has-reshaped-immigration-enforcement-at-u-s-mexico-border/.

encounters decreased by 64 percent after" this program "was implemented," and DHS considered it an "indispensable tool in addressing the ongoing crisis at the southern border"). This Administration has also created categorical parole programs that release migrants into the interior *en masse. See, e.g., Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023), *appeal dismissed,* No. 23-11528, 2023 WL 5212561 (11th Cir. July 11, 2023). And it established enforcement guidelines that would "increase[] the number of aliens with criminal convictions and migrants with final orders of removal released into the United States." *Texas v. United States*, 40 F.4th 205, 218 (5th Cir. 2022) (per curiam) (quotations omitted), *abrogated on jurisdictional grounds,* 143 S. Ct. 1964 (2023). Indeed, those guidelines have effectively compelled ICE and border patrol officers to stand down and allow most incoming migrants to remain unlawfully in the United States.

Given Defendants' failure to control illegal immigration, Texas has tried to pick up the slack.[24] One would think Defendants would welcome the help—after all, the President has admitted there is a "crisis" at the border.[25] Yet remarkably, Defendants have used the full force of the federal government to try to stop Texas from defending itself. They sued to prevent Texas from deploying a floating border barrier in the Rio Grande. *See Abbott*, 690 F. Supp. 3d 708. And they have repeatedly destroyed Texas' concertina wire fencing to allow migrants to enter the state by the thousands. "The evidence amply demonstrates the utter failure of the [the federal government] to deter, prevent, and halt unlawful entry into the United States" in contradiction to "the statutory duties they are so obviously derelict in enforcing." *Texas*, 2023 WL 8285223, at *14.

---

[24] As of April 22, 2024, Operation Lone Star—a statewide effort by Texas to decrease illegal crossings and crack down on human and drug trafficking—had cost Texas over $11 billion. Alejandro Serrano, *Texas Border Migrant Apprehensions Rise Amid Operation Lone Star*, The Texas Tribune (Apr. 22, 2024), https://www.texastribune.org/2024/04/22/texas-border-migrant-apprehensions-abbott-operation-lone star/#:~:text=The%20recent%20trend%20comes%20three,said%20gubernatorial%20spokesperson%20Andr ew%20Mahaleris.

[25] *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations*, The White House (Jan. 26, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/01/26/statement-from-president-joe-biden-on-the-bipartisan-senate-border-security-negotiations/.

Taken together, this Administration's actions—and inactions—have effectively posted a "flashing 'Come In, We're Open' sign on the southern border." *Florida*, 660 F. Supp. 3d at 1253.

## III.    The IFR

On June 4, 2024, the Biden administration finally took limited steps to curb illegal immigration that it earlier had claimed it had no authority to do. The President introduced the "Proclamation on Securing the Border,"[26] accompanied by a "Fact Sheet,"[27] a Department of Homeland Security explainer,[28] and a 194-page Federal Register notice detailing the implementing rule, 89 Fed. Reg. 48,710. These documents outline changes to border processing procedures during periods of high border encounters—defined as a seven-day consecutive average of 2,500 encounters or more, and remaining in effect until the Secretary determines the weekly average drops below 1,500 encounters. The changes include: (1) migrants unlawfully crossing the border will generally be ineligible for asylum unless they meet exceptional circumstances or fall within outlined exceptions; (2) migrants processed for expedited removal will be referred only for a credible fear screening if they express fear of return or an intent to apply for asylum; and (3) during high encounter periods, the standard for withholding of removal will be heightened to a finding of a reasonable probability of persecution.

But the IFR still falls short of fulfilling the President's duties. It permits CBP to implement asylum restrictions only after apprehensions exceed 2,500 per day for a week—when former Obama DHS Secretary Jeh Johnson admitted that even "1,000" encounters "overwhelms the

---

[26] *A Proclamation on Securing the Border*, The White House (June 4, 2024), https://www.whitehouse.gov/briefing-room/presidential-actions/2024/06/04/a-proclamation-on-securing-the-border/.

[27] *Fact Sheet: President Biden Announces New Actions to Secure the Border*, The White House (June 4, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/04/fact-sheet-president-biden-announces-new-actions-to-secure-the-border/.

[28] *Fact Sheet: Presidential Proclamation to Suspend and Limit Entry and Joint DHS-DOJ Efforts*, U.S. Dep't of Homeland Sec. (June 4, 2024), https://www.dhs.gov/news/2024/06/04/fact-sheet-presidential-proclamation-suspend-and-limit-entry-and-joint-dhs-doj.

system."[29] So the IFR makes crisis levels of illegal immigration the norm. The IFR also contains several exceptions that undermine goal of curbing illegal immigration. For example, unaccompanied migrant children are not counted *at all*. 89 Fed. Reg. 48,715. This exception encourages the trafficking of children and prevents reporting these as encounters. Another exception is a migrant who is "determined to be inadmissible at a [southwest land border] [port of entry]." *Id*. This exception adjusts the definition of encounter to *exclude* migrants who are crossing the border at the ports of entry, thus significantly limiting the number of encounters considered when determining whether the border must be shut down.

Beyond that, the IFR creates significant loopholes to allow for migrants to enter *while the border is supposed to be closed.* The IFR clarifies that the Secretary of the Department of Homeland Security can make exceptions for these migrants to enter based on vague criteria. Like "operational considerations." *Id*. The vagueness of this term has been used previously by the Biden administration to evade its duty to faithfully execute the laws requiring detention of migrants as passed by Congress and creates a system where any burden or inconvenience to the Border Patrol or the administration is sufficient to exclude that migrant from the total count of encounters. Another exception is created "based on the totality of the circumstances including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter," allowing for migrants to claim one of these statuses to be allowed into the country. *Id*. The IFR also does not include the 1,450 migrants per day who preschedule their illegal entries at the ports using the CBP One app. 89 Fed. Reg. 48,737; *id*. at 48,762.

---

[29] Anna Giaritelli, *Obama's DHS Secretary, Remarks on Southern Border Crisis*, Washington Examiner (Mar. 29, 2019), https://www.washingtonexaminer.com/news/536038/obamas-dhs-secretary-jeh-johnson-we-are-truly-in-a-crisis-at-southern-border.

## IV.    Procedural History

On June 12, 2024, Plaintiffs filed a Complaint challenging the IFR. Dkt. 1. They filed an amended complaint on July 12, 2024. The parties agreed via proposed scheduling order on June 28, 2024, to proceed directly to summary judgment and that any answer by Defendants would be stayed in the interim. *See generally* Dkt. 10; *see also id.* (¶ 5). Based on the Court's order accepting the proposed scheduling order, Plaintiffs' motion for summary judgment is due on or before July 26, 2024. *Id.*

ARGUMENT

Texas seeks to intervene in this case to protect its interests and uphold immigration laws. Under Fed. R. Civ. P. 24(a)(2), intervention as a matter of right requires four prerequisites: (1) timeliness, (2) a legally protected interest, (3) a threat of impairment to that interest, and (4) inadequate representation by existing parties. Texas meets all these criteria. Additionally, Texas wants to defend the authority behind the IFR while Plaintiffs want the rule to be vacated in a way that would cripple presidential authority. As an intervenor-defendant not invoking the court's jurisdiction or seeking additional relief, Texas need not show independent Article III standing. Given the federal government's failure to secure the border, Texas' intervention is both timely and necessary.

## I.    Texas has a right to join this suit.

Intervention is as a matter of right is governed by Fed. R. Civ. P. 24(a)(2) and includes four prerequisites: "(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests." *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998). Texas is not required to show standing since it is not pursuing "relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017)—indeed, as a proposed intervenor-*defendant*, it is not seeking relief at all. *See also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) (appellate court "erred by

11

inquiring into [intervenor-defendant's] independent Article III standing" where it sought same relief as federal government); *Commonwealth of Pennsylvania v. President U.S. of Am.*, 888 F.3d 52, 57 n.2 (3d Cir. 2018) (holding that intervenors need not show Article III standing to defend a challenged federal law they because they "moved to intervene as defendants and seek the same relief as the federal government"—the upholding of the law); *Kane Cnty., Utah v. United States*, 928 F.3d 877, 887, 887 n.12 (10th Cir. 2019) (applying *Town of Chester* to defendant-side intervenors in finding that they could rely on the United States's standing); *Melone v. Coit*, 100 F.4th 21, 28–29 (1st Cir. 2024) (rejecting argument that intervenor needed to establish independent standing when the intervenor "simply seeks to defend the agency's position"); *Env't Integrity Project v. Wheeler*, No. 20-cv-1734, 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021) (K.B. Jackson, J.) (applicants who "are seeking to intervene *as defendants*, and are not invoking the Court's jurisdiction—let alone seeking relief that is broader than or different from the party invoking the Court's jurisdiction . . . are not required to demonstrate that they have Article III standing.") (internal punctuation and citation omitted) (emphasis in original).

### A.  Texas' intervention is timely.

Texas' intervention is timely. This case is still in its infancy—indeed, Plaintiffs just filed their amended complaint seven days ago. Defendants have yet to file an answer. *See*, *e.g.*, *Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 13 (D.D.C. 2016) (ruling intervention timely nine months after litigation began because it was filed before any of the defendants had filed an answer). Nor have any dispositive motions been filed. Beyond that, Texas plans to follow the agreed scheduling order in this matter. Dkt. 10. Thus, Texas' intervention will have minimal effect on the original parties or the flow of this litigation

### B.  Texas has a legally protected interest that would be impaired if Plaintiffs prevail.

Texas is closer to the crisis than are Defendants. Indeed, border states like Texas pay a particularly high price when the federal government fails to faithfully execute our country's immigration laws. As the border towns become overrun, it impacts all levels of Texas'

infrastructure, including housing, education, health care, criminal justice system costs, welfare expenditures, and more.[30] *See Texas v. Biden*, 589 F. Supp. 3d 595, 607 (N.D. Tex. 2022) ("[T]he flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both.") (quoting Defendants' own *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021)).

Texas also has financial interests at stake based on the outcome of this litigation and any possible settlement, including: (1) having to provide certain benefits to those unlawfully present and (2) encountering administrative burdens to comply with federal law by ensuring it is not providing state and local public benefits to ineligible migrants. These likely and predictable social-service costs are concrete injuries. *See generally United States v. Texas*, 599 U.S. 670, 676 (2023) ("Monetary costs are of course an injury.").[31]

Texas has a right to intervene if "the disposition of the action may as a practical matter impair or impede [their] ability to protect [its] interest." *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (quoting FRCP 24(a)(2)). "In evaluating this prong . . ., the [D.C. Circuit] considers the 'practical consequences,' of denying intervention . . . ." *Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers*, 338 F.R.D. 1, 6 (D.D.C. 2021) (quoting *Fund For Animals, Inc.*, 322 F.3d at 735). A "possibility" of impairment of applicants' interests as a practical matter is sufficient. *Foster v. Gueory*, 655 F.2d 1319, 1325 (D.C. Cir. 1981). When a

---

[30] Urial J. Garcia, *Gov. Greg Abbott Calls for Federal Help as Thousands of Migrants Cross Border in Eagle Pass*, Tex. Trib. (Sept. 21, 2023), https://www.texastribune.org/2023/09/21/texas-migrants-border-eagle-pass/.

[31] While, in *Texas*, the Court concluded that certain States lacked standing to sue over a *general* underenforcement of immigration laws, the Court explicitly left open State standing to challenge a policy that "implicate[s] more than simply the Executive's traditional enforcement discretion," such as a policy concerning the "provision of *legal benefits* or legal status." *Id.* at 683 (emphasis added). Of course, here Texas does not have to satisfy Article III standing requirements at all because it seeks to intervene as a defendant.

movant benefits from a regulation, invalidation of that regulation would necessarily impair the movant's interests. *See, e.g.*, *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 20 (D.D.C. 2019).

The President has "broad discretion to suspend the entry of migrants into the United States." *Trump v. Hawaii*, 585 U.S. 667 (2018). And "foreign nationals seeking admission have no constitutional right to entry[.]" *Id.* at 670. To that end, it is long settled that "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Id.* at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).

Federal law authorizes the President to "suspend the entry of all migrants or any class of migrants" whenever he "finds" that their entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f); *see also id.* § 1185(a)(1) (granting the President authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of migrants, "subject to such limitations and exceptions as [he] may prescribe."). Indeed, "by its terms, § 1182(f) exudes deference to the President in every clause." *Trump*, 585 U.S. at 684; *see also id.* at 712 ("[T]he President has *inherent* authority to exclude migrants from the country.") (Thomas, J., concurring) (emphasis in original).

Thus, when a President is concerned that the present status quo encourages dangerous and illegal border crossings and undermines the integrity of the Nation's borders, he has the inherent authority to determine that a temporary suspension of entry by migrants is in the national interest. *See* 8 U.S.C. §§ 1182(f), 1185(a)(1).

In the same way, the Executive Branch has broad discretion to regulate a migrant's eligibility for asylum. Congress has conferred on the Executive Branch authority to adopt limitations on asylum eligibility. "[A]ny alien" who arrives in the United States "*may apply*" for asylum "whether or not [the alien arrives] at a designated port of arrival." 8 U.S.C. § 1158(a)(1) (emphasis added). And federal law permits the grant of asylum to an alien who meets the definition of a "refugee" and authorizes the Attorney General to "establish" by regulation "additional

limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." *Id*. § 1158(b)(2)(C).

In other words, the plain text and structure of the asylum statute separates the requirements and procedures for *applying* for asylum (*id*. § 1158(a)(1)), for asylum from the *granting* asylum (*id*. § 1158(b)(2)(C)). Simply put, while allowing "any alien" to apply for asylum with little limitation, Congress affords the Executive Branch extensive authority to regulate who *receives* asylum so long as that regulation is "consistent with" the rest of § 1158. *Id*. § 1158(b)(2)(C).

Texas benefits from enforcement of this Nation's immigration laws. Congress ultimately has "plenary authority" over immigration and naturalization. *Plyler v. Doe*, 457 U.S. 202, 225 (1982). So "Congress has developed a complex scheme governing admission to our Nation and status within our borders." *Id*. The federal government enacts and enforces these immigration laws to protect the States' interests, for example, by not requiring States to provide benefits to certain immigrants. *See, e.g.*, 8 U.S.C. §1601(2)(B) ("It continues to be the immigration policy of the United States that [] the availability of public benefits not constitute an incentive for immigration to the United States.").

Indeed, States typically "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). For instance, if the IFR is ultimately vacated, Texas will incur costs associated with providing services to illegal migrants who would reside in the State but would otherwise be kept out of the country under the IFR. That is because States have a mandated duty to provide some government resources to migrants, regardless of lawful status. *See, e.g.,* 42 C.F.R. § 435.406(b) (emergency Medicaid); *Plyler*, 457 U.S. at 230 (public education); *Texas v. United States (DACA)*, 50 F.4th 498, 517–20 (5th Cir. 2022). Federal power to limit the number of entrants— as the IFR bases its authority on—helps Texas by reducing the number of asylum seekers likely to have invalid claims. Texas has a legally protected interest in ensuring the federal authority behind the current IFR is recognized, to ensure a future administration that takes its duties seriously can wield it. This interest will be impaired if the

Administration collusively stipulates to dismissal of the IFR, or if Plaintiffs manage to vacate it on the grounds in their pleadings.

### C. Defendants cannot adequately represent Texas' interests.

A showing of inadequacy of representation is a "minimal burden." *Crossroads*, 788 F.3d at 321. Intervenors "ordinarily should be allowed to intervene *unless it is clear* that the party will provide adequate representation." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980) (emphasis added). This makes sense because an intervenor "should not need to rely on a doubtful friend to represent its interests[] when it can represent itself." *Crossroads*, 788 F.3d at 321. In this case, Defendants are anything but faithful stewards of Texas' interests.

Texas is a sovereign State that has been at ground zero of the border crisis. Illegal immigration threatens state sovereignty and exacts damaging social costs. When Texas has tried to stop illegal immigration, Defendants have sued them. *See United States v. Texas*, No. 1:24-cv-8, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024); *Abbott*, 690 F. Supp. 3d 708. Texas should not have to rely on the hope that the same Defendants who have sued to allow *more* illegal immigration will adequately represent Texas' interests here.

And while the IFR is Defendants' own directive, they cannot be trusted to defend or enforce it. For years, this Administration has abused the asylum process—calling immigrants to "surge" to the border and incentivizing illegitimate asylum claims with mass amnesty. Indeed, numbers show that since 2022, "more than 350,000 asylum cases have been closed by the US government."[32] So while migrants are neither granted nor denied asylum, they are able to indefinitely roam the county without fear of removal.

President Biden has also previously stated that he does not have the "authority to

---

[32] *Biden Admin Offers Mass Amnesty to Migrants as It Quietly Terminates 350,000 Asylum Cases: Sources*, N.Y. Post (June 2, 2024), https://nypost.com/2024/06/02/us-news/biden-admin-offers-mass-amnesty-to-migrants-as-it-quietly-terminates-350000-asylum-cases-sources/.

implement measures to shut down the border when it becomes overwhelmed," instead arguing that it needs Congress to provide new statutory powers to do so.[33] If President Biden has publicly stated that he has no authority to implement measures to shut down the border, how will he adequately defend the presidential authority he used to issue the IFR?

The Biden Administration has a history of collapsing in its defense of immigration policies. For example, in 2019, the Department of Homeland Security (DHS) promulgated a regulation known as the Public Charge rule, interpreting the statutory term "public charge" to implement federal immigration law. *See Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41292 (Aug. 14, 2019). This rule was challenged in several lawsuits and eventually vacated by the Northern District of Illinois. *See City & Cnty. of San Francisco v. USCIS*, 992 F.3d 742, 745–47 (9th Cir. 2021) (VanDyke, J., dissenting) (discussing procedural histories of challenges) (*citing Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1010–11 (N.D. Ill. 2020)). The Supreme Court granted certiorari in one of those lawsuits on February 22, 2021. *Dep't of Homeland Sec. v. New York*, 141 S. Ct. 1370 (2021).

On March 9, 2021—just days after representing that it was still reviewing the 2019 rule— the Biden Administration announced that it would no longer defend it because it determined that continuing to do so was not in the public interest.[34] Defendants moved to dismiss every pending appeal of an adverse judgment against the 2019 Rule, the result of which was acquiescence in the Northern District of Illinois's vacatur, despite the Supreme Court having already granted certiorari to review the legality of the 2019 Rule, *DHS v. New York*, 141 S. Ct. 1370 (2021), and having stayed

---

[33] Myah Ward & Burgess Everett, *Biden says he'll shut down the border if deal gives him authority*, Politico (Jan. 26, 2024), https://www.politico.com/news/2024/01/26/biden-urges-bipartisan-border-deal-00138206.

[34] U.S. Dep't of Homeland Security, DHS Statement on Litigation Related to the Public Charge Ground of Inadmissibility (Mar. 9, 2021), available at https://www.dhs.gov/news/2021/03/09/dhs-statement-litigation-related-public-charge-ground-inadmissibility.

two injunctions against its enforcement, *Wolf v. Cook County*, 140 S. Ct. 681 (2020); *DHS v. New York*, 140 S. Ct. 599 (2020), which necessarily suggested "a fair prospect that a majority of the Court will conclude that the decision[s] below w[ere] erroneous." *Conkright v. Frommert*, 556 U.S. 1401, 1402 (2009) (Ginsburg, J., in chambers). Defendants thereby "implemented a plan to instantly terminate the [2019 PubliCharge rule] with extreme prejudice—ensuring not only that the [rule] was gone . . . but that it could effectively never, ever be resurrected, even by a future administration." *San Francisco*, 992 F.3d at 743 (VanDyke, J., dissenting).

As it acknowledged to the Supreme Court, the Biden Administration's conduct was unprecedented. Tr. of Oral Argt. 73:23, *Ariz. v. City & Cnty. of San Francisco*, No. 20-1775 (U.S.). Indeed, it inverted typical practice, where the Executive asks lower courts to abate litigation regarding administrative actions it no longer supports until it can rescind or otherwise terminate those actions. *See San Francisco*, 992 F.3d at 751 (VanDyke, J., dissenting). Only there did the Administration decide to capitulate rather than provide notice and an opportunity to intervene to potentially interested parties. *Id.* at 750.

Within a week, DHS and USCIS formalized the Secretary's statement with a notice that "simply implement[ed] the district court's vacatur."[35] Asserting an "immediate need to implement the now-effective final judgment," the Administration claimed that the notice-and-comment process generally required by the APA to rescind a rule that had been promulgated through the notice-and-comment process—a rule such as that one—was "unnecessary, impracticable, and contrary to the public interest." *Id.*

In doing so, Defendants repealed the 2019 Rule without going through the APA's notice-and-comment process, which effectively amounted to an "agency process for formulating, amending, or repealing a rule" that was required to undergo that process. *See* 5 U.S.C. § 551(5).

---

[35] Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14,221, 14,221 (Mar. 15, 2021)

Worse, when those opposed to their unlawful repeal attempted to hold Defendants to the law,

Defendants actively impeded those efforts. As four Justices of the Supreme Court put it,

the Defendants:

> seized upon one of the now-consent judgments against [them]—a final judgment vacating the Rule nationwide, issued in a different litigation—and leveraged it as a basis to immediately repeal the [2019 Public Charge rule], without using notice-and-comment procedures . . . As part of this tactic of "rulemaking-by-collective-acquiescence," [*San Francisco*, 992 F. 3d at 744 (VanDyke, J., dissenting)], the Government successfully opposed efforts by other interested parties . . . to intervene in order to carry on the defense of the Rule, including possibly before this Court . . . These maneuvers raise a host of important questions. The most fundamental is whether the Government's actions, all told, comport with the principles of administrative law.

*Ariz. v. City & Cnty. of San Francisco*, 142 S. Ct. 1926, 1928 (2022) (Roberts, C.J., concurring).

When several parties sued to challenge the rule in courts across the country, the federal government defended it. And when multiple lower courts found the rule unlawful, the federal government appealed those decisions. Yet after a change in administrations, the federal government reversed course and voluntarily dismissed those appeals. In effect, the federal government's strategic surrender left in place the relief already entered, including a nationwide injunction by the Northern District of Illinois. DHS then repealed the rule without notice and comment.

One day after the federal government dismissed its petition for a writ of certiorari in the Public Charge case, a group of thirteen states moved to intervene in the Ninth Circuit to defend the rule. That court denied the motion, and the States petitioned the Supreme Court for review. The petition was granted to consider "[w]hether States with interests should be permitted to intervene to defend a rule when the United States ceases to defend." Petition for a Writ of Certiorari, *Arizona v. City & Cnty. of San Francisco*, No. 20-1775 (U.S. June 18, 2021); *see Arizona v. City & Cnty. of San Francisco*, 142 S. Ct. 417 (2021) (granting petition as to question one). Four months after oral argument, however, The Supreme Court dismissed the writ of certiorari as improvidently granted. *Arizona v. City & Cnty. of S.F., Cal.*, 596 U.S. 763 (2022).

This dismissal was remarked upon by the Chief Justice in a concurring opinion, joined by Justices Thomas, Alito, and Gorsuch. It explained that the government's "maneuvers"—leveraging a final judgment vacating the rule nationwide as a basis to immediately repeal the rule without using the required notice-and-comment procedure—"raise[d] a host of important questions." *Id.* at 765–66 (Roberts, C.J., concurring). Though the "most fundamental" question was whether administrative law principles blessed these tactics, "bound up in that inquiry [we]re a great many issues beyond the question of appellate intervention on which [this Court] granted certiorari." *Id.* at 766. Given these likely distractions, the Chief Justice concluded: "It has become clear that this mare's nest could stand in the way of our reaching the question presented on which we granted certiorari, or at the very least, complicate our resolution of that question." *Id.* at 766.

The Biden Administration pulled a similar maneuver in the litigation over the public-health orders dealing with COVID-19 (known as "Title 42 orders") under which migrants without proper travel documents were subject to expulsion rather than processing into the United States. Two lawsuits were going on simultaneously. In the Western District of Louisiana, a group of twenty-four States successfully sued to enjoin the Biden Administration from halting the Title 42 orders on APA grounds. *See Louisiana v. Centers for Disease Control & Prevention*, 603 F.Supp.3d 406 (W.D. La. 2022). At the same time in a different court, a group of migrants successfully challenged the same Title 42 orders, and that court vacated them. *See Huisha-Huisha v. Mayorkas*, 642 F.Supp. 3d 1 (D.D.C. 2022).

The same twenty-four States in *Louisiana* moved to intervene in the D.C. Circuit case. They sought to prevent the federal government from trying to leverage the vacatur in *Huisha-Huisha* to avoid complying with the injunction in *Louisiana*. *See Huisha-Hushia v. Mayorkas*, 2022 WL 19653946 (D.C. Cir. Dec. 16, 2022). The D.C. Circuit denied the intervention on timeliness grounds. *Id.* at *1–*2.

The twenty-four States then petitioned the Supreme Court for review—the petition was granted to review "[w]hether the State applicants may intervene to challenge the District Court's summary judgment order." *Arizona v. Mayorkas*, 143 S. Ct. 478 (2022). This Court also issued a

stay, precluding the district court's vacatur in *Huisha-Huisha* from taking effect. *Id*.

Yet as in *Arizona v. City & County of San Francisco*, the Supreme Court never had the chance to decide the ultimate issue of the States' intervention. On May 18, 2023, it remanded the case with instructions to dismiss the motion to intervene as moot because Congress ended the COVID-19 National Emergency and the Title 42 Orders that came with it. *See Arizona v. Mayorkas*, 143 S. Ct. 1312 (2023).

Even if Defendants could be trusted to defend the sources of authority behind the IFR, Texas—unlike them—has no interest in defending the *exceptions* to the IFR. These exceptions frustrate the stated aim of the IFR: stopping illegal immigration. To be sure, the IFR is a valid exercise of the President's inherent and broad authority to secure the Nation's borders. But it does not go far enough—it sets an untenable threshold, has exceptions that swallow the rule, and encourages the trafficking of young children. *See supra* at 9–11. Defendants will defend the IFR on the bases of these exceptions—Texas will not. Thus, for the same reasons, the D.C. Circuit "look[s] skeptically on government entities serving as adequate advocates for private parties[,]" *Crossroads*, 788 F.3d at 321, this Court should be skeptical of Defendants' ability to adequately represent the interests of Texas—a sovereign border State feeling the brunt of the crisis. *See also Fund for Animals*, 322 F.3d at 736 ("[W]e have often concluded that governmental entities do not adequately represent the interests of the aspiring intervenors.").

In the end, Defendants are unable to fully represent Texas' interest in stopping illegal immigration and restoring order to the southern border. Thus, it is "clear" that Defendants cannot provide adequate representation of Texas' interest in their defense of the IFR.

## II.    Texas should be allowed to intervene permissively.

Even if the Court denies intervention as of right, Texas asks the Court to grant it permissive intervention under Fed. R. Civ. P. 24(b)(1)(B). Permissive intervention is appropriate when an applicant's timely defense "shares a question of law or fact in common with the underlying action and if the intervention will not unduly delay or prejudice the rights of the original parties." *Acree*

*v. Republic of Iraq*, 370 F.3d 41, 49 (D.C. Cir. 2004), *abrogated by Republic of Iraq v. Beaty*, 556 U.S. 848 (2009). For the reasons explained above, the motion is timely. Intervention will neither delay the case nor prejudice the other parties. Texas plans to follow the agreed scheduling order in this case. Texas also intends to oppose Plaintiffs' claims and requests for relief, offer defensive arguments, and seek no additional relief, all of which necessarily share questions of law and fact in common with the central issues here. Texas wants the status quo preserved while Plaintiffs want the rule to be vacated. *See Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 14 (D.D.C. 2019) ("[M]ovants seek to defend the [Federal government's] decision . . . That they share this defense in common with the [Federal government] is sufficient under Rule 24(b)(1)(B)."); *see Nuesse v. Camp*, 385 F.2d 694, 704–05 (D.C. Cir. 1967) (explaining that Rule 24(b)'s common claim or defense requirement "is not interpreted strictly so as to preclude permissive intervention").

      For these reasons, Texas should be allowed to permissively intervene if this Court holds it cannot intervene as a matter of right.

## CONCLUSION

      This Court should grant Texas' motion to intervene in this proceeding.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

*/s/Kathleen T. Hunker*
**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415
Kathleen.Hunker@oag.texas.gov

_____
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station Austin,
Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR**
**PROPOSED DEFENDANT-INTERVENOR**
**STATE OF TEXAS**

**CERTIFICATE OF CONFERENCE**

I hereby certify that on July 18, 2024, I conferred with counsel for Plaintiffs and Defendants via e-mail regarding this motion. Plaintiffs and Defendants are opposed.

*/s/ Kathleen T. Hunker*
**Kathleen T. Hunker**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on July 19, 2024 and that all counsel of record were served by CM/ECF.

*/s/Kathleen T. Hunker*
**Kathleen T. Hunker**