IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRATION ADVOCACY CENTER, et al., | ) ) ) |
| *Plaintiffs*, | ) )  No. 1:24-cv-01702 |
| v. | ) ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) |
| *Defendants*. | ) ) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    Asylum, Related Relief, and the Expedited Removal System ................................ 3

    B.    Prior Asylum Bans Based on Manner of Entry ............................................ 6

    C.    The Current Proclamation, Rule, and Guidance ........................................ 7

ARGUMENT .......................................................................................................... 10

I.    THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY
AND CAPRICIOUS. ........................................................................................... 10

    A.    The Rule's Asylum Bar Violates Section 1158(a)(1). ................................ 10

    B.    The Asylum Bar Is Arbitrary and Capricious. ........................................ 16

        1.    The Rule fails to consider the harm facing migrants required to
wait in Mexico until they can secure an appointment at a port of
entry .............................................................................................. 17

        2.    The Rule fails to consider the risk of harm it imposes on people
from Mexico. ................................................................................. 19

        3.    Defendants unreasonably rely on the CBP One app. ....................................

        20

II.    THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS "MANIFEST"
FEAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. ............... 22

    A.    Requiring Noncitizens to Manifest Fear of Return to Avoid Removal
Violates the Statute .......................................................................... 22

    B.    The Manifestation Standard Is Arbitrary and Capricious. ........................... 24

        1.    The Rule failed adequately to consider evidence showing that
many noncitizens who need protection nevertheless may not
"manifest" a fear of return ............................................................ 25

        2.    The Rule's assertion that Border Patrol officers can divine which
noncitizens need protection without asking is baseless and
implausible. ................................................................................... 27

3.    The Rule failed to consider whether prior use of the manifestation standard actually bears out the assertion that the standard is reasonably designed. .................................................................29

4.    The Rule's efficiency rationale cannot justify the manifestation standard. ..............................................................................31

III.    THE RULE'S HEIGHTENED REASONABLE PROBABILITY STANDARD IS ARBITRARY AND CAPRICIOUS. ................................................32

A.    Defendants Departed from Past Practice Without an Adequate Explanation. ..........................................................................32

B.    Defendants' Decision to Require "Greater Specificity" and Detail at the Screening Stage Impermissibly Disregarded the Reasons That Many Asylum Seekers Are Unable to Do So. ...................................34

IV.    THE GUIDANCE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. ..................................................................................36

A.    The Guidance Is Unlawful in Effectively Eliminating the Right to Consult. ...........................................................................36

B.    The Guidance Is Arbitrary and Capricious. ...........................................37

V.    FAILURE TO PROVIDE NOTICE AND COMMENT RENDERS THE RULE NULL AND VOID. ...............................................................................39

A.    The Rule Fails to Meet the "Foreign Affairs" Exception. ......................40

B.    The Rule Fails to Meet the "Good Cause" Exception. ...........................41

VI.    THE COURT SHOULD GRANT VACATUR AND OTHER RELIEF. .........................45

CONCLUSION. ........................................................................................46

# TABLE OF AUTHORITIES*

CASES

*A.B.-B. v. Morgan*, 548 F. Supp. 3d 209 (D.D.C. 2020) ................................................. 25

*American Federation Government Employees, AFL-CIO v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ................................................. 39

*American Federation Government Employees, AFL-CIO v. Federal Labor Relations Authority*, 25 F.4th 1 (D.C. Cir. 2022) ................................................. 32

*American Petroleum Institute v. EPA*, 862 F.3d 50 (D.C. Cir. 2017) (per curiam) ....................... 13

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ................................................. 22

*Amerijet International, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ................................................. 29

*Bridgeport Hospital v. Becerra*, No. 22-5249, 2024 WL 3504407, ___ F.4th ___ (D.C. Cir. July 23, 2024) ................................................. 45

*Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ................................................. 39, 40, 41, 44

*City of Dania Beach v. FAA*, 628 F.3d 581 (D.C. Cir. 2010) ................................................. 29, 31

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019) ................................................. 38

*District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009) ................................................. 37

*District of Columbia v. USDA*, 444 F. Supp. 3d 1 (D.D.C. 2020) ................................................. 13-14

*East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *stayed pending appeal*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024) ................................................. 1, 7, 11, 13, 18, 19, 21-22

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ................................................. 1, 4, 7, 11, 12, 15, 44

*East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020) ................................................. 15, 18

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ................................................. 43

*E.B. v. U.S. Dep't of State*, 583 F.Supp.3d 58 (D.D.C. 2022) ................................................. 40

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009) ................................................12

*Environmental Defense Fund, Inc. v. EPA*, 716 F.2d 915 (D.C. Cir. 1983).........................45

*Fiadjoe v. Attorney General of United States*, 411 F.3d 135 (3d Cir. 2005)................................35

*Gall v. United States*, 552 U.S. 38 (2007) .........................................................................13

*George E. Warren Corp. v. EPA*, 159 F.3d 616 (D.C. Cir. 1998) .....................................24

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) ..........................................5, 6, 20, 28, 38

*Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), *aff'd in part, rev'd in part
    and remanded by* 965 F.3d 883 (D.C. Cir. 2020)..................................................46

*Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018)................................38

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ..........................................18

*Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070 (D.C. Cir. 1978)..............................40

*Hussam F. v. Sessions*, 897 F.3d 707 (6th Cir. 2018) ...................................................15

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .........................................3, 4, 14, 15, 23

*INS v. Stevic*, 467 U.S. 407 (1984) ..............................................................................23

*International Brotherhood Teamsters v. Pena*, 17 F.3d 1478 (D.C. Cir. 1994)............................40

*International Union, United Mine Workers of America v. Mine Safety & Health
    Administration*, 407 F.3d 1250 (D.C. Cir. 2005) ....................................................39

*Judulang v. Holder*, 565 U.S. 42 (2011).........................................................................17

*Kiakombua v. Wolf*, 498 F. Supp. 3d 1 (D.D.C. 2020) .............................................34, 45

*Las Americas Immigrant Advocacy Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020) ......................39

*LM-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020)...................................................39

*M.A. v. Mayorkas*, No. 1:23 cv-01843-TSC (D.D.C. filed June 23, 2023)....................................16

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012)................................................41

*Make The Road New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ..................................5

*Michel v. Louisiana*, 350 U.S. 91 (1955).......................................................................37

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)....................................17, 22, 27, 29, 30, 37, 38

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804)........................................ 23-24

*Nasrallah v. Barr*, 590 U.S. 573 (2020) ........................................................................................4

*National Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019) ...................................................36

*National Women's Law Center v. Office of Management & Budget*, 358 F. Supp. 3d 66 (D.D.C. 2019) ..............................................................................................................39

*New Jersey Department of Environmental Protection v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980) .................................................................................................................................41

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019)...............................................1, 7, 11, 12, 15, 16

*Paramasamy v. Ashcroft*, 295 F.3d 1047 (9th Cir. 2002) ...........................................................35

*Matter of Pula*, 19 I. & N. Dec. 467 (B.I.A. 1987), *superseded in part by statute on other grounds as stated in Andriasian v. INS*, 180 F.3d 1033 (9th Cir. 1999) ........................15

*Purdue University v. Scalia*, 2020 WL 7340156 (D.D.C. Dec. 14, 2020) ......................................45

*Ramsameachire v. Ashcroft*, 357 F.3d 169 (2d Cir. 2004) ..........................................................34

*Sorenson Communications, Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) ...............................41, 42

*Tang v. United States Attorney General* 578 F.3d 1270 (11th Cir. 2009) ..............................25, 35

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) .................................................38

*United Steel v. Mine Safety & Health Administration*, 925 F.3d 1279 (D.C. Cir. 2019) ...............................................................................................................................46

*Zuh v. Mukasey*, 547 F.3d 504 (4th Cir. 2008) ............................................................................15

STATUTES

5 U.S.C. § 553(a)(1)......................................................................................................................40

5 U.S.C. § 553(b)(4)(B)............................................................................................................40, 41

5 U.S.C. § 706(2) .........................................................................................................................45

8 U.S.C. § 1101(a)(42)(A) ............................................................................................................14

8 U.S.C. § 1158 ..............................................................................................................................3

8 U.S.C. § 1158(a) (1980) ...................................................................................10

8 U.S.C. § 1158(a)(1) ................................................................1, 5, 7, 10, 11

8 U.S.C. § 1158(b)(1) ...........................................................................................14

8 U.S.C. § 1158(b)(2)(C) ....................................................................................14

8 U.S.C. § 1225 .......................................................................................................23

8 U.S.C. § 1225(b)(1)(B) ......................................................................................5

8 U.S.C. § 1225(b)(1)(B)(iv) ......................................................................3, 37

8 U.S.C. § 1225(b)(1)(B)(v) ................................................................................6

8 U.S.C. § 1229 ........................................................................................................6

8 U.S.C. § 1229a ......................................................................................................6

8 U.S.C. § 1231 note ...........................................................................................23

8 U.S.C. § 1231(b)(3) ....................................................................................3, 23

8 U.S.C. § 1252(a) ..................................................................................................6

8 U.S.C. § 1252(b) ..................................................................................................6

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, Div. G,
    112 Stat. 2681, 2681-761 .........................................................................23

**LEGISLATIVE MATERIALS**

S. Rep. No. 96-256 (1979), *as reprinted in* 1980 U.S.C.C.A.N. 141 ...................................1

**OTHER AUTHORITIES**

8 C.F.R. § 208.30(d)(4) .......................................................................................37

8 C.F.R. § 208.30(e)(2) ........................................................................................6

8 C.F.R. § 208.30(e)(3) ........................................................................................6

8 C.F.R. § 208.35(a)(2)(i) ...................................................................................21

8 C.F.R. § 208.35(b)(1) .......................................................................................16

8 C.F.R. § 235.3(b)(2)(i) ..........................................................................5, 9, 26

8 C.F.R. § 235.3(b)(4) .........................................................................................37

8 C.F.R. § 235.3(b)(4)(i) ...................................................................................37

8 C.F.R. § 235.3(b)(4)(ii) ..................................................................................37

8 C.F.R. §§ 1003.12-1003.47 ..............................................................................6

8 C.F.R. § 1208.16 ...............................................................................................3

8 C.F.R. § 1208.17 ...............................................................................................3

8 C.F.R. § 1208.18 ...............................................................................................3

45 Fed. Reg. 37392 (June 2, 1980) ......................................................................6

55 Fed. Reg. 30674 (July 27, 1990) .....................................................................6

62 Fed. Reg. 10312 (Mar. 6, 1997) .................................................................5, 26

83 Fed. Reg. 55934 (Nov. 9, 2018) ................................................................7, 45

84 Fed. Reg. 33829 (July 16, 2019) ...................................................................45

84 Fed. Reg. 63994 (Nov. 19, 2019) ..................................................................45

87 Fed. Reg. 18078 (Mar. 29, 2022) .........................................................6, 32, 33

88 Fed. Reg. 31314 (May 16, 2023) ..............................................................13, 33

89 Fed. Reg. 48487 (June 3, 2024) .............................................................7, 8, 9

89 Fed. Reg. 48710 (June 7, 2024) .......................8-18, 20-22, 24, 26-35, 41-42, 44-45*

T. Alexander Aleinikoff, *YLS Sale Symposium: International Protection Challenges Occasioned by Maritime Movement of Asylum Seekers*, Opinion Juris (Mar. 16, 2014), https://bit.ly/4dhQFNe ...................................................30

Priscilla Alvarez & MJ Lee, *White House and Democratic Lawmakers Plot Ways to Strengthen their Hand on Border Security*, CNN (May 18, 2024), https://bit.ly/3WGDQXj ...............................................................................45

Center for Gender & Refugee Studies, *"Manifesting" Fear At the Border: Lessons from Title 42 Expulsions* (Jan. 30, 2024), https://bit.ly/3WnguEq ...........................31

*The Futility of 'Shutting Down Asylum' by Executive Action at the U.S.-Mexico Border*, WOLA (June 4, 2024), https://bit.ly/3LEIgrm ......................................8, 14

Stef W. Knight, *Scoop: Biden's Border Nuclear Option Is Still on the Table*, Axios (Mar. 24, 2024), https://bit.ly/4cXiSci ...................................................45

Las Americas, Comment on the Rule (July 8, 2024), https://www.regulations.gov/comment/USCIS-2024-0006-1043/attachment_2.pdf...........................................40

Order, *Grace v. Whitaker*, No. 18-cv-1853 (D.D.C. Dec. 19, 2018), ECF No. 105 .......................46

Petition for Writ of Certiorari, *Biden v. Texas*, 597 U.S. 785 (2022) No. 21-954 (U.S. Dec. 29, 2021) ....................................................................................................................18

RAICES, Comment on the Rule (July 5, 2024), https://www.regulations.gov/comment/USCIS-2024-0006-0780/attachment_1.pdf...........................................40

*Scheduling of Credible Fear Interviews While the Measures in the Securing the Border IFR Apply*, https://bit.ly/3WDYeZ8..................................................7, 38, 39

UNHCR, *Asylum Processes (Fair and Efficient Asylum Procedures)*, U.N. Doc. EC/GC/01/12 (May 31, 2001), https://bit.ly/3A0E8iP.................................................23

UNHCR, Comments on the Interim Final Rule (July 8, 2024), https://bit.ly/4deFHYG..............................................................................................23

UNHCR Executive Committee, *Conclusion No. 8 (VIII) on Determination of Refugee Status Conclusion No. 8 (VIII) on Determination of Refugee Status* (1977)..............................................................................................................................23

UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status Handbook* .................................................................................................................23

UNHCR, *Key Legal Considerations on Access to Territory for Persons in need of International Protection in the Context of the Covid-19 Response* (Mar. 16, 2020), https://bit.ly/3SnB5Yq ...................................................................................23

Ruth Ellen Wasem, Cong. Rsch. Serv., RS21349, *U.S. Immigration Policy on Haitian Migrants* (Jan. 21, 2005), https://bit.ly/3Sp5t4y ...........................................30

Seth Freed Wessler, *When the Coast Guard Intercepts Unaccompanied Kids*, ProPublica (Dec. 7, 2023), https://www.propublica.org/article/when-the-coast-guard-intercepts-unaccompanied-kids ...............................................................30

## INTRODUCTION

The asylum system reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores." Refugee Act of 1980, S. Rep. No. 96-256, at 1 (1979), *as reprinted in* 1980 U.S.C.C.A.N. 141, 141. A new Interim Final Rule issued by the U.S. Department of Homeland Security ("DHS") and the U.S. Department of Justice ("DOJ") on June 4, 2024 (the "Rule"), without any notice or comment, eviscerates that system. It not only imposes an unlawful bar on asylum, but also creates arbitrary and capricious barriers to the other more limited forms of protection that remain.

The text of the asylum statute makes unmistakably clear that asylum's protections shall apply "whether or not" a noncitizen arrives "at a designated port of arrival." 8 U.S.C. § 1158(a)(1). In stark contrast, the Rule bars asylum for noncitizens who do not enter at a port of entry.

This is not the first time the government has unlawfully attempted to bar asylum for noncitizens who cross the border between ports. A November 2018 rule attempted the same thing, and a court in this district invalidated that action as inconsistent with the asylum statute, *O.A. v. Trump*, 404 F. Supp. 3d 109, 150 (D.D.C. 2019), as did the Ninth Circuit, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 658 (9th Cir. 2021). The government tried again in 202,3 and again, the bar on noncitizens entering between ports was held unlawful. *See E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *stayed pending appeal*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024). The current Rule's bar is even more draconian and at least as unlawful. It is also arbitrary and capricious. That the executive branch felt pressure to do something because of Congress's inaction cannot excuse these legal flaws.

The Rule also imposes unlawful barriers to accessing more limited protections that remain, namely withholding of removal and protection under the Convention Against Torture ("CAT").

First, contrary to nearly three decades of past practice in "expedited removal" proceedings, migrants fleeing harm will no longer be advised of their right to seek protection. They must now, on their own, spontaneously "manifest" a fear of return just to receive a threshold "credible fear" screening that they must pass to seek protection. The government admits that its main goal in adopting this requirement was to drive down the number of noncitizens who must be interviewed about their potential fear of return—despite knowing that, in practice, removing these noncitizens, without providing any advisals or asking any questions, will result in many being returned to persecution or torture. Moreover, the inevitable result of the "manifestation" requirement will be arbitrary and disparate treatment—as underscored by the experience of multiple Individual Plaintiffs who were separated from family by the U.S. government upon arrival. While some Individual Plaintiffs were removed because they did not "manifest" a fear, their family members fleeing the exact same persecution were given an opportunity for full hearings.

Second, even those noncitizens who manage to "manifest" a fear will be screened for withholding of removal and CAT protection under a *heightened* "reasonable probability" standard. This standard is one that the government has never before applied, and for which the Rule offers no guidance, other than that it is more stringent than both the previous "reasonable possibility" standard and the statutory "significant possibility" standard for asylum screening. The Rule does not adequately justify this change, or even consider the inevitable human cost of making it more difficult to pass an initial screening.

Third, Guidance issued concurrently with the Rule shrinks the lead time for a credible fear interview to as little as *four hours*. That makes it practically impossible for noncitizens to consult with counsel or family before credible fear interview—despite a statutory right to "consult with a

person … of the [noncitizen's] choosing" beforehand. 8 U.S.C. § 1225(b)(1)(B)(iv). Each of these obstacles is individually unlawful, and their impact is worse in combination.

Finally, the Defendants issued the Rule without notice or comment, in violation of the Administrative Procedure Act ("APA"). The Rule forthrightly acknowledges that it was prompted by Congress's failure to appropriate adequate funds. But a lack of appropriations does not give the agency license to contravene statutory authority, enact arbitrary rules, to bypass APA rulemaking requirements.

For these reasons, the Court should grant summary judgment to Plaintiffs and vacate the Rule and contemporaneous Guidance.

## BACKGROUND

### A.    Asylum, Related Relief, and the Expedited Removal System

People fleeing persecution and torture can seek three primary forms of protection from removal: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the CAT, 8 C.F.R. §§ 1208.16-.18. Asylum protects individuals with a "well-founded fear of persecution"—which can be satisfied by showing a ten percent chance of persecution—on account of one or more of five protected grounds. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428, 430, 434 (1987). Withholding of removal and CAT, which implement the international treaty obligations, *id.* at 435, offer more limited protection,[1] and require applicants to meet a higher burden of proving they will more likely than not be persecuted or tortured. *See id.* at 430; *Nasrallah v. Barr*, 590 U.S. 573, 575 (2020).

---

[1] Asylum, unlike withholding of removal and CAT protection, affords additional benefits like a right to petition for immediate family members, permanent protection from deportation, and a pathway to U.S. citizenship. *See O.A. v. Trump*, 404 F.Supp.3d. at 118.

Congress "recognized that refugees fleeing imminent persecution do not have the luxury of choosing their escape route into the United States." *E. Bay Sanctuary Covenant*, 993 F.3d at 658; *see id.* at 673 (it was "well recognized when the Refugee Act of 1980 was drafted" that "[m]any migrants enter between ports of entry out of necessity" and "have no choice but to cross into a safe country irregularly prior to making an asylum claim"). Indeed, many migrants fleeing danger will not know the location of the select ports of entry offering CBP One appointments or will be unable to walk the hundreds of miles to get to one of them (especially if traveling with small children), *e.g.*, AR 2090 (appointments offered at just "eight ports of entry"); AR 8707 (listing more than 25 total southern land ports); *see also* AR 1204 ("migrant families and children [have] been harmed or killed while . . . attempting to travel to POEs with available appointments").[2] Others may not know that they need to make an appointment at all, or may be forced by cartels to cross between ports. *See* AR 351, 1204, 15217. Congress therefore provided that any noncitizen "who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* …), irrespective of such [person's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added).

In 1996, Congress created the "expedited removal scheme to substantially shorten and speed up the removal process" for certain noncitizens arriving. *Make The Rd. New York v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020). Absent an indication of fear of persecution or torture, noncitizens whom the government elects to subject to expedited removal may be removed immediately. *Id.* But Congress balanced the interest in "efficient removal" against "a second,

---

[2] Citations to "AR" are to the administrative record for the Rule; citations to "Guidance AR" are to the administrative record for the Guidance.

equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020).

The longstanding expedited removal regulations adopted in 1997 and in effect prior to the Rule required immigration officers "in every case" to ask a noncitizen placed in expedited removal proceedings "if the [noncitizen] has any fear or concern of being removed"; and to inform the noncitizen "that this may be the only opportunity" to raise such fears. 62 Fed. Reg. 10312, 10318-19 (Mar. 6, 1997); *see* 8 C.F.R. § 235.3(b)(2)(i); AR2597, 8189. That requirement reflected "very carefully considered" judgment on "how best to ensure that bona fide asylum claimants are given every opportunity to assert their claim." 62 Fed. Reg. at 10318.

Under the expedited removal system, if noncitizens express a fear of removal or an intent to seek protection, they are referred for a "credible fear interview" ("CFI") with an asylum officer. 8 U.S.C. § 1225(b)(1)(B). As Congress conceived the process, asylum seekers who demonstrated a "significant possibility" of establishing eligibility for asylum would be taken out of expedited removal proceedings and placed in full removal proceedings. In those full removal proceedings, they could pursue asylum as well as other immigration relief, including withholding of removal and CAT protection. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2)-(3).

The significant-possibility standard asks only whether noncitizens have some chance of ultimately prevailing on their claims. That low screening threshold helps mitigate the risk that noncitizens might be erroneously returned to persecution or torture in their home countries, without receiving a full hearing. "'Under this system, there should be no danger that [a person] with a genuine asylum claim will be returned to persecution.'" *Grace*, 965 F.3d at 902 (quoting H.R. Rep. No. 104-469, pt. 1, at 158 (1995)). Under longstanding regulations, the significant-possibility standard was used in the CFI process not only for asylum, but also for withholding of

removal and CAT. *See* 87 Fed. Reg. 18078, 18084, 18091 (Mar. 29, 2022) ("2022 Asylum Rule").

When noncitizens pass the CFI, they are placed in full removal proceedings, where they have the rights to counsel, to present and examine evidence, and to appeal to both the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C. §§ 1229, 1229a, 1252(a), (b); 8 C.F.R. §§ 1003.12-1003.47. They also have more time to gather evidence, consult with counsel and experts, develop arguments, and prepare, including by seeking medical or psychological help to recover from trauma. The prior administration tried to change the screening standard for withholding of removal and CAT, but the government reaffirmed its longstanding practice in the 2022 Asylum Rule. *See* 87 Fed. Reg. at 18084.

### B.    Prior Asylum Bans Based on Manner of Entry

For decades after Congress enacted the asylum statute in 1980, regulatory bars to asylum were narrow. *E.g.*, 55 Fed. Reg. 30674, 30678, 30683 (July 27, 1990) (bar for certain criminal convictions); 45 Fed. Reg. 37392 (June 2, 1980) (firm resettlement bar, later adopted by Congress). In 2018, however, the government promulgated an interim final rule and presidential proclamation that barred asylum to anyone who entered the United States between ports of entry. 83 Fed. Reg. 55934 (Nov. 9, 2018). Courts invalidated the ban as contrary to law because it required asylum seekers "to enter the United States at ports of entry to preserve their eligibility for asylum" and barred asylum to those who enter between ports, which is "a method of entry explicitly authorized by Congress" in 8 U.S.C. § 1158(a)(1). *E. Bay*, 993 F.3d at 669-70; *see O.A.*, 404 F. Supp. 3d at 147-52. The 2018 ban was also held arbitrary and capricious and issued in violation of the APA's notice and comment requirements. *E. Bay*, 993 F.3d at 671-75.

Then, in 2023, the government promulgated a similar bar on asylum between ports, together with additional barriers to asylum access. That rule likewise has been held invalid as contrary to Section 1158(a)(1). *E. Bay*, 683 F. Supp. 3d at 1053-54.

### C.    The Current Proclamation, Rule, and Guidance

On June 3, 2024, President Biden issued a Proclamation suspending and limiting the entry of noncitizens across the southern border. 89 Fed. Reg. 48487 (June 3, 2024). The following day, Defendants issued both the Rule and related Guidance. *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border IFR Apply*[3] ("Guidance"). The Guidance reduced the minimum pre-CFI consultation period to four hours.

The stated impetus for the Rule was a determination that "the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross unlawfully…or to provide timely protection to those ultimately found eligible for protection when individuals are arriving at such elevated, historic volumes." 89 Fed. Reg. at 48713. Repeatedly, the Rule references a "funding shortfall" due to which Defendants "simply lack[] sufficient resources," *id.* at 48714, and the Rule decries Congress's failure to appropriate funding DHS believes it needs to follow existing law while "avoid[ing] large-scale releases" pending immigration court removal proceedings. *Id.* at 48715; *see generally id.* at 48726-31(describing resource needs and proposed budgets that Congress chose not to adopt).

Under the Rule, which incorporates the Presidential Proclamation, noncitizens arriving at the southern border or coastline between ports of entry are categorically ineligible for asylum unless they can establish that they meet a narrow "exceptionally compelling circumstances"

---

[3] https://bit.ly/3WDYeZ8.

exception.[4] 89 Fed. Reg. 48710, 48718 (June 7, 2024); 8 C.F.R. § 208.35. This restriction will remain in effect unless the rolling seven-day average of daily "encounters" of inadmissible noncitizens at the southern border falls below 1,500 encounters per day, 89 Fed. Reg. at 48491—a numerical threshold that has been exceeded continuously since July 2020.[5]

The Rule and contemporaneous Guidance also create three significant procedural hurdles for withholding of removal and CAT. *First*, the Rule jettisons the requirement in place since 1997 that everyone subjected to expedited removal be advised of their right to seek protection and be asked if they fear removal. 89 Fed. Reg. at 48740. Now, "rather than asking" about fear of removal, the immigration officer (usually a Border Patrol agent) is to remove noncitizens without *any* process unless the officer determines that the person has spontaneously "manifested" a fear of return without being asked. *Id.* at 48718. The Rule defines "manifesting" fear as "express[ing] an intention to apply for asylum, express[ing] a fear of persecution or torture, or express[ing] a fear of return to the noncitizen's country or country of removal." *Id.* at 48740. The manifestation can be expressed through verbal or nonverbal communication, like "noises or sounds without any words" and physical behaviors, like "shaking, crying, or signs of abuse." *Id.* at 48740 n.187. The Rule is candid that Defendants' motivation for adopting this "manifestation" requirement—and no longer asking noncitizens about fear—is to reduce the number of noncitizens referred for a CFIs. 89 Fed Reg. at 48742-43.

---

[4] The exception covers noncitizens who can show "that exceptionally compelling circumstances exist" and the regulation lists "an acute medical emergency" and "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder"; and human trafficking as examples. 89 Fed. Reg. at 48718. But the Rule provides no mechanism for a noncitizen to request the opportunity to invoke an exception. The Rule also exempts unaccompanied children. *Id.* at 48710, 48715.

[5] *The Futility of 'Shutting Down Asylum' by Executive Action at the U.S.-Mexico Border*, WOLA (Jun. 4, 2024), https://bit.ly/3LEIgrm ("WOLA article").

*Second*, even if a Border Patrol agent finds that a noncitizen adequately "manifests" a fear, a noncitizen who receives a CFI must now meet a far more stringent and unprecedented screening standard to avoid expedited removal by showing a "*reasonable probability*" of eligibility for withholding of removal or CAT protection. 8 C.F.R. 208.35(b)(2)(i) (emphasis added). The Rule defines this 'reasonable probability standard as "substantially more than a reasonable possibility, but somewhat less than more likely than not," and states that it requires "greater specificity of the claim" than the existing standards of "reasonable possibility" or "significant possibility." 89 Fed. Reg. at 48746.

*Third*, the Guidance drastically reduces the minimum time for noncitizens to find and consult with a lawyer before their CFI. Previously, they had at least 24 hours, reduced from a minimum of 48 hours just one year ago. Now, noncitizens may have as few as four hours, which generally will be spent in a remote border facility without meaningful access to phones.

The Rule and Guidance are already having devastating effects. Individual Plaintiffs' declarations demonstrate how the Rule and Guidance wrongfully deny protection to asylum seekers and subjects them to serious harm.[6]

## ARGUMENT

## I.    THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A.    The Rule's Asylum Bar Is Contrary to Law.

The text of 8 U.S.C. § 1158(a)(1) could hardly be clearer: "*Any* [noncitizen] who is physically present in the United States or who arrives in the United States *(whether or not at a*

---

[6] *See* D.G. Decl. ¶¶ 7-12; E.R. Decl. ¶¶ 7-16; P.S. Decl. ¶¶ 10-15; D.C. Decl. ¶¶ 11-14; A.E. Decl. ¶¶ 8-14; E.D. Decl. ¶¶ 10-13; T.R. Decl. ¶¶ 9-13; S.G. Decl. ¶¶ 7-15; J.C. Decl. ¶¶ 12-16; J.R. Decl. ¶¶ 7-13.  These declarations have been filed under seal at Dkt. No. 15.

*designated port of arrival . . ., irrespective of such [noncitizen's] status,* may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). Congress selected that text intentionally when it modified the asylum statute in 1996. Before then, the relevant provision merely required the Attorney General to establish "a procedure for [a noncitizen] physically present in the United States or at a land border or port of entry, irrespective of such [noncitizen's] status, to apply for asylum." 8 U.S.C. § 1158(a) (1980). The 1996 Act clarified that "any" noncitizen present or arriving in the United States has the right to apply for asylum regardless of their manner of entry, *i.e.*, "whether or not at a designated port of arrival." 8 U.S.C. § 1158(a)(1).

Despite that clear statutory text, the Rule bars asylum for noncitizens who arrive in the United States outside ports of entry, unless they can demonstrate narrowly crafted "exceptionally compelling circumstances." 89 Fed. Reg. at 48710. That directly conflicts with the statute.

Not surprisingly, courts invalidated the prior attempts to bar asylum for those who entered between ports of entry, declaring that policy invalid as a "categorical ban on migrants who use a method of entry explicitly authorized by Congress." *E. Bay*, 993 F.3d at 669-70; *see O.A.*, 404 F. Supp. 3d at 147-52 (same); *cf. E. Bay*, 683 F. Supp. 3d at 1041 (invalidating similar 2023 ban). The Rule notes that Defendants "disagree" with these rulings, 89 Fed. Reg. at 48735, but that disagreement cannot change the statute's plain language. Given that the current Rule just rehashes the same arguments courts have already rejected, this Court should follow what is now a well-trod path and reject the arguments again.

As they did when promulgating the previous bans, Defendants claim that their actions are authorized by Sections 1158(b)(2)(C) and 1158(d)(5), which empower Defendants to adopt additional conditions on asylum. As the Rule itself recognizes, such conditions must be "consistent with" the asylum statute and the surrounding chapter of the Immigration and Nationality Act

10

("INA"). *See* 89 Fed. Reg. at 48716. But the Rule is flatly *inconsistent* with Section 1158(a)(1). As the Ninth Circuit explained about the 2018 ban, it is "hard to imagine a more direct conflict" with the statute than a rule that "requires migrants to enter the United States at ports of entry to preserve their eligibility for asylum," since entry between ports is also "a method of entry explicitly authorized by Congress in section 1158(a)." *E. Bay*, 993 F.3d at 669-70 (internal quotation marks omitted); *accord O.A.*, 404 F. Supp. 3d at 150; *E. Bay*, 683 F. Supp. 3d at 1041. In fact, by requiring noncitizens not just to present at a port of entry but to do so by obtaining one of the limited preexisting appointment via the "CBP One" app, this Rule places more restrictions on the manner of entry than the 2018 ban, which contained *no* restrictions at the ports of entry. *See E. Bay Sanctuary Covenant*, 993 F.3d at 659. And even if the ports were completely available, Congress has made clear that asylum must be available to "any" noncitizen "whether or not" they enter at a designated port.

Defendants offer several responses to these fundamental flaws, but none is persuasive. *First*, they assert that there is no conflict with Section 1158(a)(1) because that subsection is about who may *apply* for asylum, while the Rule concerns *eligibility* for asylum. 89 Fed. Reg at 48735. Courts rejected this argument when Defendants advanced it to justify the 2018 ban: "Explicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity." *E. Bay*, 993 F.3d at 670. Indeed, "that purported distinction is at odds with the Rule itself." *O.A.*, 404 F. Supp. 3d at 148-49. In expedited removal proceedings, the bar will be applied at the CFI; if the bar applies, the asylum officer must make a negative credible fear determination, and the noncitizen will not have the opportunity to seek asylum (absent satisfying the narrow definition of "exceptionally

compelling circumstances," *see infra*). Thus, the distinction "between limitations on who may apply and who is eligible for asylum not only strains credulity, … but snaps it." *Id.*

*Second*, Defendants point to the fact that Congress enacted other categorical bars to asylum in Section 1158(a)(2)(A) and (b)(2)(A). 89 Fed. Reg. at 48734. But that just underscores the Rule's infirmity. As the Ninth Circuit has explained, "the statutory asylum bars … do not separately conflict with the explicit text in section 1158(a)." *E. Bay*, 993 F.3d at 670. Moreover, the Rule here is a product of agency action, not statute. Congress, of course, is free to amend statutes as it sees fit. Defendants, however, may not contradict plain statutory text. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009).

*Third*, Defendants attempt to distinguish the Rule from the 2018 bar, but those attempts fail. They assert that the Rule "do[es] not treat the manner of entry as dispositive in determining eligibility. Rather, the limitation at issue here turns on whether … an individual has followed the lawful, safe, and orderly pathways that [the government] has established." 89 Fed. Reg. at 48735. That is no distinction at all. These words are merely another way of saying that the limitation turns on whether a noncitizen arrived *at a port of entry* (and, under this Rule, with an appointment). A noncitizen who arrives outside a port is barred from asylum under the Rule, absent an exceptionally compelling circumstance. Thus, the "manner of entry" *is* dispositive.

Defendants retort that the Rule does "not treat *solely* the manner of entry as dispositive," 89 Fed. Reg at 48735 (emphasis added), because a noncitizen can try to overcome the bar by demonstrating exceptionally compelling circumstances. This exact argument has already been rejected as to the similar 2023 Rule. 88 Fed. Reg. 31314, 31450 (May 16, 2023) ("2023 Rule"). That a noncitizen's "failure to present at a port of entry [with an appointment] may be excused under exceptionally compelling circumstances, does not address the reason why restricting asylum

eligibility based on place of entry conflicts with the law" because "the failure to present at a port of entry will exclude those" who cannot establish that exception. *E. Bay*, 683 F. Supp. 3d at 1041-42. More generally, the Supreme Court has made clear that, where the government cannot make an action "mandatory," it equally cannot demand a showing of "'extraordinary' circumstances to justify" a departure from that action. *Gall v. United States*, 552 U.S. 38, 46-47 (2007). Since the government cannot bar asylum for those who do not enter at ports, it cannot make them show "'extraordinary' circumstances" to avoid such a bar. *Id.* at 47; *see Am. Petrol. Inst. v. EPA*, 862 F.3d 50, 60-61 (D.C. Cir. 2017) (per curiam) (small or hard-to-access exception "falls short of saving" otherwise invalid rule); *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 25 (D.D.C. 2020) ("exceptional circumstances" exception "cannot save" invalid rule).

Moreover, the exceptional circumstances exception itself is inconsistent with the statute. The Rule defines "exceptional circumstances" to mean "imminent and extreme threats to life or safety." 89 Fed. Reg. at 48718. But that limitation is flatly inconsistent with the asylum statute's provision that a noncitizen may be granted asylum if the noncitizen is a "refugee," defined to mean someone with a "well-founded fear of persecution," on one of the enumerated grounds in their home country, 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A)—not an "imminent and extreme threat to life or safety." *See Cardoza-Fonseca*, 480 U.S. at 431 (rejecting the government's argument that "well-founded fear" is equivalent to a "clear probability"). Even if one were in "imminent" danger, the statute does not require them to face an "extreme" danger (whatever that is understood to mean) but rather only to have a well-founded fear of persecution (and at the CFI, only a significant possibility of showing a well-founded fear). When Congress authorized Defendants to "establish additional limitations and conditions" on eligibility "consistent with this section," 8 U.S.C. § 1158(b)(2)(C), it did not authorize them to override the "well-founded fear" standard expressly

incorporated by that section.

Defendants also point to the fact that the asylum bar applies only during what Defendants term "emergency" conditions, when the number of encounters has exceeded the level the Executive deems acceptable. That does not save the Rule either. Section 1158(a)(1)'s directive that noncitizens may apply for asylum regardless of their manner of entry does not include any carve-out for numerical thresholds. What is more, in practice, the numerical threshold triggering the Rule has been met every day since mid-2020.[7]

Defendants also contend that the Rule is consistent with the asylum statute because asylum is "discretionary." 89 Fed. Reg. at 48736. This argument, too, already has been roundly rejected. The discretion afforded to the Attorney General as to whether to grant asylum to eligible noncitizens is an "individualized decision." *Cardoza-Fonseca*, 480 U.S. at 444. That is different from "discretion to prescribe criteria for eligibility," which is "constrained" by the requirement that such criteria be "consistent with" Section 1158. *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 994 F.3d at 979 (9th Cir. 2020); *see O.A.*, 404 F. Supp. 3d at 151 ("[T]here is a vast difference between considering how the [noncitizen] entered the United States as one, among many, factors in the exercise of a discretionary authority, and a categorical rule that disqualifies any [noncitizen] who enters across the southern border outside a designated port of entry.").

In fact, in the very case the Rule relies upon, the Board of Immigration Appeals made clear that while manner of entry can be relevant to questions of discretion at the final stage of individual cases, "it should not be considered in such a way that the practical effect is to deny relief in virtually all cases" because "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Matter of Pula*, 19 I. & N. Dec. 467, 473-74 (BIA 1987), *superseded in part by*

---

[7] *See supra* n.5, WOLA article.

*statute on other grounds as stated in Andriasian v. INS*, 180 F.3d 1033, 1043-44 (9th Cir. 1999); *see E. Bay*, 993 F.3d at 671. By enacting a categorical bar at the front end of the process, the Rule ignores this principle and similarly disregards precedent noting that discretionary "denials [of asylum] are exceedingly rare," and are affirmed by the Board "only when the Government has demonstrated egregious negative activity by the applicant." *Zuh v. Mukasey*, 547 F.3d 504, 507 (4th Cir. 2008); *see also, e.g.*, *Hussam F. v. Sessions*, 897 F.3d 707, 719 (6th Cir. 2018) (noting that "egregious conduct by the applicant, such as criminal convictions or fraud" is generally needed for a discretionary denial of asylum).[8]

Finally, the Rule's asylum bar also violates 8 U.S.C. § 1225(b)(1)(B)(v). That section requires use of the "significant possibility" standard when assessing asylum eligibility at the credible fear stage. But the Rule instructs asylum officers conducting credible fear interviews to "determine whether the [noncitizen] is subject to [its] limitation on asylum eligibility." 8 C.F.R. § 208.35(b)(1). Thus, while the statute mandates that people pass CFIs if they have a significant possibility of eligibility for asylum, the Rule permits them to overcome its ban at the CFI stage only if they are actually eligible for asylum. By doing so, the Rule contravenes Section 1225.[9]

---

[8] Insofar as the Rule implies that the agency may enact asylum bars whenever it deems such a bar to be in the "best interests" of the country, that contention is meritless. 89 Fed. Reg. at 48737. The Rule cites a BIA decision for this proposition, but that decision did not hold that a "best interest" standard applies to threshold categorical bars. *Id.* The BIA has never suggested that extraordinary conclusion, and as a matter of sound statutory construction, it is implausible that Congress would go through the trouble of limiting the executive's authority to enact only those bars "consistent with" the rest of the statute but simultaneously allow the Executive to enact such a unilateral bar. That interpretation flips the consistency requirement on its head, reading a key *limitation* on the Defendants' regulatory authority as instead giving the Defendants free rein. *See O.A.*, 404 F. Supp. 3d at 150 (rejecting same argument and striking down 2018 asylum bar).

[9] Plaintiffs do not dwell on this error here because the same issue as to the same regulatory language is at issue in *M.A. v. Mayorkas*, No. 1:23 cv-01843-TSC (D.D.C. filed June 23, 2023).

In sum, the Rule's bar on asylum is contrary to law because it impermissibly conditions access to asylum on manner of entry.

**B.      The Asylum Bar Is Arbitrary and Capricious.**

Because the asylum bar is contrary to the statute, the Court need go no further to invalidate the Rule. But even if Defendants had statutory authority to limit asylum eligibility based on manner of entry, the Rule's ban would remain arbitrary and capricious because the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider [] important aspect[s] of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court's "task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). The Rule falls short of these standards.

Under the Rule, noncitizens seeking asylum are expected to wait in Mexico until they are able to obtain an appointment at a port of entry using a smartphone app called CBP One. An exception is made for noncitizens who can demonstrate "exceptionally compelling circumstances," which the Rule touts as a safety valve sufficient to provide protection to those who need it. Each aspect of this framework is arbitrary and capricious. The supposed safety valve is exceedingly narrow and leaves many noncitizens exposed to a high risk of serious harm—including Mexicans fleeing persecution, whom the Rule expects to wait in the very same country they are trying to flee. And the notion of obtaining an CBP One appointment is, for many noncitizens, illusory, either because they are unable to use the app (or are unaware of it) or because appointments are unavailable. Defendants have not engaged in a reasoned analysis of these problems.

1. **The Rule fails to consider the harm facing migrants required to wait in Mexico until they can secure an appointment at a port of entry.**

As noted above, the Rule places great weight on the exception for "exceptionally compelling circumstances" as a safeguard for noncitizens who face danger and cannot safely wait in Mexico to secure a CBP One appointment at a port of entry. *E.g.*, 89 Fed. Reg. at 48732-33 n.171. These "circumstances," however, are so narrowly defined that, in practice, they will leave many noncitizens exposed to grave harm. The Rule explains that an exceptionally compelling circumstance includes "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," *id.* at 48754; these "imminent threats" must be "faced at the time the noncitizen crossed the southern border" and do "not include generalized threats of violence." *Id.* at 48733. The Rule's narrow framing wholly ignores that many noncitizens will face a substantial danger of death or serious harm if forced to stay in Mexico for prolonged periods, but may not be able to establish that such a threat is "imminent" at the precise moment they cross the border.

Indeed, the government has acknowledged that forcibly returning asylum seekers to Mexico is inappropriate because "[s]ignificant evidence" demonstrates that this subjected them to "extreme violence." AR 7311; *accord* Petition for Writ of Certiorari at 7, 11, 15, *Biden v. Texas*, 597 U.S. 785 (2022) No. 21-954 (U.S. Dec. 29, 2021) (returning asylum seekers to Mexico "expose[s] migrants to unacceptable risks" of "extreme violence" including "persecution, abuse, and other harms"). The Ninth Circuit has noted that the administrative record concerning another asylum rule that required applicants to seek protection in Mexico set forth "in exhaustive detail the ways in which those seeking asylum in Mexico are (1) subject to violence and abuse from third parties and government officials, (2) denied their rights under Mexican and international law, and (3) wrongly returned to countries from which they fled persecution." *E. Bay*, 994 F.3d at 981; *see*

17

*also E. Bay*, 683 F. Supp. 3d at 1048 (noting that "migrants are generally at heightened risk of violence by both state and non-state actors" in Mexico). The D.C. Circuit likewise has noted "stomach-churning evidence of death, torture, and rape" of asylum seekers "forced to walk the plank" back into Mexico. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). The administrative record for this Rule makes these dangers clear. *See, e.g.*, AR 2330-66, 13607-10, 15380-84, 15632-37, 16116-23, 16862-68.

Defendants also failed to consider the effect of the ban on people who are at particular risk of violence in northern Mexico. Defendants well know that LGBTQ+ people, Black migrants, Indigenous people, and women are all at heightened risk of severe violence. *See E. Bay*, 683 F. Supp. 3d at 1048 (considering the record for the 2023 ban); AR 11937-41, 13607-10, 15380-84, 15632-37. In the Rule, however, Defendants say nothing concerning those risks.

   2.    **The Rule fails to consider the risk of harm it imposes on people from Mexico.**

The Rule also ignores the unique burdens it places on Mexicans, who are told to wait *in the very country they are trying to flee* because they fear persecution or torture. As mentioned above, in 2023, the government enacted a similar rule restricting asylum in various ways. One crucial difference, however, is that, unlike the 2023 rule, the current Rule applies to people from Mexico. Until this Rule took effect, Mexicans could seek asylum in the United States without respect to their method of entry, in keeping with 8 U.S.C. § 1158(a)(1). Now, however, they must wait in Mexico, for unknown and potentially prolonged periods, for CBP One appointments to remain eligible for asylum. Whether people being persecuted in Mexico can safely do so is an important aspect of the problem. After all, forcing people to stay in their country of persecution has the same consequence as *refoulement*—the very practice both domestic and international refugee protections are designed to prevent.

Defendants, however, give no consideration to this consequence. Instead, they again say that Mexican asylum seekers should get a CBP One appointment and enter between ports only if they can satisfy the "exceptionally compelling circumstances" exception. 89 Fed. Reg. at 48738. But neither domestic nor international law adopts an "imminent and extreme threat" standard to access protection, and harm may be likely even if it is not imminent at the particular moment a noncitizen decides to cross into the United States—particularly for a noncitizen forced to wait for an extended period in the same country where she fears persecution.

Defendants have not adequately considered whether the narrow "exceptionally compelling circumstances" test is sufficient to protect people forced to remain in their country of persecution. This lack of consideration contrasts sharply with Defendants' extended focus on deporting people as quickly as possible. *See, e.g.*, 89 Fed. Reg. at 48731, 48738, 48743, 48745. Efficiency may be a permissible factor even when human lives are at stake, but it cannot be determinative to the exclusion of the human cost. *Grace*, 965 F.3d at 902. By closing their eyes to the effect of the new ban on people from Mexico and the dangers in that country, Defendants have failed to consider an important aspect of the problem.

### 3. Defendants unreasonably rely on the CBP One app.

Defendants' defense of the asylum bar also depends upon the CBP One app, which, absent an exceptionally compelling circumstance, is the *only* way a noncitizen subject to the Rule can seek asylum, including for Mexican nationals who must wait for appointments in the very country

they are trying to flee.[10] Thus, if there are problems with the CBP One app—and there are many—the Rule's framework falls apart. Yet the Rule fails to address these problems.[11]

The administrative record reflects that some noncitizens lack access to up-to-date smartphones, Wi-Fi, a cellular data plan, or reliable electricity, all of which are necessary to use the CBP One app. AR 7418–19 (detailing numerous problems with the CBP One app, including bandwidth issues and location services problems). It also demonstrates that some noncitizens do not understand the few languages used in the app, are illiterate, lack technological know-how, or have disabilities that prevent them from successfully navigating the app. AR 7419. And because the number of appointments each day is limited, many asylum seekers, including many Mexicans with bona fide asylum claims, are forced to wait indefinitely under precarious conditions in Mexico in the hope of obtaining appointments. AR 7341 (noting that CBP One is overloaded because "more people want slots than are available"). Individual Plaintiffs' experiences exemplify these problems. A.E. Decl. ¶ 16; T.R. Decl. ¶ 7; E.R. Decl. ¶¶ 7, 9, 15; D.C. Decl. ¶ 14; P.S. Decl. ¶¶ 10–11. Other migrants have been "killed while waiting at the border to secure an appointment through the CBP One app or while attempting to travel to POEs with available appointments." AR 1204; *see, e.g.*, *id.* at 6940 (letter from Senator to DHS noting that a Cuban child "was fatally shot" last year while "awaiting his scheduled CBP One appointment").

Yet here is all the Rule has to say about these problems: "The Departments decline to adopt an exception … for those who present at the [port of entry] without a pre-scheduled time and place

---

[10] The 2023 Rule also required an appointment using the app, but at least contained an exception for certain noncitizens who were unable to obtain an appointment. 89 Fed. Reg. at 48732 n.171.

[11] As discussed above, Section I.A., even if the app worked perfectly, or there was no need to make an appointment at all, the Rule would violate the statute, because noncitizens must be allowed to apply for asylum "whether or not" they enter at a port. Indeed, the prior 2018 ban invalidated by the courts did not require an appointment at the port, much less by means of a complicated app.

but show that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing or serious obstacle… In these emergency border circumstances, this rule's exception for 'exceptionally compelling circumstances' captures individuals with a time sensitive imperative… Individuals who do not qualify for this exception should wait for a CBP One appointment." 89 Fed. Reg. at 48733 n.171. But, again, the "exceptionally compelling circumstances" exception can be met only when danger is "imminent and extreme" at the time of entry. 8 C.F.R. § 208.35(a)(2)(i). "Until the risk of violence rises to this level, individuals seeking to maintain their eligibility for asylum in the United States . . . must remain in Mexico," where they "are at serious risk of violence." *E. Bay*, 683 F. Supp. 3d at 1050. In short, the Rule fails to grapple with critical facts that undermine its reasoning and with the fatal consequences that will result. Therefore, it must be set aside. *See State Farm*, 463 U.S. at 43; *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies may not "brush[] aside critical facts" and must "adequately analyze" the consequences of their policies).

This exception, moreover, is particularly hollow because noncitizens who receive a CFI can attempt to invoke the exception "only if" they first clear the hurdle of the Rule's unlawful new "manifestation of fear" requirement. 89 Fed. Reg. at 48718, 48740. *See infra*, Part II.

## II.    THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS "MANIFEST" FEAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

Under the Rule's manifestation requirement, a noncitizen can be quickly removed without any process whatsoever unless an immigration officer—usually a Border Patrol agent—determines that the person spontaneously "manifests" fear of removal without being asked or advised of the right to seek protection. 89 Fed. Reg. at 48740. According to the Rule, "DHS believes that the manifestation standard is reasonably designed to identify meritorious claims" and "will enable immigration officers to effectively identify noncitizens who require credible fear interviews." *Id.*

at 48744-45. Requiring noncitizens to "manifest" fear in order to receive a credible fear interview will result in the removal of many noncitizens who fear persecution or torture, but who for any number of reasons are unable to "manifest" that fear in a way that Border Patrol officers will recognize. The manifestation standard violates the statute and is arbitrary and capricious.

A.    **Requiring Noncitizens to Manifest Fear of Return to Avoid Removal Is Contrary to Law.**

A "manifestation" requirement is inconsistent with the withholding of removal statute and CAT, both of which are meant to bring U.S. law into conformity with its international treaty obligations. *See INS v. Stevic*, 467 U.S. 407, 427 (1984).[12] These treaties require the United States "to make independent inquiries as to the persons' need for international protection and to ensure they are not at risk of *refoulement*."[13] Applicable procedures must be fair, and they must affirmatively identify and provide guidance to applicants.[14] Accordingly, the United States has a duty to implement procedures that will identify refugees in order to avoid *refoulement. UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status* Handbook ¶¶ 189-94, *reproduced at* AR 15849-50. This duty includes an affirmative obligation to elicit information that

---

[12] Congress codified withholding of removal to ensure that the United States remained in compliance with its obligation of *nonrefoulement*—that is, the obligation not to remove refugees to countries where they will face persecution. *See Cardoza-Fonseca*, 480 U.S. at 440 n.25 (withholding is mandatory "in order to comply with" the nonrefoulement provision of the U.N. Convention Relating to the Status of Refugees); 8 U.S.C. § 1231(b)(3). By ratifying CAT and then giving it domestic effect in the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. 105-277, Div. G. 112 Stat. 2681, 2681-761, Congress similarly committed the United States not to return people to countries where they are likely to be tortured. *See* 8 U.S.C. § 1231 note.

[13] UNHCR, *Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response* ¶ 3 (Mar. 16, 2020), https://bit.ly/3SnB5Yq.

[14] *See* UNHCR Executive Committee, Conclusion No. 8 (VIII) on Determination of Refugee Status Conclusion No. 8 (VIII) on Determination of Refugee Status (1977) (e)(ii); UNHCR, Asylum Processes (Fair and Efficient Asylum Procedures), ¶¶ 4-5, U.N. Doc. EC/GC/01/12 (May 31, 2001), https://bit.ly/3A0E8iP.

could establish refugee status.[15] Otherwise, the United States will breach its *non-refoulement* obligation by depriving refugees of access to protection.[16]

Because these obligations inform the United States's statutory treatment of refugees and asylum seekers, they are of particular relevance when construing the expedited removal statute, 8 U.S.C. § 1225. Statutes must be construed in a manner consistent with the international legal obligations the statutes were intended to effectuate. *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *see, e.g.*, *George E. Warren Corp. v. EPA*, 159 F.3d 616, 624 (D.C. Cir. 1998) (applying *Charming Betsy* canon).

Here, Section 1225(b)(1)(B)(iv) requires information concerning the asylum interview to be provided not only to noncitizens who are eligible for a credible fear interview, but to the broader pool of noncitizens who "may be" eligible for an interview. The statute itself provides that immigration officers "shall provide information concerning the asylum interview described in this subparagraph to [noncitizens] who *may be* eligible." *Id.* (emphasis added). Because the manifestation standard means Defendants have ceased to provide information about the credible fear process to any person who "may" qualify for asylum, the provision is contrary to law.

### B.    The Manifestation Standard Is Arbitrary and Capricious.

The manifestation of fear standard is also arbitrary and capricious. "DHS believes that the manifestation standard is reasonably designed to identify meritorious claims" and "will enable immigration officers to effectively identify noncitizens who require credible fear interviews"— without advising noncitizens of the credible fear process or asking them if they fear removal. 89

---

[15] *See* UNHCR, Comments on the Interim Final Rule 17 (July 8, 2024), https://bit.ly/4deFHYG.

[16] *See supra*, n.14.

Fed. Reg. at 48744-45. That claim is arbitrary and capricious for multiple reasons. First, Defendants failed adequately to consider the evidence in the record showing that many asylum seekers with genuine protection needs will *not* spontaneously express their fears without being given appropriate advisals and asked if they fear removal. Second, Defendants' rationale that Border Patrol agents have "expertise" that allows them to divine which noncitizens need protection is baseless and implausible. Third, Defendants impermissibly failed to consider whether the government's previous uses of the manifestation standard—by the Coast Guard at sea and by the Border Patrol under the so-called "Title 42" policy in place at the border during the COVID-19 pandemic—support their belief that the standard is reasonably designed to prevent *refoulement*. Given these flaws, the Rule's claim to efficiency cannot save it.

> **1. The Rule failed adequately to consider evidence showing that many noncitizens who need protection may not "manifest" a fear of return.**

The Rule asserts that the manifestation standard is reasonably designed to prevent refoulement, but it disregards the many reasons why genuine asylum seekers may not spontaneously express fears concerning persecution or torture without being properly advised and then asked whether they fear removal.

For example, the record shows that noncitizens who have just crossed the border are hungry, exhausted, ill, and traumatized after fleeing persecution in their home countries and danger in Mexico and are also likely to be intimidated by armed, uniformed Border Patrol officers—with the result that they are unlikely to "manifest" their fear of return. *See* AR8177-8219, 8225, 10012, 10101, 10214-15. DHS elsewhere acknowledged that many asylum seekers who have suffered past trauma are understandably wary of speaking about their fears of removal to "persons in uniform (e.g., immigration inspectors, border patrol agents) … because this can remind the survivor of the individuals who harmed them." AR2964; *see also id.* at 8197 n.22, 9823, 10180. Many courts have

recognized the same. *E.g.*, *Tang v. United States Att'y Gen.* 578 F.3d 1270, 1279 (11th Cir. 2009) (collecting cases); *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 220 (D.D.C. 2020). Moreover, people seeking asylum may have no idea that they need to "manifest" fear to avoid removal, or at what moment and to whom they must do so; they may not manifest their fear in words or actions that immigration officers expect or require; or they may speak a language that immigration officers cannot understand. *E.g.*, AR 1261, 8204-05.

For these reasons, the longstanding 1997 regulations displaced by the Rule require Border Patrol officers to ask questions designed to elicit fear of removal, and also—just as importantly—require officers to read statements that "clearly advise[] the [noncitizen] that this may be the only opportunity to present information concerning any fears or concerns about being removed" and that such information "will be heard confidentially." 62 Fed. Reg. at 10319; *see* 8 C.F.R. § 235.3(b)(2)(i); AR2596, 8189. As experts have explained: "Nothing is more crucial in preventing the deportation of genuine asylum seekers via expedited removal than ensuring that [this] information is communicated." AR 14510. "Especially given the prevalence of post-traumatic stress disorder (PTSD) among true victims of persecution, as well as the fear that inspectors may relay claims of persecution back to the home government (and thereby possibly endanger the applicant . . .), many applicants may need to receive the assurance of confidentiality before they will communicate with [immigration officers]." *Id.*; *see also id.* at 14531 n.42.

DHS has long been aware that it is essential to affirmatively advise asylum seekers of their rights to seek protection and to provide a confidential interview at which they can explain their fears. The Rule acknowledges a comprehensive study of the expedited removal system that concluded that the now-eliminated advisals are an "important protection"; and that "[n]oncitizens who are read the [advisals] are seven times more likely to be referred for a credible fear interview

and 'the likelihood of referral for a Credible Fear interview was roughly doubled for each question asked.'" 89 Fed. Reg. at 48743 n.221; *see* AR8192-94. Yet the Rule dismisses that study based on a few social science articles suggesting that "individuals tend to agree to questionnaire items"—which the agencies claim supports their view "that asking questions is likely to lead individuals to answer yes, even if they do not actually have a fear of persecution and torture." *Id.* at 48473 & n.220. But those three social science articles—which concern general opinion surveys unrelated to screening for immigration protections—say nothing about whether people will voice fears of removal spontaneously without being asked; and in no way suggest that essential, unknown information can be obtained by merely "observing" people without asking them questions. *See* AR 11905-09, 15111-26, 15163-77.

That "DHS believes that those noncitizens who indicate a fear of return on their own, in the absence of suggestive questions, are more likely to be urgently seeking protection," 89 Fed. Reg. at 48743, is baseless and beside the point. Even if some people who need protection will raise their fears without being asked, there are important reasons that many others, with just as compelling needs, will not. Because the Rule fails to grapple with those realities, the manifestation of fear standard is arbitrary and capricious.

## 2. The Rule's assertion that Border Patrol officers can divine which noncitizens need protection without asking is baseless and implausible.

The Rule asserts that Border Patrol officers have "expertise and training" that allow them to determine, without asking, which noncitizens have protection claims and (even more remarkably) which claims are "meritorious." 89 Fed. Reg. at 48744-45. That assertion is devoid of support and "is so implausible that it could not be . . . the product of agency expertise." *State Farm*, 463 U.S. at 43. The Rule's only support is a *2013* press release stating that *the Coast Guard* in 2012 had issued a "PowerPoint-based training aid" and accompanying video intended to "demonstrate

different ways a migrant might express a verbal or non-verbal manifestation of fear at sea." 89 Fed. Reg. at 48744; AR11164. Even if that were sufficient, the Coast Guard's PowerPoint is not in the record, nor are any manifestation-related training materials for Border Patrol officers. The Rule also cites general DHS guidance documents outlining the manifestation standard at a high level. 89 Fed. Reg. at 48744. They describe the standard in similar terms as the Rule's preamble—stating, for example that manifestation can be verbal or non-verbal and that non-verbal manifestations may include "hysteria" or "trembling." AR 21241-42, 11518-19. They do nothing to show that Border Patrol agents actually have the extraordinary ability to divine the reason behind someone's trembling or the cultural awareness to know if that same reaction can be expected based on an individual's background and country of origin. *Cf.* 89 Fed. Reg. at 48744 (acknowledging that "a noncitizen who has just arrived at the border may be physically tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear").

By contrast, the record does contain a training module for DHS *asylum officers* on *interviewing* traumatized people. But that document nowhere suggests that it is possible for *Border Patrol officers* to discern whether noncitizens may qualify for protection from removal *without asking them* whether they fear removal and, if so, why. AR2945-75. To the contrary, "[w]ithout asking the questions and recording the answers, immigration officers would not know which [noncitizens] should be referred for a credible fear determination." AR8225. Other record evidence is to the same effect. *See supra* Section II.B.1.

By relying on subjective officer perceptions rather than objective procedures—such as standardized advisals and questioning—the manifestation requirement inevitably will result in systematic arbitrariness in whether a noncitizen is referred for a credible fear interview. *See Grace*, 965 F.3d at 900 (a situation in which "'[a noncitizen] appearing before one official may suffer

deportation [and] an identically situated [noncitizen] appearing before another may gain the right to stay in this country' . . . is precisely 'what the APA's 'arbitrary and capricious' standard is designed to thwart'" (quoting *Judulang*, 565 U.S. at 58-59)). The Individual Plaintiffs' experiences bear this out. For example, Plaintiff D.G. entered the United States with her son and husband but was then detained separately. D.G. Decl. ¶¶ 7-8. While detained, D.G. repeatedly tried to tell immigration officers about her fears of removal, but immigrations officers either "ignored or laughed at" her, and she was removed to Colombia without receiving a credible fear interview. *Id.* ¶¶ 8-9, 11, 12. Yet D.G.'s husband and son—who had been placed in a different facility and were seeking protection from the very same persecution—were released into the United States and afforded the opportunity to seek protection. *Id.* ¶¶ 10–15.

3.    **The Rule failed to consider whether prior use of the manifestation standard actually bears out the assertion that the standard is reasonably designed.**

In claiming that the manifestation standard is reasonably designed to identify protection needs, the Rule notes that the "standard has long been used by the United States Coast Guard, a DHS component, to determine whether a screening interview is required for migrants interdicted at sea." 89 Fed. Reg. 48744. The Rule additionally notes that for a brief period, the manifestation standard was used by Border Patrol "to screen family units" expelled under Title 42 during the COVID-19 public health emergency. *Id.* Yet despite touting the government's prior experience applying the manifestation standard, the Rule fails to provide any data from that prior experience substantiating the claim that the standard "effectively identif[ies] noncitizens who require credible fear interviews." 89 Fed. Reg. at 48745. Instead, the Rule entirely ignores this "important aspect of the problem." *State Farm*, 463 U.S. at 43; *see also id.* (an agency "must examine the relevant data and articulate a satisfactory explanation for its action"). DHS's conclusory assertion that it "believes" the standard works, 89 Fed. Reg. at 48744, is insufficient under the APA, where

"conclusory statements will not do" and "an agency's statement must be one of reasoning." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (internal quotation marks and citations omitted); *see State Farm*, 463 U.S. at 43.

Moreover, while the Court need not consider extra-record evidence to hold the manifestation standard arbitrary and capricious, the data and reporting that are available regarding prior use of the manifestation standard show that it has been woefully inadequate. *See City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (extra-record evidence may be considered when "background information is needed to determine whether the agency considered all the relevant factors"). When DHS has used the manifestation standard in the interdiction context at sea, it has recorded exceedingly low rates of migrants manifesting fear—far below the 25 percent figure the government suggests as the approximate proportion of migrants with "meritorious claims." 89 Fed. Reg. at 48746.[17] For example, between 1981 and 1990, 22,940 Haitians were interdicted at sea but only 11 of them—less than 0.05 percent—were found to have adequately "volunteered information … that she or he would be persecuted if returned to Haiti."[18] And "out of the 445 Haitians interdicted by the U.S. in FY 2013"—a fiscal year that mostly post-dated issuance of the 2012 Coast Guard training noted in the Rule—"only one interdicted Haitian was given a credible fear

---

[17] In any event, the government's reliance on the 25-percent figure as representing the proportion of "meritorious claims" is itself arbitrary. *See State Farm*, 463 U.S. at 43. The government reached this figure by ignoring that many cases where noncitizens received positive CFIs between 2014-2019 remain pending, as Defendants previously acknowledged. 88 Fed. Reg. at 11716. It likewise fails to account for cases that did not result in a grant of asylum not because of the merits of the noncitizens' claim but because of other factors including lack of access to counsel and a host of other changes to asylum law that were later invalidated or enjoined.

[18] Ruth Ellen Wasem, Cong. Rsch Serv., RS21349, *U.S. Immigration Policy on Haitian Migrants*, at 3 (Jan. 21, 2005), https://bit.ly/3Sp5t4y.

interview"—an implausibly low "manifestation of fear" rate of well under 1 percent.[19] More recently, from July 2021 to September 2023, the Coast Guard referred only 7 percent of the 27,000 migrants it interdicted in the Caribbean for credible fear interviews.[20] Thus, the government's own publicly-reported data indicates that past uses of the manifestation standard have *not* effectively identified migrants with meritorious protection claims.

No equivalent data is available from DHS's use of the manifestation standard in the Title 42 COVID context, although DHS presumably collected that data just as it does in the interdiction context. However, the one publicly available survey of approximately 100 families expelled under Title 42 under the manifestation standard found that "over half (51 families) reported that they had verbally expressed a fear of return," but "CBP did not refer a single family for a fear screening."[21] Instead, the families surveyed reported that CBP officers instead "verbally abused them, telling them to 'shut up,'" stated that the families "had 'no right' to an interview," or "completely ignor[ed] their attempts to communicate." *Id.* That study has been publicly available since January 2024. This "background information" underscores that Defendants ignored "relevant" information. *City of Dania Beach*, 628 F.3d at 590.

Predictably, DHS's failure to consider the manifestation standard's past ineffectiveness is resulting in the removal of asylum seekers to danger, including the Individual Plaintiffs here. *See* D.G. Decl. ¶¶ 8-12; D.C. Decl. ¶¶ 8-13; E.R. Decl. ¶¶ 2–8, 12-13; P.S. Decl. ¶¶ 2, 13-14.

---

[19] T. Alexander Aleinikoff, *YLS Sale Symposium: International Protection Challenges Occasioned by Maritime Movement of Asylum Seekers*, Opinion Juris (Mar. 16, 2014), https://bit.ly/4dhQFNe.

[20] Seth Freed Wessler, *When the Coast Guard Intercepts Unaccompanied Kids*, ProPublica (Dec. 7, 2023), https://bit.ly/3Yk57ju.

[21] Center for Gender & Refugee Studies, *"Manifesting" Fear At the Border: Lessons from Title 42 Expulsions*, at 2 (Jan. 30, 2024), https://bit.ly/3WnguEq.

**4.   The Rule's efficiency rationale cannot justify the manifestation standard.**

The Rule makes clear that the overriding goal of the "manifestation" standard is "to help immigration officers process noncitizens more expeditiously." 89 Fed. Reg. at 48743. But the Rule does not adequately engage with the potential negative consequences for accuracy. It asserts that the manifestation standard "may result in a greater proportion of those referred to an [asylum officer] being individuals with meritorious claims," 89 Fed. Reg. at 48744-45, but this is a non-sequitur—the problem the Rule fails adequately to consider is that the manifestation standard will *also* result in a greater proportion of individuals with meritorious claims being expeditiously removed. As to that problem, the Rule offers only the meager acknowledgement that "the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview." *Id.* at 48743-44.

The Court should hold that the manifestation standard is arbitrary and capricious.

## III.   THE RULE'S HEIGHTENED REASONABLE PROBABILITY STANDARD IS ARBITRARY AND CAPRICIOUS.

The Rule unlawfully heightens the screening standard for withholding of removal and CAT claims to "reasonable probability." The Rule defines "reasonable probability" as "substantially more than a reasonable possibility, but somewhat less than more likely than not." 89 Fed. Reg. at 48746 (citing 8 C.F.R. §§ 208.35(b)(2)(i), 1208.35(b)(2)(ii)). This new standard "requires a greater specificity of the claim in the noncitizen's testimony" at the CFI than previously necessary. *Id.* at 48746. This heightened standard is arbitrary and capricious because it represents an unexplained change from decades of practice and because Defendants failed to meaningfully consider whether the new standard will result in more individuals being wrongfully removed to persecution and torture.

A.      **Defendants Departed from Past Practice Without an Adequate Explanation.**

While Defendants may depart from past precedent, in so doing, they "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed." *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 5 (D.C. Cir. 2022). A significant possibility standard is the *only* standard mentioned by statute for use in credible fear interviews; although it refers to asylum specifically, Defendants have long applied that standard to withholding and CAT claims assessed in credible fear screenings. And as recently as 2022, they rejected a higher "reasonable possibility" standard for withholding and CAT. They explained that the "significant possibility" standard strikes the proper balance between expeditious removal of non-meritorious claims and identification of potential meritorious claims. *See* 87 Fed. Reg. at 18092 ("In clarifying that the 'significant possibility' standard applies not only to credible fear screening for asylum, but also to credible fear screening for statutory withholding and CAT protection, the Departments will help ensure that the expedited removal process remains truly expedited, and will allow for asylum officers to adhere to a single legal standard in screening claims for protection from persecution and torture in the expedited removal process."). In the 2023 rule, Defendants made a U-turn, imposing the "reasonable possibility" standard. 88 Fed. Reg. at 31336-37, 31381. Now, Defendants have gone even further, completely upending their reasoning from just two years ago and raising the standard to "reasonable *probability*," described as "substantially more than a 'reasonable possibility.'" 89 Fed. Reg. at 48718 (emphasis added).

The Rule does not explain why the prior concerns that led Defendants to reject a heightened standard are no longer valid. For example, in rejecting the reasonable possibility standard, the 2022 Asylum Rule specifically examined whether imposing a higher standard would adequately "ensur[e] the United States complie[s] with its non-refoulement obligations." 87 Fed. Reg. at 18092. "[B]ased on the Departments' experience implementing divergent screening standards,"

32

they found "no evidence" that applying the reasonable fear standard in CFIs "resulted in more successful screening out of non-meritorious claims while" safeguarding against refoulement. *Id.* The Rule never explains why it departs from that finding here.[22]

    **B.**    **Defendants' Decision to Require "Greater Specificity" and Detail at the Screening Stage Impermissibly Disregarded the Reasons That Many Asylum Seekers Are Unable to Do So.**

Defendants' assumption that asylum seekers are able to provide a greater "degree of specificity" concerning their claims at the credible fear stage likewise fails to consider important aspects of the problem and runs counter to the evidence. In explaining that Defendants view the higher standard as "requiring additional specificity," the Rule states: "In most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony. Instances of past harm or those that inform a future fear of return that caused a noncitizen to seek protection generally occur before entry and would not be expected to develop after the fact of entry or after the screening stage." 89 Fed. Reg. at 48748.

That statement ignores a key aspect of the problem: asylum seekers often are unable or unlikely to *discuss* those details at that stage due to trauma and related considerations. The reality of credible fear assessments is that they are "often rushed" and "can occur under 'tense conditions.'" *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 39 (D.D.C. 2020) (Jackson, J.) (internal citation

---

[22] In the 2023 rule, the agencies raised the screening standard for withholding and CAT from "significant possibility" to "reasonable possibility," and sought to justify that move by noting that the reasonable possibility standard was already used for withholding and CAT in certain limited contexts, and therefore the Defendants had at least some expertise on how to apply that standard. Litigation over the use of the reasonable possibility standard is pending and currently in abeyance. But regardless of the outcome of that litigation, Defendants can make no similar argument here, since the "reasonable probability" standard has *never* been used for screenings of withholding and CAT and appears to have been invented out of whole cloth.

omitted). And "[a]s a practical matter, a noncitizen 'appearing at a credible fear interview has ordinarily been detained since his or her arrival in the United States and is therefore likely to be more unprepared, more vulnerable, and more wary of government officials than an asylum applicant who appears for an interview before immigration authorities well after arrival.'" *Id.* (quoting *Zhang v. Holder*, 585 F.3d 715, 724 (2d Cir. 2009)); *see also Ramsameachire v. Ashcroft*, 357 F.3d 169, 179 (2d Cir. 2004) (Sotomayor, J.).

The record details evidence that trauma may prevent asylum seekers from describing specific details of their persecution in a credible fear interview. "[M]any asylum seekers have suffered severe and sometimes very recent trauma and abusive treatment" and so "enter the United States in fragile psychological states." AR8373; *see also, e.g.*, *id.* at 14510, 14531 & n.42 (noting "the prevalence of [PTSD]" among "victims of persecution" and citing relevant studies). DHS previously has acknowledged that survivors of persecution or torture "may use avoidance as a means of coping" and so "may not wish to discuss *the details of the experience* with others"; or may be unable to do so because they "have an emotional remembrance of what happened but *may not remember the details.*" AR2964 (emphases added). This can occur due to psychological "defensive techniques to avoid reliving the events" or because traumatic events prevent the brain from "stor[ing] all of the information" in the first place. *Id.* at 2965; *accord id.* at 10008, 14618. UNHCR has therefore stressed that "second and subsequent interviews may be needed in order to establish trust and to obtain all necessary information" from trauma survivors. AR15987; *see also id.* at 14531 (importance of establishing "trusting relationship").

Further, many asylum seekers are unable to provide specific details at initial screenings due to the sensitive nature of their claims. This is often true, for example, of people with claims concerning their "sexual orientation or gender identity," AR10064; people who fear government

persecution, AR2964, 9823, 10180; *Tang*, 578 F.3d at 1279; and survivors of sexual violence, AR1008, 2963; *Fiadjoe v. Att'y Gen. of U.S.*, 411 F.3d 135, 159-60 (3d Cir. 2005); *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052-53 (9th Cir. 2002).

For all these reasons, many asylum seekers can only speak candidly about the most traumatic or painful details of their claims after developing a trusting relationship with counsel or a mental health professional. AR2966, 11787; *see* AR776 (noting comment to earlier rule stating "that compressed timelines may harm applicants who need time to develop trust in their attorneys"). Despite acknowledging these issues in the past and noting asylum officers' training on them, 89 Fed. Reg. at 48748 & n. 244, Defendants failed to reconcile these realities with the expectation that, at a credible fear interview, a noncitizen fleeing persecution or torture will be able to provide the "greater specificity" needed to satisfy a heightened "reasonable probability" standard. That failure makes the Rule's unprecedented standard arbitrary and capricious.

## IV.   THE GUIDANCE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A.   The Guidance Is Unlawful in Effectively Eliminating the Right to Consult.

The Rule is accompanied by Guidance that reduces the consultation period preceding credible fear screenings to as little as 4 hours. The result of this hyper-abbreviated period—particularly given the extreme communication challenges posed by CBP holding facilities—is that, for all practical purposes, it eliminates the right to consult and thus violates the INA.

This new four-hour policy will most likely be applied to people *in CBP custody. See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113-14 (D.C. Cir. 2019) (examining policy change in context of "key aspects of the program," including its likely consequences in practice). Conditions in CBP facilities are highly restrictive and dramatically curtail noncitizens' ability to contact the outside world. Unlike facilities under the control of Immigration & Customs Enforcement, CBP

facilities do not allow nongovernmental legal service providers to enter, so they cannot post signup sheets or receive referrals from other legal services. CBP facilities also do not allow noncitizens to freely schedule calls—instead they are given access to a phone in narrow windows of time often outside of business hours. Outgoing calls from CBP facilities do not show a callback number, and prospective attorneys are not permitted to schedule follow up calls without entering an appearance on an individual's behalf—which they cannot do without first making contact with them. Thus, if a noncitizen's potentially singular opportunity for a legal call goes unanswered, which is likely given that they often must make them outside of business hours, that noncitizen will likely never be able to speak to an attorney at all. *See* RAICES Decl. ¶¶ 23, 30.

By statute, a noncitizen is entitled to "consult with a person or persons of the [noncitizen's] choosing prior to the [credible fear] interview." 8 U.S.C. § 1225(b)(1)(B)(iv). Implementing regulations provide that the person "shall be given time to contact and consult with any person or persons of the [noncitizen's] choosing," 8 C.F.R. § 235.3(b)(4)(ii) shall be informed of that right, *id.* § 235.3(b)(4)(i); and may have the person they consult "present at the interview," *id.* § 208.30(d)(4).[23] By reducing the potential consultation period to as little as four hours, Defendants have, in substance, eliminated the right to consultation. Defendants may not impose procedural rules that, in practice, gut substantive protections. *See, e.g.*, *Dist. Atty's Office for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (postconviction relief procedures insufficient "if they are fundamentally inadequate to vindicate the substantive rights provided"); *Michel v. Louisiana*, 350

---

[23] Although the Rule suspends the requirement in 8 C.F.R. § 235.3(b)(4) that immigration officers ask noncitizens if they fear return to Mexico or their country of origin during so called "emergency circumstances," all other "existing regulations, policies, and procedures . . . outlined in 8 C.F.R. § 235.3(b)(4) regarding" credible fear interviews remain in effect. As such, Defendants are still bound by these consultation requirements. And even if they were not, Defendants would still be bound by the INA's statutory consultation requirement. *See* 8 U.S.C. § 1225(b)(1)(B)(iv).

U.S. 91, 93 (1955) (state procedures may not "raise[] an insuperable barrier" to a "claim to federal rights").

    **B.**    **The Guidance Is Arbitrary and Capricious.**

The shortened consultation period is also arbitrary and capricious. The Guidance never considered the important fairness considerations that the consultation period is meant to protect. As explained above, the credible fear statute strikes a balance between speed of removals and ensuring access to protection, so whether the waiting period provides a fair opportunity to consult and prepare is plainly an "important aspect of the problem." *State Farm*, 463 U.S. at 43. Indeed, USCIS previously explained that the 48-hour pre-CFI waiting period that had been in place for decades was intended to allow a noncitizen "to rest [and] collect his or her thoughts" in addition to contacting a person of one's choosing. Guidance AR293. The Guidance fails to grapple with the emphasis the agency previously placed on the need for time to rest and prepare. *See Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 50 (D.D.C. 2019) (it is arbitrary and capricious to address an important consideration underlying a prior policy "in an inadequate or cursory manner"). DHS merely "recognizes" these interests and sets them aside in favor of "expediency." Guidance AR4.

The abandonment of these fairness considerations also marks a departure from the statute's intent. Fairness is an essential component of the expedited removal system and an "important aspect of the problem" that the waiting-period policy needed to address. *State Farm*, 463 U.S. at 43; *see also Grace*, 965 F.3d at 902.

The Guidance also relied on impermissible and erroneous assumptions. *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (Defendants must examine and justify key assumptions). The Guidance claims that four hours is sufficient to have "in depth" conversations,

Guidance AR3, but it provides no evidence to support that conclusion. And no such evidence exists, particularly for people who have their CFIs while in CBP custody. A period as short as four hours (which might occur entirely during holidays or weekends) to consult with an attorney before a life-or-death interview would be extraordinarily limiting under the best of circumstances. In the context of restrictive CBP facilities where this policy most often applies, it denies access to any consultation for the vast majority of noncitizens.

The citations in the Guidance are simply irrelevant. They include a number of cases involving constitutional claims, but the consultation right is granted by statute. Guidance AR5, 69-112 (citing and reproducing, e.g., *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950)). The Guidance and record point to two other cases that mention a 24-hour period, *see* Guidance AR3, 5, 41-64, 167-90, but neither case addressed the legality of that period. *See Las Americas Immigrant Advocacy Ctr. v. Wolf*, 507 F. Supp. 3d 1, 23 (D.D.C. 2020) (noting that Defendants had "voluntarily" ended the "24-hour consultation requirement"); *LM-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) (resolving challenge to prior 24-hour policy in favor of plaintiffs on procedural grounds). In any event, whatever the legality of a 24-hour period, a *4-hour* period is not even in the same ballpark, and nothing in the cited case remotely suggests that any court would have condoned such a dramatically shorter period.

In short, no record evidence shows that Defendants considered important aspects of this problem. This failure to offer reasoned analysis was arbitrary and capricious. *See, e.g., Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d 66, 89 (D.D.C. 2019).

## V.    FAILURE TO PROVIDE NOTICE AND COMMENT RENDERS THE RULE NULL AND VOID.

It is perhaps unsurprising that the Rule so markedly fails to address key considerations. That is because Defendants issued the Rule without the notice-and-comment process that the APA

requires "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). These procedures are "not a mere formality." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 44 (D.D.C. 2020) ("*CAIR Coalition*") and the "more expansive the regulatory. . . the greater the necessity for public comment." *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981); *see* Las Americas, Comment on the Rule (July 8, 2024);[24] RAICES, Comment on the Rule (July 5, 2024).[25]

Here, the Rule asserts the "foreign affairs" and "good cause" exceptions to the APA's notice-and-comment requirements. 5 U.S.C. § 553(a)(1), (b)(4)(B). Neither applies.

**A.  The Rule Fails to Meet the "Foreign Affairs" Exception.**

To meet the "foreign affairs" exception, the rulemaking must "clearly and directly" involve a foreign affairs function of the United States. *CAIR Coalition*, 471 F. Supp. 3d at 52; *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 63-64 (D.D.C. 2022); *see also Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978). For example, the D.C. Circuit has held that the foreign affairs exception applied to a rule that implemented an international agreement between the United States and another sovereign state. *Int'l Bhd. Teamsters v. Pena*, 17 F.3d 1478 (D.C. Cir. 1994); *see also CAIR Coalition*, 471 F. Supp. 3d at 54.

The Rule fails that test. Applying the "clear and direct" standard, a court in this district has previously rejected the government's invocation of the foreign affairs exception to justify an

---

[24] https://www.regulations.gov/comment/USCIS-2024-0006-1043/attachment_2.pdf.

[25] https://www.regulations.gov/comment/USCIS-2024-0006-0780/attachment_1.pdf.

asylum bar imposed without notice and comment. *CAIR Coalition*, 471 F. Supp. 3d at 51-57. The government in that case argued that the rule at issue "implicate[d] foreign affairs or the President's foreign policy agenda" as it would "in some way affect ongoing negotiations with other countries." *Id.* at 56-57. But that was "not enough to satisfy the foreign affairs function exception," as "downstream effects on foreign affairs or negotiations with other countries—either positive or negative—do not bring the Rule under this exception." *Id.* at 55-57.

This Rule is no different. The Rule cites Defendants' "belief that migration is a shared responsibility among all countries in the region," and it emphasizes that the United States has been "working closely with its foreign partners" to manage migration levels. 89 Fed. Reg. at 48759. It also claims that managing border security is "a critical element of the United States' ongoing diplomatic approach." *Id.* at 48760. But each of these involves only indirect effects on foreign relations, not the exercise of a foreign affairs function. As the *CAIR Coalition* court held in addressing a prior asylum bar, "changes to our asylum criteria do not 'clearly and directly' involve activities or actions characteristic of the conduct of international relations" because even if such changes "would have downstream effects in other countries, and perhaps on … negotiations" with those countries, such "*indirect* effects do not clear the high bar" of the foreign affairs exception. *CAIR Coalition*, 471 F. Supp. 3d at 55.

**B.  The Rule Fails to Meet the "Good Cause" Exception.**

The APA also allows an exception to its procedures "when an agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(4)(B). Because any agency could gin up "good cause" arguments for virtually any rule, thereby eviscerating the APA, the D.C. Circuit has held that the exception must be "narrowly construed and only reluctantly countenanced." *N.J. Dep't of Env't*

*Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980); *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (this point has been "repeatedly made clear"); *CAIR Coalition*, 471 F. Supp. 3d at 45. Therefore, the "good cause inquiry is 'meticulous and demanding,'" *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014) (quoting *N.J. Dep't of Env't Prot.*, 626 F.2d at 1046), and the courts give no deference to an agency's conclusion that good cause exists, *CAIR Coalition*, 471 F. Supp. 3d at 45. Indeed, the D.C. Circuit has "approved an agency's decision to bypass notice and comment" only "where delay would *imminently* threaten life or physical property." *Sorenson*, 755 F.3d at 706 (emphasis added).

Defendants cannot satisfy that test. They claim that APA procedures are "impracticable" and contrary to the public interest because the delay in effective date resulting from notice and comment could encourage more people to attempt to cross the border before the new rule becomes effective. 89 Fed. Reg. at 48763-65. But there is no evidence at all to suggest that people outside the United States understand the nuanced differences between the pre-Rule status quo and the Rule. There is also no evidence to show that people's behavior would change even if they understood the differences between the 2023 rule and this Rule.

In fact, record evidence is to the contrary. It reveals that people outside the United States frequently lack understanding of the ever-changing landscape of U.S. asylum law. AR2135-40, 11638-48, 11910-15, 14209-12, 14951-61; *see e.g.*, E.R. Decl. ¶ 16; P.S. Decl. ¶¶ 12, 18. Moreover, legislation proposed in February 2024 would have completely overhauled the asylum system, including by making the various changes incorporated in the Rule. *See* 89 Fed. Reg. at 48729; AR1715-2006. That proposal had no effect at all on the number of people seeking to cross the border: by Defendants' own admission, "encounters at and between [ports of entry] along the [southwest border] fell" dramatically from December 2023 to January 2024, and then remained

basically flat through February and March. 89 Fed. Reg. at 48713 n.22. Defendants cannot explain

why a proposed version of the Rule would have a dramatic effect on people's behavior when more

sweeping legislative changes proposed at roughly the same time did not. And the record makes

clear that this lack of effect, far from being anomalous, is the norm: Changes to border security

and U.S. policy do not stop people fleeing persecution and torture from seeking refuge in the United

States. *See* AR15094, 15362-76; *see also* AR11911 (harsher border policies, rather than deterring

people from fleeing persecution, increase demand for smugglers). Even Defendants admitted in

the context of a prior asylum ban that they "cannot 'determine how'" changing entry restrictions

at the southern border "'could affect the decision calculus for various categories of [noncitizens]

planning to enter'" the United States. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 777 (9th

Cir. 2018) (quoting 83 Fed. Reg. at 55948).

It is true that border crossings increased before the end of the Title 42 policy adopted during

the COVID public health emergency. *See id.* at 48765; AR16775-81. As the record shows,

however, that was due to unique features of the Title 42 policy. Under Title 42, people were

"expelled" to northern Mexico without the opportunity to apply for any kind of protection in the

United States. But because someone expelled under Title 42 was not "issued a removal order"—

which "carries with it significant and lasting consequences"—they faced no adverse consequences

for repeatedly re-entering following expulsion. AR2459, 9040-41. Title 42 therefore

"incentiviz[ed]" people "to try to re-enter, often multiple times" while its consequence-free regime

was in place. AR7467, 9040-41, 11709. As a result, there was a spike in entries and re-entries

before Title 42 expired—that is, before DHS reverted to issuing removal orders pursuant to the

immigration laws. AR2466. But that normal system of issuing removal orders—with their

attendant lasting consequences—was back in place in May 2023, long before this Rule was issued,

so noncitizens already had strong incentives not to enter or re-enter unlawfully. Accordingly, the final days of Title 42 provide no support at all for the argument that a notice-and-comment period on a proposed rule would lead to a spike in border crossings.[26]

In any event, Defendants' prediction concerning increased border encounters would be insufficient even if it were supported by evidence. It is almost always the case that "[t]he lag period" provided by notice and comment before a regulation takes effect allows those with knowledge of the proposal "to change their behavior in response." *E. Bay*, 993 F.3d at 676. Therefore, such predictions can establish good cause only if "adequately supported by evidence in the administrative record suggesting that this dynamic might have led to . . . consequences so dire as to warrant dispensing with notice and comment procedures." *CAIR Coal.*, 471 F. Supp. 3d at 46. But here, DHS's own statistics show that, in April and May 2024, encounters at the southwest border were already falling from preceding months and were significantly below levels for the same months in 2022 and 2023. AR2157-58; CBP, *Southwest Land Border Encounters*. No matter what level of "emergency" Defendants think exists at the border *at present*, good cause can only be satisfied by a showing that "dire consequences" will result *as a result of* dispensing of ordinary procedures. Defendants acknowledge that numbers at the border were already declining when the Rule was issued, and they cannot demonstrate that intending asylum seekers have advance knowledge of U.S. immigration policies such that providing notice of a potential change would have the required causal effect.

---

[26] Defendants' claim that an injunction against the Remain in Mexico policy increased migration is implausible. That policy forced roughly 25,000 people who had already entered the United States back to the Mexican side of the border while their U.S. immigration court cases proceeded. Even then, only a small fraction of affected people attempted to cross. *See* AR2555-59 (25 of 1,400 at Hidalgo; 100 of 1,400 people at Brownsville). Defendants also cite claims by DHS officials that U.S. policy affects the behavior of people seeking asylum, but cite no evidence aside from officials' unsubstantiated beliefs, *see* 89 Fed. Reg. at 48765-66, which are not owed deference.

Defendants also argue that notice and comment would "unduly postpone implementation of a policy that is urgently needed to avert significant public harm," because the Departments are already overburdened. 89 Fed. Reg at 48762-63. But as the Rule acknowledges, these challenges are not new, and Defendants have asserted for years that the border presents a pressing problem. *See, e.g.*, 84 Fed. Reg. 63994, 63995 (Nov. 19, 2019); 84 Fed. Reg. 33829, 33830 (July 16, 2019); 83 Fed. Reg. 55934, 55935 (Nov. 9, 2018). Average daily encounters have exceeded the threshold set by the Rule since July 2020—and even the high end of the projected increase in border encounters on which the Rule relies, 89 Fed. Reg. at 48763, results in numbers comparable to many months since early 2022, AR2157-58. Agency delay cannot give rise to good cause, so Defendants' decision to wait almost *four years* to promulgate the Rule before declaring notice and comment impracticable forecloses a claim of good cause. *See, e.g.*, *Envtl. Defense Fund v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983); *Purdue Univ. v. Scalia*, 2020 WL 7340156, at *7 (D.D.C. Dec. 14, 2020). Moreover, the Rule was ready months earlier—prior to the State of the Union address on March 7—but Defendants delayed issuing it for perceived political advantage.[27] Defendants had time to for notice and comment and simply chose not to provide it.

## VI.    THE COURT SHOULD GRANT VACATUR AND OTHER RELIEF.

"When agency action is unlawful, 'vacatur is the normal remedy.'" *Bridgeport Hosp. v. Becerra*, No. 22-5249, 2024 WL 3504407, at *7 ___ F.4th ____ (D.C. Cir. July 23, 2024); *see also Kiakombua*, 498 F. Supp. 3d at 54 (finding vacatur appropriate for credible fear policies); 5 U.S.C. § 706(2). That remedy is particularly appropriate here. As Plaintiffs' declarations illustrate, with

---

[27]Stef W. Knight, *Scoop: Biden's Border Nuclear Option Is Still on the Table*, Axios (Mar. 24, 2024), https://bit.ly/4cXiSci; Priscilla Alvarez & MJ Lee, *White House and Democratic Lawmakers Plot Ways to Strengthen their Hand on Border Security*, CNN (May 18, 2024), https://bit.ly/3WGDQXj.

every day that passes, noncitizens fleeing persecution are being returned to harm without a fair assessment of their protection claims. And for all the reasons discussed above, the policies are both contrary to governing statutes and regulations and riddled with serious failures of reasoned decision-making. The Court should therefore follow "the normal course and vacate" the Rule and Guidance in their entirety. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

In addition, the Individual Plaintiffs request the Court vacate their negative credible fear determinations and removal orders, and order that Defendants return Plaintiffs who are abroad to the United States so that their claims can be processed in accordance with the law. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 144(D.D.C. 2018), *aff'd in part, rev'd in part and remanded by* 965 F.3d 883 (D.C. Cir. 2020); Order at 3-4, *Grace v. Whitaker*, No. 18-cv-1853 (D.D.C. Dec. 19, 2018), ECF No. 105 (ordering the government to "to bring [removed plaintiffs] back into the United States).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs.

Dated: July 26, 2024                    Respectfully submitted,

By:                                     /s/ Lindsay C. Harrison

Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

Blaine Bookey*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
*bbookey@uclawsf.edu*
Melissa Crow (D.C. Bar. No. 453487)

Lindsay C. Harrison (D.C. Bar #977407)
Matthew E. Price (D.C. Bar # 996158)
Mary E. Marshall (D.C. Bar #1739058)**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*
*lharrison@jenner.com*
*mmarshall@jenner.com*

Melissa Root*
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
353 N Clark St, Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

Tamara Goodlette (D.C. Bar. No. TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.or*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

Ashley Alcantara Harris
David A. Donatti
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
*aharris@aclutx.org*
*ddonatti@aclutx.org*

Edith Sangueza*
Center for Gender and Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
*sanguezaedith@uclawsf.edu*

Robert Pauw*
Center for Gender and Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
*rpauw@ghp-law.net*

*Attorneys for Plaintiffs*
*\*Admitted via certificate of pro bono representation
or pro hac vice*
*\*\*D.D.C application pending*