### DECLARATION OF JAVIER HIDALGO, THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (RAICES)

I, Javier Hidalgo, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am a Legal Director at the Refugee and Immigrant Center for Education and Legal Services (RAICES). I joined RAICES in 2018 and have served in my current role since 2023. Before I assumed my current position, I worked as a unit director, before that as a supervisor and previously, as a staff attorney. In my role as Legal Director, I work closely with and oversee the work of our Asylum Access Services program, which (among other things) serves people facing expedited removal from the United States.

3. RAICES is a 50l(c)(3) nonprofit, non-partisan organization headquartered in San Antonio, Texas. RAICES' mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. This mission encompasses striving to ensure access to asylum and protection for noncitizens, including those arriving at the border and subject to expedited removal. RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals. RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from the custody of the Department of Homeland Security (DHS). To execute our mission, we strive to serve as many noncitizens as possible through our various avenues of work.

4. As discussed in detail below, RAICES has and will continue to experience substantive harm under the Interim Final Rule issued by U.S. Citizenship and Immigration

1

Services ("USCIS"), Department of Homeland Security ("DHS") and the Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ"), entitled "Securing the Border" ("Rule"); and contemporaneous memoranda issued by DHS (collectively, "Guidance"). Many aspects of the Rule and Guidance directly impact and interfere with RAICES' core work. These aspects include (a) the suspension of asylum eligibility for virtually all noncitizens who present at ports of entry without a prescheduled appointment, or who enter the United States between ports of entry; (b) the requirement that all noncitizens seeking asylum use the CBP One application; (c) the requirement that noncitizens manifest fear in order to even qualify for a credible fear interview (CFI); (d) the new, heightened "reasonable probability" CFI screening standard for withholding and CAT protection; and (e) the reduction of the consultation time before a CFI from at least 24 hours to as little as 4 hours.

**RAICES' MISSION & SCOPE**

5.       Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to be the largest immigration legal services provider in Texas. With offices in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and San Antonio, RAICES is a frontline organization that combines expertise developed from the daily practice of immigration law with a deep commitment to advocacy. Its staff includes nearly 300 people, including attorneys, legal assistants, social workers, advocates, and support staff.

6.       Since RAICES' founding, its staff, volunteers, and pro bono attorneys have counseled and represented thousands of noncitizens throughout Texas. RAICES offers a wide array of legal services. The scope of RAICES' services includes filing "affirmative" asylum applications, which can be submitted to U.S. Citizenship and Immigration Services ("USCIS") by noncitizens who are not in removal proceedings. It also includes representing noncitizens—including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a

and in bond proceedings before the EOIR and before the Board of Immigration Appeals ("BIA"). In regular proceedings, also known as defensive proceedings, we represent people seeking asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), among other forms of relief from removal. RAICES' defensive legal representation also continues into the federal courts, where we represent clients before the United States Court of Appeals for the Fifth Circuit and the Supreme Court, where appropriate.

7. RAICES also provides services to hundreds of people in expedited removal proceedings, including those assessed for protection through the CFI screening process. Our Asylum Access Services team is most involved in our work serving individuals facing expedited removal. The team represents detained individuals in the expedited removal process. That team currently consists of a managing attorney, one senior attorney, one staff attorney, a DOJ accredited representative, four legal assistants, and two data entry clerks.[1] We currently operate hotlines specifically for individuals detained at the South Texas Detention Center, in Pearsall, Texas; Laredo Detention Center in Laredo, Texas; and the Karnes County Immigration Processing Center in Karnes, Texas, as well as individuals detained in CBP facilities who are subject to enhanced expedited removal.

8. Last year, we added our hotline number to a list distributed by EOIR to asylum seekers who are required to undergo their CFI while in CBP custody. We also post signup sheets in ICE detention centers and receive referrals from both the family members of detained people and other nongovernmental organizations (NGOs).

9. From January 1, 2024, through June 30, 2024, the Asylum Access Services team provided legal consultation or representation to 1,042 individuals in expedited removal

---

[1] Current as of the date this declaration was executed.

proceedings. Since the Rule took effect on June 4, 2024, the Asylum Access Services team has seen 74 individuals adversely affected by the Proclamation, Rule, and Guidance.

## The Rule Harms RAICES and Our Clients

10. The Proclamation, Rule, and Guidance challenged in this suit have directly impacted and interfered with RAICES' ability to provide its core services: serving noncitizens clients subjected to expedited removal, and will continue to have these effects. Thus far, these changes have forced us to divert our limited resources to preparing the relevant teams to properly and ethically represent clients impacted by the Rule. We have devoted internal resources to training staff on the Rule and related policies, as well as on how to advocate for clients impacted by these changes. We have also had to redirect staff resources. For example, we trained and relocated employees previously working on non-expedited-removal representation to provide consultations to callers in CBP custody. This shift in resources significantly hampered our ability to faithfully serve clients in non-expedited removal proceedings. Even with these reallocations of staff, we are not able to fully support people impacted by the Rule.

**The Rule's Changes to the Fear Interview Process**

11. The Rule has caused and will continue to cause significant disruption to our work on behalf of individuals facing expedited removal, making it nearly impossible for us to serve our client population.

12. As mentioned above, before individuals even receive a CFI, they must affirmatively manifest a fear of harm. RAICES has observed asylum seekers who were largely ignored by immigration officers, even if they were ultimately approved to proceed to a CFI. For example, in one case, a noncitizen was only determined to have manifested fear of harm after begging an asylum officer to allow her to pursue asylum. The officer initially told her that she did not manifest because she "did not use the word asylum," that the government is not interested in helping people

"coming here to take US jobs" who are sick or injured, and that she should "stop crying and speak like normal, decent people." This was despite her stating that she was "afraid," "wanted refuge," and "feared death." It was not until the officer observed her nearly begging on her knees that he allowed her to proceed to a CFI.

13. Historically, CFIs were conducted while people were in ICE custody. When CFIs were done exclusively in ICE custody, we were consistently able to schedule consultations—either in person or remotely—with noncitizens identified through our hotline or referral systems *before* their CFIs (which must be conducted by Asylum Officers from USCIS). We were also able to consistently consult with individuals in ICE custody who receive a negative CFI and prepare them for an immigration judge review of that determination. We were even sometimes able to attend these interviews and review hearings with clients. In addition, we were able, on a limited basis, to enter appearances to file requests for reconsideration with USCIS for individuals who have received negative credible fear determinations.

14. In our experience, RAICES' work providing consultations (and in some cases representation) is critically important at each step of the expedited removal process. In particular, our consultations advance our mission by helping people understand and prepare for the CFI process. People fleeing persecution have little knowledge of the U.S. immigration system and often find it difficult to speak of past traumatic experiences with agents of a foreign government, particularly when they are detained, when the interview takes place shortly after the frequently horrendous journey to this country, and when noncitizens have had minimal time to rest, recover, and prepare. Noncitizens are also unaware of what specific information is most relevant to the CFI process and are at risk of omitting critical details because they do not know where to focus their answers in the limited time allotted to them during a CFI. We know of other instances in

which people's clear verbal statements of fear have been ignored entirely and they have been removed without ever getting a CFI.

15. The Rule makes this already difficult process much more challenging. It significantly changes the content of a CFI, as well as the immigration judge's review. To receive protection in the United States, noncitizens must now establish that they fit within one of the narrow exceptions for asylum applications, and, if they do not, that they qualify for withholding or CAT protection. Whereas asylum can be obtained based on a well-founded fear of persecution, the withholding-of-removal statute requires the applicant to show that persecution is more likely than not—a higher standard. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Because of this heightened standard, we have had to spend additional time explaining the changes and preparing them to answer questions about their fear of persecution or torture in their home countries. Because many of the asylum seekers we advise have experienced violence and exploitation, these inquiries take a good deal of time, analysis, and trauma-informed services. As a result, RAICES' staff must now engage in much more complex and cumbersome consultations and screening interviews.

16. For example, in one case, a consultation with an asylum seeker detained in CBP custody lasted nearly three hours—far longer than normal. The caller had received an initial negative credible fear determination, and RAICES was attempting to prepare her for a hearing challenging that determination. She had been unable to consult with an attorney prior to the CFI because she was given access to a phone for only seven minutes prior to the interview. We were only able to speak with her after a negative CFI determination in order to prepare her to challenge that finding prior to appeal. That preparation call was extended largely because of the detailed conversation needed to prepare the noncitizen to explain how she fit within the narrow exceptions

to the Rule.  What is more, the hearing was scheduled to take place the very next morning, on a Saturday.  This required RAICES staff to work outside of traditional business hours to prepare for the hearing after hours and offer representation over the weekend.  This is just one of many examples of how the impossibly fast pace of proceedings, combined with the practical roadblocks created by the Rule and Guidance, force RAICES staff to drop everything to provide emergency representation all in one meeting.  Attorneys must continuously check the EOIR webpage at all hours to receive notice of an upcoming hearing that is often not posted until a few hours before the hearing.  This creates incredible strain on the Asylum Access Services team, and limits the number of clients to whom they are able to provide ethical representation.

17.     In addition to these new substantive complexities, as explained below, the timeline for us to do our much more complicated work is now very condensed.  RAICES staff typically only have one phone call with an asylum seeker to cover this more complex set of information.  This leads to not being able to prepare asylum seekers as thoroughly for their CFIs and immigration judge reviews and can also lead to having to spend additional time on the phone with each asylum seeker.

18.     Finally, it is important to note just how broadly this Rule is impacting RAICES and our clients.  In our experience, the Rule leads to people receiving negative credible fear findings.  In turn, that means that RAICES must prepare many more individuals for immigration judge review.  These changes have significantly impeded our efforts to serve recently arrived noncitizens as explained more fully below.

**Impact of Guidance on RAICES' Work**

19.     In addition to the Rule itself, the Guidance has altered the expedited removal process in ways that have significantly impaired our ability to access noncitizens and have frustrated our efforts to assist these people in the process.

20. Under the Guidance, DHS has shifted to giving individuals in CBP custody as little as 4 hours for consultation, instead of at least 24 hours, itself a reduction from the minimum of 48 hours required until a year ago. As described in more detail below, that has significantly impaired our ability to connect with clients before their CFIs.

21. The pre-CFI consultation is vitally important for all the reasons explained above. Under this new policy, people are guaranteed only 4 hours to consult after they are given the initial information about the CFI process (including a list of legal service providers, which lists RAICES as one of just a few options). There are numerous reasons why holding CFIs in CBP custody after a reduced 4-hour consultation period disrupts our critical work.

22. First, the limitations on communication with the outside world are much more severe in ICE facilities—where most of our client population is now detained during the CFI process—as compared to CBP facilities. This makes 4 hours a virtually impossible time frame for consultations, particularly because it includes weekends. Unlike in ICE facilities, NGOs cannot enter CBP facilities, which means we cannot post signup sheets there or receive referrals from other legal service providers.

23. Second, unlike in ICE facilities, we are unable to schedule specific times for calls with people who are in CBP custody; instead, noncitizens must call us on our hotline. Moreover, noncitizens are not permitted free access to a phone; instead, they are provided limited windows in which they may contact us, often outside of normal business hours, meaning that unfortunately people often cannot reach us or other providers. In fact, since the Rule and Guidance have come into effect, the vast majority of the calls we have received from people in CBP custody have come in before 8 AM or after 5:30 PM. We have been able to schedule follow-up calls with only a

limited number of individuals in CBP custody before they receive their CFIs, and even when we can it is a time-intensive, cumbersome, and impractical process.

24. Third, CBP facilities are not set up to hold people who have counsel or may be trying to access attorneys. We can email requests for signatures on forms like the DHS form for entering an appearance as counsel (form G-28) and make email requests for follow-up calls to the CBP office for the relevant sector of the border. However, we cannot call directly to a CBP facility and ask to speak to someone detained there, even if we have already entered an appearance on their behalf. We must instead request that CBP arrange for the noncitizen to call us back. Often, however, CBP does not respond quickly enough to these email requests for RAICES attorneys to be able to properly represent an individual. RAICES staff often must send many follow-up emails to eventually get a response. When our lawyers attempt to ensure access to follow-up calls by entering a notice of appearance, this often does not work. There do not seem to be protocols in place to allow or facilitate noncitizens' ability to return phone calls or send us signed forms in a timely manner. In addition, in our experience some people in CBP custody have not even been given access to a pen and paper, which means that even if they do reach us, they cannot take notes about their interview or how to arrange to call us back for follow up.

25. Fourth, referrals from family members also are of little help for those in CBP custody because it is functionally impossible to track a person's whereabouts when in CBP custody, so we do not know where a referred person is located. Unlike with ICE custody, there is no universal "online detainee locator" for people in CBP custody. While the online detainee locator will now indicate if someone is in CBP custody, it does not specify which CBP facility the person is detained in, and thus does not help to locate and contact someone who is in CBP custody in the way it does with noncitizens in ICE facilities. Moreover, the transfers and CFI process in

9

CBP custody happen so quickly that people do not have time to even learn whether DHS has assigned them a critically important "Alien Registration Number," memorize it, and communicate it to us or their families in the highly limited opportunities they have to make phone calls. Notably, some are not even provided with their Alien Registration Number before calling and are instead given IDs that cannot be used to trace their cases. The result is that we often have nothing to work with when attempting to locate clients, other than their names. The best we can do is ask families to try to pass our hotline number on to their family member seeking legal help from CBP custody and hope they are able to access a legal visitation call prior to their CFI or removal. This presents an enormous obstacle because we have learned that individuals are often only given one call for the entirety of their time with CBP.

26. The reduction of the pre-CFI consultation time to as little as 4 hours significantly exacerbates these problems. These restrictions mean that people simply do not have enough time to reach us before their CFI. In particular, including weekends in the consultation period ensures that many asylum seekers will have no real opportunity to reach an attorney before interview and possibly consequently, before their removal.

27. Because we are seeing many people only after they have already received a negative CFI, we are limited to helping the individual prepare for immigration judge review.

28. Our routine inability to provide CFI consultations is a significant problem. RAICES is one of just a few organizations that offers CFI consultations to people in CBP custody, and yet the timeline makes that extremely difficult and impracticable. And without access to our services, the right to a consultation prior to the CFI is illusory at best for many asylum seekers.

29. We have also had to overhaul our processes to handle an increased number of calls coming into our hotline from CBP because of the shortened time frame for CFI consultations and

the general expedited removal process in CBP custody. These calls are our only means of communicating with this group of asylum seekers preparing for a CFI interview. Previously, we would accept hotline calls from individuals in ICE custody based on our capacity and then schedule follow-up calls or visits. This system worked because we knew people could try reaching us several times over the course of a few days, and that if we were unable to answer those calls immediately, people could leave a message that we could return by setting up a call with them in ICE detention. Now, however, we have had to shift our hotline staffing and operations to handle a significant number of calls coming from individuals in CBP custody. The super-expedited nature of CFIs in CBP custody under the Guidance has required us to make this shift: because noncitizens will have as little as 4 hours to attempt to contact and consult with us before their CFI (and a similarly short window for immigration judge review), if we do not focus our resources in this way to catch as many calls as possible, we will never be able to communicate with people in this posture at all.

30. Even with these changes to our procedures, the Rule and Guidance are greatly impeding our ability to serve noncitizens in expedited removal. If we do not answer a call on the spot, at times the CBP agents decline to leave voicemails and do not provide any information about the people trying to reach us. Without any information about the client, we cannot email the relevant CBP sector office to try to set up a consultation call, and because of the shortened 4-hour time frame, we cannot track people down before their interviews happen. Even when we do receive a voicemail with client information, it is extremely difficult with the current constraints on our capacity to get a scheduled follow-up call with individuals for whom we do not have a signed G-28. Indeed, CBP often will not allow us to speak with anyone for whom we do not have a G-28—and they have largely stopped coordinating the pre-representational counseling required to

get the form signed. As noted above, we often receive voicemails with timestamps well before and after normal business hours, meaning individuals given access to phone calls at these times have no real chance of securing legal consultation or representation prior to their CFI.

31. Essentially, our staff must strive to immediately answer every call to our hotline because that is our sole means of advising asylum seekers in CBP custody both before and after CFIs. This has required us to devote a dramatically increased amount of staff time—including the time of staff from RAICES programs who do not generally conduct in-depth orientations and instead focus on longer-term representation in immigration court—to ensure that we can answer and respond to hotline calls. We have increased the number of hours our staff work in a day, and have asked people to come in on weekends. Staff who are trained to take these CBP calls take, on an ad hoc basis, as many calls as possible between scheduled meetings with clients in ICE custody, court dates, and other work duties. But we are still unable to answer each call and provide support.

32. Responding to this stream of calls, each of which is incredibly urgent because of the 4-hour consultation window, prevents us from supporting potential clients in ICE custody that RAICES staff would have otherwise had time and capacity to assist. That frustrates our ability to advance our mission in providing services to other noncitizens facing removal, such as those in regular removal proceedings in immigration court and those held in ICE custody.

33. Despite the expenditure of significant extra resources diverted from our work with clients in ICE custody, we still lack capacity to answer many calls, and many people are unable to call us before their CFIs in any event. Thus, we are frequently unable to assist clients before their CFIs, which is a critical part of our service mission for individuals subject to expedited removal. The reduced, 4-hour consultation period means that we will miss many potential clients entirely and will never know that they were in CBP custody or that they had a CFI.

34. Further, although we try (in addition to providing consultations) to represent as many people as we can at their CFIs, we have been able to do so for only one or two individuals in CBP custody out of hundreds who have contacted us. That is both because our resources are stretched so thin by the need to answer hotline calls, and also because the extremely short notice with which CFIs are scheduled makes it practically impossible to arrange to appear at a CFI. Prior to the policies at issue in this case, RAICES staff had more time to meet with and prepare clients. Because the Rule significantly limits our ability to meet with individuals in CBP custody, more noncitizens are going to their CFIs both unprepared and unrepresented. The lack of access to legal support, particularly when coupled with the new hurdles imposed by the Rule, make it much harder for individuals to receive a positive credible fear determination and/or vacate a negative credible fear determination.

35. Because of the challenged policy changes, our work has heavily shifted to helping people prepare for immigration court review *after* they have a CFI denial from an asylum officer. But that impedes our work by depriving noncitizens of a fair chance to prepare for *both* stages, if necessary. And many of the same barriers that exist in pre-CFI representation exist for clients at this stage, and in our experience our ability to intervene and achieve a positive outcome is limited once an asylum officer has already found no credible fear. Simply put, the compression at the front end of the expedited removal process to as little as 4 hours for the pre-CFI consultation period forces us to engage in much more work at the end of that process where our ability to provide meaningful assistance and consultation to noncitizens is diminished.

36. In addition, significant procedural hurdles make limiting our assistance to immigration judge review less effective than it would be if we could prepare our clients before the CFI. It is difficult for RAICES attorneys to submit an appearance for the immigration judge review because hearing dates are scheduled and completed in an extremely tight timeline. Typically, immigration judge review hearings are scheduled and completed within 24 to 48 hours of the time an individual receives notice of a negative CFI determination. The timing of this hearing is posted in an online portal, but often only 4 hours before the hearing. This makes it difficult to plan, within our limited capacity, for attorney representation with such little notice. It therefore significantly limits the number of people we are able to represent because we cannot know if an attorney will be available at an unknown date and time.

**Additional Harms Flowing from Expedited Removal Changes**

37. The Rule and Guidance have impacted RAICES' work in the expedited removal process and have impacted our ability to fulfill our mission, while impacting our resources and other aspects of our work.

38. First, the additional complexities mentioned above mean that our hotline calls now take much longer than they did before, reducing the number of hotline callers we can serve and increasing the number of potential clients with whom we can never speak at all. That is true even though we have scaled up the staff resources we commit, including some of our removal defense attorneys' time, to the hotline.

39. Second, because the impact of the reduced consultation period is felt nearly exclusively by people undergoing CFIs in CBP custody with their CFIs, we have had to focus heavily on helping with CFIs to people in CBP custody. This means we can serve significantly fewer individuals facing expedited removal in ICE custody.

40. Both the Rule and the Guidance have required staff to spend less time on other aspects of their work.

41. In addition to the substantive additional time that doing this extra work entails, we have also been forced to divert resources in order to reshape our training materials, both for our own staff and for *pro bono* attorneys and other volunteers.

42. Everything described above is taking a serious toll on RAICES' staff. The new credible fear procedures mean that our staff are in a constant fire drill. Legal assistants anxiously monitor the hotline to make sure we never miss a call, as it could be our only chance to speak with someone before they are rushed through a CFI and deported, potentially to a place where they face persecution or torture. Our hotline is also where the Asylum Office can reach us to participate in CFIs. Should we miss an unexpected call, that noncitizen may have to go forward with an interview without preparation or the opportunity to seek representation. The unpredictability of the calls has placed intense stress on our processes and infrastructure.

43. When we do receive calls—and they often come in bursts—our attorneys must immediately drop all their other work and do their best to talk a client through all of the Rule's convoluted exceptions, as well as withholding and CAT claims on the spot. Staff must also spend a great deal of time trying to track down clients who previously called and determine if, and when, those clients have further hearings scheduled. It is difficult to plan for capacity under these constraints and unknowns. Our staff are suffering from burnout due to the chaotic, frenetic pace of work that the Rule and Guidance necessitate.

## Conclusion

44. Overall, RAICES has been harmed by the Rule and Guidance because, together and independently, they severely restrict our ability to effectively serve people who are facing expedited removal and denial of protection. These policies are unrealistic and dangerous and send

the message that the United States is not welcoming of asylum seekers. All of these changes are fundamentally contrary to our organization's mission and vision, and they are devastating RAICES' ability to serve asylum seekers, particularly those facing expedited removal.

    I hereby declare under penalty of perjury that the foregoing is true and correct.

*/s/ Javier Hidalgo*

Javier Hidalgo
Executed on the 26th day of July, 2024, in San Antonio, TX