**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, et al.,

                                    *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

                                    *Defendants*.

Case No. 24-cv-01702

HON. RUDOLPH CONTRERAS

**BRIEF OF THE OFFICE OF THE UNITED NATIONS HIGH COMISSIONER FOR
REFUGEES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Amy Mason Saharia
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5847
(202) 434-5029 (fax)
asaharia@wc.com

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS CURIAE ........................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT .........................................................................................................3

I.  The United States Is Bound by the 1951 Convention and the 1967 Protocol....................3

II.  UNHCR Provides Authoritative Guidance on the 1951 Convention and the
1967 Protocol, as Recognized by the Supreme Court and This Court................................5

III.  The Rule Is Fundamentally at Variance with the International Framework
Established in the 1951 Convention and the 1967 Protocol ...................................6

    A.  The Limitations on Asylum Eligibility Operate as a New Bar to
Asylum and Conflict with the Right To Seek Asylum and Protection
Against Refoulement ...................................................................6

        1.  The Rule is inconsistent with the United States' non-
refoulement obligations and thus violates Article 33(1) of the
1951 Convention........................................................................7

        2.  The Rule restricts the right to seek asylum through an
individualized, fair, and efficient process ...................................10

        3.  The Rule's exemptions and exceptions do not remedy
violations of international law ...................................................13

    B.  The Rule's Manifestation-of-Fear Requirement Will Likely Lead To
Refoulement in Violation of International Law....................................16

    C.  The New Screening Standards Risk Refoulement ................................19

CONCLUSION....................................................................................................24

## TABLE OF AUTHORITIES

Page

### CASES

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th Cir. 2017)........................................5

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ..............................5

*Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 (Eur. Ct. H.R. Feb. 23, 2012) ...................17

*Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 594 F. Supp. 502 (D.D.C. 1984) ......................1, 5

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...................................................... *passim*

*M.S.S. v. Belgium and Greece*, App. No. 30696/09 (Eur. Ct. H.R. Jan. 21, 2011).......................18

*R. v. Appulonappa*, 358 D.L.R. 4th 666 (B.C. Sup. Ct.) (2013) ....................................13

*R v. Uxbridge Mags. Ct.* [1999] EWHC (Admin) 765, [1] (Brown LJ) (Eng.) ............................13

*Yusupov v. Att'y Gen. of U.S.*, 518 F.3d 185 (3d Cir. 2008)........................................5

### STATUTES AND REGULATIONS

8 U.S.C. § 1101........................................................................................15

8 U.S.C. § 1225................................................................................18, 19, 20

8 C.F.R. § 208.16....................................................................................16

8 C.F.R. § 235.3 (2023) .............................................................................18

88 Fed. Reg. 31314 (May 16, 2023) ...................................................................20

89 Fed. Reg. 48487 (June 7, 2024) ...................................................................6

89 Fed. Reg. 48710 (June 7, 2024) ............................................................. *passim*

### OTHER AUTHORITIES

142 Cong. Rec. H11054 (daily ed. Sept. 25, 1996) ...................................................22

142 Cong. Rec. H11071 (daily ed. Sept. 25, 1996) ...................................................19

Andreas Zimmerman & Claudia Mahler, *Article 1A, Para. 2, in* The 1951
    Convention Relating to the Status of Refugees & Its 1967 Protocol: A
    Commentary (Andreas Zimmerman et al. eds., 2011)..............................................4

Page

Other authorities—continued:

Convention on the Privileges & Immunities of the United Nations, Feb. 13, 1946,
  1 U.N.T.S. 15 ..................................................................................................................1

Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259,
  189 U.N.T.S. 150 ..................................................................................................... *passim*

Exec. Comm. of the High Comm'r's Programme, *Note on International
  Protection*, U.N. Doc. A/AC.96/815 (Aug. 31, 1993) .............................................8

G.A. Res. 49/169 (Dec. 23, 1994)...................................................................................4

G.A. Res. 428(V), annex, UNHCR Statute (Dec. 14, 1950) ....................................1, 5

Immigration and Customs Enforcement, *Implementation Guidance for
  Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing
  the Border, and Interim Final Rule, Securing the Border*, June 4, 2024.........................18, 23

James C. Hathaway, *The Rights of Refugees Under International Law*
  (2d ed. 2021) ..................................................................................................................11

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223,
  606 U.N.T.S. 267 ...................................................................................................... *passim*

Sir Elihu Lauterpacht & Daniel Bethlehem, *The Scope and Content of the
  Principle of Non-Refoulement: Opinion*, *in* Refugee Protection in International
  Law: UNHCR's Global Consultations on International Protection
  (Erica Feller et al. eds., 2003) ...............................................................................8, 9

Submission of UNHCR as Intervener, *R v. Sec'y of State for Foreign &
  Commonwealth Affs.* [2006] EWCA (Civ) 1279 (appeal taken from Eng.),
  *reprinted in* 20 Int'l J. Refugee L. 675, 697 (2008).................................................5

UN Ad Hoc Committee on Refugees and Stateless Persons, *Ad Hoc Committee on
  Statelessness and Related Problems, Status of Refugees and Stateless Persons
  - Memorandum by the Secretary-General*, U.N. Doc. E/AC.32/2 (Jan. 3, 1950)...................13

UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-
  Refoulement Obligations Under the 1951 Convention Relating to the Status of
  Refugees and its 1967 Protocol* (Jan. 26, 2007),
  https://www.refworld.org/policy/legalguidance/unhcr/2007/en/40854 ...................................17

Page

Other authorities—continued:

UNHCR, *Background Note on the Application of the Exclusion Clauses: Article 1F of the Convention Relating to the Status of Refugees* (Sept. 4, 2003), https://www.refworld.org/policy/legalguidance/unhcr/2003/en/33331 ............................................................................................................................10

UNHCR, *Conclusions Adopted by the Executive Committee on the International Protection of Refugees* (XXVIII) (1977) ..............................................................8

UNHCR Exec. Comm. 34th session, *The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum*, U.N.G.A. Doc. No. 12A (A/38/12/Add.1) (1983) ...........................................................................................20

UNHCR, Exec. Comm. Conclusion No. 6 (XXVIII) (1977)........................................17

UNHCR, Exec. Comm. Conclusion No. 8 (XXVIII) (1977)........................................11

UNHCR, *Fair and Fast: UNHCR Discussion Paper on Accelerated and Simplified Procedures in the European Union* (July 18, 2018), https://www.refworld.org/policy/ opguidance/unhcr/2018/en/12163 ....................................21

UNHCR, *Follow-up on Earlier Conclusions of the Sub-Committee on the Determination of Refugee Status with Regard to the Problem of Manifestly Unfounded or Abusive Applications*, U.N. Doc. EC/SCP/29 (Aug. 26, 1983).......................21

UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, U.N. Doc. EC/GC/01/12 (May 31, 2001)...................................................................................................7, 10, 11, 22

UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees* (Sept. 4, 2003), https://www.refworld.org/docid/3f5857684.html ..........................................................................................................10, 21

UNHCR, Handbook on Procedures & Criteria for Determining Refugee Status & Guidelines on International Protection, U.N. Doc. HCR/1P/4/ENG/REV.4 (4th ed. 2019) ................................................................................................... *passim*

UNHCR, *Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response* (Mar. 16, 2020), https://www.refworld.org/policy/legalguidance/unhcr/2020/en/12289 .......................................................................................18

Page

Other authorities—continued:

UNHCR, *Note on the "Externalization" of International Protection*
(May 28, 2021), https://www.refworld.org/policy/legalguidance/unhcr/z
2021/en/121534.................................................................................................................21

UNHCR, *Statement on Article 1F of the 1951 Convention* (July 2009),
https://www.unhcr.org/4a5edac09.pdf ..................................................................10

UNHCR, *UNHCR Note on the Principle of Non-Refoulement* (Nov. 1997),
https://www.refworld.org/policy/legalguidance/unhcr/1997/en/36258 ...................................7

UNHCR, *UNHCR's Intervention Before The Constitutional Court of
Ecuador in The Framework of Public Unconstitutionality Action No.
0014-19 (Ministerial Agreements And Requirements for Access to The
Territory of Venezuelans in Ecuador)* (June 6, 2019),
https://www.refworld.org/jurisprudence/amicus/unhcr/2019/en/123094 .............................17

## INTEREST OF AMICUS CURIAE[1]

The Office of the United Nations High Commissioner for Refugees ("UNHCR") is the organization entrusted by the United Nations General Assembly with responsibility for providing international protection to refugees.  *See* G.A. Res. 428(V), annex, UNHCR Statute ¶ 1 (Dec. 14, 1950).  UNHCR has a direct interest in this matter, which requires the Court to consider the lawfulness of a substantial restriction of asylum access under U.S. law.  Consistent with UNHCR's role and interest, the U.S. Supreme Court and this Court have recognized that UNHCR provides "significant guidance" in interpreting international refugee law and its incorporation into the domestic law of the United States.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987); *Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 594 F. Supp. 502, 512 (D.D.C. 1984), *aff'd by an equally divided court*, 846 F.2d 1499 (D.C. Cir. 1988).

UNHCR has a mandate to "[p]romot[e] the conclusion and ratification of international conventions for the protection of refugees" and to "supervis[e] their application and propos[e] amendments thereto."  UNHCR Statute ¶ 8(a).  UNHCR's supervisory role is also expressly provided for in two refugee conventions that apply to the United States: the 1951 Convention Relating to the Status of Refugees ("1951 Convention"), art. 35, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150, and the 1967 Protocol Relating to the Status of Refugees ("1967 Protocol"), art. II, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267.

UNHCR exercises its supervisory responsibility, among other ways, by issuing interpretations of the 1951 Convention, the 1967 Protocol, and other international refugee

---

[1] No person other than UNHCR and its counsel authored this brief in whole or in part or contributed money intended to fund its preparation or submission.  This brief does not constitute a waiver, express or implied, of any privilege or immunity that UNHCR and its staff enjoy under applicable international legal instruments and recognized principles of international law.  *See* Convention on the Privileges & Immunities of the United Nations, Feb. 13, 1946, 1 U.N.T.S. 15.

instruments.  It also regularly presents its guidance to national courts, including U.S. federal courts. This authoritative guidance is informed by UNHCR's more than seven decades of experience assisting refugees and supervising the treaty-based system of refugee protection.

UNHCR submits this brief out of concern that the Interim Final Rule ("Rule") at issue in this case, Securing the Border, 89 Fed. Reg. 48710 (June 7, 2024), severely restricts access to asylum in contravention of the 1951 Convention and 1967 Protocol.  UNHCR has a strong interest in ensuring that U.S. asylum policy remains consistent with the obligations that the United States undertook in the 1967 Protocol.  Consistent with its approach in other cases, UNHCR takes no position directly on the merits of the underlying asylum claims of any Individual Plaintiff or individuals whom Organizational Plaintiffs serve.

## SUMMARY OF ARGUMENT

The United States is bound by international treaty obligations related to refugees, including those enshrined in the 1967 Protocol, to which the United States is formally a party, and the 1951 Convention, which is incorporated by reference in the 1967 Protocol.  These treaties set out fundamental procedural and substantive refugee rights that parties must uphold, which the United States incorporated into domestic statutory law in the Refugee Act of 1980.  As the Supreme Court and this Court have recognized, UNHCR provides authoritative guidance on the interpretation of these instruments.

UNHCR is concerned that the newly implemented Interim Final Rule is at variance with fundamental principles and standards of international refugee and human rights law that are binding on the United States, including the right to seek and enjoy asylum and obligations of non-refoulement.  Specifically, the Rule contains a categorical bar on asylum eligibility in violation of these two well-established fundamental principles of international refugee law.  While the Rule exempts certain asylum-seekers, including unaccompanied children, and excepts those

2

experiencing certain circumstances—including acute medical emergencies, imminent and extreme threats to life or safety, and severe forms of trafficking—from the asylum bar, these exemptions and exceptions do not remedy the Rule's international law violations.

Two additional aspects of the Rule further threaten to move the United States out of step with its international obligations.  First, departing from the long-established regulatory affirmative obligation of U.S. immigration officials to elicit information from noncitizens to determine whether they have a fear of returning to their country of origin, the Rule shifts the burden to individuals seeking protection to affirmatively "manifest" a fear of return to obtain access to procedures for assessing eligibility for asylum and other forms of protection.  Second, the Rule raises the standards that govern the screening process—which is available only if an individual manifests a fear of return.  These aspects of the Rule, individually and cumulatively, may lead to the refoulement of large numbers of refugees improperly barred from accessing U.S. asylum procedures and protection.

Consistent with UNHCR's responsibility to supervise the implementation of international refugee treaties and advise state parties of their duties thereunder, UNHCR respectfully encourages the Court to consider the United States' international law obligations when evaluating the legality of the Rule and corresponding Implementation Guidance.

## ARGUMENT

### I.   The United States Is Bound by the 1951 Convention and the 1967 Protocol

The United States is bound by the 1951 Convention and the 1967 Protocol, and UNHCR provides authoritative guidance on the interpretation of these instruments.

The 1951 Convention and 1967 Protocol are the key instruments outlining the basic rights of refugees and asylum-seekers throughout the world.  In 1950, delegates from the United States and other United Nations Member States convened to draft an international agreement that would

ensure that "individuals . . . are not turned back to countries where they would be exposed to the risk of persecution." Andreas Zimmerman & Claudia Mahler, *Article 1A, Para. 2*, *in* The 1951 Convention Relating to the Status of Refugees & Its 1967 Protocol: A Commentary 281, 337 (Andreas Zimmerman et al. eds., 2011). The result was the 1951 Convention, which delineates the basic rights of refugees and asylum-seekers that state parties must uphold. For more than seven decades, the Convention has served as the "cornerstone of the international system" for refugee protection. G.A. Res. 49/169 (Dec. 23, 1994).

The 1951 Convention primarily addressed the needs of those who fled persecution—for reasons of race, religion, nationality, membership in a particular social group, or political opinion—in the wake of World War II. *See* 1951 Convention art. 1(A). Sixteen years later, following decisive action by states and the United Nations General Assembly, a second refugee treaty—the 1967 Protocol—was adopted. The 1967 Protocol lifted the temporal and geographical limitations of the 1951 Convention to include *any* individual unable to return to their country of origin based on a protected ground. *See* 1967 Protocol art. I(2)–(3); UNHCR, Handbook on Procedures & Criteria for Determining Refugee Status & Guidelines on International Protection, U.N. Doc. HCR/1P/4/ENG/REV.4 ¶¶ 28, 34, 35 (4th ed. 2019).

Nearly 150 state parties, including the United States, have acceded to the 1967 Protocol. As Article I(1) of the 1967 Protocol binds parties to Articles 2 through 34 of the 1951 Convention, by ratifying the Protocol, the United States agreed to comply with all of the "substantive provisions" of the 1951 Convention. *Cardoza-Fonseca*, 480 U.S. at 429. To implement the United States' commitments, Congress passed the Refugee Act, which amended the Immigration and Nationality Act ("INA") to bring "United States refugee law into conformance" with both treaties. *Id.* at 436. "The legislative history of the Refugee Act . . . makes clear that Congress intended to

4

protect refugees to the fullest extent of [the United States'] international obligations," rendering the scope and meaning of those obligations relevant to any interpretation of the INA's asylum provisions. *Yusupov v. Att'y Gen. of U.S.*, 518 F.3d 185, 203 (3d Cir. 2008) (footnote omitted); *accord, e.g.*, *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060–61 (9th Cir. 2017) (en banc).

## II.     UNHCR Provides Authoritative Guidance on the 1951 Convention and the 1967 Protocol, as Recognized by the Supreme Court and This Court

UNHCR has a mandate to supervise the application of international conventions for the protection of refugees, including the 1951 Convention and the 1967 Protocol. UNHCR Statute ¶ 8(a). In language proposed by the United States, both treaties specifically acknowledge UNHCR's supervisory role. *See* 1951 Convention pmbl., art. 35; 1967 Protocol art. II. UNHCR exercises its supervisory responsibility in part by issuing interpretive guidance concerning the 1951 Convention and its 1967 Protocol. Chief among these interpretations is UNHCR's Handbook, which UNHCR first issued in 1979.

Consistent with the role and mandate described above, the U.S. Supreme Court and others have recognized that UNHCR provides "significant guidance" in construing the 1951 Convention and the 1967 Protocol, as well as the Refugee Act that implemented them into domestic law. *See, e.g.*, *Cardoza-Fonseca*, 480 U.S. at 439 n.22; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 672 n.13 (9th Cir. 2021). Significantly, this Court also has called UNHCR's Handbook "the basic guide in this area." *Hotel & Rest. Emps. Union, Loc. 25*, 594 F. Supp. at 512. U.S. courts appropriately give weight to UNHCR's guidance because its supervisory role was dictated by language initially proposed by the United States. 1951 Convention pmbl., art. 35; 1967 Protocol art. II; *see* Submission of UNHCR as Intervener ¶ 89, *R v. Sec'y of State for Foreign & Commonwealth Affs.* [2006] EWCA (Civ) 1279 (appeal taken from Eng.), *reprinted in* 20 Int'l J. Refugee L. 675, 697 (2008).

III.    **The Rule Is Fundamentally at Variance with the International Framework Established in the 1951 Convention and the 1967 Protocol**

At the heart of the 1951 Convention and 1967 Protocol are the right to seek and enjoy asylum and the right to protection against refoulement.  *See* Handbook ¶¶ 189–90.  On June 3, 2024, President Biden issued a proclamation, entitled "Securing the Border," that temporarily suspended and limited the entry of noncitizens at the southern border beginning on June 5, 2024.  *See* Securing the Border, Proclamation No. 107773, 89 Fed. Reg. 48487, 48491–92 (June 7, 2024).  The Departments of Homeland Security and Justice contemporaneously issued the Interim Final Rule.  89 Fed. Reg. 48710.

The Rule violates basic principles of international law as set forth in the 1951 Convention and the 1967 Protocol.  In particular, the Rule establishes a new bar to asylum that departs from the exhaustive exclusion framework established in the 1951 Convention.  By requiring those seeking protection to affirmatively manifest a fear of return to access asylum procedures and raising the standards that individuals must meet to pass screening and have their claims fully considered in merits proceedings, the Rule further threatens to violate the United States' obligation to refrain from refouling refugees.  While UNHCR acknowledges that large numbers of people arriving at the southwest border in mixed movements (when refugees and migrants move together) present a significant challenge, UNHCR is concerned that the Rule may lead to the refoulement of asylum-seekers who will be erroneously barred from accessing protections guaranteed to them under the 1951 Convention and 1967 Protocol, which are binding on the United States.

A.    **The Limitations on Asylum Eligibility Operate as a New Bar to Asylum and Conflict with the Right To Seek Asylum and Protection Against Refoulement**

The Rule continues a trend of significantly eroding the protection the United States has historically offered asylum-seekers by categorically barring certain individuals from exercising their right to seek asylum.  Specifically, the Rule makes ineligible for asylum certain individuals

who enter the United States irregularly or arrive at a port of entry without an appointment to enter the country during "emergency border circumstances."  Interim Final Rule at 48732.  "Emergency border circumstances" are defined as the period from June 5, 2024, when the Rule was instituted, to either the date the President revokes the Proclamation or fourteen calendar days after the Secretary of Homeland Security determines there has been a seven-day average of fewer than 1,500 encounters along the southern border, whichever comes first.  *Id.* at 48715.  Asylum-seekers may overcome this bar only under very narrowly defined exceptions—if they can demonstrate by a preponderance of the evidence that "exceptionally compelling circumstances" exist at the time of their entry.  *Id.* at 48771.  The Rule covers all individuals who enter during "emergency border circumstances," even if they apply for asylum later when "emergency border circumstances" are no longer in effect.  This restriction is incompatible with international refugee law, as it fails to meet the United States' non-refoulement obligations.  Furthermore, access to a fair and efficient refugee determination procedure is an essential safeguard to protect asylum-seekers from refoulement.  *See* UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)* ¶ 8, U.N. Doc. EC/GC/01/12 (May 31, 2001).  State parties to the Convention are required to provide access to such a procedure.  Although the Rule exempts certain individuals from the Rule's applicability and permits individuals to prove limited categories of exceptional circumstances to overcome the bar, these considerations do not remedy these violations.

### 1. *The Rule is inconsistent with the United States' non-refoulement obligations and thus violates Article 33(1) of the 1951 Convention*

At the center of the 1951 Convention and its 1967 Protocol is the premise that no asylum-seeker may be returned ("refouled") to a country where his or her life or freedom would be threatened.  UNHCR, *UNHCR Note on the Principle of Non-Refoulement* (Nov. 1997),

https://www.refworld.org/policy/legalguidance/unhcr/1997/en/36258          (describing    non-refoulement as "the cornerstone of asylum and of international refugee law").  Article 33(1) of the 1951 Convention explicitly forbids refoulement.  Exec. Comm. of the High Comm'r's Programme, *Note on International Protection* ¶ 10, U.N. Doc. A/AC.96/815 (Aug. 31, 1993); UNHCR, *Conclusions Adopted by the Executive Committee on the International Protection of Refugees*, § 6 (XXVIII) (1977).  And the 1951 Convention does not allow any derogation from Article 33.  1951 Convention art. 42(1); 1967 Protocol art. VII(1).  As a party to the 1967 Protocol, the United States is required to adhere to this fundamental, non-derogable principle.

The 1951 Convention defines as a "refugee" any person who "is outside the country of [their] nationality and is unable or . . . unwilling" to return to such country "owing to" a "well-founded fear of being persecuted" based upon race, religion, nationality, membership in a particular social group, or political opinion.   1951 Convention art. 1(A)(2).   The 1951 Convention's non-refoulement provision prohibits States from allowing the "exp[ulsion] or return ('refouler') [of] a refugee *in any manner whatsoever* to the frontiers of territories where [their] life or freedom would be threatened."  *Id.* art. 33(1) (emphasis added).

Non-refoulement is an absolute right under international law.  The non-refoulement obligation forbids both direct refoulement of refugees and asylum-seekers (to their countries of origin) as well as *indirect* or *chain* refoulement (removal to a third country).  In other words, the United States may not remove "a refugee or asylum seeker to a third State in circumstances in which there is a risk that [they] might be sent from there to a territory where [they] would be at risk."  Sir Elihu Lauterpacht & Daniel Bethlehem, *The Scope and Content of the Principle of Non-Refoulement:  Opinion*, *in* Refugee Protection in International Law: UNHCR's Global Consultations on International Protection (Erica Feller et al. eds., 2003).   For instance,

international law forbids the United States from returning to Mexico non-Mexican refugees who pass through Mexico to claim asylum at the U.S. border where "there is a risk that" Mexico will return them to their country of origin.  *See id.*

The Rule fails to fulfill this basic principle of international law by instituting a categorical bar to asylum eligibility with very narrow exceptions that few asylum-seekers will be able to meet. While the 1951 Convention allows exceptions to the non-return of refugees, those exceptions are limited and particularized.  Article 33(2) permits the return of a "refugee" if "there are reasonable grounds for regarding [them] as a danger to the security of the country in which [they are], or" if they, "having been convicted by a final judgment of a particularly serious crime, constitute[] a danger to the community of that country."  1951 Convention art. 33(2).  The Rule's new bar does not comport with the Convention's exhaustive list of permissible exceptions.  By categorically barring asylum, the Rule goes beyond the very narrow exceptions provided for in the 1951 Convention.

Moreover, the 1951 Convention and 1967 Protocol already provide exhaustive grounds for the denial of international refugee protection to persons who would otherwise meet the criteria of the refugee definition, but who are considered undeserving of that status because there are serious reasons to believe that they have engaged in crimes against peace, war crimes, crimes against humanity, serious non-political crimes, or acts contrary to the purposes and principles of the United Nations.  *Id.* arts. 1F(a)–(c).  The exclusion provisions cannot act as a preliminary bar to assessing the merits of an asylum claim, nor can persons be excluded from refugee status for any acts that are not captured in Article 1F.  The exceptional nature and inherent complexity of exclusion require that the applicability of Article 1F be examined within a regular refugee status determination procedure offering proper procedural safeguards, rather than in admissibility

procedures.  UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees* ¶ 31 (Sept. 4, 2003), https://www.refworld.org/docid/3f5857684.html; UNHCR, *Background Note on the Application of the Exclusion Clauses: Article 1F of the Convention Relating to the Status of Refugees* (Sept. 4, 2003), https://www.refworld.org/policy/legalguidance/unhcr/2003/en/33331.  Unlike the Rule, these exclusions are applied with the "utmost caution," interpreted in a "restrictive manner," and cannot be modified without the explicit agreement of all parties to the Convention. *See* UNHCR, *Statement on Article 1F of the 1951 Convention*, § 2.1 (July 2009), https://www.unhcr.org/4a5edac09.pdf.

International law requires an individualized assessment to evaluate whether individuals may be entitled to refugee status before initiating removal proceedings against them, and prohibits excluding or barring asylum-seekers from protection for any other reason.  UNHCR, *Fair and Efficient Asylum Procedures* ¶¶ 39, 50(d).  By impermissibly adding new exclusions, the Rule circumvents international law and risks returning asylum-seekers to countries where they will face harm.

### 2.     *The Rule restricts the right to seek asylum through an individualized, fair, and efficient process*

The 1951 Convention and the 1967 Protocol define who is a refugee without reference to whether an individual has been officially recognized as such.  Handbook ¶ 28.  A person is a refugee and entitled to protection as soon as they fulfill the criteria contained in the definition.  In other words, a grant of asylum or refugee status does not make a person a refugee, but rather formally recognizes that the person is a refugee. *Id.*  The 1951 Convention and the 1967 Protocol's extension of protection to refugees who have not received formal recognition of their status necessarily requires a process for identifying refugees among asylum-seekers. *Id.* ¶ 189.  States

have established a variety of procedures to identify refugees and to avoid unwittingly refouling refugees. *Id.* ¶¶ 189, 191.  Such procedures must comply with basic due process and, in the absence of group recognition, must include an individualized examination of whether each asylum-seeker meets the definition of a refugee.  *See id.* ¶¶ 44, 192; UNHCR Exec. Comm. Conclusion No. 8 (XXVIII) ¶ (e) (1977).  Indeed, the 1951 Convention's non-refoulement obligations require states to individually assess potential asylum-seekers.

International law permits only one limited exception to states' requirement to individually adjudicate refugee status: States may institute an admissibility stage (where the case will not be examined on its merits) to their asylum procedures only to determine whether the asylum-seeker has access to effective protection in another country.   UNHCR, *Fair and Efficient Asylum Procedures* ¶¶ 11–13.  Even this narrow exception to full individualized assessment requires minimum procedural safeguards.  A state must assess whether the other country will ensure respect for international protection principles in relation to the asylum-seeker, particularly that of non-refoulement, and must examine the asylum-seeker's own circumstances and provide an effective opportunity to rebut a general presumption of safety. *Id.* ¶¶ 13–14.

No provision of either the 1951 Convention or the 1967 Protocol otherwise permits states to return refugees without first performing a full individualized assessment.   The 1951 Convention's legislative history supports this principle, as drafters "considered, but did not adopt, an all-embracing power of derogation in time of national crisis," with the U.S. delegate insisting that "any exception to the duties owed refugees be limited to 'very special cases.'"  James C. Hathaway, *The Rights of Refugees Under International Law* 292–93 (2d ed. 2021) (quoting UNHCR, *Statement of Louis Henkin*, at 21, UN Doc.E/AC.32/SR. 34–35 (Aug. 14–15, 1950)).

The Rule breaches this international law requirement by shutting the door on asylum-seekers who cross the United States' southern border irregularly during so-called "emergency border circumstances."  The Rule denies these asylum-seekers an individualized assessment of their asylum claims regardless of the strength of the claims and instead collectively deems them ineligible for international protection with only very narrowly defined exceptions.  The United States cannot use border management as a justification for deterring refugees from seeking asylum or for denying protection to entire groups of asylum-seekers.  Many affected asylum-seekers will have valid claims to protection under the 1951 Convention and 1967 Protocol.  Asylum is non-discretionary under the comprehensive framework of the 1951 Convention and the 1967 Protocol. In stark contrast, the Rule treats asylum as discretionary by permitting the exclusion of asylum-seekers who would qualify for protection under that framework.  Even prior to the Rule, the U.S. practice of discretionary denial of asylum was at odds with international law, which does not recognize discretion as a factor in determining whether to provide protection to persons who are refugees.  (The U.S. Supreme Court's contrary reading of the 1951 Convention in *Cardoza-Fonseca*, 480 U.S. at 440–41, misunderstands the Convention.)  Rather, someone who meets the criteria stipulated in Article 1 of the Convention and Article I of the Protocol "shall" be considered a refugee.  *See* 1951 Convention art. 1A(2); 1967 Protocol art. I(2).  Failure to uphold these standards risks denying international protection to asylum-seekers otherwise entitled to this protection and risks refoulement.

Further, by denying an individualized assessment to those who enter the United States irregularly, the Rule conflicts with the principle of non-penalization.  Article 31 of the 1951 Convention mandates that states "shall not impose penalties" on refugees based on "their illegal entry or presence [ . . . ] provided they present themselves without delay to the authorities and

show good cause for their illegal entry or presence." 1951 Convention art. 31(1). Neither the 1951 Convention nor the 1967 Protocol allows parties to condition access to asylum procedures on regular entry. Because refugees are fleeing persecution and lack the protection of their country of origin, they are "rarely in a position to comply with the requirements for legal entry." UN Ad Hoc Committee on Refugees and Stateless Persons, *Ad Hoc Committee on Statelessness and Related Problems, Status of Refugees and Stateless Persons - Memorandum by the Secretary-General*, art. 24 cmt. ¶ 2, U.N. Doc. E/AC.32/2 (Jan. 3, 1950); *accord R. v. Appulonappa* (2013), 358 D.L.R. 4th 666, paras. 59–60 (B.C. Sup. Ct.), *aff'd*, [2015] 3 S.C.R. 754 (Can.); *R v. Uxbridge Mags. Ct.* [1999] EWHC (Admin) 765, [1] (Brown LJ) (Eng.).

The Rule's sweeping denial of any individualized process to an entire group of asylum-seekers goes well beyond the few limited and individualized exclusions to refugee protection set forth in the 1951 Convention. 1951 Convention arts. 1(F), 33(2).

### 3. The Rule's exemptions and exceptions do not remedy violations of international law

While the Rule provides for certain exemptions and permits certain individuals to overcome the asylum bar limitations on asylum eligibility, the Rule nonetheless violates international law.

First, none of the exemptions articulated in the Rule are sufficient to remedy the threat of refoulement. Individuals exempt from the Rule include unaccompanied children, victims of severe human trafficking, and noncitizens permitted entry by the Secretary of Homeland Security. Interim Final Rule at 48715. Combined with previously instituted rules, these exemptions permit those who have been granted advance permission to seek asylum at a port of entry the opportunity to do so.

UNHCR acknowledges the United States' efforts to facilitate pre-authorized entry through a mobile application known as CBP One. However, conditioning access to asylum on adherence to specific pathways violates international law by putting individuals at risk of refoulement and impeding the right to seek asylum. For example, in the case of pre-authorized appointments, which U.S. Customs and Border Patrol manages through CBP One, UNHCR recognizes that such a tool may allow for certain efficiency gains in receiving and processing persons arriving at the border. However, UNHCR is concerned that CBP One is being used in a way that harms and penalizes people with possible international protection needs. International law requires that states grant asylum-seekers access to territory and individually examine an asylum-seeker's claim for international protection. Handbook ¶ 192. Barring asylum-seekers from access to territory violates this principle and risks refouling refugees, regardless of whether the state provides pathways to pre-authorized entry to *some* asylum-seekers.

Second, the Rule permits refugees to establish an exception from the asylum bar upon a showing, by a preponderance of the evidence, of "exceptionally compelling circumstances." Interim Final Rule at 48718. Such circumstances include acute medical emergencies, imminent and extreme threats to life or safety, and severe human trafficking. However, assessment of these circumstances—individually *and* together—do not remedy the Rule's violations of international law.

The Rule provides that asylum-seekers are excepted from the bar if they or an accompanying family member "faced an acute medical emergency." *Id.* This exception is framed too restrictively to provide effective access to territory.

In addition, the Rule states that asylum-seekers are excepted from the bar if they can establish that they "faced an imminent and extreme threat to life or safety, such as an imminent

threat of rape, kidnapping, torture, or murder." *Id.*  However, limiting asylum eligibility to only those experiencing particularly repugnant and imminent threats *at the time of their entry* is inconsistent with an individual's right to access asylum procedures under international law.  A "refugee," as contemplated by the 1951 Convention, encapsulates not only those facing current and extreme threats to life or safety—instead, it includes those with a well-founded fear of *future* persecution.  *See* 1951 Convention art. 1(A)(2).  In fact, historically in the United States, an individual need not show *past* persecution to obtain asylum since a well-founded fear of *future* persecution is sufficient.  8 U.S.C. § 1101(a)(42).  The Rule attempts to limit asylum to only those who can show a credible fear of imminent persecution, but this subjective assessment of the temporality and qualitative degree of the needs and threats faced by asylum-seekers at their time of entry is incongruous with the right to seek asylum and risks refouling individuals who would otherwise qualify for asylum.

Also, the Rule provides that asylum-seekers may still be eligible for asylum if they are a "victim of a severe form of trafficking in persons."  Interim Final Rule at 48718.  Like the other exceptions, this exception is overly narrow and risks refouling asylum-seekers who might otherwise qualify for asylum.  As outlined, the 1951 Convention defines "refugees" to encompass individuals with a "well-founded fear" of persecution, not just those who fear severe human trafficking—let alone only those who actually experienced severe human trafficking.  *See* 1951 Convention art. 1(A)(2).

Overall, the exceptions fail to ensure asylum-seekers' access to territory and are too restrictive to remedy any violation of international law, requiring asylum-seekers to make extraordinary showings when they are at their most vulnerable.  Further, both the exemptions and

exceptions run contrary to the 1951 Convention and 1967 Protocol.  For these reasons, the new asylum bar conflicts with the United States' obligations.

UNHCR further notes that, contrary to the government's claim in the explanatory text of the Rule, *see* Interim Final Rule at 48717, the availability of withholding of removal and relief under the Convention Against Torture ("CAT") to noncitizens otherwise subject to the bar does not satisfy the United States' non-refoulement obligations as set out in the 1951 Convention and 1967 Protocol.  *See supra* p. 12.  Withholding of removal and CAT relief are not adequate substitutes for asylum since they offer a lesser degree of protection.  The Convention and Protocol guarantee refugees a panoply of rights, including a pathway to citizenship, that are unavailable to individuals who receive only withholding of removal or relief under CAT.  *See* 1951 Convention arts. 17–19 (right to engage in employment on the same basis as nationals of that country), 20–24 (right to public goods and welfare on the same basis as nationals), 34 (expedited naturalization proceedings).  Moreover, withholding of removal and protection under CAT are not available to all refugees eligible for asylum, as those forms of relief require heightened standards.  *Cardoza-Fonseca*, 480 U.S. at 423–24 (holding that asylum-seekers need not show they are "more likely than not" to be subject to persecution if returned, as is required for withholding of removal (citation omitted)); 8 C.F.R. § 208.16(c)(2) (laying out a similar "more likely than not" standard for relief under CAT).

**B.    The Rule's Manifestation-of-Fear Requirement Will Likely Lead To Refoulement in Violation of International Law**

The Rule also violates the United States' non-refoulement obligation by requiring refugees to outwardly manifest a fear of return to their country of origin to obtain a credible fear interview, the first step in accessing procedures for assessing eligibility for asylum and other forms of protection.  Under the Rule, an individual who does not affirmatively manifest a fear may be

promptly removed without any opportunity to present information about his or her claims for international protection to an asylum officer.  Interim Final Rule at 48771.  The Rule's blanket policy of removing noncitizens without an assessment of their claims to asylum is the opposite of the individualized assessment that the 1951 Convention requires.  *Cf.* Handbook ¶ 189.

The prohibition of non-refoulement applies wherever a state exercises jurisdiction. UNHCR, *UNHCR's Intervention Before The Constitutional Court of Ecuador in The Framework of Public Unconstitutionality Action No. 0014-19 (Ministerial Agreements And Requirements for Access to The Territory of Venezuelans in Ecuador)* ¶ 4.3, (June 6, 2019), https://www.refworld.org/jurisprudence/amicus/unhcr/2019/en/123094; *see also* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*, (Jan. 26, 2007), https://www.refworld.org/policy/legalguidance/unhcr/2007/en/40854.  Consequently, states have a duty to establish, prior to implementing any removal measure—including at the border—that persons under their jurisdiction are not at risk of harms covered by the prohibition on refoulement. *See* UNHCR Exec. Comm. Conclusion No. 6 (XXVIII) ¶ (c) (1977) (reaffirming the fundamental importance of the observance of the principle of non-refoulement at the border).  If such a risk exists, the state is precluded from forcibly removing the persons concerned, and shall not deny their entry or admission, but shall ensure protection from refoulement.  *Id.*  The Executive Committee of the High Commissioner's Programme has confirmed that the obligation includes a duty not to reject an asylum-seeker at the frontier.  Moreover, there is no single correct formula or phrase for how the fear of persecution needs to be expressed.  *See Hirsi Jamaa and Others v. Italy*, App. No. 27765/09 ¶ 133 (Eur. Ct. H.R. Feb. 23, 2012).  States have a duty to inquire into the reasons an individual seeks to enter the territory and to keep the situation in the possible state of

17

return under deliberative review, in order to conform to that obligation.  *See M.S.S. v. Belgium and Greece*, App. No. 30696/09 ¶ 359 (Eur. Ct. H.R. Jan. 21, 2011).

Under the Convention and Protocol, "[s]tates have a duty vis-à-vis persons who have arrived at their borders to make independent inquiries as to the persons' need for international protection and to ensure they are not at risk of *refoulement*."  UNHCR, *Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response* ¶ 3 (Mar. 16, 2020), https://www.refworld.org/policy/legalguidance/ unhcr/2020/en/122898.  In other words, states must ask arriving individuals if they fear return to their country of origin.

Consistent with this obligation, before the Rule's enactment, U.S. immigration officers were required to ask a noncitizen specific questions to determine whether the individual intended to apply for asylum or had a fear of persecution.  8 C.F.R. § 235.3(b)(2)(i) (2023).  In stark contrast, the Rule shifts the burden on noncitizens to affirmatively "manifest[] a fear of" return to their country of origin or removal, or else "affirmatively express[] an intention to apply for asylum."  Interim Final Rule at 48759, 48771.  Under the Rule, the United States will no longer implement its international law obligation to determine for itself whether arriving individuals fear return to their country of origin.

In the Rule's explanatory text, the government suggests that it will not be burdensome for arriving individuals to manifest their fear because the government will display signs and videos in four languages, in areas holding noncitizens for expedited removal, to notify them about the need to report their fear of return.  *Id.* at 48741; Immigration and Customs Enforcement, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule, Securing the Border*, June 4, 2024; 8 U.S.C. § 1225(b)(1) (laying

out expedited removal process).  However, such signs and videos will not help many refugees, including those who are illiterate, who do not speak one of those four languages, and who in their most vulnerable moments cannot process the information around them.

The Rule's manifestation-of-fear requirement will likely result in refoulement of many refugees, in further contravention of the United States' obligations under the 1951 Convention. The government itself has admitted this fact.  As the government states in the Rule's explanatory text, the manifestation requirement "engender[s] a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection" and "[i]n these cases, there may be costs to noncitizens that result from their removal." Interim Final Rule at 48767.  To be clear, the "costs" the manifestation requirement imposes on refugees can amount to persecution, torture, or even death.  Because the government will not even attempt to identify whether an individual is a refugee unless he or she affirmatively manifests a fear of return without prompting by the interviewing officer—and not every refugee will do so— the government will inevitably refoul refugees.

### C.    The New Screening Standards Risk Refoulement

The Rule further reduces access to asylum, withholding of removal, and CAT relief by raising applicable standards at the screening step known as the credible fear interview.  And the Rule's implementing guidance further increases the risk of erroneous adjudications.

Established in 1996, expedited removal is a truncated removal process designed to accelerate the return of certain noncitizens arriving at the United States' southern border.  8 U.S.C. § 1225(b)(1).  To avoid immediate removal, noncitizens must pass a screening process known as the credible fear interview.  If a noncitizen passes the interview, he or she will be placed in regular, rather than accelerated, removal proceedings.  Congress chose to require a credible fear interview when it first established expedited removal as a "major safeguard[]" to protect "against returning

persons who meet the refugee definition to conditions of persecution." 142 Cong. Rec. H11071, H11081 (daily ed. Sept. 25, 1996) (statement of Rep. Henry Hyde). An individual passes a credible fear interview if he or she can show a "significant possibility" of *eligibility* for asylum. 8 U.S.C. § 1225(b)(1)(B)(v). This standard is intentionally lower than the standard for obtaining asylum in full proceedings. UNHCR notes that this "significant possibility" standard has always fallen short of what is contemplated by international law, but Congress, at the very least, employed this standard to prevent refoulement. The Rule threatens to further widen the gap between U.S. standards and those contemplated by international law.

First, the Rule increases the standard required to obtain a merits proceeding for withholding of removal or CAT relief. Should an asylum-seeker be unable to establish his or her eligibility for asylum in the credible fear interview, he or she will receive a negative credible fear determination as to their asylum claim. At that point, to avoid removal, the asylum-seeker must establish a "reasonable probability of persecution or torture," defined as "substantially more than a reasonable possibility[,] but somewhat less than more likely than not," to pass the screening for statutory withholding of removal or CAT protection. Interim Final Rule at 48718, 48770–71. The new "reasonable probability" standard is higher than the most recently implemented "reasonable possibility" standard imposed by the May 2023 Circumvention of Lawful Pathways rule, and substantially higher than the historically used "significant possibility" standard. Circumvention of Lawful Pathways, 88 Fed. Reg. 31314, 31452 (May 16, 2023). This heightened standard may lead to a risk of refoulement.

International law specifies that at the screening stage, states may only dismiss claims that are manifestly unfounded or clearly abusive—in other words, claims that are clearly fraudulent or unrelated to the criteria for granting refugee status. *See* UNHCR Exec. Comm. 34th session, *The*

*Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum* No. 30 ¶ 97(2), U.N.G.A. Doc. No. 12A (A/38/12/Add.1) (1983).  All other claims should proceed for determination in usual asylum procedures, which may include some form of accelerated or simplified process.  *See* UNHCR, *Guidelines on International Protection No. 5* ¶ 31; *see generally* UNHCR, *Note on the "Externalization" of International Protection* (May 28, 2021), https://www.refworld.org/policy/legalguidance/unhcr/2021/en/121534.

Even under accelerated procedures, international law requires certain due process protections.  UNHCR, *Fair and Fast: UNHCR Discussion Paper on Accelerated and Simplified Procedures in the European Union* 5–6 (July 18, 2018), https://www.refworld.org/policy/opguidance/unhcr/2018/en/121637.  As such, "no application" should "be treated as manifestly unfounded or abusive unless its fraudulent character or its lack of any connection with the relevant criteria is truly free from doubt."  UNHCR, *Follow-up on Earlier Conclusions of the Sub-Committee on the Determination of Refugee Status with Regard to the Problem of Manifestly Unfounded or Abusive Applications* ¶ 19, U.N. Doc. EC/SCP/29 (Aug. 26, 1983).  The Rule is at odds with this standard because it places the burden on refugees to show a "reasonable probability" of persecution or torture rather than require the government to dispel any "doubt" that the application is unfounded or fraudulent, thus risking screening out valid claims.

Second, the Rule violates international law because it imposes a threshold requirement at the credible fear stage, even before an asylum-seeker is evaluated for withholding of removal and CAT protection.  In addition to the requirement that asylum-seekers manifest a fear of return to obtain a credible fear interview, to pass the credible fear interview, asylum-seekers now must *first* establish that they are exempt from the asylum bar or that they will be able to demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist.  This procedure

violates international refugee law.  While the 1951 Convention does not set forth the exact procedures states must use to assess refugee status at the screening stage, it does provide that such procedures be fair and efficient to allow for a full and inclusive application of the 1951 Convention. *See* UNHCR, *Fair and Efficient Asylum Procedures* ¶ 5.  This means that states must afford appropriate standards and safeguards to ensure that no asylum-seeker is at risk of being refouled to a country where they may face threats to life and freedom.  The Rule fails to do that.  By requiring asylum-seekers to first show that they are *not* subject to the asylum bar, the Rule screens individuals out of a full merits examination of their asylum claims based on summary application of the Rule's asylum eligibility bar rather than consideration of the substance of their claims.

While the previously utilized credible fear interviews were already problematic when measured against international standards—notably, the "significant possibility" standard fell short of what is contemplated by international law—the Rule threatens to widen the gap even further. The prior credible fear process made an effort to satisfy the United States' non-refoulement obligations—as one Member of Congress put it, "[i]t is important . . . that the process be fair [] and . . . not result in sending genuine refugees back to persecution."  *See* 142 Cong. Rec. H11054, H11066–67 (daily ed. Sept. 25, 1996) (statement of Rep. Chris Smith).  In contrast, under the new Rule, decisionmakers are likely to reach incorrect decisions on complex eligibility questions when making them in screening interviews on compressed timetables, risking refouling asylum-seekers to countries where their lives are at risk.

In its explanation of the Rule, the government acknowledges a "likelihood that a meritorious case would fail under the raised screening standard," but suggests that the net benefits, such as purported efficiency gains and deterrence effects, outweigh this cost.  Interim Final Rule at 48746.  The 1951 Convention, however, does not permit states to cast aside their Convention

obligations for the sake of efficiency or deterrence.  In any event, that argument belies the fact that, in UNHCR's experience, screening measures generally create additional inefficiencies.  Here, the Rule will require more time for immigration officers, and later in the process, immigration judges reviewing these credible fear determinations, to determine whether individuals may be excepted from the Rule.  And the consequences of failing to protect against refoulement are significant.  An asylum-seeker who erroneously receives a negative fear determination could be returned to a place where he or she will suffer persecution and even death.

Finally, the Rule's implementing guidance further magnifies the risk of erroneous adjudications.  That guidance shortens the time for asylum-seekers to prepare for the credible fear interview from a minimum of twenty-four hours to a minimum of a mere four hours.  *See Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024*.  In UNHCR's experience, most asylum-seekers arrive to the United States in a particularly vulnerable situation, and may experience technical, psychological, and linguistic difficulties complicating their ability to undertake the screening process.  Handbook ¶ 190.  Moreover, asylum-seekers often struggle to find legal representation during screening.  Notwithstanding the requirement for DHS to post display signs that indicate that people with a fear of return should inform an immigration officer, when they do not have counsel or the meaningful ability to obtain counsel, asylum-seekers may receive limited or no legal information before their credible fear interview.  Even if an asylum-seeker were to obtain representation before his or her interview, it will be difficult, if not impossible, to make the required showing given the time pressure and other limitations of the screening interview.  Consequently, by adding a requirement that asylum-seekers overcome the asylum bar, the Rule risks denying refugees access to fair and efficient procedures,

refusing them protection, and refouling them to places where their lives and safety are at risk, all in violation of international law.

In light of the preliminary nature of screening of asylum and withholding claims, international law requires standards that guard against returning refugees to a place where they may face persecution.  The Rule fails to do so.

## CONCLUSION

UNHCR is concerned that the newly implemented Rule is at variance with the United States' obligations under international law, as it fails to ensure refugees their right to seek asylum and protection from refoulement.  UNHCR thus respectfully requests that this Court consider these obligations when evaluating the merits of Plaintiffs' claims.


Dated: July 29, 2024                              Respectfully submitted,

                                                  */s/ Amy Mason Saharia*
                                                  Amy Mason Saharia
                                                  Williams & Connolly LLP
                                                  680 Maine Avenue, S.W.
                                                  Washington, DC 20024
                                                  (202) 434-5847
                                                  (202) 434-5029 (fax)
                                                  asaharia@wc.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 29, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all counsel of record via electronic mail.

/s/ Amy Mason Saharia
Amy Mason Saharia