No. 1:24-cv-1702-RC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*

*Defendants*.

## BRIEF OF *AMICUS CURIAE*
## PUBLIC COUNSEL
## IN SUPPORT OF PLAINTIFFS

Michael H. Jacobs (D.C. Bar No. 455043)
Brendan C. Hanley (D.C. Bar No. 1735773)
CROWELL & MORING LLP
1001 Pennsylvania Ave. NW
Washington, D.C. 20004
T: (202) 624-2500 | F: (202) 628-5116
mjacobs@crowell.com
bhanley@crowell.com

*Pro Bono Counsel for Public Counsel*

**LOCAL CIVIL RULE 7(o) STATEMENTS**

Pursuant to D.D.C. LCvR 7(o), pro bono counsel for Public Counsel states as follows:

Public Counsel submits this brief pursuant to this Court's July 26, 2024 Minute Order setting July 29, 2024 as the deadline to file amicus briefs in support of Plaintiffs.

Plaintiffs consent to the filing of this brief, and the government takes no position as to this amicus participation.

This brief complies with the requirements of D.D.C. LCvR 5.4, and the type-volume limitation set forth in D.D.C. LCvR 7(o)(4), because its length does not exceed twenty-five pages.

No counsel for a party authored this amicus brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person other than amicus curiae Public Counsel or their counsel contributed money that was intended to fund the preparation or submission of this brief.

This separate amicus brief is warranted because, to our knowledge, no other amicus brief in support of Plaintiffs will focus on the same subject matter—namely, the impediments that the heightened "reasonable probability" standard will create for individuals undergoing credible fear interviews. This brief will address how a lack of specialized legal knowledge and history of trauma will prevent individuals with credible fears of persecution from articulating their claims to the degree of specificity that the "reasonable probability" standard requires.

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE .................................................................................................. 1

ARGUMENT .................................................................................................................................. 1

I.      THE RULE REQUIRES UNREPRESENTED LAY PEOPLE TO ACT LIKE TRAINED IMMIGRATION LAWYERS ........................................................................ 3

II.     THE RULE'S ILLEGAL STRINGENT STANDARD IGNORES THE IMPACT OF TRAUMA.......................................................................................................................... 8

        A.     Trauma Affects the Brain's Ability to Recall Information ................................. 9

        B.     Understanding Trauma Is Key To Understanding Claims to Relief .................. 10

CONCLUSION ............................................................................................................................. 11

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Ahmed v. Keisler*,
  504 F.3d 1183 (9th Cir. 2007) ................................................................................................5

*Antonio v. Garland*,
  58 F.4th 1067 (9th Cir. 2023) .................................................................................................7

*Clemente-Giron v. Holder*,
  556 F.3d 658 (8th Cir. 2009) ................................................................................................11

*Conde Quevedo v. Barr*,
  947 F.3d 1238 (9th Cir. 2020) ................................................................................................6

*Dep't of Homeland Sec. v. Thuraissigiam*,
  140 S. Ct. 1959, 1965-67 (2020) .............................................................................................2

*Fatin v. INS*,
  12 F.3d 1233 (3d Cir. 1993) ....................................................................................................5

*Fiadjoe v. Att'y Gen.*,
  411 F.3d 135 (3d Cir. 2005) ............................................................................................10, 11

*Henriquez-Rivas v. Holder*,
  707 F.3d 1081 (9th Cir. 2013) ................................................................................................5

*Hernandez-Chacon v. Barr*,
  948 F.3d 94 (2d Cir. 2020) ......................................................................................................5

*INS v. Aguirre-Aguirre*,
  526 U.S. 415 (1999) .................................................................................................................2

*INS v. Stevic*,
  467 U.S. 407 (1984) .................................................................................................................2

*Kiakombua v. Wolf*,
  498 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................................2

*Matter of A-B-*,
  27 I. & N. Dec. 316 (A.G. 2018) .............................................................................................6

*Matter of A-R-C-G-*,
  26 I. & N. Dec. 388 (BIA 2014) ..............................................................................................6

*Matter of Acosta*,
  19 I. & N. Dec. 211 (BIA 1985) ..............................................................................................6

*Matter of M-E-V-G-*,
   26 I. & N. Dec. 227 (BIA 2014) ...................................................................................6

*Mashiri v. Ashcroft*,
   383 F.3d 1112 (9th Cir. 2004) .....................................................................................7

*Mousa v. Mukasey*,
   530 F.3d 1025 (9th Cir. 2008) ...................................................................................11

*Niang v. Gonzalez*,
   492 F.3d 505 (4th Cir. 2007) .......................................................................................7

*Paramasamy v. Ashcroft*,
   295 F.3d 1047 (9th Cir. 2002) ...................................................................................11

*Perdomo v. Holder*,
   611 F.3d 662 (9th Cir. 2010) .......................................................................................6

*Pirir-Boc v. Holder*,
   750 F.3d 1077 (9th Cir. 2014) .....................................................................................6

*Quintero v. Garland*,
   998 F.3d 612 (4th Cir. 2021) ...................................................................................4, 6

*Ramsameachire v. Ashcroft*,
   357 F.3d 169 (2d Cir. 2004) ........................................................................................3

**Statutes**

8 U.S.C. § 1158(b)(3)-(c) .....................................................................................................2

8 U.S.C. § 1225(b) .......................................................................................................2, 3, 7

8 U.S.C. § 1231 ................................................................................................................2, 4

FARRA § 2242(b) .................................................................................................................4

INA § 235(b)(1)(A)(ii) .........................................................................................................2

INA § 241(b)(3)(A) ..............................................................................................................4

**Regulatory Sources**

8 C.F.R. § 208.16(c)(2) .........................................................................................................2

8 C.F.R. §§ 208.30(e)(2)-(3) .................................................................................................2

8 C.F.R. § 1208 .....................................................................................................................4

62 Fed. Reg. 10312 ............................................................................................................7

88 Fed. Reg. 11704 ............................................................................................................3

88 Fed. Reg. 11745 ............................................................................................................3

89 Fed. Reg. 48710 ............................................................................................................1

89 Fed. Reg. 48715 ............................................................................................................3

89 Fed. Reg. 48718 ............................................................................................................2

89 Fed. Reg. 48746 ............................................................................................................4

89 Fed. Reg. 48748 ............................................................................................................8

89 Fed. Reg. 48918 ............................................................................................................2

**Books & Periodicals**

Altaf Saadi, et al., *Associations Between Memory Loss and Trauma in US Asylum Seekers: A Retrospective Review of Medico-Legal Affidavits*, PLoS One, 2021 Mar. 23;16(3) ................................................................................................................9

Am. Psychiatric Ass'n, *Diagnostics and Statistics Manual of Mental Disorders* (5th ed. 2013) .................................................................................................................9

Amnesty International, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention and Ill-Treatment of Asylum-Seekers in the United States* (2018) ..........................................................................................................8

Ingrid Eagly & Steven Shafer, American Immigration Council, *Access to Counsel in Immigration Court* (2016) ..........................................................................................7

Jaya Ramji-Nogales et al., *Refugee Roulette: Disparities in Asylum Adjudication*, 60 Stan. L. Rev. 295 (2007) ...............................................................................................8

Jessica Chaudhary, *Memory and Its Implications for Asylum Decisions*, 6 J. Health & Biomedical L. 37 (2010) ..................................................................................9

Katrin Schock, et al., *Impact of Asylum Interviews on the Mental Health of Traumatized Asylum Seekers*, 6 Eur. J. Psychotraumatology 1 (2015) .....................10

Kristin W. Samuelson, *Post-Traumatic Stress Disorder and Declarative Memory Functioning: A Review,* 13 Dialogues Clinical Neurosci. 346 (2011) ..........................9

Madeline Blesi, *Stuck in Limbo: How a Circuit Split in Immigration Proceedings Creates Uncertainty Among Those Applying for Asylum*, U. Cin. L. Rev. Blog (Mar. 4, 2022) ................................................................................................................5

Melanie Randall & Lori Haskell, *Trauma-Informed Approaches to Law: Why Restorative Justice Must Understand Trauma and Psychological Coping*, 36 Dalhousie L.J. 501 (2013) ..................................................................................9

Sarah Katz & Deeya Haldar, *The Pedagogy of Trauma-Informed Lawyering*, 22 Clinical L. Rev. 359 (2016) ...............................................................................10

Sarah Stillman, *When Deportation is a Death Sentence*, The New Yorker, Jan. 8, 2018 ........................................................................................................................3

Brenda Star Adams & Sarah Abraham, *Trauma-Informed Lawyering Is Our Professional Responsibility*, Daily J. (Mar. 10, 2023) ......................................10

U.S. Gov't Accountability Off., GAO-08-940, *U.S. Asylum System: Significant Variation Existed in Asylum Outcomes Across Immigration Courts and Judges* (2008) ................................................................................................................8

Virginia State Bar, *Trauma-informed Representation – Practicing with Empathy* (Apr. 14, 2023) ....................................................................................................10

**Other Authorities**

142 Cong. Rec. 25347 (Sept. 27, 1996) ..........................................................................2

## INTEREST OF AMICUS CURIAE

Public Counsel, based in Los Angeles, California, is a nonprofit public interest law firm dedicated to advancing civil rights and racial and economic justice, as well as amplifying the power of their clients through comprehensive legal advocacy. Founded in 1970 on and strengthened by a pro bono legal service model, Public Counsel's staff and volunteers seek justice through direct legal services, promote healthy and resilient communities through education and outreach, and support community-led efforts to transform unjust systems in and beyond Los Angeles. Public Counsel's Immigrants' Rights Project provides pro bono placement and direct representation to individuals seeking asylum, withholding of removal, and relief under the Convention Against Torture. Public Counsel's Immigrants' Rights Project has five decades of experience representing immigrants, including unaccompanied minors and families who enter the United States at or through the Mexican border, and currently represents hundreds of individuals seeking humanitarian relief. Public Counsel has a strong interest in ensuring that immigrants receive the full and fair process and benefits to which they are entitled.

## ARGUMENT

On June 4, 2024, the government shut the nation's door on asylum seekers. Contrary to this country's longstanding commitment to welcoming refugees and asylum seekers, the government enacted an interim final rule titled "Securing the Border" ("Rule")[1] rendering desperate asylum seekers who arrive between ports of entry at the southern border categorically ineligible for asylum. 89 Fed. Reg. 48710 (June 7, 2024).

Under the Rule, noncitizens arriving between ports of entry at the southern border or at ports of entry without a CBP One appointment are no longer eligible for asylum. However, they may

---

[1] The government issued the Rule on June 4, 2024, and designated it for publication on June 7, 2024. It took effect on June 5, 2024.

1

still be eligible for protection under the Convention Against Torture ("CAT") or for withholding of removal under 8 U.S.C. § 1231(b)(3). Protection under CAT and withholding of removal provide lesser benefits than asylum to a noncitizen,[2] while requiring a higher standard of proof.[3]

Yet, the government bottlenecked the ability of vulnerable individuals to seek these forms of humanitarian protection as well. Under the Rule, after an individual expresses or "manifests" a fear of return to their home country, *i.e.*, passes the "shout test," the Department of Homeland Security ("DHS") will refer that individual for a credible fear interview ("CFI").[4] INA § 235(b)(1)(A)(ii), 8 U.S.C. § 1225(b)(1)(A)(ii). A CFI is only an initial, threshold screening device. *See* 142 Cong. Rec. 25347 (Sept. 27, 1996). The Rule imposes new, unlawful regulations governing how arriving noncitizens are initially screened to determine whether they are eligible for withholding of removal and protection under CAT. Specifically, the Rule shifts the burden on the noncitizen from showing a "significant possibility" of persecution or torture at the initial stage to a "reasonable probability" of torture or persecution. *Cf.* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. §§ 208.30(e)(2)-(3) *with* 89 Fed. Reg. 48718. This new threshold is a drastic departure from the lower standard originally imposed by Congress, which sought to create a broad catchall to avoid sending people to their deaths. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) (explaining the principle of "nonrefoulement"); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 13 (D.D.C. 2020) (citing *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965-67 (2020)) (a CFI "poses a "low bar" for

---

[2] Among other benefits, a grant of asylum allows a noncitizen to apply for permanent residence and can petition for family members to join them in the United States. Neither of these benefits are available to noncitizens awarded withholding or protection under CAT. *See* 8 U.S.C. §§ 1158(b)(3)-(c).

[3] While an individual can obtain asylum based on a well-founded fear of future persecution, withholding of removal to requires a showing that persecution in the country of removal is more likely than not. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Protection pursuant to the Convention Against Torture prohibits the deportation of an individual to a country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2).

[4] CBP agents will no longer ask individuals if they have a fear of return under the Rule. 89 Fed. Reg. 48918. Human Rights First has submitted a companion amicus brief on this issue.

asylum seekers and the asylum seeker "need not demonstrate that he or she is in fact eligible for asylum"); *Ramsameachire v. Ashcroft*, 357 F.3d 169, 179 (2d Cir. 2004) (an initial interview "may be perceived by the [asylum applicant] as coercive or threatening, depending on the alien's past experiences").

Implementation of the heightened reasonable probability standard will harm vulnerable individuals at risk of persecution. Articulating a protected ground to such a degree of specificity is complex, and generally requires legal knowledge. Effectively, noncitizens seeking humanitarian protection must now act like trained lawyers. Furthermore, individuals who have experienced severe trauma, and who receive as little as four hours to prepare for their initial screening, typically after long and arduous journeys, will have difficulty articulating fears to the degree of specificity required under the Rule. As a result, adults, children, and families will be returned unlawfully to their countries of origin, where they face the undeniable threat of harm, torture, and death.[5] *See* Sarah Stillman, *When Deportation is a Death Sentence*, The New Yorker, Jan. 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

## I.  THE RULE REQUIRES UNREPRESENTED LAY PEOPLE TO ACT LIKE TRAINED IMMIGRATION LAWYERS

The Rule imposes a vague and untenable standard upon vulnerable people. The long-standing standard an applicant must meet in a CFI was a "significant possibility" of persecution. 88 Fed. Reg. 11704; 8 U.S.C. § 1225(b).

In 2023, the government enacted the Circumvention of Lawful Pathways rule. There, they enforced the "reasonable possibility" standard.[6] 88 Fed. Reg. 11704. In contrast, under the Rule,

---

[5] Unaccompanied children are excluded from the Rule's enforcement, but children traveling with a parent or guardian are not. 89 Fed. Reg. 48715.
[6] In the 2023 Circumvention of Lawful Pathways rule, the Department of Homeland Security and the Department of Justice acknowledged that the "significant possibility" standard was "preferable . . . because it aligned with Congress's intent that a low screening standard apply." 88 Fed. Reg. 11745-46.

3

an individual seeking safe haven at the southern border who manages to successfully "manifest" a fear of removal must show a "reasonable *probability*" of persecution or torture at their CFI. 89 Fed. Reg. 48746 (citing 8 C.F.R. §§ 208.35(b)(2)(i), 1208.35(b)(2)(ii)). The Rule defines "reasonable probability" as "substantially more than a reasonable possibility, but somewhat less than more likely than not." *Id.* The Rule states that this new standard "requires a greater specificity of the claim in the noncitizen's testimony" than previously necessary under the "reasonable possibility" standard. While it remains to be seen exactly where the gray ends and the bright line begins in defining this new standard, past experience informs Public Counsel's certainty that it will create confusion and harm for individuals navigating the nation's complex immigration laws. Most importantly, this new standard demands asylum seekers show almost the same level of proof at the preliminary screening stage as they would for a full merits hearing before an immigration judge.

Statutory withholding of removal and relief under CAT are mandatory forms of humanitarian protection. FARRA § 2242(b) (codified at 8 U.S.C. § 1231 note); 8 C.F.R. §§ 1208.3(b), 1208.13(c)(1); *see also* 8 C.F.R. §§ 1208.16(c), 1208.17. If an applicant meets all of the requirements for either form of relief, they *must* be granted protection from being returned to a country where they fear harm or torture. 8 U.S.C. § 1231; 8 C.F.R. § 1208.

In the withholding context, individuals must show that their life or freedom would be threatened because of one of the five protected grounds (race, nationality, religion, political opinion, or membership in a particular social group) if they were forced to return to their country of origin. INA § 241(b)(3)(A); 8 C.F.R. § 1208.16(b). Articulating the relationship, or "nexus," between the harm feared and a protected ground to the degree of specificity that the Rule requires will be an insurmountable hurdle for most asylum seekers. Many asylum seekers have only an elementary education, are not proficient in English, or are illiterate. *See Quintero v. Garland*, 998 F.3d 612,

4

632 (4th Cir. 2021). Yet, the Rule's heightened standard will require familiarity with legal terms of art, not to mention legal skills for which immigration lawyers train.

Furthermore, the definitions of the five protected grounds are hardly self-evident, particularly to pro se applicants with little formal education. In fact, courts across the country struggle to define these terms. *See, e.g.*, Madeline Blesi, *Stuck in Limbo: How a Circuit Split in Immigration Proceedings Creates Uncertainty Among Those Applying for Asylum*, U. Cin. L. Rev. Blog (Mar. 4, 2022), https://uclawreview.org/2022/03/04/stuck-in-limbo-how-a-circuit-split-in-immigration-proceedings-creates-uncertainty-among-those-applying-for-asylum/ (explaining that circuits are split over which test defines a particular social group). Asylum seekers may fail to articulate meritorious claims during the initial screening stage simply because they do not know about the different protected grounds asylum claims can be based on, or the requirement that they show a connection between the protected ground and the feared harm, or which parts of their experiences are most relevant to satisfy those legal requirements.

For instance, Public Counsel has assisted asylum seekers who have assumed that the term "political opinion" has to do only with politicians. But "political opinion" as a protected ground "encompasses more than electoral politics or formal political ideology or action." *Ahmed v. Keisler*, 504 F.3d 1183, 1192 (9th Cir. 2007). Individuals without a knowledge of asylum law may not realize that, in certain contexts, actions such as opposition to gangs or gender-based violence can constitute political opinions. *See, e.g.*, *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1093 (9th Cir. 2013) (applicant who testified publicly against gang members qualified for asylum based on political opinion); *Hernandez-Chacon v. Barr* , 948 F.3d 94, 104-05 (2d Cir. 2020) (applicant entitled to asylum because she was persecuted on account of her political opinion when she resisted the sexual advances of a gang member); *Fatin v. INS*, 12 F.3d 1233, 1242 (3d Cir. 1993) ("feminism qualifies as a political opinion within the meaning of the relevant statutes").

The inquiry about a protected ground becomes even more opaque when the asylum seeker fears persecution based on membership in a particular social group ("PSG"). An asylum seeker must first show that the proffered PSG is cognizable. The cognizability of a PSG is ultimately a case-by-case determination. *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985); *Pirir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014); *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014) (defining cognizability).

The Board of Immigration Appeals ("BIA") first defined the term "particular social group" in its 1985 decision *Matter of Acosta*. 19 I. & N. Dec. 211 (BIA 1985). Since then, circuits have wrestled with this unwieldly term, at times finding a PSG, only to later retract that determination. *See Conde Quevedo v. Barr*, 947 F.3d 1238, 1242 (9th Cir. 2020) (the term "'particular social group' is ambiguous"); *Perdomo v. Holder*, 611 F.3d 662, 666 (9th Cir. 2010) (the court's case law regarding PSGs "continues to evolve"); *cf. Matter of A-R-C-G-*, 26 I. & N. Dec. 388, 288-89 (BIA 2014) ("married women in Guatemala who are unable to leave their relationship" is a cognizable PSG) *with Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018) ("married women in Guatemala who are unable to leave their relationship" is *not* a cognizable PSG) (vacated just three years later by *Matter of A-B-*, 28 I. & N. Dec. 307 (BIA 2021)). The Fourth Circuit succinctly explained the confusing landscape in *Quintero v. Garland*, 998 F.3d 612, 632 (4th Cir. 2021):

> [T]he law concerning [PSGs] is 'rife with ambiguities, inconsistent applications, and circuit splits. . . . Even experienced immigration attorneys have difficulty articulating the contours of [a PSG]. . . . [It is] unreasonable and fundamentally unfair to expect *pro se* [individuals]- many of whom suffer from the effects of trauma and lack literacy, English proficiency, formal education, and relevant legal knowledge-to even understand what a [PSG] is, let alone fully appreciate which facts may be relevant to their claims and articulate a legally cognizable group.

Further, establishing a cognizable PSG requires not only legal knowledge, but also corroborating evidence and access to evidence about relevant conditions in the country at issue —for example, newspaper articles and reports on human rights violations published by the U.S. State Department

6

or human rights organizations. The new Rule does not explain how a pro se individual can show reasonable probability of persecution based on membership in a PSG.

Even if an asylum seeker can demonstrate a fear on account of a protected ground, what constitutes persecution differs from jurisdiction to jurisdiction. *Cf. Niang v. Gonzalez*, 492 F.3d 505, 512 (4th Cir. 2007) (psychological harm does *not* constitute persecution in the Fourth Circuit) with *Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004) ("Persecution may be emotional or psychological, as well as physical.") and *Antonio v. Garland*, 58 F.4th 1067, 1073 (9th Cir. 2023) (threats may constitute persecution). Asylum seekers entering the United States for the first time are unknowingly at the whim of the circuit in which they seek to establish residence.

Coupled with the requirement of specialized knowledge, new obstacles to access to counsel will further exacerbate the difficulty of meeting the heightened "reasonable probability" standard. Asylum seekers are entitled to "consult" with a person of their choosing "prior to the [CFI] or any review thereof" as long as that consultation does not cause "unreasonable delay." 8 U.S.C. § 1225(b)(1)(B)(iv). However, under the Implementation Guidance ("Guidance") issued contemporaneously with the Rule, asylum seekers will be unable to do so in practice. That Guidance slashed the time afforded to asylum seekers to seek assistance from an attorney from a minimum of twenty-four to as little as four hours.[7]

Because preparing successful applications for asylum, withholding of removal, and protection under CAT is so challenging, the expertise of an immigration attorney dramatically increases a non-citizen's chance of success in gaining protection. *See* Ingrid Eagly & Steven Shafer, American Immigration Council, *Access to Counsel in Immigration Court*, at 21 (2016), https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_im

---

[7] A year ago, asylum seekers were afforded a minimum of 48 hours to consult with an attorney before a CFI. *See* 62 Fed. Reg. 10312, 10318-20 (Mar. 6, 1997).

7

migration_court.pdf (noncitizens with counsel are five times more likely to win relief); U.S. Gov't Accountability Off., GAO-08-940, *U.S. Asylum System: Significant Variation Existed in Asylum Outcomes Across Immigration Courts and Judges*, at 30 (2008), http://www. gao.gov/new.items/d08940.pdf ("Representation generally doubled the likelihood of affirmative and defensive cases being granted asylum . . . ."); *see also* Jaya Ramji-Nogales et al., *Refugee Roulette: Disparities in Asylum Adjudication*, 60 Stan. L. Rev. 295, 340 (2007) (reporting that Mexican, non-detained asylum seekers "were granted asylum at a rate of 45.6%, almost three times as high as the 16.3% grant rate for those without legal counsel").  Without adequate time to try to consult with an attorney, a traumatized individual will not have had the modicum of preparation afforded refugees prior to implementation of the Rule.

Past experience informs the conclusion that vague and untenable legal standards lead to arbitrary denials, illegally placing asylum seekers in harm's way. *See* Amnesty International, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention and Ill-Treatment of Asylum-Seekers in the United States* (2018), https://www.amnesty.org/en/wp-content/uploads/2021/05/AMR5191012018ENGLISH.pdf.

## II. THE RULE'S ILLEGAL STRINGENT STANDARD IGNORES THE IMPACT OF TRAUMA

The Rule states, with regard to an asylum seeker's ability to meet their burden under the reasonable probability standard, that "[i]n most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony."  89 Fed. Reg. 48710, 48748.  However, research on the impacts of trauma and Public Counsel's experience, as a direct services provider, contravenes this overly simplistic line of reasoning.  The effects of trauma take many forms.  For some vulnerable individuals, this "logic" simply does not hold.

8

A.      **Trauma Affects the Brain's Ability to Recall Information**

Someone who has fled their homeland and is afraid to return has almost certainly experienced trauma, which can have a neurological impact.  As the American Psychiatric Association has long recognized, an individual who has experienced trauma may have difficulty recalling events.  *See* Am. Psychiatric Ass'n, *Diagnostics and Statistics Manual of Mental Disorders* 271-72 (5th ed. 2013) (an "[i]nability to remember an important aspect of the traumatic event(s)" is one symptom of post-traumatic stress disorder); *see also* Jessica Chaudhary, *Memory and Its Implications for Asylum Decisions*, 6 J. Health & Biomedical L. 37, 39 (2010), https://bpb-us-e1.wpmucdn.com/sites.suffolk.edu/dist/e/1232/files/2016/12/Memory-and-Its-Implications-for-Asylum-Decisions.pdf ("Inconsistencies in memory do not necessarily equate to willful misrepresentation, and must be considered carefully in the context of the applicant's entire story."). For asylum seekers, the effects of trauma are compounded.  An asylum seeker may also be unable to retell the traumatic events they experienced in a narrative format, relaying events out of order and appearing illogical.  *See, e.g.*, Melanie Randall & Lori Haskell, *Trauma-Informed Approaches to Law: Why Restorative Justice Must Understand Trauma and Psychological Coping*, 36 Dalhousie L.J. 501, 523 (2013) ( "[I]nconsistencies" . . . [are] very often a typical, predictable, and normal way of responding to life threatening events and coping with and remembering traumatic experiences."); Kristin W. Samuelson, *Post-Traumatic Stress Disorder and Declarative Memory Functioning: A Review*, 13 Dialogues Clinical Neurosci. 346 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3182004/; Altaf Saadi, et al., *Associations Between Memory Loss and Trauma in US Asylum Seekers: A Retrospective Review of Medico-Legal Affidavits*, *PLoS One*, 2021 Mar. 23;16(3), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7987192/.  Moreover, the CFI itself can be a source of psychological stress as asylum seekers are forced to recount the most horrific and intimate details

9

of their lives.  Katrin Schock, et al., *Impact of Asylum Interviews on the Mental Health of Traumatized Asylum Seekers*, 6 Eur. J. Psychotraumatology 1 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4558273/pdf/EJPT-6-26286.pdf; *see also Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 154 (3d Cir. 2005) (trauma affects the ability to testify and immigration proceedings can be traumatizing in and of themselves).

The heightened "reasonable probability" standard only enhances the risk that someone with trauma-related neurological challenges will be unable to describe the source of their trauma in a detailed and internally consistent manner.  If an individual's responses during a CFI lack specificity and speak of generalized fears, due to an inability to recall events, they are unlikely to meet the heightened "reasonable probability" standard under the Rule.

### B.     Understanding Trauma Is Key To Understanding Claims to Relief

As advocates, Public Counsel staff strive to adopt a trauma-informed approach to lawyering. This entails building rapport with clients, usually over the course of multiple conversations.  Public Counsel understands that asylum seekers may be unable to reveal everything completely in one sitting.  Trauma-informed representation makes a difference in obtaining asylum seekers' stories and ultimately in securing relief.  *See* Sarah Katz & Deeya Haldar, *The Pedagogy of Trauma-Informed Lawyering*, 22 Clinical L. Rev. 359 (2016), https://www.law.nyu.edu/sites/default/files/upload_documents/Katz%20-%20Halder%20Pedagogy%20of%20Trauma-Informed%20Lawyering.pdf; Virginia State Bar, *Trauma-informed Representation – Practicing with Empathy* (Apr. 14, 2023), https://vsb.org/YLC/groups/YLC/articles/20230414-docketcall-trauma.aspx; Brenda Star Adams & Sarah Abraham, *Trauma-Informed Lawyering Is Our Professional Responsibility*, Daily J., (Mar. 10, 2023), https://www.dailyjournal.com/mcle/1238-trauma-informed-lawyering-is-our-professional-responsibility.  Furthermore, asylum seekers often land in CBP custody following

lengthy journeys in harsh conditions, such as long walks through the desert. Some may be dehydrated or have not eaten in days. These journeys follow the harrowing experiences in their home countries that forced them to flee in the first place. With as little as four hours to try to contact a lawyer to prepare for their CFIs, individuals with meritorious claims may be unable to articulate their claims to the degree of specificity that the reasonable probability standard requires.

Young asylum seekers may be intimidated by speaking with adults. They might also feel hesitant to speak frankly about experiences of abuse by family. Survivors of sexual violence may experience a sense of shame that prevents them from speaking openly about the most critical details underlying their protection claims at the credible fear screening stage. *See Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052–53 (9th Cir. 2002); *Clemente-Giron v. Holder*, 556 F.3d 658, 665 (8th Cir. 2009); *Mousa v. Mukasey*, 530 F.3d 1025, 1027–28 (9th Cir. 2008); *Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 154 (3d Cir. 2005). LGBTQ+ individuals, who may have experienced discrimination, prejudice, or abuse in their country and fear the same in the United States, may be reluctant to share their identity with anyone, even an attorney, for fear of various collateral consequences.

When attorneys work with asylum seekers over long periods, and proceed to a merits hearing, they can build trust and help asylum seekers obtain social services and mental health support that will then empower them to tell their story in full. In a preparation period of under twenty-four hours and as little as four hours, without the assistance of an attorney, this will not be possible. Consequently, asylum seekers will be unlawfully sent to places where they face persecution, torture, and death.

## CONCLUSION

With respect, for these reasons and for those stated in Plaintiffs' Complaint, amicus curiae urges the Court to grant declaratory judgement and vacatur of the Rule and Guidance.

| | |
|---|---|
| Dated: July 29, 2024 | Respectfully submitted, |
| | |
| | /s/ Michael H. Jacobs |
| | Michael H. Jacobs (D.C. Bar No. 455043) |
| | Brendan C. Hanley (D.C. Bar No. 1735773) |
| | CROWELL & MORING LLP |
| | 1001 Pennsylvania Ave. NW |
| | Washington, D.C. 20004 |
| | T: (202) 624-2500 \| F: (202) 628-5116 |
| | mjacobs@crowell.com |
| | bhanley@crowell.com |
| | |
| | *Pro Bono Counsel for Public Counsel* |