# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| Las Americas Immigrant Advocacy Center, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-01702-RC |
| | ) | |
| Department of Homeland Security, et al., | ) | |
| | ) | |
| *Defendants* | ) | |
| | ) | |

**BRIEF *AMICUS CURIAE* OF HUMAN RIGHTS FIRST, HOPE BORDER INSTITUTE, IMMIGRANT DEFENDERS LAW CENTER, KINO BORDER INITIATIVE, AND REFUGEES INTERNATIONAL IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI ...................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .........................................3

ARGUMENT .........................................................................................................5

    I.       For Nearly 30 Years, U.S. Immigration Agencies Understood that Implementing their Expedited Removal Authority Without Returning Refugees to Persecution Required Them to Ask About Fear of Return ...........................................................5

    II.     A Failure to Ask About Fear of Return Leads to Failures to Properly Refer People for Fear Screenings .........................................................................................8

    III.   The IFR's Elimination of Crucial Safeguard Denies Access to Asylum to Refugees, Including Those Who Do Not Speak English, Suffer Trauma, and Other At-Risk Asylum Seekers ............................................................................................ 10

    IV.   The IFR's "Manifestation of Fear" Requirement Is Already Resulting in the Wrongful Removal Asylum Seekers Without Fear Screenings. ................................. 12

    CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

**STATUTES**

22 U.S.C. § 6474 ................................................................................................................. 8

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208,
Div. C § 302, 110 Stat. 3009-546, 3009-579–584 (1996) ........................................... 5


**REGULATIONS**

62 Fed. Reg. 10312 (Mar. 6, 1997) ...................................................................................... 6, 7

69 Fed. Reg. 48877 (Aug. 11, 2004) .................................................................................... 6

89 Fed. Reg. 48710 (June 7, 2024) ............................................................................. 3, 4, 7, 10


**OTHER AUTHORITIES**

142 Cong. Rec. S4461 (daily ed. May 1, 1996) .................................................................. 5

Allen Keller et al., *Study on Asylum Seekers in Expedited Removal as Authorized by Section 605
of the International Religious Freedom Act of 1998* ................................................ 9

Am. Immigr. Lawyers Ass'n, *Due Process Denied: Central Americans Seeking Asylum and
Legal Protection in the United States* (June 16, 2016) ............................................. 7

Amnesty Int'l, *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers*, AI
Index AMR 01/6426/2017 (2017) .......................................................................... 8

Ctr. for Gender & Refugee Studies, *"Manifesting" Fear at the Border: Lessons from Title 42
Expulsions* 2 (Jan. 30, 2024) ............................................................................... 10

Elliot Spagat, *Behind Biden's asylum halt: Migrants must say if they fear deportation, not wait to
be asked*, Associated Press, Jul. 21, 2024 ....................................................... 12, 13

Emily Bregel, *Border agents ignoring fear claims, migrants say, in violation of Biden order
exception*, Arizona Daily Star, Jun. 15, 2024 ....................................................... 12

H.R. Rep. No. 104-469 (1996) ........................................................................................... 5

Human Rights First, *Elimination of Fear Screening Referral Safeguards in Expedited Removal*
(Jan. 30, 2024) .................................................................................................... 9

Human Rights First, *Two Weeks of the Biden Border Proclamation and Asylum Shutdown*, (June
20, 2024) ............................................................................................................ 12

Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US
Immigration Holding Cells*, (Feb. 28, 2018) ....................................................... 12

Human Rights Watch, *"They Treat You Like You Are Worthless:" Internal DHS Reports of
Abuses by US Border Officials* (Oct. 21, 2021) ................................................... 12

John Washington, *How False Border Patrol Reports Derail Asylum Claims*, The Intercept, Aug. 11, 2019.................................................................................................................................. 8

Sara Campos and Guillermo Cantor, *Deportations in the Dark: Lack of Process and Information in the Removal of Mexican Migrants*, Am. Immigr Council (Sept. 2017)................................. 8

The Expedited Removal Study, *Report on the First Year of Implementation of Expedited Removal*, Markkula Center for Applied Ethics at Santa Clara University (May 1998) ............ 6

USCIRF, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016) ....................................................................................................................................... 7, 9

USCIRF, *Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States* 7 (Feb. 2005) ........................................................................................... 9

USCIRF, *Report on Asylum Seekers in Expedited Removal* (Feb. 8, 2005).......................... 7, 8, 9

## STATEMENT OF INTEREST OF AMICI

*Amici* are non-governmental non-profit organizations that serve non-citizens and advocate for their rights, including asylum seekers affected by the Interim Final Rule at issue in this case.[1]

Human Rights First is a non-governmental organization established in 1978 that works to ensure the United States' leadership on human rights globally and compliance domestically with its human rights commitments.  Human Rights First provides pro bono legal representation to refugees, working in partnership with volunteer lawyers at leading law firms to represent asylum seekers unable to afford counsel.  Human Rights First has monitored and conducted research on expedited removal since its initial implementation and has conducted research on the impact of the regulation at issue in this litigation.  The organization has also conducted research and issued numerous reports on the impact of other policies that restrict access to asylum and subject people to extra-statutory bars to asylum.  These policies include the May 2023 asylum ban (*Circumvention of Lawful Pathways* rule), the Title 42 expulsion policy, the Migrant Protection Protocols, prior Trump administration asylum bans, and metering policies.

The Hope Border Institute brings the perspective of Catholic social teaching to bear on the realities unique to our US-Mexico border region.  Through a robust program of research and policy work, leadership development and action, the Hope Border Institute works to build justice and deepen solidarity across the borderlands.  The IFR requires asylum seekers to manifestly express their fear in order to be referred to a fear interview and heightens fear standards during

---

[1] *Amici curiae* confirm that: none of the *amici curiae* has a parent corporation; no publicly held corporation owns 10% or more of the stock of any of the *amici curiae;* no party's counsel has authored this brief in whole or in part; no party or party's counsel has contributed money intended to fund the preparation or submission of the brief; and no person other than amici has contributed money intended to fund the preparation or submission of this brief.

initial screenings.  The preceding may result in returning and removing bona fide asylum-seeking individuals and families to Mexico and elsewhere without protection.  As such, the IFR provisions represent a threat to the vulnerable families seeking safety that the Hope Border Institute accompanies in our borderlands and contradict its faith values of justice, dignity, and compassion for those in need, including the sojourner.

Immigrant Defenders Law Center (ImmDef) is a next-generation social justice law firm that defends immigrant communities against injustices in our immigration system.  ImmDef envisions a future where no immigrant is forced to face that unjust immigration system alone. ImmDef has a strong interest in ensuring that the federal government abides by its obligations under both domestic and international law while adjudicating claims for asylum and related relief, and that it respects all immigrants' and asylum seekers' due process rights.

Kino Border Initiative is a binational Catholic organization that provides direct humanitarian assistance and holistic accompaniment to people removed or returned to Nogales, Sonora or who are in transit to the U.S. Since the implementation of the "Securing the Border Proclamation" and its implementing IFR, Kino Border Initiative has witnessed firsthand its devastating effects.  Its violation of the non-refoulement clause exposes those who suffer it to being returned to danger and possible death.

Refugees International is an independent nonprofit policy organization started in 1979 that advocates for lifesaving assistance, human rights, and protection for displaced people.  Refugees International is devoted to defending access to asylum for those fleeing persecution and promoting the expansion of humanitarian pathways and resettlement as solutions to displacement crises. Refugees International does research and interviews with people seeking

refuge worldwide to learn about their needs, promote their access to security and integration, and ensure that they are not returned to harm.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

In the Interim Final Rule titled "Securing the Border" (the "IFR") the Departments of Homeland Security and Justice lay bare their commitment to refouling refugees by eliminating immigration officers' longstanding duty to ask questions to ascertain whether a person facing expedited removal must be referred for a fear screening interview under U.S. law.  Securing the Border, 89 Fed. Reg. 48710 (June 7, 2024) (amending 8 C.F.R. §§ 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35).  *Amici* offer this Brief to describe the reasons for this longstanding requirement and the dangers posed by its elimination.  In the two months since the implementation of the IFR, *amici* have interviewed asylum seekers who expressly requested asylum, relayed their past persecution, explained their asylum claims, showed agents their injuries, and reported that they had visibly sobbed and begged to be heard, but were ignored by U.S. immigration officers or told they would be deported anyway.  Other asylum seekers have reported being unable to express their fear because officers forbade them from speaking, reprimanded them, intimidated them, or told them there was no asylum anymore.  Even written and oral communications by counsel of an asylum seeker's fear of return have failed to ensure referral for a fear screening interview.

For decades, as an essential part of the implementation of the expedited removal process, U.S. immigration officers have been required to provide information about the process and ask questions to identify people who must be referred for credible fear interviews ("CFI's") under U.S. law.  Officers have been required to complete this explanation and questioning process for

everyone they are proposing to deport under expedited removal. The information and questions, which are required to be interpreted orally into the person's language where needed, are intended to allow CBP to identify who requires a fear screening interview. They are critical to ensuring that CBP does not wrongfully return refugees to persecution or torture, in violation of U.S. law and treaty commitments.

The IFR jettisons these longstanding requirements and replaces them with a chaotic, non-transparent, and unlawful practice whereby CBP officers need only refer people for a fear screening if CBP perceives them to "manifest" a fear of return or otherwise express an intention to apply for asylum, fear of persecution or torture, or fear of return. 89 Fed. Reg. at 48740 (amending 8 C.F.R. §§ 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35). For many refugees, it is now impossible to be referred for a CFI: many no longer have a meaningful opportunity to express their fear of return while others who do express fear are ignored and summarily removed.

The IFR's rationale for the manifestation requirement rests on the false assumption that immigration officers are good-faith mind readers and inevitably leads to refoulement in violation of refugee protection laws. U.S. officers have previously employed the same approach — under the Title 42 expulsion policy and in the context of interdictions at sea — and it has resulted in expelling and deporting people who fear return, including persons who in fact expressed to CBP their fear and intent to seek asylum.

Similarly, implementation of the IFR is already leading to widespread failures by CBP to refer people seeking protection for fear screenings, endangering refugees and resulting in refoulement to countries of feared persecution. The IFR has exacerbated the chaos that asylum seekers face at the border, denied them an opportunity to express their fears of return and seek

asylum, separated families, and led to the deportation of people seeking protection without a statutorily required fear screening.

## ARGUMENT

**I.    For Nearly 30 Years, U.S. Immigration Agencies Understood that Implementing their Expedited Removal Authority Without Returning Refugees to Persecution Required Them to Ask About Fear of Return**

In 1996, Congress enacted the expedited removal process, which allowed U.S. immigration officers to order non-citizens deported, an authority previously given only to immigration judges.  In enacting this legislation, Congress specifically incorporated safeguards intended to comply with the United States' obligations under the 1967 Refugee Protocol and ensure that people who feared return would not be deported without a screening on their asylum claim.  Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C § 302, 110 Stat. 3009-546, 3009-579–584 (1996).  These require immigration officers to refer for a credible fear screening interview with an asylum officer any individual who indicates an intent to apply for asylum or expresses a fear of persecution, and to "provide information concerning the asylum interview" to people who may be eligible for it.  8 U.S.C. §§ 1225(b)(1)(A)(ii); 1225(b)(1)(B)(iv).  In creating these safeguards, Congress sought to ensure that there would be "no danger that [a non-citizen] with a genuine asylum claim will be returned to persecution."  H.R. Rep. No. 104-469, at 158 (1996).  As Senator Alan Simpson, floor manager of the Senate's version of the bill, noted, "the bill provides very clearly an opportunity for every single person…without documents, or with fraudulent documents ... to seek asylum."  142 Cong. Rec. S4461 (daily ed. May 1, 1996) (statement of Sen. Alan Simpson).

In 1997, the Immigration and Naturalization Service ("INS")[2] issued regulations governing the expedited removal process, which included the requirement that immigration officers provide people at the border with brief information regarding protections for people seeking asylum and ask short questions related to whether they fear return to their country (included on the newly created Form I-867A&B).  Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10355 (Mar. 6, 1997).  Crucially, the regulation also required that interpretation be provided if necessary. *Id.* at 10356. The information and questions included in these forms were designed to ensure that CBP officers could identify who needed to be referred for a credible fear interview under the statute. *Id.* at 10318. CBP has confirmed that Form I-867A&B is also intended to comply with INA 235(b)(1)(B)(iv)'s requirement to provide information concerning the asylum interview.  Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004).

INS implemented these requirements due to concerns that bona fide asylum seekers may be reluctant to express a fear of return to an officer immediately upon arrival or may be unaware of the requirement to do so.  *See* The Expedited Removal Study, *Report on the First Year of Implementation of Expedited Removal*, Markkula Center for Applied Ethics at Santa Clara University (May 1998).[3]  In response, INS included in its interim final rule the Form I-867A&B information and questions, noting that in formulating these requirements, it had "very carefully considered how best to ensure that bona fide asylum claimants are given every opportunity to

---

[2] Prior to the creation of the Department of Homeland Security and its component agencies Customs and Border Protection, Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services, immigration processes that are part of expedited removal were conducted by INS, which was part of the Department of Justice.
[3] http://libraryweb.uchastings.edu/cgrs/Expedited%20removal%201998.pdf

assert their claim, while at the same time not unnecessarily burdening the inspections process or encouraging spurious asylum claims" and was "confident that these safeguards will adequately protect potential asylum claimants."  Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10318-319 (Mar. 6, 1997).

Over the years, the United States Commission on International Religious Freedom ("USCIRF") and other researchers have confirmed that providing the information, asking the fear questions in Form I-867A&B, and properly documenting responses is critical to ensure that people who fear return are referred for credible fear interviews as required by U.S. law. *See* USCIRF*, Report on Asylum Seekers in Expedited Removal* (Feb. 8, 2005);[4] USCIRF*, Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016);[5] Am. Immigr. Lawyers Ass'n*, Due Process Denied: Central Americans Seeking Asylum and Legal Protection in the United States* (June 16, 2016).[6]

In the preamble to the IFR, the Departments make clear that a goal of the IFR is to reduce referrals of asylum seekers for credible fear interviews and baselessly claim that the fear questions are "suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum protection," disregarding the fact that these questions have been included in the expedited removal process for nearly 30 years since its inception and have been repeatedly shown to be crucial to prevent the refoulement of refugees in violation of U.S. law.  Securing the Border, 89 Fed. Reg. 48710, 48743 (June 7, 2024) (amending 8 C.F.R. §§ 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35).

---

[4] https://www.uscirf.gov/publications/report-asylum-seekers-expedited-removal
[5] https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf
[6] https://www.aila.org/files/o-files/view-file/E6D778B9-3044-4C36-9183-640CEBB2DA4F

## II.    A Failure to Ask About Fear of Return Leads to Failures to Properly Refer People for Fear Screenings

Under the expedited removal process predating the IFR, USCIRF and non-governmental organizations documented CBP failures to properly and accurately inform migrants of their right to seek asylum, ask relevant questions, and refer eligible respondents for CFIs, in violation of statutory and regulatory protections in the expedited removal process.  *See* USCIRF*, Report on Asylum Seekers in Expedited Removal* (Feb. 8, 2005);[7] Sara Campos and Guillermo Cantor, *Deportations in the Dark: Lack of Process and Information in the Removal of Mexican Migrants*, Am. Immigr Council (Sept. 2017);[8] Amnesty Int'l, *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers*, AI Index AMR 01/6426/2017 (2017);[9] John Washington, *How False Border Patrol Reports Derail Asylum Claims*, The Intercept, Aug. 11, 2019.[10]

In light of the risks of deporting people to persecution, in the International Religious Freedom Act (IRFA) of 1998, Congress authorized USCIRF to appoint experts to examine whether immigration officers were improperly implementing expedited removal, including incorrectly failing to refer people for credible fear determinations and wrongly deporting people to countries where they may face persecution.   22 U.S.C. § 6474.  USCIRF issued a comprehensive report on expedited removal in 2005, which found failures to refer people who expressed a fear of return, and also found that people who received the information in form I-867A&B and who were asked the questions at the end of that form were more likely to receive credible fear referrals.  USCIRF, *Report on Asylum Seekers in Expedited Removal*, (Feb. 8,

---

[7] https://www.uscirf.gov/publications/report-asylum-seekers-expedited-removal
[8] https://www.americanimmigrationcouncil.org/sites/default/files/research/deportations_in_the_dark.pdf
[9] https://www.amnestyusa.org/wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf
[10] https://theintercept.com/2019/08/11/border-patrol-asylum-claim/

2005).[11]  In one study included in the report, people who received the information were seven times more likely to be referred for a credible fear interview.  Allen Keller et al., *Study on Asylum Seekers in Expedited Removal as Authorized by Section 605 of the International Religious Freedom Act of 1998;* USCIRF, *Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States* 7 (Feb. 2005).[12]  USCIRF issued an update report in 2016, documenting ongoing failures to refer people for CFIs in line with statutory obligations, with officers failing to ask the questions, correctly record responses to the questions, and refer people who expressed fear.  *See* USCIRF, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016).[13]

In other contexts where DHS has not required its personnel to ask the fear questions and DHS officers have instead only referred people for CFIs where they were considered to have "manifested" a fear of return, including in interdictions at sea and recently under the Title 42 expulsion policy, that deficient approach has resulted in failures to properly identify and refer people for credible fear screenings.  *See* Human Rights First, *Elimination of Fear Screening Referral Safeguards in Expedited Removal* (Jan. 30, 2024).[14]  Recent research by the Center for Gender and Refugee Studies showed routine violations of refugee law under the manifestation of fear approach: of 97 families interviewed by advocates and expelled under Title 42 during 2022, DHS failed to refer for a screening any of the 73 families that verbally or non-verbally expressed fear.  Ctr. for Gender & Refugee Studies, *"Manifesting" Fear at the Border: Lessons from Title*

---

[11] https://www.uscirf.gov/publications/report-asylum-seekers-expedited-removal
[12] https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf
[13] https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf
[14] https://humanrightsfirst.org/wp-content/uploads/2024/02/2024.HRF_.Fact_Sheet.Shout-formatted.pdf

*42 Expulsions* 2 (Jan. 30, 2024).[15]  Instead, the practice created a terrifying atmosphere where

CBP officers "verbally abused them, telling them to 'shut up,' declaring they had 'no right' to an

interview, or completely ignoring their attempts to communicate." *Id.*

### III.    The IFR's Elimination of Crucial Safeguard Denies Access to Asylum to Refugees, Including Those Who Do Not Speak English, Suffer Trauma, and Other At-Risk Asylum Seekers

Eliminating CBP's affirmative duty to ask questions about fear endangers vulnerable and

at-risk asylum seekers including survivors of rape, torture, and other trauma, people who do not

speak English or Spanish, LGBTQI+ asylum seekers, and political dissidents.  The IFR

characterizes a "manifestation" of fear as verbal, nonverbal, or physical, including "shaking,

crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse."

Securing the Border, 89 Fed. Reg. 48710, 48744 (June 7, 2024) (amending 8 C.F.R. §§

208.13(g), 208.35, 235.15, 1208.13(g), 1208.35).  Rather than continuing a decades-long practice

of requiring CBP officers to ask a short series of simple and straightforward questions to

ascertain whether a person needs to be referred for a CFI, the IFR treats officers as though they

are mind readers.  The Departments state that officers will observe "unconscious behavior" and

"use their expertise and training to determine whether the noncitizen is manifesting a fear" or

shaking or engaging in other behavior because they are cold, hungry or tired.  *Id.*   Whereas the

IFR attempts to claim that eliminating the fear questions will result in greater efficiency, these

simple questions take only minutes to read and are a far more straightforward practice than the

unreliable manifestation of fear approach.

---

[15] https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions

Under the IFR, many asylum seekers, including people fleeing China, Russia, Syria, Sudan, or the Democratic Republic of Congo, for example, as well as Indigenous language speakers, may not be able to convey fear in their language because CBP officers are no longer required to ask fear questions with interpretation.  Moreover, expecting survivors of torture, rape, and other trauma, LGBTQI+ people, and other refugees to shout out or otherwise volunteer their fear of return in custody, and often in a non-confidential space, will result in wrongful deportation because many will not feel safe expressing their fear.  LGBTQI+ refugees may be afraid or hesitant to express fear of harm relating to their sexual orientation, gender identity, or other persecution in a non-confidential setting and as a result will not be properly identified and referred for fear screenings.  Political dissidents may also fear identifying themselves in non-confidential areas where other people from their home country are also present. Human Rights First has spoken with asylum seekers who had no opportunity to confidentially express their fear since implementation of the IFR, as they were called to sign their deportation orders, at times together with others or in groups, and jailed in holding cells without any chance to speak privately with an officer.

In addition, many asylum seekers will not know how or when to express their fear and will be summarily removed merely because they did not know that they were required to shout or otherwise "manifest" their fear immediately upon arrival.  Indeed, as CBP officers often tell people in custody that they are being deported, subject them to verbal and physical abuse, and threaten and pressure them into signing deportation orders, some asylum seekers believe that the decision to return them has already been made and may not understand that they can safely raise fears about their deportation in this setting.  *See* Human Rights Watch, *"They Treat You Like You*

*Are Worthless:" Internal DHS Reports of Abuses by US Border Officials* (Oct. 21, 2021);[16]
Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells*, (Feb. 28, 2018).[17]

### IV.     The IFR's "Manifestation of Fear" Requirement Is Already Resulting in the Wrongful Removal of Asylum Seekers Without Fear Screenings.

The IFR's elimination of Form I-867AB's information and fear questions is already having devastating impacts.  People fleeing harm have been summarily removed without a credible fear interview due to CBP's failure to affirmatively ask about fear as well as instances where people expressing fear were outright ignored.  *See* Human Rights First, *Two Weeks of the Biden Border Proclamation and Asylum Shutdown*, (June 20,  2024);[18] Elliot Spagat, *Behind Biden's asylum halt: Migrants must say if they fear deportation, not wait to be asked*, Associated Press, Jul. 21, 2024;[19] Emily Bregel, *Border agents ignoring fear claims, migrants say, in violation of Biden order exception*, Arizona Daily Star, Jun. 15, 2024.[20]  Summary removals under the IFR include survivors of gender-based violence, Indigenous people, LGBTQ people, individuals with visible marks and bruises from attacks, and people whose family members were murdered, among others.  The elimination of the information and questions on Form I-867A&B, where CBP was previously required to record peoples' responses, has led to a disturbing lack of

---

[16] https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials
[17] https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells
[18] https://humanrightsfirst.org/wp-content/uploads/2024/06/Two-Weeks-of-the-Biden-Border-Proclamation-Asylum-Shutdown.pdf
[19] https://apnews.com/article/border-patrol-migrants-shout-test-faa388ed7164f3a658dd2383a36e6573
[20] https://tucson.com/news/local/border/us-mexico-border-arizona-biden-order-asylum-seekers/article_461bd3a4-29b1-11ef-b884-5f9fc26ba81b.html?utm_campaign=snd-autopilot&utm_medium=social&utm_source=twitter_TucsonStar

accountability for compliance with U.S. law requiring referral to credible fear interviews where a person expresses a fear of return or intent to apply for asylum.

In the less than two months since the IFR went into effect, human rights monitors and legal service organizations have received numerous reports of CBP officers and Border Patrol agents ignoring and removing asylum seekers who explicitly communicated their fear of return. Human Rights First and other organizations have interviewed asylum seekers who expressly requested asylum, relayed their past persecution, explained their asylum claims, showed agents their injuries, had anxiety attacks, and reported that they had visibly sobbed and begged to be heard, but faced an intimidating and hostile environment in CBP and Border Patrol custody, were ignored by officers, or told that they would be deported anyway.  Other families recounted that not only were they not asked whether they had a fear of return or why they came to the United States, they were not even allowed to speak.  Any signs or videos that DHS posts in CBP facilities are wildly insufficient to enable people to express fear; people have reported that they did not see or understand this information, and many do not have an opportunity to speak and express fear regardless.  *See* Elliot Spagat, *Behind Biden's asylum halt: Migrants must say if they fear deportation, not wait to be asked*, Associated Press, Jul. 21, 2024.

In June, of 457 people arriving at Kino Border Initiative after being removed from the United States, more than 75% (345) reported to KBI staff that they were either ignored or not allowed to ask for asylum.  Those who verbally expressed fear or an intention to seek asylum reported being ignored outright, lied to and told that asylum was no longer an option, or threatened with prolonged detention. Many were expressly instructed not to speak by Border Patrol agents.  "They didn't let us talk" was a sentiment expressed by most people who were removed following the IFR.

13

According to interviews conducted by amici and partner organizations since the IFR went into effect, immigration officers have responded to peoples' expressions of fear of return with the following statements before summarily removing them:

- "There is no asylum."
- "There is no asylum anymore; we don't care."
- "There is no asylum.  You guys need to watch the news."
- "There is no asylum.  Haven't you seen the news?"
- "Asylum has closed.  You can seek asylum in Mexico."
- "There are no spots for asylum and if we want, you'll be detained for a long time."
- "There is no political asylum these days, just deportation."
- "There is no asylum and whatever happened to you is not our problem."
- "That's what everyone says."
- "The border is closed."
- "The border has closed.  Don't come back."
- "The law has changed."
- "By orders of President Biden, we are no longer giving asylum to anyone. We don't want any more Mexicans."
- "I don't speak good Spanish."
- "Do you think you have the same rights as I do?  The government deducts $1,000 dollars from every paycheck I earn just so that any idiot can show up here."
- "What if I went to your house and entered without permission?  You're entering my country without permission."
- "If you return, your children will be taken and you'll be put in jail because you're illegal."
- "I'm not asking about your fear; don't tell me about your fear."
- "I don't speak Spanish; I don't know what you are saying."
- "Don't say anything; what you say doesn't matter."
- "Everyone here is wasting their time because there is no asylum since the President signed [an order] on the 4th at 9 PM, and he doesn't want any Mexicans.  They are not going to give you asylum.  Stay as long as you want, it's a prison."

Even in some cases where attorneys have communicated with DHS regarding their client's intent to seek protection, CBP has ignored these communications and summarily removed people without a CFI.   Attorneys with the Texas Rio Grande Public Defender ("TRGPD") reported to Human Rights First that clients who were arrested under Operation Lone Star and then transferred from Texas state custody to CBP and ICE detention have informed them of the significant difficulties in having their manifestations of fear of return to their

14

countries of origin and to Mexico acknowledged by CBP and ICE, resulting in removal of some

without referral for credible fear interviews.  In many cases, TRGPD immigration attorneys

provided written notification via email to CBP and ICE of their client's intent to seek refugee

protection, with their consent, and informed them that the clients would soon be transferred from

state custody to DHS custody.  Some TRGPD clients were in possession of individualized letters

expressing their fear of return to their country of nationality and to Mexico at the time of transfer

to CBP and ICE custody.  However, clients have informed TRGPD of their inability to present

their letters to CBP and ICE officers as their belongings are confiscated.  Several TRGPD clients

were summarily removed to their countries of feared persecution without CFIs despite CBP and

ICE's receipt of their written manifestation of fear sent by TRGPD and verbal expressions of

fear by these asylum seekers, as they have reported to TRGPD.[21]

Attorney David Square reported to Human Rights First that four asylum-seeking clients

of his, two from Guatemala, one from Honduras, and one from Mexico who were held in CBP

custody in the Rio Grande Valley, El Paso, and San Diego sectors were deported without CFIs

even though Square submitted a written request for a CFI to CBP in all four cases. While on

legal calls with three of his clients, Square heard each client call over a CBP officer and express

fear of return. In one case, Square received repeated verbal confirmation by CBP that his

Guatemalan client would be referred for a CFI but only days later learned from the client's

family that he had been removed to Guatemala without a CFI. In another case, Square submitted

a written request for a CFI on behalf of another Guatemalan client and spoke with CBP officers

---

[21] These details are based on conversations with around 15 clients of diverse genders and
nationalities who reported to TRGPD fear of return to their countries of nationality based on
race, political opinion, sexual orientation and membership in particular social groups such as the
intentional targeting of the family unit and retaliation from active involvement in reporting
individuals to the police and prosecutors' offices.

over two consecutive days in requesting a legal call with his client. CBP officers denied Square a legal call with his client, informed him that they did not have time to get his client out for a phone call, and instructed Square to wait for an email reply. Despite escalating the case to CBP superiors, the Guatemalan man was deported without being referred for a CFI within 48 hours of Square's initial CFI request.

Some people seeking asylum have reported to legal service organizations that they were only referred for CFIs after they repeatedly expressed fear and intent to seek asylum to multiple CBP and ICE officers, evidencing the arbitrariness and failures resulting from elimination of the mandatory use of form I-867AB to question and document whether an individual has a fear of return.

A Nicaraguan asylum seeker fleeing political persecution was only given a CFI after insisting on needing asylum whereas other people detained with him were summarily removed despite also expressing that they were seeking asylum, according to a legal service provider that spoke with Human Rights First. Initially, CBP officers told the group that they could not apply for asylum, but then only referred for CFIs the men who continued to insist on needing asylum and removed the rest.

A Black gay man from Peru fleeing sexual and physical violence, including physical assaults by police officers, reported to TRGPD that he was not asked any questions by CBP officers, was unable to give CBP a letter indicating that he intended to seek asylum because his belongings had been confiscated, was told "no" when he asked whether he could have an interview, and was frequently told not to speak by officers. He was then jailed in a cell for days after initial processing without any opportunity to speak with officers and transferred to ICE detention with a deportation order, meaning that he had been ordered removed without a referral

16

for a CFI despite his repeated requests.  Only after seven days in ICE detention was he able to speak with an ICE officer and insist that he was afraid and wanted an asylum interview.  He was finally referred for a CFI and received a positive credible fear determination.

A Colombian man who was tortured and sexually assaulted by Colombian authorities was initially ignored by U.S. officers when he expressed fear of return and had to repeatedly state that he was afraid to be referred for a CFI, according to TRGPD.  When he sought protection at the border, he was separated from his partner, arrested under Operation Lone Star, and transferred from Texas state custody to ICE detention.  He attempted to express fear repeatedly, including by sending a message to ICE on a tablet provided in detention for communication with ICE officers, sending a handwritten letter through the detention mailbox that is also used for communication with officers, and having an email sent from TRGPD immigration attorneys on his behalf advising officers of his fear. However, he was told by an officer that he had been referred for immediate deportation without being scheduled for a CFI. He subsequently expressed fear of return again to the officer and was finally, only then, referred for a CFI.

A Colombian LGBTQ woman and other women seeking protection were told that they would be deported despite expressing fear, forcing the women to beg and cry to be referred for CFIs. When the women told the officer that they "feared death," "were afraid," and "were seeking refuge," the officer told them they would be deported because they did not use the word "asylum," due to the new policy. The women reported to a legal service provider that when they began to cry and beg, the officer told them to "stop crying and speak like normal, decent people." He also stated that he "did not want to see more immigrants taking American jobs" and that "everyone says the same story." The women persisted in pleading for CFIs and were eventually referred.

The arbitrariness of who is referred for a CFI and who is summarily removed has already resulted in family separation, with family members separated in CBP custody, removed within hours and days without knowing their loved ones' whereabouts, and experiencing disparate outcomes where some family members can seek asylum while others face summary removal despite having similar and/or related asylum claims.

A Colombian family fleeing persecution was separated and three of the four family members removed without a credible fear screening despite all of them expressing their fear based on the same asylum claim.  One of the women, who had been raped and threatened by her persecutors due to her political opinion and Indigenous identity, was referred for a credible fear interview while her husband, sister-in-law, and brother-in-law were removed, according to Immigrant Defenders Law Center.

A Colombian man fleeing persecution due to his political opinion was separated from his partner and processed for deportation because he did not know that he needed to tell CBP officers about his fear of return, whereas his partner expressed fear and was referred for a CFI. The man was told to sign papers in English without having the contents translated to him and was then processed for deportation. His removal was narrowly averted due to the intervention of an attorney at the Immigrant Defenders Law Center, who contacted immigration officials about his case. He was finally referred for a CFI, received a positive credible fear determination, and has reunited with his partner in the United States.

People seeking protection who manifested their fear of return and yet were removed without a fear screening since the IFR was implemented on June 5 include:[22]

---

[22] The high proportion of Mexican nationals in these examples is due to the fact that asylum seekers of other nationalities, upon summary removal by the United States at the U.S.-Mexico

18

A Mexican woman, seven months pregnant, escaping harm and death threats by her partner told Human Rights First that she had manifested her fear and asked, "where can I request asylum? How can I request it?" A CBP officer replied, "I don't speak Spanish well." She was summarily removed within 24 hours without receiving any removal paperwork.

A Mexican survivor of gender-based violence who was so violently harmed by her husband that she suffered a miscarriage and was threatened with death reported to Human Rights First that she was removed without a CFI despite informing the CBP officer that she was seeking asylum. She was detained by CBP for three days and was not allowed to speak. A CBP officer called her and two other women to sign their deportation orders and told them, "there is no asylum and whatever happened to you is not our problem." The woman told the CBP officer that she would not sign the deportation order as she was seeking asylum. The CBP officer replied, "there are no spots for asylum and if we want, you'll be detained for a long time." She was not referred for a CFI and was returned to Mexico.

A woman and her three-year-old son twice tried to seek asylum in the initial weeks following implementation of the IFR and were summarily returned both times without being referred for a CFI, as reported to Human Rights First. The first time, she was not allowed to speak and was instructed by a Border Patrol agent to sign a deportation order to "continue the process." She asked, "what happens if I don't want to sign?" The Border Patrol agent replied, "what if I went to your house and entered without permission? You're entering my country without permission." She was summarily removed within 24 hours. The woman and her three-

---

border, are frequently turned over to Mexican immigration authorities who transport them away from the border areas where the interviews and research underlying this Brief were conducted.

year-old son turned themselves in to Border Patrol a second time and were told "there is no asylum - sign [the deportation order] or not, I have the power to return you."  The woman asked, "and if I want to request a hearing with a judge?" The Border Patrol agent replied, "there aren't any more [hearings]."  The next day they were removed to Mexico.

A 21-year-old Mexican woman who requested asylum was separated from her parents, younger sister, and extended family by Border Patrol and removed without a CFI despite her request for asylum, as reported to Human Rights First.  While being processed, she explained to a Border Patrol agent that her family was fleeing death threats and detailed the harm they had suffered in Guanajuato, Mexico.  She said, "we come seeking asylum."  The Border Patrol agent ignored her request, told her she was being deported, and returned her alone to Mexico within 24 hours without providing her with any documentation of her removal.

A Mexican family fleeing with their young children expressed their fear of return and tried to show a Border Patrol agent severe bruises from an attack suffered in their home country, but the agent said that he was not interested in seeing that, according to Kino Border Initiative. The family was summarily removed without a CFI.

A Mexican woman fleeing gender-based violence with her two young children explained to a Border Patrol agent that she was seeking asylum but the agent refused to refer her for a credible fear screening and removed them, stating: "By orders of President Biden, we are no longer giving asylum to anyone.  We don't want any more Mexicans."

Border Patrol agents refused to refer for a fear screening a Mexican family fleeing with their baby, even when the man expressed fear of return, stated that he had been kidnapped and tortured, and showed the marks on his body from the attack, according to Kino Border Initiative.

Border Patrol said: "There is no asylum anymore; we don't care."  The family was summarily removed.

A woman who fled Mexico with her son after her husband was assassinated and her son received death threats attempted to request asylum.  She reported that Border Patrol agents told them that "asylum is closed" because there were too many people seeking asylum and they didn't want any more people coming.  The woman recounted to Kino Border Initiative that an agent pressured her into signing a document in English that she did not understand and that was not translated to her.  They were then removed without a CFI.

Border Patrol agents ignored and removed a Mexican woman fleeing death threats with her three-year-old daughter even though she stated that she wanted to seek asylum and had an anxiety attack while being transported for processing by CBP.  Border Patrol said "that's what everyone says" when she expressed that she wanted to seek asylum and informed her that there was no asylum anymore.  Agents merely gave her water during her anxiety attack and refused to refer her for a credible fear interview. She was removed to Nogales, according to Refugees International.

Border Patrol separated a Mexican man from his sister and nieces and removed him without a CFI even though he expressed that he needed asylum and described the harms he was fleeing, including being beaten, having his home shot at, and his 13-year-old niece suffering an attempted kidnapping.  He was summarily removed within 24 hours while his sister and 13-year-old niece were released from CBP custody. When he spoke with Human Rights First, his twenty-year-old niece had been in CBP custody for one week.  While in CBP custody, a Border Patrol agent asked the man to sign his deportation order.  He refused and expressed his intent to seek asylum and the harms he had suffered, but the agent told him he was not interested in his

problems and removed him without him referring for a CFI or providing him with any documentation of his removal.

Others seeking protection were unable to manifest their fear of return and were removed without a fear screening under the manifestation of fear approach imposed by the IFR. A Mexican mother and her children aged seven, 12, and 17, for example, turned themselves in to Border Patrol agents to seek asylum a week after the Proclamation and IFR took effect and were summarily removed without an opportunity to express their fear of return. While they were in CBP custody, a CBP officer told them and others: "everyone here is wasting their time because there is no asylum since the President signed [an order] on the 4th at 9 PM, and he doesn't want any Mexicans. They are not going to give you asylum. Stay as long as you want, it's a prison." The mother reported to Human Rights First that she was detained for four days during which she had no opportunity to make a phone call before being summarily removed to Mexico.

A Mexican mother and her eight-year-old child were summarily removed to Mexico without any DHS paperwork after several days in CBP custody. The woman was visibly distraught, shaking, and crying upon her removal to Mexico while she reported to Human Rights First that she and her son fled Veracruz after he was nearly kidnapped. While in CBP custody, a CBP officer told the woman she would be removed and said, "the border has closed. Don't come back."

A Mexican mother with two young daughters fleeing death threats after her husband was assassinated was summarily removed by CBP within 24 hours of arrival without being provided copies of any DHS paperwork. Border Patrol agents had separated them from her sister-in-law and they had no news on her whereabouts. She reported to Human Rights First that CBP confiscated her belongings, which contained her cellphone and money. After being removed she

was stranded alone with her two young daughters without any money or means of communicating.

A Mexican woman and her two young children were summarily removed without being issued any DHS paperwork after four days in CBP custody during which she was not allowed to speak to CBP officers to express her fear and denied access to a telephone or a shower. While held in a CBP facility for three days, she and many others grew desperate and began to cry, pleading to the CBP officers to let them speak. She reported to Human Rights First: "After everything we went through in Guerrero, for them to not even let us speak of the fear we carry with us." Instead, they were spoken to harshly, reprimanded, and told they had broken the law to enter the United States. A CBP officer called her by name and took a DNA sample. When she asked why, he answered "because you're being deported. Asylum has closed" and told her "you can seek asylum in Mexico." The CBP officer intimidated and instilled fear in her, telling her in Spanish, "if you return, your children will be taken and you'll be put in jail because you're illegal." The officers confiscated her sneakers and removed her to Mexico wearing only socks.

It is the role of asylum officers in a credible fear screening, not Border Patrol or CBP officers, to assess whether a person may be able to establish asylum eligibility. Many of the cases *amici* have identified involve people who reported facing types of harms and persecution in Mexico and other countries that are consistent with documented country conditions and could lead to eligibility for asylum under U.S. law, or could require protection under the withholding of removal statute or the Convention Against Torture. Yet these asylum seekers were unable even to access a screening interview to allow the United States to conduct a rational assessment of their claims before summarily removing them. This was not the process Congress contemplated when it gave DHS officer expedited removal authority, nor is it a process DHS previously

considered to be adequate to ensure its own compliance with the expedited removal statute and with U.S. obligations not to return refugees to persecution.

## CONCLUSION

For these reasons and those laid out in Plaintiffs' own brief, the Court should grant summary judgment to Plaintiffs.

Dated: July 29, 2024                Respectfully submitted,

Christina Asencio                By: *s/Thomas K. Ragland/*
Rebecca Gendelman
Anwen Hughes                Thomas K. Ragland, Esq. (D.C. Bar No. 501021)
Licha M. Nyiendo                Clark Hill PLC
Human Rights First                1001 Pennsylvania Avenue NW
75 Broad St., 31st Fl.                Suite 1300 South
New York, NY 10004                Washington, D.C., 20004
                T: (202) 552 2360
                F: (202) 552 2384
                Email: tragland@clarkhill.com

24

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Motion of Human Rights and Legal Services Organizations for Leave to File *Amicus Curiae* Brief, proposed order, and accompanying *amicus curiae* brief with the U.S. District Court of the District of Columbia using the CM/ECF system on July 29, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: July 29, 2024                    Respectfully submitted,

By: *s/Thomas K. Ragland/*

Thomas K. Ragland, Esq. (D.C. Bar No. 501021)
Clark Hill PLC
1001 Pennsylvania Avenue NW
Suite 1300 South
Washington, D.C., 20004
T: (202) 552 2360
F: (202) 552 2384
Email: tragland@clarkhill.com