# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, et al., | |
| *Plaintiffs*, | Civil Action No. 24-cv-01702 |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | |
| *Defendants*. | |

## BRIEF OF AMICUS CURIAE NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119 IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Elizabeth Wright*
Celene Chen*
COOLEY LLP
500 Boylston Street, 14th Fl
Boston, MA 02116-3736
Tel: (617) 937 2300
Fax: (617) 937 2400
ewright@cooley.com
celene.chen@cooley.com

Allison Wettstein O'Neill*
Nachi Baru*
COOLEY LLP
10265 Science Center Drive
San Diego, CA  92121-1117
Tel:   (858) 550 600
Fax:   (858) 550 6420
aoneill@cooley.com
nbaru@cooley.com

Kathleen R. Hartnett
COOLEY LLP
3 Embarcadero Center, 20th Fl
San Francisco, California 94111-4004
Tel: (415) 693-2000
Fax: (415) 693-2222
khartnett@cooley.com

*Counsel for Amicus Curiae*
*\* Pro Hac Vice Applications Forthcoming*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule of the U.S. District Court for the District of Columbia 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), amicus curiae hereby certifies that it has no parent corporations and that no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ....................................................................................5

I.   The Rule's Blanket Ineligibility Ground Is Illegal and Ineffective. .............5

II.  The Rule's Manifestation of Fear Requirement Contravenes
     Established Best Practices and Violates Federal Law and Binding
     International Treaty Obligations....................................................8

     A.   Council 119 Members' Training Informs Their Objection to the
          Rule's Manifestation of Fear Requirement. ...............................9

     B.   CBP Is Not Well-Positioned to Interpret Nuanced
          Manifestations of Fear......................................................14

III. The Rule's Heightened "Reasonable Probability" Credible Fear
     Screening Standard Risks Disparate Treatment and Inefficiency. ...............18

     A.   The Novel "Reasonable Probability" Standard Threatens Undue
          Confusion and Disparate Treatment...................................19

     B.   Applying Multiple Standards Is Challenging and Inefficient. ...........21

CONCLUSION .................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*A.B.-B. v. Morgan*,
548 F. Supp. 3d 209 (2020) ..........................................................................16, 17

*East Bay Sanctuary Covenant v. Barr*,
No. 19-16487 (9th Cir. Oct. 15, 2019), ECF No. 68 ...........................................5

*East Bay Sanctuary Covenant v. Biden*,
683 F. Supp. 3d 1025 (N.D. Cal. 2023), *stayed pending appeal*,
2023 WL 11662094 (9th Cir. Aug. 3, 2023) .......................................................19

*East Bay Sanctuary Covenant v. Biden*,
No. 18-cv-06810 (N.D. Cal. June 7, 2023), ECF No. 174-1 ...............................5

*I.N.S. v. Stevic*,
467 U.S. 407 (1984) ............................................................................................20

*M.A. v. Mayorkas*,
No. 23-cv-01843 (D.D.C. October 6, 2023), ECF No. 46-1 ...............................20

*Matter of Mogarabbi*,
19 I. & N. Dec. 439 (BIA 1987) .........................................................................20

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. Aug. 2, 2019) ........................................................6

*In Re S-M-J-*,
21 I. & N. Dec. 722 (BIA 1997) ..........................................................................7

*Wolf v. Innovation Law Lab*,
No. 19-1212 (9th Cir. Jan. 22, 2021) ....................................................................5

**Statutes**

5 U.S.C. § 3331 ..........................................................................................................7

6 U.S.C. § 211 ..........................................................................................................16

8 U.S.C.
§ 1157(f)....................................................................................................10, 13
§ 1158(a)(1) ......................................................................................................6
§ 1231(a)(5) ..............................................................................................19, 20

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135,
2192–2205 (codified at 6 U.S.C. §§ 252–90)...............................................17, 18

INA § 101(a)(42) (codified at 8 U.S.C. § 1101(a)(42).........................................20

INA § 241(b)(3) (codified at 8 U.S.C. § 1231(b)(3)) ..................................4, 18, 19

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ..............................6

## Other Authorities

8 C.F.R.
§ 235.........................................................................................................8, 9
§ 208........................................................................................................*passim*
§ 241.8(e) ..............................................................................................19, 20

87 Fed. Reg.
18078............................................................................................................22

88 Fed. Reg.
11704............................................................................................................22
31314............................................................................................................19

89 Fed. Reg.
48487..............................................................................................................3
48491..............................................................................................................3
48710..............................................................................................................3
48711..............................................................................................................3
48712........................................................................................................7, 21
48714..............................................................................................................7
48718............................................................................................................19
48739.........................................................................................................9, 14
48743.........................................................................................................8, 12
48746............................................................................................................21
48747............................................................................................................22
48749............................................................................................................22

1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 (the "1951 Convention"); ...............................6

1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267 (the "1967 Protocol") ...............................6

1984 United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("Convention Against Torture" or "CAT") ...........................6

Center for Gender & Refugee Studies, *"Manifesting" Fear At the Border: Lessons from Title 42 Expulsions* (Jan 30, 2024), https://perma.cc/9Z5X-WULH ....................................................13, 14

*Comments on Joint Notice of Proposed Rulemaking: Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review* (July 15, 2020), https://www.regulations.gov/comment/EOIR-2020-0003-6096; ........................5

Council 119, *Comments on "Securing the Border"* (Jul. 8, 2024), https://www.regulations.gov/comment/USCIS-2024-0006-1064 .......................5

DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border ...............................................4

Elliot Spagat, *Behind Biden's asylum halt: Migrants must say if they fear deportation, not wait to be asked,* Associated Press (July 20, 2024), https://perma.cc/2YYT-CNJ6 ...................................................15

Emily Bregel, *Border agents ignoring fear claims, migrants say, in violation of Biden order exception,* Arizona Daily Star (Jun. 15, 2024) .............................................................15, 16

Exec. Order No. 10773 ....................................................................3

Fed. R. App. P. 29(a)(2) ..................................................................1

H.R. Rep. No. 104-469, pt. 1 (1966) .................................................2, 4

Local Civil Rule 7(o)(5)........................................................................1

*"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions* ..................15

National Immigrant Justice Center, *Six-Week Report: Implementation
   of the Biden Administration's June 2024 "Securing the Border"
   Asylum Ban* (June 2024) ..................................................................15

Refugee Act. H.R. Rep. No. 608, 96th Cong., 1st Sess. (1979) ............................23

S. Rep. 96-256 (1979) ............................................................................2

*"Security Bars and Processing"* (Aug. 10, 2020),
   https://www.regulations.gov/comment/USCIS-2020-0013-1897; .......................5

U.S. Citizenship and Immigration Services, RAIO Directorate –
   Officer Training Cross-Cultural Communication and Other Factors
   That May Impede Communication at an Interview (2019) ...............................12

U.S. Citizenship and Immigration Services, RAIO Directorate –
   Officer Training Interviewing – Eliciting Testimony (2019)......................11, 13

U.S. Citizenship and Immigration Services, RAIO Directorate –
   Officer Training Interviewing – Introduction to the Non-
   Adversarial Interview (2019)..............................................................11

U.S. Citizenship and Immigration Services, RAIO Directorate –
   Officer Training Interviewing – Researching and Using Country of
   Origin Information in RAIO Adjudications (2012)..........................................12

U.S. Citizenship and Immigration Services, RAIO Directorate –
   Officer Training Interviewing – Survivors of Torture and Other
   Severe Trauma (2019) ..............................................................11, 12, 13, 16

U.S. Citizenship and Immigration Services, RAIO Directorate –
   Officer Training Interviewing – Working with an Interpreter
   (2019) ......................................................................................14

U.S. Citizenship and Immigration Services, RAIO – Reasonable Fear
   of Persecution and Torture Determinations (2017) ....................................18, 19

## INTEREST OF *AMICUS CURIAE*[1]

The National Citizenship and Immigration Services Council 119 ("Council 119") is a labor organization that represents the interests of over 14,000 bargaining unit employees of United States Citizenship and Immigration Services ("USCIS"), a division of the U.S. Department of Homeland Security ("DHS"), throughout the United States and abroad. Council 119's constituents include approximately 1,500 asylum officers ("AOs"), refugee officers ("ROs"), and adjudications officers. These officers are responsible for, among other things, adjudicating affirmative asylum claims, processing refugees overseas, performing "credible fear" and "reasonable fear" screenings, researching conditions in refugee-producing countries and regions, and providing relief for survivors of human trafficking and those who assist law enforcement. Council 119's constituent members and bargaining unit employees in the Asylum Division are tasked with implementing the Interim Final Rule entitled "Securing the Border" ("the Rule"), 89 Fed. Reg. 48710 (June 7, 2024), which is the subject of this litigation.

Council 119 has a special interest in this case as the representative of the collective bargaining unit of federal government employees who are at the forefront

---

[1] Pursuant to Local Civil Rule 7(o)(5), *amicus curiae* certifies that this brief was not written in whole or in part by counsel for any party, and no person or entity other than amicus curiae and its counsel has made a monetary contribution to the preparation and submission of this brief. The parties have consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

of interviewing and adjudicating the legal claims of individuals seeking protection in the United States, many of whom are now subject to the Rule and related consequences. Council 119's members have firsthand knowledge about whether the Rule is consistent with the United States' obligations under international and domestic laws concerning the right to seek asylum and the protection of refugees; how the Rule impacts pre-screening operations and asylum adjudication; and the reality of migrant flows at our nation's southern border.

This brief relies solely upon information that is publicly available, and it does not rely on any information that is confidential, law enforcement sensitive, or classified. It represents only the views of Council 119 on behalf of the bargaining unit and does not represent the views of USCIS or USCIS employees in their official capacities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"[W]elcoming homeless refugees to [American] shores" is among "the oldest themes" in our country's history." S. Rep. 96-256, at 1 (1979). But this "national commitment to human rights and humanitarian concerns," *id.*, now comes with an asterisk: Our protection will only extend to certain refugees, depending on the time and place a refugee brings a claim for help. A system that was once carefully calibrated to avoid returning those with genuine asylum claims back to persecution, H.R. Rep. No. 104-469, pt. 1, at 158 (1966), is now almost certain to remove many

who would qualify for protection under our immigration laws without any meaningful opportunity to raise their claims—all because of where and when they present themselves.

The Rule at issue here—promulgated by the Department of Justice ("DOJ") and Department of Homeland Security ("DHS," collectively the "Departments")—is just the latest in a series of policies undermining the integrity of our asylum system. The Rule unlawfully curtails asylum eligibility for those arriving at the southern border and seeking asylum during purported "emergency border circumstances."[2] The Rule declares noncitizens ineligible for asylum unless they demonstrate exceptionally compelling circumstances. *See* 89 Fed. Reg. 48710, 48718; Exec. Order No. 10773 of June 3, 2024, 89 Fed. Reg. 48487, 48491–92 (June 7, 2024). It also limits referrals for credible fear interviews to instances where "the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal." 89 Fed. Reg. 48710. Furthermore, the Rule

---

[2] The Departments define the term "emergency border circumstances" to generally mean "situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States." 89 Fed. Reg. 48711. Looking to President Biden's June 3, 2024, Proclamation, "emergency border circumstances" are already triggered, *see* 89 Fed. Reg. 48491—and there is no indication they will not remain triggered for the foreseeable future.

requires AOs to enter negative credible fear determinations for asylum claims "unless there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist." *Id.* at 48718. And, finally, it raises the standard of proof required for noncitizens to be referred for full consideration of their claims under INA § 241(b)(3) and the Convention Against Torture, Dec. 10, 1984, to "reasonable probability" following a negative credible fear determination with respect to asylum. *Id.* at 48746. These changes prevent Council 119 members from executing upon the United States' domestic and international legal obligations.

Despite the Rule's drastic impact, the Departments paint these efforts "to secure the border" as somehow acceptable when paired with actions aimed at "build[ing] a safe, orderly, and humane immigration system while leading the largest expansion of lawful pathways for immigration in decades."[3] The Rule at issue, however, is not *humane*, and expanding lawful immigration pathways for some does not justify foreclosing lawful immigration pathways for others. Instead, it stands as a practical and symbolic contraction of the United States' commitment to humanitarian legal obligations. Concern about the United States' waning

---

[3] DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border.

commitment to the rule of law with respect to refugee protection in recent years has spurred Council 119 to speak out against unlawful policies on behalf of the union members they represent.[4] Such policies also inflict moral injury on AOs, which undermines DHS' ability to retain and recruit qualified personnel to perform the role's crucial functions. Although this Rule was not the product of careful consideration through the normal notice and comment process, but instead was thrust upon AOs and the populations they serve with minimal warning, Council 119 nevertheless took the opportunity to share its written objections.[5]  And it respectfully submits that the Rule fails legal scrutiny.

## ARGUMENT

### I.  The Rule's Blanket Ineligibility Ground Is Illegal and Ineffective.

The Rule arbitrarily forecloses asylum and other forms of protection for some—and sharply curtails it for others. The United States is, however, bound by

---

[4] *See, e.g.*, Brief of Amicus Curiae Council 119 in Support of Plaintiffs, *East Bay Sanctuary Covenant v. Biden*, No. 18-cv-06810 (N.D. Cal. June 7, 2023), ECF No. 174-1; Brief in Support of Respondents for Amicus Curiae of Council 119, *Wolf v. Innovation Law Lab*, No. 19-1212 (9th Cir. Jan. 22, 2021); Council 119, *Comments on "Security Bars and Processing"* (Aug. 10, 2020), https://www.regulations.gov/comment/USCIS-2020-0013-1897; Council 119, *Comments on Joint Notice of Proposed Rulemaking: Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review* (July 15, 2020), https://www.regulations.gov/comment/EOIR-2020-0003-6096; Brief for Amicus Curiae Council 119, *East Bay Sanctuary Covenant v. Barr*, No. 19-16487 (9th Cir. Oct. 15, 2019), ECF No. 68.

[5] Council 119, *Comments on "Securing the Border"* (Jul. 8, 2024), https://www.regulations.gov/comment/USCIS-2024-0006-1064.

certain international legal obligations to extend refuge to those who qualify for such relief. *See, e.g.*, 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 (the "1951 Convention"); 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267 (the "1967 Protocol"); 1984 United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("Convention Against Torture" or "CAT"). These treaties, and the statutes and regulations designed to implement them, prohibit our country from (i) penalizing refugees for their illegal entry or stay in the country, (ii) discriminating against them on the basis of their race, religion, and national origin, and (iii) returning them to territories where they may be tortured or their lives or freedoms would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980). Beyond that, Congress also established asylum as a discretionary form of relief. *O.A. v. Trump*, 404 F. Supp. 3d 109, 118 (D.D.C. Aug. 2, 2019) ("Asylum is a form of discretionary relief that allows an otherwise removable alien who qualifies as a refugee to remain in the United States."). Although the ultimate decision of whether or not to grant asylum is discretionary, 8 U.S.C. § 1158(a)(1) solidifies the right of noncitizens to apply for asylum, regardless of whether "physically present . . . or arriv[ing] in the United States (whether or not

at a designated port of arrival." *See O.A.*, 404 F. Supp. 3d at 117.

Yet in the face of funding shortfalls and corresponding insufficient resources, these forms of relief—both mandatory and discretionary—have been swept aside. 89 Fed. Reg. at 48714, 48732. Although Council 119 and the Biden Administration (the "Administration") readily agree that insufficient resources at our southern border present operational challenges, the clear solution is to boost resources—not upend the asylum system. This Rule is *not* a solution. The ever-increasing limitations on refugee protections not only endangers refugees but also hinders federal employees, like AOs, from carrying out their duties and implementing the laws they have sworn to carry out. 5 U.S.C. § 3331.

In line with the domestic and international obligations outlined above, AOs "ha[ve] . . . an obligation to extend refuge where such refuge is warranted." *In Re S-M-J-*, 21 I. & N. Dec. 722, 727 (BIA 1997). Thus, immigration enforcement in the United States is more than simply "initiating and conducting prompt proceedings that lead to removals at any cost." *Id.* Instead, "the government wins when justice is done." *Id.* But justice is not done by curtailing humanitarian protection in the name of addressing budgetary shortfalls. *See, e.g.*, 89 Fed. Reg. at 48712–13 (noting "DHS is processing noncitizens for removal in record numbers and with record efficiency"); *Id.* at 48724 (noting high individual removal numbers were "an

indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences").

## II. The Rule's Manifestation of Fear Requirement Contravenes Established Best Practices and Violates Federal Law and Binding International Treaty Obligations.

Under the Rule, would-be asylum seekers must now proactively and without prompting "manifest" their fear or need for protection before they will be referred for a credible fear interview. The Rule's manifestation of fear requirement is flawed—both practically and legally. This requirement departs from the ordinary requirements of 8 C.F.R. § 235.3(b)(4), as well as longstanding practice, under which Customs and Border Protection ("CBP") officers *affirmatively* ask noncitizens whether they fear returning to their country of origin.[6] The Rule eliminates the "requirement to provide individualized advisals and ask affirmative questions" of all noncitizens, claiming that such an approach will allow more effective and efficient identification of those experiencing fear of returning home or signaling an intention to seek asylum. 89 Fed. Reg. at 48743.

---

[6] *See* 89 Fed. Reg. at 48743 ("DHS acknowledges that, by implementing a manifestation standard in the circumstances outlined in this rule, it is temporarily eliminating the requirement to provide individualized advisals and ask affirmative questions via Forms I-867A and B."); 89 Fed. Reg. at 48743 ("DHS is temporarily forgoing asking the fear questions on Form I-867B with respect to noncitizens who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal.")

Under this Rule, the responsibility for discerning the need for a credible fear interview shifts from the immigration officer to ask about fear to the one seeking protection. 89 Fed. Reg. at 48739–40 (comparing the longstanding process, where "[t]he examining immigration officer must. . . ask[], among other things, whether the noncitizen has any fear of return or would be harmed if returned" to the new rule, where "the officer will not be required to . . . ask the noncitizen questions related to whether they have a fear" and "refer the noncitizen to an AO for a credible fear interview only if the noncitizen manifests a fear of return"). The Rule, at least on paper, indicates that manifestation can occur at any time, may "be expressed verbally, non-verbally, or physically," and is "intend[ed] to include a wide range of human communication and behavior" including, for example, noises, sounds, shaking and crying. 89 Fed. Reg. at 48740 & 48740 n.187.

Absent such manifestation of a fear of return or expression of an intention to apply for asylum or other protection, the immigration officer will not refer the noncitizen to an AO for a credible fear interview. This disconnect greatly increases the risk that qualifying individuals will nonetheless be removed without meaningful opportunity to present their claims. *See* 89 Fed. Reg. at 48740 (citing 8 CFR 235.15(b)(4)).

### A. Council 119 Members' Training Informs Their Objection to the Rule's Manifestation of Fear Requirement.

Although the Rule purports to embrace a broad view of what it means to

"manifest" fear, Council 119 members are skeptical, for good reason, about the on-the-ground application of this requirement. It is the strong belief of Council 119 members, informed by many years of experience, that absent carefully built rapport and trauma-informed interview techniques, many noncitizens who otherwise qualify for relief will fall short of adequately articulating their claims. Council 119 members who work as AOs and ROs have extensive experience interviewing vulnerable populations, including determining whether an individual is a refugee or merits relief under the Convention Against Torture. It is this training and experience that informs their objection to this affirmative manifestation of fear requirement—and highlights its flaws.

In their work, AOs and ROs routinely encounter applicants who are tired, confused, and traumatized. In preparation to interview such vulnerable populations, AOs and ROs have historically received substantial training in interviewing techniques designed to reliably elicit the information necessary to make legally sufficient determinations as to whether noncitizens qualify for protection or relief from removal under U.S. immigration law.[7]  AOs and ROs are taught to follow

---

[7] *See* 8 CFR § 208.1(b) ("The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO) shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles."). *See also* 8 U.S.C. § 1157(f) (requiring "all United States officials adjudicating refugee cases" to receive "the same training as that provided to officers adjudicating asylum cases," which includes "country-specific conditions, instruction on the internationally

several guiding principles, including that it is the officer's "*obligation* to elicit all pertinent information" needed to assess a protection claim[8] and that interviews must be conducted with a non-adversarial approach to build rapport and elicit credible information.[9] Training materials highlight that interviews before a government official may be highly intimidating for noncitizens, for reasons that could include prior negative experiences with authority figures, trauma resulting from their sudden flight from their country of origin, perceived or real differences between the cultures of the applicant and the interviewing official, and a fear of sharing highly personal or sensitive information.[10] There is a specialized training dedicated to torture—including discussions of certain culturally-specific psychological effects of torture and other forms of trauma.[11] These materials emphasize, too, the role a noncitizen's country of origin plays in asking probing questions aimed at developing the

---

recognized right to freedom of religion, instruction on methods of religious persecution practiced in foreign countries, and applicable distinctions within a country between the nature of and treatment of various religious practices and believers").

[8] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Eliciting Testimony (2019) at 12 (emphasis added).

[9] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Introduction to the Non-Adversarial Interview (2019) at 15 ("It is well established that a non-adversarial approach in which the interviewer builds rapport is the most effective interview style for eliciting credible information.").

[10] *Id.* at 16.

[11] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Survivors of Torture and Other Severe Trauma (2019).

interviewee's possible protection claim, the AOs' credibility evaluation, and consistency.[12]

As outlined in the text of the Rule, DHS takes the misguided position that noncitizens who affirmatively raise a fear of return on their own "are more likely to be urgently seeking protection," 89 Fed. Reg. at 48743. This position, however, runs counter to the central message of DHS' own trainings. Interviewees are often dealing with the effects of severe trauma—ranging from grief and overwhelming guilt to stress and memory concerns.[13] Casting even more doubt on DHS' stated position, training materials recognize avoidance (including avoiding talking about past events) as a coping mechanism for survivors.[14] Training materials also highlight nuances in cross-cultural communication and language barriers.[15] For noncitizens speaking English as a second language, understanding and answering "yes" or "no" questions in English may be easier—and result in fewer miscommunications—than

---

[12] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing –Researching and Using Country of Origin Information in RAIO Adjudications (2012) at 10-11.

[13] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Interviewing Survivors of Torture and Other Severe Trauma at 16-17 (2019).

[14] *Id.* at 20.

[15] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview (2019) at 8–9.

trying to formulate full sentences in English to manifest fear.[16] Furthermore, this task is even *more* daunting for noncitizens who speak an indigenous language—given the lack of linguistic resources to facilitate communication at the border.[17] Many asylum seekers arriving at the southern border do not know how to access the opportunity to present a protection claim and are unfamiliar with how to establish asylum eligibility. In light of these realities, and given the potential for past trauma and other factors to affect their capacity to do so, AO training materials emphasize that officers "must help the interviewee understand the process so that he or she can focus on and provide the information necessary" for an officer's determination.[18] AOs are instructed to be mindful of an interviewee's possible trauma or torture and recognize that the interview process may trigger trauma survivors (*i.e.*, through recounting traumatic experiences during the interview or through contact with uniformed officials).[19] AOs understand that torture survivors may be unresponsive

---

[16] *Id.*

[17] *See, e.g.*, Center for Gender & Refugee Studies, *"Manifesting" Fear At the Border: Lessons from Title 42 Expulsions*, at 2 (Jan 30, 2024), https://perma.cc/9Z5X-WULH (chronicling experience of Indigenous Guatemalan woman expelled after she could not "manifest" her fear absent sufficient Spanish skills or a translator).

[18] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Eliciting Testimony (2019) at 13.

[19] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Interviewing Survivors of Torture and Other Severe Trauma at 19–22 (2019).

with their answers or fearful of what officers will do with their information due to their distrust of interviewing officers.[20] From a practical perspective, AOs are also well-versed in the benefits (and complexities) of conducting interviews through interpreters, including indications of misinterpretation.[21]

AOs are comfortable with—and know how to support noncitizens through—the interview process. Drawing on this deep well of knowledge, Council 119 representatives register their disagreement with the Rule's manifestation of fear requirement. In Council 119 members' experience, a substantial proportion of noncitizens who qualify for relief have difficulty articulating their claims absent a non-adversarial approach, careful rapport building, and the use of trauma-informed interviewing techniques by the immigration officer.

**B.    CBP Is Not Well-Positioned to Interpret Nuanced Manifestations of Fear.**

As discussed above, the Rule abandons the practice of requiring CBP officers to affirmatively question noncitizens regarding their fear of return, and it defines "manifest" fear to incorporate "a wide range of human communication and behavior." 89 Fed. Reg. at 48740 & n.287. On the ground, these changes raise practical concerns about how noncitizens subject to this Rule can adequately

---

[20] *Id.*

[21] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Working with an Interpreter (2019) at 13.

communicate their fear of return, and whether Border Patrol Agents or CBP Officers have the requisite training and experience to reliably identify noncitizens manifesting fear.[22] The training and mission of these immigration-related law enforcement officers do not adequately prepare them to decipher the "wide range of human communication and behavior"—from noises, behaviors, shaking, and crying—that DHS intends to include under the "manifest fear" umbrella.

Providing Border Patrol Agents and CBP discretion to interpret what noncitizens communicate to them, when these same officers are not trained to interpret these communications, has resulted in manifestations of fear being ignored, and noncitizens deported without credible fear screenings. Reporting indicates even noncitizens who do speak up and tell Border Patrol they fear returning to their home country—which is supposed to prompt a credible-fear interview, even under the new Rule—have been ignored and deported.[23]

---

[22] *"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions*, supra note 19, at 2 (noting CPB did not allow noncitizens to speak before expelling them).

[23] Elliot Spagat, *Behind Biden's asylum halt: Migrants must say if they fear deportation, not wait to be asked*, Associated Press (July 20, 2024), https://perma.cc/2YYT-CNJ6; National Immigrant Justice Center, *Six-Week Report: Implementation of the Biden Administration's June 2024 "Securing the Border" Asylum Ban* (June 2024), at 2–3, 11–12, https://perma.cc/4KFE-Q432 ("Many [noncitizens] expressly instructed not to speak by Border Patrol agents. 'They didn't let us talk' was a sentiment expressed by most people who were deported following the [Rule]."); Emily Bregel, *Border agents ignoring fear claims, migrants say, in violation of Biden order exception*, Arizona Daily Star (Jun. 15, 2024), https://perma.cc/26NX-FNGH .

As distinct from USCIS, CBP "is a law enforcement agency that manages border control, including enforcing U.S. immigration and customs regulations, interdicting persons or goods illegally entering or exiting, collecting import duties, and regulating international trade." *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 213 (2020) (citing 6 U.S.C. § 211). CBP personnel carry out different parts of the DHS mission, with a focus on border security and the identification and prevention of criminal activity at the border, and their activities often place them in an adversarial role against noncitizens. CBP officials conduct their official duties in uniform— which may trigger traumatic memories or symptoms of Post-Traumatic Stress Disorder (PTSD) and even interfere with how a claim is portrayed.[24] The fact that many of these law enforcement agents are also armed, do not share a common language with the noncitizens they encounter, and interact with noncitizens in confined physical spaces (i.e., vehicle or room) only amplifies concerns about open communication.

Unlike AOs, who must "receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles," 8 CFR § 208.1(b), Border Patrol Agents and CBP do not have the same training requirements, *see A.B.-B.*, 548 F. Supp. 3d

---

[24] U.S. Citizenship and Immigration Services, RAIO Directorate – Officer Training Interviewing – Survivors of Torture and Other Severe Trauma at 17, 19, 20 (2019).

at 219–20. CBP training instead focuses on "building the expertise and capacity of an intelligence workforce capable of identifying and countering enduring and emerging threats."[25] And most notable, encounters with law enforcement agents, like Border Patrol and CBP, are inherently adversarial. *See A.B.-B.*, 219–21. Again, the previous requirement for Border Patrol and CBP to *affirmatively* question noncitizens regarding their fear of return accounted for the reality of adversarial encounters and helped ensure the United States did not violate federal law or our binding international treaty obligations by refouling noncitizens to persecution or torture without providing them an opportunity to present their claims under appropriate due process guarantees.

On a fundamental level, relying on law enforcement officers to identify applicants who should potentially be routed to AOs for a screening violates the basic principle enshrined in the Homeland Security Act's disaggregation of the functions of legacy INS: *law enforcement* (CPB and ICE) is distinct from *benefits* (USCIS). *Compare* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2192–95 (codified at 6 U.S.C. §§ 252–56) ("Subtitle D—Immigration Enforcement Functions") and 116 Stat. at 2195–2205 (codified at 6 U.S.C. §§ 256–290) ("Subtitle E—Citizenship and Immigration Services"). Law enforcement and benefits are

---

[25] U.S. Customs and Border Protection, Strategy 2021–2026 (2020) at 25.

separate functions for good reason: Many asylum seekers would hesitate to show up for their asylum interview for fear of repercussions from law enforcement.

Given the unique challenges displaced persons face (with which Council 119 members are familiar) and the distinct mission of immigration-focused law enforcement agents, the Rule flouts best practices and greatly increases the risk of noncompliance with federal law and binding international treaty obligations.

## III.   The Rule's Heightened "Reasonable Probability" Credible Fear Screening Standard Risks Disparate Treatment and Inefficiency.

The Rule—yet again—raises the standard asylum officers must apply when assessing relief under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), or the Convention Against Torture (after having entered a negative credible fear determination with respect to asylum). Over the last two years, AOs have juggled three different credible fear standards: "significant possibility,"[26] "reasonable possibility,"[27] and now,

---

[26] This standard was previously used in credible fear screenings. U.S. Citizenship and Immigration Services, RAIO – Reasonable Fear of Persecution and Torture Determinations (2017) at 11, 17.

[27] This standard, higher than significant possibility, was previously used to establish reasonable fear of persecution or torture in only two limited circumstances but was expanded to be used in credible fear screenings. *See* 8 U.S.C. § 1231(a)(5), 8 C.F.R. § 241.8(e); 8 C.F.R. §§ 208.31, 1208.31; U.S. Citizenship and Immigration Services, RAIO – Reasonable Fear of Persecution and Torture Determinations (2017) at 17–19; 88 Fed. Reg. at 31314, 31336–37, 31381 (May 16, 2023).

"reasonable probability."[28] The continually changing standards—and lack of guidance on how to apply them—raises significant concerns, including concerns about uniformity and efficiency.

**A.    The Novel "Reasonable Probability" Standard Threatens Undue Confusion and Disparate Treatment.**

Adapting to new standards is challenging—but applying novel standards with scant guidance is detrimental to Council 119 members' ability to provide fair and uniform relief and reliably identify noncitizens who lack a lawful basis to remain in the United States. By way of background, the May 2023 Circumvention of Lawful Pathways rule raised the credible fear standard applied in screening noncitizens for relief under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and the Convention Against Torture from one of "significant possibility" of persecution or torture to one of "reasonable possibility" of persecution or torture for noncitizens deemed subject to its presumption of ineligibility for asylum who are unable to rebut it.[29] Council 119 objected to this raised standard as inappropriate and unwarranted. Brief of Amicus Curiae Council 119 in Support of Plaintiffs, *M.A. v. Mayorkas*, No. 23-cv-01843,

---

[28] This standard, "substantially more than a 'reasonable possibility,' but somewhat less than more likely than not," will now be used in credible fear screenings. 89 Fed. Reg. at 48718; *see* 8 C.F.R. §§ 208.35(b)(2)(i),1208.35(b)(2)(iii).

[29] 88 Fed. Reg. 31314. *But see East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023) (vacating Circumvention of Lawful Pathways final rule), *stayed pending appeal*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024).

(D.D.C. October 6, 2023), ECF No. 46-1. But even then, precedent existed for the "reasonable possibility" standard—AOs could at least glean guidance from the two immigration contexts where this standard was in use: Reasonable fear screenings, *see* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8(e) (where an order of removal is reinstated and an asylee expresses fear of returning to that country, an asylum officer interviews to determine if there is a reasonable fear of persecution pursuant to the reasonable possibility standard); 8 C.F.R. §§ 208.31, 1208.31 (where a final administrative removal order—which results from certain felony convictions—has been issued, an asylum officer interviews for a reasonable fear determination using the reasonable possibility standard); and the well-founded fear element of the refugee definition at INA § 101(a)(42) (codified at 8 U.S.C. § 1101(a)(42)), *see Matter of Mogarabbi*, 19 I. & N. Dec. 439 (BIA 1987); *see also I.N.S. v. Stevic*, 467 U.S. 407, 424-25 (1984) ("[S]o long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility.").

The "reasonable probability" standard, by contrast, is unprecedented. No statute, caselaw, or administrative process shines light on how it should be

implemented. Equipped with little more than a vague definition[30] and generalized direction to seek "greater specificity . . . in the noncitizen's testimony,"[31] AOs must each apply this standard. The few examples provided in the Rule's preamble are woefully inadequate to meaningful instruct AOs on how the standard should be applied across the tremendously varied caseload they encounter in credible fear screenings. The Rule's lack of meaningful guidance on how AOs should interpret and apply this standard creates a significant risk of non-uniform application.

### B.    Applying Multiple Standards Is Challenging and Inefficient.

As this Rule was promulgated, the Departments were outwardly prioritizing efficiency. *See, e.g.*, 89 Fed. Reg. at 48713 (highlighting the "processing [of] noncitizens for removal in record numbers and with record efficiency"). But this heightened "reasonable probability" standard is anything but efficient. In practice, it hinders the AOs' ability to identify viable claims.

In developing this Rule, efficiency concerns were on the Departments' minds. They "considered the possibility that the application of different screening standards

---

[30] The Departments define "reasonable probability" as "substantially more than a reasonable possibility, but somewhat less than more likely than not" is utterly lacking in clarity." 8 C.F.R. §§ 208.35(b)(2)(i),1208.35(b)(2)(iii).

[31] "The Departments view the difference between the 'reasonable possibility' standard and the new 'reasonable probability' standard as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony before the AO or the IJ." 89 Fed Reg. at 48746.

to 'the same or a closely related set of facts' might result in inefficiencies." 89 Fed. Reg. 48749 (citing 87 Fed. Reg 18078, 18091 (Mar. 29, 2022) and 88 Fed. Reg 11704, 11746 (Feb 23, 2023)). Rather than weighing the practical implications of multiple standards, however, the Departments simply dismissed efficiency concerns as "unlikely." 89 Fed. Reg. at 48749. Yet previous rulemaking to change the credible fear standard back to "significant possibility" argued that the change aligning the standard for "credible fear screening for asylum" to "credible fear screening for statutory withholding and CAT protection," would "help ensure that the expedited removal process remains truly expedited, and will allow for asylum officers to adhere to a *single legal standard* in screening claims for protection from persecution and torture in the expedited removal process." 87 Fed. Reg. 18078, 18092 (May 31, 2022) (emphasis added). The inverse holds true—a lack of a single legal standard impedes efficiency.

In sum, the Rule's heightened standard raises concerns about uniformity and efficiency—but also about the role of credible fear assessments more generally. While Council 119's members appreciate the Departments' confidence "that AOs and IJs can apply this heightened standard effectively to identify those who are likely to have viable claims on the merits while mitigating the possibility that those with a viable claim would be screened out," 89 Fed. Reg. at 48747, the conditions and pressures under which the Rule's provisions are administered (including trauma,

travel, and conditions of detention facing applicants and operational pressures and high caseload facing AOs), coupled with the application of the Rule's ground of ineligibility for asylum, present substantial and unreasonable barriers to doing so.

## CONCLUSION

Council 119's members are duty-bound to ensure asylum seekers receive a fair hearing on their claims of persecution or torture. The challenged Rule stands in the way of that duty and runs contrary to the fair and workable asylum policy provided for by the Refugee Act. H.R. Rep. No. 608, 96th Cong., 1st Sess. (1979). For the foregoing reasons and those set forth by Plaintiffs, this Court should grant Plaintiffs' Motion for Summary Judgment and award Plaintiffs their requested relief.

Dated:  July 29, 2024                    Respectfully submitted,


                                         COOLEY LLP

                                         By: *Kathleen R. Hartnett*
                                             Kathleen R. Hartnett, Bar No. 483250
                                             COOLEY LLP
                                             3 Embarcadero Center, 20th Fl
                                             San Francisco, California 94111-4004
                                             Tel: (415) 693-2000
                                             Fax: (415) 693-2222
                                             khartnett@cooley.com

                                             Elizabeth Wright*
                                             Celene Chen*
                                             COOLEY LLP
                                             500 Boylston Street, 14th Fl
                                             Boston, MA 02116-3736
                                             Tel: (617) 937 2300
                                             Fax: (617) 937 2400
                                             ewright@cooley.com
                                             celene.chen@cooley.com

                                             Allison Wettstein O'Neill*
                                             Nachi Baru*
                                             COOLEY LLP
                                             10265 Science Center Drive
                                             San Diego, CA  92121-1117
                                             Tel: (858) 550 600
                                             Fax: (858) 550 6420
                                             aoneill@cooley.com
                                             nbaru@cooley.com

                                         *Counsel for Amicus Curiae*

                                         * *Pro Hac Vice Applications Forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

Dated:  July 29, 2024

COOLEY LLP

By: *Kathleen R. Hartnett*

Kathleen R. Hartnett, Bar No. 483250

*Counsel for Amicus Curiae*