BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Senior Counsel*

BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
*Senior Litigation Counsel*

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | Civil Action No. 1:24-cv-01702 |
| ) | |
| Las Americas Immigration Advocacy ) | |
| Center, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. Department of Homeland Security, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND.........................................................................3

ARGUMENT ...............................................................................................................................13

    I.    Threshhold Issues Bar Plaintiffs' Claims ........................................................................13

        A.  The organizational Plaintiffs lack standing...............................................................13

        B.  Section 1252 bars the organizational Plaintiffs' claims................................................18

        C.  The organizational Plaintiffs are not within the zone of interests. .............................20

        D.  The Court should dismiss all individual Plaintiffs who lack injury. ...........................22

    II.   The Rule and Guidance Are Consistent with the INA.......................................................24

        A.  The Rule's asylum-eligibility limitation is authorized by the INA.............................24

        B.  The changes to expedited-removal processes are consistent with the INA ...............33

    III.  The Rule Satisfies the APA's Procedural Requirements...................................................40

        A.  Foreign affairs exception ...........................................................................................40

        B.  Good cause exception. ................................................................................................42

    IV.  The Rule and Guidance Are Not Arbitrary and Capricious...............................................44

        A.  The limitation on asylum eligiblity is not arbitrary or capricious ..............................48

        B.  The changes to credible-fear processes are not arbitrary or capricious. .....................51

    V.   Any Relief Must Be Sharply Limited ...............................................................................57

CONCLUSION.............................................................................................................................65

# **TABLE OF AUTHORITIES**

## **Cases**

*Aberdeen & Rockfish R.R. v. SCRAP*,
    422 U.S. 289 (1975)..................................................................................................... 58

*Air Transp. Ass'n of Am., Inc. v. U.S.,
    DOA*, 317 F. Supp. 3d 385 (D.D.C. 2018) ............................................................... 62

*Al-Fara v. Gonzales*,
    404 F.3d 733 (3d Cir. 2005).......................................................................................... 34

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*
    988 F.2d 146 (D.C. Cir. 1993) ............................................................................. 60, 62

*Am. Ass'n of Exps. & Imps. v. United States*,
    751 F.2d 1239 (Fed. Cir. 1985)......................................................................... 40, 42

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ...................................................................................... 61

*Arizona v. United States*,
    567 U.S. 387 (2012)....................................................................................................... 25

*Ass'n v. Re*no,
    ("AILA"), 199 F.3d 1352 (D.C. Cir. 2000) ............................................... 15, 19, 20

*Ayuda, Inc. v. Reno*,
    7 F.3d 246 (D.C. Cir. 1993)......................................................................................... 22

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
    140 S. Ct. 2335 (2020)................................................................................................... 65

*Biden v. Missouri*,
    595 U.S. 87 (2022)......................................................................................................... 44

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984)....................................................................................................... 22

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983)....................................................................................................... 26

*Butte Cty. v. Chaudhuri*,
    887 F.3d 501 (D.C. Cir. 2018)..................................................................................... 39

*California v. Texas*,
    141 S. Ct. 2104 (2021) ........................................................................................... 57

*Capital Area Immigrants' Rights Coal.* v. Tru*mp*,
    ("CAIR"), 471 F. Supp. 3d 25 (D.D.C. 2020) .................................................. 40, 41

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................................................ 45

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ................................................................................................ 17

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987) ................................................................................................ 20

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) .......................................................................................... 22, 57

*Dep't of Comm. v. New York*,
    139 S. Ct. 2551 (2019) ........................................................................................... 56

*Dhakal v. Sessions*,
    895 F.3d 532 (7th Cir. 2018) ................................................................................... 4

*Direct Mktg. Ass'n v. Brohl*,
    575 U.S. 1 (2015) .............................................................................................. 58, 62

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ................................................................................................ 61

*East Bay Sanctuary Covenant v. Biden*
    993 F.3d 640 (9th Cir. 2021) .............................................................................. 28, 29

*East Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2020) .................................................................................. 47

*East Bay Sanctuary Covenant v. Biden*,
    102 F.4th 996 (9th Cir. 2024) ................................................................................. 14

*East Bay Sanctuary Covenant v. Biden*,
    683 F. Supp. 3d 1025 (N.D. Cal. 2023) ............................................................. 30, 65

*East Bay Sanctuary Covenant v. Biden*,
    2023 WL 11662094 (9th Cir. Aug. 3, 2023) ........................................................ 30

*Environmental Def. Fund, Inc. v. EPA,*
   82 F.3d 451 (D.C. Cir. 1996) ...................................................................... 25

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) .................................................................................... 45

*Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno,*
   93 F.3d 897 (D.C. Cir. 1996) ...................................................................... 21

*Food & Drug Admin. v. All. for Hippocratic,*
   *Med.*, 602 U.S. 367 (2024) .......................................................... 15, 16, 17

*Garland v. Aleman Gonzalez,*
   142 S. Ct. 2057 (2022) .................................................................... 57, 58, 59

*Giammarco v. Kerlikowske,*
   665 F. App'x 24 (2d Cir. 2016) .................................................................. 60

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .................................................................... 13, 57, 61

*Grace v. Barr,*
   965 F.3d 883 (D.C. Cir. 2020) .................................................................... 59

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) .................................................................................... 16

*Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
   429 F.3d 1136 (D.C. Cir. 2005) .................................................................. 62

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ...................................................................... 25, 28, 30, 44

*Immigrant Rights Project v. USCIS,*
   325 F.R.D. 671 (W.D. Wash. 2016) ............................................................ 21

*INS v. Cardoza-Fonseca,*
   480 U.S. 421 (1987) ...................................................................... 3, 25, 34, 35

*INS v. Legalization Assistance Project of L.A. Cty.,*
   510 U.S. 1301 (1993) ............................................................................ 21, 59

*Johnson v. Guzman Chavez,*
   594 U.S. 523 (2021) ...................................................................................... 6

iv

*Judulang v. Holder,*
565 U.S. 42 (2011) ............................................................................................ passim

*Kiyemba v. Obama,*
555 F.3d 1022 (D.C. Cir. 2009) ................................................................................ 60

*Komarenko v. INS,*
35 F.3d 432 (9th Cir. 1994) ............................................................................... 26, 31

*Kucana v. Holder,*
558 U.S. 233 (2010) ................................................................................................. 60

*Las Americas Immigrant Advocacy Ctr. v. Wolf,*
507 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................... passim

*Lewis v. Casey,*
518 U.S. 343 (1996) ................................................................................................. 57

*Linda R.S. v. Richard D.,*
410 U.S. 614 (1973) ................................................................................................. 14

*Loper Bright Enterprises v. Raimondo,*
144 S. Ct. 2244 (2024) ...................................................................................... 38, 45

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ................................................................................................. 13

*M.M.V. v. Garland,*
1 F.4th 1100 (D.C. Cir. 2021) ................................................................................ 19

*Mack Trucks, Inc. v. E.P.A.,*
682 F.3d 87 (D.C. Cir. 2012) .................................................................................. 42

*Madsen v. Women's Health Ctr.,*
512 U.S. 753 (1994) ................................................................................................. 61

*Make the Road v. Wolf,*
962 F.3d 612 (D.C. Cir. 2020) ............................................................... 18, 19, 20, 59

*Matter of D-A-C-,*
27 I. & N. Dec. 575 (B.I.A. 2019) ......................................................................... 27

*Matter of Pula,*
19 I. & N. Dec. 467 (B.I.A. 1987) .................................................................... 27, 28

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ........................................................... 22

*Moncrieffe v. Holder,*
  568 U.S. 184 (2013) ............................................................................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................... passim

*Mountain States Legal Found. v. Glickman,*
  92 F.3d 1228 (D.C. Cir. 1996) ........................................................... 20

*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ........................................................... 16

*Nat. Res. Def. Council v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) ............................................................. 57

*O.A. v. Trump,*
  404 F. Supp. 3d 109 (D.D.C. 2019) ............................................. 28, 29

*Pac. Power & Light Co. v. Fed. Power Comm'n,*
  111 F.2d 1014 (9th Cir. 1940) ............................................................ 25

*Patchak v. Zinke,*
  138 S. Ct. 897 (2018) .......................................................................... 18

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
  797 F.3d 1087 ...................................................................................... 16

*Raoof v. Sullivan,*
  315 F. Supp. 3d 34 (D.D.C. 2018) ................................................ 41, 43

*Reno v. Flores,*
  507 U.S. 292 (1993) ............................................................................ 28

*R-S-C- v. Sessions,*
  869 F.3d 1176 (10th Cir. 2017) .......................................................... 31

*Samirah v. O'Connell,*
  335 F.3d 545 (7th Cir. 2003) .............................................................. 60

*Sorenson Commc'ns Inc. v. F.C.C.,*
  755 F.3d 702 (D.C. Cir. 2014) ........................................................... 43

*Spokeo v. Robins*,
   578 U.S. 330 (2016)................................................................................. 17

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)................................................................................. 17

*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984)................................................................................. 14

*Texas v. Mayorkas*,
   No. 2:23-cv-00024, 2024 WL 3679380 (W.D. Tex. Aug. 5, 2024) ......................... 14

*Trump v. Hawaii*,
   585 U.S. 667 (2018)................................................................................. 26

*U.S. Chamber of Commerce v. S.E.C.*,
   443 F.3d 890 (D.C. Cir. 2006)................................................................ 42, 44

*United States v. Cortez*,
   449 U.S. 411 (1981)................................................................................. 62

*United States v. Texas*,
   599 U.S. 670 (2023)............................................................ 14, 17, 22, 60, 61

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978)................................................................................. 34

*Wilderness Soc. v. Tyrrel*,
   918 F.2d 813 (9th Cir. 1990)...................................................................... 39

*Yang v. INS*,
   79 F.3d 932 (9th Cir. 1996).................................................................. 26, 28

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980)................................................................ 41, 43

**Statutes**

5 U.S.C. § 553(a)(1)................................................................................. 40, 41

5 U.S.C. § 702 ....................................................................................... 20

5 U.S.C. § 702(1) ..................................................................................... 61

5 U.S.C. § 703 ....................................................................................... 60

6 U.S.C. § 271(b) .................................................................................... 5

6 U.S.C. § 552(d) ................................................................................................ 5

8 U.S.C. § 1101 ............................................................................................... 3, 4

8 U.S.C. § 1101(a)(42)(A) ................................................................................ 31

8 U.S.C. § 1103(a)(1) ......................................................................................... 5

8 U.S.C. § 1103(a)(3) ....................................................................................... 12

8 U.S.C. § 1158(a) (1982) ........................................................................... 26, 27

8 U.S.C. § 1158(a)(1) .................................................................................. 28, 30

8 U.S.C. § 1158(a)(2) ......................................................................................... 5

8 U.S.C. § 1158(b)(1)(A) ............................................................................ 25, 27

8 U.S.C. § 1158(d)(7) .................................................................................. 21, 24

8 U.S.C. § 1225(b)(1) ......................................................................................... 4

8 U.S.C. § 1229a ................................................................................................ 4

8 U.S.C. § 1231(b)(3) ......................................................................................... 5

8 U.S.C. § 1252 ............................................................................................ 18, 62

8 U.S.C. § 1252(a) ............................................................................................ 22

8 U.S.C. § 1252(a)(2)(A) .................................................................................. 18

8 U.S.C. § 1252(a)(5) ........................................................................................ 16

8 U.S.C. § 1252(e) .............................................................................................. 2

8 U.S.C. § 1252(e)(1) ........................................................................................ 15

8 U.S.C. § 1252(e)(1)(A) .............................................................................. 61, 62

8 U.S.C. § 1252(e)(3) .................................................................................... 22, 44

8 U.S.C. § 1252(e)(3)(A) .............................................................................. 19, 21

8 U.S.C. § 1252(f)(1) ................................................................................... 57, 58

8 U.S.C. § 1158 ....................................................................................... 4, 13, 31

8 U.S.C. § 1158(b)(1) ...................................................................................... 31

8 U.S.C. § 1159 ....................................................................................... 4, 13, 31

8 U.S.C. § 1182(f) ........................................................................................... 1, 8

28 U.S.C. § 1331 ............................................................................................... 18

**Regulations**

8 C.F.R. § 208.13 ............................................................................................. 26

8 C.F.R. § 208.2(a) ............................................................................................. 4

8 C.F.R. § 208.30(e)(2) .................................................................................... 32

8 C.F.R. § 235.15 ...................................................................................... 9, 10, 65

8 C.F.R. § 235.15(b)(4) ................................................................................... 10

8 C.F.R. § 235.3(b)(4)(ii) ......................................................................... 37, 39

8 C.F.R. § 208.13(g) ......................................................................................... 9

8 C.F.R. § 208.16 ............................................................................................... 5

8 C.F.R. § 208.2(b) ............................................................................................. 4

8 C.F.R. § 208.35 ............................................................................................. 65

8 C.F.R. § 208.35(a)(2) ..................................................................................... 9

8 C.F.R. § 208.35(b) ........................................................................................ 33

8 C.F.R. § 208.35(b)(2)(i) ............................................................................... 11

8 C.F.R. § 208.35(b)(3) .............................................................................. 64, 65

## INTRODUCTION

Plaintiffs, eleven noncitizens and two organizations, seek to vacate on a nationwide basis an interim final rule (the "Rule") jointly issued by the Department of Homeland Security (DHS) and the Department of Justice (DOJ) to address high levels of migration at the southern border. *See Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024). As a result of global political and economic conditions, migration to the nation's southern border had reached unsustainable levels. *Id*. at 48,711. Despite efforts to address this historic migration with the limited tools and resources provided by Congress, the "border security and immigration systems ha[d] not been able to keep pace with the number of individuals arriving at the southern border." *Id*. at 48,713. As a result, Border Patrol stations and immigration detention facilities had become overcrowded, and the asylum system has been beset by backlogs that prevent the government from screening and adjudicating claims and delivering consequences in a timely fashion. These delays incentivize migrants to travel to the United States even if they have no legal basis to remain in the country and prevent the government from providing timely protection to those who are eligible for asylum or related protections. *Id*. at 48,713-15.

To address these concerns, on June 4, 2024, the President announced a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1182(f), 1185(a), finding that entry of certain noncitizens into the United States across the southern border during periods of elevated levels of encounters would be detrimental to the interests of the United States. 89 Fed. Reg. 48,487 (June 7, 2024). The Proclamation thus suspends and limits the entry of such noncitizens while border encounters exceed specified thresholds. *Id*. The Proclamation also directs the Secretary of Homeland Security and the Attorney General to consider promptly issuing regulations to address the circumstances at the southern border that gave rise to the

suspension on entry. *Id*. at 48,492. On June 4, 2024, the Departments promulgated a Rule that establishes a limitation on asylum eligibility and revises certain procedures for expedited removal during emergency border circumstances to more swiftly remove noncitizens who do not have a legal basis to remain in the United States.

Plaintiffs ask this Court to issue nationwide relief vacating both the Rule and separate DHS guidance setting a four-hour minimum consultation period for noncitizens subject to the Rule prior to any credible fear interview. The Court should deny that request.

First, the organizational Plaintiffs, who are not regulated by the Rule or guidance, lack standing to challenge the Rule or guidance. The organizations also cannot bring a claim under 8 U.S.C. § 1252(e)—the provision they invoke—and they are not within the zone of interests of the relevant statutory provisions. The Court should also dismiss all individual Plaintiffs who have not shown they were injured by the Rule or guidance.

Second, the Rule and guidance are consistent with the Executive's statutory authority. The INA vests the Departments with express authority to impose new limits on asylum eligibility, as well as broad authority to decide how to best implement the expedited removal process. The Rule is a reasonable exercise of that authority that is consistent with the INA and prior precedent. The guidance is also fully consistent with the INA, which imposes to minimum consultation period.

Third, Plaintiffs' procedural challenge also fails, as the Rule satisfies the requirements of the Administrative Procedure Act (APA). The Departments adequately explained the foreign affairs concerns and good cause they had for issuing the Rule without pre-publication notice given, among other things, the risk of a surge of border crossers during any delayed implementation and comment period.

2

Fourth, the Rule and guidance are not arbitrary and capricious. Without the measures contemplated by the Rule, DHS cannot adjudicate arriving noncitizens' asylum claims in a timely fashion and cannot deliver timely consequences for irregular migration during the present emergency circumstances. The resulting delays "create[e] a vicious cycle" in which DHS is forced to release individuals who lack a lawful basis to remain in the United States into a backlogged immigration court system, incentivize more people to make the dangerous journey to the border, and increase a lucrative source of income for smugglers and transnational criminal organizations. 89 Fed. Reg. 48,714-15. The Departments considered all the relevant facts and issues, including those Plaintiffs raise, and provided a rational explanation for why the Rule's asylum limitation and changes to the expedited removal process were necessary to address emergency circumstances at the border.

Finally, certain relief Plaintiffs seek is barred by statute, and Plaintiffs' request for universal vacatur of the Rule and guidance is foreclosed by constitutional and equitable principles. Even if the Court disagrees, it should at a minimum limit any relief to individual Plaintiffs to avoid the disruptive consequences to border management that would result from vacating a Rule that was issued to ameliorate emergency border circumstances that threaten the safety and security of border communities and migrants.

Defendants also request that, if the Court grants any relief, the Court stay its order for 14 days to allow the government to consider seeking emergency relief in the court of appeals.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. Asylum is a form of discretionary relief under the INA, 8 U.S.C. § 1101 *et seq. See id.* § 1158; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). Generally, a grant of asylum protects noncitizens from removal, creates a path to lawful permanent residence and U.S.

citizenship, authorizes noncitizens to work, and enables certain of their immediate family members to seek asylum derivatively. *See* 8 U.S.C. §§ 1158-1159. To obtain asylum, noncitizens must show that they: (1) qualify as a "refugee"—that is, that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" a protected ground, *id.* §§ 1101(a)(42), 1158(b)(1)(A); (2) are not subject to an exception or mandatory condition or bar that precludes applying for or receiving asylum, *id.* § 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion, *id.* § 1158(b)(1)(A).

A request for asylum may arise in three circumstances: (1) a noncitizen present in the United States and not in removal proceedings may affirmatively apply to U.S. Citizenship and Immigration Services (USCIS), *see Dhakal v. Sessions*, 895 F.3d 532, 536 (7th Cir. 2018); 8 C.F.R. § 208.2(a); (2) a noncitizen in removal proceedings under 8 U.S.C. § 1229a may apply before the immigration judge (IJ) as a defense to removal, 8 C.F.R. §§ 208.2(b), 1208.2(b), 1240.11(c); and (3) a noncitizen in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) may indicate an intention to apply for asylum or fear of persecution or torture, 8 U.S.C. § 1225(b)(1)(A)(ii). In the last case, an asylum officer interviews the noncitizen to determine if the noncitizen has a "credible fear" of persecution, meaning there is a "significant possibility" that they "could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). If the noncitizen receives a positive credible fear determination, their asylum case may be heard by another asylum officer or they may be placed in removal proceedings before an IJ, where they may apply for asylum and protection, including statutory withholding of removal and protection under the Convention Against Torture (CAT). If they receive a negative credible fear determination, an IJ may review that determination. *Id.* § 1225(b)(1)(B)(iii)(III). If the IJ affirms the determination, or the noncitizen declines IJ review, they are ordered removed without further review. *See id.* § 1225(b)(1).

The INA prohibits certain noncitizens from applying for asylum and deems others ineligible to be granted asylum—for example, those who have participated in persecution or who were firmly resettled in another country before arriving in the United States. *See* 8 U.S.C. § 1158(a)(2), (b)(1)(B), (b)(2). And for decades, the Executive has promulgated conditions and limitations on asylum eligibility that render certain noncitizens ineligible for asylum. *See* 88 Fed. Reg. 11,704, 11,734-35 (Feb. 23, 2023). Attorneys General originally adopted such limits pursuant to their authority "to establish a procedure" for asylum. *See id.* In 1996, Congress codified several of those limits. *See id.* Simultaneously, Congress reaffirmed that the Departments[1] retain the same broad authority to establish new conditions, specifying that the Attorney General "may by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C); *see id.* § 1158(d)(5)(B); 6 U.S.C. § 552(d); 8 U.S.C. § 1103(a)(1), (a)(3), (g). Secretaries and Attorneys General have invoked that authority for decades to establish limitations and conditions on asylum eligibility beyond those expressly provided in the statute. *See, e.g.*, *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (internal relocation bar); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018); *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67,202 (Oct. 21, 2020); *see also* 89 Fed. Reg. 48,734-35 (collecting additional examples).

In addition to asylum, arriving noncitizens may apply for withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the Convention Against Torture, 8 C.F.R. §§ 208.16-.18, 1208.16-.18. Unlike asylum, which is discretionary, these provisions prohibit removal to a

---

[1] The Homeland Security Act of 2002 transferred certain authority under the immigration statutes from the Attorney General to the Secretary of Homeland Security. *See* 6 U.S.C. § 271(b).

country where a noncitizen will likely be persecuted or tortured. *See Moncrieffe v. Holder*, 568 U.S. 184, 187 n.1 (2013). But in contrast to asylum, statutory withholding of removal and CAT protection do not prohibit the government from removing a noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture. *See, e.g.*, *Johnson v. Guzman Chavez*, 594 U.S. 523, 536-37 (2021).

The Proclamation and Rule. The Departments have in recent years faced an unprecedented surge in global migration that has placed extraordinary strain on limited agency resources. From fiscal year 2017 to 2019, encounters of noncitizens between ports of entry (POEs) along the southwest border more than doubled, and such encounters continued to increase in 2021 and 2022. 89 Fed. Reg. 48,721. In fiscal year 2021, encounters between POEs exceeded 1.6 million, and in 2022, they reached a new high-water mark, exceeding 2.2 million. *Id*. at 48,721-22. Despite extensive and ongoing efforts to channel migrants into a growing number of lawful pathways, *id*. at 48,712-13, 48,724, encounters remained at record numbers in 2023, leading to significant operational challenges, including putting many detention facilities well over their capacity, and severely straining DHS operations and resources, as well as resources of other agencies, local communities, and non-governmental organizations, *id*. at 48,724-25.

Over the past year, "it has become increasingly clear that DHS's ability to process individuals encountered at the [southwest border]" and "critically, to deliver timely consequences to a meaningful proportion of those who do not establish a legal basis to remain in the United States" is "significantly limited by the lack of resources and tools that are available to the Departments" to respond to increased migration. 89 Fed. Reg. 48,725. Despite setting "records in terms of individuals placed in expedited removal … and credible fear interviews conducted by [asylum officers (AOs)]," given "current resources" and "the absence of congressional action,"

DHS does not have sufficient detention beds, repatriation flights, or AOs to conduct credible fear interviews for all those who claim a fear or intent to apply for asylum. As a result, DHS simply cannot process a sufficient number of noncitizens through expedited removal proceedings, and instead it has had to place those noncitizens into lengthier proceedings in the backlogged immigration court system, where many of them are released into the country. *Id*. at 48,751-52. This "creat[es] a vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences" to all those encountered at the border who "lack a lawful basis to remain in the United States," and "increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time." *Id*. at 48,714, 48,751; *see also id.* at 48,763.

The Departments thus faced an urgent situation: as a result of various factors, including "the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by [DHS's] lack of resources," 89 Fed. Reg. 48,725, many more migrants would likely cross the border and assert asylum claims, overwhelming the government's ability to process migrants in a safe, expeditious, and orderly way. The Departments had taken various measures to address the growing number of encounters, including promulgating the Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31,314 (May 16, 2023). But despite the strengthened consequences from that rule, which led to the highest numbers of returns and removals in more than a decade, high encounter levels continued and were projected to remain high. 89 Fed. Reg. 48,713, 48,762. Additional measures were thus necessary to impose consequences on irregular migration and reduce the strain on agency resources.

Against that backdrop, on June 4, 2024, the President announced a Proclamation under 8 U.S.C. §§ 1182(f), 1185(a), finding the entry of certain categories of noncitizens during high levels of encounters to be detrimental to the interests of the United States, and limiting and suspending entry of such persons unless border encounters drop below a specified threshold (and reimposing a suspension and limitation on entry should encounters again increase above a specified level). 89 Fed. Reg. 48,487 (June 7, 2024). The Proclamation provides that the "entry of any noncitizen into the United States across the southern border" is "suspended and limited," subject to exceptions for nationals and lawful permanent residents of the United States, unaccompanied children, any noncitizen who is determined to be a victim of a severe form of trafficking in persons, any noncitizen with a valid visa or other lawful permission to seek entry or admission or who presents at a port of entry at a pre-scheduled time and place, and noncitizens who otherwise merit an exception based on individualized circumstances. *Id*. at 48,491. The President directed the Secretary of Homeland Security and the Attorney General to "promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border," including "any additional limitations and conditions on asylum eligibility that they determine are warranted." *Id*. at 48,492.

To address the exigent circumstances described in the Proclamation, on June 4, 2024, DHS and DOJ promulgated a Rule that, during the emergency border circumstances identified as the periods of high encounters outlined in the Proclamation, "put[s] in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time noncitizens spend in DHS facilities," and "further streamline[s] DHS processes at the border so that DHS can more quickly deliver meaningful consequences to individuals who cross unlawfully or without authorization within the resource and operational constraints that have limited DHS

capacity to date." *Id*. at 48,730.[2] During such periods, the Rule does this by: (1) adding a limitation on asylum eligibility for those who enter across the southern border, other than those who are excepted from the Proclamation or who establish exceptionally compelling circumstances; (2) altering the process for identifying fear claims during expedited removal processing; and (3) altering the screening standard for statutory withholding of removal and CAT protection for those found ineligible for asylum under the Rule. *See generally* 8 C.F.R. §§ 208.13(g), 208.35, 235.154, 1208.13(g), 1208.35.

First, the Rule imposes a substantive limitation on asylum eligibility during emergency border circumstances. Under the Rule, individuals who do not fall under any of the Proclamation's exceptions and who cross the southern border are generally not eligible for asylum outside of a limited set of circumstances. 8 C.F.R. §§ 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Noncitizens may avoid the limit on asylum eligibility by establishing by a preponderance of the evidence that "exceptionally compelling circumstances exist," including if they demonstrate that, at the time of entry, they or a member of their family with whom the noncitizen was traveling "faced an acute medical emergency," "faced an imminent and extreme threat to their life or safety," or satisfy "the definition of 'victim of a severe form of trafficking in persons' provided in 8 CFR 214.11." 8 C.F.R. §§ 208.35(a)(2), 1208.35(a)(2).

Second, the Rule implements a "'manifestation of fear' process at the border" to reduce the time it takes to process people at the border during the present emergency border circumstances. 89 Fed. Reg. at 48,718, 48,713, 48,739-45; *see* 8 C.F.R. § 235.15. As part of this process, DHS

---

[2] The Rule provides that the suspension and limitation on entry will remain in place until 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters between POEs, but could take effect again or continue if, at any time thereafter, the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more. 89 Fed. Reg. 48,749.

does not affirmatively ask noncitizens being processed for expedited removal if they have a fear or intent to seek asylum. However, DHS has adopted measures to ensure noncitizens are informed of their rights with respect to asylum and seeking protection, such as posting signs in areas where noncitizens are processed and playing a video in most CBP facilities explaining that they should inform the inspecting officer if they have a fear of return or intend to apply for asylum. 89 Fed. Reg. at 48,741-44. This information is provided in various languages, including those most commonly spoken by noncitizens encountered by CBP, and in plain and simple language that can be easily understood by noncitizens of different education levels, cultures, and backgrounds. *Id*. Individuals who manifest a fear of persecution or torture either verbally, non-verbally, or physically will be referred to credible fear screening, thus ensuring the Departments' limited resources are focused on individuals most likely to qualify for protection, and reducing overall processing times in CBP facilities. *See* 8 C.F.R. § 235.15(b)(4).

Third, the Rule implements a higher screening standard for forms of protection other than asylum for individuals subject to the Rule's asylum limitation. Asylum officers will interview noncitizens who manifest fear and are referred for a credible fear screening to determine if the noncitizen is subject to the Rule and, if so, whether there is a significant possibility that the noncitizen could establish an exception to it. 89 Fed. Reg. 48,745-49. If the noncitizen is ineligible for asylum because of the asylum limitation, asylum officers will screen claims for withholding of removal or CAT protection to determine whether the noncitizen has established a "reasonable probability of persecution or torture"—a standard that is higher than the "significant possibility" standard that would apply without the Rule, but is still lower than the standard that will ultimately

be applied to adjudicate a claim on the merits.[3] 8 C.F.R. §§ 208.35(b)(2)(i), 1208.35(b)(2)(iii).
"[R]easonable probability means substantially more than a reasonable possibility, but somewhat
less than more likely than not, that the noncitizen would be persecuted because of his or her race,
religion, nationality, membership in a particular social group, or political opinion, or tortured, with
respect to the designated country or countries of removal." 89 Fed. Reg. 48,755. This new standard
"requires a greater specificity of the claim in the noncitizen's testimony" than simply citing to
general country conditions, and the noncitizen should "provide greater detail in their statements
and information as to the basis for their individual claim." 89 Fed. Reg. 48,746-47. This change is
intended to reduce the large number of noncitizens who pass screening for potential eligibility for
withholding and CAT protection under the "reasonable possibility" standard that applies to those
ineligible for asylum due to the Circumvention of Lawful Pathways Rule, but ultimately do not
qualify for protection under the higher "more likely than not" merits standard. 89 Fed. Reg. at
48,746-47. Reducing this significant gap between screening rates and the ultimate success rate is
essential during emergency border circumstances to allow the Departments to focus limited
resources on noncitizens who are most likely to succeed on their protection claims, reduce the
substantial and growing backlog of cases awaiting review in the immigration courts, and impose
timely consequences on those who enter irregularly, creating a disincentive for such entries. *Id.*
The practical result of the backlog is that noncitizens with meritorious claims have to wait years
for their claims to be granted, while many individuals whose claims will ultimately be denied
spend years in the United States before being ordered removed. *Id.*

---

[3] This "reasonable probability" standard is also higher than the "reasonable possibility" standard
that applies to noncitizens ineligible for asylum under the Circumvention of Lawful Pathways
Rule, which similarly is higher than the "significant possibility" standard used to screen for asylum
eligibility and for withholding and CAT eligibility for those not ineligible for asylum based on this
Rule or the Lawful Pathways Rule.

The Departments concluded that the Rule will "significantly increase" their ability "to deliver timely decisions and timely consequences at the border," "combatting perceptions and messaging to the contrary," and break the vicious cycle in which surges lead to additional releases, increase the immigration court backlog, further incentivize irregular migration, and embolden smugglers who encourage the perception that there are no consequences for unlawful entry. 89 Fed. Reg. 48,714, 48,726

Separately, to expeditiously conduct expedited removal proceedings for noncitizens arriving at the border without authorization, DHS issued guidance setting a four-hour minimum period for noncitizens subject to the Rule to "consult with a person [of their] choosing prior to" a credible fear interview. *See* 8 U.S.C. § 1225(b)(1)(B)(iv). That period begins at the time ICE or CBP provides the noncitizen with the opportunity to consult, *i.e.*, access to a phone, and continues only between the hours of 7 a.m. and 7 p.m. local time, such that the four hours need not be consecutive. *See* Consultation Admin Record (AR) at 1-5. Congress set no minimum time for consultation in the statute but provided that "consultation shall be at no expense to the Government and shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); *see* 8 U.S.C. § 1103(a)(3), (a)(5). DHS issued the guidance on a minimum four-hour consultation period to ensure consultation does not cause unreasonable delay.

This Lawsuit. On June 12, 2024, two organizations that provide services to immigrants, Las Americas Immigrant Advocacy Center, and the Refugee and Immigrant Center for Education and Legal Services, filed this suit challenging the Rule and guidance. ECF No. 1. On July 14, 2024, Plaintiffs amended their complaint to add eleven individual Plaintiffs. ECF No. 14. The organizational Plaintiffs allege the Rule and guidance will frustrate their mission by reducing the number of people eligible for asylum and by making it more difficult to provide counseling and

legal services to noncitizens subject to expedited removal. *Id*. at ¶¶ 23, 25. The individual Plaintiffs allege that they were denied credible fear interviews or denied the opportunity to seek protection from removal, and were removed from the United States because of the Rule. *Id*. at ¶¶ 11-21. Plaintiffs argue the Rule is contrary to law because it conflicts with the asylum and expedited removal statutes, 8 U.S.C. §§ 1158, 1225(b)(1) (Claims 1 & 2), ECF No. 14 at ¶¶ 93-101; that the Rule is arbitrary and capricious (Claim 3), *id*. at ¶¶ 102-05; that the Rule was improperly issued without notice and opportunity to comment, (Claim 4), *id*. at ¶¶ 106-09; and, that the guidance is contrary to law and arbitrary and capricious (Claim 5), *id*. at ¶¶ 110-16. On July 26, 2024, Plaintiffs moved for summary judgment on all claims. ECF No. 23.

## ARGUMENT

The Court should deny Plaintiffs' motion for summary judgment and grant summary judgment in favor of the government. Plaintiffs lack standing and the organizational Plaintiffs cannot raise claims challenging the expedited removal process; the Rule and guidance are consistent with the INA and prior precedent; the Rule satisfies the procedural requirements of the APA; and, neither the Rule nor the guidance is arbitrary and capricious.

## I.     Threshold Issues Bar Plaintiffs' Claims.

### A.     The organizational Plaintiffs lack standing.

The Plaintiff organizations fail to demonstrate they have standing because they cannot show they have suffered an "invasion of a legally protected interest" that is "concrete and particularized." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). The Rule does not regulate these organizations or implicate their legally protected interests in any way. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). To the extent the Plaintiff organizations allege possible harm related to potential clients who are affected by the Rule, *see* ECF No. 14, ¶¶ 22-25, it is well

established that a party—organizational or otherwise—generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), including "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). That principle precludes standing here. *See United States v. Texas*, 599 U.S. 670, 677 (2023). The Supreme Court's decision in *Texas* made clear that allowing plaintiffs to challenge immigration enforcement policy based on potential effects on third parties would violate this "fundamental Article III principle." *Id.* at 674; *see also East Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (holding, based on *Texas*, that States did not have "significant protectible interest" in enforcement of the immigration laws or policies in a particular manner or in "minimizing expenditures" related to effects policies might have on third parties).

The organizations assert the Rule and guidance will frustrate their missions of assisting noncitizens seeking asylum because those noncitizens will have less time to "find counsel" and obtain "counseling and legal services." ECF No. 14, ¶¶ 23, 25. But *Texas*, *Sure-Tan*, and *Linda R.S.* make clear that such collateral effects on an organization's potential clients are not a sufficient basis for Article III standing. Those decisions establish that third parties generally have no judicially cognizable interest in the enforcement (or non-enforcement) of immigration laws against noncitizens. *See, e.g., Texas*, 143 S. Ct. at 1969-70 (rejecting argument that indirect effects on third parties from immigration policy could support Article III standing simply because they "supply social services … to noncitizens who" may be affected by a change in immigration policy); *Sure-Tan*, 467 U.S. at 897; *Linda R.S.*, 410 U.S. at 619; *see also Texas v. Mayorkas*, No. 2:23-cv-00024, 2024 WL 3679380, at *6 (W.D. Tex. Aug. 5, 2024) (noting "the Supreme Court has more recently narrowed plaintiffs' standing to challenge federal programs based on indirect, downstream monetary costs," dismissing challenge to Circumvention of Lawful Pathways rule); *Am. Immigr.*

*Laws. Ass'n v. Reno* ("*AILA*"), 199 F.3d 1352, 1364 (D.C. Cir. 2000) (noting, among other things, "the bar on class actions" challenging the expedited removal process in 8 U.S.C. § 1252(e)(1), as further support for holding "plaintiff organizations do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens subjected to" the "expedited removal system").

The organizations' argument that they have standing to challenge changes to federal policy related to asylum seekers because they provide services to noncitizens would in theory allow them to challenge any change in policy that affects asylum seekers. The Supreme Court has rejected such attenuated theories of standing. Just two months ago, the Supreme Court held that a group of doctors could not assert standing to challenge agency actions affecting third parties—and in their view, removing protections and "public safety requirements" that might otherwise apply to those third parties—simply because the doctors might be called upon to provide services to those individuals in "emergency rooms or in doctors' offices." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 391-92 (2024). This "attenuated" theory of standing would improperly allow doctors to challenge virtually any change in policy that might indirectly affect the health or safety of potential patients because it might affect the number of patients they serve or the time involved in helping those patients. *Id.* There "would be no principled way to cabin such a sweeping doctrinal change" that would allow various groups to challenge policies affecting their potential clients, such as "[t]eachers in border states" "su[ing] to challenge" changes to "immigration policies" that would affect the number of students in their classrooms. *Id.* at 392. The "Court has consistently rejected" such an "approach to standing" "as flatly inconsistent with Article III." *Id.*

Organizations "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. for Hippocratic Med.*, 602 U.S. at 393-94 (citing

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The organizational Plaintiffs here cannot satisfy this standard. Plaintiffs allege that their "mission" is "frustrated by the Rule and Guidance" because they "impede[ ]" Plaintiffs' "ability to provide counseling and legal services" to third parties, and Plaintiffs will have to divert resources to respond. ECF No. 14, ¶ 23; *id.* ¶¶ 25, 81-92. But the Supreme Court has held that the "argument" that federal policy has "impaired" an organization's "ability to provide services and achieve their organizational missions … does not work to demonstrate standing." *All. for Hippocratic Med.*, 602 U.S. at 394. A plaintiff must show "far more than simply a setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, and "[t]he mere fact that an organization redirects some of its resources to … legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization," *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). Thus, it is not enough that "an organization diverts its resources in response to defendant's actions" even if it will "expend considerable time, energy, and resources" advocating to the agency as a result of the policy change. *All. for Hippocratic Med.*, 602 U.S. at 394-95; *see also id.* at 396 (noting "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context.").[4]

     Ultimately, the organizations allege the Rule and guidance may make it more difficult for them to help potential clients seek asylum or protection from removal, just as the medical associations in *Alliance for Hippocratic Medicine* argued for standing based on government

---

[4] *Havens* involved a private right of action under the Fair Housing Act, and Congress's aim to allow private enforcement of statutory prohibitions against discriminatory housing practices drove the Court's standing analysis in that case. 455 U.S. at 373-74; *see People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1100-01 (Millett, J., dubitante) (noting *Havens* involved a "direct, concrete, and immediate injury" to the organization's services based on a "specific legal right"). In contrast, in the INA, Congress limited review to claims from individual noncitizens directly affected by the immigration laws. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e).

actions they alleged would make it more difficult for them to "treat patients," force them to divert "resources and time," and potentially increase their costs, 602 U.S. at 390. And the Plaintiff organizations' argument for standing here fails for the same reasons that the argument failed in *Alliance*. Any voluntary changes the Plaintiff organizations make in their own affairs in light of the Executive's policy choices with respect to third-party noncitizens are not judicially cognizable injuries. *Texas*, 599 U.S. at 678 (noting that the Executive "does not exercise coercive power" over "the plaintiff" when making discretionary enforcement decisions directed at third parties).

Both organizations also allege harm from not having "advance notice" and "an opportunity to comment" on the Rule before it took effect. ECF No. 14 ¶ 23; *see id.* ¶ 25. But "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). "It makes no difference that the procedural right has been accorded by Congress," because "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Id.*; *see Spokeo v. Robins*, 578 U.S. 330, 341 (2016) (Congress's creation of a procedural right "does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). Because "Article III standing requires a concrete injury even in the context of a statutory violation," a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 578 U.S. at 341.

Finally, the Plaintiff organizations submit no evidence that shows they have actually experienced the injuries alleged in their amended complaint as a result of the Rule. Declarations providing only "speculation" are insufficient to satisfy Article III. *Clapper v. Amnesty Int'l*, 568

U.S. 398, 416 (2013). In their motion for summary judgment, Plaintiffs make no standing argument at all, let alone demonstrate that the organizations have standing. And Plaintiffs' motion does not cite the declarations the organizations submitted. *See generally* Mot., ECF No. 23.

**B.**     **Section 1252 bars the organizational Plaintiffs' claims.**

The Court also lacks statutory jurisdiction under 8 U.S.C. § 1252 to resolve the organizational Plaintiffs' claims. Although 28 U.S.C. § 1331 generally supplies jurisdiction over federal questions, 8 U.S.C. § 1252(a)(2)(A) eliminates such jurisdiction, other than as permitted by § 1252(e). *See Make the Road v. Wolf*, 962 F.3d 612, 626 (D.C. Cir. 2020). Section 1252(a)(2)(A) and (e)(3) sharply limit jurisdiction over claims involving expedited removal procedures or proceedings, and the organizational Plaintiffs do not qualify for any limited exception to that preclusion. Section 1252(a)(2)(A), titled "Matters not subject to judicial review," provides that "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... except as provided in subsection (e)," "any [] cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," "a decision ... to invoke the provisions of such section," or "procedures and policies adopted ... to implement" § 1225(b)(1). 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv). Section 1252(a)(2)(A) thus removes from federal courts any jurisdiction to review issues "relating to section 1225(b)(1)," *i.e.*, expedited removal proceedings or credible fear determinations, other than as permitted by § 1252(e). *See Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018) ("notwithstanding any other provision of law" in jurisdictional provision encompasses 28 U.S.C. § 1331).

Section 1252(e)(3) authorizes "[j]udicial review of determinations under section 1225(b) of this title and its implementation" in this Court, "limited to determinations of—(i) whether [§ 1225(b)], or any regulation issued to implement such section, is constitutional; or (ii) whether

such a regulation, or a written policy directive, written policy guideline, or written procedure … implement[ing] such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A). Such suits "must be filed no later than 60 days after the date the challenged action, regulation, directive, guideline, or procedure ... is first implemented." *Id*. § 1252(e)(3)(B); *see generally M.M.V. v. Garland*, 1 F.4th 1100, 1106-11 (D.C. Cir. 2021); *Make the Road*, 962 F.3d at 625-31.

Under these provisions, and binding D.C. Circuit precedent, the organizations' claims are barred. The D.C. Circuit has twice held that claims brought by organizations under § 1252(e)(3) are limited to claims advanced on behalf of *individuals* subject to the expedited removal provisions under a theory of associational standing. *See Make the Road*, 962 F.3d at 627-28. Through § 1252(e)(3), "Congress meant to allow actions *only by aliens* who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations." *AILA*, 199 F.3d at 1359 (emphasis added); *see also id.* ("Congress … contemplated that lawsuits challenging [actions]" through § 1252(e)(3) "would be brought, if at all, by individual aliens who … were aggrieved by the statute's implementation"); *id*. at 1364 (noting in particular "the bar on class actions" in § 1252(e)(1)(B), as an indication of congressional intent that only individual noncitizens raise claims under § 1252(e)(3)).

The D.C. Circuit recently reaffirmed this view. Rejecting an argument that organizations could sue on behalf of third-party noncitizens subject to the expedited removal procedures, the Court explained that *AILA* "rejected third party organizational standing ... as a basis to sue under Subsection 1252(e)(3)," distinguishing *AILA* as "a case [brought] on behalf of individuals directly regulated and affected by the challenged rule." *Make the Road*, 962 F.3d at 627. *Make the Road* explicitly restates the holding of *AILA* that § 1252(e)(3) "contemplate[s] that litigation could be

brought by affected individual themselves" only. *Id.* at 628. As *Make the Road* further explains, "[w]hether aggrieved individuals sue on their own or band together through a representative association does not change the nature of the lawsuit as seeking to remedy *the individual members' injuries* .... That is because associational (sometimes called 'representational') standing *is derivative and reflective of individual standing*." *Make the Road*, 962 F.3d at 628 (emphasis added). But whether a party is an individual invoking their injuries directly, or an association invoking its members' injuries, the core requirement under § 1252(e)(3) is the same: the party invoking § 1252(e)(3) must point to a specific *individual's* injuries. *See id.*; *AILA*, 199 F.3d at 1359. Here, the organizations advance a theory of injury premised only on organizational standing, and so the Court lacks jurisdiction under § 1252(e)(3) over their claims.

### C.    The organizational Plaintiffs are not within the zone of interests.

The organizational Plaintiffs' claims are also outside the zone of interests of the statutes on which they base their claims. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. For a plaintiff to be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke*, 479 U.S. at 396 (modifications omitted). "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). The organizational Plaintiffs do not argue that they are in the zone of interests and invoke no such interest here.

Nothing in the asylum or expedited removal provisions of the INA protects the interests of nonprofit organizations providing legal services to noncitizens. Neither § 1158 nor § 1225 evinces any concern with organizations or their interest in representing asylum seekers. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies..."); *id*. § 1252(a)(2)(A). These provisions do not regulate the organizational Plaintiffs' conduct or create any benefits for which these organizations themselves might be eligible. And courts have routinely concluded that immigration statutes are directed at noncitizens, not organizations advocating for them.

When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources ... does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit and other courts have thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996). That reasoning fully applies here. The Plaintiff organizations are not seeking asylum or contesting expedited removal; they seek to help others do so. Nothing in "the relevant provisions [can] be fairly read to implicate [Plaintiffs'] interest in the efficient use of resources." *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016). Because the organizations are outside the statutory scheme, the alleged effects on their resources are outside the statutory zone of

interests. And to the extent Plaintiffs may cite out-of-circuit authority applying a more lenient test, those cases can no longer support Plaintiffs' arguments after the Supreme Court recently made clear in *Texas*, 599 U.S. at 674, 677—relying on principles that inform not only the scope of Article III but also the scope of the APA's cause of action—that third parties like Plaintiffs have no cognizable interest in the way the Executive enforces the immigration laws against others.[5]

The procedural nature of some of the organizational Plaintiffs' claims makes no difference. A plaintiff asserting a violation of the APA's notice-and-comment requirements must still show a concrete Article III injury that comes within the zone of interests protected by the underlying substantive statute upon which their claims are based. *See Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014). Plaintiffs have not done so.

### D.    The Court should dismiss all individual Plaintiffs who lack injury.

Several of the individual Plaintiffs advance claims against portions of the Rule and guidance to which they were not subjected, or by which they were not injured. Those claims should be dismissed for lack of standing. The individual Plaintiffs' claims should be dismissed as to portions of the Rule and guidance to which they were not subjected or have not sufficiently alleged harm. In such circumstances they lack any "legally and judicially cognizable" injury traceable to the challenged policies. *Texas*, 143 S. Ct. at 1970; *see DaimlerChrysler Corp. v. Cuno*, 547 U.S.

---

[5] The INA confirms organizations are not within the zone of interests. A noncitizen's challenge to determinations related to asylum and protection claims must occur in individual removal proceedings, and others may not bring suit on their behalf. 8 U.S.C. § 1252(a), (b)(9); *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348, 351 (1984); *accord Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding similar review scheme precludes "organizational plaintiff" from "suing to challenge [] INS policies or statutory interpretations that bear on" a noncitizen's legal claims). And 8 U.S.C. § 1252(e)(3) creates the exclusive review scheme for any challenges related to the expedited removal process and precludes organizational challenges, *see supra* at 18-20.

332, 352 (2006) ("plaintiff must demonstrate standing for each claim" and "each form of relief sought").

First, Plaintiffs A.E, E.D., T.R., S.G., J.C., and J.R. cannot challenge the Rule's manifestation provisions because, having manifested fear and been referred for credible fear interviews, they were not injured by it. *See* A.E. Decl. ¶ 9; E.D. Decl. ¶ 10; T.R. Decl. ¶ 10; S.G. Decl. ¶¶ 10–12; J.C. Decl. ¶¶ 13–14; J.R. Decl. ¶ 10.

Second, Plaintiffs D.G., E.R., P.S., and D.C. cannot challenge the limitation on asylum eligibility, the "reasonable probability" standard governing screening of withholding and CAT claims, or the four-hour consultation period because they did not express or manifest a fear of persecution or torture and so were not subject to those provisions and procedures, all of which would have occurred later in their processing had they manifested or expressed such a fear. *See* D.G. Decl. ¶ 11; E.R. Decl. ¶¶ 14–15; P.S. Decl. ¶ 15; D.C. Decl. ¶ 13.

Third, Plaintiffs A.E., E.D., T.R., S.G., and J.C. cannot challenge the four-hour consultation period. Of those who expressed or manifested fear (A.E., E.D., T.R., S.G., J.C., and J.R.), only J.R. has alleged injury from the four-hour consultation period. The relevant statutory provision governing consultation ensures that noncitizens may "consult with a person or persons of the [noncitizen]'s choosing prior to the [credible fear] interview or any review thereof, according to regulations prescribed by the [Secretary]" so long as "[s]uch consultation [is] at no expense to the Government and [does] not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv). A.E., E.D., T.R., and J.C. all state that they were unable to speak to an attorney, but they do not explain why or provide facts that link their inability to speak with an attorney to the four-hour consultation period guidance. It is possible, for example, that they did not try to call an attorney or that they chose to consult with family members instead. Indeed, A.E.,

T.R., and J.C. merely state they "never had an opportunity to speak to an attorney," A.E. Decl. ¶¶ 8-9, "never got to speak to an attorney," T.R. Decl. ¶ 11, and "never spoke to an attorney," J.C. Dec. ¶ 14, without indicating whether they tried to speak to an attorney or whether the four-hour consultation period—as opposed to some other factor—prevented them from speaking to an attorney. S.G. claims that he was told he could only make one call and acknowledges that he was able to speak with his mother. S.G. Decl. ¶ 11. He was thus able to consult. To the extent he claims that he was unable to make additional calls because he was limited to one phone call, that limitation is not traceable to the four-hour consultation period guidance, which specifically states that the 4-hour period "allow[s] sufficient time for individuals to make multiple phone calls and have in-depth conversations." Consultation AR 3. He has therefore not established that his alleged harm is traceable to that guidance.

Finally, Plaintiffs have not demonstrated that their claims are redressable in light of the statutory limitations on the remedies available to them. *See infra* 59-60.

## II.  The Rule and Guidance Are Consistent with the INA.

### A.  The Rule's asylum-eligibility limitation is authorized by the INA.

The INA's text, structure, and history make clear that the Rule reflects a lawful exercise of the Executive's discretion to promulgate conditions on asylum eligibility. The INA expressly provides that the responsible agency heads may by Rule—and not just case-by-case adjudication—establish "limitations and conditions" on asylum eligibility, beyond those set out in the statute, that are "consistent with" the asylum statute. *Id.* § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (authorizing "other conditions or limitations").

The Rule's eligibility limitation fits comfortably within that express statutory authorization, which enables the Executive to promulgate additional conditions so long as they are

"consistent"—that is, may "coexist[]" and not reflect any "noteworthy opposing, conflicting, inharmonious, or contradictory qualities," Webster's Third New International Dictionary 484 (1993)—with the statute. *See, e.g.*, *Environmental Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam) (holding that "consistent with" signals "congruity or compatibility"), *as amended*, 92 F.3d 1209; *see also Pac. Power & Light Co. v. Fed. Power Comm'n*, 111 F.2d 1014, 1016 (9th Cir. 1940) (similar); 89 Fed. Reg. at 48,736 n.180 (collecting cases). The Rule provides that in times of heightened border encounters when the President has found that temporary suspension of entry is required, restrictions should be placed on the ability of certain noncitizens who enter during that suspension to obtain asylum, absent exceptionally compelling circumstances. 89 Fed. Reg. at 48,731-33. That determination does not conflict with the text or structure of § 1158 and is consistent with (and an appropriate exercise of the Departments' authority under) that provision.

The statutory context and history reinforce this conclusion. Section 1158 implements the government's asylum authority, which is always a matter of executive "discretion"—never of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Thus, Congress has specified that the Executive "*may* grant asylum" to a noncitizen who satisfies governing regulations but is never obligated to do so. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). That discretion stems not only from the statute, but also from the Executive's enforcement discretion in this context. Asylum decisions, like other "discretionary decisions" about whether noncitizens may remain in the United States, necessarily "bear on this Nation's international relations," *Arizona v. United States*, 567 U.S. 387, 396 (2012)—indeed, the Rule is part of an overarching cooperative effort with foreign governments to manage migration. Decisions related to asylum eligibility implicate "sensitive and weighty interests" of foreign affairs, *Holder v. Humanitarian Law Project*,

25

561 U.S. 1, 33-34 (2010), that are the Executive's particular responsibility. *See also Trump v. Hawaii*, 585 U.S. 667, 712 (2018) (emphasizing the Executive's broad discretion, codified in 8 U.S.C. § 1182(f), to suspend or place conditions on entry).

The statutory history further highlights the extensive discretion Congress conferred on the Executive. When § 1158 was first enacted in 1980, it allowed the Attorney General to grant asylum as a matter of discretion and did not include language authorizing the Executive to create "additional limitations and conditions." *See* 8 U.S.C. § 1158(a) (1982). The Attorney General, exercising that discretion, issued regulations establishing various restrictions on asylum, such as generally mandating denials for claims based on past persecution alone. *See* 8 C.F.R. § 208.13; *see also* Aliens and Nationality; Refugee and Asylum Procedures, 45 Fed. Reg. 37,392 (June 2, 1980); *Yang v. INS*, 79 F.3d 932, 936-39 (9th Cir. 1996) (upholding firm resettlement bar); *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar). In 1996, Congress codified six of the Attorney General's mandatory bars and amended the INA to expressly confirm the Attorney General's authority to add further "conditions or limitations." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 604, 110 Stat. 3009 (codified at 8 U.S.C. § 1158(b)(2)). The decision to leave undisturbed the Attorney General's mandatory bars and also affirmatively endorse the authority to promulgate additional limitations is strong support for the government's longstanding construction of its discretionary authorities. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (Congressional awareness of an Executive interpretation and failure to modify it when enacting related legislation "make out an unusually strong case of legislative acquiescence" and "ratification by implication").

Moreover, several provisions of § 1158 underscore the permissibility of the Rule's focus on promoting efficiency in the asylum system. Congress conditioned the grant of asylum on a noncitizen's applying "in accordance with the requirements and procedures established by" the Departments. 8 U.S.C. § 1158(b)(1)(A). Consistent with Congress's recognition that a properly functioning immigration system depends on orderly procedures that noncitizens must follow, the Departments have determined, in light of current exigent circumstances as found by the President, that certain noncitizens who enter across the southern border during a suspension of entry shall be generally ineligible for asylum. Congress itself has already established asylum conditions that are aimed at promoting systemic efficiency. For example, Congress generally prohibited applications for asylum filed more than one year after entry, *id*. § 1158(a)(2)(B), and prohibited noncitizens from pursuing successive asylum applications, *id.* § 1158(a)(2)(C). These provisions make clear that the INA does not prioritize the identification of otherwise-meritorious asylum claims above all else, and that administrative practicality and systemic efficiency are legitimate considerations. Nothing in the statute suggests that Congress intended to foreclose the Departments from similarly taking systemic considerations into account.

Indeed, the Executive Branch has long considered factors similar to those underlying the Rule in determining whether any particular asylum applicant warrants a favorable exercise of discretion. As the Board of Immigration Appeals has explained, "[t]he ultimate consideration" for whether a noncitizen is deserving of discretionary relief, including asylum, is whether granting relief "appears to be in the best interest of the United States," as determined by the Executive officials charged with making asylum determinations. *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (B.I.A. 2019). Consistent with that best-interest standard, the Board has long held that a noncitizen's "circumvention of orderly refugee procedures" is a relevant consideration. *Matter of*

*Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987). The Board has also considered noncitizens' "manner of entry or attempted entry," "whether [they] passed through any other countries or arrived in the United States directly from [their] country, whether orderly refugee procedures were in fact available to help [them] in any country [they] passed through, and whether [they] made any attempts to seek asylum before coming to the United States." *Id*. at 473-74. Although Congress has amended the asylum statute since *Pula*, it has never foreclosed or limited consideration of these systemic factors in exercising discretion. Although the Rule places greater weight on manner of entry during the circumstances giving rise to the Proclamation's suspension of entry, 89 Fed. Reg. at 48,732, this decades-old precedent establishes that the Departments may take into account that factor. And exactly how much weight to place on that factor, and whether to do so in weighing asylum eligibility, fall well within the broad discretion conferred by § 1158(b)(2)(C). *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (emphasizing the Executive's ability to promulgate "generic rules" even where the INA requires the exercise of discretion through "some level of individualized determination" (quotation omitted)); *Yang*, 79 F.3d at 936-37 (similar).

Plaintiffs do not meaningfully grapple with the statutory text and history described above. Instead, they principally contend that the Rule conflicts with 8 U.S.C. § 1158(a)(1), which permits a noncitizen "who arrives in the United States (whether or not at a designated port of arrival . . . )" to apply for asylum. Mot. 9-10. In so arguing, Plaintiffs contend that prior court decisions invalidating the so-called "Entry bar" effectively control this case. *See id.* at 10 (citing *East Bay v. Biden*, 993 F.3d 640, 669-70 (9th Cir. 2021); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147-52 (D.D.C. 2019)). Neither of the decisions relied on by Plaintiffs is binding precedent in this Court, however, and both decisions took an overly circumscribed view of the Departments' authority to enact additional "conditions or limitations" on a noncitizen's eligibility for asylum. *East Bay*, for

instance, effectively held that the Executive could not bar from asylum *eligibility* a class of noncitizens that Congress had provided with a statutory right to *apply* for relief. *See Easy Bay*, 993 F.3d at 670-71; *accord O.A.*, 404 F. Supp. 3d at 148-50. As the government argued, however, the statute does not require that every noncitizen eligible to *apply* for asylum must also be eligible to *receive* asylum, and the existing statutory categorical bars to eligibility that encompass noncitizens otherwise permitted to apply for asylum negate the claim that the Departments may not implement additional categorical bars to relief. To the extent that *East Bay*'s analysis is inconsistent with the principles advanced in this section, this Court should decline to follow its reasoning.

In any event, neither case casts doubt on the Departments' authority to adopt the current Rule. In *East Bay*, the Ninth Circuit held that a rule that effectively categorically prohibited noncitizens from being granted asylum if they did not arrive at a POE was inconsistent with § 1158(a)(1), which permits noncitizens to apply for asylum "whether or not" they arrived in the United States "at a designated port of arrival." *East Bay*, 993 F.3d at 669-71 (quoting § 1158(a)(1)); *accord O.A.*, 404 F. Supp. 3d at 147-50. Although that Court acknowledged that both the Executive and the Ninth Circuit "have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief," the Court concluded that the categorial port-of-entry rule impermissibly placed dispositive weight in nearly all cases on the method of entry. *East Bay*, 993 F.3d at 671; *see O.A.*, 404 F. Supp. 3d at 151.

By contrast, the Rule does not treat manner of entry as dispositive in determining asylum eligibility. First, the eligibility bar contains an exception for exceptionally compelling circumstances, including for those who face an "acute medical emergency" or "face[] an imminent and extreme threat to life or safety," as well as those who meet the definition of "victim of a severe

form of trafficking in persons" provided by regulation. 89 Fed. Reg. at 48,732-33. Second, the eligibility bar does not apply to classes of noncitizens excepted from the Proclamation, including, *inter alia*, individuals who immigration officials believe should be excepted based on relevant considerations. *Id.* at 48,715. Finally, the limitation does not differentiate between noncitizens based on whether they entered at or between POEs. *See*, *e.g.*, 8 U.S.C. § 1158(a)(1) (permitting an arriving noncitizen to apply for asylum, "whether or not at a designated port of arrival"). Because of the exceptions to both the Proclamation and the eligibility bar, noncitizens can remain eligible for asylum despite entering between POEs. Conversely, noncitizens who present at a POE may fall within the scope of the Proclamation and be subject to the Rule if, for instance, they do not schedule an appointment or arrive pursuant to a lawful process for safe and orderly entry. In these respects, the Rule is like other statutory and regulatory asylum provisions that limit asylum for defined categories of noncitizens for reasons separate from the merits of their claims.

For example, the Rule is similar to the Circumvention of Lawful Pathways regulation. Both Rules establish a limitation on asylum eligibility premised on the need to disincentivize irregular migration while encouraging use of alternative lawful pathways to enter the United States. And, importantly, under both Rules the applicability of the eligibility bar is not tied to whether the noncitizens entered at or between POEs. In the most recent *East Bay* case, the Ninth Circuit stayed the district court's vacatur of that rule, thus necessarily finding that the plaintiffs in that case were not likely to succeed in their challenge. *East Bay Sanctuary Covenant v. Biden*, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023). Notably, plaintiffs in *East Bay* made many of the same arguments that Plaintiffs make here. *East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1040-43 (N.D. Cal. 2023).

The INA doers not mandate that everyone who presents at a POE or who enters between POEs must be eligible for asylum. It would be improper to read the INA to provide that there can be "no categories of aliens for whom asylum would be completely unavailable." *Komarenko*, 35 F.3d at 436; *see R-S-C- v. Sessions*, 869 F.3d 1176, 1187 & n.9 (10th Cir. 2017). Nothing in § 1158(a)(1) precludes the Executive from taking into consideration practical and operational realities at the time a noncitizen attempts to enter. There is therefore no basis to read § 1158(a)(1) to bar the agencies from taking into account, when assessing asylum eligibility, considerations such as those embodied in the Rule. *See R-S-C-*, 869 F.3d at 1187.

Plaintiffs additionally argue that the Rule conflicts with the "asylum statute's provision that a noncitizen may be granted asylum if the noncitizen is a 'refugee,'" because the "exceptional circumstances" exception to the eligibility bar imposes a heightened standard, *i.e.*, a standard above a "well-founded fear of persecution" the noncitizen would otherwise have to show to establish asylum eligibility. Mot. 13-14 (citing 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A)). The Rule does not, however, amend or otherwise address the question of who may qualify as a "refugee" under the statute, and Plaintiffs ultimately confuse two distinct questions: who may qualify as a refugee under 8 U.S.C. § 1101(a)(42)(A), and who may qualify for asylum and be granted relief under the provisions of 8 U.S.C. § 1158. Establishing refugee status is a necessary but not sufficient condition for establishing eligibility for relief under § 1158, and the Rule places a reasonable condition on that latter question without in any way affecting the former. The further question of "exceptional circumstances," which addresses conditions where an ostensible refugee may maintain eligibility for asylum, likewise solely goes to the applicability of the eligibility bar, and not to the threshold question of whether the individual could establish status as a "refugee." There

is thus no conflict, as the Rule and the provisions Plaintiffs cite are addressing different aspects of the asylum process.

Plaintiffs' contention that the Rule violates 8 U.S.C. § 1125(b)(1)(B)(v), which requires use of the "significant possibility" standard in asylum screenings, suffers from similar misunderstandings. Mot. 15. Contrary to Plaintiffs' arguments, the Rule explicitly requires AOs and IJs to apply the "significant possibility" standard when considering the applicability of the limitation during credible fear interviews. *See* 89 Fed. Reg. 48,739 ("the AO and IJ must determine whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances"). Even without that statement, the "significant possibility" standard applies by statute, 8 U.S.C. § 1225(b)(1)(B)(v), and the regulation governing the general credible fear process mirrors the statute and requires its application in all credible fear interviews, *see* 8 C.F.R. § 208.30(e)(2) ("An alien will be found to have a credible fear of persecution if there is a significant possibility ... that the alien can establish eligibility for asylum."). In other words, the Rule requires that the "significant possibility" standard apply to the limitation.

Notably, the provisions added by the Rule mirror the language of prior rules adopting limitations on asylum eligibility applied during credible fear interviews.[6] The provisions nowhere

---

[6] *See, e.g.*, *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 31,380 ("AO will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption") *Security Bars and Processing*, 85 Fed. Reg. at 84,175 (2020) (explaining "rule does not, and could not, alter the standard for demonstrating a credible fear of persecution, which is set by statute"); *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. at 33,837 (2019) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or

suggest that the "significant possibility" standard does not apply. Instead, they merely set forth the order of operations and articulate which standard applies to the persecution or torture claims, depending on whether the rebuttable presumption applies. Specifically, the provisions first require considering the applicability of the rebuttable presumption and whether the noncitizen can establish an exception to it or rebut it. Depending on the outcome of that threshold inquiry, the Rule then provides which screening standard shall apply—"significant possibility" if screened for asylum and "reasonable probability" if not. *See* 8 C.F.R. §§ 208.35(b), 1208.35(b). Nothing in those processing provisions displaces the statutory "significant possibility" standard or the general credible fear regulation also requiring its application.

## B. The changes to expedited-removal processes are consistent with the INA.

To the extent the Court considers Plaintiffs' arguments challenging the Rule's changes to the expedited-removal process, as well as guidance DHS has adopted, Mot. 23-38, it should find those challenges also lack merit.

The manifestation standard is consistent with the INA. The Rule permissibly requires noncitizens to manifest a fear of return or express an intention to apply for asylum or a fear of persecution or torture or return to their country of removal, without prompting or questioning by the immigration officer, before being referred for a credible fear interview. The INA directs immigration officers to refer noncitizens to an asylum officer for a credible fear interview only where the noncitizen "indicates either an intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii); *accord* 8 U.S.C. § 1225(b)(1)(A)(i). The statute does not define what

---

she can establish eligibility for asylum), then the alien will have established a credible fear."); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. at 55,943 (2018) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

circumstances constitute the requisite indication of intent or fear, nor does any language in the statute place any affirmative obligation on the government to question noncitizens about fear in their home countries or any intent to seek discretionary relief. To the contrary, the onus under the statute is on the noncitizen to *indicate* either of the circumstances warranting referral. *See Indicate*, Webster's New World College Dictionary 687 (1996) (to "indicate" means to "show," "point out," "direct attention to," "express briefly or generally" or "give a sign, token, or indication of"). The Rule reasonably provides that a noncitizen can do so at any time in the process, whether verbally, non-verbally, or physically. 89 Fed. Reg. 48,740. In the absence of any explicit statutory directive, the Departments were entitled to create a process best suited to the specific exigencies the Rule is intended to address. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.").

Plaintiffs nevertheless contend that the manifestation provision is inconsistent with international law, which they claim imposes "an affirmative obligation to elicit information that could establish refugee status," Mot. 22-23, and the statute, because the INA requires DHS to "provide information concerning the asylum interview described in this subparagraph to aliens who *may* be eligible," Mot. 23 (quoting 8 U.S.C. § 1225(b)(1)(B)(iv)). Plaintiffs' argument from international law falters at the threshold, however; the "Protocol [Relating to the Status of Refugees] is not self-executing [and does not] confer any rights beyond those granted by implementing domestic legislation," *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005), and the United Nations High Commissioner for Refugees ("UNHCR") Handbook does not have "the force of law" and does not "in any way bind[] the [government] with reference to the asylum

provisions of § 208(a)," *Cardoza-Fonseca*, 480 U.S. at 439 n.22. In any event, neither the Protocol itself nor the UNCHR Handbook imposes an affirmative duty to elicit information relating to relief or protection. *See*, *e.g.*, 89 Fed. Reg. at 48,740-41. The Protocol does not address procedural questions, and the Handbook is contrary to Plaintiffs' argument. The Handbook provides that "the determination of refugee status . . . is not specifically regulated. In particular, the Convention does not indicate what type of procedures are to be adopted for the determination of refugee status. It is therefore left to each Contracting State to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure." UNHCR Handbook para. 189. Plaintiffs focus on a comment on the Rule made by the UNHCR. *See* Mot. 23 n.15. A comment by the UNCHR to an IFR obviously lacks the status of binding law, and given the absence of any other indication that the manifestation requirement is contrary to the text of the Protocol or Handbook, Plaintiffs' argument fails.

Second, Plaintiffs' statutory argument is similarly unavailing. The INA provides that DHS "shall provide information concerning the asylum interview . . to aliens who may be eligible," 8 U.S.C. § 1225(b)(1)(B)(iv), and Plaintiffs claim that the "manifestation standard means Defendants have ceased to provide information about the credible fear process to any person who 'may' qualify for asylum." Mot. 23. As explained, however, the statute does not direct DHS to "provide information" in any particular manner—and the Rule provides that CBP will provide the required information to all noncitizens subject to expedited removal. Notices are posted in CBP facilities notifying individuals that if they have a fear of return or intend to apply for asylum, they should inform the inspecting immigration officer. 89 Fed. Reg. at 48,741. And, at certain CBP facilities where the vast majority of noncitizens are processed for expedited removal, noncitizens are shown a short video explaining the importance of manifesting a fear to CBP immigration

officers. *Id*. Plaintiffs fail to address these operational changes, which are plainly consistent with the notice provisions of 8 U.S.C. § 1225(b)(1)(B)(iv). Accordingly, the Rule satisfies DHS's statutory obligation.

      <u>The changes to credible-fear screening are consistent with the INA</u>. The Rule applies its asylum-eligibility limitation in credible fear interviews and utilizes a heightened screening standard for assessing statutory withholding of removal and CAT protection claims where a noncitizen is found to be subject to the Rule's limitation on asylum eligibility. Plaintiffs do not argue that the Departments lack statutory authority to enact these changes or that these changes are contrary to law, nor could they. The statute does not foreclose applying eligibility limitations in credible fear interviews and does not require any particular standard for screening whether a noncitizen has the requisite fear of persecution or torture required to seek statutory withholding of removal or CAT protection. *See Las Americas Immigrant Advocacy Ctr. v. Wolf*, 507 F. Supp. 3d 1, 32 (D.D.C. 2020) (Jackson, J.) (underscoring "Congress's clear intent to afford noncitizens who are subject to expedited removal fewer procedural rights in order to facilitate the expeditious processing of their asylum claims").

      <u>The minimum four-hour consultation period is consistent with the INA</u>. To promptly conduct expedited removal proceedings for noncitizens described in the Proclamation and the Rule, DHS has issued guidance setting a four-hour minimum consultation period from the time the noncitizen is provided access to a phone. *See* Consultation AR 1-3. Those four hours must be between 7 a.m. and 7 p.m. local time. *Id*. Plaintiffs argue that this guidance is inconsistent with the statute and regulation. Mot. 35-37. The four-hour consultation period is, however, consistent with DHS's statutory and regulatory authority.

      Under the expedited removal statute, "[a]n alien who is eligible for" a credible fear

interview "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, *according to regulations prescribed by the [Secretary]*." 8 U.S.C § 1225(b)(1)(B)(iv) (emphasis added). Congress did not prescribe any specific time frame in which consultation should take place, but it directed that "[s]uch consultation ... shall not unreasonably delay the process." *Id*. The implementing regulations in turn provide that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). The regulation specifically notes that the consultation right depends on the "policies and procedures" adopted by DHS, *id*., and neither the statute nor the regulation prescribes a minimum time that must be provided for that consultation or defines the term "unreasonable delay."

In establishing the minimum four-hour consultation period, the guidance reasonably implements the statute and regulations. It explains that, "[A]s part of a whole-of-DHS approach, this change to the minimum consultation period will support DHS with operationalizing across its components the requirements set forth in the Presidential Proclamation of June 3, 2024 and the Securing the Border IFR" because "DHS and USCIS's resources are strained, and reasonable attempts must be made to expeditiously conduct expedited removal proceedings for noncitizens arriving during circumstances described in the Presidential Proclamation." Consultation AR 2-3. To do this, DHS must "maximiz[e] the use of expedited removal, and in turn, the number of credible fear screenings that can be conducted." *Id*. at 3. "Lengthy consultation periods, including the 24-hour consultation period, cause credible fear screenings to be delayed, increasing the amount of time noncitizens remain in immigration detention," and "[d]elays in the credible fear screening under such circumstances directly contribute to a situation where DHS's capacity can

quickly become overwhelmed." *Id*. The agency concluded that "[t]hese factors in circumstances described in the [Rule] constitute unreasonable delays in the CF process," noting that neither the statute nor the regulations set a minimum consultation period. *Id*. The guidance thus invokes and reasonably interprets the statutory requirement to not "unreasonably delay" proceedings in implementing this change. *Id.* at 2-3.

Congress expressly delegated to DHS the authority to implement the consultation provision, 8 U.S.C. § 1225(b)(1)(B)(iv), and the authority to define what "unreasonably" delay means, *id*. § 1103(a)(1), (3); *see Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (noting agency authority to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility'"). Because of this clear authority for the Departments to adapt the consultation period to emergency border circumstances, the Departments' interpretation should be given deference. *See Loper Bright*, 144 S. Ct. at 2263 (recognizing grant of discretionary authority to the agencies and cabining judicial review in such circumstances). Congress did not prohibit the Departments from considering systemic needs when determining what amount of information about the asylum process should be provided to noncitizens. And the Departments could reasonably consider that, when the existing regulations were adopted in 1997, AOs conducted 3,000 credible fear interviews a year, whereas in the past year AOs have conducted on average over 3,000 credible fear interviews *per week*. 89 Fed. Reg. at 48,742. The Departments reasonably concluded that a longer consultation period in the face of these increased numbers and present emergency border circumstances would unreasonably delay the expedited removal process.

Plaintiffs argue that by reducing the consultation period to a minimum of four hours, DHS has effectively eliminated the right to consult. Mot. 35-37. Plaintiffs point to nothing in the

statutory or regulatory text, however, that indicates there is a minimum time period required to effectuate the consultation right. Rather, DHS must balance competing interests inherent in the statute and regulation: providing an opportunity to consult according to regulations prescribed by the agency while also complying with the clear statutory imperative to ensure consultation "shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); *see* 8 C.F.R. § 235.3(b)(4)(ii). While shortening the consultation period to prevent unreasonable delay, DHS has also taken steps to ensure a meaningful opportunity to consult, by providing that the minimum four-hour period does not begin until after "CBP or ICE provides the individual with an opportunity to consult— i.e., when the individual has access to a phone," the noncitizen has been given information about the credible fear interview process and the right to consult, and the noncitizen has been provided a list of free legal services providers that is posted in CBP facilities and ICE detention centers. Consultation AR 2-4. Additionally, the minimum four hour consultation period must occur between the hours of 7 a.m. and 7 p.m. local time. *Id.* at 2. Plaintiffs' argument that a longer consultation period is nonetheless required even if it would cause further delays is in tension with the statute and the discretion the statute grants the Secretary: "Plaintiffs cannot impose upon the [Secretary] any obligation to afford more procedures than the governing statute explicitly requires or that she has chosen to afford in her discretion." *AILA*, 18 F. Supp. 2d at 56; *see Butte Cty. v. Chaudhuri*, 887 F.3d 501, 505 (D.C. Cir. 2018) ("courts generally cannot compel agencies to do more than the statute demands . . ."); *see also Wilderness Soc. v. Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990) ("Courts must be reluctant to mandate that a federal agency step through procedural hoops in effectuating its administrative role unless such procedural requirements are explicitly enumerated in the pertinent statutes").

**III.     The Rule Satisfies the APA's Procedural Requirements.**

The Rule was properly issued as an Interim Final Rule that took effect before the conclusion of the comment period. *Contra* Mot. at 38-44.[7] The Rule is exempt from the APA's notice-and-comment and publication requirements because it "involve[s] ... [a] foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), and because "the agency for good cause" has found "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," *id*. § 553(b)(B), (d)(3).

**A.     Foreign affairs exception**

The Departments permissibly invoked the foreign affairs exception to notice-and-comment rulemaking. That exception applies to rules "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). The Rule readily satisfies that test. The Rule is part of a joint effort with other nations to address irregular migration and is predicated on sharing border management with other "countries in the region," as "reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere." 89 Fed. Reg. 48,759.

Plaintiffs argue that the foreign affairs exception applies only where a rule "clearly and directly" involves a foreign affairs function. Mot. at 39 (quoting *Capital Area Immigrants' Rights Coal. v. Trump* ("*CAIR*"), 471 F. Supp. 3d 25, 52 (D.D.C. 2020)). The Rule satisfies that test. As the Departments explained, "regional partner countries have regularly encouraged DHS to take

---

[7] While issued as an Interim Final Rule that took effect immediately, the Rule also requested comments that the agency will consider before issuing a Final Rule. *See* 89 Fed. Reg. at 48,710-11. The organizations—the only Plaintiffs to raise a notice-and-comment claim—acknowledge that they were able to submit comments. *See* Mot. at 39.

steps to address migratory flows, including by channeling intending migrants into expanded lawful pathways and processes," and the Rule reflects DHS's "commitment to addressing irregular migration in the region." 89 Fed. Reg. at 48,760, 48,762. These "efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region." *Id*. at 48760. Plaintiffs' attempt to equate this Rule with the one at issue in *CAIR*, where the court found the exception did not apply, Mot. at 40, falls flat. Here, the Departments identified a shared effort with foreign nations to manage irregular migration across the region and to the southern border. *See* 89 Fed. Reg. 48,760. There is thus a closer nexus here to core foreign affairs functions than the "*indirect*" "downstream effects" the agency hoped the rule in *CAIR* would have "in other countries, and perhaps on [ ] negotiations." *CAIR*, 471 F. Supp. 3d at 55. This Rule thus falls under the foreign affairs exception because it "involve[s]" a "foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), "involving the relationships between the United States and its [noncitizen] visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980). *See also Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) (holding "agencies were not required" to "engage in formal rule-making" for regulation related to the exchange visitor visa program because foreign affairs exception applied).

Moreover, "conducting a notice-and-comment process and providing a delayed effective date on this rule likely would lead to a surge to the border before the Departments could finalize the rule, which would adversely impact the United States' foreign policy priorities." 89 Fed. Reg. 48,761 (noting "regional partner countries [ ] have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their

41

countries" leading to "undesirable international consequences"). Because "[s]ustaining and, as appropriate, ramping up efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region," *id*. at 48760, and those efforts would be undermined by delayed implementation of the Rule, the Departments were permitted to use the foreign affairs exception.

### B.    Good cause exception

The Departments also permissibly invoked the good cause exception. The good cause exception applies where the announcement of a proposed rule would create an "incentive" for those affected by the rule to act "prior to a final administrative determination," *Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1249, and thus "the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public," *U.S. Chamber of Commerce v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006); *see also Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 95 (D.C. Cir. 2012).

That is the case here. A delay during the comment period "would unduly postpone implementation of a policy that is urgently needed to avert significant public harm" and "would incentivize even more irregular migration by those seeking to enter the United States before the rule would take effect." 89 Fed. Reg. 48,762. Because the Rule makes it harder to seek asylum after entering the United States irregularly, the Departments reasonably concluded that advance notice would encourage a surge of arrivals seeking to enter before the Rule took effect, citing evidence of past surges in response to similar changes in noncitizens' ability to enter the United States, *id*. at 48765 (noting evidence of a "historic surge in migration" near the end of the Title 42 public health order and the "severe safety hazard" created by increased arrivals during an anticipated gap in implementation of the Migrant Protection Protocols). Delaying implementation

of the Rule "would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions" that could overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration to the border that the Rule seeks to address during any delay in implementation to allow for a comment period. *Id.* at 48764.

As the Rule notes, there is a "critical need to immediately implement more effective border management measures," as "described at length in the Presidential Proclamation," especially as "the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023." 89 Fed. Reg. 48,762; *Yassini*, 618 F.2d at 1360 (holding exception applied to Immigration and Naturalization Service action given need for "prompt response" to crisis). "Sustained, high encounter rates" such as this, "exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered," 89 Fed. Reg. 48,727, and those challenges would be further exacerbated by an additional surge in arrivals that would likely occur during any delay to allow for completion of the comment period, *id*. at 48764.

Plaintiffs argue there is "no evidence at all to suggest that people outside the United States understand" and respond to changes in immigration law. Mot. at 41; *id.* at 42-43. This is incorrect. The Rule identifies evidence of past surges related to changes in immigration law that affected the manner in which noncitizens outside the United States could seek asylum or other protection at the border. *See* 89 Fed. Reg. 48,765 (summarizing past surges to the border in similar circumstances); IFR AR 2,460, 2,554-60, 11,910, 12,647-50, 14,183-208, 14,480, 14,543-77, 16,755. In evaluating the good-cause exception, courts must "defer to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious."

43

*Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 n.3 (D.C. Cir. 2014). Here, the Departments reasonably explained why they believed the Rule's changes would lead to a surge in arrivals that would cause security and safety concerns at the border during any delayed implementation, traced that conclusion to evidence in the record, and explained why "the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking." 89 Fed. Reg. 48,763. Courts are ill-equipped to second-guess the Executive's predictive judgments in this context. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusion.").

Finally, Plaintiffs argue that the border has presented a "pressing problem" for years and that the Departments could have announced the Rule earlier and delayed implementation to allow for a comment period. Mot. at 44. This argument does not address the surge in migration and associated risks the Departments reasonably concluded would occur *after* the Rule was announced if it had a delayed effective date. *U.S. Chamber of Commerce*, 443 F.3d at 908 (explaining exception applies where "announcement of a proposed rule itself could be expected to precipitate activity by affected parties" that would cause harm). Ultimately, the Departments need only point to "something specific" that illustrates a particular harm will be caused by notice and delayed implementation "to forgo notice and comment," *Biden v. Missouri*, 595 U.S. 87, 96 (2022), and the Departments' explanation, supported by record evidence substantiating their concerns, easily meets that standard.

## IV.    The Rule and Guidance Are Not Arbitrary and Capricious.

First, Section 1252(e)(3) does not authorize arbitrary-and-capricious or procedural APA

challenges, only contrary-to-law challenges. *See* 8 U.S.C. § 1252(e)(3)(ii) (limiting review to "whether such a regulation … is not consistent with applicable provisions of this subchapter or is otherwise in violation of law").

Nevertheless, even if it does, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* The agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *accord Loper Bright*, 144 S. Ct. at 2263 (where a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA" is to ensure the "agency has engaged in reasoned decisionmaking within" the bounds of the delegated authority) (internal quotation marks and citations omitted).

The Rule meets that deferential standard. It was promulgated as an "emergency measure" during a period where border encounters were at levels that strain DHS's operational capacity to, *e.g.*, detain noncitizens, process individuals for expedited removal, and conduct credible fear screenings. *See* 89 Fed. Reg. at 48,730-31. In the absence of such measures, the Departments reasoned there would be a significant risk that increased irregular migration would overwhelm DHS's ability to safely, effectively, and humanely enforce and administer U.S. immigration and

asylum law, with carry-over detrimental effects to immigration court backlogs. *Id.*; *see id.* at 48,711-15. Moreover, the Departments sought to create a disincentive for migrants to undertake the dangerous journey to the southern border or to rely on dangerous human smuggling networks in the hope that the overwhelmed immigration system would not be able to expeditiously or efficiently process them for removal, and they would thereby gain a foothold in the United States during a prolonged removal process. *See*, *e.g.*, *id.* at 48,714-15, 48,730-31, 48,732, 48,761-62.

The Rule is reasonably related to these objectives. Without these emergency measures, this period of heightened border encounters would overwhelm the Departments' ability to expeditiously and effectively manage noncitizen encounters. For instance, the Departments would not have detention capacity to address the increased numbers, which would in turn tax the ability of DHS to process noncitizens through expedited removal proceedings, leading to an increase in the number of noncitizens who will instead have to be processed for removal proceedings in immigration court and released. *See* 89 Fed. Reg. 48,750-52. Requiring noncitizens processed for expedited removal to manifest an intent to seek asylum or to claim a fear of persecution or torture will sort out of the process individuals who may not have a valid claim but were nonetheless inclined to answer the government's questioning on persecution affirmatively and thereby prolong the expedited removal process or ultimately procure referral to full removal proceedings. *Id.* at 48,743-44. The Rule will allow DHS to focus on individuals who are actively asserting a claim for relief and protection, while lowering the referral rate to AOs and ultimately the immigration courts, thereby relieving pressure at those points in the process as well. *Id.* at 48,744-45. That is also the case with the asylum-eligibility limitation and its application during credible fear screenings. That eligibility limit disincentivizes attempts at entry, thereby easing stress on DHS resources, while also providing an efficient way to deal with claims of fear raised by individuals who do not fall

within any exception to the Rule. *See id.* at 48,731-33.

Additional changes within the credible-fear process also support these goals. Providing a minimum four-hour consultation period between initial access to a phone or other means to consult and the credible fear interview expedites that entire process, allowing DHS to effectively process a higher number of noncitizens in a shorter period of time, thereby easing the operational strain. Consultation AR 1-4. And the higher "reasonable probability" standard for screening for statutory withholding and CAT claims will operate in tandem with all these provisions, ensuring that only noncitizens with meritorious claims are able to extend immigration proceedings through consideration for statutory withholding of removal and CAT protection. 89 Fed. Reg. 48,745-49.

This Rule, along with other initiatives, has the effect of channeling migration to lawful and orderly pathways by imposing significant and timely consequences on those who chose to enter outside those pathways, including through placing an eligibility limitation on asylum. By reducing irregular migration, shifting to a manifestation standard for fear claims, and heightening the screening standard for protection, the government will be able to devote more of its limited resources to more effectively and quickly process migrants and will allow DHS to focus on those claims of asylum that are more likely to have merit. The Rule thus reasonably supports the effective "operation of the immigration system" during periods of heightened encounters. *Judulang v. Holder*, 565 U.S. 42, 55 (2011).

At the same time, the Proclamation and Rule are not categorical bars to entry or eligibility for asylum. The Proclamation includes numerous exceptions, including for individuals who avail themselves of a lawful pathway to the United States, and the Rule also provides exceptions to its asylum eligibility limitation, including for noncitizens who experience an acute medical emergency, face an imminent threat to life or safety, or are a "victim of a severe form of trafficking

47

in persons." *See* 89 Fed. Reg. 48,715, 48,732-33. Thus, the Rule does not foreclose asylum eligibility for noncitizens who are in circumstances that require immediate action notwithstanding existing limitations or suspensions on entry. Moreover, the Rule acknowledges the possibility that it may result in the denial of some asylum claims that otherwise may have merit. 89 Fed. Reg. 48,743-44. But the Departments weighed that cost and concluded that it is justified because "the benefits of this rule … outweigh any potential marginal increase in the likelihood that a meritorious case would fail." *Id.* at 48,746; *see East Bay v. Garland*, 994 F.3d 962, 990 (9th Cir. 2020) (Miller, J., concurring in part and dissenting in part) (explaining that review "would [have] be[en] deferential" had the agencies acknowledged that the costs of "denying meritorious claims" were outweighed by the benefits of "relieving burdens on the asylum system").

### A. The limitation on asylum eligibility is not arbitrary or capricious.

Notwithstanding the Rule's reasonable goals and justifications, Plaintiffs argue that the limitation on asylum eligibility is arbitrary and capricious because it purportedly failed to: consider the risks to noncitizens remaining in Mexico while the entry limitation is in place; consider the risks to Mexican citizens imposed by the Rule's scope; and address issues with the CBP One App. Mot. 17-21. These arguments lack merit.

First, Plaintiffs contend that the Rule fails to consider the harm noncitizens may face by remaining in Mexico to wait for a CBP One appointment. Mot. 17-18. The Departments incorporated in the current Rule the prior assessment of harm undertaken during implementation of the Circumvention of Lawful Pathways (CLP) Rule. *See* 89 Fed. Reg. at 48,732-33 (adopting the "exceptionally compelling circumstances" exception for "the reasons articulated for adopting" a similar exception under the CLP Rule). In the CLP Rule, the Departments recognized the risk of harm to noncitizens in Northern Mexico, but balanced that risk against other considerations,

including the need to channel migration to lawful pathways. *See* 88 Fed. Reg. at 31,400, 31,438. Here that balance involves the need to significantly decrease irregular border crossings. *See generally* 89 Fed. Reg. at 48,726-31. These alternative considerations have also been backstopped by an exception that permits noncitizens in need of urgent protection to seek that protection notwithstanding other limitations on entry. The Rule itself provides an exception to its application when a noncitizen establishes "exceptionally compelling circumstances," including an "acute medical emergency," "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," or that the noncitizen qualifies as a "victim of a severe form of trafficking in persons[.]" *Id.* at 48,718. And the Proclamation additionally provides exceptions, including where, "based on the totality of the circumstances, including consideration of … urgent humanitarian … interests at the time of the entry or encounter," the suspension and limitation on entry should not be applied to a particular individual. These exceptions are adequate to address the most pressing needs of noncitizens in Northern Mexico, who additionally retain the ability to schedule an appointment through the CBP One app and thereby avoid the application of the Proclamation altogether, or enter during the limitation on entry and seek only withholding of removal or CAT protection.[8]

Second, Plaintiffs argue that the Rule fails to consider the risk of harm posed to Mexican nationals, who must "wait in the very country they are trying to flee." Mot. 18 (emphasis omitted).

---

[8] Plaintiffs also argue that the Departments failed to consider "people who are at particular risk of violence in northern Mexico," Mot. 18, but the same reasons supporting the Rule generally apply to that specific class. And the Departments are otherwise not mandated to make a demographic-by-demographic assessment of risk to establish the reasonableness of the Rule; that reasonableness is established by the exceptions under both the Rule and Proclamation which apply equally to the demographics noted by Plaintiffs, and the contrary considerations that balance those harms against the need of DHS to effectively process, detain, and remove noncitizens encountered during emergency border circumstances.

Yet the Rule does address these concerns. It notes that, given the "sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal," "applying this rule to Mexican nationals will result in fast processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems while entry is suspended and limited under the Proclamation." 89 Fed. Reg. at 48,738. Given the exigent circumstances the Rule addresses, the Rule reflects the reasonable determination that "it is important to deter irregular entry by all noncitizens regardless of country of origin." *Id.* at 48,739. Moreover, Mexican nationals may still qualify for asylum by scheduling an appointment or through either an exception to the Rule or the Proclamation, and nothing in either the Rule or Proclamation precludes eligibility for withholding of removal or CAT protection. *Id.* at 48,738-79. Given the high number of Mexican nationals presenting at the border and seeking relevant relief and protection, however, inclusion of Mexican nationals within the scope of the Rule was necessary to effectuate the broader purposes of the Rule. *See generally id.*

Finally, Plaintiffs contend that the Rule ignored issues with the CBP One app that may make it difficult for some noncitizens to schedule an appointment. Mot. 19-21. The Departments have recognized potential issues with use of the CBP One app, including those noted by Plaintiffs, and have thus provided a limited exception to scheduling via the app in the CLP Rule. *See* 89 Fed. Reg. at 48,732 n.171 (citing 8 C.F.R. § 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B)). In the context of *this* Rule, however, which "applies only in the emergency circumstances described in the Proclamation and the rule, where encounters strain the border security and immigration systems' capacity," the Departments explained that any exceptions should be limited to the Rule's "exceptional compelling circumstances" provision or the exceptions in section 3(b) of the Proclamation. 89 Fed. Reg. at 48,732 n.171. Explaining this limitation, the Departments noted

both that the purposes of the two rules are distinct, if at points overlapping—with the instant Rule focused more on reducing "the number of daily entrants" and deterring irregular immigration, rather than encouraging the use of lawful pathways—and that employing a similar exception in this context would "diminish the Departments' ability to deploy resources to address the emergency circumstances that support application of this rule." *Id.* The Departments accordingly did not ignore the problems cited by Plaintiffs but concluded that in the emergency context addressed by the Rule, any further exception premised on the CBP One app risked undermining the efficacy of the Proclamation and Rule and that existing exceptions under both the Rule and Proclamation were sufficient to address the most pressing circumstances.

### B. The changes to credible-fear processes are not arbitrary or capricious.

Plaintiffs raise various arguments that the changes relating to the credible-fear process are arbitrary and capricious, challenging the manifestation standard, the heightened reasonable-probability standard for protection claims, and the four-hour minimum consultation period. Mot. 23-31, 31-35, 37-38. These changes were adequately explained, backed by data highlighting the significant gap between noncitizens referred for a credible fear interview and the ultimate grant rate for protection, and supported by past agency practice in similar circumstances.

The manifestation standard is not arbitrary or capricious. Plaintiffs first argue that, in imposing the manifestation standard, the Departments failed to consider evidence that many asylum seekers with meritorious claims will not manifest the requisite fear for a variety of reasons, including past trauma, physical exhaustion, and fear. Mot. 24-26. But Plaintiffs' argument is premised almost entirely on a conception of manifestation whereby an affirmative verbal request by the noncitizen would be required. *See*, *e.g.*, Mot. 24 (noting record evidence that "asylum seekers who have suffered past trauma are understandably *wary of speaking* about their fears of

removal") (emphasis added). Yet the Rule makes clear that the manifestation standard is flexible and encompasses much more than an explicit verbal assertion of fear or desire to apply for asylum. That standard allows the immigration officers to use their significant experience and training in assessing whether the noncitizen has manifested a fear of persecution or torture, including by visual clues and means other than an explicit statement by the noncitizen that they have a fear of persecution or torture or want to seek asylum. 89 Fed. Reg. at 48,744 ("Manifestations may be verbal, nonverbal, or physical . . . may present with non-verbal or physical cues, through behaviors such as shaking, crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse."). Moreover, contrary to Plaintiffs' assertion that the Rule eliminates "appropriate advisals," signs will be available at CBP facilities and ICE detention centers, while audiovisual aids will also be shown at most, notifying noncitizens about their rights to seek relief and protection. *See id.* at 48,741-42 & n.196.

Plaintiffs next contend that it is "implausible" to believe that immigration officers can objectively apply the manifestation standard, and that practically the standard will lead to divergent outcomes on similar facts because of the subjective nature of the inquiry. Mot. 26-28. Plaintiffs' argument ignores the reality of DHS's implementation of the manifestation standard and its extensive past experience in inspecting individuals and making referrals under the expedited removal regime. As the Rule notes, "DHS immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day." 89 Fed. Reg. at 48,743; *see ibid.* (noting "USBP's 20,000 agents encountered more than 2 million people on the SWB in FY 2023"). This expertise extends to "interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concerns." *Id.* at 48,744; *see id.* ("Agents and officers can similarly use"

skills in dealing with those suffering from trauma or physical or medical distress in identifying "any manifestations of fear"). Beyond extensive operational experience, "DHS will [also] provide immigration officers with information on how to apply the standard." *Id.* Accordingly, the Rule adequately explains that DHS's operational "experience, coupled with guidance, will help agents and officers effectively identify noncitizens with potential fear or asylum claims under a manifestation approach." *Id.* at 48,744-45.

Plaintiffs also argue that past practice applying the manifestation standard fails to support the assumption that it can adequately identify those in need of relief or protection. Mot. 28-30. Plaintiffs offer various statistics, but none effectively address whether or to what extent noncitizens with meritorious claims were "erroneously" screened out under the manifestation standard, *Id.* at 29-30. And in any event, the prior use of the manifestation standard was not meant to claim that it is 100% effective, but that in emergency circumstances it may be utilized to balance consideration of relief and protection claims with the requirements of expeditious processing of high numbers of noncitizens. 89 Fed. Reg. at 48,744 (noting use "in *other urgent and challenging situations*" or to deal with "*urgent, exigent circumstances*") (emphasis added).

Finally, Plaintiffs argue efficiency alone cannot justify use of the manifestation standard, and that the Departments failed to consider the greater proportion of individuals with meritorious claims who could be removed under that standard. Mot. 31. Yet the Departments specifically considered the possibility that the "manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview." 89 Fed. Reg. at 48,743-44. The Departments balanced that concern with the "emergency border circumstances" the Proclamation and Rule were meant to address and concluded that the manifestation standard "better achieves [a] balance" between effective use of

DHS resources and expeditious identification of those with meritorious relief claims and removal of those without. *Id.* at 48,744. Plaintiffs' argument ultimately reflects disagreement with this conclusion rather than the professed failure of the Departments to consider the issue.

The reasonable probability standard is not arbitrary or capricious. Plaintiffs contend that the reasonable probability standard represents an "unexplained change from decades of practice" and that the Departments "failed to meaningfully consider whether the new standard will result in more individuals being wrongfully" found ineligible for protection. Mot. 31-35. As Plaintiffs note, *id.* at 32, in the CLP Rule, the Departments implemented a heightened screening standard, "reasonable possibility of persecution or torture," based on the low rate at which noncitizens screened into fear proceedings ultimately obtain protection. 89 Fed. Reg. at 48,745-46. That heightened standard "has allowed the Departments to screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage." *Id.* at 48,746. But the rate at which noncitizens obtain protection has remained low even under the stricter screening standard applied under the CLP Rule. *See id.* (the "screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases"). Given that reality, the Departments explained that it is reasonable to apply a higher screening standard during the emergency border circumstances addressed by the Proclamation and the Rule, to more closely align the numbers being screened in with the class of individuals who will ultimately obtain protection. *See id.* As noted, "[t]he Departments believe that the 'reasonable probability' standard, by requiring additional specificity, will better identify claims that are likely to be meritorious in a full adjudication while screening out those whose claims are not likely to prevail." *Id.* at 48,747.

Likewise, the Rule recognizes that some individuals who could have met the lower screening standards may not be screened in under the new, "reasonable probability," standard. The

Rule explained, however, that "the benefits of this rule . . . outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard." 89 Fed. Reg. at 48,746. That benefit is especially important in the context of a Rule that is meant not only to better screen out non-meritorious claims for protection, but also to deter "noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period" after meeting a lower screening standard. *Id.*; *see id.* at 48,748-49.

Finally, the new standard adequately considers issues related to noncitizens' potential reluctance to discuss "the most traumatic or painful details" of their claims. *See* Mot. 33-35. The Rule notes that AOs "have the training and experience necessary to elicit the information required to determine whether a case is sufficiently specific to meet the 'reasonable probability' standard," 89 Fed. Reg. at 48,747, including training on interviewing victims of trauma, abuse, and persecution, *id.* at 48,748 n.244. Moreover, the standard does not demand that a noncitizen provide such specific evidence as to establish eligibility for protection on the merits, but rather only requires such evidence that the AO will "believe that the noncitizen *may* be able to establish eligibility at the merits stage." *Id.* (emphasis added). In other words, this standard remains a screening standard less than that required to establish eligibility for protection on the merits, and the Departments believe that trained AOs will be able to adequately assess when the requisite level of specificity has been met, even in cases dealing with significant past violence, trauma, or other serious harm where a noncitizen may be unwilling to fully explicate her claim during the credible fear interview. *See id.* at 48,747-48.

The minimum four-hour consultation period is not arbitrary or capricious. Plaintiffs argue that the minimum four-hour consultation period is arbitrary and capricious because the Departments "never considered the important fairness considerations that the consultation period

is meant to protect," Mot. 37, and relied on the "impermissible and erroneous assumption[]" that four hours is sufficient time to have a meaningful consultation, Mot. 37-38. Plaintiffs' first contention is refuted by the guidance, which explicitly seeks to balance fairness considerations, including consideration of extensions of time in appropriate compelling circumstances, with the need to expeditiously resolve cases. Consultation AR 2-3. DHS explained that the shortened consultation period will more expeditiously resolve meritless claims while still serving to support an opportunity to consult, including through providing time for multiple phone calls where necessary. Consultation AR 3. Plaintiffs' second contention relies on the mistaken assumption that shortening the minimum time before the credible fear interview necessarily shortens the actual time a noncitizen would use to consult with a designated representative. But that is unlikely. The minimum four-hour window only begins to run when a noncitizen has actual use of a phone, the hours are limited to roughly normal business hours for legal service providers (7 a.m.-7 p.m. local time), multiple phone calls are permitted during that time, and the four hours may be bifurcated if the noncitizen "runs out" of time on the initial day they are afforded an opportunity to use the phone. Consultation AR 2-4. Although the minimum window before the credible fear interview may be more abbreviated under this guidance, there is no reason to believe that the level of actual consultation will differ significantly or that four hours is insufficient time for consultation. *Cf. Las Americas Immigrant Advoc. Ctr.*, 507 F. Supp. 3d at 30 (noting guidance providing for one-hour initial consultation with a representative of the noncitizen's choosing, and a 30-minute follow-up as needed).

Plaintiffs' arbitrary and capricious arguments ultimately boil down to their belief that the evidence and rationale advanced by the Departments is insufficient to support the Rule. But this Court may not "second-guess[] the [Departments'] weighing of risks and benefits" and "substitute

[its own] judgment for that of the agenc[ies]." *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2571 (2019). The Departments considered the relevant evidence and provided a rationale for the changes with a rational connection to the facts. Arbitrary-and-capricious review requires nothing more.

## V.    Any Relief Must be Sharply Limited

For all of the reasons discussed above, Plaintiffs' claims fail. But should the Court disagree, under settled constitutional and equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996), and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought," *Cuno*, 547 U.S. at 352. A valid remedy "operate[s] with respect to *specific parties*," not with respect to a law "in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). Thus, only those Plaintiffs who have had the Rule or guidance applied to them would be entitled to any relief, and even then, only for the specific part of the Rule or guidance they can trace to some specific, proven injury. *Gill*, 138 S. Ct. at 1934; *see also Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 81-82 (D.C. Cir. 2020) ("a court may invalidate only some applications" of a regulation).

Even if any relief were warranted, it must be strictly limited. *First*, the court lacks jurisdiction to enjoin or vacate the Rule or challenged procedures, except as applied to individual plaintiffs, under 8 U.S.C. § 1252(f)(1). That provision strips any court other than the Supreme Court of "jurisdiction or authority to enjoin or restrain the operation of" specified provisions of the INA, "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). As the Supreme Court has explained, § 1252(f)(1)'s reference to "the operation of the relevant statutes"—which includes § 1225, the provision governing expedited removal—"is best understood to refer to the

Government's efforts to enforce or implement" those statutes. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022) (quotation omitted). Thus, § 1252(f)(1) generally prohibits courts other than the Supreme Court from "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id*. at 2065. That is exactly what Plaintiffs ask this Court to do in asking to vacate the Rule and guidance. Asylum claims are frequently raised defensively in connection with expedited removal and removal proceedings. As a result, Plaintiffs' proposed relief would direct government officials implementing §§ 1225 and 1229a to apply a different substantive rule of decision when asylum claims are raised in the proceedings governed by those provisions. Vacatur thus contravenes § 1252(f)(1) because it "order[s]" federal officials "to refrain from" applying the Rule's standards or the guidance in "implement[ing]" and "otherwise carry[ing] out" the specified statutory provisions. *Aleman Gonzalez*, 142 S. Ct. at 2065.

It does not matter that Plaintiffs seek vacatur rather than an injunction. Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. A vacatur is practically equivalent to an injunction compelling the Departments to rescind or stop implementing the Rule and guidance and therefore possesses the hallmark of the relief barred by § 1252(f)(1). The Supreme Court has repeatedly applied a functional approach and given a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s]" in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. SCRAP*, 422 U.S. 289, 307 (1975). The Court noted it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set

aside' orders of the [agency]." *Id*. at 308 n.11 (quotation omitted). Here, too, vacating the Rule or guidance would be functionally equivalent to the injunctive relief that is barred by § 1252(f)(1).

In any event, § 1252(f)(1) is not limited to injunctions. Instead, it prohibits lower-court orders that "enjoin *or restrain*" the Executive Branch's operation of the covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). The common denominator of those terms is that they involve coercion. *See* Black's Law Dictionary 529 (6th ed. 1990) ("[e]njoin" means to "require," "command," or "positively direct" (emphasis omitted)); id. at 1314 ("[r]estrain" means to "limit or "put compulsion upon" (emphasis omitted)). Together, they indicate that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 142 S. Ct. at 2065. That meaning easily encompasses judicial vacatur. Indeed, it is precisely what Congress intended in codifying § 1252(f) and limiting such remedial authority to the Supreme Court. *See* H.R. Rep. No. 104-469, pt. 1, at 161 (Conference Report) ("These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending.").

*Second*, the INA bars requests for relief "vacating the removal orders issued to each of the Individual Plaintiffs," and for those "who have been removed," requiring "paroling those Individual Plaintiffs into the United States." ECF No. 14 at 34. The first request is foreclosed by § 1252(a)(2)(A)(iii), which provides that "no court shall have jurisdiction to review" "the determination made under section 1225(b)(1)(B) of this title," which includes the determination that a noncitizen does not have a credible fear of persecution and should be issued an expedited removal order. Unlike the other provisions of § 1252(a)(2)(A), romanette (iii) does not include an exception for review under § 1252(e), and so the Court lacks any authority to set aside individual credible fear determinations or removal orders through § 1252(e). *Make the Road*, 962 F.3d at 626

(romanette (iii) does not "expressly reserve jurisdiction 'as provided in subsection (e)'"). The Court similarly lacks jurisdiction over Plaintiffs' request for parole into the country because § 1252(a)(2)(B)(ii) precludes any orders concerning "decision[s] or action[s] of the Attorney General or the Secretary ... the authority for which is specified under this subchapter to be in the[ir] discretion." Parole is governed by § 1182(d)(5) which provides that the Secretary may parole applicants for admission into the United States "in his *discretion* ... temporarily *under such conditions as he may prescribe*." (Emphasis added). The plain text thus specifies that parole decisions are "to be in the discretion" of the Secretary and are subject to § 1252(a)(2)(B)(ii). *Kucana v. Holder*, 558 U.S. 233, 239 (2010); *see Giammarco v. Kerlikowske*, 665 F. App'x 24, 26 (2d Cir. 2016) (given § 1252(a)(2)(B)(ii), court may not order government to parole individual); *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003) (similar); *see generally Kiyemba v. Obama*, 555 F.3d 1022, 1028 (D.C. Cir. 2009) (courts may not "compel[] the Executive to release [noncitizens] into the United States outside the framework of the immigration laws").

*Third*, even apart from § 1252, the universal vacatur of the Rule and guidance Plaintiffs request is contrary to constitutional and equitable principles and limitations in the INA that allow at most an award of party-specific relief. Defendants acknowledge the D.C. Circuit cases Plaintiffs cite that treat vacatur as an available remedy for a successful APA challenge to a regulation. *See* Mot. at 44-45. But the APA itself does not reference vacatur, instead limiting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703. There is no indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions." *Id*. § 706(2); *see Texas*, 143 S. Ct. at 1980-85 (Gorsuch, J., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency

action").

In any event, the D.C. Circuit has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (allowing remand without vacatur and noting that an "inadequately supported rule, however, need not necessarily be vacated"). Indeed, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground," 5 U.S.C. § 702(1), and equitable relief does not "automatically follow[] a determination" that a defendant acted illegally, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006).

The problems caused by universal remedies are well catalogued. Such remedies are in tension with Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the *plaintiff's* particular injury," *Gill*, 138 S. Ct. at 1934 (emphasis added), and the rule in equity that relief "be no more burdensome to the defendant than necessary to provide complete relief to the *plaintiffs*," *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (emphasis added). Such remedies also circumvent Rule 23's class-action requirements, "incentivize forum shopping," "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburden courts' "emergency dockets." *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). And those concerns apply equally to universal vacatur. *Texas*, 143 S. Ct. at 1985-86 (Gorsuch, J., concurring). Universal vacatur of a rule, if authorized at all, thus should be reserved for "truly extraordinary circumstances," *id.*, which do not exist here.

These problems are substantially magnified in the expedited removal context. The INA provides that "no court may ... enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except

as specifically authorized in a subsequent paragraph of this subsection." 8 U.S.C. § 1252(e)(1)(A). Moreover, no court may "certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection." *Id.* § 1252(e)(1)(B). These limitations apply "[w]ithout regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action." *Id.* § 1252(e)(1). And, as explained, the organizational Plaintiffs' claims are barred by § 1252(e)(3). *See supra* at 18-20. Universal vacatur is inconsistent with these limitations foreclosing relief other than for the specific individual Plaintiffs before the Court.

*Fourth*, even if vacatur were an available remedy, with respect to claims not foreclosed by Article III or § 1252, the circumstances of this case would warrant remand without vacatur. As explained, any relief under the APA must be limited in conformity with equitable principles. *See Allied-Signal*, 988 F.2d at 150; *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (vacatur a question of the court's remedial "discretion"). In this Circuit, that requires balancing "the seriousness of" the "deficiency" against "the disruptive consequences of an interim change that may itself be changed." *Allied–Signal*, 988 F.2d at 150–51. Applying that balance here, if the Court were to find the Rule or guidance invalid, it should remand without vacatur because the defects Plaintiffs identify could be remedied through additional explanation. *See, e.g.*, *id.* at 151 (remand without vacatur appropriate where agency can "explain" on remand issues found arbitrary and capricious). And even if this Court believes that the Rule or guidance are contrary to law, the Departments should be given an opportunity to try to address the same concerns the Rule is intended to address while comporting with this Court's construction of the statute, particularly where vacatur would have the serious negative consequences noted below. *See, e.g.*, *Air Transp. Ass'n of Am., Inc. v. U.S. DOA*, 317 F. Supp. 3d

385, 391 (D.D.C. 2018) (remand without vacatur appropriate where "conceivable that on remand it can develop a reasoned explanation of its statutory authority").

Vacatur would have seriously disruptive consequences, frustrating the "public interest in effective measures to prevent the entry of" noncitizens at the Nation's borders. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). Here, the Departments identified an urgent and potentially worsening situation at the border—large numbers of noncitizens seeking to enter without authorization, overwhelming the immigration system, incentivizing human trafficking, and risking lives—and took targeted measures to address it. *See* Murray Decl. ¶¶ 2-3, 5-9, 18-24. There is a "critical need to immediately implement more effective border management measures," as "described at length in the Presidential Proclamation," especially as "the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels." 89 Fed. Reg. 48,762. "Sustained, high encounter rates" such as this, "exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered." *Id.* at 48727; *see* Murray Decl. ¶¶ 9-17, 25, 34-40, 43-51.

The Rule and guidance have been remarkably effective in addressing these challenges. In just the first 57 days after the Rule was implemented, encounters at the southwest border decreased 57 percent and other measures of DHS's ability to swiftly deliver consequences showed marked improvement. Murray Decl. ¶ 3. The Rule and guidance have allowed DHS to utilize expedited removal more effectively, meaning that DHS is able to repatriate more individuals, process more credible fear cases, and adjudicate claims—both positive and negative—more quickly. *Id.*, ¶¶ 3, 26-27, 41-42. Since the Rule went into effect, DHS has removed or returned more than 106,000 noncitizens, the percentage of noncitizens processed through expedited removal more than tripled,

and the percentage of noncitizens released pending their removal proceedings was cut by more than half. *Id.*, ¶ 3. The Rule and guidance are therefore encouraging many migrants to use orderly migration pathways, without taxing limited border resources. *Id.*, ¶¶ 3, 11. Vacatur could erase that success and exacerbate the very problems the Rule and guidance address. A gap in application of the Rule "would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions" that could overwhelm agency resources at the border, 89 Fed. Reg. 48,764-65, and "the harms of such an increase would be immediate and substantial, even if such an increase" lasted only for a short period, *id.* at 48763. If the Rule and guidance are unavailable, the Departments expect that encounters may increase even beyond previous peak levels and that foreign partners will be less inclined to assist in combatting irregular migration. Murray Decl. ¶¶ 3, 28-33, 42, 52, 59-67.

Conversely, the individual Plaintiffs themselves will not suffer substantial harm from continued enforcement of the Rule and guidance as to others, and their own injuries, if any, can be cured by relief specific to them if otherwise permitted by the INA. As to the organizations, the Rule and guidance do not directly regulate them, and the only alleged effect of the Rule and guidance relates to their clients and the decision to reallocate resources to assist them. As explained, *supra* 13-18, that alleged harm is not a cognizable injury supporting the organization's standing or an APA action. But even if it were, an organization's marginal reallocation of its resources cannot outweigh the substantial harms to the government and the public described above.

If the Court does decide that vacatur is appropriate, it should vacate only those specific portions of the Rule that the Court determines are contrary to law or arbitrary and capricious. Importantly, the Rule's provisions—the limitation on asylum eligibility, the manifestation standard, and the "reasonable probability" standard—are severable, and each can stand

independently. The Departments included severability clauses in each provision added by the Rule. *See* 8 C.F.R. §§ 208.35(b)(3) and (e), 235.15(g), 1208.35(b)(4) and (e). Indeed, in the regulatory text and in the Rule's preamble, the Departments included explicit explanations of how the Rule is intended to function in the absence of any of its parts. *See* 89 Fed. Reg. at 48,756, 48,758 (explaining that under 8 C.F.R. § 208.35(b)(3) and § 1208.35(b)(4) the Departments intend that if the limitation on asylum eligibility is invalidated, the "reasonable probability" standard would be applied to those subject to the lawful pathways rebuttable presumption and who entered during emergency border circumstances); *id.* at 48,757, 48,758 (explaining that the Departments intend 8 C.F.R. §§ 208.35 and 1208.35 to continue functioning even if any aspect of them are rendered inoperative and that those sections are severable from any other provisions, providing as an example that the Departments would want the limitation on asylum eligibility and the "reasonable probability" standard to remain in effect even absent the manifestation standard); *id.* at 48,759 (similar discussion regarding 8 C.F.R. § 235.15). In the event the Court finds faults with specific provisions of the Rule, it should give effect to the Departments' severability clauses and only render those specific provisions inoperable. *See Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020) (plurality) ("[A]bsent extraordinary circumstances, the Court should adhere to the text of the severability or nonseverability clause.").

Finally, at a minimum, given the impact on circumstances at the border any vacatur would have, the Court should stay any order it issues for fourteen days to allow for orderly review in the court of appeals. *See E. Bay Sanctuary Covenant v. Biden*, No. 18-CV-06810-JST, 2023 WL 4729278, at *19 (N.D. Cal. July 25, 2023) (issuing 14-day stay of order vacating the Rule).

## CONCLUSION

For these reasons, the Court should grant summary judgment to Defendants on all claims.

Dated: August 16, 2024

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Senior Counsel*

By: /s/ *Brian C. Ward*
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
*Senior Litigation Counsel*

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Brian C. Ward*
    BRIAN C. WARD
    Senior Litigation Counsel
    United States Department of Justice