### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Las Americas Immigration Advocacy Center, *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>U.S. Department of Homeland Security, *et al.*,<br><br>　　　　　　　Defendants. | Civil Action No. 1:24-cv-01702 |

### DECLARATION OF ROYCE BERNSTEIN MURRAY

I, Royce Bernstein Murray, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.　　　　I am the Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security ("DHS") and have served in this role since June 30, 2024, and was serving as Acting Assistant Secretary for Border and Immigration Policy from June 10, 2024.  Prior to this role, I served as the Senior Counselor to the Secretary of Homeland Security for border and immigration issues since February 12, 2023, and served in this role in an acting capacity from April 4, 2022 until February 11, 2023.  Prior to this position, I served as a Counselor to the Secretary from March 29, 2021 to April 3, 2022, on detail from the U.S. Citizenship and Immigration Services (USCIS) Office of the Director.  Earlier in my career, from 2000 to 2002, I worked for the legacy Immigration and Naturalization Service (INS) Office of

1

International Affairs as a Presidential Management Fellow and Asylum Officer and, from 2002 to 2003, for the INS Office of General Counsel as an Associate General Counsel. From 2003 to 2007, I served as an Associate Counsel with the Refugee and Asylum Law Division in the USCIS Office of the Chief Counsel.

## I.    The Impact of the Rule

2.      In recent years, global political and economic conditions have resulted in unprecedented levels of migration throughout the Western Hemisphere and record numbers of encounters at the southwest border ("SWB"). The high level of encounters, in addition to changes in demographic trends, have significantly strained the United States' border security and immigration systems—problems Congress has failed to address.

3.      In response to these challenges—and in conjunction with other efforts DHS and the Department of Justice have taken to strengthen consequences for unlawful or unauthorized entry at the border and to encourage the use of lawful, safe, and orderly pathways—the Departments promulgated an interim final rule, *Securing the Border* ("Rule"), on June 5, 2024. The Rule, working in tandem with the Presidential Proclamation of June 3, 2024, *Securing the Border* ("Presidential Proclamation"), makes key changes to asylum processing at the border that are designed to significantly enhance DHS's ability to quickly remove individuals who do not establish a legal basis to remain in the United States, while still allowing individuals access to protection in the United States, if merited. In just the first 57 days of its implementation, the Rule has worked to dramatically shift the dynamics at the border. Total encounters by the U.S. Border Patrol ("USBP") at the southern border decreased by 57 percent, the lowest they have been since the summer of 2020 and lower than were observed during much of 2019. The impact of the Rule is also reflected in various measures of DHS's increased ability to swiftly deliver

consequences: (1) DHS removed or returned more than 106,000 noncitizens; (2) the percentage of SWB encounters processed through expedited removal nearly tripled; and (3) the percentage of SWB encounters released pending their removal proceedings was cut almost in half.  If the Rule were vacated, this significant progress would almost certainly be undone and circumstances at the SWB would quickly return to the pre-Rule period or worse.

**II.    The Problem of Irregular Migration.**

4.      Violence, food insecurity, severe poverty, corruption, climate change, the continuing effects of the COVID-19 pandemic, and dire economic conditions have all contributed to a significant increase in migration around the globe, with more people displaced from their countries today than at any other point since World War II.  This global migration is challenging many nations' immigration systems, including our own.  In the Western Hemisphere, failing authoritarian regimes in Venezuela, Cuba, and Nicaragua, along with an ongoing humanitarian challenge in Haiti, have driven millions of people from those countries. Moreover, violence, corruption, and the lack of economic opportunity—challenges that are endemic throughout the region—are driving individuals from countries such as Colombia, Ecuador, Guatemala, Honduras, and Peru to make the dangerous journey to the SWB.

5.      This new reality represents a significant departure from previous historical trends. Until the early 2010s, annual encounters routinely numbered over 1 million but the vast majority of encounters were comprised of Mexican single adults looking for economic opportunity in the United States.  After three decades of bipartisan investments in border security and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017.  Between 2017 and 2019, however, encounters along the SWB more than doubled, and—following a significant drop in 2020 during the beginning of the COVID-19 pandemic,

which shut down travel across the world—continued to increase in 2021 and 2022 as travel resumed.  In fiscal year ("FY") 2021, encounters at the SWB reached levels not seen since the early 2000s, with USBP making over 1.6 million encounters.  In FY 2022, DHS reached a record high number of encounters at the SWB, with total USBP encounters at the SWB exceeding 2.2 million.  And in FY 2023, DHS yet again reached another record year of encounters, totaling over 2.4 million encounters at and between SWB POEs.  In FY 2024 to date, there have been over 1.8 million encounters, which is greater than the pace of encounters at the same time last fiscal year.

6.      Changes to migration patterns have heightened the need for new measures at the SWB.  An increase in encounters with nationals from the northern Central American countries (El Salvador, Guatemala, and Honduras) and surges in unaccompanied children in 2014 and families in 2016 put a great deal of strain on SWB operations, given the challenges processing vulnerable populations, despite relatively low total encounter levels at the time.  When SWB encounters almost doubled in the years just before and immediately following the start of the COVID pandemic, we experienced unprecedented movements of people from other countries in the Western Hemisphere and from Eastern Hemisphere countries.  These changes have caused Mexican nationals to constitute a lower share of encounters in recent years; from FY 2021 to FY 2023 they accounted for only 29 percent of encounters.  But Mexican nationals still contribute significantly to the growing number of encounters, and Mexican nationals have been claiming fear at a higher rate than before.

7.      In light of the increase in the number of noncitizens making asylum claims due both to the increase in the number of non-Mexicans—who have historically been far more likely to make asylum claims than Mexicans—and to Mexicans claiming fear at a higher rate than

before, the time required to process and remove noncitizens has grown.  The expedited removal

process—the fastest path to removal under Title 8 of the U.S. Code for border encounters—

requires the outlay of significant government resources.  The dramatic increase in the number of

individuals who claim fear has outstripped DHS's ability—based on available resources—to

maximize the use of expedited removal.  As a result, DHS has no choice but to release

individuals from its custody who do not present a national security or public safety risk, pending

immigration court proceedings in which the length of an average case is several years.  The

length of time it takes to get through the immigration court system can inform the calculus of

noncitizens deciding whether to irregularly migrate, as they can expect to live and work in the

United States for several years before facing the prospect of removal.  If an individual applies for

asylum, they can seek employment authorization after their application has been pending for 180

days, *see* 8 U.S.C. § 1158(d)(2).

8.      The higher levels of encounters, new demographics, and an increasing proportion

of fear claims are coupled with a rise in encounters of noncitizens from countries to which

removals have been difficult to effectuate.  For example, from 2013 to 2019, 95 percent of USBP

encounters at the SWB were from Mexico and northern Central American countries—countries

to which it is comparatively easy to return people.[1]  A much higher proportion of SWB

encounters today are from other countries that are comparatively much more difficult to return

people to.[2]

9.      In response to the record levels of encounters at the SWB, DHS has taken, and

continues to take, significant steps to address regional migration flows and strengthen

---

[1] OHSS analysis of July 2024 OHSS Persist Dataset.
[2] OHSS analysis of July 2024 OHSS Persist Dataset.  *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated August 9, 2024) (CBP SW Border Encounters by Agency and Selected Citizenship).

consequences for unlawful or unauthorized entry at the border.[3]  For instance, in May 2023, DHS promulgated the Circumvention of Lawful Pathways rule (CLP rule) and implemented procedures that have strengthened consequences at the SWB for those who cross unlawfully or without authorization by presuming ineligibility for asylum-seeking noncitizens who cross the SWB or adjacent coastal borders unlawfully or without authorization after traveling through another country and without having (1) availed themselves of an existing lawful process, (2) presented at a port of entry (POE) at a pre-scheduled time using the CBP One mobile application ("CBP One app"), or (3) been denied asylum or other protection in a third country through which they traveled, unless they meet certain limited exceptions.[4]  USCIS has also updated guidance to ensure that Asylum Officers assess the possibility of internal relocation during all credible fear interviews, improving an Asylum Officer's ability to avoid placing noncitizens who will ultimately not be eligible for asylum, statutory withholding of removal, or protection under the regulations implementing U.S. obligations under the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) in the Asylum Merits Interview (AMI) process before USCIS or in immigration court proceedings.[5]  In addition, the Department of Justice and DHS announced a new Recent Arrivals immigration court docket in May 2024

---

[3] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.
[4] *See* DHS, *Fact Sheet: Circumvention of Lawful Pathways Final Rule* (May 11, 2023), https://www.dhs.gov/news/2023/05/11/fact-sheet-circumvention-lawful-pathways-final-rule.
[5] *See* DHS, *DHS Announces Proposed Rule and Other Measures to Enhance Security, Streamline Asylum Processing* (May 9, 2024), DHS Announces Proposed Rule and Other Measures to Enhance Security, Streamline Asylum Processing | Homeland Security.

that aims to more expeditiously resolve the cases of certain noncitizen single adults who attempt to cross irregularly between POEs at the SWB.[6]

10.     At the same time, the United States has undertaken a historic expansion of lawful pathways and processes to incentivize noncitizens to use safe, orderly, and lawful means to come to the United States. This effort includes establishing parole processes for certain Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals and their immediate family members. Through the end of July 2024, more than 520,600 Cubans, Haitians, Nicaraguans, and Venezuelans had arrived lawfully on commercial flights to be processed into the United States with a discretionary grant of parole, as determined on a case-by-case basis.[7] DHS has also been expanding labor pathways and dedicating a set number of nonimmigrant work-related visas to nationals of countries in the Western Hemisphere. On November 17, 2023, DHS and the Department of Labor jointly published a temporary final rule increasing the numerical limit (or cap) on H-2B nonimmigrant visas by up to 64,716 additional visas for all of FY 2024.[8] Of these, a subset of 20,000 visas are allocated for nationals of Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Haiti, or Honduras. Moreover, DHS has announced and implemented both new and updated family reunification parole (FRP) processes for nationals of seven countries in the region (Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras), and their immediate family members, who have approved family-based petitions filed on their behalf by a

---

[6] *See* DHS, *DHS and DOJ Announce Recent Arrivals Docket Process for More Efficient Immigration Hearings* (May 16, 2024), https://www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration.

[7] Similarly, through *Uniting for Ukraine*, the parole pathway for Ukrainian citizens fleeing Russia's invasion, over 214,800 Ukrainians have been granted parole. OHSS analysis of July 2024 OHSS Persist Dataset; *see* U.S. Dep't of State, *Welcoming Ukrainian Nationals to the United States*, https://www.state.gov/welcoming-ukrainian-nationals-to-the-united-states/ (last visited June 7, 2024).

[8] *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2024 for the H-2B Temporary Nonagricultural Worker Program and Portability Flexibility for H-2B Workers Seeking To Change Employers, 88 Fed. Reg. 80394 (Nov. 17, 2023).

U.S. citizen or lawful permanent resident, resulting in 58,776 parolees arriving in the United

States as of August 8, 2024.  The U.S. Government also opened Safe Mobility Offices (SMOs) in

Colombia, Costa Rica, Ecuador, and Guatemala that afford eligible individuals the opportunity to

access expedited refugee processing; more than 10,000 refugees have lawfully entered the

United States through this initiative to date.[9]

11.    These efforts are having a meaningful impact, but SWB encounter trends in late

2023 and early 2024 months demonstrated that more was needed to achieve a significant and

lasting reduction in encounters.  In December 2023, USBP recorded just under 250,000

encounters between the POEs along the SWB.[10]  This included numerous encounters of large

groups of noncitizens.[11]  As a whole, CBP recorded 302,000 encounters at and between the

POEs along the SWB in December 2023, higher than any previous month on record.[12]

12.    As described in the Rule, encounters have declined from their December 2023

peak due, in part, to a series of high-level meetings between U.S and Government of Mexico

officials to enhance collaboration and increase enforcement efforts.  Total CBP encounter levels

from January 1 to March 31, 2024 declined substantially, to a daily average of roughly 6,100 for

these three months—far less than the more-than-11,000 per day encounter numbers seen in late

---

[9] *See* U.S. Dep't of State, *Safe Mobility Initiative*, https://www.state.gov/refugee-admissions/safe-mobility-initiative (last visited May 27, 2024).
[10] U.S. Customs and Border Protection, *CBP Releases December 2023 Monthly Update* (Jan. 26, 2024), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2023-monthly-update.
[11] U.S. Customs and Border Protection, *Large group of migrants encountered were misinformed*, CBP (Mar. 31, 2023), https://www.cbp.gov/newsroom/local-media-release/large-group-migrants-encountered-were-misinformed.
[12] OHSS analysis of July 2024 Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022), OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated June 7, 2024) (SWB encounters from FY 2014 through December 2023).

December.[13]  Despite this reduction, the encounter levels between the POEs remained historically high and exceeded our ability to quickly deliver consequences to the majority of individuals who cross unlawfully.

13.    Between May 12, 2023, and June 4, 2024, CBP processed roughly 388,500 noncitizens encountered at and between SWB POEs for expedited removal, for an average of almost 1,000 per day—a significantly higher daily rate than in any prior time period.[14]  These efforts allowed DHS to remove or return more than 790,000 individuals between May 12, 2023 and June 4, 2024; equivalent to an annual rate of 745,000, which is the highest number of Title 8 repatriations since fiscal year 2010.[15]  Despite these efforts, due to a lack of personnel, resources, and funding, prior to the implementation of the Rule, DHS was forced to resort to the release of the majority of individuals encountered, pending proceedings in the backlogged immigration court system.  This was even as the Administration repeatedly requested emergency supplemental funding to address the unprecedented surge in migration at the border.

14.    With a higher number of individuals encountered claiming fear since 2010, more resources are required now than ever before to process expedited removal referrals for the vast majority of individuals who claim fear.[16]  In FY 2019—prior to the implementation of the Title

---

[13] March 2024 OHSS Persist Dataset; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (total apprehensions and title 42 expulsions from 1925 to 2022); *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legalprocesses-monthly-tables (last updated June 7, 2024) (SWB encounters from FY 2014 through December 2023).
[14] OHSS analysis of data pulled from CBP Unified Immigration Portal (UIP) on July 3, 2024.
[15] OHSS analysis of June 2024 OHSS Persist Dataset. *See also* OHSS, *2022 Yearbook of Immigration Statistics* 103 tbl. 39 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (noncitizen removals, returns, and expulsions from 1892 to 2022).
[16] April 2024 OHSS Persist Dataset.  The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010.  April 2024 OHSS Persist Database; *see also* OHSS, *Immigration Enforcement and Legal*

42 public health Order—44 percent of noncitizens encountered at the SWB placed in expedited removal proceedings claimed fear, resulting in 98,000 credible fear screenings.[17]  The number of fear claims exceeded these historically high levels after the Title 42 public health Order ended. From May 12, 2023 through June 4, 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 211,000 fear claims out of 388,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE).  These high numbers of both encounters and fear claims exacerbate the significant stress on the immigration system.

15.    Further, DHS has never had the resources to detain every individual who is amenable to such processing encountered at the SWB for the time needed to complete the expedited removal process—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day.[18]  In the months prior to implementation of the Rule, encounters between POEs on the SWB were more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at or above capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.[19]  Without the positive impacts of the Rule, DHS simply does not have

---

*Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated June 7, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status"). Further, even as compared to the 3,000 to 7,000 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher.  In FY 2023, there were 3,300 to 7,300 such daily encounters, and from October 2023 through April 2024, the corresponding numbers are 4,000 to 8,300.  April 2024 OHSS Persist Dataset.

[17] *Id.*

[18] OHSS analysis of March 2024 Persist data.

[19] CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000.  *See* OHSS analysis of April 2024 OHSS Persist Dataset.  In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present.

the resources it would need to place into expedited removal the majority of those encountered by USBP who are amenable to such processing. When DHS does not have the capacity to process noncitizens through expedited removal or detain noncitizens to await their proceedings, release into the interior of the United States after screening and vetting is generally the only option that is left.[20] The need to release individuals at the border has increased over time and peaked during surges.[21]

16.    Analysis of DHS and EOIR data clearly show that increases in the length of time to complete removal proceedings since the early 2000s have been highly correlated with a lower share of noncitizen encounters being removed, particularly non-Mexicans, and growing numbers of non-Mexican encounters. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from

Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the April 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated June 7, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status"). CBP held an average of 21,453 noncitizens in custody each day during December 2023, averaging 102 percent of CBP's daily custody capacity (21,042) roughly each day for the entire month. OHSS analysis of data downloaded from UIP on February 14, 2024.
       EOIR had a backlog of over 2.7 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024. *See* EOIR, *Adjudication Statistics: Pending Cases,[1] New Cases, and Total Completions* (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344791/dl?inline; *see also* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape*, Migration Pol'y Inst., at 1 (Jan. 2024), https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); UNHCR, *Global Trends: Forced Displacement in 2022*, at 2, 8–9, 12 (June 14, 2023), https://www.unhcr.org/global-trends-report-2022 (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases).
[20] *See Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024) ("Consistent with the Departments' conclusion in the Circumvention of Lawful Pathways rule, the Departments believe the emergency border circumstances described in the Proclamation and this rule cannot be addressed by relying on the programmatic use of its contiguous territory return authority at section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), due to resource constraints and foreign affairs considerations. *See* 88 FR at 31370; 88 FR at 11731.")
[21] *See* IFR_AR 7320-23- (Memorandum from Blas Nuñez-Neto, Ass't Sec'y for Border and Immigr. Pol'y, *Data on Migration through the Western Hemisphere* (June 2, 2024)).

countries other than Mexico and northern Central America now account for the largest numbers

of such encounters.  However, DHS simply does not have the resources or authorities it needs to

keep pace with the number of individuals arriving at the SWB.  Specifically, DHS does not have

adequate resources and tools to deliver timely consequences to the majority of individuals who

cross unlawfully or without authorization and cannot establish a legal basis to remain in the

United States or to provide timely protection to those ultimately found eligible for protection

when individuals are arriving at such elevated volumes, as they were prior to the implementation

of the Rule.[22]  As discussed above, the inability to predictably deliver timely consequences

forces DHS to release individuals pending proceedings in the backlogged immigration court

system that can take several years to result in a final decision or consequence, which then

incentivizes more people to make the dangerous journey north to take their chances at the SWB

in the interest of remaining in the United States while their case is pending.[23]  Smugglers and

transnational criminal organizations ("TCOs") have exploited this mismatch, further fueling

migration by actively advertising to migrants that they are likely to be able to remain in the

United States.[24]  Smugglers use social media[25] to shift irregular migration to areas, such as

---

[22] In April 2024, there were 121,000 USBP encounters of individuals in a family unit and single adults at the SWB. Of those, 22,000 (18%) were amenable to voluntary return, reinstatement of a removal order, or administrative removal pursuant to INA § 238(b)). Of the remaining 99,000, 31,000 (31% of the potentially amenable to expedited-removal population) were placed in expedited removal and 68,000 (68%) were released with notices to appear. OHSS analysis of April 2024 OHSS Persist Dataset and OHSS analysis of data pulled from CBP Unified Immigration Portal (UIP) on June 4, 2024.
*See also* IFR_AR 7370-80 (Memorandum from Nathaniel Kaine, Chief of Staff, U.S. CBP, *CBP Operational Information* (June 2, 2024)); DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department.
[23] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay*, N.Y. Times (Jan. 31, 2024), https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.
[24] *See* IFR_AR 7370-80 (Memorandum from Nathaniel Kaine, Chief of Staff, U.S. CBP, *CBP Operational Information* (June 2, 2024)); *see also* Parker Asmann & Steven Dudley, *How US Policy Foments Organized Crime on US-Mexico Border*, Insight Crime (June 28, 2023), https://insightcrime.org/investigations/how-us-policy-foments-organized-crime-us-mexico-border/.
[25] Tech Transparency Project, *Facebook Marketplace, WhatsApp Storefronts, and TikTok Videos: How coyotes Get Creative*, (Sept. 15, 2022), https://www.techtransparencyproject.org/articles/facebook-marketplace-whatsapp-storefronts-and-tiktok-videos-how-coyotes-get-creative.

Arizona and California, that are more remote and have fewer resources and less capacity to process and hold large numbers of people.[26] Without further action, TCOs were expected to continue to increase their efforts, resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.[27]

### III.    **The Rule is Critical to Effective Management of Irregular Migration.**

17.    In order to increase the U.S. government's ability to quickly impose consequences on individuals who cross unlawfully or without authorization and reduce encounters along our southern border, on June 5, 2024, DHS and the Department of Justice promulgated the Rule. The Rule makes three key changes to asylum processing at the southern border that are designed to significantly enhance our ability to quickly remove individuals who do not establish a legal basis to remain in the United States.

18.    First, individuals who cross the southern border unlawfully or without authorization will generally be ineligible for asylum, absent exceptionally compelling circumstances and unless they are excepted by the Proclamation.

19.    Second, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will provide noncitizens described in the Presidential Proclamation general notice regarding the process for seeking asylum, statutory withholding of removal, or CAT protection, and will only refer a noncitizen for a credible fear interview if the

---

[26] Anita Snow *Smugglers Are Bringing Migrants to a Remote Arizona Crossing, Overwhelming Agents*, The Associated Press (December 10, 2023) https://apnews.com/article/lukeville-arizona-border-crossing-closed-ae04e8c861a95e98dbfc8d49244cf092; Demian Bio, Migrant Smugglers Turn to Arizona, California and Away from Texas to Cross into U.S., Sheriff Says, *Latin Times* (May 8, 2024), https://www.latintimes.com/migrant-smugglers-turn-arizona-california-away-texas-cross-us-sheriff-says-553917.

[27] *See* Jordan, *supra* note 23.

noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

20.     Third, the U.S. will continue to adhere to its international obligations and commitments by screening individuals who manifest a fear as noted above and do not qualify for an exception to the Rule for withholding of removal and CAT protections at a reasonable probability of persecution or torture standard—a new, higher standard than the reasonable possibility standard that is applied under the CLP Rule.

21.     In addition to and in conjunction with the Rule, USCIS has changed the credible fear consultation period.  Prior to the implementation of the Rule, credible fear interviews were to take place no earlier than 24 hours after the noncitizen's acknowledgment of receipt of information explaining the credible fear process.  While the measures in the Rule apply, however, USCIS has reduced the consultation period to a minimum of four hours from the time a noncitizen is provided with an opportunity to consult (i.e., access to a phone).  The four-hour consultation period applies to all noncitizens who enter across the southern border, are not described in an exception to the Presidential Proclamation, and are processed for expedited removal.  The four-hour period must fall between 7:00 a.m. and 7:00 p.m. local time, starting from the time CBP or U.S. Immigration and Customs Enforcement (ICE) provides the individual with an opportunity to consult.

22.     The Rule works in tandem with the Presidential Proclamation, and its measures will remain in place until 14 calendar days after the Secretary makes a factual determination that there has been a seven-consecutive-calendar-day average of less than 1,500 encounters along our

14

southern border, as defined by the Proclamation.[28]  If at any time thereafter the Secretary makes

a factual determination that there has been a seven-consecutive-calendar-day average of 2,500

encounters or more along our southern border, the Rule will again be effective at 12:01 a.m.

eastern time on the next calendar day (or will continue to apply, if the 14-day calendar period has

yet to elapse) until such time as the Secretary makes another factual determination that there has

been a seven-consecutive-calendar-day average of less than 1,500 encounters or the President

revokes the Proclamation, at which time its application will be discontinued.

　　　23.　　The 1,500 encounter threshold is an appropriate level to stop applying the

measures in the Proclamation and the Rule because, at that level, DHS will be able to refer most

individuals it encounters into expedited removal and deliver a swift consequence to the majority

of individuals it encounters who do not establish a legal basis to remain in the United States—in

the form of a return or removal.[29]  The Rule includes an extended analysis that demonstrates how

this level of encounters has, historically, resulted in the majority of individuals encountered

being removed or returned.  It also shows how this ability to swiftly deliver consequences at the

---

[28] Under the Proclamation, the term "encounter" refers to a noncitizen who (i) is physically apprehended by U.S. Customs and Border Protection immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between POEs; (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between POEs; or (iii) is determined to be inadmissible at a SWB POE.  But the 1,500 and 2,500 encounter thresholds in the Proclamation and this Rule exclude the third category of encounters—individuals determined to be inadmissible at a SWB POE.

[29] *Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024) ("From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.  During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b).  This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.  Of those individuals placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found not to have a credible fear and are ordered removed.  This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.")

border decreases as encounters increase beyond that level, and how this effect is magnified once encounters increase beyond 2,500 a day.

24.    This is important because, as noted above, despite the decrease in encounters since January, in the months prior to the implementation of the Rule, the United States continued to experience historically high levels of encounters at the southern border that far outstrip its ability to quickly impose consequences at the border.  Equally important, DHS projections strongly suggest that encounters at our SWB could increase substantially between now and December absent the kind of action that the Administration has taken.

25.    In fact, recent data demonstrate that the Rule, along with other enforcement measures is working.  The historically high levels of encounters that were experienced in the months prior to the Rule's implementation have decreased markedly, although they currently remain above the levels that the Proclamation designates as an emergency circumstance.  DHS's ability to expeditiously process noncitizens and deliver swift consequences to those who do not establish a legal basis to remain in the U.S. has significantly improved.  Notably, since the Rule was implemented:

- USBP encounters at the SWB are the lowest they have been since the summer of 2020 and lower than were observed during much of 2019.  USBP's seven-day average has decreased to approximately 1,800 encounters per day, with USBP recording approximately 56,000 encounters between POEs for the month, the lowest number since September 2020 and a more than 45 percent reduction from July 2019, the last comparable year prior to the pandemic.[30]

---

[30] OHSS analysis of July 2024 OHSS Persist Dataset.

- The majority of single adult and family unit individual encounters are now processed for expedited removal. The average count of USBP encounters processed for expedited removal is up 21 percent from the immediate post pandemic period as compared to under the Rule, and, as a percentage of single adult and family unit individual encounters, the rate has almost tripled (from 18 percent of encounters immediately post-pandemic to 53 percent under the Rule).[31]

- The median time for USCIS to process fear claims under the Rule has fallen 55 percent, from 11 days in the immediate post-pandemic period to five days under the Rule; and the median time from encounter to removal for people with negative fear findings has fallen 51 percent, from 45 days in the immediate post-pandemic period to 22 days under the Rule.[32]

- Repatriations of SWB encounters as a proportion of such encounters have more than doubled (from 26 repatriations per 100 encounters to 62 repatriations per 100 encounters). Overall, in the first 57 days that the Rule was in effect the Department repatriated 106,000 individuals to more than 58 countries.[33]

- The percentage of USBP encounters of single adults and family unit individuals released pending removal proceedings has fallen by nearly half (from 64 percent in the immediate post-pandemic period to 33 percent under the Rule).[34]

---

[31] OHSS analysis of July 2024 OHSS Persist Dataset.
[32] OHSS analysis of April 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024.
[33] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024.
[34] *Id*.

- The percentage of SWB encounters processed for expedited removal manifesting fear has fallen by more than half to 24 percent, compared to 55 percent claiming fear in the immediate post-pandemic period. The comprehensive screen-in rate for people with fear claims has fallen from 61 percent to 55 percent.[35]  The lower fear manifest rate and screen-in rate allow DHS to more quickly remove noncitizens without a legal basis to remain in the United States, which is likely to dissuade noncitizens from attempting to enter between POEs and, in turn, reduces encounters at the SWB between POEs.

26.     In sum, since its implementation, the Rule has reduced the strain on limited border security and immigration systems resources and enhanced DHS's ability to address historic levels of migration by more efficiently processing migrants arriving at the southern border during emergency border circumstances.  This, in turn, has helped preserve the Departments' ability to safely, humanely, and effectively enforce and administer immigration laws and protect against overcrowding in border facilities.

27.     The Rule as a whole and each of its component pieces, along with the corresponding change to the credible fear interview consultation period, are critical tools in managing the levels of irregular migration that continue to severely strain DHS and the Department of Justice's ability to safely, effectively, and humanely enforce and administer U.S. immigration laws, including the asylum system; and further allow DHS to swiftly apply consequences for those who cannot establish a legal basis to remain in the United States and to

---

[35] OHSS analysis of April 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024. The comprehensive screen-in rate refers to the percentage of expedited removal fear claims that result in a positive fear determination, a negative fear determination vacated by EOIR, or an administrative closure combined with an NTA issued by ICE or CBP.

provide timely protection to those ultimately found eligible for protection. Without the Rule, the continued historically-high encounter numbers could be compounded by seasonal trends of increased migration in the summer and fall months and the efforts of TCOs to exploit the Rule's termination, and significantly increased numbers of noncitizens would attempt to enter the United States with the expectation that they would be able to remain in the United States for years awaiting adjudication of their asylum claim, even though most would ultimately be denied.

## IV.   If the Rule is Vacated, the Expected Increase in Encounters Between Ports of Entry Will Severely Tax DHS's Operational Capabilities.

28.     If the Rule is vacated for any amount of time, the elimination of the Rule's additional disincentives for irregular migration and the additional incentives to use safe and orderly pathways will have significant negative consequences. In particular, DHS expects that, were the Rule to be vacated, migrants would continue to enter the United States in large numbers, without waiting to take advantage of the various safe and orderly processes implemented by DHS. Should this occur, DHS would face significant challenges in managing the impending substantial increased encounters at the SWB that are strongly suggested by internal modeling. This would be compounded by increased encounters of migrants who could be incentivized to enter the United States before the Rule is potentially reinstated by court order. As a result, DHS's ability to quickly impose consequences on individuals who cross unlawfully or without authorization would be greatly impaired, resulting in more noncitizens released pending proceedings, in turn incentivizing others to make the dangerous journey north.

29.     As described above, DHS lacks sufficient resources to detain and conduct credible fear interviews for the number of noncitizens who were arriving each day and who claimed a fear of return when processed through expedited removal prior to the implementation of the Rule. This is part of the reason the Rule is necessary. The mismatch in available resources and

encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting DHS's ability to swiftly deliver consequences on individuals who do not have a legal basis to remain in the United States.[36]

30.     Prior to the implementation of the Rule, DHS anticipated a near-term increase in encounters.  The likelihood of such an increase was supported by recent trends in migration through the Darién jungle between Colombia and Panama, as well as in historical data.  For example, between January and April 2024, UNHCR tracked 139,000 irregular entries into Panama through the Darién, up from 128,000 for the same months in 2023 and a seven-fold increase over 20,000 irregular entries into Panama through the Darién during that period in 2022.[37]  Without the Rule, the number of migrants crossing the Darién would have only increased the pressure on the SWB.

31.     DHS planning projections indicate that, absent the Rule, encounters may once again reach elevated levels in the weeks to come, averaging in the four months from September to December 2024 in the range of approximately 3,400 to approximately 6,900 encounters at and between POEs per day, not including an additional approximately 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[38]

---

[36] *See* CBP, *Custody and Transfer Statistics* (May 15, 2024), https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (detailing the number of individuals processed for expedited removal compared to another processing disposition, including section 240 proceedings); *see also* IFR_AR 7320-23 (Memorandum from Blas Nuñez-Neto, Ass't Sec'y for Border and Immigr. Pol'y, *Data on Migration through the Western Hemisphere* (June 2, 2024).

[37] OHSS analysis of downloaded from UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring - January - December 2023*, https://data.unhcr.org/en/documents/details/105569 (last visited May 31, 2024); *Darien Panama: Mixed Movements Protection Monitoring – April 2024,* https://data.unhcr.org/en/documents/details/108399 (last visited May 31, 2024); *see also* IBC Human Mobility Dashboard, *Irregular Entries in Darien, Panama*, https://www.rcplac.org/en/ibcs-and-working-groups/ibc-on-human-mobility/ibc-human-mobility-dashboard (last visited May 22, 2024) (showing encounters from January 2022 through March 2024).

[38] OHSS Encounter Projections, May 2024, reflecting the Department's final projection *not* accounting for the impact of the IFR.  Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (i.e., encounters in which removal proceedings

32.     Thus, the Rule and the limitation on asylum eligibility and procedures regarding expedited removal and credible fear it establishes are needed to address not just the rate of encounters prior to the implementation of the Rule but also to position DHS to address the encounter rates in the DHS planning projections.  If the Rule, or any part of it, is vacated for any amount of time, the impact on the U.S. border and immigration systems would be substantial, potentially compounding the expected surge.

## V.     <u>CBP Impact</u>

33.     CBP, a component of DHS, is charged with enforcing federal customs and immigration laws at or near the international border, including at and between POEs, while facilitating lawful international travel and trade.

34.     CBP facilities are designed for short-term detention, have limited holding capacity, and are only designed to hold noncitizens for a few days, generally for the purpose of immigration processing and subsequent removal or transfer to the custody of another agency, or release pending removal proceedings, as appropriate.  If the Rule is vacated, such that the consequences for irregular migration are diminished and expedited removal returns to lengthier processing, CBP will likely be required to detain more noncitizens than its short-term holding facilities can handle.  This will exacerbate overcrowding of facilities, which can create unsafe conditions.

---

are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 180 per day since May 2023, based on OHSS analysis of April 2024 OHSS Persist Dataset.  *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (July 14, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.

Since 2023, the OHSS encounter projections are continuously evaluated and have consistently demonstrated a high degree of accuracy, with error rates below 15%.  This performance is well within industry standards for forecasting one, two, or three months into the future.

35.    During surges, CBP's limited personnel and resources are strained.  The processing, transportation, escort, detention, and security functions associated with migration surges require USBP to expand temporary holding capacity at its processing facilities, increase requests for assistance from other federal agencies, expand virtual processing support from Northern Border sectors, increase transportation contracts, and expand contract facility support. The expansion of holding capacities at processing facilities also requires additional Border Patrol Agents to be reassigned from border security enforcement to support processing operations.  On numerous occasions, CBP has also had to temporarily reassign Office of Field Operations personnel from POEs to support the USBP mission, reducing the capacity to process people, vehicles, and trade at POEs and even requiring the temporary closure of entire facilities.[39]  Such slowdowns in processing and impacts to facilities have an impact both on CBP personnel at the facilities and on the general public, particularly on local economies.

36.    In response to increased border encounters in recent years, USBP has expanded transportation contracts to increase its number of leased buses, transportation routes, transportation hours, and flights and routes in response to the increased encounter numbers.  It also has increased holding capacity through the construction of soft-sided facilities in seven of nine SWB Sectors.  These facilities have increased USBP's temporary holding capacity, but at a significant cost.  USBP's obligations for soft-sided facilities alone currently total more than $115 million per month.

---

[39] For example, in late November and December 2023, vehicular, rail, and/or pedestrian traffic was temporarily suspended at several POEs across the SWB.  *See, e.g.,* 89 Fed. Reg. 48725.

37.    For FY 2024, DHS requested emergency appropriations to be able to better address personnel and resource constraints during periods of high encounters.[40]  The President's October 2023 national security supplemental budget request included $8.7B in supplemental funding for DHS border operations, which would have supported the hiring of thousands of additional personnel across the DHS immigration components, supported the continued use of USBP's soft-sided facilities, and increased ICE Enforcement and Removal Operations ("ERO")[41] detention capacity.  DHS also requested $2.65B in August 2023, which would have provided additional funding for CBP's soft-sided facilities, transportation, and medical requirements, among other things.[42]  However, these budget requests have yet to be acted on by Congress.  DHS also supported the February 2024 Senate bipartisan border security legislative proposal that would have provided over $20 billion in border security funding, including adding more than 1,500 CBP personnel and increased ICE's detention capacity, but Congress failed to pass this legislation.

38.    These resource constraints continue to negatively impact CBP operations, especially in areas that may experience a localized surge or influx.  For example, prior to the implementation of the Rule, the Tucson and San Diego Sectors experienced localized surges in migration that significantly strained operations there.  USBP encountered more than 2,000 migrants per day in April 2024 in these two sectors, up 16 percent from their daily averages during the same time in April 2023, and up 72 percent from FY 2022.  The operational impacts

---

[40] *See* DHS, *Fact Sheet: Impact of Bipartisan Border Agreement Funding on Border Operations* (February 29, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/29/fact-sheet-impact-of-bipartisan-border-agreement-funding-on-border-operations.
[41] *See* The White House, *Letter Regarding Critical National Security Needs* (Oct. 20, 2023), https://www.whitehouse.gov/omb/briefing-room/2023/10/20/letter-regarding-critical-national-security-funding-needs-for-fy-2024/.
[42] *See* The White House, *Letter Regarding Critical National Needs for the American People* (Aug. 10, 2023), https://www.whitehouse.gov/omb/briefing-room/2023/08/10/letter-regarding-critical-needs-for-the-american-people/.

of this increase in encounters were exacerbated by the fact that the majority of the encounters occurred in remote areas an hour or more away in driving time from the sectors' main processing facilities. This has significantly increased the operational impacts on frontline personnel given the complicated logistics required to take individuals into custody in these remote areas, transport them extended distances to our centralized processing facilities, and process them. In San Diego, the majority of these encounters were of individuals from countries that are more difficult to process and remove—including predominantly South American countries and countries outside of the Western Hemisphere—which significantly increased the difficulty of enacting swift removals to their countries of origin. In addition, in San Diego, many of the encountered migrants spoke indigenous languages, for which there are a limited number of translators who can provide appropriate language services. Thus, it takes longer to provide appropriate translation for individuals being processed, increasing the time that such individuals spend in custody.

39.     As noted above, the main mechanism available to DHS under Title 8 authorities to impose swift consequences for amenable noncitizens is expedited removal. However, processing noncitizens for expedited removal is resource and time-intensive, and, as the Rule notes, our capacity to refer individuals into expedited removal is limited by our resources—in particular, our ability to hold individuals in CBP and ICE custody, and the number of credible fear interviews that can be conducted by USCIS each day. Prior to the Rule, processing individuals into expedited removal proceedings in USBP custody took approximately two hours per noncitizen. This process included, among other steps, conducting a sworn statement, via a Form I-867A, and asking four questions related to the noncitizen's fear of return or intention to seek asylum on the Form I-867B. Completion of the Forms I-867A and I-867B took

approximately 20-30 minutes per person. For those who indicate an intention to seek asylum or a fear of return, USBP would then provide the noncitizen with the Form M-444, which provides information about the credible fear process. As a matter of practice, the noncitizen either read this form, or the form was read to the noncitizen in a language they understand, and the noncitizen signed the form. Each individual who indicates an intention to seek asylum or a fear of return then generally must be held for a consultation period and credible fear interview in either CBP or ICE custody, with the entire process from encounter to removal, for those who do not establish a credible fear, taking an average of between 10 and 20 days across DHS facilities.

40.    The Rule has significantly streamlined expedited removal processing, allowing us to process many more individuals than before at the SWB border. A key change that has realized substantial time savings for agents and officers has been the elimination of Forms I-867A, I-867B, and M-444.[43] Instead of requiring frontline personnel to spend time filling out these forms, which require officers and agents to read a sworn statement, ask a series of questions, and have the noncitizen sign the M-444, noncitizens are referred for a credible fear interview only if they manifest a fear of return, express an intention to apply for asylum or protection, express a fear of persecution or torture, or express a fear of return to their home country or the country of removal. This streamlined process saves at least 20-30 minutes per person, allowing frontline CBP personnel to process noncitizens amenable to expedited removal more efficiently during periods of high encounters and move them more quickly into the screening process should they manifest a fear or express an intent to apply for asylum.

41.    During periods of high encounters, CBP must prioritize expeditiously processing noncitizens and moving them out of CBP short-term holding facilities to avoid overcrowding. In

---

[43] While agents and officers will still provide the noncitizen with information about the credible fear process, it is not required to be provided on a Form M-444.

previous migrant surges, this has included releasing noncitizens from custody pending immigration court removal proceedings, as opposed to expedited removal proceedings. For example, during surges in May 2019 and December 2023, USBP had to prioritize processing noncitizens for immigration court proceedings and releasing them from DHS custody if they were not a public safety or national security threat because there was not sufficient space in DHS facilities to hold noncitizens for the duration of expedited removal proceedings, releasing more than 40 percent of noncitizens encountered at the border during each month.[44] Without the Rule, CBP would similarly need to revert to processing noncitizens for lengthy immigration court proceedings and releasing noncitizens pending such proceedings, which hampers DHS's ability to impose timely consequences on noncitizens who enter the United States unlawfully.

## VI. ICE Impact

42.    ICE is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the enforcement of criminal and civil federal laws governing border control, customs, trade, and immigration. Within ICE, ERO manages and oversees all aspects of the removal process, including operations to identify and arrest removable noncitizens, domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 180 countries around the world.

43.    While ICE ERO's primary mission is the enforcement of U.S. immigration laws in the interior of the United States, as result of the most recent increase in migration flows, most of ERO's SWB Field Offices have had to reassign personnel from other programs to support and

---

[44] *See* DHS, Office of Homeland Security Statistics, *Immigration Enforcement and Monthly Processing Tables – January 2024*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables.

sustain detention, releases, and decompression efforts at the border.  This includes, as of May 23, 2024, 102 ERO personnel detailed to the SWB to support USBP operations.  This, in turn, impacts ERO's operations in other areas, affecting its ability to arrest noncitizens in the interior of the United States, conduct removals of those with final orders, and effectively manage the increasing non-detained docket.

44.    ICE's ability to detain noncitizen single adults processed through the expedited removal process is key to swiftly removing noncitizens who do not have a legal basis to remain in the United States; as a result, ICE bedspace is a critical factor for determining the number of noncitizen single adults that DHS can process for expedited removal.  As of August 10, 2024, the Fiscal Year 2024 average daily population in ICE custody was 37,770, comprising 91 percent of ICE's funded bedspace.  Due to many factors including housing detainees appropriately by gender and risk classification, infrastructure and geographic limitations, and changing bed availability with state and local partners, ICE cannot use 100 percent of the 41,500 beds for which Congress provided funding.

45.    Any potential vacatur of the Rule that resulted in an increase in unlawful crossings along the SWB, and, by extension, increased referrals of individuals processed by CBP to ICE, would quickly overwhelm ICE's detention capacity.  This would require ICE to begin declining referrals from CBP custody and would, in turn, require CBP to release more noncitizens from its custody who might otherwise be processed for expedited removal.

46.    Funding shortfalls also limit ICE's resources and ability to detain, process, and remove noncitizens.[45]  The February 2024 Senate bipartisan border security legislative proposal

---

[45] *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department ("DHS reiterates previously submitted funding requests

included resources for 1,200 new ICE personnel for functions including enforcement and removals,[46] but Congress failed to pass this legislation and Congress also failed to pass the emergency supplemental funding requests that the Administration submitted, which included requests for additional resources for enforcement, detention, transportation, and removal. Congress did enact an FY 2024 appropriations bill that provided funding for additional ICE detention bedspace; however, it does not provide DHS with sufficient funding, as requested by the Administration, that is necessary to secure the border and deliver timely consequences through the expedited removal process for noncitizens who do not have a legal basis to remain in the United States.[47]  Without the additional funding requested in the Administration's supplemental requests, ICE's enforcement mission is constrained by its reallocation of personnel and transportation to the SWB.

47.    An increase in border apprehensions also inevitably strains downstream interior processing resources.  ICE's deployment of ERO personnel to the SWB means that ERO's field officers across the nation must manage ICE's detained and non-detained dockets, which together constitute more than 7.4 million noncitizens, with fewer personnel.  If there is a surge on the

---

that are critical to secure the border, build immigration enforcement capacity, combat fentanyl and address domestic needs like natural disaster response, which Congress has failed to act on.  Among them, the October funding request, which includes $8.7 billion for border, immigration, and counter fentanyl requirements and $9.2 billion for FEMA's Disaster Relief Fund and Nonprofit Security Grant Program.  Notably, the Administration's border supplemental request includes funding to build capacity in the areas of border security, immigration enforcement, and countering fentanyl.  DHS strongly supports the additional $19 billion in funding proposals included in the Senate's bipartisan border legislation that would, among other things, enable DHS to hire more CBP agents and officers, ICE enforcement and investigative personnel, and USCIS asylum officers and provide new tools to bolster the Department's efforts to secure and manage the border.").

[46] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.

[47] *See* Associated Press, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance* (May 23, 2024), https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe; House of Representatives, *Explanatory Statement: Division C, Department of Homeland Security Appropriations Act, 2024* (Mar. 18, 2024) 14, 25, https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf; *See also* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.

SWB, ERO may be required to further divert ERO resources and personnel that support ERO's interior immigration enforcement mission, leading to increased numbers of noncitizens who have failed to depart the United States pursuant to a final order of removal, deportation, or exclusion, or who have failed to report to an ERO officer after receiving notice to report so ERO can effectuate the removal.  Focusing more ICE resources at the SWB could adversely impact ICE's ability to take immediate enforcement action against these noncitizens.

## VII.   **USCIS Impact**

48.    USCIS, a component of DHS, is the federal agency that oversees lawful immigration to the United States.  The Asylum Division, which is a part of USCIS's Refugee, Asylum, and International Operations (RAIO) Directorate, is responsible for conducting credible fear screenings for noncitizens placed in expedited removal who manifest a fear of return, or express an intention to apply for asylum, express a fear of persecution or torture, or express a fear of return to their country of nationality or the designated country of removal.

49.    Within the Asylum Division, in addition to conducting credible fear screenings, a cadre of specially trained Asylum Officers (AOs) are responsible, among other things, for adjudicating applications for asylum pursuant to 8 U.S.C. § 1158,[48] as well as for conducting reasonable fear[49] and Safe Third Country Agreement screenings.[50]

50.    By statute and regulation, AOs receive specialized training on international human rights law, non-adversarial interview techniques, and country conditions information

---

[48] USCIS adjudicates applications for asylum filed by applicants who are physically present in the United States and not in removal proceedings, 8 C.F.R. § 208.2(a), as well as those filed by unaccompanied children regardless of whether they are in removal proceedings, 8 U.S.C. § 1158(b)(3)(C).  USCIS also conducts Asylum Merits Interviews and adjudicates applications for asylum pursuant to the March 2022 interim final rule titled "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal and CAT Protection Claims by Asylum Officers," 87 Fed. Reg. 18,078 (May 31, 2022).
[49] 8 C.F.R. § 208.31.
[50] 8 C.F.R. § 208.30(e)(6).

before they can begin adjudicating cases or conducting screening interviews. *See* 8 U.S.C. § 1225(b)(1)(E); 8 C.F.R. § 208.1(b).

51.    Currently, USCIS has a total of approximately 470 permanent AOs fully trained and certified to complete the workloads described above. Given that the encounter levels in the absence of the Rule required far more than that to keep pace with credible fear referrals, USCIS has trained hundreds of additional staff members from across the agency to serve temporarily on detail as AOs and conduct credible fear interviews consistent with the statute.[51] Currently, USCIS has approximately 637 credible fear trained AOs (470 permanent staff and 167 detailees, where detailees are trained to conduct credible fear screenings only). After dedicating AOs to other workloads that must be staffed to meet processing timeframes established by statute, regulations, settlement agreements, court orders, or litigation needs, USCIS is able to assign approximately 300 AOs to conduct credible fear screenings each day.[52]

52.    Should vacatur of this Rule result in a surge in noncitizens expressing an intent to apply for asylum or a fear of persecution, torture, or return to their country of nationality or country of removal at the southern border, USCIS's already strained ability to provide credible fear screenings would quickly be outpaced. Despite the strengthened consequences in place at the SWB through the CLP rule and the complementary measures that have led to record returns and removals, encounter levels and credible fear referrals prior to the Rule were already

---

[51] 8 U.S.C. § 1225(b)(1)(E).

[52] USCIS made determinations or closed an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009. OHSS analysis of April 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated June 7, 2024) (reflecting ever increasing numbers of credible fear interview screenings at the "SW Border Credible Fear Screenings Referred to USCIS by citizenship" tab); *see also* 88 FR at 31314, 31326, 31381.

exceeding the capacity of the expedited removal process.[53]  As set forth above, the availability of sufficient numbers of AOs to conduct credible fear interviews is critical to DHS's ability to quickly complete credible fear determinations and deliver consequences to those who do not establish a legal basis to remain in the United States.

53.     The need to assign such a large percentage of its work force to credible fear screenings has already substantially impacted the ability of the Asylum Division to keep pace with new affirmative asylum receipts and to even marginally reduce the affirmative asylum backlog.  Should DHS experience another surge of noncitizens at the SWB, USCIS would be forced to deploy additional AOs to conduct credible fear screenings, leading directly to an increased growth in backlogs in its other workloads.  The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.[54]  Diverting additional AOs away from the affirmative asylum workload to conduct credible fear screenings will necessarily impede USCIS's efforts to address this growing backlog and increase processing times for older asylum applications.  Additionally, as a surge in USCIS's credible fear workload would quickly outstrip the capacity of available AOs, USCIS would be forced to detail additional staff from other parts of the agency.  Continuing to detail staff from other parts of USCIS as AOs to conduct credible fear screenings necessarily degrades USCIS's ability to administer the rest of the legal

---

[53] *See* Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶¶ 10–12, *Florida v. Mayorkas*, No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1); Decl. of Enrique M. Lucero ¶ 7, *Innovation Law Lab v. Wolf*, No. 19-15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3). IFR_AR 7370-80 (Memorandum from Nathaniel Kaine, Chief of Staff, U.S. CBP, *CBP Operational Information* (June 2, 2024).
[54] OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.  Almost all of this backlog is the result of cases filed since FY 2015.  From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed.  In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed.  OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

immigration system with corresponding impacts on the American economy, communities, and families.

54.    USCIS receives only four percent of its funding from Congressional appropriations; filing fees submitted by individuals seeking certain immigration and naturalization benefits generate the other 96 percent.  Because USCIS does not charge a filing fee for asylum applications, the agency must subsidize the asylum program with funds collected from fee-generating workstreams.

55.    Despite the recent addition of an Asylum Program Fee,[55] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding as reflected in the President's FY 2025 budget.[56]

56.    The President's FY 2024 budget request to Congress sought funds necessary to complete up to 150,000 credible fear determinations, providing USCIS with critical resources needed to expand its capacity to support timely processing of those placed in expedited removal.[57]  Further, the February 2024 Senate bipartisan border security legislative proposal would have provided new authorities to significantly streamline and speed up the process for individuals encountered at the border.[58]  Critically, the bill included resources for over 4,300 new AOs, as well as other USCIS staff to facilitate timely and fair decisions.

---

[55] On January 30, 2024, USCIS published a final rule to adjust certain immigration and naturalization benefit request fees for the first time since 2016.  The rule also includes a new Asylum Program Fee of up to $600 to be paid by employers who file certain employment-based visa petitions, which will allow USCIS to cover a greater share of its operating costs and support more timely processing of new asylum applications.
[56] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.
[57] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.
[58] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), https://www.whitehouse.gov/briefing-room/statements-

57.     However, Congress failed to move forward with this bipartisan legislative proposal.[59]  It also failed to pass the emergency supplemental funding requests that the Administration submitted.[60]  Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding provided to USCIS was limited to programs related to employment verification, overseas immigration processing, backlog reduction, and grants.  No funds were provided to support USCIS's responsibilities at the SWB.

58.     As described in the Rule, Congress has failed to provide the additional resources requested for USCIS that would have increased the number of AOs that are available to conduct credible fear interviews for SWB cases.  This reality, combined with the prospect of increases at the SWB in the absence of this Rule, and the increases in the proportion of noncitizens processed for expedited removal who claim fear of return, means that DHS will not be able to impose consequences swiftly or predictably on most individuals whom DHS encounters and who do not have a legal basis to remain.[61]

## VIII.    Impact on Relationships with Foreign Partners

59.     The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.  This strategy includes the Los Angeles Declaration on Migration and Protection, which was joined by leaders during the

---

releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.

[59] Shalanda Young, Office of Mgmt. & Budget, Exec. Office of the President, *Letter Regarding Critical National Security Funding Needs For FY 2024* (Oct. 20, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/10/Letter-regarding-critical-national-security-funding-needs-for-FY-2024.pdf

[60] *Id.*

[61] *See* IFR_AR 7320-23 (Memorandum from Blas Nuñez-Neto, Ass't Sec'y for Border and Immigr. Pol'y, *Data on Migration through the Western Hemisphere* (June 2, 2024).

Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[62]  Under the

this framework, the United States has been working closely with its foreign partners to manage

the unprecedented levels of migration that countries throughout the region have recently been

experiencing, including on efforts to: expand access to, and increase, lawful pathways, such as

the SMO initiative;[63] conduct joint enforcement efforts, such as the Darién Campaign with

Colombia and Panama and the mirrored patrols[64] with the Government of Mexico along our

shared border;[65] and share information, technical assistance, and best practices.[66]  The United

States and endorsing countries continue to progress and expand upon our shared commitments

made under this framework.[67]

     60.    Sustaining and, where appropriate, ramping up efforts to improve border security

and stem arrivals to the southern border is a critical element of the United States' ongoing

diplomatic approach to migration management with partners in the region.  Undertaking and

---

[62] *See* Los Angeles Declaration on Migration and Protection, Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries (last visited May 27, 2024).
[63] *See* U.S. Dep't of State, *Safe Mobility Initiative*, https://www.state.gov/refugee-admissions/safe-mobility-initiative (last visited June 5, 2024).
[64] *See* CBP, *Readout: U.S.-Mexico meeting on joint actions to further enhance border security* (Sept. 24, 2023), https://www.cbp.gov/newsroom/national-media-release/readout-us-mexico-meeting-joint-actions-further-enhance-border (noting that CBP encouraged mirrored patrols); U.S. Dep't of State, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue—Fact Sheet* (Oct. 13, 2023), https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/ (noting that "CBP and INM regularly coordinate enforcement efforts at the border through mirrored patrols," which suggests that those patrols were occurring).
[65] *See* DHS, *Trilateral Statement* (Apr. 11, 2023), https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.
[66] *See, e.g.*, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Exec. Order 14,010, 86 FR 8267, 8270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/; The White House, *Fact Sheet: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-level-security-dialogue/; U.S. Dep't of State, *Fact Sheet: Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023), https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/.
[67] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.

highlighting our own, domestic efforts remains a key component of our diplomacy, as regional

partner countries have regularly encouraged DHS to take steps to address migratory flows.

Given the particular challenges facing the United States and its regional partners at this moment,

the Departments assess that it is critical that the United States continue to lead the way in

responding to ever-changing and increasing migratory flows, and that this regulatory effort and

the Presidential Proclamation—and the strong consequences they will impose at the border—will

send an important message to the region that the United States is prepared to put in place

appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

61.    This approach to international coordination has yielded important results.  A

number of foreign partners, including Mexico, Panama, and Colombia, announced significantly

enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public

health Order.[68]  These governments recognized that the United States continues to take measures

to strengthen border enforcement, specifically through application of the CLP rule along with

other complementary measures, and committed to taking their own actions to address irregular

migratory flows in the region.[69]  Additionally, immediately prior to the transition from DHS

processing under the Title 42 public health Order to processing under Title 8 authorities, the

Government of Mexico announced that it had independently decided to accept the return into

Mexico of nationals from CHNV countries under Title 8 processes.[70]  The Government of

---

[68] Kathia Martínez, *US, Panama and Colombia Aim to Stop Darien Gap Migration*, AP News (Apr. 11, 2023), https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7; Camilo Montoya-Galvez, *Mexico Will Increase Efforts To Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say*, CBS News (May 10, 2023), https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/.
[69] *See* 88 FR at 31444.
[70] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/; DHS, *Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows that Lawful Pathways Work* (July 25, 2023),

Mexico linked its decision to accept return into Mexico of CHNV nationals to the success of the

CHNV parole processes framework under the Title 42 public health Order,[71] which combined

expansion of lawful pathways and processes for nationals of these countries with a meaningful

consequence framework, and which reduced irregular border crossings.[72]

62.    DHS believes that the emergency measures being taken here are needed to help

address this regional challenge, and that any decrease in migration that results will help relieve

the strain not just on the U.S.-Mexico border but on countries throughout the hemisphere.  The

actions the United States is taking demonstrate a commitment to addressing irregular migration

in the region, even as foreign partners have been taking actions themselves that are aligned with

a shared interest in reducing migration.  The actions the Departments are taking are directly

responsive to the shared challenge the United States and its regional partners are confronting.

63.    In short, the Rule is a substantive demonstration of the U.S. Government's

partnership and commitment to the shared goal of stabilizing migratory populations and

addressing migration collectively as a region, both of which are critical to maintaining strong

bilateral and multilateral relationships.

## IX.    **Conclusion.**

64.    The Presidential Proclamation and the Rule are an appropriate response to the

unprecedented global migration that was unleashed by the COVID-19 pandemic, which has

---

https://www.dhs.gov/news/2023/07/25/fact-sheet-data-first-six-months-parole-processes-cubans-haitians-nicaraguans-and.

[71] *See* Gobierno de México, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published (characterizing the effort of the Government of Mexico as a successful joint initiative and expressing the Government's commitment to continue to accept migrants back into Mexico on humanitarian grounds).

[72] *See id.* (describing a significant reduction in irregular migration following the implementation of CHNV parole processes, which pair an expansion of lawful pathways with consequences for irregular migration).

impacted governments all over the world, including in our hemisphere.  The lingering economic devastation caused by the pandemic, combined with political volatility in the region and other historical factors driving migration, have resulted in more people being displaced from their home countries today than at any other point in time since World War II.  This global migration has strained immigration and border enforcement regimes all over the world, including our own.

65.    During times such as these, when encounters have been at historically high levels that adversely impact our ability to swiftly impose consequences on those who cross our southern border unlawfully, the President has authorized extraordinary measures in order to reduce unlawful migration.  The measures in the Proclamation and the Rule are designed to allow the U.S. government to more quickly process individuals who cross unlawfully or without authorization and more expeditiously remove those who do not establish a legal basis to remain in the United States.  They are also designed to address the ways in which smuggling organizations, and economic migrants, have exploited the limitations of our immigration system in order to come to the United States and work while their immigration court proceedings take years to reach a resolution, given that system is simply not resourced, or capable, of deciding cases in a timely manner.

66.    DHS projections suggest that without the Rule and complementary measures encounter levels would remain significantly above the levels at which DHS can place into expedited removal the majority of noncitizens who are amenable to such processing given the limited resources Congress has made available.

67.    Should the court prevent DHS from implementing the Rule, DHS anticipates that encounters will increase sharply—placing even more stress on our operations at the border, and on communities throughout the country.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.  Executed on this 16 day of August, 2024.

*Royce B Murray*

_____
Royce Bernstein Murray
Assistant Secretary for Border and Immigration Policy
U.S. Department of Homeland Security