**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*, | )<br>)<br>)<br>) |
| *Plaintiffs*, | )<br>)  No. 1:24-cv-01702-RC |
| v. | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | )<br>)<br>) |
| *Defendants.* | )<br>)<br>) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

I.   PLAINTIFFS HAVE STANDING. ................................................................................. 1

    A.  The Individual Plaintiffs Have Standing. ............................................................ 1

    B.  The Organizational Plaintiffs Have Standing. .................................................... 2

    C.  Section 1252(e)(3) Permits the Organizational Plaintiffs' Claims. .................... 6

    D.  The Organizational Plaintiffs Satisfy the Zone of Interests. ............................... 7

II.  THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY AND
    CAPRICIOUS. ................................................................................................................. 9

    A.  The Asylum Bar Is Contrary to Law. .................................................................. 9

       1.   The Asylum Bar Is Not "Consistent" with Section 1158(a)(1). ................... 10

       2.   Agency Discretion in Individual Cases Cannot Justify the Rule. ................. 14

    B.  The Rule's Asylum Bar Is Arbitrary and Capricious. ........................................ 16

III. THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS MANIFEST FEAR IS
    CONTRARY TO LAW AND ARTBITRARY AND CAPRICIOUS. ............................... 19

    A.  The Manifestation Standard Is Contrary to Law. .............................................. 19

    B.  The Manifestation Standard Is Arbitrary and Capricious. ................................. 20

IV. THE RULE'S HEIGHTENED REASONABLE PROBABILITY STANDARD IS
    ARBITRARY AND CAPRICIOUS. ............................................................................... 24

V.  THE GUIDANCE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. .... 26

    A.  The Guidance Is Contrary to Law. .................................................................... 27

    B.  The Guidance Is Arbitrary and Capricious. ...................................................... 29

VI. FAILURE TO PROVIDE NOTICE AND COMMENT RENDERS THE RULE NULL AND
    VOID. ............................................................................................................................ 31

    A.  The Rule Fails to Meet the "Foreign Affairs" Exception. ................................. 31

    B.  The Rule Fails to Meet the "Good Cause" Exception. ...................................... 34

VII.   PLAINTIFFS ARE ENTITLED TO VACATUR AND OTHER RELIEF.......................36

    A.  Vacatur Is Available. ..................................................................................................36

    B.  Remand Without Vacatur Is Unwarranted.......................................................................40

    C.  The Individual Plaintiffs' Requested Remedies Are Permissible and Appropriate..........44

CONCLUSION....................................................................................................................45

## TABLE OF AUTHORITIES[*]

CASES

*Aberdeen & Rockfish R.R. Co. v. SCRAP*, 422 U.S. 289 (1975) ....................................39

*Air Transport Association of America., Inc. v. USDA*, 317 F. Supp. 3d 385 (D.D.C. 2018) ............................................................................................................................41

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ........................................................42

*Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029 (S.D. Cal. 2022) ......................38

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ...................41

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ..................................41

*Am. Ass'n of Exps. and Imps. v. United States*, 751 F.2d 1239 (Fed. Cir. 1985) ...................31, 32

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324 (D.C. Cir. 2023) ............................34

*American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ............................................................................................................................6, 7

*Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. CV 22-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ...................................................................................7

*Ayuda, Inc. v. Reno*, 7 F.3d 246 (D.C. Cir. 1993) ............................................................9

*Biden v. Missouri*, 595 U.S. 87 (2022) ............................................................................34

*Biden v. Texas*, 597 U.S. 785 (2022) ..........................................................................38, 39

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) .........................................37, 40, 41

*California v. Arizona*, 452 U.S. 431 (1981) .....................................................................39

*Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ..................................................................................1, 4, 6, 8, 9, 31, 33, 34, 35, 40*

*Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154 (D.D.C. 2021) .........................6

*City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172 (2d Cir. 2010) ......................................................................................................31, 32

*Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009) ........................................................41

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Corley v. United States*, 556 U.S. 303 (2009).............................................................................15

*Council of Parent Att'ys and Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019) .......................................................................................................................................29

*Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1 (D.C. Cir. 2015) ....................................................................................................................................17, 18

*Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017)........................................................34

*E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *decision stayed pending appeal*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024) ...........................................1, 9, 10, 11

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021)................................................................1, 3, 4, 5, 9, 10, 13, 19, 31, 34*

*E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020)............................3, 4, 5, 14

*E. Bay Sanctuary Covenant v. Trump,* 932 F.3d 742 (9th Cir. 2018)..........1, 9, 10, 14, 31, 32, 34*

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).......................................................25

*Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486 (D.C. Cir.1984)................................18

*FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024).....................................................2, 4

*Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) .......................................................................................................................................9

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023) .................................................38

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ....................................................................38

*Giammarco v. Kerlikowske*, 665 F. App'x 24 (2d Cir. 2016)......................................................46

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)..........................................16, 17, 37, 39, 40, 44, 45

*Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018)..........................................................44, 45

*Grace v. Whitaker*, No. CV 18-1853, 2019 WL 329572 (D.D.C. Jan. 25, 2019)...........................7

*Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973 (D.C. Cir. 2016).....................................................1

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................................2, 4

*Hisp. Affs. Proj. v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) .........................................................30

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).......................................................17

*Humana of S.C., Inc. v. Califano*, 590 F.2d 1070 (D.C. Cir. 1978)................................................31

*Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019)................................................24

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...........................................................................12

*INS v. Legalization Assistance Project of Los Angeles County Federation of Labor*,
  510 U.S. 1301 (1993)...........................................................................................................8, 9

*Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983) ..........................................................................34

*Kiakombua v. Wolf*, 498 F. Supp. 3d 1 (D.D.C 2022) ...........................................37, 38, 39, 44, 45

*Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) ...................................................................45

*Komarenko v. INS*, 35 F.3d 432 (9th Cir. 1994)...........................................................................14

*Kucana v. Holder*, 558 U.S. 233 (2010) .......................................................................................6

*L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020).................................................................1

*Las Americas Immigrant Advocacy Center v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020) ...............29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ......................7, 8, 9

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ...................................................27, 28

*Loughrin v. United States*, 573 U.S. 351 (2014)..........................................................................27

*Make The Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020)...................................6, 7, 37, 39

*Matter of Pula*, 19 I. & N. Dec. 467 (B.I.A. 1987)........................................................................14

*Mayor and City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452 (D. Md. 2019) ................34

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) .................................................................5, 6

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)......................................................38

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983)...............................19, 23, 26, 35

*Make The Rd. New York v. McAleenan*, 405 F. Supp. 3d 1 (D.D.C. 2019), *rev'd on
  other grounds*, *Make The Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ....................7

*Ms. L. v. ICE*, 403 F. Supp. 3d 853 (S.D. Cal. 2019) ..................................................................45

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012).......................................18

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998).........................9

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) .............37, 38

*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995)................................4

*Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554 (D.C. Cir. 2002) ........................................16

*Nat'l Women's L. Ctr. v. OMB*, 358 F. Supp. 3d 66 (D.D.C. 2019)................................41

*New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006) ........................................27

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................45

*NRDC v. EPA*, 489 F.3d 1364 (D.C. Cir. 2007) ........................................40, 41

*Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31 (D.D.C. 2020) ........................6, 8

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ....................1, 8, 9, 10, 11, 13, 14, 38, 40*

*P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ........................................44

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209 (D.C. Cir. 2004)....................41

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ........................................38

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................14

*Samirah v. Holder*, 627 F.3d 652 (7th Cir. 2010)........................................45

*Samirah v. O'Connell*, 345 F.3d 545 (7th Cir. 2003) ........................................45

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ........................................10

*Sorensen Commc'ns, Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014)....................34, 35, 36

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ........................................5

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022)........................................38

*United States v. Texas*, 599 U.S. 670 (2023) ........................................5

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ....................25, 40

*W. Virginia v. EPA*, 597 U.S. 697 (2022) ........................................15

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998)........................................45

*Yang v. INS*, 79 F.3d 932 (9th Cir. 1996) ........................................14

*Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980) ........................................31, 33

*Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685 (2022) .................................................................15

*Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995) ......................................................................32

*Zuh v. Mukasey*, 547 F.3d 504 (4th Cir. 2008) .....................................................................14

**STATUTES**

8 U.S.C. § 1101(a)(42)(A) ......................................................................................................12

8 U.S.C. § 1158(a)(1) .............................................................9. 10, 11, 12, 13, 14, 15*

8 U.S.C. § 1158(a)(2)(B) ........................................................................................................13

8 U.S.C. § 1158(a)(2)(C) ........................................................................................................13

8 U.S.C. § 1158(b)(1) .............................................................................................................12

8 U.S.C. § 1158(b)(1)(C) ........................................................................................................14

8 U.S.C. § 1158(b)(2)(C) ...........................................................................................10, 14, 15

8 U.S.C. § 1158(d)(4)(A) ..........................................................................................................8

8 U.S.C. § 1158(d)(4)(B) ..........................................................................................................8

8 U.S.C. § 1158(d)(5)(B) ................................................................................................10, 15

8 U.S.C. § 1182(f) ....................................................................................................................10

8 U.S.C. § 1225(b) ...................................................................................................................20

8 U.S.C. § 1225(b)(1)(B)(iv) ...............................................................................................8, 26

8 U.S.C. § 1225(b)(1)(B)(v) ...................................................................................................16

8 U.S.C. § 1229(b)(2) ................................................................................................................8

8 U.S.C. § 1231(b)(3) .......................................................................................................19, 20

8 U.S.C. § 1252(a)(2)(A)(iii) ..................................................................................................44

8 U.S.C. § 1252(a)(2)(B) .........................................................................................................40

8 U.S.C. § 1252(a)(2)(B)(ii) ....................................................................................................45

8 U.S.C. § 1252(a)(5) ................................................................................................................4

8 U.S.C. § 1252(b)(9) ................................................................................................................4

8 U.S.C. § 1252(e)(1) ........................................................................................6

8 U.S.C. § 1252(e)(1)(A) ..................................................................................40

8 U.S.C. § 1252(e)(3) .....................................4, 6, 7, 16, 37, 39, 40, 45*

8 U.S.C. § 1252(e)(3)(A) ..................................................................................40

8 U.S.C. § 1252(f)(1) .............................................................................38, 39, 40

8 U.S.C. § 1443(h) .............................................................................................8

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 104-469 (1996) .........................................................................39

H.R. Rep. No. 79-1980 (1946) .........................................................................32

S. Rep. No. 79-752 (1945) ..........................................................................31, 32

**OTHER AUTHORITIES**

8 C.F.R. § 235.15(b)(2)(4)(i) ...........................................................................21

8 C.F.R. § 208.30(e)(2) .....................................................................................16

8 C.F.R. § 208.35(b)(1) .....................................................................................16

87 Fed. Reg. 18078 (Mar. 29, 2022) ...............................................................24

87 Fed. Reg. 63507 (Oct. 19, 2022) ...........................................................32, 33

88 Fed. Reg. 31314 (May 16, 2023) .......................................................16, 17, 25

89 Fed. Reg. 48710 (June 7, 2024) ..................................................................10

Bryan A. Garner, *Garner's Dictionary of Legal Usage* (3d ed. 2011) .........39

CBP, Southwest Land Border Encounters, http://bit.ly/3ACyung .........42, 43

Christina Asencio, U.S. Policies Punish Refugees at the U.S. Border, Human Rights
    First (Feb. 20, 2024), https://bit.ly/3X0vBnN...........................................42

H. Aleaziz, *Biden's Asylum Restrictions Are Working as Predicted, and as Warned*,
    N.Y. Times (Aug. 24, 2024), https://nyti.ms/3AygytR .............................22

José Ignacio Castañeda Perez, June Migrant Encounters Drop to Lowest Numbers
    Seen in More Than 2 Years, Arizona Republic (July 19, 2023),
    https://bit.ly/4ehheTh. ..............................................................................43

*M.A. v. Mayorkas*, No. 1:23-cv-01843-TSC (D.D.C.)............................................................25, 30

Order, *Grace v. Whitaker*, No. 18-cv-1853 (D.D.C. Dec. 19, 2018), ECF No. 105......................45

**INTRODUCTION**

Defendants admit they promulgated the Rule and Guidance only after Congress repeatedly refused to pass legislation providing more funding and broader authority to address migration at the southern border. Congress declined to act, so Defendants took matters into their own hands. But the Rule flagrantly violates the statutory framework that Congress kept in place. Courts have emphatically rejected prior rules virtually identical to this one, and Defendants' recycled arguments are just as unpersuasive this time. The Court should follow the well-reasoned opinions in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (Moss, J.), *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 41 (D.D.C. 2020) ("*CAIR Coal.*") (Kelly, J.), *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021), *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018), and *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1041-42 (N.D. Cal. 2023),[1] and vacate the Rule and Guidance.

**I.      PLAINTIFFS HAVE STANDING.**

Defendants concede that there is at least one plaintiff with standing to raise each claim against the Rule and Guidance. Opp. 22-24.[2] The Court thus has jurisdiction over all claims and need not address Defendants' standing arguments as to particular plaintiffs. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 15-16 (D.D.C. 2020); *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 979 (D.C. Cir. 2016). In any event, those arguments lack merit.

**A.      The Individual Plaintiffs Have Standing.**

As Defendants recognize, all the Individual Plaintiffs have been harmed by the Rule and Guidance. Opp. 22-24. All Individual Plaintiffs were rendered ineligible for asylum because of

---

[1] This decision is stayed pending appeal**,** 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024).

[2] "MSJ" refers to Plaintiffs' Motion for Summary Judgment, ECF No. 23, and "Opp." refers to Defendants' Memorandum of Law, ECF No. 45-1.

their manner of entry. Then, D.G., E.R., P.S., and D.C. and her child were subjected to expedited removal because they were deemed not to "manifest" a fear, even though several expressed their fear or attempted to do so. *See* D.G. Decl. ¶¶ 9-11; E.R. Decl. ¶¶ 12-15; P.S. Decl. ¶¶ 13-15; D.C. Decl. ¶ 13.[3] And though A.E., E.D., T.R., S.G., J.C., and J.R. did receive credible fear interviews, they failed because of the heightened standards and the lack of opportunity to consult given the compressed consultation period. A.E. Decl. ¶¶ 9-12; E.D. Decl. ¶¶ 10-11; T.R. Decl. ¶¶ 10-12; S.G. Decl. ¶¶ 10-12; J.C. Decl. ¶¶ 13-15; J.R. Decl. ¶¶ 9-12. Accordingly, there is the necessary one Plaintiff for each claim, which is all that is required.[4]

### B.     The Organizational Plaintiffs Have Standing.

Contrary to Defendants' arguments, Opp. 13-18, Organizational Plaintiffs have established injury-in-fact because the Rule and Guidance "directly affect[] and interfere[] with [their] core business activities" by "'perceptibly impair[ing] [their] ability to provide counseling'" and other services to asylum seekers. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*Alliance*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

The Rule and Guidance make it much more difficult for both Las Americas and RAICES to contact and serve their asylum seeker clients and client populations. As the largest immigration legal services provider in Texas, RAICES's core work is to represent and counsel noncitizens— including detained asylum seekers in expedited removal proceedings. ECF No. 23-1 ("Hidalgo Decl.") ¶¶ 3-7. Las Americas similarly provides pro bono representation and other assistance to asylum seekers in West Texas, New Mexico, and Ciudad Juarez, Mexico. ECF No. 23-2 ("Babaie

---

[3] Plaintiffs' declarations are located on the docket at ECF No. 15-1 through ECF No. 15-10.
[4] Defendants argue that "only J.R. has alleged injury from the four-hour consultation period." Opp. 23. But J.C. also alleges such a violation. J.C. states that he learned of his potential deportation at around 12 p.m. on June 26, had his interview the following morning, fewer than 24 hours later, and that he did not speak to an attorney during that time. J.C. Dec. ¶¶ 13-14.

Decl.") ¶¶ 3-4, 9-12. The Guidance makes it much harder—when not completely impossible—for the organizations to even *contact* their clients and client populations so they can carry out that fundamental day-to-day work. Hidalgo Decl. ¶¶ 19-36; Babaie Decl. ¶¶ 45-50. For clients they do reach, the Rule and Guidance significantly increase the complexity of preparing clients for credible fear interviews ("CFIs") and the time needed to do so, while dramatically shrinking the time available; the policies also increase the number of clients who receive negative credible fear findings and must seek immigration judge review. Hidalgo Decl. ¶¶ 15-18, 20-29; Babaie Decl. ¶¶ 22-24. As a result, both organizations are unable to serve as many clients. *See* Hidalgo Decl. ¶¶ 33-34; Babaie Decl. ¶¶ 12, 32-39, 52. Consequently, the Rule and Guidance directly impact and interfere with both Organizational Plaintiffs' core activities of representing asylum seekers in expedited removal and ensuring that they have access to the asylum system and are not removed to persecution or torture. *See* Hidalgo Decl. ¶¶ 3, 7; Babaie Decl. ¶¶ 3-4, 9-11.

Furthermore, the Organizational Plaintiffs have had to divert resources to counteract these harms to their work. RAICES has had to reallocate resources to train staff and pro bono partners on changes to the expedited removal process. *See* Hidalgo Decl. ¶¶ 10, 29-30, 41. RAICES staff have had to work longer hours, including weekends, to respond to urgent calls from people in CBP custody and prepare them for CFIs and immigration judge reviews. *See id.* ¶¶ 16, 22, 26, 31. Similarly, Las Americas has had to reassign staff, including some based in Mexico, to assist with more complex CFI preparation and has had to reduce the number of clients they can represent. *See* Babaie Decl. ¶¶ 42-44, 49. Las Americas has also had to create new educational and training materials for impacted communities and non-legal partners. *See id.* ¶¶ 41-42. These are not mere "speculations," Opp. 17, but rather specific and concrete *ongoing* harms that stem directly from

the Rule and Guidance. Such injuries suffice for organizational standing. *E. Bay*, 993 F.3d at 663-64; *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 974-75 (9th Cir. 2020).[5]

The Supreme Court's recent decision in *Alliance* reaffirmed *Havens*, rejecting only the standing of certain "issue-advocacy" organizations "based on their incurring costs to oppose [agency] actions." 602 U.S. at 395. The Court held that organizations "cannot manufacture" standing "simply by expending money to gather information and advocate against the defendant's action." *Id*. at 394. That is consistent with existing D.C. Circuit precedent. *E.g. Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (an organization cannot "manufacture injury" by directing its resources to litigation). But that is not the case here. Rather, the Organizational Plaintiffs are similarly situated to the organization held to have standing in *Havens*. "Critically," the Supreme Court explained, the plaintiff in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *Alliance*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 368). It had standing because the defendants' actions "directly affected and interfered with" the plaintiff's "core business activities" of providing counseling services. *Id.* Like the *Havens* plaintiff, Organization Plaintiffs are by no means only "issue-advocacy organizations." *Id.* Just as the organization there also "provide[d] counseling and referral services for … homeseekers," *Havens*, 455 U.S. at 379, those here provide legal representation and counseling to asylum seekers. Defendants have impaired those core activities.

Additionally, Las Americas faces a potential loss of funding due to the Rule and Guidance, since 85% of its funding comes from grants, several of which require it to serve certain numbers

---

[5] Defendants assert that 8 U.S.C. § 1252(a)(5), (b)(9), and (e)(3) do not permit organizations to bring APA challenges to immigration regulations. Opp. 16 n.4. That argument has been repeatedly rejected as to § 1252(a)(5) and (b)(9). *E.g.*, *E. Bay*, 993 F.3d at 666; *CAIR Coal.*, 471 F. Supp. 3d at 39 & n.13. And, as explained below, § 1252(e)(3) also permits the Organizational Plaintiffs' claims. *See infra* Parts I.C. & VII.A.

of clients. Babaie Decl. ¶¶ 12, 22, 51-52. Because the Rule and Guidance prevent Las Americas from serving as many asylum seekers as it did previously, the policies "jeopardize[] [its] ability to receive funding." *Id.* ¶ 22. That alone establishes injury-in-fact, even apart from Las Americas' standing under *Havens*. *See E. Bay*, 993 F.3d at 663-64; *E. Bay*, 994 F.3d at 974.

Defendants' reliance on *United States v. Texas*, 599 U.S. 670 (2023), Opp. 13-14, is also misplaced. *Texas* rejected attenuated allegations of standing by states in a case involving immigration enforcement priorities. Texas and Louisiana had claimed standing to challenge DHS's enforcement priorities based on assertions that the policy "imposes costs on the States" that could be avoided if more people were arrested and detained "by the Federal Government." 599 U.S. at 674-75. The Supreme Court held that the states lacked standing to bring that particular suit because there was "no precedent" for a lawsuit aimed at forcing "the Executive Branch to alter its arrest policies to make more arrests." *Id.* at 686. The Court also reiterated that such indirect effects on state coffers cannot be the basis for standing because they are too attenuated from the challenged agency action, since a *state* can always allege downstream costs from federal policies. *Id.* at 680 & n.3 (collecting cases). Here, by contrast, Organizational Plaintiffs seek well-established relief under the Administrative Procedure Act ("APA") and have shown that the Rule and Guidance have a direct and harmful impact on their day-to-day operations. *Texas* is inapposite.

Defendants' remaining arguments likewise fail. Defendants belittle the notice-and-comment claim as a procedural violation, Opp. 17, but Plaintiffs can establish injury when they "claim[] that but for the allegedly unlawful abridged procedures they would have been able to oppose [the Rule]," even if their comment ultimately would not have dissuaded the agency's course of action. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009). Additionally, Plaintiffs have standing to challenge agency action "taken without required procedural

safeguards," such as notice and comment rulemaking requirements, so long as they "establish the agency action threatens their concrete interest," as the Rule does here. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Thus, courts in this district have repeatedly found similar harms sufficient to confer standing. *See, e.g.*, *Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 169-171 (D.D.C. 2021); *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 46-49 (D.D.C. 2020); *CAIR Coal.*, 471 F. Supp. 3d at 41-42.

### C.     Section 1252(e)(3) Permits the Organizational Plaintiffs' Claims.

Nothing in 8 U.S.C. § 1252(e)(3) bars the Organizational Plaintiffs' claims. That provision provides subject matter jurisdiction over "[c]hallenges on [the] validity of the [expedited removal] system." As the D.C. Circuit has explained, the statute "expressly preserve[s] jurisdiction over … claims of legal or constitutional error in the … rules implementing expedited removal." *Make The Rd. New York v. Wolf*, 962 F.3d 612, 625 (D.C. Cir. 2020) ("*MRNY*").

Nor does the statute bar claims by organizations. *Cf.* Opp. 18-19. Rather, it governs judicial review "without regard to the identity of the party or parties bringing the action[,]" 8 U.S.C. § 1252(e)(1). Unlike other provisions in § 1252, Section 1252(e)(3) is not limited by references to "individual [noncitizens]," and does not bar claims by organizations. *See MRNY*, 962 F.3d at 627 (claims under § 1252(e)(3) are, "by their terms, … not confined to individual expedited-removal proceedings"). "If Congress wanted the jurisdictional bar to encompass" claims brought by organizations, it "could easily have said so." *Kucana v. Holder*, 558 U.S. 233, 248 (2010); *see also MRNY*, 962 F.3d at 628 n.10 (noting that "Congress knew how to limit judicial review … under [§ 1252(e)(3)] if it wished but chose not to do so"). It did not.

Defendants also cite *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ("*AILA*"). Opp. 14-15, 18-19. But as the D.C. Circuit explained, *AILA* "rejected *third-party* organizational standing," which is distinct from an organization (as here) alleging its

own injury-in-fact. *MRNY*, 962 F.3d at 627 (emphasis added); *id.* (AILA organizations did not assert "their [own] rights"); *Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. CV 22-3118, 2023 WL 1438376, at *7 & n.6 (D.D.C. Feb. 1, 2023) (*AILA* "deals exclusively with third-party standing"); *Grace v. Whitaker*, No. CV 18-1853, 2019 WL 329572, at *4 (D.D.C. Jan. 25, 2019) (same). As then-Judge Jackson explained, *AILA*'s reference to "signs that Congress meant to allow actions only by [noncitizens] who have been subjected to" expedited removal were "made in the specific context" of what *AILA* viewed as a sweeping assertion of third-party standing to assert the rights of "nearly all [noncitizens] anywhere in the world who have tried or will try to enter the United States[.]" *MRNY v. McAleenan*, 405 F. Supp. 3d 1, 30 (D.D.C. 2019) (quoting *AILA*, 199 F.3d at 1359), *rev'd on other grounds*, *MRNY*, 962 F.3d 612.

Finally, the D.C. Circuit held in *MRNY* that organizations *can* proceed on an associational standing theory under Section 1252(e)(3), Opp. 19-20—a holding inconsistent with any reading of *AILA* under which only suits by individual noncitizens would be permissible. While Defendants attempt to paint *MRNY* as "reaffirm[ing]" that organizational standing is *not* available under Section 1252(e)(3), Opp. 19, nothing in that decision remotely so holds. Indeed, to argue otherwise, Defendants must add the critical word "only" when they claim that *MRNY* "explicitly restates the holding of *AILA* that § 1252(e)(3) 'contemplate[s] that litigation could be brought by affected individuals themselves' *only*." Opp. 19-20 (quoting 962 F.3d at 628) (emphasis added). *MRNY* said no such thing and stands for the opposite of what Defendants argue.

**D.      The Organizational Plaintiffs Satisfy the Zone of Interests.**

As nonprofits serving noncitizens seeking asylum on a pro bono or low-cost basis, the Organizational Plaintiffs easily fall within the zone of interests of the Immigration and Nationality Act ("INA"). This non-jurisdictional requirement is "not especially demanding" and bars only those actions where "a plaintiff's interests are so marginally related to or inconsistent with the

purposes implicit in a statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (cleaned up). The test is met so long as the plaintiff's claims "arguably" fall "within the zone of interests to be protected or regulated by the statute." *Id.* at 224 (quotation omitted). Moreover, courts apply the zone-of-interests test "in keeping with Congress's evident intent" in the APA "to make agency action presumptively reviewable." *Id.* at 225 (quotation omitted).

The Organizational Plaintiffs easily satisfy this test. The INA expressly contemplates that nonprofit organizations will provide immigration legal services to noncitizens. 8 U.S.C. § 1225(b)(1)(B)(iv) (providing noncitizens with the right to "consult with a person or persons of [their] choosing prior to the [CFI] or any review thereof"); *id.* § 1229(b)(2) (requiring noncitizens in removal proceedings to be provided a list of pro bono attorneys); *id.* § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process); *id.* § 1158(d)(4)(A)-(B) (requiring list of service providers to be distributed to asylum seekers along with a document advising about the right to counsel). And both Organizational Plaintiffs have shown how the Rule and Guidance impede their ability to provide those services. *See* Hidalgo Decl. ¶¶ 16, 22, 26, 31; Babaie Decl. ¶¶ 41-44, 49. In such cases, courts in this District have found the "undemanding zone-of-interests test" to be "satisfied" because nonprofit legal services organizations' "daily work is governed by the INA" and because "the INA contemplates an important role for [such] organizations." *Nw. Immigrant Rts. Project*, 496 F. Supp. 3d at 52; *accord CAIR Coal.*, 471 F. Supp. 3d at 43; *O.A.*, 404 F. Supp. 3d at 143-45.

Defendants are not aided by Justice O'Connor's in-chambers opinion in *INS v. Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers) (cited at Opp. 21), which "represents the opinion of only a single

Justice" about "a statute other than the INA." *CAIR Coal.*, 471 F. Supp. 3d at 43. Moreover, since then, the Supreme Court has consistently espoused a less demanding test. *See, e.g., Lexmark*, 572 U.S. 118; *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998).

Likewise inapposite are *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) ("*FAIR*"), and *Ayuda, Inc. v. Reno*, 7 F.3d 246 (D.C. Cir. 1993). Opp. 20-22. *FAIR* involved an anti-immigration advocacy organization that opposed a parole program for Cuban immigrants; it did not provide counseling or representation services, 93 F.3d at 899. And the plaintiffs in *Ayuda* were not implicated by the challenged agency practice. 7 F.3d at 250 & n.10; *see, e.g.*, *CAIR Coal.*, 471 F. Supp. 3d at 44 (distinguishing *FAIR* from case where plaintiffs "pointed to those portions of the INA that directly reference the asylum services they provide"); *O.A.*, 404 F. Supp. 3d at 145 & n.14. In any event, both cases predate *Lexmark* and other Supreme Court decisions clarifying the leniency of the zone-of-interests test.

## II.     THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A.     The Asylum Bar Is Contrary to Law.

Section 1158(a)(1) of the INA states that "*[a]ny* [noncitizen] who is physically present in the United States or who arrives in the United States *(whether or not at a designated port of arrival . . ., irrespective of such [noncitizen's] status,* may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). In direct conflict with Section 1158(a)(1)'s clear mandate, the Rule explicitly bars noncitizens from asylum based on both their manner and place of arrival in the United States. Defendants do not (and cannot) meaningfully engage with Plaintiffs' arguments on this point. Instead, they trot out the same tired contentions that courts have repeatedly rejected. *See O.A.*, 404

F. Supp. 3d 109; *E. Bay*, 993 F.3d 640; *E. Bay*, 932 F.3d 742; *E. Bay*, 683 F. Supp. 3d 1025.[6] This Court should reject them once again.

### 1.    The Asylum Bar Is Not "Consistent" with Section 1158(a)(1).

Defendants rely heavily on the statutory provisions allowing them to impose additional "limitations and conditions" on asylum so long as they are "consistent with" the statute. Opp. 24-25 (citing 8 U.S.C. §§ 1158(b)(2)(C) and (d)(5)(B)). But the Rule bars noncitizens from asylum because of their manner and place of entry. Defendants cannot explain how that is "consistent with" with the statute, which allows "[a]ny" noncitizens physically present in the United States to apply for asylum "whether or not" they arrived "at a designated port of arrival" and "irrespective" of their status. 8 U.S.C. § 1158(a)(1). It is not consistent: "a more direct conflict" is "hard to imagine." *E. Bay*, 993 F.3d at 669-70 (quotations omitted); *O.A.*, 404 F. Supp. 3d at 149-50. Defendants nevertheless assert that "in times of heightened border encounters" when "temporary suspension of entry is required," they can impose restrictions. Opp. 25.[7] That is not an argument based on the statute; it is an assertion of authority to override the statute. The statute does not say or even suggest that the Departments may waive Section 1158(a)(1) based on the number of border encounters or a purported lack of resources to perform their statutory mandate. What is more, while Defendants describe the bar as "temporary," *id.*, they do not dispute that its numerical threshold

---

[6] Defendants assert that because the 2023 *East Bay* district court decision is stayed pending appeal, the Ninth Circuit must think they are likely to succeed on the merits. Opp. 30. But as the Ninth Circuit has made clear, faced with a motion to stay pending appeal, the court "exercise[s] restraint in assessing the merits," and the court's "predictive analysis should not, and does not, forever decide the merits of the parties' claims. This sort of pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to act responsibly, rather than doling out justice on the fly." *E. Bay*, 993 F.3d at 661 (quotation marks omitted).

[7] To the extent Texas relies on 8 U.S.C. § 1182(f), ECF No. 47 at 14, that is no basis for upholding the Rule. The Rule disavows reliance on § 1182(f), stating it "does not authorize the President to override the asylum statute." 89 Fed. Reg. 48710, 48717 (June 7, 2024). Agency action must be sustained on the grounds on which it was based. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

has been satisfied every day since July 2020. MSJ 8, 14.

Defendants say that the Rule is "consistent with" the statute because it theoretically provides narrow exceptions for some noncitizens arriving away from a port of entry or without a CBP One appointment. Opp. 29-30. But that same argument has previously been rejected. *O.A.*, 404 F. Supp. 3d at 151; *E. Bay*, 683 F. Supp. 3d at 1042. Even if a small percentage of noncitizens who cross the southern border between ports of entry can establish the "exceptional circumstances" described by the Rule, the remainder are barred from asylum because of how they entered the United States, in direct conflict with Section 1158(a)(1). The carve-out for "exceptionally compelling circumstances" does "not address the reason why restricting asylum eligibility based on place of entry conflicts with the law." *E. Bay*, 683 F. Supp. 3d at 1042. Moreover, Defendants do not even address the case law cited by Plaintiffs holding that an agency cannot save an otherwise unlawful regulation by creating a safety valve for exceptional circumstances. *See* MSJ 13.[8] Nor do they have an answer to the fact that the exceptions that are theoretically available under this Rule are even narrower than those at issue in the 2023 Rule that was declared illegal. MSJ 17-19.

Defendants try to distinguish *East Bay* and *O.A.*, but they cannot. They assert that, in *East Bay*, the rule "impermissibly placed dispositive weight in nearly all cases on the method of entry." Opp. 29. The same is true here: the "exceptionally compelling circumstances" are "narrow" and designed to be applied only sparingly. *See* 89 Fed. Reg. at 48732-33. And a narrow carve-out does not address the courts' rationale for holding the prior asylum bars unlawful: they barred asylum based on place and manner of entry, contrary to Section 1158(a)(1).

---

[8] For the same reasons, the Defendants' decision to exempt narrow classes of noncitizens from the Rule—such as noncitizen U.S. nationals, lawful permanent residents, members of the U.S. Armed Forces, noncitizens with valid visas, and unaccompanied minors—cannot save the Rule. 89 Fed. Reg. at 48715 (cited by Opp. 30).

11

What is more, as Plaintiffs argued, MSJ 13-14, the exceptional circumstances standard itself is unlawful because it displaces Congress's judgment about the degree of fear and imminence of harm that a noncitizen must face to be eligible for asylum. Congress determined that a "well-founded fear of persecution"—which can be met by even a ten percent chance of harm, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987)—is all that is required, and accordingly it incorporated the statutory definition of "refugee" into the asylum statute. *See* 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). Defendants say that meeting the refugee definition is a "necessary but not sufficient condition" for eligibility. Opp. 31. That is not responsive. Congress has directly spoken to the level of fear and imminence of harm required for eligibility by incorporating the "refugee" definition. The Departments may not override that judgment by requiring a noncitizen to show an "imminent and extreme threat[] to life or safety." 89 Fed. Reg. at 48718. Such an additional limitation is not "consistent with" the asylum statute, and so cannot lawfully be imposed. Defendants' reliance on the exception is even more problematic in concert with the manifestation standard: because border officers no longer ask about fear, many people will never even have the chance to *invoke* the exception. MSJ 8 n.4, 22-26. Defendants have no response.

Defendants also contend that the Rule does not bar asylum based on place of entry because it not only bars noncitizens who entered between ports of entry from asylum, but *also* bars noncitizens who enter *at* ports of entry from asylum unless they have a CBP One appointment. Opp. 30. But unlawfully rationing asylum for noncitizens who present at ports by forcing them to make appointments through a difficult-to-use app with far fewer appointments than are needed, *see infra* at Part II.B.3, does not somehow cure the illegal condition on those who enter between ports. The statute is clear that "*[a]ny*" noncitizen "*whether or not at a designated port of arrival … may apply for asylum.*" 8 U.S.C. § 1158(a)(1) (emphasis added). For noncitizens entering

between ports, it remains the case that their manner of arrival triggers the bar, despite the statutory requirement that manner of arrival cannot be disqualifying.

Defendants also point to statutory conditions on asylum, such as a bar on applications for asylum filed more than one year after entry and a bar on successive applications. Opp. 27 (citing 8 U.S.C. §§ 1158(a)(2)(B), (C)). But these are *statutory* bars, enacted by Congress, and they do not limit asylum based on manner or place of entry. They provide no authority for the Rule's asylum bar, which conflicts with specific language in the statute. MSJ 12. Nor do the firm resettlement and particularly serious crime bars, which were adopted by regulation but subsequently codified by Congress. Opp. 26. Those likewise have nothing to do with manner or place of entry. Defendants assert that those bars nevertheless show that "administrative practicality and systemic efficiency" are "legitimate considerations," Opp. 27, but even if that is so, Defendants cannot pursue those aims in a manner inconsistent with the statute.

Finally, Defendants recycle the failed argument that Section 1158(a)(1) focuses on who may apply for asylum, while the Rule enacts limits on who is eligible for asylum. Opp. 29, 31. Once again, that contention has been repeatedly rejected, *E. Bay*, 993 F.3d at 670; *O.A.*, 404 F. Supp. 3d at 148-49, and this Court should reject it, too. Whatever the merits of that distinction in the abstract, it cannot justify the Rule: as the Ninth Circuit put it, "[i]t is the hollowest of rights that [a noncitizen] must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact." *E. Bay*, 932 F. 3d at 771.

Defendants also provide no answer to the point that, in expedited removal, the bar mandates rejecting asylum claims at the credible fear stage and thus generally bars noncitizens from even *applying* for asylum. MSJ 11-12; *O.A.*, 404 F. Supp. 3d at 148-49.

## 2. Agency Discretion in Individual Cases Cannot Justify the Rule.

Defendants also attempt to justify the bar on the ground that asylum is discretionary. Opp. 25. This argument has likewise been repeatedly rejected. *E.g.*, *E. Bay*, 994 F.3d at 979-80; *E. Bay*, 932 F.3d at 772-74; *O.A.*, 404 F. Supp. 3d at 151. Defendants ignore that such discretion has always been applied when considering the facts in *particular* cases and *after* an applicant has had an opportunity to present their claim. MSJ 14-15. Indeed, Defendants tacitly concede as much, acknowledging that factors including manner of entry are considered "in determining whether *any particular asylum applicant* warrants a favorable exercise of discretion." Opp. 27 (emphasis added). Discretion has never been withheld in gross or used to craft broad eligibility rules.

Defendants rely extensively on *Matter of Pula*, 19 I. & N. Dec. 467 (B.I.A. 1987), *see* Opp. 27-28, but that decision underscores the problem. *Matter of Pula* noted manner of entry as a possible discretionary factor but contemplated case-by-case weighing of equities *after* determination that an applicant is eligible for asylum. It also stated that "the danger of persecution should generally outweigh all but the most egregious of adverse factors." 19 I. & N. Dec. at 473-74; *see* MSJ 14-15. Courts have likewise emphasized that discretionary denials are "exceedingly rare" and occur only when the applicant has engaged in "egregious negative activity." *Zuh v. Mukasey*, 547 F.3d 504, 507 (4th Cir. 2008). And Congress's subsequent amendment of Section 1158(a)(1) took this even further, making it explicit that noncitizens cannot be barred from asylum because they enter between ports. Defendants ignore these points. Their "discretion" has never extended to issuing broad regulatory asylum bars based on manner of entry.[9]

Moreover, Defendants' reliance on "discretion" to promulgate broad rules would make the

---

[9] Defendants' reliance on *Komarenko v. INS*, 35 F.3d 432 (9th Cir. 1994), *Yang v. INS*, 79 F.3d 932 (9th Cir. 1996), and *Reno v. Flores*, 507 U.S. 292 (1993), *see* Opp. 26, 28, is misplaced because they predate the 1996 amendments to 8 U.S.C. § 1158(b)(1)(C) requiring any additional limitations regarding asylum eligibility be "consistent with" Section 1158(a)(1).

other statutory provisions they rely on, 8 U.S.C. §§ 1158(b)(2)(C) and (d)(5)(B), entirely superfluous. Congress would not have needed to authorize the agency to adopt additional limitations consistent with the statute if it already could do so under the rubric of discretion. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (applying "longstanding canon[] of statutory construction" that courts must "construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))). Nor can the Departments rely on discretion to override the explicit statutory directive in Section 1158(a)(1).

Undaunted, Defendants insist that Congress "has never foreclosed or limited consideration of these systemic factors in exercising discretion." Opp. 28. But the problem is not that the agencies considered "systemic factors"; it is that the Rule claims authority that Congress foreclosed—to make asylum access contingent on place and manner of entry. Further, even if there were any ambiguity on this point, courts will not infer broad agency power from congressional silence. The "agency must point to clear congressional authorization." *W. Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks and citation omitted). If Congress had wanted to give the Departments broad latitude to close the asylum process to all noncitizens at the southern border, save for the few who could establish exceptional circumstances and those lucky enough to obtain CBP One appointments, it would have said so. Asylum, after all, has long been an issue of political salience, and courts must assume that "Congress intends to make major policy decisions itself." *Id.* (quotations omitted). Had Congress "meant to confer the power the agency has asserted," it would have spoken clearly. *Id.* at 721. Instead, Congress's clear instruction was that Defendants *lack* the authority they assert, by requiring that "[a]ny" noncitizen "whether or not at a designated port of arrival … may apply for asylum." 8 U.S.C. § 1158(a)(1). Indeed, Defendants themselves

repeatedly note that Congress *failed* to give them the resources they claim to need or the "tools" (i.e., a different statutory framework) that they desire. *E.g.*, Opp. 1. They cannot justify the Rule on the ground that Congress has failed to act, yet at the same time assert that all along they have enjoyed broad discretionary authority to mold the asylum system however they wish.

Finally, the Rule's asylum bar also violates 8 U.S.C. § 1225(b)(1)(B)(v), which requires use of the "significant possibility" standard when assessing asylum eligibility at the credible fear stage. Defendants point to the Rule's preamble, which says that standard still applies, Opp. 32 (quoting 89 Fed. Reg. at 48739), but "[i]t is the language of the regulatory text, and not the preamble, that controls." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002). Here, the regulatory text unlawfully requires asylum officers to first "determine whether the [noncitizen] is subject to [its] limitation on asylum eligibility," 8 C.F.R. § 208.35(b)(1), without reference to the "significant possibility" standard. Nor may Defendants rely on 8 C.F.R. § 208.30(e)(2), which *does* contain the significant-possibility standard, because it is superseded by Section 208.35, which applies "notwithstanding any contrary section of this part, including" Section 208.30.

**B.    The Rule's Asylum Bar Is Arbitrary and Capricious.**

The asylum bar also fails to adequately protect non-Mexicans and Mexicans alike who are forced to remain in Mexico until they are able to make a CBP One appointment and attend that appointment at a port of entry. That is arbitrary and capricious.[10]

1.    Defendants do not dispute the very significant risks that migrants face in Mexico. *See* MSJ 17. Instead, they claim—by incorporating parts of the preamble to a 2023 rule—to have "recognized the risk" but "balanced that risk against other considerations, including the need to

---

[10] Contrary to Defendants' assertion, Opp. 4-5, 8 U.S.C. § 1252(e)(3) does not bar APA claims, including arbitrary and capricious challenges. *See Grace*, 965 F.3d at 891-92, 896-97.

channel migration to lawful pathways." Opp. 48-49. But that preamble did nothing more than pay a single sentence of lip service to those severe dangers, 88 Fed. Reg. 31314, 34100, and cited comments drawing attention to the danger without a relevant response, *id.* at 34138. Brushing off routine kidnappings, assaults, and murders is not reasoned consideration. *See Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 16 (D.C. Cir. 2015) (agency is arbitrary and capricious if it "merely hear[s]" but fails to adequately "respond to" serious issues). While Defendants point to the exception for those facing exceptionally compelling circumstances, they do not dispute that "many noncitizens will face a substantial danger of death or serious harm if forced to stay in Mexico for prolonged periods, but may not be able to establish that such a threat is 'imminent' at the precise moment they cross the border." MSJ 17. Defendants assert that the exceptions "are adequate to address the most pressing needs of noncitizens in Northern Mexico," Opp. 49, but do not explain how that can be so given the "stomach-churning evidence of death, torture, and rape" people seeking asylum experience there. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 723 (D.C. Cir. 2022). Nor do they explain their view, Opp. 49 n.8, that they are free to ignore record evidence of violence against vulnerable groups in Mexico, MSJ 18. *See Grace v. Barr*, 965 F.3d 883, 901 (D.C. Cir. 2020) (DHS must consider its policies' "potential consequences for asylum seekers").

      **2.**      Defendants also failed to consider the unique harms to Mexicans forced to remain in the country where they face persecution. MSJ 19-20. The passage in the Rule that supposedly addresses this problem does not actually address it at all. As Defendants note, the Rule says that given the recent "'sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal,' 'applying this rule to Mexican nationals will result in fast processing of a significant number of Mexican noncitizens[']" and so ease strain on the immigration system. Opp.

50 (quoting 89 Fed. Reg. at 48738). That does not address the stated concerns of the people whose entitlement to apply for asylum is undercut by the Rule. The "sharp increase in referrals for credible fear interviews" demonstrates that the human rights situation in Mexico is precarious—as the administrative record confirms, MSJ 17-18—and that many Mexicans face a significant possibility of persecution in their country. These facts show that Mexican citizens need a U.S. asylum system that will process their claims fairly and with care—not one that "will result in faster processing of a significant number of Mexican noncitizens" by categorically denying them protection based on manner of entry. 89 Fed. Reg. at 48738. The very passage Defendants tout as showing appreciation for the harms Mexicans face instead focuses on efficient removals without regard for those harms. That is a failure of reasoned decision-making.[11]

**3.**      Defendants point to the CBP One app as a path to avoid the asylum bar. Even if the app worked perfectly, it could not cure the statutory violation of denying asylum based on where one enters. In any event, as Plaintiffs showed, MSJ 20-21, the Rule totally disregards the practical barriers to using the app. The footnote Defendants claim discusses "potential issues with use of the CBP One app, including those noted by Plaintiffs," Opp. 50, does no such thing. Rather, it simply "decline[s] to adopt an exception" to the bar to account for CBP One problems—without ever so much as acknowledging that those issues continue to stymie many people's efforts to seek asylum. *See* MSJ 20. Moreover, even when the app is functioning, it schedules 1,450 appointments per day across the entire southern border, AR2089-90—"significantly" fewer than are needed under a Rule that is not triggered until border encounters exceed a weekly average of 2,500 per

---

[11] *See Delaware*, 785 F.3d at 16 ("'[S]elf-contradictory [] logic does not constitute an adequate explanation' of agency action" (quoting *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1520 (D.C. Cir.1984))); *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) (reasoning that "a serious flaw" in a cost-benefit analysis "can render the [resulting] rule unreasonable" and warrant vacatur on arbitrary and capricious grounds),

day, AR7341; *see also* AR6936-37 (asylum seekers must wait months in "deplorable conditions" for appointments), AR12388-97 (families forced to separate because appointment unavailable). Defendants purport to be trying to "encourag[e] the use of lawful pathways," Opp. 51, but they have willfully ignored that their preferred pathway is available only to those with economic means, technological savvy, sophisticated literacy in select languages, and a good measure of luck in scheduling an appointment that Defendants intentionally placed in short supply. Such agency duplicity cannot pass muster. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).

## III.   THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS MANIFEST FEAR IS CONTRARY TO LAW AND ARTBITRARY AND CAPRICIOUS.

### A.   The Manifestation Standard Is Contrary to Law.

Under the manifestation standard, noncitizens—most of whom have traveled thousands of miles in perilous conditions and do not speak English—must demonstrate a fear of return, without being informed of their right to seek asylum; afforded a confidential credible fear interview; asked a single question; or advised of the consequences if their fear goes unrecognized.

UNHCR is charged with providing international law guidance concerning the U.N. Refugee Treaty and Protocol. *See* UNHCR Amicus Br. 5, ECF No. 25-1; *E. Bay*, 993 F.3d at 672-73 & n.13. UNHCR's authoritative international law interpretation of those treaties is that parties thereto "*must ask* arriving individuals if they fear return to their country of origin," UNHCR Amicus Br. 18 (citing UNHCR, *Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response* ¶ 3 (Mar. 16, 2020)); *see also* MSJ 22-23 & nn.13-15 (citing UNHCR guidance and its public comment on the Rule setting out the same treaty interpretation). Under the *Charming Betsy* canon, domestic statutes must if possible be construed in accordance with that international law requirement. MSJ 23. As relevant here, those statutes include the expedited removal statute, 8 U.S.C. § 1225(b), and the

withholding statute, *id.* § 1231(b)(3). *See* MSJ 22-23 & n.12. It is necessary and appropriate to interpret those statutes in accordance with the international law requirement to ask about fear, since that was Defendants' longstanding practice before this Rule. Applying *Charming Betsy*, therefore, the Court should interpret Sections 1225(b) and 1231(b)(3) to require Defendants to ask about fear and hold the manifestation standard contrary to law.

Defendants' responses that the Refugee Protocol is not self-executing and that UNHCR's public comment on the Rule "lacks the status of binding law" miss the point. Opp. 34-35. The expedited removal and withholding statutes *are* binding law. Defendants do not and cannot dispute that those statutes must be interpreted in accordance with the treaties they are meant to effectuate. *See Cardoza Fonseca*, 480 U.S. at 436-41 & n.25. Critically, Defendants also do not and cannot dispute that UNHCR's strongly persuasive interpretation *of international law* is correct. Instead, Defendants just note that UNHCR's interpretation is not reflected in the text of the Handbook. Opp. 35. But the Handbook is not the only reference point for international law, and here UNHCR could not be clearer that international law requires governments to ask about fear. This Court should thus interpret the domestic statutes to align with that international law obligation.

Ultimately, the non-refoulement obligations under both international and domestic law would be meaningless if the agencies charged with honoring them could intentionally devise screening procedures calculated to leave refugees unrecognized. Yet that is exactly what Defendants have done in the Rule. Defendants dramatically changed the screening protocol precisely because they want to increase the proportion of noncitizens whom they can remove. The manifestation standard is inconsistent with Defendants' duty under statute and treaty.

### B.    The Manifestation Standard Is Arbitrary and Capricious.

Defendants largely fail to engage with, and do nothing to refute, the several distinct fatal defects Plaintiffs identified in the manifestation of fear requirement.

1.      Defendants disregarded extensive evidence that many asylum seekers with valid fears will not express them without receiving appropriate advisals and questions. MSJ 24-26. Defendants' main response is that officers can also register manifestations based on nonverbal cues. Opp. 51-52. But officers' "credible fear referral[s]" could always "be based solely on non-verbal cues of fear of return." AR8241 n.75 (citing 1998 agency training materials). Defendants cite no evidence that this has been a common or reliable basis for referrals in the past. In any event, as discussed below, Defendants' notion that Border Patrol officers can accurately identify non-verbal "manifestations" is itself implausible and unsupported. *See also* MSJ 26-28.

Defendants' reassurance that they will post signs and show videos about the manifestation standard is unpersuasive. Opp. 52. For decades, the government recognized that advisals and questioning were necessary. MSJ 5, 25. But this Rule's stated goal is to deliver more removals more quickly by referring fewer noncitizens for CFIs. 89 Fed. Reg. at 48716. If signs and videos could suffice to address the many reasons asylum seekers will not raise their fears without appropriate assurances and questions, then signs and videos would be incompatible with the Rule's goal. Defendants presumably rely on signs and videos now because they know these methods are *not* as efficacious as advisals and interviews. Their goal is efficiency, not efficacy.

Indeed, *amici* report that many noncitizens do not see or understand the government's signs and videos. Human Rights First Amicus Br. 13, ECF No. 27-1. The regulations also provide no mechanism to ensure that, if a noncitizen does express fear in response to a sign, that expression of fear will be relayed to the "inspecting officer" responsible for deciding whether a fear has been manifested. 8 CFR § 235.15(b)(4)(i). Thus, unsurprisingly, when some noncitizens do affirmatively express fear, they are either ignored, *see* D.G. Decl. ¶ 9; P.S. Decl. ¶¶ 13-15, told by

officers that those officers are "not in charge of that,"[12] or even told that "[t]here is no asylum and whatever happened to you is not our problem." Human Rights First Amicus Br. 14; *see id.* (collecting examples of similar responses to expressions of fear since the Rule went into effect).

2.   The Rule's premise that advisals and questioning are unnecessary because Border Patrol agents can detect protection needs without them is implausible. MSJ 26-28. Defendants respond by insisting that their officers are experts at "observing human behavior and … determining appropriate follow up." Opp. 52. Yet they never cite any evidence that officers can successfully identify fear of return, particularly given that newly arrived asylum seekers are often "tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear." 89 Fed. Reg. 48744. And the record confirms that—particularly in the presence of uniformed officers—migrants from different cultures will not always express their fear and trauma in ways that will be visible or audible. *See* MSJ 24-25. Nor do Defendants grapple with the record evidence refuting their claims that immigration officers can detect unspoken fears. *E.g.*, AR8225 ("Without asking the questions and recording the answers, immigration officers would not know which [noncitizens] should be referred for a credible fear determination."). Such "expertise" does not exist—and certainly is not reflected in the record.

In reality, when Border Patrol agents are given license to decide for themselves which noncitizens are legitimate asylum seekers—with no requirement to ask any questions and no paperwork to fill out when an agent decides someone's fear is insufficiently manifested—the result is that people's expressions of fear are being routinely "outright ignored." HRF Amicus Br. 12, ECF No. 27-1; *id.* at 12-23 (cataloging instances); *see also, e.g.*, *id.* at 16 (some people "only

---

[12] H. Aleaziz, *Biden's Asylum Restrictions Are Working as Predicted, and as Warned*, N.Y. Times, (Aug. 24, 2024), https://nyti.ms/3AygytR.

referred for CFIs after they repeatedly expressed fear and intent to seek asylum to multiple CBP and ICE officers").

**3.** That is no surprise, since data and reports concerning the manifestation requirement's past uses show that it is utterly inadequate. MSJ 28-30. Defendants respond that the undisputed Coast Guard statistics cited by Plaintiffs do not "effectively address whether or to what extent noncitizens with meritorious claims were 'erroneously' screened out." Opp. 53. But it is *Defendants* who "must examine the relevant data and articulate a satisfactory explanation for [their] action." *State Farm*, 463 U.S. at 43. The question is whether DHS had any basis to believe— in light of its years of data from using the manifestation requirement in other contexts—that the requirement allows those with protection needs to adequately express them. It is implausible that *eleven* out of over 22,000 Haitians interdicted between 1981 and 1990—and *just one* out of 445 Haitians interdicted in 2013—feared removal. MSJ 29-30. Particularly given the perilous situations in Haiti and Cuba in recent years, AR7927-40, AR11891-95, AR14443-50, it is equally implausible that just 7 percent of migrants interdicted in the Caribbean between 2021 and 2023 feared removal. MSJ 30. Manifestation rates that low raise serious questions and demand serious analysis. Yet instead, Defendants blithely assert that they never "meant to claim that [the manifestation standard] is 100% effective." Opp. 53. Such indifference to whether there is any factual basis for one of the Rule's core premises fails the standard for reasoned decision-making. *See State Farm*, 463 U.S. at 43.

Defendants have no response at all to the undisputed reporting Plaintiffs cited showing that the only other time the manifestation standard has been used at the border, under Title 42, agents repeatedly ignored unambiguous verbal expressions of fear. MSJ 30; Opp. 53. Plaintiffs' experiences and those observed by *amici* reflect that the same is happening now. MSJ 30; HRF

Amicus Br. 12-23, ECF No. 27-1. It is hard to avoid the inference that this is by design and that the manifestation standard is intended to allow agents to make subjective, unreviewable decisions to summarily remove noncitizens. *See Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J., concurring) ("One suspects the agency is not asking an important question … simply because it would prefer not to hear the answer.").

4.     As the above makes clear, there is no basis in the record for Defendants' belief that the manifestation requirement will drastically reduce the number of noncitizens referred for CFIs while still allowing for the accurate "identification of those with meritorious relief claims." Opp. 53-54. Instead, that record reflects that many noncitizens with the clearest protection needs—for example, due to sexual violence, governmental persecution, or other severe trauma—are especially likely to need the assurances that the prior advisals and questioning provided in order to sufficiently express their fear. MSJ 24-25. In short, the manifestation standard is structured to allow immigration officers to remain willfully ignorant of noncitizens' reasons for flight, while giving lip service to the prohibition on non-refoulement. The standard should be set aside.

## IV.     THE RULE'S HEIGHTENED REASONABLE PROBABILITY STANDARD IS ARBITRARY AND CAPRICIOUS.

1.     Just two years ago, Defendants expressly *rejected* a heightened standard for withholding and CAT claims, finding both that it would *not* increase efficiency *and* that it would be unfair to applicants. 87 Fed. Reg. 18078, 18092 (Mar. 29, 2022) ("Having asylum officers apply varied legal standards would … lengthen[] credible fear interviews and increase[] adjudication times. … [T]he delays associated with complicating and extending every credible fear interview likely outweigh any efficiencies gained…."). Moreover, they found that there was "no evidence" that a heightened standard "resulted in more successful screening out of non-meritorious claims while ensuring the United States complied with its nonrefoulement obligations." *Id.* at 18092.

This Rule asserts the opposite, without acknowledging these prior concerns or explaining why they were incorrect. "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009). Rather, "[i]f the new policy rests upon factual findings that contradict those which underlay its prior policy, the agency must offer a reasoned explanation ... for disregarding facts and circumstances that underlay ... the prior policy." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (quotation marks omitted). And Defendants cannot rely on their 2023 decision to impose the "reasonable possibility" standard, *see* 88 Fed. Reg. 31314, 31336-37, 31381 (May 16, 2023), to fill the gap. That standard is less stringent than "reasonable probability," was already used for withholding and CAT in certain limited contexts, and is the subject of other pending litigation in this District, *see M.A. v. Mayorkas*, No. 1:23 cv-01843-TSC. The "reasonable probability" standard, by contrast, has never been used for screenings of withholding and CAT claims and would create additional inefficiency as asylum officers and immigration judges adjust to a brand-new standard. *See* Nat'l Citizenship & Immigr. Servs. Council 119 Amicus Br. 20-21, ECF No. 28-1 ("No statute, caselaw, or administrative process shines light on how it should be implemented."); Public Counsel Amicus Br. 4, ECF No. 26-1 ("[P]ast experience informs Public Counsel's certainty that [this new standard] will create confusion and harm for individuals navigating the nation's complex immigration laws.").

    **2.**    Defendants argue that requiring noncitizens to provide greater specificity concerning their claims at the credible fear stage is reasonable because "the standard does not demand that a noncitizen provide such specific evidence as to establish eligibility for protection on the merits, but rather only requires such evidence that the AO will 'believe that the noncitizen

*may* be able to establish eligibility at the merits stage.'" Opp. 55 (quoting 89 Fed. Reg. at 48748 n.244). Further, Defendants "believe that trained AOs will be able to adequately assess when the requisite level of specificity has been met, even in cases dealing with significant past violence, trauma, or other serious harm where a noncitizen may be unwilling to fully explicate her claim during the credible fear interview." *Id.*

This wholly ignores Plaintiffs' argument—supported by record evidence—that asylum seekers often are unable or unlikely to *discuss* those details with the requisite specificity at the credible fear stage due to trauma and related considerations. The record shows that trauma may prevent asylum seekers from describing the specific details of their persecution in a credible fear interview that the Rule requires. MSJ 34-35. For these and other reasons explained in Plaintiffs' opening brief, many asylum seekers can only speak candidly about the most traumatic or painful details of their claims after developing a trusting relationship with counsel or a mental health professional. *Id.* at 33-35. The Rule wholly failed to engage with this important aspect of the problem. *See State Farm*, 463 U.S. at 43.

## V.   THE GUIDANCE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

This Court should also reject Defendants' defense of the Guidance, which shrinks the required consultation period before a credible fear interview to as little as four hours. Defendants do not dispute that the Guidance is most likely to be applied in CBP custody or that CBP custody imposes severe restrictions on noncitizens' ability to contact the outside world. *See* MSJ 35-36. They also concede that Congress imposed a "clear statutory imperative to ensure consultation" prior to a credible fear interview. Opp. 39 (citing 8 U.S.C. § 1225(b)(1)(B)(iv)). Yet they point to *nothing*—no reasoning in the policy and no factual basis in the record—to indicate either that

noncitizens in CBP custody *actually* have the ability to consult in a window as short as four hours or that the agencies meaningfully considered that issue. Those failures doom the policy.

> **A.      The Guidance Is Contrary to Law.**

In arguing that the Guidance is consistent with the INA, Defendants fixate on the facts that Congress did not provide a minimum time for consultation and said that consultation cannot cause "unreasonable delay." Opp. 37. But those facts cannot be used to nullify the underlying statutory guarantee that a person be given the opportunity to "consult with a person or persons of the [noncitizen's] choosing," 8 U.S.C. § 1225(b)(1)(B)(iv)—language that Defendants initially quote and then rigorously ignore, *see* Opp. 36-39. After all, "courts must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quotations omitted). Any interpretation of the statute that permits the systematic deprivation of the consultation guarantee violates that "'cardinal principle' of interpretation." *Id.* Otherwise, Defendants could impose a period of mere minutes and claim consistency with the statute.

Defendants' claim that they are entitled to "deference" in their statutory interpretation, Opp. 38, cannot alter that conclusion. Even in the era of *Chevron*, agencies could not ignore inconvenient statutory language. *See, e.g.*, *New York v. EPA*, 443 F.3d 880, 887 (D.C. Cir. 2006). All the more so, agencies may not do so in the wake of the Supreme Court's express holding that "[t]he deference that *Chevron* requires … cannot be squared with the APA." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024). Indeed, the portion of *Loper Bright* on which Defendants rely makes clear that even when a statute affords an agency some "flexibility," that leeway is cabined by "the limits imposed" by the plain statutory text. *Id.* (quotation omitted). And it is "the role of the reviewing court to independently interpret the statute" so as to "fix[] the boundaries of the delegated authority." *Id.* (cleaned up). Attempts to circumvent those limits receive no deference whatsoever. Nor are Defendants entitled to deference on the legal question

27

whether the Guidance violates the statutory consultation guarantee. *Loper Bright*, 144 S. Ct. at 2260 (stating that under the APA, "courts must 'decide all relevant questions of law'" (quotation omitted)). The Court must determine whether the Guidance violates the statute.

There can be no question that it does. Allowing as few as four hours makes consultation impossible for most people in CBP custody. These individuals must be escorted to a phone, have a short timeframe in which to make calls, and often receive just one opportunity (often outside of business hours) to do so. MSJ 35-36. Defendants offer no response to this reality or to the other limits on calls, like the inability to return a missed call from a noncitizen in CBP custody. MSJ 36.

Instead, Defendants say the consultation period only runs from 7 a.m. to 7 p.m. and that the four-hour clock does not start until a person is given "access to a phone," so these safeguards are sufficient to afford a "meaningful opportunity to consult." Opp. 39; *see also id.* at 56. But these minimal concessions are categorically insufficient to bring the Guidance into compliance with the statute. If a noncitizen receives "access to a phone" at 5 p.m. and then tries to reach an attorney who works from 9 a.m. to 5 p.m., that noncitizen's *entire* four-hour period would fall outside of standard business hours. In other words, under Defendants' view, DHS may inform a person of their right to consult at 5 p.m., immediately escort that person to make a call, return the person to their sleeping area when that call goes unanswered, and then conduct a credible fear interview at 9 a.m. the following day. *See* Hidalgo Decl. ¶ 23 (vast majority of calls RAICES has received from people in CBP custody have come outside of business hours, before 8 am or after 5:30 pm).

That scenario would be impermissible in the best of circumstances, and CBP custody is a far cry from the best of circumstances given the myriad limits those facilities impose on actual phone access. Defendants fail to guarantee four hours—or any amount of time—with *actual* access to a telephone. They do not ensure the ability to make more than one phone call. They do not

ensure the ability to have access to a telephone during regular business hours. The Guidance thus invites a situation in which the consultation guarantee is a nullity. *See, e.g.* J.C. Dec. ¶¶ 13-15 (describing period of fewer than 24 hours with no attorney contact); J.R. Dec. ¶¶ 9-10 (recounting a consultation window that was less than 24 hours and occurred entirely on a holiday weekend). It is accordingly contrary to law.

### B.     The Guidance Is Arbitrary and Capricious.

The Guidance fails to consider the fairness interests the consultation guarantee is meant to protect and relies on the absurd assumption that a four-hour period allows people to have "in depth" conversations in advance of a credible fear interview. MSJ 37-38. As to fairness, Defendants contend that the Guidance "explicitly seeks to balance … fairness" with efficiency. Opp. 56. But the Guidance does no more than incant the word "fairness" alongside the unsupported assertion that "the 4-hour period ... allow[s] sufficient time for individuals to make multiple phone calls and have in-depth conversations." Guidance AR3. That is not enough. *See Council of Parent Att'ys and Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 50 (D.D.C. 2019) (an agency may not address an important consideration underlying a prior policy in a "cursory manner"). Further, for that assertion to even plausibly suffice, noncitizens would have to have access for the full four-hour period—which the Guidance does not require and which does not occur. MSJ 37-38.[13]

Defendants also assert that "there is no reason to believe that the level of actual consultation" time under the Guidance "will differ significantly" from the prior, 24-hour-minimum consultation period, because they claim it is "unlikely" that "shortening the minimum time before

---

[13] Defendants obliquely suggest that an even shorter period of just one hour could be sufficient, Opp. 56 (citing *Las Americas Immigrant Advocacy Center v. Wolf*, 507 F. Supp. 3d 1, 30 (D.D.C. 2020)), but that issue was not resolved in *Las Americas*. A consultation period of 24 hours was dropped in favor of a 48-hour period before the opinion in that case. *Las Americas*, 507 F. Supp. 3d at 23.

the credible fear interview necessarily shortens the actual time a noncitizen would use to consult with a designated representative." Opp. 56. But the question here is not whether there will be less consultation with a four-hour period than the prior consultation period, which is itself being challenged as illegal. *See M.A. v. Mayorkas*, No. 1:23-cv-01843-TSC (D.D.C.). Rather, the question is whether Defendants had an adequate basis for their assumption that four hours would be sufficient to have "in depth" consultations. MSJ 37-39. They did not.

In any event, Defendants identify no support in the record for their counterintuitive claim that reducing the minimum consultation time from 24 hours to 4 hours will make no practical difference. If that were so, then there would have been no reason for Defendants to promulgate the Guidance. And even if the status quo *ante* will continue for some people, the Court should not ignore Defendants' decision to drastically shrink consultation time for others. That Defendants may choose to selectively enforce their illegal policy does not make it any less illegal. If anything, this statement suggests that Defendants now recognize that four hours is insufficient.

Finally, Defendants assert that "the shortened consultation period will more expeditiously resolve *meritless* claims[.]" Opp. 56 (emphasis added). But Defendants identify no record evidence for the illogical assumption that largely eliminating noncitizens' ability to consult with counsel prior to the complicated credible fear process will cause only those with less meritorious claims to fail their CFIs—rather than negatively impacting *all* asylum seekers, regardless of the merits of their claims. Defendants have acted arbitrarily by failing to justify this key assumption. *See Hisp. Affs. Proj. v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018).

## VI.    FAILURE TO PROVIDE NOTICE AND COMMENT RENDERS THE RULE NULL AND VOID.

Defendants' asserted exceptions to the notice-and-comment requirement do not apply.[14]

### A.    The Rule Fails to Meet the "Foreign Affairs" Exception.

Defendants have not come close to satisfying the foreign affairs exception, which applies to rules that are "clearly and directly" tied to a foreign affairs function. *CAIR Coal.*, 471 F. Supp. 3d at 52; *see Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978). "While immigration matters typically implicate foreign affairs at least to some extent, … it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law. *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) (citation and quotation marks omitted).

Instead, Defendants suggest unduly broad approaches to the foreign affairs exception that the court in *CAIR Coalition* previously rejected. First, they rely on cases suggesting that the exception applies where notice-and-comment procedures "would provoke definitely undesirable international consequences." *Am. Ass'n of Exps. and Imps. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985); *Yassini v. Crosland*, 618 F.2d 1356, 1360, n.4 (9th Cir. 1980). That test, which stems solely from a stray phrase in legislative history, *see* S. Rep. No. 79-752, at 13 (1945), has no basis in this circuit's case law. *See CAIR Coal.*, 471 F. Supp. 3d at 52. Further, even under that test, the exception applies only if the evidence shows that "adhering to notice and comment and a thirty-day grace period" itself "will 'provoke definitely undesirable international consequences.'" *E. Bay*, 993 F.3d at 676 (citing *Yassini*, 618 F.2d at 1360 n.4). Thus, courts applying that test "have

---

[14] Defendants' suggestion that only the Organizational Plaintiffs raise the notice-and-comment claim, Opp. 40 n.7, is incorrect. That claim is brought by all Plaintiffs, and all Plaintiffs—including the individual Plaintiffs, whose opportunity to apply for asylum was pretermitted by the Rule— suffered harm from Defendants' failure to engage in notice and comment. *See supra* Part I.

disapproved the use of the foreign affairs exception where the Government has failed to offer evidence of consequences *that would result from compliance with the APA's procedural requirements*." *E. Bay*, 932 F.3d at 776 (emphasis added).

Defendants offer no such evidence. They contend that "a shared effort with foreign nations to manage irregular migration across the region and to the southern border" triggers the exception, Opp. 41, but there is no evidence that adhering to the APA's procedural requirements would harm that effort. Given that the provisions of the Rule had been included in proposed legislation at the center of public debate in the months before the Rule's promulgation, *see* AR1715-2006, 11649-61, 12583-89, it is implausible that advance notice of upcoming border restrictions would impair foreign relations. *Zhang v. Slattery*, 55 F.3d 732, 745 (2d Cir. 1995) ("weight of" foreign policy "concerns is not obvious" where there had been "national debate" on the issue).

Defendants also contend that the exception applies to rules that are "'linked intimately with the Government's overall political agenda concerning relations with another country.'" Opp. 40 (quoting *Am. Ass'n of Exps. and Imps.*, 751 F.2d at 1249). But that test likewise has no basis in the statutory text. *CAIR Coal.*, 471 F. Supp 3d at 56 n.23. And it is contrary to "Congress's admonition in the legislative history of the APA not to interpret the phrase 'foreign affairs function loosely to mean any function extending beyond the borders of the United States.'" *City of New York*, 618 F.3d at 202 (quoting S. Rep. No. 79-752, at 13 (cleaned up)); *see also* H.R. Rep. No. 79-1980, at 23 (1946). In any event, the case Defendants cite involved actions taken under a statute expressly authorizing the President to "negotiate with representatives of foreign governments … to obtain" agreements on trade issues. *Am. Ass'n of Exps. And Imps.*, 751 F.2d at 1241. Here, despite an oblique reference to a "shared effort" in the region, Opp. 41, there is no record evidence suggesting that the Rule was the subject of an explicit international agreement or even negotiations with

foreign nations. *Cf., e.g.*, 87 Fed. Reg. 63507, 63507-08, 63516 (Oct. 19, 2022) (invoking foreign affairs exception as to new parole process for Venezuelan nationals that was "directly responsive to requests from" the Mexican government "to provide a lawful process for Venezuelan nationals to enter the United States," and where the program was "conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals").

Finally, Defendants suggest that a rule that merely "implicates our relations with foreign powers" would satisfy the foreign affairs exception. Opp. 41 (quoting *Yassini*, 618 F.2d at 1360 n.4). *CAIR Coalition* rejected that argument, too. 471 F. Supp. 3d at 52. Indeed, no court has ever applied so sweeping a test, for the good reason that "the foreign affairs exception would become distended" and swallow the notice-and-comment rule. *Yassini*, 618 F.2d at 1361.

Defendants unsuccessfully try to distinguish *CAIR Coalition*, claiming a "closer nexus" between the Rule and the United States' foreign affairs functions than with the asylum restriction at issue in *CAIR Coalition*. That is not true. Just as with the rule challenged in *CAIR Coalition*, the current Rule "overhauls the procedure through which the United States decides whether [noncitizens] who arrive at our southern border are eligible for asylum," and such "changes to our asylum criteria do not 'clearly and directly' involve activities or actions characteristic of the conduct of international relations." *CAIR Coal.*, 471 F. Supp. 3d at 55. And as mentioned above, neither the rule at issue in *CAIR Coalition*, nor this one is "the product of any agreement between the United States and another country, regardless of any ongoing negotiations." *Id.*

Instead, Defendants' argument here is the same one rejected in *CAIR Coalition*—that a rule satisfies the foreign-affairs exception if it would "in some way affect ongoing negotiations with other countries." *CAIR Coal.*, 471 F. Supp. 3d at 56-57. Defendants argue that providing a notice and comment period (1) would have led to increased migration, which (2) would "undermine[]" a

"critical element of the United States' ongoing diplomatic approach to migration management with partners in the region," and (3) thereby "adversely impact the United States' foreign policy priorities." Opp. 41-42 (quotations omitted).[15] Thus, by Defendants' own admission, any effects on foreign policy are several steps removed from the Rule itself. Such "*indirect* effects do not clear the high bar" required to trigger the exception. *CAIR Coal.*, 471 F. Supp. 3d at 55; *see also, e.g.*, *E. Bay*, 993 F.3d at 676-77 (foreign-affairs exception did not cover 2018 manner-of-entry-based asylum ban); *E. Bay*, 932 F.3d at 776 (same); *Jean v. Nelson*, 711 F.2d 1455, 1477-78 (11th Cir. 1983) (same for policy of detaining Haitians); *Mayor and City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 510-11 (D. Md. 2019) (same for changes to visa application criteria in State Department consular manual); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1075-77 (W.D. Wash. 2017) (same for suspension of refugee admissions from certain countries).

**B.    The Rule Fails to Meet the "Good Cause" Exception.**

The good-cause exception "is to be narrowly construed and only reluctantly countenanced" and applies "in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1339-40 (D.C. Cir. 2023) (citations omitted); *cf. Biden v. Missouri*, 595 U.S. 87, 96 (2022) (good cause existed based on medical data showing that immediate publication "would significantly reduce COVID-19 infections, hospitalizations, and deaths").

Defendants have failed to make that showing here. As an initial matter, they claim that their judgment deserves deference. Opp. 43-44. But this Court's "review of the agency's legal conclusion of good cause is *de novo*." *Sorensen Commc'ns, Inc. v. FCC*, 755 F.3d 702, 706 (D.C.

---

[15] As noted below, *see infra*, Part VI.B, Defendants' speculation about increased migration is entitled to no deference and is contradicted by the record.

Cir. 2014). Here, the sharp decrease in border encounters in the months prior to the Rule means that, even if some increase occurred, crossings still would have remained at levels Defendants have consistently managed since the fall of 2021. *See* AR2157-58. The return of such a longstanding status quo cannot amount to "dire circumstances" of the sort that trigger the good-cause exception. *CAIR Coal.*, 471 F. Supp. 3d at 46. Indeed, as in *CAIR Coalition*, Defendants "offer no factual basis or explanation for when or why that increase would ripen into a crisis so severe that it would justify bypassing" notice and comment. *Id.* at 50. Their claim of good cause should thus be denied.

In any event, Defendants' underlying factual claim that border encounters would have increased cannot receive blind deference in the context of the "meticulous and demanding" good-cause standard. *Sorensen Commc'ns*, 755 F.3d at 706. And the conclusion that notice and comment would have somehow led to an increase in irregular migration is contrary to the record and, thus, arbitrary and capricious. *Id.* at 706 n.3; *see State Farm*, 463 U.S. at 43. The record shows that neither Congress's consideration of legislation that would have enacted similar limitations as the Rule, nor the Executive's widely-reported plans to issue the Rule in early 2024, led to increased migration. MSJ 41-42, 44 & n.27. It also remains undisputed that the record contains "no evidence at all to suggest" either that "people outside the United States understand the nuanced differences between the pre-Rule status quo and the Rule,"[16] or that "people's behavior would change even if they understood" that difference. MSJ 41. The record instead shows that asylum restrictions do not stop people from seeking refuge in the United States. *Id.* at 43. Nor can Defendants point to any evidence that *any* notice and comment period ever led to an increase in migration.

---

[16] Defendants mischaracterize Plaintiffs' argument as one that there is no record evidence to suggest that migration levels have ever responded to *any* "change[] in immigration law." Opp. 43. That strawman is irrelevant: the question is whether notice and comment *on the changes in this Rule* would have led to dire consequences. *CAIR Coal.*, 471 F. Supp. 3d at 49.

The evidence Defendants cite instead concerns the end of the Title 42 policy and an injunction against the Remain in Mexico program. *See* Opp. 43. But it is undisputed that border crossings increased before the end of Title 42 because that policy involved immediate expulsions with no chance for relief and no removal order—meaning that Title 42 "incentivized people to try to re-enter, often multiple times." MSJ 42 (cleaned up). Nor is there any dispute that, in sharp contrast, "noncitizens already had strong incentives not to enter or re-enter unlawfully" even before Defendants promulgated the Rule. MSJ 43. Therefore, the events during the final days of Title 42 "provide no support at all" for Defendants' claim that a notice-and-comment period would have had catastrophic effects. *Id.*. And Defendants do not dispute that the injunction concerning the Remain in Mexico policy had at most a minimal and short-lived effect on migration. *See id.* n.26. In short, nothing in the record plausibly "support[s] the reality of the threat" on which Defendants rely. *Sorensen Commc'ns*, 755 F.3d at 706.

Although the Rule independently asserted the existing strain on Defendants' resources as an independent basis for good cause, 89 Fed. Reg. at 48762-63, Defendants do not defend that position. It is undisputed that, because Defendants dealt with similar levels of migration for years before promulgating the IFR, any strain from those levels cannot constitute good cause. Instead, Defendants suggest that increased migration would further strain resources. Opp. 44. But as shown above, there is no record support for concluding such an increase would occur. Defendants lacked good cause to bypass notice and comment.

## VII. PLAINTIFFS ARE ENTITLED TO VACATUR AND OTHER RELIEF.

### A. Vacatur Is Available.

Defendants offer several arguments why the Court may not vacate the Rule, but only grudgingly concede directly relevant contrary precedent from this Circuit. The APA generally, and 8 U.S.C. § 1252(e)(3) specifically, permit vacatur and system-wide relief.

Defendants first argue that vacatur is unavailable, suggesting relief must be "strictly limited" to "party-specific relief" for the Individual Plaintiffs. Opp. 57, 60-62; *but see infra* (addressing Defendants' contradictory arguments that Individual Plaintiffs *also* cannot be granted relief). But "as its title makes clear," Congress crafted 8 U.S.C. § 1252(e)(3) specifically to allow, "'[c]hallenges on [the] validity of the [expedited removal] *system*.'" *Grace*, 965 F.3d at 895 (emphasis added, alterations in original) (upholding systemic remedies invalidating expedited removal policies). The D.C. Circuit has thus rejected Defendants' view that courts may not order "system-wide" relief, *id*. at 907-08, instead noting the "broad[]" "sweep[]" of § 1252(e)(3)'s review authority. *MRNY*, 962 F.3d at 628 n.10; *see Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C 2022) (rejecting arguments that § 1252(e)(3) relief can be granted only to individual plaintiffs challenging expedited removal policy). Indeed, "[t]o accept the government's position would require the Court to ignore the systemic nature of this action." *Grace*, 2019 WL 329572, at *2. The whole point of channeling review into this district within 60 days under § 1252(e)(3) was to ensure that the *validity of the system* could be challenged in one action.

Defendants also suggest the APA does not allow vacatur, Opp. 60-62, conceding only in passing that vacatur is "available" under binding precedent, *id.* at 60. The D.C. Circuit has consistently held that under the APA, "[w]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *E.g.*, *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (citation omitted). And "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—*not that their application to the individual petitioners is proscribed.*" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (emphasis added, cleaned up). Accordingly, multiple courts in this district have refused to limit vacatur in immigration cases to individual plaintiffs, describing such a position as "both at

odds with settled precedent and difficult to comprehend." *O.A.*, 404 F. Supp. 3d at 153; *see also Kiakombua*, 498 F. Supp. 3d at 52.

Defendants are also incorrect that 8 U.S.C. § 1252(f)(1) bars vacatur. Opp. 57-59. [17] "By its plain terms," Section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). As every court to consider the issue has held—even after *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), on which Defendants rely, Opp. 57-58—the provision does not apply to vacatur. *See, e.g.*, *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022). That uniformity is unsurprising because nothing in the provision refers to vacatur, and it is titled "Limit on injunctive relief"—without reference to vacatur. *See Biden v. Texas*, 597 U.S. 785, 798 (2022) (Section 1252(f)'s "title … makes clear the narrowness of its scope"); *Am-Arab Anti-Discrimination Comm.*, 525 U.S. at 481 (relying on the provision's title). Thus Section 1252(f)(1) simply "prohibits lower courts from *entering injunctions*" against the operation of certain INA provisions. *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added).

Vacatur is not an injunction: It is "less drastic" than the "extraordinary remedy" of an injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010), in that it "neither compels nor restrains" agency action, *Texas*, 40 F.4th at 220; *see also Kiakombua*, 498 F. Supp. 3d at 52 (noting that "the Supreme Court has made it abundantly clear that injunctions and vacaturs

---

[17] Defendants also assert that vacatur is barred by Article III, Opp. 61, but none of the cases they cite endorse that startling proposition, which is inconsistent with longstanding precedent recognizing the availability of such relief, *see Nat'l Mining Ass'n*, 145 F.3d at 1409.

are distinct remedies, and that the latter is considered substantially less intrusive"). Section 1252(f)(1) thus has no bearing on the availability of vacatur.[18]

Defendants' contrary arguments are meritless. *Aberdeen & Rockfish R.R. Co. v. SCRAP* (cited at Opp. 58-59), addressed not vacatur but an injunctive order "direct[ing] the [agency] to perform certain acts." 422 U.S. 289, 307 (1975). And the term "restrain" in Section 1252(f)(1) does not do the work Defendants claim. Opp. 59. Rather, "restrain and enjoin" is a "common doublet" describing the concept of injunctive relief, referring to the two most common forms of injunctive relief, injunctions and restraining orders. BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 295-96 (3d ed. 2011); *California v. Arizona*, 452 U.S. 431, 432 (1981) (using "enjoined and restrained" to describe an injunction). This reading is confirmed twice over: by Section 1252(f)'s title, as noted above; and by the legislative history, which refers only to injunctions in describing Section 1252(f)(1). H.R. Rep. No. 104-469, pt. 1, at 161 (1996).

Defendants' arguments are particularly misplaced here, where Congress has labeled the challenge as systemic. 8 U.S.C. § 1252(e)(3). "In the midst of a statutory section that largely limits and channels judicial relief directly into the federal appellate courts or habeas corpus proceedings, Congress specifically provided in the expedited removal context for more traditional judicial review of 'challenges on validity of the system.'" *MRNY*, 962 F.3d at 625 (cleaned up). In Defendants' view, however, Congress's carefully crafted systemic review process is of little practical import because this Court cannot grant effective *systemic relief*. The D.C. Circuit has already held that it would be absurd for Congress to "have expressly authorized the district court to review expedited-removal policies yet simultaneously prohibited it from issuing any remedies."

---

[18] Defendants correctly do not dispute that the Court may grant Plaintiffs' requested declaratory relief. *See* ECF No. 23-3 ¶ 2. Section 1252(f)(1) "does not bar declaratory relief." *MRNY*, 962 F.3d at 635; *see also Biden*, 597 U.S. at 800.

*Grace*, 965 F.3d at 907. Likewise, it would be absurd to interpret Section 1252(f)(1)'s general terms to override Congress's specific provision of effective judicial review of systemic challenges to the expedited removal process under Section 1252(e)(3). *See CAIR Coal.*, 471 F. Supp. 3d at 60 n.29 (rejecting argument that Congress established systemic expedited review but rendered courts "powerless to remedy" systemic violations); *see also Grace*, 965 F.3d at 894 (explaining that another provision, Section 1252(a)(2)(B), does not apply to Section 1252(e)(3) actions).

Defendants' responses reinforce the availability of vacatur. They argue against "universal remedies," warning that they could "incentivize forum shopping" and prevent "different courts" from "weigh[ing] in." Opp. 61 (cleaned up). Those concerns are irrelevant here because Section 1252(e)(3)(A) *consolidates* systemic review in this district. And the D.C. Circuit has expressly rejected that argument that Section 1252(e)(1)(A) requires vacatur to be "specifically authorized" in Section 1252(e)(3). Opp. 61-62; *Grace*, 965 F.3d at 907.

### B.     Remand Without Vacatur Is Unwarranted.

The Court should also reject Defendants' argument for the "exceptional remedy" of remand without vacatur. *Bridgeport Hosp.*, 108 F.4th at 890; *see United Steel*, 925 F.3d at 1287 (remand without vacatur available only "[i]n rare cases"). As discussed above, "[w]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *Bridgeport Hosp.*, 108 F.4th at 890 (citation omitted); *accord O.A.*, 404 F. Supp. 3d at 152. The government fails to show why this normal remedy would be improper here.

First, "remand-without-vacatur is unavailable" where an agency exceeds its statutory authority "[b]ecause an agency can't 'cure' the fact that it lacks authority to take a certain action." *Bridgeport Hosp.*, 108 F.4th at 890; *see NRDC v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) ("The agency's errors could not be more serious insofar as it acted unlawfully, which is more than

sufficient reason to vacate the rules."). Because the Rule and Guidance are contrary to statute, remand without vacatur is not available.

Remand without vacatur would be inappropriate even apart from those incurable statutory violations. Where remand without vacatur is available, whether to order it "depends on the 'seriousness of the [agency action's] deficiencies' and the likely 'disruptive consequences' of vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Here, the policies' deficiencies are "substantial" and it is "unlikely that the government could justify its decision[s] on remand." *Nat'l Women's L. Ctr. v. OMB*, 358 F. Supp. 3d 66, 93 (D.D.C. 2019). Unlike *Air Transport Association of America., Inc. v. USDA*, where the agency essentially made a "citation error," Defendants offer no explanation of the steps they would take to remedy their errors, let alone demonstrate "a 'serious possibility'" of doing so. 317 F. Supp. 3d 385, 391 (D.D.C. 2018) (cited at Opp. 62-63). Contrary to their conclusory assertions, Defendants cannot "easily cure the defects [of the Rule or Guidance] by further explanation of [their] reasoning," because core aspects of that reasoning are fundamentally flawed. *Nat'l Women's L. Ctr.*, 358 F. Supp. 3d at 93; *see, e.g.*, *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1222 (D.C. Cir. 2004) (vacating rule where agency failed to consider important aspect of problem).

Accordingly, remand without vacatur would be unwarranted even if Defendants could show that vacatur would have disruptive consequences. *See Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) ("[T]he second *Allied-Signal* factor is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation.") (citation omitted).

In any event, Defendants' claims of disruption reflect unsupported speculation and are outweighed by the other equities. Their main argument is that the Rule and Guidance have been

"effective" in reducing border crossings between ports of entry, and that "[v]acatur could erase that success." Opp. 63-64. But people seeking asylum already "prefer to enter the United States at ports of entry" when that option is available[19]—and have always sought to do so, even without harsh penalties, *e,g.*, *Al Otro Lado v. Wolf*, 952 F.3d 999, 1004-05 (9th Cir. 2020) (thousands of asylum seekers waited to enter at ports even when access was more limited). That is in part because crossing between ports is inordinately dangerous and expensive. AR11894, 14204-08, 15341-43.

Defendants' own statistics concerning past asylum restrictions severely undercut their claim that the Rule or Guidance are driving asylum seekers' decisions. For example, Mexican nationals were exempt from the 2023 rule's entry-based asylum bar. So, if Defendants were correct that such restrictions effectively channeled asylum seekers to ports of entry, Opp. 64, the data would show that Mexican nationals crossed between ports at substantially higher rates than other migrants while that rule was being applied at the border between June 2023 and May 2024. But the data shows the opposite: Mexicans and non-Mexicans entered at ports at the exact same rate.[20] And this lack of any effect traceable to the 2023 rule is unsurprising; Defendants have acknowledged that a 2019 asylum bar applicable to all non-Mexicans likewise had no "noticeable impact on encounters." 88 Fed. Reg. at 31430 n.304.

Defendants rely on the fact that crossings between ports have decreased since the current Rule took effect. Opp. 63. That is unpersuasive. Crossings between ports also fell by more than 50 percent between December 2023 and May 2024, *before* the Rule took effect.[21] "U.S. officials have

---

[19] Christina Asencio, U.S. Policies Punish Refugees at the U.S. Border, Human Rights First (Feb. 20, 2024), https://bit.ly/3X0vBnN/.

[20] Between June 2023 and May 2024, 24 percent of both Mexican encounters (171,903 of 716,729) and non-Mexican encounters (439,346 of 1,805,237) occurred at ports. *See* CBP, Southwest Land Border Encounters, http://bit.ly/3ACyung.

[21] CBP, Southwest Land Border Encounters, http://bit.ly/3ACyu.

credited Mexican authorities, who have expanded their own enforcement efforts, for the decrease" during those months. AR15128; *see* AR14221 (describing Mexico's enforcement measures); 89 Fed. Reg. at 48725 (increased crossings in late 2023 due partly to Mexico's "operational constraints at the end of its fiscal year"). That crossings continued to fall in the summer months hardly shows that those further drops were *caused* by the Rule and Guidance. Indeed, "[h]istorically, the number of migrant encounters has almost always decreased during the summer months as people avoided making the journey in scorching temperatures."[22]

Further weighing against remand without vacatur is that the supposed "success" of the Rule and Guidance depends on subjecting noncitizens to extraordinary harms. The Rule itself acknowledges that it results in the removal of people with "meritorious claims." *E.g.*, 89 Fed. Reg. at 48767. Just like the last time the "manifestation of fear" requirement was applied at the border, even asylum seekers who explicitly state their fear of removal are being routinely "ignored and summarily removed." Human Rights First Amicus Br. 4, 12-23 (cataloging instances). For example, out of 457 people interviewed in Mexico after being removed under the Rule, "more than 75% (345) reported … that they were either ignored or not allowed to ask for asylum." *Id.* at 13. It is thus no wonder that the number of people being registered as "manifesting fear has fallen by more than half." ECF No. 45-2 ¶ 25 ("Murray Decl."). Meanwhile, the Rule's asylum bar and reasonable probability standard have driven down the CFI pass rate for those who do receive interviews. *Id.* Together with the Guidance, the Rule has already caused thousands of people to be removed unlawfully to countries where they face persecution or torture. *See id.* And those waiting in Mexico for CBP One appointments likewise face "extreme violence." AR7311; MSJ 17-19.

---

[22] José Ignacio Castañeda Perez, June Migrant Encounters Drop to Lowest Numbers Seen in More Than 2 Years, Arizona Republic (July 19, 2023), https://bit.ly/4ehheTh.

Thus, while Defendants invoke the public interest, Opp. 63, they disregard the strong public interest in "'ensuring that we do not deliver [noncitizens] into the hands of their persecutors,' and 'preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 546-47 (D.D.C. 2020) (citations omitted).[23]

### C.   The Individual Plaintiffs' Requested Remedies Are Permissible and Appropriate.

Finally, Defendants' arguments that this Court cannot remedy the Individual Plaintiffs' injuries fail. Opp. 59-60. Individual Plaintiffs ask the Court to vacate their negative CFI decisions and removal orders and order Defendants to return the Individual Plaintiffs who have been removed. MSJ 45; ECF No. 23-3 ¶ 4. The Court can grant these remedies. *See, e.g., Grace v. Whitaker,* 344 F. Supp. 3d 96, 144 (D.D.C. 2018); *Kiakombua*, 498 F. Supp. 3d at 57-58.

Defendants point to 8 U.S.C. § 1252(a)(2)(A)(iii) in arguing otherwise, Opp. 59, but that provision applies only to "direct review of individual [noncitizens'] negative credible-fear determinations, not to facial challenges to the written policies that govern those determinations." *Grace*, 965 F.3d at 893; *id.* at 892. That plaintiffs seek vacatur of their credible fear determinations as a *remedy* does not require the Court "to examine how USCIS officers 'appl[ied]' the challenged policies 'to individual [noncitizens].'" *Id.* at 892-93 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)). Indeed, the same relief was ordered in *Grace*. *See* 965 F.3d at 914 (Henderson, J., dissenting); Order at 3, *Grace*, No. 18-cv-1853 (D.D.C. Dec. 19, 2018), ECF No. 105.

---

[23] Defendants argue that the Individual Plaintiffs "will not suffer substantial harm" from the Rule and Guidance remaining in place. Opp. 64. But that assumes they will not be subjected to the policies again, and further ignores the public interest, which is particularly important to consider in a systemic challenge like this one. Moreover, the ongoing harm to the Organizational Plaintiffs is potent. As discussed above, Las Americas and RAICES face serious obstacles to their core work of serving asylum seekers. *See* Hidalgo Decl. ¶¶ 12-43; Babaie Decl. ¶¶ 23-65.

Defendants' argument that Section 1252(a)(2)(B)(ii) bars any order regarding return of the removed Plaintiffs also fails. Opp. 60. The D.C. Circuit has held that Section 1252(a)(2)(B)(ii) does not apply to Section 1252(e)(3) cases at all. *Grace*, 965 F.3d at 894. And *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009)—on which Defendants rely, Opp. 60—does nothing to bar claims for return under the INA. *See Grace*, 344 F. Supp. 3d at 145 (quoting and discussing *Kiyemba*). Indeed, numerous cases confirm that courts have authority to order the return of noncitizens unlawfully removed. *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009) (citing government brief in petition for review context in concluding that noncitizens may pursue legal claims from abroad "and those who prevail can be afforded effective relief by facilitation of their return"); *Walters v. Reno*, 145 F.3d 1032, 1050-51 (9th Cir. 1998) (granting reopening and requiring the agency "to parole class members into the United States, or make other arrangements so that they may attend their hearings"); *Grace*, 344 F. Supp. 3d at 142-43; *Ms. L. v. ICE*, 403 F. Supp. 3d 853, 861 (S.D. Cal. 2019).[24] The remedies that Individual Plaintiffs seek in this case are not only permissible but also necessary to afford full relief. *See Kiakombua*, 498 F. Supp. 3d at 57.[25]

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment.

---

[24] Defendants cite two irrelevant cases in which the court refused to order the government to parole individual plaintiffs into the United States: *Giammarco v. Kerlikowske*, 665 F. App'x 24 (2d Cir. 2016) and *Samirah v. O'Connell*, 345 F.3d 545 (7th Cir. 2003). Both involved challenges to the agency's discretionary parole denial, so jurisdiction was barred by 8 U.S.C. § 1252(a)(2)(B)(ii). Neither case suggests that a court cannot order parole to remedy unlawful agency action. Indeed, in a subsequent case, the *Samirah* court held that a court having jurisdiction *can* order parole to remedy the government's unlawful conduct. *Samirah v. Holder*, 627 F.3d 652, 665 (7th Cir. 2010) (mandamus order requiring "whatever steps are necessary" for reentry).
[25] For all the above reasons, Plaintiffs oppose a stay of any vacatur order. *See* Opp. 65.

Dated: August 26, 2024

Respectfully submitted,

/s/ Matthew E. Price

Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

Blaine Bookey*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
*bbookey@uclawsf.edu*
Melissa Crow (D.C. Bar. No. 453487)

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation

Matthew E. Price (D.C. Bar # 996158)
Lindsay C. Harrison (D.C. Bar #977407)
Mary E. Marshall (D.C. Bar #1739058)**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*
*lharrison@jenner.com*
*mmarshall@jenner.com*

Melissa Root*
Andrew L. Osborne*
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
353 N Clark St, Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*
*aosborne@jenner.com*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

Tamara Goodlette (D.C. Bar. No.
TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.org*

Edith Sangueza*
Center for Gender and Refugee Studies
26 Broadway, 3rd Floor

of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

Ashley Alcantara Harris*
David A. Donatti*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
*aharris@aclutx.org*
*ddonatti@aclutx.org*

New York, NY 10004
T: 415-581-8835
*sanguezaedith@uclawsf.edu*

Robert Pauw*
Center for Gender and Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
*rpauw@ghp-law.net*

*Attorneys for Plaintiffs*
*Admitted via certificate of pro bono
representation or pro hac vice*
**D.D.C application pending*