# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, et al. *Plaintiff*, v. U.S. DEPARTMENT OF HOMELAND SECURITY, et al. *Defendants*, And STATE OF TEXAS, [Proposed] *Intervenor-Defendant*. | No. 1:24-CV-01702 |

## TEXAS'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Putative Intervenor-Defendant, the State of Texas, by and through the Attorney General of Texas, files this reply to Plaintiffs' opposition to Defendants' cross-motion for summary judgment.

i

## TABLE OF CONTENTS

Table of Contents ................................................................................................................ ii

Index of Authorities ........................................................................................................... iii

Argument .............................................................................................................................1

    I. Plaintiffs' alleged injuries are do not confer organizational standing. ........................1

    II.   The IFR's Asylum Restrictions Are Not Contrary To Law. ................................3

    III.  Good Cause Exists For An Exemption From The Generally Applicable Notice And Comment Requirement. .......................................................................................5

        A.    Impracticability ...............................................................................................5

        B.    Public Interest .................................................................................................. 6

Conclusion ........................................................................................................................ 8

### INDEX OF AUTHORITIES

**Cases**

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
   72 F.4th 1324, 1339-40 (D.C. Cir. 2023) ............................................................... 6, 8

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
   659 F.3d 13, 25 (D.C. Cir. 2011) ............................................................................ 1

*Nat'l Ass'n of Home Builders v. E.P.A.*,
   667 F.3d 6, 12 (D.C. Cir. 2011) ............................................................................. 2

*Capital Area Immigrants' Rights Coal. ("CAIR") v. Trump*,
   471 F. Supp. 3d 25, 46 (D.D.C. 2020) .................................................................. 9

*Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268, 1277 (D.C. Cir. 1994) ..................................................................... 1

*FDA v. Alliance for Hippocratic Med.*,
   602 U.S. 367, 395 (2024) ............................................................................... 2, 3, 4

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363, 379 (1982) ................................................................................. 1, 3

**Constitutional Provisions & Statutes**

8 U.S.C. § 1158(a)(1) ................................................................................................ 4

8 U.S.C. § 1158(b)(1)(A) .......................................................................................... 4

8 U.S.C. § 1225(b)(1)(A)(iii)(II) ............................................................................... 4

8 U.S.C. § 1225(b)(1)(F) ........................................................................................... 4

8 U.S.C. § 1225(b)(A) ............................................................................................... 4

**Rules & Regulations**

89 Fed. Reg. 48712 ................................................................................................ 5, 6

89 Fed. Reg. 48730, 48761 ........................................................................................ 8

89 Fed. Reg. 48762 .................................................................................................... 7

89 Fed. Reg. 48764 .................................................................................................... 8

89 Fed. Reg. 48766 .................................................................................................... 7

**ARGUMENT**

This Court should uphold the IFR and grant Defendants' Cross-Motion for Summary Judgment. RAICES and Las Americas Immigrant Advocacy Center ("Plaintiffs") have failed to identify injuries that would support their claim of organizational standing. Additionally, the IFR's asylum restrictions are lawful under the Executive Branch's inherent discretion to grant or deny asylum applications. Beyond thatDefendants have shown good cause to forego the usual notice and comment requirements. Plaintiffs' arguments to the contrary are unpersuasive.

**I.    Plaintiffs' alleged injuries are do not confer organizational standing.**

Plaintiffs have still not alleged sufficient injuries to establish independent standing. As Texas has already observed, in order to establish organizational standing, Plaintiffs must show that they were compelled to divert resources to avoid an injury caused by the defendant's conduct. *See* Dkt. 47 at 6 (citing *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)); *see also Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) ("The Court [in *Havens*] did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs." (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Put another way, Plaintiffs must show that their expenditure of additional resources was for "operational costs *beyond those normally expended to carry out [their] advocacy mission.*" *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quotation omitted) (emphasis added).

Plaintiffs allege that the IFR has injured their ability to represent and counsel noncitizens—a "core business activity." Dkt. 48 at 4, quoting *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Specifically, they claim that the IFR, by "increas[ing] the complexity of preparing

1

clients for credible fear interviews . . . and the time needed to do so, while dramatically shrinking the time available," and by "increas[ing] the number of clients who receive negative credible fear findings and must seek immigration judge review," has left Plaintiffs "unable to serve as many clients" and has required both organizations "to divert resources to counteract these harms to their work." Dkt. 48 at 3.

But nothing in the IFR has prevented Plaintiffs from performing all of their core business activities, and any change in resource allocation or increase in expenditures has been voluntary. Plaintiffs' choice to divert resources from some of its programs to others in response to Defendants' actions is not enough to confer organizational standing. *See Alliance for Hippocratic Medicine,* 602 U.S. 367 at 395 ("The medical associations respond that under *Havens*, standing exists when an organization diverts its resources in response to a defendant's actions. That is incorrect.") (citation omitted). Plaintiffs are still able to perform all the same services they were performing before for noncitizens and are not prevented from representing or counseling their clients who are seeking asylum. Assuming that Plaintiffs' allegations are true, the IFR is simply creating more of the same work Plaintiffs were already undertaking. Alone, the fact that there is more overall demand for a nonprofit's services does not constitute an injury to the organization.

Additionally, Plaintiffs rely on *Havens*, claiming that—like the organizational plaintiff providing "counseling and referral services for . . . homeseekers" in *Havens*—both RAICES and Las Americas "provide legal representation and counseling to asylum seekers." Dkt. 48 at 4, quoting *Havens*, 455 U.S. 363 at 379. In *Havens*, the organizational plaintiff alleged injury based on the fact that the false information about housing availability given by the apartment complex owner impeded the organization from carrying out its mission of securing housing for low-income

individuals. *Id.* at 379. In this case, however, the IFR does not prevent Plaintiffs from carrying out their mission or daily operations of representing and counseling asylum seekers. Plaintiffs have merely alleged that the challenged action here creates more of a demand for the same work in which Plaintiffs are already engaged. That Plaintiffs have voluntarily chosen to reallocate resources to meet rising demand is not sufficient to constitute an allegation of injury.

Furthermore, there is no limiting principle to Plaintiffs' contention that their alleged injuries are fairly traceable to the IFR. In *Alliance for Hippocratic Medicine*, the Court observed that "the law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." 602 U.S. 367 at 369. Similarly, Plaintiffs in this case base their theory of injury on the basis that the government's new, more stringent standards for border security have resulted in increased demand for Plaintiffs' services. Dkt. 48 at 2-3. Plaintiffs are effectively arguing here that they would have standing to challenge any change in border policy resulting in more noncitizens being turned away and thus, more noncitizens seeking out their services. The Court in *Alliance for Hippocratic Medicine* found this type of chain of causation to be too attenuated, and this Court should similarly reject "such an expansive theory of standing." 602 U.S. 367 at 395.

## II. The IFR's asylum restrictions are not contrary to law.

The INA distinguishes sharply between its broad grant of permission for migrants to *apply* for asylum and its broad recognition of Executive Branch authority to *grant or limit* asylum. Plaintiffs' argument that the IFR's asylum restrictions are contrary to law elides this distinction.

Plaintiffs correctly identify § 1158(a)(1) of the INA as providing broad permission for "[a]ny alien who is physically present in the United States or who arrives in the United States . . .

3

irrespective of such alien's status" to "apply for asylum." Dkt. 48 at 10. But Plaintiffs leave off the explicit limitation that such applications must be made "in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

Section 1225(b) sets out the procedure for asylum claims and credible fear interviews, applies those requirements "to any or all aliens described in subclause (II)[1] as designated by the Attorney General," and puts such designation "in the sole and unreviewable discretion of the Attorney General." 8 U.S.C. § 1225(b)(A). Section 1158 itself gives broad authority to the Executive Branch to deny or limit asylum: "[t]he Secretary of Homeland Security or the Attorney General *may grant* asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section." 8 U.S.C. § 1158(b)(1)(A) (emphasis added).

It is plain from the text and structure of the INA that while Congress intended the ability to seek asylum to be broadly available, Congress also intended that the Executive Branch have wide authority to prescribe the methods of application and wide latitude to limit who may receive asylum. Defendants make appropriate and lawful use of this authority in promulgating this interim final rule.

---

[1] Subclause (II) defines the class of migrants relevant here—those who have not arrived by plane from a western hemisphere country without diplomatic relations with the United States (8 U.S.C. § 1225(b)(1)(F), have "not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

4

**III. Good cause exists for an exemption from the generally applicable notice and comment requirement.**

    **A. Impracticability**

Plaintiffs admit that a good-cause exception to the general notice and comment requirement is available where notice and comment is "impracticable"—such as "in emergency situations, where delay could result in serious harm." Dkt. 48 at 34 (citing *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1339-40 (D.C. Cir. 2023). Yet Plaintiffs assert without foundation that longstanding conditions underlying a crisis can never form the basis of this impracticability prong of the good-cause exemption. Specifically, Plaintiffs claim that "because Defendants dealt with similar levels of migration for years before promulgating the IFR, any strain from those levels cannot constitute good cause." Dkt. 48 at 36. This claim fails because it relies on a factual premise that is proveably false.

First, migration levels have not been "similar . . . for years," but have increased each year since 2021. *See* 89 Fed. Reg. 48712 n. 5 (estimating that U.S. Customs and Border Protection migrant encounters at and between points of entry rose from 1.7 million in FY 2021 to 2.4 million in FY 2022 to 2.5 million in FY 2023). The United States "continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the [Southwest Land Border] as recently as December 2023." *Id.* at 48763. Moreover, the rise in encounters "has coincided with a substantial and . . . persistent increase in the number of noncitizens making fear claims in recent years." *Id.* at 48722. "In 2023, a record 59 percent of encounters" on the [Southwest Land Border] that were "processed for expedited removal resulted in fear claims." *Id.* at 48750. Thus, the United States has seen an extraordinary rise in raw immigration encounter numbers, but also in the percentage of these encounters

5

processed for asylum claims.

Second, these rising migration levels have not been "dealt with," but have instead submerged the nation's asylum and immigration infrastructure beneath a deluge that it was never equipped to handle. In 2019, former DHS Secretary Jeh Johnson admitted that even "1,000" daily encounters "overwhelms the system." The 2.5 million encounters in FY 2023 means that U.S. CBP faced an average daily encounter rate nearly seven times higher than the capacity limit identified by former Secretary Johnson, forcing such "extraordinary measures" as curtailed and suspended operations, port of entry closures, and significant personnel reassignments. *Id.* at 48725. The U.S. Citizenship and Immigration Services' "affirmative asylum backlog has reached "almost 1.2 million cases and is growing." *Id.* at 48763. U.S. immigration courts have over 2.7 million pending cases. *Id.* This backlog is part of a "vicious cycle" in which an overburdened immigration system, unable to "impose consequences for irregular migration," incentivizes higher levels of irregular migration and illicit border crossings, adding even more stress to the nation's immigration infrastructure and beginning the cycle anew. *See id.* at 48751, 48763. Any delay in issuing the IFR would only exacerbate these harms.

The overwhelming rise of immigrants, and of immigrants seeking asylum, has left the United States immigration system underwater. Plaintiffs' insistence that the country tread water while the IFR awaits the notice and comment period turns a blind eye to critical facts. The Court should not engage in the same willful blindness.

B. Public Interest

As with the impracticability prong of the good cause exception to the notice and comment requirement, Plaintiffs likewise acknowledge that the "public interest" prong of this exception

6

applies in cases "when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." Dkt. 48 at 34 (citing *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1339-40 (D.C. Cir. 2023). But here again, Plaintiffs' argument—that this version of the good cause exemption is unavailable given the evidence in record—is directly contrary to that evidence. Dkt. 48 at 35.

The record shows that anticipation of a shift in border policy often prompts "a rush to the border to arrive before the changes take effect." 89 Fed. Reg. 48762; *see id.* at 48762-66; *see also* IFR AR 2,460, 2,554-60, 11,910, 12,647-50, 14,183-208, 14,480, 14,543-77, 16,755. DHS's determination that a notice and comment period in this case would catalyze such a rush is consonant with DHS's history of invoking the good cause exception when a failure to do so would undermine the purposes of its actions. 89 Fed. Reg. 48766 (describing DHS's invocation of the public interest prong in its Circumvention of Lawful Pathways rule, its implementation of the parole process for Venezuelans, and its promulgation of a 2017 rule affecting Cuban nationals).

Additionally, Plaintiffs' argument for why a notice and comment period for the IFR would not contribute to an influx of migration is internally inconsistent. Plaintiffs argue that there is no evidence to suggest that "people outside the United States understand the nuanced differences" that the IFR creates in the immigration system or would be motivated by such distinctions. Dkt. 48 at 35. This claim is belied by Plaintiffs' own reliance on the nuanced incentive differences between the immigration landscape before the end of Title 42 and before the issuance of this IFR to conclude that, this time, there will be no rush to the border. Dkt. 48 at 36.

In contrast, DHS's determination that a notice and comment period would be improper is driven by the realities of the immigration crisis. Migrants respond to incentives, as do all people.

7

89 Fed. Reg. 48764. When an announced change in immigration policy will operate to—or will even seem to operate to—impose any restrictions on migrant entry or asylum claims, "common sense dictates that the announcement of a proposed rule may . . . encourage those affected by it to act before it is finalized." *Capital Area Immigrants' Rights Coal. ("CAIR") v. Trump*, 471 F. Supp. 3d 25, 46 (D.D.C. 2020). This effect is amplified by the incentive for human smuggling organizations to leverage their multi-billion-dollar business model to increase demand for their illicit services, either by more or less truthful representations of U.S. policy. 89 Fed. Reg. 48730, 48761; Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border*, BBC (July 8, 2023), https://www.bbc.com/news/world-us-canada-65848683. In light of these factors, DHS has made a well-reasoned and historically consistent determination that a notice and comment period would create exactly the kind of spike in migration levels and fear claims that the IFR is designed to address.

## CONCLUSION

For each of the reasons articulated above, Texas respectfully requests that this Court deny Plaintiffs' motion for summary judgment and grant instead Defendants' motion for summary judgment and Texas's motion for summary judgment if Texas's intervention is granted.

Date: September 10, 2024.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

Respectfully submitted.

*/s/Kathleen T. Hunker*
**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415
Kathleen.Hunker@oag.texas.gov

**GARRETT GREENE**
Special Counsel
State Bar No. 24096217
Garrett.Greene@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR PROPOSED DEFENDANT-INTERVENOR STATE OF TEXAS**

9

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 10, 2024 and that all counsel of record were served by CM/ECF.

*/s/ Kathleen T. Hunker*
Kathleen T. Hunker