BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Senior Counsel*

BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
*Senior Litigation Counsel*

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ )<br><br>Las Americas Immigrant Advocacy )<br>Center, *et al.*, )<br> )<br> Plaintiffs, )<br> )<br>v. )<br> )<br>U.S. Department of Homeland Security, )<br>*et al.*, )<br> )<br> Defendants. )<br>_____ ) | Civil Action No. 1:24-cv-01702 |

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

   I.   Threshhold Barriers Preclude Plaintiffs' Claims ...................................................1

   II.   The Rule and Guidance Are Consistent with the INA.........................................4

   III.  The Rule Satisfies the APA's Procedural Requirements......................................8

   IV.  The Rule and Guidance Are Not Arbitrary and Capricious...............................12

   V.   Any Relief Must Be Sharply Limited ................................................................18

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am. v. United States Dep't of Agric.*,
   317 F. Supp. 3d 385 (D.D.C. 2018) ................................................................. 25

*Allied-Signal v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ......................................................................... 25

*Am. Immigr. Laws. Ass'n v. Reno*,
   199 F.3d 1352 (D.C. Cir. 2000) ......................................................................... 2

*Capital Area Immigrants' Rights Coal. v. Trump*,
   471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................... passim

*City of New York v. Permanent Mission of India to United Nations*,
   618 F.3d 172 (2d Cir. 2010) ............................................................................... 9

*DaimlerChrysler v. Cuno*,
   547 U.S. 332 (2006) ........................................................................................... 8

*Dep't of Comm. v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................... 18, 19

*East Bay Sanctuary Covenant v. Garland*,
   994 F.3d 962 (9th Cir. 2020) ............................................................................. 2

*East Bay Sanctuary Covenant v. Biden*,
   2023 WL 11662094 (9th Cir. Aug. 3, 2023) ..................................................... 5

*FDA v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024) ........................................................................................... 1

*Guedes v. ATF*,
   356 F. Supp. 3d 109 (D.D.C.) ............................................................................ 8

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ........................................................................................... 1

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) ......................................................................................... 22

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ............................................................................................. 23

*Humana v. Califano*,
  590 F.2d 1070 (D.C. Cir. 1978) ................................................................................... 9

*I.M. v. CBP*,
  67 F.4th 436 (D.C. Cir. 2023) ..................................................................................... 19

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) ..................................................................................... 25

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ....................................................................................................... 2

*Las Americas*,
  507 F. Supp. 3d ..................................................................................................... 17, 23

*M.M.V. v. Garland*,
  1 F.4th 1100 (D.C. Cir. 2021) ..................................................................................... 24

*Make the Road v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .............................................................................. 2, 3, 24

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ....................................................................................... 1

*Nebraska Dep't of Health & Human Servs. v. HHS*,
  435 F.3d 326 (D.C. Cir. 2006) ..................................................................................... 25

*Norton v. Southwestern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ................................................................................................. 19, 20

*Raoof v. Sullivan*,
  315 F. Supp. 3d 34 (D.D.C. 2018) ......................................................................... 10, 11

*Sale v. Haitian Centers Council, Inc.*,
  509 U.S. 155 (1993) ..................................................................................................... 15

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) ................................................................................................. 22

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) ....................................................................................................... 3

*U.S. Dept. of State v. Ray*,
  502 U.S. 164 (1991) ................................................................................................. 15, 16

*United States v. Texas*,
  599 U.S. 670 (2023).................................................................................................... 2, 22, 23

## Statutes

5 U.S.C. § 553.................................................................................................................. 9

5 U.S.C. § 553(a)(1).................................................................................................... 8, 9

5 U.S.C. § 703.................................................................................................................. 22

5 U.S.C. § 706.................................................................................................................. 22

5 U.S.C. § 706(1)............................................................................................................ 19

8 U.S.C. § 1182(d)(5)(A)............................................................................................ 20

8 U.S.C. § 1252(e)(1)(B)........................................................................................ 4, 24

8 U.S.C. § 1252(e)(3)(A)............................................................................................ 24

8 U.S.C. § 1231(a)(5).................................................................................................... 19

## Regulations

8 C.F.R. § 208.30(e)(2).................................................................................................. 6

8 C.F.R. § 208.35(b)(1)............................................................................................ 6, 7

## INTRODUCTION

For the reasons set out in Defendants' motion and in this reply, the Court should grant summary judgment to the government.

## ARGUMENT

## I.     Threshold Barriers Preclude Plaintiffs' Claims.

<u>The organizational Plaintiffs lack standing.</u> The organizations argue they have standing because the Rule and guidance "perceptibly impair" their ability to provide counseling and other services to asylum seekers by making it more difficult for them to contact asylum seekers, increasing "the complexity of preparing clients," and requiring them to divert resources to continue to carry out their missions of representing asylum seekers and ensuring they have access to the asylum system. Pls' Resp., ECF No. 48 at 2-3. Plaintiffs maintain these arguments for organizational standing survive *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which they contend restricts standing only for "issue-advocacy organizations." Pls' Resp. at 4. *Alliance* held, however, that organizations generally cannot "demonstrate standing" by arguing a policy has "impaired" their "ability to provide services and achieve their organizational missions." *All. for Hippocratic Med.*, 602 U.S. at 394. The Supreme Court noted that the injury in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), was different because the defendant specifically gave the organization "false information" that "directly affected" its "core business activities," and that "*Havens* was an unusual case" that the Court "has been careful not to extend" beyond its specific "context." *Id*. at 395-96; *see also* Defs' Mot., ECF No. 45-1 at 15-17.

"The mere fact that an organization redirects some of its resources to … legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization," *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).

Plaintiffs' theory would also, as a practical matter, nullify the principle that a lawyer has no independent litigable interest in the legal rules applicable to the lawyer's clients. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130-34 (2004).

One organization also argues it might face "a potential loss of funding" if it serves fewer clients, Pls' Resp. at 4-5, but the declaration they cite does not say the Rule or guidance will cause numbers to fall below the thresholds they identify, nor do they cite any precedent in this circuit for this type of standing. Rather, they cite Ninth Circuit decisions that required "a substantial loss in organizational funding," *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 974 (9th Cir. 2020), something they have not identified here. Those decisions were also based on an expansive reading of *Havens* that cannot survive *Alliance* limiting *Havens* to its facts, or the Supreme Court's ruling in *United States v. Texas*, 599 U.S. 670 (2023), that allegations of indirect, downstream financial harm to third parties who are not directly regulated by the challenged immigration policy are insufficient to show standing. Defs' Mot. at 13-15. And without evidence of direct harm, the organizational Plaintiffs also lack standing to raise a notice-and-comment claim. *Id*. at 17.

<u>Section 1252 bars the organizations' claims.</u> Section 1252(e)(3) permits suits only by noncitizens subject to the expedited removal procedures. Defs' Mot. at 19-20; *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1359 (D.C. Cir. 2000). Plaintiffs argue the D.C. Circuit has held organizations can sue under § 1252(e)(3), but as they acknowledge, it did so based on associational standing, Pls' Resp. at 7, something Plaintiffs do not assert here. Plaintiffs argue that the D.C. Circuit's decision in *Make the Road v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020), permitting associational standing "is inconsistent with any reading of" § 1252(e)(3) as limited to suits by noncitizens. Pls' Resp. at 7. But that is not the best reading of *Make the Road*. The D.C. Circuit noted it had previously held "that litigation could be brought by affected individuals themselves,"

and explained that associational standing is permitted because, "[w]hether aggrieved individuals sue on their own or band together through a representative association does not change the nature of the lawsuit as seeking to remedy the individual members' injuries" from being placed in expedited removal, since associational standing "is derivative and reflective of individual standing." *Make the Road*, 962 F.3d at 628. The D.C. Circuit has consistently held that § 1252(e)(3) permits suits only by individuals subject to expedited removal procedures, whether individually or banded together in an association, not organizations alleging their own injuries.

The organizations are not within the zone of interests. Plaintiffs argue they are within the zone of interests of the INA because certain INA provisions mention pro bono attorneys and organizations. Pls' Resp. at 8. But a plaintiff must fall "within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011). The organizations cannot rely on portions of the INA not at issue in this case, and nothing in § 1158 or § 1225 mentions organizations. Defs' Mot. at 20-21. Plaintiffs do not meaningfully grapple with Supreme Court and D.C. Circuit cases holding that immigrant advocacy organizations are outside the zone of interest of the immigration statutes, *id*. at 21-22, other than to argue other decisions do not describe the zone-of-interests test as especially demanding. But they do not respond to the Supreme Court's more recent ruling in *Texas* that third parties like Plaintiffs have no cognizable interest in how the Executive implements the immigration laws against others. *See* Defs' Mot. at 21-22.

The Court should dismiss individual Plaintiffs who do not have standing. Defendants noted that "Plaintiffs ma[d]e no standing argument at all" in their motion to explain how any individual Plaintiff has standing. Defs' Mot. at 18, 22-24. Defendants further argued that any Plaintiff who has not shown injury must be dismissed. *Id*. at 22-24. In response, Plaintiffs argue that "Defendants

recognize" that "all Individual Plaintiffs have been harmed by the Rule and Guidance." Pls' Resp. at 1-2. Plaintiffs are incorrect.

As Defendants noted, the individual Plaintiffs "advance claims against portions of the Rule and guidance to which they were not subjected, or by which they were not injured," and their claims should be dismissed as to portions of the Rule and guidance to which they … have not sufficiently alleged harm." Defs' Mot. at 22. Plaintiffs argue the Court should "not address Defendants' standing arguments as to particular plaintiffs" as long as "there is at least one plaintiff with standing to raise each claim against the Rule and Guidance." Pls' Resp. at 1. Plaintiffs are wrong that it would be sufficient to identify one Plaintiff with standing for each type of claim. This is not a class action—in fact class actions are explicitly forbidden in this context, *see* 8 U.S.C. § 1252(e)(1)(B)—so any Plaintiff who has not established harm must be dismissed. Moreover, Plaintiffs must demonstrate standing for each claim and form of relief sought. Defs' Mot. at 22-23. Plaintiffs seek party-specific relief related to the individual Plaintiffs' removal orders, and no broader relief is permitted. *See infra* at 20-25. The Court should thus dismiss each individual Plaintiff who has not shown actual harm sufficient to invoke the Court's jurisdiction to seek relief. Plaintiffs also do not respond to the argument that no Plaintiff has established redressability. Defs' Mot. at 24. Plaintiffs note in response to a different argument that Defendants' position "assumes they will not be subjected to the policies again," Pls' Resp. at 44 n.23, but it is Plaintiffs' burden to establish redressability and show how they will be subject to the Rule or guidance in the future.

## II.     The Rule and Guidance Are Consistent with the INA.

Plaintiffs' claims that the Rule and guidance are not statutorily authorized repackage the arguments in their Motion without meaningfully addressing the government's arguments.

<u>The Rule's asylum-eligibility limitation is authorized by the INA.</u> The text, history, and

structure of the INA all support the Rule's asylum-eligibility limitation, which operates differently than prior limitations courts have found inconsistent with the asylum statute. *See* Defs' Mot. at 24-28. Rather than address these arguments, Plaintiffs simply restate their assertion that the eligibility limitation conflicts with § 1158(a)(1), which permits a noncitizen to apply for asylum "whether or not" they arrived "at a designated port of arrival." As the government noted, however, the Rule does not limit who may *apply* for asylum, and does not even necessarily limit *eligibility* for asylum based on whether a noncitizen entered at a POE or between POEs. Defs' Mot. at 29-31.

Plaintiffs continue to rely on inapposite cases dealing with the categorical "entry" bar, *see* Pls' Resp. at 11, while relegating to a footnote a more recent case that supports the legality of the eligibility limitation in this Rule, *see id.* at 10 n.6. In *East Bay Sanctuary Covenant v. Biden*, the Ninth Circuit stayed the district court's vacatur of the Circumvention of Lawful Pathways (CLP) Rule pending appeal thus allowing that Rule to remain in effect. 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023). The eligibility limitation in that case shares many of the same characteristics as the one implemented by this Rule, *see* Pls' Resp. at 30, and the decision to stay the vacatur represents an assessment by the Ninth Circuit that the government is likely to succeed in its argument that the CLP Rule is statutorily authorized, *ibid.* Plaintiffs are of course correct that a decision on a stay represents only a "predictive analysis" that does not forever decide the merits of the case. Pls' Resp. at 10 n.6. But the fact that the Ninth Circuit has predicted that a rule similar to the one challenged here will be found lawful, and that it permitted the rule to remain in effect despite the district court's vacatur, is highly relevant.

Plaintiffs also continue to conflate distinct aspects of the asylum process. They repeat their argument that "the exceptional circumstances" exception to the eligibility limitation conflicts with the statute, insofar as the statute requires only that a noncitizen establish a "well-founded fear" of

persecution in order to qualify as a "refugee." Pls' Resp. at 12. As the government explained in its Motion, the question of "exceptional circumstances" relates only to whether the new limitation on asylum eligibility applies and does not affect the threshold question of whether a particular noncitizen is a refugee under the statutory definition of that term. Defs' Mot. at 31-32.

Plaintiffs are also incorrect to argue that the government's conception of discretion, in particular the permissibility of exercising the government's discretionary authority to establish *categorical* rules regarding asylum eligibility, renders certain statutory provisions superfluous. *See* Pls' Resp. at 14-15. Plaintiffs misunderstand the government's argument and seem to believe that the government is arguing that a categorical rule could be implemented outside the rulemaking process. To the contrary, the government's argument is that the statute itself (in Section 1158(b)(2)(C)) explicitly authorizes the Departments to issue categorical rules establishing limitations on eligibility. In short, the statute is what makes possible the government's categorical exercise of discretion in this case. The discretionary nature of the asylum decision simply provides further support for the categorical rule the government adopted under its statutory authority.

Finally, Plaintiffs dispute that the "significant possibility" standard is applied at the credible fear stage. Pls' Resp. at 16. Plaintiffs cite *nothing* in support of this proposition save for their unsupported interpretation of isolated regulatory provisions. As the government noted, the statute *requires* use of this standard and this standard necessarily applies even to the Rule's eligibility limitation. Defs' Mot. at 32. The Rule makes that clear, 89 Fed. Reg. at 48,739, as do the regulations implementing the credible-fear process, 8 C.F.R. § 208.30(e)(2). Plaintiffs point to 8 C.F.R. § 208.35(b)(1), requiring the asylum officer to determine the applicability of the eligibility limitation, which applies "notwithstanding any contrary section of this part," and does not mention the "significant possibility" standard. But Plaintiffs' argument depends on that standard being

*contrary* to the language of Section 208.35(b)(1), and it is clearly not. Rather, Section 208.30(e)(2) supplies the standard that controls consideration of the issue that Section 208.35(b)(1) presents. There is thus no real question that the significant possibility standard continues to apply at the credible fear stage, even in cases implicating the Rule's eligibility limitation.

      <u>The changes to the expedited-removal process are consistent with the INA.</u> Plaintiffs' arguments against the changes to the expedited-removal process fare no better. Pls' Resp. at 19-20, 27-29. Plaintiffs renew their argument that the manifestation standard is contrary to international law, *id.* at 19-20, but no binding international law requires that an intending refugee be explicitly questioned about their fear of persecution or torture or their intent to seek relevant protection. Such a requirement finds no support in the Refugee Protocol, the UNHCR Handbook, or the United States' statutory implementation of those international obligations. *See* Defs' Mot. at 34-35; *see also* 89 Fed. Reg. at 48,740-41. Plaintiffs continue to rely on UNHCR's *interpretation* of international law, *see* Pls' Resp. at 20, but that interpretation is not binding on the United States. As the Departments made explicit in the rulemaking, the government does *not* read any binding treaty as foreclosing implementation of the manifestation standard, 89 Fed. Reg. at 48,740-41, and Plaintiffs certainly fail to point to any such prohibition in their response.

      Plaintiffs additionally argue that the four-hour minimum consultation period is contrary to law because it effectively "negates" the right to consult. Pls' Resp. at 27-29. Absent from Plaintiffs' argument, however, is any reference to the statutory provisions governing the consultation period. *See generally id.* As the government has explained, the statute does not impose any minimum period for consultation and instead affirmatively directs only that whatever consultation *is* granted must not "unreasonably delay the process." Defs' Mot. at 36-38 (quoting 8 U.S.C. § 1225(b)(1)(B)(iv)). Plaintiffs' argument is essentially that the government erred by

adopting the minimum period it did, because that period is allegedly too compressed, *see* Pls'
Resp. at 27-29, but that contention does not relate to the government's *statutory authority* to adopt
that period. To the extent Plaintiffs argue that the government's authority is cabined by the
opportunity "to consult with a person or persons of the alien's choosing," *id.* at 27 (quoting 8
U.S.C. § 1225(b)(1)(B)(iv)), the guidance provides that "opportunity" through access to a phone,
the chance to make multiple phone calls if needed, counting only certain hours towards the four-
hour minimum, and permitting extensions of that minimum time period in appropriate
circumstances. *See* Consultation AR 2-4. The four-hour minimum period is less than what
Plaintiffs would want, but it does provide an "opportunity" for consultation, without "unreasonably
delay[ing] the process," which are the only explicit requirements under the statute.

### III.    The Rule Satisfies the APA's Procedural Requirements.

The Departments were permitted to issue an Interim Final Rule that took effect before the
conclusion of the comment period under both the foreign affairs and good cause exceptions.
*See* Defs' Mot. at 40-44. Plaintiffs' contrary arguments, Pls' Resp. at 31-36, lack merit.[1]

Foreign affairs exception. The foreign affairs exception applies because the Rule directly
involves foreign affairs functions. *See* 5 U.S.C. § 553(a)(1); Defs' Mot. at 40-42. As the
Departments explained in invoking the exception, "the United States has been working closely
with its foreign partners to manage the unprecedented levels of migration that countries throughout
the region have recently been experiencing" and the Rule is a part of the "intensive and concerted

---

[1] Only the organizations could raise a notice-and-comment claim, but they lack standing and
cannot bring claims under § 1252(e)(3). Plaintiffs dispute this, Pls' Resp. at 31 n.14, but no
individual Plaintiff alleged harm to support this claim, and they do not assert that any individual
Plaintiff submitted comments on the Rule. Plaintiffs cannot show harm to support this claim if
they did not submit comments when given the chance. *See, e.g.*, *Guedes v. ATF*, 356 F. Supp. 3d
109, 136 (D.D.C.), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019); *see also DaimlerChrysler v. Cuno*, 547 U.S.
332, 352 (2006) (plaintiffs must independently "demonstrate standing for each claim").

diplomatic outreach on migration issues" with these regional partners. 89 Fed. Reg. at 48,759. The Departments assessed not only that the Rule is "critical" to demonstrate to diplomatic partners that the United States is willing and able to put in place appropriate measures to carry out its part in this shared effort but also that the surge in arrivals that would occur if the Rule was announced before it took effect would have negative consequences for countries who have "repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries." *Id*. at 48,761; *see also id*. at 48,762 (noting both foreign partners and the United States are taking actions such as this Rule to address our "shared interest in reducing migration" and that are "directly responsive to the shared challenge the United States and its regional partners are confronting"); Defs' Mot. at 40-41. It is "unsurprising" that "Congress would categorically exclude" from the APA's notice-and-comment requirements rules "in the diplomatic context" where "agency action may be grounded in international reciprocity." *Capital Area Immigrants' Rights Coal. v. Trump* (*CAIR*), 471 F. Supp. 3d 25, 55 (D.D.C. 2020); *see also City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 178, 201-202 (2d Cir. 2010) (agency action "easily falls within the foreign affairs exception" where agency asserted "action is necessary to facilitate relations between the United States and foreign states").

Plaintiffs argue that applying the exception whenever a rule "implicates our relations with foreign powers" is too "sweeping a test," Pls' Resp. at 33, but the statute says the exception applies whenever "there is involved" a "foreign affairs function." 5 U.S.C. § 553(a)(1). It is true that in addressing another exception in 5 U.S.C. § 553 the D.C. Circuit held that the enumerated excepted categories must be clearly and directly involved, but the court was also clear that "a broad domain is preserved for" the exceptions' "operation," and that the exceptions are not to be applied "strictly" but rather have "permissive effect." *Humana v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978).

Plaintiffs also argue "there is no record evidence suggesting that the Rule was the subject of explicit international agreement." *Id*. at 32-33. But Plaintiffs cannot point to anything in the statute or cases limiting the exception only to that circumstance. *See, e.g.*, *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) (applying exception in the absence of any agreement to rule related to the "exchange visitor visa program"). Finally, Plaintiffs again argue the Rule's relation to foreign affairs is no different than the "indirect" downstream effects asserted in *CAIR*. Pls' Resp. at 33-34. But as noted, the Rule here is more directly linked to diplomatic relations that depend on shared efforts to address irregular migration and that would be undermined by a surge in migration if implementation had been delayed until after the comment period ended. Defs' Mot. at 40-41.

Good cause exception. The good cause exception applies because the Departments determined that announcing the Rule before it took effect would encourage a surge to the border that could have worsened the harm the Rule was designed to address. Defs' Mot. at 42-44. Plaintiffs do not dispute that the exception applies where the "announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare," Pls' Resp. at 34; rather, they argue border encounters were decreasing prior to the Rule and dispute that a surge was likely, *id*. at 35. This is incorrect. The Departments explained that, despite other efforts to address irregular migration, they "continue[d] to contend with exceptionally high levels of irregular migration." 89 Fed. Reg. at 48,762. They also explained that without the "changes promulgated in this rule," DHS's "internal projections suggest[ed] that total encounters" were likely to increase "from July to September," to levels that would "further exacerbate" the problem. *Id*. at 48,763. The Departments noted that "the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking." *Id*.

10

Plaintiffs argue the predicted "increase in irregular migration is contrary to the record," Pls' Resp. at 35, but the Departments cited evidence in the record of "current trends in migration" indicating "a significant increase in encounters may be imminent." 89 Fed. Reg. at 48,763; IFR AR 12610-27, 14434-42, 15093-08, 16108-11. This evidence undermines Plaintiffs' argument that the "record shows that neither Congress's consideration of legislation that would have enacted similar limitations as the Rule, nor the Executive's widely-reported plans to issue the Rule in early 2024, led to increased migration." Pls' Resp. at 35. As the Departments noted, "[b]etween January and April 2024," irregular entries "through the Darién jungle between Colombia and Panama" had significantly increased compared to the same time period the prior two years and the Departments believed "that most of those migrants [we]re on their way to seek entry into the United States … giving the Departments insufficient time to seek public comment and delay the effective date of this rule without immediate and substantial harm to U.S. interests." 89 Fed. Reg. at 48,763.

Plaintiffs maintain that the record contains no evidence that people outside the United States understand the Rule's changes or would react to it during a comment period. Pls' Resp. at 35. But the Departments properly based their conclusions on evidence that an increase in encounter levels was imminent and evidence of surges in response to other changes in immigration policy. Plaintiffs argue the evidence related to the end of Title 42 is distinguishable because Title 42 involved immediate expulsions with no removal order that "incentivized people to try to re-enter." Pls' Resp. at 36. They do not explain why the Rule's changes limiting asylum eligibility and reducing the likelihood of being released into the United States would not similarly incentivize a surge in entries before those changes took effect, or why a limitation on asylum eligibility would be more difficult for noncitizens to understand. Plaintiffs also try to distinguish the effects of the Migrant Protection Protocols as "short-lived," *id*., but the Departments explained that the harms

11

during a comment period would be "immediate and substantial" even if limited to "the months needed to complete a very rapid notice-and-comment rulemaking," *i.e.*, even if the surge here was similarly short-lived, 89 Fed. Reg. at 48,763; *see* Murray Decl. ¶¶ 30-32 (setting out evidence of anticipated near-term surge that would be compounded by a gap in application of the Rule).[2]

The good cause exception allows the Departments to make predictive judgments about the effects of announcing a rule that warrant some deference especially when supported by the available evidence. *See* Defs' Mot. at 43-44; *CAIR*, 471 F.Supp.3d at 51, 57 (noting "circumstances in which the law appropriately commands … courts defer to the Executive Branch's" prospective judgments, and that "negative international effects could well satisfy the good cause exception" when supported by "sworn declarations"). The Departments' predictive judgments were solidly grounded in the evidence, their invocation of the exception was proper.

## IV.    The Rule and Guidance Are Not Arbitrary and Capricious.

Plaintiffs' arguments that the Rule is arbitrary and capricious should be rejected.

<u>The limitation on asylum eligibility is not arbitrary or capricious.</u> Plaintiffs argue that the asylum eligibility limitation is arbitrary and capricious because the Departments failed to consider the risk of harm to various populations and because use of the CBP One app involves practical barriers to large numbers of intending refugees. Pls' Resp. at 16-19. These arguments lack merit.

Plaintiffs first contend that the government failed to adequately consider the risks of harm to noncitizens who must potentially wait in Mexico for a CBP One app appointment. Pls' Resp. at 16-17. That harm was extensively considered in the context of the CLP Rule, and that assessment was included in the current Rule by reference. *See* 89 Fed. Reg. at 48,732-33. Plaintiffs' contention

---

[2] The Departments' conclusion that noncitizens were likely to respond to the changes in the Rule is further confirmed by the large drop in encounters after the Rule took effect.

is less that the Departments did not give adequate consideration to the question but rather that they reached a determination with which Plaintiffs disagree. The Departments were not, however, required in these circumstances to address all possible risks, and it was reasonable, especially in light of the purposes of this Rule, to limit exceptions to those contained in the Rule, including "imminent and extreme threat to life or safety" and "imminent threat of rape, kidnapping, torture, or murder." *Id.* at 48,718. Nor did the government "ignore" evidence regarding harm to vulnerable groups. *See* Pls. Resp. at 17. Instead, the government noted that the same reasons that justified limiting exceptions generally applied equally to the narrower groups Plaintiffs raised. *See* Def's Mot. at 49 n.8. Given the prior consideration given to these specific groups, *see* 88 Fed. Reg. at 31,350-51, 31,392-93, the government sufficiently considered their circumstances in implementing the current Rule.

Plaintiffs' argument that the Rule gives inadequate consideration to the risks of Mexican nationals is similarly unsupported. Pls' Resp. at 17-18. The Rule recognized that some Mexican nationals may be "unable to wait in Mexico while scheduling an appointment" but concluded that categorically exempting them from operation of the Rule would undermine its purposes. *See* 89 Fed. Reg. at 48,738-39. Rather, as with other noncitizens, Mexican nationals who fail to pre-schedule an appointment at a POE must establish an exception to the Proclamation or "exceptionally compelling circumstances" in order to retain eligibility for asylum. *See id.* And, of course, Mexican nationals remain eligible for both statutory withholding of removal and protection under CAT even if they cannot establish a relevant exception. *Id.* Again, Plaintiffs' argument is less that the Departments did not consider relevant evidence in developing this Rule than that Plaintiffs would have come to different conclusions based on that evidence.

Finally, Plaintiffs' concerns about the CBP One app have been fully considered by the

Departments. The Departments noted that, in the CLP Rule, they had adopted an exception to use of the CBP One app where "it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 89 Fed. Reg. at 48,732 n.171. Acknowledging these concerns, the Departments nonetheless concluded that a similar exception should *not* be included in this Rule, given the "emergency border circumstances" that Rule was meant to address. *Id.* Plaintiffs also contend that the appointments offered through the app are "'significantly' fewer than are needed under a Rule that is not triggered until border encounters exceed a weekly average of 2,500 per day." Pls' Resp. at 18-19. But there is nothing irrational about limiting the numbers of appointments to a level that DHS can manage during emergency border circumstances. The fact that more noncitizens wish to enter than there are appointments available is not a basis to find the Rule arbitrary and capricious.

The changes to credible-fear processes are not arbitrary or capricious. Plaintiffs additionally challenge the manifestation standard, the reasonable probability standard, and the four-hour minimum consultation period as arbitrary and capricious. Pls' Resp. at 20-24, 24-26, 29-30. These changes were all reasonably explained and supported by relevant considerations.

The manifestation standard. Plaintiffs' main argument against the manifestation standard remains the purported "implausibility" that immigration officers will be able to adequately assess the need for protection in the absence of explicit advisals. *See* Pls' Resp. at 22-23. As the Rule notes, however, immigration officers have extensive practical experience in inspecting and processing noncitizens and will receive guidance on application of the manifestation standard. 89 Fed. Reg. at 48,743-45. Given this operational background and guidance, there is nothing implausible about trained immigration officers being able to assess a variety of factors to ascertain whether a particular noncitizen is manifesting fear. Likewise, Plaintiffs' concerns that those most

in need of relief or protection are unlikely to request it relies on the false assumption that an *affirmative* indication of fear or intent to seek asylum is required. As the government responded already, officers applying the manifestation standard consider a range of non-verbal cues that allow them to utilize their best judgment in assessing a noncitizen's potential fear. Defs' Mot. at 51-52.[3] Finally, Plaintiffs rely on the low number of individuals screened in for asylum eligibility under prior implementations of the manifestation standard. Pls' Resp. at 23-24. The government recognized the potential that some individuals with meritorious claims may not be screened in under the manifestation standard but balanced that possibility against the need to expeditiously resolve cases during periods of heightened border encounters. 89 Fed. Reg. at 48,743-44. Even if the prior programs were not entirely accurate in screening in every noncitizen who could have qualified for relief, Pls' Resp. at 23; *but see Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 160-62 (1993) (noting screening-out of economic migrants); *U.S. Dept. of State v. Ray*, 502 U.S. 164, 166-67 (1991) (prior to 1981, only "[a] small number of [undocumented Haitians] were eligible for asylum as political refugees"), they provide support for using the manifestation standard during extraordinary periods where immigration resources are severely taxed.

The reasonable probability standard. Plaintiffs argue that the Departments failed to adequately explain the "reasonable probability" standard in light of past statements that a heightened screening standard "would not increase efficiency and [ ] would be unfair to applicants." Pls' Resp. at 24. Plaintiffs ignore developments post-dating those statements. In the

---

[3] As the government explained, DHS has also adopted measures to ensure noncitizens are informed of their rights regarding seeking protection, such as posting signs in areas where noncitizens are processed, including ports of entry. The government has recently learned that those signs were erroneously not posted in two ports of entry; in response, CBP disseminated guidance to all ports on the southern border stating that the signs must be posted throughout areas where it is reasonable to conclude noncitizens may see them. This fact has no bearing on the lawfulness of the Rule, and no Plaintiff has alleged that he was processed in a facility without the signs.

CLP Rule, for instance, the Departments implemented the "reasonable possibility" standard to screen statutory withholding of removal and CAT protection claims. Defs' Mot. at 54. The government's experience with that standard undercut the rationale the Departments had previously relied on in earlier rejecting a heightened standard. As the Rule recognized, the reasonable possibility standard "has allowed the Departments to screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage." 89 Fed. Reg. at 48,746. The shift to the current "reasonable probability" standard was also fully explained; the rate at which noncitizens ultimately obtained relief remained significantly lower than the screen-in rate under the more permissive screening standard. *Id.* In light of that continuing disconnect, the Departments determined that an even higher screening standard was warranted, at least during emergency border circumstances. *Id.* The chain of reasoning in this history is clear: the government was previously skeptical of a heightened standard, but later successfully used a heightened standard under the CLP Rule and determined that a higher standard would both function well and address the exigencies of the current emergency border circumstances. Defs' Mot. at 54.

Plaintiffs repeat their argument "that asylum seekers often are unable or unlikely to discuss" details of their claims with the "requisite specificity at the credible fear stage" to meet the reasonable probability standard, Pls' Resp. at 25-26, but this argument relies on misconstruing how the standard operates. Details at the level required to *prove* a claim to asylum are not required, as the "reasonable probability" standard remains only a screening standard. Asylum officers will have both the training and experience necessary to elicit relevant information, as well as assess when the requisite level of specificity has been met, even where a noncitizen expresses only generalized fear of harm and in the absence of specific details relating to past violence, trauma, or other serious harm. *See* 89 Fed. Reg. at 48,747-48; *see also* Defs' Mot. at 55.

The four-hour minimum consultation period. Plaintiffs assert that the government should have provided more reasoning for the four-hour consultation period, but Plaintiffs largely disregard the actual rationale and structure the guidance adopts. The government recognized in the guidance the need to provide a framework that would maximize a noncitizen's ability to consult within the constraints caused by the emergency border circumstances the guidance is meant to address. Given those circumstances, the government affirmatively sought to balance access issues with efficiency issues and did so by mandating that the minimum consultation period begins only once a noncitizen gains access to a phone during approximately normal business hours, permitting multiple phone calls during that consultation period, and allowing for bifurcation of that period in circumstances where a noncitizen may run out of time on the initial day of consultation. Consultation AR 2-3. The record establishes that the relevant evidence and all aspects of the problem were considered, a rationale for the change was provided, and that rationale was connected to the relevant facts.

Plaintiffs also misunderstand the reference to *Las Americas Immigrant Advocacy Center*. Pls' Resp. at 29 n.13, 29-30. Noncitizens do not consult during the entire time frame of *any* consultation period; that period is simply a window of time within which to consult. As *Las Americas* noted, the guidance in that case provided for a one-hour initial consultation with the possibility of 30-minute follow-ups as needed. *See Las Americas*, 507 F. Supp. 3d at 30. Those periods of consultation were sufficient to prepare noncitizens for their interview and have the requisite "in-depth" conversation, and the four-hour minimum consultation period comfortably fits both time for an initial consultation and, if needed, a follow-up, along the lines that the government has previously provided. This prior experience is "an adequate basis for [the government's] assumption that four hours [will] be sufficient to have 'in depth' consultations." Pls' Resp. at 30.

Plaintiffs further contend that the record fails to support the "counterintuitive claim that

reducing the minimum consultation time from 24 hours to 4 hours will make no practical difference." Pls' Resp. at 30. Plaintiffs fail to cite where the government allegedly made that claim. Shortening the minimum consultation period will have the practical effect of moving the credible-fear process along at a quicker rate, allowing more efficient processing of noncitizens while yielding quicker decisions on the relief question, points the government noted in promulgating the guidance. *See* Consultation AR 2-4. At the same time, the government believes the four-hour minimum period adequately safeguards noncitizens' ability to consult with an individual of their choosing and does not foreclose longer periods of consultation for some noncitizens.

Finally, Plaintiffs contend that the shortened consultation period will affect not only noncitizens with meritless claims, but all noncitizens. Pls' Resp. at 30. It is of course true that the change in consultation period will affect those with meritorious and non-meritorious claims alike, but, as noted above, the government believes that the time provided allows for adequate consultation. *Cf.* Consultation AR 3 (noting that the consultation period does not "guarantee" actual consultation). Even so, the government understands the possibility that noncitizens with valid claims to relief may be screened out during the credible fear process, and that the changes made by the Rule may even increase the likelihood of that happening in edge cases. Given the emergency border circumstances at which this constellation of policies is aimed, that risk must be balanced against the need to maintain a fully operational border processing and enforcement apparatus during periods of heightened encounters. The government has made that balancing explicit throughout the challenged policies, and its weighing of the risks and benefits is not arbitrary or capricious. *See Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2571 (2019).

## V.    Any Relief Must Be Sharply Limited

Plaintiffs ask the Court to: (1) vacate the individual Plaintiffs' removal orders; (2) enjoin

the government to return the Plaintiffs to the United States, *id.*; and (3) universally vacate the Rule. Pls' Resp. at 36, 44. For purposes of this motion and in the circumstances of this § 1252(e)(3) challenge, the government does not dispute that if an individual Plaintiff could show he was injured by the Rule or guidance and succeeded on a challenge to the Rule or guidance, vacatur of his individual removal order may be a proper remedy. But that relief, which would redress the injuries that individual Plaintiff alleges, is the only relief sought that this Court may permissibly order.[4] Plaintiffs' additional request for an injunction requiring the government to return them to the United States fails because they do not identify any source of authority supporting that extraordinary affirmative injunctive remedy. And Plaintiffs' request for universal vacatur of the Rule fails because they do not have standing to request that relief and because numerous equitable principles and features of the INA's expedited-removal review scheme preclude it.

As an initial matter, the individual Plaintiffs do not identify any basis for an affirmative injunction requiring the government to "return" them or to parole them into the United States. Although plaintiffs argue, Pls' Resp. at 45, that INA provisions excluding parole decisions from judicial review do not by their terms bar these remedies, Plaintiffs miss the point. It is their burden to identify an affirmative source of authority permitting this Court to order their requested relief, and they do not even attempt to identify a single statute providing that authority. In order to compel an agency to take a specific action—whether under the APA, 5 U.S.C. § 706(1), or under traditional equitable principles—a court must first conclude that "an agency failed to take a discrete agency action that it is required to take." *Norton v. Southwestern Utah Wilderness Alliance*, 542

---

[4] Vacatur of an expedited removal order provides a remedy because a noncitizen who subsequently enters unlawfully could not be processed for reinstatement of removal, criminally prosecuted for illegal reentry, or found inadmissible for being previously removed based on the vacated order. 8 U.S.C. §§ 1231(a)(5), 1326, 1182(a)(9)(A). This limited relief is consistent with the strict limits on relief for habeas petitioners in § 1252(e)(4). *See I.M. v. CBP*, 67 F.4th 436 (D.C. Cir. 2023).

U.S. 55, 64 (2004). Under traditional mandamus principles that have been carried forward into the APA, such an affirmative injunction remedy is "normally limited to enforcement of a specific, unequivocal command"—that is, "the ordering of a precise, definite act about which an official has no discretion whatever." *Id.* at 53 (quotation and alterations omitted).

Plaintiffs do not identify any statute that creates a specific, unequivocal duty requiring the government to take affirmative steps to return individuals—even those removed pursuant to a process later held unlawful—or to parole anyone into the country. To the contrary, parole determinations are expressly committed to the Secretary's discretion. *See* 8 U.S.C. § 1182(d)(5)(A). Congress's decision to insulate those discretionary determinations from judicial review underscores Congress's intent to ensure the Secretary retains complete authority over whether to grant parole and the need to prevent "undue judicial interference with [the Secretary's] lawful discretion." *Norton*, 542 U.S. at 66. Nor do Plaintiffs identify any specific remedial statute permitting the affirmative injunction they seek even in the absence of a specific duty that could support the requested relief under the APA or traditional equitable practice.

In addition, Plaintiffs' request for a universal vacatur is precluded by constitutional and equitable principles, as well as numerous features of the INA's judicial-review scheme. As an initial matter, the individual Plaintiffs have not established standing to seek prospective relief. No Plaintiff has established any non-speculative possibility that he will be injured in the future by the Rule and guidance—a possibility that would require returning to the United States, entering in violation of the Proclamation (rather than, for example, scheduling an appointment on the CBP One app, or being paroled), being placed in expedited removal proceedings, and having the Rule applied in the same way. No Plaintiff even attempts to demonstrate any one of those causal links— much less all of them together. As a result, no individual Plaintiff has shown that he would benefit

from prospective relief, and thus no Plaintiff has standing to seek that relief.

Even if some Plaintiff had standing to seek prospective relief against a particular feature of the Rule or guidance, this Court could not properly enter a universal vacatur. Section 1252(f) precludes universal vacatur in this context because it strips courts, other than the Supreme Court, of jurisdiction to enjoin or restrain the Departments' implementation of certain statutory provisions, including § 1225(b). Defs' Mot. at 57-58. Plaintiffs argue "nothing" in § 1252(f) "refers to vacatur." Pls' Resp. at 38. However, the Supreme Court has long taken a functional approach and read the term "injunction" broadly to apply to orders not cast in injunctive language but that nonetheless have coercive effect, and § 1252(f)(1) extends not just to injunctions but also to any relief that would "restrain the operation" of the covered statutes. Defs' Mot. at 57-59. Plaintiffs argue vacatur is not "intrusive" and would not require the agency "to perform certain acts." Pls' Resp. at 38-39. But vacating the Rule and guidance *would* intrude on agency operations and require them to take certain acts here, namely reverting to pre-Rule expedited removal practices and extending the consultation period. Plaintiffs argue their reading of § 1252 as permitting vacatur "is confirmed … by the legislative history," which refers to injunctions. Pls' Resp. at 39. But the legislative history they cite says explicitly that the limitations on injunctive relief in § 1252(f) ensure "the procedures will remain in force while [ ] lawsuits are pending." H.R. Rep. No. 104-469, pt. 1, at 161 (1996). Here, allowing the procedures to remain in force pending litigation and any appeal means not vacating them.

Moreover, well-settled constitutional and equitable principles require the Court to limit relief to only what is necessary to remedy a Plaintiff's specific proven harms. Defs' Mot. at 57. And no individual Plaintiff can plausibly argue that universal, rather than plaintiff-specific, relief is necessary to redress his alleged injuries. Plaintiffs cite cases describing vacatur as the "normal"

remedy in the context of APA challenges to agency action. Pls' Resp. at 37-38.[5] But even assuming the APA authorizes vacatur of agency action, Plaintiffs do not persuasively explain why equitable principles support universal vacatur here. Text and precedent both make clear that the decision whether to enter vacatur—and the scope of any such relief—is constrained by equitable principles.

The APA is not properly read to require vacatur—much less universal vacatur—of agency action, notwithstanding traditional equitable principles generally restricting relief beyond the parties. Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The Supreme Court has recently reinforced this principle. "When Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). The Court explained that even seemingly mandatory statutory language— such as a directive "that an injunction 'shall be granted' if" certain conditions are met—will not "supplant the traditional equitable principles" governing relief; "such an abrupt departure from traditional equity practice" requiring relief no matter the equities requires "plain[er]" language than that. *Id.* at 1577 (quotation omitted); *see also Hecht Co.*, 321 U.S. at 329.

The APA itself provides for traditional forms of equitable actions and relief, 5 U.S.C. § 703, but explicitly preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702(1). In light of the traditional equitable principles against which it was enacted—

---

[5] Defendants acknowledge those decisions but preserve the argument that vacatur is inconsistent with the text of the APA, which authorizes courts to "set aside agency action," but nowhere mentions vacatur. 5 U.S.C. § 706; *see* Defs' Mot. at 60-61. "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff." *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring in judgment); *id*. at 695-99 (noting § 706 "does not say anything about 'vacating' agency action" and detailing "serious" arguments as to whether the APA "empowers courts to vacate agency action").

and which are explicitly incorporated into the APA—there is no basis to conclude that Congress authorized let alone compelled courts to abandon "the bedrock practice of case-by-case judgments with respect to the parties in each case" by adopting the unremarkable "set aside" language in § 706. *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring). Here, equitable principles, reinforced by the statutory scheme, make clear that universal vacatur is unwarranted. Such relief extends far beyond the relief necessary to redress the individual Plaintiffs' injuries and is thus unsupported by equity. In addition, the public interest strongly favors continued implementation of the Rule, which has dramatically reduced unlawful border crossings. Plaintiffs dispute the effectiveness of the Rule and the consequences of vacatur, but they acknowledge "the fact that crossings between ports have decreased since the current Rule took effect." Pls' Resp. at 42. Plaintiffs argue this decrease began before the Rule took effect and cannot be traced to the Rule, *id.*, but they do not dispute that there has been a significant decrease following the Rule, and they disregard evidence the Departments put forth of a likely significant increase that was predicted to take effect absent the Rule in the months after it took effect. *See supra* at 12-13; Defs' Mot. at 63-64. The Departments predicted the harms from even a short gap in application of the Rule would be immediate and substantial. *See* 89 Fed. Reg. at 48,763; Murray Decl. ¶¶ 3, 28-33, 42, 52, 59-67. Courts are ill-equipped to second guess the Executive's predictive judgments in this context even in the absence of "concrete evidence." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010).

The statutory scheme reinforces these principles. The INA and Section 1252(e) make clear that the judicial review must be narrowly focused on individual noncitizens. For example, the titles of § 1252 and § 1252(e) both refer to review of removal "orders" and thus focus a noncitizen's

own as-applied claim to relief.[6] Section 1252(e) authorizes only two types of challenges to those orders: (1) habeas challenges to a limited set of factual determinations in those orders, § 1252(e)(2); and (2) challenges to the validity of the system used to issue an order, § 1252(e)(3). Nothing in § 1252(e)(3) indicates it authorizes challenges to the system as applied to, or authorizes relief with respect to, other noncitizens who are not plaintiffs. To reinforce that focus on individual plaintiffs, § 1252(e) specifically prohibits any court from "certify[ing] a class under Rule 23 … in any" (e)(3) action. 8 U.S.C. § 1252(e)(1)(B). And as discussed, § 1252(f)(1) prohibits this Court from "enjoin[ing] or restrain[ing] the operation" of various provisions of the INA "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." *Id.* § 1252(f)(1). Thus, the INA repeatedly makes clear that Congress intended for courts reviewing (e)(3) suits to focus their attention on the individual plaintiffs' claims for relief; any universal vacatur of the challenged Rule and guidance would undermine this policy choice. Limiting relief to Plaintiffs who are part of the case and timely bring suit is consistent with the D.C. Circuit's holdings that plaintiffs who seek relief under § 1252(e)(3) more than 60 days after a policy is implemented are not entitled to any relief, even when added to a case that was timely filed. *See, e.g., M.M.V. v. Garland*, 1 F.4th 1100, 1110–11 (D.C. Cir. 2021).

Plaintiffs argue the title of § 1252(e)(3), "Challenges on validity of the system," supports the view that this provision permits systemic challenges. Pls' Resp. at 36. But the statute specifically focuses on review of individual orders, albeit on the grounds that the orders were entered pursuant to an unlawful statute or regulations. *See* 8 U.S.C. § 1252(e)(3)(A). Nothing about

---

[6] In *Make the Road New York*, 962 F.3d at 625-28, the D.C. Circuit held, in the context of a challenge to an expedited-removal policy that had not yet been applied to anyone, that noncitizens who have not yet received a removal order may bring suit through § 1252(e)(3). The court did not, however, hold that universal relief was generally consistent with § 1252(e)(3)'s limitations or otherwise address these arguments regarding constraints on this Court's equitable discretion.

those specified grounds for relief suggests that universal relief is appropriate. To the contrary, the usual relief afforded when a plaintiff successfully challenges an agency adjudication on the ground that the adjudication applied an invalid rule is that the adjudication is vacated, not that the underlying rule is vacated. *See, e.g.*, *Nebraska Dep't of Health & Human Servs. v. HHS*, 435 F.3d 326, 327-29 (D.C. Cir. 2006) (reversing vacatur as an abuse of discretion and explaining State "did not challenge the validity of the … announcements apart from their application as binding rules in the case before the [agency]"). Here, § 1252(e)(3) permits Plaintiffs to challenge their individual orders on the ground that they were entered through a flawed system. But relief must be limited to the individual Plaintiffs' orders and not to the underlying system.[7]

Finally, even if vacatur were permitted, there is good reason here to instead grant, at most, remand without vacatur. Given the serious negative consequences of vacating the Rule, the Departments should be given a chance to address any issues the Court identifies with the Rule. Defs' Mot. at 62-63. Contrary to Plaintiffs' arguments, Pls' Resp. at 40-41, remand without vacatur is appropriate where it is at least "conceivable" that "on remand" the Departments "can 'develop a reasoned explanation' of its statutory authority" for its action, *Air Transp. Ass'n of Am. v. United States Dep't of Agric.* 317 F. Supp. 3d 385, 391 (D.D.C. 2018) (quoting *Allied-Signal*, 988 F.2d at 151). Remand without vacatur requires only a "non-trivial likelihood" the Departments "would be able to state a valid legal basis for [the] rule," *In re Core Commc'ns, Inc.*, 531 F.3d 849, 850 (D.C. Cir. 2008), particularly where vacatur would have serious consequences, *see* Defs' Mot. at 63-64.

## CONCLUSION

The Court should grant summary judgment to Defendants on all claims.

---

[7] If the Court disagrees, any vacatur must be narrow to give effect to the Rule's severability clause. *See* Defs' Mot. at 64-65. Plaintiffs do not argue otherwise.

Dated: September 13, 2024                    Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             *Principal Deputy Assistant Attorney General*

                                             EREZ REUVENI
                                             *Senior Counsel*

                                        By: /s/ *Brian C. Ward*
                                             BRIAN C. WARD
                                             *Senior Litigation Counsel*
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation
                                             P.O. Box 868, Ben Franklin Station
                                             Washington, DC 20044
                                             Tel: (202) 616-9121
                                             Email: brian.c.ward@usdoj.gov

                                             CHRISTINA P. GREER
                                             PATRICK GLEN
                                             *Senior Litigation Counsel*

                                             *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Brian C. Ward*
       BRIAN C. WARD
       Senior Litigation Counsel
       United States Department of Justice