IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAS AMERICAS IMMIGRATION ADVOCACY CENTER, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | No. 1:24-cv-01702 |
| v. | ) ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) | |
| *Defendants.* | ) ) ) | |

**JOINT APPENDIX FILED PURSUANT TO LOCAL RULE 7(N)**

**INDEX**

| Proclamation | |
|---|---|
| Presidential Proclamation, *Securing the Border* (June 3, 2024) | IFR_Proc_000001-14 |
| **Interim Final Rule** | |
| *Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024), https://www.federalregister.gov/documents/2024/06/07/2024-12435/securing-the-border. | IFR_Rule_000001-63 |
| *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018), https://www.federalregister.gov/documents/2018/11/09/2018-24594/alienssubject-to-a-bar-on-entry-under-certain-presidential-proclamations-procedures-for-protection | IFR_AR_000228-231 |
| *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67,202 (Oct. 21, 2020), https://www.federalregister.gov/documents/2020/10/21/2020-23159/procedures-for-asylum-and-bars-to-asylum-eligibility. | IFR_AR_000333-391 |
| *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers,* 87 Fed. Reg. 18,078 (Mar. 29, 2022), https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-andconsideration-of-asylum-withholding-of-removal-and-cat | IFR_AR_000391-832 |
| *Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 87 Fed. Reg. 19,941 (Apr. 6, 2022), https://www.federalregister.gov/documents/2022/04/06/2022-07306/public-health-determination-and-order-regarding-suspending-the-right-to-introduce-certain-persons. | IFR_AR_000833-898 |
| *Circumvention of Lawful Pathways,* 88 Fed. Reg. 31,314 (May 16, 2023), https://www.federalregister.gov/documents/2023/05/16/2023-10146/circumvention-of-lawful-pathways | IFR_AR_001141-1155 |
| *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 41,347 (May 13, 2024), https://www.federalregister.gov/documents/2024/05/13/2024-10390/application-of-certain-mandatory-bars-in-fear-screenings. | IFR_AR_001173-1311 |
| Border Act of 2024, S. 4361, 118th Cong. (2023–2024), https://www.congress.gov/bill/118th-congress/senate-bill/4361/text?amp%3Bq=%7B%22search%22%3A%22%5C%22immig | IFR_AR_001715-2006 |

i

| | |
|---|---|
| ation%5C%22%22%7D&amp%3Br=9&s=5 | |
| CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day | IFR_AR_002089-90 |
| CBP, *Large group of migrants encountered were misinformed* (Mar. 31, 2023), https://www.cbp.gov/newsroom/local-media-release/large-group-migrants-encountered-were-misinformed | IFR_AR_002135-40 |
| CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified May 15, 2024) | IFR_AR_002156-61 |
| Cong. Res. Serv., *Mexico: Organized Crime and Drug Trafficking Organizations* (July 28, 2020), https://crsreports.congress.gov/product/pdf/R/R41576/45 | IFR_AR_002330-66 |
| Decl. of Blas Nuñez-Neto, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) | IFR_AR_002455-80 |
| Declaration of Robert E. Perez, Dkt. 95-2, Innovation Law Lab, No. 19-15716 (Mar. 3, 2020). | IFR_AR_002554-61 |
| DHS, Form I-867A (08/01/07) | IFR_AR_002596 |
| DHS, Form I-867B (08/01/07) | IFR_AR_002597 |
| DHS, USCIS, *RAIO Combined Training Program: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024) | IFR_AR_002943-79 |
| Letter from Cory Booker, Member of Cong., inquiry to Alejandro Mayorkas, Sec'y to U.S. Dep't of Homeland Sec. (Mar. 27, 2023). | IFR_AR_006935-37 |
| Letter from Edward Markey, Member of Cong., inquiry to Alejandro Mayorkas, Sec'y to U.S. Dep't of Homeland Sec. (Feb. 21, 2023). | IFR_AR_006938-41 |
| Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Sec., *Termination of Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf. | IFR_AR_007309-12 |
| Memorandum from Diane Sabatino, Deputy Exec. Assistant Comm'r, Off. of Field Operations, U.S. Customs & Border Prot., *CBP One Scheduling Functionality Changes* (May 8, 2023). | IFR_AR_007341-44 |
| Memorandum from Tricia Kennedy, Program Manager, Off. of Field Operations, U.S. Customs & Border Prot., *CBP OneTM Application* (May 8, 2023). | IFR_AR_007414-24 |
| OHSS, *Data for Securing the Border IFR* (June 2024) | IFR_AR_007434-585 |
| Ribando Seelke, Clare & Karla Rios, *Haiti: Recent Developments and U.S. Policy*, Cong. Research Serv. R47394 (Jan. 23, 2023), https://crsreports.congress.gov/product/pdf/R/R47394. | IFR_AR_007927-48 |
| U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal, Volume II: Expert Reports* (Feb. 8, 2005), | IFR_AR_008170-619 |

| | |
|---|---|
| https://www.uscirf.gov/publications/report-asylum-seekers-expedited-removal | |
| U.S. Dep't of Homeland Sec., *Department of Homeland Security Border Security Metrics Report: 2021* (Apr. 27, 2022), https://www.dhs.gov/sites/default/files/2022-06/2022_0427_plcy_border_security_metrics_report_FY2021_%2820 20_data%29.pdf. | IFR_AR_008622-713 |
| U.S. Dep't of Homeland Sec., Off. of Immigration Statistics, *Data for the February 2023 NPRM*. | IFR_AR_009000-144 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Cross-Cultural Communication & Other Factors that May Impede Communication at an Interview* (Dec. 20, 2019). | IFR_AR_009803-28 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Gender-Related Claims* (Dec. 20, 2019). | IFR_AR_009969-10020 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Dec. 20, 2019). | IFR_AR_010021-88 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Interviewing – Introduction to the Non-Adversarial Interview* (Dec. 20, 2019). | IFR_AR_010147-194 |
| U.S. Dep't of State, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm | IFR_AR_011161-71 |
| USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022) | IFR_AR_011518-19 |
| Acevedo, Nicole & Albinson Linares, *Misinformation Fuels False Hope Among Migrants After Deadly Fire in Mexico*, NBC NEWS (Mar. 30, 2023), https://www.nbcnews.com/news/latino/misinformation-fuels-false-hopes-migrants-mexico-fire-rcna77398. | IFR_AR_011638-48 |
| Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends*, Washington Office of Latin America (Dec. 15, 2023), https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/ | IFR_AR_011649-60 |
| Am. Immigration Council, *Your Rights Under Al Otro Lado v. Mayorkas*, https://www.americanimmigrationcouncil.org/al-otro-lado-mayorkas (last visited May 4, 2023). | IFR_AR_011707-14 |
| Anker, Deborah & Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 SAN DIEGO L. R. 9 | IFR_AR_011719-800 |

| | |
|---|---|
| (1981). | |
| Augustin, Ed, *Stars Align for Cuban Migrants as Record Numbers Seek Better Life in U.S.*, GUARDIAN (June 12, 2022), https://www.theguardian.com/world/2022/jun/12/cuban-migrants-us-record-numbers-migration. | IFR_AR_011891-96 |
| Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, *Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences*, 107 Personality & Individual Differences 190 (2017), https://www.sciencedirect.com/science/article/pii/S0191886916311382?via%3Dihub | IFR_AR_011905-09 |
| Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border*, BBC (July 8, 2023), https://www.bbc.com/news/world-us-canada-65848683 | IFR_AR_011910-15 |
| *Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way*, TAHIRIH (Feb. 21, 2023), https://www.tahirih.org/news/bidens-asylum-ban-will-continue-to-place-survivors-in-harms-way/. | IFR_AR_011937-41 |
| Castillo, Andrea, *Asylum Seekers Face Decision to Split Up Families or Wait Indefinitely Under New Border Policy*, L.A. TIMES (Feb. 24, 2023), https://www.latimes.com/politics/story/2023-02-24/asylum-seeking-families-consider-separation-shortage-mobile-app-appointments. | IFR_AR_012388-402 |
| Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call it dead in the House*, NPR (Feb. 4, 2024), https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached | IFR_AR_012582-99 |
| Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.*, Council on Foreign Rels. (Feb. 1, 2024), https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us | IFR_AR_012610-27 |
| Dickerson, Caitlin, *Confusion on the Border as Appeals Court Rules Against Trump's Remain in Mexico Policy*, N.Y. TIMES (Feb. 28, 2020, updated Oct. 29, 2021), https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html. | IFR_AR_012647-50 |
| Hum. Rts. First, *New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico* (Sept. 15, 2022), https://humanrightsfirst.org/library/new-report-documents-devastating-toll-of-court-ordered-reimplementation-of-remain-in-mexico/. | IFR_AR_013607-10 |
| Joanna Walters, *Migrant surges hint at chaos at US-Mexico border once Title 42 expires*, The Guardian (Dec. 16, 2022), https://www.theguardian.com/us-news/2022/dec/16/title-42-expires-us- | IFR_AR_014183-91 |

| | |
|---|---|
| mexico-border-migrants | |
| Jordan, Miriam & Michael Shear, *An End to Pandemic Restrictions Could Bring Thousands to the Border*, N.Y. TIMES (May 7, 2023), https://www.nytimes.com/2023/05/07/us/title-42-border-migrants.html. | IFR_AR_014192-201 |
| Jordan, Miriam, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html. | IFR_AR_014202-208 |
| José Ignacio Castañeda Perez, *How social media misleads migrants about the border*, The Arizona Republic (Oct. 12, 2023), *available at* https://www.azcentral.com/story/news/politics/border-issues/2023/10/11/social-media-misinforms-migrants-about-arizona-mexico-border/70846824007/ | IFR_AR_014209-12 |
| Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down*, NBC News (May 15, 2024), https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821 | IFR_AR_014219-24 |
| Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023*, Time (Dec. 22, 2023), https://time.com/6547992/migrants-crossing-darien-gap-2023 | IFR_AR_014434-42 |
| Maria Abi-Habib & Eileen Sullivan, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat*, N.Y. Times (May 3, 2022), https://www.nytimes.com/2022/05/03/world/americas/cuban-migration-united-states.html | IFR_AR_014443-50 |
| Mata, Reyes & Nick Miroff, *New Surge of Migrants Strains U.S. Capacity Ahead of May 11 Deadline*, WASH. POST (Apr. 28, 2023), https://www.washingtonpost.com/nation/2023/04/28/border-migrants-biden-title-42/. | IFR_AR_014480-84 |
| Michele R. Pistone & John J. Hoeffner, *Rules Are Made to Be Broken: How the Process of Expedited Removal Fails Asylum Seekers*, 20 Geo. Immigr. L.J. 167 (2006) | IFR_AR_014506-40 |
| Miller, Leila, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This is Why*, L.A. TIMES (Dec. 27, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion. | IFR_AR_014543-58 |
| Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay*, N.Y. Times (Jan. 31, 2024), https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html | IFR_AR_014559-68 |
| Miroff, Nick & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, WASH. POST (Oct. 24, 2018), https://www.washingtonpost.com/world/national- | IFR_AR_014569-77 |

| | |
|---|---|
| security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html. | |
| Musalo, Karen & Marcelle Rice, *The Implementation of the One-year Bar to Asylum*, 31 HASTINGS INT'L & COMP. L. REV. 693 (2008), https://repository.uchastings.edu/cgi/viewcontent.cgi?article=1567&context=faculty_scholarship. | IFR_AR_014606-39 |
| Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says*, CNN (July 27, 2022), https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html | IFR_AR_014951-61 |
| Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.*, NPR, (Apr. 22, 2024), https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration | IFR_AR_015093-108 |
| Seth J. Hill & Margaret E. Roberts, *Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions*, 31 Pol. Analysis 575 (2023) | IFR_AR_015111-26 |
| Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration*, AP News (Apr. 30, 2024), https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b | IFR_AR_015127-31 |
| Shane Costello & John Roodenburg, *Acquiescence Response Bias – Yeasaying and Higher Education*, 32 Australian Ed. & Dev. Psych. 105, 105 (2015) | IFR_AR_015163-77 |
| *Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents*, NPR (Dec. 10, 2023), https://www.npr.org/2023/12/10/1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents | IFR_AR_015213-230 |
| Steven Dudley, Parker Asmann & Victoria Dittmar, *Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*, InSight Crime (June 2023), https://insightcrime.org/wp-content/uploads/2023/06/HGBF-US-Policy-OC-and-Migration-Policy-Brief-InSight-Crime-June-2023-FINAL-ENG.pdf | IFR_AR_015332-53 |
| Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media. | IFR_AR_015362-76 |
| *Tell President Biden: End the Transit Ban, Start a Fair Path to Citizenship*, UNITARIAN UNIVERSALIST SERV. COMMITTEE, https://www.uusc.org/initiatives/transitban/ (last visited Apr. 13, 2023). | IFR_AR_015380-84 |
| United Nations High Comm'n for Refugees, *Ecuador: Monthly Update* | IFR_AR_015632-37 |

| | |
|---|---|
| *Oct. 2022* (Nov. 23, 2022), https://data.unhcr.org/en/documents/details/97082. | |
| UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (Jan. 1992 ed., reissued Feb. 2019), https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967 | IFR_AR_015808-16085 |
| UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring – April 2024,* https://data.unhcr.org/en/documents/details/108399 (last visited May 31, 2024) | IFR_AR_016108-11 |
| UNHCR, *Operational Update: Mexico* (Dec. 2023), https://reporting.unhcr.org/mexico-operational-update-6421 | IFR_AR_016116-23 |
| Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires*, AP News (May 11, 2023), https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9 | IFR_AR_016775-81 |
| Whelan, Robbie, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program: Migrants Seeking Shelter in the U.S. Under Trump Administration Policy Report Rising Numbers of Kidnappings by Criminal Groups*, WALL STREET J. (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. | IFR_AR_016862-68 |
| **Guidance** | |
| Memorandum from Ted H. Kim, Associate Dir., Refugee, Asylum and Int'l Operations Directorate, U.S. Citizenship and Immigration Servs., to Jennifer Higgins, Deputy Dir., U.S. Citizenship and Immigration Servs., *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border IFR Apply*, (Jun. 4, 2024) (on file with agency). | USCIS_4-Hour_AR 001-5 |
| *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) | USCIS_4-Hour_AR 041-64 |
| *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). | USCIS_4-Hour_AR 065-70 |
| *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020) | USCIS_4-Hour_AR 071-112 |
| *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020) | USCIS_4-Hour_AR 167-190 |
| Excerpts from U.S. Citizenship and Immigration Servs., *Credible Fear Procedures Manual*, § III.D, 7-8 (last updated Apr. 6, 2023) (on file with agency) | USCIS_4-Hour_AR 293-94 |

SECURING THE BORDER

- - - - - - -

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

There are more people around the world who are displaced from their homes today than at any point in time since World War II.  Many factors have contributed to this problem.  Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere.  Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America.  The global COVID-19 pandemic upended societies around the globe.  Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border.  In 2019, encounters nearly doubled from their 2018 level to almost 1 million.  In 2020, the global COVID-19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

2

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully.  Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact.  On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency.  Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000

3

credible fear interviews, both of which are record highs.  As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border.  Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010.  The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere.  The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge.  From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries.  However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system

4

that is simply broken -- and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated.  For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States.  This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border.  In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements.  The Congress failed to act.  In October 2023, I requested $13.6 billion for border enforcement and migration management.  This request included more than $5 billion for DHS to manage conditions on the southern border, as well as funding

IFR_Proc_000004

for critical capacity enhancements to keep the southern border secure.  The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection.  Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

(a)  over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

(b)  over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

(c)  100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

(d)  shelter and critical services for newcomers in our cities and States; and

(e)  1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.  While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade.

6

However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118-47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals

7

referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final decision.  By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity.  The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility.  However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims.  Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending.  At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts.  Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023.  Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to

8

approximately 2.46 million.  During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system -- the result of outdated laws and inadequate resources -- has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment.  This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process.  This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

9

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing.  No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal.  But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions.  I therefore hereby proclaim the following:

Section 1.  Suspension and Limitation on Entry.  The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation.  This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024.  The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

10

Sec. 2.  Applicability of Suspension and Limitation on
Entry.  (a)  The Secretary of Homeland Security shall monitor
the number of daily encounters and, subject to subsection (b) of
this section, the suspension and limitation on entry pursuant to
section 1 of this proclamation shall be discontinued at 12:01
a.m. eastern time on the date that is 14 calendar days after the
Secretary makes a factual determination that there has been a 7-
consecutive-calendar-day average of less than 1,500 encounters,
not including encounters described in subsection 4(a)(iii) of
this proclamation.

(b)  Notwithstanding a factual determination made under
subsection (a) of this section, the suspension and limitation on
entry pursuant to section 1 of this proclamation shall apply at
12:01 a.m. eastern time on the calendar day immediately after
the Secretary has made a factual determination that there has
been a 7-consecutive-calendar-day average of 2,500 encounters or
more, not including encounters described in subsection 4(a)(iii)
of this proclamation, until such suspension and limitation on
entry is discontinued pursuant to subsection (a) of this
section.

(c)  For purposes of subsection (a) and subsection (b) of
this section, unaccompanied children (as defined in section
279(g)(2) of title 6, United States Code) from non-contiguous
countries shall not be included in calculating the number of
encounters.

Sec. 3.  Scope and Implementation of Suspension and
Limitation on Entry.  (a)  The suspension and limitation on
entry pursuant to section 1 of this proclamation shall apply
across the southern border to noncitizens, other than those
described in subsection (b) of this section, during such times
that the suspension and limitation on entry is in effect.

11

(b)   The suspension and limitation on entry pursuant to
section 1 of this proclamation shall not apply to:

(i)   any noncitizen national of the United States;

(ii)   any lawful permanent resident of the United
States;

(iii)   any unaccompanied child as defined in section
279(g)(2) of title 6, United States Code;

(iv)   any noncitizen who is determined to be a victim
of a severe form of trafficking in persons, as defined
in section 7102(16) of title 22, United States Code;

(v)   any noncitizen who has a valid visa or other
lawful permission to seek entry or admission into the
United States, or presents at a port of entry pursuant
to a pre-scheduled time and place, including:

(A)   members of the United States Armed Forces
and associated personnel, United States
Government employees or contractors on orders
abroad, or their accompanying family members who
are on their orders or are members of their
household;

(B)   noncitizens who hold a valid visa or who
have all necessary documents required for
admission consistent with the requirements of
section 1182(a)(7) of title 8, United States
Code, upon arrival at a port of entry;

(C)   noncitizens traveling pursuant to the visa
waiver program as described in section 1187 of
title 8, United States Code; and

(D)   noncitizens who arrive in the United States
at a southwest land border port of entry pursuant
to a process the Secretary of Homeland Security
determines is appropriate to allow for the safe

12

and orderly entry of noncitizens into the United States;

(vi)    any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii)   any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c)    An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d)    The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e)    Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the

IFR_Proc_000012

13

United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

Sec. 4. Definitions. (a) The term "encounter" refers to a noncitizen who:

(i)   is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

(ii)  is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

(iii) is determined to be inadmissible at a southwest land border port of entry.

(b)  The term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c)  The term "southwest land border" means the entirety of the United States land border with Mexico.

(d)  The term "southern border" means the southwest land border and the southern coastal borders.

Sec. 5. Severability. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

14

Sec. 6.  General Provisions.  (a)  Nothing in this proclamation shall be construed to impair or otherwise affect:

      (i)   the authority granted by law to an executive department or agency, or the head thereof; or

      (ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

    (b)  This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

    (c)  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

    IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

**48710** **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208 and 235**

[USCIS Docket No. USCIS–2024–0006]

RIN 1615–AC92

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

[A.G. Order No. 5943–2024]

RIN 1125–AB32

**Securing the Border**

**AGENCY:** U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS"); Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ").

**ACTION:** Interim final rule ("IFR") with request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act ("INA"), finding that the entry into the United States of certain noncitizens during emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those noncitizens. The Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. The Departments are now issuing this IFR.

**DATES:**

*Effective date:* This IFR is effective at 12:01 a.m. eastern daylight time on June 5, 2024.

*Submission of public comments:* Comments must be submitted on or before July 8, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on this IFR, identified by USCIS Docket No. USCIS–2024–0006, through the Federal eRulemaking Portal: *https:// www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and

may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For the Executive Office for Immigration Review:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Public Participation
II. Executive Summary
  A. Background and Purpose
  B. Legal Authority
  C. Summary of Provisions of the IFR
III. Discussion of the IFR
  A. Current Framework
  1. Asylum, Statutory Withholding of Removal, and CAT Protection
  2. Expedited Removal and Screenings in the Credible Fear Process
  3. Lawful Pathways Condition on Asylum Eligibility
  B. Justification
  1. Global Migration at Record Levels
  2. Need for These Measures
  3. Description of the Rule and Explanation of Regulatory Changes
  C. Section-by-Section Description of Amendments
  1. 8 CFR 208.13 and 1208.13
  2. 8 CFR 208.35
  3. 8 CFR 1208.35
  4. 8 CFR 235.15
IV. Statutory and Regulatory Requirements
  A. Administrative Procedure Act
  1. Foreign Affairs
  2. Good Cause
  B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act of 1995
  E. Congressional Review Act
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Family Assessment
  I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
  J. National Environmental Policy Act
  K. Paperwork Reduction Act

**List of Abbreviations**

AO   Asylum Officer
APA   Administrative Procedure Act
BIA   Board of Immigration Appeals (DOJ, EOIR)
CAT   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP   U.S. Customs and Border Protection
CBP   One app CBP One mobile application
CDC   Centers for Disease Control and Prevention
CHNV   Cuba, Haiti, Nicaragua, and Venezuela
DHS   Department of Homeland Security
DOD   Department of Defense
DOJ   Department of Justice
EOIR   Executive Office for Immigration Review
FARRA   Foreign Affairs Reform and Restructuring Act of 1998
FRP   Family Reunification Parole
FY   Fiscal Year
HSA   Homeland Security Act of 2002
ICE   U.S. Immigration and Customs Enforcement
IFR   Interim Final Rule
IIRIRA   Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ   Immigration Judge
INA   or the Act Immigration and Nationality Act
INS   Immigration and Naturalization Service
MPP   Migrant Protection Protocols
NGO   Non-Governmental Organization
NEPA   National Environmental Policy Act
NTA   Notice to Appear
OHSS   Office of Homeland Security Statistics
OIS   Office of Immigration Statistics
OMB   Office of Management and Budget
POE   Port of Entry
RFA   Regulatory Flexibility Act
SWB   Southwest Land Border
TCO   Transnational Criminal Organization
UC   Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UIP   U.S. Customs and Border Protection Unified Immigration Portal
UMRA   Unfunded Mandates Reform Act of 1995
UNHCR   United Nations High Commissioner for Refugees
USBP   U.S. Border Patrol
USCIS   U.S. Citizenship and Immigration Services

**I. Public Participation**

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by the deadline stated above. The Departments also invite comments

IFR_Rule_000001

that relate to the economic, environmental, or federalism effects that might result from this IFR. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the IFR, explain the reason for any recommended change, and include data, information, or authority that supports such recommended change. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https:// www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https:// www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https:// www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States are unduly strained at this time, the entry into the United States of certain categories of noncitizens [1] is detrimental to the interests of the United States, and

suspending and limiting the entry of such noncitizens. The Proclamation explicitly excepts from its terms certain persons who are not subject to the suspension and limitation. This rule is necessary to respond to the emergency border circumstances discussed in the Proclamation.

The Departments use the term ''emergency border circumstances'' in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. As the preamble elsewhere explains, the periods during which the Proclamation is intended to be in effect, when encounters exceed certain thresholds, identify such situations. Hence, the Departments in this preamble use the term ''emergency border circumstances'' to refer more specifically to the period of time after the date that the Proclamation's suspension and limitation on entry would commence (as described in section 1 of the Proclamation) until the discontinuation date referenced in section 2(a) of the Proclamation or the date the President revokes the Proclamation (whichever comes first), as well as any subsequent period during which the Proclamation's suspension and limitation on entry would apply as described in section 2(b) of the Proclamation.[2] As the Proclamation and this preamble explain, these circumstances exist despite the Departments' efforts to address substantial levels of migration, and such circumstances are a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere,[3] including record levels at

the southwest land border (''SWB'').[4] In

250,000 Colombians, 210,000 Haitians, and 210,000 Salvadorans, among others. By comparison, prior to 2018 there were never more than 1 million displaced persons in the hemisphere, and prior to 2007 there were never more than 300,000. Nearly 1 in every 100 people in the Western Hemisphere was displaced in 2022, compared to less than 1 in 1,000 displaced in the region each year prior to 2018. *See* UNHCR, *Refugee Data Finder, unhcr.org/ refugee-statistics/download/?url=PhV1Xc* (last visited May 27, 2024); *see also* UNHCR, *Global Trends: Forced Displacement* in 2021, at 2, 8, 9, 12 (June 14, 2023), *https://www.unhcr.org/global- trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases); UNHCR, *Venezuela Situation, https:// www.unhcr.org/emergencies/venezuela-situation* (last updated Aug. 2023).

[4] United States Government sources refer to the U.S. border with Mexico by various terms, including ''SWB'' and ''the southern border.'' In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. As defined in section 4(d) of the Proclamation, the term ''southern border'' includes both the southwest land border (''SWB'') and the southern coastal borders. As defined in section 4(c) of the Proclamation, the term ''southwest land border'' means the entirety of the United States land border with Mexico. And as defined in section 4(b) of the Proclamation, the term ''southern coastal borders'' means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the SWB, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico. The Departments believe that the factual circumstances described herein support applying this IFR to both the SWB and the southern coastal borders, although they recognize that occasionally different variations of this terminology may be used. The Departments further note there are sound reasons for the Proclamation and rule to include maritime borders of the United States Virgin Islands and Puerto Rico; this aspect of the Proclamation and rule help avoid any incentive for maritime migration to such locations. The dangers of such migration, and the operational challenges associated with responding to such maritime migration, are well documented. *See Securing America's Maritime Border: Challenges and Solutions for U.S. National Security: Hearing Before the Subcomm. on Transp. & Mar. Sec. of the H. Comm. on Homeland Sec.,* 108th Cong. 10–11 (prepared statement of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, U.S. Coast Guard) (describing an increasingly challenging operational environment and noting that most ''Cuban and Haitian migrants use transit routes into Florida, either directly or via the Bahamas. Alternatively, Dominican and some Haitian migrants use shorter transit routes across the Mona Passage to Puerto Rico and the U.S. Virgin Islands. Common conveyances used in this region range from fishing vessels, coastal freighters, sail freighters, go-fast type vessels, and 'rusticas.' ''); PBS, *More Than 100 Migrants Stranded Near Puerto Rico Await Help During Human Smuggling Operation* (Oct. 18, 2022), *https://www.pbs.org/newshour/world/more- than-100-migrants-stranded-near-puerto-rico-await- help-during-human-smuggling-operation* (''Mona Island is located in the treacherous waters between Dominican Republic and Puerto Rico and has long been a dropping off point for human smugglers promising to ferry Haitian and Dominican migrants to the U.S. territory aboard rickety boats. Dozens of them have died in recent months in an attempt to flee their countries amid a spike in poverty and
Continued

---

[1] For purposes of this preamble, the Departments use the term ''noncitizen'' to be synonymous with the term ''alien'' as it is used in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr,* 590 U.S. 222, 226 n.2 (2020).

[2] The Departments have sought to avoid describing ''emergency border circumstances'' as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility.

[3] According to OHSS analysis of the United Nations High Commissioner for Refugees (''UNHCR'') data from 1969 to 2022, there were more than 8.5 million displaced persons in the Western Hemisphere in 2022, including approximately 6.6 million Venezuelans, 300,000 Nicaraguans, 260,000 Hondurans, 250,000 Cubans,

IFR_Rule_000002

response to record levels of encounters at the SWB,[5] the United States

Government has taken a series of significant steps to strengthen consequences for unlawful or unauthorized entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States for protection in decades.[6] These steps include:

• Promulgating and implementing the rule titled Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) (''Circumvention of Lawful Pathways rule'');

• Deploying more than 500 additional DHS personnel at a time to the SWB to support U.S. Customs and Border Protection (''CBP'') operations and refocusing a significant portion of DHS's SWB workforce to prioritize migration management above other border security missions;[7]

• Deploying over 1,000 additional Department of Defense (''DOD'') personnel on top of the 2,500 steady state presence to the SWB in May 2023 to further enhance border security;[8]

• Processing record numbers of individuals through expedited removal;[9]

• Implementing a historic expansion of lawful pathways and processes to come to the United States, including: the Cuba, Haiti, Nicaragua, and Venezuela (''CHNV'') parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide access to expedited refugee processing for eligible individuals; and the expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;[10]

• Expanding opportunities to enter the United States for seasonal employment;[11]

• Establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive in a safe, orderly, and lawful manner at ports of entry (''POEs'') through the CBP One mobile application (''CBP One app'');[12]

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year (''FY'') 2021 to up to 50,000 in FY 2024;[13]

violence.''); United States Coast Guard, *Coast Guard Repatriates 38 Migrants to Dominican Republic Following 2 Interdictions Near Puerto Rico* (Apr. 25, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3755880/coast-guard-repatriates-38-migrants-to-dominican-republic-following-2-interdict/*; United States Coast Guard, *Coast Guard Repatriates 101 Migrants to Dominican Republic Following 3 Interdictions Near Puerto Rico* (Apr. 9, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3734747/coast-guard-repatriates-101-migrants-to-dominican-republic-following-3-interdic/*; United States Coast Guard, *Federal, Local Interagency Responders Search for Possible Survivors of Capsized Migrant Vessel in Camuy, Puerto Rico* (Feb. 1, 2024), *https://www.uscg.mil/Press-Releases/Article/3663106/coast-guard-federal-local-interagency-responders-search-for-possible-survivors/*; United States Coast Guard, *Coast Guard Repatriates 28 Migrants to Dominican Republic, Following Interdiction of Unlawful Migration Voyage in the Mona Passage* (Jan. 31, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3661517/coast-guard-repatriates-28-migrants-to-dominican-republic-following-interdictio/*. There were 35,100 encounters of Dominicans between POEs at the SWB in Fiscal Year (''FY'') 2023 and 14,100 in the first six months of FY 2024 (on pace for 28,200), up from an average of 408 such encounters per year in FY 2014 through FY 2019—roughly a 90-fold increase. Office of Homeland Security Statistics (''OHSS'') analysis of March 2024 OHSS Persist Dataset.

⁵ At the SWB, U.S. Customs and Border Protection (''CBP'') completed approximately 1.7 million encounters at and between POEs in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.68 million in FY 2000. *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and Title 42 expulsions from 1925 to 2022), *and id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022), *with* OHSS, *2012 Yearbook of Immigration Statistics* 96 tbl. 35 (July 2013), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2012.pdf* (apprehensions from FY 2003 to FY 2012), *and* OHSS, *2002 Yearbook of Immigration Statistics* 184 tbl. 40 (Oct. 2003), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2002.pdf* (apprehensions from FY 1996 to FY 2002). In December 2023, CBP also completed a single-month record of approximately 302,000 encounters at and between POEs, almost one and a half times as many as the highest monthly number recorded prior to 2021 (approximately 209,000 in March 2000) based on records available in the OHSS Persist Dataset from FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individuals during the period in which noncitizens were expelled pursuant to the Centers for Disease Control and Prevention's (''CDC's'') Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See* OHSS analysis of March 2024 OHSS Persist Dataset.

DHS data in this IFR are current through March 31, 2024, the most recent month for which DHS has data that have gone through its full validation process. DHS primarily relies on two separate datasets for most of the data in this IFR. Most DHS data are pulled from OHSS's official statistical system of record data, known as the OHSS Persist Dataset, which is typically released by OHSS on a 90-day delay. Other data in this IFR are pulled from OHSS's Enforcement Lifecycle dataset, which combines 23 separate DHS and DOJ datasets to report on the end-to-end immigration enforcement process. Due to this greater complexity, Lifecycle data generally become available for reporting 90 to 120 days after the end of each quarter.

CBP also publishes preliminary data pulled from its operational systems more quickly as part of its regular Monthly Operational Updates. The data in these updates reflect operational realities but change over time as transactional records in the systems of record are cleaned and validated; they are best viewed as initial estimates rather than as final historical records. CBP released an operational update on May 15, 2024, that includes the Component's official reporting for encounters through the end of April. Based on these data, SWB encounters between POEs fell slightly by six percent between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters*, *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this IFR. Excluding March through April 2020, which was an unusual case because of the onset of the COVID–19 pandemic, the average month-over-month change between March and April for 2013 through 2024 is a 2.3 percent increase, with 4 out of those 11 years experiencing decreases in April and 7 years experiencing increases.

⁶ *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

⁷ DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), *https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border.*

⁸ *Id.*; *see also* DOD, *Austin Approves Homeland Security Request for Troops at Border* (May 2,

2023), *https://www.defense.gov/News/News-Stories/Article/3382272/austin-approves-homeland-security-request-for-troops-at-border/.*

⁹ In the months between May 12, 2023, and March 31, 2024, CBP processed roughly 316,000 noncitizens encountered at and between SWB POEs for expedited removal, more than in any prior full fiscal year. OHSS analysis of data pulled from CBP Unified Immigration Portal (''UIP'') on April 2, 2024.

¹⁰ DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

¹¹ DHS, *DHS to Supplement H–2B Cap with Nearly 65,000 Additional Visas for FY 2024, Department of Homeland Security* (Nov. 3, 2023), *https://www.dhs.gov/news/2023/11/03/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2024.*

¹² DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration*; CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

¹³ U.S. State Dep't, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024* (Nov. 3, 2023), *https://www.state.gov/report-to-congress-on-proposed-refugee-admissions-for-fiscal-year-2024/.*

IFR_Rule_000003

• Completing approximately 89 percent more immigration court cases in FY 2023 as compared to FY 2019;[14] and

• Increasing the immigration judge ("IJ") corps by 66 percent from FY 2019 to FY 2023, including maximizing the congressionally authorized number in FY 2023 for a total corps of 734.[15]

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency [16]—the border security and immigration systems have not been able to keep pace with the number of individuals arriving at the southern border.[17] Simply put, the Departments do not have adequate resources and tools to deliver timely

decisions and consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection when individuals are arriving at such elevated, historic volumes.[18]

This became even more clear in the months following the lifting of the Title 42 public health Order.[19] As the Departments resumed widespread processing under title 8 authorities, the insufficiency of both the available statutorily authorized tools and the

resources provided to implement them came into stark focus. Despite the expanded ability to impose consequences at the SWB through the Circumvention of Lawful Pathways rule and complementary measures, which led to the highest numbers of returns and removals in more than a decade,[20] encounter levels have remained elevated well above historical levels, with December 2023 logging the highest monthly total on record.[21] While encounter levels in calendar year 2024 have decreased from these record numbers, there is still a substantial and elevated level of migration, and historically high percentages of migrants are claiming fear and are challenging to remove, as discussed in more detail in Section III.B.1 of this preamble.[22] This

[14] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1–2 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*.

[15] *See* EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* 1 (Jan. 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline* (showing 734 total IJs on board in FY 2023); Executive Office for Immigration Review ("EOIR") Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 27, 2024) ("The agency's streamlining efforts also enabled EOIR, by the close of FY 2023, to fill all 734 appropriated IJ positions, thus creating the largest judge corps in the agency's history.").

[16] *See supra* note 9. Since May 12, 2023, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative credible fear determinations, the median time from encounter to removal, over the same time frames, decreased 85 percent from 73 days to 11 days. Pre-May 12, 2023, data from OHSS Lifecycle Dataset as of December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

DHS removed or returned over 662,000 noncitizens between May 12, 2023, and March 31, 2024, or an average of over 61,300 per month (excluding crew members detained on board their vessels and other administrative returns); this represents the highest average monthly count of removals and returns since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[17] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office of Management and Budget ("OMB") (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*.

[18] *Id.; see also* Ariel G. Ruiz-Soto et al., Migration Pol'y Inst., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape* 20 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Across the border, interviewed agents expressed frustration with low staffing levels and resource allocations compared to the challenge of managing the border."). DHS acknowledges that the enacted FY 2024 DHS budget does appropriate funding sufficient to pay for approximately 2,000 additional Border Patrol agents, bringing the total level indicated by Congress up to 22,000 agents, compared with 19,855 agents for FY 2023. 170 Cong Rec. H1809–10 (daily ed. Mar. 22, 2024) (Explanatory Statement Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024) ("The agreement includes . . . [funding] to hire 22,000 Border Patrol Agents."); 168 Cong Rec. S8557 (daily ed. Dec. 20, 2022) (Explanatory Statement Regarding H.R. 2617, Consolidated Appropriations Act, 2023) ("The agreement provides funding for 19,855 Border Patrol agents."). However, the FY 2024 appropriations do not fully fund CBP's existing operational and staffing requirements. Additionally, CBP estimates that it will likely be unable to implement a hiring surge to meaningfully grow its overall staffing levels towards the staffing levels funded by the FY 2024 budget before the end of the current fiscal year. The hiring process requires time and resources to bring additional agents on board. For example, it generally takes more than six months for an applicant to complete the hiring process and report to the U.S. Border Patrol ("USBP") Academy to receive necessary training. *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("However, DHS's border security and immigration enforcement efforts along the Southwest border desperately require the additional funds requested by the Administration and included in the Senate's bipartisan border security legislation, which would provide DHS with approximately $19 billion to fund additional personnel, facilities, repatriation capabilities, and other enforcement resources.").

[19] *See* Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19"). Although the CDC indicated its intention to lift the order on May 23, 2022, ongoing litigation prevented the order from being lifted until it ultimately expired on May 11, 2023. *See* 88 FR at 31319.

[20] In the ten and a half months between May 12, 2023, and March 31, 2024, DHS completed over 662,000 removals and enforcement returns, more than in any full fiscal year since FY 2011, and the highest monthly average of enforcement repatriations since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[21] There were nearly 302,000 CBP encounters at and between POEs along the SWB in December 2023, higher than any previous month on record. OHSS analysis of March 2024 OHSS Persist Dataset and historic CBP data for encounters prior to FY 2000; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[22] After peaking at nearly 302,000 in December 2023, encounters at and between POEs along the SWB fell to approximately 176,000 in January 2024, 190,000 in February 2024, and 189,000 in March 2024. At an average of 185,000 for the first three months of 2024, monthly encounters levels were almost 4 times higher than the pre-pandemic (FY 2014 through 2019) average of 48,000 encounters at and between POEs per month and—with the exceptions of FY 2022 and FY 2023—represented the highest second quarter count of encounters in any year since FY 2001. March 2024 OHSS Persist Dataset; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and title 42 expulsions from 1925 to 2022); *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-*

Continued

substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limits DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities.

The sustained, high encounter rates the Departments have experienced over the past year have outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers. Due to its funding shortfall, DHS simply lacks sufficient resources, such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides," which limits DHS's ability to conduct credible fear interviews for individuals in CBP custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process.[23] This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting the Departments' ability to deliver timely consequences to individuals who do not have a legal basis to remain in the United States.[24] Individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead released pending removal proceedings under section 240 of the

INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an IJ, a process that can take several years to conclude.[25] These immigration court proceedings can be less resource intensive for processing upon initial encounter, because individuals can be released from custody fairly quickly, but are also far less likely to result in swift decisions and swift consequences, and generally require more IJ and ICE attorney time to resolve. *Compare* INA 235(b)(1), 8 U.S.C. 1225(b)(1), *with* INA 240, 8 U.S.C. 1229a. Notably, in FY 2023, when the immigration courts had a historic high number of case completions, the number of new cases far outnumbered those completions and led to a larger backlog—likely extending the length of time it will take individuals encountered and referred into section 240 removal proceedings to finish their immigration court process.[26]

Said another way, at the current levels of encounters and with current resources, the Departments cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain. This inability to predictably deliver timely decisions and consequences further compounds incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application.[27] Smugglers and transnational criminal organizations ("TCOs") have exploited this mismatch, further fueling migration by actively advertising to migrants that they are likely to be able to remain in the United States.[28]

The Departments' ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States. This, in turn, forces DHS to release individuals into the backlogged immigration court system; for the many cases in that system initiated just prior to or during the COVID–19 pandemic, the process can take several years to result in a final decision or consequence,[29] which then incentivizes more people to make the dangerous journey north to take their chances at the SWB.[30] The status quo of the broken immigration and asylum system has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous TCOs.[31] Without countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.[32] All of these factors, taken together, pose significant threats to the

---

*monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[23] "Because ICE has very limited detention capacity and appropriated bedspace has remained relatively static, the agency must carefully prioritize whom it detains. Similar to FY 2022, during FY 2023, Enforcement and Removal Operations' limited detention capacity was primarily used to house two populations: noncitizens CBP arrested at the Southwest Border and noncitizens with criminal histories [Enforcement and Removal Operations] arrested in the interior." Fiscal Year 2023 ICE Annual Report 18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf*. In FY 2024, ICE was appropriated $5,082,218,000.00 "for enforcement, detention and removal operations." Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, 1812 (daily ed. Mar. 22, 2024).

[24] *See* CBP, *Custody and Transfer Statistics, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (last updated Apr. 12, 2024) (table showing that, under current constraints, the number of individuals processed for expedited removal makes up only a fraction of total processing dispositions, including section 240 proceedings).

[25] EOIR decisions completed in December 2023 were, on average, initiated in December 2020, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 50 percent of EOIR cases initiated during that time were still pending as of December 2023, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as February 12, 2024; EOIR Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 26, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,346 days); EOIR, *Median Completion Times for Detained Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 47 days in the first quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[26] EOIR completed more than 520,000 cases in FY 2023 (a record number), but also had almost 1.2 million case receipts, resulting in a net increase of nearly 700,000 cases in its backlog. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2020/01/31/1_pending_new_receipts_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*. OHSS estimates that

1.1 million of the nearly 1.2 million case receipts (95 percent) resulted from SWB encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[27] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html*.

[28] *See* Parker Asmann & Steven Dudley, *How US Policy Foments Organized Crime on US-Mexico Border,* Insight Crime (June 28, 2023), *https://insightcrime.org/investigations/how-us-policy-foments-organized-crime-us-mexico-border/*.

[29] *See supra* note 25.

[30] *See, e.g.,* Jordan, *supra* note 27.

[31] *See* Asmann & Dudley, *supra* note 28.

[32] *See* Jordan, *supra* note 27.

IFR_Rule_000005

safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit.

In the absence of congressional action to appropriately resource DHS and EOIR and to reform the outdated statutory framework, the Proclamation and the changes made by this rule are intended to substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. By suspending and limiting entries until 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE, and by imposing a limitation on asylum eligibility and making other policy changes, the Proclamation and IFR will realign incentives at the southern border.[33] The Proclamation and IFR will do this by improving DHS's ability to place into expedited removal the majority of noncitizens who are amenable to such processing; to avoid large-scale releases of such individuals pending section 240 removal proceedings; and to allow for swift resolution of their cases and, where appropriate, removal.

The Proclamation imposes a suspension and limitation on entry upon certain classes of noncitizens who are encountered while the suspension and limitation is in effect. The Proclamation provides that the suspension and limitation on entry applies beginning at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the

Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. Unaccompanied children ("UCs")[34] from non-contiguous countries are not included in calculating the number of encounters. If at any time after such a factual determination the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, the suspension and limitation on entry will apply at 12:01 a.m. eastern time on the next calendar day (or will continue to apply, if the 14-calendar-day period has yet to elapse) until 14 days after the Secretary makes another factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters or the President revokes the Proclamation, at which time its application will be discontinued once again.

The Proclamation does not apply to the following persons:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 217 of the INA, 8 U.S.C. 1187; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for

the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

The President authorized the Secretary of Homeland Security and the Attorney General to issue any instructions, orders, or regulations as may be necessary to implement the Proclamation, including the determination of the exceptions in section 3(b), and directed them to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

Consistent with the President's direction, the Departments have determined that this IFR is necessary to address the situation at the southern border. This IFR aligns the Departments' border operations and applicable authorities with the Proclamation's policy and objectives. Specifically, this IFR establishes a limitation on asylum eligibility that applies to certain individuals who enter during emergency border circumstances and revises certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration[35] and remove noncitizens who do not have a legal basis to remain in the United States. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.

---

[33] Under the Proclamation, the term "encounter" refers to a noncitizen who (i) is physically apprehended by CBP immigration officers within 100 miles of the United States SWB during the 14-day period immediately after entry between POEs; (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between POEs; or (iii) is determined to be inadmissible at a SWB POE. But the 1,500 and 2,500 encounter thresholds in the Proclamation and this rule exclude the third category of encounters—individuals determined to be inadmissible at a SWB POE. When describing historical data in this preamble, the Departments have generally sought to distinguish between encounters between POEs (also referred to as "USBP encounters") and encounters at and between the POEs (also referred to as "total CBP encounters" or "encounters," depending on the context).

[34] In this rulemaking, as in the Proclamation, the term "unaccompanied children" or "UCs" has the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

[35] In this preamble, "irregular migration" refers to the movement of people into another country without authorization.

## B. Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[36] The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3); see also 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); see also 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240

removal proceedings"). These adjudications are conducted by IJs within DOJ's EOIR. See 6 U.S.C. 521; INA 103(g)(1), 8 U.S.C. 1103(g)(1). With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); see also Dhakal v. Sessions, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions. See 8 CFR 1003.1(a)(1), (b)(3); see also Garland v. Ming Dai, 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities.[37] Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[ ]" "requirements and procedures" to govern asylum applications. Id. The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); see also INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the

Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[38] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. See INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(3), 8 U.S.C. 1103(a)(3); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); see also 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. See DHS, No. 0150.1, Delegation to the Bureau of Citizenship and Immigration Services (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning ("refouler") "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, supra, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

---

[36] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, 114; see also 8 U.S.C. 1231 note (United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture); 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18.

[37] The HSA further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General." Public Law 107–296, 116 Stat. 2135, 2274 (codified at 6 U.S.C. 522).

[38] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

IFR_Rule_000007

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48717**

Congress implemented these obligations through the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("Refugee Act"), creating the precursor to what is now known as statutory withholding of removal. The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[39] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (codified at 8 U.S.C. 1231 note). DHS and DOJ have implemented the obligations of the United States under Article 3 of the CAT in the Code of Federal Regulations, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c)– 208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), *amended by* 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, while the Proclamation recognizes that the

asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, eligibility for asylum, or asylum procedures. That has been the Executive Branch's consistent position for four decades.[40] That longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only in its "sphere[ ]." *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[41] The asylum statute,

first enacted in the Refugee Act of 1980, today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States," *id.,* as those terms are properly understood, and exists regardless of whether a noncitizen is inadmissible.[42] As a result, the power under section 212(f) to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[43]

*Cf., e.g., Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have "extraterritorial application" to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) "does not allow the President to expressly override particular provisions of the INA," while emphasizing the particular "sphere[ ]" in which it operates).

---

[39] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426– 27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees," which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[40] In 1984, then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws," including "expedited-removal proceedings" where they could "raise any claims for protection." *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations was understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. *See* Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (Feb. 21, 2024). At the same time, nothing in the proclamations or the INA have precluded the Departments from considering as an adverse *discretionary* criterion that a noncitizen is described in a section 212(f) proclamation.

[41] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States.

[42] Section 212(f) contrasts with 42 U.S.C. 265, which authorizes the CDC to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health." During the COVID–19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued an order invoking section 265 to expel certain noncitizens without allowing asylum applications. As the final rule implementing section 265 explained, the provision is part of a "broad public health statute" that "operates separately and independently of the immigration power" and authorizes the CDC "to temporarily suspend the effect of any law . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265 was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration." Br. for Appellants at 41– 43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[43] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also

Continued

This rule, as discussed elsewhere, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1103(a)(1), (a)(3), (g), 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

*C. Summary of Provisions of the IFR*

This IFR adds provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuate three key changes to the process for those seeking asylum, statutory withholding of removal, or protection under the CAT during emergency border circumstances giving rise to the suspension and limitation on entry under the Presidential Proclamation of June 3, 2024, Securing the Border ("Presidential Proclamation of June 3"):

• During emergency border circumstances, persons who enter across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

• During emergency border circumstances, rather than asking

invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for "any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe," the Attorney General could issue regulations governing entry during such an emergency to "deny [certain noncitizens] a hearing . . . in special cases" notwithstanding the ordinary exclusion hearing provisions governing entry). This does not mean, however, that the President could not invoke section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, or protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The "reasonable probability" standard is defined to mean substantially more than a "reasonable possibility" but somewhat less than more likely than not.

As discussed throughout this IFR, these changes are designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances.

## III. Discussion of the IFR

*A. Current Framework*

1. Asylum, Statutory Withholding of Removal, and CAT Protection

Asylum is a discretionary benefit that can be granted by the Secretary or the Attorney General if a noncitizen establishes, among other things, that they have experienced past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INA 208(b)(1)–(2), 8 U.S.C. 1158(b)(1)–(2)

(providing that, unless subject to a mandatory bar, the Secretary or Attorney General "may" grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining "refugee"). As long as they retain their asylee status, noncitizens who are granted asylum (1) cannot be removed or returned to their country of nationality or, if they have no nationality, their last habitual residence, (2) receive employment authorization incident to their status, (3) may be permitted to travel outside of the United States and return with prior consent, and (4) may seek derivative benefits for their spouses or children. INA 208(c)(1), 8 U.S.C. 1158(c)(1); *see Johnson* v. *Guzman Chavez,* 594 U.S. 523, 536 (2021) ("[A] grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year[.]" (emphasis omitted) (internal quotation marks and citation omitted)); 8 CFR 274a.12(a)(5) (employment authorization incident to asylum status); 8 CFR 223.1(b) (allowing for return to the United States after travel with a requisite travel document for a "person who holds . . . asylum status pursuant to section 208 of the Act"); *see also* 6 U.S.C. 271(b)(3) (transferring asylum functions to DHS); 6 U.S.C. 557 (providing that references to any other officer shall be deemed to refer to the "Secretary" with respect to any transferred function); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Asylum applications are generally classified as "affirmative" or "defensive" applications, depending on the agency with which they are filed. If a noncitizen is physically present in the United States, not detained, and not in section 240 removal proceedings, the noncitizen may file an asylum application with USCIS. These applications are "affirmative" filings. Generally, if the noncitizen is in section 240 removal proceedings before an IJ, the noncitizen may apply for asylum before the IJ as a defense to removal.[44] These applications are "defensive" filings.

Noncitizens are eligible for asylum if they have been persecuted or have a well-founded fear of future persecution in their country of nationality or, if they have no nationality, their last habitual residence, on account of one of five protected grounds and are not subject to a bar to eligibility. *See generally* INA 208, 8 U.S.C. 1158; INA 101(a)(42), 8 U.S.C. 1101(a)(42). To be granted

[44] The only exception is that USCIS has initial jurisdiction over asylum applications filed by a UC even where the applicant is in section 240 removal proceedings. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C).

asylum, eligible noncitizens must also establish that they merit asylum in the exercise of discretion. *Id.* Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, may qualify for other forms of protection. An application for asylum submitted by a noncitizen in section 240 removal proceedings is also considered an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b), 1208.13(c)(1). An IJ also may consider a noncitizen's eligibility for statutory withholding of removal and CAT protection under regulations issued pursuant to the implementing legislation regarding the obligations of the United States under Article 3 of the CAT. FARRA sec. 2242(b) (codified at 8 U.S.C. 1231 note); 8 CFR 1208.3(b), 1208.13(c)(1); *see also* 8 CFR 1208.16(c), 1208.17.

Statutory withholding of removal and CAT protection preclude removing a noncitizen to any country where the noncitizen would "more likely than not" face persecution or torture, meaning that the noncitizen's life or freedom would be threatened because of a protected ground or that the noncitizen would be tortured. 8 CFR 1208.16(b)(2), (c)(2). Thus, if a noncitizen establishes that it is more likely than not that their life or freedom would be threatened because of a protected ground, but is denied asylum for some other reason, the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16. Likewise, a noncitizen who establishes that they more likely than not will face torture in their country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a).

In contrast to the more generous benefits available by attaining asylum, statutory withholding of removal and CAT protection do not: (1) prohibit the Government from removing the noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status; or (3) afford the same ancillary benefits, such as derivative protection for family members. *See, e.g., Guzman Chavez,* 594 U.S. at 536 ("distinguish[ing] withholding-only relief from asylum" on the ground that withholding does not preclude the Government from removing the noncitizen to a third country and does

not provide the noncitizen any permanent right to remain in the United States); *Matter of A–K–,* 24 I&N Dec. 275, 279 (BIA 2007) (stating that "the Act does not permit derivative withholding of removal under any circumstances"); INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (statutory provision allowing asylum status to be granted to accompanying or following-to-join spouse or children of a noncitizen granted asylum; no equivalent statutory or regulatory provision for individuals granted withholding or deferral of removal).

2. Expedited Removal and Screenings in the Credible Fear Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–28, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process. The process is applicable to certain noncitizens present at or arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation requirements for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. The Departments have used the same screening process to identify potentially valid claims for statutory withholding of removal and CAT protection. If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to a USCIS AO to determine whether the noncitizen has a credible fear of persecution or torture in the country of citizenship or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4). A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the

alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). If the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 208.33(b)(2)(v), 1208.30(g).

If the AO (or an IJ reviewing the AO's decision) determines that a noncitizen has a credible fear of persecution or torture, USCIS can refer the noncitizen to an immigration court for adjudication of the noncitizen's claims in section 240 removal proceedings, 8 CFR 208.30(f), 8 CFR 1208.30(g)(2)(iv)(B), and the noncitizen may subsequently file a defensive asylum application with the court during those proceedings, *see* 8 CFR 1240.1(a)(1)(ii). Alternatively, USCIS can retain jurisdiction over the application for asylum for further consideration in an asylum merits interview. *See* 8 CFR 208.30(f). During an asylum merits interview, a positive credible fear determination is treated as the asylum application, and strict timelines thereafter govern the applicant's case before both USCIS and EOIR. *See* 8 CFR 208.2(a)(1)(ii), 208.3(a)(2), 208.4(b)(2), 208.9(a)(1), (e)(1)–(2), (g)(2), (i), 1240.17. The AO may grant asylum, subject to review within USCIS, where the noncitizen is eligible and warrants a grant as a matter of discretion. 8 CFR 208.14(b). If the noncitizen is not eligible or does not warrant a grant of asylum as a matter of discretion, the AO refers the application to EOIR. 8 CFR 208.14(c)(1). Where USCIS does not grant asylum, the AO's decision will also include a determination on eligibility for statutory withholding of removal and CAT protection based on the record before USCIS. 8 CFR 208.16(a), (c)(4).

For cases referred to EOIR following an asylum merits interview, the written record of the positive credible fear determination serves as the asylum application, 8 CFR 1240.17(e), and the record the AO developed during the asylum merits interview, as supplemented by the parties, serves as the record before the IJ, 8 CFR 1240.17(c), (f)(2)(i)(A)(1), (f)(2)(ii)(B). The IJ reviews applications for asylum de novo and also reviews applications for statutory withholding of removal and CAT protection de novo where USCIS found the noncitizen ineligible for such protection. 8 CFR 1240.17(i)(1). However, where USCIS found the noncitizen eligible for statutory withholding of removal or CAT

protection, IJs must give effect to USCIS's eligibility determination unless DHS demonstrates, through evidence or other testimony that specifically pertains to the noncitizen and was not in the record of proceedings for the asylum merits interview, that the noncitizen is not eligible for such protection. 8 CFR 1240.17(i)(2). With a limited exception, DHS may not appeal the grant of any protection for which the AO determined the noncitizen eligible. *Id.*

### 3. Lawful Pathways Condition on Asylum Eligibility

On March 20, 2020, the Director of the Centers for Disease Control and Prevention ("CDC") issued an order under 42 U.S.C. 265 and 268 suspending the introduction of certain noncitizens from foreign countries or places where the existence of a communicable disease creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of such introduction is necessary to protect the public health.[45] The CDC's Title 42 public health Order was extended multiple times.[46] While the Title 42 public health Order was in effect, noncitizens who did not have proper travel documents were generally not processed into the United States; they were instead expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in title 8 of the United States Code, which includes the INA. Circumvention of Lawful Pathways, 88 FR 11704, 11705 (Feb. 23, 2023) ("Circumvention of Lawful Pathways NPRM"). In early 2023, the President announced that the Administration expected to end the public health emergency on May 11, 2023, which would cause the then-operative Title 42 public health Order to end. *See id.* at 11708.

As the Departments stated in the Circumvention of Lawful Pathways rule, absent further action, the end of the Title 42 public health Order was expected to cause encounters with noncitizens seeking to enter the United States at the SWB to rise to or remain at all-time highs—as high as 11,000 migrants daily. 88 FR at 31331, 31315. And many of these individuals would be entitled to remain in the United States pending resolution of their asylum and protection claims. *See* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii) (not allowing for removal of those found to have a credible fear pending further consideration of the asylum claim); *see also* 88 FR at 31363 (noting that "most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future"). The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 public health Order was expected to result in many more migrants crossing the border and asserting claims of fear or seeking protection, which would in turn exceed the border security and immigration systems' capacity to process migrants in a safe, expeditious, and orderly way. *See* 88 FR at 31363. To address this expected increase in the number of migrants at the SWB and adjacent coastal borders seeking to enter the United States without authorization, the Departments promulgated the Circumvention of Lawful Pathways rule. *See* 88 FR 31314.

The Circumvention of Lawful Pathways rule, which became effective on its public inspection date, May 11, 2023, *id.*, and applies to those who enter during a two-year period, imposes a rebuttable presumption of asylum ineligibility on certain noncitizens who fail to pursue safe, orderly, and lawful processes for entry into the United States or seek protection in another qualifying country through which they traveled. 8 CFR 208.33(a), 1208.33(a). The rebuttable presumption applies to noncitizens who enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission where the entry is: (1) between May 11, 2023, and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in 42 U.S.C. 265 and 268 and the implementing regulation at 42 CFR 71.40; and (3) after the noncitizen traveled through a country other than their country of citizenship, nationality, or, if stateless,

last habitual residence, that is a party to the Refugee Convention or Refugee Protocol. 8 CFR 208.33(a)(1), 1208.33(a)(1).

The presumption does not apply to UCs or to noncitizens who availed themselves of or were traveling with a family member who availed themselves of certain safe, orderly, and lawful pathways—specifically those who (1) received appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE pursuant to a pre-scheduled time and place or presented at a POE without a pre-scheduled time and place but who can demonstrate by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. 8 CFR 208.33(a)(2), 1208.33(a)(2). Noncitizens may also overcome the presumption by demonstrating by a preponderance of the evidence that "exceptionally compelling circumstances exist." 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Such circumstances necessarily exist where, at the time of entry, the noncitizen or a family member with whom the noncitizen is traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) was a victim of a severe form of trafficking in persons under 8 CFR 214.11(a). 8 CFR 208.33(a)(3)(i)(A)–(C), (ii), 1208.33(a)(3)(i)(A)–(C), (ii). A noncitizen presumed ineligible for asylum under the rule may still apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is more likely than not that they will be persecuted because of a protected ground or tortured.

The condition on asylum eligibility in the Circumvention of Lawful Pathways rule ("Lawful Pathways condition") applies to asylum applications before USCIS and EOIR. 8 CFR 208.13(f), 1208.13(f). It also applies during credible fear screenings. 8 CFR 208.33(b), 1208.33(b). Noncitizens subject to expedited removal who indicate a fear of persecution or an intention to apply for asylum are currently first screened to assess whether the rebuttable presumption applies and, if so, whether the noncitizen is able to rebut the presumption. 8 CFR 208.33(b). If the AO

---

[45] CDC, Order Under Sections 362 & 365 of the Public Health Services Act (42 U.S.C. 265, 268): Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists (Mar. 20, 2020), *https://www.cdc.gov/ quarantine/pdf/CDC-Order-Prohibiting- Introduction-of-Persons_Final_3-20-20_3-p.pdf.*

[46] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

determines that the rebuttable presumption does not apply or the noncitizen has rebutted the presumption, the general procedures governing the credible fear process then apply. *See* 8 CFR 208.33(b)(1)(ii). On the other hand, if the AO determines that the noncitizen is covered by the rebuttable presumption and no rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 CFR 208.33(b)(1)(i), (b)(2). The Circumvention of Lawful Pathways rule currently provides that, if a noncitizen has established a reasonable possibility of persecution or torture, then DHS will issue a notice to appear ("NTA") to commence section 240 removal proceedings and may not refer the case to the asylum merits interview process. 8 CFR 208.33(b)(2)(ii).

Where a noncitizen requests review by an IJ, the IJ reviews the negative credible fear finding de novo. *See* 8 CFR 1208.33(b). If the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT protection, the IJ issues a positive credible fear finding and the case proceeds under existing procedures. *See* 8 CFR 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the noncitizen is covered by the rebuttable presumption and it has not been rebutted, but the noncitizen has established a reasonable possibility of persecution or torture, the IJ issues a positive credible fear finding and DHS will issue an NTA to commence section 240 removal proceedings. 8 CFR 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See* 8 CFR 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that USCIS reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C).

A noncitizen who has not established during expedited removal proceedings a significant possibility of eligibility for asylum because of the Lawful Pathways condition may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible. *See* 8 CFR 1208.33(b)(4). Where a principal asylum applicant in section 240 removal proceedings is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption, and where either an accompanying spouse or child does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. 8 CFR 1208.33(c).

*B. Justification*

1. Global Migration at Record Levels

Border encounters in the 1980s, 1990s, and 2000s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[47] Beginning in the 2010s, a growing share of migrants were from northern Central America[48] and, since the late 2010s, from countries throughout the Americas.[49] Since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from the northern Central American countries, and now to single adults and families from throughout the hemisphere (and beyond). Those encountered also have been more likely to seek asylum and other forms of relief or protection, straining the Departments' capacity to process individuals through expedited removal.[50]

In the early 2010s, U.S. Border Patrol ("USBP") encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2018. *See* 88 FR at 11708. This followed decades during which annual USBP encounters routinely numbered in the millions; however, the overall share of those who were processed for expedited removal and claimed a fear never exceeded 2 percent until 2011. *Id.* at 11708, 11716. Despite these historically low encounter numbers, the Departments faced significant challenges in 2014 due to an unprecedented surge in migration by UCs and in 2016 due to a surge in family units at the border— demographics that present unique challenges due to their vulnerability.[51]

From FY 2017 to FY 2019, however, encounters between the POEs along the SWB more than doubled, to more than 850,000, and—following a significant drop during the beginning of the COVID–19 pandemic—continued to increase in FY 2021 and FY 2022.[52] In FY 2021, USBP encounters between POEs along the SWB reached a level not seen since the early 2000s—over 1.6 million.[53] In FY 2022, encounters at the

---

[47] *See* 88 FR at 11708. According to OHSS Persist data and historic Office of Immigration Statistics ("OIS") Yearbooks of Immigration Statistics, Mexican nationals accounted for 87 to over 99 percent of apprehensions between POEs of persons entering without inspection between 1981 and 2010. *See* March 2024 OHSS Persist Dataset; *see, e.g.,* INS, *1981 Statistical Yearbook of the Immigration and Naturalization Service* 119 tbl. 53 (1981); INS, *1999 Statistical Yearbook of the Immigration and Naturalization Service* 208–11 tbl. 56 (Mar. 2002), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1999.pdf*. For more information about Mexican migrants' demographics and economic motivations during some of that time period, see Jorge Durand et al., *The New Era of Mexican Migration to the United States,* 86 J. Am. Hist. 518, 525–27, 530–31, 535–36 (1999).

[48] Northern Central America refers to El Salvador, Guatemala, and Honduras. 88 FR at 11708 n.35.

[49] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

[50] For noncitizens encountered at the SWB from FY 2014 to FY 2019 who were placed in expedited removal proceedings, roughly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination compared to roughly 57 percent of people from northern Central America and 90 percent of all other nationalities. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023; *see also* 88 FR at 11709 n.37.

[51] Decl. of Blas Nuñez-Neto ¶ 6, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[52] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[53] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

SWB reached a new high-water mark, with total USBP encounters exceeding 2.2 million.[54] FY 2023 saw a slight drop, but USBP encounters remained high—over 2.0 million.[55] By early 2023, while the Title 42 public health Order was in place, total encounters at the SWB—referring to the number of times U.S. officials encountered noncitizens attempting to cross the SWB without authorization to do so either between or at POEs—had reached all-time highs.[56] This dramatic increase in encounters has coincided with a substantial and—setting aside the period of time when the Title 42 public health Order was in effect—persistent increase in the number of noncitizens making fear claims in recent years. *See* 88 FR at 11716.[57] In 2019—prior to the implementation of the Title 42 public health Order—44 percent of noncitizens encountered at the SWB placed in expedited removal proceedings claimed fear, resulting in 98,000 credible fear screenings. *Id.* The number of fear

claims returned to these historically high levels after the Title 42 public health Order ended. From May 2023 through March 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 169,000 fear claims out of 315,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE).[58] These high numbers of both encounters and fear claims combine to further compound the significant stress on the immigration system.

Much of this growth in encounters was driven by nationalities that DHS had never before encountered in large numbers at the border—including nationals of countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela, as well as migrants from Eastern Hemisphere countries.[59] Because of this, DHS has had to undertake a focused diplomatic effort, working closely with the Department of State, to enter into commitments with countries to facilitate the return of their nationals. However, despite this concerted effort, it remains difficult for DHS to repatriate nationals of some of these countries who do not establish a legal basis to remain in the United States, including those from the Eastern Hemisphere—substantially limiting DHS's ability to impose consequences on these nationals.[60]

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014

to December 2020.[61] Encounters of Mexican nationals have fallen to 29 percent of total SWB encounters during this time frame—an enormous change from historical trends that has sweeping ramifications for the border and immigration system, which are detailed below.[62]

The increase in migration at the SWB is consistent with global and regional trends. Over the past three years, migration around the world has reached levels not seen since World War II.[63] The Western Hemisphere is no exception and has been facing historic levels of migration that have severely strained the immigration systems of countries throughout the region.[64] There is a growing consensus within the region that this shared challenge cannot be solved without collective action—a consensus reflected by the 22 countries that have supported the Los Angeles Declaration on Migration and Protection, which proposes a comprehensive approach to managing migration throughout the region.[65]

[54] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[55] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[56] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters). During the initial seven months of FY 2023, while the Title 42 public health Order was still in effect, total CBP encounters surged to an all-time high of 1.4 million—an 11 percent increase over the same period in FY 2022 and nearly double the encounters recorded in FY 2021 for the same time period.

[57] The percentage of noncitizens encountered at and between SWB POEs processed for expedited removal who made fear claims steadily rose from 16 percent in FY 2013 to 44 percent in FY 2019, experienced a temporary dip in FY 2020 at the start of the Title 42 public health Order, and then resumed an upward trajectory, reaching a peak of 59 percent in FY 2023, marking the highest level of fear claims as a share of the SWB expedited removal population ever recorded. *See* OHSS Enforcement Lifecycle as of December 31, 2023; March 2024 OHSS Persist Dataset. Data on the exact number of noncitizens encountered at the SWB processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that about 84 percent of all fear claims made in prior years were made by noncitizens encountered at and between SWB POEs. Even if 100 percent of fear claims made before FY 2013 were made by noncitizens encountered at the SWB, the level of fear claims as a share of SWB encounters at and between POEs processed for expedited removal in 2023 would be the highest ever.

[58] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[59] Nationals from all countries other than Mexico and the northern Central American countries accounted for less than 5 percent of total CBP SWB encounters each year between FY 1981 and FY 2010, an average of 5 percent of SWB encounters from FY 2010 to FY 2013, and 10 percent of total SWB encounters from FY 2014 to FY 2019. The increase in encounters from these new countries of origin has accelerated since the start of FY 2021, as non-Mexican, non-northern Central American countries accounted for 42 percent of encounters from the start of FY 2021 through the second quarter of FY 2024, including 51 percent of FY 2024 encounters through March 2024. OHSS analysis of historic OIS *Yearbooks of Immigration Statistics* and March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Citizenship").

[60] *See* 88 FR at 11708–11.

[61] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

The application of title 42 authorities at the SWB also altered migratory patterns, in part by incentivizing individuals who were expelled—without being issued a removal order, which, unlike a title 42 expulsion, carries immigration consequences—to try to re-enter, often multiple times. *See* 88 FR at 11709. The majority of repeat encounters were of Mexican and northern Central American nationals, who were much more likely than others to be expelled to the Mexican side of the U.S.-Mexico border—between FY 2020 and FY 2023, 72 percent of Mexican and 50 percent of northern Central American encounters at and between SWB POEs resulted in title 42 expulsion, contrasting sharply with 8 percent of non-Mexican and non-northern Central American encounters experiencing similar outcomes. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Selected Citizenship").

Even accounting for increased repeat encounters, unique encounters at and between SWB POEs also hit all-time highs in each year from FY 2021 to FY 2023. Nationals of countries other than Mexico and the northern Central America countries account for an even larger share of the growth in unique encounters, comprising 51 percent of unique encounters from January 2021 to March 2024, up from 9 percent in FY 2014 to December 2020. March 2024 OHSS Persist Dataset.

[62] March 2024 OHSS Persist Dataset.

[63] Decl. of Blas Nuñez-Neto ¶ 2, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[64] *See* 88 FR at 11710–11.

[65] *See* The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

As it prepared for the return to title 8 processing of all noncitizens, DHS led a comprehensive, all-of-government planning and preparation effort that lasted more than 18 months.[66] This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.[67] This effort also included the development and implementation of policy measures, including the joint DHS and DOJ Circumvention of Lawful Pathways rule and complementary measures, which were critically important components of DHS preparations to manage the anticipated significant influx of migrants associated with the end of the Title 42 public health Order's application at the border.[68] And the United States Government's efforts were complemented by a range of measures taken by foreign partners in the region, such as Mexico's independent decision to continue to accept the return of certain non-Mexican migrants after May 11, 2023,[69] and campaigns by Colombia and Panama to attack smuggling networks operating in the Darién Gap.[70]

The Circumvention of Lawful Pathways rule has strengthened the consequences in place for those who cross the border irregularly and is a critical component of the Government's regional strategy. DHS has also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal and limit noncitizens absconding;[71] changing the consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen's acknowledgment of receipt of information explaining the credible fear process;[72] returning certain third-country nationals to Mexico, consistent

with established processes under the INA;[73] permitting certain non-Mexican citizens to withdraw their application for admission and voluntarily return to Mexico;[74] and increasing USCIS's capacity to train and prepare additional staff temporarily detailed as AOs to conduct credible fear interviews.[75] These measures, combined with existing processes and resources and work with regional and international partners to disrupt irregular migration and smuggling networks, seek to form a comprehensive framework for managing migratory flows to the border—one that seeks to disincentivize noncitizens from putting their lives in the hands of callous smugglers by crossing the SWB between POEs and to incentivize noncitizens to use lawful, safe, and orderly pathways and processes instead.

Without the Circumvention of Lawful Pathways rule and complementary measures, DHS assesses that irregular migration at the border would be substantially higher today. DHS saw evidence of very high levels of irregular migration in the days leading up to the end of the Title 42 public health Order on May 11, 2023.[76] A historic surge in migration culminated with what were then the highest recorded encounter levels in U.S. history over the days immediately preceding May 11, which placed a significant strain on DHS's operational capacity at the border.[77] Encounters between POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the Title 42 public health Order (from May 8 to May 11).[78] The

sharp increase in encounters between POEs during the 30 days preceding May 11 represented the largest month-over-month increase in almost two decades—since January 2004.[79]

As a consequence of the elevated flows USBP experienced in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges.[80] From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000 noncitizens, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.[81] During this same time frame, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, Rio Grande Valley, and Yuma) at more than 50 percent over their holding capacity and one sector (Tucson) at more than two-and-a-half times over its holding capacity.[82]

This record number of encounters between POEs severely strained DHS operations and resources, as well as the resources of other Federal Government agencies, local communities, and non-governmental organizations ("NGOs").[83] CBP redirected limited resources from other mission needs—in particular, legitimate travel and trade operations, the volume of which by that time had surpassed pre-pandemic levels—to focus on processing apprehended noncitizens.[84] Overcrowding in CBP facilities increased the potential for health and safety risks to noncitizens, Government personnel, and contract support staff. Such risks were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody who must be processed.[85] To manage these conditions, USBP sectors redirected personnel from the field to perform tasks for noncitizens in custody, including processing, transporting, and escorting noncitizens.[86] This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.[87]

The surge in encounters between POEs immediately preceding the end of the Title 42 public health Order also led

[66] Decl. of Blas Nuñez-Neto ¶ 8, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[67] *Id.*

[68] *Id.*

[69] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[70] Decl. of Blas Nuñez-Neto ¶ 40, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[71] *Id.* ¶ 5.

[72] *Id.*

[73] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (noting the United States and Mexico's commitment to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration, and noting that Mexico will continue to accept back migrants on humanitarian grounds).

[74] Decl. of Blas Nuñez-Neto ¶ 5, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[75] *Id.*

[76] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas*, No. 22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[77] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[78] *Id.*

[79] *Id.*

[80] *Id.* ¶ 10.

[81] *Id.*

[82] *Id.*

[83] *Id.* ¶ 11.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

to significant challenges for local border communities.[88] For example, in the days leading up to May 11, 2023, local community resources in El Paso, Texas, were quickly overwhelmed as the number of noncitizens arriving in the United States surpassed the city's capacity.[89] In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency, as more than 1,000 noncitizens were sleeping on the sidewalks and left without shelter.[90] Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[91] The surge in encounters also placed strain on interior cities. In May 2023, for instance, New York's Governor declared a State Disaster Emergency.[92]

Since their implementation in May 2023, the Circumvention of Lawful Pathways rule and complementary measures have helped DHS to better manage migratory flows. Between May 12, 2023, and March 31, 2024, CBP placed into expedited removal more than 970 individuals encountered at and between POEs each day on average, and USCIS conducted a record number of credible fear interviews (more than 152,000) resulting from such cases. This is more interviews from SWB encounters at and between POEs during the span of ten and a half months than in any full fiscal year prior to 2023, and more than twice as many as the annual average from FY 2010 to FY 2019.[93] On average, since May 12, 2023, USCIS has completed approximately 3,300 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.[94] In addition, in FY 2023, IJs conducted over 38,000 credible fear and reasonable fear reviews, the highest figure on record since at least 2000.[95]

These efforts have significantly reduced the median time to process credible fear cases. Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations, the median time from encounter to removal, in the same time frames, decreased by 85 percent from 73 days to 11 days.[96]

The increase in referrals into expedited removal proceedings, combined with the streamlining of the process, has had tangible results. From May 12, 2023, to March 31, 2024, DHS removed more than 662,000 individuals—more removals than in any full fiscal year since 2013 and an indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences when individuals do not establish a legal basis to remain in the United States.[97] Over the first six months immediately following May 12, 2023, DHS saw a significant decrease in border encounters between POEs. After peaking at 9,700 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between POEs decreased by 45 percent to an average of 5,200 per day for the period from May 12, 2023, to November 30, 2023.[98] While this months-long trend included variability over shorter periods, border encounters between POEs remained below the levels projected to occur in the absence of the

Circumvention of Lawful Pathways rule and complementary measures.[99]

While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration.

After months of relatively lower encounter levels between POEs following the changes put in place after May 11, 2023, encounter levels increased through the fall of 2023,[100] and December 2023 saw the highest levels of encounters between POEs in history, including a surge in which border encounters between POEs exceeded 10,000 for three consecutive days and averaged more than 8,000 a day for the month.[101] That surge in migration was focused increasingly on western areas of the border—California and Arizona—that had not been the focal point of migration over the prior two years, and in areas that are geographically remote and challenging to respond to. For instance, the Tucson sector's average full-year encounter total for the pre-pandemic period (FY 2014 to FY 2019) was approximately 62,000; by contrast, in November and December of 2023, the sector recorded approximately 64,000 and 80,000 encounters, respectively.[102] And while the number of encounters between POEs since December 2023 has decreased, consistent with seasonal migration flows and as a result of increased enforcement, they still remain at historically high levels—USBP encounters from January 2024 to March 2024 are just 5 percent below the levels

---

[88] *Id.* ¶ 12.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *See* N.Y. Exec. Order No. 28, Declaring a Disaster Emergency in the State of New York (May 9, 2023), *https://www.governor.ny.gov/executive-order/no-28-declaring-disaster-emergency-state-new-york; see also* Mayor of Chicago Emergency Exec. Order No. 2023–2 (May 9, 2023).

[93] Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[94] Completed cases are those with credible fear interviews that have been adjudicated or that have been closed. Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[95] EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Apr. 27, 2023), *https://www.justice.gov/eoir/media/1344816/dl?inline.*

[96] Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023; post-May 12 estimates are based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. Encounter-to-removal cases include noncitizens removed after being placed in expedited removal proceedings, claiming fear, and receiving a negative fear determination or an administrative closure that is not referred to EOIR. Comparisons to the pandemic period are not relevant because many noncitizens who normally would have been referred for expedited removal processing were instead expelled under title 42 authority.

[97] OHSS analysis of data downloaded from UIP on April 2, 2024; *see* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[98] Pre-May 12, 2023, data from March 2024 OHSS Persist Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on December 12, 2023.

[99] Decl. of Blas Nuñez-Neto ¶ 4, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) (noting that in the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Title 42 public health Order).

[100] *See* CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited May 27, 2024) (providing monthly figures for 2021 to 2024).

[101] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf;* Priscilla Alvarez, *Authorities Encountering Record Number of Migrants at the Border Each Day Amid Unprecedented Surge,* CNN (Dec. 22, 2023), *https://www.cnn.com/2023/12/22/politics/border-surge-record-amounts/index.html.*

[102] *See* March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

IFR_Rule_000015

reached during the same months in 2023,[103] while some USBP sectors, such as Tucson and San Diego, have seen increases of 83 percent and 62 percent, respectively, from the second quarter of FY 2023, and Tucson is on pace for an all-time high number of annual encounters.[104]

Since the lifting of the Title 42 public health Order, then, it has become increasingly clear that DHS's ability to process individuals encountered at the SWB under applicable title 8 authorities—including, critically, to deliver timely consequences to those who do not establish a legal basis to remain in the United States—is significantly limited by the lack of resources and tools available to the Departments. In response to the record high levels of encounters between POEs in December 2023, DHS had to take extraordinary steps to shift personnel and resources to the affected sectors: CBP curtailed or suspended operations at a number of POEs, and, just before December 25, 2023, CBP reassigned 246 officers to support USBP operations. As part of these extraordinary measures: vehicular traffic through the Eagle Pass, Texas, POE was suspended on November 27, 2023; the POE in Lukeville, Arizona, was closed on December 4, 2023; rail operations at POEs in El Paso and Eagle Pass, Texas, were suspended on December 18, 2023; [105] the Morley Gate POE in Nogales, Arizona, which was closed due to construction and slated to be reopened in November 2023, delayed its reopening; [106] and operations at Pedestrian West, part of the San Ysidro POE in San Diego, California, were suspended on December 9, 2023.[107] On

January 4, 2024, once the volume of migrants had diminished and CBP officers were able to return to normal duties, port operations in these locations resumed.[108]

The decision to close POEs was not one taken lightly. The United States Government fully understands the impacts of such closures on local communities on both sides of the border, both socially and economically.[109] Closing international POEs is a measure of last resort, and one that DHS was compelled to take in order to reassign its resources to support frontline agents in a challenging moment.

In addition to concerted efforts to strengthen and maximize consequences, including through new regulations, the United States Government has engaged intensively with the Government of Mexico to identify coordinated measures both countries could take, as partners, to address irregular migration. During the period before and after the December surge, the United States Government and the Government of Mexico held numerous talks at the highest levels of government to address migration. For example, President Biden and President of Mexico Andrés Manuel López Obrador spoke on December 21, 2023, and February 3, 2024.[110] During their conversation on December 21, the presidents agreed that additional enforcement actions were urgently needed so that the POEs that were temporarily closed could reopen.[111] In

subsequent high-level meetings, both countries committed to expanding efforts to increase enforcement measures to deter irregular migration, expanding safe and lawful pathways, and strengthening cooperation.[112] The Government of Mexico expressed its concern about the economic impact of the POE closures and committed to increasing enforcement on key transit routes north.[113] On January 22, 2024, after a series of follow-on meetings between United States and Mexican Cabinet members in Washington, DC, Mexico's Foreign Secretary enumerated a series of steps that the United States and Mexico committed to taking to continue to address migration, including combating human smuggling and trafficking organizations.[114]

DHS assesses that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available and the Government of Mexico's operational constraints at the end of its fiscal year, which limited its ability to enforce its own immigration laws.[115] The

[103] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https:// www.dhs.gov/ohss/topics/immigration/ enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[104] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https:// www.dhs.gov/ohss/topics/immigration/ enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[105] *See* CBP, *Statement from CBP on Operations in Eagle Pass, Texas and Lukeville, Arizona* (Nov. 27, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-eagle-pass-texas-and-lukeville-arizona.*

[106] *See* CBP, *Statement on Operational Changes and Resumption of Rail Operations in Eagle Pass and El Paso* (Dec. 22, 2023), *https://www.cbp.gov/ newsroom/national-media-release/statement-cbp-operational-changes-and-resumption-rail-operations.*

[107] *See* CBP, *Statement from CBP on Operations in San Diego, California* (Dec. 7, 2023), *https:// www.cbp.gov/newsroom/national-media-release/ statement-cbp-operations-san-diego-california.*

[108] *See* CBP, *Statement from CBP on Resumption of Operations in Arizona, California, and Texas* (Jan. 2, 2024), *https://www.cbp.gov/newsroom/ national-media-release/statement-cbp-resumption-field-operations-arizona-california-and.*

[109] *See, e.g.,* Russel Contreras, *U.S.-Mexico Border Closures Could Cost Billions,* Axios (Dec. 22, 2023), *https://www.axios.com/2023/12/22/us-mexico-border-closures-could-cost-billions* (discussing evidence of the "devastating consequences" that follow from partial border closings); *cf.* Bryan Roberts et al., *The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry: Report to U.S. Customs and Border Protection* 5 (Apr. 2013), *https://ebir.info/wp-content/uploads/2014/07/ U.S.C.-Create-CBP-Final-Report.pdf* (discussing the benefits of adding staffing to land border POEs).

[110] *See* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/;* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Feb. 3, 2024), *https://www.whitehouse.gov/briefing-room/ statements-releases/2024/02/03/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-3/.*

[111] The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-*

bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/.

[112] The White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/ briefing-room/statements-releases/2024/02/07/ readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/.*

[113] *Id.; see also, e.g.,* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/ mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis; US, Mexico Agree to Strengthen Efforts to Curb Record Migration,* Reuters (Dec. 28, 2023), *https:// www.reuters.com/world/us-mexico-keep-border-crossings-open-lopez-obrador-says-2023-12-28/.*

[114] *See, e.g.,* Valentine Hilaire & Cassandra Garrison, *Mexico, US Pitch Measures to Ease Pressure on Border, Plan Guatemala Talks,* Reuters (Jan. 22, 2024), *https://www.reuters.com/world/ americas/mexico-us-guatemala-officials-meet-migration-talks-2024-01-22/;* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/ newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Mexico's Foreign Affairs Secretary as saying that "we have done much more law enforcement to bring down the pressure in the border in the north").

[115] *See* María Verza, *Mexico Halts Deportations and Migrant Transfers Citing Lack of Funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/ mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc; Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents,* NPR (Dec. 10, 2023), *https://www.npr.org/2023/12/10/ 1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents;*

Continued

Departments cannot address all of these factors in one rule, but assess that this rule will significantly increase the ability to deliver timely decisions and timely consequences at the border within current resources, combating perceptions and messaging to the contrary.

Encounters between POEs in January 2024 were substantially lower than December 2023 encounters, consistent with historic seasonal trends, and encounters in January 2022 and January 2023.[116] In February and March 2024, encounter levels increased from the levels in January but remained significantly lower than in December 2023.[117] Overall, from January 1 to March 31, 2024, encounters between POEs were 5 percent lower than during the same months in 2023 and 22 percent lower than those in 2022.[118] However, despite the overall decrease in encounters since December 2023, specific areas of the border—in particular USBP's San Diego and Tucson Sectors—have experienced localized increases in encounters that have, at times, strained DHS's holding capacity, adversely impacted local operations, and limited DHS's ability to swiftly impose consequences on individuals who do not establish a legal basis to remain in the United States. During the last week of April 2024, USBP's San Diego Sector encountered an average of more than 1,400 migrants each day, including many migrants from countries outside the Western Hemisphere who are more difficult to process.[119] The USBP Tucson Sector is experiencing similar, unprecedented migratory flows and consequent challenges. This high concentration of encounters, including comparatively large numbers of migrants who are hard to remove, in a focused geographic area places particular strain on the immigration enforcement system. This is particularly true in areas of the border—such as San Diego—where infrastructure-related capacity constraints limit DHS's ability to swiftly impose consequences at the border. These factors resulted in USBP's main processing facility in San Diego reaching over 200 percent capacity in April 2024, despite a recent expansion of this facility.

Since January 2024, the United States and Mexico have continued to hold regular, high-level conversations, as partners, to continue to deepen their collaboration, identify emerging trends, and coordinate additional steps by both countries to address changing flows. These meetings have informed operational deployments by both governments, including the coordinated response to the shift in migratory flows to the San Diego and Tucson sectors. This extensive ongoing collaboration was reflected by another bilateral engagement between President Biden and President López-Obrador on April 28, 2024, after which the presidents released a joint statement in which they "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights."[120]

Since then, the United States and the Government of Mexico have worked together, cooperatively, to increase enforcement.[121] But these efforts—while significant—are likely to be less effective over time. Smuggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the

funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs.

### 2. Need for These Measures

DHS projects that, absent the policy changes being promulgated here, irregular migration will once again increase, and that any disruption in Mexican enforcement will only exacerbate that trend. Without the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States.

Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution, poverty, human rights abuses, the impacts of climate change, and other factors. The case of migration through the Darién jungle between Colombia and Panama is illustrative. For example, between January and April, 2024, the United Nations High Commissioner for Refugees ("UNHCR") tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022.[122] The number of migrants crossing the Darién will only further increase the pressure on Mexico at its southern border and on the United States at the SWB.

Past unprecedented migration surges bolster the Departments' views and the need for this rulemaking. As described in detail in Section III.B.1 of this preamble, migration trends have been steadily increasing in scope and complexity, featuring increasingly varied nationalities and demographic groups. This has been true even as DHS has experienced sustained levels of historically high encounter levels. Over the past two years, an increasing proportion of total CBP encounters at the SWB has been composed of families and UCs, and DHS has seen record flows of migrants from countries outside of northern Central America.[123] These

Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends*, Washington Office of Latin America (Dec. 15, 2023), *https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/*; Jordan, *supra* note 27.

[116] OHSS analysis of March 2024 OHSS Persist Dataset.

[117] OHSS analysis of March 2024 OHSS Persist Dataset.

[118] OHSS analysis of March 2024 OHSS Persist Dataset.

[119] *See* Elliot Spagat, *The Latest Hot Spot for Illegal Border Crossings is San Diego. But Routes Change Quickly*, AP News (May 17, 2024), *https://apnews.com/article/san-diego-border-asylum-biden-mexico-da1e7b7c81e4e58912deff6d36dbdb9e*.

[120] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador*.

[121] *See* Valerie Gonzalez & Elliot Spagat, *The US Sees a Drop in Illegal Border Crossings After Mexico Increases Enforcement*, AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a*; Luke Barr, *US Customs And Border Protection Reopening 4 Ports of Entry After Migrant Surge Subsides*, ABC News (Jan. 2, 2024), *https://abcnews.go.com/US/us-customs-border-protection-reopening-4-ports-entry/story?id=106062555*; Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration*, AP News (Apr. 30, 2024), *https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b*; Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down*, NBC News (May 15, 2024), *https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821*.

[122] The UNHCR tracked 20,000 irregular entries in the Darién gap in 2022. OHSS analysis of downloaded from UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring—January–December 2023, https://data.unhcr.org/en/documents/details/105569* (last visited May 31, 2024); *Darien Panama: Mixed Movements Protection Monitoring—April 2024, https://data.unhcr.org/en/documents/details/108399* (last visited May 31, 2024).

[123] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/*

IFR_Rule_000017

international migration trends are the result of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks.[124] The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[125] including through working closely with partner countries across the Western Hemisphere.[126] But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation.

The Departments' views and the need for this rulemaking are further supported by projections developed from ongoing work by DHS's Office of Homeland Security Statistics ("OHSS"), which leads an interagency working group that produces encounter projections used for operational planning, policy development, and short-term budget planning. OHSS uses a mixed-method approach that combines a statistical predictive model with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed-methods approach blends multiple types of models through an ensemble approach of model averaging.[127] The

model includes encounter data disaggregated by country and demographic characteristics, data on apprehensions of third-country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, which can include "low" planning models that are based on the lower bound of the 95 percent forecast interval, "moderate" planning models that are based on the upper bound of the 68 percent forecast interval, and "high" planning models based on the upper bound of the 95 percent forecast interval. These planning models account for changes in effectiveness of current enforcement and lawful migration processes.[128]

Because of the significant time and operational cost it takes to redeploy resources, DHS is generally conservative in its enforcement planning. 88 FR at 31328. As a result, it focuses on its higher planning models as it projects future resource deployments to avoid using more optimistic scenarios that could leave enforcement efforts badly under-resourced. *Id.* The current internal projections, based on this robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the three months from July to September, 2024, in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[129] The Departments believe the policies in this rule are

justified in light of high levels of migration that have ultimately proved persistent even in the face of new policies that have resulted in processing migrants with record efficiency, as evidenced by the migration patterns witnessed in December 2023. Current sustained, high encounter rates exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered.[130] This is generally true when considering total encounters across the entire SWB, and even more the case when specific sectors along the border are targeted by smuggling organizations with focused localized surges in encounters—as has been happening since the late fall in Tucson, Arizona, which accounted for 35 percent of SWB encounters between POEs in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022.[131]

Despite the fact that the average of 4,400 daily encounters between POEs in the second quarter of FY 2024 is below the highs experienced in the days immediately preceding the end of the Title 42 public health Order and in December 2023,[132] daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.[133]

---

*ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SWB Encounters by Agency and Family Status" and "SWB Encounters by Citizenship and Family Status").

[124] *See* 88 FR at 31327–28 & n.59.

[125] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[126] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[127] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.,* Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art,* 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has "stood the test of time . . . that combining forecasts improves the [forecast] accuracy"); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change,* 7 Nat. Hum. Behaviour 484 (2023), *https://doi.org/10.1038/s41562-022-01517-1* (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and

multidisciplinary team members). DHS notes that the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *See* 88 FR at 31316 n.14.

[128] OHSS Southwest Border Encounter Projection, April 2024.

[129] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[130] *See, e.g.,* Decl. of Blas Nuñez-Neto ¶ 8, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[131] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables—October 2023, https:// www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[132] March 2024 OHSS Persist Dataset. As noted *supra* note 5, preliminary April data show SWB encounters between POEs fell slightly, by 6 percent, between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this rule.

[133] The Tucson Sector accounted for 35 percent of USBP encounters in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022. OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *Southwest Land Border Encounters (By Component), https:// www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component* (last modified May 15, 2024). Border encounters typically fall around the New Year and often remain lower than other months in January. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/*

Continued

**48728**    **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

When capacity is strained like this in specific locations along the border, it becomes even more difficult for the Departments to deliver timely decisions and timely consequences. At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates,[134] a scenario that would likely continue to incentivize an increasing number of migrants to journey to the United States and further increase the likelihood of sustained high encounter rates.

Even in times with sustained lower encounter volumes, such as between 2011 and 2017, the Departments experienced challenging situations, including the first surge in UCs in 2014, that severely strained the United States Government's capacity.[135] Surges in encounters at the southern border—both at and between POEs—are now occurring more frequently and at higher magnitudes, and featuring more diverse demographics and nationalities than ever before.[136] These surges affect more

CBP sectors along the border, disrupt operations more quickly, and affect readiness in other critical areas as DHS diverts resources, including front-line agents, from other urgent tasks and geographic areas.[137] These actions, in turn, impact other critical mission sets, including processing lawful trade and travel at POEs.[138]

DHS continues to lack the necessary funding and resources to deliver timely consequences to the majority of noncitizens encountered given the increased level of encounters it is experiencing at the SWB.[139] On August 10, 2023, the Administration submitted to Congress a request for $2.2 billion in supplemental funding for border operations, including $1.4 billion for CBP and $714 million for ICE for border management and enforcement and an additional $416 million for counter-fentanyl efforts.[140]

On October 20, 2023, the Administration submitted to Congress a second request for supplemental funding for DHS, which would provide funding to enhance enforcement and processing, procure and operationalize needed technologies, and hire additional personnel.[141] This funding

would further support critical border enforcement efforts, including:

• An additional 1,300 Border Patrol Agents to work alongside the 20,200 agents proposed in the President's FY 2024 budget request, as well as 300 Border Patrol Processing Coordinators and support staff;[142]

• An additional 1,600 AOs and associated support staff to process migrant claims, which would provide USCIS with the critical resources needed to expand its current credible fear interview capacity to support timely processing of those placed in expedited removal;[143] and

• An expansion of detention beds and ICE removal flight funding to sustain the current significantly increased use of expedited removal, provide necessary surge capacity, and allow DHS to process more expeditiously noncitizens who cross the SWB unlawfully and swiftly remove those without a legal basis to remain in the United States.[144]

On January 31, 2024, DHS published a new USCIS fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 FR 6194, 6194 (Jan. 31, 2024); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction, 89 FR 20101 (Mar. 21, 2024) (making corrections). Because there is

enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("Nationwide CBP Encounters by Encounter Type and Region"). Thus, while CBP's apprehension of 402,000 noncitizens between POEs in the second quarter of FY 2024 is slightly lower than the 424,000 observed in FY 2023 and 518,000 in FY 2022, it is almost four times as high as the pre-pandemic second-quarter average for FY 2014 through FY 2019, and with the exceptions of FY 2022 and FY 2023 the highest second-quarter count recorded since FY 2001. Even with the downturn between January and March, 2024, the high volume of encounters and challenging demographic mix still meant that most noncitizens processed by USBP were released from custody into the United States (including noncitizens enrolled in an ICE Alternatives to Detention program and those paroled by the Office of Field Operations). OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Agency").

[134] Since May 12, 2023, 60 percent of non-Mexican noncitizen SWB encounters (at and between POEs) processed for expedited removal who have made fear claims have been referred to EOIR for immigration proceedings. OHSS analysis of data downloaded from UIP on April 2, 2024. But based on historic (pre-pandemic) data, only 18 percent of non-Mexican noncitizens processed for expedited removal that are referred to EOIR result in an individual being granted relief or protection from removal once the case is completed. OHSS Enforcement Lifecycle December 31, 2023.

[135] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status").

[136] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/*

ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status" and "CBP SW Border Encounters by Agency and Selected Citizenship"); *The Unaccompanied Children Crisis: Does the Administration Have a Plan to Stop the Border Surge and Adequately Monitor the Children?: Hearing Before the S. Comm. On the Judiciary,* 114th Cong. (2016) (statement of Ronald Vitiello, Acting Chief of USBP), *https://www.judiciary.senate.gov/imo/media/doc/02-23-16%20Vitiello%20Testimony.pdf;* Memorandum on the Response to the Influx of Unaccompanied Alien Children Across the Southwest Border, 1 Pub. Papers of Pres. Barack Obama 635, 635 (June 2, 2014).

[137] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2).

[138] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2); Decl. of Blas Nuñez-Neto ¶ 32, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[139] Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[140] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3, attach. at 45–50 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[141] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical*

*National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[142] *See* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[143] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[144] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.*

IFR_Rule_000019

no fee required to file an asylum application or for protection screenings, 8 CFR 106.2(a)(28), and because Congress has not provided other funds to pay for the operating expenses of the Asylum Division,[145] fees generated from other immigration applications and petitions must be used to pay for these expenses. *See* INA 286(m), 8 U.S.C. 1356(m). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[146] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[147] Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget[148] would impose a burden on other filers.

In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[149] Critically, the proposal included nearly $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities,[150] including resources for:

• Over 1,500 new CBP personnel, including Border Patrol Agents and CBP Officers;
• Over 4,300 new AOs, as well as USCIS staff to facilitate timely and fair decisions;
• 100 additional IJ teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;
• Shelter and critical services for newcomers in U.S. cities and States; and
• 1,200 new ICE personnel for functions including enforcement and removals.[151]

However, Congress failed to move forward with this bipartisan legislative proposal.[152] It also failed to pass the emergency supplemental funding requests that the Administration submitted. Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. For example, the bill does not provide the resources necessary for DHS to refer the majority of noncitizens encountered by USBP who are amenable to expedited removal into such processing, resulting in large-scale releases pending section 240 removal proceedings based on current encounter numbers. Such releases, in turn, have significant impacts on communities and contribute to further migration by incentivizing potential migrants to travel to the United States with the belief that, even if initially detained, they will ultimately be released to live and work in the United States for long periods of time. Absent the Proclamation and this rule, these harmful results are especially likely given the circumstances described in the Proclamation.

The FY 2024 appropriations provided some additional funding for DHS above its request, including for additional Border Patrol Agents and a higher level of ICE detention beds than was previously appropriated.[153] Although

this increase is helpful, there are a number of ways in which the FY 2024 budget falls well short of what DHS needs to respond to the current elevated levels of migration. For example, the FY 2024 appropriations failed to fund the salary increase set across the Federal Government by the Office of Management and Budget ("OMB"), effectively reducing salary funding for the entirety of the appropriations-funded DHS workforce.[154] This reduction will limit the availability of overtime to respond to surges in irregular migration and may require difficult operational decisions during the closing months of the fiscal year, which is historically a busier period for such migration. The appropriations also did not provide sufficient funding to maintain the temporary processing facilities needed to hold migrants in custody. Further, the funds for hiring additional personnel were restricted to the current fiscal year rather than being provided as multi-year funds as requested; given the length of the hiring process, DHS will not be able to realize the increases in personnel envisioned by the legislation before the funding expires.

All of these factors, taken together, mean that under the current appropriations law, DHS will, at best, be able only to sustain most of its current operations, resulting in an operating capacity that already experiences strain during times of high migration levels; this will, in turn, reduce DHS's ability to maximize the delivery of timely consequences for those without a lawful basis to remain. Additionally, DHS will not be able to expand capacity along the border or increase its ability to deliver consequences through referrals into expedited removal. Instead, DHS may actually need to reduce capacity in some key areas, including by closing critical temporary processing facilities and pulling USBP agents away from the frontline to undertake processing and tasks related to custody. Thus, while DHS has made significant progress toward a migration strategy focused on enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy, a lack of needed resources and tools hampers DHS's current ability to manage the unprecedented flow of hemispheric migration, and the

---

[145] *See* DHS, *U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2025 Congressional Justification* CIS—IEFA—22 (Mar. 8, 2024), *https://www.dhs.gov/sites/default/files/2024-03/2024_0308_us_citizenship_and_immigration_services.pdf* (showing AOs are funded by Immigration Examinations Fee Account); *id.* at CIS—O&S—30 (showing that appropriated funds from the Refugee, Asylum, and International Operations Directorate of USCIS support Refugee Officers).

[146] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[147] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

[148] *Id.*

[149] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[150] Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call*

*it dead in the House,* NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[151] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[152] Associated Press, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance* (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

[153] *See* House of Representatives, *Explanatory Statement: Division C, Department of Homeland Security Appropriations Act, 2024,* at 14, 25 (Mar.

18, 2024), *https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf.*

[154] *See id.* at 14, 22 (explaining that for CBP, "[t]he agreement includes $346,498,000 below the request, including the following: $182,772,000 for the 2024 pay raise," and for ICE, "[t]he agreement provides $9,501,542,000 for Operations and Support, including a decrease below the request of $74,153,000 for the 2024 pay raise").

IFR_Rule_000020

situation will only worsen with expected seasonal and other increases.

Immigration-related resource challenges are not unique to front-line border officials. The immigration removal continuum—from apprehension, processing, and inspection to protection interviews and removal—is hampered by a lack of sufficient funding, resources, and tools at every stage.[155] EOIR is underfunded, without sufficient resources to address the backlog of over 2.78 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024.[156] This under-resourcing has contributed to the growth of this backlog; in FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[157] The FY 2024 budget

creates even greater strains on EOIR. EOIR received $844 million this fiscal year,[158] a cut of $16 million from FY 2023.[159] EOIR's budget was also cut $94.3 million from its inflation-adjusted funding requirements (referred to as "Current Services").[160] As a result of the significant budgetary gap, EOIR will necessarily be required to reduce the Federal and contract labor force that has been supporting its immigration courts nationwide and cut spending to technological initiatives. Specifically, EOIR has identified a need to cut 200 of its authorized Federal positions and is identifying areas in which it can make cuts to contracts, including those supporting the Office of Information Technology, with the least amount of impact on operations.

Similarly, the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing.[161] USCIS does not have enough AOs to keep pace with the number of individuals who could be referred for credible fear interviews at the border, much less keep pace with new affirmative asylum receipts or even marginally reduce the affirmative asylum backlog. In sum, the border security and immigration systems are badly strained and not functioning to provide timely relief or protection for those who warrant it or timely consequences for those without a legal basis to remain, including those without viable asylum or protection claims.

The TCOs operating in the region, and the migrants they prey upon who intend to make the dangerous journey north, have taken notice of this situation. They understand that when the capacity of DHS to quickly process individuals at the border is strained, DHS is limited in its ability to deliver timely consequences. Because of these resource limitations, individuals are more likely

than not to be released to pursue a years-long immigration court process during which, beginning 180 days after applying for asylum, they may be authorized to work.[162] These smuggling organizations have built a multi-billion-dollar industry, featuring online marketing campaigns to spread misinformation and sophisticated logistics networks designed to quickly funnel migrants to the parts of the border where DHS capacity is lower.[163]

While the emergency measures instituted by the Proclamation are in effect, the Departments will put in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time noncitizens spend in DHS facilities. The specific measures introduced by this rule are designed to further streamline DHS processes at the border so that DHS can more quickly deliver meaningful consequences to more individuals who cross unlawfully or without authorization within the resource and operational constraints that have limited DHS capacity to date.

Under this rule, while emergency border circumstances persist, the way noncitizens are processed, their eligibility for asylum, and the way in which their eligibility for protection is assessed, will change in three ways. First, during emergency border circumstances, those who enter the United States across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. As discussed in Section III.B.3.a of this preamble, the Departments expect that applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration

---

[155] *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("DHS reiterates previously submitted funding requests that are critical to secure the border, build immigration enforcement capacity, combat fentanyl and address domestic needs like natural disaster response, which Congress has failed to act on. Among them, the October funding request, which includes $8.7 billion for border, immigration, and counter fentanyl requirements and $9.2 billion for FEMA's Disaster Relief Fund and Nonprofit Security Grant Program. Notably, the Administration's border supplemental request includes funding to build capacity in the areas of border security, immigration enforcement, and countering fentanyl. DHS strongly supports the additional $19 billion in funding proposals included in the Senate's bipartisan border legislation that would, among other things, enable DHS to hire more CBP agents and officers, ICE enforcement and investigative personnel, and USCIS asylum officers and provide new tools to bolster the Department's efforts to secure and manage the border."); *see also* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*; DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request*.

[156] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/workload-and-adjudication-statistics*.

[157] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/05/08/2_new_cases_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*.

[158] Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133 ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000").

[159] Consolidated Appropriations Act, 2023, Public Law 117–328, 136 Stat. 4459, 4522 (2022) ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $860,000,000"); EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (showing FY 2023 enacted budget providing EOIR $860 million).

[160] EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (providing the Current Services Adjustment as an increase of $78.3 million, bringing the inflation-adjusted amount to $938.3 million).

[161] OHSS analysis of USCIS Global Affirmative Data as of April 25, 2024 (noting that "[d]ata is limited to filings between FY2000 and March 31, 2024").

[162] *See* 8 CFR 208.7, 274a.12(c)(8). Sixty-seven percent of individuals encountered by CBP at and between POEs at the SWB between May 2023 and March 2024 were released, including 66 percent of such individuals in the second quarter of FY 2024. These individuals include noncitizens enrolled in an ICE Alternatives to Detention program. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Out Outcomes by Agency").

[163] *See, e.g.*, Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says*, CNN (July 27, 2022), *https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html*; Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border*, BBC (July 8, 2023), *https://www.bbc.com/news/world-us-canada-65848683*.

IFR_Rule_000021

pathways, or not undertake the dangerous journey north to begin with.

Second, this rule will reduce the time it takes to process individuals placed in expedited removal at the border by changing the way CBP immigration officers identify and refer noncitizens for credible fear interviews. Under current title 8 procedures, noncitizens encountered at the border and processed for expedited removal are provided lengthy advisals regarding the credible fear and asylum process and are asked questions to ascertain whether they may potentially have a fear of persecution or torture.[164] During emergency border circumstances, DHS will move to a "manifestation of fear" process at the border, detailed below in Section III.B.3.b of this preamble, that will involve general (rather than individual) advisals and require individuals who have a fear of persecution or torture to manifest that fear, verbally, non-verbally, or physically, in order for DHS personnel to refer them for a credible fear interview.

Third, the limitation on asylum eligibility will be considered during credible fear interviews and reviews, and those who are subject to the limitation and are unable to establish a significant possibility of showing exceptionally compelling circumstances will be screened for eligibility for statutory withholding of removal and CAT protection under a heightened "reasonable probability of persecution or torture" standard—a higher standard than the "reasonable possibility" standard under the Circumvention of Lawful Pathways rule.

As the Departments described more fully in the Circumvention of Lawful Pathways rule, the current asylum system—in which a high number of migrants are initially determined to be eligible to pursue their claims, even though most ultimately are not granted asylum or protection at the merits stage—has contributed to the growing backlog of cases awaiting review by IJs.[165] The practical result is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[166] As the demographics of border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the

time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[167]

The provisions in this rule are intended to be emergency measures that impact the expedited removal process and eligibility for relief or protection only for those who enter the United States across the southern border during emergency border circumstances. Unfortunately, the significant efforts the Departments have made to address such circumstances to date have not been as effective as they could have been had

[167] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. In contrast, as discussed in Section III.B.3.a.iv of this preamble, from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024. OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019, nearly 57 percent of people from northern Central America (*i.e.*, El Salvador, Guatemala, and Honduras), and close to 90 percent of all other nationalities made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. Of note, according to OHSS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at and between SWB POEs. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from countries other than Mexico and northern Central America now account for the largest numbers of such encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

Congress provided the personnel, infrastructure, technology, and broader reforms that the Departments have requested. Communities all over the United States are being adversely impacted as a result. The goal of these measures is to quickly reduce unlawful and unauthorized entries at the border and to quickly impose decisions and consequences on those who cross our border unlawfully and lack a legal basis to remain.

3. Description of the Rule and Explanation of Regulatory Changes

This rule amends the Departments' regulations to further the purpose of the Presidential Proclamation of June 3, 2024, which suspends and limits entry along the southern border to address the emergency border circumstances outlined in that Proclamation. The rule does so by amending 8 CFR 208.13 and 1208.13 and adding regulatory provisions at 8 CFR 208.35, 235.15, and 1208.35 that (1) limit asylum eligibility for those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances; (2) alter the process for advising noncitizens of their rights to seek asylum and for identifying which noncitizens to refer to an AO for credible fear screening during emergency border circumstances; and (3) alter the standard for screening for statutory withholding of removal and CAT protection while such circumstances exist.[168] Below is an explanation of the limitation and each change to the expedited removal and fear screening process. The specific content of each provision and amendment is set forth in detail in Section III.C of this preamble.

a. Limitation on Asylum Eligibility

As discussed above in Sections III.B.1 and 2 of this preamble, irregular migration is continuing to strain the Departments' ability to timely process, detain, and remove, as appropriate, and

[168] The Departments understand that the President has directed the agencies to promptly consider issuing "any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border." Such actions may include other measures that are not addressed in this rule, and the Departments have considered and are continuing to consider such other actions. The Departments believe that the changes made in this rule are the most appropriate means to begin addressing the concerns identified in the Proclamation, and the Departments will assess the effectiveness of this rule as they continue to consider other actions to respond to the President's direction.

---

[164] 8 CFR 235.3(b)(2).
[165] 88 FR at 31315.
[166] *See supra* note 25.

thus to swiftly deliver timely decisions and timely consequences to noncitizens at the southern border. This challenge is exacerbated by the sheer number of migrants who invoke credible fear procedures at a POE or when they are encountered between POEs without following the lawful, safe, and orderly processes that DHS has made available. The Departments have implemented the Circumvention of Lawful Pathways rule and complementary measures, but Congress has not provided the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during times in which the country's border faces an emergency of the magnitude described in the Proclamation. The record numbers of migrants invoking the credible fear procedures at the southern border exacerbate the risk of severe overcrowding in USBP facilities and POEs, and it creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants without potentially meritorious claims for asylum to make the dangerous journey to the southern border to invoke credible fear procedures at the southern border and take their chances on being allowed to remain in the country for a lengthy period.

For these reasons, pursuant to section 208(b)(1)(A), (b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B), the Departments are adopting a limitation on asylum eligibility for noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Section 3(b) of the Proclamation lists classes of individuals to whom the Proclamation's suspension and limitation on entry and this limitation on asylum eligibility does not apply; those classes are discussed in Section II.A of this preamble. The exceptionally compelling circumstances exception to this rule's limitation on asylum eligibility is discussed below in Sections III.B.3.a and III.C.2 of this preamble.

The limitation on asylum eligibility is needed to address the emergency border circumstances outlined in the Proclamation and this rule and responds to the President's direction to the Secretary of Homeland Security and the Attorney General to promptly consider issuing such instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted. Under the circumstances described in the Proclamation, the Departments assess that the limitation on asylum is necessary to help streamline the Departments' processing of noncitizens, thereby conserving limited resources during the emergency border circumstances described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE.[169]

The Departments have further made the determination to apply the limitation on asylum eligibility to those who enter the United States across the southern border during emergency border circumstances irrespective of whether the noncitizen is encountered during such emergency border circumstances. This will permit a consistent application of the rule to all those who enter across the southern border during such circumstances and

are subject to this limitation on asylum eligibility, including those who evade detection at the southern border and are later placed in section 240 removal proceedings, as well as those who affirmatively apply for asylum. The Departments have considered applying the rule's asylum limitation only to those who enter and are encountered at the southern border during emergency border circumstances. The Departments believe, however, that the rule's asylum limitation should avoid creating an incentive for noncitizens to take risky measures to evade detection, which would further strain resources dedicated to apprehension at the border.[170]

Additionally, the approach adopted in this rule is consistent with the Circumvention of Lawful Pathways rule, which, with narrow exceptions, applies to all those who enter during the two-year period currently specified in that rule, regardless of whether they are apprehended at or near the border during the 14-day period immediately after entry or within 100 miles of the border. *See* 8 CFR 208.33(c), 1208.33(d). Moreover, the Departments note that the provisions of §§ 208.35(b) and 235.15 would be applicable only to those who have entered the United States during the emergency border circumstances described in the Proclamation and this rule and are processed for expedited removal. Thus, those provisions would not apply to those who have long since entered the United States. Accordingly, the Departments have determined that it is reasonable to apply this rule's limitation on asylum eligibility consistent with the Circumvention of Lawful Pathways rule, without regard to the date of encounter or commencement of proceedings.

Even if a noncitizen entered the United States across the southern border during emergency border circumstances and is not described in section 3(b) of the Proclamation, they may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist.[171] Such circumstances necessarily

---

[169] When it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b). *See* 8 CFR 208.35(a), 1208.35(a). The Departments anticipate that, when determining whether the limitation on asylum eligibility applies, AOs and IJs will rarely have grounds to reach a different result from the CBP immigration officers. *See* 8 CFR 208.35(b), 1208.35(b). In part, the Proclamation's application turns on straightforward questions of status—*e.g.*, whether someone was a noncitizen, Proclamation sec. 3(a)(i); was a noncitizen national, *id.* sec. 3(b)(i); was a lawful permanent resident, *id.* sec. 3(b)(ii); was a UC, *id.* sec. 3(b)(iii); or had a valid visa or other lawful permission to seek entry or admission into the United States or presented at a POE pursuant to a pre-scheduled time and place, *id.* sec. 3(b)(v). The Proclamation's application also turns on questions of historical fact, including whether the suspension and limitation on entry was in place at the relevant time, *id.* sec. 3(a), and whether someone was "permitted to enter by . . . a CBP immigration officer" based on two sets of specified considerations "at the time of the entry or encounter that warranted permitting the noncitizen to enter," *id.* Sec. 3(b)(vi)–(vii). These two exceptions allow CBP immigration officers to permit the entry of noncitizens who present at the encounter with—for example—medical issues requiring immediate attention. *See id.* sec. 3(b)(vi).

[170] The Departments note that adjudicators already make determinations regarding the noncitizen's date of arrival when determining whether the noncitizen is barred from filing an asylum application (unless meeting an exception) within one year of arrival. *See* INA 208(a)(2)(B) and (D), 8 U.S.C. 1158(a)(2)(B)(and (D).

[171] The Departments decline to adopt an exception mirroring the exception from the Circumvention of Lawful Pathways rule for those who present at a POE without a pre-scheduled time and place but show that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See*

IFR_Rule_000023

exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11.[172] 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Acute medical emergencies would include, but would not be limited to, situations in which someone faces a life-threatening medical emergency or faces acute and grave medical needs that cannot be

8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This rule, unlike the Circumvention of Lawful Pathways rule, applies only in the emergency circumstances described in the Proclamation and the rule, where encounters strain the border security and immigration systems' capacity. And although the Circumvention of Lawful Pathways rule was also aimed at reducing irregular migration, it was focused on encouraging the use of lawful pathways, rather than the number of daily entrants. In these emergency border circumstances, this rule's exception for "exceptionally compelling circumstances" captures individuals with a time-sensitive imperative; such individuals may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. And in these emergency border circumstances, the Departments have determined that individuals who do not qualify for this exception should wait for a CBP One appointment. Moreover, under the Circumvention of Lawful Pathways rule, this exception requires additional questioning of any noncitizen who entered at a POE and is subject to the rule—time that, in the aggregate, could diminish the Departments' ability to deploy resources to address the emergency circumstances that support application of this rule.

In addition, the Departments did not include an exception for a noncitizen who sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). This rule serves a different purpose than 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C); specifically, this rule is aimed at deterring irregular migration and speeding up the border process during a period of high encounters, rather than encouraging noncitizens to seek protection in other countries. During the emergency border circumstances described in the Proclamation and this rule, narrowing the exceptions to those who are unable to wait for an appointment is key. Those who sought and were denied protection in another country will still be eligible for asylum if they enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances, such as that at the time of entry they faced an acute medical emergency or an imminent and extreme threat to life or safety.

[172] The Departments note that noncitizens who are a "victim of a severe form of trafficking in persons" are already excepted from the Proclamation's suspension and limitation on entry as provided in section 3(b) of the Proclamation and are therefore also not subject to the rule's limitation on asylum eligibility. Nonetheless, the Departments have opted to retain "victims of severe form of trafficking in persons" as an exceptional circumstance to avoid any confusion and to ensure that the exceptions in this rule mirror the rebuttal circumstances the Departments adopted in the Circumvention of Lawful Pathways rule.

adequately addressed outside of the United States. Examples of imminent and extreme threats would include imminent threats of rape, kidnapping, torture, or murder that the noncitizen faced at the time the noncitizen crossed the southern border, such that they cannot wait for an appointment at a pre-scheduled time and place or until this IFR's limitation on asylum eligibility is not in effect for an opportunity to present at a POE without putting their life or well-being at extreme risk; it would not include generalized threats of violence.

The "exceptionally compelling circumstances" exception mirrors the rebuttal circumstance the Departments adopted in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). That exception is adopted here for the reasons articulated for adopting it in the Circumvention of Lawful Pathways NPRM and rule and the exception is intended to apply to the same circumstances identified in that NPRM and rule. *See, e.g.,* 88 FR at 11723; 88 FR at 31318, 31338, 31348, 31351, 31380, 31390, 31391–93.

Like the Circumvention of Lawful Pathways rule, this rule recognizes an additional exception that avoids the separation of families. *See* 8 CFR 208.35(c), 1208.35(c). Those noncitizens who are subject to the limitation on asylum eligibility and who do not establish exceptionally compelling circumstances under 8 CFR 208.35(a)(2)(i) or 1208.35(a)(2)(i) would be able to continue to apply for statutory withholding of removal and protection under the CAT, forms of protection to which the limitation does not apply if placed in section 240 removal proceedings. Unlike asylum, spouses and minor children are not eligible for derivative grants of statutory withholding of removal or CAT protection. *Compare* INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) ("[a] spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien"), *with* INA 241(b)(3), 8 U.S.C. 1231(b)(3) (not providing for derivative statutory withholding of removal), *and* 8 CFR 1208.16(c) (not providing for derivative CAT protection); *see also Sumolang* v. *Holder,* 723 F.3d 1080, 1083 (9th Cir. 2013) (recognizing that the asylum statute allows for derivative beneficiaries of the principal applicant for asylum, but that the withholding of removal statute makes no such allowance). Again, mirroring EOIR's

family unity provision in the Circumvention of Lawful Pathways rule, *see* 8 CFR 1208.33(c), where a principal asylum applicant is eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the limitation on eligibility established in this rule, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the noncitizen shall be excepted from the limitation on eligibility by the IJ if placed in section 240 removal proceedings. 8 CFR 1208.35(c). The Departments have determined that the possibility of separating the family should be avoided. *See* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 2, 2021) ("It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.").

In the Circumvention of Lawful Pathways rule, the Departments included a family unity provision in EOIR's regulations but not DHS's. The Departments did so because they decided at that time that those who an AO concludes are subject to the Lawful Pathways presumption and who are not able to establish an exception or rebut the presumption during a credible fear screening may not be placed into the asylum merits interview process and may instead only be issued an NTA and placed into section 240 removal proceedings. *See* 88 FR at 11725–26; 88 FR at 31336–37. For purposes of this rule, the Departments have allowed for an asylum merits interview process at the discretion of USCIS that includes USCIS discretion to apply a parallel family unity provision. *See* 8 CFR 208.35(c). This provision is discretionary to allow USCIS flexibility as it implements the new process. The Departments request comment on whether to adopt a non-discretionary family unity provision for the asylum merits interview process in a final rule.

i. Authority To Impose Additional Limitations on Asylum Eligibility

The Secretary and the Attorney General have authority to adopt this additional limitation on asylum eligibility. Both have long exercised discretion, now expressly authorized by Congress, to create new rules governing the granting of asylum. When section

IFR_Rule_000024

208 of the INA was first enacted as part of the Refugee Act of 1980, it simply provided that the Attorney General "shall establish a procedure" for a noncitizen "to apply for asylum," and that the noncitizen "may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. 1158(a) (1982). In 1980, the Attorney General, in the exercise of that broad statutory discretion, established several mandatory bars to the granting of asylum. *See* 8 CFR 208.8(f)(1) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the noncitizen as a danger to the security of the United States. *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly-serious-crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc).

In that 1990 rule, the Attorney General also codified another limitation that was first discussed in *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989). 55 FR at 30678. Specifically, although the statute defines a "refugee" and thus allows asylum for a noncitizen based on a showing of past "persecution or a well-founded fear of persecution," INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A), by regulation, a showing of past persecution only gives rise to a presumption of a well-founded fear of future persecution, which can be rebutted by showing that circumstances have changed such that the noncitizen no longer has a well-founded fear of future persecution or that the noncitizen can relocate to avoid persecution and under all the circumstances it is reasonable to expect the noncitizen to do so.[173] 8 CFR 208.13(b)(1), 1208.13(b)(1). Where the presumption is rebutted, the adjudicator, "in the

exercise of his or her discretion, shall deny the asylum application." [174] 8 CFR 208.13(b)(1)(i), 1208.13(b)(1)(i). In 1990, Congress added a mandatory statutory bar for those with aggravated felony convictions. Immigration Act of 1990, Public Law 101–649, sec. 515, 104 Stat. 4978, 5053.

With the passage of IIRIRA, Congress added three categorical statutory bars to the ability to apply for asylum for (1) noncitizens who can be removed, pursuant to a bilateral or multilateral agreement, to a third country where they would not be persecuted on account of a specified ground; (2) noncitizens who failed to apply for asylum within one year of arriving in the United States; and (3) noncitizens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604, 110 Stat. 3009, 3009–690 to –691. Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars that had been set forth in the Attorney General's asylum regulations. These bars cover (1) noncitizens who "ordered, incited, assisted, or otherwise participated" in the persecution of others; (2) noncitizens who, having been convicted of a "particularly serious crime," constitute a danger to the United States; (3) noncitizens for whom there are serious reasons to believe committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) noncitizens for whom there are reasonable grounds to regard as a "danger to the security of the United States"; (5) noncitizens who are removable under a set of specified grounds relating to terrorist activity; and (6) noncitizens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* at 3009–691 (codified at INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A)). Congress further added that aggravated felonies, defined in section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* at 3009–692 (codified at INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i)).

In IIRIRA, Congress also made clear that the Executive Branch may continue to exercise its broad discretion in determining whether to grant asylum by creating additional limitations and

conditions on the granting of asylum. The INA provides that the Attorney General and Secretary "may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 6 U.S.C. 552(d); INA 103(a)(1), 8 U.S.C. 1103(a)(1). In addition, while section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), establishes certain procedures for consideration of asylum applications, Congress specified that the Attorney General and Secretary "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum" so long as those conditions or limitations are "not inconsistent with this chapter," INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). In sum, the current statutory framework retains the broad discretion of the Attorney General (and, after the HSA, also the Secretary) to adopt additional limitations on the granting of asylum and procedures for implementing those limitations.

Previous Attorneys General and Secretaries have since invoked their authorities under section 208 of the INA, 8 U.S.C. 1158, to establish eligibility bars beyond those required by the statute itself. *See, e.g.,* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000) (requiring consideration of the applicant's ability to relocate safely in his or her home country in assessing asylum eligibility); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR") (limit on eligibility for applicants subject to certain presidential proclamations);[175] Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) ("TCT Bar final rule") (limit on eligibility for certain noncitizens who failed to apply for protection while in a third country through which they transited en route to the United States);[176] Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) (limits on eligibility for noncitizens convicted of certain criminal offenses);[177] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

---

[173] As noted below, the internal relocation provision was added in 2000 by Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000).

[174] There is a narrow exception to this mandatory discretionary ground for denial, called "humanitarian asylum," where the noncitizen establishes "compelling reasons for being unwilling or unable to return to the [noncitizen's] country arising out of the severity of . . . past persecution" or "that there is a reasonable possibility that [the non-citizen] may suffer other serious harm upon removal to the [noncitizen's] country." 8 CFR 208.13(b)(1)(iii), 1208.13(b)(1)(iii).

[175] *See O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating Proclamation Bar IFR).

[176] *See E. Bay Sanctuary Covenant* v. *Barr,* 519 F. Supp. 3d 663 (N.D. Cal. 2021) (preliminarily enjoining the TCT Bar final rule).

[177] *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020) (granting temporary restraining order against operation of the rule and ordering defendants to show cause why the rule should not be preliminarily enjoined).

Removal Proceedings; Asylum Procedures, 62 FR 10312, 10342 (Mar. 6, 1997) (IFR codifying mandatory bars and adding provision allowing for discretionary denials of asylum where "the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution"); *see also Yang,* 79 F.3d at 936–39 (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). Consistent with this historical practice, the Secretary and Attorney General exercised this authority when adopting the Lawful Pathways presumption of asylum ineligibility. *See* Circumvention of Lawful Pathways rule, 88 FR 31314.[178]

### ii. Litigation Over the Proclamation Bar IFR

This rule places a limitation on asylum eligibility for those noncitizens who are described in the Proclamation subject to certain exceptions. The Departments acknowledge prior judicial decisions addressing a different limit on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), relating to suspensions and limitations on entry by presidential proclamation under section 212(f) of the INA, 8 U.S.C. 1182(f). In *East Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640 (9th Cir. 2021) ("*East Bay III*"), the Ninth Circuit affirmed a preliminary injunction against the Proclamation Bar IFR, which categorically rendered certain noncitizens ineligible for asylum if they entered the United States in violation of a presidential proclamation or other presidential order suspending or limiting the entry of noncitizens along the southern border. The relevant presidential proclamation in that case suspended entry of all migrants along the southern border except those who entered at a POE. *See id.* at 659. The court held that the Proclamation Bar IFR was inconsistent with section 208(a) of the INA, 8 U.S.C. 1158(a), which provides that any migrant "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or

United States waters), irrespective of such alien's status, may apply for asylum." *Id.* at 670.[179]

The Departments regard this rule as substantially different than the rule the Ninth Circuit deemed invalid in *East Bay III.* The Proclamation and limitation on asylum eligibility at issue here differ significantly from the prior categorical bar on "manner of entry" because they do not treat the manner of entry as dispositive in determining eligibility. Rather, the limitation at issue here turns on whether—during emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established during these emergency situations when it is essential that noncitizens use such pathways to ensure the United States Government's ability to manage the border. And even during these situations, AOs and IJs have the ability to except noncitizens from the rule's asylum limitation where the noncitizens establish that an exceptionally compelling circumstance exists. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may be excepted from the limitation on asylum eligibility if they experienced an acute medical emergency at the time of entry regardless of where that entry occurred. Other exceptionally compelling circumstances include, but are not limited to, if the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an imminent and extreme threat to their life or safety or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. 8 CFR 208.35(a)(2)(i)(B)–(C), 1208.33(a)(2)(i)(B)–(C). Indeed, the rule's exceptionally compelling circumstances exception is identical to the grounds that would rebut the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule, which has been allowed to continue in effect despite litigation challenging its validity. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023) (staying order vacating Circumvention of Lawful Pathways rule pending appeal). Furthermore, this rule does not implicate the same concerns as the prior

categorical bar based on "manner of entry" because it applies only to individuals who enter during emergency border circumstances and would not treat solely the manner of entry as dispositive in determining eligibility even during such circumstances, given that the rule applies both at and between POEs and in light of the exceptions available under section 3(b) of the Proclamation and for exceptionally compelling circumstances under 8 CFR 208.35(a)(2) and 1208.35(a)(2).

Moreover, the Departments disagree with important aspects of the reasoning that the district court and Ninth Circuit relied upon in *East Bay III.* The Departments argued in *East Bay III* that section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), by its plain terms requires only that a noncitizen be permitted to "apply" for asylum, regardless of their manner of entry. It does not require that a noncitizen be eligible to be granted asylum, regardless of their manner of entry. Indeed, the BIA has long taken account of a noncitizen's manner of entry in determining whether to grant asylum. *See Matter of Pula,* 19 I&N Dec. 467, 473 (BIA 1987) (holding that "manner of entry . . . is a proper and relevant discretionary factor to consider in adjudicating asylum applications"). The court in *East Bay III* rejected this argument, stating that "[e]xplicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity," 993 F.3d at 670 (emphasis omitted), but the statute draws a clear distinction between the two. Section 208(a) of the INA, 8 U.S.C. 1158(a), governs who may "apply for asylum" and includes several categorical bars, such as the bar for applications for noncitizens present in the country for more than one year. INA 208(a)(1), (2)(B), 8 U.S.C. 1158(a)(1), (2)(B); *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). Section 208(b) of the INA, 8 U.S.C. 1158(b), in turn, governs who is eligible to be granted asylum. Specifically, section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), provides that the Attorney General or the Secretary "may grant asylum to an alien who has applied," INA 208(b)(2), 8 U.S.C. 1158(b)(2), then specifies six categories of noncitizens to whom "[p]aragraph (1)" (*i.e.,* the discretionary authority to grant asylum to an applicant) "shall not apply." Any noncitizen falling within one of those categories may apply for asylum under section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), but is categorically ineligible

---

[178] The Circumvention of Lawful Pathways rule was vacated by *East Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). But the Ninth Circuit has stayed that vacatur pending appeal, *see E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023), and thus the rule and its presumption remain in effect. On February 21, 2024, the Ninth Circuit placed the case in abeyance pending settlement discussions. *E. Bay Sanctuary Covenant* v. *Biden,* 93 F.4th 1130 (9th Cir. 2024).

[179] The court also held that the Proclamation Bar IFR likely did not properly fall under the good cause or foreign affairs exceptions to notice-and-comment rulemaking under 5 U.S.C. 553(a)(1) and (b)(B). *See East Bay III,* 993 F.3d at 676–77.

to receive it under section 208(b) of the INA, 8 U.S.C. 1158(b).

The broad preemptive sweep that the Ninth Circuit attributed to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), also fails to account for the discretionary nature of asylum. No noncitizen ever has a right to be granted asylum. The ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [and the Secretary's] discretion." *INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). The *East Bay III* court did not dispute that manner of entry is a permissible consideration in determining whether to exercise that discretion to grant asylum in individual cases. 99 F.3d at 671; *see also Matter of Pula*, 19 I&N Dec. at 473; *Fook Hong Mak* v. *INS*, 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) (upholding the INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

The *East Bay III* court also suggested that a regulation categorically barring asylum based on manner of entry is inconsistent with the United States' commitments under the Refugee Protocol, in which the United States adhered to specified provisions of the Refugee Convention. *See* 993 F.3d at 972–75. Even accepting *East Bay III*'s reasoning on this point, that reasoning is limited to a categorical eligibility bar premised on manner of entry; this IFR does not implicate the same concerns as the prior categorical bar on "manner of entry" for the reasons outlined above. In any event, the *East Bay III* court's conclusion was incorrect. The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through the provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3)(A), for mandatory withholding of removal. This rule specifically preserves the availability of that protection from removal. The INA's provision in section 208 of the INA, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 440–41 (1987). The *East Bay III* court also misread Article 31(1) of the Refugee Convention, which pertains only to "penalties" imposed "on account of . . . illegal entry or presence" on refugees who, among other criteria, are "coming directly from a territory where" they face persecution. *See, e.g.,*

*Singh* v. *Nelson*, 623 F. Supp. 545, 560–61 & n.14 (S.D.N.Y. 1985) (quoting the Refugee Convention). And a bar to the granting of the discretionary relief of asylum is not a penalty under Article 31(1), especially given that the noncitizen remains eligible to apply for statutory withholding of removal, which implements U.S. non-refoulement obligations under the Refugee Protocol. *See Mejia* v. *Sessions*, 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.*, 856 F.3d 249, 257 n.16 (3d Cir. 2017).

### iii. Litigation Over Other Limitations

The Departments also acknowledge other prior precedent concerning the scope of the Departments' statutory rulemaking authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Specifically, when reviewing the TCT Bar final rule, the Ninth Circuit in *East Bay Sanctuary Covenant* v. *Garland*, 994 F.3d 962 (9th Cir. 2020) ("*East Bay I*"), held that a new condition on asylum eligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), must "further[ ] the purpose" of another provision in section 208 to be "consistent with" it. 994 F.3d at 977, 977–80. The Departments disagree. A requirement that additional asylum limitations can only "further[ ] the purpose" of the existing exceptions by either targeting threats to the nation or promoting the purposes the Ninth Circuit identified in the safe-third-country or firm-resettlement bars, *id.* at 977, is irreconcilable with the statute's meaning and conflicts with its history. Not only has Congress adopted asylum bars that do not further the purpose the Ninth Circuit identified—*e.g.*, the one-year filing deadline and the bar on successive applications—it has granted to the Departments the broad discretion to add more such bars. The Ninth Circuit's approach is also inconsistent with *Trump* v. *Hawaii*, 585 U.S. 667, 690–91 (2018) (INA's express provisions governing entry "did not implicitly foreclose the Executive from imposing tighter restrictions," even if restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on"). The statutory asylum bars likewise do not foreclose imposing further conditions, even if those conditions address subjects similar to those already in the asylum statute. *See, e.g.,* INA 241(a)(5), 8 U.S.C. 1231(a)(5) (barring from asylum those whose orders of removal have been reinstated regardless whether they have asylum claims stemming from events that occurred after the original order of removal); *see R–S–C* v. *Sessions*, 869 F.3d 1176, 1184 (10th Cir. 2017) (reconciling the reinstatement provision's bar on asylum

with section 208's allowing noncitizens to apply for asylum regardless of manner of entry).

Regardless, this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a limitation on asylum eligibility.[180] The President has determined that, under certain emergency border circumstances, entries must be suspended and limited because in such circumstances the border security and immigration systems lack capacity to deliver timely decisions and timely consequences, which threatens to incentivize further migration. And in light of such circumstances and their pernicious effects, the Departments have determined that special procedures must be used to quickly process the influx of noncitizens, including those seeking asylum. Those determinations do not conflict with the text or structure of section 208 of the INA, 8 U.S.C. 1158, and are consistent with (and an appropriate exercise of the Departments' authority under) that provision. Nothing more is required for the rule to constitute a valid exercise of authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C).

Moreover, this rule's propriety is reinforced by the statutory bars on asylum Congress has enacted. Just as Congress has chosen to promote systemic efficiency by prohibiting asylum applications filed more than one year after entry and by generally prohibiting noncitizens from pursuing successive asylum applications, INA 208(a)(2)(B)–(C), 8 U.S.C. 1158(a)(2)(B)–(C), this rule furthers systemic efficiency by limiting asylum in certain situations where the strains on the immigration system are at their peak. Congress did

---

[180] The Departments' interpretation of the phrase "consistent with" is supported by judicial interpretation of the term in other contexts. The D.C. Circuit, for example, has cautioned against construing "consistent with" too narrowly in a Clean Air Act case. *Envtl. Def. Fund, Inc.* v. *EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam), *amended by* 92 F.3d 1209 (D.C. Cir. 1996). The court emphasized that this "flexible statutory language" does not require "exact correspondence . . . but only congruity or compatibility" and underscored that the phrase's ambiguity warranted deference to the agency's policy. *Id.* Other courts have adopted the same understanding of "consistent with." *See, e.g., Jimenez-Rodriguez* v. *Garland*, 996 F.3d 190, 198 (4th Cir. 2021) ("The phrase 'consistent with' does not require 'exact correspondence . . . but only congruity or compatibility.' " (quoting *Nuclear Energy Inst., Inc.* v. *EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004))); *Nat'l Wildlife Fed'n* v. *Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 878 (6th Cir. 2020) ("'[T]he phrase 'consistent with' cannot bear the weight that the Federation places on it. Response plans are 'consistent' with the contingency plans if they 'show no noteworthy opposing, conflicting, inharmonious, or contradictory qualities'—in other words, if the documents put together are 'not self-contradictory. Consistency does *not* mean exact, point-by-point correspondence.'" (cleaned up)).

IFR_Rule_000027

not foreclose the Departments from likewise taking systemic considerations into account when exercising their discretion to add conditions or limitations on eligibility. Indeed, the ultimate consideration when determining whether someone warrants a grant of relief as a matter of discretion is whether granting relief "appears in the best interests of th[e] country," *Matter of Marin,* 16 I&N Dec. 581, 584 (BIA 1978), a point Congress was aware of when it amended the INA in 1996, *see id.* (best interests standard preceded 1996 amendments by nearly two decades). The Departments find that the rule's limitation on asylum eligibility furthers the efficiency aims of the asylum statute and is in the best interests of the United States because it allows the Departments to deliver timely decisions and timely consequences in order to address the emergency border circumstances discussed in the Proclamation and this rule.

Consistent with the best-interest standard, the BIA has long held a noncitizen's "circumvention of orderly refugee procedures" to be relevant to whether a favorable exercise of discretion is warranted. *Matter of Pula,* 19 I&N Dec. at 473. And the BIA has specifically considered as relevant factors the noncitizen's "manner of entry or attempted entry." *Id.* Although the rule places greater weight on these factors under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. And exactly how much weight to place on those factors, and whether to do so in weighing asylum eligibility, falls well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 244 (2001); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993); *Yang,* 79 F.3d at 936–37.

The Departments acknowledge that *Matter of Pula* did not consider a noncitizen's arrival at a POE to weigh against a discretionary grant of asylum. *See* 19 I&N Dec. at 473. But *Matter of Pula* also did not involve circumstances in which the country's border faced an emergency of a magnitude comparable to the emergency border circumstances described by the Proclamation and this rule, where even arrivals at POEs significantly contribute to the Departments' inability to process migrants and deliver timely decisions and timely consequences to those without a lawful basis to remain. Given the emergency border circumstances described by the Proclamation and the

President's direction in section 3(d) of the Proclamation to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the situation at the southern border; and given the strain on operations and resources that high volumes of new arrivals create, such that consequences cannot be appropriately delivered; the Departments believe that the rule's limitation on asylum eligibility should apply to noncitizens who enter the United States across the southern border, including at a POE during the emergency border circumstances described in the Proclamation and this rule, unless an exception applies.

In *Matter of Pula,* the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for asylum, 19 I&N Dec. at 473–74, and this rule merely takes such circumvention into account. Because the Proclamation contains an exception for arrivals at a pre-scheduled time and place under a process approved by the Secretary, this rule's limitation on asylum will also not apply to such arrivals. One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Indeed, without CBP One, noncitizens could have longer wait times for processing at the POE depending on daily operational constraints and circumstances. *See* 88 FR at 31342. During emergency border circumstances, use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources. *See, e.g., id.* at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). The CBP One app and other lawful pathways that the United States Government has made available to those seeking to enter the United States, including to seek asylum or protection, are intended to allow for orderly processing. Therefore, those who "circumvent orderly refugee procedures," consistent with *Matter of Pula,* 19 I&N Dec. at 474, during emergency border circumstances without meeting one of the recognized exceptions will be ineligible for asylum.[181]

iv. This Limitation on Asylum Eligibility

For the reasons discussed above, the *East Bay* cases dealt with different limitations on asylum and involved different factual circumstances, and hence are distinguishable from this rule.[182] Moreover, the Departments respectfully disagree with some of the substantive holdings of the Ninth Circuit and the district court as described above. The Secretary and the Attorney General permissibly may determine that, during emergency border circumstances, it is in the "best interests of th[e] country," *Matter of Marin,* 16 I&N Dec. at 584, to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing noncitizens who do not enter in violation of it. Nothing in section 208 of the INA, 8 U.S.C. 1158, forecloses that view, and securing the best interests of the country is a reasonable policy goal under section 208 and thus "consistent with" it. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see Yang,* 79 F.3d at 939 (observing that "it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208"); *see also id.* at 935 ("We must reject the argument that [the] regulation [establishing a categorical discretionary bar to asylum eligibility] exceeds the authority of the Attorney General if we find that the regulation has a 'reasonable foundation . . .' that is, if it rationally pursues a purpose that it is lawful for the

<hr />

[181] As the BIA further explained with respect to the asylum statute as it existed at the time, "[a] careful reading of the language of [section 208(a)(1)]

<hr />

reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien.' " *Matter of Pula,* 19 I&N Dec. at 473. "The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from *any* alien present in the United States or at a land or port of entry, irrespective of such alien's status.' " *Id.* (collecting cases). Congress accordingly made clear that noncitizens like stowaways, who, at the time the Refugee Act was passed, could not avail themselves of our immigration laws, would be eligible at least to apply for asylum "irrespective of [their] status." *Id.* "Thus, while section 208(a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion." *Id.*

[182] The Departments have considered the July 25, 2023 district court decision vacating the Circumvention of Lawful Pathways rule. *See E. Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). That decision applied the holdings of the other *East Bay* decisions generally, and the Departments do not see a need to address it separately except to note that as of publication the court's vacatur remains stayed pending appeal in the Ninth Circuit, and thus the rule is in effect. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023).

IFR_Rule_000028

[immigration agencies] to seek.' " (quoting *Reno,* 507 U.S. at 309)).

Beyond the clear statutory text, settled principles of administrative law dictate that the Departments may adopt generally applicable eligibility requirements. Those principles establish that it is permissible for agencies to establish general rules or guidelines in lieu of case-by-case assessments, so long as those rules or guidelines are not inconsistent with the statute, and that principle is especially salient here as asylum is inherently discretionary in nature. *See Lopez,* 531 U.S. at 243–44 (rejecting the argument that the Bureau of Prisons was required to make "case-by-case assessments" of eligibility for sentence reductions and explaining that an agency "is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking' " (quoting *Heckler* v. *Campbell,* 461 U.S. 458, 467 (1983))); *Reno,* 507 U.S. at 313–14 (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules" (quotation marks omitted)); *Fook Hong Mak,* 435 F.2d at 730 (upholding INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration" and observing that there is no legal principle forbidding an agency that is "vested with discretionary power" from determining that it will not use that power "in favor of a particular class on a case-by-case basis"); *see also Singh,* 623 F. Supp. at 556 ("attempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories of illegal aliens"); *Matter of Salim,* 18 I&N Dec. 311, 315–16 (BIA 1982) (before *Pula,* explaining that a certain form of entry can be considered an "extremely adverse factor which can only be overcome with the most unusual showing of countervailing equities"); *cf. Peulic* v. *Garland,* 22 F.4th 340, 346–48 (1st Cir. 2022) (rejecting challenge to *Matter of Jean,* 23 I&N Dec. 373 (A.G. 2002), which established strong presumption against a favorable exercise of discretion for certain categories of applicants for asylee and refugee adjustment of status under section 209(c) of the INA, 8 U.S.C. 1159(c) (citing cases)); *Cisneros* v. *Lynch,* 834 F.3d 857, 863–64 (7th Cir. 2016) (rejecting challenge to 8 CFR 1212.7(d), which established strong presumption against a favorable exercise of discretion

for waivers under section 212(h) of the INA, 8 U.S.C. 1182(h), for certain classes of noncitizens, even if a few could meet the heightened discretionary standard (citing cases)).

The Departments recognize that in the Circumvention of Lawful Pathways rule they declined to adopt on a permanent basis the Proclamation Bar IFR because it conflicted with the tailored approach in that rule and because barring all noncitizens who enter between POEs along the SWB was not the proper approach under the circumstances the Departments then faced. *See* 88 FR at 31432. The Departments continue to believe that the approach taken in the Proclamation Bar IFR conflicts with the tailored approach of the Circumvention of Lawful Pathways rule as well as the tailored approach in this rule, which borrows heavily from the Circumvention of Lawful Pathways rule. The Proclamation Bar IFR contained no exceptions and was open-ended, allowing for implementation of any future proclamations or orders regardless of their terms. *See* 83 FR at 55952. In contrast, like the Circumvention of Lawful Pathways rule, this rule is narrowly tailored to address the emergency border circumstances described in the Proclamation and the rule and includes exceptions to account for circumstances in which waiting for an end to the suspension and limitation on entry and the limitation on asylum eligibility is not possible. And by relating the rule to a specific proclamation and the circumstances described therein, the Departments have been able to tailor its provisions to the terms of the Proclamation and the circumstances under which it is applied.

Finally, the Departments acknowledge that, unlike the Circumvention of Lawful Pathways rule, neither the Proclamation nor this rule excepts Mexican nationals. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii) (providing that the Lawful Pathways rebuttable presumption of asylum ineligibility applies only to those who enter the United States along the SWB after transiting through a third country). Traveling through a third country is a key part of the Circumvention of Lawful Pathways rule because one lawful pathway for obtaining protection is applying for protection in a third country. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments recognize that some Mexican nationals seek asylum and protection in the United States. Indeed, since 2021, DHS has seen a sharp increase in total SWB encounters of Mexican nationals, from a pre-pandemic (FY 2014 through FY

2019) average of approximately 239,000 to more than 717,000 in FY 2023.[183] Of note, this increase in encounters has been accompanied by a sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal. The percentage of Mexican nationals processed for expedited removal who claimed a fear of return averaged 6 percent in the pre-pandemic period (FY 2014 through FY 2019), and never exceeded 7 percent for any fiscal year.[184] But 29 percent of all Mexican nationals processed for expedited removal at the SWB from May 12, 2023, to March 31, 2024, made fear claims, including 39 percent in February 2024.[185] Because of this sharp increase from the historical average, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems with entry is suspended and limited under the Proclamation. At the same time, the Departments continue to believe that, if encounters decrease to levels under which the systems do not experience the substantial strains they currently experience while the Circumvention of Lawful Pathways rule remains in effect, the application of that rule only to those noncitizens who travel through a third country en route to the United States appropriately accounts for the goals of encouraging migrants to seek protection in other countries or to use safe, orderly, and lawful pathways to enter the United States, ensuring the border security and immigration systems can efficiently process noncitizens, and affording asylum and other protection to those seeking it who establish their eligibility.

Under this rule, Mexican nationals will still be eligible for asylum in some circumstances—they may present at a POE pursuant to a pre-scheduled appointment, or, if they are unable to wait in Mexico while scheduling an appointment, they may be able to establish an exception to the Proclamation or exceptionally compelling circumstances under the rule. Even if they are not able to do so, the rule does not preclude eligibility for

[183] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

[184] OHSS Enforcement Lifecycle December 31, 2023.

[185] OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

statutory withholding of removal and CAT protection, and they will be able to seek such protection. In the absence of an exception, however, Mexican nationals should be ineligible for asylum under the rule because, during the emergency border circumstances described in the Proclamation and this rule, it is important to deter irregular entry by all noncitizens regardless of country of origin. And the above data make clear that additional incentives are necessary to encourage Mexican nationals to pursue the available lawful, safe, and orderly pathways, rather than entering the country unlawfully.

v. Application During Credible Fear Screenings and Reviews

The limitation on asylum eligibility adopted here applies during merits adjudications, *see* 8 CFR 208.13(g), 1208.13(g), but will most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Noncitizens in expedited removal are subject to removal "without further hearing or review" unless they indicate an intention to apply for asylum or fear of persecution. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Noncitizens in expedited removal who indicate an intention to apply for asylum or fear of persecution are referred to an AO for an interview to determine if they have a credible fear of persecution and should accordingly remain in proceedings for further consideration of the application. INA 235(b)(1)(A)(ii), (b)(1)(B)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(ii), (b)(1)(B)(i), (ii). In addition, AOs consider whether a noncitizen in expedited removal may be eligible for statutory withholding of removal or for CAT protection. *See* 8 CFR 208.30(e)(2), (3).

This rule instructs AOs and IJs to apply the limitation it adopts during credible fear screenings and reviews. 8 CFR 208.35(b), 1208.35(b). Under the rule, when screening for asylum eligibility, the AO and IJ must determine whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances. For the reasons noted in the Circumvention of Lawful Pathways rule, the Departments expect that noncitizens rarely would be found excepted from the limitation on asylum for credible fear purposes and subsequently be found not to be excepted at the merits stage. *See* 88 FR at 31380–81.

The Departments recognize that in the recent past they changed course regarding whether to apply bars and conditions and limitations on asylum eligibility during credible fear screenings by rescinding provisions that would have applied the mandatory asylum bars during credible fear screenings. *See* 87 FR at 18135. In the Circumvention of Lawful Pathways NPRM, the Departments explained their reasoning for nevertheless applying that condition on asylum eligibility during credible fear screenings, stating that the rebuttable presumption would be less difficult to apply than other bars, limitations, or conditions because the facts regarding the presumption's applicability, exceptions, and rebuttal circumstances would generally be straightforward to apply. 88 FR at 11744–45. Indeed, the Departments have applied the presumption effectively in credible fear screenings for the time in which the Circumvention of Lawful Pathways rule has been in effect.[186]

The limitation adopted here is in many ways parallel to the Lawful Pathways rebuttable presumption—specifically, it borrows from the Circumvention of Lawful Pathways rule's rebuttal circumstances—although it is more straightforward because it does not include the Lawful Pathways rebuttable presumption's exceptions for those who applied and were denied asylum or other protection in a third country and those who were unable to schedule an appointment through the CBP One app for certain reasons. *See* 8 CFR 208.33(a)(2)(ii)(B)–(C), 1208.33(a)(2)(ii)(B)–(C). Given the Departments' experience with implementing the Circumvention of Lawful Pathways rule, the Departments are confident that the limitation and

exceptions established here will be just as straightforward to apply as the similar provisions are for the Circumvention of Lawful Pathways rule.

b. Manifestation of Fear

This rule also alters certain aspects of the expedited removal process for individuals who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. When an immigration officer inspects a noncitizen at a POE or between POEs and determines that the noncitizen is inadmissible and will be subject to expedited removal, current regulations require the immigration officer to take certain steps before ordering the noncitizen removed from the United States. *See* 8 CFR 235.3(b). This process takes approximately two hours per individual in USBP custody. In particular, the immigration officer conducts an inspection, including taking biometrics; running background checks; collecting biographic information, citizenship, and place and manner of entry; and advising the noncitizen of the charges against them. 8 CFR 235.3(b)(2)(i). The noncitizen has an opportunity to provide a response. *Id.* The officer must also read (or have read through an interpreter, if appropriate) the information contained in the Form I–867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which advises the noncitizen of their ability to seek protection in the United States. *Id.* The examining immigration officer must also read the noncitizen the questions on the Form I–867B, Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which asks, among other things, whether the noncitizen has any fear of return or would be harmed if returned. *Id.* After the noncitizen has provided answers to the questions on Form I–867B, the immigration officer records the answers, and the noncitizen then reads the statement (or has the statement read to them) and signs the statement. *Id.* On average, USBP agents spend about 20 to 30 minutes of the inspection period completing both the Form I–867A and the Form I–867B. Finally, a noncitizen who indicates a fear of return or an intention to seek asylum is served with and acknowledges receipt of a Form M–444, which includes more detailed information about the credible fear process. 8 CFR 235.3(b)(4)(i).

Instead of this current process, DHS is adding a new provision at 8 CFR 235.15(b)(4) to modify the process for determining whether a noncitizen who enters across the southern border and is

---

[186] In the post-May 12, 2023, period, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews has decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations or administrative closures that are not referred to EOIR, the median time from encounter to removal, in the same time frames, decreased 85 percent from 73 days to 11 days. Pre-pandemic medians based on OHSS analysis of OHSS Enforcement Lifecycle December 31, 2023; post-May 12 estimates based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. The Departments note that DHS recently published a notice of proposed rulemaking proposing that certain mandatory bars be considered at the screening stage under a reasonable possibility standard. Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024). If DHS were to finalize that rule as drafted, this rule's "reasonable probability" standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.

not described in section 3(b) of the Proclamation during the emergency circumstances giving rise to the Proclamation's suspension and limitation on entry should be referred to an AO for a credible fear interview. These procedures apply during emergency border circumstances. *See* 8 CFR 235.15(a). Under the new rule, immigration officers will conduct an immigration inspection and, where the noncitizen will be subject to expedited removal, will advise the noncitizen of the removal charges against them and provide an opportunity to respond, consistent with existing practice and regulations outlined above. 8 CFR 235.3(b)(2)(i). However, the immigration officer will not complete either the Form I–867A or Form I–867B or a sworn statement. Moreover, the officer will not be required to provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear. *See* 8 CFR 235.15(b)(4). Under the rule, the immigration officer will instead refer the noncitizen to an AO for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. *See id.* This manifestation can occur at any time in the process and can be expressed verbally, non-verbally, or physically.[187] In such situations, the immigration officer will not proceed further with the removal and will comply with the existing regulations, policies, and procedures, including as outlined in 8 CFR 235.3(b)(4), regarding processing and referring noncitizens for credible fear interviews. At the time that a noncitizen is referred for a credible fear interview, they will receive additional information about the credible fear process that has the same substantive information as in the current process, but without the requirement that such information be provided on a particular form.

DHS is making these changes to address the emergency circumstances at the southern border discussed in the

Proclamation and the rule in a manner consistent with its legal obligations. DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO so long as those procedures are consistent with the INA. *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

DHS believes that the above-described changes are fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). Section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A), does not specify the relevant aspects of the procedures that immigration officers must follow to determine whether a noncitizen who is subject to expedited removal can be ordered removed or whether the noncitizen must be referred to an AO for a credible fear interview. Instead, the statute provides that the immigration officer may order removed any noncitizen who, subject to certain exceptions, is arriving in the United States, or who is within a class of noncitizens subject to expedited removal as designated by the Secretary, and who is inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or 1182(a)(7). The statute further provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). But the statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture. Moreover, Congress has not provided a particular definition of the phrase "indicates . . . an intention." The statute's text thus gives DHS discretion to employ the procedures it reasonably concludes are appropriate to implement

section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[188]

Interpreting the statute in this manner is also consistent with the United States' international law obligations. As described in Section II.B of this preamble, the United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra*, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.[189] Neither the Refugee Convention nor the Protocol prescribes minimum screening procedures that must be implemented.[190] Rather, each state party has the authority "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure," as long as such procedures are consistent with the purposes of the Convention.[191] The United States has also ratified the CAT, which includes a non-refoulement provision at Article 3 that prohibits the return of a person from the United States to a country where there are "substantial grounds for believing" the person would be tortured. *See Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007); *see id.* at 115 (" '[T]he United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in

---

[187] By these terms, DHS intends to include a wide range of human communication and behavior, such that "non-verbally" could include things like noises or sounds without any words, while physical manifestations could include behaviors, with or without sound, such as shaking, crying, or signs of abuse. *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm.* A noncitizen could thus manifest a fear of returning to a previous location without using actual words to state that they are specifically afraid of return to their home country or country of removal.

[188] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 543 (1950) (" '[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigrant Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 18 (D.D.C. 2020).

[189] *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[190] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967.*

[191] *Id.*

Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' '' (quoting the Senate resolution of ratification)). The CAT similarly does not prescribe screening requirements. As such, the United States has broad discretion in what procedures are appropriate to implement, through domestic law, to satisfy its non-refoulement obligations.[192]

The United States implements its obligations under the Refugee Protocol and the CAT through the INA and related rulemaking, and it provides specified procedures—including in the expedited removal process, as described above—for seeking asylum or other protection in the United States. The process outlined in this rule temporarily affords immigration officers the ability to refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. The Departments have concluded that the manifestation standard is consistent with their obligations (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured.[193]

In addition to changing to a ''manifestation'' standard, CBP is implementing operational changes to generally inform noncitizens subject to expedited removal that, if they have a fear of return, they should inform an immigration officer, and they will be referred to an AO for consideration of their fear claim. DHS believes that these operational changes and notice provisions, as implemented, are consistent with the notice provision in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).[194] Moreover, CBP will provide immigration officers with information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically.

Upon implementation of this rule, signs will be posted in areas of CBP facilities where individuals are most likely to see these signs. The signs will provide clear direction to individuals that, in addition to being able to inform the inspecting immigration officers of urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. These signs will be in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by those described in the Proclamation and likely subject to the provisions of this rule.[195]

Moreover, in CBP's large capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return will be shown on a loop in the processing areas and will also be available in those languages most commonly spoken by those noncitizens encountered by CBP who may be described in the

Proclamation and likely subject to the provisions of this rule.[196]

The video will also explain to noncitizens that, if they inform an immigration officer that they have a fear, an AO will conduct an interview to ask questions about their fear. Consistent with CBP's Language Access Plan, CBP provides language assistance services for those who may not speak one of those languages.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have ''I Speak'' signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[198] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the sign and video are available will be read the contents of the sign and video in a language they understand.[199]

[192] Although neither the Refugee Convention nor the Refugee Protocol nor the CAT includes specific screening requirements, the United States is bound not to return noncitizens from the United States to countries where they would be tortured, or, with limited exceptions, to countries where they would be persecuted on account of a protected ground. As discussed in detail above in Section III.A.1 of this preamble, the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), not through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. And the United States implements its obligations under the CAT through regulations. *See* FARRA, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

[193] 136 Cong. Rec. 36198 (1990) (recording the Senate's advice and consent to the ratification of the CAT, subject to certain reservations, understandings, and declarations, including that the phrase in Article 3 of the CAT, '' 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' '' is understood to mean '' 'if it is more likely than not that he would be tortured' ''); *see also Pierre,* 502 F.3d at 115.

[194] DHS acknowledges that an argument could be made that the requirement in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS ''shall provide information concerning the asylum interview . . . to aliens who may be eligible,'' is not limited only to noncitizens who are eligible for a credible fear interview, but instead applies to noncitizens who are suspected of qualifying for expedited removal and ''may'' be eligible for an interview. In all events, DHS is providing information to noncitizens who are being processed for expedited removal about their right to seek asylum and protection in the United States. As explained below, DHS is posting signs on display for all noncitizens in CBP custody and including information in a video that will be on display for the vast majority of noncitizens in CBP custody, informing them that if they have a fear of return, they should inform an immigration officer and, if they do, an AO will conduct an interview and ask the noncitizens questions about any fear they may have. Noncitizens who indicate a fear of return will be given a more detailed written explanation of the credible fear interview process prior to being referred for the interview. That explanation will be translated into certain common languages or will be read to the noncitizen if required.

[195] Currently, these languages are English, Spanish, Mandarin, and Hindi.

[196] These large capacity facilities currently hold the vast majority of individuals in CBP custody. Although the videos will not be shown at smaller facilities, including small POEs and Border Patrol stations, these facilities house very few noncitizens who are subject to the asylum limitation. These small facilities will still post the relevant signs in the processing areas. And at these small facilities, resources are such that immigration officers will be able to devote a great deal of attention to observing individuals, including for any manifestations of fear or any indication that an individual requires assistance from a translator or reading assistance to understand the information provided at the facility, including the information provided on the signs. Immigration officers at these facilities are trained to provide such assistance as needed and will continue to do so under this rule.

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (Oct. 30, 2023), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf; see also* DHS, *DHS Language Access Resources, https://www.dhs.gov/publication/dhs-language-access-materials* (last updated July 17, 2023); DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last updated Mar. 10, 2021).

[199] These videos and signs will be presented in a manner that is consistent with how CBP provides other important notifications to individuals in its facilities. CBP utilizes posters for other critical information, such as ensuring that individuals are on the lookout for those who may commit suicide, advising all children in custody of the amenities available to them (*e.g.*, food, water, medical care, blankets, and hygiene products), communicating its zero tolerance regarding sexual assault, and conveying critical information about oversight entities such as the Office of the Inspector General. CBP also has a video targeted towards UCs explaining the process that they will go through. These signs and videos are similarly posted in the

Continued

**48742**    **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

DHS's experience, based on the nature of CBP facilities and the utility of the existing signs, is that short, concise, and simple notifications are effective. This is because CBP holds individuals only for as long as it takes to complete inspection and processing, including conducting any basic medical screenings and making arrangements for transfer out of CBP custody. Particularly for those who are apprehended by USBP between POEs, noncitizens will go through a number of steps during their time in a CBP facility, including completion of processing paperwork, fingerprinting, and being interviewed by an inspecting immigration officer. In many USBP facilities, these steps occur at the same time as the facility provides showers and hygiene products, medical evaluations, and food and water. Given that noncitizens may move through other areas of the facility and do not remain in custody for a long period of time, DHS regularly places important signs in both the processing areas and the detention areas of its facilities, which are the locations where noncitizens spend time while being inspected or while in CBP custody; DHS is confident that noncitizens see these existing signs and that the new signs added as part of this rule are also likely to be seen. DHS has determined that more complicated videos and signs are less effective for conveying important information.

DHS acknowledges that these procedures represent a departure from the justification that the former Immigration and Naturalization Service ("INS") provided, in 1997, when it adopted the current procedures in 8 CFR 235.3(b)(2)(i). At the time, INS explained that adopting these procedures would "ensure that bona fide asylum claimants are given every opportunity to assert their claim[s]," and that it was including the requirement that immigration officers must provide advisals about the credible fear process and ask questions about fear as "safeguards" to "protect potential asylum claimants." *See* 62 FR at 10318–19. INS further explained that these procedures would "not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims." *Id.* at 10318. While such procedures have remained in place since 1997, this fact alone is not an indication that they are required by the statute, and DHS maintains discretion to update the procedures in a manner consistent with the statute. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S.

502, 515 (2009) (holding that an agency changing an established rule need not justify the change with a more detailed justification than that supporting the original so long as it can show "good reasons" for the new policy). Given the extraordinary circumstances currently facing the Departments, DHS has determined it is reasonable to change the procedures here.

When the existing regulations were adopted in 1997, the situation at the border was different. In 1998 (the first full year that statistics concerning the expedited removal process were available), approximately 80,000 noncitizens were processed for expedited removal.[200] In that same year, AOs conducted fewer than 3,000 credible fear interviews[201] and IJ reviews numbered around 100.[202] Additionally, at that time, expedited removal was applied only to "arriving aliens," noncitizens processed at a POE, not noncitizens encountered between POEs.[203] Expedited removal was not extended to certain noncitizens encountered after entering between POEs until 2004. *See* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (extending expedited removal to noncitizens encountered within 100 air miles of the border and within 14 days of entry). At that time, USBP apprehended approximately 1.1 million noncitizens between POEs annually.[204] The numbers have changed significantly since that time. In FY 2023, USBP apprehended more than 2 million noncitizens between POEs along the SWB.[205] In February 2024, USBP processed more than 33,000 individuals for expedited removal,[206] and USBP

processed more than 28,000 in March 2024.[207] Since May 2023, USCIS has completed about 3,300 credible fear interviews per week of individuals encountered at and between SWB POEs,[208] and in FY 2023, IJs reviewed over 34,000 credible fear decisions.[209] These high levels of encounters and credible fear referrals impose a significant burden on the expedited removal process and have strained DHS and EOIR resources, substantially impairing the Departments' ability to deliver timely decisions and timely consequences. At a processing time of approximately 2 hours per person, USBP agents spent approximately 56,000 hours—the equivalent of approximately 2,333 calendar days— processing the approximately 28,000 expedited removal cases in March 2024 under the current process. High numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded.[210] This type of crowding in USBP facilities creates health and safety concerns for noncitizens and Government personnel.[211]

Additionally, compared to 1997, today's high levels of migration impose a severe strain on the credible fear process. AOs and IJs must devote substantial resources to credible fear interviews and reviews.[212] Despite the strengthened consequences in place at the SWB through the Circumvention of Lawful Pathways rule and the complementary measures that have led to record returns and removals, encounter levels and credible fear referrals are exceeding the capacity of

---

[200] *See* INS, *1998 Statistical Yearbook of the Immigration and Naturalization Service* 203 (Nov. 1998), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1998.pdf.*

[201] *See id.* at 91.

[202] EOIR, *Statistical Yearbook 2000,* at D1 (Jan. 2001), *https://www.justice.gov/sites/default/files/eoir/legacy/2001/05/09/SYB2000Final.pdf* (reporting that EOIR received 90 credible fear reviews in FY 1998).

[203] *See* 62 FR at 10318–19; *compare* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (applying expedited removal to noncitizens arriving at ports of entry), *with* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii) (permitting the application to designated noncitizens).

[204] CBP, *United States Border Patrol Nationwide Encounters Fiscal Year 1925–2020, https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/U.S.%20Border%20Patrol%20Total%20Apprehensions%20%28FY%201925%20-%20FY%202020%29%20%28508%29.pdf* (last accessed May 27, 2024).

[205] CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[206] OHSS analysis of data downloaded from UIP on April 2, 2024.

[207] OHSS analysis of data downloaded from UIP on April 2, 2024.

[208] OHSS analysis of data downloaded from UIP on April 2, 2024.

[209] *See* EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/10/26/7_credible_fear_review_and_reasonable_fear_review_decisions.pdf.*

[210] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[211] *Id.*

[212] USCIS closed or adjudicated an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009. OHSS analysis of March 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (reflecting ever increasing numbers of credible fear interview screenings at the "SW Border Credible Fear Screenings Referred to USCIS by citizenship" tab); *see also* 88 FR at 31314, 31326, 31381.

---

areas of CBP facilities where DHS is confident they are likely to be seen by noncitizens being processed.

the expedited removal process.[213] Therefore, DHS has determined that a different approach is needed here. The manifestation standard in the new rule is designed to reasonably help meet these challenges during emergency border circumstances. It is intended to help immigration officers process noncitizens more expeditiously, while still affording opportunities for those seeking protection to do so.

DHS acknowledges that, by implementing a manifestation standard in the circumstances outlined in this rule, it is temporarily eliminating the requirement to provide individualized advisals and ask affirmative questions via Forms I–867A and B. DHS has determined that, in light of the circumstances giving rise to the Proclamation and this rule, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek asylum. DHS is making the decision to use the manifestation standard consistent with the statute, as described above, and for the reasons outlined below. At bottom, based on DHS's long experience inspecting and interviewing individuals, DHS has determined that a manifestation approach is the most appropriate way to address emergency border circumstances while still sufficiently affording the ability to seek protection. Specifically, DHS makes this determination based on its significant experience relating to the inspection of individuals seeking entry and admission into the United States. DHS immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day. In FY 2019, prior to COVID–19, for example, the approximately 28,000 officers of CBP's Office of Field Operations [214] processed more than 1.1 million people at POEs every day.[215] USBP's 20,000 agents [216] encountered more than 2 million people on the SWB in FY 2023.[217]

In addition, DHS, including through its predecessor agencies, has been implementing the expedited removal provisions since 1997. It therefore has nearly 30 years of experience completing the Form I–867A advisals and asking the questions on Form I–867B.[218] Based on this experience, it is DHS's determination that, when individuals are asked affirmative questions, such as those on Form I–867B, individuals are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum. Moreover, based on this experience, DHS concludes that providing noncitizens with specific advisals on fear claims— particularly given the emergency context of this rule and because few if any other advisals are provided—would be suggestive and prompt many individuals to respond in the affirmative even if they do not have any actual fear or intention to seek asylum. For this reason, as well, DHS has made the determination, based on its experience and expertise inspecting noncitizens, to temporarily adjust its approach to individualized advisals and questions about fear.

As part of this approach, DHS is temporarily forgoing asking the fear questions on Form I–867B with respect to noncitizens who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. DHS anticipates that this approach will likely lead to a higher proportion of those referred having colorable claims for protection. Based on the expertise of DHS in administering Form I–867B, it has determined that affirmative questions are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.[219] DHS believes that those noncitizens who indicate a fear of return on their own, in the absence of suggestive questions, are more likely to be urgently seeking protection. Indeed, it is DHS's experience and assessment that asking questions is likely to lead individuals to answer yes, even if they do not actually have a fear of persecution or torture.[220] DHS acknowledges that there are mixed opinions on this point and that this may not be the case for all individuals, such that questioning may be helpful in order for some individuals to feel comfortable articulating a fear.[221] DHS recognizes

---

[213] See Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant v. Biden*, No. 18 cv 6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶¶ 10–12, *Florida v. Mayorkas*, No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1); Decl. of Enrique M. Lucero ¶ 7, *Innovation Law Lab v. Wolf*, No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3).

[214] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices* (last updated Jan. 30, 2024).

[215] See CBP, *On a Typical Day in 2019, CBP . . . , https://www.cbp.gov/newsroom/stats/typical-day-fy2019* (last modified May 11, 2022).

[216] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices* (last updated Apr. 19, 2024).

[217] See CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[218] See 62 FR at 10312, 10318–19.

[219] From 2014 through 2019, of total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. OHSS Enforcement Lifecycle December 31, 2023.

[220] This is also reflected in the behavioral science concept of "acquiescence," in which individuals tend to "consistently agree to questionnaire items, irrespective of item directionality." Shane Costello & John Roodenburg, *Acquiescence Response Bias—Yeasaying and Higher Education*, 32 Australian Ed. & Dev. Pysch. 105, 105 (2015). Studies have shown that this bias is higher amongst those with lower education levels and from countries that score higher on scales of corruption or collectivism. *See, e.g.,* Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, *Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences*, 107 Personality & Individual Differences 190 (2017); Seth J. Hill & Margaret E. Roberts, *Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions*, 31 Pol. Analysis 575 (2023).

[221] DHS acknowledges that some studies of the expedited removal process concluded that the Form I–867A information and the Form I–867B questions are important protections, and that failure to read the advisals led to lower referrals for credible fear interviews. *See, e.g.,* Allen Keller et al., *Study on Asylum Seekers in Expedited Removal as Authorized by Section 605 of the International Religious Freedom Act of 1998: Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States* 16–18 (2005), *https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf* ("USCIRF Report") (finding that noncitizens who are read the information in Form I–867A are seven times more likely to be referred for a credible fear interview and "the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked"); *see also* U.S. Gov't Accountability Off., *Opportunities Exist to Improve the Expedited Removal Process,* No. GAO/GGD–00–176 (Sept. 2000). DHS acknowledges that one study concluded that there was "little evidence" that the advisals and fear questions prompted noncitizens to make fear claims, but rather most of the noncitizens whose cases were studied "spontaneously expressed fear of returning to their home country." *See* USCIRF Report at 21. The same study noted that three quarters of those had been read the advisals on Form I–867A. *See id.* Given the small sample size (n=73) and the report's uncertain conclusion, this report does not alleviate CBP's long held "concerns that [noncitizens] may be 'prompted' to express fears to officers by the I–867B fear questions." *Id.* As in 2005, at the time of the report, DHS continues to have such concerns, and DHS further believes that the individualized advisals on Form I–867A raise similar "prompting" concerns. And, even to the extent that the study concluded otherwise, DHS notes that, under the manifestation standard outlined in the rule, noncitizens continue to have the ability to affirmatively manifest a fear. Thus, considering the current situation at the border that gives rise to the Proclamation and this rule and the need to allocate limited resources to those urgently seeking protection, DHS believes that, notwithstanding the study's finding, the approach taken in this rule provides an appropriate standard for the emergency border circumstances at issue. As noted, CBP will be providing signs and videos advising, in a general matter, that individuals may express a fear of return. Accordingly, DHS has fully considered and weighed the contrary evidence and has concluded that the rule adopts the appropriate approach to help meet the challenge when emergency border circumstances are present.

that the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview. However, in light of the emergency border circumstances facing the Departments and addressed by the Proclamation and this rule, DHS believes the standard is appropriate and necessary. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.

Additionally, DHS is eliminating the requirement that officers and agents read the individualized advisals on Form I–867A. DHS plans to replace these advisals with a generalized notice—for all individuals in CBP facilities—of the ability to raise a claim of fear of persecution or torture. DHS is making this change based on its experience suggesting that, like with the Form I–867B questions, individualized Form I–867A advisals would be suggestive and would likely lead many individuals to claim a fear of return when they otherwise would not, particularly given the emergency context of this rule and because there are few if any other advisals provided. Based on its experience, DHS determines that removing these advisals on their own is also suggestive.[222] Thus, in the context of inspecting individuals who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal, DHS has determined not to require the provision of such suggestive advisals. DHS acknowledges that, like with the Form I–867B questions, there are studies that show that such advisals make it more likely that a noncitizen will indicate a fear of return.[223] However, based on DHS's

experience, the nature of the emergency border circumstances facing the Departments, and the statutory requirements, DHS has determined that the approach taken here—eliminating the requirement to provide individualized advisals but providing signage and videos—is appropriate.[224]

Indeed, DHS notes that the manifestation standard has been used in other urgent and challenging situations to identify noncitizens with fear claims. This standard has long been used by the United States Coast Guard, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea.[225] This standard was also adopted by the United States Government to screen family units during the pendency of the Title 42 public health Order, when the Government was similarly dealing with urgent, exigent circumstances—the global pandemic—while still allowing noncitizens an opportunity to seek protection.[226]

DHS believes that the manifestation standard is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return. Manifestations may be verbal, non-verbal, or physical.[227] A manifestation of fear may present with non-verbal or physical cues, through behaviors such as shaking, crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse.[228] An individual who may

not be comfortable answering a question about whether they have a fear of return may nevertheless manifest that fear through an unconscious behavior, which can be observed by the inspecting immigration officer, and the individual may then be referred for a fear screening. DHS acknowledges that, in some cases, these behaviors may reflect circumstances other than a fear of return—for instance, a noncitizen who has just arrived at the border may be physically tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear. In such cases, DHS immigration officers will use their expertise and training to determine whether the noncitizen is manifesting a fear. If there is any doubt, however, immigration officers will be instructed to err on the side of caution and refer the noncitizen to an AO for a credible fear interview.

Moreover, DHS will provide immigration officers with information on how to apply the standard, which will build on their existing training and experience. Indeed, as noted above, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. As a result of their experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. Agents and officers are also trained on identifying potential trafficking victims or victims of crimes and are trained on appropriate follow up action. Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. Agents and officers will also receive information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically. DHS believes that this experience, coupled with guidance, will help agents and officers effectively

---

[222] This determination is based, in part, on CBP's experience that the language in specific, individualized advisals often serves as a prompt for noncitizens to express a fear while in CBP custody. This is, in part, because CBP understands that TCOs coach noncitizens and advise them to listen for certain words in the language of particular advisals as a prompt to express a fear. While it is possible that TCOs will provide noncitizens information about how to manifest fear, even in the absence of affirmative advisals, CBP believes that, at least at the outset of the process, individuals without such a fear or intent to seek asylum are less likely to remember the information a TCO provided in the absence of individualized advisals. Additionally, CBP believes that individuals who do have a fear of return or intend to seek asylum will generally make such a claim even in the absence of such advisals.

[223] *See, e.g.,* USCIRF Report at 16–18.

[224] DHS considered whether to provide a short, individualized advisal to inform noncitizens of their ability to seek asylum, in addition to these signs and videos. But DHS determined that such a short, individualized advisal would be unlikely to convey information more effectively than the signs and videos that CBP already intends to use as a general notification, and that even a short advisal would take undue time to administer. Moreover, CBP assesses that the signs and videos providing general notification of the ability to seek asylum are less suggestive than short, individualized advisals would be.

[225] U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm* (notifying the public that U.S. Coast Guard personnel were provided updated training "on identifying manifestations of fear by interdicted migrants").

[226] *See Huisha-Huisha v. Mayorkas,* 27 F.4th 718, 732–33 (D.C. Cir. 2022); CBP, Office of Field Operations, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022); USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022).

[227] *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm* (noting implementation of training that "demonstrates different ways a migrant might express a verbal or non-verbal manifestation of fear").

[228] *Id.*

IFR_Rule_000035

identify noncitizens with potential fear or asylum claims under a manifestation approach. Therefore, DHS believes that this rule remains consistent with the need to "safeguard[]" the rights of asylum seekers. *See* 62 FR at 10319. Because an immigration officer's observation of whether a noncitizen manifests a fear—rather than a noncitizen's answers to affirmative questions regarding asylum—will lead to a referral to an AO for a fear screening, this standard may result in a greater proportion of those referred to an AO being individuals with meritorious claims.

Additionally, the manifestation standard in the rule will enable DHS to streamline the process, allowing it to process noncitizens in a more expeditious manner during the emergency border circumstances identified in the Proclamation and this rule. In particular, DHS anticipates that omitting the requirement to complete Form I–867A and I–867B will save about 20 to 30 minutes per noncitizen, providing DHS with—based on the number of cases in March 2024— approximately 14,000 extra personnel hours per month.[229] This increased efficiency is critical for processing noncitizens in an expeditious way, and thus will better ensure that, given the immense challenges of irregular migration at the southern border, DHS's limited resources are used most effectively while still affording opportunities for noncitizens to seek asylum or protection. Indeed, this is particularly critical in the emergency border circumstances described in the Proclamation and the rule. As discussed above, given the number of noncitizens and the time it takes to process them during periods of heightened encounters, expediting the process is critical for avoiding overcrowding and ensuring safe conditions for those in custody.[230]

For all of these reasons, DHS believes that the "manifestation of fear" standard, as explained in the rule, will enable immigration officers to effectively identify noncitizens who require credible fear interviews while streamlining the process. During the emergency circumstances described in the Proclamation and the rule, it is important for immigration officers to

expeditiously process and swiftly apply consequences to noncitizens while still affording access to protection. Here, the Departments are currently facing such emergency circumstances, as explained above in Sections III.B.1 and 2 of this preamble. DHS believes that the approach taken in the rule is the most appropriate one in light of the situation at the southern border, as explained in this rule and as discussed in the Proclamation, balancing the need to protect those who may wish to seek protection in the United States against an urgent need to use DHS resources effectively.

*c. Raising the Standard for Protection Screening*

Under this rule, if the AO determines that, in light of the limitation on asylum eligibility under 8 CFR 208.35(a), there is not a significant possibility that the noncitizen could establish eligibility for asylum, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim. *See* 8 CFR 208.35(b)(1)(i). The AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b)(2) of the INA, 8 U.S.C. 1231(b)(2).[231] *See* 8 CFR 208.35(b)(2)(i). Likewise, when reviewing a negative credible fear determination, where the IJ concludes that there is not a significant possibility that the noncitizen could establish eligibility for asylum in light of the limitation on asylum eligibility, the IJ will assess whether the noncitizen has established a reasonable probability of persecution because of a protected ground or torture. *See* 8 CFR 1208.35(b)(2)(ii).

The Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and protection under the CAT. As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other

applications." 88 FR at 11742. In addition, "the legislative history regarding the credible fear screening process references only asylum." *Id.* at 11743. By contrast, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening procedures are to be employed, while the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions, *see, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2).

Moreover, in past rules applying a "reasonable possibility" screening standard to claims for statutory withholding of removal or CAT protection, the Departments have noted that such a screening standard is used "in other contexts where noncitizens would also be ineligible for asylum." 88 FR at 11743 (citing 8 CFR 208.31(c), (e)); *see also, e.g.,* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264, 36270 (June 15, 2020) (referencing "the established framework for considering whether to grant statutory withholding of removal or CAT protection in the reasonable fear context"). Under the Circumvention of Lawful Pathways rule, "[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum." 88 FR at 11742. For those noncitizens, the Departments implemented a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and protection under the CAT. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). The Departments similarly believe that those who enter across the southern border during the emergency border circumstances identified in the Proclamation and this rule and who are not described in section 3(b) of the Proclamation, do not establish an enumerated exception, and are unable to establish a significant possibility of eligibility for asylum should be screened for protection under a higher screening standard.

The Departments' experience with the Circumvention of Lawful Pathways rule has validated the Departments' choice to use an elevated screening standard to narrowly focus limited resources on those who are likely to be persecuted or tortured and to remove those who are unlikely to establish eligibility for statutory withholding of removal or CAT protection. Under that rule, which

---

[229] At a time savings of 30 minutes per noncitizen, multiplied by 28,466 noncitizens processed for expedited removal in March 2024, *see* OHSS analysis of data downloaded from UIP on April 2, 2024, DHS would save approximately 14,000 hours per month.

[230] *See* Decl. of Matthew J. Hudak ¶¶ 7, 17–22, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[231] As noted above, DHS is also concurrently soliciting comment on the Application of Certain Mandatory Bars Notice of Proposed Rulemaking, which proposes that certain mandatory bars be considered at the screening stage under a reasonable possibility standard.

IFR_Rule_000036

uses a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and CAT protection claims, the Departments have processed record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies.[232] Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases—this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.[233] Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard,[234] compared to an 83 percent credible fear screen-in rate in the pre-pandemic period of 2014 to 2019.[235] From 2014 through 2019, of SWB expedited removal cases with positive fear determinations, less than 25 percent of EOIR case completions ultimately resulted in a grant of protection or relief.[236]

Screening under the "reasonable possibility" standard has allowed the Departments to screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage. Although fewer noncitizens are screened in under the "reasonable possibility" standard applied in the context of the Circumvention of Lawful Pathways rule, that screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule.[237] Under the emergency border circumstances described in the Proclamation and this rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed, and overall border security and immigration systems efficiencies outweigh any challenges related to training on a new screening standard and a possible marginal increase in interview length resulting from the application of a new standard in screening interviews. Likewise, the benefits of this rule, which is consistent with all statutory and regulatory requirements and the United States' international law obligations, outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard. Swiftly removing noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period. *See, e.g.,* 88 FR at 31324 (discussing the success of the CHNV parole processes as being in part due to imposing consequences for failing to use a lawful pathway, namely swift removal); 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).[238]

To allow for swift removals in the case of those noncitizens who are unlikely to meet their ultimate burden to establish eligibility for statutory withholding of removal or protection under the CAT, the Departments have decided to raise the screening standard to "reasonable probability of persecution or torture" during the emergency border circumstances described in the Proclamation and this rule. The Departments define this "reasonable probability" standard as "substantially more than a reasonable possibility, but somewhat less than more likely than not." 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(ii). Under this standard, a noncitizen would be screened in if they provide credible testimony[239] and set forth a credible claim with sufficient specificity for an AO or IJ to be persuaded that there is a reasonable probability that the noncitizen would be persecuted or tortured so as to qualify for statutory withholding of removal or CAT protection in an ultimate merits adjudication.

The Departments view the difference between the "reasonable possibility" standard and the new "reasonable probability" standard as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony before the AO or the IJ. In particular, although claims based on general fears of return may at times be found to meet the "reasonable possibility" standard where evidence in the record of country conditions

---

[232] Decl. of Blas Nuñez-Neto ¶ 7, *M.A.* v. *Mayorkas,* No. 1:23–cv–01843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1). The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (*i.e.,* positive and negative fear determinations). *See id.* ¶ 7 n.2.

[233] Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[234] OHSS analysis of data downloaded from UIP on April 2, 2024. At this time, data on EOIR's grant rate under the Circumvention of Lawful Pathways rule is not available because only a small number of cases processed under that rule have been completed. From May 12 through November 30, 2023 (the most recent date for which fully linked records are available), a total of 61,000 SWB expedited removal cases have been referred to EOIR for section 240 removal proceedings, including 1,400 with case completions (2.2 percent). In addition, cases that are already completed are a biased sample of all future completions because in years since FY 2014, the median processing time for cases resulting in relief or other protection from removal has been, on average, about six times longer than the median processing time for cases resulting in removal orders, so reporting on the small data set of already completed cases would yield a relief rate that is artificially low. OHSS analysis of OHSS Enforcement Lifecycle Dataset December 31, 2023 and OHSS analysis of EOIR data as of January 31, 2024.

[235] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[236] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[237] DHS OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[238] *See also, e.g.,* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[239] Credible testimony alone is sufficient in a credible fear screening, and AOs are trained to ask questions to elicit testimony to assist the noncitizen in meeting their burden with testimony alone. Although testimony alone could certainly meet the burden, it is not required that the burden be met solely through testimony. And even though corroborating evidence is not required, AOs will consider any additional evidence the noncitizen presents. Additionally, AOs are trained to conduct interviews of individuals with persecution or non-persecution-related injuries, traumas, or conditions that may impact their ability to provide testimony for themselves.

indicates instances of persecution or torture within the country, such claims are less likely to be sufficient under the "reasonable probability" standard when the noncitizen cannot provide greater detail in their statements and information as to the basis for their individual claim.

The Departments frequently see such general claims of fear that lack specificity at both the screening and merits stage. However, generalized fear of persecution is ultimately not sufficient to establish a claim. *See Sharma* v. *Garland,* 9 F.4th 1052, 1060 (9th Cir. 2023) ("[A]dverse country conditions are not sufficient evidence of past persecution, for the obvious reason that '[t]o establish past persecution, an applicant must show that he as individually targeted on account of a protected ground rather than simply the victim of generalized violence.'" (quoting *Hussain* v. *Rosen,* 985 F.3d 634, 646 (9th Cir. 2012))); *Prasad* v. *INS,* 101 F.3d 614, 617 (9th Cir. 1996) (stating that to establish past persecution, "[i]t is not sufficient to show [the applicant] was merely subject to the general dangers attending a civil war or domestic unrest"); *Al Fara* v. *Gonzales,* 404 F.3d 733, 740 (3d Cir. 2005) ("[G]enerally harsh conditions shared by many other persons do not amount to persecution. . . . [H]arm resulting from country-wide civil strife is not persecution on account of an enumerated statutory factor." (quotation marks omitted)); *see also Debab* v. *INS,* 163 F.3d 21, 27 (1st Cir. 1998) (citing cases).

Moreover, to establish ultimate eligibility for CAT protection, the noncitizen must demonstrate an individualized risk of torture—not a general possibility of it. *See Escobar-Hernandez* v. *Barr,* 940 F.3d 1358, 1362 (10th Cir. 2019) ("[P]ervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there."); *Bernard* v. *Sessions,* 881 F.3d 1042, 1047 (7th Cir. 2018) ("Evidence of generalized violence is not enough; the IJ must conclude that there is a substantial risk that the petitioner will be targeted specifically."); *Lorzano-Zuniga* v. *Lynch,* 832 F.3d 822, 830–31 (7th Cir. 2016) ("[G]eneralized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country."); *Alvizures-Gomes* v. *Lynch,* 830 F.3d 49, 55 (1st Cir. 2016) (country reports demonstrating overall corruption and ineffectiveness of Guatemalan authorities "do not relieve

[the applicant] of the obligation to point to specific evidence indicating that he, personally, faces a risk of torture because of these alleged shortcomings"); *Delgado-Ortiz* v. *Holder,* 600 F.3d 1148, 1152 (9th Cir. 2010) ("Petitioners' generalized evidence of violence and crime in Mexico is not particular to Petitioners and is insufficient to meet th[e] standard [for eligibility for CAT protection].").

Under the "reasonable possibility" standard, a noncitizen presenting a claim based on general civil strife is sometimes found to pass the screening stage even where they provide only general testimony about their fear of harm. For example, a noncitizen may meet the "reasonable possibility" standard where he expresses a fear of being killed by the government upon his return to his native country, United States Government reports indicate the country may engage in human rights abuses, and the noncitizen has been involved in anti-government political activism for years, even absent specific information as to an individualized threat against the noncitizen or any other individuals who have been threatened or harmed. But to meet the "reasonable probability" standard, the noncitizen would either need to explain with some specificity why he thinks he, in particular, is likely to be harmed, or the record would have to reflect some specific information regarding the treatment of anti-government political activists similarly situated to the applicant. Such claims are assessed on a case-by-case basis. As an example, however, were the noncitizen to credibly state that he knew, and to provide details about, people who are similarly situated to him who have been killed, harmed, or credibly threatened, that testimony may be sufficient to meet the "reasonable possibility" standard because it provides more specificity as to why the noncitizen believes he would be harmed. The Departments believe that the "reasonable probability" standard, by requiring additional specificity, will better identify claims that are likely to be meritorious in a full adjudication while screening out those whose claims are not likely to prevail.[240]

The Departments are confident that AOs and IJs can apply this heightened standard effectively to identify those who are likely to have viable claims on the merits while mitigating the possibility that those with a viable claim would be screened out. The level of specificity and certainty that the "reasonable probability" standard requires remains lower than the ultimate merits standard, and AOs and IJs have the training and experience necessary to elicit the information required to determine whether a case is sufficiently specific to meet the "reasonable probability" standard.[241] This is particularly the case because, in implementing such training, USCIS expects to adapt existing training, including on the ultimate merits standard, to prepare AOs on the "reasonable probability" screening standard, since the way evidence is evaluated remains the same, save for the degree of specificity required. AOs especially have significant training in non-adversarial interview techniques and are required to elicit testimony from the noncitizen—in effect, to help the noncitizen meet their burden through testimony alone.[242] If upon such questioning a noncitizen is unable to provide specific facts that lead the AO or IJ to believe that the noncitizen would be able to meet their burden with more opportunity to prepare, such claims are unlikely to prevail at the merits stage.

Moreover, this heightened screening standard targets information—specificity based on the noncitizen's own knowledge—that should generally be available at the screening stage. A noncitizen at the screening stage generally would have information regarding their fear of harm, such as whom they are afraid of and why, and an AO will elicit information regarding the claim that either is sufficiently specific to satisfy the heightened screening standard or is not. Credible

---

[240] Although the Departments believe the standard will better identify claims that are likely to be meritorious, for now the Departments do not seek to apply the "reasonable probability" standard outside the context of this rule—that is, to those who do not establish a significant possibility of eligibility for asylum because of the limitation on asylum eligibility or, if the limitation is rendered inoperative by court order, to those who are ineligible for asylum under the Circumvention of Lawful Pathways rule, *see* 8 CFR 208.35(b)(2)(i) and (3), 1208.35(b)(2)(iii) and (4)—because in this rule

the Departments are addressing emergency border circumstances rather than regulating to change the status quo. The Departments may consider such changes in future rulemaking.

[241] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[242] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

testimony alone can satisfy the noncitizen's burden and is sometimes the only available evidence of persecution or torture. *See, e.g., Matter of Mogharrabi,* 19 I&N Dec. 439, 443 (BIA 1987). In most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony. Instances of past harm or those that inform a future fear of return that caused a noncitizen to seek protection generally occur before entry and would not be expected to develop after the fact of entry or after the screening stage. Hence, the Departments believe that this standard will screen out claims that are likely to fail at the merits stage and poses only a minimal risk of screening out claims that could ultimately succeed. For example, if a noncitizen does not know who harmed or would harm them or why, in the Departments' experience, AOs and IJs will often be able to determine—depending on the facts of the case—that it is unlikely that the noncitizen will be able to provide answers to those critical questions at the merits stage.

In addition, AOs and IJs also receive training in, and have substantial experience weighing, country conditions, which will further help them assess whether and under what circumstances the lack of specificity in a noncitizen's testimony indicates that they have little prospect of meeting their ultimate burden.[243] For example, it may

be the case that where a noncitizen expresses only generalized fear of harm based on their ethnicity, but country conditions confirm serious, ongoing harm in the form of widespread, systematic persecutory acts by government institutions targeting individuals who are similarly situated to the noncitizen, adjudicators will rely on that information to deem the "reasonable probability" standard satisfied.

AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards, so they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage.[244] Moreover, all credible fear determinations must be concurred upon by a supervisory AO before they become final to ensure quality and consistency and will be subject to de novo IJ review if requested by the noncitizen. *See* 8 CFR 235.3(b)(7), 235.15(b)(2)(i)(B), 1208.35(b).

Although AOs, supervisory AOs, and IJs will have to be trained on applying the new "reasonable probability of persecution or torture" standard, the standard as explained above is not a

significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis. Rather, it is a matter of degree—to meet the "reasonable probability of persecution or torture" standard, the noncitizen must present more specificity than is required to meet the "reasonable possibility of persecution or torture" standard, but not so much as to establish ultimate eligibility for protection. Indeed, to meet the ultimate standard, noncitizens may still be required to provide more evidence—whether testimonial or documentary.

The Departments do not believe that applying the "reasonable probability of persecution or torture" standard will increase the time required for credible fear interviews by any great margin. AOs generally ask similar questions to elicit information from noncitizens during screening interviews regardless of the standard they will apply to the information elicited. The difference will be whether the information provided as a result of those questions reaches the required level of specificity. That said, there may be cases where an AO believes that the noncitizen may be able to meet the "reasonable probability of persecution or torture" standard after answering a few additional questions. But even if there is a marginal increase in the length of some interviews, the Departments believe that the interest in swift removal of those unlikely to establish eligibility for protection during emergency border circumstances outweighs the risk of some interviews taking longer.[245] This is because a higher standard will be more likely to create a deterrent: Those less likely to establish eligibility for statutory withholding of removal or CAT protection will be swiftly removed rather than being released and waiting years for a hearing, or in some cases, absconding and remaining in the United States unlawfully. And this deterrent effect could lead to lower encounter levels as noncitizens and smugglers realize that the process is functioning

---

[243] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); 86 FR at 46918. IJs "receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078, 18170 (Mar. 29, 2022); *see also* EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.* Moreover, IJs are required to maintain professional competence in the law, U.S. Dep't of Justice, Ethics and Professionalism Guide for Immigration Judges § IV (Jan. 26, 2011), *https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf,* which necessarily includes the elements required to establish eligibility for relief or entitlement to protection from removal, *id.* Consistent with their role in adjudicating asylum and related protection applications, IJs have long been able to take administrative notice of commonly known facts, including country conditions evidence. *See* 8 CFR 208.12 (1997) (stating that the adjudicator may rely on information from a variety of sources ranging from the Department of State to credible international organizations or academic institutions); 8 CFR 208.1(a) (1997) (stating this part shall apply to all applicants for asylum whether before an AO or an IJ). Federal Government country

conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information to which IJs often look. *See, e.g., Sowe v. Mukasey,* 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (quotation marks omitted)); *Xiao Ji Chen v. U.S. Dep't of Justice,* 471 F.3d 315, 341 (2d Cir. 2006) (Department of State country reports are "usually the best available source of information on country conditions" (quotation marks omitted)).

[244] *See* USCIS, *RAIO Directorate—Officer Training: Note Taking* (Feb. 12, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Survivors of Torture and Other Severe Trauma* (Nov. 2, 2023); USCIS, *RAIO Directorate—Officer Training: Children's Claims* (Dec. 20, 2020); USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With an Interpreter* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[245] In Section III.B.3.b of this preamble, the Departments conclude that there is a need to streamline immigration officers' processing of noncitizens through expedited removal while the Proclamation's suspension and limitation on entry is in effect. That reasoning is not inconsistent with the reasoning here. Because AOs interview only a subset of noncitizens processed through expedited removal, the Departments believe at most a portion of those noncitizens' credible fear interviews may be longer, and, as noted, any marginal increase in the time it takes to conduct some interviews is outweighed by improving deterrence and avoiding erroneous screen-ins, which result in noncitizens being added to the backlog of immigration cases and being released into and remaining in the United States for a significant period of time.

more effectively.[246] Screening out those unlikely to establish eligibility for protection has the added benefit of saving United States Government resources overall because fewer noncitizens who are unlikely to establish eligibility for protection will be placed into section 240 removal proceedings before EOIR, which as of the end of December 2023 had a backlog of more than 2.7 million cases.[247]

In developing this rule, the Departments considered the possibility that the application of different screening standards to "the same or a closely related set of facts" might result in inefficiencies. *See* 87 FR at 18091; *see also* 88 FR at 11746. The Departments note, however, that under this rule, that is unlikely to be the case. The facts relevant to whether a noncitizen is subject to the rule's limitation on asylum eligibility will only rarely be relevant to the inquiry into whether the noncitizen has a fear of persecution or torture. For example, whether the noncitizen faced an acute medical emergency that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(A) or 1208.35(a)(2)(i)(A) will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal and so only the "reasonable probability" standard will be applied to the facts relevant to their persecution or torture claim. And where a noncitizen meets such an exception, they will continue to be eligible to pursue asylum in addition to any claim of persecution or torture,

and those claims will all be considered only under the "significant possibility" standard. Similarly, whether a noncitizen faced an imminent and extreme threat to life and safety that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(B) or 1208.35(a)(2)(i)(B) will involve an evaluation of the discrete set of circumstances at the time of the noncitizen's arrival at the border, and will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal. The question of an imminent threat relates to the situation immediately prior to the noncitizen's entry into the United States, rather than necessarily any fear of persecution or torture. Thus, the Departments do not believe there will generally be a need to apply multiple standards to the same set of facts.

d. The Scope of This Rule

The Departments have decided to tie the application of this IFR, including the limitation on asylum eligibility, to emergency border circumstances. The suspension and limitation on entry applies beginning at 12:01 a.m. eastern time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. If encounters increase again (including during the 14-calendar-day period), the suspension and limitation will apply again (or continue to apply, as applicable) after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of more than 2,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. These thresholds are consistent with those set forth in sections 2(a) and (b) of the Proclamation.[248] In order to maximize

the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims. However, as described below, DHS has been limited in its ability to do so as a result of capacity and resource constraints. The number of people who can be processed for expedited removal is dependent on the Departments' resources and can be impacted by several factors, including limited detention beds and holding capacity;[249] the presence or absence of sufficient AOs to conduct credible fear interviews for all those who claim a fear or indicate an intent to apply for asylum; the availability of IJs to review negative fear findings; and the ability to repatriate individuals ordered removed in a timely manner—an option that is not always available because, among other things, it relies on independent decisions made by foreign governments.

Sustained high encounter rates threaten to overwhelm the Departments' ability to effectively process, detain, and remove the migrants encountered, as appropriate, in a timely manner. *See* 88 FR at 31316. The President has determined that the suspension and limitation on entry is necessary to manage encounter levels. The Departments have determined that emergency border circumstances described in the Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard because, in such circumstances, DHS lacks the capacity to deliver timely consequences, and absent this rule, must resort to large-scale releases of noncitizens pending section 240 removal proceedings, which leads to significant harms and threatens to incentivize further migration by individuals who recognize

---

[246] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[247] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[248] The 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained. The absence of a similar waiting period prior to a reactivation reflects the operational exigencies in a circumstance in which there has been a 7-consecutive-calendar-day average of more than 2,500 encounters and is necessary to avoid a surge to the border in advance of a reactivation. As the Departments have explained, the preliminary data pulled from DHS's operational systems have not undergone a full validation process. *See supra* note 5. But a rapid policy and operational response to emergency border circumstances requires relying on this more recent data when making factual determinations consistent with sections 2(a) and

2(b) of the Proclamation. Hence, the data used to make these factual determinations may differ somewhat from the more definitive numbers that ultimately emerge from DHS's full validation process.

[249] *See, e.g.,* Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, H1812 (daily ed. Mar. 22, 2024).

IFR_Rule_000040

limitations on the ability to deliver timely consequences.[250]

DHS simply lacks sufficient resources to detain and conduct credible fear interviews for the number of noncitizens arriving each day who claim a fear of return when processed through expedited removal. This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting DHS's ability to swiftly deliver consequences on individuals who do not have a legal basis to remain in the United States.[251] The Departments have determined that the 1,500-encounter threshold is a reasonable proxy for when the border security and immigration system is no longer over capacity and the measures adopted in this rule are not necessary to deal with such circumstances.

At the outset, it is important to put the threshold in context. From FY 2000 through FY 2008, USBP encounters between POEs averaged approximately 3,000 per day, routinely including monthly averages over 3,500 for a few months most springs.[252] The vast majority (94 percent) of individuals encountered by USBP during this period were Mexican nationals, and very few of those who were processed for expedited removal claimed a fear of return or an intent to seek asylum during that process—fewer than one percent of all CBP SWB encounters.[253] As a result, DHS and its predecessor agency were able to swiftly remove or voluntarily return the vast majority of those

encountered at the SWB using comparatively few resources. *See* 88 FR at 11708, 11716.

From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period—May 2019 when USBP encounters peaked at 4,300 during that year's surge.[254] Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs even above 2,500 per day.[255] In fact, for the 15 years prior to March 2021, DHS did not experience a single month with more than 5,000 total average daily encounters.[256] However, during that time, the demographics of these encounters changed significantly, with nationals from the northern Central American countries steadily increasing as a proportion of encounters, becoming a majority of individuals encountered between POEs for the first time in history in 2017—a trend that continued until 2020. Starting in 2014, families and UCs increased as a proportion of USBP encounters as well, reaching a high of 65 percent of encounters in 2019.[257] Finally, and as described in

greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever, accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low.[258]

The change in the nationalities and demographics being encountered at the border has coincided with a dramatic increase in the number of individuals who claim fear when they are processed at the border. Between 2005 and 2015, the proportion of noncitizens encountered by CBP and processed for expedited removal who claimed fear ranged from 5 percent at the low end to 26 percent at the high end.[259] Driven by the changing demographics at the border, both the percentage of those processed for expedited removal as well as the percentage of those processed for expedited removal who claimed a fear of return or an intent to seek asylum generally increased during this time frame.[260] This, in turn, has resulted in a steep increase in the number of credible fear interviews that USCIS is required to conduct.[261]

In 2023, a record 59 percent of encounters at and between POEs on the SWB that were processed for expedited removal resulted in fear claims. From 2016 to 2023, the percentage of SWB encounters processed for expedited removal who claimed a fear dipped below 41 percent just once, in FY 2020, the first year of the COVID–19

---

[250] See Section III.B.2 of this preamble. The Departments acknowledge that, despite the protections preserved by the rule and the available exceptions, the provisions adopted by this rule will result in the denial of some asylum claims that otherwise may have been granted and, as with all screening mechanisms, there is some risk that a case that might otherwise warrant protection might not proceed to a merits adjudication. However, in light of the emergency circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate and necessary. And given the Departments' experience with asylum and protection screenings and adjudications, the Departments believe the rule's provisions will produce accurate outcomes, although the Departments believe the rule continues to be justified even if that expectation turns out to be misplaced in close cases.

[251] See CBP, *Custody and Transfer Statistics* (May 15, 2024), *https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (detailing the number of individuals processed for expedited removal compared to another processing disposition, including section 240 proceedings).

[252] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 3,000 per day from FY 2004 to FY 2008; data on encounters at POEs are not available prior to FY 2004.

[253] OHSS analysis of March 2024 OHSS Persist Dataset.

[254] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) averaged approximately 1,500 per day during this period. For most of this period (from FY 2009 through FY 2018), the share of encounters processed for expedited removal and the share of those processed through expedited removal making fear claims generally increased, so that during FY 2018, 41 percent of SWB encounters were processed for expedited removal and 45 percent of those processed for expedited removal made fear claims, yielding an all-time high of 18 percent of all encounters making fear claims. OHSS analysis of March 2024 OHSS Persist Dataset. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that the vast majority (84 percent) of all fear claims made in prior years were made by SWB encounters. Even if 100 percent of fear claims made before FY 2013 were made by SWB encounters, FY 2018 would represent the all-time highest percentage of all encounters making fear claims.

[255] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

[256] OHSS analysis of March 2024 OHSS Persist Dataset.

[257] OHSS analysis of March 2024 OHSS Persist Dataset. Northern Central Americans accounted for 54 percent of encounters between POEs in 2017. Northern Central Americans' proportion of encounters between POEs continued to increase until it reached 71 percent of USBP encounters in 2019 but dropped at the onset of the pandemic, in 2020, to less than 26 percent. See also OHSS, *Immigration and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/*

*immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

[258] OHSS analysis of OIS Yearbook of Immigration Statistics 1980–1999 and OHSS analysis of March 2024 OHSS Persist Dataset. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship"). Nationality breakouts of border encounters are not available prior to 1980, but Mexicans accounted for 97 percent of encounters for all of 1980 through 1999 and never accounted for less than 96 percent in any fiscal year during that period.

[259] OHSS analysis of March 2024 OHSS Persist Dataset.

[260] The percentage of those processed via expedited removal fell again in 2019 due to resource constraints. OHSS analysis of March 2024 OHSS Persist Dataset.

[261] The share of noncitizens encountered by CBP at and between POEs who were processed through expedited removal increased from 6 percent in FY 2005 to between 39 and 47 percent each year from FY 2012 to FY 2018, but then dropped in FY 2019 because DHS was unable to scale up expedited removal processing in proportion to the substantial increase in USBP encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

IFR_Rule_000041

pandemic.[262] The global COVID–19 pandemic briefly interrupted this trend, which has continued after the lifting of the Title 42 public health Order in May 2023. Between May 12, 2023, and the end of March 2024, DHS processed a record number of individuals through expedited removal as it sought to maximize the consequences at the border, and 54 percent of noncitizens processed for expedited removal indicated a fear of persecution or intent to seek asylum.[263] As part of DHS's comprehensive effort to impose strengthened consequences at the border after the lifting of the Title 42 public health Order, USCIS reassigned a significant number of AOs to conduct credible fear interviews, which resulted in USCIS completing a record number of such interviews. In fact, USCIS conducted more interviews from SWB encounters during the span of ten and a half months after the lifting of the Title 42 public health Order than in any full fiscal year prior to 2023, and twice as many as the annual average from FY 2010 to FY 2019.[264]

As DHS transitioned from the enforcement of the Title 42 public health Order at the border to full use of its title 8 authorities after May 11, 2023, DHS's capacity constraints—and the impact of those constraints on DHS's ability to impose consequences on noncitizens who cross unlawfully or without authorization—have come increasingly into focus. Given these real resource constraints, DHS has had to make hard choices about whom it can prioritize for detention or refer into expedited removal.[265] As a result of a lack of sufficient holding spaces, detention beds, and AOs, DHS has only been able to refer certain noncitizens into expedited removal—which, as detailed above, is the most efficient tool available under title 8 authorities to impose swift consequences for irregular migration. This means that DHS cannot impose consequences swiftly or predictably on most people encountered at the border, feeding the narrative pushed by smugglers that irregular

migrants will be able to stay in the United States.[266]

The expedited removal process requires the outlay of significant Government resources. When a noncitizen in expedited removal indicates an intention to seek asylum or a fear of persecution, rather than being swiftly removed, they are referred to an AO for a credible fear interview and may seek review of any negative screening by an IJ—all of which takes time and Government resources. As described in further detail above, DHS has made significant process enhancements to reduce the overall time it takes for individuals to proceed through this process. However, the availability of sufficient numbers of AOs to conduct credible fear interviews is critical to DHS's ability to quickly adjudicate fear claims and deliver consequences to those who do not have a credible fear of persecution or torture.

As described above, Congress has failed to provide the additional resources requested for USCIS that would have increased the number of AOs that are available to conduct credible fear interviews for SWB cases. This reality, combined with increases in encounters at the border, and increases in the proportion of noncitizens processed for expedited removal who claim fear of return, means that DHS cannot impose consequences swiftly or predictably on most people whom DHS encounters. Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings,[267] undercutting the effectiveness of the previous measures that have been implemented. This reality contributes to the vicious cycle described above in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.

As a result of the changes to the nationalities and demographics being encountered at the border, and the associated increase in the rate of claiming fear by individuals encountered, the amount of resources required to deliver consequences quickly through referrals into expedited removal for the vast majority of individuals who claimed a fear in 2000 (when DHS's predecessor agency averaged 3,000 to 7,000 daily

encounters between POEs) or in 2010 (when DHS averaged 1,000 to 2,000 daily encounters between POEs) was far lower than the amount of resources required to manage the same number of encounters today.[268]

Of course, as noted above, DHS has been experiencing much higher encounter levels,[269] and simply does not have the resources it would need to place into expedited removal the majority of those encountered by USBP who are amenable to such processing. Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.[270] When DHS does not

---

[262] OHSS analysis of March 2024 OHSS Persist Dataset.

[263] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[264] OHSS analysis of data downloaded from CBP UIP on April 2, 2024. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is only available since FY 2013; for the years prior to FY 2013 there was no full fiscal year in which the total number of USCIS fear claims was equal to the number of fear claims completed for SWB encounters processed for expedited removal between May 12, 2023, and March 31, 2024.

[265] ICE, *Fiscal Year 2023 ICE Annual Report* 17–18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf*.

[266] March 2024 OHSS Persist Dataset.

[267] OHSS analysis of March 2024 OHSS Persist Dataset.

[268] March 2024 OHSS Persist Dataset. The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010. OHSS Persist Database March 31, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

[269] Even as compared to the 2,000 to 7,000 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher. In FY 2023, there were 3,300 to 7,300 such daily encounters, and from October 2023 through March 2024, the corresponding numbers are 4,000 to 8,300. March 2024 OHSS Persist Dataset.

[270] *See* OHSS analysis of data downloaded from UIP on April 2, 2024. CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000. *See* OHSS analysis of March 2024 OHSS Persist Dataset. In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

Continued

have the capacity to process individuals through expedited removal or detain noncitizens to await their proceedings, releasing individuals into the interior of the United States is generally the only option that is left.[271] The need to release individuals at the border has increased over time and peaked during surges.

By contrast, when encounters (excluding UCs from non-contiguous countries and noncitizens determined to be inadmissible at a SWB POE) are below 1,500 per day, DHS will be able to refer most individuals it encounters into expedited removal and deliver a swift consequence to the majority of individuals it encounters who do not establish a legal basis to remain in the United States—in the form of a return or removal. Given limited congressional appropriations and agency funding levels, DHS has a finite capacity to deliver such consequences at the border, which is reflected in the number of individuals that can be processed through expedited removal on any given day. As detailed above, DHS over the past year has significantly streamlined the expedited removal process and has set records in terms of individuals placed in expedited removal by CBP at the SWB and credible fear interviews conducted by AOs. Given current resources, however, and in the absence of congressional action, there is a limit

on how many people can be put through the process—and that limit directly informs the 1,500 threshold.

From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.[272] During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b).[273] This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.[274] As discussed previously, of those individuals encountered by USBP and placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found not to have a credible fear and are ordered removed.[275] This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.[276]

Simply put, at 1,500 daily encounters, DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries. DHS would also be able to minimize releases of those who are amenable to expedited removal or transfer them to ICE custody pending immigration proceedings. By contrast, above 2,500 encounters—the level at which the Proclamation and the rule would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level. At the 2,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements described above, DHS would be able to place just 43 percent of the individuals who are not quickly repatriated into expedited removal—significantly less than the 70 percent under the 1,500-encounter threshold.[277] This would, in turn, lead to a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States, with DHS only able to quickly remove or return substantially less than half of the individuals it encounters.[278] Moreover, the percentage of people who can be referred to expedited removal and ultimately be quickly removed if they do not establish a legal basis to remain decreases rapidly as encounters increase beyond 2,500 given the baseline constraints outlined above.

This difficulty in imposing swift consequences on individuals without a legal basis to remain in the United States during periods of elevated

---

CBP held an average of 21,863 noncitizens in custody each day during December 2023, averaging 104 percent of CBP's daily custody capacity (21,042) roughly each day for the entire month. OHSS analysis of data downloaded from UIP on February 14, 2024.

EOIR had a backlog of over 2.7 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline; see also* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape,* Migration Pol'y Inst., at 1 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); UNHCR, *Global Trends: Forced Displacement in 2022,* at 2, 8–9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases).

[271] Consistent with the Departments' conclusion in the Circumvention of Lawful Pathways rule, the Departments believe the emergency border circumstances described in the Proclamation and this rule cannot be addressed by relying on the programmatic use of its contiguous territory return authority at section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), due to resource constraints and foreign affairs considerations. *See* 88 FR at 31370; 88 FR at 11731.

[272] OHSS analysis of data downloaded from UIP on April 2, 2024.

[273] Based on comprehensive CBP processing dispositions for single adults, family units, and UCs from contiguous countries encountered May 12, 2023 to March 31, 2024; data downloaded from UIP on April 2, 2024.

[274] At 1,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 1,250 encounters would not be subject to rapid repatriation, including 1,240 who would potentially be amenable to expedited removal. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 72 percent of people not subject to rapid repatriation and 73 percent of potentially amenable single adults and family units into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024. Applying the rule even more broadly based on a lower threshold would also raise countervailing considerations, *see supra* note 250, and so the Departments have struck the balance reflected in the rule.

[275] OHSS analysis of data downloaded from UIP on April 2, 2024.

[276] At 1,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 250 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be

repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 830 repatriations (sums do not add due to rounding), or 56 percent of encounters.

[277] At 2,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 2,080 encounters would not be subject to rapid repatriation. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 43 percent of people not subject to rapid repatriation into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024.

[278] At 2,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 420 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 1,010 repatriations (sums do not add due to rounding), or 40 percent of encounters.

IFR_Rule_000043

encounters is borne out by both recent experience, which is detailed in Sections III.B.1 and 2 of this preamble, and by historical data. DHS historical data also clearly show the dichotomy between the outcomes for individuals processed at the border at the 1,500- and 2,500-encounter levels. DHS data show that releases from CBP custody as a share of encounters have generally been highest during periods of sustained high-encounter levels, and lowest when encounters have been at 1,500 or below. For example, from FY 2013 through FY 2019, months with average daily USBP encounters of fewer than 1,500 per day resulted in a minimal level of releases due to capacity constraints at the border.[279] During the 2013 to 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. During that 7-year stretch, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 individuals released each day, while months in which daily encounters exceeded 2,500 resulted in approximately 1,300 releases each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings.[280]

It is important to note, however, the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals. During the 2013 to 2019 time frame—which forms the basis for the analysis in the preceding paragraph—the vast majority of encounters at the border were from Mexico, El Salvador, Guatemala, and Honduras—countries that are comparatively easy to return people to.[281] Today, a much higher proportion of SWB encounters are from other countries that are comparatively much more difficult to return people to, including record numbers from the Eastern Hemisphere.[282] At the same time, the proportion of encounters

involving family units and UCs, although still high, is lower today than it was during periods of high numbers of encounters and releases in FY 2019.[283] Although shifting demographics affect the Departments' capacity to deliver timely decisions and timely consequences at varying levels of encounters, it remains clear that with the challenging demographics being encountered today, DHS would have the ability to deliver a timely consequence to the majority of people it processes at the border when encounters are below 1,500—supporting the decision to suspend the application of the rule when DHS reaches that level of encounters over a 7-day average. Likewise, as discussed above, the Departments have concluded that it is reasonable to apply the rule when encounter levels rise above a 7-day average of 2,500 due to the sharp decrease in their ability to swiftly impose meaningful consequences at the border once encounters exceed that level.

Lastly, it is important to note that using a single threshold—for example, 1,500 encounters—to activate or deactivate the measures in this rule would pose significant challenges and not be operationally viable. Having a single threshold would likely lead to scenarios where the rule would be regularly activated and deactivated as the 7-day average rose above and below 1,500, which would have significant operational impacts for CBP, ICE, and USCIS, and be confusing for government personnel, migrants, and other key stakeholders. For example, the Departments will need to notify and provide guidance to their personnel to apply the provisions of this rule in connection with each activation and deactivation. These actions represent a burden on staff time and resources that would have negative operational impacts if activation or deactivation happened regularly. CBP and ICE will also face scenarios in which they would have many people in their custody some of whom would be subject to and others of whom would not be subject to the provisions of this rule, and CBP and ICE will need to keep track of which individuals needed to be processed under which procedures—something that could become extraordinarily complex and unwieldy if the rule were to be activated and deactivated regularly. Legal service providers and migrants would similarly face a great

deal of confusion about when the provisions of this rule were in effect based upon a single threshold of 1,500 encounters to activate or deactivate the measures in this rule. The burden of tracking, identifying, and applying different standards that change back and forth over a matter of days is significantly more complex for USCIS personnel as they consider protection claims.

For all of these reasons, it is important to ensure that there is a clear division between the levels at which the rule is deactivated and when it is activated. And to ensure that stakeholders are aware of when the rule is deactivated and activated, DHS will notify the public about Secretarial determinations of the encounter levels described in sections 2(a) and 2(b) of the Proclamation. As noted above, the 2,500-encounter level is a good proxy for when DHS's ability to quickly impose consequences at the border for individuals who do not establish a legal basis to remain is becoming so degraded that it is likely to further incentivize additional unlawful crossings. It also has the benefit of increasing the time that would elapse between deactivations and activations, allowing DHS to ensure that its personnel are not having to constantly switch back and forth between different procedures.[284]

The exclusion of those determined to be inadmissible at a SWB POE from the 1,500- and 2,500-encounter thresholds is also reasonable in light of recent policy decisions, processing experience, and operational needs. Since May 12, 2023, SWB daily POE encounters have averaged 1,650—largely because DHS has been incentivizing individuals to present at POEs in a safe, orderly manner.[285] This number has stayed relatively constant compared to the number of encounters between POEs, which have varied widely, from a low of 2,554 on May 21, 2023, to a high of 10,822 on December 18, 2023.[286] The predictability in the number of POE encounters, paired with the processing efficiencies gained by the widespread use of the CBP One app, improves CBP's

[279] For FY 2013 to FY 2019, in months with fewer than 1,500 encounters between POEs, USBP released an average of 11 encounters per day. OHSS analysis of March 2024 OHSS Persist Dataset.

[280] OHSS analysis of March 2024 OHSS Persist Dataset.

[281] OHSS analysis of March 2024 OHSS Persist Dataset.

[282] OHSS analysis of March 2024 OHSS Persist Dataset.

[283] UCs and family units accounted for 65 percent of USBP encounters in FY 2019, compared to 45 percent in FY 2024 through March. OHSS analysis of March 2024 OHSS Persist Dataset.

[284] The Departments recognize that, due to the rule's approach, at a given encounter level between 1,500 and 2,500 encounters per day—such as 2,000 encounters a day—whether the rule applies will be path dependent. If encounters have been above 2,500, the rule will apply. If encounters have been below 1,500, the rule will not apply. This is a necessary consequence of providing the clear division that the Departments have deemed necessary, and the Departments assess that adopting this approach best balances the relevant considerations.

[285] OHSS analysis of March 2024 OHSS Persist Dataset.

[286] OHSS analysis of March 2024 OHSS Persist Dataset.

**48754**    Federal Register / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

ability to manage encounters at POEs. The vast majority of noncitizens who present at a SWB POE have done so after having registered with the CBP One app.[287] Because such individuals have registered with the CBP One app, CBP can process these individuals more efficiently and in a more orderly way than individuals encountered between POEs.[288] This is a critical element of our strategy to encourage the use of safe, orderly, and lawful pathways, as described above, to incentivize noncitizens to seek out lawful pathways instead of attempting to cross into the United States irregularly. CBP officers will determine the most appropriate processing disposition on a case-by-case basis, although DHS expects to generally issue such individuals an NTA for removal proceedings under section 240 of the INA.

In short, DHS has assessed that the emergency border circumstances that are described by the Proclamation and this rule—and that the President has concluded warrant the step of suspending and limiting entry—reasonably capture the capacity of the border security and immigration systems to deliver consequences in a timely manner to individuals who cross unlawfully or without authorization. Thus, the Departments have determined to tie the application of the rule's provisions to the date that the Proclamation takes effect, and to include a mechanism to temporarily halt the application of the rule's provisions when encounters between POEs reach 1,500 and to restart the application of its provisions if they once again rise above 2,500. Because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation, the Departments intend for the Secretary of Homeland Security to continue to make the factual determinations regarding the 1,500 and 2,500 thresholds described in this rule and in sections 2(a) and 2(b) of the Proclamation, even if the Proclamation is enjoined, in order to provide continuity during emergency border circumstances. Lastly, the Proclamation may be revoked by the President upon a determination that it is no longer needed.[289]

## C. Section-by-Section Description of Amendments

### 1. 8 CFR 208.13 and 1208.13

DHS and DOJ are adding a paragraph (g) to the end of 8 CFR 208.13 and 1208.13, respectively, *Establishing asylum eligibility*, to explain when a noncitizen is potentially subject to this IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13. Paragraph (g) refers the reader to the new regulatory provisions at 8 CFR 208.35 and 1208.35 that establish the limitation on eligibility for asylum where a noncitizen entered the United States across the southern border during emergency border circumstances.

### 2. 8 CFR 208.35

DHS is adding to 8 CFR part 208, *Procedures for Asylum and Withholding of Removal*, a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances*. Within subpart D, DHS is adding a new § 208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances*. This section sets forth a new limitation on asylum eligibility and screening procedures related to the application of such limitation in expedited removal proceedings and the conduct of credible fear screenings during the emergency border circumstances. This provision applies notwithstanding any contrary provision of part 208.

Section 208.35 consists of the following provisions:

Paragraph (a) sets forth the limitation on asylum eligibility. Under the rule, a noncitizen is ineligible for asylum if the noncitizen is described in § 208.13(g) and not described in section 3(b) of the Proclamation. This approach is consistent with the general policy of the Proclamation and rule and provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways, such as for those who arrive in the United States at a southwest land border POE pursuant to a process approved by the Secretary of Homeland Security.[290]

Paragraph (a)(2) contains provisions regarding an exception to the limitation on asylum eligibility that aligns with the means for rebutting the presumption of asylum ineligibility in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). The exception applies if the noncitizen, or the noncitizen's family member as described in § 208.30(c) with whom the noncitizen is traveling, demonstrates by a preponderance of the evidence exceptionally compelling circumstances, including that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in § 208.30(c) with whom the noncitizen is traveling:

• Faced an acute medical emergency;

• Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

• Satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

Paragraph (a)(2)(ii) makes clear that where a noncitizen establishes one of the above, they shall necessarily have established exceptionally compelling circumstances. This exception for exceptionally compelling circumstances limits the potential adverse effects of the limitation on asylum eligibility on certain particularly vulnerable populations, and family members with whom they are traveling, without undermining the key policy imperative to disincentivize irregular migration during a time when encounters are above certain benchmarks.[291] Paragraph (a)(2)(iii) deems those who have established exceptionally compelling circumstances for purposes of this asylum limitation or who are described in the provisions of the Proclamation as being excepted from its suspension and limitation on entry as having established exceptionally compelling circumstances for purposes of the Lawful Pathways condition. This provision is intended to simplify administration of this asylum limitation while it and the Circumvention of

---

*Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[291] *See, e.g.,* 88 FR at 31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.").

---

[287] OHSS analysis of March 2024 OHSS Persist Dataset.

[288] *See, e.g.,* 88 FR at 11719.

[289] The Departments have not sought to apply the rule even after any revocation of the Proclamation by the President, because the Departments expect that any such revocation would only follow consultation with the Departments regarding the policy and operational implications of such an

action. Moreover, a decision by the President would reflect important changed circumstances, and the Departments would want to take into account those changed circumstances in assessing the appropriate policy as to the issues covered by this rule.

[290] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures To Humanely*

Lawful Pathways rule are both operative.

Paragraph (b) prescribes procedures for considering the limitation on asylum eligibility during the credible fear screening process and for applying the "reasonable probability" standard in the event the Proclamation or the limitation on asylum eligibility are rendered inoperable by court order. Under paragraph (b)(1), the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the limitation on asylum eligibility in paragraph (a). The paragraph sets forth three possible procedural scenarios depending on the AO's findings. First, where the AO determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a)—including that there is not a significant possibility, *see* INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii),[292] that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception to the limitation under paragraph (a)(2), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim and continue to consider the noncitizen for potential eligibility for statutory withholding of removal and CAT protection under the procedures in paragraph (b)(2), as described below. *See* 8 CFR 208.35(b)(1)(i). Second, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 208.13(g), the AO will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 208.33(b). *See id.* 208.35(b)(1)(ii). This provides that those noncitizens who are not subject to the Proclamation because they did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 208.33(b)(1)(ii), if the noncitizen is not subject to that condition, they will be screened for a significant possibility of

eligibility for statutory withholding of removal or CAT protection consistent with § 208.30.[293] Third, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the AO will conduct the screening consistent with 8 CFR 208.30. *See id.* 208.35(b)(1)(iii).

If the AO determines that the noncitizen is subject to paragraph (a) and cannot establish a significant possibility that they will be able to establish exceptionally compelling circumstances by a preponderance of the evidence per paragraph (a)(2), the AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b) of the INA, 8 U.S.C. 1231(b). *See* 8 CFR 208.35(b)(2)(i). As noted above, for purposes of this section, reasonable probability means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the noncitizen would be persecuted because of his or her race, religion, nationality, membership in a particular social group, or political opinion, or tortured, with respect to the designated country or countries of removal. *See id.*

If the noncitizen establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, DHS will issue a positive credible fear determination and follow the procedures in § 208.30(f). *See id.* 208.35(b)(2)(ii). Under § 208.30(f), USCIS may issue an NTA for removal proceedings under section 240 of the INA, or, in its discretion, retain the application for an asylum merits interview pursuant to § 208.2(a)(1)(ii). Under the regulations governing the asylum merits interview process, where USCIS exercises its discretion to retain jurisdiction over an application for asylum of a noncitizen found to have a credible fear of persecution or torture

pursuant to § 208.30(f), the written record of the positive credible fear determination is treated as the asylum application. 8 CFR 208.3(a)(2). Under this IFR, however, noncitizens who are subject to the limitation on asylum eligibility under 8 CFR 208.35(a), and fail to show a significant possibility of being able to establish an exception by a preponderance of the evidence at the credible fear interview, will receive a negative credible fear determination with respect to their application for asylum, pursuant to § 208.35(b)(1)(i), but could go on to receive a positive credible fear determination with respect to a potential claim for statutory withholding of removal or protection under the CAT at the reasonable probability of persecution or torture standard. *See id.* 208.35(b)(2).

In the event that USCIS were to exercise its discretion to place such a case into the asylum merits interview process, the credible fear record in that case would have found the applicant unable to establish eligibility for asylum under § 208.35(a) and the positive determination would be based only on a potential statutory withholding of removal or protection under the CAT claim. USCIS may thus need supplementary information to constitute an application for asylum, as the asylum claim may not have been fully explored in the credible fear record given that the AO determined the applicant would have been ineligible for asylum based on the rule's limitation on asylum eligibility. Therefore, § 208.35(b)(2)(ii) allows USCIS to require a noncitizen who received a negative credible fear determination with respect to their application for asylum pursuant to § 208.35(b)(1)(i), but whose application is nonetheless retained by USCIS for asylum merits interview proceedings, to submit an asylum application to USCIS within 30 days of service of the positive credible fear determination, to ensure that there is a record of their potential asylum claim to serve as a substantive asylum application. For purposes of the filing and receipt date, the date of service of the positive credible fear determination will continue to serve as the date of filing pursuant to § 208.3(a)(2); however, if USCIS requires the submission of an asylum application, the timelines laid out in § 208.9(a)(1) and § 208.9(e)(2) may be delayed up to 15 days, considering the need to allow extra time for the submission of an asylum application to USCIS following service of the positive credible fear determination. *See id.* 208.35(b)(2)(ii). Under this IFR, if the applicant does not submit the

---

[292] In the *Circumvention of Lawful Pathways* rule, the Departments described how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard. *See* 88 FR at 31380. That discussion in the *Circumvention of Lawful Pathways* rule also applies to AOs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, AOs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

[293] In such cases, consistent with the *Circumvention of Lawful Pathways* rule, DHS would also have discretion to refer the noncitizen to EOIR for section 240 removal proceedings. *See Matter of E–R–M– & L–R–M–*, 25 I&N Dec. 520 (BIA 2011); *see also* 88 FR at 31348.

application within the time period required, USCIS will refer the noncitizen to section 240 removal proceedings before an IJ. USCIS does not foresee that it would be a prudent use of resources to place such cases into the asylum merits interview process, considering that USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the border. Nevertheless, the IFR preserves the flexibility for USCIS to exercise its discretion to potentially place such cases into the asylum merits interview process (albeit with the potential addition of a supplementary application for asylum) should available resources and circumstances ever be such that it would be prudent to place such cases into the asylum merits interview process.

If the noncitizen fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. *See id.* 208.35(b)(2)(iii). If the noncitizen indicates on the Record of Negative Fear that they request IJ review of the adverse finding, *see id.* 208.35(b)(2)(iv), the AO will serve the noncitizen with a Notice of Referral to Immigration Judge, *see id.* 208.35(b)(2)(v). *See* 88 FR at 11747; 88 FR at 31423. The record of determination, including copies of the Notice of Referral to Immigration Judge, the AO's notes, the summary of the material facts, and other materials upon which the AO based their determination regarding the applicability of the condition on asylum eligibility (which, in cases where the limitation on asylum eligibility created by this IFR applies, includes materials showing the relevant known entry date), will be provided to the IJ with the negative determination. *See* 8 CFR 208.35(b)(2)(v). The IJ would then review the case consistent with § 1208.35, described below.

If, following IJ review, the IJ makes a positive credible fear determination under § 1208.35(b)(2)(iii) or § 1208.35(b)(4), the case will proceed under § 1208.30(g)(2)(iv)(B). *See id.* 208.35(b)(2)(v)(A). The IJ may vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with 8 CFR 1208.2(a)(1)(ii). *See id.* 1208.30(g)(2)(iv)(B). Alternatively, DHS may commence section 240 removal proceedings, during which time the noncitizen may file an application for

asylum, statutory withholding of removal, and CAT protection in accordance with § 1208.4(b)(3)(i). *See id.* 1208.30(g)(2)(iv)(B).

If the IJ makes a negative credible fear determination, however, the case will be returned to DHS for removal of the noncitizen. *See id.* 208.35(b)(2)(v)(B). Consistent with the purpose of the expedited removal process and this IFR, there would be no appeal from the IJ's decision and DHS would not accept requests for reconsideration. *See id.* USCIS may, however, in its sole discretion, reconsider a negative determination. *See id.;* 88 FR at 11747; 88 FR at 31418–19.

Paragraph (b)(3) applies in the event that the limitation on asylum eligibility in paragraph (a) is rendered inoperative by court order. In such circumstance, those who enter during emergency border circumstances and who are found not to have a significant possibility of eligibility for asylum because of the Lawful Pathways condition will be screened for eligibility for statutory withholding of removal and CAT protection under the "reasonable probability" screening standard. This will ensure continued applicability of that standard during emergency border circumstances, even absent the rule's limitation on asylum eligibility. The Departments acknowledge that under this approach, not all who would have been subject to the higher screening standard if the limitation remained in force would be subject to it in the event of an injunction—*i.e.,* those who do not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence; those excepted from the Lawful Pathways condition under the exceptions at 8 CFR 208.33(a)(2)(ii)(A) and (C); those excepted from the Lawful Pathways condition because they present at a POE without a pre-scheduled time and place and demonstrate that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; and those who enter across the maritime borders covered by the Proclamation that are not covered by the Lawful Pathways condition. The Departments have adopted a somewhat narrower scope for the standard to avoid a circumstance where AOs and IJs would be required to analyze both the applicability of the Lawful Pathways condition and then also whether the noncitizen would otherwise be subject to the rule's limitation—which could complicate and increase the time required to conduct credible fear

screenings. The Departments believe the approach adopted strikes the right balance between the interest in applying the screening standard to those to whom it would otherwise apply and administrability in the event the limitation on asylum eligibility is rendered inoperative by court order. The Departments request comment on whether to expressly expand this provision to also apply to those who are found not to have a significant possibility of eligibility for asylum due to a mandatory bar to asylum eligibility if the rule Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024), is finalized.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the DOJ family unity provision in the Circumvention of Lawful Pathways rule. *See* 8 CFR 1208.33(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity provision where the other requirements are met. The expressly permissive, discretionary nature of this provision, which owes in part to the considerations described earlier in this section with respect to asylum merits interviews, distinguishes it from the parallel DOJ provision in the Circumvention of Lawful Pathways rule and the parallel DOJ provision described in the next section of this preamble.

Paragraph (d) mirrors 8 CFR 208.33(c) and 1208.33(d) and specifies the ongoing applicability of the limitation on asylum eligibility by providing that it shall apply to "any asylum application" that is filed by a covered noncitizen "regardless of when the application is filed and adjudicated." *Id.* 208.35(d)(1). The Departments have excepted from this ongoing application of the limitation on asylum eligibility certain noncitizens who enter the United States during emergency border circumstances while under the age of 18 and who later seek asylum as principal applicants so long as the asylum application is filed after the period of time described in § 208.13(g) during which the noncitizen entered. *See id.* 208.35(d)(2). Commenters on the Circumvention of Lawful Pathways rule raised concerns about the impact of that rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents. 88 FR at 31320. The Departments decided to adopt a provision excepting

IFR_Rule_000047

such children from that rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognized that children who enter with their families are generally traveling due to their parents' decision-making. 88 FR at 31320. The Departments believe that these considerations are also relevant to this rule and have decided to adopt a similar approach as that adopted in the Circumvention of Lawful Pathways rule.

The Departments considered whether to except family units, or children who are part of family units, from the limitation on asylum eligibility entirely. The Departments decline to adopt such an approach. Excepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so. And excepting only the child could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening, as they would not be subject to the limitation but their parents could be. Although accompanied children remain subject to the limitation on asylum eligibility generally, the Departments have determined that the limitation should not apply to them in any application for asylum they file after the relevant period, but only if they apply as a principal (as opposed to a derivative) applicant.

The Departments also considered applying a specific calendar date to this provision, similar to the approach taken by the Departments in the Circumvention of Lawful Pathways rule.[294] The Departments determined that such a provision would be challenging to implement because the Departments have not identified a date certain upon which emergency border circumstances are expected to discontinue. The Departments believe that the key purpose of an asylum application waiting period—protecting against any perceived incentive for family units to migrate irregularly—is adequately served by a requirement that the applicable period of emergency border circumstances is no longer in place at the time of application. For that same reason, the Departments do not believe it is necessary to make this exception unavailable during any period of emergency border circumstances; instead, this exception will be available

after the end of the emergency border circumstance during which the applicant entered. Because noncitizens will not know in advance when the emergency border circumstance will end, and when another emergency border circumstance might occur, the approach adopted in the rule addresses noncitizens' incentives without restricting this exception more than is necessary.

The Departments believe this approach balances the interest in ensuring the limitation has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the limitation, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to children who filed as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the end of the circumstances leading to the suspension and limitation on entry, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the limitation entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exception, in light of the urgent need to gain efficiencies in the expedited removal process and dissuade entry during the circumstances described in the Proclamation and this rule.

Finally, DHS is including a severability clause in this provision. *See* 8 CFR 208.35(e). If any provision of this section, § 235.15, or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DHS intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. Indeed, in this rule, the Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility. This

approach is consistent with the nature of the rule as an emergency measure and reflects DHS's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, even in the absence of the limitation on asylum eligibility, as expressly set forth in paragraph (b)(3), the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. Similarly, even in the absence of the new provision at 8 CFR 235.15 discussed below, the changes made in § 208.35 are expected to prove helpful in the emergency circumstances described by the Proclamation and the rule. *See id.* 208.35(e).

### 3. 8 CFR 1208.35

Like DHS's addition to 8 CFR part 208, DOJ is adding to 8 CFR part 1208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DOJ is adding a new § 1208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and procedures related to IJ review of credible fear determinations in expedited removal proceedings during emergency border circumstances. This provision applies notwithstanding any contrary provision in EOIR's regulations. Section 1208.35 consists of the following provisions:

Paragraph (a) mirrors new § 208.35(a), discussed above.

Paragraph (b) provides procedures for credible fear determinations. Under these procedures, when a noncitizen has requested IJ review of an AO's negative credible fear determination, the IJ will evaluate the case de novo, taking into account the credibility of the statements made by the noncitizen in support of the noncitizen's claim and such other facts as are known to the IJ. *See* 8 CFR 1208.35(b)(1). The paragraph sets forth three possible procedural scenarios depending on the IJ's determinations. First, where the IJ determines that the

---

[294] Under that rule, the Lawful Pathways condition does not apply to certain asylum applications filed after May 11, 2025—two years after that rule's initial issuance. 8 CFR 208.33(c)(2), 1208.33(d)(2); 88 FR at 31449.

noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 1208.13(g), the IJ will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 1208.33(b). *See id.* 1208.33(b)(2)(i).[295] This provides that those noncitizens who did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 1208.33(b)(2)(i), if the noncitizen is not subject to that condition they will be screened for a significant possibility of eligibility for statutory withholding of removal or CAT protection consistent with § 208.30. Second, where the IJ determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the IJ will follow the procedures in 8 CFR 1208.30. *See id.* 1208.33(b)(2)(ii). Third, where the IJ determines that the IFR's limitation on asylum eligibility applies—including that there is not a significant possibility that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception under paragraph (a)(2) of the limitation, the IJ will apply the Circumvention of Lawful Pathways rule's procedures set forth in § 1208.33(b)(2)(ii), except that the IJ will apply a "reasonable probability" standard to parallel the standard adopted by DHS. *See id.* 1208.33(b)(2)(iii).

Paragraph (b)(4), mirrors new § 208.35(b)(3), discussed above.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the family unity provision in the Circumvention of Lawful Pathways rule. *See id.* 1208.33(c), 1208.35(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the

IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met.

Paragraph (d) mirrors new § 208.35(d), discussed above.

Paragraph (e) contains a severability provision that serves a similar purpose to the provision in § 208.35(e) described above. If any provision of this section or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DOJ intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. This approach is consistent with the nature of the rule as an emergency measure and reflects DOJ's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, as set forth explicitly in paragraph (b)(4), even in the absence of the limitation on asylum eligibility, the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. *See id.* 1208.35(e).

### 4. 8 CFR 235.15

DHS is adding to 8 CFR part 235, *Inspection of Persons Applying for Admission,* a new § 235.15, *Inadmissible aliens and expedited removal during emergency border circumstances.* New 8 CFR 235.15 will further streamline aspects of the expedited removal process by effectively replacing paragraphs (b)(2)(i) and (b)(4)(i) of 8 CFR 235.3 for those individuals described in § 235.3(b)(1)(i) or (ii) and who are described in § 208.13(g) but not described in section 3(b) of the Proclamation. *See* 8 CFR 235.15. The changes would not affect implementation of 8 CFR 235.3(b)(4)(ii)

or any other portion of 8 CFR 235.3. *See id.* The changes are as follows.

First, under 8 CFR 235.3(b)(2)(i), the record of proceeding includes a sworn statement using Form I–867AB, *Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act.* Under the existing regulations, the examining immigration officer reads (or has read) to the noncitizen all information contained on Form I–867A. Following questioning and recording of the noncitizen's statement regarding identity, alienage, and inadmissibility, the examining immigration officer records the noncitizen's response to the questions contained on Form I–867B, and has the noncitizen read (or has read to the noncitizen) the statement, and the noncitizen signs and initials each page of the statement and each correction, if any.

DHS is adding a new 8 CFR 235.15(b)(2)(i) to apply to certain noncitizens instead of this current process during emergency border circumstances. Under this procedure, Forms I–867A and I–867B will no longer be mandated in such circumstances. Instead, the immigration officer shall advise the individual of the charges against them on the Form I–860 and give him or her an opportunity to respond to those charges. *See* 8 CFR 235.15(b)(2)(i)(B). This provision does not require that the response be done through a sworn statement. *See id.* Consistent with current regulations, however, the inspecting officer must obtain supervisory concurrence of an expedited removal order in accordance with § 235.3(b)(7). *Id.* Moreover, consistent with current regulations, the examining immigration official shall serve the noncitizen with Form I–860, and the noncitizen shall be required to sign the form acknowledging receipt. *Id.* The new 8 CFR 235.15(b)(2)(i) no longer mandates that the signature occur on the reverse, but preserves the requirement that the noncitizen be required to sign, allowing greater flexibility for location of signature blocks on the document. *See id.* 235.3(b)(2)(i). The new provision maintains the requirement that interpretative assistance shall be used if necessary to communicate with the noncitizen. *Id.* 235.3(b)(2)(i)(B). The new 8 CFR 235.15(b)(2)(i) also allows for greater flexibility regarding how DHS records the information that supports the finding that the noncitizen is inadmissible and subject to expedited removal. This operational flexibility is consistent with the President's determination that emergency border circumstances are present such that the suspension and limitation on entry is warranted.

---

[295] As explained above regarding AOs, the discussion in the Circumvention of Lawful Pathways rule regarding how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard, *see* 88 FR at 31380, is equally applicable to IJs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, IJs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

IFR_Rule_000049

Second, under 8 CFR 235.3(b)(4), if a noncitizen subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer does not proceed further with removal of the noncitizen until the noncitizen has been referred for an interview by an AO in accordance with 8 CFR 208.30.

Instead of this current process, DHS is adding a new 8 CFR 235.3(b)(4), applicable to those who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. Under this provision the immigration officer would refer the noncitizen to an AO if the noncitizen manifests a fear of return or affirmatively expresses an intention to apply for asylum, or affirmatively expresses a fear of persecution or torture, or a fear of return to his or her country or the country of removal.

Third, under 8 CFR 235.3(b)(4)(i), the referring officer provides the noncitizen with a written disclosure on Form M–444, *Information About Credible Fear Interview,* describing (1) the purpose of the referral and description of the credible fear interview process; (2) the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; (3) the right to request a review by an IJ of the AO's credible fear determination; and (4) the consequences of failure to establish a credible fear of persecution or torture. New 8 CFR 235.15(b)(4) will simply require that an immigration officer provide "a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of the AO's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture." 8 CFR 235.15(b)(4)(i)(B). Thus, while maintaining the substance of the information that must be provided to the noncitizen, the regulation removes the requirement that it be on a particular form, allowing for greater flexibility in how the information is distributed.

Finally, DHS is including a severability clause in this provision. *See id.* 235.15(g). DHS believes that each of these changes can function sensibly without the others, given that each change is independently seeking to provide greater flexibility during a time when the suspension and limitation on entry is in effect, while still protecting

the important ability of individuals to seek protection from removal. DHS further believes that even if a court order enjoins or vacates the Proclamation or provisions other than § 235.15 of this rule, the provisions in § 235.15 can continue to apply to those described in § 208.13(g) and not described in section 3(b) of the Proclamation, even if they cannot be subject to those provisions by operation of such court order.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). Consistent with the APA, the Departments have not invoked these procedures because (1) this rule involves a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments have found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3), for the reasons explained below. At the same time, the Departments seek and welcome post-promulgation comments on this IFR.

### 1. Foreign Affairs

This rule is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question "is clearly and directly involved in a foreign affairs function." [296] In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d

Cir. 2008) (quotation marks omitted).[297] This rule satisfies both standards.

The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere. This strategy includes the Los Angeles Declaration on Migration and Protection, which was joined by leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[298] Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing, including on efforts to: expand access to, and increase, lawful pathways, such as the Safe Mobility Office initiative;[299] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols[300] with the Government of Mexico along

[296] *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up); *see Mast Indus., Inc.* v. *Regan,* 596 F. Supp. 1567, 1582 (Ct. Int'l Trade 1984); *see also Am. Ass'n of Exps. & Imps.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that the exception applies where a rule is "linked intimately with the Government's overall political agenda concerning relations with another country").

[297] *See, e.g., Rajah,* 544 F.3d at 437 ("There are at least three definitely undesirable international consequences that would follow from notice and comment rulemaking. First, sensitive foreign intelligence might be revealed in the course of explaining why some of a particular nation's citizens are regarded as a threat. Second, relations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security. Third, the process would be slow and cumbersome, diminishing our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists."); *see also Yassini* v. *Crosland,* 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("For the [foreign affairs] exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."). *But see E.B.,* 583 F. Supp. 3d at 64–66 (rejecting the "provoke definitely undesirable international consequences" standard).

[298] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries* (last visited May 27, 2024).

[299] *See* U.S. Dep't of State, *Safe Mobility Initiative, https://www.state.gov/refugee-admissions/safe-mobility-initiative* (last visited May 27, 2024).

[300] *See* CBP, *Readout: U.S.-Mexico meeting on joint actions to further enhance border security* (Sept. 24, 2023), *https://www.cbp.gov/newsroom/national-media-release/readout-us-mexico-meeting-joint-actions-further-enhance-border* (noting that CBP encouraged mirrored patrols); U.S. Dep't of State, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue—Fact Sheet* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/* (noting that "CBP and INM regularly coordinate enforcement efforts at the border through mirrored patrols," which suggests that those patrols were occurring).

our shared border; [301] and share information, technical assistance, and best practices.[302] The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.[303]

This international coordination has yielded important results. A number of foreign partners, including Mexico, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public health Order.[304] These governments recognized that the United States was taking measures to strengthen border enforcement, specifically through application of the Circumvention of Lawful Pathways rule along with other complementary measures, and committed to taking their own actions to address irregular migratory flows in the region.[305] Additionally, immediately prior to the transition from DHS processing under the Title 42 public health Order to processing under title 8 authorities, the Government of Mexico announced that it had independently decided to accept the return into Mexico of nationals from CHNV countries under title 8 processes.[306] However, in the

intervening months, Mexico and other partners' resources have been significantly strained by sustained high encounter levels, and at different times enforcement by our partners has been disrupted, leading to surges at our own border.[307]

In public messaging, the Government of Mexico linked its decision to accept return into Mexico of CHNV nationals to the success of the CHNV parole processes framework under the Title 42 public health Order,[308] which combined expansion of lawful pathways and processes for nationals of these countries with a meaningful consequence framework, and which reduced irregular border crossings.[309] Sustaining and, as appropriate, ramping

up efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. This has been a key component of our diplomacy, as regional partner countries have regularly encouraged DHS to take steps to address migratory flows, including by channeling intending migrants into expanded lawful pathways and processes. For example, following the development of the parole process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023— regional partners urged the United States to continue building on this approach, which imposed consequences for irregular migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States.[310] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region and at the U.S.-Mexico border slowed. *See* 88 FR at 31317 ("DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.").

The United States has continued to build on this historic expansion of lawful pathways and processes, which include the humanitarian parole processes for CHNV nationals; [311] efforts to expand labor pathways and dedicate a set number of visas to nationals of countries in the hemisphere; [312] the implementation of new Family Reunification Parole ("FRP") processes for certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras; and the modernization of FRP processes for certain nationals of Cuba and Haiti.[313]

[301] *See* DHS, *Trilateral Statement* (Apr. 11, 2023), *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[302] *See, e.g., Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* Exec. Order 14010, 86 FR 8267, 8270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/;* The White House, *Fact Sheet: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-level-security-dialogue/;* U.S. Dep't of State, *Fact Sheet: Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/.*

[303] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024),

[304] Kathia Martínez, *US, Panama and Colombia Aim to Stop Darien Gap Migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Camilo Montoya-Galvez, *Mexico Will Increase Efforts To Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say,* CBS News (May 10, 2023), *https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/.*

[305] 88 FR at 31444.

[306] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/;*

[307] *See* Charles G. Ripley III, *Crisis Prompts Record Emigration from Nicaragua, Surpassing Cold War Era,* Migration Pol'y Inst. (Mar. 7, 2023), *https://www.migrationpolicy.org/article/record-emigration-nicaragua-crisis;* James Fredrick, *Mexico Feels Pressure of Relentless Migration from South America,* N.Y. Times (Sept. 21, 2023) ("Similar scenes are playing out across the country as Mexico's immigration system strains under a tide of people desperately trying to go north. The relentless surge has led to a hodgepodge response in Mexico ranging from shutting down railways heading north to the busing of people to areas with fewer migrants."); Megan Janetsky & Javier Córdoba, *Central America scrambles as the international community fails to find solution to record migration,* AP News (Oct. 20, 2023), *https://apnews.com/article/costa-rica-migration-darien-gap-biden-420e2d1219d403d7feec6463a6e9cdae* (noting the resources pull migration flows place on certain Central American countries); María Verza, *Mexico halts deportations and migrant transfers citing lack of funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc* (observing that the "head of Mexico's immigration agency . . . ordered the suspension of migrant deportations and transfers due to a lack of funds"); Valerie Gonzalez & Elliot Spagat, *The US sees a drop in illegal border crossings after Mexico increases enforcement,* AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a* (noting the disruption in enforcement that resulted from Mexico's lack of funding and quoting Andrew Selee, President of the Migration Policy Institute, as saying that "[t]he U.S. is able to lean on Mexico for a short-term enforcement effect at the border, but the long-term effects are not always clear").

[308] *See* Gobierno de México, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published* (characterizing the effort of the Government of Mexico as a successful joint initiative and expressing the Government's commitment to continue to accept migrants back into Mexico on humanitarian grounds).

[309] *See id.* (describing a significant reduction in irregular migration following the implementation of CHNV parole processes, which pair an expansion of lawful pathways with consequences for irregular migration).

[310] *See* 88 FR at 31444; The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[311] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023), *https://www.uscis.gov/CHNV.*

[312] *See* DHS & U.S. Dep't of Labor, *Temporary Rule—Exercise of Time-Limited Authority To Increase the Numerical Limitation for FY 2024 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers,* 88 FR 80394 (Nov. 17, 2023).

[313] DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10,

Concurrently, the Governments of Colombia and Panama have made significant efforts to combat smuggling networks operating on both sides of the Darién Gap.[314] The Government of Mexico has likewise increased enforcement along its southern border and the transit routes north.[315] These enforcement campaigns have been implemented at substantial cost for those governments and, as with United States Government actions, reflect our shared regional responsibility to manage migration.[316]

Given the particular challenges facing the United States and its regional partners at this moment, the Departments assess that it is critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that this regulatory effort and the Presidential Proclamation—and the strong consequences they will impose at the border—will send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In addition to this IFR's clear and direct involvement in foreign affairs, the Departments believe that conducting a notice-and-comment process and providing a delayed effective date on this rule likely would lead to a surge to the border before the Departments could finalize the rule, which would adversely impact the United States' foreign policy priorities. Prior to the end of the Title 42 public health Order, regional partners expressed great concern about the misperception that the end of the Order would mean an open U.S. border and result in a surge of irregular migration flowing through their countries as migrants sought to enter the United States. *See* 88 FR at 31444. One foreign partner, for example, expressed the strong concern that the formation of caravans during the spring of 2022 was spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order. *See id.* This view is consistent with the views of other regional partner countries that have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid.

The surge about which many foreign leaders were concerned happened sooner than expected. In the weeks leading up to the lifting of the Title 42 public health Order, hemispheric migration spiked. Entries into the Darién jungle by migrants staged in Colombia began increasing in the months leading up to May 12, 2023, from a little more than 24,600 in January 2023, to more than 40,000 in April 2023 immediately before the Order lifted.[317] And as described more fully above, total CBP encounters at the SWB increased to then-record levels in the days immediately preceding May 12, 2023, a situation that was fueled by noncitizens seeking to enter the United States before new policies were put into effect, as well as by smuggling organizations that disseminated misinformation.[318] The scale of regional migration in those weeks strained the immigration processes of all the affected countries, including those of the United States.

As noted above, the United States saw a similar scale of migration at the end of 2023. The surge in December 2023 led the United States Government and the Government of Mexico to hold a series of engagements at the highest levels—including between the countries' Presidents and Cabinet Members—to address the shared challenge of migration confronting both countries.[319] These conversations included commitments by both governments to continue to expand efforts to coordinate enforcement actions on both sides of the border.[320] January, February, and March are typically slower months, but since these engagements, and the joint operational actions that resulted, there has been a decrease in USBP encounters at the border, as discussed in Section III.B.1 of this preamble.

The record-breaking hemispheric migration throughout the region has deeply affected governments from South America all the way to the U.S.-Mexico border. Panama has been encountering record numbers of migrants transiting one of the most dangerous smuggling corridors on the planet, the Darién Jungle.[321] Colombia, Peru, and Ecuador have hosted around 3 million,[322] over 1.5 million,[323] and more than 475,000 Venezuelans,[324] respectively, while Costa Rica has recently hosted hundreds of thousands of Nicaraguans.[325] Mexico has received record-breaking numbers of

---

2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

[314] *See* Kathia Martinez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Juan Zamorano & Christopher Sherman, *Explainer: Panama launches operation against smugglers in Darien Gap,* AP News (June 3, 2023), *https://apnews.com/article/panama-colombia-darien-gap-migrants-d0ec93c4d4ddc91f34e31c704b4cf8ae.*

[315] *See, e.g.,* Associated Press, *U.S. Border Arrests Decline Amid Increased Enforcement in Mexico,* NPR (Apr. 13, 2024), *https://www.npr.org/2024/04/13/1244590706/mexico-border-arrests-fall-march* ("Mexico detained migrants 240,000 times in the first two months of the year, more than triple from the same period of 2023, sending many deeper south into the country to discourage them from coming to the United States. While Mexico hasn't released figures for March, U.S. officials have said Mexican enforcement is largely responsible for recent declines.").

[316] *See, e.g.,* The White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[317] *See* Servicio Nacional de Migración Panamá, *Estadísticas, Tránsito Irregular por Darién 2023, https://www.migracion.gob.pa/inicio/estadisticas.*

[318] *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* (noting that "[m]any migrants were acutely aware of looming policy changes as they searched Thursday for an opportunity to turn themselves over to U.S. immigration authorities before the 11:59 EDT deadline . . . [and] [e]ven as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message . . . [and] offering to take migrants to the United States and telling them the border was open starting Thursday").

[319] *See supra* Section III.B.1 of this preamble.

[320] *See, e.g.,* White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/;* Amna Nawaz, *Mexico's foreign secretary discusses what her country is doing to ease border crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Foreign Secretary Bárcena as describing "much more law enforcement to bring down the pressure in the border" by Mexico in the preceding weeks).

[321] *See* Nick Paton Walsh et al., *On one of the world's most dangerous migrant routes, a cartel makes millions off the American dream,* CNN (Apr. 17, 2023), *https://www.cnn.com/2023/04/15/americas/darien-gap-migrants-colombia-panama-whole-story-cmd-intl/index.html;* Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us;* Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023.*

[322] *See* UNHCR, *Colombia Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/colombia.*

[323] *See* UNHCR, *Peru Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/peru.*

[324] *See* UNHCR, *Ecuador Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/ecuador.*

[325] *See* UNHCR, *Costa Rica Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/costa-rica.*

IFR_Rule_000052

asylum applications in addition to the enforcement efforts it is undertaking.[326]

As described more fully above, DHS's internal projections suggest that SWB encounters may once again reach extremely elevated levels in the weeks to come, averaging in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[327] Regional migration trends support these projections. For example, between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[328] Moreover, as noted above, the Government of Mexico has been receiving record-breaking numbers of asylum applications—reflecting the large number of migrants currently in Mexico.

The weeks leading up to May 12, 2023, demonstrated that when migrants anticipate major changes in border policy, there is the potential to ignite a rush to the border to arrive before the changes take effect.[329] Any delay between announcement of this rule and its implementation through notice and comment would almost certainly trigger a surge in migration that would undermine the principal goal of this entire effort: to reduce migratory flows to our border, and throughout the region.

The Departments believe that the emergency measures being taken here are needed to help address this regional challenge, and that any decrease in migration that results will help relieve the strain not just on the U.S.-Mexico border but on countries throughout the hemisphere. The actions the United States is taking in this regulation demonstrate a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration. The IFR changes key procedures to significantly streamline and strengthen the consequences delivered for unlawful or unauthorized entry at the southern border. The actions the Departments are taking are directly responsive to the shared challenge the United States and its regional partners are confronting and, equally important, it is critical to implement these actions without a lengthy period of advance notice before the actions go into effect.

2. Good Cause

The Departments have also found good cause to forego the APA's notice-and-comment and delayed-effective-date procedures. *See* 5 U.S.C. 553(b)(B), (d)(3). Such procedures are impracticable because the delays associated with such procedures would unduly postpone implementation of a policy that is urgently needed to avert significant public harm. Such procedures are likewise contrary to the public interest because an advance announcement of this rule would seriously undermine a key goal of the policy: It would incentivize even more irregular migration by those seeking to enter the United States before the rule would take effect.

First, the "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations . . . or where delay could result in serious harm."[330] Findings of impracticability are "inevitably fact- or context-dependent,"[331] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures[332] and the agency's diligence in addressing the problem it seeks to address.[333]

The critical need to immediately implement more effective border management measures is described at length in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble. Despite the strengthened consequences in place at the SWB, including the Circumvention of Lawful Pathways rule and other measures, the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[334] DHS's ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's negative credible fear determination, which requires additional time and resources.

---

[326] *See* UNHCR, *Operational Update: Mexico* (Dec. 2023), *https://reporting.unhcr.org/mexico-operational-update-6421;* UNHCR, *Fact Sheet, Mexico* (Nov. 2023), *https://data.unhcr.org/en/documents/download/105202* ("From January to October 2023, Mexico received over 127,796 asylum applications, the highest ever number of asylum claims received in this time frame."); Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay,* Reuters (Feb. 13, 2023), *https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/* ("Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance.").

[327] OHSS Southwest Border Encounter Projection, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[328] *See supra* note 122.

[329] Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810– JST (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[330] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[331] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[332] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[333] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[334] According to March 2024 OHSS Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000, USBP completed 250,000 encounters along the SWB in December 2023, higher than any previous month on record. *See also* OHSS, *2022 Yearbook of Immigration Statistics,* tbls. 33 & 35, *https://www.dhs.gov/ohss/topics/immigration/yearbook.*

Without adequate resources and tools to keep pace, the Departments cannot deliver timely decisions and timely consequences to all noncitizens encountered at the SWB who do not establish a lawful basis to remain. Instead, DHS is forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[335] Even then, it can take weeks, months, or years to execute a removal order depending upon the facts of the individual case.[336]

Quite simply, these historic levels of encounters and fear claims, combined with limited resources and tools to manage them, create a vicious cycle: The expectation of a lengthy stay in the United States and the inability to impose consequences for irregular migration close in time to entry inspires more people to make the dangerous journey north to take their chances at the border.[337] The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.[338] At the end of the first quarter of FY 2024, there were over 2.7 million cases pending in the immigration courts.[339] During FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[340]

Absent changes promulgated in this rule, recent encounter trends both in the region and at our southern border indicate a risk of further exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered, and exacerbating perceived incentives to migrate now. As noted above, DHS's current internal projections suggest that total encounters will average in the range of 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are

expected to be encountered at POEs after making appointments though the CBP One app.[341] Even at the low end of such projections, such a volume of encounters would likely result in thousands of migrants per day being referred to section 240 removal proceedings; their cases would further exacerbate the immigration court backlog and perceived incentives to migrate irregularly, and would take many years to complete. Such harms would be mitigated by the additional measures put in place by this rule. If implementation of the rule is delayed, by contrast, the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking. Thus, it is impracticable to delay the measures in this rule for even a few months to allow for notice and an opportunity to comment and a delayed effective date. In the interim, the heightened levels of migration and forced displacement that have resulted in the President's determination to apply the suspension and limitation on entry and the Departments adopting the provisions in this rule would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants [342]—only a small proportion of whom are likely to be granted asylum or other protection—would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. The Departments must immediately safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. This rule does just that.

Furthermore, current trends in migration, including through the Darién jungle between Colombia and Panama, indicate that a significant increase in encounters may be imminent. Between

January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[343] And the Departments believe that most of those migrants are on their way to seek entry into the United States.[344] Based on historical trends, the Departments expect that many of these migrants may already be proximate to the SWB, giving the Departments insufficient time to seek public comment and delay the effective date of this rule without immediate and substantial harm to U.S. interests. Indeed, as of May 2024, CBP estimates that there are more than 40,000 non-Mexican migrants in northern Mexico, proximate to the SWB, in addition to more than 100,000 such migrants in central and southern Mexico. These

---

[335] *See supra* note 25.

[336] OHSS analysis of March 2024 OHSS Persist Dataset.

[337] *See, e.g.,* Jordan, *supra* note 27.

[338] OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024. Almost all of this backlog is the result of cases filed since FY 2015. From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed. In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed. OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

[339] *See* EOIR, *Caseload: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[340] *See id.;* EOIR, *New Cases and Total Completions-Historical, https://www.justice.gov/eoir/media/1344801/dl?inline* (Jan. 18, 2024).

[341] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day* (last modified July 14, 2023).

[342] Decl. of Matthew J. Hudak, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[343] *See supra* note 122.

[344] *See* Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.,* NPR, (Apr. 22, 2024), *https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration* (''[Analysts] keep a close eye on the Darién Gap in Panama and the borders between Central American countries, two key points to gauge the number of people venturing up north. 'In most countries (outward) migration has increased . . . particularly in Venezuela, and that's not really reflected yet in the U.S. numbers,' said [one analyst]. . . . Despite Mexico's cracking down on migrants, [the analyst] said people are still making their way up north, even if they need to pause for months at different points during their journey. 'There must be a huge number of people from Venezuela bottled up in Mexico right now,' he said.''); Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us* (''The surge across the Darién Gap is reflected in an influx at the southern U.S. border, where U.S. border authorities reported that they apprehended close to 2.5 million people during fiscal year 2023, a record high, while northern cities such as New York are also struggling to manage the arrivals.''); Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023/* (''Laurent Duvillier, UNICEF's spokesperson for Latin America and the Caribbean based in Panama, tells TIME that many—driven to leave their homes by poverty, crime, or discrimination—aim to seek asylum in the U.S. or Canada, though they may never get there. This analysis is supported by refugee protection organization HIAS, with a spokesperson telling TIME that, by the group's estimations, between 90 to 95% of those crossing the Darién Gap aim to reach the U.S.''); Ariel G. Ruiz Soto, *Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border* (''Record flows of extracontinental migrants through the Darien Gap jungle that connects Colombia to Panama foreshadow increases in migration through Central America and Mexico. The 28,000 Venezuelan migrants who trekked through the deadly jungle in August were mostly en route to the United States; with more than 34,000 Venezuelans recorded at the Darien Gap in September, it is very likely that many of them will be reaching the U.S.-Mexico border soon.'').

IFR_Rule_000054

numbers show that a very large number of migrants would likely have the ability and the incentive to travel to the U.S. border, and the Departments assess that announcing this rule in advance would likely yield the type of surges described in connection with prior changes in significant border policies affecting the availability of asylum for large numbers of migrants. For these reasons, consistent with the President's judgment, and given the emergency circumstances facing the Departments, the Departments assess that it would be impracticable to delay the policies set forth in this rule to allow time to complete notice-and-comment rulemaking or delay the rule's effective date.

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[345] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[346] A number of cases follow this logic in the context of economic regulation.[347] The same logic

applies here, where the Departments are responding to exceedingly serious challenges at the border, and advance announcement of this response—which will increase the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly— would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. For the same reasons, "the [need] for immediate implementation" outweighs the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forego it.[348] The Departments' experience has been that in some circumstances when official public announcements have been made regarding significant upcoming changes in immigration laws and procedures that would impact how individuals are processed at the border, such as changes that restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States—including, most recently, in the days preceding the lifting of the Title 42 public health Order in May 2023.[349] This is not only because, generally, would-be migrants respond to real and perceived incentives created by border management and immigration policies, such that many choose to seek entry under a border processing regime they think is preferable, prior to the implementation of a new system, including increasing the speed of their transit north in an effort to arrive before the implementation of any such measure. Additionally, smugglers routinely prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy, as highlighted by the many examples described below.[350]

The acuteness of such concerns is borne out by the facts. An influx of migrants occurred in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[351] Leading up to the Order's expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[352] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. 88 FR at 31315. In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effects.[353]

Similarly, on February 28, 2020, the Ninth Circuit lifted a stay of a

---

[345] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[346] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[347] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can

be expected to precipitate activity by affected parties that would harm the public welfare.").

[348] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[349] *See supra* Sections III.B.1 and III.B.2 of this preamble.

[350] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/*

*national-security/theres-still-one-way-into-america/ 2018/10/24/d9b68842-aafb-11e8-8fdb- aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border- title-42-mexico-asylum- 8c239766c2cb6e257c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

The Departments recognize that there has been reporting on the possibility of the policies set forth in the Proclamation and this IFR since February with no apparent month-over-month increase in encounters. *See, e.g.,* Myah Ward, *Biden considering major new executive actions for migrant crisis,* Politico (Feb. 21, 2024), *https:// www.politico.com/news/2024/02/21/biden- considering-major-new-executive-actions-for- southern-border-00142524.* But such reporting about vague, possible plans differs significantly from officially proposed policy changes with timelines provided for implementation, such as those mentioned below.

[351] *See Huisha-Huisha* v. *Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *stay granted, Arizona* v. *Mayorkas,* __ S. Ct. __, 2022 WL 17750015 (U.S. Dec. 19, 2022); DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), *https://www.dhs.gov/news/2022/12/13/statement- secretary-mayorkas-planning-end-title-42.*

[352] *See, e.g.,* Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why,* L.A. Times (Dec. 23, 2022), *https:// www.latimes.com/world-nation/story/2022-12-23/ la-fg-mexico-title-42-confusion.*

[353] OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

nationwide injunction of the Migrant Protection Protocols ("MPP"), a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[354] Almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.[355] Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.[356] Absent immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.[357] And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so they were diverted away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.[358]

This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that those arriving before the Order ended and the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States.[359] This surge culminated with

what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border.[360] Encounters between POEs (which excludes arrival of inadmissible individuals scheduled through the CBP One app, who appear at POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11).[361] The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.[362]

Meanwhile, the current backlogs and inefficiencies in our border security and immigration systems render DHS unable to effect removals and apply consequences at a sufficient scale to deter migration by those whose claims may not ultimately succeed.[363] This, too, serves as an incentive for migrants to take a chance. And sudden influxes, which result in part from smugglers' deliberate actions, overload scarce United States Government resources dedicated to border security that, as reflected above, are already stretched extremely thin.[364] This rule is specifically designed to allow the United States Government to deliver consequences more swiftly, and with a reduced resource burden, during such an influx.

In a more manageable steady-state environment, when encounters surge in specific sectors, DHS manages its detention capacity using the other tools at its disposal, such as lateral decompression flights and similar efforts.[365] But the increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what

DHS resources and operations are designed to handle. They raised detention capacity concerns anew. At that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities. Given the nature of its facilities, increased numbers and times in custody increase the likelihood that USBP facilities will become quickly overcrowded.[366] Crowding, particularly given the way that USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[367]

The Departments assess that there would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for this rule or delayed its effective date. As demonstrated by the Departments' experience with the end of the Title 42 public health Order and MPP, significant shifts in U.S. border policies lead to an increase in migrants coming to the SWB that risks overwhelming the Departments' resources and operations. This rule is likewise a significant shift in U.S. border policy that affects the vast majority of noncitizens arriving at the southern border who do not have documents sufficient for lawful admission—a shift that may be viewed as similar to the end of the Title 42 public health Order and MPP. In addition, unlike the Lawful Pathways rebuttable presumption, the limitation on asylum eligibility in this rule would affect Mexican migrants, which may provide an additional perceived incentive for such migrants—who constitute a large and geographically proximate potential population[368]—to rush to the border during a notice-and-comment period. Finally, such a surge in migration would come at a time when our border security and immigration systems' resources are already stretched thin and severely backlogged.[369]

---

[354] *See Innovation Law Lab* v. *Wolf,* 951 F.3d 1073, 1077, 1095 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab* v. *Mayorkas,* 5 F.4th 1099 (9th Cir. 2021).

[355] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[356] *Id.* ¶¶ 4, 8.

[357] *Id.* ¶ 14.

[358] *Id.* ¶ 15.

[359] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2). Conversely, as noted above, smugglers also messaged that the border would be open starting on May 12. *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9.* This conflicting messaging underscores smuggling organizations' tendency to deceptively message on changes in border policy to lure vulnerable migrants to pay for their services.

[360] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–6810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[361] *Id.*

[362] *Id.*

[363] *See* EOIR, *Adjudication Statistics: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[364] Decl. of Enrique Lucero ¶¶ 6–8, *Innovation Law Lab* v. *Wolf,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3); Decl. of Robert E. Perez ¶ 15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[365] *See* 88 FR at 11715.

[366] Decl. of Matthew J. Hudak ¶¶ 6, 14, 17, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[367] *Id.* ¶ 17.

[368] U.S. Census Bureau, *Mexico, https://www.census.gov/popclock/world/mx* (last visited May 27, 2024).

[369] *See, e.g.,* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape,* Migration Pol'y Inst., at 1 (rev. Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); The White House, *Fact Sheet: Whitn*

Continued

Therefore, the Departments believe that a gap between when this rule is made public and when it becomes effective would create the same incentive for migrants to come to the United States before the rule takes effect.

The Departments' determination here is consistent with past practice. For example, in the Circumvention of Lawful Pathways rule, the Departments undertook a notice-and-comment rulemaking while the Title 42 public health Order remained in effect,[370] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. The Departments noted that such a gap "would likely result in a significant further increase in irregular migration," and that such an increase, "exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions." *Id.* at 31445.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures,[371] and witnessed a drastic reduction in irregular migration by Venezuelans.[372] The process by which eligible Venezuelans could receive advance travel authorization to present at a POE was accompanied by a policy that those who entered the United States outside this process or who entered Mexico illegally after the

date of announcement would be ineligible for parole under this process, and was conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. *See* 87 FR at 63508. Thus, had the parole process been announced prior to a lengthy notice-and-comment period, it likely would have resulted in thousands of Venezuelan nationals attempting to cross the United States and Mexican borders before the ineligibility criteria went into effect, and before the United States was able to return Venezuelan nationals to Mexico in large numbers.

DHS also concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region."[373] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[374] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities," "could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could result in significant loss of human life."[375]

Given the urgent circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for this rule would be contrary to the public interest because an advance announcement of the rule would incentivize even more irregular migration by those seeking to enter the United States before the IFR would take effect.

## B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)

Executive Order 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and Executive Order 13563 ("Improving Regulation and Regulatory Review"), directs agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs ("OIRA") of OMB reviewed this IFR as a significant regulatory action under Executive Order 12866, as amended by Executive Order 14094. The estimated effects of the rule are described and summarized qualitatively below. Consistent with OMB Circular A–4, the Departments assessed the impacts of this rule against a baseline. The baseline used for this analysis is the "no action" baseline, or what the world would be like absent the rule. For purposes of this analysis, the Departments assumed that the no-action baseline involved continued application of the Circumvention of Lawful Pathways rule.

The expected effect of this rule, as discussed above, is primarily to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish

---

*House Calls on Congress To Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office and Management Budget (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[370] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[371] *See* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[372] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

[373] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[374] *Id.*

[375] *Id.; accord* U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

IFR_Rule_000057

a reasonable probability of persecution or torture would still be able to seek statutory withholding or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for work authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection. In these cases, there may be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. The Departments welcome comments on the effects described above to inform analysis in a final rule.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare and make available to the public a final regulatory flexibility analysis that describes the effect of a rule on small entities (*i.e.*, small businesses, small organizations, and small governmental jurisdictions) when the agency was required "to publish a general notice of proposed rulemaking" prior to issuing the final rule. *See* 5 U.S.C. 604(a). Because this IFR is being issued without a prior proposal, on the grounds set forth above, a regulatory flexibility analysis is not required under the RFA.

### D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 658(6), 1502(1). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon

the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This IFR is not subject to the UMRA because the Departments did not publish a proposed rule prior to this action. In addition, this rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to an entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of Title II of the UMRA, therefore, do not apply, and the Departments have not prepared a statement under the UMRA.

### E. Congressional Review Act

OMB has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

### F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the

stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.,* applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 [376] and Instruction Manual 023–01–001–01, Revision 01 ("Instruction Manual 023–01") [377] establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ")

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. [378]

The IFR effectuates the following three changes to the process for those seeking asylum, withholding of removal, or protection under the CAT during emergency border circumstances:

• For those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will provide general notice regarding the processes for seeking asylum, withholding of removal, and protection under the CAT, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

• During emergency border circumstances, persons who enter the United States across the southern border and who are not described in paragraph 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and

extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the Proclamation and do not establish exceptionally compelling circumstances will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

Given the nature of the IFR, it is categorically excluded from DHS's NEPA implementing procedures, as it satisfies all three relevant conditions. First, the Departments have determined that the IFR fits clearly within categorical exclusions A3(a) and (d) of DHS's Instruction Manual 023–01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively. The IFR changes certain administrative procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. Second, this IFR is a standalone rule and is not part of any larger action. Third, the Departments are not aware of any extraordinary circumstances that would cause a significant environmental impact. Therefore, this IFR is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this IFR is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01, Appendix A, because the IFR's asylum limitation and the reasonable probability standard will be applied by EOIR in substantially the same manner as it will be applied by DHS. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

*K. Paperwork Reduction Act*

This IFR does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163,

---

[376] DHS, *Implementation of the National Environmental Policy Act, Directive 023–01, Revision 01* (Oct. 31, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Directive%2023-01%20Rev%2001_508compliantversion.pdf.*

[377] DHS, *Implementation of the National Environmental Policy Act (NEPA), Instruction Manual 023–01–001–01, Revision 01* (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*

[378] Instruction Manual 023–01 at V.B(2)(a) through (c).

IFR_Rule_000059

44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

## List of Subjects

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR parts 208 and 235 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. In § 208.13, add paragraph (g) to read as follows:

### § 208.13   Establishing asylum eligibility.

\* \* \* \* \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

■ 3. Add subpart D, consisting of § 208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, 208.30, and 208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in § 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 208.33(a)(3).

(b) *Application in credible fear determinations.* (1) *Initial determination.* The asylum officer shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the asylum officer determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, then the asylum officer shall enter a negative credible fear determination with respect to the alien's asylum claim and continue

to consider the alien's claim under paragraph (b)(2) of this section.

(ii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 208.13(g), the asylum officer shall follow the procedures in § 208.33(b).

(iii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Protection eligibility screening.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(ii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, the Department will issue a positive credible fear determination and follow the procedures in § 208.30(f). For any case in which USCIS retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in an interview pursuant to § 208.9, USCIS may require aliens who received a negative credible fear determination with respect to their asylum claim under paragraph (b)(1)(i) of this section to submit a Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form, to USCIS within 30 days from the date of service of the positive credible fear determination. The date of service of the positive credible fear determination remains the date of filing and receipt of the asylum application under § 208.3(a)(2); however, for any case in which USCIS requires the alien to submit a Form I–589, it may extend the

timelines in § 208.9(a)(1) and (e)(2) by up to 15 days. If USCIS requires the alien to submit a Form I–589 and the alien fails to do so within the applicable timeline, USCIS shall issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Immigration judges will evaluate the case as provided in 8 CFR 1208.35(b). The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) and (B) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.35(b)(2)(iii) or (b)(4), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a negative credible fear determination, the case shall be returned to the Department for removal of the alien. No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(3) *Procedures in the absence of the limitation on asylum eligibility.* If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 208.13(g), the asylum officer shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 208.33(b)(2).

(c) *Family unity in the asylum merits process.* In cases where the Department

retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii), where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 208.16(c)(2) and would be granted asylum but for the limitation on asylum in paragraph (a)(1) of this section or § 208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the asylum officer may deem the principal applicant to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any provision of this section, § 235.15, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 235.15 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 4. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806 and notes, 1807, and 1808 (Title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

■ 5. Add § 235.15 to read as follows:

### § 235.15 Inadmissible aliens and expedited removal during emergency border circumstances.

(a) *Applicability.* Notwithstanding §§ 235.3(b)(2)(i) and 235.3(b)(4)(i) (but not § 235.3(b)(4)(ii)), the provisions of this section apply to any alien described in § 235.3(b)(1)(i) through (ii) if the alien is described in § 208.13(g) and is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border.

(b) *Expedited removal.* (1) [Reserved]

(2) *Determination of inadmissibility—* (i) *Record of proceeding.* (A) A noncitizen who is arriving in the United States, or other alien as designated pursuant to § 235.3(b)(1)(ii), who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter) shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien.

(B) The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges. After obtaining supervisory concurrence in accordance with § 235.3(b)(7), the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) [Reserved]

(iii) [Reserved]

(3) [Reserved]

(4) *Claim of asylum or fear of persecution or torture.* (i) If an alien subject to the expedited removal

provisions manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with part 208 of this chapter.

(A) The inspecting immigration officer shall document whether the alien has manifested or affirmatively expressed such intention, fear, or concern.

(B) The referring officer shall provide the alien with a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an immigration judge of the asylum officer's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture.

(ii) [Reserved]

(c)–(f) [Reserved]

(g) *Severability.* The Department intends that in the event that any provision of paragraphs (a), (b)(2)(i), and (b)(4) of this section, § 208.35, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 208.35 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 7. In § 1208.13, add paragraph (g) to read as follows:

### § 1208.13   Establishing asylum eligibility.

\*     \*     \*     \*     \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier) refer to the provisions on asylum eligibility described in § 1208.35.

■ 8. Add subpart D, consisting of § 1208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 1208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this chapter, including §§ 1003.42, 1208.2, 1208.13, 1208.30, and 1208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 1208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in 8 CFR 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this title.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 1208.33(a)(3).

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.35(b), and the alien has requested immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 1208.13(g), the immigration judge shall follow the procedures in § 1208.33(b).

(ii) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the immigration judge shall follow the procedures in § 1208.30.

(iii) Where the immigration judge determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the alien under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.35(b)(2)(v)(A) and (B).

(4) If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or

IFR_Rule_000062

unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 1208.13(g), the immigration judge shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 1208.33(b)(2)(ii).

(c) *Family unity and removal proceedings.* In removal proceedings under section 240 of the Act, where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the limitation on asylum eligibility in paragraph (a)(1) of this section or § 1208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the

Act, the alien shall be deemed to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 1208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 1208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 1208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any

provision of this section or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*
[FR Doc. 2024–12435 Filed 6–4–24; 4:15 pm]
**BILLING CODE 4410–30–P; 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

[Docket No. DHS–2016–0089]

## National Infrastructure Advisory Council

**AGENCY:** National Protection and Programs Directorate, DHS.

**ACTION:** Committee management; notice of an Open Federal Advisory Committee meeting.

**SUMMARY:** The National Infrastructure Advisory Council (NIAC) will meet Thursday, February 16, 2017, at 1331 F Street NW., Suite 1000, Washington, DC 20004. This meeting will be open to the public.

**DATES:** The NIAC will meet on February 16, 2017. The meeting will be held from 1:30 p.m.–4:30 p.m. EST. The meeting may close early if the committee has completed its business. For additional information, please consult the NIAC Web site, *www.dhs.gov/NIAC*, or contact the NIAC Secretariat by phone at (703) 235–2888 or by email at *NIAC@hq.dhs.gov.*

**ADDRESSES:** 1331 F Street NW., Suite 1000, Washington, DC 20004. Members of the public will register at the registration table prior to entering the meeting room. For information on facilities or services for individuals with disabilities, or to request special assistance at the meeting, contact the person listed under **FOR FURTHER INFORMATION CONTACT** below as soon as possible.

To facilitate public participation, we are inviting public comment on the issues to be considered by the Council as listed in the "Summary" section below. Comments must be submitted in writing no later than 12:00 p.m. on February 13, 2017, in order to be considered by the Council in its meeting. The comments must be identified by "DHS–2016–0089," and may be submitted by any *one* of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting written comments.

• *Email: NIAC@hq.dhs.gov.* Include the docket number (DHS–2016–0089) in the subject line of the message.

• *Fax:* (703)235–9707.

• *Mail:* Ginger Norris, National Protection and Programs Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0612, Washington, DC 20598–0607.

*Instructions:* All written submissions received must include the words "Department of Homeland Security" and the docket number for this action. Written comments received will be posted without alteration at *www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket or to read background documents or comments received by the NIAC, go to *www.regulations.gov.* Enter "NIAC" in the search line and the Web site will list all relevant documents for your review.

Members of the public will have an opportunity to provide oral comments on the topics on the meeting agenda below, and on any previous studies issued by the NIAC. We request that comments be limited to the issues and studies listed in the meeting agenda and previous NIAC studies. All previous NIAC studies can be located at *www.dhs.gov/NIAC.* Public comments may be submitted in writing or presented in person for the Council to consider. Comments received by Ginger Norris on or after 1:00 p.m. on February 16, 2017 will still be accepted and reviewed by the Members, but not necessarily at the time of the meeting. In-person presentations will be limited to three minutes per speaker, with no more than 15 minutes for all speakers. Parties interested in making in-person comments should register on the Public Comment Registration list available at the entrance to the meeting location prior to the beginning of the meeting.

**FOR FURTHER INFORMATION CONTACT:** Ginger Norris, Department of Homeland Security, National Protection and Programs Directorate, Office of Infrastructure Protection, NIAC, Designated Federal Officer, 245 Murray Lane SW., Mail Stop 0607, Washington, DC 20598–0607, telephone 202–441–5885.

**SUPPLEMENTARY INFORMATION:** Notice of this meeting is given under the Federal Advisory Committee Act, 5 U.S.C. appendix. The NIAC shall provide the President, through the Secretary of Homeland Security, with advice on the security and resilience of the Nation's critical infrastructure sectors. The NIAC will meet to discuss issues relevant to critical infrastructure security and resilience, as directed by the President.

The meeting will commence at 1:00 p.m. EST. At this meeting, the Council will discuss its newest tasking and receive briefings. All presentations will be posted prior to the meeting on the Council's public Web page— *www.dhs.gov/NIAC.*

## Public Meeting Agenda

I. Opening of Meeting
II. Roll Call of Members
III. Opening Remarks and Introductions
IV. Approval of SEP 2016 Meeting Minutes
V. Presentations on Future Focus Study
VI. Public Comment
VII. Discussion of New NIAC Business
VIII. Closing Remarks
IX. Adjournment

Dated: January 4, 2017.

**Ginger Norris,**

*Designated Federal Officer for the NIAC.*

[FR Doc. 2017–00789 Filed 1–13–17; 8:45 am]

**BILLING CODE 9110–9–P**

# DEPARTMENT OF HOMELAND SECURITY

## Office of the Secretary

[DHS Docket No. DHS–2017–0004]

## Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice concerns the authority of the Department of Homeland Security (DHS or the Department) to place certain designated categories of aliens in expedited removal proceedings. On November 13, 2002, the former Immigration and Naturalization Service (INS) of the Department of Justice issued a notice designating certain aliens who arrive by sea, either by boat or other means, as eligible for placement in expedited removal proceedings, with an exception for Cuban citizens or nationals (hereinafter "Cuban nationals"). On August 11, 2004, DHS issued a notice designating certain aliens in the United States as eligible for placement in expedited removal proceedings, also with an exception for Cuban nationals. In light of recent changes in the relationship between the United States and Cuba, the Department has determined that the exceptions for Cuban nationals, contained in the designations of November 13, 2002 and August 11, 2004, are no longer warranted and are thus hereby eliminated. The rest of the November 13, 2002 and August 11, 2004 designations, including any implementing policies, are unaffected by this notice and remain unchanged.

**DATE:** This notice is effective on January 13, 2017. Interested persons are invited to submit written comments on this notice on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by DHS Docket Number DHS–2017–0004, by any one of the following methods:

IFR_AR_000228

• *Federal e-Rulemaking Portal* *www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http:// www.regulations.gov.* The *http:// www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http:// www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http:// www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to remove, without a hearing before an immigration judge, certain aliens arriving in the United States and certain other applicants for admission who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii). Specifically, with limited exception, the Act authorizes the Secretary to apply (by designation) expedited removal proceedings to all or any subset of aliens who (1) have not been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and (2) have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility. Section 235(b)(1)(A)(iii)(I)–(II), 8 U.S.C. 1225(b)(1)(A)(iii)(I)–(II). The Secretary may modify such designations at any time. *Id.*

On November 13, 2002, the former INS issued a **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), to designate additional aliens who may be placed in expedited removal proceedings. 67 FR 68924. Specifically, that notice designated the following class of aliens who may be placed in expedited removal proceedings: "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." *Id.* The INS noted at the time that "[p]lacing these individuals in expedited removal proceedings and maintaining detention for the duration of all immigration proceedings, with limited exceptions, will ensure prompt immigration determinations and ensure removal from the country of those not granted relief in those cases, while at the same time protecting the rights of the individuals affected." *Id.* The INS also stated that "exercising its authority to detain this class of aliens . . . will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life." *Id.* The INS further noted that preventing illegal migration by sea also protects national security, as "[a] surge in illegal migration by sea threatens [that] security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities." *Id.*

The November 13, 2002 notice, however, contained an exception for Cuban nationals who are otherwise described in the designated class, stating that expedited removal proceedings would not be initiated against such Cuban nationals who arrive by sea. *Id.* The INS based this exception on "longstanding U.S. policy to treat Cubans differently from other aliens," citing the Cuban Adjustment Act, Public Law 89–732 (1966) (8 U.S.C. 1255 note), as an example of such treatment. *Id.* The notice also cited section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), which at the time statutorily exempted Cuban nationals who arrived by aircraft at a U.S. port of entry from being placed in expedited removal proceedings because of the lack of diplomatic relations between the United States and Cuba. That section expressly provides that expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." Section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F).

On August 11, 2004, DHS issued a similar **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), to designate an additional class of aliens who may be placed in expedited removal proceedings. 69 FR 48877. That notice authorized the Department to place in expedited removal proceedings any or all members of the following class of aliens: "Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, who are encountered by any immigration officer within 100 air miles

IFR_AR_000229

of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter.'' *Id.* DHS noted at the time that "exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.'' *Id.*

Like the November 13, 2002 notice, the August 11, 2004 notice contained an exception for Cuban nationals who are otherwise described in the designated class and stated that expedited removal proceedings would not be initiated against such nationals encountered in the United States. *Id.* The notice similarly based this exception on that fact that "removals to Cuba [could not] presently be assured and for other U.S. policy reasons,'' *id.,* citing section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), as well.

Since those notices were issued, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries.

DHS also has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. First, the Department notes that the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by aircraft at a U.S. port of entry no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. *See* section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). In fact, DHS and DOJ are promulgating rules in this issue of the **Federal Register**, amending 8 CFR 235.3(b)(1)(i) and 1235.3(b)(1)(i) to strike the regulatory exception for Cuban nationals arriving by aircraft at a U.S. port of entry. Second, the improved relationship between the United States and Cuba, along with Cuba's agreement to accept the repatriation of its nationals, has eroded certain U.S. policy justifications for the exception. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS has determined, in consultation with the Department of State, that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States.

Accordingly, this notice eliminates the categorical exceptions for Cuban nationals, with respect to both the November 13, 2002 and August 11, 2004 notices, on a prospective basis, beginning on January 13, 2017, *see* 8 CFR 235.3(b)(1)(ii) (designation may be effective as early as the date of issuance). As a result, Cuban nationals encountered on or after January 13, 2017 are included in the classes of aliens subject to expedited removal as designated in the November 13, 2002 and August 11, 2004 notices. DHS is not changing any other aspects of those designations and, apart from the modification described above, will continue exercising its expedited removal authority as indicated in the November 13, 2002 and August 11, 2004 notices.

As it did for the November 13, 2002 and August 11, 2004 notices, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii), the Department has determined that good cause exists to exempt this notice from the notice-and-comment and 30-day delayed effective date requirements under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(3)(B) and (d)(3). Delaying the implementation of this notice to allow public notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time.'' Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I).

Moreover, as with the August 11, 2004 notice, the designation in this notice is necessary to remove quickly from the United States aliens who are encountered shortly after illegally entering across U.S. land borders. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

DHS has determined that pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Among other things, such opportunity for notice and comment could result in a surge in migration of Cuban nationals seeking to travel to and enter the United States prior to the effectuation of the changes announced in this notice. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. *See Matter of D–J–,* I. & N. Dec. 572, 579 (A.G. 2003). A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge in migration over land or sea could result in significant loss of human life. For the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable and contrary to the public interest.

In addition, the change implemented by this notice is part of a major foreign policy initiative announced by the President, and is central to ongoing

IFR_AR_000230

diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and that this notice is exempt from APA procedural requirements on that basis.

Finally, and for the same reasons described above, DHS finds that delay caused by publication would adversely affect the interests of the United States and the effective enforcement of the immigration laws, and therefore invokes 8 CFR 235.3(b)(1)(ii) to make this designation effective immediately upon placement on public inspection.

Although advance notice and comment procedures are not in the interests of the United States with respect to this notice, DHS is interested in receiving comments from the public on the elimination of the categorical exception for Cuban nationals. DHS believes that by maintaining a dialogue with interested parties, DHS may be better positioned to ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(A)(iii)) and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) With respect to the above-referenced Designation of November 13, 2002, 67 FR 68924, I hereby rescind the provision at numbered paragraph (5), specifying that "[e]xpedited removal proceedings will not be initiated against Cuban citizens or nationals who arrive by sea," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

(2) With respect to the above-referenced Designation of August 11, 2004, 69 FR 48877, I hereby rescind the provision at numbered paragraph (6), specifying that "[t]he expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

Signed: at Washington, DC this 11th of January, 2017.

**Jeh Charles Johnson,**
*Secretary of Homeland Security.*
[FR Doc. 2017–00914 Filed 1–13–17; 8:45 am]
**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2593–16; DHS Docket No. USCIS–2015–USCIS–2013–0006]**

**RIN 1615–ZB62**

**Extension of the Designation of Somalia for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Somalia for Temporary Protected Status (TPS) for a period of 18 months, effective March 18, 2017 through September 17, 2018. This extension allows eligible Somali nationals (and aliens having no nationality who last habitually resided in Somalia) to retain TPS through September 17, 2018, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because conditions in Somalia supporting its designation for TPS continue to be met. Through this Notice, DHS also sets forth procedures necessary for nationals of Somalia (or aliens having no nationality who last habitually resided in Somalia) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** The 18-month extension of the TPS designation of Somalia is effective as of March 18, 2017, and will remain in effect through September 17, 2018. The 60-day re-registration period runs from January 17, 2017 through March 20, 2017. Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.

**FOR FURTHER INFORMATION CONTACT:**
• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS

Web page at *http://www.uscis.gov/tps.* You can find specific information about the extension of Somalia's designation for TPS by selecting "Somalia" from the menu on the left side of the TPS Web page.

• You can also contact Guillermo Roman-Riefkohl, TPS Program Manager, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible aliens without nationality who last habitually resided in the designated country.
• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs, so long as they continue to meet the requirements of TPS.

**67202** Federal Register / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC41**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

**[EOIR Docket No. 18–0002; A.G. Order No. 4873–2020]**

**RIN 1125–AA87**

**Procedures for Asylum and Bars to Asylum Eligibility**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** On December 19, 2019, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") published a notice of proposed rulemaking ("NPRM") that would amend their respective regulations governing the bars to asylum eligibility. The Departments also proposed to clarify the effect of criminal convictions and to remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. This final rule ("final rule" or "rule") responds to comments received and adopts the provisions of the NPRM with technical corrections to ensure clarity and internal consistency.

**DATES:** This rule is effective on November 20, 2020.

**FOR FURTHER INFORMATION CONTACT:**
Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041, telephone (703) 305–0289 (not a toll-free call).

Maureen Dunn, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services ("USCIS"), DHS, 20 Massachusetts Avenue NW, Washington, DC 20529–2140; telephone (202) 272–8377 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Proposed Rule

On December 19, 2019, the Departments published an NPRM that would amend their respective regulations governing the bars to asylum eligibility, clarify the effect of criminal convictions, and remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640 (Dec. 19, 2019).

### A. Authority and Legal Framework

The Departments published the proposed rule pursuant to their respective authorities regarding the adjudication of asylum applications. 84 FR at 69641–42, 69644–45.

Regarding the DOJ, the Attorney General, through himself and the Executive Office for Immigration Review ("EOIR"), has authority over immigration adjudications. *See* 6 U.S.C. 521; section 103(g) of the Immigration and Nationality Act ("INA" or "the Act") (8 U.S.C. 1103(g)). Immigration judges in DOJ adjudicate defensive asylum applications filed during removal proceedings [1] and affirmative asylum applications referred to the immigration courts by USCIS within DHS. INA 101(b)(4) (8 U.S.C. 1101(b)(4)); 8 CFR 1003.10(b), 1208.2. The Board of Immigration Appeals ("BIA" or "the Board") hears appeals from immigration judges' decisions, including decisions related to the relief of asylum. 8 CFR 1003.1.

The immigration laws further provide the Attorney General with authority regarding immigration adjudications and determinations. For example, the Attorney General's determination with respect to all questions of law is "controlling." INA 103(a)(1) (8 U.S.C. 1103(a)(1)). The Attorney General possesses a general authority to "establish such regulations * * * as the Attorney General determines to be necessary for carrying out" his authorities under the INA. INA 103(g)(2) (8 U.S.C. 1103(g)(2)). In addition, the INA authorizes the Attorney General to (1) "by regulation establish additional limitations and conditions, consistent with [INA 208 (8 U.S.C. 1158)], under which an alien shall be ineligible for asylum under," INA 208(b)(1) (8 U.S.C. 1158(b)(1)); and (2) "provide by regulation for * * * conditions or limitations on the consideration of an application for asylum not inconsistent with the Act." INA 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C) and (d)(5)(B)).

Regarding the Department of Homeland Security, the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charges the Secretary of Homeland Security ("the Secretary") "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1) (8 U.S.C. 1103(a)(1)), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the immigration and nationality laws, INA 103(a)(3) (8 U.S.C. 1103(a)(3)). The HSA also transferred to USCIS responsibility for affirmative asylum applications, *i.e.*, applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). If an alien is not in removal proceedings, USCIS asylum officers determine in the first instance whether an alien's asylum application should be granted. *See* 8 CFR 208.2.

### B. Provisions of the Proposed Rule

The NPRM proposed to amend 8 CFR 208.13 and 1208.13 by adding new paragraphs (c)(6)–(9) and amending 8 CFR 208.16 and 1208.16 by removing and reserving paragraphs (e) in each section.

#### 1. Bars to Asylum Eligibility

Pursuant to the authorities outlined above, the Departments proposed to revise 8 CFR 208.13 and 1208.13 in each section to add paragraphs (c)(6) to add the following bars on eligibility for asylum for the following aliens:

• Aliens who have been convicted of an offense arising under INA 274(a)(1)(A) or (a)(2) or INA 276 (8 U.S.C. 1324(a)(1)(A) or (a)(2) or 1326) (convictions related to alien harboring, alien smuggling, and illegal reentry). *See* 8 CFR 208.13(c)(6)(i) and 1208.13(c)(6)(i) (proposed); 84 FR at 69647–49.

• Aliens who have been convicted of a Federal, State, tribal, or local crime that the Attorney General or Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined under the law of the jurisdiction where the conviction occurred or as in 18 U.S.C. 521(a). *See* 8 CFR 208.13(c)(6)(ii) and 1208.13(c)(6)(ii) (proposed); 84 FR at 69649–50.

• Aliens who have been convicted of an offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where

---

[1] One exception is that asylum officers in DHS have initial jurisdiction to adjudicate asylum applications filed by unaccompanied alien children ("UAC") in removal proceedings. INA 208(b)(3)(C) (8 U.S.C. 1158(b)(3)(C)); *see also* 6 U.S.C. 279(g)(2) (UAC defined).

IFR_AR_000333

the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person. *See* 8 CFR 208.13(c)(6)(iii) and 1208.13(c)(6)(iii) (proposed); 84 FR at 69650–51.

• Aliens who have been convicted of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(iv)(A) and 1208.13(c)(6)(iv)(A) (proposed); 84 FR at 69650–51.[2]

• Aliens who have been convicted of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by (a) the person's current or former spouse, (b) an alien with whom the person shares a child in common, (c) an alien who is cohabitating with or who has cohabitated with the person as a spouse, (d) an alien similarly situated to a

spouse of the person under the domestic or family violence laws of the jurisdiction, or (e) any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government. *See* 8 CFR 208.13(c)(6)(v)(A), 1208.13(c)(6)(v)(A) (proposed); 84 FR at 69651–53. The NPRM also provided that an alien's conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act (8 U.S.C. 1227(a)(2)(E)(i)–(ii)) would not disqualify him or her from asylum under this provision if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)). *See* 8 CFR 208.13(c)(6)(v)(C), 1208.13(c)(6)(v)(C) (proposed); 84 FR at 69651–53.

• Aliens who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed); 84 FR at 69645–47.

• Aliens who have been convicted of any misdemeanor offense under Federal, State, tribal, or local law that involves (1) possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry; (2) the receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or (3) possession or trafficking of a controlled substance or controlled substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana. *See* 8 CFR 208.13(c)(6)(vi)(B), 1208.13(c)(6)(vi)(B) (proposed); 84 FR at 69653–54.

• Aliens for whom there are serious reasons to believe have engaged in acts of battery or extreme cruelty, as defined in 8 CFR 204.2(c)(1)(vi), upon a person and committed by the same list of aliens as set forth above regarding domestic-violence convictions. *See* 8 CFR 208.13(c)(6)(vii)(A)–(E), 1208.13(c)(6)(vii)(A)–(E) (proposed); 84

FR at 69651–53. The NPRM further provided that an alien's offense would not disqualify him or her from asylum under this provision for crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) and (ii) of the Act if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)) (8 U.S.C. 1227(a)(2)(E)(i)–(ii)). *See* 8 CFR 208.13(c)(6)(vii)(F), 1208.13(c)(6)(vii)(F) (proposed); 84 FR at 69651–53.

2. Additional Instruction and Definitions for Analyzing the New Bars to Eligibility

The Departments proposed to revise 8 CFR 208.13 and 1208.13 by adding paragraphs (c)(7) through (9), which would have provided relevant definitions and other procedural instructions for the implementation of the proposed bars to eligibility discussed above.

First, this proposed revision would have defined the terms "felony" ("any crime defined as a felony by the relevant jurisdiction * * * of conviction, or any crime punishable by more than one year of imprisonment") and "misdemeanor" ("any crime defined as a misdemeanor by the relevant jurisdiction * * * of conviction, or any crime not punishable by more than one year of imprisonment"). 8 CFR 208.13(c)(7)(i)–(ii), 1208.13(c)(7)(i)–(ii) (proposed); 84 FR at 69646, 69653.

The proposed rule further would have provided instructions that whether an activity would constitute a basis for removability is irrelevant to determining whether the activity would make an alien ineligible for asylum and that all criminal convictions referenced in the proposed bars to eligibility would include inchoate offenses. 8 CFR 208.13(c)(7)(iii)–(iv), 1208.13(c)(7)(iii)–(iv) (proposed).

Regarding convictions that have been modified, vacated, clarified, or otherwise altered, the proposed rule would have instructed that such modifications, vacaturs, clarifications, or alterations do not have any effect on the alien's eligibility for asylum unless the court issuing the order had jurisdiction and authority to do so, and the court did not do so for rehabilitative purposes or to alleviate possible immigration-related consequences of the conviction. 8 CFR 208.13(c)(7)(v), 1208.13(c)(7)(v) (proposed); 84 FR at 69654–56. The rule would have further provided that the modification, vacatur, clarification, or other alteration is presumed to be for the purpose of ameliorating the immigration

---

[2] When determining whether an alien's offense qualifies under this provision, the NPRM further provided that the adjudicator would not be required to find the initial conviction as a predicate offense. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Further, the NPRM provided that the adjudicator would be permitted to consider the underlying conduct of the crime and would not be limited to those facts found by the criminal court or otherwise contained in the record of conviction. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Instead, the adjudicator would be required only to make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the convictions occurred. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B).

consequences of a conviction if it was entered subsequent to the initiation of removal proceedings or if the alien moved for the order more than one year following the original order of conviction or sentencing. 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed); 84 FR at 69654–56. Finally, the proposed rule would have specifically allowed the asylum officer or immigration judge to "look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence" to determine what effect such order should be given under proposed 8 CFR 208.13(c)(7)(v) and 1208.13(c)(7)(v). 8 CFR 208.13(c)(9),1208.13(c)(9) (proposed); 84 FR at 69654–56.

### 3. Reconsideration of Discretionary Denials

Lastly, the proposed rule would have removed and reserved 8 CFR 208.16(e) and 1208.16(e), which provide for the automatic review of a discretionary denial of an alien's asylum application if the alien is subsequently granted withholding of removal. 84 FR at 69656–57.

## II. Public Comments on the Proposed Rule

### A. Summary of Public Comments

The comment period for the NPRM closed on January 21, 2020, with 581 comments received.[3] Individual commenters submitted 503 comments, and 78 comments were submitted by organizations, including non-government organizations, legal advocacy groups, non-profit organizations, religious organizations, congressional committees, and groups of members of Congress. Most individual commenters opposed the NPRM. All organizations opposed the NPRM.

### B. Comments Expressing Support for the Proposed Rule

*Comment:* One commenter supported the final rule to ensure that individuals who qualify for asylum are granted that status only when merited in the exercise of discretion and to provide a uniform and fair standard to prevent criminal aliens from "gaining a foothold in the United States."

One commenter stated that the NPRM was an appropriate exercise of discretionary authority. The commenter

stated that asylum is an extraordinary benefit that offers a path to lawful permanent residence and United States citizenship and, thus, should be discretionary. The commenter stated that asylees are protected from removal, authorized to work in the United States, and may travel under certain circumstances, and that asylees' spouses and children are eligible for derivative status in the United States. The commenter stated that the United States asylum system is generous, asserting that, in fiscal year 2018, 38,687 individuals were granted asylum, including 25,439 affirmative grants and 13,248 defensive grants. The commenter stated that this was the highest number of grants since fiscal year 2002.

The commenter cited the BIA: "The ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States." *Matter of D–A–C–*, 27 I&N Dec. 575, 578 (BIA 2019) (citing *Matter of C–V–T–*, 22 I&N Dec. 7, 11 (BIA 1998) and *Matter of Mendez*, 21 I&N Dec. 296, 305 (BIA 1996)). The commenter stated that criminal aliens, as described in the NPRM, should not be granted the benefit of asylum because their admission would not be in the best interest of the United States.

The commenter emphasized that the NPRM would not bar individuals from all forms of fear-based protection and that individuals who were barred from asylum under the NPRM could still apply for withholding of removal under the INA or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT" and "CAT regulations").[4] The commenter opined that the NPRM would improve the integrity of the asylum system.

The commenter stated that the crimes and conduct listed in the NPRM should constitute a "conclusive determination that an applicant does not merit asylum in the exercise of discretion." The commenter stated that the NPRM would ensure fair and uniform application of the immigration laws because aliens who have been convicted of similar crimes would not receive different

outcomes depending on their adjudicator.

The commenter stated that the NPRM was authorized by the Act, which the commenter stated provides for regulations establishing additional conditions or limitations on asylum. The commenter stated that the NPRM was consistent with existing limitations on asylum eligibility in the statute because several statutory provisions exclude individuals from asylum eligibility on the basis of criminal conduct or other conduct indicating that the applicant does not merit asylum. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (particularly serious crime); INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) (serious nonpolitical crime outside the United States); INA 208(b)(2)(B)(i) (8 U.S.C. 1158(b)(2)(B)(i)) (conviction for aggravated felony); INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) (offenses designated as particularly serious crimes or serious nonpolitical crimes by regulation); INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (alien engaged in persecution of another on account of a protected ground); INA 208(b)(2)(A)(iv) (8 U.S.C. 1158(b)(2)(A)(iv)) (reasonable grounds to regard alien as a danger to the security of the United States); INA 208(b)(2)(A)(v) (8 U.S.C. 1158(b)(2)(A)(v)) (alien presents national security concerns or engaged in terrorist activity).

The commenter supported the NPRM's proposed limitation on asylum eligibility for those who have been convicted of a felony, stating that felonies are categorized as such because they present more serious criminal conduct, which has a higher social cost. The commenter asserted that a felony conviction should be such a heavily weighted negative factor that it should conclusively establish that an alien does not merit asylum. The commenter supported defining a crime by the maximum possible sentence, as opposed to the actual sentence imposed, because of the variability of sentences that can be imposed on individuals who commit the same crime yet appear before different judges or are charged in different jurisdictions. The commenter asserted that immigration consequences should not vary based on the jurisdiction or a judge's "individual personality" and instead should be standardized in the interest of fairness, uniformity, and efficiency.

Commenters also supported the NPRM's proposed limitation on eligibility for individuals convicted of alien harboring in violation of section 274(a)(1)(A) of the Act (8 U.S.C. 1324(a)(1)(A)). Specifically, the

---

[3] The Departments reviewed all 581 comments submitted in response to the rule; however, the Departments did not post 5 of the comments to regulations.gov for public inspection. Of these comments, three were duplicates of another comment written by the same commenter, and two were written in Spanish. Accordingly, the Departments posted 576 comments.

[4] Adopted and opened for signature Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) (implemented in the immigration context in principal part at 8 CFR 208.16(c) through 208.18 and 8 CFR 1208.16(c) through 1208.18). *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note).

IFR_AR_000335

commenters stated that smuggling involves a business where people are routinely treated not as human beings, but as chattel. The commenters stated that individuals who participate in smuggling, or who place others into the hands of smugglers, should not be eligible for asylum because the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life. Commenters similarly supported the NPRM's proposed limitation on eligibility for asylum for aliens who have been convicted of illegal reentry in violation of section 276 of the Act (8 U.S.C. 1326). Commenters stated that such individuals have demonstrated contempt for U.S immigration law and should not be granted asylum. Commenters stated that a conviction under section 276 of the Act (8 U.S.C. 1326) requires that an alien repeatedly violated the immigration laws because such a conviction requires that the alien illegally reentered after a prior removal and intentionally chose not to present himself or herself at a port of entry. The commenters stated that whether or not the final rule includes the felony bar to asylum, it should incorporate a mandatory bar for those convicted of illegal reentry.

Commenters also expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have committed criminal acts on behalf of or in furtherance of a criminal street gang. The commenters stated that such activity is an indicator of ongoing danger to the community. The commenters noted that, although widespread criminal activity is not a sufficient legal basis to receive asylum protection, adjudicators routinely hear testimony about the harm suffered by people subjected to extortion threats, murders, kidnappings, and sexual assaults by organized criminal groups. The commenters stated that the United States immigration system should not award a discretionary benefit to those who would destabilize communities at home and abroad through violence.

Commenters supported the NPRM's approach authorizing adjudicators to determine—on the basis of sufficient evidence—whether a particular criminal act was committed "in support, promotion, or furtherance of a criminal street gang." Specifically, the commenters stated that the range of crimes committed by street gangs is broad and that not all gang members are convicted of a gang participation offense even when they commit a crime on behalf of the gang. The commenters noted that such a determination would

not be based on "mere suspicion" but would only occur where the adjudicator knows or has reason to believe that the crime was committed in furtherance of gang activity on the basis of competent evidence. The commenters stated that "[g]ang violence is a scourge on our communities, and those who further the goals of criminal street gangs should not be put on a path to citizenship."

Commenters expressed support for the NPRM's proposed limitation on asylum eligibility where an individual has been convicted of multiple driving-under-the-influence ("DUI") offenses or a single offense resulting in death or serious bodily injury. The commenters stated that drunk and impaired driving is a dangerous activity that kills more than 10,000 people in the United States each year and injures many more. The commenters stated that individuals with recidivist DUI records, or who have already caused injury or death, should not be rewarded with asylum. The commenters expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have been convicted of certain misdemeanors. The commenters encouraged the Departments to consider including misdemeanor offenses involving sexual abuse or offenses reflecting a danger to children, asserting that such offenses are indicative of an ongoing danger to the community.

The commenters expressed support for the NPRM's approach to treating vacated, expunged, or modified convictions and sentences. The commenter stated that the approach is consistent with the Attorney General's decision in *Matter of Thomas and Thompson,* 27 I&N Dec. 674 (A.G. 2019). The commenters also stated that such an approach would be appropriate in the interests of uniform application of the law across jurisdictions by helping to ensure that aliens convicted of the same or similar conduct receive the same consequence with respect to asylum eligibility.

The commenters expressed support for the NPRM's proposed removal of 8 CFR 208.16(e) and 1208.16(e), stating that these provisions are unnecessary. Specifically, the commenters stated that the current regulations require an adjudicator who denies an asylum application in the exercise of discretion to revisit and reconsider that denial by weighing factors that would already have been considered in the original discretionary analysis. The commenters stated that there should not be a presumption that the adjudicator did not properly weigh discretionary factors in the first instance. The commenters stated that, as noted by the NPRM, such

a requirement is inefficient, requiring additional adjudicatory resources to re-evaluate a decision that was only just decided by the same adjudicator. The commenters also stated that an alien already has opportunities to seek review of that discretionary decision through motions or an appeal.

Other commenters expressed general support for the NPRM. Some commenters stated that such a rule would make America safer. One commenter stated that further restrictions on asylum were necessary because individuals who have no basis to remain in the United States "routinely ask to use political asylum as a last ditch effort to remain." At least one commenter stated that the NPRM would not adversely affect "innocent asylum seeker[s] truly escaping political persecution." Other commenters stated that all applications for relief should require at least a minimum of good character and behavior. One commenter stated that the NPRM "is a direct result of state and local governments working to nullify undocumented criminal activity by dropping charges, expunging records or pardoning crimes, including serious crimes like armed robbery * * * sex assault, domestic abuse, wire fraud, identity theft etc."

One commenter expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who are convicted of offenses related to controlled substances, stating that the United States must bar those who engage in drug trafficking into the United States. Another commenter expressed support for the proposed limitations on asylum eligibility for individuals who are convicted of domestic violence offenses or who engage in identity theft, stating that such individuals should not have the opportunity to be lawfully present in the United States.

*Response:* The Departments note the commenters' support for the rule. The Departments have taken the commenters' recommendations under advisement.

## C. Comments Expressing Opposition to the Proposed Rule

### 1. General Opposition

*Comment:* Many commenters expressed general opposition to the NPRM. Some provided no reasoning, simply stating, "I oppose this proposed rule" with varying degrees of severity. Many commenters also asked the Departments to withdraw the NPRM. Others, as explained in the following sections, provided specific points of

IFR_AR_000336

**67206** **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

opposition or their reasoning underlying their opposition.

*Response:* The Departments are unable to provide a detailed response to comments that express only general opposition without providing reasoning for their opposition. The following sections of this final rule provide the Departments' responses to comments that offered specific points of opposition or reasoning underlying their opposition.

### 2. Violation of Law

#### a. Violation of Domestic Law

Commenters asserted that the proposed rule violated United States law in three main ways: First, it violated law regarding particularly serious crimes; second, it improperly disposed of the categorical approach to determine immigration consequences of criminal offenses; and third, it violated law regarding the validity of convictions for immigration purposes. Overall, commenters were concerned that the NPRM's provisions contradicting case law would result in the "wrongful exclusion" of immigrants from asylum eligibility.

#### i. Law Regarding "Particularly Serious Crime" Bar

*Comment:* Commenters opposed the NPRM, stating that it violates domestic law and contravenes existing case law from the BIA, the circuit courts of appeals, and the Supreme Court of the United States regarding the particularly serious crime bar to asylum for multiple reasons. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)). In general, commenters alleged that the NPRM was untethered to the approach set out by Congress regarding particularly serious crimes and that if Congress had sought to sweepingly bar individuals from asylum eligibility based on their conduct or felony convictions, as outlined in the NPRM, it would have done so in the Act. Commenters stated that adding seven new categories of barred conduct rendered the language of section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)) essentially meaningless and drained the term "particularly serious crime" of any sensible meaning because the Departments were effectively considering all offenses, regardless of seriousness, as falling under the particularly serious crime bar to asylum. One organization asserted that this violated the Supreme Court's requirements for statutory interpretation, citing *Corley* v. *United States,* 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons[ ] [is] that a statute should be construed so

that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (alterations and quotation marks omitted)).

At the same time, commenters also asserted that the additional crimes to be considered particularly serious by the proposed rule have been repeatedly recognized as not particularly serious. For example, commenters cited *Matter of Pula,* 19 I&N Dec. 467, 474 (BIA 1987), and noted the BIA's conclusion that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Paraphrasing *Delgado* v. *Holder,* 648 F.3d 1095, 1110 (9th Cir. 2010) (Reinhardt, J., concurring in part and concurring in the judgment), commenters stated that, outside of the aggravated felony context, "it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, 'run-of-the-mill' offenses do not constitute particularly serious crimes."

Commenters asserted that low-level offenses like misdemeanor DUI with no injury or simple possession of a controlled substance cannot constitute a particularly serious crime. In support of this proposition, commenters cited *Mellouli* v. *Lynch,* 575 U.S. 798 (2015) (possession of drug paraphernalia was not a controlled substances offense); *Carachuri-Rosendo* v. *Holder,* 560 U.S. 563 (2010) (subsequent marijuana possession offense is not an aggravated felony); and *Leocal* v. *Ashcroft,* 543 U.S. 1 (2004) (conviction for DUI was not an aggravated felony crime of violence). Commenters asserted that if the Departments wished to abrogate the Supreme Court's interpretation of the statute, they should do so by passing new legislation, not by proposing what the commenters consider to be unlawful rules.

Moreover, commenters asserted that the "essential key to determining whether a crime is particularly serious * * * is whether the nature of the crime is one which indicates that the alien poses a danger to the community." *Matter of G–G–S–,* 26 I&N Dec. 339 (BIA 2014) (quotation marks omitted). Commenters argued that despite the analytical requirement, the proposed rule arbitrarily re-categorizes many offenses as particularly serious without consideration of whether the nature of the crime indicates that the alien poses a danger to the community. Commenters expressed additional concern that this categorization removes all discretion

from the adjudicator to determine whether an individual's circumstances merit such a harsh penalty.

Commenters further asserted that, because Congress made commission of a "particularly serious crime" a bar to asylum but did not make commission of other categories of crimes such a bar, Congress intended to preclude that result. Commenters alleged that the NPRM violated the canon of construction articulated in *United States* v. *Vonn,* 535 U.S. 55, 65 (2002), *expressio unius est exclusio alterius,* which means that "expressing one item of a commonly associated group or series excludes another left unmentioned," because it attempted to create additional categories of crime bars to asylum eligibility in a manner inconsistent with the statute and congressional intent. Commenters analogized these NPRM provisions to another rule that had categorically barred "arriving aliens" from applying for adjustment of status in removal proceedings. *See* 8 CFR 245.1(c)(8) (1997). The Federal courts of appeals were split over whether that now-rescinded rule circumvented the Act and congressional intent because adjustment of status was ordinarily a discretionary determination.[5]

Commenters further alleged that the NPRM unlawfully categorically exempted a wide range of offenses from a positive discretionary adjudication of asylum. Commenters acknowledged that the Attorney General can provide for "additional limitations and conditions" on asylum applications consistent with the asylum statute by designating offenses as per se particularly serious, *see* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), but commenters emphasized that crimes that are not particularly serious are still subject to a discretionary determination. Commenters stated that Congress did not intend to authorize the Attorney General to categorically bar "large swaths of asylum seekers from protection." Commenters alleged that the Departments purposefully wrote the NPRM in this way (designating the bars as both particularly serious crimes and categorical exceptions to positive

---

[5] *Compare Scheerer* v. *U.S. Att'y Gen.,* 445 F.3d 1311, 1321–22 (11th Cir. 2006) (holding that the regulation was unlawful); *Bona* v. *Gonzales,* 425 F.3d 663, 668–71 (9th Cir. 2005) (same); *Zheng* v. *Gonzales,* 422 F.3d 98, 116–20 (3d Cir. 2005) (same), *and Succar* v. *Ashcroft,* 394 F.3d 8, 29 (1st Cir. 2005) (same), *with Akhtar* v. *Gonzales,* 450 F.3d 587, 593–95 (5th Cir. 2006) (upholding validity of the regulation), *rehearing en banc granted and remanded on other grounds,* 461 F.3d 584 (2006) (en banc), *and Mouelle* v. *Gonzales,* 416 F.3d 923, 928–30 (8th Cir. 2005) (same), *vacated on other grounds,* 126 S. Ct. 2964 (2006).

IFR_AR_000337

discretionary adjudication) to "insulate the Proposed Rules from review."

*Response:* The Departments disagree with comments asserting that the rule violates domestic law. Commenters asserted that Congress did not intend for the Attorney General to categorically bar "large swaths of asylum seekers from protection." However, Congress, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), vested the Attorney General with broad authority to establish conditions or limitations on asylum. Public Law 104–208, div. C, 110 Stat. 3009, 3009–546.

At that time, Congress created three categories of aliens who are barred from applying for asylum and adopted six other mandatory bars to asylum eligibility. IIRIRA, sec. 604(a), 110 Stat. at 3009–690 through 3009–694 (codified at INA 208(a)(2)(A)–(C), (b)(2)(A)(i)–(vi) (8 U.S.C. 1158(a)(2)(A)–(C), (b)(2)(A)(i)–(vi))). Congress further expressly authorized the Attorney General to expand upon two bars to asylum eligibility—the bars for "particularly serious crimes" and "serious nonpolitical crimes." INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)). Congress also vested the Attorney General with the ability to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Significantly, "[t]his delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1)," as "the statute clearly empowers" the Attorney General and the Secretary to "adopt[ ] further limitations" on eligibility to apply for or receive asylum. *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 & n.9 (10th Cir. 2017). In authorizing "additional limitations and conditions" by regulation, the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The Act instructs only that additional limitations on eligibility are to be established "by regulation," and must be "consistent with" the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); *see also* INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Moreover, a long-held principle of administrative law is that an agency, within its congressionally delegated policymaking responsibilities, may "properly rely upon the incumbent administration's view of wise policy to

inform its judgments." *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 865 (1984). Accordingly, an agency may make policy choices that Congress either inadvertently or intentionally left to be resolved by the agency charged with administration of the statute, given the current realities faced by the agency. *See id.* at 865–66. Through the publication of the NPRM, the Departments have properly exercised this congressionally delegated authority. Such policymaking is well within the confines of permissible agency action. Additionally, despite commenters' assertions that the Departments should pursue these changes through legislative channels, the Departments, as part of the Executive Branch, do not pursue legislative changes but instead rely on regulatory authority to interpret and enforce legislation as enacted by Congress.

As explained in the NPRM, Congress granted the Attorney General and the Secretary broad authority to determine additional "limitations and conditions" on asylum. For example, the Attorney General and the Secretary have authority to impose procedural requirements for asylum seekers and to designate by regulation additional crimes that could be considered particularly serious crimes or serious nonpolitical crimes. *See* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)); *see also* INA 208(2)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Based on the comments received, the Departments realize that the preamble to the NPRM resulted in confusion regarding which authority the Departments relied on in promulgating this rule. Specifically, commenters raised concerns regarding the Departments' reliance on section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) in support of some of the new bars to asylum eligibility. In response to these concerns and confusion, the Departments emphasize that, as in the proposed rule, the regulatory text itself does not designate any offenses covered in 8 CFR 208.13(c)(6) or 1208.13(c)(6) as specific particularly serious crimes.[6] Instead, this rule, like the proposed rule, sets out seven new "additional limitations," consistent with the Departments' authority at INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) to establish "additional limitations and conditions" on asylum

eligibility. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

This reliance on the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) is consistent with the proposed rule. There, although the Departments cited the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes, the Departments also cited the authority at section 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) in support of each category of bars included in the rule. *See generally* 84 FR at 69645–54. The references throughout the preamble in the NPRM to the Attorney General's and the Secretary's authorities to designate additional particularly serious crimes accordingly highlighted one of two alternative bases for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. In other words, although the Departments are not specifically designating any categories of offenses as "particularly serious crimes," the authority of the Attorney General and the Secretary to deny eligibility to aliens convicted of such offenses helps demonstrate that the new bars are "consistent with" the INA because the offenses to which the new bars apply—similar to "particularly serious crimes"—indicate that the aliens who commit them may be dangerous to the community of the United States or otherwise may not merit eligibility for asylum. As a result, the Departments need not address in detail commenters' concerns about whether discrete categories of offenses should constitute "particularly serious crimes" because (1) the new rule does not actually designate any specific offense as such crimes; and (2) section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)), as already discussed and as recognized by the Departments, independently authorizes the Attorney General and the Secretary to establish additional limitations and conditions on asylum eligibility.

Commenters asserted that Congress intended for the only criminal bars to asylum to be those contemplated by the particularly serious crime and serious nonpolitical crime bars. The Departments, however, disagree. Although the INA explicitly permits the Attorney General and the Secretary to designate additional crimes as particularly serious crimes or serious nonpolitical crimes, this does not mean that any time the Attorney General and the Secretary decide to limit eligibility for asylum based on criminal activity,

---

[6] The Departments do not intend, however, to imply that an immigration adjudicator could not or should not find those offenses to be particularly serious crimes in the context of adjudicating individual asylum applications on a case-by-case basis.

the limit must be based on either a particularly serious crime or a serious nonpolitical crime. Rather, the Attorney General and the Secretary may choose to designate certain criminal activity as a limitation or condition on asylum eligibility separate and apart from the scope of crimes considered particularly serious. These additional limitations must simply be established by regulation and must be consistent with the rest of section 208 of the Act (8 U.S.C. 1158).

Nothing in the Act suggests that Congress intended for the particularly serious crime bar at section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)) or the serious nonpolitical crime bar at section 208(b)(2)(A)(iii) of the Act (8 U.S.C. 1158(b)(2)(A)(iii)) to be the sole bars to asylum based on criminal activity. The Departments disagree with comments suggesting that existing exceptions to asylum eligibility occupy the entire field of existing exceptions. The Attorney General and the Secretary have the authority to impose additional limitations on asylum eligibility that are otherwise consistent with the limitations contained section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)). Those existing limitations include limitations on eligibility because of criminal conduct. *See, e.g.,* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime)) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Deciding to impose additional limitations on asylum eligibility that are also based on criminal conduct, as the Departments are doing in this rulemaking, is accordingly consistent with the statute. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).

Of note, in *Trump* v. *Hawaii,* the Supreme Court determined that the INA's provisions regarding the entry of aliens "did not implicitly foreclose the Executive from imposing tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA." 138 S. Ct. 2392, 2411–12 (2018). Thus, by the same reasoning, Congress's statutory command that certain aliens are ineligible for asylum based on a conviction for a particularly serious crime or serious nonpolitical crime does not deprive the Attorney General and Secretary of authority, by regulation, to deny asylum eligibility for certain other aliens whose circumstances may—in a general sense—be "similar."

Commenters' references to the proposed rule revising 8 CFR 245.1(c)(8) (1997) (limitations on eligibility for adjustment of status) and subsequent case law striking down that proposed rule are inapposite. The First Circuit explained that the adjustment of status statute grants the Attorney General discretion to grant applications, but that this authority does not extend to grant the Attorney General authority to define eligibility for that relief. *Succar,* 394 F.3d at 10. However, unlike the adjustment of status statute, INA 245(a) (8 U.S.C. 1255(a)), the asylum statute explicitly grants the Attorney General authority to define additional limitations on eligibility for relief that are "consistent with this section." [7] INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). This express grant of authority contradicts any implied limitation on the Attorney General's authority that might otherwise be inferred from Congress's delineation of certain statutory bars.

### ii. Law Regarding the Categorical Approach

*Comment:* Commenters asserted that the proposed rule violated the Supreme Court's longstanding categorical approach. Commenters stated that "federal courts have repeatedly embraced the 'categorical approach' to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court." Additionally, commenters noted that the Supreme Court has "long deemed undesirable" a "*post hoc* investigation into the facts of the predicate offenses." *Moncrieffe* v. *Holder,* 569 U.S. 184, 200 (2013). Commenters argued that the proposed rule directly communicates this directive to avoid post hoc investigations.

---

[7] Moreover, at least two Federal courts of appeals rejected the reasoning in *Succar. See supra* note 5; *see also Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) ("We also reject [the] argument * * * that the agency must not make categorical exclusions, but may rely only on case-by-case assessments. Even if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority. The approach pressed by [the petitioner]—case-by-case decisionmaking in thousands of cases each year—could invite favoritism, disunity, and inconsistency. The [agency] is not required continually to revisit issues that may be established fairly and efficiently in a single rulemaking proceeding." (citations, footnote, and quotation marks omitted)); *Fook Hong Mak* v. *INS,* 435 F.2d 728, 730 (2d Cir. 1970) ("We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis * * * .").

Commenters emphasized that the categorical approach promotes fairness and due process, as well as judicial and administrative efficiency by avoiding "pseudo-criminal trials." Citing *Moncrieffe,* commenters noted concern that if an immigration adjudicator were required to determine the nature and amount of remuneration involved in, for example, a marijuana-related conviction, the "overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary." *Id.* at 201. Commenters noted that this would result in a disparity of outcomes based on the presiding immigration judge and would further burden the immigration court system. Moreover, commenters noted that the Supreme Court has repeatedly applied the categorical approach and found that its virtues outweigh its shortcomings. Citing *Mathis* v. *United States,* 136 S. Ct. 2243, 2252–53 (2016), commenters noted that the Supreme Court articulated basic reasons for adhering to the elements-only inquiry of the categorical approach, including "serious Sixth Amendment concerns" and "unfairness to defendants" created by alternative approaches.

Commenters asserted that the Departments' concern regarding the unpredictable results of the categorical approach is misleading because immigration adjudicators may already utilize a facts-based analysis to determine whether an offense is a "particularly serious crime" that would bar asylum. Commenters further alleged that the Departments recognized that this was a red herring by noting that the BIA has rectified some anomalies by determining that certain crimes, although not aggravated felonies, nonetheless constitute particularly serious crimes. *See* 84 FR at 69646.

Commenters further noted that, even if an offense does not rise to the level of a particularly serious crime, immigration adjudicators may deny asylum as a matter of discretion. In addition, commenters averred that for gang-related and domestic violence offenses, the proposed rule undermined criminal judgments and violated due process because the proposed rule disregarded the established framework for determining whether a conviction is an aggravated felony. Rather than looking to the elements of the offense, as currently required by the categorical approach, commenters noted that the proposed rule required adjudicators to consider "gang-related" or "domestic violence" conduct that may not have been one of the required elements for a

IFR_AR_000339

conviction and therefore not objected to by the asylum applicant or his or her attorney during the criminal proceeding.

*Response:* The Departments first note that the traditional elements-to-elements categorical approach extolled by the commenters and as set out in *Mathis* by the Supreme Court is an interpretive tool frequently applied by the courts to determine the immigration-related or penal consequences of criminal convictions. *Cf. Mathis,* 136 S. Ct. at 2248 ("To determine whether a prior conviction is for generic burglary (or other listed crime) courts apply what is known as the categorical approach * * *."). However, this traditional categorical approach is not the only analytical tool blessed by the Supreme Court, and the exact analysis depends on the language of the statute at issue. For example, in *Nijhawan* v. *Holder,* 557 U.S. 29, 38 (2009), the Court held that the aggravated felony statute at section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43)) "contains some language that refers to generic crimes and some language that almost certainly refers to the specific circumstances in which a crime was committed." Based on the language of section 101(a)(43)(M)(i) of the Act (8 U.S.C. 1101(a)(43)(M)(i)), the Supreme Court held that the INA required a "circumstance-specific" analysis to determine whether an aggravated felony conviction for a fraud or deceit offense involved $10,000 or more under INA 101(a)(43)(M)(i) (8 U.S.C. 1101(a)(43)(M)(i)). *Id.* at 40. And in *Mathis* itself, the Supreme Court observed that the categorical approach is not the only permissible approach: Again relying on the language as written in a statute by Congress, the Supreme Court explained that "Congress well knows how to instruct sentencing judges to look into the facts of prior crimes: In other statutes, using different language, it has done just that." *Mathis,* 136 S. Ct. at 2252 (noting the determination in *Nijhawan* that a circumstance-specific approach applies when called for by Congress).

Nevertheless, the Departments did not purport to end the use of the traditional categorical approach for determining asylum eligibility through the proposed rule. Instead, the Departments explained that the use of the categorical approach has created inconsistent adjudications and created inefficiencies through the required complexities of the analysis in immigration adjudications. *See* 84 FR at 69646–47. The Departments' concerns with the categorical approach are in line with those of an increasing number of Federal judges and others who are required to work within its confines. *See, e.g., Lopez-Aguilar* v. *Barr,* 948

F.3d 1143, 1149 (9th Cir. 2020) (Graber, J., concurring) ("I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. * * * The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results."); *see also Lowe* v. *United States,* 920 F.3d 414, 420 (6th Cir. 2019) (Thapar, J., concurring) ("[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent.").

As a result, the Departments proposed, for example, that an alien who has been convicted of "[a]ny felony under Federal, State, tribal, or local law" would be ineligible for asylum. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). This provision would not require an adjudicator to conduct a categorical analysis and compare the elements of the alien's statute of conviction with a generic offense. As explained in the NPRM, the Departments believe this will create a more streamlined and predictable approach that will increase efficiency in immigration adjudications. 84 FR at 69647. It will also increase predictability because it will be clear and straightforward which offenses will bar an individual from asylum.

The Attorney General and the Secretary have the authority to place additional limitations on eligibility for asylum, provided that they are consistent with the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). There is no obligation that any criminal-based limitation implemented pursuant to this authority must correspond with a particular generic offense to which an adjudicator would compare the elements of the alien's offense using the categorical approach, particularly when not every criminal provision implemented by Congress itself requires such an analysis. *See Nijhawan,* 557 U.S. at 36; *see also United States* v. *Keene,* 955 F.3d 391, 393 (4th Cir. 2020) (holding that Congress did not intend for the violent crimes in aid of racketeering activity statute (18 U.S.C. 1959) to require a categorical analysis because "the statutory language * * * requires only that a defendant's *conduct,* presently before the court, constitute one of the enumerated federal offenses as well as the charged state crime" (emphasis in original)). Additionally, prior case law interpreting and applying the categorical approach

to determine whether a crime is particularly serious does not apply where, like here, the Departments are designating additional limitations on eligibility for asylum under the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).[8]

Finally, the Departments expect immigration adjudicators to determine whether an alien is barred from asylum eligibility under the other provisions of the proposed rule due to the alien's conviction or conduct in keeping with case law. For example, in order to determine whether an alien's misdemeanor conviction is a conviction for an offense "involving * * * the possession or trafficking of a controlled substance or controlled substance paraphernalia," the adjudicator would be required to review the specific elements of the underlying offense as required by the categorical approach. On the other hand, the inquiry into whether conduct is related to street-gang activity or domestic violence as promulgated by the rule is similar to statutory provisions that already require an inquiry into conduct-based allegations that may bar asylum but that do not require a categorical approach analysis. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (bar to asylum based on persecution of others); INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (immigration benefits for aliens who are battered or subjected to extreme cruelty).

### iii. Law Regarding the Validity of Convictions

*Comment:* Commenters also asserted that the proposed rule's establishment of criteria for determining whether a conviction or sentence is valid for immigration purposes exceeded the Act's statutory grant of authority, violated case law, and violated the Constitution. Broadly speaking,

---

[8] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of the new categories of bars in the proposed rule. *See* 84 FR at 69645–54. The regulatory text, however, does not actually designate any additional offenses as "particularly serious crimes." The text instead aligns with section 208(b)(2)(C) by setting out "[a]dditional limitations on asylum eligibility." *See id.* at 65659. Section 208(b)(2)(B)(ii) remains relevant to the current rule in that the new bars are "consistent with" the INA partly because they deny eligibility as a result of crimes or conduct that share certain characteristics with "particularly serious crimes," but the Departments clarify that they are promulgating this rule under section 208(b)(2)(C). Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

commenters asserted that the NPRM is contrary to the intent of Congress because it attempts to "rewrite immigration law." First, commenters asserted that the proposed rule violated the full faith and credit owed to State court decisions. Second, commenters asserted that the Departments misread and misinterpreted applicable case law in justifying the presumption against the validity of post-conviction relief. Third, commenters expressed concern with the rebuttable presumption against the validity of post-conviction relief in certain circumstances created by the proposed rule.

Commenters expressed opposition to the NPRM's rebuttable presumption that an order vacating a conviction or modifying, clarifying, or otherwise altering a sentence are for the purpose of ameliorating the conviction's immigration consequences in certain circumstances, *see* 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed), because they alleged that it could violate principles of federalism under the Constitution's Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, as codified by the Full Faith and Credit Act, 28 U.S.C. 1738. Commenters asserted that the proposed rule abandoned the presumption of regularity that should accompany State court orders. By precluding an adjudicator from considering a post-conviction order entered to cure substantive or procedural constitutional deficiencies, adjudicators are effectively given permission to second-guess State court decisions, which would undermine the authority of and attribute improper motives to State and Federal tribunals. Commenters alleged that in, this way, immigration judges would become fact-finders who look beyond State court records. Further, one commenter contended that the NPRM undermined local authority to "evaluate the impact and consequences certain conduct should have on its residents by adding broad misdemeanor offenses as a bar to asylum relief," which the commenter asserted would interfere with a local authority's "sovereign prerogative to shape its law enforcement policies to best account for its complex social and political realities."

Commenters averred that the Departments cited "a misleading quote" from *Matter of F–*, 8 I&N Dec. 251, 253 (BIA 1959), which would allow asylum adjudicators to look beyond the face of the State court order. *See* 84 FR at 69656. Commenters asserted that the Departments failed to read *Matter of F-* in its entirety and that, if they had, they would have noted that the BIA instead offered support in favor of presuming the validity of a State court order unless

there is a reason to doubt it. *Matter of F–*, 8 I&N Dec. at 253 ("Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself.").

Additionally, commenters stated the proposed rule violates circuit courts of appeals case law holding that the BIA may not consider outside motives. Commenters cited *Pickering* v. *Gonzales,* 465 F.3d 263, 267–70 (6th Cir. 2006), which held that the BIA was limited to reviewing the authority of the court issuing a vacatur and was not permitted to review outside motives, such as avoiding negative immigration consequences. Commenters also cited *Reyes-Torres* v. *Holder,* 645 F.3d 1073, 1077–78 (9th Cir. 2011), and noted that the court held that the respondent's motive was not relevant to the immigration court's inquiry into whether the decision vacating his conviction was valid. Finally, commenters cited *Rodriguez* v. *U.S. Attorney General,* 844 F.3d 392, 397 (3d Cir. 2006), which held that the immigration judge may rely only on "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Commenters asserted that, in direct contravention of these cases, the proposed rule grants "vague and indefinite authority to look beyond a facially valid vacatur," which violates asylum seekers' rights to a full and fair proceeding.

Commenters also asserted that the Departments improperly extended the decision in *Matter of Thomas and Thompson,* 27 I&N Dec. 674, to all forms of post-conviction relief. By extending this decision, commenters stated that the proposed rule imposes an ultra vires and unnecessary burden on asylum seekers. Commenters first asserted that the Attorney General's decision in *Matter of Thomas and Thompson* had no justification in the text or history of the Act. Specifically, commenters stated that the Act does not limit the authority of immigration judges by requiring them to consider only State court sentence modifications that are based on substantive or procedural defects in the underlying criminal proceedings. Rather, commenters asserted, the Act requires a "convict[ion] by a final judgment." Commenters argued that, because a vacated judgment is neither "final" nor a "judgment," it would have

no effect on immigration proceedings. Commenters argued therefore that the Act does not permit immigration judges to treat a vacated judgment as valid and effective based on when, how, or why it was vacated. Moreover, commenters asserted that "[c]ourt orders are presumptively valid, not the other way around."

Commenters asserted that the BIA, in *Matter of Cota-Vargas,* 23 I&N Dec. 849, 852 (BIA 2005), *overruled by Matter of Thomas and Thompson,* 27 I&N Dec. 674, relied on the text of the Act and the legislative history behind Congress's definition of "conviction" and "sentence" in section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)) to hold that proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Commenters argued that, as a result, neither the text of the Act nor the legislative history supports the conclusion reached in *Matter of Thomas and Thompson,* and hence that the decision should not be extended to the proposed rule. Commenters stated that the same is true of orders modifying, clarifying, or altering a judgment or sentence, as recognized by the BIA in *Matter of Cota-Vargas,* 23 I&N Dec. at 852. Specifically, commenters quoted *Matter of Cota-Vargas* in noting that the NPRM's approach to "sentence modifications has no discernible basis in the language of the Act."

Commenters also objected to the two situations in which the rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence arises: When a court enters a judgment or sentencing order after the asylum seeker is already in removal proceedings; or when the asylum seeker moves the court to modify, clarify, or alter a judgment or sentencing order more than one year after it was entered. Commenters cited the holding in *Padilla* v. *Kentucky,* 559 U.S. 356, 374 (2010), that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. Commenters alleged that the presumption is unlawful under *Padilla* because it holds asylum applicants whose rights were violated under *Padilla* to a different standard. Commenters similarly asserted that the presumption would prejudice asylum seekers who have not had an opportunity to seek review of their criminal proceedings until applying for asylum. Commenters stated that asylum applicants would be forced to rebut the presumption that an order, entered after the asylum seeker was

placed in removal proceedings or requested more than one year after the date of conviction or sentence was entered, is invalid. In this way, commenters alleged, the NPRM would "compound the harm to immigrants who * * * have been denied constitutionally compliant process in the United States criminal legal system."

One commenter asserted that some orders changing a sentence or conviction are entered after removal proceedings began because the alien had not received the constitutionally required advice regarding immigration consequences stemming from his or her criminal convictions. Other commenters explained that because criminal defendants oftentimes lack legal representation in post-conviction proceedings, they may have lacked knowledge of their constitutional rights or resources to challenge their convictions or related issues. Commenters also explained that asylum applicants may not have had reason to suspect defects in their criminal proceedings until they applied for asylum and met with an attorney. Commenters asserted that the NPRM would also harm those people if they realized these defects more than one year after their convictions were entered.

Another commenter explained that "state and federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings. Collateral sanctions imposed on persons convicted of crimes—such as ineligibility to apply for relief from removal and other immigration consequences—should be subject to waiver, modification, or another form of relief if the sanctions are inappropriate or unfair in a particular case."

*Response:* The Attorney General and the Secretary are granted general authority to "establish such regulations [as each determines to be] necessary for carrying out" their authorities under the INA. INA 103(a)(1), (a)(3), and (g)(2) (8 U.S.C. 1103(a)(1), (a)(3), and (g)(2)); *see also Tamenut* v. *Mukasey,* 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam) (describing INA 103(g)(2) (8 U.S.C. 1103(g)(2)) as "a general grant of regulatory authority"); *cf. Narenji* v. *Civiletti,* 617 F.2d 745, 747 (DC Cir. 1979) ("The [INA] need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him."). As stated above, the Attorney General and the Secretary also have the congressionally provided

authority to place additional limitations and conditions on eligibility for asylum, provided that they are consistent with section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Prescribing the effect to be given to vacated, expunged, or modified convictions or sentences is an ancillary aspect of prescribing additional limitations or conditions on asylum eligibility.

As explained in the NPRM, the rule codifies the principle set forth in *Matter of Thomas and Thompson,* 27 I&N Dec. at 680, that, if the underlying reasons for the vacatur, expungement, or modification were for "rehabilitation or immigration hardship," the conviction remains effective for immigration purposes. *See* 84 FR at 69655. Even before *Matter of Thomas and Thompson* was decided, courts of appeals repeatedly accepted the result reached in that case. *See id.; see also Saleh* v. *Gonzales,* 495 F.3d 17, 24 (2d Cir. 2007); *Pinho* v. *Gonzales,* 432 F.3d 193, 215 (3d Cir. 2005). Therefore, the Departments reject commenters' assertions that the rule improperly relies on or extends *Matter of Thomas and Thompson.*[9] In addition, the Departments note that agencies may decide whether to announce reinterpretations of a statute through rulemaking or through adjudication. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 (citing, *inter alia, NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 294 (1974)). In *Matter of Thomas and Thompson,* the Attorney General elected to address prior BIA precedent regarding the validity of modifications, clarifications, or other alterations through administrative adjudication. *Id.* at 689. That the Attorney General declined to consider additional issues on this topic through the administrative adjudication does not foreclose him from later promulgating additional interpretations or reinterpretations of the Act through rulemaking, as is being

done in this final rule. *See Bell Aerospace Co.,* 416 U.S. at 294.

The Departments also reject commenters' claims that the approach set forth by the rule violates the Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, or the Full Faith and Credit Act, 28 U.S.C. 1738. The Full Faith and Credit provisions of 28 U.S.C. 1738 apply to courts and not administrative agencies. *See NLRB* v. *Yellow Freight Sys., Inc.,* 930 F.2d 316, 320 (3d Cir. 1991) (federal administrative agencies are not bound by section 1738 because they are not "courts"); *see also Am. Airlines* v. *Dep't. of Transp.,* 202 F.3d 788, 799 (5th Cir. 2000) (28 U.S.C. 1738 did not apply to the Department of Transportation because it is "an agency, not a 'court'").

Moreover, as explained by the Second Circuit, and as reiterated by the Attorney General in *Matter of Thomas and Thompson,* when an immigration judge reviews a State conviction for an offense, the immigration judge is merely comparing the State conviction to the Federal definition of an offense under the Act. *Saleh,* 495 F.3d at 26 ("[T]he BIA is simply interpreting how to apply Saleh's vacated State conviction for receiving stolen property to the INA and is not refusing to recognize or relitigating the validity of Saleh's California state conviction."); *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 ("[T]he immigration judge in such a case simply determines the effect of that order for the purposes of federal immigration law."). As a result, because the State court order remains effective and unchanged for all other purposes, there is no intrusion on State law and no violation of the principles of federalism and comity. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688.

The Departments reject commenters' assertions that the NPRM improperly quotes *Matter of F–,* 8 I&N Dec. 251. The NPRM cites *Matter of F-* only to support the proposition that the alien must establish that a court issuing an order vacating or expunging a conviction or modifying a sentence had jurisdiction and authority to do so. 84 FR at 69656. No law compels the Departments to accept State court orders entered without jurisdiction, and there is no sound public policy reason for doing so. Further, adopting such a policy would also potentially raise difficulties for the faithful and consistent administration of the immigration laws, as the Departments could be required to accept a State court judgment declaring an alien to be a United States citizen, even though a State court cannot confer or establish United States citizenship. Both

---

[9] To the extent the commenters disagree with the substance of the Attorney General's decision in *Matter of Thomas and Thompson,* the Departments note that this rulemaking is not the mechanism for expressing such criticisms. The Attorney General has the authority to review administrative determinations in immigration proceedings, which includes the power to refer cases for review. INA 103(a)(1), (g) (8 U.S.C. 1103(a)(1), (g)); 8 CFR 1003.1(h)(1); *see also Xian Tong Dong* v. *Holder,* 696 F.3d 121, 124 (1st Cir. 2012) (the Attorney General is authorized to direct the BIA to refer cases to him for review and, given this authority, his decisions are entitled to *Chevron* deference). When the Attorney General certifies a case to himself, he has broad discretion to review the issues before him. *See Matter of J–F–F–,* 23 I&N Dec. 912, 913 (A.G. 2006).

IFR_AR_000342

*Matter of F-* and the regulatory language simply restate the longstanding proposition that adjudicators in the Departments are not bound by judgments rendered by courts without jurisdiction, and even the full language noted by commenters from *Matter of F-* adheres to that proposition. *Matter of F–,* 8 I&N Dec. at 253 (explaining that, although "familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court," the "presumption of regularity or of jurisdiction may be overcome by extrinsic evidence or by the record itself").

Commenters' statements that the Departments' interpretation of "conviction" runs contrary to Congress's intent in defining the term are similarly misplaced. As explained by the Attorney General, in enacting section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)), Congress made clear that immigration consequences should flow from the original determination of guilt. *Matter of Thomas and Thompson,* 27 I&N Dec. at 682 (describing subsequent case law analyzing Congress's intent in enacting a definition for conviction). To the extent that commenters relied on *Matter of Cota-Vargas,* 23 I&N Dec. 849, the Attorney General expressly overruled that decision and explained that Congress did intend to clarify the definition of "conviction" for immigration purposes. *Matter of Thomas and Thompson,* 27 I&N Dec. at 679, 682.

Regarding commenters' concerns about the creation of a rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence, the Departments reiterate that this is merely a presumption. Individuals will be able to overcome the presumption by providing evidence that the modification, clarification, or vacatur was sought for genuine substantive or procedural reasons. As noted in the NPRM, the purpose of this presumption is to promote finality in immigration proceedings by encouraging individuals to pursue legitimate concerns regarding the validity of prior convictions. 84 FR at 69656.

The Departments disagree that creating a rebuttable presumption is unlawful under *Padilla* v. *Kentucky,* 559 U.S. 356. In *Padilla,* the Supreme Court held that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. *Id.* at 374. The rule does not affect this right, and noncitizen defendants continue to retain this right in criminal proceedings. Moreover, if a noncitizen

defendant is not properly apprised of the immigration consequences of a guilty plea, that individual continues to have the right to pursue the necessary action to address that error through the criminal justice system. Similarly, an individual whose Sixth Amendment rights were determined to have been violated in contravention of *Padilla* would be able to present this evidence in immigration proceedings and, if the evidence is sufficient, overcome the presumption that the individual was seeking a modification, clarification, or vacatur for immigration purposes.

Regarding commenters' assertions that State and Federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings, the Departments disagree. Administration and enforcement of the nation's immigration laws as written by Congress are entirely within the purview of the Executive Branch, specifically the Attorney General and the Secretary. *See* INA 103 (8 U.S.C. 1103). The Attorney General and the Secretary are granted discretion and authority to determine the manner in which to administer and enforce the immigration laws. *Id.* At the same time, this rule will not have any bearing on how States or other jurisdictions implement their criminal justice system because, as explained, any post-conviction relief remains valid for all other purposes.

b. Violation of International Law

*Comment:* Numerous commenters alleged that the proposed rule violates the United States' obligations to protect refugees and asylum seekers under international law, including obligations flowing from the Protocol relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 ("the Protocol" or "the 1967 Protocol"), which incorporates Articles 2 to 34 of the 1951 Convention relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6233, 6259–76 ("the Refugee Convention"). Commenters stated that, by virtue of signing the Protocol, the United States is bound to create refugee laws that comply with the Protocol. Commenters asserted that the current laws, regulations, and processes governing asylum adjudications are already exceedingly harsh and are not compliant with international obligations. Commenters claimed that, rather than working to better align the United States with international obligations, the proposed rule's new categorical bars to asylum violate both the language and spirit of the Refugee Convention.

Commenters speculated that the proposed rule will violate the principle of non-refoulement, as described in Article 33(1) of the Refugee Convention, which requires that "[n]o contracting state shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Commenters noted that, in considering non-refoulement, the United States is obligated to ensure a heightened consideration to children. Commenters also claimed that the exception to refugee protection contained in Article 33(2) of the Refugee Convention [10] does not affect non-refoulement obligations. Commenters also outlined the United States' obligations to protect migrants, irrespective of migration status, as outlined in the Universal Declaration of Human Rights and other human rights instruments. Commenters stated that to comply with these protection obligations, the United States must respond to the protection needs of migrants, with a particular duty of care for migrants in vulnerable situations.

Commenters also asserted that the proposed rule violates the United States' obligations under customary international law. These commenters cited Article III of the U.S. Constitution and *Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 729 (2004), in asserting that customary international law is recognized as and must be applied as U.S. law. Commenters stated that, unlike treaty law, customary international law cannot be derogated by later legislation and remains in full force at all times. Commenters claimed that even good faith efforts by States to change a rule are violations of customary international law until the rule has been changed by a consensus of States through *opinio juris* and state practice. Despite this summary of customary international law, these commenters did not specify how the proposed rule violates customary international law.

Other commenters averred that the proposed rule violates international law by expanding the definition of a "particularly serious crime" beyond the parameters of the term as defined by the United Nations High Commissioner for

---

[10] Article 33(2) of the Refugee Convention provides: "The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

IFR_AR_000343

Refugees ("UNHCR") by rendering nearly all criminal convictions bars to asylum. Commenters recognized that Article 33(2) of the Refugee Convention allows states to exclude or expel individuals from refugee protection if they have been "convicted by a final judgment of a particularly serious crime" and "constitute[] a danger to the community of that country." However, commenters asserted that this clause is intended only for "extreme cases," in which the particularly serious crime is a "capital crime or a very grave punishable act." Commenters cited UNHCR's statement that the crime "must belong to the gravest category" and that the individual must "become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Again citing UNHCR, commenters further asserted that this exception does not include less extreme crimes such as "petty theft or the possession for personal use of illicit narcotic substances."

Commenters also expressed concern that the proposed rule's categorical bars do not allow for an individualized analysis as to whether an individual who has been convicted of a particularly serious crime also presents a danger to the community. Commenters noted that, in the proposed rule, the Departments cited the need for increased efficiency as a justification for creating these additional bars. However, commenters responded that an individualized determination is exactly what is required by the Refugee Convention. Specifically, commenters claimed that the Departments ignored UNHCR guidelines,[11] which require not only a conviction for a particularly serious crime but also a determination that the individual constitutes a danger to the community of the country of refuge. Commenters averred that a conviction, without more, does not make an individual a present or future danger to the community. Commenters accordingly asserted that the Refugee Convention's "particularly serious crime" bar should apply only after a determination that an individual was convicted of a particularly serious crime and a separate assessment demonstrates that he or she is a present or future danger.

In addition, commenters alleged that the Act, in combination with subsequent agency interpretations, have already expanded the term "particularly serious crime" far beyond its contemplated definition by creating the categorical "particularly serious crime" bar that incorporates the aggravated felony definition. Similarly, commenters stated that adjudicators already have overly broad discretion to deny asylum based on alleged criminal conduct. These commenters claimed that the proposed rule would cause the United States to further depart from its international obligations by creating additional bars without consideration of other factors, such as dangerousness. Commenters alleged that, in justifying the proposed rule, the Departments improperly cited the "serious non-political crime" bar that applies only to conduct that occurred outside the United States.

In addition to these alleged violations of international law, commenters also asserted that the Departments' emphasis on the discretionary nature of asylum violates U.S. treaty obligations, congressional intent, and case law. Commenters noted that, although a refugee seeking protection in the United States does not always have a claim to mandatory protection, Congress's intent, in enacting the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("the Refugee Act"), was to expand the availability of refugee protection and bring the United States into compliance with its obligations under the 1967 Protocol. Commenters alleged that the proposed rule does the opposite by providing seven categorical bars to asylum and, as a result, violates the spirit and intent of the Refugee Act.

Commenters alleged that the Departments' reliance on the Attorney General's discretion to enact the proposed changes is ultra vires because the Attorney General, even in his discretion, may not violate domestic law, international treaties, or fundamental human rights. Specifically, commenters averred that the Attorney General's discretion is limited by the criteria in sections 208(b) and (d) of the Act (8 U.S.C. 1158(b) and (d)) as well as the legislative history regarding these sections, which, according to the commenters, clearly incorporate international law and legal norms. Commenters stated, moreover, that where the United States is a party to a treaty, any decision to abrogate the treaty must be clearly expressed by Congress.

One commenter expressed concern with the Departments' interpretation and reliance on Article 34 of the Refugee Convention, which provides that parties "shall as far as possible facilitate the assimilation and naturalization of refugees." This commenter criticized the Departments' analysis regarding the availability of alternative relief for individuals barred from asylum under the proposed rule. Specifically, the commenter noted that, although Article 34 requires the United States only to make efforts to naturalize refugees, not to naturalize all refugees, this does not mean that the United States then has the discretion to limit access to the asylum system in the first place.

*Response:* As explained in the NPRM, this rule is consistent with the United States' obligations as a party to the 1967 Protocol, which incorporates Articles 2 through 34 of the 1951 Refugee Convention.[12] This rule is also consistent with U.S. obligations under Article 3 of the CAT, as implemented in the immigration regulations pursuant to the implementing legislation.

As an initial matter, the rule affects eligibility for asylum but does not place any additional limitations on statutory withholding of removal or protection under the CAT regulations. The United States implemented the non-refoulement provision of Article 33(1) of the Refugee Convention through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement provision of Article 3 of the CAT through the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 429, 440–41 (1987); *Matter of C-T-L–,* 25 I&N Dec. 341 (BIA 2010) (applying section 241(b)(3)); *see also* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822; 8 CFR 208.16 through 208.18; 1208.16 through 1208.18. The Supreme Court has explained that asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34," which provides that contracting States "'shall as far as possible facilitate the assimilation and naturalization of refugees.'" *Cardoza-Fonseca,* 480 U.S. at 441. Article 34 "is

---

[11] Commenters cited paragraph 154 the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees.

[12] The Departments also note that neither of these treaties is self-executing, and that they are therefore not directly enforceable in U.S. law except to the extent that they have been implemented by domestic legislation. *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (CAT "was not self-executing"); *see also INS* v. *Stevic,* 467 U.S. 407, 428 n.22 (1984) ("Article 34 merely called on nations to facilitate the admission of refugees to the extent possible; the language of Article 34 was precatory and not self-executing.").

precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible.'' *Id.*

Because the rule does not affect statutory withholding of removal or CAT protection, the proposed rule is consistent with the non-refoulement provisions of the 1951 Refugee Convention, the 1967 Protocol, and the CAT. *See Matter of R–S–C–,* 869 F.3d at 1188 & n.11 (explaining that ''the Refugee Convention's non-refoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution— is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016); *Maldonado* v. *Lynch,* 786 F.3d 1155, 1162 (9th Cir. 2015) (explaining that Article 3 of the CAT, which sets out the non-refoulement obligations of parties, was implemented in the United States by FARRA and its implementing regulations).

The rule does not affect the withholding of removal process or standards. INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16, 1208.16. An alien who can demonstrate that he or she would more likely than not face persecution on account of a protected ground or torture may qualify for statutory withholding of removal or CAT protection. Therefore, because individuals who may be barred from asylum by the rule remain eligible to seek statutory withholding of removal and CAT protection, the rule does not violate the principle of non-refoulement. *Cf. Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) (discussing the distinction between asylum and withholding of removal and explaining that ''withholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood'').

Commenters asserted, without support, that the United States must respond to the needs of migrants to comply with the 1948 Universal Declaration of Human Rights. *See* Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948) (''UDHR''). The UDHR is a non-binding human rights instrument, not an international agreement, and thus it does not impose legal obligations on the United States. *Alvarez-Machain,* 542 U.S. at 728, 734–35 (citing John P. Humphrey, The U.N. Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39, 50 (Evan Luard ed., 1967) (quoting Eleanor Roosevelt as stating that the Declaration is '''a statement of principles * * * setting up a common standard of achievement for all peoples and all nations' and 'not a treaty or international agreement * * * impos[ing] legal obligations.' '')). In any case, although the UDHR proclaims the right of ''[e]veryone'' to ''seek and to enjoy'' asylum, UDHR Art. 14(1), it does not purport to state specific standards for establishing asylum eligibility, and it certainly cannot be read to impose an obligation on the United States to grant asylum to ''everyone,'' *see id.,* or to prevent the Attorney General and the Secretary from exercising their discretion granted by the INA, consistent with U.S. obligations under international law as implemented in domestic law. *See* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol* 3 (Jan. 26, 2007), *https://www.unhcr.org/4d9486929.pdf* (''The principle of *non-refoulement* as provided for in Article 33(1) of the 1951 Convention does not, as such, entail a right of the individual to be granted asylum in a particular State.''). The United States' overall response to the needs of migrants extends beyond the scope of this rulemaking.

To the extent that commenters made blanket assertions that the rule violates customary international law or other international documents and statements of principles, the commenters ignore the fact that the rule leaves the requirements for an ultimate grant of statutory withholding of removal or CAT withholding or deferral of removal unchanged.

As explained in additional detail in section II.C.2.a.i of this preamble, the rule did not designate additional particularly serious crimes in the regulatory text. Because the Departments have the independent authority for these changes under INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)), the Departments need not further respond to comments regarding the current ''particularly serious crime'' bar, as those comments extend beyond the scope of this rulemaking. Nevertheless, commenters' assertions that the proposed rule improperly and unlawfully expands the definition of ''particularly serious crime'' beyond the definition provided by UNHCR are misguided. UNHCR's interpretations of or recommendations regarding the Refugee Convention and the Protocol, such as set forth in the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva 1992) (reissued Feb. 2019), are ''not binding on the Attorney General, the BIA, or United States courts.'' *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). ''Indeed, the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.' '' *Id.* at 427–28. To the extent such guidance ''may be a useful interpretative aid,'' *id.* at 427, it would apply to statutory withholding of removal—which is the protection that implements Article 33 of the Convention—and which, as discussed above, this rule does not affect.

Commenters also relied on the advisory opinion UNHCR Handbook to assert that an adjudicator must make an individualized assessment as to whether an asylum applicant presents or will present a danger to the community. Again, as noted above, the Departments clarify in section II.C.2.a.i that the rule did not designate additional particularly serious crimes in the regulatory text. Regardless, the Departments have longstanding authority under U.S. law to create asylum-related conditions without an individualized consideration of present or future danger to the community.[13] For example, in 2000, Attorney General Janet Reno limited asylum eligibility pursuant to the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) based on ''a fundamental change in circumstances'' or the ability of an alien to reasonably relocate within the alien's country of nationality or last habitual residence, even where that alien had established he or she had suffered past persecution. *See* Asylum Procedures, 65 FR 76121, 76133–36 (Dec. 6, 2000) (adding 8 CFR 208.13(b)(1)(i)–(iii)). As outlined in the NPRM, the Attorney General and Congress have previously established several mandatory bars to asylum eligibility. 84 FR at 69641. The Departments note that the adjudicator must still make an individualized determination as to whether a given offense falls into the category of conduct

---

[13] In addition, even if this rulemaking did enact regulatory provisions requiring an interpretation of particularly serious crimes, U.S. law has long held that, once an alien is found to have been convicted of a particularly serious crime, there is no need for a separate determination whether he or she is a danger to the community. *See Matter of N–A–M–,* 24 I&N Dec. 336, 343 (BIA 2007), *aff'd, N–A–M–* v. *Holder,* 587 F.3d 1052 (10th Cir. 2009), *cert. denied,* 562 U.S. 1141 (2011); *Matter of Q–T–M–T–,* 21 I&N Dec. 639, 646–47 (BIA 1996); *Matter of K–,* 20 I&N Dec. 418, 423–24 (BIA 1991); *Matter of Carballe,* 19 I&N Dec. 357, 360 (BIA 1986).

IFR_AR_000345

contemplated by an individual bar. *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009). In addition, as explained above, the UNHCR Handbook is not binding on the Attorney General, the BIA, or United States courts, although it "may be a useful interpretative aid." *Aguirre-Aguirre,* 526 U.S. at 427.

The Departments disagree with commenters' assertions that, by relying on the discretionary nature of asylum, the rule violates U.S. treaty obligations, congressional intent, and case law. As explained above, because the rule does not alter eligibility for withholding of removal or CAT protection, the rule does not violate U.S. treaty obligations and ensures continued compliance with U.S. non-refoulement obligations. Additionally, Congress's intent in enacting the Refugee Act was "a desire to revise and regularize the procedures governing the admission of refugees into the United States." *Stevic,* 467 U.S. at 425. Rather than expanding the availability of refugee protection, as asserted by commenters, the Refugee Act's definition of refugee does "not create a new and expanded means of entry, but instead regularizes and formalizes the policies and practices that have been followed in recent years." *Id.* at 426 (quoting H.R. Rep. No. 96–608, at 10 (1979)). Moreover, case law supports the Attorney General's authority under U.S. law to limit asylum. *See Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding regulatory implementation of the firm resettlement bar); *see also Komarenko,* 35 F.3d at 436 (upholding regulatory implementation of the "particularly serious crime" bar).

Regarding the Attorney General's and the Secretary's discretion to enact the rule, the Departments disagree that the rule is ultra vires because, as explained above, Congress has granted the Attorney General and the Secretary the authority to limit eligibility for asylum. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Moreover, the rule does not violate applicable obligations under domestic law or international treaties for the reasons discussed above.

3. Concerns With Categorical Bars

In addition to comments generally opposing the seven bars proposed by the NPRM, commenters also raised concerns related to specific bars.

a. Felonies

*Comment:* Commenters opposed the proposed limitation on asylum

eligibility for individuals who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). Commenters generally stated that the proposed limitation was overbroad and that the Departments failed to support their stated position that offenses carrying potential sentences of more than one year correlate to recidivism and dangerousness. Commenters asserted that the proposed limitation would "sweep in" minor conduct, including some State misdemeanors.

Commenters also opposed the Departments' proposed definition of the term "felony," *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), as any crime defined as a felony by the relevant jurisdiction of conviction, or any crime punishable by more than one year imprisonment. Commenters objected to both portions of the proposed definition.

Specifically, commenters opposed the definition's reliance on the maximum possible sentence of an offense over the actual sentence imposed. Commenters opposed the Departments' reasoning for that determination. *See* 84 FR at 69646 ("[T]he sentence actually imposed often depends on factors such as offender characteristics that may operate to reduce a sentence but do not diminish the gravity of the crime." (alteration and quotation marks omitted)). Commenters stated that imposing a sentence requires careful consideration of numerous factors, including any mitigating circumstances, and that the proposed definition dismissed careful sentencing considerations by prosecutors and criminal sentencing courts, which are charged with considering public safety. Commenters stated that the actual sentence imposed is a more faithful and accurate measure of whether an individual's conduct was "particularly serious" and that not every offense that would be a felony under the proposed definition is or should be considered a "particularly serious crime." Commenters also stated that not every alien convicted of a crime that is punishable by more than one year of imprisonment is a danger to the community who should be barred from asylum eligibility.

Commenters also opposed the proposal that the definition of felony include any offense that is labeled as a felony in its respective jurisdiction, regardless of the maximum term of imprisonment or other factors. Commenters stated that, with certain types of offenses, the difference between misdemeanors and felonies does not necessarily involve aggravated conduct

or heightened risk to the public but rather factual elements, such as the alleged dollar value of a stolen good. Accordingly, commenters stated, it would be inappropriate to categorically bar eligibility for asylum on this basis.

Commenters asserted that a categorical bar against all felonies, as defined by the NPRM, would result in drastic inconsistencies and unfair results and would undermine the Departments' stated goal of uniformity and consistency. Commenters stated that the proposed definition would improperly treat a broad range of offenses as equally severe. Additionally, commenters stated, a broad range of criminal conduct encompassing varying degrees of severity or dangerousness could be charged under the same disqualifying offense.

At the same time, commenters suggested that identical conduct in different States (or other jurisdictions) would have different consequences on eligibility for asylum, depending on whether the jurisdiction labeled the crime as a felony or set a maximum penalty of over one year of imprisonment. As an example, one commenter asserted that felony theft threshold amounts among the States vary considerably, ranging from $200 to $2,500 or more, but noted that the proposed rule would treat these varying offenses equally under the proposed definition. The commenter stated that the definition was overbroad and did not exercise the "special caution" that should be taken with asylum cases given the high stakes involved. Other commenters stated that the desire for consistency should not be elevated over "legitimate concerns of fairness and accurate assessments of dangerousness."

One commenter opined that the proposed limitation would ignore the federalist nature of the U.S. criminal justice system, where each State has its own criminal code and makes individual determinations about which conduct should be criminalized, and how.

Commenters stated that the "harsh inequities" created by the rule would dissuade aliens who are fleeing persecution to plead guilty to misdemeanor charges that could carry a one-year sentence, even if the plea agreement would not include any incarceration, which could in turn have a host of unintended collateral consequences in the criminal justice system. Numerous commenters offered specific examples of State laws that they asserted would improperly be considered disqualifying offenses under the proposed limitation and accompanying definition. For example,

commenters stated that some States, such as Massachusetts, define misdemeanors, which may carry a sentence of one year or more in a "house of correction," much more broadly than many other States. Commenters also listed statutes from New York,[14] Maryland,[15] and several other States that they believed should not qualify as a basis for limiting eligibility to asylum.

*Response:* The Departments disagree with commenters' opposition to the inclusion of any felony conviction as a bar to asylum eligibility and to the corresponding proposed definition of "felony" for the purposes of determining whether the bar applies. As an initial matter, to the extent commenters expressed concern that the inclusion of any felony is an inaccurate measure of whether an individual's conduct was "particularly serious" or that not every offense that would be a felony under the proposed definition is or should be considered a "particularly serious crime," the Departments need not address these concerns in detail because this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[16] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

---

[14] *See* N.Y.P.L. 145.05. (criminalizing the causing of $250 worth of property damage); N.Y.P.L. 275.34 (criminalizing the recording of a movie in a theater two times); N.Y.P.L. 220.06 (criminalizing simple possession of more than half an ounce of a narcotic).

[15] *See* MD. CODE, ALCO. BEV. 6–307; MD. CODE, ALCO. BEV. 6–402 (criminalizing the sale of alcohol to a visibly intoxicated person with a sentence of up to two years); MD. CODE, CRIM. LAW 3–804 (criminalizing the use of a telephone to make a single anonymous phone call to annoy or embarrass another person with a sentence of up to three years); MD. CODE, CRIM. LAW 4–101 (criminalizing the simple possession of a "dangerous weapon," including a utility knife, on one's person, with a sentence of up to three years); MD. CODE, CRIM. LAW 6–105 (criminalizing the burning of property under $1,000 with a sentence of up to 18 months); MD. CODE, CRIM. LAW 6–205 (criminalizing the unauthorized entry into a dwelling with a sentence of up to three years); MD. CODE, CRIM. LAW 7–203 (criminalizing the temporary use of another person's vehicle without his or her consent (*i.e.*, "joyriding") with a sentence of up to four years); MD. CODE, TAX–GEN. 13–1015 (criminalizing the import, sale or transportation of unstamped cigarettes within the state of Maryland with a sentence of up to two years).

[16] The proposed rule's preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of all felonies as bars to asylum eligibility. *Compare* 84 FR at 69645 (explaining that the Attorney General and the Secretary could reasonably exercise their discretion to "classify felony offenses as particularly serious crimes for purposes of 8 U.S.C.

As explained above, the Departments reiterate the explanation in the NPRM that the inclusion of any felony conviction as a bar to asylum eligibility is intended to avoid inconsistencies, inefficiencies, and anomalous results that often follow from the application of the categorical approach. 84 FR at 69645–46. In addition, the felony limitation on eligibility for asylum is consistent with other losses of benefits for felony convictions. *See* 84 FR at 69647 (explaining that treating a felony conviction as disqualifying for purposes of obtaining the discretionary benefit of asylum would be consistent with the disabilities arising from felony convictions in other contexts and would reflect the "serious social costs of such crimes").

The Departments disagree with commenters' concerns that the felony limitation and related definition of "felony" would result in drastic inconsistencies and unfair results, undermining the stated purpose of the rule. As described in the NPRM, the existing reliance on the categorical approach to determine the immigration consequences of convictions has far too often resulted in seemingly inconsistent or anomalous results. 84 FR at 69645–46.[17] The rule will significantly help to curtail inconsistencies and confusion over what offenses may be disqualifying for purposes of asylum, as all aliens who have been convicted of the same level of offense will receive the same treatment during asylum proceedings.

The Departments understand that the States have different criminal codes with different definitions of crimes, levels of offense, and other differences. With respect to commenters' federalism concerns, Congress has plenary authority over aliens, and that authority has been delegated the Departments. *See Zadvydas* v. *Davis,* 533 U.S. 678, 695

---

1158(b)(2)(B)(ii)"), *with id.* at 69647 (explaining that, in addition to their authority under section 208(b)(2)(C), "the Attorney General and the Secretary" further propose relying on their respective authorities under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to make all felony convictions disqualifying for purposes of asylum eligibility"). The regulatory text, however, does not actually designate any additional offenses as "particularly serious crimes." Instead, the discussion of particularly serious crimes helps illustrate how issuing the new bars pursuant to section 208(b)(2)(C) is "consistent with" the rest of the INA because the new bars—similar to the "particularly serious crime" bar—exclude from eligibility those aliens whose conduct demonstrates that they are dangerous to the United States or otherwise do not merit eligibility for asylum. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

[17] Further discussion of the problems with the categorical approach is set out above in section II.C.2.a.i.

(2001) (citing *INS* v. *Chadha,* 462 U.S. 919, 941–42 (1983), for the proposition that Congress must choose "a constitutionally permissible means of implementing" that power); INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Additionally, as stated in the NPRM and above in section II.C.2.A.ii, the categorical approach is overly complex, leads to inconsistent treatment of aliens who have been convicted of serious criminal offenses, and presents a strain on judicial and administrative resources. Although some aliens who have been convicted of serious criminal offenses are appropriately barred from discretionary benefits under the Act, such as asylum, others are not. *See, e.g., Lowe,* 920 F.3d at 420 (Thapar, J., concurring) ("[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent."). This rule will provide certainty by establishing a bright-line rule that is both easy to understand and will apply uniformly to all applicants who have been convicted of felonies, which the Departments believe to be significant offenses. Aliens are being given advance notice through the NPRM, which was published on December 19, 2019, 84 FR at 69646, and by this publication of the final rule, that any felony conviction will be a bar to eligibility for the discretionary benefit of asylum. *Cf.* 8 CFR 208.3(c)(6)(vi)(A), 8 CFR 1208.3(c)(6)(vi)(A) (proposed) (barring aliens who have been convicted of felonies "on or after [the effective date").

The Departments disagree that the proposed definition of "felony" implicates federalism concerns by defining the term "felony," as it is to be used in this context, differently from States' (or other jurisdictions') definitions of felonies. In fact, the Departments believe that the felony definition is consistent with principles of federalism by primarily deferring to each State's choice of what offenses to define as felonies. Similarly, the alternative definition capturing any crime punishable by more than one year of imprisonment is consistent with the Federal definition and many States' definitions of "felony." *See, e.g.,* 18 U.S.C. 3559 (defining "felonies" as offenses with a maximum term of imprisonment of more than one year); 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws).

Congress has delegated to the Departments, not the States or other jurisdictions, the authority to set additional limitations on eligibility for

IFR_AR_000347

asylum, and the Departments have reasonably determined that the offenses encompassed within the definition should be disqualifying offenses. This rule will not have any direct bearing on how States or other jurisdictions implement their criminal justice system.

With respect to commenters' concerns that the rule will affect how and when aliens enter into plea deals for criminal offenses, such pleadings take place during criminal proceedings, not immigration proceedings. Although asylum adjudications may rely on the information derived from criminal proceedings, the Departments believe that any effects that the rule might have outside of the immigration context are beyond the context of this rulemaking. *Cf. San Francisco* v. *USCIS,* 944 F.3d 773, 804 (9th Cir. 2019) ("Any effects [of a DHS rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). Additionally, the Departments believe that this rule would actually provide more clarity in the pleading process because the rule sets forth straightforward guidelines about what offenses would and would not be disqualifying offenses for purposes of asylum. In turn, criminal defense attorneys will be better able to advise their clients on the predictable immigration consequences of a conviction. *Cf. Padilla,* 559 U.S. at 357 ("There will, however, undoubtedly be numerous situations in which the deportation consequences of a plea are unclear. In those cases, a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry adverse immigration consequences. But when the deportation consequence is truly clear, as it was here, the duty to give correct advice is equally clear.").

Second, regarding the commenters' concerns with the definition for the term "felony," *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), the Departments disagree that the definition should look to the actual sentence imposed instead of the maximum possible sentence. As noted in the NPRM, consideration of an offense's maximum possible sentence is generally consistent with the way other Federal laws define felonies. *See* 84 FR at 69646; *see also, e.g.,* 5 U.S.C. 7313(b) ("For the purposes of this section, 'felony' means any offense for which imprisonment is authorized for a term exceeding one year."); *cf.* U.S.S.G. 2L1.2 cmt. n.2 ("'Felony' means any federal, state, or local offense punishable by imprisonment for a term exceeding one year."). The Model Penal Code and most States likewise define a felony as a crime with a possible sentence in

"excess of one year." Model Penal Code § 1.04(2); *see also* 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws).

In addition, as recognized by the commenters, sentencing courts and prosecutors consider a number of factors when imposing a sentence, many of which have no bearing on the seriousness of the crime committed. Specifically, in *Matter of N–A–M–,* 24 I&N Dec. 336 (BIA 2007), the BIA explained that the sentence imposed might be based on conduct "subsequent and unrelated to the commission of the offense, such as cooperation with law enforcement authorities," or "offender characteristics." *Id.* at 343 (determining that the respondent had been convicted of a particularly serious crime even where no term of imprisonment was imposed); *see also Holloway* v. *Att'y Gen. U.S.,* 948 F.3d 164, 175 (3d Cir. 2020) ("[T]he maximum penalty that may be imposed often reveals how the legislature views an offense. Put succinctly, the maximum possible punishment is certainly probative of a misdemeanor's seriousness." (footnote and internal quotation marks omitted)). Such considerations are necessarily unrelated to the seriousness of the actual crime, and the sentence imposed is "not the most accurate or salient factor to consider in determining the seriousness of an offense." *Matter of N–A–M–,* 24 I&N Dec. at 343; *see also Holloway,* 948 F.3d at 175 n.12 (stating that the penalty imposed may be more reflective of how a sentencing judge viewed an offender than the offense itself).

The Departments therefore reject recommendations to consider the sentence imposed when determining whether a conviction is a felony, as opposed to the NPRM's proposal to consider the maximum possible sentence associated with a given offense. The Departments are persuaded by the reasoning of the U.S. Court of Appeals for the Third Circuit, which recognized that, in cases where the analysis centers around an offense, and not the offender (as in the "particularly serious crime" analysis), "the maximum punishment is a more appropriate data point because it provides insight into how a state legislature views a crime— not how a sentencing judge views an individual." *Holloway,* 948 F.3d at 175 n.12. Thus, the Departments continue to believe that lengthier maximum sentences are associated with more serious offenses that appropriately should have consequences when determining asylum eligibility. 84 FR at 69646.

Furthermore, as noted above, the Departments are acting within their designated authority pursuant to section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum) to designate felonies, as defined in the rule, as disqualifying offenses for purposes of asylum eligibility. *See* section II.C.2.a.i. Assuming, arguendo, that the commenters are correct that felonies as defined by the final rule do not necessarily reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular dangerousness threshold. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of felonies as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars on eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Indeed, by expressly including "serious nonpolitical crimes" as a statutory basis for ineligibility, Congress indicated that "particularly serious crimes" need not be the only crime-based bar on asylum

eligibility. And by further excluding from eligibility aliens who engage in certain harmful conduct, regardless of whether those aliens pose a danger to the United States, *see* INA 208(b)(2)(A)(i) (persecutor bar) (8 U.S.C. 1158(b)(2)(A)(i)), Congress indicated that "dangerousness" need not be the only criterion by which eligibility for asylum is to be determined.

b. Alien Smuggling or Harboring

*Comment:* Commenters raised several concerns with respect to the NPRM's proposed bar to asylum eligibility for aliens convicted of harboring or smuggling offenses under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed).

First, commenters asserted that the NPRM improperly broadened the existing statutory bar to asylum for many individuals who have been convicted of alien smuggling or harboring under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). Specifically, commenters noted that such convictions already constitute aggravated felonies under the Act that would bar an alien from eligibility for asylum,[18] "except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual)." *See* INA 101(a)(43)(N) (8 U.S.C. 1101(a)(43)(N)). Commenters opposed the NPRM, asserting that it improperly proposed removing the limited exception to this bar and imposing a blanket bar against anybody convicted of such an offense. Commenters asserted that adjudicators should have the discretion to decide whether individuals convicted of such offenses, who are not already statutorily precluded because their convictions are not considered aggravated felonies, should be barred from asylum.

Commenters also asserted that the proposed limitation undermined congressional intent. Specifically, commenters stated that Congress intended to make asylum available to those present in the United States, without regard to how they entered, and would not have intended to bar from asylum first-time offenders who were convicted for helping their family

members escape persecution. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)) (providing that an alien "who arrives in the United States (whether or not at a designated port of arrival * * *)" may apply for asylum in accordance with the rest of the section). Commenters stated that this congressional intent is demonstrated by the fact that Congress did not consider such offenses to be aggravated felonies and thus, in turn, particularly serious crimes that would bar asylum eligibility.

Commenters also asserted that the proposed limitation undermined UNHCR's recognition that aliens must sometimes commit crimes "as a means of, or concomitant with, escape from the country where persecution was feared," and that the fear of persecution should be considered a mitigating factor when considering such convictions. However, the commenters did not elaborate on how this assertion pertains to aliens who commit crimes concomitant with another person's escape from a country where persecution may be feared.

Commenters asserted that the Departments failed to properly explain how all smuggling and harboring convictions under section 274 of the Act (8 U.S.C. 1324) reflected a danger to the community that should result in a categorical bar to asylum.

Numerous commenters stated that they opposed the proposed limitation because it unfairly penalized asylum seekers for helping their family members, such as minor children and spouses, to come to the United States for any reason, including to escape from persecutors, traffickers, or abusers. Commenters stated that the proposed bar would force family members to choose between their loved ones remaining in danger in their countries of origin and themselves or their family being barred from asylum and returned to their persecutors. At least one commenter stated that the Departments illogically concluded that the hazard posed to a child or spouse being smuggled is greater than the harm the same child or spouse would face in the country of origin.

At least one commenter suggested that children in particular would be harmed by the proposed bar because children are often derivatives on their parents' asylum application and may have nobody else to care for them in the United States if their parents are deported. Commenters also stated that asylum seekers often travel to the United States in family units and that some types of persecution are "familial by nature, culture, and law." Commenters suggested that the proposed limitation would undermine

the sanctity of the family and eliminate family reunification options, which would result in permanent separation of families.

Commenters asserted that survivors of domestic violence who are forced to flee to the United States without their children should not be barred from asylum for trying to later reunite the family.

Commenters also objected to the Departments' assertion that families could present themselves at the United States border, stating that this may not be possible due to recently implemented policies and regulations. Some commenters asserted that the proposed bar "is particularly insidious" in light of documents [19] that they claimed revealed efforts to utilize smuggling prosecutions against parents and caregivers as part of a strategy to deter families from seeking asylum in the United States and that the NPRM proposed an expansion of those efforts.

At least one commenter stated that the proposed bar, in addition to the above-described policies, would harm good Samaritans who provide humanitarian aid to migrants traversing deserts with harsh conditions. At least one commenter expressed concerns that existing prohibitions against harboring, which include "transportation," could be applied to punish those who engage in routine conduct like driving someone to work or to a doctor's appointment. *See* INA 274(a)(1)(A)(iii) (8 U.S.C. 1324(a)(1)(A)(iii)) (establishing criminal penalties for an individual who "conceals, harbors, or shields from detection [or attempts to do so], [an] alien in any place, including * * * any means of transportation").

Commenters also generally asserted that the proposed limitation would multiply the harms that asylum seekers face in coming to the United States.

*Response:* The Departments disagree with comments suggesting that the additional limitation on eligibility for asylum for aliens who have been convicted of bringing in or harboring certain aliens pursuant to sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) is inappropriate or unlawful.

The Departments reject commenters' concerns that the additional limitation is an unlawful expansion of existing bars to asylum eligibility set forth at

---

[18] A conviction for an aggravated felony is automatically considered a conviction for a particularly serious crime that would bar an alien from asylum eligibility under section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)). INA 208(b)(2)(B)(i) (8 U.S.C. 1158(b)(2)(B)(i)).

[19] Commenters cited Ryan Devereaux, *Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers,* The Intercept (Apr. 29, 2019), *https:// theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/* (describing how, in May 2017, DHS allegedly set out to target parents and family members of unaccompanied minors for prosecution).

IFR_AR_000349

section 101(a)(43)(N) of the Act (8 U.S.C. 1101(a)(43)(N)). It is within the Departments' delegated authority to set forth additional limitations on asylum eligibility. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). In other words, the Departments may expand upon the existing grounds for ineligibility and the disqualifying offenses, even when those or similar grounds have already been assigned immigration consequences, and the Departments have done so in this rulemaking. *Cf. Hawaii,* 138 S. Ct. 2411–12 (holding that Congress "did not implicitly foreclose * * * tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA").

The Departments disagree with commenters who stated that adjudicators should have the discretion to determine whether aliens who have been convicted of offenses under sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) should be eligible for asylum. Convictions for such offenses are serious and harmful. As noted in the NPRM, even first-time alien smuggling offenses display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse. 84 FR at 69648. And as also noted in the NPRM, the Act already bars most individuals who have been convicted of this offense from asylum eligibility, thus demonstrating congressional recognition of the seriousness of such offenses. *Id.* at 69647. Accordingly, the Departments have concluded that no aliens who have been convicted of such offenses should merit the discretionary benefit of asylum.

The Departments disagree with commenters that an additional limitation on eligibility for aliens who have been convicted of alien smuggling or harboring offenses contravenes the "whether or not at a designated port of arrival" language in the asylum statute at section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)). The Departments stress that this additional limitation has no bearing on the asylum applicant's manner of entry; rather it involves the asylum applicant's conduct with respect to unlawful entry of others. Thus, the Departments do not further address these comments.

Comments concerning statements or guidance from UNHCR are misplaced. UNHCR's interpretations of or recommendations regarding the Refugee Convention and Refugee Protocol "may be a useful interpretative aid," but they are "not binding on the Attorney General, the BIA, or United States courts.'" *Aguirre-Aguirre,* 526 U.S. at 427. Indeed, as noted already, "the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Id.* at 427–28.

The Departments disagree with commenters who stated that the Departments failed to explain how all smuggling and harboring convictions reflected a danger to the community that should result in a categorical bar to asylum.[20] The Departments believe that they adequately explained their reasoning in the NPRM that such offenses place others, including children, in potentially hazardous situations that could result in injury or death, and that they reflect a flagrant disregard for immigration laws. As a result, those people who commit these offenses present a danger to the community. 84 FR at 69648.

Additionally, as stated above, the Departments have designated such alien smuggling or harboring offenses as discrete bases for ineligibility pursuant to the authority provided by section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum). Assuming, arguendo, that commenters are correct that the offenses designated by the rule do not accurately reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to the conditions or limitations meet a threshold of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by

regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of the alien smuggling and harboring offenses included in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). And, as explained previously, Congress's inclusion of statutory bars on eligibility for aliens who engage in certain harmful conduct or commit certain types of crimes that are not "particularly serious," *see* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)), demonstrates that the "dangerousness" associated with the conduct is not the sole criterion by which the Departments may consider whether an alien should be eligible for asylum.

The Departments disagree that this rule would undermine family values or particularly harm children. The Departments believe that the rule helps families and children by discouraging the dangerous practices of alien smuggling and harboring. The Departments disagree with commenters' assertions that current administrative policies or practices prevent families from presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

Finally, regarding commenters' concerns for good Samaritans, the Departments note again that the bar requires a conviction for it to apply in a particular case. As a result, an individual who leaves provisions or other assistance for individuals traversing the harsh terrain at the southern border would not be ineligible for asylum under this bar unless he or she is in fact prosecuted and convicted. As with the other bars, the Departments understand that the individual circumstances surrounding each offense will vary and that some cases may involve mitigating circumstances, but

---

[20] In addition, the Departments note that some commenters agreed with the Departments' determination regarding the dangerousness of these offenses. For example, one organization stated that "the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life."

the Departments find that in the context of asylum eligibility, adjudicators should not look behind a conviction to readjudicate an alien's criminal culpability. Although the individual circumstances behind an alien's prosecution may vary, the Departments have concluded that, to promote adjudicative efficiency, it is appropriate to provide a clear standard that defers to the original prosecutor's determination to pursue a conviction of the alien for his or her conduct, as well as the criminal court's existing determination of a reasonable doubt that the alien engaged in the conduct.

c. Illegal Reentry

*Comment:* Commenters specified several reasons for opposing the NPRM's proposed limitation on eligibility for asylum for aliens convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed). Under section 276(a) of the Act (8 U.S.C. 1326(a)), aliens who unlawfully reenter the United States after having been previously removed are subject to fines and to a term of imprisonment of two years or less. Section 276(b) of the Act (8 U.S.C. 1326(b)) describes certain aliens, such as those who have been removed after commission of an aggravated felony, who face significantly higher penalties for unlawfully reentering the United States after previously having been removed and authorizes sentences of imprisonment up to 20 years as possible penalties.

Some commenters asserted that the Departments improperly concluded that aliens who have been convicted of such offenses are per se dangers to the community, as recidivist offenders of the law, because the NPRM did not consider whether an alien's prior offenses were serious. *See* 84 FR at 69648.

Commenters asserted that the proposed limitation would violate Article 31(1) of the Refugee Convention, which generally prohibits imposing penalties based on a refugee's manner of entry or presence in the country. Commenters stated that this is a critical principle of the Convention because "it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge." Commenters stated that the NPRM did not sufficiently explain how the proposed limitation was consistent with the Convention.

Commenters also asserted that the proposed limitation undermined congressional intent and was not consistent with other provisions in the Act. Specifically, commenters stated that Congress, in accordance with international treaty obligations, has "clearly supported the right to claim asylum anywhere on the U.S. border or at a land, sea, or air port of entry" for almost 40 years. The commenters cited the Refugee Act, where, they stated, Congress authorized asylum claims by any foreign national "physically present in the United States or at a land border or port of entry." The commenters stated that Congress later expressly reaffirmed this position in enacting section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)), which states that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival * * *)" may apply for asylum. Commenters believed that this provision "reflected Congress's ongoing intent to comply with international law, as well as its recognition that allowing an applicant for refugee status to assert a claim for asylum at any point along a land border is a necessary component of essential refugee protections."

Commenters also asserted that the proposed limitation was inconsistent with the Act because it would treat all immigration violations as just as serious as those violations that should fall under the particularly serious crime bar, thus rendering meaningless the limiting language of "particularly serious crimes" in the statute. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)).

Commenters asserted that the proposed limitation was inconsistent with any of the other bars previously recognized by the BIA or the circuit courts because the crime of illegal reentry under section 276 of the Act (8 U.S.C. 1326) has no element of danger or violence to others and has no victim.

Commenters stated that the BIA and the circuit courts have also recognized that an alien's manner of entry should have little effect on eligibility for asylum. *See, e.g., Hussam F.* v. *Sessions,* 897 F.3d 707, 718 (6th Cir. 2018) (holding that it was an abuse of discretion to deny asylum as a matter of discretion when the only negative factor was the alien's "intentional failure to disclose that his passport was obtained in a non-traditional manner"); *Zuh* v. *Mukasey,* 547 F.3d 504, 511 n.4 (4th Cir. 2008) ("When an alien uses fraudulent documents to escape imminent capture or further persecution, courts and [immigration judges] may give this

factor little to no weight."); *Huang* v. *INS,* 436 F.3d 89, 100 (2d Cir. 2006) ("As with peripheral embellishments, if illegal manner of flight and entry are enough independently to support a denial of asylum, we can readily take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum. It follows that Wu's manner of entry, on the facts in this record, could not bear the weight given to it by the [immigration judge]."); *Mamouzian* v. *Ashcroft,* 390 F.3d 1129, 1138 (9th Cir. 2004) ("[I]n order to secure entry to the United States and to escape their persecutors, genuine refugees may lie to immigration officials and use false documentation."); *Matter of Pula,* 19 I&N Dec. at 473–74 (holding that the circumvention of the immigration laws is one factor for consideration).

Commenters stated that asylum seekers are often motivated to illegally reenter the United States after having been deported to seek protection from harm rather than for criminal purposes, and that individuals who legitimately fear returning to their countries of origin have been criminally prosecuted under section 276 of the Act (8 U.S.C. 1326). Commenters were concerned that the proposed bar would further criminalize vulnerable individuals fleeing persecution and would result in denial of meritorious claims for asylum. Commenters opined that such individuals should not be barred from asylum.

Commenters stated that the Departments did not take into consideration that trafficking victims may have reentered the United States without authorization "either because they were smuggled in by [a] trafficker, or because they were removed by the U.S., and then returned to find safety."

Commenters stated that "racial and ethnic disparity in the number of sentenced offenders is even more pronounced in the context of illegal reentry" and that "latinx immigrants are disproportionately impacted by over-prosecution of illegal reentry offenses and harsh sentencing of illegal reentry convictions."

Some commenters described anecdotes of "clients who have had to enter the United States without inspection due to cartel kidnappings, fears of being separated at the border, or misinformation by coyotes." One commenter stated that juveniles who were apprehended at the border and placed in Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") custody might request to return to their country

of origin due to "detention fatigue." The commenter stated that, upon return, these juveniles might face the same or new persecution, forcing them to flee once again.

One commenter stated that this proposed limitation was unnecessary because many convictions under section 276 of the Act (8 U.S.C. 1326) already qualify as aggravated felonies. INA 101(a)(43)(O) (8 U.S.C. 1101(a)(43)(O)) (providing that "an offense described in section 1325(a) [illegal entry] or 1326 of this title [illegal reentry] committed by an alien who was previously deported on the basis of an [aggravated felony as defined by section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43))]" is an aggravated felony). Additionally, commenters stated that the proposed limitation was unnecessary because individuals who are convicted under section 276 of the Act (8 U.S.C. 1326) are also subject to reinstatement of a prior order of removal under section 241(a)(5) of the Act (8 U.S.C. 1231(a)(5)), and, thus, are barred from applying for asylum if the prior order is reinstated. *See* INA 241(a)(5) (8 U.S.C. 1231(a)(5)) (stating that an alien whose "prior order of removal is reinstated * * * is not eligible and may not apply" for any relief under the INA); 8 CFR 1208.31(e), (g)(2), 1241.8(e). The commenters suggested that the Departments inappropriately expanded the bar to categorically exclude anyone convicted of illegal reentry.

Some commenters stated that the proposed limitation was improper because underlying removal orders that are the basis for an illegal reentry conviction are often incorrectly issued and do not withstand legal scrutiny.

Commenters expressed concern that individuals who attempt illegal reentry into the United States to flee persecution may have been previously removed from the United States without being aware of their right to apply for asylum. Commenters opined that such individuals "would not have knowingly abandoned their right." Commenters also stated that some individuals may have been prevented from seeking asylum during prior entries.

Commenters asserted that asylum seekers who illegally reenter could have been incorrectly found to lack a credible fear in prior credible fear interviews. Some commenters stated that asylum seekers with legitimate claims may have been previously removed because they were unable to establish eligibility for relief without adequate access to legal representation. Some commenters asserted that there are credible reports that DHS officers do not comply with requirements to inform individuals subject to expedited removal of their

rights or to refer those with a fear of return to asylum officers for credible fear screenings, even when requested, and that DHS officers have engaged in harassment or the spread of misinformation that interferes with individuals' abilities to pursue asylum. One commenter stated that there is a higher risk that credible fear interviews may result in erroneous denial because border patrol officers, not asylum officers, have been conducting asylum interviews. Commenters proposed that the illegal reentry bar to asylum eligibility would "essentially punish asylum seekers for the failure of DHS officers to follow the agency's own rules." Commenters stated that preserving discretion, rather than implementing a categorical bar, would ensure that meritorious asylum claims are heard and correct previous errors.

Some commenters stated that the Departments did not take into account that illegal reentry "may be the only possible option" for asylum applicants. Commenters asserted that "current U.S. violations of international and domestic law regarding access to territory" further intensified this proposition. Commenters stated that they believed that a number of the Executive Branch's administrative policies—such as (1) "metering" at the border; (2) the Migrant Protection Protocols ("MPP"), *see* DHS, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf;* (3) the "third-country transit bar," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019); and (4) international asylum cooperative agreements, *see* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 FR 63994 (Nov. 19, 2019)—drive asylum seekers to enter illegally rather than wait to present themselves at a port of entry, which in turn subjects them to the illegal reentry bar. Commenters suggested that, given these policies, the Departments incorrectly asserted that aliens who have previously been removed from the United States may present themselves at a port of entry. *See* 84 FR at 69648. One commenter suggested that many individuals who are driven to enter the United States unlawfully due to these policies do so with the intention of turning themselves in to U.S. Border Patrol authorities. Commenters also raised concerns that the proposed limitation would "condemn to persecution those who are

simply trying to enter the [United States] to reunite with their family and community." Commenters were also concerned that individuals with convictions under section 276 of the Act (8 U.S.C. 1326) would be punished twice for the same crime by also being barred from asylum.

Some commenters stated that the NPRM unfairly punished individuals who have fled persecution multiple times or who have faced persecution arising after they had been removed, resulting in multiple unlawful entries. Commenters stated that refugee protection principles upon which asylum law is based require newly arising claims to be examined. Commenters specifically stated that, in proposing the illegal reentry bar, the Departments did not consider that immigrant survivors of violence who are removed to their countries of nationality may face violent retaliation and possibly death at the hands of their abusers or perpetrators and may flee the same perpetrators of domestic and sexual violence multiple times. Commenters asserted that a discretionary assessment was necessary to ensure that meritorious claims are heard.

*Response:* The Departments disagree with commenters who oppose the rule's additional limitation on asylum eligibility for those who have been convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). The Departments have appropriately exercised their delegated authority to impose additional limitations on asylum eligibility per section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

First, the Departments clarify that this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[21] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6). Regardless of commenters' concerns regarding the dangerousness of these crimes, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) offers a discrete basis

---

[21] Although the Departments at times cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of a subset of the included bars in the proposed rule, *see* 84 FR at 69645–54, the references to the authority to designate additional particularly serious crimes highlighted an alternative basis for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

under which the Departments may designate these offenses as bases for ineligibility. Although the "particularly serious crime" designation would justify the conclusion that an alien is dangerous, *see* section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(a)(ii)) ("the alien, having been convicted by final judgment of a particularly serious crime, constitutes a danger to the community of the United States"), the Attorney General's and the Secretary's authorities to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) require only that such limitations or conditions be "consistent with [section 208 of the Act (8 U.S.C. 1158)]." Thus, even assuming, arguendo, that the offenses designated by the final rule do not necessarily reflect an alien's dangerousness, the Attorney General and the Secretary retain the authority to promulgate the new bar. Accordingly, the Departments are unpersuaded by commenters' concerns regarding whether these offenses may not pose a danger to the community because such a finding is not required under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

With respect to commenters who expressed concern that the proposed limitation would violate Article 31 of the Refugee Convention, as well as undermine congressional intent and established case law, the Departments note that the rule's limitations on eligibility for asylum are consistent with Article 31 of the Refugee Convention. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to receive asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention.[22] *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588.

The proposed rule is also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is

precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n.16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C, 869 F.3d at 1188; Ramirez-Mejia, 813 F.3d at 241.* As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation. Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188. Additionally, as noted above, the United States implemented the non-refoulement obligation of Article 33(1) of the Refugee Convention through the withholding-of-removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement obligation of the CAT under the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. Individuals who may be barred from asylum by the rule remain eligible to seek withholding of removal and protection under CAT in accordance with non-refoulement obligations.

Additionally, as noted in the NPRM, the statutory bar on applying for asylum and other forms of relief when an order of removal is reinstated has been upheld by every circuit to consider the question. 84 FR at 69648; *see Garcia* v. *Sessions,* 873 F.3d 553, 557 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 2648 (2018); *R–S–C,* 869 F.3d at 1189; *Mejia,* 866 F.3d at 587; *Garcia,* 856 F.3d at 30; *Cazun,* 856 F.3d at 260; *Perez-Guzman* v. *Lynch,* 835 F.3d 1066, 1082 (9th Cir. 2016); *Jimenez-Morales* v. *U.S. Att'y Gen.,* 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez-Mejia* v. *Lynch,* 794 F.3d 485, 489–90 (5th Cir. 2015); *Herrera-Molina* v. *Holder,* 597 F.3d 128, 137–38 (2d Cir. 2010). This reflects a broad understanding that individuals who repeatedly enter the United States unlawfully should not be eligible for the discretionary benefit of asylum and that limiting such eligibility does not conflict with section 208(a) of the Act (8 U.S.C. 1158(a)).

The Departments disagree with commenters' assertions that current administrative practices prevent asylum seekers from lawfully presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

With respect to commenters' concerns that the rule should not apply to those who unlawfully reentered the United States because of their desire to be reunited with family members living in the United States or to individuals who have been victims of trafficking or smuggling, the Departments believe that evaluations of mitigating factors or criminal culpability based on motives are more appropriately reserved for criminal proceedings. As stated in the NPRM, the Departments believe it is reasonable to limit eligibility for asylum to exclude aliens convicted of illegal reentry because this type of offense demonstrates that an alien has repeatedly flouted the immigration laws. *See* 84 FR at 69648. The Departments have a legitimate interest in maintaining the orderly and lawful admission of aliens into the United States. Aliens convicted of illegal reentry have engaged in conduct that undermines that goal.

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with a legitimate fear of persecution or torture may still apply for statutory withholding of removal or CAT withholding and deferral, forms of protection that this final rule does not affect. Additionally, these commenters misapprehend the purpose of this rulemaking. Awarding the discretionary benefit of asylum to individuals described in this rule would, among other things, encourage lawless behavior and subject the United States and its communities to the dangers associated with the crimes or conduct in which such persons have engaged. The Departments have appropriately exercised their authority to impose additional limitations on asylum eligibility to bar such individuals from that relief. Accordingly, those persons do not have meritorious asylum claims. By definition, if an applicant is ineligible for the discretionary benefit of asylum because of this rule, or any other statutory or regulatory limitation, he or she does not have a meritorious claim for asylum.

The Departments disagree with commenters' concerns that individuals with convictions under section 276 of the INA (8 U.S.C. 1326) would be punished twice for the same crime by

---

[22] The Ninth Circuit recently indicated—erroneously, in the view of the Departments—that removal can be considered a "penalty" under Article 31(1) of the Refugee Convention. *E. Bay Sanctuary Covenant* v. *Trump,* 950 F.3d 1242, 1276 (9th Cir. 2020). In doing so, however, the Ninth Circuit cited the Supreme Court's decision in *Padilla,* 559 U.S. at 364, which discussed immigration penalties in terms of criminal proceedings, not Article 31(1) of the Refugee Convention. Further, the Ninth Circuit noted its observation solely in the context of limiting asylum eligibility based on manner of entry, and the court did not reach other asylum restrictions such as this rule.

IFR_AR_000353

being barred from asylum. The Departments emphasize that immigration proceedings are civil in nature, and thus denial of relief from removal is not a punishment, particularly with respect to a discretionary benefit such as asylum. *Cf. Mejia,* 866 F.3d at 588 ("We therefore perceive no basis for concluding that depriving aliens, upon illegal re-entry, additional opportunities to apply for discretionary relief constitutes a 'penalty.'"). In addition, commenters' logic would have far-reaching implications that would undermine the entire statutory scheme that imposes any immigration consequences on account of an alien's criminal convictions, including eligibility for forms of relief or removability from the United States, *see, e.g.,* INA 212(a)(2) (8 U.S.C. 1182(a)(2)) (criminal grounds of inadmissibility); 237(a)(2) (8 U.S.C. 1227(a)(2)) (criminal grounds of deportability), but there has never been any reason to question the framework in such a manner, *see, e.g., Nijhawan,* 557 U.S. at 36 (analyzing whether convictions for certain crimes constituted aggravated felonies for purposes of the INA without questioning whether immigration penalties could be imposed for those convictions).

d. Criminal Street Gang Activity

*Comment:* Several commenters opposed the imposition of a bar to asylum eligibility based on the furtherance of criminal street gang activity.

As an initial matter, commenters noted that, under the current asylum system, a conviction for an offense categorized as a gang-related crime would bar an individual from asylum in most cases. However, commenters expressed concern that the NPRM extends culpability for gang-related crime beyond offenses categorized as gang-related crimes and would also bar individuals from asylum if an adjudicator "knows or has reason to believe the crime was committed in furtherance of criminal street gang activity." Commenters asserted that the standard for this bar is so broad that individuals not associated with gangs could be included in this category and barred from asylum.

At the same time, commenters argued that the proposed rule does not sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as gang-related. As a result, commenters expressed concern that the proposed rule granted immigration adjudicators too much latitude to determine whether

a crime fits into the vague category of supporting, promoting, or furthering the activity of a criminal street gang. Commenters were concerned that information in databases of gang-related crimes or factors such as where the criminal activity occurred may lead to improper categorization of gang-related activity. Commenters were similarly concerned that the bar does not account for the circumstances of the offense, such as whether coercion or threats forced the asylum applicant to undertake the criminal activity. Commenters asserted that immigration adjudicators should, at a minimum, be permitted to consider such factors as coercion or duress prior to granting or denying asylum.

Commenters asserted that the "reason to believe" standard is ultra vires and unconscionably limits asylum eligibility for those most in need of protection. Commenters asserted that the "reason to believe" standard grandly expands the number of convictions for which an eligibility analysis is required and would "sweep[] in even petty offenses that would otherwise not trigger immigration consequences." Commenters asserted, moreover, that the "reason to believe" standard for determining whether there is a sufficient link between the underlying conviction and the gang-related activity is "overly broad and alarmingly vague."

Additionally, commenters argued that the "reason to believe" standard places the adjudicator in the role of a second prosecutor and requires the adjudicator to decide, without the benefit of a criminal trial and attendant due process of law, whether a crime could have been potentially gang-related. At the same time, commenters stated that immigration adjudicators, who are not criminologists, sociologists, or criminal law experts, would be required to analyze past misdemeanor convictions to determine whether there is a link to gang activity, regardless of whether the individual was also charged or convicted of a street gang offense.

Commenters cited concerns regarding the admission of "all reliable evidence" to determine whether there was "reason to believe" that the conduct implicated gang-related matters. They averred that this phrase was potentially limitless and that its scope required both parties to present fulsome arguments regarding an offense's possible gang connections. Moreover, commenters asserted that the proposed rule fails to articulate what type of evidence or non-adjudicated conduct may be considered by an adjudicator when determining whether a bar to asylum applies.

In addition, commenters expressed concern that permitting adjudicators to rely on "all reliable evidence" will result in immigration adjudicators relying on any type of evidence, including police reports, unsubstantiated or subsequently recanted hearsay statements, and discredited methods of gang identification, such as gang databases. Commenters asserted that this will result in a compounded disparate racial impact based on over-inclusion of young people of color in those gang databases. Commenters asserted that gang databases are "notoriously inaccurate, outdated, and infected by racial bias." Additionally, commenters stated that gang databases are unregulated and that an individual may be included in a database simply based on "living in a building or even neighborhood where there are gang members, wearing certain colors or articles of clothing, or speaking to people law enforcement believe to be gang members."

One commenter referenced a decision of the Supreme Judicial Court of Massachusetts holding that the information contained in gang databases is hearsay, not independently admissible, and raises serious Confrontation Clause concerns. *Commonwealth* v. *Wardsworth,* 124 NE3d 662, 678–79 & nn.24–25 (Mass. 2019). That commenter also asserted that, despite the concern expressed by the Supreme Judicial Court of Massachusetts regarding the use of gang databases, immigration judges continue to regularly rely on such reports. By relying on such unreliable evidence, commenters averred, the proposed rule will exacerbate due process violations already occurring as a result of unsubstantiated gang ties.

Commenters further noted that, because these databases disparately affect young people of color, relying on these databases would multiply the harm already caused by racially disparate policing and racially disparate rates of guilty pleas to minor offenses. Commenters claimed that asylum seekers of color are subject to racially disparate policing, which results in racially disparate rates of guilty pleas to minor offense, and which also results in this population being erroneously entered and overrepresented in gang databases. In support of the inaccuracy of these databases, one commenter cited concerns that police departments falsify gang affiliations of youth encountered by police officers. As a result, commenters asserted, the proposed rule would "invite extended inquiry into the character of young men of color" who

may otherwise have meritorious asylum claims and who are already subject to racially suspect policing practices.

Commenters noted that police reports are inherently unreliable in the absence of the protections offered by the Confrontation Clause of the Sixth Amendment and the Federal Rules of Evidence, neither of which apply in immigration court. Regarding the unreliability of evidence, one commenter provided an example where neither the police officers nor the alleged victims were required to testify. Without this testimony, the commenter alleged, the immigration adjudicator would be unable to determine whether a victim had a motive to lie to the police, whether the victim later recanted his or her statements, or whether the police officer misunderstood some critical fact. Moreover, commenters asserted that, although immigration adjudicators would be unable to rely on uncorroborated allegations such as those contained in arrest reports, adjudicators could nevertheless shield denials based on such information by relying on discretion.

Commenters stated that the proposed rule would exacerbate due process violations that already occur as a result of unsubstantiated information about gang ties. Commenters claimed that asylum applicants are already subjected to wrongful denials of asylum based on allegations of gang activity made by DHS. Commenters alleged that DHS relies on unreliable foreign databases and "fusion" intelligence-gathering centers outside of the United States. For example, one commenter alleged that information regarding gang affiliations gathered from the fusion intelligence-gathering center in El Salvador has already been used against asylum seekers, despite having been found to be inaccurate. At the same time, commenters asserted that immigration adjudicators routinely premise enforcement, detention, and discretionary denials of relief on purported gang membership and often grant deference to gang allegations made by Immigration and Customs Enforcement ("ICE") personnel. Commenters asserted that the already expanded use of gang databases to apprehend and remove foreign nationals has been widely criticized as an overbroad, unreliable, and often biased measure of gang membership and involvement.

Additionally, commenters expressed disagreement with the Departments' position that all gang-related offenses could be considered as particularly serious crimes. Commenters criticized the Departments' reliance on statistics

from up to 16 years ago to demonstrate that gang members commit violent crimes and drug crimes. Commenters disagreed with the Departments' conclusion that all crimes that may be construed as connected to gang activity are particularly serious. Commenters asserted instead that it is illogical to argue that, because gang members may commit some violent crimes and drug crimes, all crimes committed by anyone remotely connected with a gang are particularly serious.

Commenters also asserted that the proposed rule will result in asylum seekers who live in economically distressed areas but who have a minor criminal conviction, for example for a property crime, being excluded from protection. Commenters asserted that including even minor crimes construed as gang-related in the "particularly serious crime" bar and preventing those individuals from accessing asylum is "disingenuous at best, and tinged with racial animus at worst." Commenters asserted that this bar would perpetuate racial bias within the immigration court system.

Commenters asserted that the gang-related-crimes bar should not be introduced at all due to the complex nature of gang ties and the frequency with which individuals are mislabeled as being part of a gang. These commenters argued that the risk of erroneously barring legitimate asylum seekers from eligibility is too high. Another commenter noted that it was "particularly cruel" to create a bar related to gang offenses "in the wake of this Administration's refusal to countenance gang violence as a ground to asylum." Moreover, commenters asserted that the INA and existing regulations already permit immigration adjudicators to deny asylum as a matter of discretion. Adding this new bar based on gang-related activity, according to these commenters, risks excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

Commenters noted that previous attempts to expand the grounds of removal and inadmissibility to include gang membership failed to pass both houses of Congress. One commenter noted concern that an individual could be erroneously convicted of a gang-related crime because of the widespread nature of gang activity in Central America. This commenter also expressed concern that, because gangs in Central America may act with impunity and "often control a corrupt judiciary," an individual could be erroneously convicted of a crime for

refusing to acquiesce to a gang's demands.

*Response:* As explained further in section II.C.2.a.i, the bar based on activity related to criminal street gangs is enacted pursuant to the Attorney General's and the Secretary's designated authorities to establish additional limitations and conditions on asylum. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[23] This authority requires such conditions and limitations to be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses meet a threshold of dangerousness or seriousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)"), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered a "danger to the community of the United States" by virtue of "having been convicted by a final judgment of a particularly serious crime"). Although the Departments have determined that the included offenses involving criminal street gangs represent dangerous offenses and that the offenders represent particular dangers to society, *see* 84 FR at 69649–50, the Departments would nevertheless be acting within the authority of section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) if commenters are correct that some offenses included are not connected to dangerousness. Section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of criminal street gang-

---

[23] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of gang-related crimes as bars to asylum eligibility. *Compare* 84 FR at 69650 ("Regardless, criminal street gangs-related offenses—whether felonies or misdemeanors—could reasonably be designated as 'particularly serious crimes' pursuant to 8 U.S.C. 1158(b)(2)(B)(ii)."), *with id.* ("Moreover, even if 8 U.S.C. 1158(b)(2)(B)(ii) did not authorize the proposed bar, the Attorney General and the Secretary would propose designating criminal gang-related offenses as disqualifying under 8 U.S.C. 1158(b)(2)(C)."). Nevertheless, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) aligns with the regulatory text and was used to support all of the categories of bars set out in the rule.

related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and the Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Moreover, Congress has expressly excluded from eligibility certain aliens who engage in conduct or commit crimes of a certain character or gravity, regardless of whether those aliens are "dangerous" to the United States, and regardless of whether those crimes have been formally designated as "particularly serious." *See* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)). The Departments have concluded that criminal street gang-related offenses are sufficiently similar to such conduct and crimes that aliens who commit such offenses should not be rewarded with asylum and the many benefits that asylum confers.

Further, the Departments disagree with comments asserting the criminal street gang-related offenses are not necessarily indicative of a danger to the United States. *See* 84 FR at 69650. Specifically, the Departments believe that such offenses are strong indicators of recidivism and ongoing, organized criminality. *Id.* Based on the data and research articulated in the NPRM, the Departments believe that individuals who enter the United States and are then convicted of a crime related to criminal street gang activity present an ongoing danger to the community and should therefore be ineligible for asylum. Significantly, the Departments reject commenters' assertions that the Departments relied on data that was over 16 years old. Although one of the reports relied upon in the NPRM was published in 2004, additional studies and information were cited ranging from 2010 to 2015. *See* 84 FR at 69650. Additionally, the White House recently issued a fact sheet observing that "[a]pproximately 38 percent of all murders in Suffolk County, New York, between January 2016 and June 2017" were linked to a single criminal gang—MS–13—alone. The White House, *Protecting American Communities from the Violence of MS–13* (Feb. 6, 2020), *https://www.whitehouse.gov/briefings-statements/protecting-american-communities-violence-ms-13/; see also*

Alan Feuer, *MS–13 Gang: 96 Charged in Sweeping Crackdown on Long Island,* N.Y. Times (Dec. 20, 2019), *https://www.nytimes.com/2019/12/20/nyregion/ms-13-long-island.html;* Proc. No. 9928, 84 FR 49187, 49187 (Sept. 13, 2019) (explaining that the DOJ is working with law enforcement in El Salvador, Guatemala, and Honduras to "help coordinate the fight against MS–13, the 18th Street Gang, and other dangerous criminal organizations that try to enter the United States in an effort to ravage our communities," and that this partnership "targets gangs at the source and works to ensure that these criminals never reach our borders"); *id.* (observing that, in 2017 and 2018, ICE officers "made 266,000 arrests of aliens with criminal records, including those charged or convicted of 100,000 assaults, nearly 30,000 sex crimes, and 4,000 violent killings"). These more recent examples demonstrate the continued threat posed by gang-related crime.

The Departments disagree with commenters' assertions that the rule fails to sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as a gang-related event. As an initial matter, the rule does not purport to categorize individuals as street gang members. Rather, the inquiry is limited into whether an adjudicator knows or has reason to believe that a prior conviction for a Federal, State, tribal, or local crime was committed in support, promotion, or furtherance of criminal street gang activity. 84 FR at 69649. This rule defines "criminal street gang" by referencing how that term is defined in the convicting jurisdiction or, alternatively, as the term is defined in 18 U.S.C. 521(a). The Departments believe that the language of the Federal statute conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices, as do the definitions in the convicting jurisdictions. This rule leaves the determination of whether a crime was in fact committed "in furtherance" of gang-related activity to adjudicators in the first instance. As noted in the NPRM, to the extent that this type of inquiry may lead to concerns regarding inconsistent application of the bar, the Departments reiterate that the BIA is capable of ensuring a uniform approach. *See* 8 CFR 1003.1(e)(6)(i).

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with legitimate fear of persecution or torture may still apply for statutory

withholding of removal or protection under the CAT regulations, as discussed in section II.C.5. In addition, and as explained previously, these commenters misapprehend the purpose of this rulemaking. The Departments have concluded that persons subject to the new bars do not warrant asylum because awarding the discretionary benefit of asylum to such individuals would encourage lawless behavior, subject the United States to certain dangers, and otherwise undermine the policies underlying the statutory framework for asylum. These persons accordingly do not have meritorious asylum claims. And, because nothing in the INA precludes the imposition of these new bars, the fact that these persons' claims might otherwise be meritorious is irrelevant.

Regarding commenters' concerns with the "reason to believe" standard articulated in the rule, the Departments note that this standard is used elsewhere in the INA. For example, when considering admissibility, immigration judges consider whether there is reason to believe that the individual "is or has been an illicit trafficker in any controlled substance." INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)). In accordance with this provision, courts have upheld findings of inadmissibility in the absence of a conviction. *See Cuevas* v. *Holder,* 737 F.3d 972, 975 (5th Cir. 2013) (holding "that an alien can be inadmissible under [INA 212(a)(2)(C)] (8 U.S.C. 1182(a)(2)(C))] even when not convicted of a crime"); *Garces* v. *U.S. Att'y Gen.,* 611 F.3d 1337, 1345 (11th Cir. 2010) (stating that section 1182(a)(2)(C) of the Act (8 U.S.C. 1182(a)(2)(C)) renders an alien inadmissible based on a "reason to believe" standard, which does not require a conviction); *Lopez–Umanzor* v. *Gonzales,* 405 F.3d 1049, 1053 (9th Cir. 2005) ("Section 1182(a)(2)(C) does not require a conviction, but only a 'reason to believe' that the alien is or has been involved in drug trafficking."). The bar on criminal street gang-related activity is narrower in scope than the inadmissibility charge based on illicit trafficking in that the bar in this rule still requires a conviction. As such, the Departments believe that the "reason to believe" standard is appropriately applied to the final rule.

Similarly, the "all reliable evidence" standard is not a new standard in immigration proceedings. Immigration judges routinely consider any relevant evidence provided in removal hearings by either party. 8 CFR 1240.1(c). Additionally, the BIA held, in the context of evaluating whether a crime constitutes a particularly serious crime,

that, once the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime, the adjudicator may consider all reliable information in making a "particularly serious crime" determination, including but not limited to the record of conviction and sentencing information. *Matter of N–A–M–,* 24 I&N Dec. at 337–38. The Ninth Circuit has held that the BIA's interpretation in *Matter of N-A-M-* is reasonable. *Anaya-Ortiz* v. *Holder,* 594 F.3d 673, 678 (9th Cir. 2010). Additionally, various circuit courts have applied the "all reliable information" standard articulated in *Matter of N-A-M-* in considering whether crimes are particularly serious. *See, e.g., Luziga* v. *Att'y Gen. U.S.,* 937 F.3d 244, 253 (3d Cir. 2019); *Marambo* v. *Barr,* 932 F.3d 650, 655 (8th Cir. 2019).

The Departments disagree with commenters' concerns about adjudicators' reliance on arrest reports and uncorroborated information. As an initial point, most asylum claims are based significantly on hearsay evidence that is uncorroborated by non-hearsay evidence. Such evidence, however, does not necessarily make an asylum claim unreliable or insusceptible to proper adjudication. Adjudicators assessing asylum applications are well versed in separating reliable from unreliable information, assigning appropriate evidentiary weight to the evidence submitted by the applicant and DHS, and determining whether corroborative evidence needs to be provided. *See* INA 208(b)(1)(B) (8 U.S.C. 1158(b)(1)(B)). Moreover, this rule does not provide adjudicators with unfettered discretion; instead, adjudicators must consider such evidence in the context of making a criminal street gang determination under the "reason to believe" standard. An asylum officer's assessment of eligibility necessarily must explain the consideration of the evidence of record as it applies to the evaluation of bars to asylum and the burden of proof, and it must also explain the exercise of discretion. Similarly, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna* v. *Ashcroft,* 325 F.3d 396, 405 (3d Cir. 2003) (quoting *Bustos-Torres* v. *INS,* 898 F.2d 1053, 1055 (5th Cir. 1990)). Nothing in this rule undermines or withdraws from this standard. Moreover, the Departments would not purport to

impinge on an adjudicator's evidentiary determination or direct the result of such a determination. If aliens have concerns about the reliability of any evidence, aliens may challenge the reliability of that evidence as part of their arguments to the adjudicator. As a result, the Departments have concluded that concerns regarding the reliability of gang databases or other evidence are more properly addressed in front of the immigration judge or asylum officer in individual cases.

The Departments disagree with comments that adjudicators should have the discretion to determine whether factors such as coercion or duress affected an individual's involvement in criminal street gang-related activity. The Departments believe that criminal street gang-related activity is serious and harmful in all circumstances. As stated in the NPRM, "[c]riminal gangs of all types * * * are a significant threat to the security and safety of the American public." 84 FR at 69650. Accordingly, the Departments have concluded that aliens who have been convicted of such offenses do not merit the discretionary benefit of asylum, even if their gang involvement was potentially the result of coercion or some other unique circumstance. In addition, the Departments believe that considerations regarding criminal culpability for criminal street gang-related offenses would be best addressed during the individual's underlying criminal proceedings.

Commenters' assertions that the rule will exacerbate harms caused by racially disparate policing practices or that the result of this rule will disproportionately affect people of color are outside the scope of this rulemaking. *Cf. San Francisco,* 944 F.3d at 803–04 ("Any effects [of the public charge rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). The rulemaking does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Moreover, the rule was not racially motivated, nor did racial animus or a legacy of bias play any role in the publication of the rule. Rather, this final rule is being published to categorically preclude from asylum eligibility certain aliens with various criminal convictions because the Departments determined that individuals engaging in criminal activity that is related to criminal street gangs present a sufficient danger to the United States to warrant exclusion from the discretionary benefit of asylum. To the extent that the rule disproportionately affects any group referenced by the commenters, any such

impact is beyond the scope of this rule, as this rule was not drafted with discriminatory intent towards any group, and the provisions of the rule apply equally to all applicants for asylum.

e. Driving Under the Influence of an Intoxicant

*Comment:* Commenters opposed the proposed categorical bar to asylum based on a DUI conviction. Commenters stated that the proposed categorical bars encompass crimes with a wide range of severity, and commenters asserted that DUI does not rise to a comparable level of severity as a particularly serious crime warranting its promulgation as a categorical bar to asylum. Other commenters similarly stated that, because DUI does not involve conduct that is necessarily dangerous on its own, the offense is not serious enough to support a categorical bar to asylum. Commenters provided examples of allegedly low-level convictions for DUI, based on examples such as a court concluding that, when "the key is in the ignition and the engine is running, a person 'operates' a vehicle, even if that person is sleeping or unconscious," *State* v. *Barac,* 558 SW3d 126, 130 (Mo. Ct. App. 2018), or when a person operates a vehicle while under the influence but no injury to another person results. Accordingly, commenters asserted that DUI is not necessarily serious or sufficiently dangerous to warrant a categorical bar. One commenter summarized the concern by stating that offenses related to DUI are "excessively overbroad in the convictions and conduct covered[ ] and are not tailored to identify conduct that is 'serious' or identify individuals who pose a danger to the community."

Commenters also asserted that creating a blanket categorical bar to asylum based on a DUI conviction would eliminate the opportunity for adjudicators to consider the facts before them in exercising discretion. Commenters stated that adjudicators should consider the severity of the DUI offense given relevant facts, such as the applicant's criminal history, the underlying cause of the applicant's criminal record involving DUI, the applicant's efforts towards rehabilitation, the length of time passed since the conviction, the applicant's potential danger to the community, and the applicant's risk of persecution if returned to his or her home country.

Commenters noted that multiple DUI convictions are not an absolute bar to cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)) and cited the Attorney General's opinion that

IFR_AR_000357

such offenses were inconclusive of an individual's character, thus allowing individuals to rebut the presumption with evidence of good character and rehabilitation. *Matter of Castillo-Perez,* 27 I&N Dec. 664 (A.G. 2019). Commenters stated that, ''if individuals seeking discretionary cancellation of removal are afforded the opportunity to show that they merit permanent residence in spite of their prior convictions for driving under the influence, it is nonsensical to promulgate a rule denying asylum seekers that same opportunity.''

Finally, commenters noted that low-income people and people of color are more likely to be pulled over and charged with DUI. These commenters alleged that the proposed rule accordingly exacerbates the unjust criminal justice system by including these provisions as a bar to asylum eligibility.

*Response:* The Departments disagree that DUI does not warrant a categorical bar to asylum eligibility.

Although commenters provided limited examples of times where an individual convicted of a DUI offense fortunately may not have caused actual harm to others, these sorts of DUI convictions alone would not render an alien ineligible for asylum under this rule. The final rule bars aliens with DUI convictions from asylum eligibility under two grounds in 8 CFR 208.13(c)(6)(iii), (c)(6)(iv) and 1208.18(c)(6)(iii), (c)(6)(iv). First, under 8 CFR 208.13(c)(6)(iii) and 1208.18(c)(6)(iii), a single DUI offense would only be disqualifying if it ''was a cause of serious bodily injury or death of another person.'' Second, under 8 CFR 208.13(c)(6)(iv)(A) and 1208.13(c)(6)(iv)(A), any second or subsequent DUI offense would be disqualifying. Accordingly, a single conviction that does not cause bodily injury or death to another would not be a bar to asylum, but would continue to be considered by adjudicators in determining whether an alien should receive asylum as a matter of discretion.

The Departments maintain that DUI convictions, particularly those covered by this rule (based on actions that cause serious bodily injury or death or that indicate recidivism, along with the risk of harm from such recurrent dangerous behavior), constitute serious, dangerous activity that threatens community safety. First, the Departments reiterate that DUI laws exist, in part, to protect unknowing persons from the dangerous people who ''choose to willingly disregard common knowledge that their criminal acts endanger others.'' 84 FR at 69651. Second, the Supreme Court and

other Federal courts have repeatedly echoed the gravity of such acts. *See Begay* v. *United States,* 553 U.S. 137, 141 (2008) (''Drunk driving is an extremely dangerous crime.''), *abrogated on other grounds by Johnson* v. *United States,* 576 U.S. 591 (2015); *United States* v. *DeSantiago-Gonzalez,* 207 F.3d 261, 264 (5th Cir. 2000) (''[T]he very nature of the crime * * * presents a 'serious risk of physical injury' to others[.]''); *Marmolejo-Campos* v. *Holder,* 558 F.3d 903, 913 (9th Cir. 2009) (''[T]he dangers of drunk driving are well established * * * .''); *see also Holloway,* 948 F.3d at 173–74 (''A crime that presents a potential for danger and risk of harm to self and others is 'serious.' * * * 'There is no question that drunk driving is a serious and potentially deadly crime * * * . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases.' '' (quoting *Virginia* v. *Harris,* 558 U.S. 978, 979–80 (2009) (Roberts, C.J., dissenting from denial of writ of certiorari))).

It is well within the Departments' authority to condition asylum eligibility based on a DUI conviction. The INA authorizes the Attorney General and the Secretary to establish by regulation additional limitations and conditions on asylum eligibility, INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)), and Federal courts have upheld BIA discretionary denials of asylum based on DUI convictions, even in circumstances where a DUI conviction does not constitute a particularly serious crime. *See, e.g., Kouljinski* v. *Keisler,* 505 F.3d 534, 543 (6th Cir. 2007). For the reasons above, DUI is a serious crime that represents a blatant disregard for the laws and societal values of the United States; accordingly, the final rule limits asylum eligibility by considering a DUI conviction to be a categorical bar to asylum.

For these reasons, the Departments decline to tailor the bar to precisely identify serious conduct, evaluate severity of conduct, identify individuals who pose a danger to communities, or provide discretion to adjudicators, as suggested by commenters. The Departments will no longer afford discretion to adjudicators considering DUI convictions in the circumstances defined by this rule; elimination of such discretion is, again, well within the Departments' authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Regarding DUI convictions in the context of cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)), the Departments note that cancellation of

removal is separate from asylum, and this rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to ''asylum eligibility''). Although both forms of relief may eventually lead to lawful permanent resident status in the United States, cancellation of removal generally applies to a different class of aliens, and its conditions and requirements are different from asylum relief.[24] *Compare* INA 240A(b) (8 U.S.C. 1229b(b)), *with* INA 208 (8 U.S.C. 1158)). Cancellation of removal requires ''good moral character,'' which asylum relief neither requires nor mentions. Thus, references to DUI convictions and their relative effect on the good moral character requirement for cancellation of removal are irrelevant to asylum eligibility. Commenters conflate two separate forms of relief from removal intended for separate populations with separate eligibility provisions.

Likewise, the Attorney General's statement in *Matter of Castillo-Perez,* 27 I&N Dec. at 671—that multiple DUI convictions were not necessarily conclusive evidence of an individual's character—was made in regards to eligibility for cancellation of removal, not asylum.[25] Accordingly, that case has no bearing on this rulemaking.

---

[24] Generally, cancellation of removal is a discretionary form of relief in which the Attorney General may cancel removal and adjust status to lawful permanent residence (''LPR'') of an otherwise inadmissible or deportable alien who has been physically present in the United States for a continuous period of not less than 10 years preceding the date of the application; has been a person of good moral character during such period; has not been convicted of an offense under INA 212(a)(2), 237(a)(2), or 237(a)(3) (8 U.S.C. 1182(a)(2), 1226(a)(2), or 1226(a)(3)); and establishes that removal would result in exceptional and extremely unusual hardship to the applicant's U.S. citizen or LPR spouse, parent, or child. *See* INA 240A(b) (8 U.S.C. 1229b(b)). In contrast, asylum is a discretionary benefit that precludes an alien from removal, creates a pathway to LPR status and citizenship, and affords various ancillary benefits such as work authorization, opportunity for certain family members to obtain derivative asylee and LPR status, and authorization, in some cases, to receive certain financial assistance from the government. *See* INA 208 (8 U.S.C. 1158). Asylum eligibility includes the following factors: The alien must be physically present or arrive in the United States; the alien must meet the definition of ''refugee'' under INA 101(a)(42)(A) (8 U.S.C. 1101(a)(42)(A)), and the alien must otherwise be eligible for asylum in that no statutory bars or limitations apply. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)), INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), INA 208(b)(2) (8 U.S.C. 1158(b)(2)) and 8 CFR 1240.8(d); *see also* 84 FR at 69642.

[25] Nevertheless, the Attorney General in the context of discussing eligibility for cancellation of removal as a matter of discretion made clear that ''[m]ultiple DUI convictions are a serious blemish on a person's record and reflect disregard for the safety of others and for the law.'' *Castillo-Perez,* 27 I&N Dec. at 670. This reasoning as to the

Continued

In sum, the rulemaking categorically bars asylum eligibility for those with one or more DUI convictions in order to protect communities from the dangers of driving under the influence. *See* 84 FR at 69650–51; *see also* 84 FR at 69640. It does not consider other factors of apparent concern to commenters, such as financial status, race, or nationality. The rulemaking also does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Such considerations are outside the scope of this rulemaking.

### f. Battery or Domestic Violence

*Comment:* Commenters opposed the proposed bar to asylum based on domestic assault or battery, stalking, or child abuse. Broadly, commenters opposed a bar to asylum based on "mere allegations of conduct without any adjudication of guilt" for several reasons. First, commenters stated that a bar based on conduct, not convictions, violates INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), which bars noncitizens who, "having been convicted by a final judgment of a particularly serious crime, constitute[ ] a danger to the community of the United States." In accordance with the plain text and judicial interpretation of this section of the Act, commenters asserted, the statute prohibits application of the "particularly serious crime" bar based only on non-adjudicated facts, thereby precluding separation of "the seriousness determination from the conviction." Accordingly, commenters stated that the proposed application of the "particularly serious crime" bar based on conduct involving domestic assault or battery directly contradicts the statute, which requires a final judgment of conviction. Commenters also alleged that the proposed rule violates the Supreme Court's holding that "conviction" refers to the "crime as generally committed," rather than the actual conduct. *See Sessions* v. *Dimaya,* 138 S. Ct. 1204, 1217 (2018); *see also Delgado,* 648 F.3d at 1109 n.1 (Reinhardt, J., concurring in part and concurring in the judgment). One commenter asserted that the statute "only bars asylum seekers for alleged conduct in exceptional circumstances like potential terrorist activity or persecution of others. * * * [C]onduct-based asylum bars should be used only in very limited circumstances, and in this case should not be expanded."

Relatedly, commenters raised constitutional concerns. Commenters cited constitutional principles that "individuals have a right to defend themselves against criminal charges and are presumed innocent until proven guilty. Individuals should not be excluded from asylum eligibility based on allegations of criminal misconduct that have not been proven in a court of law." Accordingly, commenters opposed the NPRM because it "deprives the individual the opportunity to challenge the alleged behavior and does away with the presumption of innocence." More specifically, a commenter claimed that, under the NPRM, an incident and subsequent arrest related to domestic assault or battery would trigger an inquiry into the alien's conduct, thereby undermining the criminal justice system and constitutional due process protections for criminal defendants who may not have access to counsel. The commenter alleged that, regardless of whether the alien was convicted of the offense, the alien may still be barred from asylum relief following an adjudicator's independent inquiry into the incident.

Commenters also stated that a bar based on conduct alone, especially in the context of domestic assault or battery, could disproportionately penalize innocent individuals and victims, and subsequently their spouses and children, who may be denied immigration status or be left with an abuser. First, commenters explained that specific barriers—including discrimination, community ostracism, community or religious norms, or lack of eligibility for certain services—deter aliens from even initially contacting law enforcement. Second, if law enforcement was involved, commenters expressed concern about cross arrests in which both the perpetrator of abuse and the victim are arrested but no clear determinations of fault are made. Commenters stated that "authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances." Further, commenters alleged that "identifying the primary aggressor is not always consistently nor correctly conducted," especially if survivors acted in self-defense. Commenters also expressed concern that survivors of domestic assault or battery are oftentimes vulnerable, with the result that a bar based on conduct alone could affect populations with overlapping

vulnerabilities. For example, commenters specifically referenced lesbian, gay, bisexual, transgender, and queer or questioning ("LGBTQ") survivors, who are already allegedly prone to experience inaction by law enforcement in response to domestic violence, and limited English proficiency individuals, who may be unable to fully describe the abuse to police officers, prompting officers to then use the offenses' perpetrators for interpretation.

One commenter expressed concern that the NPRM establishes a lower standard by which admission may be denied because other forms of admission require an actual conviction or factual admission to form the basis of denial. Accordingly, the commenter stated that similarly situated persons would be treated inconsistently based upon the mechanism for admission that they choose. This commenter also asserted that U nonimmigrant status and Violence Against Women Act of 1994, Public Law 103–322, 108 Stat. 1902 ("VAWA") relief are insufficient alternative forms of relief because they generally require acknowledgement from a local authority, negating the need for a fact-finding hearing. Presumably then, most individuals affected by the NPRM would be ineligible for these alternative forms of relief. In addition, the commenter noted that granting those benefits is entirely different from making an asylum applicant overcome an asylum bar.

Commenters also identified unintended consequences of the proposed rule, explaining that individuals may act maliciously. One commenter suggested that individuals may file for baseless temporary restraining orders or protective orders to try to block domestic violence victims' applications for employment authorization documents following an asylum application. Another commenter speculated that abusers may falsely accuse or frame survivors of domestic violence to terrorize or control them. One commenter asserted that survivors may be hesitant to report abuse or request a restraining order if it could negatively impact the immigration status of the perpetrator, especially in situations where they share a child. Another commenter stated that it would "undoubtedly embolden[ ] perpetrators more and len[d] more strength to otherwise weak accusations."

Some commenters generally stated that the NPRM too broadly categorized domestic violence offenses as particularly serious crimes. Relatedly, another commenter stated that the bar is too vague and requires adjudicators to

---

seriousness of DUI offenses supports the type of categorical bar at issue here and does not conflict with the Departments' determination that DUI offenses should categorically bar asylum eligibility.

become experts in domestic criminal law jurisdictions of every State to determine whether, for example, conduct "amounts to" domestic assault or battery, stalking, or child abuse. Further, the commenter noted that the NPRM's definition of battery and extreme cruelty is different from the various States' criminal laws, which creates inconsistent application. That commenter also alleged that the proposed exceptions for individuals who have been battered or subjected to extreme cruelty are "insufficient, vague, and place[d] a high burden on victims." Another commenter asserted that it is "unclear how 'serious' will be defined, and whether and how detrimental and potentially false information provided by abusers will be considered in decision-making." One commenter suggested that "the presentation of evidence under oath by adverse parties is a more appropriate forum for adjudications as to whether or not domestic violence took place, and will likely lead to fewer determinations that will cruelly strip immigrant survivors of their right to seek asylum." Another commenter asserted that the NPRM does not include a framework or limits to guide an adjudicator's inquiry, especially in the context of false accusations. For these reasons, commenters opposed the NPRM because it allegedly would cause inconsistent and unjust results.

Some commenters claimed that the proposed bar is unnecessary because the current bars for those with domestic violence convictions or aggravated felony convictions allow for "the denial of asylum protection for these types of crimes when appropriate," whereas the proposed bar denies asylum protection for vulnerable individuals. Accordingly, commenters believed that "immigration judges should retain discretion in these situations and be permitted to grant relief in situations where the asylum seeker is not at fault."

Many commenters alleged that the proposed bar conflicts with VAWA. One commenter alleged that the NPRM "distorts language contained in VAWA * * * in order to create barriers for asylum seekers." Commenters stated that VAWA gives discretion to adjudicators "based on a number of factors and circumstances." Accordingly, commenters stated that the proposed "blunt approach" conflicts with VAWA and lacks "evidence-based justification for treating asylum seekers differently." Commenters were also concerned with the lack of "analogous protections in the asylum context to protect a survivor from the devastating

effects of a vindictive abuser's unfounded allegations."

Commenters also disagreed with the proposed approach towards the burden of proof as compared to VAWA. Because of the "vastly different interests at stake," commenters stated that VAWA's low burden of proof is necessary for several reasons: More harm results from erroneously denying relief than erroneously granting relief, a lower standard maximizes the self-petitioner's confidentiality and safety, certain evidence may be inaccessible to a victim because the abuser blocked access, and no liberty interests are implicated for alleged perpetrators. By contrast, commenters asserted, a "rigorous burden of proof is appropriate when potentially barring applicants from asylum," as the NPRM did, because "[t]he consequences of invoking the bar are dire, with the applicant's life and safety hanging in the balance."

Commenters also disagreed that the exception for asylum applicants who demonstrate eligibility for a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) sufficiently protects survivors deemed not to be the primary aggressors. Commenters noted that survivors may be unaware of their eligibility for a waiver, unaware that such a waiver exists, or too fearful to apply.

Commenters also claimed that the waiver application process turns an otherwise non-adversarial inquiry into a "multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency." Commenters also questioned whether adjudicators could conduct such an inquiry and correctly apply the exception because they are removed from the immediate circumstances surrounding an incident. Accordingly, commenters alleged that the waiver fails to adequately protect survivors and, in some cases, inflicts harm.

*Response:* First, commenters are incorrect that the rule's conditioning of asylum eligibility on conduct violated INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)) because that section requires a final judgment of conviction. As discussed above, this rule, like the proposed rule, designates the listed offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[26] *See* 8 CFR 208.13(c)(6),

1208.13(c)(6). This section provides authority to the Attorney General and the Secretary to condition or limit asylum eligibility, consistent with the statute, but does not require any sort of conviction. Accordingly, the bar is consistent with the plain text of that section, and the Supreme Court cases cited by commenters are not specifically relevant.

The Departments disagree with the comment that conduct-based bars should be used only in "very limited circumstances," not including domestic assault or battery, stalking, or child abuse. As explained in the NPRM, the Departments believe that domestic violence is "particularly reprehensible because the perpetrator takes advantage of an 'especially vulnerable' victim." 84 FR at 69652 (quoting *Carillo* v. *Holder,* 781 F.3d 1155, 1159 (9th Cir. 2015)). Accordingly, the Departments emphasize that such conduct must not be tolerated in the United States, and the discretionary benefit of asylum, along with the numerous ancillary benefits that follow, will not be granted to aliens who engage in such acts. *See id.* Further, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(iv) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)–(iv)),[27] and the Departments believe it is

---

[26] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a

particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of these domestic violence-related bars at 8 CFR 208.13(c)(6)(vi), (vii), 1208.13(c)(6)(vi), (vii). *See* 84 FR at 69651–53. However, as stated in the proposed rule, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) provides underlying authority for all these provisions. 84 FR at 69652 (noting that, even if all of the proposed domestic violence offenses would not qualify as particularly serious crimes, convictions for such offenses—as well as engaging in conduct involving domestic violence that does not result in a conviction—"should be a basis for ineligibility for asylum under section 208(b)(2)(C) of the INA"). The Departments acknowledge that the proposed rule stated that the Attorney General and the Secretary were, in part, "[r]elying on the authority under section 208(b)(2)(B)(ii) of the INA." *Id.* at 69651. But the regulatory text of the new bar does not actually designate any additional offense as "particularly serious." The Departments thus clarify that the current bars are an exercise of the authority granted by section 208(b)(2)(C), and that the discussion of the "particularly serious crime" bar merely helps illustrate how the new bars are "consistent with" the statutory asylum scheme. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

[27] These provisions provide as follows: (1) INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) ("the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion"); (2) INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) ("there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the
Continued

IFR_AR_000360

appropriate to also enforce an asylum bar based on conduct involving domestic battery or extreme cruelty.

The rule does not violate the constitutional rights of aliens, nor does it offend constitutional principles referenced by the commenters. First, commenters incorrectly equated denial of a discretionary benefit to "criminal charges." The Departments will not bring "criminal charges" against aliens in this context; rather, the Departments will deny asylum based on certain convictions and conduct, in some limited instances, as stated in the NPRM and authorized by statute. *See* 84 FR at 69640.

The Departments disagree that the rule undermines the criminal justice system and constitutional due process protections in either the civil or criminal context. As an initial matter, aliens have no liberty interest in the discretionary benefit of asylum. *See Yuen Jin* v. *Mukasey,* 538 F.3d 143, 156–57 (2d Cir. 2008); *see also Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) (citing *DaCosta* v. *Gonzales,* 449 F.3d 45, 49–50 (1st Cir. 2006)); *cf. Hernandez* v. *Sessions,* 884 F.3d 107, 112 (2d Cir. 2018) (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko* v. *Ashcroft,* 392 F.3d 970, 971 (8th Cir. 2004) (finding that there is no right to effective assistance of counsel with regard to an asylum claim because an alien does not have a liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In other words, "[t]here is no constitutional right to asylum per se." *Mudric* v. *Mukasey,* 469 F.3d 94, 98 (3d Cir. 2006). Further, although aliens may choose to be represented by counsel, the government is not required to appoint counsel. INA 292 (8 U.S.C. 1362).

Second, the Departments reiterate that Congress authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The Departments exercise such authority in promulgating the provisions of the rule, 84 FR at 69652, that allow adjudicators to inquire into allegations of conduct to determine whether the conduct constitutes battery

or extreme cruelty barring asylum, similar to current statutory provisions requiring inquiry into other conduct-based allegations that may bar asylum. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)); *see also Meng* v. *Holder,* 770 F.3d 1071, 1076 (2d Cir. 2014) (considering evidence in the record to determine whether it supported the agency finding that an alien's conduct amounted to persecution, thus triggering the persecutor bar under INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). A similar inquiry is also conducted under INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) to determine immigration benefits for aliens who are battered or subjected to extreme cruelty. Hence, promulgating an additional conduct-based bar to asylum eligibility, even without a conviction, is consistent with and therefore not necessarily precluded by the INA.

The Departments disagree that the rule disproportionately penalizes innocent individuals, victims, and their spouses or children. First, the Departments emphasize the exceptions for aliens who have been battered or subjected to extreme cruelty and aliens who were not the primary perpetrators of violence in the relationship. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception protects qualified innocent individuals and their spouses or children from asylum ineligibility by providing that individuals whose crimes or conduct were based on "grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act [8 U.S.C. 1227(a)(2)(E)(i)–(ii)]" would nevertheless be not rendered ineligible for asylum if such individuals "would be described in section 237(a)(7)(A) of the Act [8 U.S.C. 1227(a)(7)(A]]." *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). Section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)), in turn, describes individuals who: (1) Were battered or subject to extreme cruelty; (2) were not the primary perpetrator of violence in the relationship; and (3) whose convictions were predicated upon conduct where the individual acted in self-defense, violated a protection order intended to protect that individual, or where the crime either did not result in serious bodily injury or was connected to the individual having been battered or subjected to extreme cruelty.

The Departments disagree with commenters' concerns that the provided exceptions are insufficient. To the extent that the commenters are concerned that individuals might not be able to avail themselves of the exception

because of a lack of awareness of the waiver or their eligibility for it, such concerns are unfounded. Just as aliens are currently informed of eligibility and other asylum requirements through the Act and regulations; the instructions to the I–589 application and the form itself; representatives or other legal assistance projects; or other sources, aliens will similarly be informed of the existence of this exception. The Departments encourage individuals to contact law enforcement if they experience domestic violence; however, potential resolutions to the sort of specific barriers referenced by the commenters are outside the scope of this rulemaking. It is the Departments' aim, however, that the exception to the bar would reduce such barriers.

In regard to commenters' concerns about cross arrests and no definite determinations made, the Departments note that the adjudicatory inquiry into whether acts constitute battery or extreme cruelty is in no way novel. *See, e.g.,* INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (providing for similar adjudicatory inquiry in the context of cancellation of removal). The Departments are confident in adjudicators' continued ability to conduct such inquiries, which include properly applying exceptions for innocent individuals. The Departments acknowledge that survivors are oftentimes vulnerable individuals. The bar and related exception are specifically promulgated to ensure that aliens with convictions for or who engage in conduct involving domestic assault or battery are ineligible for asylum, thereby reducing subsequent effects on vulnerable individuals.

The Departments may predicate asylum eligibility based on certain convictions or conduct under the statutory authority that allows them to limit or condition asylum eligibility. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Aliens may apply for immigration benefits for which they are eligible, and the INA affords various ancillary benefits in accordance with the specific relief granted. In other words, aliens are generally free to apply (or not to apply) for benefits, and then the relevant provisions of the statute are consistently applied. *See* 8 CFR 208.1(a)(1), 1208.1(a)(1). Accordingly, aliens may be "similarly situated," as phrased by the commenters, but whether "similarly situated" aliens choose to apply for the same benefits under the INA is not a decision for the Departments to make.

The Departments emphasize that the sufficiency of alternative forms of protection or relief, such as U

nonimmigrant status and VAWA relief referenced by the commenters, varies in accordance with the unique facts in each case. For example, although some aliens may be unable to obtain the necessary law enforcement certification, many others are able to successfully meet all the necessary requirements. *See* 8 CFR 214.14. The Departments, however, reiterate that the new bar for convictions or conduct involving domestic assault or battery, stalking, or child abuse, contains an exception that is intended to ensure that innocent victims of violence are not rendered ineligible for asylum relief. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception demonstrates both the Departments' concern for domestic violence victims and their consideration of how best to address those victims' circumstances, and the Departments have concluded that—especially in light of countervailing considerations such as the need to protect the United States from the harms associated with domestic abusers—this exception is sufficient.

The Departments acknowledge the commenters' concerns regarding unintended consequences stemming from the rule. The Departments, however, reiterate that mere allegations alone would not automatically bar asylum eligibility. Rather, an adjudicator will consider the alleged conduct and make a determination on whether it amounts to battery or extreme cruelty, thereby triggering the bar to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vii),1208.13(c)(6)(vii) (proposed); *see also* 84 FR at 69652. Similar considerations are currently utilized in other immigration contexts, including other asylum provisions (INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) and removability (INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)). In conjunction with the exception at 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed), the Departments believe this inquiry is properly used in this context as well.

Commenters' allegations that the bar is too vague or broad to cover only offenses that constitute "particularly serious crimes" are irrelevant because, although the Departments possess statutory authority under section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii) to designate a "particularly serious crime," the Departments are also authorized to establish additional limitations or conditions on asylum. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The only requirement is that these limitations or conditions must be

consistent with section 208 of the Act (8 U.S.C. 1158). Nothing in section 208 of the Act (8 U.S.C. 1158) conflicts with this rule.

The Departments also disagree with commenters who alleged that the rule requires adjudicators to have expertise in all State jurisdictions. The rule requires adjudicators to engage in a fact-based inquiry, and that inquiry accounts for the differences in State law regarding criminal convictions for offenses related to domestic violence. *See* 84 FR at 69652. Further, even if adjudicators must interpret and apply law from various jurisdictions, the Departments are confident that adjudicators will properly do so, as they currently do in other immigration contexts. *See, e.g.,* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (other asylum provisions); INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) (removability).

The Departments disagree that the exception is "insufficient" or "vague" or "place[s] a high burden on victims." The exception directly references and adapts the statutory requirements in INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)). In the interest of consistency and protection afforded to victims since its enactment, the exceptions to this categorical bar align with those enacted by Congress.

The Departments decline to evaluate the commenters' various examples. A proper inquiry is fact-based in nature; absent the entirety of facts for each unique case, various examples cannot be adequately addressed. The BIA has deemed some domestic violence offenses as "particularly serious crimes." *See* 84 FR at 69652 (providing such examples of BIA decisions). As explained in the proposed rule, that case-by-case approach fails to include all of the offenses enumerated in the rule, and it does not include conduct related to domestic violence. *Id.* Accordingly, the Departments believe this rule-based approach is preferable because it will facilitate fair and just adjudicatory results.

In addition, the Departments disagree with commenters that the bar is unnecessary. The Departments believe the bar and its exception establish important protections for vulnerable individuals, including those not at fault, and clarify the Departments' views on such reprehensible conduct. *See id.*

The rule does not conflict with or distort language in VAWA. The rule is solely applicable to eligibility for the discretionary benefit of asylum. The rule does not expound upon or specifically supplement VAWA. Rather, the rule adds categorical bars to asylum eligibility, clarifies the effect of certain

criminal convictions—and, in one instance, abusive conduct that may not necessarily involve a criminal conviction—on asylum eligibility, and eliminates automatic reconsideration of discretionary denials of asylum. *See generally* 84 FR at 69640. The rule excludes from a grant of asylum and its many ancillary benefits aliens who have been convicted of certain offenses or engaged in certain conduct. Contrary to the commenters' remarks, the rule is not intended to exclude survivors of domestic violence; in fact, the preamble to the rule, 84 FR at 69652, provided an extensive explanation of the Departments' opposition to domestic violence, including an overview of various legislative and regulatory actions that seek to protect victims and to convey strong opposition to domestic violence. Moreover, the rule is fully consonant with other regulations, *see, e.g.,* 8 CFR 204.2(c)(1)(i)(E), designed to ensure that those who commit acts of domestic violence, even if they are not convicted, do not distort or undermine the immigration laws of the United States. Accordingly, although VAWA and the rule may not use the same approach, both are instrumental in the government's efforts to protect victims from domestic violence in the United States.

In that vein, the rule provides protection to victims of domestic violence by way of the exceptions to the bar in 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). The rule also conveys the Departments' opposition to domestic violence by denying asylum eligibility to aliens convicted of or who have engaged in such conduct so that abusers may not stay in the United States. *See* 84 FR at 69652.

Addressing commenters' concerns that the "life and safety" of aliens were "hanging in the balance," the Departments reiterate the alternative forms of relief or protection that may be available to applicants who are ineligible for asylum under the rulemaking—applicants may still apply for statutory withholding of removal or CAT protection. *See* 84 FR at 69642. Accordingly, the Departments disagree that a "vigorous burden of proof" is necessary in this context. On the contrary, asylum is a discretionary benefit in which the alien bears the burden of proof to demonstrate eligibility under the conditions and limitations Congress authorized the Departments to establish. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)).

To clarify the exception in 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed),

IFR_AR_000362

applicants need not be granted a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) to qualify for the exception. Rather, applicants must only satisfy one of the following criteria contained in the Act to the satisfaction of an adjudicator: (1) The applicant was acting in self-defense; (2) the applicant was found to have violated a protection order intended to protect the applicant; or (3) the applicant committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the applicant's having been battered or subjected to extreme cruelty. 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed); *see also* 84 FR at 69653. Together, the proposed rule and this final rule serve, in part, as notice to the public that such provisions exist—including the exception for applicants who are themselves victims. *See* 84 FR at 69640 (stating that this section of the **Federal Register** contains notices to the public of the proposed issuance of rules and regulations). Accordingly, just like other immigration benefits and relevant exceptions, aliens are on notice upon publication in the **Federal Register**.

Finally, the exceptions provided by 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) do not create an adversarial process. These provisions mirror the text of the statute except that aliens only need to satisfy the criteria, not be actually granted an exception. In this way, the exceptions as stated in the rule are arguably less stringent than the statutory exception. Further, the Departments remain confident that adjudicators will continue to properly apply the exceptions, regardless of commenters' concerns of how far removed adjudicators may be from the immediate circumstances of the conduct at issue. The exceptions are not intended to mitigate harm already suffered by survivors; rather, it is the Departments' hope that the exceptions ensure that the conduct of applicants who are actually victims of domestic violence does not bar their asylum eligibility. Accordingly, the Departments strongly disagree that the exceptions will inflict harm on survivors, as commenters alleged.

g. Document Fraud Misdemeanors

*Comment:* Numerous commenters opposed implementing a categorical limitation on eligibility for asylum for individuals convicted of Federal, State, tribal, or local misdemeanor offenses related to document fraud, stating that it would result in denial of meritorious asylum claims. *See* 8 CFR

208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1) (proposed). Commenters stated that some asylum applicants have necessarily and justifiably used false documents to escape persecution. Commenters stated that the NPRM ignored common circumstances related to convictions involving document fraud, such as when individuals flee their countries of origin with no belongings and "must rely on informal networks to navigate their new circumstances." Some commenters suggested that applicants' use of fraudulent documents in entering the United States can be linked to their financial means but did not offer further detail on that position. Commenters stated that it was "arbitrary and irrational" for the Departments to suggest that such conduct would render somebody unfit to remain in the United States or a threat to public safety.

Commenters also suggested that the proposed limitation contravened long-standing case law establishing that violations of the law arising from an asylum applicants' manner of flight should be just one of many factors to be considered in the exercise of discretion. *Matter of Pula,* 19 I&N Dec. at 474. Some commenters objected to the proposed limitation because it allegedly did not provide a sufficient exception for those who have unknowingly engaged in such conduct, such as those who have unknowingly obtained false documents from bad actors like unscrupulous notarios. Other commenters opposed the proposed limitation because it did not provide a sufficient exception for those who must use false documentation to flee persecution.

Some commenters recognized the NPRM's proposed exception to this limitation on asylum eligibility.[28] Commenters opined that the proposed exception was not sufficient, given the consequences for those who do not fit within the exception. Commenters stated that asylum seekers who obtain false documents when passing through a third country or who may be unable to prove that they fall within an

exception would be adversely affected by the proposed limitation.

Some commenters stated that the proposed exception was unrealistic given circumstances that could prevent asylum seekers from immediately claiming a fear of persecution, such as mistrust of government officials, language barriers, or trauma-induced barriers.

At least one commenter noted that traffickers routinely provide victims with false documents for crossing borders and that trafficking victims may be unable to explain the circumstances of their documentation to law enforcement. The commenter also noted that traffickers regularly confiscate, hide, or destroy their victims' documents to exert control over their victims and that trafficking victims often lack documentation. The commenter opined that trafficking victims were thus particularly vulnerable to bad actors who falsely claim that they can prepare legal documentation.

Commenters stated that the NPRM did not properly consider that some asylum seekers would be required to, or inadvertently, use false documents in the United States while their proceedings were pending, for example, in order to drive or work. Commenters suggested that continued availability of asylum protection to low-wage immigrant workers could encourage them to "step out of the shadows" when faced with workplace exploitation, dangers, and discrimination. By contrast, commenters stated, a categorical limitation would further incentivize some employers to hire and exploit undocumented workers where employers use aliens' immigration status against them and force asylum seekers "deeper into the dangerous informal economy." At least one commenter stated that DHS recently made it harder for asylum seekers with pending applications to survive without using fraudulent documents by proposing a rule that would extend the waiting period for asylum seekers to apply for work authorization from 180 days to one year.

At least one commenter suggested that the proposed limitation related to document-fraud offenses undermined an important policy objective to encourage truthful testimony by asylum seekers.

At least one commenter stated that there was a discrepancy between the Departments' reasoning that the use of fraudulent documents "so strongly undermines government integrity that it would be inappropriate to allow an individual convicted of such an offense

---

[28] *See* 8 CFR 208.13(c)(6)(vi)(B)(1) and 1208.13(c)(6)(vi)(B)(1), which provide that a misdemeanor offense related to document fraud would bar eligibility for asylum unless the alien can establish (1) that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry.

IFR_AR_000363

to obtain the discretionary benefit of asylum'' and possible availability of adjustment of status for a document-fraud-related conviction if the conviction qualified as a petty offense or if the individual obtained a waiver of inadmissibility.

*Response:* The Departments have considered all comments and recommendations submitted regarding the bar to asylum eligibility for aliens with misdemeanor document fraud convictions. Despite commenters' concerns, the Departments continue to believe this exception is consistent with distinctions regarding certain document-related offenses as recognized by the BIA, *Matter of Pula,* 19 I&N Dec. at 474–75; existing statutes, *see* INA 274C(a)(6) and (d)(7) (8 U.S.C. 1324c(a)(6) and (d)(7)); and existing regulations, *see* 8 CFR 270.2(j) and 1270.2(j), as noted in the NPRM. *See* 84 FR at 69653; *cf. Matter of Kasinga,* 21 I&N Dec. 357, 368 (BIA 1996) (concluding that possession of a fraudulent passport was not a significant adverse factor where the applicant ''did not attempt to use the false passport to enter'' the United States, but instead ''told the immigration inspector the truth''). The Departments will not amend the bar as laid out in the proposed rule and will continue to rely on the justifications provided in the NPRM. *See* 84 FR at 69653.[29]

Further, offenses related to fraudulent documents that carry a potential sentence of at least one year are already aggravated felonies, and thus are disqualifying offenses for purposes of asylum. INA 101(a)(43)(P) (8 U.S.C. 1101(a)(43)(P)). Courts have recognized that proper identity documents are essential to the functioning of immigration proceedings. *See Noriega-Perez* v. *United States,* 179 F.3d 1166, 1173–74 (9th Cir. 1999). Furthermore, in passing the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 231, Congress acknowledged the critical role that identity documents play in protecting national security and public safety.

Regarding the commenters' concerns for aliens who may use fraudulent documents as a means to flee persecution or other harms, the Departments reiterate the exception for this bar in the rule for aliens who can establish (1) that the conviction resulted

from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry. 8 CFR 208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1).

The Departments agree with commenters that there are certain, limited circumstances under which an individual with a legitimate asylum claim might need to utilize fraudulent documents during his or her flight to the United States, and the Departments provided this exception to the bar to account for such circumstances. The Departments believe that the exception, as proposed in the NPRM, is sufficient to allow individuals who may have committed document-fraud offenses directly related to their legitimate claims of fear to apply for asylum. The Departments believe that this exception, which is consistent with the exception in INA 274C(d)(7), 8 U.S.C. 1324c(d)(7), allowing the Attorney General to waive civil money penalties for document fraud to an alien granted asylum or statutory withholding of removal, strikes the appropriate balance between recognizing the seriousness of document-fraud-related offenses, including the threat they pose to a functioning asylum system, and the very limited instances where a conviction for such an offense should not bar an applicant from eligibility for asylum.

The Departments disagree with concerns that aliens with viable asylum claims might not be able to either immediately disclose their fear of return at a port-of-entry or prove that they fall within an exception to the bar. DHS has, by regulation, established procedures for determining whether individuals who present themselves at the border have a credible fear of persecution or torture, 8 CFR 208.30, and officers who conduct the interviews are required by regulation to undergo ''special training in international human rights law, non-adversarial interview techniques, and other relevant national and international refugee laws and principles,'' 8 CFR 208.1(b). Asylum officers are required to determine that the alien is able to participate effectively in his or her interview before proceeding, 8 CFR 208.30(d)(1), (5), and verify that the alien has received information about the credible fear process, 8 CFR

208.30(d)(2). The alien may consult with others prior to his or her interview. 8 CFR 208.30(d)(4). Such regulations are intended to recognize and accommodate the sensitive nature of fear-based claims and to foster an environment in which aliens may express their claims to an immigration officer.

The Departments disagree with the commenters that this bar to asylum is inconsistent with case law, particularly *Matter of Pula. See* 19 I&N Dec. at 474–75. The Departments first note that *Matter of Pula* pertains to how adjudicators should weigh discretionary factors in asylum applications. *Id.* This rule, by contrast, sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. Additionally, *Matter of Pula* stated that whether a fraudulent document offense should preclude a favorable finding of discretion depends on ''the seriousness of the fraud.'' *Id.* at 474. The Departments in this rule are clarifying that the disqualifying offenses, which as provided by the rule must have resulted in a misdemeanor conviction, are serious enough to preclude eligibility for asylum, and have provided an exception for those situations that the Departments have determined should not preclude eligibility.

The Departments further reject some comments as unjustified within the context of a law-abiding society. For example, criticizing the rule because it may discourage participation in criminal activity—*e.g.,* driving without a license—or other activity in violation of the law—*e.g.,* working without employment authorization—is tantamount to saying the Departments should encourage and reward unlawful behavior. The Departments decline to adopt such suggestions. More specifically, the Departments reject commenters' suggestions that the additional limitation should not apply to document-fraud-related offenses that stem from fraudulent driver's licenses or employment authorization. The Departments' position on this matter is both reasonable and justified. As explained in the NPRM, such offenses are serious, ''pos[ing] * * * a significant affront to government integrity'' and are particularly pernicious in the context of immigration law, where the use of fraudulent documents, ''especially involving the appropriation of someone else's identity, * * * strongly undermines government integrity.'' 84 FR at 69653. Commenters' concerns about how the rule might affect working conditions of aliens are beyond the scope of this rulemaking.

---

[29] The Departments also reject some comments as wholly unfounded. For example, there is no logical or factual indication that the rule, combined with a criminal conviction for document fraud necessary for the bar to apply, would subsequently cause an alien to commit another crime—*i.e.,* perjury—by testifying untruthfully while in immigration proceedings.

Congress has delegated its authority to the Departments to propose additional, *i.e.,* broader, limitations on the existing bars to asylum eligibility, so long as the additional limitations are consistent with the Act. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). The Departments are acting pursuant to their authority to create additional limitations on asylum eligibility and are not designating additional offenses as particularly serious crimes pursuant to INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), as discussed above. Accordingly, the Departments do not address commenters' concerns that the disqualifying offenses are not or should not be particularly serious crimes.

The Departments disagree with commenters' assertions that the rule would unfairly affect trafficking victims because traffickers force them to use fraudulent documents when they are crossing the border. The Departments recognize the serious nature of such circumstances, but they believe that considerations regarding criminal culpability for document-fraud-related offenses would be best addressed during criminal proceedings.

Finally, regarding commenters' points about the effect of document-fraud-related convictions in the context of adjustment of status under INA 245(a) (8 U.S.C. 1255(a)), the Departments note that adjustment of status is separate from asylum, and the rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to "asylum" eligibility). The adjustment of status conditions and consequent benefits are different from asylum. *See Mahmood* v. *Sessions,* 849 F.3d 187, 195 (4th Cir. 2017) (observing that, although "strong policies underlie" both asylum and adjustment of status, "[t]hese policies serve different purposes"). *Compare* INA 209(b) (8 U.S.C. 1159(b)) *and* 245(a) (8 U.S.C. 1255(a)), *with* INA 208 (8 U.S.C. 1158). The Departments do note, however, that, because adjustment of status is a discretionary form of relief, an alien's document-fraud-related conviction that would bar the alien from asylum eligibility under this rule could also separately be the basis for a denial of adjustment of status. *See, e.g., Matter of Hashmi,* 24 I&N Dec. 785, 790 (BIA 2009) (instructing immigration judges to consider "whether the respondent's application for adjustment merits a favorable exercise of discretion" when considering whether to continue proceedings).

### h. Unlawful Public Benefits Misdemeanors

*Comment:* Commenters opposed the NPRM's proposed limitation on asylum eligibility based on convictions for misdemeanor offenses involving the "unlawful receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority." *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2). Commenters stated that this proposed limitation would disproportionately impact low-income individuals and people of color. Commenters stated that complex evaluations involving assets, income, household composition, and changing circumstances, such as employment or housing, could easily result in overpayments and miscalculations of benefits by both case workers for recipients and recipients themselves. Commenters asserted that these calculations could be especially confusing and difficult for low-income persons who may have literacy challenges, low education levels, or limited English proficiency.

One commenter stated that this proposed limitation was overbroad because there is no requirement that any convictions related to the unlawful receipt of public benefits be linked to fraud or require intentionality.

Commenters asserted that unlawful receipt of public benefits is not a "particularly serious crime." The commenters stated that the proposed limitation fails to differentiate between dangerous offenses and those committed out of desperation and observed that such offenses do not involve an element of intentional or threatened use of force. One commenter stated that the Departments' assertions that such offenses burden taxpayers and drain resources from lawful beneficiaries was not sufficient to render these offenses "particularly serious crimes." Specifically, the commenter stated that this was inconsistent with the intent of the Act and the 1967 Protocol, as well as BIA precedent, citing the following: United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.1.A.S. No. 6577, 606 U.N.T.S. 268 ("The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that

country."); *Delgado,* 648 F.3d at 1110 (Reinhardt, J., concurring in part and concurring in the judgment) ("The agency's past precedential decisions also help to illuminate the definition of a 'particularly serious crime.' Crimes that the Attorney General has determined to be 'particularly serious' as a categorical matter, regardless of the circumstances of an individual conviction, include felony menacing (by threatening with a deadly weapon), armed robbery, and burglary of a dwelling (during which the offender is armed with a deadly weapon or causes injury to another). Common to these crimes is the intentional use or threatened use of force, the implication being that the perpetrator is a violent person." (footnotes omitted)).

Commenters stated that the Departments greatly overstated the scope of this issue and failed to support their assertions that such crimes are of an "inherently pernicious nature." *See* 84 FR at 69653. Commenters stated that, by contrast, "data demonstrates that the incidents of these types of fraud crimes are minimal. For example, the incidence of fraud in the Supplemental Nutrition Assistance Program is estimated at 1.5% for all incidents of fraud, including individuals of all citizenship categories and including both fraud committed by agencies, retailers/shops and individuals." *See* Randy Alison Aussenberg, Cong. Research Serv., R45147, *Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)* (2018), *https://fas.org/sgp/crs/misc/R45147.pdf.*

*Response:* The Departments have considered all of the comments received, and have chosen not to make any changes to the NPRM's regulatory language establishing an additional limitation on asylum eligibility for individuals who have been convicted of an offense related to public benefits. *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2).

The Departments disagree with commenters who believe that the rule would unfairly impact low-income individuals. By contrast, the rule is designed to limit asylum eligibility for those who criminally take advantage of benefits designed to assist low-income individuals. The Departments recognize commenters' concerns that individuals might be unaware of the complex systems that might result in miscalculation and overpayment of benefits; however, the Departments believe that it would be more appropriate for criminal culpability for such offenses to be determined during criminal proceedings.

IFR_AR_000365

In response to comments that such offenses are not particularly serious crimes, the Departments again note that the Departments' authority to set forth additional limitations and conditions on asylum eligibility requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses be particularly serious crimes or involve any calculation of dangerousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). As discussed in the NPRM, limiting asylum eligibility for those who have been convicted of such offenses, which are of an "inherently pernicious nature," is consistent with previous Government actions to prioritize enforcement of the immigration laws against such offenders. 84 FR at 69653.

Regardless of the relative frequency of public benefits fraud, the Departments have concluded that convictions for such crimes, however often they occur, should be disqualifying for eligibility for the discretionary benefit of asylum. For example, the Departments are encouraged by the data cited by commenters indicating that the rate of fraud in certain programs may be low, but low rates of fraud do not support countenancing the abuse of public benefits by the remainder of the programs' participants.

i. Controlled Substance Possession or Trafficking Misdemeanors [30]

*Comment:* Commenters also opposed designation of misdemeanor possession or trafficking of a controlled substance or controlled-substance paraphernalia as categorical bars to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3) (proposed). Commenters asserted that the proposed limitation would be unnecessary, overbroad, and racially discriminatory.

Commenters remarked that the proposed limitation was overbroad with respect to the convictions and conduct covered and was not tailored to bar only those who have engaged in "serious" conduct or otherwise posed a danger to the community. Commenters also stated that the proposed limitation was overbroad because it did not account for jurisdictions that had decriminalized certain drugs, like cannabis.

Commenters said that, given the stakes at issue in asylum claims, protection should not be predicated on an applicant's abstinence from drugs. Commenters also stated that this proposed limitation was particularly inappropriate "at a time of such inconsistency in federal laws surrounding drug legalization." Commenters generally expressed concern about the Federal government's perpetuation of the "war on drugs."

Commenters stated that the proposed limitation would not make anybody safer but rather result in the denial of bona fide asylum claims. Commenters stated that the proposed limitation would "go beyond any common sense meaning" of the term "particularly serious crime." Commenters were particularly concerned with the implications of this proposed limitation because it would eliminate the opportunity for applicants to present mitigating circumstances that, commenters stated, are commonly associated with such convictions, such as addiction, self-medication, and any subsequent treatment or rehabilitation. Commenters asserted that the proposed limitation would improperly expand bars to asylum eligibility based on laws where enforcement decisions are "heavily tainted" by racial profiling.

Commenters also expressed concern that the proposed limitation would unfairly punish asylum seekers who might be vulnerable to struggles with addiction as a coping mechanism after facing significant trauma, particularly in light of obstacles to accessing medical or psychological treatment. Commenters stated that the proposed limitation eliminated any possibility of a treatment- and compassion-based approach to addiction. Commenters stated that the Departments' position on this matter was at odds with national trends to "move toward a harm reduction approach to combating drug and alcohol addiction." Some commenters noted that treatment of misdemeanor offenses relating to controlled substances, particularly with respect to offenses involving possession of marijuana or prescription drugs, was "wildly disproportionate to the severity of these offenses." One commenter asserted that these offenses do not have an element of violence or dangerousness and stated that the "only victims are the offenders themselves."

One commenter remarked that the Departments relied on "misleading evidence that does not create a link between dangerousness" and the disqualifying offense. The commenter stated that widespread opioid abuse is "rooted in over-prescription by healthcare providers based on the assurances of pharmaceutical companies" and does not serve as a relevant justification for the additional limitation.

One commenter stated that courts and statutes, including the Supreme Court, have treated varying simple possession drug offenses differently. For example, the commenter read the Supreme Court's decision in *Lopez* v. *Gonzales,* 549 U.S. 47 (2006), to mean that simple possession of a controlled substance is not a "drug trafficking crime unless it would be treated as a felony if prosecuted under federal law." The commenter also remarked that a single incident of simple possession of any controlled substance except for Flunitrazepam is not treated as a felony and is thus not considered an aggravated felony, *see* 21 U.S.C. 844; and that some second convictions for possession have been recognized as drug trafficking aggravated felonies, but not all, *see Carachuri-Rosendo* v. *Holder,* 560 U.S. 563, 566 (2010); *Berhe* v. *Gonzales,* 464 F.3d 74, 85–86 (1st Cir. 2006). The commenter asserted that the nuanced and varying assessments related to such offenses suggest "they do not merit blanket treatment of the same severity."

Some commenters objected to existing aggravated felony bars with respect to drug-related offenses in addition to the proposed limitation. Commenters stated that immigration judges should continue to be able to exercise discretion over those controlled-substance-related offenses that are not already subject to an existing bar to asylum. Commenters also generally objected to criminalizing possession of drugs for personal use, given the medical value and current inconsistent treatment among states, but no analysis was provided connecting these comments to the NPRM, specifically.

---

[30] In addition to the comments regarding the bar to asylum discussed in this section, multiple commenters shared their opinion that marijuana should be legalized, without reference to a particular provision of the proposed rule. The Departments note that broad questions of national drug policy, including the legalization of marijuana at the national or State level, are outside the scope of this rulemaking. Marijuana remains a controlled substance, with the resulting penalties that may flow from its possession, trafficking, or other activities involving it. *See* 21 CFR 1308.11 (Schedule I controlled substances).

*Response:* The Departments have considered all comments and recommendations submitted regarding the NPRM. The final rule does not alter the regulatory language set forth in the NPRM with respect to the limitation on misdemeanor offenses involving possession or trafficking of a controlled substance or controlled-substance paraphernalia. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3).

Consistent with the INA's approach toward controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), this rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. However, as discussed in the NPRM, the Departments have determined that possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." *Id.* Accordingly, the Departments made a policy decision to protect against such threats by barring asylum to such possessors and traffickers, and Federal courts have agreed with such treatment in the past. *See Ayala-Chavez* v. *U.S. INS,* 944 F.2d 638, 641 (9th Cir. 1991) ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood* v. *INS,* 803 F.2d 1165, 1167 (11th Cir. 1988))).

The Departments note that aliens barred from asylum eligibility as a result of this provision may still be eligible for withholding of removal under the Act or CAT protection, provisions that would preclude return to a country where they experienced or fear torture or persecution. *See* 84 FR at 69642.

The Departments disagree with comments suggesting that the bar is overbroad and not appropriately tailored only to aliens who have engaged in serious conduct or pose a danger to the community. Similarly, the Departments strongly disagree with commenters who asserted that this additional limitation will not make communities safer. Despite commenters' arguments, the Departments reiterate that controlled substance offenses represent significant and dangerous offenses that are damaging to society as a whole. *See Matter of Y–L–,* 23 I&N Dec. 270, 275 (A.G. 2002) (noting that "[t]he harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes"). The illicit use of controlled substances imposes

substantial costs on society from loss of life, familial disruption, the costs of treatment or incarceration, lost economic productivity, and more. *Id.* at 275–76 (citing *Matter of U–M–,* 20 I&N Dec. 327, 330–31 (BIA 1991) ("This unfortunate situation has reached epidemic proportions and it tears the very fabric of American society.")); 84 FR at 69654; *see also* Office of Nat'l Drug Control Policy, *National Drug Control Strategy* 11 (Feb. 2020), *https://www.whitehouse.gov/wp-content/uploads/2020/02/2020-NDCS.pdf* (explaining, in support of the national drug control strategy, the devastating effects of drug use and the necessity for treatment that includes "continuing services and support structures over an extended period of time"). Increased controlled substance prevalence is often correlated with increased rates of violent crime and other criminal activities. *See* 84 FR at 69650 (explaining that perpetrators of crimes such as drug trafficking are "displaying a disregard for basic societal structures in preference of criminal activities that place other members of the community * * * in danger").

Even assuming, arguendo, the commenters are correct that such offenses do not reflect an alien's dangerousness to the same extent as those offenses that are formally designated "particularly serious crimes," the Departments' authority to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular level of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the

Secretary to establish a wide range of conditions on asylum eligibility, and the designation of certain drug-related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Further, as discussed at length in the NPRM, this additional limitation on asylum eligibility is consistent with the Act's treatment of controlled-substance offenses as offenses that may render aliens removable from or inadmissible to the United States. 84 FR at 69654.

### 4. Due Process and Fairness Considerations

*Comment:* The Departments received numerous comments asserting that the rule violates basic notions of fairness and due process. One commenter asserted that anything that makes the asylum process harder, which the NPRM does according to the commenter, is a denial of due process. Commenters claimed that the Departments' true goal in promulgating these rules is to reduce the protections offered by existing asylum laws and to erode "any semblance of due process and justice for those seeking safety and refuge in this country."

In addition to general objections regarding due process, commenters asserted various constitutional problems with the proposed rule. Citing *United States* v. *Davis,* 139 S. Ct. 2319, 2323 (2019), commenters specified that due process requires laws and regulations to "give ordinary people fair warning about what the law demands of them." These commenters argued that the proposed rule fails to give affected individuals fair notice of which offenses will bar asylum. Commenters also noted that equal protection principles require the government to treat similarly situated people in the same manner but averred that the proposed rule, as applied, would result in similarly situated applicants being treated differently.

Commenters stated that requiring immigration adjudicators to deny a legal benefit, even a discretionary one, based on alleged and uncharged conduct is a clear violation of the presumption of innocence, which the commenters

IFR_AR_000367

argued is a fundamental tenet of our democracy.

Commenters alleged that immigration proceedings are not the proper venue for the sort of evidentiary considerations required by the rule. Commenters argued that asylum applicants will not have the opportunity to be confronted by evidence or to contest such evidence in a criminal court. These commenters noted that criminal courts afford defendants additional due process protections not found in immigration court, such as the right to counsel, the right to discovery of the evidence that will be presented, and robust evidentiary rules protecting against the use of unreliable evidence.

Similarly, commenters alleged that, due to the ''lack of robust evidentiary rules in immigration proceedings,'' many applicants would be unable to rebut negative evidence submitted against them, even if the evidence submitted is false. One commenter claimed, without more, that there is a high likelihood that such evidence is false. Commenters were concerned that unreliable evidence would be submitted in support of the application of the additional bars. Alternatively, commenters stated that immigration adjudicators might rely on evidence where a judicial court had already evaluated reliability and not credited the evidence based on a lack of reliability. In addition, commenters were concerned that the rule authorizes adjudicators to seek out unreliable evidence obtained in violation of due process to determine whether an applicant's conduct triggers the particularly serious crime bar.

Commenters were concerned that requiring applicants to disprove allegations of gang-related activity or domestic violence would result in re-litigation of convictions or litigation of conduct that fell outside the scope of prior convictions. Similarly, commenters were concerned that the rule violates due process because it requires adjudicators to consider an applicant's conduct, separate and apart from any criminal court decision, that may trigger a categorical bar to asylum. One commenter asserted that ''people seeking asylum should have the right to be considered innocent until proven guilty, and should not be denied asylum based on an accusation.'' Moreover, commenters alleged that this consideration extends to whether a vacated or modified conviction or sentence still constitutes a conviction or sentence triggering the bar to asylum.

Commenters alleged that adjudicators might improperly rely on uncorroborated allegations in arrest reports and shield the ensuing decision from judicial review by claiming discretion. Commenters stated that the rule lacks safeguards to prevent such erroneous decisions.

Commenters expressed concern that asylum applicants, especially detained applicants, would struggle to find evidence related to events that may have occurred years prior to the asylum application. One organization noted that the rule would be particularly challenging for detained respondents because they often lack representation and would be required to rebut circumstantial allegations with limited access to witnesses and evidence.

The Departments also received numerous comments stating that asylum hearings, which typically last three or fewer hours, provide insufficient time to permit both parties to present full arguments on these complex issues, as effectively required by the rule, thereby resulting in due process violations.

One commenter raised due process and constitutional concerns if the rule fails to provide proper notice to the alien. In that case, commenters alleged that the Sixth Amendment right to ''be accurately apprised by defense counsel of the immigration consequences of his guilty plea to criminal charges'' applies but that the rule fails to account for those consequences.

*Response:* The rule does not violate notions of fairness or due process. As an initial matter, asylum is a discretionary benefit, as demonstrated by the text of the statute, which states the Departments ''may'' grant asylum, INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), and which provides authority to the Attorney General and the Secretary to limit and condition, by regulation, asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Courts have found that aliens have no cognizable due process interest in the discretionary benefit of asylum. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, ''[t]here is no constitutional right to asylum per se.'' *Mudric,* 469 F.3d at 98. Thus, how the Departments choose to exercise their authority to limit or condition asylum eligibility and an adjudicator's consideration of an applicant's conduct in relation to asylum eligibility do not implicate due process claims.

The rule does not ''reduce the protections offered by the asylum laws.'' In fact, the rule makes no changes to asylum benefits at all; rather, it changes who is eligible for such benefits. *See* 84 FR at 69640. Further, the rule is not intended to ''erode'' due process and justice for aliens seeking protection; instead, the rule revises asylum eligibility by adding categorical bars to asylum eligibility, clarifying the effect of certain criminal convictions and conduct on asylum eligibility, and removing automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. Although some of these changes may affect aliens seeking protection in the United States, these effects do not constitute a deprivation of due process or justice, and alternative forms of protection—withholding of removal under the Act along with withholding of removal or deferral of removal under the CAT regulations— remain available for qualifying aliens. *See* 84 FR at 69642.

Regarding commenters' concerns that the rule does not sufficiently provide notice to aliens regarding which offenses would bar asylum eligibility, the Departments first note that the publication of the NPRM and this final rule serves, in part, as notice to the public regarding which offenses bar asylum eligibility. *See* 5 U.S.C. 552. Courts have held that an agency's informal rulemaking pursuant to 5 U.S.C. 553 constitutes sufficient notice to the public if it ''fairly apprise[s] interested persons of the 'subjects and issues' involved in the rulemaking[.]'' *Air Transport Ass'n of America* v. *FAA,* 169 F.3d 1, 6 (D.C. Cir. 1999) (quoting *Small Refiner Lead Phase-Down Task Force* v. *EPA,* 705 F.2d 506, 547 (D.C. Cir. 1983)).

To the extent that commenters argued that the rule is insufficiently clear with regards to the substance of what offenses are disqualifying,[31] the Departments disagree. This rule clearly establishes which offenses bar asylum by listing such offenses in detail in the regulatory text at 8 CFR 208.13(c)(6)–(9) and 1208.13(c)(6)–(9). Unlike other statutory provisions that have been found unconstitutionally vague,[32] this rule clearly establishes grounds for mandatory denial of request for asylum. 8 CFR 208.13(c)(6)–(9), 1208.13(c)(6)– (9). The regulatory text adds paragraph (c)(7) to specifically define terms used

---

[31] *Cf. Dimaya,* 138 S. Ct. at 1225 (''Perhaps the most basic of due process's customary protections is the demand of fair notice.'').

[32] For example, the Court in *Dimaya,* 138 S. Ct. at 1222–23, held that the Federal criminal code provision at issue was unconstitutionally vague in part because it failed to provide definitions for or explain such terms as ''ordinary case'' and ''violent.'' On the other hand, the term ''crime involving moral turpitude'' has continuously been upheld as not unconstitutionally vague, despite repeated judicial criticism. *See, e.g., Islas-Veloz* v. *Whitaker,* 914 F.3d 1249, 1250 (9th Cir. 2019) (''the phrase 'crime involving moral turpitude' [is] not unconstitutionally vague'').

in 8 CFR 208.13 and 1208.13, and the regulatory text otherwise references applicable definitions for terms not found in paragraph (c)(7). *See, e.g.,* 8 CFR 1208.13(c)(6)(iv)(A) (defining driving while intoxicated or impaired "as those terms are defined under the jurisdiction where the conviction occurred"). Further, just as the INA contains various criminal grounds for ineligibility without specified elements, *see generally* INA 101(a)(43) (8 U.S.C. 1101(a)(43)), here, the Departments have provided a detailed list of particular criminal offenses or related activities that would render an alien ineligible for asylum. Accordingly, despite the commenter's argument that the regulatory text fails to give "fair warning" of which offenses would bar asylum eligibility, the regulatory text is sufficiently clear to provide the public with the requisite notice. *See Davis,* 139 S. Ct. at 2323.

The Departments acknowledge the commenters' general equal protection concerns; however, without more detailed comments providing for the specific concerns of commenters, the Departments are unable to provide a complete response to these comments. The Departments note, however, that categorical bars to asylum apply equally to all asylum applicants and do not classify applicants on the basis of any protected characteristic, such as race or religion.

Immigration proceedings are civil in nature; thus constitutional protections for criminal defendants, including evidentiary rules, do not apply. *See INS* v. *Lopez-Mendoza,* 468 U.S. 1032, 1038 (1984); *Dallo* v. *INS,* 765 F.2d 581, 586 (6th Cir. 1985); *Baliza* v. *INS,* 709 F.2d 1231, 1233 (9th Cir. 1983); *Longoria-Castaneda* v. *INS,* 548 F.2d 233 (8th Cir. 1977). In addition, any determinations regarding evidence or other related procedural issues by a criminal court do not automatically apply in a subsequent immigration proceeding or asylum interview. The Departments emphasize that the NRPM did not propose and the final rule does not enact any changes to the immigration court or asylum interview rules of procedure or evidentiary consideration processes. Accordingly, adjudicators will continue to receive and consider "material and relevant evidence," and it is the adjudicator who determines what evidence so qualifies. 8 CFR 1240.1(c). Immigration adjudicators regularly consider and receive evidence regarding criminal offenses or conduct in the context of immigration adjudications, including asylum applications, where such evidence has been frequently considered as part of the "particularly

serious crime" determination or as part of the ultimate discretionary decision. *Cf. Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (holding that aliens convicted of violent or dangerous offenses generally do not merit asylum as a matter of discretion).

Many of the commenters' concerns rely on circumstances that are purely speculative or that are only indirectly implicated by the rule. For example, commenters' concerns regarding an alien's hypothetical inability to confront evidence require first that concerning evidence is at issue, that such evidence is false, and finally that the alien is unable (for reasons unspecified by commenters) to rebut such evidence. Likewise, commenters' concerns regarding evidence supporting the bars rest on the premise that such specific evidence is submitted in the future, that such evidence has not been tested, and that such evidence is thus unreliable. Regarding these concerns, the Departments are unable to comment on speculative examples.

In regard to commenters' concerns about the reliability determinations of evidence already made by judicial courts, the regulations require that immigration judges consider material and relevant evidence. *See* 8 CFR 1240.1(c). Immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). The rule does not undermine or revise that standard; thus, commenters' concerns are unwarranted.

In general, commenters' concerns are no different than existing concerns regarding the reliability of evidence submitted by aliens in asylum cases, which is generally rooted in hearsay, frequently cannot be confronted or rebutted, and is typically uncorroborated except by other hearsay evidence. *See, e.g., Angov* v. *Lynch,* 788 F.3d 893, 901 (9th Cir. 2015) ("The specific facts supporting a petitioner's asylum claim—when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a foreign country. In order for [DHS] to present evidence 'refuting or in any way contradicting' petitioner's testimony, it would have to conduct a costly and often fruitless investigation abroad, trying to prove a negative—that the incidents petitioner alleges did not happen." (quoting *Abovian* v. *INS,* 257 F.3d 971, 976 (9th Cir. 2001) (Kozinski, J., dissenting from denial of petition for

rehearing en banc))); *Mitondo* v. *Mukasey,* 523 F.3d 784, 788 (7th Cir. 2008) ("Most claims of persecution can be neither confirmed nor refuted by documentary evidence. Even when it is certain that a particular incident occurred, there may be doubt about whether a given alien was among the victims. Then the alien's oral narration must stand or fall on its own terms. Yet many aliens, who want to remain in the United States for economic or social reasons unrelated to persecution, try to deceive immigration officials."). Asylum adjudicators are well experienced at separating reliable from unreliable evidence, regardless of its provenance, and this rule neither inhibits their ability to do so nor changes the process for assessing evidence.

Further, as discussed in the preamble to the proposed rule, the rule contemplates the consideration of all "reliable" evidence and authorizes adjudicators to assess all "reliable" evidence. 84 FR at 69649 and 69652. The rule does not encourage adjudicators to "seek out unreliable evidence," as commenters alleged. Accordingly, the Departments disagree with commenters that adjudicators will improperly rely on information in arrest reports that the adjudicators have determined is unreliable, and the Departments further disagree that adjudicators would seek to protect such decisions by claiming discretion.

As explained in section II.C.2.a.i, the rule establishes limits and conditions on asylum eligibility; it does not add offenses to the "particularly serious crime" bar. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6) (both using prefatory language that reads "[a]dditional limitations on eligibility for asylum"). To the extent that commenters' concerns relate specifically to the "particularly serious crime" bar, the Departments decline to respond because those concerns are outside the scope of this rulemaking.

Regarding commenters' concerns that the domestic violence and gang-related bars to asylum eligibility would violate due process due to the requirement that the adjudication re-litigate the offense or consider conduct separate and apart from a criminal conviction, the Departments first note that there has never been a prohibition on the consideration of conduct when determining the immigration consequences of an offense or action.[33]

---

[33] To the extent the issues raised by commenters relate to the domestic violence provision of the rule that is not based on a criminal conviction, the Departments note that regulations have considered

IFR_AR_000369

Further, the consideration of conduct in this manner matches certain bars to admissibility or bases of deportability under the INA. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (instructing that an alien who the relevant official "knows or has reason to believe * * * is or has been an illicit trafficker in any controlled substance" is inadmissible); INA 212(a)(2)(H) (8 U.S.C. 1182(a)(2)(H)) (instructing that an alien who the relevant official "knows or has reason to believe is or has been * * * a trafficker in severe forms of trafficking in persons" is inadmissible); INA 237(a)(2)(F) (8 U.S.C. 1227(a)(2)(F)) (instructing that an alien described in section 212(a)(2)(H) of the Act (8 U.S.C. 1182(a)(2)(H)) is deportable); *see also, e.g., Lopez-Molina* v. *Ashcroft,* 368 F.3d 1206, 1207–08 & n.1 (9th Cir. 2004) (explaining that the immigration judge found the respondent removable due to a reason to believe he was a controlled substance trafficker on account of a prior arrest report and information surrounding his conviction for misprision of a felony). In addition, the consideration of the alien's conduct in these circumstances is consistent with the consideration of conduct when reviewing a circumstance-specific ground of removability or deportability. *See Nijhawan,* 55 U.S. at 38.

Further, as discussed above, the rule does not violate due process because asylum is a discretionary benefit that does not implicate a liberty interest. *See Yuen Jin,* 538 F.3d at 156–57 (collecting cases); *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50); *cf. Hernandez,* 884 F.3d at 112 (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko,* 392 F.3d at 971 (finding that an alien has no right to effective assistance of counsel with regard to an asylum claim because there is no liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In addition, aliens may provide argument and evidence that they are not subject to an asylum bar. *See* 8 CFR 1240.8(d) (providing that the alien bears the burden of proof to show that a basis for mandatory denial does not apply); *see also* 84 FR at 69642.

Finally, commenters' Sixth Amendment concerns, including the

---

similar conduct in the context of immigration law for nearly 25 years with no recorded challenges to the provisions of 8 CFR 204.2(c)(1)(i)(E) as a violation of due process.

---

presumption that a person is "innocent until proven guilty" are inapposite. The protections afforded by that amendment apply to criminal defendants, and asylum applicants in immigration proceedings are not criminal defendants. *See, e.g., Ambati* v. *Reno,* 233 F.3d 1054, 1061 (7th Cir. 2000) ("Deportation hearings are civil proceedings, and asylum-seekers, therefore, have no Sixth Amendment right to counsel."); *Lavoie* v. *Immigration and Naturalization Service,* 418 F.2d 732, 734 (9th Cir. 1969) ("[D]eportation proceedings are civil and not criminal, in nature, and [] the rules * * * requiring the presence of counsel during interrogation, and other Sixth Amendment safeguards, are not applicable to such proceedings."); *Lyon* v. *U.S. Immigr. and Customs Enf't,* 171 F. Supp. 3d 961, 975 (N.D. Cal 2016) ("[T]he Ninth Circuit has never so held, and the Court is reluctant to so interpret the INA absent any indication that Congress intended to import full Sixth Amendment standards into the INA.").

The Departments maintain that they have correctly concluded that convictions pursuant to expunged or vacated orders or modified sentences remain effective for immigration purposes if the underlying reason for expungement, vacatur, or modification was for "rehabilitation or immigration hardship." *Matter of Thomas and Thompson,* 27 I&N Dec. at 680; *see also* 84 FR at 69655. Courts also support this principle, stating that it is "entirely consistent with Congress's intent * * * [to] focus[ ] on the original attachment of guilt (which only a vacatur based on some procedural or substantive defect would call into question)" and to "impose[ ] uniformity on the enforcement of immigration laws." *Saleh,* 495 F.3d at 24.

Next, contrary to commenters' concerns, this rule does not violate principles such as being "innocent until proven guilty." Convictions and sentences are not re-litigated during immigration proceedings. Rather, convictions and sentences at issue in immigration proceedings have already been determined in a separate hearing, consistent with due process, and "[l]ater alterations to that sentence that do not correct legal defects[ ] do not change the underlying gravity of the alien's action." *Matter of Thomas and Thompson,* 27 I&N Dec. at 683. Congress determined that immigration consequences should attach to an alien's original conviction and sentencing, pursuant to section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)). *See id.* Thus, the Departments do not deprive an alien of due process or presume guilt when an

alien's conviction or sentence, if expunged, vacated or modified for rehabilitation or immigration purposes, remains effective for immigration proceedings, including asylum adjudications, because such an expungement, vacatur, or modification does not call into question whether the underlying criminal proceedings themselves complied with due process.

The Departments once again reiterate their statutory authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). In accordance with that authority, the Departments promulgated the NPRM and believe that the provisions of this final rule are sufficient without commenters' recommended safeguards.

Finally, issues involving evidence gathering are beyond the scope of this rulemaking. For issues regarding representation, *see* section II.C.6.h. The Departments disagree that hearings lack sufficient time for both parties to present arguments. *See* Office of the Chief Immigration Judge, *Immigration Court Practice Manual,* 68–69 (Mar. 17, 2020), *https://www.justice.gov/eoir/page/file/1258536/download* (noting that, at a master calendar hearing, a respondent should be prepared "to estimate (in hours) the amount of time needed to present the case at the individual calendar hearing"). Moreover, if parties believe additional time is needed, the regulations provide a mechanism for them to seek additional time through a motion for continuance. *See* 8 CFR 1003.29.

**5. Insufficient Alternative Protection From Removal**

*Comment:* The Departments received numerous comments alleging that withholding of removal under the Act and protection under the CAT regulations are insufficient alternative forms of protection for individuals barred from asylum pursuant to the proposed rule. Overall, commenters believed that refugees "should not be required to settle for these lesser forms of relief." Commenters averred that the availability of these forms of protection does not justify the serious harm caused by the proposed rule's "overly harsh and broad limits on asylum." Specifically, statutory withholding of removal and protection under the CAT regulations are much narrower in scope and duration than asylum and require applicants to establish a higher burden of proof. One commenter noted that, even if an applicant was able to meet the higher burden of proof for statutory withholding of removal or protection

under the CAT regulations, the individual would not then be accorded the benefits required by the Refugee Convention.

Commenters cited a number of limitations imposed on recipients of these forms of protection to demonstrate why they are insufficient alternatives to asylum. For example, commenters expressed concern regarding the prohibition on international travel for recipients of statutory withholding of removal and CAT protection. Commenters noted that, unlike recipients of asylum, these individuals are not provided travel documents. At the same time, because these individuals have been ordered removed but that removal has been withheld or deferred, any international travel would be considered a "self-deportation," foreclosing any future return to the United States. Commenters stated that this conflicts with the Refugee Convention, which requires that contracting states issue travel documents for international travel to refugees lawfully staying in their territory.

Commenters also claimed the proposed rule contravenes the Refugee Convention by failing to ensure "that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country." Commenters alleged that individuals who are granted statutory withholding of removal or protection under the CAT regulations would be unable to reunite with family in the United States because these forms of relief do not allow the recipient to petition for derivative beneficiaries. Due to this, commenters stated that the proposed rule instituted another formal policy of family separation that permanently separate spouses and children from their family members.

Commenters also stated that the proposed rule would lead to additional forms of family separation because spouses and minor children who traveled with the primary asylum seeker would still need to establish individual eligibility for statutory withholding of removal or protection under the CAT regulations because there is no derivative application available in such circumstances. Also, commenters expressed concern that, without the ability to petition for additional family members, the proposed rule would force family members who remain in danger abroad to make the journey to the United States alone, likely endangering children who might be forced to make the journey as unaccompanied minors.

As another example of the lesser benefits of statutory withholding of removal and protection under the CAT regulations, commenters noted that recipients of withholding of removal must apply annually for work authorization. Commenters explained that individuals not only have to pay for these work authorization applications, but also face delays in adjudication of work authorization applications, which often results in the loss of legal authorization to work.

Similarly, commenters noted that recipients of statutory withholding of removal or protection under the CAT regulations may lose access to Federal public benefits, including "supplemental security income, food stamps, Medicaid, and cash assistance." Commenters expressed concern that, although recipients of withholding of removal may be eligible for a period of seven years to receive Federal means-tested public benefits, after seven years, the presumption is that the alien would have adjusted status. However, because recipients of withholding of removal are not provided a pathway to lawful permanent residency, commenters expressed concern that vulnerable individuals such as those who are disabled or elderly would be at risk of losing those public benefits.

Commenters also noted that recipients of statutory withholding of removal and protection under the CAT regulations remain in a tenuous position because they are not granted lawful status to remain in the United States indefinitely. Commenters averred that this contravenes the Refugee Convention by failing to "as far as possible facilitate the assimilation and naturalization of refugees." Recipients of statutory withholding of removal or protection under the CAT regulations may have their status terminated at any time based on a change in the conditions of their home country. Commenters explained that, because these individuals have no access to permanent residence or citizenship, they may be required to check in with immigration officials periodically. Commenters claimed that, at these check-ins, individuals may be required to undergo removal to a third country to which the individual has no connection.

Because of the constant prospect of deportation or removal, commenters stated that recipients of withholding or CAT protection are in a constant state of uncertainty. This uncertainty, commenters alleged, is particularly harmful to asylum seekers who have experienced severe human rights abuses. Commenters argued that certainty of a safe place to live forever

is one of the most important aspects of the treaties establishing the refugee system. Commenters claimed that uncertainty and limbo discourage recipients from establishing connections to the United States, which in turn generates community instability. Commenters alleged that a lack of community stability will result in increased criminal activity as individuals are less incentivized to invest in the community or keep the community safe. Additionally, this uncertainty may reduce the incentive for individuals to invest in their community by, for example, opening businesses, hiring others, or paying taxes.

Commenters were concerned that increasing the population of people who are ineligible to receive asylum may create a cohort of individuals who will later need a "legislative fix" to adjust their status and grant them full rights as citizens.

Finally, commenters noted that both statutory withholding of removal and protection under the CAT regulations require a higher burden of proof than asylum. Commenters explained that asylum requires only that the applicant demonstrate at least a 10 percent chance of being persecuted if removed. Withholding of removal, either under the Act or under the CAT regulations, however, requires the applicant to demonstrate that it is more likely than not that he or she would be persecuted or tortured if returned—*i.e.*, he or she must show a more than fifty percent chance of being persecuted or tortured if removed. Commenters noted that, because of this higher burden of proof, an applicant may have a valid and strong asylum claim but be unable to meet the burden for statutory withholding of removal or protection under the CAT regulations. As a result, commenters alleged that an individual may be returned to a country where he or she would face persecution or even death.

Commenters averred that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations.

*Response:* The Departments maintain that statutory withholding of removal under the Act and protection under the CAT regulations are sufficient alternatives for individuals who are barred from asylum by one of the new bars. As stated, asylum is a discretionary form of relief subject to regulation and limitations by the Attorney General and the Secretary. *See*

IFR_AR_000371

INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Significantly, the United States implemented the non-refoulement provisions of Article 33(1) of the Refugee Convention and Article 3 of the CAT through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41; *see also* 8 CFR 208.16 through 208.1; 1208.16 through 1208.18.

As recognized by commenters, asylum recipients are granted additional benefits not granted to recipients of statutory withholding of removal or CAT protection. Although the Attorney General and the Secretary are authorized to place limitations on those who receive asylum, it is Congress that delineates the attendant benefits to receiving relief or protection under the INA. *See, e.g.,* INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)) (asylees cannot be removed and can travel abroad without prior consent); INA 208(b)(3) (8 U.S.C. 1158(b)(3)) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b) (8 U.S.C. 1159(b)) (allowing the Attorney General or the Secretary to adjust the status of an asylee to that of a lawful permanent resident). Commenters identified various benefits that would be denied to individuals who receive statutory withholding of removal or protection under the CAT regulations as opposed to asylum. Congress chose not to provide the identified immigration benefits to recipients of statutory withholding of removal under the Act or protection under the CAT regulations. Congress, of course, may always revisit its decision; however, that is not the proper role of the Executive Branch.

Moreover, the United States is not required under U.S. law to provide the benefits identified by commenters to all individuals who seek asylum. For example, the valuable benefit of permanent legal status is not required under the United States' international treaty obligations.

In addition, recipients of statutory withholding of removal are eligible for numerous public benefits. Specifically, recipients of statutory withholding are eligible for Supplemental Security Income ("SSI"), the Supplemental Nutrition Assistance Program ("SNAP," also known as food stamps), and Medicaid for the first seven years after their applications are granted,[34] and for

Temporary Assistance to Needy Families ("TANF") during the first five years after their applications are granted.[35] Although asylees are eligible for additional benefits administered by HHS and ORR, the Departments believe that it is reasonable to exercise their discretion under U.S. law to limit these benefits to asylum recipients who do not have or who have not been found to have engaged in the sort of conduct identified in the bars to asylum eligibility being implemented in this rule because doing so incentivizes lawful behavior.

Commenters' assertions that statutory withholding of removal and protection under the CAT regulations essentially trap individuals in the United States is misplaced. Although an individual who has been granted these forms of protection is not guaranteed return to the United States if he or she leaves the country, these forms of protection do not prevent individuals from traveling outside the United States. *See Cazun,* 856 F.3d at 257 n.16.

To the extent commenters raised concerns that recipients of statutory withholding and CAT protection must apply annually for work authorization, the United States is permitted to place restrictions on work authorization. As required by Article 17 of the Refugee Convention, the United States must accord refugees "the most favourable treatment accorded to nationals of a foreign country in the same circumstances." Individuals who have received a grant of withholding of removal or protection under the CAT regulations are not in the same position as an individual who has been granted lawful permanent resident status. Rather, these individuals have been ordered removed and had their removal withheld or deferred pursuant to a grant of withholding of removal or protection under the CAT regulations. The United States has opted to grant these individuals work authorization, despite their lack of permanent lawful status. However, because these individuals are not accorded permanent lawful status, the United States has determined that they must submit a yearly renewal for that work authorization.

Significantly, although the burden of proof to establish statutory withholding of removal or protection under the CAT regulations is higher than to establish asylum, this burden remains in compliance with the Protocol and Refugee Convention, which require that

"[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion," and Article 3 of the CAT, which similarly requires that "[n]o State Party shall expel, return * * * or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." As explained by the Supreme Court with respect to statutory withholding of removal, the use of the term "would" be threatened as opposed to "might" or "could" indicates that a likelihood of persecution is required. *Stevic,* 467 U.S. at 422. Citing congressional intent to bring the laws of the United States into compliance with the Protocol, the Court concluded that Congress intended withholding of removal to require a higher burden of proof and that the higher burden complied with Article 33 of the Refugee Convention. *Id.* at 425–30. Similarly, the "burden of proof for an alien seeking CAT protection is higher than the burden for showing eligibility for asylum." *Lapaix* v. *U.S. Att'y Gen.,* 605 F.3d 1138, 1145 (11th Cir. 2010). As with statutory withholding of removal and the risk of persecution, the burden of proof for CAT protection and the risk of torture is "more likely than not." *Compare* 8 CFR 1208.16(b)(2) (statutory withholding), *with* 1208.16(c)(2) (CAT protection).[36]

In response to commenters who asserted that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations, the Departments note that such an assessment would not be feasible. The Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions or pertinent criminal conduct that would be subject to the bars added by this rule. Without this data, the

---

[34] 8 U.S.C. 1612(a)(1), (a)(2)(A)(iii), (a)(3) (SSI & SNAP); 8 U.S.C. 1612(b)(1), (b)(2)(A)(i)(III), (b)(3)(C) (Medicaid).

[35] 8 U.S.C. 1612(b)(1), (b)(2)(A)(ii)(III), (b)(3)(A)–(B) (TANF and Social Services Block Grant); 8 U.S.C. 1622(a), (b)(1)(C); 8 U.S.C. 1621(c) (state public assistance).

[36] The burden associated with the CAT regulations is consistent with congressional intent. As the Third Circuit has noted, the U.S. Senate gave its advice and consent to ratification of the CAT subject to several reservations, understandings, and declarations, including that the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *Auguste,* 395 F.3d at 132.

Departments cannot reliably estimate the population affected by this rule. In addition, even with these statistics, it is impossible to accurately predict in advance whether immigration judges would grant these individuals statutory withholding of removal or protection under the CAT regulations due to the fact-bound nature of such claims, the various factors that must be established for each claim (*e.g.,* credibility), independent nuances regarding the claim, evidence submitted, and myriad other factors.

6. Policy Concerns

a. Unfair, Cruel Effects on Asylum Seekers

*Comment:* Commenters opposed the rule because, among many reasons, they alleged that it imposes unfair, cruel effects on aliens who would otherwise be eligible for asylum. Commenters alleged that the rule constitutes an "unnecessary, harsh, and unlawful gutting of [ ] asylum protections." Commenters also alleged that the rule disadvantages asylum seekers because, in comparison to other forms of relief, no waiver of inadmissibility is available to waive misdemeanor convictions, rendering asylum "disproportionately and counterintuitively more difficult to obtain for some of the most vulnerable people." Many commenters were also concerned that the rule denies protection to people who most need it and whom the asylum system was designed to protect. For those people, commenters stated, asylum is their "only pathway to safety and protection."

Many commenters expressed opposition to the rule by claiming that the rule will exclude bona fide refugees from asylum eligibility. Relatedly, commenters also opposed the rule because they alleged that it prevents aliens from presenting meritorious, legitimate claims. Overall, most commenters asserted that the consequence of asylum ineligibility was "disproportionately harsh." In support, commenters provided various examples of offenses that would, in their view, unjustly render an alien ineligible for asylum under the rule: An alien in Florida who stole $301 worth of groceries; an alien with two convictions for DUI, regardless of whether the alien seeks treatment for alcohol addiction or the circumstances of the convictions; an alien defensively seeking asylum who has been convicted of a document fraud offense related to his or her immigration status; or a mother convicted for bringing her own child across the southern border seeking safety.

Commenters alleged that aliens seeking asylum are typically fleeing persecution or death, so ineligibility based on such minor infractions constitutes "punishment that clearly does not fit the crime." As stated by one commenter, "Congress designed our current laws to provide a safe haven for asylum seekers and their immediate family members who are still in danger abroad. If an asylum claim is denied, those individuals may be killed, tortured, or subjected to grave harm after being deported."

Commenters also opposed the rule by claiming that it bars asylum for aliens "simply accused" of engaging in battery or extreme cruelty; commenters believed it to be unfair that the rule could bar asylum based on conduct without a conviction.[37] Commenters opposed barring asylum relief based on "mere allegations" without any "adjudication of guilt." One commenter stated that the rule exceeds the scope of the Act because, the commenter claimed, the INA allows asylum bars to be based only on convictions for particularly serious crimes.

Many commenters expressed opposition to a wide range of issues related to asylum seekers. One commenter expressed concern with the treatment of immigrants, stating that mistreatment "increases blood pressure, diabetes, and risks for acute crises like heart attacks[,] which harm immigrant communities and negatively impact our healthcare system." Another commenter expressed opposition to the United States' allocation of resources, stating that the redirection of tax cuts and expanded military budgets could help to assist asylum seekers. Others more broadly expressed general opposition to family separation without relating that concern to this rule.

*Response:* The Departments disagree that the rule "guts" asylum protections or that the rule affects otherwise eligible asylum applicants in an unfair or otherwise cruel manner. First, as discussed elsewhere, asylum is a discretionary form of relief. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)). Accordingly, aliens who apply for asylum must establish that they are statutorily eligible for asylum and merit a favorable exercise of discretion. *See id.;* INA 240(c)(4)(A) (8 U.S.C. 8 U.S.C. 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. 316, 345 n.12 (A.G. 2018), *abrogated on other grounds by Grace* v. *Whitaker,* 344 F. Supp. 3d 96, 140

(D.D.C. 2018), *aff'd in part, Grace* v. *Barr,* 965 F.3d 883 (D.C. Cir. 2020). Over time, Congress, the Attorney General, and the Secretary have established various categories of aliens who are barred from asylum and have established additional limitations and conditions on asylum eligibility in keeping with the Departments' congressionally provided authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)); *see also* 84 FR at 69641.

Rather than "gut" asylum protections, the rule narrows asylum eligibility by adding categorical bars for aliens who have engaged in certain criminal conduct that the Departments have determined constitutes a disregard for the societal values of the United States; clarifies the effect of criminal convictions on asylum eligibility; and removes reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments establish these changes as additional limitations and conditions on asylum eligibility, pursuant to their statutory authority in sections 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Further, the Departments promulgate this rule to streamline determinations for asylum eligibility so that those who qualify for and demonstrate that they warrant a favorable exercise of discretion might be granted asylum and enjoy its ancillary benefits in a more timely fashion. Given the rule's clarified conditions and limitations on asylum eligibility, the Departments anticipate more timely adjudications for two reasons. First, non-meritorious claims will more quickly be resolved because the rule eliminates the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, thereby freeing up time and resources that can be subsequently allocated towards adjudication of meritorious asylum claims. Second, the Departments believe that, because fewer people would be eligible for asylum, fewer applications may be filed overall, thereby reducing the total number of asylum applications requiring adjudication. As a result, the Departments could allocate their time and resources to asylum applications that are more likely to be meritorious. In this way, the rule does not eliminate protection for those who need it most or the benefits available to asylees; instead, it may actually allow for those people to more quickly receive protection.

In response to commenters who claim that the rule prevents aliens from seeking asylum who otherwise have meritorious claims, the Departments

---

[37] Further discussions of comments specifically regarding allegations of gang-related activity and domestic violence are contained in sections II.C.3.d and II.C.3.f, respectively.

IFR_AR_000373

emphasize that the rule changes asylum eligibility. Accordingly, despite commenters' assertions, an alien who is ineligible under the provisions of this rule would not, in fact, have a meritorious claim.

The Departments do not believe that the examples of misdemeanors that commenters provided in response to the request for public feedback about whether the proposed rule was over-inclusive warrant altering the scope of the proposed rule. Regarding certain referenced examples, the Departments strongly disagree that the rule employs too harsh a consequence or that the "punishment does not fit the crime." The bars articulated in this rule indicate the Departments' refusal to harbor individuals who have committed conduct that the Departments have determined is undesirable. This is not a punishment. For example, the Departments strongly oppose driving under the influence and disagree that two DUI convictions, regardless of the circumstances or harm caused to others, do not warrant ineligibility for asylum. As previously stated, driving under the influence represents a blatant disregard for the laws of the United States. Further, the Departments disagree that document fraud does not warrant ineligibility for asylum, as it undermines the integrity of our national security and the rule of law. Overall, the Departments disagree that such examples demonstrate that revision of the rule is warranted.

The Departments further disagree that the rule disadvantages asylum seekers by failing to provide a waiver of inadmissibility for misdemeanor convictions. No such waiver is required by statute in the asylum eligibility context. Further, the Departments reiterate that alternative forms of relief or protection may still be available for aliens who are ineligible for asylum under the rule. *See* 84 FR at 69658 (explaining that an alien will still be eligible to apply for statutory withholding of removal or protection under regulations implementing U.S. obligations under Article 3 of the CAT); *see also* INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16 through 208.18; 1208.16 through 1208.18; *cf. Negusie* v. *Holder,* 555 U.S. 511, 527–28 (2009) (Scalia, J. and Alito, J., concurring) (noting that, if asylum is denied under the persecutor bar to an alien who was subject to coercion, that alien "might anyway be entitled to protection under the Convention Against Torture"). Accordingly, aliens who are ineligible for asylum under the rule will not "automatically" be returned to countries where they fear

persecution or torture, contrary to commenters' assertions.

The Departments emphasize that the rule changes the asylum eligibility regulations, but it does not affect the regulatory provisions for refugee processing under 8 CFR parts 207, 209, 1207, and 1209. Further, it does not categorically exclude "bona fide refugees" from the United States.

The INA does not preclude conduct-based bars. In fact, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(v) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)–(v)). Thus, commenters' concerns that the rule exceeds the scope of the statute are unwarranted, and the Departments choose, pursuant to statutory authority, to condition and limit asylum eligibility using conduct-based bars.

Relating to commenters' general humanitarian concerns for asylum seekers, such concerns are outside of the scope of this rulemaking, and the Departments decline to address them. Whether the current statutory framework appropriately addresses all aspects of the problems faced by aliens seeking asylum is a matter for Congress; here, the Departments merely exercise their authority under the discretion afforded to them by the existing statutes.

b. Incorrect Assumptions Regarding Criminal Convictions

*Comment:* Commenters alleged that the Departments promulgated the proposed rule based on incorrect assumptions regarding criminal convictions. Generally, commenters asserted that a conviction, without more, is both an unreliable predictor of future danger and an unreliable indicator of past criminal conduct. As an example, commenters stated that an alien may plead guilty to certain crimes to avoid the threat of a more severe sentence.

Commenters also asserted that not every noncitizen convicted of a crime punishable by more than one year in prison constitutes a danger to the community, which relates to the more general proposition advanced by commenters that the length of a sentence does not necessarily correlate with the consequential nature of the crime. One commenter mentioned that innocence and biased enforcement concerns underlie convictions and that there is a "growing understanding domestically that a criminal conviction is a poor metric for assessing current public safety risk." Another commenter disagreed with the Departments' use of "public safety" as a justified reason for restricting liberty—in this case, liberty of asylum seekers.

Commenters claimed that the Departments provided no evidence underlying these assumptions. Further, commenters alleged that the proposed rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") because of these faulty assumptions.

*Response:* The Departments disagree that this rule was based on incorrect assumptions. The Departments have concluded that convictions with longer sentences tend to be associated with more consequential crimes and that offenders who commit such crimes are generally more likely to be dangerous to the community, and less deserving of the benefit of asylum, than offenders who commit crimes punishable by shorter sentences. *See* 84 FR at 69646. This determination is supported throughout the nation's criminal law framework. For example, for sentencing for Federal crimes, criminal history serves as a "proxy" for the need to protect the public from the defendant's future crimes. *See United States* v. *Hayes,* 762 F.3d 1300, 1314 n.8 (11th Cir. 2008); *see also* U.S. Sentencing Guidelines Manual § 4A1.2 cmt. Background (U.S. Sentencing Comm'n 2018). Further, in numerous Federal statutes and the Model Penal Code, crimes with a possible sentence exceeding one year constitute "felonies" regardless of the assumptions and implications referenced by the commenters. *See, e.g.,* 84 FR at 69646 (providing 5 U.S.C. 7313(b); Model Penal Code § 1.04(2); and 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) as exemplary authorities that define "felony," in part, by considering whether the sentence may exceed one year). Accordingly, and pursuant to their statutory authority, the Departments have determined that similarly conditioning asylum eligibility on criminal convictions with possible sentences of more than one year is proper and reasonable because such convictions are general indicators of social harm and conduct that the Departments have deemed undesirable.

Regarding commenters' claims that the proposed rule is arbitrary and capricious because it is based on faulty assumptions, the Departments respond in section II.D.1, which addresses comments related to the APA and other regulatory requirements.

c. Disregards Criminal Activity Linked to Trauma

*Comment:* Many commenters expressed opposition to the rule by alleging that it disregards the reality that criminal activity is oftentimes linked to trauma experienced by asylum seekers

in their countries of origin or on their journey to safety. Citing statistics and evidence regarding the vulnerability of asylum seekers and the high likelihood that they have experienced various forms of trauma related to the circumstances from which they are trying to escape and a lack of affordable healthcare, commenters asserted that asylum seekers are at a higher risk of self-medicating with drugs or alcohol, which in turn would increase the likelihood for asylum seekers to be involved in the criminal justice system and, as a result of the rule, ineligible for asylum. Commenters stated that aliens with substance use disorders, drug-related convictions, and other related addictions should be provided with "treatment and compassion" and not barred from asylum eligibility. A commenter stated that the rule renders aliens who have experienced persecution and subsequent trauma "at greater risk of being returned to a country where they will only be further tortured and harmed."

Commenters claimed that denying aliens who have experienced such trauma the opportunity to present countervailing factors regarding their subsequent or associated criminal activity was "simply cruel." Commenters alleged that the rule ignores the fact that these aliens likely struggle with post-traumatic stress disorder, other untreated mental health problems such as anxiety or depression, substance use disorders or addictions, self-medication, poverty, and over-policing. Accordingly, commenters stated that the rule would "further marginalize asylum seekers already struggling with trauma and discrimination" and exclude "those convicted of offenses that are coincident to their flight from persecution."

Some commenters emphasized the trauma experienced by children prior to arriving in the United States and in ORR custody. Those commenters also emphasized that many children are then convicted and tried as adults for crimes stemming from that trauma, which, under the NPRM, would bar them from asylum. The commenters stated that such children, if given appropriate treatment, support, and services, are able to recover rather than remain in the juvenile or criminal justice systems. Accordingly, commenters disagreed with the NPRM's approach of categorically barring such individuals and preventing them from presenting context and mitigating evidence for their crimes.

*Response:* The Departments acknowledge the trauma aliens may face but note that aliens barred from asylum

eligibility may still be eligible for alternative measures of protection precluding their return to a country where they experienced torture or persecution resulting in trauma. *See* 84 FR at 69642. The Departments, however, disagree that the possibility of personal trauma or other strife is sufficient to overcome the dangerousness or harms to society posed by the offenders subject to the sorts of bars to asylum implemented by the rule because, as discussed in the proposed rule, possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." 84 FR at 69654; *accord Ayala-Chavez*, 944 F.2d at 641 ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood*, 803 F.2d at 1167)). Also, commenters' suggestions regarding treatment, support, and services for children who have experienced trauma are outside the scope of this rulemaking.

Finally, the Departments note that, consistent with the INA's approach to controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), the rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. The Departments have concluded that allowing this limited exception to application of the new bar appropriately balances the competing policy objectives of protecting the United States from the harms associated with drug trafficking and possession, on the one hand, and the goal of not imposing unduly harsh penalties on persons subject to the new bars, on the other.

d. Problems With Existing Asylum System

*Comment:* Commenters opposed the NPRM because they alleged that the current overall asylum system is too harsh. Specifically, commenters stated that the current bars to asylum are too harsh and overly broad, given that all serious crimes are already considered as part of the discretionary analysis and that asylum seekers are already heavily vetted and scrutinized. Accordingly, commenters stated that the asylum restrictions should be narrowed rather than expanded.

Specifically, commenters asserted that the current "harsh system" places a high evidentiary burden on applicants to establish eligibility and disregards the danger they may face if they are sent

back to their countries.[38] Commenters claimed that conditions in Mexico, where many asylum seekers are sent, are dangerous, and that asylum seekers are killed or experience other harms. In addition, commenters referenced numerous other barriers to asylum—the complex "web" of laws and regulations that asylum seekers must navigate, sometimes from jail or without counsel, and other recent policies such as the MPP, *see* DHS, *Policy Guidance for Implementation for the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf*, and the "third-country transit bar," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019).

Further, commenters asserted that the current criminal bars to asylum eligibility are too broad, emphasizing, for example, that the term "aggravated felony," which is a "particularly serious crime" that renders the applicant ineligible for asylum, has come to encompass "hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses and misdemeanors * * *. A single one of these past offenses eliminates an individual's eligibility for asylum, with no regard to the danger that person will face if sent back to their country."

Commenters also explained that immigration judges currently have full discretion to deny asylum to any alien who is not categorically barred from relief but who has been convicted of criminal conduct. Accordingly, commenters asserted that the existing system is sufficient to ensure that relief is denied to those who may be dangerous to a community, while at the same time providing latitude for adjudicators to consider unique challenges that asylum seekers face resulting from the harm they have faced. In light of these facts, commenters opposed adding more bars and encouraged the Departments to instead narrow the bars.

*Response:* Commenters' concerns regarding the entire asylum system, including the asserted complex "web" of asylum laws and regulations, are outside the scope of this rulemaking. The rule adds categorical bars to asylum

---

[38] Commenters also mentioned numerous other alleged barriers to asylum unrelated to the NPRM, including the required time between an application's submission and the attached photo's taking, English-only application forms, and additional concerns. The Departments acknowledge the general concerns with the asylum system, but because these concerns do not relate to particular provisions of the NPRM, the Departments do not address them further.

eligibility; clarifies the effect of criminal convictions and, in one instance, criminal conduct, on asylum eligibility; and removes automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments do not otherwise propose to amend the asylum system established by Congress and implemented by the Departments through rulemaking and policy over the years.

The Departments note here, and the proposed rule acknowledged, in part, *see, e.g.,* 84 FR at 69645–46, that, although immigration judge discretion, BIA review, and scrutiny of asylum applicants could achieve results similar to some of the proposed provisions, the rule streamlines the system to increase efficiency. By eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, the Departments anticipate that adjudication of asylum claims will be a much quicker process. In addition, the Departments believe that, given the clarified conditions and limitations on asylum eligibility, fewer non-meritorious or frivolous asylum claims may be filed overall, with the result that the Departments' adjudication resources would be allocated, from the beginning, to claims that are more likely to have merit. Overall, the Departments maintain that a rule-based approach to accomplish that goal is preferable. *See* 84 FR at 69646.

The Departments reiterate that asylum is a discretionary benefit; the Departments work in coordination to establish requirements, limits, and conditions, which may include evidentiary burdens. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Contrary to the commenters' assertions that the rule disregards the dangers faced by aliens, the rule noted alternative forms of protection for which aliens may apply, even if they are subject to an asylum bar. *See* 84 FR at 69642. Nevertheless, many commenters' concerns referencing allegedly dangerous conditions in Mexico, the effects of the MPP, and the third-country transit bar are also outside the scope of this rulemaking.

The Departments disagree with commenters' assertions that the asylum bars should be narrowed. Given efficiency interests, the Departments posit that expanded categorical bars will streamline the asylum system, with the result that asylum benefits may be granted more quickly to eligible aliens.

## e. Inefficiencies in Immigration Proceedings

*Comment:* Commenters opposed the rule because they alleged that various provisions would result in inefficiencies and exacerbate an already inefficient, backlogged, and under-staffed immigration system.

First, commenters stated that requiring adjudicators to make "complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct," would lead to inefficiencies. Many commenters stated that the rule effectively requires adjudicators to "engage in mini-trials into issues already adjudicated by the criminal law system based on evidence that may not have been properly tested for its veracity in the criminal process," thereby decreasing efficiency. Further, commenters stated that adjudicators will have to "conduct a separate factual inquiry into the basis for a criminal conviction or allegations of criminal conduct to determine whether the individual is eligible for asylum," instead of relying on adjudications from the criminal legal system.

Other commenters stated that the rule is especially inefficient in the case of family members' asylum eligibility. Commenters alleged that, under the proposed rule, family members' claims will be adjudicated separately and potentially before different adjudicators. Given that family members' claims are oftentimes interrelated and children are less able to sufficiently explain asylum claims, commenters concluded that the rule, especially as it relates to family claims, further increases inefficiencies in the system.

Commenters also stated that these ramifications directly contradict one of the rule's stated justifications of increased efficiency and alleged that the rule increased the time and expense necessary to process asylum claims. One commenter alleged that this will decrease the ability of asylum seekers to access healthcare, food, and housing. That commenter also averred that asylum seekers will likely have to request to reschedule interviews, which will introduce further delay, because the rule's filing deadlines restrict applicants' ability to provide supplementary evidence. Further, commenters alleged that the Departments failed to provide information or research to explain how the rule would increase efficiencies in the system.

Many commenters asserted that the rule will require a highly nuanced, resource-intensive inquiry that will prolong asylum proceedings and "invariably lead to erroneous determinations" or disparate results, with the consequence that appeals will increase and consume further Departmental resources.

*Response:* The Departments disagree with the commenters' assertions regarding inefficiencies.

First, adjudicators currently conduct a factual inquiry similar to the inquiry contemplated by the new bars in other immigration contexts. *See* 84 FR at 69652 (providing, as examples, the removability context in INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) and consideration of the persecutor bar in INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). Thus, adjudicators are adequately trained and equipped to conduct such analyses.

Second, the Departments emphasize that this rule is just one tool for increasing efficiencies in the immigration adjudications process and for correcting what the Departments view as problematic rules regarding asylum eligibility. This rule is not intended to correct all inefficiencies or to be a complete panacea, and DOJ has implemented numerous initiatives recently to address inefficiencies where appropriate. *See, e.g.,* EOIR, *Policy Memorandum 20–07: Case Management and Docketing Practices* (Jan. 31, 2020), *https://www.justice.gov/eoir/page/file/1242501/download* (implementing efficient docketing practices); EOIR, *Policy Memorandum 19–11:* "*No Dark Courtrooms*" (Mar. 31, 2019), *https://www.justice.gov/eoir/file/1149286/download* (providing policies to reduce and minimize the impact of unused courtrooms and docket times to address the caseload and backlog); EOIR, *Policy Memorandum 19–05: Guidance Regarding the Adjudication of Asylum Applications Consistent with INA § 208(d)(5)(A)(iii)* (Nov. 19, 2018), *https://www.justice.gov/eoir/page/file/1112581/download* (providing policy guidance to effectuate the statutory directive to complete asylum adjudications within 180 days of filing, absent extraordinary circumstances); *see also* DOJ, *Memorandum for the Executive Office for Immigration Review: Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest* (Dec. 5, 2017), *https://www.justice.gov/opa/press-release/file/1015996/download* (reiterating EOIR's commitment to efficient adjudication).

Although the Departments agree that the current system for adjudicating asylum applications frequently fails to meet the statutory deadline of completing such cases within 180 days

IFR_AR_000376

absent exceptional circumstances, INA 208(d)(5)(A)(iii) (8 U.S.C. 1158(d)(5)(A)(iii)) the Departments believe this rulemaking will improve efficiency. The Departments direct commenters to the proposed rule at 84 FR at 69645–46 for an extensive explanation of inefficiencies addressed through this rulemaking, which provides adequate "information and research" describing how the rule will increase efficiencies. Notably, courts have often recognized that rule-based approaches promote more efficient administration than wholly discretionary, case-by-case determinations. *See Lopez* v. *Davis,* 531 U.S. 230, 244 (2001) (observing that "a single rulemaking proceeding" may allow an agency to more "fairly and efficiently" address an issue than would "case-by-case decisionmaking" (quotation marks omitted)); *cf. Marin-Rodriguez* v. *Holder,* 612 F.3d 591, 593 (7th Cir. 2010) ("An agency may exercise discretion categorically, by regulation, and is not limited to making discretionary decisions one case at a time under open-ended standards."); *cf. Baylor Cty. Hosp. Dist.* v. *Price,* 850 F.3d 257, 263 (5th Cir. 2017) ("DHHS opted for a bright-line rule after considering its lack of agency resources to make case-by-case judgments" because "the statutory text had to be articulated properly and in an administratively efficient way."). The Departments acknowledge the backlog in asylum applications, *see* EOIR, *Adjudication Statistics: Total Asylum Applications* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1106366/download,* and the Departments, as a matter of policy, choose to address this backlog and resulting inefficiencies in part through this rulemaking.

The backlogged asylum system presents challenges; however, the Departments disagree with commenters regarding how best to address the backlog. The Departments disagree that the rule will prolong proceedings and lead to erroneous determinations, thus allegedly prompting more appeals. On the contrary, the Departments have concluded that the rule will increase efficiencies by eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies as they apply to asylum adjudications. *See* 84 FR at 69646–47. The Departments have determined that this rule-based approach is preferable, partly because, given the specific context of asylum eligibility, it will result in consistent treatment of asylum

seekers with respect to criminal convictions. *See id.*

Finally, concerns regarding access to healthcare, food, and housing, are outside the scope of this rulemaking.

### f. Disparate Impact on Certain Persons

*Comment:* Many commenters opposed the rule because they claimed it will harm or disparately affect asylum applicants whom commenters deem the most vulnerable people in society. Commenters explained that, although asylum seekers and refugees are generally vulnerable, the rule further implicates other vulnerable groups, such as LGBTQ individuals; victims of trafficking; communities of color, especially youth, and other minority ethnic groups; individuals who have experienced trauma, coercion, abuse, or assault; people with mental illness, especially those lacking adequate mental health services, such as children in ORR custody; people struggling with addictions and related convictions, regardless of whether they have sought treatment; parents who cross the border with children to seek safety; individuals convicted of document fraud who unknowingly use fraudulent documents or unscrupulous services to procure immigration documents; victims of domestic or intimate violence; people from Central America and the "Global South"; and low-income people. Commenters were concerned that the rule categorically bars these populations without consideration of mitigating factors, thereby potentially resulting in the return of such people to countries and communities where they initially experienced discrimination, bias, trauma, and violence. In a related vein, commenters were concerned that these populations are more prone to be convicted of minor offenses that will, under the rule, preclude them from asylum relief. For example, one commenter speculated that a trafficking victim who leaves a child alone at home while on a brief trip to a store could be convicted of "endangering the welfare of a child" and then barred from asylum.

Commenters especially emphasized concerns regarding the effect of the rule on two groups: LGBTQ individuals, especially transgender women; and trafficking individuals.[39] Regarding LGBTQ individuals, multiple commenters asserted that the rule constitutes a

"unique threat" because those individuals have likely faced:

a high degree of violence and disenfranchisement from economic and political life in their home countries. * * * Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave[s] many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices.

One commenter explained that some LGBTQ individuals are charged with a variety of crimes in connection with their private, consensual conduct because of differences in discriminatory laws regarding this population around the world.

For trafficking victims, commenters explained that the rule bars them from asylum when they are only involuntarily part of a trafficking scheme and will likely face subsequent retaliation and other harms from their traffickers. Commenters were especially concerned that the rule denies asylum benefits to people who desperately need and will greatly benefit from them. Further, commenters asserted that alternative forms of relief are oftentimes insufficient for trafficking victims. For example, commenters explained that trafficking victims who have been removed are not eligible for T nonimmigrant status. Similarly, commenters explained that trafficking victims who are forced by their traffickers to commit other crimes may then be ineligible for other forms of relief under certain crime bars. Commenters also explained that trafficking victims typically receive intervention and other support services only after coming into contact with law enforcement; thus, this rule would preclude them from such resources.

Commenters explained that, not only are these people more prone to experiencing harms if they are barred from asylum, but also these people are more prone to initially experience harms that subsequently result in their involvement in the criminal justice system, which would, under this rule, bar them from asylum. For these reasons, commenters opposed the rule.

*Response:* To the extent that commenters ask the Departments to establish unique protections for these referenced groups, such protections are outside the scope of this particular rulemaking. Congress has chosen to provide special protections for certain groups, such as unaccompanied alien children, and Congress could choose to

---

[39] Commenters also expressed concerns for communities of color. These concerns, however, are addressed in section II.C.3.d because commenters' concerns on this point were primarily connected to concerns regarding the gang-related offenses included in the rule.

IFR_AR_000377

similarly extend protections to LGBTQ persons or other groups. Without such congressional action, however, the Departments are merely implementing the statutory framework as it currently exists. Further, to the extent that the commenters posit that the noted groups are more prone to engage in criminal conduct implicated by the rule—*e.g.,* fraud, DUI, human smuggling, gang activity, drug-related crimes—the Departments have no evidence that such groups are more likely to commit such crimes than any other groups of asylum applicants, and commenters did not provide evidence that would suggest otherwise. Thus, the Departments reject the assertion that the rule would have a disparate impact on discrete groups, absent evidence such groups are more likely to engage in criminal behavior addressed by the rule.

The rule includes several provisions that act, in part, to preclude returning vulnerable persons, including LGBTQ individuals and trafficking victims, to countries where they may have experienced or fear, as referenced by the commenters, discrimination, bias, trauma, and violence. As an initial matter, regardless of asylum eligibility, vulnerable persons may be eligible for statutory withholding of removal and protection under the CAT regulations. *See* 84 FR at 69642. Next, the rule includes an exception to the bar based on domestic assault or battery, stalking, or child abuse. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F). The exception mirrors the provisions in the statute at INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) (removability context), but has one significant difference. In the removability context, applicants claiming this exception must satisfy the statutory criteria and be granted a discretionary waiver. Under the rule, however, applicants claiming the exception must only satisfy the criteria; no waiver is required. *See* 84 FR at 69653. This exception exists so that proper considerations can be taken of the vulnerability of domestic violence victims. The Departments believe this exception strikes the proper balance between providing protections for domestic violence victims while advancing the goals of reducing the incidence of domestic violence and protecting the United States from the sorts of conduct that would subject offenders to the new bars.

Commenters' concerns regarding vulnerable individuals' increased likelihood of convictions for minor offenses for certain vulnerable groups relate to the larger criminal justice system and accordingly fall outside the scope of this rulemaking. *See* section II.C.6.k for further discussion. Moreover, as noted above, the Departments have no evidence—and commenters provided none—that the groups identified by commenters are more prone to engage in criminal conduct implicated by the rule that would increase the likelihood of a conviction for, *e.g.,* fraud, DUI, human smuggling, gang activity, or drug-related crimes.

Next, this rule expands asylum ineligibility based on offenses committed in the United States, not abroad. *See* 84 FR at 69647 n.5. Thus, the rule does not expand asylum ineligibility for trafficking victims forced to commit crimes abroad or LGBTQ individuals whose private, consensual acts are criminalized abroad. Indeed, case law has long recognized that some criminal prosecutions abroad, if pretextual, can, for example, form the basis of a protection claim. *See, e.g., Fisher* v. *INS,* 79 F.3d 955, 962 (9th Cir. 1996) (noting "two exceptions to the general rule that prosecution does not amount to persecution—disproportionately severe punishment and pretextual prosecution"); *Matter of S–P–,* 21 I&N Dec. 486, 492 (BIA 1996) (noting that "prosecution for an offense may be a pretext for punishing an individual" on account of a protected ground). The rule does not alter such case law.

### g. Adjudicator Discretion

*Comment:* Many commenters opposed the rule out of concern that it strips adjudicators of discretion. First, commenters stated that it is crucial that adjudicators consider countervailing factors "to determine whether the circumstances merit such a harsh penalty." Another commenter explained that "[d]iscretion allows an adjudicator to consider a person's entire experience, including those factors that led to criminal behavior as well as the steps towards rehabilitation that individuals have taken." Commenters claimed that effective use of discretion is crucial in these circumstances: "The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community." Thus, commenters alleged that the rule's removal of that discretion is punitive and unnecessary. One commenter stated that the purpose of the NPRM seems to be to remove all discretion from adjudicators to consider each case on a case-by-case basis. Another commenter underscored the importance of adjudicators retaining discretion to make individualized determinations because Congress established asylum as a discretionary form of relief.

One commenter alleged that the rule diminishes due process protections, stating that, "by preventing the use of discretion in such cases[,] the proposed rules have a chilling effect on due process. Ensuring adjudicators have discretion to grant asylum under such circumstances allows asylum seekers to have a fair day in court and guards against further injustice resulting from errors that might have occurred in the criminal legal system."

Commenters also alleged that the proposed rule incorrectly raises the burden of proof to establish that a favorable grant of discretion is warranted so that it is equivalent to the burden required to establish a well-founded fear of persecution. These commenters averred that this is problematic in the face of contrary case law that requires a more cautious, restrained view of the Attorney General's and the Secretary's discretion and that cautions against permitting the Departments unchecked power and unrestrained discretion in making asylum determinations. Commenters first cited *Matter of Pula,* 19 I&N Dec. at 474, arguing that it encouraged a restrained view of discretion because the Board asserted that "the danger of persecution should generally outweigh all but the most egregious of adverse factors." Commenters averred that the Supreme Court cautioned against unlimited discretion in *Moncrieffe,* 569 U.S. at 200–01, by holding that the government must follow the categorical approach. Similarly, commenters cited *Delgado,* 648 F.3d at 1097, to support this proposition because the Ninth Circuit "first assert[ed] its jurisdiction to review the Attorney General's discretionary authority" and overruled an earlier decision that the jurisdiction-stripping provision at 8 U.S.C. 1252 barred the court's judicial review.

On the other hand, in the context of convictions or conduct related to domestic violence, battery, or extreme cruelty, commenters also opposed the amount of discretion afforded to adjudicators because the rule allegedly provides no clear guidance for the adjudicator's inquiry, analysis, and resulting determination. For example, commenters asserted that it is unclear what constitutes "reliable evidence" under the rule. Commenters were concerned that this would result in inconsistent decisions or diminished due process. Further, commenters were also concerned because determinations under the rule would be discretionary

IFR_AR_000378

and therefore non-appealable in most cases.

*Response:* Congress has authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility consistent with the statute. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Through this rule, the Departments exercise such authority by establishing categorical bars to asylum that constitute such limits and conditions. The Departments disagree that adjudicators must be afforded discretion to consider mitigating factors in determining asylum eligibility in all circumstances. Given the challenges faced by the agencies and the operative functioning of current categorical bars, *see* INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), the Departments add the new categorical bars, in part, to improve the efficient processing of asylum claims. The regulatory changes are not punitive or intended to revoke all discretion from adjudicators, as commenters alleged; rather, the Departments promulgate this rule to facilitate and streamline processing of asylum claims. *See e.g.,* 84 FR at 69646–47, 69657.

The rule does not diminish due process. As discussed above, the discretionary benefit of asylum is not a liberty or property interest subject to due process protections. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, "[t]here is no constitutional right to asylum per se." *Mudric,* 469 F.3d at 98. The Departments disagree that affording discretion to adjudicators in lieu of promulgating the additional bars is a preferable way to process asylum applications. Moreover, nothing in this rule prevents individuals from appealing the immigration judge's determination. *See* 8 CFR 1003.38 (appeals with the BIA). Further, as explained in section II.C.6.k, resolving errors in the criminal justice system is beyond the scope of this rulemaking.

The Departments reiterate their authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Accordingly, the Departments may promulgate bars that govern determinations regarding asylum eligibility. In light of this authority, the Departments also disagree with commenters that the rule provides adjudicators with insufficient guidance for the sound exercise of their judgment in determining eligibility for asylum. For example, the proposed rule provides clarity surrounding determinations whether a conviction is a felony by applying the relevant jurisdiction's

definition; also, it provides detailed guidance on vacated or expunged convictions, and modified convictions and sentences. 84 FR at 69646, 69654–55. Immigration judges and asylum officers currently exercise discretion to determine whether an asylum seeker merits relief for a wide range of reasons, many of which are not similarly set out or defined in the Act or by regulation. *See, e.g., Matter of A–B–,* 27 I&N Dec. 316 at 345 n.12 (outlining factors for consideration in discretionary asylum determinations). The Departments accordingly do not believe that the new bars require immigration judges or asylum officers to exercise significantly more discretion than those judges or officers already do.

Further, the Departments note that providing more exacting guidance, as some commenters suggested, would impede the very nature of legal discretion, as demonstrated by its definition: "[f]reedom in the exercise of judgment," or "the power of free decision-making." Black's Law Dictionary (11th ed. 2019); *see also* "Discretion," Merriam-Webster, *https://www.merriam-webster.com/dictionary/discretion* (last updated Feb. 15, 2020) (defining "discretion" as the "power of free decision or latitude of choice within certain legal bounds"). Doing so would thus aggravate the problems that some commenters perceived in the rule's alleged lack of sufficient flexibility.

Next, nothing in the final rule changes the standard of proof as regards an individual's ability to demonstrate that he or she warrants a positive grant of discretion. As an initial matter, citing a standard of proof for discretion is a misnomer. Rather, the determination of whether an alien warrants a discretionary grant of asylum is an analysis that requires reviewing the circumstances of the case. In determining whether the alien warrants a discretionary grant of asylum, the immigration judge considers a number of factors and considerations. *See Matter of Pula,* 19 I&N Dec. at 473–74 (outlining how adjudicators should weigh discretionary factors in applications for asylum). By contrast, the final rule sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. As a result, the final rule does not create a standard of proof for establishing that an alien warrants a discretionary grant of asylum.

Similarly, the Departments disagree with commenters' assertions that the final rule violates Supreme Court and court of appeals precedent regarding the

amount of discretion granted to the Attorney General and the Secretary. As explained, Congress, in IIRIRA, vested the Attorney General with broad authority to establish conditions or limitations on asylum. *See* 110 Stat. at 3009–692. Congress also vested the Attorney General with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)). This broad authority is not undercut by the cases cited by commenters. Neither *Moncrieffe* nor *Delgado* presumes to limit the Attorney General's discretion to place limits on asylum. Rather, *Moncrieffe* addressed whether a conviction for possession of a small amount of marijuana with intent to distribute qualified as an aggravated felony. 569 U.S. at 206. Similarly, the *Delgado* court held that it had authority to review certain discretionary determinations made by the Attorney General when not explicitly identified in the INA. 648 F.3d at 1100. However, this inquiry was based on statutory interpretation to determine whether the court had jurisdiction to review a BIA decision. Apart from disagreeing with the Department's legal arguments on appeal, neither of these two decisions purported, even in dicta, to place additional limitations on the Attorney General's ability to consider whether to grant asylum as a matter of discretion.

h. Issues With Representation

*Comment:* Commenters opposed the NPRM because they alleged that it made the asylum system more arduous for asylum seekers, especially children, to navigate alone. One commenter claimed that 86 percent of detainees lack access to counsel. Overall, commenters were concerned that the rule's changes disadvantage asylum seekers by making it more difficult for them to proceed without representation and for organizations, in turn, to provide representation and assistance to aliens.

Commenters pointed out that asylum seekers lack the benefit of appointed counsel, which is especially significant for pro se aliens affected by the rule, particularly in regard to gathering evidence and developing responses to refute the "extremely broad grounds" for the denial of asylum.

Commenters also alleged that it will be more difficult for organizations to represent and assist aliens in accordance with the rule's provisions. Commenters stated that backlogs at USCIS are detrimental to organizations and the aliens they represent because

IFR_AR_000379

aliens may wait years for a decision on their applications, while organizations have limited resources to assist immigrants and must seek to prioritize spending for emergency situations.

Commenters also stated that the system is already complicated; further complicating it with additional barriers will require much time, funding, and effort by immigration advocates. Finally, commenters stated that an asserted "lack of predictability" in application of the rule would "create a substantial burden on immigration legal services providers, who [would] be unable to advise their clients as to their asylum eligibility, a long-term and stable form of protection from persecution."

*Response:* The commenters' particular concerns regarding representation in immigration proceedings or during asylum adjudications are outside the scope of this rulemaking. The rule does not involve securing or facilitating representation, and Congress has already directed that aliens have a right to counsel in removal proceedings but at no expense to the government. INA 292 (8 U.S.C. 1362). Moreover, 87 percent of asylum applicants in pending asylum cases have representation, and there is nothing in the rule that would cause a reduction in that representation rate. *See* EOIR, *Adjudication Statistics: Representation Rate* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1062991/download.*

In addition, the Departments continue to maintain resources designed to assist aliens in proceedings find representation or otherwise help themselves in their proceedings. *See* EOIR, *Find Legal Representation, https://www.justice.gov/eoir/find-legal-representation* (last updated Nov. 29, 2016). Further, the Office of Legal Access Programs within EOIR works to increase access to information and raise the level of representation for individuals in immigration proceedings. *See* EOIR, *Office of Legal Access Programs, https://www.justice.gov/eoir/office-of-legal-access-programs* (last updated Feb. 19, 2020).

In regard to commenters' concerns regarding the backlog at USCIS, the rule facilitates a more streamlined approach by eliminating inefficiencies. *See, e.g.,* 84 FR at 69647, 69656–57. For example, the rule's established definition for "felony" will create greater uniformity by accounting for "possible variations in how different jurisdictions may label the same offense" and avoid anomalies in the asylum context "that arise from the definition of 'aggravated felonies.'" *Id.* at 69647. Significantly, that definition eliminates the need for adjudicators and courts alike to engage

in the categorical approach for aggravated felonies. *See id.* These improvements to the asylum system will increase predictability, therefore rendering representation less complicated and potentially requiring less funding by immigration advocates.

The Departments emphasize that the rule does not create an entirely new system. As with any other change to the regulations, the Departments anticipate that immigration advocates and organizations will adjust and adapt their strategies to continue to provide effective representation for their selected clients.

i. Against American Ideals

*Comment:* Commenters opposed the rule because they alleged that it conflicts with American ideals. Commenters remarked that the rule conflicts with the United States' tradition and moral obligation of providing a "haven for persons fleeing oppression" and a "beacon of hope" for vulnerable people, and that it violates principles that people should have freedom and equal rights under the law "regardless of skin color or birthplace." Many commenters characterized these concerns as humanitarian, religious, and American ideals of showing compassion, fairness, and respect for human rights. Another commenter claimed that the rule "eviscerated the spirit and overall purpose of the U.S. asylum system by categorically refusing protection to large groups of vulnerable people who are neither a danger to the public nor a threat to U.S. national security interests, and who have no other safe and reasonable option for protection."

Other commenters expressed opposition by claiming that the rule would diminish the United States' role as a world leader, hurt the country's international reputation, and undermine foreign policy interests abroad. One commenter stated that the rule would diminish the "country's historical role as a defender of human rights."

*Response:* The rule does not conflict with American traditions or moral obligations related to caring for vulnerable people. On the contrary, the rule streamlines the asylum system to improve the consistency and predictability of the adjudication of claims, thereby enabling applicants who qualify for asylum eligibility to swiftly access the benefits that follow a grant of asylum. Those benefits include, among many, preclusion from removal, a path to lawful permanent resident status and citizenship, work authorization, the possibility of derivative lawful status for certain family members, and access to

certain financial assistance from the Federal government. *See R–S–C,* 869 F.3d at 1180; INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)); INA 208(c)(1)(B), (d)(2) (8 U.S.C. 1158(c)(1)(B), (d)(2)); *see also* 84 FR at 69641. The availability of these benefits demonstrates American ideals of compassion realized through the asylum system.

Aliens with certain criminal convictions demonstrate a disregard for the societal values of the United States and may constitute a danger to the community or threaten national security. The Departments have concluded that limiting asylum eligibility for these aliens furthers American ideals of the rule of law and a commitment to public safety. Although such aliens are not eligible for asylum under the rule, they may still be eligible for withholding of removal under the Act (INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 1208.16(b)), or protection under the CAT regulations (8 CFR 1208.16(c)). These forms of protection limit removal to a country where the alien is more likely than not to be persecuted based on protected grounds or tortured, thereby affording protection to aliens, even if they are ineligible for asylum.

The Departments do not agree that the rule diminishes the United States' international reputation for caring for the less fortunate. On the contrary, the Departments believe the rule strengthens the United States' ability to care for those who truly deserve the discretionary benefit of asylum and may take full advantage of the numerous benefits that follow.

j. Bad Motives

*Comment:* Commenters opposed the NPRM because they alleged that the Departments published it with racist motives. Commenters stated that the rule was published "out of animus to asylum seekers and [with] a desire to undermine the asylum system through an end-run around Congress" because the rule would "necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors." One commenter specifically stated the rule was based upon a "dark legacy" of bias against Latin American countries and violated the Equal Protection Clause of the Fourteenth Amendment.

One commenter stated that "the [A]dministration has targeted low-income, immigrant communities of color to further their white supremacist

agenda of maintaining a white majority in the United States.'' Other commenters alleged that DHS and ICE have relied on racist policing techniques to identify gang activity, which rarely result in criminal convictions.

Commenters also opposed the rule because they alleged that it is an attempt to ''drastically limit asylum eligibility,'' ''exclude refugees from stability and security,'' and make the United States more ''hostile'' towards immigrants. In other words, commenters alleged that the rule ''represent[ed] a thinly veiled attempt to prevent otherwise eligible asylum seekers from lawfully seeking refuge in the United States.'' Commenters referenced public documents allegedly revealing the Administration's efforts to utilize smuggling prosecutions against parents and caregivers as part of its overall strategy to deter families from seeking asylum. Commenters were concerned that the rule threatens to ''magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.''

*Response:* The rule is not racially motivated, nor did racial animus or a ''legacy of bias'' play a role in the rule. Rather, the rule categorically precludes from asylum eligibility certain aliens based on the aliens' various criminal convictions and, in one limited instance, criminal conduct, because the Departments believe that the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect communities from danger and inefficient in regard to overall case processing. *See* 84 FR at 69640.

To the extent that the rule disproportionately affects any group referenced by the commenters, the rule was not intentionally drafted to discriminate against any group. The provisions of the rule apply equally to all asylum applicants without regard to any applicant's ethnic or national background, or any other personal characteristics separate and apart from the criminal or conduct history laid out in the rule. Accordingly, the rule does not violate the Equal Protection Clause of the Fourteenth Amendment. *See Washington* v. *Davis,* 426 U.S. 229, 242 (1976) (''[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial

discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.'' (citation omitted)); *cf. United States* v. *Smith,* 818 F.2d 687, 691 (9th Cir. 1987) (''We begin our review of this challenge by holding that persons convicted of crimes are not a suspect class.'').

As explained in the proposed rule, Congress expressly authorized the Attorney General and the Secretary to establish conditions or limitations for the consideration of asylum applications under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)) that are not inconsistent with the statute. *See* 84 FR at 69643. The Departments promulgate this final rule in accordance with these statutory sections, and in doing so, have promulgated a rule that is equally applicable to all races. The Departments strongly disavow any allegation of white supremacy.

The Departments reiterate that the rule does not encourage or facilitate hostility towards immigrants. Instead, the rule categorically precludes from asylum eligibility certain aliens based on criminal convictions, and, in one limited instance, criminal conduct, because the Departments believe the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect the American public from danger and inefficient in regard to overall case processing. The rule retains the current general statutory asylum system, *see* 84 FR at 69640, with the result that applicants for asylum must prove that they are (1) statutorily eligible for asylum, and (2) merit a favorable exercise of discretion. INA 208(b)(1)(A), 240(c)(4)(A) (8 U.S.C. 1158(b)(1)(A) 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. at 345 n.12. That framework continues to be equally applicable to persons of all races.

The rule does not affect regulatory provisions regarding refugee processing under 8 CFR parts 207, 209, 1207, and 1209, and it does not categorically exclude refugees from the United States or facilitate hostility towards immigrants. The Departments disavow allegations that the government used smuggling prosecutions against parents and caregivers specifically to deter families from seeking asylum. Rather, the Departments anticipate that the rule will better facilitate efficient processing of asylum applications by introducing a more streamlined approach, thus helping families who qualify for asylum

and demonstrate their applications merit a favorable decision.

k. Problems With the Criminal Justice System

*Comment:* Commenters opposed the proposed rule because they alleged that it implicates a criminal justice system that suffers from structural challenges such as racial profiling, unjust outcomes, barriers to equal justice, and incentives to plead guilty, especially in the context of misdemeanors.

Related to commenters' concerns regarding racism in the NPRM,[40] commenters explained their concern that the NPRM imports racial disparities prevalent in the criminal justice system into the immigration system, stating, ''[a]sylum seekers of color, like all communities of color in the United States, are already disproportionately targeted and punished by the criminal justice system.'' Particularly, commenters stated that both undocumented and documented non-white immigrants are arrested, convicted of drug crimes, given longer sentences, and deported more frequently than their white counterparts. Further, commenters stated that LGBTQ aliens are more prone to experiencing violence from police.

One commenter opposed the NPRM, stating that it would exacerbate problems in our criminal justice system, such as increased incarceration, deportations, and racial profiling, which would, in turn, exacerbate health concerns for individuals and communities.

*Response:* The final rule amends the Departments' respective regulations governing bars to asylum eligibility. The rule clarifies the effect of criminal convictions and, in one instance, criminal conduct, in the asylum context and removes regulations governing automatic reconsideration of discretionary denials of asylum applications. *See* 84 FR at 69640. Accordingly, commenters' concerns regarding structural challenges to the criminal justice system are outside the scope of this rulemaking. The rule does not seek or intend to address actual or alleged injustices of the criminal justice system as a whole, as referenced by the commenters, including racial profiling, disparities based on race and sexual orientation, unjust outcomes, barriers to equal justice, incentives to plead guilty, and health concerns following alleged increases in incarceration, deportations, and racial profiling.

---

[40] *See* section II.C.6.j for further discussion.

l. Automatic Review of Discretionary Denials

*Comment:* Many commenters expressed strong opposition to the rule because it eliminates automatic review of discretionary denials. Commenters were concerned that language barriers and lack of financial resources may prevent applicants with meritorious claims from adequately presenting their cases. According to commenters, "[m]aintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections."

*Response:* The Departments disagree that reconsideration of discretionary denials of asylum is necessary and find that commenters' concerns regarding removal of these provisions are unwarranted. First, the current regulations providing for automatic reconsideration of discretionary denials at 8 CFR 208.16(e) and 1208.16(e) are inefficient, unclear, and unnecessary. *See* 84 FR at 69656. Federal courts have expressed similar sentiment as they approach related litigation. *See Shantu* v. *Lynch,* 654 F. App'x 608, 613–14 (4th Cir. 2016) (discussing unresolved anomalies of the regulations regarding reconsideration of discretionary denials); *see also* 84 FR at 69656–57.

Further, there are currently multiple avenues through which an asylum applicant may challenge a discretionary denial, with the result that removing the regulations providing for reconsideration (8 CFR 208.16(e) and 1208.16(e)) does not effectively render asylum eligibility determinations final. *See* 84 FR at 69657. First, under 8 CFR 1003.23(b)(1), an immigration judge may reconsider a decision upon his or her own motion.[41] Second, also under 8 CFR 1003.23(b)(1), an alien may file a motion to reconsider with the immigration judge. Third, under 8 CFR 1003.38, an alien may file an appeal with the BIA. The Departments have concluded that these alternatives sufficiently preserve the alien's ability to obtain review of the immigration judge's discretionary asylum decision, while removing the confusing,

inefficient, and unnecessary automatic review provisions at 8 CFR 208.16(e) and 1208.16(e).

7. Recommendations

*Comment:* Commenters provided numerous recommendations to the Departments.

First, several commenters suggested that the Departments provide annual bias training to all immigration judges and prosecutors.

Next, two commenters recommended that the sentencing guidelines as provided in the Washington Adult Sentencing Guidelines Manual be incorporated into the NPRM to provide clarity and guidance to immigration judges.

Another commenter asserted that international human rights law obligations required the Departments to

(1) put in place and allocate resources to the identification and assessment of protection needs; and (2) establish mechanisms for entry and stay of migrants who are considered to have protection needs prohibiting their return under international human rights law, including non-refoulement, as well as the rights to health, family life, best interests of the child, and torture rehabilitation.

A commenter suggested the Departments should incorporate recent innovative criminal justice reforms. For example, the commenter pointed to special drug trafficking courts that "recognize the need for discretion in the determination of criminal culpability" and suggested that the Departments should create specialized asylum eligibility courts.

Another commenter emphasized the effects of climate change, claiming that the United States should be "creating new categories of asylum given the predictions on climate change migrants and the latest UN human rights ruling declaring governments cannot deport people back to countries if their lives are in danger due to climate change."

One commenter recommended that the Departments continue to hire more immigration judges and asylum officers and to retain discretion with immigration adjudicators to make determinations on a case-by-case basis rather than expand the categorical bars.

Some commenters emphasized the general need for comprehensive, compassionate immigration reform. One commenter specifically urged the Departments to support the New Way Forward Act, which, according to the commenter, "rolls back harmful immigration laws [because] it proposes immigration reform measures that dismantle abuses of our system and our asylum seeking community."

Some commenters urged the Departments to take a more "welcoming" approach, citing the positive effects of diversity and economic advantages.

Another commenter, despite opposing the NPRM, provided several recommendations regarding the domestic violence crime bar and primary perpetrator exception should the Departments publish the rule as final. First, the commenter recommended that all immigration adjudicators should receive specialized training developed with input from stakeholders regarding domestic violence and the unique vulnerabilities faced by immigrants. Second, the commenter recommended that an automatic supervisory review should follow any determination that an applicant does not meet an exception to an asylum bar. Third, the commenter recommended that adjudicators should be required to provide written explanations of (1) the factual findings, weighed against the evidence, if a determination is made that an applicant does not meet an exception to the asylum bar and (2) their initial decisions to apply the bar, including what "'serious reasons' existed for believing that the applicant engaged in acts of domestic violence or extreme cruelty." Fourth, when applicants do not meet the exception, the commenter recommended that adjudicators identify what evidence, if any, was provided by the alleged primary perpetrator, how it was weighed, and what the adjudicator did to determine whether it was false or fabricated. Fifth, the commenter requested that agencies regularly engage with stakeholders to assess the impact of the bar and the exception on survivors.

Several commenters urged the Departments to dedicate their efforts to ensuring that individuals fleeing violence would be granted full asylum protections. One commenter suggested that the bars to asylum be narrowed by eliminating the bar related to convictions in other countries.

Some commenters suggested that families, especially children, be allowed to apply for asylum together, rather than require each person to file a separate application.

*Response:* The Departments note the commenters' recommendations.

Some commenters' suggestions involved issues or topics outside the scope of the rule, such as the suggestions that immigration judges should be provided certain types of training or to allow for additional flexibilities for family-based versus individual asylum applications. The

---

[41] On August 26, 2020, the Department of Justice proposed restricting the ability of an immigration judge to reconsider a decision upon his or her own motion. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 52491, 52504–06 (Aug. 26, 2020). That rule has not yet been finalized, but even if the proposal is adopted in the final rule, asylum applicants would still remain able to file a motion to reconsider or an appeal in order to challenge an immigration judge's discretionary denial in these circumstances.

IFR_AR_000382

Departments may consider these recommendations in the event of additional rulemakings, but do not take any further action in response to these out-of-scope suggestions at this point.

Other commenters' suggestions involved topics outside the authority of the Departments, such as suggestions that there should be new asylum-related protections due to concerns surrounding climate change or that legislative changes to the immigration laws should be enacted. If Congress enacts these or other changes to the immigration laws, the Departments' regulations will reflect such changes in future rules. However, this rule is designed to implement the immigration laws currently in force.

Regarding the remaining suggestions related to the provisions of this rule, the Departments decline to adopt the recommendations or make changes to the proposed rule except as set out below in section III. Overall, the Departments find that the commenters' recommendations would frustrate the rule's purpose by slowing and prolonging the adjudicatory process, thereby undermining the goal of more efficiently processing asylum claims. Further, the Departments have determined, as discussed above, that the included offenses are significant offenses that warrant rendering aliens described by the rule ineligible for asylum.

For example, the Departments decline to adopt one commenter's requests to automatically require supervisory review of an asylum officer's decision to apply a bar, or to require the asylum officer or immigration judge to issue a written decision explaining the application of the bars. The Departments believe that the existing processes for issuing decisions and providing review of asylum determinations give sufficient protections to applicants. *See, e.g.,* 8 CFR 208.14(c)(1) (explaining that, for a removable alien, when an asylum officer cannot grant an asylum application, the officer shall refer the application for adjudication in removal proceedings by an immigration judge); 8 CFR 1003.3(a)(1) (providing for appeals of immigration judge decisions to the BIA); 8 CFR 1003.37(a) (explaining that a "decision of the Immigration Judge may be rendered orally or in writing," and that, if the decision is oral, it shall be "stated by the Immigration Judge in the presence of the parties" and a memorandum "summarizing the oral decision shall be served on the parties"). Requiring additional steps beyond these long-standing processes would only create inefficiencies that this rule seeks to avoid. For example,

this rule removes the automatic review of a discretionary denial of asylum specifically because "mandating that the decision maker reevaluate the very issue just decided is an inefficient practice that * * * grants insufficient deference to the original fact finding and exercise of discretion." 84 FR at 69657.

The Departments also decline to incorporate a commenter's suggestion to include the Washington Adult Sentencing Guidelines Manual into the rule, as the Departments believe the rule provides sufficient guidance to adjudicators without adding a specific state's criminal law manual, which would only add confusion to the immigration adjudication process.

### D. Comments Regarding Regulatory Requirements

#### 1. Administrative Procedure Act

*Comment:* Commenters raised concerns that this rule violated the APA's requirements, as set forth in 5 U.S.C. 553(b) through (d). First, commenters stated that the 30-day comment period was not sufficient for such a significant rule and that, at a minimum, the comment period should have been 60 days. Commenters cited the complexity of the legal and policy issues raised by the rule, the impact of the rule on asylum-seekers, and the potential implications of the rule regarding the United States' compliance with international and domestic asylum law. In support, commenters referenced Executive Orders 12866 and 13563, both of which recommend a "meaningful opportunity to comment" with a comment period of not less than 60 days "in most cases." They also noted that the comment period for this rule ran through the winter holiday season, with multiple Federal holidays.

Commenters also stated that the rule was arbitrary and capricious under the APA because the Departments did not provide sufficient evidence to support such significant changes. For example, commenters noted the lack of statistics regarding the number of asylum seekers that would be affected by the rule and expressed concerned that the Departments were relying on conclusory statements in support of the rule.

Commenters further stated that the reasons given for the rule were insufficient and, therefore, arbitrary and capricious. For example, commenters took issue with the Departments' explanation that the additional categories of criminal bars were necessary to address the "inefficient" and "unpredictable" case-by-case adjudication process. Instead, commenters stated that the case-by-case

process ensured that the adjudicator takes into account all of the relevant factors in making a determination.

Commenters had specific concerns with the rule's provision that all felony convictions constitute a particularly serious crime. Commenters stated that the rule provided no evidence to support the provision, and that a criminal record in and of itself does not reliably predict future dangerousness. Further, the provision does not address persons who accept plea deals to avoid lengthy potential sentences; who have rehabilitated since the conviction; or who have committed a crime that does not involve a danger to the community or circumstances when a Federal, State, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence.

Commenters stated that the rule was arbitrary and capricious because it is inconsistent with the statute, *see* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)), which requires a separate showing from the particularly serious crime determination that the alien constitutes a danger to the community.

Commenters also raised concerns with the "reason to believe" standard for gang-related crime determinations. The commenters asserted that the standard relied on ineffective, inaccurate, and discriminatory practices and was therefore arbitrary and capricious.

*Response:* The Departments believe the 30-day comment period was sufficient to allow for a meaningful public input, as evidenced by the significant number of public comments received, including almost 80 detailed comments from interested organizations. The APA does not require a specific comment period length. *See* 5 U.S.C. 553(b)–(c). Similarly, although Executive Orders 12866 and 13563 recommend a comment period of at least 60 days, such a period is not required. Federal courts have presumed 30 days to be a reasonable comment period length. For example, the D.C. Circuit recently stated that, "[w]hen substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n* v. *Fed. Commc'ns Comm'n,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Litigation has mainly focused on the reasonableness of comment periods shorter than 30 days, often in the face of exigent circumstances, and the Departments are unaware of any case

law holding that a 30-day comment period was insufficient. *See, e.g., N. Carolina Growers' Ass'n, Inc.* v. *United Farm Workers,* 702 F.3d 755, 770 (4th Cir. 2012) (analyzing the sufficiency of a 10-day comment period); *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 629–30 (D.C. Cir. 1996) (15-day comment period); *Northwest Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (7-day comment period).

The Departments also believe that the 30-day comment period was preferable to a longer comment period since this rule involves public safety concerns. *Cf. Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (noting that the Federal Aviation Administration had good cause to not engage in notice-and-comment rulemaking because the rule was needed to protect public safety as demonstrated by numerous then-recent helicopter crashes). By proceeding with a 30-day comment period rather than a 60-day period, the Departments are able to more quickly finalize and implement this rule, which prevents persons with certain criminal histories, such as domestic violence or gang-related crimes, from receiving asylum and potentially residing or prolonging their presence in the United States on that basis during the pendency of the asylum process.

Regarding commenters' APA concerns about the statistical analysis in this rule, the Departments reiterate that they are unable to provide precise data on the number of persons affected by the rule because the Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. An attempt to quantify the population affected would risk providing the public with inaccurate data that at best would be unhelpful. As a general matter, the rule will likely result in fewer asylum grants annually, but the Departments do not believe that further analysis—in the absence of any reliable data—is warranted. *See Stilwell* v. *Office of Thrift Supervision,* 569 F.3d 514, 519 (D.C. Cir. 2009) ("The APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation."); *see also id.* (upholding an agency's decision to rely on its "long experience" and "considered judgment," rather than statistical analyses, in promulgating a rule).

Likewise, the Departments disagree with commenters that the NPRM did not sufficiently explain the reasons for adding additional per se criminal bars. As explained in the NPRM, immigration judges and the BIA have had difficulty applying the "particularly serious crime" bar and, therefore, the Departments believe additional standalone criminal bars will provide a clear and efficient process for adjudicating asylum applications involving criminal convictions. *See* 84 FR at 69646. The Attorney General and the Secretary have not issued regulations identifying additional categories of convictions that qualify as particularly serious crimes, which has in turn resulted in adjudicators and the courts analyzing on a case-by-case basis whether individual criminal statutes qualify as particularly serious crimes. However, this statute-by-statute determination has not provided adjudicators with sufficient guidance in making "particularly serious crime" determinations due to the individualized nature of the BIA's determinations. *See id.* By adding these standalone criminal bars, the rule helps ensure that immigration adjudicators will be able to apply clear standards outside of applying the particularly serious crime bar. In regards to commenters' concerns about the blanket felony conviction bar, the Departments chose to include a bar for all felony convictions because it provides a clear standard to apply in adjudicating the effect to be given to criminal offenses as part of asylum determinations.

Adjudicators will be able to efficiently determine the effect of criminal convictions without resort to complex legal determinations as to the immigration effects of a specific criminal statute. The Departments are aware that the particular personal circumstances and facts of each case are unique; however, the Departments believe that the clarity and consistency of a per se rule outweigh any benefits of a case-by-case approach.

Further, adding a bar to asylum eligibility for all felony convictions recognizes the significance of felony convictions. For example, Congress recognized the relationship between felonies and the seriousness of criminal offenses when it explicitly defined "aggravated felony" to include numerous offenses requiring a term of imprisonment of at least one year. *See* INA 101(a)(43)(F), (G), (J), (P), (R), (S) (8 U.S.C. 1101(a)(43)(F), (G), (J), (P), (R), (S)). Similarly, Congress focused on the importance of felonies in the Armed Career Criminal Act, a sentencing enhancement statute for persons who have been convicted of three violent felonies, which requires the predicate offenses to be punishable by imprisonment for terms exceeding one year. *See* 18 U.S.C. 924(e)(2)(B).

The Departments also disagree that the use of the "reason to believe" standard for gang-related crime determinations is arbitrary and capricious. The "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations, and the Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes* v. *Holder,* 741 F.3d 1, 3–4 (9th Cir. 2014) (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). There is no reason that the Departments cannot apply this same standard when determining whether a criminal conviction involves gang activity.

In addition, the Departments disagree with commenters that the use of the "reason to believe" standard would enable adjudicators to rely on inaccurate, ineffective, or discriminatory evidence when making determinations regarding gang-related crimes. As discussed above, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). Nothing in the rule undermines or withdraws from this standard. If an alien believes that an adjudicator has relied on inaccurate, ineffective, or discriminatory evidence in making this determination, such decision would be subject to further review.

Finally, the Departments clarify that this rule creates additional standalone criminal bars to asylum and does not alter the definitions of the "particularly serious crime" bar. As a result, this rule does not create any inconsistencies with the "particularly serious crime" bar statutory language regarding dangerousness, which, the Departments note, does not require a separate finding of dangerousness. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)); *see also, e.g., Matter of R–A–M–,* 25 I&N Dec. 657, 662 (BIA 2012) (explaining that, for purposes of the "particularly serious crime" bar, "it is not necessary to make a separate determination whether the alien is a danger to the community").

IFR_AR_000384

2. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

*Comment:* Commenters raised concerns that the Departments' cost-benefit analysis presented no evidence that potential benefits from the rule exceed the potential costs. For example, commenters explained that the Departments' primary stated reason for adopting new categorical bars was that the exercise of discretion has created inefficiency and inconsistency. However, commenters stated that the Departments' cost-benefit estimates failed to account for new assessments regarding numerous questions of law and fact that the rule would require. Accordingly, commenters argued that the Departments' cost-benefit analysis was unreliable.

Further, commenters stated that the agencies did not comply with Executive Orders 12866, 13563, and 13771, which require agencies to quantify potential costs to the fullest extent possible. Commenters explained that the Departments noted that the rule would likely result in fewer asylum grants annually but failed to quantify or evaluate the impact of the decrease and did not provide any evidence or indication that an attempt was made at quantifying this impact. Commenters explained that the Departments are required to use the best methods available to estimate regulatory costs and benefits, even if those estimates cannot be precise. Commenters also noted that the Departments did not attempt to provide a high and low estimate for the rule's potential impacts despite such an estimation being common practice in rulemaking.

Commenters noted that public comments on this rule and other recent asylum-related rulemakings provided the Departments with data regarding the impacts of asylum denials. Commenters gave examples of potential costs that the Departments failed to consider, including, for example, costs from the differences in benefits for individuals who may obtain only lesser protection in the form of statutory withholding of removal or protection under the CAT regulations; costs from the detention and deportation of individuals who would otherwise have meritorious asylum claims; economic and non-economic costs to asylum-seekers' families; costs to businesses that currently employ or are patronized by asylum-seekers; costs from the torture and killings of deported asylum-seekers;

and intangible costs from the diminution of respect for U.S. treaty obligations and diminution of respect for human life and the safety of asylum-seekers, among others. As a result, commenters stated that the Departments did not support their conclusion that "the expected costs of this proposed rule are likely to be de minimis."

*Response:* The Departments disagree that the rule will create additional adjudicatory burdens that will outweigh the rule's benefits. The purpose of the rule is to limit asylum eligibility for persons with certain criminal convictions, which in turn will lessen the burdens on the overtaxed asylum system. There are currently more than one million pending cases at the immigration courts, with significant year over year increases, despite a near doubling of the number of immigration judges over the past decade and the completion of historic numbers of cases. *See* EOIR, *Adjudication Statistics: Pending Cases* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1242166/download;* EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (June 2020), *https://www.justice.gov/eoir/page/file/1242156/download;* EOIR, *Adjudication Statistics: New Cases and Total Completions* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1060841/download*). Of these pending cases, over 575,000 include an asylum application.

These new bars will help achieve the goal of alleviating the burden on the immigration system while retaining the existing framework for asylum adjudications. As stated in the NPRM, this rule does not change the role of an immigration judge or asylum officer in adjudicating asylum applications; immigration judges and asylum officers currently consider an applicant's criminal history to determine the associated immigration consequences, if any, and whether the applicant warrants asylum as a matter of discretion. *See* 84 FR at 69657–58. These additional bars will be considered under that existing framework and, therefore, the Departments do not anticipate additional costs to the adjudication process.

In addition, the Departments believe the rule complies with the cost-benefit analysis required by Executive Orders 12866, 13563, and 13771. Executive Order 12866 requires the Departments to quantify costs "to the fullest extent that these can be usefully estimated." *See* E.O. 12866, 58 FR 51735, 51735, sec. 1(a) (Sept. 30, 1993). As explained in the NPRM, the Departments do not maintain data on the number of asylum applicants with criminal convictions or,

more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. Without this data, the Departments cannot reliably estimate the population effected by this rule, outside of identifying the group likely affected by the rule: Asylum applicants with criminal convictions and pertinent criminal conduct, barred under this rule, and asylum applicants denied asylum solely as a matter of discretion that will no longer receive automatic review of such decisions.

Based on this identified population, commenters provided a number of potential ancillary costs to the likely increase in asylum denials under these additional bars, which the Departments have reviewed. As explained in the NPRM, a main effect of the likely increase in asylum denials is a potential increase in grants of statutory withholding of removal or protection under the CAT regulations. 84 FR at 69658. These forms of protection do not provide the same benefits as asylum, including the ability to gain permanent status in the United States, obtain derivative status for family members, or travel outside the country. Such non-monetary costs are difficult to quantify, but the Departments believe that the similarly difficult-to-quantify benefits associated with the rule—such as a reduction in the risks associated with dangerous aliens and an increase in adjudicative efficiency—outweigh these costs.

Commenters also cited other potential costs, such as the effects that the bars could have on businesses employing or patronized by asylum applicants. However, such projections were general, tenuous, and unsupported by data, and the Departments are unaware of any reliable data parsing business income attributable to individuals affected by this rule—*i.e.,* asylum applicants who have been convicted of or engaged in certain types of criminal behavior—as opposed to non-criminal asylum applicants, asylees, refugees, aliens granted statutory withholding of removal or protection under the CAT, or other groups of aliens in general. Moreover, because aliens may still obtain work authorization if granted withholding of removal or protection under the CAT, 8 CFR 274a.12(a)(10), this rule would not necessarily foreclose employment or patronage opportunities for aliens subject to its parameters. Finally, even if there were identifiable economic costs for these aliens, the Departments believe that the benefits associated with limiting asylum eligibility based on certain criminal conduct would outweigh them because

IFR_AR_000385

of (1) the rule's likely impact in improving adjudicatory efficiency, and (2) the intangible benefits associated with promotion of the rule of law. *See* E.O. 12866, 58 FR at 51734 (directing agencies to account for "qualitative" benefits that are "difficult to quantify," but which are "essential to consider"). The Departments further disagree with commenters' assertions that these bars will have a negative intangible cost on the United States' interests or international standing, as Congress expressly conferred on the Attorney General and the Secretary the authority to provide these additional asylum limitations, which—as explained in the NPRM—are consistent with U.S. treaty obligations. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); 84 FR at 69644.

### III. Provisions of the Final Rule

The Departments have considered and responded to the comments received in response to the NPRM. In accordance with the authorities discussed above in section I.A, the Departments are now issuing this final rule to finalize the NPRM. The final rule adopts the provisions of the NPRM as final, with the following minor edits for clarity, for the reasons discussed above in section II in response to the comments received.[42]

#### *A. 8 CFR 208.13(c)(6)(ii)*

As drafted in the NPRM, 8 CFR 208.13(c)(6)(ii) would have included a reference to "the Secretary:" "The alien has been convicted [of a crime] that the Secretary knows or has reason to believe * * * ." For internal consistency within 8 CFR 208.13(c)(6)(ii) and for specificity, the Departments are replacing this reference to "the Secretary" with "the asylum officer," the officials in DHS who adjudicate asylum applications.

#### *B. 8 CFR 1208.13(c)(6)(ii)*

Regulations in chapter V of 8 CFR govern proceedings before EOIR and not before DHS. The Departments, however, mistakenly listed both the Attorney General and the Secretary in 8 CFR 1208.13(c)(6)(ii) as drafted in the NPRM: "The alien has been convicted [of a crime] that the Attorney General or Secretary knows or has reason to believe * * * ." This final rule removes the reference to the Secretary so that 8 CFR 208.13(c)(6)(ii), governing DHS, references the Secretary, and 8 CFR 1208.13(c)(6)(ii) references only officials within DOJ. It further changes "Attorney

---

[42] In addition, the final rule makes clarifying grammatical edits to the punctuation of the proposed rule, such as by replacing semicolons with periods where relevant.

General" to "immigration judge" for internal consistency within the rest of 8 CFR 1208.13.

#### *C. 8 CFR 1208.13(c)(6)(v)(B)*

This rule amends the cross-reference in 8 CFR 1208.13(c)(6)(v)(B) so that it reads "under paragraph (c)(6)(v)(A)" instead of "under paragraph (c)(6)(v)" as published in the NPRM. This change provides clarity and matches the same cross-reference in 8 CFR 208.13(c)(6)(v)(B)—(C) and 8 CFR 1208.13(c)(6)(v)(C).

In addition, this rule changes "adjudicator" to "immigration judge" for specificity and clarity. This matches the specific reference to "asylum officer," who is the relevant adjudicating entity for DHS, in 8 CFR 208.13(c)(6)(v)(B).

#### *D. 8 CFR 1208.13(c)(7)(v)*

As with the change discussed above to 8 CFR 1208.13(c)(6)(v)(B), this rule corrects the reference to the "asylum officer" to read "immigration judge" in 8 CFR 1208.13(c)(7)(v). The immigration judge is the relevant adjudicator for DOJ's regulations.

#### *E. 8 CFR 1208.13(c)(9)*

As with the change discussed above regarding 8 CFR 1208.13(c)(6)(v)(B), this rule removes "or other adjudicator" from the proposed text for 8 CFR 1208.13(c)(9). This change provides clarity because the immigration judge is the relevant adjudicator for DOJ's regulations and matches the specific reference to only an "asylum officer" in 8 CFR 208.13(c)(9).

#### *F. 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii)*

This rule amends the same language in both 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) so that the provisions instruct that an alien will be barred from asylum if the immigration judge or asylum officer "knows or has reason to believe" that the alien has engaged on or after the effective date in certain acts of battery or extreme cruelty. Previously, these provisions provided "[t]here are serious reasons for believing" the alien has engaged in such conduct. In other words, the Departments have replaced the "serious reasons for believing" standard in proposed 8 CFR 208.13(c)(6)(vii) and proposed 8 CFR 1208.13(c)(6)(vii) with a "knows or has reason to believe" standard.

This change is intended to prevent confusion and ensure the rule's consistency, both within the new provisions it adds to 8 CFR and with the INA more generally. As discussed

above, the "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (providing that an alien who "the consular officer or the Attorney General knows or has reason to believe" is an illicit trafficker of controlled substances is inadmissible). The Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes,* 741 F.3d at 3–4 (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). Further, without this change, the rule may have created additional unintended questions regarding what sort of reasons to believe are sufficient to qualify as "serious" reasons. Although the Departments are modifying the language in the final rule to reduce the likelihood of confusion, they reiterate that the language in 8 CFR 1208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) is intended to be analogous to similar provisions in 8 CFR 204.2.

### IV. Regulatory Requirements

#### *A. Regulatory Flexibility Act*

The Departments have reviewed this proposed rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) and have determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule would not regulate "small entities" as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings.

#### *B. Administrative Procedure Act*

This final rule is being published with a 30-day effective date as required by the Administrative Procedure Act. 5 U.S.C. 553(d).

#### *C. Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

IFR_AR_000386

## D. Congressional Review Act

The Office of Information and Regulatory Affairs has determined that this rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

## E. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

The Office of Information and Regulatory Affairs, Office of Management and Budget ("OMB"), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866, but not an economically significant regulatory action. Accordingly, the rule has been submitted to OMB for review. The Departments certify that this rule has been drafted in accordance with the principles of Executive Order 12866, section 1(b); Executive Order 13563; and Executive Order 13771.

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of using the best available methods to quantify costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Similarly, Executive Order 13771 requires agencies to manage both the public and private costs of regulatory actions.

Because this final rule does not make substantive changes from the NPRM that would impact the rule's expected costs and benefits, the Departments have performed the same analysis as set out in the NPRM. 84 FR at 69657–59.

This rule provides seven additional mandatory bars to eligibility for asylum pursuant to the Attorney General's and the Secretary's authorities under sections 208(b)(2)(C) and 208(d)(5) of the INA (8 U.S.C. 1182(b)(2)(C) and 1182(d)(5)).[43] This rule adds bars on eligibility for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of, or engage in criminal conduct, as appropriate, with respect to: (1) A felony under Federal, State, tribal, or local law; (2) an offense under section 274(a)(1)(A) or (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A) or 1324(a)(2)) (Alien Smuggling or Harboring); (3) an offense under section 276 of the Act (8 U.S.C. 1326) (Illegal Reentry); (4) a Federal, State, tribal, or local crime involving criminal street gang activity; (5) certain Federal, State, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a Federal, State, tribal, or local domestic violence offense; and (7) certain misdemeanors under Federal, State, tribal, or local law for offenses related to false identification; the unlawful receipt of public benefits from a Federal, State, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia.

The seven bars are in addition to the existing mandatory bars relating to the persecution of others, convictions for particularly serious crimes, commission of serious nonpolitical crimes, security threats, terrorist activity, and firm resettlement in another country that are currently contained in the INA and its implementing regulations. *See* INA 208(b)(2) (8 U.S.C. 1158(b)(2)); 8 CFR 208.13, 1208.13. Under the current statutory and regulatory framework, asylum officers and immigration judges consider the applicability of mandatory bars to the relief of asylum in every proceeding involving an alien who has submitted a Form I–589 application for asylum. Although this rule expands the mandatory bars to asylum, it does not change the nature or scope of the role of an immigration judge or an asylum officer during proceedings for consideration of asylum applications. Immigration judges and asylum officers are already trained to consider both an alien's previous conduct and criminal record to determine whether any immigration consequences result, and this rule does not propose any adjudications that are more challenging than those that are already conducted. For example, immigration judges already consider the documentation of an alien's criminal record that is filed by the alien, the alien's representative, or the DHS representative in order to determine whether one of the mandatory bars applies and whether the alien warrants asylum as a matter of discretion. Because the new bars all relate to an alien's criminal convictions or other criminal conduct, adjudicators will conduct the same analysis to determine the applicability of the bars proposed by the rule.[44] The Departments do not expect the additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications.

The expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually;[45] however, because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application, neither DOJ nor DHS can quantify precisely the expected decrease. An alien who would be barred from asylum as a result of the rule may still be eligible to apply for the protection of withholding of removal under section 241(b)(3) of the INA (8 U.S.C. 1231(b)(3)) or withholding of removal or deferral of removal under regulations implementing U.S. obligations under Article 3 of the CAT. *See* INA 241(b)(3) (8 U.S.C. 1231(b)(3));

---

[43] As discussed further below, this rule will not otherwise impact the ability of an alien who is denied asylum to receive the protection of withholding of removal under the Act or withholding of removal or deferral of removal under the CAT.

[44] The Departments note that one of the new bars, regarding whether the alien has "engaged" in certain acts of battery or extreme cruelty, does not necessarily require a criminal conviction or criminal conduct. The Departments believe that a criminal arrest or conviction is the most likely evidence to be filed with the immigration court related to this bar, but even in cases where no such evidence is available, the analysis by immigration judges related to this bar is not an expansion from the current analysis immigration judges employ in determining whether conduct rises to level of "extreme cruelty" under 8 CFR 204.2(c)(1)(vi) in other contexts during removal proceedings. *See, e.g., Bedoya-Melendez v. U.S. Atty. Gen.*, 680 F.3d 1321, 1326–28 (11th Cir. 2012) (demonstrating that, although there is a circuit split as to whether the "extreme cruelty" analysis is discretionary, all circuits look to conduct and not convictions in conducting the "extreme cruelty" analysis); *Stepanovic v. Filip*, 554 F.3d 673, 680 (7th Cir. 2009) (explaining that, in analyzing whether conduct rises to the level of "extreme cruelty," the immigration judge "must determine the facts of a particular case, make a judgment call as to whether those facts constitute cruelty, and, if so, whether the cruelty rises to such a level that it can rightly be described as extreme"). In addition, adjudicators have experience reviewing questions of an alien's conduct in other contexts during the course of removal proceedings. *See* INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)) (providing that an alien is inadmissible if "the Attorney General knows or has reason to believe" that the alien is an illicit trafficker of a controlled substance, regardless of whether the alien has a controlled substance-related conviction).

[45] In Fiscal Year ("FY") 2018, DOJ's immigration courts granted over 13,000 applications for asylum. *See* EOIR, *Adjudication Statistics: Asylum Decision Rates,* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1248491/download.*

8 CFR 208.16 through 208.18; 1208.16 through 1208.18. For those aliens barred from asylum under this rule who would otherwise be positively adjudicated for asylum, it is possible they would qualify for withholding (provided a bar to withholding did not apply separate and apart from this rule) or deferral of removal.[46] To the extent this rule has any impacts, they would almost exclusively fall on that population.[47]

The full extent of the impacts on this population is unclear and would depend on the specific circumstances and personal characteristics of each alien, and neither DHS nor DOJ collects such data at such a level of granularity. Both asylum applicants and those who receive withholding of removal or protection under CAT may obtain work authorization in the United States. Although asylees may apply for lawful permanent resident status and later citizenship, they are not required to do so, and some do not. Further, although asylees may bring certain family members to the United States, not all asylees have family members or family members who wish to leave their home countries. Moreover, family members of aliens granted withholding of removal may have valid asylum claims in their own right, which would provide them with a potential path to the United States as well. The only clear impact is that aliens granted withholding of removal generally may not travel outside the United States without executing their underlying order of removal and, thus, may not be allowed to return to the United States; however, even in that situation—depending on the destination of their travel—they may have a prima facie case for another grant of withholding of removal should they attempt to reenter. In short, there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole.

Applications for withholding of removal typically require a similar amount of in-court time to complete as an asylum application due to a similar nucleus of facts. 8 CFR 1208.3(b) (an

asylum application is deemed to be an application for withholding of removal). In addition, this rule does not affect the eligibility of applicants for the employment authorization documents available to recipients of those protections and during the pendency of the consideration of the application in accordance with the current regulations and agency procedures. *See* 8 CFR 274a.12(c)(8), (c)(18), 208.7, 1208.7.

This rule removes the provision at 8 CFR 208.16(e) and 1208.16(e) regarding automatic reconsideration of discretionary denials of asylum. This change has no impact on DHS adjudicative operations because DHS does not adjudicate withholding requests. DOJ estimates that immigration judges nationwide must apply 8 CFR 1208.16(e) in approximately 800 cases per year on average.[48] The removal of the requirement to reconsider a discretionary denial will increase immigration court efficiencies and reduce any cost from the increased adjudication time by no longer requiring a second review of the same application by the same immigration judge. This impact, however, would likely be minor because of the small number of affected cases, and because affected aliens have other means to seek reconsideration of a discretionary denial of asylum. Accordingly, DOJ has concluded that removal of paragraphs 8 CFR 208.16(e) and 1208.16(e) would not increase the costs of EOIR's operations, and would, if anything, result in a small increase in efficiency. Removal of 8 CFR 208.16(e) and 1208.16(e) may have a marginal cost for aliens in immigration court proceedings by removing one avenue for an alien who would otherwise be denied asylum as a matter of discretion to be granted that relief. However, of the average of 800 aliens situated as such each year during the last 10 years, an average of fewer than 150, or 0.4 percent, of the average 38,000 total asylum completions[49] each year filed an appeal in their case, so the affected population is very small, and the overall impact would be nominal at most.[50]

Moreover, such aliens would retain the ability to file a motion to reconsider in such a situation and, thus, would not actually lose the opportunity for reconsideration of a discretionary denial.

For the reasons explained above, the expected costs of this rule are likely to be *de minimis.* This rule is accordingly exempt from Executive Order 13771. *See* OMB, *Guidance Implementing Executive Order 13771, titled ''Reducing Regulation and Controlling Regulatory Costs''* (2017), *https://www.whitehouse .gov/sites/whitehouse.gov/files/omb/ memoranda/2017/M-17-21-OMB.pdf.*

### F. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Paperwork Reduction Act

This rule does not propose new or revisions to existing ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. 3501 *et seq.,* and its implementing regulations, 5 CFR part 1320.

### I. Signature

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, has delegated the authority to electronically sign this document to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the **Federal Register**.

### List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

---

[46] Because asylum applications may be denied for multiple reasons and because the proposed bars do not have exact analogues in existing immigration law, there is no precise data on how many otherwise grantable asylum applications would be denied using these bars and, thus, there is no way to calculate precisely how many aliens would be granted withholding. Further, because the immigration judge would have to adjudicate the application in either case, there is no cost to DOJ.

[47] In FY 2018, DOJ's immigration courts completed 45,923 cases with an application for asylum on file. For the first three quarters of FY 2018, 622 applicants were denied asylum but granted withholding.

[48] This approximation is based on the number of initial case completions with an asylum application on file that had a denial of asylum but a grant of withholding during FYs 2009 through the third quarter of 2018.

[49] Thirty-eight thousand is the average of completions of cases with an asylum application on file from FY 2008 through FY 2018. Completions consist of both initial case completions and subsequent case completions.

[50] Because each case may have multiple bases for appeal and appeal bases are not tracked to specific levels of granularity, it is not possible to quantify precisely how many appeals were successful on this particular issue.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble and pursuant to the authority vested in the Acting Secretary of Homeland Security, part 208 of title 8 of the Code of Federal Regulations is amended as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as fol1ows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229, 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by adding paragraphs (c)(6) through (9) to read as follows:

### § 208.13 Establishing asylum eligibility.

\*    \*    \*    \*    \*

(c) \* \* \*

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the asylum officer knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The asylum officer knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local

IFR_AR_000389

government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term ''felony'' means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term ''misdemeanor'' means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine

whether such order should be given any effect under this section.

§ 208.16 [Amended]

■ 3. Amend § 208.16 by removing and reserving paragraph (e).

**Department of Justice**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 4. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; Pub. L. 115–218.

■ 5. Amend § 1208.13 by adding paragraphs (c)(6) through (9) to read as follows:

§ 1208.13 Establishing asylum eligibility.

\* \* \* \* \*

(c) \* \* \*

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the immigration judge knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or

drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the immigration judge to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The immigration judge need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the immigration judge is not limited to facts found by the criminal court or

provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The immigration judge knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the immigration judge determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An immigration judge is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

## § 1208.16    [Amended]

■ 6. Amend § 1208.16 by removing and reserving paragraph (e).

Approved:

**Chad R. Mizelle,**

*Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security.*

Approved:

Dated: October 14, 2020.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2020–23159 Filed 10–20–20; 8:45 am]

**BILLING CODE 4410–30–P 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208, 212, and 235**

[CIS No. 2692–21; DHS Docket No. USCIS–2021–0012]

RIN 1615–AC67

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Parts 1003, 1208, 1235, and 1240**

[A.G. Order No. 5369–2022]

RIN 1125–AB20

### Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule with request for comments.

---

**SUMMARY:** On August 20, 2021, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") (collectively "the Departments") published a notice of proposed rulemaking ("NPRM" or "proposed rule") that proposed amending regulations governing the procedures for determining certain protection claims and available parole procedures for individuals subject to expedited removal and found to have a credible fear of persecution or torture. After a careful review of the comments received, the Departments are now issuing an interim final rule ("rule" or "IFR") that responds to comments received in response to the NPRM and adopts the proposed rule with changes. Most significantly, the IFR provides that DHS's United States Citizenship and Immigration Services ("USCIS") will refer noncitizens whose applications are not granted to DOJ's Executive Office for Immigration Review ("EOIR") for streamlined removal proceedings. The IFR also establishes timelines for the consideration of applications for asylum and related protection by USCIS and, as needed, EOIR. This IFR responds to comments received in response to the NPRM and adopts the NPRM with changes as described in this rule. The Departments solicit further public comment on the IFR's revisions, which will be considered and addressed in a future rule.

**DATES:** *Effective Date:* This interim final rule is effective May 31, 2022.

*Submission of public comments:* Comments must be submitted on or before May 31, 2022. The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on the entirety of this interim final rule package, identified by DHS Docket No. USCIS–2021–0012, through the Federal eRulemaking Portal: *https://www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the interim final rule and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 (not a toll-free call) for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For USCIS:* Rená Cutlip-Mason, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20588–0009; telephone (240) 721–3000 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
　A. Background
　B. Legal Authority
　C. Changes in the IFR
　1. Revisions to the Proposed DHS Regulations
　2. Revisions to the Proposed DOJ Regulations
　D. Provisions of the IFR
　1. Credible Fear Screening Process
　2. Applications for Asylum
　3. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear
　4. Streamlined Section 240 Removal Proceedings Before the Immigration Judge
　5. Parole
　E. Summary of Costs and Benefits
　F. Effective Date
III. Discussion of the IFR
　A. Credible Fear Screening Process
　B. Applications for Asylum
　C. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear
　D. Streamlined Section 240 Removal Proceedings Before the Immigration Judge
　1. Schedule of Proceedings
　2. Pre-Hearing Procedures
　b. Merits Hearing(s)
　2. Evidentiary Standard
　3. Timeline for Proceedings
　4. Continuances and Filing Extensions
　5. Consideration of Statutory Withholding of Removal and CAT Protection
　6. Exceptions to Streamlined Procedures
　E. Other Amendments Related to Credible Fear
　F. Parole
　G. Putative Reliance Interests
IV. Response to Public Comments on the Proposed Rule
　A. Summary of Public Comments
　B. General Feedback on the Proposed Rule
　1. General Support for the Proposed Rule
　a. Immigration Policy Benefits
　b. Positive Impacts on Applicants, Their Support Systems, and the Economy
　2. General Opposition to the Proposed Rule
　a. Immigration Policy Concerns
　b. Negative Impacts on Applicants and Their Support Systems
　c. Negative Impacts on U.S. Citizens and the Economy
　d. Other General Opposition to the Proposed Rule
　C. Basis for the Proposed Rule
　1. DOJ and DHS Statutory/Legal Authority
　2. Need for the Proposed Rule/DOJ and DHS Rationale
　3. Prior Immigration Rulemakings
　D. Proposed Changes
　1. Applicability
　2. Parole
　a. General Comments on Parole
　b. Change in Circumstances Under Which Parole May Be Considered
　c. Availability of Employment Authorization for Those in Expedited Removal Who Have Been Paroled From Custody
　d. Other Comments on Proposed Approach to Parole
　3. Credible Fear Screening Process
　a. General Comments on Credible Fear Screening Process
　b. "Significant Possibility" Standard for Protection Claims
　c. Due Process in Credible Fear Screening
　d. Removal of Mandatory Bars From Consideration

IFR_AR_000734

e. Other Comments on the Proposed Credible Fear Screening Process
4. Applications for Asylum
a. Written Record of the Credible Fear Determination Created by USCIS, Together With the Service of the Credible Fear Determination, Treated as an Application for Asylum
b. Date Positive Credible Fear Determination Served as Date of Filing and Receipt
c. Inclusion of Applicant's Spouse and Children
d. Due Process in Asylum Applications
e. Other Comments on Proposed Provisions on Applications for Asylum
5. Adjudication of Applications for Asylum for Noncitizens With Credible Fear
a. DHS Interpretation of Statute in Creating a New Adjudication Process
b. Review of Asylum Claim by an Asylum Officer, Rather Than by an Immigration Judge, in Section 240 Removal Proceedings
c. Requirements for USCIS Asylum Merits Adjudication
d. Failure To Appear
e. Process for USCIS To Deny an Application for Asylum or Other Protection and Issue a Removal Order
f. Other Comments on Proposed Adjudication of Applications for Asylum
6. Application Review Proceedings Before an Immigration Judge
a. Creation of New Limited Proceedings in Lieu of Section 240 Removal Proceedings and Limitation on Relief to Asylum, Statutory Withholding of Removal, and Convention Against Torture Review Only
b. De Novo Review of Full Asylum Hearing Record and Consideration of Additional Testimony and Evidence
c. Immigration Judge's Discretion To Vacate Asylum Officer's Removal Order
d. Immigration Judge's Authority To Review All Asylum Officer Decisions
e. Appeal of Immigration Judge's Decision to the Board of Immigration Appeals
f. Other Comments on Proposed Application Review Proceedings before Immigration Judges
E. Other Issues Related to the Proposed Rulemaking
1. Public and Stakeholder Input
2. Severability
3. Discretion and Phased Implementation
a. Discretion
b. Phased Implementation
4. Comments on Immigration Court Inefficiencies and Bottlenecks
F. Statutory and Regulatory Requirements
1. Impacts and Benefits (E.O. 12866 and E.O. 13563)
a. Methodology
b. Population
c. Costs or Transfers
i. Impacts on the Credible Fear Asylum Population and Support Networks
ii. Impacts on U.S. Workers, Companies, Economy
iii. Impacts on Federal Government
iv. Other Comments on Costs or Transfers
d. Other Comments on Impacts and Benefits of the Proposed Rulemaking
2. Paperwork Reduction Act

3. Other Comments on Statutory and Regulatory Requirements
G. Comments Outside of the Scope of This Rulemaking
V. Statutory and Regulatory Requirements
A. Administrative Procedure Act
B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)
1. Summary of the Rule and Its Potential Impacts
2. Background and Purpose of the Rule
3. Population
4. Impacts of the Rule
a. Impacts to the Credible Fear Asylum Population
b. Impacts to USCIS
i. Total Quantified Estimated Costs of Regulatory Changes
ii. Intra-Federal Government Sector Impacts
c. Familiarization Costs, Benefits, and Transfers of Possible Early Labor Market Entry
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Family Assessment
I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
J. National Environmental Policy Act
K. Paperwork Reduction Act

## I. Public Participation

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this interim final rule by the deadline stated above. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this interim final rule. Comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the interim final rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change. Comments submitted in a manner other than those listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the interim final rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the agency name and the DHS Docket No. USCIS–2021–0012 for this rulemaking. All submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or that is offensive. For additional information, please read the Privacy and Security Notice available at *https:// www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https:// www.regulations.gov,* referencing DHS Docket No. USCIS–2021–0012. You may also sign up for email alerts on the online docket to be notified when comments are posted or a final rule is published.

## II. Executive Summary

### A. Background

On August 20, 2021, the Departments published an NPRM in the **Federal Register** proposing to amend the regulations governing the process for further consideration of asylum and related protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906 (Aug. 20, 2021).

The preamble discussion in the NPRM, including the detailed presentation of the need for reforming the system for processing asylum and related protection claims at the Southwest border, is generally adopted by reference in this IFR, except to the extent specifically noted in this IFR, or in the context of proposed regulatory text that is not contained in this IFR.

To reform and improve the process, the NPRM proposed revisions to 8 CFR parts 208, 235, 1003, 1208, and 1235. Those proposed revisions fell into five main categories. First, individuals subject to expedited removal and found to have a credible fear of persecution or torture would have their claims for asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act ("INA" or "the Act") ("statutory withholding of removal"), or

Convention Against Torture ("CAT")[1] protection initially adjudicated by USCIS following a nonadversarial interview before an asylum officer. Second, individuals granted protection by USCIS would be entitled to asylum, statutory withholding of removal, or protection under the CAT, as appropriate, without further adjudication. Third, individuals not granted protection would be ordered removed by the asylum officer but would have the ability to seek prompt, de novo review with an immigration judge ("IJ") in EOIR through a newly established procedure, with appeal available to the Board of Immigration Appeals ("BIA") and the Federal courts. Fourth, individuals placed in expedited removal proceedings would be eligible for consideration for parole from custody in accordance with section 212(d)(5) of the Act, if DHS determined, in the exercise of its discretion and on a case-by-case basis, that parole is warranted because, inter alia, detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities). Finally, the NPRM proposed to restore the expedited removal framework and credible fear screening processes that were in place before various regulatory changes made from late 2018 through late 2020. Specifically, the longstanding "significant possibility" screening standard would apply once more to all such protection claims arising from expedited removal proceedings initiated pursuant to section 235(b)(1) of the Act, and the mandatory bars to asylum and withholding of removal (with limited exception) would not apply at this initial screening stage.

The comment period for the NPRM opened on August 20, 2021, and closed on October 19, 2021, with 5,235 public comments received. The Departments summarize and respond to the public comments below in Section IV of this preamble.

*B. Legal Authority*

The Departments are publishing this IFR pursuant to their respective and joint authorities concerning asylum, statutory withholding of removal, and protection under the CAT. Section 235 of the INA provides that if an asylum officer determines that a noncitizen subject to expedited removal has a

credible fear of persecution, the noncitizen shall receive "further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). This IFR addresses how that further consideration, including of the noncitizen's related claims to statutory withholding of removal and CAT protection, will occur.

Section 208 of the INA authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen—including a noncitizen subject to expedited removal under section 235(b) of the INA—"who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section." INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); *see* INA 208(a)(1), 8 U.S.C. 1158(a)(1) (referencing asylum applications by noncitizens subject to expedited removal under section 235(b) of the INA, 8 U.S.C. 1225(b)); *see also* INA 208(d)(1), (d)(5)(B), 8 U.S.C. 1158(d)(1), (d)(5)(B) (further authorizing rulemaking concerning asylum applications).

These provisions of the INA reflect that the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the execution of Federal immigration law. *See, e.g.,* HSA 101, 441, 451(b), 471, 1511(d)(2), 6 U.S.C. 111, 251, 271(b), 551(d)(2). By operation of the HSA, certain references to the "Attorney General" in the INA are understood to refer to the Secretary. HSA 1517, 6 U.S.C. 557. As amended by the HSA, the INA thus "charge[s]" the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1), 8 U.S.C. 1103(a)(1), and grants the Secretary the power to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary's authority thus includes the authority to publish regulations governing the apprehension, inspection and admission, detention and removal, withholding of removal, and release of noncitizens[2] encountered in the interior of the United States or at or between the U.S. ports of entry. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231. Certain

of the Secretary's authorities have been delegated within DHS to the Director of USCIS.[3] USCIS asylum officers conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's affirmative asylum application should be granted. *See* 8 CFR 208.2(a), 208.9(a), 208.30.

In addition, under the HSA, the Attorney General retains authority to "establish such regulations . . ., issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his authorities under the INA. HSA 1102, INA 103(g)(2), 8 U.S.C. 1103(g)(2). The Attorney General also retains authority over certain individual immigration adjudications, including removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings," "section 240 proceedings," or "240 proceedings"), and certain adjudications related to asylum applications, conducted by IJs within DOJ's EOIR. *See* HSA 1101(a), 6 U.S.C. 521(a); INA 103(g), 8 U.S.C. 1103(g). With limited exceptions, IJs within EOIR adjudicate asylum and withholding of removal applications filed by noncitizens during the pendency of section 240 removal proceedings, and IJs also adjudicate asylum applications referred by USCIS to the immigration court. 8 CFR 1208.2(b), 1240.1(a); *see* INA 101(b)(4), 240(a)(1), 8 U.S.C. 1101(b)(4), 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3).

The United States is a party to the 1967 United Nations Protocol Relating to the Status of Refugees, January 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention contains a qualified non-refoulement obligation to refrain from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 19 U.S.T. at 6276. The United States implements its obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

[2] This rule uses the term "noncitizen" as equivalent to the statutory term "alien." *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr,* 140 S. Ct. 1442, 1446 n.2 (2020).

[3] *See* DHS, *Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1* (June 5, 2003); *see also* 8 CFR 2.1, 208.2(a), 208.30.

IFR_AR_000736

provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), which provides that a noncitizen may not be removed to a country where his or her life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.

The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681. In addition, FARRA includes the following policy statement: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . . " *Id.,* sec. 2242(a). DHS and DOJ have promulgated various regulations implementing U.S. obligations under Article 3 of the CAT, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c) through (f), 208.17, and 208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

Section 212 of the INA vests in the Secretary the discretionary authority to grant parole to applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit. INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Section 103 of the INA authorizes the Secretary to establish rules and regulations governing parole. INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3).

*C. Changes in the IFR*

After carefully reviewing the public comments received in response to the NPRM, this IFR makes 23 changes to the regulatory provisions proposed in the NPRM, many of which were recommended or prompted by commenters. The regulatory changes pertain to both the DHS and DOJ regulations. As also described below, procedurally, the Departments could issue a final rule. However, the Departments are publishing this IFR rather than proceeding to a final rule in order to provide the public with an additional opportunity to comment. Although not legally required, the additional opportunity to comment on the IFR's changes to the NPRM is

desirable given the new procedures and scheduling deadlines applicable to the IFR's streamlined EOIR process, the limited time between issuance of this IFR and when the first cases will be calendared for hearings, and the changes made to facilitate a shift from the proceedings proposed in the NPRM to the IFR's streamlined 240 proceedings. The Departments therefore solicit further public comment on the IFR's revisions, which will be considered and addressed in a final rule.

1. Revisions to the Proposed DHS Regulations

First, in new 8 CFR 208.30(g)(1)(i), this rule provides that USCIS may, in its discretion, reconsider a negative credible fear finding with which an IJ has concurred, provided such reconsideration is requested by the applicant or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first. USCIS, however, will not accept more than one such request for reconsideration of a negative credible fear finding.

Second, this rule adds a new 8 CFR 208.4(b)(2) to clarify that noncitizens whose asylum applications are retained by USCIS for further consideration following a positive credible fear determination may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, provided the information is submitted directly to the asylum office no later than 7 days prior to the scheduled asylum interview, or for documents submitted by mail, postmarked no later than 10 days prior to the interview. This rule further provides that, upon the asylum officer finding good cause in an exercise of USCIS discretion, the asylum officer may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in new 8 CFR 208.9(e)(2) and provided in new 8 CFR 208.4(b)(2). In new 8 CFR 208.9(e)(2), this rule further provides that, in the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent a decision from being issued to the applicant within 60 days of service

of the positive credible fear determination.

Third, this rule provides in new 8 CFR 208.2(a)(1)(ii), 208.30(f), 1208.2, and 1208.30(g) that USCIS may further consider the asylum application of a noncitizen found to have a credible fear of persecution or torture through a nonadversarial merits interview conducted by an asylum officer when such application is retained by USCIS or referred to USCIS by an IJ after an IJ has vacated a negative credible fear determination. Such nonadversarial merits interviews are known as "Asylum Merits interviews" and are governed by the procedures in 8 CFR 208.9.

Fourth, this rule provides in new 8 CFR 208.9(b) that, in the case of a noncitizen whose case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal and CAT protection. This rule provides that if the asylum application is not granted, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal in accordance with 8 CFR 208.16(b) or CAT protection pursuant to 8 CFR 208.16(c). *See* 8 CFR 208.16(a), (c). Even if the asylum officer determines that the applicant has established eligibility for statutory withholding of removal or protection under the CAT, the asylum officer shall proceed with referring the asylum application to the IJ for a hearing pursuant to 8 CFR 208.14(c)(1). *See* 8 CFR 208.16(a). If the asylum application includes a dependent (that is, a spouse or child who is in the United States and is included on the principal applicant's application as a dependent, *cf.* 8 CFR 208.30(a), 208.1(f)) who has not filed a separate application and the principal applicant is determined to not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b). If the asylum officer determines that there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for asylum, statutory withholding of removal, or protection under the CAT, the asylum officer shall inform the dependent of that determination. *See id.* USCIS also intends to inform dependents that they may request their own credible fear determination and

IFR_AR_000737

may separately file an asylum application if they choose to do so. If a spouse or child who was included in the principal's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 208.3(a)(2), 1208.3(a)(2).

Fifth, this rule provides in 8 CFR 208.9(a)(1) that USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the noncitizen, subject to the need to reschedule an interview due to exigent circumstances. *See* 8 CFR 208.9(a)(1).

Sixth, this rule includes language from existing regulations, currently in effect, in 8 CFR 208.9(d), that was inadvertently not included in the NPRM's proposed regulatory text related to USCIS's discretion to limit the length of a statement or comment and require its submission in writing. *See* 8 CFR 208.9(d)(1).

Seventh, this rule removes language proposed in the NPRM in 8 CFR 208.9(f)(2) related to having the Asylum Merits record include verbatim audio or video recordings, and provides that the interview will be recorded and a verbatim transcript of the interview shall be included in the record. *See* 8 CFR 208.9(f)(2).

Eighth, this rule clarifies in 8 CFR 208.9(g)(2) that if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of employment authorization pursuant to 8 CFR 208.7. The rule continues to provide that, for asylum applications retained by USCIS for further consideration, if the applicant is unable to proceed effectively in English, the asylum officer shall arrange for the assistance of an interpreter in conducting the Asylum Merits interview. *See* 8 CFR 208.9(g)(2).

Ninth, although the NPRM proposed to amend 8 CFR 208.10(a) to provide that, for noncitizens whose cases are retained by USCIS for further consideration of their asylum application after a positive credible fear determination, failure of a noncitizen to appear for an Asylum Merits interview might result in the issuance of an order of removal, no changes to 8 CFR

208.10(a) are being made in this IFR. Failure to appear may result in referral of the noncitizen to section 240 removal proceedings before an IJ as well as dismissal of the asylum application. *See* 8 CFR 208.10(a).

Tenth, in 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii), this rule establishes the regulatory authority for consideration for parole of noncitizens in expedited removal or in expedited removal with pending credible fear determinations consistent with the current regulation at 8 CFR 212.5(b).

Eleventh, the rule includes a technical amendment to 8 CFR 212.5(b) to incorporate a reference to 8 CFR 235.3(b).

Twelfth, in 8 CFR 235.3(c)(2), this rule includes a technical amendment to establish the regulatory authority for consideration for parole of noncitizens whose asylum applications are retained by USCIS for further consideration following a positive credible fear determination consistent with the current regulation at 8 CFR 212.5(b).

Thirteenth, the IFR includes edits to 8 CFR 208.14 and 8 CFR 1208.14 to emphasize that asylum officers' decisions on approval, denial, referral, or dismissal of an asylum application remain subject to review within USCIS, and an edit to 8 CFR 208.14(c)(1) to make clear that an asylum applicant described in 8 CFR 208.14(c)(4)(ii)(A), if not granted asylum, may first be placed into expedited removal and receive a positive credible fear screening before being referred to an IJ.

## 2. Revisions to the Proposed DOJ Regulations

In the fourteenth change from the NPRM, this rule neither adopts the NPRM's proposal to create a new IJ review process when USCIS does not grant asylum nor requires the applicant to affirmatively request such review. Instead, this rule requires DHS to refer noncitizens whose applications for asylum are not granted to section 240 removal proceedings by issuing a Notice to Appear ("NTA"). However, this rule adds 8 CFR 1240.17 to DOJ's regulations, which will impose streamlining measures to enable such proceedings to be completed more expeditiously than ordinary section 240 proceedings involving cases that originate from the credible fear process. The rules and procedures that apply during all section 240 proceedings will generally apply to cases governed by the new 8 CFR 1240.17, but the rule's additional procedural requirements will further ensure efficient adjudication while preserving fairness.

Fifteenth, this rule does not adopt the NPRM's proposed evidentiary limitations, which would have required the noncitizen to demonstrate that any additional evidence or testimony to be considered by the IJ was not duplicative of that considered by the asylum officer and was necessary to fully develop the record. Instead, with the exception of time limits, the long-standing evidentiary standards for section 240 removal proceedings will apply as provided in new 8 CFR 1240.17(g)(1). To ensure expeditious adjudication, this rule imposes deadlines for the submission of evidence as specified in new 8 CFR 1240.17(f). In general, new 8 CFR 1240.17(f)(2) requires the respondent to submit any additional documentary evidence by the time of the status conference which, under new 8 CFR 1240.17(f)(1), is held 30 days, or the next available date no later than 35 days, after the master calendar hearing unless a continuance or a filing extension is granted. Under new 8 CFR 1240.17(f)(3)(i), DHS must file any documents 15 days prior to the merits hearing or, if the IJ determines a merits hearing is not warranted, 15 days following the status conference. New 8 CFR 1240.17(f)(3)(ii) allows the respondent to submit a supplemental filing replying to DHS and identifying any additional witnesses or documentation 5 days prior to the merits hearing or, if the IJ determines a merits hearing is not warranted, 25 days following the status conference. These deadlines may be extended in accordance with the continuances and extension provisions in new 8 CFR 1240.17(h), and an IJ may otherwise accept late-filed evidence pursuant to new 8 CFR 1240.17(g)(2) under certain circumstances, including if required to do so under statute or the Constitution.

Sixteenth, the rule provides that streamlined section 240 removal proceedings for cases covered by the new 8 CFR 1240.17, where the USCIS Asylum Merits interview record is transmitted to EOIR for review, will generally be adjudicated under an expedited timeline. The master calendar hearing will occur 30 to 35 days after DHS commences proceedings as provided in new 8 CFR 1240.17(b) and (f)(1). Any merits hearing will be held 60 days after the master calendar hearing, or on the next available date no later than 65 days after the master calendar hearing, *see* 8 CFR 1240.17(f)(2), subject to continuance and filing extension requests as outlined in new 8 CFR 1240.17(h). This rule also imposes time limits for an IJ to issue a decision as provided in new 8 CFR

1240.17(f)(5). To ensure expeditious adjudication, this rule adopts the NPRM's requirement that USCIS must file the complete record of proceedings for the Asylum Merits interview, including the transcript and decision, with the immigration court and serve it on the respondent pursuant to new 8 CFR 1240.17(c). Additionally, as in the NPRM, this rule does not require the respondent to complete and file a new asylum application, but instead provides that the record of the positive credible determination shall be treated as satisfying the application filing requirements subject to any supplementation or amendment, and shall further be deemed to satisfy EOIR's application filing requirements for any spouse or child included in the cases referred by USCIS and who has not separately filed an asylum application that was adjudicated by USCIS, as provided in new 8 CFR 1208.3(a)(2). *See* 8 CFR 1240.17(e).

Seventeenth, to prepare cases for expeditious adjudication, this rule requires IJs to hold status conferences to take place 30 days after the master calendar hearing, or if a hearing cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, as outlined in new 8 CFR 1240.17(f)(2). This rule requires both parties to participate at the status conference, although the level of participation required by the respondent depends on whether the respondent has legal representation. At a minimum, as required by new 8 CFR 1240.17(f)(2)(i)(A), if the respondent will contest removal or seek any protection(s) for which the asylum officer did not determine the respondent eligible, the respondent shall indicate whether the respondent intends to testify, present any witnesses, or offer additional documentation. If a respondent thereafter obtains legal representation, nothing in the IFR prohibits respondent's counsel from supplementing statements or submissions made by the respondent during the status conference so long as there is no delay to the merits hearing or a filing deadline or, if the case will be delayed, the respondent satisfies the IFR's provisions governing continuances and filing extensions. Under new 8 CFR 1240.17(f)(2)(ii) and (f)(3), if DHS will participate in the case, DHS shall, at the status conference or in a written statement filed no later than 15 days prior to the scheduled merits hearing (or if the IJ determines that no such hearing is warranted, no later than 15 days following the status conference), set forth its position on the respondent's

application and identify contested issues of law or fact, among other things. Where DHS has elected to participate in the case but does not timely provide its position as required under paragraph (f)(2)(ii), the IJ has authority pursuant to new 8 CFR 1240.17(f)(3)(i) to deem claims or arguments previously advanced by the respondent unopposed, subject to certain exceptions. The purpose of the status conference and these procedural requirements is to identify and narrow the issues and ready the case for a merits hearing.

Eighteenth, under new 8 CFR 1240.17(f)(2)(i)(B), a respondent may choose to concede removability and not seek asylum, in which case the IJ will issue an order of removal and deny asylum, but the IJ shall, with a limited exception, give effect to a determination by an asylum officer that the respondent is eligible for statutory withholding of removal or protection under the CAT. DHS may not appeal a grant of statutory withholding of removal or protection under the CAT in this context to the BIA except to argue that the IJ should have denied the application(s) based on certain evidence, as provided in new 8 CFR 1240.17(i)(2).

Nineteenth, new 8 CFR 1240.17(h) establishes standards for continuances during these streamlined section 240 removal proceedings. The rule adopts a "good cause" standard for respondent-requested continuances or filing extensions that would delay any merits hearing up to certain limits as detailed in new 8 CFR 1240.17(h)(2)(i). Any such continuance or extension generally shall not exceed 10 days. When the respondent has received continuances or filing extensions that cause a merits hearing to occur more than 90 days after the master calendar hearing, the rule requires the respondent to meet a heightened standard for further continuances or extensions as provided in new 8 CFR 1240.17(h)(2)(ii). Pursuant to new 8 CFR 1240.17(h)(2)(iii), any further continuances or extensions requested by the respondent that would cause a merits hearing to occur more than 135 days after the master calendar hearing may be granted only if the respondent demonstrates that failure to grant the continuance or extension would be contrary to statute or the Constitution. DHS may receive continuances or extensions based on significant Government need, as outlined in new 8 CFR 1240.17(h)(3), which will not count against the limits on respondent-requested continuances. Further, as provided in new 8 CFR 1240.17(h)(2)(iv) and (h)(4), any delay due to exigent circumstances shall not

count toward the limits on continuances or extensions.

Twentieth, new 8 CFR 1240.17(f)(4)(i) and (ii) provide that in certain circumstances the IJ may decide the respondent's application without holding a merits hearing, including where neither party has elected to provide testimony and DHS has declined to cross-examine the respondent or where the IJ intends to grant the application and DHS has not elected to examine the respondent or present evidence or witnesses. Under these provisions, the IJ shall still hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record.

Twenty-first, new 8 CFR 1240.17(i)(2) provides that, where the asylum officer does not grant asylum but determines the respondent is eligible for statutory withholding of removal or CAT relief, and where the IJ subsequently denies asylum and issues a removal order, the IJ shall generally give effect to the asylum officer's determination(s). In such circumstances, the IJ shall issue a removal order, but the IJ shall give effect to the asylum officer's determination by granting statutory withholding of removal or protection under the CAT unless DHS presents evidence or testimony that specifically pertains to the respondent, that was not in the record of proceedings for the USCIS Asylum Merits interview, and that demonstrates that the respondent is not eligible for the protection in question.

Twenty-second, this rule sets forth certain exceptions from the procedures and timelines summarized above. Under new 8 CFR 1240.17(k), such exceptions include the following circumstances: The respondent was under the age of 18 on the date that the NTA was issued and is not in consolidated removal proceedings with an adult family member; the respondent has produced evidence demonstrating prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, voluntary departure, or CAT relief and the respondent is seeking to apply for, or has applied for, such relief or protection; the respondent has produced evidence supporting a prima facie showing that the respondent is not subject to removal, and the question of removability cannot be resolved simultaneously with the adjudication of the applications for asylum and related protection; the IJ finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or

IFR_AR_000739

both in that alternative country or countries; the case is on remand or has been reopened following the IJ's order; or the respondent exhibits indicia of mental incompetency.

Finally, DOJ is making technical edits in 8 CFR 1003.42 to conform with changes to DHS regulations proposed in the NPRM and adopted in this rule related to the credible fear screening process in new 8 CFR 208.30(e).

### D. Provisions of the IFR

The Departments carefully considered the 5,235 public comments received, and this IFR generally adopts the framework proposed in the NPRM with certain modifications as explained in this rule. This rule also relies on the justifications articulated in the NPRM, except as reflected in this preamble.

### 1. Credible Fear Screening Process

The Departments are generally returning to the regulatory framework governing the credible fear screening process in place before various regulatory changes were made from the end of 2018 through the end of 2020, which currently are not in effect.[4] As

---

[4] On November 9, 2018, the Departments issued an IFR that barred noncitizens who entered the United States in contravention of a covered presidential proclamation or order from eligibility for asylum, required that they receive a negative credible fear finding on their asylum claims, and required that their statutory withholding and CAT claims be considered under the higher reasonable fear screening standard. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55939, 55943 (Nov. 9, 2018) ("Presidential Proclamation Bar IFR"). A month later, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the IFR, *E. Bay Sanctuary Covenant v. Trump,* 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018), and the Ninth Circuit affirmed, *E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640, 680 (9th Cir. 2021).

On July 16, 2019, the Departments published another IFR, entitled "Asylum Eligibility and Procedural Modifications," 84 FR 33829 (July 16, 2019) ("Third Country Transit (TCT) Bar IFR"), which generally barred noncitizens from asylum eligibility if they entered or attempted to enter the United States across the Southwest border after failing to apply for protection from persecution or torture while in any one of the third countries through which they transited, required a negative credible fear finding for such noncitizens' asylum claims, and required their withholding and CAT claims be considered under the higher reasonable fear screening standard. *Id.* at 33837–38. The U.S. District Court for the District of Columbia vacated the TCT Bar IFR. *Capital Area Immigrants' Rights Coal. v. Trump,* 471 F. Supp. 3d 25, 45–57 (D.D.C. 2020). The Departments issued a final rule on December 17, 2020, entitled "Asylum Eligibility and Procedural Modifications," 85 FR 82260 (Dec. 17, 2020) ("TCT Bar rule"), which again attempted to bar from asylum eligibility those noncitizens who transited through a third country before arriving at the border. The U.S. District Court for the Northern District of California subsequently issued a preliminary injunction against implementation of the TCT Bar rule, which remains in place as of this

writing. *E. Bay Sanctuary Covenant v. Barr,* 519 F. Supp. 3d 663, 668 (N.D. Cal. Feb. 2021).

Around the same time that the Departments issued the final TCT Bar rule, they also issued the final rule entitled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 FR 80274 (Dec. 11, 2020) ("Global Asylum rule"). That rule revised the credible fear screening process to require that all the mandatory bars to asylum and withholding be considered during the credible fear screening process and established a new screening standard for withholding of removal and CAT protection. On January 8, 2021, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the Global Asylum rule. *Pangea Legal Servs. v. DHS,* 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) ("*Pangea II*"). That preliminary injunction remains in place as of this writing.

Finally, the Departments also published a final rule entitled "Security Bars and Processing," 85 FR 84160 (Dec. 23, 2020) ("Security Bars rule"), which added an additional bar to asylum and withholding that would be applied to the credible fear screening process. The Departments have delayed the Security Bars rule's effective date to December 31, 2022, as the Departments consider possible action to rescind or revise the rule. *See* Security Bars and Processing; Delay of Effective Date, 86 FR 73615 (Dec. 28, 2021).

---

provided in this IFR, DHS is amending 8 CFR 208.30(b) to return to providing that noncitizens subject to expedited removal who indicate an intention to apply for asylum, or who express a fear of persecution or torture, or a fear of return to the noncitizen's country, shall be screened by a USCIS asylum officer for a credible fear of persecution or torture (rather than a credible fear of persecution, reasonable possibility of persecution, or reasonable possibility of torture). All references in 8 CFR 208.30 and 8 CFR 235.6 to a "credible fear of persecution, reasonable possibility of persecution, or a reasonable possibility of torture" are replaced with "credible fear of persecution or torture" or "credible fear."

DHS is further amending 8 CFR 208.30(b) to provide that the asylum officer to whom such a noncitizen is referred for a credible fear screening may, in USCIS's discretion and with supervisory concurrence, refer the noncitizen for proceedings under section 240 of the Act without making a credible fear determination.

DHS is amending 8 CFR 208.30(c) to provide for the inclusion of a noncitizen's concurrently arriving spouse or child in the noncitizen's positive credible fear evaluation and determination, unless the noncitizen declines such inclusion. Additionally, DHS is amending 8 CFR 208.30(c) to provide asylum officers with the discretion to include a noncitizen's other concurrently arriving family members in the noncitizen's positive credible fear evaluation and determination for purposes of family unity.

DHS is amending 8 CFR 208.30(e) to return to defining "credible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the [asylum] officer, that the [noncitizen] can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act." DHS is further amending 8 CFR 208.30(e) to return to defining "credible fear of torture" as "a significant possibility that the [noncitizen] is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to [8 CFR] 208.16 or [ ] 208.17."

Additionally, as provided in the NPRM, DHS is amending 8 CFR 208.30(e)(5) to return to the existing and two-decade-long practice of not applying at the credible fear screening the mandatory bars to applying for, or being granted, asylum that are contained in sections 208(a)(2)(B)–(D) and (b)(2) of the Act, including any bars established by regulation under section 208(b)(2)(C) of the Act, or bars to eligibility for statutory withholding of removal, with limited exceptions. DHS is maintaining the regulations related to the threshold screening under the safe third country agreement with Canada in 8 CFR 208.30(e)(6), but making technical edits to change "credible fear of persecution, reasonable possibility of persecution, or reasonable possibility of torture" to "credible fear of persecution or torture" to align the terminology with the rest of this IFR. DHS will continue to require supervisory review of all credible fear determinations before they can become final. *See* 8 CFR 208.30(e)(8).

Consistent with the NPRM, this IFR amends 8 CFR 208.30(g) to return to providing that once an asylum officer has made a negative credible fear determination, if a noncitizen refuses or fails to either request or decline IJ review, such refusal or failure to make an indication will be considered a request for IJ review. In those instances, the noncitizen will be served with a Form I–863, Notice of Referral to Immigration Judge. If, upon review of an asylum officer's negative credible fear determination, the IJ finds the noncitizen possesses a credible fear of persecution or torture, the IJ shall vacate the Form I–860, Notice and Order of Expedited Removal, and remand the case to DHS for further consideration of the application for asylum. Alternatively, DHS may commence section 240 removal proceedings, during which the noncitizen may file an

application for asylum and withholding of removal. If the IJ concurs with the negative credible fear determination, DHS can execute the individual's expedited removal order, promptly removing the individual from the United States.

In comparison to the NPRM, in this IFR, DHS is amending 8 CFR 208.30(g) to provide that USCIS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred, provided such reconsideration is requested by the noncitizen or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first, and further provided that no previous request for consideration has already been made.[5] There is no change for noncitizens who do not elect to have their determination reviewed by an IJ. Any reconsideration request made prior to review by an IJ will be treated as an election for review by an IJ. *See* 8 CFR 208.30(g)(1).

2. Applications for Asylum

Under section 235(b)(1)(B)(ii) of the Act, noncitizens who receive a positive credible fear determination from a USCIS asylum officer are referred for "further consideration of the application for asylum." As provided in the NPRM, this rule establishes a new process by which such "further consideration" may occur, wherein a noncitizen will have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by an IJ in section 240 removal proceedings. *See* 8 CFR 208.30(f).

In issuing both the NPRM and this IFR, the Departments concluded that the expedited removal process presented an opportunity for establishing a more efficient process for making protection determinations for those coming to our borders. The credible fear interview process creates a unique opportunity for the protection claim to be presented to a trained asylum officer and documented; that documentation can then initiate and facilitate a merits adjudication. Unlike those noncitizens who are placed directly into section 240 removal proceedings after apprehension at the border, noncitizens placed instead into expedited removal and who subsequently make a fear claim are referred to USCIS for an interview under oath. Rather than move noncitizens who

receive positive credible fear determinations directly into section 240 proceedings—which is what happens to noncitizens apprehended at the border who are not placed into expedited removal—the Departments have determined that it is appropriate to establish a more efficient process that includes the involvement of USCIS and the creation of a documented record of the noncitizen's protection claim during the credible fear screening process. By treating the record of the credible fear determination as an asylum application and by issuing a follow-up interview notice when the credible fear determination is served, USCIS will be able to promptly schedule and conduct an interview on the merits of the noncitizen's protection claims and issue a final decision. For those noncitizens not granted asylum by USCIS, the IFR's process will also create a more complete record of the principal applicant's protection claims, as well as those of their spouse or child included on the application and interviewed during the Asylum Merits interview. EOIR can then use the rationale of the USCIS determination in a streamlined section 240 removal proceeding. Consistent with the NPRM, DHS is amending 8 CFR 208.3 to address application and filing requirements for noncitizens over whom USCIS retains jurisdiction for further consideration of asylum applications pursuant to the Asylum Merits process established by this rule. DHS is amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that the written record of a positive credible fear finding satisfies the asylum application filing requirements in 8 CFR 208.3(a)(1). DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(1) and (2), that noncitizens placed in the Asylum Merits process are subject neither to the general requirement in 8 CFR 208.3(a)(1) that asylum applicants file a Form I–589, Application for Asylum and for Withholding of Removal, nor to the benefit request submission requirements of 8 CFR 103.2.

Consistent with the NPRM, DHS is also amending 8 CFR 208.3(a) to provide that the written record of the positive credible fear determination shall be considered a complete asylum application for purposes of the one-year filing deadline at 8 CFR 208.4(a), requests for employment authorization based on a pending application for asylum under 8 CFR 208.7, and the completeness requirement at 8 CFR 208.9(a); shall not be subject to the requirements of 8 CFR 103.2; and shall be subject to the conditions and

consequences in 8 CFR 208.3(c) upon signature at the Asylum Merits interview, as described in new 8 CFR 208.3(a)(2). DHS is amending 8 CFR 208.3(c)(3) to provide that receipt of a properly filed asylum application under 8 CFR 208.3(a) commences the period after which a noncitizen may file an application for employment authorization based on a pending asylum application. DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that the date that the positive credible fear determination is served on the noncitizen shall be considered the date of filing and receipt. DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that biometrics captured during expedited removal for the principal applicant and any dependents may be used to verify identity and for criminal and other background checks for purposes of an asylum application under the jurisdiction of USCIS and any subsequent immigration benefit.

DHS is amending current 8 CFR 208.4(c), rather than 8 CFR 208.3(a)(2) as provided in the NPRM, and redesignating it as 8 CFR 208.4(b), with certain modifications as compared to the NPRM, to provide the noncitizen the opportunity to subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, within a specified time frame (7 or 10 days, depending on the method of submission) prior to the scheduled Asylum Merits interview. DHS is further amending current 8 CFR 208.4(c) to provide, in new 8 CFR 208.4(b)(2), that, finding good cause in an exercise of USCIS's discretion, the asylum officer may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in 8 CFR 208.9(e)(2). In the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent an Asylum Merits decision from being issued to the applicant within 60 days of service of the positive credible fear determination, as described in new 8 CFR 208.9(e)(2).

---

[5] Reconsideration requests made by noncitizens of negative credible fear determinations already affirmed by an IJ are colloquially known as requests for reconsideration ("RFRs").

3. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear

Under the framework in place prior to this rulemaking, if an asylum officer determined that a noncitizen subject to expedited removal had a credible fear of persecution or torture, DHS placed the noncitizen before an immigration court for adjudication of the noncitizen's claims by initiating section 240 removal proceedings. Section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), however, authorizes a procedure for "further consideration of [an] application for asylum" that may commence outside of section 240 removal proceedings.

Consistent with the NPRM, DHS is amending 8 CFR 208.2(a) to provide that USCIS may take initial jurisdiction to further consider the application for asylum, in an Asylum Merits interview, of a noncitizen, other than a stowaway and a noncitizen physically present in or arriving in the Commonwealth of the Northern Mariana Islands ("CNMI"), found to have a credible fear of persecution or torture. DHS is amending 8 CFR 208.9(b) to provide that the purpose of the Asylum Merits interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. In comparison to the NPRM, DHS is further amending 8 CFR 208.9(b) to provide that, in the case of a noncitizen whose case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal and CAT protection. This rule further provides in 8 CFR 208.16(a) that, in the case of a noncitizen whose case is retained by or referred to USCIS for an Asylum Merits interview and whose asylum application is not approved, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal under 8 CFR 208.16(b) or withholding or deferral of removal pursuant to the CAT under 8 CFR 208.16(c).

In comparison to the NPRM, DHS is amending 8 CFR 208.9(a) to provide that USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the

noncitizen subject to the need to reschedule an interview due to exigent circumstances, as provided in new 8 CFR 208.9(a)(1). Consistent with the NPRM, DHS is amending 8 CFR 208.9 to specify the procedures for such interviews before an asylum officer. With limited exception, these amendments generally provide that the same procedures applicable to affirmative asylum interviews will also apply to interviews under this rule, such as the right to have counsel present, 8 CFR 208.9(b), at no expense to the Government.

In this IFR, DHS also includes language from existing regulations in 8 CFR 208.9(d) that was inadvertently not included in the NPRM's proposed regulatory text related to the USCIS's discretion to limit the length of a statement or comment and require its submission in writing. As was stated in the NPRM, DHS is amending 8 CFR 208.9(f) to provide, in new 8 CFR 208.9(f)(2), that for Asylum Merits interviews, a verbatim transcript of the interview will be included in the referral package to the immigration judge. However, DHS is removing the language proposed in the NPRM regarding the record also including a verbatim audio or video recording in new 8 CFR 208.9(f)(2). DHS believes that recording the interview in order to produce a verbatim transcript that will be included in the record is sufficient to meet the aims of the rule.[6]

DHS is amending 8 CFR 208.9(g) to provide, in new 8 CFR 208.9(g)(2), that if a noncitizen is unable to proceed effectively in English at an Asylum Merits interview, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. In comparison to the NPRM, this rule provides in new 8 CFR 208.9(g)(2) that if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for purposes eligibility for employment authorization.

In comparison to the revisions proposed in the NPRM, this IFR leaves existing 8 CFR 208.10 unchanged—thus providing that a noncitizen's failure to appear for an Asylum Merits interview may result in the referral of the application for consideration in section 240 removal proceedings before an IJ (as opposed to the issuance of an order of removal). *See* 8 CFR 208.10(a)(1).

In 8 CFR 208.14(b), USCIS continues to implement its authority to grant asylum in any case within its

jurisdiction. In comparison to the NPRM, DHS is amending 8 CFR 208.14(c) and 208.16(a) and (c) to provide that if an asylum officer conducting an Asylum Merits interview for further consideration of an asylum application after a positive credible fear determination does not grant asylum to an applicant, the asylum officer will determine whether the applicant is eligible for statutory withholding of removal or CAT protection. The asylum officer will not issue an order of removal as proposed in the NPRM, nor issue a final decision on an applicant's request for statutory withholding of removal or CAT protection. Instead, the asylum officer will refer the application—together with the appropriate charging document and written findings of, and the determination on, eligibility for statutory withholding of removal or CAT protection—to an IJ for adjudication in streamlined section 240 removal proceedings. *See* 8 CFR 208.14(c); 8 CFR 208.16(a), (b), (c)(4); 8 CFR 1208.14(c). The referral of the asylum application of a principal applicant to the IJ will also include any dependent of that principal applicant, as appropriate. *See* 8 CFR 208.3(a)(2), 208.14(c)(1). If the asylum application includes a dependent who has not filed a separate application and the principal applicant is determined to not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 1208.3(a)(2).

4. Streamlined Section 240 Removal Proceedings Before the Immigration Judge

DOJ is adding 8 CFR 1240.17, which shall govern section 240 removal proceedings for respondents whose cases originate from the credible fear process and who have not been granted asylum after an initial adjudication by an asylum officer, pursuant to 8 CFR 208.14(c)(1). The general rules and procedures that govern all other removal proceedings under section 240 apply to removal proceedings covered by this

---

[6] The Departments may consider making available a process by which parties to EOIR proceedings under 8 CFR 1240.17 will be able to timely review, upon request, the recording of the USCIS Asylum Merits interview.

rule with certain exceptions designed to streamline the proceedings and account for the unique procedural posture of these cases.

Under new 8 CFR 1240.17(b), USCIS will issue an NTA to any noncitizen not granted asylum by USCIS after an Asylum Merits interview held pursuant to 8 CFR 208.2(a), with the master calendar hearing in these streamlined section 240 proceedings scheduled for 30 to 35 days after service of the NTA. Under new 8 CFR 1240.17(e), the record of the proceedings for the interview before the asylum officer and the asylum officer's decision shall be admitted as evidence and considered by the IJ. Moreover, this rule provides that a respondent is not required to separately prepare and file a Form I–589, Application for Asylum and for Withholding of Removal, and that the record of the positive credible fear determination satisfies the application filing requirements for the principal applicant as well as for any dependent included in the referral who did not separately file an asylum application that was adjudicated by USCIS. *See* 8 CFR 208.3(a), 1208.3(a), 1240.17(e). That is, any spouse or child included in the referral will be deemed to have satisfied EOIR's application filing requirements as a principal applicant.

The Departments have determined that it is appropriate for cases under this rule to proceed on a streamlined time frame before the IJ as claims will have been significantly developed and analyzed by USCIS before the IJ proceedings start, the record will be available for review by the IJ, and respondents will not be required to prepare and file an asylum application. Accordingly, the rule establishes timelines for certain hearings to occur as provided in new 8 CFR 1240.17(f)(1)–(4). As set forth in new 8 CFR 1240.17(h), the rule imposes limitations on the length of continuances and filing extensions that can be granted before a respondent must satisfy a heightened standard to receive additional continuances or filing extensions that have the effect of further delaying a hearing required under the rule. The rule also imposes certain procedural requirements and gives IJs additional tools designed to narrow the issues and ready the case for a merits hearing, if necessary. Under new 8 CFR 1240.17(f)(1) and (2), the rule requires the IJ to hold a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, and imposes obligations on both parties to participate

at the conference, although the level of participation required by the respondent depends on whether the respondent has legal representation. If DHS indicates that it will participate in the case, DHS has an obligation under new 8 CFR 1240.17(f)(2)(ii) and (f)(3) to set forth its position on the respondent's application and identify contested issues of law or fact (including which elements, if any, of the respondent's claim(s) it is challenging), among other things. In certain circumstances, where DHS does not respond in a timely manner to the respondent's claims, the IJ has authority to deem those claims unopposed, as provided in new 8 CFR 1240.17(f)(3)(i). However, DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference. *See* 8 CFR 1240.17(f)(3)(i). Where DHS has indicated that it will not participate in a merits hearing, the rule allows DHS, in certain, limited instances, to retract this position prior to the merits hearing, as provided in new 8 CFR 1240.17(f)(2)(ii). The rule allows IJs to hold additional status conferences if the case is not ready for a merits hearing, as provided in new 8 CFR 1240.17(f)(2).

Under new 8 CFR 1240.17(f)(4), the IJ may forgo a merits hearing and decide the respondent's application on the documentary record (1) if neither party has requested to present testimony and DHS has indicated that it waives cross-examination, or (2) if the noncitizen has timely requested to present testimony, DHS has indicated that it waives cross-examination and does not intend to present testimony or produce evidence, and the IJ concludes that the application can be granted without further testimony. The rule preserves the IJ's ability to hold a merits hearing if the IJ decides that it is necessary to fulfill the IJ's duty to fully develop the record.

If the case cannot be decided on the documentary record, the new 8 CFR 1240.17(f)(2) requires the IJ to hold a merits hearing 60 days after the master calendar hearing or, if a hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. At the merits hearing, the respondent may testify fully and offer any additional evidence that has been submitted in compliance with the time limits on evidentiary filings under the normal evidentiary standards that apply to 240 removal proceedings as provided in new 8 CFR 1240.17(f)(4)(iii)(A) and (g)(1). If the proceedings cannot be completed at the scheduled merits hearing, the IJ shall schedule any continued merits hearing as soon as possible but no later

than 30 days after the initial merits hearing except in case of a continuance or extension as provided in 8 CFR 1240.17(f)(4)(iii)(B). Under new 8 CFR 1240.17(f)(5), the IJ is required, wherever practicable, to issue an oral decision on the date of the final merits hearing or, if the IJ concludes that no hearing is necessary, no later than 30 days after the status conference. Where issuance of an oral decision on such date is not practicable, the IJ must issue an oral or written decision as soon as practicable, and in no case more than 45 days after the applicable date described in the preceding sentence. *See* 8 CFR 1240.17(f)(5).

Under new 8 CFR 1240.17(i)(2), if the IJ denies asylum but an asylum officer has determined that the respondent is eligible for statutory withholding of removal or protection under the CAT with respect to the proposed country of removal, then the IJ shall enter an order of removal but give effect to the asylum officer's eligibility determination by granting the applicable form of protection, unless DHS demonstrates that evidence or testimony that specifically pertains to the respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview establishes that the respondent is not eligible for such protection. Under new 8 CFR 1240.17(f)(2)(i)(B), the rule similarly provides that where an asylum officer has declined to grant asylum but has determined that the respondent is eligible for statutory withholding of removal or protection under the CAT with respect to the proposed country of removal, the respondent may elect not to contest removal and not pursue a claim for asylum before the IJ but still receive statutory withholding of removal or CAT protection. In such a case, the rule provides that the IJ shall enter an order of removal but give effect to the asylum officer's eligibility determination by granting the applicable form of protection, unless DHS makes a prima facie showing through evidence that specifically pertains to the respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. Similarly, new 8 CFR 1240.17(d) further provides that an IJ must give effect to an asylum officer's determination that a noncitizen is eligible for statutory withholding of removal or protection under the CAT, even if the noncitizen is ordered removed in absentia, unless DHS makes a prima facie showing through evidence that specifically pertains to the

respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. In addition, new 8 CFR 1240.17(l) makes clear that DHS may, in keeping with existing regulations, seek to terminate such protection.[7]

Finally, the rule specifically exempts certain cases that cannot be expedited under the circumstances from the timelines and other expedited aspects of the streamlined 240 proceedings. *See* 8 CFR 1240.17(k). Such exceptions include the following circumstances: The respondent was under the age of 18 on the date that the NTA was issued and is not in consolidated removal proceedings with an adult family member, 8 CFR 1240.17(k)(1); the respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, protection under the CAT, and voluntary departure, and the respondent is seeking to apply for, or has applied for, such relief or protection, 8 CFR 1240.17(k)(2);[8] the respondent has produced evidence that supports a prima facie showing that the respondent is not removable and the IJ determines that the issue of whether the respondent is removable cannot be resolved simultaneously with the adjudication of the applications for asylum and related protection, 8 CFR 1240.17(k)(3); the IJ finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or both in that alternative country or countries, 8 CFR 1240.17(k)(4); the case is on remand or has been reopened following the IJ's order, 8 CFR 1240.17(k)(5); or the respondent exhibits indicia of mental incompetency, 8 CFR 1240.17(k)(6). The provisions at 8 CFR 1240.17(f), (g), and (h), which pertain to the schedule of proceedings, to the consideration of evidence and testimony, and to continuances, adjournments, and filing extensions, will not apply in such cases. The other provisions in 8 CFR 1240.17, however, will apply.

### 5. Parole

DHS is amending 8 CFR 235.3(b)(2)(iii) to permit parole of detained individuals whose inadmissibility is being considered in the expedited removal process, or who have been ordered removed under the expedited removal process, only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, which includes, as interpreted in longstanding regulations, *see* 8 CFR 212.5(b), circumstances in which continued detention is not in the public interest, provided that the noncitizen presents neither a security risk nor a risk of absconding. Similarly, DHS is amending 8 CFR 235.3(b)(4)(ii) to permit parole of detained individuals pending a credible fear interview and any review of an asylum officer's credible fear determination by an IJ only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, including if continued detention is not in the public interest, provided that the noncitizen presents neither a security risk nor a risk of absconding. This rule further finalizes, as proposed, that such a grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under 8 CFR 274a.12(c)(11). *See* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). The IFR also includes a technical amendment to 8 CFR 212.5(b) to incorporate a reference to 8 CFR 235.3(b). Parole is not guaranteed but instead considered on a case-by-case basis to determine whether it is warranted as a matter of discretion; DHS also may impose reasonable conditions on parole such as periodic reporting to U.S. Immigration and Customs Enforcement ("ICE"). *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(d).[9]

Additionally, DHS is including in this rule a technical amendment to 8 CFR 235.3(c)(2) to provide that parole of noncitizens with positive credible fear determinations whose asylum applications are retained by USCIS for further consideration through the Asylum Merits process is permissible only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, including if continued detention is not in the public interest, provided that the noncitizen presents neither a security risk nor a risk of absconding. This technical amendment is necessary to clarify that the parole authority pertaining to noncitizens awaiting an Asylum Merits interview with USCIS under this rule will be consistent with 8 CFR 212.5, just as the parole authority pertaining to detained noncitizens subject to expedited removal who are placed in section 240 removal proceedings is consistent with 8 CFR 212.5. As noted above, parole is not guaranteed but instead considered on a case-by-case basis to determine whether it is warranted as a matter of discretion.

### E. Summary of Costs and Benefits

The primary individuals and entities that this rule is expected to affect are: (1) Noncitizens who are placed into expedited removal and who receive a credible fear screening; (2) the support networks of asylum applicants who receive a positive credible fear determination; (3) USCIS; and (4) EOIR. The expected impacts to these individuals and entities and to others are detailed in Section V.B of this preamble. In brief, by reducing undue delays in the asylum adjudication system, and by providing a variety of procedural safeguards, the rule protects equity, human dignity, and fairness given that individuals who are eligible for asylum or other protection may receive that protection more promptly, while individuals who are ineligible may more promptly be ordered removed. In the Departments' judgment, these benefits—which are difficult or impossible to quantify—along with the benefits of the rule that are more amenable to quantification, amply justify the aggregate costs of the rule.

The rule's impact on affected noncitizens (and, in turn, on their support networks) may vary substantially from person to person depending on, among other things, whether the individual receives a positive credible fear determination and whether the individual's asylum claim is granted or not granted by USCIS. For example, some individuals may benefit more from an earlier grant of asylum because they may be able to enter the labor force sooner. And individuals who establish credible fear may benefit from cost savings associated with no longer having to file a Form I–589, Application for Asylum and for Withholding of Removal.

The Departments have estimated the human resource- and information-related expenditures required for USCIS to implement this rule. These estimates are developed along three population

---

[7] Nothing in this rule alters the existing regulatory provisions governing termination of withholding or deferral; those provisions apply to any noncitizen whose removal has been withheld or deferred, whether through the procedure established in this rule or otherwise. *See* 8 CFR 208.17(d), 208.24(f), 1208.17(d), 1208.24(f).

[8] The rule does not specify the particular type of evidence that must be produced in order to demonstrate prima facie eligibility for relief. Such evidence could include testimonial evidence as well as documentary evidence. The rule further does not require that a completed application for the relief at issue be filed with the immigration court.

[9] Noncitizens who are paroled are not considered to be "admitted" to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

bounds to account for possible variations in the number of credible fear screenings in future years. Implementation of the rule also is expected to reduce EOIR's workload, allowing EOIR to focus efforts on other priority work and to reduce the growth of its substantial current backlog. That expected reduction in workload would result from (1) cases in which USCIS grants asylum never reaching EOIR, resulting in a potential 15 percent reduction in EOIR's caseload originating from credible fear screening (assuming historic grant rates), and (2) many of the cases reaching EOIR being resolved with less investment of immigration court time and resources than they would have required if referred directly to EOIR in the first instance.

An important caveat to the Departments' estimates of the potential costs and benefits associated with this rule is that it will take time to fully implement the rule, as the Departments intend to take a phased approach to implementing the rule.

*F. Effective Date*

This IFR will be effective 60 days from the date of publication in the **Federal Register**.

This rule applies prospectively and only to adults and families who are placed in expedited removal proceedings and indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home country, after the rule's effective date. The rule does not apply to unaccompanied children, as they are statutorily exempt from expedited removal proceedings. *See* 8 U.S.C. 1232(a)(5)(D)(i) (providing that "any unaccompanied alien child" whom DHS seeks to remove "shall be . . . placed in removal proceedings under section 240" of the INA); *see also* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").[10] The rule also does not apply to individuals in the United States who are not apprehended at or near the border and subject to expedited removal.[11] Such individuals will

continue to have their asylum claims heard in section 240 removal proceedings in the first instance, or through an affirmative asylum application under section 208 of the INA, 8 U.S.C. 1158, if they have not yet been placed in immigration proceedings. The rule also does not apply to (1) stowaways or (2) noncitizens who are physically present in or arriving in the CNMI who are determined to have a credible fear. Such individuals will continue to be referred to asylum-and-withholding-only proceedings before an IJ under 8 CFR 208.2(c).

**III. Discussion of the IFR**

The principal purpose of this IFR is to simultaneously increase the promptness, efficiency, and fairness of the process by which noncitizens who cross the border without appropriate documentation are either removed or, if eligible, granted protection. The IFR accomplishes this purpose both by instituting a new process for resolving the cases of noncitizens who have been found to have a credible fear of persecution or torture and by facilitating the use of expedited removal for more of those who are eligible, and especially for populations whose detention presents particular challenges. When individuals placed into the expedited removal process make a fear claim, they are referred to a USCIS asylum officer, who interviews them to determine whether they have a credible fear of persecution or torture. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 208.30. Under

procedures in place immediately prior to the effective date of this IFR, individuals who receive a positive credible fear determination are referred to an immigration court for section 240 removal proceedings, during which they have the opportunity to apply for asylum and other forms of relief or protection from removal. *See* 8 CFR 208.30(f) (2018) (providing that if a noncitizen, other than a stowaway, "is found to have a credible fear of persecution or torture, the asylum officer will so inform the [noncitizen] and issue an NTA, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act"). As explained in the NPRM, it may take years before the individual's protection claim is first adjudicated by an IJ. This delay creates additional stress and uncertainty for those ultimately determined to merit asylum and other forms of humanitarian protection, as they are left in limbo as to whether they might still be removed, are unable to lawfully work until their asylum application has been granted or has remained pending for several months, and are unable to petition for qualified family members, some of whom may still be at risk of harm. Moreover, the ability to stay in the United States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim. Such additional entrants only further increase the backlog and lengthen the delays.

To respond to this problem, this rule at 8 CFR 208.2(a)(1)(ii) and 208.9 provides USCIS the authority to adjudicate in the first instance the asylum claims of individuals who receive a positive credible fear determination, and further provides that USCIS does so following a nonadversarial interview by an asylum officer. The rule also provides at 8 CFR 208.3(a)(2) that the record of a credible fear interview will serve as an asylum application for noncitizens whose cases are retained by or referred back to USCIS for adjudication after a positive credible fear determination, thereby allowing cases originating with a credible fear screening to be adjudicated substantially sooner. Both the Departments and the noncitizen can avoid the burden caused by delays associated with otherwise requiring the noncitizen to file a Form I–589, Application for Asylum and for Withholding of Removal. *See* Section IV.D.4.a of this preamble. By

---

[10] In lieu of being placed in section 240 removal proceedings, unaccompanied children from contiguous countries who meet special criteria may be permitted to withdraw their applications for admission and be voluntarily returned to their country of nationality or country of last habitual residence. *See* 8 U.S.C. 1232(a)(2).

[11] The former Immigration and Naturalization Service ("INS") initially implemented expedited removal processes only for certain noncitizens arriving at ports of entry. In 2002, DHS, by designation, expanded the application of expedited removal to certain noncitizens who (1) entered the United States by sea, either by boat or other means, (2) were not admitted or paroled into the United States, and (3) had not been continuously present in the United States for at least 2 years. Notice

Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 FR 68924 (Nov. 13, 2002). In 2004, DHS published an immediately effective notice in the **Federal Register** to expand the application of expedited removal to certain noncitizens encountered within 100 miles of the border and to noncitizens who entered the United States without inspection fewer than 14 days before they were encountered. Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004). In 2019, DHS expanded the process to the full extent authorized by statute to reach certain noncitizens, not covered by prior designations, who entered the country without inspection less than two years before being apprehended and who were encountered anywhere in the United States. Designating Aliens for Expedited Removal, 84 FR 35409 (July 23, 2019). President Biden has directed DHS to consider whether to modify, revoke, or rescind that 2019 expansion. Executive Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 FR 8267, 8270–71 (Feb. 2, 2021). On March 21, 2022, DHS published a **Federal Register** Notice rescinding the 2019 designation. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 FR 16022 (Mar. 21, 2022).

IFR_AR_000745

authorizing USCIS to adjudicate in the first instance the asylum claims of individuals who receive a positive credible fear determination and by making it possible for this adjudication to be made promptly and independently of EOIR, the Departments predict that the rule will also help to stem the rapid growth of the EOIR caseload, described in greater detail in the NPRM. *See* 86 FR 46937. As for the noncitizen, this change reduces potential barriers to protection for eligible applicants by enabling asylum seekers to meet the statutory requirement to apply for asylum within one year of arrival, avoiding the risk of filing delays, and immediately beginning the waiting period of work authorization eligibility. *See id.* at 46916. Any spouse or child who arrived with the principal asylum applicant and is included as a dependent on the principal applicant's positive credible fear determination may make a separate claim for protection and submit their own principal asylum application to USCIS for consideration.

As noted in the NPRM, the current system for processing protection claims made by individuals encountered at or near the border and who establish credible fear was originally adopted in 1997. From 2018 through 2020, however, several attempts were made to change the credible fear screening process. Many of these attempts have been initially vacated or enjoined, and the implementation of others has been delayed pending consideration of whether they should be revised or rescinded.[12] The Global Asylum rule, which is enjoined, revised regulations to provide that noncitizens with positive credible fear determinations would be placed in asylum-and-withholding-only proceedings before an IJ. *See* 85 FR 80276. In the Global Asylum rule, the Departments explained their view that placing such noncitizens in asylum-and-withholding-only proceedings before an IJ would "bring the proceedings in line with the statutory objective that the expedited removal process be streamlined and efficient," *id.,* and later noted that it would "lessen the strain on the immigration courts by limiting the focus of such proceedings and thereby streamlining the process," *id.* at 80286. The Departments provided that these asylum-and-withholding-only proceedings would follow the same rules of procedure that apply in section 240 proceedings and that a noncitizen could appeal their case to the BIA and Federal circuit courts, as necessary. *See id.* at 80289. The Departments

acknowledged that IJs often adjudicate multiple forms of relief in a single removal proceeding, in addition to asylum, statutory withholding of removal, or CAT protection claims, and stated that those additional issues "generally only serve to increase the length of the proceedings" and that "there may be rare scenarios in which [noncitizens] subject to expedited removal are eligible for a form of relief other than asylum." *Id.* In the Global Asylum rule, the Departments concluded that placing noncitizens with positive credible fear determinations into more limited asylum-and-withholding-only proceedings properly balanced the need to prevent noncitizens from being removed to countries where they may face persecution or torture with ensuring efficiency in the overall adjudication process. *See id.*

This rule offers another approach. It establishes a streamlined and simplified adjudication process for individuals encountered at or near the border, placed into expedited removal, and determined to have a credible fear of persecution or torture, with the aim of deciding protection claims in a more timely fashion while ensuring appropriate safeguards against error.[13] The rule authorizes USCIS to adjudicate in the first instance the asylum claims of individuals who receive positive credible fear determinations under the expedited removal framework in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). The procedures that USCIS asylum officers will use to adjudicate these claims will be nonadversarial, and the decisions will be made within time frames consistent with those established by Congress in section 208(d)(5)(A) of the INA, 8 U.S.C. 1158(d)(5)(A).[14]

The Departments believe that the approach in this rule, in contrast to the approach outlined in the Global Asylum rule, will allow for noncitizens' claims

to be heard more efficiently and fairly. As further explained in this rule, allowing noncitizens with positive credible fear determinations to have their asylum, statutory withholding, and CAT protection claims heard in a nonadversarial setting before an asylum officer capitalizes on the investment of time and expertise that USCIS has already made and, for the subset of cases in which asylum is granted by USCIS, saves investment of time and resources by EOIR and ICE. *See* Sections II.C. and IV.D.5 of this preamble. The extensive and well-rounded training that asylum officers receive is designed to enable them to conduct nonadversarial interviews in a fair and sensitive manner. This rule will also enable meritorious cases to be resolved more quickly, reducing the overall asylum system backlogs and using limited asylum officer and IJ resources more efficiently. If the asylum officer does not grant asylum following an Asylum Merits interview, the noncitizen will be referred to an IJ for streamlined section 240 removal proceedings, with a structure that provides for the prompt resolution of their claims and that allows the noncitizen to seek other forms of relief. If the asylum application includes a dependent who has not filed a separate application and the principal applicant is determined not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the applicant's dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. This will allow EOIR to consider all family members to have separately filed an asylum application once the family is placed into the streamlined section 240 removal proceedings.

This IFR will help more effectively achieve many of the goals outlined in the Global Asylum rule—including improving efficiency, streamlining the adjudication of asylum, statutory withholding of removal, and CAT protection claims, and lessening the strain on the immigration courts—albeit with a different approach. This rule helps meet the goal of lessening the strain on the immigration courts by having USCIS asylum officers adjudicate asylum claims in the first instance, rather than IJs. As explained further in this rule, the Departments anticipate that the number of cases USCIS refers to EOIR for adjudication will decrease. *See* Sections IV.F.1.a and V.B.4.b.ii of this preamble. In contrast to the Global Asylum rule, in this rule, the

---

[12] *See supra* note 4 (discussing recent regulations and their current status).

[13] Section 4(b)(i) of Executive Order 14010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, instructed the Secretary to review the procedures for individuals placed into expedited removal at or near the border and issue a report with recommendations "for creating a more efficient and orderly process that facilitates timely adjudications [of asylum and protection claims] and adherence to standards of fairness and due process." 86 FR 8267, 8270 (Feb. 2, 2021).

[14] *See* INA 208(d)(5)(A)(ii)–(iii), 8 U.S.C. 1158(d)(5)(A)(ii)–(iii) (specifying that an initial interview or hearing on an asylum application should generally commence within 45 days after the filing of the application and that final administrative adjudication should generally be completed within 180 days after the filing of the application).

IFR_AR_000746

Departments are amending regulations to include several time frames for the adjudication process and particular procedural requirements designed to streamline the overall process and take advantage of the record created by the asylum officer, while still providing noncitizens with a full and fair opportunity to present testimony and evidence in support of their claims before an IJ. *See* Sections II.A.4 and III.D of this preamble. Accordingly, these changes better meet the Departments' goals of improving efficiency and streamlining the process. In addition, upon reconsideration, the Departments recognize that giving noncitizens the opportunity to seek other forms of relief within the context of streamlined section 240 removal proceedings helps reduce barriers to accessing other immigration benefits that may be available, and that the potential benefits to noncitizens of having such an opportunity outweigh efficiency concerns.

The Departments clarify that nothing in this rule is intended to displace DHS's (and, in particular, USCIS's) prosecutorial discretion to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue an NTA to place the noncitizen in ordinary section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See* 8 CFR 208.30(b), (f); *Matter of J–A–B– & I–J–V– A–,* 27 I&N Dec. 168, 171 (BIA 2017); *Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523 (BIA 2011). Moreover, should any provision of the rule governing the USCIS process for cases covered by 8 CFR 208.2(a)(1)(ii) be enjoined or vacated, EOIR has the discretion to place into ordinary section 240 proceedings any case referred to EOIR under this section.

*A. Credible Fear Screening Process*

The credible fear screening regulations under this rulemaking generally recodify the current screening process, returning the regulatory language, in large part, to what was in place prior to the various regulatory changes made from the end of 2018 through the end of 2020. Noncitizens encountered at or near the border or ports of entry and determined to be inadmissible pursuant to INA 212(a)(6)(C) or (a)(7), 8 U.S.C. 1182(a)(6)(C) or (a)(7), can be placed in expedited removal and provided a credible fear screening if they indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home countries. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C.

1225(b)(1)(A)(ii), (B); 8 CFR 235.3(b)(4), 1235.3(b)(4). Individuals claiming a fear or an intention to apply for protection are referred to USCIS asylum officers for an interview and consideration of their fear claims under the "significant possibility" standard, which presently applies to all relevant protection claims because the regulatory changes referenced above have been vacated or enjoined.[15]

The Departments are returning to codifying the historical practice of applying the "significant possibility" standard across all forms of protection screened in the credible fear process. This rule adopts the "significant possibility" standard for credible fear screening for purposes of asylum, statutory withholding of removal, and CAT protection. While the statutory text at INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), only defines "credible fear" for purposes of screening asylum claims, the Departments believe that the efficiency gained in screening the same or a closely related set of facts using the same legal standard at the same time is substantial and should not be overlooked. Moreover, the credible fear screening process is preliminary in nature; its objective is to sort out, without undue decision costs, which cases merit further consideration. *See generally* INA 235(b)(1)(B); 8 U.S.C. 1225(b)(1)(B). Efficiently using one standard of law at the preliminary step is consistent with that objective, even though the ultimate adjudication of a noncitizen's claim for each form of protection may require a distinct analysis.

The standard for establishing a credible fear of persecution under the INA requires "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under section 208" of the INA. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). While the "significant possibility" standard for the purpose of screening for asylum is established by statute, the statute does not specify a standard to be used in screening for statutory withholding of removal or CAT protection. In June 2020, the Departments proposed alternative standards for statutory withholding of removal and CAT protection. *See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264,

36268 (June 15, 2020) ("Global Asylum NPRM"). Under that proposed rule, "asylum officers would consider whether [noncitizens] could establish a credible fear of persecution, a reasonable possibility of persecution, or a reasonable possibility of torture." *Id.* at 36269. In finalizing that rule, the Departments noted that in changing the standard of law for withholding of removal and deferral of removal, an individual's "screening burdens would become adequately analogous to the merits burdens, where the [individual's] burdens for statutory withholding of removal and protections under the CAT regulations are higher than the burden for asylum." Global Asylum rule, 85 FR 80277. However, pursuant to an Executive order and with the additional context of the court's injunction against the implementation of the Global Asylum rule in *Pangea II,*[16] the Departments have reviewed and reconsidered that rule. *See* Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 2, 2021) ("E.O. on Legal Immigration") (ordering review of existing regulations for consistency with the E.O. on Legal Immigration). In line with this review, the Departments have revisited the approach of having divergent standards applied during the credible fear screening and determined that keeping one standard in screening for asylum, statutory withholding, and CAT protection better promotes an efficient credible fear screening process.

In multiple rulemaking efforts, the Departments promulgated divergent standards for asylum and withholding of removal, along with variable standards for individuals barred from certain types of protection.[17] However, in working to create efficiencies within this process, as well as recognizing that the Departments have signaled their intention to either modify or rescind these rules,[18] adhering to the legal standard that was set by Congress in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v), is the logical

---

[15] *See supra* note 4 (discussing recent regulations and their current status).

[16] *See supra* note 4 (discussing recent regulations and their current status).

[17] *See supra* note 4 (describing the TCT Bar IFR, Presidential Proclamation Bar IFR, and Security Bars rule).

[18] *See* Executive Office of the President, Office of Management and Budget ("OMB"), Office of Information and Regulatory Affairs ("OIRA"), Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaHistory* (last visited Mar. 5, 2022) (select DHS or DOJ); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaMain* (last visited Mar. 5, 2022) (select DHS or DOJ).

IFR_AR_000747

choice. *See* 86 FR 46914. Upon reconsideration, the Departments believe that the varied legal standards created by different rulemakings, and enjoined or vacated by legal challenges, defeat their intended purpose, and complicate and extend the initial screening process provided for in INA section 235. Having asylum officers apply varied legal standards would generally lead to the need to elicit additional testimony from noncitizens at the time of the credible fear screening interview, which lengthens credible fear interviews and increases adjudication times. In the Departments' view, the delays associated with complicating and extending every credible fear interview likely outweigh any efficiencies gained by potential earlier detection of individuals who may be barred from or ineligible for certain types of protection. For example, when the TCT Bar IFR was in effect,[19] asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied, whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record sufficiently such that a determination could be made according to the higher reasonable fear standard. This additional time spent developing the record when the higher reasonable fear standard applied decreased the efficiency of the screening interviews themselves and complicated the analysis asylum officers were required to perform, thus contributing to the overall lengthening of the entire process.

In the Global Asylum NPRM, the Departments stated that "[r]aising the standards of proof to a 'reasonable possibility' for the screening of

[noncitizens] seeking statutory withholding of removal and CAT protection would allow the Departments to better screen out non-meritorious claims and focus limited resources on claims much more likely to be determined to be meritorious by an immigration judge." 85 FR 36271. However, based on the Departments' experience implementing divergent screening standards for asylum, statutory withholding of removal, and CAT protection while the TCT Bar IFR was in effect, no evidence has been identified that this approach resulted in more successful screening out of non-meritorious claims while ensuring the United States complied with its non-refoulement obligations.

The Departments also reasoned in the Global Asylum NPRM: "Adopting a higher standard for statutory withholding and CAT screenings would not hinder the streamlined process envisioned for expedited removal. Asylum officers already receive extensive training and guidance on applying the 'reasonable possibility' standard in other contexts because they are determining whether a reasonable possibility of persecution or torture exists in reasonable fear determinations pursuant to 8 CFR 208.31. In some cases, asylum officers would need to spend additional time eliciting more detailed testimony from [noncitizens] to account for the higher standard of proof; however, the overall impact on the time asylum officers spend making screening determinations would be minimal." 85 FR 36271. However, the Departments have reconsidered these predictions, again based on the experience implementing divergent screening standards while the TCT Bar IFR was in effect. Beyond the additional time asylum officers themselves spent conducting these screening interviews, making determinations, and recording their assessments, supervisory asylum officers reviewing these cases spent additional time assessing whether the varying standards of proof were properly applied to the forms of relief for which asylum officers screened. This effort also required the additional investment of time and resources from Asylum Division headquarters, including training and quality assurance staff who had to develop and deliver guidance and trainings on the new process, monitor the work being conducted in the field to ensure compliance with regulations and administrative processes, and provide guidance to asylum officers and supervisory asylum officers on individual cases. Attorneys from the

USCIS Office of Chief Counsel had to spend time and resources reviewing and advising on training materials and guidance issued by the Asylum Division, as well as on individual cases on which legal advice was sought to ensure proper application of the divergent screening standards on various forms of relief. IJs reviewing negative determinations by asylum officers were also compelled to spend additional time ensuring the proper application of these screening standards, compared to the time spent reviewing determinations under a single standard in the status quo ante. The Departments failed to account in the relevant rulemakings for the necessity of expending these additional resources beyond time spent by asylum officers themselves making screening determinations.

The Departments also stated in the Global Asylum NPRM: "The procedural aspects of making screening determinations regarding fear of persecution and of torture would remain largely the same. Moreover, using a higher standard of proof in the screening context for those seeking statutory withholding of removal or protection under the CAT regulations in the immigration courts allows the Departments to more efficiently and promptly distinguish between aliens whose claims are more likely or less likely to ultimately be meritorious." 85 FR 36271. However, for the reasons detailed above, the Departments' experience implementing divergent screening standards while the TCT Bar IFR was in effect demonstrated that these predictions of increased efficiency and promptness did not materialize, undermining congressional intent that the screening process in the expedited removal context operate nimbly and in a truly expedited manner.

In clarifying that the "significant possibility" standard applies not only to credible fear screening for asylum, but also to credible fear screening for statutory withholding and CAT protection, the Departments will help ensure that the expedited removal process remains truly expedited, and will allow for asylum officers to adhere to a single legal standard in screening claims for protection from persecution and torture in the expedited removal process.

Similarly, through this rulemaking, the Departments are generally returning the regulatory text to codify the pre-2018, and current, practice of screening for eligibility for asylum and statutory withholding of removal while not applying most bars to asylum or withholding of removal in the credible

---

[19] The TCT Bar IFR went into effect on July 16, 2019, *see* 84 FR 33829, and was vacated on June 30, 2020, *see Capital Area Immigrants' Rights Coal. v. Trump,* 471 F. Supp. 3d at 45–57. The TCT Bar rule went into effect on January 19, 2021. *See* 85 FR 82260. However, it did not have an impact on credible fear processing. The TCT Bar rule did not directly make any amendments to the credible fear regulations at 8 CFR 208.30 and instead relied on changes to the credible fear regulations made by the Global Asylum rule in order to apply the TCT bar in credible fear. On January 8, 2021, the Global Asylum rule was preliminarily enjoined. *See Pangea II,* 512 F. Supp. 3d 966. As a result of the preliminary injunction in *Pangea II,* the amendments to 8 CFR 208.30 made by the Global Asylum rule were enjoined. Thus, the bar to asylum eligibility at 8 CFR 208.13(c)(4) established in the TCT Bar rule did not apply in credible fear while the Global Asylum rule remained enjoined. The TCT Bar rule itself was enjoined on February 16, 2021. *See E. Bay Sanctuary Covenant,* 519 F. Supp. 3d at 668. Therefore, only the TCT Bar IFR ever went into effect.

fear screening process. The Global Asylum rule, which has been enjoined, attempted to require the application of a significantly expanded list of mandatory bars during credible fear screenings and mandated a negative credible fear finding should any of the bars apply to the noncitizen at that initial stage. *See* 85 FR 80278; *supra* note 4. In the Global Asylum NPRM, the Departments justified this change by stating: ''From an administrative standpoint, it is pointless and inefficient to adjudicate claims for relief in section 240 proceedings when it is determined that an alien is subject to one or more of the mandatory bars to asylum or statutory withholding at the screening stage. Accordingly, applying those mandatory bars to aliens at the 'credible fear' screening stage would eliminate removal delays inherent in section 240 proceedings that serve no purpose and eliminate the waste of adjudicatory resources currently expended in vain.'' 85 FR 36272. However, upon reconsideration, the Departments have determined that, in most cases, the stated goal of promoting administrative efficiency can be better accomplished through the mechanisms established in this rulemaking rather than through applying mandatory bars at the credible fear screening stage. The Departments now believe that it is speculative whether, had the Global Asylum rule been implemented, a meaningful portion of the EOIR caseload might have been eliminated because some individuals who were found at the credible fear screening stage to be subject to a mandatory bar would not have been placed into section 240 proceedings. This is particularly true in light of the Global Asylum rule's preservation of a noncitizen's ability to request review of a negative credible fear determination (including the application of mandatory bars at the credible fear stage) by an IJ, as well as that rule's allowance for individuals found subject to a mandatory bar to asylum at the credible fear screen stage to nonetheless have their asylum claims considered by an IJ in asylum-and-withholding-only proceedings if they demonstrate a reasonable possibility of persecution or torture and are not subject to a bar to withholding of removal. Requiring asylum officers to broadly apply mandatory bars during credible fear screenings would have made these screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious, and would further limit DHS's ability to use expedited removal

to an extent that is operationally advantageous.

Requiring asylum officers to broadly apply the mandatory bars at credible fear screening would increase credible fear interview and decision times because asylum officers would be expected to devote time to eliciting testimony, conducting analysis, and making decisions about all applicable bars. For example, when the TCT Bar IFR was in effect,[20] asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied, whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record sufficiently such that a determination could be made according to the higher reasonable fear standard. As another example, a ''particularly serious crime'' is not statutorily defined in detail, beyond an aggravated felony,[21] and offenses typically are designated as particularly serious crimes through case-by-case adjudication—the kind of fact-intensive inquiry requiring complex legal analysis that would be more appropriate in a full adjudication before an asylum officer or in section 240 proceedings with the availability of judicial review than in credible fear screenings.[22] Presently, asylum officers ask questions related to all mandatory bars to develop the record sufficiently and identify potential bars but, since mandatory bars are not currently being applied in the credible fear determination, the record does not need to be developed to the level of detail that would be necessary if the issue of a mandatory bar was outcome-determinative for the credible fear determination. If a mandatory bar were to become outcome determinative, it would be necessary to develop the

record sufficiently to make a decision about the mandatory bar such that, depending on the facts, the interview would go beyond its congressionally intended purpose as a screening for potential eligibility for asylum or related protection—and a fail-safe to minimize the risk of refoulement—and would instead become a decision on the relief or protection itself. The level of detailed testimony necessary in some cases to make such a decision would require asylum officers to spend significantly more time developing the record during the interview and conducting additional research following the interview.

IJs reviewing negative credible fear determinations where a mandatory bar was applied would, depending on the facts, similarly face a more complicated task, undermining the efficiency of that process as well. Applying a mandatory bar often involves a complex legal and factual inquiry. While asylum officers are trained to gather and analyze such information to determine the applicability of mandatory bars in affirmative asylum adjudications, they are currently instructed to assess whether certain bars may apply in the credible fear screening context. *See* USCIS, Credible Fear of Persecution and Torture Determinations Lesson Plan 42–43 (Feb. 13, 2017). The latter assessment is designed to identify any mandatory bar issues requiring further exploration for IJs and the ICE attorneys representing DHS in section 240 removal proceedings, *see* 6 U.S.C. 252(c), rather than to serve as a comprehensive analysis upon which a determination on the applicability of a bar may be based.[23] Because of the complexity of the inquiry required to develop a sufficient record upon which to base a decision to apply certain mandatory bars, such a decision is, in general and depending on the facts, most appropriately made in the context of a full merits interview or hearing, whether before an asylum officer or an IJ, and not in a screening context.

Furthermore, the Departments recognize that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process. In

---

[20] *See supra* note 19.

[21] *See* INA 208(b)(2)(A)(ii), (B)(i), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(i).

[22] *See Matter of Frentescu,* 18 I&N Dec. 244, 247 (BIA 1982) (setting out multi-factor test to determine whether a noncitizen has committed a particularly serious crime, including ''the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community''); *see also Matter of L–S–,* 22 I&N Dec. 645, 649 (BIA 1999) (en banc); *Matter of G–G–S–,* 26 I&N Dec. 339, 343–43 (BIA 2014) (''We have held that for an alien who has not been convicted of an aggravated felony or whose aggravated felony conviction did not result in an aggregate term of imprisonment of 5 years or more, it is necessary to examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction to determine whether the crime was particularly serious.'').

[23] *See* USCIS, Credible Fear of Persecution and Torture Determinations Lesson Plan 44 (Feb. 13, 2017) (''The officer must keep in mind that the applicability of these bars requires further evaluation that will take place in the full hearing before an immigration judge if the applicant otherwise has a credible fear of persecution or torture. In such cases, the officer should consult a supervisory officer follow procedures on 'flagging' such information for the hearing, and prepare the appropriate paperwork for a positive credible fear finding.'').

IFR_AR_000749

response to the Global Asylum NPRM, a commenter emphasized that each of the mandatory bars involves intensive legal analysis and asserted that requiring asylum officers to conduct this analysis during a screening interview would result in "the return of many asylum seekers to harm's way." Global Asylum rule, 85 FR 80294. Another commenter expressed the concern that "countless asylum-seekers could be erroneously knocked out of the process based on hasty decisions, misunderstandings, and limited information." *Id.* at 80295. Upon review and reconsideration, due to the intricacies of the fact-finding and legal analysis often required to apply mandatory bars, the Departments now believe that individuals found to have a credible fear of persecution generally should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240 removal proceedings provide.

In light of these concerns, the Departments have reconsidered their position stated in the preamble to the Global Asylum NPRM that any removal delays resulting from the need to fully consider the mandatory bars in section 240 proceedings "serve no purpose" and amount to "adjudicatory resources currently expended in vain." 85 FR 36272. As stated above, the Departments now believe that, in many cases, especially when intensive fact-finding is required, the notion that consideration of mandatory bars at the credible fear screening stage would result in elimination of removal delays for individuals subject to the bars is speculative. Moreover, to the extent consideration of mandatory bars in section 240 proceedings does result in delays to removal, the Departments believe in light of the public comments cited above that such delays do serve important purposes—particularly in cases with complicated facts—namely, ensuring that the procedures and forum for determining the applicability of mandatory bars appropriately account for the complexity of the inquiry and afford noncitizens potentially subject to the mandatory bars a reasonable and fair opportunity to contest their applicability. Adjudicatory resources designed to ensure that noncitizens are not refouled to persecution due to the erroneous application of a mandatory bar are not expended in vain. Rather, the expenditure of such resources helps keep the Departments in compliance with Federal law and international treaty obligations.

Given the need to preserve the efficiencies Congress intended in

making credible fear screening part of the expedited removal process and to ensure procedural fairness for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory withholding of removal but for the potential applicability of a mandatory bar, the Departments have decided that the Global Asylum rule's broad-based application of mandatory bars at the credible fear screening stage should be rescinded.[24]

If an asylum officer determines that an individual does not have a credible fear of persecution or torture, the individual can request that an IJ review the asylum officer's negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g). The Departments also are re-codifying the treatment of a failure or refusal on the part of a noncitizen to request IJ review of a negative credible fear determination as a request for IJ review. *See* 8 CFR 208.30(g)(1), 1208.30(g)(2)(i). In the Global Asylum rule, the Departments amended regulations to treat a noncitizen's refusal to indicate whether they would like IJ review as declining IJ review. *See* 85 FR 80296. The Departments explained that treating refusals as requests for review serves to create unnecessary and undue burdens and that it is reasonable to require an individual to answer affirmatively when asked by an asylum officer if they would like IJ review. *See id.* In this rule, the Departments are reverting to the pre-existing regulations. Upon reconsideration, the Departments recognize that there may be numerous explanations for a noncitizen's refusal or failure to indicate whether they would like to seek IJ review—and indeed there will be cases in which a noncitizen wants review but fails to explicitly indicate it. The Departments now conclude that treating any refusal or failure to elect review as a request for IJ review, rather than as a declination of such review, is fairer and better accounts for the range of explanations for a noncitizen's failure to seek review. Treating such refusals or failures to elect review as requests for IJ review appropriately ensures that any noncitizen who may wish to pursue IJ

review (that is, any noncitizen who has not, in fact, declined IJ review) has the opportunity to do so. A noncitizen who genuinely wishes to decline review may of course withdraw the request for review before the IJ; in such a case, the IJ will return the noncitizen's case to DHS for execution of the expedited removal order. *See* 8 CFR 1208.30(g)(2).

In comparison to the NPRM, in this rule, the Departments are amending 8 CFR 208.30(g) to provide, in new 8 CFR 208.30(g)(1)(i), that USCIS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred, provided the request for reconsideration is received from the noncitizen or their attorney or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first. USCIS's reconsideration of any such request is discretionary. After an IJ has concurred with a negative credible fear determination, DHS can execute the individual's expedited removal order, promptly removing the individual from the United States. Under no circumstances, however, will USCIS accept more than one request for reconsideration.

The Departments carefully considered the public comments received in response to the NPRM related to the proposal to foreclose any DHS reconsideration of negative credible fear determinations. Based on those comments, the Departments decided to retain the existing regulatory language related to DHS reconsideration, *see* 8 CFR 208.30(g), but to place reasonable procedural limits on the practice. Accordingly, the Departments are amending the regulation to include numerical and time limitations and clarify that DHS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred. These procedural limitations and clarifications are necessary to ensure that reconsideration requests to USCIS do not obstruct the streamlined process that Congress intended in creating expedited removal. These changes also are consistent with the statutory scheme of INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B), under which it is the IJ review of the negative credible fear determination that serves as the check to ensure that noncitizens who have a credible fear of persecution or torture are not returned based on an erroneous screening determination by USCIS. The expedited removal statute and its implementing regulations generally prohibit any further administrative review or appeal of an IJ's decision made after review of a

---

[24] In addition to the proposed changes to the DOJ portions of the regulations in the NPRM related to the application of mandatory bars in the credible fear process, the IFR also includes a similar edit to 8 CFR 1003.42(d)(1). Both 8 CFR 1003.42 and 8 CFR 1208.30 relate to IJs' review of asylum officers' credible fear determinations, and the Departments intend for the regulations to be consistent with regard to the treatment of mandatory bars in the credible fear review process.

IFR_AR_000750

negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (C); 8 CFR 1003.42(f)(2), 1208.30(g)(2)(iv)(A). Congress similarly has made clear its intent that expedited removal should remain a streamlined, efficient process by limiting judicial review of many determinations in expedited removal. *See* INA 242(a)(2)(A), (e), 8 U.S.C. 1252(a)(2)(A), (e). These statutory provisions limiting administrative and judicial review and directing expeditious determinations reflect clear congressional intent that expedited removal be a truly expedited process.

The numerical and time limitations promulgated in this rule are consistent with congressional intent and with the purpose of the current regulation allowing for such requests. The Departments believe that, over time, the general allowance for reconsideration by USCIS asylum offices came to be used beyond its original intended scope. Such requests have not used a formalized process, since there is currently no formal mechanism for noncitizens to request reconsideration of a negative credible fear determination before USCIS; instead, they are entertained on an informal, ad hoc basis whereby individuals contact USCIS asylum offices with their reconsideration requests after an IJ has affirmed the negative credible fear determination. This informal, ad hoc allowance for such requests, including multiple requests, has proven difficult to manage. To deal with these many requests, USCIS has had to devote time and resources that could more efficiently be used on initial credible fear and reasonable fear determinations, affirmative asylum cases, and now, Asylum Merits interviews with the present rule.

## B. Applications for Asylum

If the noncitizen is found to have a credible fear, this IFR changes the procedure as described above. Under this rule, rather than referring the individual to an IJ for an adversarial section 240 removal proceeding in the first instance, or, as provided for in a presently enjoined regulation, asylum-and-withholding-only proceedings before an IJ,[25] the individual's asylum application instead may be retained for further consideration by USCIS through a nonadversarial interview before an asylum officer. *See* 8 CFR 208.30(f). Similarly, if, upon review of an asylum officer's negative credible fear

determination, an IJ finds that an individual does have a credible fear of persecution or torture, the individual also can be referred back to USCIS for further consideration of the individual's asylum claim. *See* 8 CFR 1003.42, 1208.30(g). To eliminate delays between a positive credible fear determination and the filing of an application for asylum, the Departments are amending regulations to provide, in new 8 CFR 208.3(a)(2), that the written record of the credible fear determination created by USCIS during the credible fear process, and subsequently served on the individual together with the service of the credible fear decision itself, will be treated as an "application for asylum," with the date of service on the individual considered the date of filing. Every individual who receives a positive credible fear determination and whose case is retained by USCIS will be considered to have filed an application for asylum at the time the determination is served on them. The application will be considered filed or received as of the service date for purposes of the one-year filing deadline for asylum, *see* INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), and for starting the waiting period for eligibility to file for employment authorization based upon a pending asylum application, *see* 8 CFR 208.3(c)(3). The Departments are amending regulations to provide that this application for asylum will be considered a complete application for purposes of 8 CFR 208.4(a), 208.7, and 208.9(a) in order to qualify for an interview and adjudication, and will be subject to the other conditions and consequences provided for in 8 CFR 208.3(c) once the noncitizen signs the documentation under penalty of perjury and with notice of the consequences of filing a frivolous asylum application at the time of the Asylum Merits interview, as provided in new 8 CFR 208.3(a)(2).[26]

The Departments will implement these changes to the credible fear process by having the USCIS asylum officer conducting the credible fear interview advise the noncitizen of the consequences of filing a frivolous asylum application and capture the noncitizen's relevant information through testimony provided under oath. During the credible fear interview, as 8 CFR 208.30(d) already provides and will continue to provide under the IFR, the asylum officer will "elicit all relevant and useful information" for the credible fear determination, create a summary of the material facts presented by the noncitizen during the interview, review the summary with the noncitizen, and allow the noncitizen to correct any errors. The record created will contain the necessary biographical information and sufficient information related to the noncitizen's fear claim to be considered an application. As a matter of longstanding practice in processing families through credible fear screenings, the information captured by the asylum officer during the credible fear interview will contain information about the noncitizen's spouse and children, if any, including those who were not part of the credible fear determination—but under this rule only a spouse or child who was included in the credible fear determination pursuant to 8 CFR 208.30(c) or who has a pending asylum application with USCIS pursuant to 8 CFR 208.2(a)(1)(ii) can be included as a dependent on the request for asylum.[27] *See* 8 CFR 208.3(a)(2). Any spouse or child included as a dependent on the credible fear determination may request to file a separate asylum application as a

[25] *See Global Asylum* rule, 85 FR 80276; *supra* note 4 (discussing recent regulations and their current status).

[26] In addition, the Departments are amending 8 CFR 1208.3 and 1208.4 to account for changes made by this rule, including the provisions that will treat the record of the credible fear determination as an application for asylum in the circumstances addressed by the rule. The amendment at 8 CFR 1208.3(c)(3) affects language that was enacted in the rule entitled "Procedures for Asylum and Withholding of Removal," 85 FR 81698 (Dec. 16, 2020). The December 16, 2020, rulemaking made various changes to DOJ regulations, including 8 CFR 1208.3(c)(3). *Id.* at 81750–51. The December 16, 2020, rulemaking is preliminarily enjoined. *See* Order at 1, *Nat'l Immigrant Justice Ctr.* v. *Exec. Office for Immigration Review*, No. 21–cv–56 (D.D.C. Jan. 14, 2021). This rule makes changes to the regulations only as necessary to effectuate its goals. The Departments anticipate that additional changes to the relevant regulations, including rescission of or revision to the language added by the preliminarily enjoined regulation, will be made through later rulemakings. *See* Executive Office of

[27] While only a spouse or child included on the credible fear determination or who presently has an asylum application pending with USCIS after a positive credible fear determination can be included as a dependent on the subsequent asylum application under this process, the noncitizen granted asylum remains eligible to apply for accompanying or follow-to-join benefits for any qualified spouse or child not included on the asylum application, as provided for in 8 CFR 208.21. The Departments believe that it is procedurally impractical to attempt to include a spouse or child on the application when the spouse or child has not previously been placed into expedited removal and subsequently referred to USCIS after a positive credible fear determination. This is similar to the inability to include a spouse or child not in section 240 removal proceedings on the asylum application of a principal asylum applicant who is in such section 240 removal proceedings. Under such circumstances, there is no clear basis for issuing a final order of removal against such an individual spouse or child should the asylum application not be approved.

IFR_AR_000751

principal applicant with USCIS at any time while the principal's asylum application is pending with USCIS. *See* 8 CFR 208.3(a)(2). A copy of the principal applicant's application for asylum—the record of the credible fear determination, including the asylum officer's notes from the interview, the summary of material facts, and other materials upon which the determination was based—will be provided to the noncitizen at the time that the positive credible fear determination is served. *See* 8 CFR 208.30(f). As provided in new 8 CFR 208.4(b)(2), the noncitizen may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, up until 7 days prior to the scheduled Asylum Merits interview before a USCIS asylum officer, or for documents submitted by mail, postmarked no later than 10 days before the scheduled Asylum Merits interview. The asylum officer, finding good cause in an exercise of USCIS discretion, may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in 8 CFR 208.9(e)(2). In new 8 CFR 208.9(e)(2), this rule further provides that, in the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent the Asylum Merits decision from being issued to the applicant within 60 days of service of the positive credible fear determination. The Departments believe that such limitations are necessary to ensure that the process remains expeditious while maintaining fairness.

The information required to be gathered during the credible fear screening process is based on the noncitizen's own testimony under oath in response to questions from a trained USCIS asylum officer. Thus, the Departments believe that the screening would provide sufficient information upon which to ascertain the basis of the noncitizen's request for protection. Under this rule, noncitizens who receive a positive credible fear determination would have an asylum application on file with the Government within days of their credible fear screenings, thereby meeting the one-year asylum filing deadline, avoiding

the risk of filing delays, and expeditiously beginning the waiting period for employment authorization eligibility.

## C. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear

In this IFR, consistent with the NPRM, the Departments are amending regulations to authorize USCIS asylum officers to conduct Asylum Merits interviews for individuals whose cases are retained for further consideration by USCIS following a positive credible fear determination or returned to USCIS if an IJ vacates an asylum officer's negative credible fear finding.[28] The Departments carefully considered the comments received in response to the NPRM focused on timelines related to Asylum Merits interviews, and, in this IFR, are including regulatory language clarifying timelines for scheduling hearings and providing asylum decisions.

As provided in 8 CFR 208.9(a)(1), USCIS will not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination, unless the applicant requests in writing that an interview be scheduled sooner. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the noncitizen—*i.e.*, the date the asylum application is considered filed, *see* 8 CFR 208.3(a)(2)—subject to the need to reschedule an interview due to exigent circumstances. *See* 8 CFR 208.9(a)(1). These timelines are consistent with the INA, which provides that, "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed." INA 208(d)(5)(A)(ii), 8 U.S.C. 1158(d)(5)(A)(ii).

The nonadversarial Asylum Merits interview process will provide several procedural safeguards, such as the following: (1) The applicant may have

counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence, 8 CFR 208.9(b); (2) the applicant or applicant's representative will have an opportunity to make a statement or comment on the evidence presented and the representative will also have the opportunity to ask follow-up questions of the applicant and any witness, 8 CFR 208.9(d)(1); (3) a verbatim transcript of the interview will be included in the referral package to the IJ, with a copy also provided to the noncitizen, 8 CFR 208.9(f)(2), 1240.17(c); (4) an asylum officer will arrange for the assistance of an interpreter if the applicant is unable to proceed effectively in English, and if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for purposes of eligibility for employment authorization, 8 CFR 208.9(g); and (5) the failure of a noncitizen to appear for an interview may result in the referral of the noncitizen to section 240 removal proceedings before an IJ, 8 CFR 208.10(a)(1)(iii), unless USCIS, in its own discretion, excuses the failure to appear, 8 CFR 208.10(b)(1). The Departments believe that these procedural safeguards will enhance efficiency and further the expeditious adjudication of noncitizens' asylum claims, while at the same time balancing due process and fairness concerns. The protection claims considered in Asylum Merits interviews will be adjudicated in a separate queue, apart from adjudications of affirmative asylum applications filed directly with USCIS.

Allowing the cases of individuals who receive a positive credible fear determination to remain with USCIS for the Asylum Merits interview, rather than initially referring the case to an IJ for an adversarial section 240 removal proceeding or, as provided for in a presently enjoined regulation, for an asylum-and-withholding-only proceeding,[29] will capitalize on the investment of time and expertise that USCIS has already made and, for the subset of cases in which asylum is granted by USCIS, save investment of time and resources by EOIR and ICE. It will also enable meritorious cases to be resolved more quickly, reducing the overall asylum system backlogs and using limited asylum officer and IJ resources more efficiently. The Asylum Merits interview process affords noncitizens a fair opportunity to present their claims. In addition, noncitizens

---

[28] In addition to the proposed changes to the DHS portion of the regulations in the NPRM, the IFR also includes a similar edit to 8 CFR 1003.42(d)(1). This edit is intended to ensure consistency with 8 CFR 1003.42 and the proposed edits to 8 CFR 1208.30(g)(2) so that both provisions properly direct that a case where an IJ vacates a negative credible fear finding will be referred back to USCIS as intended by both the NPRM and the IFR.

[29] *See* Global Asylum rule, 85 FR 80276; *supra* note 4 (discussing recent regulations and their current status).

who are not granted asylum will be referred to an immigration court for a streamlined section 240 removal proceeding, which means that an IJ will consider their asylum and, as necessary, statutory withholding and CAT protection claims. Overall, these ample procedural safeguards will ensure due process, respect human dignity, and promote equity.

Section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), authorizes a procedure for "further consideration" of asylum applications that is separate from section 240 removal proceedings. As the Department of Justice recognized over two decades ago, "the statute is silent as to the procedures for those who . . . demonstrate a credible fear of persecution." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 10312, 10320 (Mar. 6, 1997) (interim rule). It "does not specify how or by whom this further consideration should be conducted." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 444, 447 (Jan. 3, 1997) (proposed rule).

By not specifying what "further consideration" entails, the statute leaves it to the Departments to determine. Under the familiar *Chevron* framework, it is well-settled that such "ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000) (citing *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984)); *see also Epic Sys. Corp.* v. *Lewis,* 138 S. Ct. 1612, 1629 (2018) (noting that *Chevron* rests on "the premise that a statutory ambiguity represents an implicit delegation to an agency to interpret a statute which it administers" (quotation marks and citation omitted)). An agency may exercise its delegated authority to plug the gap with any "reasonable interpretation" of the statute. *Chevron,* 467 U.S. at 844.

By its terms, the phrase "further consideration" is open-ended. The fact that Congress did not specify the nature of the proceedings for those found to have a credible fear, *see* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), contrasts starkly with two other provisions in the same section that expressly require or deny section 240 removal proceedings for certain other classes of noncitizens. In one provision, INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A), Congress provided that an applicant for admission who "is not

clearly and beyond a doubt entitled to be admitted" must be "detained for a proceeding under [INA 240]." And in another, INA 235(a)(2), 8 U.S.C. 1225(a)(2), Congress provided that "[i]n no case may a stowaway be considered . . . eligible for a hearing under [INA 240]." This shows that Congress knew how to specifically require or prohibit referral to a section 240 removal proceeding when it wanted to do so. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Salinas* v. *United States R.R. Ret. Bd.,* 141 S. Ct. 691, 698 (2021) (quotation marks and citation omitted).

The D.C. Circuit has "consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion." *Catawba Cnty., N.C.* v. *EPA,* 571 F.3d 20, 36 (D.C. Cir. 2009) (quotation marks and citation omitted). That Congress's silence in section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), permits the Departments discretion to establish procedures for "further consideration" is reinforced by the fact that the noncitizens whom DHS has elected to process using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings under section 235(b)(2)(A) of the INA, 8 U.S.C. 1225(b)(2)(A).

If, following an Asylum Merits interview described in this IFR, USCIS grants asylum, the individual may be allowed to remain in the United States indefinitely with the status of asylee and eventually may apply for lawful permanent residence. *See* INA 208(c)(1), 209(b), 8 U.S.C. 1158(c)(1), 1159(b). If asylum is not granted, the asylum officer will refer the application, together with the appropriate charging document and the record of the Asylum Merits interview, for adjudication in streamlined section 240 removal proceedings before an IJ. *See* 8 CFR 208.14(c)(1), 1240.17(a).

The Departments carefully considered the public comments received in response to the NPRM and reconsidered the proposals outlined in the NPRM related to having USCIS asylum officers make final decisions regarding statutory withholding of removal and CAT protection claims and issue removal orders. *See* 86 FR 46917–19. In this IFR, DHS is amending 8 CFR 208.9(b) to

provide that, in the case of a noncitizen whose case is retained by or referred to USCIS for further consideration through an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal or CAT protection. This IFR further provides in 8 CFR 208.16(a) and (c) that if the asylum application is not granted, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal under 8 CFR 208.16(b) or CAT protection under 8 CFR 208.16(c). Asylum officers will not issue orders of removal to applicants who are not granted asylum as proposed in the NPRM, but rather will refer applicants who are not granted asylum to the immigration court for consideration of their protection claims in streamlined section 240 removal proceedings before an IJ. *See* 8 CFR 208.14(c)(1), 208.16(a). USCIS will not issue a final decision on an applicant's request for statutory withholding of removal or CAT protection. Rather, pursuant to new 8 CFR 1240.17(d), (f)(2)(i)(B), and (i)(2), if an asylum officer does not grant asylum but determines the noncitizen is eligible for statutory withholding of removal or CAT protection and the IJ does not grant asylum, the IJ will issue a removal order and, subject to certain exceptions, give effect to USCIS's determination.

If the asylum application includes a dependent who has not filed a separate application, the asylum officer will, as appropriate and prior to referring the family to streamlined section 240 proceedings before an IJ, elicit information sufficient to determine whether there is a significant possibility that the applicant's dependent has experienced or fears harm that would be an independent basis for protection in the event that the principal applicant is not granted asylum. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal applicant's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 208.3(a)(2), 1208.3(a)(2). This provision will allow any spouse or child in the streamlined procedure to exercise their right to seek protection on an independent basis without the need for delaying the proceedings to allow for the preparation and filing of an I–589, Application for Asylum and for Withholding of Removal. The

Departments have determined that these changes meet the goals of this rule, such as improving efficiency while allowing noncitizens to receive a full and fair opportunity to be heard, and are also responsive to commenters' concerns raised in response to the NPRM, as detailed in Sections IV.D.5 and 6 of this preamble. While USCIS will not make final decisions regarding statutory withholding of removal and CAT protection claims and issue removal orders, it is appropriate for USCIS to make eligibility determinations regarding statutory withholding of removal and protection under the CAT. As a threshold issue, applications for asylum, statutory withholding of removal, and protection under the CAT are all factually linked. While the legal standards and requirements differ among the forms of relief and protection, the relevant applications will substantially share the same set of operative facts that an asylum officer would have already elicited, including through evidence and testimony, in the nonadversarial Asylum Merits interview. Moreover, asylum officers receive extensive training, and develop extensive expertise, in assessing claims and country conditions, and are qualified to determine whether an applicant will face harm in the proposed country. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b). Asylum officers also receive training on the standards and eligibility issues related to determinations for statutory withholding of removal and CAT protection in order to conduct credible fear screening interviews and make appropriate credible fear determinations under 8 CFR 208.30(e). *See* 8 CFR 208.1(b).

While asylum officers will also not make final decisions regarding a dependent's eligibility for asylum, statutory withholding of removal, and CAT protection claims if the dependent has not received a prior separate positive credible fear determination or filed a separate principal asylum application with USCIS, it is appropriate for asylum officers to elicit sufficient information regarding each dependent's eligibility for protection in order to allow for those claims to be on the record and appropriately considered should the family be placed into streamlined section 240 removal proceedings. In many cases, the family members will likely substantially share the same set of operative facts that an asylum officer would have already elicited from the principal applicant, including through evidence and testimony, during the same

nonadversarial Asylum Merits interview. Accordingly, the additional questioning that will ordinarily be needed to develop the record enough to facilitate an IJ's adjudication of any claims through streamlined section 240 proceedings is expected to be modest. Moreover, any dependent who wishes to be adjudicated as a principal applicant by USCIS may file a separate application with USCIS prior to referral to removal proceedings.

Where a noncitizen's asylum application is not granted by USCIS, automatic referral to streamlined section 240 proceedings—as further discussed in Section III.D of this preamble—ensures that the application of the principal applicant and any family members may be reviewed by the IJ. In the streamlined section 240 proceedings, the IJ will adjudicate de novo the noncitizen's and any family members' applications for asylum and, if USCIS determined them ineligible for statutory withholding of removal or protection under the CAT, such claims as well. Statutory withholding of removal and CAT protection are nondiscretionary forms of protection, the granting of which is mandatory upon a showing of eligibility. *See, e.g., Myrie* v. *Att'y Gen. United States,* 855 F.3d 509, 515–16 (3d Cir. 2017); *Benitez Ramos* v. *Holder,* 589 F.3d 426, 431 (7th Cir. 2009). Because an asylum officer does not issue an order of removal under the IFR, it is appropriate to wait until the IJ enters the order of removal before generally giving effect to USCIS's statutory withholding of removal and CAT protection eligibility determinations. *See Matter of I–S– & C–S–,* 24 I&N Dec. 432, 433 (BIA 2008).

### D. Streamlined Section 240 Removal Proceedings Before the Immigration Judge

Upon careful consideration of the comments received in response to the NPRM, as discussed in Section IV of this preamble, this IFR does not adopt the IJ review proceedings proposed in the NPRM. *See* 86 FR 46946–47 (8 CFR 1003.48, 1208.2(c) (proposed)). Instead, the Departments will place noncitizens whose applications for asylum are not granted by USCIS, as well as any spouse or children included on the noncitizen's application, in section 240 proceedings that will be streamlined as provided in new 8 CFR 1240.17. *See* 8 CFR 1240.17(a), (b). As provided in new 8 CFR 1240.17(a), IJs must conduct these proceedings in accordance with the procedures and requirements set forth in section 208 of the Act, 8 U.S.C. 1158.

Currently, further consideration of an asylum application by an individual in

expedited removal is done through section 240 proceedings. *See, e.g.,* 8 CFR 208.30(f) (2020); [30] 8 CFR part 1240, subpart A (2020). Such proceedings follow issuance of an NTA, which informs the noncitizen of DHS's charges of inadmissibility or removability, INA 239(a)(1), 8 U.S.C. 1229(a)(1), and these proceedings provide an opportunity for the noncitizen to make his or her case to an IJ, INA 240(a)(1), 8 U.S.C. 1229a(a)(1). Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: The right to representation at no expense to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(i)(ii)–(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA, 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review in the appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252.

Under the IFR, USCIS will have authority to adjudicate asylum claims brought by noncitizens subject to expedited removal and found to have a credible fear of persecution or torture rather than immediately referring such cases for adjudication by IJs in section 240 removal proceedings. The Departments have determined that noncitizens who subsequently are not granted asylum by USCIS should be referred to section 240 removal proceedings that will be streamlined as described in new 8 CFR 1240.17. The well-established rights that apply in section 240 proceedings will continue to apply during the 240 proceedings described in new 8 CFR 1240.17, but the latter will include new procedures designed to streamline the process while continuing to ensure fairness.

The Departments believe that these cases can be adjudicated more expeditiously than other cases in section 240 removal proceedings. Unlike other cases, noncitizens subject to this IFR will have had a full opportunity to present their protection claims to an asylum officer. Moreover, as established in new 8 CFR 1240.17(c) and (e), IJs and parties in any subsequent streamlined section 240 removal proceedings will have the benefit of a fully developed record and

---

[30] The Global Asylum rule would have revised the process, placing such noncitizens into asylum-and-withholding-only proceedings instead of section 240 proceedings, *see* 85 FR 80276, but it was enjoined, *see supra* note 4.

IFR_AR_000754

decision prepared by USCIS.[31] Because the USCIS Asylum Merits interview will create a record that includes testimony and documentary evidence, the Departments believe that less time will be needed in immigration court proceedings to build the evidentiary record. Thus, cases will be resolved more expeditiously before the IJ. The Departments recognize that, in some instances, IJs may need to take additional testimony and evidence—beyond what is contained in the USCIS record—to fully develop the record. *See, e.g.,* 8 CFR 1240.17(f)(4)(iii). By providing IJs with the ability to rely upon the previously developed record in most cases, while preserving the flexibility for IJs to take new evidence and testimony when warranted, without the additional motions practice contemplated by the NPRM's provisions, the IFR creates more streamlined, efficient adjudications overall. Accordingly, the Departments believe that it is possible to achieve the purposes of the NPRM—to increase efficiency and maintain procedural fairness—by making procedural changes to streamline existing 240 proceedings instead of establishing the IJ review proceedings proposed under the NPRM.

In keeping with this goal, the IFR provides that these section 240 proceedings will be subject to particular procedural requirements designed to streamline the overall process and take advantage of the record created by the asylum officer while still providing noncitizens with a full and fair opportunity to present testimony and evidence in support of their claims. Where the IJ would not be able to take advantage of that record, the streamlining measures do not apply. Thus, new 8 CFR 1240.17(k) exempts certain cases from the streamlined process, including, for example, where the respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, CAT protection, or voluntary departure, 8 CFR 1240.17(k)(2); where the respondent has raised a substantial defense to the removal charge,[32] 8 CFR

1240.17(k)(3); or where the designated country of removal is different from the one that the asylum officer considered in adjudicating the noncitizen's application for asylum or protection, 8 CFR 1240.17(k)(4).[33] New 8 CFR 1240.17(k) makes other exceptions for certain vulnerable noncitizens and it exempts cases that have been reopened or remanded. *See* 8 CFR 1240.17(k)(1), (5), (6). Accordingly, with these exceptions, the Departments believe that these proceedings can be expedited given the limited forms of relief and protection that will need to be adjudicated by the IJ and given that the IJ and the parties will benefit from the record developed before USCIS.

The IFR provides additional procedures that will contribute to efficient adjudication. As provided in revised 8 CFR 208.3(a)(2) and 8 CFR 1208.3(a)(2) and new 8 CFR 1240.17(e), the IFR treats the record underlying the positive credible fear determination as the noncitizen's asylum application, as well as an asylum application for any spouse or child included as a dependent on the application for purposes of EOIR's filing requirements if USCIS does not grant the principal applicant's application and if the spouse or child does not separately file an asylum application that is adjudicated by USCIS. This procedure obviates the need for the noncitizen and any dependent to prepare and file a new application before the IJ. IJs are also required to hold status conferences to identify and narrow issues under new 8 CFR 1240.17(f)(1), (2). The USCIS Asylum Merits interview record and decision will permit the parties and the

IJ to identify any errors or omissions in the record, narrow issues, and provide any additional bases for asylum or related protection. Specifically, the rule, as provided in new 8 CFR 1240.17(f)(2) and (3), imposes obligations on the parties to identify and narrow the issues prior to the merits hearing, although the obligations on the noncitizen depend on whether the noncitizen has representation. As provided by new 8 CFR 1240.17(f)(2)(ii)(A), DHS must state whether it intends to rest on the existing record, waive cross-examination of the respondent, otherwise participate in the proceedings before the IJ, or waive appeal in the event the IJ grants protection. This position may be retracted by DHS, orally or in writing, prior to the issuance of the IJ's decision, if DHS seeks consideration of evidence pursuant to the standard laid out in 8 CFR 1240.17(g)(2). *See* 8 CFR 1240.17(f)(2)(ii)(C). Moreover, if DHS indicates that it will participate in the case, at the status conference or via a subsequent written statement it shall state its position on the respondent's claim(s); state which elements of the respondent's claim(s) it is contesting and which facts it is disputing, if any, and provide an explanation of its position; identify any witnesses it intends to call; provide any additional non-rebuttal or non-impeachment evidence; and state the status of the identity, law enforcement, or security investigations or examinations required by section 208(d)(5)(A)(i) of the Act, 8 U.S.C. 1158(d)(5)(A)(i), and 8 CFR 1003.47. *See* 8 CFR 1240.17(f)(2)(ii), (f)(3). If DHS does not timely respond, either at the status conference or in its written statement, to one or more of the respondent's arguments or claimed bases for asylum, including which arguments raised by the respondent DHS is disputing and which facts it is contesting, the IJ has authority to deem those arguments or claims unopposed, provided, however, that DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference. *See* 8 CFR 1240.17(f)(3)(i). The IFR creates additional efficiencies by permitting IJs to decide applications on the documentary record in certain circumstances, including where neither party has elected to present testimony and DHS has not elected to cross-examine the noncitizen or where the IJ determines that the application can be granted without further testimony and DHS declines to cross-examine the noncitizen. *See* 8 CFR 1240.17(f)(4)(i), (ii). Notwithstanding these provisions,

---

[31] New 8 CFR 1240.17(c) provides that DHS will serve the record of proceedings for the Asylum Merits interview and the asylum officer's written decision on the respondent and on the immigration court no later than the date of the master calendar hearing; it further provides that, in the exceptional case in which service is not effectuated by that date, the schedule of proceedings pursuant to new 8 CFR 1240.17(f) will be delayed until service is effectuated.

[32] As stated in note 8, *supra,* the rule does not specify that a particular type of evidence is required in order to show prima facie eligibility for relief,

and such evidence could include testimonial evidence as well as documentary evidence.

[33] Under this IFR, a noncitizen's accompanying spouse and children may be included in the request for asylum if they were included in the credible fear determination. *See* 8 CFR 208.3(a)(2), 208.30(c). Where a noncitizen is accompanied by a spouse or children, and the noncitizen is found to have a credible fear of persecution or torture, the family has the choice to have the spouse and children be included as dependents on the asylum application or to separately seek asylum as principal applicants. *See* 8 CFR 208.3(a)(2), 208.30(c). Should the family choose to have the spouse and children proceed solely as dependents, the asylum officer will, as appropriate, elicit sufficient information to determine whether there is a significant possibility that the applicant's spouse or child has experienced or fears harm that would be an independent basis for protection in the event that the principal applicant is not granted asylum prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal applicant's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 1208.3(a)(2).

IFR_AR_000755

however, the IJ shall hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record. *See id.*

The IFR also gives appropriate effect to the asylum officer's determination of a noncitizen's eligibility for statutory withholding of removal or protection under the CAT. This serves to increase efficiency and provides a safeguard where an asylum officer has already found that the noncitizen could be subject to persecution or torture if removed. In general, in cases where the IJ denies asylum and issues a removal order, the IJ will give effect to the asylum officer's determination of eligibility for statutory withholding of removal or protection under the CAT; the IJ may not sua sponte review the asylum officer's determination. *See 8 CFR 1240.17(d), (f)(2)(i)(B), (i)(2).* However, these provisions account for the possibility that DHS may submit evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview in order to demonstrate that the respondent is not eligible for the protection(s) the asylum officer determined. *See id.* In such a case, the IJ will, based on the review of this new evidence or testimony, make a separate determination regarding the noncitizen's eligibility for statutory withholding of removal or protection under the CAT, as relevant.

1. Schedule of Proceedings

The Departments are imposing procedural adjudication time frames and limitations on continuances and filing extensions during streamlined section 240 removal proceedings under this IFR. The Departments believe that these time frames and limitations are justified given both the streamlining procedures discussed above and the fact that such cases will come to the IJ with a complete asylum application and following a nonadversarial interview before an asylum officer at which a comprehensive record, including a verbatim transcript and decision, has been assembled.

Under new 8 CFR 1240.17, the Departments will impose procedural time frames on IJs with respect to their hearing schedules. Specifically, an IJ will hold a master calendar hearing 30 days after service of the NTA or, if a hearing cannot be held on that date, on the next available date no later than 35 days after service. As provided by new 8 CFR 1240.17(f)(1) and (2), the IJ will hold a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that

date, on the next available date no later than 35 days after the master calendar hearing, followed by a merits hearing, if necessary, 60 days after the master calendar hearing or, if a hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing.[34] If needed, under new 8 CFR 1240.17(f)(4)(iii), the IJ may hold a subsequent merits hearing to resolve any lingering issues or complete testimony no later than 30 days after the initial merits hearing. As further discussed below, the IJ may grant continuances and filing extensions under specified standards. *See 8 CFR 1240.17(h).* Finally, under 8 CFR 1240.17(f)(5), whenever practical, the IJ shall issue an oral decision on the date of the final merits hearing or, if the IJ determines that no such hearing is warranted, no more than 30 days after the status conference; and where issuance of an oral decision on such date is not practicable, the IJ shall issue an oral or written decision as soon as practicable, no later than 45 days after the final merits hearing or, if the IJ concludes that no hearing is necessary, no later than 75 days after the status conference.[35]

The combined effect of these provisions should fully achieve the NPRM's efficiency goals while allowing noncitizens to receive a full and fair hearing in streamlined section 240 removal proceedings rather than through the IJ review process contemplated by the NPRM. The well-established rights that apply in ordinary section 240 proceedings will continue to apply during the streamlined section 240 proceedings described in new 8 CFR 1240.17, but certain new procedures will streamline the process by taking advantage of the record created by the asylum officer and ensure a prompt, efficient, and fair hearing on the respondent's claim.

a. Pre-Hearing Procedures

In order to best prepare the case for adjudication, new 8 CFR 1240.17(f) establishes initial procedures to ensure that the IJ has a complete picture of the case and the relevant issues prior to conducting any merits hearing that may be needed. As provided in new 8 CFR 1240.17(f)(1), at the master calendar hearing, the IJ will perform the functions required by 8 CFR 1240.10(a), including advising the respondent of the right to be represented, at no expense to the Government, by counsel of the respondent's own choosing. *See 8 CFR 1240.17(f)(1).* Additionally, the IJ will advise as to the nature of the streamlined section 240 removal proceedings, including that the respondent has pending applications for asylum, statutory withholding of removal, and withholding or deferral of removal under the CAT, as appropriate; that the respondent has the right to testify, call witnesses, and present evidence in support of these applications; and of the deadlines that govern the submission of evidence. *See id.* Finally, except where the noncitizen is ordered removed in absentia, at the conclusion of the master calendar hearing the IJ will schedule a status conference to take place 30 days after the master calendar hearing or, if necessary, on the next available hearing date no later than 35 days after the master calendar hearing. *See id.* The IJ will also advise as to the requirements for the status conference. *See id.* The adjournment of the case until the status conference will not be considered a noncitizen-requested continuance under new 8 CFR 1240.17(h)(2). *See id.*

The purpose of the status conference is to take pleadings, identify and narrow any issues, and determine whether the case can be decided on the documentary record alone or, if a merits hearing before the IJ is needed, to ready the case for such a hearing. *See 8 CFR 1240.17(f)(2).* In general, the Departments expect that the parties will use the record of the Asylum Merits interview as a tool to prepare the proceeding for the IJ's adjudication. *See id.*

At the status conference, the noncitizen must indicate, orally or in writing, whether the noncitizen intends to contest removal or seek any protection(s) for which the asylum officer did not determine the noncitizen eligible. *See 8 CFR 1240.17(f)(2)(i).* The IJ will also advise the noncitizen that the respondent has the right to testify, call witnesses, and present evidence in support of the noncitizen's application; and of the deadlines that govern the

---

[34] Because the timing of the merits hearing is tied to the date that the status conference occurs, the Departments note that any delay of the status conference will necessarily result in a corresponding delay of the merits hearing. In other words, if the status conference occurs 45 days after the master calendar hearing rather than 30–35 days after it because, for example, the respondent requested a continuance to seek counsel on the immigration court had to close on the original date of the status conference, *see* 8 CFR 1240.17(h), the merits hearing would still occur 30–35 days after the status conference—on days 75–80.

[35] In other words, where it is not practicable to issue an oral decision on the date of the final merits hearing, the immigration judge has up to 45 days to issue a decision. Where an IJ has determined that a merits hearing is not necessary, and it is not practicable to issue a decision within 30 days after the status conference, the IJ has up to an additional 45 days within which to issue a decision.

submission of evidence. If a noncitizen expresses an intent to contest removal or seek protection for which the asylum officer did not determine the noncitizen eligible, the noncitizen must, orally or in writing: (1) Indicate whether the noncitizen plans to testify before the IJ; (2) identify any witnesses the noncitizen plans to call at the merits hearing; and (3) provide any additional documentation in support of the applications. *See* 8 CFR 1240.17(f)(2)(i)(A). A represented noncitizen is further required to: (4) Describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings before the asylum officer; (5) articulate or confirm any additional bases for asylum and related protection, whether or not they were presented or developed before the asylum officer; and (6) state any additional requested forms of relief or protection. If a noncitizen is unrepresented, the IJ will ask questions and guide the proceedings in order to elicit relevant information from the noncitizen and otherwise fully develop the record. *See Quintero* v. *Garland,* 998 F.3d 612, 623–30 (4th Cir. 2021) (describing the general duty of the IJ to develop the record, which is "especially crucial in cases involving unrepresented noncitizens"); *see also Matter of S–M–J–,* 21 I&N Dec. 722, 723–24, 729 (BIA 1997) (en banc) (also describing the general duty of the IJ to develop the record). If a noncitizen does not express an intent to contest removal or seek protection for which the asylum officer did not determine the noncitizen eligible, the IJ will order the noncitizen removed and will not conduct further proceedings. *See* 8 CFR 1240.17(f)(2)(i)(B). In such cases, where the asylum officer determined the noncitizen eligible for statutory withholding of removal or protection under the CAT, the IJ will issue a removal order and will give effect to that protection, unless DHS makes a prima facie showing—through evidence that specifically pertains to the noncitizen and that was not included in the record of proceedings for the USCIS Asylum Merits interview—that the noncitizen is not eligible for such protection. *See id.*

For its part, DHS must indicate at the status conference, orally or in writing, whether it intends to: (1) Rest on the record; (2) waive cross-examination of the noncitizen; (3) otherwise participate in the case; or (4) waive appeal if the IJ decides to grant the noncitizen's application. *See* 8 CFR 1240.17(f)(2)(ii). If DHS indicates that it will participate in the case, it then must, orally or in

writing: (1) State its position on each of the noncitizen's claimed grounds for asylum or related protection; (2) state which elements of the noncitizen's claim for asylum or related protection it is contesting and which facts it is disputing, if any, and provide an explanation of its position; (3) identify any witnesses it intends to call at any merits hearing; (4) provide any additional non-rebuttal or non-impeachment evidence; and (5) state whether the appropriate identity, law enforcement, or security investigations or examinations have been completed. *See id.* DHS can provide this information at the status conference or by submitting a written statement under 8 CFR 1240.17(f)(3)(i) as outlined below. *See id.*

At the status conference, as further detailed below, the IJ will determine whether further proceedings are warranted; if they are, the IJ will schedule the merits hearing to take place 60 days after the master calendar hearing or, if the merits hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(2). The IJ may also schedule additional status conferences prior to any merits hearing if the IJ determines such conferences will contribute to efficient resolution of the case. *See id.*

After the adjournment of the status conference, where DHS intends to participate in a case, DHS is required to file a written statement providing information required under 8 CFR 1240.17(f)(2)(ii) but that DHS did not provide at the status conference, as well as any other relevant information or argument in response to the noncitizen's submissions. *See* 8 CFR 1240.17(f)(3)(i). DHS's written statement is due no later than 15 days prior to the scheduled merits hearing or, if the IJ determines that no such hearing is warranted, no later than 15 days following the status conference. *See id.* The noncitizen may also submit a supplemental filing after the status conference to reply to any statement submitted by DHS, identify any additional witnesses, and provide any additional documentation in support of the respondent's application. *See* 8 CFR 1240.17(f)(3)(ii). Any such filing is due no later than 5 days prior to the scheduled merits hearing or, if the IJ determines that no such hearing is warranted, no later than 25 days following the status conference. *See id.*

The IFR's efficiencies and timeline are predicated on the parties' participation in the status conference and other procedural steps needed to narrow the issues and prepare the case for adjudication in advance of any merits

hearing before an IJ. This rule helps "ensure efficient adjudication by focusing the immigration courts' limited resources on the issues that the parties actually contest." *Matter of A–C–A–A–,* 28 I&N Dec. 351, 352 (A.G. 2021). In this regard, as described above, DHS ICE Office of the Principal Legal Advisor attorneys representing DHS in immigration court ("DHS attorneys") play a critical role in narrowing the issues during section 240 removal proceedings. The Departments believe that the rule's requirements will increase the overall efficiency of case adjudications and help parties better prepare their respective positions before the IJ.

b. Merits Hearing(s)

Based on the parties' statements and submissions at the status conference, the IJ will determine whether the noncitizen's application may be decided on the documentary record without a merits hearing or whether a merits hearing is required. *See* 8 CFR 1240.17(f)(4)(i)–(iii). Specifically, an IJ may decline to hold a merits hearing and decide the application on the documentary record if: (1) DHS has indicated that it waives cross-examination and neither the noncitizen nor DHS has requested to present testimony under the pre-hearing procedures described above, *see* 8 CFR 1240.17(f)(4)(i); or (2) the noncitizen has timely requested to present testimony and DHS has indicated that it waives cross-examination and does not intend to present testimony or produce evidence, and the IJ concludes that the asylum application can be granted without further hearing, *see* 8 CFR 1240.17(f)(4)(ii). Notwithstanding these provisions, the IJ shall hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record. *See* 8 CFR 1240.17(f)(4)(i), (ii).[36]

---

[36] The Departments emphasize that permitting the IJ to issue decisions in some cases without holding a hearing does not undermine the fairness or integrity of asylum proceedings because the respondent will already have testified, under oath, before the asylum officer. The IFR's framework only allows for the IJ to render a decision without scheduling a hearing in a manner that would not prejudice the noncitizen or undermine the integrity of asylum proceedings.

In *Matter of Fefe,* 20 I&N Dec. 116 (BIA 1989), the BIA held that "[a]t a minimum . . . the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct." *Id.* at 118. The BIA determined that the regulations required these procedures for fairness reasons and to maintain "the integrity of the asylum process itself." *Id.* The provisions in this IFR that permit IJs to decide applications without a hearing in certain

Continued

If the IJ determines to hold a merits hearing, the IJ will conduct that hearing as in section 240 removal proceedings generally. The IJ will swear the noncitizen to the truth and accuracy of any information or statements, hear all live testimony requested by the parties, and consider the parties' submissions. *See* 8 CFR 1240.17(f)(4)(iii)(A).

The Departments' goal is for the IJ to issue an oral decision at the conclusion of a single merits hearing (when a merits hearing is required) whenever practicable, *see* 8 CFR 1240.17(f)(4)(iii)(A), (f)(5), but the Departments recognize that not every case may be resolved in that fashion. The rule therefore allows the IJ flexibility in such circumstances to hold another status conference and take any other steps the IJ considers necessary and efficient for the resolution of the case. *See* 8 CFR 1240.17(f)(4)(iii)(B). In all circumstances, the IJ will be required to schedule any subsequent merits hearing no later than 30 days after the initial merits hearing. *Id.*

2. Evidentiary Standard

This IFR provides that, in the streamlined section 240 proceedings, noncitizens and DHS will have the opportunity to address alleged errors in the USCIS Asylum Merits record, present testimony, and submit additional evidence. The longstanding evidentiary standard for section 240 proceedings applies—evidence must be relevant and probative, and its use must be fundamentally fair. 8 CFR 1240.17(g)(1); *see* 8 CFR 1240.7(a) ("The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case . . . ."); *Nyama* v. *Ashcroft,* 357 F.3d 812, 816 (8th Cir. 2004) ("The traditional rules of evidence do not apply to immigration proceedings . . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.' " (citations omitted) (citing *Henry* v. *INS,* 74 F.3d 1, 6 (1st Cir. 1996); quoting *Espinoza* v. *INS,* 45 F.3d 308, 310 (9th Cir. 1995))); *Matter of Ramirez-Sanchez,* 17 I&N Dec. 503, 505 (BIA 1980) (holding that evidence must be "relevant and probative and its use not fundamentally unfair"). In addition, any evidence submitted must be timely (after taking into account a timely request for a continuance or filing extension that is granted), *see* 8 CFR 1240.17(g)(1), subject to certain exceptions, *see* 8 CFR 1240.17(g)(2). Evidence submitted after the deadline set by the IJ but before the IJ issues a decision in the case may be considered only if it could not reasonably have been obtained and presented before the applicable deadline through the exercise of due diligence, or it its exclusion would violate a statute or the Constitution.[37] *See id.* As in all section 240 proceedings, the IJ will exclude evidence that does not meet the requirements described above. *See* 8 CFR 1240.17(g)(1).

The Departments are not adopting the NPRM's proposal that noncitizens seeking to submit additional evidence for IJ review would have to demonstrate that it was not duplicative and was necessary to develop the record. Instead, the Departments believe the IFR's provisions will promote efficiency and fairness by allowing the parties and adjudicators to apply longstanding, workable evidentiary standards. The Departments believe that the NPRM's efficiency goals can be achieved in the context of streamlined section 240 removal proceedings without the NPRM's evidentiary restrictions because, unlike individuals in ordinary section 240 removal proceedings, noncitizens whose cases are subject to this rule will already have received an initial adjudication by USCIS, and their case will come to the immigration court with a fully developed record.

3. Timeline for Proceedings

As noted in the NPRM, the Departments' purpose for conducting rulemaking on this topic is to develop a "better and more efficient" system for processing applications for asylum and related relief brought by individuals subject to expedited removal under section 235 of the Act, 8 U.S.C. 1225. 86 FR 46907. Under the current procedures, individuals who are first placed in the expedited removal process but who are subsequently found to have a credible fear of persecution or torture are placed in section 240 removal proceedings before the immigration court. 8 CFR 208.30(f) (2020). Under existing procedures, these proceedings often take several years to complete and can be highly protracted and inefficient. Further, as stated in the NPRM, the current system was created at a time when most noncitizens encountered at the border were single adults from Mexico, relatively few of whom made asylum claims. *See* 86 FR 46908. In contrast, at present, a large share of noncitizens encountered at the border are families and unaccompanied children, a significant portion of whom express the intention to seek asylum. *See id.*

Given the above, the IFR establishes the timeline and procedures detailed below to apply in all cases subject to the streamlined section 240 removal proceedings. The Departments believe that these procedures serve important efficiency interests while still permitting noncitizens an appropriate amount of time to prepare for proceedings.

Immigration court proceedings commence when DHS files the NTA, and the master calendar hearing will take place 30 days after the date the NTA is served or, if a hearing cannot be held on that date, on the next available date no later than 35 days after service. *See* 8 CFR 1240.17(b). Except where the noncitizen is ordered removed in absentia, the IJ will then schedule a status conference 30 days after the initial master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(1). From there, if warranted, the merits hearing will be scheduled 60 days after the master calendar hearing or, if a hearing cannot be scheduled on that date, on the next available date no later than 65 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(2). If any subsequent merits hearing is necessary, the IJ will schedule it no later than 30 days after the initial merits hearing. *See* 8 CFR 1240.17(f)(4)(iii)(B). Finally, whenever practicable, the IJ shall issue an oral decision on the date of the final merits hearing or, if no such hearing is held, 30 days after the status conference. *See* 8 CFR 1240.17(f)(4)(iii)(A), (f)(5). If the IJ cannot issue a decision on that date, the IJ must issue an oral or written decision as soon as practicable and no later than 45 days after the applicable date described in the previous sentence. *See* 8 CFR 1240.17(f)(5).

Under the default timeline set forth in the IFR, at least 90 days is provided from the service of the NTA before the merits hearing for the noncitizen to secure counsel, obtain evidence, and otherwise prepare—in addition to the time the noncitizen had to secure counsel and obtain evidence leading up to the Asylum Merits interview. *See Matter of C–B–,* 25 I&N Dec. 888, 889 (BIA 2012) (holding that "the [IJ] must grant a reasonable and realistic period of time to provide a fair opportunity for a

---

circumstances do not raise the same concerns that animated the BIA's decision in *Matter of Fefe,* including because the cases covered by the IFR involve noncitizens who have already received a hearing on their asylum and protection claims before an asylum officer.

[37] In addition, as described below, under new 8 CFR 1240.17(h), a party may seek to have an extension of a filing deadline. For example, a party may seek to have a filing deadline extended if there is an unexpected delay in receipt of the evidence from a medical practitioner or other party.

noncitizen to seek, speak with, and retain counsel"). Moreover, as discussed below, 8 CFR 1240.17(h) contemplates continuances and filing extensions by request of the parties. The Departments believe these time frames, including the standards for continuances and extensions, ensure adequate time and protect procedural fairness while also meeting the Department's goal of creating efficient and streamlined proceedings. Unlike in ordinary section 240 removal proceedings, noncitizens in these streamlined section 240 proceedings will already have had an incentive and time to obtain representation prior to the commencement of immigration court proceedings. Similarly, noncitizens will not be appearing in immigration court on a totally blank slate; they will have had notice regarding what sort of evidence is needed and a prior opportunity to obtain any available evidence ahead of the Asylum Merits interview. In addition, where a noncitizen is placed in removal proceedings under the procedures in the IFR, the noncitizen will have already applied before USCIS for asylum, withholding of removal, and protection under the CAT, as relevant. The noncitizen will have had the opportunity to testify before, and submit evidence to, the asylum officer, and the asylum officer will have fully evaluated the noncitizen's eligibility for asylum, withholding of removal, and protection under the CAT. Moreover, any dependent would have also had the opportunity to testify before the asylum officer, and the asylum officer would have elicited testimony from the dependent for any independent basis for eligibility for asylum, withholding of removal, and protection under the CAT. The IJ will be provided with the record before USCIS, including the asylum officer's decision, the verbatim transcript of the Asylum Merits interview, and the evidence on which the asylum officer relied in reaching the decision. In the Departments' view, it is appropriate for cases under this IFR to proceed on an expedited time frame before the immigration courts as claims will have been significantly developed and analyzed before the proceedings start.

### 4. Continuances and Filing Extensions

The IFR establishes modified standards for continuances and filing extensions in streamlined section 240 proceedings. Generally, in immigration proceedings, a noncitizen may file a motion for continuance for good cause shown. *See* 8 CFR 1003.29. The regulations have incorporated this

"good cause" standard since 1987, *see* 8 CFR 3.27 (1987),[38] and substantial case law and agency guidance have elaborated on its meaning, *see, e.g., Matter of L–A–B–R–,* 27 I&N Dec. 405, 413–19 (A.G. 2018) (clarifying the framework for applying the "good cause" standard when a noncitizen requests a continuance to pursue collateral relief); *Matter of Hashmi,* 24 I&N Dec. 785, 790 (BIA 2009) (setting forth factors for consideration when determining whether there is good cause for a continuance so that a noncitizen may pursue adjustment of status before USCIS); *Matter of Garcia,* 16 I&N Dec. 653, 657 (BIA 1978) (holding that, in general, IJs should favorably exercise discretion to continue proceedings when a prima facie approvable visa petition and adjustment application are submitted); *Usubakunov* v. *Garland,* 16 F.4th 1299, 1305 (9th Cir. 2021) (holding that the denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to a violation of his statutory right to counsel). The Departments believe that good cause remains an appropriate standard for most continuances because it provides IJs with sufficient guidance and discretion to manage their cases both fairly and efficiently, and the IFR adopts this standard as the default for continuance requests by noncitizens in streamlined section 240 proceedings, subject to certain restrictions described below.

Specifically, the IFR imposes limits on the length of continuances that may be granted for good cause. First, no individual continuance for good cause may exceed 10 days unless the IJ determines that a longer continuance would be more efficient. *See* 8 CFR 1240.17(h)(2)(i). This will ensure that continuances do not delay proceedings unnecessarily, either by being too long or too short. The Departments recognize that, on occasion, it may be appropriate and more efficient to grant one lengthier continuance to achieve its intended

---

[38] *See also* Aliens and Nationality; Rules of Procedure for Proceedings Before Immigration Judges, 52 FR 2931, 2934, 2938 (Jan. 29, 1987) (final rule). The regulation at 8 CFR 3.27 has been redesignated twice—first to 8 CFR 3.29, second to its current location at 8 CFR 1003.29—without amending the regulatory text. *See* Executive Office for Immigration Review; Rules of Procedures, 57 FR 11568, 11569 (Apr. 6, 1992) (interim rule); Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 FR 9824, 9830 (Feb. 28, 2003) (final rule). The regulatory text was recently amended by "Procedures for Asylum and Withholding of Removal," 85 FR 81698, 81699, 81750 (Dec. 16, 2020) (final rule), but that rule has been preliminarily enjoined, *see* Order at 1, *Nat'l Immigrant Justice Ctr.* v. *EOIR,* No. 21–cv–56 (D.D.C. Jan. 14, 2021).

purpose—for example, to gather evidence that will take time to obtain or to secure the availability of a witness—such that it would not be necessary to grant further continuances at the time that the proceedings are scheduled to reconvene. *Cf. Meza Morales* v. *Barr,* 973 F.3d 656, 665 (7th Cir. 2020) (Barrett, J.) (" '[T]imeliness' is not a hard and fast deadline; some cases are more complex and simply take longer to resolve. Thus, not all mechanisms that lengthen the proceedings of a case prevent 'timely' resolution. That is presumably why nobody appears to think that continuances conflict with the regulation's timeliness requirement."). Thus, this IFR provides IJs with sufficient flexibility to grant continuances for good cause to ensure fairness of proceedings while appropriately balancing efficiency considerations.

Second, the IFR also establishes two modified continuance procedures that govern in specific factual circumstances unique to streamlined section 240 removal proceedings. The Departments believe that the IFR's streamlined section 240 proceedings warrant modified standards for continuances under certain conditions because the IFR's streamlined 240 proceedings occur after noncitizens have had a nonadversarial hearing before an asylum officer and have had a chance to present their claims for asylum and protection from removal. Additionally, the Departments have a considerable interest in developing an efficient process to fully and fairly adjudicate the claims of those noncitizens who were initially screened for expedited removal but have demonstrated a credible fear of persecution or torture. As noted in the NPRM, section 235 of the Act, 8 U.S.C. 1225, developed a system that "was initially designed for protection claims to be the exception, not the rule, among those encountered at or near the border." 86 FR 46909. Accordingly, the IFR's imposition of modified requirements for continuances in streamlined section 240 removal proceedings is in keeping with the NPRM's purpose to develop more fair and efficient processes to adjudicate the claims of individuals encountered at or near the border and found to have a credible fear of persecution or torture.

Specifically, the IFR provides that IJs should apply the "good cause" standard only where the aggregate length of all continuances and extensions requested by the noncitizen does not cause a merits hearing to take place more than 90 days after the master calendar hearing. 8 CFR 1240.17(h)(2)(i). The IFR then implements different criteria based

on the length of the resulting delay for deciding requests for continuances and extensions by the noncitizen that would cause a merits hearing to occur more than 90 days after the master calendar hearing. *See* 8 CFR 1240.17(h)(2)(ii)–(iii).

Where a noncitizen-requested continuance or filing extension would cause a merits hearing to take place between 91 and 135 days after the master calendar hearing, an IJ should grant a continuance or filing extension if the noncitizen demonstrates that it is necessary to ensure a fair proceeding and the need for it exists despite the noncitizen's exercise of due diligence. *See* 8 CFR 1240.17(h)(2)(ii). The length of continuances and extensions under this provision are, as a matter of procedure, limited to the time necessary to ensure a fair proceeding. *See id.*

Next, should the noncitizen request any continuances or filing extensions that would cause a merits hearing to take place more than 135 days after the master calendar hearing, the noncitizen must demonstrate that failure to grant the continuance or extension would be contrary to statute or the Constitution. 8 CFR 1240.17(h)(2)(iii).

Noncitizens in removal proceedings have the "right to a full and fair hearing," *Arrey* v. *Barr,* 916 F.3d 1149, 1157 (9th Cir. 2019) (collecting cases), which "derives from the Due Process Clause of the Fifth Amendment," *Cinapian* v. *Holder,* 567 F.3d 1067, 1074 (9th Cir. 2009); *see also Matter of Sibrun,* 18 I&N Dec. 354, 356 (BIA 1983) ("It should be emphasized that the full panoply of procedural protections . . . are not mandated for [noncitizens] in these civil, administrative proceedings . . . . All that is required here is that the hearing be fundamentally fair." (citations omitted)). A full and fair hearing, "at a minimum, includes a reasonable opportunity to present and rebut evidence and to cross-examine witnesses." *Grigoryan* v. *Barr,* 959 F.3d 1233, 1240 (9th Cir. 2020) (citing *Cinapian,* 567 F.3d at 1074 (citing, in turn, section 240(b)(4)(B) of the Act, 8 U.S.C. 1229a(b)(4)(B))). When adjudicating continuance and extension requests pursuant to the IFR's heightened standards, IJs should consider whether the request is related to the noncitizen's ability to reasonably present his or her case or implicates any of the rights found at section 240(b)(4)(B) of the Act, 8 U.S.C. 1229a(b)(4)(B). Thus, continuance requests to present testimony and evidence, to rebut evidence, or to cross-examine witnesses may meet the standards set forth in new 8 CFR 1240.17(h)(2)(ii) and (iii).[39]

In addition to the foregoing, the Departments emphasize that the Act provides noncitizens in section 240 removal proceedings with the right to representation at no Government expense, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A), and that the noncitizen must be provided a reasonable opportunity to obtain counsel. *See Matter of C–B–,* 25 I&N Dec. 888, 889 (BIA 2012) ("In order to meaningfully effectuate the statutory and regulatory privilege of legal representation where it has not been expressly waived by a noncitizen, the Immigration Judge must grant a reasonable and realistic period of time to provide a fair opportunity for the noncitizen to seek, speak with, and retain counsel."). Federal courts have strictly reviewed IJ decisions to deny continuances for seeking counsel or take other actions that may impinge that right in proceedings. *See, e.g., Usubakunov,* 16 F.4th at 1305 (holding that the denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to violation of his statutory right to counsel); *see also Leslie* v. *Att'y Gen. of U.S.,* 611 F.3d 171, 180–81 (3d Cir. 2010) (The "statutory and regulatory right to counsel is also derivative of the due process right to a fundamentally fair hearing."); *Hernandez Lara* v. *Barr,* 962 F. 3d 45, 54 (1st Cir. 2021) ("The statutory right to counsel is a fundamental procedural protection worthy of particular vigilance."). Accordingly, a continuance to seek representation would be sufficient to qualify for the heightened continuance standards in these streamlined 240 proceedings if denial would violate a noncitizen's right to representation or another statutory or constitutional right.[40]

The Departments emphasize that the time periods that determine the relevant continuance standard do not begin to run until the day after the master calendar hearing, at which the IJ will advise noncitizens of their rights in the streamlined section 240 proceedings, including their right to representation, at no expense to the Government, and of the availability of pro bono legal services, and will ascertain that noncitizens have received a list of such pro bono legal service providers. 8 CFR 1240.17(f)(1) (citing 8 CFR 1240.10(a)); *see* INA 240(b)(4), 8 U.S.C. 1229a(b)(4). Furthermore, these calculations only pertain to delay of hearings and deadlines specifically included in this regulation, namely, the status conference hearing or a merits hearing and any filing deadline that, if extended, would have the effect of delaying a hearing. Any continuances with respect to interim hearings or deadlines that may be set by the IJ do not impact determination of the continuance standard that applies in this section.[41] Continuances or filing extensions granted due to exigent circumstances, such as court closures or

---

[39] The Departments note, however, that the decision to grant or deny a continuance or extension will depend on the individual facts and circumstances present in each case. *See, e.g., De Ren Zhang* v. *Barr,* 767 F. App'x 101, 104–05 (2d Cir. 2019) [collecting cases in which the Second Circuit upheld an IJ's denial of a continuance where a noncitizen "had already received multiple continuances, or had a significant amount of time in which to gather and submit evidence" but, under the particular circumstances of that case, concluding that the IJ's denial of a continuance was an abuse of the IJ's discretion); *Bondarenko* v. *Holder,* 733 F.3d 899, 906–08 (9th Cir. 2013) (holding that the denial of the noncitizen's request for a continuance to investigate the Government's forensic report was a violation of the noncitizen's right to due process); *Cruz Rendon* v. *Holder,* 603 F.3d 1104, 1111 (9th Cir. 2010) (determining that "the denial of the requested continuance" to obtain evidence that bore directly on the noncitizen's eligibility for relief, "in conjunction with the limitations placed upon her testimony, prevented [the noncitizen] from fully and fairly presenting her case").

[40] This does not mean that a request for a continuance to seek counsel can never be denied. *See Usubakunov,* 16 F.4th at 1304 ("We recognize that immigration courts bear a crushing caseload and an applicant cannot unreasonably delay the administrative process, which has various component parts and must be managed efficiently by the IJ."); *see also Arrey,* 916 F.3d at 1158 (explaining that a noncitizen "is not denied the right to counsel where continuing the hearing would have been futile or where the IJ had done everything he reasonably could to permit [the noncitizen] to obtain counsel" (quotation marks and citation omitted)). Such determinations are made on a case-by-case basis. *See Biwot* v. *Gonzales,* 403 F.3d 1094, 1099 (9th Cir. 2005) ("The inquiry is fact-specific and thus varies from case to case. We pay particular attention to the realistic time necessary to obtain counsel; the time frame of the requests for counsel; the number of continuances; any barriers that frustrated a [noncitizen's] efforts to obtain counsel, such as being incarcerated or an inability to speak English; and whether the [noncitizen] appears to be delaying in bad faith."); *see also Gonzalez-Veliz* v. *Garland,* 996 F.3d 942, 949 (9th Cir. 2021) (comparing cases granting and denying requests for continuances to seek counsel).

[41] In other words, the IJ would determine the appropriate standard to consider when reviewing a noncitizen's request for a continuance by considering how much the continuance would shift the merits hearing. For example, the IJ would apply the "good cause" standard under 8 CFR 1240.17(h)(2)(i) if a noncitizen requests an initial continuance of the status conference for 10 days, which would in turn cause the merits hearing to be delayed by 10 days (because the merits hearing will occur 30–35 days after the status conference). However, if the noncitizen later requests further continuances that would cause the status conference to occur later than day 60, and in turn would cause the merits hearing to occur later than day 90, the IJ would apply the heightened continuance standard under 8 CFR 1240.17(h)(2)(ii).

illness of a party, will not count against the aggregate limits on continuances, as further explained below and as set forth at new 8 CFR 1240.17(h)(4).

The Departments have also contemplated DHS's need for continuances and provided for them in appropriate situations. The IJ may grant DHS a continuance and extend filing deadlines based on significant Government need, as set forth at new 8 CFR 1240.17(h)(3). The Departments anticipate that significant Government need will only arise in exceptional cases. The IFR provides a nonexclusive list of examples of significant Government needs, including "confirming domestic or foreign law enforcement interest in the respondent" and "conducting forensic analysis of documents submitted in support of a relief application or other fraud-related investigations." 8 CFR 1240.17(h)(3). The Departments believe that requiring DHS to demonstrate a significant Government need for a continuance serves efficiency interests without undermining DHS's opportunity to present its case. First, DHS inherently possesses the subject-matter expertise to navigate section 240 proceedings in general and does not face the same obstacles as do noncitizens in exploring and securing competent representation. Second, noncitizens, not DHS, bear the burden of proof throughout the majority of streamlined section 240 proceedings. Of particular relevance, noncitizens generally bear the burden of demonstrating eligibility for protection-based relief. *See, e.g.,* INA 208(b)(1)(B), 8 U.S.C. 1158(b)(1)(B). Third, DHS does not face the same issues with respect to access to counsel, especially when taking into consideration the likelihood that some noncitizens will be detained during the course of proceedings. IJs must be able to take such factors under consideration when considering continuance requests made by noncitizens, but they are not relevant to such requests made by DHS.

In addition, these timelines and standards do not apply to an IJ's ability to continue a case, extend a filing deadline, or adjourn a hearing due to exigent circumstances, such as the unavailability of the IJ, the parties, or counsel due to illness, or the closure of the immigration court. *See* 8 CFR 1240.17(h)(4). Such continuances must be limited to the shortest time necessary and each must be justified. *See id.* The Departments recognize the magnitude and weight of asylum claims, and the importance of ensuring that asylum procedures do not undermine the fairness of proceedings. *See Quintero,* 998 F.3d at 632 ("[N]eedless to say,

these cases *per se* implicate extremely weighty interests in life and liberty, as they involve individuals seeking protection from persecution, torture, or even death."); *Xue* v. *BIA,* 439 F.3d 111, 113–14 (2d Cir. 2006) ("We should not forget, after all, what is at stake. For each time we wrongly deny a meritorious asylum [or withholding] application, . . . we risk condemning an individual to persecution. Whether the danger is of religious discrimination, extrajudicial punishment, forced abortion or involuntary sterilization, physical torture or banishment, we must always remember the toll that is paid if and when we err."); *Matter of O–M–O–,* 28 I&N Dec. 191, 197 (BIA 2021) ("The immigration court system has no more solemn duty than to provide refuge to those facing persecution or torture in their home countries, consistent with the immigration laws."). The Departments believe that this rule strikes the appropriate balance by providing noncitizens with a full and fair opportunity to present their claims—first before USCIS and then, if necessary, in streamlined section 240 removal proceedings—while ensuring that such claims are adjudicated in a timely and efficient manner.

5. Consideration of Statutory Withholding of Removal and CAT Protection

The NPRM proposed that, where USCIS denied asylum, IJs would reconsider the entire USCIS Asylum Merits record de novo, including grants of statutory withholding of removal and protection under the CAT. *See, e.g.,* 86 FR 46946 (8 CFR 1003.48(a) (proposed)). Upon further review, including the review of comments as discussed further below, the Departments have determined that IJs should generally give effect to an asylum officer's determination that a noncitizen is eligible for statutory withholding of removal or protection under the CAT subject to certain exceptions.

Specifically, under new 8 CFR 1240.17(i)(1), if an asylum officer finds that the noncitizen is not eligible for asylum or other protection sought, IJs will adjudicate de novo all aspects of a noncitizen's application, including the noncitizen's eligibility for asylum and, if necessary, statutory withholding of removal or protection under the CAT. However, if an asylum officer does not grant asylum but finds that a noncitizen is eligible for statutory withholding of removal or protection under the CAT, the noncitizen has two options.

First, the noncitizen may indicate that the noncitizen does not intend to contest removal or seek protection(s) for

which the asylum officer did not find the noncitizen eligible, as described at new 8 CFR 1240.17(f)(2)(i)(B). In that case, unless DHS makes a prima facie showing, through evidence that specifically pertains to the noncitizen and was not in the record of proceedings for the USCIS Asylum Merits interview, that the noncitizen is not eligible for such protection(s), the IJ will issue the removal order and give effect to any protection for which the asylum officer found the noncitizen eligible, and no further proceedings will be held.[42]

Second, and alternatively, the noncitizen may contest the asylum officer's decision to not grant asylum, in which case the IJ will adjudicate de novo the noncitizen's application for asylum. *See* 8 CFR 1240.17(i)(2). If the IJ subsequently denies asylum, then the IJ will enter an order of removal and give effect to the protections for which the asylum officer deemed the noncitizen eligible, unless DHS demonstrates through evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. *See id.*[43]

---

[42] In addition, at 8 CFR 1240.17(d), the IFR provides that a noncitizen who fails to appear and who is ordered removed in absentia under section 240(b)(5)(A) of the INA, 8 U.S.C. 1229a(b)(5)(A), will still receive the benefit of any protections from removal for which the asylum officer found that the noncitizen was eligible unless DHS makes a prima facie showing through evidence that specifically pertains to the noncitizen and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. Where USCIS has determined that an applicant is eligible for statutory withholding of removal or protection under the CAT, the United States would risk violating its nonrefoulement obligations by nonetheless removing the noncitizen to the country in which they more likely than not would be subject to persecution or torture due to the failure to appear. That would particularly be so if the noncitizen's failure to attend the hearing were due to misunderstanding, confusion, or a belief that no further steps were necessary to preserve the noncitizen's eligibility for statutory withholding of removal or protection under the CAT.

[43] The Departments emphasize that the evidence or testimony relied upon by DHS to demonstrate that the noncitizen is not eligible for withholding of removal or protection under the CAT must be evidence or testimony not considered by the asylum officer that pertains specifically to the noncitizen and establishes that the noncitizen is not eligible. For example, DHS could submit information that arose from background checks conducted after the asylum officer interview, but DHS cannot point to a statement by the noncitizen in the Form I–213, Record of Deportable/Inadmissible Alien. The evidence or testimony must demonstrate the noncitizen's ineligibility for the protection that the asylum officer determined the noncitizen was eligible for. The IJ's decision must be based on such new evidence or testimony; the IJ may not

Continued

The Departments have determined that these changes are advisable for several reasons. First, after reviewing comments, the Departments have declined to adopt certain provisions proposed in the NPRM and instead have set forth that after an asylum officer does not grant asylum, an individual will be automatically referred to streamlined section 240 removal proceedings. Automatic referral to streamlined section 240 proceedings means that every noncitizen whose application is not approved by the asylum officer will have the opportunity to have their case reviewed by the IJ, without first affirmatively requesting review. During streamlined 240 proceedings, the noncitizen may elect to have the IJ adjudicate de novo the noncitizen's asylum application, and any protection claim for which the asylum officer found the noncitizen ineligible. At the same time, the rule recognizes that an asylum officer's determination that a noncitizen is eligible for protection should generally be given effect in the interest of efficiency and to ensure that the noncitizen is not returned to a country where an immigration official has already determined that the noncitizen may be persecuted or tortured.

It is appropriate for USCIS to make eligibility determinations for statutory withholding of removal and protection under the CAT. As a threshold issue, applications for asylum, statutory withholding of removal, and protection under the CAT are all factually linked. While the legal standards and requirements differ among the forms of relief and protection, the relevant applications will substantially share the same set of operative facts that an asylum officer would have already elicited, including through evidence and testimony, in the nonadversarial proceeding. Moreover, asylum officers receive extensive training, and develop extensive expertise, in assessing claims and country conditions and are qualified to determine whether an applicant will face harm in the proposed country. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b). Asylum officers also receive training on standards and eligibility issues related to determinations for statutory withholding of removal and CAT protection in order to conduct credible fear screening interviews and make appropriate credible fear determinations under 8 CFR 208.30(e). *See* 8 CFR

208.1(b). Finally, statutory withholding of removal and protection under the CAT are nondiscretionary forms of protection, the granting of which is mandatory upon a showing of eligibility. *See, e.g., Myrie,* 855 F.3d at 515–16; *Benitez Ramos,* 589 F.3d at 431. Because the asylum officer does not issue an order of removal under the IFR, it is appropriate to wait until the IJ enters the order of removal before giving effect to USCIS's statutory withholding of removal and CAT protection eligibility determinations. *See Matter of I–S– & C–S–,* 24 I&N Dec. at 433.

Thus, this IFR recognizes that applications for discretionary and mandatory forms of protection will be reviewed by IJs. However, determinations that a noncitizen is eligible for a mandatory form of protection will be given effect by the IJs, unless DHS demonstrates, through new evidence specifically pertaining to the noncitizen, that the noncitizen is not eligible for such protection.

Considering the comments received on the NPRM, the Departments recognize that this procedure is an intermediate approach between the NPRM and the commenters' suggestions described below in Section IV.D.6 of this preamble. Whereas the NPRM would have allowed the IJ to sua sponte review the asylum officer's statutory withholding and CAT determinations, the IFR instead places the burden on DHS to demonstrate, with new evidence specific to the noncitizen, that the noncitizen is not eligible for such protections. The Departments have determined that this process is most efficient, given that there may be particular instances, such as evidence of fraud or criminal activity, where overturning the asylum officer's eligibility determination is justified. If the Departments provided no mechanism in these streamlined section 240 removal proceedings through which the asylum officer's eligibility determinations could be overturned, DHS would have to follow the procedures set forth in 8 CFR 208.17(d) and 208.24(f) in instances where overturning the asylum officer's eligibility determinations is justified. Providing an exception where DHS demonstrates that evidence or testimony specifically pertaining to the noncitizen and not in the record of proceedings for the USCIS Asylum Merits interview establishes that the noncitizen is not eligible is substantially more efficient, consistent with the overall aims of this IFR.

6. Exceptions to Streamlined Procedures

The IFR provides specific exceptions that will allow certain noncitizens or situations to be exempted from these streamlined procedures and timelines despite originating in the expedited removal process and being referred to immigration court following an asylum officer's initial adjudication. *See* 8 CFR 1240.17(k). These exceptions ensure procedural fairness because not all cases that might otherwise be placed in streamlined section 240 removal proceedings would in fact be suitable for the expedited timeline.

At new 8 CFR 1240.17(k)(3), the IFR provides an exception to the expedited timeline if the noncitizen has raised a substantial challenge to the charge that the noncitizen is subject to removal— *e.g.,* if the noncitizen has a claim to U.S. citizenship or the charge that the noncitizen is subject to removal is not supported by the record—and that challenge cannot be resolved simultaneously with the noncitizen's applications for asylum, statutory withholding of removal, or withholding or deferral of removal under the CAT.

Because the IFR places noncitizens into section 240 proceedings, the noncitizen can affirmatively elect to apply for a wide range of relief in addition to asylum, statutory withholding of removal, and protection under the CAT. *See, e.g.,* 8 CFR 1240.1(a)(1)(ii) (providing IJs with the authority to adjudicate a wide range of applications for relief); 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing . . . ."). The IFR therefore provides an exception to the timeline if the noncitizen produces evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, withholding or deferral of removal under the CAT, or voluntary departure, and is seeking to apply for, or has applied for, such relief or protection. *See* 8 CFR 1240.17(k)(2). For example, a noncitizen who also is eligible to seek adjustment of status under section 245 of the Act, 8 U.S.C. 1255, could provide the IJ with proof of prima facie eligibility and a copy of the submitted Form I–130, Petition for Alien Relative, and upon receipt of such evidence, the timeline in 8 CFR 1240.17(f)–(h) would not apply.[44] Testimonial evidence, and

---

reconsider the asylum officer's determination or deny eligibility based merely on disagreement with the asylum officer's conclusions or evaluation of the record before the asylum officer.

[44] Although a submitted visa petition demonstrating prima facie eligibility for relief would be an optimal way to demonstrate

out-of-court written statements, could also be considered by immigration judges as evidence of prima facie eligibility for relief. The Departments believe this exception from the timeline is appropriate to allow effective adjudication of the new relief being sought because the IJ will not have the benefit of an already developed record regarding those forms of relief, which the IJ will have for the noncitizen's application for asylum or other protection.[45]

Similarly, the IFR provides an exception where the IJ finds the noncitizen subject to removal to a different country or countries in which the noncitizen claimed a fear of persecution and torture before the asylum officer, and the noncitizen claims a fear of persecution or torture with respect to that alternative country. *See* 8 CFR 1240.17(k)(4). The Departments similarly believe the IFR's timeline should not apply in these circumstances because the record would need to be developed without the benefit of previous adjudication.

The Departments have also considered the effect of the streamlined 240 proceedings on vulnerable populations. To ensure procedural fairness, the Departments will exempt the following categories of noncitizens from these procedures: Noncitizens under the age of 18 on the date the NTA was issued, except noncitizens in section 240 proceedings with an adult family member, 8 CFR 1240.17(k)(1); and noncitizens who have exhibited indicia of mental incompetency, 8 CFR 1240.17(k)(6).

Finally, the expedited timeline does not apply to cases that have been reopened or remanded following the IJ's order. 8 CFR 1240.17(k)(5). Reopened and remanded cases may present unique

---

[45] The Departments also note that this shift from the NPRM to streamlined section 240 removal proceedings addresses comments that the NPRM would have improperly burdened noncitizens by requiring them to file motions to vacate their removal orders and by limiting noncitizens to only one such motion. Further, by placing noncitizens into streamlined 240 proceedings—thereby allowing them to seek various forms of relief or protection for which they may be eligible—the IFR also addresses comments that the NPRM would have authorized the IJs to exercise discretion over whether to allow the respondent to apply for additional forms of relief or protection.

issues that are outside of the scope of these streamlined 240 proceedings.

*E. Other Amendments Related to Credible Fear*

In addition to the new procedures at 8 CFR 1240.17, this IFR amends 8 CFR 1003.42, 1208.2, 1208.3, 1208.4, 1208.5, 1208.14, 1208.16, 1208.18, 1208.19, 1208.22, 1208.30, and 1235.6. Except for the amendments at 8 CFR 1003.42, the Departments proposed amendments to all of these sections in the NPRM in order to: (1) Effectuate the reestablishment of the ''significant possibility'' standard in credible fear review proceedings before EOIR; (2) ensure that IJs, like asylum officers, do not apply the mandatory bars at the credible fear screening process; and (3) ensure that the provisions providing for the USCIS Asylum Merits process are accurately reflected in EOIR's regulations where relevant, including confirmation that the written record of the positive credible fear determination will count as an asylum application. The IFR adopts these same changes with limited technical amendments where necessary to accord with the streamlined section 240 proceedings under new 8 CFR 1240.17.

The Departments also include amendments to 8 CFR 1003.42(d)(1) in this IFR. Although these amendments were not included in the NPRM, they are direct corollaries of the NPRM's proposed amendments and are necessary to ensure consistency, both internally within DOJ's regulatory provisions and more broadly between DHS's and DOJ's regulations. Specifically, the IFR amends 8 CFR 1003.42(d)(1) to ensure consistency with the revisions to 8 CFR 208.30(e) related to credible fear screening standards and treatment of mandatory bars in the credible fear screening process and with the revisions to 8 CFR 1208.30(g)(2) so that both provisions properly direct that when an IJ vacates a negative credible fear finding, the IJ will refer the case back to USCIS as intended by the NPRM and the IFR.

*F. Parole*

This rule amends the DHS regulations governing the circumstances in which parole may be considered for individuals who are being processed under the expedited removal provisions of INA 235(b)(1), 8 U.S.C. 1225(b)(1). Expedited removal is a procedure that applies when an immigration officer ''determines'' that a noncitizen ''arriving in the United States,'' or a noncitizen covered by a designation who has not been admitted or paroled into the United States, is inadmissible under

either INA 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C) (fraud or misrepresentation), or INA 212(a)(7), 8 U.S.C. 1182(a)(7) (lack of proper documents), and further determines that the noncitizen should be placed in expedited removal. INA 235(b)(1)(A)(i), (iii), 8 U.S.C. 1225(b)(1)(A)(i), (iii). Other noncitizens who are applicants for admission—and whom an immigration officer determines are not clearly and beyond a doubt entitled to be admitted—generally are referred for ordinary removal proceedings under INA 240, 8 U.S.C. 1229a. *See* INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A).

The statute generally provides for the detention of noncitizens subject to expedited removal pending a final credible fear determination and, if no such fear is found, until removed. *See* INA 235(b)(1)(B)(iii)(IV), 8 U.S.C. 1225(b)(1)(B)(iii)(IV) (noncitizens in the expedited removal process ''shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed''). The statute, likewise, provides that noncitizens determined to have a credible fear ''shall be detained for further consideration of the application for asylum.'' INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). Congress has, however, expressly granted DHS the authority to release any applicant for admission from detention via parole ''on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). This includes DHS's authority to parole noncitizens detained under section 235 of the Act, 8 U.S.C. 1225. *See Jennings* v. *Rodriguez,* 138 S. Ct. 830, 837, 844 (2018).

The NPRM proposed to replace the current narrow parole standard with a standard that would permit parole ''only when DHS determines, in the exercise of discretion, that parole is required to meet a medical emergency, for a legitimate law enforcement objective, or because detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities).'' 86 FR 46946 (8 CFR 235.3(b)(2)(iii) (proposed)); *see id.* at 46913–14. Having considered all comments received on this issue, DHS has determined that the current narrow standard should be replaced not with the standard proposed in the NPRM but with the longstanding parole standard applicable in other circumstances and described in 8 CFR 212.5(b), with which DHS officers and agents have substantial experience. That provision describes

IFR_AR_000763

five categories of certain noncitizens detained under 8 U.S.C. 1225(b) who may meet the parole standard of INA 212(d)(5), 8 U.S.C. 1182(d)(5), provided they present neither a security risk nor a risk of absconding: (1) Noncitizens who have serious medical conditions such that continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) noncitizens who will be witnesses in proceedings conducted by judicial, administrative, or legislative bodies in the United States; and (5) noncitizens whose continued detention is not in the public interest. *See* 8 CFR 212.5(b)(1)–(5). Consistent with the statute and the regulation, DHS will consider noncitizens covered by this rule for parole under this standard pending their credible fear interview "only on a case-by-case basis," 8 CFR 212.5(b), and may impose reasonable conditions on parole (including, for example, periodic reporting to ICE) to ensure that the noncitizen will appear at all hearings and for removal from the United States if required to do so, 8 CFR 212.5(c)–(d); *see* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

For purposes of making these case-by-case determinations concerning parole of noncitizens pending a credible fear interview, the Secretary recognizes that, in circumstances where DHS has determined that the continued detention of a noncitizen who has been found not to be a flight risk or a danger to the community is not in the public interest, the release of that noncitizen on parole may serve "urgent humanitarian reasons" or achieve "significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(b)(5).

The INA does not define these ambiguous terms, leaving them to the agency's reasonable construction.[46] In implementing the statutory parole authority, DHS and the former INS have long interpreted the statute to permit parole of noncitizens whose continued detention is not in the public interest as determined by specific agency officials. Specifically, prior to the 1996 amendment to the INA that provided for parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104–208, div. C, tit. VI, subtit. A, sec. 602, 110 Stat. 3009, 3009–689, the former INS had paroled individuals "whose continued detention" was "not in the public interest," 8 CFR 212.5(b)(5) (1995); *see* Detention and Parole of Inadmissible Aliens; Interim Rule With Request for Comments, 47 FR 30044, 30045 (July 9, 1982) (interim rule). After the 1996 amendment, the agency incorporated the new "case-by-case" requirement into its regulation, while also providing, similar to prior regulatory authority, that parole of certain noncitizens, including those who pose neither a security risk nor a risk of absconding and whose "continued detention" would generally be justified for "significant public benefit" or "urgent humanitarian reasons," consistent with the 1996 statutory amendment. 62 FR 10348; *see id.* at 10313.

Nothing in INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), prohibits DHS from considering its resources and detention capacity when it determines, on a case-by-case basis, whether the parole of a noncitizen otherwise subject to detention under INA 235(b), 8 U.S.C. 1225(b), would have a significant public benefit or would advance urgent humanitarian reasons.[47] Rather, consistent with the statute, 8 CFR 212.5, and longstanding practice, DHS may take into account the important prerogative for it to use its detention resources for other individuals whose detention is in the public interest, including because of public safety or national security reasons. As has been the case for decades, DHS views detention as not being in the public interest where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular noncitizen would limit the agency's ability to detain other noncitizens whose release may pose a greater risk of flight or danger to the community.[48] With regard to noncitizens detained pending a credible fear interview, whose inadmissibility was still being considered, or who had been ordered removed in expedited removal proceedings, the former INS, in a 1997 rule, restricted the regulatory authority for release on parole to where parole is required for a "medical emergency" or "a legitimate law enforcement objective." 8 CFR 235.3(b)(2)(iii), (b)(4)(ii) (current); *see* 62 FR 10356. As the NPRM explained, this current narrow standard effectively prevents DHS from placing into expedited removal many noncitizens who would otherwise be eligible for this process, especially families, given the practical constraints and the legal limits of the *Flores* Settlement Agreement ("FSA").[49] *See* 86 FR 46910. These restrictions on DHS's ability to detain families in significant numbers and for an appreciable length of time, coupled with capacity constraints imposed by the COVID–19 pandemic, have effectively prevented the Government from processing more than a very limited number of families under expedited removal. Amending the regulation by which the former INS previously constrained itself (and now DHS) to considering parole for noncitizens in the expedited removal process far more narrowly than what the statute authorizes will advance the significant public benefit of allowing DHS to place more eligible noncitizens, particularly noncitizen families, in

---

[46] *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if agency's reading differs from what the court believes is the best statutory interpretation." (citing *Chevron*, 467 U.S. at 843–44)); *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 515 (9th Cir. 2012) (en banc) ("We defer to an agency not because it is better situated to interpret statutes, but because we have determined that Congress created gaps in the statutory scheme that cannot be filled through interpretation alone, but require the exercise of policymaking judgment." (citing *Chevron*, 467 U.S. at 865)); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of 8 CFR 212.5).

[47] *See, e.g., New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D. N.M. 2020) ("This vague ['significant public benefit'] standard [in INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A)] conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers . . . .").

[48] *See, e.g.,* ICE, *Interim Guidance for Implementation of* Matter of M–S–, *27 I&N Dec. 509 (A.G. 2019) During the Stay of the Modified Nationwide Preliminary Injunction in Padilla v. ICE, No. 18–298, 2019 WL 2766720 (W.D. Wash. July 2, 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture* (July 15, 2019); *Memorandum from DHS Secretary John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvement Policies 3 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf; Memorandum from Gene McNary, INS Commissioner, Parole Project for Asylum Seekers at Ports of Entry and INS Detention 1* (Apr. 20, 1992).

[49] Stipulated Settlement Agreement, *Flores v. Reno,* No. 85–cv–4544 (C.D. Cal. Jan. 17, 1997); *see also* 86 FR 46910 & n.27 (describing the FSA). The FSA provides for a general policy favoring release of minors and requires the expeditious transfer of minors who are not released from custody, including minors accompanied by their parents or legal guardians, to a non-secure, state-licensed program. *See* FSA ¶¶ 6, 12, 14, 19. When the former ICE family residential centers were operational, the court determined that such facilities were secure, unlicensed facilities; therefore, DHS generally released noncitizen children detained during their immigration proceedings within 20 days. *See Flores v. Sessions,* 394 F. Supp. 3d 1041, 1070–71 (C.D. Cal. 2017).

expedited removal proceedings, rather than processing them through lengthy and backlogged ordinary section 240 removal proceedings.

This approach will allow DHS to more efficiently obtain orders of removal for families who do not raise a fear claim or who are found not to possess a credible fear, thereby facilitating their expeditious removal without the need for lengthy immigration court proceedings, and will allow other families to have their fear claims adjudicated in a more timely manner. Accordingly, the flexibility of the 8 CFR 212.5(b) standard—subject, of course, to the limitations on the parole authority contained in INA 212(d)(5), 8 U.S.C. 1182(d)(5)—will allow DHS to achieve the significant public benefits of more effectively utilizing the expedited removal authority in response to changing circumstances and promoting border security. DHS expects that expedited removal of families who do not make a fear claim, or who are determined not to have a credible fear of persecution or torture, will reduce the incentives for abuse by those who will not qualify for protection and smugglers who exploit the processing delays that result from ordinary removal backlogs.

Finally, the contours of the category of noncitizens "whose continued detention is not in the public interest," 8 CFR 212.5(b)(5), have been developed through directives and guidance. For example, in 2009 ICE issued guidance stating that "when an arriving alien found to have a credible fear establishes to the satisfaction of [ICE Detention and Removal Operations (DRO)] his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described [later in the directive]), parole the alien on the basis that his or her continued detention is not in the public interest." ICE Policy No. 11002.1 ¶ 6.2, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009), *https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.* DHS intends to use further directives and guidance to apply the parole standard to noncitizens in expedited removal pending a credible fear interview. DHS emphasizes that any such directives or guidance will account for the fact that there are important and relevant differences between the population of noncitizens who have received a positive credible fear determination and the population of noncitizens in expedited removal who have not received a credible fear determination, including the expected length of time before such an individual

may be ordered removed and considerations relevant to assessing flight risk.

*G. Putative Reliance Interests*

In responses to comments below, the Departments have addressed the reliance interests in the status quo asserted by commenters. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (requiring agencies to consider "serious reliance interests" when changing policies); *see also Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 222 (2016) (referring to "significant" and "serious" reliance interests (quotation marks omitted)). The governmental commenters do not appear to have identified any reliance interests. Although some commenters identified what they believed would be burdens on or injuries to State, county, and local governments as a result of the proposed rule—claims that are addressed in the Departments' responses to comments—none clearly identified any significant reliance interests in the current state of affairs.

The Departments perceive no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions the NPRM implicated or that are affected by this IFR. Even if such reliance interests exist, the Departments would nevertheless promulgate this regulation for the reasons stated in this rule.

**IV. Response to Public Comments on the Proposed Rule**

*A. Summary of Public Comments*

In response to the proposed rule, the Departments received 5,235 comments during the 60-day public comment period. Approximately 1,347 of the comments were letters submitted through mass mailing campaigns, and 3,790 comments were unique submissions. Primarily, individuals and anonymous entities submitted comments, as did multiple State Attorneys General, legal service providers, advocacy groups, attorneys, religious and community organizations, elected officials, and research and educational institutions, among others.

Comments received during the 60-day comment period are organized by topic below. The Departments reviewed the public comments received in response to the proposed rule and address relevant comments in this IFR, grouped by subject area. The Departments do not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the changes to made by this rule. This IFR

does not resolve issues outside the scope of this rulemaking. A brief summary of comments the Departments deemed to be out of scope or unrelated to this rulemaking, making a substantive response unnecessary, is provided at the end of the section. Comments may be reviewed at *https://www.regulations.gov,* docket number USCIS–2021–0012.

Following careful consideration of public comments received, the Departments in this IFR have made modifications to the regulatory text proposed in the NPRM. The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to those regulatory amendments, except where a new or supplemental rationale is reflected in this IFR. As a general matter, the Departments believe that the IFR addresses concerns expressed by a majority of those who commented on the NPRM's proposed IJ review procedure by establishing that when the asylum officer denies a noncitizen's application for asylum, that noncitizen will be placed into streamlined section 240 proceedings, rather than the alternative procedure proposed in the NPRM. While the Departments found a number of the concerns raised by commenters to be persuasive in making this change, general statements that the IFR addresses commenters' concerns should not be read to mean that the Departments have adopted or agree with commenters' reasoning in whole or in part.

The Departments welcome comments on the IFR's revisions that are submitted in accordance with the instructions for public participation in Section I of this preamble. Among other topics, the Departments invite comment on the procedures for streamlined section 240 proceedings and whether any further changes to those procedures would be appropriate.

*B. General Feedback on the Proposed Rule*

1. General Support for the Proposed Rule

a. Immigration Policy Benefits

*Comments:* Several commenters supported the proposed rule on the basis of immigration policy benefits, including: Reducing duplication of effort between USCIS asylum officers and IJs by allowing asylum officers to adjudicate claims that originated through the USCIS-administered credible fear screening process with less or no expenditure of immigration court time or resources; improving the process to better serve traumatized populations;

IFR_AR_000765

expediting the asylum application process and allowing covered asylum seekers to receive protection sooner; making the asylum application process more efficient and fair; helping to better manage migrant flows and increase security at the Southwest border; and providing due process, dignity, and equity within the system.

*Response:* The Departments acknowledge the commenters' support for the rule.

b. Positive Impacts on Applicants, Their Support Systems, and the Economy

*Comments:* A few commenters supported the proposed rule, without substantive rationale, on the basis of positive impacts on applicants, their support systems, and the U.S. economy. Some commenters supported the proposed rule and expressed gratitude for helping people who are in fear for their lives and encouraged facilitating a smoother pathway for noncitizens once they get through the initial process successfully. Another commenter stated that the rule represents a fundamental shift that will help eligible asylum applicants receive humanitarian protection and not keep asylum seekers in limbo for years while awaiting a final status determination. An individual commenter supporting the rule wrote that asylum seekers who have received a positive credible fear determination may be able to enter the labor force sooner. According to this commenter, enabling earlier access to employment for asylum-eligible individuals could reduce the public burden, reduce the burden on the asylum support network, and benefit those asylum seekers in terms of equity, human dignity, and fairness.

*Response:* The Departments acknowledge these commenters' support for the rule and agree the rule will benefit asylum seekers and their support systems, including public entities.

2. General Opposition to the Proposed Rule

a. Immigration Policy Concerns

*Comments:* Many commenters expressed general opposition to the rule out of a belief that this Administration is not committed to enforcing U.S. immigration law or deterring unauthorized migration into the United States, or out of a belief that the Administration intends to drive more irregular migration for political reasons. Several of these commenters pointed to the high numbers of Southwest border encounters that have occurred in 2021 as support for their beliefs.

*Response:* The Departments acknowledge the commenters'

frustration with the high rates of unauthorized entry into the United States between ports of entry on the Southwest border in 2021, a continuation of an increase that has been observed since April 2020.[50] However, the Departments disagree with the commenters' suggestion that the high numbers of border encounters imply either that the Administration supports or is indifferent to such unauthorized entries. To the contrary, maintaining an orderly, secure, and well-managed border and reducing irregular migration are priorities for the Departments and for the Administration. The Fiscal Year ("FY") 2022 President's Budget directs resources toward robust investments in border security and safety measures, including border technology and modernization of land ports of entry. *See* DHS, *FY 2022 Budget in Brief* 1–2, *https://www.dhs.gov/sites/default/files/publications/dhs_bib_-_web_version_-_final_508.pdf.* Under this Administration, the United States has also bolstered public messaging discouraging irregular migration and strengthened anti-smuggling and anti-trafficking operations, while at the same time investing in Central America to address the lack of economic opportunity, weak governance and corruption, and violence and insecurity that lead people to leave their homes in the first place and attempt the dangerous journey to our Southwest border. *See* Press Release, The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021) *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/* (last visited Mar. 14, 2022). The Departments emphasize that the COVID–19 pandemic and associated economic downturn, along with two severe hurricanes that together impacted Nicaragua, Honduras, Guatemala, and El Salvador in November 2020, have added to those longstanding problems. *See* DHS, Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border (Mar. 16, 2021), *https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandro-n-mayorkas-regarding-situation;* USAID, Latin American

Storms—Fact Sheet #1, (FY) 2021 (Nov. 19, 2020), *https://www.usaid.gov/crisis/hurricanes-iota-eta/fy21/fs1* (last visited Mar. 14, 2022). Finally, misinformation—including the false message that our borders are "open"—has also driven irregular migration. *See* DHS, Secretary Mayorkas Delivers Remarks in Del Rio, TX (Sep. 20, 2021), *https://www.dhs.gov/news/2021/09/20/secretary-mayorkas-delivers-remarks-del-rio-tx.* The Departments reiterate that the borders of the United States are not open and that individuals should not put their own lives or the lives of their family members in the hands of smugglers or other criminals who represent otherwise.

*Comments:* Many commenters generally opposed the rule due to concerns that USCIS asylum officers would be more likely than IJs to grant asylum or other protection to individuals who should not be eligible for it or to otherwise "loosen" the requirements for asylum eligibility. Some commenters expressed, without providing details, that IJs are better trained, better qualified, or better equipped to "vet" applicants or detect fraudulent claims. Other commenters explained that they were concerned USCIS asylum officers would not apply the law or would not serve as impartial adjudicators. Commenters based this concern on at least two different rationales. Some commenters reasoned that asylum officers were subject to greater political control than IJs; other commenters reasoned that asylum officers are too "unaccountable" to the public. Finally, a few commenters expressed concern about USCIS being "fee-driven" and that having a "fee-driven" agency control the credible fear process removes it from congressional oversight.

While most comments that disapproved of authorizing asylum officers to adjudicate defensive asylum applications urged the Departments to continue to require that IJs within EOIR adjudicate all such applications, some comments urged that "Federal judges" or immigration judges "appointed by the judicial branch" should be hired to quickly and impartially adjudicate asylum claims.

*Response:* The Departments disagree with the assertion that USCIS asylum officers cannot appropriately vet or determine eligibility for protection. Asylum officers are career Government employees selected based on merit, they receive extensive training, and they possess expertise in determining eligibility for protection. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b); *see, e.g.,* USAJOBS,

---

[50] *See* U.S. Customs and Border Protection ("CBP"), Southwest Land Border Encounters, *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.*

IFR_AR_000766

Asylum Officer, *https://www.usajobs.gov/job/632962200* (last visited Mar. 14, 2022) (specifying that asylum officers are members of the competitive service); *see also* 22 U.S.C. 6473(b) (requisite training on religious persecution claims). USCIS asylum officers must undergo ''special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles.'' 8 CFR 208.1(b); *see also* INA 235(b)(1)(E)(i), 8 U.S.C. 1225(b)(1)(E)(i) (requiring that asylum officers have ''professional training in country conditions, asylum law, and interview techniques''). While IJs handle a broad swath of immigration-related matters, USCIS asylum officers are uniquely trained to adjudicate protection claims. Additionally, USCIS asylum officers have dedicated resources available to them to address fraud concerns, including Fraud Detection and National Security (''FDNS'') officers embedded within the USCIS Asylum Division.[51] FDNS employs numerous measures to detect and deter immigration benefit fraud and aggressively pursues benefit fraud cases in collaboration with USCIS adjudication officers and Federal law enforcement agencies. Since 2004, FDNS and ICE have collaborated in a strategic partnership to combat immigration fraud. FDNS officers work closely with law enforcement and intelligence community partners to resolve potential fraud, national security, and public safety concerns and to ensure the mutual exchange of current and comprehensive information. They conduct administrative investigations into suspected benefit fraud and aid in the resolution of national security or criminal concerns. Administrative investigations may include compliance reviews, interviews, site visits, and requests for evidence, and they may also result in a referral to ICE for consideration of a criminal investigation. Determining asylum eligibility and vetting is already a necessary part of the day-to-day work of a USCIS asylum officer and will continue to be so after this rule takes effect. Regardless of whether it is an IJ or an asylum officer who adjudicates an application, no individual may be granted asylum or withholding of removal until certain vetting and identity checks have been made. INA 208(d)(5)(A)(i), 8 U.S.C. 1158(d)(5)(A)(i);

8 CFR 208.14(b), 1003.47. The Departments believe that commenters' concerns about USCIS having a financial incentive to ''rubber-stamp'' grant applications for asylum or lacking congressional oversight because it is primarily fee-funded are likewise misplaced. USCIS adjudicates asylum applications without charge, *see* 86 FR 46922, and is subject to congressional oversight.

Moreover, EOIR is currently burdened with a heavy case backlog, as described in the NPRM. Notably, EOIR's caseload includes a wide range of immigration and removal cases. *See EOIR Policy Manual,* Part II.1.4(a) (updated Dec. 30, 2020), *https://www.justice.gov/eoir-policy-manual* (''EOIR Policy Manual''). Allowing USCIS to take on cases originating in the credible fear process therefore is expected to reduce delays across all of EOIR's dockets, as well as reducing the time it takes to adjudicate these protection claims. The Departments believe that alleviating immigration court caseloads through the fair, efficient process articulated in this rule is a positive step forward. Suggestions asking for additional Federal judges within the judicial branch to handle the influx of asylum and protection-related cases should be directed to Congress.

*Comments:* Many commenters generally opposed the rule on the ground that a higher-priority or better way to address the overwhelmed U.S. asylum system would be to ''regain control'' over who enters the country by ''tak[ing] steps to significantly reduce the number of people flowing across the border'' and by not releasing individuals who have entered the United States without inspection or parole.

*Response:* The Departments acknowledge concerns raised by the commenters and note that this rulemaking is one part of a multifaceted whole-of-government approach to addressing irregular migration and ensuring that the U.S. asylum system is fair, orderly, and humane. This whole-of-government approach seeks to make better use of existing enforcement resources by investing in border security measures that will facilitate greater effectiveness in combatting human smuggling and trafficking and addressing the entry of undocumented migrants. The United States also is working with governments of nearby countries to facilitate secure management of borders in the region and to investigate and prosecute organizations involved in criminal

smuggling.[52] These and other efforts to address irregular migration are beyond the scope of this rule, which specifically concerns the procedures by which individuals who are encountered near the border and placed into expedited removal will receive consideration of their claims for asylum or other protection, as is required by law. INA 235(b)(1), 8 U.S.C. 1225(b)(1). However, to the extent that the significant delays in the adjudication of asylum claims today contribute to rates of irregular migration, the Departments believe that the efficiencies introduced by the rule will help to reduce any incentive to exploit the system and enhance the Government's efforts to address irregular migration. By limiting the amount of time a noncitizen may remain in the United States while a claim for relief or protection is pending, the rule stands to dramatically reduce potential incentives for noncitizens to make false claims for relief and protection.

Finally, the Departments emphasize that individuals who have entered the United States without inspection or parole and who are subsequently encountered and placed into expedited removal are presumptively detained, as the statute provides that such individuals are subject to mandatory detention. *See* INA 235(b)(1)(B)(ii), (iii)(IV), 8 U.S.C. 1225(b)(1)(B)(ii), (iii)(IV). Such individuals may be released on parole only in accordance with the statutory and regulatory standards. *See* INA 212(d)(5), 8 U.S.C. 1182(d)(5); 8 CFR 212.5, 235.3(b)(2)(iii), (b)(4)(ii).

*Comments:* Many commenters generally opposed the rule on the ground that allowing USCIS to adjudicate the merits of asylum claims through a nonadversarial process would ''take away the rights of the American people to be represented in court when migrants seek benefits that would place them on the path to citizenship'' or ''remov[e] . . . safeguards that are meant to protect the American population.'' Commenters asserted that allowing asylum claims to be adjudicated without a DHS attorney cross-examining the applicant and having the opportunity to offer impeachment evidence would give fewer rights to the American people, while the noncitizen applicant would

---

[51] *See* USCIS, Fraud Detection and National Security Directorate, *https://www.uscis.gov/about-us/directorates-and-program-offices/fraud-detection-and-national-security-directorate.*

[52] *See* Press Release, The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/* (last visited Mar. 14, 2022).

IFR_AR_000767

still have the opportunity to be represented by counsel.

*Response:* The Departments do not agree with the premise of commenters' assertions. A nonadversarial process does not take away the rights of the American people, but rather it allows for the presentation and consideration of asylum and other protection claims in a manner that is fair and efficient. Asylum officers are Government officials who are well-trained in making credibility determinations and assessing evidence. The asylum officer position is a specialized position focusing on asylum and related relief and protection from removal; as explained in Section III.B of this preamble, asylum officers already adjudicate affirmative asylum claims through a nonadversarial process. An asylum officer can consider evidence relevant to an applicant's claim, including evidence that might be introduced as impeachment evidence in immigration court, and an asylum officer, where appropriate, can ask the applicant questions similar to those that a DHS attorney might ask in immigration court during a cross-examination. The Departments believe that the American public is better served if claims for asylum or related protection that originate through the credible fear screening process may be adjudicated—fairly and efficiently—not only within section 240 proceedings before IJs but also by asylum officers who specialize in such claims.

*Comment:* Several commenters generally opposed the rule out of a belief that it is being promulgated solely for the purpose of providing asylum or other immigration benefits faster or through an easier procedure and is thereby putting the interests of migrants ahead of the interests of U.S. persons or of the public interest.

*Response:* The Departments disagree with the view that the rule is not in the public interest. Rather, providing a process through which vulnerable populations may seek protection is the means by which the United States meets its obligations under both U.S. and international law. *See* Refugee Protocol, 19 U.S.T. 6223; INA 208, 241(b)(3), 8 U.S.C. 1158, 1231(b)(3); FARRA sec. 2242. Amending the existing process to allow adjudications—both those that end in grants and those that end in denials—to be made more promptly, while maintaining fundamental fairness, is a change that is in the public interest. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g., INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 424 (1987) (observing that the Refugee Act of

1980 established "a broad class of refugees who are eligible for a discretionary grant of asylum, and a narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger"); FARRA sec. 2242 (legislation implementing U.S. obligations under Article 3 of the CAT not to remove noncitizens to any country where there are substantial grounds for believing the person would be in danger of being subjected to torture). Ensuring that the Departments uphold these American values as enshrined in U.S. law is in the national interest. It is also in the public interest that the procedures by which the Departments administer the law and uphold these values not regularly result in years-long delays, which may be detrimental to both the U.S. public and those seeking protection. Efficient processing of cases is in the public interest, as cases that span years can consume substantially greater Government resources, including by contributing to delays in immigration court proceedings that hinder DHS's ability to swiftly secure the removal of noncitizens who are high priorities for removal. The process created by this rule therefore advances the public interest by authorizing the Departments to employ a fair and efficient procedure for individuals to seek protection as an appropriate alternative to the exclusive use of section 240 proceedings and by reducing immigration court backlogs that are detrimental to the public interest.

*Comments:* Some commenters generally opposed the rule on the ground that it allows noncitizens to seek review of any denial of asylum or other protection but does not allow an opportunity for correcting or reviewing erroneous grants of asylum or other protection.

*Response:* The Departments acknowledge the concern regarding error correction when asylum or other protection is granted, but the Departments believe this concern is addressed by existing statutory and regulatory provisions, as well as by DHS's longstanding practices regarding the supervision of asylum officers. To reiterate those longstanding supervision practices, the Departments have revised 8 CFR 208.14(b) and (c) and, correspondingly, 8 CFR 1208.14(b) and (c), to emphasize that asylum officers' decisions on approval, denial, dismissal, or referral of an asylum application remain subject to review within USCIS.

As noted above, the Secretary of Homeland Security is charged with the administration and enforcement of the

immigration laws and has the control, direction, and supervision of all employees and of all the files and records of USCIS. *See* INA 103(a)(1), (2), 8 U.S.C. 1103(a)(1), (2). Further, the asylum statute vests the Secretary of Homeland Security with the authority to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). The Secretary's broad authority includes the authority to review and modify immigration benefit decisions, including grants of asylum. Such authority has been delegated to the Director of USCIS. *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); *see also* 8 CFR 2.1. Further, USCIS retains authority under this delegation to reopen or reconsider decisions (including asylum decisions) at any time on the agency's own motion, based upon any new facts or legal determinations. *See* 8 CFR 103.5(a)(5). Nothing in this IFR in any way detracts from or diminishes the authority and responsibility of the Secretary of Homeland Security and the Director of USCIS over any grant of asylum that is issued by USCIS.

Beyond these statutory and regulatory provisions, 100 percent of USCIS asylum officers' approvals, denials, referrals, or dismissals of an asylum application are currently subject to supervisory review before a final decision is made and served on the applicant. *See* Memorandum from Andrew Davidson, Chief, Asylum Div., USCIS, *Modifications to Supervisory Review of Affirmative Asylum Cases* (Mar. 31, 2021). The decision of the asylum officer on whether or not to grant asylum undergoes review by a supervisor, and may be further reviewed as USCIS deems appropriate, before finalization and service on the applicant. *Id.* The Departments have revised 8 CFR 208.14(b) and (c), and made corresponding revisions to 8 CFR 1208.14(b) and (c), to emphasize that asylum officers' decisions on approval, denial, dismissal, or referral of an asylum application remain subject to review within USCIS. The Asylum Division also as a matter of policy determines which cases should receive further review at the headquarters level before being finalized. *See, e.g.,* USCIS Asylum Division, *Affirmative Asylum Procedures Manual,* III.Q. Quality Assurance Review (May 2016), *https://www.uscis.gov/sites/default/files/document/guides/AAPM-2016.pdf.* Further, the Director of USCIS, or the Director's delegate, "may direct that any case or class of cases be certified" to another USCIS official, including the USCIS Director herself, for decision. *See* 8 CFR 103.4(a)(1). Accordingly, USCIS

adjudicates each asylum claim, and the individual asylum officer is only empowered to grant asylum, as an exercise of the Secretary's authority. *See* 8 CFR 208.9(a).

If a grant of asylum or withholding of removal is not warranted, the grant may be terminated by USCIS or an immigration judge, as appropriate. *See* INA 208(c)(2), 8 U.S.C. 1158(c)(2); 8 CFR 208.24, 1208.24. A grant of CAT deferral of removal may also be terminated. *See* 8 CFR 208.17(d)–(f), 1208.17(d)–(f). The procedures for termination of a grant of asylum, withholding of removal, or deferral of removal is not changed by the rule. Any further judicial review may occur after the termination of asylum or other protection commences.

Moreover, with regard to individuals who are found eligible for withholding of removal but not granted asylum, the rule generally provides an opportunity for correcting an erroneous finding of eligibility through the streamlined section 240 proceeding. For example, if the DHS attorney becomes aware of new derogatory information indicating that the noncitizen is ineligible for that other protection, such information can be submitted and accounted for in the IJ's removal order. Finally, to the extent this IFR sets up a process under which, where an asylum officer declines to grant a noncitizen's asylum claim, that noncitizen can continue to pursue that claim before an IJ, the IFR does not break new ground. Rather, in these respects, the IFR mirrors the longstanding affirmative asylum process.

*Comments:* Several commenters generally opposed the rule on the ground that it would delay or otherwise make it harder for DHS to remove noncitizens by giving them more opportunities to appeal. Commenters expressed concern that delays in removal, coupled with more expeditious grants of asylum, would encourage more irregular migration and incentivize individuals to make fraudulent claims for asylum to obtain parole from detention.

*Response:* The Departments acknowledge the commenters' concern but disagree with their conclusions. The rule intends to streamline adjudication of protection claims, whether granted or not. As noted in the NPRM, for claims involving non-detained individuals in section 240 removal proceedings, including asylum seekers encountered at the border and initially screened into expedited removal who establish a credible fear of persecution, the current average case completion time for EOIR is 3.75 years, and individuals who

arrive at the border and seek protection therefore often must wait several years for an initial adjudication by an IJ. *See* 86 FR 46909, 46928 tbl. 6. Any appeal after that adjudication adds even more time than an individual may expect to remain in the United States. Given the length of the process under the status quo and the streamlining procedures incorporated into the new process to promote prompt resolution of removal proceedings, it is unlikely that the new process allowed by the rule will result in further "delays in removal" that commenters fear may encourage further irregular migration or incentivize the filing of non-meritorious claims by individuals who do not need protection. The new process replaces a single section 240 removal proceeding in immigration court with a merits interview before an asylum officer, followed by a streamlined section 240 removal proceeding if USCIS does not grant asylum. Comments that assume this new two-step process will result in greater delays overlook that the new process is tailored specifically to adjudicate asylum and related protection claims, and individuals in the process will have been determined by an immigration officer to be inadmissible under section 235(b)(1)(A)(i) of the INA, 8 U.S.C. 1225(b)(1)(A)(i).[53] Additionally, as detailed in Section III.D of this preamble, the streamlined 240 removal proceeding will be governed by special procedural rules, including time frames and limits on continuances, that assure prompt completion. This streamlined process, as provided by the rule, thus addresses the commenters' underlying concern regarding delays. As explained in the NPRM, the Departments believe that this rule will substantially reduce the average time to adjudicate asylum claims—whether the final decision is a grant or a denial—thereby reducing any incentive for exploitation of the asylum system.

*Comments:* Several commenters generally opposed the rule based on the view that nearly all the migrants encountered at or near the Southwest border are economic migrants, not legitimate asylum seekers, and that all such individuals should therefore be removed without wasting resources on adjudications and appeals.

*Response:* The Departments acknowledge commenters' concern that legitimate asylum seekers be identified and distinguished from individuals seeking to enter the United States for other purposes, and the rule is indeed designed to more expeditiously and fairly distinguish the one group from the other. The Departments disagree with commenters' characterization that nearly all migrants encountered at the Southwest border are only seeking economic opportunity. Recent surveys of individuals seeking to migrate to the United States have found that individuals cite a variety of factors, often in combination, for leaving their country of origin. While economic concerns and a belief in American prosperity and opportunity are common reasons stated, violence and insecurity have been cited as reasons for migrating by majorities or near majorities of those surveyed.[54] And, regardless, Congress has instructed that individuals in expedited removal who claim a fear of persecution or indicate an intent to apply for asylum be given an individualized credible fear screening. INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); *see also* 8 CFR 208.30. The purpose of these individualized screenings is to prevent the removal of individuals in need of protection to a country where they face persecution or torture. Under this IFR, as under current regulations, individuals who receive a positive credible fear determination are given a fair opportunity to pursue their claim for asylum or other protection. Individuals who receive a negative credible fear determination and individuals who are determined to not warrant a discretionary grant of asylum or to be otherwise ineligible for protection will be subject to removal. Moreover, by making changes to facilitate the more frequent use of expedited removal for broader classes of individuals and families, the IFR will enable the Departments to more quickly secure removal orders in cases in which no fear claim is asserted or no credible fear is established than if such individuals and families were instead placed directly in removal proceedings, as frequently occurs.

---

[53] To be sure, the IFR includes exceptions to these streamlined section 240 proceedings. One of those exceptions is for noncitizens who raise a substantial challenge to the charges of inadmissibility or removability. *See* 8 CFR 1240.17(k)(3). Certain streamlining provisions under 8 CFR 1240.17, including the deadlines, and the limits on continuances and extensions of deadlines, will not apply in cases involving such noncitizens.

[54] *See, e.g.,* Randy Capps et al., Migration Policy Institute, *From Control to Crisis: Changing Trends and Policies Reshaping U.S.-Mexico Border Enforcement* 18–19 (Aug. 2019), *https://www.migrationpolicy.org/sites/default/files/publications/BorderSecurity-ControltoCrisis-Report-Final.pdf* (last visited Mar. 15, 2022); Medicins Sans Frontieres, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* 10–11 (May 2017), *https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf* (last visited Mar. 15, 2022).

IFR_AR_000769

*Comments:* Multiple individual commenters generally opposing the proposed rule asserted that the rule, contrary to its stated purpose, would most likely increase the backlog of asylum cases, either because of the multiple levels of appeal available whenever an individual's claim is not granted or because the rule would likely encourage more people to enter the United States and make a fear claim.

*Response:* The Departments agree that high rates of asylum applications relative to historic data are of concern for both USCIS asylum offices and the immigration courts. However, commenters misapprehend the nature of the review and appeal structure proposed in the NPRM and finalized, in modified form, in this IFR. The new process replaces a single section 240 removal proceeding in immigration court with an interview before an asylum officer, which is followed by a streamlined section 240 removal proceeding if the asylum officer does not grant asylum. Commenters assume that any new two-step process will increase the backlog of asylum cases, but the process this IFR establishes is tailored specifically to adjudicate asylum claims. Additionally, as detailed above in Section III.D of this preamble, unlike an ordinary section 240 removal proceeding, streamlined section 240 removal proceedings will be governed by special procedural rules, including limits on continuances, that assure prompt completion. As a result, the process established by this rule is expected to take less time and assist in stemming case backlogs relative to the current process of initially adjudicating all claims through an ordinary section 240 proceeding, followed by the possibility of appeal to the BIA and review by the U.S. Courts of Appeals. The Departments also disagree with commenters' predictions that the rule would increase the backlog of asylum cases by encouraging more individuals to seek asylum or related protection, as commenters have not identified any evident causal mechanism by which the rule as a whole, in context, would systematically and substantially incentivize more individuals to seek to enter the United States and pursue asylum. On the contrary, the Departments believe that, by enabling prompt adjudication of asylum claims—including the prompt rejection of claims that lack merit—the rule would discourage individuals who lack a basis for asylum or related protection to seek to enter the United States or claim protection.

*Comments:* A few commenters expressed opposition for each of the following reasons: The proposed rule would change the substantive standard for asylum eligibility; the proposed rule would allow noncitizens who entered the United States without authorization to "cut the line" ahead of those who have been awaiting legal immigration and therefore will be unfair and harmful to those whose cases are delayed and will remove incentives for individuals to pursue legal immigration; and the proposed rule would automatically provide for "immediate" U.S. citizenship. A few commenters also expressed opposition on the ground that only elected officials should make asylum decisions or, alternatively, only voters should make asylum determinations. In addition, one commenter opposing the rule described it as "giving two chances at asylum" and another commenter described it as a proposal to "cut funding for the detention of asylum seekers."

*Response:* The concerns expressed by these commenters are based on apparent factual misunderstandings of the asylum standards, the asylum adjudications system, and the effect of an asylum grant. In that regard, the NPRM would not have changed, and the IFR does not change, the standards for qualifying for asylum. Further, the NPRM would not have provided, and the IFR does not provide, "immediate" U.S. citizenship to anyone. Rather, this rulemaking is concerned with the system for adjudicating asylum claims by noncitizens found to have credible fears of persecution or torture. While a noncitizen granted asylum may eventually apply for and receive citizenship if certain conditions are met, a grant of asylum on its own does not entitle the recipient to citizenship. The Departments believe that the changes suggested by these comments either are not within the scope of the rulemaking or would be impermissible under current U.S. law.

*Comments:* A commenter stated that the proposed rule would negatively affect individuals seeking asylum through the affirmative application process. The commenter noted that USCIS has more than 400,000 pending affirmative asylum cases, and most cases take more than 180 days to adjudicate. The commenter stated that the proposed rule would exacerbate this backlog by adding to the queue the asylum claims of individuals in expedited removal proceedings. While the commenter acknowledged that the Departments proposed in the NPRM to increase staffing levels in order to implement the new rule, the commenter stated that these additional resources should be used to adjudicate existing

cases in order within the 180-day period mandated by Congress. Other commenters stated that the Departments have not addressed whether the proposed rule will increase backlogs and wait times for affirmative cases.

*Response:* The Departments acknowledge the commenter's concern for individuals with affirmative asylum cases pending before USCIS but disagree that this rule will negatively affect them. As discussed in the NPRM, the Departments have planned for the new process described in this rule to be implemented in phases, as the necessary staffing and resources are put into place. A phased implementation will allow the Departments to begin employing the proposed process in a controlled manner for a limited number of cases, giving USCIS the opportunity to work through operational challenges and ensure that each noncitizen placed into the process is given a full and fair opportunity to have any protection claim presented, heard, and properly adjudicated in full conformance with the law. As the commenter acknowledged, USCIS plans to hire new employees and secure additional funding to implement this rule so that it will not be necessary to divert resources from existing caseloads, including affirmative asylum, to do so. USCIS has estimated that it will need to hire approximately 800 new employees and spend approximately $180 million to fully implement the proposed Asylum Merits interview and adjudication process to handle approximately 75,000 cases annually. While addressing the affirmative asylum backlog is outside the scope of the rulemaking, the Departments acknowledge the importance of doing so and note that USCIS has taken other actions to address this priority. These include expanding facilities; hiring and training new asylum officers; implementing operational changes to increase interviews and case completions and reduce backlog growth; establishing a centralized vetting center; and working closely with technology partners to develop several tools that streamline case processing and strengthen the integrity of the asylum process.[55] In addition, on September 30, 2021, Congress passed the Extending Government Funding and Delivering Emergency Assistance Act, which provides dedicated backlog elimination funding to USCIS for "application

---

[55] *See* USCIS, *Backlog Reduction of Pending Affirmative Asylum Cases: Fiscal Year 2021 Report to Congress* (Oct. 20, 2021), *https://www.dhs.gov/ sites/default/files/2021-12/USCIS%20-%20Backlog %20Reduction%20of%20Pending %20Affirmative%20Asylum%20Cases.pdf.*

IFR_AR_000770

processing, the reduction of backlogs within asylum, field, and service center offices, and support of the refugee program.'' Public Law 117–43, sec. 132, 135 Stat. 344, 351.

*Comments:* Some commenters generally proposed alternative ways to reduce delays and strain on the U.S. system for asylum adjudication and urged the Departments to implement these alternatives rather than the proposed rule. Proposed alternatives included the following actions:

• Taking unspecified actions to significantly reduce the number of people crossing the border;

• devoting more resources to the current asylum process, including hiring more IJs;

• adopting stricter substantive standards for demonstrating asylum eligibility;

• implementing the Migrant Protection Protocols (''MPP'');

• criminally prosecuting anyone who makes a fraudulent asylum claim;

• denying all asylum requests; and

• denying asylum to noncitizens who cross the border between ports of entry.

*Response:* The Departments acknowledge the commenters' suggestions and recognize that building an immigration system that works and maintaining an orderly, secure, and well-managed border requires multiple coordinated lines of effort. High numbers of unauthorized border crossings, transnational criminal organizations seeking to profit from a range of illicit activities, and the ongoing impact of COVID–19 on the processing of migrants present significant challenges along the Southwest border. DHS has deployed unprecedented levels of personnel, technology, and resources and has made critical security improvements to secure and manage our borders. The Departments emphasize that this rule addresses specifically the way in which asylum and related protection claims of certain individuals encountered near the border are considered, with the aim of adjudicating those claims in a timelier manner while ensuring fundamental fairness. Comments advocating for other immigration policy changes that in theory could lead to fewer individuals making fear claims are outside the scope of this rulemaking.

The Departments agree that increasing the number of IJs is part of the solution to alleviating the current strain on the U.S. asylum system. The Fiscal Year 2022 President's Budget requests an additional 100 IJs and associated support staff to ensure the efficient and fair processing of cases, and EOIR will continue to request funding to add additional IJs. *See* DOJ, *FY 2022 Budget Request, https://www.justice.gov/jmd/ page/file/1398846/download.* Given the increase in the number of immigration judges requested of and authorized by Congress during recent budget cycles, the Fiscal Year 2022 President's Budget also requests 100 additional ICE litigators to prosecute the removal proceedings initiated by DHS, consistent with 6 U.S.C. 252(c). *See* DHS, *ICE Budget Overview Fiscal Year 2022 Congressional Justification* ICE– O&S–22, *https://www.dhs.gov/sites/ default/files/publications/u.s._ immigration_and_customs_ enforcement.pdf* (explaining that the ICE Office of the Principal Legal Advisor currently faces a staffing budgetary shortfall of several hundred positions).

b. Negative Impacts on Applicants and Their Support Systems

*Comments:* A few commenters opposed the proposed rule based on generally stated concerns about negative consequences for asylum seekers. Commenters stated that the existing process for adjudicating asylum claims originating in credible fear screening is effective and provides strong legal protections for asylum seekers, including the opportunity for judicial review. Other commenters expressed concern that any streamlining of the existing process would result in asylum seekers being ordered removed without receiving full and fair consideration of their protection claims.

*Response:* The Departments disagree with the commenters' premise that any change from the existing procedure that seeks to determine relief or protection claims in a timelier manner will be detrimental to individuals who are seeking asylum. The procedure established by this rule gives individuals appropriate procedural protections, as well as an opportunity for those whose relief or protection claims are denied to seek judicial review after exhausting their administrative remedies. Moreover, as described above, the Departments are finalizing the rule with certain changes from the NPRM that are responsive to concerns about fairness, such as retaining USCIS's authority to entertain reconsideration of a negative credible fear determination that has been upheld by an IJ, specifying a minimum number of days between a positive credible fear determination and the Asylum Merits interview, and eliminating the restrictions on the evidence applicants may submit before IJs.

c. Negative Impacts on U.S. Citizens and the Economy

*Comments:* Many commenters generally opposed the rule due to concerns that it will lead to increases in unauthorized immigration, immigration benefits illegally obtained by fraud, or lawful immigration that the commenters perceived as illegitimate. Commenters expressed concern that such immigration would have negative effects on U.S. citizens and the U.S. economy, including with respect to availability of housing and other resources, wages and jobs, public health, costs of schools and healthcare, crime and safety, the deficit, and the environment, among other things. For the most part, commenters did not provide details about why they believed that the rule would result in increased immigration or increased rates of fraud or misrepresentation. Some commenters, however, explained that they believed the rule would drive increased unauthorized or fraudulent immigration ''by promising aliens who have made bogus asylum claims freedom from detention.'' Other commenters explained that they believed the rule would drive increased unauthorized or fraudulent immigration by allowing for nonadversarial merits adjudications, without an ICE attorney assigned to cross-examine the applicant or present impeachment evidence.

*Response:* The Departments acknowledge the comments on the potential negative impacts of lawful immigration, including the impacts on wages, jobs, and the labor force. However, because the rule does not change the substantive standard for asylum or related protection, the Departments do not expect that the rule will lead to increases in legal immigration, although it may lead to some eligible noncitizens receiving asylum or related protection sooner than they otherwise would. Section V.B of this preamble estimates the effects, on a per-individual, per-day basis, of individuals receiving employment authorization earlier as a result of efficiencies introduced by the rule. Contrary to commenters' claims, as detailed in Section V.B of this preamble, the increased efficiencies of this IFR could also result in fewer individuals who are ineligible for protection receiving employment authorization, if their applications are not granted before the waiting period for employment authorization under 8 CFR 274a.12(c)(8) has run. Furthermore, even if there were reason to believe that the rule may lead to increases in legal immigration, the Departments note that commenters did not provide any data or studies

IFR_AR_000771

supporting negative net impacts of asylees on U.S. citizens or the U.S. economy.[56]

While the Departments acknowledge the commenters' concerns about the negative impacts of unauthorized immigration and unauthorized entrance into the United States without inspection or parole, the Departments disagree with the commenters that there is reason to believe that the rule will result in an increase in the number of individuals who enter the United States without inspection or parole, or in an increase in those who stay beyond their authorized period of admission. If anything, by more expeditiously ordering removed those who are ineligible for protection, this rule may send a stronger deterrent signal relative to the status quo. Moreover, as outlined above, the United States is undertaking a range of efforts to address irregular migration and promote security at the border. Without additional information about the mechanism by which commenters anticipate that this rule will lead to more unauthorized migration, the Departments cannot further evaluate these comments. The Departments note that the rule does not "promis[e] . . . freedom from detention," and the Departments disagree with the commenters' concern about the nonadversarial nature of the Asylum Merits interview, as previously explained.

Similarly, while the Departments appreciate commenters' concerns about individuals seeking to obtain asylum or related protection by fraud or misrepresentation, the Departments disagree that there is any reason to believe that the rule will result in an increase in either the incidence or success of such fraud or misrepresentation. As explained earlier in Section IV.B.2.a of this preamble, the Departments are confident that asylum

officers have the training, skills, and experience needed to assess credibility and appropriately determine asylum eligibility through a nonadversarial interview.[57] With respect to comments noting a negative impact of immigration (whether lawful or unauthorized) on availability of housing, public health, costs of schools and healthcare, the deficit, and the environment, the comments lacked specific information expanding on these statements and explaining how this rule would impact these areas. Environmental issues are addressed in Section V.J of this preamble.

*Comments:* Numerous commenters stated that the needs, interests, and protection of the American people should come first, and they asserted that the proposed rule would "elevate" asylum seekers and others who enter the United States without authorization above U.S. citizens. Many individual commenters stated that the asylum program should be halted, or should not be changed, until the United States can support and help its own citizens who are in need.

*Response:* The Departments acknowledge the commenters' concern for U.S. citizens, and in particular for U.S. citizens in need. The Departments disagree, however, with the commenters' assumption that the rule either prioritizes the interests of asylum seekers over the interests of U.S. citizens or will be to the detriment of the needs, interests, or protection of U.S. citizens. An asylum system that more expeditiously determines whether individuals are or are not eligible for asylum or other protection in the United States, while providing due process, is in the public interest. It complies with Congress's instruction in INA 235, 8

U.S.C. 1225, that individuals in expedited removal be screened for credible fear of persecution and receive individualized consideration of their claims; it allows individuals who are not eligible for protection to be removed more promptly, thereby reducing any incentives to exploit the process; and it allows individuals who are eligible for asylum or other protection to sooner receive that assurance and integrate into their new community. Some commenters invoked particular categories of U.S. citizens in need, including persons experiencing unemployment or homelessness, veterans, persons with disabilities, and children in foster care, but the commenters did not provide any explanation or information to support the idea that this rule will operate to the detriment of these groups, or to support the idea that halting the asylum program—as some commenters proposed—would benefit these groups. The Departments note that the rule's potential and uncertain impacts on the U.S. labor force are analyzed in Section V.B of the preamble.

*Comments:* Multiple commenters stated generally that asylees' dependence on Government programs for support would lead to an undue burden on American taxpayers, exacerbation of the U.S. deficit, or increased costs of education and healthcare in the communities where asylees live.

*Response:* The Departments appreciate commenters' concern that public costs at the Federal, State, or local level might accompany increases in the number of individuals granted asylum in the United States. However, these general comments did not provide information or explanation to support either (1) the premise that this rule will lead to more individuals being granted asylum in the United States, or (2) the premise that increases in the number of individuals granted asylum in the United States would, on net, lead to increased public costs or costs of education or healthcare. The Departments believe that the IFR is unlikely to lead to significant increases in the number of individuals granted asylum in the United States, much less to increased public costs or costs of education or healthcare that outpace asylees' contributions in taxes and economic activity. A more detailed explanation of the possible impacts of this rule is provided in Section V.B of this preamble. Additionally, the Departments emphasize that estimating the fiscal impacts of immigration is a complex calculation. The first-order net fiscal impact of immigration is the

---

[56] Isolating immigration's effect on labor markets has been an ongoing task in the research. A 2017 National Academies of Sciences, Engineering, and Medicine ("NAS") publication synthesizes the current peer-reviewed literature on the effects of immigration and empirical findings from various publications. NAS, *The Economic and Fiscal Consequences of Immigration* (2017), *https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration* (last visited Mar. 5, 2022) ("2017 NAS Report"). Although this report is not specific to asylees, its analysis may be instructive. The report cautions that economic theory alone is not capable of producing definitive answers about the net impacts of immigration on labor markets over specific periods or episodes. Empirical investigation is needed. But wage and employment impacts created by flows of foreign-born workers into labor markets are difficult to measure. The effects of immigration have to be isolated from many other influences that shape local and national economies and the relative wages of different groups of workers. *Id.* at 4.

[57] The approval rate [total cases granted/total cases granted + total case denied + total cases referred (USCIS affirmative asylum processing only)] of asylum officers and IJs on the merits of asylum claims from Fiscal Years 2017 through 2021 show approval rates for asylum claims adjudicated by asylum officers to be in the 26–37 percent range, while IJ approval rates on asylum claims that started as credible fear screenings ranged from 31–39 percent and on all asylum claims (regardless of whether they began in the expedited removal or credible fear process) ranged from 26–37 percent. This information suggests that asylum officers are just as equipped to identify individuals not meeting asylum eligibility requirements as IJs who use the adversarial process with the participation of ICE's Office of the Principal Legal Advisor to reach a decision on asylum eligibility. USCIS, Refugee, Asylum and Int'l Operations Directorate, Asylum Division Workload Statistics for Affirmative Asylum 2009 to 2021 (2022); EOIR Adjudications Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 19, 2022), *https://www.justice.gov/eoir/page/file/1062976/download*; EOIR Adjudications Statistics: Asylum Decision Rates (Jan. 19, 2022), *https://www.justice.gov/eoir/page/file/1248491/download*.

IFR_AR_000772

difference between the various tax contributions the immigrants in question make to public finances and the Government expenditures on public benefits and services they receive. These first-order impacts are sensitive to immigrants' demographic and skill characteristics, their role in labor and other markets, and the rules regulating accessibility and use of Government programs.[58] In addition, second-order effects may also occur, and analysis of such effects presents methodological and empirical challenges. For example, as with the native-born population, the age structure of an immigrant population plays a major role in assessing any fiscal impacts. Children and young adults contribute less to society in terms of taxes and draw more in benefits by using public education, for example. On average, as people age and start participating in the labor market, they become net contributors to public finances, paying more in taxes than they draw from public benefit programs. Moreover, older adults could again become net users of public benefit programs. Compared to the native-born population, immigrants can also differ in their characteristics in terms of skills, education levels, income levels, number of dependents in the family, the places they choose to live, etc., and any combination of these factors could have varying fiscal impacts. Local and State economic conditions and laws that govern public finances or the availability of public benefits also vary and can influence the fiscal impacts of immigration.

d. Other General Opposition to the Proposed Rule

*Comments:* Many commenters stated that asylum seekers should remain in Mexico during the pendency of their immigration hearings or otherwise generally referred to the Migrant Protection Protocols (''MPP''). Similarly, other commenters asked the Department to clarify how the rule may comply or conflict with MPP. Specifically, commenters raised concerns regarding implementation of the program, litigation surrounding MPP, as well as alternative proposals for MPP.

*Response:* Because MPP is decidedly separate from the expedited removal and credible fear process, comments concerning MPP are outside the scope of the changes made in this rule.[59] The

Departments appreciate engagement and concerns related to MPP, but discussion of the program, ongoing litigation, and DHS's efforts to terminate the program are outside the scope of this rulemaking. Moreover, the Secretary of DHS has already explained in detail his reasons for terminating MPP and his decision not to use the contiguous-territory-return authority on a programmatic basis.[60]

*C. Basis for the Proposed Rule*

1. DOJ and DHS Statutory/Legal Authority

*Comments:* Many individual commenters generally argued that the Departments do not have the statutory or legal authority to issue the rule, but the commenters did not provide a basis for their belief. Some individual commenters stated that the rule is unlawful, bypasses Congress, or cannot be issued as an executive decision.

*Response:* The Departments believe that these general comments misapprehend or misstate the legal authorities involved in this rulemaking. As noted above in Section II.B of this preamble, asylum, statutory withholding of removal, and protection under the CAT are established or required by statute. *See* INA 208, 8 U.S.C. 1158; INA 241(b)(3), 8 U.S.C. 1231(b)(3); FARRA sec. 2242. This rule does not seek to bypass Congress or otherwise act where Congress has not given the Departments authority. This

placed into section 240 proceedings, not the noncitizens at issue here, who are initially placed into expedited removal proceedings. *See* Memorandum from Robert Silvers, Under Secretary, Office of Strategy, Policy, and Plans, *Guidance Regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols* 4 (Dec. 2, 2021), *https://www.dhs.gov/sites/default/files/2022-01/21_1202_plcy_mpp-policy-guidance_508.pdf.* Nor does MPP eliminate expedited removal as an option for processing certain inadmissible noncitizens arriving in the United States. Some individuals—*e.g.,* Mexican nationals or nationals of countries outside the Western Hemisphere—may be eligible for processing through expedited removal but could not be considered for processing under MPP, which explicitly excludes certain categories of noncitizens. Additionally, the permanent injunction in *Texas* v. *Biden* specifically preserves the Secretary of DHS's discretion to make individual determinations about how to process a particular individual. *See Texas* v. *Biden,* 2021 WL 3603341, at *27. That discretion encompasses whether to process a specific noncitizen for 240 proceedings or expedited removal. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520 (BIA 2011).

[60] *See* Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, *Termination of Migrant Protection Protocols* (Oct. 29, 2021), *https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-memo.pdf;* DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), *https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf.*

rule is consistent with statutory authority provided by Congress, and it is intended to create efficiencies in implementing a framework allowing for fair, consistent adjudications.

*Comments:* Commenters argued that the Homeland Security Act of 2002 expressed congressional intent that defensive asylum claims be adjudicated by IJs rather than asylum officers by granting EOIR the authority to adjudicate these claims but making no such provision for USCIS. Moreover, commenters noted that because the HSA specified the date on which powers would be vested in USCIS, Congress did not intend that the Departments be able to reallocate the authorities of IJs and asylum officers through regulations and that Congress has decided not to reallocate authorities relevant to the proposed rule since 2003. Another comment argued that the Illegal Immigration Reform and Immigrant Responsibility Act expressed congressional intent that asylum seekers found to have a credible fear of persecution have their cases adjudicated by IJs. One comment cited IIRIRA legislative history in arguing that the credible fear interview's purpose is to ''weed out non-meritorious cases'' and that asylum proceedings should be overseen by an IJ. One commenter asserted that legislative proposals under consideration in both the House and the Senate demonstrate Congress's interest in asylum policy and in immigration policy generally. The commenter argued that gridlock in Congress does not give executive agencies a ''free pass'' to overstep the legislative directives given to them by Congress.

*Response:* The Departments believe that these comments misapprehend or misstate the legal authorities involved in this rulemaking. This rule does not seek to bypass Congress or otherwise act where Congress has not given the Departments authority. If an asylum officer determines that a noncitizen has a credible fear of persecution, the noncitizen ''shall be detained for further consideration of the application for asylum.'' INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). The statute, however, ''does not specify how or by whom this further consideration should be conducted.'' Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 444, 447 (Jan. 3, 1997).

By not specifying what ''further consideration'' entails, the statute leaves it to the agency to determine. Under *Chevron,* it is well-settled that such ''ambiguity constitutes an implicit delegation from Congress to the agency

---

[58] *See generally* 2017 NAS Report at 323–27.

[59] Individuals processed for expedited removal are excluded from MPP, as that program is being implemented in compliance with the court order in *Texas* v. *Biden,* No. 2:21–cv–67, —F. Supp. 3d. —, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). By its terms, MPP applies only to noncitizens initially

IFR_AR_000773

to fill in the statutory gaps.'' *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000) (citing *Chevron,* 467 U.S. at 844); *see also Epic Sys. Corp.,* 138 S. Ct. at 1629 (noting that *Chevron* rests on ''the premise that a statutory ambiguity represents an implicit delegation to an agency to interpret a statute which it administers'' (quotation marks omitted)). An agency may exercise its delegated authority to plug the gap with any ''reasonable interpretation'' of the statute. *Chevron,* 467 U.S. at 844.

By its terms, the phrase ''further consideration'' is open-ended. The fact that Congress did not specify the nature of the proceedings for those found to have a credible fear contrasts starkly with two other provisions in the same section that expressly require or deny section 240 removal proceedings for certain other classes of noncitizens. In one provision, INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(a), Congress provided that an applicant for admission who ''is not clearly and beyond a doubt entitled to be admitted'' must be ''detained for a proceeding under section [INA 240].'' And in another, INA 235(a)(2), 8 U.S.C. 1225(a)(2), Congress provided that ''[i]n no case may a stowaway be considered . . . eligible for a hearing under section [INA 240].'' These examples show that Congress knew how to specifically require immediate referral to a section 240 removal proceeding when it wanted to do so. ''Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'' *Salinas,* 141 S. Ct. at 698 (quotation marks omitted).

The D.C. Circuit has ''consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion.'' *Catawba Cnty.,* 571 F.3d at 36 (quotation marks omitted). The suggestion that Congress's silence in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), permits the Departments discretion to establish procedures for ''further consideration'' is reinforced by the fact that the noncitizens whom DHS has elected to process using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings under section 235(b)(2)(A) of the INA, 8 U.S.C. 1225(b)(2)(A). *See* INA 235(b)(2)(B)(ii), 8 U.S.C. 1225(b)(2)(B)(ii).

The Departments disagree with the comments arguing that any statute requires asylum cases to be adjudicated through an adversarial process. The rule is designed to implement the statute, which does not specify what ''further consideration of [an] application for asylum'' entails and which thereby leaves it to the agency to determine what will occur when an individual placed in expedited removal is found to have demonstrated a credible fear of persecution. INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). Nothing in the asylum statute requires the Secretary of Homeland Security to establish an adversarial procedure to determine whether a noncitizen may be granted asylum.

The Departments also disagree with the comments that defensive asylum applications are statutorily required to be adjudicated by DOJ instead of by DHS. The asylum statute provides that specified noncitizens ''may apply for asylum,'' including ''in accordance with . . . [INA 235(b), 8 U.S.C. 1225(b)],'' INA 208(a)(1), 8 U.S.C. 1158(a)(1), and that ''[t]he Secretary of Homeland Security or the Attorney General may grant asylum to [a noncitizen] who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under [the asylum statute] if the Secretary of Homeland Security or the Attorney General determines that such [noncitizen] is a refugee,'' INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208(b)(1)(A) of the INA does not distinguish between affirmative and defensive asylum applications, and its text—''*may* grant asylum,'' indicating that the Secretary of Homeland Security, on considering an asylum application, may determine not to grant it—confers adjudicatory authority.

Cross-references between the asylum statute and the expedited removal statute provide further support for the conclusion that the asylum statute authorizes DHS to adjudicate defensive asylum applications. *See, e.g.,* INA 208(a)(1), 8 U.S.C. 1158(a)(1) (citing INA 235(b), 8 U.S.C. 1225(b)); INA 235(b)(1)(A)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(i), (ii) (citing INA 208, 8 U.S.C. 1158). The legislative history of the asylum statute supports this reading as well. Prior to 2005, section 208(b)(1)(A) referred only to the Attorney General. *See* INA 208(b)(1) (2000), 8 U.S.C. 1158(b)(1) (2000). Congress specifically added in certain references to the Secretary of Homeland Security in the REAL ID Act of 2005 and backdated the references' effectiveness to the HSA's effective date. Public Law

109–13, div. B, 101(a)(1), (2), (h)(1), 119 Stat. 231.[61] In addition, the REAL ID Act's conference report explains that the Act amended INA 208(b)(1) ''to clarify that the Secretary of Homeland Security and the Attorney General both have authority to grant asylum,'' ''[b]ecause both the Secretary of Homeland Security and the Attorney General may now exercise authority over asylum depending on the context in which asylum issues arise.'' H.R. Rep. No. 109–72, at 162 (2005).

Last, although the Departments acknowledge that some statements in IIRIRA's legislative history could be read to suggest an expectation that noncitizens detained for ''further consideration'' would be placed in ''normal non-expedited removal proceedings,'' *see, e.g.,* H.R. Rep. No. 104–828, at 209 (1996), the legislative history is inconsistent and, in any event, ''legislative history is not the law,'' *Epic Sys.,* 138 S. Ct. at 1631. The Departments decline to read a limitation from the inconsistent legislative history into otherwise open-ended statutory text.

*Comments:* Several commenters remarked that the proposed rule would create a rushed adjudication process in violation of U.S. obligations under both domestic and international law and contrary to United Nations High Commissioner for Refugees (''UNHCR'') guidance. Pursuant to such guidance, commenters recommended that the Departments make efforts to maximize asylum seekers' access to counsel and argued that the detention of asylum seekers poses obstacles in this regard. Another commenter requested that no part of the asylum process, including the credible fear interview, should occur in a U.S. Customs and Border Protection facility. Similarly, another commenter cited UNHCR guidance and argued that accelerated procedures must, under international law, minimize risks of non-refoulement by giving asylum seekers guidance on the procedure itself and access to necessary facilities, including a competent interpreter, for submitting a protection claim, as well as the right to appeal a negative fear determination.

*Response:* The Departments disagree with the commenters that the procedures for considering protection claims promulgated in this rule violate U.S. or international law. As an initial

---

[61] That is not to say that the Secretary lacks other authorities in INA 208, 8 U.S.C. 1158, where Congress did not expressly add the Secretary in the REAL ID Act of 2005. Since enactment of the HSA, Congress has inserted piecemeal references to the Secretary in various provisions of the INA without doing so comprehensively.

IFR_AR_000774

note, while the Departments do consider and value UNHCR guidance in interpreting the United States' obligations under the 1967 Refugee Protocol, such guidance is not binding. The Departments agree with the commenters on the need to provide access to counsel to individuals making fear claims and have done so in this rule. For example, 8 CFR 235.3(b)(4)(ii) provides that prior to a credible fear interview, a noncitizen shall be given time to contact and consult with any person or persons of their choosing. In 8 CFR 208.30(d)(4), DHS provides that such person or persons may be present at the credible fear interview. In 8 CFR 208.9(b), DHS provides that individuals may have counsel or a representative present at affirmative asylum interviews or Asylum Merits interviews. In 8 CFR 1240.3 and 1240.10(a)(1), DOJ provides that noncitizens may have representation in section 240 proceedings before the IJ. The provisions at 8 CFR 1240.3 and 1240.10(a)(1) will apply in removal proceedings under this rule; though these proceedings are streamlined, noncitizens in them will have the right to representation at no expense to the Government. Furthermore, the Departments plan to ensure as part of the service of the positive credible fear determination, where an individual is placed in the Asylum Merits process, that they are provided with a fact sheet explaining the process and a contact list of free or low-cost legal service providers similar to what the individual would be provided if they were issued an NTA and placed into section 240 removal proceedings before EOIR.

The Departments agree with the commenters that individuals subject to an accelerated procedure, such as a credible fear screening within expedited removal, should be provided guidance about the procedure, including information about the right to review of a negative credible fear determination. In 8 CFR 235.3(b)(4)(i), DHS continues to provide that individuals referred for credible fear interviews receive a written disclosure on Form M–444, Information About Credible Fear Interview, describing "[t]he purpose of the referral and description of the credible fear interview process"; "[t]he right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government"; "[t]he right to request a review by an [IJ] of the asylum officer's credible fear determination"; and "[t]he consequences of failure to establish a credible fear of persecution or torture." Additionally, for every credible fear

interview, asylum officers are trained to explain the purpose of the interview and ensure the individual understands. In addition, 8 CFR 208.30(d)(2) requires asylum officers conducting credible fear interviews to verify that the noncitizen has received Form M–444, Information About Credible Fear Interview, and to determine that they understand the credible fear determination process. Under this rule, if an asylum officer determines an individual does not have a credible fear of persecution or torture, the asylum officer must refer the individual to an IJ if the individual requests review or refuses or fails to indicate whether he or she requests review of the asylum officer's credible fear determination. 8 CFR 208.30(g)(1), 1208.30(g)(2)(i). The process for IJ review of negative credible fear determinations involves the creation of a record of proceeding, the receiving of evidence, the provision of interpreters, and the right to consult with a person or persons of the individual's choosing prior to the review. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42.

The Departments further agree with commenters on the need to provide competent interpretation. In 8 CFR 208.30(d)(5), DHS continues to provide that asylum officers conducting credible fear interviews will arrange for the assistance of an interpreter for noncitizens unable to proceed effectively in English where the asylum officer is unable to proceed competently in a language the alien speaks and understands. The rule provides in 8 CFR 208.9(g)(2) that asylum officers conducting Asylum Merits interviews will arrange for interpreter services for applicants unable to proceed effectively in English. Similarly, EOIR will provide interpretation services in credible fear determinations and hearings before an IJ. 8 CFR 1003.42(c), 1240.5. The Departments have mechanisms in place to ensure the quality of interpretation, including the absence of improper bias. These include training adjudicators to recognize signs of potential problems with interpretation and taking appropriate remedial measures; channels to report interpretation issues to the contracting entities providing interpretation services; and the periodic review of the terms and conditions of interpretation services contracts.

Regarding the commenters' opposition to the detention of asylum seekers, the Departments note that INA 235(b)(1)(B)(iii)(IV), 8 U.S.C. 1225(b)(1)(B)(iii)(IV), provides that individuals receiving credible fear interviews "shall be detained pending a final determination of credible fear of

persecution and, if found not to have such a fear, until removed." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), further provides that noncitizens who receive a positive credible fear determination "shall be detained for further consideration of the application for asylum." However, the INA additionally authorizes the Secretary to parole into the United States temporarily, on a case-by-case basis, such individuals "for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). And as explained in more detail above, the Departments have provided in this rule for the reform of certain regulatory provisions implementing this statutory authority for individuals detained in the expedited removal process and for those pending a credible fear determination or any review thereof.

Similarly, the Departments disagree with commenters' proposal of disallowing credible fear interviews by USCIS asylum officers in CBP facilities during the credible fear process and note that this proposal is outside the scope of this rulemaking. Given the expedited nature of credible fear interviews and their role in initial processing of a covered noncitizen, CBP plays an important role in referral of claims of fear to a USCIS asylum officer. While the Departments have implemented safeguards to decouple law enforcement aims from the sensitive nature of protection screening, DHS and DOJ will remain flexible in how they use DHS facilities.

## 2. Need for the Proposed Rule/DOJ and DHS Rationale

*Comments:* A commenter stated that the rule would create stronger "pull factors" encouraging foreign nationals to take advantage of quick release on parole and with the expectation that they would be able to live and work in the United States indefinitely while seeking asylum through an even more extended process than now exists. Other commenters argued that the proposed rule would lead to granting more asylum applications and that such an outcome is inappropriate because most asylum applications are not meritorious. Another commenter similarly argued that requiring noncitizens to prove their worthiness for a "discretionary form of relief" is required under existing laws and consistent with congressional intent; the commenter faulted the proposal for, in the commenter's view, disregarding the requirements of the expedited removal statute.

Conversely, a commenter stated that the proposed rule wrongly assumes that

IFR_AR_000775

asylum seekers at the border are more likely to have fraudulent claims and suggested imposing section 240 proceedings as the mechanism for review of asylum officer adjudication. The commenter cited a statistic that found that ''83 percent of [affirmative asylum] cases that asylum officers did not grant after interview were subsequently granted asylum by the immigration courts in 2016.'' Another commenter noted that the increase in credible fear referrals in the past decade more likely resulted from the deterioration of human rights conditions in nearby countries rather than an increase in fraudulent claims.

*Response:* The Departments disagree with the generalized belief that the availability of parole in accordance with INA 212(d)(5), 8 U.S.C. 1182(d)(5), serves as a pull factor for individuals who would be covered by this process. As stated above in Section IV.B.2.a of this preamble, recent surveys of individuals seeking to migrate to the United States have found that individuals cite a variety of factors, often in combination, for leaving their country of origin. While economic concerns and a belief in American prosperity and opportunity are common reasons stated, violence and insecurity have been cited as reasons for migrating by majorities or near majorities of those surveyed.[62] To the extent that individuals are motivated by economic concerns, the mere possibility of parole out of custody marginally earlier—based on an individualized determination—is not expected to significantly increase or alter the incentives that lead an individual to journey to the United States or remain in their country of origin. Importantly, noncitizens in expedited removal who are paroled prior to a credible fear determination (that is, the noncitizens affected by this IFR's amendment to the regulations concerning parole) will not be eligible for employment authorization based on having been paroled.

As to the claim that the majority of asylum applications are fraudulent, the Departments disagree. This assertion is not supported by fact. Moreover, denied asylum claims are not necessarily fraudulent. If an individual is not granted asylum or related protection by a USCIS asylum officer, it may be because they are ineligible for protection or have not shown that they merit a discretionary grant of asylum. In addressing commenters' concern about the percentage of affirmative asylum applications that were not granted by USCIS but subsequently granted asylum

by EOIR, the Departments note that numerous factors may explain this difference in outcomes, including that the IJ may be presented with additional evidence and testimony beyond what was heard by the asylum officer, and that the IJ may consider the asylum claim in light of changed circumstances underlying the application since the asylum officer's decision. INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D).

*Comment:* Many commenters expressed concern for ensuring balance between fairness and efficiency. Commenters noted that addressing immigration backlogs should be the Departments' priority, but the commenters also stated that procedural safeguards must be retained. Other commenters supported the implementation of a nonadversarial hearing process but asserted that due process concerns related to the expedited removal process could undermine the Departments' goals of improving fairness or efficiency. Another commenter stated that compressed timelines may harm applicants who need time to develop trust in their attorneys and the asylum system.

*Response:* The Departments agree that addressing the backlog of cases should be a priority, and applicants for asylum and related protection must be given due process. The Departments anticipate this rule will divert certain cases from immigration court and will enhance efficient processing of noncitizens subject to the expedited removal process, thereby stemming the growth of EOIR's current backlog. The Departments also agree that ensuring fairness while being efficient may take time to execute on a national scale. It is for that reason that the Departments adopt a phased approach such that efficiencies can be developed while fairness is not lost due to administrative exigencies. While asylum applications are governed by a statutory timeline and this rule also uses a timeline to ensure applications stay on track, the Departments have incorporated safeguards to ensure that integrity is not compromised for the sake of administrative efficiency. Specifically, as noted in the regulatory text, the IFR provides for appropriate exceptions to the timelines at various stages of the asylum case, including submission of late-filed evidence and the timing of scheduled hearings.

*Comments:* Comments attributed the immigration court backlog to ''confusing and rapid fluctuations in the agencies' interpretation of the particular social group definition,'' changes in DHS prosecutorial discretion policies,

policies divesting IJs of authority to control their dockets, BIA and Attorney General opinions that preclude IJs from relying on parties' stipulations, and office and court closures resulting from the COVID–19 pandemic.

*Response:* The Departments recognize commenters' concerns that numerous factors may impact the pending caseload. Accordingly, there may be numerous individual and combined approaches for addressing this issue. The Departments will not discuss at length the potential factors identified by commenters, as they are largely outside of the scope of this rulemaking.

However, the Departments note that the goal of this IFR is to implement more efficient procedures for adjudicating certain protection-based claims. This will, in turn, help address the pending caseload while also ensuring that such cases are given appropriate full and fair consideration. To the extent that the IFR limits IJs' authority to fully control their dockets, for example by establishing a regulatory timeline for scheduling and adjudicating these claims, the Departments believe that this regulatory schedule will ensure efficient processing of such claims while also permitting sufficient flexibility for IJs to deviate from the schedule by granting continuances where appropriate.

*Comments:* One commenter stated that expediting the processing of asylum claims will not solve the current border crisis if the Administration also expands the categories of eligibility for asylum and stated that an improvement to asylum efficiency requires a combination of tightening the screening standards of eligibility for asylum and faster processing, including swift removal of those with meritless claims.

Another commenter asserted that the Departments must not only consider immigration through a national security perspective, but must also pay attention to ''humanitarian protection, legal immigration and naturalization, foreign student education and cultural exchange, and economic competitiveness.'' The commenter expressed approval of the proposal in light of the challenges posed by backlogs. Conversely, at least one other commenter stated that the Departments should focus more on national security.

*Response:* The Departments agree that fair and efficient processing of asylum claims is in the interest of the American people. Such a program of humanitarian protection not only speaks to American values of altruism, inclusiveness, and charity but is necessarily tied to our national security and economic interests. *See, e.g.,* Deborah E. Anker &

---

[62] *See supra* note 54.

IFR_AR_000776

Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980,* 19 San Diego L. Rev. 9 (1981) (noting that humanitarian protection speaks to American values). National security is a critical aspect of the asylum and refugee protection programs, not only because the Departments vet applicants to ensure they are not ineligible for asylum on national security grounds, but also because ensuring a safe haven for forcibly displaced persons around the world can promote national security. *See, e.g.,* Elizabeth Neumann, *Robust Refugee Programs Aid National Security* (Dec. 17, 2020), *https:// immigrationforum.org/wp-content/ uploads/2020/12/Robust-Refugee-Programs-Aid-National-Security12_16_ 20.pdf* (last visited Mar. 14, 2022). In this rule, the Departments are not expanding asylum eligibility, but putting forward procedures that will use their respective resources to more effectively and efficiently issue decisions on protection claims. The Departments believe that such efficiencies will allow meritorious claims to be granted more promptly and will facilitate removal of those individuals who do not warrant protection from removal.

3. Prior Immigration Rulemakings

*Comments:* Two commenters expressed support for the immigration rulemakings finalized during the prior Administration, stating that they kept borders safe and reduced the flow of unauthorized migrants. However, one commenter stated that the prior Administration destroyed the immigration system by overturning previously accepted legal interpretations and implementing procedures to deny people asylum. Another commenter expressed support for abandoning regulatory changes implemented under the prior Administration that obstructed access to asylum relief. One commenter stated that the proposed changes to the screening process for people in expedited removal proceedings are an important improvement over the previous regulatory changes implemented under the prior Administration.

A commenter asserted that neither the Global Asylum rule nor the Security Bars rule should be implemented, as their provisions are incompatible with international legal standards and could have risks for individuals seeking protection in the United States. Another commenter suggested that, to ensure cases move quickly through asylum offices and court systems without delay,

DHS and DOJ should reverse the prior rules and policies such as the TCT Bar rule, Presidential Proclamation Bar IFR, Global Asylum rule, and Security Bars rule.

A commenter stated that two asylum-related rules, the Global Asylum rule and Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) ("Criminal Bars to Asylum rule"), issued by the prior Administration were issued in violation of the HSA and the Federal Vacancies Reform Act ("FVRA") and did not provide sufficient time for public comment on their "complicated provisions." Therefore, the commenter said, both rules are null and void. The commenter also asserted that the provision of the Global Asylum rule that forced people into asylum-and-withholding-only proceedings was inconsistent with the INA, as Congress created a default rule that arriving individuals seeking asylum are to be placed in section 240 removal proceedings. The commenter also wrote that DHS and DOJ acted arbitrarily and capriciously by requiring individuals with credible fear findings to be placed in asylum-and-withholding-only proceedings.

Another commenter stated that DHS should continue to rescind employment authorization rules issued by the prior Administration because they were issued by agency officials in violation of the Administrative Procedure Act ("APA"). With respect to employment authorization based on a pending asylum application, the commenter said this Administration should immediately restore the 150-day waiting period and 30-day processing time requirement for asylum seekers.

*Response:* The Departments are revisiting and reconsidering numerous asylum-related rulemakings and policies in accordance with Executive Order 14010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border ("E.O. on Migration"), and the E.O. on Legal Immigration. The E.O. on Migration provides that the "United States will . . . restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering." 86 FR 8267. The E.O. on Migration directs the Departments to determine whether to rescind various rules, such as the Presidential Proclamation Bar IFR, the TCT Bar rule,

and other policies, which the Departments have been reviewing and reconsidering. *See* 86 FR 8269–70. In addition, the E.O. on Legal Immigration instructed the Secretary of State, Attorney General, and Secretary of Homeland Security to "identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers." 86 FR 8277. The Departments have outlined several rulemaking efforts in the Spring and Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, consistent with the E.O. on Migration and the E.O. on Legal Immigration.[63] The Departments plan to address the Presidential Proclamation Bar IFR, TCT Bar rule, Criminal Bars to Asylum rule, and other provisions of the Global Asylum rule in separate rulemakings.

The Departments acknowledge the commenter's concerns about the regulatory changes made in the Global Asylum rule, which are enjoined, related to placing noncitizens with positive credible fear determinations in asylum-and-withholding-only proceedings. As explained earlier in this IFR, the Departments are amending regulations to allow for USCIS to retain such noncitizens' asylum applications for a nonadversarial Asylum Merits interview before an asylum officer, rather than initially refer them to an IJ for asylum-and-withholding-only proceedings, as provided in the presently enjoined regulation. *See* 8 CFR 208.30(f). Meanwhile, DHS maintains the discretion to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue an NTA to place the noncitizen in section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See* 8 CFR 208.30(b), (f); *Matter of J–A–B– & I–J–V–A–,* 27 I&N Dec. at 171; *Matter of E–R–M– & L–R– M–,* 25 I&N Dec. 520, 523–24 (BIA 2011).

On December 23, 2020, the Departments published the Security Bars rule, which was scheduled to become effective on January 22, 2021. The effective date of the Security Bars rule has been delayed several times,

[63] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/ public/do/eAgendaHistory* (last visited Mar. 14, 2022) (select "Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions," then select DHS or DOJ); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https:// www.reginfo.gov/public/do/eAgendaMain* (last visited Mar. 14, 2022) (select DHS or DOJ).

IFR_AR_000777

most recently until December 31, 2022.[64] Thus, the Security Bars rule is not currently in effect. The Departments are reviewing and reconsidering the Security Bars rule and plan to publish a separate NPRM to solicit public comments on whether to modify or rescind the Security Bars rule.[65] The commenters' claims related to these rules, the rules related to employment authorization for noncitizens with pending asylum applications,[66] and the HSA, APA, and FVRA fall outside of the scope of this rulemaking, and thus are not being addressed.

*Comments:* A commenter expressed support for this Administration's decision to vacate an Attorney General ruling issued under the prior Administration that prohibited IJs from managing their own dockets through administrative closure. The commenter suggested that the Administration should promulgate clear rules on administrative closure, which can improve inefficiencies and backlogs.

*Response:* This comment is beyond the scope of this rule because the rule does not involve or impact administrative closure. DOJ plans, however, to initiate a rulemaking that provides general administrative closure authority to IJs and the BIA.[67]

---

[64] The Security Bars rule's effective date was first delayed by the rule, Security Bars and Processing; Delay of Effective Date, 86 FR 6847 (Jan. 25, 2021), until March 22, 2021. The effective date of the Security Bars rule was again delayed until December 31, 2021, Security Bars and Processing; Delay of Effective Date, 86 FR 15069 (Mar. 22, 2021), and further delayed until December 31, 2022, Security Bars and Processing; Delay of Effective Date, 86 FR 73615 (Dec. 28, 2021).

[65] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC69* (last visited Mar. 14, 2022); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1615-AC69* (last visited Mar. 14, 2022).

[66] On February 7, 2022, in *AsylumWorks* v. *Mayorkas,* No. 20–cv–3815, 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the United States District Court for the District of Columbia vacated two DHS employment authorization-related rules entitled "Asylum Application, Interview, and Employment Authorization for Applicants," 85 FR 38532 (June 26, 2020) ("2020 Asylum EAD Rule"), and "Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications," 85 FR 37502 (June 22, 2020).

[67] Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1125-AB18* (last visited Mar. 14, 2022).

## D. Proposed Changes

### 1. Applicability

*Comments:* A commenter asserted that it would be unfair for asylum seekers who have been issued an NTA to be unable to have a nonadversarial interview before an asylum officer or a review before an IJ. The commenter stated that if the Administration has determined that the USCIS interview process is the most efficient and fair, then it should also be accessible to noncitizens ICE places in section 240 proceedings, such as pregnant women and families.

A commenter asserted that the rule does not remedy the unequal treatment of affirmative and defensive cases, remarking that it instead goes halfway, by saying that some noncitizens in expedited removal—those referred for hearings before asylum officers—could seek a "partial review" with an IJ instead of the "full case review" that those in the affirmative asylum process would have if they were not granted asylum by USCIS. Additionally, a commenter remarked that it is unclear why the rule differentiates between "normal" cases and those of stowaways and asylum seekers physically present in or arriving in the Commonwealth of the Northern Mariana Islands.

*Response:* The Departments disagree that it is unfair for noncitizens who are placed in section 240 removal proceedings to continue to have their claims heard before IJs rather than in nonadversarial interviews before USCIS in the first instance. It is well established that DHS officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. *See Arizona* v. *United States,* 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." (citation omitted)). USCIS, in particular, has the prosecutorial discretion, as appropriate, to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue an NTA to place the noncitizen in section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See, e.g., Matter of E–R–M–& L–R–M–,* 25 I&N Dec. at 523–24. Such discretion is needed because there may be circumstances in which it may be more appropriate for a noncitizen's protection claims to be heard and considered in the adversarial process before an IJ in the first instance (for example, in cases where a noncitizen may have committed significant criminal activity, have engaged in past acts of harm to others, or pose a public safety or national security threat). In addition, the Departments anticipate that DHS will also need to continue to place many noncitizens receiving a positive credible fear determination into ordinary section 240 removal proceedings while USCIS takes steps needed to allow for full implementation of the new process for all cases. This rule establishes an appropriate alternative to the exclusive use of ordinary section 240 removal proceedings. Nevertheless, noncitizens who are placed into streamlined section 240 removal proceedings will continue to have access to the same procedural protections that have been in place for asylum adjudications for many years. This rule authorizes the Departments to employ a fair and efficient procedure for individuals to seek protection, which includes opportunities for applicants to present their claims fully and fairly before asylum officers in a nonadversarial setting and, if not granted asylum, before IJs in streamlined section 240 removal proceedings. The comment related to the processing of claims of stowaways and noncitizens arriving from the Commonwealth of the Northern Mariana Islands falls outside of the scope of this rulemaking and, therefore, is not being addressed. As noted in the NPRM, this IFR would not apply to (1) stowaways or (2) noncitizens who are physically present in or arriving in the Commonwealth of the Northern Mariana Islands who are determined to have a credible fear. Such individuals would continue to be referred to asylum-and-withholding-only proceedings before an IJ under 8 CFR 208.2(c).

### 2. Parole

#### a. General Comments on Parole

*Comments:* Several commenters provided general comments on parole or the rule's proposed change to the regulations governing the circumstances in which individuals in expedited removal proceedings may be paroled. Many of these commenters expressed opposition to DHS loosening the parole requirements or paroling noncitizens "simply because they lack resources to detain them." Some of these commenters expressed doubt about the legality of paroling noncitizens simply because detention is unavailable or impractical.

*Response:* The Departments acknowledge and take seriously the concerns expressed. The Departments

IFR_AR_000778

note, however, that the comments suggesting that the Departments had proposed for parole to be automatically granted upon a determination that detention is "unavailable or impracticable" are mistaken; as proposed, parole would be "in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter," 86 FR 46946 (8 CFR 235.3 (proposed)), which impose additional prerequisites to the exercise of parole authority. In this IFR, DHS is finalizing a change to the DHS regulations that will make even clearer that parole of noncitizens who are being processed under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), may be granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Because the regulatory text that DHS is finalizing no longer specifies that parole may be considered when detention is "unavailable or impracticable," the Departments decline to address in detail commenters' arguments respecting that particular language. Nevertheless, the Departments have explained the longstanding regulatory and policy basis, consistent with the statutory authority, for taking detention resources into consideration when making parole determinations. *See supra* Section III.F of this preamble.

b. Change in Circumstances Under Which Parole May Be Considered

*Comments:* Many commenters either supported the proposed expansion of the circumstances under which parole may be considered or urged the adoption of what they characterize as a broader standard, consistent with section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5). Some commenters urged DHS to adopt the long-standing parole standards applicable in other circumstances described in 8 CFR 212.5(b). Commenters stated that they welcomed a change that would allow families the possibility of parole—or that would allow for greater availability of parole in general—and help ensure the availability of detention space for those who pose the greatest threats to national security and public safety. One commenter stated that the proposed change would be an effective step toward a policy that, where possible, ensures noncitizens' compliance with appointments and court dates and timely departure from the United States, if ordered removed, through supervision and case management rather than through detention. Numerous commenters stated that, while they welcomed the proposed rule's expansion of the circumstances in

which parole may be considered, the proposed provisions were too narrow and should be amended to allow consideration of parole in a broader range of circumstances, consistent with the breadth of DHS's statutory parole authority under section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5). Commenters stated that adopting the standard of 8 CFR 212.5(b), which would allow parole consideration, among other things, when continued detention is not in the public interest, would give the agency more flexibility, achieve a uniform regulatory standard across the removal process, and promote family stability.

A few commenters requested that DHS establish a presumption of parole, with DHS bearing a burden of demonstrating by clear and convincing evidence that there is a need for detention based on the public interest. Commenters also suggested that this standard should apply to all asylum seekers who establish a credible fear during the credible fear interview, regardless of their manner of entry, and regardless of whether they are referred for section 240 proceedings or for an Asylum Merits interview. One commenter urged that the regulations should support a presumption that detention is not in the public interest in cases of survivors fleeing gender-based violence, as well as for others who have established a credible fear. Some commenters also asked the Departments to clarify that asylum seekers should only be detained as a last resort. Similarly, one commenter stated that detention should only be used when it is demonstrated that an individual is a danger to the community or a flight risk that cannot be mitigated by other conditions. Another commenter stated that "detailing clear and consistent provisions for parole and detention" would be more efficient than case-by-case determinations. One commenter urged that the regulations at 8 CFR 235.3(b) should be amended to emphasize release from custody at the earliest possible stage of proceedings and asserted that parole eligibility should not be contingent on the outcome of credible fear screening.

Other commenters opposed the proposed expansion of the circumstances under which parole may be considered. Some commenters opposed the NPRM on the ground that any policy that makes it more likely that noncitizens encountered at the border will be released from custody will, in the commenters' view, encourage illegal immigration and harm the integrity of the immigration system. In explanation, one commenter discussed past policy changes related to parole and stated that

the lesson to be learned is that as soon as a policy is enacted that makes it more likely that asylum seekers will be released from DHS custody, the number of asylum seekers who enter to exploit that policy "balloons." Other commenters expressed concern that noncitizens who are aware they most likely will not be granted asylum will have a strong incentive to abscond. Citing the statistic that 38 percent of people who receive a positive credible fear determination and are released do not file an asylum application, a commenter expressed concern about a more permissive approach to parole, especially if individuals realize that their cases will no longer take years to resolve and thus their best chance for remaining in the United States would be to abscond.

*Response:* The Departments acknowledge the range of views expressed, from support for the proposed regulatory amendment, to support for adopting instead the standard of 8 CFR 212.5(b), to support for more expansive use of parole for noncitizens subject to INA 235, 8 U.S.C. 1225, to opposition to any change that would expand the circumstances under which parole may be considered for such individuals. As explained above, having considered all comments received, the Departments agree with those commenters who suggested that the standard of 8 CFR 212.5(b)—the standard already applicable to, *e.g.,* noncitizens who have received a positive credible fear determination and whose cases are pending—should replace the more constrained standard of 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii), which allow for parole only for medical emergency or legitimate law enforcement objective. The Departments agree that the standard of 8 CFR 212.5(b), allowing for parole for urgent humanitarian reasons or significant public benefit, will give DHS more flexibility to delineate the circumstances in which parole may be considered, on a case-by-case basis and consistent with section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A), for this population. That said, the Departments emphasize that individuals who have not yet received a positive credible fear determination may not be similarly situated to individuals who have, as those pending a credible fear interview may shortly be subject to a final removal order. As a result, subsequent directives or guidance will clarify how officers and agents may determine whether "continued detention is not in the public interest" 8 CFR 212.5(b)(5), for noncitizens who are being processed

IFR_AR_000779

under INA 235(b)(1), 8 U.S.C. 1225(b)(1), and who have not yet received a positive credible fear determination for purposes of deciding whether parole for urgent humanitarian reasons or significant public benefit would be warranted. Thus, while the IFR establishes a uniform regulatory standard in the DHS regulations for consideration of parole for individuals described in 8 CFR 235.3(b) (*i.e.,* those in the expedited removal process) and 8 CFR 235.3(c) (*i.e.,* "arriving aliens" placed in section 240 removal proceedings), application of that standard on a case-by-case basis will appropriately account for individualized considerations particular to noncitizens who have not already been determined to have a credible fear of persecution or torture, as explained above in Section III.F of this preamble.

The Departments disagree with the commenters who urged that the regulations at issue should be amended to establish a presumption of parole, or to provide that detention will be used only as a last resort. These commenters did not explain how the standards they proposed would be permitted under section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A), and the Departments conclude that such options would be inconsistent with DHS's discretionary parole authority.

The Departments also disagree with the commenters who opposed loosening current regulatory restrictions on the exercise of parole authority on the ground that doing so would encourage illegal immigration and harm the integrity of the immigration system. These comments do not account for the fact that the amended standard for parole applies only to individuals being processed under the Departments' expedited removal authority under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), and that the effect of the amendment will be to allow DHS to process more individuals through expedited removal rather than referring them to lengthier section 240 removal proceedings. As a result, individuals who express no fear of persecution or torture or who are determined not to have a credible fear can be ordered removed more promptly, which should discourage such individuals from seeking to enter the United States and thereby improve the integrity of the immigration system. The Departments acknowledge commenters' contention that increases in the number of noncitizens at the border have been observed after various past policy changes. However, considering the many complex factors that may affect the rates of individuals seeking to enter

the United States and make a claim for asylum, the Departments disagree that this perceived correlation amounts to evidence of causation or to a compelling reason to depart from a policy change that is otherwise justified. The Departments acknowledge the concern expressed by some commenters about the risk that paroled individuals may abscond but emphasize that the regulations will continue to provide that parole is available only to those noncitizens who present "neither a security risk nor a risk of absconding." With regard to the commenter who suggested that noncitizens who do not file an asylum application after receiving a positive credible fear determination mean to abscond rather than pursue an asylum claim, the Departments note that failure to timely submit an asylum application after receiving a positive credible fear determination may be due to a lack of understanding or inability to obtain the language or other assistance needed to complete and file a Form I–589, Application for Asylum and for Withholding of Removal, or for other reasons not indicative of an intent to abscond. The Departments are unaware of, and commenters did not provide, any information showing that a noncitizen's intention to abscond can reasonably be inferred from a failure to timely submit an asylum application. In addition, DHS officials, in their discretion, may impose reasonable conditions on the grant of parole (including, *e.g.,* periodic reporting to ICE) to ensure that the individual will appear at all hearings and for removal from the United States when required to do so. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(c)–(d).

*Comments:* Some commenters stated that the NPRM would establish a subjective, ambiguous standard for when parole may be allowed. Specifically, commenters stated that the proposed rule did not address what condition or set of conditions would be sufficient for DHS to consider detention "impracticable" and recommended that the rule utilize more definite language. Commenters also remarked that "unavailable" is not clearly defined and within DHS's control to an extent that the proposed standard is "ripe for agency abuse."

*Response:* Although the Departments disagree that the standard proposed in the NPRM was "ripe for agency abuse," the Departments acknowledge commenters' uncertainty about the contours of the proposed standard. The Departments are not finalizing the proposed amendment that would have allowed parole consideration if

"detention is unavailable or impracticable" and, thus, need not further address that standard. Instead, DHS is finalizing an amendment that would allow for consideration of parole under the existing standards in 8 CFR 212.5(b), which, as explained in Section III.F above, includes parole on a case-by-case basis when continued detention is not in the public interest. The longstanding authority for DHS to take its detention capacity into account when making parole determinations is explained above, and future directives and guidance will build upon existing directives and guidance documents that are well understood by DHS officers and agents even as they are applied to the populations affected by this rule.

*Comments:* At least one commenter offered the following specific suggestions: That 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii) be amended to clarify that DHS should parole people if continued detention is not in the public interest; that 8 CFR 235.3(c) be amended to clarify that any asylum seeker who is placed in section 240 removal proceedings may be released on parole in the public interest, regardless of their manner of entry, by deleting the phrase "arriving alien(s)" and replacing it with "noncitizen(s)"; and that regulatory language be revised to ensure that all asylum seekers who establish a credible fear of persecution or torture are eligible for parole under 8 CFR 212.5(b)(5), regardless of whether they are referred to ordinary section 240 removal proceedings or have their cases retained by USCIS for an Asylum Merits interview.

*Response:* DHS is amending 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii) to permit parole consideration in accordance with the longstanding regulation at 8 CFR 212.5(b), which includes parole in circumstances where continued detention is not in the public interest. The Departments emphasize that—consistent with INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), and 8 CFR 212.5(b)—parole will be granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The Departments decline the commenter's other suggestions. First, the commenter's suggestion to amend 8 CFR 235.3(c) in the manner suggested is outside the scope of this rule. This rule concerns only noncitizens processed under the expedited removal provisions of INA 235(b)(1), 8 U.S.C. 1225(b)(1), whereas 8 CFR 235.3(c) generally pertains to "arriving aliens" who are placed in section 240 proceedings. Second, 8 CFR 208.30(f) already provides that "[i]f an alien, other than

IFR_AR_000780

an alien stowaway, is found to have a credible fear of persecution or torture,'' then ''[p]arole . . . may be considered only in accordance with section 212(d)(5) of the Act and 8 CFR 212.5'' to cover those who are placed directly into section 240 removal proceedings. DHS, moreover, is amending 8 CFR 212.5 to provide that the standard of 8 CFR 212.5(b) applies to noncitizens detained pursuant to 8 CFR 235.3(b), as well as 8 CFR 235.3(c). Finally, the Departments are adding language to 8 CFR 235.3(c) to allow for parole under the standard of 8 CFR 212.5(b) for noncitizens whose asylum cases are retained by or referred to USCIS for an Asylum Merits interview under this rule after a positive credible fear determination. Thus, regardless of whether the noncitizen's asylum case is retained by USCIS for adjudication on the merits or referred to immigration court, noncitizens who receive a positive credible fear determination are generally eligible for parole consideration under the standard of 8 CFR 212.5(b).

*Comments:* Some commenters stated that the proposed rule did not clearly indicate whether parole would be available (and if so, under what standard) for individuals who receive a positive credible fear determination and are placed into the new Asylum Merits process. These commenters suggested specific revisions to the text of current 8 CFR 235.3(c). A few other commenters also expressed doubt that individuals who receive a positive credible fear determination and are placed into the new Asylum Merits process would have access to parole.

*Response:* In the IFR, DHS is clarifying that parole will be available for individuals who receive a positive credible fear determination and are placed into the new Asylum Merits process under the standard of 8 CFR 212.5(b)—that is, under the same standard as for individuals who receive a positive credible fear hearing and are referred to immigration court. *See* 8 CFR 208.30(f), 8 CFR 235.3(c).

*Comments:* Some commenters asserted that the proposed rule's expansion of parole would be unlawful and unauthorized by Congress. One commenter stated that the proposed rule is ultra vires, contending that INA 235(b)(1), 8 U.S.C. 1225(b)(1), provides for the detention of noncitizens in expedited removal proceedings throughout the entire process, from apprehension to a determination on any subsequent asylum claim. This commenter also discussed the statutory history of the parole provision and claimed that it shows a congressional

intent that parole be used in a restrictive manner. Other commenters urged that authorizing DHS to parole asylum seekers into the United States whenever DHS determines that detention is ''unavailable or impracticable'' would directly conflict with the INA and congressional intent to delegate only limited parole authority to DHS. One of these commenters stated that the rationale behind the proposed rule is ''pretextual at best'' and remarked that it simply provides a convenient, albeit ultra vires, reason to release asylum seekers from custody. Another commenter stated that, because current rates of migrant encounters mean that DHS will never have enough space to detain every person, detention would always be unavailable or impracticable, and more and more noncitizens would be released. Several commenters further stated that detention capacity is within DHS's control and that it can make space unavailable to effectively make the detention of any noncitizen unavailable or impractical, which would violate the INA.

*Response:* The Departments disagree that the expansion of the circumstances in which parole may be considered for a noncitizen in expedited removal proceedings proposed in the NPRM would be unlawful or ultra vires and also disagree with the unsupported assertion that the Departments' rationale is in any way ''pretextual.'' As explained above, Congress has given DHS discretion to ''parole'' a noncitizen who is an applicant for admission ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The Departments have always understood this parole authority to apply to individuals detained pursuant to the detention provisions of INA 235, 8 U.S.C. 1225, and the Supreme Court has endorsed this interpretation in *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 837, 844 (2018).

This rule amends DHS regulations to replace the exceptionally narrow standard governing the circumstances in which parole may be allowed for noncitizens being processed under expedited removal, and who have not yet received a credible fear determination, *see* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii), with the broader regulatory standard that already governs the circumstances in which parole may be allowed after a noncitizen has received a positive credible fear determination, *see* 8 CFR 208.30(f)(2), 212.5(b). This broader regulatory standard is fully consistent with DHS's statutory parole authority. While the

agency previously drew a distinction between the parole standard for those pending a credible fear determination (or whose inadmissibility is still being considered or subject to an expedited removal order) and those found to have a credible fear—perhaps as a matter of policy—there is no legal requirement for this distinction. The parole statute does not distinguish between the various procedural postures of noncitizens covered by INA 235(b), 8 U.S.C. 1225(b), or specifically reference any of the detention provisions at INA 235(b), 8 U.S.C. 1225(b). *See* INA 212(d)(5), 8 U.S.C. 1182(d)(5). There is, therefore, no reason on the face of the statute to read the detention provision at INA 235(b)(1)(B)(iii)(IV), 8 U.S.C. 1225(b)(1)(B)(iii)(IV), any differently from the identically worded detention provisions in INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), and INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A), which the Supreme Court has endorsed as subject to the Secretary's full statutory release-on-parole authority. *See Jennings,* 138 S. Ct. at 844; *see also Clark* v. *Martinez,* 543 U.S. 371, 378 (2005) (''To give these same words a different meaning for each category [of person it applied to] would be to invent a statute rather than interpret one.'').

This amendment would also allow DHS, in making parole determinations for individual noncitizens on a case-by-case basis, to utilize its limited detention bed space for noncitizens found to be a flight risk or danger to the community, as well as permit the DHS officers to devote more time to their handling of assigned detained cases— allowing for more efficient processing of issues, including responding to inquiries, requests for release, and securing travel documents for noncitizens subject to orders of removal. DHS would also be able to reallocate detention resources to other areas, such as alternatives to detention, which are not as cost prohibitive.

The Departments reject the contention that DHS's control over its detention capacity is so complete that it is capable of increasing the use of parole or by artificially reducing available bedspace. The Department's capacity to detain an individual on any given day is determined by many different factors, including the availability of appropriated funds, the number and demographic characteristics of individuals in custody as well as those encountered at or near the border or within the interior of the United States, and the types of facilities with available bedspace. Capacity restrictions at individual facilities imposed for a variety of reasons ranging from public

health requirements to court-ordered limitations also constrain the availability of detention space.

Because the regulatory text that DHS is finalizing no longer specifies that parole may be considered when detention is "unavailable or impracticable," the Departments decline to address in detail commenters' arguments respecting that particular language.

*Comments:* A few commenters that encouraged DHS to amend the regulations to provide for parole when continued detention is not in the public interest stated that this term should be interpreted to encompass, among other things, the impact of continued detention on an individual's or their family's physical or mental health, safety, well-being, family unity, and other considerations.

*Response:* As explained above, DHS intends to use further directives or guidance to promote fair and consistent determinations as to when "continued detention is not in the public interest" for noncitizens in expedited removal who have not yet received a credible fear determination. The Departments recognize that the term "public interest" is open to interpretation but note that the noncitizen's personal interests, while potentially relevant, are not determinative of whether continued detention is not in the public interest.

*Comments:* A few commenters stated that, although any change that increases DHS's ability to grant parole seems positive on its face, the proposed rule still leaves the decision of whether to parole an individual up to the discretion of a DHS officer. Commenters expressed concern about this discretion based on their experience with parole decisions they described as arbitrary or biased. Commenters recommended that the rule create accountability mechanisms and clear decision-making procedures to ensure parole requests are decided consistently, without bias or undue political influence, or in pro forma fashion without regard to the substance of the requests. For example, one commenter suggested there be a mandate that ICE provide a timely response in a language the applicant can understand that includes individualized analysis of the reasons why parole was denied. Another commenter recommended that DHS amend its regulations to include a specific time frame within which ICE officers must review parole requests and issue parole decisions, a mandate that parole interviews must take place before the issuance of a denial of a parole request, a requirement of detailed recordkeeping to help provide transparency and

oversight of parole decisions, and an independent department charged with routinely reviewing each ICE field office's parole grant and denial rates. A commenter asked that the rule specify to whom at the agency asylum seekers should submit their parole requests, which officers make these decisions, and what documentation should be included or can be provided as satisfactory alternatives.

*Response:* The NPRM proposed to amend, and this IFR will amend, the DHS regulations specifying the circumstances in which parole may be considered for noncitizens in expedited removal proceedings. Additionally, consistent with the INA, DHS's exercise of discretion will be conducted on a case-by-case basis, given the unique factual circumstances of each case and to ensure the requirements for parole have been thoroughly considered and addressed. Comments that suggest new regulatory provisions to establish accountability mechanisms and decision-making procedures are therefore beyond the scope of the current rulemaking.

*Comments:* One commenter urged that the rule should not include detention availability as a factor for parole, since the determination of whether to deprive an individual of their liberty "should never be contingent on or determined by the budget or physical infrastructure of a Federal agency." Another commenter expressed concern that the proposed rule's allowance for parole consideration when detention is unavailable or impracticable would lead to increased calls for detention beds, an outcome the commenter opposed. A commenter asserted that, under the expanded grounds for parole, detention should only be considered "practical" if asylum seekers are provided with the ability to access medical care, legal counsel, and language assistance.

*Response:* Because the regulatory text that DHS is finalizing no longer specifies that parole may be considered when detention is "unavailable or impracticable," the Departments decline to address in detail commenters' arguments respecting that particular language. With regard to the comment premised on the idea that detention "should never be contingent on or determined by the budget or physical infrastructure of a Federal agency," the Departments disagree. By statute, a noncitizen who is being processed under the expedited removal provisions of section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), is subject to detention unless DHS exercises its discretion to "parole" the noncitizen "only on a case-by-case

basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS's resources may appropriately be considered in determining whether to exercise parole authority pursuant to section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A). Indeed, the availability of DHS detention resources is integral from an operational standpoint. For example, there may be a limited number of available detention beds in a particular facility or an insufficient number of DHS officers available to handle the volume of detainees, thereby hampering DHS's ability to promptly and efficiently process cases. DHS can focus its detention resources on those noncitizens found to be a flight risk or danger to the community, particularly when there are a limited number of detention beds.

*Comment:* A few commenters stated that the proposed rule's expansion of the circumstances in which parole may be allowed is a welcome development but requested clarification regarding how the changed parole standard will be integrated into the proposed adjudicative process. Specifically, a commenter inquired whether a paroled person would be subject to the new procedure established by the rule and, if so, when and where the credible fear interview and Asylum Merits interview would take place. The commenter also asked whether a paroled person would be forced to remain near where they were detained and what the process would be for changing the venue of the asylum interview.

*Response:* The procedure established by the rule is available to parolees. If the person or family unit is paroled prior to their credible fear interview, the Departments anticipate that their credible fear interview and Asylum Merits interview, if applicable, will take place at a USCIS Asylum Office near their destination within the United States and that such persons would not be required to remain in the vicinity of where they were detained. DHS anticipates that the credible fear interview will normally take place within 30 days of referral of the noncitizen to USCIS. DHS officials, in their discretion, may impose reasonable conditions on the grant of parole (including, *e.g.,* periodic reporting to ICE) to ensure that the individual will appear at all hearings and for removal from the United States when required to do so. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(c)–(d).

c. Availability of Employment Authorization for Those in Expedited Removal Who Have Been Paroled From Custody

*Comments:* Several commenters urged that the proposed regulations should be amended to provide for parole-based employment authorization eligibility for all people whom DHS paroles from detention, to respect the dignity of asylum seekers and ensure that they can support themselves and their families. Several commenters asserted that ensuring parole-based eligibility for an employment authorization document ("EAD") for asylum seekers released from detention would help them secure housing, food, health care, and other necessities. Commenters discussed how authorizing asylum seekers to work at the earliest practicable stage would offer a variety of benefits to both asylum seekers and host communities, including helping to reduce their social and economic exclusion; reduce the risk that they experience extreme poverty, food insecurity, or homelessness; and alleviate the loss of skills, low self-esteem, and mental health problems that often accompany prolonged periods of idleness. One commenter also stated that barriers to employment authorization often impede asylum seekers' access to counsel or other services, such as food assistance, and remarked that asylum seekers' inability to work may have long-term negative impacts on their economic prospects and mental health. A commenter asserted that forcing parolees to wait for months or years for an adjudication of their claim without any means to find legal employment lends itself to abusive and harmful employment arrangements that are marked by unscrupulous employers taking advantage of asylum seekers' desperation. A commenter stated that the denial of EADs to parolees would have a particularly negative impact on LGBT migrants, as they often travel alone with no support system.

A commenter noted that the EAD is often the only government-issued identification an asylum seeker may have in their possession, and individuals forced to wait to apply for employment authorization would thus likely be without a valid identification, leading to challenges when securing housing, opening bank and utility accounts, or encountering law enforcement. The commenter concluded that limiting employment authorization for individuals released under 8 CFR 235.3(b)(4)(ii) would endanger the lives of asylum seekers and their families.

On the other hand, another commenter noted that it supports the decision to restrict EAD eligibility "solely on the basis of receiving parole" and recommended that this decision be maintained. The commenter asserted that DHS does not have the authority to grant EADs to asylum seekers for whom the INA does not provide such eligibility or for whom the INA expressly grants the Secretary discretionary authority. The commenter argued that it would be unreasonable to conclude that Congress authorized DHS to use parole to permit an indefinite number of asylum seekers to enter the United States, in its discretion, and to allow them to engage in employment. The commenter also said providing EAD eligibility "solely on the basis of being paroled" would serve as a powerful pull factor for illegal immigration.

Several commenters addressed the waiting period for EAD eligibility for asylum seekers. Some commenters argued that the one-year waiting period for EAD eligibility based on a pending asylum application, pursuant to the current DHS regulations at 8 CFR 208.7, is excessive and inhumane. One commenter stated that individuals forced to wait a year to apply for employment authorization would likely be unable to secure necessities such as food, shelter, and medical care. However, another commenter maintained that, per section 208(d)(2) of the Act, 8 U.S.C. 1158(d)(2), the Secretary cannot grant employment authorization to an asylum applicant until at least 180 days after the filing of the application for asylum. The commenter encouraged DHS to abide by the INA's 180-day restriction, arguing that failing to do so would encourage illegal immigration and fraud in the asylum system.

A commenter suggested that DHS require by regulation that parole-based EADs be adjudicated within 30 days of receipt, claiming that delays in USCIS adjudication force individuals to wait for months for parole-based employment authorization. A commenter, in asserting that the proposed rule's parole provision is an ultra vires application, stated that the proposed rule does not actually limit employment authorization. The commenter stated that, even though the proposed rule provides that parole would not serve as an independent basis for employment authorization, nothing in 8 CFR 274a.12(c)(8) prohibits applications filed after the asylum seeker files a completed asylum application.

*Response:* The Departments acknowledge the multiple comments both in support of and in opposition to the NPRM's provision restricting EAD-eligibility based on parole for this subset of parolees. The Departments have considered comments highlighting potential benefits that would accrue to asylum applicants and their support networks if they were to receive employment authorization earlier as well as the potential drawbacks of providing earlier employment authorization and balanced those benefits and drawbacks in light of the broader interests served in the rulemaking. On balance, the Departments believe that this rulemaking's overall framework promoting efficiency in the adjudication of protection-related claims and the overall statutory scheme with respect to obtaining employment authorization based on pending asylum applications is best served by finalizing the DHS regulatory language in the NPRM for several reasons.

First, the Departments note that the overall goal of the rulemaking is to ensure that noncitizens receive final decisions on their claims for protection as quickly and efficiently as possible, consistent with fundamental fairness, and ensuring that noncitizens appear for any interviews and hearings is key to this process. Providing parole-based employment authorization to noncitizens who are in expedited removal or in expedited removal with a pending credible fear determination (that is, employment authorization with no prerequisite waiting period) risks incentivizing more individuals to enter the United States and seek out this process in the hopes of obtaining parole under this framework while disincentivizing appearance. Moreover, individuals for whom employment authorization is the most salient benefit of securing asylum, if eligible, would have less of an incentive to appear for subsequent interviews and hearings. *See* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). Second, the Departments believe that their approach is consistent with the provisions in section 208(d)(2) of the Act, 8 U.S.C. 1158(d)(2), regarding a waiting period for employment authorization for asylum applicants, which states that "[a]n applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum." INA 208(d)(2), 8 U.S.C. 1158(d)(2). The Departments recognize that the "otherwise eligible" language in section 208(d)(2) of the Act, 8 U.S.C. 1158(d)(2), could be read to encompass employment authorization based on

IFR_AR_000783

parole. However, noncitizens paroled with a pending credible fear determination are all seeking asylum (or related protection) and are being paroled on a case-by-case basis for urgent humanitarian reasons or significant public benefit while they await a screening interview on their protection claims. The Departments note that potential benefits associated with more expeditious employment authorization are expected under the new process in that the waiting period will begin running sooner here as an application will be considered filed at the time of a positive credible fear determination. Additionally, eligible noncitizens will likely receive a final determination granting relief or protection, and employment authorization incident to status, prior to being eligible for an employment authorization under 8 CFR 274a.12(c)(8) based on a pending asylum application.

With respect to waiting periods for asylum-based EADs generally, the Departments note that on February 7, 2022, in *AsylumWorks* v. *Mayorkas,* No. 20–cv–3815, 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the United States District Court for the District of Columbia vacated two DHS employment authorization-related rules entitled "Asylum Application, Interview, and Employment Authorization for Applicants," 85 FR 38532 (June 26, 2020), and "Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications," 85 FR 37502 (June 22, 2020). Finally, the Departments disagree with the commenter that states that the Secretary of Homeland Security lacks the discretionary authority to grant employment authorization to those paroled. The Departments note that the Secretary of Homeland Security, as a matter of policy for the reasons outlined above, is exercising his discretionary authority narrowly as to noncitizens who are in expedited removal or in expedited removal with a pending credible fear determination and who are paroled from custody.

d. Other Comments on Proposed Approach to Parole

*Comments:* A few commenters urged that detained asylum seekers should have access to bond determination hearings, as well as regular opportunities to challenge continued detention. Another commenter stated that regulations should ensure meaningful access to counsel for those in immigration detention, readily accessible confidential attorney-client meeting spaces, confidential free telephone and televideo communication options, as well as minimum restrictions on visitation.

*Response:* These comments are beyond the scope of the current rulemaking, which amends only the regulatory provisions specifying the circumstances in which parole may be considered for noncitizens subject to expedited removal.

*Comments:* One commenter stated that the proposed rule would essentially deny all individuals the right to have their custody reviewed by a neutral arbiter and urged that the regulations should require a neutral decisionmaker. The commenter suggested that IJs should be given the power to review and revise parole decisions made under the proposed regulations.

*Response:* These comments are beyond the scope of the current rulemaking, which amends only the regulatory provisions specifying the circumstances in which parole may be considered for noncitizens subject to expedited removal.

*Comments:* A commenter stated that the unprecedented surge in family unit migration, which the commenter attributed to the *Flores* Settlement Agreement, is endangering children at the border and that such migration will continue to soar unless the dynamics causing this trend are changed. The commenter asserted that the Departments should "address" the *Flores* Settlement Agreement before taking any steps to expand the availability of parole for asylum seekers and suggested that the agencies promulgate regulations that would enable DHS to detain adults and children entering illegally in family units, to comply with the detention provisions in the INA.

*Response:* The *Flores* Settlement Agreement requires the promulgation of the relevant and substantive terms of the FSA as regulations, FSA ¶ 9, and based on a 2001 Stipulation, the Agreement terminates "45 days following defendants' publication of final regulations implementing [the] Agreement," Stipulation Extending Settlement Agreement ¶ 40, *Flores* v. *Reno,* No. 85–cv–4544 (C.D. Cal. Dec. 7, 2001). In August 2019, DHS and the Department of Health and Human Services published a *Flores* final rule, Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 FR 44392 (Aug. 23, 2019); however, that rule was partially enjoined, *see Flores* v. *Rosen,* 984 F.3d 720 (9th Cir. 2020). While the FSA does impose restrictions on DHS's ability to detain family units, addressing the FSA by promulgating regulations to implement such Agreement is outside the scope of this rule.

*Comments:* Several commenters supported expanding the circumstances in which parole may be granted to allow release of families from detention but opposed any expansion of the expedited removal system upon which the proposed asylum process is premised. A couple of commenters asserted that the expedited removal process is harmful and emphasized that DHS is not required to use expedited removal. These commenters recommended that the proposed rule be amended to avoid the use of expedited removal. Commenters argued that the expedited removal process does not provide due process, fails to comply with domestic refugee law and international commitments, and has led to mistreatment and the return of refugees to persecution.

Commenters also argued that the proposed changes to 8 CFR 235.3 to expand the possibility of parole would eliminate the barrier to placing families into expedited removal and would risk further cementing expedited removal as a primary tool to remove noncitizens, creating possibilities for use of the expedited removal structure to be expanded by future administrations.

*Response:* The Departments disagree that the expedited removal process does not comport with due process or U.S. refugee law. *See, e.g., DHS* v. *Thuraissigiam,* 140 S. Ct. 1959, 1963–64 (2020) (addressing the Due Process Clause of the Fifth Amendment). Comments expressing opposition to the Departments' use of expedited removal generally are also beyond the scope of this rulemaking, which amends certain procedures and standards applicable to noncitizens once they have already been placed into expedited removal.

*Comments:* Several commenters stated that detention is a harmful and punitive practice that should be reduced or eliminated completely and expressed disappointment that the proposed rule did not include systematic efforts to limit or eliminate the detention of asylum seekers. A couple of commenters added that detention is not necessary to achieve the goal of ensuring that people seeking asylum appear for their appointments. A few commenters remarked that detention makes it nearly impossible for asylum seekers to assert their protection claims effectively, as their ability to access legal resources and legal representation is often non-existent. One commenter stated that only 30 percent of detained immigrants receive legal representation and argued that the remote location of detention facilities, the inadequate

IFR_AR_000784

access to counsel and interpreters, and the frequent transfer of detainees present nearly insurmountable barriers to detainees seeking to obtain legal assistance. A few commenters asserted that detention of asylum seekers flouts U.S. legal obligations under the Refugee Convention and Protocol or that presumptive detention of asylum seekers violates international refugee and human rights law. Some commenters suggested that DHS invest its resources in housing, medical treatment, and travel expenses for asylum seekers, rather than expediting asylum interviews and moving people through detention faster. They stated that this would help ensure that those entering the United States are welcomed by a supportive community.

*Response:* Although the Departments acknowledge the commenters' concerns about access to legal services, the Departments disagree with the commenters who urged that the regulations at issue should be amended to systematically limit or eliminate the detention of anyone indicating an intention to seek asylum. The Departments believe that the standards proposed by these commenters would not be consistent with the detention provisions of section 235(b)(1)(B)(ii) of the Act, 8 U.S.C. 1225(b)(1)(B)(ii), or DHS's parole authority under section 212(d)(5)(A) of the Act, 8 U.S.C. 1182(d)(5)(A). Proposals to change those detention provisions are properly directed to Congress, not to the Departments. The Departments also do not believe that commenters' requests are feasible. Commenters did not explain what budget authority DHS would have to invest resources in non-detention housing, medical treatment, and travel expenses for noncitizens arriving at the border and indicating an intention to apply for asylum in the United States.

3. Credible Fear Screening Process

a. General Comments on Credible Fear Screening Process

*Comments:* Some commenters indicated that the changes to the credible fear screening process in the NPRM are valuable and necessary and expressed general support for the changes. Other commenters expressed opposition to the procedural changes based on the belief that individuals in the expedited removal process are coached to lie and express fear. Several commenters described the credible fear process as a "loophole" to be exploited by dangerous people to get into the United States. Other commenters stated that the majority of asylum seekers are

not properly vetted, while another stated that individuals claim credible fear without any proof. Similarly, several commenters stated that documented proof should be submitted, and that testimony alone or a simple statement of credible fear is unacceptable.

Another commenter stated that credible fear should be established immediately after the individual is detained to avoid having U.S. persons suffer at the hands of criminals. Similarly, another commenter suggested that individuals who are national security threats or have "egregious criminal histories" should not be permitted to make credible fear claims. Some commenters stated that asylum officers should not be conducting credible fear interviews, asserting that the existing process lacks transparency and oversight, and another commenter recommended that IJs handle credible fear claims.

Several commenters expressed concern with conditions and due process in expedited removal and credible fear interviews in general, arguing that those factors would affect the case outcome in various stages of the asylum process.

*Response:* The Departments acknowledge the commenters' support for the changes to the credible fear screening process in this rule and acknowledge the other commenters' concerns about the credible fear screening process. The Departments disagree that the credible fear screening process is a loophole to be exploited by dangerous individuals and that the rule will only encourage more individuals to come to the border and request asylum. Expedited removal and the credible fear screening process were established by Congress. The credible fear process ensures that the U.S. Government adheres to its international obligations, as implemented through U.S. law, to refrain from removing a noncitizen to a country where the noncitizen would be persecuted or tortured. *See* Section II.B and II.C of this preamble. To the extent that commenters assert that noncitizens seeking protection generally are liars or criminals seeking to exploit a "loophole," the Departments reject that characterization as unfounded. This rulemaking is one part of a multifaceted whole-of-government approach to addressing irregular migration and ensuring that the U.S. asylum system is fair, orderly, and humane, and this rulemaking is consistent with the E.O. on Migration, which states that "[s]ecuring our borders does not require us to ignore the humanity of those who seek to cross them. The opposite is

true." 86 FR 8267. This whole-of-government approach seeks to make better use of existing enforcement resources by investing in border security measures that are proven to work and that will facilitate greater effectiveness in combatting human smuggling and trafficking and the entry of undocumented individuals. This rule seeks to ensure that the Departments process the protection claims of individuals in the credible fear screening process promptly and efficiently, meaning that it allows individuals who are not eligible for protection to be removed more promptly.

The Departments recognize that the credible fear screening and review process involves eliciting testimony from individuals seeking protection and does not require noncitizens to provide written statements or documentation. Both asylum officers and IJs receive training and have experience with assessing evidence and the credibility of noncitizens who appear before them for interviews or hearings. Asylum officers and IJs have experience identifying and raising concerns surrounding inconsistencies and lack of detail, and thus are equipped to make well-reasoned decisions regarding credibility, even in the absence of written statements or other documentation. Moreover, requiring written statements or other documentation would likely limit the ability of certain asylum seekers to obtain protection, given that some may have fled their home countries without the ability to secure documentation, and obtaining documentation once they are in the United States may not be feasible. Indeed, the INA explicitly provides that "testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii).

Moreover, the Departments respectfully disagree with commenters' assertions that credible fear interviews are plagued with due process concerns. While some issues may arise due to the nature of credible fear interviews—which may be the first time or one of the first times an individual has provided testimony related to sensitive topics and which often occur remotely with an interpreter and with the individual in a detained setting—USCIS asylum officers are trained to conduct those interviews in a fair and sensitive manner, and

IFR_AR_000785

every credible fear determination is reviewed by a supervisory asylum officer and subject to additional IJ review if the applicant so chooses or, under this IFR, fails or refuses to decline such review. The Departments do not agree that potential issues with the credible fear determination, to the extent that any may exist, would necessarily affect case outcomes in the new process. Applicants will have ample opportunity to correct any biographic or informational errors in the Form I–870. Asylum officers will not be limited to considering only the testimony provided during the credible fear interview but will conduct a full nonadversarial interview to determine asylum eligibility for the principal applicant. Moreover, if the applicant fails to establish asylum eligibility before the asylum officer at the Asylum Merits interview under the IFR, they will have the opportunity to present their claims for asylum and withholding or deferral of removal before an IJ when they are placed in streamlined section 240 proceedings and the IJ will review their claims.

b. "Significant Possibility" Standard for Protection Claims

*Comments:* Several commenters expressed general support for restoring the "significant possibility" standard. One commenter stated that clarifications at proposed 8 CFR 208.30(e)(2) provide important protections to individuals in expedited removal and comport with section 235(b)(1)(B) of the Act, 8 U.S.C. 1225(b)(1)(B).

Other commenters expressed general disapproval with the use of the "significant possibility" standard, either advocating for a higher standard or stating that the use of a less stringent standard may encourage frivolous claims or claims from individuals solely seeking employment authorization.

*Response:* The Departments acknowledge the support of commenters. The rule adopts the "significant possibility" standard for credible fear screenings for purposes of asylum, withholding of removal, and CAT protection. As explained above in Section III.A of this preamble, while the statutory text only defines "credible fear" for purposes of screening asylum claims, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v); *see also* 86 FR 46914, the Departments believe that the efficiency gained in screening the same set of facts using the same standard of law for all three forms of protection is substantial and should not be overlooked. Moreover, the credible fear screening process is preliminary in nature; its objective is to sort out,

without undue decision costs, which cases merit further consideration and to act as a fail-safe to minimize the risk of refoulement. Using one standard of law is consistent with those objectives, even though the ultimate adjudication of a noncitizen's claim for each form of protection may require a distinct analysis.

*Comments:* One commenter requested that the Departments elaborate upon the "significant possibility" test to make clear that the showing that must be made is not a "significant possibility" of persecution, but a "significant possibility" that the "claimant could make out a well-founded fear of such persecution where there exists as little as a one in ten chance of such serious harm occurring." The commenter argued that the "preponderance of the evidence" threshold is not applicable during this process. The commenter also stressed that nothing in the proposed rule requires the asylum officer to investigate all the possible avenues by which an applicant for protection may be able to access asylum. Similarly, some commenters said that more training and oversight is needed to ensure that asylum officers correctly apply the low bar standard and do not misinterpret it.

Alternatively, a commenter suggested that the standard "manifestly unfounded" be applied during the credible fear screening. That is, the commenter believes that unless an individual's claim is assessed to be manifestly unfounded, or unrelated to the criteria for granting asylum, they should have access to full proceedings. The commenter believes this would guard against the risk that an individual would be returned to a country where they face persecution. The commenter further stated that the "significant possibility" standard is a step in the right direction but still does not match international standards. Another commenter expressed the concern that the "significant possibility" standard proposed in the rule is largely impossible to meet in practice because "it virtually forces the non-citizen to produce at once all of the evidence necessary to gain success at trial."

*Response:* The Departments appreciate comments regarding further elaboration on the "significant possibility" standard, alternative standards, and the "significant possibility" standard's use in credible fear interviews. The "significant possibility" standard is a statutory standard found at INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and suggested use of the "manifestly unfounded" or other international standards

concerning refugee claims in screening for credible fear would require legislative change. As commenters have recognized, appropriate application of the "significant possibility" standard is nuanced and fact-intensive. The Departments therefore believe that further elaboration on the appropriate application of the standard is best accomplished through case law, training, and oversight, rather than through abstract discussion or further codification. Such training is an integral part of ensuring the appropriate application of this standard, but the Departments do not believe it is appropriate to codify such training or oversight in the regulatory text.

*Comments:* Some commenters stated that the return to the "significant possibility" standard is appropriate but observed that the proposed rule does not specify a choice of law rule, which is important for respecting the rights of asylum seekers, and commenters suggest that this language be added at 8 CFR 208.30. One commenter asked that DHS apply the law most favorable to the individual seeking protection when determining whether he or she meets the credible fear standard.

*Response:* The Departments agree that USCIS should apply the law most favorable to the individual seeking protection at the credible fear screening stage. DHS remains subject to the injunction in *Grace* v. *Whitaker,* 344 F. Supp. 3d 96, 135–40, 146 (D.D.C. 2018), which found that a DHS policy memo applying only the law of the circuit where the credible fear interview occurs rather than the circuit law most favorable to the applicant's claim was unlawful. Therefore, USCIS continues to apply the choice of law most favorable to the applicant when screening for credible fear.

*Comment:* A few commenters generally opposed the rule on the ground that changing the standard for credible fear screening will delay removal of noncitizens with meritless claims for protection.

*Response:* The Departments disagree that the rule's changes to the credible fear screening process will, in the aggregate, contribute to delays in removal. Divergent standards for asylum and withholding of removal along with variable standards for individuals barred from certain types of relief were promulgated in multiple rulemaking efforts over the last few years.[68] However, in working to create efficiencies within this process, adopting the standard of law that was

---

[68] *See supra* note 4 (discussing recent regulations and their current status).

set by Congress for credible fear claims is the logical choice. The varied legal standards created by asynchronous rulemaking, and often enjoined or vacated by legal challenges, defeated their intended purpose by complicating and extending the initial screening process provided for in section 235 of the Act, 8 U.S.C. 1225. Use of different legal standards for asylum, statutory withholding of removal, and CAT protection required additional time for adjudicators to evaluate whether a mandatory bar to asylum or to statutory withholding of removal was present. Additionally, adjudicators were required to evaluate the same evidence twice for the same factual scenario. Notably, use of the different standards would require asylum officers to apply the mandatory bars to asylum in order to consider screening for statutory withholding of removal. In turn, this would inevitably increase credible fear interview and decision times, requiring analysis of the bars and then applying the higher evidentiary standard. For example, when the TCT Bar IFR was in effect, asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied and, if so, whether an exception to the bar might have applied. Then, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, asylum officers had to develop the record sufficiently such that a determination could be made according to the higher reasonable possibility standard. IJs reviewing negative credible fear determinations where a mandatory bar was applied would similarly be required to review the credible fear determination under two different standards, undermining the efficiency of that process as well.

In the Departments' view, the delays associated with complicating and extending each and every credible fear interview to use two different standards outweigh any efficiency that could be gained by potential earlier detection of individuals who may be barred from or ineligible for certain types of protection. Commenters have not provided any data or information suggesting that the asylum caseload would be meaningfully reduced by evaluating the existence of bars to eligibility during the credible fear screening or by applying a "reasonable possibility" standard (rather than the "significant possibility" standard) in screening claims for statutory withholding of removal or CAT protection. In clarifying that the "significant possibility" standard

applies not only to credible fear screening for asylum, but also to credible fear screening for statutory withholding and CAT protection, the Departments will continue to ensure that the expedited removal process remains expedited and will allow for asylum officers and, upon credible fear review, IJs, to adhere to a single standard of law in fulfilling the United States' nonrefoulement obligations.

*c. Due Process in Credible Fear Screening*

*Comments:* Multiple commenters recommended that the Departments retain the language at 8 CFR 208.30(g)(2)(i) acknowledging USCIS's ability to reconsider a negative credible fear finding after it has been upheld by an IJ. Commenters expressed their belief that an additional option for review, even after a Supervisory Asylum Officer ("SAO") has reviewed the asylum officer's credible fear determination and an IJ has concurred with the determination, is still necessary to preserve the rights of noncitizens.

Commenters described a range of issues that they allege render the credible fear process systematically "unreliable," making the need for additional safeguards against refoulement—including USCIS reconsideration—more acute. Describing the negative effects of trauma and procedural limitations on credible fear outcomes, commenters suggested that the ability to file a request for reconsideration with USCIS has saved "countless" asylum seekers from refoulement. One commenter noted that reconsideration provides "an important safety net" and can address instances in which the credible fear process may not have provided a fair process, including where appropriate interpretation for indigenous language speakers and adequate accommodations for disabilities were not provided. Another commenter suggested that the reconsideration processes in place are "central to the American value of due process" and a second commenter, for similar reasons, expressed strong opposition to eliminating them through this rule.

Multiple commenters argued that revising this provision would eliminate a key procedural safeguard for asylum seekers, citing a September 2021 study by Human Rights First.[69] Several

commenters provided examples of individuals who successfully sought reconsideration and, as a result, won protection. These commenters concluded that reconsideration by USCIS is a means to avoid unlawful refoulement due to mishandled credible fear interviews, errors in the initial credible fear record, and barriers to adequate review by an IJ.

Adding to the above arguments, a commenter asserted that the factors distinguishing USCIS reconsideration from IJ review favor due process and administrative efficiency. The commenter said reconsideration allows for more time to access counsel, since asylum seekers can request reconsideration at any time following the credible fear determination and prior to removal. On the other hand, EOIR is required to schedule hearings within 7 business days of the credible fear determination. The commenter added that USCIS asylum officers will often provide asylum seekers time to explain errors with their initial interview, while IJ reviews move quickly and do not consider procedural errors in the credible fear interview. Furthermore, the commenter suggested that USCIS benefits from requests for reconsideration, as they serve as checks and balances for the agency while informing future asylum officer training. Given the differences between IJ review and USCIS reconsideration, an individual commenter argued that "[requests for reconsideration] are often our only recourse after a negative [credible fear interview] finding."

*Response:* The Departments acknowledge the comments related to whether an IJ should have sole jurisdiction to review negative credible fear determinations made by USCIS, or whether USCIS should retain the practice of entertaining requests for reconsideration even after a negative credible fear determination is served on the applicant and reviewed and affirmed by an IJ. Some context for the regulatory language at play and the way this practice has developed is helpful to frame this discussion. Prior to publication of the Global Asylum rule on December 11, 2020, the language related to reconsideration was located at 8 CFR 1208.30(g)(2)(iv)(A). With the Global Asylum rule, the Departments moved it from that section to 8 CFR 208.30(g)(2)(i).[70] The regulatory language recognizes USCIS's inherent discretionary authority to reconsider its own determination, but it was never meant to provide for a general process

[69] *See* Human Rights First, *Biden Administration Move to Eliminate Requests for Reconsideration Would Endanger Asylum Seekers, Deport Them to Persecution and Torture* (Sept. 2021), *https:// www.humanrightsfirst.org/sites/default/files/ RequestsforReconsideration.pdf* (last visited Mar. 14, 2022).

[70] *See* 85 FR 80275; *supra* note 4 (discussing recent regulations and their current status).

by which individuals could submit requests for reconsideration of negative credible determinations to USCIS that had already been reviewed and upheld by an IJ as a matter of course. In practice, however, this regulatory language has served as a basis for entertaining such requests and, over the years, they have become an ad hoc yet increasingly significant portion of the work of USCIS asylum offices. Because this was never meant to be a formalized process, there is no formal mechanism for individuals to request reconsideration of a negative credible fear determination before USCIS; instead, such requests are entertained on an informal ad hoc basis whereby individuals contact USCIS asylum offices with their requests for reconsideration after an IJ has affirmed the negative credible fear determination, and asylum offices have to quickly assign officers and supervisors to review those requests. This informal, ad hoc allowance for such requests has proven difficult to manage and led to the expenditure of significant USCIS resources to entertain such requests. Yet USCIS has continued to entertain these requests because, in line with what some commenters argued, IJ review has sometimes failed to address allegations of error or newly available evidence that may compel a positive credible fear determination, and individuals would otherwise have no other recourse.

The informal ad hoc approach of USCIS entertaining requests for review of negative credible fear determinations that has developed over time requires USCIS to devote resources to these requests that could more efficiently be used on initial credible fear and reasonable fear determinations, affirmative asylum adjudications, and now Asylum Merits interviews under the present rule. Because there is no formal mechanism by which to accept and review such requests, there can be no uniform procedure guiding their review. Likewise, because they are not applications, petitions, motions, or some other type of formal request, USCIS does not maintain comprehensive, official data in the Asylum Division's case management system on requests for reconsideration in a standardized manner that can be readily queried. In any event, the Departments agree with commenters

that some type of data related to these requests, including how many are received, how often the negative credible fear determinations are reconsidered, and how often a positive decision is issued, would be helpful to inform this discussion. The Departments accordingly have attempted to gather the best data available related to these requests, based on informal tracking by some offices, which is not comprehensive or standardized.

The available data related to requests for reconsideration (''RFRs'') of negative credible fear determinations already affirmed by an IJ is as follows:

Fiscal Year 2019 (''FY19'')

During FY19, the following USCIS asylum offices informally tracked credible fear RFRs received at their offices: Houston, TX (ZHN); Los Angeles, CA (ZLA); New York, NY (ZNY); Newark, NJ (ZNK); New Orleans, LA (ZOL); and San Francisco, CA (ZSF). The remaining offices (Arlington, VA (ZAR/ZAC); Chicago, IL (ZCH); and Miami, FL (ZMI)) did not track RFRs received.

| | |
|---|---|
| FY19: Total negative CF determinations by the offices that tracked RFRs. | 12,071. |
| FY19: Total RFRs submitted to offices that tracked RFRs ..................... | 2,086 (17 percent of negatives from the offices that tracked RFRs). |
| FY19: Total negative determinations changed to positive post-RFR by offices that tracked RFRs. | 231 (11 percent of RFR submissions and 2 percent of all negatives from the offices that tracked RFRs). |

Fiscal Year 2020 (''FY20'')

During FY20, the following USCIS asylum offices informally tracked credible fear RFRs received at their offices: Boston, MA (ZBO); Houston, TX (ZHN); Los Angeles, CA (ZLA); New York, NY (ZNY); Newark, NJ (ZNK); New Orleans, LA (ZOL); and San Francisco, CA (ZSF). The remaining offices (Arlington, VA (ZAR/ZAC); Chicago, IL (ZCH); and Miami, FL (ZMI) did not track RFRs received.

| | |
|---|---|
| FY20: Total negative CF determinations by the offices that tracked RFRs. | 7,698. |
| FY20: Total RFRs submitted to offices that tracked RFRs ..................... | 2,109 (27 percent of negatives from the offices that tracked RFRs). |
| FY20: Total negative determinations changed to positive post-RFR by offices that tracked RFRs. | 150 (7 percent of RFR submissions and 2 percent of all negatives from the offices that tracked RFRs). |

Fiscal Year 2021 (''FY21'')

During FY21, the following USCIS asylum offices informally tracked credible fear RFRs received at their offices: Arlington, VA (ZAR/ZAC); Boston, MA (ZBO); Houston, TX (ZHN); Los Angeles, CA (ZLA); New York, NY (ZNY); Newark, NJ (ZNK); and New Orleans, LA (ZOL). The remaining offices (Chicago, IL (ZCH); Miami, FL (ZMI); and San Francisco, CA (ZSF)) did not track RFRs received.

| | |
|---|---|
| FY21: Total negative CF determinations by the offices that tracked RFRs. | 11,232. |
| FY21: Total RFRs submitted to offices that tracked RFRs ..................... | 1,213 (10.7 percent of negatives from the offices that tracked RFRs). |
| FY21: Total negative determinations changed to positive post-RFR by offices that tracked RFRs. | 188 (15 percent of RFR submissions and 1.6 percent of all negatives from the offices that tracked RFRs). |

Although the above data do not account for every case in which a request for reconsideration of a negative credible fear determination was made, they demonstrate the significant number of requests for reconsideration that USCIS asylum offices have entertained. Anecdotally, offices report that given the sizeable number of requests received, it is not uncommon to have four or five senior asylum officers working on RFRs full-time, along with two supervisors dedicating half of each day to RFRs on a regular basis, with additional oversight (approximately one

hour per day) by upper management (such as a Section Chief). The number of hours required to review an RFR may vary, as the task includes reviewing the credible fear record in light of any allegations of clear error or the presentation of any newly available evidence that may change the decision from a negative to a positive and determining if another interview is necessary to make a decision. In cases in which another interview is provided, a single request could take upwards of four hours to complete. Moreover, given the time-sensitive nature of the request, considering the individual is in the process of being expeditiously removed, where offices exercise their discretion to review such requests, they have to act quickly to ensure the review takes place prior to removal. Where RFRs are entertained, to ensure the review takes place prior to removal, if an office does not already have full-time staff dedicated to RFR review at a given moment, they must pull asylum officers off their regular caseload of credible fear, reasonable fear, or affirmative asylum cases and require them to quickly shift gears to review RFRs, in addition to requiring SAOs to do the same. Furthermore, while offices have not tracked cases where multiple RFRs are received, anecdotally, they report that it is not uncommon to receive multiple RFRs from the same applicant, in some instances as many as two to three or more per case.

To channel USCIS's resources to where they can most efficiently be used, with the present rulemaking, the Departments first proposed revising 8 CFR 208.30(g)(1)(i) to eliminate USCIS reconsiderations and provide that an IJ has sole jurisdiction to review whether the individual has established a credible fear of persecution or torture once the asylum officer has made a negative credible fear determination and the individual is served with a Form I–863 (after the individual either requests IJ review or declines to request review and that declination is treated as a request for review). Once the Form I–863 was served, jurisdiction to review the credible fear determination would then have rested solely with EOIR. The Departments based this revision on the notion that requests to reconsider negative credible fear determinations where applicants have new, previously unavailable evidence, or where a clear procedural or substantive error in the determination is alleged, should properly take the form of motions to reopen before EOIR and be decided by an IJ.

Upon further consideration and after reflecting on the comments received on this topic, however, the Departments agree with many of the commenters that even after a negative credible fear determination has been reviewed by an SAO, the individual has been served with the decision, and an IJ has reviewed and concurred with the negative determination, in some rare instances USCIS may still want to reconsider the determination as a matter of discretion. For example, if there is an allegation of procedural or substantive error in the original determination and the IJ did not address this issue during IJ review, it may be an appropriate exercise of USCIS's discretion to reconsider the case. While the Departments disagree with the commenters' characterization of credible fear interviews as rife with procedural errors, the Departments also recognize that errors sometimes occur given all the unique circumstances at play. In some instances, errors that may or may not have been avoidable will occur and should be corrected. In those instances, the Departments believe there should be some recourse for the noncitizens who are affected. The Departments do not take lightly the notion that, as referred to by commenters and as demonstrated by the above data, there are some cases where the negative credible fear determination is overturned and, absent such individuals requesting reconsideration and USCIS exercising its discretion to reconsider, these individuals may have been removed to a country where they were in fact ultimately able to demonstrate a credible fear of persecution or torture. Considering the gravity of the consequences of failing to address a potential clear error in the negative credible fear determination, including potentially violating the United States' non-refoulement obligations and returning the individual to a country where there is a significant possibility that the individual could be persecuted or tortured, the Departments agree that it is appropriate to allow an option for reconsideration as a last resort. While the NPRM framed that option as being best exercised by EOIR before the IJ, considering the many comments showing how USCIS is specially positioned to reconsider a decision even after an IJ has concurred with it, the Departments agree that potential reconsideration by USCIS should continue to be allowed. As such, instead of adopting the revisions to 8 CFR 208.30(g)(1)(i) that were proposed in the NPRM, in this IFR, DHS is retaining language at 8 CFR 208.30(g)(1)(i) recognizing that DHS may, in its discretion, reconsider a negative credible fear finding with which an IJ has concurred.

At the same time, the Departments remain concerned that requests for reconsideration of negative credible fear determinations not be permitted to undermine the present rule's purpose to create a more efficient and streamlined process following a credible fear determination, while ensuring due process. As noted in the preamble to the NPRM, the original changes to 8 CFR 208.30(g) proposed in the NPRM were put forth to be consistent with the statutory scheme of INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii), under which IJ review of the credible fear determination serves as the check to ensure individuals are not returned to a country where they have demonstrated a credible fear. The Departments stand by that assertion from the NPRM's preamble and want to emphasize that even though they are recognizing the possibility that USCIS may, in its discretion, reconsider a negative credible fear determination, such an exercise of discretion is not the appropriate primary mechanism for review of a credible fear determination—that credible fear review, per statute, rests with the IJ once jurisdiction is transferred to EOIR. The recognition of USCIS's inherent discretionary authority to potentially reconsider a credible fear determination must not be used to undercut the statutory scheme of expedited removal, including the proper role of the IJ to review USCIS's negative credible fear determination, nor will DHS permit it to obfuscate the purpose of the present rule. Accordingly, while DHS is maintaining the regulatory reference to its inherent discretionary authority to reconsider a negative credible fear determination in the present rule, it is also placing a temporal and numerical limitation on allowances for reconsideration to ensure the exercise of such authority is consistent with the statutory expedited removal and credible fear framework. The present rule provides at 8 CFR 208.30(g)(1)(i) that any request for reconsideration must be received no more than 7 days after the IJ's concurrence with the negative credible fear determination, or prior to the individual's removal, whichever date comes first. This time limit is necessary to ensure the avenue of allowing USCIS reconsideration does not undercut the whole expedited removal process in cases where the applicant has already had an opportunity to present his or her claim before an asylum officer, the asylum officer has made a decision that was

concurred with by an SAO, and an IJ has reviewed the determination in accordance with the statutory scheme. Additionally, for the same reasons, it is necessary to limit any request for reconsideration of a negative credible fear determination before USCIS to one request only, which the Departments have also provided for at 8 CFR 208.30(g)(1)(i). Considering, as mentioned above, that asylum offices report receiving multiple RFRs for a single case and devoting significant resources that could more efficiently be spent adjudicating the cases of applicants who have not yet had any opportunity for their claims to be heard, this numerical limitation is also essential if USCIS is going to continue entertaining such requests. If unlimited requests were allowed, or if there were no limit on the time frame during which such requests may be lodged, the Departments would run the risk of endorsing an ad hoc process that would undermine the very purpose of the statutory scheme of expedited removal laid out by Congress, and indeed also the very purpose of the present rule. The Departments, after careful reflection, instead are providing the best balance to promote both due process and finality, consistent with the statutory scheme of expedited removal, including the statutory language that clearly directs that the IJ is the proper reviewer of any negative credible fear determination made by an asylum officer.

*Comments:* One commenter expressed support for the Departments' proposal to eliminate the regulatory text that describes USCIS's authority to reconsider negative credible fear determinations that have already been reviewed by a supervisory asylum officer and upheld by an IJ. This commenter agreed with the Departments' assessment that the proposal would increase efficiency, that it more closely aligns with the statutory scheme of section 235 of the Act, 8 U.S.C. 1225, and that it would be necessary to ensure that requests for reconsideration do not frustrate the streamlined process that Congress intended for expedited removal. The commenter asserted that requests for reconsideration have become "an overwhelmingly popular tactic" to delay removal among individuals without meritorious fear claims, diverting resources from those with legitimate claims.

*Response:* The Departments acknowledge the comment related to how the proposed changes align with the statutory scheme governing expedited removal and credible fear.

The Departments also agree that resources should be used efficiently and generally should not be diverted from those who have not yet had any interview or determination to those who have already had an opportunity to present their claim and who received a negative credible fear determination made by an asylum officer, reviewed by a supervisory asylum officer, and concurred with by an IJ. For these reasons, while the Departments are not maintaining the exact revisions to 8 CFR 208.30(g) proposed in the NPRM, the Departments are taking this opportunity to clarify that the statutorily-mandated review of any negative credible fear determination must take place by an IJ pursuant to INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), and that IJ review is the appropriate method by which a negative credible fear determination made by USCIS is reviewed. Following IJ review, pursuant to USCIS's inherent discretionary authority to review its own decisions, USCIS may, as a matter of discretion, reconsider a negative credible fear determination that has already been concurred with by an IJ, 8 CFR 208.30(g), but the Departments agree with the comment that this exercise of discretion cannot be allowed to frustrate the underlying expedited removal process laid out by Congress. Accordingly, DHS is providing for revisions to 8 CFR 208.30(g) that place reasonable limits on when USCIS may entertain a request for reconsideration as a matter of discretion, including that any reconsideration be requested by the noncitizen or their attorney or initiated by USCIS no more than 7 days after the IJ concurrence with the negative credible fear determination, or prior to the noncitizen's removal, whichever date comes first, and that only one such request may be entertained per case. These reasonable limitations are necessary to ensure that USCIS's exercise of discretion in allowing any potential reconsideration of a negative credible fear determination is not inconsistent with Congress's instructions in establishing the expedited removal process and to ensure requests for reconsideration cannot be used as a tactic to delay removal for individuals with non-meritorious claims, which, as the commenter expressed, is a serious issue that diverts resources from USCIS hearing potentially meritorious claims.

d. Removal of Mandatory Bars From Consideration

*Comments:* A commenter stated that the NPRM did not provide a good enough rationale for rescinding the

regulatory change that would require application of the "mandatory bars" against asylum claims during credible fear screening. The commenter expressed opposition to "ignoring" mandatory bars, such as if the applicant is a criminal, is a danger to the United States, or participated in the persecution of others. A number of commenters supported the Departments' proposal to not apply the mandatory bars to asylum and withholding of removal during the credible fear screening process. One comment stated that application of U.S. law relating to bars to asylum is so complex and often fact-intensive that it is simply not possible to make fair and accurate legal determinations on these issues in the context of credible fear screenings, which do not allow sufficient time to identify the factual information and legal arguments that may need to be raised on these points. Another commenter stated that exclusion from refugee protection is a complex inquiry into factual and legal questions involving not only international refugee law, but in many cases, international human rights, humanitarian law, and international criminal law. The commenter stated that this inquiry cannot be adequately assessed in a screening interview, particularly given truncated timelines, lack of legal assistance, lack of understanding about the procedure, challenges with translation and interpretation, and the prevalence of trauma.

*Response:* The Departments acknowledge the commenter's invitation to further explain their reasons for recodifying the historical practice of not applying mandatory bars to asylum or statutory withholding of removal at the credible fear screening stage. *See* 8 CFR 208.30(e)(5)(i)(A). As described in Section III.A of this preamble, requiring asylum officers to apply mandatory bars during credible fear screenings would make these screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious. Because of the complexity of the inquiry required to develop a sufficient record upon which to base a decision to apply a mandatory bar, such a decision is most appropriately made in the context of a full merits hearing, whether before an asylum officer or an IJ, and not in a screening context. Furthermore, due process and fairness considerations counsel against applying mandatory bars during the credible fear screening process. Due to the intricacies of fact finding and legal analysis required to make a determination on the applicability of any mandatory bars,

IFR_AR_000790

individuals found to have a credible fear of persecution should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240 proceedings provide. In light of the need to preserve the efficiency Congress intended in making credible fear screening part of the expedited removal process and to ensure due process for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory withholding of removal but for the potential applicability of a mandatory bar, the Departments have determined that these goals can be accomplished by returning to the historical practice of not applying mandatory bars at the credible fear screening stage.

The commenter's suggestion that the Departments intend through this rulemaking to ignore any mandatory bar is mistaken. On the contrary, asylum officers are trained to gather and analyze information to determine the applicability of mandatory bars in affirmative asylum adjudications, and they are instructed to assess whether certain bars may apply in the credible fear screening context. The latter assessment is designed to flag any mandatory bar issues requiring further exploration in Asylum Merits interviews or section 240 removal proceedings. Asylum officers and IJs will continue to apply the mandatory bars in their adjudications, when justified by the facts and the law. Individuals subject to a mandatory bar will not be found eligible for any immigration benefit foreclosed by the bar.

The Departments agree with these commenters that a complicated process requiring full evidence gathering and determinations to be made on possible bars to eligibility is incompatible with the function of the credible fear interview as a screening mechanism designed to quickly identify potentially meritorious claims deserving of further consideration in a full merits hearing and to facilitate the rapid removal of individuals determined to lack a significant possibility of establishing eligibility for asylum, statutory withholding of removal, or protection under the CAT. As detailed further above, not applying mandatory bars at the credible fear screening stage both preserves the efficiency Congress intended in making credible fear screening part of the expedited removal process and helps ensure a fair process for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory

withholding of removal but for the potential applicability of a mandatory bar. The Departments have determined that these goals can be accomplished by returning to the historical practice of not applying mandatory bars at the credible fear screening stage.

*Comment:* One commenter praised the Departments' proposal to generally not apply the statutory mandatory bars to asylum and withholding of removal during the credible fear screening process but urged the Departments to remove some of the limited exceptions to ensure any additional bars are not applied. The commenter stated that this is a step in the right direction, but the regulatory language should be expanded to eliminate consideration of the bars to asylum resulting from the Presidential Proclamation Bar IFR and TCT Bar rule.

*Response:* The Departments acknowledge the suggestion and note that they plan to propose to modify or rescind the regulatory changes promulgated in the Presidential Proclamation Bar IFR[71] and the TCT Bar rule[72] in separate rulemakings. These rulemakings contain the bars that the commenter has urged the Departments to remove from consideration within the credible fear process. The Departments note that these two rules are not currently in effect. Federal courts have either vacated or enjoined the Departments from implementing both the TCT Bar IFR and TCT Bar rule as well as the Presidential Proclamation Bar IFR.[73]

*Comment:* One commenter urged the Departments to implement the Global Asylum rule, including its requirement that USCIS asylum officers apply the mandatory bars to asylum and statutory withholding of removal at the credible

fear stage. The commenter cited the Departments' justification for this provision in the preamble to the Global Asylum rule, arguing that it is "pointless, wasteful, and inefficient to adjudicate claims for relief in section 240 proceedings when it can be determined that an alien is subject to one or more of the mandatory bars to asylum or statutory withholding at the screening stage."

*Response:* The Departments note that the Global Asylum rule has been enjoined, so it cannot be implemented at this time.[74] The Departments acknowledge that in the preamble to the Global Asylum rule, they justified the departure from the historic practice of not applying the mandatory bars at the credible fear screening stage by arguing that it would be an inefficient use of an immigration court's resources to conduct full merits hearings on claims of individuals determined at the credible fear stage to be barred from asylum or statutory withholding of removal. However, as detailed further above, the Departments have subsequently determined that the stated goal of promoting administrative efficiency can be better accomplished through the mechanisms established in this rulemaking, rather than through broadly applying mandatory bars at the credible fear stage. The Departments now believe that it is speculative whether, had the Global Asylum rule been implemented, a meaningful portion of the EOIR caseload might have been eliminated because some individuals who were found at the credible fear screening stage to be subject to a mandatory bar would not have been placed into section 240 proceedings. On the other hand, requiring asylum officers to broadly apply the mandatory bars would, in many cases, increase credible fear interview and decision times. While the TCT Bar IFR was in effect, asylum officers were required to spend additional time during interviews determining whether the bar potentially applied, eliciting testimony related to the application of the bar, exploring whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record to ensure a legally sufficient determination could be made according to the higher reasonable fear standard. As discussed above, these efforts also increased the workload of supervisory asylum officers, Asylum Division Headquarters staff, USCIS

---

[71] Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, Noncitizens Subject to a Bar on Entry Under Section 212(f); Procedures for Protection Claims, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC34* (last visited Mar. 14, 2022); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Noncitizens Subject to a Bar on Entry Under Section 212(f); Procedures for Protection Claims, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1615-AC34* (last visited Mar. 14, 2022).

[72] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC69* (last visited Mar. 14, 2022); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, Bars to Asylum Eligibility and Procedures, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1615-AC69* (last visited Mar. 14, 2022).

[73] *See supra* note 4 (discussing recent regulations and their current status).

[74] *See supra* note 4 (discussing recent regulations and their current status).

IFR_AR_000791

Office of Chief Counsel attorneys, and IJs. Presently, asylum officers ask questions related to all mandatory bars to develop the record sufficiently to flag potential bars but, since mandatory bars are generally not applied in the credible fear determination, the record does not need to be developed to the level of detail that would be necessary if the issue was outcome determinative for the credible fear determination. If a mandatory bar were outcome determinative, it would be necessary to develop the record sufficiently to make a decision about the mandatory bar such that, in many cases, the interview would go beyond its intended purpose of being a screening for potential eligibility for protection and rather become a decision on the form of protection itself. The level of detailed testimony necessary to make such a decision, in many cases and depending on the facts, would require asylum officers to spend more time carefully developing the record during the interview and conducting additional research following the interview. IJs reviewing negative credible fear determinations where a mandatory bar was applied would similarly face additional factors to consider in their review, depending on the facts, often undermining the efficiency of that process as well.

e. Other Comments on the Proposed Credible Fear Screening Process

*Comments:* One commenter asserted that the NPRM does not improve efficiencies in adjudication or lead to cost savings when compared to having the asylum adjudication process take place outside of the context of expedited removal and detention. The commenter asserted that, rather than streamlining the process, the NPRM creates a new layer of USCIS adjudication with possibly two reviews by an immigration court. The commenter also asserted that the NPRM fails to adopt a long-suggested solution of allowing for grants of asylum at the credible fear interview stage or eliminating the credible fear screening process so that cases may proceed directly to the merits before USCIS.

*Response:* The Departments note that the goals of this rulemaking include ensuring that noncitizens placed into the Asylum Merits process receive final decisions on their claims for protection as quickly and efficiently as possible, while also providing ample procedural safeguards designed to ensure due process, respect human dignity, and promote equity. In this rule, the Departments have outlined a process that continues to allow noncitizens to seek IJ review of asylum officers'

negative credible fear determinations, as required by statute. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). In addition, following an Asylum Merits interview before an asylum officer, if the asylum officer does not grant asylum, the noncitizen will have the opportunity to have their protection claims considered before an IJ in streamlined section 240 removal proceedings. The Departments expect that this new process will allow protection claims to be adjudicated more quickly—whether granted or not—than they are under the current process (in which all individuals who receive positive credible fear determinations are referred for ordinary section 240 removal proceedings) and will provide procedural safeguards to ensure that noncitizens receive full and fair adjudications of their protection claims.

The Departments have considered the commenter's proposals to eliminate credible fear screenings and adjudicate protection claims outside the context of the expedited removal process, as well as to allow for grants of asylum at the credible fear screening stage. While the Departments acknowledge the proposals, at this time, the Departments decline to adopt these proposals in favor of the approach presented in this rule. The Departments believe that a credible fear screening provides a meaningful opportunity for a noncitizen to provide USCIS asylum officers with valuable information pertaining to their protection claims, and that a subsequent Asylum Merits interview will allow noncitizens to expand on the details and circumstances surrounding their need for protection. On the other hand, the credible fear screening process allows the Departments to assess who may not be eligible for protection and promptly execute removal orders. Overall, the credible fear screening process that the Departments implement, which is consistent with congressional intent, allows for the Departments to identify noncitizens who may or may not be eligible for protection. *See* INA 235(b)(1), 8 U.S.C. 1225(b)(1). As for allowing grants of asylum at the credible fear screening stage, the Departments acknowledge the recommendation but are not addressing the matter in this rulemaking as it falls outside of the scope of this rule.

*Comments:* Multiple commenters expressed support for the "clarification" in the NPRM that only USCIS asylum officers would conduct credible fear interviews. Some of these commenters asserted that CBP officers who had previously performed these screenings were hostile and confrontational and were more likely to make negative

credible fear determinations. Another commenter asserted that this "specification" is consistent with congressional intent because the INA expressly requires asylum officers, who have professional training in asylum law and interview techniques, to conduct credible fear interviews.

*Response:* The Departments acknowledge the commenters' support and agree that the rule clarifies that USCIS asylum officers will conduct credible fear interviews, which is consistent with the INA. *See* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i); 8 CFR 208.30(d). USCIS asylum officers receive training and possess experience in handling asylum and related adjudications; receive regular trainings on asylum-related country conditions and legal issues, as well as nonadversarial interviewing techniques; and have ready access to country conditions experts. The Departments acknowledge the concerns of the commenters regarding the conduct of CBP officers but note that these issues fall outside of the scope of this rulemaking.

*Comments:* One commenter suggested that the Departments should codify the elimination of the Prompt Asylum Claim Review ("PACR") and the Humanitarian Asylum Review Process ("HARP") by regulation, including by imposing enhanced procedural protections for all credible fear interviews, including that they not be conducted while in CBP custody. The commenter believes that, as the Departments revisit their asylum screening procedures, they should take this opportunity to prevent reintroduction of the programs by a future administration.

*Response:* Pursuant to the E.O. on Migration's directive to cease implementing PACR and HARP, and to consider rescinding any orders, rules, regulations, guidelines, or policies implementing those programs, the Departments have ceased implementing those programs. *See* 86 FR 8270. The Departments acknowledge the recommendation that those changes be codified by regulation, but further consideration and discussion of these programs fall outside of the scope of this rulemaking.

4. Applications for Asylum

a. Written Record of the Credible Fear Determination Created by USCIS, Together With the Service of the Credible Fear Determination, Treated as an Application for Asylum

*Comments:* A commenter expressed support for the provision requiring

IFR_AR_000792

asylum officers to provide a summary of material facts and interview notes to asylum seekers during the credible fear screening process. Various commenters expressed concern about time constraints for asylum seekers to amend or supplement the asylum application. One commenter argued that the 7-day timeline for submitting an amended or supplemented application—10 days if mailed—would be infeasible due to the remote location of many asylum offices and the brief timeline between the interview notice and the scheduled interview. The commenter recommended that the rule impose a requirement that USCIS provide a minimum time frame for applicants prior to the Asylum Merits interview. Another commenter urged that more time be allowed for applicants and attorneys to develop a case. Some commenters argued that the credible fear documentation is often unreliable and that applicants will need adequate time and assistance to make modifications or to supplement the record. Citing the procedural limitations at proposed 8 CFR 208.9(d)(1), many commenters recommended the Departments develop a more robust procedure for the asylum seeker or counsel to make corrections or statements at any stage of the process or during the Asylum Merits interview, while providing additional time to review the hearing transcript following the hearing.

Another commenter suggested that the proposed rule be framed with the expectation that the asylum application will be supplemented, modified, or corrected prior to the hearing. The commenter also recommended the rule include a provision that would require asylum officers to encourage asylum seekers to correct or supplement the record.

Several commenters expressed concern that supplementations, modifications, or corrections to the record would undermine the applicant's credibility and negatively impact the applicant's case outcome. One commenter recommended that the Departments change the rule to explicitly protect applicant credibility with respect to modifications, corrections, or supplementations to the credible fear determination.

Finally, citing proposed 8 CFR 208.3(a)(2) allowing an applicant to amend, correct, or supplement information collected during expedited removal, a commenter stated it was unclear whether this provision would also apply to the asylum officer's credible fear interview notes.

*Response:* The Departments appreciate comments supporting the treatment of a credible fear determination as an asylum application. In creating this efficiency, the Departments aim as well to reduce potential barriers to protection for eligible applicants. The Departments acknowledge the support for the provision stating that a copy of the application for asylum, including the asylum officer's notes from the interview and basis for the determination, will be provided to the noncitizen at the time that the credible fear determination is served. *See* 8 CFR 208.30(f), (g)(1). The Departments recognize that the initial screening determination may not necessarily capture details that an asylum applicant wishes to include for further consideration of the applicant's eligibility for asylum, statutory withholding of removal, or CAT protection. Therefore, it is important that an applicant be able to modify or supplement the application for asylum. However, given commenters' concerns about credibility, ability to modify credible fear notes, and general concerns with the proposed process, the Departments want to clarify that modifications or supplements should not seek to modify or amend the credible fear determination made by the asylum officer. Under this rule, applicants may modify, amend, or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or alternatively, may supplement the information collected during their credible fear interview. The Departments are making this change to allow for applicants to make corrections or further develop their claim but are making clear that a line-by-line correction of the asylum officers' notes is not necessary or expected for purposes of the process or an assessment of credibility. The Departments do not believe that added protections are needed to protect against potential negative impacts on credibility assessments. Where there are discrepancies or inconsistencies, an applicant may explain such statements in their supplemental materials or at the Asylum Merits interview. As is always the case with any credibility determination made in the context of a nonadversarial asylum interview before USCIS, if a credibility concern arises, such as potential inconsistent testimony, the applicant will be given the opportunity to explain the inconsistency and the concern may be resolved if the applicant provides a

reasonable explanation, which in some instances may relate to the nature of the credible fear interview itself if that constitutes such a reasonable explanation in the specific case. In creating a streamlined process, the Departments do not expect the applicant to do a wholesale edit of a credible fear interview record, but rather wish to ensure that biographic and basic information about the fear claim is correct, so that the applicant may further develop the claim at the Asylum Merits interview. The Departments address comments relating to constraints on timeline below in Section IV.D.4.d of this preamble.

*Comments:* A few commenters warned that the proposal to treat the record of the credible fear determination as an asylum application would create a conflict of interest because the asylum office would create the same record that it would then adjudicate, and the asylum office would develop the record during the credible fear screening and could then not grant asylum based on that record. A commenter asserted that the person preparing the asylum application is not simply writing down what the applicant says and that such person must be a zealous advocate for the applicant, which may include arguing for a novel interpretation of the law. Another commenter said that the NPRM must be revised to promote neutral decision-making based on objective evidence in the record and correct application of U.S. and international law. Another commenter stated that if adjudicators face significant backlogs or certain types of claims are viewed unfavorably, it is possible that asylum officers responsible for preparing and lodging asylum applications may feel pressure or incentivized to file fewer claims (*e.g.,* by issuing a greater number of negative fear determinations) and suggested that robust protections through checks-and-balances (referencing firewalls, where possible, as an example) within USCIS may help alleviate such concerns.

*Response:* The Departments disagree with the commenters that the asylum officer's role in preparing the asylum application through the creation of the credible fear record represents a conflict of interest with their role in adjudicating the asylum application of an individual found to have a credible fear in the first instance. By deeming the record of the credible fear interview to constitute the asylum application, the Departments ensure that the statements made by the noncitizen, including any arguments for a novel interpretation of the law, become part of the asylum application. Similarly, 8 CFR

208.30(d)(4) provides that counsel for the noncitizen may be present at the credible fear interview and for the asylum officer to permit counsel to make a statement at the end of the interview, which statement may include an argument for a novel interpretation of the law, and which would become part of the record. Furthermore, the rule provides at 8 CFR 208.4(c)(2) that noncitizens who receive a positive credible fear determination that is treated as the asylum application may supplement the information collected during the process that concluded with a positive credible fear determination. It further provides at 8 CFR 208.9(b) that asylum applicants may have counsel or a representative present at an Asylum Merits interview. Such representative will have an opportunity to make a statement or comment on the evidence presented upon completion of the hearing. *See* 8 CFR 208.9(d). Taken together, these provisions ensure that noncitizens and their representatives have ample opportunity to engage in zealous advocacy, including the presentation of arguments for novel interpretations of the law. As neutral fact finders conducting nonadversarial interviews in both the credible fear screening and asylum adjudication contexts, asylum officers are duty-bound to consider the totality of evidence in the record and issue decisions based on the facts and the law. Their role in creating the credible fear record that will be treated as an asylum application thus poses no inherent conflict of interest. Additionally, different asylum officers may be making the credible fear determination and conducting the Asylum Merits interview, thus obviating any perceived appearance of conflict. Furthermore, contrary to the commenter's assertion, nothing in this rule pressures or incentivizes asylum officers to issue negative credible fear determinations that are not warranted by the facts and law applicable to an individual's case. This rule aims to address the backlog of asylum claims before EOIR by providing a more efficient mechanism for processing asylum claims originating in the credible fear screening process while guaranteeing due process and an objective application of the law to the facts in each case, not by pressuring asylum officers toward particular outcomes.

*Comments:* Some commenters opposed treating the written record of the credible fear interview as an asylum application on the ground that it "demands that USCIS assume the burden in what should be the non-citizen's role in the asylum application process." These commenters stated that this feature of the rule will require the Government to adjudicate more asylum applications.

*Response:* The Departments disagree that the IFR requires USCIS to assume a burden by treating the written record of the credible fear determination as an asylum application, as USCIS is required to produce this record as part of the credible fear screening process. While this change will mean that a greater percentage of noncitizens receiving a credible fear determination will subsequently receive a decision on the merits of their claims for asylum, statutory withholding of removal, and CAT, it will also mean that a final decision will be made in a more timely fashion than accomplished under the present process. As explained above, ensuring that all noncitizens who receive a positive credible fear determination quickly have an asylum application on file allows cases originating with a credible fear screening to be adjudicated substantially sooner than they otherwise would be—regardless of whether the noncitizen is granted asylum or ordered removed. Under the current process, noncitizens who receive a positive credible fear determination may wait months or years before attending a Master Calendar Hearing, and the IJ may be asked for multiple continuances to any deadline for the noncitizen to file an asylum application. By treating the credible fear documentation as the application for asylum, both the Departments and the noncitizen avoid the burden caused by delays, continuances, and rescheduled hearings sought in order for the noncitizen to file an asylum application. *See supra* Section III.B of this preamble.

b. Date Positive Credible Fear Determination Served as Date of Filing and Receipt

*Comments:* Multiple commenters supported the general idea that a positive credible fear determination would serve as an asylum application filing for purposes of the one-year filing deadline and to start the clock on employment authorization based on a pending asylum application, thereby helping asylum seekers avoid missing the one-year filing deadline and making it possible for asylum seekers to access employment authorization as quickly as possible. One commenter noted that this provision comports with the underlying policy goals of the one-year filing deadline. Other commenters provided opinions about the one-year filing deadline generally, suggesting that the one-year filing deadline has become a barrier to applicants as many miss the filing deadline through lack of knowledge or notice of the deadline, confusion about the process, believing they already filed, or due to the lack of coordination between DHS and DOJ leading to court proceedings not being timely initiated. One commenter provided examples of personal stories showcasing how many asylum seekers fail to meet the deadline due to trauma, grief, or hope for the possibility of safe return to their home country.

Several commenters further reasoned that the proposed change would save both asylum officers and IJs time in that they will not have to adjudicate whether an asylum application was filed within a year or whether an exception to the filing deadline was established (and, if so, whether the application was filed within a reasonable period of time given the exception). Instead, the commenter suggested that adjudicators will be able to concentrate on the substance of the claim. Some commenters went further, suggesting that Congress eliminate the one-year filing deadline entirely, as the deadline effectively acts as a bar to asylum and has arbitrarily blocked "tens of thousands of refugees" with meritorious claims for asylum.

Various commenters supported expedited access to EADs for asylum seekers deemed to have a credible fear of persecution. Commenters expressed strong support for any procedural changes that would make it easier for asylum seekers to obtain EADs as quickly as possible. An individual commenter supported eliminating any delay between a positive credible fear determination and the filing of an application for asylum by treating the written record of the determination by USCIS as an application for asylum and starting the waiting period for employment authorization based on a pending asylum application. The commenter said enabling asylum seekers earlier access to employment could reduce the public burden, reduce the burden on the asylum support network, and benefit asylum seekers in terms of equity, human dignity, and fairness. A few commenters discussed the importance of the employment authorization to asylum seekers, including the ability to build financial security; gain housing and food; pay for competent legal counsel; ensure their home gets heating and electricity; escape situations of abuse; and obtain a form of identification that may allow the individual to get a driver's license, access social benefits, open a bank account, register their child for school,

IFR_AR_000794

and enroll in health insurance. Citing research and examples from clients, commenters asserted that employment authorization not only allows asylum seekers to meet their basic daily needs and secure their fundamental rights, but it serves the economic interests of the United States through entrepreneurship, professional expertise, and tax revenue. A commenter argued that asylum seekers who have access to employment authorization would be less reliant on community resources and non-profit services. As expressed by commenters, individuals who experience barriers to employment authorization as a result of erroneous calculations in the starting and stopping of the waiting period for an EAD based on a pending asylum application are forced to work in exploitative situations and cannot support themselves or their families.

*Response:* The Departments agree that ensuring that asylum seekers promptly have an application for asylum on file and that claims are timely adjudicated can help promote equity and fairness for individuals, including by allowing for earlier employment authorization on the basis of the asylum application or incident to status as an asylee, which in turn may reduce burdens on asylum support networks or the public. These fairness considerations were important factors in the Departments' decision to treat the record underlying the positive credible fear determination as an application for asylum for purposes of meeting the one-year filing deadline and for purposes of beginning the time period applicants must wait before applying for or receiving employment authorization based on a pending asylum application. Instead of placing all individuals with a positive credible fear determination into removal proceedings before EOIR, where they then would have to defensively file a Form I–589, Application for Asylum and for Withholding of Removal (that would also require USCIS Service Center Operations to expend resources intaking the form and scheduling applicants for biometrics), and have them appear for multiple hearings before EOIR (where ICE resources would also be required to represent the Government in proceedings), applicants with a positive credible fear determination who are placed into the Asylum Merits process will have their credible fear record serve as the asylum application without having to expend additional agency resources to perform intake or additional applicant resources to file a new asylum application. This process will ensure applicants can apply for an EAD as soon as possible

once either the requisite time period has passed based on the record underlying the positive credible fear determination that serves as the asylum application or their asylum application is granted (making the individual eligible for employment authorization incident to status). Additionally, the rule will promote equity and due process by ensuring that individuals who are allowed to remain in the United States for the express purpose of having their asylum claim adjudicated after receiving a positive credible fear determination do not inadvertently miss the one-year filing deadline.

The Departments also agree that having the record underlying the positive credible fear determination serve as the asylum application will create significant efficiencies in immigration court for noncitizens referred to streamlined section 240 proceedings when USCIS declines to grant asylum. Generally, noncitizens seeking asylum and related protections defensively during removal proceedings must complete and file the Form I–589, Application for Asylum and for Withholding of Removal. IJs must often grant continuances and delay hearings to allow noncitizens to complete the application. When a noncitizen files an asylum application defensively beyond the one-year filing deadline, the IJ and the parties must devote resources and time to resolving the issue of whether any exception to the one-year bar has been established and whether the application was thereafter filed within a reasonable period of time. However, this rule will increase efficiency during immigration court proceedings for certain cases originating from the credible fear process by reducing or eliminating the need for IJs to delay hearings for noncitizens to prepare the asylum applications and by obviating the need for IJs and the parties to spend time addressing issues related to the one-year filing deadline.

Additionally, while the Departments agree that the issue of the one-year filing deadline for asylum is an important one, the comments related generally to the one-year filing deadline go outside the scope of the present rulemaking. The one-year filing deadline (including exceptions to the deadline) is set by Congress, INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B).

*Comments:* Some commenters offered general opinions about EADs for asylum seekers and expressed concern that any waiting period for employment authorization is too long. A commenter stated that DHS should rescind employment authorization rules issued by the prior Administration because

they were issued by agency officials in violation of the APA. The commenter said this Administration should immediately restore the 150-day waiting period and 30-day processing time requirement for asylum seekers. Another commenter concluded that the proposed rule ''sidesteps'' rescinding the timeline that leaves asylum seekers without the basic means to provide for themselves and urged DHS to enable applicants to seek employment authorization based on a grant of parole under 8 CFR 274a.12(c)(11). This commenter stated that paroling asylum seekers without employment authorization simply ensures their exploitation and destitution.

*Response:* The Departments acknowledge the comments related generally to EADs based on a pending asylum application, often referred to as ''(c)(8)'' EADs because of the regulatory provision under which USCIS may grant such EADs, 8 CFR 274a.12(c)(8). The ''(c)(11)'' EADs referred to by the commenter relate to another subsection of that same provision, 8 CFR 274a.12(c)(11), which authorizes USCIS to grant an EAD to a noncitizen paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit. The eligibility criteria for EADs based on a pending asylum application are beyond the scope of the present rule. The present rule contains no substantive changes to EAD eligibility based on a pending asylum application or the requisite waiting period for applying for an EAD based on a pending asylum application. In the 2020 Asylum EAD Rule,[75] DHS clarified that noncitizens who have been paroled into the United States after being found to have a credible fear or reasonable fear of persecution or torture may not apply under 8 CFR 274a.12(c)(11) (parole-related EADs), but may apply for employment authorization under 8 CFR 274a.12(c)(8) if they apply for asylum in accordance with the rules for (c)(8) EADs and are otherwise eligible. *See* 85 FR 38536. Those eligibility criteria are beyond the scope of the present rule. DHS welcomes comments related to these topics in separate, future rulemaking projects, as provided in the Spring and Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions.

---

[75] Asylum Application, Interview, and Employment Authorization for Applicants, 85 FR 38532 (June 26, 2020). On February 7, 2022, in *AsylumWorks* v. *Mayorkas*, No. 20–cv–3815, 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the United States District Court for the District of Columbia vacated the 2020 Asylum EAD rule.

c. Inclusion of Applicant's Spouse and Children

*Comments:* Several commenters asserted that the rule should permit asylum applicants to add a spouse and children or supplement family information at any point during the application process. A few commenters suggested that the proposed rule's inflexibility with regard to changes to family information makes it more restrictive than the current rule, undermines the Departments' goal of efficiency, and contradicts the Administration's promise to keep families together. Other commenters reasoned that applicants may fail to discuss relevant family members during the credible fear process due to stress, trauma, fear, confusion regarding the asylum process and law, or because the asylum officer fails to inquire about family members. One commenter added that individuals should not be forced to choose between their own safety and reuniting with family members.

One commenter stated that the proposed rule fails to consider how the provision of a credible fear decision automatically constituting the filing of an asylum application would affect the many asylum seekers who do not cross the border with their family members (*e.g.,* different times and places, in groups or alone) and are thereby unable to join their claims. The commenter stated that the rule may result in family separations when some family members' asylum cases are approved and others are not, where they could have otherwise been joined. One commenter concluded that requiring spouses and children to arrive concurrently with the principal applicant wrongly deprives asylum seekers of protection for their spouse or children and is furthermore inefficient as USCIS will have to adjudicate a Form I–730, Refugee/ Asylee Relative Petition, for family members who do not make it into the credible fear case. Another commenter described the Form I–730 process and remarked that the adjudicatory burden on USCIS will continue for years as more forms come into play instead of USCIS adjudicating the whole family's adjustment applications all at once. A commenter also requested information about what will be the filing date in situations where multiple family members name each other as dependents and what will happen to dependents if the principal applicant is not granted asylum.

*Response:* The Departments acknowledge comments related to dependents on an asylum application for individuals placed in the Asylum

Merits process after receiving a positive credible fear determination. The spouse or child (unmarried, under 21 years old) of a principal asylee may derive asylum status from their spouse or parent. The derivative asylee may be included on the original application for asylum, or, if not included as a dependent on the application, the principal asylee may petition for their relatives by filing a Form I–730, Refugee/Asylee Relative Petition, within two years of the grant of asylum. Like affirmative and defensive asylum applications, a grant of asylum to the principal asylum applicant following an Asylum Merits interview will confer asylum status on their spouse or children if they are included as dependents in the application and not subject to any mandatory bars to asylum applicable to dependents. Principal applicants will be allowed to include dependents on their application in the new process if the dependents also entered the United States concurrently with the principal applicant and are on the same credible fear case, or, in the alternative, if the spouse or child already has a pending application under this new Asylum Merits process before USCIS. Additionally, a principal asylee may file a Form I–730, Refugee/Asylee Relative Petition, on behalf of any of their qualifying derivative family members after they are granted asylum. The Departments are cognizant of the concerns expressed by commenters about the need for flexibility in allowing dependents to be added to an asylum case under the new Asylum Merits process and contend that the procedures for dependents outlined in the IFR are as flexible as possible, while still ensuring the process can run smoothly and efficiently. The Departments would like to highlight that, in the credible fear process, applicants are specifically asked about all of their family members, and this information is recorded in the Form I–870, Record of Determination/ Credible Fear Worksheet. If the applicant receives a positive credible fear determination and is placed in the new Asylum Merits process, they will be allowed another opportunity to review and correct the information in their Form I–870. Accordingly, applicants will have ample opportunity to ensure that the information related to their family members is accurately reflected in their application under the new process. And if there are any qualifying family members that entered with the applicant or are already in the United States and also have an asylum application pending with USCIS after a positive credible fear finding, the

principal applicant is free to include them in his or her application. If for any reason a principal applicant fails to add a dependent to their initial asylum application, the principal applicant is not prevented from having that family member derive asylee status because the principal applicant is free to petition for that family member if and when the principal applicant is granted asylum, either by USCIS or by EOIR. With this IFR, the Departments are now establishing a procedure under which the principal applicant will receive a decision on the principal applicant's case before USCIS and, if the principal applicant is not granted asylum, the principal applicant and any dependents on the case who are not in lawful status will be served with an NTA in immigration court and placed into streamlined section 240 removal proceedings before an IJ. In streamlined section 240 proceedings, the principal applicant may still be granted asylum and, if so, may confer that asylum status upon all of the qualifying dependents on the case. If the principal applicant is not granted asylum, then the principal applicant will be considered for statutory withholding of removal or withholding or deferral of removal under the CAT, and the IJ will also consider claims of the dependents that were elicited by the asylum officer during the Asylum Merits interview to determine if they are eligible for asylum or any other form of relief or protection.

In response to the questions presented by commenters, the filing date will reflect the filing of the principal applicant. If a spouse or child is a dependent on an application under the new Asylum Merits process and also files as a principal applicant themselves, then the filing date for the dependent spouse or child's application will be either (1) the date the dependent spouse or child's Form I–589 was filed or (2) the date of service of the positive credible fear determination on their spouse or parent, whichever date is earlier. Additionally, if the principal applicant is not granted asylum, then the principal applicant and any dependents who are not in lawful status will be issued an NTA and placed in streamlined section 240 proceedings. *See* 8 CFR 208.14(c)(1). If there is a dependent under the new process who also has a pending affirmative asylum application before USCIS, then USCIS will adjudicate that asylum application on its own before placing that individual in section 240 proceedings and, if that individual is eligible for asylum as a principal applicant, the

individual would not be referred to immigration court.

Additionally, under the revised 8 CFR 208.16, for cases under the jurisdiction of USCIS following a positive credible fear determination, if USCIS found the principal applicant ineligible for asylum, though USCIS cannot grant withholding or deferral of removal, the asylum officer is authorized to make a determination on the principal applicant's eligibility for statutory withholding of removal or withholding or deferral of removal under the CAT if the principal applicant shows eligibility for such relief based on the record before USCIS. If USCIS determines that the principal applicant has shown eligibility for withholding or deferral of removal based on the record before USCIS, that determination will be given effect by the IJ if the IJ finds the principal applicant ineligible for asylum and issues a final order of removal, unless DHS demonstrates that evidence or testimony specifically pertaining to the respondent and not included in the record of proceedings for the USCIS Asylum Merits interview establishes that the respondent is not eligible for such protection(s), pursuant to the new 8 CFR 1240.17(i)(2). As described in 8 CFR 1240.17(i), once in section 240 proceedings, under the new process, the IJ will conduct a de novo review of the principal applicant's eligibility for asylum, and if the principal applicant is not granted asylum, will consider de novo the principal applicant's eligibility for statutory withholding of removal and withholding or deferral of removal under the CAT in cases where USCIS did not determine that the respondent was eligible for such relief. In cases where the principal applicant is not granted asylum by the IJ, the IJ will also review asylum eligibility for all other family members and if one family member is found eligible for asylum by EOIR and the others can receive asylum as derivative asylees, it will not be necessary for the IJ to evaluate the remaining family members' eligibility for asylum or withholding or deferral of removal. If a respondent is not granted asylum and cannot otherwise derive asylum from a family member, then the IJ will review each respondent's eligibility for statutory withholding of removal and withholding or deferral of removal under the CAT.

*Comments:* One commenter requested the regulatory language be amended to define ''accompanying family members'' in 8 CFR 208.30, including by specifying what family members are included (*e.g.,* siblings, cousins, etc.) and what including the family members on the form would accomplish.

*Response:* The Departments acknowledge the comment related to who may be included as an accompanying family member in a credible fear determination, but fully specifying the details of that process is beyond the scope of this rulemaking. In most cases, however, the Departments understand an ''accompanying family member[ ]'' to include a parent or sibling.

*Comments:* A commenter warned that the proposed inclusion of an applicant's spouse and children in the request for asylum conflicts with existing regulations. The commenter described what they called ''riders,'' or those individuals who previously filed affirmative applications and are already in the country and remarked that existing regulations require riders not originating from a credible fear claim to receive NTAs and be referred to immigration court for section 240 removal proceedings (8 CFR 208.14(c)(1)). The commenter argued that the proposed rule does not address this or how this circumstance would work procedurally and asserted that riders cannot be included in grants of statutory withholding of removal or protection under the CAT.

*Response:* The Departments acknowledge the comments related to so-called ''riders.'' The present rulemaking does not change the governing law with respect to who may derive asylum from a principal applicant granted asylum in the United States. INA 208(b)(3), 8 U.S.C. 1158(b)(3). Further, the present rulemaking is not changing the status quo governing withholding of removal or deferral of removal with respect to an individual—both forms of relief or protection are individual in nature and a dependent cannot derive any status from a family member's grant of withholding or deferral of removal. The present rulemaking is not changing anything about the nature of withholding or deferral of removal in that neither confer any type of status to a dependent. If a principal applicant is not granted asylum by USCIS under the new Asylum Merits process, then the principal applicant and all dependents included in the request for asylum who are not in lawful status will be issued an NTA and placed in streamlined section 240 proceedings, as described above. If one of the dependents does have a pending affirmative asylum application before USCIS, then that application will be adjudicated as well, but if that individual is not found eligible for asylum on their own, then they will also be issued an NTA and placed in section 240 proceedings if they are not otherwise in lawful status. Accordingly, the concerns expressed by the commenter related to ''riders'' appear to be unfounded, as anyone without legal status who is found ineligible for asylum by USCIS, whether in the affirmative asylum process or under this new Asylum Merits process, will be issued an NTA and placed in section 240 proceedings before an IJ.

d. Due Process in Asylum Applications

*Comments:* Some commenters emphasized the importance of formal hearings and a presentation of all available evidence in a court setting to, in their opinion, ensure due process. A few commenters argued that it was important for asylum claims to be heard before an independent, impartial judiciary.

*Response:* The Departments disagree that a court setting or independent judiciary is necessary or otherwise required to allow for due process. *See, e.g.,* 16D C.J.S., Constitutional Law sec. 2010 (2022) (''Due process always stands as a constitutionally grounded procedural safety net in administrative proceedings[.]''). Moreover, transfer of authority to the Judiciary is outside the Departments' authority and beyond the scope of this rulemaking. The Departments only have the authority to promulgate rulemaking with respect to the authority already delegated to them by statute. Congress has expressly recognized the unique and specialized role of asylum officers in making credible fear determinations and in adjudicating the merits of asylum applications. Congress explicitly designated that ''asylum officers'' are responsible for conducting credible fear interviews and making credible fear determinations. INA 235(b)(1), 8 U.S.C. 1225(b)(1). Further, an ''asylum officer'' is defined by statute at INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), as an immigration officer who: (1) ''has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under'' INA 208, 8 U.S.C. 1158, and (2) ''is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.'' Thus, Congress specifically contemplated that asylum officers act as full-time adjudicators of asylum applications and have specialized training to conduct such adjudications. Moreover, in addition to laying out the required background and role of asylum officers who both conduct credible fear determinations and adjudicate applications for asylum under INA 208,

8 U.S.C. 1158, Congress emphasized the important role of asylum officers in adjudicating asylum applications filed by even the most vulnerable applicants. In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Public Law 110–457, 122 Stat. 5044, Congress provided that asylum officers have initial jurisdiction over any asylum application filed by an unaccompanied child, and therefore asylum officers are specifically empowered to take all necessary steps to render a decision on an affirmative asylum case filed by a UAC. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C). Accordingly, Congress has repeatedly recognized the vital role of asylum officers in various contexts related to asylum applications.

Under the INA, asylum officers are authorized to make initial credible fear determinations and are also the only adjudicators authorized to conduct the initial interview of the most vulnerable asylum applicants, unaccompanied children, even where those children may have already been placed into section 240 removal proceedings before EOIR. In addition to these very particular roles that Congress assigned to asylum officers, asylum officers are also recognized as full-time adjudicators of asylum claims under INA 208, 8 U.S.C. 1158. Asylum officers receive extensive training in substantive law and procedure, nonadversarial interview techniques and record development, decision writing, research skills, working with interpreters, and interviewing vulnerable individuals, including children; lesbian, gay, bisexual, transgender, queer, and intersex ("LGBTQI") persons; survivors of gender-based violence; and survivors of torture and trauma. The extensive and well-rounded training asylum officers receive is designed to enable them to conduct nonadversarial interviews in a fair and sensitive manner. Indeed, Congress recognized the special role of asylum officers when it vested asylum officers, not IJs, with initial jurisdiction over asylum applications submitted by unaccompanied children even where they have already been placed in section 240 removal proceedings before EOIR. The present rulemaking builds on the already existing role of asylum officers in adjudicating affirmative asylum applications to have asylum officers also adjudicate asylum applications of individuals retained by or referred to USCIS for further consideration through an Asylum Merits interview following a positive credible fear determination. Additionally, after considering

comments and adjusting the present rule such that asylum officers will no longer issue removal orders under the framework of this rule as described above and below, USCIS will not be issuing orders related to statutory withholding of removal or withholding or deferral of removal under the CAT. In those cases in which the asylum officer finds that an individual is not eligible for asylum, the asylum officer will determine whether the individual is nonetheless eligible for withholding of removal under 8 CFR 208.16(b) or (c) or deferral of removal under 8 CFR 208.17. As proposed in the NPRM, asylum officers will determine applicants' eligibility for withholding of removal, thereby maintaining the due process protections that already exist within affirmative asylum interviews conducted by USCIS asylum officers. *See* 8 CFR 208.9. While the Departments appreciate the concerns expressed by commenters concerned with protecting the due process rights of asylum applicants, the Departments are confident that those rights will be preserved through the nonadversarial interview process conducted by highly trained and specialized asylum officers, with a de novo review of the asylum claim by an IJ if USCIS finds the applicant ineligible for asylum. The IJ will also review any claim to statutory withholding of removal or withholding or deferral of removal under the CAT and any other potential form of relief or protection if the applicant is not granted asylum. Moreover, the rule does not contemplate any change to the noncitizen's ability to appeal an IJ's decision.

*Comments:* Various commenters expressed concern that the proposed rule does not establish a minimum amount of time between the positive credible fear determination and the Asylum Merits interview for asylum seekers to obtain counsel and prepare before the hearing. One commenter asserted that the rule seeks to "unreasonably shorten" asylum seekers' timeline for finding representation and gathering evidence—both time consuming processes that may require additional steps such as translation or mail services. Another commenter argued that the lack of "meaningful temporal space" between the credible fear determination and the asylum hearing would wrongly favor an efficient administrative process over a reasoned and fair decision of law. Another commenter suggested that provisions to expedite and replace the existing application process would go against congressional intent to identify

and protect the rights of genuine asylum seekers to due process. Similarly, another commenter expressed concern that the rule's silence on the timeline between the credible fear determination and the hearing before an asylum officer may frustrate the statutory right of access to counsel. While the rule would clarify the right to representation during the hearing, some commenters expressed the concern that asylum seekers would not be able to secure counsel in practice. They argued that the time between the credible fear determination and the hearing before an asylum officer is short and would not account for applicants with limited resources and language barriers.

Several commenters expressed concern that applicants would encounter difficulties in meeting the evidentiary requirements for the asylum hearing due to trauma, time restraints, detention, and other compounding factors. Specifically, commenters argued that survivors of trauma are often most likely to have trouble gathering sufficient evidence to support their application due to time restraints, the unavailability of documentary evidence and services, intimidation, and unawareness of available resources. One commenter expressed concern that the new credible fear process would not provide enough time for survivors of trauma or torture to recover and adequately prepare for interviews. One commenter claimed that any proposal to amend the rule that overlooks the intersection of trauma and the outcome of an asylum application will "result in systematic refoulement." Similarly, another commenter argued that some individuals—including those with low levels of literacy, those with language access issues, and those who have suffered from trauma—may require additional time and assistance to complete or amend their applications.

Many commenters recommended that the rule ensure meaningful opportunities for asylum seekers to find counsel and gather evidence by establishing an adequate timeline between the credible fear determination and the Asylum Merits interview before an asylum officer. One commenter recommended that the rule should provide a minimum 90-day timeline to submit evidence to USCIS between the credible fear determination and the Asylum Merits interview.

*Response:* The Departments acknowledge concerns raised related to the amount of time provided between service of the positive credible fear determination and the Asylum Merits interview before USCIS. The Departments understand that applicants

IFR_AR_000798

will need time to review their applications and supporting documentation, consult with representatives, and prepare for their Asylum Merits interview. At the same time, the underlying purpose of the present rule is to make the process more efficient by streamlining proceedings that heretofore have been drawn out for months or even years. To balance the efficiency goals of the present rule with the due process concerns raised by commenters and shared by the Departments, DHS is clarifying at 8 CFR 208.9(a)(1) that there will be a minimum of 21 days between the service of the positive credible fear determination on the applicant and the date of the scheduled Asylum Merits interview. While recognizing that affirmative asylum applicants often spend a greater amount of time preparing their asylum application in advance of filing and have more time inside the United States to procure and consult with counsel, the Departments also must consider that delaying the Asylum Merits interview for any considerable length of time to allow applicants in the Asylum Merits process a similar amount of time would undermine the basic purpose of this rule: To more expeditiously determine whether an individual is eligible or ineligible for asylum. Accordingly, the Departments must weigh the benefits associated with more expeditiously hearing and deciding claims originating in the context of expedited removal and the credible fear screening process with the challenge applicants and representatives may face in preparing for the Asylum Merits interview during a limited time period, including where language barriers and other challenges raised in the comments are present. Thus, after careful consideration, the Departments have determined that a 21-day minimum time frame between service of the positive credible fear determination and the Asylum Merits interview is the most reasonable option. This 21-day minimum time frame will strike an appropriate balance between achieving operational efficiency and still ensuring fairness by providing applicants and their representatives time to prepare for the Asylum Merits interview.

*Comments:* Citing research, commenters also suggested that the location of the asylum interview, in addition to the timeline, affects asylum seekers' ability to gather evidence and find counsel, including where such asylum seekers are survivors of trauma with scarce resources. A commenter suggested that the ability to access counsel and have a legal representative

present at the Asylum Merits interview would only be meaningful if the hearing takes place in an accessible location and if the applicants have sufficient opportunity to gather evidence and prepare. Considering the importance of location in assessing due process concerns, one commenter urged the Departments to provide more clarity on the location of the nonadversarial Asylum Merits interviews to ensure meaningful access to legal representation and adequate opportunities to meet evidentiary requirements. A commenter also suggested the rule include a two-hour limit on the distance between the location of the scheduled interview and the applicant's location and provide an automatic mechanism for changing the location if a person moves within the United States. Another commenter recommended that this rulemaking provide a right to seek a change of venue to avoid the risk of an "unfair burden" on asylum seekers who move after being released from detention. A commenter suggested that the Asylum Merits interview occur with USCIS at the asylum seeker's initial destination outside of the expedited removal process.

*Response:* The Departments acknowledge the comments related to location of the Asylum Merits interview and potential changes in the location of the interview. Under the present rule, following the positive credible fear determination where the applicant is placed into the Asylum Merits process, the applicant's interview will be scheduled with the asylum office with jurisdiction over their case. Just like affirmative asylum cases, sometimes the asylum office with jurisdiction over the case may be distant from the applicant's residence. Unfortunately, because USCIS has limited asylum offices and office space, it would be impossible to always ensure an applicant only has to travel two hours or less to appear at an interview, but USCIS makes every reasonable effort to schedule applicants in a convenient location, including by orchestrating asylum interviews at circuit ride locations (*i.e.,* locations other than an asylum office, such as a USCIS field office, where USCIS conducts asylum interviews) throughout the United States when possible and practicable. As for the comments recommending that the hearing should take place at the asylum applicant's initial destination outside of the expedited removal process, USCIS agrees that this is the appropriate venue when the applicant has been paroled, and that is why the asylum office with

jurisdiction over the applicant's place of residence following the positive credible fear determination will be the office with jurisdiction over the applicant's case. Additionally, if an applicant changes residence prior to an Asylum Merits interview and notifies USCIS of the change, just as with an affirmative asylum interview, USCIS will attempt to reschedule the applicant's interview to occur at the office with jurisdiction over the applicant's new residence location. USCIS also appreciates the comments related to applicants securing access to counsel for their Asylum Merits interview. Just as with affirmative asylum interviews, USCIS will make reasonable efforts to ensure applicants are scheduled for their Asylum Merits interview in a time and place that ensures their representatives of record can attend and meaningfully participate in the interview.

*Comments:* Some commenters suggested that requests for adjournment or continuances should be assessed more liberally where the delay sought is to find an attorney or gather supporting evidence. One commenter recommended that the rule decouple the proposed definition of "filing" a claim from the time periods specified in the INA, including the 45 days required for initial consideration and 180 days for completion.

*Response:* The Departments acknowledge the comments related to the timeline for applications and potential continuances. The Departments cannot change the statutory procedures governing asylum under INA 208, 8 U.S.C. 1158, including the procedures set out in INA 208(d)(5)(A), 8 U.S.C. 1158(d)(5)(A), related to security checks and the general framework indicating that in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence no later than 45 days after the date an application is filed, and in the absence of exceptional circumstances, the administrative adjudication of the application, not including administrative appeal, shall be completed within 180 days of the filing date. Accordingly, it is not within the Departments' authority to decouple the filing date from the timeline for adjudicating the asylum application. Regarding requests to reschedule, applicants should follow the instructions on the USCIS website and their appointment notices, just as they do with affirmative asylum interviews.

*Comments:* Various commenters expressed concern about time constraints for asylum seekers to amend

or supplement the asylum application. One commenter argued that the 7-day timeline for submitting an amended or supplemented application—10 days if mailed—would be infeasible due to the remote location of many asylum offices and the brief timeline between the interview notice and the scheduled interview. The commenter recommended that the rule impose a requirement that USCIS provide at least six weeks' notice to applicants prior to the asylum hearing.

*Response:* As mentioned in the response to comments related to what form the application for asylum will take under the new rule and how it may be supplemented or modified, the Departments recognize that the initial credible fear screening determination may potentially include errors or misunderstandings and may not necessarily capture every detail an applicant would like to provide. The Departments agree with commenters that it is important for applicants to be able to modify or supplement their applications for asylum to account for such misunderstandings or errors or to add nuance. However, also as mentioned in the earlier response, the Departments note that modifications or supplements should only take the form of correcting the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or providing additional evidence beyond that collected during the credible fear interview. The credible fear determination and the notes collected by the asylum officer are part of the record of determination and form the basis for establishing a credible fear of persecution or torture, but it would not be practical or possible to expect the applicant to review the entirety of the asylum officer's notes or the asylum officer's own work product in making the credible fear determination and make modifications to those items.

As further explained in the response to previous comments on the topic of what form amendments may take, in creating a streamlined process, the Departments do not expect the applicant to do a wholesale edit of a credible fear interview, but rather wish to ensure that biographic and basic information about the fear claim is correct, so that the applicant may further develop the claim at the Asylum Merits interview. Accordingly, while the Departments appreciate commenters' concerns about the time frame under which applicants may be expected to make corrections or provide supplemental evidence, the Departments believe that the provided time frame achieves the best possible balance between allowing applicants

sufficient time to present their evidence and achieving a streamlined process. The six-week notice time frame suggested by one commenter would be twice as long as the notice provided to affirmative asylum applicants for their interviews. While the commenter might consider six weeks an ideal time frame to prepare for an asylum interview, it would not be practical or achieve the goals of operational efficiency to wait six weeks for the interview to take place in every case. As mentioned above, however, there will be a minimum time frame between the positive credible fear determination and the Asylum Merits interview of 21 days. Also, as described above, USCIS believes this time frame best reaches the goals of providing applicants in this new process with adequate time to prepare for their Asylum Merits interviews and allowing expeditious adjudications. As for the time frame for submitting additional evidence, USCIS is providing applicants in the Asylum Merits process with evidentiary submission requirements that also reflect that careful balance. It would be impractical for USCIS to require all evidence to be submitted at the credible fear stage, and USCIS recognizes that applicants may need time to collect some additional evidence. Moreover, while the burden of proof is on the applicant to establish eligibility for asylum, as always with any asylum case, documentary evidence is not required to sustain the applicant's burden of proof in establishing asylum eligibility; testimony alone may be sufficient where it is credible, persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. INA 208(b)(1)(B)(i), (ii), 8 U.S.C. 1158(b)(1)(B)(i), (ii). When applicants seek to provide documentary evidence to sustain their burden of proof, USCIS welcomes that evidence but also must place some limit on the time for submission to allow asylum officers to meaningfully engage with the evidence. Asylum officers must review each case file, including the evidence the applicant has submitted in support of the applicant's claim, sufficiently in advance of the Asylum Merits interview to begin to assess its probative value, conduct additional research if needed, and prepare to elicit testimony from the applicant about such evidence. The Departments agree with commenters that applicants need time to locate and submit such evidence, but asylum officers also need time to review and examine such evidence in advance of the interview if the evidence is to be meaningfully explored. Accordingly, the

Departments consider that requiring additional evidence be submitted at least 7 days in advance of the interview if submitted in person, or postmarked 10 days in advance if mailed, is a reasonable time given the various interests at play in setting up such a time frame. While DHS appreciates the specific comment related to the challenge of submitting evidence in person, that is precisely why DHS is allowing an additional 3 days for mailing if evidence is submitted via mail. This time frame allows for asylum offices to receive and properly file the evidence and for asylum officers to review submissions as they prepare for Asylum Merits interviews. This time frame also preserves the time available during the Asylum Merits interview to meaningfully elicit testimony from an applicant and allow representatives time to ask follow-up questions or provide additional statements if needed, instead of taking up that time with the asylum officer's review of just-submitted evidence. Notably, this time frame for the Asylum Merits interview is more generous to applicants than the time frame provided at current 8 CFR 208.9, which requires evidence to be submitted at least 14 days in advance of the interview. Given the realities of the COVID–19 pandemic, current operational practice is to require evidence to be submitted 7 days in advance of an affirmative asylum interview if submitted in person, and 10 days if submitted via mail. Moreover, if there is evidence that the applicant was unable to procure during the required time frame and that the applicant believes is highly material or essential to the applicant's case, the asylum officer has discretion to allow the applicant a brief extension to provide such evidence. Likewise, if an asylum officer identifies a piece of evidence that is essential, such as evidence necessary to establish a derivative relationship for a member of the case, the asylum officer will issue a request for evidence to the applicant and provide a reasonable time to respond. And as mentioned above, documentary evidence is not required to sustain the applicant's burden of proof in establishing asylum eligibility— testimony alone may be sufficient where it is credible, persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. INA 208(b)(1)(B)(i), (ii), 8 U.S.C. 1158(b)(1)(B)(i), (ii). Furthermore, even in cases where the asylum officer determines that the applicant should provide evidence that corroborates otherwise credible testimony, if the applicant does not have the evidence

IFR_AR_000800

and cannot reasonably obtain the evidence, it is not required to be provided. *Id.* Thus, even where the applicant may wish to provide additional documentary evidence, but it is not reasonably available in the time frame provided, the applicant may still meet the burden of establishing asylum eligibility.

*Comments:* Several commenters asserted that applicants must be allowed adequate representation when preparing an asylum application; one commenter explained that such representation is necessary to ''make an effective submission'' while ''meet[ing] the standards of modern corroboration requirements'' in adjudication. Commenters argued that asylum seekers may not understand what nuances in the record could affect their case due to the complex, politicized, and evolving nature of asylum standards. Therefore, as one commenter asserted, the opportunity to amend or correct the credible fear interview record would only be meaningful if applicants have access to adequate interpretation and legal services. Similarly, another commenter stated that correcting or supplementing a credible fear interview record could be ''difficult or impossible'' without legal counsel. A commenter added that a lack of resources, poor knowledge of systems, and obstacles associated with detention intensify the need for counsel in the asylum application process. Considering these challenges, the commenter recommended that agencies inform asylum seekers—in their own language—of their right to counsel, to present additional evidence, and to expand the grounds of the asylum claim. Additionally, the commenter recommended that agencies clarify the higher standards at the asylum interview compared with the credible fear interview and provide a contact list of local legal services providers.

*Response:* The Departments acknowledge the comments related to the role of counsel for applicants who are placed in the Asylum Merits interview process. As mentioned above in response to comments about amending or supplementing the application, the Departments do not expect the applicant to conduct a word-by-word, line-by-line review of the asylum officer's credible fear interview and make corrections to the notes or the asylum officer's work product. Instead, the Departments would welcome any corrections to the applicant's biographic information, clarifications the applicant would like to make to the Form I–870, or any additional evidence the applicant would like to provide in support of the application. In any event, the Departments agree with commenters that information related to the process in which the applicant is placed and access to counsel are of utmost importance. That is why the Departments plan to ensure that when an individual is placed in the Asylum Merits process, the individual is provided with a fact sheet explaining the process, including the relevant standards, and a contact list of free or low-cost legal service providers similar to that which applicants would receive in section 240 removal proceedings before EOIR.

*Comments:* Many commenters reiterated the challenges asylum seekers experience in obtaining access to adequate counsel and developing their asylum claims, particularly while in detention or during expedited processes. One commenter argued that noncitizens must be given an opportunity to amend their credible-fear interview record with representation because, in the context of detention, DHS is ''not currently capable of carrying out a proper fact-finding proceeding.'' Another commenter additionally claimed that adequate interpretation and legal services are ''nearly impossible'' to find when the applicant is detained. A commenter added that the proposed rule only allows for legal representation at no expense to the Government in the application process, compounding difficulties for asylum seekers who are ineligible to apply for employment authorization. Several commenters proposed that the Government fund legal representation programs for asylum seekers in the credible fear and Asylum Merits stages. Additionally, a commenter suggested the rule provide more information on access to counsel, legal orientation programs, and education for pro se applicants and applicants with cognitive, mental, or physical impairments.

*Response:* The Departments acknowledge the comments related to access to counsel while in expedited removal; however, such comments are outside the scope of the present rulemaking, as they relate to the expedited removal process generally. This rulemaking is not altering the expedited removal process itself but rather introducing an alternative procedure for ''further consideration'' of the asylum claims of individuals who receive a positive credible fear determination. The rule preserves applicants' ability to retain and access counsel within the new Asylum Merits process before USCIS. Further, while the Departments appreciate comments suggesting the possibility of Government-funded attorneys in the credible fear process and for the asylum application, those comments are also outside the purview of this rulemaking. The Departments agree that it is important to, whenever feasible, provide applicants with information on access to counsel and provide education for pro se applicants. That is why such information, including an advisal of the right to be represented during the interview and of information related to the nature of the interview, is provided to applicants at various stages during the credible fear interview, including during the interview itself. Further, the Departments plan to provide information about the Asylum Merits process, as well as information related to free or low-cost legal service providers, along with service of the positive credible fear determination. The Departments take commenters' concerns about applicants with cognitive, mental, or physical impairments very seriously. DHS already has a practice of placing individuals in section 240 removal proceedings when they are unable to testify on their own behalf due to possible cognitive or mental impairments, physical disability, or other factors that impede them from effectively testifying in the context of a credible fear interview. In section 240 proceedings, IJs consider whether applicants demonstrate indicia of incompetency and, if so, which safeguards are appropriate. *See, e.g., Matter of M–A–M–,* 25 I&N Dec. 474 (BIA 2011). Accordingly, applicants with indicia of incompetency will continue to have their claims considered in ordinary section 240 proceedings.

*Comments:* Commenters asserted that the NPRM's estimated 90-day case completion timeline would be ''unrealistic,'' ''troubling,'' and ''could prejudice the rights of asylum seekers.'' One of these commenters argued that the expedited timeline would affect due process, in part because asylum seekers often have limited resources, physical and emotional needs, and barriers to preparing their cases, including difficulty finding counsel. Similarly, a commenter expressed concern that the proposed rule at 8 CFR 208.3(a)(2) would maintain the 45-day timeline for consideration and 180-day requirement for completion. Another commenter argued that the 45-day timeline for completing adjudications for new arrivals would ''require extraordinary resources,'' contribute to the USCIS

backlog, and exacerbate due process concerns.

*Response:* The Departments acknowledge commenters' concerns regarding the timeline of case processing. As mentioned above with respect to the comments related to the processing timeline from positive credible fear determination to Asylum Merits interview, it is not within the Departments' authority to change the 45-day timeline for interviews and the 180-day timeline for adjudications set by Congress in INA 208(d)(5)(A), 8 U.S.C. 1158(d)(5)(A), absent exceptional circumstances. In this IFR, the Departments changed the rule language from that proposed in the NPRM to acknowledge that Asylum Merits decisions would generally be issued within 60 days of service of the positive credible fear determination absent exigent circumstances. *See* 8 CFR 208.9(e)(2).

*Comments:* A commenter argued that the proposal to remove the application requirement for noncitizens apprehended at the border gives such noncitizens procedural protections not afforded to asylum seekers who already reside in the United States. The commenter opposed the possibility that, under the proposed provisions, asylum seekers with strong ties to the United States would still be required to complete and submit Form I–589 in a timely fashion, while individuals seeking admission at the border would have rights beyond what existing statutes provide. The commenter added that the lack of an asylum application requirement would complicate the review of cases.

*Response:* The Departments acknowledge the comments related to the form of application created by this rule, but the present rule is not eliminating the requirement that there be an application for asylum from the principal applicants in the new process. Instead of affirmatively filing a Form I–589, as is required for individuals in the United States who have not been placed into section 240 removal proceedings and seek to file for asylum affirmatively before USCIS, or defensively filing a Form I–589, as is required for individuals in the United States who have already been placed into section 240 removal proceedings (either following a positive credible fear determination or otherwise), applicants in the process established by this IFR will be considered to have filed their asylum application in the form of the documented testimony provided under oath to an asylum officer during the credible fear interview and included as part of their positive credible fear

determination. 8 CFR 208.3(a). The Departments are streamlining the requirement for individuals who are already in the credible fear process such that the information collected in the credible fear determination itself becomes the basis of an application for asylum. To require such individuals to subsequently submit a paper I–589 asylum application in order to seek asylum would be unnecessarily repetitive. Treating the credible fear determination as the asylum application eliminates duplicative collection of information for individuals who have already been found to have a credible fear of persecution or torture. These individuals are still subject to the one-year filing deadline and the other statutory bars to filing for asylum, the same requirements to appear for an interview, the same consequences for a failure to appear before USCIS, and the same requirements for EAD eligibility as other applicants. Moreover, the underlying procedures related to attorney participation remain the same as those for affirmative asylum applicants before USCIS. Most fundamentally, the eligibility standards governing adjudication of asylum applications are identical for applicants in the new process as they are for affirmative asylum applicants.

In addition, the Departments will provide ample procedural safeguards to noncitizens throughout the new process established in this rule, including in the Asylum Merits interview itself, such as the following: (1) A verbatim transcript of the interview will be included in any referral package to the immigration judge, 8 CFR 208.9(f)(2); (2) an asylum officer will arrange for the assistance of an interpreter if the applicant is unable to proceed effectively in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purpose of eligibility for employment authorization, 8 CFR 208.9(g)(2); and (3) an asylum officer will, when not granting asylum, also consider an applicant's eligibility for statutory withholding of removal or CAT protection within the context of the Asylum Merits interview. Thus, if the asylum application is not approved, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal or CAT protection under 8 CFR 208.16(b) or (c). *See* 8 CFR 208.16(a), 208.17(a). Even if the asylum officer determines that the applicant has established eligibility for statutory withholding of removal or CAT protection, the asylum officer shall proceed with referring the asylum application to the IJ for a hearing

pursuant to 8 CFR 208.14(c)(1). *See* 8 CFR 208.16(a).

The Departments acknowledge the commenter's concern about appellate review. As indicated above, this rulemaking does not eliminate the application requirement for principal asylum applicants. Rather, it changes the form of application for those individuals who receive a positive credible fear determination. As is the case for BIA review of asylum claims originating in the affirmative asylum process before USCIS, where an applicant has filed a Form I–589, the records created and evidence considered by asylum officers and IJs under the new process will go well beyond the application itself to include the testimony of the principal and derivative applicants, the results of background, identity, and security checks, and identity documents. They may also include affidavits and testimony from witnesses, country of origin information, civil documents, law enforcement records, medical records, court documents, and numerous other forms of evidence. By the time a case reaches the BIA, a robust record is available for the Board's consideration, only a small portion of which is the asylum application itself. Therefore, the Departments are confident that the records created before USCIS and IJs will enable the BIA to conduct a proper review under the appropriate legal standards of any cases on appeal arising out of the new processes created by this rulemaking.

e. Other Comments on Proposed Provisions on Applications for Asylum

*Comments:* A commenter supported the proposed change to allow the Asylum Office to rely on biometric information collected during the expedited removal process rather than requiring covered noncitizens to report to an Application Support Center ("ASC") for new fingerprinting. The commenter reasoned that elimination of duplicative biometric collection prevents asylum seekers from having to take time off from work or find childcare, and eliminates the risk for adverse consequences (*e.g.,* stopping the asylum EAD clock or failure to appear at an ASC appointment). The commenter went on to state that the Government would also save time and money by not requiring the capture of biometric data that DHS has already collected previously.

*Response:* The Departments acknowledge the commenter's support for using the biometrics already captured during the expedited removal process for the asylum application, for

the reasons outlined by the commenter. It is these very concerns expressed by the commenter that weighed in favor of allowing DHS to use the biometrics already captured in the expedited removal process for purposes of the asylum application as well. USCIS may still have to require applicants to attend an ASC appointment or otherwise obtain their biometrics in support of the asylum application following a positive credible fear determination but is working to obtain the ability to reuse the biometrics already captured by other DHS entities for the asylum application before USCIS.

*Comments:* One commenter believed that, because the asylum applicant has the right to seek review of an asylum officer's decision not to grant asylum before an IJ, all denied claims will end up in our judicial system. Moreover, the commenter stated, because the rule seeks to reduce the immigration court backlog, adjudicators will be instructed to approve or grant asylum claims of individuals arriving at the border.

*Response:* The Departments disagree that the rule's aim to reduce the immigration court backlog sends signals to adjudicators that they must grant non-meritorious cases. Each adjudication is based on specific, individualized facts, and, in the case of asylum, the grant of asylum status further requires not only a finding of substantive eligibility, but also a favorable exercise of discretion. If an asylum officer does not grant asylum, the noncitizen will be placed into streamlined section 240 removal proceedings. After being placed in streamlined removal proceedings and having the asylum claim reviewed de novo by the IJ, if the IJ denies asylum, the noncitizen may (as now in ordinary section 240 proceedings) appeal the IJ's decision to the BIA. And, as with BIA decisions in ordinary section 240 proceedings, the noncitizen may then seek judicial review before the appropriate U.S. Court of Appeals. *See* INA 242(a), 8 U.S.C. 1252(a). Judicial review serves as an important mechanism to ensure fairness and due process. Further, this rule leaves in place the statutory process by which the cases of noncitizens determined to have no credible fear of persecution or torture are resolved quickly, and creates a framework that also allows clearly grantable asylum cases to also be resolved quickly. Nevertheless, nothing in the rule suggests or requires that complex cases will be rushed or essential parts of the analysis or required vetting and security checks will be ignored, as there are no changes to substantive asylum eligibility. The

Departments recognize that some cases may take longer to complete due to, for instance, particularly complex issues.

## 5. Adjudication of Applications for Asylum for Noncitizens With Credible Fear

### a. DHS Interpretation of Statute in Creating a New Adjudication Process

*Comments:* A commenter expressed concern with the NPRM's proposal to authorize asylum officers to issue removal orders, including in cases where an asylum-seeker fails to appear for a merits hearing before USCIS. The commenter contends that this new authority would put asylum officers in an enforcement-oriented or adversarial role, which could undermine the nonadversarial proceeding. The commenter asked that ICE or IJs instead be tasked with issuing removal orders. Furthermore, the commenter stated that an applicant who may have missed a hearing inadvertently should have an opportunity to remedy the situation before a removal order is issued. The commenter urged the Government to consider nonadversarial first-instance asylum hearings in a context that corresponds with international standards on detention and affords asylum-seekers sufficient time and opportunity to recover from trauma, gather information about their cases, and have access to legal advice, assistance, and representation.

*Response:* The Departments have carefully considered the comments received in response to the NPRM regarding an asylum officer's authority to issue a removal order. As discussed elsewhere, the Departments have decided not to adopt that proposal. Instead, under the IFR, an asylum officer will issue an NTA when not granting an application for asylum and refer the case for streamlined section 240 proceedings before an IJ. Given this choice of process in the IFR, the Departments find it is unnecessary to further respond to the comments regarding an asylum officer's authority to issue a removal order, as the Departments believe the concerns of those comments are now addressed.

### b. Review of Asylum Claim by an Asylum Officer, Rather Than by an Immigration Judge, in Section 240 Removal Proceedings

*Comments:* Several commenters expressed support for the proposal to have asylum officers adjudicate asylum applications in the first instance, noting that asylum officers are trained in assessing country conditions, conducting interviews, and handling

sensitive information. One commenter stated that having USCIS adjudicate asylum applications would allow for a fast yet equitable process. One commenter noted that the proposed process would encourage asylum seekers to speak openly about their fears, and stated that asylum officers are better equipped than IJs to adjudicate protection-related claims. Another commenter asked DHS to clarify what types of trainings would be offered to asylum officers and suggested such training should emphasize cultural competence.

*Response:* The Departments agree that a nonadversarial process is well-suited to adjudicating claims for asylum and related protection. The Departments concur with commenters who make specific reference to the trainings that all asylum officers undergo before they may work with vulnerable populations. The Departments note that asylum officers are trained in asylum and refugee law, interviewing techniques, country of origin information, decision-making, interviewing survivors of torture, fraud identification and evaluation techniques, and addressing national security concerns. *See e.g.,* USCIS, Asylum Division Training Programs, *https://www.uscis.gov/ humanitarian/refugees-and-asylum/ asylum/asylum-division-training-programs.* Cultural competence is an integral part of many of these trainings, and the Departments acknowledge the commenter's suggestion that trainings should emphasize this skill.

*Comments:* Many commenters opposed the proposal to have asylum officers adjudicate asylum applications in the first instance, generally stating that only IJs should grant asylum. Other commenters argued that only IJs have the requisite training or that claims should not be adjudicated by "bureaucrats." One commenter remarked that the proposal to have asylum officers adjudicate asylum claims would introduce the potential of "political abuse," and some commenters argued that asylum claim adjudication must be conducted by IJs to prevent undue bias or corruption. A few form letter campaigns expressed concern that the proposal would make asylum officers "the most powerful immigration officials in the country." One commenter expressed concern that the proposal would circumvent the careful analysis asylum applications demand and recommended increasing funding and hiring additional IJs to process the immigration backlog. Another commenter opposed allowing asylum officers to adjudicate asylum claims and suggested Federal judges should be

IFR_AR_000803

placed in courts near the border to handle asylum claims expediently. A commenter asked how DHS will ensure that only qualified asylum officers will adjudicate asylum claims and remarked that such qualifications are part of the legal definition of an IJ.

*Response:* The Departments strongly disagree with statements asserting or suggesting that asylum officers, who are career Government employees selected based on merit as explained earlier in Section IV.B.2.a of this preamble, are biased or otherwise politically motivated. As noted above in Section III.C of this preamble, USCIS asylum officers already must undergo "special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles." 8 CFR 208.1(b). USCIS asylum officers already adjudicate asylum applications as part of their duties, and this fact will not be affected by the rule. Also, as noted above in Section IV.B.2.a of this preamble, no individual may be granted asylum or withholding of removal until certain vetting and identity checks have been conducted. INA 208(d)(5)(A)(i), 8 U.S.C. 1158(d)(5)(A)(i). Additionally, while the Departments believe that commenters' statements are grounded in misinformation, the Departments also note that Government officials are entitled to the presumption of official regularity in the manner in which they conduct their duties. *United States* v. *Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926). Commenters failed to provide any examples of what they incorrectly posit to be concerns with bureaucratic "power[ ]" or bias on part of asylum officers. The Departments believe that such concerns stem from a fundamental misunderstanding of the United States' immigration system as well as the respective roles of IJs and asylum officers. Additionally, the comments lack any meaningful explanation or evidentiary basis; such baseless accusations against public officials are "easy to allege and hard to disprove." *Crawford-El* v. *Britton,* 523 U.S. 574, 585 (1998) (quotation marks omitted); *see also Nat'l Archives & Records Admin.* v. *Favish,* 541 U.S. 157, 174 (2004) (requiring the production of evidence rather than "bare suspicion" that "responsible officials acted negligently or otherwise improperly in the performance of their duties").

*Comments:* Referencing the NPRM's preamble, several commenters stated that the prior Administration's border strategy has led to a significant increase in the number of backlogged asylum cases. These commenters stated that

authorizing border cases to be handled not only by immigration courts but also by the USCIS Asylum Division will increase efficiency by eliminating redundancy. These commenters stated that permitting asylum officers to maintain jurisdiction throughout the life of a case capitalizes on the work and time already invested in each case during credible fear screenings, which will alleviate pressure on the immigration courts and eventually lead to a much more efficient immigration system. Other commenters likewise supported the proposed rule and stated that, while the number of IJs has doubled, the number of pending cases has tripled and outstripped the hiring of IJs. These commenters also stated that the immigration procedures contemplated in IIRIRA are inadequate for the number of applicants now seeking asylum in the United States. Two commenters stated that IJs can adjudicate asylum cases efficiently but that they must be provided more resources.

A commenter indicated that there is no evidence that asylum officer interviews are more efficient than IJ adjudications. The commenter added that backlogs may in fact expand as a result of reallocating funding to cases under the proposed system, stating that the asylum offices do not have room for the proposed additional hires and that asylum officers may leave their jobs. The commenter stated that asylum officers typically conduct only two interviews a day while IJs conduct multiple hearings and that the latter are more efficient because IJs and counsel are more competent in immigration law. A commenter agreed that the proposed rule would extend the backlog by extending the appeals process for asylum seekers. Another commenter stated that the proposed rule could not seriously address backlogs because credible fear determinations and asylum applications only make up a small portion of immigration court dockets. A commenter also expressed doubt that the new process would alleviate backlogs because of startup costs for the new process.

However, two commenters stated that, under the current system, outcomes of an asylum case can depend almost as much on luck as on the merits of an asylum application. The commenters cited a source indicating that approval rates by individual IJs can vary from 0.9 percent of all cases to 96.7 percent. One of the commenters stated that such disparity causes unnecessary stress for individuals and also indicates the absence of clear, uniform standards used by IJs to adjudicate cases. The

commenter stated that, conversely, the Asylum Division uses rigorous quality assurance processes and requires supervisory review of all cases and similar statutory definitions and policy guidance used by refugee officers in USCIS will also be applied to the work of asylum officers. The commenter concluded by stating that, under the new rule, the unpredictability and variance that characterize the current immigration court system will be replaced by greater consistency and clarity in the decision-making process across all asylum offices.

Other commenters asserted that the rule would not create a more expeditious process and that limiting the rights of asylum seekers in expedited removal would better streamline immigration. Commenters also stated that it would be problematic for asylum seekers to have the right to an attorney but not to grant "the American people" the "right to be represented by an ICE attorney."

*Response:* The Departments agree that allowing USCIS to adjudicate these cases will alleviate pressure on the immigration courts and eventually lead to a much more efficient immigration system. Further, the Departments understand comments relating to reallocation of resources affecting the backlog of cases, the hiring, potential loss, and retention of asylum officers, and concerns for delay as the USCIS Asylum Division takes on this new caseload. It is on this basis that the Departments are phasing in implementation of this rule. The graduated steps involved will allow for the Departments to address concerns that arise and learn how implementation can be better operationalized. In comparing adjudications between USCIS and IJs, the specialized role of asylum officers coupled with ownership of a case from screening to adjudication allows for efficiency gains. Further, the USCIS Asylum Division has steps in place to ensure consistency in adjudications, and safeguards will continue as USCIS adjudicates applications pursuant to this rule. The Departments disagree that an adversarial process is required to adjudicate the merits of an asylum application. However, as noted above in Section III.D of this preamble, this IFR will provide for a streamlined section 240 removal proceeding in the event that an asylum officer does not grant asylum. The United States Government will be represented by ICE in those adversarial proceedings in accordance with 6 U.S.C. 252(c).

IFR_AR_000804

c. Requirements for USCIS Asylum Merits Adjudication

*Comments:* A commenter expressed concern that the procedural safeguards for hearings before asylum officers will fall short of due process requirements. The commenter suggested that all procedural safeguards available in immigration court proceedings be included in hearings before an asylum officer to ensure fairness. Meanwhile, another commenter stated that the provisions of 8 CFR 208.9(d) alone would not violate the due process rights of noncitizens, citing the right to a de novo hearing in immigration courts under proposed § 1003.48(e)(1). The commenter cautioned, however, that the combination of 8 CFR 208.9(d) and 1003.48(e)(1) will deny noncitizens the chance to explain the circumstances of their persecution or well-founded fear of persecution in a complete and orderly way, and that the rule is inconsistent with 8 U.S.C. 1229(a)(4)(b) and due process guaranteed by the Fifth Amendment.

Another commenter recommended asylum officers be required to introduce relevant country-conditions evidence—including evidence on gender-based violence, gang violence, and any recognized efforts to combat the aforementioned—when the applicant has not presented such evidence during the hearing before an asylum officer. Similarly, another commenter explained that having more complete knowledge of a country's conditions would allow asylum officers to properly elicit full testimony from asylum seekers. One commenter suggested additional procedural safeguards to promote "a less traumatic procedure," such as trauma survivors being given an opportunity to request interviewers of a specific gender.

*Response:* The Departments acknowledge the concerns of the commenters regarding the procedural safeguards in Asylum Merits interviews before USCIS asylum officers and disagree that such safeguards will fall short of due process requirements. As explained earlier in this IFR, the Departments are making several modifications to the process proposed in the NPRM in response to comments, including referring noncitizens who are not granted asylum by an asylum officer to an IJ for streamlined section 240 removal proceedings. DHS will provide ample procedural safeguards to noncitizens throughout the Asylum Merits process, including in the Asylum Merits interview itself, such as the following: (1) The applicant may have counsel or a representative present, may

present witnesses, and may submit affidavits of witnesses and other evidence, 8 CFR 208.9(b); (2) the applicant or applicant's representative will have an opportunity to make a statement or comment on the evidence presented, and the representative will also have the opportunity to ask follow-up questions, 8 CFR 208.9(d)(1); (3) a verbatim transcript of the interview will be included in any referral package to the IJ, 8 CFR 208.9(f)(2); (4) an asylum officer will arrange for the assistance of an interpreter if the applicant is unable to proceed effectively in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of eligibility for employment authorization, 8 CFR 208.9(g)(2); and (5) the failure of a noncitizen to appear for an interview may result in the referral of the noncitizen to ordinary section 240 removal proceedings before an IJ, unless USCIS, in its own discretion, excuses the failure to appear, *see* 8 CFR 208.10(b)(1). Furthermore, as explained earlier, if an asylum officer does not grant asylum to an applicant, the asylum officer will determine whether the applicant is eligible for statutory withholding and CAT protection before referring the case to streamlined section 240 removal proceedings before an IJ. The Departments believe that these procedures will give applicants a fair opportunity to present their claims, as well as have their claims heard and properly decided in an efficient manner.

As for requiring asylum officers to introduce country conditions evidence, the Departments decline to impose such a requirement. Asylum officers receive extensive country conditions training, have ready access to country conditions experts, and regularly consider country conditions when making decisions as a matter of course. In addition, current affirmative asylum interview procedures allow for applicants to request interviewers of a specific gender. These same procedures will apply in the context of Asylum Merits interviews.

*Comments:* Several commenters requested clarifications and modifications to procedures for merits hearings before asylum officers, including opportunities to present details and evidence pertaining to the case. A commenter explained that communication plays a crucial role in the interview process and asserted that the rule does not provide sufficient opportunity for legal advocates to call witnesses, present additional information, or prompt their clients to speak on their own behalf. Some commenters argued that the NPRM empowers asylum officers to present

evidence, but does not allow applicants or their counsels to frame and present their cases, or to examine or challenge any evidence introduced. Likewise, one commenter remarked that the structure of the hearing before asylum officers reverses the "normal order of adjudication," thus giving minimal opportunity to asylum seekers, who have the "burden of proof," to make statements and be directly examined.

Several commenters asserted that asylum officers provide limited to no opportunity for counsel to cross-examine applicants and present witness testimonies during interviews, which causes stress to applicants and limits the protections otherwise provided to them in section 240 removal proceedings. A few commenters asserted that limiting counsel's ability to make a statement or ask questions would jeopardize due process rights and reduce counsel's ability to properly advocate for the asylum seeker. Several commenters stated that more robust and meaningful participation by counsel during the hearing would help address the due process concerns arising from the revised provisions in 8 CFR 208.9, while reducing confusion or the need for appeals. Some commenters proposed that the rule include at least one continuance for the purpose of seeking counsel to advance equity within the adjudication process. Several commenters asserted that without access to counsel, asylum seekers would lack meaningful representation necessary for a successful hearing.

Some commenters recommended that 8 CFR 208.9 be revised to allow representatives to make an opening statement, elicit testimony from the applicant during the hearing, and provide a closing statement. Similarly, from an efficiency and due process standpoint, a commenter recommended that the asylum seeker's counsel—rather than an asylum officer with limited time to review "the often voluminous case file"—ask questions during the hearing. The commenter suggested that 8 CFR 208.9(d) be further amended to provide that the representative will also have the opportunity to ask follow-up questions during the interview or hearing. One commenter urged USCIS to consider consulting with lawyers who appear in immigration courts to receive feedback on the effects of the rule.

*Response:* The Departments acknowledge the concerns of the commenters regarding procedures for USCIS Asylum Merits adjudication, including the role of counsel in Asylum Merits interviews. As provided in 8 CFR 208.9(b), the purpose of the Asylum Merits interview will be to elicit all

relevant and useful information bearing on the applicant's eligibility for asylum. USCIS asylum officers have experience with (and receive extensive training on) eliciting testimony from applicants and witnesses, engaging with counsel, and providing applicants the opportunity to present, in their own words, information bearing on eligibility for asylum. Asylum officers also are trained to give applicants the opportunity to provide additional information that may not already be in the record so that the asylum officer has a complete understanding of the events that form the basis for the application. Noncitizens who are placed in the Asylum Merits process will have multiple opportunities to provide information relevant to their claims before USCIS asylum officers in nonadversarial settings, as well as the opportunity for an IJ to review or consider their claims. If an IJ ultimately denies protection to an applicant, BIA review will be available.

Within the context of Asylum Merits interviews, noncitizens retain the ability to access and secure counsel. *See* 8 CFR 208.9(b). As in the affirmative asylum interview context, USCIS will make every reasonable effort to ensure applicants are scheduled for their hearing in a time and place that ensures their representatives of record can attend and meaningfully participate in their interview. Applicants may request rescheduling of Asylum Merits interviews by following the instructions set forth on the USCIS website and in appointment notices. At the Asylum Merits interview, the applicant may present witnesses and may submit affidavits and other evidence. *See id.* At the completion of the Asylum Merits interview, the applicant or the applicant's representative will have an opportunity to make a statement or comment on the evidence presented. The representative will also have the opportunity to ask follow-up questions. *See* 8 CFR 208.9(d)(1). The Departments recognize the importance of the role of counsel in advising and assisting noncitizens with presenting their claims and believe that this rule provides counsel the opportunity to do so within the context of Asylum Merits interviews. As a result, the Departments decline to make further changes in response to these comments. As for the suggestion to consult with legal practitioners appearing before the immigrant courts, the Departments note that the NPRM provided the opportunity for any and all members of the public, including legal practitioners, to offer feedback on the rule, and in this

IFR the Departments are including another request for public comments.

*Comments:* Citing the impact of legal representation on asylum case outcomes, a commenter indicated that the NPRM increases access to legal representation. The commenter noted that the NPRM allows representatives with DOJ EOIR accreditation, including individuals with partial accreditation, to represent clients seeking statutory withholding of removal and CAT protection before USCIS. The commenter noted that by allowing statutory withholding of removal and CAT protection claims to proceed before USCIS, applicants would have greater access to free or low-cost legal representation from DOJ-accredited representatives. Another commenter recommended that the rule permit USCIS to appoint counsel in cases where counsel is needed, allow asylum seekers and their counsel to record objections and request the record reflect nonverbal activity, and create a procedure to report misconduct following hearings before asylum officers in the event that asylum officers mishandle such hearings.

*Response:* The Departments acknowledge the feedback on the impact that the rule may have on access to legal representation. Given the Departments' decision to have asylum officers issue final decisions solely as to the asylum claims, rather than also issuing final decisions regarding statutory withholding and CAT protection claims as proposed in the NPRM or otherwise issuing removal orders, the commenter's note about individuals with partial accreditation is no longer relevant. While the Departments appreciate comments suggesting that USCIS appoint counsel to noncitizens in certain instances, those comments are outside the purview of this rulemaking. The Departments note that asylum seekers and counsel will have the opportunity to make a statement or comment on the evidence presented at Asylum Merits interviews, which may include raising objections and requesting that the record reflect nonverbal activity. As for reporting asylum officer misconduct, USCIS will follow existing agency-wide procedures on receiving and responding to complaints and misconduct, which are available on the USCIS website.

*Comments:* Several commenters expressed support for the provision in the NPRM requiring asylum officers to record and transcribe hearings. A commenter noted that the provision allows noncitizens to receive a recording and transcript of their hearing before an asylum officer, which they

believe would place the noncitizen on equal footing with the DHS attorney. Some commenters added that the recordings and transcriptions of hearings would allow for accurate documentation of the proceedings and align with transparency and accessibility priorities. One commenter requested that DHS also clarify how asylum seekers will be able to access their hearing transcripts because it would allow noncitizens to determine whether they require help from counsel. The commenter also asked that the Departments address the possibility of widening the scope of the provision so that asylum seekers may access transcripts from IJ proceedings. Another commenter expressed concern about the inability of records to capture non-verbal cues and reactions during the hearing. This commenter suggested that a human communications specialist be consulted to determine how to incorporate non-verbal cues into hearing records.

One commenter noted that the requirement to record or transcribe the hearing may not be feasible and argued that this requirement would pose challenges for IJs conducting de novo reviews of hearings before asylum officers. Another commenter similarly urged USCIS to clarify how the review of hearing records would be conducted and the impact on the due process rights of asylum seekers. The commenter stated that full recordings of hearings would be hours long and claimed that generating transcripts would lengthen the time needed to issue decisions. Considering these issues, the commenter recommended that USCIS identify who would be reviewing the records and determine whether asylum officers would take notes in conjunction with the hearing recordings.

Another commenter suggested that all interviews, regardless of their nature, be recorded. They specified that all questions and answers be documented in the language they were initially spoken in and later interpreted. The commenter also recommended that the Departments provide adjudication documents in the asylum seeker's language, and that, in the case of literacy limitations, an interpreter read the records to an asylum seeker. Finally, in cases where the asylum seeker is detained, the commenter recommended the agencies ensure privacy to review the records.

*Response:* The Departments acknowledge the support for recording and transcribing Asylum Merits interviews. The Asylum Merits interview will be recorded so that a transcript of the interview can be

created. A verbatim transcript of the interview will be included in the referral package to the IJ. *See* 8 CFR 208.9(f)(2). A copy of that transcript will also be provided to the noncitizen. In addition, asylum officers will take notes during Asylum Merits interviews. As for nonverbal cues or reactions, asylum officers may make note of such matters as appropriate.[76] The Departments do not anticipate that these procedures will lead to significant delays in the adjudication of the noncitizen's asylum claim before USCIS. The Departments recognize one commenter's concern that there may be logistical challenges associated with implementing recording or transcription of interviews before asylum officers. However, the Departments are taking a phased approach to implementation in part to address this concern. The rule does make changes to long-standing practices, and as implementation progresses, the Departments will work to ameliorate any challenges that arise as the process is put into practice. Also, allowing for robust independent review of asylum officers' decisions to not grant asylum is an important feature that ensures administrative fairness over and above due process minimums.

In addition, USCIS will arrange for an interpreter when an applicant is unable to proceed with an Asylum Merits interview in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of eligibility for employment authorization. *See* 8 CFR 208.9(g)(2). At the Asylum Merits interview, the asylum officer will provide information about the hearing to the applicant, which will be interpreted for the applicant. While the Departments acknowledge the recommendation that questions and answers be documented in the language in which they were initially spoken and that adjudication documents be provided in the language spoken by the applicant, the Departments note that Asylum Merits interviews will be recorded and transcribed, and that notice of decisions will be provided to applicants in writing. The Departments believe that these various procedural safeguards sufficiently allow for applicants to access their Asylum Merits interview records and remain informed of the reasons for any decisions not to grant asylum. Thus, further

documentation or explanation requirements are not warranted in this IFR.

The comments recommending that DHS arrange a private setting for detained individuals to review their records fall outside of the scope of this rulemaking, and thus are not being addressed. The Departments believe that receipt of the transcript from the asylum officer's Asylum Merits interview will benefit the IJ and the noncitizen by providing a clear, precise, and accurate record of the basis for the adjudication. The Departments acknowledge the suggestion related to widening the scope of availability of transcripts from proceedings before IJs; however, this suggestion is beyond the scope of this IFR. Upon appeal of a decision by an IJ to the BIA, the hearing, where appropriate, is transcribed by the BIA and sent to both parties. *See EOIR Policy Manual,* Part II, Ch. 4.10(b), Part III, Ch. 4.2(f). Further, immigration hearings before the IJ are recorded. *See* 8 CFR 1240.9. If either party would like a recording of the proceedings before the IJ, an audio recording is available by making arrangements with the immigration court staff. *See EOIR Policy Manual,* Part II, Ch. 4.10(a).

*Comments:* Several commenters expressed support for the provision in the NPRM at 8 CFR 208.9(g) that would require USCIS to provide an interpreter for the hearing before an asylum officer, reasoning that such a requirement would promote fairness and accuracy in adjudication. Conversely, one commenter expressed concern that the provision in the NPRM, paired with other provisions in the NPRM, would "disproportionately harm vulnerable, minority populations" in the event that an Asylum Office cannot find an interpreter. Some commenters asserted that language barriers would result in mistakes in the record and complicate the appeal process. To address language access concerns, two commenters suggested this provision be extended to all asylum officer interviews, with some changes. The commenters suggested the agency provide specifications of the interpreter's qualifications and make Government-provided interpretation non-obligatory, asserting that these modifications would enhance asylum applicants' access to competent interpretation during the hearing.

One commenter, in support of the use of interpreters during hearings before asylum officers, urged USCIS to implement additional safeguards to combat the systemic problems associated with language access. The commenter suggested that the safeguards include a mandate for

interpretation throughout the full hearing in the asylum seeker's native language and incorporate specifications on the use of telephonic and video interpretations, and suggested that telephonic and video interpretation be used in cases where no qualified in-person interpreter is available. A commenter also suggested that the rule require everything said in any language during the interview process be part of the record to curtail the possibility of error and omission. Lastly, the commenter recommended a routine screening of interpreters to ensure consistency and accuracy in hearing records.

*Response:* As explained earlier, USCIS will provide an interpreter for Asylum Merits interviews when an applicant is unable to proceed with the hearing in English, and if an interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of eligibility for employment authorization. *See* 8 CFR 208.9(g)(2). The Departments acknowledge the commenters' support for the provision and disagree with the commenters who assert that this requirement will disproportionately harm vulnerable, minority populations. USCIS has existing contracts with telephonic interpreters to provide interpretation for credible fear screening and affirmative asylum interviews, and thus has extensive experience providing contract interpreter services.

Per contractual requirements, the USCIS contract interpreters are carefully vetted and tested. They must pass rigorous background checks as well as demonstrate fluency in reading and speaking English as well as the language of interpretation. The USCIS contractor must test and certify the proficiency of each interpreter as part of their quality control plan. The USCIS contractor also must provide interpreters capable of accurately interpreting the intended meaning of statements made by the asylum officer, applicant, representative, and witnesses during interviews or hearings. The USCIS contractor will provide interpreters who are fluent in reading and speaking English and one or more other languages. The one exception to the English fluency requirement involves the use of relay interpreters in limited circumstances at USCIS's discretion. A relay interpreter is used when an interpreter does not speak both English and the language the applicant speaks, such as a rare language or dialect.

In addition, USCIS contractor-provided telephonic interpreters must be at least 18 years of age and pass a security and background investigation

---

[76] Asylum officers conducting Asylum Merits interviews will continue to follow the guidance on note-taking they receive during their basic training. *See* USCIS, RAIO Combined Training Program: Note-Taking Training Module (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Note_Taking_LP_RAIO.pdf.*

by the USCIS Office of Security and Integrity. They cannot be the applicant's attorney or representative of record; a witness testifying on the applicant's behalf; a representative or employee of the applicant's country of nationality or, if stateless, the applicant's country of last habitual residence; a person who prepares an Application for Asylum and for Withholding of Removal or Refugee/Asylee Petition for a fee, or who works for such a preparer or attorney; or a person with a close relationship to the applicant, as deemed by the Asylum Office, such as a family member. All contract interpreters must be located within the United States and its territories (*i.e.,* Puerto Rico, Guam, etc.). Additionally, under the International Religious Freedom Act of 1998, USCIS must ensure that ''persons with potential biases against individuals on the grounds of religion, race, nationality, membership in a particular social group, or political opinion . . . shall not in any manner be used to interpret conversations between aliens and inspection or asylum officers.'' 22 U.S.C. 6473(a). In light of these requirements, the Departments are confident that USCIS will be able to ensure that communication among all parties is clear and accurate.

The Departments acknowledge that current interpreter contracts cannot absorb the expected increase in the need for interpretation services. DHS anticipates that it will need to both increase funding on existing contracts and procure new contracts for interpretation services. As a result of this IFR, the need for interpretation services will increase as the number of Asylum Merits interviews USCIS performs rises, which is further discussed in Section VI of this preamble. DHS declines to make modifications in this rule related to the commenters' recommendation to extend the USCIS-provided interpreter provision to all asylum interviews before USCIS as changes to USCIS's affirmative asylum process are outside the scope of this rulemaking.[77]

---

[77] On September 17, 2021, DHS published a temporary final rule that extends and modifies the requirement for certain asylum applicants to use a USCIS-provided telephonic contract interpreter to keep the USCIS workforce and applicants safe during the COVID–19 public health emergency. *See* Asylum Interview Interpreter Requirement Modification Due to COVID–19, 86 FR 51781 (Sept. 17, 2021). The rule is effective until March 16, 2023. *See* 87 FR 14757 (Mar. 16, 2022) (extending temporary final rule); *see also* 85 FR 59655 (Sept. 23, 2020) (original temporary final rule); 86 FR 15072 (Mar. 22, 2021) (first extension of temporary final rule).

### d. Failure To Appear

*Comments:* Various commenters opposed the proposed revisions that would allow an asylum officer to issue an order of removal when a noncitizen fails to appear for a scheduled hearing. Some of these commenters asserted that there are many reasons an asylum seeker might miss an interview that are not reasonably attributable to the applicant. Other commenters opposed this aspect of the proposal, arguing that the proposed rule offers fewer protections for asylum seekers than provided by the regulations governing in-absentia removal hearings before an IJ. Commenters argued that, unlike in section 240 removal proceedings, the proposed regulation does not contemplate safeguards to ensure that the asylum officer has provided the required evidence of inadmissibility and correctly issued the removal order. Because DHS is required to establish ''by clear, unequivocal, and convincing evidence'' that the noncitizen is removable and received written notice of the time and place of proceedings before a judge will issue an in-absentia removal order, these commenters asserted that the proposed rule requires the asylum officer to act as both the adjudicator and the prosecutor when it comes to issuing the removal order. These commenters opposed this aspect of the proposal because the proposed regulations do not include a process through which the noncitizen would seek rescission and reopening after receiving an in-absentia removal order from an asylum officer. Finally, other commenters opposed this part of the proposal because it does not include a provision that requires heightened notice of asylum hearings for children under 14, as exists in the regulations governing section 240 removal proceedings. Some commenters expressed concern about this aspect of the proposal because it would permit an asylum officer to issue a removal order without previously issuing a notice of failure to appear, which one of these commenters stated would provide an important safeguard preventing the issuance of a removal order against an individual who did not attend their hearing through no fault of their own. Commenters asserted that the agencies did not provide any rationale for the decision not to provide notice to asylum seekers of their failure to appear and that this lack of notice of failure to appear offends due process.

Also expressing due process concerns, a commenter suggested that the final rule must establish clear and fair notice procedures before any removal order is allowed. For example, the commenter expressed concern that the proposed rule does not have a requirement that the asylum officer issue a notice of further consideration hearing that would be comparable to the procedure under current 8 CFR 208.30(f), under which the officer issues an NTA for full consideration of the asylum and withholding of removal claims in section 240 removal proceedings.

Asserting that due process requires notice and an opportunity to be heard, commenters argued that the proposed regulation would violate due process by not providing an effective remedy for lack of notice and providing only a discretionary opportunity to be heard. While acknowledging that the proposed rule would provide that USCIS may excuse the failure to appear if the applicant demonstrated ''exceptional circumstances,'' the commenter argued that it is unclear whether this language would permit USCIS to rescind a removal order that had already been issued. Moreover, the commenter stated that this language keeps the decision to excuse the failure to appear entirely discretionary, unlike the statutory right to petition the immigration court to reopen in section 240 proceedings. Nor would this language, according to the commenter, provide applicants with a right to petition for reopening their cases due to lack of notice, a right they would have in section 240 removal proceedings.

One commenter argued that granting asylum officers authority to issue in-absentia removal orders as proposed would violate asylum seekers' due process rights, citing uncertainties surrounding reasonable access to legal representation in the proposed rule and the extreme consequences of an inabsentia removal order. Citing due process concerns, another commenter objected to this aspect of the proposed rule because it would not provide a mechanism for requesting postponement, aside from the discretionary ''brief extension of time'' or for requesting a change of venue. A commenter expressed concern that the proposed rule provides authority to issue a removal order for failing to appear for biometrics appointments without incorporating the limited safeguards required for in-absentia orders of removal by IJs.

Commenters recommended that the final rule include, either directly or by reference, the same or higher protections as an individual would receive in immigration court proceedings. A commenter suggested that, if the final rule adopts the NPRM's proposal, it should include provisions

that allow applicants to ask USCIS to rescind the removal order and reopen their cases where the applicant can show a due process violation or exceptional circumstances that excuse a failure to appear. Instead of allowing asylum officers to issue in-absentia removal orders, a commenter urged the Departments to require that cases be referred to immigration court when asylum seekers fail to appear for their interviews. Another commenter asserted that authorizing asylum officers to issue in-absentia removal orders would have a disproportionate and unfair impact on applicants with disabilities as well as asylum seekers who speak languages of lesser diffusion, who are less likely to receive notice of such appointments in a language they can understand.

*Response:* The Departments have considered the comments related to the possibility of asylum officers issuing in-absentia removal orders as outlined in the NPRM and, after careful consideration, have opted not to include that proposal in this IFR. Under the present rule as revised, asylum officers will not be issuing removal orders following the Asylum Merits interview. Consistent with the Departments' determination that final orders of removal for individuals whose asylum claims are being adjudicated under the framework of this IFR will only be issued by IJs, asylum officers also will not issue removal orders if an applicant fails to comply with biometrics requirements or fails to appear for the hearing. Instead, failure to appear for hearings or to comply with biometrics requirements will result in applicants not having their asylum claims considered through the process established by this IFR. In those circumstances, noncitizens will be issued an NTA and placed in ordinary section 240 proceedings before EOIR. In those ordinary section 240 proceedings, noncitizens would not be considered to have asylum applications pending but would have the opportunity to file a Form I–589.

e. Process for USCIS To Deny an Application for Asylum or Other Protection and Issue a Removal Order

*Comments:* A commenter provided a lengthy background analysis of the CAT, its implementation in the FARRA, and the authority of asylum officers to order the removal of asylum seekers. The commenter stated that the proposed rulemaking correctly does not amend the provision in 8 CFR 1208.16(f) for statutory withholding and CAT protection. Furthermore, the commenter asserted that the only statutory authority asylum officers have to order that

asylum seekers be removed is expedited removal under section 235(b)(1)(B)(iii)(I) of the INA. The commenter argued that asylum officers therefore lack authority to issue an order of removal after not granting a noncitizen's asylum claim and therefore also lack authority to adjudicate claims for statutory withholding of removal or CAT protection. Citing text from the NPRM's preamble, the commenter reasoned that the Departments incorrectly relied on a "vestigial" provision of INA regarding "orders of deportation" that were replaced by IIRIRA "orders of removal." The commenter also argued that the Departments cannot rely on *Mitondo* v. *Mukasey,* 523 F.3d 784 (7th Cir. 2008), reasoning that that case cannot be applied in the context of expedited removals because it turned on vague statutory language related to the Visa Waiver Program whereas, the commenter argued, the statutory language on asylum officers' powers of removal in section 235(b)(1) is more explicit.

*Response:* The Departments have carefully considered the comments received in response to the NPRM regarding an asylum officer's authority to issue a removal order. As discussed elsewhere, under this IFR, asylum officers will not issue removal orders. The Departments agree that an asylum officer should issue an NTA when not granting an application for asylum and refer the case for streamlined 240 proceedings before an IJ. Given this process, the Departments find it is unnecessary to further respond to the comments regarding an asylum officer's authority to issue a removal order.

f. Other Comments on Proposed Adjudication of Applications for Asylum

*Comments:* One commenter recommended several actions to address delays in the USCIS affirmative asylum adjudication process, including to reduce or eliminate the diversion of asylum office staff to conduct credible fear screenings and instead refer asylum seekers for full asylum interviews, create a new streamlined process to refer new requests for asylum originating at the U.S. border to USCIS asylum offices, ramp up hiring of asylum office staff, modernize the interview scheduling and filing systems, create an application route for cancellation of removal cases, and resolve more cases at the USCIS asylum offices in lieu of actions that typically occur in immigration courts, such as termination of immigration court proceedings for individuals who have filed an asylum application. The

commenter also urged USCIS to address the occurrence of asylum granted by an immigration court but not initially granted by USCIS.

*Response:* The Departments acknowledge the recommendations to address delays in the affirmative asylum adjudication process, but further consideration and discussion of the affirmative asylum adjudication process and different outcomes between affirmative asylum office adjudications and immigration court decisions fall outside of the scope of this rulemaking. The provisions of this rule respond to the problem of delay and backlogs for individuals encountered at the border who seek asylum or related protection by establishing a streamlined and simplified adjudication process. As discussed, the principal purpose of this IFR is to simultaneously increase the promptness, efficiency, and procedural fairness of the expedited removal process for individuals who have been found to have a credible fear of persecution or torture.

*Comments:* A commenter requested that the Departments further clarify adjudicatory timelines and processes so that stakeholders can fully evaluate the fairness, feasibility, and potential efficiencies of the rule. For example, the commenter stated that the proposed rule does not establish a timeline for the submission of evidence and does not provide for continuances but, rather, only extensions of undefined length and purpose. This commenter also requested that the Departments address the anticipated timeline and process for the adjudication of asylum claims for individuals who are released from detention following a positive credible fear determination but prior to the adjudication of their claim by an asylum officer, stating the proposed rule seemed to focus on asylum claim adjudication for detained noncitizens.

*Response:* The Departments acknowledge the request to clarify adjudicatory timelines and processes. DHS is clarifying at 8 CFR 208.9(a)(1) that there will be a minimum of 21 days between the service of the positive credible fear determination on the applicant and the date of the scheduled Asylum Merits interview, unless the applicant requests in writing that an interview be scheduled sooner.

DOJ is also clarifying the timeline for adjudications before the immigration court should the proceedings be referred to EOIR pursuant to new 8 CFR 1240.17(a) and (b). Notably, applicants will not appear for a master calendar hearing until at least 30 days after DHS serves the NTA, as set forth at new 8 CFR 1240.17(b). Applicants will then be

IFR_AR_000809

provided the opportunity to elect to testify and submit additional documentary evidence, as well as to identify errors in the record of proceedings before the asylum officer, including the asylum officer's decision. 8 CFR 1240.17(e). At this stage, parties may elect to proceed on the documentary record or may request a final merits hearing. 8 CFR 1240.17(f)(1). Based on an independent evaluation of the record, the IJ will then determine whether to decide the application on the documentary record or to hold a merits hearing. 8 CFR 1240.17(f)(2). If deemed necessary, the merits hearing generally will be scheduled 60 to 70 days after the initial master calendar hearing. Proceedings may be continued and filing deadlines may be extended, subject to certain requirements previously discussed in Section III.D of this preamble. In general, the Departments expect that the initial merits proceedings will be completed within 135 days from the first master calendar hearing before an IJ, and often substantially sooner. Having provided additional clarity regarding adjudicating timelines in the IFR, the Departments invite further comments.

*Comments:* A commenter recommended that the Departments allow asylum seekers with a positive credible fear determination to proceed as affirmative asylum applicants before USCIS, with referral to an immigration court occurring after the asylum interview, as necessary. The commenter stated that this approach would reduce the burden on immigration courts and allow for efficient processing of meritorious claims in a nonadversarial system.

*Response:* The Departments acknowledge the recommendation. The IFR provides for a nonadversarial asylum officer interview and adjudication with referral to an immigration court if the applicant is not granted asylum, through a streamlined section 240 proceeding with special procedures that will appropriately introduce efficiencies made possible by the asylum officer's record and determinations.

### 6. Application Review Proceedings Before an Immigration Judge

*Comments:* A majority of commenters who discussed the proposed IJ review proceedings expressed due process, procedural, constitutional, and other concerns about the creation of new IJ review proceedings and argued that applicants not granted asylum by the asylum officer should instead be referred to section 240 removal proceedings.

Commenters stated that many asylum seekers with strong and straightforward claims would benefit from the chance to be granted asylum after an interview with an asylum officer. Oner commenter stated that the initial interview with an asylum officer is "theoretically a good idea" but would ultimately depend on implementation. However, commenters were concerned that the NPRM's IJ review proceedings would disproportionately affect applicants with more complex cases. Thus, commenters supported referral to an IJ for a full evidentiary hearing if an applicant's case was initially not granted by an asylum officer. Commenters expressed significant concern about the possibility of a noncitizen being returned to a country where he or she fears persecution or torture without receiving a full adversarial hearing.

Several commenters remarked that they would be more supportive of the NPRM's provisions regarding initial asylum officer adjudication if the NPRM retained all asylum seekers' rights to full merits hearings in immigration court.

On the other hand, some commenters were supportive of the NPRM's provisions that would have allowed a noncitizen whose application was not granted to submit additional evidence for IJ review.

*Response:* Upon careful consideration, the Departments have revised the process set forth in the NPRM so that individuals will be placed in streamlined section 240 proceedings rather than the NPRM's proposal for non-section 240 proceedings, as described in new 8 CFR 1240.17, if an asylum officer does not grant asylum after an initial adjudication. As a general matter, the Departments agree with commenters that section 240 proceedings provide a better alternative than the proceedings proposed in the NPRM. IJs, DHS attorneys, and immigration counsel are familiar and experienced with the rules and procedures that apply to section 240 proceedings because those proceedings are the most common type conducted by IJs. The statute and regulations provide detailed standards and consistent rules for the conduct of section 240 hearings and noncitizens' rights during such proceedings, *see* 8 U.S.C. 1229a *et seq.,* 8 CFR 1240.1 through 1240.19. Currently, asylum and protection applications filed by noncitizens whose cases originate from the credible fear process are adjudicated in section 240 proceedings. In contrast, the NPRM would have created a new process and

would have imposed new evidentiary standards and limitations. *See* 86 FR 46946. The Departments believe that the NPRM process could have resulted in efficiencies while still ensuring a fair process, *see, e.g., id.* at 46906; however, as commenters claim, the NPRM process may also have resulted in increased immigration court and appellate litigation surrounding the interpretation and application of the new standards and evidentiary limitations. To avoid those complications, the Departments have decided not to adopt the NPRM's approach at this time and have instead decided to place noncitizens in streamlined section 240 proceedings if an asylum officer does not approve the noncitizen's application. This process will not employ the novel evidentiary restrictions proposed in the NPRM, but will instead apply largely the same long-standing rules and standards governing the submission of evidence that apply in ordinary section 240 proceedings. However, in keeping with the NPRM's purpose to increase efficiency and procedural fairness of the expedited removal process for individuals who have been found to have a credible fear of persecution or torture, 86 FR 46909, and in light of the efficiencies gained by initial adjudication before and creation of a record by the asylum officer, these streamlined section 240 proceedings will be subject to particular procedural requirements that ensure they are completed in an expeditious manner while still preserving fairness to noncitizens.[78]

The Departments agree with the commenters' assertions that noncitizens and the overall immigration adjudication system will benefit from this rulemaking in part by authorizing asylum officers to grant asylum to noncitizens determined to have a credible fear of persecution or torture. 8 CFR 208.2(a)(1)(ii). Asylum officers receive extensive training and possess expertise, *see supra* Section III.C of this preamble; INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b), and the Departments are confident in asylum officers' ability to carry out their duties in accordance with all applicable

---

[78] Streamlined section 240 proceedings are conducted in accordance with section 240 of the INA, 8 U.S.C. 1229a, but with particular procedural requirements laid out in new 8 CFR 1240.17, as described above in Section III of this preamble. EOIR has made other such procedural changes, including the recent procedural requirements imposed on cases subject to case flow processing under *Policy Memorandum* ("PM") *21–18, Revised Case Flow Processing before the Immigration Courts* (Apr. 2, 2021). Generally, that PM eliminates the master calendar hearing for represented non-detained cases, but those cases are still conducted pursuant to section 240 of the INA, 8 U.S.C. 1229a.

statutes and regulations and in an efficient, fair manner.

The Departments have amended their respective regulations in this IFR to provide certain procedural protections that address commenters' concerns about the process that applies if an asylum officer does not grant asylum after an initial adjudication. For example, all noncitizens not granted asylum by asylum officers after an initial adjudication will be issued an NTA and referred to streamlined section 240 proceedings, as described in new 8 CFR 1240.17. Because, under this IFR, such noncitizens will be referred for streamlined section 240 proceedings, 8 U.S.C. 1229a, the applicable evidentiary standard is consistent with the longstanding evidentiary standard for section 240 proceedings—evidence is admissible unless the IJ determines it is untimely, not relevant or probative, or that its use is fundamentally unfair. 8 CFR 1240.17(g); 8 CFR 1240.7(a); *Nyama,* 357 F.3d at 816 ("The traditional rules of evidence do not apply to immigration proceedings. . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally unfair.' " (quoting *Espinoza,* 45 F.3d at 310)); *Matter of Ramirez-Sanchez,* 17 I&N Dec. 503, 505 (1980) (holding that evidence must be "relevant and probative and its use must not be fundamentally unfair").

As part of the streamlined section 240 proceedings adopted by DOJ in this IFR at new 8 CFR 1240.17, noncitizens may elect to testify or present additional evidence that meets this evidentiary standard. 8 CFR 1240.17(g). If the noncitizen timely requests to testify, the IJ must schedule a hearing unless the IJ determines that the application can be granted without live testimony and DHS has not requested to present testimony or cross-examine the noncitizen, as described at new 8 CFR 1240.17(f)(4)(ii). Given these protections, among others, the Departments are confident that the procedures are sufficient to ensure that noncitizens will not be removed to a country where they fear persecution or torture without the opportunity for a hearing before an IJ.

The Departments acknowledge those commenters who expressed support for the NPRM's evidentiary procedures, but the new process established by this IFR at new 8 CFR 1240.17(g), and as described above in Section III of this preamble, maintains the noncitizen's ability to submit evidence to asylum officers and IJs, albeit in accordance with a broadened evidentiary standard consistent with section 240 proceedings. The new process further includes rules governing continuances, procedures for

prehearing conferences, and the requirement of submissions by the parties. The Departments believe that the revisions, including (1) transmission of the asylum office record, (2) requirements that the IJ not hold a hearing unless requested by a party or if necessary, and (3) the deadlines imposed, will prevent time-consuming evidentiary hearings and increase the overall efficiencies and effectiveness in all cases.

a. Creation of New Limited Proceedings in Lieu of Section 240 Removal Proceedings and Limitation on Relief to Asylum, Statutory Withholding of Removal, and Convention Against Torture Review Only

*Comments:* Several commenters expressed opposition to the NPRM's procedures proposing that applicants who are not granted asylum or are found ineligible for statutory withholding of removal or CAT protection by an asylum officer must affirmatively request further review by an IJ. Overall, these commenters suggested that, if the Departments move forward with the NPRM's new hearing process, these applicants should be automatically referred to the IJ for a hearing, ideally in section 240 proceedings.

Multiple commenters compared this process to the procedures for credible fear review in which applicants who neither affirmatively request IJ review nor waive review are referred to the IJ. *See* 8 CFR 208.30(g)(1).[79] Commenters stated that it was unclear why the Departments would not apply the same presumption to the NPRM's process for people who are not granted asylum by asylum officers since, commenters explained, the new hearing process is essentially an extension of the credible fear interview process at issue in 8 CFR 208.30(g)(1). In other words, commenters urged the Departments to automatically refer asylum officers' decisions to not grant asylum to the IJ for section 240 proceedings unless the asylum seeker affirmatively states or files a notice waiving IJ review (*i.e.,* "opts out").

Commenters expressed concern that requiring an applicant to affirmatively seek further review may result in some applicants not receiving further IJ review due to the applicant's confusion or the complexity of the process, and not due to a lack of desire for further review. For example, commenters noted

that many asylum seekers who receive a negative credible fear finding may not know that they can seek a "de novo review" or may not understand the consequences of failing to seek review. In addition, there may be problems for applicants with the translation of documents informing them about the appeal process into a language they can read, or with applicants understanding the gravity of the process. Finally, commenters explained that automatic referral to an IJ is preferable to requiring an affirmative election because the applicant may receive an asylum officer's decision not to grant asylum through the mail, which triggers a short time to respond and other mail difficulties.

Commenters expressed concern that the 30-day period to request review by the IJ is too short and recommended extending the time period in which a noncitizen must respond after receiving a denial in the mail from 30 to 60 days.

Some commenters compared the IJ referral procedures in the NPRM to those for applicants who have affirmatively applied before USCIS. *See* 8 CFR 208.14(c)(1) (instructing the asylum officer to refer the application of an applicant who is inadmissible or deportable for adjudication in section 240 proceedings). Commenters were concerned that the difference in the procedures would create confusion in immigrant communities and lead many asylum seekers in the NPRM process to mistakenly believe that their cases would be automatically referred to the immigration court. Similarly, commenters were concerned that having two different paths may also create confusion potentially for the asylum office itself.

Some commenters said that substituting an "appeal" for a "referral" for IJ review is confusing and potentially deceptive, especially for applicants who appear pro se at an asylum officer interview. Commenters said that such applicants will likely have difficulty understanding paperwork that explains the contours of these IJ review hearings, as well as the obligation to file a notice of appeal, thereby potentially foreclosing further administrative and judicial review. Commenters further expressed concern that additional categories of applicants would be particularly affected by the requirement to affirmatively request IJ review, including non-English speakers, individuals with mental health disabilities, trauma victims, and individuals in detention.

Commenters noted that language barriers, effects of trauma, and the detrimental effects of detention all

---

[79] This citation refers to 8 CFR 208.30(g)(1) prior to publication of the Global Asylum rule, which amended 8 CFR 208.30(g), *see* 85 FR 80392, but which has since been enjoined, *see supra* note 4 (discussing recent regulations and their current status).

negatively impact an asylum seeker's ability to affirmatively request review. In addition, commenters noted that the noncitizens who would be placed in proceedings before EOIR will have already had an asylum officer determine that the claim is credible and, therefore, not frivolous. Thus, commenters explained, such asylum seekers would be unlikely to request review, resulting in the waiver of meritorious claims.

*Response:* This IFR does not implement the NPRM's proposal for IJ review proceedings, and instead adopts streamlined section 240 proceedings, as described above in Section III of this preamble. Specifically, as described in new 8 CFR 1240.17, DHS will file an NTA and place the noncitizen in these streamlined section 240 proceedings in all cases where the noncitizen was found to have a credible fear of persecution or torture, but the asylum officer subsequently did not grant the asylum application.

The Departments believe that providing streamlined section 240 proceedings addresses nearly all of the commenters' concerns and requests on this topic. Applicants will not be required to affirmatively request review by an IJ, and applicants will not be referred to the limited IJ proceedings proposed in the NPRM. Instead, applicants will be referred to streamlined section 240 proceedings that incorporate various procedural measures to enhance efficiency, consistent with the streamlined nature of these proceedings, while still ensuring fairness to noncitizens. Proceedings under this IFR are conducted under section 240 of the Act, 8 U.S.C. 1229a, and the streamlined proceedings will advance more expeditiously than ordinary section 240 proceedings generally proceed because the IJ will have the benefit of the full asylum officer record and the IJ and the parties will be subject to timelines that ensure the proceedings are adjudicated promptly. The streamlined 240 proceedings will also ensure that the intent of the NPRM to streamline IJ review is preserved.

Nevertheless, the Departments believe that these additional procedural measures will not create confusion for noncitizens, as section 240 proceedings are the most common type of immigration proceeding, and these new, straightforward procedural requirements will be directly communicated to noncitizens. Moreover, the new procedural timelines in the IFR are responsive to commenters' concerns that noncitizens need longer than 30 days to identify errors in the asylum officer's decision. Notably, under the

IFR, as set forth at new 8 CFR 1240.17(b), the master calendar hearing will be held 30 days after the NTA is served, or, if a hearing cannot be held on that date, on the next available date no later than 35 days after the date of service. At the conclusion of the initial master calendar hearing, the IJ will schedule a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, as described at new 8 CFR 1240.17(f)(1). At status conferences provided for at new 8 CFR 1240.17(f)(2), noncitizens will indicate orally or in writing whether they intend to contest removal or seek any protections for which an asylum officer did not determine a noncitizen eligible, and if seeking protections, noncitizens will indicate whether they intend to testify before the immigration court, identify any witnesses they intend to call, and provide any additional documentation. 8 CFR 1240.17(f)(2)(i). Where a noncitizen is represented by counsel, the noncitizen shall further describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings, articulate any additional bases for asylum and related protections, and state any additional requested forms of relief. *Id.* The IFR also provides specifically for continuances and filing extensions in streamlined section 240 proceedings, which allows appropriate flexibility with regard to the established timelines. *See* 8 CFR 1240.17(h). If a noncitizen needs additional time beyond these timelines, as commenters suggested, new 8 CFR 1240.17(h)(2) provides for respondent-requested continuances and filing extensions. Thus, these timelines are clear, streamlined, and reasonable, allowing noncitizens the opportunity to reasonably present their cases while maintaining the overall efficiencies of the NPRM.

In addition to established evidentiary standards, section 240 proceedings—including the streamlined section 240 proceedings addressed in this IFR—provide a number of procedural protections established by statute and regulation, such as the right to representation, "a reasonable opportunity to examine the evidence against the [noncitizen], to present evidence on the [noncitizen's] own behalf, and to cross-examine witnesses," and the creation of a complete record of the proceedings. INA 240(b)(4), 8 U.S.C. 1229a(b)(4). Additionally, the Act and the regulations establish that the IJ should play a robust role in

proceedings. *See* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) (requiring IJs to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses"); 8 CFR 1003.10(b) (same and requiring IJs to take other actions that are "appropriate and necessary for the disposition of" each case); 8 CFR 1240.10(a) (requiring IJs to, inter alia, advise noncitizens of certain rights in section 240 proceedings and to explain factual allegations and legal charges in the NTA in non-technical language); 8 CFR 1240.11(a)(2) (requiring IJs to inform noncitizens of "apparent eligibility to apply for any of the benefits enumerated in this chapter"); 8 CFR 1240.1(a)(1)(iv) (authorizing IJs to "take any other action consistent with applicable law and regulations as may be appropriate" in a section 240 proceeding). Additionally, section 240 proceedings provide for special consideration for noncitizens who may present with competency issues. *See* INA 240(b)(3), 8 U.S.C. 1229a(b)(3); *Matter of M–A–M–,* 25 I&N Dec. at 479–84 (stating that where a noncitizen shows indicia of incompetency, the IJ must inquire further and establish safeguards where appropriate). In addition, the IFR carves out a specific exception to the general timeline and procedures in the streamlined 240 proceedings for a noncitizen who has exhibited indicia of incompetency at new 8 CFR 1240.17(k)(6).

The Departments note that the IFR does not permit noncitizens to "opt-out" of or decline further proceedings before an IJ because section 240 of the Act, 8 U.S.C. 1229a, requires an IJ, as opposed to the asylum officer, to issue the order of removal in cases where asylum is denied. The IFR does, however, allow a noncitizen to indicate that the noncitizen does not wish to contest removal or seek any protections for which the asylum officer did not find the noncitizen eligible, as set forth in new 8 CFR 1240.17(f)(2)(i)(B). In such a case, if the asylum officer determined the noncitizen eligible for withholding of removal or protection under the CAT, the IJ will give effect to that protection as determined by the asylum officer unless DHS makes a prima facie showing through new evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceeding for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. In addition, if a noncitizen fails to appear for the IJ proceedings, the IJ will generally be required to order an in-absentia removal order pursuant to

existing regulations, but will similarly give effect to the asylum officer's determination, if any, that the noncitizen is eligible for withholding of removal or protection under the CAT, unless DHS demonstrates that the respondent is not eligible for such protection, as provided in new 8 CFR 1240.17(d).

*Comments:* Commenters expressed concerns that the NPRM's proposed IJ review proceedings lacked procedural protections and due process safeguards. Commenters stated that placing applicants whose cases are not granted by the asylum officer in these limited, asylum-only-type proceedings limits critical and well-established due process protections for applicants. In other words, commenters generally supported placing applicants in section 240 proceedings, to include the broader evidentiary standard applied in 240 proceedings, rather than a new limited proceeding tethered to the asylum interview record, and imposing a narrow evidentiary standard.

Commenters stated that the NPRM's proposed IJ review proceedings would erase the procedural guarantees and protections of full removal hearings and inappropriately limit immigration court consideration of asylum officer decisions. For instance, under the NPRM, an applicant would be unable to submit applications for other forms of relief without submitting additional motions, and would be unable to submit additional evidence unless an IJ deems it "necessary" and "not duplicative." Commenters stated that IJs would be expected to rule in these "reviews" without holding evidentiary hearings. Similarly, commenters expressed concern that the proceedings would effectively be limited to review of only the asylum officer's notes, which would deprive the applicant of the right to present testimonial and documentary evidence, cross-examine adverse witnesses, and review and rebut all evidence considered by the adjudicator. Commenters expressed concern that the procedures in the NPRM's proposed IJ review, as compared to section 240 proceedings, could deprive applicants of a true opportunity to be heard. Commenters stated that the evidentiary provisions of the IJ review process could not cure the absence of these procedural protections. Commenters said the evidentiary procedures proposed by the NPRM during IJ review are vague and inadequate, and the NPRM's articulated rationales for a truncated hearing rather than full section 240 proceedings are arbitrary and capricious.

Commenters expressed concern about the nature of the record before the IJ in the review proceedings proposed by the NPRM—more specifically, that the NPRM gives a disproportionate amount of deference to asylum officer decisions while simultaneously limiting IJ adjudication to a mere review of the asylum officer-created record, rather than providing for a full de novo merits hearing. Commenters believed the NPRM would allow credible fear interview notes to be the sole basis of the asylum application, and that proposed 8 CFR 208.14(c) would allow asylum applications to be the sole piece of evidence reviewed by the IJ. Commenters also believed that relying on the asylum officer to adequately develop the record falls far short of due process standards. Commenters expressed concern that the asylum officer's notes may not explain why certain types of evidence were not allowed to be presented. Given these concerns, commenters said that this would create a chain of reliance on limited and often incomplete credible fear interview notes, would limit the ability of counsel to effectively supplement the record where necessary, and would prejudice clients who were not able to fully present their claims during the credible fear interview because of incapacity, trauma, or an improper setting for the interview.

Commenters stated that the NPRM does not explicitly guarantee the applicant a right to receive a decision from the IJ that lays out the reasons for their decision. Commenters reasoned that these decisions are critical for BIA and judicial review and thus, at a minimum, the NPRM should include the same standard of requiring an IJ to explain the reasoning underlying the court's decision as in section 240 proceedings.

Commenters expressed concern that the proposed IJ review procedure would provide insufficient review in light of the nature of the asylum officers' adjudications and decisions. Commenters stated that, in the context of asylum officers' adjudications of affirmative asylum applications or those filed by unaccompanied children, applicants receive a one-page notice explaining the decision with limited legal explanation. Assuming the decisions by asylum officers in the new procedures under the NPRM would be similar, commenters expressed concern that the NPRM does not provide the same safeguard of section 240 proceedings that is provided to these other applicants. Commenters stated that asylum officers do not always adequately review the entire record and make referrals to the immigration court for complex cases. Commenters stated that the NPRM's proposed IJ review proceedings would not ensure that any errors or omissions by the asylum officer are uncovered, particularly where the IJ rejected additional evidence or testimony that might support the protection claim.

Commenters stated that full section 240 proceedings are necessary because many applicants who currently are referred to removal hearings by asylum officers are granted asylum by an IJ. Commenters stated that reasons for the high number of cases granted after referral to EOIR, in the current section 240 referral process, include insufficiency or inaccuracy of credible fear interview notes as a sole measure of credibility, the structure of the asylum officer's interview, access to counsel, and access to evidentiary material and witness testimony. In contrast, commenters said the standard for considering admissible evidence in section 240 proceedings is relevance and fundamental fairness, and that immigration proceedings favor broad evidentiary admissibility. Commenters said the reason for the large disparity in outcomes was the right to a full de novo court hearing, where attorneys were free to offer documents, briefs, and testimony.

Commenters also took issue with the NPRM's statement that a noncitizen would have a "full opportunity to challenge" an asylum officer's decision to not grant asylum through an IJ's review of the asylum interview record. Commenters stated that, statistically, a large number of asylum applicants are unsuccessful in making a strong case for themselves at their hearings before asylum officers, citing impacts of trauma on presenting claims and difficulties with providing documentary evidence on short notice. Thus, commenters asserted, it is not realistic or fair to expect that the record of the hearing before an asylum officer, on which the IJ would rely during their review, would be sufficient to ensure that applicants have the opportunity to adequately make their case.

Commenters stated that the availability of section 240 proceedings for some applicants and only limited proceedings under the NPRM for other asylum applicants is not rationally connected to (1) whether a noncitizen has been or may be persecuted or tortured in the country the noncitizen left behind, and (2) the noncitizen's ability to articulate the claim or timely obtain evidence. Therefore, commenters urged that any final rule preserve the right to full adversarial proceedings before an IJ for those applicants who

have not had their applications granted by an asylum officer.

Commenters stated that the NPRM is not clear as to what extent applicants who do not receive a grant of asylum by the asylum officer will be negatively impacted if placed in affirmative proceedings without a guarantee of full section 240 proceedings. Commenters stated that if the NPRM decreased due process protections of applicants by denying the benefit of full section 240 proceedings, it may reduce access to the asylum process. Commenters said the NPRM raises transparency concerns regarding how the Departments will handle cases after review by an asylum officer.

Commenters said the Departments must not enact a faster process at the expense of due process protections and one commenter expressed concern that the NPRM's limited review proceedings would result in the creation of a de facto "rocket docket" that would place asylum seekers at risk of summary deportations. Absent clarification on the potential impact of these provisions, the commenters said they had been denied an opportunity to meaningfully comment on the NPRM.

*Response:* As described above in Section III of this preamble, the Departments have determined that a noncitizen whose asylum claim is not granted by an asylum officer after an initial adjudication will be issued an NTA and referred to an IJ for streamlined section 240 removal proceedings, and the Departments have decided not to implement the IJ review proceedings originally proposed in the NPRM. Section 240 proceedings follow issuance of a notice of charges of inadmissibility or removability against a noncitizen, INA 239(a)(1), 8 U.S.C. 1229(a)(1); INA 240(a), 8 U.S.C. 1229a(a), and provide an opportunity for the noncitizen to make a case to an IJ, INA 240(a), 8 U.S.C. 1229a(a), (b). Accordingly, the use of section 240 proceedings provides notice and an opportunity to be heard, which satisfies due process. *See, e.g., LaChance* v. *Erickson,* 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard.").

The Departments' decision not to implement the NPRM's proposal for limited review proceedings for applications not granted by the asylum officer and instead to refer noncitizens to streamlined section 240 removal proceedings addresses commenters' concerns that the NPRM's proposed proceedings were overly restrictive. In response to commenters' concerns regarding the nature of the record

created by the asylum officer, the Departments note that while the written record of the positive credible fear determination will be considered a complete asylum application, applicants may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination. 8 CFR 208.4(b)(2). Also, because the IFR is consistent with the evidentiary standard for section 240 proceedings, noncitizens may review and present evidence that is relevant and probative, which eliminates the NPRM's limited evidentiary standard of "necessary" and "not duplicative" and ensures noncitizens have the opportunity to supplement the record for IJ review. 8 CFR 1240.17(g). Upon conclusion of the streamlined section 240 proceedings, the DOJ regulations provide that an IJ will issue a decision considering the full record before the IJ, as set forth at new 8 CFR 1240.17(f)(5), and noncitizens will have an opportunity for appeal. 8 CFR 1240.13, 1240.15. The IJ has a duty to provide a decision orally or in writing. *See Matter of Kelly,* 24 I&N Dec. 446, 447 (BIA 2008) (holding that the IJ has a responsibility "to insure [sic] that the decision in the record is complete"); 8 CFR 1003.37. Specifically, the IJ "shall decide whether an alien is removable from the United States. The determination of the [IJ] shall be based only on the evidence produced at the hearing." INA 240(c)(1)(A), 8 U.S.C. 1229a(c)(1)(A). These provisions ensure that noncitizens receive a meaningful opportunity to be heard and afford procedural protections and due process safeguards. Moreover, under the IFR, noncitizens will not need to engage in additional motions practice—as they would have under the NPRM—should they wish to seek other forms of relief beyond the applications previously considered by the asylum officer. Further, IJs will conduct hearings for noncitizens who request to present live testimony, unless the application can be granted without a hearing, as indicated at new 8 CFR 1240.17(f)(4). The Departments find that the process set forth in this IFR addresses commenters' concerns that the NPRM provided undue deference to asylum officers while limiting the IJ's role in the proposed application review proceedings. While the Departments recognize that commenters stated they prefer "full" section 240 proceedings over those proposed in the NPRM, the Departments believe that the

streamlined procedures set forth in this rule are necessary and appropriate for furthering efficiency interests while still ensuring fair adjudication of claims. In addition, the transcription of the hearing before an asylum officer, along with the additional timelines for completing cases that are included in this IFR, address commenters' concerns about transparency as to how the Departments will handle cases.

*Comments:* Commenters similarly stated that the NPRM does not permit procedures provided in section 240 proceedings, specifically in regard to continuances. Commenters explained that in section 240 proceedings, noncitizens are first scheduled for master calendar hearings where, among other things, IJs ask if they need a continuance to secure representation. Commenters stated that continuances are routine throughout the course of a case in immigration court. However, if proceedings are transferred to the asylum office, commenters were concerned that noncitizens will have less freedom to request their interview be rescheduled because DHS only allows for continuances of asylum officer proceedings in "exceptional circumstances."

Commenters also pointed out that 8 CFR 1003.48(e) as proposed in the NPRM did not adequately contemplate the legitimate needs for which an extension may be necessary (*e.g.,* to obtain representation by counsel). Commenters reasoned that applications for continuances should be fully documented, setting forth the steps already taken to secure an attorney or to obtain supporting evidence. Commenters believed that requests should be granted to allow for additional time, within reasonable limits, if applicants establish that they have been diligent and thorough with their search.

*Response:* At new 8 CFR 1240.17(h), the IFR explicitly provides for continuances in the context of streamlined section 240 proceedings. As specifically relevant to commenters' concerns, the IJ may grant initial continuances, including continuances to allow the noncitizen time to secure representation. These initial continuance standards will be governed by the long-standing, traditional "good cause" standard, as described at new 8 CFR 1240.17(h)(2)(i). *See* 8 CFR 1003.29.

As discussed above in Section III of this preamble, and as found at new 8 CFR 1240.17(h)(2)(ii) and (iii), the IFR also allows additional continuances beyond the initial 30-day "good cause" period, but the standards for additional

continuances beyond the initial 30-day "good cause" period will be increasingly restrictive as the noncitizen's requested continuances increase the aggregate delay of the proceedings. The IFR provides heightened standards for consideration when the merits hearing has been delayed for more than 90 days past the initial master calendar hearing due to continuances granted to the noncitizen. Nevertheless, the IFR preserves the opportunity for continuances as necessary to ensure a fair proceeding or to prevent a violation of statutory or constitutional rights, including the statutory right to counsel, as set forth at new 8 CFR 1240.17(h)(2)(ii)–(iii).

*Comments:* Commenters explained that the NPRM's proposed "prohibition" on immigration court consideration on the issue of removability may violate due process and result in wrongful removals. For example, commenters described a situation in which an IJ properly probed for facts and discovered that the noncitizen facing removal was in fact a U.S. citizen. However, commenters explained, if IJs are not permitted to make a ruling on admissibility or removability, there is no incentive for them to inquire to determine if the applicant before them has undiscovered legal status. To ensure that noncitizens are not removed by mistake and to avoid unnecessary hearings for those who are not removable, the commenters said that IJs should be permitted to inquire and make determinations regarding removability.

*Response:* The IFR resolves commenters' concerns with issues of removability and admissibility. In the streamlined section 240 removal proceedings introduced by this IFR, as in all section 240 proceedings, the IJ must make a determination regarding whether the noncitizen is subject to removal as charged. 8 CFR 1240.17(f)(2)(i), (k)(3); 8 CFR 1240.10(c), (d). The IFR includes an exception to the timelines in the streamlined proceedings for cases in which the noncitizen makes a prima facie showing that the noncitizen is not subject to removability and the IJ determines that the challenge cannot be resolved simultaneously with the adjudication of the noncitizen's applications for asylum, statutory withholding of removal, or withholding or deferral of removal under the CAT. Instead, these noncitizens will be subject to ordinary section 240 proceedings, as described at new 8 CFR 1240.17(k)(3).

*Comments:* Commenters disagreed with the NPRM's statement that "requiring a full evidentiary hearing before an IJ after an asylum officer's denial would lead to inefficiencies without adding additional value or procedural protections." 86 FR 46918. Commenters argued that this ignores the reality of the asylum process by assuming that applicants will be able to develop a full evidentiary record before the asylum officer, demonstrates a misunderstanding of how difficult it is to be granted asylum, and could hinder due process. Commenters said that nonadversarial hearings with asylum officers are not faster and fairer than immigration court hearings with represented applicants, especially if attorneys on both sides agree to narrow issues in dispute before the IJ. At least one commenter believed that, under the NPRM, an IJ's decision regarding rejecting or admitting evidence would not be reviewable by the BIA or a U.S. Court of Appeals because the NPRM did not require the judge to provide a reasoned decision. Therefore, commenters explained, the NPRM's proposed IJ review could deny a noncitizen the opportunity to relate clearly and completely the circumstances of persecution or a well-founded fear of persecution to either an asylum officer or IJ. Commenters anticipated that the NPRM, if it had been promulgated in that form, would be vacated because it is inconsistent with due process guaranteed by the Fifth Amendment as well as INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B), which provides that noncitizens shall have a reasonable opportunity to examine the evidence against them, to present evidence on their own behalf, and to cross-examine witnesses presented by the Government.

*Response:* The Departments disagree with commenters' concerns that the initial asylum officer adjudication of claims would not provide further efficiencies over the current expedited removal credible fear screening process. Although this IFR revises the process as proposed by the NPRM for reviewing applications that an asylum officer does not grant, the Departments maintain that having an Asylum Merits interview with an asylum officer for noncitizens with positive credible fear determinations, as both the IFR and NPRM provide, will be more expeditious than the current process of referring all noncitizens with positive credible fear determinations to section 240 proceedings before the immigration court. As described in the NPRM, immigration courts are experiencing large and growing backlogs and subsequent adjudication delays. 86 FR 46907. Asylum officers are well trained and experienced with asylum adjudications, and each case that is granted by USCIS is a direct reduction in cases that would have been before EOIR. *See id.* The threshold asylum officer hearing proposed in the NPRM also will ensure that cases referred to immigration court will include a well-developed record. Where cases are referred with such a record, IJs will not have to grant continuances for respondents to file applications for asylum and related protection. Even though parties will be able to file additional evidence, the asylum officer record will help IJs to narrow issues. For both these reasons, USCIS adjudication of claims will promote efficiency before EOIR.

In addition, the IFR does not adopt the NPRM's proposal for broad limits on introducing new evidence. Instead, the IFR provides at new 8 CFR 1240.17(g)(1) that IJs may exclude documentary evidence or witness testimony "only if it is not relevant or probative; if its use is fundamentally unfair; or if the documentary evidence is not submitted or the testimony is not requested by the applicable deadline, absent a timely request for a continuance or filing extension that is granted." The Departments believe the IFR's evidentiary standard addresses the commenters' concerns regarding the need for a full evidentiary hearing. Further, the Departments believe that, overall, the IFR's streamlined section 240 proceedings will be equally effective, if not more so, than the NPRM's proposed proceedings in enhancing efficient adjudication and replacing time-consuming evidentiary hearings. For example, the IFR provides that the asylum officer's record will be automatically transmitted upon DHS's issuance of an NTA, which will enable the parties to narrow the issues and assist the IJ's review of the case. The IFR also provides that if neither party requests to present testimony, or if the IJ determines that the asylum application can be granted without hearing testimony and DHS does not request to present testimony or evidence, the IJ can decide the case without a hearing. The IFR also provides various deadlines for the scheduling of hearings and the issuance of the IJ decision. These measures enhance efficiency by precluding the need for a full evidentiary hearing in some cases and by facilitating a more efficient hearing when one is necessary.

Finally, in response to commenters' concerns regarding administrative and judicial review of IJ decisions regarding the admission of evidence, the Departments emphasize that there is not a substantive difference regarding IJs'

IFR_AR_000815

**18160** Federal Register / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

decisions on the admission of evidence in these streamlined section 240 proceedings and standard 240 proceedings. Either party may challenge the IJ's decision during a subsequent appeal to the BIA, which will be reviewed pursuant to the same standards of review as for appeals from ordinary section 240 proceedings. *See* 8 CFR 1003.1; INA 242, 8 U.S.C. 1252. A noncitizen who receives an adverse decision from the BIA may file a petition for review subject to the requirements of section 242 of the INA, 8 U.S.C. 1252, and nothing in this rule affects that statutory provision.

*Comments:* Commenters expressed concerns that IJs would serve a "pseudo-appellate" role by reviewing decisions by asylum officers. The commenters characterized the current IJ review process of negative credible fear interviews as "deficient" and explained that expanding this aspect of the IJ's duty will amplify due process concerns and result in erroneous removals. Therefore, commenters urged that, if the NPRM is not withdrawn, the Departments should at least automatically refer claims not granted by asylum officers for full section 240 proceedings.

*Response:* The Departments find that the decision to place individuals whose applications are not granted by the asylum officer into streamlined 240 proceedings, rather than the NPRM's proposed IJ review proceedings, addresses commenters' concerns that the new procedures would have been akin to a credible fear review rather than an adjudication in removal proceedings. As commenters point out, section 240 proceedings allow noncitizens a fuller opportunity to present evidence and testimony to develop the record, secure and work with counsel if they have not yet done so, and participate in additional hearings as needed. *See generally* 8 CFR part 1240. The IFR includes additional procedural requirements to ensure that proceedings will proceed more expeditiously, but will still give noncitizens a full opportunity to develop the record and obtain a de novo determination as to asylum eligibility from the IJ, thus obviating commenters' concerns. When conducting these streamlined 240 proceedings, IJs will exercise independent judgment and discretion in reviewing the claims before them for adjudication. *See* 8 CFR 1003.10(b); *see generally* EOIR, *Ethics and Professionalism Guide for Immigration Judges* (Jan. 2011), *https:// www.justice.gov/eoir/sibpages/ IJConduct/EthicsandProfessionalism GuideforIJs.pdf* (*IJ Ethics and*

*Professionalism Guide*) (requiring IJs to, inter alia, be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance of violations of the law or applicable ethical standards). The Departments believe the protections provided in section 240 proceedings are appropriate to provide a sufficient record for appeal.

Nevertheless, the Departments also clarify that, contrary to commenters' conclusory statements, IJs' current credible fear review process is not "deficient" and does not violate due process. The IFR maintains the NPRM's approach of restoring the credible fear screening standards that were in effect prior to the regulatory changes made between 2018 and 2020. *See* 86 FR 46911. None of those regulations has gone into effect, as all are delayed, vacated, or enjoined. *See id.* at 46909 n.24. The Departments believe that returning the regulations to the framework in place prior to the changes made between 2018 and 2020 will ensure the process is more efficient, effective, and consistent with congressional intent. *Id.* at 46914. The Supreme Court has emphasized that noncitizens who are encountered in close vicinity to and immediately after crossing the border and placed in expedited removal proceedings, which include the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 140 S. Ct. at 1983. Congress provided the right to a determination whether the noncitizen has a "significant possibility" of establishing eligibility for asylum under INA 208, 8 U.S.C. 1158. *See also* INA 235(b)(1)(B)(ii), (v), 8 U.S.C. 1225(b)(1)(B)(ii), (v). Because the regulations reestablish the "significant possibility" standard, consistent with the statute, it does not infringe on noncitizens' rights. *See Thuraissigiam,* 140 S. Ct. at 1983. In addition, despite the Departments' disagreement with the commenters' characterization of the credible fear review process, the Departments find that this IFR addresses commenters' concerns as IJs will continue to have the traditional adjudicator authorities in 240 proceedings.

*Comments:* Commenters stated that the reports by the U.S. Commission on International Religious Freedom ("USCIRF"), the Administrative Conference of the United States ("ACUS"), and the Migration Policy Institute ("MPI") cited in the NPRM as support for asylum officers adjudicating defensive claims do not suggest

eliminating full evidentiary IJ hearings of defensive asylum claims, which commenters believed the NPRM implied. 86 FR 46917–18. Commenters stated that requiring the applicant to petition the IJ for consideration of additional evidence would curtail due process beyond the procedure recommended by USCIRF whereby asylum officers would either grant asylum cases immediately after the credible fear interview or, in more complicated cases, refer the applicant to full proceedings before an IJ.

*Response:* The NPRM's references to reports by the USCIRF, ACUS, and MPI were not meant to imply support for the NPRM's proposed process, as commenters alleged. Rather, the NPRM clearly stated that those reports "assumed that individuals denied asylum by a USCIS asylum officer would be issued an NTA and placed into section 240 removal proceedings before an IJ, where the noncitizen would have a second, full evidentiary hearing on the asylum application with a different decision-maker. *This proposed rule would not adopt that approach . . . .*" 86 FR 46918 (emphasis added). Nevertheless, for the reasons discussed thus far and above in Section III of this preamble, this IFR replaces the NPRM's proposed IJ review procedure with streamlined section 240 removal proceedings.

*Comments:* Commenters raised concerns that the NPRM's procedures distinct from section 240 IJ review could have a negative impact on those applicants who are unrepresented by counsel, non-English speakers, or trauma survivors. Accordingly, commenters recommended that asylum seekers instead be given an opportunity to obtain counsel and present all evidence in support of their claims in section 240 merits hearings before IJs. Commenters asserted that only such a hearing would ensure that pro se applicants are not wrongfully returned to danger in violation of the United States' nonrefoulement obligations.

Commenters generally argued that issues related to lack of access to counsel stem from the fact that noncitizens appearing before the immigration courts have no right to Government-appointed counsel. Commenters urged the Departments to consider that, while many asylum seekers do not have access to legal representation at any stage of immigration proceedings, they are particularly unlikely to have legal representation at early stages of presenting their claims. Other commenters believed that the majority of asylum applicants do not have

IFR_AR_000816

representation. Commenters expressed concerns that, under the NPRM, unrepresented asylum seekers would not be able to adequately present their asylum claims before the asylum officer, and that these initial deficiencies would later pose significant challenges to legitimate claims, even with the assistance of counsel, once asylum seekers are before the immigration court. Commenters also raised concerns that unrepresented applicants, many of whom are unfamiliar with the complexities of immigration law and do not speak English, would be unable to adequately draft filings, fill out forms, and present their claims at all, particularly within the time constraints presented by the NPRM. Commenters noted that these concerns are further exacerbated by the fact that many applicants suffer from post-traumatic stress disorder or other mental health ailments.

Commenters stated that the NPRM would negatively impact trauma survivors' ability to present their claims because they may not be able to immediately disclose all relevant facts pertaining to their claims to their asylum officers or even their own counsel. Commenters stated that it is common for asylum seekers to disclose only limited information about their past persecution in early statements and then to provide greater detail when later questioned by an IJ. Commenters stated that it may take several meetings with an advocate before asylum seekers are comfortable enough to share the details of their persecution. Commenters asserted that the NPRM would increase the likelihood that such applicants may face erroneous adverse credibility determinations, and that the expedited process would be generally detrimental to a full exploration of claims. Commenters particularly argued that more robust procedural safeguards are critically important to guaranteeing LGBTQ+ asylum seekers the opportunity to present their claims. Commenters cited *Matter of M–A–M–,* 25 I&N Dec. 474, as an example of a case that recognized the important procedural protections available in section 240 removal proceedings. In *Matter of M–A–M–,* the BIA recognized the right for applicants who may lack mental capacity to present expert testimony to demonstrate that their mental health conditions impacted their claims. *Id.* at 479.

Moreover, commenters believed that asylum officers are not in the best position to probe an applicant on the reasons for inconsistencies in a claim, particularly when the asylum seeker acted pro se or received ineffective

assistance of counsel before the Asylum Office. Commenters anecdotally stated that they have witnessed circumstances where asylum officers failed to thoroughly probe the reasons for inconsistencies, but where applicants later resolved inconsistencies during direct examination in immigration court. Without the ability to testify live on the same issues in a truly de novo proceeding, one commenter said, many traumatized asylum seekers would not have the opportunity to present critical evidence that would prove their claims.

*Response:* The IFR addresses commenter concerns about the rule's impact on vulnerable populations, including individuals with post-traumatic stress disorder, individuals who face language barriers, and individuals who are unrepresented, by providing that noncitizens whose applications are not granted by the asylum officer will be placed in streamlined section 240 proceedings rather than finalizing the IJ review procedure proposed in the NPRM. The Departments have included procedural rules to ensure the efficient disposition of these cases, and noncitizens in these streamlined 240 proceedings will receive all of the procedural protections required by section 240 of the Act, 8 U.S.C. 1229a, which commenters were concerned were lacking in the NPRM. *See* INA 240(b)(4), 8 U.S.C. 1229a(b)(4) (setting forth noncitizen's rights in proceedings); *see also Matter of M–A– M–,* 25 I&N Dec. at 479–83 (stating that where a noncitizen has indicia of incompetency, the IJ must inquire further and establish safeguards where appropriate). The Departments believe that these measures are sufficient to ensure that all noncitizens, including vulnerable noncitizens, have adequate time to prepare and present their claims. Moreover, the IFR explicitly exempts certain categories of noncitizens, including juveniles and mentally incompetent individuals, from the streamlined procedures created by this IFR, as described at new 8 CFR 1240.17(k).

With respect to commenters' concerns about noncitizens not having adequate access to or time to obtain counsel, the Departments recognize the "immense value of legal representation in immigration proceedings, both to the individuals that come before [EOIR] and to the efficiency of [its] hearings." *Director's Memo* ("DM") *22–01: Encouraging and Facilitating Pro Bono Legal Services* 1 (Nov. 5, 2021), *https:// www.justice.gov/eoir/book/file/ 1446651/download.* As with all noncitizens in section 240 removal proceedings, the individuals subject to

the IFR have a right to representation at no cost to the Government. INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A).[80] Additionally, resources are available for pro se noncitizens in immigration court. *See, e.g.,* EOIR, Pro Bono Legal Service Providers, *https://probono.eoir. justice.gov;* EOIR, Immigration Court Online Resource, *https://icor.eoir. justice.gov/en/;cf.* EOIR, Press Release, EOIR Announces "Access EOIR" Initiative (Sept. 28, 2021) (aiming to increase representation before EOIR), *https://www.justice.gov/eoir/pr/eoir- announces-access-eoir-initiative;* EOIR, Press Release, EOIR Launches Resources to Increase Information and Representation (Oct. 1, 2020), *https:// www.justice.gov/eoir/pr/eoir-launches- resources-increase-information-and- representation.*

In addition, because noncitizens in section 240 removal proceedings, including the streamlined section 240 proceedings set forth in the IFR, have the right to provide testimony and evidence in support of their applications, the Departments find that placing noncitizens whose applications are not granted by the asylum officer in streamlined section 240 proceedings rather the NPRM's proposed distinct proceedings addresses commenters' concerns about the effect of a lack of representation early in the expedited removal or asylum application process. In other words, noncitizens who fail to provide evidence or testimony on relevant parts of their claims before asylum officers due to a lack of representation will have the ability to submit additional evidence or testimony to the IJ during subsequent streamlined section 240 proceedings, as described above in Section III of this preamble. Further, noncitizens in these streamlined section 240 proceedings will have opportunities to obtain

---

[80] The Departments strive to improve access to counsel, as evidenced through other policies and rulemakings, and recognize that increasing access to counsel will, in turn, further the efficiency of all of the Departments' operations, including those set forth in this rulemaking. *See DM 22–01: Encouraging and Facilitating Pro Bono Legal Services* (Nov. 5, 2021) ("Competent legal representation provides the court with a clearer record and can save hearing time through more focused testimony and evidence, which in turn allows the judge to make better-informed and more expeditious rulings."); *see generally* Executive Order 14012, 86 FR 8277, 8277 (Feb. 2, 2021) (directing Attorney General and Secretary to "identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers, as appropriate and consistent with applicable law"). Nevertheless, recommendations from commenters calling for noncitizens to have access to appointed counsel in section 240 removal proceedings are beyond the scope of this rulemaking.

IFR_AR_000817

representation even before removal proceedings are initiated as they may be represented during the initial adjudication conducted by the asylum officer. *See* 8 CFR 208.9.

The Departments believe that commenters' concerns that the procedures proposed in the NPRM would negatively impact individuals whose claims develop over time or who need additional time and testimony to explain inconsistencies and aspects of their claim that they do not feel were adequately addressed during the interview are ameliorated by the IFR, which does not contain the NPRM's restrictions on the introduction of new testimony or documentary evidence. Instead, the IFR incorporates evidentiary standards consistent with those in section 240 proceedings—evidence must be relevant, probative, and fundamentally fair, as described at 8 CFR 1240.17(g)(1). *See* INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B) (noncitizens must have a "reasonable opportunity" to present evidence on their behalf); 8 CFR 1240.7(a); *see also Nyama,* 357 F.3d at 816 ("The traditional rules of evidence do not apply to immigration proceedings . . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.'" (quoting *Espinoza,* 45 F.3d at 310)). Noncitizens may also request to provide additional testimony where they believe that it is necessary, as described above in Section III of this preamble.

*Comments:* Commenters expressed concerns that, by relying solely on the record before the asylum officer, the NPRM would effectively result in IJs "rubber-stamping" asylum officer decisions without providing meaningful review and oversight. Commenters stated that full evidentiary hearings before an IJ provide an essential check on errors during the credible fear interview and affirmative interview processes.

Commenters stated that the NPRM does not mandate that IJs have the same obligations regarding evidence and the record that are set forth in the INA for section 240 proceedings, such as an obligation to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses." INA 240(b)(1), 8 U.S.C. 1229a(b)(1). Instead, commenters stated that the NPRM would create a presumption against holding immigration court hearings and against the presentation of additional evidence or testimony. Commenters were concerned that, as a result, IJs would pretermit claims and affirm decisions

not granting asylum without first conducting a hearing in person.

Commenters urged that a fuller review is necessary to prevent a negative use of the asylum officer's increased authority under the NPRM in the future. Similarly, commenters also expressed concern that future IJ performance metrics could exacerbate these issues by encouraging overly cursory reviews.

*Response:* As an initial matter, the decision to place noncitizens whose applications are adjudicated but not granted by the asylum officer in streamlined section 240 proceedings, rather than the NPRM's proposed IJ review proceedings, addresses commenters' concerns that limited proceedings would not allow for meaningful review and oversight by the IJ. In particular, the switch to streamlined section 240 proceedings will ensure that the IJ's review is meaningful and not a "rubber-stamp" of the asylum officer's decision. The streamlined section 240 proceedings established by the IFR will allow noncitizens to submit additional testimony or evidence, if they deem it necessary, as described at new 8 CFR 1240.17(e), (f). Accordingly, commenters' concerns—that the IJ could deny an application based solely on the record before the asylum officer without allowing the noncitizen to testify or provide evidence—are no longer applicable.

The Departments believe that the procedures in this IFR also ameliorate commenters' concerns over statements in the NPRM that IJs could decide whether to accept additional evidence or make a determination based solely on the asylum officer's record. In addition to applying the statutory procedures regarding evidence and maintenance of the record set forth in section 240 of the Act, 8 U.S.C. 1229a, the IFR permits noncitizens to request to submit additional testimony where necessary and only permits the IJ to deny such requests where the IJ concludes there is sufficient evidence in the record to grant the asylum application without hearing additional testimony. The Departments further believe that the detailed review procedures set forth in the IFR alleviate commenters' concerns about IJs adjudicating applications without adequately reviewing asylum officer decisions. Because the IFR ameliorates the commenters' concerns on these points, the IFR also addresses the commenters' related concern that future IJ performance metrics could exacerbate these issues.[81]

*Comments:* Commenters disputed the NPRM's justification that the limited review proceedings would increase efficiency in the asylum adjudication process. For example, commenters stated that IJs would have to divert resources from substantive adjudications to address a large number of motions or appeals resulting from confusion over the requirement that the applicant affirmatively request further IJ review within a short time period. Commenters suggested that this provision may also spark litigation and diversion of resources to correct injustices that would otherwise lead the United States to return refugees to persecution, in violation of nonrefoulement principles.

Commenters also remarked that the NPRM did not adequately explain why establishing an entirely separate process through the Asylum Office and courts would serve efficiency interests when those same officials would continue to be tasked with their current functions and duties. Commenters said that the Departments did not provide a meaningful rationale for why a separate procedure apart from section 240 proceedings was necessary to carry out efficient, just results for asylum seekers. Commenters suggested that it would be more efficient to place all applicants in section 240 proceedings, instead of the NPRM's IJ review procedure, because the novel proceedings would give rise to prolonged disputes about the introduction of new evidence to supplement the asylum officer's record or support prima facie eligibility for alternative relief. Commenters argued that motions that would increase under the NPRM would include motions to file additional evidence; motions to vacate the limited asylum-, withholding-, and CAT-only proceedings to pursue other relief or protection; and the inevitable cross-motions, motions to reconsider, interlocutory appeals to the BIA, motions to reopen, and petitions for review by U.S. Courts of Appeals. Commenters also asserted, generally, that challenges to expedited removal cases are already compounding the backlog of cases.

---

[81] EOIR no longer reviews IJ performance through individual IJ performance metrics. IJs are held to

high ethical standards, in part, to avoid impropriety or the appearance of impropriety, which would include deciding cases consistent with performance metrics rather than applicable law and regulations. *See IJ Ethics and Professionalism Guide* (providing that IJs must be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance that the IJ is violating the law or applicable ethical standards); *see also EOIR Policy Manual,* Part II, ch. 1.3(c) (stating that IJs "strive to act honorably, fairly, and in accordance with the highest ethical standards").

IFR_AR_000818

*Response:* The IFR addresses nearly all of the commenters' concerns by providing that noncitizens whose applications are adjudicated but not granted by the asylum officer will now be placed in streamlined proceedings under section 240 of the Act, 8 U.S.C. 1229a.

The Departments emphasize that section 240 proceedings are the default, most common type of removal proceeding. This familiar framework safeguards due process interests by ensuring that noncitizens have certain rights and protections in such proceedings. *See* INA 240(b)(4), 8 U.S.C. 1229a(b)(4). The Departments believe that adhering to this statutory framework, but establishing procedural case-processing measures specific to this category of cases, will further the Departments' efficiency interests without undermining fairness in proceedings. Further, noncitizens in streamlined section 240 proceedings may apply for other forms of relief or protection without the need to first submit a motion to the IJ to vacate the asylum officer's order of removal, which would have been the case under the NPRM at 8 CFR 1003.48(d) (proposed). *See* 86 FR 46920. The IFR provides, at new 8 CFR 1240.17(k)(2), that a noncitizen will not be subject to the streamlined procedures if the noncitizen produces evidence of prima facie eligibility and the noncitizen is seeking to apply for, or has applied for, such relief or protection other than asylum, statutory withholding of removal, withholding or deferral of removal under the CAT, and voluntary departure.

*Comments:* Commenters asserted that the NPRM's IJ review procedure would violate the Act or is otherwise contrary to congressional intent.

First, commenters asserted that the Act requires that individuals in expedited removal who seek review of asylum officers' decisions not to grant asylum be placed in full section 240 removal proceedings. Commenters further stated that none of the statutory sections on which the NPRM relied displaces the statutory presumption of section 240 removal proceedings. Commenters stated that nothing in the Act suggests that Congress exempted from section 240 removal proceedings noncitizens seeking asylum who are determined to have credible fear, or any subset of that population.

Commenters argued that the Departments' statutory interpretation erroneously rests on the negative inference that section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), permits proceedings other than section 240 proceedings because that section does not explicitly require section 240 proceedings, as compared with section 235(b)(2) of the Act, 8 U.S.C. 1225(b)(2), which explicitly requires section 240 proceedings. Commenters asserted that reading is erroneous because section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), establishes a general rule that applicants for admission must be placed in section 240 removal proceedings. Commenters believe that section 235(b)(2)(B)(ii) of the Act, 8 U.S.C.1225(b)(2)(B)(ii), then creates an exception to that automatic entitlement for those defined as "arriving" in section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), because such individuals are placed in expedited removal. In sum, commenters generally assert that DHS screens 8 U.S.C. 1225(b)(1) applicants to determine which of the two statutorily established methods of removal will apply: Expedited removal for those without credible fear, or standard removal proceedings for those who establish credible fear. Commenters asserted that the statute has never been and cannot now reasonably be understood to exclude all (b)(1) applicants from a full removal hearing once they are no longer subject to the expedited removal process.

Commenters also disputed the Departments' interpretation of section 235(b)(2)(A) of the Act, 8 U.S.C. 1225(b)(2)(A), and statement that "noncitizens whom DHS has elected to process into the United States using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings." 86 FR 46917. Commenters argue that a credible fear screening creates an exit from expedited removal proceedings, and, by design, those who establish credible fear are no longer subject to expedited removal. Thus, commenters concluded, the Departments' view that people seeking asylum can be forced into lesser proceedings in immigration court is contrary to law.

Commenters also believe that the legislative history of expedited removal demonstrates that Congress intended for all noncitizens found to possess a credible fear of persecution or torture to be afforded section 240 proceedings. Commenters stated that, in drafting the asylum statute and significantly amending the Act through IIRIRA, it is clear that Congress contemplated that asylum seekers would be afforded an opportunity to defend against deportation before an IJ in full section 240 proceedings, which include various procedural and due process safeguards.

Specifically, commenters cited the congressional record in support of their position. *See, e.g.,* 142 Cong. Rec. S4461 (1996) (statement of Sen. Alan Simpson) ("[T]he bill provides very clearly an opportunity for every single person[, even those] without documents, or with fraudulent documents . . . to seek asylum.").

Commenters further argued that IIRIRA includes three levels of screening to ensure that asylum seekers are clearly identified so that genuine asylum seekers are not subject to the expedited procedures that apply to non-asylum seekers. In support, commenters referenced statements by the chief drafters of the law explaining that asylum seekers can be ordered removed only after full section 240 proceedings where they can submit evidence, call witnesses, and testify. *See, e.g.,* 142 Cong. Rec. S4492 (1996) (statement of Sen. Alan Simpson) ("If [asylum seekers] have credible fear, they get a full hearing without any question."). Commenters also suggested that other provisions in the Act demonstrate congressional intent to place such applicants in section 240 removal proceedings. For example, commenters stated that at the same time Congress enacted expedited removal, Congress gave asylum seekers a full year to submit an initial application in recognition that asylum cases take time to prepare. Accordingly, commenters said that the NPRM contravened congressional intent by precluding access to section 240 removal proceedings for applicants not granted asylum following a positive credible fear interview.

On the other hand, some commenters objected to the NPRM on the basis that it would extend the credible fear and review process further than Congress intended. Specifically, these commenters asserted that the additional review by the asylum officers and within USCIS undermined congressional intent for the expedited removal process to be truly expedited. In support, commenters cited Congress's statutory scheme to limit the administrative review of expedited removal orders and limit judicial review of determinations made during the expedited removal process. *See* INA 242, 8 U.S.C. 1252. Commenters concluded that creating additional levels of review would slow the credible fear process, waste administrative resources, and run counter to Congress's legislative aims.

Commenters stated that the restrictions on IJs in the NPRM's limited proceedings would conflict with the IJ's role to develop the record before the

IFR_AR_000819

court. Commenters stated that the Act and its implementing regulations require IJs to take an active role in section 240 removal proceedings to develop the record and ensure that applicants are advised of the nature of the proceedings, as well as their rights and responsibilities therein. *See, e.g., Abdurakhmanov* v. *Holder,* 735 F.3d 341, 346 n.4 (6th Cir. 2012) ("An IJ has . . . an obligation[ ] to ask questions of the [noncitizen] during the hearing to establish a full record . . . . [The questioning] should be designed to elicit testimony relevant to the fair resolution of the [noncitizen's] applications."); *Toure* v. *Att'y Gen.,* 443 F.3d 310, 325 (3d Cir. 2006) ("[A]n IJ has a duty to develop an applicant's testimony, especially regarding an issue that she may find dispositive . . . ." (citing *Matter of S–M–J–,* 21 I&N Dec. at 723–26)). Commenters stated that this duty differentiates IJs from Article III judges but is consistent with other types of administrative proceedings. Commenters explained that in the immigration context, courts have recognized that unique features of immigration court proceedings require IJs to fill this role to ensure fair and accurate adjudications.

In addition, commenters stated that the NPRM's IJ review procedure would conflict with the United States' international obligations, including nonrefoulement, because it would diminish the significance of immigration court review as a safeguard. On the other hand, commenters stated that the protections afforded to applicants in section 240 proceedings comport with UNHCR guidance emphasizing that the asylum adjudicator's role is to "ensure that the applicant presents his case as fully as possible and with all available evidence." *See* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 205(b)(1) (2019), *https://www.unhcr.org/en-us/ publications/legal/5ddfcdc47/ handbook-procedures-criteria-determining-refugee-status-under-1951-convention.html* (last visited Mar. 5, 2022). Commenters also expressed concerns that the NPRM would effectively penalize asylum seekers based on their manner of entry—in violation of Article 31 of the Refugee Convention—as the NPRM would apply only to persons who have sought asylum at or after recently crossing the border.

*Response:* The Departments have considered commenters' concerns that the NPRM's proposal that noncitizens not granted asylum by the asylum officer would immediately be ordered removed, with the opportunity to seek IJ review through a newly created proceeding, would violate congressional intent, the Act, and international obligations. Through this IFR, noncitizens not granted asylum by the asylum officer instead will be referred to streamlined section 240 proceedings before an IJ. While the Departments are establishing procedural steps to ensure the efficient disposition of these cases, noncitizens in streamlined section 240 proceedings established by the IFR are entitled to the same general rights and protections as noncitizens in section 240 proceedings. *See, e.g.,* INA 240(b)(4), 8 U.S.C. 1229a(b)(4) (setting forth noncitizens' rights in proceedings). This shift generally resolves the commenters' concerns on these points by returning to the use of section 240 proceedings and affirming the role of the IJ as the adjudicator, while still ensuring that the proceedings are completed expeditiously.

The Departments disagree, however, with commenters' argument that the NPRM violates congressional intent to create an efficient expedited removal process by proposing an additional layer of adjudication and review by the asylum officer. Specifically, the Departments believe that the commenters' concerns erroneously conflate expedited removal of noncitizens who have not demonstrated a credible fear of persecution or torture with the separate process that occurs for noncitizens who have established a credible fear of persecution or torture. The Act makes clear that most noncitizens who are arriving in the United States, if inadmissible under certain provisions of the Act, will be removed "without further hearing or review." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). The Act carves out one exception to this general rule: If the noncitizen indicates a fear of persecution or torture or an intention to apply for asylum, rather than face immediate removal, the noncitizen will instead be interviewed by an asylum officer to determine whether the noncitizen has a credible fear of persecution. INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). If, during the interview, the noncitizen does not demonstrate a credible fear, the Act again calls for the noncitizen's immediate removal "without further hearing or review." INA 235(b)(1)(B)(iii)(I), 8 U.S.C. 1225(b)(1)(B)(iii)(I).[82] This IFR does not

make any significant changes to the implementing regulations for these statutory provisions.

Although the initial screening process is intended to be expedited, once a noncitizen is determined to have a credible fear of persecution or torture, the Act no longer calls for the noncitizen's removal without further hearing or review. Rather, it establishes that the noncitizen's application for asylum shall be given "further consideration." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii).[83] The Act does not specify the contours of or the appropriate speed at which such further consideration should occur before a noncitizen receives a final adjudication.

The Departments believe that the "further consideration" directed by Congress reasonably encompasses establishing a procedure under which an asylum officer adjudicates the asylum application in the first instance and, if the application is not granted, refers the noncitizen to streamlined section 240 proceedings. The Departments believe that this procedure will be more efficient than the current lengthy process in which noncitizens are referred directly to section 240 proceedings, both because cases that can readily be granted by the asylum officer will be removed from the docket, and because cases referred to the immigration court will arrive in immigration court with the benefit of a record assembled by the asylum officer that enables these section 240 proceedings to be substantially streamlined, as outlined above in Section III of this preamble.

Commenters' references to provisions of the Act that limit judicial review of decisions made during the initial screening process—*i.e.,* whether there is expressed or established credible fear of persecution or torture—are inapposite because those provisions only limit judicial review of decisions made during that initial screening process. The Departments' view is that Congress did not eliminate or limit judicial review in cases involving noncitizens determined to have credible fear just because they were initially screened as possible candidates for expedited removal. *See Thuraissigiam,* 140 S. Ct. at 1965 ("Applicants can avoid

---

[82] Although the Act states that, under these circumstances, the noncitizen will be removed without further hearing or review, the Act also provides for a very limited IJ review of the asylum

officer's determination that the noncitizen does not have a credible fear of persecution or torture. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). The IJ's decision reviewing the asylum officer's credible fear determination is final and not subject to reconsideration or appeal. 8 CFR 1208.30(g)(2)(iv)(A).

[83] For further discussion regarding the legal authority for the NPRM, see Section II.B of this preamble.

IFR_AR_000820

expedited removal by claiming asylum . . . . If the asylum officer finds an applicant's asserted fear to be credible, the applicant will receive 'full consideration' of his asylum claim in a standard removal hearing.'' (footnotes omitted)).

*Comments:* Commenters emphasized the importance of judicial review for adjudicating applications for asylum or protection, particularly for marginalized groups, and expressed concern that the NPRM would not sufficiently protect the right to judicial review.

Commenters suggested placing applicants whose claims are adjudicated but not granted by an asylum officer in section 240 proceedings rather than a new proceeding to ensure judicial review and avoid potential future litigation about the Federal courts' jurisdiction over these cases. While commenters primarily advocated for section 240 proceedings, they also recommended additional ways to improve the NPRM's proceedings to ensure adequate judicial review, such as, for example, amending the rule so that the IJ, not the asylum officer, would issue a removal order. The noncitizen could then appeal the IJ's decision to the BIA and seek judicial review of the BIA's decision.

In contrast, other commenters disagreed that further changes are needed to protect judicial review and emphasized that the NPRM does not alter any current safeguards for individuals seeking asylum or protection. The commenters reiterated that those who are not granted asylum, withholding of removal, or protection under the CAT by an asylum officer would still have the option to have their cases heard by the immigration court, which would be a second level of review.

*Response:* The Departments agree with commenters that the Departments' procedures must ensure the right to judicial review of adjudications of applications for asylum or protection. Judicial review ensures fairness and accuracy in immigration proceedings, and Congress specifically sought to ensure review remained available for asylum applications while otherwise limiting review over other types of decisions. *See* INA 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii) (Congress limiting judicial review of agency decisions regarding discretionary forms of relief "other than the granting of relief under [INA 208(a),] section 1158(a) of this title.").

Regarding commenters' concerns that the procedure proposed in the NPRM might not allow for further judicial review, the Departments disagree with

that view and, in any case, emphasize that the process has been revised as described above in Section III of this preamble so that noncitizens whose applications are adjudicated but not granted by the asylum officer will be issued an NTA and placed in streamlined section 240 proceedings. As with all section 240 removal proceedings, a noncitizen may first appeal the IJ's decision to the BIA, 8 CFR 1240.15, and then appeal the BIA's decision to a Federal circuit court, INA 242, 8 U.S.C. 1252. In addition, under the IFR, the IJ issues the removal order, if applicable, rather than the asylum officer, consistent with some commenters' suggestions. The changes under this IFR demonstrate the Departments' continued commitment to fair adjudications, and address commenters' concerns regarding the need to ensure the availability of judicial review.

The Departments are committed to maintaining longstanding procedural protections inherent in section 240 proceedings for noncitizens subject to the expedited removal process and subsequently determined to have a credible fear of persecution or torture. The Departments acknowledge that some commenters supported the NPRM's approach, and the Departments believe that the IFR will maintain the efficiencies and benefits provided for in the NPRM through the implementation of the new streamlined 240 removal proceedings.

b. De Novo Review of Full Asylum Hearing Record and Consideration of Additional Testimony and Evidence

*Comments:* Commenters disputed the NPRM's characterization of the proposed IJ review proceedings as "de novo," stated that use of the term "de novo" is "paradoxical" and "misleading," and said that the proposed IJ review process may violate asylum seekers' due process rights. Commenters said that any standard of review other than a true de novo review would be inconsistent with the challenges associated with the effects of trauma, gathering evidence, and the asylum officers' previous role in granting or referring cases, not denying applications for asylum.

Commenters stated that, while 8 CFR 1003.48(e) as proposed in the NPRM referred to the review by the IJ as "de novo," the use of the phrase "de novo" appears to be misplaced. Commenters further stated that the current review proceedings for affirmative asylum applicants referred to immigration court, in which the IJ holds a new hearing and issues a decision

independent from the asylum officer, are considered de novo review. On the other hand, commenters noted that, while the NPRM calls the new proceedings de novo, the IJ would not be required to conduct a new hearing independent of the asylum officer's decision. The commenters said a "de novo" hearing would typically treat a case as if it were being heard for the first time, but the NPRM limits the scope of "de novo" hearings by imposing evidentiary restrictions and limiting the IJ review to the transcript of the interview. Similarly, commenters also opposed the NPRM's use of the term "shall" when directing the IJ to review the asylum officer's decision and use of the term "may" when directing the IJ to consider additional evidence. Commenters explained that such terms impute an improper deference to the asylum officer's decision and limit the applicant's ability to supplement the record.

At least one commenter expressed concern that the IJ's review of the asylum officer's decision would become similar to IJ review of asylum officers' credible fear interview decisions, which commenters disputed was a de novo review.

*Response:* First, the Departments clarify that de novo review is a "court's nondeferential review of an administrative decision, usu[ally] through a review of the administrative record plus any additional evidence the parties present." *Review, de novo review,* Black's Law Dictionary (11th ed. 2019). De novo review does not mean, as some commenters suggested, that proceedings must begin anew without reference to the underlying decision (indeed, this construction would undermine the entire concept of a review) or with unlimited opportunities to submit new record evidence. *Id.* ("[N]ondeferential review of an administrative decision" usually involves review of the "administrative record" and "additional evidence" presented by the parties.).

For example, the BIA conducts de novo review of legal questions, even though it generally may not consider new record evidence. *See* 8 CFR 1003.1(d)(3)(ii) ("The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo."). The de novo review standard permits the BIA to draw legal conclusions without deference to the IJ's decision, based upon the record before it. By contrast, the BIA may only overturn an IJ's finding of fact where, based upon the existing record, the IJ's

finding was "clearly erroneous." *See* 8 CFR 1003.1(d)(3)(i).

In sum, the distinction between de novo review and other standards of review, such as clear error, is not based upon whether parties may submit additional record evidence, but rather how much deference the adjudicator must give to the underlying determinations based upon the existing record evidence. Accordingly, commenters' implications that a credible fear review under 8 CFR 1208.30(g) is not a de novo review are inaccurate. De novo review is a widely used standard of review in immigration proceedings and, under the IFR, IJs will conduct de novo review of asylum officer decisions as described at new 8 CFR 1240.17(i).

Second, the Departments emphasize that commenters' concerns regarding the submission of evidence under the NPRM are ameliorated by the IFR's shift from the limited review proceedings to streamlined 240 proceedings as discussed above in Section III of this preamble. Specifically, under the IFR, either party may submit record evidence and request to present testimony, pursuant to new 8 CFR 1240.17(f)(2)(i) and (ii). The IFR directs IJs to review an asylum officer's decision de novo, *see* new 8 CFR 1240.17(i), and the admission of evidence is governed by an evidentiary standard consistent with that currently used in section 240 proceedings. Given the shift to that evidentiary standard, the IFR does not contain the language stating that the IJ "may" accept additional evidence.

*Comments:* Multiple commenters expressed due process concerns associated with the NPRM's proposed de novo review proceedings before an IJ, in particular with the limitations that any additional testimony or documentation reviewed by the IJ must be "necessary" and "not duplicative." Overall, commenters stated that the NPRM seemed to eliminate or dilute longstanding procedural rights that noncitizens have had in section 240 removal proceedings. Commenters stated that the NPRM would deprive many asylum seekers of a meaningful opportunity to present their full story because a full examination would not occur before asylum officers, and evidentiary hearings before an IJ would generally be foreclosed. Commenters explained that this outcome is particularly inappropriate in situations where an IJ denies an application on the basis of an adverse credibility finding.

Some commenters stated that the Departments appeared to contemplate that the asylum seeker would not ever appear before the IJ in most cases

because the IJ would simply issue a decision based on the IJ's review of the asylum officer's record. Commenters compared this alleged limitation to EOIR's Case Flow Processing policy, which commenters stated limits master calendar hearings. Commenters explained that this hearing limitation essentially gives the IJ an appellate review role but deprives the asylum seeker's counsel from providing briefing to the IJ. One commenter stated that depriving asylum seekers of an evidentiary hearing would be "overkill" because the new proceedings outside of section 240 proceedings already would save significant time for IJs by narrowing the legal issues to be decided and shrinking the scope of relief or protection.

Commenters stated that the nature of the hearings before the IJ would exacerbate rather than correct issues that may arise in the proceedings before the asylum officer because the hearing before the IJ is one in which the IJ reviews the record already created by USCIS. For example, commenters claimed the record would be sparse and unlikely to reflect a full accounting of the harm, persecution, or torture the asylum seeker experienced. Commenters alleged that the cumulative effect of this limitation as well as the evidentiary limitation would be to extend summary removal from the stage of threshold contact through the period when the claim is disposed of on the merits. At a minimum, commenters urged that the NPRM be revised to permit the taking of fresh testimony and the submission of new evidence to the IJ upon a proper showing.

Further, commenters disputed that the NPRM's proposed procedure would result in a "complete" record. One commenter alleged that the proposed nonadversarial procedures would relegate attorneys to "passive observer status" and prevent them from developing "critical elements" of a record, usually developed through presenting testimony, calling witnesses, or submitting documentary evidence.

Also, regarding the evidentiary rules in the application review proceedings before the IJ, commenters said it is unclear whether an IJ would be required to give notice and an opportunity to provide additional evidence before summarily affirming the asylum officer's decision. Commenters said the Ninth Circuit has long held that the IJ must give the asylum applicant notice of the evidence required and an opportunity to provide it if the IJ believes further corroborating evidence is required to support an otherwise credible application. However, the

commenters continued, there is no similar process for asylum interviews, which generally occur in one day, with all evidence required to be submitted prior to the interview.

Commenters said that IJs would need additional training in order to preserve fairness and due process, given the distinct nature of reviewing interview transcripts. Commenters expressed concern that the NPRM did not adequately consider what this training may involve, but commenters urged the Departments to develop this training before enacting a final rule.

Commenters said it is reasonable to expect that many asylum seekers would want to provide supplemental evidence and recommended that the Departments provide further assurances that asylum seekers would be able to do so and are entitled to a comprehensive review of their case before an IJ.

To comport with due process and minimize the risk of refoulement, commenters asserted that the NPRM should prohibit pretermission by IJs based solely on the asylum officer's record and should instead specify a presumption of admissibility of new evidence and eliminate the requirement that parties must file motions to supplement the record.

*Response:* As described above, the Departments have decided to refer all noncitizens whose applications are adjudicated but not granted by the asylum officer to streamlined section 240 removal proceedings rather than implementing the IJ review procedure proposed in the NPRM. As part of the streamlined section 240 removal proceedings, the Departments are not proposing to apply a novel evidentiary standard, and, instead, will adopt an evidentiary standard consistent with that used in section 240 removal proceedings. Parties to proceedings are familiar with this standard, and IJs have experience in its application. Further, while streamlined section 240 removal proceedings under this IFR include certain procedural requirements to maintain the expedited nature of the overall process, noncitizens will be assured the longstanding due process rights inherent in section 240 removal proceedings.

The Departments emphasize that this decision not to adopt the NPRM's proposed evidentiary restrictions will not reduce the efficiencies the Departments sought in the NPRM. In fact, as previously explained, the Departments believe that the IFR's streamlined section 240 removal proceedings will be equally as effective as the NPRM's proposed IJ review proceedings in enhancing efficient

IFR_AR_000822

adjudication and replacing time-consuming evidentiary hearings. For example, the IFR provides that the asylum officer's record will be automatically transmitted upon DHS's issuance of an NTA, which will expedite the parties' ability to narrow the issues and assist the IJ's review of the case. The IFR also provides that if neither party requests to present testimony, or if the IJ determines that the asylum application can be granted without hearing testimony, and DHS does not request to present evidence or witnesses or to cross-examine the noncitizen, the IJ can decide the case without a hearing. The IFR also provides various deadlines and procedural measures to ensure efficient processing that preclude the need to conduct a full evidentiary hearing or otherwise facilitate a more efficient hearing.

The Departments disagree with commenters that noncitizens will be deprived a meaningful opportunity to present their claims to asylum officers. Asylum officers conduct interviews with the purpose of "elicit[ing] all relevant and useful information bearing on the applicant's eligibility for asylum." 8 CFR 208.9(b). Asylum officers receive specialized training and information in order to carry out their duties with professionalism and competence. *See* 8 CFR 208.1(b). Asylum officers have experience with (and receive extensive training on) eliciting testimony from applicants and witnesses, engaging with counsel, and providing applicants the opportunity to present, in their own words, information bearing on eligibility for asylum. As described in the NPRM, asylum officers will "develop[ ] and consider[ ] the noncitizen's claim fully, including by taking testimony and accepting evidence, during the nonadversarial proceeding." 86 FR 46918. Asylum officers also are trained to give applicants the opportunity to provide additional information that may not already be in the record so that the asylum officer has a complete understanding of the events that form the basis for the application. Thus, the hearing before the asylum officer functions as an evidentiary hearing, as the applicant is required to "provide complete information regarding the applicant's identity, including name, date and place of birth, and nationality, and may be required to register his identity." 8 CFR 208.9(b). Further, the noncitizen may have counsel or a representative present, present witnesses, and submit affidavits of witnesses and other evidence. *Id.*

Noncitizens who are placed in the new process established by this IFR will have multiple opportunities to provide information relevant to their claims before USCIS asylum officers in nonadversarial settings, and at different stages will have the opportunity for an IJ to review or consider their asylum claim de novo.

Further, the Departments disagree with commenters that IJs need special training to review transcripts. IJs regularly review hearing notes and records from USCIS, transcripts of hearings that indicate a criminal conviction, and transcripts of oral decisions that are appealed to the BIA. *See, e.g.,* 8 CFR 1003.5(a) (transcripts for the BIA); 8 CFR 1003.41(a)(4) (criminal hearing transcripts); *see also EOIR Policy Manual,* Part VIII, Ch. VIII.3.A: Uniform Docketing System Manual (providing process under which IJs must review oral decisions and transcripts through eTranscription); *Operating Policies and Procedures Memorandum* ("OPPM") *84–9: Processing Hearing Transcriptions* (Oct. 17, 1984) (transcripts from USCIS). In light of established DOJ guidance, as well as the general presumption of administrative regularity, the Departments are confident that IJs will continue their work with professionalism and competency. *See Chem. Found.,* 272 U.S. at 14–15; *see also IJ Ethics and Professionalism Guide.*

Regarding comments on pretermission—that is, the practice of denying applications on the papers without hearing an applicant's testimony because the IJ concludes that the applicant has not made a prima facie case for the relief or protection sought—to the extent that commenters refer to pretermission of asylum applications under the separate Global Asylum rule, that rule is currently enjoined.[84] The NPRM and this IFR do not rely on or involve that rule's discussion of pretermission of asylum applications. If commenters are alleging that the NPRM's IJ review proceedings would effectively result in pretermission, the Departments disagree but emphasize that, as described above in Section III of this preamble, this IFR revises the NPRM to provide streamlined section 240 proceedings with certain procedural requirements in new 8 CFR 1240.17 that include, in part, the submission of additional evidence. In addition, as provided in new 8 CFR 1240.17(f)(4)(i)–(ii), an IJ may not determine the noncitizen's eligibility for relief in these proceedings without a hearing unless

the noncitizen does not wish to testify or the IJ determines that the application can be granted. Accordingly, the Departments find that commenters' concerns with pretermission under the Global Asylum rule, which would have allowed an IJ to pretermit and deny an application, are addressed by the procedures set out in the IFR. The IFR does not disturb the evidentiary standard applicable in section 240 removal proceedings.

*Comments:* One commenter stated that the criteria for a noncitizen to supplement the record before the IJ—whether evidence is "duplicative" or "necessary"—is a "fuzzy concept" and others argued that the standard may implicate due process violations or cause delay. Commenters urged the Departments to describe clearly what evidence and testimony is "necessary" and "not duplicative" to develop the factual record and to specify that the threshold to meet these standards is low.

For example, one commenter explained that "duplicative" can mean "effectively identical," and it can mean "involving duplication" to some lesser degree. In the latter sense, the commenter explained that it means "*unnecessarily* doubled or repeated," which would likely be subjective. The commenter said the NPRM provides no basis for determining what is "duplicative."

Likewise, commenters stated that the NPRM provides no guidance on what new testimony or documentation may be "necessary." For example, one commenter stated that much evidence that is relevant or critical can be seen as not "necessary" to "a reasoned decision." Moreover, commenters alleged that a strict reading of the "necessity" requirement could be mandated by future decisions of the Attorneys General and would turn IJs into reviewers of a record created by the asylum officer. Thus, commenters explained, the NPRM threatens to turn an immigration court proceeding in this context into one that is adversarial in name only, with a concomitant loss of faith in the integrity of the process.

Commenters stated that, given that the rules of evidence do not apply in immigration court, the interpretation of the evidentiary standards would be left to each individual IJ. Commenters stated that, based on their experience, IJs would have widely different interpretations, leading to inconsistent application and confusion among applicants and counsel. Other commenters explained that the NPRM creates a new, unknown standard in immigration court proceedings rather

---

[84] *See supra* note 4 (discussing recent regulations and their current status).

IFR_AR_000823

than relying on the longstanding discretionary authority of IJs to conduct and control the nature of the proceedings. One commenter found "enormous discrepancies" among IJs' handling of discretionary motions.

At least one commenter alleged that many courts along the Southwest border would be antagonistic to a discretionary motion like that contemplated by the NPRM. The commenter said the pressure, volume of cases, and speed required of IJs along the border make it far less likely that the IJs would look upon these motions favorably.

Commenters stated that pro se individuals, in particular, may hesitate to submit additional evidence out of fear that it will be rejected as duplicative or unnecessary.

Commenters stated that the NPRM lacked guidance for adjudicators on these terms and would lead to further delay because the parties would litigate the issue of admissibility of evidence. Commenters further stated that this litigation would also make judicial review of the determination to exclude evidence virtually impossible.

Commenters stated that the NPRM does not specify what an asylum officer's decision must contain, such that an incomplete or undeveloped asylum application record might pass muster at the IJ level. One commenter stated that it is unclear how IJs "will explain in court the standards for submitting additional testimony and documentation" if IJs merely conduct a paper review "solely on the basis of the record before the asylum officer." Thus, commenters urged the Departments to specify when and how IJs would provide this explanation to noncitizens and mandate that the IJ explain the standard in all cases, rather than on a discretionary basis.

*Response:* As described above in Section III of this preamble, the Departments have decided to refer noncitizens whose applications for asylum are not granted by the asylum officer to streamlined section 240 removal proceedings rather than implementing the IJ review proceedings proposed in the NPRM. As part of the streamlined section 240 proceedings, the Departments are no longer proposing to apply the NPRM's evidentiary standard, but, instead, as provided in new 8 CFR 1240.17(g)(1), will apply an evidentiary standard consistent with that applied in section 240 proceedings. *See* 8 CFR 1240.7(a); *see also Matter of D–R–,* 25 I&N Dec. 445, 458 (BIA 2011) ("In immigration proceedings, the sole test for admission of evidence is whether the evidence is probative and its admission is

fundamentally fair." (quotation marks and citation omitted)); *Matter of Interiano-Rosa,* 25 I&N Dec. 264, 265 (BIA 2010) ("[IJs] have broad discretion to conduct and control immigration proceedings and to admit and consider relevant and probative evidence.").

Parties to proceedings are familiar with this standard, and IJs have experience in its application. Accordingly, the Departments find that this change addresses commenters' concerns with the NPRM's evidentiary standard, including the potential for its inconsistent application, negative impacts on pro se individuals, the need for corresponding guidance for adjudicators, and the need for clarity regarding how noncitizens would be informed of the new standard. The IFR does not disturb the current evidentiary standard for section 240 removal proceedings.

Nevertheless, in response to commenters' concerns about IJs' inconsistent application of evidentiary standards and discretionary motions determinations, the Departments emphasize that IJs exercise independent judgment and discretion in adjudicating cases before them. *See* 8 CFR 1003.10(b); *see generally IJ Ethics and Professionalism Guide* (requiring IJs to, inter alia, be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance of violations of the law or applicable ethical standards). IJs will continue to interpret and apply applicable law and regulations, regardless of geographic location or caseload.

In response to comments that the NPRM could result in the adjudication of allegedly incomplete or undeveloped asylum applications, the Departments first emphasize that asylum officers receive thorough training and regularly adjudicate affirmative applications for asylum. *See* 8 CFR 208.1(b), 208.14. Every case presents a unique set of facts, but asylum officers are trained to elicit "all relevant and useful information bearing on whether the [noncitizen] can establish credible fear" of persecution or a reasonable possibility of torture during the interview, which forms the basis of the decision. 8 CFR 208.30(d). Under the IFR in new 8 CFR 1240.17(c), asylum officers also provide numerous documents to the IJ. Also, under the IFR, in credible fear determinations, the asylum officer must provide to the IJ a written record of the determination, including copies of the asylum officer's notes, a summary of the material facts as stated by the applicant, any additional facts relied on by the asylum

officer, and the asylum officer's determination of whether, in light of such facts, the noncitizen established a credible fear of persecution or torture. 8 CFR 208.30(e)(1), (f), (g). Under new 8 CFR 1240.17(c) and (e), and 8 CFR 208.9(f), from the Asylum Merits interviews, the asylum officer must provide to the IJ all supporting information provided by the noncitizen, any comments submitted by the Department of State or DHS, any other unclassified information considered by the asylum officer in the written decision, and a verbatim transcript of the interview. Notwithstanding these requirements, under the IFR in new 8 CFR 1240.17(f)(2)(i)(A), and (g), the noncitizen may submit additional evidence or testimony, consistent with the applicable evidentiary standard, to supplement the record during any subsequent IJ review. Considering all this information, the Departments disagree with the assertion that an IJ would make a decision based on an "incomplete" or "undeveloped" record, as commenters alleged.

*Comments:* Multiple commenters said that the NPRM's process and evidentiary standards would allow IJs to review an interview transcript and concur with asylum officers' decisions to not grant asylum with little due process (so-called "rubber-stamping") and without meaningful participation by asylum seekers' counsel. Commenters alleged that the requirement that litigants make an initial showing that evidence is new and not duplicative would allow IJs to "rubber-stamp" the asylum officer's negative determination. One commenter was especially concerned that the IJ decisions would be based on "severely truncated hearings," where asylum seekers do not have a right to counsel, are not allowed to present testimony or evidence, and where asylum officers take often incomplete and incorrect notes. Commenters stated that the NPRM contained no provision by which an applicant may challenge a negative decision by the IJ to exclude additional evidence, which could lead to a "rubber-stamp" of the underlying asylum officer's decision to not grant asylum. Similarly, one commenter said that the NPRM would essentially allow the alleged current "disturbing practice" of IJs "rubber stamping" credible fear reviews to "bleed over" into the merits process.

Commenters stated that if the IJ listened to the recording of the interview before the asylum officer rather than waiting for a transcript of the interview, the entire process could be completed within a few days or

weeks of the asylum seeker's arrival in the United States, similar to other procedures under the prior Administration. Some commenters alleged that nothing in the NPRM would require an IJ who rejects testimony or other evidence to give a reasoned explanation for that decision, which could allow IJs who may have a propensity to deny claims the procedural opportunity to do so. Commenters said that IJs would have little incentive under the NPRM to permit inclusion of additional evidence and may opt to exclude evidence if there are any indicia that the facts were already in the administrative record. Commenters remarked that, as the NPRM acknowledges, IJs are overburdened with overflowing dockets. As a result, commenters argued, IJs would be inclined to deny requests for submission of additional evidence or testimony on even a vague finding that the submissions would be duplicative or unnecessary. One commenter said the NPRM would thus perpetuate what the commenter characterized as the deterioration of the immigration court system as a "rubber-stamping tool" for removal orders issued by DHS and upend the purpose of the courts.

Commenters stated that applicants with additional evidence should not be hindered by evidentiary limitations, especially given that, as alleged by commenters, case completion quotas provide IJs with incentives to adjudicate claims as quickly as possible. Likewise, commenters said that IJ performance metrics compound concerns that IJs would have a disincentive to find a need for evidentiary hearings when asylum cases are not granted. Commenters said the performance metrics are deeply problematic because they create financial incentives for IJs to prize speed over fairness. Commenters stated that over 40 percent of IJs have been on the bench for fewer than five years, and many have backgrounds in criminal prosecution or the military and need to learn the increasingly complex procedural and substantive immigration rules on the job. The commenters said these relatively new IJs would be placed in a role of appellate review of decisions rendered by asylum officers who also will have been newly hired. This combination of fewer due process rights in eliciting testimony by new asylum officers with appellate-type review by relatively new IJs would not provide adequate protection to asylum seekers.

Commenters stated that some IJs depart markedly from the average asylum grant rates in their own courts, rejecting more than 90 percent of asylum claims in non-detained cases. In addition, those commenters explained that IJs' asylum grant rates are significantly influenced by factors other than the merits of the cases, such as the gender and prior prosecutorial experience of the IJ. Commenters were therefore concerned that some IJs may likewise summarily or arbitrarily deny asylum applicants the opportunity to testify, thereby pretermitting their appeals.

Commenters asserted that the evidentiary restrictions during IJ review are particularly problematic in light of alleged problems, based on political influence, with the country conditions information available to the asylum officers who would be tasked with making the record the IJ would review. In other words, at least one commenter stated, if applicants are denied a full and fair opportunity to present evidence that challenges the country conditions information underlying the asylum officer's decision to not grant asylum or protection, IJs may "rubber-stamp" decisions that are based on inaccurate information resulting from impermissible political considerations.

*Response:* As described above, the IFR, in new 8 CFR 1240.17, revises the process so that noncitizens whose applications for asylum are not granted following the Asylum Merits interview are referred to streamlined section 240 removal proceedings, rather than implementing the novel IJ review procedure proposed by the NPRM. As part of this change, the Departments are no longer proposing evidentiary standards like those in the NPRM. *See* 8 CFR 1003.48(e)(1) (proposed); 86 FR 46911, 46920. Rather, the IFR adopts an approach consistent with the current evidentiary standard for section 240 removal proceedings; subject to the applicable deadline in streamlined section 240 proceedings, IJs may exclude additional evidence only if it is not relevant, probative, or timely or if its use is fundamentally unfair. In other words, unlike the NPRM, the IFR does not require the IJ to make a novel threshold determination regarding the need for the evidence. In addition, the noncitizen will have the privilege of being represented by counsel at no expense to the Government during proceedings before the IJ if the noncitizen chooses. INA 292, 8 U.S.C. 1362.[85] Further, unlike the NPRM, this IFR specifically contemplates that the IJ will, if necessary, conduct hearings to narrow the issues and take testimony or further evidence, as provided in new 8 CFR 1240.17(f)(4). These features of streamlined section 240 removal proceedings preclude the possibility that an IJ would simply "rubber-stamp" an asylum officer's asylum decision, as commenters alleged.

Regarding commenters' concerns with the process of IJs' credible fear reviews, the IFR returns the credible fear screening process to that which was in effect prior to the regulatory changes made between 2018 and 2020. *See generally* 8 CFR 208.30. The DOJ regulations at 8 CFR 1003.42 and 1208.30(g)(2) provide an extensive process through which an IJ reviews a negative credible fear determination. IJs exercise independent judgment and discretion and follow applicable laws and regulations in credible fear reviews, and they would continue to do so under this rule. *See, e.g., IJ Ethics and Professionalism Guide* (requiring IJs to, inter alia, be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance of violations of the law or applicable ethical standards).

More specifically, the Departments reject commenters' contentions that IJs currently "rubber-stamp" asylum officer's negative credible fear determinations and that such practice would carry over into an IJ's review of an asylum officer's decisions under the NPRM or the IFR. Under 8 CFR 208.30(d)(4) of DHS's regulations, which the NPRM did not propose to amend, noncitizens may consult with a person or persons of their choosing before the interview, contrary to commenters' allegations that noncitizens have no right to counsel. Upon an exercise of USCIS's discretion, that person or persons may be present at the interview and may present a statement at the end of the interview. 8 CFR 208.30(d)(4). Further, noncitizens may "present other evidence, if available," *see id.,* contrary to commenters' allegations that noncitizens may not present testimony or evidence. The Departments also disagree with commenters' allegations that asylum officers take "often incomplete" or "incorrect" notes. Asylum officers receive extensive training and possess expertise, *see* 8 CFR 208.1(b); INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), and the Departments are confident in the asylum officers' ability to carry out their duties in accordance with all applicable statutes and regulations. Further, this IFR provides that the record from the Asylum Merits interview will include a verbatim transcript of the interview before the asylum officer, obviating the need for IJs

---

[85] To be sure, the NPRM proposed that noncitizens would have the same privilege. *See* 8 CFR 1003.12 (proposed), 1003.16; *see also* 86 FR 46919.

to rely exclusively on asylum officers' notes.

The Departments also disagree with commenters who recommended IJs review recordings of the Asylum Merits interviews instead of verbatim transcripts as a way to increase efficiency. The Departments prefer the review of transcripts considering their clarity, ease of use, and increased specificity in citations. Further, the Departments disagree that listening to a recording would save a significant amount of time compared to reviewing a transcript. For these reasons, the IFR includes the transcript alone in the record that is referred to the IJ for use in subsequent streamlined 240 removal proceedings.[86]

Although the Departments believe that this IFR addresses commenters' concerns about "rubber-stamping" because it provides for streamlined section 240 removal proceedings rather than the NPRM's IJ review procedure and associated standard for the submission of evidence, the Departments dispute commenters' allegations that IJs would reject evidence or refuse to hold an evidentiary hearing based on performance metrics or other bases unrelated to the specifics of an individual proceeding. IJs independently adjudicate each case by applying applicable law and regulations, not by considering performance metrics. 8 CFR 1003.10(b) (providing that IJs "may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases"). In addition, EOIR no longer reviews IJ performance through individual judge performance metrics. IJs are held to high ethical standards in part to avoid impropriety or the appearance of impropriety, which would include deciding cases consistent with performance metrics rather than applicable law and regulations. *See also IJ Ethics and Professionalism Guide* (providing that IJs must be faithful to the law, maintain professional competence in the law, act impartially, and avoid actions that would create the appearance that the IJ is violating the law or applicable ethical standards); *see also EOIR Policy Manual,* Part II, ch. 1.3(c) (stating that IJs "strive to act honorably, fairly, and in accordance

with the highest ethical standards"). Likewise, the Departments do not share the commenters' concerns with IJs' professional experience or diverse backgrounds. IJs are selected on merit with baseline qualifications, including possession of a J.D., LL.M., or LL.B. degree; active membership in a State bar; and seven years of experience as a licensed attorney working in litigation or administrative law. IJs receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary. IJs are also expected to maintain professionalism and competence in the law.[87] Likewise, the Departments reject commenters' implications that newly hired asylum officers are less competent or professional than IJs. As explained earlier in Section IV.B.2.a of this preamble, asylum officers are selected based on merit, receive extensive training, and possess expertise in determining eligibility for protection. The Departments are confident in asylum officers' ability to carry out their duties in accordance with all applicable statutes and regulations.

The Departments disagree with commenters' use of asylum grant rates to imply that IJs with low grant rates make arbitrary decisions or are influenced by factors outside of the merits of the case. An individual IJ's grant rate may be affected by factors outside the IJ's control. For example, an IJ assigned to a detained docket will generally have a higher percentage of applicants who are ineligible for asylum due to criminal convictions compared with an IJ who is assigned to a nondetained docket. The Departments reiterate the ethical and professional standards to which IJs are held, discussed above, which would preclude arbitrarily or summarily denying noncitizens the opportunity to testify or considering improper factors in a case, as commenters alleged. IJs are required to adjudicate cases in an impartial manner based on their independent judgment and discretion, applying applicable law and regulations. 8 CFR 1003.10(b).

Overall, commenters' accusations of bias or impropriety that would lead to due process violations are insufficient to "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow* v. *Larkin,* 421 U.S. 35, 47 (1975). The Departments are confident in the competency, integrity, and professionalism of IJs and asylum officers in providing due process of law to all noncitizens before them. Further, if a noncitizen believes that an IJ has

acted improperly or otherwise prejudiced the proceeding, the noncitizen may appeal the IJ's decision to the BIA, 8 CFR 1240.15, and in turn appeal the BIA's decision to a Federal circuit court, INA 242, 8 U.S.C. 1252. *See also Avendano-Hernandez* v. *Lynch,* 800 F.3d 1072, 1075 (9th Cir. 2015) (remanding the case and stating that the IJ "exhibit[ed] some of the same misconceptions about the transgender community that [the noncitizen] faced in her home country" by failing "to recognize the difference between gender identity and sexual orientation," and refusing to allow the use of female pronouns); *see also Shahinaj* v. *Gonzales,* 481 F.3d 1027, 1029 (8th Cir. 2007) (remanding the IJ's adverse credibility finding that was based in part on "the IJ's personal and improper opinion [that the noncitizen] did not dress or speak like or exhibit the mannerisms of a homosexual"). In addition, individuals who believe that an IJ has engaged in judicial misconduct may submit a complaint to EOIR's Judicial Conduct and Professionalism Unit:

Executive Office for Immigration Review, attn.: Judicial Conduct and Professionalism Unit, 5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041, *judicial.conduct@ usdoj.gov.*

The Departments disagree with commenters who broadly asserted that noncitizens should not be "hindered" by evidentiary limitations. Although the IFR does not adopt the NPRM's proposed evidentiary standard, the IFR includes an evidentiary standard consistent with that currently used in section 240 proceedings. *See Nyama,* 357 F.3d at 816 ("The traditional rules of evidence do not apply to immigration proceedings . . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.' " (quoting *Espinoza,* 45 F.3d at 310)); *Matter of Ramirez-Sanchez,* 17 I&N Dec. at 505 (holding that evidence must be "relevant and probative and its use must not be fundamentally unfair"). The IFR further provides, in new 8 CFR 1240.17(g)(2), that evidence filed after the applicable deadline may be considered if it could not reasonably have been obtained and presented before the deadline through the exercise of due diligence. While the bar for admitting evidence in immigration proceedings is relatively low, noncitizens have never had a wholly unrestricted right to present any and all evidence or testimony.

Finally, the Departments also disagree with commenters' allegations that

---

[86] While USCIS will have to record the USCIS interview in order to create a transcript of the interview, the Departments did not intend to imply in the NPRM that EOIR would receive a recording with the record in every case. The receipt of the recording would be redundant with the transcript and, as noted, more time consuming to review than a transcript.

[87] *See IJ Ethics and Professionalism Guide.*

IFR_AR_000826

country conditions information available to asylum officers is inaccurate, inappropriately politically influenced, or otherwise problematic. Federal Government country conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information. *See, e.g., Sowe* v. *Mukasey,* 538 F.3d 1281, 1285 (9th Cir. 2008) (''U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations.'' (quotation marks omitted)); *Xiao Ji Chen* v. *U.S. Dep't of Justice,* 471 F.3d 315, 341 (2d Cir. 2006) (State Department country reports are ''usually the best available source of information on country conditions'' (quotation marks omitted)). Commenters have provided no reasoning beyond conclusory allegations that the country conditions information available to asylum officers is inaccurate or inappropriately politically influenced. Further, under the IFR, IJs will consider all relevant and probative evidence, consistent with the evidentiary standards in section 240 proceedings and subject to the applicable deadline. Thus, IJs may consider country conditions information in accordance with its probative value, which will vary by case, as well as evidence submitted by the noncitizen that challenges such country conditions information.

*Comments:* Multiple commenters expressed concerns that limiting an asylum seeker's oral testimony to items that are not duplicative of the written application, on the belief that the written record would suffice for deciding the applicant's veracity, would violate the asylum seeker's due process rights.

Commenters stated that it would be difficult for IJs to assess credibility issues through a transcript or videos, and commenters disagreed that IJs could review credibility issues de novo absent additional testimony. Instead, commenters asserted that live, in-person testimony is required to assess an applicant's demeanor, candor, and responsiveness to questions. Further, commenters cited *Goldberg* v. *Kelly,* 397 U.S. 254, 269 (1970), for the proposition that the right to present one's testimony is crucial ''where credibility and veracity are at issue.'' One commenter noted that, in such instances, *Goldberg* v. *Kelly* provides that a person ''must be allowed to state his position orally'' and ''written submissions are a wholly unsatisfactory basis for decision.'' *Id.* at 369. Accordingly, commenters stated that, to comport with due process, it is

critical that IJs provide applicants with ample opportunity to present their case, including the chance to explain any perceived omissions or inconsistencies, before making credibility findings.

Additionally, commenters emphasized that IJs have a duty to develop the record in immigration proceedings, for which the ability to personally examine the applicant is a crucial tool.

Relatedly, commenters stated that, if represented, the applicant's counsel should be allowed to present and guide relevant, probative testimony because this form of examination most effectively elicits the noncitizen's factual basis for relief or protection. The commenters said that records from asylum interviews do not present all of the relevant facts as coherently as a direct examination by counsel who is familiar with the case. Moreover, commenters stated that during the course of testimony, a question from counsel or from the IJ could elicit an answer that unexpectedly gives rise to a new line of questioning or even a new legal theory of the case.

*Response:* As discussed above in Section III of this preamble, the IFR provides that noncitizens whose applications are not granted by the asylum officer will be placed in streamlined section 240 removal proceedings instead of implementing the NPRM's IJ review procedure. In streamlined section 240 proceedings, the noncitizen is entitled to testify before the IJ if the noncitizen timely requests the opportunity to do so, unless the IJ determines that asylum may be granted without the need to hear additional testimony. However, under new 8 CFR 1240.17(f)(2), and (f)(4)(i)–(ii), the IJ may forego a hearing and decide the case on the documentary record if (1) neither the noncitizen nor DHS has timely requested to present testimony under the pre-hearing procedures and DHS has not requested to cross-examine the noncitizen, or (2) the noncitizen elected to testify or provide evidence but the IJ determines that relief or protection may be granted without further proceedings and DHS has not requested to cross-examine the noncitizen. Additionally, noncitizens will have the privilege of representation at no expense to the Government, and, if the noncitizen is represented, the noncitizen's representative will be able to shape the course of direct examination. INA 240(b)(4), 8 U.S.C. 1229a(b)(4). Moreover, IJs will continue to have the authority to ''interrogate, examine, and cross-examine the [noncitizen] and any witnesses,'' thereby maintaining the IJ's ability to

develop the record. INA 240(b)(1), 8 U.S.C. 1229a(b)(1). Further, IJs will continue to assess a noncitizen's credibility, as set forth in section 240(c)(4)(C) of the Act, 8 U.S.C. 1229a(c)(4)(C). Thus, the Departments believe that the changes made in this IFR, provided generally in new 8 CFR 1240.17, address commenters' concerns by preserving noncitizens' ability to testify before an IJ in support of their claims, while at the same time maintaining the efficiencies highlighted in the NPRM by establishing expedited procedural requirements for the timely resolution of noncitizens' proceedings.

*Comments:* Commenters also stated that applicants must be given the opportunity to submit evidence, as needed, to develop their claims in the IJ review stage because the ability to present additional evidence before the IJ is crucial to ensuring due process for immigrants seeking protection.

First, several commenters said that duplicative evidence is sometimes necessary to persuade an IJ. For example, commenters indicated that multiple reports of the same phenomena might persuade an IJ of the prevalence of an issue. Likewise, commenters said that some IJs may not be persuaded by a single piece of evidence, but duplicative evidence may satisfy the IJ or increase the evidentiary weight an IJ gives to an applicant's testimony.

Similarly, several commenters said that the law accords greater deference to Government sources, such as State Department reports, and IJs may find other or contradictory evidence deserving of little evidentiary weight. Thus, commenters explained, while duplicative in a strict sense, filing several reports from different sources that similarly rebut the State Department's conclusions can be necessary to making a successful claim. However, under the NPRM, commenters asserted that IJs can exclude this evidence merely because it is facially duplicative without ever reaching the question as to whether it is necessary.

Additionally, commenters pointed out that corroborating accounts of persecution, such as declarations from multiple witnesses about the same event, can often assist in showing the applicant's credibility and the severity of the persecution they suffered. Commenters also indicated that asylum adjudications may hinge on considering evidence in the aggregate, such as whether a series of incidents rises to the level of persecution, or whether evidence of similarly situated cases and country conditions cumulatively establish a likelihood of future harm to the applicant. Thus, commenters stated

that the NPRM creates the risk that IJs may erroneously reject evidence as "duplicative" when it is in fact critical to a cumulative analysis, noting that for the IJ, it is precisely the overwhelming nature of the evidence pointing toward one conclusion that makes it persuasive. Accordingly, commenters argued that the NPRM's restriction on duplicative evidence would make it impossible to prove, to the satisfaction of the adjudicator, many meritorious claims.

Commenters also stated that, in some instances, an IJ may not be able to determine if new evidence or testimony is "duplicative" and "necessary" until the hearing is concluded. According to commenters, questioning from counsel or from an IJ during seemingly duplicative testimony may elicit new information relevant to an asylum seeker's claim. Thus, commenters expressed concern that while the need for duplicative evidence might not become apparent until the hearing is concluded, the decision to exclude additional testimony and documentary evidence will have been made at the outset of the proceeding. As it is not always possible to predict what will be a central issue in a case, and as duplicative evidence can actually be necessary to meet the applicant's burden of proof, commenters believed that permitting duplicative evidence would not be "inefficient."

*Response:* As discussed above in Section III of this preamble, the IFR provides that individuals whose applications are not granted by the asylum officer will be placed in streamlined section 240 removal proceedings rather than the NPRM's proposed IJ review procedure. As part of those streamlined section 240 proceedings, noncitizens may submit additional evidence before the IJ in support of their claims. Because these removal proceedings are governed by section 240 of the Act, 8 U.S.C. 1229a— subject to specific procedural requirements and timelines, as described above in Section III— noncitizens will be able to submit evidence in these proceedings, as provided in new 8 CFR 1240.17(g)(1), and the IJ will only exclude such evidence if the IJ determines that the evidence is untimely, that it is not relevant or probative, or that its use is fundamentally unfair. *See* 8 CFR 1240.7(a); *see also Matter of D–R–,* 25 I&N Dec. at 458 ("In immigration proceedings, the sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair." (quotation marks omitted)); *Matter of Interiano-Rosa,* 25 I&N Dec. 264, 265 (BIA 2010) ("[I]Js

have broad discretion to conduct and control immigration proceedings and to admit and consider relevant and probative evidence."). In other words, the ability of noncitizens in these proceedings to introduce evidence or testimony will not hinge on the IJ's analysis of whether or not the evidence is duplicative of the record from the noncitizen's hearing before the asylum officer. Consistent with currently applicable evidentiary rules in section 240 proceedings, noncitizens may instead submit evidence that commenters noted would otherwise be duplicative. Given the above, commenters' concerns about the evidentiary restrictions in the NPRM's proposed limited IJ proceedings are moot.

*Comments:* Commenters expressed concerns that the NPRM would harm applicants who face unique hurdles during proceedings, including individuals who were unable to provide a complete record before the asylum officer due to trauma, lack an understanding of the process, are unrepresented, have language barriers, or are members of a vulnerable or marginalized population. Specifically, commenters were concerned with the NPRM's limitation that IJs only review the record created by the asylum officer and the NPRM's evidentiary standard that applicants can only submit "non-duplicative" evidence to the IJ. With so much at stake, commenters believed that these applicants should not be hindered by rules that limit their ability to fully present their claims.

Commenters provided a wide range of reasons that the NPRM's evidentiary standards would particularly disadvantage pro se applicants. Commenters speculated that pro se individuals, particularly those without English language proficiency, may not be aware of the full scope of evidence they can provide before the asylum officer and that USCIS's traditional use of broad, open-ended questions may not be sufficient to elicit relevant information for the adjudication of an asylum claim. Similarly, commenters explained that those applicants who do not retain a lawyer prior to the Asylum Merits interview may lose their opportunity to develop the facts and law in their claim. Commenters also indicated that detained applicants frequently need time to contact family to support their legal claims; thus, commenters believed that the NPRM disproportionately disadvantages those without counsel in detention.

Commenters also believed the NPRM would make it difficult for unrepresented, noncitizens without

English language proficiency to examine the record and make their case to the IJ during the review process. According to one commenter, the record forwarded by the Asylum Office to the IJ for review will "undoubtedly be in English," making it effectively impossible for applicants who are not represented and who do not read English to ascertain what is in the record, to make arguments about how the asylum officer erred, and to determine what additional information or evidence they possess and could provide to support their claim.

Additionally, commenters stated that the NPRM did not account for language access issues, noting that when an applicant speaks a rare language or dialect, the Asylum Office frequently cannot find an interpreter, and this language gap frequently results in mistakes in the record. Given the heightened evidentiary standard for introducing new evidence into the record, commenters expressed concern that interpretation mistakes would be difficult to correct through the appeal process proposed by the NPRM.

Commenters stated that the NPRM's evidentiary restrictions in IJ review proceedings would prejudice many unrepresented applicants because pro se individuals would be unable to comply with the pre-trial procedures requiring detailed justifications for the admission of proposed evidence. One commenter did not believe that having an IJ explain "restrictive and vague standards" to pro se applicants in court would be sufficient to apprise those applicants of the procedures they should follow to provide further relevant evidence to the court. Commenters argued that most applicants cannot be expected to meet these additional procedural burdens to submit evidence. Further, commenters stated that demanding that applicants meet additional evidentiary burdens before the IJ—especially if the applicant was not adequately represented when presenting the claim to the asylum officer—does not advance the fairness of the system. Moreover, commenters indicated that if the IJ needs to make a decision to admit new evidence or to allow further testimony based on a review of the evidence the applicant seeks to present, the NPRM added what is, in effect, a motion to reopen to every asylum claim, which may overly burden the finite legal services available to applicants.

Additionally, commenters noted that some applicants suffer from cognitive or emotional issues that may prevent them from testifying effectively before the asylum officer or without a lengthy interview over the course of multiple

days or weeks. Commenters also noted that the ability to present new evidence is crucial in cases involving applicants who are members of the LGBTQ+ community because some applicants may not have ''come out'' yet to themselves or to their families when they arrive in the United States, or at the time of an asylum interview, given that the way an individual identifies may evolve over time. Similarly, commenters indicated that IJs may need more educational evidence about asylum claims for transgender and gender nonconforming applicants or applicants who are living with HIV, stating that the time to acquire evidence, to obtain legal representation, and to present testimony, are particularly crucial in such cases.

*Response:* As discussed above in Section III of this preamble, the IFR provides that noncitizens whose asylum applications are not granted by an asylum officer will be placed in streamlined section 240 removal proceedings rather than finalizing the NPRM's proposed IJ review procedure. Because section 240 proceedings provide noncitizens with procedural safeguards, including the right to counsel at no expense to the Government and the ability to reasonably present their case, the Departments believe that this shift largely addresses commenters' concerns with the NPRM's effect on underrepresented, non-English speaking, traumatized, and other marginalized noncitizens. In response to commenters' concerns related to unrepresented individuals appearing before an asylum officer for an Asylum Merits interview, the Departments note that, as explained earlier in this IFR, USCIS asylum officers have experience with (and receive extensive training on) eliciting testimony from applicants and witnesses and providing applicants the opportunity to present, in their own words, information bearing on eligibility for asylum. Asylum officers also are trained to give applicants the opportunity to provide additional information that may not already be in the record so that the asylum officer has a complete understanding of the events that form the basis for the application. *See supra* Section IV.D.5 of this preamble. With respect to commenters' concerns about interpreters for Asylum Merits interviews, the Departments note that USCIS has existing contracts with telephonic interpreters to provide interpretation for credible fear screening and affirmative asylum interviews, and thus has extensive experience providing contract interpreter services. USCIS

contractors must provide interpreters capable of accurately interpreting the intended meaning of statements made by the asylum officer, applicant, representative, and witnesses during interviews or hearings. The USCIS contractor will provide interpreters who are fluent in reading and speaking English and one or more other languages. The one exception to the English fluency requirement involves the use of relay interpreters in limited circumstances at USCIS's discretion. A relay interpreter is used when an interpreter does not speak both English and the language the applicant speaks, such as a rare language or dialect. *See supra* Section IV.D.5 of this preamble. As explained earlier in this IFR, USCIS will arrange for the assistance of an interpreter in conducting the Asylum Merits interview, and if an interpreter is unavailable, will attribute any delays to USCIS for the purpose of employment authorization eligibility, as described in new 8 CFR 208.9(g)(2). Thus, USCIS will ensure that there is clear communication among the various individuals participating in any Asylum Merits interview.

The Departments recognize that unrepresented noncitizens may have difficulties identifying errors in the asylum officer's decision as well as making legal arguments before the IJ regarding those errors. Accordingly, under the IFR, unrepresented noncitizens are not required to submit a written statement to the IJ identifying errors in the asylum officer's decision; instead, under new 8 CFR 1240.17(f)(2), the IJ will conduct a status conference to narrow the issues, determine the noncitizen's position, and ascertain whether a merits hearing will be needed. At this status conference, the noncitizen will state whether the noncitizen intends to testify, identify any witnesses the noncitizen intends to call in support of the noncitizen's application, and provide any additional documentation in support of the noncitizen's application. *Id.* In addition, individuals who speak a language other than English will be provided an interpreter.

Further, should any noncitizen—including unrepresented or other vulnerable noncitizens—wish to provide additional testimony and evidence before the IJ, the respondent may do so under the IFR, as provided in new 8 CFR 1240.17(f)(2)(i), without needing to satisfy the kind of threshold requirements proposed in the NPRM. As previously stated, the only limitation on the admission of evidence in the IFR's streamlined section 240 proceedings is that the IJ must exclude evidence if it is

untimely, not relevant or probative, or if its use is fundamentally unfair, which is consistent with the standard evidentiary rules in all other section 240 proceedings. *Matter of D–R–,* 25 I&N Dec. at 458 (''In immigration proceedings, the sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.'' (quotation marks omitted)).

Finally, regarding commenters' concerns over the ability of noncitizens with competency concerns to testify effectively in a short time period, the Departments note that the IFR, in new 8 CFR 1240.17(k)(6), excepts noncitizens who have exhibited indicia of incompetency. These noncitizens would instead be placed in ordinary section 240 removal proceedings.[88]

Thus, the Departments believe that the IFR adequately responds to commenters' concerns by placing all applicants who are not granted asylum following an Asylum Merits interview into streamlined section 240 removal proceedings, thereby providing additional procedural protections and safeguards, and ensuring due process. *See Hussain* v. *Rosen,* 985 F.3d 634, 644 (9th Cir. 2021) (''[D]ue process has been provided whenever a[ noncitizen] is given a full and fair opportunity to be represented by counsel, to prepare an application for . . . relief, and to present testimony and other evidence in support of the application.'' (quotation marks omitted)).

*Comments:* Commenters stated that, contrary to the Departments' goals, the NPRM's proposed evidentiary requirements would result in a less efficient and more burdensome adjudicatory system. For example, commenters stated that, in addition to providing evidence, applicants and counsel would have to proffer each piece of evidence, which would increase the time and cost of proceedings. Commenters stated that, although the NPRM provides for the possibility of supplementing the record, the NPRM frames it as the exception for the sake of judicial efficiency and places a new burden on the applicant to prove that any new evidence is necessary for the case.

Commenters said it would be impossible to gather the relevant evidence needed and to prepare clients for testimony in such a short time frame. Commenters said applicants often need

---

[88] In addition, EOIR will provide a qualified representative through the EOIR National Qualified Representative Program (''NQRP'') to a respondent who is found to be incompetent to represent themselves in immigration proceedings and who is both unrepresented and detained.

to gather evidence from their home countries, which could not be obtained in only a few weeks, especially for clients who are detained. Some commenters similarly said it is well established under U.S. law that asylum seekers often flee for their lives without the ability to first collect documentation to support their claims, and it can be difficult, if not impossible, for asylum seekers or their representatives to gather evidence from family and friends in their country of origin. It is thus unreasonable to expect that asylum seekers will present all their evidence at a streamlined hearing before an asylum officer, thus leading to an incomplete record for IJ review. Commenters stated that, to fulfill their ethical duties to their clients, legal advocates would have to immediately seek to fill the inevitable evidentiary gaps in the record, and then prepare written motions seeking to admit that evidence and seeking a full individual merits hearing.

Commenters said the NPRM's evidentiary restrictions would add challenges for an IJ to conduct meaningful de novo review of an appeal. Commenters stated IJs could instead conduct their review directly in court, without relying on proceedings with the asylum officer, and with better results because the IJ would be able to make a credibility assessment of the applicant, as well as any witnesses. Some commenters remarked that the majority of claims not granted by an asylum officer would end up in immigration court, and, under the NPRM, IJs would be flooded with requests to present new evidence and to grant individual hearings.

Commenters wrote that, if the IJ were to grant a motion to allow testimony and additional evidence, the proposed regulation would have failed to save any time or expense either to noncitizens or EOIR, because the case would then proceed in immigration court just as an affirmative case that is referred to court does now. On the other hand, if the IJ were to reject an applicant's additional testimony or other evidence, then the applicants would almost certainly file an appeal.

Commenters expressed concern that judicial review of the NPRM's evidentiary restrictions could be limited and inefficient in practice. For example, if the IJ does not provide a reasoned explanation for the rejection (which the proposed NPRM does not require), a court of appeals would be highly likely to remand the case to the BIA, with a further remand to the IJ, because judicial review of the IJ's action would be nearly impossible without such an explanation. Commenters similarly

stated that a decision by the IJ to reject additional testimony or documents would not require specific reasons, making judicial review of the determination that the evidence is not necessary or would be duplicative virtually impossible. Commenters stated that denials of requests to present additional evidence would lead to an increase in interlocutory appeals to the BIA and could lead to additional rounds of Federal circuit court appeals as asylum seekers challenge the sufficiency of the immigration court record. In addition, commenters stated, many Federal courts place onerous exhaustion requirements on petitions for review of BIA decisions, and some courts even suggest that noncitizens must seek reconsideration to point out ignored arguments or improper legal approaches before having those arguments considered on appeal. As a result, commenters stated that the NPRM's procedures, which were designed to be efficient, would cause significant inefficiencies on the back end by forcing applicants to file motions to reconsider before the immigration court and the BIA.

*Response:* As described above in Section III of this preamble, the IFR revises the process in new 8 CFR 1240.17(a) and (b), so that noncitizens whose applications for asylum are adjudicated but not granted by an asylum officer are referred to streamlined 240 proceedings through the issuance of an NTA, rather than seeking IJ review through the procedure proposed by the NPRM. As part of this change, the Departments are also removing the evidentiary standards proposed by the NPRM. *See* 8 CFR 1003.48(e)(1) (proposed); 86 FR 46911, 46920. Instead, as provided in new 8 CFR 1240.17(g)(1), the IFR affirms that noncitizens in the streamlined 240 proceedings may submit additional evidence to the IJ consistent with the traditional evidentiary standard applied in 240 proceedings. With this change, the IFR does not include those procedural requirements that commenters were concerned would create inefficiencies.

Specifically, unlike what was proposed in the NPRM, the IFR does not require the noncitizen to demonstrate that any desired new evidence or testimony is non-duplicative and necessary or require the IJ to make a threshold determination that the evidence satisfies that standard. Because the noncitizen may submit evidence during streamlined section 240 proceedings, any delay in the availability of evidence during the asylum officer review, and any

corresponding gap in the record, may be addressed before the IJ. The lack of an additional, novel evidentiary standard reduces the likelihood of appeals and subsequent litigation, identified by the commenters, surrounding the submission of evidence.

In addition, given that the IFR is consistent with the longstanding evidence standard used in section 240 proceedings, the Departments do not believe that the IFR will have a chilling effect on the availability of judicial review regarding an IJ's evidentiary determinations. The IFR does not amend a noncitizen's right to appeal a decision, in accordance with the statutes and regulations. *See* 8 CFR 1003.3, 1003.38.

*Comments:* Commenters stated that while the NPRM's proposed "non-duplicative" and "necessary" standard for the submission of new evidence may create more efficiency, it is inappropriate because it (1) reverses Congress's original intent to protect asylum seekers from expedited removal and give them sufficient time after their initial arrival in the United States to prepare an asylum application; (2) violates international obligations to prevent the refoulement of genuine refugees; and (3) undermines the United States' commitment to asylum protection and the preservation of human rights. Commenters stated that the proposed restriction on new evidence in the proposed IJ review proceedings would be fundamentally unfair and violate both U.S. asylum law and the Refugee Convention and Protocol. Similarly, commenters stated that the NPRM's evidentiary restrictions, if adopted, conflict with the statutory and regulatory affirmative duty of IJs to fully develop the record.

*Response:* As described above in Section III of this preamble, the IFR revises the process in new 8 CFR 1240.17(a) and (b) to provide that noncitizens whose applications for asylum are not granted by an asylum officer are referred to streamlined section 240 removal proceedings through the issuance of an NTA, rather than seeking IJ review through the procedure proposed by the NPRM. As part of this change, the Departments are also removing the "non-duplicative" and "necessary" evidentiary standards proposed by the NPRM. *See* 8 CFR 1003.48(e)(1) (proposed); 86 FR 46911, 46920. Instead, the IFR affirms that noncitizens in streamlined section 240 removal proceedings may submit additional evidence to the IJ, as provided in new 8 CFR 1240.17(g)(1), consistent with the traditional evidentiary standard application in 240

proceedings. This change addresses commenters' concerns that the NPRM's evidentiary standard violates congressional intent and the United States' international obligations.

Similarly, the IFR's changes address commenters' concerns regarding IJs' duty to develop the record. Unlike the proposal in the NPRM, the IFR specifically contemplates, in new 8 CFR 1240.17(f)(1) and (2), the IJ conducting a master calendar hearing in all cases, followed by a status conference to discuss the noncitizen's claim and narrow the issues. Overall, IJs will continue to exercise independent judgment and discretion in accordance with the case law, statutes, and regulations to decide each case before them. *See* 8 CFR 1003.10(b).

*Comments:* Commenters suggested numerous alternative formulations regarding the NPRM's proposed evidentiary standard for IJ review proceedings. Some commenters proposed that the standard for introduction of new evidence before the IJ should be lower, stating that a low threshold will ensure that newly-developed evidence and any evidence the asylum officer erroneously failed to include in the record is considered in immigration court. Commenters stated that lowering the evidentiary threshold would still provide improved efficiency because IJs would still only hear new evidence, decreasing the amount of time spent reviewing each case and helping to stem the growth of EOIR's case backlog.

Other commenters similarly argued that, if the proposed process cannot be amended to guarantee section 240 removal proceedings for asylum seekers, the Departments should allow applicants to freely present evidence and testimony during the IJ review proceedings.

Commenters also suggested changes that they stated would better align the procedures for these review proceedings with international law and international procedures. First, commenters stated that the Departments could follow the example set by the United Nations Committee Against Torture and require an explanation for late submission, with a presumption in favor of accepting the explanation and admitting the evidence. Second, commenters stated that the UNHCR urges states to consider all available evidence to meet their obligations under international law. Commenters noted that a more lenient evidentiary standard would better align with the United States' obligations under the Refugee Protocol, including ensuring that adjudicators consider all evidence that could support a claim,

even when only submitted on appeal, and that the unique realities implicated in adjudicating international protection claims require flexibility.

*Response:* As explained above in Section III of this preamble, under the IFR in new 8 CFR 1240.17(a) and (b), if the application for asylum is adjudicated but not granted by the asylum officer, DHS will issue an NTA and refer the applicant to streamlined section 240 removal proceedings before an IJ. Because the Departments are not pursuing the proposed IJ review procedure, including the proposed limitations on new evidence, the Departments need not further respond directly to commenters' suggestions for how those proceedings could have been improved. Further, the Departments believe that the change in the IFR to streamlined section 240 proceedings ultimately addresses commenters' concerns, as noncitizens will have the opportunity to address any perceived errors in the asylum officer's written decision, submit new evidence without regard to the evidentiary limitations proposed in the NPRM, and testify before the IJ.

*Comments:* Commenters expressed concern that the NPRM would essentially give the IJ an appellate review role but would not provide rights for noncitizens or their counsel to address any errors in the asylum officer's decision. Specifically, commenters stated, the NPRM does not contain any information about whether the IJ would issue a briefing schedule, whether the parties would appear before the IJ for a hearing, or whether it would be incumbent on the noncitizen to convince the IJ that further legal argument is necessary in the case. Other commenters were concerned that the NPRM did not provide sufficient guidance as to the structure of the hearing before an IJ.

*Response:* As part of the shift from the NPRM's proposed IJ review procedure to streamlined section 240 removal proceedings, this IFR contains detailed instructions regarding the mechanics of these proceedings before the IJ, including a requirement that IJs hold a status conference and afford the parties an opportunity to make additional legal argument. These provisions are designed to ensure that these proceedings are adjudicated efficiently while at the same time responding to commenters' interest in having more procedural details specified in the regulation. Specifically, under new 8 CFR 1240.17(b) and (f), the IJ will conduct at least an initial master calendar hearing in all cases and will also conduct a status conference and possibly receive written statements to

narrow the issues. Under new 8 CFR 1240.17(f)(2), the noncitizen shall describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings before the asylum officer and provide any additional documentation in support of the applications. *See* 8 CFR 1240.17(f)(2)(i)(A)(*1*)(*ii*)–(*iii*). If, under new 8 CFR 1240.17(f)(4), the IJ determines that the application cannot be granted on the documentary record and the noncitizen has elected to testify or DHS has elected to cross-examine the noncitizen or present testimony or evidence, the IJ will hold an evidentiary hearing.

*Comments:* Commenters further indicated that the NPRM does not require the Departments to inform the noncitizen or their counsel that the case is being reviewed by an IJ.

*Response:* The Departments disagree with commenters' concerns on this point because, under the NPRM, the case would only be reviewed by an IJ if the noncitizen or their counsel first requested such review. Nevertheless, the Departments emphasize that any concerns about the provision of notice regarding the IJ review are addressed by this IFR. Under new 8 CFR 1240.17(b), a noncitizen whose application for asylum is not granted following an Asylum Merits interview will receive notice about the IJ proceedings, because DHS will serve an NTA on all such individuals in order to initiate the section 240 removal proceedings. *See also* INA 239(a)(1), 8 U.S.C. 1229(a)(1).

*Comments:* Commenters stated that, while a verbatim transcript of the Asylum Merits interview will be provided to the IJ, there is no indication that the noncitizen will have access to the audio recording of proceedings with the asylum officer to review for interpretation errors.

*Response:* The Departments intend to make available a process by which parties to EOIR proceedings under 8 CFR 1240.17 will be able to timely review, upon request, the recording of the USCIS Asylum Merits interview. In addition, noncitizens should follow EOIR's procedures to obtain access and copies of their immigration records after cases have been docketed with the immigration courts.

*Comment:* Another commenter stated that the NPRM is silent as to whether a noncitizen's motion to present further evidence to the IJ will be considered applicant-caused delay for purposes of the EAD clock and urged the Departments not to penalize noncitizens in this way for moving to include further evidence that would be

IFR_AR_000831

necessary to a fair adjudication of their claim.

*Response:* The Departments understand asylum applicants' desire to obtain EADs, but neither the NPRM nor this IFR amends DHS's procedures pertaining to the issuance of EADs. Accordingly, any delay attributable to an applicant, including a continuance to obtain evidence sought in immigration court, will be considered an applicant-caused delay for purposes of EAD eligibility just as it would under the status quo.

*Comments:* Commenters also expressed concerns that the NPRM "ties the hands" of the Government and that these asylum adjudications will be susceptible to fraudulent and frivolous claims. Commenters pointed out that the NPRM requires DHS to proffer evidence or testimony for an admissibility ruling but does not provide a clear opportunity for DHS to cross-examine noncitizens regarding evidence the noncitizens may have relied on during their interviews with asylum officers.

*Response:* The Departments disagree with any allegation that this rule would increase fraudulent asylum applications. First, all asylum applications submitted to USCIS for initial adjudication by the asylum officer will be subject to the consequences of filing a frivolous application. 8 CFR 208.3(c); *see also* INA 208(d)(4), 8 U.S.C. 1158(d)(4). Second, although the NPRM would have required both parties to make new threshold evidentiary showings in order to submit additional testimony or evidence before the IJ, the IFR, in new 8 CFR 1240.17(f)(2)(ii) and (f)(3), provides DHS with an explicit opportunity in all cases to respond to any new argument or evidence by the noncitizen, call witnesses, and submit additional documentation, including documentation for rebuttal or impeachment purposes. In addition, both the NPRM and IFR in 8 CFR 208.9(c) provide DHS the opportunity to address credibility concerns with the applicant during the asylum officer hearing. Although the hearing before the asylum officer is nonadversarial, the asylum officer, a DHS employee, has the authority to "present evidence, receive evidence, and question the applicant and any witnesses" during the interview. *Id.* Accordingly, the IFR maintains certain procedures proposed in the NPRM and provides additional procedures that are responsive to commenters' concerns.

c. Immigration Judge's Discretion To Vacate Asylum Officer's Removal Order

As discussed below, commenters opposed the limitation on noncitizens' ability to seek other forms of relief or protection beyond asylum, withholding of removal, or protection under the CAT in the proposed IJ review proceedings unless the noncitizen files a motion to vacate the removal order entered by the asylum officer and the IJ grants that motion as a matter of discretion. *See* 8 CFR 1003.48(d) (proposed).

*Comments:* Commenters opposed the limitation on noncitizens' ability to seek other forms of relief or protection beyond asylum, withholding of removal, or protection under the CAT in the proposed IJ review proceedings unless the noncitizen files a motion to vacate the removal order entered by the asylum officer and the IJ grants that motion as a matter of discretion. *See* 8 CFR 1003.48(d) (proposed).

Commenters pointed out that noncitizens frequently apply for other forms of immigration relief, such as Special Immigrant Juvenile classification, T nonimmigrant status, or U nonimmigrant status concurrently with their applications for asylum, withholding, and protection under the CAT, and expressed a range of concerns that the rule would limit the ability of noncitizens to pursue these types of statutorily-available statuses in the proposed limited IJ review proceedings, which commenters stated was contrary to congressional intent to provide other forms of relief or protection.

First, commenters said that the NPRM's proposed procedure for a discretionary motion to vacate a removal order and transfer the noncitizen to section 240 proceedings is insufficient and that the NPRM would effectively cut off access to these remedies for vulnerable applicants. For example, commenters speculated that unrepresented or child applicants would be unable to meet the procedural requirements for filing the proposed motion, such as a showing of prima facie eligibility. Commenters also noted that some forms of relief are much harder to seek if the applicant is removed than they would be if the applicant could have sought them during the proceedings before the IJ. For example, it could be difficult to confer with an attorney with the relevant expertise while abroad.

Second, commenters found the discretionary motion requirement inefficient. Commenters noted that applicants who seek collateral relief before USCIS, such as T or U nonimmigrant status, often seek

administrative closure or termination of the immigration court proceedings while those applications are adjudicated. Because these cases are then off the IJ's docket, administrative closure or termination in these cases serves the stated goal of efficiency in immigration proceedings, but the NPRM would not allow for this efficiency.

Third, commenters noted that the rule would effectively prevent individuals who become eligible for other relief during appeal from seeking it because they would not have sought to have the case transferred to section 240 proceedings in a timely manner. Commenters asserted that the NPRM provides no justification for this punitive and burdensome change in opportunity for an asylum applicant whose case originated in credible fear screening to seek other relief for which they may become eligible while the case is on appeal.

Finally, commenters further stated that limiting or denying access to all forms of complementary protection conflicts with international standards.

*Response:* As explained above in Section III of this preamble, the Departments are not adopting the IJ review procedure proposed in the NPRM; instead, this IFR provides that noncitizens whose applications for asylum are not granted by an asylum officer will be issued an NTA and referred to an IJ for further review of their applications in a streamlined section 240 removal proceeding. Under the new 8 CFR 1240.17(k)(2), noncitizens who provide evidence of prima facie eligibility for forms of relief or protection other than asylum, withholding of removal, protection under the CAT, and voluntary departure and who either seek to apply or have applied for such relief or protection will be exempted from the timelines applicable in these streamlined proceedings. The IJ will then consider the noncitizen's eligibility for relief as in section 240 proceedings generally. *See, e.g.,* 8 CFR 1240.1(a)(1)(ii) (providing the IJ with the authority to determine a wide range of applications for relief or protection). Further, there will no longer be an intervening requirement for the noncitizen to file a discretionary motion to vacate the asylum officer's removal order and for the IJ to grant such a motion before the noncitizen may seek additional forms of relief or protection. Instead, under new 8 CFR 1240.17(k)(2), noncitizens who produce evidence of prima facie eligibility and submit or intend to submit an application or petition for another form of relief or protection will be exempt from the streamlined

procedure set out in the IFR. Accordingly, the shift to streamlined section 240 proceedings addresses commenters' concerns about the motion process and limitation on the available forms of relief or protection for noncitizens in these proceedings.

*Comments:* Commenters were concerned that the proposal to require a motion for the IJ to vacate the removal order is a new process that will waste Government resources by adding another motion for IJs to review and that it would likely generate additional rounds of appeals. Commenters stated that it would be more efficient to instead allow an IJ to decide the entire matter in front of them without being forced to ignore or exclude other information that would show removal is unwarranted.

Similarly, rather than a process that requires the applicant to identify other grounds of immigration eligibility beyond the three enumerated in 8 CFR 1003.48(a), as set out in the NPRM, commenters argued that it would be fairer and more efficient if the asylum officer and the IJ could inquire about all possible grounds during their respective hearings. Commenters further suggested that the Departments revise the NPRM to have the asylum office refer all cases not granted asylum to section 240 removal proceedings.

*Response:* The Departments believe that these commenter concerns will be addressed by this IFR, which establishes that noncitizens who are not granted asylum after an Asylum Merits interview will be placed into streamlined section 240 removal proceedings, rather than the IJ review proceedings proposed by the NPRM. Under the IFR, asylum officers will not issue removal orders that would need to be vacated by the IJ. Rather, a noncitizen will not be ordered removed until after the IJ has reviewed the asylum officer's decision and concluded that the noncitizen does not warrant asylum.[89] Additionally, the noncitizen need not affirmatively request or seek review of the asylum officer's decision. Rather,

under new 8 CFR 1240.17(a) and (b), if the asylum officer does not grant asylum, DHS will serve the applicant with an NTA and initiate a streamlined section 240 removal proceeding by filing the NTA with the immigration court. Further, just as in all proceedings governed by section 240 of the Act, 8 U.S.C. 1229a, noncitizens may seek other forms of relief or protection, and the IJ will consider additional possible grounds for relief or protection beyond asylum, withholding of removal, and protection under the CAT. *See* 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing . . . ."). Further, under new 8 CFR 1240.17(k)(2), the proceedings for noncitizens who apply for other forms of relief or protection and produce evidence of prima facie eligibility will not be subject to the same expedited procedures detailed in this IFR for these proceedings generally.

*Comments:* Commenters expressed concerns that the NPRM's requirement for applicants to file a motion before they may seek additional forms of relief or protection would prejudice noncitizens who are without counsel or do not speak English because these noncitizens would likely be unaware of their eligibility for additional forms of relief or protection, would be unaware of the option to file a motion for vacatur, or would not realistically be able to file such motions. Specifically, at least one commenter argued that the NPRM would lead to due process violations by denying noncitizens the right to seek relief or protection for which they might be eligible. Similarly, commenters argued that the NPRM's time and number limitations on motions for section 240 removal proceedings raise due process concerns for noncitizens with disabilities or PTSD, or those who speak rare languages.

Commenters further expressed concern that pro se individuals would be particularly harmed by the NPRM's rules for the motion to vacate. For example, one commenter noted that a pro se noncitizen who previously moved unsuccessfully to vacate with insufficient evidence or argument would be precluded from filing any additional evidence or an additional motion, even if the noncitizen later obtained the help of an attorney or representative who is able to show prima facie eligibility for asylum or protection. Instead, commenters suggested that asylum applicants should be allowed to make more than one

motion to show they are eligible for a different form of relief or protection. Commenters asserted that this change will not significantly impact the efficiency of IJ review because most asylum seekers requesting further review do not usually have a claim to a different form of relief from removal.

*Response:* The IFR's changes from the NPRM address commenter concerns about the impact of the motion to vacate requirement on pro se and non-English speaking noncitizens. Specifically, as discussed elsewhere, the IFR establishes that USCIS will affirmatively refer all applicants whose applications are not granted by the asylum officer to streamlined section 240 removal proceedings for adjudication by an IJ. Adjudication by the IJ is automatic upon DHS's filing of the NTA with the immigration court. Additionally, as in all proceedings governed by section 240 of the Act, DOJ's regulations allow noncitizens to seek other forms of relief or protection, without first filing a motion, and the IJ will consider additional possible grounds for relief or protection beyond asylum, withholding of removal, and protection under the CAT. *See* 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing . . . ."); *see also Quintero,* 998 F.3d at 623–24 (collecting cases discussing an IJ's affirmative duty to develop the record). Further, pursuant to new 8 CFR 1240.17(k)(2), the proceedings for noncitizens who apply for other forms of relief or protection and produce evidence of prima facie eligibility will not be subject to the same expedited timeline procedures detailed in this IFR for these expedited proceedings generally. No motion is necessary to demonstrate prima facie eligibility because the IJ could make such determination based on oral representations or information otherwise provided to the IJ.

In addition, as noted above, the IFR, as provided in new 8 CFR 1240.17(k)(6), excepts respondents who have exhibited indicia of incompetency from these streamlined section 240 proceedings. These respondents would instead be placed in ordinary section 240 proceedings.

*Comments:* Commenters disagreed with the NPRM's approach that applicants who may be eligible to seek some other form of relief or protection beyond asylum, withholding of removal, and protection under the CAT would be able to do so only after the completion

---

[89] A respondent who fails to appear for their hearing, however, may be ordered removed in absentia for failure to appear. *See* INA 240(b)(5)(A), 8 U.S.C. 1229a(b)(5)(A). As discussed above in Section III of this preamble, under new 8 CFR 1240.17(d), if the asylum officer had determined that a respondent who fails to appear before the IJ was eligible for statutory withholding of removal or protection under the CAT, the IJ will issue an in-absentia removal order and generally will give effect to protection for which the asylum officer found the respondent eligible, unless DHS makes a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS Asylum Merits interview, that the respondent is not eligible for such protection.

of a full asylum application and interview. Commenters explained that this approach would force applicants to relive and testify in depth about traumatic events in their lives relevant to their asylum claims, even if they have alternative avenues to relief—such as T nonimmigrant status or SIJ classification—that do not require in-person hearings and would not lead to possible re-traumatization.

At least one commenter disagreed with the NPRM's lack of a provision regarding continuances for a noncitizen to obtain evidence of the additional relief or protection for which they may be eligible. The commenter noted that it often takes months to obtain relevant evidence, but under the NPRM, noncitizens may be forced to go forward with IJ review before this process is complete. Additionally, commenters objected to the proposed limitations providing for only one motion for vacatur and requiring that the filing would have to precede a determination on the merits of the protection claim. Commenters argued that these limitations would effectively force applicants to choose which remedy they wish to seek before their appellate rights are exhausted with respect to the asylum, statutory withholding, and CAT claims. Commenters stated that requiring the motion to be filed prior to the IJ's decision on eligibility for asylum or related protection undermines the Departments' goal of balancing fairness and efficiency.

Commenters suggested that there should be exceptions to the time and numerical limitations on the proposed motion for vacatur to account for scenarios such as those in which (1) the noncitizen receives ineffective assistance of counsel, (2) new facts exist that give rise to new fears and forms of relief or protection, (3) updates to immigration laws are made, or (4) other unusual circumstances arise.

*Response:* The IFR's changes from the NPRM, as discussed above in Section III of this preamble, address commenters' concerns with the NPRM's proposals related to the timing and number limits for motions to vacate the asylum officer's removal order. Specifically, because asylum officers will not be issuing removal orders and applicants instead will be placed in streamlined section 240 removal proceedings, noncitizens may seek other forms of relief or protection beyond asylum, withholding of removal, and protection under the CAT, without an intervening motion or other threshold requirement like that set out by the NPRM. *See* 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of

his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing[.]"). Should noncitizens request a continuance to obtain evidence of prima facie eligibility for other forms of relief or protection, the base standard for continuances in streamlined section 240 proceedings will continue to be good cause, as provided in new 8 CFR 1240.17(h)(2)(i). However, as discussed above in Section III of this preamble, the aggregate length of continuances for good cause is capped at 30 days, as provided in new 8 CFR 1240.17(h)(2)(i) and (h)(3). Additional continuances beyond 30 days will require a heightened showing, as provided in new 8 CFR 1240.17(h)(2)(ii)–(iii).

Further, under new 8 CFR 1240.17(k)(2), the proceedings for noncitizens who apply for other forms of relief or protection and produce evidence of prima facie eligibility will not be subject to the same streamlined procedures detailed in this IFR. In addition, for such cases, IJs may utilize the same common docket-management tools as those generally used in section 240 removal proceedings, such as continuances and administrative closure, in appropriate cases where a noncitizen may be eligible for alternative forms of relief, such as adjustment of status under section 245 of the Act, 8 U.S.C. 1255.

With respect to commenters who expressed concern about the possible trauma that noncitizens might endure from testifying, the Departments note that the IFR does not require noncitizens to testify before the IJ. Rather, it gives noncitizens the opportunity to provide further testimony should they wish to do so. Thus, as provided in new 8 CFR 1240.17(f)(2)(i), if noncitizens feel that they have had adequate opportunity to articulate the nature of their claims before the asylum officer, they need not elect to further testify and may rest on the record of proceedings before the asylum officer. The IFR provides in new 8 CFR 1240.17(f)(2) that the parties will engage in a status conference prior to the merits hearing during which the parties will narrow the issues in dispute. In some instances, the IJ may determine that the application can be decided on the documentary record without additional testimony from the noncitizen. *Id.* Further, under new 8 CFR 1240.17(f)(2)(ii), DHS may decide not to contest certain issues, and noncitizens need not testify about sensitive issues that DHS does not contest. The

Departments also note that both asylum officers and IJs undergo ongoing training and support to promote the quality of adjudications and to prepare them to address sensitive claims. Asylum officers who conduct interviews are required by regulation to undergo "special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles." 8 CFR 208.1(b). Asylum officers are also required to determine that noncitizens are able to participate effectively in their interviews before proceeding. 8 CFR 208.30(d)(1), (5). These DHS regulations are intended to recognize and accommodate the sensitive nature of fear-based claims and to foster an environment in which noncitizens may express their claims to an asylum officer. Similarly, IJs must undergo comprehensive, ongoing training, as provided in DOJ's existing regulations. 8 CFR 1003.0(b)(1)(vii). IJs are further directed to conduct hearings in a manner that would not discourage a noncitizen from presenting testimony on difficult subject matter. *See OPPM 17–03: Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children* 3 (Dec. 20, 2017) ("Every [IJ] should employ age-appropriate procedures whenever a juvenile noncitizen or witness is present in the courtroom."); *Matter of J–R–R–A–*, 26 I&N Dec. 609, 612 (BIA 2015) ("[W]here a mental health concern may be affecting the reliability of the applicant's testimony, the [IJ] should, as a safeguard, generally accept that the applicant believes what he has presented, even though his account may not be believable to others or otherwise sufficient to support the claim."); *Matter of Y–S–L–C–*, 26 I&N Dec. 688, 690–91 (BIA 2015) ("Conduct by an [IJ] that can be perceived as bullying or hostile can have a chilling effect on a [noncitizen's] testimony and thereby limit his or her ability to fully develop the facts of the claim . . . . [S]uch treatment of any [noncitizen] is never appropriate[.]"). DHS retains the option to issue an NTA to place the noncitizen in ordinary section 240 removal proceedings prior to the Asylum Merits interview, and it could do so if the applicant appears to have a strong claim for a form of relief or protection that the asylum officer cannot grant. This procedure would be another means of preventing the applicant from having to testify twice.

*Comments:* Several commenters expressed concern that the proposed motion to vacate removal orders would be left to the discretion of the IJ, even if the applicant had established prima

IFR_AR_000834

facie eligibility for a different form of relief from removal. In particular, commenters stated that the NPRM did not make clear how that discretion should be exercised. Commenters argued that the ability to appeal such denials to the BIA would not be a sufficient safeguard because of the complexity of filing an appeal for some applicants. Commenters asserted that the discretionary nature of the motion would result in the wrongful removal of noncitizens with available relief, which would run afoul of due-process obligations. Further, some commenters worried that DHS could exercise discretion not to refer an applicant to section 240 removal proceedings even if an IJ were to grant a motion to vacate.

*Response:* The IFR's changes from the NPRM, as discussed above in Section III of this preamble, address commenters' concerns with the NPRM's proposed framework under which both the IJ and DHS would make discretionary determinations in the context of a motion to vacate. First, under the IFR, when an asylum officer does not grant asylum, DHS will serve an applicant with an NTA and initiate streamlined section 240 removal proceedings by filing the NTA with the immigration court. *See* 8 CFR 208.14(c). Second, as recognized in new 8 CFR 1240.17(k)(2), because applicants will be referred to streamlined section 240 removal proceedings, they may seek other forms of relief or protection beyond asylum, withholding of removal, and protection under the CAT, without an intervening motion or other threshold requirement like that set out by the NPRM. *See also* 8 CFR 1240.11(a)(2) (''The [IJ] shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing[.]''). Finally, as provided in new 8 CFR 1240.17(k)(2), noncitizens who produce evidence of prima facie eligibility for relief or protection other than asylum, withholding of removal, protection under the CAT, or voluntary departure and indicate an intent to apply for, or who have applied for, such form of relief or protection will be excepted from these streamlined section 240 proceedings and have their cases adjudicated under the standard processes. Accordingly, noncitizens who are eligible to seek forms of relief or protection other than asylum, withholding of removal, and protection under the CAT do not have to receive a favorable discretionary grant in order to do so.

*Comments:* Commenters asserted that the NPRM's proposed differing treatment of various categories of asylum seekers is unfairly arbitrary. For example, commenters feared that the eligibility of asylum seekers to apply for any form of relief or protection—rather than just asylum, statutory withholding of removal, and protection under the CAT—would be based solely on how CBP and ICE have exercised discretion to process noncitizens on a given day.

Commenters argued that the Departments should allow IJs to grant motions to vacate removal orders both where the noncitizen would be eligible to apply for relief or protection if in a section 240 proceeding and where the noncitizen would be eligible to apply for collateral relief adjudicated by USCIS because it did not appear that an IJ would have the authority to terminate a case under the NPRM.

Commenters also urged that a noncitizen should be allowed to file an interlocutory appeal to the BIA if an IJ denied a motion to vacate under the NPRM.

Finally, commenters requested a clarification and rationale for the NPRM's prohibition on a motion to vacate premised on an application for voluntary departure. Commenters expressed concern that, if neither USCIS nor EOIR can grant voluntary departure, individuals could be separated from their families or otherwise negatively affected.

*Response:* The IFR's changes from the NPRM, as discussed above in Section III.D of this preamble, address commenters' concerns with the NPRM's motion to vacate framework. First, under the IFR, any applicant not granted asylum by an asylum officer after an Asylum Merits interview will be served with an NTA and placed in streamlined section 240 removal proceedings without the need to request an IJ's review.[90] Accordingly, individuals in streamlined section 240 proceedings will be able to apply for all forms of relief or protection for which they may be eligible, including voluntary departure, thus addressing commenters' concerns on this issue.

---

[90] To the extent that commenters' concerns relate to the general discretion of DHS to determine whether to place an applicant for admission in expedited removal under section 235 of the Act, 8 U.S.C. 1235, or to issue an NTA and refer the applicant to section 240 proceedings, commenters' concerns are beyond the scope of this rule. *See, e.g., Matter of M–S–,* 27 I&N Dec. 509, 510 (A.G. 2019) (''[I]f the [noncitizen] is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings.'').

**d. Immigration Judge's Authority To Review All Asylum Officer Decisions**

*Comments:* Commenters stated that asylum applicants who were not granted asylum but were granted withholding of removal or CAT protection may be deterred from seeking IJ review because of the possibility of being denied all relief or protection and removed. Commenters stated that such deterrence is particularly inappropriate for individuals granted withholding of removal or CAT protection because they are unable to travel abroad or petition for relatives to follow to the United States. Commenters also stated that the proposed rule would leave those granted withholding of removal or CAT protection by the asylum officer with a difficult choice of seeking review and potentially being removed to their country of feared harm or facing permanent separation from family members. Overall, commenters expressed concern that the proposal could have a chilling effect on the decision to seek review of an asylum officer's decision to not grant asylum where doing so would require risking the loss of already-issued protection, citing international treaty obligations to not return refugees to countries where they might suffer persecution or torture. Other commenters were concerned that an asylum applicant would not receive notice that seeking review of an asylum officer's decision to not grant asylum could also result in IJ review of granted protections.

Some commenters asserted that requiring IJs to review grants of protection is contrary to the rule's stated goals of improving efficiency and addressing the immigration court backlog. Commenters argued that it is inefficient to require an IJ to revisit portions of the asylum officer's decision that neither party has requested the IJ review and observed that granted cases can and will be reviewed upon the asylee's application for permanent residence. Other commenters stated that an IJ's unilateral decision to reverse protections that were granted by an asylum officer would undercut the IJ's role as a neutral arbiter.

Commenters asserted that allowing IJs to review grants of protection is inconsistent with the principles of adversarial adjudication. Commenters noted that the proposed rule would have DHS (as the adverse party to an asylum seeker in immigration court) argue that a benefit was wrongfully granted by another DHS component (USCIS) and asserted that it would be irrational for ICE to argue in this manner before EOIR that another component of

DHS erred in its decision-making. Similarly, commenters argued that the executive branch cannot contest a decision also issued by the executive branch, asserting that the same reasoning has long applied to the prohibition on DHS seeking judicial review of BIA decisions in Federal court. According to commenters, this aspect of the rule would discourage cooperation between the parties to narrow the issues or stipulate to relief, resulting in unnecessary court battles and delay.

Commenters argued that it would be inequitable for DHS to obtain automatic review of a grant of withholding of removal or CAT protection when noncitizens do not obtain automatic review of denials. Some commenters also worried that authorizing, but not requiring, IJs to review withholding of removal and CAT decisions risks inconsistent revocation of these benefits if some IJs decide to conduct this review and others do not, arguing that the risk of arbitrarily and permanently separating families outweighs any efficiency concerns.

Commenters also asserted that "mixed cases" could create confusion for noncitizens attempting to request review of their case before U.S. Courts of Appeals. For example, commenters stated that IJs could reverse the denial of withholding of removal but leave the asylum denial and order of removal on the basis of prior grounds of inadmissibility undisturbed. Commenters worried that, in such cases, noncitizens requesting review before courts of appeal would likely exceed the "mandatory and jurisdictional" 30-day limit to review their asylum denial and accompanying removal order. Finally, commenters asserted that these procedural hurdles would deter pro bono attorneys from taking cases.

*Response:* As described above in Section III of this preamble, this IFR does not adopt the NPRM's proposed IJ review procedure and instead implements streamlined section 240 removal proceedings in new 8 CFR 1240.17. One consequence of this change from the NPRM, which the Departments emphasize was requested by the majority of those who commented on this aspect of the NPRM, is that the asylum officer will not issue orders of removal or grant withholding of removal or protection under the CAT. Rather, because the IJ will issue orders of removal, the IJ will also grant or deny withholding of removal and protection under the CAT. *See Matter of I–S– & C–S–,* 24 I&N Dec. 432, 434 (BIA 2008) ("[W]hen an [IJ] decides to grant withholding of removal, an explicit

order of removal must be included in the decision.").

Nevertheless, asylum officers will continue to consider the applicant's eligibility for withholding of removal and protection under the CAT during the Asylum Merits interviews and, if they do not grant the application for asylum, will indicate whether the applicant has demonstrated eligibility for withholding of removal or protection under the CAT based on the record before USCIS. *See* 8 CFR 208.14(c)(1); 8 CFR 208.16(a). Upon an asylum officer's decision to not grant asylum, the noncitizen is placed in streamlined section 240 removal proceedings. The IFR provides that the IJ will schedule a status conference where the noncitizen will indicate whether the noncitizen intends to contest removal or seek any protections for which the asylum officer did not determine that the noncitizen was eligible. If the noncitizen does not intend to contest removal or seek any protections for which the asylum officer did not determine that the noncitizen was eligible, the IJ will order the noncitizen removed. If the asylum officer determined that the noncitizen was eligible for withholding of removal or protection under the CAT, the IJ will give effect to the protection for which the asylum officer determined that the noncitizen was eligible, subject to the ability of DHS to present new evidence establishing that the applicant is not eligible for protection.

However, the noncitizen can elect to contest removal or seek protections that were not granted by the asylum officer. Where the asylum officer did not grant the application for asylum and determined that the applicant is not eligible for statutory withholding of removal or withholding or deferral of removal under the CAT, the IJ will review each of the applications de novo as provided in new 8 CFR 1240.17(i)(1). Where the asylum officer did not grant asylum but determined that the applicant was eligible for statutory withholding of removal or protection under the CAT, the IJ will adjudicate the application for asylum de novo, as provided in new 8 CFR 1240.17(i)(2). Further, under new 8 CFR 1240.17(i)(2), if the IJ denies asylum and enters an order of removal, the IJ will also issue an order giving effect to the protections for which the asylum officer determined that the noncitizen was eligible, unless DHS affirmatively demonstrates through evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. The IJ

will grant any protections for which the IJ finds the noncitizen eligible.

The Departments believe that these procedures outlined in the IFR address many concerns of the commenters while also promoting efficiency in governmental processes. First, the IFR does not allow the IJ to reconsider sua sponte relief or protection for which the asylum officer determined the noncitizen was eligible. Instead, under new 8 CFR 1240.17(i)(2), if the noncitizen elects to contest removability or the asylum officer's determination, the burden shifts to DHS to present evidence showing that evidence or testimony not included in the asylum officer record and specifically pertaining to the noncitizen establishes that the noncitizen is not eligible for the relief or protection. The Departments believe it is necessary for DHS to be able to revisit the issue of eligibility in special circumstances, such as when there may be evidence of fraud or new derogatory information affecting eligibility. As explained above, the Departments believe that, without a process for DHS to address such issues in the streamlined section 240 removal proceedings, DHS would otherwise have to follow the procedures in 8 CFR 208.17(d) and 208.24(f) in instances where overturning the asylum officer's eligibility determination is justified.

### e. Appeal of Immigration Judge's Decision to the Board of Immigration Appeals

*Comments:* Some commenters expressed support for the appeal procedures in the NPRM.

Other commenters expressed concern that, without a traditional immigration court hearing transcript to review, BIA and Federal court review would be cursory. Similarly, commenters asserted that the BIA and Federal court review under the NPRM would be meaningless because they believed such review would be conducted on the basis of a partial, incomplete record and that, in many cases, there would be initial rounds of litigation regarding application of the NPRM's limitations on the introduction of evidence.

*Response:* As discussed above in Section III of this preamble, under this IFR, applicants not granted asylum by the asylum officer after an Asylum Merits interview will be referred to streamlined section 240 removal proceedings before the immigration court. This change from the NPRM addresses commenters' concerns about the effect of the nature of the IJ review proceedings set out in the NPRM on any subsequent BIA or appellate review. Under the IFR, in new 8 CFR 1240.17(a)

and (g)(1), noncitizens will be afforded longstanding procedural protections and due process safeguards inherent in section 240 proceedings, including the right to representation at no cost to the Government and the rights to present evidence and testimony. *See* INA 240(b)(4)(A)–(B), 8 U.S.C. 1229a(b)(4)(A)–(B). More specifically, under new 8 CFR 1240.17(a), noncitizens will have the opportunity to be heard at scheduled hearings and the ability to develop the record by presenting evidence that is timely submitted, relevant, probative, and not fundamentally unfair. Furthermore, under new 8 CFR 1240.17(g)(2), IJs may consider late-filed evidence that is filed before the IJ issues a decision in the case if it could not reasonably have been obtained and presented before the deadline through the exercise of due diligence. A complete record of all evidence and testimony will be kept in accordance with the standard procedures for section 240 proceedings. INA 240(b)(4)(C), 8 U.S.C. 1229a(b)(4)(C). This includes but is not limited to: (1) The record of proceedings before the asylum office, as outlined in 8 CFR 208.9(f); (2) a written statement, if any, from the noncitizen describing any alleged errors and omissions in the asylum officer's decision or the record of proceedings before the asylum office; and (3) documentation and testimony in support of the application for relief or protection. The Departments believe that this requirement will alleviate procedural concerns and ensure that the BIA will have a full record on appeal and that U.S. Courts of Appeals will have a full record in a petition for review.

f. Other Comments on Proposed Application Review Proceedings Before Immigration Judges

*Comments:* Commenters urged the Departments to remove the regulatory language that would permit the immigration court to reject an asylum application if proof of payment of the fee, if required, is not submitted, citing proposed 8 CFR 1208.3(a)(2). Commenters asserted that asylum applications should never require a fee because seeking safety from persecution is a fundamental human right and refusing asylum applicants for the inability to pay would effectively cause the United States to abrogate its international obligations. Stating that the prior Administration's fee rule is enjoined, commenters suggested that the Departments should not leave open the possibility for future administrations by explicitly including the possibility of an

asylum application fee in this proposed regulation.

*Response:* As noted in the NPRM, the Departments published numerous rules in recent years that have been vacated, enjoined, or otherwise delayed. 86 FR 46909 n.24. Two such rules are final rules regarding application fees issued by DHS and DOJ, respectively. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 FR 46788 (Aug. 3, 2020) (enjoined by *Immigrant Legal Res. Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020), and *Nw. Immigrant Rts. Project* v. *United States Citizenship & Immigr. Servs.,* 496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed,* No. 20–5369, 2021 WL 161666 (DC Cir. Jan. 12, 2021)); Executive Office for Immigration Review; Fee Review, 85 FR 82750 (Dec. 18, 2020) (partially enjoined by *Cath. Legal Immigr. Network, Inc.* v. *Exec. Off. for Immigr. Rev.,* 513 F. Supp. 3d 154 (D.D.C. 2021)).

Language regarding the submission of an application fee, if any, for applications for asylum was included in the latter rule. 8 CFR 1208.3(c)(3); *see also* 85 FR 82765–69 (discussing commenters' concerns regarding an application fee for asylum applications). The NPRM proposed to amend the regulations only as necessary to effectuate the changes related to the credible fear and asylum adjudication processes as explained in the NPRM and this IFR. *See, e.g.,* 86 FR 46914 n.38. As a result, the NPRM did not include any proposed edits regarding the asylum application fee-related language in § 1208.3(c)(3).[91] The language related to the payment of an asylum application fee, if any, was included simply as surrounding regulatory text that was reprinted to ensure correct amendments to the language related to the credible fear and asylum adjudication processes.

DOJ, however, will be considering additional changes to the regulations regarding the applicable fees for applications and motions during EOIR proceedings. *See* Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https:// www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202110& RIN=1125-AB19* (last visited Mar. 9, 2022).

*Comments:* Commenters urged the Departments to rescind the provisions of the Global Asylum rule that expressly

permit pretermission of asylum claims and to enact a broad regulatory bar on the practice. At a minimum, commenters asked the Departments to expressly prohibit IJs from pretermitting asylum applications upon review from asylum officers' decisions to not grant asylum, arguing that allowing IJs to do so under the proposed system of minimal process would violate the Constitution.

*Response:* As stated above, the NPRM only proposed to amend provisions of prior rulemakings to the extent necessary to implement the proposed changes related to the credible fear and asylum adjudication processes. *See, e.g.,* 86 FR 46914 n.38. The provisions referenced by commenters at 8 CFR 1208.13(e) regarding pretermission of applications were added by the Departments as part of a separate rulemaking known as the Global Asylum rule. *See* 85 FR 80274. Because this provision is beyond the scope of the changes needed to effectuate the credible fear and application review processes included in the NPRM, the Departments are not including any changes to this provision at this point. However, the Departments will consider whether to modify or rescind 8 CFR 1208.13(e) and the other remaining portions of the regulations affected by enjoined regulations in future rulemakings. *See, e.g.,* Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda: Department of Justice, *https://www.reginfo.gov/public/do/ eAgendaMain?operation=OPERATION_ GET_AGENCY_RULE_LIST& currentPub=true&agencyCode=& showStage=active&agencyCd=1100& csrf_token=1F5E59171165 D9C756F8D13DB0280F16BF4E61995 A08C2DA5251225495 FD83335EE930292724E7EF24ABEB50141 CF0AC59747* (last visited Mar. 1, 2022).

*Comments:* Commenters urged the Departments to preserve Federal court review of asylum cases in any asylum process, stressing that judicial review protects refugees from politicized policies, rushed administrative decision-making, or discriminatory factual and legal interpretations and provides judicial oversight of administrative adjudications with life-or-death consequences. Some commenters argued that the proposed rule does not provide adequate appellate protections for asylum seekers, explaining that the provision of the NPRM subjecting asylum seekers to expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1), unless and until they are granted asylum, could be found by courts to trigger the INA's jurisdiction-stripping provision relating

---

[91] The commenter is incorrect that the Department included language regarding an application fee for applications for asylum at 8 CFR 1208.3(a)(2).

IFR_AR_000837

to expedited removal. *See* INA 242(a)(2)(A), 8 U.S.C. 1252(a)(2)(A).

Specifically, commenters expressed concern that some courts might view a challenge to the denial of an asylum application that affirms an expedited order of removal and denies all relief or protection as asking the court "to review . . . any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to [INA 235(b)(1), 8 U.S.C. 1225(b)(1)]," claims for which the statute bars jurisdiction. *See* INA 242(a)(2)(A), 8 U.S.C. 1252(a)(2)(A). Commenters asserted that the statute authorizes only two processes for the issuance of a removal order: (1) An expedited removal order under INA 235(b)(1), 8 U.S.C. 1225(b)(1), for which judicial review is barred; and (2) a removal order entered in proceedings under INA 240, 8 U.S.C. 1229a, for which judicial review is available but which the NPRM expressly proposed not to use. As such, according to commenters, the Departments' simultaneous assertion that INA 235(b)(1), 8 U.S.C. 1225(b)(1) provides the authority to create the proposed procedures while at the same time stating that an order of removal issued pursuant to those procedures is not "an order of removal pursuant to [INA 235(b)(1), 8 U.S.C. 1225(b)(1)]" could raise questions about the availability of judicial review.

Commenters also expressed concern that, even if this Administration is committed to interpreting the proposed rule as allowing for judicial review, a future administration could advise counsel at ICE and DOJ to interpret the rule more narrowly and argue that judicial review is not available. According to commenters, the possibility that the proposed rule could inadvertently deprive asylum seekers of judicial review is another reason to ensure that those not granted asylum by an asylum officer after passing a credible fear screen are referred to proceedings under INA 240, 8 U.S.C. 1229a.

Finally, some commenters questioned what items the Federal courts would review, even if there is no jurisdictional hurdle to review by a U.S. Court of Appeals. Asserting that the circuit courts of appeals are used to reviewing records that include full immigration court hearing transcripts, commenters expressed concern that, under the proposed rule, courts of appeals would review a written decision of the BIA, which reviewed an IJ's review of an asylum officer's decision. Although the record likely would include a transcript

of the asylum officer interview, commenters worried that the transcript would be two levels removed from the Federal court review and would not be in the formal format that Federal courts are accustomed to reviewing.

*Response:* As explained above in Section III of this preamble, the Departments are not adopting the IJ review procedure proposed in the NPRM; instead, under this IFR, noncitizens whose applications for asylum are adjudicated but not granted by an asylum officer will be issued an NTA and referred to an IJ for further review of their applications in streamlined section 240 removal proceedings. If the IJ in turn denies the noncitizen's application for asylum, the IJ will issue an order of removal, and the noncitizen may appeal that decision under the generally applicable procedures, first to the BIA and then in a petition for review to the appropriate U.S. Court of Appeals. 8 CFR 1003.24; INA 242, 8 U.S.C. 1252. Accordingly, this change addresses commenters' concerns regarding the availability of judicial review.

Regarding commenters' concerns about the record for judicial review, the Departments do not agree that the nature of the record presents concerns. As stated in the NPRM, USCIS will transcribe the Asylum Merits interview before the asylum officer, and that verbatim transcript will be included in the referral package sent to the immigration court, as finalized in 8 CFR 208.9(f). Because the Departments will ensure that the transcripts of these hearings are in a format that is appropriate for the IJ's review of the record, commenters' concerns that the transcript will not be sufficiently formal or otherwise helpful for BIA or Federal court review is simply speculative. The noncitizen may then supplement the record from the hearing by the asylum officer during the noncitizen's proceedings before an IJ, including by providing statements or evidence regarding any alleged insufficiency during the Asylum Merits proceedings. Further, if the noncitizen appeals the IJ's decision, all hearings conducted by the IJ will be transcribed under standard EOIR procedures. *See* 8 CFR 1003.5(a) (2020).[92]

*Comments:* Some commenters stated that, although they suggested changes to strengthen due process protections with respect to the proposed IJ review proceedings, the Departments are on track to usher in a modernized U.S. asylum system that is orderly, efficient, and fair.

Another commenter called attention to what it said is "the fundamental defect in our immigration adjudication system that gives rise to the technocratic changes proposed" in the NPRM: The lack of an independent immigration court. The commenter suggested that the Departments adopt a "new model" in which an independent court, presided over by independent judges, would assertedly "make rational decisions based on the facts and the law of the cases it hears."

Commenters also expressed concern that the proposed appeal process seems vague, among other flaws, leaving it unclear what will happen to someone where an IJ on appeal rules in contradiction of the lower authority.

*Response:* Commenters' assertions regarding problems with the immigration court system as a whole are beyond the scope of this rulemaking. Nonetheless, the Departments emphasize that IJs exercise "independent judgment and discretion" in deciding cases, 8 CFR 1003.1(d)(1)(ii) and 1003.10(b), and are prohibited from considering political influences in their decision-making, *IJ Ethics and Professionalism Guide* ("An Immigration Judge should not be swayed by partisan interests or public clamor.").

Moreover, as noted above and in Section III of this preamble, the Departments have not adopted the IJ review procedure proposed in the NPRM and instead are providing that if an asylum officer adjudicates but does not grant asylum, the noncitizen will be issued an NTA in streamlined section 240 removal proceedings. Because new 8 CFR 1240.17(a) provides that the same rules and procedures governing proceedings under 8 CFR, part 1240, subpart A, apply unless otherwise noted, if the IJ in turn denies relief or protection, a noncitizen may appeal the IJ's decision to the BIA under the DOJ regulations at 8 CFR 1240.15 and may further petition for review of the BIA's decision by a Federal circuit court. The Departments believe that this revision addresses commenters' concerns about

---

[92] DOJ amended 8 CFR 1003.5 in 2020 as part of a final rule that affected EOIR procedures related to the processing of BIA appeals. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 81588 (Dec. 16, 2020). On March 10, 2021, the United States District Court for the Northern District of California granted a nationwide preliminary injunction barring the Department from implementing or enforcing the 2020 rule or any portion thereof and stayed the effectiveness of the

rule. *Centro Legal de La Raza* v. *Exec. Off. for Immigr. Rev.*, No. 21–CV–00463–SI, 2021 WL 916804, at *1 (N.D. Cal. Mar. 10, 2021). Accordingly, the Departments cite to the regulations in effect prior to publication of the December 16, 2020 rule.

the alleged vagueness and unfairness of the proposed appeal process in the NPRM by providing a clear process for appeal and incorporating longstanding protections that ensure fairness in immigration proceedings.

*Comments:* Commenters urged the Departments to ensure that all noncitizens have access to motions to reopen protections, asserting that the NPRM is unclear about whether there would be an opportunity for the noncitizen to move to reopen if not physically removed following a removal order.

*Response:* As noted above and in Section III of this preamble, the Departments have decided not to adopt the IJ review procedure proposed in the NPRM and instead are providing that if an asylum officer adjudicated but did not grant asylum, the noncitizen will be issued an NTA in streamlined section 240 removal proceedings. The standard rules governing motions to reopen will continue to apply in those section 240 proceedings. *See* INA 240(b)(5)(C), (c)(7), 8 U.S.C. 1229a(b)(5)(C), (c)(7); 8 CFR 1003.2, 1003.23. The Departments believe this change addresses commenters' concerns about the clarity of rules governing access to motions to reopen in the NPRM.

*Comments:* Commenters urged the Departments to generally end the practice of expedited removal, particularly in the case of asylum seekers, and grant applicants a full hearing before an IJ when requesting an appeal on a negative decision by an asylum officer.

*Response:* Commenter recommendations to eliminate expedited removal are beyond the scope of this rulemaking. Nevertheless, the Departments note that expedited removal is a statutorily provided procedure. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) ("If an immigration officer determines that [a noncitizen] . . . who is arriving in the United States . . . is inadmissible . . . the officer shall order the [noncitizen] removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution."); INA 235(b)(1)(B)(iii)(I), 8 U.S.C. 1225(b)(1)(B)(iii)(I) ("[I]f the officer determines that [a noncitizen] does not have a credible fear of persecution, the officer shall order the [noncitizen] removed from the United States without further hearing or review.").

*Comments:* Commenters suggested ways to ensure timely, effective, and fair immigration court decisions: (1) Formalize IJ authority to use administrative closure to manage their dockets; (2) establish formal pre-hearing conferences for DHS attorneys and noncitizens' counsel to confer and identify issues in dispute prior to trial, stipulate to issues where there is no dispute, or agree that asylum or protection is grantable based on the written submissions; (3) clarify the IJ's authority to terminate section 240 removal proceedings to allow a noncitizen to pursue applications for permanent status before USCIS if the noncitizen establishes prima facie eligibility for such status; and (4) create a formal mechanism for asylum seekers and other immigrants to advance immigration court hearing dates to ensure that their cases are timely heard and that hearing slots do not go unused.

*Response:* Comments suggesting improvements for immigration court proceedings generally are outside the scope of this rulemaking. However, the Departments briefly explain the current legal scheme and how it may relate to this IFR.

First, regarding commenters' request that IJs be able to utilize administrative closure to manage their dockets, the Attorney General recently issued *Matter of Cruz-Valdez,* 28 I&N Dec. 326 (A.G. 2021), finding that, while the process of rulemaking proceeds, the current standard for administrative closure is set out in *Matter of Avetisyan,* 25 I&N Dec. 688 (BIA 2012), and *Matter of W–Y–U–,* 27 I&N Dec. 17 (BIA 2017). Parties should refer to the current case law until further rulemaking is completed. *See* Director Memorandum's (DM) 22–03, *Administrative Closure* (Nov. 22, 2021).

Second, regarding the commenters' request for a formal pre-hearing conference, the IFR, in new 8 CFR 1240.17(f), provides that the IJ will hold a prehearing status conference to narrow the issues and otherwise simplify the case.

Third, commenters' request that the Departments clarify general IJ authority to terminate proceedings to allow a noncitizen to pursue other relief or protection before USCIS is beyond the scope of this rulemaking. This IFR specifically addresses procedures for noncitizens subject to the expedited removal process; it does not involve general IJ authority to terminate proceedings. Regarding IJs' general authority to terminate proceedings, relevant case law provides that an IJ may dismiss or terminate section 240 removal proceedings only under the circumstances identified in the regulations. *See Matter of S–O–G– & F–D–B–,* 27 I&N Dec. 462 (BIA 2018). Further, parties may agree to dismiss proceedings for the noncitizen to pursue other relief or protection before USCIS. *See Matter of Kagumbas,* 28 I&N Dec. 400, 401 n.2 (BIA 2021) (noting that parties are not prohibited "from agreeing to dismiss proceedings so that a respondent may pursue adjustment of status before . . . USCIS"). Fourth, regarding commenters' request for EOIR to create a formal mechanism for noncitizens to file a motion to advance hearing dates, the Immigration Court Practice Manual provides formal instructions for requests to advance a hearing date. *See EOIR Policy Manual,* Part II.5.10(b). Moreover, EOIR maintains a formal policy to ensure that all available blocks of immigration court time are utilized to the maximum extent practicable. *See* EOIR, *PM 19–11, No Dark Courtrooms* (May 1, 2019), *https:// www.justice.gov/eoir/file/1149286/ download.*

### E. Other Issues Related to the Proposed Rulemaking

#### 1. Public and Stakeholder Input

*Comments:* Several commenters requested a comment period extension for various reasons, such as unclear deadline instructions, insufficient time to comment, and impacts of the COVID–19 pandemic. One commenter stated that commenting on this rule is difficult without understanding its interaction with other proposed rulemakings relating to the asylum system.

Additionally, two commenters requested that the proposed rule be rescinded, revised, and reposted for another comment period opportunity. One of these commenters said the agency should reissue a new NPRM after providing asylum seekers meaningful opportunities to present their own recommendations for reforming the asylum system.

*Response:* Although the APA does not require a specific time period for public comments, Executive Orders 12866, 58 FR 51735 (Sept. 30, 1993), and 13563, 76 FR 3821 (Jan. 18, 2011), recommend a comment period of at least 60 days. Here, the Departments have provided a 60-day comment period that allowed for adequate notice, evinced by the over 5200 comments received and addressed in this rule. In addition, the Departments are issuing this rulemaking as an IFR with a request for comment, thus allowing the public a further chance to provide input. The Departments consequently do not agree with the need for an extension. Additionally, suggestions to rescind, revise, and republish the rule upend the rulemaking process. The NPRM is designed to provided fair notice and

allow for public input. Engaging in continual reworking of such a notice because of public comment undermines the methodology of informal rulemaking under the APA.

*Comments:* Several commenters urged USCIS to engage with stakeholders like immigration advocates, non-governmental organizations, and asylum seekers to improve existing processes prior to publishing the rule. One commenter provided specific feedback from its members about improving the efficiency and accessibility of the asylum system.

Another commenter similarly requested that, before any further steps are taken to finalize the rule, additional consultations take place. The commenter "remind[ed]" the Departments that, in response to a rule proposed by the prior Administration, UNHCR emphasized that it was prepared to offer technical assistance, and the asylum officers' union observed that the current Administration "must make sure that the individuals tasked with implementing policy have a voice in crafting new regulations." The commenter stated that, by Executive order, the President has mandated that Federal Departments "shall promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United States land borders." If the Departments choose not to engage in such consultation and planning with experts, the commenter requested an explanation of why not.

*Response:* The Departments acknowledge commenters' requests for further engagement and their suggestions to improve the asylum program. Here, the Departments provided a 60-day comment period in the NPRM, which provided the opportunity for members of the public, including the commenters, public employee unions, and other stakeholders, to offer feedback on the rule. In addition, in this IFR, the Departments are including another request for public comments. Furthermore, the Departments regularly engage experts from non-governmental and intergovernmental organizations to supplement the extensive training provided to their personnel. The Departments also note that they regularly hold public engagement sessions with stakeholders, allowing further opportunity for the consultations the commenters have requested. The Departments are continually seeking ways to improve the manner in which they carry out their duties in service to

the public and take into account stakeholder feedback when doing so.

*Comments:* Some commenters requested a more specific definition of "particular social group" to better understand the proposed rule and provide feedback. Similarly, several commenters requested a delay in implementation of the rule until the "particular social group" rule is issued so that Congress has the opportunity to comment and, if necessary, to legislate on who is eligible for asylum.

*Response:* The Departments acknowledge the commenters' interest in the forthcoming rulemaking addressing, among other things, the definition of the term "particular social group" as used in the INA.[93] However, the Departments disagree that the implementation of this IFR should be delayed until the "particular social group" rule is issued. The Departments do note, however, that in issuing this rulemaking as an IFR, they are soliciting further comment on its provisions. This rulemaking does not change any of the criteria for asylum eligibility, but rather addresses the procedures and mechanisms by which the asylum claims of individuals subject to expedited removal are considered and processed. By contrast, the "particular social group" rulemaking would codify the Departments' interpretations of certain Federal statutes they are charged with implementing. The Administrator of the Office of Information and Regulatory Affairs within the Office of Management of Budget has determined that this IFR is a "major rule" within the meaning of Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (also known as the Congressional Review Act), 5 U.S.C. 804(2). Accordingly, this IFR is effective 60 days after publication, thus allowing additional time for congressional review. If Congress deems it necessary to legislate on asylum eligibility or any other topic within its authority under the United States Constitution, it may certainly do so without regard to any regulations promulgated by Executive departments. The Departments will faithfully execute any laws enacted by Congress and signed by the President.

## 2. Severability

*Comments:* A commenter expressed concern that, if certain protective provisions in the proposed rule are severed, then it "would fall short of international standards for fair and

efficient processing of asylum applications."

*Response:* The Departments acknowledge the commenter's concern. The Departments are committed to ensuring that the process afforded applicants meets the requirements of due process even if certain aspects of the IFR are enjoined by a court. With this consideration in mind, the Departments reiterate the statement on severability set forth in the NPRM. 86 FR 46921. That is, to the extent that any portion of the IFR is stayed, enjoined, not implemented, or otherwise held invalid by a court, the Departments intend for all other parts of the rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect. Thus, even if a judicial decision invalidating a portion of the IFR results in a partial reversion to the current regulations or to the statutory language itself, the Departments intend that the rest of the IFR continue to operate in tandem with the reverted provisions, if at all possible, and subject to the discretion permitting USCIS to decide to issue individuals NTAs and refer noncitizens to ordinary section 240 removal proceedings.

## 3. Discretion and Phased Implementation

### a. Discretion

*Comments:* One commenter expressed concern about providing DHS with discretion to determine whether noncitizens who receive a positive credible fear determination are issued NTAs and referred directly to section 240 removal proceedings or instead have their cases retained by USCIS for Asylum Merits interviews. The commenter urged DHS to eliminate the discretion to place noncitizens in section 240 removal proceedings rather than in the new process. This commenter believes that such discretion is arbitrary, inconsistent, and will "exacerbate negative bias" in the decision-making process. Another commenter urged the Departments to reconsider the use of discretion because the commenter believes there is a high risk of inconsistent treatment among asylum seekers subject to the new process and asylum seekers who are placed in section 240 removal proceedings in the first instance.

*Response:* The Departments acknowledge the commenters' concerns but disagree that permitting DHS to continue to exercise its discretion to place noncitizens who establish a credible fear of persecution or torture directly into ordinary section 240

---

[93] *See* Executive Office of the President, OMB, OIRA, Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC65* (last visited Feb. 27, 2022).

IFR_AR_000840

removal proceedings before an IJ, as finalized in new 8 CFR 208.30(b), is arbitrary, inconsistent, or will exacerbate negative bias. Such discretion is needed because there may be circumstances in which it may be more appropriate for a noncitizen's protection claims to be heard and considered in the adversarial process before an IJ in the first instance (for example, in cases where a noncitizen may have committed significant criminal acts, engaged in past acts of harm to others, or created a public safety or national security threat). In addition, the Departments anticipate that DHS will also need to continue to place many noncitizens receiving a positive credible fear determination into ordinary section 240 removal proceedings while USCIS takes steps needed to allow for full implementation of the new process. Noncitizens who are placed into section 240 removal proceedings in the first instance will have access to the same procedural protections that have been in place for asylum adjudications for many years. Such exercise of discretion is similar to and in line with DHS's recognized prosecutorial discretion to issue an NTA to a covered noncitizen in expedited removal proceedings at any time after the covered noncitizen is referred to USCIS for a credible fear determination. *See Matter of E–R–M– & L–R–M–*, 25 I&N Dec. at 523. Moreover, USCIS asylum officers have experience with exercising discretion in various contexts, including in the adjudication of the asylum application itself, and, thus, will be well suited to exercise discretion in this context.

b. Phased Implementation

*Comments:* Some commenters expressed opposition to the phased rule implementation approach. One commenter asserted that a Federal district court has found that the practice of expediting cases for a particular subset of individuals may violate their rights, citing *Las Americas Immigrant Advocacy Center* v. *Trump*, 475 F. Supp. 3d 1194 (D. Or. 2020). Another commenter asserted that there is no justification for what the commenter viewed as the rule's preferential treatment for non-detained families over detained individuals and single adult women and men. Another commenter suggested a detailed plan for USCIS to conduct a pilot project allowing asylum seekers to opt into the new process and then have USCIS collect evidence about the fairness and expeditiousness of the rule before it becomes final. Alternatively, the commenter suggested providing a preliminary period during

which the rule would be in effect followed by a "stay" of the regulatory changes to ensure that the new process is producing fair and expeditious decisions.

*Response:* As discussed in greater detail in the costs and benefits analysis of this rule and its impacts on USCIS, as required under Executive Orders 12866 and 13563, USCIS has estimated that it will need to hire new employees and spend additional funds to fully implement the new Asylum Merits process. If the number of noncitizens placed into expedited removal and making successful fear claims increases, the cost to implement the rule with staffing levels sufficient to handle the additional cases in a timely fashion would be substantially higher. Until USCIS can support full implementation, USCIS will need to continue to place a large percentage of individuals receiving a positive credible fear determination into ordinary section 240 removal proceedings in the first instance.

Current resource constraints will prevent the Departments from immediately achieving their ultimate goal of having the protection claims of nearly all individuals who receive a positive credible fear determination adjudicated by an asylum officer in the first instance. The Departments are also accounting for existing and emerging priorities impacting the workload of the USCIS Asylum Division, such as the affirmative asylum caseload and the streamlined asylum application processing of certain Afghan parolees as described in section 2502(a) of the Extending Government Funding and Delivering Emergency Assistance Act.[94] The Departments believe that, to fully implement the rule, additional resources will be required. The Departments therefore will expand use of the new Asylum Merits process in phases, as the necessary staffing and resources are put into place.

While the Departments acknowledge the commenters' recommendations that the Departments proceed with a pilot project or have regulatory changes take effect for a limited time, the Departments believe that the phased implementation approach is better suited for this new process. A phased implementation will allow the Departments to begin employing the new process in an orderly and controlled manner and for a limited

number of cases, giving USCIS the opportunity to work through operational challenges and ensure that each noncitizen placed into the process is given a full and fair opportunity to have protection claims presented, heard, and properly adjudicated in full conformance with the law. Phased implementation will also have an immediately positive impact in reducing the number of individuals arriving at the Southwest border who are placed into backlogged immigration court dockets, thus allowing the Departments to more quickly adjudicate some cases. Phased implementation will also ensure that EOIR is able to dedicate IJs to the streamlined section 240 removal proceedings, which will require available docket space to meet these proceedings' scheduling requirements.

Given limited agency resources, the Departments anticipate first implementing this new process for only a limited number of noncitizens who receive a positive credible fear determination after the effective date of this rule. The Departments believe this is necessary because USCIS capacity is currently insufficient to handle all referrals under this new process. The Departments also anticipate limiting referrals under the initial implementation of this rule to noncitizens apprehended in certain Southwest border sectors or stations, as well as based on the noncitizen's final intended destination (*e.g.,* if the noncitizen is within a predetermined distance from the potential interview location). As the USCIS Asylum Division gains resources and builds capacity, the Departments anticipate that additional cases could be considered for processing pursuant to this phased implementation.

The Departments also disagree that the decision in *Las Americas* precludes a phased implementation of the IFR. The relevant part of that decision addressed only whether the adoption of a separate policy constituted "final agency action" that could be challenged under the APA. 475 F. Supp. 3d at 1216. The decision did not purport to prohibit agencies from implementing regulatory programs in phases.

Overall, the Departments will work together to ensure that both agencies have capacity as this rule's implementation proceeds. For example, if EOIR does not have additional available docket space, USCIS will not expand the rule's application at that point.

---

[94] *See* Public Law 117–43, sec. 2502, 135 Stat. 344, 377 (2021); DHS, DHS Announces Fee Exemptions, Streamlined Processing for Afghan Nationals as They Resettle in the U.S. (Nov. 8, 2021), *https://www.dhs.gov/news/2021/11/08/dhs-announces-fee-exemptions-streamlined-processing-afghan-nationals-they-resettle.*

IFR_AR_000841

### 4. Comments on Immigration Court Inefficiencies and Bottlenecks

*Comments:* Some commenters suggested several ways to address inefficiencies and bottlenecks, such as quickly filling existing positions, surging staffing to the courts, and requesting funding from Congress to increase the number of immigration court interpreters, support staff, IJs, BIA legal and administrative staff, and BIA members. Additionally, these commenters suggested pre-hearing requirements to narrow issues for trial and to create a process to advance cases stuck in the court backlog.

*Response:* The Departments acknowledge the commenters' suggestions and recommendations to help improve the immigration adjudication process as a whole. The commenters' suggestions regarding the hiring process, staff surges, and increased funding are beyond the scope of this rulemaking. However, DOJ has already implemented or is currently implementing a number of measures referenced by the commenters, as described below. For example, DOJ has reduced the average IJ hiring process from 742 days (over 2 years) in 2017 to 8 to 10 months at present. Upon receipt of qualified applicants from the Office of Personnel Management ("OPM"), DOJ immediately begins assessment of the applicants. DOJ also consistently meets its internal deadlines for this process. As a result of these efforts, as of October 2021, DOJ had hired 65 new IJs in FY 2021, bringing the total number of IJs to 559. *See* EOIR, Adjudication Statistics: Immigration Judge (IJ) Hiring (Jan. 2022), *https://www.justice.gov/eoir/ page/file/1242156/download.* DOJ continues to focus on filling all vacancies as expeditiously as possible.

DOJ has consistently requested increased funding for additional authorized positions. In its FY 2022 budget request, DOJ requested an additional 600 authorized positions, to include 300 attorney positions. Of the 300 attorney positions, DOJ anticipates hiring 100 new IJs and support staff. *See* DOJ, FY 2022 Budget and Performance Summary: Executive Office for Immigration Review (Aug. 20, 2021), *https://www.justice.gov/jmd/page/file/ 1399026/download.* DHS also requested funding appropriations to meet the increased workload in the immigration courts and ameliorate staffing budgetary shortfalls. For FY 2022, DHS requested 100 additional ICE litigator positions to prosecute the removal proceedings initiated by DHS, consistent with 6 U.S.C. 252(c). *See* DHS, ICE Budget Overview: FY2022 Congressional

Justification at ICE–O&S–22, *https:// www.dhs.gov/sites/default/files/ publications/u.s._immigration_and_ customs_enforcement.pdf.*

In new 8 CFR 1240.17(f)(1)–(3), the IFR establishes certain pre-hearing requirements for individuals in streamlined section 240 proceedings. Establishing pre-hearing requirements for all cases, however, is beyond the scope of this rulemaking. DOJ reiterates that IJs may issue orders for pre-hearing statements. 8 CFR 1003.21(b), (c). Further, EOIR's case flow processing model, which applies to certain non-detained cases with representation, incorporates shorter matter hearings or pre-trial conferences for cases that are not yet ready for trial, as appropriate. *See* EOIR, *PM 21–18: Revised Case Flow Processing Before the Immigration Courts* (Apr. 2, 2021), *https:// www.justice.gov/eoir/filing-deadlines- non-detained-cases; see also* EOIR, *DM 22–04: Filing Deadlines in Non-Detained Cases* (Dec. 16, 2021), *https:// www.justice.gov/eoir/book/file/ 1456951/download* (amending *PM 21– 18*).

### F. Statutory and Regulatory Requirements

#### 1. Impacts and Benefits (E.O. 12866 and E.O. 13563)

##### a. Methodology

*Comments:* A commenter referenced the NPRM statement that the agencies cannot accurately estimate the benefits to the agencies. Additionally, the commenter referenced several specific cost estimates and case numbers from the NPRM and reasoned that the numbers are now incorrect because more cases have been added since then, causing an increase in cost and resulting in less financial efficiency for the rule.

*Response:* USCIS acknowledges the increasing backlog and agrees that it can have an impact on credible fear asylum applicants, their families, and support networks. As stated in the NPRM, this rule is expected to slow the growth of EOIR's backlog and allow EOIR to work through its current backlog more quickly. First, the rule will allow DHS to process more noncitizens encountered at or near the border through expedited removal—rather than placing them into section 240 removal proceedings—thereby quickly and efficiently securing removal orders for those who do not make a fear claim or who receive a negative credible fear determination. Second, this rule is estimated to reduce EOIR's overall credible fear workload by at least 15 percent. This estimate is based on the average of EOIR asylum grant data over

the past five years for cases originating with a credible fear claim.[95] Under this IFR, grants of asylum for such cases would generally be made by USCIS without involvement by EOIR (setting aside those cases in which asylum is granted after referral to a streamlined section 240 proceeding). Because the Departments expect that USCIS's asylum grant rate will be approximately the same as EOIR's, approximately 15 percent of cases originating in credible fear interviews will no longer contribute to EOIR's workload. Third, the above calculation sets a lower bound on EOIR's expected workload reduction, as it does not account for efficiencies that may be realized in cases that are referred to EOIR for streamlined section 240 proceedings. In these three ways, the rule will enable IJs to focus efforts on other high-priority work, including backlog reduction. Moreover, for noncitizens who are placed into the process established by this IFR, the Departments expect that asylum decisions will be reached faster than if they were to go through the current process with EOIR.

Unfortunately, not all benefits can be quantified at this time, as the Departments acknowledged in the NPRM and affirm in this IFR. Benefits driven by increased efficiency would enable some asylum-seeking individuals to move through the asylum process more expeditiously than through the current process, with timelines potentially decreasing significantly, thus promoting both human dignity and equity. Adjudicative efficiency gains and changes to the regulatory standard for consideration for parole could lead to individuals spending less time in detention, which would benefit the Government, considering its limited resources and inability to detain all those apprehended, as well as the affected individuals, who would be able to continue to prepare for and pursue relief or protection outside the confines of a detention setting.

##### b. Population

*Comments:* A commenter asserted that the 75,000 to 300,000 range of

---

[95] *See supra* note 57 (discussing IJs' and asylum officers' similar approval rates on the merits of the asylum claim). Based on the five-year (FY 2017 through FY 2021) average, an estimated 15 percent of the total number of EOIR asylum cases completed originating from credible fear screening were granted asylum. *See* EOIR, Adjudications Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 19, 2022), *https://www.justice.gov/eoir/page/file/ 1062976/download.* Calculation: FY 2017 to FY 2021 grant rates (14.02 percent) + (16.48 percent) + (15.38 percent) + (16.60 percent) + 14.32 percent)/ 5 = 15 percent average (rounded).

IFR_AR_000842

people cited in the NPRM who would receive credible fear determination does not include the "2019 DHS expansion of the expedited removal process to the full extent authorized by statute."

*Response:* The Departments disagree that the population cited in the NPRM underestimates the number of people who would receive credible fear determinations. Although there is no way to predict exact future filing volumes, USCIS determined the population expected to be affected by this rule to be the average number of credible fear completions processed annually by USCIS (71,363, *see* Table 3). However, as changes in credible fear cases and asylum in general can be driven by multiple factors that are difficult to predict, USCIS provided estimates for potential populations above and beyond the current number of annual credible fear completions. At present, the estimated lower bound of 75,000 is greater than current annual average of completions, and USCIS has estimated a maximum population of 300,000 people who could be impacted to account for variations and uncertainty in the future population. Although the 2019 DHS expansion of the expedited removal process is currently in place, President Biden, in his E.O. on Migration, has directed DHS to consider whether to modify, revoke, or rescind the expansion. It is unknown when or if the expansion would be rescinded or what other factors outside of this rulemaking may impact the size of this population. Therefore, the Departments have done their best to provide estimates at varying potential population levels.

### c. Costs or Transfers

#### i. Impacts on the Credible Fear Asylum Population and Support Networks

#### Fees

*Comments:* Several commenters stated that the United States has a legal obligation to protect those seeking asylum, and some stated that asylum applications should never require a fee. Additionally, many commenters said fee increases disproportionately impact low-income immigrants and vulnerable populations, including gender-based violence survivors. Other commenters stated that increased fees would financially harm noncitizens seeking asylum and create a barrier for many applicants. An individual commenter suggested that the fee-based services of USCIS would endanger the freedoms of U.S. citizens.

*Response:* USCIS currently does not charge a fee to apply for asylum. This rule is not requiring low-income

noncitizens or other vulnerable populations to pay a fee for their asylum application to be adjudicated. Additionally, fee waivers are currently available for an applicant who cannot afford to pay to apply for an immigration benefit that requires a fee. The provisions of this IFR are not expected to impact any applicant who entered the United States legally and is seeking to obtain immigration benefits through the appropriate processes or any natural-born or naturalized U.S. citizen not part of an asylum applicant's support network.

*Comments:* Several commenters referenced the rule's statement that a significant investment of resources will be necessary to build up the capacity of USCIS to make this new rule fully operational. Several commenters urged DHS to secure the necessary resources from Congress to the extent possible, rather than through increased fees for applicants.

*Response:* The Departments acknowledge these comments and the concern they show for the funding of this rule. As the commenters state, fees are necessary for USCIS to collect to pay for the work USCIS performs in adjudicating applications and petitions for immigration benefits. USCIS acknowledged in the NPRM that, if this rule were to be funded through a future fee rule, it would increase fees by an estimated weighted average between 13 percent and 26 percent, depending on volume of applicants. 86 FR 46937. This estimated increase would be attributable to the implementation of the asylum officer portions of the proposed rule only. USCIS conducts notice-and-comment rulemaking to raise fees and increase revenue for such staffing actions. Although the substance of the future fee rule is outside of the scope of this rule, USCIS currently does not charge a fee to apply for asylum. USCIS is exploring all options to provide funding for this rule.

#### Other Impacts

*Comments:* A commenter expressed concern that the potential for more expedited denials of applications risks making some asylum seekers less likely to receive employment authorization while their cases are pending.

*Response:* This rule is intended to improve the Departments' ability to consider the asylum claims of individuals encountered at or near the border more promptly while ensuring fundamental fairness. Faster processing will lead to timelier case completions for asylum claims, including both approvals and denials. Employment authorization is a discretionary benefit

that USCIS may grant to those who qualify. This rule does not change the requirements for employment authorization or for asylum, but it may change the amount of time some applicants' cases remain pending. Applicants whose asylum claims are approved can work immediately.

*Comments:* Multiple commenters asserted that the proposed rule will do little to address the backlog of cases or improve efficiency. Other commenters argued that the rule would divert already scarce agency resources away from noncitizens who submit affirmative asylum applications in addition to unaccompanied noncitizen minors, over whose asylum claims USCIS has initial jurisdiction. Another commenter expressed concern that, if USCIS shifted experienced asylum officers into this new role, it would slow down existing caseloads due to less experienced new hires.

*Response:* The Departments disagree with the criticisms from these commenters. This rule will allow EOIR to focus efforts on high-priority work and will likely contribute to EOIR's efforts to reduce its substantial current backlog over time. Ultimately, EOIR will not see the cases in which USCIS grants asylum, which the Departments estimate as at least a 15 percent reduction in EOIR's overall credible fear workload. Over time, this rule stands to reduce the backlog of cases pending in immigration courts and will enable faster processing of cases originating in credible fear screening—whether asylum is granted or denied—than if they were to go through the current process with EOIR. USCIS has estimated that it will need to hire approximately 800 new employees to fully implement the proposed asylum officer interview and adjudication process to handle approximately 75,000 cases annually. USCIS will not shift asylum officer resources from their current workload to implement this program but has explained how it will hire, train, and deploy staff specifically dedicated to this program in Section IV.B.1.b of this preamble.

Although addressing the affirmative asylum backlog is outside the scope of the rulemaking, the Departments acknowledge the importance of doing so and note that USCIS has taken other actions to address this priority. These include expanding facilities; hiring and training new asylum officers; implementing operational changes to increase interviews and case completions and reduce backlog growth; establishing a centralized vetting center; and working closely with technology partners to develop several tools that

IFR_AR_000843

streamline case processing and strengthen integrity of the asylum process.[96] In addition, on September 30, 2021, Congress passed the Extending Government Funding and Delivering Emergency Assistance Act, which provides dedicated backlog elimination funding to USCIS for ''application processing, the reduction of backlogs within asylum, field, and service center offices, and support of the refugee program.'' Public Law 117–43, sec. 132, 135 Stat. at 351.

*Comment:* A commenter asserted that biometric information collection for both EAD submissions and asylum applications is duplicative, time-consuming, and costly due to the relatively low number of asylum offices throughout the country.

*Response:* Biometrics information is collected on every individual associated with a Form I–589 filing, and for the Form I–765(c)(8) category, USCIS started collecting biometrics, and the associated $85 biometrics service fee, in October 2020. This rule does not change biometric collection requirements related to Form I–589 or Form I–765. USCIS may still have to require applicants to attend an ASC appointment or otherwise obtain their biometrics in support of the asylum application following a positive credible fear determination but is working to obtain the ability to reuse the biometrics already captured by other DHS entities for the asylum application before USCIS.

*Comments:* One commenter said that DHS failed to consider the long-term financial and procedural impact on fee-paying legal immigrants who pay USCIS petition fees and that this proposed rule unfairly shifts the financial burden from the U.S. taxpayer (DOJ) to lawful immigrants (USCIS). The commenter asserted that it is in the best interest of those who pay fees to have the money mostly spent on adjudicating their petitions, not on humanitarian interests. The commenter argued that the United States should have funded the operation, not lawful immigrants, and that funding could have been used on projects such as e-filing systems and process improvements instead. The commenter asserted that the proposal harms fee-paying immigrants, such as those with master's and doctoral degrees in the STEM (science, technology, engineering, and mathematics) fields who are needed for the United States' international competitiveness. The commenter suggested that DOJ hire more IJs or that funding should come from Congress or by charging asylum seekers in expedited removal a fee that fully covers the cost to adjudicate their case.

*Response:* USCIS already performs humanitarian work through credible and reasonable fear screenings, asylum interviews, and refugee processing for which the costs are covered through fees paid by applicants and petitioners. Should this rule be funded through a future fee rule, the financing would be no different. This rule is not requiring fee-paying immigrants with master's and doctoral degrees in the STEM field to take on the full burden of this new program. Although some applicants who fall into these categories may face increased fees under a future fee rule, historically, changes to fees are spread across a variety of applicants and petitioners and are fully outlined in a notice-and-comment rulemaking.

*Comment:* A commenter asserted that the NPRM would cause significant harm to its mission and programming and to the clients it serves. It stated that it will need to make significant changes in its programming to provide meaningful representation and pro bono services and may have to divert more resources to represent asylum seekers in appeals. Additionally, the commenter asserted, the fast-tracking of interviews and the limitations on attorney representation during the interviews would significantly hinder its ability to provide legal services in a timely and meaningful manner. As a result, it would have a smaller population it could represent in the United States. Without access to counsel, it asserted, asylum seekers would be less likely to prevail on the merits of their claims. The commenter alleged that the consequences of these proposed changes would be devastating for tens of thousands of refugees whom the United States has committed to protecting.

*Response:* The Departments acknowledge the commenter's concern but disagree that this rule will negatively impact asylum seekers in the manner the commenter predicts. This rule is intended to improve the Departments' ability to consider the asylum claims of individuals encountered at or near the border more promptly while ensuring fundamental fairness. This rule does not change the requirements for asylum applicants or the evaluation criteria that are used during adjudication.

Prompt adjudication of these claims will benefit asylum seekers, the Departments, and the public. The Departments understand that applicants will need time to review their applications and supporting documentation, consult with representatives, and prepare for their Asylum Merits interviews before USCIS asylum officers. At the same time, the underlying purpose of this rulemaking is to establish a process for promptly adjudicating cases that heretofore have been drawn out for months or even years before EOIR. To balance the efficiency goals of the present rule with the fairness and due process concerns raised by commenters and shared by the Departments, the Departments are clarifying at 8 CFR 208.9(a)(1) that there will be a minimum of 21 days between the service of the positive credible fear determination on the applicant and the date of the scheduled Asylum Merits interview. This time frame mirrors the time frame provided to applicants in the affirmative asylum process, where asylum interviews are generally scheduled, and interview notices are mailed to applicants, 21 days in advance of the asylum interview date. This rule does not limit access to counsel for asylum applicants. To the contrary, 8 CFR 208.9(b) provides that ''[t]he applicant may have counsel or a representative present'' at the asylum interview, and 8 CFR 208.9(d)(1) provides the applicant's representative an opportunity to make a statement, comment on the evidence presented, and ask follow-up questions.

Moreover, the Departments are forgoing the IJ review procedure proposed by the NPRM. Rather, applicants who are not granted asylum after a hearing conducted by the asylum officer will be placed in streamlined section 240 removal proceedings. Although these proceedings will be substantially streamlined relative to ordinary section 240 proceedings, the Departments have designed a process that is intended to facilitate and preserve access to counsel and ensure that noncitizens receive a full and fair hearing.

First, noncitizens subject to these procedures who have not secured counsel by the time of their Asylum Merits interview will continue to have a meaningful opportunity to secure counsel during removal proceedings. The IFR provides for a 30-day gap between the asylum officer's decision not to grant asylum and the noncitizen's master calendar hearing in immigration court, during which time the noncitizen may seek counsel. At the master calendar hearing, IJs must advise unrepresented noncitizens of their rights in removal section 240 removal proceedings, including their right to

[96] *See* USCIS, *Backlog Reduction of Pending Affirmative Asylum Cases: Fiscal Year 2021 Report to Congress* (Oct. 20, 2021), *https://www.dhs.gov/sites/default/files/2021-12/USCIS%20-%20Backlog%20Reduction%20of%20Pending%20Affirmative%20Asylum%20Cases.pdf.*

IFR_AR_000844

representation and the availability of pro bono legal services, and provide a list of pro bono legal service providers. INA 240(b)(4), 8 U.S.C. 1229a(b)(4); 8 CFR 1240.10. The noncitizen will have an additional 30 days before the status conference to seek counsel without needing to request a continuance. A noncitizen who remains unrepresented at the status conference may request a continuance for good cause shown to secure counsel and may receive such continuances for up to an additional 30 days. *Matter of C–B–,* 25 I&N Dec. at 889 (''In order to meaningfully effectuate the statutory and regulatory privilege of legal representation . . . , the [IJ] must grant a reasonable and realistic period of time to provide a fair opportunity for a respondent to seek, speak with, and retain counsel.''). The IFR permits further continuances to secure counsel in appropriate circumstances even under the rule's heightened continuance requirements, which apply after 30 days of continuances have been granted. *See, e.g., Usubakunov,* 16 F.4th at 1305 (denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to violation of his statutory right to counsel). Accordingly, the IFR provides a significant and reasonable amount of time for noncitizens to obtain counsel and allows for continuances to secure representation in appropriate circumstances.

Second, the IFR recognizes that a noncitizen might not obtain counsel before the beginning of proceedings and therefore allows for continuances or extensions of filing deadlines where counsel needs additional time to prepare, so long as counsel demonstrates that the need for the continuance or extension satisfies the applicable standard. The rule also provides flexibility to counsel by allowing noncitizens to file additional documents and supporting evidence after the filing deadline when certain conditions are met.

Third, the rule provides a meaningful opportunity for both represented and unrepresented noncitizens to present their claims during streamlined section 240 removal proceedings. The rule is consistent with IJs' duty to develop the record, and various provisions of the rule particularly enable IJs to do so in cases involving pro se respondents. In cases where the noncitizen is represented, the IFR is designed to streamline proceedings by narrowing the issues to be adjudicated, which the Departments anticipate will benefit all parties and their counsels as well as EOIR.

ii. Impacts on U.S. Workers, Companies, Economy

Approximately five commenters provided specific feedback about the impacts on U.S. workers, companies, and the economy.

*Comments:* A commenter expressed concern about the fiscal impact on American taxpayers and stated that the proposed rule is not clear about how USCIS will cover the costs related to the rule. Another commenter requested that DHS provide estimates of the proposal's impact on the number of immigrants and asylum seekers intending to enter the country and the costs associated with any increased immigration. The commenter also requested an estimate of how much the humanitarian effort of accepting asylees would cost the average U.S. citizen and expressed concern about immigration's impact on the country's limited financial resources.

*Response:* The work performed by USCIS is primarily paid for through fees collected from applicants or petitioners requesting immigration or naturalization benefits.[97] USCIS acknowledged in the NPRM that, if this rule were to be funded through a future fee rule, it would increase fees by an estimated weighted average of between 13 percent and 26 percent, depending on volumes of applicants. 86 FR 46937. USCIS conducts notice-and-comment rulemaking to raise fees and increase revenue for such staffing actions. Although speculating on future fees is outside of the scope of this rule, USCIS currently does not charge a fee to apply for asylum. USCIS is exploring all options to provide funding for this rule.

The population expected to be affected by this rule is the average number of credible fear completions processed annually by USCIS (71,363, *see* Table 3), split between an average of 59,280 positive-screen cases and 12,083 negative-screen cases. This can be considered the maximum ''encompassing'' population that could be impacted. However, the Departments take into consideration larger populations to account for variations and uncertainty in the future population. Regarding the costs associated with increased immigration, this rule focuses on the direct costs to USCIS related to staffing needs to absorb the new workload it will take on from EOIR. Further, the Departments recognize the role of support networks, which could include public and private entities and family and personal friends,

legal services providers and advisors, religious and charity organizations, State and local public institutions, educational providers, and non-governmental organizations (''NGOs''), but it is not possible to place a monetary value on such support. The rule does not change the substantive eligibility standard for asylum or the evidentiary requirements. Therefore, USCIS has no reason to expect that the rule will have a significant effect on the number of individuals who may be granted asylum. Additionally, individuals whose asylum claims are pending are not provided any special humanitarian aid funded by U.S. taxpayers.

*Comments:* Several commenters speculated that, in the current economic situation of high inflation and low job-growth, the influx of working-age immigrants may create wage decreases impacting low-wage American workers. Another commenter cited a study and the testimony of a former member of Congress indicating that immigrants with low education and skills may compete with the most vulnerable Americans, which would assertedly lower wages and benefit businesses.

*Response:* The commenters suggesting that increased immigration, particularly of low-skilled immigrants, to the United States may adversely impact the wages of low-income Americans provide no evidence indicating such an impact would be the most likely outcome of this rulemaking. Furthermore, these comments blur the distinction between legal and illegal immigration and provide little evidence on the impact of asylum seekers in particular on wages.[98]

Faster adjudications for applicants who receive a positive credible fear determination mean they may enter the labor market sooner under this rule than they would currently. Conversely, some asylum seekers that currently enter the labor market with a pending asylum application will no longer enter the labor market under this rule if they receive a negative decision on their asylum claim at an earlier date. Therefore, at this time, it is unknown exactly how this rule will impact employment authorization for this population or what impacts such authorizations would have on the labor market. Because the ''(c)(8)'' EAD does not include or require, at the initial or

---

[97] *See* USCIS, Budget, Planning and Performance (May 28, 2021), *https://www.uscis.gov/about-us/budget-planning-and-performance.*

[98] Economic research indicates that immigration in general has had little effect on the distribution of wages in the United States in recent decades. *See* Jane G. Gravelle, Cong. Research Serv., R46212, *Wage Inequality and the Stagnation of Earnings of Low-Wage Workers: Contributing Factors and Policy Options* (Feb. 5, 2020), *https://crsreports.congress.gov/product/pdf/R/R46212/3* (last visited Mar. 5, 2022).

IFR_AR_000845

renewal stage, any data on employment, and since it does not involve an associated labor condition application, we have no information on wages, occupations, industries, or businesses that may employ such workers. Therefore, USCIS cannot confirm the type of work that asylum seekers obtain or the wages they earn.

The Bureau of Labor Statistics ("BLS") publishes statistics on employment that can provide insight into the current economic situation. Total nonfarm payroll employment rose by 210,000 in November 2021, while the unemployment rate fell to 4.2 percent and the number of unemployed persons fell by 542,000 to 6.9 million.[99] BLS also publishes job openings, a measure of the unmet demand for labor. In November 2021, there were 10.6 million job openings.[100] Meanwhile, BLS' quarterly employment cost index shows that wages and salaries increased for civilian, private industry, and State and local government workers in September 2021.[101] The arguments that low job growth or the influx of working-age immigrants may create wage decreases impacting low-wage American workers are speculative and not supported by the data.

iii. Impacts on Federal Government

Impacts on U.S. Citizenship and Immigration Services

Approximately 15 submissions provided feedback about the impacts to USCIS.

*Comments:* Many commenters asserted that the proposed rule will do little to address case backlogs at either EOIR or USCIS and will require extensive resources from USCIS. Several commenters argued that the financial and administrative burden will shift from EOIR to USCIS. Multiple commenters expressed concern that resources will be drawn away from the current process in order to conduct training for and implement the new process, which will increase backlogs. Another commenter suggested that that newly hired asylum officers should be deployed to the existing asylum offices to reduce the already existing backlogs.

*Response:* EOIR's caseload includes a wide range of immigration and removal

cases. Allowing asylum officers to take on cases originating in the credible fear process is expected to reduce delays across all of EOIR's docket, as well as reduce the time it takes to adjudicate these protection claims. By shifting that caseload to USCIS, the rule will enable IJs to focus efforts on other high-priority work.

USCIS acknowledges that it will take time and money to hire and train new asylum officers, but it does not anticipate shifting current resources to do so. Hiring and training asylum officers is already a part of regular USCIS operations. USCIS does not anticipate increased backlogs as a direct result of this rule. As stated in the NPRM and in this IFR, there is the potential for backlogs to be mitigated, though USCIS cannot predict the timing and scope of such potential changes with accuracy. Staffing levels and priorities across the agency are continuously monitored and actions are taken as needed.

*Comments:* Several commenters asserted that training asylum officers would increase financial burden on USCIS. Additionally, multiple commenters reasoned that, since USCIS funds itself based on fees, and because fees will not be charged for this new process, USCIS will not have enough funding to cover training and implementation of the new rule. Several commenters expressed concern that the proposed rule's economic analysis did not state USCIS's ability to pay for the additional costs or address other impacts to USCIS, such as appeals or accessibility issues due to the limited number of asylum offices and the need for expanded teleconferencing technology for remote hearings.

*Response:* As outlined in the NPRM and affirmed in this IFR, this rule does have associated costs, but it also has benefits (*see* Table 1). As previously stated, if the medium- and high-volume bands of 150,000 and 300,000 asylum applicants were to be funded through a future fee rule, it would increase fees by an estimated weighted average of 13 percent and 26 percent respectively. This estimated increase would be attributable to the implementation of the asylum officer portions of the proposed rule only. USCIS conducts notice-and-comment rulemaking to raise fees and increase revenue for such staffing actions. USCIS is exploring all options to provide funding for this rule.

The Departments do not expect this rule to result in an increase in appeals or the number of individuals requiring access to an asylum office, but they do recognize that the timing of appeals and asylum interviews may change because

of this rule. As part of the estimated USCIS FY 2022 and FY 2023 funding requirements by volume of credible fear referrals (*see* Tables 7 and 8), USCIS included estimated costs associated with needs such as interpreter and transcription services, facilities, IT case management, and other contracts, supplies, and equipment. The Departments agree with the commenters that there will be expanded resourcing needs to implement this rule.

*Comments:* A commenter stated that moving the funding type from an appropriations-funded model to a fee-based enterprise model would result in USCIS's dependency on high fees to generate revenue.

*Response:* USCIS agrees generally that, if funding is sourced to fees, higher fees over time are necessary to generate revenue in line with costs, but disagrees that fee-based funding would generate a harmful dependency. USCIS relies on fees to fund almost all the work the agency performs. USCIS is exploring all options to provide funding for this rule. However, if the rule is to be funded through a future fee rule, it would increase fees by an estimated weighted average between 13 percent and 26 percent, depending on volumes of applicants.

*Comments:* A commenter stated that the rule does not make an appropriate comparison for the proposed new procedures. Specifically, the NPRM stated that USCIS would have to hire approximately 800 new employees and spend approximately $180 million to handle approximately 75,000 cases per year if the rule was implemented. The commenter said the rule improperly compares whether the proposed rule, backed with $180 million in new funding, would provide more fair and expeditious decisions than the existing system that receives no additional funding. The commenter said the appropriate comparison is whether the proposed rule, backed with $180 million in new funding, would provide more fair and expeditious decisions when compared with the existing system if the existing system were backed with $180 million in new funding.

*Response:* The Departments have determined that important procedural changes are needed to improve the system of asylum adjudication for cases originating in credible fear screening, and that simply adding more money to the existing procedures would not yield the same benefits in fairness and reduced delays. Implementing these important procedural changes will involve costs for, among other things, personnel and training. It is not possible

[99] BLS, The Employment Situation—November 2021 (Dec. 3, 2021), *https://www.bls.gov/news.release/archives/empsit_12032021.pdf* (last visited Feb. 27, 2022).

[100] BLS, Job Openings and Labor Turnover—November 2021 (Jan. 4, 2022), *https://www.bls.gov/news.release/archives/jolts_01042022.pdf* (last visited Feb. 27, 2022).

[101] BLS, Employment Cost Index—September 2021 (Oct. 29, 2021), *https://www.bls.gov/news.release/archives/eci_10292021.pdf* (last visited Feb. 27, 2022).

to place a monetary value on fairness and expeditiousness in the process of adjudicating the protection claims of noncitizens arriving at the border. However, to the extent that the $180 million amount referenced above would facilitate the implementation of the rule, the Departments believe that it will enable greater benefits in terms of fair and expeditious decisions than the same amount applied to the existing system.

Impacts on the Executive Office for Immigration Review

Approximately four submissions provided feedback about the impacts on EOIR.

*Comments:* A commenter worried that the proposed rule will do little address case backlogs and will require extensive resources from EOIR. Another commenter asserted that the proposed rule will further burden the immigration courts and create delays. A commenter argued that, although the proposed rule may limit the growth of the IJ docket, it does not offer any relief to IJs, and it merely moves some cases to USCIS, which already has a backlog of cases. A commenter was concerned that there is no reason to believe that conducting interviews in detention centers would be quicker than the EOIR process because doing so does not eliminate duplicative hearings and eliminates access to the courts.

*Response:* The rule will not directly change how cases that are already pending before EOIR are adjudicated. However, as stated in the NPRM, this rule is expected to slow the growth of EOIR's backlog and allow EOIR to work through its current backlog more quickly. First, the rule will allow DHS to process more noncitizens encountered at or near the border through expedited removal—rather than placing them into section 240 removal proceedings—thereby quickly and efficiently securing removal orders for those who do not make a fear claim or who receive a negative credible fear determination. Second, as explained above at Section IV.F.1.a of this preamble, this rule is estimated to reduce EOIR's overall credible fear workload by at least 15 percent. Third, the calculation described above sets a lower bound on EOIR's expected workload reduction, as it does not account for efficiencies that may be realized in cases that are referred to EOIR for streamlined section 240 proceedings. In these three ways, the rule will enable IJs to focus efforts on other high-priority work, including backlog reduction. The Departments agree that the interviews themselves may not take less time; however, the overall process for asylum applicants to apply, interview, and receive a decision will take less time. Adjudicative efficiency gains and revised parole guidelines for case-by-case consideration could lead to individuals spending less time overall in detention, which would benefit the Government, considering its limited resources and inability to detain all those apprehended, and the affected individuals, who would be able to continue to prepare for and pursue relief or protection outside the confines of a detention setting. Thus, as stated in the NPRM and in this IFR, there is the potential for backlogs to be mitigated, though we cannot predict the timing and scope of such potential changes with accuracy.

*Comments:* A commenter stated that, in the four months since the NPRM was drafted, the EOIR backlog grew by more than 100,000 cases, which is already larger than the number of cases (75,000) the proposed rule is intended to address. Further, the commenter argued that this expansion of duties would address only 5 percent of the overall immigration backlog and would require 27 percent of EOIR's overall budget.

*Response:* The Departments recognize the need to address the growing EOIR backlog, which is one of the catalysts for this rule. The NPRM developed three population bounds for credible fear screenings, ranging from 75,000 as a lower bound to 300,000 as an upper bound to account for possible variations in future years. 86 FR 46923. As stated, EOIR would not see the cases in which USCIS grants asylum, which the Departments estimate will result in at least a 15 percent reduction in the number of cases that would normally arrive at EOIR after a positive credible fear determination. Such efficiency improvements, in conjunction with streamlined review, could benefit applicants and the Government, though we cannot make exact predictions germane to these changes.

Other Comments on Impacts on the Federal Government

Approximately four submissions provided other comments on impacts on the Federal Government.

*Comments:* A commenter asserted that the emphasis on expedited removal and accompanying detention is likely to maintain or increase extremely high levels of unnecessary spending on detention.

*Response:* As stated in the NPRM and affirmed in this IFR, DHS will consider paroling detained individuals in the expedited removal process, on a case-by-case basis, consistent with the INA and relevant regulations and policies. Having considered all comments received on the issues of detention and parole, the Departments have determined that the current narrow standard should be replaced not with the standard proposed in the NPRM but with the standard of 8 CFR 212.5(b). That provision describes five categories of noncitizens who may meet the parole standard of INA 212(d)(5), 8 U.S.C. 1182(d)(5), based on a case-by-case determination, provided they present neither a security risk nor a risk of absconding: (1) Noncitizens who have serious medical conditions for which continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) noncitizens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) noncitizens whose continued detention is not in the public interest. Expanding the potential for parole out of custody for this population is expected to improve the Departments' ability to utilize expedited removal for a greater number and more diverse category of noncitizens, mitigate associated detention costs, and promote the dignity of asylum applicants.

iv. Other Comments on Costs or Transfers

Approximately three submissions provided other comments on costs or transfers.

*Comments:* A commenter stated that the proposed rule will be costly to noncitizens; ICE attorneys; judges and staff of the immigration courts and the BIA; the Office of Immigration Litigation in the Department of Justice, which will have to defend the denials of asylum and protection appeals in Federal courts; and judges and staff of the U.S. Courts of Appeals. Further, the commenter asserted that the proposed rule's economic analysis did not reflect costs to the Federal judiciary.

*Response:* The Departments do not expect this rule to be the cause of an increase in the number of appeals to the BIA or petitions for review before a U.S. Court of Appeals. Noncitizens who receive a negative credible fear determination may seek a de novo review of that determination by an IJ but otherwise have no opportunity for further appeal. *See* 8 U.S.C. 1225(b)(1)(B)(iii). The IFR does not change that. An applicant whose asylum claim is denied and who is ordered removed may appeal the decision to the BIA and further petition for review by a U.S. Court of Appeals. This rule does not change the current appeals process, does

IFR_AR_000847

nor is it expected to result in a greater number of BIA appeals or U.S. Court of Appeals petitions for review than would occur otherwise.

*Comments:* A commenter asserted that the rule would increase costs and time frames for various reasons: interview length will increase; asylum officers will be required to write a justification for the decision in cases where they do not grant asylum; transcripts of hearings will take longer to make; asylum officers will be required to read lengthy transcripts; applicants may unfairly be denied a chance to appeal if they have to understand and file a notice of appeal; IJs will have more paperwork; and counsel will routinely appeal cases in which the IJ denied a motion to allow for additional testimony and evidence.

*Response:* The Departments estimated the costs of transcription services, which are included in Table 8 as their own line item. USCIS does not currently estimate asylum interview times because each case is unique, and there are a variety of factors outside of this rulemaking that may impact the length of an interview. Asylum officers are already required to review all documentation submitted by and pertinent to an asylum applicant prior to an interview. Likewise, regardless of the decision being made, an asylum officer provides a justification for the decision, which is then reviewed. This rule does not change the requirements for asylum applicants or the evaluation criteria that are used during adjudication.

*Comment:* Several commenters said the proposed rule would create a "massive new USCIS infrastructure," the cost of which would be borne by other applicants for USCIS benefits.

*Response:* USCIS has estimated the staffing resources it will need to implement this rule at somewhere between 794 and 4,647 total new positions. USCIS acknowledged in the NPRM that if this rule were to be funded through a future fee rule, it would increase fees by an estimated weighted average between 13 percent and 26 percent, depending on volumes of applicants. USCIS is exploring all options to provide funding for this rule and will consider the overall costs borne by applicants for USCIS benefits in doing so.

*Comments:* A commenter requested that the proposed rule be funded by taxpayers.

*Response:* USCIS is exploring all options to provide funding for this rule. USCIS acknowledged in the NPRM that, if this rule were to be funded through a future fee rule, it would increase fees

by an estimated weighted average between 13 percent and 26 percent, depending on volumes of applicants. That estimate, however, does not preclude USCIS from considering other sources of funding, such as funding from taxpayers.

### d. Other Comments on Impacts and Benefits of the Proposed Rulemaking

*Comments:* Several commenters said the Departments did not analyze or discuss the likelihood that the proposed rule's revisions to the asylum process would encourage more noncitizens to seek asylum. For example, the Departments considered the administrative efficiencies expected to be gained from the rule and the expected benefits conferred upon non-citizens availing themselves of the asylum process through quicker adjudication timelines. But the Departments allegedly failed to analyze or discuss whether these changes to the asylum process would in fact encourage more noncitizens living abroad to make their way to the United States. The commenters asserted that an increase in noncitizens seeking to enter the United States will further drive up enforcement actions at the Southwest border and increase the statistical likelihood of non-meritorious asylum claims and illegal entry overall. The commenter argued that MPP, for example, achieved concrete results in managing asylum seekers attempting to cross the Southwest border, but claimed it was unclear whether the proposed rule would achieve even remotely the same results because the Departments failed to analyze this issue. At a minimum, the commenter said, the Departments should have addressed with specificity whether the proposed rule would be expected to decrease or increase the number of noncitizens attempting to travel to the United States to seek asylum and explain the basis for their conclusions.

*Response:* The Departments do not expect this rule to encourage or cause an increase in the number of individuals seeking asylum in the United States. As explained above, this rule is not expected to create any significant new incentives that would drive increased irregular migration. To the contrary, by reducing the amount of time a noncitizen can expect to remain in the United States with a pending asylum claim that originated in credible fear screening, the rule dramatically reduces a critical incentive for noncitizens not in need of protection to exploit the system. Although eligible individuals may be granted asylum sooner, ineligible individuals may be identified

and ordered removed more quickly. This rule does not change the substantive standard for asylum eligibility, and commenters have not identified any evident causal mechanism by which the rule as a whole, in context, would systematically and substantially incentivize more individuals to seek to enter the United States and pursue asylum.

### 2. Paperwork Reduction Act

*Comments:* A commenter requested eliminating Form I–589 in order to prevent asylum applicants from facing rejection, delays, or missing the deadline because the form was not correctly completed. The commenter argued that Form I–589 is burdensome for applicants to complete because it is technical and is written in and must be completed in English (although most asylum seekers have limited English proficiency). The commenter also stated that many asylum seekers do not have legal representation while filling out the form, often causing applicants to make mistakes and leave required questions blank, which could result in rejection of the application.

*Response:* The rule addresses the commenter's concern in that applicants with a positive credible fear determination who are placed into the Asylum Merits process will not have to file a Form I–589. Rather, such an applicant's credible fear record will serve as the asylum application. This process will also ensure applicants can apply for an EAD as soon as possible once the requisite time period has been met based on the date of service of a positive credible fear determination that serves as the date of filing of an asylum application. This streamlined process will not only promote efficiency but will also serve the interests of fairness and human dignity while simultaneously reducing the burden on asylum support networks and the public by ensuring asylum seekers have access to employment authorization as quickly as possible. Additionally, the rule will promote equity and due process by ensuring that individuals who are allowed to remain in the United States for the express purpose of having their asylum claims adjudicated after receiving a positive credible fear determination do not inadvertently miss the one-year filing deadline for asylum after being placed into section 240 removal proceedings and failing to defensively file their Form I–589 within the first 12 months. The requirement for affirmative asylum applicants and defensive asylum applicants in traditional section 240 removal

proceedings to submit a Form I–589 is outside the scope of this rulemaking.

### 3. Other Comments on Statutory and Regulatory Requirements

Approximately four submissions provided other feedback on statutory and regulatory requirements.

### National Environmental Policy Act ("NEPA")

*Comments:* Two commenters expressed concerns that the Departments have not adequately complied with NEPA, 42 U.S.C. 4321 *et seq.,* by failing to specifically consider certain potential environmental impacts of this rule. The comments focused primarily on population growth impacts. Commenters also raised broader concerns about the adequacy of DHS's NEPA compliance procedures as set forth in the relevant DHS implementing directive and instruction manual.

*Response:* Even assuming that such impacts are amenable to meaningful analysis in some contexts, any such analysis with respect to this rule would be fundamentally speculative in nature. This rule will not alter immigration eligibility criteria or result in an increase in the number of individuals who may be admitted or paroled into the United States. Rather, this rule changes specific procedures for adjudicating certain asylum claims pursuant to existing standards and shifts certain adjudicative responsibilities from DOJ to DHS. The commenters offered no basis to conclude that such changes would result in environmental impacts susceptible to meaningful analysis. This rule will not result in any major Federal action that will significantly affect the human environment and is not part of a larger action. As discussed in the NPRM and in the NEPA section below, the rule falls squarely within Categorical Exclusions A3(a) and A3(d) in *DHS Instruction Manual 023–01–001–01. See* DHS, *Instruction Manual 023–01–001–01, Revision 01, Implementation of the National Environmental Policy Act (NEPA) A–1, A–2* (Nov. 6, 2014), *https:// www.dhs.gov/sites/default/files/ publications/DHS_ Instruction%20Manual%20023-01-001- 01%20Rev%2001_ 508%20Admin%20Rev.pdf* (*Instruction Manual 023–01*). Commenters' broader concerns about the adequacy of DHS's NEPA compliance procedures are outside the scope of this rulemaking.

### Federalism

*Comments:* Commenters asserted that the proposed rule failed to properly consider and analyze federalism concerns. The commenters stated that, contrary to the Departments' conclusion that the proposed rule insubstantially impacts States and presents no substantial federalism concerns, the proposed rule would have wide-ranging effects on States' finances and resources. Finally, the commenters argued that the Departments should reassess federalism implications and republish the proposed rule.

In contrast, another commenter asserted that the proposed rule does not have sufficient federalism implications to require a federalism summary impact statement. The commenter referenced section 6 of Executive Order 13132 and stated that the proposed rule would not have direct effect on the States, the relationship between the National Government and the States, or the distribution of power and responsibilities among the different levels of government.

*Response:* The Departments did consider federalism concerns and determined that the rule would not have a substantial direct effect on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. 86 FR 46939. The Departments also determined the rule is within the purview and authority of the Departments and does not directly affect States. *Id.* As detailed above, the rule's primary consequences are to authorize a new procedure by which asylum claims originating in credible fear screening may be adjudicated and to authorize a revision to the regulations governing parole of noncitizens in expedited removal. The latter change will enable DHS to place more noncitizens encountered at or near the border into expedited removal, allowing such noncitizens who do not make a fear claim or who are determined not to have a credible fear of persecution or torture to be ordered removed more swiftly.

The Departments further note that immigration generally is an area of Federal regulation in which the Federal Government, rather than the States, has the preeminent role. *See, e.g., Toll* v. *Moreno,* 458 U.S. 1, 10–12 (1982) ("Our cases have long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders."); *Truax* v. *Raich,* 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *accord Sure-Tan, Inc.* v. *NLRB,* 467 U.S. 883, 897 (1984) (explaining that third parties lack a cognizable interest "in procuring enforcement of the immigration laws" against third parties in particular ways).

### Unfunded Mandate Reform Act ("UMRA")

*Comments:* Several commenters asserted that the proposed rule failed to analyze whether an unfunded mandate was being imposed on the States. The commenters wrote that the Departments addressed the requirements of the UMRA by denying any impact. However, the commenters raised concerns and provided examples of how States may incur costs associated with undocumented noncitizens or noncitizens who have been granted asylum. Further, the commenters said that, contrary to the requirements of the UMRA, the Departments failed to allow elected leaders in State, local, and Tribal government to provide input on the proposed rule.

*Response:* The Departments disagree with these comments. The UMRA is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. As stated in the NPRM, although this rule is expected to exceed the $100 million expenditure in any one year when adjusted for inflation ($169.8 million in 2020 dollars based on the Consumer Price Index for All Urban Consumers ("CPI–U")),[102] the Departments do not believe this rule would impose any unfunded Federal mandates on State, local, or Tribal governments, in the aggregate, or on the private sector. The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). The term "Federal intergovernmental mandate" means, in relevant part, a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See* 2

---

[102] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, By Month, *https://www.bls.gov/cpi/ tables/supplemental-files/historical-cpi-u- 202103.pdf* (last visited Feb. 28, 2022). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2020 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(258.811 − 152.383)/152.383] * 100 = (106.428/ 152.383) *100 = 0.6984 * 100 = 69.84 percent = 69.8 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.698 = $169.8 million in 2020 dollars.

IFR_AR_000849

U.S.C. 658(5). The term "Federal private sector mandate" means, in relevant part, a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See* 2 U.S.C. 658(7).

This rule does not contain such a mandate because it does not impose any enforceable duty upon any other level of government or private-sector entity. Any downstream effects on such entities would arise solely due to their voluntary choices and would not be a consequence of an enforceable duty. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under the UMRA.[103] The requirements of the UMRA, therefore, do not apply to this rule; accordingly, the Departments have not prepared an UMRA statement.

*Comments:* Several States asserted that States and local communities "disproportionately bear the social and economic costs of illegal immigration" because immigrants may arrive with "little to no warning," a criminal record, and little to no resources, with States ultimately bearing the cost of providing assistance for such individuals. Additionally, two commenters stated that noncitizens granted the legal status of asylee are entitled to certain public benefits, such as Social Security Income, Medicaid, welfare, food stamps, employment authorization, a driver's license, education, and healthcare, which Americans rely on.

*Response:* To the extent that States and local communities bear social or economic costs associated with what the commenters term "illegal immigration," or with noncitizens entering the United States without documentation and seeking asylum, those are not costs associated with this rule. As explained above, this rule is not expected to create any significant new incentives that would drive increased irregular migration. To the contrary, by reducing the amount of time a noncitizen can expect to remain in the United States with a pending asylum claim, the rule dramatically reduces a critical incentive for noncitizens not in need of protection to exploit the system.

Moreover, with regard to the asserted "social cost," commenters cited figures associated with noncitizens within the United States who are taken into ICE custody and thus improperly conflated the characteristics of such noncitizens with the characteristics of noncitizens encountered at or near the border

seeking asylum.[104] The commenters' assumptions and generalizations about the characteristics of noncitizens seeking asylum in the United States, including their assumptions about the extent to which this population relies on public services or support rather than private support networks, are not supported by evidence.

With regard to the asserted economic or fiscal cost, commenters referenced public benefits and public services, as well as State expenditures on border security and policing. However, as explained in more detail above, estimating the net fiscal impact of immigration is a complex calculation that requires consideration of not only Government expenditures on public benefits and services but also the various tax contributions the noncitizens in question make to public finances. Commenters did not provide information or data that would allow for a reliable estimation of the net fiscal impact associated with relevant populations or associated with any marginal change in relevant populations.[105]

The Departments have acknowledged the role of support networks in supporting noncitizens affected by this rule. Notably, this rule's reduction in adjudication delays may allow some noncitizens to become eligible for employment authorization—and enter the labor market—sooner under this rule than they currently would, which could

lead to less reliance on those support networks. Individuals granted asylum may work immediately.

Executive Order 13990

*Comments:* A commenter stated that the proposed rule does not mention Executive Order 13990, which requires agencies to use an interim estimate of the social costs of greenhouse gases when monetizing the value of changes regulations. The commenter said it is clear that the Departments did not refer to the Executive order during rulemaking, and that it is arbitrary and capricious for agencies to follow the Executive order only when the Biden Administration dislikes a policy.

*Response:* Executive Order 13990 seeks to protect public health and the environment and restore science to tackle the climate crisis. The Departments agree with the commenter that they did not mention or refer to E.O. 13990 for this rulemaking. This rule establishes a new procedure by which individuals who receive a positive credible fear determination may have their claims for asylum adjudicated by USCIS in the first instance, rather than EOIR bearing the full responsibility for adjudicating such claims. The changes made through this rule are within the purview and authority of the Departments and do not have any direct or substantial link to greenhouse gas emissions. Moreover, the rule does not otherwise relate to the subject matter of E.O. 13990.[106]

*G. Comments Outside of the Scope of This Rulemaking*

The Departments received many comments outside of the scope of this rulemaking. Because these comments are outside of the relevant scope, the Departments are not providing responses to these comments or addressing the issues raised in these comments. Comments from the public outside of the scope of this rulemaking concerned the following issues: USCIS maintaining its "Last In, First Out" affirmative asylum scheduling process to reduce incentives for applicants to file only for the purpose of obtaining an EAD; termination of the Deferred Action for Childhood Arrivals ("DACA") program; a recommendation that individuals seeking protection due to climate change should receive positive credible fear determinations and be granted asylum; policies relating to Afghan evacuees; the title 42 order

---

[103] *See* 2 U.S.C. 1502(1), 658(6).

[104] For example, commenters cited ICE's FY 2020 Enforcement and Removal Operations Report for the proposition that 90 percent of the noncitizens administratively arrested by ICE in FY 2020 had either criminal convictions or criminal charges pending. But, as that report makes clear, in FY 2020, due to the COVID–19 pandemic, ICE "narrowly focus[ed] enforcement efforts on public safety risks and individuals subject to mandatory detention based on criminal grounds." *See* ICE, *U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report* 4 (2020), *https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf.*

[105] Much of the information commenters did cite, moreover, was not specific to recently arrived noncitizens pursuing asylum claims but instead attempted to estimate—for example—total education costs associated with students with limited English proficiency, total education costs associated with all children living in a household with an undocumented person, or total costs certain States have incurred for law enforcement agencies conducting public safety and security activities near the Southwest border. *See* Marc Ferris and Spencer Raley, *The Elephant in the Classroom: Mass Immigration's Impact on Education, Federation for American Immigration Reform* 6 (Sept. 2016), *https://www.fairus.org/sites/default/files/2017-08/FAIR-Education-Report-2016.pdf* (last visited Feb. 28, 2022); Matthew O'Brien, Spencer Raley, and Jack Martin, *The Fiscal Burden of Immigration on United States Taxpayers, Federation for American Immigration Reform* 1 (2017), *https://www.fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf* (last visited Feb. 28, 2022).

[106] In addition, a district court has enjoined certain agencies from implementing Section 5 of E.O. 13990. *See Louisiana v. Biden,* No. 2:21–cv–1074, 2022 WL 438313 (W.D. La. Feb. 11, 2022), *appeal filed,* No. 22–30087 (5th Cir. Feb. 19, 2022).

IFR_AR_000850

issued by the Centers for Disease Control and Prevention; policies relating to immigration vetting and background checks; and other immigration and border management policies.

## V. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The APA generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** and allow for a period of public comment. 5 U.S.C. 553(b). The Departments published an NPRM on August 20, 2021, and allowed for a 60-day comment period. As detailed previously, in response to comments, the Departments have altered the rule in multiple ways. The Departments are in compliance with the APA's notice-and-comment requirements with respect to these changes because each change is a logical outgrowth of the proposals set forth in the NPRM, or a rule of agency procedure to which the notice-and-comment requirements do not apply, or both.

To satisfy the APA's notice-and-comment requirements, generally, the final rule an agency adopts must either meet an exception to the notice-and-comment requirements or be a logical outgrowth of the NPRM. *Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158, 174 (2007). The logical outgrowth test asks whether the purposes of notice and comment have been adequately served, such that there was "fair notice." *See id.* "In most cases, if the agency . . . alters its course in response to the comments it receives, little purpose would be served by a second round of comment." *Am. Water Works Ass'n* v. *EPA,* 40 F.3d 1266, 1274 (D.C. Cir. 1994). Accordingly, the "logical outgrowth" test normally is applied to consider "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *Id.* The changes made in this IFR were adopted in response to comments received and build logically on the NPRM. Thus, in these circumstances, "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc.* v. *Surface Transp. Bd.,* 584 F.3d 1076, 1079–80 (D.C. Cir. 2009) (quotation marks omitted).

Moreover, the APA's notice-and-comment requirements do not apply to "rules of agency . . . procedure." 5 U.S.C. 553(b)(A). A "'critical feature' of

the procedural exception 'is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'" *JEM Broad. Co., Inc.* v. *FCC,* 22 F.3d 320, 326 (D.C. Cir. 1994) (quoting *Batterton* v. *Marshall,* 648 F.2d 694, 707 (D.C. Cir. 1980)); *cf. Texas* v. *United States,* 809 F.3d 134, 176 (5th Cir. 2015) (holding that a rule is not procedural when it "modifies substantive rights and interests" (quoting *U.S. Dep't of Lab.* v. *Kast Metals Corp.,* 744 F.2d 1145, 1153 (5th Cir. 1984)). "In determining whether a rule is substantive, [a court] must look at [the rule's] effect on those interests ultimately at stake in the agency proceeding." *Neighborhood TV Co., Inc.* v. *FCC,* 742 F.2d 629, 637 (D.C. Cir. 1984). "Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive." *Nat'l Sec. Couns.* v. *CIA,* 931 F. Supp. 2d 77, 107 (D.D.C. 2013); *see Am. Hosp. Ass'n* v. *Bowen,* 834 F.2d 1037, 1051 (D.C. Cir. 1987). Moreover, "an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties." *James V. Hurson Assocs., Inc.* v. *Glickman,* 229 F.3d 277, 281 (D.C. Cir. 2000). Finally, although a procedural rule generally may not "encode[ ] a substantive value judgment or put[ ] a stamp of approval or disapproval on a given type of behavior," *Bowen,* 834 F.2d at 1047, "the fact that the agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one," *Glickman,* 229 F.3d at 282.

Notably, many of the revisions to the proposed rule do not alter individuals' rights or interests. *See JEM Broad.,* 22 F.3d at 326. Instead, the revisions relate to the procedure by which such claims shall be presented before the agencies, *see id.,* without encoding a substantive value judgment, *see Bowen,* 834 F.2d at 1047, other than the need for procedural efficiency, *see Glickman,* 229 F.3d at 282; *see also Lamoille Valley R. Co.* v. *I.C.C.,* 711 F.2d 295, 328 (D.C. Cir 1983) (holding that an order changing the schedule for an adjudication, including when parties were to submit briefing, was a procedural rule); *Elec. Priv. Info. Ctr.* v. *U.S. Dep't of Homeland Sec.,* 653 F.3d 1, 5 (D.C. Cir. 2011) (even "a rule with a 'substantial impact' upon the persons subject to it is not necessarily a substantive rule" (citing *Pub. Citizen*

v. *Dep't of State,* 276 F.3d 634, 640–41 (D.C. Cir. 2002)); *Ranger* v. *FCC,* 294 F.2d 240, 244 (D.C. Cir. 1961) (while holding that a rule was procedural, noting that "no substantive rights were actually involved by the regulation itself" even if "failure to observe it might cause the loss of substantive rights").

Although additional notice and comment are not required, the Departments acknowledge that they would benefit from the public's input on the provisions in this IFR as well as the IFR's implementation. However, the Departments also believe that the immigration system would benefit from rapid implementation of the rule, which is lawful given that the rule is a logical outgrowth of the NPRM and because the changes relate to procedural issues. The benefits of rapid implementation include the ability to begin allocating resources to implement the new process, including hiring asylum officers, which can take many months. Further, the benefit of additional public comment alongside practical experience with gradual implementation will aid the Departments in promulgating a future final rule. For these reasons, the Departments have decided to follow the NPRM with this IFR.

### B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, to the extent permitted by law, to proceed only if the benefits justify the costs. They also direct agencies to select regulatory approaches that maximize net benefits while giving consideration, to the extent appropriate and consistent with law, to values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. In particular, E.O. 13563 emphasizes the importance of not only quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility, but also considering equity, fairness, distributive impacts, and human dignity. All of these considerations are relevant here. OIRA within OMB has designated this IFR an economically significant regulatory action under sec. 3(f)(1) of E.O. 12866. Accordingly, OIRA has reviewed this regulation.

1. Summary of the Rule and Its Potential Impacts

As detailed previously, in response to comments, the Departments have

altered the rule in multiple ways from the NPRM. None of the revisions outlined in Section II.C of this preamble has led to revisions in the overall cost benefit analysis, which remains unchanged from the NPRM. However, relative to the NPRM, the changes in this IFR, such as the use of streamlined section 240 removal proceedings in place of the NPRM's IJ review procedure, may result in smaller overall operational efficiencies, as discussed below.

This rule changes and streamlines the overall adjudicatory process for asylum applications arising out of the expedited removal process. By reducing undue delays in the system, and by providing a variety of procedural safeguards, the rule protects equity, human dignity, and fairness.

A central feature of the rule changes the respective roles of an IJ and an asylum officer during proceedings for further consideration of asylum applications after a positive credible fear determination. Notably, IJs will retain their existing authority to review de novo the negative determinations made by asylum officers in a credible fear proceeding. In making credible fear determinations, asylum officers will return to evaluating whether there is a significant possibility that the noncitizen could establish eligibility for asylum, withholding of removal, or CAT protection for possible referral to a full hearing of the claim, and the noncitizen will still be able to seek review of that negative credible fear determination before the IJ.

Asylum officers will take on a new role of adjudicating the merits of protection claims made by some noncitizens who have received a positive credible fear determination, a role previously carried out only by IJs as part of a proceeding under section 240 of the INA. Noncitizens whose claims are not granted by an asylum officer will be referred to an IJ for a streamlined section 240 removal proceeding.

The population of individuals likely to be affected by this rule's provisions are individuals for whom USCIS completes a credible fear screening. The average annual number of credible fear screenings for FY 2016 through 2020 completed by USCIS is broken out as

59,280 positive credible fear determinations and 12,083 negative credible fear determinations, for a total of 71,363 individuals with credible fear determinations. DHS expects that this population will be affected by the rule in a number of ways, which may vary from person to person depending on (1) whether the individual receives a positive credible fear determination, and (2) whether the individual's asylum claim is granted by an asylum officer. In addition, because of data constraints and conceptual and empirical challenges, we can provide only a partial monetization of the impacts on individuals. For example, asylum seekers who establish credible fear may benefit from having their asylum claims adjudicated potentially sooner than they otherwise would. Those who are granted asylum sooner receive humanitarian protection from the persecution they faced in their country of origin on account of their race, religion, nationality, membership in a particular social group, or political opinion, and they have a possible path to citizenship in the United States. These outcomes obviously constitute a benefit in terms of human dignity and equity, but it is a benefit that is not readily monetized. Asylum seekers who establish credible fear may also benefit from cost savings associated with not having to incur filing expenses, as well as earlier labor force entry. The Departments have estimated this impact on a per-person workday basis.

As it relates to the Government and USCIS costs, the planned human resource and information-related expenditures required to implement this rule are monetized as real resource costs. These estimates are developed along three population bounds, ranging from 75,000 to 300,000 credible fear screenings to account for possible variations in future years. Furthermore, the possibility of parole for more individuals—applied on a case-by-case basis—could lower the cost to the Government per person processed. The Departments have also estimated potential employment tax impacts germane to earlier labor force entry, likewise on a per-person workday basis. Such estimates made on a per-person basis reflect a range of wages that the

impacted individuals could earn. The per-person per-workday estimates are not extended to broader monetized impacts due to data constraints.

An important caveat for the possible benefits to asylum applicants who establish a credible fear introduced above and discussed more thoroughly in this analysis is that it is expected to take time to implement this rule. Foremost, the Departments expect the resourcing of this rule to be implemented in a phased approach. Further, although up-front expenditures to support the changes from this rule based on planning models are high, the logistical and operational requirements of this rule may take time to fully implement. For instance, once USCIS meets its staffing requirements, time will be required for the new asylum staff to be trained for their positions, which may occur over several months. As a result, the benefits to applicants and the Government may not be realized immediately.

To develop the monetized costs of the rule, the Departments relied on a low, midrange, and high population bound to reflect future uncertainty in the population. In addition, resources are partially phased in over FYs 2022 and 2023, as a full phasing in of resources, potentially up to FY 2026, is not possible at this time because of budget constraints and timing of hiring, and because the Departments do not have fully developed resource projections applicable to this rule stretching past FY 2023. The average annualized cost of this rule ranges from $180.4 million to $1.0 billion, at a 3 percent discount rate, and from $179.5 million to $995.8 million, at a 7 percent discount rate. At a 3 percent discount rate, the total 10-year costs could range from $1.5 billion to $8.6 billion, with a midpoint of $3.9 billion. At a 7 percent discount rate, the total 10-year costs could range from $1.3 billion to $7.0 billion, with a midpoint of $3.2 billion.

A summary of the potential impacts of this IFR are presented in Table 1 and are discussed in more detail more in the following analysis. Where quantitative estimates are provided, they apply to the midpoint figure (applicable to the wage range or the population range).

TABLE 1—SUMMARY OF THE EXPECTED IMPACTS OF THE INTERIM FINAL RULE

| Entities impacted | Annual population estimate | Expected impacts |
|---|---|---|
| Individuals who receive a positive credible fear determination. | USCIS provides a range from 75,000 to 300,000 total individuals who receive credible fear determinations. In recent years (see Table 3), approximately 83.1 percent of individuals screened have received a positive credible fear determination. | • Maximum potential cost-savings to applicants of Form I–589 of $364.86 per person.<br>• Potential cost savings to applicants of Form I–765 of $370.28 per person.<br>• Potential early labor earnings for asylum applicants who obtain an EAD of $225.44 per person per workday. This impact could potentially constitute a transfer from workers in the U.S. labor force to certain asylum applicants. We identified two factors that could drive this impact of early entry to the labor force: (i) More expeditious grants of asylum, thereby authorizing work incident to status; and (ii) a change in timing apropos to the "start" time for filing for employment authorization—the "EAD-clock" duration is not impacted, but it "shifts" to an earlier starting point. On the other hand, some individuals who would have reached the "EAD-clock" duration for a pending asylum application and obtained employment authorization under the current regulations may not obtain employment authorization if their asylum claims are promptly denied.<br>• The impacts involving compensation to individuals may be overstated because of potential value of non-paid work such as childcare or housework.<br>• Individuals might not have to wait lengthy times for a decision on their protection claims. This is a benefit in terms of equity, human dignity, and fairness.<br>• Some individuals could benefit from de novo review by an IJ of the asylum officer's decision not to grant their asylum claims. |
| Individuals who receive a negative credible fear determination. | USCIS provides a range from 75,000 to 300,000 total individuals who receive credible fear determinations. In recent years (see Table 3), approximately 16.9 percent of individuals screened have received a negative credible fear determination. | • Some individuals may benefit in terms of human dignity if paroled from detention while awaiting their credible fear interviews and determinations.<br>• Parole may result in more individuals failing to appear for hearings. |
| DHS–USCIS | N/A | • At a 7 percent discount rate, the resource costs could be $451.2 million annually, based on up-front and continuing expenditures.<br>• It is reasonable to assume that there could be a reduction in Form I–765 filings due to more expeditious adjudication of asylum claims, but there could also be countervailing influences; hence, the volume of Form I–765 filings (writ large or for specific classes related to asylum) could decrease, remain the same, or increase—these reasons are elucidated in the analysis. A net change in Form I–765 volumes overall could impact the incumbent volume of biometrics and biometrics services fees collected; however, based on the structure of the USCIS ASC biometrics processing contract, it would take a significant change in such volumes for a particular service district to generate marginal cost increases or savings per biometrics submission. |
| EOIR | 555 current IJs as well as support staff and other personnel. | • After implementation is fully phased in, EOIR no longer adjudicates asylum claims raised in expedited removal in the first instance. EOIR would conduct streamlined section 240 removal proceedings for individuals not granted asylum.<br>• Allows EOIR to focus efforts on other high-priority work and reduce its substantial current backlog.<br>• There could be non-budget related cost savings if the actual time worked on a credible fear case decreases in the transfer of credible fear cases to USCIS. |
| Support networks for asylum applicants who receive a positive credible fear determination. | Unknown | • To the extent that some applicants may be able to earn income earlier than they otherwise could currently, burdens on the support network of the applicant may be lessened. This network could include public and private entities and family and personal friends, legal services providers and advisors, religious and charitable organizations, State and local public institutions, educational providers, and NGOs. |
| Other | Unknown | • There could be familiarization costs associated with this IFR; for example, if attorneys representing each asylum client reviewed the rule, based on average reading speed, the cost would be about $76.3 million, which would potentially be incurred during the first year the rule is effective.<br>• There may be some labor market impacts as some asylum seekers who currently enter the labor market with a pending asylum application would no longer be entering the labor market under this IFR if they receive negative decisions on their asylum claims sooner. Applicants with a positive credible fear determination may enter the labor market sooner under this IFR than they would currently.<br>• Tax impacts: Employees and employers would pay their respective portion of Medicare and Social Security taxes as a result of the earlier entry of some individuals into the labor market. We estimate employment tax impacts could be $34.49 per person on a workday basis. |

In addition to the impacts summarized above, and as required by OMB Circular A–4, Table 2 presents the prepared accounting statement showing the costs and benefits associated with this regulation.

### TABLE 2—OMB A–4 ACCOUNTING STATEMENT
[$ millions, FY 2020]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| Time period: FY 2022 through FY 2031 | | | | |
| **Benefits** | | | | |
| Monetized benefits ................................................. | Not estimated | Not estimated | Not estimated | |
| Annualized quantified, but un-monetized, benefits .............................. | N/A | N/A | N/A | |
| Unquantified benefits .................................................... | Some individuals may benefit from filing cost savings related to Forms I–589 and I–765. Early labor market entry would be beneficial in terms of labor earnings to the applicant, but also because it could reduce burdens on the applicants' support networks. Benefits driven by increased efficiency would enable some asylum-seeking individuals to move through the asylum process more expeditiously than through the current process, with timelines potentially decreasing significantly, thus promoting both human dignity and equity. Adjudicative efficiency gains and expanded possibility of parole on a case-by-case basis could lead to individuals spending less time in detention, which would benefit the Government and the affected individuals. Another, potentially very significant, benefit is that EOIR would not see the cases in which USCIS grants asylum, which we estimate as at least a 15 percent reduction in its overall credible fear workload. This could help mitigate the backlog of cases pending in immigration courts. Additionally, this benefit would extend to individuals granted or not granted asylum faster than if they were to go through the current process with EOIR. Depending on the individual case circumstances, this IFR would mean that such noncitizens would likely not remain in the United States—for years, potentially—pending resolution of their claims, and those who qualify for asylum would be granted asylum several years earlier than under the present process. The anticipated operational efficiencies from this IFR may provide for prompt grant of relief or protection to qualifying noncitizens and ensure that those who do not qualify for relief or protection may be removed sooner than under current rules. Relative to the NPRM, the changes in this IFR may result in smaller operational efficiencies to DHS because the ICE Office of the Principal Legal Advisor will need to play a more significant role because noncitizens not approved for asylum will now be placed into streamlined section 240 removal proceedings. | | | Regulatory Impact Analysis ("RIA"). |
| **Costs** | | | | |
| Annualized monetized costs for 10-year period between 2021 and 2030 (discount rate in parentheses). | (3 percent) $453.8 | $180.4 | $1,002.4 | RIA. |
| | (7 percent) $451.2 | $179.5 | $995.8 | |
| Annualized quantified, but un-monetized, costs ...................................... | • Potential cost-savings applicable to Form I–589 of $338.86 per person. | | | RIA. |
| | • Potential cost-savings applicable to Form I–765 of $377.32 per person. <br>• Familiarization costs of about $76.3 million (in 2022). <br>• The transfer of cases from EOIR to USCIS would allow resources at EOIR to be directed to other work, and there is a potential for cost savings to be realized for credible fear processing specifically if the average cost of worktime spent on cases by USCIS asylum officers would be lower than at EOIR currently. These would not be budgetary cost savings, and USCIS has not made a one-to-one time- and cost-specific comparison between worktime actually spent on a case at EOIR and USCIS. | | | RIA. |
| Qualitative (unquantified) costs ...................................... | N/A | | | |

IFR_AR_000854

TABLE 2—OMB A–4 ACCOUNTING STATEMENT—Continued

[$ millions, FY 2020]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| Time period: FY 2022 through FY 2031 | | | | |
| **Transfers** | | | | |
| Annualized transfers: ............................................................ | Potential transfers include labor earnings that would accrue to credible fear asylum applicants who enter the labor market earlier than they would currently. The impact accruing to labor earnings developed in this rule has the potential to include both distributional effects (which are transfers) and indirect benefits to employers. The distributional impacts would accrue to asylum applicants who enter the U.S. labor force earlier than under current regulations, in the form of increased compensation (wages and benefits) and to the Government in the form of tax impacts. A portion of this compensation gain and tax payment might be transferred to asylum applicants from others who are currently in the U.S. labor force or eligible to work lawfully. | | | |
| From whom to whom? ........................................... | Potential transfers include a distributional economic impact in the form of a transfer to asylum applicants who enter the labor force earlier than they would currently if they take on work performed by others already in the U.S. workforce. | | | |
| Miscellaneous analyses/category ....................................... | N/A | | | RIA. |
| Effects on State, local, or Tribal governments ..................................... | N/A | | | |
| Effects on small businesses ................................................... | This IFR does not directly regulate small entities, but rather individuals. | | | RFA. |
| Effects on wages ............................................... | None | | | |
| Effects on growth .................................................. | None | | | |

### 2. Background and Purpose of the Rule

The purpose of this rule is to address the rising number of apprehensions at or near the Southwest border and the ability of the U.S. asylum system to fairly and efficiently handle protection claims made by those encountered. The rule streamlines and simplifies the adjudication process for certain individuals who are encountered at or near the border, placed into expedited removal, and determined to have a credible fear of persecution or torture, with the aim of adjudicating applications for asylum, statutory withholding of removal, and CAT protection in a timelier fashion and with appropriate procedural protections against error. A principal feature of the rule is to transfer the initial responsibility for adjudicating asylum, statutory withholding of removal, and CAT protection applications from IJs to USCIS asylum officers for individuals within expedited removal proceedings who receive a positive credible fear determination.

The IFR may broaden the circumstances in which individuals making a fear claim during the expedited removal process could be considered for parole on a case-by-case basis prior to a positive credible fear determination being made. For such individuals, parole could be granted as an exercise of discretion consistent with INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), when continued detention is not in the public interest.

This rule applies only to recently-arrived individuals who are subject to expedited removal—*i.e.,* adults and families. The rule does not apply to unaccompanied children, as they are statutorily exempt from being placed into expedited removal. It also does not apply to individuals already residing in the United States and whose presence in the United States is outside the coverage of noncitizens designated by the Secretary as subject to expedited removal. The rule also does not apply to (1) stowaways or (2) noncitizens who are physically present in or arriving in the CNMI. Those classes of noncitizens

will continue to be referred to asylum/withholding-only hearings before an IJ under 8 CFR 208.2(c). Finally, this rule does not require that a noncitizen amenable to expedited removal after the effective date of the rule be placed in the nonadversarial merits adjudication process described in this IFR. Rather, DHS generally, and USCIS in particular, retain discretion to issue an NTA to a covered noncitizen in expedited removal proceedings to instead place them in ordinary section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. at 523; *see also* 8 CFR 1208.2(c).

In this section we provide some data and information relevant to the ensuing discussion and analysis of the potential impacts of the rule. We first present USCIS data followed by EOIR data. Table 3 shows USCIS data for the Form I–589 and credible fear cases for the five-year span from FY 2016 through FY 2020.

IFR_AR_000855

TABLE 3—USCIS FORM I–589, APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL, AND CREDIBLE FEAR DATA

[FY 2016 through FY 2020][107]

| FY | Form I–589 receipts | | Credible fear completions | | | Total credible fear cases[108] |
|---|---|---|---|---|---|---|
| | Initial receipts | Pending receipts | Positive screen | Negative screen | All completions | |
| 2016 ........................................ | 115,888 | 194,986 | 73,081 | 9,697 | 82,778 | 94,048 |
| 2017 ........................................ | 142,760 | 289,835 | 60,566 | 8,245 | 68,811 | 79,842 |
| 2018 ........................................ | 106,041 | 319,202 | 74,677 | 9,659 | 84,336 | 99,035 |
| 2019 ........................................ | 96,861 | 349,158 | 75,252 | 16,679 | 91,931 | 102,204 |
| 2020 ........................................ | 93,134 | 386,014 | 12,824 | 16,134 | 28,958 | 30,839 |
| 5-year Total ............................ | 554,684 | N/A | 296,400 | 60,414 | 356,814 | 405,968 |
| 5-year Average ....................... | 110,937 | 307,839 | 59,280 | 12,083 | 71,363 | 81,194 |

Source: USCIS Office of Performance and Quality ("OPQ"), and USCIS Refugee, Asylum, and International Operations ("RAIO") Directorate, CLAIMS 3 database, global (received May 11, 2021).

As can be seen from Table 3, the Form I–589 pending case number has grown steadily since 2016, and, as of the fourth quarter of FY 2021, was 412,796,[109] which is well above the five-year average of 307,839. Over that same period, the majority, 83.1 percent, of completed credible fear screenings were positive, while 16.9 percent were negative.

In addition to the credible fear case data presented in Table 3, USCIS data and analysis can provide some insight concerning how long it has taken for the credible fear screening process to be completed. As detailed in this preamble, although this rule's primary concern is the length of time before incoming asylum claims are expected to be adjudicated by EOIR, changes to USCIS

processes enabled by this rule (including, for example, improved systems for conducting credible fear interviews for individuals who are not in detention facilities) are also expected to reduce processing times for credible fear cases. Table 4 provides credible fear processing durations at USCIS.

TABLE 4—CREDIBLE FEAR TIME DURATIONS FOR DETAINED AND NON-DETAINED CASES

[In average and median days, FY 2016 through FY 2021]

| FY | Screen | Detained | | Non-detained | |
|---|---|---|---|---|---|
| | | Average | Median | Average | Median |
| 2016 ........................ | Positive ........................................ | 23.3 | 13 | 290.6 | 163.0 |
| | Negative ....................................... | 34 | 26 | 197.1 | 80.5 |
| 2017 ........................ | Positive ........................................ | 23.3 | 13 | 570.1 | 407.0 |
| | Negative ....................................... | 34.2 | 25 | 496.1 | 354.0 |
| 2018 ........................ | Positive ........................................ | 22.6 | 16 | 816.2 | 671.0 |
| | Negative ....................................... | 32.3 | 25 | 811.7 | 668.0 |
| 2019 ........................ | Positive ........................................ | 35.6 | 24 | 1,230.9 | 1,082.0 |
| | Negative ....................................... | 44.7 | 33 | 1,067.3 | 959.0 |
| 2020 ........................ | Positive ........................................ | 37.2 | 20 | 1,252.7 | 1,065.0 |
| | Negative ....................................... | 30.3 | 16 | 1,311.2 | 1,247.0 |
| 2021 ........................ | Positive ........................................ | 25.6 | 15 | 955.3 | 919.0 |
| | Negative ....................................... | 29.8 | 17 | 1,174.0 | 1,109.0 |

Source: Data and analysis provided by USCIS, RAIO Directorate, SAS Predictive Modeling Environment and data-bricks databases, received May 11, 2021. FY 2021 includes partial fiscal year data as of May 2021.

Table 4 reports the "durations," defined as the elapsed days from date of apprehension to forwarding of the

credible fear screening process at USCIS, in both averages and medians. USCIS has included data through May

11, 2021. The total time for cases from apprehension to adjudication by EOIR can be found by adding the times in

---

[107] In FY 2020, the credible fear filings are captured in Form I–870, Record of Determination/ Credible Fear Worksheet. As part of the credible fear screening adjudication, USCIS asylum officers prepare Form I–870, Record of Determination/ Credible Fear Worksheet. This worksheet includes biographical information about the applicant, including the applicant's name, date of birth, gender, country of birth, nationality, ethnicity, religion, language, and information about the applicant's entry into the United States and place of detention. Additionally, Form I–870 collects sufficient information about the applicant's marital

status, spouse, and children to determine whether they may be included in the determination. Form I–870 also documents the interpreter identification number of the interpreter used during the credible fear interview and collects information about relatives or sponsors in the United States, including their relationships to the applicant and contact information. In previous years credible fear filings included Form I–867, Credible Fear Referral. Prior to FY 2020, the USCIS Asylum Division electronically received information about credible fear determinations through referral documentation provided by CBP. The referral documentation

includes a form containing information about the applicant: Form I–867, Credible Fear Referral.

[108] The credible fear total receipts are larger than the sum of positive and negative determinations because the latter apply to "completions," referring to cases forwarded to EOIR, and thus exclude cases that were administratively closed.

[109] USCIS, Immigration and Citizenship Data, *https://www.uscis.gov/tools/reports-and-studies/ immigration-and-citizenship-data* (filter by Asylum Category to search for file "All USCIS Application and Petition Form Types (Fiscal Year 2021), 4th Qtr, July 1–September 30, 2021) (Dec. 15, 2021)").

IFR_AR_000856

Table 4 with the times in Table 6, below.

The data in Table 4 are not utilized to develop quantitative impacts, but rather are intended to build context and situational awareness. There are several key observations from the information presented. Foremost, there is a substantial difference between durations for the detained and the non-detained populations. The existence of a gap is expected because USCIS can interface with detained individuals rapidly. However, the gap has grown over time; in 2016 the duration for positive-screened processing was 12.5 times greater, but by 2021 it had grown to a factor of nearly 40. Second, and relatedly, there is a substantial duration rise through 2019 for both detained and non-detained screenings,

although there has been a recent pullback. Furthermore, the duration for negative screenings is lower across the board than for positive screenings—as of the most recent data point, the duration was about 19 percent lower for negative screened cases. It is also seen that the FY 2021 average durations for detained cases are relatively close to FY 2016 through FY 2018 levels, with this series witnessing a spike in 2019.

Because some of the EOIR data are presented in medians, we note that the median durations are lower than the means for both screened types. This indicates that a small number of cases take an exceptionally long time to resolve, resulting in large outlier data points that skew the mean upwards. For non-detained cases, the gap between median and mean duration is relatively

consistent up to FY 2021, but the mean and median converge toward the end of the period; this feature of the data could indicate that fewer outlier durations were represented in the data.

It is possible that the rule may impact the volume and timing of employment authorization applications and approvals. Although we cannot predict the net change in filings for the Form I–765 categories, we present data on initial filings and approvals for three asylum-related categories in Table 5. As a result of the rule, there could be substitutions in Form I–765 categories from the (c)(8), Applicant for Asylum/ Pending Asylum, into the (a)(5), Granted Asylum Under Section 208, and (a)(10) Granted Withholding of Removal/243 (H) categories, in Table 5.

TABLE 5—USCIS FORM I–765 APPLICATION FOR EMPLOYMENT AUTHORIZATION INITIAL RECEIPTS AND APPROVALS RELATED TO ASYLEE CATEGORIES

[FY 2016 through FY 2020]

| FY | EAD category (a)(5) Granted asylum under section 208 | | EAD category (c)(8) applicant for asylum/pending asylum | | EAD category (a)(10) granted withholding of removal/243 (H) | |
|---|---|---|---|---|---|---|
| | Initial receipts | Approvals | Initial receipts | Approvals | Initial receipts | Approvals |
| 2016 | 29,887 | 27,139 | 169,970 | 152,269 | 2,008 | 1,621 |
| 2017 | 32,673 | 29,648 | 261,782 | 234,053 | 1,936 | 1,076 |
| 2018 | 38,743 | 39,598 | 262,965 | 246,525 | 1,733 | 1,556 |
| 2019 | 47,761 | 41,288 | 216,038 | 177,520 | 2,402 | 2,101 |
| 2020 | 31,931 | 36,334 | 233,864 | 183,820 | 3,318 | 2,554 |
| 5-year total | 180,995 | 174,007 | 1,144,619 | 994,187 | 11,397 | 8,908 |
| 5-year Average | 36,199 | 34,801 | 228,924 | 198,837 | 2,279 | 1,782 |

Source: OPQ, USCIS, Form I–765 Application for Employment Authorization: All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type (May 11, 2021), https://www.uscis.gov/sites/default/files/document/reports/I-765_Application_for_Employment_FY03-20.pdf.

Across the three relevant employment authorization categories, the total of the averages is 267,402 initial EADs, with a total of 235,420 approved EADs.

Having presented information and data applicable to USCIS specifically, we now turn to EOIR data and information. Table 6 presents average and median processing times for EOIR to complete cases originating from the credible fear screening process, positive

and negative, and detained and non-detained. The processing time represents that time between when a case is lodged in EOIR systems and a final decision. Note that the "initial case completions" are not directly comparable to USCIS completions (see Table 3) in terms of annual volumes for two primary reasons. First, there can be timing differences in terms of when a

credible fear case is sent to EOIR and when it is lodged in its processing systems. Second, not all individuals determined to have a credible fear follow up with their cases with EOIR, and some filed cases are administratively closed. Therefore, as a rule, case completions by EOIR would be necessarily lower than "completions" at USCIS.

TABLE 6—EOIR TIME DURATION METRICS, DAYS, AND COMPLETIONS FOR CASES WITH A CREDIBLE FEAR ORIGIN

| FY | Average processing time | Median processing time | Initial case completions |
|---|---|---|---|
| **6A. Average and Median Processing Times (in Days) for Form I–862 Initial Case Completions with a Credible Fear Origin** | | | |
| 2016 | 413 | 214 | 16,794 |
| 2017 | 447 | 252 | 26,531 |
| 2018 | 648 | 512 | 33,634 |
| 2019 | 669 | 455 | 55,404 |
| 2020 | 712 | 502 | 33,517 |
| 2021–March 31, 2021 (years) | 1,078 (2.95) | 857 (2.35) | 6,646 |

TABLE 6—EOIR TIME DURATION METRICS, DAYS, AND COMPLETIONS FOR CASES WITH A CREDIBLE FEAR ORIGIN—Continued

| FY | Average processing time | Median processing time | Initial case completions |
|---|---|---|---|
| **6B. Average and Median Processing Times (in Days) for Form I–862 Initial Case Completions with a Credible Fear Origin and Only an Application for Asylum, Statutory Withholding of Removal, and Withholding and Deferral of Removal Under the CAT** | | | |
| 2016 | 514 | 300 | 7,519 |
| 2017 | 551 | 378 | 13,463 |
| 2018 | 787 | 690 | 19,293 |
| 2019 | 822 | 792 | 30,052 |
| 2020 | 828 | 678 | 21,058 |
| 2021–March 31, 2021 (years) | 1,283 (3.52) | 1,316 (3.61) | 3,730 |

Source: EOIR, Planning, Analysis, and Statistics Division ("PASD"), data obtained April 19, 2021. The row for FY 2021 reflects data through March 31, 2021.

The FY 2021 data point reflects data through the start of FY 2021 to March 31, 2021, and we have included the current processing times in years for situational awareness. As Table 6 shows, there was an across-the-board jump in processing times in FY 2018, followed by a leveling off until FY 2021, when the processing times surged again.

3. Population

The population expected to be affected by this rule is the total number of credible fear completions processed annually by USCIS (71,363, see Table 3), split between an average of 59,280 positive-screen cases and 12,083 negative-screen cases. This can be considered the maximum, "encompassing," population that could be impacted. However, we take into consideration larger populations to account for variations and uncertainty in the future population.

4. Impacts of the Rule

This section is divided into three subsections. The first (a) focuses on impacts on asylum seekers, presented on a per-person basis. The second (b) discusses costs to the Federal Government, and the third (c) discusses other, possible impacts, including benefits.

a. Impacts on the Credible Fear Asylum Population

Under the new procedure established by this rule, asylum applicants who have established a credible fear of persecution or torture would not be required to file Form I–589 with USCIS. Individuals in this population could accrue cost savings because of this change. There is no filing fee for Form I–589, and the time burden is currently estimated at 12.0 hours per response, including the time for reviewing instructions and completing and

submitting the form.[110] Regarding cost savings, DHS believes the minimum wage is appropriate to rely on as a lower bound, as the applicants would be new to the U.S. labor market. The Federal minimum wage is $7.25 per hour; however, in this rule, we rely on the "effective" minimum wage of $11.80. As The New York Times reported, "[t]wenty-nine states and the District of Columbia have state-level minimum hourly wages higher than the federal [minimum wage]," as do many city and county governments. This New York Times report estimates that "the effective minimum wage in the United States [was] $11.80 an hour in 2019."[111] Therefore, USCIS uses the "effective" minimum hourly wage rate of $11.80 to estimate a lower bound. USCIS uses a national average wage rate across occupations of $27.07[112] to take into consideration the variance in average wages across States as an upper bound.

DHS accounts for worker benefits by calculating a benefits-to-wage multiplier using the most recent BLS report detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS relies on a benefits-to-wage multiplier of 1.45 and, therefore, is able to estimate the full opportunity cost per applicant,

including employee wages and salaries and the full cost of benefits such as paid leave, insurance, retirement, and other benefits.[113] The total rate of compensation for the effective minimum hourly wage is $17.11 ($11.80 × benefits burden of 1.45), which is 62.8 percent higher than the Federal minimum wage.[114] The total rate of compensation for the average wage is $39.25 ($27.07 × benefits burden of 1.45).

For applicants who have established a credible fear, the opportunity cost of 12 hours to file Form I–589 at the lower and upper bound wage rates is $205.32 (12 hours × $17.11) and $471.00 (12 hours × $39.25), respectively, with a midrange average of $338.16. In addition, form instructions require a passport-style photograph for each family member associated with the Form I–589 filing. The Departments obtained an estimate of the number of additional family members applicable via data on biometrics collections for the Form I–589. Biometrics information is collected on every individual associated with a Form I–589 filing, and the tracking of collections is captured in the USCIS Customer Profile Management System ("CPMS") database. A query of this system reveals that for the five-year period of FY 2016 through FY 2020, an average of 296,072 biometrics collections accrued for the Form I–589 annually. Dividing this

[110] See USCIS, Form I–589, Application for Asylum and for Withholding of Removal: Instructions, OMB No. 1615–0067, at 14 (expires July 31, 2022), https://www.uscis.gov/sites/default/files/document/forms/i-589instr.pdf.

[111] Ernie Tedeschi, Americans Are Seeing Highest Minimum Wage in History (Without Federal Help), The New York Times (Apr. 24, 2019), https://www.nytimes.com/2019/04/24/upshot/why-america-may-already-have-its-highest-minimum-wage.html (last visited Mar. 5, 2022). We note that, with the wage level dated to 2019, we do not make an inflationary adjustment because the Federal minimum wage has not changed since then.

[112] For the average wage for all occupations, the Departments rely on BLS statistics. See BLS, May 2020 National Occupational Employment and Wage Estimates, https://www.bls.gov/oes/2020/may/oes_nat.htm#00-0000 (last visited Feb. 28, 2022).

[113] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/(Wages and Salaries per hour) ($38.60 Total Employee Compensation per hour)/($26.53 Wages and Salaries per hour) = 1.454957 = 1.45 (rounded). See BLS, Employer Cost for Employee Compensation—December 2020, Table 1. Employer Costs for Employee Compensation by Ownership (Dec. 2020), https://www.bls.gov/news.release/archives/ecec_03182021.pdf (last visited Feb. 28, 2022).

[114] The Federal minimum wage is $7.25 hourly, which burdened at 1.45 yields $10.51. It follows that: (($17.11 wage − $10.51 wage)/$10.51)) wage = 0.628, which rounded and multiplied by 100 = 62.8 percent.

IFR_AR_000858

figure by the same five-year period average of 110,937 initial filings (Table 3) yields a multiplier of 2.67 (rounded).[115] Under the supposition that each phase causes applicants to incur a cost of $10,[116] there could be $26.70 in additional cost-savings at either wage bound.[117] The resulting cost savings per applicant from no longer having to file Form I–589 could range from $232.02 to $497.70, with a midrange of $364.86.[118]

Though these applicants would no longer be required to file Form I–589, DHS recognizes that applicants would likely expend some time and effort to prepare for their asylum interviews and provide documentation for their asylum claims under this rule as well. DHS does not know exactly how long, on average, individuals may spend preparing for their credible fear interviews under the rule, and how that amount of time and effort would compare to the time individuals currently spend preparing for the credible fear interviews. If the increased time were substantial—*i.e.,* above and beyond that currently earmarked for the asylum application process—lower cost savings could result.

Under the rule, asylum applicants who established a credible fear would be able to file for employment authorization via the Form I–765, Application for Employment Authorization (''EAD''), while their asylum applications are being adjudicated. We cannot say, however, whether the volume of Form I–765 EADs filed would increase or decrease in upcoming years due to this rule. Currently, asylum applicants can file for an EAD under the asylum (c)(8) category while their asylum applications are pending. Such applications are subject to a waiting period that commences when their completed Form I–589s are filed. Asylum applicants who establish a credible fear would still be subject to

the waiting period.[119] Applicants would still be able to file for their EADs under the (c)(8) category. We analyze the impacts regarding the EAD filing in two steps, explaining first why filing volumes might decline and the impacts related to that decline, and then why countervailing factors might mitigate such a decline.

One result of this rule is that asylum applications for some individuals pursuant to this rule could be granted asylum earlier than they would be under current conditions. Because an asylum approval grants employment authorization incident to status, and because USCIS automatically provides an asylum granted EAD ((a)(5)) after a grant of asylum by USCIS, some applicants may choose not to file for an EAD based on the pending asylum application under the expectation that asylum would be granted earlier than the EAD approval. This could result in cost savings to some applicants.

There is no filing fee for the initial (c)(8) EAD Form I–765 application, and the time burden is currently estimated at 4.75 hours, which includes the time associated with submitting two passport-style photos along with the application.[120] As stated earlier, the Department of State estimates that each passport photo costs about $10 each. Submitting two passport photos results in an estimated cost of $20 per Form I–765 application. Because the (c)(8) EAD does not include or require, at the initial or renewal stage, any data on employment, and since it does not involve an associated labor condition application, we have no information on wages, occupations, industries, or businesses that may employ such workers. Hence, we continue to rely on the wage bounds

(effective minimum and national average) developed earlier. At the wage bounds relied upon, the opportunity-cost savings are $81.27 (4.75 hours × $17.11 per hour), and $186.44 (4.75 hours × $39.25). When the $20 photo cost is included, the cost savings would be $101.27 and $206.44 per applicant, respectively. However, some might choose to file for an EAD even if they hope that asylum will be granted earlier than the EAD approval because they want to have documentation that reflects that they are employment authorized.

In the discussion of the possible file volume decline for the Form I–589, above, we noted that applicants and family members would continue to submit biometrics as part of their asylum claims, and that, as a result, there would not be changes in costs or cost savings germane to biometrics. For the Form I–765(c)(8) category, USCIS started collecting biometrics, and the associated $85 biometrics service fee, in October 2020.[121]

The submission of biometrics involves travel to an ASC for the biometric services appointment. In past rulemakings, DHS estimated that the average round-trip distance to an ASC is 50 miles, and that the average travel time for the trip is 2.5 hours.[122] The cost of travel also includes a mileage charge based on the estimated 50-mile round trip at the 2021 General Services Administration (''GSA'') rate of $0.56 per mile.[123] Because an individual would spend an average of 1 hour and 10 minutes (1.17 hours) at an ASC to submit biometrics,[124] adding the ASC time and travel time yields 3.67 hours. At the low- and high-wage bounds, the opportunity costs of time are $62.79 and $144.05.[125] The travel cost is $28, which is the per mileage reimbursement rate of 0.56 multiplied by 50-mile travel distance. Adding the time-related and travel costs generates a per-person

[115] Calculation: Average Form I–589 biometrics collections 296,072/110,937 average initial Form I–589 filings = 2.67 (rounded). Data were obtained from the USCIS Immigration Records and Identity Services (''IRIS'') Directorate, via the CPMS database (data obtained May 7, 2021).

[116] The U.S. Department of State estimates an average cost of $10 per passport photo in its supporting statement for its Paperwork Reduction Act submission for the Application for a U.S. Passport, OMB #1405–0004 (DS–11) (Feb. 8, 2011), *https://www.reginfo.gov/public/do/ PRAViewDocument?ref_nbr=201102–1405–001* (last visited Feb. 28, 2022) (see question #13 of the Supporting Statement).

[117] Calculation: $10 per photo cost × 2.67 photos per Form I–589 = $26.70.

[118] Calculation: $205.32 + $26.70 = $232.02; $338.16 + $26.70 = $364.86; $471.00 + $26.70 = $497.70.

[119] On February 7, 2022, in *AsylumWorks* v. *Mayorkas*, No. 20-cv-3815 (BAH), 2022 WL 355213, at *12 (D.D.C. Feb. 7, 2022), the U.S. District Court for the District of Columbia vacated two DHS employment authorization-related rules entitled ''Asylum Application, Interview, and Employment Authorization for Applicants,'' 85 FR 38532 (June 26, 2020), and ''Removal of 30-Day Processing Provision for Asylum Application-Related Form I–765 Employment Authorization Applications,'' 85 FR 37502, (June 22, 2020), that addressed waiting periods. Separately, a partial preliminary injunction was issued on September 11, 2020, in *Casa de Maryland, Inc.* v. *Wolf,* 486 F. Supp. 3d 928, 935 (D. Md. 2020), that exempts certain individuals from a 365-day waiting period and certain other eligibility criteria, but retains a 180-day waiting period. Although the duration of time required for the waiting period varies based on application of these rules and the related vacaturs and injunctions, a required waiting period remains in effect notwithstanding these rules, vacaturs, or injunctions.

[120] *See* USCIS, Instructions for Application for Employment Authorization, OMB No. 1615–0040, at 31 (expires July 31, 2022), *https://www.uscis.gov/ sites/default/files/document/forms/i-765instr.pdf.*

[121] USCIS collects biometrics for Form I–765 (c)(8) submissions, but a preliminary injunction in *Casa de Maryland,* 486 F. Supp. at 935, currently exempts members of certain organizations from this biometrics collection.

[122] *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 FR 536, 572 (Jan. 3, 2013).

[123] *See* GSA, POV Mileage Rates (Archived), *https://www.gsa.gov/travel/plan-book/ transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived* (last visited Feb. 28, 2022).

[124] *See* USCIS, Instructions for Application for Employment Authorization, OMB No. 1615–0040, at 31 (expires July 31, 2022), *https://www.uscis.gov/ sites/default/files/document/forms/i-765instr.pdf.*

[125] Calculations: Total time burden of 3.67 hours × total rate of compensation for the effective wage $17.11 = $62.79; total time burden of 3.67 hours × total rate of compensation for the average wage $39.25 = $144.05.

IFR_AR_000859

biometrics submission cost of $90.79, at the low-wage bound and $172.05 at the high-wage bound.[126] Although the biometrics collection includes the $85 service fee, fee waivers and exemptions are granted on a case-by-case basis (across all forms) that are immaterial to this IFR. Accordingly, not all individuals pay the fee. When the opportunity costs of time for filing Form I–765 ($101.27 and $206.44, respectively) are added to the opportunity costs of time and travel for biometrics submissions ($90.79 and 172.05), the total opportunity costs of time to file Form I–765 and submitting biometrics are $192.07 and $378.49, respectively. For those who pay the biometrics service fee, the total costs are $277.07 and $463.49, respectively, with a midpoint of $370.28.[127] These figures represent the maximum per-person cost savings for those who choose not to file for an EAD.[128]

Having developed the cost savings for applicants who do not file for an EAD, we now turn to factors that could counteract a potential decline in Form I–765 volumes. First, applicants will benefit from a timing change relevant to the EAD waiting period as it relates to the "filing date" of their asylum applications that will allow an EAD to be filed earlier than it could be currently. USCIS allows for an EAD to be filed under 8 CFR 208.7 and 274a.12(c)(8) when an asylum application is pending and certain other conditions are met. Here, an asylum application will be pending when the credible fear determination is served on the individual as opposed to current practice under which the asylum application is pending when lodged in immigration court. This change in

timing could allow some EADs to be approved earlier for those who file for an EAD with a pending asylum application. In this sense, the EAD waiting period remains the same in duration, but the starting point shifts to an earlier position for asylum applicants who will file for an initial EAD under the (c)(8) category.

DHS would begin to consider for parole on a case-by-case basis all noncitizens who have been referred to USCIS for a credible fear screening under the broader standard adopted by this IFR during the relatively short period between being referred to USCIS for a credible fear screening interview and the issuance of a credible fear determination. A parole grant does not constitute employment authorization, however, and the rule provides, in 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii), that noncitizens paroled pending credible fear screening will not be eligible for employment authorization based on that grant of parole from custody. Currently there are two Form I–765 classes, (a)(5), "Granted Asylum Sec. 208," and (a)(10), "Granted Withholding of Removal/243 (H)," that could apply to noncitizens whose asylum applications are considered under the procedure established by this IFR. In the past, some parolees under these categories have been able to obtain EADs sooner than they would if they were explicitly subject to the filing clock that applies to a pending Form I–589.

Given the two changes discussed above related to the EAD filings—(1) the change in timing for when an EAD can be filed; and (2) the broadening of the standard under which certain noncitizens placed in expedited removal may be considered for parole before receiving a credible fear determination—some applicants may file for an EAD, even under the expectation that their asylum could be granted earlier, if they expect to receive an (a)(5) asylum granted EAD even sooner. In this sense, the potential for more rapid approvals of an EAD claim may be expected to provide a net pecuniary benefit, even considering a more expeditious asylum claim. Coupled with the expectation that some individuals may seek an EAD for the non-pecuniary benefit associated with its documentary value, we cannot determine if these countervailing influences might limit, or even completely absorb, any reductions in EAD filing for credible fear asylum applicants.

Regardless of whether, under the rule, it is the more expeditious asylum grant or EAD approval that results in employment authorization, individuals

who enter the labor force earlier are able to earn income earlier. The assessments of possible impacts rely on the implicit assumption that credible fear asylum seekers who receive employment authorization will enter and be embedded in the U.S. labor force. This assumption is justifiable for those whose labor force entry was effectuated by the EAD approval, as opposed to the grant of asylum. We believe this assumption is justifiable because applicants would generally not have expended the direct costs and opportunity costs of applying for an EAD if they did not expect to recoup an economic benefit. We also take the extra step of assuming these entrants to the labor force are employed. It is possible that some applicants who are eventually denied asylum are currently able to obtain employment authorizations—approved while their asylum application was pending. We do not know what the annual or current scale of this population is, but it is an expected consequence of this IFR that such individuals would not obtain employment authorizations in the future.

The impact is attributable to the difference in days between when asylum would be granted under the rule and the current baseline. USCIS describes this distributional impact in more detail. Since a typical workweek is 5 days, the total day difference ("D") can be scaled by 0.714 (5 days/7 days) and then multiplied by the average wage ("W") and the number of hours in a typical workday (8) to obtain the impact, as in the formula: $D \times 0.714 \times W \times 8$. In terms of each actual workday, the daily distributional impacts at the wage bounds are $136.88 ($17.11 \times 8$ hours) and $314.00 ($39.25 \times 8$ hours), respectively, on a per-person basis, with a midrange wage of $225.44.

USCIS cannot expand the per-person per-day quantified impacts to a broader monetized estimate. Foremost, although Table 5 provides filing volumes for the asylum relevant EADs, we cannot determine how many individuals within this population would be affected. In addition, we cannot determine what the average day difference would be for any individual who could be impacted. To quantify the day difference, the Departments would need to simultaneously analyze the current and future interaction between the asylum grant and EAD approvals. Doing so for the current system is conceptually possible with a significant devotion of time and resources, but it is not possible to conduct a similar analysis for future cases without relying on several assumptions that may not be accurate.

---

[126] Calculations: Opportunity cost of time, effective wage $62.79 + travel cost of $28 = $90.79; Opportunity cost of time, average wage $144.05 + travel cost of $28 = $172.05.

[127] Calculations: $192.07 + biometrics services fee of $85 = $277.07; $378.49 + biometrics services fee of $85 = $463.49. Although we have the overall count for biometrics for the period from October 1, 2020, through May 1, 2021, we do not know how many biometrics service fees were collected with these biometrics' submissions; the fee data are retained by the USCIS Office of the Chief Financial Officer ("OCFO"), but the Form I–765 fee payments are not captured by eligibility class.

[128] There is a scenario that the Departments have considered, though it is not likely to occur often. Currently, an asylum applicant might file for an EAD and have the EAD approved prior to the grant of asylum. It is possible that, under this rule, asylum may be approved more expeditiously. At the time of the asylum grant, the individual will automatically receive a category (a)(5) EAD based on the grant of asylum; if the applicant did already file for an EAD, then the filing costs associated with the EAD would be sunk costs, since the (c)(8) EAD does not actually provide any benefit over the (a)(5) EAD. Because this scenario is likely to be rare, DHS has not attempted to quantify its impact.

IFR_AR_000860

As a result, we cannot extend the per-person cost (in terms of earnings) to an aggregate monetized cost, even if we knew either the population impacted or the day-difference average because an estimate of the costs would require both data points. The impact on labor earnings developed above has the potential to include both distributional effects (which are transfers) and indirect benefits to employers.[129] The distributional impacts would be felt by asylum seekers who enter the U.S. labor force earlier than under current regulations in the form of increased compensation (wages and benefits). A portion of this compensation gain might be transferred to asylum applicants from others who are currently in the U.S. labor force or eligible to work lawfully. Alternatively, employers that need workers in the U.S. labor market may benefit from those asylum applicants who receive their employment authorizations earlier as a result of the IFR, gaining productivity and potential profits that the asylum applicants' earlier starts would provide. Companies may also benefit by not incurring opportunity costs associated with the next-best alternative to the immediate labor the asylum applicant would provide, such as having to pay existing workers to work overtime hours. To the extent that overtime pay could be reduced, some portion of this pay could be transferred from the workers to the companies.

We do not know what the next-best alternative may be for those companies. As a result, the Departments do not know the portion of overall impacts of this IFR that are transfers or benefits, but the Departments estimate the maximum monetized impact of this IFR in terms of a daily, per-person basis compensation. The extent to which the portion of impacts would constitute benefits or transfers is difficult to discern and would depend on multiple labor market factors. However, we think it is reasonable to posit that the portion of impacts attributable to transfers would mainly be benefits, for the following reason: If there are both workers who obtain employment authorization under this rule and other workers who are available for a specific position, an employer would be expected to consider any two candidates to be substitutable to a high degree.

There is an important caveat, however. There could be costs involved in hiring asylum seekers that are not captured in this discussion. As the U.S. economy recovers from the effects of the COVID–19 pandemic, there may be structural changes to the general labor market and to specific job positions that could impact the next-best alternatives that employers face. The Departments cannot speculate on how such changes in relation to the earlier labor market entry of some asylum applicants could mitigate the beneficial impacts for employers.

The early possible entry into the labor force of some positive-screened credible fear asylum applicants is not expected to change the composition of the labor market, as it would affect only the timing under which some individuals could enter the market. The Departments do not have reason to believe the overall U.S. labor market would be affected, given the relatively small population that is expected to be impacted. Moreover, some asylum seekers who currently enter the labor market with a pending asylum application may no longer be entering the labor market under this IFR if they receive a negative decision sooner on their asylum claim. Specifically, there could be individuals who receive positive credible fear determinations, but whose asylum applications are ultimately denied within 180 days of filing. Under this rule and the resultant shortened adjudication time frame, these individuals who otherwise would have been eligible to receive (c)(8) EADs no longer will be eligible because their asylum claims will have been adjudicated (and thus their asylum applications will no longer be pending) prior to the expiration of the waiting period required for (c)(8) filings. The lost compensation to these individuals could constitute a transfer to others in the U.S. workforce. Because we cannot predict how many people would be impacted in such a way, we are not able to quantify this impact.

Furthermore, there may be tax impacts for the Government. It is difficult to quantify income tax impacts of earlier entry of some asylum seekers in the labor market because individual tax situations vary widely, but the Departments considered the effect of Social Security and Medicare taxes, which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively), with a portion paid by the employer and the same amount withheld from the employee's wages.[130]

With both the employee and employer paying their respective portions of Medicare and Social Security taxes, the total estimated accretion in tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent.[131] The Departments will rely on this total tax rate where applicable. The Departments are unable to quantify other tax transfer payments, such as for Federal income taxes and State and local taxes. As noted above, the Departments do not know how many individuals with a positive credible fear determination will be affected, and what the average day-difference would be, and therefore the Departments cannot make an informed monetized estimate of the potential impact. It accordingly follows that the Departments cannot monetize the potential tax impacts of the IFR. However, the Departments can provide partial quantitative information by focusing on the workday earnings presented earlier. The workday earnings, at the wage bounds of $136.88 and $314.00, are multiplied by 0.153 to obtain $20.94 and $48.04, respectively, with a midpoint of $34.49. These values represent the daily employment tax impacts per individual. The tax impacts per person would amount to the total day-difference in earnings scaled by 0.714, to reflect a five-day workweek. Conversely, to the extent that this rule prevents a person from obtaining an EAD, there may be losses in tax revenue.

Having developed partial (based on an individual basis) monetized impacts of this IFR, there are two important caveats applicable to the population of asylum applicants who have received a positive credible fear determination. First, as we detail extensively in the following subsection, there will be resource requirements and associated costs needed to make this IFR operational and effective. These changes will not occur instantaneously and may require months or even a year or more to fully implement. Although existing USCIS resources will be able to effectuate changes for some individuals rather quickly, others (and thus the entire population from an average perspective) will face delay in realizing the impacts. These individuals thus may face a delay in realizing benefits such as earlier

---

[129] Transfer payments are monetary payments from one group to another that do not affect total resources available to society. *See* OMB, Circular A–4 at 14, 38 (Sept. 17, 2003), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf* (last visited Feb. 28, 2022) (providing further discussion of transfer payments and distributional effects).

[130] *See* Internal Revenue Service, *Publication 15 (Circular E), Employer's Tax Guide* (Dec. 16, 2021),

*https://www.irs.gov/pub/irs-pdf/p15.pdf* (last visited Feb. 28, 2022); *see also* Market Watch, *More Than 44 Percent of Americans Pay No Federal Income Tax* (Sept. 16, 2018), *https://www.marketwatch.com/story/81-million-americans-wont-pay-any-federal-income-taxes-this-year-heres-why-2018-04-16* (last visited Mar. 5, 2022).

[131] Calculation: (6.2 percent Social Security + 1.45 percent Medicare) × 2 employee and employer losses = 15.3 percent total estimated tax loss to Government.

IFR_AR_000861

asylum determinations, income gains, and possible filing cost savings. Second, despite the possibility that some baseline EAD filers may choose not to file in the future, there could be mitigating effects that would reduce the volume decline for Form I–765(c)(8) submissions.

In closing, we have noted that the impacts developed in this section apply to the population that receives a positive credible fear determination. Additionally, for the subset of this population that receives a negative asylum determination from USCIS, the possibility of de novo review of their claims by IJs may benefit some applicants by affording another opportunity for review and approval of their asylum claims.

It is possible that the earnings impact described could overstate the quantified benefits directly attributable to receiving earlier employment authorization. For those who entered the labor market after receiving employment authorization and began to receive paid compensation from an employer, counting the entire amount received by the employer as a benefit may result in an overestimate. Even without working for wages, the time spent by an individual has value. For example, if someone performs childcare, housework, or other activities without paid employment, that time still has value. Consequently, a more accurate estimate of the net benefits of receiving employment authorization under the proposed rule would attempt to account for the value of time of the individual before receiving employment authorization. For example, the individual and the economy would gain the benefit of the worker entering the workforce and receiving paid compensation but would lose the value of the worker's time spent performing non-paid activities. Due to the wide variety of non-paid activities an individual could pursue without employment authorization, it is difficult to estimate the value of that time. As an example, if 50 percent of wages were a suitable proxy of the value for this non-paid time, the day-impacts per person would be scaled by half accordingly.

### b. Impacts to USCIS

#### i. Total Quantified Estimated Costs of Regulatory Changes

In this subsection, the Departments discuss impacts on the Federal Government. Where possible, cost estimates have been quantified; otherwise they are discussed qualitatively. The total annual costs are provided only for those quantified costs that can be applied to a population.

### Costs of Staffing to USCIS

USCIS will need additional staffing to implement the provisions presented in this rule. The staffing requirement will largely depend on the volume of credible fear referrals. In addition to asylum officers, USCIS will require additional supervisory staff and operational personnel commensurate with the number of asylum officers needed. USCIS anticipates an increased need for higher-graded field adjudicators and supervisors to implement the provisions of this IFR. Approximately 92 percent of the field asylum officers are currently employed at the GS–12 pay level or lower.[132] Under this model, USCIS will be assuming work normally performed by an IJ. EOIR data indicate that the weighted average salary was $155,089 in FY 2021 for IJs; $71,925 for Judicial Law Clerks (''JLCs''); $58,394 for Legal Assistants; $132,132 for DHS Attorneys; and $98.51 per hour for interpreters.[133] Notably, entry-level IJs are required to adjudicate a wider array of immigration applications than asylum officers, and their decisions, unlike those of current USCIS asylum officers, are not subject to 100 percent supervisory review. As such, under this IFR, USCIS asylum officers making determinations on statutory withholding of removal and CAT protection claims would be performing work at a GS–13 minimum level, considering they will be conducting adjudications traditionally performed only by IJs.[134] In addition, first-line Supervisory Asylum Officers (''SAOs'') reviewing these decisions would be graded at a GS–14.[135] Currently, not all SAOs are at a grade GS–14. Aligning all first line SAOs to a GS–14 ensures operational flexibility and makes this position consistent with the similar work processes and functions performed by the first-line Supervisory Refugee Officer position.

Currently, USCIS refers all individuals who receive a positive credible fear determination to IJs at EOIR for consideration of the individuals' asylum claims. Based on historical EOIR data on the amount of time required to complete a typical hearing with a credible fear origin and only an application for asylum, the median duration for credible fear merit plus master hearings from FY 2016 through FY 2020 was about 97 minutes, or 1.6 hours. Factoring in the EOIR weighted average salaries for the IJs, JLCs, DHS Attorneys, and interpreters required for EOIR to complete these hearings, we estimate the median cost to be $470.62[136] per hearing over the same time frame.

USCIS analyzes a range of credible fear cases to estimate staffing requirement costs. At a lower bound volume of 75,000 credible fear cases, USCIS assumes it would receive fewer credible fear cases compared to prior years (apart from FY 2020, which had a lower number of credible fear cases due to the COVID–19 pandemic and resulting border closures). A volume of 300,000 credible fear cases is an upper bound, based on the assumption that nearly all individuals apprehended will be placed into expedited removal for USCIS to process. As shown in Table 3, the lowest number of credible fear cases received for FY 2016 through FY 2019 was 79,842 in FY 2017, while the highest was 102,204 in FY 2019. DHS recognizes that the estimated volume of 300,000 is nearly three times the highest annual number of credible fear cases received, but DHS presents this as an upper bound estimate to reflect the uncertainty concerning an operational limit on how many credible fear cases could be handled by the agency in the future. Inclusion of this unlikely upper bound scenario is intended only to present information concerning the potential costs should the agency consider an intervention at the highest end of the range. USCIS expects volumes to fall within the lower and upper bounds and therefore we also provide a primary estimate of 150,000 credible fear cases.[137]

---

[132] In 2021, the base salary for a GS–12 ranged from $66,829, at step 1, up to $86,881, at step 10. *See* OPM, Salary Table 2021–GS Incorporating the 1% General Schedule Increase Effective January 2021, *https://www.opm.gov/policy-data-oversight/ pay-leave/salaries-wages/salary-tables/pdf/2021/ GS.pdf* (last visited Mar. 1, 2022) (''OPM Salary Table'').

[133] Weighted average base salaries across position, FY, and location are drawn from DOJ EOIR PASD analysis. Interpreter wages are converted hourly here because these positions are paid differently and not always on an annual basis. In 2021, the base salary for a GS–15 step 3 was $117,824 and step 4 was $121,506. *See* OPM Salary Table.

[134] In 2021, the base salary for a GS–13 step 1 was $79,468. *See* OPM Salary Table.

[135] In 2021, the base salary for a GS–14 step 1 was $93,907. *See* OPM Salary Table.

[136] Estimate were based on analysis provided by EOIR on May 19, 2021, of median digital audio recording length data from all merits and master asylum hearings between FY 2016 and FY 2020. The five-year average estimated cost of hearings is based on 2,087 assumed hours per year for the IJ, JLC, and DHS attorneys at the annual salaries shown, plus the hourly cost per interpreter. These annual values were multiplied by the respective sums of the annual median lengths of master and merits hearings for corresponding years to produce the five-year average cost per hearing of $470.62.

[137] The primary estimate of 150,000 is not equal to the average of the lower volume of 75,000 credible fear cases and the upper volume of 300,000 credible fear cases. Rather, this primary estimate, based on OCFO modeling, represents the number of cases that the agency may reasonably expect. The

IFR_AR_000862

USCIS has estimated the staffing resources it will need to implement this rule. At the three volume levels of credible fear cases, USCIS plans to hire between 794 and 4,647 total new positions, with a primary estimate of 2,035 total new positions.[138] The estimated costs associated with payroll, non-payroll, and other general expenses—including interpreter services, transcription services, facilities, physical security, information technology ("IT") case management, and other contract, supplies, and equipment—are anticipated to begin in FY 2022.

The costs of this rule are likely to include initial costs associated with the hiring and training of staff, and those costs would continue in future years. Additionally, as was explained in Section G of the NPRM, the Departments expect a phased approach to implementation due to budgetary and logistical factors. 86 FR 46922. The cost estimates developed below focus on three volume bands and are based on initial data and staffing models that captured initial implementation costs accruing to FY 2022 and FY 2023. These estimates therefore partially capture the likely phasing of resourcing and costs, but not the full phasing that could extend into further years. The Departments do not currently have the appropriate data to include an implementation of the IFR in their estimates of quantified resource costs. However, we do not believe a partial implementation significantly skews the expected costs of this rule. We offer some additional comments concerning this phased implementation as it relates to costs at the conclusion of this analysis.

The Departments recognize that initial costs are likely to spill into future years depending on the pace of hiring; employee retention; obtaining and signing contracts (for interpreters, transcription, and facilities); and training. For the remainder of FY 2022, DHS will finalize job descriptions, post new positions, and begin the hiring process to onboard some new Federal employees, and DHS will work to procure new contracts for interpreters, transcription, facilities, and security staff as its current fiscal situation allows. In FY 2022, the implementation costs are expected to range between $179.8 million and $952.4 million with a primary cost estimate of $438.2 million, assuming all staff is hired and corresponding equipment needs are fulfilled in the fiscal year. DHS recognizes that, operationally, it may take more time to attain the necessary staffing and equipment. However, we are not able to reliably predict those timelines due to the uncertain nature of the recruitment and onboarding processes. Any delay in hiring would reduce the first-year costs of implementation, as explained further below. The itemized planned resources are presented in Table 7.

TABLE 7—ESTIMATED USCIS FY 2022 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS

[$ in thousands]

| | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| (A) Staffing | $140,507 | $355,175 | $806,697 |
| Payroll * | 113,602 | 285,983 | 648,257 |
| Non-Payroll | 26,905 | 69,192 | 158,440 |
| (B) General Expenses | 39,313 | 83,025 | 145,682 |
| Interpreter Services | 6,615 | 19,136 | 44,179 |
| Transcription Services | 9,366 | 26,697 | 37,362 |
| Facilities | 6,635 | 17,606 | 40,865 |
| Physical Security | 623 | 1,654 | 3,839 |
| IT Case Management | 12,500 | 12,500 | 12,500 |
| Other Contract/Supplies/Equipment | 3,574 | 5,432 | 6,937 |
| Total | 179,820 | 438,200 | 952,379 |

Source: USCIS Analysis from RAIO and USCIS OCFO, May 19, 2021.

In FY 2023, USCIS estimates costs between $164.7 million and $907.4 million, with a primary estimate of $413.6 million, as shown in Table 8. The reductions as compared to FY 2022 are mostly attributable to non-recurring, one-time costs for new staff and upgrades to IT case management systems, although a decline in costs pertaining to other contracts, supplies, and equipment is also expected. The largest expected cost decrease is for IT case management, which is estimated to decline from $12.5 million in FY 2022 down to $4.375 million in FY 2023. Meanwhile, costs for interpreter and transcription services, facilities, and physical security are expected to rise in FY 2023 because of resource cost increases. For FY 2024 through FY 2031 of implementation, DHS expects resource costs to stabilize.

TABLE 8—ESTIMATED USCIS FY 2023 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS

[$ in thousands]

| | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| (A) Staffing | $133,427 | $337,047 | $766,159 |
| Payroll* | 122,753 | 309,758 | 703,852 |

OCFO volume levels were developed as a guide for several possible ranges that could be realized in the future, taking into account variations in the populations. The actual volume levels could be above or below these levels.

[138] The primary estimate of 2,035 total new positions is not equal to the average of the lower-794 and upper-bound 4,647 estimates. Rather, this primary estimate, based on a staffing allocation model, represents the number of staff in a mix of occupations at a mix of grade levels that the agency may need to hire to handle the volume of credible fear cases. The staffing is commensurate with OCFO model volume levels, which were developed as a guide for several possible ranges that could be realized in the future, taking into account variations in the populations. Actual volume levels and hence actual staffing levels could be above or below these levels.

Table 8—Estimated USCIS FY 2023 Funding Requirements by Volume of Credible Fear Referrals—Continued

[$ in thousands]

|  | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| Non-Payroll | 10,674 | 27,289 | 62,307 |
| (B) General Expenses | 31,267 | 76,554 | 141,249 |
| Interpreter Services | 6,813 | 19,710 | 45,504 |
| Transcription Services | 9,647 | 27,498 | 38,483 |
| Facilities | 6,834 | 18,134 | 42,091 |
| Physical Security | 642 | 1,704 | 3,954 |
| IT Case Management | 4,375 | 4,375 | 4,375 |
| Other Contract/Supplies/Equipment | 2,956 | 5,133 | 6,842 |
| Total | 164,694 | 413,601 | 907,408 |

Source: USCIS Analysis from RAIO and OCFO, May 19, 2021.

To estimate the costs for each category itemized in Tables 7 and 8, USCIS considered the inputs for each. USCIS expects to hire most new staff at the GS–13, step 1 level, on average, and most of those hired will serve as asylum officers. As stated, these officers will be making determinations on statutory withholding of removal and withholding and deferral of removal under the CAT, so their pay will be higher than the current asylum officer pay, which is at a GS–12 level. Additionally, USCIS assumes step 1 because these employees are expected to be new to the position. See 5 U.S.C. 5333 (providing that new appointments generally ''shall be made at the minimum rate of the appropriate grade''). Payroll costs also include Government contributions to non-pay benefits, such as healthcare and retirement. Although payroll is the greatest estimated cost to hiring staff, non-payroll costs include training, equipping, and setting staff up with resources such as laptops, cell phones, and office supplies. For example, asylum officers have been required to attend and successfully complete a multi-week residential training at a Federal Law Enforcement Training Center (''FLETC'') as a condition of their continued employment. The estimated cost per student (including FLETC enrollment costs, travel, etc.) was approximately $7,000. However, USCIS is currently engaging a virtual training that is approximately $5,000 per student. Although the training is expected to shift back to in-person training in the future, we currently do not have a projected date for this shift. To fully furnish and equip new employees, USCIS estimates a cost of $3,319 per asylum employee. Costs for new equipment would be largely commensurate with the increase in staffing levels.

In addition to costs associated with hiring new staff, DHS anticipates that it will need to both increase funding on existing contracts and procure new ones. As a result of this IFR, the need for interpretation services will increase as the number of asylum interviews USCIS performs rises. Current interpreter contracts cannot absorb this expected increase. Using current contracts, USCIS applied the current cost model to the estimated increase in case volumes in order to estimate costs. The facilities and physical security estimates were similarly based on current cost models that were expanded to account for additional employees. Additional contract support will also be needed for transcription services to create a written record of the asylum hearing because such staff are not currently employed by USCIS. To create transcription service estimates, USCIS applied EOIR's current cost model to USCIS's estimated increase in case volumes. DHS also anticipates costs associated with general expenses associated with miscellaneous contract, supplies, and equipment commensurate with the increase in staff. The timing of these costs will depend on the hiring timeline but are expected to commence in the first year. DHS recognizes that if it takes more than one year to hire and equip asylum employees, costs may instead be experienced in later years.

Costs of IT Upgrades for USCIS

DHS is planning upgrades to internal management systems and databases as a requirement to implement this IFR. The estimated cost of these upgrades in FY 2022 is a one-time cost of $12.5 million that will impact virtually all processing and record-keeping systems at USCIS. This cost embodies funds for enhancements and refurbishment to the USCIS global case management system that would support features such as ensuring transition of positive credible fear screening cases to the hearing process currently provided for affirmative asylum cases; support for withholding of removal and CAT adjudication features; non-detained scheduling enhancements; and capabilities to accept and provide review for electronic documents. The one-time cost also includes funds earmarked for teams that support integrations with other internal and external-facing systems, such as record-keeping; identity management and matching; reporting and analytics; applicant-facing interfaces; and other key USCIS systems, as well as external systems at ICE, CBP, and DOJ.[139]

Included in these $12.5 million in costs are the costs to pay staff to make these changes. DHS estimates between 30 and 40 individuals, with a little over half being contract personnel and the rest being Federal employees, would be involved (either part- or full-time) in the implementation of these enhancements through FY 2022. The Federal personnel would mainly comprise GS–14 and GS–15 level personnel and supervisory and management staff.

IT costs are expected to decline in FY 2023 and remain flat into the future at $4.375 million. This amount accounts for ongoing operations and maintenance costs. New features or upgrades are not expected at this time, but if they were to be needed in the future, those enhancements would result in additional costs not included here.

At present, DHS does not envision its planned IT upgrades requiring new facilities or additional structures.

---

[139] Although this plan tracks the FY 2022 time frame, variations in the pace of Federal and contractor hiring and retention during the performance period, unforeseen legal or other policy challenges to any electronic process, and the ability of relevant offices to truly operationalize minimal functionality given their own staffing constraints to handle manually any additional process automations, could delay some implementation into FY 2023.

IFR_AR_000864

Importantly, DHS's upgrades are expected to coincide with the first electronic processing of the Form I–589. Since this will be a significant change for processing asylum applications, unexpected errors or system changes could have impacts on this project as well. Completion of the upgrades is also dependent on the availability of ICE, CBP, and DOJ systems to integrate with USCIS systems to provide for streamlined implementation. However, because this plan was developed outside the scope of this rule, we do not attribute costs to it.

As described earlier in this analysis, we expect no net change regarding biometrics collection germane to asylum applications for individuals with a positive credible fear determination. We also detailed how factors concomitant to more expeditious EAD approvals make it impossible to estimate the magnitude or even direction of the net change in Form I–765 filing volumes (related to asylum or withholding of removal), and,

hence, commensurate biometrics collections (and fee payments).

Given the parameters of this rule, however, any net change in biometrics would not impose new costs on the Federal Government. The maximum monthly volume of biometrics submissions allowed by the current ASC contract is 1,633,968 and the maximum annual volume is 19,607,616.[140] The average number of individuals that submitted biometrics annually across all USCIS forms for the period FY 2016 through FY 2020 was 3,911,857.[141] Given that the average positive-screened credible fear population is 59,280 (Table 3), which is 1.52 percent of the biometrics volume, a volume change would not encroach on the ASC contract bounds.

To better illustrate the limited impact of biometrics collection on USCIS, one scenario that we do account for relates to costs for a particular USCIS–ASC district. The DHS–ASC contract was designed to be flexible to reflect variations in benefit request volumes.

The pricing mechanism within this contract embodies such flexibility. Specifically, the ASC contract is aggregated by USCIS district, and each district has five volume bands with its pricing mechanism. The incumbent pricing strategy takes advantage of economies of scale because larger biometrics processing volumes have smaller corresponding biometrics processing prices.[142] For example, Table 9 provides an example of the pricing mechanism for a particular USCIS district. This district incurs a monthly fixed cost of $25,477.79, which will cover all biometrics submissions under a volume of 8,564. However, the price per biometrics submission decreases from an average cost of $6.66 for volumes between a range of 8,565 and 20,524 to an average of $5.19 once the total monthly volume exceeds 63,503. In other words, the average cost decreases when the biometrics submissions volume increases (jumps to a higher volume band).

### TABLE 9—EXAMPLE OF PRICING MECHANISM FOR A USCIS DISTRICT PROCESSING BIOMETRICS APPOINTMENTS, FY 2021

| District X | | Volume band | Minimum volume | Maximum volume | Costs |
|---|---|---|---|---|---|
| Baseline: Fixed price per month | ................................................. | AA .............. | 0 | 8,564 | $25,477.79 |
| Fixed price per person processed | ................................................. | AB .............. | 8,565 | 20,524 | 6.66 |
| Fixed price per person processed | ................................................. | AC .............. | 20,525 | 31,752 | 5.94 |
| Fixed price per person processed | ................................................. | AD .............. | 31,753 | 63,504 | 5.53 |
| Fixed price per person processed | ................................................. | AE .............. | 63,505 | 95,256 | 5.19 |

Source: USCIS, IRIS Directorate, received May 10, 2021.

At the district level, since there are small marginal changes to costs in terms of volumes, it would take a substantial change in volumes for a particular district to experience a significant change in costs for that district. If biometrics volumes increase on net, there could be small marginal, and hence average, cost declines; in contrast, if volumes decline, some of those marginal costs might not be realized.

Having developed the costs for USCIS to implement the rule, this section brings the total costs together as annual inputs that are discounted over a 10-year horizon. At the three population bounds, the inputs are captured in Table 10. The FY 2022 and FY 2023 costs are from Tables 7 and 8. For FY 2024 through FY 2031, human resources cost increases. As stated earlier, USCIS expects positions to be filled at step 1 for each GS level, so in years where

employees remain at the same step for more than one year, these estimates account only for human resource cost increases (FYs 2026, 2028 and 2030). The general non-IT cost increases account for expected contract pricing increases. Finally, IT costs are expected to remain flat at $4.375 million into the future, which accounts for ongoing operations and maintenance costs.

### TABLE 10—MONETIZED COSTS OF THE INTERIM FINAL RULE TO USCIS
[In undiscounted 2020 dollars]

| FY | Human resources | General (non-IT) cost | IT expenditure | Annual total |
|---|---|---|---|---|
| Time Period: FYs 2022 through 2031 | | | | |
| **10A. Low Population Bound (75k Annual Cases)** | | | | |
| 2022 .................................................................. | $140,507,000 | $26,813,000 | $12,500,000 | $179,820,000 |

[140] Data and information were provided by the USCIS IRIS Directorate. The average annual biometrics volumes were obtained through the CPMS database. The cost of the contract reflects the most recent contract update, dated June 18, 2020.

[141] Data and information were provided by USCIS IRIS Directorate, utilizing the CPMS database.

[142] "Economies of scale" refers to a scenario where a greater quantity of output produced (in this

case, more biometric service appointments) results in a lower per-unit fixed cost or per-unit variable cost to produce that output.

IFR_AR_000865

TABLE 10—MONETIZED COSTS OF THE INTERIM FINAL RULE TO USCIS—Continued

[In undiscounted 2020 dollars]

| FY | Human resources | General (non-IT) cost | IT expenditure | Annual total |
|---|---|---|---|---|
| Time Period: FYs 2022 through 2031 | | | | |
| 2023 | 133,427,000 | 26,892,000 | 4,375,000 | 164,694,000 |
| 2024 | 137,429,810 | 27,698,760 | 4,375,000 | 169,503,570 |
| 2025 | 141,552,704 | 28,529,723 | 4,375,000 | 174,457,427 |
| 2026 | 142,968,231 | 29,385,614 | 4,375,000 | 176,728,846 |
| 2027 | 147,257,278 | 30,267,183 | 4,375,000 | 181,899,461 |
| 2028 | 148,729,851 | 31,175,198 | 4,375,000 | 184,280,049 |
| 2029 | 153,191,747 | 32,110,454 | 4,375,000 | 189,677,201 |
| 2030 | 154,723,664 | 33,073,768 | 4,375,000 | 192,172,432 |
| 2031 | 159,365,374 | 34,065,981 | 4,375,000 | 197,806,355 |
| 10-year total | 1,459,152,660 | 300,011,682 | 51,875,000 | 1,811,039,342 |
| **10B. Primary Population Bound (150k Annual Cases)** | | | | |
| 2022 | 355,175,000 | 70,525,000 | 12,500,000 | 438,200,000 |
| 2023 | 337,047,000 | 72,179,000 | 4,375,000 | 413,601,000 |
| 2024 | 347,832,504 | 74,344,370 | 4,375,000 | 426,551,874 |
| 2025 | 358,963,144 | 76,574,701 | 4,375,000 | 439,912,845 |
| 2026 | 362,552,776 | 78,871,942 | 4,375,000 | 445,799,718 |
| 2027 | 374,154,464 | 81,238,100 | 4,375,000 | 459,767,565 |
| 2028 | 377,896,009 | 83,675,243 | 4,375,000 | 465,946,252 |
| 2029 | 389,988,681 | 86,185,501 | 4,375,000 | 480,549,182 |
| 2030 | 393,888,568 | 88,771,066 | 4,375,000 | 487,034,634 |
| 2031 | 406,493,002 | 91,434,198 | 4,375,000 | 502,302,200 |
| 10-year total | 3,703,991,149 | 803,799,121 | 51,875,000 | 4,559,665,270 |
| **10C. High Population Bound (300k Annual Cases)** | | | | |
| 2022 | 806,697,000 | 133,182,000 | 12,500,000 | 952,379,000 |
| 2023 | 766,159,000 | 136,874,000 | 4,375,000 | 907,408,000 |
| 2024 | 793,740,724 | 140,980,220 | 4,375,000 | 939,095,944 |
| 2025 | 822,315,390 | 145,209,627 | 4,375,000 | 971,900,017 |
| 2026 | 830,538,544 | 149,565,915 | 4,375,000 | 984,479,459 |
| 2027 | 860,437,932 | 154,052,893 | 4,375,000 | 1,018,865,824 |
| 2028 | 869,042,311 | 158,674,480 | 4,375,000 | 1,032,091,791 |
| 2029 | 900,327,834 | 163,434,714 | 4,375,000 | 1,068,137,548 |
| 2030 | 909,331,112 | 168,337,755 | 4,375,000 | 1,082,043,868 |
| 2031 | 942,067,032 | 173,387,888 | 4,375,000 | 1,119,829,921 |
| 10-year total | 8,500,656,879 | 1,523,699,492 | 51,875,000 | 10,076,231,371 |

The totals reported in Table 10 are collated in Table 11, with the 10-year discounted present values, each at a 3 percent and 7 percent discount rate. Because the cost inputs differ for each year, the average annualized equivalence costs are not uniform across discount rates.

TABLE 11—MONETIZED COSTS OF THE INTERIM FINAL RULE

[In millions, FY 2020 dollars]

| Population level | Undiscounted | 3-percent | | 7-percent | |
|---|---|---|---|---|---|
| | 10-year cost | 10-year cost | Annualized cost | 10-year cost | Annualized cost |
| Low | $1,811.0 | $1,538.8 | $180.4 | $1,260.8 | $179.5 |
| Primary | 4,559.7 | 3,871.3 | 453.8 | 3,168.9 | 451.2 |
| High | 10,076.2 | 8,550.3 | 1,002.4 | 6,993.7 | 995.8 |

As discussed in Section G of the NPRM, and mentioned earlier in this preamble, DHS expects this rule to be implemented in phases. Our quantitative cost estimates assume that the funding for the rule is essentially available when the rule takes effect, and that implementation costs are spread out over several years due to timing effects related to operational and hiring impacts. In reality, budgeting constraints and variations are expected to play a prominent role in the phasing in of the program. Our estimates thus account partially but not fully for such phasing. Incorporating additional phasing into resource allocation models is complex because of the interaction

IFR_AR_000866

between initial and recurring costs, and DHS is not prepared at this time to attempt to fully phase in the costs quantitatively. Despite this limitation, we do not believe that the true costs would be significantly different than those presented above. A phased implementation would not skew the actual costs, but rather allocate them to different timing sequences. In fact, from a discounting perspective, the present value of the costs would actually be lower if they were allocated to future years. DHS will continue to evaluate all pertinent data and information related to the phasing approach, and, if feasible, may include refined estimates of the resource-related costs in the final rule.

As of the final drafting of this IFR, DHS believes that, through FY 2022, new staff positions can be funded with existing resources, which would support a minimum processing level of 50,000 annual family-unit cases. For the medium and high-volume bands of 150,000 and 300,000 annual cases, respectively, DHS does not believe it can meet the full staffing requirements with current funding. Based on preliminary modeling, it could take up to three years to fully staff the medium-volume band and up to five years to staff the high-volume band.[143]

If the medium- and high-volume bands of 150,000 and 300,000 were to be funded through a future fee rule, it would increase fees by an estimated weighted average of 13 percent and 26 percent respectively. This estimated increase would be attributable to the implementation of the asylum officer portions of the IFR only, and it is provided to show the magnitude of the impact that implementation of this IFR would have beyond whatever other increases might be included in a future fee rule. The 13 percent or 26 percent estimated weighted average increase would be in addition to any changes in the Immigration Examinations Fee Account non-premium budget.

ii. Intra-Federal Government Sector Impacts

This rule is expected to shift the initial case processing of some asylum and protection claims from EOIR to USCIS. We present this shift in case processing as new resource costs for USCIS because USCIS would incur costs such as hiring new staff and funding new IT upgrades. The IJs at EOIR will continue to remain at DOJ and work on other high-priority matters. The IJs are

expected to continue to work on cases in which USCIS does not grant asylum because individuals whose asylum claims are not granted will be referred to EOIR for a streamlined section 240 removal proceeding. Cases in which USCIS grants asylum, however, would not receive further review within EOIR. Accordingly, every such case would constitute a direct reduction in new cases that EOIR would have to adjudicate. Given EOIR's significant pending caseload of approximately 1.3 million cases, reducing the number of cases referred to EOIR by 11,250 to 45,000 (assuming that approximately 15 percent of cases are granted, based on historical data as described above)[144] will enable EOIR to focus its resources on addressing existing pending cases and reducing the growth of the overall pending caseload. A reduction in the pending caseload may reduce the overall time required for adjudications because dockets would not have to be set as far into the future. This reduction in turn would better enable EOIR to meet its mission of fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws, including granting relief or protection to noncitizens who qualify.

c. Familiarization Costs, Benefits, and Transfers of Possible Early Labor Market Entry

It is possible that there will be familiarization costs associated with this IFR. It is expected that applicants and their support networks will incur costs to read and develop an understanding of this rule and the associated changes in the current asylum process. If, for example, attorneys are utilized, the cost could be $103.81 per hour, which is the average hourly wage for lawyers including the full cost of benefits.[145] As of the time of this analysis, there are approximately 155,000 words in this IFR. Although we could not identify formal studies on the subject, some reports suggest that, on average, a person reads about 250 words per minute, though there can be variation according to individual attributes and type of material being read. Based on the word count at the time of this analysis, it would thus take

about 10.3 hours[146] to read the rule. At the burdened wage for attorneys, this would be about $612.48 per review. If each individual in the population required such a reviewer, the total familiarization cost would be about $76.3 million, which would potentially be incurred during the first year the rule is effective.[147] Since this estimate assumes each individual would hire an attorney unfamiliar with this rule, it is likely to be an overestimate of actual familiarization costs.

The rule offers other benefits to asylum applicants and the Government. Although we cannot precisely parse the portion of the IFR's impact constituting transfers and the portion constituting costs, we believe that most of the distributional effects will comprise transfers that are beneficial to some asylum applicants (which we calculated on a per-person, workday basis), as opposed to costs. These transfers may impact the support network of the applicants. This network could include public and private entities, and it may comprise family and personal friends; legal services providers and advisors; religious and charity organizations; State and local public institutions; educational providers; and non-governmental organizations. To the extent that some individuals may be able to earn income earlier, burdens on this support network may be lessened and the tax impacts could be beneficial at the local or State level. In addition, as described above, it will take time for USCIS to make the requisite resourcing and staffing changes needed to fully effectuate the changes through which the impacts could be realized. In other words, there is likely to be a delay ranging from several months to more than a year for a sizeable portion of the impacts to begin to be realized. As a result, resources and efforts related to the applicants' support networks can be expected to be maintained in the short to medium term.

---

[143] These figures are based on preliminary results of staffing and resource allocation estimates provided by DHS's USCIS RAIO Directorate, Asylum Division; information was obtained on July 7, 2021.

[144] Calculations: 75,000 cases × 15 percent = 11,250; 300,000 cases × 15 percent = 45,000.

[145] For the average wage for lawyers, the Departments rely on BLS statistics. *See* BLS, May 2020 National Occupational Employment and Wage Estimates, *https://www.bls.gov/oes/2020/may/oes_nat.htm#00-0000* (last visited Mar. 1, 2022).

Calculation: $71.59 × 1.45 benefits burden = $103.81 (rounded).

[146] Calculation: 155,000 words/250 words per minute = 620 minutes; 620 minutes/60 minutes per hour = 10.3 hours (rounded).

[147] The benchmark of 250 words per minute applies to most adults, according to several reports. *See, e.g.,* HealthGuidance.org, What Is the Average Reading Speed and the Best Rate of Reading? (Jan. 3, 2020), *https://www.healthguidance.org/entry/13263/1/what-is-the-average-reading-speed-and-the-best-rate-of-reading.html* (last visited Feb. 28, 2022); ExecuRead, Speed Reading Facts, *https://secure.execuread.com/facts/* (last visited Feb. 28, 2022). It is noted that the reading of technical material can be slower than other types of documents. Because this document is technical in some ways, the actual review time might be higher, thus resulting in higher familiarization costs than reported herein. Calculation: 10.3 hours × $103.81 per hour = $1,069.24; $1,069.24 × 71,363 = $76.3 million.

IFR_AR_000867

In addition to the likely pecuniary benefits associated with early labor force entry, there could be other benefits. As a result of this rule, DHS will begin to consider parole on a case-by-case basis for noncitizens who have been referred to USCIS for a credible fear screening under an expanded set of factors. Allowing for parole to be considered for more individuals in Government custody could allow for resource redistribution within DHS, as DHS might be able to shift resources otherwise dedicated to the transportation and detention of these individuals and families. This redistribution would allow DHS to prioritize the use of its limited detention bed space to detain those noncitizens who pose the greatest threats to national security and public safety while facilitating the expanded use of the expedited removal process to order the removal of those who make no fear claim or who express a fear but subsequently fail to meet the credible fear screening standard after interview by an asylum officer (or, if applicable, by an IJ). DHS, however, does not know how many future referrals for a credible fear screening will be eligible for parole; therefore, DHS cannot make an informed monetized estimate of the impact of this potential resource redistribution.

This rule presents substantial costs for USCIS, especially as costs are incurred to upgrade IT systems and begin hiring and training new staff. However, there are several expected qualitative benefits associated with the increased efficiency that would enable many individuals determined to have a credible fear of persecution or torture to move through the asylum adjudication or removal process more expeditiously than through the current process. Currently, it takes anywhere from eight months to five years for individuals claiming credible fear to have a final asylum determination made for their case. Under this rule, it is expected that USCIS will reach a decision on the merits of an asylum application within about 60 days of the application's filing date for most cases. As a result, individuals who are granted asylum by USCIS would likely experience a much-reduced wait time for their asylum determination. Those who are not granted asylum by USCIS are also expected to receive a final decision (either denial of asylum and issuance of a removal order or grant of asylum by an IJ) faster than under the current procedures for cases originating in credible fear screening. The timelines of 8 CFR 1240.17 provide for the

streamlined removal proceedings to conclude within 90 days of service of an NTA (that is, within approximately 5 months of the application's filing date) in a typical case, in the absence of continuances or extensions. Greater efficiencies in the adjudicative process could lead to individuals spending less time in detention, which is a benefit to both the individuals and the Federal Government. Another benefit is that EOIR will not see the cases in which USCIS grants asylum, which we estimate as at least a 15 percent reduction in its overall credible fear workload.[148] The Departments anticipate this reduction will help mitigate the number of cases pending in immigration court.

Additionally, this benefit will extend to individuals granted or not granted asylum faster than if they were to go through the current process with EOIR. For cases that are referred to EOIR, an asylum officer will have already prepared the equivalent of Form I–589, gathered evidence, and provided time for individuals to obtain counsel and request necessary documents from their home country, if desired. Having credible fear cases fully developed by an asylum officer will enable IJs to focus their efforts on the merits of a case instead of developing it anew, thus resulting in prompt IJ review. For those credible fear cases in which an individual receives a positive screen but a decision not granting the individual's asylum claim, USCIS recognizes that some streamlined section 240 removal proceedings will conclude with little expenditure of EOIR resources—if, for example, the applicant does not contest the asylum officer's decision. Therefore, the benefit to EOIR under the new procedures could be greater than the Departments are able to currently quantify.

The reduction of credible fear cases that EOIR would need to process would enable EOIR to focus its resources on addressing existing pending cases and reducing the growth of the overall pending caseload. It would also allow EOIR to shift some resources to other work. We cannot currently make a one-to-one comparison between the work time actually spent on credible fear cases between EOIR judges and USCIS

asylum officers, but if there is a reduction in average work time spent on cases, there could be cost savings for EOIR, though it is emphasized that these cost savings would not be budgetary. Further, this rule may slow the growth of the number of Form I–765s for pending asylum applicants. As explained above, if some individuals are granted asylum faster than under current conditions, some applicants in this process may choose not to file for an EAD. This could result in cost savings to applicants, as discussed, and it would also reduce USCIS's adjudication burden.

The Departments assess that noncitizens placed into expedited removal proceedings and the new streamlined 240 procedures established by this rule will more likely receive a prompter adjudication of their claims for asylum, withholding of removal, or CAT protection than they would under the existing regulations. Depending on the individual circumstances of each case, this IFR could mean that such noncitizens would likely not remain in the United States—for years, potentially—pending resolution of their claims, and those who qualify for asylum will be granted asylum several years earlier than they are under the present process.

Overall, the anticipated operational efficiencies from this rule may provide for a prompter grant of protection to qualifying noncitizens and ensure that those who do not qualify for relief or protection are removed sooner than they would be in the absence of this rulemaking. Relative to the NPRM, the changes in this IFR may result in smaller overall operational efficiencies for DHS because attorneys from the ICE Office of the Principal Legal Advisor ("OPLA") will need to participate in the streamlined section 240 removal process. With respect to DHS, the IFR's adoption of streamlined section 240 proceedings in place of the NPRM's proposed IJ application review proceedings means that DHS attorneys will necessarily participate in immigration court when the asylum officer does not grant asylum.[149] Likewise, with respect to EOIR, streamlined section 240 proceedings may require somewhat greater immigration court resources than would the optional IJ application review proceedings proposed in the NPRM. Considering both quantifiable and

---

[148] Based on the five-year (FY 2017 through FY 2021) average, an estimated 15 percent of EOIR asylum applicants were granted asylum in cases originating with a credible fear claim. *See* EOIR, Adjudications Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 19, 2022), *https://www.justice.gov/eoir/page/file/1062976/download.* Calculation: FY 2017 to FY 2021 grant rates (14.02 percent) + (16.48 percent) + (15.38 percent) + (16.60 percent) + 14.32 percent)/5 = 15 percent average (rounded).

[149] On the other hand, relative to the baseline, the reduced number of cases that reach immigration court as a result of this rule, as described above, will translate into a workload reduction for DHS's OPLA, just as for EOIR, enabling DHS attorneys to dedicate more time to other high-priority matters.

unquantifiable benefits and costs, the Departments believe that the aggregate benefits of the rule would amply justify the aggregate costs.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* (''RFA''), imposes certain requirements on Federal agency rules that are subject to the notice-and-comment requirements of the APA. *See* 5 U.S.C. 603(a), 604(a). This IFR does not directly regulate small entities and is not expected to have a direct effect on small entities. Rather, this IFR regulates individuals, and individuals are not defined as ''small entities'' by the RFA. *See* 5 U.S.C. 601(6). Although some employers that qualify as small entities [150] could experience costs or transfer effects, these impacts would be indirect. Based on the evidence presented in this analysis and throughout this preamble, DHS certifies that this IFR would not have a significant economic impact on a substantial number of small entities.

Nonetheless, in connection with the NPRM, USCIS examined the potential impact of this rule on small entities, 86 FR 46938, and several commenters provided feedback about the rule's impact.

*Comments:* A commenter claimed that the prior analysis did not adequately analyze the impact on small entities and that the rule should therefore be withdrawn. The comment asserted that the rule's substantial changes would entail extensive legal preparation, interpretation, explanation, and evidentiary efforts by the representatives of the impacted asylum seekers. These changes would stand to affect the resources and revenue of both private attorneys and non-profit organizations, including small entities. Because the rule, according to the commenter, would increase the complexity of the asylum system, these entities could either lose money or respond by charging higher fees. The latter response, the commenter asserted, would push more clients to proceed on their own behalf.

In addition, the commenter claimed that the potential familiarization costs of about $69.05 per hour, as presented in the NPRM, were unexplained and that the required time in hours was not accounted for. The commenter also claimed that the Departments' determination that the rule does not regulate small entities is erroneous because the added legal efforts will

impact the resources and operations of legal providers, including small entities.

*Response:* The Departments disagree with this assessment of the RFA. As the Government has previously recognized, ''[t]he courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates small entities.'' [151] This rule directly regulates individuals and does not regulate small entities. Changes in resources or business operations for legal providers may be indirect impacts, but the rule imposes no mandates or requirements on such entities. Furthermore, the Departments acknowledge that the rule could impact the support networks of individuals, which could include legal services and assistance providers that might qualify as small entities, but again, these effects are indirect consequences of the rule.

Regarding the commenters' claims about familiarization costs, we provided a reference noting that the wage used to calculate those costs represents the national average for lawyers applicable to the May 2020 BLS National Occupational Employment and Wage Estimates. In this IFR, we take the additional step of providing an estimate for these costs, based on the maximum population, typical reading speed, and word count. Based on this information, familiarization costs could be around $76.3 million the first year the rule is effective, and likely less in future years.

*Comments:* Several commenters expressed concern that fee increases will negatively impact legal service providers because asylum seekers may no longer be able to afford to hire legal counsel and would demand pro bono services. Additionally, they expressed concern that regulatory changes that force cases to be processed on an expedited timeline will increase the amount of time legal service providers must spend on a case, which will limit the number of clients they can serve.

*Response:* The Departments recognize the role of legal service providers in the application process for many asylum seekers. USCIS currently does not charge a fee to apply for asylum, nor does this rule require this population to pay a fee for their asylum applications to be adjudicated. This rule does not change an asylum applicant's ability to hire legal counsel or acquire pro bono services, nor does it prevent a legal

service provider from offering its services. The purpose of the rule is to make the asylum process more efficient by streamlining proceedings that heretofore have been drawn out for months or even years before EOIR.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (''UMRA'') is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector.

Although this rule is expected to exceed the $100 million expenditure in any one year when adjusted for inflation ($178 million in 2021 dollars based on the Consumer Price Index for All Urban Consumers (''CPI–U'')),[152] the Departments do not believe this rule would impose any unfunded Federal mandates on State, local, or Tribal governments, or on the private sector. The impacts are likely to apply to individuals, potentially in the form of beneficial distributional effects and cost savings. There could be tax impacts related to the distributional effects. However, these effects do not constitute ''mandates'' for purposes of the UMRA. *See* 2 U.S.C. 658 (defining mandates only as statutory or regulatory provisions that ''impose an enforceable duty'' on the private sector or on State, local, or Tribal governments). Further, the real resource costs quantified in this analysis apply to the Federal Government and also are not mandates.

---

[150] The definition of ''small entity'' includes ''small business[es].'' *See* 5 U.S.C. 601(3).

[151] *See* U.S. Small Business Administration Office of Advocacy, *A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act* 22 (Aug. 2017), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/06/21110349/How-to-Comply-with-the-RFA.pdf* (last visited Feb. 28, 2022).

[152] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202112.pdf* (last visited Feb. 28, 2022).

Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2021 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(270.970−152.383)/152.383] * 100 = [118.587/152.383] * 100 = 0.77821673 * 100 = 77.82 percent = 78 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.78 = $178 million in 2021 dollars.

Therefore, the Departments have not prepared a written UMRA statement.

*E. Congressional Review Act*

The Administrator of the Office of Information and Regulatory Affairs has determined that this IFR is a "major rule" within the meaning of Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (also known as the Congressional Review Act), 5 U.S.C. 804(2). Accordingly, this final rule is effective 60 days after publication.

*F. Executive Order 13132 (Federalism)*

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*H. Family Assessment*

The Departments have assessed this action in accordance with section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, div. A, sec. 654(c), 112 Stat. 2681, 2681–529 (1998). With respect to the criteria specified in section 654(c), the Departments determined that the rule would not have any adverse impacts on family safety or stability. The rule would expand the circumstances in which asylum-seeking families who have been placed into expedited removal and who present neither a security risk nor a risk of absconding may be paroled from custody, thereby helping preserve family unity and safety, while also avoiding the overcrowding of detention facilities and better aligning detention resources, including the use of alternatives to detention. Additionally, this rule would result in greater efficiencies in the expedited removal and asylum processes, providing speedier resolution of meritorious cases and reducing the overall asylum system backlogs.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

The Departments analyze actions to determine whether the National Environmental Policy Act, Public Law 91–190, 83 Stat. 852 (1970) (codified at 42 U.S.C. 4321–4347), applies to them and, if so, what degree of analysis is required. *See* DHS, *Implementation of the National Environmental Policy Act, Directive 023–01* (Oct. 31, 2014), *https:// www.dhs.gov/publication/directive-023- 01-rev-01-and-instruction-manual-023- 01-001-01-rev-01-and-catex* ("Directive 023–01"); *Instruction Manual 023–01. Directive 023–01* and *Instruction Manual 023–01* establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1501.4, 1507.3(e)(2)(ii). The DHS categorical exclusions are listed in Appendix A of *Instruction Manual 023– 01*. For an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[153]

As discussed in more detail throughout this rule, the Departments are modifying regulations applicable to noncitizens who have been placed into the expedited removal process, specifically for those who are found to have a positive credible fear. The rule

could result in an increase in the number of noncitizens in expedited removal paroled out of custody, thereby promoting efficient processing and prioritization of DHS's limited detention bed space to detain those noncitizens who pose the greatest threats to national security and public safety.

Generally, the Departments believe NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impacts would be largely, if not completely, speculative. This rule would not alter any eligibility criteria, but rather would change certain procedures, specifically, which Federal agency adjudicates certain asylum claims. The rule also would not make any changes to detention facilities. Rather, the detention facilities are already in existence and to attempt to calculate how many noncitizens would be paroled—a highly discretionary benefit—and how many would proceed to the detention centers would be nearly impossible to determine. The Departments have no reason to believe that the IFR's amendments would change the environmental effect, if any, of the existing regulations.

Therefore, the Departments have determined that, even if NEPA applied to this action, this rule clearly fits within categorical exclusion A3(d) in *Instruction Manual 023–01*, which provides an exclusion for "promulgation of rules . . . that amend an existing regulation without changing its environmental effect." *Instruction Manual 023–01* at A–2. Furthermore, the Departments have determined that this rule clearly fits within categorical exclusion A3(a) in *Instruction Manual 023–01* because the proposed rule is of a strictly administrative or procedural nature. *Id.* at A–1. This rule is not a part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded, and no further NEPA analysis is required.

*K. Paperwork Reduction Act*

USCIS Form I–765

Under the Paperwork Reduction Act ("PRA"), Public Law 104–13, 109 Stat. 163 (1995), all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. In compliance with the PRA, DHS published a notice of proposed rulemaking on August 20, 2021, in which it requested comments on the revision to the information

---

[153] *Instruction Manual 023–01* at V.B(2)(a)–(c).

collection associated with this rulemaking.

DHS and USCIS invite the general public and other Federal agencies to comment on the impact of the proposed collection of information for an additional 60 days. Comments are encouraged and must be submitted on or before May 31, 2022. All submissions received must include the OMB Control Number 1615–0040 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation sections of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of IT (*e.g.*, permitting electronic submission of responses).

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–765; I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of employment authorization. USCIS is revising the form instructions to correspond with revisions related to information about the asylum application and parole.

(5) *An estimate of the total number of noncitizens and the amount of time estimated for an average noncitizen to respond:* The estimated total number of noncitizens for the information collection I–765 paper filing is 2,178,820, and the estimated hour burden per response is 4.5 hours; the estimated total number of noncitizens for the information collection I–765 online filing is 107,180, and the estimated hour burden per response is 4 hours; the estimated total number of noncitizens for the information collection I–765WS is 302,000, and the estimated hour burden per response is 0.5 hours; the estimated total number of noncitizens for the information collection biometrics submission is 302,535, and the estimated hour burden per response is 1.17 hours; the estimated total number of noncitizens for the information collection passport photos is 2,286,000, and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection of information is 11,881,376 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal Services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procedure, Aliens.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, 8 CFR parts 208, 212, and 235 are amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.2 by:
■ a. Revising paragraph (a);
■ b. Removing the word "or" at the end of paragraph (c)(1)(vii);
■ c. Removing the period at the end of paragraph (c)(1)(viii) and adding "; or" in its place; and
■ d. Removing and reserving paragraph (c)(1)(ix).

The revision reads as follows:

**§ 208.2   Jurisdiction.**

(a) *Jurisdiction of U.S. Citizenship and Immigration Services (USCIS).* (1) Except as provided in paragraph (b) or (c) of this section, USCIS shall have initial jurisdiction over:

(i) An asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry; and

(ii) Interviews provided in accordance with section 235(b)(1)(B)(ii) of the Act to further consider the application for asylum of an alien, other than a stowaway or alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands, found to have a credible fear of persecution or torture in accordance with § 208.30(f) and retained by USCIS, or referred to USCIS by an immigration judge pursuant to 8 CFR 1003.42 and 1208.30 after the immigration judge has vacated a negative credible fear determination. Interviews to further consider applications for asylum under this paragraph (a)(1)(ii) are governed by the procedures provided for in § 208.9. Further consideration of an asylum application filed by a stowaway who has received a positive credible fear

IFR_AR_000871

determination will be under the jurisdiction of an immigration judge pursuant to paragraph (c) of this section.

(2) USCIS shall also have initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31.

\* \* \* \* \*

■ 3. Amend § 208.3 by revising paragraphs (a) and (c)(3) to read as follows:

### § 208.3 Form of application.

(a)(1) Except for applicants described in paragraph (a)(2) of this section, an asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

(2) For asylum applicants, other than stowaways, who are awaiting further consideration of an asylum application pursuant to section 235(b)(1)(B)(ii) of the Act following a positive credible fear determination, the written record of a positive credible fear finding issued in accordance with § 208.30(f) or 8 CFR 1003.42 or 1208.30 satisfies the application filing requirements in paragraph (a)(1) of this section for purposes of consideration by USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii). The written record of the positive credible fear determination shall be considered a complete asylum application for purposes of §§ 208.4(a), 208.7, and 208.9(a); shall not be subject to the requirements of 8 CFR 103.2; and shall be subject to the conditions and consequences in paragraph (c) of this section upon signature at the asylum interview. The date that the positive credible fear determination is served on the alien shall be considered the date of filing and receipt. Application information collected electronically will be preserved in its native format. The applicant's spouse and children may be included in the request for asylum only if they were included in the credible fear determination pursuant to § 208.30(c), or also presently have an application for asylum pending adjudication with USCIS pursuant to § 208.2(a)(1)(ii). If USCIS does not grant the applicant's asylum application after an interview conducted in accordance with § 208.9 and if a spouse or child

who was included in the request for asylum does not separately file an asylum application that is adjudicated by USCIS, the application will also be deemed to satisfy the application filing requirements of 8 CFR 1208.4(b) for a spouse or child who was included in the request for asylum. The biometrics captured during expedited removal for the principal applicant and any dependents may be used to verify identity and for criminal and other background checks for purposes of an asylum application under the jurisdiction of USCIS pursuant to § 202.2(a)(1) and any subsequent immigration benefit.

\* \* \* \* \*

(c) \* \* \*

(3) An asylum application under paragraph (a)(1) of this section must be properly filed in accordance with 8 CFR part 103 and the filing instructions. Receipt of a properly filed asylum application under paragraph (a) of this section will commence the period after which the applicant may file an application for employment authorization in accordance with § 208.7 and 8 CFR 274a.12 and 274a.13.

\* \* \* \* \*

■ 4. Amend § 208.4 by redesignating paragraph (c) as paragraph (b) and revising it to read as follows:

### § 208.4 Filing the application.

\* \* \* \* \*

(b) *Amending an application after filing.* (1) For applications being considered by USCIS pursuant to § 208.2(a)(1)(i), upon the request of the alien, and as a matter of discretion, the asylum officer or immigration judge with jurisdiction may permit an asylum applicant to amend or supplement the application. Any delay in adjudication or in proceedings caused by a request to amend or supplement the application will be treated as a delay caused by the applicant for purposes of § 208.7 and 8 CFR 274a.12(c)(8).

(2) For applications being considered by USCIS pursuant to § 208.2(a)(1)(ii), the asylum applicant may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, provided the information is submitted directly to the asylum office no later than 7 calendar days prior to the scheduled asylum interview, or for documents submitted by mail, postmarked no later than 10 calendar days prior to the scheduled asylum interview. The asylum officer,

finding good cause in an exercise of USCIS's discretion, may consider amendments or supplements submitted after the 7- or 10-day (depending on the method of submission) deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described at § 208.9(e)(2). Any amendment, correction, or supplement shall be included in the record.

■ 5. Amend § 208.9 by:

■ a. Revising paragraphs (a) through (g); and

■ b. Adding paragraph (i).

The revisions and addition read as follows:

### § 208.9 Procedure for interview before an asylum officer.

(a) *Claims adjudicated.* USCIS shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of § 208.3(a)(2) or (c)(3), when applicable, and is within the jurisdiction of USCIS pursuant to § 208.2(a). In all cases, such proceedings shall be conducted in accordance with section 208 of the Act.

(1) *Timing of interview.* For interviews on asylum applications within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), USCIS shall not schedule the interview to take place fewer than 21 days after the applicant has been served with a record of the positive credible fear determination pursuant to § 208.30(f), unless the applicant requests in writing that an interview be scheduled sooner. The asylum officer shall conduct the interview within 45 days of the applicant being served with a positive credible fear determination made by an asylum officer pursuant to § 208.30(f) or made by an immigration judge pursuant to 8 CFR 1208.30, subject to the need to reschedule an interview due to exigent circumstances, such as the unavailability of an asylum officer to conduct the interview, the inability of the applicant to attend the interview due to illness, the inability to timely secure an appropriate interpreter pursuant to paragraph (g)(2) of this section, or the closure of the asylum office.

(2) [Reserved]

(b) *Conduct and purpose of interview.* The asylum officer shall conduct the interview in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. For interviews on applications within the

jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), the asylum officer shall also elicit all relevant and useful information bearing on the applicant's eligibility for withholding of removal under the Act and protection under the Convention Against Torture, and, as appropriate, elicit sufficient information to make a determination whether there is a significant possibility that the applicant's spouse or child, if included in the request for asylum, has experienced or fears harm that would be an independent basis for asylum, withholding of removal under the Act, or protection under the Convention Against Torture in the event that the principal applicant is not granted asylum. If the asylum officer determines that there is a significant possibility that the applicant's spouse or child has experienced or fears harm that would be an independent basis for asylum, withholding of removal under the Act, or protection under the Convention Against Torture, the asylum officer shall inform the spouse or child of that determination. At the time of the interview, the applicant must provide complete information regarding the applicant's identity, including name, date and place of birth, and nationality, and may be required to register this identity. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) *Authority of asylum officer.* The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present evidence, receive evidence, and question the applicant and any witnesses.

(d) *Completion of the interview.* Upon completion of the interview before an asylum officer:

(1) The applicant or the applicant's representative will have an opportunity to make a statement or comment on the evidence presented. The representative will also have the opportunity to ask follow-up questions of the applicant and any witness. The asylum officer may, in the asylum officer's discretion, limit the length of any statement or comment and may require its submission in writing.

(2) USCIS shall inform the applicant that the applicant must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision

will be treated as delay caused by the applicant for purposes of § 208.7.

(e) *Extensions.* The asylum officer will consider evidence submitted by the applicant together with the applicant's asylum application.

(1) For applications being considered under § 208.2(a)(1)(i), the applicant must submit any documentary evidence at least 14 calendar days in advance of the interview date. As a matter of discretion, the asylum officer may consider evidence submitted within the 14-day period prior to the interview date or may grant the applicant a brief extension of time during which the applicant may submit additional evidence. Any such extension will be treated as a delay caused by the applicant for purposes of § 208.7.

(2) For applications being considered under § 208.2(a)(1)(ii), the asylum officer may grant the applicant a brief extension of time during which the applicant may submit additional evidence, but the asylum officer shall not grant any extension to submit additional evidence that would prevent a decision from being issued on the application within 60 days of service of the positive credible fear determination made by an asylum officer pursuant to § 208.30(f) or made by an immigration judge pursuant to 8 CFR 1208.30 except when the interview has been rescheduled due to exigent circumstances pursuant to paragraph (a)(1) of this section.

(f) *Record.* (1) The asylum application, as defined in § 208.3(a), all supporting information provided by the applicant, any comments submitted by the Department of State or by DHS, and any other unclassified information considered by the asylum officer in the written decision shall comprise the record.

(2) For interviews on asylum applications within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), except for statements made off the record with the permission of the asylum officer, the interview shall be recorded. A verbatim transcript of the interview shall be prepared and included in the referral package to the immigration judge as described in § 208.14(c)(1), with a copy also provided to the applicant.

(g) *Interpreters.* (1) Except as provided in paragraph (g)(2) of this section, an applicant unable to proceed with the interview in English must provide, at no expense to USCIS, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. The interpreter must be at least 18 years of age. Neither the applicant's

attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph (g)(1) may be considered a failure to appear for the interview for purposes of § 208.10.

(2) Notwithstanding paragraph (h) of this section, for interviews on asylum applications within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), if the applicant is unable to proceed effectively in English, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. If a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of employment authorization pursuant to § 208.7.

*       *       *       *       *

(i) *Dependents of applicants being considered under § 208.2(a)(1)(ii).* This paragraph (i) governs when an applicant whose application for asylum is being considered under § 208.2(a)(1)(ii) is not granted asylum pursuant to § 208.14(c) and has included a spouse or children within their request for asylum. The asylum officer will make a determination whether there is a significant possibility that the spouse or child has experienced or fears harm that would be an independent basis for asylum, withholding of removal under the Act, or protection under the Convention Against Torture, based on the information elicited pursuant to paragraph (b) of this section. This determination will be included in the record, as otherwise described in paragraph (f) of this section. Referral of the principal applicant's application to an immigration judge, along with the appropriate charging documents, will not be made until any pending application by the spouse or child as a principal applicant is adjudicated.

*       *       *       *       *

■ 6. Amend § 208.14 by revising paragraphs (b), (c) introductory text, and (c)(1) to read as follows:

**§ 208.14  Approval, denial, referral, or dismissal of application.**

*       *       *       *       *

(b) *Approval by an asylum officer.* In any case within the jurisdiction of USCIS, unless otherwise prohibited in § 208.13(c), an asylum officer, subject to review within USCIS, may grant, in the exercise of his or her discretion, asylum to an applicant who qualifies as a refugee under section 101(a)(42) of the Act, and whose identity has been checked pursuant to section 208(d)(5)(A)(i) of the Act.

(c) *Denial, referral, or dismissal by an asylum officer.* If the asylum officer, subject to review within USCIS, does not grant asylum to an applicant after an interview conducted in accordance with § 208.9, or if, as provided in § 208.10, the applicant is deemed to have waived the applicant's right to an interview or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application as follows:

(1) *Inadmissible or deportable aliens.* Except for applicants described in paragraph (c)(4)(ii) of this section who have not already been subject to proceedings in accordance with § 235.3(b) of this chapter, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging documents may not be issued, shall dismiss the application).

*    *    *    *    *

■ 7. Amend § 208.16 by revising paragraphs (a) and (c)(4) to read as follows:

### § 208.16    Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.

(a) *Consideration of application for withholding of removal.* An asylum officer shall not determine whether an alien is eligible for withholding of the exclusion, deportation, or removal of the alien to a country where the alien's life or freedom would be threatened, except in the case of an alien who is determined to be an applicant for admission under section 235(b)(1) of the Act, who is found to have a credible fear of persecution or torture, whose case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii) to consider the application for asylum, and whose application for asylum is not granted; or in the case of the spouse or child of such an alien who is included in the alien's asylum application and who files a separate application for asylum with USCIS that is not granted. In such cases, the asylum officer will determine, based

on the record before USCIS, whether the applicant is eligible for statutory withholding of removal under paragraph (b) of this section or withholding or deferral of removal pursuant to the Convention Against Torture under paragraph (c) of this section. Even if the asylum officer determines that the applicant has established eligibility for withholding of removal under paragraph (b) or (c) of this section, the asylum officer shall proceed with referring the application to the immigration judge for a hearing pursuant to § 208.14(c)(1). In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

*    *    *    *    *

(c) *    *    *    *

(4) In considering an application for withholding of removal under the Convention Against Torture, the adjudicator shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the adjudicator determines that the alien is more likely than not to be tortured in the country of removal, the alien is eligible for protection under the Convention Against Torture, and the adjudicator shall determine whether protection under the Convention Against Torture should be granted either in the form of withholding of removal or in the form of deferral of removal. The adjudicator shall state that an alien eligible for such protection is eligible for withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section. If an alien eligible for such protection is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section, the adjudicator shall state that the alien is eligible for deferral of removal under § 208.17(a). For cases under the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), the asylum officer may make such a determination based on the application and the record before USCIS; however, the asylum officer shall not issue an order granting withholding of removal or deferral of removal because that is referred to the immigration judge pursuant to § 208.14(c)(1) and 8 CFR 1240.17.

*    *    *    *    *

■ 8. Amend § 208.30 by revising the section heading and paragraphs (b), (c), (d) introductory text, (e) heading, (e)(1) through (4), (e)(5)(i), (e)(6) introductory text, (e)(6)(ii), (f), and (g) to read as follows:

### § 208.30    Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

*    *    *    *    *

(b) *Process and authority.* If an alien subject to section 235(a)(2) or 235(b)(1) of the Act indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by a USCIS asylum officer in accordance with this section. A USCIS asylum officer shall then screen the alien for a credible fear of persecution or torture. An asylum officer, as defined in section 235(b)(1)(E) of the Act, has the authorities described in § 208.9(c). If in exercising USCIS's discretion, it is determined that circumstances so warrant, the asylum officer, after supervisory concurrence, may refer the alien for proceedings under section 240 of the Act without making a credible fear determination.

(c) *Treatment of family units.* (1) A spouse or child of a principal alien who arrived in the United States concurrently with the principal alien shall be included in that alien's positive credible fear evaluation and determination, unless the principal alien or the spouse or child declines such inclusion. Any alien may have his or her evaluation and determination made separately, if that alien expresses such a desire. The option for members of a family unit to have their evaluations and determinations made separately shall be communicated to all family members at the beginning of the interview process.

(2) The asylum officer in the officer's discretion may also include other accompanying family members who arrived in the United States concurrently with a principal alien in that alien's positive fear evaluation and determination for purposes of family unity.

(3) For purposes of family units in credible fear determinations, the category of "child" includes only unmarried persons under 21 years of age.

(d) *Interview.* A USCIS asylum officer will conduct the credible fear interview in a nonadversarial manner, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on whether the alien can establish a credible fear of persecution or torture. The information provided during the interview may form the basis of an asylum application pursuant to

IFR_AR_000874

paragraph (f) of this section and § 208.3(a)(2). The asylum officer shall conduct the interview as follows:

*    *    *    *    *

(e) *Determination.* (1) The asylum officer shall create a written record of the officer's determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture.

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. However, prior to January 1, 2030, in the case of an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands, the officer may only find a credible fear of persecution if there is a significant possibility that the alien can establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that the alien is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit a positive credible fear finding pursuant to paragraph (f) of this section in order to receive further consideration of the application for asylum and withholding of removal.

(5)(i) Except as provided in paragraphs (e)(5)(ii) through (iv), or paragraph (e)(6) or (7) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and (b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless issue a Notice to Appear or retain the alien for further consideration of the alien's claim pursuant to paragraph (f) of this section, if the alien is not a stowaway. If the alien is a

stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

*    *    *    *    *

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the United States during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada by operation of the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries (''Agreement''). In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided, however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph (e)(6). The asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

*    *    *    *    *

(ii) If the alien establishes by a preponderance of the evidence that the alien qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

*    *    *    *    *

(f) *Procedures for a positive credible fear finding.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue the alien a record of the positive credible fear determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based. The documents may be served in-person, by mail, or electronically. USCIS has complete discretion to either issue a Form I–862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act, or retain jurisdiction over the application for asylum pursuant to

§ 208.2(a)(1)(ii) for further consideration in a hearing pursuant to § 208.9. Should any part of 8 CFR 1240.17 be enjoined or vacated, USCIS has the discretion to determine that it will issue a Form I–862, Notice to Appear, in all cases that receive a positive credible fear determination. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–863, Notice of Referral to Immigration Judge, for full consideration of the asylum claim, or the withholding of removal claim, in proceedings under § 208.2(c). Parole of the alien may be considered only in accordance with section 212(d)(5) of the Act and 8 CFR 212.5.

(g) *Procedures for a negative credible fear finding.* (1) If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of decision and issue the alien a record of the credible fear determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based. The asylum officer shall inquire whether the alien wishes to have an immigration judge review the negative decision, which shall include an opportunity for the alien to be heard and questioned by the immigration judge as provided for under section 235(b)(1)(B)(iii)(III) of the Act, using Form I–869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. The alien shall indicate whether the alien desires such review on Form I–869. A refusal or failure by the alien to make such indication shall be considered a request for review.

(i) If the alien requests such review, or refuses or fails to either request or decline such review, the asylum officer shall serve the alien with a Form I–863, Notice of Referral to Immigration Judge, for review of the credible fear determination in accordance with paragraph (g)(2) of this section. USCIS may, in its discretion, reconsider a negative credible fear finding that has been concurred upon by an immigration judge provided such reconsideration is requested by the alien or initiated by USCIS no more than 7 calendar days after the concurrence by the immigration judge, or prior to the alien's removal, whichever date comes first, and further provided that no previous request for reconsideration of that negative finding has already been made. The provisions of 8 CFR 103.5 shall not apply to credible fear determinations.

(ii) If the alien is not a stowaway and does not request a review by an

IFR_AR_000875

immigration judge, DHS shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal, after review by a supervisory asylum officer.

(iii) If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(2)(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1003.42 and 1208.30(g).

(ii) The record of the negative credible fear determination, including copies of the Form I–863, Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 9. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255, 1359; section 7209 of Pub. L. 108–458 (8 U.S.C. 1185 note); Title VII of Pub. L. 110–229 (8 U.S.C. 1185 note); 8 CFR part 2; Pub. L. 115–218.

Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 10. Amend § 212.5 by revising paragraph (b) introductory text to read as follows:

### § 212.5 Parole of aliens into the United States.

\*    \*    \*    \*    \*

(b) *Parole from custody.* The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(b) or (c) of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

\*    \*    \*    \*    \*

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 11. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379,

1731–32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

■ 12. Amend § 235.3 by revising paragraphs (b)(2)(iii), (b)(4)(ii), and (c) to read as follows:

### § 235.3 Inadmissible aliens and expedited removal.

\*    \*    \*    \*    \*

(b) \*    \*    \*
(2) \*    \*    \*

(iii) *Detention and parole of alien in expedited removal.* An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal. Parole of such alien shall only be considered in accordance with section 212(d)(5) of the Act and § 212.5(b) of this chapter. A grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under § 274a.12(c)(11) of this chapter.

\*    \*    \*    \*    \*

(4) \*    \*    \*

(ii) *Detention pending credible fear interview.* Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien shall only be considered in accordance with section 212(d)(5) of the Act and § 212.5(b) of this chapter. A grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under § 274a.12(c)(11) of this chapter. Prior to the interview, the alien shall be given time to contact and consult with any person or persons of the alien's choosing. If the alien is detained, such consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the Government, and shall not unreasonably delay the process.

\*    \*    \*    \*    \*

(c) *Arriving aliens placed in proceedings under section 240 of the Act or aliens referred for an asylum merits interview under § 208.2(a)(1)(ii) of this chapter.* (1) Except as otherwise provided in this chapter, any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with section 235(b) of the Act. Parole of such alien

shall only be considered in accordance with § 212.5(b) of this chapter. This paragraph (c) shall also apply to any alien who arrived before April 1, 1997, and who was placed in exclusion proceedings.

(2) Except as otherwise provided in this chapter, any alien over whom USCIS exercises jurisdiction pursuant to § 208.2(a)(1)(ii) of this chapter after being found to have a credible fear of persecution or torture shall be detained in accordance with section 235(b) of the Act. Parole of such alien shall only be considered in accordance with § 212.5(b) of this chapter.

\*    \*    \*    \*    \*

■ 13. Amend § 235.6 by:
■ a. Removing and reserving paragraphs (a)(1)(iii) and (iv);
■ b. Revising paragraph (a)(2)(i);
■ c. Removing the period at the end of paragraph (a)(2)(ii) and adding "; or" in its place; and
■ d. Revising paragraph (a)(2)(iii). The revisions read as follows:

### § 235.6 Referral to immigration judge.

(a) \*    \*    \*
(2) \*    \*    \*

(i) If an asylum officer determines that the alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge;

\*    \*    \*    \*    \*

(iii) If an immigration officer refers an applicant in accordance with the provisions of § 208.2(c)(1) or (2) of this chapter to an immigration judge for an asylum- or withholding-only hearing.

\*    \*    \*    \*    \*

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, 8 CFR parts 1003, 1208, 1235, and 1240 are amended as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 14. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 15. Amend § 1003.42 by revising the section heading and paragraph (d)(1) to read as follows:

IFR_AR_000876

## §1003.42   Review of credible fear determinations.

*   *   *   *   *

(d) * * *

(1) The immigration judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim, and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding of removal under section 241(b)(3)(B) of the Act or deferral of removal under the Convention Against Torture.

*   *   *   *   *

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 16. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 17. Amend § 1208.2 by:
■ a. Revising paragraph (a);
■ b. Removing and reserving paragraph (c)(1)(ix); and
■ c. Removing "paragraph (c)(1) or (c)(2)" and adding "paragraph (c)(1) or (2)" in its place in paragraph (c)(3)(i).
The revision reads as follows:

## §1208.2   Jurisdiction.

(a) *U.S. Citizenship and Immigration Services (USCIS)*. (1) Except as provided in paragraph (b) or (c) of this section, USCIS shall have initial jurisdiction over:

(i) An asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry; and

(ii) Interviews provided in accordance with section 235(b)(1)(B)(ii) of the Act to further consider the application for asylum of an alien, other than a stowaway, found to have a credible fear of persecution or torture in accordance with 8 CFR 208.30(f) and retained by USCIS, or referred to USCIS by an immigration judge pursuant to §§ 1003.42 of this chapter and 1208.30, after the immigration judge has vacated a negative credible fear determination. Interviews to further consider applications for asylum under this paragraph (a)(1)(ii) are governed by the procedures provided for under 8 CFR 208.9. Further consideration of an asylum application filed by a stowaway who has received a positive credible fear determination will be under the jurisdiction of an immigration judge pursuant to paragraph (c) of this section.

(2) USCIS shall also have initial jurisdiction over credible fear determinations under 8 CFR 208.30 and reasonable fear determinations under 8 CFR 208.31.

*   *   *   *   *

■ 18. Amend § 1208.3 by:
■ a. Revising paragraph (a); and
■ b. Adding the words "under paragraph (a)(1) of this section" following "An asylum application" in paragraph (c)(3).
The revision reads as follows:

## §1208.3   Form of application.

(a)(1) Except for applicants described in paragraph (a)(2) of this section, an asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

(2) In proceedings under § 1240.17 of this chapter, the written record of a positive credible fear determination issued in accordance with 8 CFR 208.30(f), and §§ 1003.42 of this chapter and 1208.30, shall be construed as the asylum application and satisfies the application filing requirements and § 1208.4(b). The written record of the positive credible fear determination shall be considered a complete asylum application for purposes of § 1208.4(a), with the date of service of the positive credible fear determination on the alien considered the date of filing and receipt, and shall be subject to the conditions and consequences provided for in paragraph (c) of this section following the applicant's signature at the asylum merits interview before the USCIS asylum officer. The applicant's spouse and children may be included in the request for asylum only if they were included in the credible fear determination pursuant to 8 CFR 208.30(c), or also presently have an application for asylum pending adjudication with USCIS pursuant to 8 CFR 208.2(a)(1)(ii). If USCIS does not grant the applicant's asylum application after an interview conducted in accordance with 8 CFR 208.9 and if a spouse or child who was included in the request for asylum does not separately file an asylum application that is adjudicated by USCIS, the application will be deemed to satisfy the application filing requirements of

§ 1208.4(b) for a spouse or child who was included in the request for asylum. The asylum applicant may subsequently seek to amend, correct, or supplement the record of proceedings created before the asylum officer or during the credible fear review process as set forth in § 1240.17(g) of this chapter concerning the consideration of documentary evidence and witness testimony.

*   *   *   *   *

## §1208.4   [Amended]

■ 19. Amend § 1208.4 by adding the words "except that an alien in proceedings under § 1240.17 of this chapter is not required to file the Form I–589" after "underlying proceeding" in paragraph (b)(3)(i).

## §1208.5   [Amended]

■ 20. Amend § 1208.5(b)(2) by removing the reference to "§ 1212.5 of this chapter" and adding "8 CFR 212.5" in its place.

■ 21. Amend § 1208.14 by revising paragraphs (b), (c) introductory text, and (c)(1) to read as follows:

## §1208.14   Approval, denial, referral, or dismissal of application.

*   *   *   *   *

(b) *Approval by an asylum officer*. In any case within the jurisdiction of USCIS, unless otherwise prohibited in § 1208.13(c), an asylum officer, subject to review within USCIS, may grant, in the exercise of his or her distraction, asylum to an applicant who qualifies as a refugee under section 101(a)(42) of the Act, and whose identity has been checked pursuant to section 208(d)(5)(A)(i) of the Act.

(c) *Denial, referral, or dismissal by an asylum officer*. If the asylum officer, subject to review within USCIS, does not grant asylum to an applicant after an interview conducted in accordance with 8 CFR 208.9, or if, as provided in 8 CFR 208.10, the applicant is deemed to have waived the applicant's right to an interview or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application, as follows:

(1) *Inadmissible or deportable aliens*. Except for applicants described in paragraph (c)(4)(ii) of this section who have not already been subject to proceedings in accordance with 8 CFR 235.3, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging

documents may not be issued, shall dismiss the application).

\* \* \* \* \*

■ 22. Amend § 1208.16 by revising paragraph (a) to read as follows:

### § 1208.16  Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.

(a) *Consideration of application for withholding of removal.* Consideration of eligibility for statutory withholding of removal and protection under the Convention Against Torture by a DHS officer is as provided at 8 CFR 208.16. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

\* \* \* \* \*

■ 23. Amend § 1208.18 by revising paragraph (b)(1) to read as follows:

### § 1208.18  Implementation of the Convention Against Torture.

\* \* \* \* \*

(b) \* \* \*

(1) *Aliens in proceedings on or after March 22, 1999.* (i) An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999, may apply for withholding of removal under § 1208.16(c), and, if applicable, may be considered for deferral of removal under § 1208.17(a).

(ii) In addition, an alien may apply for withholding of removal under 8 CFR 208.16(c), and, if applicable, may be considered for deferral of removal under 8 CFR 208.17(a), in the following situation: The alien is determined to be an applicant for admission under section 235(b)(1) of the Act, the alien is found to have a credible fear of persecution or torture, the alien's case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at 8 CFR 208.2(a)(1)(ii) to consider the application for asylum, and that application for asylum is not granted.

\* \* \* \* \*

### § 1208.19  [Removed and Reserved]

■ 24. Remove and reserve § 1208.19.
■ 25. Revise § 1208.22 to read as follows:

### § 1208.22  Effect on exclusion, deportation, and removal proceedings.

An alien who has been granted asylum may not be deported or removed unless asylum status is terminated pursuant to 8 CFR 208.24 or § 1208.24. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation,

or deferral of removal, may not be deported or removed to the country to which his or her deportation or removal is ordered withheld or deferred unless the withholding order is terminated pursuant to 8 CFR 208.24 or § 1208.24 or deferral is terminated pursuant to 8 CFR 208.17 or § 1208.17(d) or (e).

■ 26. Amend § 1208.30 by revising the section heading and paragraphs (a), (e), and (g)(2) to read as follows:

### § 1208.30  Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) *Jurisdiction.* The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, DHS has exclusive jurisdiction to make the determinations described in this subpart. Except as otherwise provided in this subpart, paragraphs (b) through (g) of this section are the exclusive procedures applicable to stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act and who receive fear interviews, determinations, and reviews under section 235(b)(1)(B) of the Act. Prior to January 1, 2030, an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands is ineligible to apply for asylum and may only establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act or withholding or deferral of removal under the regulations in §§ 1208.16(c) through (f), 1208.17, and 1208.18 issued pursuant to the Convention Against Torture's implementing legislation.

\* \* \* \* \*

(e) *Determination.* For the standards and procedures for asylum officers in conducting credible fear interviews, and in making positive and negative credible fear determinations, see 8 CFR 208.30. The immigration judges will review such determinations as provided in paragraph (g) of this section and §§ 1003.42 and 1240.17 of this chapter.

\* \* \* \* \*

(g) \* \* \*

(2) *Review by immigration judge of a negative credible fear finding.* (i) The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's request, or upon the applicant's refusal or failure either to request or to decline the review after being given such opportunity, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. The immigration judge shall not have the

authority to remand the case to the asylum officer.

(ii) The record of the negative credible fear determination, including copies of the Form I–863, Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

(iii) A credible fear hearing will be closed to the public unless the alien states for the record or submits a written statement that the alien is waiving that requirement; in that event the hearing shall be open to the public, subject to the immigration judge's discretion as provided in § 1003.27 of this chapter.

(iv) Upon review of the asylum officer's negative credible fear determination:

(A) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution or torture, the case shall be returned to DHS for removal of the alien. The immigration judge's decision is final and may not be appealed. USCIS may nevertheless reconsider a negative credible fear finding as provided at 8 CFR 208.30(g)(1)(i).

(B) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution or torture, the immigration judge shall vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with § 1208.2(a)(1)(ii). Alternatively, DHS may commence removal proceedings under section 240 of the Act, during which time the alien may file an application for asylum and withholding of removal in accordance with § 1208.4(b)(3)(i).

(C) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution or torture, the alien shall be allowed to file an application for asylum and withholding of removal before the immigration judge in accordance with § 1208.4(b)(3)(iii). The immigration judge shall decide the application as provided in that section. Such decision may be appealed by either the stowaway or DHS to the Board of Immigration Appeals. If a denial of the application for asylum and for withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If an approval of the application for asylum or for withholding of removal becomes final, DHS shall terminate removal proceedings under section 235(a)(2) of the Act.

## PART 1235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 27. The authority citation for part 1235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32; Title VII of Pub. L. 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Public Law 115–218.

■ 28. Amend § 1235.6 by:
■ a. Revising paragraph (a)(2)(i);
■ b. Removing the period at the end of paragraph (a)(2)(ii) and adding ''; or'' in its place; and
■ c. Revising paragraph (a)(2)(iii).
The revisions read as follows:

### § 1235.6   Referral to immigration judge.

(a) * * *
(2) * * *
(i) If an asylum officer determines that an alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge;

*  *  *  *  *

(iii) If an immigration officer refers an applicant in accordance with the provisions of 8 CFR 208.2(b) to an immigration judge.

*  *  *  *  *

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

■ 29. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 30. Add § 1240.17 to read as follows:

### § 1240.17   Removal proceedings where the respondent has a credible fear of persecution or torture.

(a) *Scope.* This section applies in cases referred to the immigration court under 8 CFR 208.14(c)(1) where the respondent has been found to have a credible fear of persecution or torture, and U.S. Citizenship and Immigration Services (USCIS) subsequently adjudicated but did not grant the respondent's application for asylum under section 208 of the Act; or the respondent was included in a spouse's or parent's application under 8 CFR 208.2(a)(1)(ii) that USCIS subsequently adjudicated but did not grant under section 208 of the Act. Except as otherwise provided in this section, removal proceedings for such respondents shall be governed by the same rules and procedures that apply to proceedings conducted under this subpart. In all cases, such proceedings shall be conducted in accordance with section 208 of the Act. Should any part of the USCIS process governing cases covered by 8 CFR 208.2(a)(1)(ii) be enjoined or vacated, the Executive Office for Immigration Review (EOIR) shall have the discretion to adjudicate any case referred to EOIR under 8 CFR 208.14(c)(1) using the rules and procedures that apply to proceedings conducted under this subpart without regard to this section.

(b) *Commencement of proceedings.* Removal proceedings conducted under this section shall commence when DHS files a Notice to Appear (NTA) pursuant to 8 CFR part 1239 and schedules the master calendar hearing to take place 30 days after the date the NTA is served or, if a hearing cannot be held on that date, on the next available date no later than 35 days after the date of service. Where the NTA is served by mail, the date of service shall be construed as the date the NTA is mailed. The DHS component issuing the NTA shall also identify for the respondent and the immigration court that the case is subject to the provisions of this section. DHS shall personally serve the NTA on the respondent whenever practicable and by mail when personal service is not effectuated, and shall inform the respondent of the right to be represented by counsel.

(c) *Service of the record.* No later than the date of the master calendar hearing, DHS shall serve on the respondent and on the immigration court where the NTA is filed the record initiating proceedings as defined in this paragraph (c). The record initiating proceedings shall include the record of proceedings for the asylum merits interview, as outlined in 8 CFR 208.9(f), the Form I–213, Record of Deportable/Inadmissible Alien, pertaining to the respondent, and the asylum officer's written decision issued pursuant to 8 CFR 208.19. If service is not effectuated as provided in this paragraph (c), the schedule of proceedings pursuant to paragraph (f) of this section shall be delayed until service is effectuated.

(d) *Failure to appear.* An immigration judge shall issue an in absentia removal order where the respondent fails to appear at the master calendar hearing scheduled under paragraph (b) of this section, or at a later status conference or hearing under this section, if the requirements under section 240(b)(5) of the Act and § 1003.26 of this chapter are met, unless the immigration judge waives the respondent's presence under § 1003.25(a) of this chapter. If the asylum officer determined the respondent eligible for withholding of removal under the Act or withholding or deferral of removal under the Convention Against Torture, the immigration judge shall give effect to the protection for which the asylum officer determined the respondent eligible, unless DHS makes a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for such protection(s). Where DHS makes such a showing at the master calendar hearing or status conference, the immigration judge shall allow the respondent a reasonable opportunity of at least 10, but no more than 30, days to respond before issuing an order.

(e) *Form of application.* In removal proceedings under this section, the written record of the positive credible fear determination issued in accordance with 8 CFR 208.30(f) satisfies the respondent's filing requirement for the application for asylum, withholding of removal under the Act, and withholding or deferral of removal under the Convention Against Torture. The record of the proceedings for the hearing before the asylum officer, as outlined in 8 CFR 208.9(f), and the asylum officer's decision, together with any amendment, correction, or supplementation made before the immigration judge as described in § 1208.3(a)(2) of this chapter, shall be admitted as evidence and considered by the immigration judge, in addition to any further documentation and testimony provided by the parties under the procedures in this section.

(f) *Schedule of proceedings*—(1) *Master calendar hearing.* At the master calendar hearing, the immigration judge shall perform the functions required by § 1240.10(a), including advising the respondent of the right to be represented, at no expense to the Government, by counsel of the respondent's own choice. In addition, the immigration judge shall advise the respondent as to the nature of removal proceedings under this section, including: That the respondent has pending applications for asylum, withholding of removal under the Act and withholding or deferral of removal under the Convention Against Torture, as appropriate; that the respondent has the right to present evidence in support of the applications; that the respondent has the right to call witnesses and to testify at any merits hearing; and that the respondent must comply with the

deadlines that govern the submission of evidence. Except where the respondent is ordered removed in absentia, at the conclusion of the master calendar hearing, the immigration judge shall schedule a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing. The immigration judge shall inform the respondent of the requirements for the status conference. The adjournment of the case until the status conference shall not constitute a continuance for the purposes of paragraph (h)(2) of this section.

(2) *Status conference.* The purpose of the status conference shall be to take pleadings, identify and narrow the issues, determine whether the case can be decided on the documentary record, and, if necessary, ready the case for a merits hearing. At the status conference, the immigration judge shall advise the respondent that: The respondent has the right to present evidence in support of the applications; the respondent has the right to call witnesses and to testify at any merits hearing; and the respondent must comply with the deadlines that govern the submission of evidence. Based on the parties' representations at the status conference and an independent evaluation of the record, the immigration judge shall decide whether further proceedings are warranted or whether the case will be decided on the documentary record in accordance with paragraph (f)(4) of this section. If the immigration judge determines that further proceedings are warranted, the immigration judge shall schedule the merits hearing to take place 60 days after the master calendar hearing or, if the merits hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. The immigration judge may schedule additional status conferences prior to the merits hearing if the immigration judge determines that such conferences are warranted and would contribute to the efficient resolution of the case.

(i) *The respondent.* At the status conference, the respondent shall plead to the NTA under § 1240.10(c), and indicate orally or in writing whether the respondent intends to seek any protection(s) for which the asylum officer did not find the respondent eligible.

(A)(*1*) If the respondent indicates that the respondent intends to contest removal or seek any protection(s) for which the asylum officer did not determine the respondent eligible, the

respondent shall, either orally or in writing:

(*i*) Indicate whether the respondent intends to testify before the immigration court;

(*ii*) Identify any witnesses the respondent intends to call in support of the applications at the merits hearing;

(*iii*) Provide any additional documentation in support of the applications;

(*iv*) Describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings before the asylum officer;

(*v*) Articulate or confirm any additional bases for asylum and related protection, whether or not they were presented to or developed before the asylum officer; and

(*vi*) State any additional requested forms of relief or protection.

(*2*) If the respondent is unrepresented, the respondent shall not be required to provide items set forth in paragraphs (f)(2)(i)(A)(*1*)(*iv*), (*v*), and (*vi*) of this section.

(B) If the respondent indicates that the respondent does not intend to contest removal or seek any protection(s) for which the asylum officer did not find the respondent eligible, the immigration judge shall order the respondent removed, and no further proceedings shall be held by the immigration judge. If the asylum officer determined the respondent eligible for withholding of removal under the Act or withholding or deferral of removal under the Convention Against Torture, the immigration judge shall give effect to the protection(s) for which the asylum officer determined the respondent eligible, unless DHS makes a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for such protection(s).

(ii) *DHS.* (A) At the status conference, DHS shall indicate orally or in writing whether it intends to:

(*1*) Rest on the record;

(*2*) Waive cross examination of the respondent;

(*3*) Otherwise participate in the case; or

(*4*) Waive appeal if the immigration judge decides that the respondent's application should be granted.

(B) If DHS indicates that it will participate in the case, it shall, either orally or in writing at the status conference, or in a written submission pursuant to paragraph (f)(3)(i) of this section:

(*1*) State its position on each of the respondent's claimed grounds for asylum or related protection;

(*2*) State which elements of the respondent's claim for asylum or related protection it is contesting and which facts it is disputing, if any, and provide an explanation of its position;

(*3*) Identify any witnesses it intends to call at any merits hearing;

(*4*) Provide any additional non-rebuttal or non-impeachment evidence; and

(*5*) State whether the appropriate identity, law enforcement, or security investigations or examinations required by section 208(d)(5)(A)(i) of the Act and § 1003.47 of this chapter have been completed.

(C) Any position DHS expresses pursuant to paragraph (f)(2)(ii)(A) of this section may be retracted, orally or in writing, prior to the issuance of the immigration judge's decision, if DHS seeks consideration of evidence pursuant to the standard laid out in paragraph (g)(2) of this section. Where the immigration judge holds a merits hearing or hearings, any position DHS expressed pursuant to paragraph (f)(2)(ii)(A) may only be retracted prior to the final hearing; if no such hearing is held, the retraction must take place prior to the immigration judge's decision.

(3) *Written submissions.* (i) If DHS intends to participate in the case, DHS shall file a written statement that provides any information required under paragraph (f)(2)(ii) of this section that DHS did not provide at the status conference, as well as any other relevant information or argument in response to the respondent's submissions. DHS's written statement, if any, shall be filed no later than 15 days prior to the scheduled merits hearing or, if the immigration judge determines that no such hearing is warranted, no later than 15 days following the status conference. Where DHS intends to participate in the case but does not timely provide its position as required under paragraph (f)(2)(ii) of this section, either at the status conference or in its written statement, to one or more of the respondent's claimed grounds for asylum or related protection, including which arguments raised by the respondent it is disputing and which facts it is contesting, the immigration judge shall have authority to deem those arguments or claims unopposed; provided, however, that DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference.

(ii) The respondent may submit a filing no later than 5 days prior to the scheduled merits hearing or, if the immigration judge determines that no such hearing is warranted, no later than 25 days following the status conference, that supplements the respondent's oral statement or written submission under paragraph (f)(2)(i) of this section. In the respondent's supplemental filing, if any, the respondent shall reply to any statement submitted by DHS, identify any additional witnesses, and provide any additional documentation in support of respondent's applications.

(4) *Merits hearings.* (i) If DHS has indicated that it waives cross examination and neither the respondent nor DHS has requested to present testimony under the pre-hearing procedures in paragraph (f)(2) and (3) of this section, the immigration judge shall decide the case on the documentary record, without holding a merits hearing, unless the immigration judge, after consideration of the record, determines that a merits hearing is necessary to fulfill the immigration judge's duty to fully develop the record.

(ii) If the respondent has timely requested to present testimony and DHS has indicated that it waives cross examination and does not intend to present testimony or produce evidence, and the immigration judge concludes, consistent with the immigration judge's duty to fully develop the record, that the respondent's application can be granted without further testimony, the immigration judge shall grant the application without holding a merits hearing.

(iii) In all other situations, the immigration judge shall proceed as follows:

(A) If the immigration judge determines that proceedings can be completed at the merits hearing scheduled under paragraph (f)(1) of this section, the immigration judge shall hold the scheduled merits hearing, at which the immigration judge shall swear the respondent to the truth and accuracy of any information or statements submitted pursuant to paragraphs (f)(2) and (3) of this section, hear all live testimony requested by the parties, consider the parties' submissions, and, whenever practicable, issue an oral decision in the case.

(B) If the immigration judge determines that proceedings cannot be completed at the merits hearing scheduled under paragraph (f)(1) of this section, the immigration judge may conduct a portion of the scheduled hearing, hold a status conference in lieu of the scheduled hearing, and take any other steps the immigration judge deems

necessary and efficient to expeditiously resolve the case. The immigration judge shall schedule any and all subsequent merits hearings to occur no later than 30 days after the initial merits hearing.

(5) *Decision.* Whenever practicable, the immigration judge shall issue an oral decision on the date of the final merits hearing or, if the immigration judge determines that no merits hearing is warranted, no more than 30 days after the status conference. The immigration judge may not, however, issue a decision in a case where DHS has made a prima facie showing, through evidence that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for withholding of removal or protection under the Convention Against Torture unless the respondent was first provided a reasonable opportunity of at least 10, but no more than 30, days to respond to the evidence submitted by DHS. Where issuance of an oral decision on the date specified under the first sentence of this paragraph (f)(5) is not practicable, the immigration judge shall issue an oral or written decision as soon as practicable, and in no case more than 45 days after the date specified under the first sentence of this paragraph (f)(5).

(g) *Consideration of evidence and testimony.* (1) The immigration judge shall exclude documentary evidence or witness testimony only if it is not relevant or probative; if its use is fundamentally unfair; or if the documentary evidence is not submitted or the testimony is not requested by the applicable deadline, absent a timely request for a continuance or filing extension that is granted.

(2) The immigration judge may consider documentary evidence or witness testimony submitted after the applicable deadline, taking into account any timely requests for continuances or filing extensions that are granted, but before the immigration judge has issued a decision, only if the evidence could not reasonably have been obtained and presented before the applicable deadline through the exercise of due diligence or if the exclusion of such evidence would violate a statute or the Constitution. The admission of such evidence shall not automatically entitle either party to a continuance or filing extension; such a continuance or extension is governed by paragraph (h) of this section.

(h) *Continuances, adjournments, and filing extensions*—(1) *In general.* For cases governed by this section, an immigration judge may grant a continuance of a hearing date or

extension of a filing deadline only as set forth in this paragraph (h).

(2) *Respondent-requested continuances and filings extensions.* (i) The immigration judge may, for good cause shown, grant the respondent continuances and extend the respondent's filing deadlines. Each such continuance or extension shall not exceed 10 calendar days, unless the immigration judge determines that a longer period is more efficient. The immigration judge may not grant the respondent continuances or extensions for good cause that cause a merits hearing to occur more than 90 days after the master calendar hearing.

(ii) The immigration judge may grant the respondent continuances or extensions that cause a merits hearing to occur more than 90 days after the master calendar hearing only if the respondent demonstrates that the continuance or extension is necessary to ensure a fair proceeding and the need for the continuance or extension exists despite the respondent's exercise of due diligence. The length of any such continuance or extension shall be limited to the time necessary to ensure a fair proceeding. The immigration judge may not grant the respondent continuances or extensions pursuant to this paragraph (h)(2)(ii) that cause a merits hearing to occur more than 135 days after the master calendar hearing.

(iii) The immigration judge may grant the respondent continuances or extensions notwithstanding the requirements of paragraphs (h)(2)(i) and (ii) of this section if the respondent demonstrates that failure to grant the continuance or extension would be contrary to statute or the Constitution.

(iv) In calculating the delay to a merits hearing for purposes of applying paragraphs (h)(2)(i) and (ii) of this section, the immigration judge shall exclude any continuances, hearing delays, or filing extensions issued pursuant to paragraphs (h)(3) and (4) of this section.

(3) *DHS-requested continuances and filings extensions.* The immigration judge may, based on significant Government need, grant DHS continuances and extend DHS's filing deadlines. Significant Government need may include, but is not limited to, confirming domestic or foreign law-enforcement interest in the respondent, conducting forensic analysis of documents submitted in support of a relief application or other fraud-related investigations, and securing criminal history information, translations of foreign language documents, witness testimony or affidavits, or evidence suggesting that the respondent is

**18226** **Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

described in sections 208(a)(2)(A)(C), 208(b)(2), or 241(b)(3)(B) of the Act or has filed a frivolous asylum application as defined in 8 CFR 208.20.

(4) *Continuances, adjournments, and filing extensions due to exigent circumstances.* The immigration judge may continue a status conference or a hearing, or extend a filing deadline, and a status conference or a hearing set forth in this section may be adjourned, where necessary due to exigent circumstances, such as the unavailability of an immigration judge, the respondent, or either party's counsel assigned to the case due to illness; or the closure of the immigration court or a relevant DHS office. Any such continuance, extension, or adjournment shall be limited to the shortest period feasible and shall not be counted against the time limits set forth in paragraphs (h)(2)(i) and (ii) of this section. A new finding of exigent circumstances must be made to justify any and every subsequent continuance, extension, or adjournment under this paragraph (h)(4).

(i) *Decision.* (1) Where the asylum officer did not grant asylum and did not determine that the respondent was eligible for withholding of removal under the Act or for withholding or deferral of removal under the Convention Against Torture based on the record before USCIS, the immigration judge shall adjudicate, de novo, the respondent's applications for asylum and, if necessary, for withholding of removal under the Act, and withholding or deferral of removal under the Convention Against Torture.

(2) Except as provided in paragraph (f)(2)(i)(B) of this section, where the asylum officer did not grant asylum but determined the respondent eligible for withholding of removal under the Act, or for withholding or deferral of removal under the Convention Against Torture, the immigration judge shall adjudicate, de novo, the respondent's application for asylum. If the immigration judge

subsequently denies asylum and enters a removal order, the immigration judge shall give effect to the protection(s) for which the asylum officer determined the applicant eligible, unless DHS has demonstrated, through evidence or testimony that specifically pertains to the respondent and was not in the record of proceedings for the USCIS asylum merits interview, that the respondent is not eligible for such protection(s). The immigration judge shall also grant any additional protection(s) for which the immigration judge finds the applicant eligible. DHS shall not be permitted to appeal to the Board the grant of any protection(s) for which the asylum officer determined the respondent eligible, except to argue that the immigration judge should have denied the application(s) based on the evidence allowed under this paragraph (i)(2).

(3) Where the respondent has requested voluntary departure in the alternative to, or in lieu of, asylum and related protection, the immigration judge shall adjudicate this application where necessary.

(j) *Changes of venue.* Where an immigration judge grants a motion to change venue under § 1003.20 of this chapter, the schedule of proceedings pursuant to paragraph (f) of this section commences again with the master calendar hearing at the court to which venue has been changed.

(k) *Exceptions.* The provisions in paragraphs (f) through (h) of this section shall not apply in any of the following circumstances:

(1) The respondent was under the age of 18 on the date the NTA was issued, except where the respondent is in removal proceedings with one or more adult family members.

(2) The respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, withholding of removal under the Act, withholding or deferral of removal under the Convention Against Torture,

or voluntary departure, and the respondent is seeking to apply for, or has applied for, such relief or protection.

(3) The respondent has produced evidence that supports a prima facie showing that the respondent is not subject to removal as charged (including under any additional or substitute charges of removal brought by DHS pursuant to § 1240.10(e)), and the immigration judge determines, under § 1240.10(d), that the issue of whether the respondent is subject to removal cannot be resolved simultaneously with the adjudication of the respondent's applications for asylum, withholding of removal under the Act, or withholding or deferral of removal under the Convention Against Torture.

(4) The immigration judge, pursuant to § 1240.10(f), finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or both in that alternative country or countries.

(5) The case has been reopened or remanded following the immigration judge's order.

(6) The respondent has exhibited indicia of mental incompetency.

(l) *Termination of protection.* Nothing in this section shall preclude DHS from seeking termination of asylum, withholding of removal under the Act, or withholding or deferral of removal under the Convention Against Torture pursuant to 8 CFR 208.17(d) and 208.24(f).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

Dated: March 17, 2022.

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2022–06148 Filed 3–24–22; 8:45 am]

**BILLING CODE 9111–97–P**

**DATES:** Nominations for membership on the HICPAC should be received no later than September 17, 2022. Packages received after this time will not be considered for the current membership cycle.

**ADDRESSES:** All nominations should be mailed to HICPAC, Division of Healthcare Quality Promotion, NCEZID, CDC, 1600 Clifton Road NE, Mailstop H16–3, Atlanta, Georgia 30329–4027, emailed (recommended) to *hicpac@cdc.gov,* or faxed to (404) 639–4043.

**FOR FURTHER INFORMATION CONTACT:** Sydnee Byrd, MPA, HICPAC, Division of Healthcare Quality Promotion, NCEZID, CDC, 1600 Clifton Road NE, Mailstop H16–3, Atlanta, Georgia 30329–4027; Telephone: (404) 718–8039, Email: *hicpac@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** The U.S. Department of Health and Human Services policy stipulates that committee membership be balanced in terms of points of view represented, and the committee's function. Appointments shall be made without discrimination on the basis of age, race, ethnicity, gender, sexual orientation, gender identity, HIV status, disability, and cultural, religious, or socioeconomic status. Nominees must be U.S. citizens and cannot be full-time employees of the U.S. Government. Current participation on federal workgroups or prior experience serving on a federal advisory committee does not disqualify a candidate; however, it is HHS policy is to avoid excessive individual service on advisory committees and multiple committee memberships. Committee members are Special Government Employees (SGEs), requiring the filing of financial disclosure reports at the beginning and annually during their terms. CDC reviews potential candidates for HICPAC membership each year and provides a slate of nominees for consideration to the Secretary of HHS for final selection. HHS notifies selected candidates of their appointment near the start of the term in July 2023, or as soon as the HHS selection process is completed. Note that the need for different expertise varies from year to year and a candidate who is not selected in one year may be reconsidered in a subsequent year. Candidates should submit the following items:

▪ Current curriculum vitae, including complete contact information (telephone numbers, mailing address, email address)

▪ At least one letter of recommendation from person(s) not employed by the U.S. Department of Health and Human Services. (Candidates may submit letter(s) from current HHS employees if they wish, but at least one letter must be submitted by a person not employed by an HHS agency (*e.g.,* CDC, NIH, FDA, etc.).

Nominations may be submitted by the candidate him- or herself, or by the person/organization recommending the candidate.

The Director, Strategic Business Initiatives Unit, Office of the Chief Operating Officer, Centers for Disease Control and Prevention, has been delegated the authority to sign Federal Register notices pertaining to announcements of meetings and other committee management activities, for both the Centers for Disease Control and Prevention and the Agency for Toxic Substances and Disease Registry.

**Kalwant Smagh,**

*Director, Strategic Business Initiatives Unit, Office of the Chief Operating Officer, Centers for Disease Control and Prevention.*

[FR Doc. 2022–07236 Filed 4–5–22; 8:45 am]

**BILLING CODE 4163–18–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** General notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby issuing this Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Public Health Determination and Termination). This Public Health Determination and Termination terminates the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on August 2, 2021 (August Order), and all related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service (PHS) Act and implementing regulations. This Termination will be implemented on May 23, 2022.

**DATES:** The Termination issued in this Order will be implemented on May 23, 2022.

**FOR FURTHER INFORMATION CONTACT:** Candice Swartwood, Division of Global Migration and Quarantine, National Center for Emerging and Zoonotic Infectious Diseases, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H16–4, Atlanta, GA 30329. Telephone: 404–498–1600. Email: *dgmqpolicyoffice@cdc.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

Coronavirus disease 2019 (COVID–19) is a quarantinable communicable disease caused by the SARS–CoV–2 virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued the August Order, replacing a prior order issued on October 13, 2020, which continued a series of orders issued pursuant to 42 U.S.C. 265, 268 and the implementing regulation at 42 CFR 71.40, suspending the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19 (CDC Orders).

The CDC Orders issued under 42 U.S.C. 265, 268 and 42 CFR 71.40 were intended to reduce the risk of COVID–19 introduction, transmission, and spread at ports of entry (POE) and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens and residents, Department of Homeland Security and U.S. Customs and Border Patrol personnel and noncitizens at the facilities, and local healthcare systems. CDC deemed the measures included in the CDC Orders necessary for the protection of public health during the ongoing COVID–19 pandemic.

The August Order applied specifically to "covered noncitizens," defined as "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE."

IFR_AR_000883

Three groups typically make up covered noncitizens—single adults (SA), individuals in family units (FMU), and unaccompanied noncitizen children (UC).

In the August Order, CDC committed to reassessing the public health circumstances necessitating the Order at least every 60 days by reviewing the latest information regarding the status of the COVID–19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. borders. On March 11, 2022, CDC fully terminated the August Order and all previous orders issued under 42 U.S.C. 265, 268 and 42 CFR 71.40 with respect to UC based on a thorough determination of the status of the COVID–19 public health emergency, an analysis of the specific care available to UC, and the absence of legitimate countervailing reliance interests on the CDC Orders. The instant Public Health Determination and Termination considers the current status of the pandemic, the receding numbers of COVID–19 cases, hospitalizations, and deaths most recently related to the Omicron variant, and constitutes the reassessment concluding on March 30, 2022.

Based on this analysis, the CDC Director finds that, pursuant to 42 U.S.C. 265 and 42 CFR 71.40, there is no longer a serious danger that the entry of covered noncitizens, as defined by the August Order, into the United States will result in the introduction, transmission, and spread of COVID–19 and that a suspension of the introduction of covered noncitizens is no longer required in the interest of public health. While the introduction, transmission, and spread of COVID–19 into the United States is likely to continue to some degree, the cross-border spread of COVID–19 due to covered noncitizens does not present the serious danger to public health that it once did, given the range of mitigation measures now available. CDC continues to stress the need for robust COVID–19 mitigation measures at the border, including vaccination and continued masking in congregate settings. CDC has determined that the extraordinary measure of an order under 42 U.S.C. 265 is no longer necessary, particularly in light of less burdensome measures that are now available to mitigate the introduction, transmission, and spread of COVID–19. Therefore, CDC is terminating the August Order and all related prior orders issued pursuant to 42 U.S.C. 265, 268 and 42 CFR 71.40. This Termination will be implemented on May 23, 2022, to enable the

Department of Homeland Security (DHS) time to implement appropriate COVID–19 protocols, such as scaling up a program to offer COVID–19 vaccinations to migrants, and prepare for full resumption of regular migration under Title 8 authorities.

**Legal Authority**

CDC is hereby immediately terminating the August Order and all prior orders issued pursuant to sections 362 and 365 of the PHS Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40.

**Referenced Order**

A copy of the Order is provided below, and a copy of the signed Order can be found at *https://www.cdc.gov/ coronavirus/2019-ncov/cdcresponse/ Final-CDC-Order-Prohibiting-Introduction-of-Persons.pdf.*

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention (CDC)**

**Order Under Sections 362 & 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40**

**Public Health Determination and Order Regarding the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists**

*Executive Summary*

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby issuing this Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Public Health Determination and Termination). This Public Health Determination and Termination terminates the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on August 2, 2021 (August Order),[1] and all related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service (PHS) Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40 (CDC Orders);[2] this

Termination will be implemented on May 23, 2022. The August Order continued a suspension of the right to introduce ''covered noncitizens,'' as defined in the Order,[3] into the United States along the U.S. land and adjacent coastal borders.[4] The August Order states that CDC will reassess at least every 60 days whether the Order remains necessary to protect the public health. Based on the public health landscape, the current status of the COVID–19 pandemic, and the procedures in place for the processing of covered noncitizens, taking into account the inherent risks of transmission of SARS–CoV–2 in congregate settings, CDC has determined that a suspension of the right to introduce such covered noncitizens is no longer necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States. This Termination will be implemented on May 23, 2022, to enable the Department of Homeland Security (DHS) to implement appropriate COVID–19 mitigation protocols, such as scaling up a program to provide COVID–19 vaccinations to migrants, and prepare for full resumption of regular migration processing under Title 8 authorities. Until that date, it is CDC's expectation that DHS will continue to apply exceptions outlined in the August Order to covered noncitizens as appropriate, including the exception based on the totality of an individual's circumstances on a case-by-case basis.

*Outline of Determination and Order*

I. Background
  A. Evolution of the COVID–19 Pandemic and the U.S. Government Response
  1. First Wave—January to June 2020
  2. Second Wave—June to August 2020

---

[1] Available at *https://www.cdc.gov/coronavirus/ 2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf* (last visited Mar. 7, 2022); *see also* 86 FR 42828 (Aug. 5, 2021).

[2] ''CDC Orders'' issued under these legal authorities are found at 85 FR 17060 (Mar. 26, 2020), 85 FR 22424 (Apr. 22, 2020), 85 FR 31503 (May 26, 2020), 85 FR 65806 (Oct. 16, 2020), and 86 FR 42828 (Aug. 5, 2021) (fully incorporating by

reference 86 FR 38717 (July 22, 2021), see 86 FR 42828, 42829 at note 3).

[3] *See infra* I.

[4] The August Order specifically excepted unaccompanied noncitizen children (UC) and incorporated an exception for UC issued by CDC on July 16, 2021 (July Exception). Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, *https://www.cdc.gov/ coronavirus/2019-ncov/more/pdf/Notice UnaccompaniedChildren.pdf* (July 16, 2021); 86 FR 38717 (July 22, 2021); *see* 86 FR 42828, 42829 at note 1 (Aug. 5, 2021) (which fully incorporated by reference the July Exception relating to UC). On March 11, 2022, CDC fully terminated the August Order and all prior orders issued under the same authorities with respect to UC. *See https:// www.cdc.gov/coronavirus/2019-ncov/more/pdf/ NoticeUnaccompaniedChildren-update.pdf.*

IFR_AR_000884

3. Third Wave—Alpha Variant—September 2020 to May 2021
4. Fourth Wave—Delta Variant—June to October 2021
5. Fifth Wave—Omicron Variant— November 2021 to March 2022
B. Current Status of the COVID–19 Pandemic
1. Community Levels
2. Healthcare Systems and Resources
3. Mitigation Measures
a. Test Availability
b. Vaccines and Boosters
c. Treatments
4. Congregate Settings
5. DHS Mitigation Measures
II. Public Health Determination
III. Legal Considerations
A. Temporary Nature of Orders Under 42 U.S.C. 265 and Absence of Reliance Interests
B. Basis for Termination Under 42 U.S.C. 265, 268 and 42 CFR 71.40
IV. Issuance and Implementation
A. Implementation of This Termination
B. APA Review

## I. Background

Coronavirus disease 2019 (COVID–19) is a quarantinable communicable disease[5] caused by the SARS–CoV–2 virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued the August Order,[6] replacing a prior order issued on October 13, 2020 (October Order) which continued a series of orders issued pursuant to 42 U.S.C. 265, 268 and the implementing regulation at 42 CFR 71.40,[7] suspending the right to

introduce[8] certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19.[9] The August Order applied specifically to ''covered noncitizens,'' defined as ''persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station[10] at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE.''[11]

Three groups typically make up covered noncitizens—single adults (SA),[12] individuals in family units (FMU),[13] and unaccompanied noncitizen children (UC).[14] UC were specifically excepted from the August Order[15] based on its explicit incorporation by reference of CDC's July Exception of UC.[16] On March 11, 2022, CDC fully terminated the August Order and all previous orders issued under 42 U.S.C. 265, 268 and 42 CFR 71.40 with respect to UC. This termination with respect to UC was based on a thorough determination of the current status of

the COVID–19 pandemic as well as an analysis of the specific care available to UC[17] and the absence of legitimate countervailing reliance interests, and was prioritized ahead of CDC's reassessment for SA and FMU in light of the entry of a preliminary injunction by the U.S. District Court for the Northern District of Texas that was to go into effect on March 11, 2022, enjoining CDC from excepting UC from the August Order based solely on their status as UC.[18]

The CDC Orders issued under 42 U.S.C. 265, 268 and 42 CFR 71.40 were intended to reduce the risk of COVID–19 introduction, transmission, and spread at POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens, U.S. nationals, lawful permanent residents, DHS and U.S. Customs and Border Protection (CBP) personnel and noncitizens at the facilities, and local healthcare systems. The measures included in the CDC Orders were deemed necessary for the protection of public health.

In the August Order, CDC committed to reassessing the public health circumstances necessitating the Order at least every 60 days by reviewing the latest information regarding the status of the COVID–19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. borders.[19] CDC conducted its most recent reassessment on January 28, 2022; in addition, a reassessment specific to UC was completed on March 11, 2022. The instant Public Health Determination and Termination considers the current status of the

---

[5] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order 13295, as provided under 361 of the Public Health Service Act (42 U.S.C. 264), 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East Respiratory Syndrome and COVID–19), influenza caused by novel or reemergent influenza viruses that are causing, or have the potential to cause, a pandemic, and measles. *See* Exec. Order 13295, 68 FR 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 FR 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 FR 45671 (July 31, 2014), 86 FR 52591 (Sep. 22, 2021).

[6] *See supra* note 1.

[7] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), which was subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists,

85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[8] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[9] *See supra* note 2.

[10] POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within Department of Homeland Security (DHS).

[11] 86 FR 42828, 42841.

[12] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a ''family unit.'' 86 FR 42828, 42830 at note 13.

[13] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). *Id.* at note 14.

[14] CDC understands UC to be a class of individuals similar to or the same as those individuals who would be considered ''unaccompanied alien children'' (*see* 6 U.S.C. 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 FR 38717, 38718 at note 4.

[15] 86 FR 42828, 42829 at note 3.

[16] *See supra* note 4.

[17] While SA, FMU, and UC are all processed by U.S. Customs and Border Protection (CBP), a component of DHS, following that initial intake, UC are referred to HHS' Office of Refugee Resettlement (ORR) for care. *See* 86 FR 42828, 42835–37 (describing the processing of noncitizen SA and FMU by DHS components, CBP and Immigration and Customs Enforcement (ICE), under both regular Title 8 immigration and under an order pursuant to 42 U.S.C. 265). At both the CBP and ORR stages, UC receive special attention. This care and the distinct immigration processing available to UC compared to SA and FMU provided the basis for the exception of UC in the July Exception and the August Order. *See* 86 FR 42828, 42835–37 (describing the processing of noncitizen SA and FMU by DHS components, CBP and ICE, under both regular Title 8 immigration and under an order pursuant to 42 U.S.C. 265); *see also* 87 FR 15243, 15246–47 (Mar. 17, 2022) (describing the different COVID–19 mitigation measures applied where UC are processed).

[18] *Texas* v. *Biden*, No. 4:21–Cv–0579–P, 2022 WL 658579, at *16–18 (N.D. Tex. Mar. 4, 2022).

[19] 86 FR 42828, 42840.

pandemic, including the receding numbers of COVID–19 cases, hospitalizations, and deaths most recently related to the Omicron variant, and constitutes the reassessment concluding on March 30, 2022. This Determination and Termination also reflects the recent issuance of CDC's COVID–19 Community Levels framework.[20] Additionally, the National COVID–19 Preparedness Plan was recently updated to provide a roadmap to help the nation continue fighting COVID–19, while also allowing resumption of more normal routines.[21]

Based on the analysis below, the CDC Director finds that, pursuant to 42 U.S.C. 265 and 42 CFR 71.40, there is no longer a serious danger that the entry of covered noncitizens, as defined by the August Order, into the United States will result in the introduction, transmission, and spread of COVID–19 and that a suspension of the introduction of covered noncitizens is no longer required in the interest of public health. While the introduction, transmission, and spread of COVID–19 into the United States is likely to continue to some degree, the cross-border spread of COVID–19 due to covered noncitizens does not present the serious danger to public health that it once did, given the range of mitigation measures now available. CDC continues to stress the need for robust COVID–19 mitigation measures at the border, including vaccination and continued masking in congregate settings. CDC has determined that the extraordinary measure of an order under 42 U.S.C. 265 is no longer necessary, particularly in light of less burdensome measures that are now available to mitigate the introduction, transmission, and spread of COVID–19. Therefore, as described below, CDC is terminating the August Order and all related prior orders issued pursuant to 42 U.S.C. 265, 268 and 42 CFR 71.40. This Termination will be implemented on May 23, 2022, to enable DHS to implement appropriate COVID–19 protocols, such as scaling up a program to offer COVID–19 vaccinations to migrants, and prepare for full resumption of regular migration under Title 8 authorities.

## A. Evolution of the COVID–19 Pandemic and the U.S. Government Response

Since late 2019, SARS–CoV–2, the virus that causes COVID–19, has spread throughout the world, resulting in a pandemic. As of March 30, 2022, there have been over 480 million confirmed cases of COVID–19 globally, resulting in over six million deaths.[22] The United States has reported over 79 million cases resulting in over 975,000 deaths due to the disease[23] and is currently averaging around 26,000 new cases of COVID–19 a day as of March 28, 2022.[24]

The U.S. government response to the COVID–19 pandemic has focused on taking actions and providing guidance based on the best available scientific information. The United States has experienced five waves of the pandemic, each with its own unique epidemiologic characteristics.[25] As the waves of COVID–19 cases have surged and ebbed, so too have actions taken in response to the pandemic. Earlier phases of the pandemic required extraordinary actions by the U.S. government and society at large. However, epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted many of those early actions to be relaxed in favor of more nuanced, targeted, and narrowly tailored guidance that provides a less burdensome means of preventing and controlling the SARS–CoV–2 virus and COVID–19. Of note for this Determination are the multiple travel- and migration-related measures taken by the U.S. government in each phase.

### 1. First Wave—January to June 2020

SARS–CoV–2 was first identified as the cause of an outbreak of respiratory illness that began in Wuhan, Hubei Province, People's Republic of China.[26] The United States reported its first COVID–19 case on January 21, 2020,[27]

and the HHS Secretary declared COVID–19 a public health emergency on January 31, 2020.[28] Community transmission was detected in the United States in February 2020.[29] COVID–19 cases initially spread in a small number of U.S. metropolitan areas, most notably in New York City and surrounding areas.[30] The resulting first wave of the pandemic peaked in the United States on April 7, 2020, with two million cases (3% of cumulative cases) and over 127,000 deaths (13% of cumulative deaths).[31] During this period, public health officials monitored the situation closely and began instituting community-level nonpharmaceutical interventions such as school closures and physical distancing, in addition to promoting respiratory and hand hygiene practices.[32] Vaccines and approved therapeutics were not available during this time.[33]

As public health officials learned more about the epidemiology of SARS–CoV–2, the U.S. government, state and local health departments, and other partners implemented aggressive measures to slow transmission of the virus in the United States.[34] Many of the mitigation actions taken by the U.S. government during this wave involved travel and migration. The President issued a series of actions limiting entry into the United States, including proclamations suspending entry into the country of immigrants or nonimmigrants who were physically present within certain countries during the 14-day period preceding their entry

---

[20] *COVID–19 Community Levels*, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html* (updated Mar. 24, 2022); *see infra* I.B.1.

[21] *National COVID–19 Preparedness Plan—March 2022*, available at *https://www.whitehouse.gov/wp-content/uploads/2022/03/NAT-COVID-19-PREPAREDNESS-PLAN.pdf* (last visited Mar. 30, 2022).

[22] *Coronavirus disease (COVID–19) pandemic*, World Health Organization, *https://covid19.who.int/* (last visited Mar. 30, 2022).

[23] *COVID Data Tracker*, Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#datatracker-home* (last visited Mar. 30, 2022).

[24] *See Trends in Number of COVID–19 Cases and Deaths in the US Reported to CDC, by State/Territory*, Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#trends_dailycases*, noting a seven-day moving average of 26,190 cases on March 28, 2022.

[25] *Supra* note 21.

[26] Patel A, Jernigan DB. *Initial Public Health Response and Interim Clinical Guidance for the 2019 Novel Coronavirus Outbreak—United States, December 31, 2019–February 4, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:140–146. DOI: *http://dx.doi.org/10.15585/mmwr.mm6905e1*.

[27] *Id.*

[28] *Determination that a Public Health Emergency Exists*, U.S. Department of Health and Human Services (Jan. 31, 2020), *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx* (last visited Mar. 30, 2022).

[29] *Geographic Differences in COVID–19 Cases, Deaths, and Incidence—United States, February 12–April 7, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:465–471. DOI: *http://dx.doi.org/10.15585/mmwr.mm6915e4*.

[30] *Id.*

[31] *Case notifications from state, local and territorial public health jurisdictions*, Centers for Disease Control and Prevention, *https://data.cdc.gov/Case-Surveillance/COVID-19-Case-Surveillance-Public-Use-Data/vbim-akqf*, (last accessed Mar. 30, 2022); *Provisional COVID-19 Death Counts by Week Ending Date and State*, Centers for Disease Control and Prevention, *https://data.cdc.gov/NCHS/Provisional-COVID-19-Death-Counts-by-Week-Ending-D/r8kw-7aab* (last accessed Mar. 30, 2022); *COVID-19 Reported Patient Impact and Hospital Capacity by State Timeseries*, Unified Hospital Analytic, *https://healthdata.gov/Hospital/COVID-19-Reported-Patient-Impact-and-Hospital-Capa/g62h-syeh* (last accessed Mar. 30, 2022).

[32] Jernigan DB. *Update: Public Health Response to the Coronavirus Disease 2019 Outbreak—United States, February 24, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:216–219. DOI: *http://dx.doi.org/10.15585/mmwr.mm6908e1*.

[33] *Id.*

[34] *See supra* note 26.

or attempted entry,[35] and Canada and Mexico joined the United States in temporarily restricting travelers across land borders for non-essential purposes.[36] CDC began screening travelers from certain countries at airports and issued several travel health notices [37] and, following a series of COVID–19 outbreaks on cruise ships, issued a No Sail Order and Suspension of Further Embarkation.[38]

It was in the context of this initial wave of the pandemic and travel- and migration-related actions that the CDC Director promulgated an interim final rule at 42 CFR 71.40 implementing his authority under 42 U.S.C. 265, 268 [39] and issued an Order under the interim final rule suspending the introduction of certain "covered aliens" on March 20, 2020 (March Order).[40] The March Order sought to avert the serious danger of the introduction of COVID–19 into the land POEs and Border Patrol stations at or near the United States borders with Canada and Mexico due to encountered noncitizens otherwise being held in the common areas of the facilities and in close proximity to one another as they undergo immigration processing. The March Order applied to SA, FMU, and UC and was subsequently amended and extended in April and May 2020.[41]

### 2. Second Wave—June to August 2020

During the second wave of the pandemic, from approximately June to August 2020, COVID–19 spread geographically throughout the United States.[42] Case numbers peaked on July 14, 2020, and in total the second wave resulted in approximately 2.6 million COVID–19 cases (4% of cumulative cases) and over 75,000 deaths (4% of cumulative deaths). During the second wave, public health officials and scientists learned more about COVID–19 transmission, including asymptomatic transmission,[43] particularly in congregate, high-density settings, such as meat-packing plants and correctional facilities.[44] The medical community learned more about potential effects of COVID–19 on specific populations, such as pregnant people,[45] the elderly, and immunocompromised people. In July 2020, CDC announced that cloth face coverings (masks) are a critical public health tool in reducing the spread of COVID–19, particularly when used universally within communities.[46] As stay-at-home orders issued during the first wave were lifted, CDC continued to promote broad implementation of masking and face covering requirements.[47] One pivotal marker of the second wave was the creation of

Operation Warp Speed, a partnership between the HHS and Department of Defense (DOD) aimed to help accelerate the development of a COVID–19 vaccine.[48]

As concerns about asymptomatic transmission grew and vaccines and therapeutics were still being developed, the U.S. government continued to take steps to protect the public health. CDC extended the No Sail Order and Suspension of Further Embarkation for cruise ships [49] and, as the second wave was being replaced by the third, issued an Order temporarily halting evictions in the United States due to the potential for accelerated transmission in congregate settings such as shelters for displaced persons.[50] The CDC Order under 42 U.S.C. 265, 268 and 42 CFR 71.40 issued in March 2020 and amended and extended in April and May 2020, continued to be in place throughout this period.

### 3. Third Wave—Alpha Variant— September 2020 to May 2021

COVID–19 variants, including the B.1.1.7 (Alpha) variant, emerged in the fall of 2020, heralding the third wave of the pandemic [51] and resulting in 22.5 million COVID–19 cases (34% of cumulative cases) and over 398,000 deaths (21% of cumulative deaths) in the United States.[52] The third wave lasted from approximately September 2020 to May 2021 and coincided with the initial availability of vaccines for COVID–19 [53] and increased availability

[35] See Proclamation 9984 (Jan. 31, 2020), 85 FR 6709 (Feb. 5, 2020) (regarding the People's Republic of China); Proclamation 9992 (Feb. 28, 2020), 85 FR 12855 (Mar. 4, 2020) (regarding the Republic of Iran); Proclamation 9993 (Mar. 11, 2020), 85 FR 15045 (Mar. 16, 2020) (regarding the Schengen Area of Europe); Proclamation 9996 (Mar. 14, 2020), 85 FR 15341 (Mar. 18, 2020) (regarding the United Kingdom and Republic of Ireland); and Proclamation 10041, as amended by Proclamation 10042 (May 24, 2020), 85 FR 31933 (May 28, 2020) (regarding the Federative Republic of Brazil).

[36] See 85 FR 16547 (Mar. 24, 2020); 85 FR 16548 (Mar. 24, 2020).

[37] Supra note 32; see also CDC Advises Travelers to Avoid All Nonessential Travel to China, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s0128-travelers-avoid-china.html (Jan. 28, 2020), advising travelers to avoid all nonessential travel to countries with known viral spread.

[38] 85 FR 16628 (Mar. 24, 2020); extended 85 FR 21004 (Apr. 15, 2020); see also Moriarty LF, Plucinski MM, Marston BJ, et al. Public Health Responses to COVID-19 Outbreaks on Cruise Ships—Worldwide, February–March 2020. MMWR Morb Mortal Wkly Rep 2020;69:347–352. DOI: http://dx.doi.org/10.15585/mmwr.mm6912e3.

[39] See 85 FR 16559 (Mar. 24, 2020).

[40] See 85 FR 17060 (Mar. 26, 2020).

[41] See supra note 7.

[42] Oster AM, Kang GJ, Cha AE, et al. Trends in Number and Distribution of COVID-19 Hotspot Counties—United States, March 8–July 15, 2020.

MMWR Morb Mortal Wkly Rep 2020;69:1127–1132. DOI: http://dx.doi.org/10.15585/mmwr.mm6933e2.

[43] Payne DC, Smith-Jeffcoat SE, Nowak G, et al. SARS–CoV–2 Infections and Serologic Responses from a Sample of U.S. Navy Service Members—USS Theodore Roosevelt, April 2020. MMWR Morb Mortal Wkly Rep 2020;69:714–721. DOI: http://dx.doi.org/10.15585/mmwr.mm6923e4.

[44] Dyal JW, Grant MP, Broadwater K, et al. COVID–19 Among Workers in Meat and Poultry Processing Facilities—19 States, April 2020. MMWR Morb Mortal Wkly Rep 2020;69:557–561. DOI: http://dx.doi.org/10.15585/mmwr.mm6918e3; see also Hagan LM, Williams SP, Spaulding AC, et al. Mass Testing for SARS–CoV–2 in 16 Prisons and Jails—Six Jurisdictions, United States, April–May 2020. MMWR Morb Mortal Wkly Rep 2020;69:1139–1143. DOI: http://dx.doi.org/10.15585/mmwr.mm6933a3; Njuguna H, Wallace M, Simonson S, et al. Serial Laboratory Testing for SARS–CoV–2 Infection Among Incarcerated and Detained Persons in a Correctional and Detention Facility—Louisiana, April–May 2020. MMWR Morb Mortal Wkly Rep 2020;69:836–840. DOI: http://dx.doi.org/10.15585/mmwr.mm6926e2.

[45] Ellington S, Strid P, Tong VT, et al. Characteristics of Women of Reproductive Age with Laboratory-Confirmed SARS–CoV–2 Infection by Pregnancy Status—United States, January 22–June 7, 2020. MMWR Morb Mortal Wkly Rep 2020;69:769–775. DOI: http://dx.doi.org/10.15585/mmwr.mm6925a1.

[46] CDC calls on Americans to wear masks to prevent COVID-19 spread (press release), Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html (Jul. 14, 2020) (noting the growing body of evidence supporting cloth face coverings as a source control to help prevent the person wearing the mask from spreading COVID–19 to others; the main protection individuals gain from masking occurs when others in their communities also wear face coverings).

[47] Hendrix MJ, Walde C, Findley K, Trotman R. Absence of Apparent Transmission of SARS–CoV–2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy—Springfield, Missouri, May 2020. MMWR Morb Mortal Wkly Rep 2020;69:930–932. DOI: http://dx.doi.org/10.15585/mmwr.mm6928e2.

[48] Operation Warp Speed: Accelerated COVID–19 Vaccine Development Status and Efforts to Address Manufacturing Challenges, Government Accountability Office, https://www.gao.gov/products/gao-21-319 (Feb. 11, 2021).

[49] See 85 FR 44085 (July 21, 2020).

[50] See 85 FR 55292 (Sept. 4, 2020). The CDC Director subsequently renewed the "eviction moratorium" Order until March 31, 2021 (86 FR 8020 (Feb. 3, 2021)), then modified and extended the Order until June 30, 2021 (86 FR 16731 (Mar. 31, 2021)) and extended the Order until July 31, 2021 (86 FR 34010 (Jun. 28, 2021)). On August 3, 2021, the CDC Director announced a new Order to temporarily halt residential evictions in communities with substantial or high transmission of COVID–19 to prevent the further spread of COVID–19 (86 FR 43244 (Aug. 6, 2021)).

[51] Science Brief: Emerging SARS–CoV–2 Variants—Updated, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/scientific-brief-emerging-variants.html (updated Jan. 28, 2021).

[52] Per internal CDC calculations.

[53] COVID-19 vaccines were initially available only for those persons with higher risk of COVID–19, such as immunocompromised individuals and healthcare workers, but access was subsequently expanded to the general population aged 16 years and older. The U.S. Food and Drug Administration (FDA) issued emergency use authorizations for three COVID-19 vaccines: Two mRNA vaccines (produced by Pfizer-BioNTech and Moderna) and one viral vector vaccine (produced by Johnson & Continued

of therapeutics.[54] Even as the third wave began to ebb, however, a new variant—B.1.617.2 (Delta)—began circulating in India and other countries.

The U.S. government responded to the Alpha variant and resulting surge in cases with additional travel- and migration-related restrictions, beginning with a requirement for air passengers from the United Kingdom (where the Alpha variant was first identified) to present a negative COVID–19 test result before boarding a flight to the United States; [55] CDC subsequently expanded the predeparture testing requirement to air passengers departing to the United States from any foreign country.[56] Due to the inherent risk of transmission of COVID–19 in the travel context,[57] CDC

also issued an Order requiring face masks to be worn while on conveyances traveling into, within, or out of the United States and at U.S. transportation hubs.[58] Based on developments with respect to variants and the continued spread of COVID–19, the U.S. government expanded the list of countries from which entry into the United States was limited.[59] CDC also announced a Conditional Sailing Order framework under which cruise ships could resume passenger operations only after meeting stringent public health mitigation measures, such as frequent testing of crew members.[60]

In October 2020, following the promulgation of the Final Rule for 42 CFR 71.40,[61] CDC published a new Order under 42 U.S.C. 265 and 268 and the regulation suspending the right to introduce certain covered persons into the United States.[62] As with all prior CDC Orders, the October Order applied to ''covered aliens,'' which included certain SA, FMU, and UC seeking entry into the United States without valid travel documents and provided certain exceptions, including a case-by-case exception to be applied by CBP officers with supervisor approval upon a determination that an individual should be excepted from application of the Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. The October Order was the subject of litigation regarding its application to both FMU and UC.[63]

### 4. Fourth Wave—Delta Variant—June to October 2021

The COVID–19 pandemic's fourth wave lasted from June to October 2021 and was characterized by the spread of the Delta variant in the United States; during this period the United States experienced 9.8 million cases (15% of cumulative cases) and over 179,000 deaths (9% of cumulative deaths).[64] Vaccines were widely available during the fourth wave and uptake rose slightly throughout this period.[65]

Given the predictable global spread of the virus, the effectiveness of COVID–19 vaccines, and the rising availability of COVID–19 vaccines globally, and recognizing the need to allow the domestic and global economy to continue recovering from the effects of the pandemic, the President issued a Proclamation reflecting the United States' desire to move away from the country-by-country restrictions previously applied during the COVID–19 pandemic and to adopt an air travel policy that relies primarily on vaccination to advance the safe resumption of international air travel to the United States.[66] The Proclamation was followed by a suite of travel-related mitigation measures.[67] Even as available

Johnson/Janssen); *see generally https:// www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs;* Dooling K, McClung N, Chamberland M, et al. *The Advisory Committee on Immunization Practices' Interim Recommendation for Allocating Initial Supplies of COVID–19 Vaccine—United States,* 2020. MMWR Morb Mortal Wkly Rep 2020;69:1857–1859. DOI: *http:// dx.doi.org/10.15585/mmwr.mm6949e1.* In May 2021, adolescents 12 to 15 years old became eligible to receive COVID–19 vaccines. Wallace M, Woodworth KR, Gargano JW, et al. *The Advisory Committee on Immunization Practices' Interim Recommendation for Use of Pfizer-BioNTech COVID–19 Vaccine in Adolescents Aged 12–15 Years—United States, May 2021.* MMWR Morb Mortal Wkly Rep 2021;70:749–752. DOI: *http:// dx.doi.org/10.15585/mmwr.mm7020e1.*

[54] U.S. Food and Drug Administration, *Emergency Use Authorization, https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs* (last accessed Mar. 30, 2022).

[55] *CDC to Require Negative COVID–19 Test for Air Travelers from the United Kingdom to the U.S.,* Centers for Disease Control and Prevention, *https:// www.cdc.gov/media/releases/2020/s1224-CDC-to-require-negative-test.html* (Dec. 24, 2020).

[56] *See* 86 FR 7387 (Jan. 26, 2021).

[57] CDC has issued orders and guidance focusing on the ''travel context,'' which encompasses both conveyances and transportation hubs, because these are locations where large numbers of people may gather and physical distancing can be difficult. Furthermore, many people need to take public transportation for their livelihoods. Passengers (including young children) may be unvaccinated and some on board, including personnel operating the conveyances or working at the transportation hub, may have underlying health conditions that cause them to be at increased risk of severe illness (*i.e.,* those who might not be protected by vaccination because of weakened immune systems). Such people may not have the option to disembark or relocate to another area of the conveyance. Transportation hubs are also places where people depart to different geographic locations, both across the United States and around the world. Therefore, an exposure in a transportation hub can have consequences to many destination communities if people become infected after they travel. *See Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/ travelers/face-masks-public-transportation.html* (updated Feb. 25, 2022).

[58] *Id.*

[59] This included restrictions and suspension of entry of noncitizens (immigrants and nonimmigrants) who were present within the European Schengen Area, the United Kingdom (excluding overseas territories outside of Europe), the Republic of Ireland, the Federative Republic of Brazil, the Republic of South Africa, and the Republic of India in the 14-day period prior to attempted entry. *See* Proclamation 10143 (Jan. 25, 2021), 86 FR 7467 (Jan. 28, 2021) (regarding the Schengen Area of Europe, the United Kingdom, the Republic of Ireland, the Federative Republic of Brazil, and the Republic of South Africa); Proclamation 10199 (Apr. 30, 2021), 86 FR 24297 (May 6, 2021) (regarding the Republic of India).

[60] *See* 86 FR 59720 (Oct. 28, 2021). The Order was extended in April, May, and October 2021.

[61] *See* 85 FR 56424 (Sept. 11, 2020).

[62] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020).

[63] For example, on November 18, 2020, the United States District Court for the District of Columbia preliminarily enjoined the U.S. government from expelling UC pursuant to the October 2020 Order. *PJES* v. *Mayorkas,* No. 1:20–cv–02245 (D.D.C.), Dkt. Nos. 79–80. While prohibited from expelling UC, the U.S. government worked to create solutions for the appropriate care of UC pursuant to regular immigration authorities.

On Friday, January 29, 2021, the United States Court of Appeals for the District of Columbia Circuit granted a stay pending appeal of the District Court's preliminary injunction (*PJES* v. *Mayorkas,* No. 20–5357, Doc. No. 1882899), thereby permitting CDC and DHS to resume enforcement of the October Order and immediately expel UC. On January 30, 2021, CDC exercised its discretion to temporarily except UC from expulsion pending the outcome of its public health reassessment of the October Order. *See* 86 FR 9942 (Feb. 17, 2021).

[64] Per internal CDC calculations.

[65] *Trends in Number of COVID–19 Vaccinations in the US,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#vaccination-trends* (last updated Mar. 29, 2022).

[66] *See* Proclamation 10294 (Oct. 25, 2021), 86 FR 59603 (Oct. 28, 2021) (terminating the suspension of entry into the United States regarding the People's Republic of China, the Republic of Iran, the Schengen Area of Europe, the United Kingdom and Republic of Ireland, the Federative Republic of Brazil, the Republic of South Africa, and the Republic of India).

[67] Including amending the *Requirement for Proof of Negative COVID–19 Test or Recovery from COVID–19 for All Air Passengers Arriving in the United States* (*https://www.cdc.gov/quarantine/fr-proof-negative-test.html*) to shorten the time window for predeparture testing to one day for air passengers who were not fully vaccinated against COVID–19; *Order Requiring Airlines to Collect Contact Information for All Passengers Arriving into the United States* (*https://www.cdc.gov/quarantine/ order-collect-contact-info.html*), and the *Order Implementing Presidential Proclamation on Safe Resumption of Global Travel During the COVID–19 Pandemic,* which required all non-U.S.-citizen, non-immigrants, with limited exceptions, traveling to the United States by air to be fully vaccinated against COVID–19 and show proof of vaccination (*https://www.cdc.gov/quarantine/order-safe-travel.html*).

mitigation measures allowed the U.S. government to shift its pandemic approach in the travel context, the country continued to see a surge in COVID–19 cases caused by the Delta variant necessitating different measures in non-travel contexts. For example, as a result, the CDC Director extended the aforementioned eviction moratorium [68] for persons in counties experiencing substantial or high rates of transmission.[69]

During the fourth wave, CDC also issued the July Exception excepting UC from the October 2020 Order, which followed CDC's decision in January 2021 to temporarily except UC from expulsion pending a public health reassessment of the October Order.[70] The October 2020 Order was subsequently replaced by the August Order under 42 U.S.C. 265 and 268 and 42 CFR 71.40, which fully incorporated the July Exception. The August Order explained why the mitigation measures specific to UC and discussed in the July Exception were not available to SA and FMU and, thus, why the August Order applied only to SA and FMU.[71] As with many of the other actions taken by the U.S. government during this wave, the August Order was predicated, in part, on the significant increase in community transmission levels brought forth by the Delta variant.

### 5. Fifth Wave—Omicron Variant—November 2021 to March 2022

The highly infectious SARS–CoV–2 variant B.1.1.529 (Omicron) is responsible for the currently receding fifth wave of the pandemic. The fifth wave resulted in an extraordinary and unparalleled increase in COVID–19 cases around the world.[72] Although the emergence of the Omicron variant resulted in the highest reported numbers of cases and hospitalizations during the pandemic, disease severity indicators, including hospital length of stay, intensive care unit admissions, and deaths, remained lower than during

previous pandemic waves.[73] As a result of the Omicron surge, the United States experienced almost 24 million cases (36% of cumulative cases); given this volume of cases, however, the resulting number of deaths in the United States (163,000 deaths, or 9% of cumulative deaths) was comparatively small.[74] Vaccination efforts continued across the country during this fifth wave and were expanded to include children aged 5 to 11 years.[75] Despite breakthrough cases due to Omicron, vaccines continued to provide substantial protection against severe illness, hospitalizations, and deaths due to COVID–19.[76]

Although the COVID–19 public health emergency continues,[77] scientific understanding about the epidemiology of COVID–19 and its variants as well as the effectiveness of pharmaceuticals and nonpharmaceutical interventions have substantially expanded, allowing the U.S. government and CDC to transition to a more narrowly tailored set of tools to prevent and control the spread of the SARS–CoV–2 virus and COVID–19. The U.S. government continues to pivot away from country-specific measures. Following the temporary issuance of country-based restrictions as Omicron emerged,[78] all country-based restrictions were later lifted by the

President, as recommended by CDC.[79] Based on an increasing body of evidence, CDC recommended that everyone be vaccinated and remain up to date with vaccines, including boosters for those eligible.[80] As more information about the Omicron variant and vaccine effectiveness became available, CDC calibrated its mitigation measures in accordance with the epidemiology of the virus and the different characteristics of the predominant variants. This included shortening the recommended duration of quarantine and isolation for most members of the general public in community settings [81] and also shortening the timeframe for its COVID–19 testing requirements for all air passengers boarding flights to the United States.[82] DHS also required that all inbound non-citizen, non-lawful permanent residents traveling to the United States via land POE—whether for essential or non-essential reasons—must provide proof of full COVID–19 vaccination status upon request.[83] These refinements in policy reflect CDC's increased understanding of the science and its desire to tailor mitigation measures so that they are no more burdensome than necessary. The ability of CDC to be responsive to the public health landscape and adjust such

[68] *See* 85 FR 55292 (Sept. 4, 2020).

[69] *See* 86 FR 43244 (Aug. 6, 2021).

[70] *See supra* note 63.

[71] 86 FR 42828, 42837–38.

[72] Omicron was first reported to the World Health Organization (WHO) by South Africa on November 24, 2021; on November 26, 2021, WHO designated it a Variant of Concern (VOC). On November 30, 2021, the U.S. also decided to classify Omicron as a VOC. This decision was based on a number of factors, including detection of cases attributed to Omicron in multiple countries, even among persons without travel history, transmission and replacement of Delta as the predominant variant in South Africa, changes in the spike protein of the virus, and concerns about potential decreased effectiveness of vaccination and treatments.

[73] Iuliano AD, Brunkard JM, Boehmer TK, et al. *Trends in Disease Severity and Health Care Utilization During the Early Omicron Variant Period Compared with Previous SARS–CoV–2 High Transmission Periods—United States, December 2020–January 2022.* MMWR Morb Mortal Wkly Rep. ePub: 25 January 2022. DOI: *http://dx.doi.org/10.15585/mmwr.mm7104e4; see also supra* note 26.

[74] Per internal CDC calculations.

[75] Woodworth KR, Moulia D, Collins JP, et al. *The Advisory Committee on Immunization Practices' Interim Recommendation for Use of Pfizer-BioNTech COVID–19 Vaccine in Children Aged 5–11 Years—United States, November 2021.* MMWR Morb Mortal Wkly Rep 2021;70:1579–1583. DOI: *http://dx.doi.org/10.15585/mmwr.mm7045e1.*

[76] *Omicron Variant: What You Need to Know,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html* (updated Feb. 2, 2022). *See also* Tenforde MW, Self WH, Gaglani M, et al. *Effectiveness of mRNA Vaccination in Preventing COVID-19–Associated Invasive Mechanical Ventilation and Death—United States, March 2021–January 2022.* MMWR Morb Mortal Wkly Rep. ePub: 18 March 2022. DOI: *http://dx.doi.org/10.15585/mmwr.mm7112e1.*

[77] The public health emergency determination has been renewed by the Secretary of HHS at 90-day intervals since January 2020, most recently on January 14, 2022. *See Renewal of Determination That A Public Health Emergency Exists,* Office of the Assistant Secretary for Preparedness and Response, *https://aspr.hhs.gov/legal/PHE/Pages/COVID19-14Jan2022.aspx* (last visited Mar. 9, 2022).

[78] Those restrictions included suspending entry into the United States of immigrants or nonimmigrants who were physically present within eight southern African countries during the 14-day period preceding their entry or attempted entry into the United States. *See* Proclamation 10315 (Nov. 26, 2021), 86 FR 68385 (Dec. 1, 2021).

[79] *See* Proclamation 10329 (Dec. 28, 2021), 87 FR 149 (Jan. 3, 2022) (terminating Proclamation 10315 regarding eight southern African countries).

[80] A person is considered up to date after receiving all recommended COVID-19 vaccines, including any booster dose(s) when eligible, *Stay Up to Date with Your Vaccines,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html* (issued Jan. 2022, updated Mar. 22, 2022).

[81] *CDC Updates and Shortens Recommended Isolation and Quarantine Period for General Population,* Centers for Disease Control and Prevention, *https://www.cdc.gov/media/releases/2021/s1227-isolation-quarantine-guidance.html* (Dec. 27, 2021). Specifically, the length of isolation period for the general public was shortened to five days, followed by five days of wearing a well-fitting mask. *See also What We Know About Quarantine and Isolation,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine-isolation-background.html* (updated Feb. 25, 2022).

[82] *Requirement for Proof of Negative COVID–19 Test or Recovery from COVID–19 for All Air Passengers Arriving in the United States,* updating COVID–19 testing requirements (available at *https://www.cdc.gov/quarantine/pdf/Amended-Global-Testing-Order_12-02-2021-p.pdf*). All air passengers two years or older with a flight departing to the United States from a foreign country starting on December 6, 2021, are required show a negative COVID–19 viral test result taken no more than one day before travel, or documentation of having recovered from COVID–19 in the past 90 days, before they board their flight. This requirement remains in place.

[83] *See* 87 FR 3429 (Jan. 24, 2022) (applying restrictions to the U.S.-Canada border) and 87 FR 3425 (applying restrictions to the U.S.-Mexico border).

measures up and down is critical to successfully fighting the pandemic.

During the fifth wave of the pandemic and as specified in the August Order, CDC reviewed the public health rationale underlying the need for the Order every 60 days. By the time of the second reassessment in late November 2021 the public health situation with respect to COVID–19 was improving. However, the sudden emergence of the Omicron variant led CDC to find that the August Order continued to be necessary. Because case numbers remained historically high in January, CDC's third public health reassessment determined that the need for the August Order remained.

*B. Current Status of the COVID–19 Pandemic*

As a result of the Omicron variant, the United States recorded its highest seven-day moving average number of cases on January 15, 2022.[84] Following this unprecedented peak, however, the number of COVID–19 cases in the United States began to rapidly decrease, falling by over 95% as of March 30, 2022.[85] After a brief period of continued increases,[86] deaths and hospitalizations also reversed course and began a swift descent.[87] Even at their peaks, however, the number of deaths and hospitalizations during Omicron were substantially lower than would have been expected from previous waves, based on the case counts. These welcomed changes were due, in part, to widespread population immunity[88] and

a generally lower overall risk of severe disease due to the nature of the Omicron variant.

As the overall COVID–19 case count decreases, CDC has observed an increased percentage of cases due to a newly detected subvariant of Omicron, BA.2. As of March 24, 2022, the BA.2 subvariant is estimated to represent approximately 54.9% of sequenced cases in the United States.[89] Experts do not expect this subvariant to lead to a large surge in cases or hospitalizations, due in part to the levels of immunity provided by other Omicron subvariants (B.1.1.529 and BA.1.1) and by vaccination. Should COVID–19 cases show signs of potentially straining the U.S. healthcare system in the future, CDC's Community COVID–19 Levels framework described below better equips the country to swiftly respond.

As the waves of the pandemic have surged and abated, so too have actions the U.S. government has taken in response to the pandemic. While earlier phases of the pandemic required extraordinary actions by the government and society at large, epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted the country to safely transition to more normal routines.[90] As part of that transition, CDC is also shifting to more nuanced and narrowly tailored guidance that provides a less burdensome means of preventing and controlling the SARS–CoV–2 virus and COVID–19.

*1. Community COVID–19 Levels*

During the first four waves of the pandemic, CDC relied on a formula to calculate community transmission levels and update COVID–19 prevention

strategies.[91] These indicators reflected the goal of limiting transmission as vaccine availability increased.[92] The CDC Director examined these indicators in conducting the public health assessment for the August Order.[93]

The COVID–19 pandemic has shifted to a new phase, however, due to the widespread uptake of highly effective COVID–19 vaccines, the accrual of high rates of vaccine- and infection-induced immunity at the population level, and the availability of effective therapeutics, testing, and masks or respirators.[94] As a result, CDC released a new framework in February 2022, "COVID–19 Community Levels," reflecting a shift in focus from eliminating SARS–CoV–2 transmission toward disease control and healthcare system protection.[95] This new framework examines three currently relevant metrics for each U.S. county: New COVID–19 hospital admissions per 100,000 population in the past seven days, the percent of staffed inpatient beds occupied by patients with COVID–19, and total new COVID–19 cases per 100,000 population in the past seven days.[96] CDC determined that data on disease severity and healthcare system strain complement case rates, and that these data together are more informative for

---

[84] *See supra* note 24, citing a seven-day moving average of 806,324 cases on January 15, 2022 (last updated Mar. 29, 2022).

[85] *Id.* (noting a peak of 806,324 seven-day moving average number of cases to 26,190 seven-day moving average number of cases on March 29, 2022).

[86] *COVID Data Tracker Weekly Review: Stay Up to Date—Interpretive Summary for Jan. 28, 2022,* Centers for Disease Control and Prevention, *https:// www.cdc.gov/coronavirus/2019-ncov/covid-data/ covidview/past-reports/01282022.html* (Jan. 28, 2022).

[87] *See New Admissions of Patients with Confirmed COVID–19, United States,* Centers for Disease Control and Prevention, *https:// covid.cdc.gov/covid-data-tracker/#new-hospital-admissions* (last updated Mar. 28, 2022); *see also supra* note 24, noting a peak of 4,172 seven-day moving average number of deaths declining to 644 seven-day moving average number of deaths on March 29, 2022.

[88] In addition to vaccine-induced immunity, studies have consistently shown that infection with SARS–CoV–2 lowers an individual's risk of subsequent infection and an even lower risk of hospitalization and death. National estimates of both vaccine- and infection-induced antibody seroprevalence have been measured among blood donors; as of December 2021, these measures demonstrated 94.7% of persons 16 years and older showed antibody seroprevalence for COVID–19. *Science Brief: Indicators for Monitoring COVID–19 Community Levels and Making Public Health*

*Recommendations,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/indicators-monitoring-community-levels.html* (updated Mar. 4, 2022); *Nationwide COVID–19 Infection- and Vaccination-Induced Antibody Seroprevalence (Blood donations),* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#nationwide-blood-donor-seroprevalence* (last updated Feb. 18, 2022).

[89] *Variant Proportions,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#variant-proportions* (showing data for the week ending March 26, 2022).

[90] *Transcript for CDC Media Telebriefing: Update on COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/media/releases/2022/t0225-covid-19-update.html* (Feb. 25, 2022). COVID–19 vaccines are highly effective against severe illness and death. Widespread uptake of these vaccines, coupled with higher rates of infection-induced immunity at the population level, as well as the broad availability of mitigation measures and effective therapeutics have moved the pandemic to a different phase. *See also State of the Union Address, https://www.whitehouse.gov/state-of-the-union-2022/* (Mar. 1, 2022).

[91] In September 2020, CDC released the Indicators of Community Transmission framework, which incorporated two metrics to define community transmission: Total new cases per 100,000 persons in the past seven days, and percentage of Nucleic Acid Amplification Test results that are positive during the past seven days. CDC also encouraged local decision-makers to also assess the following factors, in addition to levels of SARS–CoV–2, to inform the need for layered prevention strategies across a range of settings: Health system capacity, vaccination coverage, capacity for early detection of increases in COVID–19 cases, and populations at risk for severe outcomes from COVID–19. *See* Christie A, Brooks JT, Hicks LA, et al. *Guidance for Implementing COVID–19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage.* MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: *http://dx.doi.org/10.15585/mmwr.mm7030e2.*

[92] *Id.*

[93] *Supra* note 1.

[94] *Supra* note 88.

[95] *Indicators for Monitoring COVID–19 Community Levels and Implementing Prevention Strategies,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/downloads/science/Scientific-Rationale-summary_COVID-19-Community-Levels_2022.02.23.pptx* (Feb. 23, 2022).

[96] New COVID–19 admissions and the percent of staffed inpatient beds occupied represent the current potential for strain on the health system, while data on new cases acts as an early warning indicator of potential increases in health system strain in the event of a COVID–19 surge. Community vaccination coverage and other local information, like early alerts from surveillance, such as through wastewater or the number of emergency department visits for COVID–19, when available, can also inform decision making for health officials and individuals. *Supra* note 20.

public health recommendations for individual, organizational, and jurisdictional decisions than data on community transmission rates alone.[97] This comprehensive approach to assessing COVID–19 Community Levels can inform decisions about layered COVID–19 prevention strategies, including testing and masking to reduce medically significant disease and limit strain on the healthcare system and other societal functions.[98]

Using these data, the COVID–19 Community Levels for each county are classified as low, medium, or high. CDC recommends using county COVID–19 Community Levels to help determine which mitigation measures should be implemented within a community.[99] As of March 31, 2022, 94.9% of U.S. counties are classified at the low COVID–19 Community Level, 4.5% of U.S. counties are classified at the medium COVID–19 Community Level; only 0.5% of U.S. counties are classified at the high COVID–19 Community Level.[100] Furthermore, 97.1% of the U.S. population lives in counties classified as "low," 2.5% live in counties classified as "medium," and 0.4% live in counties classified as "high."[101]

2. Healthcare Systems and Resources

With the ebb of the fifth wave, the number of new hospital admissions of patients with confirmed COVID–19 has similarly receded. Daily new hospitalization admissions peaked with 154,696 daily new admissions on January 15, 2022. The large number of cases in a very short time led to a high volume of hospitalizations that strained some local healthcare systems and, in some instances, impacted care for non-COVID–19-related concerns.[102] Despite this high volume of COVID–19 cases and hospitalizations, COVID–19 cases caused by the Omicron variant were, on average, less severe.[103]

The observed reduction in severity of COVID–19 cases and ongoing effective use of pharmaceutical interventions make it possible to minimize medically significant disease and prevent excessive strain on the healthcare sector, even with the occurrence of

SARS–CoV–2 transmission.[104] Accordingly, at this stage of the pandemic, data on disease severity and healthcare system strain complement case rates and result in a more comprehensive approach to assessing COVID–19 Community Levels.

3. Mitigation Measures

Effective public health mitigation measures have contributed to the vast majority of the U.S. population living in a county identified by CDC as having either a "low" or "medium" COVID–19 Community Level. In addition to earlier public health measures, such as masking and physical distancing, the development and widespread deployment of COVID–19 tests, vaccines, and therapeutics have greatly reduced the transmission of the virus and severity of the disease throughout the United States and provided a new understanding of how prevention measures may be used to minimize the impact of COVID–19 on health and society.[105] These measures and the resulting current status of the COVID–19 pandemic are a major factor in CDC's determination that the Orders issued under the authorities of 42 U.S.C. 265, 268 and 42 CFR 71.40 suspending the right to introduce certain persons into the United States are no longer necessary to protect the public health.

a. Test Availability

Testing continues to be an essential part of COVID–19 mitigation due to the potential for asymptomatic and pre-symptomatic transmission. Compared to earlier in the pandemic, COVID–19 tests are widely available in the United States. During January 2022, Americans had access to over 480 million at-home tests in addition to rapid point of care and laboratory tests.[106] With the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons for isolation and identification of close contacts for quarantine and testing if indicated.[107]

Testing is also particularly helpful in congregate settings, where testing facility residents and personnel can help facilitate early identification of increased infection rates and prompt mitigation actions to help avoid strain on facility operations.[108] CDC recommends broad use of COVID–19 tests among facility workforces and within the larger community; such workforce testing may decrease the necessity for testing residents in congregate settings.

b. Vaccines and Boosters

Since August 2021, the scientific community has made significant strides in the development and distribution of COVID–19 vaccines, including booster shots. When the August Order was issued, three COVID–19 vaccines were authorized by the U.S. Food and Drug Administration (FDA) for emergency use and recommended for all people 12 years of age and up. While the daily count of total COVID–19 vaccine doses administered across the United States has plateaued, the cumulative number of people protected by COVID–19 vaccination has grown since the August Order.[109] As of March 30, 2022, over 209 million people in the United States 12 years of age or older (73.9% of the population 12 years or older) have been fully vaccinated and over 245 million people in the United States 12 years or older (86.6%) have received at least one dose.[110] To address concerns with potential waning immunity,[111] booster shots are now recommended for all

---

[97] Supra note 88.

[98] Id.

[99] See supra note 20.

[100] COVID–19 Integrated County View, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=all_states&list_select_county=all_counties&data-type=CommunityLevels&null=CommunityLevels (last updated Mar. 31, 2022); see also infra note 152.

[101] Per internal CDC calculations.

[102] Supra note 73.

[103] Id.

[104] Supra note 88.

[105] See COVID Data Tracker Weekly Review: Interpretive Summary for March 4, 2022, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/03042022.html (Mar. 4, 2022), indicating that the whole community can be safe only when [everyone] take[s] steps to protect each other, even when the COVID–19 Community Level is low or medium.

[106] Testing is available for free at 21,500 locations around the country. See supra note 21.

[107] See COVID–19 Testing and Diagnostics Working Group (TDWG), U.S. Department of Health and Human Services, https://www.hhs.gov/coronavirus/testing/testing-diagnostics-working-group/index.html (last visited Mar. 31, 2022) (defining the role of the COVID–19 TDWG, which

develops testing-related guidance and provides targeted investments to expand the available testing supply and maximize testing capacity).

[108] Interim Guidance on Management of Coronavirus Disease 2019 (COVID–19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#Strategies (updated Feb. 15, 2022).

[109] Supra note 65.

[110] In comparison, as of July 28, 2021, over 163 million people in the United States (57.6% of the population 12 years or older) had been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) had received at least one dose. Id.; see also COVID–19 Vaccinations in the United States, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last updated Mar. 30, 2022).

[111] Thompson MG, Natarajan K, Irving SA, et al. Effectiveness of a Third Dose of mRNA Vaccines Against COVID–19–Associated Emergency Department and Urgent Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance—VISION Network, 10 States, August 2021–January 2022. MMWR Morb Mortal Wkly Rep 2022;71:139–145. DOI: http://dx.doi.org/10.15585/mmwr.mm7104e3.

IFR_AR_000891

adults ages 18 years and older.[112] As of March 30, 2022, 48.3% of fully vaccinated individuals 18 years and older in the United States have also received a booster dose.[113]

Since the August Order, eligibility for COVID–19 vaccines has expanded to include children ages five to 11.[114] Children ages six months through four years may soon become eligible for a COVID–19 vaccine; CDC is working with state and local jurisdictions for the eventual rollout of this critical product.[115] Improving COVID–19 vaccination coverage among children and adolescents is crucial to maintaining low rates of COVID–19-associated morbidity and mortality among these groups and ensuring a safe and expedited return to normal routines for everyone.[116]

Vaccines, including boosters, continue to be the single most important public health tool for fighting COVID–19 and CDC recommends that all people get vaccinated as soon as they are eligible and stay up to date on vaccinations.[117] Evidence shows that people who have completed the primary COVID–19 vaccination series, and received a booster when eligible, are at substantially reduced risk of severe illness and death from COVID–19; in

contrast, the cumulative rate of COVID–19-associated hospitalizations is substantially higher in unvaccinated adults than in those who are up to date on COVID–19 vaccines.[118] Therefore, vaccines, including booster doses when appropriate, provide a substantial measure of protection against COVID–19-associated hospitalization and severe disease, including from the Omicron variant.[119] The increased percentage of individuals who are not only vaccinated but have also received a booster—which was not available at the time of the August Order—strengthens community protection levels and is a critical step toward resuming normal routines safely.

The availability of COVID–19 vaccines globally has also increased dramatically since the August Order.[120] On August 2, 2021, only 29% of the world had received at least one dose of a COVID–19 vaccine, with 12% being fully vaccinated.[121] As of March 30, 2022, 64.9% of the world population has received at least one dose of a COVID–19 vaccine and 57% of the global population is fully vaccinated with a primary vaccine series.[122] Fighting COVID–19 abroad is key to the nation's effort to protect people at home and stay ahead of new variants; therefore, the United States remains committed to accelerating global vaccination efforts.[123]

c. Treatments

Compared to August 2021, treatments for COVID–19 are more widely available. Although monoclonal antibodies were available in August 2021 and some continue to be effective and were widely used during the Omicron wave, such treatments must be administered by infusion and are cumbersome to administer. The FDA has issued emergency use

authorizations (EUA) for a number of treatments for COVID–19 for people at high risk of COVID–19 disease progression, some of which were developed after August 2021.[124] In February 2022, FDA issued an EUA for a new monoclonal antibody that is specifically effective in combatting the Omicron variant.[125] FDA has also authorized oral antiviral medications that target the SARS–CoV–2 virus.[126] The U.S. government has expedited the development, manufacturing, and procurement of these treatments, securing 20 million courses of antiviral pills, which have been shown to reduce the risk of hospitalization or death by 89%.[127] The availability of efficacious and accessible treatments add a powerful layer of protection against severe COVID–19 that was not available in the summer of 2021.[128] The U.S. government's commitment to making such medications available and the ability to produce variant-specific treatments are critical components of the next phase of the fight against COVID–19.

4. Congregate Settings

As highlighted in the August Order, the very nature of congregate settings increases the risk for COVID–19 outbreaks.[129] Now, however, numerous non-pharmaceutical and pharmaceutical interventions are available to decrease the spread and severity of COVID–19 in these settings.[130] Throughout the

---

[112] *CDC Expands Eligibility for COVID–19 Booster Shots to All Adults,* Centers for Disease Control and Prevention, *https://www.cdc.gov/media/releases/2021/s1119-booster-shots.html* (released Nov. 19, 2021). *See also* COVID–19 Vaccine Booster Shots, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html* (updated Feb. 2, 2022).

[113] *See supra* note 112 (citing data as of Mar. 30, 2022). Additionally, 46.5% of fully vaccinated individuals 12 years of age and older in the United States have received a booster dose.

[114] *See supra* note 75.

[115] *COVID-19 Vaccination for Children,* Centers for Disease Control and Prevention, *https://www.cdc.gov/vaccines/covid-19/planning/children.html* (last reviewed Dec. 9, 2021).

[116] *See generally* Murthy BP, Zell E, Saelee R, et al. *COVID–19 Vaccination Coverage Among Adolescents Aged 12–17 Years—United States, December 14, 2020–July 31, 2021.* MMWR Morb Mortal Wkly Rep 2021;70:1206–1213. DOI: *http://dx.doi.org/10.15585/mmwr.mm7035e1.*

[117] *COVID–19 Vaccines Work,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html* (updated Dec. 23, 2021). *See also supra* note 111, attributing decline of vaccine effectiveness to waning vaccine induced immunity over time, possible increased immune evasion by SARS–CoV–2 variants, or a combination of these and other factors and finding that receiving a booster shot was highly effective at preventing COVID–19-associated emergency department and urgent care encounters and preventing COVID–19-associated hospitalizations). *See also Stay Up to Date with Your Vaccines,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html* (updated Mar. 30, 2022), a person is considered up to date after receiving all recommended COVID–19 vaccines, including any booster(s) when eligible. *See also infra* I.B.5.

[118] This pattern applies to all age groups but is most pronounced among adults aged 65 years and older, who are at increased risk for hospitalization and death.

[119] A recent CDC study found that among people hospitalized with COVID–19, severe outcomes during the Omicron wave appear lower than during previous high transmission waves. *COVID Data Tracker Weekly Review: Boosters Work—Interpretive Summary for Feb. 11, 2022,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/02112022.html.*

[120] *Coronavirus disease (COVID–19): Vaccine access and allocation,* World Health Organization, *https://www.who.int/news-room/questions-and-answers/item/coronavirus-disease-(covid-19)-vaccine-access-and-allocation* (Aug. 6, 2021).

[121] *Coronavirus (COVID–19) Vaccinations,* Our World in Data, *https://ourworldindata.org/covid-vaccinations#what-share-of-the-population-has-received-at-least-one-dose-of-the-covid-19-vaccine* (updated Mar. 30, 2022).

[122] *Id.*

[123] *See supra* note 21.

[124] *Treatments Your Healthcare Provider Might Recommend if You Are Sick,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/your-health/treatments-for-severe-illness.html* (updated Jan. 13, 2022), noting monoclonal antibody treatments may help the immune system recognize and respond more effectively to the virus.

[125] *FDA News Release: Coronavirus (COVID–19) Update: FDA Authorizes New Monoclonal Antibody for Treatment of COVID–19 that Retains Activity Against Omicron Variant,* U.S. Food and Drug Administration, *https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-new-monoclonal-antibody-treatment-covid-19-retains* (Feb. 11, 2022).

[126] *See supra* note 44.

[127] *See supra* note 21. The availability of new oral antiviral medications makes treatment more accessible to patients who are at risk for progression to severe COVID–19, *see FDA News Release: Coronavirus (COVID–19) Update: FDA Authorizes First Oral Antiviral for Treatment of COVID–19,* U.S. Food and Drug Administration, *https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-oral-antiviral-treatment-covid-19* (Dec. 22, 2021).

[128] *Id.* Antiviral pills will also be added to the stockpile for the first time.

[129] *See supra* note 44, explaining preventing coronavirus disease 2019 (COVID–19) in correctional and detention facilities can be challenging because of population-dense housing, varied access to hygiene facilities and supplies, and limited space for isolation and quarantine.

[130] *See supra* note 108.

IFR_AR_000892

pandemic, congregate settings have adapted processes to mitigate COVID–19 risk, including incorporating mask use, improving ventilation, enhancing cleaning and disinfection procedures, and connecting people to medical care. Current CDC guidance for correctional and detention facilities recommends that certain key mitigation measures, including provision of vaccinations and use of standard infection controls remain in place at all times.[131] In addition, facilities are encouraged to identify their own risk levels and apply additional mitigation measures as necessitated by local conditions.[132]

Rather than requiring physical distancing to be kept in place at all times, CDC's congregate settings guidance allows such measures to be scaled up or down based on local data trends and facility characteristics.[133] Because case counts and hospitalizations are decreasing in most areas of the country, many correctional and detention facilities are resuming certain activities that had previously been paused to facilitate physical distancing, signaling the resumption of more normal operations for many congregate settings.[134]

5. DHS Mitigation Measures

It is CDC's understanding that DHS facilities incorporate some of the recommended COVID–19 mitigation measures for congregate settings into their protocols. In particular, CBP continues to implement a variety of mitigation measures based on the infection prevention strategy referred to as the hierarchy of controls, which includes engineering upgrades, masking for migrants, and PPE for its workforce.[135] Moreover, vaccine uptake

among the CBP workforce has reached approximately 86% among personnel on the U.S.-Mexico border.

Of particular note, DHS has recently begun implementing a vaccination program for migrants processed under Title 8 immigration authorities and held in CBP facilities. The DHS vaccination program will apply to all age-appropriate migrants who lack legal status and are processed pursuant to Title 8 authorities; have entered the United States after crossing the Southwest Border; and are taken into DHS custody. DHS has conveyed to CDC that all such migrants who are unable to provide proof of vaccination with an FDA EUA- or WHO EUL-approved vaccine will be provided an initial dose of a COVID–19 mRNA vaccine. DHS began implementing their vaccination program at 11 sites on March 28, 2022. DHS is working to expand this program over the next two months and states that their goal is to provide vaccinations to up to 6,000 migrants a day across 27 sites across the Southwest Border by May 23, 2022.

In addition, since the August Order, the DHS Office of the Chief Medical Officer has worked with partners in local communities to move individuals safely out of CBP custody and through the appropriate Title 8 immigration procedures, as applicable to the individual noncitizens. Through these partnerships, DHS has supported state, local, tribal, and territorial partners and NGOs in developing robust COVID–19 testing and quarantine programs along the Southwest Border.

II. Public Health Determination

As the COVID–19 pandemic and public health landscape evolve, CDC reassesses the need for continued measures under 42 U.S.C. 265, 268 and 42 CFR 71.40, the authorities that support the CDC Orders.[136] This Public Health Determination and Termination is based upon the most recent science and data available to CDC. Based upon the data, CDC has determined that, although the implementation of the CDC Orders to reduce the numbers of

noncitizens held in congregate settings in POEs and Border Patrol stations has been part of the layered COVID–19 mitigation strategy used over the past two years, less burdensome measures are now available to mitigate the introduction, transmission, and spread of COVID–19 resulting from the entry of covered noncitizens.

This Public Health Determination and Termination is the most recent step in CDC's continued efforts toward aligning the public health measures response to the COVID–19 pandemic with the best available science. Throughout the COVID–19 pandemic, CDC has taken a range of actions to help protect the public's health. These actions have been informed by the status of the pandemic based on the scientific and epidemiological information available at the time. The actions fall along a spectrum of restrictions on movement and activities in public. Some, like the masking order for conveyances, impact individuals but do not restrict movement; others, like the No Sail Order, apply to entire industries.

The CDC Orders issued under the authorities of 42 U.S.C. 265, 268 and 42 CFR 71.40 suspending the right to introduce certain persons into the United States are among the most restrictive measures CDC has undertaken in the fight against COVID–19. The U.S. government has only used the extraordinary authority available under 42 U.S.C. 265 to restrict the introduction of persons in one instance prior to the COVID–19 pandemic—in 1929, in response to a meningitis outbreak.[137] During the earlier periods of the COVID–19 pandemic, while scientists were still learning about its epidemiology and developing therapeutics and vaccines, the CDC Orders were deemed necessary due to the rapid spread of the virus. As the understanding of the virus has grown and vaccines and therapeutics for the disease have become more widely available, lower COVID–19 Community Levels have been observed.

The August Order recognized the full panoply of mitigation measures available as key to slowing the spread of the virus and protecting U.S. healthcare systems while widespread vaccination efforts continued. Like other COVID–19 mitigation measures issued by CDC, the August Order was always intended as a temporary measure as understanding of the virus evolved. The scientific knowledge, availability of vaccines and

---

[131] Id. CDC recommends facilities should maintain, at all times, the following aspects of standard infection control, monitoring, and capacity to respond to cases of COVID–19: (1) Provide COVID–19 vaccination, including boosters; (2) maintain standard infection control; (3) maintain SARS–CoV–2 testing strategies; (4) prevent COVID–19 introduction from the community; and (5) prepare for outbreaks.

[132] Some congregate settings and detention facilities are resuming activities such as inter-facility transfers and detention of individuals for non-violent offenses, which has previously been paused due to the pandemic.

[133] Id. (Recommending that facilities develop and use metrics to guide modification of COVID–19 prevention measures using data on local trends and facility characteristics).

[134] Per information provided by DHS.

[135] These mitigation efforts include installing plexiglass dividers in facilities, enhancing ventilation systems, adhering to CDC guidance of cleaning and disinfection, and providing masks to migrants, as well as PPE to CBP personnel. These measures generally follow the infection prevention control referred to as the hierarchy of controls. *See Hierarchy of Controls,* Centers for Disease Control and Prevention, available at *https://www.cdc.gov/*

niosh/topics/hierarchy/default.html (last visited Mar. 30, 2022). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment). CBP also continues to update the CBP Job Hazard Analysis and the CBP COVID toolkit based on the latest relevant public health guidance.

[136] As noted above, CDC reviews the public health rationale underlying the need for the Order every 60 days.

[137] See 85 FR 56424, 56440–42 (noting that, despite passing the precursor to 42 U.S.C. 265 during a cholera epidemic in 1893, the U.S. government did not exercise this authority until 1929).

therapeutics, and high percentage of the U.S. population living in a county identified as having "low" or "medium" COVID–19 Community Levels have permitted CDC to carefully step-down the various public health mitigation measures used. This step-down involves purposeful narrowing of some restrictions while terminating others when the public health need for and efficacy of the measures no longer outweigh the severity of the restriction. For example, CDC took the unprecedented step of halting cruise ship travel during the earliest phases of the pandemic, but permitted gradual resumption of cruises as the public health situation evolved.[138] Likewise, the United States has transitioned from suspending the entry of persons traveling from specified countries[139] to a framework of CDC travel health notices and testing and proof of vaccination requirements[140] that allow for reopening global travel and migration while still implementing necessary mitigation measures. CDC believes that the restrictions remaining in place as part of the travel framework (*e.g.*, proof of vaccination requirements for noncitizens entering the United States by air or land POE, and proof of a negative COVID–19 test result)[141] continue to be necessary and are appropriately balanced to minimize restrictions on individuals. CDC continually evaluates the need for these measures and is committed to tailoring them to meet the current public health needs. These careful step-downs have been driven by the evolution of the COVID–19 pandemic and scientific developments and are part of CDC's commitment to exercise its authorities in a manner that provides the greatest benefit for public health while imposing the minimum necessary burden on individuals and communities.

In the context of the CDC Orders issued under 42 U.S.C. 265, 268 and 42 CFR 71.40, this public health-driven step-down first narrowed implementation to except UC and then fully terminated the Orders with respect to UC once there was no longer public health justification for such a suspension. While the CDC Orders under 42 U.S.C. 265, 268 and 42 CFR 71.40 provided an important measure to protect against the introduction, transmission, and spread of COVID–19 during earlier phases of the pandemic by reducing the number of noncitizens held in congregate settings, other public health measures are now available to provide necessary public health protection for noncitizens, Americans, and the DHS workforce.[142] CDC acknowledges that public health concerns may arise in congregate settings, including COVID–19 transmission. CDC has determined that, although there is still a risk of COVID–19 transmission in crowded congregate settings, including DHS facilities, that risk does not present a sufficiently serious danger to public health to necessitate maintaining the August Order. Furthermore, the mitigation measures available will help reduce severe outcomes and reduce the serious danger of introduction, transmission, and spread of COVID–19 into the United States by covered noncitizens.

Both at home and abroad, vaccination rates are increasing. Vaccination among the American public and the DHS workforce in particular has been largely successful and, as stated in the August Order, widespread vaccination of federal employees and personnel in congregate settings at POE and Border Patrol stations demonstrates important progress toward the normalization of border operations.[143] Since August 2021, vaccination rates in the countries of origin for the current majority of incoming noncitizens have also increased dramatically.[144] Such global increases in vaccination rates and infection-induced immunity provide additional layers of protection. As noted above, DHS is currently scaling up a program that provides vaccines to encountered noncitizens taken into CBP custody along the Southwest Border.[145] CDC is supportive of these efforts as a public health measure as they align with CDC's and the U.S. government's emphasis on global vaccination to fight COVID–19. Even if full COVID–19 vaccination cannot be assured, partial vaccination provides some level of protection against severe illness and hospitalization and helps maintain U.S. healthcare resources.[146]

The August Order also highlighted the threat posed by emerging variants and the potential for a future, vaccine-resistant variant, either of which could negatively impact U.S. communities and local healthcare resources.[147] Based in part on these threats, CDC concluded at that time that SA and FMU should continue to be subject to the August Order, pending further improvements in the public health situation, and subject to continual reassessment.[148] Since the August Order was implemented, public health officials have learned a great deal about variants and how best to respond to them. In response to Omicron, the U.S. government updated the National COVID–19 Preparedness Plan for monitoring COVID–19 to swiftly adapt tools to combat a new variant and deploy emergency resources to help communities.[149] The Plan includes steps to ensure that variant surveillance,

---

[138] CDC issued the original No Sail Order on March 14, 2020, and a version of the order remained in place until October 29, 2020, when it was replaced with a Framework for Conditional Sailing which permitted a phased resumption of cruise ship operations as long as certain public health mitigation measures were met. This Framework for Conditional Sailing became non-binding for cruise ships in Florida by court order in July 2021 and was allowed to expire on January 15, 2022. The Framework was replaced by a voluntary program, CDC's COVID–19 Program for Cruise Ships, wherein cruise lines choosing to opt into the program are required to follow all recommendations and guidance as a condition of their participation in the program. *See Technical Instructions for CDC's COVID–19 Program for Cruise Ships Operating in U.S. Waters,* Centers for Disease Control and Prevention, *https:// www.cdc.gov/quarantine/cruise/management/ technical-instructions-for-cruise-ships.html#program-for-cruise-ships* (last updated Mar. 18, 2022); *see also supra* notes 38, 49, and 60.

[139] *See supra* notes 35, 59, 66, 78, and 79.

[140] *See supra* note 67.

[141] *CDC Orders,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/laws-regulations.html* (updated Mar. 12, 2022).

[142] Since the August Order, the collection, production, and analysis of key COVID–19 response metrics has continued to expand. Advances in public health surveillance may enable officials and facilities (including congregate setting facilities) to rapidly institute necessary mitigation measures in the event of an outbreak. For example, CDC launched and is continually enhancing the National Wastewater Surveillance System to track the presence of SARS–CoV–2 in wastewater samples collected across the country. *See supra* note 21.

[143] CBP most recently reported vaccination rates between 75% and 91% among its U.S. Border Patrol and Office of Field Operations personnel.

[144] Thus far in 2022, Mexico, Cuba, Guatemala, Honduras, and Nicaragua constitute the top five countries of origin for covered noncitizens. Rates of vaccination for each country are as follows: Cuba: 88% fully vaccinated, 94% only partly vaccinated; Guatemala: 33% fully vaccinated, 9.8% only partly vaccinated; Honduras: 47% fully vaccinated, 6% only partly vaccinated; Mexico: 61% fully vaccinated, 4.5% only partly vaccinated; Nicaragua: 61% fully vaccinated, 82% only partly vaccinated. *Coronavirus (COVID–19) Vaccinations,* Our World in Data, *https://ourworldindata.org/covid-vaccinations* (last visited Mar. 31, 2022).

[145] *See supra* I.B.5. CDC strongly supports broad vaccination at the Southwest Border in furtherance of public health, and will implement termination of the Order on May 23, 2022, in part to give DHS time to scale up its vaccination program. That said, given the current status of the pandemic and the range of mitigation measures currently in place and in the process of being implemented, CDC believes the serious risk to public health that the CDC Orders were intended to address has been sufficiently alleviated, even in the absence of complete implementation of the DHS vaccination program.

[146] As demonstrated by the U.S. government's experience with Operation Artemis and Operation Allies Welcome, a COVID–19 vaccination program helps protect noncitizens, as well as personnel serving these populations and American communities. Vaccination of all encountered noncitizens aligns with larger U.S. government pandemic efforts and safe travel policies.

[147] 86 FR 42828, 42837.

[148] *Id.*

[149] *See supra* note 21.

vaccines, tests, and treatments can be updated and deployed quickly.[150]

At this point in the pandemic, the United States has high rates of vaccine and infection-induced immunity in the population, as well as availability of effective therapeutics, testing, and well-fitting masks. These tools, which have been developed and distributed over the past two years, help minimize medically significant disease and prevent excessive strain on the healthcare sector even while SARS–CoV–2 virus continues to circulate. As noted above, 97.1% of the U.S. population is currently living in an area classified as having a ''low'' COVID–19 Community Levels, meaning most of the population can operate under more relaxed COVID–19 mitigation strategies.[151] Noteworthy for purposes of this Determination, as of March 31, 2022, all 24 U.S. counties along the U.S.-Mexico border are classified as having a ''low'' COVID–19 Community Level.[152] Like prior CDC Orders, the August Order, issued during the fourth wave of the pandemic, noted the goal of slowing the introduction, transmission, and spread of SARS–CoV–2 into the United States by covered noncitizens.[153] With the ebb of the Omicron surge across the United States, however, the public health findings underlying the August Order have changed. Although COVID–19 remains a concern, the readily available and less burdensome public health mitigation tools to combat the disease render an order under 42 U.S.C. 265 to prevent a serious danger to the public health unnecessary. At this point in the pandemic, the previously identified public health risk is no longer commensurate with the extraordinary measures instituted by the CDC Orders. As the pandemic evolves, CDC will continue to monitor the situation with respect to COVID–19 at U.S. borders and will continue to consult with DHS on combatting COVID–19 in DHS facilities

following the Termination of the August Order.

## III. Legal Considerations

### A. Temporary Nature of Orders Under 42 U.S.C. 265 and Absence of Reliance Interests

In issuing this Public Health Determination and Termination, CDC has considered whether state or local governments, or their subdivisions, have any ''legitimate reliance''[154] interests in the continued expulsion of covered noncitizens pursuant to 42 U.S.C. 265 (Section 265). CDC has determined that no state or local government could be said to have legitimately relied on the CDC Orders issued under 42 U.S.C. 265, 268 and 42 CFR 71.40 to implement long-term or permanent changes to its operations because those orders are, by their very nature, short-term orders, authorized only when specified statutory criteria are met, and subject to change at any time in response to an evolving public health crisis. Section 265 may be invoked only if CDC determines that there is a ''serious danger of the introduction of [a communicable] disease into the United States, and that this danger is so increased by the introduction of persons or property from such country [where the communicable disease exists] that a suspension of the right to introduce such persons and property is required in the interest of the public health.''[155] Moreover, the statute may be invoked only ''for such period of time as [CDC] may deem necessary'' to avert such a danger.[156] As HHS's implementing regulation further recognizes, in prohibiting the introduction of covered persons ''in whole or in part,''[157] a CDC Order is effective ''only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease.''[158]

For these reasons, the CDC Orders have consistently been subject to periodic reviews to ensure their continued necessity. CDC's initial order issued in March 2020 made clear that the Order represented a ''*temporary* suspension of the introduction of [covered] persons into the United States''[159] and that the order would remain effective only for ''30 days, or until [CDC] determine[s] that the danger of further introduction of COVID–19

into the United States has ceased to be a serious danger to the public health, *whichever is shorter.*''[160] The March 2020 Order was subsequently extended on April 20, 2020, and then amended on May 19, 2020. The fact that the policy was frequently reviewed should have underscored that CDC's use of its authority under 42 U.S.C. 265 was a temporary measure subject to change at any time. The October 2020 Order again confirmed this understanding of CDC's authority, noting the ''temporary'' nature of the suspension of the introduction of covered persons, as well as the facts that the Order would be reviewed every 30 days based on ''the latest information regarding the status of the COVID–19 pandemic and associated public health risks,'' and that CDC ''retain[ed] the authority to extend, modify, or terminate the Order, or implementation of [the] Order, at any time as needed to protect public health.''[161]

In addition, CDC's ability to exercise its authority under Section 265 as to certain groups has fluctuated due to litigation, further rendering it unreasonable for any state or local government to have acted in reliance on the continued exercise of the authority. CDC's exercise of the Section 265 authority was first challenged shortly after CDC issued its initial order in March 2020, and subsequent court orders enjoining CDC from exercising its authority under 42 U.S.C. 265 as to certain groups of covered noncitizens should have further discouraged reliance on temporary CDC orders. For example, in November 2020, the United States District Court for the District of Columbia enjoined the expulsion of UC on the basis that Section 265 likely did not authorize such expulsions.[162] Although the government obtained a stay of the injunction in January 2021,[163] the extent of the government's authority under Section 265 remained contested. In addition, in September 2021, the United States District Court for the District of Columbia similarly enjoined the expulsion of FMU, again on the basis that Section 265 likely did not authorize such expulsions.[164] The U.S. Court of Appeals for the D.C. Circuit recently upheld the government's authority under 42 U.S.C. 265 to expel FMU, but the court held

---

[150] *Id.*

[151] Per internal CDC calculations.

[152] *COVID–19 Integrated County View*, Centers for Disease Control and Prevention, *https:// covid.cdc.gov/covid-data-tracker/#county-view?list_ select_state=all_states&list_select_county=all_ counties&data-type=CommunityLevels (last updated Mar. 31, 2022)*, noting 100% (n=24) of counties along the U.S.-Mexico border are considered ''Low'': California (San Diego County, Imperial County); Arizona (Pima County, Santa Cruz County, Cochise County, Yuma County); New Mexico (Luna County, Dona Ana County, Otero County, Eddy County, Lea County); and Texas (Presidio County, Brewster County, Terrell County, Webb County, Zapata County, Cameron County, El Paso County, Hudspeth County, Val Verde County, Kinney County, Maverick County, Starr County, Hidalgo County).

[153] *See* 86 FR 42828, 42834 and 42838.

[154] *See Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

[155] 42 U.S.C. 265.

[156] *Id.*

[157] *Id.*

[158] 42 CFR 71.40(a).

[159] 85 FR at 17061 (emphasis added).

[160] 85 FR at 17068.

[161] 85 FR at 65807, 65812.

[162] *See P.J.E.S.* v. *Wolf,* 502 F. Supp. 3d 492 (D.D.C. 2020).

[163] Order, *P.J.E.S.* v. *Mayorkas, et al.*, No. 20–5357 (D.C. Cir. Jan. 29, 2021), Doc. No. 1882899.

[164] *See Huisha-Huisha* v. *Mayorkas,* No. CV 21–100 (EGS), 2021 WL 4206688, at *12 (D.D.C. Sept. 16, 2021).

IFR_AR_000895

that such expulsions cannot be to places where the noncitizen are likely to be persecuted or tortured.[165] Although the decision will not take effect until the mandate issues in late April 2022, the decision should have put any state or local government on notice that there might be significant practical constraints on the government's ability to expel covered FMU quickly.

Moreover, by August 2021, state and local governments were on notice that the federal government would be taking steps towards the resumption of normal border operations. In the August 2021 Order, CDC stated that it "view[ed] this public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens, taking into account COVID–19 concerns and immigration facilities' ability to implement mitigation measures." [166] Accordingly, state and local governments could not have reasonably relied on CDC's indefinite use of its expulsion authority under Section 265. As a factual matter, CDC is not aware of any reasonable or legitimate reliance on the continued expulsion of covered noncitizens under 42 U.S.C. 265 beyond potentially local healthcare systems' allocation of resources, which CDC has considered in this Order.[167]

Even if a state or local government had relied on the continued existence of a CDC order under this authority, 42 U.S.C. 265 only authorizes CDC to prevent the introduction of noncitizens when it is required in the interest of public health. No state or local government could reasonably rely on CDC's continued application of Section 265 once CDC determined that there is no longer sufficient public health risk present with respect to the introduction of covered noncitizens. Therefore, CDC's considered judgment is that any reliance interest that might be said to

exist in connection with the continued suspension of the right to introduce covered noncitizens under 42 U.S.C. 265 is not weighty enough to displace CDC's determination that there is no public health justification for such a suspension at this time.[168] To the extent that any state or local government did rely on the expulsion of noncitizens for purposes of resource allocation despite the reasons cautioning against such reliance, CDC concludes that resource allocation concerns do not outweigh CDC's determination that the suspension of the right to introduce covered noncitizens is not required to avert a serious danger to public health.

CDC has also considered whether there may be any short-term reliance on the continued expulsion of noncitizens under the August 2021 Order. CDC concludes that any short-term reliance interests would be limited for all the reasons explained above, and particularly in light of the expressly temporary nature of the Order. For the same reasons, CDC concludes that any such reliance does not outweigh CDC's determination that the expulsion of covered noncitizens is not required to avert a serious danger to public health. Moreover, to the extent that any state or local government has made any short-term plans based on the existence of the August Order, the effective date of this Termination has been set for 52 days from the date of issuance, thus providing state and local governments time to adjust to the resumption of regular Title 8 immigration processing.

Finally, the CDC Orders issued under 42 U.S.C. 265, 268 and 42 CFR 71.40 are not, and do not purport to be, policy decisions about controlling immigration; rather, as explained, CDC's exercise of its authority under Section 265 depends on the existence of a public health need. Thus, to the extent that state and local governments along the border or elsewhere were relying on an order under 42 U.S.C. 265 as a means of controlling immigration, such reliance would not be reasonable or legitimate. And even if such reliance were reasonable or legitimate, that reliance would not outweigh CDC's conclusion that expulsions are not necessary under the terms of 42 U.S.C. 265 or warrant disruption of ordinary processing of covered noncitizens.

*B. Basis for Termination Under 42 U.S.C. 265, 268 and 42 CFR 71.40*

CDC is hereby terminating the August Order [169] and all prior orders issued pursuant to sections 362 and 365 of the PHS Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40.[170] This Termination will be implemented on May 23, 2022, for the operational reasons outlined herein, including to give DHS time to implement additional COVID–19 mitigation measures. The statutory and regulatory authorities permit the CDC Director to issue Orders prohibiting, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, *only for such period of time that the Director deems necessary* to avert the serious danger of the introduction of a quarantinable communicable disease, based on a determination by the Director that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.[171]

Pursuant to 42 U.S.C. 265 and the implementing regulation, the CDC Director has the authority to issue orders to mitigate the introduction and further spread of COVID–19 disease.[172] In recognition of the extraordinary nature of these emergency public health powers, section 265 and its implementing regulation contemplate that the exercise of these authorities will be temporally and geographically limited in scope as described below. Critically, these authorities also require that any orders issued will be terminated when they are no longer necessary to protect the public health. The authority to make this determination has been delegated to the CDC Director.

---

[165] *Id.* at *1. The D.C. Circuit also noted the "considerable difference" in public health situations between March 2020 and March 2022. *Id.* at *13.

[166] 86 FR 42828, 42831; *see also id.* at 42837 (discussing a necessary mitigation measure "as DHS moves towards the resumption of normal border operations"); *id.* at 42838 ("CDC believes that the gradual resumption of normal border operations under Title 8 is feasible. With careful planning, this may be initiated in a stepwise manner that complies with COVID–19 mitigation protocols."); *id.* at 42840 (noting that "although this Order will continue with respect to SA and FMU, DHS will use case-by-case exceptions based on the totality of the circumstances where appropriate to except individual SA and FMU in a manner that gradually recommences normal migration operations as COVID–19 health and safety protocols and capacity allows"); *id.* (CDC considered "the use of case-by-case exceptions as a step towards the resumption of normal border operations under Title 8").

[167] *See supra* I.B.2.

[168] *See Regents,* 140 S. Ct. at 1913 (explaining that features evidencing the temporary and non-rights-conferring nature of a government program "surely are pertinent in considering the strength of any reliance interests," and can be considered by the agency).

[169] *See supra* notes 1 and 4.

[170] *See supra* note 7.

[171] 42 U.S.C. 265; 42 CFR 71.40.

[172] 85 FR 56424, 56425–26. The Director may suspend the introduction of persons not only to prevent the introduction of a quarantinable communicable disease, but also to aid in continued efforts to mitigate spread of that disease.

IFR_AR_000896

CDC explained in the preamble to the Final Rule for 42 CFR 71.40 that, in issuing an Order under these authorities, it may "consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation . . . includ[ing]: the overall number of cases of disease; any large increase in the number of cases over a short period of time; the geographic distribution of cases; any sustained (generational) transmission; the method of disease transmission; morbidity and mortality associated with the disease; the effectiveness of contact tracing; the adequacy of state and local healthcare systems; and the effectiveness of state and local public health systems and control measures." [173] Other factors noted in the Final Rule are the potential for disease spread among persons held in congregate settings, the potential for disease spread to the community at large, and strain on healthcare systems.[174]

CDC is committed to avoiding the imposition of unnecessary burdens in exercising its communicable disease authorities. This aligns with the underlying legal authority in 42 U.S.C. 265, which makes clear that this authority extends only for *such period of time* deemed necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States.[175] Such an order must also be predicated, in part, upon a determination that the danger of such introduction is so increased that a suspension of the right to introduce such persons into the United States is *required in the interest of public health.*[176]

CDC has considered these and other relevant factors in the foregoing determination, including the overall shift in the U.S. government response to the pandemic, and has determined that less restrictive means are available to avert the public health risks associated with the introduction, transmission, and spread of COVID–19 into the United States due to the entry of covered noncitizens. Although COVID–19 continues to spread within the United States, as a result of the numerous tools for disease prevention, mitigation, and treatment which have become available over the past two years, and the other considerations explained above, an order suspending the right to introduce covered noncitizens under 42 U.S.C.

265 is no longer required in the interest of public health.

## IV. Issuance and Implementation

Based on the foregoing Public Health Determination, I hereby Terminate the August Order and all previous orders issued pursuant to Sections 362 and 365 of the PHS Act (42 U.S.C. 265, 268), and their implementing regulations under 42 CFR 71.40.[177] This Termination will be implemented on May 23, 2022.

Following an assessment of the current epidemiologic status of the COVID–19 pandemic and the U.S. government's ongoing response efforts, I find there is no longer a public health justification for the August Order and previous Orders issued under these authorities; employing such a broad restriction to preserve the health and safety of U.S. citizens, U.S. nationals, and lawful permanent residents, and personnel and noncitizens in POE and U.S. Border Patrol stations is no longer necessary to protect the public health. Other current public health mitigation measures sufficiently reduce the serious danger of introduction, transmission, and spread of the virus that causes COVID–19 as a result of the entry of covered noncitizens, including in congregate settings where such noncitizens would otherwise be held while undergoing immigration processing, including at POE and U.S. Border Patrol stations at or near the U.S. land and adjacent coastal borders.

Termination of the August Order is based on the current status of the COVID–19 pandemic and the available public health mitigation measures. In making this determination, I have considered myriad facts, including epidemiological information such as the viral transmissibility and asymptomatic transmission of COVID–19, the epidemiology and spread of SARS–CoV–2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, COVID–19 Community Levels, national levels of transmission and immunity, the availability and efficacy of vaccination and treatments, as well as public health concerns with congregate settings at border facilities. While holding noncitizens in congregate settings with limited options for COVID–19 mitigation is accompanied by inherent risk, the overall public health landscape in the United States has changed such that the justification

for the August Order is no longer sustained.

The COVID–19 pandemic is ongoing and appropriate public health mitigation measures must continue to be applied.[178] Although it cannot be known how the spread of SARS–CoV–2 will change in the future (*e.g.,* due to the emergence of a new variant), CDC plans to rely on COVID–19 Community Levels, among other factors, to inform how prevention measures may be used to minimize the impact of COVID–19 on health and society, including at the U.S. borders.[179] To that end, CDC will continue to assess the public health situation at the U.S. borders even after this Termination as part of its comprehensive COVID–19 response. If, for example, there is a substantial change in the public health situation with respect to the pandemic, such as due to new and particularly concerning SARS–CoV–2 variants, CDC could determine a new order under 42 U.S.C. 265, 268 and 42 CFR 71.40 is necessary. Any such determination would be based on the public health needs identified at that time.

### A. Implementation of This Termination

CDC is required by the Final Rule to consult with "all Federal departments or agencies whose interests would be impacted by this order," "as practicable under the circumstances."[180] CDC recognizes that resumption of border operations under Title 8 authorities, and the need to put additional appropriate COVID–19 mitigation measures in place, requires time to operationalize in a manner that protects the health and safety of the migrants, workforce, and American communities. Based on DHS' recommendation and in order to provide DHS time to implement operational plans for fully resuming Title 8 processing, including incorporating appropriate COVID–19 measures, this Termination will be implemented on May 23, 2022.

DHS has represented that over the next several weeks it is taking important steps to implement processes in preparation for the full resumption of border operations pursuant to Title 8 authorities, in a manner that promotes the health and safety of migrants, CBP employees, and the local communities. Most recently, DHS has initiated a vaccination program for all age-eligible migrants who lack legal status and are processed pursuant to Title 8

---

[173] *Id.* at 56444.

[174] *Id.* at 56431; 56434.

[175] 42 U.S.C. 265; 42 CFR 71.40.

[176] 42 CFR 71.40.

[177] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 FR 56424 (Sept. 11, 2020).

[178] *See supra* note 105, indicating that the whole community can be safe only when [everyone] take[s] steps to protect each other, even when the COVID–19 Community Level is low or medium.

[179] *Id.*

[180] 42 CFR 71.40.

IFR_AR_000897

authorities; this program will be scaled up over the next two months.[181] As stated above, CDC recognizes vaccination as the single most important public health tool for fighting COVID–19 and recommends that all eligible persons, regardless of citizenship, be vaccinated and remain up to date with boosters.[182] The implementation timeline of this Termination will provide DHS with time to scale its vaccination program, as well as ready its operational capacity, implement appropriate COVID–19 protocols, and prepare for resumption of regular migration under Title 8.

CDC recognizes that the Termination of the August Order will lead to an increase in the number of noncitizens being processed in DHS facilities which could result in overcrowding in congregate settings. Moreover, DHS projects, based on available intelligence as well as seasonal migration patterns, an increase in encounters in the coming months, which could lead to further crowding in DHS facilities. DHS reports that it is taking steps to plan for such increases, including by readying decompression plans, deploying additional personnel and resources to support U.S. Border Patrol, and enhancing its ability to safely hold noncitizens it encounters. Putting such plans in place, ensuring that the workforce is adequately and appropriate trained for their shifting roles, and deploying critical resources require time. This Termination will be implemented on May 23, 2022, to provide DHS with additional time to ready such operational plans and prepare for full resumption of regular migration under Title 8.

For the foregoing reasons, this Termination will be implemented on May 23, 2022. To the extent that any state or local government has a misplaced reliance on the August Order, the timeline for implementation of the Termination also allows time for such entities to adjust their planning in anticipation of the full resumption of Title 8 border processing. During this temporary period of continued application of the August Order, DHS will continue to exercise its discretion to issue case-by-case exceptions based on the totality of the circumstances as set forth in the August

Order.[183] DHS has represented that it will continue to make use of this exception where, for example, a noncitizen may suffer particular harms associated with expulsion (*e.g.*, vulnerable and medically fragile persons) until the Termination is effective.

*B. APA Review*

This Termination shall be implemented on May 23, 2022. I consulted with DHS and other federal departments as required by the Final Rule before I issued this Order and requested that DHS aid in the implementation of this Termination.[184] DHS is developing operational plans for implementing this Termination. CDC will review these plans and ensure that they are consistent with the language of this Termination and public health best practices.

This Termination, like the preceding Orders issued under this authority, is not a rule subject to notice and comment under the Administrative Procedure Act (APA).[185] Even if it were, notice and comment are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Termination.[186] Given the extraordinary nature of an order under Section 265, the resultant restrictions on application for asylum and other immigration processes under Title 8, and the statutory and regulatory requirement that an CDC order under the authority last no longer than necessary to protect public health, it would be impracticable and contrary to the public interest and immigration laws that apply in the absence of an order under 42 U.S.C. 265 to delay the effective date of this termination beyond May 23, 2022 for the reasons outlined herein.[187] As explained, DHS requires time to

institute operational plans to implement this order, including COVID–19 mitigation measures, and begin regular immigration processing pursuant to Title 8. In light of the August Order's significant disruption of ordinary immigration processing and DHS's need for time to implement an orderly and safe termination of the order, there is good cause not to delay issuing this termination or to delay the termination of this order past May 23, 2022. In addition, this Order concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID–19 transmission over shared borders and therefore directly ''involve[s] . . . a . . . foreign affairs function of the United States;'' [188] thus, notice and comment are not required.

With this Termination, I hereby determine that the danger of further introduction, transmission, or spread of COVID–19 into the United States from covered noncitizens, as defined in the August Order, has ceased to be a serious danger to the public health and therefore the continuation of the August Order, and all previous orders issued under the same authority, is no longer necessary to protect public health. Nothing in this Termination will prevent me from issuing a new Order under 42 U.S.C. 265, 268 and 42 CFR 71.40 based on new findings, as dictated by public health needs.

**Sherri Berger,**

*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2022–07306 Filed 4–4–22; 11:15 am]

**BILLING CODE 4163–18–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Advisory Board on Radiation and Worker Health (ABRWH); Notice of Charter Renewal**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice of charter renewal.

**SUMMARY:** This gives notice under the Federal Advisory Committee Act of October 6, 1972, that the Advisory Board on Radiation and Worker Health (ABRWH), Centers for Disease Control and Prevention, Department of Health and Human Services, has been renewed

---

[181] *See supra* I.B.5.

[182] In line with CDC's emphasis on the importance of vaccination, CDC has kept its requirement for noncitizens to provide proof of vaccination for air travel and also supports DHS's Order requiring the same at the land borders (*see supra* notes 67 and 83).

[183] ''Persons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC regarding the standards for such exceptions to help ensure consistency with current CDC guidance and public health recommendations.'' 86 FR 42828, 42841 (Aug. 5, 2021).

[184] 42 U.S.C. 268; 42 CFR 71.40(d).

[185] While this Termination is not a rule subject to notice and comment under the APA (5 U.S.C. 553), the Office of Information and Regulatory Affairs has determined that this is a major rule as defined by Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act (CRA). 5 U.S.C. 804(2). The agency finds, for the reasons listed above, that good cause exists to make this rule effective on May 23, 2022, under 5 U.S.C. 808(2).

[186] 5 U.S.C. 553(b)(3)(B).

[187] 5 U.S.C. 553(a)(1).

[188] 5 U.S.C. 553(a)(1).

IFR_AR_000898

Captain of the Port in accordance with current local agreements.

*Participant* means any person or vessel registered with the event sponsor as participating in the event or otherwise designated by the event sponsor as having a function tied to the event.

(c) *Patrol of the marine event.* The COTP may assign one or more official patrol vessels, as described in § 100.40, to the regulated event. The Event PATCOM will be designated to oversee the patrol. The patrol vessel and the Event PATCOM may be contacted on VHF–FM Channel 16. The Event PATCOM may terminate the event, or the operation of any vessel participating in the marine event, at any time if deemed necessary for the protection of life or property.

(d) *Special local regulations.* (1) Controls on vessel movement. The Event PATCOM or official patrol vessel may forbid and control the movement of all persons and vessels in the regulated area(s). When hailed or signaled by an official patrol vessel, the person or vessel being hailed must immediately comply with all directions given. Failure to do so may result in expulsion from the area, citation for failure to comply, or both.

(2) Directions, instructions, and minimum speed necessary.

(i) The operator of a vessel in the regulated area must stop the vessel immediately when directed to do so by an official patrol vessel and then proceed only as directed.

(ii) A person or vessel must comply with all instructions of the Event PATCOM or official patrol vessel.

(iii) A non-participant must contact the Event PATCOM or an official patrol vessel to request permission to either enter or pass through the regulated area. If permission is granted, the non-participant may enter or pass directly through the regulated area as instructed by the Event PATCOM or official patrol vessel at a minimum speed necessary to maintain a safe course that minimizes wake and without loitering.

(3) Postponement or cancellation. The COTP, or Event PATCOM may postpone or cancel a marine event at any time if, in the COTP's sole discretion, the COTP determines that cancellation is necessary for the protection of life or property.

(e) *Enforcement periods.* This section is subject to enforcement from 4 p.m. to 6:30 p.m. on April 1, 2023, and from 8:30 a.m. to 12:30 p.m. on April 2, 2023.

Dated: March 21, 2023.

**Jonathan D. Theel,**
*Captain, U.S. Coast Guard, Captain of the Port, Delaware Bay.*

[FR Doc. 2023–06385 Filed 3–27–23; 8:45 am]

**BILLING CODE 9110–04–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

[CIS No. 2720–22; DHS Docket No. USCIS–2023–0003]

**RIN 1615–AC84**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1240**

[EOIR No. 23–0010; AG Order No. 5632–2023]

**RIN 1125–AB29**

**Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule amends existing Department of Homeland Security (''DHS'') and Department of Justice (''DOJ'') (collectively, ''the Departments'') regulations to implement the Additional Protocol to the Agreement between The Government of the United States of America and The Government of Canada For Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries (''Additional Protocol of 2022'') negotiated by the Governments of the United States and Canada and signed in Ottawa, Ontario, Canada, on March 29, 2022, and in Washington, DC, United States, on April 15, 2022, respectively. The Additional Protocol of 2022 supplements certain terms of the December 5, 2002, Agreement between The Government of the United States and The Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries (''Safe Third Country Agreement,'' ''STCA,'' or ''Agreement''). Pursuant to the STCA, the respective governments manage which government decides certain individuals' requests for asylum or other protection relating to fear of persecution or torture (referred to as a ''refugee status claim'' in the STCA and the Additional Protocol of 2022) pursuant to its laws, regulations, and policies implementing its international treaty obligations relating to non-refoulement. Under the STCA, only those individuals who cross the U.S.-Canada land border at a port of entry (''POE''), or in transit while being removed or deported to a third country from the ''country of last presence,'' are subject to the terms of the STCA. Once the Additional Protocol of 2022 is implemented, the STCA also will apply to individuals who cross the U.S.-Canada land border between POEs, including certain bodies of water, and who make an asylum or other protection claim relating to a fear of persecution or torture within 14 days after such crossing. The Additional Protocol of 2022 will enter into force once the United States and Canada have officially notified each other that they have completed the necessary domestic procedures for bringing the Additional Protocol of 2022 into force. The Departments intend this official notification to coincide with the effective date of this final rule at 12:01 a.m. on Saturday, March 25, 2023.

**DATES:** This final rule is effective at 12:01 a.m. on Saturday, March 25, 2023.

**FOR FURTHER INFORMATION CONTACT:**

*For U.S. Citizenship and Immigration Services:* Rená Cutlip-Mason, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20588–0009; telephone (240) 721–3000 (not a toll-free call).

*For Executive Office of Immigration Review:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, Department of Justice, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of Legal Authority
  C. Summary of the Final Rule Provisions
II. Background
  A. DOJ and DHS Legal Authority
  B. Overview of the Safe Third Country Agreement in the Context of Asylum, Expedited Removal Proceedings, and Removal Proceedings
    1. Asylum
    2. Expedited Removal Proceedings and Removal Proceedings

3. Safe Third Country Agreement
C. Updates to the Safe Third Country Agreement Through the Additional Protocol of 2022
III. Discussion of Final Rule
  A. General Discussion of Changes
  B. Determinations Regarding Crossing Between POEs and Whether 14 Days Have Elapsed
  C. Considerations Relating to the Preponderance-of-the-Evidence Standard
  D. Return to the Country of Last Presence
IV. Detailed Summary of Regulatory Changes
  A. New 8 CFR 208.30(e)(6) and (7)
  B. New 8 CFR 1003.42(h)(1) and (2) and 8 CFR 1240.11(g) (Heading), (g)(1) Through (4), (h)(1)
V. Statutory and Regulatory Requirements
  A. Administrative Procedure Act
  B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act of 1995
  E. Congressional Review Act
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Family Assessment
  I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
  J. National Environmental Policy Act
  K. Paperwork Reduction Act

## I. Executive Summary

### A. Purpose of the Regulatory Action

The Departments are amending their respective regulations to implement the Additional Protocol of 2022 to the STCA.[1] Under the STCA and its existing implementing regulations, third country nationals seeking asylum or other protection from persecution or torture must make a claim in the first country they arrive in (United States or Canada), unless they qualify for an exception to the STCA.[2] Thus, asylum seekers[3] arriving from Canada at a land border POE[4] in the United States, or in transit through the United States during removal by Canada, are generally barred from pursuing their asylum or other protection claim[5] relating to persecution or torture[5] in the United States unless they meet an exception under the STCA. Those who do not meet an exception under the STCA may be returned to Canada to pursue their claim. Similarly, third country nationals arriving from the United States at a Canadian land border POE, or in transit through Canada during removal by the United States, who are seeking asylum or other protection relating to fear of persecution or torture in Canada may be returned to the United States under the STCA to pursue their asylum or other protection claim relating to fear of persecution or torture under United States immigration law, unless they qualify for an exception under the STCA.

The Additional Protocol of 2022 supplements the STCA.[6] The United and Canada have agreed to the Additional Protocol of 2022, but amendments to the existing regulations of the United States are necessary to extend the STCA's application under the Additional Protocol of 2022 to individuals who cross between the official POEs along the U.S.-Canada shared border, including certain bodies of water as determined by the United States and Canada, and make an asylum or other protection claim relating to fear of persecution or torture within 14 days after such crossing.

### B. Summary of Legal Authority

The authority for the Attorney General and the Secretary of Homeland Security ("Secretary") to issue this final rule is found in section 208(a)(2)(A) of the Immigration and Nationality Act ("INA" or "the Act"), 8 U.S.C. 1158(a)(2)(A), which governs an individual's eligibility to apply for asylum if the Attorney General or the Secretary determines that the noncitizen may be removed, pursuant to a bilateral or multilateral agreement, to a safe third country. Under sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), the Secretary is authorized to establish such regulations as the Secretary deems necessary for carrying out the Secretary's authority under the INA. Under section 103(g) of the INA, 8 U.S.C. 1103(g), the Attorney General is authorized to establish such regulations as the Attorney General deems necessary in immigration proceedings.

### C. Summary of the Final Rule Provisions

This rule does not alter the procedures applied to expedited removal proceedings, credible fear screenings, or threshold screening interviews as provided in the current regulations. The STCA is implemented within the existing framework that authorizes the removal of noncitizens[7] from the United States, including expedited removal proceedings under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), and ordinary removal proceedings before an immigration judge under section 240 of the INA, 8 U.S.C. 1229a.

This final rule amends 8 CFR 208.30(e)(6) of the DHS regulations to authorize an asylum officer to conduct a threshold screening interview. This interview will determine whether a noncitizen is ineligible to apply for asylum by claiming a fear of persecution or torture (pursuant to section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A)), when such a claim is made within 14 days after crossing the U.S.-Canada land border between POEs, including crossing the border in bodies of water mutually designated by the United States and Canada. This final rule revises 8 CFR 208.30(e)(6)(i) to clarify that persons who are subject to the Additional Protocol of 2022 and who do not qualify for an exception under the STCA are ineligible to apply for asylum in the United States. This rule also revises 8 CFR 208.30(e)(6)(ii) by adding a reference to the Additional Protocol of 2022 to clarify that a noncitizen must establish, by a preponderance of the evidence, that an exception applies before an asylum officer may proceed with the credible fear determination. This rule also amends 8 CFR 208.30(e)(6)(iii) by clarifying that the STCA includes the Additional Protocol of 2022. This rule also revises 8 CFR 208.30(e)(7) by adding a reference to the Additional Protocol of 2022 to clarify that the

---

[1] See Agreement between The Government of The United States of America and The Government of Canada For Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries, Can.-U.S., Dec. 5, 2002, T.I.A.S. No. 04–1229, https://www.state.gov/04-1229.

[2] See Art. 4; see also 8 CFR 208.30(e)(6), 1003.42(h), 1240.11(g).

[3] The Departments use the term "asylum seeker" to be synonymous with the term "Refugee Status Claimant" used in the STCA and Additional Protocol of 2022, which is defined as "any person who makes a refugee status claim in the territory of one of the Parties." STCA art. 1(d).

[4] See 19 CFR 101.1 (defining "port" and "port of entry") and 8 CFR 100.4 (list of POEs).

[5] The Departments use the term "asylum or other protection claim relating to persecution or torture"

to be synonymous with the phrase "Refugee Status Claim" used in the STCA and Additional Protocol of 2022, which means "a request from a person to the government of either Party for protection consistent with the Convention or the Protocol, the Torture Convention, or other protection grounds in accordance with the respective laws of each Party." STCA art. 1(c). The Convention, Protocol, and Torture Convention referenced in the definition are the Convention Relating to the Status of Refugees, done at Geneva, July 28, 1951; the Protocol Relating to the Status of Refugees, done at New York, January 31, 1967; and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, done at New York, December 10, 1984.

[6] See Additional Protocol of 2022 art. 1. Correspondingly, the provisions of the STCA apply to the Additional Protocol of 2022 except as otherwise specified in the Additional Protocol of 2022. See id.

[7] For purposes of the discussion in this preamble, the Departments use the term "noncitizen" to be synonymous with the term "alien" as it is used in the INA. See INA 101(a)(3), 8 U.S.C. 1101(a)(3); Barton v. Barr, 140 S. Ct. 1442, 1446 n.2 (2020) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.' See 8 U.S.C. 1101(a)(3)."). Throughout this preamble the Departments also use the terms "individual" or "person."

IFR_AR_001142

procedures outlined in 8 CFR 208.30(e)(7) apply to noncitizens who are subject to an agreement under section 208(a)(2)(A) of the Act, 8 U.S.C. 1158(a)(2)(A), other than the U.S.-Canada STCA, which includes the Additional Protocol of 2022.

Further, this rule revises 8 CFR 1003.42(h)(1) of the regulations of the Department of Justice's Executive Office for Immigration Review ("EOIR"), which establishes that an asylum officer's determination relating to the application of the STCA is not subject to an immigration judge's review. This final rule clarifies that this provision also extends to determinations made pursuant to the Additional Protocol of 2022. This rule also revises 8 CFR 1003.42(h)(2) to clarify that the existing provisions, which establish that any determination by DHS that a noncitizen being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law is not subject to an immigration judge's review, also extend to a determination made pursuant to the Additional Protocol of 2022.

Next, because the STCA, as supplemented by the Additional Protocol of 2022, also applies to individuals in removal proceedings, this final rule makes corresponding amendments to 8 CFR 1240.11(g) (heading) and (g)(1) through (4) of the EOIR regulations to require an immigration judge to consider the Additional Protocol of 2022 to the STCA in determining whether a noncitizen should be returned to Canada for adjudication of their protection claim or whether the noncitizen should be permitted to apply for asylum or seek other protection relating to fear of persecution or torture in the United States. Last, this rule revises 8 CFR 1240.11(h)(1) by adding a reference to the Additional Protocol of 2022 to clarify that the procedures outlined in 8 CFR 1240.11(h)(1) apply to noncitizens who are subject to agreements under section 208(a)(2)(A) of the Act, 8 U.S.C. 1158(a)(2)(A), other than the U.S.-Canada STCA, which includes the Additional Protocol of 2022.

## II. Background

### A. DOJ and DHS Legal Authority

The Attorney General and the Secretary publish this joint rule pursuant to their respective authorities concerning asylum, withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), and protection under the Convention

Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment[8] ("Convention Against Torture" or "CAT") determinations. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the administration and enforcement of Federal immigration law.

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of [noncitizens]," and it grants the Secretary the power to take all actions "necessary for carrying out" his authority under the immigration laws. *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3); *see also* 6 U.S.C. 112, 202. The Secretary's authority also includes the authority to publish regulations governing the apprehension, inspection and admission, detention, removal, withholding of removal, and release of noncitizens encountered in the interior of the United States or at or between the U.S. POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

In addition, under the HSA, the Attorney General retained authority over conduct of removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). EOIR's immigration judges conduct these adjudications. *See* INA 103(g), 8 U.S.C. 1103(g), 6 U.S.C. 521; *see also* 8 CFR 1001.1(l). This immigration judge authority includes adjudication of certain asylum applications, as well as requests for statutory withholding of removal and protection under the CAT. Additionally, the INA provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

The INA authorizes the Attorney General and Secretary to set "requirements and procedures" for implementing the asylum provisions in section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), and to establish by regulation, consistent with section 208 of the INA, 8 U.S.C. 1158, "other conditions or limitations on the consideration of an application for asylum," INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

The HSA grants DHS concurrent authority to adjudicate affirmative asylum applications—*i.e.*, applications for asylum filed with DHS for individuals not in removal

proceedings—and authority to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. *See* 6 U.S.C. 271(b)(3); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). By operation of the HSA, the references to the "Attorney General" in the INA are understood also to encompass the Secretary, either solely or additionally, with respect to statutory authorities vested in the Secretary in the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. *See* 6 U.S.C. 557. Some of those authorities have been delegated within DHS to the Director of U.S. Citizenship and Immigration Services ("USCIS"), and USCIS asylum officers conduct threshold screening interviews, conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted.[9] *See* 8 CFR 208.2(a), 208.9, 208.30.

With limited exceptions, immigration judges within DOJ adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, and immigration judges adjudicate applications of asylum-seekers in cases USCIS refers to the immigration court. 8 CFR 1208.2(b), 1240.1(a); *see* INA 101(b)(4), 240(a)(1), 241(b)(3), 8 U.S.C. 1101(b)(4), 1229a(a)(1), 1231(b)(3).

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention generally provides that parties to the Convention cannot expel or return ("refouler") "a refugee in any manner whatsoever to the frontiers of territories where [their] life or freedom would be threatened on account of [their] race, religion, nationality, membership of a particular social group or political opinion." *See* 19 U.S.T. at 6276. The United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the 1967 Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the

---

[8] Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85.

[9] *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003), *https://www.hsdl.org/?abstract&did=234775.*

IFR_AR_001143

Case 1:24-cv-01702-RC    Document 53    Filed 09/27/24    Page 317 of 1372

INA, 8 U.S.C. 1231(b)(3), which provides that noncitizens may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention. *See* 8 CFR 208.16, 1208.16; Regulations Concerning the Convention Against Torture, 64 FR 8478, 8478 (Feb. 19, 1999) (effective Mar. 22, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

Similarly, "[u]nder Article 3 [of the CAT], the United States has agreed not to 'expel, return ("refouler") or extradite' a person to another state where [they] would be tortured." 64 FR at 8478. Regulations to implement the United States' obligations under Article 3 of the CAT are located primarily at 8 CFR 208.16(c) through 208.18 (DHS regulations) and 1208.16(c) through 1208.18 (EOIR regulations).[10]

*B. Overview of the Safe Third Country Agreement in the Context of Asylum, Expedited Removal Proceedings, and Removal Proceedings*

1. Asylum

Asylum is a discretionary benefit that can be granted by the Attorney General or the Secretary if a noncitizen establishes, among other things, that they have experienced past persecution or has a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* INA 101(a)(42), 208, 240(c)(4)(A), 8 U.S.C. 1101(a)(42), 1158, 1229a(c)(4)(A); 8 CFR 208.13, 1208.13. Under section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), any person who arrives or is physically present in the United States is generally permitted to apply for asylum. For an asylum officer or immigration judge to grant asylum, however, they must determine that no bars to applying for asylum[11] under section 208(a)(2) of the INA, 8 U.S.C. 1158(a)(2), nor any bars to eligibility for asylum under section 208(b)(2)(A) of the INA, 8 U.S.C. 1158(b)(2)(A), apply to an individual's case.[12] One of these bars provides that

a noncitizen does not have the right to apply for asylum in the United States if the Attorney General or the Secretary[13] determines that the noncitizen "may be removed, pursuant to a bilateral or multilateral agreement, to a country where the [noncitizen]'s life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the [noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection[.]" INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). The statute also preserves the Departments' discretion not to apply the bar in section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), in a given case if DHS "finds that it is in the public interest for the [noncitizen] to receive asylum in the United States." *Id.* The INA further provides that "[n]o court shall have jurisdiction" to review any determination made under any of the provisions within section 208(a)(2) of the Act, 8 U.S.C. 1158(a)(2), including the safe third country provision at INA section 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). *See* INA 208(a)(3), 8 U.S.C. 1158(a)(3).

2. Expedited Removal Proceedings and Removal Proceedings

The STCA is implemented within the framework of existing proceedings that authorize the removal of noncitizens from the United States, including expedited removal proceedings under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), and removal proceedings before an immigration judge under section 240 of the INA, 8 U.S.C. 1229a.

An applicant for admission must be inspected by an immigration officer[14] to determine whether the individual is admissible to the United States. *See* INA 235(a), (b), 8 U.S.C. 1225(a), (b). If a noncitizen cannot "clearly and beyond a doubt" establish that they are entitled to be admitted, then an immigration officer will determine, as a matter of discretion, whether the individual will be placed in expedited removal proceedings, where applicable, under section 235 of the INA, 8 U.S.C. 1225, or in removal proceedings under section 240 of the INA, 8 U.S.C. 1229a.[15]

Under expedited removal proceedings, individuals arriving in the United States, also referred to as "arriving aliens"[16] or "certain other [noncitizens]" as designated by the Secretary who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), for misrepresentation, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), for failure to meet documentation requirements for admission, may be "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum under [section 208 of the INA, 8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), (iii), 8 U.S.C. 1225(b)(1)(A)(i), (iii); 8 CFR 235.3(b). In addition to the foregoing classes of noncitizens subject to expedited removal, the Secretary has designated other noncitizens subject to expedited removal, including noncitizens who are present in the United States without having been inspected at a POE, who are encountered by an immigration officer within 100 air miles of a U.S. land border, "who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter," and who otherwise meet certain criteria for expedited removal.[17]

Generally, if a noncitizen is placed into expedited removal proceedings, and the noncitizen indicates an intention to apply for asylum or expresses a fear of persecution or torture or a fear of return to their country,[18] the examining immigration officer will refer the noncitizen for an interview with an asylum officer. The purpose of the interview with an asylum officer is to screen for potential eligibility for asylum and other related protection claims relating to fear of persecution or torture. *See* 8 CFR 208.30(e)(2) and (3). Under the STCA, however, for

---

[10] *See* 64 FR at 8478.

[11] The bars to applying for asylum include removal to a safe third country (INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A)), the one-year filing deadline for filing an application for asylum (INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B)), and previous denials of asylum (INA 208(a)(2)(C), 8 U.S.C. 1158(a)(2)(C)).

[12] The bars to eligibility for asylum include persecution of others on account of one of the protected grounds, conviction of a particularly serious crime, serious reasons for believing the noncitizen committed a serious nonpolitical crime outside the United States prior to arrival in the United States, certain support for or participation in terrorist activities, reasons for regarding the

noncitizen as a danger to the security of the United States, and firm resettlement. *See* INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A).

[13] As noted previously noted in Part II.A of this preamble, references to the Attorney General in the INA, in general, are to be read as referring to the Secretary of Homeland Security, either solely or in addition to the Attorney General, by operation of the HSA. *See* 6 U.S.C. 557.

[14] *See* 8 CFR 1.2 (defining "immigration officer").

[15] *See* INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A) ("Subject to subparagraphs (B) and (C), in the case

of a [noncitizen] who is an applicant for admission, if the examining immigration officer determines that a [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained for a proceeding under [section 240]."); *see also* INA 235(b)(2)(B), 8 U.S.C. 1225(b)(2)(B) (providing that crewmen, stowaways, and noncitizens subject to expedited removal are not entitled to section 240 removal proceedings).

[16] "Arriving alien" is defined in regulations as meaning, in general, an "applicant for admission coming or attempting to come into the United States at a port-of-entry," and the term includes noncitizens who are interdicted at sea and brought into the United States. 8 CFR 1.2, 1001.1(q).

[17] *See* Designating Aliens For Expedited Removal, 69 FR 48877, 48877 (Aug. 11, 2004).

[18] *See* 8 CFR 235.3(b)(4).

noncitizens arriving from Canada at a land border POE, the asylum officer will conduct a threshold screening, prior to any credible fear screening, to determine whether a noncitizen is subject to the STCA and barred from applying for asylum or seeking other protection relating to fear of persecution or torture. *See* 8 CFR 208.30(e)(6), 8 CFR 1240.11(g)(4). An immigration judge does not have jurisdiction to review an asylum officer's determination that the STCA applies. *See* 8 CFR 1003.42(h)(1) and (2). Under 8 CFR 208.30(e)(7) or 8 CFR 1240.11(h), if a noncitizen is subject to an agreement other than the U.S.-Canada STCA, the procedures outlined in 8 CFR 208.30(e)(7) or 1240.11(h) apply. *See* 8 CFR 208.30(e)(7), 1240.11(h).

If DHS does not make an STCA determination and refers the noncitizen to an immigration judge for section 240 removal proceedings, the immigration judge determines whether the noncitizen is eligible to apply for asylum or other protection claims relating to fear of persecution or torture, including whether the STCA applies to render the noncitizen ineligible to apply for asylum under section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), and subject to removal to Canada under the terms of the STCA. *See* INA 235(b)(1)(A)(i), (b)(2)(A), 8 U.S.C. 1225(b)(1)(A)(i), (b)(2)(A); 8 CFR 235.1(f)(2), 1240.11(g).

### 3. Safe Third Country Agreement

On December 5, 2002, the Governments of Canada and the United States signed the STCA to effectively manage the flow of asylum and other protection claimants between the two countries. The STCA allocates responsibility between the United States and Canada whereby one country or the other (but not both) assumes responsibility for processing the claims of certain third country national [19] asylum seekers who are traveling from Canada into the United States or from the United States into Canada. The STCA provides for a threshold determination concerning which country will consider the merits of a noncitizen's asylum and other protection claims relating to persecution or torture. This process enhances the two nations' ability to manage, in an orderly fashion, asylum and other protection claims brought by persons

crossing the U.S.-Canada common border.[20]

Consistent with section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), the STCA provides for the return of certain asylum seekers to the ''country of last presence,'' the country in which the noncitizen was physically present immediately prior to making the asylum or protection claim,[21] following the crossing of the land border at a POE,[22] or in transit from the country of last presence during the course of deportation or removal. Accordingly, under the STCA, noncitizens arriving in the United States from Canada at a POE, or in transit, must seek asylum or protection in Canada, unless they meet an exception under the STCA.[23]

The Attorney General and the Secretary promulgated final rules implementing the STCA, adding, among other provisions, 8 CFR 208.30(e) (DHS regulations) and 8 CFR 1003.42(h) and 1240.11(g) (EOIR regulations) on November 29, 2004.[24]

The DHS regulations implementing the STCA under 8 CFR 208.30(e)(6) provide a mechanism within the expedited removal process for determining whether the STCA or its exceptions apply.[25] Prior to making a determination whether a noncitizen who is arriving in the United States (at a U.S.-Canada land border POE or in transit through the United States during removal by Canada) and placed into expedited removal proceedings has a credible fear of persecution or torture, the asylum officer conducts the threshold screening interview to determine whether the noncitizen is ineligible to apply for asylum or other protection relating to persecution or

torture and subject to removal to Canada.[26] In doing so, the asylum officer follows the same non-adversarial interview procedures as generally used in the expedited removal credible fear context.[27] Additionally, the asylum officer advises the noncitizen of the STCA's exceptions and questions the noncitizen as to whether any of the exceptions apply to the noncitizen's case.[28] If the asylum officer, with concurrence from a supervisory asylum officer, determines that the STCA applies and that the noncitizen does not qualify for an exception under the STCA, the noncitizen is not eligible to apply for asylum or other protection relating to persecution or torture in the United States. The noncitizen is advised that the noncitizen will be removed to pursue their protection claim(s) in Canada. *See* 8 CFR 208.30(e)(6)(i).

If the noncitizen establishes by a preponderance of the evidence that the noncitizen qualifies for an exception under the terms of the STCA, the asylum officer will make a written notation of the basis for the STCA exception and conduct a credible fear interview to determine whether the noncitizen has a credible fear of persecution or torture.[29]

For individuals arriving from Canada at a land border POE or in transit during removal by the Canadian government who are issued a Notice to Appear placing them directly in section 240 removal proceedings (instead of being processed through expedited removal proceedings [30]), the immigration judge makes the STCA determination, as authorized by 8 CFR 1240.11(g) of the EOIR regulations. The immigration

---

[19] The STCA does not apply to those seeking asylum or other protection relating to fear of persecution or torture who are citizens of Canada or the United States or who, not having a country of nationality, are habitual residents of Canada or the United States. *See* STCA art. 2.

[20] *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports of Entry, 69 FR 69480, 69488 (Nov. 29, 2004) (''DHS Final Rule'').

[21] *See* STCA art. 1(a) (defining ''Country of Last Presence'').

[22] *See* 19 CFR 101.1 (defining POE); *see also* 8 CFR 100.4 (list of POEs).

[23] Under Article 6 of the STCA, either country retains discretion to examine a protection claim where it determines that it is the public interest to do so, notwithstanding the provisions of the STCA.

[24] *See* DHS Final Rule, 69 FR at 69480; Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR 69490 (Nov. 29, 2004) (''DOJ Final Rule''). The final rules were issued after the Departments both had published proposed rules. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620 (Mar. 8, 2004); Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR 10627 (Mar. 8, 2004).

[25] The exceptions under the STCA can be found in 8 CFR 208.30(e)(6)(iii) and (iv).

[26] *See* 8 CFR 208.30(e)(6).

[27] *See* 8 *id.* (''In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided, however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph[.]'').

[28] *See* 8 CFR 208.30(e)(6).

[29] *See* 8 CFR 208.30(e)(6)(ii). When a noncitizen is determined to be not subject to the STCA or subject to an exception, the asylum officer conducts the credible fear screening to identify potential eligibility for asylum, statutory withholding of removal, and protection under the CAT. *See* 8 CFR 208.30 (describing this process). If the asylum officer determines that a noncitizen does have a credible fear of persecution or torture, DHS may either: (1) refer the noncitizen to an immigration judge by initiating section 240 removal proceedings where the noncitizen may apply for asylum or other protection, or (2) retain jurisdiction over the noncitizen's asylum claim for further consideration in an interview pursuant to 8 CFR 208.9(b). *See* 8 CFR 208.2(a)(1)(ii), 208.30(f), 1208.2(a)(1)(iii), 1235.6(a)(1)(i).

[30] DHS has discretion to place a noncitizen who is otherwise subject to expedited removal into section 240 removal proceedings before an immigration judge. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523 (BIA 2011).

judge makes this determination during the course of section 240 removal proceedings and in accordance with the procedures set forth in 8 CFR 1240.1 *et seq.* If the immigration judge determines that the STCA applies and the noncitizen does not qualify for an exception to STCA, the noncitizen is ineligible to apply for asylum or other protection.[31] The noncitizen may apply for any other relief from removal for which the noncitizen may be eligible, but if the noncitizen is ordered removed, the noncitizen shall be ordered removed to Canada.[32] The immigration judge may not review, consider, or decide any discretionary public interest exception because such determinations are reserved to DHS. However, if DHS files a written notice in the proceedings before the immigration judge that DHS has decided in the public interest to allow the noncitizen to pursue claims for asylum or other related protection in the United States, the noncitizen may apply for asylum and or other related protection.[33]

Under 8 CFR 208.30(e)(6)(ii), or under 8 CFR 1240.11(g)(2) (if the noncitizen is in section 240 removal proceedings), noncitizens must establish by a preponderance of the evidence that they qualify for an exception under the terms of the STCA in order to establish eligibility to apply for asylum.

*C. Updates to the Safe Third Country Agreement Through the Additional Protocol of 2022*

Canada and the United States negotiated the Additional Protocol of 2022 to allow both governments to extend the application of the STCA to individuals who cross the U.S.-Canada land border between POEs, including certain bodies of water, and who make an asylum or other protection claim relating to fear of persecution or torture within 14 days after such crossing.

On February 23, 2021, President Biden released a statement with Prime Minister Justin Trudeau of Canada: Roadmap for a Renewed U.S.-Canada Partnership.[34] The leaders declared a shared interest in revitalizing and expanding the two countries' "historic alliance and steadfast friendship." [35] The leaders expressed their common concern about the global migration

crisis, commitment to providing haven to refugees and asylum seekers, and determination to work together to strengthen efforts in these areas, including refugee resettlement.[36]

On November 18, 2021, the two leaders (also joined by President Andrés Manuel López Obrador of Mexico) issued a joint statement following the North American Leaders' Summit ("NALS"), underscoring the need for bold regional cooperation due to "[t]he complex factors causing an extraordinary increase in irregular migration throughout the hemisphere." [37] They also affirmed their commitment to adopt an ambitious and comprehensive approach to safe, orderly, and humane migration management, based on shared responsibility.[38]

The Canadian Minister of Immigration, Refugees, and Citizenship and the Secretary finalized the Additional Protocol of 2022, signed in Ottawa, Ontario, Canada, on March 29, 2022, and in Washington, DC, United States, on April 15, 2022, respectively.

The Additional Protocol of 2022 does not change the existing provisions of the STCA or the processes associated with the determinations on whether the STCA applies. However, it extends the application of the STCA so that it applies not only to noncitizens who are encountered at a POE or in transit, but now also to noncitizens who enter in areas located between POEs on the U.S.-Canada land border, including certain bodies of water as mutually determined by the Governments of the United States and Canada, and who make an asylum or other protection claim relating to fear of persecution or torture within 14 days after such crossing.[39] The Additional Protocol of 2022 also stipulates that the

country of last presence will not be required to accept the return of an asylum seeker if it determines that the asylum seeker did not make a claim relating to fear of persecution or torture within 14 days after crossing the land border between the POEs.[40] To assist the country of last presence in making this determination, the Additional Protocol of 2022 provides that the receiving country shall provide the country of last presence any relevant information, including information regarding the apprehension or entry of the noncitizen, if available.[41]

The Additional Protocol of 2022 is expected to support orderly migration, ensure the integrity of the asylum process and processes related to other protection claims, encourage individuals to seek asylum in the country of last presence, and discourage dangerous and illegal crossings between POEs.

### III. Discussion of Final Rule

*A. General Discussion of Changes*

With this final rule, the Departments are implementing the terms of the Additional Protocol of 2022 to the STCA and amending their respective regulations at 8 CFR 208.30(e)(6) and (7),[42] 8 CFR 1003.42(h)(1) and (2), and 8 CFR 1240.11(g) and (h)(1)[43] governing the threshold screening process and the eligibility of noncitizens to apply for

---

[31] *See* 8 CFR 1240.11(g)(4).

[32] *Id.*

[33] *See* 8 CFR 1240.11(g)(3).

[34] *See* White House, Roadmap for a Renewed U.S.-Canada Partnership (Feb. 23, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/23/roadmap-for-a-renewed-u-s-canada-partnership/* ("Roadmap").

[35] *Id.*

[36] *Id.*

[37] *See* White House, Building Back Better Together: A Secure, Prosperous North America (Nov. 18, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/18/building-back-better-together-a-secure-prosperous-north-america/* ("Building Back Better Together").

[38] *Id.; see also* White House, Fact Sheet: Key Deliverables for the 2023 North American Leaders' Summit, (Jan. 10, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/10/fact-sheet-key-deliverables-for-the-2023-north-american-leaders-summit/* ("Fact Sheet"). Additionally, last year, Canada adopted the Los Angeles Declaration on Migration and Protection. *See* White House, Los Angeles Declaration on Migration and Protection (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/* ("Los Angeles Declaration").

[39] *See* Additional Protocol of 2022 art. 1 ("Except to the extent specified herein, the provisions of the Agreement shall apply, *mutatis mutandis,* except Article 10 of the Agreement, to this Additional Protocol . . . .").

[40] Additional Protocol of 2022 art. 3(b).

[41] *See id.* art. 3(c). The Additional Protocol of 2022 contains provisions that are not relevant to this rulemaking but that are related to the implementation of the Additional Protocol of 2022, such as provisions relating to the development of standard operating procedures (Article 4), Termination (Article 5), Suspension (Article 6), and Effective Date of the Additional Protocol of 2022 (Article 7).

[42] DHS is making conforming amendments to 8 CFR 208.30(e)(7), which addresses the implementation procedures for agreements under section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), other than the STCA and the Additional Protocol of 2022. DHS is amending the paragraph by replacing the current reference to the STCA of "other than the U.S.-Canada Agreement effectuated in 2004" with an updated reference to read "other than the U.S.-Canada Agreement, which includes the Additional Protocol of 2022." The amendments thus clarify that the procedures outlined in paragraph (e)(7) of 8 CFR 208.30 do not apply to those noncitizens who are subject to the U.S.-Canada Agreement, which includes the Additional Protocol of 2022. *See* 8 CFR 208.30(e)(7) (revised).

[43] DOJ is making conforming amendments to 8 CFR 1240.11(h)(1), which addresses the implementation of procedures for bilateral or multilateral agreement other than the STCA and the Additional Protocol of 2022. DOJ is amending the paragraph by replacing the current reference to the STCA of "—other than the 2002 U.S.-Canada Agreement—" with an updated reference to read "—other than the 2002 U.S.-Canada Agreement, which includes the Additional Protocol of 2022—." *See* 1240.11(h)(1) (revised).

asylum. Because the Additional Protocol of 2022 only expands the application of the STCA, but otherwise does not make any changes that would affect existing policies, procedures, and safeguards in and associated with the STCA determinations, the existing policies, procedures, and safeguards, as outlined in current regulations, also apply to the terms of the Additional Protocol of 2022.[44]

Under the amended final regulations, the terms of the STCA as supplemented by the Additional Protocol of 2022 will also apply to those individuals who cross the U.S.-Canada land border between the POEs on or after 12:01 a.m. on Saturday, March 25, 2023, and make a claim for asylum or other protection claim relating to a fear of persecution or torture within 14 days after such crossing. *See* 8 CFR 208.30(e)(6) and (7) and (e)(6)(i) through (iii), 1003.42(h)(1) and (2), 1240.11(g)(1) through (4) (as revised by this rule). Correspondingly, the Departments are adding references to the Additional Protocol of 2022 to these provisions where necessary to incorporate the Additional Protocol of 2022 within the regulatory framework.

Moreover, under the STCA, as supplemented by the Additional Protocol of 2022 and this rule, other noncitizens who are not defined as "arriving aliens" but who are subject to expedited removal proceedings will be subject to the same threshold screening to determine whether such noncitizens are barred from applying for asylum in the United States under the STCA, as supplemented by the Additional Protocol of 2022. These other individuals, who are subject to expedited removal proceedings with DHS, include noncitizens encountered within 100 miles of the land border and within 14 days of crossing the U.S.-Canada border.[45] In this context, a noncitizen is not eligible to apply for asylum or other related protection in the United States when DHS determines, during the threshold screening interview, that the noncitizen may be removed to Canada because the STCA, as supplemented by the Additional Protocol of 2022, is applicable and none of the exceptions apply to the noncitizen. *See* INA 208(a)(2), 8 U.S.C. 1158(a)(2); 8 CFR 208.30(e)(6)(i) through (iii) (revised). However, if DHS determines that the noncitizen has established by a preponderance of the evidence that an exception to the STCA, as supplemented by the Additional Protocol of 2022, does apply, then the asylum officer will make a written

notation of the inapplicability of the STCA, which includes the Additional Protocol of 2022, and immediately proceed with the credible fear determination. *See* 8 CFR 208.30(e)(6)(ii) (revised). As provided in the existing EOIR regulations, immigration judges do not have jurisdiction to review an asylum officer's STCA determination.[46] The new regulatory text will continue to provide that an immigration judge does not have jurisdiction to review an asylum officer's STCA determination under the STCA, as supplemented by the Additional Protocol of 2022. *See* 8 CFR 1003.42(h)(1) (revised) (for applicants for admission), 8 CFR 1003.42(h)(2) (revised) (for noncitizens in transit).

DOJ is also amending the regulatory text of 8 CFR 1003.42(h)(1) by removing the term "arriving alien" and replacing it with "applicants for admission" to clarify that an asylum officer's determinations regarding applicants for admissions are not subject to review by the immigration judge. *See* 8 CFR 1003.F42(h)(1) (revised). However, where an asylum officer has made a negative credible fear finding, the new regulatory text continues to provide that an immigration judge will continue to have jurisdiction to review this finding. *See id.*

DOJ is further amending the EOIR regulations to add references to the Additional Protocol of 2022 throughout 8 CFR 1240.11(g) and (h)(1), where appropriate, and to reflect that if a noncitizen is placed into section 240 removal proceedings, the immigration judge will make the determination whether the STCA, as supplemented by the Additional Protocol of 2022, applies. *See* 8 CFR 1240.11(g)(1) and (g)(2)(i) (revised).

DOJ is also amending 8 CFR 1240.11(g)(2)(ii) and (g)(3) by adding references to the Additional Protocol of 2022 to clarify that individuals who are subject to the STCA, as supplemented by the Additional Protocol of 2022, may establish exceptions. *See* 8 CFR 1240.11(g)(2)(ii) and (g)(3) (revised). Furthermore, DOJ is amending 8 CFR 1240.11(g)(3) to clarify that an immigration judge does not have jurisdiction to review, consider, or decide any issues pertaining to any discretionary determination of whether the noncitizen should be permitted to pursue an asylum claim notwithstanding the STCA, as supplemented by the Additional Protocol of 2022, because, under current STCA procedures, discretionary public

interest determinations are reserved to DHS. *See* 8 CFR 1240.11(g)(3) (revised).

As is the case under current STCA procedures, a noncitizen in section 240 removal proceedings otherwise ineligible to apply for asylum under the STCA, as supplemented by the Additional Protocol of 2022, may apply for asylum with an immigration judge if DHS files a written notice in the proceedings before the immigration judge that DHS has decided in the public interest to allow the noncitizen to pursue claims for asylum or other related protection. *See* 8 CFR 1240.11(g)(3) (revised). In addition, DOJ is amending 8 CFR 1240.11(g)(4), which provides that a noncitizen who is found to be ineligible to apply for asylum because of a safe third country agreement,[47] such as the STCA, is also ineligible to apply for statutory withholding of removal[48] or protection under the CAT. *See* 8 CFR 1240.11(g)(4) (revised). Because the Additional Protocol of 2022 supplements the STCA without changing this procedure, those noncitizens subject to the STCA, as supplemented by the Additional Protocol of 2022, will continue to be ineligible for withholding of removal or protection under the CAT. *See* 8 CFR 1240.11(g)(4) (revised). However, the noncitizen may apply for any relief from removal for which the noncitizen may be otherwise eligible, as is currently the case before the Additional Protocol of 2022 becomes effective. *See* 8 CFR 1240.11(g)(4) (current); 8 CFR 1240.11(g)(4) (revised).

Finally, DHS is amending the last sentence of 8 CFR 1240.11(g)(4) by adding a reference to the Additional Protocol of 2022. Adding a reference to the Additional Protocol of 2022 does not change procedures that have been in place under the STCA. The provision continues to state that, where an immigration judge determines that a noncitizen in removal proceedings is subject to the STCA and no exceptions apply, the noncitizen will be ordered removed to Canada, where the noncitizen will be able to pursue their protection claim under the laws of Canada, but the provision now clarifies that the STCA includes the Additional Protocol of 2022. *See* 8 CFR 1240.11(g)(4) (revised).

*B. Determinations Regarding Crossing Between POEs and Whether 14 Days Have Elapsed*

The Additional Protocol of 2022 supplements the STCA to provide that the STCA not only applies to

---

[44] Additional Protocol of 2022 art. 1.
[45] *See* 69 FR at 48877.

[46] *See* 8 CFR 1003.42(h)(1) and (2).

[47] *See* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).
[48] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3).

IFR_AR_001147

individuals encountered at a POE or in transit while being removed or deported to a third country, but also to individuals who have crossed the U.S.-Canada land border between POEs, including via mutually designated bodies of water along or across the U.S.-Canada land border, and who seek asylum or other protection relating to persecution or torture within 14 days after such crossing.[49] As explained throughout this preamble, the Departments have existing procedures in place in the expedited removal context and the section 240 removal proceedings context relating to individuals crossing the U.S. border at designated POEs, in transit, or between POEs, as well as for the assessment of a 14-day time frame. The STCA is embedded within this process. *See* Part II of this preamble. Hence, the determinations concerning applicability of the STCA, as supplemented by the Additional Protocol of 2022, including the location and time of a noncitizen's crossing, as well as the calculation of the 14 days, will be made within that existing framework.[50] Consistent with existing practice, the noncitizen may not challenge an asylum officer's determination regarding whether the STCA, as supplemented by the Additional Protocol of 2022, applies to the noncitizen. *See* 8 CFR 208.30(e)(6) (current); 8 CFR 208.30(e)(6) (revised); *see also* 8 CFR 1003.42(h); INA 208(a)(3), 8 U.S.C. 1158(a)(3).

*C. Considerations Relating to the Preponderance-of-the-Evidence Standard*

Under the STCA, a noncitizen must establish by a preponderance of the evidence that an exception to the STCA applies. *See* 8 CFR 208.30(e)(6)(ii) (DHS regulation), 1240.11(g)(2) (EOIR regulation). Because the implementation of the Additional Protocol of 2022 does not alter the procedural aspects of the administration of the STCA, a noncitizen—to establish eligibility to apply for asylum or other protection relating to a fear of persecution or torture—must continue to establish by a preponderance of the evidence that an exception to the STCA (now, as supplemented by the Additional Protocol of 2022), applies to the noncitizen. *See* 8 CFR 208.30(e)(6)(ii), 1240.11(g)(2)(i) (revised).

*D. Return to the Country of Last Presence*

The Additional Protocol of 2022 requires information-sharing steps that

do not result in additional regulatory amendments. These steps will be included in the standard operating procedures of the United States and Canada related to information sharing and will help each country to address and resolve any differences regarding operational implementation.

Under the STCA as originally signed, neither the United States nor Canada is required to accept the return of an asylum seeker automatically; both countries review each case individually in making those decisions.[51] Either country may choose to allow an asylum seeker who is encountered at a POE, or in transit, from the other country to pursue an asylum or other protection claim relating to fear of persecution or torture if circumstances warrant in accordance with its own laws and policies.[52]

Similarly, under the terms of the Additional Protocol of 2022, the country of last presence is not required to accept the return of the asylum seeker if it determines that the noncitizen did not make a claim for asylum or other protection claim relating to fear of persecution or torture within 14 days after crossing the land border in between the POEs.[53]

Under the Additional Protocol of 2022, the receiving country is responsible for providing the country of last presence sufficient information relevant to the determination of the noncitizen's crossing of the land border between the POEs and the noncitizen's claim, including a copy of the record of apprehension between the POEs, if available, to assist the country of last presence in making the necessary determinations.[54] Therefore, before a noncitizen can be returned to Canada, DHS will provide relevant information, including a copy of the record of apprehension if available, to the Canadian Government.[55]

---

[49] *See* Additional Protocol of 2022 arts. 1–2.
[50] *See* 69 FR at 48879.

[51] *See* STCA art. 4(3); *see also* DHS Final Rule, 69 FR 69483–84; DOJ Final Rule, 69 FR 69493–94.
[52] *See* STCA arts. 4, 6.
[53] *See* Additional Protocol of 2022 art. 3(b).
[54] *See* Additional Protocol of 2022 art. 3(c).
[55] These additional information sharing steps do not result in additional regulatory amendments. In accordance with Article 4 of the Additional Protocol of 2022—which refers to Article 8 of the STCA's mandate to establish standard operating procedures—these procedures shall also be included in standard operating procedures to assist with the implementation. *See* Additional Protocol of 2022 art. 4. In accordance with the second paragraph of Article 8 of the STCA, which provides that these standard operating procedures "shall include mechanisms for resolving differences respecting the interpretation and implementation of the terms of [the STCA]," the Departments will cooperate with their Canadian counterparts to address and resolve any differences in the same spirit in which the STCA has been implemented over the years and in which the Additional Protocol

**IV. Detailed Summary of Regulatory Changes**

*A. New 8 CFR 208.30(e)(6) and (7)*

DHS is amending 8 CFR 208.30(e)(6) in the introductory text by adding references to the Additional Protocol of 2022. DHS is further amending the provision by adding that, prior to any determination concerning whether a noncitizen who, on or after 12:01 a.m. on Saturday, March 25, 2023, entered the United States by crossing the U.S.-Canada land border between POEs, including a crossing of the border in those waters as mutually designated by the United States and Canada, and who made an asylum or other protection claim relating to fear of persecution or torture within 14 days after such crossing, the asylum officer shall conduct a threshold screening interview to determine whether the noncitizen is ineligible to apply for asylum under section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), and subject to removal to Canada by operation of the STCA, which includes the Additional Protocol of 2022. DHS is further amending the third sentence of 8 CFR 208.30(e)(6) by adding a reference to the Additional Protocol of 2022 and rewording the provision, so that, under the amended provision, the asylum officer shall advise the noncitizen of the exceptions in the STCA, which includes the Additional Protocol of 2022, and question the noncitizen as to the applicability of any of these exceptions to the noncitizen's case.

DHS is amending 8 CFR 208.30(e)(6)(i) by adding references to the Additional Protocol of 2022 to clarify that, if the asylum officer, with concurrence from a supervisory asylum officer, determines from the threshold screening interview that the noncitizen is subject to the STCA, which includes the Additional Protocol of 2022, and that the noncitizen does not qualify for an exception under the STCA, which includes the Additional Protocol of 2022, then the noncitizen is ineligible to apply in the United States for asylum or other forms of protection relating to a fear of persecution or torture.

Next, DHS is amending 8 CFR 208.30(e)(6)(ii) by adding references to the Additional Protocol of 2022, where appropriate, to clarify that if a noncitizen establishes by a preponderance of the evidence that they

of 2022 was negotiated. As reflected in the STCA and the Additional Protocol of 2022 themselves, and as previously indicated by DHS, the resolution of these procedures is more appropriately addressed through operating procedures than through the promulgation of regulations. *See* DHS Final Rule, 69 FR 69486.

qualify for an exception under the terms of the STCA, which includes the Additional Protocol of 2022, then the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to determine whether the noncitizen has a credible fear of persecution or torture under 8 CFR 208.30(d). DHS is amending 8 CFR 208.30(e)(6)(iii) by adding a reference to the Additional Protocol of 2022 to clarify that a noncitizen qualifies for an exception to the STCA, which includes the Additional Protocol of 2022, if the noncitizen is not being removed from Canada in transit through the United States and meets the requirements of the exceptions otherwise listed.

Last, DHS is amending 8 CFR 208.30(e)(7) to clarify that the STCA referenced in that paragraph includes the Additional Protocol of 2022. This amendment does not change the substance of that paragraph.

The amendments to 8 CFR 208.30(e)(6) and (7) are effective at 12:01 a.m. on Saturday, March 25, 2023. The Department of State (''DOS'') will publish the Additional Protocol of 2022 on its website,[56] once effective, and noncitizens should refer to the DOS web page.

This rule does not otherwise alter the procedures applied to expedited removal proceedings, credible fear screenings, or threshold screening interviews as provided in the current regulations.

*B. New 8 CFR 1003.42(h)(1) and (2) and 8 CFR 1240.11(g) (Heading), (g)(1) Through (4), and (h)(1)*

DOJ is revising 8 CFR 1003.42(h)(1) in the paragraph heading, and throughout the text of the paragraph, by replacing ''arriving alien'' with ''applicant for admission'' and adding references to the Additional Protocol of 2022 to clarify that an immigration judge has no jurisdiction to review an asylum officer's determination that an applicant for admission is ineligible to apply for asylum pursuant to the STCA, which includes the Additional Protocol of 2022, formed under section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), and that the noncitizen should be returned to Canada to pursue the noncitizen's claim for asylum or other protection under the laws of Canada. DOJ is further amending the third sentence of the same paragraph by adding references to the Additional Protocol of 2022 and replacing ''arriving alien'' with

''applicant for admission'' to clarify that, in any case where an asylum officer has found that an applicant for admission qualifies for an exception to the STCA, which includes the Additional Protocol of 2022, or that the STCA, which includes the Additional Protocol of 2022, does not apply, an immigration judge has jurisdiction to review a negative credible fear finding made thereafter by the asylum officer. DOJ, in addition, is amending 8 CFR 1003.42(h)(2) to add a reference to the Additional Protocol of 2022. This amendment does not affect the substance of that paragraph. Under the amended provision, an immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law, under the terms of the STCA, which includes the Additional Protocol of 2022.

Next, DOJ is amending 8 CFR 1240.11(g) (heading) and (g)(1) by adding references to the Additional Protocol of 2022, with the effect that the STCA, which includes the Additional Protocol of 2022, will apply to noncitizens who are placed in section 240 removal proceedings, provided that they, on or after 12:01 a.m. on Saturday, March 25, 2023, enter the United States by crossing the U.S.-Canada land border between the POEs and claim a fear of persecution or torture within 14 days after such crossing. In appropriate cases, the immigration judge will determine whether, under that Agreement, which includes the Additional Protocol of 2022, the noncitizen should be returned to Canada, or whether the noncitizen should be permitted to pursue asylum or other protection claims in the United States.

DOJ is also amending 8 CFR 1240.11(g)(2)(i) and (ii) by adding references to the Additional Protocol of 2022, where appropriate, and to clarify that a noncitizen is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), unless the immigration judge determines by a preponderance of the evidence that (1) the STCA, which includes the Additional Protocol of 2022, does not apply to the noncitizen or does not preclude the noncitizen from applying for asylum or other forms of protection in the United States; or (2) the noncitizen qualifies for an exception to the STCA, which includes the Additional Protocol of 2022, as set forth in 8 CFR 1240.11(g)(3).

DOJ is also amending 8 CFR 1240.11(g)(3) by adding references to the Additional Protocol of 2022, where

appropriate, to clarify that the immigration judge shall apply the relevant regulations in deciding whether the noncitizen qualifies for any exception that would permit the United States to exercise authority over the noncitizen's asylum claim. The amendments further clarify that related exceptions are codified at 8 CFR 208.30(e)(6)(iii). The regulation continues to provide that the immigration judge shall not review, consider, or decide any issues pertaining to any discretionary determination of whether the noncitizen should be permitted to pursue an asylum claim in the United States because such discretionary public interest determinations are reserved to DHS. The amendments further clarify that a noncitizen in removal proceedings who is otherwise ineligible to apply for asylum under the STCA, which includes the Additional Protocol of 2022, may apply for asylum if DHS files a written notice in the proceedings before the immigration judge that it has decided in the public interest to allow the noncitizen to pursue claims for asylum or other related protection.

Next, DOJ is amending 8 CFR 1240.11(g)(4) by adding references to the Additional Protocol of 2022, where appropriate, to clarify the following provisions: first, a noncitizen who is found to be ineligible to apply for asylum under section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), is ineligible to apply for statutory withholding of removal and seek protection under the CAT; second, the noncitizen in this scenario may apply for any other relief from removal for which the noncitizen may be eligible; and third, if a noncitizen who is subject to the STCA, which includes the Additional Protocol of 2022, and section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), is ordered removed, the noncitizen shall be ordered removed to Canada, in which case the noncitizen will be able to pursue their protection claim under the laws of Canada.

Finally, DOJ is amending 8 CFR 1240.11(h)(1) to add a reference to the Additional Protocol of 2022. This amendment does not affect the substance of that paragraph.

The amendments to 8 CFR 1003.42(h)(1) and (2) and 8 CFR 1240.11(g) (heading), and paragraphs (g)(1), (g)(2)(i) and (ii), (g)(3) and (4), and (h)(1) are effective at 12:01 a.m. on Saturday, March 25, 2023.

This rule does not otherwise alter the procedures applied to noncitizens in section 240 removal proceedings as provided in current regulations.

---

[56] *See* DOS, Treaties and Other International Acts Series (TIAS), *https://www.state.gov/tias/* (last visited Mar. 16, 2023).

## V. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** and allow for a period of public comment. 5 U.S.C. 553(b). The APA also generally requires publication of a substantive rule not less than 30 days before its effective date. 5 U.S.C. 553(d). Agencies may forgo notice-and-comment rulemaking and a delayed effective date when the rulemaking involves "a military or foreign affairs function of the United States." [57]

The Departments are bypassing notice-and-comment procedures and a delay in the effective date of the regulation because this rule involves a "foreign affairs function of the United States." [58] The purpose of the foreign

affairs exemption is to allow more cautious and sensitive consideration of those matters that affect relations with other Governments. [59] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [60] In addition, although the text of the APA does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. [61] Under either formulation, a rule is covered by the foreign affairs exemption if, among other things, it directly involves activities or actions characteristic to the conduct of international relations. [62] Cooperative agreements regulating migration and immigration with other nations, such as the STCA and the Additional Protocol of 2022, are similar to the executive agreements that have previously been recognized as part of the executive powers that bear the characteristics of the conduct of international relations. [63] The use of the foreign affairs exemption is well established and has long been recognized by courts as applicable when a rule itself—as is the case with this

rulemaking—implements an international agreement between the United States and another sovereign state. [64]

This rule falls under the foreign affairs exemption because it puts into effect the negotiated-and-signed Additional Protocol of 2022, which is supplementing the existing agreement between the Governments of the United States and Canada regarding migration issues and border management and, in particular, the management of the flow of asylum seekers. Furthermore, the Additional Protocol of 2022 implements United States foreign policy and fosters diplomatic relations with the Government of Canada by mutually supporting the integrity of each country's immigration system and aspects of the system specific to the U.S.-Canada border and regional migration management. [65]

In cases other than those involving the implementation of international agreements, certain courts have found that immigration matters typically implicate foreign affairs, but that not all immigration matters meet the APA's foreign affairs exemption. [66] In those cases, courts have evaluated not only whether agency action implicates foreign affairs broadly, but also whether the use of notice-and-comment procedures and a 30-day delay in the

---

[57] *See* 5 U.S.C. 553(a)(1).

[58] In 2004, when implementing the STCA, DHS and DOJ promulgated regulations through notice-and-comment rulemaking even though the rulemaking related to United States foreign affairs and the Departments could have asserted that exemption to the notice-and-comment requirement. At the time, however, the STCA had only been recently negotiated, and the regulations created a new regulatory framework to address the special terms of the STCA. The Departments thus made a discretionary decision that public comment could be beneficial. The Departments' 2004 decision does not obligate the Departments now to make the same decision with respect to this rulemaking. *See, e.g., Hoctor* v. *U.S. Dep't of Agric.,* 82 F.3d 165, 171– 72 (7th Cir. 1996) (observing that there is nothing in the APA to forbid an agency to use notice-and-comment procedures even if not required under the APA and that courts should attach no weight to an agency's varied approaches involving similar rules); *see also Indep. Living Res.* v. *Or. Arena Corp.,* 982 F. Supp. 698, 744 n.62 (D. Or. 1997) (observing that agencies may voluntarily elect notice-and-comment procedures for a variety of reasons even though not required); *cf. Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 101–02 (2015) (holding that agencies may "grant additional procedural rights in the exercise of their discretion," including "the right to notice and an opportunity to comment" when not otherwise required by the APA, but also noting that "reviewing courts are generally not free to impose them if the agencies have not chosen to grant them" (quotation marks omitted)); *Malek-Marzban* v. *Immigr. & Naturalization Serv.,* 653 F.2d 113, 116 (4th Cir. 1981) (concluding that agencies are not estopped from asserting the foreign affairs exemption even if they routinely and voluntarily submitted policy decisions involving foreign affairs functions to rulemaking procedures in the past; the agencies' past actions do not restrict agencies' prerogatives when circumstances require swift action). Unlike in 2004, when the rulemaking created a completely new regulatory framework to implement the STCA, this rulemaking implements the terms of the Additional Protocol of 2022, which only expands the locations to which the STCA applies, while leaving in place the existing regulatory processes and procedures. Additionally, with this rulemaking, the Departments are implementing an existing international obligation and have determined that bypassing notice-and-comment procedures on the implementation of this foreign policy is warranted without seeking

comments, for the reasons outlined in this rulemaking.

[59] *See, e.g., City of New York* v. *Permanent Mission of India to United Nations,* 618 F.3d 172, 175, 200–03 (2d Cir. 2010) (holding that a DOS notice establishing an exemption from real property taxes on property owned by foreign governments was properly promulgated without notice and comment under the foreign affairs exemption of the APA); *see also Am. Ass'n of Exps. & Imps. Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985).

[60] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[61] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[62] *See City of New York,* 618 F.3d at 201 (finding that a DOS notice related directly to foreign affairs); *see Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25, 53 (D.D.C. 2020) ("*CAIR*") (observing that, for the foreign affairs exemption to apply, a rule must clearly and directly involve activities or actions characteristic to the conduct of international relations), *appeal dismissed as moot sub nom. I.A.* v. *Garland,* No. 20–5271, 2022 WL 696459 (D.C. Cir. Feb. 24, 2022).

[63] *See Am. Ins. Ass'n* v. *Garamendi,* 539 U.S. 396, 415 (2003) (recognizing that the President has authority to enter into executive agreements with other countries, requiring no ratification by the Senate or approval by Congress, and that this power has "been exercised since the early years of the Republic"); *see also Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 188 (1993) (recognizing that immigration matters may involve foreign and military affairs for which the President has unique responsibility); *Toll* v. *Moreno,* 458 U.S. 1, 10 (1982) ("Our cases have long recognized the preeminent role of the Federal Government with respect to the regulation of [noncitizens] within our borders."); *Truax* v. *Raich,* 239 U.S. 33, 42 (1915) (finding that "[t]he authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal government").

[64] *See Int'l Bhd. of Teamsters* v. *Peña,* 17 F.3d 1478, 1486 (D.C. Cir. 1994) (upholding a regulation published under the foreign affairs exemption of the APA and implementing an agreement between the United States and Mexico); *WBEN, Inc.* v. *United States,* 396 F.2d 601, 616 (2d Cir.1968) (finding that the foreign affairs exemption applied to Federal Communications Commission rule implementing an agreement between the United States and Canada that imposed power limits on pre-sunrise broadcasts); *CAIR,* 471 F. Supp. 3d at 54 (observing that "the foreign affairs function exception plainly covers heartland cases in which a rule itself directly involves the conduct of foreign affairs," such as "scenarios in which a rule implements an international agreement between the United States and another sovereign state").

[65] *See* STCA Introductory statements ("RECOGNIZING and respecting the obligations of each Party under its immigration laws and policies; EMPHASIZING that the United States and Canada offer generous systems of refugee protection, recalling both countries' traditions of assistances to refugees and displaced persons abroad, consistent with the principles of international solidarity that underpin the international refugee protection system, and committed to the notion that cooperation and burden-sharing with respect to refugee status claimants can be enhanced; . . . CONVINCED . . . that agreements among states may enhance the international protection of refugees by promoting the orderly handling of asylum applications by the responsible party and the principle of burden-sharing . . . .").

[66] *See Yassini* v. *Crosland,* 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (stating that "[t]he foreign affairs exception would become distended if applied to [former Immigration and Naturalization Service] actions generally, even though immigration matters typically implicate foreign affairs").

IFR_AR_001150

effective date would "provoke definitely undesirable international consequences." [67] Here, a delay in implementation of the Additional Protocol of 2022 created by notice-and-comment rulemaking and a delayed effective date would lead to undesirable international consequences by jeopardizing not only the goals of the Additional Protocol of 2022, but also the United States diplomatic relationship with Canada and the credibility of the United States as a negotiating partner on migration issues.

The Additional Protocol of 2022 and these implementing regulations further the United States foreign policy goal of collaborating with one of our closest allies, partners, and neighbors, as demonstrated by the joint public statements made by the Governments of Canada and the United States in the Roadmap for a Renewed U.S.-Canada Partnership [68] and the 2021 and 2023 NALS.[69] Implementing these regulations without delay supports international cooperation and reaffirms the United States commitment, as reflected in the Additional Protocol of 2022, to manage migration by deterring migration through irregular pathways and promoting the orderly handling of asylum seekers.[70] Because each government under the Additional Protocol of 2022 can expeditiously return an asylum applicant who crosses between POEs, just as occurs now at POEs under existing regulations, implementing the Additional Protocol of 2022 through these regulations furthers the shared United States and Canadian policy goal of reducing incentives for individuals to cross the shared border between POEs and to circumvent legal pathways, including existing legal channels for humanitarian protection. Through the Additional Protocol of 2022 and its implementation, both countries proactively and preventatively address situations that may lead to significant draws of asylum seekers between POEs to either the United States or Canada. Thus, the Additional Protocol of 2022 is an important element of both countries' ability to manage their shared border and maintain the integrity of their respective legal immigration and refugee and asylum protection policies.

In light of the expressed commitment and acknowledgement of shared responsibility by the United States Government to adopt an ambitious and comprehensive approach to safe, orderly, and humane migration management, as evidenced in joint public statements,[71] it is critical that the United States Government act upon its commitment. Delaying the implementation of this rulemaking to pursue notice and comment could create doubt in Canada, and potentially other future partners, about whether the United States has sufficient flexibility and capacity to carry out agreements in accordance with its declared commitments.[72] Therefore, this agreement should be implemented rapidly by amending the regulatory framework through this rule, in light of the President's renewed foreign policy commitment and the longstanding U.S.-Canada relationship.[73]

In sum, the importance of promptly and faithfully implementing an international agreement requires publishing this final rule without notice and comment and without delaying the effective date of the rule. Any delay in implementing the Additional Protocol of 2022 caused by notice-and-comment procedures or by a delayed effective date could have a detrimental impact on meeting United States foreign policy objectives, on diplomatic relations with Canada, and on the credibility of the United States as a migration partner overall.[74]

*B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)*

Although this rule pertains to a foreign affairs function of the United States and therefore falls outside the scope of Executive Order 12866, the Departments voluntarily submitted the rule to the Office of Information and Regulatory Affairs of the Office of Management and Budget ("OMB") for review, and OMB reviewed the rule on an expedited basis as though it were a significant regulatory action under section 3(f)(4) of that Executive Order.

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act, Public Law 96–354, 94 Stat. 1164 (1980), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121, 110 Stat. 857, 864 (1996) (codified at 5 U.S.C. 601 *et seq.*), requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is not subject to notice-and-comment rulemaking.

*D. Unfunded Mandates Reform Act of 1995*

This final rule will not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year (adjusted for inflation), and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under

---

[67] *See E. Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640, 676 (9th Cir. 2021) (stating that, for the foreign affairs exemption to apply, the public rulemaking provisions should provoke definitely undesirable international consequences); *see also City of New York,* 618 F.3d at 202 ("In short, while a case-by-case determination that public rule making would provoke 'definitely undesirable international consequences,' may well be necessary before the foreign affairs exception is applied to areas of law like immigration that only indirectly implicate international relations, quintessential foreign affairs functions such as diplomatic relations and the regulation of foreign missions are different. Such actions clearly and directly involve a foreign affairs function'' (some quotation marks omitted)); *Rajah,* 544 F.3d at 437 (recognizing that multiple undesirable consequences could follow from notice-and-comment rulemaking, including impaired relations with other countries if the government were to conduct and resolve a public debate on matters affecting the other country).

[68] *See* White House, Roadmap.

[69] *See* White House, Building Back Better Together.; *see also* White House, Fact Sheet; White House, Los Angeles Declaration.

[70] The Departments also believe that promoting orderly handling of asylum claims may reduce the possibility for success in forum shopping.

[71] *See* White House, Building Back Better Together; *see also* White House, Roadmap; White House, Fact Sheet; White House, Los Angeles Declaration.

[72] *See E. Bay Sanctuary Covenant,* 993 F.3d at 676 (explaining that the "[u]se of the exception is generally permissible where the international consequences of the rule-making requirements are obvious or thoroughly explained"); *Am. Ass'n of Exps. & Imps. Textile & Apparel Grp.,* 751 F.2d at 1249 (finding that the foreign affairs exemption facilitates "more cautious and sensitive consideration of those matters which 'so affect relations with other Governments that . . . public rule-making provisions would provoke definitely undesirable international consequences'" (quoting H.R. Rep. No. 69–1980, at 23 (1946)).

[73] *See Rajah,* 544 F.3d at 437 (observing that the notice-and-comment process can be "slow and cumbersome," which can negatively affect efforts to secure U.S. national interests, thereby justifying application of foreign affairs exemption); *Am. Ass'n of Exps. & Imps. Textile & Apparel Grp.,* 751 F.2d at 1249 ("The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country. Were we to require that CITA provide notice thirty days before they take [e]ffect, the President's power to conduct foreign policy would plainly be hampered.").

[74] As explained in this section, the United States and Canada negotiated the Additional Protocol of 2022 in the context of broader discussions to increase U.S.-Canadian cooperation on hemispheric migration, to enhance information sharing in support of each country's immigration-related decision-making process, and to expand collaboration in the region to deter irregular migration at the source and in transit countries. Expeditious implementation of the Additional Protocol of 2022 underscores the U.S.'s commitment to these imperatives and avoids possible undesirable international consequences.

the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48; *see also* 2 U.S.C. 1532(a).

*E. Congressional Review Act*

This final rule is not a major rule as defined by section 804 of the legislation commonly known as the Congressional Review Act ("CRA"), *see* Public Law 104–121, sec. 251, 110 Stat. 847, 868 (1996) (codified in relevant part at 5 U.S.C. 804). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets. DHS and DOJ have complied with the CRA's reporting requirements and have sent this rule to Congress and to the Comptroller General as required by 5 U.S.C. 801(a)(1). Because of this submission; because this rule is not a major rule; and because the foreign affairs exemption in the APA applies to this rule, this rule does not have a delayed effective date. *See* 5 U.S.C. 801(a)(4).

*F. Executive Order 13132 (Federalism)*

This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This final rule was drafted and reviewed in accordance with Executive Order 12988, Civil Justice Reform. This rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities so as to minimize litigation and undue burden on the Federal court system. The Departments have determined that this proposed rule meets the applicable standards provided in section 3 of Executive Order 12988.

*H. Family Assessment*

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act,

1999,[75] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[76] The Departments have systematically reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) has a sufficient justification for any financial impact on families; (6) may be carried out by State or local government or by the family; or (7) establishes an implicit or explicit policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If an agency determines a regulation may negatively affect family wellbeing, then the agency must provide an adequate rationale for its implementation.

The Additional Protocol of 2022 expands the applicability of the STCA, but otherwise leaves in place all existing policies, procedures, and safeguards provided by the current regulations implementing the STCA. The Departments have therefore determined that the implementation of this rule will not negatively affect family wellbeing and will not have any impact on the autonomy or integrity of the family as an institution.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This final rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act, Public Law 91–190, 83 Stat. 852 (1970) (codified at 42 U.S.C. 4321 *et seq.*) ("NEPA"), applies to them and, if so, what degree of analysis and documentation is required. DHS

Directive 023–01 Rev. 01[77] and Instruction Manual 023–01–001–01 Rev. 01 ("Instruction Manual")[78] establish the policies and procedures that DHS and its components use to comply with the NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing the procedural requirements of NEPA. The CEQ regulations allow Federal agencies to establish, in their NEPA implementing procedures, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown normally do not, individually and cumulatively, have a significant effect on the human environment and, therefore, do not require preparation of an environmental assessment or environmental impact statement.[79] Appendix A of the Instruction Manual lists the DHS categorical exclusions.

Under DHS NEPA implementing procedures, for an action to be categorically excluded it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[80]

This final rule amends existing DHS and DOJ regulations at 8 CFR 208.30(e)(6) and (7), 8 CFR 1003.42(h)(1) and (2), and 8 CFR 1240.11(g) by incorporating modifications recently negotiated by the Government of the United States and the Government of Canada to specific terms of the STCA in the Additional Protocol of 2022. The STCA permits the respective governments to manage which government decides certain noncitizens' requests for protection from persecution or torture; correspondingly, under section 208(a)(2)(A) of the INA, 8 U.S.C. 1182(a)(2)(A), and section 240 of the INA, 8 U.S.C. 1229a, the Departments apply the threshold screening requirement outlined in 8 CFR 208.30(e)(6), 8 CFR 1003.42(h) and 8 CFR 1240.11(g)(1) through (4) and pursuant to domestic implementation of

---

[75] *See* 5 U.S.C. 601 note.
[76] Public Law 105–277, 112 Stat. 2681, 2681–528 (1998).

[77] DHS, Implementation of the National Environmental Policy Act, Directive 023–01 (Oct. 31, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf.*
[78] DHS, Instruction Manual 023–01–001–01, Revision 01, Implementation of the National Environmental Policy Act (NEPA) (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*
[79] *See* 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d).
[80] *See* Instruction Manual sec. V.B(2)(a)–(c).

this international treaty obligation to determine whether they should adjudicate a noncitizen's claim for asylum or other protection claim relating to persecution or torture. The STCA, as originally negotiated, did not include those noncitizens seeking entry into the United States between the official POEs (to include certain bodies of waters as mutually designated by the United States and Canada) and who make an asylum or other protection claim within 14 days after such crossing. Upon implementation of the Additional Protocol of 2022 in each respective country, and upon the effective date of this rule at 12:01 a.m. on Saturday, March 25, 2023, the threshold screening requirement will also apply to noncitizens who cross the U.S.-Canada land border between the official POEs and make an asylum or other protection claim relating to persecution or torture within 14 days after such crossing.

The Departments are not aware of any significant impact on the environment, or any change in environmental effect that will result from the amendments being promulgated in this Final Rule. Furthermore, the Departments have determined that this rule clearly fits within categorical exclusion A3 in the Instruction Manual. The rule is applied prospectively.

This final rule addresses specific threshold screening requirements as negotiated in the Additional Protocol of 2022 and is not part of a larger action. In accordance with its NEPA implementing procedures, the Departments find no extraordinary circumstances associated with this final rule that may give rise to significant environmental effects requiring further analysis and documentation. Therefore, this action is categorically excluded, and no further NEPA analysis or documentation is required.

### K. Paperwork Reduction Act

This rule does not propose new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (codified at 44 U.S.C. chapter 35), and its implementing regulations, 5 CFR part 1320.

### List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Authority delegations (Government agencies), Fees, Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procedure, Aliens.

### Regulatory Amendments

### DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in this preamble, DHS amends part 208 of chapter I of the title 8 of the Code of Federal Regulations as follows:

### PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for 8 CFR part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.30 by revising paragraphs (e)(6) introductory text, (e)(6)(i) through (iii), and (e)(7) to read as follows:

### § 208.30  Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\*    \*    \*    \*    \*

(e) \* \* \*

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the United States during removal by Canada or an alien who, on or after 12:01 a.m. on Saturday, March 25, 2023, entered the United States by crossing the U.S.-Canada land border between the ports-of-entry, including a crossing of the border in those waters as mutually designated by the United States and Canada, and who made an asylum or other protection claim relating to fear of persecution or torture within 14 days after such crossing, has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada by operation of the Agreement Between the Government of the United States and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"), which includes the Additional Protocol of 2022 to the Agreement Between the Government of the United States of America and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Additional Protocol of 2022"). In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph (e)(6). The asylum officer shall advise the alien of the exceptions contained in the Agreement, which includes the Additional Protocol of 2022, and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer, with concurrence from a supervisory asylum officer, determines that an alien is subject to the Agreement, which includes the Additional Protocol of 2022, and that an alien does not qualify for an exception under the Agreement, which includes the Additional Protocol of 2022, during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After the asylum officer's documented finding is reviewed by a supervisory asylum officer, the alien shall be advised that the alien will be removed to Canada in order to pursue the alien's claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that the alien qualifies for an exception under the terms of the Agreement, which includes the Additional Protocol of 2022, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

(iii) An alien qualifies for an exception to the Agreement, which includes the Additional Protocol of 2022, if the alien is not being removed from Canada in transit through the United States and:

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not

IFR_AR_001153

apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the United States pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States to the alien, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

\* \* \* \* \*

(7) When an immigration officer has made an initial determination that an alien, other than an alien described in paragraph (e)(6) of this section and regardless of whether the alien is arriving at a port of entry, appears to be subject to the terms of an agreement authorized by section 208(a)(2)(A) of the Act, and seeks the alien's removal consistent with that provision, prior to any determination concerning whether the alien has a credible fear of persecution, reasonable possibility of persecution, or a reasonable possibility of torture, the asylum officer shall conduct a threshold screening interview to determine whether the alien is ineligible to apply for asylum in the United States and is subject to removal to a country ("receiving country") that is a signatory to the applicable agreement authorized by section 208(a)(2)(A) of the Act, other than the U.S.-Canada Agreement, which includes the Additional Protocol of 2022. In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, except that paragraphs (d)(2) and (4) of

this section shall not apply to aliens described in this paragraph (e)(7). The asylum officer shall advise the alien of the applicable agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case. The alien shall be provided written notice that if the alien fears removal to the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country and wants the officer to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in that country, the alien should affirmatively state to the officer such a fear of removal. If the alien affirmatively states such a fear, the asylum officer will determine whether the individual has demonstrated that it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in that country.

\* \* \* \* \*

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in this preamble, the Attorney General amends parts 1003 and 1240 of chapter V of title 8 of the Code of Federal Regulations as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 3. The authority citation for 8 CFR part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1003, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p.1002; section 203 Pub. L. 105–100, 111 Stat 2196–200; sections 1506 and 1510 of Pub. L. 106–308, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 4. Amend § 1003.42 by revising paragraphs (h)(1) and (2) to read as follows:

### § 1003.42 Review of credible fear determinations.

\* \* \* \* \*

(h) *Safe Third Country Agreement*— (1) *Applicants for admission, 2002 U.S.-Canada Agreement, which includes the Additional Protocol of 2022.* An immigration judge has no jurisdiction to review a determination by an asylum officer that an applicant for admission is not eligible to apply for asylum pursuant to the 2002 U.S.-Canada Agreement, which includes the Additional Protocol of 2022, formed under section 208(a)(2)(A) of the Act

and should be returned to Canada to pursue their claims for asylum or other protection under the laws of Canada. See 8 CFR 208.30(e)(6). However, in any case where an asylum officer has found that an applicant for admission qualifies for an exception to that Agreement, which includes the Additional Protocol of 2022, or that the Agreement, which includes the Additional Protocol of 2022, does not apply, an immigration judge does have jurisdiction to review a negative credible fear finding made thereafter by the asylum officer as provided in this section.

(2) *Aliens in transit.* An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law, under the terms of the 2002 U.S.-Canada Agreement, which includes the Additional Protocol of 2022.

\* \* \* \* \*

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

■ 5. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 6. Amend § 1240.11 by revising paragraphs (g) and (h)(1) to read as follows:

### § 1240.11 Ancillary matters, applications.

\* \* \* \* \*

(g) *U.S.-Canada safe third country agreement, which includes the Additional Protocol of 2022.* (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to Canada pursuant to the 2002 U.S.-Canada Agreement ("Agreement"), in the case of an alien who is subject to the terms of the Agreement, which includes the Additional Protocol of 2022, and is placed in proceedings pursuant to section 240 of the Act. In an appropriate case, the immigration judge shall determine whether under that Agreement, which includes the Additional Protocol of 2022, the alien should be returned to Canada, or whether the alien should be permitted to pursue asylum or other protection in the United States.

(2) An alien described in paragraph (g)(1) of this section is ineligible to

IFR_AR_001154

apply for asylum, pursuant to section 208(a)(2)(A) of the Act, unless the immigration judge determines, by preponderance of the evidence, that:

(i) The Agreement, which includes the Additional Protocol of 2022, does not apply to the alien or does not preclude the alien from applying for asylum in the United States; or

(ii) The alien qualifies for an exception to the Agreement, which includes the Additional Protocol of 2022, as set forth in paragraph (g)(3) of this section.

(3) The immigration judge shall apply the applicable regulations in deciding whether the alien qualifies for any exception under the Agreement, which includes the Additional Protocol of 2022, that would permit the United States to exercise authority over the alien's asylum claim. The exceptions under the Agreement, which includes the Additional Protocol of 2022, are codified at 8 CFR 208.30(e)(6)(iii). The immigration judge shall not review, consider, or decide any issues pertaining to any discretionary determination on whether the alien should be permitted to pursue an asylum claim in the United States notwithstanding the general terms of the Agreement, which includes the Additional Protocol of 2022, as such discretionary public interest determinations are reserved to DHS. However, an alien in removal proceedings who is otherwise ineligible to apply for asylum under the Agreement, which includes the Additional Protocol of 2022, may apply for asylum if DHS files a written notice in the proceedings before the immigration judge that it has decided in the public interest to allow the alien to pursue claims for asylum or withholding of removal.

(4) An alien who is found to be ineligible to apply for asylum under section 208(a)(2)(A) of the Act is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention Against Torture. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to the Agreement, which includes the Additional Protocol of 2022, and section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to Canada, in which the alien will be able to pursue his or her claims for asylum or protection against persecution or torture under the laws of Canada.

(h) * * *.

(1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination

that an alien may be removed to a third country pursuant to a bilateral or multilateral agreement—other than the 2002 U.S.-Canada Agreement, which includes the Additional Protocol of 2022—in the case of an alien who is subject to the terms of the relevant agreement and is placed in proceedings pursuant to section 240 of the Act. In an appropriate case, the immigration judge shall determine whether under the relevant agreement the alien should be removed to the third country, or whether the alien should be permitted to pursue asylum or other protection claims in the United States. If more than one agreement applies to the alien and the alien is ordered removed, the immigration judge shall enter alternate orders of removal to each relevant country.

*    *    *    *    *

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security,*

Dated: March 22, 2023.

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2023–06351 Filed 3–24–23; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

**14 CFR Part 71**

**[Docket No. FAA–2022–1161; Airspace Docket No. 22–ASO–18]**

**RIN 2120–AA66**

### Amendment of Class D and Class E Airspace; Greenville, Spartanburg, and Greer, SC

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action amends Class D airspace, Class E surface airspace, and Class E airspace extending upward from 700 feet above the surface in the Greenville, Spartanburg, and Greer, SC areas due the decommissioning of the Fairmont non-directional beacon (NDB) and cancellation of associated approaches into Spartanburg Downtown Memorial Airport/Simpson Field, as well as updating the airport's name and geographic coordinates. Additionally, this action updates the name, geographic coordinates, and airspace of Greenville Spartanburg International Airport, Greenville Downtown Airport, and Donaldson Field Airport. Controlled airspace is necessary for the

safety and management of instrument flight rules (IFR) operations in the area.

**DATES:** Effective 0901 UTC, June 15, 2023. The Director of the Federal Register approves this incorporation by reference action under 1 CFR part 51, subject to the annual revision of FAA Order JO 7400.11 and publication of conforming amendments.

**ADDRESSES:** A copy of the notice of proposed rulemaking (NPRM), all comments received, this final rule, and all background material may be viewed online at *www.regulations.gov* using the FAA Docket number. Electronic retrieval help and guidelines are available on the website. It is available 24 hours each day, 365 days each year.

FAA Order JO 7400.11G, Airspace Designations and Reporting Points, and subsequent amendments can be viewed online at *www.faa.gov/air_traffic/ publications/*. For further information, you can contact the Airspace Policy Group, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; Telephone: (202) 267–8783.

**FOR FURTHER INFORMATION CONTACT:** John Fornito, Operations Support Group, Eastern Service Center, Federal Aviation Administration, 1701 Columbia Avenue, College Park, GA 30337; Telephone: (404) 305–6364.

**SUPPLEMENTARY INFORMATION:**

### Authority for This Rulemaking

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority, as it amends airspace in Greenville, Spartanburg, and Greer, SC, to support IFR operations in the area.

### History

The FAA published a notice of proposed rulemaking for Docket No. FAA–2022–1161 in the **Federal Register** (87 FR 66636, November 4, 2022) to amend Class D airspace, Class E surface airspace, and Class E airspace extending upward from 700 feet above the surface in the Greenville, Spartanburg, and Greer, SC areas, as well as updating the

IFR_AR_001155


# Proposed Rules

**Federal Register**

Vol. 89, No. 93

Monday, May 13, 2024

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 208**

**[DHS Docket No. USCIS–2024–0005]**

**RIN 1615–AC91**

### Application of Certain Mandatory Bars in Fear Screenings

**AGENCY:** U.S. Citizenship and Immigration Services (''USCIS''), Department of Homeland Security (''DHS'' or ''the Department'').

**ACTION:** Notice of proposed rulemaking (NPRM).

**SUMMARY:** DHS proposes to allow asylum officers (''AOs'') to consider the potential applicability of certain bars to asylum and statutory withholding of removal during certain fear screenings. Specifically, under this proposed rule, AOs would be authorized to consider certain bars during credible and reasonable fear screenings, including credible fear screenings where the Circumvention of Lawful Pathways (''CLP'') rule applies. The proposed rule is intended to enhance operational flexibility and help DHS more swiftly remove certain noncitizens who are barred from asylum and statutory withholding of removal.

**DATES:** Written comments on the proposed rule must be submitted on or before June 12, 2024. The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on the entirety of this proposed rule package, identified by DHS Docket No. USCIS–2024–0005, through the Federal eRulemaking Portal at *https://www.regulations.gov*. Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Department's officials, will not be considered comments on the proposed rule and may not receive a response

from the Department. Please note that the Department cannot accept any comments that are hand-delivered or couriered. In addition, the Department cannot accept comments contained on any form of digital media storage devices, such as CDs, DVDs, or USB drives. The Department is not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov*, please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Director for Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested parties are invited to submit comments on this action by submitting relevant written data, views, or arguments. To provide the most assistance to the Department, comments should reference a specific portion of the proposed rule; explain the reason for any recommendation; and include data, information, or authority that supports the recommended course of action. Comments submitted to DHS must be in English, or an English translation must be provided. Comments submitted in a manner other than those listed above, including emails or letters sent to the Department's officials, will not be considered comments on the proposed rule and may not receive a response from the Department.

*Instructions:* If you submit a comment, you must include the agency name and the DHS Docket No. USCIS–2024–0005 for this rulemaking. All submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any public comment submission you make to the Department. The Department may withhold information provided in

comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov*.

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov*, referencing DHS Docket No. USCIS–2024–0005. You may also sign up for email alerts on the online docket to be notified when comments are posted or when the final rule is published.

## II. Legal Authority and Background

### A. Legal Authority

The Immigration and Nationality Act (''INA''), as amended by the Homeland Security Act of 2002 (''HSA''), Public Law 107–296, 116 Stat. 2135, as amended, charges the Secretary ''with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens,'' except insofar as those laws assign functions to the President or other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions ''necessary for carrying out'' the Secretary's authority to administer and enforce the immigration laws. INA 103(a)(1) and (3), 8 U.S.C. 1103(a)(1) and (3); *see also* 6 U.S.C. 202 (authorities of the Secretary), 271(a)(3) (conferring authority on USCIS Director to establish ''policies for performing [immigration adjudication] functions'').

Under the INA, DHS and the Department of Justice (''DOJ'') each have authority over credible fear screenings. USCIS AOs are charged with conducting initial credible fear screenings, INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding inspection and admission, detention and removal, withholding of removal, and deferral of removal. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, January 31, 1967, 19 552U.S.T. 6223, 606 U.N.T.S. 268 (''Refugee Protocol''), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status

IFR_AR_001591

of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention''). Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning (''refouler'') ''a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.''

Congress implemented U.S. non-refoulement obligations under the 1967 Protocol in the Refugee Act of 1980, creating the precursor to what is now known as statutory withholding of removal. The Supreme Court has long recognized that the United States implements its nonrefoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened because of one of the protected grounds listed in Article 33 of the Refugee Convention. *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 1208.16; *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 429–30 (1987) (discussing the statutory precursor to INA 241(b)(3), INA 243(h)); *INS* v. *Stevic,* 467 U.S. 407 (1984) (same). The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1) and (3), (g)(1) and (2); 8 U.S.C. 1103(a)(1) and (3), (g)(1) and (2).

The Departments also have authority to implement U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994) (''CAT''). The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA'') provides the Secretary with the authority to ''prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681– 822 (8 U.S.C. 1231 note). DHS and DOJ have implemented the United States' obligations under Article 3 of the CAT in their respective immigration regulations, consistent with FARRA.

*See, e.g.,* 8 CFR 208.16(c) through 208.18, 1208.16(c) through 1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

### B. The Asylum and Expedited Removal Process

#### 1. Asylum and Related Protection

Asylum is a discretionary benefit that can be granted by the Attorney General or the Secretary if a noncitizen establishes, among other things, that they have experienced past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INA 208(b)(1), 8 U.S.C. 1158(b)(1) (providing that the Attorney General and Secretary ''may'' grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining ''refugee''). Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, nonetheless may qualify for other forms of protection. Specifically, an applicant may also be eligible for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3); *see* 8 CFR 1208.3(b), 1208.13(c)(1), or withholding or deferral of removal under the regulations implementing U.S. obligations under Article 3 of the CAT, 8 CFR 1208.3(b), 1208.13(c)(1); *see also id.* §§ 1208.16(c), 1208.17.

Withholding and deferral of removal bar a noncitizen's removal to any country where the noncitizen would be ''more likely than not'' to face persecution or torture, meaning that the noncitizen would face a clear probability that their life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2). Thus, if a noncitizen establishes that it is more likely than not that the noncitizen's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), (B), 8 U.S.C. 1231(b)(3)(A), (B); 8 CFR 208.16, 1208.16. Likewise, a noncitizen who establishes that they more likely than not will face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a).

The INA provides mandatory bars to applying for asylum at section 208(a)(2) of the INA, 8 U.S.C. 1158(a)(2), to asylum eligibility at section 208(b)(2)(A) of the INA, 8 U.S.C. 1158(b)(2)(A), and to eligibility for withholding of removal at section 241(b)(3)(B) of the INA, 8 U.S.C. 1231(b)(3)(B) (referred to collectively as ''mandatory bars''). There are no bars to deferral of removal under the regulations implementing U.S. obligations under Article 3 of the CAT. Several of these mandatory bars seek to protect the public from individuals who are terrorists, have persecuted others, been convicted of significant crimes, or represent a danger to the public.

Specifically, the following statutory bars to asylum eligibility are codified at section 208(b)(2)(A)(i) through (v) of the INA, 8 U.S.C. 1158(b)(2)(A)(i) through (v), and to eligibility for withholding of removal at section 241(b)(3)(B) of the INA, 8 U.S.C. 1231(b)(3)(B): (1) those who ''ordered, incited, assisted, or otherwise participated in the persecution of any person'' ''on account of'' or ''because of'' a protected ground, INA 208(b)(2)(A)(i), 241(b)(3)(B)(i), 8 U.S.C. 1158(b)(2)(A)(i), 1231(b)(2)(B)(i); (2) those convicted of a ''particularly serious crime,'' INA 208(b)(2)(A)(ii), 241(b)(3)(B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), 1231(b)(2)(B)(ii); (3) where ''there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States,'' INA 208(b)(2)(A)(iii), 241(b)(3)(B)(iii), 8 U.S.C. 1158(b)(2)(A)(iii), 1231(b)(2)(B)(iii); (4) where ''there are reasonable grounds to believe that the alien is a danger to the security of the United States,'' INA 208(b)(2)(A)(iv), 241(b)(3)(B)(iv), 8 U.S.C. 1158(b)(2)(A)(iv), 1231(b)(2)(B)(iv); and (5) those described in certain terrorism-related provisions, INA 208(b)(2)(A)(v), 241(b)(3)(B), 8 U.S.C. 1158(b)(2)(A)(v), 1231(b)(2)(B).

A sixth statutory bar to eligibility for asylum, which does not bar eligibility for statutory withholding of removal, applies to any noncitizen who ''was firmly resettled in another country prior to arriving in the United States.'' INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi). And, additionally, there are statutory bars to withholding of removal eligibility for admitted noncitizens who are deportable under INA 237(a)(4)(D), 8 U.S.C. 1227(a)(4)(D), for involvement in genocide, torture, extrajudicial killing, or Nazi persecution as defined in INA 212(a)(3)(E)(i)–(iii), 8 U.S.C. 1182(a)(3)(E)(i)–(iii). *See* INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B).

IFR_AR_001592

2. Expedited Removal and the Credible Fear Screening Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process. The process is applicable to noncitizens arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), regarding material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), regarding documentation requirements for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Under expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." [1] *Id.*

The former Immigration and Naturalization Service, and later DHS, implemented a screening process, known as the "credible fear" screening, to identify potentially valid claims for asylum, statutory withholding of removal, and CAT protection. Any noncitizen who indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process is referred to a USCIS AO for an interview to determine whether the noncitizen has a credible fear of persecution or torture in the country of return. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4), 1235.3(b)(4)(i). If the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an immigration judge review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g).

Generally, if the AO determines that a noncitizen subject to expedited removal has a credible fear of persecution or torture, DHS may either retain jurisdiction over the noncitizen's application for asylum pursuant to 8 CFR 208.2(a)(1)(ii) for further consideration in an asylum merits interview ("AMI") under 8 CFR 208.9, or refer the noncitizen to an immigration court for adjudication of the noncitizen's claims by initiating

removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), through service of a notice to appear on the noncitizen and filed with EOIR. 8 CFR 208.30(f). On the other hand, if an asylum officer finds that a noncitizen does not have a credible fear, the asylum officer's determination is subject to further review by an immigration judge, as set forth in the governing regulations. *See* 8 CFR 208.30(g), 208.33(b)(2)(v); 1208.30(g)(2), 1208.33(b). Generally, if an immigration judge, upon review of the AO's negative credible fear determination, finds that the noncitizen possesses a credible fear of persecution or torture, the immigration judge vacates the expedited removal order and refers the case back to DHS for either an AMI or the initiation of section 240 removal proceedings. *See id.* 1208.30(g)(2)(iv)(B).

"The term 'credible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Pursuant to the regulations at 208.30(e)(2), credible fear of persecution in this process also encompasses whether there is a significant possibility, taking into account the credibility of the statements made by the noncitizen in support of the noncitizen's claim and such other facts as are known to the officer, that the noncitizen can establish eligibility for withholding of removal under section 241(b)(3) of the Act. 8 CFR 208.30(e)(2).[2] In addition, under 8 CFR 208.30(e)(3), a credible fear of torture in this process means a significant possibility that the noncitizen is eligible for withholding of removal or deferral of removal under CAT. 8 CFR 208.30(e)(3). As noted below, other regulations provide a different screening standard to be used in certain contexts with respect to statutory withholding of removal and CAT protection. *See, e.g.,* 8 CFR 208.31, 208.33.

*C. Reasonable Fear Screening Process*

The INA also provides for additional streamlined removal proceedings beyond expedited removal proceedings. First, DHS may reinstate a prior removal order for any noncitizen who "has

reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." INA 241(a)(5), 8 U.S.C. 1231(a)(5); *see* 8 CFR 241.8. Second, DHS may issue an administrative removal order for certain noncitizens who are not lawful permanent residents and are deportable under INA 237(a)(2)(A)(iii), 8 U.S.C. 1227(a)(2)(A)(iii), for having been convicted of an aggravated felony. INA 238(b), 8 U.S.C. 1228(b); *see* 8 CFR 238.1.

Although both streamlined proceedings preclude noncitizens from seeking discretionary relief from removal, including asylum, *see* INA 238(b)(5), 241(a)(5), 8 U.S.C. 1228(b)(5), 1231(a)(5), DHS may not remove a noncitizen to a country where they are more likely than not to be persecuted or tortured. *See* INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16(b)–(c), 208.31. Accordingly, if a noncitizen ordered removed under either section 241(a)(5) or 238(b) of the Act, 8 U.S.C. 1231(a)(5) or 1228(b), indicates a fear of return to the country to which he or she has been ordered removed, DHS refers the case to an AO for a determination of whether the individual has a reasonable fear of persecution or torture. 8 CFR 208.31.

The AO will find that a noncitizen who "establishes a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal" has a reasonable fear of persecution or torture. 8 CFR 208.31(c). As with credible fear interviews, the regulations currently direct that the AO does not consider the statutory bars to withholding of removal as part of the reasonable fear determination. *Id.* If the AO determines that the noncitizen does not have a reasonable fear of persecution or torture, the noncitizen may request that an immigration judge review that determination. 8 CFR 208.31(g); 8 CFR 1208.31(e). If the AO finds a reasonable fear, the AO refers the noncitizen to proceedings before an immigration judge where the noncitizen may only seek withholding of removal under the Act or withholding of removal and deferral of removal under the Convention Against Torture. 8 CFR 208.31(e); *see Johnson* v. *Guzman Chavez,* 141 S. Ct. 2271, 2282–83 (2021) (describing "withholding only" proceedings).

---

[1] Unaccompanied children are not subject to expedited removal. *See* 8 U.S.C. 1232(a)(5)(D); *see also* 6 U.S.C. 279(g)(2) (defining "unaccompanied [] child").

[2] The statute requires the "significant possibility" standard to be used to screen for asylum eligibility, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and the statute does not refer to statutory withholding and CAT protection. Instead, a screening standard for statutory withholding and CAT protection is set forth in regulation.

IFR_AR_001593

*D. Past Regulatory Actions on This Topic*

Historically, AOs have not considered the applicability of mandatory bars to asylum or statutory withholding of removal when determining whether a noncitizen could establish eligibility for asylum or other forms of protection during the initial screening interview. The former INS issued a rule in 2000 precluding—without explanation—consideration of the asylum bars at the credible fear stage. *See, e.g.,* Asylum Procedures, 65 FR 76121, 76129 (Dec. 6, 2000) (codifying the statement in 8 CFR 208.30 that a noncitizen who appears to be subject to one or more of the mandatory bars would nevertheless be referred to section 240 removal proceedings for full consideration of their claim and explaining that this change was done in response to comments suggesting such a referral "regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the Act").

In 2020, DHS, jointly with the Department of Justice ("DOJ") (collectively, "DHS and DOJ" or "the Departments"), amended the regulations to instruct adjudicators to apply the mandatory bars during credible fear interviews for the first time. Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274, 80391, 80393, 80399 (Dec. 11, 2020) ("Global Asylum Rule"); *see also* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR. 36264, 36272 (June 15, 2020) ("Global Asylum NPRM"). The Departments explained that applying the mandatory bars at the credible fear screening stage would eliminate removal delays inherent in section 240 proceedings that serve no purpose and eliminate wasted adjudicatory resources. 85 FR at 80295–96. On January 8, 2021, before the rule became effective, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the Global Asylum Rule. *Pangea Legal Servs.* v. *DHS,* 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021).[3]

On December 23, 2020, DHS and DOJ jointly published a final rule ("Security Bars" or "Asylum Eligibility and Public Health" rule) to clarify that the Departments may consider emergency public health concerns based on communicable disease (not limited to COVID–19) when determining whether an alien is subject to the existing statutory bars to asylum and withholding of removal at INA 208(b)(2)(A)(iv) and 241(b)(3)(B)(iv), 8 U.S.C. 1158(b)(2)(A)(iv) and 1231(b)(3)(B)(iv), for noncitizens for whom "there are reasonable grounds to believe" that they are "a danger to the security of the United States" (commonly known as the "security bar").[4] The rule was scheduled to take effect on January 22, 2021, but its effective date has been delayed multiple times, now until December 31, 2024.[5]

The Security Bars rule would have made a noncitizen ineligible for asylum if, among other things, the noncitizen was physically present in a country in which a communicable disease was prevalent or epidemic, and the Secretary of Homeland Security and the Attorney General determined that the physical presence in the United States of noncitizens coming from that country would cause a danger to the public health.[6] In the credible fear context, the rule would have applied the security bar to asylum and withholding of removal to credible fear screenings such that if the bar applied, the noncitizen would receive a negative credible fear determination with respect to asylum and withholding of removal and then be screened only for deferral of removal according to whether there is a clear probability (more likely than not standard) the noncitizen would experience torture in the country of removal. The portion of the final Security Bars rule that would have applied the security bar to credible fear screenings, however, was rooted in the provision of the Global Asylum Rule that never went into effect due to being enjoined prior to its effective date as noted above.

In 2022, DHS and DOJ again amended the credible fear regulations to instruct AOs to not consider the applicability of mandatory bars during credible fear screenings, *see* 8 CFR 208.30(e)(5), and to remove from 8 CFR 1003.42 and 1208.30 the language implemented by the Global Asylum Rule instructing immigration judges to consider the mandatory bars during credible fear reviews. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078, 18219, 18221–22 (Mar. 29, 2022) ("Asylum Processing IFR"). The Departments explained that "[r]equiring asylum officers to broadly apply the mandatory bars at credible fear screening would increase credible fear interview and decision times because asylum officers would be expected to devote time to eliciting testimony, conducting analysis, and making decisions about all applicable bars," and it would require a "fact-intensive inquiry requiring complex legal analysis that would be more appropriate in a full adjudication before an asylum officer or in section 240 proceedings with the availability of judicial review than in credible fear screenings." Asylum Processing IFR, 87 FR at 18093. The Departments further stated that "due process and fairness considerations counsel against applying mandatory bars during the credible fear screening process." *Id.* at 18134. In sum, the Departments explained that not applying mandatory bars at the credible fear screening stage both preserves the efficiency Congress intended in making credible fear screening part of the expedited removal process and helps ensure a fair process for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory withholding of removal but for the potential applicability of a mandatory bar. *Id.*[7]

In May 2023, the Departments published a rule, which implemented a new condition on eligibility for asylum to be applied at the credible fear stage, but did not alter the general rule regarding the application of mandatory statutory bars at the credible fear stage. Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) ("Circumvention of Lawful Pathways rule" or "CLP rule"); *see* 8 CFR 208.33, 1208.33; *see also* Circumvention of Lawful Pathways, 88 FR 11704 (Feb. 23, 2023) ("Lawful Pathways NPRM").

---

[3] In *Pangea Legal Servs.,* the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the Global Asylum Rule in its entirety nationwide before it became effective. 512 F. Supp. 3d at 977. The court concluded that the plaintiffs were likely to succeed on the merits of their claim that the Global Asylum Rule "was done without authority of law" because the DHS official who approved it, then-Acting Secretary Chad Wolf, was not properly designated as Acting Secretary. *Id.* at 975. The court did not address any challenges to the rule's substance.

[4] Security Bars and Processing, 85 FR 84160 (Dec. 23, 2020).

[5] *Id.*; Security Bars and Processing; Delay of Effective Date, 87 FR 79989 (Dec. 28, 2022); *see also* Security Bars and Processing; Delay of Effective Date, 86 FR 73615 (Dec. 28, 2021); Security Bars and Processing; Delay of Effective Date, 86 FR 15069 (Mar. 22, 2021); Security Bars and Processing; Delay of Effective Date, 86 FR 6847 (Jan. 25, 2021).

[6] *See* Security Bars and Processing, 85 FR 84160, 84190 (Dec. 23, 2020).

[7] A full discussion of the Departments' reasoning to return to the regulatory framework in place prior to the Global Asylum Rule and no longer apply the mandatory bars in credible fear interview is found in the Asylum Processing IFR. *See* 87 FR at 18092–94, 18134–36.

IFR_AR_001594

## III. Need for This Proposed Rule

This proposed rule is intended to provide DHS additional operational flexibility in screening determinations by giving AOs discretion, at the earliest stage possible, to consider whether a given noncitizen is unlikely to be able to establish eligibility for asylum or statutory withholding of removal because of a mandatory bar that relates to participation in persecution, or national security, criminal, or other public safety concern,[8] and, in relevant cases, to issue a negative fear of persecution determination based on the application of such a bar. As the purpose of the screening process is to identify individuals who are ineligible for relief at the earliest stage possible in order to create systematic efficiencies while simultaneously protecting legal rights, ignoring statutory bars to such relief with serious implications, including terrorism and significant criminality, during this process runs counter to the policy goals. This discretionary flexibility would be available in credible fear determinations, including both determinations of noncitizens subject to the circumvention of lawful pathways rebuttable presumption of asylum ineligibility or noncitizens not so subject, or during reasonable fear determinations where the noncitizen is subject to reinstatement of a prior order of removal or a final administrative removal order. The rule is consistent with the Administration's demonstrated record of providing operators maximum flexibility and tools to apply consequences, including by more expeditiously removing those without a lawful basis to remain in the United States, while providing immigration relief or protection to those who merit it at the earliest point possible. This rule will allow DHS to quickly screen out certain non-meritorious protection claims and to swiftly remove those noncitizens who present a national security or public safety concern.[9]

By allowing AOs to promptly issue negative fear determinations in cases in which there is easily verifiable evidence the noncitizen could be subject to a bar and where the noncitizen is unable to establish, at the relevant standard, that the bar would not apply, and the noncitizen is not otherwise able to establish a credible or reasonable fear of torture, the Department will shorten the overall time between encounter and finality of a removal order and removal from the United States. For those noncitizens in whose cases a negative determination is made due to applicability of a bar, the regulation would prevent them from entering a potentially years-long immigration court process and would conserve those DHS and EOIR resources that would have been required to complete such process to focus on meritorious cases.[10]

The population to which this rule will apply is likely to be relatively small, as informed by the number of cases with bars that are flagged by USCIS during screenings. Given the gravity of the offenses that trigger these bars, however, it is nevertheless important that individuals who meet the criteria be identified and removed as quickly as possible. The type of credible or reasonable fear determination where this rule could be outcome determinative is limited to cases that would have otherwise been found to have a positive credible or reasonable fear of persecution, since those are cases that could be given a negative determination due to a mandatory bar under this proposed rule. For FY 2024 through April 23, 2024, USCIS records indicated that out of a total 29,751 positive credible fear of persecution

determinations, AOs flagged a potential bar (without counting firm resettlement) in 733 cases (or 2.5% of total cases with a positive credible fear of persecution determination).[11] For FY 2023, USCIS records indicated that out of a total 50,117 positive credible fear of persecution determinations, AOs flagged a potential bar (without counting firm resettlement) in 1,497 cases (or 3% of total cases with a positive credible fear of persecution determination).[12] In FY 2022, AOs flagged a potential bar (without counting firm resettlement) in 626 out of 24,282 positive credible fear of persecution determinations (or 2.6% of total cases with a positive credible fear of persecution determination).[13] In FY 2021, 479 cases were flagged as having a potential mandatory bar (without counting firm resettlement) out of 24,512 positive credible fear determinations (2%), and in FY 2020, 346 cases out of a total 8,887 positive credible fear determinations (4%) had a mandatory bar (without counting firm resettlement) flagged.[14]

For reasonable fear cases, the percentage of positive reasonable fear of persecution determinations where AOs flagged a potential bar to statutory withholding of removal is significantly higher than the percentage of positive credible fear of persecution determinations where a bar was flagged. For FY 2024 through April 23, 2024, AOs flagged a potential bar to withholding of removal in 143 cases out of 1,430 positive reasonable fear of persecution determinations (or 10% of cases where a positive reasonable fear of persecution was found).[15] For FY 2023, AOs flagged a potential bar to withholding of removal in 309 cases out of 1,534 positive reasonable fear of persecution determinations (or 20% of cases where a positive reasonable fear of persecution was found).[16] In FY 2022, AOs flagged a potential bar in 236 out of 1,127 positive reasonable fear of persecution determinations (or 21% of total cases with a positive reasonable fear of persecution determination).[17] In

---

[8] This rule will not change current treatment of the "firm resettlement" bar at INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv). For further explanation of the Department's reasoning, see Section IV.A. below.

[9] The expedited removal statute requires AOs to determine whether the noncitizen "could establish eligibility for asylum under [INA 208]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (defining "credible fear of persecution"). Accordingly, the statute permits consideration of the mandatory asylum bars, which constitute an element of asylum eligibility under section 208 of the Act. The statute is silent with respect to the nature of screening for potential statutory and CAT-based withholding of removal eligibility and thus affords DHS discretion in how best to implement withholding of removal obligations in the expedited removal, administrative removal, and reinstatement contexts.

*See Am. Immigration Lawyers Ass'n* v. *Reno,* 18 F. Supp. 2d 38, 56 (D.D.C. 1998) (observing that because the INA is "silent" with respect to certain expedited removal procedures, "the Court must defer to the [agency]'s determination as to what procedures are appropriate, so long as that determination is reasonable" and that the court "cannot impose upon the [agency] any obligation to afford more procedures than the governing statute explicitly requires or that [it] has chosen to afford in [its] discretion" (citing *Vt. Yankee Nuclear Power Corp.* v. *NRDC,* 435 U.S. 519, 524–25 (1978)), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000); *cf. Las Americas Immigrant Advocacy Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 32 (D.D.C. 2020) (Jackson, J.) (underscoring "Congress's clear intent to afford noncitizens who are subject to expedited removal fewer procedural rights in order to facilitate the expeditious processing of their asylum claims").

[10] As described above in section II.B.2 of this preamble, if the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an immigration judge review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g). This rulemaking does not affect a noncitizen's ability to request immigration judge review of an adverse credible fear determination.

[11] Asylum Global Case Management System (data as of Apr. 25, 2024). USCIS does not currently apply bars in credible or reasonable fear screenings but notes the possible applicability of the bar, and thereby notifies OPLA, if the case is referred to EOIR for adjudication.

[12] Asylum Global Case Management System (data as of Feb. 10, 2024).

[13] *Id.*

[14] *Id.*

[15] Asylum Global Case Management System (data as of Apr. 25, 2024).

[16] Asylum Global Case Management System (data as of Feb. 10, 2024).

[17] *Id.*

FY 2021, 80 cases were flagged as having a potential mandatory bar out of 541 positive reasonable fear determinations (15%), and in FY 2020, 56 cases out of a total 394 positive reasonable fear determinations (14%) had a mandatory bar flagged.[18]

Credible or reasonable fear cases that received a positive fear of torture determination would not be impacted by this proposed regulation, since the screening for torture encompasses screening for deferral of removal under CAT, for which there are no bars; likewise, negative credible or reasonable fear determinations based solely on a noncitizen failing to show a likelihood of persecution and torture would not be affected by this rule, since the assessment of a mandatory bar in those cases would not be outcome determinative. For the latter two categories, AOs will continue to flag bars where they may be evident in the record, even if they are not outcome determinative in a given case.

This rule has three anticipated impacts. First, this rule expands the Department's ability to more quickly remove noncitizens who fall within the Administration's highest enforcement priorities: those who present national security or public safety threats.[19] As explained further below in Section IV of this preamble, the rule would allow AOs discretion to issue negative fear findings in cases in which there are indicia of a mandatory bar, and the noncitizen is unable to establish at the relevant standard that the bar would not apply. The specific mandatory bars this rule would allow AOs to consider are those relating to public safety and/or national security threats, with the intent of allowing the Department flexibility in some cases to more quickly remove individuals who present such concerns.[20]

Second, the rule would increase operational flexibility. For example, AOs could use their judgment to apply these bars in cases in which there is evidence available to the AO that triggers an inquiry into a bar, and the AO is confident that they can address that bar efficiently at the credible fear or reasonable fear interview. Currently, when an AO elicits information during

an interview indicating that a bar may apply—even when that information makes it clear a bar will apply during a full adjudication of the asylum or withholding claim—the AO is foreclosed from considering the application of a bar as part of the fear determination. Instead, the AO flags the potential bar, which may include preparing a memorandum to file related to the potential bar and the reasons for which it may apply.[21] Although not determinative, ICE may consider and further develop this information when litigating before EOIR, and EOIR may consider this information along with other relevant factors in the case in the adjudication of immigration court proceedings.[22] ICE ERO and EOIR may rely upon the potential bar in making custodial determinations.[23]

Third, this rule may provide efficiencies for ICE Office of the Principal Legal Advisor ("OPLA") and ICE Enforcement and Removal Operations ("ERO") and may reduce referrals to EOIR in cases in which a negative fear determination can be made at the screening stage for an individual who would otherwise need to traverse the entire immigration court process.[24] As part of OPLA's extensive responsibilities, in preparation for a removal hearing, OPLA reviews whether

[21] USCIS, *RAIO Directorate—Officer Training: Credible Fear of Persecution and Torture Determinations* (Feb. 20, 2023).

[22] *See Matter of D–R–,* 25 I. & N. Dec. 445 (BIA 2011) (in immigration proceedings, the "sole test for admission of evidence is whether the evidence is probative and its admission fundamentally fair."); *Matter of Velasquez,* 19 I. & N. Dec. 377, 380 (BIA 1986) (same).

[23] *Matter of R–A–V–P–,* 27 I. & N. Dec. 803 (BIA 2020) ("The Immigration Judge may also consider the likelihood that relief from removal will be granted in determining whether [a noncitizen] warrants bond.")

[24] OPLA serves as the DHS's representative in removal proceedings before EOIR, including cases involving national security threats, human rights violators, and criminal noncitizens. *See* 6 U.S.C. 252(c). Accordingly, OPLA is responsible for ensuring that the Department's interests are fully represented in cases filed by not only ICE but also USCIS and CBP. During removal proceedings, OPLA attorneys receive and review evidence, which may include examining databases of multiple agencies for criminal and immigration history and preparing evidence for review. OPLA attorneys present the Department's position, both by appearing in immigration court to make oral arguments and to examine witnesses and by submitting written briefs and are also responsible for representing the government in administrative appeals, including reviewing whether to appeal a case in the first instance, reviewing a noncitizen's arguments on appeal, preparing written appellate briefs and motions, and appearing for oral arguments. OPLA personnel dedicate dozens of hours in cases pending before the immigration courts, to ensure the Government's interests are dutifully represented. *See generally* U.S. Immigration and Customs Enforcement, Office of the Principal Legal Advisor, *https://www.ice.gov/about-ice/opla* (last visited Feb. 9, 2024).

the noncitizen is statutorily eligible for relief or protection and if there are any statutory bars to relief or protection. Thus, for each case in which a noncitizen appears before the immigration courts, OPLA is reviewing for statutory bars. Cases involving potential bars to relief or protection such as terrorism-related inadmissibility grounds or assistance in the persecution of others, are assigned to certain designated attorneys specializing in such cases, entail special reporting requirements, and coordination with OPLA headquarters divisions. Requiring AOs to continue proceedings for a noncitizen with an otherwise positive credible or reasonable fear where the evidence would be sufficient to apply a mandatory bar at the credible or reasonable fear stage therefore introduces the possibility that OPLA resources will be unnecessarily expended in further developing the record for immigration court hearings.

Additionally, the Department is currently maximizing referrals to expedited removal, consistent with the Secretary's enforcement priorities, which include threats to border security. For instance, DHS established the Family Expedited Removal Management (FERM), which leverages alternatives to detention to process families through expedited removal, including credible fear screenings, in a non-detained setting. These efforts enhance DHS's ability, within the current statutory framework governing expedited removal, to more quickly apply consequences to those without a legal basis to remain. However, resources to administer expedited removal generally and FERM specifically are limited, and no process specifically establishes the discretionary flexibility to more quickly reach a final order of removal for the population to whom this rule would apply.

Consequently, individuals to whom mandatory bars may apply and who receive a positive credible fear determination continue to be referred to EOIR for immigration court proceedings, joining the backlog which exceeded 2,400,000 cases pending cases at the end of FY 2023, a backlog that can result, in some instances, in a lengthy process.[25] The current framework therefore unnecessarily extends adjudication of cases that correspond to the Secretary's enforcement priorities, while using needed EOIR and OPLA resources to adjudicate cases which could be more

[18] *Id.*

[19] Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), available at *https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf* (last visited Feb. 9, 2024).

[20] This rule will not change current treatment of the "firm resettlement" bar at INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv). For further explanation of the Department's reasoning, see Section IV.A. below.

[25] *See* EOIR, *Exec. Off. For Immigration Rev.: Pending Cases, New Cases, and Total Completions* (Oct. 12, 2023), available at *https://www.justice.gov/eoir/media/1344791/dl?inline* (last visited Apr. 28, 2024).

efficiently deployed in other cases. DHS believes it is appropriate to establish additional avenues through which to deliver swift decisions and consequences for irregular migration, rather than allowing clearly ineligible individuals to further tax limited resources.

Finally, the rule may reduce or eliminate the need for detention or alternatives to detention and monitoring in some cases, freeing up ICE ERO resources for high-priority cases, including those in which detention is required. Though detention is not mandated in all such cases, ICE ERO may detain some noncitizens to whom this rule might apply during the immigration court process, following a credible or reasonable fear determination. Detention comes at cost to the taxpayer and reduces availability of beds for other high-priority populations and noncitizens subject to mandatory detention, including recent border crossers placed in expedited removal proceedings and individuals who have been administratively arrested and have criminal convictions or pose a national security or public safety threat; from February 2023 through February 2024, the median monthly EOIR processing time for a detained case ranged from 44 to 69 days.[26] And in cases in which ICE ERO determines detention is not necessary, ICE ERO may still expend resources to monitor the individual via the use of alternatives to detention, check-ins, and so on. This rule would potentially conserve ICE ERO resources to the extent it precludes additional or more extended detention or monitoring of individuals in cases in which an AO has determined at the fear determination stage that a mandatory bar applies.

In practice, DHS believes the rule would likely result in AOs using discretion to issue negative fear determinations in certain cases where there is evidence that a bar applies to a noncitizen, there is a lack of evidence that the noncitizen could overcome the bar (*e.g.,* by establishing an exception or exemption), and the noncitizen is not otherwise able to establish a positive fear of torture at the applicable standard.[27] AOs will continue to retain

discretion to issue positive fear determinations where a noncitizen demonstrates a credible or reasonable fear at the applicable screening standard, even where there may be indicia of a mandatory bar but the available evidence at the screening stage as to the applicability of the bar is limited, or where there is additional evidence that the noncitizen would not be subject to the bar because of exception or exemption. This rule also preserves the option for noncitizens to be placed in an AMI or in proceedings before an immigration judge when a possible bar needs to be further developed for assessment, as is currently the practice; likewise, ICE will retain the ability to detain or otherwise monitor the noncitizen in those cases. *See* 8 CFR 208.9; INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(1)(ii). *See also* INA 212(d)(5), 8 U.S.C. 1182(d)(5).

Notably, this rule would not *require* AOs to consider applicability of bars as part of a fear determination.[28] Such a requirement would reduce operational flexibility by potentially adding hours to interviews in which there are indicia that a bar might apply, but for which a strong case cannot be immediately established.[29] Rather this rule would create the flexibility for the AO to exercise discretion—with supervisory review of any decision—on the applicability of bars during the screening stage. Moreover, this proposed rule would not disturb the long-standing regulation establishing that in making credible fear determinations, asylum officers "shall consider whether the [ ] case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 CFR 208.30(e)(4).

The Department recognizes that the inclusion of mandatory bars in credible fear screenings has been a focus of many rules since 2020 that have made numerous changes in this area. As discussed above in section II.C of this preamble, the Global Asylum Rule set

out to instruct adjudicators for the first time to apply the statutory mandatory bars in INA 208(b)(2)(A) and INA 241(b)(3), 8 U.S.C. 1158(b)(2)(A), 1231(b)(3), during credible fear interviews.[30] Subsequently, in 2022, the Departments rejected the consideration of all statutory mandatory bars during credible fear screenings and re-codified the prior practice of not doing so. Asylum Processing IFR, 87 FR at 18092–94, 18134–36; *see also* Asylum Processing NPRM, 86 FR at 46914–15. The Departments reasoned that applying the mandatory bars during all credible fear screening interviews would make those credible fear screenings less efficient,[31] which could jeopardize the ability to use expedited removal,[32] undermine Congress's intent that the expedited removal process be swift,[33] and undermine procedural fairness.[34] The Departments did not, however, conclude that applying the mandatory bars would lead to these potentially negative repercussions in all or even most cases. *See* 87 FR at 18093 (stating that the factual and legal inquiries required to consider the mandatory bars were "*in general and depending on the facts,* most appropriately made in the context of a full merits interview or hearing") (emphasis added).

Subsequently, the Departments issued the Circumvention of Lawful Pathways rule, which established a rebuttable presumption of asylum ineligibility that asylum officers apply during credible fear screenings. *See* 8 CFR 208.33(b). In the proposed rule's preamble, the Departments distinguished the lawful pathways rebuttable presumption from the statutory mandatory bars and indicated a belief that the presumption would be easier to apply because the asylum officer would have relevant information related to the applicability of the presumption of asylum ineligibility at the outset of the credible fear interview. 88 FR at 11744–45. Despite the belief that applying the presumption would generally be easier than applying other bars, the Departments stated that any costs resulting from increasing the length of

---

[26] Includes completed cases with a removal order, voluntary departure, relief, a termination, or a dismissal outcome. Results based on OHSS analysis of EOIR data as of April 1st, 2024. EOIR data up-to-date as of February 29, 2024.

[27] As described above in section II.B.2 of this preamble, if the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an immigration judge review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g).

This rulemaking does not affect a noncitizen's ability to request immigration judge review of an adverse credible fear determination.

[28] The Global Asylum Rule took a different approach than this proposal, requiring that AOs consider multiple mandatory bars. *See* 85 FR at 80278 ("DHS requires asylum officers to determine . . . whether an alien is subject to one or more of the mandatory bars"). This proposed rule would not require such consideration.

[29] Because credible fear screenings are conducted at the significant possibility standard, in cases where the application of a bar is not obvious, *requiring* the AO to consider application of a bar would likely result in significantly extended interviews with no meaningful outcome because relevant information might not be available to the officer at screening even with a significantly extended interview.

[30] DHS has long applied in the expedited removal process the "safe-third-country" bar to eligibility to apply for asylum at INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). *See* 8 CFR 208.30(e)(6). The Department is not proposing to apply other INA 208(a)(2)(A) bars, *see, e.g.,* INA 208(a)(2)(C) (successive asylum application), in credible fear screenings at this time.

[31] *See* Asylum Processing IFR, 87 FR at 18093, 18134; Lawful Pathways NPRM, 88 FR at 11744.

[32] *See* Asylum Processing IFR, 87 FR at 18093.

[33] *See* Asylum Processing NPRM, 86 FR at 46914; Asylum Processing IFR, 87 FR at 18094, 18134–35.

[34] Asylum Processing IFR, 87 FR at 18093–94, 18097.

IFR_AR_001597

some credible fear interviews were outweighed by the broader interests in ensuring orderly processing and expedited rejection of unmeritorious claims at the outset in the emergent circumstance expected following the end of the Title 42 public health Order. *Id.*

Following implementation of the Circumvention of Lawful Pathways rule, the Department has refined its prior position on application of the mandatory bars in credible fear screenings for multiple reasons. First, the Department has determined that the permissive consideration of the mandatory bars in the manner proposed by this rule does not conflict with these prior rulemakings and is clearly distinguishable. Most notably, this rule does not propose to require the consideration of the mandatory bars in all interviews—as had been contemplated by the Global Asylum Rule. Instead, this rule would allow the AO flexibility to choose to consider a bar based on the individual facts and circumstances of an applicant's case and based on information available to the asylum officer. As noted previously, the Departments did not determine in the Asylum Processing IFR that applying all of the mandatory bars would always be more appropriate at the merits stage, but rather stated that the factual and legal inquiries were ''in general and depending on the facts, most appropriately made in the context of a full merits interview or hearing.'' 87 FR at 18093. Moreover, the Asylum Processing IFR did not consider one alternative to decrease the costs of applying the mandatory bars while maintaining many of the benefits— namely, conducting a factual and legal inquiry into the bars only in those cases for which doing so is likely to be an efficient and appropriate use of resources. The Department now assesses that, based on that approach, applying certain bars at the credible fear stage can be an efficient and appropriate use of resources in a larger class of cases than the Asylum Processing IFR appreciated.

Second, in contrast to the rule considered when deciding not to apply mandatory bars during credible fear screenings—the Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019) (''Third-Country-Transit Bar IFR'')—the Department has had many uninterrupted months of experience applying the rebuttable presumption, providing a more consistent baseline of determinations for evaluation about adding consideration of other mandatory bars during screening interviews. In the Asylum Processing IFR, the Departments relied

extensively on their experience applying the Third-Country-Transit Bar IFR to explain why applying the mandatory bars during credible fear screenings was not the preferred approach. *See, e.g.,* 84 FR at 18092, 18135–36. But as recognized in the Lawful Pathways NPRM, ''[b]ecause of the short and tumultuous life of the . . . [Third-Country-Transit Bar] IFR, it was difficult for the Departments to gather reliable data on the efficacy of the particular process adopted under that rule.'' Lawful Pathways NPRM, 88 FR at 11746.[35] Due to litigation, the Third-Country-Transit Bar IFR was applied during credible fear screenings consistently only between approximately September 9, 2019, and March 26, 2020—just over six months— after an initial two months of abrupt starts and stops and patchwork orders. As noted in the Asylum Processing IFR, the Departments found applying the Third-Country-Transit Bar IFR not to be a prudent way to allocate resources and from that, reasoned that applying the mandatory bars would likely be imprudent as well. Now, however, the Circumvention of Lawful Pathways rule and complementary measures have been in constant effect since May 11, 2023, and the Departments have been able to implement it without interruption. This experience has helped the Department increase significantly their capacity to screen noncitizens encountered at the border under expedited removal and move them through the process quicker than ever before. Now that it is clear a rebuttable presumption of asylum ineligibility can be applied effectively during the credible fear process, the Department wishes to provide the AOs additional discretion to apply certain

---

[35] The IFR was preliminarily enjoined nationwide on July 24, 2019, six days after it went into effect. *East Bay Sanctuary Covenant* v. *Barr,* 385 F. Supp. 3d 922, 960 (N.D. Cal. 2019). The court denied a stay of that decision, thus halting the IFR. *East Bay Sanctuary Covenant* v. *Barr,* No. 19–CV–04073–JST, 2019 WL 11691196, at *1 (N.D. Cal. Aug. 1, 2019). After implementation of the IFR was halted nationwide for twenty-three days, on August 16, the Ninth Circuit then granted a stay of the preliminary injunction insofar as it applied outside the circuit, which meant that the IFR could be applied only outside the Ninth Circuit. *East Bay Sanctuary Covenant* v. *Barr,* 934 F.3d 1026, 1028 (9th Cir. 2019). Twenty-six days later, on September 9, the district court restored the nationwide scope of the injunction, again halting its application. *East Bay Sanctuary Covenant* v. *Barr,* 391 F. Supp. 3d 974, 976 (N.D. Cal. 2019). Two days later the Supreme Court stayed the preliminary injunction, which allowed the Departments to implement the IFR until it was vacated on June 30, 2020. *Barr* v. *East Bay Sanctuary Covenant,* 140 S. Ct. 3 (2019); *Cap. Area Immigrants' Rts. Coal.* v. *Trump,* 471 F. Supp. 3d 25, 60 (D.D.C. 2020). But even before the vacatur, the first Title 42 public health Order issued on March 26, 2020, which limited the processing of certain noncitizens under Title 8.

mandatory statutory bars that may be easily verifiable in screening interviews.

Third, the Department believes that the proposal would not be inconsistent with prior statements regarding congressional intent. In the Asylum Processing NPRM, the Departments stated that it may be inconsistent with Congress's intent for the Departments to ''creat[e] a complicated screening process that requires full evidence gathering and determinations to be made on possible bars to eligibility.'' 86 FR at 46914; *see also* Asylum Processing IFR, 87 FR at 18135 (''The Departments agree with these commenters that a complicated process requiring full evidence gathering and determinations to be made on possible bars to eligibility is incompatible with the function of the credible fear interview''). The proposal here would not create any such process as AOs would only consider a bar in those cases where there is easily verifiable evidence available to the AO that in their discretion warrants an inquiry into a bar, and the AO is confident that they can consider that bar efficiently at the credible fear stage. The Department does not believe Congress's intent that expedited removal proceedings be swift requires reading the statute to not allow application of mandatory bars during fear screenings at all, particularly where, as here, the Department proposes to apply those bars in a manner that would not increase the length of expedited removal proceedings except in those cases in which there is evidence indicating that they may apply.

Fourth, the Department believes AOs can apply mandatory bars during fear screenings while ensuring a fair process. As noted previously, there are cases where the applicability of a bar is clear and there is not a significant possibility that the applicant could show the bar does not apply by a preponderance of the evidence (in credible fear), or a reasonable possibility that the bar does not apply (in reasonable fear). The screening standards themselves ensure a fair process in that the noncitizen need only meet the significant possibility or reasonable possibility standard in order to pass through the screening process. In such cases, the Department believes it is reasonable to apply the mandatory bars during the screening and issue a negative determination. For example, if a noncitizen was convicted of murder and sentenced to ten or more years in prison in a country with a fair and independent judicial system—it may be clear that the noncitizen is barred from asylum and withholding of removal for a conviction for a particularly serious crime, INA 208(b)(2)(A)(ii),

241(b)(3)(B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), 1231(b)(2)(B)(ii), or because there are serious reasons to believe that the noncitizen committed a serious nonpolitical crime outside the United States, INA 208(b)(2)(A)(iii), 241(b)(3)(B)(iii), 8 U.S.C. 1158(b)(2)(A)(iii), 1231(b)(2)(B)(iii).

## IV. Discussion of the Proposed Rule

As discussed below, this proposed rule would amend 8 CFR 208.30, 208.31, and 208.33 to allow AOs to consider the mandatory bars to asylum under section 208(b)(2)(A)(i)–(v) of the Act, 8 U.S.C. 1158(b)(2)(A)(i)–(v), and to withholding of removal under section 241(b)(3)(B) of the Act, 8 U.S.C. 1231(b)(3)(B), during credible fear interviews and reasonable fear interviews.[36] This would include both credible fear interviews where the asylum officer has found that the noncitizen is subject to the lawful pathways rebuttable presumption of ineligibility for asylum (§ 208.33) and those where the lawful pathways rebuttable presumption either does not apply or the noncitizen successfully overcome the presumption at the credible fear interview by showing a significant possibility of being eligible for an exception or rebutting the presumption (§ 208.30).[37]

### A. Consideration of Mandatory Bars During Credible Fear and Reasonable Fear Screenings

Consistent with section 235(b)(1)(B) of the INA, 8 U.S.C. 1225(b)(1)(B), DHS is proposing to allow for the consideration of certain mandatory bars to asylum in the determination as to whether a noncitizen has a credible fear of persecution with respect to asylum. Additionally, DHS is proposing to allow for the consideration of the mandatory bars to withholding of removal under section 241(b)(3) of the Act in the determination as to whether a noncitizen has a credible or reasonable

fear of persecution with respect to statutory withholding of removal.

Specifically, this NPRM would allow AOs to consider the mandatory bars to asylum found at section 208(b)(2)(A)(i) through (v) of the Act but would not change current treatment of the mandatory bar to asylum found at section 208(b)(2)(A)(vi) of the Act (*i.e.,* the ''firm resettlement bar'') or the bars to applying for asylum found at section 208(a)(2) of the Act.[38] Recent changes made to the firm resettlement provisions in 8 CFR 208.15 and 1208.15 by the Global Asylum Rule are preliminary enjoined. *See Pangea Legal Servs.* v. *DHS,* 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021). The pre-Global Asylum rule firm resettlement regulations currently in effect, 8 CFR 208.15, 1208.15 (2020), include a burden-shifting framework that requires the Department to bear the initial ''burden of presenting prima facie evidence of an offer of firm resettlement'' that can be rebutted by the noncitizen. *Matter of A–G–G–,* 25 I&N Dec 486, 501 (BIA 2011). This framework differs from the analytical framework for the security-related bars that are the subject of this rulemaking, and the *Matter of A–G–G–* framework and firm resettlement definition could make it difficult for AOs to easily verify whether a noncitizen is subject to the bar. In other words, AOs would not consider the applicability of these bars when making the credible fear determination, and noncitizens would be referred to the appropriate immigration court proceeding if they establish the requisite fear, though the AO may note the possible applicability of a bar under INA 208(a)(2) or (b)(2)(A)(vi), 8 U.S.C. 1158(a)(2) or (b)(2)(A)(vi), for further review during those proceedings. DHS may address such bars through other rulemaking but is not including them in this rule's proposed changes as they do not relate to the same serious security and other concerns as the bars to asylum eligibility at INA 208(b)(2)(A)(i)–(v).

Further, this NPRM does not propose to change how DHS considers bars to protection under the CAT, *see generally* 8 CFR 208.16(d)(2), because such bars do not apply to deferral of removal under the CAT, *see generally* 8 CFR 208.17. Moreover, while this NPRM authorizes AOs to consider certain mandatory bars to relief in credible fear determinations, including the credible fear determinations of stowaways, it is not intended to nor does it otherwise alter the special rules applicable to stowaways, such as the prohibition on

issuing a notice to appear for stowaways.[39]

This NPRM contains permissive language that would allow, but not require, a USCIS AO to consider the mandatory bars to asylum (other than firm resettlement) and statutory withholding of removal in credible fear and reasonable fear interviews where there is evidence that such a mandatory bar could apply to the noncitizen. This permissive language provides operational flexibility to not consider a mandatory bar as part of the screening process if, for instance, an AO believes that inquiry into the bar's applicability could unduly delay case completion without concomitant mission benefits.

This NPRM proposes changes to screenings conducted under 8 CFR 208.30 (the general rule on credible fear determinations), § 208.31 (the rule governing certain reasonable fear determinations), and § 208.33 (special procedures under the CLP rule).

With respect to credible fear screenings conducted under § 208.30, this NPRM would allow the AO to consider the applicability of the mandatory bars to asylum (other than firm resettlement) and statutory withholding of removal. In such cases, the AO would enter a negative credible fear of persecution determination if the noncitizen fails to demonstrate a significant possibility that the noncitizen would be able to prove by a preponderance of the evidence that the given bar would not apply and if the noncitizen was otherwise unable to demonstrate a credible fear of torture pursuant to 8 CFR 208.30(e)(3). This standard—whether there is a significant possibility that the noncitizen could establish eligibility—is consistent with existing standards in § 208.30 and the statutory eligibility standard. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v).

With respect to screenings conducted under § 208.33 (*i.e.,* the CLP rule), in cases where the AO has entered a negative credible fear of persecution determination with respect to the noncitizen's asylum claim pursuant to the CLP rule's rebuttable presumption of asylum ineligibility, the NPRM would allow AOs to consider the applicability of the mandatory bars to statutory withholding of removal in making a follow-on reasonable possibility of persecution determination. In other words, under the proposed rule, if a noncitizen in the credible fear process is subject to the CLP presumption of asylum ineligibility and cannot

---

[36] In addition to these changes, the rule would make an unrelated non-substantive change to 8 CFR 208.31(g) and replace the last sentence of 8 CFR 208.31(g) and paragraphs (g)(1)–(2). Because those provisions describe the procedures for immigration judge review of an AO's reasonable fear finding and are duplicative with the corresponding provision governing immigration court procedures at 8 CFR 1208.31(g), they are not needed in the DHS regulations in chapter I of title 8 of the CFR. Accordingly, this rule would replace those provisions in 8 CFR 208.31(g) with a short statement that informs the reader that the immigration judge review procedures are set forth at 8 CFR 1208.31(g).

[37] The Department notes that if DHS finalizes this NPRM, DOJ may wish to clarify the procedures immigration judges will follow in reviewing DHS screenings.

[38] *See supra,* n.31.

[39] *See* INA 235(a)(2), 8 U.S.C. 1225(a)(2); *see also* 8 CFR 208.30(e)(5).

IFR_AR_001599

demonstrate a significant possibility of being able to establish eligibility for an exception or rebutting the presumption by a preponderance of the evidence, and there is evidence that a mandatory bar to statutory withholding of removal could apply, the AO may enter a negative reasonable possibility of persecution determination if the noncitizen fails to show a reasonable possibility the bar does not apply and if the noncitizen is otherwise unable to demonstrate a reasonable possibility of torture. The standard proposed here—a reasonable possibility that the bar does not apply—is consistent with the general approach under the CLP rule, which calls for AOs to assess whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 CFR 208.33(b)(2)(i).

Finally, DHS also proposes changes with respect to reasonable fear screenings conducted under 8 CFR 208.31(c). Such screenings apply to noncitizens subject to removal pursuant to the issuance of a Final Administrative Removal Order or reinstatement of a prior removal order over whom USCIS has jurisdiction pursuant to 8 CFR 208.31(b). Under this NPRM, if there is evidence that such noncitizen could be subject to a mandatory bar to statutory withholding of removal, the AO may consider the applicability of the bar in the reasonable fear of persecution determination and if doing so, the AO would find there is no reasonable fear of persecution if the noncitizen is unable to show that there is a reasonable possibility that no mandatory bar applies. This NPRM does not propose to allow for the application of the mandatory bars to withholding of removal to reasonable fear of torture determinations under 8 CFR 208.31(c). As with the option to apply the mandatory bars to asylum (other than firm resettlement) and statutory withholding of removal in a credible fear determination, the option to apply the mandatory bars to statutory withholding of removal in a reasonable fear determination may be exercised at the discretion of USCIS, and this NPRM does not propose to mandate application of the mandatory bars across the board in either credible fear or reasonable fear screenings.

*B. Screening Procedures*

*1. Credible Fear Interviews*

This NPRM would apply to noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1)

and have been referred to USCIS for a credible fear screening pursuant to section 235(b)(1)(A)(ii) of the Act.

As described above, in the credible fear process, such noncitizens are subject to removal "without further hearing or review" unless they indicate an intention to apply for asylum or fear of persecution. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Noncitizens in expedited removal who indicate an intention to apply for asylum or fear of persecution are referred to an AO for an interview to determine if they have a credible fear of persecution and should accordingly remain in proceedings for further consideration of the application. INA 235(b)(1)(A)(ii), (b)(1)(B)(ii)–(ii), 8 U.S.C. 1225(b)(1)(A)(ii), (b)(1)(B)(ii)–(ii). In addition, AOs consider whether a noncitizen in expedited removal may be eligible for withholding of removal under section 241(b)(3) of the Act, 8 U.S.C. 1231(b)(3), or for protection under the regulations implementing U.S. *non-refoulement* obligations under the CAT. 8 CFR 208.30(e)(2)–(3).

Under the existing regulations governing credible fear determinations, when an AO makes a determination as to whether a noncitizen has a credible fear of persecution, there is first a consideration of whether the noncitizen is subject to the CLP presumption of asylum ineligibility pursuant to 8 CFR 208.33(b)(1). If subject to the CLP presumption, the AO considers whether there is a significant possibility the noncitizen would be able to show an exception to or rebut the presumption by a preponderance of the evidence. If the CLP presumption of asylum ineligibility does not apply or the noncitizen establishes an exception or rebuts, then the AO will consider whether there is a significant possibility the noncitizen could show eligibility for asylum or statutory withholding of removal if given the opportunity to do so in a full hearing, without taking any mandatory bars to asylum or withholding of removal into consideration when making that determination. Nevertheless, AOs ask noncitizens questions about the mandatory bars to asylum and withholding of removal during credible fear interviews for the benefit of the record and, as appropriate, may record information related to a bar potentially applying in an adverse memorandum to the file for immigration enforcement personnel to reference where it may be relevant for their use.

Under this NPRM, the current credible fear process would remain the same. The only aspect of the determination that would change is that the USCIS AO would have the

discretion to consider the potential application of mandatory bars to asylum (other than firm resettlement) and statutory withholding of removal when screening the noncitizen for a credible fear of persecution (in cases where the CLP does not apply or was rebutted) or to consider the potential application of the mandatory bars to statutory withholding of removal (in cases where the CLP does apply and is not rebutted). The AO would consider whether there is a significant possibility that the noncitizen would be able to show the relevant bar does not apply by a preponderance of the evidence. Accordingly, the use of the significant possibility screening standard for credible fear of persecution would remain the same as that in place without this NPRM. *See* 8 CFR 208.30(e)(2). Further, the preponderance standard is the standard that would ultimately apply in a merits determination in any case where evidence of a mandatory bar is present and the applicant bears the burden of showing by a preponderance of the evidence that the bar does not apply. *See* 8 CFR 208.13(c)(2)(ii), 208.16(d)(2), 1208.14(c)(ii), 1208.16(d)(2).

For a noncitizen in the credible fear process where the CLP applies and has not established an exception or rebutted the presumption of asylum ineligibility, the only change this NPRM would make is that it would allow the AO, when screening the noncitizen for statutory withholding of removal, to consider if there was any evidence a mandatory bar to withholding of removal could apply and, if so, exercise the discretion to screen that noncitizen for withholding of removal by taking into account the applicability of that bar(s). Consistent with existing standards, the screening standard to screen for statutory withholding of removal in such an instance where a mandatory bar could be considered as part of the screening would be if the noncitizen showed a reasonable possibility that they are not subject to a mandatory bar(s).

As noted above, the Department does not propose to allow for the consideration of the mandatory bars to withholding of removal in the screening for withholding of removal under CAT for any credible fear screening, whether the determination is occurring pursuant to 8 CFR 208.30(e)(3) or 8 CFR 208.33(b)(2)(i). Any determination that screens for protection under CAT, whether it is under 8 CFR 208.30(e)(3) or 8 CFR 208.33(b)(2)(i), involves screening for both withholding of removal under CAT pursuant to 8 CFR 208.16 and deferral of removal under CAT pursuant to 8 CFR 208.17. Because

there are no mandatory bars to deferral of removal under CAT, considering the mandatory bars to withholding of removal in any determination that screens for eligibility for protection under CAT would be a futile exercise.

2. Reasonable Fear Interviews

This NPRM would also apply to noncitizens who have been ordered removed under section 238(b) of the Act or whose deportation, exclusion, or removal order has been reinstated under section 241(a)(5) of the Act, and who are referred to USCIS for a reasonable fear screening pursuant to 8 CFR 208.31. The purpose of the reasonable fear determination is to screen the noncitizen for any potential statutory withholding of removal, or any withholding or deferral of removal under CAT claim. The standard to screen for withholding or deferral of removal under CAT is a reasonable possibility of persecution or torture, which will remain untouched in this NPRM since, as mentioned above, there are no mandatory bars to deferral of removal under CAT.

In this NPRM, the proposed screening standard under which the AO may consider a mandatory bar to statutory withholding of removal during a reasonable fear interview in a case where the noncitizen appears subject to one or more mandatory bars is whether the noncitizen fails to show that there is a reasonable possibility that no bar applies.[40] For example, a noncitizen who is subject to administrative removal under INA 238(b), 8 U.S.C. 1228(b), because they are deportable under INA 237(a)(2)(A)(iii), 8 U.S.C. 1227(a)(2)(A)(iii), for having been convicted of an "aggravated felony" as defined in INA 101(a)(43), 8 U.S.C. 1101(a)(43), may be determined not to have a reasonable fear of persecution if they were sentenced to a term of imprisonment of more than five years. *See* INA 241(b)(3)(B)(iv), 8 U.S.C. 1231(b)(3)(B)(iv). That noncitizen, however, may nonetheless be referred to an immigration judge for "withholding

only" proceedings if they establish a reasonable fear of torture.

*C. Application in Relation to the Circumvention of Lawful Pathways Rule*

The proposed rule may, in some instances, apply in a credible fear determination where the CLP presumption of asylum ineligibility has also been found to apply in a credible fear determination under 8 CFR 208.33(b)(2)(i). In such a credible fear determination, an AO will first determine whether the noncitizen can demonstrate a significant possibility of showing by a preponderance of the evidence that the noncitizen would not be subject to the presumption of asylum ineligibility, that an exception to the presumption would apply, or that the presumption could be rebutted under 8 CFR 208.33(b)(1). If there is no such significant possibility, the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim pursuant to 8 CFR 208.33(b)(1)(i). The AO then screens the noncitizen for statutory withholding of removal and protection under CAT by determining whether there is a reasonable possibility the noncitizen would suffer persecution or torture in the designated country of removal, pursuant to 8 CFR 208.33(b)(2). If there is no reasonable possibility of persecution or torture, the AO will enter a negative credible fear determination under 8 CFR 208.33(b)(2)(iii).

In some cases, the evidence in the credible fear record, including the noncitizen's testimony, may fail to show a reasonable possibility of persecution or torture in the country of removal and there will be no need to consider the mandatory bars to statutory withholding of removal for the AO to issue a legally sufficient negative credible fear determination. In other instances, however, the evidence in the record may be such that it would be more efficient to base a negative credible fear of persecution determination on a mandatory bar to statutory withholding of removal pursuant to 8 CFR 208.33 where there is evidence of a mandatory bar to withholding of removal and the noncitizen is unable to demonstrate there is a reasonable possibility that the mandatory bar does not apply.

Under the CLP rule, AOs apply the presumption of asylum ineligibility to be applied in any credible fear case where it applies. However, applying the mandatory bars to withholding of removal in a credible fear determination (regardless of whether the CLP applies) under this proposed rule would be at USCIS's discretion. If the evidence in the credible fear record before USCIS is such that a USCIS AO would be unable

to apply the mandatory bars in the credible fear determination efficiently or effectively obtain sufficient information related to a bar in the time allotted for a credible fear interview, then USCIS may exercise its discretion not to apply the bars in a given case. In contrast, under the CLP rule, a USCIS AO is required to apply the CLP presumption of asylum ineligibility in a credible fear determination in any case where the noncitizen is subject to the presumption and required to explore in the credible fear record the applicability of the presumption, potential exceptions, and potential circumstances that could rebut the presumption. The CLP rule requires the AO to make a determination as to whether the noncitizen has demonstrated a significant possibility of being able to show by a preponderance of the evidence that the presumption of ineligibility does not apply, that there is an exception, or that it could be rebutted and, if so, continue with a credible fear determination under 8 CFR 208.30, but if not, screen the applicant for statutory withholding of removal and protection under CAT under 8 CFR 208.33(b)(2). The CLP rule requires the application of its presumption of asylum ineligibility in any credible fear screening where it applies (with exceptions and the possibility of being rebutted in certain circumstances) to achieve its stated goal of encouraging migrants to avail themselves of lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel, thereby reducing reliance on human smuggling networks that exploit migrants for financial gain.

The current proposed rule may, in some instances, apply in a credible fear screening on top of the CLP rule if the evidence in the credible fear record is such that a USCIS AO could effectively and efficiently apply a mandatory bar to withholding of removal in the credible fear determination in the context of such a screening. Where it is evident that a noncitizen in the credible fear process who is subject to the CLP rule and cannot show a reasonable possibility of persecution is subject to a mandatory bar to withholding of removal that would prevent that individual from ultimately being able to receive that form of relief from an immigration judge, but the noncitizen can nonetheless potentially establish a reasonable fear of persecution, it would be ineffective, inefficient, and thwart the underlying goals of the CLP rule to still allow that individual to be placed in regular INA 240 removal proceedings.

---

[40] The original rule establishing the "reasonable fear" screening process at 8 CFR 208.31 and excluding consideration of the mandatory withholding bars was promulgated in 1999. *See* Regulations Concerning the Convention Against Torture, 64 FR 8478 (1999) (interim rule). The rule did not explain why the bars should not be considered. *See* 64 FR at 8485. Prior to 1999, if a noncitizen subject to reinstatement of removal under INA 241(a)(5), 8 U.S.C. 1231(a)(5), expressed a fear of returning to their country, the noncitizen would be referred to an AO for a determination "whether the [noncitizen]'s removal to that country must be withheld under section 241(b)(3) of the Act," 8 U.S.C. 1231(b)(3), including whether any of the mandatory withholding bars applied. 8 CFR 241.8 (1998).

This proposed rule would allow USCIS to prevent that scenario from happening in cases where USCIS determines that to do so would be an effective and efficient use of USCIS resources.

*D. Security Bar to Asylum and Withholding of Removal*

Under the present proposed rule, USCIS may, in its discretion, consider the security bars to asylum and withholding of removal when making a credible fear or reasonable fear determination. INA 208(b)(2)(A)(iv), 241(b)(3)(B)(iv), 8 U.S.C. 1158(b)(2)(A)(iv), 1231(b)(3)(B)(iv). As discussed above in Section II.D of this preamble, DHS and DOJ jointly published the Asylum Eligibility and Public Health rule in 2020 providing that the Departments may consider emergency public health concerns based on communicable disease (not limited to COVID–19) when determining whether a noncitizen is subject to the existing statutory security bars to asylum and withholding of removal at INA 208(b)(2)(A)(iv) and 241(b)(3)(B)(iv), 8 U.S.C. 1158(b)(2)(A)(iv) and 1231(b)(3)(B)(iv).[41] Should the provisions of the Asylum Eligibility and Public Health rule go into effect as currently scheduled on December 31, 2024, it would have implications as to who could constitute a security risk—as in, what is "a danger to the security of the United States." Under the instant rule, AOs would be allowed to consider those provisions as part of applying the security bar in credible fear and reasonable fear screenings.

*E. Severability*

DHS intends for the provisions of this proposed rule to be severable from each other. In short, if a court holds that any provision in a final 8 CFR 208.30, 208.31, or 208.33 is invalid or unenforceable, DHS intends that the remaining provisions of a final 8 CFR 208.30, 208.31, or 208.33, as relevant, would continue in effect to the greatest extent possible. In addition, if a court holds that any such provision is invalid or unenforceable as to a particular person or circumstance, DHS intends that the provision would remain in effect as to any other person or circumstance.

Remaining provisions of a final rule could continue to function sensibly independent of any provision held invalid or unenforceable. For example, USCIS AOs may apply the mandatory bars to asylum or statutory withholding

of removal in credible fear determinations pursuant to 8 CFR 208.30(e)(5)(ii)(A) at the standard of whether the noncitizen demonstrated a significant possibility of establishing by a preponderance of the evidence that a mandatory bar would not apply, even if a court finds that the amended regulations applying mandatory bars to statutory withholding of removal in reasonable fear determinations are facially invalid. Similarly, the proposed rule could be applied in 8 CFR 208.30 credible fear determinations even if a court finds applying the rule on top of the CLP in credible fear determinations at the "reasonable possibility" standard invalid.

**V. Statutory and Regulatory Requirements**

*A. Administrative Procedure Act*

The Department is issuing this proposed rule with a 30-day comment period because it seeks to finalize the proposed rule, as appropriate, as quickly as possible to provide an additional tool to more promptly remove noncitizens who pose public safety and national security risks. DHS believes that the comment period is reasonable and appropriate because this proposed rule relates to a discrete topic that has been addressed in multiple recent notice-and-comment rulemakings, as described in section II.D of this preamble. This proposed rule is relatively short and would not dictate a widescale change in practice; instead, the rule would preserve appropriate flexibility for AOs to apply the mandatory bars as part of fear screenings when it makes sense to do so.

DHS also has an interest in swiftly finalizing this change, thereby expanding operational flexibility. DHS has taken historic measures to channel migrants into lawful pathways and processes, while imposing swift consequences, including removals, on those without a legal basis to remain in the U.S. From May 12, 2023 to March 31, 2024, DHS has removed or returned over 660,000 individuals, the vast majority of whom crossed the southwest border.[42] Total removals and returns since mid-May 2023 exceed removals and returns in every full fiscal year since 2011.[43] Overall, the number of people removed, returned, or expelled over the last three years accounts for a majority of southwest border encounters

during the same time period.[44] These measures are having an impact, but DHS remains challenged by global trends of historic migration, which have led to unprecedented shifts in southwest border encounter demographics and volume. Given current encounter trends, DHS would benefit from additional tools and increased flexibility, to swiftly and predictably impose consequences on those without a legal basis to remain.

In light of the discrete nature of the change proposed, multiple recent rounds of notice-and-comment on this topic, and the need for additional operational flexibility, DHS believes that a 30-day comment period is reasonable and appropriate.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 Modernizing Regulatory Review)*

Executive Order 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and Executive Order 13563 ("Improving Regulation and Regulatory Review") direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Although this rule has not been designated significant under section 3(f)(1) of Executive Order 12866 by the Office of Management and Budget ("OMB") because it does not meet the specified criteria with respect to economic impacts, the OMB has designated this rule as a significant regulatory action under Executive Order 14094, as amended by Executive Order 14094. Accordingly, OMB has reviewed this rule.

The expected effects of this proposed rule are discussed above. The revised procedures described above would reduce the amount of time that some noncitizens who are subject to mandatory bars contained in section 208(b)(2)(A)(i)–(v) of the Act that prevent them from being granted

---

[41] Security Bars and Processing, 85 FR 84160 (Dec. 23, 2020).

[42] OHSS analysis of UIP data as of April 2, 2024.

[43] *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 39 (Nov. 2023) (Noncitizen Removals, Returns, and Expulsions, Fiscal Year 1892 to 2022).

[44] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated Apr. 5, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship" and "DHS Repatriations by Type").

IFR_AR_001602

asylum, or the mandatory bars contained in section 241(b)(3)(B) of the Act that prevent them from being granted withholding of removal, remain in the United States.

The population to which this rule will apply is likely to be relatively small, as informed by the number of cases with bars that are flagged by USCIS during screenings. For example, in FY 2023, only 1,497 (or about 3%) of all positive credible fear decisions were flagged by the AO for a potential bar. The Department expects that AOs would choose to apply a mandatory bar to an even smaller subset of these flagged cases, because not all flagged cases have sufficient supporting evidence easily available to the AO. The benefits of the proposed rule are expected to include a modest, unquantified reduction in strains on limited national resources, specifically a reduction of the resources expended to detain noncitizens subject to the above cited mandatory bars for potentially lengthy periods of time while their cases are considered by immigration courts. Additionally, since such cases would no longer need to be heard before an immigration court, additional capacity would be available for immigration judges to decide other cases. Under the rule, noncitizens subject to the above cited bars will be quickly removed from the United States, freeing up the Departments' resources to safely, humanely, and effectively enforce and administer the immigration laws. The public safety of the United States may be enhanced as some noncitizens who have engaged in certain criminal activity, persecuted others, or have been involved in terrorist activities are quickly removed from the country. The speedy removal of these noncitizens may create disincentives for other noncitizens who would be subject to these mandatory bars when considering attempting to enter the United States.

The costs of the proposed rule would be primarily borne by noncitizens and the Department. Noncitizens to whom the above cited bars would be applied in fear screenings would lose the opportunity to contest the application of the mandatory bars in a full INA 240 merits hearing before an immigration judge, or to seek appellate review of the immigration judge's decision should the immigration judge decide to apply a mandatory bar and deny the case in such INA 240 removal proceedings. Such noncitizens would also lose the opportunity to gather additional evidence during the period of time between the fear screening and the merits immigration judge hearing to show that the mandatory bar in question

should not be applied in their case given that they will be more quickly removed under the proposed rule than they would be currently. In addition, the proposed rule would, in some cases, result in AOs spending additional time, during fear screenings, to inquire into the applicability of the above cited mandatory bars, additional time writing up the required mandatory bar analysis for the credible or reasonable fear determination, and additional time spent by SAOs to review any mandatory bar analysis conducted in such determinations, although AOs would have discretion whether to consider such bars at the screening stage and could therefore minimize the government costs associated with the proposed rule in cases where the additional development of the record and analysis would not be outcome determinative or otherwise an effective use of resources.

### C. Regulatory Flexibility Act

DHS has reviewed this proposed rule in accordance with the Regulatory Flexibility Act, Public Law 96–354, 94 Stat. 1164 (1980), as amended (codified at 5 U.S.C. 601 *et seq.*) and has determined that this rule would not have a significant economic impact on a substantial number of small entities. The rule would not regulate ''small entities'' as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum or are otherwise placed in immigration proceedings.

### D. Unfunded Mandates Reform Act of 1995

This proposed rule would not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, adjusted for inflation, and it would not significantly or uniquely affect small governments. Therefore, no actions are deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48; *see also* 2 U.S.C. 1532(a).

### E. Executive Order 13132 (Federalism)

This proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule would not have sufficient federalism implications to warrant the preparation of a federalism summary

impact statement. DHS nonetheless welcomes public comment on possible federalism implications of this proposed rule.

### F. Executive Order 12988 (Civil Justice Reform)

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Family Assessment

DHS has reviewed this proposed rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[45] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[46] DHS has reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation. DHS has determined that this proposed rule will not negatively affect family well-being.

### H. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This proposed rule does not have tribal implications under Executive Order 13175 because it would not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

### I. Executive Order 13045 (Protection of Children From Environmental Health Risks and Safety Risks)

Executive Order 13045 requires agencies to consider the impacts of environmental health risks or safety

---

[45] *See* 5 U.S.C. 601 note.
[46] Public Law 105–277, 112 Stat. 2681 (1998).

IFR_AR_001603

risks that may disproportionately affect children. DHS has reviewed this proposed rule and have determined that this rule is not a covered regulatory action under Executive Order 13045. The rule is not considered significant under Section 3(f)(1) of Executive Order 12866 and would not create an environmental risk to health or risk to safety that might disproportionately affect children.

*J. National Environmental Policy Act*

DHS and its components analyze proposed actions to determine whether the National Environmental Policy Act of 1969, (42 U.S.C. 4321 *et seq.*) ("NEPA"), applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01,[47] and Instruction Manual 023–01–001–01, Revision 01 ("Instruction Manual")[48] establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1), 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). DHS has established its categorical exclusions through its Instruction Manual in Appendix A. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[49]

The proposed rule, if finalized, would allow AOs to apply certain bars to asylum and statutory withholding of removal at the fear screening stage. DHS has determined that the promulgation of this proposed rule satisfies all three requirements for a categorical exclusion. First, the proposed rule fits clearly within categorical exclusion A3(d) of the Instruction Manual, Appendix A, for the promulgation of rules that "interpret or amend an existing regulation without changing its environmental effect." The proposed rule would change the point in time at which certain statutory bars are considered but would not change any environmental effect of the bars. Second, this proposed rule is a standalone rule and is not part of any larger action. Third, DHS is not aware of any extraordinary circumstances that would cause a significant environmental impact. Therefore, this proposed rule is categorically excluded from further NEPA review.

*K. Paperwork Reduction Act*

This NPRM does not propose new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects in 8 CFR Part 208**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security proposes to amend chapter I of title 8 of the Code of Federal Regulations as set forth below.

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.30 by revising the first sentence of paragraph (e)(2) and paragraph (e)(5) to read as follows:

**§ 208.30 Credit fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

\* \* \* \* \*

(e) \* \* \*

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act, including that the alien is not subject to a mandatory bar,

if considered under paragraph (e)(5)(ii) of this section. \* \* \*

\* \* \* \* \*

(5) Except as provided in paragraph (e)(6) or (7) of this section:

(i) If an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and (b)(2)(A)(vi) of the Act, the Department of Homeland Security shall nonetheless issue a Notice to Appear or retain jurisdiction over the alien's case for further consideration of the alien's claim pursuant to paragraph (f) of this section, if the alien is not a stowaway.

(ii) If an alien, who is unable to establish a credible fear of torture, is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to being granted either asylum or withholding of removal, as set forth in section 208(b)(2)(A)(i)–(v) of the Act or section 241(b)(3)(B) of the Act, respectively, the asylum officer may consider the applicability of such bar(s) as part of the asylum officer's credible fear determination.

(A) The asylum officer shall issue a negative credible fear finding with regard to the alien's eligibility for asylum or withholding of removal under the Act if the asylum officer determines there is not a significant possibility that the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply.

(B) The asylum officer shall issue a Notice to Appear or retain jurisdiction over the alien's case for further consideration of the alien's claim pursuant to paragraph (f) of this section, if the asylum officer finds that there is a significant possibility that the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply.

(iii) In all cases, if the alien is a stowaway and the Department would otherwise initiate proceedings under paragraphs (e)(5)(i) and (ii) of this section, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3) and shall not retain jurisdiction over the case for further consideration nor issue a Notice to Appear.

\* \* \* \* \*

■ 3. Amend § 208.31 by revising paragraphs (c) and (g) to read as follows:

---

[47] DHS, Implementation of the National Environmental Policy Act, Directive 023–01, Revision 01 (Oct. 31, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf.*

[48] DHS, Implementation of the National Environmental Policy Act (NEPA), Instruction Manual 023–01–001–01, Revision 01 (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*

[49] Instruction Manual at V.B(2)(a) through (c).

IFR_AR_001604

**§ 208.31  Reasonable fear of persecution or torture determinations involving aliens ordered removed under section 238(b) of the Act and aliens whose removal is reinstated under section 241(a)(5) of the Act.**

\*    \*    \*    \*    \*

(c) *Interview and procedure.* The asylum officer shall conduct the interview in a non-adversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall determine that the alien has an understanding of the reasonable fear determination process. The alien may be represented by counsel or an accredited representative at the interview, at no expense to the Government, and may present evidence, if available, relevant to the possibility of persecution or torture. The alien's representative may present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of persons who may be present at the interview and the length of the statement. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country or nationality, or if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture. The alien shall be determined to have a reasonable fear of persecution if the alien establishes a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, unless the alien appears to be subject to one or more of the mandatory bars to being granted withholding of removal under the Act contained in section 241(b)(3)(B) of the Act and the alien fails to show that there is a reasonable possibility that no mandatory bar applies, if the asylum officer considers such bars. The alien shall be determined to have a reasonable fear of persecution or torture if the alien establishes a reasonable possibility that he or she would be tortured in the country of removal.

\*    \*    \*    \*    \*

(g) *Review by immigration judge.* The asylum officer's negative decision regarding reasonable fear shall be subject to review by an immigration judge upon the alien's request. If the alien requests such review, the asylum officer shall serve him or her with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. The immigration judge's review shall proceed under the procedures set forth in 8 CFR 1208.31(g).

■ 4. Amend § 208.33 by revising paragraphs (b)(2)(i) through (iii) to read as follows:

**§ 208.33  Lawful pathways condition on asylum eligibility.**

\*    \*    \*    \*    \*

(b) \*    \*    \*

(2) \*    \*    \*

(i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) of this section, the asylum officer will assess whether the alien has established a reasonable possibility of persecution (meaning a reasonable possibility of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the identified country or countries of removal identified pursuant to section 241(b) of the Act. As part of this reasonable possibility determination, if there is evidence that the alien is subject to one or more of the mandatory bars to being granted withholding of removal under the Act contained in section 241(b)(3)(B) of the Act, the asylum officer may consider the applicability of such bar(s).

(ii) In cases described in paragraph (b)(2)(i) of this section, if the alien establishes a reasonable possibility of persecution with respect to the identified country or countries of removal and, to the extent bars are considered, that there is a reasonable possibility that no mandatory bar applies, the Department will issue a Form I–862, Notice to Appear. If the alien establishes a reasonable possibility of torture with respect to the identified country or countries of removal, the Department will issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) of this section, if an alien fails to establish a reasonable possibility of persecution with respect to the identified country or countries of removal or, to the extent bars are considered, fails to establish that there is a reasonable possibility that no mandatory bar applies, and fails to establish a reasonable possibility of torture with respect to the identified country or countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

\*    \*    \*    \*    \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2024–10390 Filed 5–9–24; 4:15 pm]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2024–1290; Project Identifier MCAI–2024–00078–T]**

**RIN 2120–AA64**

**Airworthiness Directives; Dassault Aviation Airplanes**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice of proposed rulemaking (NPRM).

---

**SUMMARY:** The FAA proposes to supersede Airworthiness Directive (AD) 2023–22–13, which applies to certain Dassault Aviation Model FALCON 7X airplanes. AD 2023–22–13 requires revising the existing maintenance or inspection program, as applicable, to incorporate new or more restrictive airworthiness limitations. Since the FAA issued AD 2023–22–13, the FAA has determined that new or more restrictive airworthiness limitations are necessary. This proposed AD would continue to require certain actions in AD 2023–22–13 and would require revising the existing maintenance or inspection program, as applicable, to incorporate new or more restrictive airworthiness limitations, as specified in a European Union Aviation Safety Agency (EASA) AD, which is proposed for incorporation by reference (IBR). The

IFR_AR_001605

II

**Calendar No. 397**

118TH CONGRESS
2D SESSION
# S. 4361

Making emergency supplemental appropriations for border security and combatting fentanyl for the fiscal year ending September 30, 2024, and for other purposes.

––––––––––––––––

## IN THE SENATE OF THE UNITED STATES

MAY 16, 2024

Mr. MURPHY introduced the following bill; which was read the first time

MAY 20, 2024

Read the second time and placed on the calendar

––––––––––––––––

# A BILL

Making emergency supplemental appropriations for border security and combatting fentanyl for the fiscal year ending September 30, 2024, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the ''Border Act of 2024''.

5    **SEC. 2. TABLE OF CONTENTS.**

6        The table of contents of this Act is as follows:

Sec. 1. Short Title.

2

Sec. 2. Table of Contents.
Sec. 3. References.

DIVISION A—BORDER SECURITY AND COMBATTING FENTANYL
SUPPLEMENTAL APPROPRIATIONS ACT, 2024

DIVISION B—BORDER ACT

1 **SEC. 3. REFERENCES.**

2      Except as expressly provided otherwise, any reference

3 to ''this Act'' contained in any division of this Act shall

4 be treated as referring only to the provisions of that divi-

5 sion.

IFR_AR_001716

3

## DIVISION A—BORDER SECURITY AND COMBATTING FENTANYL SUPPLEMENTAL APPROPRIATIONS ACT, 2024

The following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2024, and for other purposes, namely:

### TITLE I

### DEPARTMENT OF JUSTICE

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

For an additional amount for "Executive Office for Immigration Review", $440,000,000, to remain available until September 30, 2026: *Provided,* That of the total amounts provided under this heading in this Act, $404,000,000 shall be for Immigration Judge Teams, including appropriate attorneys, law clerks, paralegals, court administrators, and other support staff, as well as necessary court and adjudicatory costs, and $36,000,000 shall be for representation for certain incompetent adults pursuant to section 240(e) of the Immigration and Nationality Act (8 U.S.C. 1229a(e)): *Provided further,* That not more than 3 percent of the funds available for representation for certain incompetent adults in the preceding proviso shall be available for necessary administrative expenses: *Provided further,* That with the exception of immi-

IFR_AR_001717

4

1 gration judges appointed pursuant to section 1003.10 of

2 title 8, Code of Federal Regulations, amounts provided

3 under this heading in this Act for Immigration Judge

4 Teams may not be used to increase the number of perma-

5 nent positions: *Provided further,* That the Executive Office

6 for Immigration Review shall submit a spending plan to

7 the Committees on Appropriations of the House of Rep-

8 resentatives and the Senate within 45 days after the date

9 of enactment of this Act: *Provided further,* That such

10 amount is designated by the Congress as being for an

11 emergency requirement pursuant to section

12 251(b)(2)(A)(i) of the Balanced Budget and Emergency

13 Deficit Control Act of 1985.

14               LEGAL ACTIVITIES

15 SALARIES AND EXPENSES, GENERAL LEGAL ACTIVITIES

16       For an additional amount for ''Salaries and Ex-

17 penses, General Legal Activities'', $11,800,000, to remain

18 available until September 30, 2026, for necessary expenses

19 of the Criminal Division associated with the Joint Task

20 Force Alpha's efforts to combat human trafficking and

21 smuggling in the Western Hemisphere: *Provided,* That

22 such amount is designated by the Congress as being for

23 an emergency requirement pursuant to section

24 251(b)(2)(A)(i) of the Balanced Budget and Emergency

25 Deficit Control Act of 1985.

IFR_AR_001718

5

1        UNITED STATES MARSHALS SERVICE

2           FEDERAL PRISONER DETENTION

3        For an additional amount for "United States Mar-

4    shals       Service—Federal       Prisoner       Detention",

5    $210,000,000, to remain available until expended, for de-

6    tention costs due to enforcement activities along the south-

7    ern and northern borders: *Provided,* That such amount is

8    designated by the Congress as being for an emergency re-

9    quirement pursuant to section 251(b)(2)(A)(i) of the Bal-

10   anced Budget and Emergency Deficit Control Act of 1985.

11       FEDERAL BUREAU OF INVESTIGATION

12              SALARIES AND EXPENSES

13       For an additional amount for "Federal Bureau of In-

14   vestigation—Salaries and Expenses", $204,000,000, to

15   remain available until September 30, 2026, for expenses

16   related to the analysis of DNA samples, including those

17   samples collected from migrants detained by the United

18   States Border Patrol: *Provided,* That such amount is des-

19   ignated by the Congress as being for an emergency re-

20   quirement pursuant to section 251(b)(2)(A)(i) of the Bal-

21   anced Budget and Emergency Deficit Control Act of 1985.

22       DRUG ENFORCEMENT ADMINISTRATION

23              SALARIES AND EXPENSES

24       For an additional amount for "Drug Enforcement

25   Administration—Salaries and Expenses", $23,200,000, to

6

1  remain available until September 30, 2026, to enhance

2  laboratory analysis of illicit fentanyl samples to trace illicit

3  fentanyl supplies back to manufacturers, to support Oper-

4  ation Overdrive, and to bolster criminal drug network tar-

5  geting efforts through data system improvements: *Pro-*

6  *vided,* That such amount is designated by the Congress

7  as being for an emergency requirement pursuant to sec-

8  tion 251(b)(2)(A)(i) of the Balanced Budget and Emer-

9  gency Deficit Control Act of 1985.

7

1    TITLE II

2    DEPARTMENT OF HOMELAND SECURITY

3    DEPARTMENTAL    MANAGEMENT,    INTEL-

4        LIGENCE, SITUATIONAL AWARENESS, AND

5        OVERSIGHT

6    OFFICE OF THE SECRETARY AND EXECUTIVE

7    MANAGEMENT

8    OPERATIONS AND SUPPORT

9        For an additional amount for ''Office of the Secretary

10    and Executive Management—Operations and Support'',

11    $33,000,000, to remain available until September 30,

12    2026, of which $30,000,000 shall be for necessary ex-

13    penses relating to monitoring, recording, analyzing, public

14    reporting on, and projecting migration flows and the im-

15    pacts policy changes and funding have on flows and re-

16    lated resource requirements for border security, immigra-

17    tion enforcement, and immigration services and of which

18    $3,000,000 shall be for the Office of the Immigration De-

19    tention Ombudsman for reporting and oversight relating

20    to expanded detention capacity: *Provided,* That such

21    amount is designated by the Congress as being for an

22    emergency    requirement    pursuant    to    section

23    251(b)(2)(A)(i) of the Balanced Budget and Emergency

24    Deficit Control Act of 1985.

8

SECURITY, ENFORCEMENT, AND

INVESTIGATIONS

U.S. CUSTOMS AND BORDER PROTECTION

OPERATIONS AND SUPPORT

(INCLUDING TRANSFER OF FUNDS)

1      For an additional amount for "U.S. Customs and
2 Border Protection—Operations and Support",
3 $4,001,239,000, to remain available until September 30,
4 2026: *Provided,* That of the total amount provided under
5 this heading in this Act, $2,091,363,000 shall be for oper-
6 ational requirements relating to migration surges along
7 the southwest border, counter-fentanyl activities, nec-
8 essary expenses at ports of entry, reimbursement to the
9 Department of Defense for border operations support, and
10 other related expenses; $1,134,876,000 shall be for the
11 hiring of U.S. Customs and Border Protection personnel;
12 $25,000,000 shall be for familial DNA testing; and
13 $750,000,000 shall be transferred to "Federal Emergency
14 Management Agency—Federal Assistance" to support
15 sheltering and related activities provided by non-Federal
16 entities through the Shelter and Services Program: *Pro-*
17 *vided further,* That such amount is designated by the Con-
18 gress as being for an emergency requirement pursuant to
19 section 251(b)(2)(A)(i) of the Balanced Budget and
20 Emergency Deficit Control Act of 1985.

9

1    PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

2    For an additional amount for ''U.S. Customs and
3    Border Protection—Procurement, Construction, and Im-
4    provements'', $2,334,000,000, to remain available until
5    September 30, 2027: *Provided,* That of the total amount
6    provided under this heading in this Act, $2,000,000,000
7    shall be for acquisition and deployment of non-intrusive
8    inspection technology, $260,000,000 shall be for acquisi-
9    tion and deployment of border security technology, and
10    $74,000,000 shall be for acquisition and deployment of air
11    assets: *Provided further,* That such amount is designated
12    by the Congress as being for an emergency requirement
13    pursuant to section 251(b)(2)(A)(i) of the Balanced Budg-
14    et and Emergency Deficit Control Act of 1985.

15    U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

16    OPERATIONS AND SUPPORT

17    For an additional amount for ''U.S. Immigration and
18    Customs    Enforcement—Operations    and    Support'',
19    $6,043,876,000, to remain available until September 30,
20    2026: *Provided*, That of the total amount provided under
21    this heading in this Act, $1,671,614,000 shall be for in-
22    creased custodial detention capacity, $2,465,643,000 shall
23    be for increased removal flights and related activities, in-
24    cluding short-term staging facilities, $415,752,000 shall
25    be for hiring U.S. Immigration and Customs Enforcement

IFR_AR_001723

10

1  personnel, $203,765,000 shall be for counter fentanyl in-
2  vestigations and enforcement, and $1,287,102,000 shall
3  be for increased enrollment capabilities and related activi-
4  ties within the Alternatives to Detention program: *Pro-*
5  *vided further,* That such amount is designated by the Con-
6  gress as being for an emergency requirement pursuant to
7  section 251(b)(2)(A)(i) of the Balanced Budget and
8  Emergency Deficit Control Act of 1985.

9  PROTECTION, PREPAREDNESS, RESPONSE, AND
10                RECOVERY

11        FEDERAL EMERGENCY MANAGEMENT AGENCY

12                    FEDERAL ASSISTANCE

13        For an additional amount for ''Federal Emergency
14  Management        Agency—Federal        Assistance'',
15  $100,000,000, to remain available until September 30,
16  2025, for Operation Stonegarden: *Provided,* That not less
17  than 25 percent of the total amount provided under this
18  heading in this Act shall be for States other than those
19  located along the southwest border: *Provided further,* That
20  such amount is designated by the Congress as being for
21  an  emergency  requirement  pursuant  to  section
22  251(b)(2)(A)(i) of the Balanced Budget and Emergency
23  Deficit Control Act of 1985.

11

1    RESEARCH, DEVELOPMENT, TRAINING, AND

2                    SERVICES

3    U.S. CITIZENSHIP AND IMMIGRATION SERVICES

4                OPERATIONS AND SUPPORT

5        For an additional amount for "U.S. Citizenship and

6    Immigration    Services—Operations    and    Support",

7    $3,995,842,000, to remain available until September 30,

8    2026: *Provided,* That of the total amount provided under

9    this heading in this Act, $3,383,262,000 shall be for hir-

10   ing and associated costs, $112,580,000 shall be for non-

11   personnel operations, including transcription services, and

12   $500,000,000 shall be for facilities: *Provided further,* That

13   such amounts shall be in addition to any other amounts

14   made available for such purposes, and shall not be con-

15   strued to require any reduction of any fee described in

16   section 286(m) of the Immigration and Nationality Act

17   (8 U.S.C. 1356(m)): *Provided further,* That such amount

18   is designated by the Congress as being for an emergency

19   requirement pursuant to section 251(b)(2)(A)(i) of the

20   Balanced Budget and Emergency Deficit Control Act of

21   1985.

22   FEDERAL LAW ENFORCEMENT TRAINING CENTERS

23               OPERATIONS AND SUPPORT

24       For an additional amount for "Federal Law Enforce-

25   ment    Training    Centers—Operations    and    Support",

12

1  $50,703,000, to remain available until September 30,

2  2026: *Provided,* That of the total amount provided under

3  this heading in this Act, $49,603,000 shall be for training-

4  related expenses, to include instructors, tuition, and over-

5  head costs associated with the delivery of basic law en-

6  forcement training and $1,100,000 shall be for the nec-

7  essary mission support activities and facility maintenance

8  required for law enforcement training: *Provided further,*

9  That such amount is designated by the Congress as being

10  for an emergency requirement pursuant to section

11  251(b)(2)(A)(i) of the Balanced Budget and Emergency

12  Deficit Control Act of 1985.

13      GENERAL PROVISIONS—THIS TITLE

14      Sec. 201. (a) The Secretary shall, by March 1, 2025,

15  and quarterly thereafter, provide to the Committees on

16  Appropriations of the House of Representatives and the

17  Senate a report describing changes in performance metrics

18  and operational capabilities relating to border security, im-

19  migration enforcement, and immigration services, and the

20  relationship of those changes to actual and projected en-

21  counters on the southwest border.

22      (b) The report required by subsection (a) shall also

23  include an analytic assessment of how policy changes and

24  resources provided in this title of this Act impact effi-

25  ciencies and resource needs for—

13

1        (1) other programs within the Department; and

2        (2) other Federal Departments and agencies.

3    SEC. 202. (a) Amounts made available in this Act

4  under the heading "U.S. Customs and Border Protec-

5  tion—Procurement, Construction, and Improvements" for

6  acquisition and deployment of border security technology

7  shall be available only as follows:

8        (1) $170,000,000 for the procurement and de-

9    ployment of autonomous surveillance towers systems

10   in locations that are not currently covered by such

11   systems or technology, as defined in subsection (d);

12       (2) $47,500,000 for the procurement and de-

13   ployment of mobile surveillance capabilities, includ-

14   ing mobile video surveillance systems and for obso-

15   lete mobile surveillance equipment replacement,

16   counter-UAS, and small unmanned aerial systems;

17       (3) $25,000,000 for subterranean detection ca-

18   pabilities;

19       (4) $7,500,000 for seamless integrated commu-

20   nications to extend connectivity for Border Patrol

21   agents; and

22       (5) $10,000,000 for the acquisition of data

23   from long duration unmanned surface vehicles in

24   support of maritime border security.

IFR_AR_001727

14

1    (b) None of the funds available under subsection

2 (a)(1) shall be used for the procurement or deployment

3 of border security technology that is not autonomous.

4    (c) For the purposes of this section, ''autonomous''

5 and ''autonomous surveillance tower systems'' are defined

6 as integrated software and/or hardware systems that uti-

7 lize sensors, onboard computing, and artificial intelligence

8 to identify items of interest that would otherwise be manu-

9 ally identified by personnel.

10    (d) Not later than 90 days after the date of enact-

11 ment of this Act, and monthly thereafter, U.S. Customs

12 and Border Protection shall provide to the Committees on

13 Appropriations of the House of Representatives and the

14 Senate an expenditure plan for the use of the funds avail-

15 able under subsection (a)(1) and such expenditure plan

16 shall include the following:

17        (1) the number and type of systems that will be

18    procured;

19        (2) the U.S. Border Patrol sectors where each

20    system will be deployed;

21        (3) a timeline for system deployments, including

22    a timeline for securing necessary approvals and land

23    rights;

24        (4) estimated annual sustainment costs for the

25    systems; and

15

1        (5) other supporting information.

2    SEC. 203. (a) Amounts made available in this Act

3    under the heading "U.S. Customs and Border Protec-

4    tion—Procurement, Construction, and Improvements" for

5    acquisition and deployment of non-intrusive inspection

6    technology shall be available only through an open com-

7    petition occurring after the date of enactment of this Act

8    to acquire innovative technologies that improve perform-

9    ance, including through the integration of artificial intel-

10   ligence and machine learning capabilities.

11   (b) Beginning on March 1, 2025, the Commissioner

12   of U.S. Customs and Border Protection shall provide to

13   the Committees on Appropriations of the House of Rep-

14   resentatives and the Senate a quarterly update on the im-

15   pacts of deployments of additional non-intrusive inspection

16   technology on key performance metrics and operational ca-

17   pabilities and such expenditure plan shall include the fol-

18   lowing:

19        (1) the percentage of passenger and cargo vehi-

20        cles scanned;

21        (2) the percentage of seizures of narcotics, cur-

22        rency, weapons, and ammunition, and other illicit

23        items at inbound and outbound operations at ports

24        of entry, checkpoints, and other locations as applica-

25        ble; and

16

1    (3) the impact on U.S. Customs and Border
2        Protection workforce requirements resulting from
3        the deployment of additional non-intrusive inspection
4        technology.

5    SEC. 204. (a) Not later than 30 days after the date
6    of enactment of this Act, the Under Secretary for Manage-
7    ment at the Department of Homeland Security shall pro-
8    vide to the Committees on Appropriations of the House
9    of Representatives and the Senate an expenditure and hir-
10   ing plan for amounts made available in this title of this
11   Act.

12   (b) The plan required in subsection (a) shall not
13   apply to funds made available in this Act under the head-
14   ing ''Federal Emergency Management Agency—Federal
15   Assistance'' or to funds transferred by this Act to such
16   heading.

17   (c) The plan required in subsection (a) shall be up-
18   dated and submitted to the Committees on Appropriations
19   of the House of Representatives and the Senate every 30
20   days and no later than the 5th day of each month to re-
21   flect changes to the plan and expenditures of funds until
22   all funds made available in this title of this Act are ex-
23   pended or have expired.

IFR_AR_001730

17

1    (d) None of the funds made available in this title of
2  this Act may be obligated prior to the submission of such
3  plan.

4    SEC. 205. The remaining unobligated balances, as of
5  the date of enactment of this Act, from amounts made
6  available under the heading "U.S. Customs and Border
7  Protection—Procurement, Construction, and Improve-
8  ments" in division D of the Consolidated Appropriations
9  Act, 2020 (Public Law 116–93) and described in section
10  209(a)(1) of such division of that Act and division F of
11  the Consolidated Appropriations Act, 2021 (Public Law
12  116–260) and described in section 210 of such division
13  of that Act are hereby rescinded, and an amount of addi-
14  tional new budget authority equivalent to the amount re-
15  scinded pursuant to this section is hereby appropriated,
16  for an additional amount for fiscal year 2024, to remain
17  available until September 30, 2028, and shall be available
18  for the same purposes and under the same authorities and
19  conditions for which such amounts were originally pro-
20  vided in such Acts: *Provided,* That none of the funds allo-
21  cated for pedestrian physical barriers pursuant to this sec-
22  tion may be made available for any purpose other than
23  the construction of steel bollard pedestrian barrier built
24  at least 18 to 30 feet in effective height and augmented
25  with anti-climb and anti-dig features: *Provided further,*

18

1    That for purposes of this section, the term "effective

2    height" refers to the height above the level of the adjacent

3    terrain features: *Provided further,* That none of the funds

4    allocated for pedestrian physical barriers pursuant to this

5    section may be made available for any purpose other than

6    construction of pedestrian barriers consistent with the de-

7    scription in the first proviso at locations identified in the

8    Border Security Improvement Plan submitted to Congress

9    on August 1, 2020: *Provided further,* That the Commis-

10    sioner of U.S. Customs and Border Protection may

11    reprioritize the construction of physical barriers outlined

12    in the Border Security Improvement Plan and, with prior

13    approval of the Committees on Appropriations of the

14    House of Representatives and the Senate, add additional

15    miles of pedestrian physical barriers where no such bar-

16    riers exist, prioritized by operational requirements devel-

17    oped in coordination with U.S. Border Patrol leadership:

18    *Provided further,* That within 180 days of the date of en-

19    actment of this Act, the Secretary shall submit a report

20    to the Committees on Appropriations of the House of Rep-

21    resentatives and the Senate detailing how the funds will

22    be used, by sector, to include the number of miles to be

23    built: *Provided further,* That none of the funds made avail-

24    able pursuant to this section shall be available for obliga-

19

1 tion until the Secretary submits the report detailed in the

2 preceding proviso.

3     SEC. 206. (a) Not later than 60 days after the date

4 of the enactment of this Act and monthly thereafter, the

5 Director of U.S. Immigration and Customs Enforcement

6 (in this section, referred to as the ''Director'') shall pro-

7 vide to the Committees on Appropriations of the House

8 of Representatives and the Senate data detailing the num-

9 ber of weekly removal flights conducted by U.S. Immigra-

10 tion and Customs Enforcement, the cost per flight, the

11 number of individuals by nationality on each flight, the

12 average length of time by nationality between when the

13 individual was removed and when the individual's final

14 order of removal was issued, and the number of empty

15 seats on each flight.

16     (b) The Director shall also provide to the Committees

17 on Appropriations of the House of Representatives and the

18 Senate data detailing the number of voluntary repatri-

19 ations coordinated by U.S. Immigration and Customs En-

20 forcement, the costs associated with each repatriation, the

21 number of individuals by nationality, the average length

22 of time by nationality between when the individual was

23 removed and when the individual's final order of removal

24 was issued, and the number of individuals that have opted

25 into this program still awaiting repatriation.

20

1    SEC. 207. (a) Not later than 30 days after the date
2  of enactment of this Act and weekly thereafter, the Direc-
3  tor of U.S. Immigration and Customs Enforcement (in
4  this section referred to as the ''Director'') shall provide
5  to the Committees on Appropriations of the House of Rep-
6  resentatives and the Senate a plan to increase custodial
7  detention capacity using the funds provided for such pur-
8  pose in this title of this Act, until such funds are ex-
9  pended.

10    (b) The plan required by subsection (a) shall also in-
11  clude data on all detention capacity to which U.S. Immi-
12  gration and Customs Enforcement has access but cannot
13  use, the reason that the capacity cannot be used, and a
14  course of action for mitigating utilization issues.

15    (c) The Director shall provide notice to the Commit-
16  tees on Appropriations of the House of Representatives
17  and the Senate in the plan required by subsection (a) of
18  any planned facility acquisitions, cost data, utilization
19  rates, increase of average daily population, and notice of
20  any termination or reduction of a contract for detention
21  space, whether such actions are funded by this Act or any
22  other Act for this or prior fiscal years.

23    (d) The Director shall notify the Committees on Ap-
24  propriations of the House of Representatives and the Sen-
25  ate not less than 30 days prior to the planned date of

21

1 a contract termination or implementation of a reduction

2 in detention capacity.

3     SEC. 208. None of the funds provided in this title

4 of this Act for ''U.S. Immigration and Customs Enforce-

5 ment—Operations Support'' may be used for community-

6 based residential facilities.

7     SEC. 209. (a) Prior to the Secretary of Homeland Se-

8 curity (in this section referred to as the ''Secretary'') re-

9 questing assistance from the Department of Defense for

10 border security operations, the Secretary shall ensure that

11 an alternatives analysis and cost-benefit analysis is con-

12 ducted that includes data on the cost effectiveness of ob-

13 taining such assistance from the Department of Defense

14 in lieu of other options.

15     (b) The Secretary shall submit to the Committees on

16 Appropriations of the House of Representatives and the

17 Senate, a report detailing the types of support sought by

18 the Secretary in any request for assistance from the De-

19 partment of Defense for border security operations and

20 the operational impact of such request on Department of

21 Homeland Security operations within 30 days of the date

22 of enactment of this Act and quarterly thereafter.

23     (c) The Secretary shall include with the data re-

24 quested in subsection (b) the results of the alternatives

22

1 analysis and cost-benefit analysis required under sub-

2 section (a).

3     SEC. 210. Eligibility for funding made available by

4 this title of this Act for transfer from "U.S. Customs and

5 Border Protection—Operations and Support" to "Federal

6 Emergency Management Agency—Federal Assistance"

7 for the Shelter and Services Program shall not be limited

8 to entities that previously received or applied for funding

9 for the Shelter and Services Program or the Emergency

10 Food and Shelter-Humanitarian program.

11     SEC. 211. Of the total amount provided under the

12 heading "U.S. Customs and Border Protection—Oper-

13 ations and Support" in this title of this Act for transfer

14 to "Federal Emergency Management Agency—Federal

15 Assistance" for the Shelter and Services Program—

16         (1) not more than $500,000,000 shall be avail-

17     able for transfer immediately upon enactment of this

18     Act;

19         (2) an additional $188,000,000 shall be avail-

20     able for transfer upon submission of a written cer-

21     tification by the Secretary of Homeland Security, to

22     the Committees on Appropriations of the House of

23     Representatives and the Senate, that U.S. Immigra-

24     tion and Customs Enforcement has—

IFR_AR_001736

23

1          (A) the ability to detain 46,500 individuals
2     and has increased the total number of Enforce-
3     ment and Removal Operations deportation offi-
4     cers by 200 above the current on board levels
5     as of the date of enactment of this Act;

6          (B) increased the total number of U.S.
7     Customs and Border Protection officers by 200
8     above the current on board levels as of the date
9     of enactment of this Act; and

10          (C) increased the total number of U.S.
11     Citizenship and Immigration Services asylum
12     officers by 800 above the current on board lev-
13     els as of the date of enactment of this Act; and

14     (3) an additional $62,000,000 shall be available
15     for transfer upon submission of a written certifi-
16     cation by the Secretary of Homeland Security, to the
17     Committees on Appropriations of the House of Rep-
18     resentatives and the Senate, that U.S. Immigration
19     and Customs Enforcement has—

20          (A) conducted a total of 1,500 removal
21     flights since the date of enactment of this Act;
22     and

23          (B) ensured that at least 75 percent of
24     Border Patrol agents assigned to duty along the
25     southwest land border have been trained on the

24

1          procedures included in sections 235B and 244B

2          of the Immigration and Nationality Act.

25

1    TITLE III

2    DEPARTMENT OF HEALTH AND HUMAN

3    SERVICES

4    ADMINISTRATION FOR CHILDREN AND FAMILIES

5    REFUGEE AND ENTRANT ASSISTANCE

6    For an additional amount for ''Refugee and Entrant

7    Assistance'', $350,000,000, to remain available until ex-

8    pended, for carrying out section 235(c)(5)(B) of the Wil-

9    liam Wilberforce Trafficking Victims Protection Reauthor-

10    ization Act of 2008 (8 U.S.C. 1232(c)(5)(B)): *Provided,*

11    That for the purposes of carrying out such section the Sec-

12    retary of Health and Human Services may use amounts

13    made available under this heading in this Act to award

14    grants to, or enter into contracts with, public, private, or

15    nonprofit organizations, including States: *Provided fur-

16    ther,* That such amount is designated by the Congress as

17    being for an emergency requirement pursuant to section

18    251(b)(2)(A)(i) of the Balanced Budget and Emergency

19    Deficit Control Act of 1985.

IFR_AR_001739

26

1        TITLE IV

2    DEPARTMENT OF STATE AND RELATED

3                    AGENCY

4    BILATERAL ECONOMIC ASSISTANCE

5    FUNDS APPROPRIATED TO THE PRESIDENT

6           INTERNATIONAL DISASTER ASSISTANCE

7        For an additional amount for ''International Disaster

8    Assistance'', $850,000,000, to remain available until ex-

9    pended, to address humanitarian needs in the Western

10   Hemisphere: *Provided,* That such amount is designated by

11   the Congress as being for an emergency requirement pur-

12   suant to section 251(b)(2)(A)(i) of the Balanced Budget

13   and Emergency Deficit Control Act of 1985.

14              ECONOMIC SUPPORT FUND

15       For an additional amount for ''Economic Support

16   Fund'', $415,000,000, to remain available until Sep-

17   tember 30, 2026: *Provided,* That of the total amount made

18   available under this heading in this Act, $230,000,000

19   shall be made available to increase foreign country capac-

20   ity to accept and integrate returned and removed individ-

21   uals, which shall be administered in consultation with the

22   Secretary of Homeland Security, including to address

23   partner government requests that enable the achievement

24   of such objectives, as appropriate: *Provided further,* That

25   of the total amount made available under this heading in

27

1  this Act, $185,000,000 shall be made available to reduce

2  irregular migration within the Western Hemisphere: *Pro-*

3  *vided further,* That prior to the obligation of funds made

4  available pursuant to the preceding proviso that are made

5  available to support the repatriation operations of a for-

6  eign government, the Secretary of State shall submit to

7  the appropriate congressional committees a monitoring

8  and oversight plan for the use of such funds, and such

9  funds shall be subject to prior consultation with such com-

10  mittees and the regular notification procedures of the

11  Committees on Appropriations: *Provided further,* That the

12  Secretary of State shall submit to such committees the

13  text of any agreements or awards related to such oper-

14  ations, which may include documents submitted in classi-

15  fied form, as appropriate, including any agreement with

16  a foreign government, nongovernment entity, or inter-

17  national organization, as applicable, not later than 5 days

18  after the effective date of such document: *Provided further,*

19  That funds appropriated under this heading in this Act

20  may be made available as contributions: *Provided further,*

21  That funds appropriated under this heading in this Act

22  shall not be used to support the refoulement of migrants

23  or refugees: *Provided further,* That such amount is des-

24  ignated by the Congress as being for an emergency re-

28

1 quirement pursuant to section 251(b)(2)(A)(i) of the Bal-

2 anced Budget and Emergency Deficit Control Act of 1985.

3    INTERNATIONAL SECURITY ASSISTANCE

4             DEPARTMENT OF STATE

5       INTERNATIONAL NARCOTICS CONTROL AND LAW

6                   ENFORCEMENT

7    For an additional amount for "International Nar-

8 cotics Control and Law Enforcement", $25,000,000, to re-

9 main available until September 30, 2025, to counter the

10 flow of fentanyl, fentanyl precursors, and other synthetic

11 drugs into the United States, following consultation with

12 the Committees on Appropriations: *Provided,* That such

13 amount is designated by the Congress as being for an

14 emergency requirement pursuant to section

15 251(b)(2)(A)(i) of the Balanced Budget and Emergency

16 Deficit Control Act of 1985..

29

TITLE V

GENERAL PROVISIONS—THIS ACT

SEC. 501. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 502. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 503. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2024.

SEC. 504. Each amount designated in this Act by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985 shall be available (or repurposed or rescinded, if applicable) only if the President subsequently so designates all such amounts and transmits such designations to the Congress.

SEC. 505. Any amount appropriated by this Act, designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, and subsequently so designated by the President, and transferred

30

1 pursuant to transfer authorities provided by this Act shall

2 retain such designation.

3    This division may be cited as the ''Border Security

4 and Combatting Fentanyl Supplemental Appropriations

5 Act, 2024''.

IFR_AR_001744

1 # DIVISION B—BORDER ACT

2 **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

3    (a) SHORT TITLE.—This division may be cited as the

4 ''Border Act''.

5    (b) TABLE OF CONTENTS.—The table of contents for

6 this division is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.

TITLE I—CAPACITY BUILDING

Subtitle A—Hiring, Training, and Systems Modernization

CHAPTER 1—HIRING AUTHORITIES

Sec. 101. USCIS direct hire authority.
Sec. 102. ICE direct hire authority.
Sec. 103. Reemployment of civilian retirees to meet exceptional employment needs.
Sec. 104. Establishment of special pay rate for asylum officers.

CHAPTER 2—HIRING WAIVERS

Sec. 111. Hiring flexibility.
Sec. 112. Supplemental Commissioner authority and definitions.

CHAPTER 3—ALTERNATIVES TO DETENTION IMPROVEMENTS AND TRAINING FOR U.S. BORDER PATROL

Sec. 121. Alternatives to detention improvements.
Sec. 122. Training for U.S. Border Patrol.

CHAPTER 4—MODERNIZING NOTICES TO APPEAR

Sec. 131. Electronic notices to appear.
Sec. 132. Authority to prepare and issue notices to appear.

Subtitle B—Asylum Processing at the Border

Sec. 141. Provisional noncustodial removal proceedings.
Sec. 142. Protection merits removal proceedings.
Sec. 143. Voluntary departure after noncustodial processing; withdrawal of application for admission.
Sec. 144. Voluntary repatriation.
Sec. 145. Immigration Examinations Fee Account.
Sec. 146. Border reforms.
Sec. 147. Protection Appellate Board.

TITLE II—ASYLUM PROCESSING ENHANCEMENTS

Sec. 201. Combined screenings.

IFR_AR_001745

32

Sec. 202. Credible fear standard and asylum bars at screening interview.
Sec. 203. Internal relocation.
Sec. 204. Asylum officer clarification.

TITLE III—SECURING AMERICA

Subtitle A—Border Emergency Authority

Sec. 301. Border emergency authority.

Subtitle B—Fulfilling Promises to Afghan Allies

Sec. 311. Definitions.
Sec. 312. Support for Afghan allies outside the United States.
Sec. 313. Conditional permanent resident status for eligible individuals.
Sec. 314. Refugee processes for certain at-risk Afghan allies.
Sec. 315. Improving efficiency and oversight of refugee and special immigrant processing.
Sec. 316. Support for certain vulnerable Afghans relating to employment by or on behalf of the United States.
Sec. 317. Support for allies seeking resettlement in the United States.
Sec. 318. Reporting.

TITLE IV—PROMOTING LEGAL IMMIGRATION

Sec. 401. Employment authorization for fiancés, fiancées, spouses, and children of United States citizens and specialty workers.
Sec. 402. Additional visas.
Sec. 403. Children of long-term visa holders.
Sec. 404. Military naturalization modernization.
Sec. 405. Temporary family visits.

TITLE V—SELF-SUFFICIENCY AND DUE PROCESS

Subtitle A—Work Authorizations

Sec. 501. Work authorization.
Sec. 502. Employment eligibility.

Subtitle B—Protecting Due Process

Sec. 511. Access to counsel.
Sec. 512. Counsel for certain unaccompanied alien children.
Sec. 513. Counsel for certain incompetent individuals.
Sec. 514. Conforming amendment.

TITLE VI—ACCOUNTABILITY AND METRICS

Sec. 601. Employment authorization compliance.
Sec. 602. Legal access in custodial settings.
Sec. 603. Credible fear and protection determinations.
Sec. 604. Publication of operational statistics by U.S. Customs and Border Protection.
Sec. 605. Utilization of parole authorities.
Sec. 606. Accountability in provisional removal proceedings.
Sec. 607. Accountability in voluntary repatriation, withdrawal, and departure.

IFR_AR_001746

33

Sec. 608. GAO analysis of immigration judge and asylum officer decision-making regarding asylum, withholding of removal, and protection under the Convention Against Torture.
Sec. 609. Report on counsel for unaccompanied alien children.
Sec. 610. Recalcitrant countries.

TITLE VII—OTHER MATTERS

Sec. 701. Severability.

TITLE VIII—BUDGETARY EFFECTS

Sec. 801. Budgetary effects.

**SEC. 2. DEFINITIONS.**

In this division:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—Except as otherwise explicitly provided, the term "appropriate committees of Congress" means—

(A) the Committee on Appropriations of the Senate;

(B) the Committee on the Judiciary of the Senate;

(C) the Committee on Homeland Security and Governmental Affairs of the Senate;

(D) the Committee on Appropriations of the House of Representatives;

(E) the Committee on the Judiciary of the House of Representatives; and

(F) the Committee on Homeland Security of the House of Representatives.

(2) SECRETARY.—The term "Secretary" means the Secretary of Homeland Security.

IFR_AR_001747

34

# TITLE I—CAPACITY BUILDING

# Subtitle A—Hiring, Training, and Systems Modernization

## CHAPTER 1—HIRING AUTHORITIES

**SEC. 101. USCIS DIRECT HIRE AUTHORITY.**

(a) IN GENERAL.—The Secretary may appoint, without regard to the provisions of sections 3309 through 3319 of title 5, United States Code, candidates needed for positions within the Refugee, Asylum and International Operations Directorate, the Field Operations Directorate, and the Service Center Operations Directorate of U.S. Citizenship and Immigration Services for which—

(1) public notice has been given;

(2) the Secretary has determined that a critical hiring need exists; and

(3) the Secretary has consulted with the Director of the Office of Personnel Management regarding—

(A) the positions for which the Secretary plans to recruit;

(B) the quantity of candidates Secretary is seeking; and

(C) the assessment and selection policies the Secretary plans to utilize.

IFR_AR_001748

35

1    (b) DEFINITION OF CRITICAL HIRING NEED.—In

2  this section, the term "critical hiring need" means per-

3  sonnel necessary for the implementation of this division

4  and associated work.

5    (c) REPORTING.—Not later than 1 year after the date

6  of enactment of this Act, and annually thereafter for the

7  following 4 years, the Secretary, in consultation with the

8  Director of the Office of Personnel Management, shall

9  submit to Congress a report that includes—

10        (1) demographic data, including veteran status,

11      regarding individuals hired pursuant to the authority

12      under subsection (a);

13        (2) salary information of individuals hired pur-

14      suant to such authority; and

15        (3) how the Department of Homeland Security

16      exercised such authority consistently with merit sys-

17      tem principles.

18    (d) SUNSET.—The authority to make an appointment

19  under this section shall terminate on the date that is 5

20  years after the date of the enactment of this Act.

21  **SEC. 102. ICE DIRECT HIRE AUTHORITY.**

22    (a) IN GENERAL.—The Secretary may appoint, with-

23  out regard to the provisions of sections 3309 through

24  3319 of title 5, United States Code, candidates needed for

25  positions within Enforcement and Removal Operations of

36

1 U.S. Immigration and Customs Enforcement as a deporta-
2 tion officer or with duties exclusively relating to the En-
3 forcement and Removal, Custody Operations, Alternatives
4 to Detention, or Transportation and Removal program for
5 which—

6      (1) public notice has been given;

7      (2) the Secretary has determined that a critical
8   hiring need exists; and

9      (3) the Secretary has consulted with the Direc-
10   tor of the Office of Personnel Management regard-
11   ing—

12          (A) the positions for which the Secretary
13       plans to recruit;

14          (B) the quantity of candidates the Sec-
15       retary is seeking; and

16          (C) the assessment and selection policies
17       the Secretary plans to utilize.

18 (b) DEFINITION OF CRITICAL HIRING NEED.—In
19 this section, the term ''critical hiring need'' means per-
20 sonnel necessary for the implementation of this division
21 and associated work.

22 (c) REPORTING.—Not later than 1 year after the date
23 of the enactment of this Act, and annually thereafter for
24 the following 4 years, the Secretary, in consultation with

37

1 the Director of the Office of Personnel Management, shall

2 submit to Congress a report that includes—

3       (1) demographic data, including veteran status,

4       regarding individuals hired pursuant to the authority

5       under subsection (a);

6       (2) salary information of individuals hired pur-

7       suant to such authority; and

8       (3) how the Department of Homeland Security

9       exercised such authority consistently with merit sys-

10      tem principles.

11  (d) SUNSET.—The authority to make an appointment

12 under this section shall terminate on the date that is 5

13 years after the date of the enactment of this Act.

14 **SEC. 103. REEMPLOYMENT OF CIVILIAN RETIREES TO**

15          **MEET EXCEPTIONAL EMPLOYMENT NEEDS.**

16  (a) AUTHORITY.—The Secretary, after consultation

17 with the Director of the Office of Personnel Management,

18 may waive, with respect to any position in U.S. Immigra-

19 tion and Customs Enforcement, U.S. Customs and Border

20 Protection, or U.S. Citizenship and Immigration Services,

21 the application of section 8344 or 8468 of title 5, United

22 States Code, on a case-by-case basis, for employment of

23 an annuitant in a position necessary to implement this di-

24 vision and associated work, for which there is exceptional

38

1 difficulty in recruiting or retaining a qualified employee,

2 or when a temporary emergency hiring need exists.

3     (b) PROCEDURES.—The Secretary, after consultation

4 with the Director of the Office of Personnel Management,

5 shall prescribe procedures for the exercise of the authority

6 under subsection (a), including procedures for a delegation

7 of authority.

8     (c) ANNUITANTS NOT TREATED AS EMPLOYEES FOR

9 PURPOSES OF RETIREMENT BENEFITS.—An employee for

10 whom a waiver under this section is in effect shall not

11 be considered an employee for purposes of subchapter III

12 of chapter 83 or chapter 84 of title 5, United States Code.

**13 SEC. 104. ESTABLISHMENT OF SPECIAL PAY RATE FOR ASY-**

**14                    LUM OFFICERS.**

15     (a) IN GENERAL.—Subchapter III of chapter 53 of

16 title 5, United States Code, is amended by inserting after

17 section 5332 the following:

**18 "§ 5332a. Special base rates of pay for asylum officers**

19     "(a) DEFINITIONS.—In this section—

20         "(1) the term 'asylum officer' has the meaning

21     given such term in section 235(b)(1) of the Immi-

22     gration and Nationality Act (8 U.S.C. 1225(b)(1));

23         "(2) the term 'General Schedule base rate'

24     means an annual rate of basic pay established under

25     section 5332 before any additions, such as a locality-

1   based comparability payment under section 5304 or
2   5304a or a special rate supplement under section
3   5305; and

4       ''(3) the term 'special base rate' means an an-
5   nual rate of basic pay payable to an asylum officer,
6   before any additions or reductions, that replaces the
7   General Schedule base rate otherwise applicable to
8   the asylum officer and that is administered in the
9   same manner as a General Schedule base rate.

10  ''(b) SPECIAL BASE RATES OF PAY.—

11      ''(1) ENTITLEMENT TO SPECIAL RATE.—Not-
12  withstanding section 5332, an asylum officer is enti-
13  tled to a special base rate at grades 1 through 15,
14  which shall—

15          ''(A) replace the otherwise applicable Gen-
16      eral Schedule base rate for the asylum officer;

17          ''(B) be basic pay for all purposes, includ-
18      ing the purpose of computing a locality-based
19      comparability payment under section 5304 or
20      5304a; and

21          ''(C) be computed as described in para-
22      graph (2) and adjusted at the time of adjust-
23      ments in the General Schedule.

24      ''(2) COMPUTATION.—The special base rate for
25  an asylum officer shall be derived by increasing the

IFR_AR_001753

40

1    otherwise applicable General Schedule base rate for

2    the asylum officer by 15 percent for the grade of the

3    asylum officer and rounding the result to the nearest

4    whole dollar.''.

5    (b) CLERICAL AMENDMENT.—The table of sections

6    for subchapter III of chapter 53 of title 5, United States

7    Code, is amended by inserting after the item relating to

8    section 5332 the following:

"5332a. Special base rates of pay for asylum officers.''.

9    (c) EFFECTIVE DATE.—The amendments made by

10   this section shall take effect on the first day of the first

11   applicable pay period beginning 30 days after the date of

12   the enactment of this Act.

## CHAPTER 2—HIRING WAIVERS

14   **SEC. 111. HIRING FLEXIBILITY.**

15   (a) IN GENERAL.—Section 3 of the Anti-Border Cor-

16   ruption Act of 2010 (6 U.S.C. 221) is amended by striking

17   subsection (b) and inserting the following new subsections:

18   ''(b) WAIVER AUTHORITY.—The Commissioner of

19   U.S. Customs and Border Protection may waive the appli-

20   cation of subsection (a)(1) in the following circumstances:

21       ''(1) In the case of a current, full-time law en-

22       forcement officer employed by a State or local law

23       enforcement agency, if such officer—

41

1              "(A) has served as a law enforcement offi-

2           cer for not fewer than three years with no

3           break in service;

4              "(B) is authorized by law to engage in or

5           supervise the prevention, detection, investiga-

6           tion, or prosecution of, or the incarceration of

7           any person for, any violation of law, and has

8           statutory powers for arrest or apprehension;

9              "(C) is not currently under investigation,

10          does not have disciplinary, misconduct, or de-

11          rogatory records, has not been found to have

12          engaged in a criminal offense or misconduct,

13          has not resigned from a law enforcement officer

14          position under investigation or in lieu of termi-

15          nation, and has not been dismissed from a law

16          enforcement officer position; and

17             "(D) has, within the past ten years, suc-

18          cessfully completed a polygraph examination as

19          a condition of employment with such officer's

20          current law enforcement agency.

21         "(2) In the case of a current, full-time Federal

22       law enforcement officer, if such officer—

23              "(A) has served as a law enforcement offi-

24          cer for not fewer than three years with no

25          break in service;

IFR_AR_001755

42

1          ''(B) has authority to make arrests, con-
2     duct investigations, conduct searches, make sei-
3     zures, carry firearms, and serve orders, war-
4     rants, and other processes;

5          ''(C) is not currently under investigation,
6     does not have disciplinary, misconduct, or de-
7     rogatory records, has not been found to have
8     engaged in a criminal offense or misconduct,
9     has not resigned from a law enforcement officer
10    position under investigation or in lieu of termi-
11    nation, and has not been dismissed from a law
12    enforcement officer position; and

13         ''(D) holds a current background investiga-
14    tion, in accordance with current standards re-
15    quired for access to Top Secret or Top Secret/
16    Sensitive Compartmented Information.

17    ''(3) In the case of an individual who is a mem-
18    ber of the Armed Forces (or a reserve component
19    thereof) or a veteran, if such individual—

20         ''(A) has served in the Armed Forces for
21    not fewer than three years;

22         ''(B) holds, or has held within the past five
23    years, Top Secret or Top Secret/Sensitive Com-
24    partmented Information clearance;

43

1            ''(C) holds, or has undergone within the

2            past five years, a current background investiga-

3            tion in accordance with current standards re-

4            quired for access to Top Secret or Top Secret/

5            Sensitive Compartmented Information;

6            ''(D) received, or is eligible to receive, an

7            honorable discharge from service in the Armed

8            Forces, has not engaged in a criminal offense,

9            has not committed a military offense under the

10            Uniform Code of Military Justice, and does not

11            have disciplinary, misconduct, or derogatory

12            records; and

13            ''(E) was not granted any waivers to ob-

14            tain the clearance referred to subparagraph

15            (B).

16     ''(c) TERMINATION OF WAIVER AUTHORITY.—The

17 authority to issue a waiver under subsection (b) shall ter-

18 minate on September 30, 2027.''.

19     (b) REINSTATEMENT.—Upon termination of the

20 waiver authority under subsection (b) of section 3 of the

21 Anti-Border Corruption Act of 2010 (6 U.S.C. 221), as

22 amended by subsection (a), the text of section 3(b) of the

23 Anti-Border Corruption Act of 2010 (6 U.S.C. 221(b))

24 shall be reinstated as it appeared on the day before the

25 date of the enactment of this Act.

IFR_AR_001757

44

## SEC. 112. SUPPLEMENTAL COMMISSIONER AUTHORITY AND DEFINITIONS.

3    (a) SUPPLEMENTAL COMMISSIONER AUTHORITY.—

4 Section 4 of the Anti-Border Corruption Act of 2010

5 (Public Law 111–376) is amended to read as follows:

**"SEC. 4. SUPPLEMENTAL COMMISSIONER AUTHORITY.**

7    "(a) NON-EXEMPTION.—An individual who receives a

8 waiver under subsection (b) of section 3 is not exempt

9 from other hiring requirements relating to suitability for

10 employment and eligibility to hold a national security des-

11 ignated position, as determined by the Commissioner of

12 U.S. Customs and Border Protection.

13    "(b) BACKGROUND INVESTIGATIONS.—Any indi-

14 vidual who receives a waiver under subsection (b) of sec-

15 tion 3 who holds a background investigation in accordance

16 with current standards required for access to Top Secret

17 or Top Secret/Sensitive Compartmented Information shall

18 be subject to an appropriate background investigation.

19    "(c) ADMINISTRATION OF POLYGRAPH EXAMINA-

20 TION.—The Commissioner of U.S. Customs and Border

21 Protection is authorized to administer a polygraph exam-

22 ination to an applicant or employee who is eligible for or

23 receives a waiver under subsection (b) of section 3 if infor-

24 mation is discovered prior to the completion of a back-

25 ground investigation that results in a determination that

26 a polygraph examination is necessary to make a final de-

45

1 termination regarding suitability for employment or con-

2 tinued employment, as the case may be.''.

3    (b) REPORT.—The Anti-Border Corruption Act of

4 2010 (Public Law 111–376; 124 Stat. 4104) is amended

5 by adding at the end the following new section:

6 **"SEC. 5. REPORTING REQUIREMENTS.**

7    "(a) ANNUAL REPORT.—Not later than one year

8 after the date of the enactment of this section, and annu-

9 ally thereafter for three years, the Commissioner of U.S.

10 Customs and Border Protection shall submit a report to

11 Congress that includes, with respect to the reporting pe-

12 riod—

13       "(1) the number of waivers granted and denied

14    under section 3(b);

15       "(2) the reasons for any denials of such waiver;

16       "(3) the percentage of applicants who were

17    hired after receiving a waiver;

18       "(4) the number of instances that a polygraph

19    was administered to an applicant who initially re-

20    ceived a waiver and the results of such polygraph;

21       "(5) an assessment of the current impact of the

22    polygraph waiver program on filling law enforcement

23    positions at U.S. Customs and Border Protection;

IFR_AR_001759

1    ''(6) additional authorities needed by U.S. Cus-

2   toms and Border Protection to better utilize the

3   polygraph waiver program for its intended goals; and

4    ''(7) any disciplinary actions taken against law

5   enforcement officers hired under the waiver author-

6   ity authorized under section 3(b).

7  ''(b) ADDITIONAL INFORMATION.—The first report

8 submitted under subsection (a) shall include—

9    ''(1) an analysis of other methods of employ-

10   ment suitability tests that detect deception and could

11   be used in conjunction with traditional background

12   investigations to evaluate potential employees for

13   suitability; and

14    ''(2) a recommendation regarding whether a

15   test referred to in paragraph (1) should be adopted

16   by U.S. Customs and Border Protection when the

17   polygraph examination requirement is waived pursu-

18   ant to section 3(b).''.

19 (c) GAO REPORT.—The Anti-Border Corruption Act

20 of 2010 (Public Law 111–376; 124 Stat. 4104), as

21 amended by subsection (b) of this section, is further

22 amended by adding at the end the following new section:

23 **''SEC. 6. GAO REPORT.**

24 ''(a) IN GENERAL.—Not later than five years after

25 the date of the enactment of this section, and every five

47

1 years thereafter, the Comptroller General of the United
2 States shall—

3     ''(1) conduct a review of the disciplinary, mis-
4     conduct, or derogatory records of all individuals
5     hired using the waiver authority under subsection
6     (b) of section 3—

7         ''(A) to determine the rates of disciplinary
8         actions taken against individuals hired using
9         such waiver authority, as compared to individ-
10         uals hired after passing the polygraph as re-
11         quired under subsection (a) of that section; and

12         ''(B) to address any other issue relating to
13         discipline by U.S. Customs and Border Protec-
14         tion; and

15     ''(2) submit to the Committee on Homeland Se-
16     curity and Governmental Affairs of the Senate and
17     the Committee on Homeland Security of the House
18     of Representatives a report that appropriately pro-
19     tects sensitive information and describes the results
20     of the review conducted under paragraph (1).

21   ''(b) SUNSET.—The requirement under this section
22 shall terminate on the date on which the third report re-
23 quired by subsection (a) is submitted.''.

24   (d) DEFINITIONS.—The Anti-Border Corruption Act
25 of 2010 (Public Law 111–376; 124 Stat. 4104), as

48

1    amended by subsection (c) of this section, is further

2    amended by adding at the end the following new section:

3    **"SEC. 7. DEFINITIONS.**

4        "In this Act:

5            "(1) CRIMINAL OFFENSE.—The term 'criminal

6        offense' means—

7                "(A) any felony punishable by a term of

8            imprisonment of more than one year; and

9                "(B) any other crime for which an essen-

10           tial element involves fraud, deceit, or misrepre-

11           sentation to obtain an advantage or to dis-

12           advantage another.

13           "(2) FEDERAL LAW ENFORCEMENT OFFICER.—

14       The term 'Federal law enforcement officer' means a

15       'law enforcement officer', as defined in section

16       8331(20) or 8401(17) of title 5, United States Code.

17           "(3) MILITARY OFFENSE.—The term 'military

18       offense' means—

19                "(A) an offense for which—

20                    "(i) a member of the Armed Forces

21                may be discharged or separated from serv-

22                ice in the Armed Forces; or

23                    "(ii) a punitive discharge is, or would

24                be, authorized for the same or a closely re-

25                lated offense under the Manual for Courts-

49

1          Martial, as pursuant to Army Regulation

2          635–200 chapter 14–12; and

3              "(B) an action for which a member of the

4          Armed Forces received a demotion in military

5          rank as punishment for a crime or wrongdoing,

6          imposed by a court martial or other authority.

7          "(4) VETERAN.—The term 'veteran' has the

8      meaning given such term in section 101(2) of title

9      38, United States Code.".

## CHAPTER 3—ALTERNATIVES TO DETENTION IMPROVEMENTS AND TRAINING FOR U.S. BORDER PATROL

**SEC. 121. ALTERNATIVES TO DETENTION IMPROVEMENTS.**

14      (a) CERTIFICATION.—Not later than 90 days after

15  the date of the enactment of this Act, the Director of U.S.

16  Immigration and Customs Enforcement shall certify to the

17  appropriate committees of Congress that—

18          (1) with respect to the alternatives to detention

19      programs, U.S. Immigration and Customs Enforce-

20      ment's processes that condition the release of aliens

21      under any type of supervision, consistent and stand-

22      ard policies are in place across all U.S. Immigration

23      and Customs Enforcement field offices;

50

1    (2) the U.S. Immigration and Customs En-
2    forcement's alternatives to detention programs use
3    escalation and de-escalation techniques; and

4    (3) reports on the use of, and policies with re-
5    spect to, such escalation and de-escalation tech-
6    niques are provided to the public appropriately pro-
7    tecting sensitive information.

8  (b) ANNUAL POLICY REVIEW.—

9    (1) IN GENERAL.—Not less frequently than an-
10    nually, the Director shall conduct a review of U.S.
11    Immigration and Customs Enforcement policies with
12    respect to the alternatives to detention programs so
13    as to ensure standardization and evidence-based de-
14    cision making.

15    (2) SUBMISSION OF POLICY REVIEWS.—Not
16    later than 14 days after the completion of each re-
17    view required by paragraph (1), the Director shall
18    submit to the appropriate committees of Congress a
19    report on the results of the review.

20  (c) INDEPENDENT VERIFICATION AND VALIDA-
21  TION.—Not less frequently than every 5 years, the Direc-
22  tor shall ensure that an independent verification and vali-
23  dation of U.S. Immigration and Customs Enforcement
24  policies with respect to the alternatives to detention pro-
25  grams is conducted.

IFR_AR_001764

51

1 **SEC. 122. TRAINING FOR U.S. BORDER PATROL.**

2     (a) IN GENERAL.—The Commissioner of U.S. Cus-

3 toms and Border Protection shall require all U.S. Border

4 Patrol agents and other employees or contracted employ-

5 ees designated by the Commissioner to participate in an-

6 nual continuing training to maintain and update their un-

7 derstanding of—

8         (1) Department of Homeland Security policies,

9     procedures, and guidelines;

10         (2) the fundamentals of law (including the

11     Fourth Amendment to the Constitution of the

12     United States), ethics, and professional conduct;

13         (3) applicable Federal law and regulations;

14         (4) applicable migration trends that the Com-

15     missioner determines are relevant;

16         (5) best practices for coordinating with commu-

17     nity stakeholders;

18         (6) de-escalation training; and

19         (7) any other information the Commissioner de-

20     termines to be relevant to active duty agents.

21     (b)   TRAINING   SUBJECTS.—Continuing   training

22 under this section shall include training regarding—

23         (1) the non-lethal use of force policies available

24     to U.S. Border Patrol agents and de-escalation

25     strategies and methods;

52

1    (2) identifying, screening, and responding to

2    vulnerable populations, such as children, persons

3    with diminished mental capacity, victims of human

4    trafficking, pregnant mothers, victims of gender-

5    based violence, victims of torture or abuse, and the

6    acutely ill;

7    (3) trends in transnational criminal organiza-

8    tion activities that impact border security and mi-

9    gration;

10    (4) policies, strategies, and programs—

11        (A) to protect due process, the civil,

12        human, and privacy rights of individuals, and

13        the private property rights of land owners;

14        (B) to reduce the number of migrant and

15        agent deaths; and

16        (C) to improve the safety of agents on pa-

17        trol;

18    (5) personal resilience;

19    (6) anti-corruption and officer ethics training;

20    (7) current migration trends, including updated

21    cultural and societal issues of countries that are a

22    significant source of migrants who are—

23        (A) arriving to seek humanitarian protec-

24        tion; or

53

1          (B) encountered at a United States inter-
2     national boundary while attempting to enter
3     without inspection;

4          (8) the impact of border security operations on
5     natural resources and the environment, including
6     strategies to limit the impact of border security op-
7     erations on natural resources and the environment;

8          (9) relevant cultural, societal, racial, and reli-
9     gious training, including cross-cultural communica-
10    tion skills;

11         (10) training required under the Prison Rape
12    Elimination Act of 2003 (42 U.S.C. 15601 et seq.);

13         (11) risk management and safety training that
14    includes agency protocols for ensuring public safety,
15    personal safety, and the safety of persons in the cus-
16    tody of the Department of Homeland Security; and

17         (12) any other training that meets the require-
18    ments to maintain and update the subjects identified
19    in subsection (a).

20    (c) COURSE REQUIREMENTS.—Courses offered under
21 this section—

22         (1) shall be administered by U.S. Customs and
23    Border Protection; and

24         (2) shall be approved in advance by the Com-
25    missioner of U.S. Customs and Border Protection to

54

1    ensure that such courses satisfy the requirements for

2    training under this section.

3    (d) ASSESSMENT.—Not later than 2 years after the

4   date of the enactment of this Act, the Comptroller General

5   of the United States shall submit to the Committee on

6   Homeland Security and Governmental Affairs of the Sen-

7   ate and the Committee on Homeland Security of the

8   House of Representatives a report that assesses the train-

9   ing and education provided pursuant to this section, in-

10  cluding continuing education.

## CHAPTER 4—MODERNIZING NOTICES TO APPEAR

**SEC. 131. ELECTRONIC NOTICES TO APPEAR.**

14    Section 239 of the Immigration and Nationality Act

15  (8 U.S.C. 1229) is amended—

16        (1) in subsection (a)—

17            (A) in paragraph (1), in the matter pre-

18        ceding subparagraph (A), by inserting "or, if

19        elected by the alien in writing, by email or other

20        electronic means to the extent feasible, if the

21        alien, or the alien's counsel of record, volun-

22        tarily elects such service or otherwise accepts

23        service electronically" after "mail"; and

24            (B) in paragraph (2)(A), in the matter

25        preceding clause (i), by inserting "or, if elected

55

1          by the alien in writing, by email or other elec-
2          tronic means to the extent feasible, if the alien,
3          or the alien's counsel of record, voluntarily
4          elects such service or otherwise accepts service
5          electronically'' after ''mail''; and
6      (2) in subsection (c)—
7          (A) by inserting ''the alien, or to the
8          alien's counsel of record, at'' after ''delivery
9          to''; and
10          (B) by inserting '', or to the email address
11          or other electronic address at which the alien
12          elected to receive notice under paragraph (1) or
13          (2) of subsection (a)'' before the period at the
14          end.

15 **SEC. 132. AUTHORITY TO PREPARE AND ISSUE NOTICES TO**
16              **APPEAR.**

17      Section 239(a) of the Immigration and Nationality
18 Act (8 U.S.C. 1229(a)) is amended by adding at the end
19 the following:

20      ''(4) AUTHORITY FOR CERTAIN PERSONNEL TO
21      SERVE NOTICES TO APPEAR.—Any mission support
22      personnel within U.S. Customs and Border Protec-
23      tion or U.S. Immigration and Customs Enforcement
24      who are subject to the oversight of an immigration
25      officer with authority to issue a notice to appear,

56

1    and who has received the necessary training to issue

2    such a notice, shall be authorized to prepare a notice

3    to appear under this section for review and issuance

4    by the immigration officer.''.

## Subtitle B—Asylum Processing at the Border

7    SEC. 141. PROVISIONAL NONCUSTODIAL REMOVAL PRO-

8        CEEDINGS.

9        (a) IN GENERAL.—Chapter 4 of title II of the Immi-

10   gration and Nationality Act (8 U.S.C. 1221 et seq.) is

11   amended by inserting after section 235A the following:

12   "SEC. 235B. PROVISIONAL NONCUSTODIAL REMOVAL PRO-

13       CEEDINGS.

14       "(a) GENERAL RULES.—

15           "(1) CIRCUMSTANCES WARRANTING NONCUSTO-

16       DIAL PROCEEDINGS.—The Secretary, based upon

17       operational circumstances, may refer an alien appli-

18       cant for admission for proceedings described in this

19       section if the alien—

20               "(A) indicates an intention to apply for a

21           protection determination; or

22               "(B) expresses a credible fear of persecu-

23           tion (as defined in section 235(b)(1)(B)(v)) or

24           torture.

57

1 ''(2) RELEASE FROM CUSTODY.—Aliens re-
2 ferred for proceedings under this section shall be re-
3 leased from physical custody and processed in ac-
4 cordance with the procedures described in this sec-
5 tion.

6 ''(3) ALTERNATIVES TO DETENTION.—An adult
7 alien, including a head of household, who has been
8 referred for a proceeding under this section shall be
9 supervised under the Alternatives to Detention pro-
10 gram of U.S. Immigration and Customs Enforce-
11 ment immediately upon release from physical cus-
12 tody and continuing for the duration of such pro-
13 ceeding.

14 ''(4) FAMILY UNITY.—The Secretary shall en-
15 sure, to the greatest extent practicable, that the re-
16 ferral of a family unit for proceedings under this
17 section includes all members of such family unit who
18 are traveling together.

19 ''(5) EXCEPTIONS.—

20 ''(A) UNACCOMPANIED ALIEN CHIL-
21 DREN.—The provisions under this section may
22 not be applied to unaccompanied alien children
23 (as defined in section 462(g) of the Homeland
24 Security Act of 2002 (6 U.S.C. 279(g))).

25 ''(B) APPLICABILITY LIMITATION.—

58

1          "(i) IN GENERAL.—The Secretary
2     shall only refer for proceedings under this
3     section an alien described in clause (ii).
4          "(ii) ALIEN DESCRIBED.— An alien
5     described in this clause is an alien who—
6              "(I) has not affirmatively shown,
7          to the satisfaction of an immigration
8          officer, that the alien has been phys-
9          ically present in the United States for
10         more than the 14-day period imme-
11         diately prior to the date on which the
12         alien was encountered by U.S. Cus-
13         toms and Border Protection; and
14             "(II) was encountered within 100
15         air miles of the international land bor-
16         ders of the United States.
17     "(6) TIMING.—The provisional noncustodial re-
18     moval proceedings described in this section shall
19     conclude, to the maximum extent practicable, not
20     later than 90 days after the date the alien is in-
21     spected and determined inadmissible.
22     "(b) PROCEDURES FOR PROVISIONAL NONCUSTO-
23 DIAL REMOVAL PROCEEDINGS.—
24          "(1) COMMENCEMENT.—

59

1    ''(A) IN GENERAL.—Provisional noncusto-
2    dial removal proceedings shall commence under
3    this section with respect to an alien immediately
4    after the Secretary properly serves a notice of
5    removal proceedings on the alien.

6    ''(B) 90-DAY TIMEFRAME.—The 90-day
7    period under subsection (a)(6) with respect to
8    an alien shall commence upon an inspection and
9    inadmissibility determination of the alien.

10   ''(2) SERVICE AND NOTICE OF INTERVIEW RE-
11   QUIREMENTS.—In provisional noncustodial removal
12   proceedings conducted under this section, the Sec-
13   retary shall—

14   ''(A) serve notice to the alien or, if per-
15   sonal service is not practicable, to the alien's
16   counsel of record;

17   ''(B) ensure that such notice, to the max-
18   imum extent practicable, is in the alien's native
19   language or in a language the alien under-
20   stands; and

21   ''(C) include in such notice—

22   ''(i) the nature of the proceedings
23   against the alien;

24   ''(ii) the legal authority under which
25   such proceedings will be conducted; and

1        "(iii) the charges against the alien

2    and the statutory provisions the alien is al-

3    leged to have violated;

4        "(D) inform the alien of his or her obliga-

5    tion—

6            "(i) to immediately provide (or have

7        provided) to the Secretary, in writing, the

8        mailing address, contact information, email

9        address or other electronic address, and

10        telephone number (if any), at which the

11        alien may be contacted respecting the pro-

12        ceeding under this section; and

13            "(ii) to provide to the Secretary, in

14        writing, any change of the alien's mailing

15        address or telephone number shortly after

16        any such change;

17        "(E) include in such notice—

18            "(i) the time and place at which the

19        proceeding under this section will be held,

20        which shall be communicated, to the extent

21        practicable, before or during the alien's re-

22        lease from physical custody; or

23            "(ii) immediately after release, the

24        time and place of such proceeding, which

25        shall be provided not later than 10 days

IFR_AR_001774

61

1           before the scheduled protection determina-

2           tion interview and shall be considered

3           proper service of the commencement of

4           proceedings; and

5           ''(F) inform the alien of—

6               ''(i) the consequences to which the

7           alien would be subject pursuant to section

8           240(b)(5) if the alien fails to appear at

9           such proceeding, absent exceptional cir-

10          cumstances;

11             ''(ii) the alien's right to be rep-

12          resented, at no expense to the Federal

13          Government, by any counsel or accredited

14          representative selected by the alien who is

15          authorized to represent an alien in such a

16          proceeding; and

17          ''(G) the information described in section

18          235(b)(1)(B)(iv)(II).

19      ''(3) PROTECTION DETERMINATION.—

20          ''(A) IN GENERAL.—To the maximum ex-

21          tent practicable, within 90 days after the date

22          on which an alien is referred for proceedings

23          under this section, an asylum officer shall con-

24          duct a protection determination of such alien in

62

1  person or through a technology appropriate for

2  protection determinations.

3      ''(B) ACCESS TO COUNSEL.—In any pro-

4  ceeding under this section or section 240D be-

5  fore U.S. Citizenship and Immigration Services

6  and in any appeal of the result of such a pro-

7  ceeding, an alien shall have the privilege of

8  being represented, at no expense to the Federal

9  Government, by counsel authorized to represent

10  an alien in such a proceeding.

11      ''(C) PROCEDURES AND EVIDENCE.—The

12  asylum officer may receive into evidence any

13  oral or written statement that is material and

14  relevant to any matter in the protection deter-

15  mination. The testimony of the alien shall be

16  under oath or affirmation administered by the

17  asylum officer.

18      ''(D)  INTERPRETERS.—Whenever  nec-

19  essary, the asylum officer shall procure the as-

20  sistance of an interpreter, to the maximum ex-

21  tent practicable, in the alien's native language

22  or in a language the alien understands, during

23  any protection determination.

24      ''(E) LOCATION.—

63

1     "(i) IN GENERAL.—Any protection de-

2    termination authorized under this section

3    shall occur in—

4      "(I) a U.S. Citizenship and Im-

5     migration Services office;

6      "(II) a facility managed, leased,

7     or operated by U.S. Citizenship and

8     Immigration Services;

9      "(III) any other location des-

10     ignated by the Director of U.S. Citi-

11     zenship and Immigration Services; or

12      "(IV) any other federally owned

13     or federally leased building that—

14       "(aa) the Director has au-

15      thorized or entered into a memo-

16      randum of agreement to be used

17      for such purpose; and

18       "(bb) meets the special rules

19      under clause (ii) and the min-

20      imum requirements under clause

21      (iii).

22    "(ii) SPECIAL RULES.—

23      "(I) LOCATION.—A protection

24     determination may not be conducted

25     in a facility that is managed, leased,

1    owned, or operated by U.S. Immigra-

2    tion and Customs Enforcement or

3    U.S. Customs and Border Protection.

4    ''(II) REASONABLE TIME.—The

5    Secretary shall ensure that a protec-

6    tion determination is conducted dur-

7    ing a reasonable time of the day.

8    ''(III) GEOGRAPHICAL LIMITA-

9    TION.—The Secretary shall ensure

10    that each protection determination for

11    an alien is scheduled at a facility that

12    is a reasonable distance from the cur-

13    rent residence of such alien.

14    ''(IV) PROTECTION FOR CHIL-

15    DREN.—In the case of a family unit,

16    the Secretary shall ensure that the

17    best interests of the child or children

18    are considered when conducting a pro-

19    tection determination of the child's

20    family unit.

21    ''(iii) MINIMUM LOCATION REQUIRE-

22    MENT.—Each facility that the Director au-

23    thorizes to be used to conduct protection

24    determinations shall—

IFR_AR_001778

65

1           ''(I)   have   adequate   security

2      measures  to  protect  Federal  employ-

3      ees, aliens, and beneficiaries for bene-

4      fits; and

5           ''(II) ensure the best interests of

6      the  child  or  children  are  prioritized

7      pursuant  to  clause  (ii)(IV)  if  such

8      children  are  present  at  the  protection

9      determination.

10     ''(F) WRITTEN RECORD.—The asylum offi-

11     cer  shall  prepare  a  written  record  of  each  pro-

12     tection  determination,  which—

13          ''(i)  shall  be  provided  to  the  alien,  or

14     to  the  alien's  counsel  of  record,  upon  a  de-

15     cision; and

16          ''(ii)  shall  include—

17               ''(I)  a  summary  of  the  material

18          facts  stated  by  the  alien;

19               ''(II)  any  additional  facts  relied

20          upon  by  the  asylum  officer;

21               ''(III)  the  asylum  officer's  anal-

22          ysis  of  why,  in  the  light  of  the  facts

23          referred  to  in  subclauses  (I)  and  (II),

24          the  alien  has  or  has  not  established  a

66

1        positive or negative outcome from the

2        protection determination; and

3            ''(IV) a copy of the asylum offi-

4        cer's interview notes.

5    ''(G) RESCHEDULING.—

6        ''(i) IN GENERAL.—The Secretary

7    shall promulgate regulations that permit

8    an alien to reschedule a protection deter-

9    mination in the event of exceptional cir-

10    cumstances.

11        ''(ii) TOLLING OF TIME LIMITA-

12    TION.—If an interview is rescheduled at

13    the request of an alien, the period between

14    the date on which the protection deter-

15    mination was originally scheduled and the

16    date of the rescheduled interview shall not

17    count toward the 90-day period referred to

18    in subsection (a)(6).

19    ''(H) WITHDRAWAL OF APPLICATION, VOL-

20    UNTARY DEPARTURE, AND VOLUNTARY REPA-

21    TRIATION.—

22        ''(i) VOLUNTARY DEPARTURE.—The

23    Secretary may permit an alien to volun-

24    tarily depart in accordance with section

25    240E.

67

1          "(ii) WITHDRAWAL OF APPLICA-
2          TION.—The Secretary may permit an alien,
3          at any time before the protection merits
4          interview, to withdraw his or her applica-
5          tion and depart immediately from the
6          United States in accordance with section
7          240F.

8          "(iii) VOLUNTARY REPATRIATION.—
9          The Secretary may permit an alien to vol-
10         untarily repatriate in accordance with sec-
11         tion 240G.

12     "(I) CONVERSION TO REMOVAL PRO-
13     CEEDINGS UNDER SECTION 240.—The asylum
14     officer or immigration officer may refer or place
15     an alien into removal proceedings under section
16     240 by issuing a notice to appear for the pur-
17     pose of initiating such proceedings if either
18     such officer determines that—

19          "(i) such proceedings are required in
20          order to permit the alien to seek an immi-
21          gration benefit for which the alien is le-
22          gally entitled to apply; and

23          "(ii) such application requires such
24          alien to be placed in, or referred to pro-

68

1    ceedings under section 240 that are not
2    available to such alien under this section.
3        ''(J) PROTECTION OF INFORMATION.—
4            ''(i) SENSITIVE OR LAW ENFORCE-
5        MENT INFORMATION.—Nothing in this sec-
6        tion may be construed to compel any em-
7        ployee of the Department of Homeland Se-
8        curity to disclose any information that is
9        otherwise protected from disclosure by law.
10           ''(ii) PROTECTION OF CERTAIN INFOR-
11       MATION.—Before providing the record de-
12       scribed in subparagraph (F) to the alien or
13       to the alien's counsel of record, the Direc-
14       tor shall protect any information that is
15       prohibited by law from being disclosed.
16   ''(c) PROTECTION DETERMINATION.—
17       ''(1) IDENTITY VERIFICATION.—The Secretary
18   may not conduct the protection determination with
19   respect to an alien until the identity of the alien has
20   been checked against all appropriate records and
21   databases maintained by the Attorney General, the
22   Secretary of State, or the Secretary.
23       ''(2) IN GENERAL.—
24           ''(A) ELIGIBILITY.—Upon the establishing
25       the identity of an alien pursuant to paragraph

IFR_AR_001782

69

1    (1), the asylum officer shall conduct a protec-
2    tion determination in a location selected in ac-
3    cordance with this section.

4        ''(B) OUTCOME.—

5            ''(i) POSITIVE PROTECTION DETER-
6            MINATION OUTCOME.—If the protection de-
7            termination conducted pursuant to sub-
8            paragraph (A) results in a positive protec-
9            tion determination outcome, the alien shall
10           be referred to protection merits removal
11           proceedings in accordance with the proce-
12           dures described in paragraph (4).

13           ''(ii) NEGATIVE PROTECTION DETER-
14           MINATION OUTCOME.—If such protection
15           determination results in a negative protec-
16           tion determination outcome, the alien shall
17           be subject to the process described in sub-
18           section (d).

19       ''(3) RECORD.—

20           ''(A) USE OF RECORD.—In each protection
21           determination, or any review of such determina-
22           tion, the record of the alien's protection deter-
23           mination required under subsection (b)(3)(F)
24           shall constitute the underlying application for
25           the alien's application for asylum, withholding

IFR_AR_001783

1  of removal under section 241(b)(3), or protec-
2  tion under the Convention Against Torture for
3  purposes of the protection merits interview.

4  "(B) DATE OF FILING.—The date on
5  which the Secretary issues a notification of a
6  positive protection determination pursuant to
7  paragraph (2)(B)(i) shall be considered, for all
8  purposes, the date of filing and the date of re-
9  ceipt of the alien's application for asylum, with-
10  holding of removal under section 241(b)(3), or
11  protection under the Convention Against Tor-
12  ture, as applicable.

13  "(4) REFERRAL FOR PROTECTION MERITS RE-
14  MOVAL PROCEEDINGS.—

15  "(A) IN GENERAL.—If the alien receives a
16  positive protection determination—

17  "(i) the alien shall be issued employ-
18  ment authorization pursuant to section
19  235C; and

20  "(ii) subject to paragraph (5), the
21  asylum officer shall refer the alien for pro-
22  tection merits removal proceedings de-
23  scribed in section 240D.

1          "(B) NOTIFICATIONS.—As soon as prac-
2     ticable after a positive protection determination,
3     the Secretary shall—

4               "(i) issue a written notification to the
5          alien of the outcome of such determination;

6               "(ii) include all of the information de-
7          scribed in subsection (b)(2); and

8               "(iii) ensure that such notification
9          and information concerning the procedures
10         under section 240D, shall be made, at a
11         minimum, not later than 30 days before
12         the date on which the required protection
13         merits interview under section 240D oc-
14         curs.

15     "(5) AUTHORITY TO GRANT RELIEF OR PRO-
16     TECTION.—

17          "(A) IN GENERAL.—If an alien dem-
18     onstrates, by clear and convincing evidence,
19     that the alien is eligible for asylum, withholding
20     of removal under section 241(b)(3), or protec-
21     tion under the Convention Against Torture dur-
22     ing the protection determination, the asylum of-
23     ficer, subject to the procedures under subpara-
24     graph (B), may grant an application for such
25     relief or protection submitted by such alien

IFR_AR_001785

72

1 without referring the alien to protection merits

2 removal proceedings under section 240D.

3   "(B) SUPERVISORY REVIEW.—

4    "(i) IN GENERAL.—An application

5  granted by an asylum officer under sub-

6  paragraph (A) shall be reviewed by a su-

7  pervisory asylum officer to determine

8  whether such grant is warranted.

9    "(ii) LIMITATION.—A decision by an

10  asylum officer to grant an application

11  under subparagraph (A) shall not be final,

12  and the alien shall not be notified of such

13  decision, unless a supervisory asylum offi-

14  cer first determines, based on the review

15  conducted pursuant to clause (i), that such

16  a grant is warranted.

17    "(iii) EFFECT OF APPROVAL.—If the

18  supervisor determines that granting an

19  alien's application for relief or protection is

20  warranted—

21    "(I) such application shall be ap-

22   proved; and

23    "(II) the alien shall receive writ-

24   ten notification of such decision as

25   soon as practicable.

1          ''(iv) EFFECT OF NON-APPROVAL.—If
2      the supervisor determines that the grant is
3      not warranted, the alien shall be referred
4      for protection merits removal proceedings
5      under section 240D.
6          ''(C) SPECIAL RULES.—Notwithstanding
7      any other provision of law—
8              ''(i) if an alien's application for asy-
9          lum is approved pursuant to subparagraph
10         (B)(iii), the asylum officer may not issue
11         an order of removal; and
12             ''(ii) if an alien's application for with-
13         holding of removal under section 241(b)(3)
14         or for withholding or deferral of removal
15         under the Convention Against Torture is
16         approved pursuant to subparagraph
17         (B)(iii), the asylum officer shall issue a
18         corresponding order of removal.
19         ''(D) BIANNUAL REPORT.—The Director
20     shall submit a biannual report to the relevant
21     committees of Congress that includes, for the
22     relevant period—
23             ''(i) the number of cases described in
24         subparagraph (A) that were referred to a

74

1    supervisor pursuant to subparagraph (B),

2    disaggregated by asylum office;

3        ''(ii) the number of cases described in

4    clause (i) that were approved subsequent

5    to the referral to a supervisor pursuant to

6    subparagraph (B);

7        ''(iii) the number of cases described in

8    clause (i) that were not approved subse-

9    quent to the referral to a supervisor pursu-

10   ant to subparagraph (B);

11       ''(iv) a summary of the benefits for

12   which any aliens described in subpara-

13   graph (A) were considered amenable and

14   whose cases were referred to a supervisor

15   pursuant to subparagraph (B),

16   disaggregated by case outcome referred to

17   in clauses (ii) and (iii);

18       ''(v) a description of any anomalous

19   case outcomes for aliens described in sub-

20   paragraph (A) whose cases were referred

21   to a supervisor pursuant subparagraph

22   (B); and

23       ''(vi) a description of any actions

24   taken to remedy the anomalous case out-

25   comes referred to in clause (v).

1          ''(E) PROTECTION OF PERSONALLY IDEN-
2     TIFIABLE INFORMATION.—In preparing each re-
3     port pursuant to subparagraph (D), the Direc-
4     tor shall—

5               ''(i) protect any personally identifiable
6          information associated with aliens de-
7          scribed in subparagraph (A); and

8               ''(ii) comply with all applicable pri-
9          vacy laws.

10          ''(6) EMPLOYMENT AUTHORIZATION.—An alien
11     whose application for relief or protection has been
12     approved by a supervisor pursuant to paragraph
13     (5)(B) shall be issued employment authorization
14     under section 235C.

15     ''(d) NEGATIVE PROTECTION DETERMINATION.—

16          ''(1) IN GENERAL.—If an alien receives a nega-
17     tive protection determination, the asylum officer
18     shall—

19               ''(A) provide such alien with written notifi-
20          cation of such determination; and

21               ''(B) subject to paragraph (2), order the
22          alien removed from the United States without
23          hearing or review.

24          ''(2) OPPORTUNITY TO REQUEST RECONSIDER-
25     ATION OR APPEAL.—The Secretary shall notify any

76

1    alien described in paragraph (1) immediately after

2    receiving notification of a negative protection deter-

3    mination under this subsection that he or she—

4           ''(A) may request reconsideration of such

5    determination in accordance with paragraph

6    (3); and

7           ''(B) may request administrative review of

8    such protection determination decision in ac-

9    cordance with paragraph (4).

10    ''(3) REQUEST FOR RECONSIDERATION.—

11           ''(A) IN GENERAL.—Any alien with respect

12    to whom a negative protection determination

13    has been made may submit a request for recon-

14    sideration to U.S. Citizenship and Immigration

15    Services not later than 5 days after such deter-

16    mination.

17           ''(B) DECISION.—The Director, or des-

18    ignee, in the Director's unreviewable discretion,

19    may grant or deny a request for reconsideration

20    made pursuant to subparagraph (A), which de-

21    cision shall not be subject to review.

22    ''(4) ADMINISTRATIVE REVIEW.—

23           ''(A) IN GENERAL.—Except as provided in

24    subparagraph (B), the administrative review of

25    a protection determination with respect to an

77

1    alien under this subsection shall be based on
2    the record before the asylum officer at the time
3    at which such protection determination was
4    made.

5        ''(B) EXCEPTION.—An alien referred to in
6    subparagraph (A), or the alien's counsel of
7    record, may submit such additional evidence or
8    testimony in accordance with such policies and
9    procedures as the Secretary may prescribe.

10        ''(C) REVIEW.—Each review described in
11    subparagraph (A) shall be conducted by the
12    Protection Appellate Board.

13        ''(D) STANDARD OF REVIEW.—In accord-
14    ance with the procedures prescribed by the Sec-
15    retary, the Protection Appellate Board, upon
16    the request of an alien, or the alien's counsel of
17    record, shall conduct a de novo review of the
18    record of the protection determination carried
19    out pursuant to this section with respect to the
20    alien.

21        ''(E) DETERMINATION.—

22            ''(i) TIMING.—The Protection Appel-
23        late Board shall complete a review under
24        this paragraph, to the maximum extent
25        practicable, not later than 72 hours after

78

1 receiving a request from an alien pursuant

2 to subparagraph (D).

3 ''(ii) EFFECT OF POSITIVE DETER-

4 MINATION.—If, after conducting a review

5 under this paragraph, the Protection Ap-

6 pellate Board determines that an alien has

7 a positive protection determination, the

8 alien shall be referred for protection merits

9 removal proceedings under section 240D.

10 ''(iii) EFFECT OF NEGATIVE DETER-

11 MINATION.—If, after conducting a review

12 under this paragraph, the Protection Ap-

13 pellate Board determines that an alien has

14 a negative protection determination, the

15 alien shall be ordered removed from the

16 United States without additional review.

17 ''(5) JURISDICTIONAL MATTERS.—In any action

18 brought against an alien under section 275(a) or

19 276, the court shall not have jurisdiction to hear any

20 claim attacking the validity of an order of removal

21 entered pursuant to subsection (c)(5)(C)(ii).

22 ''(e) SERVICE OF PROTECTION DETERMINATION DE-

23 CISION.—

24 ''(1) PROTECTION DETERMINATION DECI-

25 SION.—

1          "(A) IN GENERAL.—Upon reaching a deci-
2      sion regarding a protection determination, the
3      Secretary shall—

4              "(i) immediately notify the alien, and
5          the alien's counsel of record, if applicable,
6          that a determination decision has been
7          made; and

8              "(ii) schedule the service of the pro-
9          tection determination decision, which shall
10         take place, to the maximum extent prac-
11         ticable, not later than 5 days after such
12         notification.

13         "(B) SPECIAL RULES.—

14             "(i) LOCATION.—Each service of a
15         protection determination decision sched-
16         uled pursuant to subparagraph (A)(ii) may
17         occur at—

18                 "(I) a U.S. Immigration and
19             Customs Enforcement facility;

20                 "(II) an Immigration Court; or

21                 "(III) any other federally owned
22             or federally leased building that—

23                     "(aa) the Secretary has au-
24                 thorized or entered into a memo-

80

1          randum of agreement to be used

2          for such purpose; and

3                    "(bb) meets the minimum

4          requirements under this subpara-

5          graph.

6          "(ii) MINIMUM REQUIREMENTS.—In

7          conducting each service of a protection de-

8          termination decision, the Director shall en-

9          sure compliance with the requirements set

10         forth in clauses (ii)(II), (ii)(III), (ii)(IV),

11         and (iii) of subsection (b)(3)(E).

12    "(2) PROCEDURES FOR SERVICE OF PROTEC-

13    TION DETERMINATION DECISIONS.—

14         "(A) WRITTEN DECISION.—The Secretary

15         shall ensure that each alien and the alien's

16         counsel of record, if applicable, attending a de-

17         termination decision receives a written decision

18         that includes, at a minimum, the articulated

19         basis for the denial of the protection benefit

20         sought by the alien.

21         "(B) LANGUAGE ACCESS.—The Secretary

22         shall ensure that each written decision required

23         under subparagraph (A) is delivered to the alien

24         in—

81

1           ''(i) the alien's native language, to the

2           maximum extent practicable; or

3           ''(ii) another language the alien un-

4           derstands.

5       ''(C) ACCESS TO COUNSEL.—An alien who

6   has obtained the services of counsel shall be

7   represented by such counsel, at no expense to

8   the Federal Government, at the service of the

9   protection determination. Nothing in this sub-

10   paragraph may be construed to create a sub-

11   stantive due process right or to unreasonably

12   delay the scheduling of the service of the pro-

13   tection determination.

14       ''(D) ASYLUM OFFICER.—A protection de-

15   termination decision may only be served by an

16   asylum officer.

17       ''(E) PROTECTIONS FOR ASYLUM OFFICER

18   DECISIONS BASED ON THE MERITS OF THE

19   CASE.—The Secretary may not impose restric-

20   tions on an asylum officer's ability to grant or

21   deny relief sought by an alien in a protection

22   determination or protection merits interview

23   based on a numerical limitation.

24       ''(3) NEGATIVE PROTECTION DETERMINA-

25   TION.—

1          "(A) ADVISEMENT OF RIGHTS AND OPPOR-
2       TUNITIES.—If an alien receives a negative pro-
3       tection determination decision, the asylum offi-
4       cer shall—

5              "(i) advise the alien if an alternative
6           option of return is available to the alien,
7           including—

8                  "(I) voluntary departure;

9                  "(II) withdrawal of the alien's
10              application for admission; or

11                 "(III) voluntary repatriation; and

12             "(ii) provide written or verbal infor-
13          mation to the alien regarding the process,
14          procedures, and timelines for appealing
15          such denial, to the maximum extent prac-
16          ticable, in the alien's native language, or in
17          a language the alien understands.

18       "(4) PROTECTION FOR CHILDREN.—In the case
19    of a family unit, the Secretary shall ensure that the
20    best interests of the child or children are considered
21    when conducting a protection determination of the
22    child's family unit.

23       "(5) FINAL ORDER OF REMOVAL.—If an alien
24    receives a negative protection determination decision,

IFR_AR_001796

83

1    an alien shall be removed in accordance with section

2    241 upon a final order of removal.

3    "(f) FAILURE TO CONDUCT PROTECTION DETER-

4    MINATION.—

5        "(1) IN GENERAL.—If the Secretary fails to

6    conduct a protection determination for an alien dur-

7    ing the 90-day period set forth in subsection

8    (b)(3)(A), such alien shall be referred for protection

9    merits removal proceedings in accordance with

10    240D.

11        "(2) NOTICE OF PROTECTION MERITS INTER-

12    VIEW.—

13            "(A) IN GENERAL.—If an alien is referred

14        for protection merits removal proceedings pur-

15        suant to paragraph (1), the Secretary shall

16        properly file with U.S. Citizenship and Immi-

17        gration Services and serve upon the alien, or

18        the alien's counsel of record, a notice of a pro-

19        tection merits interview, in accordance with

20        subsection (b)(2).

21            "(B) CONTENTS.—Each notice of protec-

22        tion merits interview served pursuant to sub-

23        paragraph (A)—

24                "(i) shall include each element de-

25            scribed in subsection (b)(2); and

IFR_AR_001797

84

1          ''(ii) shall—

2                    ''(I) inform the alien that an ap-

3          plication for protection relief shall be

4          submitted to the Secretary not later

5          than 30 days before the date on which

6          the alien's protection merits interview

7          is scheduled;

8                    ''(II) inform the alien that he or

9          she shall receive employment author-

10         ization, pursuant to section 235C, not

11         later than 30 days after filing the ap-

12         plication required under subclause (I);

13                    ''(III) inform the alien that he or

14         she may submit evidence into the

15         record not later than 30 days before

16         the date on which the alien's protec-

17         tion merits interview is scheduled;

18                    ''(IV) describe—

19                         ''(aa) the penalties resulting

20                    from the alien's failure to file the

21                    application required under sub-

22                    clause (I); and

23                         ''(bb) the terms and condi-

24                    tions for redressing such failure

25                    to file; and

IFR_AR_001798

85

1           "(V) describe the penalties re-
2       sulting from the alien's failure to ap-
3       pear for a scheduled protection merits
4       interview.

5       "(3) DATE OF FILING.—The date on which an
6   application for protection relief is received by the
7   Secretary shall be considered the date of filing and
8   receipt for all purposes.

9       "(4) EFFECT OF FAILURE TO FILE.—

10          "(A) IN GENERAL.—Failure to timely file
11      an application for protection relief under this
12      subsection will result in an order of removal,
13      absent exceptional circumstances.

14          "(B) OPPORTUNITY FOR REDRESS.—

15              "(i) IN GENERAL.—The Secretary
16          shall promulgate regulations authorizing a
17          15-day opportunity for redress to file an
18          application for protection relief if there are
19          exceptional circumstances regarding the
20          alien's failure to timely file an application
21          for protection relief.

22              "(ii) CONTENTS.—Each application
23          submitted pursuant to clause (i) shall—

24                  "(I) describe the basis for such
25              request;

1          ''(II) include supporting evidence;

2          and

3              ''(III) identify the exceptional

4          circumstances that led to the alien's

5          failure to file the application for pro-

6          tection relief in a timely manner.

7      ''(C) DECISION .—In evaluating a request

8  for redress submitted pursuant to subparagraph

9  (B)(i), the Director, or designee—

10          ''(i) shall determine whether such re-

11         quest rises to the level of exceptional cir-

12         cumstances; and

13          ''(ii) may schedule a protection deter-

14         mination interview.

15   ''(5) EMPLOYMENT AUTHORIZATION.—

16      ''(A) IN GENERAL.—Employment author-

17  ization shall be provided to aliens described in

18  this subsection in accordance with section

19  235C.

20      ''(B) REVOCATION.—The Secretary may

21  revoke the employment authorization provided

22  to any alien processed under this section or sec-

23  tion 240D if such alien—

87

1      ''(i) has obtained authorization for

2      employment pursuant to the procedures

3      described in section 235C; and

4          ''(ii) absent exceptional circumstances,

5      subsequently fails to appear for a protec-

6      tion determination under subsection (b)(3)

7      or a protection merits interview under

8      240D(c)(3).

9  ''(g) FAILURE TO APPEAR.—

10     ''(1) PROTECTION MERITS INTERVIEW.—The

11  provisions of section 240(b)(5) shall apply to pro-

12  ceedings under this section.

13     ''(2) OPPORTUNITY TO REDRESS.—

14         ''(A) IN GENERAL.—Not later than 15

15      days after the date on which an alien fails to

16      appear for a scheduled protection determination

17      or protection merits interview, the alien may

18      submit a written request for a rescheduled pro-

19      tection determination or protection merits inter-

20      view.

21         ''(B) CONTENTS.—Each request submitted

22      pursuant to subparagraph (A) shall—

23             ''(i) describe the basis for such re-

24          quest;

25             ''(ii) include supporting evidence; and

IFR_AR_001801

88

1              ''(iii) identify the exceptional cir-

2           cumstances that led to the alien's failure to

3           appear.

4              ''(C) DECISION.—In evaluating a request

5           submitted pursuant to subparagraph (A), the

6           Director, or designee shall determine whether

7           the evidence included in such request rises to

8           the level of exceptional circumstances. Such de-

9           cision shall not be reviewable.

10   ''(h) RULEMAKING.—

11       ''(1) IN GENERAL.—The Secretary may promul-

12   gate such regulations as are necessary to implement

13   this section in compliance with the requirements of

14   section 553 of title 5, United States Code.

15       ''(2) INITIAL IMPLEMENTATION.—Until the

16   date that is 180 days after the date of the enact-

17   ment of this section, the Secretary may issue any in-

18   terim final rules necessary to implement this section

19   without having to satisfy the requirements of section

20   553(b)(B) of title 5, United States Code, provided

21   that any such interim final rules shall include a 30-

22   day post promulgation notice and comment period

23   prior to finalization in the Federal Register.

24       ''(3) REQUIREMENT.—All regulations promul-

25   gated to implement this section beginning on the

89

1    date that is 180 days after the date of the enact-
2    ment of this section, shall be issued pursuant to the
3    requirements set forth in section 553 of title 5,
4    United States Code.

5    "(i) SAVINGS PROVISIONS.—

6        "(1) EXPEDITED REMOVAL.—Nothing in this
7    section may be construed to expand or restrict the
8    Secretary's discretion to carry out expedited remov-
9    als pursuant to section 235 to the extent authorized
10   by law. The Secretary shall not refer or place an
11   alien in proceedings under section 235 if the alien
12   has already been placed in or referred to proceedings
13   under this section or section 240D.

14       "(2) DETENTION.—Nothing in this section may
15   be construed to affect the authority of the Secretary
16   to detain an alien released pursuant to this section
17   if otherwise authorized by law.

18       "(3) SETTLEMENT AGREEMENTS.—Nothing in
19   this section may be construed—

20           "(A) to expand or restrict any settlement
21       agreement in effect as of the date of the enact-
22       ment of this section; or

23           "(B) to abrogate any provision of the stip-
24       ulated settlement agreement in Reno v. Flores,
25       as filed in the United States District Court for

1      the Central District of California on January

2      17, 1997 (CV–85–4544–RJK), including all

3      subsequent court decisions, orders, agreements,

4      and stipulations.

5      "(4) IMPACT ON OTHER REMOVAL PRO-

6      CEEDINGS.—The provisions of this section may not

7      be interpreted to apply to any other form of removal

8      proceedings.

9      "(5) SPECIAL RULE.—For aliens who are na-

10     tives or citizens of Cuba released pursuant to this

11     section and who are otherwise eligible for adjust-

12     ment of status under the first section of Public Law

13     89–732 (8 U.S.C. 1255 note) (commonly known as

14     the 'Cuban Adjustment Act'), the requirement that

15     an alien has been inspected and admitted or paroled

16     into the United States shall not apply. Aliens who

17     are natives or citizens of Cuba or Haiti and have

18     been released pursuant to section 240 (8 U.S.C.

19     1229) shall be considered to be individuals described

20     in section 501(e)(1) of the Refugee Education As-

21     sistance Act of 1980 (8 U.S.C. 1522 note).

22     "(6) REVIEW OF PROTECTION DETERMINA-

23     TIONS.—Except for reviews of constitutional claims,

24     no court shall have jurisdiction to review a protec-

91

1    tion determination issued by U.S. Citizenship and

2    Immigration Services under this section.

3          ''(7) FINAL REMOVAL ORDERS.—No court shall

4    have jurisdiction to review a final order of removal

5    issued under this section.

6       ''(j) JUDICIAL REVIEW.—Notwithstanding any other

7   provision of this Act, judicial review of any decision or ac-

8   tion in this section shall be governed only by the United

9   States District Court for the District of Columbia, which

10  shall have sole and original jurisdiction to hear challenges,

11  whether constitutional or otherwise, to the validity of this

12  section or any written policy directive, written policy

13  guideline, written procedure, or the implementation there-

14  of, issued by or under the authority of the Secretary to

15  implement this section.

16    ''(k) REPORTS ON ASYLUM OFFICER GRANT

17  RATES.—

18        ''(1) PUBLICATION OF ANNUAL REPORT.—Not

19       later than 1 year after the date of the enactment of

20       the Border Act, and annually thereafter, the Direc-

21       tor of U.S. Citizenship and Immigration Services

22       shall publish a report, on a publicly accessible

23       website of U.S. Citizenship and Immigration Serv-

24       ices, which includes, for the reporting period—

IFR_AR_001805

1    "(A) the number of protection determina-

2  tions that were approved or denied; and

3    "(B) a description of any anomalous inci-

4  dents identified by the Director, including any

5  action taken by the Director to address such an

6  incident.

7  "(2) SEMIANNUAL REPORT TO CONGRESS.—

8    "(A) IN GENERAL.—Not less frequently

9  than twice each year, the Director of U.S. Citi-

10  zenship and Immigration Services shall submit

11  a report to the relevant committees of Congress

12  that includes, for the preceding reporting pe-

13  riod, and aggregated for the applicable calendar

14  year—

15      "(i) the number of cases in which a

16    protection determination or protection mer-

17    its interview has been completed; and

18      "(ii) for each asylum office or duty

19    station to which more than 20 asylum offi-

20    cers are assigned—

21        "(I) the median percentage of

22      positive determinations and protection

23      merits interviews in the cases de-

24      scribed in clause (i);

1          ''(II) the mean percentage of
2     negative determinations and protec-
3     tion merits interviews in such cases;
4     and

5          ''(III) the number of cases de-
6     scribed in subsection (c)(5) in which
7     an alien was referred to a supervisor
8     after demonstrating, by clear and con-
9     vincing evidence, eligibility for asylum,
10    withholding of removal, or protection
11    under the Convention Against Tor-
12    ture, disaggregated by benefit type;

13         ''(IV) the number of cases de-
14    scribed in clause (i) that were ap-
15    proved by a supervisor; and

16         ''(V) the number of cases de-
17    scribed in clause (i) that were not ap-
18    proved by a supervisor.

19        ''(B) PRESENTATION OF DATA.—The in-
20    formation described in subparagraph (A) shall
21    be provided in the format of aggregate totals by
22    office or duty station.

23    ''(l) DEFINITIONS.—In this section:

24        ''(1) APPLICATION FOR PROTECTION RELIEF.—
25    The term 'application for protection relief' means

94

1    any request, application or petition authorized by

2    the Secretary for asylum, withholding of removal, or

3    protection under the Convention Against Torture.

4        ''(2) ASYLUM OFFICER.—The term 'asylum offi-

5    cer' has the meaning given such term in section

6    235(b)(1)(E).

7        ''(3) CONVENTION AGAINST TORTURE.—The

8    term 'Convention Against Torture' means the

9    United Nations Convention against Torture and

10    Other Cruel, Inhuman or Degrading Treatment or

11    Punishment, done at New York December 10, 1984,

12    including any implementing regulations.

13        ''(4) DIRECTOR.—The term 'Director' means

14    the Director of U.S. Citizenship and Immigration

15    Services.

16        ''(5)    EXCEPTIONAL    CIRCUMSTANCES.—The

17    term 'exceptional circumstances' has the meaning

18    given such term in section 240(e)(1).

19        ''(6) FINAL ORDER OF REMOVAL.—The term

20    'final order of removal' means an order of removal

21    made by an asylum officer at the conclusion of a

22    protection determination, and any appeal of such

23    order, as applicable.

24        ''(7) PROTECTION APPELLATE BOARD.—The

25    term 'Protection Appellate Board' means the Protec-

95

1    tion Appellate Board established under section 463

2    of the Homeland Security Act of 2002.

3       ''(8)   PROTECTION   DETERMINATION   DECI-

4    SION.—The term 'protection determination decision'

5    means the service of a negative or positive protection

6    determination outcome.

7       ''(9) RELEVANT COMMITTEES OF CONGRESS.—

8    The term 'relevant committees of Congress' means—

9          ''(A) the Committee on Homeland Security

10          and Governmental Affairs of the Senate;

11          ''(B) the Committee on the Judiciary of

12          the Senate;

13          ''(C) the Committee on Appropriations of

14          the Senate;

15          ''(D) the Committee on Homeland Security

16          of the House of Representatives;

17          ''(E) the Committee on the Judiciary of

18          the House of Representatives;

19          ''(F) the Committee on Appropriations of

20          the House of Representatives; and

21          ''(G) the Committee on Oversight and Ac-

22          countability of the House of Representatives.

23       ''(10)   SECRETARY.—The   term   'Secretary'

24    means the Secretary of Homeland Security.''.

IFR_AR_001809

96

1    (b) CLERICAL AMENDMENT.—The table of contents

2  of the Immigration and Nationality Act (8 U.S.C. 1101

3  note) is amended by inserting after the item relating to

4  section 235A the following:

"Sec. 235B. Provisional noncustodial removal proceedings.".

5  **SEC. 142. PROTECTION MERITS REMOVAL PROCEEDINGS.**

6    (a) IN GENERAL.—Chapter 4 of title II of the Immi-

7  gration and Nationality Act (8 U.S.C. 1221 et seq.) is

8  amended by inserting after section 240C the following:

9  **"SEC. 240D. PROTECTION MERITS REMOVAL PROCEEDINGS.**

10    "(a) COMMENCEMENT OF PROCEEDINGS.—Removal

11  proceedings under this section shall commence imme-

12  diately after the Secretary properly serves notice on an

13  alien who was—

14        "(1) processed under section 235B and referred

15      under subsection (c)(4) of that section after having

16      been issued a notice of a positive protection deter-

17      mination under such subsection; or

18        "(2) referred under section 235B(f).

19    "(b) DURATION OF PROCEEDINGS.—To the max-

20  imum extent practicable, proceedings under this section

21  shall conclude not later than 90 days after the date on

22  which such proceedings commence.

23    "(c) PROCEDURES.—

24        "(1) SERVICE AND NOTICE REQUIREMENTS.—

25      Upon the commencement of proceedings under this

97

1 section, the Secretary shall provide notice of removal

2 proceedings to the alien, or if personal service is not

3 practicable, to the alien's counsel of record. Such no-

4 tice shall be provided, to the maximum extent prac-

5 ticable, in the alien's native language, or in a lan-

6 guage the alien understands, and shall specify or

7 provide—

8   ''(A) the nature of the proceedings against

9  the alien;

10   ''(B) the legal authority under which such

11  proceedings will be conducted;

12   ''(C) the charges against the alien and the

13  statutory provisions alleged to have been vio-

14  lated by the alien;

15   ''(D) that the alien shall—

16    ''(i) immediately provide (or have pro-

17   vided) to the Secretary, in writing, the

18   mailing address, contact information, email

19   address or other electronic address, and

20   telephone number (if any) at which the

21   alien may be contacted respecting the pro-

22   ceeding under this section; and

23    ''(ii) provide to the Secretary, in writ-

24   ing, any change of the alien's mailing ad-

1          dress or telephone number after any such
2          change;

3              "(E)(i) the time and place at which the
4          proceeding under this section will be held,
5          which information shall be communicated, to
6          the extent practicable, before or during the
7          alien's release from physical custody; or

8              "(ii) immediately after release, the time
9          and place of such proceeding shall be provided
10         to the alien, or to the alien's counsel of record,
11         not later than 10 days before the scheduled pro-
12         tection determination interview, which shall be
13         considered proper service of the commencement
14         of proceedings;

15             "(F) the consequences for the alien's fail-
16         ure to appear at such proceeding pursuant to
17         section 240(b)(5)(A), absent exceptional cir-
18         cumstances;

19             "(G) the alien's right to be represented, at
20         no expense to the Federal Government, by any
21         counsel, or an accredited representative, se-
22         lected by the alien who is authorized to practice
23         in such a proceeding; and

24             "(H) information described in section
25         235(b)(1)(B)(iv)(II).

IFR_AR_001812

1      ''(2) ALTERNATIVES TO DETENTION.—An adult

2   alien, including a head of household, who has been

3   referred for proceedings under this section, shall be

4   supervised under the Alternatives to Detention pro-

5   gram of U.S. Immigration and Customs Enforce-

6   ment for the duration of such proceedings.

7      ''(3) PROTECTION MERITS INTERVIEW.—

8         ''(A) IN GENERAL.—An asylum officer

9      shall conduct a protection merits interview of

10     each alien processed under this section.

11        ''(B) ACCESS TO COUNSEL.—Section

12     235B(b)(3)(B) shall apply to proceedings under

13     this section.

14        ''(C) PROCEDURES AND EVIDENCE.—The

15     asylum officer may receive into evidence any

16     oral or written statement that is material and

17     relevant to any matter in the protection merits

18     interview. The testimony of the alien shall be

19     under oath or affirmation, which shall be ad-

20     ministered by the asylum officer.

21        ''(D) TRANSLATION OF DOCUMENTS.—Any

22     foreign language document offered by a party

23     in proceedings under this section shall be ac-

24     companied by an English language translation

25     and a certification signed by the translator,

1  which shall be printed legibly or typed. Such
2  certification shall include a statement that the
3  translator is competent to translate the docu-
4  ment, and that the translation is true and accu-
5  rate to the best of the translator's abilities.
6      "(E) INTERPRETERS.—An interpreter may
7  be provided to the alien for the proceedings
8  under this section, in accordance with section
9  235B(b)(3)(D).
10      "(F) LOCATION.—The location for the pro-
11  tection merits interview described in this section
12  shall be determined in accordance with the
13  terms and conditions described in section
14  235B(b)(3)(E).
15      "(G) WRITTEN RECORD.—The asylum offi-
16  cer shall prepare a written record of each pro-
17  tection merits interview, which shall be provided
18  to the alien or the alien's counsel, that in-
19  cludes—
20          "(i) a summary of the material facts
21      stated by the alien;
22          "(ii) any additional facts relied upon
23      by the asylum officer;
24          "(iii) the asylum officer's analysis of
25      why, in light of the facts referred to in

1            clauses (i) and (ii), the alien has or has
2            not established eligibility for asylum under
3            section 208, withholding of removal under
4            section 241(b)(3), or protection under the
5            Convention Against Torture; and
6                "(iv) a copy of the asylum officer's
7            interview notes.
8            "(H) PROTECTION OF CERTAIN INFORMA-
9        TION.—Before providing the record described in
10       subparagraph (G) to the alien or the alien's
11       counsel of record, the Director shall protect any
12       information the disclosure of which is prohib-
13       ited by law.
14           "(I) RULEMAKING.—The Secretary shall
15       promulgate regulations that permit an alien to
16       request a rescheduled interview due to excep-
17       tional circumstances.
18           "(J) WITHDRAWAL OF APPLICATION, VOL-
19       UNTARY DEPARTURE, AND VOLUNTARY REPA-
20       TRIATION.—
21               "(i) VOLUNTARY DEPARTURE.—The
22           Secretary may permit an alien to volun-
23           tarily depart in accordance with section
24           240E.

IFR_AR_001815

102

1            "(ii) WITHDRAWAL OF APPLICA-
2        TION.—The Secretary may permit an alien,
3        at any time before the protection merits
4        interview, to withdraw his or her applica-
5        tion and depart immediately from the
6        United States in accordance with section
7        240F.

8            "(iii) VOLUNTARY REPATRIATION.—
9        The Secretary may permit an alien to vol-
10       untarily repatriate in accordance with sec-
11       tion 240G.

12      "(4) SPECIAL RULE RELATING TO ONE-YEAR
13   BAR.—An alien subject to proceedings under this
14   section shall not be subject to the one-year bar
15   under section 208(a)(2)(B).

16      "(5) TIMING OF PROTECTION MERITS INTER-
17   VIEW.—A protection merits interview may not be
18   conducted on a date that is earlier than 30 days
19   after the date on which notice is served under para-
20   graph (1).

21   "(d) PROTECTION MERITS DETERMINATION.—

22      "(1) IN GENERAL.—After conducting an alien's
23   protection merits interview, the asylum officer shall
24   make a determination on the merits of the alien's
25   application for asylum under section 208, with-

1  holding of removal under section 241(b)(3), or pro-
2  tection under the Convention Against Torture.

3  ''(2) POSITIVE PROTECTION MERITS DETER-
4  MINATION.—In the case of an alien who the asylum
5  officer determines meets the criteria for a positive
6  protection merits determination, the asylum officer
7  shall approve the alien's application for asylum
8  under section 208, withholding of removal under sec-
9  tion 241(b)(3), or protection under the Convention
10  Against Torture.

11  ''(3) NEGATIVE PROTECTION MERITS DETER-
12  MINATION.—

13      ''(A) IN GENERAL.—In the case of an alien
14      who the asylum officer determines does not
15      meet the criteria for a positive protection merits
16      determination—

17          ''(i) the asylum officer shall deny the
18          alien's application for asylum under section
19          208, withholding of removal under section
20          241(b)(3), or protection under the Conven-
21          tion Against Torture; and

22          ''(ii) the Secretary shall—

23              ''(I) provide the alien with writ-
24              ten notice of the decision; and

IFR_AR_001817

104

1      ''(II) subject to subparagraph

2      (B) and subsection (e), order the re-

3      moval of the alien from the United

4      States.

5   ''(B) REQUEST FOR RECONSIDERATION.—

6   Any alien with respect to whom a negative pro-

7   tection merits determination has been made

8   may submit a request for reconsideration to

9   U.S. Citizenship and Immigration Services not

10   later than 5 days after such determination, in

11   accordance with the procedures set forth in sec-

12   tion 235B(d)(3).

13 ''(e) APPEALS.—

14   ''(1) IN GENERAL.—An alien with respect to

15  whom a negative protection merits determination

16  has been made may submit to the Protection Appel-

17  late Board a written petition for review of such de-

18  termination, together with additional evidence sup-

19  porting the alien's claim, as applicable, not later

20  than 7 days after the date on which a request for

21  reconsideration under subsection (d)(3)(B) has been

22  denied.

23   ''(2) SWORN STATEMENT.—A petition for re-

24  view submitted under this subsection shall include a

25  sworn statement by the alien.

IFR_AR_001818

105

1    ''(3) RESPONSIBILITIES OF THE DIRECTOR.—

2        ''(A) IN GENERAL.—After the filing of a

3    petition for review by an alien, the Director

4    shall—

5        ''(i) refer the alien's petition for re-

6        view to the Protection Appellate Board;

7        and

8        ''(ii) before the date on which the

9        Protection Appellate Board commences re-

10       view, subject to subparagraph (B), provide

11       a full record of the alien's protection mer-

12       its interview, including a transcript of such

13       interview—

14           ''(I) to the Protection Appellate

15           Board; and

16           ''(II) to the alien, or the alien's

17           counsel of record.

18       ''(B) PROTECTION OF CERTAIN INFORMA-

19   TION.—Before providing the record described in

20   subparagraph (A)(ii)(II) to the alien or the

21   alien's counsel of record, the Director shall pro-

22   tect any information the disclosure of which is

23   prohibited by law.

24       ''(4) STANDARD OF REVIEW.—

1          "(A) IN GENERAL.—In reviewing a protec-
2     tion merits determination under this subsection,
3     the Protection Appellate Board shall—

4               "(i) with respect to questions of fact,
5          determine whether the decision reached by
6          the asylum officer with initial jurisdiction
7          regarding the alien's eligibility for relief or
8          protection was clear error; and

9               "(ii) with respect to questions of law,
10         discretion, and judgement, make a de novo
11         determination with respect to the alien's
12         eligibility for relief or protection.

13          "(B) in making a determination under
14     clause (i) or (ii) of subparagraph (A), take into
15     account the credibility of the statements made
16     by the alien in support of the alien's claim and
17     such other facts as are known to the Protection
18     Appellate Board.

19          "(5) COMPLETION.—To the maximum extent
20     practicable, not later than 7 days after the date on
21     which an alien files a petition for review with the
22     Protection Appellate Board, the Protection Appellate
23     Board shall conclude the review.

24          "(6) OPPORTUNITY TO SUPPLEMENT.—The
25     Protection Appellate Board shall establish a process

107

1    by which an alien, or the alien's counsel of record,

2    may supplement the record for purposes of a review

3    under this subsection not less than 30 days before

4    the Protection Appellate Board commences the re-

5    view.

6        "(7) RESULT OF REVIEW.—

7            "(A) VACATUR OF ORDER OF REMOVAL.—

8        In the case of a determination by the Protection

9        Appellate Board that the application of an alien

10       for asylum warrants approval, the Protection

11       Appellate Board shall vacate the order of re-

12       moval issued by the asylum officer and grant

13       such application.

14           "(B) WITHHOLDING OF REMOVAL AND

15       CONVENTION AGAINST TORTURE ORDER OF RE-

16       MOVAL.—In the case of a determination by the

17       Protection Appellate Board that the application

18       of an alien for withholding of removal under

19       section 241(b)(3) or protection under the Con-

20       vention Against Torture warrants approval, the

21       Protection Appellate Board—

22               "(i) shall not vacate the order of re-

23           moval issued by the asylum officer; and

24               "(ii) shall grant the application for

25           withholding of removal under section

108

1          241(b)(3) or protection under the Conven-
2          tion Against Torture, as applicable.
3              "(C) AFFIRMATION OF ORDER OF RE-
4          MOVAL.—In the case of a determination by the
5          Protection Appellate Board that the petition for
6          review of a protection merits interview does not
7          warrant approval, the Protection Appellate
8          Board shall affirm the denial of such applica-
9          tion and the order of removal shall become
10         final.
11             "(D) NOTIFICATION.—Upon making a de-
12         termination with respect to a review under this
13         subsection, the Protection Appellate Board shall
14         expeditiously provide notice of the determina-
15         tion to the alien and, as applicable, to the
16         alien's counsel of record.
17         "(8) MOTION TO REOPEN OR MOTION TO RE-
18         CONSIDER.—
19             "(A) MOTION TO REOPEN.—A motion to
20         reopen a review conducted by the Protection
21         Appellate Board shall state new facts and shall
22         be supported by documentary evidence. The re-
23         submission of previously provided evidence or
24         reassertion of previously stated facts shall not
25         be sufficient to meet the requirements of a mo-

109

1    tion to reopen under this subparagraph. An

2    alien with a pending motion to reopen may be

3    removed if the alien's order of removal is final,

4    pending a decision on a motion to reopen.

5        "(B) MOTION TO RECONSIDER.—

6            "(i) IN GENERAL.—A motion to re-

7            consider a decision of the Protection Ap-

8            pellate Board—

9                "(I) shall establish that—

10                    "(aa) the Protection Appel-

11                    late Board based its decision on

12                    an incorrect application of law or

13                    policy; and

14                    "(bb) the decision was incor-

15                    rect based on the evidence in the

16                    record of proceedings at the time

17                    of the decision; and

18                "(II) shall be filed not later than

19                30 days after the date on which the

20                decision was issued.

21            "(ii)    LIMITATION.—The    Protection

22            Appellate Board shall not consider new

23            facts or evidence submitted in support of a

24            motion to reconsider.

25        "(f) ORDER OF REMOVAL.—

IFR_AR_001823

110

1            ''(1) IN GENERAL.—The Secretary—

2                 ''(A) shall have exclusive and final jurisdic-

3              tion over the denial of an application for relief

4              or protection under this section; and

5                 ''(B) may remove an alien to a country

6              where the alien is a subject, national, or citizen,

7              or in the case of an alien having no nationality,

8              the country of the alien's last habitual resi-

9              dence, or in accordance with the processes es-

10             tablished under section 241, unless removing

11             the alien to such country would be prejudicial

12             to the interests of the United States.

13         ''(2) DETENTION; REMOVAL.—The terms and

14 conditions under section 241 shall apply to the de-

15 tention and removal of aliens ordered removed from

16 the United States under this section.

17    ''(g) LIMITATION ON JUDICIAL REVIEW.—

18         ''(1) DENIALS OF PROTECTION.—Except for re-

19 view of constitutional claims, no court shall have ju-

20 risdiction to review a decision issued by U.S. Citi-

21 zenship and Immigration Services under this section

22 denying an alien's application for asylum under sec-

23 tion 208, withholding of removal under section

24 241(b)(3), or protection under the Convention

25 Against Torture.

IFR_AR_001824

111

1    ''(2) FINAL REMOVAL ORDERS.—No court shall

2    have jurisdiction to review a final order of removal

3    issued under this section.

4    ''(h) RULEMAKING.—

5    ''(1) IN GENERAL.—The Secretary may promul-

6    gate such regulations as are necessary to implement

7    this section in compliance with the requirements of

8    section 553 of title 5, United States Code.

9    ''(2) INITIAL IMPLEMENTATION.—Until the

10   date that is 180 days after the date of the enact-

11   ment of this section, the Secretary may issue any in-

12   terim final rules necessary to implement this section

13   without having to satisfy the requirements of section

14   553(b)(B) of title 5, United States Code, provided

15   that any such interim final rules shall include a 30-

16   day post promulgation notice and comment period

17   prior to finalization in the Federal Register.

18   ''(3) REQUIREMENT.—All regulations promul-

19   gated to implement this section beginning on the

20   date that is 180 days after the date of the enact-

21   ment of this section, shall be issued pursuant to the

22   requirements set forth in section 553 of title 5,

23   United States Code.

24   ''(i) SAVINGS PROVISIONS.—

IFR_AR_001825

112

1  ''(1) DETENTION.—Nothing in this section may
2  be construed to affect the authority of the Secretary
3  to detain an alien who is processed, including for re-
4  lease, under this section if otherwise authorized by
5  law.

6  ''(2) SETTLEMENT AGREEMENTS.—Nothing in
7  this section may be construed—

8      ''(A) to expand or restrict any settlement
9      agreement in effect on the date of the enact-
10     ment of this section; or

11     ''(B) to abrogate any provision of the stip-
12     ulated settlement agreement in Reno v. Flores,
13     as filed in the United States District Court for
14     the Central District of California on January
15     17, 1997 (CV–85–4544–RJK), including all
16     subsequent court decisions, orders, agreements,
17     and stipulations.

18  ''(3) IMPACT ON OTHER REMOVAL PRO-
19  CEEDINGS.—The provisions of this section may not
20  be interpreted to apply to any other form of removal
21  proceedings.

22  ''(4) CONVERSION TO REMOVAL PROCEEDINGS
23  UNDER SECTION 240.—The asylum officer or immi-
24  gration officer may refer or place an alien into re-
25  moval proceedings under section 240 by issuing a

113

1          notice to appear for the purpose of initiating such

2          proceedings if either such officer determines that—

3                    ''(A) such proceedings are required in

4               order to permit the alien to seek an immigra-

5               tion benefit for which the alien is legally enti-

6               tled to apply; and

7                    ''(B) such application requires such alien

8               to be placed in, or referred to proceedings

9               under section 240 that are not available to such

10              alien under this section.

11         ''(j) FAMILY UNITY.—In the case of an alien with

12     a minor child in the United States who has been ordered

13     removed pursuant to this section, the Secretary shall en-

14     sure that such alien is removed with the minor child, if

15     the alien elects.

16         ''(k) JUDICIAL REVIEW.—Notwithstanding any other

17     provision of this Act, judicial review of any decision or ac-

18     tion in this section shall be governed only by the United

19     States District Court for the District of Columbia, which

20     shall have sole and original jurisdiction to hear challenges,

21     whether constitutional or otherwise, to the validity of this

22     section or any written policy directive, written policy

23     guideline, written procedure, or the implementation there-

24     of, issued by or under the authority of the Secretary to

25     implement this section.

114

1 ''(l) DEFINITIONS.—In this section:

2 ''(1) ASYLUM OFFICER.—The term 'asylum offi-

3 cer' has the meaning given such term in section

4 235(b)(1)(E).

5 ''(2) CONVENTION AGAINST TORTURE.—The

6 term 'Convention Against Torture' means the

7 United Nations Convention against Torture and

8 Other Cruel, Inhuman or Degrading Treatment or

9 Punishment, done at New York December 10, 1984,

10 including any implementing regulations.

11 ''(3) DIRECTOR.—The term 'Director' means

12 the Director of U.S. Citizenship and Immigration

13 Services.

14 ''(4) EXCEPTIONAL CIRCUMSTANCES.—The

15 term 'exceptional circumstances' has the meaning

16 given such term in section 240(e)(1).

17 ''(5) FINAL ORDER OF REMOVAL.—The term

18 'final order of removal' means an order of removal

19 made by an asylum officer at the conclusion of a

20 protection determination, and any appeal of such

21 order, as applicable.

22 ''(6) PROTECTION APPELLATE BOARD.—The

23 term 'Protection Appellate Board' means the Protec-

24 tion Appellate Board established under section 463

25 of the Homeland Security Act of 2002.

IFR_AR_001828

1 "(7) PROTECTION DETERMINATION DECI-
2 SION.—The term 'protection determination decision'
3 means the service of a negative or positive protection
4 determination outcome.

5 "(8) SECRETARY.—The term 'Secretary' means
6 the Secretary of Homeland Security.".

7 (b) CLERICAL AMENDMENT.—The table of contents
8 of the Immigration and Nationality Act (8 U.S.C. 1101
9 et seq.) is amended by inserting after the item relating
10 to section 240C the following:

"Sec. 240D. Protection merits removal proceedings.".

11 **SEC. 143. VOLUNTARY DEPARTURE AFTER NONCUSTODIAL**
12 **PROCESSING; WITHDRAWAL OF APPLICATION**
13 **FOR ADMISSION.**

14 (a) IN GENERAL.—Chapter 4 of title II of the Immi-
15 gration and Nationality Act (8 U.S.C. 1221 et seq.), as
16 amended by section 142(a), is further amended by insert-
17 ing after section 240D the following:

18 **"SEC. 240E. VOLUNTARY DEPARTURE AFTER NONCUSTO-**
19 **DIAL PROCESSING.**

20 "(a) CONDITIONS.—

21 "(1) IN GENERAL.—The Secretary of Homeland
22 Security (referred to in this section as the 'Sec-
23 retary') may permit an alien to voluntarily depart
24 the United States under this subsection, at the
25 alien's own expense, instead of being subject to pro-

116

1    ceedings under section 235B or 240D or before the

2    completion of such proceedings, if such alien is not

3    deportable under paragraph (2)(A)(iii) or (4)(B) of

4    section 237(a).

5        "(2) PERIOD OF VALIDITY.—Permission to de-

6    part voluntarily under this subsection shall be valid

7    for a period not to exceed 120 days.

8        "(3) DEPARTURE BOND.—The Secretary may

9    require an alien permitted to depart voluntarily

10   under this subsection to post a voluntary departure

11   bond, which shall be surrendered upon proof that

12   the alien has departed the United States within the

13   time specified in such bond.

14   "(b) AT CONCLUSION OF PROCEEDINGS.—

15       "(1) IN GENERAL.—The Secretary may permit

16   an alien to voluntarily depart the United States

17   under this subsection, at the alien's own expense, if,

18   at the conclusion of a proceeding under section

19   240D, the asylum officer—

20           "(A) enters an order granting voluntary

21       departure instead of removal; and

22           "(B) determines that the alien—

23               "(i) has been physically present in the

24           United States for not less than 60 days

25           immediately preceding the date on which

117

1      proper notice was served in accordance

2      with section 235B(e)(2);

3          ''(ii) is, and has been, a person of

4      good moral character for at least 5 years

5      immediately preceding the alien's applica-

6      tion for voluntary departure;

7          ''(iii) is not deportable under para-

8      graph (2)(A)(iii) or (4) of section 237(a);

9      and

10         ''(iv) has established, by clear and

11     convincing evidence, that he or she has the

12     means to depart the United States and in-

13     tends to do so.

14     ''(2) DEPARTURE BOND.—The Secretary shall

15     require any alien permitted to voluntarily depart

16     under this subsection to post a voluntary departure

17     bond, in an amount necessary to ensure that such

18     alien will depart, which shall be surrendered upon

19     proof that the alien has departed the United States

20     within the time specified in such bond.

21     ''(c) INELIGIBLE ALIENS.—The Secretary shall not

22     permit an alien to voluntarily depart under this section

23     if such alien was previously permitted to voluntarily depart

24     after having been found inadmissible under section

25     212(a)(6)(A).

IFR_AR_001831

118

1    "(d) CIVIL PENALTY FOR FAILURE TO DEPART.—

2        "(1) IN GENERAL.—Subject to paragraph (2),

3    an alien who was permitted to voluntarily depart the

4    United States under this section and fails to volun-

5    tarily depart within the period specified by the Sec-

6    retary—

7            "(A) shall be subject to a civil penalty of

8        not less than $1,000 and not more than

9        $5,000; and

10           "(B) shall be ineligible, during the 10-year

11       period beginning on the last day such alien was

12       permitted to voluntarily depart, to receive any

13       further relief under this section and sections

14       240A, 245, 248, and 249.

15       "(2) SPECIAL RULE.—The restrictions on relief

16   under paragraph (1) shall not apply to individuals

17   identified in section 240B(d)(2).

18       "(3) NOTICE.—The order permitting an alien

19   to voluntarily depart shall describe the penalties

20   under this subsection.

21   "(e) ADDITIONAL CONDITIONS.—The Secretary may

22   prescribe regulations that limit eligibility for voluntary de-

23   parture under this section for any class of aliens. No court

24   may review any regulation issued under this subsection.

IFR_AR_001832

119

1  ''(f) JUDICIAL REVIEW.—No court has jurisdiction

2  over an appeal from the denial of a request for an order

3  of voluntary departure under subsection (b). No court may

4  order a stay of an alien's removal pending consideration

5  of any claim with respect to voluntary departure.

6  ''(g) RULE OF CONSTRUCTION.—Nothing in this sec-

7  tion may be construed to affect any voluntary departure

8  relief in any other section of this Act.

9  **''SEC. 240F. WITHDRAWAL OF APPLICATION FOR ADMIS-**

10  **SION.**

11  ''(a) WITHDRAWAL AUTHORIZED.—The Secretary of

12  Homeland Security (referred to in this section as the 'Sec-

13  retary'), in the discretion of the Secretary, may permit any

14  alien for admission to withdraw his or her application—

15  ''(1) instead of being placed into removal pro-

16  ceedings under section 235B or 240D; or

17  ''(2) at any time before the alien's protection

18  merits interview occurs under section 240D.

19  ''(b) CONDITIONS.—An alien's decision to withdraw

20  his or her application for admission under subsection (a)

21  shall be made voluntarily. Permission to withdraw an ap-

22  plication for admission may not be granted unless the

23  alien intends and is able to depart the United States with-

24  in a period determined by the Secretary.

120

1    ''(c) CONSEQUENCE FOR FAILURE TO DEPART.—An

2  alien who is permitted to withdraw his or her application

3  for admission under this section and fails to voluntarily

4  depart the United States within the period specified by

5  the Secretary pursuant to subsection (b) shall be ineligible,

6  during the 5-year period beginning on the last day of such

7  period, to receive any further relief under this section and

8  section 240A.

9    ''(d) FAMILY UNITY.—In the case of an alien with

10  a minor child in the United States who has been ordered

11  removed after withdrawing an application under this sec-

12  tion, the Secretary shall ensure that such alien is removed

13  with the minor child, if the alien elects.

14    ''(e) RULE OF CONSTRUCTION.—Nothing in this sec-

15  tion may be construed to affect any withdrawal require-

16  ments in any other section of this Act.''.

17    (b) CLERICAL AMENDMENT.—The table of contents

18  of the Immigration and Nationality Act (8 U.S.C. 1101

19  et seq.), as amended by section 142(b), is further amended

20  by inserting after the item relating to section 240D the

21  following:

''Sec. 240E.  Voluntary departure after noncustodial processing.
''Sec. 240F.  Withdrawal of application for admission.''.

22  **SEC. 144. VOLUNTARY REPATRIATION.**

23    (a) IN GENERAL.—Chapter 4 of title II of the Immi-

24  gration and Nationality Act (8 U.S.C. 1221 et seq.), as

121

1 amended by section 143(a), is further amended by insert-

2 ing after section 240F, the following:

3 **"SEC. 240G. VOLUNTARY REPATRIATION.**

4     ''(a) ESTABLISHMENT.—The Secretary of Homeland

5 Security (referred to in this section as the 'Secretary')

6 shall establish a voluntary repatriation program in accord-

7 ance with the terms and conditions of this section.

8     ''(b) VOLUNTARY REPATRIATION IN LIEU OF PRO-

9 CEEDINGS.—Under the voluntary repatriation program es-

10 tablished under subsection (a), the Secretary may permit

11 an alien to elect, at any time during proceedings under

12 section 235B or before the alien's protection merits deter-

13 mination under section 240D(d), voluntary repatriation in

14 lieu of continued proceedings under section 235B or

15 240D.

16     ''(c) PERIOD OF VALIDITY.—An alien who elects vol-

17 untary repatriation shall depart the United States within

18 a period determined by the Secretary, which may not ex-

19 ceed 120 days.

20     ''(d) PROCEDURES.—Consistent with subsection (b),

21 the Secretary may permit an alien to elect voluntary repa-

22 triation if the asylum officer—

23         ''(1) enters an order granting voluntary repatri-

24         ation instead of an order of removal; and

25         ''(2) determines that the alien—

122

1          "(A) has been physically present in the
2     United States immediately preceding the date
3     on which the alien elects voluntary repatriation;
4          "(B) is, and has been, a person of good
5     moral character for the entire period the alien
6     is physically present in the United States;
7          "(C) is not described in paragraph
8     (2)(A)(iii) or (4) of section 237(a);
9          "(D) meets the applicable income require-
10     ments, as determined by the Secretary; and
11          "(E) has not previously elected voluntary
12     repatriation.
13     "(e) MINIMUM REQUIREMENTS.—
14          "(1) NOTICE.—The notices required to be pro-
15     vided to an alien under sections 235B(b)(2) and
16     240D(c)(1) shall include information on the vol-
17     untary repatriation program.
18          "(2) VERBAL REQUIREMENTS.—The asylum of-
19     ficer shall verbally provide the alien with information
20     about the opportunity to elect voluntary repatri-
21     ation—
22          "(A) at the beginning of a protection de-
23     termination under section 235B(c)(2); and
24          "(B) at the beginning of the protection
25     merits interview under section 240D(b)(3).

IFR_AR_001836

1 ''(3) WRITTEN REQUEST.—An alien subject to

2 section 235B or 240D—

3     ''(A) may elect voluntary repatriation at

4     any time during proceedings under 235B or be-

5     fore the protection merits determination under

6     section 240D(d); and

7     ''(B) may only elect voluntary repatri-

8     ation—

9         ''(i) knowingly and voluntarily; and

10         ''(ii) in a written format, to the max-

11         imum extent practicable, in the alien's na-

12         tive language or in a language the alien

13         understands, or in an alternative record if

14         the alien is unable to write.

15 ''(f) REPATRIATION.—The Secretary is authorized to

16 provide transportation to aliens, including on commercial

17 flights, if such aliens elect voluntary repatriation.

18 ''(g) REINTEGRATION.—Upon election of voluntary

19 repatriation, the Secretary shall advise the alien of any

20 applicable reintegration or reception program available in

21 the alien's country of nationality.

22 ''(h) FAMILY UNITY.—In the case of an alien with

23 a minor child in the United States who has been permitted

24 to voluntarily repatriate pursuant to this section, the Sec-

IFR_AR_001837

124

1   retary shall ensure that such alien is repatriated with the

2   minor child, if the alien elects.

3      ''(i) IMMIGRATION CONSEQUENCES.—

4         ''(1) ELECTION TIMING.—In the case of an

5      alien who elects voluntary repatriation at any time

6      during proceeding under section 235B or before the

7      protection merits interview, a final order of removal

8      shall not be entered against the alien.

9         ''(2) FAILURE TO TIMELY DEPART.—In the

10     case of an alien who elects voluntary repatriation

11     and fails to depart the United States before the end

12     of the period of validity under subsection (c)—

13           ''(A) the alien shall be subject to a civil

14        penalty in an amount equal to the cost of the

15        commercial flight or the ticket, or tickets, to the

16        country of nationality;

17           ''(B) during the 10-year period beginning

18        on the date on which the period of validity

19        under subsection (c) ends, the alien shall be in-

20        eligible for relief under—

21              ''(i) this section;

22              ''(ii) section 240A; and

23              ''(iii) section 240E; and

24           ''(C) a final order of removal shall be en-

25        tered against the alien.

IFR_AR_001838

125

1    "(3) EXCEPTIONS.—Paragraph (2) shall not

2    apply to a child of an adult alien who elected vol-

3    untary repatriation.

4  "(j) CLERICAL MATTERS.—

5    "(1) RULE OF CONSTRUCTION.—Nothing in

6    this section may be construed to affect any voluntary

7    departure under any other section of this Act.

8    "(2) SAVINGS CLAUSE.—Nothing in this section

9    may be construed to supersede the requirements of

10    section 241(b)(3).

11    "(3) JUDICIAL REVIEW.—No court shall have

12    jurisdiction of the Secretary's decision, in the Sec-

13    retary's sole discretion, to permit an alien to elect

14    voluntary repatriation. No court may order a stay of

15    an alien's removal pending consideration of any

16    claim with respect to voluntary repatriation.

17    "(4) APPROPRIATIONS.—There are authorized

18    to be appropriated to the Secretary such sums as

19    necessary to carry out this section.

20  "(k) VOLUNTARY REPATRIATION DEFINED.—The

21  term 'voluntary repatriation' means the free and voluntary

22  return of an alien to the alien's country of nationality (or

23  in the case of an alien having no nationality, the country

24  of the alien's last habitual residence) in a safe and dig-

25  nified manner, consistent with the obligations of the

126

1 United States under the Convention Relating to the Sta-

2 tus of Refugees, done at Geneva July 28, 1952 (as made

3 applicable by the1967 Protocol Relating to the Status of

4 Refugees, done at New York January 31, 1967 (19 UST

5 6223)).''.

6     (b) CLERICAL AMENDMENT.—The table of contents

7 of the Immigration and Nationality Act (8 U.S.C. 1101

8 et seq.), as amended by section 143(b), is further amended

9 by inserting after the item relating to section 240F the

10 following:

"Sec. 240G. Voluntary repatriation.''.

**11 SEC. 145. IMMIGRATION EXAMINATIONS FEE ACCOUNT.**

12     Section 286 of the Immigration and Nationality Act

13 (8 U.S.C. 1356) is amended—

14         (1) in subsection (m), by striking ''collected.''

15     and inserting ''collected: *Provided further*, That such

16     fees may not be set to recover any costs associated

17     with the implementation of sections 235B and

18     240D, are appropriated by Congress, and are not

19     subject to the fees collected.''; and

20         (2) in subsection (n), by adding at the end the

21     following: ''Funds deposited in the 'Immigration Ex-

22     aminations Fee Account' shall not be used to reim-

23     burse any appropriation for expenses associated with

24     the implementation of sections 235B and 240D.''.

127

1 **SEC. 146. BORDER REFORMS.**

2   (a) SPECIAL RULES FOR CONTIGUOUS CONTINENTAL

3 LAND BORDERS.—

4       (1) IN GENERAL.—Chapter 4 of title II of the

5       Immigration and Nationality Act (8 U.S.C. 1221 et

6       seq.) is amended by adding at the end the following:

7 **"SEC. 244A. SPECIAL RULES FOR CONTIGUOUS CONTI-**

8                 **NENTAL LAND BORDERS.**

9   "(a) IN GENERAL.—An alien described in section 235

10 or 235B who arrives by land from a contiguous conti-

11 nental land border (whether or not at a designated port

12 of arrival), absent unusual circumstances, shall be prompt-

13 ly subjected to the mandatory provisions of such sections

14 unless the Secretary of Homeland Security (referred to in

15 this section as the 'Secretary') determines, on a case-by-

16 case basis, that there is—

17       "(1) an exigent medical circumstance involving

18       the alien that requires the alien's physical presence

19       in the United States;

20       "(2) a significant law enforcement or intel-

21       ligence purpose warranting the alien's presence in

22       the United States;

23       "(3) an urgent humanitarian reason directly

24       pertaining to the individual alien, according to spe-

25       cific criteria determined by the Secretary;

128

1      ''(4) a Tribal religious ceremony, cultural ex-
2  change, celebration, subsistence use, or other cul-
3  turally important purpose warranting the alien's
4  presence in the United States on Tribal land located
5  at or near an international land border;

6      ''(5) an accompanying alien whose presence in
7  the United States is necessary for the alien who
8  meets the criteria described in any of the paragraphs
9  (1) through (4) to further the purposes of such pro-
10  visions; or

11      ''(6) an alien who, while in the United States,
12  had an emergent personal or bona fide reason to
13  travel temporarily abroad and received approval for
14  Advance Parole from the Secretary.

15  ''(b) RULES OF CONSTRUCTION.—Nothing in this
16  section may be construed—

17      ''(1) to preclude the execution of section
18  235(a)(4) or 241(a)(5);

19      ''(2) to expand or restrict the authority to grant
20  parole under section 212(d)(5), including for aliens
21  arriving at a port of entry by air or sea, other than
22  an alien arriving by land at a contiguous continental
23  land border for whom a special rule described in
24  subsection (a) applies; or

1 ''(3) to refer to or place an alien in removal
2 proceedings pursuant to section 240, or in any other
3 proceedings, if such referral is not otherwise author-
4 ized under this Act.

5 ''(c) TRANSITION RULES.—

6 ''(1) MANDATORY PROCESSING.—Beginning on
7 the date that is 90 days after the date of the enact-
8 ment of this section, the Secretary shall require any
9 alien described in subsection (a) who does not meet
10 any of the criteria described in paragraphs (1)
11 through (6) of that subsection to be processed in ac-
12 cordance with section 235 or 235B, as applicable,
13 unless such alien is subject to removal proceedings
14 under subsection (b)(3).

15 ''(2) PRE-CERTIFICATION REFERRALS AND
16 PLACEMENTS.—Before the Comptroller General of
17 the United States has certified that sections 235B
18 and 240D are fully operational pursuant to section
19 146(d) of the Border Act, the Secretary shall refer
20 or place aliens described in subsection (a) in pro-
21 ceedings under section 240 based upon operational
22 considerations regarding the capacity of the Sec-
23 retary to process aliens under section 235 or section
24 235B, as applicable.

IFR_AR_001843

130

1  ''(3) POST-CERTIFICATION REFERRALS AND
2  PLACEMENTS.—After the Comptroller General
3  makes the certification referred to in paragraph (2),
4  the Secretary may only refer aliens described in sub-
5  section (a) to, or place such aliens in, proceedings
6  under section 235(b) or 235B, as applicable, unless
7  such alien is subject to removal proceedings under
8  subsection (b)(3).''.

9  (2) CLERICAL AMENDMENT.—The table of con-
10  tents of the Immigration and Nationality Act (8
11  U.S.C. 1101 et seq.) is amended by inserting after
12  the item relating to section 244 the following:

''Sec. 244A. Special rules for contiguous continental land borders.''.

13 (b) MODIFICATION OF AUTHORITY TO ARREST, DE-
14 TAIN, AND RELEASE ALIENS.—

15  (1) IN GENERAL.—Section 236(a)(2) of the Im-
16  migration and Nationality Act (8 U.S.C. 1226(a)(2))
17  is amended—

18   (A) in the matter preceding subparagraph
19   (A), by striking ''on'';

20   (B) in subparagraph (A), by inserting
21   ''on'' before ''bond''; and

22   (C) by amending subparagraph (B) to read
23   as follows:

24    ''(B)(i) in the case of an alien encountered
25    in the interior, on conditional parole; or

IFR_AR_001844

1         ''(ii) in the case of an alien encountered at

2         the border—

3             ''(I) pursuant to the procedures under

4             235B; or

5             ''(II) on the alien's own recognizance

6             with placement into removal proceedings

7             under 240; and''.

8     (2) EFFECTIVE DATE.—The amendments made

9 by paragraph (1) shall take effect immediately after

10 the Comptroller General of the United States cer-

11 tifies, in accordance with subsection (d), that sec-

12 tions 235B and 240D of the Immigration and Na-

13 tionality Act, as added by sections 141 and 142, are

14 fully operational.

15 (c) REPORTING REQUIREMENT.—

16     (1) IN GENERAL.—Section 236 of the Immigra-

17 tion and Nationality Act (8 U.S.C. 1226) is amend-

18 ed by adding at the end the following:

19 ''(f) SEMIANNUAL REPORT.—

20     ''(1) IN GENERAL.—Not later than 180 days

21 after the date on which the Comptroller General

22 makes the certification described in section 146(d)

23 of the Border Act, and every 180 days thereafter,

24 the Secretary of Homeland Security shall publish, on

25 a publicly accessible internet website in a

132

1  downloadable and searchable format, a report that
2  describes each use of the authority of the Secretary
3  under subsection (a)(2)(B)(ii)(II).

4  ''(2) ELEMENTS.—Each report required by
5  paragraph (1) shall include, for the applicable 180-
6  day reporting period—

7  ''(A) the number of aliens released pursu-
8  ant to the authority of the Secretary of Home-
9  land Security under subsection (a)(2)(B)(ii)(II);

10  ''(B) with respect to each such release—

11  ''(i) the rationale;

12  ''(ii) the Border Patrol sector in
13  which the release occurred; and

14  ''(iii) the number of days between the
15  scheduled date of the protection determina-
16  tion and the date of release from physical
17  custody.

18  ''(3) PRIVACY PROTECTION.—Each report pub-
19  lished under paragraph (1)—

20  ''(A) shall comply with all applicable Fed-
21  eral privacy laws; and

22  ''(B) shall not disclose any information
23  contained in, or pertaining to, a protection de-
24  termination.''.

IFR_AR_001846

133

1          (2) EFFECTIVE DATE.—The amendment made
2     by paragraph (1) shall take effect immediately after
3     the Comptroller General of the United States cer-
4     tifies, in accordance with subsection (d), that sec-
5     tions 235B and 240D of the Immigration and Na-
6     tionality Act, as added by sections 141 and 142, are
7     fully operational.

8     (d) CERTIFICATION PROCESS.—

9          (1) DEFINITIONS.—In this subsection:

10              (A) FULLY OPERATIONAL.—The term
11          ''fully operational'' means the Secretary has the
12          necessary resources, capabilities, and personnel
13          to process all arriving aliens referred to in sec-
14          tions 235B and 240D of the Immigration and
15          Nationality Act, as added by sections 141 and
16          142, within the timeframes required by such
17          sections.

18              (B) REQUIRED PARTIES.—The term ''re-
19          quired parties'' means—

20                   (i) the President;

21                   (ii) the Secretary;

22                   (iii) the Attorney General;

23                   (iv) the Director of the Office of Man-
24               agement and Budget;

IFR_AR_001847

134

1    (v) the Committee on Homeland Secu-
2    rity and Governmental Affairs of the Sen-
3    ate;
4    (vi) the Committee on the Judiciary of
5    the Senate;
6    (vii) the Committee on Appropriations
7    of the Senate;
8    (viii) the Committee on Homeland Se-
9    curity of the House of Representatives;
10    (ix) the Committee on the Judiciary
11    of the House of Representatives; and
12    (x) the Committee on Appropriations
13    of the House of Representatives.
14    (2) REVIEW.—
15    (A) IN GENERAL.—Not later than 180
16    days after the date of the enactment of this
17    Act, the Comptroller General of the United
18    States shall review the implementation of sec-
19    tions 235B and 240D of the Immigration and
20    Nationality Act, as added by sections 141 and
21    142, to determine whether such sections are
22    fully operational.
23    (B) REVIEW ELEMENTS.—In completing
24    the review required under subparagraph (A),
25    the Comptroller General shall assess, in com-

135

1          parison to the available resources, capabilities,
2          and personnel on the date of the enactment of
3          this Act, whether there are sufficient—

4              (i) properly trained personnel, includ-
5          ing support personnel;

6              (ii) real property assets and other re-
7          quired capabilities;

8              (iii) information technology infrastruc-
9          ture;

10              (iv) field manuals and guidance, regu-
11          lations, and policies;

12              (v) other investments that the Comp-
13          troller General considers necessary; and

14              (vi) asylum officers to effectively proc-
15          ess all aliens who are considered amenable
16          for processing under section 235(b), sec-
17          tion 235B, section 240, and section 240D
18          of the Immigration and Nationality Act.

19      (3) CERTIFICATION OF FULL IMPLEMENTA-
20      TION.—If the Comptroller General determines, after
21      completing the review required under paragraph (2),
22      that sections 235B and 240D of the Immigration
23      and Nationality Act are fully operational, the Comp-
24      troller General shall immediately submit to the re-
25      quired parties a certification of such determination.

136

1 　　　(4) NONCERTIFICATION AND SUBSEQUENT RE-

2 　　VIEWS.—If the Comptroller General determines,

3 　　after completing the review required under para-

4 　　graph (2), that such sections 235B and 240D are

5 　　not fully operational, the Comptroller General

6 　　shall—

7 　　　　　(A) notify the required parties of such de-

8 　　　　termination, including the reasons for such de-

9 　　　　termination;

10 　　　　　(B) conduct a subsequent review in accord-

11 　　　　ance with paragraph (2)(A) not later than 180

12 　　　　days after each previous review that concluded

13 　　　　that such sections 235B and 240D were not

14 　　　　fully operational; and

15 　　　　　(C) conduct a subsequent review not later

16 　　　　than 90 days after each time Congress appro-

17 　　　　priates additional funding to fully implement

18 　　　　such sections 235B and 240D.

19 　　　(5) DETERMINATION OF THE SECRETARY.—Not

20 　　later than 7 days after receiving a certification de-

21 　　scribed in paragraph (3), the Secretary shall confirm

22 　　or reject the certification of the Comptroller General.

23 　　　(6) EFFECT OF REJECTION.—

24 　　　　　(A) NOTIFICATION.—If the Secretary re-

25 　　　　jects a certification of the of the Comptroller

137

1    General pursuant to paragraph (A), the Sec-
2    retary shall immediately—

3         (i) notify the President, the Comp-
4         troller General, and the congressional com-
5         mittees listed in paragraph (1) of such re-
6         jection; and

7         (ii) provide such entities with a ra-
8         tionale for such rejection.

9         (B) SUBSEQUENT REVIEWS.—If the Comp-
10        troller General receives a notification of rejec-
11        tion from the Secretary pursuant to subpara-
12        graph (A), the Comptroller General shall con-
13        duct a subsequent review in accordance with
14        paragraph (4)(B).

**SEC. 147. PROTECTION APPELLATE BOARD.**

16    (a) IN GENERAL.—Subtitle E of title IV of the
17    Homeland Security Act of 2002 (6 U.S.C. 271 et seq.)
18    is amended by adding at the end the following:

**"SEC. 463. PROTECTION APPELLATE BOARD.**

20    "(a) ESTABLISHMENT.—The Secretary shall estab-
21    lish within the U.S. Citizenship and Immigration Services
22    an appellate authority to conduct administrative appellate
23    reviews of protection merits determinations made under
24    section 240D of the Immigration and Nationality Act in

138

1 which the alien is denied relief or protection, to be known

2 as the 'Protection Appellate Board'.

3    "(b) COMPOSITION.—Each panel of the Protection

4 Appellate Board shall be composed of 3 U.S. Citizenship

5 and Immigration Services asylum officers (as defined in

6 section 235(b)(1)(E) of the Immigration and Nationality

7 Act (8 U.S.C. 1225(b)(1)(E))), assigned to the panel at

8 random, who—

9        "(1) possess the necessary experience adjudi-

10       cating asylum claims; and

11       "(2) are from diverse geographic regions.

12   "(c) DUTIES OF ASYLUM OFFICERS.—In conducting

13 a review under section 240D(e) of the Immigration and

14 Nationality Act, each asylum officer assigned to a panel

15 of the Protection Appellate Board shall independently re-

16 view the file of the alien concerned, including—

17       "(1) the record of the alien's protection deter-

18       mination (as defined in section 101(a) of the Immi-

19       gration and Nationality Act (8 U.S.C. 1101(a))), as

20       applicable;

21       "(2) the alien's application for a protection

22       merits interview (as defined in section 240D(l) of

23       that Act);

24       "(3) a transcript of the alien's protection merits

25       interview;

1    ''(4) the final record of the alien's protection

2    merits interview;

3    ''(5) a sworn statement from the alien identi-

4    fying new evidence or alleged error and any accom-

5    panying information the alien or the alien's legal

6    representative considers important; and

7    ''(6) any additional materials, information, or

8    facts inserted into the record.

9    ''(d) DECISIONS.—Any final determination made by

10    a panel of the Protection Appellate Board shall be by ma-

11    jority decision, independently submitted by each member

12    of the panel.

13    ''(e) EXCLUSIVE JURISDICTION.—The Protection Ap-

14    pellate Board shall have exclusive jurisdiction to review

15    appeals of negative protections merits determinations.

16    ''(f) PROTECTIONS FOR DECISIONS BASED ON MER-

17    ITS OF CASE.—The Director of U.S. Citizenship and Im-

18    migration Services may not impose restrictions on an asy-

19    lum officer's ability to grant or deny relief or protection

20    based on a numerical limitation.

21    ''(g) REPORTS.—

22    ''(1) IN GENERAL.—Not later than 1 year after

23    the date of the enactment of this section, and annu-

24    ally thereafter, the Secretary—

1    ''(A) shall submit a report to the appro-
2    priate committees of the Congress that in-
3    cludes, for the preceding year—

4    ''(i) the number of petitions for review
5    submitted by aliens under section 240D(e)
6    of the Immigration and Nationality Act;

7    ''(ii) the number of appeals considered
8    by the Protection Appellate Board under
9    such section that resulted in a grant of re-
10    lief or protection;

11    ''(iii) the number of appeals consid-
12    ered by the Protection Appellate Board
13    under such section that resulted in a denial
14    of relief or protection;

15    ''(iv) the geographic regions in which
16    the members of the Protection Appellate
17    Board held their primary duty station;

18    ''(v) the tenure of service of the mem-
19    bers of the Protection Appellate Board;

20    ''(vi) a description of any anomalous
21    case outcome identified by the Secretary
22    and the resolution of any such case out-
23    come;

24    ''(vii) the number of unanimous deci-
25    sions by the Protection Appellate Board;

IFR_AR_001854

141

1                 "(viii) an identification of the number

2             of cases the Protection Appellate Board

3             was unable to complete in the timelines

4             specified under section 240D(e) of the Im-

5             migration and Nationality Act; and

6                 "(ix) a description of any steps taken

7             to remediate any backlog identified under

8             clause (viii), as applicable; and

9             "(B) in submitting each such report, shall

10         protect all personally identifiable information of

11         Federal employees and aliens who are subject to

12         the reporting under this subsection.

13         "(2) APPROPRIATE COMMITTEES OF CONGRESS

14     DEFINED.—In this subsection, the term 'appropriate

15     committees of Congress' means—

16             "(A) the Committee on Appropriations of

17         the Senate;

18             "(B) the Committee on the Judiciary of

19         the Senate;

20             "(C) the Committee on Homeland Security

21         and Governmental Affairs of the Senate;

22             "(D) the Committee on Appropriations of

23         the House of Representatives;

24             "(E) the Committee on the Judiciary of

25         the House of Representatives; and

IFR_AR_001855

142

1        "(F) the Committee on Homeland Security

2            of the House of Representatives.".

3    (b) CLERICAL AMENDMENT.—The table of contents

4 of the Homeland Security Act of 2002 (6 U.S.C. 101 et

5 seq.) is amended by inserting after the item relating to

6 section 462 the following:

"Sec. 463. Protection Appellate Board.".

# TITLE II—ASYLUM PROCESSING ENHANCEMENTS

9 **SEC. 201. COMBINED SCREENINGS.**

10    Section 101(a) of the Immigration and Nationality

11 Act (8 U.S.C. 1101(a)) is amended by adding at the end

12 the following:

13    "(53) The term 'protection determination' means—

14        "(A) a screening conducted pursuant to section

15        235(b)(1)(B)(v); or

16        "(B) a screening to determine whether an alien

17        is eligible for—

18            "(i) withholding of removal under section

19            241(b)(3); or

20            "(ii) protection under the Convention

21            against Torture and Other Cruel, Inhuman or

22            Degrading Treatment or Punishment, done at

23            New York December 10, 1984, which includes

24            the regulations implementing any law enacted

25            pursuant to Article 3 of such convention.

IFR_AR_001856

143

1 ''(54) The term 'protection merits interview' means
2 an interview to determine whether an alien—

3  ''(A) meets the definition of refugee under
4  paragraph (42), in accordance with the terms and
5  conditions under section 208;

6  ''(B) is eligible for withholding of removal
7  under section 241(b)(3); or

8  ''(C) is eligible for protection under the Conven-
9  tion against Torture and Other Cruel, Inhuman or
10  Degrading Treatment or Punishment, done at New
11  York December 10, 1984, which includes the regula-
12  tions implementing any law enacted pursuant to Ar-
13  ticle 3 of such convention.''.

14 **SEC. 202. CREDIBLE FEAR STANDARD AND ASYLUM BARS**
15    **AT SCREENING INTERVIEW.**

16  Section 235(b)(1)(B) of the Immigration and Nation-
17 ality Act (8 U.S.C. 1225(b)(1)(B)) is amended—

18  (1) in clause (v), by striking ''significant possi-
19  bility'' and inserting ''reasonable possibility''; and

20  (2) by adding at the end, the following:

21   ''(vi) ASYLUM EXCEPTIONS.—An asy-
22   lum officer, during the credible fear screen-
23   ing of an alien—

24    ''(I) shall determine whether any
25    of the asylum exceptions under section

144

1          208(b)(2) disqualify the alien from re-
2          ceiving asylum; and

3              ''(II) may determine that the
4          alien does not meet the definition of
5          credible fear of persecution under
6          clause (v) if any such exceptions
7          apply, including whether any such ex-
8          emptions to such disqualifying excep-
9          tions may apply.''.

10  **SEC. 203. INTERNAL RELOCATION.**

11      (a) IN GENERAL.—Section 208(b)(2)(A) of the Im-
12  migration and Nationality Act (8 U.S.C. 1158(b)(2)(A))
13  is amended—

14          (1) in clause (v), by striking ''or'' at the end;
15          (2) in clause (vi), by striking the period at the
16      end and inserting ''; or''; and
17          (3) by adding at the end the following:

18              ''(vii) there are reasonable grounds for
19          concluding that the alien could avoid perse-
20          cution by relocating to—

21              ''(I) another location in the
22          alien's country of nationality; or

23              ''(II) in the case of an alien hav-
24          ing no nationality, another location in

145

1           the alien's country of last habitual

2           residence.''.

3       (b) INAPPLICABILITY.—Section 244(c)(2)(B)(ii) of

4   the Immigration and Nationality Act (8 U.S.C.

5   1254a(c)(2)(B)(ii)) is amended by inserting ''clauses (i)

6   through (vi) of'' after ''described in''.

**SEC. 204. ASYLUM OFFICER CLARIFICATION.**

8       Section 235(b)(1)(E) of the Immigration and Nation-

9   ality Act (8 U.S.C. 1225(b)(1)(E)) is amended—

10          (1) in clause (i), by striking ''comparable to''

11      and all that follows and inserting '', including non-

12      adversarial techniques;'';

13          (2) in clause (ii), by striking the period at the

14      end and inserting ''; and''; and

15          (3) by adding at the end the following:

16              ''(iii)(I) is an employee of U.S. Citi-

17          zenship and Immigration Services; and

18              ''(II) is not a law enforcement offi-

19          cer.''.

# TITLE III—SECURING AMERICA
## Subtitle A—Border Emergency Authority

**SEC. 301. BORDER EMERGENCY AUTHORITY.**

24      (a) IN GENERAL.—Chapter 4 of title II of the Immi-

25  gration and Nationality Act (8 U.S.C. 1221 et seq.), as

IFR_AR_001859

146

1 amended by section 146(a), is further amended by adding

2 at the end the following:

**"SEC. 244B. BORDER EMERGENCY AUTHORITY.**

4      "(a) USE OF AUTHORITY.—

5          "(1) IN GENERAL.—In order to respond to ex-

6      traordinary migration circumstances, there shall be

7      available to the Secretary, notwithstanding any other

8      provision of law, a border emergency authority.

9          "(2) EXCEPTIONS.—The border emergency au-

10     thority shall not be activated with respect to any of

11     the following:

12              "(A) A citizen or national of the United

13          States.

14              "(B) An alien who is lawfully admitted for

15          permanent residence.

16              "(C) An unaccompanied alien child.

17              "(D) An alien who an immigration officer

18          determines, with the approval of a supervisory

19          immigration officer, should be excepted from

20          the border emergency authority based on the to-

21          tality of the circumstances, including consider-

22          ation of significant law enforcement, officer and

23          public safety, humanitarian, and public health

24          interests, or an alien who an immigration offi-

25          cer determines, in consultation with U.S. Immi-

147

1    gration and Customs Enforcement, should be
2    excepted from the border emergency authority
3    due to operational considerations.

4        ''(E) An alien who is determined to be a
5    victim of a severe form of trafficking in persons
6    (as defined in section 103 of the Trafficking
7    Victims Protection Act of 2000 (22 U.S.C.
8    7102)).

9        ''(F) An alien who has a valid visa or other
10   lawful permission to enter the United States,
11   including—

12           ''(i) a member of the Armed Forces of
13       the United States and associated per-
14       sonnel, United States Government employ-
15       ees or contractors on orders abroad, or
16       United States Government employees or
17       contractors, and an accompanying family
18       member who is on orders or is a member
19       of the alien's household, subject to re-
20       quired assurances;

21           ''(ii) an alien who holds a valid travel
22       document upon arrival at a port of entry;

23           ''(iii) an alien from a visa waiver pro-
24       gram country under section 217 who is not

148

1           otherwise subject to travel restrictions and

2           who arrives at a port of entry; or

3                ''(iv) an alien who presents at a port

4                of entry pursuant to a process approved by

5                the Secretary to allow for safe and orderly

6                entry into the United States.

7        ''(3) APPLICABILITY.—The border emergency

8    authority shall only be activated as to aliens who are

9    not subject to an exception under paragraph (2),

10    and who are, after the authority is activated, within

11    100 miles of the United States southwest land bor-

12    der and within the 14-day period after entry.

13    ''(b) BORDER EMERGENCY AUTHORITY DE-

14    SCRIBED.—

15        ''(1) IN GENERAL.—Whenever the border emer-

16    gency authority is activated, the Secretary shall have

17    the authority, in the Secretary's sole and

18    unreviewable discretion, to summarily remove from

19    and prohibit, in whole or in part, entry into the

20    United States of any alien identified in subsection

21    (a)(3) who is subject to such authority in accordance

22    with this subsection.

23        ''(2) TERMS AND CONDITIONS.—

24                ''(A) SUMMARY REMOVAL.—Notwith-

25                standing any other provision of this Act, subject

IFR_AR_001862

1 to subparagraph (B), the Secretary shall issue
2 a summary removal order and summarily re-
3 move an alien to the country of which the alien
4 is a subject, national, or citizen (or, in the case
5 of an alien having no nationality, the country of
6 the alien's last habitual residence), or in accord-
7 ance with the processes established under sec-
8 tion 241, unless the summary removal of the
9 alien to such country would be prejudicial to
10 the interests of the United States.

11 "(B) WITHHOLDING AND CONVENTION
12 AGAINST TORTURE INTERVIEWS.—

13 "(i) IN GENERAL.—In the case of an
14 alien subject to the border emergency au-
15 thority who manifests a fear of persecution
16 or torture with respect to a proposed coun-
17 try of summary removal, an asylum officer
18 (as defined in section 235(b)(1)(E)) shall
19 conduct an interview, during which the
20 asylum officer shall determine that, if such
21 alien demonstrates during the interview
22 that the alien has a reasonable possibility
23 of persecution or torture, such alien shall
24 be referred to or placed in proceedings

IFR_AR_001863

150

1    under section 240 or 240D, as appro-
2    priate.

3        "(ii) SOLE MECHANISM TO REQUEST
4    PROTECTION.—An interview under this
5    subparagraph conducted by an asylum offi-
6    cer shall be the sole mechanism by which
7    an alien described in clause (i) may make
8    a claim for protection under—

9            "(I) section 241(b)(3); and

10            "(II) the Convention Against
11        Torture.

12        "(iii) ALIEN REFERRED FOR ADDI-
13    TIONAL PROCEEDINGS.—In the case of an
14    alien interviewed under clause (i) who dem-
15    onstrates that the alien is eligible to apply
16    for protection under section 241(b)(3) or
17    the Convention Against Torture, the
18    alien—

19            "(I) shall not be summarily re-
20        moved; and

21            "(II) shall instead be processed
22        under section 240 or 240D, as appro-
23        priate.

24        "(iv) ADDITIONAL REVIEW.—

IFR_AR_001864

151

1          ''(I) OPPORTUNITY FOR SEC-
2     ONDARY REVIEW.—A supervisory asy-
3     lum officer shall review any case in
4     which the asylum officer who inter-
5     viewed the alien under the procedures
6     in clause (iii) finds that the alien is
7     not eligible for protection under sec-
8     tion 241(b)(3) or the Convention
9     Against Torture.

10          ''(II) VACATUR.—If, in con-
11     ducting such a secondary review, the
12     supervisory asylum officer determines
13     that the alien demonstrates eligibility
14     for such protection—

15               ''(aa) the supervisory asylum
16          officer shall vacate the previous
17          negative determination; and

18               ''(bb) the alien shall instead
19          be processed under section 240
20          or 240D.

21          ''(III) SUMMARY REMOVAL.—If
22     an alien does not seek such a sec-
23     ondary review, or if the supervisory
24     asylum officer finds that such alien is
25     not eligible for such protection, the

1          supervisory asylum officer shall order
2              the alien summarily removed without
3              further review.
4      "(3) ACTIVATIONS OF AUTHORITY.—
5          "(A)  DISCRETIONARY  ACTIVATION.—The
6      Secretary may activate the border emergency
7      authority if, during a period of 7 consecutive
8      calendar days, there is an average of 4,000 or
9      more aliens who are encountered each day.
10          "(B) MANDATORY ACTIVATION.—The Sec-
11      retary shall activate the border emergency au-
12      thority if—
13              "(i) during a period of 7 consecutive
14              calendar days, there is an average of 5,000
15              or more aliens who are encountered each
16              day; or
17              "(ii) on any 1 calendar day, a com-
18              bined total of 8,500 or more aliens are en-
19              countered.
20          "(C) CALCULATION OF ACTIVATION.—
21              "(i) IN GENERAL.—For purposes of
22              subparagraphs (A) and (B), the average
23              for the applicable 7-day period shall be cal-
24              culated using—
25                  "(I) the sum of—

153

1              ''(aa) the number of encoun-
2          ters that occur between the
3          southwest land border ports of
4          entry of the United States;
5              ''(bb) the number of encoun-
6          ters that occur between the ports
7          of entry along the southern
8          coastal borders; and
9              ''(cc) the number of inad-
10          missible aliens encountered at a
11          southwest land border port of
12          entry as described in subsection
13          (a)(2)(F)(iv); divided by
14          ''(II) 7.
15      ''(ii) LIMITATION.—Aliens described
16      in subsection (a)(2)(C) from noncontiguous
17      countries shall not be included in calcu-
18      lating the sum of aliens encountered.
19  ''(4) LIMITATIONS.—
20      ''(A) IN GENERAL.—For purposes of para-
21      graph (3), the Secretary shall not activate the
22      border emergency authority—
23          ''(i) during the first calendar year
24          after the effective date, for more than 270
25          calendar days;

154

1          "(ii) during the second calendar year

2          after the effective date, for more than 225

3          days; and

4          "(iii) during the third calendar year,

5          for more than 180 calendar days.

6     "(B) IMPLEMENTATION.—When the au-

7     thority is activated, the Secretary shall imple-

8     ment the authority within 24 hours of such ac-

9     tivation.

10    "(5) SUSPENSIONS OF AUTHORITY.—The Sec-

11    retary shall suspend activation of the border emer-

12    gency authority, and the procedures under sub-

13    sections (a), (b), (c), and (d), not later than 14 cal-

14    endar days after the date on which the following oc-

15    curs, as applicable:

16         "(A) In the case of an activation under

17         subparagraph (A) of paragraph (3), there is

18         during a period of 7 consecutive calendar days

19         an average of less than 75 percent of the en-

20         counter level used for activation.

21         "(B) In the case of an activation under

22         clause (i) or (ii) of paragraph (3)(B), there is

23         during a period of 7 consecutive calendar days

24         an average of less than 75 percent of the en-

25         counter level described in such clause (i).

155

1    ''(6) WAIVERS OF ACTIVATION OF AUTHOR-
2    ITY.—

3        ''(A) FIRST CALENDAR YEAR.—Notwith-
4        standing paragraph (3), beginning the first cal-
5        endar year after the effective date, the Sec-
6        retary shall only have the authority to activate
7        the border emergency authority for 270 cal-
8        endar days during the calendar year, provided
9        that—

10            ''(i) for the first 90 calendar days in
11            which any of the requirements of para-
12            graph (3) have been satisfied, the Sec-
13            retary shall be required to activate such
14            authority;

15            ''(ii) for the remaining 180 days that
16            the authority is available in the calendar
17            year, the Secretary may, in the sole,
18            unreviewable, and exclusive discretion of
19            the Secretary, determine whether to acti-
20            vate the requirements of the border emer-
21            gency authority under paragraph (3)(B)
22            until the number of days that the authority
23            has not been activated is equal to the num-
24            ber of days left in the calendar year; and

IFR_AR_001869

156

1          "(iii) when the number of calendar
2      days remaining in the calendar year is
3      equal to the number of days that the au-
4      thority has not been activated, the Sec-
5      retary shall be required to activate the bor-
6      der emergency authority for the remainder
7      of the calendar year on days during which
8      the requirements of paragraph (3)(B) have
9      been satisfied.

10      "(B) SECOND CALENDAR YEAR.—Notwith-
11  standing paragraph (3), beginning the second
12  calendar year after the effective date, the Sec-
13  retary shall only have the authority to activate
14  the border emergency authority for 225 cal-
15  endar days during the calendar year, provided
16  that—

17          "(i) during the first 75 calendar days
18      during which any of the requirements of
19      paragraph (3) have been satisfied, the Sec-
20      retary shall be required to activate the au-
21      thority;

22          "(ii) for the remaining 150 days that
23      the authority is available in the calendar
24      year, the Secretary may, in the sole,
25      unreviewable, and exclusive discretion of

157

1 the Secretary, determine whether to acti-
2 vate the requirements of the border emer-
3 gency authority under paragraph (3)(B)
4 until the number of days that the authority
5 has not been activated is equal to the num-
6 ber of days left in the calendar year; and

7 "(iii) when the number of calendar
8 days remaining in the calendar year is
9 equal to the number of days that the au-
10 thority has not been activated, the Sec-
11 retary shall be required to activate the bor-
12 der emergency authority for the remainder
13 of the calendar year on days during which
14 the requirements of paragraph (3)(B) have
15 been satisfied.

16 "(C) THIRD CALENDAR YEAR.—Notwith-
17 standing paragraph (3), beginning the third cal-
18 endar year after the effective date, the Sec-
19 retary shall only have the authority to activate
20 the border emergency authority for 180 cal-
21 endar days during the calendar year, provided
22 that—

23 "(i) during the first 60 calendar days
24 during which any of the requirements of
25 paragraph (3) have been satisfied, the Sec-

1     retary shall be required to activate the au-

2     thority;

3           "(ii) for the remaining 120 days that

4     the authority is available in each calendar

5     year, the Secretary may, in the sole,

6     unreviewable, and exclusive discretion of

7     the Secretary, determine whether to acti-

8     vate the requirements of the border emer-

9     gency authority under paragraph (3)(B)

10     until the number of days that the authority

11     has not been activated is equal to the num-

12     ber of days left in the calendar year; and

13           "(iii) when the number of calendar

14     days remaining in the calendar year is

15     equal to the number of days that the au-

16     thority has not been activated, the Sec-

17     retary shall be required to activate the bor-

18     der emergency authority for the remainder

19     of the calendar year on days during which

20     the requirements of paragraph (3)(B) have

21     been satisfied.

22         "(7) EMERGENCY SUSPENSION OF AUTHOR-

23     ITY.—

24           "(A) IN GENERAL.—If the President finds

25     that it is in the national interest to temporarily

1 suspend the border emergency authority, the
2 President may direct the Secretary to suspend
3 use of the border emergency authority on an
4 emergency basis.

5    "(B) DURATION.—In the case of a direc-
6 tion from the President under subparagraph
7 (A), the Secretary shall suspend the border
8 emergency authority for not more than 45 cal-
9 endar days within a calendar year, notwith-
10 standing any limitations on the use of the au-
11 thority described in this subsection.

12 "(c) CONTINUED ACCESS TO SOUTHWEST LAND
13 BORDER PORTS OF ENTRY.—

14    "(1) IN GENERAL.—During any activation of
15 the border emergency authority under subsection
16 (b), the Secretary shall maintain the capacity to
17 process, and continue processing, under section 235
18 or 235B a minimum of 1,400 inadmissible aliens
19 each calendar day cumulatively across all southwest
20 land border ports of entry in a safe and orderly
21 process developed by the Secretary.

22    "(2) SPECIAL RULES.—

23       "(A) UNACCOMPANIED ALIEN CHILDREN
24 EXCEPTION.—For the purpose of calculating
25 the number under paragraph (1), the Secretary

IFR_AR_001873

160

1           shall count all unaccompanied alien children,
2           who are nationals of contiguous countries, proc-
3           essed at southwest land border ports of entry,
4           but shall not count such children who are na-
5           tionals of noncontiguous countries.

6               "(B) TRANSITION RULES.—The provisions
7           of section 244A(c) shall apply to this section.

8       "(d) BAR TO ADMISSION.—Any alien who, during a
9   period of 365 days, has 2 or more summary removals pur-
10  suant to the border emergency authority, shall be inadmis-
11  sible for a period of 1 year beginning on the date of the
12  alien's most recent summary removal.

13      "(e) SAVINGS PROVISIONS.—

14          "(1) UNACCOMPANIED ALIEN CHILDREN.—
15          Nothing in this section may be construed to interfere
16          with the processing of unaccompanied alien children
17          and such children are not subject to this section.

18          "(2) SETTLEMENT AGREEMENTS.—Nothing in
19          this section may be construed to interfere with any
20          rights or responsibilities established through a settle-
21          ment agreement in effect before the date of the en-
22          actment of this section.

23          "(3) RULE OF CONSTRUCTION.—For purposes
24          of the Convention Relating to the Status of Refu-
25          gees, done at Geneva July 28, 1952 (as made appli-

IFR_AR_001874

161

1    cable by the 1967 Protocol Relating to the Status of

2    Refugees, done at New York January 31, 1967 (19

3    UST 6223)), the Convention Against Torture, and

4    any other applicable treaty, as applied to this sec-

5    tion, the interview under this section shall occur only

6    in the context of the border emergency authority.

7    ''(f) JUDICIAL REVIEW.—Judicial review of any deci-

8    sion or action applying the border emergency authority

9    shall be governed only by this subsection as follows:

10    ''(1) Notwithstanding any other provision of

11    law, except as provided in paragraph (2), no court

12    or judge shall have jurisdiction to review any cause

13    or claim by an individual alien arising from the deci-

14    sion to enter a summary removal order against such

15    alien under this section, or removing such alien pur-

16    suant to such summary removal order.

17    ''(2) The United States District Court for the

18    District of Columbia shall have sole and original ju-

19    risdiction to hear challenges, whether constitutional

20    or otherwise, to the validity of this section or any

21    written policy directive, written policy guideline,

22    written procedure, or the implementation thereof,

23    issued by or under the authority of the Secretary to

24    implement this section.

25    ''(g) EFFECTIVE DATE.—

IFR_AR_001875

162

1   ''(1) IN GENERAL.—This section shall take ef-

2 fect on the day after the date of the enactment of

3 this section.

4   ''(2) 7-DAY PERIOD.—The initial activation of

5 the authority under subparagraph (A) or (B)(i) of

6 subsection (b)(3) shall take into account the average

7 number of encounters during the preceding 7 con-

8 secutive calendar days, as described in such subpara-

9 graphs, which may include the 6 consecutive cal-

10 endar days immediately preceding the date of the

11 enactment of this section.

12 ''(h) RULEMAKING.—

13   ''(1) IN GENERAL.—The Secretary may promul-

14 gate such regulations as are necessary to implement

15 this section in compliance with the requirements of

16 section 553 of title 5, United States Code.

17   ''(2) INITIAL IMPLEMENTATION.—Until the

18 date that is 180 days after the date of the enact-

19 ment of this section, the Secretary may issue any in-

20 terim final rules necessary to implement this section

21 without having to satisfy the requirements of section

22 553(b)(B) of title 5, United States Code, provided

23 that any such interim final rules shall include a 30-

24 day post promulgation notice and comment period

25 prior to finalization in the Federal Register.

IFR_AR_001876

1       "(3) REQUIREMENT.—All regulations promul-

2 gated to implement this section beginning on the

3 date that is 180 days after the date of the enact-

4 ment of this section shall be issued pursuant to the

5 requirements set forth in section 553 of title 5,

6 United States Code.

7     "(i) DEFINITIONS.—In this section:

8       "(1) BORDER EMERGENCY AUTHORITY.—The

9 term 'border emergency authority' means all au-

10 thorities and procedures under this section.

11       "(2) CONVENTION AGAINST TORTURE.—The

12 term 'Convention Against Torture' means the Con-

13 vention against Torture and Other Cruel, Inhuman

14 or Degrading Treatment or Punishment, done at

15 New York December 10, 1984, and includes the reg-

16 ulations implementing any law enacted pursuant to

17 Article 3 of the Convention against Torture and

18 Other Cruel, Inhuman or Degrading Treatment or

19 Punishment, done at New York December 10, 1984.

20       "(3) ENCOUNTER.—With respect to an alien,

21 the term 'encounter' means an alien who—

22          "(A) is physically apprehended by U.S.

23 Customs and Border Protection personnel—

24            "(i) within 100 miles of the southwest

25 land border of the United States during

164

1     the 14-day period immediately after entry

2     between ports of entry; or

3       ''(ii) at the southern coastal borders

4      during the 14-day period immediately after

5      entry between ports of entry; or

6     ''(B) is seeking admission at a southwest

7     land border port of entry and is determined to

8     be inadmissible, including an alien who utilizes

9     a process approved by the Secretary to allow for

10    safe and orderly entry into the United States.

11    ''(4) SECRETARY.—The term 'Secretary' means

12 the Secretary of Homeland Security.

13    ''(5) SOUTHERN COASTAL BORDERS.—The term

14 'southern coastal borders' means all maritime bor-

15 ders in California, Texas, Louisiana, Mississippi,

16 Alabama, and Florida.

17    ''(6) UNACCOMPANIED ALIEN CHILD.—The

18 term 'unaccompanied alien child' has the meaning

19 given such term in section 462(g)(2) of the Home-

20 land Security Act of 2002 (6 U.S.C. 279(g)(2)).

21 ''(j) SUNSET.—This section—

22    ''(1) shall take effect on the date of the enact-

23 ment of this section; and

24    ''(2) shall be repealed effective as of the date

25 that is 3 years after such date of enactment.''.

165

1    (b) CLERICAL AMENDMENT.—The table of contents

2  of the Immigration and Nationality Act (8 U.S.C. 1101

3  et seq.), as amended by section 146(b), is further amended

4  by inserting after the item relating to section 244A the

5  following:

"Sec. 244B Border emergency authority.".

# Subtitle B—Fulfilling Promises to Afghan Allies

**SEC. 311. DEFINITIONS.**

9    In this subtitle:

10    (1) APPROPRIATE   COMMITTEES   OF   CON-

11  GRESS.—The term "appropriate committees of Con-

12  gress" means—

13        (A) the Committee on the Judiciary of the

14    Senate;

15        (B) the Committee on Foreign Relations of

16    the Senate;

17        (C) the Committee on Armed Services of

18    the Senate;

19        (D) the Committee on Appropriations of

20    the Senate;

21        (E) the Committee on Homeland Security

22    and Governmental Affairs of the Senate;

23        (F) the Committee on the Judiciary of the

24    House of Representatives;

1          (G) the Committee on Foreign Affairs of
2      the House of Representatives;

3          (H) the Committee on Armed Services of
4      the House of Representatives;

5          (I) the Committee on Appropriations of the
6      House of Representatives; and

7          (J) the Committee on Homeland Security
8      of the House of Representatives.

9      (2) IMMIGRATION LAWS.—The term "immigra-
10  tion laws" has the meaning given such term in sec-
11  tion 101(a)(17) of the Immigration and Nationality
12  Act (8 U.S.C. 1101(a)(17)).

13      (3) SECRETARY.—The term "Secretary" means
14  the Secretary of Homeland Security.

15      (4) SPECIAL IMMIGRANT STATUS.—The term
16  "special immigrant status" means special immigrant
17  status provided under—

18          (A) the Afghan Allies Protection Act of
19      2009 (8 U.S.C. 1101 note; Public Law 111–8);

20          (B) section 1059 of the National Defense
21      Authorization Act for Fiscal Year 2006 (8
22      U.S.C. 1101 note; Public Law 109–163); or

23          (C)    subparagraph    (N)    of    section
24      101(a)(27) of the Immigration and Nationality

1    Act (8 U.S.C. 1101(a)(27)), as added by sec-

2    tion 316(a).

3    (5) SPECIFIED APPLICATION.—The term ''spec-

4    ified application'' means—

5         (A) a pending, documentarily complete ap-

6         plication for special immigrant status; and

7         (B) a case in processing in the United

8         States Refugee Admissions Program for an in-

9         dividual who has received a Priority 1 or Pri-

10        ority 2 referral to such program.

11    (6) UNITED STATES REFUGEE ADMISSIONS

12    PROGRAM.—The term ''United States Refugee Ad-

13    missions Program'' means the program to resettle

14    refugees in the United States pursuant to the au-

15    thorities provided in sections 101(a)(42), 207, and

16    412 of the Immigration and Nationality Act (8

17    U.S.C. 1101(a)(42), 1157, and 1522).

**SEC. 312. SUPPORT FOR AFGHAN ALLIES OUTSIDE THE**

**UNITED STATES.**

20    (a) RESPONSE TO CONGRESSIONAL INQUIRIES.—The

21 Secretary of State shall respond to inquiries by Members

22 of Congress regarding the status of a specified application

23 submitted by, or on behalf of, a national of Afghanistan,

24 including any information that has been provided to the

168

1 applicant, in accordance with section 222(f) of the Immi-

2 gration and Nationality Act (8 U.S.C. 1202(f)).

3     (b) OFFICE IN LIEU OF EMBASSY.—During the pe-

4 riod in which there is no operational United States em-

5 bassy in Afghanistan, the Secretary of State shall des-

6 ignate an appropriate office within the Department of

7 State—

8     (1) to review specified applications submitted by

9 nationals of Afghanistan residing in Afghanistan, in-

10 cluding by conducting any required interviews;

11     (2) to issue visas or other travel documents to

12 such nationals, in accordance with the immigration

13 laws;

14     (3) to provide services to such nationals, to the

15 greatest extent practicable, that would normally be

16 provided by an embassy; and

17     (4) to carry out any other function the Sec-

18 retary of State considers necessary.

19 **SEC. 313. CONDITIONAL PERMANENT RESIDENT STATUS**

20         **FOR ELIGIBLE INDIVIDUALS.**

21     (a) DEFINITIONS.—In this section:

22     (1) CONDITIONAL PERMANENT RESIDENT STA-

23 TUS.—The term "conditional permanent resident

24 status" means conditional permanent resident status

25 under section 216 and 216A of the Immigration and

169

1    Nationality Act (8 U.S.C. 1186a, 1186b), subject to

2    the provisions of this section.

3        (2) ELIGIBLE INDIVIDUAL.—The term "eligible

4    individual" means an alien who—

5            (A) is present in the United States;

6            (B) is a citizen or national of Afghanistan

7        or, in the case of an alien having no nationality,

8        is a person who last habitually resided in Af-

9        ghanistan;

10           (C) has not been granted permanent resi-

11       dent status;

12           (D)(i) was inspected and admitted to the

13       United States on or before the date of the en-

14       actment of this Act; or

15           (ii) was paroled into the United States

16       during the period beginning on July 30, 2021,

17       and ending on the date of the enactment of this

18       Act, provided that such parole has not been ter-

19       minated by the Secretary upon written notice;

20       and

21           (E) is admissible to the United States as

22       an immigrant under the immigration laws, in-

23       cluding eligibility for waivers of grounds of in-

24       admissibility to the extent provided by the im-

170

1       migration laws and subject to the terms of sub-
2       section (c) of this section.
3   (b) CONDITIONAL PERMANENT RESIDENT STATUS
4   FOR ELIGIBLE INDIVIDUALS.—
5       (1) ADJUSTMENT OF STATUS TO CONDITIONAL
6       PERMANENT RESIDENT STATUS.—Beginning on the
7       date of the enactment of this Act, the Secretary
8       may—
9           (A) adjust the status of each eligible indi-
10          vidual to that of an alien lawfully admitted for
11          permanent residence status, subject to the pro-
12          cedures established by the Secretary to deter-
13          mine eligibility for conditional permanent resi-
14          dent status; and
15          (B) create for each eligible individual a
16          record of admission to such status as of the
17          date on which the eligible individual was ini-
18          tially inspected and admitted or paroled into
19          the United States, or July 30, 2021, whichever
20          is later,
21      unless the Secretary determines, on a case-by-
22      case basis, that such individual is subject to any
23      ground of inadmissibility under section 212 (other
24      than subsection (a)(4) of the Immigration and Na-
25      tionality Act (8 U.S.C. 1182) and is not eligible for

IFR_AR_001884

1 a waiver of such grounds of inadmissibility as pro-

2 vided by this subtitle or by the immigration laws.

3  (2) CONDITIONAL BASIS.—An individual who

4 obtains lawful permanent resident status under this

5 section shall be considered, at the time of obtaining

6 the status of an alien lawfully admitted for perma-

7 nent residence, to have obtained such status on a

8 conditional basis subject to the provisions of this

9 section.

10 (c) CONDITIONAL PERMANENT RESIDENT STATUS

11 DESCRIBED.—

12  (1) ASSESSMENT.—

13   (A) IN GENERAL.—Before granting condi-

14  tional permanent resident status to an eligible

15  individual under subsection (b)(1), the Sec-

16  retary shall conduct an assessment with respect

17  to the eligible individual, which shall be equiva-

18  lent in rigor to the assessment conducted with

19  respect to refugees admitted to the United

20  States through the United States Refugee Ad-

21  missions Program, for the purpose of deter-

22  mining whether the eligible individual is subject

23  to any ground of inadmissibility under section

24  212 (other than subsection (a)(4)) of the Immi-

25  gration and Nationality Act (8 U.S.C. 1182).

IFR_AR_001885

1   (B) CONSULTATION.—In conducting an as-
2 sessment under subparagraph (A), the Sec-
3 retary may consult with the head of any other
4 relevant agency and review the holdings of any
5 such agency.

6 (2) REMOVAL OF CONDITIONS.—

7   (A) IN GENERAL.—Not earlier than the
8 date described in subparagraph (B), the Sec-
9 retary may remove the conditional basis of the
10 status of an individual granted conditional per-
11 manent resident status under this section un-
12 less the Secretary determines, on a case-by-case
13 basis, that such individual is subject to any
14 ground of inadmissibility under paragraph (2)
15 or (3) of section 212(a) of the Immigration and
16 Nationality Act (8 U.S.C. 1182(a)), and is not
17 eligible for a waiver of such grounds of inadmis-
18 sibility as provided by this subtitle or by the im-
19 migration laws.

20   (B) DATE DESCRIBED.—The date de-
21 scribed in this subparagraph is the earlier of—

22    (i) the date that is 4 years after the
23 date on which the individual was admitted
24 or paroled into the United States; or

25    (ii) July 1, 2027.

IFR_AR_001886

173

1  (C) WAIVER.—

2        (i) IN GENERAL.—Except as provided

3     in clause (ii), with respect to an eligible in-

4     dividual, the Secretary may waive the ap-

5     plication of the grounds of inadmissibility

6     under 212(a) of the Immigration and Na-

7     tionality Act (8 U.S.C. 1182(a)) for hu-

8     manitarian purposes or to ensure family

9     unity.

10        (ii) EXCEPTIONS.—The Secretary may

11     not waive under clause (i) the application

12     of subparagraphs (C) through (E) and (G)

13     through (H) of paragraph (2), or para-

14     graph (3), of section 212(a) of the Immi-

15     gration and Nationality Act (8 U.S.C.

16     1182(a)).

17        (iii) RULE OF CONSTRUCTION.—Noth-

18     ing in this subparagraph may be construed

19     to expand or limit any other waiver author-

20     ity applicable under the immigration laws

21     to an applicant for adjustment of status.

22  (D) TIMELINE.—Not later than 180 days

23     after the date described in subparagraph (B),

24     the Secretary shall endeavor to remove condi-

25     tions as to all individuals granted conditional

IFR_AR_001887

174

1    permanent resident status under this section

2    who are eligible for removal of conditions.

3    (3) TREATMENT OF CONDITIONAL BASIS OF

4    STATUS PERIOD FOR PURPOSES OF NATURALIZA-

5    TION.—An individual in conditional permanent resi-

6    dent status under this section, or who otherwise

7    meets the requirements under (a)(1) of this section,

8    shall be considered—

9        (A) to have been admitted to the United

10       States as an alien lawfully admitted for perma-

11       nent residence; and

12       (B) to be present in the United States as

13       an alien lawfully admitted to the United States

14       for permanent residence, provided that, no alien

15       shall be naturalized unless the alien's conditions

16       have been removed under this section.

17   (d) TERMINATION OF CONDITIONAL PERMANENT

18 RESIDENT STATUS.—

19   (1) IN GENERAL.—Conditional permanent resi-

20   dent status shall terminate on, as applicable—

21       (A) the date on which the Secretary re-

22       moves the conditions pursuant to subsection

23       (c)(2), on which date the alien shall be lawfully

24       admitted for permanent residence without con-

25       ditions;

175

1          (B) the date on which the Secretary deter-
2     mines that the alien was not an eligible indi-
3     vidual under subsection (a)(2) as of the date
4     that such conditional permanent resident status
5     was granted, on which date of the Secretary's
6     determination the alien shall no longer be an
7     alien lawfully admitted for permanent residence;
8     or

9          (C) the date on which the Secretary deter-
10    mines pursuant to subsection (c)(2) that the
11    alien is not eligible for removal of conditions, on
12    which date the alien shall no longer be an alien
13    lawfully admitted for permanent residence.

14    (2) NOTIFICATION.—If the Secretary termi-
15    nates status under this subsection, the Secretary
16    shall so notify the individual in writing and state the
17    reasons for the termination.

18    (e) RULE OF CONSTRUCTION.—Nothing in this sec-
19 tion shall be construed to limit the authority of the Sec-
20 retary at any time to place in removal proceedings under
21 section 240 of the Immigration and Nationality Act (8
22 U.S.C. 1229a) any alien who has conditional permanent
23 resident status under this section, if the alien is deportable
24 under section 237 of such Act (8 U.S.C. 1227) under a

176

1    ground of deportability applicable to an alien who has been

2    lawfully admitted for permanent residence.

3        (f) PAROLE EXPIRATION TOLLED.—The expiration

4    date of a period of parole shall not apply to an individual

5    under consideration for conditional permanent resident

6    status under this section, until such time as the Secretary

7    has determined whether to issue conditional permanent

8    resident status.

9        (g) PERIODIC NONADVERSARIAL MEETINGS.—

10            (1) IN GENERAL.—Not later than 180 days

11        after the date on which an individual is conferred

12        conditional permanent resident status under this

13        section, and periodically thereafter, the Office of

14        Refugee Resettlement shall make available opportu-

15        nities for the individual to participate in a nonadver-

16        sarial meeting, during which an official of the Office

17        of Refugee Resettlement (or an agency funded by

18        the Office) shall—

19                (A) on request by the individual, assist the

20            individual in a referral or application for appli-

21            cable benefits administered by the Department

22            of Health and Human Services and completing

23            any applicable paperwork; and

IFR_AR_001890

177

1        (B) answer any questions regarding eligi-
2        bility for other benefits administered by the
3        United States Government.

4        (2) NOTIFICATION OF REQUIREMENTS.—Not
5    later than 7 days before the date on which a meeting
6    under paragraph (1) is scheduled to occur, the Sec-
7    retary of Health and Human Services shall provide
8    notice to the individual that includes the date of the
9    scheduled meeting and a description of the process
10   for rescheduling the meeting.

11       (3) CONDUCT OF MEETING.—The Secretary of
12   Health and Human Services shall implement prac-
13   tices to ensure that—

14       (A) meetings under paragraph (1) are con-
15       ducted in a nonadversarial manner; and

16       (B) interpretation and translation services
17       are provided to individuals granted conditional
18       permanent resident status under this section
19       who have limited English proficiency.

20       (4) RULES OF CONSTRUCTION.—Nothing in
21   this subsection shall be construed—

22       (A) to prevent an individual from electing
23       to have counsel present during a meeting under
24       paragraph (1); or

178

1           (B) in the event that an individual declines
2       to participate in such a meeting, to affect the
3       individual's conditional permanent resident sta-
4       tus under this section or eligibility to have con-
5       ditions removed in accordance with this section.

6   (h) CONSIDERATION.—Except with respect to an ap-
7 plication for naturalization and the benefits described in
8 subsection (p), an individual in conditional permanent
9 resident status under this section shall be considered to
10 be an alien lawfully admitted for permanent residence for
11 purposes of the adjudication of an application or petition
12 for a benefit or the receipt of a benefit.

13  (i) NOTIFICATION OF REQUIREMENTS.—Not later
14 than 90 days after the date on which the status of an
15 individual is adjusted to that of conditional permanent
16 resident status under this section, the Secretary shall pro-
17 vide notice to such individual with respect to the provisions
18 of this section, including subsection (c)(1) (relating to the
19 conduct of assessments) and subsection (g) (relating to
20 periodic nonadversarial meetings).

21  (j) APPLICATION FOR NATURALIZATION.—The Sec-
22 retary shall establish procedures whereby an individual
23 who would otherwise be eligible to apply for naturalization
24 but for having conditional permanent resident status, may

IFR_AR_001892

179

1 be considered for naturalization coincident with removal
2 of conditions under subsection (c)(2).

3    (k) ADJUSTMENT OF STATUS DATE.—

4        (1) IN GENERAL.—An alien described in para-
5        graph (2) shall be regarded as lawfully admitted for
6        permanent residence as of the date the alien was ini-
7        tially inspected and admitted or paroled into the
8        United States, or July 30, 2021, whichever is later.

9        (2) ALIEN DESCRIBED.—An alien described in
10       this paragraph is an alien who—

11            (A) is described in subparagraphs (A), (B),
12            and (D) of subsection (a)(2), and whose status
13            was adjusted to that of an alien lawfully admit-
14            ted for permanent residence on or after July
15            30, 2021, but on or before the date of the en-
16            actment of this Act; or

17            (B) is an eligible individual whose status is
18            then adjusted to that of an alien lawfully admit-
19            ted for permanent residence after the date of
20            the enactment of this Act under any provision
21            of the immigration laws other than this section.

22    (l) PARENTS AND LEGAL GUARDIANS OF UNACCOM-
23 PANIED CHILDREN.—A parent or legal guardian of an eli-
24 gible individual shall be eligible to obtain status as an alien

IFR_AR_001893

180

1  lawfully admitted for permanent residence on a conditional

2  basis if—

3        (1) the eligible individual—

4              (A) was under 18 years of age on the date

5              on which the eligible individual was granted

6              conditional permanent resident status under

7              this section; and

8              (B) was not accompanied by at least one

9              parent or guardian on the date the eligible indi-

10             vidual was admitted or paroled into the United

11             States; and

12       (2) such parent or legal guardian was admitted

13       or paroled into the United States after the date re-

14       ferred to in paragraph (1)(B).

15  (m) GUIDANCE.—

16       (1) INTERIM GUIDANCE.—

17             (A) IN GENERAL.—Not later than 120

18             days after the date of the enactment of this

19             Act, the Secretary shall issue guidance imple-

20             menting this section.

21             (B) PUBLICATION.—Notwithstanding sec-

22             tion 553 of title 5, United States Code, guid-

23             ance issued pursuant to subparagraph (A)—

IFR_AR_001894

1           (i) may be published on the internet
2       website of the Department of Homeland
3       Security; and

4           (ii) shall be effective on an interim
5       basis immediately upon such publication
6       but may be subject to change and revision
7       after notice and an opportunity for public
8       comment.

9       (2) FINAL GUIDANCE.—

10          (A) IN GENERAL.—Not later than 180
11      days after the date of issuance of guidance
12      under paragraph (1), the Secretary shall final-
13      ize the guidance implementing this section.

14          (B) EXEMPTION FROM THE ADMINISTRA-
15      TIVE PROCEDURE ACT.—Chapter 5 of title 5,
16      United States Code (commonly known as the
17      ''Administrative Procedure Act''), or any other
18      law relating to rulemaking or information col-
19      lection, shall not apply to the guidance issued
20      under this paragraph.

21  (n) ASYLUM CLAIMS.—

22      (1) IN GENERAL.—With respect to the adju-
23  dication of an application for asylum submitted by
24  an eligible individual, section 2502(c) of the Extend-
25  ing Government Funding and Delivering Emergency

IFR_AR_001895

182

1    Assistance Act (8 U.S.C. 1101 note; Public Law

2    117–43) shall not apply.

3       (2) RULE OF CONSTRUCTION.—Nothing in this

4    section may be construed to prohibit an eligible indi-

5    vidual from seeking or receiving asylum under sec-

6    tion 208 of the Immigration and Nationality Act (8

7    U.S.C. 1158).

8    (o) PROHIBITION ON FEES.—The Secretary may not

9 charge a fee to any eligible individual in connection with

10 the initial issuance under this section of—

11       (1) a document evidencing status as an alien

12    lawfully admitted for permanent residence or condi-

13    tional permanent resident status; or

14       (2) an employment authorization document.

15    (p) ELIGIBILITY FOR BENEFITS.—

16       (1) IN GENERAL.—Notwithstanding any other

17    provision of law—

18          (A) an individual described in subsection

19       (a) of section 2502 of the Afghanistan Supple-

20       mental Appropriations Act, 2022 (8 U.S.C.

21       1101 note; Public Law 117–43) shall retain his

22       or her eligibility for the benefits and services

23       described in subsection (b) of such section if the

24       individual has a pending application, or is

IFR_AR_001896

183

1  granted adjustment of status, under this sec-
2  tion; and

3        (B) such benefits and services shall remain
4  available to the individual to the same extent
5  and for the same periods of time as such bene-
6  fits and services are otherwise available to refu-
7  gees who acquire such status.

8    (2) EXCEPTION FROM 5-YEAR LIMITED ELIGI-
9  BILITY FOR MEANS-TESTED PUBLIC BENEFITS.—
10  Section 403(b)(1) of the Personal Responsibility and
11  Work Opportunity Reconciliation Act of 1996 (8
12  U.S.C. 1613(b)(1)) is amended by adding at the end
13  the following:

14        ''(F) An alien whose status is adjusted
15  under section 313 of the Border Act to that of
16  an alien lawfully admitted for permanent resi-
17  dence or to that of an alien lawfully admitted
18  for permanent residence on a conditional
19  basis.''.

20    (q) RULE OF CONSTRUCTION.—Nothing in this sec-
21  tion may be construed to preclude an eligible individual
22  from applying for or receiving any immigration benefit to
23  which the individual is otherwise entitled.

24    (r) EXEMPTION FROM NUMERICAL LIMITATIONS.—

184

1     (1) IN GENERAL.—Aliens granted conditional

2 permanent resident status or lawful permanent resi-

3 dent status under this section shall not be subject to

4 the numerical limitations under sections 201, 202,

5 and 203 of the Immigration and Nationality Act (8

6 U.S.C. 1151, 1152, and 1153).

7     (2) SPOUSE AND CHILDREN BENEFICIARIES.—

8 A spouse or child who is the beneficiary of an immi-

9 grant petition under section 204 of the Immigration

10 and Nationality Act (8 U.S.C. 1154) filed by an

11 alien who has been granted conditional permanent

12 resident status or lawful permanent resident status

13 under this section, seeking classification of the

14 spouse or child under section 203(a)(2)(A) of that

15 Act (8 U.S.C. 1153(a)(2)(A)) shall not be subject to

16 the numerical limitations under sections 201, 202,

17 and 203 of the Immigration and Nationality Act (8

18 U.S.C. 1151, 1152, and 1153).

19 (s) EFFECT ON OTHER APPLICATIONS.—Notwith-

20 standing any other provision of law, in the interest of effi-

21 ciency, the Secretary may pause consideration of any ap-

22 plication or request for an immigration benefit pending

23 adjudication so as to prioritize an application for adjust-

24 ment of status to an alien lawfully admitted for permanent

25 residence under this section.

1    (t) AUTHORIZATION FOR APPROPRIATIONS.—There

2  is authorized to be appropriated to the Attorney General,

3  the Secretary of Health and Human Services, the Sec-

4  retary, and the Secretary of State such sums as are nec-

5  essary to carry out this section.

6  **SEC. 314. REFUGEE PROCESSES FOR CERTAIN AT-RISK AF-**

7                **GHAN ALLIES.**

8    (a) DEFINITION OF AFGHAN ALLY.—

9        (1) IN GENERAL.—In this section, the term

10    ''Afghan ally'' means an alien who is a citizen or na-

11    tional of Afghanistan, or in the case of an alien hav-

12    ing no nationality, an alien who last habitually re-

13    sided in Afghanistan, who—

14        (A) was—

15            (i) a member of—

16                (I) the special operations forces

17                of the Afghanistan National Defense

18                and Security Forces;

19                (II) the Afghanistan National

20                Army Special Operations Command;

21                (III) the Afghan Air Force; or

22                (IV) the Special Mission Wing of

23                Afghanistan;

186

1          (ii) a female member of any other en-
2     tity of the Afghanistan National Defense
3     and Security Forces, including—
4               (I) a cadet or instructor at the
5          Afghanistan National Defense Univer-
6          sity; and
7               (II) a civilian employee of the
8          Ministry of Defense or the Ministry of
9          Interior Affairs;
10         (iii) an individual associated with
11     former Afghan military and police human
12     intelligence activities, including operators
13     and Department of Defense sources;
14         (iv) an individual associated with
15     former Afghan military counterintelligence,
16     counterterrorism, or counternarcotics;
17         (v) an individual associated with the
18     former Afghan Ministry of Defense, Min-
19     istry of Interior Affairs, or court system,
20     and who was involved in the investigation,
21     prosecution or detention of combatants or
22     members of the Taliban or criminal net-
23     works affiliated with the Taliban; or
24         (vi) a senior military officer, senior
25     enlisted personnel, or civilian official who

IFR_AR_001900

187

1          served on the staff of the former Ministry

2          of Defense or the former Ministry of Inte-

3          rior Affairs of Afghanistan; or

4          (B) provided service to an entity or organi-

5          zation described in subparagraph (A) for not

6          less than 1 year during the period beginning on

7          December 22, 2001, and ending on September

8          1, 2021, and did so in support of the United

9          States mission in Afghanistan.

10      (2) INCLUSIONS.—For purposes of this section,

11  the Afghanistan National Defense and Security

12  Forces includes members of the security forces

13  under the Ministry of Defense and the Ministry of

14  Interior Affairs of the Islamic Republic of Afghani-

15  stan, including the Afghanistan National Army, the

16  Afghan Air Force, the Afghanistan National Police,

17  and any other entity designated by the Secretary of

18  Defense as part of the Afghanistan National De-

19  fense and Security Forces during the relevant period

20  of service of the applicant concerned.

21  (b) REFUGEE STATUS FOR AFGHAN ALLIES.—

22      (1) DESIGNATION AS REFUGEES OF SPECIAL

23  HUMANITARIAN CONCERN.—Afghan allies shall be

24  considered refugees of special humanitarian concern

25  under section 207 of the Immigration and Nation-

IFR_AR_001901

188

1    ality Act (8 U.S.C. 1157), until the later of 10 years

2    after the date of enactment of this Act or upon de-

3    termination by the Secretary of State, in consulta-

4    tion with the Secretary of Defense and the Sec-

5    retary, that such designation is no longer in the in-

6    terest of the United States.

7        (2) THIRD COUNTRY PRESENCE NOT RE-

8    QUIRED.—Notwithstanding section 101(a)(42) of the

9    Immigration and Nationality Act (8 U.S.C.

10   1101(a)(42)), the Secretary of State and the Sec-

11   retary shall, to the greatest extent possible, conduct

12   remote refugee processing for an Afghan ally located

13   in Afghanistan.

14   (c) AFGHAN ALLIES REFERRAL PROGRAM.—

15       (1) IN GENERAL.—Not later than 180 days

16   after the date of the enactment of this Act—

17           (A) the Secretary of Defense, in consulta-

18       tion with the Secretary of State, shall establish

19       a process by which an individual may apply to

20       the Secretary of Defense for classification as an

21       Afghan ally and request a referral to the United

22       States Refugee Admissions Program; and

23           (B) the head of any appropriate depart-

24       ment or agency that conducted operations in

25       Afghanistan during the period beginning on De-

189

1     cember 22, 2001, and ending on September 1,

2     2021, in consultation with the Secretary of

3     State, may establish a process by which an indi-

4     vidual may apply to the head of the appropriate

5     department or agency for classification as an

6     Afghan ally and request a referral to the United

7     States Refugee Admissions Program.

8     (2) APPLICATION SYSTEM.—

9          (A) IN GENERAL.—The process established

10    under paragraph (1) shall—

11               (i) include the development and main-

12          tenance of a secure online portal through

13          which applicants may provide information

14          verifying their status as Afghan allies and

15          upload supporting documentation; and

16               (ii) allow—

17                    (I) an applicant to submit his or

18               her own application;

19                    (II) a designee of an applicant to

20               submit an application on behalf of the

21               applicant; and

22                    (III) in the case of an applicant

23               who is outside the United States, the

24               submission of an application regard-

25               less of where the applicant is located.

190

1   (B) USE BY OTHER AGENCIES.—The Sec-
2 retary of Defense may enter into arrangements
3 with the head of any other appropriate depart-
4 ment or agency so as to allow the application
5 system established under subparagraph (A) to
6 be used by such department or agency.

7 (3) REVIEW PROCESS.—As soon as practicable
8 after receiving a request for classification and refer-
9 ral described in paragraph (1), the head of the ap-
10 propriate department or agency shall—

11   (A) review—

12     (i) the service record of the applicant,
13   if available;

14     (ii) if the applicant provides a service
15   record or other supporting documentation,
16   any information that helps verify the serv-
17   ice record concerned, including information
18   or an attestation provided by any current
19   or former official of the department or
20   agency who has personal knowledge of the
21   eligibility of the applicant for such classi-
22   fication and referral; and

23     (iii) the data holdings of the depart-
24   ment or agency and other cooperating
25   interagency partners, including biographic

191

1          and biometric records, iris scans, finger-
2          prints, voice biometric information, hand
3          geometry biometrics, other identifiable in-
4          formation, and any other information re-
5          lated to the applicant, including relevant
6          derogatory information; and
7      (B)(i) in a case in which the head of the
8   department or agency determines that the ap-
9   plicant is an Afghan ally without significant de-
10  rogatory information, refer the Afghan ally to
11  the United States Refugee Admissions Program
12  as a refugee; and
13          (ii) include with such referral—
14              (I) any service record concerned,
15          if available;
16              (II) if the applicant provides a
17          service record, any information that
18          helps verify the service record con-
19          cerned; and
20              (III) any biometrics for the appli-
21          cant.
22      (4) REVIEW PROCESS FOR DENIAL OF REQUEST
23  FOR REFERRAL.—
24          (A) IN GENERAL.—In the case of an appli-
25      cant with respect to whom the head of the ap-

192

1     propriate department or agency denies a re-
2     quest for classification and referral based on a
3     determination that the applicant is not an Af-
4     ghan ally or based on derogatory information—

5          (i) the head of the department or
6          agency shall provide the applicant with a
7          written notice of the denial that provides,
8          to the maximum extent practicable, a de-
9          scription of the basis for the denial, includ-
10         ing the facts and inferences, or evidentiary
11         gaps, underlying the individual determina-
12         tion; and

13         (ii) the applicant shall be provided an
14         opportunity to submit not more than 1
15         written appeal to the head of the depart-
16         ment or agency for each such denial.

17    (B) DEADLINE FOR APPEAL.—An appeal
18    under clause (ii) of subparagraph (A) shall be
19    submitted—

20         (i) not more than 120 days after the
21         date on which the applicant concerned re-
22         ceives notice under clause (i) of that sub-
23         paragraph; or

193

1          (ii) on any date thereafter, at the dis-
2     cretion of the head of the appropriate de-
3     partment or agency.

4     (C) REQUEST TO REOPEN.—

5          (i) IN GENERAL.—An applicant who
6     receives a denial under subparagraph (A)
7     may submit a request to reopen a request
8     for classification and referral under the
9     process established under paragraph (1) so
10    that the applicant may provide additional
11    information, clarify existing information,
12    or explain any unfavorable information.

13          (ii) LIMITATION.—After considering 1
14    such request to reopen from an applicant,
15    the head of the appropriate department or
16    agency may deny subsequent requests to
17    reopen submitted by the same applicant.

18    (5) FORM AND CONTENT OF REFERRAL.—To
19    the extent practicable, the head of the appropriate
20    department or agency shall ensure that referrals
21    made under this subsection—

22          (A) conform to requirements established by
23    the Secretary of State for form and content;
24    and

194

1           (B) are complete and include sufficient
2       contact information, supporting documentation,
3       and any other material the Secretary of State
4       or the Secretary consider necessary or helpful
5       in determining whether an applicant is entitled
6       to refugee status.

7       (6) TERMINATION.—The application process
8   and referral system under this subsection shall ter-
9   minate upon the later of 1 year before the termi-
10  nation of the designation under subsection (b)(1) or
11  on the date of a joint determination by the Secretary
12  of State and the Secretary of Defense, in consulta-
13  tion with the Secretary, that such termination is in
14  the national interest of the United States.

15  (d) GENERAL PROVISIONS.—

16      (1) PROHIBITION ON FEES.—The Secretary,
17  the Secretary of Defense, or the Secretary of State
18  may not charge any fee in connection with a request
19  for a classification and referral as a refugee under
20  this section.

21      (2) DEFENSE PERSONNEL.—Any limitation in
22  law with respect to the number of personnel within
23  the Office of the Secretary of Defense, the military
24  departments, or a Defense Agency (as defined in
25  section 101(a) of title 10, United States Code) shall

IFR_AR_001908

195

1  not apply to personnel employed for the primary

2  purpose of carrying out this section.

3  (3) REPRESENTATION.—An alien applying for

4  admission to the United States under this section

5  may be represented during the application process,

6  including at relevant interviews and examinations,

7  by an attorney or other accredited representative.

8  Such representation shall not be at the expense of

9  the United States Government.

10  (4) PROTECTION OF ALIENS.—The Secretary of

11  State, in consultation with the head of any other ap-

12  propriate Federal agency, shall make a reasonable

13  effort to provide an alien who has been classified as

14  an Afghan ally and has been referred as a refugee

15  under this section protection or to immediately re-

16  move such alien from Afghanistan, if possible.

17  (5) OTHER ELIGIBILITY FOR IMMIGRANT STA-

18  TUS.—No alien shall be denied the opportunity to

19  apply for admission under this section solely because

20  the alien qualifies as an immediate relative or is eli-

21  gible for any other immigrant classification.

22  (6) AUTHORIZATION OF APPROPRIATIONS.—

23  There are authorized to be appropriated such sums

24  as necessary for each of fiscal years 2024 through

25  2034 to carry out this section.

IFR_AR_001909

196

1     (e) RULE OF CONSTRUCTION.—Nothing in this sec-

2   tion may be construed to inhibit the Secretary of State

3   from accepting refugee referrals from any entity.

4   **SEC. 315. IMPROVING EFFICIENCY AND OVERSIGHT OF**

5   **REFUGEE AND SPECIAL IMMIGRANT PROC-**

6   **ESSING.**

7     (a) ACCEPTANCE OF FINGERPRINT CARDS AND SUB-

8   MISSIONS OF BIOMETRICS.—In addition to the methods

9   authorized under the heading relating to the Immigration

10   and Naturalization Service under title I of the Depart-

11   ments of Commerce, Justice, and State, the Judiciary, and

12   Related Agencies Appropriations Act of 1998 (Public Law

13   105–119, 111 Stat. 2448; 8 U.S.C. 1103 note), and other

14   applicable law, and subject to such safeguards as the Sec-

15   retary, in consultation with the Secretary of State or the

16   Secretary of Defense, as appropriate, shall prescribe to en-

17   sure the integrity of the biometric collection (which shall

18   include verification of identity by comparison of such fin-

19   gerprints with fingerprints taken by or under the direct

20   supervision of the Secretary prior to or at the time of the

21   individual's application for admission to the United

22   States), the Secretary may, in the case of any application

23   for any benefit under the Immigration and Nationality Act

24   (8 U.S.C. 1101 et seq.), accept fingerprint cards or any

25   other submission of biometrics—

197

1      (1) prepared by international or nongovern-

2 mental organizations under an appropriate agree-

3 ment with the Secretary or the Secretary of State;

4      (2) prepared by employees or contractors of the

5 Department of Homeland Security or the Depart-

6 ment of State; or

7      (3) provided by an agency (as defined under

8 section 3502 of title 44, United States Code).

9 (b) STAFFING.—

10      (1) VETTING.—The Secretary of State, the Sec-

11 retary, the Secretary of Defense, and any other

12 agency authorized to carry out the vetting process

13 under this subtitle, shall each ensure sufficient staff-

14 ing, and request the resources necessary, to effi-

15 ciently and adequately carry out the vetting of appli-

16 cants for—

17      (A) referral to the United States Refugee

18 Admissions Program, consistent with the deter-

19 minations established under section 207 of the

20 Immigration and Nationality Act (8 U.S.C.

21 1157); and

22      (B) special immigrant status.

23      (2) REFUGEE RESETTLEMENT.—The Secretary

24 of Health and Human Services shall ensure suffi-

25 cient staffing to efficiently provide assistance under

198

1    chapter 2 of title IV of the Immigration and Nation-
2    ality Act (8 U.S.C. 1521 et seq.) to refugees reset-
3    tled in the United States.

4    (c) REMOTE PROCESSING.—Notwithstanding any
5    other provision of law, the Secretary of State and the Sec-
6    retary shall employ remote processing capabilities for ref-
7    ugee processing under section 207 of the Immigration and
8    Nationality Act (8 U.S.C. 1157), including secure digital
9    file transfers, videoconferencing and teleconferencing ca-
10   pabilities, remote review of applications, remote inter-
11   views, remote collection of signatures, waiver of the appli-
12   cant's appearance or signature (other than a final appear-
13   ance and verification by the oath of the applicant prior
14   to or at the time of the individual's application for admis-
15   sion to the United States), waiver of signature for individ-
16   uals under 5 years old, and any other capability the Sec-
17   retary of State and the Secretary consider appropriate, se-
18   cure, and likely to reduce processing wait times at par-
19   ticular facilities.

20   (d) MONTHLY ARRIVAL REPORTS.—With respect to
21   monthly reports issued by the Secretary of State relating
22   to United States Refugee Admissions Program arrivals,
23   the Secretary of State shall report—

24       (1) the number of monthly admissions of refu-
25       gees, disaggregated by priorities; and

199

1    (2) the number of Afghan allies admitted as

2  refugees.

3    (e) INTERAGENCY TASK FORCE ON AFGHAN ALLY

4  STRATEGY.—

5       (1) ESTABLISHMENT.—Not later than 180 days

6    after the date of the enactment of this Act, the

7    President shall establish an Interagency Task Force

8    on Afghan Ally Strategy (referred to in this section

9    as the ''Task Force'')—

10          (A) to develop and oversee the implementa-

11       tion of the strategy and contingency plan de-

12       scribed in subparagraph (A)(i) of paragraph

13       (4); and

14          (B) to submit the report, and provide a

15       briefing on the report, as described in subpara-

16       graphs (A) and (B) of paragraph (4).

17       (2) MEMBERSHIP.—

18          (A) IN GENERAL.—The Task Force shall

19       include—

20             (i) 1 or more representatives from

21          each relevant Federal agency, as des-

22          ignated by the head of the applicable rel-

23          evant Federal agency; and

24             (ii) any other Federal Government of-

25          ficial designated by the President.

IFR_AR_001913

200

(B) RELEVANT FEDERAL AGENCY DE-
FINED.—In this paragraph, the term "relevant
Federal agency" means—

(i) the Department of State;

(ii) the Department Homeland Secu-
rity;

(iii) the Department of Defense;

(iv) the Department of Health and
Human Services;

(v) the Federal Bureau of Investiga-
tion; and

(vi) the Office of the Director of Na-
tional Intelligence.

(3) CHAIR.—The Task Force shall be chaired
by the Secretary of State.

(4) DUTIES.—

(A) REPORT.—

(i) IN GENERAL.—Not later than 180
days after the date on which the Task
Force is established, the Task Force, act-
ing through the chair of the Task Force,
shall submit a report to the appropriate
committees of Congress that includes—

(I) a strategy for facilitating the
resettlement of nationals of Afghani-

1          stan outside the United States who,
2          during the period beginning on Octo-
3          ber 1, 2001, and ending on September
4          1, 2021, directly and personally sup-
5          ported the United States mission in
6          Afghanistan, as determined by the
7          Secretary of State in consultation
8          with the Secretary of Defense; and
9              (II) a contingency plan for future
10         emergency operations in foreign coun-
11         tries involving foreign nationals who
12         have worked directly with the United
13         States Government, including the
14         Armed Forces of the United States
15         and United States intelligence agen-
16         cies.
17         (ii) ELEMENTS.—The report required
18     under clause (i) shall include—
19             (I) the total number of nationals
20         of Afghanistan who have pending
21         specified applications, disaggregated
22         by—
23              (aa) such nationals in Af-
24          ghanistan and such nationals in
25          a third country;

202

1          (bb) type of specified appli-
2      cation; and
3          (cc) applications that are
4      documentarily complete and ap-
5      plications that are not
6      documentarily complete;
7        (II) an estimate of the number of
8      nationals of Afghanistan who may be
9      eligible for special immigrant status;
10       (III) with respect to the strategy
11     required under subparagraph
12     (A)(i)(I)—
13          (aa) the estimated number
14      of nationals of Afghanistan de-
15      scribed in such subparagraph;
16          (bb) a description of the
17      process for safely resettling such
18      nationals of Afghanistan;
19          (cc) a plan for processing
20      such nationals of Afghanistan for
21      admission to the United States
22      that—
23          (AA) discusses the fea-
24      sibility of remote processing
25      for such nationals of Af-

203

1    ghanistan residing in Af-
2    ghanistan;

3    (BB) includes any
4    strategy for facilitating ref-
5    ugee and consular proc-
6    essing for such nationals of
7    Afghanistan in third coun-
8    tries, and the timelines for
9    such processing;

10    (CC) includes a plan
11    for conducting rigorous and
12    efficient vetting of all such
13    nationals of Afghanistan for
14    processing;

15    (DD) discusses the
16    availability and capacity of
17    sites in third countries to
18    process applications and
19    conduct any required vetting
20    for such nationals of Af-
21    ghanistan, including the po-
22    tential to establish addi-
23    tional sites; and

24    (EE) includes a plan
25    for providing updates and

IFR_AR_001917

204

1          necessary information to af-
2          fected individuals and rel-
3          evant nongovernmental or-
4          ganizations;

5          (dd) a description of consid-
6          erations, including resource con-
7          straints, security concerns, miss-
8          ing or inaccurate information,
9          and diplomatic considerations,
10         that limit the ability of the Sec-
11         retary of State or the Secretary
12         to increase the number of such
13         nationals of Afghanistan who can
14         be safely processed or resettled;

15         (ee) an identification of any
16         resource or additional authority
17         necessary to increase the number
18         of such nationals of Afghanistan
19         who can be processed or reset-
20         tled;

21         (ff) an estimate of the cost
22         to fully implement the strategy;
23         and

24         (gg) any other matter the
25         Task Force considers relevant to

IFR_AR_001918

1       the implementation of the strat-

2       egy;

3       (IV) with respect to the contin-

4       gency plan required by clause

5       (i)(II)—

6           (aa) a description of the

7           standard practices for screening

8           and vetting foreign nationals con-

9           sidered to be eligible for resettle-

10           ment in the United States, in-

11           cluding a strategy for vetting,

12           and maintaining the records of,

13           such foreign nationals who are

14           unable to provide identification

15           documents or biographic details

16           due to emergency circumstances;

17           (bb) a strategy for facili-

18           tating refugee or consular proc-

19           essing for such foreign nationals

20           in third countries;

21           (cc) clear guidance with re-

22           spect to which Federal agency

23           has the authority and responsi-

24           bility to coordinate Federal reset-

25           tlement efforts;

IFR_AR_001919

206

1           (dd) a description of any re-
2       source or additional authority
3       necessary to coordinate Federal
4       resettlement efforts, including
5       the need for a contingency fund;
6           (ee) any other matter the
7       Task Force considers relevant to
8       the implementation of the contin-
9       gency plan; and
10      (V) a strategy for the efficient
11  processing of all Afghan special immi-
12  grant visa applications and appeals,
13  including—
14          (aa) a review of current
15      staffing levels and needs across
16      all interagency offices and offi-
17      cials engaged in the special immi-
18      grant visa process;
19          (bb) an analysis of the ex-
20      pected Chief of Mission approvals
21      and denials of applications in the
22      pipeline in order to project the
23      expected number of visas nec-
24      essary to provide special immi-
25      grant status to all approved ap-

1     plicants under this subtitle dur-
2     ing the several years after the
3     date of the enactment of this
4     Act;
5     (cc) an assessment as to
6     whether adequate guidelines exist
7     for reconsidering or reopening
8     applications for special immi-
9     grant visas in appropriate cir-
10    cumstances and consistent with
11    applicable laws; and
12    (dd) an assessment of the
13    procedures throughout the special
14    immigrant visa application proc-
15    ess, including at the Portsmouth
16    Consular Center, and the effec-
17    tiveness of communication be-
18    tween the Portsmouth Consular
19    Center and applicants, including
20    an identification of any area in
21    which improvements to the effi-
22    ciency of such procedures and
23    communication may be made.
24    (iii) FORM.—The report required
25    under clause (i) shall be submitted in un-

208

1    classified form but may include a classified
2    annex.
3        (B) BRIEFING.—Not later than 60 days
4    after submitting the report required by clause
5    (i), the Task Force shall brief the appropriate
6    committees of Congress on the contents of the
7    report.
8    (5) TERMINATION.—The Task Force shall re-
9    main in effect until the later of—
10        (A) the date on which the strategy re-
11        quired under paragraph (4)(A)(i)(I) has been
12        fully implemented;
13        (B) the date of a determination by the
14        Secretary of State, in consultation with the Sec-
15        retary of Defense and the Secretary, that a task
16        force is no longer necessary for the implementa-
17        tion of subparagraphs (A) and (B) of para-
18        graph (1); or
19        (C) the date that is 10 years after the date
20        of the enactment of this Act.
21    (f) IMPROVING CONSULTATION WITH CONGRESS.—
22    Section 207 of the Immigration and Nationality Act (8
23    U.S.C. 1157) is amended—
24        (1) in subsection (a), by amending paragraph
25        (4) to read as follows:

209

1    ''(4)(A) In the determination made under this sub-
2    section for each fiscal year (beginning with fiscal year
3    1992), the President shall enumerate, with the respective
4    number of refugees so determined, the number of aliens
5    who were granted asylum in the previous year.

6    ''(B) In making a determination under paragraph
7    (1), the President shall consider the information in the
8    most recently published projected global resettlement
9    needs report published by the United Nations High Com-
10    missioner for Refugees.'';

11        (2) in subsection (e), by amending paragraph
12        (2) to read as follows:

13        ''(2) A description of the number and allocation
14        of the refugees to be admitted, including the ex-
15        pected allocation by region, and an analysis of the
16        conditions within the countries from which they
17        came.''; and

18        (3) by adding at the end the following—

19    ''(g) QUARTERLY REPORTS ON ADMISSIONS.—Not
20    later than 30 days after the last day of each quarter begin-
21    ning the fourth quarter of fiscal year 2024, the President
22    shall submit to the Committee on Homeland Security and
23    Governmental Affairs, the Committee on the Judiciary,
24    and the Committee on Foreign Relations of the Senate
25    and the Committee on Homeland Security, the Committee

IFR_AR_001923

210

1 on the Judiciary, and the Committee on Foreign Affairs

2 of the House of Representatives a report that includes the

3 following:

4     ''(1) REFUGEES ADMITTED.—

5         ''(A) The number of refugees admitted to

6         the United States during the preceding quarter.

7         ''(B) The cumulative number of refugees

8         admitted to the United States during the appli-

9         cable fiscal year, as of the last day of the pre-

10         ceding quarter.

11         ''(C) The number of refugees expected to

12         be admitted to the United States during the re-

13         mainder of the applicable fiscal year.

14         ''(D) The number of refugees from each

15         region admitted to the United States during the

16         preceding quarter.

17     ''(2) ALIENS WITH PENDING SECURITY

18     CHECKS.—With respect only to aliens processed

19     under section 101(a)(27)(N), subtitle C of title III

20     of the Border Act, or section 602(b)(2)(A)(ii)(II) of

21     the Afghan Allies Protection Act of 2009 (8 U.S.C.

22     1101 note; Public Law 111–8)—

23         ''(A) the number of aliens, by nationality,

24         security check, and responsible vetting agency,

25         for whom a National Vetting Center or other

211

1    security check has been requested during the

2    preceding quarter, and the number of aliens, by

3    nationality, for whom the check was pending

4    beyond 30 days; and

5        ''(B) the number of aliens, by nationality,

6    security check, and responsible vetting agency,

7    for whom a National Vetting Center or other

8    security check has been pending for more than

9    180 days.

10    ''(3) CIRCUIT RIDES.—

11        ''(A) For the preceding quarter—

12            ''(i) the number of Refugee Corps of-

13        ficers deployed on circuit rides and the

14        overall number of Refugee Corps officers;

15            ''(ii) the number of individuals inter-

16        viewed—

17                ''(I) on each circuit ride; and

18                ''(II) at each circuit ride location;

19            ''(iii) the number of circuit rides; and

20            ''(iv) for each circuit ride, the dura-

21        tion of the circuit ride.

22        ''(B) For the subsequent 2 quarters, the

23    number of circuit rides planned.

24    ''(4) PROCESSING.—

IFR_AR_001925

212

1       ''(A) For refugees admitted to the United
2   States during the preceding quarter, the aver-
3   age number of days between—

4           ''(i) the date on which an individual
5       referred to the United States Government
6       as a refugee applicant is interviewed by the
7       Secretary of Homeland Security; and

8           ''(ii) the date on which such individual
9       is admitted to the United States.

10      ''(B) For refugee applicants interviewed by
11  the Secretary of Homeland Security in the pre-
12  ceding  quarter,  the  approval,  denial,  rec-
13  ommended approval, recommended denial, and
14  hold rates for the applications for admission of
15  such individuals, disaggregated by nationality.''.

**16 SEC. 316. SUPPORT FOR CERTAIN VULNERABLE AFGHANS**

**17        RELATING TO EMPLOYMENT BY OR ON BE-**

**18        HALF OF THE UNITED STATES.**

19      (a) SPECIAL IMMIGRANT VISAS FOR CERTAIN REL-
20  ATIVES  OF  CERTAIN  MEMBERS  OF  THE  ARMED
21  FORCES.—

22          (1) IN GENERAL.—Section 101(a)(27) of the
23      Immigration  and  Nationality  Act  (8  U.S.C.
24      1101(a)(27)) is amended—

213

1          (A) in subparagraph (L)(iii), by adding a

2      semicolon at the end;

3          (B) in subparagraph (M), by striking the

4      period at the end and inserting "; and"; and

5          (C) by adding at the end the following:

6          "(N) a citizen or national of Afghanistan

7      who is the parent or brother or sister of—

8              "(i) a member of the armed forces (as

9          defined in section 101(a) of title 10,

10         United States Code); or

11             "(ii) a veteran (as defined in section

12         101 of title 38, United States Code).".

13     (2) NUMERICAL LIMITATIONS.—

14         (A) IN GENERAL.—Subject to subpara-

15     graph (C), the total number of principal aliens

16     who may be provided special immigrant visas

17     under subparagraph (N) of section 101(a)(27)

18     of the Immigration and Nationality Act (8

19     U.S.C. 1101(a)(27)), as added by paragraph

20     (1), may not exceed 2,500 each fiscal year.

21         (B) CARRYOVER.—If the numerical limita-

22     tion specified in subparagraph (A) is not

23     reached during a given fiscal year, the numer-

24     ical limitation specified in such subparagraph

IFR_AR_001927

214

1 for the following fiscal year shall be increased
2 by a number equal to the difference between—
3      (i) the numerical limitation specified
4     in subparagraph (A) for the given fiscal
5     year; and
6      (ii) the number of principal aliens pro-
7     vided special immigrant visas under sub-
8     paragraph (N) of section 101(a)(27) of the
9     Immigration and Nationality Act (8 U.S.C.
10     1101(a)(27)) during the given fiscal year.
11     (C) MAXIMUM NUMBER OF VISAS.—The
12 total number of aliens who may be provided
13 special immigrant visas under subparagraph
14 (N) of section 101(a)(27) of the Immigration
15 and Nationality Act (8 U.S.C. 1101(a)(27))
16 shall not exceed 10,000.
17     (D) DURATION OF AUTHORITY.—The au-
18 thority to issue visas under subparagraph (N)
19 of section 101(a)(27) of the Immigration and
20 Nationality Act (8 U.S.C. 1101(a)(27)) shall—
21      (i) commence on the date of the en-
22     actment of this Act; and
23      (ii) terminate on the date on which all
24     such visas are exhausted.

IFR_AR_001928

215

1    (b) CERTAIN AFGHANS INJURED OR KILLED IN THE

2 COURSE OF EMPLOYMENT.—Section 602(b) of the Af-

3 ghan Allies Protection Act of 2009 (8 U.S.C. 1101 note;

4 Public Law 111–8) is amended—

5        (1) in paragraph (2)(A)—

6            (A) by amending clause (ii) to read as fol-

7        lows:

8                "(ii)(I) was or is employed in Afghan-

9            istan on or after October 7, 2001, for not

10           less than 1 year—

11               "(aa) by, or on behalf of, the

12           United States Government; or

13               "(bb) by the International Secu-

14           rity Assistance Force (or any suc-

15           cessor name for such Force) in a ca-

16           pacity that required the alien—

17               "(AA) while traveling off-

18           base with United States military

19           personnel stationed at the Inter-

20           national    Security    Assistance

21           Force (or any successor name for

22           such Force), to serve as an inter-

23           preter   or   translator   for   such

24           United States military personnel;

25           or

216

1              "(BB) to perform activities

2                  for the United States military

3                  personnel stationed at Inter-

4                  national Security Assistance

5                  Force (or any successor name for

6                  such Force); or

7              "(II) in the case of an alien who was

8              wounded or seriously injured in connection

9              with employment described in subclause

10             (I), was employed for any period until the

11             date on which such wound or injury oc-

12             curred, if the wound or injury prevented

13             the alien from continuing such employ-

14             ment;"; and

15             (B) in clause (iii), by striking "clause (ii)"

16          and inserting "clause (ii)(I)";

17          (2) in paragraph (13)(A)(i), by striking "sub-

18       clause (I) or (II)(bb) of paragraph (2)(A)(ii)" and

19       inserting "item (aa) or (bb)(BB) of paragraph

20       (2)(A)(ii)(I)";

21          (3) in paragraph (14)(C), by striking "para-

22       graph (2)(A)(ii)" and inserting "paragraph

23       (2)(A)(ii)(I)"; and

24          (4) in paragraph (15), by striking "paragraph

25       (2)(A)(ii)" and inserting "paragraph (2)(A)(ii)(I)".

IFR_AR_001930

217

1    (c) EXTENSION OF SPECIAL IMMIGRANT VISA PRO-
2  GRAM UNDER AFGHAN ALLIES PROTECTION ACT OF
3  2009.—Section 602(b) of the Afghan Allies Protection Act
4  of 2009 (8 U.S.C. 1101 note; Public Law 111–8) is
5  amended—

6        (1) in paragraph (3)(F)—

7            (A) in the subparagraph heading, by strik-
8        ing ''FISCAL YEARS 2015 THROUGH 2022'' and
9        inserting ''FISCAL YEARS 2015 THROUGH 2029'';
10       and

11           (B) in clause (i), by striking ''December
12       31, 2024'' and inserting ''December 31, 2029'';
13       and

14           (C) in clause (ii), by striking ''December
15       31, 2024'' and inserting ''December 31, 2029'';
16       and

17       (2) in paragraph (13), in the matter preceding
18       subparagraph (A), by striking ''January 31, 2024''
19       and inserting ''January 31, 2030''.

20    (d) AUTHORIZATION OF VIRTUAL INTERVIEWS.—
21  Section 602(b)(4) of the Afghan Allies Protection Act of
22  2009 ( 8 U.S.C. 1101 note; Public Law 111–8;) is amend-
23  ed by adding at the end the following:

24           ''(D)  VIRTUAL  INTERVIEWS.—Notwith-
25       standing section 222(e) of the Immigration and

218

1    Nationality Act (8 U.S.C. 1202(e)), an applica-

2    tion for an immigrant visa under this section

3    may be signed by the applicant through a vir-

4    tual video meeting before a consular officer and

5    verified by the oath of the applicant adminis-

6    tered by the consular officer during a virtual

7    video meeting.''.

8  (e) QUARTERLY REPORTS.—Paragraph (12) of sec-

9 tion 602(b) of the Afghan Allies Protection Act of 2009

10 (8 U.S.C. 1101 note; Public Law 111–8) is amended is

11 amended to read as follows:

12    ''(12) QUARTERLY REPORTS.—

13     ''(A) REPORT TO CONGRESS.—Not later

14    than 120 days after the date of enactment of

15    the Border Act and every 90 days thereafter,

16    the Secretary of State and the Secretary of

17    Homeland Security, in consultation with the

18    Secretary of Defense, shall submit to the appro-

19    priate committees of Congress a report that in-

20    cludes the following:

21     ''(i) For the preceding quarter—

22      ''(I) a description of improve-

23     ments made to the processing of spe-

24     cial immigrant visas and refugee proc-

219

1  essing for citizens and nationals of Af-

2  ghanistan;

3      ''(II) the number of new Afghan

4  referrals to the United States Refugee

5  Admissions Program, disaggregated

6  by referring entity;

7      ''(III) the number of interviews

8  of Afghans conducted by U.S. Citizen-

9  ship and Immigration Services,

10  disaggregated by the country in which

11  such interviews took place;

12      ''(IV) the number of approvals

13  and the number of denials of refugee

14  status requests for Afghans;

15      ''(V) the number of total admis-

16  sions to the United States of Afghan

17  refugees;

18      ''(VI) number of such admis-

19  sions, disaggregated by whether the

20  refugees come from within, or outside

21  of, Afghanistan;

22      ''(VII) the average processing

23  time for citizens and nationals of Af-

24  ghanistan who are applicants for re-

220

1    ferral under section 314 of the Border

2    Act;

3        ''(VIII) the number of such cases

4        processed within such average proc-

5        essing time; and

6        ''(IX) the number of denials

7        issued with respect to applications by

8        citizens and nationals of Afghanistan

9        for referrals under section 314 of the

10        Border Act.

11        ''(ii) The number of applications by

12        citizens and nationals of Afghanistan for

13        refugee referrals pending as of the date of

14        submission of the report.

15        ''(iii) A description of the efficiency

16        improvements made in the process by

17        which applications for special immigrant

18        visas under this subsection are processed,

19        including information described in clauses

20        (iii) through (viii) of paragraph (11)(B).

21        ''(B) FORM OF REPORT.—Each report re-

22        quired by subparagraph (A) shall be submitted

23        in unclassified form but may contain a classi-

24        fied annex.

221

1    ''(C) PUBLIC POSTING.—The Secretary of
2    State shall publish on the website of the De-
3    partment of State the unclassified portion of
4    each report submitted under subparagraph
5    (A).''.

6    (f) GENERAL PROVISIONS.—

7    (1) PROHIBITION ON FEES.—The Secretary,
8    the Secretary of Defense, or the Secretary of State
9    may not charge any fee in connection with an appli-
10    cation for, or issuance of, a special immigrant visa
11    or special immigrant status under—

12    (A) section 602 of the Afghan Allies Pro-
13    tection Act of 2009 (8 U.S.C. 1101 note; Public
14    Law 111–8);

15    (B) section 1059 of the National Defense
16    Authorization Act for Fiscal Year 2006 (8
17    U.S.C. 1101 note; Public Law 109–163); or

18    (C) subparagraph (N) of section
19    101(a)(27) of the Immigration and Nationality
20    Act (8 U.S.C. 1101(a)(27)), as added by sub-
21    section (a)(1).

22    (2) DEFENSE PERSONNEL.—Any limitation in
23    law with respect to the number of personnel within
24    the Office of the Secretary of Defense, the military
25    departments, or a Defense Agency (as defined in

IFR_AR_001935

222

1    section 101(a) of title 10, United States Code) shall

2    not apply to personnel employed for the primary

3    purpose of carrying out this section.

4        (3) PROTECTION OF ALIENS.—The Secretary of

5    State, in consultation with the head of any other ap-

6    propriate Federal agency, shall make a reasonable

7    effort to provide an alien who is seeking status as

8    a special immigrant under subparagraph (N) of sec-

9    tion 101(a)(27) of the Immigration and Nationality

10   Act (8 U.S.C. 1101(a)(27)), as added by subsection

11   (a)(1), protection or to immediately remove such

12   alien from Afghanistan, if possible.

13       (4) RESETTLEMENT SUPPORT.—A citizen or

14   national of Afghanistan who is admitted to the

15   United States under this section or an amendment

16   made by this section shall be eligible for resettlement

17   assistance, entitlement programs, and other benefits

18   available to refugees admitted under section 207 of

19   the Immigration and Nationality Act (8 U.S.C.

20   1157) to the same extent, and for the same periods

21   of time, as such refugees.

22   **SEC. 317. SUPPORT FOR ALLIES SEEKING RESETTLEMENT**

23                **IN THE UNITED STATES.**

24       Notwithstanding any other provision of law, during

25   the period beginning on the date of the enactment of this

223

1 Act and ending on the date that is 10 years thereafter,
2 the Secretary and the Secretary of State may waive any
3 fee or surcharge or exempt individuals from the payment
4 of any fee or surcharge collected by the Department of
5 Homeland Security and the Department of State, respec-
6 tively, in connection with a petition or application for, or
7 issuance of, an immigrant visa to a national of Afghani-
8 stan under section 201(b)(2)(A)(i) or 203(a) of the Immi-
9 gration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)
10 and 1153(a)), respectively.

**SEC. 318. REPORTING.**

12    (a) QUARTERLY REPORTS.—Beginning on January
13 1, 2028, not less frequently than quarterly, the Secretary
14 shall submit to the Committee on the Judiciary of the Sen-
15 ate and the Committee on the Judiciary of the House of
16 Representatives a report that includes, for the preceding
17 quarter—

18        (1) the number of individuals granted condi-
19        tional permanent resident status under section 313,
20        disaggregated by the number of such individuals for
21        whom conditions have been removed;

22        (2) the number of individuals granted condi-
23        tional permanent resident status under section 313
24        who have been determined to be ineligible for re-

224

1    moval of conditions (and the reasons for such deter-

2    mination); and

3        (3) the number of individuals granted condi-

4    tional permanent resident status under section 313

5    for whom no such determination has been made

6    (and the reasons for the lack of such determination).

7    (b) ANNUAL REPORTS.—Not less frequently than an-

8    nually, the Secretary, in consultation with the Attorney

9    General, shall submit to the appropriate committees of

10    Congress a report that includes for the preceding year,

11    with respect to individuals granted conditional permanent

12    resident status under section 313—

13        (1) the number of such individuals who are

14    placed in removal proceedings under section 240 of

15    the Immigration and Nationality Act (8 U.S.C.

16    1229a) charged with a ground of deportability under

17    subsection (a)(2) of section 237 of that Act (8

18    U.S.C. 1227), disaggregated by each applicable

19    ground under that subsection;

20        (2) the number of such individuals who are

21    placed in removal proceedings under section 240 of

22    the Immigration and Nationality Act (8 U.S.C.

23    1229a) charged with a ground of deportability under

24    subsection (a)(3) of section 237 of that Act (8

1    U.S.C. 1227), disaggregated by each applicable
2    ground under that subsection;

3         (3) the number of final orders of removal issued
4    pursuant to proceedings described in paragraphs (1)
5    and (2), disaggregated by each applicable ground of
6    deportability;

7         (4) the number of such individuals for whom
8    such proceedings are pending, disaggregated by each
9    applicable ground of deportability; and

10        (5) a review of the available options for removal
11    from the United States, including any changes in
12    the feasibility of such options during the preceding
13    year.

# TITLE IV—PROMOTING LEGAL IMMIGRATION

**SEC. 401. EMPLOYMENT AUTHORIZATION FOR FIANCÉS, FIANCÉES, SPOUSES, AND CHILDREN OF UNITED STATES CITIZENS AND SPECIALTY WORKERS.**

20    Section 214(c) of the Immigration and Nationality
21    Act (8 U.S.C. 1184(c)) is amended by adding at the end
22    the following:

23    "(15) The Secretary of Homeland Security shall au-
24    thorize an alien fiancé, fiancée, or spouse admitted pursu-
25    ant to clause (i) or (ii) of section 101(a)(15)(K), or any

IFR_AR_001939

226

1 child admitted pursuant to section 101(a)(15)(K)(iii) to
2 engage in employment in the United States incident to
3 such status and shall provide the alien with an 'employ-
4 ment authorized' endorsement during the period of au-
5 thorized admission.

6     ''(16) Upon the receipt of a completed petition de-
7 scribed in subparagraph (E) or (F) of section 204(a)(1)
8 for a principal alien who has been admitted pursuant to
9 section 101(a)(15)(H)(i)(b), the Secretary of Homeland
10 Security shall authorize the alien spouse or child of such
11 principal alien who has been admitted under section
12 101(a)(15)(H) to accompany or follow to join a principal
13 alien admitted under such section, to engage in employ-
14 ment in the United States incident to such status and
15 shall provide the alien with an 'employment authorized'
16 endorsement during the period of authorized admission.''.

17 **SEC. 402. ADDITIONAL VISAS.**

18     Section 201 of the Immigration and Nationality Act
19 (8 U.S.C. 1151) is amended—

20          (1) in subsection (c)—

21              (A) by adding at the end the following:

22     ''(6)(A) For fiscal years 2025, 2026, 2027, 2028, and
23 2029—

24              ''(i) 512,000 shall be substituted for 480,000 in
25          paragraph (1)(A)(i); and

227

1        ''(ii) 258,000 shall be substituted for 226,000

2    in paragraph (1)(B)(i)(i) of that paragraph.

3        ''(B) The additional visas authorized under subpara-

4    graph (A)—

5            ''(i) shall be issued each fiscal year;

6            ''(ii) shall remain available in any fiscal year

7        until issued; and

8            ''(iii) shall be allocated in accordance with this

9        section and sections 202 and 203.''; and

10        (2) in subsection (d), by adding at the end the

11    following:

12    ''(3)(A) For fiscal years 2025, 2026, 2027, 2028, and

13    2029, 158,000 shall be substituted for 140,000 in para-

14    graph (1)(A).

15        ''(B) The additional visas authorized under subpara-

16    graph (A)—

17            ''(i) shall be issued each fiscal year;

18            ''(ii) shall remain available in any fiscal year

19        until issued; and

20            ''(iii) shall be allocated in accordance with this

21        section and sections 202 and 203.''.

22    **SEC. 403. CHILDREN OF LONG-TERM VISA HOLDERS.**

23        (a) MAINTAINING FAMILY UNITY FOR CHILDREN OF

24    LONG-TERM H–1B NONIMMIGRANTS AFFECTED BY

25    DELAYS IN VISA AVAILABILITY.—Section 203(h) of the

IFR_AR_001941

228

1 Immigration and Nationality Act (8 U.S.C. 1153(h)) is
2 amended by adding at the end the following:

3      "(6) CHILD STATUS DETERMINATION FOR CER-
4    TAIN   DEPENDENT   CHILDREN   OF   H–1B   NON-
5    IMMIGRANTS.—

6          "(A)   DETERMINATIVE   FACTORS.—For
7       purposes of subsection (d), the determination of
8       whether an alien described in subparagraph (B)
9       satisfies the age and marital status require-
10      ments set forth in section 101(b)(1) shall be
11      made using the alien's age and marital status
12      on the date on which an initial petition as a
13      nonimmigrant   described   in   section
14      101(a)(15)(H)(i)(b) was filed on behalf of the
15      alien's parent, if such petition was approved.

16         "(B) ALIEN DESCRIBED.—An alien is de-
17      scribed in this subparagraph if such alien—

18             "(i) maintained, for an aggregate pe-
19          riod of at least 8 years before reaching 21
20          years of age, the status of a dependent
21          child of a nonimmigrant described in sec-
22          tion   101(a)(15)(H)(i)(b)   pursuant   to   a
23          lawful admission; and

24             "(ii)(I) sought to acquire the status of
25          an alien lawfully admitted for permanent

1         residence during the 2-year period begin-

2         ning on the date on which an immigrant

3         visa became available to such alien; or

4             "(II) demonstrates, by clear and con-

5         vincing evidence, that the alien's failure to

6         seek such status during such 2-year period

7         was due to extraordinary circumstances.".

8   (b) NONIMMIGRANT DEPENDENT CHILDREN OF H-

9 1B NONIMMIGRANTS.—Section 214 of the Immigration

10 and Nationality Act (8 U.S.C. 1184) is amended by add-

11 ing at the end the following:

12   "(s) CHILD DERIVATIVE BENEFICIARIES OF H-1B

13 NONIMMIGRANTS.—

14         "(1) AGE DETERMINATION.—In the case of an

15         alien who maintained, for an aggregate period of at

16         least 8 years before reaching 21 years of age, the

17         status of a dependent child of a nonimmigrant de-

18         scribed in section 101(a)(15)(H)(i)(b) pursuant to a

19         lawful admission, such alien's age shall be deter-

20         mined based on the date on which an initial petition

21         for classification under such section was filed on be-

22         half of the alien's parent, if such petition is ap-

23         proved.

24         "(2)    LONG-TERM    DEPENDENTS.—Notwith-

25         standing the alien's actual age or marital status, an

1  alien who is determined to be a child under para-
2  graph (1) and is otherwise eligible may change sta-
3  tus to, or extend status as, a dependent child of a
4  nonimmigrant     described     in     section
5  101(a)(15)(H)(i)(b) if the alien's parent—

6      ''(A) maintains lawful status under such
7      section;

8      ''(B) has an employment-based immigrant
9      visa petition that has been approved pursuant
10     to section 203(b); and

11     ''(C) has not yet had an opportunity to
12     seek an immigrant visa or adjust status under
13     section 245.

14  ''(3) EMPLOYMENT AUTHORIZATION.—An alien
15  who is determined to be a child under paragraph (1)
16  is authorized to engage in employment in the United
17  States incident to the status of his or her non-
18  immigrant parent.

19  ''(4) SURVIVING RELATIVE CONSIDERATION.—
20  Notwithstanding the death of the qualifying relative,
21  an alien who is determined to be a child under para-
22  graph (1) is authorized to extend status as a de-
23  pendent child of a nonimmigrant described in section
24  101(a)(15)(H)(i)(b).''.

25  (c) MOTION TO REOPEN OR RECONSIDER.—

231

1          (1) IN GENERAL.—A motion to reopen or re-
2     consider the denial of a petition under section 204
3     of the Immigration and Nationality Act (8 U.S.C.
4     1154) and a subsequent application for an immi-
5     grant visa or adjustment of status under section 245
6     of the Immigration and Nationality Act (8 U.S.C.
7     1255), may be granted if—

8               (A) such petition or application would have
9          been approved if—

10                   (i) section 203(h)(6) of the Immigra-
11              tion and Nationality Act, as added by sub-
12              section (a), had been in effect when the pe-
13              tition or application was adjudicated; and

14                   (ii) the person concerned remains eli-
15              gible for the requested benefit;

16               (B) the individual seeking relief pursuant
17          to such motion was in the United States at the
18          time the underlying petition or application was
19          filed; and

20               (C) such motion is filed with the Secretary
21          or the Attorney General not later than the date
22          that is 2 years after the date of the enactment
23          of this Act.

IFR_AR_001945

232

1        (2) PROTECTION FROM REMOVAL.—Notwith-
2    standing any other provision of the law, the Attor-
3    ney General and the Secretary—

4            (A) may not initiate removal proceedings
5        against or remove any alien who has a pending
6        nonfrivolous motion under paragraph (1) or is
7        seeking to file such a motion unless—

8                (i) the alien is a danger to the com-
9            munity or a national security risk; or

10                (ii) initiating a removal proceeding
11            with respect to such alien is in the public
12            interest; and

13            (B) shall provide aliens with a reasonable
14        opportunity to file such a motion.

15        (3) EMPLOYMENT AUTHORIZATION.—An alien
16    with a pending, nonfrivolous motion under this sub-
17    section shall be authorized to engage in employment
18    through the date on which a final administrative de-
19    cision regarding such motion has been made.

20   **SEC. 404. MILITARY NATURALIZATION MODERNIZATION.**

21        (a) IN GENERAL.—Chapter 2 of title III of the Immi-
22   gration and Nationality Act (8 U.S.C. 1421 et seq.) is
23   amended—

24        (1) by striking section 328 (8 U.S.C. 1439);
25    and

233

1    (2) in section 329 (8 U.S.C. 1440)—

2      (A) by amending the section heading to

3      read as follows: &ldquo;**NATURALIZATION**

4      **THROUGH SERVICE IN THE SELECTED RE-**

5      **SERVE OR IN ACTIVE-DUTY STATUS**.—&rdquo;;

6      (B) in subsection (a)—

7        (i) in the matter preceding paragraph

8        (1), by striking &ldquo;during either&rdquo; and all

9        that follows through &ldquo;foreign force&rdquo;;

10        (ii) in paragraph (1)—

11          (I) by striking &ldquo;America Samoa,

12          or Swains Island&rdquo; and inserting

13          &ldquo;American Samoa, Swains Island, or

14          any of the freely associated States (as

15          defined in section 611(b)(1)(C) of the

16          Individuals with Disabilities Edu-

17          cation Act (20 U.S.C.

18          1411(b)(1)(C)),&rdquo;; and

19          (II) by striking &ldquo;he&rdquo; and insert-

20          ing &ldquo;such person&rdquo;; and

21        (iii) in paragraph (2), by striking &ldquo;in

22        an active-duty status, and whether separa-

23        tion from such service was under honorable

24        conditions&rdquo; and inserting &ldquo;in accordance

25        with subsection (b)(3)&rdquo;; and

IFR_AR_001947

234

1        (C) in subsection (b)—

2            (i) in paragraph (1), by striking "he"

3        and inserting "such person"; and

4            (ii) in paragraph (3), by striking "an

5        active-duty status" and all that follows

6        through "foreign force, and" and inserting

7        "in an active status (as defined in section

8        101(d) of title 10, United States Code), in

9        the Selected Reserve of the Ready Reserve,

10       or on active duty (as defined in such sec-

11       tion) and, if separated".

12   (b) CLERICAL AMENDMENT.—The table of contents

13 for the Immigration and Nationality Act (8 U.S.C. 1101

14 et seq.) is amended by striking the items relating to sec-

15 tions 328 and 329 and inserting the following:

"Sec. 329. Naturalization through service in the Selected Reserve or in active-duty status.".

## SEC. 405. TEMPORARY FAMILY VISITS.

17   (a) ESTABLISHMENT OF NEW NONIMMIGRANT VISA

18 SUBCATEGORY.—Section 101(a)(15)(B) of the Immigra-

19 tion and Nationality Act (8 U.S.C. 1101(a)(15)(B)) is

20 amended by striking "temporarily for business or tempo-

21 rarily for pleasure;" and inserting "temporarily for—

22            "(i) business;

23            "(ii) pleasure; or

24            "(iii) family purposes;".

IFR_AR_001948

235

1    (b) REQUIREMENTS APPLICABLE TO FAMILY PUR-

2 POSES VISAS.—Section 214 of the Immigration and Na-

3 tionality Act (8 U.S.C. 1184), as amended by section

4 403(b), is further amended by adding at the end the fol-

5 lowing:

6    "(t) REQUIREMENTS APPLICABLE TO FAMILY PUR-

7 POSES VISAS.—

8       "(1) DEFINED TERM.—In this subsection and

9    in section 101(a)(15)(B)(iii), the term 'family pur-

10    poses' means any visit by a relative for a social, oc-

11    casional, major life, or religious event, or for any

12    other purpose.

13       "(2) FAMILY PURPOSES VISA.—Except as pro-

14    vided in paragraph (3), family travel for pleasure is

15    authorized pursuant to the policies, terms, and con-

16    ditions in effect on the day before the date of the

17    enactment of the Border Act.

18       "(3) SPECIAL RULES FOR FAMILY PURPOSES

19    VISAS FOR ALIENS AWAITING IMMIGRANT VISAS.—

20          "(A) NOTIFICATION OF APPROVED PETI-

21       TION.—A visa may not be issued to a relative

22       under section 101(a)(15)(B)(iii) until after the

23       consular officer is notified that the Secretary of

24       Homeland Security has approved a petition

25       filed in the United States by a family member

236

1 of the relative who is a United States citizen or

2 lawful permanent resident.

3   "(B) PETITION.—A petition referred to in

4 subparagraph (A) shall—

5     "(i) be in such form and contain such

6    information as the Secretary may prescribe

7    by regulation; and

8     "(ii) shall include—

9      "(I) a declaration of financial

10     support, affirming that the petitioner

11     will provide financial support to the

12     relative for the duration of his or her

13     temporary stay in the United States;

14      "(II) evidence that the relative

15     has—

16       "(aa) obtained, for the dura-

17      tion of his or her stay in the

18      United States, a short-term trav-

19      el medical insurance policy; or

20       "(bb) an existing health in-

21      surance policy that provides cov-

22      erage for international medical

23      expenses; and

237

1          ''(III) a declaration from the rel-

2          ative, under penalty of perjury, af-

3          firming the relative's—

4              ''(aa) intent to depart the

5          United States at the conclusion

6          of the relative's period of author-

7          ized admission; and

8              ''(bb) awareness of the pen-

9          alties for overstaying such period

10         of authorized admission.

11     ''(4) PETITIONER ELIGIBILITY.—

12         ''(A) IN GENERAL.—Absent extraordinary

13     circumstances, an individual may not petition

14     for the admission of a relative as a non-

15     immigrant described in section

16     101(a)(15)(B)(iii) if such individual previously

17     petitioned for the admission of such a relative

18     who—

19         ''(i) was admitted to the United

20         States pursuant to a visa issued under

21         such section as a result of such petition;

22         and

23         ''(ii) overstayed his or her period of

24         authorized admission.

25     ''(B) PREVIOUS PETITIONERS.—

238

1               "(i) IN GENERAL.—An individual fil-

2     ing a declaration of financial support on

3     behalf of a relative seeking admission as a

4     nonimmigrant described in section

5     101(a)(15)(B)(iii) who has previously pro-

6     vided a declaration of financial support for

7     such a relative shall—

8              "(I) certify to the Secretary of

9         Homeland Security that the relative

10         whose admission the individual pre-

11         viously supported did not overstay his

12         or her period of authorized admission;

13         or

14              "(II) explain why the relative's

15         overstay was due to extraordinary cir-

16         cumstances beyond the control of the

17         relative.

18         "(ii) CRIMINAL PENALTY FOR FALSE

19     STATEMENT.—A certification under clause

20     (i)(I) shall be subject to the requirements

21     under section 1001 of title 18, United

22     States Code.

23     "(C) WAIVER.—The Secretary of Home-

24     land Security may waive the application of sec-

25     tion 212(a)(9)(B) in the case of a non-

239

1 immigrant described in section
2 101(a)(15)(B)(iii) who overstayed his or her pe-
3 riod of authorized admission due to extraor-
4 dinary circumstances beyond the control of the
5 nonimmigrant.''.

6 (c) RESTRICTION ON CHANGE OF STATUS.—Section
7 248(a)(1) of the Immigration and Nationality Act (8
8 U.S.C. 1258(a)(1)) is amended by inserting ''(B)(iii),''
9 after ''subparagraph''.

10 (d) FAMILY PURPOSE VISA ELIGIBILITY WHILE
11 AWAITING IMMIGRANT VISA.—

12 (1) IN GENERAL.—Notwithstanding section
13 214(b) of the Immigration and Nationality Act (8
14 U.S.C. 1184(b)), a nonimmigrant described in sec-
15 tion 101(a)(15)(B)(iii) of such Act, as added by sub-
16 section (a), who has been classified as an immigrant
17 under section 201 of such Act (8 U.S.C. 1151) and
18 is awaiting the availability of an immigrant visa sub-
19 ject to the numerical limitations under section 203
20 of such Act (8 U.S.C. 1153) may be admitted pursu-
21 ant to a family purposes visa, in accordance with
22 section 214(t) of such Act, as added by subsection
23 (b), if the individual is otherwise eligible for admis-
24 sion.

240

1        (2) LIMITATION.—An alien admitted under sec-
2    tion 101(a)(15)(B)(iii) of the Immigration and Na-
3    tionality Act, pursuant to section 214(t)(3) of such
4    Act, as added by subsection (b), may not be consid-
5    ered to have been admitted to the United States for
6    purposes of section 245(a) of such Act (8 U.S.C.
7    1255(a)).

8    (e) RULE OF CONSTRUCTION.—Nothing in this sec-
9    tion, or in the amendments made by this section, may be
10   construed as—

11       (1) limiting the authority of immigration offi-
12   cers to refuse to admit to the United States an ap-
13   plicant under section 101(a)(15)(B)(iii) of the Immi-
14   gration and Nationality Act, as added by subsection
15   (a), who fails to meet 1 or more of the criteria under
16   section 214(t) of such Act, as added by subsection
17   (b), or who is inadmissible under section 212(a) of
18   such Act (8 U.S.C. 1182(a)); or

19       (2)    precluding    the    use    of    section
20   101(a)(15)(B)(ii) of the Immigration and Nation-
21   ality Act, as added by subsection (a), for family
22   travel for pleasure in accordance with the policies
23   and procedures in effect on the day before the date
24   of the enactment of this Act.

# TITLE V—SELF-SUFFICIENCY AND DUE PROCESS

## Subtitle A—Work Authorizations

**SEC. 501. WORK AUTHORIZATION.**

Section 208(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1158(d)(2)) is amended to read as follows:

"(2) EMPLOYMENT ELIGIBILITY.—Except as provided in section 235C—

"(A) an applicant for asylum is not entitled to employment authorization, but such authorization may be provided by the Secretary of Homeland Security by regulation; and

"(B) an applicant who is not otherwise eligible for employment authorization may not be granted employment authorization under this section before the date that is 180 days after the date on which the applicant files an application for asylum.".

**SEC. 502. EMPLOYMENT ELIGIBILITY.**

(a) IN GENERAL.—Chapter 4 of title II of the Immigration and Nationality Act (8 U.S.C. 1221 et seq.), as amended by section 141(a), is further amended by adding at the end the following:

**"SEC. 235C. EMPLOYMENT ELIGIBILITY.**

"(a) EXPEDITED EMPLOYMENT ELIGIBILITY.—

IFR_AR_001955

242

1    ''(1) IN GENERAL.—The Secretary of Homeland

2    Security shall authorize employment for any alien

3    who—

4        ''(A)(i) is processed under the procedures

5        described in section 235(b)(1) and receives a

6        positive protection determination pursuant to

7        such procedures; or

8        ''(ii)(I) is processed under the procedures

9        described in section 235B; and

10       ''(II)(aa) receives a positive protection de-

11       termination and is subsequently referred under

12       section 235B(c)(2)(B)(i) for a protection merits

13       interview; or

14       ''(bb) is referred under section 235B(f)(1)

15       for a protection merits interview; and

16       ''(B) is released from the physical custody

17       of the Secretary of Homeland Security.

18   ''(2) APPLICATION.—The Secretary of Home-

19   land Security shall grant employment authorization

20   to—

21       ''(A) an alien described in paragraph

22       (1)(A)(i) immediately upon such alien's release

23       from physical custody;

24       ''(B) an alien described in paragraph

25       (1)(A)(ii)(II)(aa) at the time such alien receives

1    a positive protection determination or is re-
2    ferred for a protection merits interview; and
3        ''(C) an alien described in paragraph
4        (1)(A)(ii)(II)(bb) on the date that is 30 days
5        after the date on which such alien files an ap-
6        plication pursuant to section 235B(f).
7    ''(b) TERM.—Employment authorization under this
8  section—
9        ''(1) shall be for an initial period of 2 years;
10   and
11       ''(2) shall be renewable, as applicable—
12           ''(A) for additional 2-year periods while
13           the alien is in protection merits removal pro-
14           ceedings, including while the outcome of the
15           protection merits interview is under administra-
16           tive or judicial review; or
17           ''(B) until the date on which—
18               ''(i) the alien receives a negative pro-
19               tection merits determination; or
20               ''(ii) the alien otherwise receives em-
21               ployment authorization under any other
22               provision of this Act.
23   ''(c) RULES OF CONSTRUCTION.—
24       ''(1) DETENTION.—Nothing in this section may
25   be construed to expand or restrict the authority of

IFR_AR_001957

1    the Secretary of Homeland Security to detain or re-
2    lease from detention an alien, if such detention or
3    release from detention is authorized by law.

4        ''(2) LIMITATION ON AUTHORITY.—The Sec-
5    retary of Homeland Security may not authorize for
6    employment in the United States an alien being
7    processed under section 235(b)(1) or 235B in any
8    circumstance not explicitly described in this sec-
9    tion.''.

10        (b) CONFORMING AMENDMENT.—The table of con-
11    tents for the Immigration and Nationality Act (8 U.S.C.
12    1101 et seq.) is amended by inserting after the item relat-
13    ing to section 235B, as added by section 141(b), the fol-
14    lowing:

''Sec. 235C. Employment eligibility.''.

15    # Subtitle B—Protecting Due Process

16    ## SEC. 511. ACCESS TO COUNSEL.

17        (a) IN GENERAL.—Section 235(b)(1)(B)(iv) of the
18    Immigration    and    Nationality    Act    (8    U.S.C.
19    1225(b)(1)(B)(iv)) is amended to read as follows:

20            ''(iv) INFORMATION ABOUT PROTEC-
21            TION DETERMINATIONS.—

22                ''(I) IN GENERAL.—The Sec-
23                retary of Homeland Security shall
24                provide an alien with information in
25                plain language regarding protection

245

determinations conducted under this
section, including the information de-
scribed in subclause (II)—

"(aa) at the time of the ini-
tial processing of the alien; and

"(bb) to the maximum ex-
tent practicable, in the alien's na-
tive language or in a language
the alien understands.

"(II) INFORMATION DE-
SCRIBED.—The information described
in this subclause is information relat-
ing to—

"(aa) the rights and obliga-
tions of the alien during a protec-
tion determination;

"(bb) the process by which a
protection determination is con-
ducted;

"(cc) the procedures to be
followed by the alien in a protec-
tion determination; and

"(dd) the possible con-
sequences of—

IFR_AR_001959

246

1              "(AA) not complying
2          with the obligations referred
3          to in item (aa); and
4              "(BB) not cooperating
5          with Federal authorities.
6          "(III) ACCESSIBILITY.—An alien
7      who has a limitation that renders the
8      alien unable to read written materials
9      provided under subclause (I) shall re-
10     ceive an interpretation of such mate-
11     rials in the alien's native language, to
12     the maximum extent practicable, or in
13     a language and format the alien un-
14     derstands.
15         "(IV) TIMING OF PROTECTION
16     DETERMINATION.—
17             "(aa) IN GENERAL.—The
18         protection determination of an
19         alien shall not occur earlier than
20         72 hours after the provision of
21         the information described in sub-
22         clauses (I) and (II).
23             "(bb) WAIVER.—An alien
24         may—

247

1           "(AA) waive the 72-
2               hour requirement under
3               item (aa) only if the alien
4               knowingly and voluntarily
5               does so, only in a written
6               format or in an alternative
7               record if the alien is unable
8               to write, and only after the
9               alien receives the informa-
10              tion required to be provided
11              under subclause (I); and
12          "(BB) consult with an
13              individual of the alien's
14              choosing in accordance with
15              subclause (V) before waiving
16              such requirement.
17      "(V) CONSULTATION.—
18          "(aa) IN GENERAL.—An
19              alien who is eligible for a protec-
20              tion determination may consult
21              with one or more individuals of
22              the alien's choosing before the
23              screening or interview, or any re-
24              view of such a screening or inter-
25              view, in accordance with regula-

248

1 tions prescribed by the Secretary

2 of Homeland Security.

3 "(bb) LIMITATION.—Con-

4 sultation described in item (aa)

5 shall be at no expense to the

6 Federal Government.

7 "(cc) PARTICIPATION IN

8 INTERVIEW.—An individual cho-

9 sen by the alien may participate

10 in the protection determination of

11 the alien conducted under this

12 subparagraph.

13 "(dd) ACCESS.—The Sec-

14 retary of Homeland Security

15 shall ensure that a detained alien

16 has effective access to the indi-

17 viduals chosen by the alien, which

18 may include physical access, tele-

19 phonic access, and access by elec-

20 tronic communication.

21 "(ee) INCLUSIONS.—Con-

22 sultations under this subclause

23 may include—

24 "(AA) consultation with

25 an individual authorized by

249

1         the Department of Justice

2         through the Recognition and

3         Accreditation Program; and

4             "(BB) consultation

5         with an attorney licensed

6         under applicable law.

7         "(ff) RULES OF CONSTRUC-

8         TION.—Nothing in this subclause

9         may be construed—

10           "(AA) to require the

11        Federal Government to pay

12        for any consultation author-

13        ized under item (aa);

14           "(BB) to invalidate or

15        limit the remedies, rights,

16        and procedures of any Fed-

17        eral law that provides pro-

18        tection for the rights of indi-

19        viduals with disabilities; or

20           "(CC) to contravene or

21        limit the obligations under

22        the Vienna Convention on

23        Consular Relations done at

24        Vienna April 24, 1963.".

IFR_AR_001963

250

1    (b) CONFORMING AMENDMENT.—Section 238(a)(2)

2  of the Immigration and Nationality Act (8 U.S.C.

3  1228(a)(2)) is amended by striking "make reasonable ef-

4  forts to ensure that the alien's access to counsel" and in-

5  serting "ensure that the alien's access to counsel, pursu-

6  ant to section 235(b)(1)(B)(iv),".

**SEC. 512. COUNSEL FOR CERTAIN UNACCOMPANIED ALIEN**

**CHILDREN.**

9    Section 235(c)(5) of the William Wilberforce Traf-

10  ficking Victims Protection Reauthorization Act of 2008 (8

11  U.S.C. 1232(c)(5)) is amended to read as follows:

12    "(5) ACCESS TO COUNSEL.—

13      "(A) IN GENERAL.—Except as provided in

14      subparagraph (B), the Secretary of Health and

15      Human Services shall ensure, to the greatest

16      extent practicable and consistent with section

17      292 of the Immigration and Nationality Act (8

18      U.S.C. 1362), that all unaccompanied alien

19      children who are or have been in the custody of

20      the Secretary of Health and Human Services or

21      the Secretary of Homeland Security, and who

22      are not described in subsection (a)(2)(A), have

23      counsel to represent them in legal proceedings

24      or matters and protect them from mistreat-

25      ment, exploitation, and trafficking. To the

251

1     greatest extent practicable, the Secretary of
2     Health and Human Services shall make every
3     effort to utilize the services of pro bono counsel
4     who agree to provide representation to such
5     children without charge.
6         ''(B) EXCEPTION FOR CERTAIN CHIL-
7     DREN.—
8             ''(i) IN GENERAL.—An unaccom-
9         panied alien child who at 13 years of age
10        or younger is referred to Health and
11        Human Services or placed in removal pro-
12        ceedings pursuant to section 240 of the
13        Immigration and Nationality Act (8 U.S.C.
14        1229a), shall be represented by counsel
15        subject to clause (v).
16            ''(ii) AGE DETERMINATIONS.—The
17        Secretary of Health and Human Services
18        shall ensure that age determinations of un-
19        accompanied alien children are conducted
20        in accordance with the procedures devel-
21        oped pursuant to subsection (b)(4).
22            ''(iii) APPEALS.—The rights and
23        privileges under this subparagraph—
24                ''(I) shall not attach to—

252

1          ''(aa) an unaccompanied
2          alien child after the date on
3          which—

4               ''(AA) the removal pro-
5               ceedings of the child under
6               section 240 of the Immigra-
7               tion and Nationality Act (8
8               U.S.C. 1229a) terminate,
9               without an application for
10              relief pending;

11              ''(BB) an order of re-
12              moval with respect to the
13              child becomes final; or

14              ''(CC) an immigration
15              benefit is granted to the
16              child; or

17          ''(bb) an appeal to a district
18          court or court of appeals of the
19          United States, unless certified by
20          the Secretary as a case of ex-
21          traordinary importance; and

22          ''(II) shall attach to administra-
23          tive reviews and appeals.

24          ''(iv) IMPLEMENTATION.—Not later
25          than 90 days after the date of the enact-

253

1        ment of the Border Act, the Secretary of
2        Health and Human Services shall imple-
3        ment this subparagraph.

4                "(v) REMEDIES.—

5                    "(I) IN GENERAL.—For the pop-
6                ulation described in clause (i) of this
7                subparagraph and subsection (b)(1) of
8                section 292 of the Immigration and
9                Nationality Act (8 U.S.C. 1362), de-
10               claratory judgment that the unaccom-
11               panied alien child has a right to be re-
12               ferred to counsel, including pro-bono
13               counsel, or a continuance of immigra-
14               tion proceedings, shall be the exclusive
15               remedies available, other than for
16               those funds subject to appropriations.

17                   "(II) SETTLEMENTS.—Any set-
18               tlement under this subparagraph shall
19               be subject to appropriations.".

**20  SEC. 513. COUNSEL FOR CERTAIN INCOMPETENT INDIVID-**
**21        UALS.**

22       Section 240 of the Immigration and Nationality Act
23   (8 U.S.C. 1158(a)) is amended—

24           (1) by redesignating subsection (e) as sub-
25       section (f); and

IFR_AR_001967

254

1      (2) by inserting after subsection (d) the fol-

2    lowing:

3    "(e) REPRESENTATION FOR CERTAIN INCOMPETENT

4    ALIENS.—

5          "(1) IN GENERAL.—The immigration judge is

6      authorized to appoint legal counsel or a certified

7      representative accredited through the Department of

8      Justice to represent an alien in removal proceedings

9      if—

10              "(A) pro bono counsel is not available; and

11              "(B) the alien—

12                  "(i) is unrepresented;

13                  "(ii) was found by an immigration

14              judge to be incompetent to represent them-

15              selves; and

16                  "(iii) has been placed in or referred to

17              removal proceedings pursuant to this sec-

18              tion.

19          "(2) DETERMINATION ON COMPETENCE.—

20              "(A) PRESUMPTION OF COMPETENCE.—An

21          alien is presumed to be competent to participate

22          in removal proceedings and has the duty to

23          raise the issue of competency. If there are no

24          indicia of incompetency in an alien's case, no

255

1　further inquiry regarding competency is re-
2　quired.

3　　　　"(B) DECISION OF THE IMMIGRATION
4　　　JUDGE.—

5　　　　　　"(i) IN GENERAL.—If there are indi-
6　　　　　cia of incompetency, the immigration judge
7　　　　　shall consider whether there is good cause
8　　　　　to believe that the alien lacks sufficient
9　　　　　competency to proceed without additional
10　　　　safeguards.

11　　　　　　"(ii) INCOMPETENCY TEST.—The test
12　　　　　for determining whether an alien is incom-
13　　　　　petent to participate in immigration pro-
14　　　　　ceedings, is not malingering, and con-
15　　　　　sequently lacks sufficient capacity to pro-
16　　　　　ceed, is whether the alien, not solely on ac-
17　　　　　count of illiteracy or language barriers—

18　　　　　　　"(I) lacks a rational and factual
19　　　　　　understanding of the nature and ob-
20　　　　　　ject of the proceedings;

21　　　　　　　"(II) cannot consult with an
22　　　　　　available attorney or representative;
23　　　　　　and

256

1                                                                                                                  "(III) does not have a reasonable

2               opportunity to examine and present

3               evidence and cross-examine witnesses.

4               "(iii) No APPEAL.—A decision of an

5 immigration judge under this subpara-

6 graph may not be appealed administra-

7 tively and is not subject to judicial review.

8      "(C) EFFECT OF FINDING OF INCOM-

9 PETENCE.—A finding by an immigration judge

10 that an alien is incompetent to represent him-

11 self or herself in removal proceedings shall not

12 prejudice the outcome of any proceeding under

13 this section or any finding by the immigration

14 judge with respect to whether the alien is inad-

15 missible under section 212 or removable under

16 section 237.

17      "(3) QUARTERLY REPORT.—Not later than 90

18 days after the effective date of a final rule imple-

19 menting this subsection, and quarterly thereafter,

20 the Director of the Executive Office for Immigration

21 Review shall submit to the appropriate committees

22 of Congress a report that includes—

23           "(A)(i) the number of aliens in proceedings

24 under this section who claimed during the re-

25 porting period to be incompetent to represent

257

1     themselves, disaggregated by immigration court

2     and immigration judge; and

3           "(ii) a description of each reason given for

4     such claims, such as mental disease or mental

5     defect; and

6           "(B)(i) the number of aliens in proceedings

7     under this section found during the reporting

8     period by an immigration judge to be incom-

9     petent to represent themselves, disaggregated

10    by immigration court and immigration judge;

11    and

12          "(ii) a description of each reason upon

13    which such findings were based, such as mental

14    disease or mental defect.

15    "(4) RULE OF CONSTRUCTION.—Nothing in

16    this subsection may be construed—

17          "(A) to require the Secretary of Homeland

18    Security or the Attorney General to analyze

19    whether an alien is incompetent to represent

20    themselves, absent an indicia of incompetency;

21          "(B) to establish a substantive due process

22    right;

23          "(C) to automatically equate a diagnosis of

24    a mental illness to a lack of competency;

258

1               ''(D) to limit the ability of the Attorney

2           General or the immigration judge to prescribe

3           safeguards to protect the rights and privileges

4           of the alien;

5               ''(E) to limit any authorized representation

6           program by a State, local, or Tribal govern-

7           ment;

8               ''(F) to provide any statutory right to rep-

9           resentation in any proceeding authorized under

10          this Act, unless such right is already authorized

11          by law; or

12              ''(G) to interfere with, create, or expand

13          any right or responsibility established through a

14          court order or settlement agreement in effect

15          before the date of the enactment of the Border

16          Act.

17         ''(5) RULEMAKING.—The Attorney General is

18  authorized to prescribe regulations to carry out this

19  subsection.''.

**20 SEC. 514. CONFORMING AMENDMENT.**

21     Section 292 of the Immigration and Nationality Act

22 (8 U.S.C. 1362) is amended to read as follows:

**23 "SEC. 292. RIGHT TO COUNSEL.**

24     ''(a) IN GENERAL.—In any removal proceeding be-

25 fore an immigration judge and in any appeal proceeding

IFR_AR_001972

259

1 before the Attorney General from an order issued through

2 such removal proceeding, the person concerned shall have

3 the privilege of being represented (at no expense to the

4 Federal Government) by any counsel who is authorized to

5 practice in such proceedings.

6 ''(b) EXCEPTIONS FOR CERTAIN POPULATIONS.—

7 The Federal Government is authorized to provide counsel,

8 at its own expense, in proceedings described in subsection

9 (a) for—

10 ''(1) unaccompanied alien children described in

11 paragraph (5) of section 235(c) of the William Wil-

12 berforce Trafficking Victims Protection Reauthoriza-

13 tion Act of 2008 (8 U.S.C. 1232(c)); and

14 ''(2) subject to appropriations, certain incom-

15 petent aliens described in section 240(e).''.

# TITLE VI—ACCOUNTABILITY
# AND METRICS

**SEC. 601. EMPLOYMENT AUTHORIZATION COMPLIANCE.**

19 Not later than 1 year and 180 days after the date

20 of the enactment of this Act, and annually thereafter, the

21 Secretary shall submit a report to the appropriate commit-

22 tees of Congress and to the public that describes the ac-

23 tions taken by Secretary pursuant to section 235C of the

24 Immigration and Nationality Act, as added by section 502,

25 including—

IFR_AR_001973

1       (1) the number of employment authorization

2    applications granted or denied pursuant to sub-

3    section (a)(1) of such section 235C, disaggregated

4    by whether the alien concerned was processed under

5    the procedures described in section 235(b)(1) or

6    235B of such Act;

7       (2) the ability of the Secretary to comply with

8    the timelines for provision of work authorization pre-

9    scribed in subparagraphs (A) through (C) of section

10    235C(a)(2) of such Act, including whether com-

11    plying with subparagraphs (A) and (B) of such sec-

12    tion 235C(a)(2) has caused delays in the processing

13    of such aliens;

14       (3) the number of employment authorizations

15    revoked due to an alien's failure to comply with the

16    requirements under section 235B(f)(5)(B) of the

17    Immigration and Nationality Act, as added by sec-

18    tion 141, or for any other reason, along with the ar-

19    ticulated basis; and

20       (4) the average time for the revocation of an

21    employment authorization if an alien is authorized to

22    work under section 235C of the Immigration and

23    Nationality Act and is subsequently ordered re-

24    moved.

IFR_AR_001974

261

### SEC. 602. LEGAL ACCESS IN CUSTODIAL SETTINGS.

Not later than 180 days after the date of the enactment of this Act, and annually thereafter, the Secretary shall submit a report to the appropriate committees of Congress and to the public regarding alien access to legal representation and consultation in custodial settings, including—

(1) the total number of aliens who secured or failed to secure legal representation pursuant to section 235(b)(1)(B)(iv)(V) of the Immigration and Nationality Act, as added by section 511, before the protection determination under section 235(b)(1)(B)(i) of such Act, including the disposition of such alien's interview;

(2) the total number of aliens who waived the 72-hour period pursuant to section 235(b)(1)(B)(iv)(IV)(bb) of such Act, including the disposition of the alien's protection determination pursuant to section 235(b)(1)(B)(i) of such Act;

(3) the total number of aliens who required a verbal interpretation of the information about screenings and interviews pursuant to section 235(b)(1)(B)(iv) of such Act, disaggregated by the number of aliens who received or did not receive such an interpretation, respectively, pursuant to section 235(b)(1)(B)(iv)(III) of such Act, including the

IFR_AR_001975

1    disposition of their respective protection determina-
2        tions pursuant to section 235(b)(1)(B)(i) of such
3        Act;

4        (4) the total number of aliens who received in-
5        formation, either verbally or in writing, in their na-
6        tive language; and

7        (5) whether such policies and procedures with
8        respect    to    access    provided    in    section
9        235(b)(1)(B)(iv) have been made available publicly.

**SEC. 603. CREDIBLE FEAR AND PROTECTION DETERMINA-**

        **TIONS.**

12    Not later than 1 year and 60 days after the date of
13 the enactment of this Act, and annually thereafter, the
14 Director of U.S. Citizenship and Immigration Services
15 shall submit a report to the appropriate committees of
16 Congress and to the public that sets forth—

17        (1) the number of aliens who requested or re-
18        ceived a protection determination pursuant to sec-
19        tion 235(b)(1)(B) of the Immigration and Nation-
20        ality Act (8 U.S.C. 1225(b)(1)(B));

21        (2) the number of aliens who requested or re-
22        ceived a protection determination pursuant to sec-
23        tion 235B(b) of such Act, as added by section 141;

24        (3) the number of aliens described in para-
25        graphs (1) and (2) who are subject to an asylum ex-

263

1    ception under section 235(b)(1)(B)(vi) of such Act,

2    disaggregated by specific asylum exception;

3        (4) the number of aliens for whom an asylum

4    officer determined that an alien may be eligible for

5    a waiver under section 235(b)(1)(B)(vi) of such Act

6    and did not apply such asylum exception to such

7    alien;

8        (5) the number of aliens described in paragraph

9    (1) or (2) who—

10            (A) received a positive screening or deter-

11        mination; or

12            (B) received a negative screening or deter-

13        mination;

14        (6) the number of aliens described in paragraph

15    (5)(B) who requested reconsideration or appeal of a

16    negative screening and the disposition of such re-

17    quests;

18        (7) the number of aliens described in paragraph

19    (6) who, upon reconsideration—

20            (A) received a positive screening or deter-

21        mination, as applicable; or

22            (B) received a negative screening or deter-

23        mination, as applicable;

IFR_AR_001977

1    (8) the number of aliens described in paragraph

2    (5)(B) who appealed a decision subsequent to a re-

3    quest for reconsideration;

4    (9) the number of aliens described in paragraph

5    (5)(B) who, upon appeal of a decision, disaggregated

6    by whether or not such alien requested reconsider-

7    ation of a negative screening—

8        (A) received a positive screening or deter-

9        mination, as applicable; or

10        (B) received negative screening or deter-

11        mination, as applicable; and

12    (10) the number of aliens who withdraw their

13    application for admission, including—

14        (A) whether such alien could read or write;

15        (B) whether the withdrawal occurred in

16        the alien's native language;

17        (C) the age of such alien; and

18        (D) the Federal agency or component that

19        processed such withdrawal.

20 **SEC. 604. PUBLICATION OF OPERATIONAL STATISTICS BY**

21        **U.S. CUSTOMS AND BORDER PROTECTION.**

22    (a) IN GENERAL.—Beginning in the second calendar

23 month beginning after the date of the enactment of this

24 Act, the Commissioner for U.S. Customs and Border Pro-

25 tection shall publish, not later than the seventh day of

IFR_AR_001978

265

1 each month, on a publicly available website of the Depart-

2 ment, information from the previous month relating to—

3     (1) the number of alien encounters,

4     disaggregated by—

5         (A) whether such aliens are admissible or

6         inadmissible, including the basis for such deter-

7         minations;

8         (B) the U.S. Border Patrol sector and

9         U.S. Customs and Border Protection field office

10         that recorded the encounter;

11         (C) any outcomes recorded in the terrorist

12         screening database (as such term is defined in

13         section 2101 of the Homeland Security Act of

14         2002 (6 U.S.C. 621)), including—

15             (i) whether the alien is found to be in-

16             admissible or removeable due to a specific

17             ground relating to terrorism;

18             (ii) the alien's country of nationality,

19             race or ethnic identification, and age; and

20             (iii) whether the alien's alleged ter-

21             rorism is related to domestic or inter-

22             national actors, if available;

23         (D) aliens with active Federal or State

24         warrants for arrest in the United States and

266

the nature of the crimes justifying such warrants;

(E) the nationality of the alien;

(F) whether the alien encountered is a single adult, an individual in a family unit, an unaccompanied child, or an accompanied child;

(G) the average time the alien remained in custody, disaggregated by demographic information;

(H) the processing disposition of each alien described in this paragraph upon such alien's release from the custody of U.S. Customs and Border Protection, disaggregated by nationality;

(I) the number of aliens who are paroled pursuant to section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)), disaggregated by geographic region or sector;

(J) the recidivism rate of aliens described in this paragraph, including the definition of "recidivism" and notice of any changes to such definition; and

(K) aliens who have a confirmed gang affiliation, including—

267

1           (i) whether such alien was determined
2       to be inadmissible or removable due to
3       such affiliation;
4           (ii) the specific gang affiliation al-
5       leged;
6           (iii) the basis of such allegation; and
7           (iv) the Federal agency or component
8       that made such allegation or determina-
9       tion;
10      (2) seizures, disaggregated by the U.S. Border
11  Patrol sector and U.S. Customs and Border Protec-
12  tion field office that recorded the encounter, of—
13          (A) narcotics;
14          (B) firearms, whether inbound or out-
15      bound, including whether such firearms were
16      manufactured in the United States, if known;
17          (C) monetary instruments, whether in-
18      bound and outbound; and
19          (D) other specifically identified contra-
20      band;
21      (3) with respect to border emergency authority
22  described in section 244A of the Immigration and
23  Nationality Act, as added by section 301—
24          (A) the number of days such authority was
25      in effect;

268

1    (B) the number of encounters (as defined

2    in    section    244A(i)(3)    of    such    Act,

3    disaggregated by U.S. Border Patrol sector and

4    U.S. Customs and Border Patrol field office;

5    (C) the number of summary removals

6    made under such authority;

7    (D) the number of aliens who manifested

8    a fear of persecution or torture and were

9    screened for withholding of removal or for pro-

10    tection under the Convention Against Torture,

11    and the disposition of each such screening, in-

12    cluding the processing disposition or outcome;

13    (E) the number of aliens who were

14    screened at a port of entry in a safe and orderly

15    manner each day such authority was in effect,

16    including the processing disposition or outcome;

17    (F) whether such authority was exercised

18    under subparagraph (A), (B)(i), or (B)(ii) of

19    section 244A(b)(3) of such Act;

20    (G) a public description of all the methods

21    by which the Secretary determines if an alien

22    may be screened in a safe and orderly manner;

23    (H) the total number of languages that are

24    available for such safe and orderly process;

269

1          (I) the number of aliens who were returned

2      to a country that is not their country of nation-

3      ality;

4          (J) the number of aliens who were re-

5      turned to any country without a humanitarian

6      or protection determination during the use of

7      such authority;

8          (K) the number of United States citizens

9      who were inadvertently detained, removed, or

10     affected by such border emergency authority;

11         (L) the number of individuals who have

12     lawful permission to enter the United States

13     and were inadvertently detained, removed, or

14     affected by such border emergency authority;

15         (M) a summary of the impact to lawful

16     trade and travel during the use of such border

17     emergency authority, disaggregated by port of

18     entry;

19         (N) the disaggregation of the information

20     described in subparagraphs (C), (D), (E), (I),

21     (J), (K), and (L) by the time the alien re-

22     mained in custody and by citizenship and family

23     status, including—

24             (i) single adults;

25             (ii) aliens traveling in a family unit;

IFR_AR_001983

1          (iii) unaccompanied children;

2          (iv) accompanied children;

3      (4) information pertaining to agricultural in-

4   spections;

5      (5) border rescues and mortality data;

6      (6) information regarding trade and travel; and

7      (7) with respect to aliens who were transferred

8   from the physical custody of a State or Federal law

9   enforcement agency or other State agency to the

10  physical custody of a Federal agency or compo-

11  nent—

12          (A) the specific States concerned;

13          (B) whether such alien had initially been

14      charged with a State crime before the State

15      transferred such alien to such Federal agency

16      or component; and

17          (C) the underlying State crime with which

18      the alien was charged.

19      (b) TOTALS.—The information described in sub-

20  section (a) shall include the total amount of each element

21  described in each such paragraph in the relevant unit of

22  measurement for reporting month.

23      (c) DEFINITIONS.—The monthly publication required

24  under subsection (a) shall—

271

1          (1) include the definition of all terms used by

2     the Commissioner; and

3          (2) specifically note whether the definition of

4     any term has been changed.

5     (d) PROTECTION OF PERSONALLY IDENTIFIABLE IN-

6 FORMATION.—In preparing each publication pursuant to

7 subsection (a), the Secretary shall—

8          (1) protect any personally identifiable informa-

9     tion associated with aliens described in subsection

10     (a); and

11          (2) comply with all applicable privacy laws.

12 **SEC. 605. UTILIZATION OF PAROLE AUTHORITIES.**

13     Section 602(b) of the Illegal Immigration Reform and

14 Immigrant Responsibility Act of 1996 (8 U.S.C. 1182

15 note) is amended to read as follows:

16     ''(b) ANNUAL REPORT TO CONGRESS.—

17          ''(1) IN GENERAL.—Not later than 90 days

18     after the end of each fiscal year, the Secretary of

19     Homeland Security shall submit a report to the

20     Committee on the Judiciary of the Senate, the Com-

21     mittee on Homeland Security and Governmental Af-

22     fairs of the Senate, the Committee on the Judiciary

23     of the House of Representatives, the Committee on

24     Homeland Security of the House of Representatives,

25     and the public that identifies the number of aliens

272

1  paroled into the United States pursuant to section

2  212(d)(5) of the Immigration and Nationality Act (8

3  U.S.C. 1182(d)(5)).

4  ''(2) CONTENTS.—Each report required under

5  paragraph (1) shall include—

6         ''(A) the total number of aliens—

7              ''(i) who submitted applications for

8         parole;

9              ''(ii) whose parole applications were

10        approved; or

11             ''(iii) who were granted parole into

12        the United States during the fiscal year

13        immediately preceding the fiscal year dur-

14        ing which such report is submitted;

15        ''(B) the elements described in subpara-

16        graph (A), disaggregated by—

17             ''(i) citizenship or nationality;

18             ''(ii) demographic categories;

19             ''(iii) the component or subcomponent

20        of the Department of Homeland Security

21        that granted such parole;

22             ''(iv) the parole rationale or class of

23        admission, if applicable; and

24             ''(v) the sector, field office, area of re-

25        sponsibility, or port of entry where such

1    parole was requested, approved, or grant-

2    ed;

3        ''(C) the number of aliens who requested

4    re-parole, disaggregated by the elements de-

5    scribed in subparagraph (B), and the number of

6    denials of re-parole requests;

7        ''(D) the number of aliens whose parole

8    was terminated for failing to abide by the terms

9    of parole, disaggregated by the elements de-

10    scribed in subparagraph (B);

11        ''(E) for any parole rationale or class of

12    admission which requires sponsorship, the num-

13    ber of sponsor petitions which were—

14            ''(i) confirmed;

15            ''(ii) confirmed subsequent to a non-

16        confirmation; or

17            ''(iii) denied;

18        ''(F) for any parole rationale or class of

19    admission in which a foreign government has

20    agreed to accept returns of third country na-

21    tionals, the number of returns of such third

22    country nationals such foreign government has

23    accepted;

IFR_AR_001987

274

1          ''(G) the number of aliens who filed for

2      asylum after being paroled into the United

3      States; and

4          ''(H) the number of aliens described in

5      subparagraph (G) who were granted employ-

6      ment authorization based solely on a grant of

7      parole.

8      ''(3) PROTECTION OF PERSONALLY IDENTIFI-

9   ABLE INFORMATION.—In preparing each report pur-

10  suant to paragraph (1), the Secretary shall—

11          ''(A) protect any personally identifiable in-

12      formation associated with aliens described in

13      paragraph (1); and

14          ''(B) comply with all applicable privacy

15      laws.''.

16  **SEC. 606. ACCOUNTABILITY IN PROVISIONAL REMOVAL**

17              **PROCEEDINGS.**

18      (a) IN GENERAL.—Not later than 1 year and 30 days

19  after the date of the enactment of this Act, the Secretary

20  shall submit a report to the appropriate committees of

21  Congress and the public regarding the implementation of

22  sections 235B and 240D of the Immigration and Nation-

23  ality Act, as added by sections 3141 and 3142 during the

24  previous 12-month period.

IFR_AR_001988

275

1    (b) CONTENTS.—Each report required under sub-

2 section (a) shall include—

3        (1) the number of aliens processed pursuant to

4    section 235B(b) of the Immigration and Nationality

5    Act, disaggregated by—

6            (A) whether the alien was a single adult or

7        a member of a family unit;

8            (B) the number of aliens who—

9                (i) were provided proper service and

10               notice upon release from custody pursuant

11               to section 235B(b)(2) of such Act; or

12               (ii) were not given such proper service

13               and notice;

14           (C) the number of aliens who received a

15       protection determination interview pursuant to

16       section 235B(c) of such Act within the 90-day

17       period required under section 235B(b)(3)(A) of

18       such Act;

19           (D) the number of aliens described in sub-

20       paragraph (C)—

21               (i) who retained legal counsel;

22               (ii) who received a positive protection

23               determination;

24               (iii) who received a negative protection

25               determination;

276

1    (iv) for those aliens described in

2    clause (iii), the number who—

3        (I) requested reconsideration;

4        (II) whether such reconsideration

5        resulted in approval or denial;

6        (III) whether an alien upon re-

7        ceiving a negative motion for reconsid-

8        eration filed an appeal;

9        (IV) who appealed a negative de-

10       cision without filing for reconsider-

11       ation;

12       (V) whether the appeal resulted

13       in approval or denial, disaggregated

14       by the elements in subclauses (III)

15       and (IV); and

16       (VI) whether the alien, upon re-

17       ceiving a negative decision as de-

18       scribed in subclauses (III) and (V),

19       was removed from the United States

20       upon receiving such negative decision;

21       (v) who absconded during such pro-

22       ceedings; and

23       (vi) who failed to receive proper serv-

24       ice;

IFR_AR_001990

277

1          (E) the number of aliens who were proc-
2      essed pursuant to section 235B(f) of such Act;
3      and

4          (F) the number of aliens described in sub-
5      paragraph (E) who submitted their application
6      pursuant to section 235B(f)(2)(B)(i) of such
7      Act;

8      (2) the average time taken by the Department
9  of Homeland Security—

10          (A) to perform a protection determination
11      interview pursuant to section 235B(b) of such
12      Act;

13          (B) to serve notice of a protection deter-
14      mination pursuant to section 235B(e) of such
15      Act after a determination has been made pursu-
16      ant to section 235B(b) of such Act;

17          (C) to provide an alien with a work author-
18      ization pursuant to section 235C of such Act,
19      as added by section 501, disaggregated by the
20      requirements under subparagraphs (A), (B),
21      and (C) of section 235C(a)(2) of such Act; and

22          (D) the utilization of the Alternatives to
23      Detention program authorized under section
24      235B(a)(3) of such Act, disaggregated by—

IFR_AR_001991

278

1          (i) types of alternatives to detention

2          used to supervise the aliens after being re-

3          leased from physical custody;

4              (ii) the level of compliance by the

5          alien with the rules of the Alternatives to

6          Detention program; and

7              (iii) the total cost of each Alternatives

8          to Detention type;

9      (3) the number of aliens processed pursuant to

10   section 240D(d) of such Act, disaggregated by—

11        (A) whether the alien was a single adult or

12      a member of a family unit;

13        (B) the number of aliens who were pro-

14      vided proper service and notice of a protection

15      determination pursuant to section 235B(e) of

16      such Act;

17        (C) the number of aliens who received a

18      protection merits interview pursuant to section

19      240D(c)(3) of such Act within the 90-day pe-

20      riod required under section 240D(b) of such

21      Act;

22        (D) the number of aliens who received a

23      positive protection merits determination pursu-

24      ant to section 240D(d)(2) of such Act;

279

(E) the number of aliens who received a negative protection merits determination pursuant to section 240D(d)(3) of such Act, disaggregated by the number of aliens who appealed the determination pursuant to section 240D(e) of such Act and who received a result pursuant to section 240D(e)(7) of such Act;

(F) the number of aliens who were processed pursuant to section 240D of such Act who retained legal counsel;

(G) the number of aliens who appeared at such proceedings; and

(H) the number of aliens who absconded during such proceedings; and

(4) the average time taken by the Department of Homeland Security—

(A) to perform a protection merits interview pursuant to section 240D(d) of such Act;

(B) to serve notice of a protection merits determination pursuant to section 240D(d) of such Act; and

(C) the utilization of Alternatives to Detention program authorized under section 240D(c)(2) of such Act, disaggregated by—

280

1          (i) types of alternatives to detention
2          used to supervise the aliens after being re-
3          leased from physical custody; and

4          (ii) the level of compliance by the
5          aliens with rules of the Alternatives to De-
6          tention program.

7     (c) PROTECTION OF PERSONALLY IDENTIFIABLE IN-
8 FORMATION.—In preparing each report pursuant to sub-
9 section (a), the Secretary shall—

10          (1) protect any personally identifiable informa-
11     tion associated with aliens described in subsection
12     (a); and

13          (2) comply with all applicable privacy laws.

## SEC. 607. ACCOUNTABILITY IN VOLUNTARY REPATRIATION, WITHDRAWAL, AND DEPARTURE.

16     (a) IN GENERAL.—Not later than 1 year and 30 days
17 after the date of the enactment of this Act, the Secretary
18 shall submit a report to the appropriate committees of
19 Congress regarding the implementation of section 240G
20 of the Immigration and Nationality Act, as added by sec-
21 tion 144.

22     (b) CONTENTS.—The report required under sub-
23 section (a) shall include the number of aliens who utilized
24 the provisions of such section 240G, disaggregated by—

25          (1) demographic information;

IFR_AR_001994

281

1    (2) the period in which the election took place;

2    (3) the total costs of repatriation flight when

3    compared to the cost to charter a private, commer-

4    cial flight for such return;

5    (4) alien use of reintegration or reception pro-

6    grams in the alien's country of nationality after re-

7    moval from the United States;

8    (5) the number of aliens who failed to depart

9    in compliance with section 240G(i)(2) of such Act;

10    (6) the number of aliens to which a civil penalty

11    and a period of ineligibility was applied; and

12    (7) the number of aliens who did depart.

13    **SEC. 608. GAO ANALYSIS OF IMMIGRATION JUDGE AND ASY-**

14    **LUM OFFICER DECISION-MAKING REGARD-**

15    **ING ASYLUM, WITHHOLDING OF REMOVAL,**

16    **AND PROTECTION UNDER THE CONVENTION**

17    **AGAINST TORTURE.**

18    (a) IN GENERAL.—Not later than 2 years after the

19    Comptroller General of the United States submits the cer-

20    tification described in section 146(d)(3), the Comptroller

21    General shall analyze the decision rates of immigration

22    judges and asylum officers regarding aliens who have re-

23    ceived a positive protection determination and have been

24    referred to proceedings under section 240 or 240D of the

282

1 Immigration and Nationality Act, as applicable, to deter-

2 mine—

3      (1) whether the Executive Office for Immigra-

4      tion Review and U.S. Citizenship and Immigration

5      Services have any differential in rate of decisions for

6      cases involving asylum, withholding of removal, or

7      protection under the Convention Against Torture

8      and Other Cruel, Inhuman or Degrading Treatment

9      or Punishment, done at New York December 10,

10      1984; and

11      (2) the causes for any such differential, includ-

12      ing any policies, procedures, or other administrative

13      measures.

14 (b) RECOMMENDATIONS.—Upon completing the anal-

15 ysis required under subsection (a), the Comptroller Gen-

16 eral shall submit recommendations to the Director of the

17 Executive Office for Immigration Review and the Director

18 of U.S. Citizenship and Immigration Services regarding

19 any administrative or procedural changes necessary to en-

20 sure uniformity in decision-making between those agen-

21 cies, which may not include quotas.

22 **SEC. 609. REPORT ON COUNSEL FOR UNACCOMPANIED**

23                **ALIEN CHILDREN.**

24 (a) IN GENERAL.—Not later than 120 days after the

25 date of the enactment of this Act, and annually thereafter,

283

1  the Secretary of Health and Human Services shall submit

2  a report to the appropriate committees of Congress with

3  respect to unaccompanied alien children who received ap-

4  pointed counsel pursuant to section 235(c)(5)(B) of the

5  William Wilberforce Trafficking Victims Protection Reau-

6  thorization Act of 2008, as added by section 512, includ-

7  ing—

8        (1) the number of unaccompanied alien children

9     who obtained such counsel compared to the number

10    of such children who did not obtain such counsel;

11       (2) the sponsorship category of unaccompanied

12    alien children who obtained counsel;

13       (3) the age ranges of unaccompanied alien chil-

14    dren who obtained counsel;

15       (4) the administrative appeals, if any, of unac-

16    companied alien children who obtained counsel; and

17       (5) the case outcomes of unaccompanied alien

18    children who obtained counsel.

19  (b) PROTECTION OF PERSONALLY IDENTIFIABLE IN-

20  FORMATION.—In preparing each report pursuant to sub-

21  section (a), the Secretary of Health and Human Services

22  shall—

23       (1) protect any personally identifiable informa-

24    tion associated with aliens described in subsection

25    (a); and

284

1    (2) comply with all applicable privacy laws.

2    **SEC. 610. RECALCITRANT COUNTRIES.**

3    Section 243(d) of the Immigration and Nationality

4    Act (8 U.S.C. 1253(d)) is amended—

5        (1) by striking ''On being notified'' and insert-

6    ing the following:

7        ''(1) IN GENERAL.—On being notified''; and

8        (2) by adding at the end the following:

9        ''(2) REPORT ON RECALCITRANT COUNTRIES.—

10            ''(A) IN GENERAL.—Not later than 90

11        days after the last day of each fiscal year, the

12        Secretary of Homeland Security and the Sec-

13        retary of State shall jointly—

14                ''(i) prepare an unclassified annual re-

15            port, which may include a classified annex,

16            that includes the information described in

17            subparagraph (C); and

18                ''(ii) submit such report to Committee

19            on Homeland Security and Governmental

20            Affairs of the Senate; the Committee on

21            the Judiciary of the Senate, the Committee

22            on Foreign Relations of the Senate, the

23            Committee on Homeland Security of the

24            House of Representatives, the Committee

25            on the Judiciary of the House of Rep-

285

1  resentatives, and the Committee on For-
2  eign Affairs of the House of Representa-
3  tives.

4  "(B) BRIEFING.—Not later than 30 days
5  after the date on which a report is submitted
6  pursuant to subparagraph (A), designees of the
7  Secretary of Homeland Security and of the Sec-
8  retary of State shall brief the committees re-
9  ferred to in subparagraph (A)(ii) regarding any
10  measures taken to encourage countries to ac-
11  cept the return of their citizens, subjects, or na-
12  tionals, or aliens whose last habitual residence
13  was within each such country, who have been
14  ordered removed from the United States.

15  "(C) CONTENTS.—Each report prepared
16  pursuant to subparagraph (A)(i) shall include—
17      "(i) a list of all countries that—
18          "(I) deny the acceptance of their
19      citizens, subjects, or nationals, or
20      aliens whose last habitual residence
21      was within such country, who have
22      been ordered removed to such country
23      from the United States; or
24          "(II) unreasonably delay the ac-
25      ceptance of their citizens, subjects, or

286

1          nationals, or aliens whose last habit-
2          ual residence was within such country,
3          who have been ordered removed to
4          such country from the United States;
5          ''(ii) for each country described in
6          clause (i)(II), the average length of delay
7          of such citizens, subjects, nationals, or
8          aliens acceptance into such country;
9          ''(iii) a list of the foreign countries
10         that have placed unreasonable limitations
11         upon the acceptance of their citizens, sub-
12         jects, or nationals, or aliens whose last ha-
13         bitual residence was within such country,
14         who have been ordered removed to such
15         country from the United States;
16         ''(iv) a description of the criteria used
17         to determine that a country described
18         under clause (iii) has placed such unrea-
19         sonable limitations;
20         ''(v) the number of aliens ordered re-
21         moved from the United States to a country
22         described in clause (i) or (iii) whose re-
23         moval from the United States was pending
24         as of the last day of the previous fiscal
25         year, including—

IFR_AR_002000

287

1      ''(I) the number of aliens who—

2            ''(aa) received a denial of a

3      work authorization; and

4            ''(bb) are not eligible to re-

5      quest work authorization;

6      ''(vi) the number of aliens ordered re-

7      moved from the United States to a country

8      described in clause (i) or (iii) whose re-

9      moval from the United States was pending

10     as of the last day of the previous fiscal

11     year and who are being detained,

12     disaggregated by—

13           ''(I) the length of such detention;

14           ''(II) the aliens who requested a

15     review of the significant likelihood of

16     their removal in the reasonably fore-

17     seeable future;

18           ''(III) the aliens for whom the re-

19     quest for release under such review

20     was denied;

21           ''(IV) the aliens who remain de-

22     tained on account of special cir-

23     cumstances despite no significant like-

24     lihood that such aliens will be re-

25     moved in the foreseeable future,

IFR_AR_002001

288

1  disaggregated by the specific cir-
2  cumstance;
3      ''(V) the aliens described in sub-
4  clause (IV) who are being detained
5  based on a determination that they
6  are specially dangerous;
7      ''(VI) the aliens described in sub-
8  clause (V) whose request to review the
9  basis for their continued detention
10  was denied;
11      ''(VII) demographic categories,
12  including part of a family unit, single
13  adults, and unaccompanied alien chil-
14  dren;
15      ''(vii) the number of aliens referred to
16  in clauses (i) through (iii) who—
17      ''(I) have criminal convictions,
18  disaggregated by National Crime In-
19  formation Center code, whether mis-
20  demeanors or felonies;
21      ''(II) are considered national se-
22  curity threats to the United States;
23      ''(III) are members of a criminal
24  gang or another organized criminal

1         organization, if found to be inadmis-

2         sible or removable on such grounds; or

3                ''(IV) have been released from

4         U.S. Immigration and Customs En-

5         forcement custody on an order of su-

6         pervision and the type of supervision

7         and compliance with such supervision,

8         if applicable;

9                ''(viii) a description of the actions

10        taken by the Department of Homeland Se-

11        curity and the Department of State to en-

12        courage foreign nations to accept the re-

13        turn of their nationals; and

14                ''(ix) the total number of individuals

15        that such jurisdiction has accepted who are

16        not citizens, subjects, or nationals, or

17        aliens who last habitually resided within

18        such jurisdiction and have been removed

19        from the United States, if any.''.

## TITLE VII—OTHER MATTERS

21 **SEC. 701. SEVERABILITY.**

22     If any provision of this division, any amendment

23 made by this division, or the application of any such provi-

24 sion or amendment to any person or circumstance is held

25 to be unconstitutional, the remainder of this division, the

290

1 amendments made by this division, and the application of
2 such provisions or amendments to any other person or cir-
3 cumstance shall not be affected.

# TITLE VIII—BUDGETARY EFFECTS

**SEC. 801. BUDGETARY EFFECTS.**

7    (a) STATUTORY PAYGO SCORECARDS.—The budg-
8 etary effects of this division shall not be entered on either
9 PAYGO scorecard maintained pursuant to section 4(d) of
10 the Statutory Pay-As-You-Go Act of 2010.

11    (b) SENATE PAYGO SCORECARDS.—The budgetary
12 effects of this division shall not be entered on any PAYGO
13 scorecard maintained for purposes of section 4106 of H.
14 Con. Res. 71 (115th Congress).

15    (c) CLASSIFICATION OF BUDGETARY EFFECTS.—
16 Notwithstanding Rule 3 of the Budget Scorekeeping
17 Guidelines set forth in the joint explanatory statement of
18 the committee of conference accompanying Conference Re-
19 port 105–217 and section 250(c)(8) of the Balanced
20 Budget and Emergency Deficit Control Act of 1985, the
21 budgetary effects of this division shall not be estimated—

22        (1) for purposes of section 251 of such Act;

23        (2) for purposes of an allocation to the Com-
24        mittee on Appropriations pursuant to section 302(a)
25        of the Congressional Budget Act of 1974; and

IFR_AR_002004

291

1        (3) for purposes of paragraph (4)(C) of section

2    3 of the Statutory Pay-As-You-Go Act of 2010 as

3    being included in an appropriation Act.

IFR_AR_002005

Calendar No. 397

118TH CONGRESS
2D SESSION

# S. 4361

# A BILL

Making emergency supplemental appropriations for border security and combatting fentanyl for the fiscal year ending September 30, 2024, and for other purposes.

MAY 20, 2024

Read the second time and placed on the calendar

IFR_AR_002006

U.S. Customs and Border Protection

# CBP One™ Appointments Increased to 1,450 Per Day

*App offers a safe, orderly, and humane lawful process for noncitizens*

**Release Date:** Fri, 06/30/2023

**WASHINGTON** – U.S. Customs and Border Protection today announced the expansion of available appointments for noncitizens through the CBP One™ app to 1,450 per day, up from 1,250. This represents a nearly 50 percent increase from May 12 when CBP processed 1,000 appointments per day. Scheduling an appointment in CBP One™ continues to provide a safe, orderly, and humane process for noncitizens to access ports of entry, where CBP Officers receive advance information for screening and vetting and to determine admissibility on a case-by-case basis. CBP One™ is a key component of DHS efforts to incentivize migrants to use lawful processes and disincentivize attempts at irregular or unlawful entry to the United States. Because the app provides a direct system to request appointments, it reduces the potential for smugglers or others to exploit migrants.

"CBP is expanding the number of available appointments at ports of entry for the second time in less than two months, through scheduling enhancements and operational efficiencies," said Troy A. Miller, Senior Official Performing the Duties of Commissioner. "By utilizing innovative technologies like CBP One™, we are improving the delivery of our homeland security mission and providing for safe and efficient processes at ports of entry."

From May 12 through June 23, more than 49,000 noncitizens have presented at Southwest border ports of entry through scheduled CBP One™ appointments for inspection under Title 8 and determination of admissibility on a case-by-case basis, while unlawful entries between ports of entry have declined by 64 percent. CBP One™ provides meaningful access to noncitizens seeking to present at a port of entry, consistent with the law. Appointments can be made from Central Mexico, which means migrants do not have to go to Northern Mexico until they have a confirmed appointment. appointment.

Noncitizens may schedule appointments for free in CBP One™ using a two-step process: Noncitizens first may request appointments at any point during a 23-hour period each day and, if allocated an appointment, will have another 23-hour period to confirm that appointment.

Each day, CBP One™ allocates the majority of appointments randomly to those who requested an appointment at each port of entry. The remainder are allocated to the requestors with the oldest accounts who have been waiting the longest for an appointment. Appointments do not guarantee admission and a determination of admissibility is made on a case-by-case basis by CBP Officers.

Noncitizens who cross between the ports of entry, or who present at a port of entry without making a CBP One™ appointment, will be subject to the Circumvention of Lawful Pathways rule which places a common-sense condition on asylum eligibility for those who fail to use lawful processes, with certain exceptions. Individuals who appear at a port of entry with a CBP One™ appointment are excepted from the Circumvention of Lawful Pathways rule, are issued a Notice to Appear before an immigration judge, and processed under Title 8 immigration authorities.

Appointments are available at eight ports of entry: Brownsville, Paso Del Norte in El Paso, Eagle Pass, Hidalgo, and Laredo in Texas; Calexico and San Ysidro in California; and Nogales in Arizona.

More information on the CBP One™ mobile application is available in English, Spanish, Haitian Creole, Portuguese, and Russian. The CBP One™ application can be downloaded for free from the Apple and Google Application Stores as well from the CBP website.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the comprehensive management, control, and protection of our nation's borders, combining customs, immigration, border security, and agricultural protection at and between official ports of entry.*

**Last Modified: Jul 14, 2023**

IFR_AR_002090



U.S. Customs and Border Protection

# Large group of migrants encountered were misinformed

**Release Date:** Fri, 03/31/2023

**For More Information:** El Paso Sector

EL PASO, Texas – More than 1,000 migrants, mostly from Venezuela, surrendered themselves to Border Patrol Agents in the El Paso Sector, on Wednesday, after reports indicated that migrants may have been misinformed regarding current immigration policies and initiatives.

At approximately 3:30 p.m. on March 29, U.S. Border Patrol in El Paso Sector received reports of a large group of migrants walking eastbound, in Mexico, paralleling the international border from the Bridge of the Americas Port of Entry. At approximately 4:00 p.m., agents from the El Paso Station began to encounter groups of migrants, 20-30 at a time, with more than 1,000 entering the U.S. illegally and surrendering to Border Patrol Agents at the border gate, near Barker Street and Cesar E. Chavez Border Highway.

The migrants encountered were primarily citizens from Venezuela, but were also from other various countries including Nicaragua, Colombia, and Ecuador. Throughout the night and into the early morning hours, agents continued to encounter groups attempting to make illegal entry into the United States.

All migrants were processed safely, efficiently, and effectively at the El Paso Sector's processing centers. All migrants were expelled under Title 42 authority or processed for removal proceedings under Title 8.

Many of the migrants claimed that they received information regarding CBP immigration policies via various social media platforms. Migrants indicated social media posts stated that if they surrendered to agents in El Paso at a certain location, they would be allowed to remain in the United States. That information was not correct.

The U.S. Border Patrol continues to expel migrants under CDC's Title 42 authority. Nationalities amenable to Title 42 include: México, Guatemala, Honduras, El Salvador, Venezuela, Nicaragua, Cuba and Haití. Those migrants that cannot be expelled under Title 42 and do not have a legal basis to remain in the United States, will be placed in removal proceedings under Title 8.

"U.S. Border Patrol in El Paso Sector will continue to fully enforce immigration laws at our border," said El Paso Sector Chief Patrol Agent Anthony Scott Good. "People should not listen to the lies of smugglers, who often take advantage of vulnerable migrants by providing false information in order to profit from charging migrants to cross the border illegally."

U.S. Customs and Border Protection welcomes assistance from the community. Citizens are encouraged to report suspicious activity to the U.S. Border Patrol while remaining anonymous by calling 1-800-635-2509.

Follow us on Twitter at *@USBPChiefEPT*

---

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the comprehensive management, control, and protection of our nation's borders, combining customs, immigration, border security, and agricultural protection at and between official ports of entry.*

**Last Modified: Mar 31, 2023**

## Press Officer

**Name:** Landon Hutchens
**Email:**
Landon.R.Hutchens@cbp.dhs.gov
**Phone:**
+1 202-407-4241

IFR_AR_002136

6/2/24, 4:41 PM

Large group of migrants encountered were misinformed | U.S. Customs and Border Protection

IFR_AR_002137



**Media Contacts**

**Office of Public Affairs**

 (202) 344-1780

CBPMEDIARELATIONS

https://www.cbp.gov/newsroom/local-media-release/large-group-migrants-encountered-were-misinformed    3/6



IFR_AR_002138

6/2/24, 4:41 PM

Large group of migrants encountered were misinformed | U.S. Customs and Border Protection

## All Other Inquiries

(202) 325-8000

IFR_AR_002139

Large group of migrants encountered were misinformed | U.S. Customs and Border Protection



## Social Media Directory

View a complete list of local and regional CBP social media accounts.

**View the Directory**

IFR_AR_002140

Large group of migrants encountered were misinformed | U.S. Customs and Border Protection



U.S. Customs and Border Protection

# Southwest Land Border Encounters

Demographics for U.S. Border Patrol (USBP) and Office of Field Operations (OFO) include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Children (UC)

For a breakdown of encounters by USBP Sector and OFO Field Office, visit Southwest Land Border Encounters (By Component).

To access the data used to build this dashboard, please visit the **CBP Data Portal**.

*Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.*

**Note:** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

IFR_AR_002156

IFR_AR_002157

5/27/24, 2:10 PM

Southwest Land Border Encounters | U.S. Customs and Border Protection

2/6

**U.S. Customs and Border Protection**

**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

FY
(All) ▼

Component
(All) ▼

Demographic
(All) ▼

Citizenship Grouping
(All) ▼

Title of Authority
(All) ▼

**Reset Filters**

FY   ■ 2021   ■ 2022   ■ 2023   ■ 2024 (FYTD)

## FY Southwest Land Border Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024 (FYTD) | 240,932 | 242,403 | 301,980 | 176,197 | 189,908 | 189,357 | 179,725 | | | | | | 1,520,502 |
| 2023 | 231,529 | 235,173 | 252,315 | 157,358 | 156,630 | 193,249 | 211,992 | 206,690 | 144,556 | 183,479 | 232,963 | 269,735 | 2,475,669 |

IFR_AR_002158



**Source:** USBP and OFO official year end reporting for FY21-FY23; USBP and OFO month end reporting for FY24 to date. Data is current as of 5/3/2024.

## U.S. Border Patrol and Office of Field Operations Encounters[1]

IFR_AR_002159

Southwest Land Border Encounters | U.S. Customs and Border Protection

5/27/24, 2:10 PM



U.S. Customs and
Border Protection

## U.S. Customs and Border Protection (CBP) Encounters
Southwest Land Border Encounters for Fiscal Year (FY) 2024 to Date

Demographic: (All) ▸    Citizenship Grouping: (All) ▸    Title of Authority: (All) ▸    **Reset Filters**

| | OFO | USBP | All CBP |
|---|---|---|---|
| MAR FY2024 | 51,886 | 137,471 | 189,357 |
| APR FY2024 | 50,841 | 128,884 | 179,725 |
| Percent Change | ▼ -2.% | ▼ -6.2% | ▼ -5.1% |

### FYTD Southwest Land Border Demographic by Month

| | Office of Field Operations | | | | | U.S. Border Patrol | | | | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Single Adults | FMUA | UC / Single Minors | Accompanied Minors | Total | Single Adults | FMUA | UC / Single Minors | Total | |
| OCT | 29,376 | 21,877 | 903 | 122 | 52,278 | 93,648 | 84,407 | 10,699 | 188,754 | 240,932 |
| NOV | 28,854 | 21,466 | 856 | 120 | 51,296 | 96,490 | 82,678 | 11,939 | 191,107 | 242,403 |
| DEC | 29,307 | 21,791 | 1,007 | 139 | 52,244 | 135,571 | 101,710 | 12,455 | 249,736 | 301,980 |
| JAN | 30,264 | 20,530 | 1,031 | 153 | 51,978 | 76,929 | 39,807 | 7,483 | 124,219 | 176,197 |
| FEB | 28,988 | 19,167 | 997 | 122 | 49,274 | 85,304 | 45,972 | 9,358 | 140,634 | 189,908 |
| MAR | 30,166 | 20,657 | 903 | 160 | 51,886 | 83,558 | 45,988 | 7,925 | 137,471 | 189,357 |
| APR | 28,400 | 21,415 | 886 | 140 | 50,841 | 81,090 | 40,159 | 7,635 | 128,884 | 179,725 |
| Total | 205,355 | 146,903 | 6,483 | 956 | 359,697 | 652,590 | 440,721 | 67,494 | 1,160,805 | 1,520,502 |

**Source:** USBP and OFO official year end reporting for FY23; USBP and OFO month end reporting for FY24 to date. Data is current as of 5/3/2024.

[1] Beginning in March FY2020, USBP and OFO Encounter statistics include both Title 8 Apprehensions, Title 8 Inadmissibles, and Title 42 Expulsions. To learn more, visit Title 8 and Title 42 Statistics.

## Related Resources

### Previous Year Statistics

FY 2021

FY 2020

FY 2019

FY 2018



IFR_AR_002160

FY 2017

**Claims of Fear Statistics**

FY 2017-2019

**Last Modified: May 15, 2024**

IFR_AR_002161



# Mexico: Organized Crime and Drug Trafficking Organizations

Updated July 28, 2020

Congressional Research Service

https://crsreports.congress.gov

R41576

**Congressional Research Service**
*Informing the legislative debate since 1914*

**SUMMARY**

R41576

July 28, 2020

**June S. Beittel**
Analyst in Latin American Affairs

# Mexico: Organized Crime and Drug Trafficking Organizations

Mexican drug trafficking organizations (DTOs) pose the greatest crime threat to the United States and have "the greatest drug trafficking influence," according to the U.S. Drug Enforcement Administration's (DEA's) annual *National Drug Threat Assessment*. These organizations, often referred to as *transnational criminal organizations* (TCOs), continue to diversify into crimes of extortion, human smuggling, and oil theft, among others. Their supply chains traverse the Western Hemisphere and the globe. Their extensive violence since 2006 has caused Mexico's homicide rate to spike. They produce and traffic illicit drugs into the United States, including heroin, methamphetamine, marijuana, and synthetic opioids such as fentanyl, and they traffic South American cocaine.

Mexican DTO activities significantly affect the security of both the United States and Mexico. As Mexico's DTOs expanded their control of the opioids market, U.S. overdoses rose sharply, according to the Centers for Disease Control, setting a record in 2019 with more than 70% of overdose deaths involving opioids, including fentanyl. Many analysts believe that Mexican DTOs' role in the trafficking and producing of opioids is expanding.

## Evolution of Mexico's Criminal Environment

Mexico's DTOs have been in constant flux, and yet they continue to wield extensive political and criminal power. In 2006, four DTOs were dominant: the Tijuana/Arellano Félix Organization (AFO), the Sinaloa Cartel, the Juárez/Vicente Carrillo Fuentes Organization (CFO), and the Gulf Cartel. Government operations to eliminate the cartel leadership increased instability among the groups and sparked greater violence. Over the next dozen years, Mexico's large and comparatively more stable DTOs fragmented, creating at first seven major groups and then nine, which are briefly described in this report. The DEA has identified those nine organizations as Sinaloa, Los Zetas, Tijuana/AFO, Juárez/CFO, Beltrán Leyva, Gulf, La Familia Michoacana, the Knights Templar, and Cartel Jalisco Nuevo Generación (CJNG).

In mid-2019, the leader of the long-dominant Sinaloa Cartel, Joaquín "El Chapo" Guzmán, was sentenced to life in a U.S. prison, further fracturing the once-hegemonic DTO. In December 2019, Genaro García Luna, a former head of public security in the Felipe Calderón Administration (2006-2012), was arrested in the United States on charges he had taken enormous bribes from Sinaloa, further eroding public confidence in Mexican government efforts.

Since his inauguration in late 2018, Mexican President Andrés Manuel López Obrador has implemented what some analysts contend is an ad hoc approach to security that has achieved little sustained progress. Despite reform promises, the president has relied on a conventional policy of using the military and a military-led national guard to help suppress violence. The president has targeted oil theft, which siphons away billions in government revenue annually.

## Recent Developments

In 2019, Mexico's national public security system reported more than 34,500 homicides, setting another record in absolute homicides and the highest national homicide rate since Mexico has published these data. In late 2019, several cartel fragments committed flagrant acts of violence, killing U.S.-Mexican citizens in some instances. Some Members of Congress questioned a U.S. policy of returning Central American migrants and others to await U.S. asylum proceedings in border cities, such as Tijuana, because these cities have reported among the highest urban homicide rates in the world. The Trump Administration also raised concerns over whether Mexican crime groups should be listed as terror organizations.

In June 2020, two high-level attacks on Mexican criminal justice authorities stunned Mexico, including an early morning assassination attempt targeting the capital's police chief, allegedly by the CJNG. He survived the attack, but three others were killed in one of Mexico City's most affluent neighborhoods. The other was the murder of a Mexican federal judge in Colima who had ruled in significant organized crime cases, including extradition of the CJNG's top leader's son to the United States.

For more background, see CRS Insight IN11205, *Designating Mexican Drug Cartels as Foreign Terrorists: Policy Implications*, CRS Report R45790, *The Opioid Epidemic: Supply Control and Criminal Justice Policy—Frequently Asked Questions*, and CRS Report R42917, *Mexico: Background and U.S. Relations*.

IFR_AR_002331

# Contents

Introduction ..................................................................................................................... 1
Congressional Concerns .................................................................................................... 4
Escalation of DTO-Related Homicide, Corruption, and Impunity ........................................... 6
    Corruption and Government Institutions......................................................................... 9
Criminal Landscape in Mexico.......................................................................................... 11
    Illicit Drugs in Mexico and Components of Its Drug Supply Market................................. 13
Evolution of the Major Drug Trafficking Groups ................................................................. 16
    Nine Major DTOs....................................................................................................... 16
        Tijuana/Arellano Félix Organization ....................................................................... 17
        Sinaloa DTO ........................................................................................................ 19
        Juárez/Carrillo Fuentes Organization ...................................................................... 20
        Gulf DTO ............................................................................................................ 21
        Los Zetas............................................................................................................. 22
        Beltrán Leyva Organization ................................................................................... 24
        La Familia Michoacana ......................................................................................... 25
        Knights Templar.................................................................................................... 26
        Cártel Jalisco Nuevo Generación ............................................................................ 27
    Fragmentation, Competition, and Diversification............................................................ 28
Outlook .......................................................................................................................... 29

# Figures

Figure 1. Map of Mexico................................................................................................... 2
Figure 2. Stratfor Cartel Map by Region of Influence........................................................... 5
Figure 3. Major Ports of Entry at the U.S.-Mexican Border................................................... 9
Figure 4. U.S. Customs and Border Patrol Seizures of Fentanyl and Methamphetamine ........... 15

# Appendixes

Appendix. Drug Trafficking in Mexico and Government Efforts to Combat the DTOs ............. 31

# Contacts

Author Information .......................................................................................................... 34

IFR_AR_002332

# Introduction

Mexico shares a nearly 2,000-mile border with the United States, and the two countries have historically close trade, cultural, and demographic ties. Mexico's stability is of critical importance to the United States, and the nature and intensity of violence in Mexico has been of particular concern to the U.S. Congress. Over the past decade, Congress has held numerous hearings addressing violence in Mexico, U.S. counternarcotics assistance, and border security issues.

According to one Mexican think tank that publishes an annual assessment, the top five cities in the world for violence in 2019 were in Mexico.[1] Increasing violence, intimidation of Mexican politicians in advance of elections, and assassinations of journalists and media personnel have continued to raise alarm. From 2017 through 2019, a journalist was murdered nearly once a month on average, leading to Mexico's status as one of the world's most dangerous countries to practice journalism.[2] In the run-up to the 2018 local and national elections, some 37 mayors, former mayors, or mayoral candidates were killed, and murders of nonelected public officials rose above 500.[3]

Over many years, Mexico's brutal drug-trafficking-related violence has been dramatically punctuated by beheadings, public hangings of corpses, and murders of dozens of journalists and officials. Violence has spread from the border with the United States into Mexico's interior. Organized crime groups have splintered and diversified their crime activities, turning to extortion, kidnapping, oil theft, human smuggling, sex trafficking, retail drug sales, and other illicit enterprises. These crimes often are described as more "parasitic" for local communities and populations inside Mexico, degrading a sense of citizen security. The violence has flared in the Pacific states of Michoacán and Guerrero, in the central states of Guanajuato and Colima, and in the border states of Tamaulipas, Chihuahua, and Baja California, where Mexico's largest border cities are located (for map of Mexico, see **Figure 1**).

Drug traffickers exercised significant territorial influence in parts of the country near drug production hubs and along drug trafficking routes during the six-year administration of President Enrique Peña Nieto (2012-2018), much as they had under the previous president. Although homicide rates declined early in Peña Nieto's term, total homicides rose by 22% in 2016 and 23% in 2017, reaching a record level. In 2018, homicides in Mexico rose above 33,000 for a national rate of 27 per 100,000 people. According to the U.S. Department of State, Mexico exceeded 34,500 intentional homicides in 2019, for a national rate of 29 per 100,000.[4] Thus, for each of the most recent three years, records were set and then eclipsed.

---

[1] El Consejo Ciudadano para la Seguridad Pública y la Justicia Penal (Citizen Council for Public Security and Criminal Justice), "Boletín Ranking 2019 de las 50 Ciudades más Violentas del Mundo," June 1, 2020, at http://www.seguridadjusticiaypaz.org.mx/sala-de-prensa/1590-boletin-ranking-2019-de-las-50-ciudades-mas-violentas-del-mundo. The survey found in 2019 the world's top most violent cities (all in Mexico) were (1) Tijuana, (2) Ciudad Juárez, (3) Uruapan, (4) Irapuato, and (5) Ciudad Obregon.

[2] For background on Mexico, see CRS Report R42917, *Mexico: Background and U.S. Relations*, by Clare Ribando Seelke. See also Juan Albarracín and Nicholas Barnes, "Criminal Violence in Latin America," *Latin American Research Review*, vol. 55, no. 2 (June 23, 2020), pp. 397-406.

[3] For more background, see Laura Y. Calderón et al., *Organized Crime and Violence in Mexico*, University of San Diego, April 2019. See also CRS Report R45199, *Violence Against Journalists in Mexico: In Brief*, by Clare Ribando Seelke.

[4] Testimony of Richard Glenn, Deputy Assistant Secretary, Bureau of International Narcotics and Law Enforcement Affairs, before the House Foreign Affairs Committee, Subcommittee on the Western Hemisphere, Civilian Security, and Trade, for a hearing on "Assessing U.S. Security Assistance to Mexico," February 13, 2020.

IFR_AR_002333

**Figure 1. Map of Mexico**



Source: Congressional Research Service (CRS).

Violence is an intrinsic feature of the trade in illicit drugs. Traffickers use it to settle disputes, and a credible threat of violence maintains employee discipline and provides a semblance of order with suppliers, creditors, and buyers while serving to intimidate potential competitors.[5] This type of drug-trafficking-related violence has occurred routinely and intermittently in U.S. cities since the early 1980s. The violence now associated with drug trafficking organizations (DTOs) in Mexico is of an entirely different scale. In Mexico, the violence is not only associated with resolving disputes, maintaining discipline, and intimidating rivals but also has been directed toward the government, political candidates, and the media. Some observers note that some of Mexico's violence might be considered exceptional by the typical standards of organized crime.[6] Periodically, when organized-crime-related homicides in Mexico break out in important urban centers or result in the murder of U.S. citizens, Members of Congress have considered the possibility of designating the criminal groups as foreign terrorists, as in late 2019.[7] However, the DTOs appear to lack a discernible political goal or ideology, which is one element of a widely

---

[5] Robert J. MacCoun and Peter Reuter, *Drug War Heresies: Learning from Other Times, Vices and Places* (New York: Cambridge University Press, 2001); Kevin Jack Riley, *SnowJob? The War Against International Cocaine Trafficking* (New Brunswick: Transactional Publishers, 1996).

[6] See, for example, Vanda Felbab-Brown, *Peña Nieto's Piñata: The Promise and Pitfalls of Mexico's New Security Policy Against Organized Crime*, Brookings Institution, February 2013; Phil Williams, "The Terrorism Debate Over Mexican Drug Trafficking Violence," *Terrorism and Political Violence*, vol. 24, no. 2 (2012).

[7] CRS Insight IN11205, *Designating Mexican Drug Cartels as Foreign Terrorists: Policy Implications*, coordinated by Liana W. Rosen.

recognized definition of terrorism. In June 2020, the State Department's annual *Country Reports on Terrorism* affirmed that in 2019, there was not credible evidence that international terrorist groups had bases in Mexico or that Mexican criminals had facilitated terrorist group members crossing the U.S.-Mexican border.[8]

Mexico's high homicide rate is not exceptional in the region, where many countries are plagued by high rates of violent crime, such as the "Northern Triangle" countries of Central America—El Salvador, Guatemala, and Honduras. Overall, the Latin American region has a significantly higher homicide level than other regions worldwide, although there is wide variation within the region. According to the United Nations' *Global Study on Homicide*, published July 2019, Latin America, with 13% of the world's population in 2017, had 37% of the world's intentional homicides.[9] Mexico's homicide rate was once about average for the region, but the country's intentional homicides and homicide rates have risen steadily in the past few years. (This increase contrasts with homicide-rate declines in the Northern Triangle countries, where high rates decreased somewhat between 2017 and 2018.)

Accurately portraying Mexico's criminal landscape can be challenging. Government enforcement actions and changing patronage patterns for bribery have unpredictable consequences for criminal groups, generating near-constant flux. This has been especially the case as new gangs emerge and old gangs splinter, shifting power balances. Stratfor, a geopolitical intelligence company, has broken rival crime networks in Mexico into three regional groupings: the Tamaulipas State, Sinaloa State, and Tierra Caliente regional groups.[10] This regional framework also shows several states and regions of Mexico where the activities of these three regional groups mix or are contested. (See **Figure 2** for a 2020 map by Stratfor.)

On December 1, 2018, President Andrés Manuel López Obrador, the populist leftist leader of the National Regeneration Movement (MORENA) party, took office for a six-year term after winning 53% of the vote in July 2018 elections. The new president pledged to make Mexico a more just and peaceful society and vowed to govern with austerity. He said he would not pursue a war against the DTOs and crime groups but would work to address the social conditions that allow criminal groups to thrive.

In his first year in office, President López Obrador backed constitutional reforms to allow military involvement in public security to continue for five more years, despite a 2018 Supreme Court ruling that prolonged military involvement in security violated the constitution. He secured congressional approval to stand up a new 80,000-strong National Guard (composed of former military, federal police, and new recruits) to combat crime. The approach to the National Guard and the continuation of an active domestic role for the military surprised many in the human rights community, who succeeded in persuading Mexico's Congress to modify López Obrador's original proposal to ensure the National Guard would be under civilian command. The National Guard's first assignment for about 27,000 members of the new force was vigorous migration enforcement to comply with Trump Administration demands. As the National Guard continued to deploy in 2020, of the first 90,000 members of the National Guard (which has now exceeded

---

[8] U.S. State Department, *Country Reports on Terrorism 2019*, see Mexico country report at https://www.state.gov/reports/country-reports-on-terrorism-2019/.

[9] United Nations, *U.N. Global Study on Homicide 2019*, July 8, 2019; see also "'Breathtaking Homicidal Violence': Latin America in Grip of Murder Crisis," *The Guardian*, April 26, 2018.

[10] "Stratfor now divides Mexican organized criminal groups into the distinct geographic areas from which they emerged. This view is not just a convenient way of categorizing an increasingly long list of independent crime groups in Mexico, but rather it reflects the internal realities of most crime groups in Mexico." See "Mexico's Drug War Update: Tamaulipas-Based Groups Struggle," *Stratfor Worldview*, April 16, 2015.

IFR_AR_002335

100,000 members), 80% tested did not meet basic policing training standards.[11] López Obrador contends that Mexico's National Guard was not prepared to handle the violence of the DTOs; as the National Guard was trained to carry out that task, López Obrador said the military can fill in through 2024.[12]

# Congressional Concerns

Over the past dozen years, Congress has held numerous oversight hearings addressing the violence in Mexico, U.S. counternarcotics assistance, and border security issues. Congressional concern increased in 2012 after U.S. consulate staff and security personnel working in Mexico came under attack.[13] (Two U.S. officials traveling in an embassy vehicle were wounded in an attack allegedly abetted by corrupt Mexican police.[14]) Occasional use of car bombs, grenades, and rocket-propelled grenade launchers—such as the one used to bring down a Mexican army helicopter in 2015—continues to raise concerns. Incidents such as the late-2019 massacre of dual U.S.-Mexican citizens near the U.S.-Mexican border have prompted Members of Congress to consider whether Mexican drug traffickers may be adopting insurgent or terrorist techniques.

Perceived harms to the United States from the DTOs—or *transnational criminal organizations* (TCOs), as the U.S. Department of Justice now identifies them—are due primarily to the organizations' control of and efforts to move illicit drugs to the United States and to expand aggressively into heroin, synthetic opioids, and methamphetamine. Mexico experienced a sharp increase in opium poppy cultivation between 2014 and 2018, and Mexico is a growing producer of (and transit country for) synthetic opioids. This increase corresponds to an epidemic of opioid-related deaths in the United States and continued high demand for heroin and synthetic opioids.[15]

> ## The Mérida Initiative
>
> The Mérida Initiative is a U.S.-Mexican antidrug and rule-of-law partnership that Congress has provided $3.1 billion through FY2020. Many analysts have observed the need for more reporting on Mérida Initiative outcomes to help Congress oversee the funds it has appropriated. The State Department has pointed to some indicators of success, such as improvements in intelligence sharing and police cooperation that have helped to capture and extradite high-profile criminals. But the ongoing concerns about escalating violence in Mexico and drug overdose deaths in the United States have led many to question the efficacy of the Mérida Initiative.
>
> See CRS In Focus IF10578, *Mexico: Evolution of the Mérida Initiative, 2007-2020.*

---

[11] Arturo Angel, "80% en Guardia Nacional Carece de Certificación Como Policía, Predominan en esta Fuerza Militares y Marinos," *Animal Politico*, July 7, 2020.

[12] Mark Stevenson, "Mexico Authorizes Military Policing for 4 More Years," Associated Press, May 11, 2020.

[13] In 2011, a U.S. Immigration and Customs Enforcement (ICE) agent was killed and another wounded in a drug gang shooting incident in San Luis Potosí, north of Mexico City. See "U.S. Immigration Agent Shot Dead in Mexico Attack," BBC News, February 16, 2011.

[14] C. Archibold and Karla Zabludovsky, "Mexico Detains 12 Officers in Attack on Americans in Embassy Vehicle," *New York Times*, August 28, 2012; Michael Weissenstein and Olga R. Rodriguez, "Mexican Cops Detained in Shooting of U.S. Government Employees That Highlights Police Problems," Associated Press, August 27, 2012.

[15] Steven Dudley et al., "Mexico's Role in the Deadly Rise of Fentanyl," Wilson Center Mexico Institute and *InSight Crime*, February 2019. According to the Centers for Disease Control and Prevention, of the 72,000 Americans who died of drug overdoses in 2017, nearly 28,500 deaths involved fentanyl or an analog of the synthetic drug—45% more than in 2016.

IFR_AR_002336

**Figure 2. Stratfor Cartel Map by Region of Influence**

(published January 2020)



**Source:** Stratfor Global Intelligence, "Tracking Mexico's Cartels in 2020," at https://worldview.stratfor.com/article/stratfor-mexico-cartel-forecast-2020#/entry/jsconnect/error.

**Notes:** The map indicates the regions of influence and origins of Mexico's transnational criminal organizations, drug trafficking organizations, or cartels.

Some Members of Congress are concerned about the persistently high levels of violence in Mexico, including attacks on journalists, attacks and killings of political candidates and their families that lead some Mexican candidates to withdraw from their races, attacks that leave judges fearing for their safety, and other aggressive measures taken against citizens and officials to ensure impunity. Overt political intimidation poses a significant threat to democracy in Mexico through the use of forced disappearances, violent kidnappings, and robberies to intimidate politicians and citizens.[16] The major Mexican crime groups have continued to diversify their operations by engaging in such crimes as human smuggling, extortion, and oil theft while increasing their lucrative drug business.

The U.S. Congress has expressed concern over the violence and has sought to provide oversight on U.S.-Mexican security cooperation. Congress may continue to evaluate how the Mexican

---

[16] Secretariado Ejecutivo del Sistema Nacional de Seguridad Pública, "Informe de Víctimas de Homicidio, Secuestro y Extorsión 2017," March 20, 2018; Kevin Sieff, "36 Local Candidates in Mexico Have Been Assassinated, Leading Others to Quit," *Washington Post*, May 21, 2018.

government is combating the illicit drug trade, working to reduce related violence, and monitoring the effects of drug trafficking and violence on the security of both the United States and Mexico. Congress provided a new reporting requirement in the FY2020 National Defense Authorization Act (P.L. 116-92, §7211) that requires unclassified and classified reporting to Congress on foreign opioid traffickers, such as Mexico's TCOs. There is consideration in the FY2021 NDAA of an amendment to highlight countries that are significant sources of fentanyl and fentanyl analogs for further reporting and potential sanctions.

# Escalation of DTO-Related Homicide, Corruption, and Impunity

The number of homicides and the homicide rate grew substantially beginning in 2007, during the administration of President Felipe Calderón, and stayed at elevated levels through ensuing Mexican administrations. The sharp rise in absolute numbers of deaths was unprecedented, even compared with other Latin American countries with similarly high rates of crime and homicides.[17] Estimates of Mexico's disappeared or missing—numbering more than 73,000 since 2007, as reported by the Mexican government in mid-2020—have generated domestic and international concern.[18] Alarm has grown about new bouts of extreme violence and the continuing discovery of mass graves around the country.[19]

Casualties are reported differently by the Mexican government and Mexican media outlets that track the violence, so debate exists on how many have been killed.[20] This report conveys Mexican government data, but the data have not been reported consistently or completely.[21] Although different tallies diverged, during President Calderón's tenure (2006-2012), there was a sharp increase in total homicides, which leveled off at the end of 2012 when Calderón left office. In the Enrique Peña Nieto administration, after a couple years' decline, a steep increase was recorded between 2016 and the end of 2018, surpassing previous totals. According to some sources, since 2006, when violence grew in response to a more direct government assault on the crime groups, through the end of 2018, Mexico experienced some 125,000-150,000 homicides related to organized crime. These homicides do not include the 73,000 considered to be missing or disappeared over the past 14 years, as reported by the current government under President López Obrador, or the continued rise through López Obrador's first 600 days in office.[22]

---

[17] This finding appears in several annual reports from the University of San Diego's Justice in Mexico program, including in Calderón et al., *Organized Crime*.

[18] Mary Beth Sheridan, "Mexico's Plague of Disappearances Continues to Worsen," *Washington Post*, July 14, 2020; "Mexican Gov't Unveils Plan to Search for Missing People," *Agencia EFE* (English Edition), February 4, 2019.

[19] Andrea Navarro, "Drug Cartels Muscle into Town Packed with Americans," *Bloomberg*, December 4, 2019; "Mexico: 50 Bodies Among Remains at Farm Outside Guadalajara," Associated Press, December 15, 2019.

[20] The Mexican news organizations *Reforma* and *Milenio* both keep a tally of "narco-executions." For instance, in 2014, *Reforma* reported 6,400 such killings, the lowest it has reported since 2008, whereas *Milenio* reported 7,993 organized-crime-related murders. Kimberly Heinle, Octavio Rodríguez Ferreira, and David A. Shirk, *Drug Violence in Mexico: Data and Analysis Through 2015*, University of San Diego, April 2016.

[21] The government data published has changed over time. Under the Calderón government, tallies of "organized-crime-related" homicides were published until September 2011. The Peña Nieto administration also issued such estimates but stopped in mid-2013, only publishing data on all intentional homicides. The Justice in Mexico project has identified an average (over many years) of homicides linked to organized crime by assessing several sources. Of total homicides reported by the Mexican government, between 25% and 50% of those killings were likely linked to organized crime.

[22] Sheridan, "Mexico's Plague of Disappearances Continues to Worsen." The author notes, "In Mexico, the disappearances are blamed on a wider variety of culprits: organized crime gangs, police, the military or some

A spate of crime in late 2019 appears to have been committed by factions of once-cohesive criminal groups. In October, Mexican security forces seized a son of imprisoned Mexican drug kingpin Joaquín "El Chapo" Guzmán—until the Sinaloa Cartel responded with overwhelming force that brought chaos to Sinaloa State's capital, Culiacán, and prompted authorities to quickly release him. Reportedly, there is a split within the once all-powerful Sinaloa DTO, involving one faction led by El Chapo's offspring and another led by a senior top leader (see "Sinaloa DTO" section, below). In early November 2019, nine U.S.-Mexican dual citizens of an extended Mormon family (including children) were slain in the border state of Sonora. These incidents drew the attention of President Trump, who pushed the Mexican government to invite greater assistance from the U.S. government to help Mexico win the drug war.[23] In 2019, Mexico City—with one of the highest police-per-population ratios in the country and traditionally considered off-limits to overt cartel violence—registered its highest homicide level in 25 years, exceeding 1,500 murders.

As Mexico faced the Coronavirus Disease 2019 (COVID-19) pandemic in the spring of 2020, organized crime groups stepped up their activities, although in other countries in the region there were temporary declines in crime. Fighting among crime groups and cartels appears to have risen in Mexico, keeping homicide levels elevated. Fragmentation of DTOs has resulted in increased competition over drug infrastructure (see textbox).[24]

> ### Crime and Coronavirus Response in Mexico
>
> Homicide levels have increased as Mexico faces the Coronavirus Disease 2019 (COVID-19) pandemic. In the first six months of 2020, Mexico's homicide rate rose by an estimated nearly 2% over the record set in the same period of 2019. In 2020, armed battles between crime groups and Mexican security forces continued. In 12 of Mexico's 32 states, journalists reported social media depictions of cartel operatives passing out pandemic survival supplies (some stamped with drug trafficking organization [DTO] logos) in direct competition with Mexican authorities. Along the country's west coast, in certain municipalities (equivalent to U.S. counties), some of the larger DTOs have supplied other public goods and services. In the Pacific state of Guerrero, where dozens of criminal groups operate openly, police have been absent and vigilante groups that reportedly have close links to the cartels imposed and enforced curfews.
>
> Under pandemic quarantine (declared March 30, 2020, in Mexico), criminal groups have still fought for territory and drug trafficking routes. In some Mexican cities, opportunistic crimes such as mugging, kidnapping, or extortion declined during the COVID-19 lockdown, but powerful cartels, such as the Cártel Jalisco Nueva Generación (CJNG), have attacked competitors, keeping homicide levels elevated.[1] The pandemic has become an opportunity for the DTOs to exert greater power within their areas of influence, according to some analysts.
>
> **Sources:** "Mexican Criminal Groups See Covid-19 Crisis as Opportunity to Gain More Power," *Guardian*, April 20, 2020; José de Córdoba, "Mexico's Cartels Distribute Aid to Win Support," *Wall Street Journal*, May 15, 2020; Ioan Grillo, "How Mexico's Drug Cartels Are Profiting from the Pandemic," *New York Times*, July 7, 2020.

On June 16, 2020, a federal judge who had supervised a case involving Rubén "El Menchito" Oseguera, the son of the CJNG leader and allegedly also a top cartel figure, was killed. The judge, who had ruled in a case involving El Menchito's 2020 extradition to the United States, also

---

combination of the three." For more on Mexico's National Search Commission set up by the López Obrador government, see Eoin Wilson, "Mexico: Coronavirus Pandemic Hasn't Stopped the Disappearances," *Al Jazeera*, June 16, 2020; U.S. State Department, Bureau of Democracy, Human Rights, and Labor, *2019 Country Reports on Human Rights Practices*, March 11, 2020.

[23] For background, see CRS Insight IN11205, *Designating Mexican Drug Cartels as Foreign Terrorists: Policy Implications*, coordinated by Liana W. Rosen; Ioan Grillo, "How the Sinaloa Cartel Bested the Mexican Army," *Time*, October 18, 2019; and Manuel Bojorquez, "Massacre of Mormon Family Reveals Evolution of Cartel Violence in Mexico," CBS News, November 9, 2019.

[24] Jane Esberg, "More Than Cartels: Counting Mexico's Crime Rings," International Crisis Group, May 8, 2020, at https://www.crisisgroup.org/latin-america-caribbean/mexico/more-cartels-counting-mexicos-crime-rings.

had delivered judgments in top Sinaloa Cartel cases. He and his wife were murdered outside their home in the capital city of Colima. Colima, a small state neighboring Jalisco, has in recent years seen Mexico's highest per capita rate of intentional homicides.[25] Less than two weeks after the judge and his wife were killed, on the morning of June 26, 2020, armed men ambushed Mexico City's police chief and secretary of public security, Omar García Harfuch, seriously wounding him and killing two bodyguards and a bystander. García Harfuch, from his hospital bed, accused the CJNG of launching the attack in a tweeted message.[26]

Many analysts contend these attacks mark the CJNG's expansion across the country and willingness to go after Mexican government officials in a brazen fashion.[27] (For more background, see "Cártel Jalisco Nuevo Generación" section, below.) The DTOs' use of strategic violence and displays of firepower to send messages to top public officials is a growing concern. Judges reportedly are citing the Mexico City incident to decline organized crime cases out of concern for their personal safety.[28]

Since early 2019, a significant number of migrants have resided in temporary shelters or provisional encampments in Mexico's northern border states of Baja California, Chihuahua, and Tamaulipas under the Migrant Protection Protocols.[29] All these border states have homicide rates exceeding national averages. In 2019, as in 2018, the two Mexican cities with the highest incidence of violent crime were Ciudad Juárez, Chihuahua, with 1,281 murders, and Tijuana, Baja California, with 2,000 homicides (see **Figure 3**).[30] Migrants and border city residents were frequent victims of predatory crime in addition to homicide, such as kidnapping, robbery, and extortion. The turf battle between the once-predominant Sinaloa Cartel and its aggressive competitor—the CJNG—spawned chaotic violence from the border city of Tijuana all the way to Mexico's east coast.

Many U.S. policymakers have expressed deep concerns about the extent of territory in Mexico not under central government control, where criminal groups and their fragments attempt to achieve dominance and ensure impunity from government authorities.[31] The CJNG, for instance, was involved in violent clashes with rivals to control border crossings and smuggling routes into the United States.

In March 2020, Mexico experienced its most violent month, with 3,000 murder victims reported. The central state of Guanajuato was Mexico's most violent state in the first half of 2020, with brutal attacks on two drug rehabilitation centers in the same city that resulted in 10 and 28 homicides, respectively. A battle over the illicit petroleum market between two major rivals, the CJNG and the oil tappers of the Cártel Santa Rosa de Lima (CSRL), boosted crime-related fatalities in Guanajuato.[32] Both the leader of CSRL, José Antonio Yépez, known as "El Morro,"

---

[25] Zachary Goodwin, "Why One of Mexico's Smallest States Is Also Its Most Violent, *InSight Crime*, June 24, 2020. The article notes that the remains of a Colima congresswoman, Anel Bueno, were found in an unmarked grave two weeks before the judge's murder.

[26] Kevin Sieff, "Mexico's Bold Jalisco Cartel Places Elite in Its Sights," *Washington Post*, July 14, 2020.

[27] Ioan Grillo, "How Mexico's Drug Cartels Are Profiting from the Pandemic;" James Bosworth, "Mexico Security Update—June 2020," June 29, 2020; "Mexico Security Update—July 2020," July 6, 2020.

[28] For remarks by Mexico's attorney general, see Gustavo Castillo García, "Va el 'Narco' por el Control Político y Territorial: Gertz," *La Jornada*, July 7, 2020.

[29] The Trump Administration's Migration Protection Protocols allow for persons seeking asylum in the United States to be returned to Mexico to await their U.S. hearings.

[30] Data provided by the University of San Diego's Justice in Mexico project to CRS, May 1, 2020.

[31] For more on criminal fragmentation, see Esberg, "More Than Cartels."

[32] Jorgic and Sanchez, "As Mexico Focuses on Coronavirus, Drug Gang Violence Rises"; Falko Ernst, "Mexican

and CJNG leaders threaten government officials to deter enforcement actions against them.[33] Inter-cartel battles over the lucrative synthetic opioid fentanyl market in several states in central Mexico also have expanded over the past couple of years.

### Figure 3. Major Ports of Entry at the U.S.-Mexican Border



**Source:** Prepared by CRS.

## Corruption and Government Institutions

The criminal involvement of state governors with the DTOs and other criminals is one window into the extent of corruption in the layers of government and across parties in Mexico.[34] Twenty former state governors, many from the long-dominant Institutional Revolutionary Party (PRI), were under investigation or in jail in 2018.[35] Former governors of the states of Coahuila, Tamaulipas, and Quintana Roo have been charged with money laundering and conspiracy. Other noteworthy examples of allegedly corrupt former governors include those prosecuted in Mexico and the United States:

---

Criminal Groups See Covid-19 Crisis as Opportunity to Gain More Power," *The Guardian*, April 20, 2020.

[33] El Morro, for instance, threatened the state government of Guanajuato and federal officials in June 2020 when his cousin, wife, and mother were picked up in a sweep to limit the Cártel Santa Rosa de Lima's oil theft.

[34] For more on the issue of corruption and impunity in Mexico, see Roberto Simon and Geert Aalbers, "The Capacity to Combat Corruption (CCC) Index," Americas Society and the Council of the Americas (AS/COA) and Control Risks, June 2019, at https://americasquarterly.org/wp-content/uploads/2020/05/2019CCC_Report.pdf; CRS Report R45733, *Combating Corruption in Latin America: Congressional Considerations*, coordinated by June S. Beittel.

[35] According to the Mexico country report of the U.S. State Department's *Country Reports on Human Rights Practices* for 2018, "nearly 20 former governors had been sentenced, faced corruption charges, or were under formal investigation." See U.S. State Department, Bureau of Democracy, Human Rights and Labor, *2018 Country Reports on Human Rights Practices*, April 2019.

- Tomás Yarrington of Tamaulipas (1999-2005) of the PRI was arrested in Italy in 2017 and extradited to the United States in 2018 for U.S. charges of drug trafficking, money laundering, and racketeering. Since 2012, he had been under investigation for his links to the Gulf Cartel and Los Zetas in Mexico.[36]

- César Duarte of Chihuahua (2010-2016) of the PRI was an international fugitive wanted on a Red Notice by Interpol until his July 2020 arrest in Florida (during a visit of President López Obrador to Washington, DC) for extradition back to Mexico.[37]

- Javier Duarte of Veracruz (2010-2016) of the PRI was arrested in Guatemala and extradited to Mexico in August 2017. During his term, the number of persons forcibly disappeared in Veracruz is estimated to have exceeded 5,000.[38] Following his trial in Mexico, Duarte received a nine-year sentence in September 2018.[39]

Over the six years of PRI President Peña Nieto's term (2012-2018), Mexico fell 32 places in Transparency International's Corruption Perception Index.[40] In the 2019 survey, Mexican respondents' perceptions of corruption improved slightly due to the popularity of President Lopéz Obrador in his first year in office. However, citizen perceptions of the security situation in Mexico appear to have worsened in much of the country in the first months of 2020.

Another nongovernmental study on combating corruption in the region examined the capacity of 15 countries in Latin America and the Caribbean to uncover, prevent, and punish corruption. Mexico's ranking was near the middle in the 2020 survey but had moved little from the year before due to meager progress on long-term institutional reforms and low independence and efficiency in the legal system.[41]

---

[36] U.S. Department of Justice, "Former Mexican Governor Extradited to the Southern District of Texas," press release, April 20, 2018, at https://www.justice.gov/usao-sdtx/pr/former-mexican-governor-extradited-southern-district-texas.

[37] Jacob Sánchez, "Gobierno de Chihuahua Anuncia Cacería de Propiedades de César Duarte en EU," *El Sol de México*, November 27, 2019; "Fugitive Mexican Governor Arrested in Miami," Reuters, July 8, 2020.

[38] Patrick J. McDonnell and Cecilia Sanchez, "A Mother Who Dug in a Mexican Mass Grave to Find the 'Disappeared' Finally Learns Her Son's Fate," *Los Angeles Times*, March 20, 2017.

[39] "Mexico Fugitive Ex-Governor Roberto Borge Extradited," BBC News, January 4, 2018, at https://www.bbc.com/news/world-latin-america-42564581; Rafael Martínez, "Vinculan a Proceso a Exgobernador de Quintana Roo, Roberto Borge," *El Sol de México*, November 13, 2019, at https://www.elsoldemexico.com.mx/republica/justicia/vinculan-a-proceso-a-exgobernador-de-quintana-roo-roberto-borge-concesiones-isla-mujeres-4451151.html.

[40] See *Corruption Perceptions Index 2018*, Transparency International, January 29, 2018, at https://www.transparency.org/cpi2018 and https://www.transparency.org/news/feature/cpi-2018-regional-analysis-americas.

[41] Roberto Simon and Geert Aalbers, *The Capacity to Combat Corruption (CCC) Index: Assessing Latin America's Ability to Detect, Punish and Prevent Corruption Amid COVID-19 2020*, Anti-Corruption Working Group, AS/COA, Americas Quarterly, and Control Risks, June 8, 2020.

---

### Links Among Crime Groups, Police, and Other High-Ranking Officials

In Mexico, arrests of police and other public officials accused of cooperating with the drug trafficking organizations (DTOs) rarely have been followed by convictions, although a few prominent cases of corruption have achieved results. Police corruption has been so ubiquitous that law enforcement officials sometimes carry out violent assignments from DTOs and other criminal groups. Purges of Mexico's municipal, state, and federal police have not rid the police of this enduring problem.

When El Chapo Guzmán escaped a second time from a federal maximum-security prison in 2015, scores of Mexican prison personnel were arrested. Eventually, the prison warden was fired. Guzmán, who led Mexico's notorious Sinaloa Cartel for decades, was extradited to the United States in early 2017. In February 2019, he was convicted in federal court in New York for multiple counts of operating a continuing criminal enterprise. Some of the New York trial's most incendiary testimony alleged that senior Mexican government officials took bribes from Guzmán. One prosecution witness alleged that then-President Enrique Peña Nieto (2012-2018) received a $100 million bribe from Guzmán, an allegation Peña Nieto strongly disputed. Some observers maintain that allegation was far-fetched.

In December 2019, Genaro García Luna was arrested in Texas on a U.S. indictment accused of taking multimillion-dollar bribes from the Sinaloa Cartel while holding top law enforcement positions. García Luna headed Mexico's Federal Investigation Agency from 2001 to 2005 (under former President Vicente Fox of the National Action Party, or PAN). Under President Felipe Calderón, also of PAN, García Luna became secretary of public security. García Luna left Mexico in 2012 and sought to become a naturalized U.S. citizen. President López Obrador cited García Luna's U.S. arrest as evidence that the preceding Calderón government's fierce enforcement strategy had not successfully repelled the DTOs and that the López Obrador administration's alternative approach was more effective in reducing corruption.

**Sources:** Alan Feuer, "The Public Trial of El Chapo, Held Partially in Secret," *New York Times*, November 21, 2018; Steven Dudley, "The End of the Big Cartels: Why There Won't Be Another Chapo," *InSight Crime*, March 18, 2019; U.S. Department of Justice, "Former Mexican Secretary of Public Security Arrested for Drug-Trafficking Conspiracy and Making False Statements," press release, December 10, 2019.

---

In early 2020, U.S. Secretary of State Mike Pompeo designated former Nayarit Governor Roberto Sandoval Castañeda (2011-2017, PRI Party) and his immediate family for corruption in misappropriating state assets and accepting bribes from the CJNG and the Beltran Leyva Organization. This designation was made under the Global Magnitsky Human Rights Accountability Act, rendering the designees ineligible for U.S. visas.[42]

# Criminal Landscape in Mexico

The splintering of the large DTOs into competing factions and gangs of different sizes began in 2007 and continues today. The emergence of these different crime groups, ranging from TCOs to small local mafias (with certain trafficking or other crime specialties), has made the crime situation diffuse and the crime groups' behavior harder to suppress or eradicate.

The older, large DTOs tended to be hierarchical, often bound by familial ties and led by hard-to-capture cartel kingpins. They have been replaced by flatter, more nimble organizations that tend to be loosely networked. Far more common in the present crime group formation is the outsourcing of certain aspects of trafficking. The various smaller organizations have resisted norms that might limit violence. Moreover, rivalries among a greater number of organized crime "players" have led to more violence, although in some cases the smaller organizations are "less

---

[42] U.S. Department of State, "Public Designation of the Former Governor of the Mexican State of Nayarit, Roberto Sandoval Castañeda, Due to Involvement in Significant Corruption," press release, February 28, 2020. For more background, see CRS In Focus IF10576, *The Global Magnitsky Human Rights Accountability Act*, by Dianne E. Rennack, and CRS Report R46362, *Foreign Officials Publicly Designated by the U.S. Department of State on Corruption or Human Rights Grounds: A Chronology*, by Liana W. Rosen and Michael A. Weber.

able to threaten the state and less endowed with impunity."[43] However, the larger organizations (Sinaloa, for example) that have adopted a cellular structure are still able to protect their leadership, such as the 2015 escape orchestrated for Sinaloa leader El Chapo Guzmán through a mile-long tunnel from a maximum-security Mexican prison.

The scope of the violence generated by Mexican crime groups has been difficult to measure due to restricted reporting by the government and attempts by crime groups to mislead the public. Criminal actors sometimes publicize their crimes in garish displays intended to intimidate their rivals, the public, or security forces, or they publicize their criminal acts of violence on the internet. Conversely, the DTOs may seek to mask their crimes by indicating that other actors, such as a competitor cartel, are responsible. Some shootouts are not reported due to media self-censorship or because the bodies disappear.[44] One opposite example is the reported death in 2010 of a leader of the Knights Templar, Nazario Moreno González, but no body was recovered at the time. Rumors of his survival persisted and were confirmed in 2014, when he was killed in a gun battle with Mexican security forces.[45] (See "Knights Templar" section, below.)

Forced disappearances in Mexico also are a growing concern, and efforts to accurately count the missing or forcibly disappeared have been limited, a problem exacerbated by underreporting. Government estimates of the number of disappeared people in Mexico—especially of those who are missing due to force and possible homicide—have varied widely over time, although a focus of the current Mexican government's security strategy is an effort to accurately assess this problem.[46] The López Obrador government has established a National Search Commission and announced in June 2020 that more than 73,000 Mexicans are missing or disappeared.[47]

In the Gulf Coast state of Veracruz, a vast mass grave was unearthed in 2017 that contained some 250 skulls and other remains, some of which were found to be years old.[48] Journalist watchdog group *Animal Político*, which focuses on combating corruption with transparency, concluded in a 2018 investigative piece that many states lack equipment to adequately investigate violent crime. For example, the authors found that 20 of Mexico's 32 states lack biological databases needed to identify unclaimed bodies. Additionally, 21 states lack access to the national munitions database used to trace bullets and weapons.[49]

The State Department's June 2020 U.S. travel advisory for Mexico, which cautioned generally against travel to Mexico due to COVID-19 pandemic concerns, warned that five Mexican states are not recommended for travel due to crime—Colima, Guerrero, Michoacán, Sinaloa, and

---

[43] Patrick Corcoran, "Mexico Government Report Points to Ongoing Criminal Fragmentation," *InSight Crime*, April 14, 2015.

[44] Christopher Sherman, "Drug War Death Tolls a Guess Without Bodies," Associated Press, March 26, 2013.

[45] Ioan Grillo, *Gangster Warlords* (New York: Bloomsbury Press, 2016). See also Parker Asmann, "Walled Inside Homes, Corpses of Mexico's Disappeared Evade Authorities," *InSight Crime*, July 31, 2019.

[46] For more on the López Obrador administration's security approach, see CRS Report R42917, *Mexico: Background and U.S. Relations*, by Clare Ribando Seelke.

[47] For more background on the commission, see State Department, *2019 Country Reports on Human Rights Practices: Mexico*.

[48] McDonnell and Sanchez, "A Mother Who Dug in a Mexican Mass Grave;" "Mexico Violence: Skulls Found in a New Veracruz Mass Grave," BBC News, March 20, 2017.

[49] Arturo Angel, "Dos Años del Nuevo Sistema Penal: Mejoran los Juicios, pero no el Trabajo de Policías, Fiscalías," *Animal Político*, June 18, 2018, at https://www.animalpolitico.com/2018/06/nuevo-sistema-penal-estudio-juicios/.

Tamaulipas—and recommended reconsideration of travel for another 11 due to crime. The total of 16 states featured in the June advisory comprise half of Mexico's states.[50]

According to the Swiss-based Internal Displacement Monitoring Centre, about 380,000 people were forcibly displaced in Mexico between 2009 and 2018 as a result of violence and organized crime. Some Mexican government authorities have said the number may exceed 1 million, but in such a count the definition of the causes for displacement is broad and includes anyone who moved due to violence. Dislocated Mexicans often cite clashes between armed groups or with Mexican security forces, inter-gang violence, and fear of future violence as reasons for leaving their homes and communities.[51]

# Illicit Drugs in Mexico and Components of Its Drug Supply Market

Today, the major Mexican DTOs are poly-drug, handling more than one type of drug, although they may specialize in the production or trafficking of specific products. According to the U.S. State Department's 2020 *International Narcotics Control Strategy Report* (INCSR), Mexico is a significant source and transit country for heroin, marijuana, and synthetic drugs (such as methamphetamine and fentanyl) destined for the United States. Mexico remains the main trafficking route for U.S.-bound cocaine from the major supply countries of Colombia and (to a lesser extent) Peru and Bolivia.[52] The U.S. Drug Enforcement Administration (DEA) notes that traffickers and retail sellers of fentanyl and heroin combine the drugs in various ways, such as pressing the combined powder drugs into highly addictive and extremely powerful counterfeit pills.

The west coast state of Sinaloa, with its long coastline and difficult-to-access areas, is favorable for drug cultivation and remains the heartland of Mexico's drug trade. Marijuana and opium poppy cultivation have flourished in the state for decades.[53] It also has been the home of Mexico's most notorious and successful drug traffickers.

**Cocaine.** Cocaine of Colombian origin supplies most of the U.S. market, and most of that supply is trafficked through Mexico. Mexican drug traffickers are the primary wholesalers of U.S. cocaine. According to the White House Office of National Drug Control Policy (ONDCP), coca cultivation and cocaine production in Colombia increased to a record 951 metric tons of pure cocaine in 2019, an 8% rise over 2018.[54] Cutting cocaine with synthetic opioids (often unbeknownst to users) has become more commonplace and increases the danger of overdose.

**Heroin and Synthetically Produced Opioids.** In its 2019 *National Drug Threat Assessment* (NDTA), the DEA warned that Mexico's crime organizations, aided by corruption and impunity, present an acute threat to U.S. communities given their dominance in heroin and fentanyl exports. Mexico's heroin traffickers, which traditionally provided black or brown heroin to the western part of the United States, in 2012 and 2013 began to change their opium processing methods to

[50] U.S. Department of State, Bureau of Consular Affairs, "Mexico Travel Advisory," June 17, 2020, at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

[51] Juan Arvizo, "Crimen Desplazó a 380 Mil Personas," *El Universal*, July 24, 2019. See also Parker Asmann, "Is the Impact of Violence in Mexico Similar to War Zones?," *InSight Crime*, October 23, 2017.

[52] U.S. State Department, *International Narcotics Control Strategy Report*, March 2020.

[53] The region where Sinaloa comes together with the states of Chihuahua and Durango is a drug-growing area sometimes called Mexico's "Golden Triangle," after the productive area of Southeast Asia by the same name. In this region, one-third of the population is estimated to make a living from the illicit drug trade.

[54] White House, Office of National Drug Control Policy (ONDCP), "United States and Colombian Officials Set Bilateral Agenda to Reduce Cocaine Supply," press release, March 5, 2020.

produce white heroin, a purer and more potent product. The DEA maintains that no other crime groups, foreign or domestic, have a comparable reach to distribute within the United States.[55]

According to the ONDCP, 41,800 hectares of opium poppy were cultivated in Mexico in 2018—down 5% compared with 2017 but up 280% since 2013. Mexico's potential production of pure heroin rose to 106 metric tons (MT) in 2018 from 26 MT in 2013.[56] The DEA reports that 90% of U.S.-seized heroin comes from Mexico; this heroin is increasingly laced with fentanyl.

The extent of Mexico's role in the production of fentanyl, which is 30-50 times more potent than heroin, is less well understood than Mexico's role in fentanyl trafficking, which is increasingly well documented.[57] What is known is that seizures of fentanyl, fentanyl analogs, and methamphetamine—the leading synthetic lab-produced drugs entering the U.S. illicit drug market—have been rising along the Southwest border. (For U.S. Customs and Border Protection seizure data, see **Figure 4**.)

Illicit imports of fentanyl from Mexico involve Chinese-produced fentanyl or fentanyl precursors coming most often from China. Many analysts contend that plant-sourced drugs, such as heroin and morphine, may be gradually replaced in the criminal market by synthetic drugs. In the first half of 2019, according to the State Department, Mexico seized 157.3 kilograms of fentanyl, a 94% increase over the same time period in 2018.[58] Some observers suggest that if synthetic drugs continue to expand their market share, the drug cartel structure that has relied upon control of opium production, heroin manufacture, and distribution using the system of drug trafficking routes, or *plazas*, in Mexico for trafficking drugs for sale inside the United States could be disrupted. Synthetic drug trafficking with distribution arranged over the internet via the Dark Web would replace it. Abandoning heroin for the cheaper-to-produce fentanyl might cause Mexican opium farmers to be thrown out of work.[59]

---

[55] ONDCP, "New Annual Data Released by White House Office of National Drug Control Policy Shows Poppy Cultivation and Potential Heroin Production Remain at Record-High Levels in Mexico," press release, June 14, 2019.

[56] For background on Mexico's heroin and fentanyl exports, see CRS In Focus IF10400, *Trends in Mexican Opioid Trafficking and Implications for U.S.-Mexico Security Cooperation*, by Liana W. Rosen and Clare Ribando Seelke.

[57] Drug Enforcement Agency (DEA), 2017 *National Drug Threat Assessment (NDTA)*, DEA-DCT-DIR-040-1, October 2017. See also Steven Dudley, "The End of the Big Cartels: Why There Won't Be Another El Chapo," *InSight Crime*, March 18, 2019.

[58] U.S. State Department, *International Narcotics Control Strategy Report*, March 2020.

[59] For sources of the concepts here, see Dudley, "The End of the Big Cartels;" testimony of Bryce Pardo, RAND Corporation, to House Homeland Security on Intelligence and Counterterrorism Subcommittee and Border Security, Facilitation, and Operations Hearing, "Homeland Security Implications of the Opioid Crisis," July 25, 2019; Vanda Felbab-Brown, "Fending Off Fentanyl and Hunting Down Heroin: Controlling Opioid Supply from Mexico," Brookings Institution, July 2020.

IFR_AR_002346

**Figure 4. U.S. Customs and Border Patrol Seizures of Fentanyl and Methamphetamine**

(data from FY2014-FY2019)



**Source:** U.S. Customs and Border Protection, Office of Field Operations' Nationwide Drug Seizures and U.S. Border Patrol's Nationwide Seizures, at https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

**Notes:** Prepared by CRS Graphics.

However, the economic devastation of the COVID-19 pandemic, projected by the International Monetary Fund to reduce economic growth in Mexico by more than 10% in 2020 (estimated as of June 2020), may temporarily push former opium growers back into cultivation. The medium- and longer-term impacts of the pandemic and coming recession on drug markets and consumer demand remain unknown.[60]

**Methamphetamine.** Mexican-produced methamphetamine has overtaken U.S. sources of the drug and expanded into nontraditional methamphetamine markets inside the United States, allowing Mexican traffickers to control the wholesale market inside the United States, according to the DEA. The expansion of methamphetamine seizures inside Mexico, as reported by the annual INCSR, is significant. As of August 2018, as reported in the 2019 INCSR, Mexican authorities had seized 130 MT of methamphetamine, due in part to a large seizure of some 50 MT in Sinaloa.[61] U.S. methamphetamine seizures significantly increased between 2014 and 2019, as shown in **Figure 4**. The purity and potency of methamphetamine has driven up overdose deaths in the United States.

**Cannabis.** In the first six months of 2019, Mexico seized 91 MT of marijuana and eradicated more than 2,250 hectares of marijuana, according to the State Department's 2020 INCSR.

---

[60] Many analysts have made observations about the near-term impacts of the pandemic, but there is a diversity of perspectives on the long term. See Parker Asmann, Chris Dalby and Seth Robbins, "Six Ways Coronavirus Is Impacting Organized Crime in the Americas," *InSight Crime,* May 4, 2020; Ernst, "Mexican Criminal Groups See Covid-19 Crisis as Opportunity to Gain More Power;" Robert Muggah, "The Pandemic Has Triggered Dramatic Shifts in the Global Criminal Underworld," *Foreign Policy,* May 8, 2020.

[61] Arthur DeBruyne, "An Invisible Fentanyl Crisis Emerging on Mexico's Northern Border," *Pacific Standard,* February 6, 2019. See also "50 Tonnes of Meth Seized in Sinaloa; Estimated Value US $5 Billion," *Mexico New Daily,* August 18, 2018; Mike La Susa, "Massive Mexico Methamphetamine Seizure Reflects Market Shifts," *InSight Crime,* August 21, 2018.

IFR_AR_002347

Authorities are projecting a continued decline in U.S. demand for Mexican marijuana because drugs "other than marijuana" will likely predominate. This is also the case due to legalized cannabis or medical cannabis in several U.S. states and Canada, reducing its value as part of Mexican trafficking organizations' portfolio. Mexico is also considering cannabis legalization and regulation.

# Evolution of the Major Drug Trafficking Groups

The DTOs have been in constant flux in recent years.[62] By some accounts, when President Calderón came to office in 2006, there were four dominant DTOs: the Tijuana/Arellano Félix organization (AFO), the Sinaloa Cartel, the Juárez/Vicente Carillo Fuentes Organization (CFO), and the Gulf Cartel. Since then, the large, formerly stable organizations that existed in the earlier years of the Calderón administration have fractured into many more groups.

For several years, the DEA identified the following seven organizations as dominant: Sinaloa, Los Zetas, Tijuana/AFO, Juárez/CFO, Beltrán Leyva, Gulf, and La Familia Michoacana. In some sense, these seven might be viewed as the "traditional" DTOs. However, many analysts suggest those seven groups have fragmented. In the past decade, as fragmentation has produced many more criminal actors, it has been accompanied by many groups' diversification into other types of criminal activity, as noted earlier. The following section focuses on the nine DTOs that are currently most prominent (about which the most information is readily available) and whose current status illuminates the fluidity of all the crime groups in Mexico as they face new challenges from competition and changing market dynamics. Some analysts maintain there may be as many as 20 major organizations and more than 200 criminal groups overall in Mexico.[63]

## Nine Major DTOs

Reconfiguration of the major DTOs—often referred to as TCOs due to their diversification—preceded the intensive fragmentation that exists today. The Gulf Cartel, based in northeastern Mexico, had a long history of dominant power and profits, with the height of its power in the early 2000s. However, the Gulf Cartel's enforcers—Los Zetas, who were organized from highly trained Mexican military deserters—split to form a separate DTO and turned against their former employers, engaging in a hyper-violent competition for territory.

The well-established Sinaloa DTO, with roots in western Mexico, has fought brutally for increased control of routes through the border states of Chihuahua and Baja California, with the goal of remaining the country's dominant DTO. Sinaloa has a decentralized structure of loosely linked smaller organizations, which has been susceptible to conflict when units break away. Nevertheless, the decentralized structure has enabled it to be quite adaptable in the highly competitive and unstable environment that now prevails.[64]

Sinaloa survived the arrest of its billionaire founder El Chapo Guzmán in 2014. The federal operation to capture and detain Guzmán, which gained support from U.S. intelligence, was viewed as a major victory for the Peña Nieto government. Initially the kingpin's arrest did not

---

[62] See Patrick Corcoran, "How Mexico's Underworld Became Violent," *InSight Crime*, April 2, 2013. According to this article, constant organizational flux, which continues today, characterizes violence in Mexico.

[63] Muggah, "The Pandemic Has Triggered Dramatic Shifts in the Global Criminal Underworld;" Esberg, "More Than Cartels."

[64] Oscar Becerra, "Traffic Report: Battling Mexico's Sinaloa Cartel," *Jane's Information Group*, May 7, 2010. The author describes the networked structure: "The Sinaloa Cartel is not a strictly vertical and hierarchical structure, but instead is a complex organization containing a number of semiautonomous groups."

spawn a visible power struggle within the DTO. His dramatic escape in July 2015 and his rearrest in January 2016, however, raised speculation that his role in the Sinaloa Cartel might have become more as a figurehead rather than a functional leader.

The Mexican government's decision to extradite Guzmán to the United States, carried out on January 19, 2017, appears to have led to violent competition from a competing cartel, the CJNG, which split from Sinaloa in 2010. Over 2016 and the early months of 2017, the CJNG's quick rise and a possible power struggle inside of Sinaloa between El Chapo's sons and a successor to their father, a longtime associate known as "El Licenciado," reportedly caused increasing violence.[65]

In the Pacific Southwest, La Familia Michoacana—a DTO once based in the state of Michoacán and influential in surrounding states—split apart in 2015. It eventually declined in importance as its successor, the Knights Templar, grew in prominence in the region known as the *Tierra Caliente* of Michoacán, Guerrero, and in parts of neighboring states Colima and Jalisco. At the same time, the CJNG rose to prominence between 2013 and 2015, and many analysts currently deem it Mexico's largest and most dangerous DTO. The CJNG has thrived with the decline of the Knights Templar, which was targeted by the Mexican government.[66] The CJNG has assassinated numerous public officials in an effort to intimidate the Mexican government.

Open-source research about the traditional DTOs and their successors mentioned above is more available than information about smaller factions. With as many as 200-400 criminal groups, it is hard to assess longevity or do a census of which groups are major actors. Current information about the array of new regional and local crime groups is more difficult to assess than information about these traditional DTOs. The once-coherent organizations and their successors are still operating, both in conflict with one another and, at times, cooperatively.

## Tijuana/Arellano Félix Organization

The AFO is a regional "tollgate" organization that historically has controlled the drug smuggling route between Baja California (Mexico) and southern California.[67] It is based in the border city of Tijuana. One of the founders of modern Mexican DTOs, Miguel Ángel Félix Gallardo, a former police officer from Sinaloa, created a network that included the Arellano Félix family and numerous other DTO leaders (such as Rafael Caro Quintero, Amado Carrillo Fuentes, and El Chapo Guzman). The seven "Arellano Félix" brothers and four sisters inherited the AFO from their uncle, Miguel Ángel Félix Gallardo, after his arrest in 1989 for the murder of DEA Special Agent Enrique "Kiki" Camarena.[68]

The AFO was once one of the two dominant DTOs in Mexico, infamous for brutally controlling the drug trade in Tijuana in the 1990s and early 2000s.[69] The other was the Juárez DTO, also

---

[65] Anabel Hernández, "The Successor to El Chapo: Dámaso López Núñez," *InSight Crime*, March 13, 2017.

[66] Juan Montes and José de Córdoba, "Cartel Becomes Top Mexico Threat," *Wall Street Journal*, July 9, 2020; Luis Alonso Pérez, "Mexico's Jalisco Cartel—New Generation: From Extinction to World Domination," *InSight Crime* and *Animal Político*, December 26, 2016.

[67] John Bailey, "Drug Trafficking Organizations and Democratic Governance," in *The Politics of Crime in Mexico: Democratic Governance in a Security Trap* (Boulder: FirstForum Press, 2014), p. 121. Mexican political analyst Eduardo Guerrero-Gutiérrez of the Mexican firm Lantia Consulting defines a *toll-collector* cartel or DTO as one that derives much of the organization's income from charging fees to other DTOs using its transportation points across the U.S.-Mexican border.

[68] Special Agent Camarena was an undercover DEA agent working in Mexico who was kidnapped, tortured, and killed in 1985. The Guadalajara-based Félix Gallardo network broke up in the wake of the investigation of its role in the murder.

[69] Mark Stevenson, "Mexico Arrests Suspected Drug Trafficker Named in US Indictment," Associated Press, October

known as the Carrillo Fuentes Organization. The Mexican government and U.S. authorities took vigorous enforcement action against the AFO in the early years of the 2000s, with the arrests and killings of the five brothers involved in the drug trade—the last of whom was captured in 2008.

In 2008, Tijuana became one of the most violent cities in Mexico. That year, the AFO split into two competing factions when Eduardo Teodoro "El Teo" García Simental, an AFO lieutenant, broke from Fernando "El Ingeniero" Sánchez Arellano (the nephew of the Arellano Félix brothers who had taken over the management of the DTO). García Simental formed another faction of the AFO, reportedly allied with the Sinaloa DTO.[70] Further contributing to the escalation in violence, other DTOs sought to gain control of the profitable Tijuana/Baja California–San Diego/California plaza in the wake of the power vacuum left by the earlier arrests of the AFO's key leadership.

Some observers believe the 2010 arrest of García Simental created a vacuum for the Sinaloa DTO to gain control of the Tijuana/San Diego smuggling corridor.[71] Despite its weakened state, the AFO appears to have maintained control of the plaza through an agreement made between Sánchez Arellano and the Sinaloa DTO's leadership, with Sinaloa and other trafficking groups paying a fee to use the plaza.[72]

In 2013, the DEA identified Sánchez Arellano as one of the six most influential traffickers in the region.[73] Following his arrest in 2014, however, Sánchez Arellano's mother, Enedina Arellano Félix, who was trained as an accountant, reportedly took over. It remains unclear if the AFO retains enough power through its own trafficking and other crimes to continue to operate as a tollgate cartel. Violence in Tijuana rose to more than 100 murders a month in late 2016, with the uptick in violence attributed to Sinaloa battling its new challenger, the CJNG.[74] The CJNG has apparently taken an interest in both local drug trafficking inside Tijuana and cross-border trafficking into the United States. As in other parts of Mexico, the role of the newly powerful CJNG organization may determine the nature of the area's DTO configuration in coming years.[75] Some analysts maintain that the resurgence of violence in Tijuana and the spiking homicide rate in the nearby state of Southern Baja California are linked to the CJNG forging an alliance with remnants of the AFO. Tijuana was the city with the highest number of homicides in the country in both 2018 and 2019.

---

24, 2013.

[70] Steven Dudley, "Who Controls Tijuana?," *InSight Crime*, May 3, 2011. Sánchez Arellano took control in 2006 after the arrest of his uncle, Javier Arellano Félix.

[71] E. Eduardo Castillo and Elliot Spagat, "Mexico Arrests Leader of Tijuana Drug Cartel," Associated Press, June 24, 2014.

[72] "Mexico Security Memo: Torreon Leader Arrested, Violence in Tijuana," *Stratfor Worldview*, April 24, 2013, at http://www.stratfor.com/analysis/mexico-security-memo-torreon-leader-arrested-violence-tijuana#axzz37Bb5rDDg. In 2013, Nathan Jones at the Baker Institute for Public Policy asserted that the Sinaloa-AFO agreement allows those allied with the Sinaloa DTO, such as the CJNG, or otherwise not affiliated with Los Zetas to also use the plaza. For more information, see Nathan P. Jones, "Explaining the Slight Uptick in Violence in Tijuana," Baker Institute, September 17, 2013, at http://bakerinstitute.org/files/3825/.

[73] Castillo and Spagat, "Mexico Arrests Leader."

[74] Christopher Woody, "Mexico Is Settling into a Violent Status Quo," *Houston Chronicle*, March 21, 2017.

[75] Sandra Dibble, "New Group Fuels Tijuana's Increased Drug Violence," *San Diego Union-Tribune*, February 13, 2016; Christopher Woody, "Tijuana's Record Body Count Is a Sign That Cartel Warfare Is Returning to Mexico," *Business Insider*, December 15, 2016.

## Sinaloa DTO

Sinaloa, described as Mexico's oldest and most established DTO, comprises a network of smaller organizations. In April 2009, President Barack Obama designated the notorious Sinaloa Cartel as a drug kingpin entity pursuant to the Foreign Narcotics Kingpin Designation Act.[76] Frequently regarded as the most powerful drug trafficking syndicate in the Western Hemisphere, the Sinaloa Cartel was an expansive network at its apex: Sinaloa leaders successfully corrupted public officials from the local to the national level inside Mexico and abroad to operate in some 50 countries. Traditionally one of Mexico's most prominent organizations, each of Sinaloa's major leaders was designated a kingpin in the early 2000s. At the top of the hierarchy was El Chapo Guzmán, listed in 2001; Ismael Zambada García ("El Mayo"), listed in 2002; and Juan José "El Azul" Esparragoza Moreno, listed in 2003.

By some estimates, Sinaloa had grown to control 40%-60% of Mexico's drug trade by 2012 and had annual earnings calculated to be as high as $3 billion.[77] The DEA has long identified the Sinaloa Cartel as the primary trafficker of drugs to the United States.[78] In 2008, a federation dominated by the Sinaloa Cartel (which included the Beltrán Leyva Organization and the Juárez DTO) broke apart, leading to a battle among the former partners that sparked the most violent period in recent Mexican history.

Since its 2009 kingpin designation of Sinaloa, the United States has attempted to dismantle Sinaloa's operations by targeting individuals and financial entities allied with the cartel. For example, in August 2017, the U.S. Department of the Treasury sanctioned the Flores DTO and its leader, Raúl Flores Hernández, as kingpins, having previously sanctioned some 12 businesses and 16 members of his financial and drug trafficking enterprise as collaborators with Sinaloa.[79]

The Sinaloa Cartel's most visible longtime leader, El Chapo Guzmán, escaped twice from Mexican prisons—in 2001 and again in 2015. The July 2015 escape, after his rearrest the year prior, was a major embarrassment to the Peña Nieto administration, and that incident may have convinced the Mexican government to extradite the alleged kingpin rather than try him in Mexico after his recapture.

In January 2017, the Mexican government extradited Guzmán to the United States. He was indicted in New York District's federal court in Brooklyn and tried from November 2018 to February 2019. His lawyers maintained he was not the head of the Sinaloa enterprise.[80] Nevertheless, he was convicted by a federal jury in February 2019 and sentenced by a U.S. district judge in July 2019 to a life term in prison, with the addition of 30 years, and ordered to pay $12.6 billion in forfeiture for being the principal leader of the Sinaloa Cartel and for 26 drug-related charges, including a murder conspiracy.[81]

---

[76] P.L. 106-120. At the same time, President Barack Obama identified two other Mexican DTOs as kingpins: La Familia Michoacana and Los Zetas. The kingpin designation is one of two major programs by the U.S. Department of the Treasury imposing sanctions on drug traffickers. Congress enacted the program sanctioning individuals and entities globally in 1999.

[77] From 2012 on, cartel leader El Chapo Guzmán was ranked in *Forbes Magazine*'s listing of self-made billionaires.

[78] "Profile: Sinaloa Cartel," *InSight Crime*, January 8, 2016.

[79] U.S. Department of the Treasury, "Treasury Sanctions Longtime Mexican Drug Kingpin Raul Flores Hernandez and His Vast Network: OFAC Kingpin Act Action Targets 22 Mexican Nations and 43 Entities in Mexico," press release, August 9, 2017.

[80] Alan Feuer, "El Chapo May Not Have Been Leader of Drug Cartel, Lawyers Say," *New York Times*, June 26, 2018.

[81] DEA, "Joaquín 'El Chapo' Guzmán, Sinaloa Cartel Leader, Sentenced to Life in Prison Plus 30 Years," press

After Guzmán's trusted deputy El Azul Esparragoza Moreno was reported to have died in 2014, the head of the Sinaloa DTO was assumed to be Guzmán's partner, Ismael Zambada García, alias "El Mayo," who is thought to continue in that leadership role.[82] Sinaloa may operate with a more horizontal leadership structure than previously thought.[83] Sinaloa operatives control certain territories, making up a decentralized network of bosses who conduct business and violence through alliances with each other and local gangs. Local gangs throughout the region specialize in specific operations and are then contracted by the Sinaloa DTO network.[84] The shape of the cartel in the current criminal landscape is evolving, however, as Sinaloa's rivals eye a formidable drug empire built on the proceeds from trafficking South American cocaine and locally sourced methamphetamine, marijuana, and heroin to the U.S. market.

The Sinaloa Cartel appears to have been under a certain amount of pressure thus far in 2020. Some analysts warn that Sinaloa remains powerful given its dominance internationally and its infiltration of the upper reaches of the Mexican government. Other analysts maintain that Sinaloa is in decline, citing its breakup into factions and violence from inter- and intra-organizational tensions. The CJNG evidently has battled against its former partner, Sinaloa, in a number of regions and has been deemed by several authorities to be Mexico's new most expansive cartel. Friction between two factions of the Sinaloa organization intensified in May and June 2020, with violent infighting between a faction led by El Chapo's children (known collectively as "Los Chapitos") and those aligned with a faction under El Mayo.[85]

## Juárez/Carrillo Fuentes Organization

Based in the border city of Ciudad Juárez in the central northern state of Chihuahua, the once-powerful Juárez DTO controlled the smuggling corridor between Ciudad Juárez and El Paso, TX, in the 1980s and 1990s.[86] By some accounts, the Juárez DTO controlled at least half of all Mexican narcotics trafficking under the leadership of its founder, Amado Carrillo Fuentes. Vicente Carrillo Fuentes, Amado's brother, took over the leadership of the cartel when Amado died during plastic surgery in 1997 and reportedly led the Juárez organization until his arrest in October 2014.

In 2008, the Juárez DTO broke from the Sinaloa federation, with which it had been allied since 2002.[87] The ensuing rivalry between the Juárez DTO and the Sinaloa DTO helped to turn Ciudad Juárez into one of the most violent cities in the world. From 2008 to 2011, the Sinaloa DTO and

---

release, July 17, 2019.

[82] Kyra Gurney, "Sinaloa Cartel Leader 'El Azul' Dead? 'El Mayo' Now in Control?," *InSight Crime*, June 9, 2014. Juan José Esparragoza Moreno supposedly died of a heart attack while recovering from injuries sustained in a car accident.

[83] Observers dispute the extent to which Guzmán made key strategic decisions for Sinaloa. Some maintain he was a figurehead whose arrest had little impact on Sinaloa's functioning, as he ceded operational tasks to El Mayo and Esparragoza long before his arrest.

[84] "Revelan Estructura y Enemigos de 'El Chapo'," *Excélsior*, March 26, 2014; Bailey, "Drug Trafficking Organizations and Democratic Governance," p. 119.

[85] Parker Asmann, "Three Massacres Expose Weakness of Mexico's 'Catch-all' Security Policy," *InSight Crime*, July 9, 2019.

[86] Bailey, "Drug Trafficking Organizations and Democratic Governance," p. 121.

[87] Some analysts trace the origins of the split to a personal feud between El Chapo Guzmán of the Sinaloa DTO and former ally Vicente Carrillo Fuentes. In 2004, Guzmán allegedly ordered the killing of Rodolfo Carrillo Fuentes, one of Vicente's brothers. Guzmán's son, Edgar, was killed in May 2008, allegedly on orders from Carrillo Fuentes. See Alfredo Corchado, "Juárez Drug Violence Not Likely to Go Away Soon, Authorities Say," *Dallas Morning News*, May 17, 2010.

the Juárez DTO fought a "turf war," and Ciudad Juárez experienced a wave of violence with spikes in homicides, extortion, kidnapping, and theft—at one point reportedly experiencing 10 murders a day.[88] From 2008 to 2012, the violence in Juárez cost about 10,000 lives. Reportedly, more than 15% of the population displaced by drug-related violence inside Mexico between 2006 and 2010 came from the border city, even though it had only slightly more than 1% of Mexico's population.[89]

Traditionally a major trafficker of both marijuana and cocaine, the Juárez Cartel became active in opium cultivation and heroin production, according to the DEA. Between 2012 and 2013, violence dropped considerably, which some analysts attributed to both the actions of the police and President Calderón's socioeconomic program *Todos Somos Juárez*, or We Are All Juárez.[90] Some analysts posit Sinaloa's success in its battle over the Juárez DTO after 2012 abetted by local authorities as the reason for the relatively peaceful and unchallenged control of the border city despite the Juárez DTO's continued presence in the state.[91] The El Paso and Juárez transit route experienced regular violence with the rise in killings on the Mexican side of the border since 2016, however, largely thought to be a battle for control between Sinaloa and the CJNG and through their proxies.[92]

## Gulf DTO

Based in the border city of Matamoros, Tamaulipas, with operations in other Mexican states on the Gulf side of Mexico, the Gulf DTO was a transnational smuggling operation with agents in Central and South America.[93] The Gulf DTO was the main competitor challenging Sinaloa for trafficking routes in the early 2000s, but it now battles its former enforcement wing, Los Zetas, over territory in northeastern Mexico. The Gulf DTO reportedly has split into several competing gangs. Some analysts no longer consider it a whole entity and maintain that it is so fragmented that factions of its original factions are fighting.[94]

The Gulf DTO arose in the bootlegging era of the 1920s. In the 1980s, its leader, Juan García Ábrego, developed ties to Colombia's Cali Cartel and to the Mexican federal police. García Ábrego was captured in 1996 near Monterrey, Mexico.[95] His violent successor, Osiel Cárdenas Guillén, corrupted elite Mexican military forces to become his hired assassins. Those corrupted military personnel became known as Los Zetas when they fused with the Gulf Cartel. In the early

---

[88] Steven Dudley, "Police Use Brute Force to Break Crime's Hold on Juárez," *InSight Crime*, February 13, 2013. Some Mexican newspapers such as *El Diario* reported more than 300 homicides a month in 2010 when the violence peaked.

[89] For an in-depth narrative of the conflict in Juárez and its aftermath, see Steven Dudley, "Juárez: After the War," *InSight Crime*, February 13, 2013. For a discussion of out-migration from the city due to drug-related violence, see Viridiana Rios Contreras, "The Role of Drug-Related Violence and Extortion in Promoting Mexican Migration: Unexpected Consequences of a Drug War," *Latin America Research Review*, vol. 49, no. 3 (2014).

[90] Calderón launched *Todos Somos Juárez* and sent the Mexican military into Ciudad Juárez in an effort to drive out DTO proxies and operatives. "Calderón Defiende la Estrategia en Ciudad Juárez en Publicación de Harvard," *CNN Mexico*, February 17, 2013. See also CRS Report R41349, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond*, by Clare Ribando Seelke and Kristin Finklea.

[91] See Steven Dudley, "How Juárez's Police, Politicians Picked Winners of Drug War," *InSight Crime*, February 13, 2013.

[92] Daniel Borunda, "Mexican Army Again to Patrol Juárez; Military to Increase Presence After Surge in Violence Across Chihuahua," *El Paso Times*, May 14, 2018.

[93] Bailey, "Drug Trafficking Organizations and Democratic Governance," p. 120.

[94] Scott Stewart, "Tracking Mexico's Cartels in 2018," *Stratfor Worldview*, February 1, 2018.

[95] Steven Dudley and Sandra Rodríguez, *Civil Society, the Government and the Development of Citizen Security*, Wilson Center Mexico Institute, Working Paper, August 2013, p. 11.

2000s, Gulf was considered one of the most powerful Mexican DTOs. Cárdenas was arrested by Mexican authorities in 2003, but he continued to run his drug enterprise from prison until his extradition to the United States in 2007.[96]

Tensions between the Gulf DTO and Los Zetas culminated in their split in 2010. Antonio "Tony Tormenta" Cárdenas Guillén, Osiel's brother, was killed that year, and leadership of the Gulf went to another high-level Gulf lieutenant, Jorge Eduardo Costilla Sánchez, also known as "El Coss," until his arrest in 2012. Exactly what instigated the split between Los Zetas and Gulf has not been determined, but the growing strength of the paramilitary group and its leader was a factor. Some analysts say Los Zetas blamed the Gulf DTO for the murder of a Zeta close to their leader, which sparked the rift.[97] Others posit that the split happened earlier, but the Zetas organization that had brought both military discipline and sophisticated firepower to cartel combat was clearly acting independently by 2010.

Mexican federal forces identified and targeted a dozen Gulf and Zeta bosses they believed responsible for the wave of violence in Tamaulipas in 2014.[98] Analysts have reported that the structures of both the Gulf DTO and Los Zetas have been decimated by federal action and combat between each other, and both groups now operate largely as fragmented cells that do not communicate with each other and often take on new names.[99]

From 2014 through 2016, Tamaulipas state reported daily kidnappings, daytime shootings, and burned-down bars and restaurants in towns and cities in many parts of the state, such as the port city of Tampico. Fragmented cells of the Gulf DTO and of Los Zetas have expanded into other criminal operations, such as fuel theft, kidnapping, and widespread extortion. In the 2019 NDTA, the DEA maintained that the Gulf Cartel, which traditionally focused on the cocaine and marijuana trade, has expanded into heroin and methamphetamine and smuggles the majority of its drug shipments into South Texas.[100]

## Los Zetas

Los Zetas originally consisted of former elite airborne special force members of the Mexican army who defected to the Gulf DTO and became its hired assassins.[101] Although Zeta members are part of a prominent transnational DTO, their main asset is not drug smuggling but organized violence. They evolved from the armed wing of the Gulf Cartel to an outfit in their own right that amassed significant power to carry out an extractive business model, thus generating revenue

---

[96] George W. Grayson, *Mexico: Narco-Violence and a Failed State?* (New Brunswick, NJ: Transaction Publishers, 2010).

[97] Eduardo Guerrero Gutiérrez, "El Dominio del Miedo," *Nexos*, July 1, 2014. Suspecting the Gulf DTO of the death of Sergio Mendoza, the founder of Los Zetas, Heriberto "El Lazo" Lazcano reportedly offered a 24-hour amnesty period for Gulf operatives to claim responsibility, which they never did. This event, some scholars maintain, was the origin of the split between the groups.

[98] Jorge Monroy, "Caen Tres Lideres de Los Zetas y Cartel de Golfo," *El Economista*, June 18, 2014. In June 2014, Mexican marines captured three of those identified.

[99] Interview with Eduardo Guerrero, June 2014. "Balkanization," or decentralization of the structure of the organization, does not necessarily indicate that a criminal group is weak but simply indicates that the group lacks a strong central leadership. Also, news outlets inside Tamaulipas remain reluctant to report on some of the most threatened by DTO cells, so they are reluctant to report on criminal violence and its consequences.

[100] DEA, *2019 NDTA*.

[101] Most reports indicate that Los Zetas were created by a group of 30 lieutenants and sub-lieutenants who deserted from the Mexican military's Special Mobile Force Group (Grupos Aeromóviles de Fuerzas Especiales, GAFES) to join the Gulf Cartel in the late 1990s.

from crimes such as fuel theft, extortion, human smuggling, piracy, arms smuggling, and kidnapping, which are widely seen to inflict more suffering on the Mexican public than does transnational drug trafficking.[102]

Los Zetas had a significant presence in several Mexican states on the Gulf side of the country and extended their reach to Ciudad Juárez (Chihuahua) and some Pacific states. They also operate in Central and South America. More aggressive than other groups, Los Zetas used intimidation as a strategy to maintain control of territory, making use of social media and public displays of bodies and body parts to send messages to frighten Mexican security forces, the local citizenry, and rival organizations. Sometimes smaller gangs and organizations use the "Zeta" name to tap into the benefits of the Zeta reputation, or "brand."

Unlike many other DTOs, Los Zetas have been less inclined to attempt to win local populations' support in the territory in which they operate. They are linked to a number of massacres, such as the 2011 firebombing of a casino in Monterrey that killed 53 people and the 2011 torture and mass execution of 193 migrants who were traveling through northern Mexico by bus.[103] Los Zetas are known to kill those who cannot pay extortion fees or who refuse to work for them, often targeting migrants.[104]

In 2012, Mexican marines killed longtime Zeta leader Heriberto Lazcano (alias "El Lazca"), one of the founders of Los Zetas, in a shootout in the northern state of Coahuila.[105] The capture of his successor, Miguel Ángel Treviño Morales (alias "Z-40"), notorious for his brutality, in 2013 by Mexican federal authorities was a second blow to the group. Some analysts date the beginning of the "loss of coherence" of Los Zetas to Lazcano's killing. According to Mexico's former attorney general, federal government efforts against the cartels through April 2015 hit Los Zetas the hardest, with more than 30 Los Zetas leaders removed.[106]

Los Zetas are known for their diversification and expansion into various criminal activities, such as fuel theft. According to media coverage, losses by Pemex, Mexico's state oil company, from siphoned-off oil in recent years have exceeded $3 billion. In 2017, the Atlantic Council released a report estimating that Los Zetas control about 40% of the market in stolen oil. Los Zetas have resisted government attempts to curtail their sophisticated networks.[107]

Although many observers dispute the scope of the territory now held by major Los Zetas factions and how fragmentation influenced the formerly cohesive group's prospects, most concur that the organization is no longer as powerful as it was during the peak of its dominance in 2011 and 2012. Two rival factions are Cartel del Noreste, a rebranded version of the traditional core of Los Zetas, and the Old School Zetas, known by their Spanish acronym EV. One scholar has characterized how Los Zetas succeeded in spinning off powerful franchises or cells after

---

[102] Bailey, "Drug Trafficking Organizations and Democratic Governance," p. 120; interview with Alejandro Hope, Wilson Center, July 2014.

[103] George Grayson, *The Evolution of Los Zetas in Mexico and Central America: Sadism as an Instrument of Cartel Warfare* (Carlisle Barracks, PA: U.S. Army War College Press, 2014), p. 9.

[104] According to Grayson, Los Zetas also are believed to kill members of law enforcement officials' families in revenge for action taken against the organization, reportedly even targeting families of fallen military men.

[105] Will Grant, "Heriberto Lazcano: The Fall of a Mexican Drug Lord," BBC News, October 13, 2012.

[106] "Los Zetas Are the Criminal Organization Hardest Hit by the Mexican Government," *Southernpulse.info*, May 13, 2015.

[107] Michael Lohmuller, "Will Pemex's Plan to Fight Mexico Oil Thieves Work?," *InSight Crime*, February 18, 2015; Ian M. Ralby, *Downstream Oil Theft: Global Modalities, Trends, and Remedies*, Atlantic Council, January 2017.

leadership decapitation.[108] According to the 2019 NDTA, Los Zetas continue to traffic a range of drugs, including heroin and cocaine, through distribution hubs in Laredo, Dallas, and New Orleans.

## Beltrán Leyva Organization

Before 2008, the Beltrán Leyva Organization (BLO) was part of the Sinaloa federation and controlled access to the U.S. border in Mexico's Sonora State. The Beltrán Leyva brothers developed close ties with Sinaloa head El Chapo Guzmán and his family, along with other Sinaloa-based top leadership. The January 2008 arrest of BLO's leader, Alfredo Beltrán Leyva, through intelligence reportedly provided by Guzmán, triggered BLO's split from the Sinaloa DTO.[109] The two organizations have remained bitter rivals since.

BLO suffered a series of setbacks at the hands of the Mexican security forces, beginning with the 2009 killing of Arturo Beltrán Leyva, followed closely by the arrest of Carlos Beltrán Levya. In 2010, the organization broke up when the remaining brother, Héctor Beltrán Leyva, took the remnants of BLO and rebranded it as the South Pacific (*Pacífico Sur*) Cartel. Another top lieutenant, Edgar "La Barbie" Valdez Villarreal, took a faction loyal to him and formed the Independent Cartel of Acapulco, which he led until his arrest in 2010.[110] The South Pacific Cartel appeared to retake the name Beltrán Leyva Organization and achieved renewed prominence under Hector Beltrán Leyva's leadership until his arrest in 2014.

Splinter organizations have arisen since 2010, such as the *Guerreros Unidos* and *Los Rojos*, among at least five others with roots in BLO. Los Rojos operates in Guerrero and relies heavily on kidnapping and extortion for revenue as well as trafficking cocaine, although analysts dispute the scope of its involvement in the drug trade.[111] The Guerreros Unidos traffics cocaine as far north as Chicago in the United States and reportedly operates primarily in the central and Pacific states of Guerrero, México, and Morelos. The Guerreros Unidos, according to authorities in the Peña Nieto government, murdered 43 Mexican teacher trainees, who were handed to them by local authorities in Guerrero, and then burned their bodies.[112]

Like other DTOs, BLO was believed to have infiltrated the upper levels of the Mexican government for at least part of its history, but whatever reach it once had has likely declined significantly after Mexican authorities arrested many of its leaders. According to the 2019 NDTA,

---

[108] See, for example, Guadaulpe Correa-Cabrera, *Los Zetas Inc.: Criminal Corporations, Energy, and Civil War in Mexico* (Austin, TX: University of Texas Press, 2017).

[109] See *InSight Crime* profile, "Beltrán Leyva Organization." The profile suggests that Guzmán gave authorities information on Alfredo Beltrán Leyva to secure the release of Guzmán's son from prison.

[110] Edgar Valdez is an American-born smuggler from Laredo, TX, and allegedly started his career in the United States dealing marijuana. His nickname is "La Barbie" due to his fair hair and eyes. Nicholas Casey and José de Córdoba, "Alleged Drug Kingpin Is Arrested in Mexico," *Wall Street Journal*, August 31, 2010. La Barbie, a former Beltrán Leyva Organization (BLO) operative and Sinaloa Cartel ally, was arrested in Mexico in 2010 and later extradited to the United States in 2015. After originally pleading not guilty, he eventually reached a plea deal with U.S. prosecutors and in June 2018 was sentenced to nearly 50 years in prison. Parker Asmann, "Was Mexico Cartel Enforcer 'La Barbie' a U.S. Informant?," *InSight* Crime, June 15, 2020, at https://www.insightcrime.org/news/analysis/mexico-la-barbie-informant/.

[111] Marguerite Cawley, "Murder Spike in Guerrero, Mexico Points to Criminal Power Struggle," *InSight Crime*, May 30, 2014; "Mexico Nabs Drug Gang Leader in State of Guerrero," Associated Press, May 17, 2014.

[112] According to the profile of Guerreros Unidos on the *InSight Crime* website, an alleged leader of the group is the brother-in-law of the former mayor of Iguala.

BLO splinter factions rely on loose alliances with the CJNG, the Juárez Cartel, and elements of Los Zetas to move drugs across the border.[113]

## La Familia Michoacana

Based originally in the Pacific state of Michoacán, La Familia Michoacana (LFM) traces its roots to the 1980s. Formerly aligned with Los Zetas before the group's split from the Gulf DTO, LFM announced its intent to operate independently from Los Zetas in 2006, declaring that LFM's mission was to protect Michoacán from drug traffickers, including its new enemies, Los Zetas.[114] From 2006 to 2010, LFM acquired notoriety for its use of extreme, symbolic violence, military tactics gleaned from Los Zetas, and a pseudo-ideological or religious justification for its existence.[115] LFM members reportedly made donations of food, medical care, schools, and other social services to benefit the poor in rural communities to project a populist "Robin Hood" image.

In 2010, however, LFM played a less prominent role, and in November 2010, LFM reportedly called for a truce with the Mexican government and announced it would disband.[116] A month later, spiritual leader and cofounder Nazario "El Más Loco" Moreno González was reportedly killed, although authorities claimed his body was stolen.[117] The body was never recovered, and Moreno González reappeared in another shootout with Mexican federal police in 2014, after which his death was officially confirmed.[118] Moreno González had been nurturing the development of a new criminal organization that emerged in early 2011, calling itself the Knights Templar and claiming to be a successor or offshoot of LFM.[119]

Though "officially" disbanded, LFM remained in operation, even after the 2011 arrest of leader José de Jesús Méndez Vargas (alias "El Chango"), who allegedly took over after Moreno González's disappearance.[120] Though largely fragmented, remaining cells of LFM remain active in trafficking, kidnapping, and extortion in Guerrero and Mexico states, especially in the working-class suburbs around Mexico City through 2014.[121] Observers report that LFM was largely driven out of Michoacán by the Knights Templar, although a group calling itself the New Family Michoacan, *La Nueva Familia Michoacana*, reportedly has been active in parts of Guerrero and Michoacán. As a DTO, LFM has specialized in methamphetamine production and smuggling, along with some trafficking of other synthetic drugs. It has also been known to traffic marijuana and cocaine and to tax and regulate heroin production.

---

[113] DEA, *2019 NDTA*.

[114] Alejandro Suverza, "El Evangelio Según La Familia," *Nexos*, January 1, 2009. For more on its early history, see *InSight Crime*'s profile on La Familia Michoacana (LFM).

[115] In 2006, LFM gained notoriety when it rolled five severed heads allegedly of rival criminals across a discotheque dance floor in Uruapan. LFM was known for leaving signs (*narcomantas*) on corpses and at crime scenes that referred to LFM actions as "divine justice." William Finnegan, "Silver or Lead," *New Yorker*, May 31, 2010.

[116] "Mexican Drug Wars: Bloodiest Year to Date," *Stratfor Worldview*, December 20, 2010.

[117] Dudley Althaus, "Ghost of 'The Craziest One' Is Alive in Mexico," *InSight Crime*, June 11, 2013.

[118] Mark Stevenson and E. Eduardo Castillo, "Mexico Cartel Leader Thrived by Playing Dead," Associated Press, March 10, 2014.

[119] The Knights Templar was purported to be founded and led by Servando "La Tuta" Gómez, a former school teacher and a lieutenant to Moreno Gonzáles. However, after Moreno González's faked demise, taking advantage of his death in the eyes of Mexican authorities, Moreno González and Gómez founded the Knights Templar together in the wake of a dispute with LFM leader José de Jesús Méndez Vargas, who stayed with LFM. See Falko A. Ernst, "Seeking a Place in History—Nazario Moreno's Narco Messiah," *InSight Crime*, March 13, 2014.

[120] Adriana Gómez Licón, "Mexico Nabs Leader of Cult-Like La Familia Cartel," Associated Press, June 21, 2011.

[121] CRS interview with Dudley Althaus, June 2014.

## Knights Templar

The Knights Templar began as a splinter group from LFM, announcing its presence in Michoacán in 2011. Similar to LFM, the Knights Templar began as a vigilante group, claiming to protect the residents of Michoacán from other criminal groups, such as Los Zetas, but in reality it operated as a DTO. The Knights Templar is known for the trafficking and manufacture of methamphetamine, but the organization also moves cocaine and marijuana north. Like LFM, it preaches its own version of evangelical Christianity and claims to have a commitment to "social justice" while being the source of much insecurity in Michoacán and surrounding states.

Frustration with the perceived ineffectiveness of Mexican law enforcement in combating predatory criminal groups led to the birth in Michoacán of *autodefensa*, or self-defense, organizations, particularly in the Tierra Caliente region in the southwestern part of the state. Composed of citizens from a wide range of backgrounds—farmers, ranchers, businessmen, former DTO operatives, and others—the self-defense militias primarily targeted members of the Knights Templar. Local business owners, who had grown weary of widespread extortion and hyper-violent crime that was ignored by corrupt local and state police, provided seed funding to resource the militias, but authorities cautioned that some of the self-defense groups had extended their search for resources and weapons to competing crime syndicates, such as the CJNG. Despite some analysts' contention that ties to rival criminal groups are highly likely, other observers are careful not to condemn the entire self-defense movement. They note some gains in the effort to combat the Knights Templar when government security forces were unsuccessful, although conflict between self-defense groups also has led to violence.

The Knights Templar reportedly has emulated LFM's penchant for diversification. The Knights Templar battled LFM, and by 2012 its control of Michoacán was nearly as widespread as LFM's had once been, especially by demanding that local businesses pay tribute through hefty levies. The Knights Templar also moved aggressively into illegal mining, such as mining iron ore from illegally operated mines. Through mid-2014, the Knights Templar reportedly had been using Mexico's largest port, Lázaro Cárdenas, located in the southern tip of Michoacán, to smuggle illicit goods.[122] Analysts and Mexican officials, however, suggest a 2014 federal occupation of Lázaro Cárdenas resulted in an "impasse," rendering DTOs unable to receive and send shipments.[123]

The Mexican government and self-defense forces delivered heavy blows to the Knights Templar, especially with the confirmed killing in March 2014 of Nazario Moreno González, who led the Knights, and the killing of Enrique Plancarte, another top leader, weeks later.[124] Previously, the self-defense forces and the Knights Templar reportedly had split Michoacán roughly into two, although other criminal organizations continued to operate successfully in the area. In February 2015, the Knights Templar DTO leader Servando "La Tuta" Gómez was captured. The former schoolteacher had taken risks by being interviewed in the media. With La Tuta's arrest, the fortunes of the Knights Templar plummeted.

---

[122]"Mexico Seizes Tonnes of Minerals in Port Plagued by Drug Gangs," Reuters, March 3, 2014. The Knights Templar shared control with the powerful Sinaloa DTO. Both groups reportedly received shipments of cocaine from South America and precursor chemicals used to produce methamphetamines largely from Asia.

[123] Interview with Eduardo Guerrero, July 2014.

[124] Olga R. Rodriguez, "Mexican Marines Kill Templar Cartel's Leader," Associated Press, April 1, 2014.

## Cártel Jalisco Nuevo Generación

Originally known as the Zeta Killers, the CJNG made its first appearance in 2011 with a roadside display of the bodies of 35 alleged members of Los Zetas. The group is based in Jalisco State with operations in central Mexico, including the states of Colima, Michoacán, México, Guerrero, and Guanajuato.[125] It has grown into a dominant force in the states of the Tierra Caliente, including parts of Guerrero, Michoacán, and the state of Mexico. The CJNG has early roots in the Milenio Cartel, which was active before 2010 in the Tierra Caliente region.[126]

The CJNG reportedly served as an enforcement group for the Sinaloa DTO until the summer of 2013.[127] Analysts and Mexican authorities have suggested that the split between Sinaloa and the CJNG is one of the many indications of a general fragmentation of crime groups. The Mexican military delivered a blow to the CJNG with the July 2013 capture of its leader's deputy, Víctor Hugo "El Tornado" Delgado Renteria. He was replaced by the current leader, Nemesio Oseguera Cervantes, known as El Mencho. In January 2014, the Mexican government arrested El Mencho's son, Rubén "El Menchito" Oseguera, believed to be the CJNG's second-in-command. However, El Menchito, who was released by Mexican judges twice, was rearrested by Mexican authorities and later extradited to the United States in February 2020.[128]

In 2015, the Mexican government declared the CJNG one of the most dangerous cartels in the country. In 2016, the U.S. Department of the Treasury echoed the Mexican government when it described the group as one of the world's "most prolific and violent drug trafficking organizations."[129] According to some analysts, the CJNG has operations throughout the Americas, Asia, and Europe. The group is allegedly responsible for distributing cocaine and methamphetamine along "10,000 kilometers of the Pacific coast in a route that extends from the Southern Cone to the border of the United States and Canada."[130]

To best understand the CJNG's international reach, it is important to first consider its expansion within Mexico. In 2016, many analysts maintained that the CJNG controlled a territory equivalent to almost half of Mexico. The group has battled Los Zetas and Gulf Cartel factions in Tabasco, Veracruz, and Guanajuato, and it has battled the Sinaloa federation in the Baja Peninsula and Chihuahua.[131] The CJNG's ambitious expansion campaign has led to high levels of violence, particularly in Ciudad Juárez and Tijuana.[132] The group also has been linked to several mass graves in southwestern Mexico and was responsible for shooting down a Mexican army helicopter in 2015, the first successful takedown of a military asset of its kind in Mexico.[133]

---

[125] "Se Pelean el Estado de México 4 Carteles," *El Siglo de Torreón*, March 2, 2014; CRS interview with Dudley Althaus, 2014.

[126] "Tracking Mexico's Cartels in 2017," *Stratfor Worldview*, February 3, 2017.

[127] Reportedly, the CJNG's leadership was originally composed of former associates of slain Sinaloa DTO leader Ignacio "Nacho" Coronel, who operated his Sinaloa faction in Jalisco until he was killed by security forces in July 2010.

[128] Juan Carlos Huerta Vázquez, "'El Menchito', un Desafío para la PGR," *Proceso*, January 15, 2016.

[129] U.S. Department of the Treasury, "Treasury Sanctions Individuals Supporting Powerful Mexico-Based Drug Cartels," press release, October 27, 2016.

[130] Luis Alonso Pérez, "Mexico's Jalisco Cartel—New Generation: From Extinction to World Domination," *InSight Crime* and *Animal Político*, December 26, 2016.

[131] "Tracking Mexico's Cartels in 2017," *Stratfor Worldview*, February 3, 2017.

[132] Deborah Bonello, "After Decade-Long Drug War, Mexico Needs New Ideas," *InSight Crime 2016 GameChangers: Tracking the Evolution of Organized Crime in the Americas*, January 4, 2017.

[133] Angel Rabasa et al., *Counterwork: Countering the Expansion of Transnational Criminal Networks*, RAND

The CJNG's efforts to dominate key ports on both the Pacific and Gulf Coasts have allowed it to consolidate important components of the global narcotics supply chain. In particular, the CJNG asserts control over the ports of Veracruz, Mazanillo, and Lázaro Cárdenas, which has given the group access to precursor chemicals that flow into Mexico from China and other parts of Latin America.[134] As a result, the CJNG has been able to pursue an aggressive growth strategy underwritten by U.S. demand for Mexican methamphetamine, heroin, and fentanyl.[135]

Despite leadership losses, the CJNG has extended its geographic reach and maintained its own cohesion while exploiting the splintering of the Sinaloa organization. It is considered an extremely powerful cartel, with a presence in 27 of 32 Mexican states in 2020. Its reputation for extreme and intimidating violence continues. The daylight ambush of Mexico City Chief of Police Omar García Harfuch in late June 2020 was preceded by publicized threats that targeted him and Jalisco State Governor Enrique Alfaro. Press reports say the tally of the CJNG's attacks on Jalisco public officials exceeds 100, including lawmakers, federal, state and local police, soldiers, and Jalisco's minister of tourism. Notably, the DEA considers the CJNG a top U.S. threat and Mexico's most well-armed DTO and has offered a $10 million reward for information leading to the arrest of El Mencho, who is believed to be hiding in the mountains of Jalisco, Michoacán, and Colima. He is a former police officer who once served time for heroin trafficking in California. The CJNG was the target of a major DEA operation in March 2020 that resulted in some 600 arrests.[136]

## Fragmentation, Competition, and Diversification

As stated earlier, DTOs today are more fragmented and more competitive than in the past. However, analysts disagree about the extent of this fragmentation, its importance, and whether the group of smaller organizations will be easier to dismantle. Fragmentation that began in 2010 and accelerated in 2011 redefined the "battlefield" and brought new actors, such as Los Zetas and the Knights Templar, to the fore. In 2018, an array of smaller organizations were active, and some of the once-small groups, such as the CJNG, entered the space left after other DTOs were dismantled. Recently, some analysts have identified the CJNG as a cartel with national reach like the Sinaloa DTO, although it was originally an allied faction or the armed wing of Sinaloa organization.

A newer cartel, known as Los Cuinis, was identified as a major organization in 2015. In April 2015, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) named both the CJNG and Los Cuinis as Specially Designated Narcotics Traffickers under the Foreign Narcotics Kingpin Designation Act. According to an OFAC statement, the Los Cuinis DTO has become "one of the most powerful and violent drug cartels in Mexico."[137] Other analysts view the fragments as the cause of heightened violence but note that groups appear less able to challenge the national government and engage in some types of transnational crimes, including drug trafficking.

---

Corporation, 2017.

[134] "Tracking Mexico's Cartels in 2017," *Stratfor Worldview*, February 3, 2017.

[135] Bonello, "After Decade-Long Drug War."

[136] Montes and Córdoba, "Cartel Becomes Top Mexico Threat"; Sieff, "Mexico's Bold Jalisco Cartel Places Elite in Its Sights." See also U.S. Department of Justice, "DEA-Led Operation Nets More Than 600 Arrests Targeting Cártel Jalisco Nueva Generación," press release, March 11, 2020.

[137] See U.S. Department of the Treasury, "Treasury Sanctions Business Network of the Los Cuinis Drug Trafficking Organization," press release, August 19, 2015.

IFR_AR_202360

Contrary to the experience in Colombia in the 1980s and 1990s, with the sequential dismantling of the enormous Medellín and Cali cartels, fragmentation in Mexico has been associated with resurging violence.[138] A kingpin strategy implemented by the Mexican government has incapacitated numerous top- and mid-level leaders in all the major DTOs either through arrest or deaths in arrest efforts. However, this strategy contributed to violent succession struggles, shifting alliances among the DTOs, a proliferation of new gangs and small DTOs, and the replacement of existing leaders and criminal groups by even more violent ones.

The ephemeral prominence of some new gangs and DTOs, regional changes in the power balance among different groups, and shifting allegiances often catalyzed by government enforcement actions make elusive an accurate portrait of the current criminal landscape. As noted earlier, in the last months of 2019, almost all the investigations of flagrant incidents of violence involving the DTOs in Sinaloa State, the Tierra Caliente region, and the Mexican border states were committed by fragments of formerly cohesive criminal groups. Diversification of the DTOs and their evolution into poly-crime outfits may be evidence of organizational vitality and growth. Others contend that diversification signals that U.S. and Mexican drug enforcement measures are cutting into profits from drug trafficking or constitutes a response to shifting U.S. drug consumption patterns, such as legalization of marijuana in some U.S. states (and Canada) and a large increase in demand for plant-based and synthetic opioids.[139]

# Outlook

The goal of successive Mexican governments has been to diminish the extent and character of the DTOs' activity from a national security threat to a law-and-order problem and, once this is achieved, to return responsibility for addressing this challenge from military forces back to the police. Former President Peña Nieto did not succeed in his stated objective to reduce the scope of the military's role in domestic policing, and military enforcement activities led to serious allegations of torture and human rights abuses. Current President López Obrador decided to continue a militarized policing strategy. He authorized a continuation of Mexican armed forces in domestic law enforcement through the remainder of his tenure. The National Guard he began deploying in July 2019 has had, thus far, fewer abuse allegations than the military.[140] The López Obrador government continues to face DTO-related corruption charges against public officials, politicians, and members of the nation's police forces. As of mid-2020, López Obrador's campaign pledges to carry out broader anti-corruption efforts have not been fully implemented.[141]

---

[138] In Colombia's case, successfully targeting the huge and wealthy Medellín and Cali cartels and dismantling them meant that a number of smaller DTOs (*cartelitos*) replaced them. The smaller organizations have not behaved as violently as the larger cartels, and thus the Colombian government was seen to have reduced violence in the drug trade. However, there were critical factors in Colombia that were not present in Mexico, such as the presence of guerrilla insurgents and paramilitaries that became deeply involved in the illegal drug business. Some have argued that the Colombian cartels of the 1980s and 1990s were structured and managed very differently than their contemporary Mexican counterparts.

[139] Morris Panner, "Latin American Organized Crime's New Business Model," *ReVista*, vol. 11, no. 2 (Winter 2012). The author comments that "the business is moving away from monolithic cartels toward a series of mercury-like mini-cartels. Whether diversification is a growth strategy or a survival strategy in the face of shifting narcotics consumption patterns, it is clear that organized crime is pursuing a larger, more extensive agenda."

[140] Testimony of Maureen Meyer, in U.S. Congress, House Committee of Foreign Affairs, Subcommittee on the Western Hemisphere, Civilian Security, and Trade, *Strengthening Security and Rule of Law in Mexico*, hearings, 116th Cong., 2nd sess., January 15, 2020.

[141] Calderón et al., *Organized Crime*; Gina Hinojosa and Maureen Meyer, *The Future of Mexico's National Anti-Corruption System: The Anti-Corruption Fight under President López-Obrador*, Washington Office on Latin America,

As discussed in this report, the splintering of the large criminal organizations has led to increased violence. The demise of the traditional kingpins, envisioned as ruling their cartel armies in a hierarchical fashion from a central position, has led to equally violent, smaller, highly fractured groups.[142] The central states of Jalisco, Colima, and Guanajuato, where criminal markets were in flux, saw Mexico's most intense violence in 2019 and into early 2020. Two causes of the current violence may be the decline of Sinaloa Cartel's dominance and the heightened competition to profit from the increasing production and distribution of heroin and synthetic opioids and methamphetamine. Some observers remain convinced of the capacity of both the Sinaloa organization and its primary competitor, the expansive CJNG, to retain significant power using their well-established bribery and corruption networks backed by violence.

Many U.S. government officials and policymakers have concerns about the Mexican government's capacity to reduce violence in Mexico or curb the power of the DTOs. Many analysts have viewed a continued reliance on the kingpin strategy, which they argue has not lowered violence in a sustainable way, as problematic. Some analysts back a new strategy of targeting the middle operational layer of each major criminal group to handicap the groups' regeneration capacity.[143] Other structural factors that plague Mexico's struggle for security and stability include very high criminal impunity and continued high demand for drugs from the United States and Europe.

---

August 2019. For more background, see **Appendix**.

[142] Patrick Corcoran, "Why Are More People Being Killed in Mexico in 2019?," *InSight Crime*, August 8, 2019.

[143] See, for example, Vanda Felbab-Brown, *AMLO's Security Policy: Creative Ideas, Tough Reality*, Brookings Institution, March 2019.

# Appendix. Drug Trafficking in Mexico and Government Efforts to Combat the DTOs

Drug trafficking organizations (DTOs) have operated in Mexico for more than a century. The DTOs can be described as global businesses with forward and backward linkages for managing supply and distribution of all manner of narcotics in many countries. As businesses, their goal is to bring their product to market in the most efficient way to maximize their profits.

Mexican DTOs are the major wholesalers of illegal drugs in the United States and are increasingly gaining control of U.S. retail-level distribution through alliances with U.S. gangs. Their operations, however, are markedly less violent in the United States than in Mexico, despite their reportedly significant presence in many U.S. jurisdictions.

The DTOs use bribery and violence as complementary tactics. Violence is used to discipline employees, enforce agreements, limit the entry of competitors, and coerce. Bribery and corruption help to neutralize government action against the DTOs, ensure impunity, and facilitate smooth operations. The proceeds of drug sales (either laundered or as cash smuggled back to Mexico) are used in part to corrupt U.S. and Mexican border officials,[144] Mexican law enforcement, security forces, and public officials tend to either ignore DTO activities or actively support and protect the DTOs. Mexican DTOs advance their operations through widespread corruption. When corruption fails to achieve cooperation and acquiescence, violence is the ready alternative.

The relationship of Mexico's drug traffickers to the government and to one another is rapidly evolving, and any snapshot (such as the one provided in this report) must be continually adjusted to current realities. In the early 20th century, Mexico was a source of marijuana and heroin trafficked to the United States, and by the 1940s, Mexican drug smugglers were notorious in the United States. The growth and entrenchment in Mexico of drug trafficking networks occurred during a period of one-party rule by the Institutional Revolutionary Party (PRI), which governed the country for 71 years. During that period, the government was centralized and hierarchical, and, to a large degree, it tolerated and protected some drug production and trafficking in certain regions of the country, even though the PRI government did not generally tolerate crime.[145]

Mexico is a longtime recipient of U.S. counterdrug assistance, but cooperation was limited between the mid-1980s and the mid-2000s due to U.S. distrust of Mexican officials and Mexican sensitivity about U.S. involvement in the country's internal affairs. Numerous accounts maintain that for many years, the Mexican government pursued an overall policy of accommodation of DTOs. Under this system, arrests and eradication of drug crops took place, but due to the effect of widespread corruption, the system was "characterized by a working relationship between Mexican authorities and drug lords" through the 1990s.[146]

The system's stability began to fray in the 1990s, as Mexican political power decentralized and the push toward democratic pluralism began, first at the local level and then nationally with the election of National Action Party candidate Vicente Fox as president in 2000.[147] The process of

---

[144] For further discussion of corruption of U.S. and Mexican officials, see Loren Riesenfeld, "Mexico Cartels Recruiting U.S. Border Agents: Inspector General," *InSight Crime*, April 16, 2015; CRS Report R41349, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond*, by Clare Ribando Seelke and Kristin Finklea.

[145] Luis Astorga and David A. Shirk, *Drug Trafficking Organizations and Counter-Drug Strategies*, University of California-San Diego, Center for U.S.-Mexican Studies, Working Paper 10-01, 2010, p. 5.

[146] Francisco E. González, "Mexico's Drug Wars Get Brutal," *Current History*, February 2009.

[147] Shannon O'Neil, "The Real War in Mexico: How Democracy Can Defeat the Drug Cartels," *Foreign Affairs*, vol. 88, no. 4 (July/August 2009).

democratization upended the equilibrium that had developed between state actors (such as the Federal Security Directorate, which oversaw domestic security from 1947 to 1985) and organized crime. No longer were certain officials able to ensure drug traffickers' impunity to the same degree and to regulate competition among Mexican DTOs for, or *plazas*. To a large extent, DTO violence directed at the government appears to be an attempt to reestablish impunity, whereas the inter-cartel violence seems to be an attempt to establish dominance over specific drug trafficking plazas. The intra-DTO violence (or violence inside the organizations) reflects a reaction to suspected betrayals and the competition to succeed killed or arrested leaders.

Other transformations of the drug trade took place during the 1980s and early 1990s. As Colombian DTOs were forcibly broken up, Mexican traffickers gradually took over the highly profitable traffic in cocaine to the United States. Intense U.S. government enforcement efforts led to the shutdown of the traditional trafficking route used by the Colombians through the Caribbean. As Colombian DTOs lost this route, they increasingly subcontracted the trafficking of cocaine produced in the Andean region to the Mexican DTOs, which they paid in cocaine rather than cash. These already-strong Mexican organizations gradually took over the cocaine trafficking business, evolving from being mere couriers of cocaine for the Colombians to being the wholesalers they are today.

As Mexico's DTOs rose to dominate the U.S. drug markets in the 1990s, the business became even more lucrative. This shift raised the financial stakes, which encouraged the use of violence in Mexico to protect and promote market share. The violent struggles among DTOs is now over strategic routes and warehouses where drugs are consolidated before entering the United States, reflecting these higher stakes.

Former President Felipe Calderón (2006-2012) made an aggressive campaign against criminal groups, especially the large DTOs, the central focus of his administration's policy. He sent several thousand Mexican military troops and federal police to combat the organizations in drug trafficking "hot spots" around the country. His government made some dramatic arrests, but few of the captured kingpins were convicted. Between 2007 and 2012, as part of much closer U.S.-Mexican security cooperation, the Mexican government significantly increased extraditions to the United States, with a majority of the suspects wanted by the U.S. government on drug trafficking and related charges. The number of extraditions grew through 2012 and remained steady during President Enrique Peña Nieto's term (2012-2018). A consequence of the militarized strategy used in successive Mexican administrations was an increase in accusations of human rights violations against the Mexican military, which was largely untrained in domestic policing.

According to a press investigation of published Mexican government statistics, Mexican armed forces injured or killed some 3,900 individuals in their domestic operations between 2007 and 2014, labeled by the military *civilian aggressors*.[148] According to the report, the government data did not explain the high death rate (about 500 were injuries and the rest killings) or specify which of the military's victims were armed and which were bystanders. (Significantly, the military's role in injuries and killings ceased to be made public after 2014, according to the account.[149])

Few incidents of suspected police and security force torture are reported in Mexico (less than 10%), according to several estimates, in large part because of a belief that nothing will be done. Impunity for military and police is likely to follow an established pattern of high levels of impunity for most crimes. Judicial and policing weaknesses have allowed about a 95% impunity

---

[148] Steve Fisher and Patrick J. McDonnell, "Mexico Sent in the Army to Fight the Drug War. Many Question the Toll on Society and the Army Itself," *Los Angeles Times*, June 18, 2018.

[149] Fisher and McDonnell, "Mexico Sent in the Army to Fight the Drug War."

level for the resolution of crimes on average. For decades, roughly 90% of crimes in Mexico have gone unreported, while of those crimes that are reported only 4%-6% of the total reach conclusion adequately.[150]

Peña Nieto pledged a new direction in his security policy to focus more on reducing criminal violence that affects civilians and businesses and less on removing the leaders of the large DTOs. Ultimately, that promise was not met. His attorney general, Jesús Murillo Karam, said in 2012 that Mexico faced challenges from some 60-80 crime groups, a proliferation he attributed to his predecessor Calderón's kingpin strategy.[151] However, despite Peña Nieto's pledge to alter his approach, analysts found considerable continuity between the strategies of Calderón and Peña Nieto.[152] The Peña Nieto government recentralized control over security and continued the strategy of taking down top drug kingpins, adopting Calderón's list of top trafficker targets, updated as needed. Significantly, the resulting fragmentation has continued to splinter Mexico's criminal groups with attendant violence and instability.[153]

Following some reorganization, Peña Nieto continued cooperation with the United States under the Mérida Initiative begun during Calderón's term. The Mérida Initiative, a bilateral anticrime assistance program launched in 2008, initially focused on providing Mexico with hardware, such as planes, scanners, and other equipment, to combat the DTOs. The Peña Nieto government continued the Mérida programs. However, the focus on crime prevention, which received significant attention early in his term, ended prematurely due to budget cutbacks.[154]

President Andrés Manuel López Obrador, who took office in 2018, pledged to make Mexico a more just and peaceful society and vowed to govern with austerity. López Obrador made broad promises to fight corruption and reduce violence, build infrastructure in southern Mexico, revive the state oil company, and promote social programs.[155] Given the oil price collapse in early 2020, fiscal constraints, rising violence, and significant health effects and projected severe recession linked to the Coronavirus Disease 2019 (COVID-19) pandemic, many observers question whether his goals are attainable.[156]

López Obrador launched a new presidential commission to coordinate the investigation of a high-profile, unsolved case from 2014 in which a drug cartel allegedly murdered 43 youth in Guerrero state. In June 2020, arrest warrants were issued for more than 40 municipal officials in Guerrero after years of flawed investigations.[157] López Obrador has remained popular, although his denial that homicide levels have continued to increase and his criticism of the press for not providing more positive coverage have raised concerns. Some analysts question his commitment to combat

---

[150] María Novoa, "The Wheels of Justice in Mexico Are Failing. What Can Be Done?," *Americas Quarterly*, July 9, 2020.

[151] Patrick Corcoran, "Mexico Has 80 Drug Cartels: Attorney General," *In Sight Crime*, December 20, 2012.

[152] Vanda Felbab-Brown, *Changing the Game or Dropping the Ball? Mexico's Security and Anti-Crime Strategy Under President Peña Nieto*, Brookings Institution, November 2014. Velbab-Brown maintains that the government of Peña Nieto "largely slipped into many of the same policies of President Felipe Calderón."

[153] Scott Stewart, "Tracking Mexico's Cartels in 2019," *Stratfor Worldview*, January 29, 2019.

[154] With the sharp oil price declines in 2014 onward, the administration was forced to impose budget austerity measures, including on aspects of security. See CRS In Focus IF10578, *Mexico: Evolution of the Mérida Initiative, 2007-2020*, by Clare Ribando Seelke.

[155] CRS In Focus IF10578, *Mexico: Evolution of the Mérida Initiative, 2007-2020*, by Clare Ribando Seelke.

[156] Laura Weiss, "Can AMLO End Mexico's Drug War?," *World Politics Review*, May 16, 2019; Arturo Angel, "Mandan Fondo Anticrimen a COVID-19, pese al Aumento de Violencia y Depuración Policial Incompleta," *Animal Político*, April 14, 2020.

[157] "New Arrest Warrants Issued in Case of Mexico's Missing 43," Associated Press, June 30, 2020.

corruption and to curb Mexico's persistent organized-crime-related violence. During his presidential campaign, López Obrador said he would consider unconventional approaches, such as legalization of some drugs. However, several observers maintain that the administration has not issued an effective or comprehensive security policy to combat the DTOs (beyond measures to deter vulnerable youth from crime).[158]

## Author Information

June S. Beittel
Analyst in Latin American Affairs

## Acknowledgments

Research Librarian Carla Davis-Castro provided invaluable research for this report.

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

---

[158] For more on the President Lopéz Obrador's evolving approach to security, see CRS Report R42917, *Mexico: Background and U.S. Relations*, by Clare Ribando Seelke.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

East Bay Sanctuary Covenant, *et al.*,

               Plaintiffs,

v.

Joseph R. Biden, *et al.*,

               Defendants.

No. 4:18-cv-06810-JST

### DECLARATION OF BLAS NUÑEZ-NETO

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security (DHS) and have served in this role since March 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration Policy since October 1, 2021. Prior to this acting role, I served as the Chief Operating Officer for U.S. Customs and Border Protection (CBP), a DHS component, since March 5, 2021. In a prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil Kerlikowske, from January 12, 2015 to January 16, 2017.

1

IFR_AR_002455

**The challenged rule is critical to DHS' plan to effectively manage irregular migration.**

2.      On May 12, 2023, after a robust regulatory process that included responding to more than 50,000 comments from the public, DHS and the Department of Justice (DOJ) implemented the Circumvention of Lawful Pathways rule. The rule is designed to incentivize noncitizens to use the new and existing lawful, safe, and orderly processes that DHS has established and expanded, and disincentivize dangerous and irregular border crossings by placing a condition on asylum eligibility for those noncitizens who fail to do so, and who do not otherwise qualify for an exception. Critically, the rule fits into a broader strategy to address historic migratory challenges impacting the entire Western Hemisphere. Through a variety of actions, the United States and its foreign partners are seeking to incentivize migrants to use lawful, safe, and orderly pathways, as well as to disincentivize irregular migration. As such, this rule is a critical component of the United States' regional strategy and aims to discourage noncitizens from crossing the Southwest Border (SWB) unlawfully between ports of entry, or without authorization at a port of entry.[1]

3.      Imposing consequences for unlawfully, or irregularly, crossing the border is, by itself, not sufficient to deter irregular migration. Migrants have, time and time again, shown that they are willing to endure unfathomable suffering for an opportunity to come to the United States, even if their chances of success are small. To be effective, the consequences DHS applies must be paired with incentives for migrants to use lawful processes. DHS and the U.S. Department of State have been working with our foreign partners in the Western Hemisphere to enhance enforcement efforts along national borders and expand lawful pathways in countries

---

[1] U.S. Dep't of Homeland Sec., *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border

2

IFR_AR_002456

throughout the region—including protection programs—to address the current migration challenge. DHS has, over the past two years, undertaken a series of measures designed to increase access to processes and pathways for noncitizens to come to the United States or in a safe, orderly, and lawful manner. But similarly, incentives without consequences are insufficient to deter irregular migration—they must go hand-in-hand. In concert with the increase in lawful means for migrants to come to the United States in a safe and orderly manner, this rule imposes strengthened consequences on noncitizens who do not avail themselves of the wide range of lawful pathways the U.S. Government has made available for entering the United States, do not seek protection from countries they travel through, and do not merit an exception or otherwise overcome the rule's presumption. In this way, the rule follows the successful model of the Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") processes, which significantly reduced encounters from those countries after their implementation: it creates a viable lawful, safe, and orderly option for noncitizens, and imposes consequences for failing to follow that process.

4.      The rule's condition on asylum eligibility is a temporary measure intended to respond to a time of heightened irregular migration throughout the Western Hemisphere. Importantly, and as detailed further below, the rule is working as intended and has already significantly reduced encounters at the border. In the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order. These levels of irregular migration would severely stress DHS and DOJ's continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. They would also quickly overwhelm shelter capacity in border communities and interior cities.

IFR_AR_002457

**Hemispheric conditions are driving encounter levels that strain DHS resources.**

5.     Violence, food insecurity, severe poverty, corruption, climate change, the continuing effects of the COVID-19 pandemic, and dire economic conditions have all contributed to a significant increase in irregular migration around the globe, fueling the highest levels of irregular migration since World War II.  This wave of global migration is challenging many nations' immigration systems, including the United States.  In the Western Hemisphere, failing authoritarian regimes in Venezuela, Cuba, and Nicaragua, along with an ongoing humanitarian crisis in Haiti, have driven millions of people from those countries to leave their homes.  Additionally, violence, corruption, and the lack of economic opportunity—challenges that are endemic throughout the region—are driving noncitizens from countries such as Brazil, Colombia, Ecuador, and Peru to make the dangerous journey to the U.S. border.  This is in addition to the continuing economic headwinds and rule of law concerns in traditional sending countries, such as Guatemala, Honduras, and El Salvador.

6.     In the early 2010s, after three decades of bipartisan investments in border security and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017.  This followed decades during which annual encounters routinely numbered in the millions.  However, even during this period of relatively low encounter levels at the border, DHS faced significant challenges in 2014 due to an unprecedented surge in migration of unaccompanied children, and in 2016 due to a surge in family units at the border—demographics that present unique challenges due to their vulnerability.  Between 2017 and 2019, however, encounters along the SWB more than doubled, and—following a significant drop during the beginning of the COVID-19 pandemic, which shut down travel across the world—continued to increase in 2021 and 2022.  In fiscal year (FY) 2021, encounters at the SWB reached levels not seen since the early 2000s, with U.S. Border Patrol (USBP) making 1.7

4

IFR_AR_002458

million encounters.  In FY 2022, DHS reached a new high-water mark for encounters at the land border, with total USBP encounters at the SWB exceeding 2.2 million.  As a result of the hemispheric conditions described above, much of this growth in encounters was driven by nationalities that DHS has historically not encountered in large numbers at the border—including countries that make it difficult for DHS to repatriate their nationals who do not establish a legal basis to remain in the United States.

7.      From March 20, 2020 to May 11, 2023, the DHS implemented the CDC's Title 42 public health Order, under which noncitizens encountered by DHS personnel could be quickly expelled to Mexico or to their home country—but only if Mexico or their home country accepted their return.[2]  Importantly, an expulsion under the Title 42 public health Order did not carry with it any lasting consequences for noncitizens, aside from their expulsion.  It was, however, a relatively quick process for frontline personnel.  By contrast, a removal under DHS' traditional Title 8 authorities carries with it significant and lasting consequences, including a minimum 5-year ban on admission and the potential to be criminally prosecuted for illegal re-entry.  Title 8 processes, however, are substantially longer than Title 42 processes.

8.      In preparation for the return to Title 8 processing of all noncitizens, DHS led a comprehensive, all of government planning effort that lasted more than 18 months.  This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.  This effort also included the

---

[2] The Title 42 public health Order applied to certain noncitizens arriving from Canada or Mexico who would otherwise be held in a "congregate setting" at a port of entry or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders.  Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists 86 Fed. Reg. 42,828 42,841 (Aug 5, 2021).  Under the Title 42 public health Order, "covered noncitizens apprehended at or near U.S. borders" were "expelled" to Mexico, Canada, or their country of origin. *Id.* at 42,836.  As a result, they could be processed much faster—in "roughly 15 minutes," as compared to "approximately an hour and a half to two hours" for noncitizens who are processed and issued a notice to appear for removal proceedings under Title 8. *Id.*

IFR_AR_002459

development and implementation of policy measures, including the rule and its associated lawful pathways and processes, that were critically important components of DHS preparations to manage the anticipated significant influx of migrants at the SWB associated with the end of Title 42's application at the border.

9.      In the days leading up to the end of the Title 42 public health Order on May 12, 2023, DHS saw a historic surge in migration.  This surge culminated with the highest recorded encounter levels in U.S. country's history over the days immediately preceding May 11, which placed significant strain on DHS's operational capacity at the border.  Encounters between ports of entry (thus excluding arrivals scheduled through the CBP One application, who appear at ports of entry) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the public health Order (from May 8 to May 11).  The sharp increase in encounters during the 30 days preceding May 11 represents the largest month over month increase in almost two decades—since January 2004.

10.      As a result, in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges as described below.  From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.  During this same timeframe, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, RGV, and Yuma) more than 50 percent over their holding capacity and one sector (Tucson) more than two-and-a-half times its holding capacity.

6

IFR_AR_002460

11.     As discussed more fully below, this record number of encounters severely strained DHS operations and resources, as well as the resources of other federal government agencies, local communities, and non-governmental organizations.  CBP had to redirect limited resources from other mission needs—particularly, legitimate travel and trade operations, the volume of which now surpasses pre-pandemic levels—to focus on processing apprehended noncitizens.  Overcrowding in CBP facilities increased the potential of health and safety risks to noncitizens, government personnel, and contract support staff—risks which were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody that must be processed.  To manage these overcrowded conditions, USBP sectors had to pull personnel from the field to perform tasks including processing, transporting, escorting, and detaining noncitizens in custody, as well as other related functions.  This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.

12.     The surge in encounters immediately preceding the end of Title 42 also led to significant challenges for local border communities.  For example, in the days leading up to May 12, local community resources in El Paso, Texas were soon overwhelmed as the number of noncitizens arriving in the United States quickly surpassed the city's capacity.  In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency,[3] as more than 1,000 noncitizens were sleeping on the sidewalks

---

[3] Sneha Dey, *As Title 42 comes to an end, El Paso declares state of emergency,* Tex. Tribune (Apr. 30, 2023), https://www.texastribune.org/2023/04/30/el-paso-state-of-emergency-title-42.

IFR_AR_002461

and left without shelter.[4]  Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[5]

**Implementation of the rule has significantly reduced encounters at the U.S. border and migration throughout the Western Hemisphere.**

13.     In the weeks since May 12, 2023, DHS has executed on its more than 18-month post-Title 42 planning effort by leading a whole-of-government effort to ensure the safe, orderly, and humane management of the nation's borders and the continued enforcement of U.S. immigration laws.  The rule plays an integral role in this effort.  These efforts, and in particular the disincentives to irregular migration put in place through the new rule, have produced significant results.  From May 12 to June 13, 2023, encounters between ports of entry at the SWB have decreased by 69 percent compared to their peak just before the end of Title 42, with CBP averaging approximately 3,360 USBP encounters between ports of entry.  As a result of this swift and sustained decline in encounters, the number of noncitizens in USBP holding facilities has decreased from a high of more than 28,500 on May 10—or 153 percent of its rated holding capacity at that time—to approximately 8,600 on June 9, or 46 percent of its holding capacity.

14.     The strengthened consequences in place at the border under Title 8 authorities, including use of the rule, has reduced migration throughout the Western Hemisphere as intending migrants and the smuggling networks that move them assess the new policies.  For example, daily entries into the perilous Darién jungle between Colombia and Panama have declined by more than 50 percent since May 11, from nearly 1,900 encounters between May 1 and May 11 to

---

[4] Rose Flores, Dakin Andone & Nouran Salahieh, *Migrants Living on the Streets of El Paso are Urged to Turn Themselves in to Immigration Authorities as Expiration of Title 42 Looms,* CNN (May 9, 2023), https://www.cnn.com/2023/05/09/us/title-42-expires-border-immigration-tuesday/index.html.

[5] Edgar Sandoval, Eileen Sullivan & Miriam Jordan, *Some Texas Border Cities Are Already Under a State of Emergency,* New York Times (May 11, 2023), https://www.nytimes.com/2023/05/11/us/texas-el-paso-state-emergency-title-42.html.

8

IFR_AR_002462

approximately 800 a day between June 1 and June 14. It is clear that actions taken by the U.S. Government to provide both legal pathways and consequences to irregular migration—actions that also spurred regional partners to undertake their own measures seeking to address irregular movements of migrants—were critical factors in reducing migratory flows throughout the Western Hemisphere.

15.     The rule has strengthened the consequences for noncitizens who cross unlawfully between ports of entry, or without prior authorization at ports of entry. Overall, in the four weeks since the rule has been implemented, 46 percent of single adults processed under the rule[6] making credible fear claims have been screened-in,[7] compared to an 83 percent screen-in rate in the pre-pandemic period of 2014 to 2019. As intended, the rule has significantly reduced screen-in rates for noncitizens encountered along the SWB. The decline in encounters at the U.S. border, and entries into the Darién Gap, show that the application of consequences as a result of the rule's implementation is disincentivizing noncitizens from pursuing irregular migration and incentivizing them to use safe and orderly pathways.

16.     Between May 12 to June 13, 2023, U.S. Citizenship and Immigration Services (USCIS) has interviewed approximately 8,195 noncitizens who have been subject to the rule. Out of these noncitizens, 261 (3 percent) were able to establish an exception to the rule; 689 (8 percent) were able to rebut the presumption; and 7,243 (88 percent) were subject to the presumption. Of the noncitizens who were able to establish an exception to the rule, 189 (72 percent) were able to establish a credible fear of persecution or torture under the "significant

---

[6] This includes all categories of noncitizens processed under the rule, including those who establish an exception or rebut the presumption.

[7] The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by cases adjudicated on merit (i.e. positive and negative fear determinations).

IFR_AR_002463

possibility" standard. Of the noncitizens who were able to rebut the presumption, 528 (77 percent) were able to establish a credible fear of persecution or torture under the "significant possibility" standard. Of the noncitizens who were subject to the rule's presumption, 3,036 (42 percent) were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard. Additionally, thousands more are currently in CBP or U.S. Immigration and Customs Enforcement (ICE) custody going through the expedited removal process.

17.     The rebuttable presumption established by the rule has allowed DHS to significantly increase its use of expedited removal, including by applying it to more nationalities than it otherwise would have. This is because, prior to the rule's implementation, the screen-in rates for noncitizens from some key countries—including Venezuela, Cuba, and Nicaragua—were sufficiently high as to make it ineffective to refer nationals of those countries into expedited removal, given the significant, multiagency resources required to process them. Absent the rule's impact on screen-in rates, it is likely that DHS would not devote the resources to process noncitizens from those countries for expedited removal as it would result in issuing a notice to appear before an immigration judge anyway while unnecessarily increasing time in custody. This, in turn, may lead to increased encounter levels and all the challenges that they entail.

18.     In its preparations for the end of the Title 42 public health Order, DHS made improvements to the technology and processes at the border that are now allowing it to process credible fear cases more quickly than ever before—enhancing its ability to quickly deliver consequences to noncitizens who do not establish a legal basis to remain in the United States. DHS has reduced the median time for USCIS to complete fear claim cases for single adults encountered since May 12 by 57 percent, to 13 days from CBP apprehension compared to 30 days in the pre-pandemic period (2014–2019). These process enhancements and the rule work

10

together to more quickly and effectively, impose consequences on those who do not establish a legal basis to remain in the United States. The rule allows DHS to place more noncitizens into the expedited removal process, and the process enhancements help ensure that the increased use of expedited removal does not result in unhelpful backlogs or increased holding times. Without the rule, these process enhancements would be substantially less effective given significantly higher screen in rates that would, as noted above, make it largely impractical for DHS to apply expedited removal to key nationalities encountered at the border.

19.     The rule's implementation has generated widespread understanding that DHS has strengthened consequences at the border for those who enter without authorization even as DHS has significantly increased lawful pathways and processes for noncitizens to come to the United States in a safe and orderly manner. The effect of these developments is that there has been an immediate reduction in encounters at the border.

20.     As part of these efforts, DHS has repatriated approximately 50,000 noncitizens, including single adults and family units to more than 100 countries since May 12. This includes more than 1,650 noncitizens from Cuba, Haiti, Nicaragua, and Venezuela who were returned or removed to Mexico during this time-frame—the first time in the United States' bilateral history that the Government of Mexico has accepted third country nationals under Title 8 authorities at the border at scale.

21.     The ability to quickly apply consequences at the border is important because DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put intending migrants' lives at risk for profit.[8]  These criminal

---

[8] *See* U.S. Dep't of Justice, Press Release, *Defendants Indicted in Tractor Trailer Smuggling Incident That Resulted in 53 Deaths* (July 20, 2022), https://www.justice.gov/usao-wdtx/pr/defendants-indicted-tractor-trailer-smuggling-incident-resulted-53-deaths; U.S. Dep't of Justice, Press Release, *Cuban National Sentenced to Over 38 Years in*

11

IFR_AR_002465

organizations intentionally twist information about U.S. immigration policy for the express

purposes of encouraging would-be migrants to use their services—services that regularly result

in tragedy. Because profit is the motivating factor, criminal organizations have no qualms when

it comes to exploiting migrants through false promises—particularly when there are changes in

the United States' immigration policy or border operations. This familiar pattern was seen in the

weeks leading up to the lifting of Title 42.

22.     In the days immediately following the rule's effective date, media reporting

confirmed internal DHS analyses that the rule and accompanying messaging were ultimately

effective in communicating that there would be stricter consequences for crossing the SWB

unlawfully between ports of entry, or without authorization at ports of entry, after the end of

Title 42. For example, a *Washington Post* article states that in interviews with migrants waiting

on the Mexican side of the SWB, U.S. messaging relating to stricter penalties under Title 8

authorities were a factor in many intending migrants' decisions to attempt to cross the border

"before—not after—Title 42's expiration."[9] Similarly, the article further describes migrants'

understanding that there would be consequences associated with irregularly crossing the SWB

without scheduling an appointment at a port of entry through the CBP One app.[10]

23.     As part of its preparations for the end of the Title 42 public health Order and the

implementation of the rule, DHS significantly expanded access to land border ports of entry.

The CBP One mobile app, which is available to download for free to a mobile device, allows

---

*Prison for Drug Trafficking and Other Crimes after Using His Border Ranch as a Criminal Corridor* (Mar. 9,
2022), https://www.justice.gov/usao-wdtx/pr/cuban-national-sentenced-over-38-years-prison-drug-trafficking-and-
other-crimes-after.
[9] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy
Brings Reset, But No Sudden Rush*, Wash. Post (May 12, 2023).
https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/
[10] *See also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions
are Lifted*, Associated Press: PBS (May 11, 2023), https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-
border-in-final-hours-before-title-42-asylum-restrictions-are-lifted.

IFR_AR_002466

noncitizens of any nationality who are in Central or Northern Mexico to schedule an appointment to present at a port of entry along the SWB in a safe and orderly manner. The advance biographic and biometric information captured by the app allows CBP to significantly improve the efficiency of its processes at the border—even as it ensures that every individual processed is thoroughly vetted against national security and public safety systems. This, in turn, has allowed CBP to greatly increase its ability to process inadmissible noncitizens at land border ports of entry compared to its 2014-2019 pre-pandemic average. On June 1, CBP expanded the number of available daily appointments from 1,000 to 1,250 per day—almost four times the average number of noncitizens processed per day at ports of entry than in the years preceding the pandemic. This expansion has allowed a greater number of noncitizens to present themselves in a safe and orderly manner at ports of entry each day during their scheduled appointment time. DHS has also made a series of updates to the app that have significantly improved access to appointments and provided greater predictability to migrants about the process. This app, available in English, Spanish, and Haitian Creole, effectively cuts out the smugglers, decreases migrant exploitation, and improves safety and security in addition to making the process more efficient.

24.     The rule's combination of strengthened consequences at the U.S. land border, regional partnership, and increased lawful pathways and processes for noncitizens has had an immediate impact on encounters at the U.S. border and migration throughout the region. **If DHS cannot rely on the rule, DHS expects an increase in encounters between ports of entry that will severely tax operational capacities to the detriment of other critical missions and expects the absence of the rule to negatively impact receiving communities in the United States and our relationships with foreign partners.**

25.     As detailed in the rule, DHS planning models suggest that, without the strengthened consequences, including those put in place by the rule, these elevated encounter

IFR_AR_002467

levels would have continued after May 11.[11] Thus, if the rule is unavailable for any amount of time, DHS expects that the current decline in border encounters will quickly be erased by a surge in border crossings that could match—or even exceed—the levels seen in the days leading up to the end of the Title 42 public health Order.

26. To put the current situation on the ground into perspective, CBP's Southern Border Intelligence Center estimates that as of June 14, 2023, approximately 104,000 migrants are in Northern Mexico, within eight hours of the U.S. border, with many more along the transit route between Colombia and the SWB. It appears that many of these migrants are waiting to see whether the strengthened consequences associated with the rule's implementation are real.[12] DHS anticipates that any interruption in the rule's implementation will result in another surge in migration that will significantly disrupt and tax DHS operations. This expectation is not speculative. DHS needs only to look back to the pre-May 12 surge, which was only blunted by the application of strengthened consequences at the border and expanded access to lawful pathways and processes, in large part as a result of the rule's implementation on May 12, to identify the repercussions of losing the rule. A similar surge now would put even greater strain on DHS operations, given that Title 8 processes take substantially longer and are more operationally complex than Title 42 processes at the border.

**Impact on CBP**

---

[11] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314, 31316 & n.14 (May 16, 2023).

[12] *See* José Ignacio Castañeda Perez, *Here's Why There Was No Immediate Migrant Influx at the Arizona Border When Title 42 Ended*, Ariz. Republic (June 1, 2023) https://www.azcentral.com/story/news/politics/border-issues/2023/06/01/title-42-lifted-but-no-immediate-migrant-influx-was-seen/70269773007/. This news article explains that due to new immigration rules and consequences, migrants and transnational smuggling networks are taking a "wait and see" approach when it comes to the SWB. This observation is noted by Adam Isacson, director for defense oversight at the Washington Office on Latin America, who states that "[b]oth migrants and their smugglers right now are trying to figure out what those new pathways are."

IFR_AR_002468

27. CBP, a component of DHS, is charged with enforcing federal customs and immigration laws at or near the international border, including at and between U.S. ports of entry, while facilitating lawful international travel and trade. CBP facilities, whether operated by the Office of Field Operations (OFO) or USBP, are designed for short-term custody and have limited holding capacity. These facilities are only designed to hold noncitizens for a few days, generally for the purpose of immigration processing and subsequent transfer to the custody of another agency, or release pending removal proceedings, as appropriate. CBP facilities typically do not provide services adequate for longer-term detention, such as beds, routine medical care, or recreational areas. If the rule is enjoined, CBP will likely once again be required to hold more noncitizens than its short-term, small capacity holding facilities can handle. This will exacerbate overcrowding of facilities, which can create unsafe conditions.

28. As noted above, CBP experienced severe overcrowding in the period leading up to May 12, 2023. During this time, USBP encounters outpaced processing and movement out of USBP custody—generally via transfer to ICE custody, repatriation, expulsion, or release—of noncitizens from CBP holding facilities by an average of 950 noncitizens daily for seven days in a row. The inability to process noncitizens out of USBP custody quickly enough to match the rate at which agents were making apprehensions led to a sharp increase in the number of noncitizens in USBP custody, as detailed above. This sharp increase in its in-custody numbers, in turn, required Border Patrol agents to be reassigned from frontline border security enforcement activities to support processing operations in its facilities.

29. Previous migration trends tended to heavily impact only a couple of sectors over a given period of time, shifting locations across the SWB over time. Under these circumstances, USBP had the ability to "laterally decompress" migrants to less-impacted sectors by leveraging

15

air and ground transportation contracts, helping to mitigate the effects of migrant surges in over-capacity sectors. As noted above, between May 8 and 11, 2023, however, eight out of the nine SWB Sectors were over capacity, which limited USBP's ability to move noncitizens laterally to alleviate the pressure in over capacity sectors.

30. As part of its preparations for and response to this surge, CBP instituted a number of other extraordinary measures at great expense to the agency. For example, USBP had to expand processing facility support by hiring additional armed facility guards, porters, data entry specialists, and Border Patrol Processing Coordinators. To address personnel shortages caused by the increased encounter numbers, USBP executed memoranda of agreement with other federal agencies to provide surge support.[13] Some of these agreements required USBP to reimburse the cost of these agencies' support, totaling more than $50,600,000 in FY 2023 (almost twice the cost in FY 2022).[14] USBP also expanded transportation contracts to increase its number of leased buses, transportation routes, transportation hours, and flights and routes in response to the increased encounter numbers. It also began increasing holding capacity through the expansion of the soft-sided facilities in El Paso and Yuma sectors. These facilities have significantly increased USBP's temporary holding capacity, but at a cost. Specifically, the El Paso expansion cost more than $46 million to mobilize, and costs nearly $26 million per month to maintain. The Yuma expansion cost more than $14 million to mobilize and more than $6 million per month to maintain.

31. Overcrowding at CBP facilities adversely impacts noncitizens in CBP custody as well as CBP personnel. DHS's Office of Health Security (OHS) notes that overcrowding and

---

[13] Agencies included ICE Homeland Security Investigations, Federal Air Marshals, U.S. Marshals Service, Bureau of Prisons, U.S. Secret Service, National Oceanic and Atmospheric Administration, U.S. Coast Guard, U.S. Forest Service, DHS Volunteer Support, and ICE Enforcement and Removal Operations
[14] Total cost in FY 2022 was more than $26,500,000.

IFR_AR_002470

increased movement of noncitizens between facilities may result in adverse health outcomes, including the spread of communicable diseases (e.g., COVID-19, measles, varicella, etc.) among noncitizens held in these facilities. Furthermore, noncitizens held in overcrowded facilities may be particularly vulnerable to communicable diseases due to situational factors relating to the arduous journey to the SWB, including, in many cases, days and weeks of poor health and nutrition, lack of access to health care, and/or inadequate water, sanitation, and hygiene services. For these reasons, surges, which inherently increase the risk of overcrowding in CBP holding facilities along the SWB, negatively impact CBP's ability to avoid preventable harm and mitigate health and welfare risks to noncitizens and the DHS workforce.

32.     OFO operations at ports of entry would also be adversely impacted if the rule is unavailable to DHS. During surges of noncitizens encountered between ports of entry, OFO often needs to provide assistance to USBP to process noncitizens. Because each port of entry has a finite number of resources and processing capacity to facilitate lawful trade and travel, and irregular migration, any diversion of resources toward processing increased numbers of noncitizens takes resources away from those missions. This, in turn, challenges OFO's ability to execute its national security, counter-narcotics, and trade and travel missions by requiring the diversion of critical resources.

33.     In response to the pre-May 11 surge, 124 OFO personnel—who are dedicated to the processing of legitimate travel and trade operations of which volume now surpasses pre-pandemic levels—were detailed to assist USBP processing of apprehensions between ports of entry. For example, in April 2023, OFO detailed staff from ports of entry in Laredo, Texas, to the Rio Grande Valley—a move that required Laredo to close some vehicle lanes, slowing down its operations. In mid-April 2023, CBP also had to temporarily close ports of entry in the El

17

Paso, TX area in order to manage the surge in encounters in that area of operations. This included the cessation, and subsequent resumption at reduced volume, of all port of entry operations at the Bridge of the Americas (BOTA) in El Paso, Texas—a port of entry that primarily focuses on processing cargo shipments—from April 13 through April 17, 2023. The economic impact of this five-day processing slowdown was likely acute; in FY2022, more than $10.7 billion in imports passed through the BOTA port of entry, or roughly $205 million per week. Additionally, from April 13 to 17, 2023, the Ysleta port of entry in El Paso also detailed personnel to assist USBP, necessitating a reduction on open travel lanes by approximately 37 percent for commercial cargo and 58 percent for passenger traffic. At both locations, increased wait times for inspection reached as high as 180 minutes—with substantial economic costs as a result.

34.     OFO also had to take extraordinary measures to ensure that legitimate trade and travel continued to flow along the SWB. In addition to the personnel detailed to support USBP operations between ports of entry, OFO temporarily deployed approximately 420 personnel to support SWB ports of entry, at a cost of approximately $4 million monthly, and deployed approximately 39 OFO Special Response Team operators to SWB locations to ensure continuation of safe and secure operations at ports of entry. In the weeks leading up to the end of the Title 42 public health Order, as certain ports of entry began processing increased numbers of noncitizens seeking an exception to the public health Order and due to OFO providing assistance to USBP to process noncitizens encountered between ports of entry, OFO spent over $8 million in support of overtime needs. OFO also repurposed the Brownsville Immigration Hearing Facility to process noncitizens at a cost of over $13.8 million in FY23 through June 30, and approximately $1.5 million monthly thereafter.

18

IFR_AR_002472

**Impact on ICE**

35.     Within ICE, ERO oversees programs and conducts operations to identify and arrest removable noncitizens, to detain these noncitizens when necessary, and to remove noncitizens with final orders of removal from the United States to more than 170 countries around the world. ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers.  Over the past two years, ERO has routinely detailed personnel to the SWB to support USBP frontline operations— impacting its ability to execute its missions.  As of June 6, 2023, ERO had 134 personnel deployed to support USBP operations along the SWB.

36.     As of May 10, 2023, ICE had approximately 22,000 noncitizens in custody, or 64 percent of its funded bedspace, in part due to pandemic-related restrictions on congregant settings that impacted ERO's ability to fully utilize beds in its detention network.  These COVID-19 related restrictions were lifted with the end of the public health emergency on May 11, 2023. Since then, ICE bed usage increased quickly as part of DHS' comprehensive efforts to deliver consequences at the border.  On June 11, 2023, ICE had approximately 29,800 noncitizens in its custody.  This sharp increase in detention bed usage has come even as daily encounters have remained comparatively low compared to their pre-May 12 levels—a direct result of the record number of noncitizens being processed under expedited removal through the rule.  However, if another surge developed as a result of the rule not being in place, the anticipated increase of custodial transfer requests from CBP under Title 8 processes would quickly overwhelm ICE's detention capacity—which is limited by its appropriated funding— such that further CBP requests for bedspace would have to be declined.  This, in turn, would

19

require CBP to release more noncitizens from its custody who might otherwise be processed for expedited removal.

37.    In the event of a similar surge in the future, increased CBP encounters would have a significant impact on ICE transportation resources. If CBP sectors become overwhelmed to the point where CBP's transportation assets and contracts are insufficient, ICE would have to divert its transportation resources from interior and removal operations to assist CBP. This would include the use of ICE Air Charters typically needed for removal and interior movements to instead decompress the border, an increase in ICE Air Commercial removals, and increased ground transportation for removals to Mexico. This, in turn, would impact ERO's ability to execute its core enforcement mission of apprehending and removing noncitizens from the interior of the United States.

**Impact on Communities**

38.    An increase in encounters between ports of entry will also strain the communities along the border and in the interior of the United States who receive noncitizens released from DHS custody pending the outcome of their immigration proceedings. DHS generally seeks to release noncitizens in the vicinity of hospitality sites—locations which provide immediate resources and social service assistance—run by non-governmental organizations or municipalities along the SWB. DHS has, over the past two years, worked closely with partners to build these kinds of capacity at the border. As a result of these efforts, these sites can currently provide overnight shelter and other kinds of support for thousands of noncitizens each day. Absent the rule, DHS anticipates encounter levels that would require noncitizens to be released from custody at levels that will greatly exceed the capacity of these sites to receive them.

20

39.      The Department supports border and interior communities receiving noncitizens through the humanitarian relief provided under the Emergency Food and Shelter Program (EFSP) as well as the newly established Shelter and Services Program (SSP).  However, even with the increase in Congressional funding from $150 million in FY2022 to $800 million in FY 2023 for these programs, DHS recognizes that the demand from communities and NGOs for this funding still far exceeds what has been made available.  For example, in April, the EFSP National Board received $1.26 billion in applications for only $350 million in available funds. DHS anticipates that SSP funding will also, unfortunately, not fully meet the needs of our community and NGO partners at the border and within the interior.

**Impact on Relationships with Foreign Partners**

40.      The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—something that is reflected by the critical diplomatic efforts that DHS and the Department of State have been making to engage with partners throughout the Western Hemisphere.  DHS relies on and works closely with its foreign partners to manage migration throughout the region.[15]  Regional partner countries have encouraged and supported DHS's approach to address irregular migration through the application of disincentives for unlawful entry—through increased enforcement and consequences—coupled with incentives to provide intending migrants with expanded lawful pathways and processes, including humanitarian protection, innovative parole processes, and labor migration.

---

[15] *See, e.g.*, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Exec. Order 14,010, 86 FR 8,267, 8,270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*

IFR_AR_002475

41.     Prior to the end of the Title 42 public health Order, regional partner countries expressed great concern that, without specific action from the United States to combat the misperception that the end of the Order would mean an open U.S. border, a surge of irregular migration would flow through their countries as migrants seek to enter the United States. One foreign partner, for example, noted that they believed the formation of caravans in the spring of 2022 were spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order. Moreover, regional partner countries have repeatedly expressed concerns about the ways in which recent migratory flows challenge their local communities and immigration infrastructure and have regularly highlighted how policy announcements have a direct and immediate impact on migratory flows through their countries.

42.     Regional partners have observed that, as a central part of a consequence framework that aims to slow migratory flows in the region, this rule is working and has reduced irregular migration in their countries as well as on our border. As noted earlier, following the development of the enforcement process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which couples processes for noncitizens to find protection in the region or travel directly to the United States with consequences for those who do not avail themselves of these processes.[16] But the lawful processes and regional protection mechanisms by themselves are not sufficient, as described above—DHS's ability to implement its border-

---

[16] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region, and at the U.S.-Mexico border slowed.

IFR_AR_002476

management strategy is predicated on its ability to impose consequences on those who do not take advantage of lawful processes to access opportunity and protection in the United States.

43.    Continuing to implement and build on this approach is critical to the United States' ongoing engagements on migration management with regional partners. For example, a number of foreign partners, including Mexico, Guatemala, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of Title 42. These governments recognized that the United States was taking new measures to strengthen enforcement of its border, in large part through the application of the rule, and committed to doing the same in order to impact irregular migratory flows in the region.

44.    For example, following the transition from DHS processing under Title 42 public health Order to processing under Title 8 authorities, Mexican authorities announced the continued acceptance of the return into Mexico of nationals from these CHNV countries under Title 8 processes. This is the first time in the United States' bilateral history with Mexico that the Mexican government has stated it would accept the return or removal of non-Mexican nationals under Title 8.[17] This decision was premised on the existence of lawful pathways and processes for nationals of these countries that were combined with a meaningful consequence framework to reduce irregular border crossings; this consequence framework includes the rule's rebuttable presumption of asylum ineligibility for noncitizens who chose to circumvent lawful pathways. If DHS can no longer rely on the rule—thus creating a gap in the carefully balanced incentive structure that has been created—it could potentially put this arrangement in jeopardy.

---

[17] White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

IFR_AR_002477

45.     Like the United States, officials from a number of countries, including Mexico, have expressed grave concerns about the impacts that another significant increase in migrants will have on their communities and government agencies.  If DHS cannot apply the rule, DHS assesses there will be an increase in migration flows, and regional partner countries may take the view that the United States has reneged on the shared goal of stabilizing migratory populations and addressing migration collectively as a region.

46.     Ultimately, continued implementation of the rule is central to achieving a key foreign policy goal—fostering a hemisphere-wide approach of addressing migration on a regional basis.  Implementation of the rule responds to discussions with and feedback from regional partner countries, several of whom have previously criticized the United States for maintaining policies that create a pull factor throughout the region.  Eliminating the visible consequence for irregular migrants that is a core component of the rule would concern many foreign partners because it would incentivize migrants to make the journey north—particularly given how smugglers would weaponize the change in policy to drive migration.  This, in turn, would directly undermine the increased enforcement policies the United States' partners have undertaken, many of which were implemented at substantial cost for those governments—including, for example, the current unprecedented campaign by Colombia and Panama to attack smuggling networks operating in the Darién, and Mexico's deployments of law enforcement and military personnel to conduct enforcement along its southern border and transit routes.  Partner governments could be less inclined to support U.S. efforts to manage migratory flows through region—particularly through robust enforcement of their borders—if they perceive that United States is not committed to enforcing its own.

24

IFR_AR_002478

47. In short, the rule is a substantive demonstration of the U.S. Government's partnership and commitment to the shared goal of stabilizing migratory populations and addressing migration collectively as a region, both of which are critical to maintaining strong bilateral and multilateral relationships. If the rule is enjoined, it could serve to undermine the regional approach that has been carefully developed through thoughtful and intensive diplomatic effort.

**Conclusion**

48. This rule is a foundational component of the comprehensive, all of government approach that DHS implemented to prepare for the end of Title 42 and respond to the unprecedented movement of people in our hemisphere. This approach provides incentives for intending migrants to use safe and orderly pathways and processes that have been expanded to come to the United States, even as it seeks to disincentivize noncitizens from crossing unlawfully between ports of entry or without authorization at ports of entry. The rule is a critical component of this measured and thoughtful approach to managing migratory flows, by imposing strengthened consequences at the border in order to change the calculus of intending migrants.

49. This approach is working as intended, rapidly and significantly reducing encounters at the border while providing record numbers of noncitizens with access to lawful pathways and processes to seek protection in the region or come to the United States. The more than 18-month long planning effort that DHS undertook, which included making key, ongoing enhancements to the expedited removal process, has allowed it to deliver the rule's strengthened consequences under Title 8 processes that are operating at a higher scale and more quickly than ever before.

IFR_AR_002479

50.     Should the rule no longer be in effect, DHS anticipates a return to elevated encounter levels that would place significant strain on DHS components, border communities, and interior cities, despite the careful planning and significant investments that have been made. CBP facilities will be overcrowded once again, placing the noncitizens in our custody and the frontline personnel who care for them at risk.  Border communities, and the NGOs that support them, will once again receive large scale releases of noncitizens that will overwhelm their ability to coordinate safe temporary shelter and quick onward transportation.  And interior destination cities will, once again, see their systems strained.

51.     DHS does not have to imagine what the impacts of a surge in migration of the anticipated scale would look like; we just experienced it.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 16th day of June, 2023.

Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security

IFR_AR_002480

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Chad F. Wolf, *et al.*,       )
    *Applicants,*        )
                        )
v.                      )         No. 19-15716
                        )
Innovation Law Lab, *et al.*,  )
    *Respondents.*      )
_____)

### DECLARATION OF ROBERT E. PEREZ

I, Robert E. Perez, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge
and information made known to me in the course of my employment, hereby make the following
declaration with respect to the above-captioned matter:

1.    This declaration is being submitted to supplement the declaration submitted before this
Court on February 28, 2020, in support of the Government's Emergency Motion under
Circuit Rule 27-3 for an Immediate Stay Pending Disposition of a Petition for Certiorari or
an Immediate Administrative Stay in *Innovation Law Lab* v. *Wolf*, No. 19-15716.

2.    As the Deputy Commissioner of U.S. Customs and Border Protection (CBP), and the
agency's senior career official, my primary focus is working closely with the
Commissioner to ensure that CBP's mission of protecting our Nation's borders from
terrorists and terrorist weapons is carried out effectively in partnership with other Federal,
state, local, and foreign entities. Other top CBP priorities for which I am responsible
include securing and facilitating legitimate global trade and travel, keeping illegal drugs

1

and illegal aliens from crossing our borders, and protecting our Nation's food supply and agriculture industry from pests and disease.

3.    I am familiar with the Ninth Circuit's February 28, 2020 order in *Innovation Law Lab v. Wolf*, No. 19-15716, lifting the stay imposed by a motions panel of the Ninth Circuit and affirming the decision of the district court to issue a preliminary injunction setting aside the Migrant Protection Protocols (MPP). I previously advised of the injunction's significant implementation concerns for CBP. As noted below in some of the reporting available to CBP regarding the events of February 28-29, 2020, those concerns began to be realized quickly after the issuance of the Ninth Circuit's decision.

4.    The temporary suspension of port operations in certain locations became necessary to ensure the safety of the traveling public and port employees and maintain the integrity of border security operations. Shortly after the issuance of the Ninth Circuit's ruling, attorneys were contacting the ports and other CBP offices, demanding that their clients be permitted to present themselves at the port of entry and to enter the United States. Indeed, one attorney demanded to be permitted immediately to bring over 1,000 individuals to a bridge at the Brownsville port of entry.

5.    By the afternoon of February 28, 2020, about 100 migrants were gathered on the Mexican side of the border at the Brownsville, Texas Port of Entry at the Gateway International Bridge. Attorneys showed up at the Gateway International Bridge to advise CBP personnel that MPP had been enjoined and demanded that their clients be paroled into the United States. Later that evening, additional CBP personnel and local law enforcement responded to the Brownsville Port of Entry due to large groups of migrants and attorneys gathering on the Gateway International Bridge in Brownsville to provide additional security at the Port

2

of Entry while standing by to deploy in the event of a surge. Specifically, the OFO Special Response Team (SRT) was activated, and the OFO Mobile Field Force (MFF) was assembled and made ready. Also, ten Border Patrol Agents (BPAs) and one Supervisory BPA were pulled from line-watch operations in the Brownsville are of responsibility and redeployed to support Port operations. Mexican authorities were notified and worked to remove the mass gathering from the bridge. By midnight EST on Saturday, February 29, 2020, it was communicated to CBP that all but about 35 migrants had returned to the shelter.

6.  Notably, based on information available to CBP, there are currently about 2,200 people waiting at campsites on the Mexican side of the Gateway International Bridge. To the best of CBP's knowledge, approximately 1,400 of those aliens have been processed pursuant to MPP and are pending hearings in immigration court. While not all of the approximately 2,200 individuals are pending removal proceedings after being processed pursuant to MPP, a large group is about 50 yards from the border crossing point at the Gateway International Bridge. In addition to the aliens within immediate proximity to the border at the campsite, there are MPP-processed aliens housed at a shelter approximately five miles from the Gateway International Bridge. If there was a surge of this group based on an injunction applicable to MPP, it would hinder the port's ability to fulfill CBP's priority missions, particularly when detention capacity at the Gateway International Bridge is only 15 individuals.

7.  On February 28, 2020, in El Paso, Texas, approximately 250-350 Cuban nationals assembled on the Mexican side of the bridge at the Paso Del Norte (PDN) border crossing. Mexican authorities were also contacted to attempt to disperse the group. Additional

3

IFR_AR_002556

Office of Field Operations (OFO), Border Patrol, Air and Marine Operations and state and local law enforcement were deployed to El Paso PDN to support port personnel in securing the port. Specifically, the OFO SRT was activated, and the OFO MFF was assembled and made ready. The Mexican side of the bridge was cleared of vehicle and pedestrian traffic; however, the migrant group remained on the Mexican side of the bridge. The El Paso Police Department posted police officers north of the POE to provide additional security. CBP Officers assigned to the Paso Del Norte Border Crossing reported the group of migrants had dispersed and departed the area. On the morning of February 29, following port closure of about nine hours, operations resumed at PDN, and the SRT and MFF were demobilized.

8.  Moreover, during an approximate 12-hour timeframe, there were a total of 32 apprehensions of aliens crossing between the ports in the El Paso area, 28 of which had been previously processed for MPP. Thus, the anticipated surge of such migrants was not limited to the Ports of Entry but was realized between the Ports of Entry as well.

9.  The Hidalgo, Texas area also reported large groups of migrants gathering to arrive from Mexico. The Hidalgo POE reported approximately 25 Cuban nationals approaching the Hidalgo International Bridge. Due to safety concerns to the traveling public, CBP Officers temporarily halted both northbound and southbound vehicular and pedestrian traffic by 6:00 pm. Although all northbound and southbound traffic resumed by 7:15 pm EST, MFF officers deployed to secure the port. Shortly thereafter, by 7:30 pm EST, an additional group of Cuban nationals arrived at the border crossing point resulting in traffic being halted once again. All northbound and southbound traffic resumed again by 8:00 pm EST. By 9:30 pm EST, the group of migrants grew to approximately 200 individuals. Border

4

Patrol provided additional personnel to assist at the POE. After coordinating with Government of Mexico officials, the Hidalgo Port Director agreed to explain the status of Port operations to a small group of representatives of the larger migrant group. The group had been informed by their attorneys that MPP was no longer in effect, and they should report to the Port of Entry to be processed and should be allowed to enter the United States. The Port Director clarified the status of Port operations as they related to MPP, and by midnight EST on February 29, the large group of Cuban nationals dispersed. Ports then resumed normal operations.

10. In making operational decisions related to the Hidalgo POE, Port management must be mindful of the population in Mexico that may rush to the border, especially when 25 aliens had already gathered shortly after the issuance of a decision enjoining a significant program. Per information currently available to CBP, there are about 1,400 individuals residing in the community surrounding the shelter, and most have been processed for MPP. In addition to those residing in the area surrounding the shelter, CBP understands that there are about 300 individuals inside the shelter that are waiting to make entry into the United States.

11. The Laredo, Texas POE reported large groups of migrants gathering to arrive from Mexico. At approximately 6:50 pm EST on February 28, the Laredo POE received reports of migrants leaving shelters in Nuevo Laredo, Tamaulipas, Mexico with the intent of making entry through the Lincoln Juarez and Gateway to the Americas bridges in Laredo. MFF Officers were placed on standby at the Lincoln Juarez and Gateway to the Americas bridges. Additional officers were deployed to the border crossing points. Border Patrol and Laredo Police Department provided personnel to supplement operations at the POE.

5

IFR_AR_002558

Admissibility processing was temporarily suspended. Mexican authorities assisted with the influx of migrants on the Mexican side of the Gateway to the Americas Bridge, which led to the migrants being dispersed by the early morning hours of February 29.

12. At this time, there are approximately 2,000 aliens who have been processed pursuant to MPP, returned through the Laredo Port of Entry. At any given time, it is my understanding that there are approximately 200-300 individuals spread throughout the seven shelters in Nuevo Laredo who have been processed for MPP or otherwise expected to be seeking admission into the United States. Mexican officials have also advised that there are other aliens that stay in hotels throughout the Nuevo Laredo area, but that number is unknown at this time.

13. The Nogales, Arizona Port of Entry also reported large groups of migrants gathering to arrive from Mexico, but port closure was not determined to be operationally necessary. The San Ysidro Port of Entry reported approximately 50 migrants gathered in Tijuana, but held back by Mexican immigration officials.

14. Within hours of the issuance of the Ninth Circuit's decision, mass gatherings on the Mexican side of the border were determined to be a safety risk to the traveling public and CBP personnel, and operational decisions were made to temporarily suspend port operations in certain locations. While it is difficult to know with certainty what may have occurred had the Ninth Circuit not granted a temporary stay of its decision, it is likely that the number of migrants gathered at the border, whether at or between the ports of entry, could have increased dramatically. This could have included not only the approximately 25,000 individuals currently waiting in Mexico for removal proceedings who may arrive in

6

the United States from Mexico and request immediate admission, but also others in Mexico that have become aware of CBP's operational limitations and seek to exploit them.

15. During the short period of time that the injunction was operative on February 28, the ability of CBP law enforcement officers and agents to protect against national security threats and interdict illicit materials was undoubtedly and negatively impacted. For example, Border Patrol assets were redeployed and redirected to Ports of Entry to address the large groups forming. The diversion of manpower and aerial assets to support response to these events adversely impacted the ability for Border Patrol to safeguard the border between the ports of entry and created a vulnerability in these areas. At Ports of Entry, response to these events diverted resources from other priority missions, including performance of secondary inspections of high-risk conveyances and travelers, and facilitation of lawful trade and travel. These gaps in coverage for CBP law enforcement agents and officers covering such surges increase the likelihood of successful smuggling events and pose a national security risk at the border that is frequently exploited by organized transnational criminal activity. For Border Patrol in particular, these gaps in coverage also create an officer safety issue because agents that remain performing their primary function of patrolling the border continue to do so in isolated areas with less agents to provide back-up in response to high risk arrests/incidents.

IFR_AR_002560

I declare that the foregoing is true and correct to the best of my knowledge, information,
and belief.

Executed this third day of March, 2020.

Robert E. Perez
Deputy Commissioner
U.S. Customs and Border Protection

8

IFR_AR_002561

**U.S. Department of Homeland Security**

# Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act

Office:_____     File No:_____

Statement by:_____

In the case of:_____

Date of Birth:_____     Gender (circle one):   Male   Female

At:_____     Date:_____

Before:_____
<div align="center">(Name and Title)</div>

In the_____ language.  Interpreter _____ Employed by_____

I am an officer of the United States Department of Homeland Security.  I am authorized to administer the immigration laws and to take sworn statements.  I want to take your sworn statement regarding your application for admission to the United States.  Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States.  This may result in your being denied admission and immediately returned to your home country without a hearing.  If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision.  It is very important that you tell me the truth.  If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country.  If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.   You will have the opportunity to speak privately and confidentially to another officer about your fear or concern.  That officer will determine if you should remain in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Page 1 of _____                                                                                                     I-867A  (08/01/07)

IFR_AR_002596

**U.S. Department of Homeland Security**

**Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act**

Q:  Why did you leave your home country or country of last residence?

A.

Q.   Do you have any fear or concern about being returned to your home country or being removed from the United States?

A.

Q.  Would you be harmed if you are returned to your home country or country of last residence?

A.

Q.  Do you have any question or is there anything else you would like to add?

A.

I have read (or have had read to me) this statement, consisting of ____pages (including this page).   I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above named officer of the Department of Homeland Security.  I have initialed each page of this statement (and the corrections noted on page(s)_____).

Signature: _____

Sworn and subscribed to before me at _____
on _____.

_____
Signature of Immigration Officer

Witnessed by:_____

IFR_AR_002597

I-867B  (08/01/07)



### *RAIO DIRECTORATE*

# INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA

## TRAINING MODULE

*This Page Left Blank Intentionally*

**RAIO Directorate**

## INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA

### Training Module

## MODULE DESCRIPTION

This module provides background information on torture, including what is meant by the term "torture," the motives and methods of torturers, and the recovery of survivors. The lesson focuses primarily on the effects of torture and severe trauma and how these effects can affect the interview process. Through discussion and practical exercises, you will gain exposure to effective interviewing techniques and the effects of secondary trauma.

Note: This lesson plan was originally developed in 1995 for use in training new Asylum Officers and has changed little since that time. It is based on the experiences of the authors in their work with refugees and was reviewed by several experts in the field of working with survivors of torture and other severe trauma, including Dr. Allan Keller, Dr. Antonio Martinez, Dr. Andrea Northwood, and Dr. Pamela Elizabeth. In addition, two individuals who work with survivors, one a survivor herself, gave invaluable input into the development of this lesson plan; they requested that their names not be included, however. A mock interview practical exercise that is used during the training is based on mock interview exercises developed by the clinical staff of the Bellevue-NYU Program for Survivors of Torture. Our thanks also to the staff at the Center for Victims of Torture in Minneapolis for their support of RAIO training efforts, and to all who have contributed to these training materials and to the trainings that are conducted for new RAIO officers and in the RAIO field offices.

## ENABLING PERFORMANCE OBJECTIVES

1. Recognize motives, forms, and effects of torture.

2. Identify symptoms of Post-Traumatic Stress Disorder or other trauma-related conditions.

3. Explain how different factors can impede communication during an interview with a survivor of torture.

4.  Explain how interview techniques may be used to help elicit testimony from a survivor of torture or other serious trauma.

5.  Recognize secondary trauma as it may arise in RAIO adjudications.

## RECOMMENDED READING

None

## ADDITIONAL RESOURCES

1.  American Medical Association. (2016). *AMA principles of medical ethics*. AMA Code of Medical Ethics. Retrieved July 20, 2023, from https://www.ama-assn.org/delivering-care/ama-principles-medical-ethics

2.  American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787

3.  American Psychological Association. (2017). Ethical principles of psychologists and code of conduct (2002), amended effective June 1, 2010, and January 1, 2017. https://www.apa.org/ethics/code/.

4.  Baranowski, K. A. (2020). Documenting human rights violations: An introduction to the psychological evaluation of asylum seekers. *Practice Innovations, 5*(1), 32-44.

5.  Başoğlu, M. (2009). A multivariate contextual analysis of torture and cruel, inhuman, and degrading treatments: Implications for an evidence-based definition of torture. *American Journal of Orthopsychiatry, 79*(2), pp. 135-145.

6.  Başoğlu, M., Özmen, E., Şahin, D., Paker, M., Taşdemir, Ö., Ceyhanli, A., Incesu, C., & Sarimurat, N. (1996). Appraisal of self, social environment, and state authority as possible mediator of posttraumatic stress disorder in tortured political activists. *Journal of Abnormal Psychology, 105*(2), 232-236.

7.  Boyes, A. (2021, August 27). *What it really means to have self-compassion*. Psychology Today. Retrieved August 29, 2023, from https://www.psychologytoday.com/us/blog/in-practice/202108/what-it-really-means-have-self-compassion/

8.  Brimbal, L., Meissner, C. A., Kleinman, S. M., Phillips, E. L., Atkinson, D. J., Dianiska, R. E., Rothweiler, J. N., Oleszkiewicz, S., & Jones, M. S. (2021). Evaluating the benefits of a rapport-based approach to investigative interviews: A

training study with law enforcement investigators. *Law and Human Behavior, 45*(1), 55-67.

9. Center for Victims of Torture. (n.d.). *Resources*. Retrieved August 21, 2023, from https://www.cvt.org/resources/

10. Friedman, E. H. (2007). *A failure of nerve: Leadership in the age of the quick fix.* Seabury Books.

11. Gorman, W. (2001). Refugee survivors of torture: Trauma and treatment. *Professional Psychology: Research and Practice, Special Section: Issues in the Treatment of Survivors of Political Torture, 32*(5), 443-451.

12. Hárdi, L., & Kroó, A. (2011). The trauma of torture and the rehabilitation of torture survivors. *Zeitschrift für Psychologie/Journal of Psychology, 219*(3), 133-142.

13. Jones, P. J., Levari, D. E., Bellet, B. W., & McNally, R. J. (2023). Exposure to descriptions of traumatic events narrows one's concept of trauma. *Journal of Experimental Psychology: Applied, 29*(1), 179-187.

14. Kira, I. A. (2017). A critical outlook at torture definition, structure, dynamics, and interventions. *Peace and Conflict: Journal of Peace Psychology, 23*(3), 328-333.

15. Kira, I. A., Aljakoub, J., Al Ibraheem, B., & Shuwiekh, H. A. M. (2022). Are torture survivors more resilient and develop higher PTG, than nontortured refugees?: The role of will to exist, live, and survive: A replication and extension, *Peace and Conflict: Journal of Peace Psychology*. https://doi.org/10.1037/pac0000639

16. Kira, I. A., Templin, T., Lewandowski, L., Clifford, D., Wiencek, P., Hammad, A., Mohanesh, J., & Al-haidar, A.-M. (2006). The effects of torture: Two community studies. *Peace and Conflict: Journal of Peace Psychology, 12*(3), 205-228.

17. Kjellenberg, E., Nilsson, F., Daukantaité, D., & Cardeña, E. (2014). Transformative narratives: The impact of working with war and torture survivors. *Psychological Trauma: Theory, Research, Practice, and Policy, 6*(2), 120-128.

18. Martinez, A., & Fabri, M. The dilemma of revictimization: Survivors of torture giving testimony. Retrieved from https://www.heartlandalliance.org/wp-content/uploads/sites/5/2016/02/the-kovler-center-the-dilemma-of-revictimization.pdf.

19. National Center for PTSD. (2007). *Working with trauma survivors: What workers need to know*. Retrieved August 1, 2023, from https://www.ptsd.va.gov/professional/treat/type/work_with_survivors.asp

20. Physicians for Human Rights. *Examining Asylum Seekers*.

21. Reicherter, D., Wang, S.-R., Ohrtman, T. N., Ndukwe, N., Vaatainen, S., Alcalay, S., & Brown, L. M. (2022). Implementation of trauma-informed best practices for international criminal investigations conducted by the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/ISIL (UNITAD). *Psychological Injury and Law, 15*(4), 319-329.

22. Schippert, A. C. S. P., Grov, E. K., & Bjørnnes, A. K. (2021). Uncovering re-traumatization experiences of torture survivors in somatic health care: A qualitative systematic review, *PLoS ONE, 16*(2), 1-20. https://doi.org/10.1371/journal.pone.0246074.

23. Schubert, C. C., & Punamäki, R.-L. (2011). Mental health among torture survivors: Cultural background, refugee status and gender. *Nordic Journal of Psychiatry, 65*(3), 175-182.

24. United Nations. *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (June 1987). (Discussed in RAIO Training module, *International Human Rights Law*)

25. Weschler, L. (1990). *A miracle, a universe: Settling accounts with torturers*. Penguin.

26. Wheeler, J. (2018, June 26). *Five pragmatic tools to become a nonanxious presence: Tips and tricks for being a mindful counselor*. Counseling Today. Retrieved August 18, 2023, from https://ct.counseling.org/2018/06/five-pragmatic-tools-to-become-a-nonanxious-presence-tips-and-tricks-for-being-a-mindful-counselor/

**CRITICAL TASKS**

| Task Description |
| --- |
| Knowledge of policies and procedures for processing claims from survivors of torture |
| Knowledge of strategies and techniques for communicating with survivors of torture and other severe trauma |
| Skill in interacting with individuals who have suffered trauma (e.g., considerate, non-confrontational, empathetic |
| Skill in recognizing and managing secondary trauma |

**SCHEDULE OF REVISIONS**

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
| --- | --- | --- | --- |
| 1/31/2019 | Footer | Removed "draft" designation | Karrie Gurbacki |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
| 11/2/2023 | Entire Lesson Plan | Added recent research to Additional Resources; added information on triggers and related strategies, and on effects of secondary trauma; minor formatting changes; fixed typos and links | Survivors of Torture Lesson Plan Working Group |
| 4/24/2024 | Pages 1- 7 | Rebranding edits to remove specific training program mention and to update lesson plan objectives and linked KSAs. | RAIO Training |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

TABLE OF CONTENTS

1   INTRODUCTION ...................................................................................10

2   OVERVIEW...........................................................................................10

2.1 The Global Situation.......................................................................11
2.2 Common Experiences of Torture Survivors....................................11
2.3 Treatment Centers ..........................................................................11
2.4 Sensitivity to Torture Survivors .....................................................11

3   DEFINITION .........................................................................................12

4   MOTIVES OF TORTURERS ....................................................................13

5   FORMS OF TORTURE ...........................................................................14

5.1 Overview .........................................................................................14
5.2 Methods ..........................................................................................14

6   THE EFFECTS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA ...........................15

6.1 Overview .........................................................................................15
6.2 Physical Effects ..............................................................................15
6.3 Psychological Effects .....................................................................16
6.4 Post-Traumatic Stress Disorder (PTSD) .......................................18
6.5 Other Factors ..................................................................................18

7   TRIGGERS ............................................................................................19

8   RECOVERY FOR SURVIVORS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA .......19

8.1 Overview .........................................................................................20
8.2 Factors Affecting Recovery............................................................20

9   HOW TRAUMA-RELATED CONDITIONS CAN INTERFERE WITH THE INTERVIEW PROCESS
    21

9.1 Overview .........................................................................................21
9.2 Effect on Interview Process............................................................22

**10    INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA ..........................24**

10.1 Interview Techniques ..................................................................24

10.2 Documentation ..........................................................................28

**11    EFFECTS ON INDIVIDUALS WHO ARE CLOSE TO OR WHO WORK WITH SURVIVORS ..........28**

11.1 Overview ..................................................................................28

11.2 Secondary Trauma ......................................................................29

11.3 Family Members of Survivors ........................................................29

11.4 Caregivers and Others .................................................................29

11.5 Officers in RAIO ........................................................................29

        11.5.1 Effects that RAIO Officers Might Experience ..........................30
        11.5.2 Strategies to Cope with Secondary Trauma..............................31

**12    SUMMARY ...............................................................................32**

**PRACTICAL EXERCISES .......................................................................34**

**OTHER MATERIALS ...........................................................................35**

**SUPPLEMENT A – REFUGEE AFFAIRS DIVISION .........................................36**

Recommended Reading ........................................................................36

Additional Resources ........................................................................36

Supplements ..................................................................................36

**SUPPLEMENT B – ASYLUM DIVISION .......................................................37**

Recommended Reading ........................................................................37

Additional Resources ........................................................................37

Supplements ..................................................................................37

> Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.
>
> For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

> Officers in the RAIO Directorate conduct interviews primarily to determine eligibility for immigration benefits or requests; to corroborate information provided by applicants, petitioners, and beneficiaries; and/or to establish whether a person understands the consequences of their actions.
>
> The RAIO Training modules of the RAIO Directorate – Foundations Training Program and the adjudication-specific training courses constitute primary field guidance for all officers who conduct interviews for the RAIO Directorate. The USCIS Policy Manual also provides guidance for officers when conducting interviews. There may be some instances where the guidance in the Policy Manual conflicts with guidance provided by the RAIO Directorate. If this is the case, you should follow the RAIO guidance. Further guidance regarding interviews for specific applications will be discussed during adjudication-specific trainings.
>
> In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.

## 1    INTRODUCTION

This lesson covers the definition of torture, the motives and methods of torturers, and the recovery of survivors. The lesson also discusses the effects of torture and severe trauma and how these effects can affect the interview process. The lesson offers interviewing techniques and discusses how you may be affected by secondary traumatization.[1]

## 2    OVERVIEW

---

[1] This lesson plan does not cover the legal definition or elements of torture for decision-making for protection under the Convention Against Torture (CAT).  Please refer to the Asylum Division lesson, *Convention Against Torture (CAT) Determinations*, for making legal determinations for protection under the Convention Against Torture (CAT) in the context of a merits interview, Reasonable Fear (RF), and Credible Fear (CF).

## 2.1     The Global Situation

Torture victims are any gender or age. The practice of torturing individuals is not limited to a particular political ideology; it is an abuse of power that covers the entire range of the political spectrum. Torture of prisoners is routine in many countries. Torture may occur while individuals are serving sentences for having committed crimes, are incarcerated pending judicial hearings, are detained without being formally charged, or are in the informal custody of another person (or persons) who have control over them.[2]

## 2.2     Common Experiences of Torture Survivors

Generally, the experiences of torture survivors are similar in that usually the victims have been abruptly taken away from their familiar "world," held in captivity where they were tortured, then escaped or were released. The specter of the tortured individual instills terror in the community. The victim is stigmatized, often ostracized.

In addition, torture survivors have all experienced a loss of control. Usually when faced with danger, an individual can fight or run; torture victims cannot do either of these and have no control over their lives and fate. This loss of control and helplessness often remains with the survivor long after the experience, as does the sense of estrangement and isolation.[3]

## 2.3     Treatment Centers

Because of the widespread use of torture and the problems encountered by survivors of torture, treatment centers for survivors are available throughout the United States and the world. The mental health field is learning more about the psychology of survivors of torture and developing treatments to specifically address the effects of their experiences. Examples of centers in the United States include: the "Center for Victims of Torture" in Minneapolis, the "Bellevue/NYU Program for Survivors of Torture" in New York, "The Marjorie Kovler Center for the Treatment of Survivors of Torture" in Chicago, and "Survivors International" in San Francisco.

## 2.4     Sensitivity to Torture Survivors

RAIO officers are not expected to be psychologists, but you can be sensitive to persons who have experienced torture and understand how the experience of torture can potentially inhibit applicants from fully expressing their claim.

---

[2] Note that the UN definition of torture, cited below, limits the definition to that which is performed by or with the consent of a public official.

[3] The Center for Victims of Torture website, https://www.cvt.org/; United Nations main website, https://www.un.org/en; and United Nations International Day in Support of Victims of Torture website, https://www.un.org/en/observances/torture-victims-day.

## 3   DEFINITION

Torture has been defined in a variety of ways by international organizations, healthcare providers, academics, and others. Generally speaking, torture has an element of deliberate intent by the perpetrator.

Article 1, United Nations Convention against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, 27 June 1987, states:

> "For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."[4]

(Adopted and opened for signature, ratification, and accession by General Assembly resolution 39/46 of 10 December 1984; entry into force on 26 June 1987; ratified by the US Senate in 1990; US became a party in 1994.)[5]

The World Medical Association, in its "Declaration of Tokyo," (1975), defines torture in the following manner:

> "For the purpose of this declaration, torture is defined as the deliberate, systematic or wanton infliction of physical or mental suffering by one or more persons acting alone or on the orders of any authority, to force another person to yield information, to make a confession, or for any other reason."

A more descriptive definition of torture is offered by Elena O. Nightingale, M.D., Ph.D., in "The Problem of Torture and the Response of the Health Professional":

---

[4] This definition of torture is for purposes of the Convention. Since only states are parties to the Convention, the focus is on severe harm inflicted by officials or individuals acting in official capacity.

[5] While the United States ratified the Convention Against Torture on October 21, 1994, subject to certain declarations, reservations, and understandings, and the Convention entered into force for the United States thirty days later, on November 20, 1994, the term "torture" is defined in U.S. immigration law by 8 C.F.R. § 208.18. However, this lesson plan is intended to demonstrate the variety of social and legislative contexts that consider torture for purposes of interviewing survivors of torture and other severe trauma. For further information on making legal determinations for protection under the Convention Against Torture (CAT), please refer to the Asylum Division lesson, *Convention Against Torture (CAT) Determinations*, as well as the background reading associated with that lesson.

"Torture is the deliberate infliction of pain by one person on another--that is the unique feature of torture. It is very different from the trauma that is suffered from a natural event, such as an earthquake or flood...

"There are at least four characteristics of torture that seem to be quite consistent. First, at least two persons are involved—a perpetrator and a victim, and often, though not always, they are face-to-face. Second, the torturer has complete physical control over the victim. This is important because the helplessness of the victim[s] remains with [them] long after the torture episode is over. Third, pain and suffering are an integral part of torture, but the main purpose is not really pain and suffering but rather humiliation and breaking of the will. Therefore, there are means of torture that do not involve physical pain and suffering, including sensory deprivation, continuous noise, light, hunger, cold, and so on. Finally, torture is a purposeful, systematic activity. In addition to breaking the will of the victim, the intent is to obtain information or a confession, to punish the victim, or to intimidate the victim and others. That is, the purpose is not only to destroy the person who is being tortured, but to have that person be a lesson to others so they will not do whatever the government that sanctions torture feels is not in its interests. And that's a very important component. The torture we are speaking about is the systematic government-sanctioned use of torture that is for political purposes."[6]

## 4    MOTIVES OF TORTURERS

"[T]he body [is] abused to gain access to the mind."[7] As detailed in the above definitions, torture involves the intentional infliction of physical and/or mental pain and suffering for a specific purpose. Torture is the means used to achieve that purpose. Torture is the purposeful attempt to destroy an individual's will in order to gain or maintain power, to silence someone, or simply because of opposition to who that person is or what they believe in. Although the immediate goal of torturers in some cases is to extract information, obtain a confession, or destroy the person as a participant in or leader of a group that the torturers oppose, in most cases the ultimate goal is to give an example for others; it is a means of destroying the emotional, spiritual, social, and political well-being of a group or community.

Torturers attempt to:

- destroy the personality of the victim

- weaken the individual, the family, the community, and/or the society

---

[6] Nightingale, E. O. (1990). The problem of torture and the response of the health professional. In J. Gruschow & K. Hannibal (Eds.), *Health services for the treatment of torture and trauma survivors* (pp. 8-9). Washington DC: American Association for the Advancement of Science.

[7] Denford, J. (1996). The treatment of survivors of torture. In D. Forrest (Ed.), *A glimpse of hell: Reports on torture worldwide* (p. 155). London: Amnesty International.

- create a climate of fear or apathy

Torture leaves the survivor as well as the family and community of the survivor feeling afraid, vulnerable, humiliated, intimidated, and isolated. Distrust among community members may also develop, diminishing supportive community ties.

## 5    FORMS OF TORTURE

### 5.1    Overview

While torture may take many forms, the methods utilized can be grouped into specific categories. The Center for Victims of Torture describes four categories of forms of torture: physical assaults, psychological torture, deprivation of humane conditions, and sensory over-stimulation.[8]

Despite specific professional ethical prohibitions, some medical personnel and psychologists have assisted in torture, devising methods of torture that maximize the long-term effects of torture and do not leave physical signs, which can impact torture survivors' attempts to obtain asylum. Medical personnel are often present when victims are being tortured to assure that the victims do not die. Their presence makes them culpable of crimes against humanity; it does not legitimate the acts being performed.

Though some methods of torture leave no physical marks, they may have devastating physical, neurological, and psychological effects, disabling the person for life.

### 5.2    Methods

Examples of methods of the four forms of torture include:

- Physical assaults:

  ➢ Sexual violence (adults and children are all victims of sexual violence)[9]

  ➢ Electric shocks to all parts of the body (most frequently to the genitalia)

  ➢ Beatings / Physical assault (the majority of torture victims are subjected to beatings)

  ➢ Burning the victim

---

[8] The Center for Victims of Torture (2023, August 25). *Effects of Torture*. Retrieved from https://www.cvt.org/resources/effects-of-torture/.

[9] Sexual violence other than rape can also have lasting psychological effects.

> ➢ Forcing the body into contorted positions or forcibly stretching it beyond normal capacity

- Psychological torture (e.g., threatening to harm or kill the victim or relatives of the victim; mock executions; witnessing or hearing the torture of others; forced nudity)

- Deprivation of humane conditions (e.g., depriving the victim of food, sleep, light, and protection from the elements)

- Sensory over-stimulation (e.g., exposure to powerful lights and/or constant/very loud noise, non-therapeutic administration of drugs)

The most common forms of torture are beatings and psychological torture, with most victims being subjected to some form of psychological torture.[10]

# 6    THE EFFECTS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA

## 6.1    Overview

Torture can have lasting physical and psychological effects. The most debilitating long-term effects of torture, however, tend to be psychological rather than physical. Symptoms affect a high percentage of survivors. This is also true of other forms of traumatic abuse, such as witnessing the assault, mutilation, or murder of others; experiencing the burning or bombing of communities; forced separation from loved ones; and other exposure to horrific sights or events. Cultural background plays a role in how the effects of torture are manifested for different groups, with some groups tending to present with more somatic[11] complaints, and other groups presenting more psychological symptoms.[12]

## 6.2    Physical Effects

There are many possible physical effects of torture. Physical effects include (but are not limited to) the following:

- Musculoskeletal pain

- Loss of use of body mobility (due to nerve damage, muscle damage, etc.)

- Loss of complete use of certain body functioning

- Loss of vision

---

[10] The Center for Victims of Torture (2023, August 25). *Effects of Torture*. Retrieved from https://www.cvt.org/resources/effects-of-torture/.

[11] Some cultures conceive the body and mind as inseparable, so report physical (somatic) complaints to communicate distress rather than identifying concerns as psychological.

[12] Schubert, C. C., & Punamäki, R.-L. (2011). Mental health among torture survivors: Cultural background, refugee status and gender. *Nordic Journal of Psychiatry, 65*(3), 175-182.

- Hearing loss

- Headaches

- Pregnancy

- Sexually transmitted diseases

- Scars (most forms of torture, however, do not leave lasting scars)

## 6.3  Psychological Effects

The psychological effects (and corresponding symptoms) of torture and other forms of severe trauma can include the following.[13]

**Emotional**

- blunted affect, or restricted affect (psychic numbing, showing no emotion or inappropriate emotion)

- depression

- panic disorders / panic attacks

- phobias

- anxiety

- suspiciousness; distrust

- detachment

- feelings of isolation / alienation

- feelings of guilt, shame, humiliation, worthlessness, or helplessness

- loss of confidence

- lack of interest in previously enjoyable activities

- anger (at those who perpetrated the trauma or those who were exempted)

- thoughts of death or suicide

**Psychosomatic**

- headaches

- pains for which there is no medical explanation

- nervousness

- insomnia or hypersomnia

---

[13] The following list is one of several ways of categorizing the effects of trauma on survivors.

- gastrointestinal complaints; diarrhea

- fainting

- sweating

- weakness; fatigue

- loss of appetite; weight loss or gain

- nightmares

- flashbacks

- reliving the physical pain of what happened

**Behavioral**

- hypervigilance

- excessive substance use

- aggressive behavior

- irritability

- withdrawal

- sexual dysfunction

**Mental**

- confusion

- loss of concentration

- loss of memory

- mental dullness

- attention blocking

- recurring thoughts of the traumatic event(s)

- dissociation[14]

It is important to note that although most psychological effects of torture are universal, some may vary somewhat across cultures, and some may be culture-specific. For example, to a Tibetan Buddhist, body fluids are considered to have a spiritual energy and

---

[14] "Disruption of and/or discontinuity in the normal integration of consciousness, memory, identity, emotion, perception, body representation, motor control, and behavior." This may present as blank stares, non-responsiveness to questions, losing track of questions, or appearing to behave as though reliving the traumatic event. American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787.

are not replenishable.[15] A form of torture which has been used against Tibetans is drawing blood and discarding it in an inappropriate manner. This can have severe psychological effects on the individual; their energy and spirit are irreversibly depleted.

Many of these psychological effects (as well as certain physical effects) can lead to a deterioration of the family structure and community ties. Social functioning of the individual is often impaired; this affects parenting skills, the ability to interact as a family member or part of a community, and the ability to hold a job and support oneself and one's family. The socioeconomic functioning of the entire community may suffer, as the effects of torture and other forms of severe trauma have a far-reaching impact on the community as well as the individual.

## 6.4    Post-Traumatic Stress Disorder (PTSD)

Although reactions to torture and other forms of severe trauma differ among individuals and cultures, the most common conditions are depression and Post-Traumatic Stress Disorder (PTSD). According to "The Dilemma of Revictimization: Survivors of Torture Giving Testimony" by Antonio Martinez, Ph.D., and Mary Fabri, Psy.D.,

> "The dynamics of the disorder are best understood by the interaction between two factors: the painful intrusive memories of the trauma, and the defenses used to ward off these memories. **The questioning during investigations, hearings, etc. is an extremely emotional event for the survivor. The story is rarely recounted without an actual sensory reliving of the experience (physical pain, tastes, sounds, smells). It is not simply a recollection of events.**"[16] (emphasis added)

## 6.5    Other Factors

There are other issues which may compound the effects of torture and other forms of severe trauma on survivors.

1.  The survivor may be overwhelmed by grief or bereavement due to separation from and/or loss of loved ones that has occurred as a secondary consequence of the survivor's torture.

2.  The survivor may experience an overwhelming sense of guilt, especially if they survived while others continued to be tortured or were killed after the survivor was freed, or if their torture was due to their association with the survivor. Survivors may feel that they were somehow to blame for their own torture or for the torture of others.

---

[15] Eisenman, Dr. David. Associate Medical Director, Bellevue/NYU Program for Survivors of Torture. Interview, 17 December 1997.

[16] Martinez, A., & Fabri, M. The dilemma of revictimization: Survivors of torture giving testimony. Retrieved from https://www.heartlandalliance.org/wp-content/uploads/sites/5/2016/02/the-kovler-center-the-dilemma-of-revictimization.pdf.

3. Survivors who have resettled in a country other than their own face difficulties adjusting to unfamiliar customs and a new language. They may also feel that they do not fit into the new environment. Their established position in their family and society may have been greatly altered by their resettlement, and they may feel a loss of purpose in their lives, especially if it is difficult for them to get and keep a job, and if economic survival is problematic for them.

4. Uncertain immigration status in the country of refuge can be very stressful for a survivor and can add greatly to their feeling of instability and uncertainty. The survivor may fear being deported and returned to the country where the abuse occurred. Waiting for a decision on a request for asylum or refugee status can be very stressful; being denied can have profound negative effect on a survivor.

5. The survivor may have a physical disability as a result of the torture / trauma that they experienced. The survivor may also, as noted above, be especially susceptible to illness.

## 7     TRIGGERS

As noted above, torture and other severe trauma can leave lasting psychological effects on survivors. Often, symptoms appear after a latency period and do not usually subside merely with the passing of time. A survivor may appear to be adjusting fairly well, only to have symptoms triggered without warning.

There are many possible triggers: an event may trigger painful memories or an individual may remind the survivor of the torturer. Even sounds and smells can trigger symptoms.

An interview could potentially trigger psychological or physical symptoms for some applicants as the required inquiries involve asking about trauma. Refer to Section 10.1, *Interview Techniques*, for interview techniques and strategies to utilize when an applicant is presenting with symptoms of distress following exposure to a trigger.

The implications for the interview are substantial. Recollections of the traumatic events, such as are required in the interview, can trigger symptoms. If the survivor was interrogated, the mere experience of the interview can remind the survivor of being interrogated where their life was dependent upon the whim of the interrogator. Uniformed security guards, a particular manner of questioning or particular questions, certain objects in the interview room or office environment, etc., can trigger memories of the trauma and cause "flashbacks" for the survivor. A survivor may be very fearful of symptoms being triggered during the interview.

## 8     RECOVERY FOR SURVIVORS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA

## 8.1    Overview

Research has revealed significant variability in individual responses to torture. Many torture survivors experience chronic psychological or physical symptoms, which range from mild to severe, while other torture survivors experience recovery from psychological and/or physical symptoms, as well as posttraumatic growth and increased resiliency. In recent years, specialized mental health treatments have been developed for survivors of torture in order to facilitate recovery from symptoms which cause distress and impair functioning.[17]

## 8.2    Factors Affecting Recovery

It is difficult to predict how a particular individual might heal from a torture experience. Psychologists have found, however, that the situations listed below may help in recovery.

**Certain situations can help in recovery**

- the survivor was an activist and was abused due to their activism

  - Such individuals tend to recover more easily than someone who was tortured merely to serve as an example or to get at others in the community.[18]

- the survivor holds strong religious beliefs

- the survivor is able to seek legal redress for the past abuse (for themselves, or to help others)

- the survivor has access to rehabilitation

- the survivor is in a supportive environment where they can be productive

  - Being in an environment that is permanently safe where there is no threat of future harm is important in recovery. Having regularized immigration status in the country of resettlement can add greatly to the feelings of safety and security of a survivor.

  - Being able to continue with normal family, social, and work-related functions without being viewed by others as having been somehow diminished by the past experiences can help in recovery.

  - In some instances, peers/the community may view the survivor as having been strong to have survived.

---

[17] See Additional Resources: Gorman (2001), Hárdi et al. (2011), Kjellenberg et al. (2014), Kira (2017), and Kira et al. (2006).

[18] See Additional Resources: Başoğlu et al. (1996), Kira et al. (2022), and Kira et al. (2006).

- ➢ Having someone who is easily accessible with whom the survivor feels comfortable talking about the experience can also help in recovery.

- ➢ The survivor has family with them in exile and/or is assured that their family is safe.

- certain cultural values can have a positive impact[19]

  - ➢ For example, a survivor's belief in "karma" may help them to release feelings of revenge or anger toward the perpetrator: suffering is part of one's fate that one must accept; the perpetrator cannot escape their own fate because of their actions so justice will eventually prevail.

**Certain situations can have a negative impact on recovery**

- certain cultural values can adversely affect recovery

  - ➢ For example, women who have been sexually abused in cultures that view such women as responsible for their own abuse have an especially difficult time accepting what happened to them and overcoming their shame.

- culture differences or "culture shock"—difficulty living in a culture that is different from one's own—can have a negative impact on recovery

- lack of economic resources can also have a negative impact on recovery

- bias and discrimination (such as anti-immigrant bias) can have an adverse impact on the recovery of those survivors who resettle in a country other than their own, or in an area that is culturally different from their own

- uncertain future can negatively impact recovery

  - ➢ An uncertain future can negatively affect a survivor's rate of recovery. Survivors who are under the surveillance of their torturers may not know if or when they may be forced to again undergo torture. Even if survivors have resettled in another country and are out of immediate harm's way, their future may still be uncertain if they have no legal status in the country of resettlement or if their immigration status is pending.

# 9    HOW TRAUMA-RELATED CONDITIONS CAN INTERFERE WITH THE INTERVIEW PROCESS

## 9.1    Overview

---

[19] Cultural factors can also have a negative impact; see the section immediately below.

If an applicant is suffering from Post-Traumatic Stress Disorder or other trauma-related conditions, your ability to gather information on which to base a decision may be affected.[20]

An interview—even a job interview—can be a stressful experience for any individual. An interview as crucial to an individual's future as a refugee or asylum interview, by its very nature, is very stress-producing. Symptoms of trauma-related conditions are often exacerbated in stressful situations. Therefore, the interview can be extremely difficult for a survivor of torture or other severe trauma.

Undergoing questioning about the events that occurred can be very emotional for the survivor. The survivor can actually relive sensory experiences, such as sounds, smells, and physical pain. Various factors such as contact with persons in uniform (e.g., immigration inspectors, border patrol agents) or being questioned in a particular manner may trigger symptoms of Post-Traumatic Stress Disorder because this can remind the survivor of the individuals who harmed them. The survivor may feel robbed of power, vulnerable, and defenseless, similar to how they felt during the torture experience. The survivor may react in a variety of ways during the interview.

## 9.2    Effect on Interview Process

Often, the symptoms of PTSD that may be triggered in the survivor during the interview are experienced internally, and the survivor will not discuss this with those present. These symptoms, however, will have an impact on the survivor's ability to portray their claim.

**Survivor may avoid discussing events**

A survivor may use avoidance as a means of coping. They may do whatever necessary to avoid thinking about the events due to the humiliation and the emotional pain evoked. They may not wish to discuss the details of the experience with others, may not sleep to avoid having nightmares, or may isolate themself from others to avoid talking about past events. A survivor may also avoid contact with others from their country who may remind them of the experience. A survivor also may avoid such contact because they are fearful that "spies" associated in some way with their abusers may have "infiltrated" their community. (This is not an unrealistic fear, as there have been cases in which government agents from countries have developed ties to communities in resettlement countries in order to report information back to their governments on the activities of certain individuals.)

A torture survivor may be more willing to discuss the physical symptoms resulting from the experience(s) than the psychological symptoms.

**Survivor may have difficulty remembering events**

---

[20] See also Section 7, *Triggers*.

A survivor may have suffered brain damage as a result of abuse such as blows to the head and other forms of trauma. This may lead to cognitive problems and an inability to remember certain things.

Additionally, a survivor may have an emotional remembrance of what happened but may not remember the details. They may experience intense fears and anticipation of going through the experience but may not be able to remember what it was that happened. This may be due to:

- defensive techniques to avoid reliving the events, which include

  ➢ denial that events occurred

  ➢ minimizing the events

  ➢ blocking memory of the events

  ➢ dissociation

- overstimulation of the brain during the occurrence of the traumatic events so that the brain did not store all of the information

- confusion or distortion of memory due to anxiety (e.g., mixing up names and/or dates)

**Survivor may respond in unpredictable ways**

- They may lose composure. The question-and-answer format of the interview conducted by a stranger may remind the survivor of being interrogated and questioned for the "truth," and then punished for telling the truth or for lying. The survivor may see the interview as determining whether they will live or die. Even waiting to be interviewed may remind the survivor of waiting to be taken to be tortured.

- A torture survivor may manifest a wide variety of emotions when recounting past events. They may laugh at what appears to be inappropriate moments or may cry hysterically. The survivor may remember the details of the event(s) but be emotionally detached and recount events as if merely reciting a memorized story without any emotion at all.

- A torture survivor may avoid answering questions or may change the subject because they may be afraid of having an emotional outburst or a dissociation experience.

- A torture survivor may have difficulty following or tracking your questions or difficulty answering questions coherently. This can be due to severe concentration difficulties as a result of the memory problems listed previously.

- A torture survivor may avoid eye contact. Eye contact may be difficult for a torture survivor due to the experience of having been constantly watched while being detained and undergoing torture.

- A torture survivor may be unresponsive to questions you pose, even if they know the answers and could speak extensively on the topic.[21]

**Survivor may distrust the interviewing officer and may therefore avoid revealing certain information**

A torture survivor may have a distrust of others, particularly persons in positions of power or authority (e.g., USCIS officers). (Survivors may also distrust even family members and friends.) The survivor may be fearful of what you will do with the information obtained at the interview, and so may not fully disclose to the officer the experiences they had.

Often, a distrust of others helped survivors escape further abuse and survive in their countries. Therefore, survivors may attempt to protect themselves by distrusting others in other situations as well.

The effects listed above can also have an impact on interactions other than at the interview. Individuals who work with survivors in a counseling capacity are often not able to elicit all that happened to the survivor during the first few counseling sessions. In addition, a survivor may not have explained everything about the claim to their representative prior to the interview.[22] It is important to keep in mind how a trauma experience may impact an individual during the interview, and the way in which a trauma experience can manifest in an interview should not be a factor that creates doubt about an individual's credibility.


## 10    INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA

### 10.1    Interview Techniques

At every interview there is a potential for retraumatizing an applicant who may be a survivor of torture or other severe trauma. You must be aware of the effects of trauma on certain applicants and use this awareness in formulating interview strategies. You may have to modify your interview techniques to adapt to certain situations. Unfortunately,

---

[21] This type of response may give rise to credibility concerns related to the applicant's candor or responsiveness. Just like you need to consider an applicant's cultural or educational background in determining whether a response is credible, you must take into consideration the effects of torture and trauma on an applicant's ability to respond. See RAIO Training module, *Credibility*, which cites multiple court cases overturning lower decisions where the impact of torture was not properly considered in making a determination regarding the applicant's credibility.

[22] Consider the implications for the interview if applicants have not been able to fully explain their claim to their legal representative or counselor.

you will not always know who is a survivor and who is not a survivor. As noted above, some applicants will not fully disclose all information about their past to you. You should therefore treat each applicant as a possible survivor and attempt to be as sensitive as possible during all interviews.

Interview techniques that may be helpful include the following.

**Treat the applicant with humanity**

The manner in which you approach the applicant and the interview can greatly affect the way in which the applicant will respond and be able to express their claim at the interview.

You should attempt to build rapport as soon as you meet the applicant, for example by finding some way to connect with the applicant on a human level or connecting on issues not related to the torture experience. Setting the tone at the beginning of the interview can assist you in eliciting the necessary information throughout the interview and can assist the applicant in relating their claim.

**Try to help the person feel safe and in control**

- You should recognize the power differential that exists between the applicant and yourself and take care not to exploit it.

- You should explain the purpose and process of the interview, including the fact that you will be taking notes and the reason for taking notes. In this way, a survivor will know what they can expect during the interview, thus relieving some of the anxiety of the unknown.

- If the claim involves sexual abuse and you are not the same sex as the applicant, you can offer the applicant an opportunity to be interviewed by an officer of the same sex, if one is available.[23]

- You should start with easy topics in order to establish rapport.

- You can ask open-ended questions that give the applicant some control over the information they must give.

- You can acknowledge how difficult it may be for the applicant to answer certain questions; you can also give the applicant permission to let you know when something is too difficult.

---

[23] Sometimes just giving the applicant the opportunity to be interviewed by someone else can relieve some of the applicant's stress about the interview as it indicates that the asylum officer is sensitive to and understanding of the applicant's situation.

- You can acknowledge that an event may have been particularly traumatic for an applicant (e.g., "That must have been very difficult for you.")

- You can elicit sufficient detail to establish credibility and gain an understanding of the basis of the claim without probing too deeply into all the details of a painful experience.

- Questions such as "Was your life different after your experience? ...How?" can also give you further insight into the nature of the event as well as an understanding of the long-term effects of the experience on the applicant.

- If the applicant does not speak English and it is necessary for you to discuss issues with the interpreter, attorney or legal representative, dependents on the applicant's case, or anyone else at the interview, you should have the discussion translated to the applicant. This keeps the applicant informed of what is going on and can diminish the loss of control the applicant may feel.[24]

- You should respect a survivor's need to protect themself during the interview and should respect the survivor's need to have a sense of control during the interview. This is a major issue for survivors, as their control has been completely stripped from them in many situations; thus lack of control can be very unnerving.

**Be thorough but sensitive**

- You should explain to the applicant the process and roles of the individuals at the interview to reduce the feeling of anxiety.

- You can ask broader, open-ended questions in the beginning of the interview to give the applicant a feeling of control, then go back for details.

- You should not speak in a loud voice, should avoid changes in mood or attitude toward the applicant, should avoid reacting with disbelief, and should avoid being confrontational or argumentative with the applicant.

  ➢ It is important to remember that there is a range of behavior that a survivor may exhibit when confronted with discrepancies in their story. Some survivors may be able to explain the discrepancy in a rational manner, while others may become more confused. This may have very little to do with an attempt to fabricate a claim.

- You should approach the interview as a means of gathering information rather than as an interrogation, and should convey that message to the applicant by your manner.

---

[24] For additional information, see RAIO Training module, *Interviewing – Working with an Interpreter*.

- You should allow the applicant to ask questions or ask for clarification; the officer should rephrase questions that appear to be confusing or not understood by the applicant.

**Remember the purpose of the interview**

- You should be knowledgeable in human rights conditions in the applicant's country so that you can ask relevant questions and avoid unnecessary questions.

- You should give the applicant time to recompose themself if necessary during the interview, and to relate the account of their experiences in a manner that is the most comfortable for the applicant.

  ➢ At times after asking a question, it may be appropriate to allow the applicant several seconds of silence to organize their thoughts and determine how to answer a particularly difficult question. Although you may feel a need to fill in the silence by asking additional questions, it may be more beneficial to allow for the silence at particular times during the interview.[25]

  ➢ If an interview with a survivor of torture is particularly long or difficult, you can give the applicant an opportunity to take a break, get water, etc.

- You can emphasize mutual goals you and the applicant have.

- You should respond non-defensively if an applicant exhibits suspiciousness or distrust.

It is important to keep in mind that you may not be aware of what the applicant is going through during the interview and that you cannot change the manner in which the applicant presents themself. Rather, you must be aware of how you are conducting the interview and adapt your own behavior whenever necessary to be able to effectively elicit the applicant's claim.

**Respond to signs indicating that the applicant is experiencing distress related to triggers**

You can use techniques to mitigate the symptoms of distress experienced by the torture survivor after exposure to a trigger, including attending to the interviewee's nonverbal cues of distress, modeling how to cope with distress, and responding to their distress by promoting the positive and helping the interviewee feel safe. For example, when you notice the interviewee is tearful or that their voice is quavering, you can acknowledge their distress and allow them to talk or allow them to regain composure before proceeding to the next question. You can also remind the interviewee of the course of the interview and provide positive feedback for the interviewee's efforts during the interview. For

---

[25] For additional information, see RAIO Training module, *Interviewing – Eliciting Testimony*.

example, "I see this is difficult for you. Please take your time. It seems like you are working hard to answer these questions. I can see the effort you are making to complete this interview."

One effective strategy involves setting an intention to act as the non-anxious person in the room. Non-anxious person is an effective interview strategy conducted using the trauma-informed approach to obtain necessary information from individuals who have experienced trauma. The non-anxious person strategy involves the interviewer managing their emotional reactions when exposed to the emotional processes of others, maintaining a nonjudgmental perspective, focusing on engaging the applicant in the interview by active listening, and allowing the interviewee to tell their story by being curious, which empowers them. This strategy includes refraining from expressions of horror, disbelief, or distress in response to what the interviewee is saying; giving the outward appearance of calm and concern; and allowing the interviewee to express emotions while relating their story, which communicates to the interviewee that you can handle hearing the story.[26]

## 10.2   Documentation

Documentation of a survivor's experience from their country is usually not available; persons who practice torture usually do not leave written accounts of their actions, and physicians and psychologists who might provide treatment and/or documentation may themselves be harmed if caught. In addition, many in the medical profession may not be trained in recognizing the signs of torture. Furthermore, a survivor may be afraid to go to a doctor if a doctor was present during and involved in the torture. Although survivors are often not able to seek medical or psychological attention, some are able to obtain care and documentation of their abuse.

Documentation of physical symptoms and conditions, however, may not necessarily be able to verify the cause of the symptoms or conditions.

## 11   EFFECTS ON INDIVIDUALS WHO ARE CLOSE TO OR WHO WORK WITH SURVIVORS

### 11.1   Overview

Individuals who have relationships or work with survivors of torture or trauma may be impacted by the experience of survivors recounting stories of torture or trauma. The impact may be positive, for example posttraumatic growth, or negative, including but not limited to secondary traumatic stress and/or burnout. Additionally, the repeated exposure to descriptions of traumatic events can alter an officer's perception of the severity of

---

[26] See Additional Resources: Baranowski (2020), Brimbal et al. (2021), Friedman (2007), Reicherter et al. (2022), Wheeler (2018, June 26), and Schippert et al. (2021), for details regarding effective strategies for interviewing applicants, with histories of trauma, exhibiting signs of distress.

another's reported trauma. An officer's perception may be altered in a way that directly impacts the officer's analysis during the interview. To conduct objective interviews, officers must be aware of how they may be impacted by the experience in order to mitigate potential negative impacts that could inappropriately influence the analysis of an applicant's interview.[27]

## 11.2    Secondary Trauma

The term "secondary trauma" (also called "vicarious trauma") is used to refer to the psychological and physiological effects experienced by individuals who work with or are close to trauma survivors. Vicarious trauma can result from empathic engagement with trauma survivors and their trauma stories, combined with a commitment or responsibility to help them.[28] Symptoms of secondary trauma mimic the symptoms of PTSD. Secondary trauma is a normal reaction and is experienced in varying degrees by individuals who are in constant contact with survivors of trauma.

## 11.3    Family Members of Survivors

Secondary trauma may affect family members of the survivor as well as individuals who were closely associated with the survivor, such as a friend or colleague who escaped being tortured. (This is important to note when interviewing an applicant who is related to or closely associated with someone who was a victim of torture or other severe trauma.)

## 11.4    Caregivers and Others

Secondary trauma can affect individuals who work intensely or frequently with survivors, including service providers such as doctors, nurses, social workers, and mental health care providers.

## 11.5    Officers in RAIO

Although officers in RAIO do not have the same in-depth contact with torture survivors that certain service providers have, you may still be affected by the stress from continually interviewing applicants who have undergone hardships and may be survivors of torture or other forms of trauma. You must recognize how this stress may be affecting you and take steps to address problems that may arise as a result. It is important that you take care of your mental health while doing this work and reach out for available services to address problems that may arise as a result of secondary trauma.[29]  It is also essential to

---

[27] See Additional Resources: Jones et al. (2023) and Kjellenberg et al. (2014) for more details.

[28] Herman, J. L., & van der Kolk, B. A. (2020). *Treating complex traumatic stress disorders in adults: Scientific foundations and therapeutic models*. Guilford Publications.

[29] Through the Employee Assistance Program (EAP), RAIO staff have access to free and confidential counseling 24 hours per day, 7 days per week, to help handle difficult situations and manage stress. Seeking counseling services

establish healthy boundaries, such as taking needed breaks, and engage in self-care activities that promote relaxation and well-being.

Secondary trauma could also have an effect on your interactions with others and your work performance. Things to look out for are the potential for: decreasing objectivity, tolerance, patience, and the ability to listen dispassionately to others; overreaction or reaction with disbelief and sarcasm to stories of torture or other forms of abuse; and a decreased sense of personal accomplishment.

## 11.5.1 Effects that RAIO Officers Might Experience

Those who work with trauma survivors "may begin to show signs of stress disorders ranging from difficulty sleeping to PTSD symptoms such as intrusive thoughts and heightened reactivity."[30] Individuals who work with survivors can also experience the following effects:

**Burnout**[31]

The term "burnout" refers to the cumulative psychological strain of working with many different stressors. It often manifests as a gradual wearing down over time.

The factors that could lead to burnout include:

- Professional isolation
- Emotional drain from empathizing
- Complex client population
- Long hours with finite resources
- Ambiguous success
- Unreciprocated giving and attentiveness
- Failure to live up to one's own expectations for effecting positive change

The symptoms of burnout can include:

- Depression
- Cynicism
- Boredom

---

for mental health treatment does not disqualify you from working for the government or passing a background check.

[30] National Center for PTSD. (2007). *Working with trauma survivors: What workers need to know.* Retrieved August 1, 2023, from https://www.ptsd.va.gov/professional/treat/type/work_with_survivors.asp.

[31] *Id.*

- Loss of compassion
- Discouragement

**Compassion stress**[32]

Compassion stress refers to the stress of helping or wanting to help a trauma survivor. Compassion stress is seen as a *natural outcome* of knowing about trauma experienced by a client, friend, or family member, rather than a pathological process. It can be of sudden onset, and the symptoms include:

- Helplessness
- Confusion
- Isolation
- Secondary traumatic stress symptoms

**Compassion fatigue**[33]

Compassion fatigue is considered a more severe example of cumulative compassion stress. It is defined as "a state of exhaustion and dysfunction, biologically, physiologically, and emotionally, as a result of prolonged exposure to compassion stress."[34]

## 11.5.2  Strategies to Cope with Secondary Trauma

There are various ways you can prevent or treat secondary trauma, including getting regular physical exercise, adequate sleep, and proper nutrition, and talking to a counselor or other health professional. Taking regular breaks and being assigned to different types of tasks can also help. Practicing mindfulness and self-compassion can also help individuals working with survivors cope with difficult emotions and reduce trauma reactions.[35] It is also important to seek social support from a supportive environment of family and/or friends with whom to discuss feelings. In addition, anyone who is suffering from secondary trauma can connect with and share their experiences with co-workers who are likely to understand what they are going through more than anyone else might. Also, you are encouraged to reach out to your supervisor, as you feel comfortable, to discuss what options may be available for support.[36]

---

[32] *Id.*

[33] *Id.*

[34] *Id.* (citing Figley, C. R. (Ed.). (1995). *Compassion fatigue: Coping with secondary traumatic stress disorder in those who treat the traumatized.* New York: Brunner/Mazel.)

[35] See Additional Resources: Boyes (2021, August 27) for more details.

[36] Through the Employee Assistance Program (EAP), RAIO staff have access to free and confidential counseling 24 hours per day, 7 days per week, to help handle difficult situations and manage stress. Seeking counseling services

## 12   SUMMARY

Torture is practiced in many countries. It affects persons of all genders and ages, including children.

**Motive of Torturers**

- To give an example to others
- A means of destroying the emotional, spiritual, social, and political well-being of a group or community
- Torturers attempt to:
  - ➢ destroy the personality of the victim
  - ➢ weaken the individual, the family, the community, and/or the society

**Forms of Torture**

Torturers use a variety of methods of torture that leave long-lasting psychological damage but that do not usually leave lasting physical evidence.

- Psychological torture
- Sensory deprivation / Sensory overload
- Sexual violence
- Electric shocks
- Beatings
- Burns
- Forcing the body into contorted positions or forcibly stretching it beyond normal capacity
- Non-therapeutic administration of drugs

**Effects of Torture and Other Trauma**

Symptoms affect a high percentage of survivors. Symptoms exhibited by applicants suffering from trauma-related conditions may be physical or psychological and include:

- Emotional
- Psychosomatic
- Behavioral

---

for mental health treatment does not disqualify you from working for the government or passing a background check.

- Mental

Such symptoms can affect the RAIO officer's ability to elicit necessary information.

Post-Traumatic Stress Disorder (PTSD) and depression are the most common long-term reactions to torture and other forms of severe trauma.

Often, symptoms appear after a latency period and do not usually subside merely with time. Symptoms may be "triggered" without warning at any time. The rate of recovery for survivors varies from individual to individual and a variety of factors can influence the rate of recovery. However, survivors may never fully recover from a torture experience.

An applicant suffering from PTSD or other trauma-related condition may

- avoid discussing events

- have difficulty remembering events

- respond in unpredictable ways

- avoid revealing certain information

**Interviewing Survivors of Torture**

Officers need to be aware of the possible symptoms of trauma-related conditions and elicit information in the most effective and sensitive way possible.

- Treat the applicant with humanity

- Try to help the applicant feel safe / in control

- Be thorough but sensitive

- Remember the purpose of the interview

- Respond to signs indicating that the applicant is experiencing distress related to triggers

**Effects on Individuals who are Close to or Who Work with Survivors**

Individuals who work with trauma survivors, as well as family members and others who are close to trauma survivors, may experience secondary trauma, the symptoms of which are similar to those of PTSD. Other effects of secondary trauma can include burnout and compassion stress and fatigue.

IFR_AR_002975

## PRACTICAL EXERCISES

**Materials for Practical Exercises will be handed out at the training.**

---

### Practical Exercise # 1

- **Title:**

- **Student Materials:**

---

# OTHER MATERIALS

**None**

IFR_AR_002977

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

## RECOMMENDED READING

    None

## ADDITIONAL RESOURCES

    None

## SUPPLEMENTS

| |
|---|
| **International and Refugee Adjudications Supplement** |
| **Module Section Subheading** |

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

## RECOMMENDED READING

None

## ADDITIONAL RESOURCES

None

## SUPPLEMENTS

> **Asylum Adjudications Supplement**

RECEIVED
By ESEC at 9:09 am, Mar 28, 2023

# United States Senate

WASHINGTON, DC 20510

March 27, 2023

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
2801 Nebraska Avenue, NW
Washington, DC 20528

The Honorable Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue NW Washington, D.C. 20229

Dear Secretary Mayorkas and Acting Commissioner Miller,

I write to express my grave concerns about the implementation of the CBP One mobile application as the sole method for migrants to seek asylum at the border and for Haitians, Nicaraguans, Cubans, and Venezuelans to seek humanitarian parole. Public reporting has showed that users continue to experience a multitude of technical problems, which could ultimately lead to more migrants turning to potentially fatal, unregulated border crossings.[1]

Since the app became the primary method for seeking asylum and humanitarian parole in January 2023, it has been plagued by inconsistencies that have created an inequitable process. U.S Customs and Border Protection (CBP) releases a limited number of appointments each day. Successfully receiving an appointment is akin to winning the lottery for the thousands of migrants living in camps waiting to secure an interview slot. Beyond the odds of getting an appointment, technical issues make it virtually impossible for many migrants to access the app – antiquated devices, poor cell phone service, or language access have all become barriers.

When CBP established the app as the sole method for Haitians, Nicaraguans, Cubans, and Venezuelans to seek humanitarian parole, the app was only available in English and Spanish. This overlooked the fact that the majority of Haitian nationals speak only Haitian Creole.[2] I applaud CBP for quickly addressing the problem and offering a Haitian Creole translation in February 2023. However, error messages still only appear in English, leaving non-English speakers without direction when they encounter an issue.[3]

---

[1] Bernard Debusmann Jr., *At U.S. Border, Tech Issues Plague New Migrant Applications*, BBC NEWS (March 8, 2023) https://www.bbc.com/news/world-us-canada-64814095.
[2] Dara Lind, *How To Seek Asylum (Under Biden's Proposed Asylum Transit Ban), In 12 Not-At-All-Easy Steps*, IMMIGRATION IMPACT (Feb. 22, 2023) https://immigrationimpact.com/2023/02/22/steps-to-seek-asylum-biden-transit-ban/.
[3] *Id.*

News reports in early February indicated that Black migrants attempting to use CBP One faced additional challenges because the app is failing to register the photo of their faces.[4] Despite staff-level assurances that this issue was due to user error and not a problem with the app itself, these reports have continued.[5] I remain deeply concerned that the technology used to capture faces with darker complexions has not been adequately tested and structurally disadvantages Black asylum seekers and urge the agency to address the issue.

During a recent visit to Matamoros, Mexico, I had the opportunity to speak with migrant mothers who shared their experience attempting to sign up for appointments through the app. CBP and State Department officials also acknowledged problems, confirming recent reports of families with children who cannot secure appointments for their entire family. For example, by the time a family with two parents and two children has completed the application for an appointment, all of the appointments made available that day are usually filled. This results in family members who have appointment times presenting themselves and abandoning their children or other member of their family that did not successfully obtain an appointment.[6] I am glad that CBP recently addressed this issue to make it easier for family units to secure appointments by releasing appointments in larger batches at fewer intervals of time. Even with this improvement, I urge CBP to review and assess its implementation and efficiency to ensure families are not faced with the difficult decision of separating at the border in order to seek asylum.

The process for registering for appointments is also in need of improvement. Many migrants have antiquated mobile devices that are slow to connect to the internet. Some migrants do not have phones at all, while others cannot use CBP One because they do not read or write. These difficulties result in a select group of asylum seekers securing appointments. Additional impediments include the requirement that asylum seekers be in Mexico in order to register for an appointment, leading them to wait, sometimes for months at a time, in migrant camps at the border in deplorable conditions. Occasionally, the app wrongly identifies migrants who are in Mexico as already inside the U.S. and blocks them from registering for appointments.

Pregnant or nursing mothers are also particularly harmed by the current CBP One process because they do not qualify for a life-threatening injury or medical emergency exemption to Title 42. Service providers in the area have communicated to my staff that this interpretation has forced some pregnant women to cross outside ports of entry and present themselves to CBP agents in the United States, where they can receive adequate and safe medical care.

I welcome the changes CBP made to the app to respond to these glaring problems, but several issues remain that must be addressed. First, the process does not consider the how long it has been since a person registered on the app when that person then tries to secure an appointment. Since appointments open every day and fill within minutes of opening, CBP One has created a

---

[4] Arelis Hernández, *Desperate Migrants Seeking Asylum Face a New Hurdle: Technology*, WASHINGTON POST (Mar. 11, 2023) https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/.

[5] Melissa Del Bosque, Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates say, THE GUARDIAN (Feb. 8, 2023) https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[6] Andrea Castillo, *Asylum Seekers Face Decision to Split up Families or Wait Indefinitely Under New Border Policy*, LA TIMES (Feb. 24, 2023) https://www.latimes.com/politics/story/2023-02-24/asylum-seeking-families-consider-separation-shortage-mobile-app-appointments.

IFR_AR_006936

luck-based lottery system to gain an appointment. Some migrants could obtain an appointment the same day they register, others could be forced to wait for months. Reports have indicated that some asylum seekers have turned to use automation apps that employ "inhumanly fast reflexes" previously employed by ticket scalpers to gain access to one of the limited daily appointments.[7] CBP must implement a more orderly process does not reward people seeking to game the system.

Even if the CBP One app was as efficient, user friendly, fair, and inclusive as possible – which I hope one day it will be – it would still be inherently discriminatory. To use the app, a person must have a working cell phone, a reliable internet connection, and must have adequate resources and be in good enough health to safely stay in a single location either near the southern border or in their country of origin. This situation is not the reality for asylum seekers whose lives are threatened in their home country or in northern Mexico. It is not a reality for pregnant women, who do not qualify for a humanitarian exception to the CBP One appointment process. And it is not a reality for asylum seekers who travel to our border or stay in their country of origin but do not have phone or internet access, or are unable to use a cell phone.

These shortcomings are the logical result of a rushed and inadequate development and testing process. Documents detailing the development of the CBP One app acquired by the American Immigration Council indicate that the rapid implementation of the app has confused CBP officials, and that there has been little consideration of the app's flaws or transparency surrounding the app's functions.[8] While the expansion of opportunities for asylum seekers to have their claims heard is vital, I am disappointed that precautions were not taken before our government made the CBP One app the sole avenue to schedule appointments.

As your agency prepares for the long-overdue end of Title 42 expulsions in May 2023, I strongly support increasing the number of appointments available on CBP One to accommodate as many legitimate asylum claims of migrants who cannot return to their homes. I also encourage you explore additional pathways that would allow people without the resources necessary to secure CBP One appointments to safely claim asylum at ports of entry.

Thank you for your attention to this important matter.

Sincerely,

Cory A. Booker
United States Senator

---

[7] Stephania Corpi Arnaud, *Once a Ticket Scalpers' Tool, Auto Clickers Now Help Migrants Enter the U.S.,* REST OF THE WORLD (Feb. 22, 2023) https://restofworld.org/2023/auto-clicker-migrants-us-mexico/.
[8] Government Documents Reveal Information about the Development of the CBP One App, AMERICAN IMMIGRATION COUNCIL (Feb. 28, 2023) https://www.americanimmigrationcouncil.org/FOIA/government-documents-reveal-information-about-development-cbp-one-app.

IFR_AR_006937

RECEIVED
By ESEC at 10:41 am, Feb 22, 2023

EDWARD J. MARKEY
MASSACHUSETTS

COMMITTEES:
ENVIRONMENT AND PUBLIC WORKS
CHAIR:
SUBCOMMITTEE ON CLEAN AIR, CLIMATE, AND
NUCLEAR SAFETY
HEALTH, EDUCATION, LABOR, AND PENSIONS
CHAIR:
SUBCOMMITTEE ON PRIMARY HEALTH AND
RETIREMENT SECURITY
COMMERCE, SCIENCE, AND TRANSPORTATION
SMALL BUSINESS AND ENTREPRENEURSHIP
CHAIR:
U.S. SENATE CLIMATE CHANGE TASK FORCE

SUITE SD–255
DIRKSEN BUILDING
WASHINGTON, DC 20510–2107
202–224–2742

975 JFK FEDERAL BUILDING
15 NEW SUDBURY STREET
BOSTON, MA 02203
617–565–8519

1550 MAIN STREET, 4TH FLOOR
SPRINGFIELD, MA 01103
413–785–4610

# United States Senate

February 21, 2023

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20016

Dear Secretary Mayorkas,

I write to urge the Department of Homeland Security (DHS) to cease using the CBP One mobile application, which DHS recently made a requirement for migrants seeking asylum in the United States at the southern border. Under the new DHS policy, those asylum seekers must now use the CBP One app to submit biometric information and schedule appointments to present themselves at certain points of entry (POEs).[1] This expanded use of the CBP One app raises troubling issues of inequitable access to — and impermissible limits on — asylum, and has been plagued by significant technical problems and privacy concerns. DHS should shelve the CBP One app immediately.

I appreciate that, through the expanded use of the CBP One app — initially launched in October 2020 with limited functionality—the Biden administration intended to ensure the safe and orderly processing of noncitizens at POEs. But requiring asylum seekers to use a virtual platform accessible only with a smartphone effectively denies to indigent migrants their legally protected right to seek asylum.[2] Those fleeing dangerous conditions often lack access to technology, including smartphones and the internet access required to download and use the CBP One app.[3]

Furthermore, even migrants with the resources and know-how to obtain and use this technology must schedule an appointment at, and travel to, one of only eight POEs participating in the CBP One app's expanded rollout—out of 328 POEs nationwide.[4] Advocates report that migrants in

---

[1] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

[2] CBP One Mobile Application, U.S. Customs and Border Protection, *NEW: Submit Advance Information and Schedule an Appointment Capability for Non-Citizens without Appropriate Travel Documents*, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

[3] *Id.*

[4] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-

The Honorable Alejandro Mayorkas
Page **2** of **4**

Reynoso and Matamoros, Mexico were given appointments for asylum in Tijuana, some 1,500 miles away.[5] Technology can facilitate asylum processing, but we cannot allow it to create a tiered system that treats asylum seekers differently based on their economic status — including the ability to pay for travel — language, nationality, or race.

According to reports, the app also was not ready for its expanded use, could not handle the volume of applicants, and frequently did not work.[6] One user described how she "would create an account, go through several more steps and the app would then restart to step one, a seemingly endless cycle."[7]

Additionally, the use of the CBP One app to collect biometric information raises privacy concerns and poses unique threats to immigrant communities. According to DHS, the CBP One app uses facial comparison and cloud technology to collect, store, and process data — including biometric and geolocation information — on asylum seekers before they enter the United States.[8] But this technology is fraught with serious problems. An analysis of face recognition software tools conducted by the National Institute of Standards and Technology (NIST) found that "one-to-one matching . . . saw higher rates of false positives for Asian and African American faces relative to images of Caucasians," up to a factor of 100 times.[9] It therefore comes as no surprise that CBP One has reportedly rejected photos from some migrants — particularly those with dark complexions — delaying or rejecting their applications and requiring them to start the arduous process all over again.[10] Accuracy issues aside, government collection of biometric data is extremely problematic because it is highly invasive and invites serious privacy violations.

The use of geolocation tracking and cloud storage also raises surveillance concerns. These features allow the government to identify and track migrants' movements without their knowledge or consent. Communities of color are systematically subjected to over-policing. The proliferation of biometric surveillance tools is therefore likely to disproportionately infringe on the privacy of individuals in Black, Brown, and immigrant communities.

Last, but certainly not least, the CBP One app promotes the false notion that, in order to seek asylum in the United States, an appointment is required. It is not, under either U.S. or international law. Indeed, according to DHS guidance from November 2021, "asylum seekers or

---

continues-prepare-end-title-42-announces-new-border-enforcement-measures-and; *At Ports of Entry*, U.S. Customs and Border Protection, https://www.cbp.gov/border-security/ports-entry.
[5] Sandra Sanchez, *CBP One app gives cash-strapped asylum-seekers interviews hundreds of miles away* (Jan. 18, 2023), https://www.borderreport.com/immigration/cbp-one-app-gives-cash-strapped-asylum-seekers-interviews-hundreds-of-miles-away/.
[6] Regina Yurrita, *Asylum seekers met with issues from new CBP One app*, CBS8 (Feb. 1, 2023), https://www.cbs8.com/article/news/local/asylum-seekers-met-with-issues-from-cbp-one-app/509-5f69579c-05e1-4999-a7a9-720eab0cc680.
[7] *Id.*
[8] *Privacy Impact Assessment for CBP One*, Dep't of Homeland Security (Feb. 19, 2021), https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf.
[9] National Institute of Standards and Technology, *NIST Study Evaluates Effects of Race, Age, Sex on Face Recognition Software* (Dec. 19, 2019), https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software.
[10] Suzanne Monyak, *Migrants grapple with government app to make asylum appointments*, Roll Call (Jan. 31, 2023), https://rollcall.com/2023/01/31/migrants-grapple-with-government-app-to-make-asylum-appointments/.

The Honorable Alejandro Mayorkas
Page **3** of **4**

others seeking humanitarian protection cannot be required to submit advance information in order to be processed at a Southwest Border land POE."[11] Disturbingly, requiring asylum seekers to remain in Mexico and await their appointments mirrors "metering" efforts under the Trump administration.[12] And those awaiting their appointments can face dangerous conditions, In January, a 17-year old Cuban boy awaiting his scheduled CBP One appointment in Monterrey, Mexico was fatally shot, underscoring the dangers facing asylum seekers.[13]

Currently, the CBP One app is required for asylum seekers requesting an exception from Title 42; after Title 42 restrictions are lifted, its use will be greatly expanded.[14] This carries profound long-term implications for the U.S. immigration system. In order to help us better understand current and future issues surrounding the CBP One app, please provide written answers to the following questions by March 10, 2023:

1. Will DHS commit to permanently cease using the CBP One application to screen asylum applicants? If not, why not, and will DHS at least temporarily stop using it until DHS can remove any biometric technology and geolocation functionality and fix the app's technical issues?
2. Will DHS ensure that there is an alternative means for migrants to seek asylum at the southern border, one that does not require an app or internet access? Currently, are asylum seekers who lack a smartphone or internet access — and therefore cannot schedule an appointment through CBP One — turned back when they present themselves at a POE?
3. How is DHS preventing the CBP One app from discriminating against applicants of color, including the app's rejecting photos of applicants with darker complexions?
4. What assistance, if any, is DHS providing to asylum seekers whose photos are rejected, or who receive error messages or experience other technical problems with CBP One? Can migrants seeking asylum at the southern border still exercise that right without using the CBP One app?
5. Before CBP One's expanded rollout, was the application tested to screen for technology glitches or failures? If not, why not?
6. Before CBP One's expanded rollout, were civil society or nongovernmental organizations consulted? If not, why not?
7. Why are only eight POEs participating in CBP One? How and why did DHS decide on this number and the specific locations?
8. How many appointments does DHS make available each day through the CBP One app?

---

[11] *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry*, U.S. Customs and Border Protection (Nov. 1, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf
[12] *Metering and Asylum Turnbacks*, American Immigration Council (Mar. 8, 2021), https://www.americanimmigrationcouncil.org/research/metering-and-asylum-turnbacks.
[13] Press Release, *Teenager Killed While Waiting in Mexico to Seek Asylum in the United States*, Young Center for Immigrant Children's Rights (Jan. 26, 2023), https://www.theyoungcenter.org/media-press-releases/2023/1/26/teenager-killed-while-waiting-in-mexico-to-seek-asylum-in-the-united-states.
[14] *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, Dep't of Homeland Security (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

IFR_AR_006940

The Honorable Alejandro Mayorkas
Page **4** of **4**

9. In what geographic areas does the CBP One application work and how was this decided?
10. How is DHS working with Mexico to ensure the safety of individuals who must travel in order to present themselves at one of the eight participating POEs?
11. The CBP One app is available only in English, Spanish, and Haitian Creole languages. This makes the app inaccessible to asylum seekers who speak a different language. How did DHS decide on these three languages? What options are available for asylum seekers using the CBP One app who don't speak those three languages?
12. What steps is DHS taking to prevent exploitation of asylum seekers through clone apps or scam attempts? How is DHS defending against misinformation around the CBP One app?
13. How is DHS safeguarding biometric and geolocation information obtained through use of the CBP One App? How is DHS ensuring that this information cannot be misused? Has CBP shared any personal information collected by the CBP One App with any other government agencies or law enforcement entities? If so please describe that sharing in detail.

Rather than mandating use of an app that is inaccessible to many migrants, and violates both their privacy and international law, DHS should instead implement a compassionate, lawful, and human-rights centered approach for those seeking asylum in the United States.

Thank you for your attention to this urgent matter, and I look forward to your response.

Sincerely,

_____
Edward J. Markey
United States Senator

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



October 29, 2021

MEMORANDUM TO:    Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection

Ur M. Jaddou
Director
U.S. Citizenship and Immigration Services

Robert Silvers
Under Secretary
Office of Strategy, Policy, and Plans

FROM:    Alejandro N. Mayorkas
Secretary

SUBJECT:    **Termination of the Migrant Protection Protocols**

---

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a
memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols."
On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a
Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration
Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum
Seekers at the United States Border*.  In this Executive Order, President Biden directed the
Secretary of Homeland Security "to promptly review and determine whether to terminate or
modify the program known as the Migrant Protection Protocols."  After completing a
comprehensive review as directed by EO 14010, I concluded that the Migrant Protection
Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect
(the "June 1 memo").

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations.  *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021).  As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration.  *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original).  The Department is fully complying with the District Court's order.  At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways.  In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border.  I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated.  In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.  Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving

2

either of these goals.  Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities.  It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.  Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border.  Of course, correlation does not equal causation and, even here, the evidence is not conclusive.  I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims.  I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border.  This is a shared responsibility of all countries across the region.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.  This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements.  Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.  Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

and lasting changes to the asylum system. MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts. MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix. Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form. For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP. Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP. The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP. But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

May 8, 2023

MEMORANDUM FOR THE FILE

FROM:                          Diane Sabatino
                               Deputy Executive Assistant Commissioner ████████
                               Office of Field Operations
                               U.S. Customs and Border Protection

SUBJECT:                       CBP One Scheduling Functionality Changes

This memorandum explains forthcoming changes to the process for noncitizens to schedule their presentation at certain land ports of entry (POEs). The new process discussed below will be implemented into the CBP One application scheduling functionality following the lifting of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order at the end of the day on May 11, 2023.

### I.  CBP One Scheduling Background

Since the CBP One app was expanded to permit undocumented noncitizens to schedule an appointment directly in CBP One, significantly more noncitizens have been seeking to schedule an appointment via CBP One than available appointment slots. Additionally, despite multiple changes to the CBP One Individual Advance Information Submission workflow, there continue to be challenges for users associated with the scheduling process. Specifically, end users, non-governmental organizations (NGOs) and other external stakeholders continue to provide feedback on bandwidth and connectivity issues, including the perception that a user's connectivity impacts their ability to receive an appointment. These stakeholders also report that the daily rush to schedule an appointment causes anxiety and frustration as noncitizens have limited opportunity to complete the process because all available appointments are filled within minutes. In response to this feedback, U.S. Customs and Border Protection (CBP) is adjusting the scheduling mechanism to a daily appointment allocation process to provide noncitizens additional time to complete their submission and further ensure equitable access for noncitizens.

### II.  CBP One Daily Appointment Allocation Process

Under the updated process, CBP will allocate appointments to noncitizens who have requested an appointment on a daily basis. Noncitizens who are allocated an appointment will be required to confirm acceptance of the appointment by completing the photo capture and liveness detection process.

***Process Outline***

*Registration and Advance Information Submission*

   a) All steps to create a registration in CBP One will remain the same as current procedures, except there will be a required field for individuals and families to request a preferred

POE as part of the advance information submission. In keeping with the current process, one member of a family or group of co-travelers may register on behalf of the entire family or group. Similarly, as under the current process, a user may create multiple registrations.

b) Registrations must be complete to request an appointment.

*Request Appointment:*

a) To be considered for the daily appointment allocation, noncitizens with a completed registration must request an appointment. This will be done on a daily basis, and can be done anytime during a 23-hour window. To request an appointment, the noncitizen will log into their CBP One account, select the appropriate registration record, and click on "ask for an appointment." This step will request an appointment on behalf of all members of the submitted family or group of co-travelers associated with the registration. For example, if there is a registration tied to a family of four, the "ask for an appointment" step will request appointments for all four family members.

b) New appointments will continue to be released 13 days in advance, and users will be asking for an appointment for any day up to the next 13 days. This means they are eligible to fill any open slots where individuals who were allocated appointments did not confirm them within the allotted time.

c) To request an appointment, noncitizens must successfully geolocate in Central or Northern Mexico. Geolocation is captured at the time an individual logs in to "ask for an appointment."

d) Noncitizens can change their requested POE, if desired, when they "ask for an appointment"; otherwise, it will default to the POE they requested as part of the advance information submission.

e) CBP One will prevent noncitizens from selecting multiple registrations and therefore attempting to request multiple appointments, increasing their chances of being allocated an appointment or potentially securing multiple appointments.

f) In the event a noncitizen does not receive an allocated appointment during the process outlined, they must "ask for an appointment" again during a subsequent 23-hour window to be considered for that day's allocation.

   i. This process of requesting an appointment daily is being implemented in an effort to ensure that only noncitizens who are in a geofenced area and actively seeking an appointment are considered. In addition, NGOs have advised that a one-time request, which remains open indefinitely, would pose a larger risk for fraud and abuse.

*Schedule an Appointment:*

a) Each day, appointments will be allocated from the registrations of noncitizens who have "asked for an appointment" the previous day.

b) Allocations will be conducted in two groups:

   i. First, a percentage of the appointments will be offered, in order, to noncitizens who have been in the process the longest (calculated by registration create date.)

    ii. Second, a percentage of the appointments will be offered randomly to all noncitizens who have selected "ask for an appointment" in the prior 23-hour registration period.

c) A family or group of co-travelers will only be allocated an appointment if there is sufficient capacity to accommodate the entire family or group. For example, if there is a group of six, they will only be offered appointments on a date and time with six available slots.

d) Those who are offered an appointment will receive:

    i. An email notification directing the noncitizen to log into CBP One and respond to the appointment offer;

    ii. A push notification to their phone directing the noncitizen to log into CBP One and respond to the appointment offer; and

    iii. An in-app CBP One notification alerting the noncitizen they received an appointment offer.

e) Noncitizens will have 23 hours from the time of notification of an available appointment to accept the appointment offer by completing another geolocation check, photo capture, and liveness detection process.

    i. This 23-hour period runs at the same time as the "request an appointment" period each day. In other words, on any given day, there will be noncitizens "asking for an appointment" for a period of 23 hours. There will also be noncitizens confirming appointments that were allocated to them over the same 23 hours. There is a 1-hour window where new appointments are randomly allocated and any non-confirmed appointments from the previous day are reallocated among the current registrations who "asked for an appointment." At the end of the 1 hour, the whole 23-hour cycle starts again.

*Additional Requirements:*

Noncitizens who experience technical issues and cannot complete the photo process to accept an appointment offer can request an extension beyond the 23-hour window directly through the app. CBP continues to explore additional options for noncitizens who continue to have difficulties with the facial photograph matching to be able to verify their information and accept an appointment.

## III.    Impact to Noncitizens and POE Operations

The allocation process reduces the burden on the noncitizen to complete the process to schedule an appointment within minutes. Those with low connectivity, older technology, or vulnerabilities will have a more equal opportunity to schedule an appointment compared to those with stable and strong connections. The 23-hour window to confirm an appointment allows additional time to seek assistance and successfully complete the process.

The split allocation groups provide a process to attempt to ensure that all who "ask for an appointment" will be offered an appointment over time. This will improve noncitizens' opportunities to schedule an appointment compared to the current system.

4

Additionally, the allocation process provides cybersecurity benefits by reducing bad actors' ability to schedule and sell appointments. Under the current first-come, first-serve system, CBP is aware of attempts to "spoof" the app or use bots and other programs to schedule available appointments immediately upon their release and then subsequently sell those available appointments, reducing the ability for noncitizens to successfully schedule.  In contrast, the allocation process removes the ability to utilize bots to obtain appointments as CBP will allocate and issue the appointments only to those who are in the registration pool.

OFO will prepare public messaging, which will make clear that selection is random and that CBP does not individually select noncitizens for appointments, other than by weighting some slots for those who have been waiting the longest.

This process change would not impact the daily POE operations or the way an individual demonstrates they have an appointment to the CBP officer.

**IV.     Conclusion**

Following considerations of the potential impacts of adjusting the CBP One scheduling process, the agency has concluded that introducing a random allocation system in combination with a system that accounts for the length of time an individual has been attempting to obtain an appointment will be an improvement over the current CBP One scheduling process.

May 8, 2023

MEMORANDUM FOR THE FILE

FROM:                    Tricia Kennedy
                         Program Manager          TRICIA B KENNEDY    Digitally signed by TRICIA B
                                                                      KENNEDY
                                                                      Date: 2023.05.08 12:05:13 -04'00'
                         Office of Field Operations (OFO)
                         U.S. Customs and Border Protection (CBP)

SUBJECT:                 CBP One<sup>TM</sup> Application

I am the CBP One<sup>TM</sup> (CBP One) application Product Owner for OFO.  I have been in this role
since development started for this application in 2019.  I am responsible for providing and
prioritizing requirements for the Emerging Technology Team within the Office of Information
Technology (OIT).  I am also the lead for testing and deploying most of the capabilities within
the application, including the deployment of the ability of noncitizens to use the app to schedule
an appointment to present themselves at a land POE.  This memo provides certain data and
information about the CBP One application and that capability.  This information was confirmed
and relied upon in rulemaking.

## I.       CBP One Application Background

In October 2020, CBP launched the free CBP One mobile and desktop application to modernize
and streamline access to CBP services.  CBP One is intended to provide one common portal for
travelers and stakeholders to interact with CBP across a wide range of mission sets, with an
intuitive interface.  The application includes defined user roles for different functionality for
travelers, importers, brokers, carriers, International Organizations, and additional stakeholders to
improve access to and experience with CBP services.  From a traveler and trade perspective,
CBP One facilitates the advance submission and payment for Form I-94s, advance information
for biological or other permitted agriculture products for travelers, as well as the ability to
quickly create and submit manifests for bus passengers or schedule perishable inspections.  Key
capabilities for stakeholders and travelers include scheduling exams with live status updates and
chat capability, instant access to proof of admission status and remaining days for their
authorized length of stay and advance submission of import documents to streamline their
inspection upon arrival.

Since the app's launch, CBP has instituted several functionalities specific to noncitizens who
lack documents sufficient for admission (referred to throughout this memo as "migrants" or
"undocumented noncitizens").  Specifically, in February 2021, CBP One offered International
Organizations (IOs) the capability to check case status for individuals during the winddown of
the Migrant Protection Protocols (MPP).  In April 2021, CBP developed a capability to permit
IOs to assist individuals in submitting advance information and scheduling a time to present at a

Port of Entry (POE) to be considered for an exception to the Title 42 public health Order (Title 42 Order). This capability was fully available in both the mobile and desktop version of the application. These processes did not have the same geofencing and live photo requirement discussed below in the Submit Advance Information capability, given the role of trusted Non-Government Organizations (NGOs) in the process, as it was anticipated that their ability to interact with noncitizens before submitting information on would help limit potential fraud in using the app.

In April 2022, CBP added a capability to the app to allow certain Ukrainian nationals seeking parole into the United States under the Uniting for Ukraine program to directly submit advance information and schedule their arrival at a land Port of Entry. This capability was also made available in the mobile application and via the desktop version of the application.

As of October 2022 and augmented in January 2023, Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) requesting to travel to the United States to seek parole under the CHNV parole processes utilize CBP One as part of the Advance Travel Authorization (ATA) process to provide passport information and a live photo to enable CBP to verify their identity and conduct law enforcement vetting prior to their travel to the United States. This ATA process was the first time that the live photo requirement was added to a CBP One functionality. The CHNV ATA process is only available via the mobile application due to the live photo requirement. A live photo utilizes software that verifies "genuine presence," or that the user is a live person. This software is not currently compatible with the desktop version and requires a mobile phone to complete.

## II.     CBP One Direct "Submit Advance Information" Capability

Up until January 12, 2023, only those noncitizens eligible for the U4U were able to directly submit their information and schedule an appointment at a POE. As referenced above, NGOs had access to the app to schedule appointments for noncitizens seeking exceptions to the Title 42 Order. On January 12, 2023, CBP transitioned away from NGO access, and moved to expand the ability to directly submit advance information and schedule an appointment to seek a Title 42 Order exception to all undocumented noncitizens. These appointments are available at 8 ports of entry on the Southwest Border.

Currently, this capability within the CBP One application, referred to as the "Submit Advance Information" capability, requires two distinct steps for users to obtain an appointment to present at one of the participating Ports of Entry.

1.  The first step is for a user to create a registration either for themselves or for all members of a family group or otherwise traveling together as co-travelers. This step can be accessed and completed from anywhere, with no geofencing restrictions. Users must have a Login.gov authenticated identity to register, and there is no limit to the number of family members or co-travelers who can be included in that registration. CBP continues

to encourage families and groups to create one registration on behalf of the entire family or group. Users may generally create multiple accounts and multiple registrations. However, if a user creates a registration consisting of more than five individuals, the user may not create another registration under the same account. This limitation is designed to prevent fraudulent use of the app. Users must submit biographic and biometric information for each individual to be included in the registration, all of which is information which would otherwise be collected during primary and/or secondary processing at the POEs. This includes descriptive information such as: Name, Date of Birth, Country of Birth, City of Birth, Country of Residence, Contact Information, Addresses, Nationality, Employment history (optional), Travel History, Emergency Contact (optional), U.S. and Foreign Addresses, Familial Information (optional), Marital Status (optional), Identity Document (not a Western Hemisphere Travel Initiative (WHTI) compliant document) (optional), Gender, Preferred Language, Height (optional), Weight (optional), Eye Color and Photograph. The photo collected is a still photo, and is used for 1-to-1 facial matching during the scheduling step. A 1-to-1 facial matching means the photo submitted by users during the registration process described here is compared to subsequent photos submitted by the same user during the scheduling process described below. This photo matching helps prevent fraudulent use of CBP One by ensuring the same individual who registered is the same individual requesting an appointment. Once the registration is complete, the user will see a summary screen listing everyone in the registration, with each individual given unique confirmation numbers and provided instructions to request an appointment. The user will also receive a confirmation email with the same information as that displayed on the summary screen.

2. The second step is to request an appointment at a Port of Entry. The ability to schedule appointments opens at 11 a.m. ET each day. The user must be within the geofenced area to do this. The user will access the application, select "Submit Advance Information," and then select their previously completed registration. This will pull up all the co-travelers registered in the previous step and allow the user who created the registration to request an appointment for everyone in the registration. After review to ensure the user selects the correct registration (because, as described in Step 1, users may create multiple registrations), the user will select their desired Port of Entry. The CBP app will immediately respond if no appointments are available for the next thirteen days. If an appointment is available, the user will be asked to submit a live photo, which is subject to software that verifies "genuine presence" or that the user is a live person. The photo is also compared to the still photo submitted in the registration process using the 1-to-1 facial matching process described above. The live photograph is required only from the main account holder; other members of the family or group are not required to submit a live photograph. Next, the application will collect the latitude and longitude to ensure the user is within Central or Northern Mexico. Finally, if appointments are available, the user will be presented with a calendar to select a day and times. The app will only display dates and times available for the number of individuals in a particular submission. For example, if a user is scheduling appointments for a family of five, the app will only

provide date/time options when there are five appointments available.  Once selected, the user will be provided a confirmation screen with their appointment information and all individuals in their submission who have an appointment on the same day and time.  The user will also receive another confirmation email with the appointment information.  Users can cancel or reschedule their appointments through the application at any time.

The application is currently geofenced to only allow appointment scheduling for those located in Central and Northern Mexico.  This requirement allows individuals to remain in areas with increased support networks instead of congregating in already strained communities near the U.S./Mexico border.  Since the implementation of geofencing, various checks have been implemented through the workflow to detect whether a user is employing techniques to spoof their location. Additionally, in April 2023, CBP began conducting analysis on the potential use of automation techniques and has taken definitive steps toward addressing these issues. Detecting fraud and misuse and deploying countermeasures is an ongoing effort for CBP that will continue to be a priority.

Two major modifications have also been made to the desktop version of the application.

- On January 12, 2023, CBP eliminated the ability for undocumented noncitizens to access the desktop version of the application to submit information and schedule an appointment. This was eliminated since the requirement of a live photo cannot be completed via the desktop version. Additionally, in an attempt to limit noncitizens from congregating at the border in unsafe conditions, the application was geofenced to only allow appointment scheduling for those located in Central and Northern Mexico. The new requirement for geofencing to Central and Northern Mexico cannot be accomplished via a web browser. Finally, removing the desktop version ensured there is a singular method for migrants to submit their information and schedule appointments.
- On January 26, 2023, after a short transition period following the implementation of direct access to CBP One by noncitizens, CBP discontinued the capability for NGOs to access the desktop version of the app to schedule appointments.  The NGO access was removed based on information that such capability had been used to exploit undocumented noncitizens, including financial exploitation.

**CBP One Application Timeline For Capabilities Related to Undocumented Noncitizens**



### III.     CBP One App Feedback on, and Evolution of Workflow and Technical Issues

CBP primarily receives reports of errors or other concerns through three mechanisms.  First, the CBP One email inbox, is the primary mechanism by which users send an inquiry or concern about any capability within the CBP One application.  Since CBP One has many capabilities and functionalities, and is available to a diverse audience, the inbox initially responds to the author by asking them to select the appropriate topic pertaining to their specific issue.  Emails related to the scheduling capability s are addressed by one of three teams: CBP Customer Service, Office of Information Technology, or the CBP One team within OFO.  My team is responsible for the overall management of this inbox.   CBP also receives reports of errors or issues through recurrent briefings and sessions with NGOs.  Third, CBP personnel both at local POEs and within CBP Headquarters receive direct email communications from the NGOs.

CBP has made several changes to the app in response to user feedback.  In particular, there have been several technical changes since February 2023.  When the advance scheduling functionality was implemented on January 12, 2023, it was originally implemented as a single workflow.  Therefore, in contrast to the process described above, from January 12, 2023 through February 23, 2023, the "Submit Advance Information" capability to register and schedule an appointment was completed in the same workflow.  In other words, all steps were completed at the same time: as part of the registration process, the user had to take a live photo and the app captured the phone's geolocation.  At that time, the user was immediately presented the option to schedule an appointment. If there were no available appointments during the initial registration, the user was required to return to CBP One at a later time to separately access the previously-submitted registration to schedule an appointment.  The user had to provide a new live photo, and the app re-verified the geolocation before the user could access the calendar again to seek an appointment.

During this initial period, users were experiencing a high number of error codes, or the app was "timing out," or "crashing," primarily around the process of submitting a photograph to verify liveness.  Through NGO assistance and user feedback, CBP was made aware that the registration process was having particular "timing out" issues for families with babies or young children.  While CBP had conducted internal load testing of the app prior to its launch, as well as testing in partnership with an NGO partner, such internal testing did not include testing the bandwidth of other technological platforms that supported the app.  Following the reports of error messages, CBP was able to identify that they were primarily caused by bandwidth/connectivity issues in our support services.  CBP utilizes a third-party software to verify liveness from a company called iProov through a Silicon Valley Innovation Program Pilot with the Department of Homeland Security.  Based on the significant demand and predefined service requirements with the vendor, iProov was forced to reduce the rate at which they were processing liveness verification, which created an excess number of errors for users as maximum bandwidth was exceeded.

For these reasons, CBP made the decision to reduce the requirement to validate liveness for each user during registration and scheduling and increase bandwidth for users. On February 18, 2023, CBP modified the process in an attempt to collect liveness and geolocation at the same time However, this change was not successful at reducing the errors users were experiencing. Therefore, CBP implemented a new workflow change on February 23, 2023, to separate the workflow into two distinct steps: registration and scheduling. This process is described above. This new workflow allowed for the removal of the liveness verification process from the registration completely, as the users could no longer schedule during that workflow. Liveness was now restricted to the scheduling workflow only, and only if the application found available appointments for the Port of Entry requested. This change has resulted in a smaller technical burden for the liveness software, and CBP has received feedback from NGOs that there are fewer reported errors as a result of the liveness detection, however users still experience errors in low bandwidth and connectivity scenarios and navigating the daily scheduling process. Users continue to utilize unauthorized old versions of the app to circumvent the changes. CBP has received feedback from NGOs and noncitizens that individuals attempt to access older version of the app that allows them to schedule via previous workflows with different photo requirements. They have reported using older versions has a perceived advantage to scheduling an appointment compared to those on newer versions.

During this same time frame, CBP also consolidated appointment slots to provide the same number of appointments per day, but with more available at a particular time, to make it easier for families to schedule an appointment. For example, Brownsville started with 5 different time slots. On February 16, 2023, based on a request from the OFO Operations Directorate, I combined those time slots into two larger time slots while maintaining the same number of appointments. CBP also continues to advise that all members of a family seeking to travel together make an appointment in a single submission, as families or groups who do not register together on one CBP One account may not be accommodated at the same POE or on the same date.

In addition, CBP has made and is continuing to make several changes or enhancements to the application to address technical concerns or enhance the user experience. Below is a list of some of those issues as well as their associated resolution and implementation date.

| Issue | Comments | Resolution | Date Resolved |
|-------|----------|------------|---------------|
| Log-on issues when Sharing Devices | When sharing devices, users were not logging out of their account, resulting in new users canceling or rescheduling the previous users existing appointments. | Enhancement implemented to mitigate this issue including requiring the user to sign out of their account when they close the application. | 1/24/2023 |

| | | | |
|---|---|---|---|
| Location Services - Users too close to the Border | The geofence needed a half mile buffer to address those users who were very close to U.S./Mexico border | Geolocation was adjusted to address this issue. | 1/24/2023 |
| Haitian Creole translation requested | NGOs requested Haitian Creole as a priority translation. | CBP One update with Haitian/Creole translation as of February 1, 2023. | 2/1/2023 |
| Certain biographical information, such as height and weight are unknown to many users | Users are not aware of their height and weight | Made these fields optional. | 3/6/2023 |
| Change the posting from 0900 to 1100 | NGOs requested we change the daily post of appointments to 1100 so the users do not have to get up so early | The posting and messaging was updated to 1100 eastern. | 3/8/2023 |
| More clearly explain reason for errors and reduce the instances of the spinning seal | | Modified error messages to more clearly explain the problem. | 4/4/2023 |
| Users can not delete duplicate registrations themselves. | Users with multiple registrations would like to delete the extra appointments. | Implemented ability to delete registrations to manage multiple registrations more easily under their account. | 4/4/2023 |
| Terms and Conditions are only in English | | Implemented translated terms and conditions. | 4/6/2023 |
| Upcoming Enhancements: | | | |
| Translate drop down menus to include Spanish and Haitian Creole | | | 5/11/23 |
| Program the app to replace special characters with English characters, consistent with backend data systems, to address the issue where users are using special characters in their names which results in an error is USEC. | | | 5/11/23 |

IFR_AR_007420

| | | | |
|---|---|---|---|
| Facilitate the auto-capture of data from passports, if applicable to facilitate user input and increase data integrity. | | | End May 2023 |
| Implement new software to better track errors and system performance | | | End of June 2023 |
| Enable capability to create registrations (only) via desktop app | | | Summer 2023 |

### IV.    CBP One Application Dashboard

In order to provide a common operating picture and for senior managers, the Office of Information Technology implemented a dashboard to consolidate data from multiple databases within the Automated Targeting System.  The data contains the following information about undocumented noncitizens as it relates to the CBP One capability on the Southwest Border:

- Number of appointments (by age, gender, nationality)
- Number of registrations (by Day and Group vs. Single)
- Number processed at a POE (by day, POE, age, gender, nationality)

Based on a review of the dashboard on April 18, 2023, CBP data on group and single scheduled appointments shows that, for appointments scheduled from March 8, 2023 through May 1, 2023, groups make up an average of 83% of the CBP One scheduled appointments.

| CBP One Dashboard Data Pull *Data Pulled as of April 18, 2023* | | |
|---|---|---|
| **Scheduled Entry Date** | **Percentage of Group Appointments** | **Percentage of Single Appointments** |
| 05/01/2023 | 85% | 15% |
| 04/30/2023 | 88% | 12% |
| 04/29/2023 | 87% | 13% |
| 04/28/2023 | 89% | 11% |
| 04/27/2023 | 88% | 12% |
| 04/26/2023 | 88% | 12% |
| 04/25/2023 | 88% | 12% |
| 04/24/2023 | 90% | 10% |
| 04/23/2023 | 88% | 12% |
| 04/22/2023 | 92% | 8% |
| 04/21/2023 | 91% | 9% |

| | | |
|---|---|---|
| 04/20/2023 | 91% | 9% |
| 04/19/2023 | 86% | 14% |
| 04/18/2023 | 90% | 10% |
| 04/17/2023 | 84% | 16% |
| 04/16/2023 | 93% | 7% |
| 04/15/2023 | 94% | 6% |
| 04/14/2023 | 94% | 6% |
| 04/13/2023 | 92% | 8% |
| 04/12/2023 | 92% | 8% |
| 04/11/2023 | 94% | 6% |
| 04/10/2023 | 94% | 6% |
| 04/09/2023 | 91% | 9% |
| 04/08/2023 | 91% | 9% |
| 04/07/2023 | 92% | 8% |
| 04/06/2023 | 91% | 9% |
| 04/05/2023 | 88% | 12% |
| 04/04/2023 | 91% | 9% |
| 04/03/2023 | 91% | 9% |
| 04/02/2023 | 91% | 9% |
| 04/01/2023 | 91% | 9% |
| 03/31/2023 | 85% | 15% |
| 03/30/2023 | 84% | 16% |
| 03/29/2023 | 77% | 23% |
| 03/28/2023 | 73% | 27% |
| 03/27/2023 | 80% | 20% |
| 03/26/2023 | 77% | 23% |
| 03/25/2023 | 78% | 22% |
| 03/24/2023 | 79% | 21% |
| 03/23/2023 | 78% | 22% |
| 03/22/2023 | 79% | 21% |
| 03/21/2023 | 76% | 24% |
| 03/20/2023 | 77% | 23% |
| 03/19/2023 | 59% | 41% |
| 03/18/2023 | 70% | 30% |
| 03/17/2023 | 69% | 31% |
| 03/16/2023 | 79% | 21% |
| 03/15/2023 | 69% | 31% |
| 03/14/2023 | 75% | 25% |
| 03/13/2023 | 75% | 25% |
| 03/12/2023 | 68% | 33% |
| 03/11/2023 | 73% | 27% |
| 03/10/2023 | 73% | 27% |
| 03/09/2023 | 69% | 31% |

| 03/08/2023 | 60% | 40% |
| --- | --- | --- |
| **Average** | **83%** | **17%** |

## V.     CBP Engagement with Stakeholders

CBP has remained in constant contact with the stakeholder community.  In particular, CBP has ensured that relevant NGOs have been briefed on the transition from the submission of information and scheduling of appointments away from the NGOs to direct submission by the undocumented noncitizens.  CBP conducted two formal briefings to the NGOs on January 11 and 13, 2023.  These introductory briefs were followed by 4 additional update briefings as well as 3 live training sessions, as of April 11, 2023.  In additional to these formalized briefings, numerous emails and phone calls were held with individual NGOs regarding issues and concerns.  A list of the dates and participants in each briefing is listed below.  Additionally, the most beneficial exchange of information occurs during every day conversations between the NGOs and the officials in OFO field offices, who communicate with the CBP One Program Manager at OFO HQ almost every day to address questions and issues as close to real-time as possible.  This communication occurs in person as well as both email and phone calls.

Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals.  Additionally, NGOs have discussed helping individuals complete their submissions and working with individuals during the scheduling process as best as possible.  NGOs have even requested information about the phone requirements to ensure they invest in adequate equipment for migrants to use.

- January 11, 2023 – CBP One Brief for IO Partners
- January 13, 2023 – CBP One Brief for IO Partners #2
- February 6, 2023 – Discussion: CBP One with NGOs
- February 22, 2023 – California Welcoming Task Force/DHS Biweekly Engagement
- March 14, 2023 – Live Training Session – CBP One (Laredo area NGOs)
- March 23, 2023 – Live Training Session – CBP One (Mexicali shelter NGOs)
- March 31, 2023 – CBP One Scheduling Discussion (RGV NGOs)
- April 10, 2023 – Live Training session – CBP One (Tijuana Shelter NGOs)

## VI.     Feedback and Studies on Racial Bias

CBP received feedback that CBP One was having particular issues recognizing individuals of color.  The vast majority of the feedback received from users and NGOs during in-person, phone, email, and formal briefings were challenges related to the registration process.  Neither CBP nor CBP One collects data on race or skin complexion, and CBP does not provide the third-party software provider any personally identifiable information.  However, as noted above, CBP and iProov determined that there were issues related to the bandwidth for liveness detection, and

made requisite app updates.  Following the app updates and increased bandwidth, iProov data provided to CBP shows the app is successfully verifying liveness around 80 – 90 percent of the time.  Additionally, CBP requested the results of previous analytics conducted on racial bias in iProov's genuine presence software.  IProov advised they conducted their own equality analysis and provided a summary statement of their findings, stating that "Across our global platform, differences in performance between ethnicities are of the order of tenths of a percent. These long-term averages are smaller than the variations we see month-to month for each ethnicity, and so it's unlikely they would be noticeable to users." Based on communications with IProov, CBP's understanding of the term "performance" is the "successful identification of genuine presence."

## VII.    Language and Disability Access

The CBP One advance information workflow is currently available in Spanish, English, and Haitian Creole.  Haitian Creole was added on February 1, 2023 based on stakeholder feedback that language access was a significant concern for the large Haitian population attempting to use this functionality.  The terms and conditions were translated in all 3 languages on April 6, 2023. However, not all drop-down menus are translated. CBP is working to translate the drop-down menus and terms of service, and anticipates that this will be completed by May 11, 2023. Additionally, CBP makes efforts to translate error messages, although I am not able to confirm that 100% of errors are translated.  The CBP One team is able to translate the vast majority of errors, unless it is a bug or stems from an independent system that CBP One does not control. For example, 500 and 403 errors are now translated.

CBP will continue to assess whether additional languages are warranted, based on user feedback and demographics encountered at the border.  CBP continues to monitor and evaluate language access in CBP One and will continue to respond to stakeholder feedback for additional languages as needed.  Initial analysis conducted in March 2023 indicated the current three languages account for 82% of the applications users with the next highest demand being Russian at 9%. CBP has not received any requests for the app to be translated into Russian, and does not intend on adding Russian currently.  Additionally, CBP is aware that Login.gov is currently not available in Haitian Creole.  I have asked members of CBP's Office of Information Technology to reach out to their contacts at Login.gov and submit a request for translation into Haitian Creole.

The CBP One app is also undergoing a section 508 compliance review, which will be complete by the end of May 2023.  CBP expects a final certification by the end of August 2023.  In the meantime, CBP is aware of multiple free iOS and Android assistive technologies that can be used to access the app, if needed.  For example, users can utilize free translate applications or other applications targeted to convert text to sound, provide magnification or translate into various languages.  There are also videos online in various languages that provide step-by-step instruction.  CBP is in the process of developing step-by step instructions in Spanish and Haitian Creole.

IFR_AR_007434

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including record levels at the southwest land border ("SWB")

There were 15,100 encounters of Dominicans between POEs at the SWB in FY 2023 and 14,100 in the first six months of FY 2024 (on pace for 28,200), up from an average of 400 such encounters per year in FY 2014 through FY 2019 – roughly a 90-fold increase. Office of Homeland Security Statistics ("OHSS") analysis of March 2024 OHSS Persist Dataset

USBP Encounters of Dominican Republic Nationals, FY 2014 - FY 2024 YTD (March 31)

| Row Label | Dominican Republic |
|---|---|
| 2014 | 645 |
| 2015 | 482 |
| 2016 | 530 |
| 2017 | 181 |
| 2018 | 234 |
| 2019 | 306 |
| 2020 | 266 |
| 2021 | 1180 |
| 2022 | 5814 |
| 2023 | 35092 |
| 2024 | 14082 |
| Grand Tot | 58812 |

Source March 2024 OHSS Persist.

IFR_AR_007435

3A



The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including record levels at the southwest land border ("SWB")

According to OHSS analysis of the United Nations High Commissioner for Refugees data from 1969 to 2022, there were more than 8.5 million displaced persons in the Western Hemisphere in 2022, including approximately 6.6 million Venezuelans, 300,000 Nicaraguans, 260,000 Hondurans, 250,000 Cubans, 250,000 Colombians, 210,000 Haitians, and 210,000 El Salvadorans, among others. By comparison, prior to 2018 there were never more than 1 million displaced persons in the hemisphere, and prior to 2007 there were never more than 300,000. Nearly every 1 in 100 people in the Western Hemisphere was displaced in 2022, compared to less than 1 in 1,000 displaced in the region each year prior to 2018. *See* UNHCR, *Refugee Data Finder*, unhcr.org/refugee-statistics/download/?url=PhVlXc (last visite

| Row Labels | Total Displaced 2022 |
|---|---|
| Venezuela (Bolivarian Republic of) | 6,588,994 |
| Nicaragua | 293,808 |
| Honduras | 260,560 |
| Cuba | 254,523 |
| Colombia | 253,345 |
| Haiti | 208,282 |
| El Salvador | 207,395 |
| Guatemala | 197,179 |
| Mexico | 144,070 |
| Brazil | 51,927 |
| Ecuador | 43,558 |
| Peru | 28,243 |
| Chile | 13,214 |
| Dominican Rep. | 7,720 |
| Jamaica | 5,213 |
| United States of America | 3,421 |
| Bolivia (Plurinational State of) | 2,900 |
| Argentina | 2,449 |
| Bahamas | 1,991 |
| Costa Rica | 1,554 |
| Paraguay | 1,366 |
| Guyana | 1,177 |
| Panama | 1,176 |
| Trinidad and Tobago | 916 |
| Uruguay | 646 |
| Belize | 546 |
| Barbados | 457 |
| Canada | 404 |
| Saint Vincent and the Grenadines | 256 |
| Dominica | 219 |
| Saint Lucia | 216 |
| Suriname | 173 |
| Grenada | 167 |
| French Guiana | 166 |
| Guadeloupe | 145 |
| Antigua and Barbuda | 116 |
| Saint Kitts and Nevis | 54 |
| Curacao | 40 |
| Turks and Caicos Islands | 30 |
| Anguilla | 10 |
| Aruba | 7 |
| Cayman Islands | 5 |
| **Grand Total** | **8,578,638** |

OHSS analysis of data downloaded from https://www.unhcr.org/refugee-statistics/downloa

| Row Label | Total Displaced |
|---|---|
| 1969 | 14,500 |
| 1970 | 18,100 |
| 1971 | 59,430 |
| 1972 | 20,800 |
| 1974 | 20,800 |
| 1975 | 16,010 |
| 1976 | 3,890 |
| 1977 | 3,000 |
| 1978 | 148,280 |
| 1979 | 26,590 |
| 1980 | 100,577 |
| 1981 | 319,027 |
| 1982 | 307,917 |
| 1983 | 317,941 |
| 1984 | 334,460 |
| 1985 | 296,955 |
| 1986 | 300,629 |
| 1987 | 297,803 |
| 1988 | 316,065 |
| 1989 | 202,323 |
| 1990 | 170,746 |
| 1991 | 174,619 |
| 1992 | 172,330 |
| 1993 | 156,547 |
| 1994 | 168,498 |
| 1995 | 155,951 |
| 1996 | 149,669 |
| 1997 | 140,646 |
| 1998 | 126,039 |
| 1999 | 111,651 |
| 2000 | 424,177 |
| 2001 | 436,492 |
| 2002 | 446,885 |
| 2003 | 401,189 |
| 2004 | 323,073 |
| 2005 | 257,007 |
| 2006 | 271,490 |
| 2007 | 740,834 |
| 2008 | 564,965 |
| 2009 | 597,991 |
| 2010 | 569,622 |
| 2011 | 553,408 |
| 2012 | 530,004 |
| 2013 | 569,474 |
| 2014 | 572,404 |
| 2015 | 631,114 |
| 2016 | 742,606 |
| 2017 | 912,406 |
| 2018 | 3,910,744 |
| 2019 | 5,617,518 |
| 2020 | 6,152,141 |
| 2021 | 7,051,710 |
| 2022 | 8,578,638 |

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including record levels at the southwest land border ("SWB")

At the SWB, U.S. Customs and Border Protection completed approximately 1.7 million encounters at and between POEs in Fiscal Year ("FY") 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.68 million in FY 2000. *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf, *and id.* at 94-96 tbl. 35 (apprehensions from FY 2013 to FY 2022), *with* OHSS, *2012 Yearbook of Immigration Statistics* 96 tbl. 35 (July 2013), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2012.pdf (apprehensions from FY 2003 to FY 2012), *and* OHSS, *2002 Yearbook of Immigration Statistics* 184 tbl. 40 (Oct. 2003), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2002.pdf (apprehensions from FY 1996 to FY 2002). In December 202Border Encounters Book-Outs by Selected Citizenship"). would be the highest str. arch 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. Id.

CBP SW Border Encounters, FY 2000 - December 2023

| | |
|---|---|
| **2000** | **1,566,421** |
| 10 | 87,819 |
| 11 | 74,362 |
| 12 | 66,256 |
| 1 | 175,383 |
| 2 | 200,619 |
| 3 | 209,311 |
| 4 | 170,621 |
| 5 | 155,961 |
| 6 | 103,856 |
| 7 | 111,963 |
| 8 | 113,448 |
| 9 | 96,822 |
| **2001** | **1,231,412** |
| 10 | 81,995 |
| 11 | 67,217 |
| 12 | 54,828 |
| 1 | 124,586 |
| 2 | 150,616 |
| 3 | 169,904 |
| 4 | 142,040 |
| 5 | 123,054 |
| 6 | 89,034 |
| 7 | 83,853 |
| 8 | 84,837 |
| 9 | 59,448 |
| **2002** | **930,341** |
| 10 | 37,746 |
| 11 | 32,694 |
| 12 | 31,531 |
| 1 | 79,647 |
| 2 | 95,645 |
| 3 | 126,906 |
| 4 | 121,908 |
| 5 | 97,571 |
| 6 | 78,730 |
| 7 | 76,719 |
| 8 | 82,860 |
| 9 | 68,384 |
| **2003** | **906,734** |
| 10 | 61,913 |
| 11 | 47,919 |
| 12 | 37,930 |
| 1 | 87,002 |
| 2 | 97,016 |
| 3 | 98,625 |
| 4 | 75,564 |
| 5 | 88,845 |
| 6 | 75,634 |
| 7 | 79,396 |
| 8 | 84,651 |
| 9 | 72,239 |
| **2004** | **1,211,693** |
| 10 | 69,246 |
| 11 | 62,452 |
| 12 | 48,280 |
| 1 | 98,764 |
| 2 | 116,398 |
| 3 | 162,530 |
| 4 | 142,491 |
| 5 | 125,502 |
| 6 | 101,178 |
| 7 | 98,989 |
| 8 | 99,986 |
| 9 | 85,877 |
| **2005** | **1,269,247** |
| 10 | 81,687 |
| 11 | 70,617 |
| 12 | 54,028 |
| 1 | 101,552 |
| 2 | 121,177 |
| 3 | 150,892 |
| 4 | 148,688 |
| 5 | 125,226 |
| 6 | 99,490 |
| 7 | 105,093 |
| 8 | 107,620 |
| 9 | 103,177 |
| **2006** | **1,168,358** |
| 10 | 91,935 |
| 11 | 78,817 |
| 12 | 60,375 |
| 1 | 110,987 |
| 2 | 132,780 |
| 3 | 169,077 |
| 4 | 133,964 |
| 5 | 113,311 |
| 6 | 76,274 |
| 7 | 67,636 |
| 8 | 67,631 |
| 9 | 65,571 |
| **2007** | **954,928** |
| 10 | 68,083 |
| 11 | 58,199 |
| 12 | 47,537 |
| 1 | 79,794 |
| 2 | 86,435 |
| 3 | 122,450 |
| 4 | 112,773 |
| 5 | 97,196 |
| 6 | 79,997 |
| 7 | 75,766 |
| 8 | 69,142 |
| 9 | 57,556 |
| [illegible] | [illegible] |

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including record levels at the southwest land border ("SWB"). Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individuals during the period in which noncitizens were expelled pursuant to the Centers for Disease Control and Prevention's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels.   See OHSS analysis of March 2024 OHSS Persist Dataset.

| Row Label | | Repeat | Unique | Grand Total |
|---|---|---|---|---|
| | 12153 | 110605 | 366856 | 489612 |
| **2013** | **12153** | **110605** | **366856** | **489612** |
| 10 | 609 | 8001 | 25887 | 34847 |
| 11 | 604 | 8082 | 19473 | 33159 |
| 12 | 598 | 6844 | 21635 | 29077 |
| 1 | 650 | 7643 | 24192 | 32485 |
| 2 | 641 | 9043 | 32482 | 40636 |
| 3 | 766 | 11818 | 41426 | 54650 |
| 4 | 786 | 12135 | 41850 | 54771 |
| 5 | 718 | 11466 | 38256 | 50500 |
| 6 | 879 | 9295 | 30816 | 40790 |
| 7 | 1917 | 8570 | 29509 | 40006 |
| 8 | 2001 | 9080 | 36944 | 42311 |
| 9 | 1884 | 8306 | 28016 | 38206 |
| **2014** | **25281** | **107240** | **437427** | **570048** |
| 10 | 2002 | 9876 | 30163 | 41835 |
| 11 | 2109 | 8516 | 28067 | 38692 |
| 12 | 2138 | 7632 | 24937 | 36707 |
| 1 | 1862 | 7607 | 25731 | 35200 |
| 2 | 1660 | 8515 | 32298 | 42473 |
| 3 | 2000 | 10725 | 44823 | 57548 |
| 4 | 1924 | 11414 | 44035 | 58383 |
| 5 | 2263 | 10923 | 55847 | 69033 |
| 6 | 2222 | 9231 | 49119 | 60572 |
| 7 | 2213 | 8668 | 38052 | 48833 |
| 8 | 2475 | 7593 | 29698 | 39766 |
| 9 | 2519 | 6830 | 24657 | 34006 |
| **2015** | **41383** | **77125** | **326348** | **444856** |
| 10 | 2433 | 7254 | 24216 | 35903 |
| 11 | 2583 | 6713 | 23729 | 33024 |
| 12 | 3346 | 6667 | 24216 | 34231 |
| 1 | 3168 | 5901 | 21110 | 30179 |
| 2 | 2571 | 6283 | 23700 | 32554 |
| 3 | 3323 | 7442 | 28397 | 39162 |
| 4 | 3228 | 6728 | 28343 | 38299 |
| 5 | 3406 | 6828 | 30449 | 40684 |
| 6 | 3409 | 6301 | 28910 | 38620 |
| 7 | 4175 | 5560 | 28875 | 38610 |
| 8 | 5421 | 5726 | 31272 | 42419 |
| 9 | 4318 | 5722 | 31131 | 41171 |
| **2016** | **52905** | **75488** | **429198** | **558591** |
| 10 | 6271 | 6056 | 32918 | 45245 |
| 11 | 5638 | 5778 | 33971 | 45387 |
| 12 | 3544 | 5921 | 38924 | 48393 |
| 1 | 3756 | 5012 | 24628 | 33396 |
| 2 | 6500 | 5294 | 26674 | 38068 |
| 3 | 5656 | 6789 | 33514 | 45773 |
| 4 | 5043 | 7373 | 37833 | 48271 |
| 5 | 6227 | 7711 | 41035 | 54987 |
| 6 | 2599 | 6608 | 35961 | 45168 |
| 7 | 3413 | 5812 | 37433 | 46658 |
| 8 | 3625 | 6249 | 41605 | 51569 |
| 9 | 4253 | 6871 | 44946 | 56070 |
| **2017** | **30007** | **52409** | **332753** | **415199** |
| 10 | 5259 | 7798 | 53650 | 66707 |
| 11 | 4414 | 7084 | 51868 | 63366 |
| 12 | 6212 | 5762 | 48442 | 58416 |
| 1 | 2601 | 5023 | 34570 | 42458 |
| 2 | 958 | 4115 | 18502 | 23555 |
| 3 | 1086 | 2740 | 12766 | 16592 |
| 4 | 1228 | 2563 | 11977 | 15768 |
| 5 | 1214 | 3141 | 15585 | 19940 |
| 6 | 1228 | 3109 | 17230 | 21567 |
| 7 | 1630 | 3292 | 20092 | 25014 |
| 8 | 2141 | 3845 | 24583 | 30569 |
| 9 | 2192 | 3877 | 21088 | 31157 |
| **2018** | **21569** | **59621** | **458763** | **519944** |
| 10 | 1842 | 4436 | 28564 | 34842 |
| 11 | 1815 | 4372 | 32844 | 39031 |
| 12 | 1773 | 4186 | 34517 | 40476 |
| 1 | 2000 | 4427 | 29408 | 35801 |
| 2 | 1703 | 4767 | 30215 | 36690 |
| 3 | 1710 | 6017 | 42186 | 50213 |
| 4 | 1635 | 6588 | 42796 | 51019 |
| 5 | 1568 | 5702 | 44520 | 51780 |
| 6 | 1088 | 4271 | 33646 | 40001 |
| 7 | 1999 | 5014 | 39538 | 46011 |
| 8 | 1907 | 5013 | 43447 | 50366 |
| **2019** | **19820** | **76484** | **880925** | **977229** |
| 10 | 1852 | 5645 | 53276 | 60775 |
| 11 | 1846 | 4898 | 55710 | 62463 |
| 12 | 1713 | 3848 | 50228 | 60789 |
| 1 | 1809 | 4410 | 52094 | 58313 |
| 2 | 1633 | 5513 | 69397 | 76543 |
| 3 | 1745 | 6846 | 95141 | 103730 |
| 4 | 1726 | 7218 | 109846 | 109413 |
| 5 | 1667 | 8572 | 133874 | 144113 |
| 6 | 1268 | 7522 | 35470 | 104310 |
| 7 | 1367 | 6359 | 74022 | 81748 |
| 8 | 1540 | 7153 | 53916 | 62608 |
| 9 | 1606 | 8291 | 42415 | 52424 |
| **2020** | **8849** | **149237** | **299080** | **458866** |
| 10 | 1524 | 8323 | 35292 | 45109 |
| 11 | 1493 | 7904 | 33305 | 42642 |
| 12 | 1271 | 7163 | 31709 | 40563 |
| 1 | 1055 | 7739 | 27789 | 36583 |
| 2 | 1508 | 7653 | 27925 | 36486 |
| 3 | 739 | 8384 | 25234 | 34457 |
| 4 | 112 | 7957 | 9837 | 17106 |
| 5 | 239 | 10961 | 12037 | 23237 |
| 6 | 308 | 14909 | 17812 | 33029 |
| 7 | 304 | 18762 | 21883 | 40949 |
| 8 | 370 | 21612 | 26211 | 30007 |
| 9 | 386 | 21740 | 33142 | 57668 |
| **2021** | **7736** | **601993** | **1122970** | **1734699** |
| 10 | 394 | 33060 | 38499 | 71943 |
| 11 | 379 | 34747 | 36887 | 72113 |
| 12 | 392 | 37382 | 34220 | 73954 |
| 1 | 569 | 36666 | 41179 | 79054 |
| 2 | 681 | 41703 | 58652 | 101098 |
| 3 | 639 | 57123 | 115515 | 173277 |
| 4 | 684 | 61710 | 116401 | 178795 |
| 5 | 693 | 69944 | 109960 | 180597 |
| 6 | 748 | 66603 | 121683 | 189034 |
| 7 | 839 | 62501 | 133539 | 196888 |
| 8 | 857 | 54155 | 154628 | 209860 |
| 9 | 820 | 50747 | 140434 | 192001 |
| **2022** | **37446** | **594941** | **1746557** | **2378944** |
| 10 | 878 | 48646 | 111113 | 164657 |
| 11 | 1210 | 46033 | 117602 | 174965 |
| 12 | 1222 | 43619 | 104412 | 176213 |
| 1 | 1210 | 42371 | 111293 | 154874 |
| 2 | 1343 | 50670 | 114177 | 166010 |
| 3 | 3981 | 61897 | 156692 | 222574 |
| 4 | 21256 | 59580 | 154949 | 235785 |
| 5 | 1366 | 60113 | 179637 | 241106 |
| 6 | 1210 | 52239 | 154385 | 207834 |
| 7 | 1257 | 43587 | 153318 | 208163 |
| 8 | 1260 | 43794 | 103033 | 204087 |
| 9 | 1429 | 42392 | 183726 | 227547 |
| **2023** | **18403** | **410600** | **2046666** | **2475620** |
| 10 | 1142 | 41608 | 187079 | 231329 |
| 11 | 1174 | 37263 | 196737 | 235173 |
| 12 | 1222 | 32659 | 218434 | 252315 |
| 1 | 1345 | 35103 | 116910 | 157358 |
| 2 | 1205 | 42274 | 113355 | 156830 |
| 3 | 1170 | 49617 | 142262 | 193249 |
| 4 | 1841 | 40933 | 163912 | 206690 |
| 5 | 1987 | 20547 | 122222 | 144316 |
| 6 | 2080 | 19001 | 162448 | 183479 |
| 7 | 2030 | 19001 | 216065 | 237863 |
| 8 | 2167 | 18508 | 104870 | 248721 |
| 9 | 1429 | 42392 | 183726 | 227547 |
| **2024** | **6701** | **85125** | **1248975** | **1340799** |
| 10 | 1025 | 15916 | 122891 | 248922 |
| 11 | 1082 | 14344 | 103817 | 242413 |
| 12 | 1179 | 14659 | 280162 | 303980 |
| 1 | 1108 | 11701 | 163290 | 176189 |
| 2 | 1117 | 13806 | 174995 | 189914 |
| 3 | 1330 | 14010 | 172723 | 188571 |

Note: Unique encounters exclude encounters of individuals not previously encountered in the prior 365 days. Administrative encounters are not considered for removal proceedings and therefore not included in OHSS analysis of unique versus repeat encounters.

Source: March 2024 OHSS Persist.

IFR_AR_007439

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including record levels at the southwest land border ("SWB"). CBP released an operational update on May 15, 2024, that includes the Component's official reporting for encounters through the end of April. Based on these data, SWB encounters between POEs fell slightly by 6 percent between March and April. DHS analysis of data obtained from CBP, Southwest Land Border Encounters, https://www.dhs.gov/immivment/tools/southwest-land-border-encounters https://www.dhs.gov/immivment/tools/southwest-land-border-encounters (last accessed May 24,



IFR_AR_007440

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including record levels at the southwest land border ("SWB")

Excluding March through April 2020, which was an unusual case because of the onset of the COVID pandemic, the average month over month change between March and April for 2013 through 2024 is a 2.3 percent increase, with four out of these eleven years experiencing decreases in April and seven years experiencing increases.

USBP SWB Encounters, FY 2013 - FY 2024 YTD

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | March-April %change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 28929 | 27636 | 23243 | 26921 | 35042 | 47293 | 48212 | 43856 | 34436 | 33230 | 33797 | 31802 | 414397 | 2% |
| 2014 | 35312 | 31896 | 29528 | 28668 | 36403 | 49596 | 51502 | 60683 | 57861 | 40708 | 31388 | 25825 | 479370 | 4% |
| 2015 | 26450 | 24641 | 25019 | 21514 | 24376 | 29791 | 29750 | 31576 | 29303 | 28388 | 30239 | 30286 | 331333 | 0% |
| 2016 | 32724 | 32838 | 37014 | 23758 | 26072 | 33316 | 38089 | 40337 | 34450 | 33723 | 37048 | 39501 | 408870 | 14% |
| 2017 | 46184 | 47211 | 43251 | 31576 | 18754 | 12195 | 11127 | 14519 | 16087 | 18187 | 22288 | 22537 | 303916 | -9% |
| 2018 | 25488 | 29085 | 28995 | 25975 | 26666 | 37390 | 38243 | 40339 | 34089 | 31299 | 37524 | 41486 | 396579 | 2% |
| 2019 | 51005 | 51857 | 50751 | 47979 | 66883 | 92833 | 99273 | 132856 | 94902 | 71978 | 50684 | 40507 | 851508 | 7% |
| 2020 | 35402 | 33524 | 32853 | 29205 | 30077 | 30389 | 16182 | 21593 | 30816 | 38556 | 47276 | 54762 | 400635 | -47% |
| 2021 | 69048 | 69169 | 71141 | 75316 | 97643 | 169216 | 173699 | 172654 | 178649 | 200658 | 196514 | 185515 | 1659222 | 3% |
| 2022 | 159113 | 167015 | 170602 | 147877 | 159170 | 211181 | 203504 | 224370 | 192399 | 183834 | 181774 | 207597 | 2206436 | -4% |
| 2023 | 205134 | 207680 | 222018 | 129513 | 130521 | 163672 | 183921 | 171382 | 99538 | 132642 | 181054 | 218763 | 2045838 | 12% |
| 2024 | 188754 | 191119 | 249737 | 124204 | 140638 | 137480 | 128884 | | | | | | 1031932 | -6% |

Source: March 2024 OHSS Persist; April 2024 figure from CBP SWB Data Portal.

Average excluding FY21

2.3%

IFR_AR_007442

Processing record numbers of individuals through expedited removal;
In the months between May 12, 2023, and March 31, 2024, CBP processed roughly 316,000 noncitizens encountered at and between SWB POEs for expedited removal, more than in any prior full fiscal year. OHSS analysis of data pulled from CBP Unified Immigration Portal (UIP) on April 2, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| **SW Border Encounters** | **1,694,114** |
| **Processed for ER** | **316,288** |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | **120,709** |
| Credible fear referrals | 46,628 |
| CFIs conducted | 45,522 |
| **CFI results** | **45,086** |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,481 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| **CBP repatriations** | **95,037** |
| No fear claim ER removals | 74,040 |
| Negative fear; no IJ review | 19 |
| Negative fear; IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | **195,579** |
| **Reprocessed with other dispositions** | **836** |
| **ER processed by ICE non-detained** | **87,760** |
| **ER processed in ICE Custody** | **106,983** |
| Credible fear referrals | 93,630 |
| CFIs conducted | 84,045 |
| **CFI results** | **82,016** |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,839 |
| Admin closed without CFI | 7,179 |
| **ICE removals (REPATRIATIONS)** | **29,926** |
| No fear claim ER removals | 4,368 |
| Negative fear; no IJ review | 4 |
| Negative fear; IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | **87,760** |
| Credible fear referrals | 28,590 |
| CFIs conducted | 22,519 |
| **CFI results** | **21,229** |
| Positive fear finding | 13,009 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,112 |
| Vacated | 1,872 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| **ICE removals (REPATRIATIONS)** | **36,803** |
| No fear claim ER removals | 34,600 |
| Negative fear; no IJ review | 0 |
| Negative fear; IJ affirmed | 1,893 |
| Other | 310 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

USBP Encounters by citizenship and selected processing dispositions, FY 2005 - FY 2023

| | Total | | | | |
|---|---|---|---|---|---|
| Fiscal Year | Encounters | ER | ERCF | ER% encou | ERCF % ER |
| 2005 | 1,171,391 | 36,576 | 635 | 3% | 1.7% |
| 2006 | 1,071,976 | 58,398 | 1,443 | 5% | 2.5% |
| 2007 | 858,736 | 59,475 | 1,616 | 7% | 2.7% |
| 2008 | 705,049 | 77,031 | 1,459 | 11% | 1.9% |
| 2009 | 540,851 | 73,110 | 1,954 | 14% | 2.7% |
| 2010 | 447,731 | 80,774 | 2,800 | 18% | 3.5% |
| 2011 | 327,577 | 93,967 | 3,686 | 29% | 3.9% |
| 2012 | 356,873 | 148,909 | 4,000 | 42% | 2.7% |
| 2013 | 414,397 | 202,109 | 9,293 | 49% | 4.6% |
| 2014 | 479,370 | 198,021 | 15,951 | 41% | 8.1% |
| 2015 | 331,333 | 147,607 | 16,767 | 45% | 11% |
| 2016 | 408,870 | 185,726 | 48,179 | 45% | 26% |
| 2017 | 303,916 | 123,778 | 36,108 | 41% | 29% |
| 2018 | 396,579 | 170,469 | 50,893 | 43% | 30% |
| 2019 | 851,508 | 184,948 | 57,183 | 22% | 31% |
| 2020 | 400,635 | 75,976 | 13,914 | 19% | 18% |
| 2021 | 1,659,222 | 82,183 | 64,755 | 5% | 79% |
| 2022 | 2,206,436 | 110,858 | 71,401 | 5% | 64% |
| 2023 | 2,045,837 | 190,851 | 125,264 | 9% | 66% |
| FY24 YTD | 753,824 | 100,983 | 48,818 | 13% | 48% |

Notes: FY 24 YTD includes data for Oct 2023 - Jan 2024. ER columns include noncitizens with 'ER','ER/LR','ER/TFR','EX','ER/CF','STW/CF','VWP/CF' dispositions or

Source: OHSS Persist as of December 2023.

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency
Since May 12, 2023, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative credible fear determinations, the median time from encounter to removal, over the same timeframes, decreased 85 percent from 73 days to 11 days. Pre-May 12, 2023, data from OHSS Lifecycle Dataset as of December 31, 2023; post-May 11, 2023, data from OHSS analysis of UIP ER Daily Report Data Dashboard as of March 31, 2024.

| | | DHS | | | | |
|---|---|---|---|---|---|---|
| | | Mexico | NCA | W. Hem | E. Hem | DHS Total |
| Encounter to Referral | Completed Count | 1,672 | 941 | 2,547 | 179 | 5,339 |
| | Median Days | 2 | 5 | 4 | 7 | 3 |
| | Pending Count | 7,372 | 5,260 | 4,080 | 304 | 17,016 |
| | Median Days | 1 | 1 | 1 | 1 | 1 |
| Referral to CFI Result | Completed Count | 1,574 | 869 | 2,326 | 166 | 4,935 |
| | Median Days | 4 | 4 | 4 | 13 | 4 |
| | Pending Count | 98 | 72 | 221 | 13 | 404 |
| | Median Days | 17 | 14 | 12 | 20 | 15 |
| Encounter to CFI Result | Completed Count | 1,616 | 913 | 2,428 | 172 | 5,129 |
| | Median Days | 6 | 12 | 11 | 20 | 10 |
| | Pending Count | 2,251 | 1,181 | 2,355 | 332 | 6,119 |
| | Median Days | 1 | 1 | 1 | 1 | 1 |
| Negative Fear to Removal | Completed Count | 552 | 146 | 110 | 30 | 808 |
| | Median Days | 2 | 8 | 5 | 51 | 4 |
| | Pending Count | 300 | 306 | 683 | 16 | 1,315 |
| | Median Days | 4 | 6 | 6 | 85 | 5 |
| Encounter to Removal | Completed Count | 552 | 146 | 110 | 30 | 808 |
| | Median Days | 10 | 18 | 15 | 115 | 11 |
| | Pending Count | 328 | 347 | 780 | 16 | 1,490 |
| | Median Days | 10 | 20 | 19 | 154 | 17 |

Note: Data are current through March 31, 2024. All Median processing times are limited to noncitizens in ER who make credible fear claims and exclude no-fear removals, noncitizens reprocessed into other (non-ER) processing dispostions, and people released without being removed.
DHS Encounter to Referral from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Referral to CFI Result from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Encounter to CFI Result from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Negative Fear to Removal from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Encounter to Removal from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on April 2, 2024.

| Median Processing Times | 2014-19 |
|---|---|
| Encounter to Removal (no fear cases) | |
| Encounter to CF Referral | 13 |
| CF Referral to CIS Determination | 8 |
| Negative Determination to EOIR CFR Decision | |
| Comprehensive Negative Determination to Removal | 22 |
| Encounter to Removal (Negative Determinations only) | 73 |

Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023.

Expedited Removal Median Processing Times, FY 2014 - FY 2019 and May 12 - December 31, 2023

| | 2014-2019 | May 12, 2023 - March 31, 2024 | % change |
|---|---|---|---|
| Encounter to CF Referral | 13 | 3 | 77% |
| Referral to fear determination | 8 | 4 | 50% |
| Comprehensive Negative Fear to removal | 22 | 4 | 82% |
| Encounter to Removal | 73 | 11 | 85% |

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency
DHS removed or returned over 662,000 noncitizens between May 12, 2023, and March 31, 2024, or an average of over 61,300 per month (excluding crew members detained on board their vessels and other administrative returns); this represents the highest average monthly count of removals and returns since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from USP on April 2, 2024

| | |
|---|---|
| 5/12/23 - 3/31/24 monthly avg | 61,357 |
| Max monthly avg FY2011-FY2022 | 59,372 |

| ovals and Returns by | Mar-24 | | | Since May 12 | |
|---|---|---|---|---|---|
| | Daily Average | Monthly Total | % change vs. prev. month | Monthly Average | Total |
| **Land Repatriations from CBP to Mexico[1]** | | | | | |
| Mexico | 935 | 28,990 | ▲ 18% | 24,210 | 261,471 |
| Honduras | 4 | 127 | ▲ 79% | 321 | 3,467 |
| Guatemala | 20 | 620 | ▼ 53% | 922 | 9,953 |
| El Salvador | 1 | 23 | ▼ 12% | 58 | 624 |
| Cuba | 2 | 55 | ▼ 7% | 46 | 492 |
| Haiti | 0 | 1 | ▼ 67% | 5 | 53 |
| Nicaragua | 3 | 79 | ▼ 91% | 217 | 2,347 |
| Venezuela | 3 | 82 | ▼ 22% | 1,187 | 12,820 |
| Other | 8 | 234 | ▲ 169% | 100 | 1,077 |
| Total | **975** | **30,211** | **▲ 11%** | **27,065** | **292,304** |
| **Other CBP Enforcement Repatriations[2]** | | | | 0 | |
| India | 77 | 2,402 | ▲ 4% | 2,350 | 25,375 |
| Canada | 80 | 2,495 | ▲ 18% | 2,051 | 22,152 |
| China, Peoples Republic | 37 | 1,135 | ▼ 15% | 1,170 | 12,638 |
| France | 31 | 967 | ▲ 9% | 1,113 | 12,020 |
| Mexico | 19 | 588 | ▼ 20% | 776 | 8,381 |
| Philippines | 31 | 969 | ▲ 41% | 604 | 6,527 |
| Nigeria | 16 | 511 | ▼ 7% | 575 | 6,205 |
| United Kingdom | 10 | 318 | ▲ 9% | 420 | 4,537 |
| Colombia | 10 | 317 | ▼ 6% | 409 | 4,418 |
| Algeria | 17 | 522 | ▲ 21% | 352 | 3,804 |
| Other | 214 | 6,634 | ▲ 15% | 6,301 | 68,051 |
| Total | **517** | **16,019** | **▲ 9%** | **15,360** | **165,886** |
| **ERO Repatriations[3]** | | | | 0 | |
| Mexico | 179 | 5,555 | ▼ 20% | 5,626 | 60,764 |
| Honduras | 79 | 2,458 | ▼ 22% | 3,909 | 42,212 |
| Guatemala | 165 | 5,115 | ▼ 18% | 4,734 | 51,127 |
| Venezuela | 4 | 135 | ▼ 33% | 279 | 3,008 |
| Ecuador | 21 | 658 | ▲ 46% | 609 | 6,574 |
| Colombia | 42 | 1,290 | ▲ 52% | 863 | 9,325 |
| El Salvador | 34 | 1,047 | ▼ 17% | 1,117 | 12,068 |
| Nicaragua | 6 | 179 | ▼ 16% | 154 | 1,668 |
| Haiti | 0 | 2 | ▼ 71% | 54 | 583 |
| Cuba | 1 | 26 | ▼ 54% | 37 | 397 |
| Dominican Republic | 7 | 229 | ▼ 5% | 248 | 2,680 |
| Peru | 5 | 145 | ▼ 62% | 444 | 4,799 |
| Other | 24 | 751 | ▲ 4% | 858 | 9,264 |
| Total | **567** | **17,590** | **▼ 15%** | **18,932** | **204,469** |
| **Total Repatriations[4]** | | | | 0 | |
| Mexico | 1,133 | 35,133 | ▲ 9% | 30,613 | 330,616 |
| Guatemala | 202 | 6,270 | ▼ 17% | 5,702 | 61,586 |
| Honduras | 102 | 3,164 | ▼ 3% | 4,253 | 45,936 |
| India | 78 | 2,430 | ▲ 2% | 2,402 | 25,938 |
| Canada | 81 | 2,507 | ▲ 18% | 2,068 | 22,336 |
| Venezuela | 9 | 284 | ▼ 19% | 1,522 | 16,441 |
| Colombia | 54 | 1,685 | ▲ 39% | 1,289 | 13,920 |
| China, Peoples Republic | 38 | 1,167 | ▼ 16% | 1,208 | 13,041 |
| El Salvador | 38 | 1,164 | ▼ 10% | 1,196 | 12,918 |
| France | 31 | 972 | ▲ 9% | 1,120 | 12,097 |
| Other | 327 | 10,144 | ▲ 4% | 9,984 | 107,830 |
| Total | **2,094** | **64,920** | **▲ 4%** | **61,357** | **662,659** |

[1]Land repatriations from CBP to Mexico are limited to SW Border encounters after May 11, 2023.
[2]Other CBP Enforcement Repatriations include noncitizens removed or returned from the Northern and Maritime Borders and from air and seaports.
[3]ERO repatriations are limited to departures after May 11, 2023 and are reported based on recorded departure date through March 31, 2024.
[4]Total DHS removals and returns, excluding administrative returns. Administrative returns include withdrawals of applications for admission without prejudice and crew members required to remain aboard their vessels.
Note: All data report on individuals. Data are pulled from a live system and will not match ERO or OHSS end-of-year reporting. Repatriation flights may include mixes of single adults and family units. Data are current through March 31, 2024.
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on April 2, 2024.

**Table 39.**

**NONCITIZEN REMOVALS, RETURNS, AND EXPULSIONS: FISCAL YEARS 1892 TO 2022**

| Year | Removals[1] | Administrative Returns[2] | Enforcement Returns[2] | Expulsions[3] | Total TB | monthly total |
|---|---|---|---|---|---|---|
| 1892 | 2,801 | NA | NA | X | **2,801** | 233 |
| 1893 | 1,630 | NA | NA | X | **1,630** | 136 |
| 1894 | 1,806 | NA | NA | X | **1,806** | 151 |
| 1895 | 2,596 | NA | NA | X | **2,596** | 216 |
| 1896 | 3,037 | NA | NA | X | **3,037** | 253 |
| 1897 | 1,880 | NA | NA | X | **1,880** | 157 |
| 1898 | 3,229 | NA | NA | X | **3,229** | 269 |
| 1899 | 4,052 | NA | NA | X | **4,052** | 338 |
| 1900 | 4,602 | NA | NA | X | **4,602** | 384 |
| 1901 | 3,879 | NA | NA | X | **3,879** | 323 |
| 1902 | 5,439 | NA | NA | X | **5,439** | 453 |
| 1903 | 9,316 | NA | NA | X | **9,316** | 776 |
| 1904 | 8,773 | NA | NA | X | **8,773** | 731 |
| 1905 | 12,724 | NA | NA | X | **12,724** | 1,060 |
| 1906 | 13,108 | NA | NA | X | **13,108** | 1,092 |
| 1907 | 14,059 | NA | NA | X | **14,059** | 1,172 |
| 1908 | 12,971 | NA | NA | X | **12,971** | 1,081 |
| 1909 | 12,535 | NA | NA | X | **12,535** | 1,045 |
| 1910 | 26,965 | NA | NA | X | **26,965** | 2,247 |
| 1911 | 25,137 | NA | NA | X | **25,137** | 2,095 |
| 1912 | 18,513 | NA | NA | X | **18,513** | 1,543 |
| 1913 | 23,399 | NA | NA | X | **23,399** | 1,950 |
| 1914 | 37,651 | NA | NA | X | **37,651** | 3,138 |
| 1915 | 26,675 | NA | NA | X | **26,675** | 2,223 |
| 1916 | 21,648 | NA | NA | X | **21,648** | 1,804 |
| 1917 | 17,881 | NA | NA | X | **17,881** | 1,490 |
| 1918 | 8,866 | NA | NA | X | **8,866** | 739 |
| 1919 | 11,694 | NA | NA | X | **11,694** | 975 |
| 1920 | 14,557 | NA | NA | X | **14,557** | 1,213 |
| 1921 | 18,296 | NA | NA | X | **18,296** | 1,525 |
| 1922 | 18,076 | NA | NA | X | **18,076** | 1,506 |
| 1923 | 24,280 | NA | NA | X | **24,280** | 2,023 |
| 1924 | 36,693 | NA | NA | X | **36,693** | 3,058 |
| 1925 | 34,885 | NA | NA | X | **34,885** | 2,907 |
| 1926 | 31,454 | NA | NA | X | **31,454** | 2,621 |
| 1927 | 31,417 | NA | 15,012 | X | **46,429** | 3,869 |
| 1928 | 30,464 | NA | 19,946 | X | **50,410** | 4,201 |
| 1929 | 31,035 | NA | 25,888 | X | **56,923** | 4,744 |
| 1930 | 24,864 | NA | 11,387 | X | **36,251** | 3,021 |
| 1931 | 27,886 | NA | 11,719 | X | **39,605** | 3,300 |
| 1932 | 26,490 | NA | 10,775 | X | **37,265** | 3,105 |
| 1933 | 25,392 | NA | 10,347 | X | **35,739** | 2,978 |
| 1934 | 14,263 | NA | 8,010 | X | **22,273** | 1,856 |
| 1935 | 13,877 | NA | 7,978 | X | **21,855** | 1,821 |
| 1936 | 16,195 | NA | 8,251 | X | **24,446** | 2,037 |
| 1937 | 16,905 | NA | 8,788 | X | **25,693** | 2,141 |
| 1938 | 17,341 | NA | 9,278 | X | **26,619** | 2,218 |
| 1939 | 14,700 | NA | 9,590 | X | **24,290** | 2,024 |
| 1940 | 12,254 | NA | 8,594 | X | **20,848** | 1,737 |
| 1941 | 7,336 | NA | 6,531 | X | **13,867** | 1,156 |
| 1942 | 5,542 | NA | 6,904 | X | **12,446** | 1,037 |
| 1943 | 5,702 | NA | 11,947 | X | **17,649** | 1,471 |
| 1944 | 8,821 | NA | 32,270 | X | **41,091** | 3,424 |
| 1945 | 13,611 | NA | 69,490 | X | **83,101** | 6,925 |
| 1946 | 17,317 | NA | 101,945 | X | **119,262** | 9,939 |
| 1947 | 23,434 | NA | 195,880 | X | **219,314** | 18,276 |
| 1948 | 25,276 | NA | 197,184 | X | **222,460** | 18,538 |
| 1949 | 23,874 | NA | 276,297 | X | **300,171** | 25,014 |
| 1950 | 10,199 | NA | 572,477 | X | **582,676** | 48,556 |
| 1951 | 17,328 | NA | 673,169 | X | **690,497** | 57,541 |
| 1952 | 23,125 | NA | 703,778 | X | **726,903** | 60,575 |
| 1953 | 23,482 | NA | 885,391 | X | **908,873** | 75,739 |
| 1954 | 30,264 | NA | 1,074,277 | X | **1,104,541** | 92,045 |
| 1955 | 17,695 | NA | 232,769 | X | **250,464** | 20,872 |
| 1956 | 9,006 | NA | 80,891 | X | **89,897** | 7,491 |
| 1957 | 5,989 | NA | 63,379 | X | **69,368** | 5,781 |
| 1958 | 7,875 | NA | 60,600 | X | **68,475** | 5,706 |
| 1959 | 8,468 | NA | 56,610 | X | **65,078** | 5,423 |
| 1960 | 7,240 | NA | 52,796 | X | **60,036** | 5,003 |
| 1961 | 8,181 | NA | 52,383 | X | **60,564** | 5,047 |
| 1962 | 8,025 | NA | 54,164 | X | **62,189** | 5,182 |
| 1963 | 7,763 | NA | 69,392 | X | **77,155** | 6,430 |
| 1964 | 9,167 | NA | 73,042 | X | **82,209** | 6,851 |
| 1965 | 10,572 | NA | 95,263 | X | **105,835** | 8,820 |
| 1966 | 9,680 | NA | 123,683 | X | **133,363** | 11,114 |
| 1967 | 9,728 | NA | 142,343 | X | **152,071** | 12,673 |
| 1968 | 9,590 | NA | 179,952 | X | **189,542** | 15,795 |
| 1969 | 11,030 | NA | 240,958 | X | **251,988** | 20,999 |
| 1970 | 17,469 | NA | 303,348 | X | **320,817** | 26,735 |
| 1971 | 18,294 | NA | 370,074 | X | **388,368** | 32,364 |
| 1972 | 16,883 | NA | 450,927 | X | **467,810** | 38,984 |
| 1973 | 17,346 | NA | 568,005 | X | **585,351** | 48,779 |
| 1974 | 19,413 | NA | 718,740 | X | **738,153** | 61,513 |
| 1975 | 24,432 | NA | 655,814 | X | **680,246** | 56,687 |
| 1976[4] | 38,471 | NA | 955,374 | X | **993,845** | 82,820 |
| 1977 | 31,263 | NA | 867,015 | X | **898,278** | 74,857 |
| 1978 | 29,277 | NA | 975,515 | X | **1,004,792** | 83,733 |
| 1979 | 26,825 | NA | 966,137 | X | **992,962** | 82,747 |
| 1980 | 18,013 | NA | 719,211 | X | **737,224** | 61,435 |
| 1981 | 17,379 | NA | 823,875 | X | **841,254** | 70,105 |
| 1982 | 15,216 | NA | 812,572 | X | **827,788** | 68,982 |
| 1983 | 19,211 | NA | 931,600 | X | **950,811** | 79,234 |
| 1984 | 18,696 | NA | 909,833 | X | **928,529** | 77,377 |
| 1985 | 23,105 | NA | 1,041,296 | X | **1,064,401** | 88,700 |
| 1986 | 24,592 | NA | 1,586,320 | X | **1,610,912** | 134,243 |
| 1987 | 24,336 | NA | 1,091,203 | X | **1,115,539** | 92,962 |
| 1988 | 25,829 | NA | 911,790 | X | **937,619** | 78,135 |
| 1989 | 34,427 | NA | 830,890 | X | **865,317** | 72,110 |
| 1990 | 30,039 | NA | 1,022,533 | X | **1,052,572** | 87,714 |
| 1991 | 33,189 | NA | 1,061,105 | X | **1,094,294** | 91,191 |
| 1992 | 43,671 | NA | 1,105,829 | X | **1,149,500** | 95,792 |
| 1993 | 42,542 | NA | 1,243,410 | X | **1,285,952** | 107,163 |
| 1994 | 45,674 | NA | 1,029,107 | X | **1,074,781** | 89,565 |
| 1995 | 50,924 | NA | 1,313,764 | X | **1,364,688** | 113,724 |
| 1996 | 69,680 | NA | 1,573,428 | X | **1,643,108** | 136,926 |
| 1997 | 114,432 | NA | 1,440,684 | X | **1,555,116** | 129,593 |
| 1998 | 174,813 | NA | 1,570,127 | X | **1,744,940** | 145,412 |
| 1999 | 183,114 | NA | 1,574,863 | X | **1,757,977** | 146,498 |
| 2000 | 188,467 | NA | 1,675,876 | X | **1,864,343** | 155,362 |
| 2001 | 189,026 | NA | 1,349,371 | X | **1,538,397** | 128,200 |
| 2002 | 165,168 | NA | 1,012,116 | X | **1,177,284** | 98,107 |
| 2003 | 211,098 | NA | 945,294 | X | **1,156,392** | 96,366 |
| 2004 | 240,665 | NA | 1,166,576 | X | **1,407,241** | 117,270 |
| 2005 | 246,431 | NA | 1,096,920 | X | **1,343,351** | 111,946 |
| 2006 | 280,974 | NA | 1,043,381 | X | **1,324,355** | 110,363 |
| 2007 | 319,382 | NA | 891,390 | X | **1,210,772** | 100,898 |
| 2008 | 359,795 | NA | 811,263 | X | **1,171,058** | 97,588 |
| 2009 | 379,739 | 59,409 | 523,153 | X | **962,301** | 80,192 |
| 2010 | 382,449 | 61,895 | 409,898 | X | **854,242** | 71,187 |
| 2011 | 390,413 | 60,896 | 261,149 | X | **712,458** | 59,372 |
| 2012 | 415,579 | 47,361 | 183,744 | X | **646,684** | 53,890 |
| 2013 | 432,334 | 44,707 | 134,265 | X | **611,306** | 50,942 |
| 2014 | 405,193 | 45,666 | 118,170 | X | **569,029** | 47,419 |
| 2015 | 324,428 | 43,237 | 86,399 | X | **454,064** | 37,839 |
| 2016[5] | 332,331 | 30,341 | 76,137 | X | **438,809** | 36,567 |
| 2017 | 284,365 | 15,072 | 85,380 | X | **384,817** | 32,068 |
| 2018 | 327,608 | 72,756 | 87,202 | X | **487,566** | 40,631 |
| 2019 | 347,090 | 89,719 | 81,401 | X | **518,210** | 43,184 |
| 2020 | 237,364 | 113,857 | 53,595 | 206,770 | **404,816** | 33,735 |
| 2021 | 85,783 | 128,339 | 49,664 | 1,071,074 | **263,786** | 21,982 |
| 2022 | 108,733 | 180,266 | 81,121 | 1,103,966 | **370,120** | 30,843 |

X Not applicable.
NA Not available.
[1]Removals are the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States based on an order of removal. A noncitizen who is removed has administrative or criminal consequences placed on subsequent reentry owing to the fact of the removal.
[2]Returns are the confirmed movement of an inadmissible or deportable noncitizen out of the United States not based on an order of removal. Administrative returns include crew members from 2005 to 2017, and both crew members and administrative withdrawals since 2018. The enforcement returns are all returns with the exception of crew members and administrative withdrawals. All returns are reported as enforcement returns from 1927 to 2008.
[3]U.S. Border Patrol (USBP) and OFO data for 2020, 2021, and 2022 include encounters resulting in expulsions on public health grounds under U.S. Code Title 42 in response to the COVID-19 pandemic.
[4]Includes the 15 months from July 1, 1975 to September 30, 1976 because the end date of fiscal years was changed from June 30 to September 30.
[5]The counting methodology for administrative arrests by ICE Enforcement and Removal Operations (ERO) was revised to align with ICE ERO reporting for 2016; for earlier years only one administrative arrest could be counted for the same person on the same day.
Source: DHS Office of Immigration Statistics.

Despite the expanded ability to impose consequences at the SWB through the Circumvention of Lawful Pathways rule and complementary measures, which led to the highest numbers of returns and removals in more than a decade
In the ten and a half months between May 12, 2023, and March 31, 2024, DHS completed over 662,000 removals and enforcement returns, more than in any full fiscal year since FY 2011, and the highest monthly average of enforcement repatriations since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024

| | |
|---|---|
| 5/12/23 - 3/31/24 repatriations | 662,659 |
| Max Repatriations FY2012-FY2022 | 646,684 |
| 5/12/23 - 3/31/24 monthly avg | 61,357 |
| Max monthly avg FY2011-FY2022 | 59,372 |

| Removals and Returns by Citize | Mar-24 | | | Since May 12 | |
|---|---|---|---|---|---|
| | Daily Average | Monthly Total | % change vs. prev. month | Monthly Average | Total |
| **Land Repatriations from CBP to Mexico[1]** | | | | | |
| Mexico | 935 | 28,990 | ▲ 18% | 24,210 | 261,471 |
| Honduras | 4 | 127 | ▲ 79% | 321 | 3,467 |
| Guatemala | 20 | 620 | ▼ 53% | 922 | 9,953 |
| El Salvador | 1 | 23 | ▼ 12% | 58 | 624 |
| Cuba | 2 | 55 | ▼ 7% | 46 | 492 |
| Haiti | 0 | 1 | ▼ 67% | 5 | 53 |
| Nicaragua | 3 | 79 | ▼ 91% | 217 | 2,347 |
| Venezuela | 3 | 82 | ▼ 22% | 1,187 | 12,820 |
| Other | 8 | 234 | ▲ 169% | 100 | 1,077 |
| **Total** | **975** | **30,211** | **▲ 11%** | **27,065** | **292,304** |
| **Other CBP Enforcement Repatriations[2]** | | | | 0 | |
| India | 77 | 2,402 | ▲ 4% | 2,350 | 25,375 |
| Canada | 80 | 2,495 | ▲ 18% | 2,051 | 22,152 |
| China, Peoples Republic | 37 | 1,135 | ▼ 15% | 1,170 | 12,638 |
| France | 31 | 967 | ▲ 9% | 1,113 | 12,020 |
| Mexico | 19 | 588 | ▼ 20% | 776 | 8,381 |
| Philippines | 31 | 969 | ▲ 41% | 604 | 6,527 |
| Nigeria | 16 | 511 | ▼ 7% | 575 | 6,205 |
| United Kingdom | 10 | 318 | ▲ 9% | 420 | 4,537 |
| Colombia | 10 | 317 | ▼ 6% | 409 | 4,418 |
| Algeria | 17 | 522 | ▲ 21% | 352 | 3,804 |
| Other | 214 | 6,634 | ▲ 15% | 6,301 | 68,051 |
| **Total** | **517** | **16,019** | **▲ 9%** | **15,360** | **165,886** |
| **ERO Repatriations[3]** | | | | 0 | |
| Mexico | 179 | 5,555 | ▼ 20% | 5,626 | 60,764 |
| Honduras | 79 | 2,458 | ▼ 22% | 3,909 | 42,212 |
| Guatemala | 165 | 5,115 | ▼ 18% | 4,734 | 51,127 |
| Venezuela | 4 | 135 | ▼ 33% | 279 | 3,008 |
| Ecuador | 21 | 658 | ▲ 46% | 609 | 6,574 |
| Colombia | 42 | 1,290 | ▲ 52% | 863 | 9,325 |
| El Salvador | 34 | 1,047 | ▼ 17% | 1,117 | 12,068 |
| Nicaragua | 6 | 179 | ▼ 16% | 154 | 1,668 |
| Haiti | 0 | 2 | ▼ 71% | 54 | 583 |
| Cuba | 1 | 26 | ▼ 54% | 37 | 397 |
| Dominican Republic | 7 | 229 | ▼ 5% | 248 | 2,680 |
| Peru | 5 | 145 | ▼ 62% | 444 | 4,799 |
| Other | 24 | 751 | ▲ 4% | 858 | 9,264 |
| **Total** | **567** | **17,590** | **▼ 15%** | **18,932** | **204,469** |
| **Total Repatriations[4]** | | | | 0 | |
| Mexico | 1,133 | 35,133 | ▲ 9% | 30,613 | 330,616 |
| Guatemala | 202 | 6,270 | ▼ 17% | 5,702 | 61,586 |
| Honduras | 102 | 3,164 | ▼ 3% | 4,253 | 45,936 |
| India | 78 | 2,430 | ▲ 2% | 2,402 | 25,938 |
| Canada | 81 | 2,507 | ▲ 18% | 2,068 | 22,336 |
| Venezuela | 9 | 284 | ▼ 19% | 1,522 | 16,441 |
| Colombia | 54 | 1,685 | ▲ 39% | 1,289 | 13,920 |
| China, Peoples Republic | 38 | 1,167 | ▼ 16% | 1,208 | 13,041 |
| El Salvador | 38 | 1,164 | ▼ 10% | 1,196 | 12,918 |
| France | 31 | 972 | ▲ 9% | 1,120 | 12,097 |
| Other | 327 | 10,144 | ▲ 4% | 9,984 | 107,830 |
| **Total** | **2,094** | **64,920** | **▲ 4%** | **61,357** | **662,659** |

[1]Land repatriations from CBP to Mexico are limited to SW Border encounters after May 11, 2023.
[2]Other CBP Enforcement Repatriations include noncitizens removed or returned from the Northern and Maritime Borders and from air and
[3]ERO repatriations are limited to departures after May 11, 2023 and are reported based on recorded departure date through March 31, 2024.
[4]Total DHS removals and returns, excluding administrative returns. Administrative returns include withdrawals of applications for admission without prejudice and crew members required to remain aboard their vessels.
Note: All data report on individuals. Data are pulled from a live system and will not match ERO or OHSS end-of-year reporting. Repatriation flights may include mixes of single adults and family units. Data are current through March 31, 2024.
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on April 2, 2024.

**Table 39.**

**NONCITIZEN REMOVALS, RETURNS, AND EXPULSIONS: FISCAL YEARS 1892 TO 2022**

| Year | Removals[1] | e Returns[2] | nt Returns[2] | xpulsions[3] | Total T8 | monthly total |
|---|---|---|---|---|---|---|
| 1892 | 2,801 | NA | NA | X | **2,801** | 233 |
| 1893 | 1,630 | NA | NA | X | **1,630** | 136 |
| 1894 | 1,806 | NA | NA | X | **1,806** | 151 |
| 1895 | 2,596 | NA | NA | X | **2,596** | 216 |
| 1896 | 3,037 | NA | NA | X | **3,037** | 253 |
| 1897 | 1,880 | NA | NA | X | **1,880** | 157 |
| 1898 | 3,229 | NA | NA | X | **3,229** | 269 |
| 1899 | 4,052 | NA | NA | X | **4,052** | 338 |
| 1900 | 4,602 | NA | NA | X | **4,602** | 384 |
| 1901 | 3,879 | NA | NA | X | **3,879** | 323 |
| 1902 | 5,439 | NA | NA | X | **5,439** | 453 |
| 1903 | 9,316 | NA | NA | X | **9,316** | 776 |
| 1904 | 8,773 | NA | NA | X | **8,773** | 731 |
| 1905 | 12,724 | NA | NA | X | **12,724** | 1,060 |
| 1906 | 13,108 | NA | NA | X | **13,108** | 1,092 |
| 1907 | 14,059 | NA | NA | X | **14,059** | 1,172 |
| 1908 | 12,971 | NA | NA | X | **12,971** | 1,081 |
| 1909 | 12,535 | NA | NA | X | **12,535** | 1,045 |
| 1910 | 26,965 | NA | NA | X | **26,965** | 2,247 |
| 1911 | 25,137 | NA | NA | X | **25,137** | 2,095 |
| 1912 | 18,513 | NA | NA | X | **18,513** | 1,543 |
| 1913 | 23,399 | NA | NA | X | **23,399** | 1,950 |
| 1914 | 37,651 | NA | NA | X | **37,651** | 3,138 |
| 1915 | 26,675 | NA | NA | X | **26,675** | 2,223 |
| 1916 | 21,648 | NA | NA | X | **21,648** | 1,804 |
| 1917 | 17,881 | NA | NA | X | **17,881** | 1,490 |
| 1918 | 8,866 | NA | NA | X | **8,866** | 739 |
| 1919 | 11,694 | NA | NA | X | **11,694** | 975 |
| 1920 | 14,557 | NA | NA | X | **14,557** | 1,213 |
| 1921 | 18,296 | NA | NA | X | **18,296** | 1,525 |
| 1922 | 18,076 | NA | NA | X | **18,076** | 1,506 |
| 1923 | 24,280 | NA | NA | X | **24,280** | 2,023 |
| 1924 | 36,693 | NA | NA | X | **36,693** | 3,058 |
| 1925 | 34,885 | NA | NA | X | **34,885** | 2,907 |
| 1926 | 31,454 | NA | NA | X | **31,454** | 2,621 |
| 1927 | 31,417 | NA | 15,012 | X | **46,429** | 3,869 |
| 1928 | 30,464 | NA | 19,946 | X | **50,410** | 4,201 |
| 1929 | 31,035 | NA | 25,888 | X | **56,923** | 4,744 |
| 1930 | 24,864 | NA | 11,387 | X | **36,251** | 3,021 |
| 1931 | 27,886 | NA | 11,719 | X | **39,605** | 3,300 |
| 1932 | 26,490 | NA | 10,775 | X | **37,265** | 3,105 |
| 1933 | 25,392 | NA | 10,347 | X | **35,739** | 2,978 |
| 1934 | 14,263 | NA | 8,010 | X | **22,273** | 1,856 |
| 1935 | 13,877 | NA | 7,978 | X | **21,855** | 1,821 |
| 1936 | 16,195 | NA | 8,251 | X | **24,446** | 2,037 |
| 1937 | 16,905 | NA | 8,788 | X | **25,693** | 2,141 |
| 1938 | 17,341 | NA | 9,278 | X | **26,619** | 2,218 |
| 1939 | 14,700 | NA | 9,590 | X | **24,290** | 2,024 |
| 1940 | 12,254 | NA | 8,594 | X | **20,848** | 1,737 |
| 1941 | 7,336 | NA | 6,531 | X | **13,867** | 1,156 |
| 1942 | 5,542 | NA | 6,904 | X | **12,446** | 1,037 |
| 1943 | 5,702 | NA | 11,947 | X | **17,649** | 1,471 |
| 1944 | 8,821 | NA | 32,270 | X | **41,091** | 3,424 |
| 1945 | 13,611 | NA | 69,490 | X | **83,101** | 6,925 |
| 1946 | 17,317 | NA | 101,945 | X | **119,262** | 9,939 |
| 1947 | 23,434 | NA | 195,880 | X | **219,314** | 18,276 |
| 1948 | 25,276 | NA | 197,184 | X | **222,460** | 18,538 |
| 1949 | 23,874 | NA | 276,297 | X | **300,171** | 25,014 |
| 1950 | 10,199 | NA | 572,477 | X | **582,676** | 48,556 |
| 1951 | 17,328 | NA | 673,169 | X | **690,497** | 57,541 |
| 1952 | 23,125 | NA | 703,778 | X | **726,903** | 60,575 |
| 1953 | 23,482 | NA | 885,391 | X | **908,873** | 75,739 |
| 1954 | 30,264 | NA | 1,074,277 | X | **1,104,541** | 92,045 |
| 1955 | 17,695 | NA | 232,769 | X | **250,464** | 20,872 |
| 1956 | 9,006 | NA | 80,891 | X | **89,897** | 7,491 |
| 1957 | 5,989 | NA | 63,379 | X | **69,368** | 5,781 |
| 1958 | 7,875 | NA | 60,600 | X | **68,475** | 5,706 |
| 1959 | 8,468 | NA | 56,610 | X | **65,078** | 5,423 |
| 1960 | 7,240 | NA | 52,796 | X | **60,036** | 5,003 |
| 1961 | 8,181 | NA | 52,383 | X | **60,564** | 5,047 |
| 1962 | 8,025 | NA | 54,164 | X | **62,189** | 5,182 |
| 1963 | 7,763 | NA | 69,392 | X | **77,155** | 6,430 |
| 1964 | 9,167 | NA | 73,042 | X | **82,209** | 6,851 |
| 1965 | 10,572 | NA | 95,263 | X | **105,835** | 8,820 |
| 1966 | 9,680 | NA | 123,683 | X | **133,363** | 11,114 |
| 1967 | 9,728 | NA | 142,343 | X | **152,071** | 12,673 |
| 1968 | 9,590 | NA | 179,952 | X | **189,542** | 15,795 |
| 1969 | 11,030 | NA | 240,958 | X | **251,988** | 20,999 |
| 1970 | 17,469 | NA | 303,348 | X | **320,817** | 26,735 |
| 1971 | 18,294 | NA | 370,074 | X | **388,368** | 32,364 |
| 1972 | 16,883 | NA | 450,927 | X | **467,810** | 38,984 |
| 1973 | 17,346 | NA | 568,005 | X | **585,351** | 48,779 |
| 1974 | 19,413 | NA | 718,740 | X | **738,153** | 61,513 |
| 1975 | 24,432 | NA | 655,814 | X | **680,246** | 56,687 |
| 1976[4] | 38,471 | NA | 955,374 | X | **993,845** | 82,820 |
| 1977 | 31,263 | NA | 867,015 | X | **898,278** | 74,857 |
| 1978 | 29,277 | NA | 975,515 | X | **1,004,792** | 83,733 |
| 1979 | 26,825 | NA | 966,137 | X | **992,962** | 82,747 |
| 1980 | 18,013 | NA | 719,211 | X | **737,224** | 61,435 |
| 1981 | 17,379 | NA | 823,875 | X | **841,254** | 70,105 |
| 1982 | 15,216 | NA | 812,572 | X | **827,788** | 68,982 |
| 1983 | 19,211 | NA | 931,600 | X | **950,811** | 79,234 |
| 1984 | 18,696 | NA | 909,833 | X | **928,529** | 77,377 |
| 1985 | 23,105 | NA | 1,041,296 | X | **1,064,401** | 88,700 |
| 1986 | 24,592 | NA | 1,586,320 | X | **1,610,912** | 134,243 |
| 1987 | 24,336 | NA | 1,091,203 | X | **1,115,539** | 92,962 |
| 1988 | 25,829 | NA | 911,790 | X | **937,619** | 78,135 |
| 1989 | 34,427 | NA | 830,890 | X | **865,317** | 72,110 |
| 1990 | 30,039 | NA | 1,022,533 | X | **1,052,572** | 87,714 |
| 1991 | 33,189 | NA | 1,061,105 | X | **1,094,294** | 91,191 |
| 1992 | 43,671 | NA | 1,105,829 | X | **1,149,500** | 95,792 |
| 1993 | 42,542 | NA | 1,243,410 | X | **1,285,952** | 107,163 |
| 1994 | 45,674 | NA | 1,029,107 | X | **1,074,781** | 89,565 |
| 1995 | 50,924 | NA | 1,313,764 | X | **1,364,688** | 113,724 |
| 1996 | 69,680 | NA | 1,573,428 | X | **1,643,108** | 136,926 |
| 1997 | 114,432 | NA | 1,440,684 | X | **1,555,116** | 129,593 |
| 1998 | 174,813 | NA | 1,570,127 | X | **1,744,940** | 145,412 |
| 1999 | 183,114 | NA | 1,574,863 | X | **1,757,977** | 146,498 |
| 2000 | 188,467 | NA | 1,675,876 | X | **1,864,343** | 155,362 |
| 2001 | 189,026 | NA | 1,349,371 | X | **1,538,397** | 128,200 |
| 2002 | 165,168 | NA | 1,012,116 | X | **1,177,284** | 98,107 |
| 2003 | 211,098 | NA | 945,294 | X | **1,156,392** | 96,366 |
| 2004 | 240,665 | NA | 1,166,576 | X | **1,407,241** | 117,270 |
| 2005 | 246,431 | NA | 1,096,920 | X | **1,343,351** | 111,946 |
| 2006 | 280,974 | NA | 1,043,381 | X | **1,324,355** | 110,363 |
| 2007 | 319,382 | NA | 891,390 | X | **1,210,772** | 100,898 |
| 2008 | 359,795 | NA | 811,263 | X | **1,171,058** | 97,588 |
| 2009 | 379,739 | 59,409 | 523,153 | X | **962,301** | 80,192 |
| 2010 | 382,449 | 61,895 | 409,898 | X | **854,242** | 71,187 |
| 2011 | 390,413 | 60,896 | 261,149 | X | **712,458** | 59,372 |
| 2012 | 415,579 | 47,361 | 183,744 | X | **646,684** | 53,890 |
| 2013 | 432,334 | 44,707 | 134,265 | X | **611,306** | 50,942 |
| 2014 | 405,193 | 45,666 | 118,170 | X | **569,029** | 47,419 |
| 2015 | 324,428 | 43,237 | 86,399 | X | **454,064** | 37,839 |
| 2016[5] | 332,331 | 30,341 | 76,137 | X | **438,809** | 36,567 |
| 2017 | 284,365 | 15,072 | 85,380 | X | **384,817** | 32,068 |
| 2018 | 327,608 | 72,756 | 87,202 | X | **487,566** | 40,631 |
| 2019 | 347,090 | 89,719 | 81,401 | X | **518,210** | 43,184 |
| 2020 | 237,364 | 113,857 | 53,595 | 206,770 | **404,816** | 33,735 |
| 2021 | 85,783 | 128,339 | 49,664 | 1,071,074 | **263,786** | 21,982 |
| 2022 | 108,733 | 180,266 | 81,121 | 1,103,966 | **370,120** | 30,843 |

X Not applicable.
NA Not available.
[1] Removals are the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States based on an order of removal. A noncitizen who is removed has administrative or criminal consequences placed on subsequent reentry owing to the fact of the removal.
[2] Returns are the confirmed movement of an inadmissible or deportable noncitizen out of the United States not based on an order of removal. Administrative returns include crew members from 2005 to 2017, and both crew members and administrative withdrawals since 2018. The enforcement returns are all returns with the exception of crew members and administrative withdrawals. All returns are reported as enforcement returns from 1927 to 2008.
[3] U.S. Border Patrol (USBP) and OFO data for 2020, 2021, and 2022 include encounters resulting in expulsions on public health grounds under U.S. Code Title 42 in response to the COVID-19 pandemic.
[4] Includes the 15 months from July 1, 1975 to September 30, 1976 because the end date of fiscal years was changed from June 30 to September 30.
[5] The counting methodology for administrative arrests by ICE Enforcement and Removal Operations (ERO) was revised to align with ICE ERO reporting for 2016; for earlier years only one administrative arrest could be counted for the same person on the same day.
Source: DHS Office of Immigration Statistics.





encounter levels have remained elevated well above historical levels, with December 2023 logging the highest monthly total on record.
There were nearly 302,000 CBP encounters at and between POEs along the SWB in December 2023, higher than any previous month on record. OHSS analysis of March 2024 OHSS Persist Dataset and historic CBP data for encounters prior to FY 2000

CBP SW Border Encounters, FY 2000 - December 2023

Notes: Data for FY 2000 - FY 2003 are limited to USBP encounters between POEs.
Source: OHSS Persist as of December 2023.

12/2023 encounters [illegible]

| | |
|---|---|
| **2000** | **[illegible]** |
| 10 | [illegible] |
| 11 | [illegible] |
| 12 | [illegible] |
| 1 | [illegible] |
| 2 | [illegible] |
| 3 | [illegible] |
| 4 | [illegible] |
| 5 | [illegible] |
| 6 | [illegible] |
| 7 | [illegible] |
| 8 | [illegible] |
| 9 | [illegible] |
| **2001** | **[illegible]** |
| 10 | [illegible] |
| 11 | [illegible] |
| 12 | [illegible] |
| 1 | [illegible] |
| 2 | [illegible] |
| 3 | [illegible] |
| 4 | [illegible] |
| 5 | [illegible] |
| 6 | [illegible] |
| 7 | [illegible] |
| 8 | [illegible] |
| 9 | [illegible] |
| **2002** | **[illegible]** |
| 10 | [illegible] |
| 11 | [illegible] |
| 12 | [illegible] |
| 1 | [illegible] |
| 2 | 95,645 |
| 3 | 126,906 |
| 4 | 121,908 |
| 5 | 97,571 |
| 6 | 78,730 |
| 7 | 76,719 |
| 8 | 82,860 |
| 9 | 68,384 |
| **2003** | **906,734** |
| 10 | 61,913 |
| 11 | 47,919 |
| 12 | 37,930 |
| 1 | 87,002 |
| 2 | 97,016 |
| 3 | 98,625 |
| 4 | 75,564 |
| 5 | 88,845 |
| 6 | 75,634 |
| 7 | 79,396 |
| 8 | 84,651 |
| 9 | 72,239 |
| **2004** | **1,211,693** |
| 10 | 69,246 |
| 11 | 62,452 |
| 12 | 48,280 |
| 1 | 98,764 |
| 2 | 116,398 |
| 3 | 162,530 |
| 4 | 142,491 |
| 5 | 125,502 |
| 6 | 101,178 |
| 7 | 98,989 |
| 8 | 99,986 |
| 9 | 85,877 |
| **2005** | **1,269,247** |
| 10 | 81,687 |
| 11 | 70,617 |
| 12 | 54,028 |
| 1 | 101,552 |
| 2 | 121,177 |
| 3 | 150,892 |
| 4 | 148,688 |
| 5 | 125,226 |
| 6 | 99,490 |
| 7 | 105,093 |
| 8 | 107,620 |
| 9 | 103,177 |
| **2006** | **1,168,358** |
| 10 | 91,935 |
| 11 | 78,817 |
| 12 | 60,375 |
| 1 | 110,987 |
| 2 | 132,780 |
| 3 | 169,077 |
| 4 | 133,964 |
| 5 | 113,311 |
| 6 | 76,274 |
| 7 | 67,636 |
| 8 | 67,631 |
| 9 | 65,571 |
| **2007** | **954,928** |
| 10 | 68,083 |
| 11 | 58,199 |
| 12 | 47,537 |
| 1 | 79,794 |
| 2 | 86,435 |
| 3 | 122,450 |
| 4 | 112,773 |
| 5 | 97,196 |
| 6 | 79,997 |
| 7 | 75,766 |
| 8 | 69,142 |
| 9 | 57,556 |
| **2008** | **792,553** |
| 10 | 58,616 |
| 11 | 48,693 |
| 12 | 38,556 |
| 1 | 66,471 |
| 2 | 80,724 |
| 3 | 97,774 |
| 4 | 99,518 |
| 5 | 77,048 |
| 6 | 60,492 |
| 7 | 56,806 |
| 8 | 56,142 |
| 9 | 51,713 |
| **2009** | **619,123** |
| 10 | 49,217 |
| 11 | 38,450 |
| 12 | 31,206 |
| 1 | 50,737 |
| 2 | 55,132 |
| 3 | 74,323 |
| 4 | 65,129 |
| 5 | 57,593 |
| 6 | 52,600 |
| 7 | 50,986 |
| 8 | 51,084 |
| 9 | 42,666 |
| **2010** | **527,419** |
| 10 | 47,290 |
| 11 | 39,064 |
| 12 | 31,352 |
| 1 | 40,741 |
| 2 | 48,753 |
| 3 | 69,152 |
| 4 | 62,351 |
| 5 | 54,018 |
| 6 | 39,308 |
| 7 | 32,363 |
| 8 | 33,717 |
| 9 | 29,310 |
| **2011** | **401,073** |
| 10 | 32,451 |
| 11 | 28,516 |
| 12 | 25,728 |
| 1 | 29,737 |
| 2 | 34,408 |
| 3 | 48,920 |
| 4 | 42,739 |
| 5 | 37,543 |
| 6 | 32,909 |
| 7 | 29,520 |
| 8 | 30,216 |
| 9 | 28,386 |
| **2012** | **426,125** |
| 10 | 31,344 |
| 11 | 28,617 |
| 12 | 24,380 |
| 1 | 30,798 |
| 2 | 37,009 |
| 3 | 48,538 |
| 4 | 46,680 |
| 5 | 43,020 |
| 6 | 36,808 |
| 7 | 32,833 |
| 8 | 33,699 |
| 9 | 32,399 |
| **2013** | **489,612** |
| 10 | 34,847 |
| 11 | 33,159 |
| 12 | 29,077 |
| 1 | 32,485 |
| 2 | 40,636 |
| 3 | 54,010 |
| 4 | 54,771 |
| 5 | 50,500 |
| 6 | 40,790 |
| 7 | 40,006 |
| 8 | 41,125 |
| 9 | 38,206 |
| **2014** | **570,048** |
| 10 | 41,835 |
| 11 | 38,692 |
| 12 | 36,707 |
| 1 | 35,200 |
| 2 | 42,473 |
| 3 | 57,548 |
| 4 | 59,383 |
| 5 | 69,033 |
| 6 | 66,572 |
| 7 | 48,833 |
| 8 | 39,766 |
| 9 | 34,006 |
| **2015** | **444,856** |
| 10 | 35,903 |
| 11 | 33,024 |
| 12 | 34,231 |
| 1 | 30,179 |
| 2 | 32,554 |
| 3 | 39,162 |
| 4 | 38,299 |
| 5 | 40,684 |
| 6 | 38,620 |
| 7 | 38,610 |
| 8 | 42,419 |
| 9 | 41,171 |
| **2016** | **558,991** |
| 10 | 45,245 |
| 11 | 45,387 |
| 12 | 48,393 |
| 1 | 33,396 |
| 2 | 38,068 |
| 3 | 45,779 |
| 4 | 48,271 |
| 5 | 54,987 |
| 6 | 45,168 |
| 7 | 46,658 |
| 8 | 51,569 |
| 9 | 56,070 |
| **2017** | **415,199** |
| 10 | 66,707 |
| 11 | 63,366 |
| 12 | 58,416 |
| 1 | 42,458 |
| 2 | 23,555 |
| 3 | 16,592 |
| 4 | 15,768 |
| 5 | 19,940 |
| 6 | 21,657 |
| 7 | 25,014 |
| 8 | 30,569 |
| 9 | 31,157 |
| **2018** | **519,944** |
| 10 | 34,842 |
| 11 | 39,031 |
| 12 | 40,476 |
| 1 | 35,865 |
| 2 | 36,690 |
| 3 | 50,213 |
| 4 | 51,019 |
| 5 | 51,790 |
| 6 | 43,096 |
| 7 | 40,005 |
| 8 | 46,551 |
| 9 | 50,366 |
| **2019** | **977,229** |
| 10 | 60,775 |
| 11 | 62,463 |
| 12 | 60,789 |
| 1 | 58,313 |
| 2 | 76,543 |
| 3 | 103,730 |
| 4 | 109,413 |
| 5 | 144,113 |
| 6 | 104,310 |
| 7 | 81,748 |
| 8 | 62,608 |
| 9 | 52,424 |
| **2020** | **458,066** |
| 10 | 45,139 |
| 11 | 42,642 |
| 12 | 40,563 |
| 1 | 36,583 |
| 2 | 36,686 |
| 3 | 34,457 |
| 4 | 17,106 |
| 5 | 23,237 |
| 6 | 33,029 |
| 7 | 40,949 |
| 8 | 50,007 |
| 9 | 57,668 |
| **2021** | **1,734,699** |
| 10 | 71,943 |
| 11 | 72,113 |
| 12 | 73,994 |
| 1 | 78,414 |
| 2 | 101,098 |
| 3 | 173,277 |
| 4 | 178,795 |
| 5 | 180,597 |
| 6 | 189,034 |
| 7 | 213,593 |
| 8 | 209,840 |
| 9 | 192,001 |
| **2022** | **2,378,944** |
| 10 | 164,837 |
| 11 | 174,845 |
| 12 | 179,253 |
| 1 | 154,874 |
| 2 | 166,010 |
| 3 | 222,574 |
| 4 | 235,785 |
| 5 | 241,136 |
| 6 | 207,834 |
| 7 | 200,162 |
| 8 | 204,087 |
| 9 | 227,547 |
| **2023** | **2,475,669** |
| 10 | 231,529 |
| 11 | 235,173 |
| 12 | 252,315 |
| 1 | 157,358 |
| 2 | 156,630 |
| 3 | 193,249 |
| 4 | 211,992 |
| 5 | 206,690 |
| 6 | 144,556 |
| 7 | 183,479 |
| 8 | 232,963 |
| 9 | 269,735 |
| **2024 YTD** | **1,340,799** |
| 10 | 240,932 |
| 11 | 242,413 |
| 12 | 301,980 |
| 1 | 176,189 |
| 2 | 189,914 |
| 3 | 189,371 |

Source: March 2024 OHSS Persist.

**Table 33.**
**NONCITIZEN APPREHENSIONS: FISCAL YEARS 1925 TO 2022**

| Year | Number | Year | Number |
|---|---|---|---|
| 1925 | 22,199 | 1981 | 975,780 |
| 1926 | 12,735 | 1982 | 970,246 |
| 1927 | 16,393 | 1983 | 1,251,357 |
| 1928 | 23,566 | 1984 | 1,246,981 |
| 1929 | 32,711 | 1985 | 1,348,749 |
| 1930 | 20,880 | 1986 | 1,767,400 |
| 1931 | 22,276 | 1987 | 1,190,488 |
| 1932 | 22,735 | 1988 | 1,008,145 |
| 1933 | 20,949 | 1989 | 954,243 |
| 1934 | 10,319 | 1990 | 1,169,939 |
| 1935 | 11,016 | 1991 | 1,197,875 |
| 1936 | 11,728 | 1992 | 1,258,481 |
| 1937 | 13,054 | 1993 | 1,327,261 |
| 1938 | 12,851 | 1994 | 1,094,719 |
| 1939 | 12,037 | 1995 | 1,394,554 |
| 1940 | 10,492 | 1996 | 1,649,986 |
| 1941 | 11,294 | 1997 | 1,536,520 |
| 1942 | 11,784 | 1998 | 1,679,439 |
| 1943 | 11,175 | 1999 | 1,714,035 |
| 1944 | 31,174 | 2000 | 1,814,729 |
| 1945 | 69,164 | 2001 | 1,387,486 |
| 1946 | 99,591 | 2002 | 1,062,270 |
| 1947 | 193,657 | 2003 | 1,046,422 |
| 1948 | 192,779 | 2004 | 1,264,232 |
| 1949 | 288,253 | 2005 | 1,291,065 |
| 1950 | 468,339 | 2006 [3] | 1,206,408 |
| 1951 | 509,040 | 2007 | 960,673 |
| 1952 [1] | 543,538 | 2008 [4] | 1,043,759 |
| 1953 | 865,318 | 2009 | 889,212 |
| 1954 | 1,089,583 | 2010 | 796,587 |
| 1955 | 254,096 | 2011 | 678,606 |
| 1956 | 87,696 | 2012 [5] | 790,735 |
| 1957 | 59,918 | 2013 | 796,223 |
| 1958 | 53,474 | 2014 | 695,174 |
| 1959 | 45,336 | 2015 | 598,545 |
| 1960 | 70,684 | 2016 [6] | 683,782 |
| 1961 | 88,823 | 2017 | 457,677 |
| 1962 | 92,758 | 2018 | 739,486 |
| 1963 | 88,712 | 2019 | 1,175,841 |
| 1964 | 86,597 | 2020 [7] | 608,058 |
| 1965 | 110,371 | 2021 | 1,880,376 |
| 1966 | 138,520 | 2022 | 2,594,235 |
| 1967 | 161,608 | | |
| 1968 | 212,057 | | |
| 1969 | 283,557 | | |
| 1970 | 345,353 | | |
| 1971 | 420,126 | | |
| 1972 | 505,949 | | |
| 1973 | 655,968 | | |
| 1974 | 788,145 | | |
| 1975 | 766,600 | | |
| 1976 [2] | 1,097,739 | | |
| 1977 | 1,042,215 | | |
| 1978 | 1,057,977 | | |
| 1979 | 1,076,418 | | |
| 1980 | 910,361 | | |

[1] Prior to 1960, data are limited to U.S. Customs and Border Protection (CBP) U.S. Border Patrol (USBP) apprehensions; beginning in 1960, data also include Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) administrative arrests.
[2] Includes the 15 months from July 1, 1975 to September 30, 1976 because the end date of fiscal years was changed from June 30 to September 30.
[3] Beginning in 2006, data also include arrests of fugitive and nonfugitive aliens under the National Fugitive Operations Program of ICE Enforcement and Removal Operations (ERO).
[4] Beginning in 2008, data also include all administrative arrests conducted by ICE ERO.
[5] Beginning in 2012, data also include administrative encounters by CBP Office of Field Operations (OFO), reflecting attempted unlawful entries into the United States.
[6] Prior to 2016 reporting methodology, [illegible]
[7] Beginning in 2020, data include CBP encounters resulting in expulsions on public health grounds under U.S. Code Title 42 in response to the COVID-19 pandemic.
Source: DHS Office of Immigration Statistics.

While encounter levels in calendar year 2024 have decreased from these record numbers, there is still a substantial and elevated level of migration, and historically high percentages of migrants are claiming fear and are challenging to remove, as discussed in more detail in Section III.B.1 of this preamble.
After peaking at nearly 302,000 in December 2023, encounters at and between POEs along the SWB fell to approximately 176,000 in January 2024, 190,000 in February 2024, and 189,000 in March 2024. At an average of 185,000 for the first three months of 2024, monthly encounters levels were almost four times higher than the pre-pandemic (FY 2014 through 2019) average of 48,000 encounters at and between POEs per month and—with the exception of FY 2022 and FY 2023—represented the highest Q2 count of encounters in any year since FY 2001. March 2024 OHSS Persist Dataset;

SWB USBP Encounters, FY 2000-FY 2024 Q2

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Grand Total | Q2 average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 87,819 | 74,362 | 66,256 | 175,383 | 200,619 | 209,311 | 170,621 | 155,961 | 103,856 | 111,963 | 113,448 | 96,822 | 1,566,421 | 585,313 |
| 2001 | 81,995 | 67,217 | 54,828 | 124,586 | 150,616 | 169,904 | 142,040 | 123,054 | 89,034 | 83,853 | 84,837 | 59,448 | 1,231,412 | 445,106 |
| 2002 | 37,746 | 32,694 | 31,531 | 79,647 | 95,645 | 126,906 | 121,908 | 97,571 | 78,730 | 76,719 | 82,860 | 68,384 | 930,341 | 302,198 |
| 2003 | 61,913 | 47,919 | 37,930 | 87,002 | 97,016 | 98,625 | 75,564 | 88,845 | 75,634 | 79,396 | 84,651 | 72,239 | 906,734 | 282,643 |
| 2004 | 65,388 | 57,942 | 43,663 | 92,751 | 110,824 | 155,089 | 135,632 | 118,811 | 94,607 | 92,152 | 93,299 | 80,089 | 1,140,247 | 358,664 |
| 2005 | 75,908 | 65,110 | 48,410 | 93,029 | 113,776 | 143,044 | 140,074 | 115,817 | 90,796 | 94,964 | 96,745 | 93,718 | 1,171,391 | 349,849 |
| 2006 | 83,561 | 70,954 | 52,663 | 101,262 | 125,030 | 160,696 | 126,554 | 105,443 | 68,365 | 59,633 | 59,733 | 58,082 | 1,071,976 | 386,988 |
| 2007 | 60,726 | 51,592 | 40,527 | 72,000 | 79,273 | 114,136 | 104,465 | 88,510 | 71,336 | 66,793 | 59,801 | 49,577 | 858,736 | 265,409 |
| 2008 | 51,355 | 42,208 | 31,824 | 59,034 | 73,483 | 89,769 | 91,552 | 69,240 | 53,850 | 49,468 | 48,544 | 44,722 | 705,049 | 222,286 |
| 2009 | 42,937 | 32,782 | 25,946 | 44,503 | 49,211 | 67,342 | 58,493 | 50,883 | 46,044 | 43,841 | 43,519 | 35,350 | 540,851 | 161,056 |
| 2010 | 40,890 | 32,815 | 25,034 | 34,784 | 42,790 | 61,361 | 55,237 | 47,045 | 32,955 | 25,609 | 26,415 | 22,796 | 447,731 | 138,935 |
| 2011 | 26,165 | 22,405 | 19,429 | 23,926 | 28,786 | 42,014 | 36,251 | 31,236 | 27,166 | 23,170 | 24,166 | 22,863 | 327,577 | 94,726 |
| 2012 | 25,612 | 23,368 | 18,983 | 25,714 | 31,579 | 42,218 | 40,628 | 36,966 | 30,669 | 26,978 | 27,567 | 26,591 | 356,873 | 99,511 |
| 2013 | 28,929 | 27,636 | 23,243 | 26,921 | 35,042 | 47,293 | 48,212 | 43,856 | 34,436 | 33,230 | 33,797 | 31,802 | 414,397 | 109,256 |
| 2014 | 35,312 | 31,896 | 29,528 | 28,668 | 36,403 | 49,596 | 51,502 | 60,683 | 57,861 | 40,708 | 31,388 | 25,825 | 479,370 | 114,667 |
| 2015 | 26,450 | 24,641 | 25,019 | 21,514 | 24,376 | 29,791 | 29,750 | 31,576 | 29,303 | 28,388 | 30,239 | 30,286 | 331,333 | 75,681 |
| 2016 | 32,724 | 32,838 | 37,014 | 23,758 | 26,072 | 33,316 | 38,089 | 40,337 | 34,450 | 33,723 | 37,048 | 39,501 | 408,870 | 83,146 |
| 2017 | 46,184 | 47,211 | 43,251 | 31,576 | 18,754 | 12,195 | 11,127 | 14,519 | 16,087 | 18,187 | 22,288 | 22,537 | 303,916 | 62,525 |
| 2018 | 25,488 | 29,085 | 28,995 | 25,975 | 26,666 | 37,390 | 38,243 | 40,339 | 34,089 | 31,299 | 37,524 | 41,486 | 396,579 | 90,031 |
| 2019 | 51,005 | 51,857 | 50,751 | 47,979 | 66,883 | 92,833 | 99,273 | 132,856 | 94,902 | 71,978 | 50,684 | 40,507 | 851,508 | 207,695 |
| 2020 | 35,402 | 33,524 | 32,853 | 29,205 | 30,077 | 30,389 | 16,182 | 21,593 | 30,816 | 38,556 | 47,276 | 54,762 | 400,635 | 89,671 |
| 2021 | 69,048 | 69,169 | 71,141 | 75,316 | 97,643 | 169,216 | 173,699 | 172,654 | 178,649 | 200,658 | 196,514 | 185,515 | 1,659,222 | 342,175 |
| 2022 | 159,113 | 167,015 | 170,602 | 147,877 | 159,170 | 211,181 | 203,504 | 224,370 | 192,399 | 181,834 | 181,774 | 207,597 | 2,206,436 | 518,228 |
| 2023 | 205,134 | 207,680 | 222,018 | 129,513 | 130,521 | 163,672 | 183,921 | 171,382 | 99,538 | 132,642 | 181,054 | 218,763 | 2,045,838 | 423,706 |
| 2024 | 188,754 | 191,119 | 249,737 | 124,204 | 140,638 | 137,480 | | | | | | | 1,031,932 | 402,322 |
| | | | | | Q2 | 402,322 | | | | | | | | |
| 2014-2019 | 36,194 | 36,255 | 35,760 | 29,912 | 33,192 | 42,520 | 44,664 | 53,385 | 44,449 | 37,381 | 34,862 | 33,357 | | |
| | | | | | 2014-2019 avg Q2 | 105,624 | | | | | | | | |
| | | | | | | 3.80899573 | | | | | | | | |

Source: OHSS Persist March 2024.

Individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead released pending removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an IJ, a process that can take several years to conclude.
EOIR decisions completed in December 2023 were, on average, initiated in December 2020, during the significant operational disruptions caused by the COVID-19 pandemic (with encounters several months earlier than that); but 50 percent of EOIR cases initiated during that time were still pending as of December 2023, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of February 12, 2024

| | 1-Dec-23 | | | | | | |
|---|---|---|---|---|---|---|---|
| Cases completed December 2023 | Completed cases | Mean filed date | Median filed date | Difference- days | | Difference- years | |
| Total Completed | 19-Jan-29 | 19-Dec-20 | 21-Dec-21 | 1077 | 710 | 2.95 | 1.95 |
| FTP | 211 | 13-Jul-22 | 30-Sep-21 | 506 | 792 | 1.39 | 2.17 |
| Relief not on merits | 357 | 24-Oct-19 | 19-Nov-20 | 1499 | 1107 | 4.11 | 3.03 |
| Relief on merits | 4,153 | 30-Apr-19 | 18-Apr-19 | 1676 | 1688 | 4.59 | 4.62 |
| Removal Order | 18,678 | 19-Mar-22 | 28-Dec-22 | 622 | 338 | 1.70 | 0.93 |
| Removal Order - In Absentia | 12,844 | 4-Apr-22 | 11-Jan-23 | 606 | 324 | 1.66 | 0.89 |
| Removal Order - Not in Absentia | 5,834 | 12-Feb-22 | 28-Nov-22 | 657 | 368 | 1.80 | 1.01 |
| Terminated/Dismissal/Other | 23,205 | 26-Mar-20 | 14-May-20 | 1345 | 1296 | 3.68 | 3.55 |
| Voluntary Departure | 533 | 13-Feb-22 | 6-Apr-23 | 656 | 239 | 1.80 | 0.65 |

| Case outcomes by filing date | Dec-20 |
|---|---|
| Total Filed | 11,335 |
| Relief on merits[1] | 277 |
| Other relief[2] | 94 |
| Removal Order[3] | 2,612 |
| Absentia | 972 |
| Not in absentia | 1,640 |
| Voluntary Departure | 247 |
| Failure to Prosecute | 10 |
| Terminate/Dismiss/closure/other[4] | 2,438 |
| Pending Cases | 5,657 |
| Pending cases as a percentage of total filed c | 50% |

[1] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.
[2] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.
[3] Includes completion codes for removal order, withdrawal, abandonment, denial, and DHS negative fear decision affirmed.
[4] Includes completion codes for termination, dismissal, administrative closure, and other administrative completions.
Source: OHSS analysis of EOIR data as of February 12, 2024.

**EOIR Completions and Median Processing time by Year of Completion: Fiscal Years 2000 - 2024 YTD (Feb 2024)**

| MOST CURRENT OUTCOMES | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Completions** | **209,320** | **205,605** | **182,912** | **162,862** | **156,326** | **164,732** | **173,397** | **176,137** | **192,291** | **273,554** | **238,889** | **140,304** | **415,845** | **652,429** | **354,930** |
| *Median Processing Time (total)* | *70* | *85* | *175* | *355* | *313* | *354* | *479* | *326* | *385* | *260* | *215* | *1,054* | *1,138* | *933* | *662* |
| ***Median Processing Time (minus RO-IA)*** | ***46*** | ***59*** | ***140*** | ***365*** | ***344*** | ***436*** | ***522*** | ***347*** | ***360*** | ***296*** | ***303*** | ***1,112*** | ***1,297*** | ***1,177*** | ***805*** |
| Relief on merits1 | 28,330 | 29,774 | 28,838 | 26,686 | 22,317 | 19,636 | 19,161 | 21,213 | 25,116 | 32,923 | 25,276 | 19,314 | 38,204 | 47,468 | 20,604 |
| *Median Processing Time* | *690* | *710* | *787* | *838* | *937* | *991* | *1,053* | *1,038* | *1,196* | *1,118* | *983* | *1,486* | *1,505* | *1,510* | *1,454* |
| Other relief2 | 1,472 | 1,586 | 7,248 | 12,223 | 10,669 | 14,199 | 20,352 | 7,632 | 1,689 | 2,181 | 1,978 | 1,708 | 6,023 | 6,068 | 2,388 |
| *Median Processing Time* | *678* | *768* | *900* | *945* | *945* | *1,023* | *1,097* | *1,169* | *1,036* | *984* | *643* | *1,334* | *1,454* | *1,462* | *1,211* |
| | | | | | | | | | | | | | | | |
| Year-total completions | 0.2 | 0.2 | 0.5 | 1 | 0.9 | 1 | 1.3 | 0.9 | 1.1 | 0.7 | 0.6 | 2.9 | 3.1 | 2.6 | 1.8 |
| Year-Median Processing Time (minus RO-IA) | 0.1 | 0.2 | 0.4 | 1 | 0.9 | 1.2 | 1.4 | 1 | 1 | 1 | 1 | 3 | 3.6 | 3.2 | 2.2 |
| Year-Relief on merits | 1.9 | 1.9 | 2.2 | 2.3 | 2.6 | 2.7 | 2.9 | 2.8 | 3.3 | 3.1 | 2.7 | 4.1 | 4.1 | 4.1 | 4 |
| Years - other relief | 1.9 | 2.1 | 2.5 | 2.6 | 2.6 | 2.8 | 3 | 3.2 | 2.8 | 2.7 | 1.8 | 3.7 | 4 | 4 | 3.3 |

**EOIR Completions and Median Processing time by Year of Completion - excluding detained Population: Fiscal Years 2000 - 2024 YTD (Feb 2024)**

| MOST CURRENT OUTCOMES | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Completions** | **95,550** | **93,680** | **93,820** | **100,485** | **96,084** | **115,291** | **123,871** | **112,679** | **119,693** | **185,772** | **148,589** | **115,003** | **384,242** | **594,235** | **324,226** |
| *Median Processing Time (total)* | *447* | *525* | *657* | *723* | *742* | *644* | *751* | *751* | *788* | *605* | *434* | *1,377* | *1,239* | *1,127* | *757* |
| ***Median Processing Time (minus RO-IA)*** | ***552*** | ***615*** | ***747*** | ***828*** | ***908*** | ***887*** | ***910*** | ***973*** | ***1,085*** | ***959*** | ***890*** | ***1,447*** | ***1,419*** | ***1,332*** | ***1,134*** |
| Relief on merits1 | 25,011 | 25,874 | 24,969 | 22,809 | 18,655 | 16,112 | 16,075 | 17,541 | 21,236 | 27,725 | 20,502 | 17,948 | 37,296 | 46,135 | 19,988 |
| *Median Processing Time* | *784* | *799* | *879* | *953* | *1,054* | *1,135* | *1,212* | *1,202* | *1,329* | *1,329* | *1,240* | *1,569* | *1,535* | *1,541* | *1,498* |
| Other relief2 | 1,260 | 1,320 | 6,952 | 11,927 | 10,325 | 13,890 | 20,078 | 7,221 | 1,242 | 1,705 | 1,430 | 1,406 | 5,699 | 5,431 | 1,968 |
| *Median Processing Time* | *756* | *895* | *930* | *966* | *966* | *1,040* | *1,106* | *1,204* | *1,297* | *1,176* | *1,079* | *1,529* | *1,505* | *1,603* | *1,553* |
| | | | | | | | | | | | | | | | |
| Year-total completions | 1.2 | 1.4 | 1.8 | 2 | 2 | 1.8 | 2.1 | 2.1 | 2.2 | 1.7 | 1.2 | 3.8 | 3.4 | 3.1 | 2.1 |
| Year-Median Processing Time (minus RO-IA) | 1.5 | 1.7 | 2 | 2.3 | 2.5 | 2.4 | 2.5 | 2.7 | 3 | 3 | 2 | 4 | 3.9 | 3.6 | 3.1 |
| Year-Relief on merits | 2.1 | 2.2 | 2.4 | 2.6 | 2.9 | 3.1 | 3.3 | 3.3 | 3.6 | 3.6 | 3.4 | 4.3 | 4.2 | 4.2 | 4.1 |
| Years - other relief | 2.1 | 2.5 | 2.5 | 2.6 | 2.6 | 2.8 | 3 | 3.3 | 3.6 | 3.2 | 3 | 4.2 | 4.1 | 4.4 | 4.3 |
| | | | | | | | | | | | | | | | |
| | 13 | 15 | 16 | 12 | 14 | 10 | 9 | 14 | 13 | 12 | 7 | 11 | 3 | 6 | 3 |
| | 17 | 19 | 20 | 15 | 19 | 15 | 13 | 21 | 24 | 22 | 20 | 11 | 4 | 5 | 11 |
| | 3 | 3 | 3 | 4 | 4 | 5 | 5 | 5 | 4 | 7 | 9 | 3 | 1 | 1 | 1 |
| | 3 | 4 | 1 | 1 | 1 | 1 | 0 | 1 | 9 | 6 | 15 | 7 | 2 | 5 | 11 |



Notably, in FY 2023, when the immigration courts had a historic high number of case completions, the number of new cases far outnumbered those completions and led to a larger backlog—likely extending the length of time it will take individuals encountered and referred into section 240 removal proceedings to finish their immigration court process.
EOIR completed more than 520,000 cases in FY 2023 (a record number), but also had almost 1.2 million case receipts, resulting in a net increase of nearly 700,000 cases in its backlog. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* 1 (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2020/01/31/1_pending_new_receipts_and_total_completions.pdf; EOIR, *Adjudication Statistics: New Cases and Total Completions - Historical* (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf. OHSS estimates that 1.1 million of the nearly 1.2 million case receipts (95 percent) resulted from SWB encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
ADJUDICATION STATISTICS
Pending Cases,[1] New Cases, and Total Completions

| FY | Pending Cases at End of Fiscal Year | Initial Receipts[2] | Total Completions[3] |
|---|---|---|---|
| 2014 | 430,290 | 230,175 | 141,680 |
| 2015 | 460,266 | 193,005 | 143,644 |
| 2016 | 521,735 | 228,460 | 143,488 |
| 2017 | 656,394 | 295,263 | 183,079 |
| 2018 | 796,868 | 316,135 | 195,142 |
| 2019 | 1,088,586 | 547,310 | 277,081 |
| 2020 | 1,261,113 | 369,773 | 232,294 |
| 2021 | 1,408,871 | 244,287 | 115,920 |
| 2022 | 1,791,788 | 707,594 | 314,495 |
| 2023 | 2,471,618 | 1,208,222 | 524,926 |
| 2024 (First Quarter) | 2,780,777 | 462,416 | 152,540 |

Data Generated: January 18, 2024
[1] Pending cases equals removal, deportation, exclusion, asylum-only, and withholding only.
[2] Initial receipts equals removal, deportation, exclusion, asylum-only, and withholding only.
[3] Total completions equals initial case completions plus subsequent case completions.

CBP records that linked to EOIR

| | SW_BORDER | | | |
|---|---|---|---|---|
| CBP Record (Y/N) | 0 | **1** | | |
| CBP Record | 11,431 | **1,146,726** | 1,147,000 | 95% |
| No CBP Record | 49,222 | - | | |
| Total | 60,653 | **1,146,726** | 1,147,000 | |

Source: OHSS analysis of EOIR and CBP data data as of February 21, 2024.

Border encounters in the 1980s, 1990s, and 2000s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.
According to OHSS Persist data and historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 87 to over 99 percent of apprehensions between POEs of persons entering without inspection between 1981 and 2010. *See* OHSS Persist Dataset as of March 2024; *see, e.g.*, INS, *1981 Statistical Yearbook of the Immigration and Naturalization Service* 119 tbl. 53 (1981); INS, *1999 Statistical Yearbook of the Immigration and Naturalization Service* 208–11 tbl. 56 (Mar. 2002),

Apprehensions of EWIs by Citizenship

| | Mexico | All Other | Total | Mx% total |
|---|---|---|---|---|
| 1981 | 894,771 | 3,779 | 898,550 | 100% |
| 1982 | 870,806 | 31,657 | 902,463 | 96% |
| 1983 | 1,157,948 | 32,250 | 1,190,198 | 97% |
| 1984 | 1,159,101 | 37,252 | 1,196,353 | 97% |
| 1985 | 1,291,734 | 8,957 | 1,300,691 | 99% |
| 1986 | 1,661,997 | 58,324 | 1,720,321 | 97% |
| 1987 | 1,133,092 | 33,891 | 1,166,983 | 97% |
| 1988 | 943,147 | 42,332 | 985,479 | 96% |
| 1989 | 914,516 | 7,927 | 922,443 | 99% |
| 1990 | 1,080,699 | 50,755 | 1,131,454 | 96% |
| 1991 | 1,120,099 | 41,396 | 1,161,495 | 96% |
| 1992 | 1,193,455 | 32,538 | 1,225,993 | 97% |
| 1993 | 1,258,009 | 36,247 | 1,294,256 | 97% |
| 1994 | 1,029,039 | 35,029 | 1,064,068 | 97% |
| 1995 | 1,330,017 | 35,154 | 1,365,171 | 97% |
| 1996 | 1,586,492 | 33,541 | 1,620,033 | 98% |
| 1997 | 1,463,573 | 35,694 | 1,499,267 | 98% |
| 1998 | 1,598,903 | 28,845 | 1,627,748 | 98% |
| 1999 | 1,614,492 | 39,519 | 1,654,011 | 98% |
| 1981-1999 | 23,301,890 | 625,087 | 23,926,977 | 97% |
| 1981 - 200 | 28,887,711 | 814,421 | 29,702,132 | 97% |

Source: OIS Yearbook of Immigration Statistics, 1981-1999, "Deportable

USBP SWB Encounters by Selected Citizenship, FY2000-FY2023

| | Mexico | All Other | Total | Mexico Percent of Total | | | |
|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 25,738 | 1,566,421 | 98% | 4,221 | 71 | 4,292 |
| 2001 | 1,201,510 | 29,902 | 1,231,412 | 98% | 3,292 | 82 | 3,374 |
| 2002 | 902,042 | 28,299 | 930,341 | 97% | 2,471 | 78 | 2,549 |
| 2003 | 867,256 | 39,478 | 906,734 | 96% | 2,376 | 108 | 2,484 |
| 2004 | 1,074,330 | 65,917 | 1,140,247 | 94% | 2,943 | 181 | 3,124 |
| 2005 | 1,016,433 | 154,958 | 1,171,391 | 87% | 2,785 | 425 | 3,209 |
| 2006 | 973,826 | 98,150 | 1,071,976 | 91% | 2,668 | 269 | 2,937 |
| 2007 | 800,720 | 58,016 | 858,736 | 93% | 2,194 | 159 | 2,353 |
| 2008 | 653,065 | 51,984 | 705,049 | 93% | 1,789 | 142 | 1,932 |
| 2009 | 495,573 | 45,278 | 540,851 | 92% | 1,358 | 124 | 1,482 |
| 2010 | 396,819 | 50,912 | 447,731 | 89% | 1,087 | 139 | 1,227 |
| 2011 | 280,580 | 46,997 | 327,577 | 86% | 769 | 129 | 897 |
| 2012 | 262,341 | 94,532 | 356,873 | 74% | 719 | 259 | 978 |
| 2013 | 265,409 | 148,988 | 414,397 | 64% | 727 | 408 | 1,135 |
| 2014 | 226,770 | 252,600 | 479,370 | 47% | 621 | 692 | 1,313 |
| 2015 | 186,017 | 145,316 | 331,333 | 56% | 510 | 398 | 908 |
| 2016 | 190,760 | 218,110 | 408,870 | 47% | 523 | 598 | 1,120 |
| 2017 | 127,938 | 175,978 | 303,916 | 42% | 351 | 482 | 833 |
| 2018 | 152,257 | 244,322 | 396,579 | 38% | 417 | 669 | 1,087 |
| 2019 | 166,458 | 685,050 | 851,508 | 20% | 456 | 1,877 | 2,333 |
| 2020 | 253,104 | 147,531 | 400,635 | 63% | 693 | 404 | 1,098 |
| 2021 | 608,051 | 1,051,171 | 1,659,222 | 37% | 1,666 | 2,880 | 4,546 |
| 2022 | 738,780 | 1,467,656 | 2,206,436 | 33% | 2,024 | 4,021 | 6,045 |
| 2023 | 579,146 | 1,466,692 | 2,045,838 | 28% | 1,587 | 4,018 | 5,605 |
| 2024 Q1-Q2 | 304,540 | 727,392 | 1,031,932 | 30% | 834 | 1,993 | 2,827 |

OHSS Persist March 2024.

Beginning in the 2010s, a growing share of migrants were from northern Central America, and, since the late 2010s, from countries throughout the Americas.

According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. OHSS Persist Dataset March 2024. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID-19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for 3, CBP also completed a single-month record of approximately 302,000 encounters at and between POEs, almost one and a half times as many as the highest monthly number recorded prior to 2021 (approximately 209,000 in March 200

SWB USBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total | | Mexico | NCA | Other |
|---|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 | 2000 | 98% | 1% | 0% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | 2001 | 98% | 2% | 1% |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 | 2002 | 97% | 2% | 1% |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 | 2003 | 96% | 3% | 1% |
| 2004 | 1,074,130 | 51,462 | 14,655 | 1,140,247 | 2004 | 94% | 5% | 1% |
| 2005 | 1,016,433 | 112,683 | 42,275 | 1,171,391 | 2005 | 87% | 10% | 4% |
| 2006 | 973,826 | 87,664 | 10,486 | 1,071,976 | 2006 | 91% | 8% | 1% |
| 2007 | 800,720 | 51,617 | 6,399 | 858,736 | 2007 | 93% | 6% | 1% |
| 2008 | 653,065 | 45,397 | 6,587 | 705,049 | 2008 | 93% | 6% | 1% |
| 2009 | 495,573 | 38,643 | 6,635 | 540,851 | 2009 | 92% | 7% | 1% |
| 2010 | 396,819 | 42,185 | 8,727 | 447,731 | 2010 | 89% | 9% | 2% |
| 2011 | 280,580 | 39,220 | 7,777 | 327,577 | 2011 | 86% | 12% | 2% |
| 2012 | 262,341 | 86,705 | 7,827 | 356,873 | 2012 | 74% | 24% | 2% |
| 2013 | 265,409 | 137,548 | 11,440 | 414,397 | 2013 | 64% | 33% | 3% |
| 2014 | 226,770 | 237,860 | 14,740 | 479,370 | 2014 | 47% | 49.6% | 3% |
| 2015 | 186,017 | 133,528 | 11,788 | 331,333 | 2015 | 56% | 40% | 4% |
| 2016 | 190,760 | 199,401 | 18,709 | 408,870 | 2016 | 47% | 49% | 5% |
| 2017 | 127,938 | 162,891 | 13,087 | 303,916 | 2017 | 42% | 54% | 4% |
| 2018 | 152,257 | 223,604 | 20,718 | 396,579 | 2018 | 38% | 56% | 5% |
| 2019 | 166,458 | 607,774 | 77,276 | 851,508 | 2019 | 20% | 71% | 9% |
| 2020 | 253,104 | 103,816 | 43,715 | 400,635 | 2020 | 63% | 26% | 11% |
| 2021 | 608,051 | 683,896 | 367,275 | 1,659,222 | 2021 | 37% | 41% | 22% |
| 2022 | 738,780 | 520,602 | 947,054 | 2,206,436 | 2022 | 33% | 24% | 43% |
| 2023 | 579,146 | 447,273 | 1,019,419 | 2,045,838 | 2023 | 28% | 22% | 50% |
| 2024 Q2 | [illegible] | [illegible] | [illegible] | [illegible] | 2024 Q2 | [illegible] | [illegible] | 50% |
| | | | | | | | | |
| FY2010-20 | [illegible] | [illegible] | [illegible] | [illegible] | FY2010-20 | [illegible] | [illegible] | 2% |
| FY2014-20 | [illegible] | [illegible] | [illegible] | [illegible] | FY2014-20 | [illegible] | [illegible] | 6% |
| FY2021-20 | [illegible] | [illegible] | [illegible] | [illegible] | FY2021-20 | [illegible] | [illegible] | 41% |

[illegible]

[illegible]

SWB Total CBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total | | Mexico | NCA | Other |
|---|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 | 2000 | 98% | 1% | 0% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | 2001 | 98% | 2% | 1% |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 | 2002 | 97% | 2% | 1% |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 | 2003 | 96% | 3% | 1% |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 | 2004 | 94% | 4% | 2% |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 | 2005 | 87% | 9% | 4% |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 | 2006 | 91% | 8% | 2% |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 | 2007 | 92% | 6% | 2% |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 | 2008 | 92% | 6% | 2% |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 | 2009 | 91% | 6% | 2% |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 | 2010 | 89% | 8% | 3% |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 | 2011 | 86% | 10% | 4% |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 | 2012 | 74% | 21% | 5% |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 | 2013 | 65% | 29% | 6% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | 2014 | 50% | 44% | 6% |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 | 2015 | 57% | 32% | 11% |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 | 2016 | 46% | 41% | 13% |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 | 2017 | 44% | 45% | 11% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | 2018 | 43% | 50% | 8% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | 2019 | 24% | 64% | 12% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | 2020 | 65% | 23% | 12% |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 | 2021 | 38% | 40% | 22% |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 | 2022 | 34% | 23% | 43% |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 | 2023 | 29% | 20% | 51% |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 | 2024Q2 | 29% | 20% | 51% |
| | | | | | | | | |
| FY2010-20 | 361,490 | 78,216 | 21,352 | 461,057 | FY2010-20 | 78% | 17% | 5% |
| FY2014-20 | 239,257 | 281,231 | 60,557 | 581,045 | FY2014-20 | 41% | 48% | 10% |
| FY2021-20 | 641,739 | 501,447 | 839,342 | 1,982,528 | FY2021-20 | 32% | 25% | 42% |

[illegible]

| | | | |
|---|---|---|---|
| | | CBP | |
| Daily Avg | 2009-2020 | 1,463 | |
| Daily Avg | 2024Q2 | 306 | 4.8 |



Those encountered also have been more likely to seek asylum and other forms of relief or protection, straining the Departments' capacity to process individuals through expedited removal.
For noncitizens encountered at the SWB from FY 2014 to FY 2019 who were placed in expedited removal proceedings, roughly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination compared to roughly 57 percent of people from northern Central America and 90 percent of all other nationalities. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023

| ER fear claims 2014-2019 claiming fear by citizenship | |
|---|---|
| Mexico | 6% |
| NCA | 57% |
| Other | 90% |

Average number of SWB CFIs completed per week in 2014-2019: 1,444

% of all ER claiming fear in 2019: 44%

## Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims by Country

| MOST CURRENT OUTCOMES | TOTAL 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **471,989** | **359,453** | **438,908** | **336,791** | **439,776** | **878,156** | **416,485** | **1,578,628** | **2,187,156** | **2,051,374** | **615,642** |
| **T8 Encounters** | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | 1,109,854 | 1,488,394 | 615,642 |
| **Processed for Expedited Removal** | 228,049 | 180,592 | 227,911 | 160,305 | 214,667 | 223,200 | 91,719 | 84,687 | 119,665 | 207,197 | 82,719 |
| No fear claim[2] | 174,419 | 130,820 | 130,629 | 89,349 | 115,080 | 121,732 | 66,219 | 15,051 | 38,167 | 62,097 | 40,923 |
| No fear claim - confirmed removal or return | 166,051 | 129,846 | 127,921 | 86,688 | 110,087 | 118,756 | 63,698 | 10,956 | 28,260 | 53,931 | 28,823 |
| Reprocessed[3] | 4,893 | 3,321 | 4,379 | 2,167 | 4,081 | 3,366 | 1,664 | 20,618 | 31,503 | 10,255 | 9,312 |
| Confirmed removal or return | 1,006 | 1,012 | 819 | 418 | 669 | 607 | 650 | 415 | 507 | 363 | 83 |
| Credible fear claims[4] | 48,737 | 46,451 | 92,903 | 68,789 | 95,506 | 98,102 | 23,836 | 49,018 | 49,995 | 134,845 | 32,484 |
| Positive fear determinations | 35,051 | 33,972 | 73,871 | 53,666 | 74,438 | 70,879 | 8,462 | 33,710 | 28,362 | 81,147 | 16,170 |
| Negative fear determinations | 9,197 | 7,535 | 9,419 | 7,325 | 9,110 | 17,668 | 12,353 | 13,249 | 17,847 | 42,359 | 11,899 |
| Negative fear determinations appealed to EOIR | 7,348 | 6,260 | 7,629 | 5,898 | 6,745 | 14,295 | 9,729 | 12,812 | 16,798 | 34,582 | 10,038 |
| Negative fear determinations vacated by EOIR | 1,298 | 1,232 | 1,999 | 1,451 | 1,278 | 3,866 | 3,158 | 3,524 | 4,789 | 6,584 | 2,202 |
| Negative fear determinations upheld by EOIR | 6,050 | 5,028 | 5,630 | 4,447 | 5,467 | 10,429 | 6,571 | 9,288 | 12,009 | 27,998 | 7,836 |
| Case closures | 4,489 | 4,944 | 9,613 | 7,798 | 11,958 | 9,555 | 3,021 | 2,059 | 3,786 | 11,339 | 4,415 |
| Case closures referred to EOIR | 1,306 | 1,708 | 4,373 | 3,698 | 6,652 | 3,345 | 983 | 1,067 | 2,497 | 5,401 | 1,577 |
| Case closures not referred to EOIR | 3,183 | 3,236 | 5,240 | 4,100 | 5,306 | 6,210 | 2,038 | 992 | 1,289 | 5,938 | 2,838 |
| ER/CF claims not referred to EOIR[5] | 11,082 | 9,539 | 12,660 | 9,974 | 13,138 | 20,012 | 11,233 | 10,717 | 14,347 | 41,713 | 12,535 |
| Executed removal orders | 9,768 | 8,487 | 11,240 | 9,286 | 11,608 | 18,423 | 8,740 | 6,247 | 8,576 | 31,968 | 3,612 |
| ER CF claims referred to EOIR[6] | 37,655 | 36,912 | 80,243 | 58,815 | 82,368 | 78,090 | 12,603 | 38,301 | 35,648 | 93,132 | 19,949 |
| **EOIR Cases Started** | 37,277 | 36,616 | 78,712 | 57,168 | 77,810 | 72,182 | 11,871 | 32,470 | 29,132 | 77,135 | 13,747 |
| Still in EOIR proceedings[7] | 6,437 | 7,058 | 16,141 | 14,674 | 22,957 | 26,875 | 7,011 | 23,055 | 22,510 | 70,283 | 13,669 |
| EOIR case completion[8] | 30,840 | 29,558 | 62,571 | 42,494 | 54,853 | 45,307 | 4,860 | 9,415 | 6,622 | 6,852 | 78 |
| Failure to prosecute | 2 | 2 | 1 | 8 | 49 | 114 | 4 | 15 | 5 | 24 | 3 |
| Terminations / Dismissals[9] | 7,025 | 6,498 | 15,819 | 12,881 | 17,335 | 16,323 | 1,593 | 3,627 | 980 | 954 | 9 |
| Asylum granted or other EOIR relief from removal[10] | 6,581 | 6,598 | 11,156 | 6,936 | 8,924 | 7,365 | 1,477 | 1,417 | 894 | 447 | 3 |
| Relief on merits[11] | 4,874 | 5,815 | 9,731 | 6,055 | 8,040 | 6,393 | 1,117 | 1,217 | 760 | 302 | - |
| Relief not on merits[12] | 1,707 | 783 | 1,425 | 881 | 884 | 972 | 360 | 200 | 134 | 145 | 3 |
| Removal orders[13] | 17,232 | 16,460 | 35,595 | 22,669 | 28,545 | 21,505 | 1,786 | 4,356 | 4,743 | 5,427 | 63 |
| In absentia | 7,095 | 5,386 | 13,034 | 9,329 | 13,907 | 6,682 | 444 | 2,759 | 3,131 | 2,952 | 9 |
| Executed removal orders | 857 | 549 | 1,063 | 741 | 761 | 378 | 34 | 71 | 94 | 52 | - |
| Not in absensia | 10,137 | 11,074 | 22,561 | 13,340 | 14,638 | 14,823 | 1,342 | 1,597 | 1,612 | 2,475 | 54 |
| Executed removal orders | 4,951 | 4,651 | 6,591 | 5,495 | 6,734 | 10,206 | 601 | 324 | 662 | 1,478 | 13 |
| Appeals to BIA | 4,854 | 5,943 | 13,874 | 7,435 | 7,111 | 4,501 | 571 | 575 | 463 | 279 | - |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 450 | 460 | 746 | 516 | 430 | 470 | 128 | 46 | 45 | 34 | - |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 4,404 | 5,483 | 13,128 | 6,919 | 6,681 | 4,031 | 443 | 529 | 418 | 245 | - |

| MOST CURRENT OUTCOMES | MEXICO 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **260,781** | **230,784** | **231,342** | **155,356** | **188,247** | **206,191** | **269,504** | **617,043** | **753,002** | **608,786** | **163,088** |
| **T8 Encounters** | 260,781 | 230,784 | 231,342 | 155,356 | 188,247 | 206,191 | 123,569 | 45,285 | 76,124 | 267,674 | 163,088 |
| **Processed for Expedited Removal** | 121,730 | 111,583 | 109,033 | 68,895 | 86,918 | 84,703 | 53,540 | 8,970 | 19,175 | 30,454 | 12,270 |
| No fear claim[2] | 115,786 | 103,363 | 100,320 | 64,495 | 79,040 | 79,899 | 47,203 | 8,315 | 18,364 | 25,966 | 8,732 |
| No fear claim - confirmed removal or return | 115,454 | 103,156 | 100,132 | 64,335 | 78,879 | 79,845 | 47,152 | 8,255 | 18,258 | 25,792 | 8,641 |
| Reprocessed[3] | 980 | 1,446 | 1,093 | 448 | 1,847 | 393 | 409 | 153 | 288 | 509 | 1,036 |
| Confirmed removal or return | 449 | 601 | 346 | 144 | 319 | 178 | 116 | 35 | 58 | 79 | 20 |
| Credible fear claims[4] | 4,964 | 6,774 | 7,620 | 3,952 | 6,031 | 4,411 | 5,928 | 502 | 523 | 3,979 | 2,502 |
| Positive fear determinations | 3,114 | 3,771 | 4,936 | 2,761 | 3,813 | 1,830 | 1,306 | 214 | 198 | 1,897 | 983 |
| Negative fear determinations | 983 | 1,544 | 1,153 | 435 | 962 | 1,347 | 3,573 | 200 | 215 | 1,453 | 985 |
| Negative fear determinations appealed to EOIR | 770 | 1,136 | 871 | 335 | 648 | 837 | 2,124 | 158 | 177 | 993 | 657 |
| Negative fear determinations vacated by EOIR | 58 | 105 | 146 | 74 | 74 | 75 | 476 | 31 | 46 | 226 | 75 |
| Negative fear determinations upheld by EOIR | 712 | 1,031 | 725 | 261 | 574 | 762 | 1,648 | 127 | 131 | 767 | 582 |
| Case closures | 867 | 1,459 | 1,531 | 756 | 1,256 | 1,234 | 1,049 | 88 | 110 | 629 | 534 |
| Case closures referred to EOIR | 96 | 172 | 312 | 97 | 97 | 95 | 171 | 7 | 7 | 165 | 102 |
| Case closures not referred to EOIR | 771 | 1,287 | 1,219 | 659 | 1,159 | 1,139 | 878 | 81 | 103 | 464 | 432 |
| ER/CF claims not referred to EOIR[5] | 1,696 | 2,726 | 2,226 | 1,020 | 2,047 | 2,411 | 3,975 | 250 | 272 | 1,691 | 1,342 |
| Executed removal orders | 1,416 | 2,340 | 2,015 | 999 | 1,993 | 2,329 | 3,347 | 219 | 228 | 1,434 | 579 |
| ER CF claims referred to EOIR[6] | 3,268 | 4,048 | 5,394 | 2,932 | 3,984 | 2,000 | 1,953 | 252 | 251 | 2,288 | 1,160 |
| **EOIR Cases Started** | 3,244 | 4,003 | 5,258 | 2,843 | 3,805 | 1,923 | 1,711 | 208 | 225 | 1,956 | 854 |
| Still in EOIR proceedings[7] | 389 | 636 | 1,039 | 686 | 862 | 622 | 1,067 | 119 | 133 | 1,700 | 840 |
| EOIR case completion[8] | 2,855 | 3,367 | 4,219 | 2,157 | 2,943 | 1,301 | 644 | 89 | 92 | 256 | 14 |
| Failure to prosecute | - | 1 | - | 2 | 3 | 6 | - | 1 | - | - | 1 |
| Terminations / Dismissals[9] | 853 | 935 | 1,077 | 591 | 638 | 262 | 275 | 30 | 15 | 18 | - |
| Asylum granted or other EOIR relief from removal[10] | 366 | 379 | 400 | 218 | 233 | 86 | 29 | 5 | 9 | 8 | - |
| Relief on merits[11] | 212 | 263 | 280 | 163 | 199 | 57 | 15 | - | 1 | 5 | - |
| Relief not on merits[12] | 154 | 116 | 120 | 55 | 34 | 29 | 14 | 5 | 8 | 3 | - |
| Removal orders[13] | 1,636 | 2,052 | 2,742 | 1,346 | 2,069 | 947 | 340 | 53 | 68 | 230 | 13 |
| In absentia | 570 | 592 | 917 | 545 | 625 | 168 | 121 | 11 | 28 | 51 | 1 |
| Executed removal orders | 99 | 83 | 124 | 69 | 59 | 17 | 4 | 1 | 1 | 5 | - |
| Not in absensia | 1,066 | 1,460 | 1,825 | 801 | 1,444 | 779 | 219 | 42 | 40 | 179 | 12 |
| Executed removal orders | 618 | 845 | 1,032 | 483 | 1,083 | 682 | 164 | 29 | 29 | 157 | 10 |
| Appeals to BIA | 509 | 634 | 678 | 301 | 353 | 119 | 37 | 15 | 9 | 5 | - |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 25 | 30 | 34 | 25 | 11 | 9 | 3 | 3 | 3 | - | - |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 484 | 604 | 644 | 276 | 342 | 110 | 34 | 12 | 6 | 5 | - |

| MOST CURRENT OUTCOMES | NORTHERN CENTRAL AMERICA 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **192,855** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **T8 Encounters** | 192,855 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Processed for Expedited Removal** | 94,089 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim[2] | 57,204 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim - confirmed removal or return | 49,433 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Reprocessed[3] | 3,424 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Confirmed removal or return | 397 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Credible fear claims[4] | 33,461 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Positive fear determinations | 23,168 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations | 7,279 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations appealed to EOIR | 5,751 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations vacated by EOIR | 1,063 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations upheld by EOIR | 4,688 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures | 3,014 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures referred to EOIR | 811 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures not referred to EOIR | 2,203 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER/CF claims not referred to EOIR[5] | 8,419 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | 7,516 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER CF claims referred to EOIR[6] | 25,042 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **EOIR Cases Started** | 24,797 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Still in EOIR proceedings[7] | 4,614 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR case completion[8] | 20,183 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Failure to prosecute | 2 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Terminations / Dismissals[9] | 4,884 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Asylum granted or other EOIR relief from removal[10] | 3,190 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief on merits[11] | 2,003 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief not on merits[12] | 1,187 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Removal orders[13] | 12,107 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| In absentia | 4,826 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | 513 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Not in absensia | 7,281 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | 3,618 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Appeals to BIA | 3,283 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 278 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 3,005 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| MOST CURRENT OUTCOMES | ALL OTHERS 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **T8 Encounters** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Processed for Expedited Removal** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim[2] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim - confirmed removal or return | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Reprocessed[3] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Confirmed removal or return | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Credible fear claims[4] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Positive fear determinations | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations appealed to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations vacated by EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations upheld by EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures referred to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures not referred to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER/CF claims not referred to EOIR[5] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER CF claims referred to EOIR[6] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **EOIR Cases Started** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Still in EOIR proceedings[7] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR case completion[8] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Failure to prosecute | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Terminations / Dismissals[9] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Asylum granted or other EOIR relief from removal[10] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief on merits[11] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief not on merits[12] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Removal orders[13] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| In absentia | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Not in absensia | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Appeals to BIA | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

- Represents zero.
[1] Includes SW Border encounters by USBP and OFO. Excludes Unaccompanied Children (UC), Accompanied Minors (AM), OFO administrative encounters, and parolees released into the United States with Notice to Appear and a CBP One confirmation number, none of whom are amenable to expedited removal.
[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data.
[3] Fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed by ICE into other dispositions.
[4] Individuals placed in ER and found to have a Credible Fear (CF) case in USCIS APSO system.
[5] Negative CF interviews not appealed to Executive Office for Immigration Review (EOIR), negative CF interviews affirmed by EOIR, and case closures not referred to EOIR. Cases result in final ER removal orders.
[6] USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.
[7] Cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, zero bond, BIA appeal, or decision rescinded.
[8] Cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.
[9] Completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.
[10] Completion codes for conditional grants of asylum, grants of asylum, adjustment of status under various statutory provisions, asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, and cancellation of removal.
[11] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.
[12] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.
[13] Completion codes for removal order, grant of voluntary departure, withdrawal of fear claim, abandonment, and denial.
Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.
Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of December 31, 2023.

From FY 2017 to FY 2019, however, encounters between the POEs along the SWB more than doubled, to more than 850,000, and—following a significant drop during the beginning of the COVID-19 pandemic—continued to increase in FY 2021 and FY 2022 OHSS analysis of March 2024 OHSS Persist Dataset

SWB Encounters by Agency, FY 2013 - FY2014- YTD (March)

| Row Label OFO | | USBP | Grand Total |
|---|---|---|---|
| 2013 | 75215 | 414397 | 489612 |
| 2014 | 90678 | 479370 | 570048 |
| 2015 | 113523 | 331333 | 444856 |
| 2016 | 150121 | 408870 | 558991 |
| 2017 | 111283 | 303916 | 415199 |
| 2018 | 123365 | 396579 | 519944 |
| 2019 | 125721 | 851508 | 977229 |
| 2020 | 57431 | 400635 | 458066 |
| 2021 | 75477 | 1659222 | 1734699 |
| 2022 | 172508 | 2206436 | 2378944 |
| 2023 | 429831 | 2045838 | 2475669 |
| 2024 | 308867 | 1031932 | 1340799 |

Source: March 2024 Persist Dataset

IFR_AR_007455

.

IFR_AR_007456

In FY 2021, USBP encounters between POEs along the SWB reached a level not seen since the early 2000s—over 1.6 million. OHSS analysis of March 2024 OHSS Persist Dataset

SWB Encounters by Agency, FY 2013 - FY2014- YTD (March)

| Row Label | OFO | USBP | Grand Total |
|---|---|---|---|
| 2013 | 75215 | 414397 | 489612 |
| 2014 | 90678 | 479370 | 570048 |
| 2015 | 113523 | 331333 | 444856 |
| 2016 | 150121 | 408870 | 558991 |
| 2017 | 111283 | 303916 | 415199 |
| 2018 | 123365 | 396579 | 519944 |
| 2019 | 125721 | 851508 | 977229 |
| 2020 | 57431 | 400635 | 458066 |
| 2021 | 75477 | 1659222 | 1734699 |
| 2022 | 172508 | 2206436 | 2378944 |
| 2023 | 429831 | 2045838 | 2475669 |
| 2024 | 308867 | 1031932 | 1340799 |

Source: March 2024 Persist Dataset

In FY 2022, encounters at the SWB reached a new high-water mark, with total USBP encounters exceeding 2.2 million. OHSS analysis of March 2024 OHSS Persist Dataset

SWB Encounters by Agency, FY 2013 - FY2014- YTD (March)

| Row Label | OFO | USBP | Grand Total |
|---|---|---|---|
| 2013 | 75215 | 414397 | 489612 |
| 2014 | 90678 | 479370 | 570048 |
| 2015 | 113523 | 331333 | 444856 |
| 2016 | 150121 | 408870 | 558991 |
| 2017 | 111283 | 303916 | 415199 |
| 2018 | 123365 | 396579 | 519944 |
| 2019 | 125721 | 851508 | 977229 |
| 2020 | 57431 | 400635 | 458066 |
| 2021 | 75477 | 1659222 | 1734699 |
| 2022 | 172508 | 2206436 | 2378944 |
| 2023 | 429831 | 2045838 | 2475669 |
| 2024 | 308867 | 1031932 | 1340799 |

Source: March 2024 Persist Dataset

FY 2023 saw a slight drop, but USBP encounters remained high—over 2.0 million.

OHSS analysis of March 2024 OHSS Persist Dataset

SWB Encounters by Agency, FY 2013 - FY2014- YTD (March)

| Row Labels | OFO | USBP | Grand Total |
|------------|-------|---------|-------------|
| 2013 | 75215 | 414397 | 489612 |
| 2014 | 90678 | 479370 | 570048 |
| 2015 | 113523 | 331333 | 444856 |
| 2016 | 150121 | 408870 | 558991 |
| 2017 | 111283 | 303916 | 415199 |
| 2018 | 123365 | 396579 | 519944 |
| 2019 | 125721 | 851508 | 977229 |
| 2020 | 57431 | 400635 | 458066 |
| 2021 | 75477 | 1659222 | 1734699 |
| 2022 | 172508 | 2206436 | 2378944 |
| 2023 | 429831 | 2045838 | 2475669 |
| 2024 | 308867 | 1031932 | 1340799 |

Source: March 2024 Persist Dataset

By early 2023, while the Title 42 public health Order was in place, total encounters at the SWB—referring to the number of times U.S. officials encountered noncitizens attempting to cross the SWB without authorization to do so either between or at POEs—had reached all-time highs. During the initial 7 months of FY 2023, while the Title 42 public health Order was still in effect, total CBP encounters surged to an all-time high of 1.4 million—an 11 percent increase over the same period in FY 2022 and nearly double the encounters recorded in FY 2021 for the same time period.

SWB Total Encounters

| Row Label | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 34847 | 33159 | 29077 | 32485 | 40636 | 54010 | 54771 | 50500 | 40790 | 40006 | 41125 | 38206 | 489612 |
| 2014 | 41835 | 38692 | 36707 | 35200 | 42473 | 57548 | 59383 | 69033 | 66572 | 48833 | 39766 | 34006 | 570048 |
| 2015 | 35903 | 33024 | 34231 | 30179 | 32554 | 39162 | 38299 | 40684 | 38620 | 38610 | 42419 | 41171 | 444856 |
| 2016 | 45245 | 45387 | 48393 | 33396 | 38068 | 45779 | 48271 | 54987 | 45168 | 46658 | 51569 | 56070 | 558991 |
| 2017 | 66707 | 63366 | 58416 | 42458 | 23555 | 16592 | 15768 | 19940 | 21657 | 25014 | 30569 | 31157 | 415199 |
| 2018 | 34842 | 39031 | 40476 | 35865 | 36690 | 50213 | 51019 | 51790 | 43096 | 40005 | 46551 | 50366 | 519944 |
| 2019 | 60775 | 62463 | 60789 | 58313 | 76543 | 103730 | 109413 | 144113 | 104310 | 81748 | 62608 | 52424 | 977229 |
| 2020 | 45139 | 42642 | 40563 | 36583 | 36686 | 34457 | 17106 | 23237 | 33029 | 40949 | 50007 | 57668 | 458066 |
| 2021 | 71943 | 72113 | 73994 | 78414 | 101098 | 173277 | 178795 | 180597 | 189034 | 213593 | 209840 | 192001 | 1734699 |
| 2022 | 164837 | 174845 | 179253 | 154874 | 166010 | 222574 | 235785 | 241136 | 207834 | 200162 | 204087 | 227547 | 2378944 |
| 2023 | 231529 | 235173 | 252315 | 157358 | 156630 | 193249 | 211992 | 206690 | 144556 | 183479 | 232963 | 269735 | 2475669 |
| 2024 | 240932 | 242413 | 301980 | 176189 | 189914 | 189371 | | | | | | | 1340799 |
| | 1074534 | 1082308 | 1156194 | 871314 | 940857 | 1179962 | 1020602 | 1082707 | 934666 | 959057 | 1011504 | 1050351 | 12364056 |

Source: March 2024 Persist Dataset

| 92% |
| 11% |

| 1,438,246 |

IFR_AR_007461

This dramatic increase in encounters has coincided with a substantial and—setting aside the period of time when the Title 42 public health Order was in effect—persistent increase in the number of noncitizens making fear claims in recent years.
The percentage of noncitizens encountered at and between SWB POEs processed for expedited removal who made fear claims steadily rose from 16 percent in FY 2013 to 44 percent in FY 2019, experienced a temporary dip in FY 2020 at the start of the Title 42 public health Order, and then resumed an upward trajectory, reaching a peak [illegible]

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims**

| MOST CURRENT OUTCOMES | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | | | | | | | | | | |
| **Total Encounters**[1] | 436,363 | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 416,485 | 1,578,617 | 2,187,157 | 2,051,375 |
| **T8 Encounters** | 436,363 | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | 1,109,855 | 1,488,395 |
| **Processed for Expedited Removal** | 229,838 | 228,049 | 180,592 | 227,911 | 160,305 | 214,667 | 223,200 | 91,719 | 84,687 | 119,665 | 206,882 |
| **Percent ER** | 53% | 48% | 50% | 52% | 48% | 49% | 25% | 41% | 16% | 11% | 14% |
| No fear claim[2] | 191,236 | 174,341 | 130,807 | 130,674 | 89,374 | 115,065 | 121,707 | 66,196 | 15,041 | 38,168 | 63,090 |
| No Fear Claim - confirmed removal or return | 183,573 | 166,172 | 129,908 | 127,971 | 86,696 | 110,033 | 118,720 | 63,643 | 10,881 | 28,090 | 48,872 |
| Reprocessed[3] | 2,611 | 4,958 | 3,398 | 4,538 | 2,209 | 3,984 | 3,227 | 1,581 | 20,664 | 31,481 | 21,463 |
| Confirmed removal or return | 531 | 905 | 819 | 867 | 408 | 526 | 442 | 554 | 271 | 350 | 215 |
| Credible fear claims[4] | 35,991 | 48,750 | 46,387 | 92,699 | 68,722 | 95,618 | 98,266 | 23,942 | 48,982 | 50,016 | 122,329 |
| Percent Claiming fear | 16% | 21% | 26% | 41% | 43% | 45% | 44% | 26% | 58% | 42% | 59% |
| Positive fear determinations | 30,771 | 35,039 | 33,890 | 73,579 | 53,517 | 74,502 | 70,957 | 8,490 | 33,751 | 28,398 | 74,623 |
| Negative fear determinations | 2,642 | 9,120 | 7,522 | 9,387 | 7,301 | 9,132 | 17,707 | 12,406 | 13,267 | 17,865 | 39,455 |
| Negative fear determinations appealed to EOIR | 2,383 | 7,270 | 6,245 | 7,598 | 5,871 | 6,750 | 14,307 | 9,755 | 12,821 | 16,809 | 31,959 |
| Negative fear determinations vacated by EOIR | 228 | 1,269 | 1,225 | 1,995 | 1,446 | 1,277 | 3,842 | 3,114 | 3,439 | 4,697 | 5,618 |
| Negative fear determinations upheld by EOIR | 2,155 | 6,001 | 5,020 | 5,603 | 4,425 | 5,473 | 10,465 | 6,641 | 9,382 | 12,112 | 26,341 |
| Case closures | 2,578 | 4,591 | 4,975 | 9,733 | 7,904 | 11,984 | 9,602 | 3,046 | 1,964 | 3,753 | 8,251 |
| Case closures referred to EOIR | 964 | 1,547 | 1,810 | 4,627 | 3,844 | 6,604 | 3,322 | 962 | 956 | 2,415 | 2,985 |
| Case closures not referred to EOIR | 1,614 | 3,044 | 3,165 | 5,106 | 4,060 | 5,380 | 6,280 | 2,084 | 1,008 | 1,338 | 5,266 |
| ER CF claims not referred to EOIR[5] | 4,028 | 10,895 | 9,462 | 12,498 | 9,915 | 13,235 | 20,145 | 11,376 | 10,836 | 14,506 | 39,103 |
| Executed Removal Orders | 3,601 | 9,701 | 8,423 | 11,055 | 9,226 | 11,648 | 18,490 | 8,729 | 6,219 | 8,537 | 25,628 |
| ER CF claims referred to EOIR[6] | 31,963 | 37,855 | 36,925 | 80,201 | 58,807 | 82,383 | 78,121 | 12,566 | 38,146 | 35,510 | 83,226 |
| **EOIR cases started** | 31,641 | 37,426 | 36,544 | 78,512 | 57,006 | 77,599 | 71,612 | 11,689 | 30,827 | 28,403 | 62,216 |
| Still in EOIR Proceedings | 4,560 | 6,312 | 6,928 | 16,782 | 15,544 | 25,121 | 27,620 | 6,445 | 22,507 | 22,171 | 58,077 |
| | 14% | 17% | 19% | 21% | 27% | 32% | 39% | 55% | 73% | | |
| EOIR Cases completed | 27,081 | 31,114 | 29,616 | 61,730 | 41,462 | 52,478 | 43,992 | 5,244 | 8,320 | 6,232 | 4,139 |
| Terminations / Dismissals / Other | 5,802 | 6,955 | 6,412 | 14,896 | 11,880 | 15,803 | 15,471 | 1,766 | 3,257 | 857 | 503 |
| Asylum granted or other EOIR relief from removal | 6,901 | 6,435 | 6,388 | 10,619 | 6,509 | 8,376 | 6,825 | 1,357 | 1,087 | 710 | 315 |
| Removal Orders | 14,378 | 17,724 | 16,816 | 36,215 | 23,073 | 28,299 | 21,696 | 2,121 | 3,976 | 4,665 | 3,321 |
| In Absentia | 7,531 | 7,278 | 5,539 | 13,244 | 9,441 | 13,614 | 6,535 | 542 | 2,633 | 3,057 | 1,597 |
| Executed Removal Orders | 987 | 814 | 515 | 988 | 636 | 659 | 321 | 32 | 61 | 78 | 22 |
| Not in Absentia | 6,847 | 10,446 | 11,277 | 22,971 | 13,632 | 14,685 | 15,161 | 1,579 | 1,343 | 1,608 | 1,724 |
| Executed Removal Orders | 3,410 | 5,023 | 4,687 | 6,634 | 5,655 | 6,823 | 10,569 | 734 | 321 | 742 | 976 |
| Appeals to BIA | 3,021 | 5,136 | 6,227 | 14,520 | 7,753 | 7,361 | 4,782 | 687 | 484 | 409 | 163 |
| Grants of relief + other favorable-to-noncitizen jud | 243 | 422 | 419 | 686 | 469 | 396 | 456 | 121 | 36 | 36 | 22 |
| EOIR Removal Orders + other favorable-to-OPL | 2,778 | 4,714 | 5,808 | 13,834 | 7,284 | 6,965 | 4,326 | 566 | 448 | 373 | 141 |
| | 8% | 10% | 13% | 21% | 20% | 22% | 11% | 11% | 9% | 5% | 8% |

- Represents zero.
[1] Excludes Unaccompanied Children (UC), Accompanied Minors (AM), OFO administrative encounters, and parolees released into the United States with Notice to Appear and a CBP One confirmation number, none of whom are amenable to expedited removal. Exclusions made up 13 percent of total encounters between FY2013 and FY2023 Q4.
[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed with other dispositions in ICE custody.
[3] Fear claim in CBP custody but no associated record of a fear claim in USCIS APSO data; case results in an ER removal order.
[4] Based on USCIS APSO clock-ins.
[5] Includes fear claims withdrawn prior to a credible fear interview, negative CF interviews not appealed to EOIR, negative CF interviews upheld by EOIR, and case closures not referred to EOIR. Cases result in final ER removal orders.
[illegible]

| Year | Encounter | SWB Encounter | SWB T8 encoun | SWB CBP encou | SWB CBP ER & | Total APSO C[illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 1,590,196 | 1,566,325 | 1,566,325 | 1,566,325 | N/A | [illegible] | | | | | | |
| 2001 | 1,255,843 | 1,231,359 | 1,231,359 | 1,231,359 | N/A | [illegible] | | | | | | |
| 2002 | 953,629 | 930,293 | 930,293 | 930,293 | N/A | [illegible] | | | | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 906,694 | N/A | [illegible] | | | | | | |
| 2004 | 1,330,801 | 1,211,633 | 1,211,633 | 1,211,633 | N/A | [illegible] | | | | | | |
| 2005 | 1,440,160 | 1,269,176 | 1,269,176 | 1,269,247 | 81,450 | [illegible] | | | | | | |
| 2006 | 1,296,708 | 1,168,340 | 1,168,340 | 1,168,358 | 95,132 | [illegible] | | | | | | |
| 2007 | 1,078,811 | 954,907 | 954,907 | 954,928 | 92,551 | [illegible] | | | | | | |
| 2008 | 946,642 | 792,535 | 792,535 | 792,553 | 107,684 | [illegible] | | | | | | |
| 2009 | 779,816 | 619,010 | 619,010 | 619,123 | 103,107 | [illegible] | | | | | | |
| 2010 | 692,904 | 527,372 | 527,372 | 527,419 | 111,935 | [illegible] | | | | | | |
| 2011 | 553,597 | 401,073 | 401,073 | 401,073 | 125,101 | [illegible] | | | | | | |
| 2012 | 560,572 | 426,125 | 426,125 | 426,125 | 175,319 | [illegible] | | | | | | |
| 2013 | 626,412 | 489,612 | 489,612 | 489,612 | 230,003 | [illegible] | | | | | | |
| 2014 | 711,667 | 570,048 | 570,048 | 570,048 | 228,263 | [illegible] | | | | | | |
| 2015 | 591,831 | 444,856 | 444,856 | 444,856 | 180,682 | [illegible] | | | | | | |
| 2016 | 690,433 | 558,991 | 558,991 | 558,991 | 228,020 | [illegible] | | | | | | |
| 2017 | 526,807 | 415,199 | 415,199 | 415,199 | 160,401 | [illegible] | | | | | | |
| 2018 | 626,035 | 519,944 | 519,944 | 519,944 | 214,820 | [illegible] | | | | | | |
| 2019 | 1,084,644 | 977,229 | 977,229 | 977,229 | 223,314 | [illegible] | | | | | | |
| 2020 | 561,718 | 458,082 | 253,292 | 458,066 | 91,770 | 39,524 | 23,942 | | 20% | 26% | 9% | |
| 2021 | 1,828,981 | 1,734,685 | 671,159 | 1,734,699 | 84,707 | 64,244 | 48,982 | | 5% | 58% | 7% | |
| 2022 | 2,617,845 | 2,378,944 | 1,299,437 | 2,378,944 | 119,677 | 75,264 | 50,016 | | 5% | 42% | 4% | |
| 2023 | 2,752,822 | 2,475,669 | 1,910,905 | 2,475,669 | 207,344 | 160,868 | 122,329 | | 8% | 59% | 6% | |
| 2013-2019[4] | | | | | | | 577,532 | 486,433 | 84% | | | |

[illegible]

From May 2023 through March 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 169,000 fear claims out of 315,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE). OHSS analysis of this pulled from CBP UIP on April 2, 2024

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| SW Border Encounters | 1,694,114 |
| Processed for ER | 316,288 |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | **120,709** |
| Credible fear referrals | 46,626 |
| CFIs conducted | 45,522 |
| **CFI results** | **45,086** |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,481 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| **CBP repatriations** | **95,437** |
| No fear claim ER removals | 78,040 |
| Negative fear; no IJ review | 19 |
| Negative fear; IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | **195,579** |
| Reprocessed with other dispositions | 836 |
| **ER processed by ICE non-detained** | **87,760** |
| **ER processed in ICE Custody** | **106,983** |
| Credible fear referrals | 93,630 |
| CFIs conducted | 84,045 |
| **CFI results** | **82,016** |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,839 |
| Admin closed without CFI | 7,179 |
| **ICE removals (REPATRIATIONS)** | **29,926** |
| No fear claim ER removals | 4,368 |
| Negative fear; no IJ review | 4 |
| Negative fear; IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | **87,760** |
| Credible fear referrals | 28,590 |
| CFIs conducted | 22,519 |
| **CFI results** | **21,229** |
| Positive fear finding | 13,609 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,112 |
| Vacated | 1,872 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| **ICE removals (REPATRIATIONS)** | **36,803** |
| No fear claim ER removals | 34,600 |
| Negative fear; no IJ review | 0 |
| Negative fear; IJ affirmed | 1,893 |
| Other | 310 |

5/12/2023
3/31/2024

524 Days in May 12, 2023 - Mar. 31, 2024

Daily Averages

| | | |
|---|---|---|
| Total ER (excluding cases reprocessed out of ER) | 315,452 | 974 |
| Total fear referrals | 168,846 | 521.1258 |
| Total CFIs | 152,086 | 469.4012 |
| Claimed Fear | 54% | |
| CFI conducted | 48% | |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of USP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007464





Much of this growth in encounters was driven by nationalities that DHS had never before encountered in large numbers at the border—including nationals of countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela, as well as migrants from Eastern Hemisphere countries.
Nationals from all other countries other than Mexico and the northern Central American countries accounted for less than 5 percent of total CBP SWB encounters each year between FY 1981 and FY 2010, an average of 5 percent of SWB encounters from FY 2010 to FY 2013, and for 10 percent of total SWB encounters from FY 2014 to FY 2019. The increase in encounters from these new countries of origin has accelerated since the start of FY 2021, as non-Mexican/non-northern Central American countries accounted for 42 percent of encounters from the start of FY 2021 through the second quarter of FY 2024, including 51 percent of FY 2024 encounters through March 2024.

Apprehensions of EWIs by Citizenship

| | Mexico | All Other | Total | of SWB Encounters |
|---|---|---|---|---|
| 1981 | 894,771 | 3,779 | 898,550 | 0% |
| 1982 | 870,806 | 31,657 | 902,463 | 4% |
| 1983 | ####### | 32,250 | ####### | 3% |
| 1984 | ####### | 37,252 | ####### | 3% |
| 1985 | ####### | 8,957 | ####### | 1% |
| 1986 | ####### | 58,324 | ####### | 3% |
| 1987 | ####### | 33,891 | ####### | 3% |
| 1988 | 943,147 | 42,332 | 985,479 | 4% |
| 1989 | 914,516 | 7,927 | 922,443 | 1% |
| 1990 | ####### | 50,755 | ####### | 4% |
| 1991 | ####### | 41,396 | ####### | 4% |
| 1992 | ####### | 32,538 | ####### | 3% |
| 1993 | ####### | 36,247 | ####### | 3% |
| 1994 | ####### | 35,029 | ####### | 3% |
| 1995 | ####### | 35,154 | ####### | 3% |
| 1996 | ####### | 33,541 | ####### | 2% |
| 1997 | ####### | 35,694 | ####### | 2% |
| 1998 | ####### | 28,845 | ####### | 2% |
| 1999 | ####### | 39,519 | ####### | 2% |
| 1981-1999 | ####### | 625,087 | ####### | 3% |
| 1981 - 200 | ####### | 625,087 | ####### | 3% |

Source: OIS Yearbook of Immigration Statistics, 1981-1999, "Deportable Aliens Located by Status at Entry and Region and
Note: Pre-2003 encounter data are limited to encounters betrween ports of entry.

SWB Total CBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 |
| | | | | |
| FY2010-20 | 361,490 | 78,216 | 21,352 | 461,057 |
| FY2014-20 | 239,257 | 281,231 | 60,557 | 581,045 |
| FY2021-20 | 641,739 | 501,447 | 839,342 | 1,982,528 |

| | Mexico | NCA | Other |
|---|---|---|---|
| 2000 | 98% | 1% | 0% |
| 2001 | 98% | 2% | 1% |
| 2002 | 97% | 2% | 1% |
| 2003 | 96% | 3% | 1% |
| 2004 | 94% | 4% | 2% |
| 2005 | 87% | 9% | 4% |
| 2006 | 91% | 8% | 2% |
| 2007 | 92% | 6% | 2% |
| 2008 | 92% | 6% | 2% |
| 2009 | 91% | 6% | 2% |
| 2010 | 89% | 8% | 3% |
| 2011 | 86% | 10% | 4% |
| 2012 | 74% | 21% | 5% |
| 2013 | 65% | 29% | 6% |
| 2014 | 50% | 44% | 6% |
| 2015 | 57% | 32% | 11% |
| 2016 | 46% | 41% | 13% |
| 2017 | 44% | 45% | 11% |
| 2018 | 43% | 50% | 8% |
| 2019 | 24% | 64% | 12% |
| 2020 | 65% | 23% | 12% |
| 2021 | 38% | 40% | 22% |
| 2022 | 34% | 23% | 43% |
| 2023 | 29% | 20% | 51% |
| 2024Q2 | 29% | 20% | 51% |
| | | | |
| FY2010-20 | 78% | 17% | 5% |
| FY2014-20 | 41% | 48% | 10% |
| FY2021-20 | 32% | 25% | 42% |

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014 to December 2020.
March 2024 OHSS Persist Dataset

Apprehensions of EWIs by Citizenship

| | Mexico | All Other | Total | of SWB Encounters |
|---|---|---|---|---|
| 1981 | 894,771 | 3,779 | 898,550 | 0% |
| 1982 | 870,806 | 31,657 | 902,463 | 4% |
| 1983 | 1,157,948 | 32,250 | 1,190,198 | 3% |
| 1984 | 1,159,101 | 37,252 | 1,196,353 | 3% |
| 1985 | 1,291,734 | 8,957 | 1,300,691 | 1% |
| 1986 | 1,661,997 | 58,324 | 1,720,321 | 3% |
| 1987 | 1,133,092 | 33,891 | 1,166,983 | 3% |
| 1988 | 943,147 | 42,332 | 985,479 | 4% |
| 1989 | 914,516 | 7,927 | 922,443 | 1% |
| 1990 | 1,080,699 | 50,755 | 1,131,454 | 4% |
| 1991 | 1,120,099 | 41,396 | 1,161,495 | 4% |
| 1992 | 1,193,455 | 32,538 | 1,225,993 | 3% |
| 1993 | 1,258,009 | 36,247 | 1,294,256 | 3% |
| 1994 | 1,029,039 | 35,029 | 1,064,068 | 3% |
| 1995 | 1,330,017 | 35,154 | 1,365,171 | 3% |
| 1996 | 1,586,492 | 33,541 | 1,620,033 | 2% |
| 1997 | 1,463,573 | 35,694 | 1,499,267 | 2% |
| 1998 | 1,598,903 | 28,845 | 1,627,748 | 2% |
| 1999 | 1,614,492 | 39,519 | 1,654,011 | 2% |
| 1981-1999 | 23,301,890 | 625,087 | 23,926,977 | 3% |
| 1981 - 200 | 23,301,890 | 625,087 | 23,926,977 | 3% |

Source: OIS Yearbook of Immigration Statistics, 1981-1999, "Deportable Aliens Located by Status at Entry and Region and Cou
Note: Pre-2003 encounter data are limited to encounters betrween ports of entry.

SWB Total CBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 |
| | | | | |
| FY2010-20 | 361,490 | 78,216 | 21,352 | 461,057 |
| FY2014-20 | 239,257 | 281,231 | 60,557 | 581,045 |
| FY2021-20 | 641,739 | 501,447 | 839,342 | 1,982,528 |

| | Mexico | NCA | Other |
|---|---|---|---|
| 2000 | 98% | 1% | 0% |
| 2001 | 98% | 2% | 1% |
| 2002 | 97% | 2% | 1% |
| 2003 | 96% | 3% | 1% |
| 2004 | 94% | 4% | 2% |
| 2005 | 87% | 9% | 4% |
| 2006 | 91% | 8% | 2% |
| 2007 | 92% | 6% | 2% |
| 2008 | 92% | 6% | 2% |
| 2009 | 91% | 6% | 2% |
| 2010 | 89% | 8% | 3% |
| 2011 | 86% | 10% | 4% |
| 2012 | 74% | 21% | 5% |
| 2013 | 65% | 29% | 6% |
| 2014 | 50% | 44% | 6% |
| 2015 | 57% | 32% | 11% |
| 2016 | 46% | 41% | 13% |
| 2017 | 44% | 45% | 11% |
| 2018 | 43% | 50% | 8% |
| 2019 | 24% | 64% | 12% |
| 2020 | 65% | 23% | 12% |
| 2021 | 38% | 40% | 22% |
| 2022 | 34% | 23% | 43% |
| 2023 | 29% | 20% | 51% |
| 2024Q2 | 29% | 20% | 51% |
| | | | |
| FY2010-20 | 78% | 17% | 5% |
| FY2014-20 | 41% | 48% | 10% |
| FY2021-20 | 32% | 25% | 42% |

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014 to December 2020.
The application of title 42 authorities at the SWB also altered migratory patterns, in part by incentivizing individuals who were expelled—without being issued a removal order, which, unlike a title 42 expulsion, carries immigration consequences—to try to re-enter, often multiple times. *See* 88 FR at 11709. The majority of repeat encounters were of Mexican and northern Central American nationals, who were much more likely than others to be expelled to the Mexican side of the U.S.-Mexico border—between FY 2020 and FY 2023, 72 percent of Mexican and 50 percent of northern Central American encounters at and between SWB POEs resulted in title 42 expulsion, contrasting sharply with 8 percent of non-Mexican and non-northern Central American encounters experiencing similar outcomes. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* , https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024

| | Mexico | | Mexico Tot | NTriangle | | NTriangle To | Other | | Other Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Row Labels | T42 | T8 | | T42 | T8 | | T42 | T8 | | |
| 2013 | | 317562 | 317562 | | 140442 | 140442 | | 31608 | 31608 | 489612 |
| 2014 | | 285502 | 285502 | | 248063 | 248063 | | 36483 | 36483 | 570048 |
| 2015 | | 253660 | 253660 | | 142341 | 142341 | | 48855 | 48855 | 444856 |
| 2016 | | 256083 | 256083 | | 227458 | 227458 | | 75450 | 75450 | 558991 |
| 2017 | | 181519 | 181519 | | 187539 | 187539 | | 46141 | 46141 | 415199 |
| 2018 | | 221711 | 221711 | | 258413 | 258413 | | 39820 | 39820 | 519944 |
| 2019 | | 237067 | 237067 | | 623569 | 623569 | | 116593 | 116593 | 977229 |
| 2020 | 157871 | 139821 | 297692 | 38120 | 68640 | 106760 | 8783 | 44831 | 53614 | 458066 |
| 2021 | 582549 | 73056 | 655605 | 397751 | 303300 | 701051 | 83240 | 294803 | 378043 | 1734699 |
| 2022 | 692363 | 115976 | 808339 | 344579 | 197039 | 541618 | 42565 | 986422 | 1028987 | 2378944 |
| 2023 | 348730 | 368603 | 717333 | 138582 | 356704 | 495286 | 77063 | 1185987 | 1263050 | 2475669 |
| 2024 | | 385680 | 385680 | | 267831 | 267831 | | 687288 | 687288 | 1340799 |
| Grand Tota | 1781513 | 2836240 | 4617753 | 919032 | 3021339 | 3940371 | 211651 | 3594281 | 3805932 | 1.2E+07 |
| | 72% | | | 50% | | | 8% | | | |

Source: OHSS Persist - March 2024 unique encounters pivot table

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 45 percent of total SWB encounters from January 2021 to March 2024 – including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024 – up from 10 percent from FY 2014 to December 2020.

Even accounting for increased repeat encounters, unique encounters at and between SWB POEs also far off-time highs in each year from FY 2021 to FY 2023. Nationals of countries other than Mexico and northern Central America account for an even larger share of the growth in unique encounters, comprising 51 percent of unique encounters from January 2021 to March 2024 up from 9 percent in FY 2014 to December 2020. March 2024 OHSS Person Dataset.

Encounters of Mexican nationals have fallen to 29 percent of total SWB encounters during this time frame—an enormous change from historical trends that has sweeping ramifications for the border and immigration system, which are detailed below. March 2024 OHSS Persist Dataset.

SWB Total CBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total | | Mexico | NCA | Other |
|---|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 | 2000 | 98% | 1% | 0% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | 2001 | 98% | 2% | 1% |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 | 2002 | 97% | 2% | 1% |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 | 2003 | 96% | 3% | 1% |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 | 2004 | 94% | 4% | 2% |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 | 2005 | 87% | 9% | 4% |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 | 2006 | 91% | 8% | 2% |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 | 2007 | 92% | 6% | 2% |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 | 2008 | 92% | 6% | 2% |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 | 2009 | 91% | 6% | 2% |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 | 2010 | 89% | 8% | 3% |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 | 2011 | 86% | 10% | 4% |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 | 2012 | 74% | 21% | 5% |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 | 2013 | 65% | 29% | 6% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | 2014 | 50% | 44% | 6% |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 | 2015 | 57% | 32% | 11% |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 | 2016 | 46% | 41% | 13% |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 | 2017 | 44% | 45% | 11% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | 2018 | 43% | 50% | 8% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | 2019 | 24% | 64% | 12% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | 2020 | 65% | 23% | 12% |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 | 2021 | 38% | 40% | 22% |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 | 2022 | 34% | 23% | 43% |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 | 2023 | 29% | 20% | 51% |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 | 2024Q2 | 29% | 20% | 51% |

Between May 12, 2023, and March 31, 2024, CBP placed into expedited removal more than FN individuals encountered at and between POEs each day on average, and USCIS conducted a record number of credible fear interviews (more than 152,000) resulting from such cases. This is most interviews from SWB encounters at and between POEs during the span of ten and a half months that is any full fiscal year prior to FY 2023, and since that twice as many as the annual average from FY 2010 to FY 2019.
Pre-May 12, 2023, data from DHHS (which Dataset, post-May 11, 2023, data from DHHS analysis of data downloaded from CBP on April 2, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| **SW Border Encounters** | **1,694,314** |
| | |
| | **316,288** |
| | |
| **Processed for ER** | |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | **128,709** |
| Credible fear referrals | 86,629 |
| CFIs conducted | 45,522 |
| **CFI results** | **45,086** |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 15,956 |
| Pending or blank order | 739 |
| Affirmed | 10,483 |
| Vacated | 2,714 |
| Not appealed to IJ | 6,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 447 |
| **CBP repatriations** | **99,437** |
| No fear claim ER removals | 74,080 |
| Negative fear, IJ review | 19 |
| Negative fear, IJ affirmed | 17,296 |
| ER indicative VRs | 1,319 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | **194,179** |
| **Reprocessed with other dispositions** | **836** |
| **ER processed by ICE non-detained** | **87,768** |
| **ER processed by ICE Custody** | **106,983** |
| Credible fear referrals | 55,630 |
| CFIs conducted | 64,043 |
| **CFI results** | **62,016** |
| Positive fear finding | 47,287 |
| Negative fear finding | 27,936 |
| Appealed to IJ | 25,849 |
| Pending or blank order | 1,893 |
| Affirmed | 17,694 |
| Vacated | 5,260 |
| Not appealed to IJ | 2,891 |
| Admin closed | 6,650 |
| Admin closed without CFI | 2,876 |
| **ICE removals (REPATRIATIONS)** | **29,926** |
| No fear claim ER removals | 4,568 |
| Negative fear, IJ review | 4 |
| Negative fear, IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | **87,768** |
| Credible fear referrals | 28,290 |
| CFIs conducted | 22,515 |
| **CFI results** | **21,229** |
| Positive fear finding | 13,609 |
| Negative fear finding | 7,371 |
| Appealed to IJ | 7,034 |
| Pending or blank order | 1,034 |
| Affirmed | 4,532 |
| Vacated | 1,472 |
| Not appealed to IJ | 337 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| **ICE removals (REPATRIATIONS)** | **36,803** |
| No fear claim ER removals | 0 |
| Negative fear, IJ review | 0 |
| Negative fear, IJ affirmed | 1,003 |
| Other | 510 |



Nationwide
Credible Fear Claims 2000-2023

Notes: ER counts are based on month of encounter. Population is limited to single adults and family case individuals encountered by CBP in the southwest land border, including ORO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of CBP SW Daily Report Data Download as of April 2, 2024

On average, since May 12, 2023, USCIS has completed approximately 3,300 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.
Completed cases are those with credible fear interviews that have been adjudicated or that have been closed. Pre-May 12, 2023, data from ORISS Lifecycle Dataset; post-May 11, 2023, data from ORISS analysis of data downloaded from UIP on April 2, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| SW Border Encounters | 1,694,114 |
| | 316,288 |
| **Processed for ER** | |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | 120,709 |
| Credible fear referrals | 46,628 |
| CFIs conducted | 45,522 |
| **CFI results** | 45,086 |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,881 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| **CBP repatriations** | 95,037 |
| No fear claim ER removals | 74,040 |
| Negative fear, no IJ review | 19 |
| Negative fear; IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | 195,579 |
| Reprocessed with other dispositions | 836 |
| **ER processed by ICE non-detained** | 87,760 |
| **ER processed in ICE Custody** | 106,983 |
| Credible fear referrals | 93,630 |
| CFIs conducted | 84,045 |
| **CFI results** | 82,016 |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,839 |
| Admin closed without CFI | 7,179 |
| **ICE removals (REPATRIATIONS)** | 29,926 |
| No fear claim ER removals | 4,368 |
| Negative fear; no IJ review | 4 |
| Negative fear; IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | 87,760 |
| Credible fear referrals | 26,590 |
| CFIs conducted | 22,519 |
| **CFI results** | 21,229 |
| Positive fear finding | 13,009 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,112 |
| Vacated | 1,872 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| **ICE removals (REPATRIATIONS)** | 36,803 |
| No fear claim ER removals | 34,600 |
| Negative fear; no IJ review | 0 |
| Negative fear; IJ affirmed | 1,893 |
| Other | 310 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of USP ER Daily Report Data Dashboard as of April 2, 2024.



Nationwide
Credible Fear Claims: 2000-2023

Total Fear (excluding cases reprocessed out of ) 321,452   6,815
Total Fear referrals                             168,848   5,648
Total CFIs                                       152,086   3,594

Weekly average 2014-2019                          1,448

weekly average CFIs: % increase from 2014-19
* FY2024 as of April 2nd, 2024
** Fy2024 as of December 31, 2023.

IFR_AR_007473



Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations, the median time from encounter to removal, in the same time frames, decreased by 85 percent from 73 days to 11 days.
Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023; post-May 12 estimates are based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from CBP's Unified Data Portal on April 2, 2024. Encounter-to-Removal cases include noncitizens removed after being placed in expedited removal proceedings, claiming fear, and receiving a negative fear determination or an administrative closure that is not referred to EOIR. Comparisons to the pandemic period are not relevant because many noncitizens who normally would have been referred for expedited removal processing were instead expelled under title 42 authority.

| | | DHS | | | | |
|---|---|---|---|---|---|---|
| | | Mexico | NCA | W. Hem | E. Hem | DHS Total |
| Encounter to Referral | Completed Count | 1,672 | 941 | 2,547 | 179 | 5,339 |
| | Median Days | 2 | 5 | 4 | 7 | 3 |
| | Pending Count | 7,372 | 5,260 | 4,080 | 304 | 17,016 |
| | Median Days | 1 | 1 | 1 | 1 | 1 |
| Referral to CFI Result | Completed Count | 1,574 | 869 | 2,326 | 166 | 4,935 |
| | Median Days | 4 | 4 | 4 | 13 | 4 |
| | Pending Count | 98 | 72 | 221 | 13 | 404 |
| | Median Days | 17 | 14 | 12 | 20 | 15 |
| Encounter to CFI Result | Completed Count | 1,616 | 913 | 2,428 | 172 | 5,129 |
| | Median Days | 6 | 12 | 11 | 20 | 10 |
| | Pending Count | 2,251 | 1,181 | 2,355 | 332 | 6,119 |
| | Median Days | 1 | 1 | 1 | 1 | 1 |
| Negative Fear to Removal | Completed Count | 552 | 146 | 110 | 30 | 808 |
| | Median Days | 2 | 8 | 5 | 51 | 4 |
| | Pending Count | 300 | 306 | 683 | 16 | 1,315 |
| | Median Days | 4 | 6 | 6 | 85 | 5 |
| Encounter to Removal | Completed Count | 552 | 146 | 110 | 30 | 808 |
| | Median Days | 10 | 18 | 15 | 115 | 11 |
| | Pending Count | 328 | 347 | 780 | 16 | 1,490 |
| | Median Days | 10 | 20 | 19 | 154 | 17 |

Note: Data are current through March 31, 2024. All Median processing times are limited to noncitizens in ER who make credible fear claims and exclude no-fear removals, noncitizens reprocessed into other (non-ER) processing dispostions, and people released without being removed.
DHS Encounter to Referral from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Referral to CFI Result from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Encounter to CFI Result from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Negative Fear to Removal from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Encounter to Removal from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on April 2, 2024.

| Median Processing Times | 2014-19 |
|---|---|
| Encounter to Removal (no fear cases) | |
| Encounter to CF Referral | 13 |
| CF Referral to CIS Determination | 8 |
| Negative Determination to EOIR CFR Decision | |
| Comprehensive Negative Determination to Removal | 22 |
| Encounter to Removal (Negative Determinations only) | 73 |

Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023.

Expedited Removal Median Processing Times, FY 2014 - FY 2019 and May 12 - December 31, 2023

| | 2014-2019 | May 12, 2023 - March 31, 2024 | % change |
|---|---|---|---|
| Encounter to CF Referral | 13 | 3 | 77% |
| Referral to fear determination | 8 | 4 | 50% |
| Comprehensive Negative Fear to removal | 22 | 4 | 82% |
| Encounter to Removal | 73 | 11 | 85% |

From May 12, 2023, to March 31, 2024, DHS removed more than 662,000 individuals—more removals than in any full fiscal year since 2013 and an indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences when individuals do not establish a legal basis to remain in the United States.
OHSS analysis of data downloaded from UIP on April 2, 2024; *see* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

| | |
|---|---|
| 5/12/23 - 3/31/24 repatriations | 662,659 |
| Max Repatriations FY2012-FY2022 | 646,684 |

| Removals and Returns by Citize | Mar-24 Daily Average | Mar-24 Monthly Total | Mar-24 % change vs. prev. month | Since May 12 Monthly Average | Since May 12 Total |
|---|---|---|---|---|---|
| **Land Repatriations from CBP to Mexico[1]** | | | | | |
| Mexico | 935 | 28,990 | ▲ 18% | 24,210 | 261,471 |
| Honduras | 4 | 127 | ▲ 79% | 321 | 3,467 |
| Guatemala | 20 | 620 | ▼ 53% | 922 | 9,953 |
| El Salvador | 1 | 23 | ▼ 12% | 58 | 624 |
| Cuba | 2 | 55 | ▼ 7% | 46 | 492 |
| Haiti | 0 | 1 | ▼ 67% | 5 | 53 |
| Nicaragua | 3 | 79 | ▼ 91% | 217 | 2,347 |
| Venezuela | 3 | 82 | ▼ 22% | 1,187 | 12,820 |
| Other | 8 | 234 | ▲ 169% | 100 | 1,077 |
| **Total** | **975** | **30,211** | **▲ 11%** | **27,065** | **292,304** |
| **Other CBP Enforcement Repatriations[2]** | | | | 0 | |
| India | 77 | 2,402 | ▲ 4% | 2,350 | 25,375 |
| Canada | 80 | 2,495 | ▲ 18% | 2,051 | 22,152 |
| China, Peoples Republic | 37 | 1,135 | ▼ 15% | 1,170 | 12,638 |
| France | 31 | 967 | ▲ 9% | 1,113 | 12,020 |
| Mexico | 19 | 588 | ▼ 20% | 776 | 8,381 |
| Philippines | 31 | 969 | ▲ 41% | 604 | 6,527 |
| Nigeria | 16 | 511 | ▼ 7% | 575 | 6,205 |
| United Kingdom | 10 | 318 | ▲ 9% | 420 | 4,537 |
| Colombia | 10 | 317 | ▼ 6% | 409 | 4,418 |
| Algeria | 17 | 522 | ▲ 21% | 352 | 3,804 |
| Other | 214 | 6,634 | ▲ 15% | 6,301 | 68,051 |
| **Total** | **517** | **16,019** | **▲ 9%** | **15,360** | **165,886** |
| **ERO Repatriations[3]** | | | | 0 | |
| Mexico | 179 | 5,555 | ▼ 20% | 5,626 | 60,764 |
| Honduras | 79 | 2,458 | ▼ 22% | 3,909 | 42,212 |
| Guatemala | 165 | 5,115 | ▼ 18% | 4,734 | 51,127 |
| Venezuela | 4 | 135 | ▼ 33% | 279 | 3,008 |
| Ecuador | 21 | 658 | ▲ 46% | 609 | 6,574 |
| Colombia | 42 | 1,290 | ▲ 52% | 863 | 9,325 |
| El Salvador | 34 | 1,047 | ▼ 17% | 1,117 | 12,068 |
| Nicaragua | 6 | 179 | ▼ 16% | 154 | 1,668 |
| Haiti | 0 | 2 | ▼ 71% | 54 | 583 |
| Cuba | 1 | 26 | ▼ 54% | 37 | 397 |
| Dominican Republic | 7 | 229 | ▼ 5% | 248 | 2,680 |
| Peru | 5 | 145 | ▼ 62% | 444 | 4,799 |
| Other | 24 | 751 | ▲ 4% | 858 | 9,264 |
| **Total** | **567** | **17,590** | **▼ 15%** | **18,932** | **204,469** |
| **Total Repatriations[4]** | | | | 0 | |
| Mexico | 1,133 | 35,133 | ▲ 9% | 30,613 | 330,616 |
| Guatemala | 202 | 6,270 | ▼ 17% | 5,702 | 61,586 |
| Honduras | 102 | 3,164 | ▼ 3% | 4,253 | 45,936 |
| India | 78 | 2,430 | ▲ 2% | 2,402 | 25,938 |
| Canada | 81 | 2,507 | ▲ 18% | 2,068 | 22,336 |
| Venezuela | 9 | 284 | ▼ 19% | 1,522 | 16,441 |
| Colombia | 54 | 1,685 | ▲ 39% | 1,289 | 13,920 |
| China, Peoples Republic | 38 | 1,167 | ▼ 16% | 1,208 | 13,041 |
| El Salvador | 38 | 1,164 | ▼ 10% | 1,196 | 12,918 |
| France | 31 | 972 | ▲ 9% | 1,120 | 12,097 |
| Other | 327 | 10,144 | ▲ 4% | 9,984 | 107,830 |
| **Total** | **2,094** | **64,920** | **▲ 4%** | **61,357** | **662,659** |

[1]Land repatriations from CBP to Mexico are limited to SW Border encounters after May 11, 2023.
[2]Other CBP Enforcement Repatriations include noncitizens removed or returned from the Northern and Maritime Borders and from air and
[3]ERO repatriations are limited to departures after May 11, 2023 and are reported based on recorded departure date through March 31, 2024.
[4]Total DHS removals and returns, excluding administrative returns. Administrative returns include withdrawals of applications for admission without prejudice and crew members required to remain aboard their vessels.
Note: All data report on individuals. Data are pulled from a live system and will not match ERO or OHSS end-of-year reporting. Repatriation flights may include mixes of single adults and family units. Data are current through March 31, 2024.
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on April 2, 2024.

**Table 39.**

**NONCITIZEN REMOVALS, RETURNS, AND EXPULSIONS: FISCAL YEARS 1892 TO 2022**

| Year | Removals[1] | e Returns[2] | nt Returns[2] | xpulsions[3] | Total T8 | monthly total |
|---|---|---|---|---|---|---|
| 1892 | 2,801 | NA | NA | X | **2,801** | 233 |
| 1893 | 1,630 | NA | NA | X | **1,630** | 136 |
| 1894 | 1,806 | NA | NA | X | **1,806** | 151 |
| 1895 | 2,596 | NA | NA | X | **2,596** | 216 |
| 1896 | 3,037 | NA | NA | X | **3,037** | 253 |
| 1897 | 1,880 | NA | NA | X | **1,880** | 157 |
| 1898 | 3,229 | NA | NA | X | **3,229** | 269 |
| 1899 | 4,052 | NA | NA | X | **4,052** | 338 |
| 1900 | 4,602 | NA | NA | X | **4,602** | 384 |
| 1901 | 3,879 | NA | NA | X | **3,879** | 323 |
| 1902 | 5,439 | NA | NA | X | **5,439** | 453 |
| 1903 | 9,316 | NA | NA | X | **9,316** | 776 |
| 1904 | 8,773 | NA | NA | X | **8,773** | 731 |
| 1905 | 12,724 | NA | NA | X | **12,724** | 1,060 |
| 1906 | 13,108 | NA | NA | X | **13,108** | 1,092 |
| 1907 | 14,059 | NA | NA | X | **14,059** | 1,172 |
| 1908 | 12,971 | NA | NA | X | **12,971** | 1,081 |
| 1909 | 12,535 | NA | NA | X | **12,535** | 1,045 |
| 1910 | 26,965 | NA | NA | X | **26,965** | 2,247 |
| 1911 | 25,137 | NA | NA | X | **25,137** | 2,095 |
| 1912 | 18,513 | NA | NA | X | **18,513** | 1,543 |
| 1913 | 23,399 | NA | NA | X | **23,399** | 1,950 |
| 1914 | 37,651 | NA | NA | X | **37,651** | 3,138 |
| 1915 | 26,675 | NA | NA | X | **26,675** | 2,223 |
| 1916 | 21,648 | NA | NA | X | **21,648** | 1,804 |
| 1917 | 17,881 | NA | NA | X | **17,881** | 1,490 |
| 1918 | 8,866 | NA | NA | X | **8,866** | 739 |
| 1919 | 11,694 | NA | NA | X | **11,694** | 975 |
| 1920 | 14,557 | NA | NA | X | **14,557** | 1,213 |
| 1921 | 18,296 | NA | NA | X | **18,296** | 1,525 |
| 1922 | 18,076 | NA | NA | X | **18,076** | 1,506 |
| 1923 | 24,280 | NA | NA | X | **24,280** | 2,023 |
| 1924 | 36,693 | NA | NA | X | **36,693** | 3,058 |
| 1925 | 34,885 | NA | NA | X | **34,885** | 2,907 |
| 1926 | 31,454 | NA | NA | X | **31,454** | 2,621 |
| 1927 | 31,417 | NA | 15,012 | X | **46,429** | 3,869 |
| 1928 | 30,464 | NA | 19,946 | X | **50,410** | 4,201 |
| 1929 | 31,035 | NA | 25,888 | X | **56,923** | 4,744 |
| 1930 | 24,864 | NA | 11,387 | X | **36,251** | 3,021 |
| 1931 | 27,886 | NA | 11,719 | X | **39,605** | 3,300 |
| 1932 | 26,490 | NA | 10,775 | X | **37,265** | 3,105 |
| 1933 | 25,392 | NA | 10,347 | X | **35,739** | 2,978 |
| 1934 | 14,263 | NA | 8,010 | X | **22,273** | 1,856 |
| 1935 | 13,877 | NA | 7,978 | X | **21,855** | 1,821 |
| 1936 | 16,195 | NA | 8,251 | X | **24,446** | 2,037 |
| 1937 | 16,905 | NA | 8,788 | X | **25,693** | 2,141 |
| 1938 | 17,341 | NA | 9,278 | X | **26,619** | 2,218 |
| 1939 | 14,700 | NA | 9,590 | X | **24,290** | 2,024 |
| 1940 | 12,254 | NA | 8,594 | X | **20,848** | 1,737 |
| 1941 | 7,336 | NA | 6,531 | X | **13,867** | 1,156 |
| 1942 | 5,542 | NA | 6,904 | X | **12,446** | 1,037 |
| 1943 | 5,702 | NA | 11,947 | X | **17,649** | 1,471 |
| 1944 | 8,821 | NA | 32,270 | X | **41,091** | 3,424 |
| 1945 | 13,611 | NA | 69,490 | X | **83,101** | 6,925 |
| 1946 | 17,317 | NA | 101,945 | X | **119,262** | 9,939 |
| 1947 | 23,434 | NA | 195,880 | X | **219,314** | 18,276 |
| 1948 | 25,276 | NA | 197,184 | X | **222,460** | 18,538 |
| 1949 | 23,874 | NA | 276,297 | X | **300,171** | 25,014 |
| 1950 | 10,199 | NA | 572,477 | X | **582,676** | 48,556 |
| 1951 | 17,328 | NA | 673,169 | X | **690,497** | 57,541 |
| 1952 | 23,125 | NA | 703,778 | X | **726,903** | 60,575 |
| 1953 | 23,482 | NA | 885,391 | X | **908,873** | 75,739 |
| 1954 | 30,264 | NA | 1,074,277 | X | **1,104,541** | 92,045 |
| 1955 | 17,695 | NA | 232,769 | X | **250,464** | 20,872 |
| 1956 | 9,006 | NA | 80,891 | X | **89,897** | 7,491 |
| 1957 | 5,989 | NA | 63,379 | X | **69,368** | 5,781 |
| 1958 | 7,875 | NA | 60,600 | X | **68,475** | 5,706 |
| 1959 | 8,468 | NA | 56,610 | X | **65,078** | 5,423 |
| 1960 | 7,240 | NA | 52,796 | X | **60,036** | 5,003 |
| 1961 | 8,181 | NA | 52,383 | X | **60,564** | 5,047 |
| 1962 | 8,025 | NA | 54,164 | X | **62,189** | 5,182 |
| 1963 | 7,763 | NA | 69,392 | X | **77,155** | 6,430 |
| 1964 | 9,167 | NA | 73,042 | X | **82,209** | 6,851 |
| 1965 | 10,572 | NA | 95,263 | X | **105,835** | 8,820 |
| 1966 | 9,680 | NA | 123,683 | X | **133,363** | 11,114 |
| 1967 | 9,728 | NA | 142,343 | X | **152,071** | 12,673 |
| 1968 | 9,590 | NA | 179,952 | X | **189,542** | 15,795 |
| 1969 | 11,030 | NA | 240,958 | X | **251,988** | 20,999 |
| 1970 | 17,469 | NA | 303,348 | X | **320,817** | 26,735 |
| 1971 | 18,294 | NA | 370,074 | X | **388,368** | 32,364 |
| 1972 | 16,883 | NA | 450,927 | X | **467,810** | 38,984 |
| 1973 | 17,346 | NA | 568,005 | X | **585,351** | 48,779 |
| 1974 | 19,413 | NA | 718,740 | X | **738,153** | 61,513 |
| 1975 | 24,432 | NA | 655,814 | X | **680,246** | 56,687 |
| 1976[4] | 38,471 | NA | 955,374 | X | **993,845** | 82,820 |
| 1977 | 31,263 | NA | 867,015 | X | **898,278** | 74,857 |
| 1978 | 29,277 | NA | 975,515 | X | **1,004,792** | 83,733 |
| 1979 | 26,825 | NA | 966,137 | X | **992,962** | 82,747 |
| 1980 | 18,013 | NA | 719,211 | X | **737,224** | 61,435 |
| 1981 | 17,379 | NA | 823,875 | X | **841,254** | 70,105 |
| 1982 | 15,216 | NA | 812,572 | X | **827,788** | 68,982 |
| 1983 | 19,211 | NA | 931,600 | X | **950,811** | 79,234 |
| 1984 | 18,696 | NA | 909,833 | X | **928,529** | 77,377 |
| 1985 | 23,105 | NA | 1,041,296 | X | **1,064,401** | 88,700 |
| 1986 | 24,592 | NA | 1,586,320 | X | **1,610,912** | 134,243 |
| 1987 | 24,336 | NA | 1,091,203 | X | **1,115,539** | 92,962 |
| 1988 | 25,829 | NA | 911,790 | X | **937,619** | 78,135 |
| 1989 | 34,427 | NA | 830,890 | X | **865,317** | 72,110 |
| 1990 | 30,039 | NA | 1,022,533 | X | **1,052,572** | 87,714 |
| 1991 | 33,189 | NA | 1,061,105 | X | **1,094,294** | 91,191 |
| 1992 | 43,671 | NA | 1,105,829 | X | **1,149,500** | 95,792 |
| 1993 | 42,542 | NA | 1,243,410 | X | **1,285,952** | 107,163 |
| 1994 | 45,674 | NA | 1,029,107 | X | **1,074,781** | 89,565 |
| 1995 | 50,924 | NA | 1,313,764 | X | **1,364,688** | 113,724 |
| 1996 | 69,680 | NA | 1,573,428 | X | **1,643,108** | 136,926 |
| 1997 | 114,432 | NA | 1,440,684 | X | **1,555,116** | 129,593 |
| 1998 | 174,813 | NA | 1,570,127 | X | **1,744,940** | 145,412 |
| 1999 | 183,114 | NA | 1,574,863 | X | **1,757,977** | 146,498 |
| 2000 | 188,467 | NA | 1,675,876 | X | **1,864,343** | 155,362 |
| 2001 | 189,026 | NA | 1,349,371 | X | **1,538,397** | 128,200 |
| 2002 | 165,168 | NA | 1,012,116 | X | **1,177,284** | 98,107 |
| 2003 | 211,098 | NA | 945,294 | X | **1,156,392** | 96,366 |
| 2004 | 240,665 | NA | 1,166,576 | X | **1,407,241** | 117,270 |
| 2005 | 246,431 | NA | 1,096,920 | X | **1,343,351** | 111,946 |
| 2006 | 280,974 | NA | 1,043,381 | X | **1,324,355** | 110,363 |
| 2007 | 319,382 | NA | 891,390 | X | **1,210,772** | 100,898 |
| 2008 | 359,795 | NA | 811,263 | X | **1,171,058** | 97,588 |
| 2009 | 379,739 | 59,409 | 523,153 | X | **962,301** | 80,192 |
| 2010 | 382,449 | 61,895 | 409,898 | X | **854,242** | 71,187 |
| 2011 | 390,413 | 60,896 | 261,149 | X | **712,458** | 59,372 |
| 2012 | 415,579 | 47,361 | 183,744 | X | **646,684** | 53,890 |
| 2013 | 432,334 | 44,707 | 134,265 | X | **611,306** | 50,942 |
| 2014 | 405,193 | 45,666 | 118,170 | X | **569,029** | 47,419 |
| 2015 | 324,428 | 43,237 | 86,399 | X | **454,064** | 37,839 |
| 2016[5] | 332,331 | 30,341 | 76,137 | X | **438,809** | 36,567 |
| 2017 | 284,365 | 15,072 | 85,380 | X | **384,817** | 32,068 |
| 2018 | 327,608 | 72,756 | 87,202 | X | **487,566** | 40,631 |
| 2019 | 347,090 | 89,719 | 81,401 | X | **518,210** | 43,184 |
| 2020 | 237,364 | 113,857 | 53,595 | 206,770 | **404,816** | 33,735 |
| 2021 | 85,783 | 128,339 | 49,664 | 1,071,074 | **263,786** | 21,982 |
| 2022 | 108,733 | 180,266 | 81,121 | 1,103,966 | **370,120** | 30,843 |

X Not applicable.
NA Not available.
[1] Removals are the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States based on an order of removal. A noncitizen who is removed has administrative or criminal consequences placed on subsequent reentry owing to the fact of the removal.
[2] Returns are the confirmed movement of an inadmissible or deportable noncitizen out of the United States not based on an order of removal. Administrative returns include crew members from 2005 to 2017, and both crew members and administrative withdrawals since 2018. The enforcement returns are all returns with the exception of crew members and administrative withdrawals. All returns are reported as enforcement returns from 1927 to 2008.
[3] U.S. Border Patrol (USBP) and OFO data for 2020, 2021, and 2022 include encounters resulting in expulsions on public health grounds under U.S. Code Title 42 in response to the COVID-19 pandemic.
[4] Includes the 15 months from July 1, 1975 to September 30, 1976 because the end date of fiscal years was changed from June 30 to September 30.
[5] The counting methodology for administrative arrests by ICE Enforcement and Removal Operations (ERO) was revised to align with ICE ERO reporting for 2016; for earlier years only one administrative arrest could be counted for the same person on the same day.
Source: DHS Office of Immigration Statistics.

After peaking at 9,700 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between POEs decreased by 45 percent to an average of 5,200 per day for the period from May 12, 2023, to November 30, 2023. Pre-May 12, 2023 data from March 2024 OHSS Persist Dataset, post-May 11, 2023 data from OHSS analysis of data downloaded from UIP on December 12, 2023.

| Expedited Removal Processing: Southwest Border | May | November | |
|---|---|---|---|
| SW Border Encounters | 68,766 | 186,533 | 5/12/23 |
| Processed for ER | 18,769 | 29,381 | 11/30/23 |
| % Encounters processed for ER | 27% | 16% | 100 |
| **ER processed in CBP Custody** | **5,824** | **10,528** | |
| Credible fear referrals | 2,459 | 5,805 | |
| CFIs conducted | 2,366 | 5,715 | |
| **CFI results** | **2,364** | **5,703** | |
| Positive fear finding | 909 | 1,282 | |
| Negative fear finding | 1,516 | 1,569 | |
| Appealed to IJ | 778 | 1,462 | |
| Pending or blank order | 60 | 32 | |
| Affirmed | 675 | 1,059 | |
| Vacated | 43 | 331 | |
| Not appealed to IJ | 546 | 567 | |
| Admin closed | 137 | 452 | |
| Admin closed without CFI | 77 | 88 | |
| **CBP repatriations** | **4,722** | **8,526** | |
| No fear claim ER removals | 3,366 | 6,718 | |
| Negative fear, no IJ review | 2 | 2 | |
| Negative fear, IJ affirmed | 1,177 | 1,591 | |
| ER withdrawn VRs | 51 | 63 | |
| Other | 126 | 152 | |
| **ER transfers to ICE for processing** | **12,945** | **18,853** | |
| Reprocessed with other dispositions | 40 | 301 | |
| ER processed by ICE non-detained | 2,407 | 13,064 | |
| **ER processed in ICE Custody** | **10,496** | **5,688** | |
| Credible fear referrals | 5,995 | 4,736 | |
| CFIs conducted | 9,915 | 4,124 | |
| **CFI results** | **9,915** | **4,077** | |
| Positive fear finding | 5,335 | 2,319 | |
| Negative fear finding | 4,068 | 1,252 | |
| Appealed to IJ | 3,114 | 998 | |
| Pending or blank order | 184 | 58 | |
| Affirmed | 2,670 | 714 | |
| Vacated | 260 | 226 | |
| Not appealed to IJ | 954 | 254 | |
| Admin closed | 654 | 566 | |
| Admin closed without CFI | 60 | 459 | |
| **ICE removals (REPATRIATIONS)** | **4,563** | **1,633** | |
| No fear claim ER removals | 217 | 241 | |
| Negative fear, no IJ review | 0 | 0 | |
| Negative fear, IJ affirmed | 3,412 | 736 | |
| Other | 932 | 654 | |
| **ER processed by ICE non-detained** | **2,407** | **13,064** | |
| Credible fear referrals | 117 | 3,922 | |
| CFIs conducted | 24 | 3,436 | |
| **CFI results** | **24** | **3,423** | |
| Positive fear finding | 15 | 2,607 | |
| Negative fear finding | 10 | 1,296 | |
| Appealed to IJ | 6 | 1,253 | |
| Pending or blank order | 0 | 210 | |
| Affirmed | 4 | 742 | |
| Vacated | 2 | 301 | |
| Not appealed to IJ | 4 | 43 | |
| Admin closed | 1 | 120 | |
| Admin closed without CFI | 20 | 599 | |
| **ICE removals (REPATRIATIONS)** | **1,509** | **6,705** | |
| No fear claim ER removals | 1,485 | 6,538 | |
| Negative fear, no IJ review | 0 | 0 | |
| Negative fear, IJ affirmed | 6 | 540 | |
| Other | 18 | 27 | |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and November 30, 2023.
Source: Office of Homeland Security Statistics analysis of CBP ER Daily Report Data Dashboard as of April 2, 2024.

CBP Encounters, May 1 - May 31, 2023

| | USBP | OFO | Total |
|---|---|---|---|
| 5/1/2023 | 7,913 | 881 | 8,794 |
| 5/2/2023 | 7,767 | 915 | 8,681 |
| 5/3/2023 | 8,624 | 890 | 9,514 |
| 5/4/2023 | 8,486 | 1,037 | 9,523 |
| 5/5/2023 | 9,184 | 899 | 10,083 |
| 5/6/2023 | 8,985 | 970 | 9,955 |
| 5/7/2023 | 8,779 | 921 | 9,600 |
| 5/8/2023 | 10,316 | 885 | 11,201 |
| 5/9/2023 | 10,802 | 802 | 11,604 |
| 5/10/2023 | 10,375 | 779 | 11,154 |
| 5/11/2023 | 9,806 | 915 | 10,721 |
| 5/12/2023 | 6,213 | 1,335 | 7,548 |
| 5/13/2023 | 4,199 | 1,354 | 5,693 |
| 5/14/2023 | 4,199 | 1,303 | 5,502 |
| 5/15/2023 | 3,797 | 1,510 | 5,307 |
| 5/16/2023 | 3,702 | 1,255 | 4,957 |
| 5/17/2023 | 2,836 | 1,311 | 4,147 |
| 5/18/2023 | 3,201 | 1,215 | 4,416 |
| 5/19/2023 | 2,960 | 1,254 | 4,214 |
| 5/20/2023 | 3,196 | 1,334 | 4,530 |
| 5/21/2023 | 2,554 | 1,279 | 3,833 |
| 5/22/2023 | 2,648 | 1,216 | 3,864 |
| 5/23/2023 | 3,503 | 1,254 | 4,757 |
| 5/24/2023 | 3,409 | 1,391 | 4,800 |
| 5/25/2023 | 3,467 | 1,272 | 4,769 |
| 5/26/2023 | 3,452 | 1,238 | 4,690 |
| 5/27/2023 | 3,305 | 1,235 | 4,530 |
| 5/28/2023 | 3,358 | 1,285 | 4,643 |
| 5/29/2023 | 3,313 | 1,255 | 4,568 |
| 5/30/2023 | 3,563 | 1,296 | 4,859 |
| 5/31/2023 | 3,379 | 1,277 | 4,656 |

Source: OHSS Persist March 2024

Average in 7 days before 5/12/23  9,700

Average encounters per day May 12, 2023 - Nov. 30, 2023  5,200

IPR_AR_007478



After months of relatively lower encounter levels between POEs following the changes put in place after May 11, 2023, encounter levels increased through the fall of 2023, and December 2023 saw the highest levels of encounters between POEs in history, including a surge in which border encounters between POEs exceeded 10,000 for three consecutive days and averaged more than 8,000 a day for the month

*OHSS analysis of March 2024 OHSS Persist Dataset; see also: OHSS, Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 30, 2024); OHSS, 2022 Yearbook of Immigration Statistics 103–04 tbl. 39 (Nov. 2023), https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; -Priscilla Alvarez, Authorities Encountering Record Number of Migrants at the Border Each Day Amid Unprecedented Surge, CNN (Dec. 22, 2023), https://www.cnn.com/2023/12/22/politics/border-surge-record-amounts/index.html*

CBP SW Border Encounters, FY 2000 - December 2023

| | |
|---|---|
| **2000** | **1,586,621** |
| 10 | 87,819 |
| 11 | 74,560 |
| 12 | 66,259 |
| 1 | 175,883 |
| 2 | 200,659 |
| 3 | 209,411 |
| 4 | 170,621 |
| 5 | 155,961 |
| 6 | 109,858 |
| 7 | 111,963 |
| 8 | 112,648 |
| 9 | 96,822 |
| **2001** | **1,235,413** |
| 10 | 81,995 |
| 11 | 67,217 |
| 12 | 54,828 |
| 1 | 116,586 |
| 2 | 155,616 |
| 3 | 169,904 |
| 4 | 141,040 |
| 5 | 115,059 |
| 6 | 89,034 |
| 7 | 83,653 |
| 8 | 84,657 |
| 9 | 59,448 |
| **2002** | **930,341** |
| 10 | 37,746 |
| 11 | 32,694 |
| 12 | 31,531 |
| 1 | 79,647 |
| 2 | 95,645 |
| 3 | 126,906 |
| 4 | 121,908 |
| 5 | 97,571 |
| 6 | 78,730 |
| 7 | 76,719 |
| 8 | 82,860 |
| 9 | 68,384 |
| **2003** | **906,734** |
| 10 | 61,913 |
| 11 | 47,919 |
| 12 | 37,930 |
| 1 | 87,002 |
| 2 | 97,016 |
| 3 | 98,625 |
| 4 | 75,564 |
| 5 | 88,845 |
| 6 | 75,634 |
| 7 | 79,396 |
| 8 | 84,651 |
| 9 | 72,239 |
| **2004** | **1,211,693** |
| 10 | 69,246 |
| 11 | 62,452 |
| 12 | 48,280 |
| 1 | 98,764 |
| 2 | 116,398 |
| 3 | 162,530 |
| 4 | 142,491 |
| 5 | 125,502 |
| 6 | 101,178 |
| 7 | 98,989 |
| 8 | 99,986 |
| 9 | 85,877 |
| **2005** | **1,269,247** |
| 10 | 81,687 |
| 11 | 70,617 |
| 12 | 54,028 |
| 1 | 101,552 |
| 2 | 121,177 |
| 3 | 150,892 |
| 4 | 148,688 |
| 5 | 125,226 |
| 6 | 99,490 |
| 7 | 105,093 |
| 8 | 107,620 |
| 9 | 103,177 |
| **2006** | **1,168,358** |
| 10 | 91,935 |
| 11 | 78,817 |
| 12 | 60,375 |
| 1 | 110,987 |
| 2 | 132,780 |
| 3 | 169,077 |
| 4 | 133,964 |
| 5 | 113,311 |
| 6 | 76,274 |
| 7 | 67,636 |
| 8 | 67,631 |
| 9 | 65,571 |
| **2007** | **954,928** |
| 10 | 68,083 |
| 11 | 58,199 |
| 12 | 47,537 |
| 1 | 79,794 |
| 2 | 86,435 |
| 3 | 122,450 |
| 4 | 112,773 |
| 5 | 97,196 |
| 6 | 79,997 |
| 7 | 75,766 |
| 8 | 69,142 |
| 9 | 57,556 |
| **2008** | **792,553** |
| 10 | 58,616 |
| 11 | 48,693 |
| 12 | 38,556 |
| 1 | 66,471 |
| 2 | 80,724 |
| 3 | 97,774 |
| 4 | 99,518 |
| 5 | 77,048 |
| 6 | 60,492 |
| 7 | 56,806 |
| 8 | 56,142 |
| 9 | 51,713 |
| **2009** | **619,123** |
| 10 | 49,217 |
| 11 | 38,450 |
| 12 | 31,206 |
| 1 | 50,737 |
| 2 | 55,132 |
| 3 | 74,323 |
| 4 | 65,129 |
| 5 | 57,593 |
| 6 | 52,600 |
| 7 | 50,986 |
| 8 | 51,084 |
| 9 | 42,666 |
| **2010** | **527,419** |
| 10 | 47,290 |
| 11 | 39,064 |
| 12 | 31,352 |
| 1 | 40,741 |
| 2 | 48,753 |
| 3 | 69,152 |
| 4 | 62,351 |
| 5 | 54,018 |
| 6 | 39,308 |
| 7 | 32,363 |
| 8 | 33,717 |
| 9 | 29,310 |
| **2011** | **401,073** |
| 10 | 32,451 |
| 11 | 28,516 |
| 12 | 25,728 |
| 1 | 29,737 |
| 2 | 34,408 |
| 3 | 48,920 |
| 4 | 42,739 |
| 5 | 37,543 |
| 6 | 32,909 |
| 7 | 29,520 |
| 8 | 30,216 |
| 9 | 28,386 |
| **2012** | **426,125** |
| 10 | 31,344 |
| 11 | 28,617 |
| 12 | 24,380 |
| 1 | 30,798 |
| 2 | 37,009 |
| 3 | 48,538 |
| 4 | 46,680 |
| 5 | 43,020 |
| 6 | 36,808 |
| 7 | 32,833 |
| 8 | 33,699 |
| 9 | 32,399 |
| **2013** | **489,612** |
| 10 | 34,847 |
| 11 | 33,159 |
| 12 | 29,077 |
| 1 | 32,485 |
| 2 | 40,636 |
| 3 | 54,010 |
| 4 | 54,771 |
| 5 | 50,500 |
| 6 | 40,790 |
| 7 | 40,006 |
| 8 | 41,125 |
| 9 | 38,206 |
| **2014** | **570,048** |
| 10 | 41,835 |
| 11 | 38,692 |
| 12 | 36,707 |
| 1 | 35,200 |
| 2 | 42,473 |
| 3 | 57,548 |
| 4 | 59,383 |
| 5 | 69,033 |
| 6 | 66,572 |
| 7 | 48,833 |
| 8 | 39,766 |
| 9 | 34,006 |
| **2015** | **444,856** |
| 10 | 35,903 |
| 11 | 33,024 |
| 12 | 34,231 |
| 1 | 30,179 |
| 2 | 32,554 |
| 3 | 39,162 |
| 4 | 38,299 |
| 5 | 40,684 |
| 6 | 38,620 |
| 7 | 38,610 |
| 8 | 42,419 |
| 9 | 41,171 |
| **2016** | **558,991** |
| 10 | 45,245 |
| 11 | 45,387 |
| 12 | 48,393 |
| 1 | 33,396 |
| 2 | 38,068 |
| 3 | 45,779 |
| 4 | 48,271 |
| 5 | 54,987 |
| 6 | 45,168 |
| 7 | 46,658 |
| 8 | 51,569 |
| 9 | 56,070 |
| **2017** | **415,199** |
| 10 | 66,707 |
| 11 | 63,366 |
| 12 | 58,416 |
| 1 | 42,458 |
| 2 | 23,555 |
| 3 | 16,592 |
| 4 | 15,768 |
| 5 | 19,940 |
| 6 | 21,657 |
| 7 | 25,014 |
| 8 | 30,569 |
| 9 | 31,157 |
| **2018** | **519,944** |
| 10 | 34,842 |
| 11 | 39,031 |
| 12 | 40,476 |
| 1 | 35,865 |
| 2 | 36,690 |
| 3 | 50,213 |
| 4 | 51,019 |
| 5 | 51,790 |
| 6 | 43,096 |
| 7 | 40,005 |
| 8 | 46,551 |
| 9 | 50,366 |
| **2019** | **977,229** |
| 10 | 60,775 |
| 11 | 62,463 |
| 12 | 60,789 |
| 1 | 58,313 |
| 2 | 76,543 |
| 3 | 103,730 |
| 4 | 109,413 |
| 5 | 144,113 |
| 6 | 104,310 |
| 7 | 81,748 |
| 8 | 62,608 |
| 9 | 52,424 |
| **2020** | **458,066** |
| 10 | 45,139 |
| 11 | 42,642 |
| 12 | 40,563 |
| 1 | 36,583 |
| 2 | 36,686 |
| 3 | 34,457 |
| 4 | 17,106 |
| 5 | 23,237 |
| 6 | 33,029 |
| 7 | 40,949 |
| 8 | 50,007 |
| 9 | 57,668 |
| **2021** | **1,734,699** |
| 10 | 71,943 |
| 11 | 72,113 |
| 12 | 73,994 |
| 1 | 78,414 |
| 2 | 101,098 |
| 3 | 173,277 |
| 4 | 178,795 |
| 5 | 180,597 |
| 6 | 189,034 |
| 7 | 213,593 |
| 8 | 209,840 |
| 9 | 192,001 |
| **2022** | **2,378,944** |
| 10 | 164,837 |
| 11 | 174,845 |
| 12 | 179,253 |
| 1 | 154,874 |
| 2 | 166,010 |
| 3 | 222,574 |
| 4 | 235,785 |
| 5 | 241,136 |
| 6 | 207,834 |
| 7 | 200,162 |
| 8 | 204,087 |
| 9 | 227,547 |
| **2023** | **2,475,669** |
| 10 | 231,529 |
| 11 | 235,173 |
| 12 | 252,315 |
| 1 | 157,358 |
| 2 | 156,630 |
| 3 | 193,249 |
| 4 | 211,992 |
| 5 | 206,690 |
| 6 | 144,556 |
| 7 | 183,479 |
| 8 | 232,963 |
| 9 | 269,735 |
| **2024 YTD** | **1,340,799** |
| 10 | 240,932 |
| 11 | 242,413 |
| 12 | 301,980 |
| 1 | 176,189 |
| 2 | 189,914 |
| 3 | 189,371 |

Notes: Data for FY 2000 - FY 2003 are limited to USBP encounters between POEs.
Source: OHSS Persist as of March 2024.

CBP Encounters, Dec. 1 - Dec. 31, 2023

| | USBP | OFO | Total |
|---|---|---|---|
| **12/1/2023** | 7,235 | 1,718 | 8,953 |
| **12/2/2023** | 7,591 | 1,719 | 9,310 |
| **12/3/2023** | 8,420 | 1,732 | 10,152 |
| **12/4/2023** | 8,575 | 1,635 | 10,210 |
| **12/5/2023** | 10,324 | 1,800 | 12,124 |
| **12/6/2023** | 8,248 | 1,728 | 9,976 |
| **12/7/2023** | 7,206 | 1,714 | 8,920 |
| **12/8/2023** | 5,865 | 1,723 | 7,588 |
| **12/9/2023** | 6,207 | 1,741 | 7,948 |
| **12/10/2023** | 7,945 | 1,713 | 9,658 |
| **12/11/2023** | 7,458 | 1,698 | 9,156 |
| **12/12/2023** | 8,319 | 1,783 | 10,102 |
| **12/13/2023** | 9,026 | 1,791 | 10,817 |
| **12/14/2023** | 8,616 | 1,726 | 10,342 |
| **12/15/2023** | 9,373 | 1,657 | 11,030 |
| **12/16/2023** | 8,647 | 1,606 | 10,253 |
| **12/17/2023** | 8,342 | 1,666 | 10,008 |
| **12/18/2023** | 10,822 | 1,688 | 12,510 |
| **12/19/2023** | 10,518 | 1,732 | 12,250 |
| **12/20/2023** | 10,560 | 1,654 | 12,214 |
| **12/21/2023** | 8,990 | 1,638 | 10,628 |
| **12/22/2023** | 8,635 | 1,753 | 10,358 |
| **12/23/2023** | 7,622 | 1,691 | 9,313 |
| **12/24/2023** | 6,761 | 1,603 | 8,364 |
| **12/25/2023** | 5,913 | 1,600 | 7,513 |
| **12/26/2023** | 5,936 | 1,578 | 7,514 |
| **12/27/2023** | 7,703 | 1,678 | 9,381 |
| **12/28/2023** | 8,293 | 1,678 | 9,971 |
| **12/29/2023** | 7,654 | 1,591 | 9,245 |
| **12/30/2023** | 7,029 | 1,696 | 8,725 |
| **12/31/2023** | 5,900 | 1,625 | 7,525 |

Source: OHSS Persist March 2024

*December 2023 USBP average*
8,594

For instance, the Tucson sector's average full-year encounter total for the pre-pandemic period (FY 2014 to FY 2019) was approximately 62,000; by contrast, in November and December of 2023, the sector recorded approximately 64,000 and 80,000 encounters, respectively. *See* March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

USBP SWB Encounters by Sector, FY 2013 - FY 2024 YTD

| Row Label | Big Bend, | Del Rio, TX | El Centro, | El Paso, T | Laredo, TX | Rio Grande | San Diego, | Tucson, A | Yuma, AZ | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 3684 | 23510 | 16306 | 11154 | 50749 | 154453 | 27496 | 120939 | 6106 | 414397 |
| 2014 | 4096 | 24255 | 14511 | 12339 | 44049 | 256392 | 29911 | 87915 | 5902 | 479370 |
| 2015 | 5031 | 19013 | 12820 | 14495 | 35888 | 147257 | 26290 | 63397 | 7142 | 331333 |
| 2016 | 6366 | 23078 | 19448 | 25634 | 36562 | 186830 | 31891 | 64891 | 14170 | 408870 |
| 2017 | 6002 | 13476 | 18633 | 25193 | 25460 | 137562 | 26086 | 38657 | 12847 | 303916 |
| 2018 | 8045 | 15833 | 29230 | 31561 | 32641 | 162262 | 38591 | 52172 | 26244 | 396575 |
| 2019 | 9637 | 57269 | 35138 | 182143 | 38378 | 339135 | 58049 | 63490 | 68269 | 851508 |
| 2020 | 8627 | 40342 | 27487 | 54396 | 51425 | 90203 | 53277 | 66074 | 8804 | 400635 |
| 2021 | 37267 | 259294 | 59236 | 193918 | 112241 | 549080 | 142464 | 191234 | 114488 | 1659222 |
| 2022 | 31948 | 480931 | 72378 | 307844 | 106843 | 468124 | 176290 | 251984 | 310094 | 2206436 |
| 10 | 3606 | 28213 | 5042 | 14001 | 7444 | 45382 | 14339 | 19189 | 21897 | 159113 |
| 11 | 3308 | 30226 | 3889 | 15538 | 8030 | 47999 | 13448 | 21515 | 23062 | 167015 |
| 12 | 3410 | 33260 | 4140 | 19470 | 7305 | 43848 | 13624 | 15758 | 29787 | 170602 |
| 1 | 2379 | 31154 | 4830 | 18039 | 7375 | 30232 | 12294 | 17716 | 23858 | 147877 |
| 2 | 3007 | 30815 | 5689 | 20618 | 9501 | 33847 | 13517 | 21208 | 20968 | 159170 |
| 3 | 3665 | 41631 | 7567 | 25618 | 13800 | 44072 | 16662 | 27239 | 30927 | 211181 |
| 4 | 3383 | 40931 | 6248 | 29865 | 12577 | 41922 | 14616 | 25281 | 28681 | 203504 |
| 5 | 2880 | 44735 | 6996 | 34643 | 11682 | 46011 | 17113 | 25939 | 34371 | 224370 |
| 6 | 2024 | 45610 | 6305 | 26242 | 9886 | 44663 | 14037 | 21270 | 22362 | 192399 |
| 7 | 1619 | 49618 | 6707 | 25024 | 6603 | 35189 | 15991 | 16623 | 24460 | 181834 |
| 8 | 1400 | 52735 | 6815 | 29756 | 6299 | 27286 | 14751 | 18506 | 24226 | 181774 |
| 9 | 1267 | 52003 | 8150 | 49030 | 6341 | 27673 | 15898 | 21740 | 25495 | 207597 |
| 2023 | 11823 | 393226 | 50570 | 427471 | 45644 | 338337 | 230941 | 373625 | 174201 | 2045838 |
| 10 | 1304 | 42767 | 7316 | 53318 | 6012 | 28290 | 17875 | 22938 | 25314 | 205134 |
| 11 | 1523 | 48196 | 7024 | 53529 | 4309 | 27832 | 16850 | 23411 | 25006 | 207680 |
| 12 | 1190 | 51701 | 9759 | 55769 | 3353 | 28189 | 18952 | 22131 | 30974 | 222018 |
| 1 | 1079 | 28425 | 4563 | 30038 | 3257 | 14913 | 15440 | 20261 | 11537 | 129513 |
| 2 | 981 | 22939 | 3495 | 32911 | 4114 | 14981 | 17030 | 23560 | 10510 | 130521 |
| 3 | 1200 | 23904 | 4448 | 40103 | 5210 | 17956 | 23286 | 33898 | 13667 | 163672 |
| 4 | 1181 | 20809 | 3349 | 42552 | 5394 | 37881 | 25123 | 33960 | 13672 | 183921 |
| 5 | 1421 | 29971 | 4041 | 26172 | 3464 | 38032 | 22858 | 30139 | 15284 | 171382 |
| 6 | 412 | 24632 | 1680 | 13231 | 1919 | 11435 | 12901 | 24359 | 8969 | 99538 |
| 7 | 404 | 24505 | 1458 | 16466 | 2436 | 26527 | 15032 | 39215 | 6599 | 132647 |
| 8 | 568 | 29689 | 1458 | 25234 | 3097 | 46537 | 18985 | 48752 | 6734 | 181054 |
| 9 | 560 | 45688 | 1979 | 38148 | 3079 | 45764 | 26609 | 51001 | 5935 | 218763 |
| 2024 | 2555 | 194288 | 10105 | 150328 | 15995 | 97457 | 185469 | 342002 | 33733 | 1031932 |
| 10 | 479 | 38207 | 2049 | 22105 | 2827 | 32113 | 29879 | 55225 | 5870 | 188754 |
| 11 | 427 | 42951 | 1788 | 22407 | 2811 | 18775 | 31164 | 64637 | 6159 | 191119 |
| 12 | 322 | 71048 | 2222 | 33965 | 2267 | 18213 | 34371 | 80184 | 7145 | 249737 |
| 1 | 324 | 16701 | 1127 | 17515 | 2190 | 7341 | 24709 | 50563 | 3734 | 124204 |
| 2 | 567 | 14100 | 1209 | 23916 | 2922 | 11950 | 31562 | 49452 | 4960 | 140638 |
| 3 | 436 | 11281 | 1710 | 30420 | 2978 | 9065 | 33784 | 41941 | 5865 | 137480 |



| | |
|---|---|
| FY14-19 Tucson Avg. | 61,754 |
| Nov. 2023 | 64,637 |
| Dec. 2023 | 80,184 |

Source: March 2024 Persist; Unique Encounters Pivot Table

IFR_AR_007478

IFR_AR_007479

And while the number of encounters between POEs since December 2023 has decreased, consistent with seasonal migration flows and as a result of increased enforcement, they still remain at historically high levels—USBP encounters from January 2024 to March 2024 are just 5 percent below the levels reached during the same months in 2023, OHSS analysis of March 2024 OHSS Persist Dataset, *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

USBP encounters FY 2013 - FY 2024 YTD

| | | | |
|---|---|---|---|
| 2013 | 414397 | | |
| 2014 | 479370 | | |
| 2015 | 331333 | Change from FY2[ ] | -5% |
| 2016 | 408870 | | |
| 2017 | 303916 | | |
| 2018 | 396579 | | |
| 2019 | 851508 | | |
| 2020 | 400635 | | |
| 2021 | 1659222 | | |
| 2022 | 2206436 | | |
| 10 | 159113 | | |
| 11 | 167015 | | |
| 12 | 170602 | | |
| 1 | 147877 | FY2022 Q2 monthly average | 172,743 |
| 2 | 159170 | | |
| 3 | 211181 | | |
| 4 | 203504 | | |
| 5 | 224370 | | |
| 6 | 192399 | | |
| 7 | 181834 | | |
| 8 | 181774 | | |
| 9 | 207507 | | |
| 2023 | 2045838 | | |
| 10 | 205134 | | |
| 11 | 207680 | | |
| 12 | 222016 | | |
| 1 | 129513 | FY2022 Q2 monthly average | 141,235 |
| 2 | 130521 | | |
| 3 | 163672 | | |
| 4 | 183921 | | |
| 5 | 171382 | | |
| 6 | 99538 | | |
| 7 | 132442 | | |
| 8 | 183054 | | |
| 9 | 218763 | | |
| 2024 | 1031932 | | |
| 10 | 188754 | | |
| 11 | 191119 | | |
| 12 | 249737 | | |
| 1 | 124204 | FY2022 Q2 monthly average | 134,107 |
| 2 | 140638 | | |
| 3 | 137480 | | |

Source: Persist March 2024

while some USBP sectors, such as Tucson and San Diego, have seen increases of 83 percent and 62 percent, respectively, from the second quarter of FY 2023, and Tucson is on pace for an all-time high number of annual encounters.

OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration-enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

USBP SWB Encounters by Sector, FY 2013 - FY 2024 YTD

| Row Label | Big Bend | 'Del Rio, TX | El Centro, | El Paso, TX | Laredo, TX | Rio Grande | San Diego, | Tucson, AZ | Yuma, AZ | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 3684 | 23510 | 16306 | 11154 | 50749 | 154453 | 27496 | 120939 | 6106 | 414397 |
| 2014 | 4096 | 24255 | 14511 | 12339 | 44049 | 256392 | 29911 | 87915 | 5902 | 479370 |
| 2015 | 5031 | 19013 | 12820 | 14495 | 35888 | 147257 | 26290 | 63397 | 7142 | 331333 |
| 2016 | 6366 | 23078 | 19448 | 25634 | 36562 | 186830 | 31891 | 64891 | 14170 | 408870 |
| 2017 | 6002 | 13476 | 18633 | 25193 | 25460 | 137562 | 26086 | 38657 | 12847 | 303916 |
| 2018 | 8045 | 15833 | 29230 | 31561 | 32641 | 162262 | 38591 | 52172 | 26244 | 396579 |
| 2019 | 9637 | 57269 | 35138 | 182143 | 38378 | 339135 | 58049 | 63490 | 68269 | 851508 |
| 2020 | 8627 | 40342 | 27487 | 54396 | 51425 | 90203 | 53277 | 66074 | 8804 | 400635 |
| 2021 | 37267 | 259294 | 59236 | 193918 | 112241 | 549080 | 142464 | 191234 | 114488 | 1659222 |
| 2022 | 31948 | 480931 | 72376 | 307844 | 106843 | 468124 | 176290 | 251984 | 310094 | 2206436 |
| 10 | 3606 | 28213 | 5042 | 14001 | 7444 | 45382 | 14339 | 19189 | 21897 | 159113 |
| 11 | 3308 | 30226 | 3889 | 15538 | 8030 | 47999 | 13448 | 21515 | 23062 | 167015 |
| 12 | 3410 | 33260 | 4140 | 19470 | 7305 | 43848 | 13624 | 15758 | 29787 | 170602 |
| 1 | 2379 | 31154 | 4830 | 18039 | 7375 | 30232 | 12294 | 17716 | 23858 | 147877 |
| 2 | 3007 | 30815 | 5689 | 20618 | 9501 | 33847 | 13517 | 21208 | 20968 | 159170 |
| 3 | 3665 | 41631 | 7567 | 25618 | 13800 | 44072 | 16662 | 27239 | 30927 | 211181 |
| 4 | 3383 | 40931 | 6248 | 29865 | 12577 | 41922 | 14616 | 25281 | 28681 | 203504 |
| 5 | 2880 | 44735 | 6996 | 34643 | 11682 | 46011 | 17113 | 25939 | 34371 | 224370 |
| 6 | 2024 | 45610 | 6305 | 26242 | 9886 | 44663 | 14037 | 21270 | 22362 | 192399 |
| 7 | 1619 | 49618 | 6707 | 25024 | 6603 | 35189 | 15991 | 16623 | 24460 | 181834 |
| 8 | 1400 | 52735 | 6815 | 29756 | 6299 | 27286 | 14751 | 18506 | 24226 | 181774 |
| 9 | 1267 | 52003 | 8150 | 49030 | 6341 | 27673 | 15898 | 21740 | 25495 | 207597 |
| 2023 | 11823 | 393226 | 50570 | 427471 | 45644 | 338337 | 230941 | 373625 | 174201 | 2045838 |
| 10 | 1304 | 42767 | 7316 | 53318 | 6012 | 28290 | 17875 | 22938 | 25314 | 205134 |
| 11 | 1523 | 48196 | 7024 | 53259 | 4309 | 27832 | 16850 | 23411 | 25006 | 207680 |
| 12 | 1190 | 51701 | 9759 | 55769 | 3353 | 28189 | 18952 | 22131 | 30974 | 222018 |
| 1 | 1079 | 28425 | 4563 | 30038 | 3257 | 14913 | 15440 | 20261 | 11537 | 129513 |
| 2 | 981 | 22939 | 3495 | 32911 | 4114 | 14981 | 17030 | 23560 | 10510 | 130521 |
| 3 | 1200 | 23904 | 4448 | 40103 | 5210 | 17956 | 23286 | 33898 | 13667 | 163672 |
| 4 | 1181 | 20809 | 3349 | 42552 | 5394 | 37881 | 25123 | 33960 | 13672 | 183921 |
| 5 | 1421 | 29971 | 4041 | 26172 | 3464 | 38032 | 22858 | 30139 | 15284 | 171382 |
| 6 | 412 | 24632 | 1680 | 13231 | 1919 | 11435 | 12901 | 24359 | 8969 | 99538 |
| 7 | 404 | 24505 | 1458 | 16466 | 2436 | 25527 | 15032 | 39215 | 6599 | 132642 |
| 8 | 568 | 29689 | 1458 | 25234 | 3097 | 46537 | 18985 | 48752 | 6734 | 181054 |
| 9 | 560 | 45688 | 1979 | 38148 | 3079 | 45764 | 26609 | 51001 | 5935 | 218763 |
| 2024 | 2555 | 194288 | 10105 | 150328 | 15995 | 97457 | 185469 | 342002 | 33733 | 1031932 |
| 10 | 479 | 38207 | 2049 | 22105 | 2827 | 32113 | 29879 | 55225 | 5870 | 188754 |
| 11 | 427 | 42951 | 1788 | 22407 | 2811 | 18775 | 31164 | 64637 | 6159 | 191119 |
| 12 | 322 | 71048 | 2222 | 33965 | 2267 | 18213 | 34371 | 80184 | 7145 | 249737 |
| 1 | 324 | 16701 | 1127 | 17515 | 2190 | 7341 | 24709 | 50563 | 3734 | 124204 |
| 2 | 567 | 14100 | 1209 | 23916 | 2922 | 11950 | 31562 | 49452 | 4960 | 140638 |
| 3 | 436 | 11281 | 1710 | 30420 | 2978 | 9065 | 33784 | 41941 | 5865 | 137480 |

Source: March 2024 Persist; Unique Encounters Pivot Table

|  | San Diego | Tucson |
|---|---|---|
| FY24 change from FY23: | 62% | 83% |
| Tucson projected encounters FY24: | | 684,004 |
| Tucson Max 1960-2020: | | 616,346 |

Encounters between POEs in January 2024 were substantially lower than December 2023 encounters, consistent with historic seasonal trends, and encounters in January 2022 and January 2023. OHSS analysis of March 2024 OHSS Persist Dataset.

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 28929 | 27636 | 23243 | 26921 | 35042 | 47293 | 48212 | 43856 | 34436 | 33230 | 33797 | 31802 |
| 2014 | 35312 | 31896 | 29528 | 28668 | 36403 | 49596 | 51502 | 60683 | 57861 | 40708 | 31388 | 25825 |
| 2015 | 26450 | 24641 | 25019 | 21514 | 24376 | 29791 | 29750 | 31576 | 29303 | 28388 | 30239 | 30286 |
| 2016 | 32724 | 32838 | 37014 | 23758 | 26072 | 33316 | 38089 | 40337 | 34450 | 33723 | 37048 | 39501 |
| 2017 | 46184 | 47211 | 43251 | 31576 | 18754 | 12195 | 11127 | 14519 | 16087 | 18187 | 22288 | 22537 |
| 2018 | 25488 | 29085 | 28995 | 25975 | 26666 | 37390 | 38243 | 40339 | 34089 | 31299 | 37524 | 41486 |
| 2019 | 51005 | 51857 | 50751 | 47979 | 66883 | 92833 | 99273 | 132856 | 94902 | 71978 | 50684 | 40507 |
| 2020 | 35402 | 33524 | 32853 | 29205 | 30077 | 30389 | 16182 | 21593 | 30816 | 38556 | 47276 | 54762 |
| 2021 | 69048 | 69169 | 71141 | 75316 | 97643 | 169216 | 173699 | 172654 | 178649 | 200658 | 196514 | 185515 |
| 2022 | 159113 | 167015 | 170602 | 147877 | 159170 | 211181 | 203504 | 224370 | 192399 | 181834 | 181774 | 207557 |
| 2023 | 205134 | 207680 | 222018 | 129513 | 130521 | 163672 | 183921 | 171382 | 99538 | 132642 | 181054 | 218763 |
| 2024 | 188754 | 191119 | 249737 | 124204 | 140638 | 137480 | | | | | | |

Source: March 2024 OHSS Persist Dataset.

IFR_AR_007482

In February and March 2024, encounter levels increased from the levels in January but remained significantly lower than in December 2023.
OHSS analysis of March 2024 OHSS Persist Dataset.

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 28929 | 27636 | 23243 | 26921 | 35042 | 47293 | 48212 | 43856 | 34436 | 33230 | 33797 | 31802 |
| 2014 | 35312 | 31896 | 29528 | 28668 | 36403 | 49596 | 51502 | 60683 | 57861 | 40708 | 31388 | 25825 |
| 2015 | 26450 | 24641 | 25019 | 21514 | 24376 | 29791 | 29750 | 31576 | 29303 | 28388 | 30239 | 30286 |
| 2016 | 32724 | 32838 | 37014 | 23758 | 26072 | 33316 | 38089 | 40337 | 34450 | 33723 | 37048 | 39501 |
| 2017 | 46184 | 47211 | 43251 | 31576 | 18754 | 12195 | 11127 | 14519 | 16087 | 18187 | 22288 | 22537 |
| 2018 | 25488 | 29085 | 28995 | 25975 | 26666 | 37390 | 38243 | 40339 | 34089 | 31299 | 37524 | 41486 |
| 2019 | 51005 | 51857 | 50751 | 47979 | 66883 | 92833 | 99273 | 132856 | 94902 | 71978 | 50684 | 40507 |
| 2020 | 35402 | 33524 | 32853 | 29205 | 30077 | 30389 | 16182 | 21593 | 30816 | 38556 | 47276 | 54762 |
| 2021 | 69048 | 69169 | 71141 | 75316 | 97643 | 169216 | 173699 | 172654 | 178649 | 200658 | 196514 | 185515 |
| 2022 | 159113 | 167015 | 170602 | 147877 | 159170 | 211181 | 203504 | 224370 | 192399 | 181834 | 181774 | 207597 |
| 2023 | 205134 | 207680 | 222018 | 129513 | 130521 | 163672 | 183921 | 171382 | 99538 | 132642 | 181054 | 218763 |
| 2024 | 188754 | 191119 | 249737 | 124204 | 140638 | 137480 | | | | | | |

Source: March 2024 OHSS Persist Dataset.

Overall, from January 1 to March 31, 2024, encounters between POEs were 5 percent lower than during the same months in 2023 and 22 percent lower than those in 202
OHSS analysis of March 2024 OHSS Persist Dataset.

USBP encounters FY 2013 - FY 2024 YTD

| | | | |
|---|---|---|---|
| 2013 | 414397 | | |
| 2014 | 479370 | Change from FY22 | -22% |
| 2015 | 331333 | Change from FY23 | -5% |
| 2016 | 408870 | | |
| 2017 | 303916 | | |
| 2018 | 396579 | | |
| 2019 | 851508 | | |
| 2020 | 400635 | | |
| 2021 | 1659222 | | |
| 2022 | 2206436 | | |
| 10 | 159113 | | |
| 11 | 167015 | | |
| 12 | 170602 | | |
| 1 | 147877 | FY2022 Q2 monthly average | 172,743 |
| 2 | 159170 | | |
| 3 | 211181 | | |
| 4 | 203504 | | |
| 5 | 224370 | | |
| 6 | 192399 | | |
| 7 | 181834 | | |
| 8 | 181774 | | |
| 9 | 207597 | | |
| 2023 | 2045838 | | |
| 10 | 205134 | | |
| 11 | 207680 | | |
| 12 | 222018 | | |
| 1 | 129513 | FY2022 Q2 monthly average | 141,235 |
| 2 | 130521 | | |
| 3 | 163672 | | |
| 4 | 183921 | | |
| 5 | 171382 | | |
| 6 | 99538 | | |
| 7 | 132642 | | |
| 8 | 181054 | | |
| 9 | 218763 | | |
| 2024 | 1031932 | | |
| 10 | 188754 | | |
| 11 | 191119 | | |
| 12 | 249737 | | |
| 1 | 124204 | FY2022 Q2 monthly average | 134,107 |
| 2 | 140638 | | |
| 3 | 137480 | | |

Source: Persist March 2024

2.

IFR_AR_007485

Over the past two years, an increasing proportion of total CBP encounters at the SWB has been composed of families and UCs, and DHS has seen record flows of migrants from countries outside of northern Central America.

March 2024 OHSS Persist Dataset, *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* , https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SWB Encounters by Agency and Family Status" and "SWB Encounters by Citizenship and Family Status").

| | Mexico | NTriangle | Other | Grand Total |
|---|---|---|---|---|
| 2014 | 285502 | 248063 | 36483 | 570048 |
| 2015 | 253660 | 142341 | 48855 | 444856 |
| 2016 | 256083 | 227458 | 75450 | 558991 |
| 2017 | 183119 | 187539 | 46141 | 415199 |
| 2018 | 221711 | 258413 | 39820 | 519944 |
| 2019 | 237067 | 623569 | 116593 | 977229 |
| 2020 | 297692 | 106760 | 53614 | 458066 |
| 2021 | 655605 | 701051 | 378043 | 1734699 |
| 2022 | 808339 | 541618 | 1028987 | 2378944 |
| 2023 | 717333 | 495286 | 1263050 | 2475669 |
| 2024 | 385680 | 267831 | 687288 | 1340799 |
| 10 | 63994 | 52517 | 125021 | 240932 |
| 11 | 64814 | 52558 | 125041 | 242413 |
| 12 | 69039 | 62694 | 170247 | 301980 |
| 1 | 59917 | 32523 | 83749 | 176189 |
| 2 | 62987 | 38390 | 88537 | 189914 |
| 3 | 65929 | 28749 | 94693 | 189371 |

| Row Label | AM | FM | SA | UC | UNK | Grand Total |
|---|---|---|---|---|---|---|
| 2014 | | 67040 | 341482 | 72715 | 88771 | 570048 |
| 2015 | | 39834 | 251505 | 44123 | 109394 | 444856 |
| 2016 | | 103053 | 327864 | 66362 | 61712 | 558991 |
| 2017 | | 104987 | 257901 | 48618 | 3693 | 415199 |
| 2018 | 1320 | 160827 | 299157 | 58234 | 406 | 519944 |
| 2019 | 948 | 526975 | 368306 | 80634 | 366 | 977229 |
| 2020 | 688 | 70990 | 353003 | 33233 | 152 | 458066 |
| 2021 | 2108 | 479716 | 1105694 | 146930 | 251 | 1734699 |
| 2022 | 2963 | 560630 | 1662476 | 152027 | 818 | 2378944 |
| 2023 | 2535 | 821119 | 1513777 | 137275 | 563 | 2475669 |
| 2024 | 816 | 526034 | 748158 | 65462 | 329 | 1340799 |
| 10 | 122 | 106281 | 122992 | 11502 | 35 | 240932 |
| 11 | 120 | 104149 | 125283 | 12799 | 62 | 242413 |
| 12 | 139 | 123493 | 164833 | 13463 | 52 | 301980 |
| 1 | 153 | 60333 | 107135 | 8512 | 56 | 176189 |
| 2 | 122 | 65138 | 114239 | 10357 | 58 | 189914 |
| 3 | 160 | 66640 | 113676 | 8829 | 66 | 189371 |

| | Other | FM | UC |
|---|---|---|---|
| 2014 | 6% | 12% | 13% |
| 2015 | 11% | 9% | 10% |
| 2016 | 13% | 18% | 12% |
| 2017 | 11% | 25% | 12% |
| 2018 | 8% | 31% | 11% |
| 2019 | 12% | 54% | 8% |
| 2020 | 12% | 15% | 7% |
| 2021 | 22% | 28% | 8% |
| 2022 | 43% | 24% | 6% |
| 2023 | 51% | 33% | 6% |
| 2024 | 51% | 39% | 5% |
| 10 | 52% | 44% | 5% |
| 11 | 52% | 43% | 5% |
| 12 | 56% | 41% | 4% |
| 1 | 48% | 34% | 5% |
| 2 | 47% | 34% | 5% |
| 3 | 50% | 35% | 5% |

Source: OHSS Persist March 2024 Unique Encounters Pivot table.

OHS uses the encounter projection to generate a range of planning models, which can include "low" planning models that are based on the lower bound of the 95 percent forecast interval, "moderate" planning models that are based on the upper bound of the 95 percent forecast interval, and "high" planning models based on the upper bound of the 95 percent forecast interval. These planning models account for changes in effectiveness of current enforcement and lawful migration. OHSS Southwest Border Encounter Projection, April 2024.




**FOUO**
April Encounter Projections: Blended

**Projected encounters exclude OFO releases with parole dispositions and/or CBP One appointments, but include other OFO paroles.**

**Key updates from previous versions:** Updated the selection of nesting average terms in the models and the assumptions in the high planning line. Added a low planning line. Updated the input data and maintained all other model specification parameters from March 2024 projections. Detailed results are available with the breakdowns of results by country.

**Workbook Details:** This workbook presents the most recent Blended Encounter Projections. The workbook contains the following worksheets:
- **Overview:** Current overview worksheet, providing details about the workbook and the projections.
- **Totals:** Encounter projections by Total, Family Type, and UC OTM.
  - *Note:* UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Daily Average:** Encounter projections by Total, Family Type, and UC OTM.
  - *Note:* UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Planning, Low:** Encounter projections from the Blended planning line adjusted to assume increased impact of current enforcement and lawful migration processes. The adjustment lowers all countries to the lower bound of a 95% confidence interval. This line is also referred to as the Low planning line.
- **Blended, Models SME:** Encounter projections by select 14 countries plus Other, broken down by Total and Family Type. Results come from BSTS, and then a multiplier defined by the SME survey results. The multiplier based on the SME survey results is designed to incorporate information not included in the statistical model.
- **Planning, Mod:** Encounter projections from the Blended planning line adjusted to assume moderately diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 95% confidence interval. This line is also referred to as the Moderate planning line.
- **Planning, High:** Encounter projections from the Blended planning line adjusted to assume substantially diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 95% confidence interval. This line is also referred to as the High planning line.
- **Graphs:** Graphs illustrate the daily averages by family type.

**The Blended Encounter Projections:** A blend methods approach that combines the knowledge and trend of subject matter expertise with mathematical, regression-based predictive models. Were specifically, the current Blended Projections average, or 'blend', the:
- Bayesian Structural Time Series (BSTS) Model projections;
- LightGBM Model projections. (Results not reported in this round and not included in the Blended model.)
- Structured Subject Matter Expert (SME) Survey responses.

**Model Specifications and Notes:**
- Uses actuals of encounters through:
  - BSTS Model: 2024-03-31
  - LightGBM Model: 2024-03-31
- Model Descriptions:
  - The BSTS Model was built using a machine learning approach and includes a 12-seasonal component, an autoregressive component (AR(1)), and a regressor component:
    - The BSTS regression component includes the following predictors: Mexico Apprehensions (through Feb 2024); USA Unemployment (through Jan 2024); Fatalities (through Mar 2024); Disasters (through Mar 2024); Remittances (Mexico – through Feb 2024; Colombia – through Feb 2024; Nicaragua – through Feb 2024; Guatemala – through Mar 2024; and ratio of Removals by TB Encounters (through Feb 2024)).
  - LW LightGBM Model was built using a machine learning approach and includes prediction from the BSTS.

**FOUO**
Encounter projections by Total, Family Type, and UC OTM, Daily Average

| | 24-Apr | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | 25-Jan | 25-Feb | 25-Mar | 25-Apr | 25-May | 25-Jun | 25-Jul | 25-Aug | 25-Sep Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | | | | | | | |
| Planning, Low | 4,453 | 4,262 | 3,903 | 3,698 | 3,491 | 4,449 | 3,784 | 3,699 | 4,832 | 5,053 | 3,820 | 4,118 | 4,562 | 4,471 | 3,769 | 3,670 | 3,643 | 4,147 | 3,940 |
| Blended (Models and SME) | 5,517 | 5,065 | 4,978 | 4,988 | 5,045 | 5,842 | 5,177 | 5,308 | 6,261 | 6,359 | 5,375 | 5,500 | 5,937 | 5,878 | 5,091 | 5,066 | 5,034 | 5,764 | 5,384 |
| Planning, Moderate | 6,271 | 6,028 | 5,722 | 5,752 | 5,873 | 6,586 | 5,887 | 6,210 | 6,991 | 5,125 | 6,142 | 6,260 | 6,711 | 6,687 | 5,884 | 5,775 | 5,754 | 6,523 | 6,123 |
| Planning, High | 6,905 | 7,005 | 6,456 | 6,558 | 6,671 | 7,100 | 6,607 | 6,816 | 7,591 | 6,835 | 6,859 | 6,860 | 7,925 | 7,308 | 6,548 | 6,470 | 6,444 | 7,057 | 6,841 |
| **PAI** | | | | | | | | | | | | | | | | | | |
| Planning, Low | 1,451 | 1,549 | 1,351 | 1,473 | 1,490 | 1,758 | 1,510 | 1,348 | 3,006 | 1,280 | 1,068 | 1,081 | 1,802 | 1,764 | 1,766 | 1,614 | 1,635 | 1,886 | 1,655 |
| Blended (Models and SME) | 1,900 | 1,561 | 1,899 | 1,899 | 2,011 | 2,260 | 2,019 | 2,139 | 2,534 | 1,737 | 2,128 | 2,114 | 2,218 | 2,369 | 2,093 | 2,124 | 2,114 | 2,331 | 2,158 |
| Planning, Moderate | 2,100 | 2,329 | 2,176 | 2,199 | 2,179 | 2,507 | 2,263 | 2,597 | 2,822 | 2,096 | 2,428 | 2,462 | 2,671 | 2,855 | 2,447 | 2,852 | 2,608 | 3,070 | 2,679 |
| Planning, High | 2,564 | 2,547 | 2,421 | 2,561 | 2,501 | 2,589 | 2,493 | 2,501 | 2,802 | 2,356 | 2,712 | 2,640 | 2,871 | 2,856 | 2,447 | 2,552 | 2,485 | 2,658 | 2,519 |
| **UC** | | | | | | | | | | | | | | | | | | |
| Planning, Low | 2,433 | 2,535 | 1,480 | 1,440 | 1,382 | 1,460 | 2,163 | 2,110 | 2,509 | 1,649 | 2,046 | 2,297 | 2,487 | 2,456 | 1,805 | 1,803 | 1,803 | 2,046 | 2,168 |
| Blended (Models and SME) | 3,384 | 3,225 | 3,800 | 2,757 | 2,798 | 3,327 | 2,923 | 3,063 | 3,415 | 2,410 | 3,060 | 3,104 | 3,549 | 3,285 | 2,741 | 3,003 | 3,003 | 3,300 | 3,087 |
| Planning, Moderate | 3,738 | 3,754 | 3,009 | 3,106 | 3,147 | 3,770 | 3,351 | 3,406 | 3,804 | 3,408 | 3,434 | 3,563 | 3,782 | 3,714 | 3,109 | 3,099 | 3,113 | 3,430 | 3,599 |
| Planning, High | 4,333 | 4,158 | 3,889 | 3,558 | 3,620 | 4,156 | 3,763 | 4,024 | 4,128 | 3,891 | 3,975 | 4,214 | 4,124 | 3,510 | 3,668 | 3,668 | 3,524 | 3,803 | 3,884 |
| **UC OTM** | | | | | | | | | | | | | | | | | | |
| Planning, Low | 268 | 317 | 169 | 168 | 154 | 131 | 170 | 243 | 214 | 168 | 160 | 171 | 213 | 230 | 163 | 170 | 163 | 192 | 185 |
| Blended (Models and SME) | 273 | 279 | 253 | 240 | 229 | 195 | 212 | 312 | 308 | 274 | 283 | 225 | 245 | 284 | 263 | 263 | 238 | 274 | 272 |
| Planning, Moderate | 305 | 343 | 310 | 295 | 280 | 233 | 261 | 400 | 412 | 346 | 341 | 306 | 305 | 357 | 353 | 357 | 310 | 362 | 339 |
| Planning, High | 322 | 327 | 331 | 338 | 90 | 304 | 80 | 113 | 249 | 82 | 112 | 151 | 132 | 146 | 117 | 123 | 136 | 132 | 123 |
| Planning, Moderate | 202 | 225 | 238 | 231 | 227 | 192 | 200 | 309 | 326 | 244 | 253 | 219 | 213 | 237 | 248 | 208 | 228 | 206 | 193 |
| Planning, High | 233 | 262 | 286 | 270 | 270 | 220 | 231 | 358 | 372 | 304 | 291 | 257 | 251 | 259 | 303 | 238 | 238 | 316 | 236 |

**Note:** Encounters exclude OFO Paroles and CBP One appointments. UC OTM are calculated by summing all non-Mexican UC encounter projections.

IFR_AR_007487

IFR_AR_007488

The current internal projections, based on this robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the three months from July to September, 2024, in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP (
OHSS Encounter Projections, April 2024.

| | |
|---|---|
| July-Sept average low | 3,886 |
| July-Sept average high | 6,738 |

FOUO

April Encounter Projections: Blended

Office of Homeland Security Statistics
U.S. Department of Homeland Security

**Projected encounters exclude OFO releases with parole dispositions and/or CBP One appointments, but include other OFO parolees.**

**Key updates from previous version:** Updated the selection of moving average terms in the models and the assumptions in the high planning line. Added a low planning line. Updated the input data and maintained all other model specification parameters from March 2024 projections. Detailed results are available with the breakdowns of results by country.

**Workbook Details:** This workbook presents the most recent Blended Encounter Projections. The workbook contains the following worksheets:

- **Overview**: Current worksheet, providing details about the workbook and the projections.
- **Totals**: Encounter projections by Total, Family Type, and UC OTM.
  - *Note:* UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Daily Average**: Encounter projections by Total, Family Type, and UC OTM.
  - *Note:* UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Planning, Low:** Encounter projections from the Blended planning line adjusted to assume increased impact of current enforcement and lawful migration processes. The adjustment lowers all countries to the lower bound of a 95% confidence interval. This line is also referred to as the Low planning line.
- **Blended, Models-SME**: Encounter projections by select 14 countries plus Other, broken down by Total and Family Type. Results come from BSTS, and then a multiplier defined by the SME survey results. The multiplier based on the SME survey results is designed to update the statisical projection with real-time (subjective) insight gathered from SMEs, incorporating information not included in the statistical model.
- **Planning, Mod**: Encounter projections from the Blended planning line adjusted to assume moderately diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 68% confidence interval. This line is also referred to as the Moderate planning line.
- **Planning, High**: Encounter projections from the Blended planning line adjusted to assume substantially diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 95% confidence interval. This line is also referred to as the High planning line.
- **Graphs**: Graphs illustrate the daily averages by family type.

**The Blended Encounter Projections:** A mixed-methods approach that combines the knowledge and intel of subject matter expertise with mathematical, regression-based predictive models. More specifically, the current Blended Projections average, or 'blend', the:

- Bayesian Structural Time Series (BSTS) Model projections.
- LightGBM Model projections. (Results not reported in this round and not included in the Blended model.)
- Structured Subject Matter Expert (SME) Survey responses

**Model Specifications and Notes:**

- Uses actuals of encounters through:
  - BSTS Model: **2024-03-31**
  - LightGBM Model: **2024-03-31**
- Model Descriptions:
  - The BSTS Model was built using a machine learning approach and includes: a 12-seasonal component, an autoregressive component (AR(1)), and a regression component.
    - The BSTS regression component includes the following predictors: Mexico Apprehensions (through Feb 2024), USA Unemployment (through Jan 2024), Fatalities (through Mar 2024), Disasters (through Mar 2024), Remittances (Mexico - through Feb 2024, Colombia - through Feb 2024, Nicaragua - through Feb 2024, Guatemala - through Mar 2024) and ratio of Removals by T8 Encounters (through Feb 2024).
  - The LightGBM Model was built using a machine learning approach and includes predictors from the BSTS.

FOUO

**Encounter projections by Total, Family Type, and UC OTM; Daily Average**

| | 24-Apr | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | 25-Jan | 25-Feb | 25-Mar | 25-Apr | 25-May | 25-Jun | 25-Jul | 25-Aug | 25-Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 4,063 | 4,262 | 3,565 | 3,600 | 3,655 | 4,403 | 3,784 | 3,894 | 4,832 | 3,053 | 3,830 | 4,118 | 4,502 | 4,471 | 3,703 | 3,670 | 3,643 | 4,337 | 3,966 |
| Blended (Models and SME) | 5,517 | 5,665 | 4,978 | 4,988 | 5,045 | 5,842 | 5,177 | 5,348 | 6,261 | 4,395 | 5,375 | 5,530 | 5,957 | 5,878 | 5,091 | 5,046 | 5,034 | 5,784 | 5,384 |
| Planning, Moderate | 6,271 | 6,394 | 5,732 | 5,718 | 5,775 | 6,596 | 5,907 | 6,102 | 6,991 | 5,125 | 6,182 | 6,260 | 6,711 | 6,607 | 5,844 | 5,775 | 5,764 | 6,537 | 6,127 |
| Planning, High | 6,995 | 7,095 | 6,456 | 6,418 | 6,475 | 7,320 | 6,607 | 6,826 | 7,691 | 5,825 | 6,958 | 6,960 | 7,435 | 7,308 | 6,568 | 6,476 | 6,464 | 7,261 | 6,841 |
| **FM** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 1,431 | 1,544 | 1,391 | 1,471 | 1,499 | 1,728 | 1,510 | 1,584 | 2,008 | 1,280 | 1,585 | 1,602 | 1,798 | 1,794 | 1,616 | 1,635 | 1,608 | 1,799 | 1,605 |
| Blended (Models and SME) | 1,960 | 2,061 | 1,899 | 1,980 | 2,011 | 2,260 | 2,023 | 2,120 | 2,534 | 1,727 | 2,139 | 2,114 | 2,328 | 2,309 | 2,093 | 2,126 | 2,113 | 2,332 | 2,118 |
| Planning, Moderate | 2,238 | 2,329 | 2,176 | 2,249 | 2,279 | 2,537 | 2,292 | 2,397 | 2,803 | 1,996 | 2,436 | 2,382 | 2,605 | 2,578 | 2,370 | 2,395 | 2,381 | 2,609 | 2,392 |
| Planning, High | 2,504 | 2,587 | 2,442 | 2,506 | 2,537 | 2,804 | 2,549 | 2,663 | 3,061 | 2,253 | 2,722 | 2,640 | 2,871 | 2,835 | 2,637 | 2,652 | 2,639 | 2,875 | 2,654 |
| **SA** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 2,423 | 2,501 | 1,985 | 1,941 | 1,982 | 2,483 | 2,103 | 2,110 | 2,594 | 1,645 | 2,040 | 2,297 | 2,487 | 2,456 | 1,895 | 1,843 | 1,860 | 2,346 | 2,166 |
| Blended (Models and SME) | 3,284 | 3,325 | 2,826 | 2,757 | 2,798 | 3,327 | 2,922 | 2,963 | 3,435 | 2,479 | 2,961 | 3,134 | 3,349 | 3,285 | 2,741 | 2,665 | 2,683 | 3,196 | 3,007 |
| Planning, Moderate | 3,728 | 3,754 | 3,269 | 3,186 | 3,227 | 3,770 | 3,351 | 3,406 | 3,864 | 2,908 | 3,436 | 3,563 | 3,792 | 3,714 | 3,184 | 3,094 | 3,112 | 3,639 | 3,444 |
| Planning, High | 4,153 | 4,166 | 3,695 | 3,598 | 3,639 | 4,196 | 3,763 | 3,832 | 4,276 | 3,320 | 3,892 | 3,975 | 4,218 | 4,126 | 3,610 | 3,506 | 3,524 | 4,065 | 3,864 |
| **UC** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 208 | 217 | 189 | 188 | 174 | 192 | 170 | 201 | 229 | 128 | 205 | 220 | 217 | 221 | 192 | 192 | 176 | 192 | 195 |
| Blended (Models and SME) | 272 | 279 | 253 | 251 | 236 | 256 | 232 | 265 | 292 | 189 | 275 | 283 | 281 | 284 | 257 | 255 | 238 | 256 | 259 |
| Planning, Moderate | 306 | 311 | 287 | 283 | 268 | 289 | 264 | 298 | 324 | 221 | 310 | 315 | 314 | 316 | 290 | 287 | 270 | 289 | 291 |
| Planning, High | 337 | 342 | 318 | 314 | 299 | 321 | 295 | 330 | 355 | 252 | 344 | 345 | 346 | 347 | 322 | 318 | 301 | 321 | 323 |
| **UC OTM** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 112 | 127 | 104 | 108 | 90 | 106 | 83 | 114 | 149 | 48 | 113 | 131 | 131 | 142 | 117 | 121 | 100 | 115 | 112 |
| Blended (Models and SME) | 172 | 185 | 163 | 166 | 147 | 165 | 140 | 174 | 208 | 105 | 178 | 189 | 191 | 200 | 176 | 178 | 158 | 175 | 171 |
| Planning, Moderate | 202 | 215 | 194 | 195 | 177 | 196 | 170 | 205 | 237 | 134 | 211 | 219 | 221 | 229 | 207 | 208 | 188 | 206 | 201 |
| Planning, High | 232 | 243 | 223 | 224 | 205 | 225 | 199 | 234 | 266 | 163 | 242 | 247 | 251 | 258 | 237 | 236 | 216 | 235 | 230 |

**Note:** Encounters exclude OFO Paroles and CBP One appointments. UC OTM are calculated by summing all non-Mexican UC encounter projections.

See app.

IFR_AR_007490

The current internal projections, based on the robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the fleet months from July to September, 2024, in the range of approximately 5,900 to approximately 6,700 encounters in and between POEs per day, not including an additional 1,450 noncitizen per day who are expected to be encountered at POEs after making appointments through the CBP One app that the OHSS encounter projection (includes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (i.e., encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset.

CBP Enforcement Encounters, Excluding People Who Have Registered with CBP 1, May 12, 2023 - March 31, 2024

Row value Sum of count

| | | |
|---|---|---|
| May-12 | 6593 | 107.15 |
| Jun-23 | 5098 | 169.9333 |
| Jul-23 | 4194 | 135.2903 |
| Aug-23 | 4478 | 144.4516 |
| Sep-23 | 5252 | 175.0667 |
| Oct-23 | 5671 | 182.9333 |
| Nov-23 | 6540 | 218 |
| Dec-23 | 5695 | 188.3 |
| Jan-24 | 5868 | 189.3 |
| Feb-24 | 6018 | 200.1053 |
| Mar-24 | 6937 | 211.9 |

IFR_AR_007491

One app

IFR_AR_007492

This is generally true when considering total encounters across the entire SWB, and even more the case when specific sectors along the border are targeted by smuggling organizations with focused localized surges in encounters—as has been happening since the late fall in Tucson, Arizona, which accounted for 35 percent of SWB encounters between POEs in the second quarter of FY 2024, up from 18 percent in FY 2023 and 15 percent in FY 2022. March 2024 OHSS Person Dataset, see also: OHSS, *Immigration Enforcement and Legal Processes Monthly Tables - October 2022*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

USBP SWB Encounters by Sector, FY 2013 – FY 2024 YTD

| Row Labels | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande | San Diego, | Tucson, AZ | Yuma, AZ | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 3684 | 23510 | 16304 | 11154 | 50749 | 154452 | 27496 | 120939 | 6106 | 414407 |
| 2014 | 4056 | 24255 | 14511 | 12359 | 44005 | 256302 | 29011 | 87553 | 5903 | 470730 |
| 2015 | 5051 | 19013 | 22829 | 14495 | 35889 | 147257 | 26290 | 63397 | 7142 | 331333 |
| 2016 | 6364 | 23976 | 19448 | 25424 | 36162 | 186838 | 31891 | 64891 | 14170 | 408970 |
| 2017 | 6002 | 13476 | 18433 | 25359 | 25446 | 137562 | 26086 | 38657 | 12047 | 303814 |
| 2018 | 8045 | 15833 | 29158 | 31561 | 32641 | 162262 | 38591 | 52172 | 26244 | 396379 |
| 2019 | 8637 | 57303 | 35138 | 182143 | 36578 | 339135 | 58049 | 63490 | 68203 | 851608 |
| 2020 | 8627 | 40342 | 27487 | 54398 | 11425 | 95659 | 33277 | 66074 | 8804 | 400633 |
| 2021 | 37267 | 258394 | 39136 | 100558 | 112191 | 549080 | 142664 | 191314 | 114469 | 1645312 |
| 2022 | 53948 | 480931 | 72378 | 307444 | 168463 | 468124 | 176293 | 251064 | 310894 | 2306456 |

Tucson percent of USBP 2022 Q2    15%
Tucson percent of USBP 2023 Q2    18%
Tucson percent of USBP 2024 Q2    35%

Source: March 2024 Person, Unique Encounters Pixel Table

IFR_AR_007493

Despite the fact that the average of 4,400 daily encounters between POEs in the second quarter of FY 2024 is below the highs experienced in the days immediately preceding the end of the Title 42 public health Order and in December 2023, OHSS Persist Dataset as of March 31, 2024.

**CBP Encounters, May 1 – May 31, 2023**

| | USBP | OFO | Total |
|---|---|---|---|
| 5/1/2023 | 7,913 | 881 | 8,794 |
| 5/2/2023 | 7,767 | 915 | 8,682 |
| 5/3/2023 | 8,624 | 890 | 9,514 |
| 5/4/2023 | 8,486 | 1,037 | 9,523 |
| 5/5/2023 | 9,184 | 899 | 10,083 |
| 5/6/2023 | 8,985 | 970 | 9,955 |
| 5/7/2023 | 8,779 | 920 | 9,699 |
| 5/8/2023 | 10,216 | 885 | 11,101 |
| 5/9/2023 | 10,802 | 802 | 11,604 |
| 5/10/2023 | 10,375 | 779 | 11,154 |
| 5/11/2023 | 9,836 | 915 | 10,751 |
| 5/12/2023 | 6,223 | 1,325 | 7,548 |
| 5/13/2023 | 4,339 | 1,354 | 5,693 |
| 5/14/2023 | 4,199 | 1,303 | 5,502 |
| 5/15/2023 | 3,737 | 1,310 | 5,047 |
| 5/16/2023 | 3,702 | 1,255 | 4,957 |
| 5/17/2023 | 2,836 | 1,311 | 4,147 |
| 5/18/2023 | 3,233 | 1,223 | 4,456 |
| 5/19/2023 | 2,960 | 1,254 | 4,214 |
| 5/20/2023 | 3,196 | 1,334 | 4,530 |
| 5/21/2023 | 2,554 | 1,279 | 3,833 |
| 5/22/2023 | 2,648 | 1,216 | 3,864 |
| 5/23/2023 | 3,503 | 1,214 | 4,717 |
| 5/24/2023 | 3,609 | 1,191 | 4,800 |
| 5/25/2023 | 3,497 | 1,272 | 4,769 |
| 5/26/2023 | 3,452 | 1,238 | 4,690 |
| 5/27/2023 | 3,305 | 1,225 | 4,530 |
| 5/28/2023 | 3,358 | 1,285 | 4,643 |
| 5/29/2023 | 3,313 | 1,255 | 4,568 |
| 5/30/2023 | 3,563 | 1,296 | 4,859 |
| 5/31/2023 | 3,179 | 1,277 | 4,456 |

Source: OHSS Persist March 2024

**CBP Encounters, Dec. 1 - Dec. 31, 2023**

| | USBP | OFO | Total |
|---|---|---|---|
| 12/1/2023 | 7,225 | 1,728 | 8,953 |
| 12/2/2023 | 7,591 | 1,719 | 9,310 |
| 12/3/2023 | 8,420 | 1,732 | 10,152 |
| 12/4/2023 | 8,575 | 1,635 | 10,210 |
| 12/5/2023 | 10,324 | 1,800 | 12,124 |
| 12/6/2023 | 8,248 | 1,728 | 9,976 |
| 12/7/2023 | 7,206 | 1,714 | 8,920 |
| 12/8/2023 | 5,865 | 1,733 | 7,598 |
| 12/9/2023 | 6,207 | 1,741 | 7,948 |
| 12/10/2023 | 7,945 | 1,713 | 9,658 |
| 12/11/2023 | 7,458 | 1,698 | 9,156 |
| 12/12/2023 | 8,319 | 1,783 | 10,102 |
| 12/13/2023 | 9,026 | 1,791 | 10,817 |
| 12/14/2023 | 8,616 | 1,726 | 10,342 |
| 12/15/2023 | 9,373 | 1,657 | 11,030 |
| 12/16/2023 | 8,647 | 1,606 | 10,253 |
| 12/17/2023 | 8,342 | 1,666 | 10,008 |
| 12/18/2023 | 10,822 | 1,688 | 12,510 |
| 12/19/2023 | 10,510 | 1,720 | 12,230 |
| 12/20/2023 | 10,562 | 1,692 | 12,254 |
| 12/21/2023 | 8,990 | 1,638 | 10,628 |
| 12/22/2023 | 8,655 | 1,703 | 10,358 |
| 12/23/2023 | 7,622 | 1,691 | 9,313 |
| 12/24/2023 | 6,761 | 1,603 | 8,364 |
| 12/25/2023 | 5,913 | 1,600 | 7,513 |
| 12/26/2023 | 5,936 | 1,578 | 7,514 |
| 12/27/2023 | 7,703 | 1,678 | 9,381 |
| 12/28/2023 | 8,293 | 1,678 | 9,971 |
| 12/29/2023 | 7,654 | 1,591 | 9,245 |
| 12/30/2023 | 7,243 | 1,643 | 8,886 |
| 12/31/2023 | 5,900 | 1,625 | 7,525 |

Source: OHSS Persist March 2024

**CBP Encounters, Jan. 1 - Mar. 31, 2024**

| | USBP | OFO | Total |
|---|---|---|---|
| 1/1/2024 | 2,605 | 1,611 | 4,216 |
| 1/2/2024 | 3,939 | 1,645 | 5,584 |
| 1/3/2024 | 4,006 | 1,732 | 5,738 |
| 1/4/2024 | 2,789 | 1,680 | 4,469 |
| 1/5/2024 | 3,054 | 1,682 | 4,736 |
| 1/6/2024 | 3,646 | 1,735 | 5,381 |
| 1/7/2024 | 2,731 | 1,682 | 4,413 |
| 1/8/2024 | 2,765 | 1,711 | 4,476 |
| 1/9/2024 | 3,303 | 1,652 | 4,955 |
| 1/10/2024 | 2,910 | 1,692 | 4,602 |
| 1/11/2024 | 3,746 | 1,753 | 5,499 |
| 1/12/2024 | 4,097 | 1,677 | 5,774 |
| 1/13/2024 | 4,158 | 1,678 | 5,836 |
| 1/14/2024 | 4,089 | 1,700 | 5,789 |
| 1/15/2024 | 3,942 | 1,605 | 5,547 |
| 1/16/2024 | 4,329 | 1,621 | 5,950 |
| 1/17/2024 | 4,229 | 1,651 | 5,880 |
| 1/18/2024 | 5,038 | 1,713 | 6,751 |
| 1/19/2024 | 5,024 | 1,715 | 6,739 |
| 1/20/2024 | 4,935 | 1,676 | 6,611 |
| 1/21/2024 | 3,596 | 1,620 | 5,216 |
| 1/22/2024 | 4,109 | 1,582 | 5,691 |
| 1/23/2024 | 4,097 | 1,694 | 5,791 |
| 1/24/2024 | 4,247 | 1,700 | 5,947 |
| 1/25/2024 | 4,883 | 1,794 | 6,677 |
| 1/26/2024 | 4,711 | 1,639 | 6,350 |
| 1/27/2024 | 3,394 | 1,655 | 5,049 |
| 1/28/2024 | 4,334 | 1,703 | 6,037 |
| 1/29/2024 | 4,708 | 1,694 | 6,402 |
| 1/30/2024 | 4,547 | 1,694 | 6,241 |
| 1/31/2024 | 5,243 | 1,643 | 6,886 |
| 2/1/2024 | 5,098 | 1,784 | 6,882 |
| 2/2/2024 | 4,748 | 1,767 | 6,515 |
| 2/3/2024 | 4,884 | 1,719 | 6,603 |
| 2/4/2024 | 4,874 | 1,799 | 6,673 |
| 2/5/2024 | 4,852 | 1,694 | 6,546 |
| 2/6/2024 | 5,297 | 1,703 | 7,000 |
| 2/7/2024 | 4,240 | 1,662 | 5,902 |
| 2/8/2024 | 4,983 | 1,710 | 6,693 |
| 2/9/2024 | 4,931 | 1,721 | 6,652 |
| 2/10/2024 | 5,196 | 1,751 | 6,947 |
| 2/11/2024 | 4,483 | 1,721 | 6,204 |
| 2/12/2024 | 4,506 | 1,693 | 6,199 |
| 2/13/2024 | 4,271 | 1,712 | 5,983 |
| 2/14/2024 | 4,279 | 1,614 | 5,893 |
| 2/15/2024 | 5,086 | 1,657 | 6,743 |
| 2/16/2024 | 4,627 | 1,649 | 6,276 |
| 2/17/2024 | 5,157 | 1,687 | 6,844 |
| 2/18/2024 | 5,001 | 1,731 | 6,732 |
| 2/19/2024 | 5,080 | 1,716 | 6,796 |
| 2/20/2024 | 4,763 | 1,673 | 6,436 |
| 2/21/2024 | 4,396 | 1,703 | 6,099 |
| 2/22/2024 | 4,314 | 1,663 | 5,977 |
| 2/23/2024 | 5,275 | 1,706 | 6,981 |
| 2/24/2024 | 5,951 | 1,639 | 7,590 |
| 2/25/2024 | 4,901 | 1,662 | 6,563 |
| 2/26/2024 | 5,088 | 1,717 | 6,805 |
| 2/27/2024 | 4,949 | 1,690 | 6,639 |
| 2/28/2024 | 4,882 | 1,716 | 6,598 |
| 2/29/2024 | 4,526 | 1,673 | 6,199 |
| 3/1/2024 | 5,447 | 1,667 | 7,114 |
| 3/2/2024 | 5,367 | 1,690 | 7,057 |
| 3/3/2024 | 5,394 | 1,646 | 7,040 |
| 3/4/2024 | 5,531 | 1,658 | 7,189 |
| 3/5/2024 | 5,476 | 1,681 | 7,157 |
| 3/6/2024 | 5,633 | 1,667 | 7,300 |
| 3/7/2024 | 5,128 | 1,702 | 6,830 |
| 3/8/2024 | 5,071 | 1,703 | 6,774 |
| 3/9/2024 | 4,772 | 1,672 | 6,444 |
| 3/10/2024 | 4,610 | 1,648 | 6,258 |
| 3/11/2024 | 4,309 | 1,602 | 5,911 |
| 3/12/2024 | 4,667 | 1,648 | 6,315 |
| 3/13/2024 | 4,384 | 1,662 | 6,046 |
| 3/14/2024 | 4,267 | 1,680 | 5,947 |
| 3/15/2024 | 4,301 | 1,690 | 5,991 |
| 3/16/2024 | 3,885 | 1,649 | 5,534 |
| 3/17/2024 | 3,541 | 1,652 | 5,193 |
| 3/18/2024 | 4,354 | 1,725 | 6,079 |
| 3/19/2024 | 3,759 | 1,688 | 5,447 |
| 3/20/2024 | 3,623 | 1,632 | 5,255 |
| 3/21/2024 | 3,997 | 1,666 | 5,663 |
| 3/22/2024 | 3,469 | 1,739 | 5,208 |
| 3/23/2024 | 3,778 | 1,697 | 5,475 |
| 3/24/2024 | 3,666 | 1,643 | 5,309 |
| 3/25/2024 | 4,127 | 1,718 | 5,845 |
| 3/26/2024 | 4,503 | 1,713 | 6,216 |
| 3/27/2024 | 4,298 | 1,728 | 6,026 |
| 3/28/2024 | 4,458 | 1,646 | 6,104 |
| 3/29/2024 | 3,990 | 1,690 | 5,680 |
| 3/30/2024 | 3,857 | 1,701 | 5,558 |
| 3/31/2024 | 3,818 | 1,659 | 5,477 |

Source: OHSS Persist March 2024



4,421  Daily average Q2

USBP:
9,740  Daily Average week ending 5/11/23

December 2023 USBP average
8,056



daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.

The Tucson Sector accounted for 35 percent of USBP encounters in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022. OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *Southwest Land Border Encounters (By Component)*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component (last modified May 15, 2024). Border encounters typically fall around the New Year and often remain lower than other months in January. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("Nationwide CBP Encounters by Encounter Type and Region").

USBP SWB Encounters by Sector, FY 2013 - FY 2024 YTD

| Row Labe | Big Bend, | Del Rio, T. | El Centro, | El Paso, T. | Laredo, T. | Rio Grand | San Diego | Tucson, A | Yuma, AZ | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2013** | **3684** | **23510** | **16306** | **11154** | **50749** | **154453** | **27496** | **120939** | **6106** | **414397** |
| **2014** | **4096** | **24255** | **14511** | **12339** | **44049** | **256392** | **29911** | **87915** | **5902** | **479370** |
| **2015** | **5031** | **19013** | **12820** | **14495** | **35888** | **147257** | **26290** | **63397** | **7142** | **331333** |
| **2016** | **6366** | **23078** | **19448** | **25634** | **36562** | **186830** | **31891** | **64891** | **14170** | **408870** |
| **2017** | **6002** | **13476** | **18633** | **25193** | **25460** | **137562** | **26086** | **38657** | **12847** | **303916** |
| **2018** | **8045** | **15833** | **29230** | **31561** | **32641** | **162262** | **38591** | **52172** | **26244** | **396579** |
| **2019** | **9637** | **57269** | **35138** | **182143** | **38378** | **339135** | **58049** | **63490** | **68269** | **851508** |
| **2020** | **8627** | **40342** | **27487** | **54396** | **51425** | **90203** | **53277** | **66074** | **8804** | **400635** |
| **2021** | **37267** | **259294** | **59236** | **193918** | **112241** | **549080** | **142464** | **191234** | **114488** | **1659222** |
| **2022** | **31948** | **480931** | **72378** | **307844** | **106843** | **468124** | **176290** | **251984** | **310094** | **2206436** |
| 10 | 3606 | 28213 | 5042 | 14001 | 7444 | 45382 | 14339 | 19189 | 21897 | 159113 |
| 11 | 3308 | 30226 | 3889 | 15538 | 8030 | 47999 | 13448 | 21515 | 23062 | 167015 |
| 12 | 3410 | 33260 | 4140 | 19470 | 7305 | 43848 | 13624 | 15758 | 29787 | 170602 |
| 1 | 2379 | 31154 | 4830 | 18039 | 7375 | 30232 | 12294 | 17716 | 23858 | 147877 |
| 2 | 3007 | 30815 | 5689 | 20618 | 9501 | 33847 | 13517 | 21208 | 20968 | 159170 |
| 3 | 3665 | 41631 | 7567 | 25618 | 13800 | 44072 | 16662 | 27239 | 30927 | 211181 |
| 4 | 3383 | 40931 | 6248 | 29865 | 12577 | 41922 | 14616 | 25281 | 28681 | 203504 |
| 5 | 2880 | 44735 | 6996 | 34643 | 11682 | 46011 | 17113 | 25939 | 34371 | 224370 |
| 6 | 2024 | 45610 | 6305 | 26242 | 9886 | 44663 | 14037 | 21270 | 22362 | 192399 |
| 7 | 1619 | 49618 | 6707 | 25024 | 6603 | 35189 | 15991 | 16623 | 24460 | 181834 |
| 8 | 1400 | 52735 | 6815 | 29756 | 6299 | 27286 | 14751 | 18506 | 24226 | 181774 |
| 9 | 1267 | 52003 | 8150 | 49030 | 6341 | 27673 | 15898 | 21740 | 25495 | 207597 |
| **2023** | **11823** | **393226** | **50570** | **427471** | **45644** | **338337** | **230941** | **373625** | **174201** | **2045838** |
| 10 | 1304 | 42767 | 7316 | 53318 | 6012 | 28290 | 17875 | 22938 | 25314 | 205134 |
| 11 | 1523 | 48196 | 7024 | 53529 | 4309 | 27832 | 16850 | 23411 | 25006 | 207680 |
| 12 | 1190 | 51701 | 9759 | 55769 | 3353 | 28189 | 18952 | 22131 | 30974 | 222018 |
| 1 | 1079 | 28425 | 4563 | 30038 | 3257 | 14913 | 15440 | 20261 | 11537 | 129513 |
| 2 | 981 | 22939 | 3495 | 32911 | 4114 | 14981 | 17030 | 23560 | 10510 | 130521 |
| 3 | 1200 | 23904 | 4448 | 40103 | 5210 | 17956 | 23286 | 33898 | 13667 | 163672 |
| 4 | 1181 | 20809 | 3349 | 42552 | 5394 | 37881 | 25123 | 33960 | 13672 | 183921 |
| 5 | 1421 | 29971 | 4041 | 26172 | 3464 | 38032 | 22858 | 30139 | 15284 | 171382 |
| 6 | 412 | 24632 | 1680 | 13231 | 1919 | 11435 | 12901 | 24359 | 8969 | 99538 |
| 7 | 404 | 24505 | 1458 | 16466 | 2436 | 26527 | 15032 | 39215 | 6599 | 132642 |
| 8 | 568 | 29689 | 1458 | 25234 | 3097 | 46537 | 18985 | 48752 | 6734 | 181054 |
| 9 | 560 | 45688 | 1979 | 38148 | 3079 | 45764 | 26609 | 51001 | 5935 | 218763 |
| **2024** | **2555** | **194288** | **10105** | **150328** | **15995** | **97457** | **185469** | **342002** | **33733** | **1031932** |
| 10 | 479 | 38207 | 2049 | 22105 | 2827 | 32113 | 29879 | 55225 | 5870 | 188754 |
| 11 | 427 | 42951 | 1788 | 22407 | 2811 | 18775 | 31164 | 64637 | 6159 | 191119 |
| 12 | 322 | 71048 | 2222 | 33965 | 2267 | 18213 | 34371 | 80184 | 7145 | 249737 |
| 1 | 324 | 16701 | 1127 | 17515 | 2190 | 7341 | 24709 | 50563 | 3734 | 124204 |
| 2 | 567 | 14100 | 1209 | 23916 | 2922 | 11950 | 31562 | 49452 | 4960 | 140638 |
| 3 | 436 | 11281 | 1710 | 30420 | 2978 | 9065 | 33784 | 41941 | 5865 | 137480 |

| | |
|---|---|
| Tucson percent of USBP 2022 Q2 | 13% |
| Tucson percent of USBP 2023 Q2 | 18% |
| Tucson percent of USBP 2024 Q2 | 35% |

Source: March 2024 Persist; Unique Encounters Pivot Table

daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.

Thus, while CBP's apprehension of 462,000 noncitizens between POEs in the second quarter of FY 2024 is slightly lower than the 424,000 observed in FY 2023 and 719,000 in FY 2022, it is almost four times as high as the pre-pandemic second-quarter average for FY 2014 through FY 2019, and with the exception of FY 2022 and FY 2023 the highest second-quarter count recorded since FY 2

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Q2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 87,819 | 74,362 | 66,256 | 175,383 | 200,619 | 209,211 | 170,621 | 155,961 | 103,856 | 111,963 | 113,448 | 96,622 | 585,313 |
| 2001 | 81,995 | 67,217 | 54,828 | 124,586 | 150,616 | 169,904 | 142,040 | 123,054 | 89,034 | 83,853 | 84,837 | 59,448 | 445,106 |
| 2002 | 37,746 | 32,694 | 31,531 | 79,647 | 95,645 | 126,906 | 121,908 | 97,571 | 78,730 | 76,719 | 82,860 | 68,384 | 302,198 |
| 2003 | 61,910 | 47,919 | 37,930 | 87,002 | 97,016 | 98,625 | 75,564 | 88,845 | 75,634 | 79,396 | 84,651 | 72,239 | 282,643 |
| 2004 | 69,246 | 62,452 | 48,280 | 98,764 | 116,398 | 162,530 | 142,491 | 125,502 | 101,178 | 98,989 | 99,986 | 85,877 | 377,692 |
| 2005 | 81,687 | 70,617 | 54,028 | 101,552 | 121,177 | 150,892 | 148,688 | 125,226 | 99,490 | 105,093 | 107,620 | 103,177 | 373,621 |
| 2006 | 91,935 | 78,817 | 60,375 | 110,987 | 132,780 | 169,077 | 133,964 | 113,311 | 76,274 | 67,636 | 67,631 | 65,571 | 412,844 |
| 2007 | 68,083 | 58,199 | 47,537 | 79,794 | 86,435 | 122,450 | 132,773 | 97,196 | 79,997 | 75,766 | 69,142 | 57,556 | 288,679 |
| 2008 | 58,616 | 48,693 | 38,556 | 66,471 | 80,724 | 97,774 | 99,518 | 77,048 | 60,492 | 56,806 | 56,142 | 51,713 | 244,969 |
| 2009 | 49,217 | 38,450 | 31,206 | 50,737 | 55,132 | 74,323 | 65,129 | 57,593 | 52,600 | 50,986 | 51,084 | 42,666 | 180,192 |
| 2010 | 47,290 | 39,064 | 31,352 | 40,741 | 48,753 | 69,152 | 62,351 | 54,018 | 39,308 | 32,363 | 33,717 | 29,310 | 158,646 |
| 2011 | 32,451 | 28,516 | 25,728 | 29,737 | 34,408 | 48,920 | 42,739 | 37,543 | 32,909 | 29,520 | 30,216 | 28,386 | 113,065 |
| 2012 | 31,344 | 28,617 | 24,380 | 30,798 | 37,009 | 48,538 | 46,680 | 43,020 | 36,808 | 32,833 | 33,699 | 32,399 | 116,345 |
| 2013 | 34,847 | 33,159 | 29,077 | 32,485 | 40,636 | 54,010 | 54,771 | 50,500 | 40,790 | 40,006 | 41,125 | 38,206 | 127,131 |
| 2014 | 43,835 | 38,692 | 36,707 | 35,200 | 42,473 | 57,548 | 59,383 | 69,033 | 66,572 | 48,833 | 39,766 | 34,006 | 135,221 |
| 2015 | 35,903 | 33,024 | 34,231 | 30,179 | 32,554 | 39,162 | 38,299 | 40,684 | 38,620 | 38,610 | 42,419 | 41,171 | 101,895 |
| 2016 | 45,245 | 45,387 | 48,393 | 33,396 | 38,068 | 45,779 | 48,271 | 54,987 | 45,168 | 46,658 | 51,569 | 56,070 | 117,243 |
| 2017 | 66,707 | 63,366 | 58,416 | 42,458 | 23,555 | 16,592 | 15,768 | 19,940 | 21,657 | 25,014 | 30,569 | 31,157 | 82,605 |
| 2018 | 34,842 | 39,031 | 40,476 | 35,865 | 36,690 | 50,213 | 51,019 | 51,790 | 43,096 | 40,005 | 46,551 | 50,360 | 122,768 |
| 2019 | 60,775 | 62,463 | 60,789 | 58,313 | 76,543 | 103,730 | 109,413 | 144,113 | 104,310 | 81,748 | 62,608 | 52,424 | 238,586 |
| 2020 | 45,139 | 42,642 | 40,563 | 36,583 | 36,686 | 34,457 | 17,106 | 23,237 | 33,029 | 40,949 | 50,007 | 57,668 | 107,726 |
| 2021 | 71,943 | 72,113 | 73,994 | 78,414 | 101,098 | 173,277 | 178,795 | 180,597 | 189,034 | 213,593 | 209,840 | 192,001 | 352,789 |
| 2022 | 164,837 | 174,845 | 179,253 | 154,874 | 166,010 | 222,574 | 235,785 | 241,136 | 207,834 | 200,162 | 204,087 | 227,547 | 543,458 |
| 2023 | 231,529 | 235,173 | 252,315 | 157,358 | 156,630 | 193,249 | 211,992 | 206,690 | 144,556 | 183,479 | 232,963 | 269,735 | 507,237 |
| 2024 | 188,754 | 191,119 | 249,737 | 124,204 | 140,638 | 137,480 | | | | | | | 402,322 |

IFR_AR_007496

IFR_AR_007497



daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.

Even with the downturn between January and March, 2024, the high volume of encounters and challenging demographic mix still meant that most noncitizens processed by USBP were released from custody into the United States (including noncitizens enrolled in an ICE Alternatives to Detention program and those paroled by the Office of Field Operations). OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Agency").

CBP SW Border Encounters Book-Out Outcomes by Agency, FY 2014 - FY 2024 YTD

| | | Total CBP | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | USBP Releases | OFO Paroles | Other outcomes |
| 2024 | 10 | 240,932 | 28,651 | 0 | 0 | 31,923 | 10,451 | 122,680 | 47,028 | 199 |
| | 11 | 242,413 | 25,213 | 0 | 0 | 27,581 | 11,687 | 131,259 | 46,498 | 175 |
| | 12 | 301,980 | 21,557 | 0 | 0 | 28,347 | 12,591 | 191,807 | 47,513 | 165 |
| | 1 | 176,189 | 25,739 | 0 | 0 | 25,195 | 7,460 | 70,426 | 47,189 | 180 |
| | 2 | 189,914 | 27,655 | 0 | 0 | 31,316 | 9,004 | 76,953 | 44,807 | 179 |
| | 3 | 189,371 | 30,156 | 0 | 0 | 26,425 | 7,414 | 78,051 | 46,920 | 405 |

| | | USBP | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | USBP Releases | Other outcomes |
| 2024 | 10 | 188,754 | 26,348 | 0 | 0 | 30,022 | 9,677 | 122,680 | 27 |
| | 11 | 191,119 | 22,794 | 0 | 0 | 26,152 | 10,852 | 131,259 | 62 |
| | 12 | 249,737 | 19,114 | 0 | 0 | 27,174 | 11,607 | 191,807 | 35 |
| | 1 | 124,204 | 23,129 | 0 | 0 | 24,170 | 6,452 | 70,426 | 27 |
| | 2 | 140,638 | 25,271 | 0 | 0 | 30,324 | 8,035 | 76,953 | 55 |
| | 3 | 137,480 | 27,435 | 0 | 0 | 25,241 | 6,524 | 78,051 | 229 |

| | | OFO | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | OFO Paroles | Other outcomes |
| 2024 | 10 | 52,178 | 2,303 | 0 | 0 | 1,901 | 774 | 47,028 | 172 |
| | 11 | 51,294 | 2,419 | 0 | 0 | 1,429 | 835 | 46,498 | 113 |
| | 12 | 52,243 | 2,443 | 0 | 0 | 1,173 | 984 | 47,513 | 130 |
| | 1 | 51,985 | 2,610 | 0 | 0 | 1,025 | 1,008 | 47,189 | 153 |
| | 2 | 49,276 | 2,384 | 0 | 0 | 992 | 969 | 44,807 | 124 |
| | 3 | 51,891 | 2,721 | 0 | 0 | 1,184 | 890 | 46,920 | 176 |

OHSS Persist March 31 2024.

Total CBP Q2 Releases 66%

Total CBP Q2 Releases 364,346
Average daily CBP Q2 Releases 4,048

Total USBP Q2 Releases 56%

Total USBP Q2 Releases 225,430
Average daily USBP Q2 Releases 2,505

Total OFO Q2 Releases 91%

Total OFO Q2 Releases 138,916
Average daily OFO Q2 Releases 1,544

| | TotalEncounters | USBPReleases |
|---|---|---|
| 10 | 6,292 | 4,089 |
| 11 | 6,371 | 4,375 |
| 12 | 8,325 | 6,394 |
| 1 | 4,140 | 2,348 |
| 2 | 4,688 | 2,565 |
| 3 | 4,583 | 2,602 |

-

At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates, Since May 12, 2023, 60 percent of non-Mexican noncitizen SWB encounters (at and between POEs) processed for expedited removal were have made fear claims have been referred to EOIR for immigration proceedings. OHSS analysis of data downloaded from UIP on April 2, 2024.

| OTM Expedited Removal Processing: Southwest Border | Since May 12 | | |
|---|---|---|---|
| **SW Border Encounters** | **1,196,991** | | |
| **Processed for ER** | **256,217** | | |
| % Encounters processed for ER | 7% | | |
| **ER processed in CBP Custody** | **79,686** | Percent of OTMs processed for ER making fear claims: | 59% |
| Credible fear referrals | 40,219 | | |
| CFIs conducted | 39,257 | | |
| **CFI results** | **38,918** | Percent of OTM fear claims positive | 54% |
| Positive fear finding | 16,571 | | |
| Negative fear finding | 18,783 | | |
| Appealed to IJ | 13,154 | Percent of OTM fear claims negative fear vacated by IJ | 6% |
| Pending or blank order | 733 | | |
| Affirmed | 9,820 | | |
| Vacated | 2,581 | Total referrals to EOIR | 60% |
| Not appealed to IJ | 5,629 | | |
| Admin closed | 3,564 | | |
| Admin closed without CFI | 785 | | |
| **CBP repatriations** | **56,600** | | |
| No fear claim ER removals | 39,438 | | |
| Negative fear; no IJ review | 19 | | |
| Negative fear; IJ affirmed | 13,803 | | |
| ER withdrawn VRs | 1,898 | | |
| Other | 1,442 | | |
| **ER transfers to ICE for processing** | **176,531** | | |
| Reprocessed with other dispositions | 581 | | |
| ER processed by ICE non-detained | 74,906 | | |
| **ER processed in ICE Custody** | **101,044** | | |
| Credible fear referrals | 88,064 | | |
| CFIs conducted | 79,202 | | |
| **CFI results** | **77,333** | | |
| Positive fear finding | 45,230 | | |
| Negative fear finding | 26,184 | | |
| Appealed to IJ | 20,889 | | |
| Pending or blank order | 1,403 | | |
| Affirmed | 16,331 | | |
| Vacated | 3,155 | | |
| Not appealed to IJ | 5,295 | | |
| Admin closed | 5,919 | | |
| Admin closed without CFI | 6,698 | | |
| **ICE removals (REPATRIATIONS)** | **27,266** | | |
| No fear claim ER removals | 4,359 | | |
| Negative fear; no IJ review | 4 | | |
| Negative fear; IJ affirmed | 16,152 | | |
| Other | 6,751 | | |
| **ER processed by ICE non-detained** | **74,906** | | |
| Credible fear referrals | 22,928 | | |
| CFIs conducted | 18,537 | | |
| **CFI results** | **17,816** | | |
| Positive fear finding | 10,898 | | |
| Negative fear finding | 6,354 | | |
| Appealed to IJ | 5,943 | | |
| Pending or blank order | 895 | | |
| Affirmed | 3,368 | | |
| Vacated | 1,680 | | |
| Not appealed to IJ | 411 | | |
| Admin closed | 564 | | |
| Admin closed without CFI | 1,799 | | |
| **ICE removals (REPATRIATIONS)** | **33,313** | | |
| No fear claim ER removals | 31,690 | | |
| Negative fear; no IJ review | 0 | | |
| Negative fear; IJ affirmed | 1,452 | | |
| Other | 171 | | |

Notes: All counts are based on month of encounter. Population is limited to non-Mexican single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007499

At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates. But based on historic (pre-pandemic) data, only 18 percent of non-Mexican noncitizens processed for expedited removal that are referred to EOIR result in an individual being granted relief or protection from removal once the case is completed. ©HSS Enforcement Lifecycle December 31, 2023.

| | |
|---|---|
| SWB ER cases with EOIR case completions | 265,623 |
| case completions resulting in relief/protection from removal | 47,560 |
| % of case completions that are relief/protection | 18% |

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims**

| MOST CURRENT OUTCOMES | TOTAL | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 | |
| **Total Encounters** | 471,989 | 359,453 | 438,908 | 356,791 | 439,776 | 876,336 | 456,485 | 1,578,628 | 2,107,356 | 2,051,374 | 633,642 | |
| **T8 Encounters** | 471,989 | 359,453 | 438,908 | 356,791 | 439,776 | 876,336 | 223,174 | 521,398 | 1,359,854 | 1,688,704 | 633,642 | |
| **Processed for Expedited Removal** | 228,049 | 180,932 | 227,311 | 160,305 | 214,667 | 223,200 | 95,719 | 84,687 | 119,665 | 207,197 | 82,719 | |
| No fear claim[1] | 174,419 | 130,820 | 130,629 | 69,349 | 115,086 | 121,732 | 66,219 | 13,051 | 58,147 | 62,697 | 40,923 | |
| No fear claim - confirmed removal or return | 166,051 | 129,046 | 127,921 | 66,688 | 110,087 | 116,756 | 63,698 | 10,956 | 29,260 | 53,931 | 28,823 | |
| Fear claims withdrawn[2] (based on APSO receipts) | 4,893 | 3,321 | 4,379 | 2,167 | 4,081 | 5,366 | 1,664 | 20,618 | 51,503 | 10,255 | 9,312 | |
| Confirmed removal or return | 1,806 | 1,012 | 819 | 418 | 669 | 697 | 430 | 413 | 507 | 563 | 83 | |
| Credible fear claims[3] (APSO cases only) | 48,737 | 46,431 | 92,303 | 88,789 | 95,500 | 98,102 | 27,836 | 49,018 | 49,995 | 134,845 | 32,484 | |
| Positive fear determinations | 33,051 | 33,072 | 73,871 | 53,666 | 74,438 | 70,879 | 8,462 | 35,710 | 28,362 | 81,147 | 16,170 | |
| Negative fear determinations | 9,197 | 7,535 | 9,410 | 7,325 | 9,310 | 17,668 | 12,353 | 13,249 | 17,847 | 42,359 | 11,899 | |
| Negative fear determinations appealed to EOIR | 7,349 | 6,260 | 7,629 | 5,898 | 6,743 | 14,295 | 9,729 | 12,812 | 16,798 | 34,582 | 10,038 | |
| Negative fear determinations vacated by EOIR | 1,258 | 1,232 | 1,999 | 1,451 | 1,278 | 3,864 | 3,136 | 3,524 | 4,789 | 6,584 | 2,262 | |
| Negative fear determinations upheld by EOIR | 6,090 | 5,028 | 5,630 | 4,447 | 5,467 | 10,429 | 6,573 | 9,288 | 12,009 | 27,998 | 7,836 | |
| Case closures | 4,489 | 4,044 | 9,615 | 7,798 | 11,550 | 9,555 | 5,023 | 2,059 | 3,786 | 13,339 | 4,411 | |
| Case closures referred to EOIR | 1,366 | 1,708 | 4,375 | 5,698 | 6,652 | 3,345 | 983 | 1,067 | 2,497 | 5,401 | 1,577 | |
| Case closures not referred to EOIR | 3,183 | 3,236 | 5,240 | 4,100 | 5,306 | 6,210 | 2,038 | 992 | 1,289 | 5,938 | 2,838 | |
| ER/CF claim not referred to EOIR[4] | 11,082 | 9,539 | 12,660 | 9,974 | 13,158 | 20,012 | 11,255 | 10,717 | 14,347 | 41,715 | 12,535 | |
| Executed removal orders | 9,768 | 6,487 | 11,240 | 9,286 | 11,608 | 18,423 | 8,740 | 6,247 | 8,576 | 31,968 | 3,612 | |
| **Total referrals to EOIR[5]** (Includes closed cases, vacated negative and positive decisions) | 37,655 | 36,912 | 80,245 | 58,813 | 82,568 | 78,090 | 12,603 | 38,301 | 55,648 | 93,132 | 19,049 | |
| **EOIR Cases Started** | 37,277 | 36,616 | 78,732 | 57,168 | 77,810 | 72,182 | 11,871 | 32,470 | 29,132 | 77,135 | 15,747 | |
| Still in EOIR proceedings | 6,437 | 7,058 | 16,141 | 14,674 | 22,957 | 26,875 | 7,011 | 25,053 | 22,520 | 70,285 | 15,669 | 0.6% |
| EOIR cases completed | 30,840 | 29,558 | 62,571 | 42,494 | 54,853 | 45,307 | 4,860 | 9,413 | 6,622 | 6,852 | 78 | |
| Failure to prosecute | 2 | 2 | 1 | 8 | 49 | 114 | 4 | 15 | 5 | 24 | 5 | |
| Terminations / Dismissals | 7,025 | 6,498 | 15,819 | 12,881 | 17,335 | 16,325 | 1,393 | 5,627 | 980 | 954 | 9 | |
| Asylum granted or other EOIR relief from removal | 6,581 | 6,598 | 11,156 | 6,556 | 8,924 | 7,363 | 1,477 | 1,417 | 894 | 447 | 1 | |
| Relief on merits | 4,874 | 3,815 | 9,731 | 6,055 | 8,040 | 6,393 | 1,117 | 1,217 | 769 | 302 | | |
| Relief not on merits | 1,707 | 783 | 1,425 | 881 | 884 | 972 | 360 | 200 | 134 | 145 | 5 | |
| Removal orders | 17,232 | 16,460 | 30,595 | 22,669 | 28,565 | 21,505 | 1,786 | 4,356 | 4,743 | 5,427 | 63 | |
| In absentia | 7,095 | 5,386 | 15,036 | 3,529 | 15,907 | 6,682 | 444 | 2,759 | 3,131 | 2,952 | 9 | |
| Executed removal orders | 937 | 549 | 1,063 | 741 | 763 | 378 | 54 | 71 | 94 | 52 | | |
| Not in absentia | 10,137 | 11,074 | 22,561 | 13,540 | 14,658 | 14,823 | 1,342 | 1,597 | 1,612 | 2,475 | 54 | |
| Executed removal orders | 4,931 | 4,631 | 6,391 | 5,499 | 6,734 | 10,206 | 693 | 529 | 662 | 1,478 | 13 | |
| Appeals to BIA | 4,804 | 3,943 | 13,474 | 7,455 | 7,311 | 4,301 | 371 | 375 | 463 | 279 | | |
| Grants of relief + other favorable-to-noncitizen judgments appealed to BIA | 430 | 460 | 746 | 516 | 430 | 470 | 128 | 46 | 45 | 34 | - | |
| EOIR removal orders + other favorable-to-DHS judgments appealed to BIA | 4,404 | 3,483 | 13,128 | 6,919 | 6,681 | 4,031 | 443 | 329 | 418 | 245 | - | |

- Represents zero.

[1] Excludes unaccompanied children, accompanied minors, and OFO administrative cases excluding crewmembers, parolee, and withdrawals, none of whom are amenable to expedited removal. Exclusions made up 5.4 percent of total encounters between FY2013 and FY2023 Q3.

[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed with other dispositions in ICE custody.

[3] Fear claim in CBP custody but no associated record of a fear claim in USCIS APSO data; case results in an ER removal order.

[4] Based on USCIS APSO check-ins.

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of November 26, 2023.

[5] Includes positive credible fear interviews, negative CF interviews vacated by EOIR, and case closures referred to EOIR.

[6] Cases decided on merits includes grants of relief, including administrative closures and grants of prosecutorial discretion as "other" forms of relief.

Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of November 26, 2023.

Similarly, the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing. OHSS analysis of USCIS Global Affirmative Data as of April 25, 2024 (noting that "[d]ata is limited to filings between FY2000 and March 31, 2024").

Data is limited to fillings between FY2000 and March 31, 2024
By Filling Date
FIL_FY

| Frequency | Admin Close - NACARA Grant | Admin Close/Dismissal | Asylum Terminated | Deny/Referral | Grant | Pending | Total |
|---|---|---|---|---|---|---|---|
| 2000 | 173 | 4,204 | 154 | 19,898 | 17,083 | 17 | 41,529 |
| 2001 | 77 | 7,389 | 173 | 30,666 | 21,877 | 22 | 60,204 |
| 2002 | 36 | 6,426 | 152 | 33,878 | 18,391 | 49 | 58,932 |
| 2003 | 34 | 5,718 | 75 | 25,430 | 11,014 | 33 | 42,304 |
| 2004 | 40 | 3,472 | 45 | 15,472 | 8,783 | 18 | 27,830 |
| 2005 | 48 | 2,172 | 41 | 14,274 | 7,676 | 30 | 24,241 |
| 2006 | 12 | 2,259 | 19 | 12,987 | 7,918 | 27 | 23,222 |
| 2007 | 17 | 3,989 | 14 | 13,914 | 7,118 | 26 | 25,078 |
| 2008 | 15 | 2,946 | 15 | 14,344 | 7,409 | 23 | 24,752 |
| 2009 | 10 | 1,765 | 19 | 14,518 | 7,695 | 20 | 24,027 |
| 2010 | 8 | 2,827 | 14 | 16,085 | 9,186 | 30 | 28,150 |
| 2011 | 10 | 4,010 | 49 | 19,169 | 11,387 | 50 | 34,675 |
| 2012 | 9 | 5,637 | 103 | 20,742 | 14,882 | 106 | 41,479 |
| 2013 | 14 | 7,956 | 20 | 18,627 | 17,116 | 455 | 44,188 |
| 2014 | 7 | 10,412 | 8 | 25,314 | 16,993 | 4,232 | 56,966 |
| 2015 | 4 | 14,578 | 7 | 33,748 | 16,046 | 19,173 | 83,556 |
| 2016 | 12 | 17,012 | - | 28,570 | 11,387 | 59,141 | 116,122 |
| 2017 | 7 | 18,250 | 3 | 28,370 | 10,481 | 83,936 | 141,047 |
| 2018 | 8 | 10,860 | 3 | 34,582 | 15,175 | 46,538 | 107,166 |
| 2019 | 8 | 8,400 | 2 | 29,516 | 13,775 | 46,978 | 98,679 |
| 2020 | 3 | 8,869 | - | 12,542 | 5,597 | 68,377 | 95,388 |
| 2021 | 3 | 5,027 | - | 10,245 | 3,148 | 45,355 | 63,778 |
| 2022 | 2 | 23,074 | - | 7,602 | 11,636 | 199,829 | 242,143 |
| 2023 | - | 45,687 | - | 531 | 10,088 | 401,593 | 457,899 |
| 2024 (as of Marc | - | 23,347 | - | 13 | 785 | 191,901 | 216,046 |
| Total | 557 | 246,286 | 916 | 481,037 | 282,646 | 1,167,959 | 2,179,401 |

Source: OHHS analysis of USCIS Global data as of April 25, 2024

Because of these resource limitations, individuals are more likely than not to be released to pursue a years-long immigration court process during which, beginning 180 days after applying for asylum, they may be authorized to work.
Sixty-seven percent of individuals encountered by USBP at the SWB between May 2023 and March 2024 were released, including 66 percent of such individuals in the second quarter of FY 2024. These individuals include noncitizens enrolled in an ICE Alternatives to Detention program. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters Book-Out Outcomes by Agency").

**CBP SW Border Encounters Book-Out Outcomes by Agency — Total CBP**

| Year | Month | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | USBP Releases | OFO Paroles | Other outcomes |
|---|---|---|---|---|---|---|---|---|---|---|
| | 5 | 206,690 | 25,259 | 32,445 | 0 | 31,639 | 8,511 | 77,850 | 30,795 | 191 |
| | 6 | 144,556 | 31,924 | 0 | 0 | 29,311 | 6,160 | 36,551 | 40,373 | 237 |
| | 7 | 183,479 | 30,363 | 0 | 0 | 26,831 | 9,544 | 70,462 | 46,094 | 185 |
| | 8 | 232,963 | 33,431 | 0 | 0 | 38,649 | 13,047 | 101,651 | 45,965 | 220 |
| 2023 | 9 | 269,735 | 27,957 | 0 | 0 | 27,418 | 12,601 | 155,961 | 45,489 | 309 |
| | 10 | 240,932 | 28,651 | 0 | 0 | 31,923 | 10,451 | 122,680 | 47,028 | 199 |
| | 11 | 242,413 | 25,213 | 0 | 0 | 27,581 | 11,687 | 131,259 | 46,498 | 175 |
| | 12 | 301,980 | 21,557 | 0 | 0 | 28,347 | 12,591 | 191,807 | 47,513 | 165 |
| | 1 | 176,189 | 25,739 | 0 | 0 | 25,195 | 7,460 | 70,426 | 47,189 | 180 |
| | 2 | 189,914 | 27,655 | 0 | 0 | 31,316 | 9,004 | 76,953 | 44,807 | 179 |
| 2024 | 3 | 189,371 | 30,156 | 0 | 0 | 26,425 | 7,414 | 78,051 | 46,920 | 405 |

**USBP**

| Year | Month | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | USBP Releases | Other outcomes |
|---|---|---|---|---|---|---|---|---|---|
| | 5 | 171,382 | 22,944 | 31,580 | 0 | 30,929 | 8,059 | 77,850 | 20 |
| | 6 | 99,538 | 29,209 | 0 | 0 | 28,098 | 5,648 | 36,551 | 32 |
| | 7 | 132,642 | 27,418 | 0 | 0 | 25,775 | 8,970 | 70,462 | 17 |
| | 8 | 181,054 | 30,368 | 0 | 0 | 36,638 | 12,381 | 101,651 | 16 |
| 2023 | 9 | 218,763 | 25,336 | 0 | 0 | 25,428 | 12,011 | 155,961 | 27 |
| | 10 | 188,754 | 26,348 | 0 | 0 | 30,022 | 9,677 | 122,680 | 27 |
| | 11 | 191,119 | 22,794 | 0 | 0 | 26,152 | 10,852 | 131,259 | 62 |
| | 12 | 249,737 | 19,114 | 0 | 0 | 27,174 | 11,607 | 191,807 | 35 |
| | 1 | 124,204 | 23,129 | 0 | 0 | 24,170 | 6,452 | 70,426 | 27 |
| | 2 | 140,638 | 25,271 | 0 | 0 | 30,324 | 8,035 | 76,953 | 55 |
| 2024 | 3 | 137,480 | 27,435 | 0 | 0 | 25,241 | 6,524 | 78,051 | 229 |

**OFO**

| Year | Month | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | OFO Paroles | Other outcomes |
|---|---|---|---|---|---|---|---|---|---|
| | 5 | 35,308 | 2,315 | 865 | 0 | 710 | 452 | 30,795 | 171 |
| | 6 | 45,018 | 2,715 | 0 | 0 | 1,213 | 512 | 40,373 | 205 |
| | 7 | 50,837 | 2,945 | 0 | 0 | 1,056 | 574 | 46,094 | 168 |
| | 8 | 51,909 | 3,063 | 0 | 0 | 2,011 | 666 | 45,965 | 204 |
| 2023 | 9 | 50,972 | 2,621 | 0 | 0 | 1,990 | 590 | 45,489 | 282 |
| | 10 | 52,178 | 2,303 | 0 | 0 | 1,901 | 774 | 47,028 | 172 |
| | 11 | 51,294 | 2,419 | 0 | 0 | 1,429 | 835 | 46,498 | 113 |
| | 12 | 52,243 | 2,443 | 0 | 0 | 1,173 | 984 | 47,513 | 130 |
| | 1 | 51,985 | 2,610 | 0 | 0 | 1,025 | 1,008 | 47,189 | 153 |
| | 2 | 49,276 | 2,384 | 0 | 0 | 992 | 969 | 44,807 | 124 |
| 2024 | 3 | 51,891 | 2,721 | 0 | 0 | 1,184 | 890 | 46,920 | 176 |

Total CBP: 2,378,222

| | |
|---|---|
| Total Releases | 1,602,322 |
| Q2 releases | 364,346 |
| Release Percentage | 67% |
| Release Percentage | 66% |

USBP:

| | |
|---|---|
| CBP Releases | 1,113,651 |
| Q2 releases | 225,430 |
| Release Percentage | 61% |
| Release Percentage | 56% |

Releases since Oct 1st 65%

OFO:

| | |
|---|---|
| CBP Releases | 488,671 |
| Q2 releases | 138,916 |
| Release Percentage | 90% |
| Release Percentage | 91% |

Notes: In order to protect privacy, table cells are rounded to the nearest ten. Encounters are limited to SW Border (at and between ports of entry). Book-outs reported by encounter date. Records may not match Component reporting due to differences in reporting methodologies. Data are current as of January 31, 2024; future reporting may include updates to previous reports' data.
Source: Office of Homeland Security Statistics Persist Dataset.

border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.

According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. OHSS Persist Dataset March 2024. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID-19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted

SWB Total CBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 |
| | | | | |
| FY2010-20 | 361,490 | 78,216 | 21,352 | 461,057 |
| FY2014-20 | 239,257 | 281,231 | 60,557 | 581,045 |
| FY2021-20 | 641,739 | 501,447 | 839,342 | 1,982,528 |

| | Mexico | NCA | Other |
|---|---|---|---|
| 2000 | 98% | 1% | 0% |
| 2001 | 98% | 2% | 1% |
| 2002 | 97% | 2% | 1% |
| 2003 | 96% | 3% | 1% |
| 2004 | 94% | 4% | 2% |
| 2005 | 87% | 9% | 4% |
| 2006 | 91% | 8% | 2% |
| 2007 | 92% | 6% | 2% |
| 2008 | 92% | 6% | 2% |
| 2009 | 91% | 6% | 2% |
| 2010 | 89% | 8% | 3% |
| 2011 | 86% | 10% | 4% |
| 2012 | 74% | 21% | 5% |
| 2013 | 65% | 29% | 6% |
| 2014 | 50% | 44% | 6% |
| 2015 | 57% | 32% | 11% |
| 2016 | 46% | 41% | 13% |
| 2017 | 44% | 45% | 11% |
| 2018 | 43% | 50% | 8% |
| 2019 | 24% | 64% | 12% |
| 2020 | 65% | 23% | 12% |
| 2021 | 38% | 40% | 22% |
| 2022 | 34% | 23% | 43% |
| 2023 | 29% | 20% | 51% |
| 2024Q2 | 29% | 20% | 51% |
| | | | |
| FY2010-20 | 78% | 17% | 5% |
| FY2014-20 | 41% | 48% | 10% |
| FY2021-20 | 32% | 25% | 42% |

| | | CBP | |
|---|---|---|---|
| Daily Avg | 2009-2020 | 1,463 | |
| Daily Avg | 2024Q2 | 306 | 4.8 |

for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id*.

border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.
For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023.

| ER fear claims 2014-2019 claiming fear by citizenship | |
|---|---|
| Mexico | 6% |

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims by Country**

| MOST CURRENT OUTCOMES | TOTAL 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **471,989** | **359,453** | **438,908** | **336,791** | **439,776** | **878,156** | **416,485** | **1,578,628** | **2,187,156** | **2,051,374** | **615,642** |
| **T8 Encounters** | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | 1,109,854 | 1,488,394 | 615,642 |
| **Processed for Expedited Removal** | 228,049 | 180,592 | 227,911 | 160,305 | 214,667 | 223,200 | 91,719 | 84,687 | 119,665 | 207,197 | 82,719 |
| No fear claim[2] | 174,419 | 130,820 | 130,629 | 89,349 | 115,080 | 121,732 | 66,219 | 15,051 | 38,167 | 62,097 | 40,923 |
| No fear claim - confirmed removal or return | 166,051 | 129,846 | 127,921 | 86,688 | 110,087 | 118,756 | 63,698 | 10,956 | 28,260 | 53,931 | 28,823 |
| Reprocessed[3] | 4,893 | 3,321 | 4,379 | 2,167 | 4,081 | 3,366 | 1,664 | 20,618 | 31,503 | 10,255 | 9,312 |
| Confirmed removal or return | 1,006 | 1,012 | 819 | 418 | 669 | 607 | 650 | 415 | 507 | 363 | 83 |
| Credible fear claims[4] | 48,737 | 46,451 | 92,903 | 68,789 | 95,506 | 98,102 | 23,836 | 49,018 | 49,995 | 134,845 | 32,484 |
| Positive fear determinations | 35,051 | 33,972 | 73,871 | 53,666 | 74,438 | 70,879 | 8,462 | 33,710 | 28,362 | 81,147 | 16,170 |
| Negative fear determinations | 9,197 | 7,535 | 9,419 | 7,325 | 9,110 | 17,668 | 12,353 | 13,249 | 17,847 | 42,359 | 11,899 |
| Negative fear determinations appealed to EOIR | 7,348 | 6,260 | 7,629 | 5,898 | 6,745 | 14,295 | 9,729 | 12,812 | 16,798 | 34,582 | 10,038 |
| Negative fear determinations vacated by EOIR | 1,298 | 1,232 | 1,999 | 1,451 | 1,278 | 3,866 | 3,158 | 3,524 | 4,789 | 6,584 | 2,202 |
| Negative fear determinations upheld by EOIR | 6,050 | 5,028 | 5,630 | 4,447 | 5,467 | 10,429 | 6,571 | 9,288 | 12,009 | 27,998 | 7,836 |
| Case closures | 4,489 | 4,944 | 9,613 | 7,798 | 11,958 | 9,555 | 3,021 | 2,059 | 3,786 | 11,339 | 4,415 |
| Case closures referred to EOIR | 1,306 | 1,708 | 4,373 | 3,698 | 6,652 | 3,345 | 983 | 1,067 | 2,497 | 5,401 | 1,577 |
| Case closures not referred to EOIR | 3,183 | 3,236 | 5,240 | 4,100 | 5,306 | 6,210 | 2,038 | 992 | 1,289 | 5,938 | 2,838 |
| ER/CF claims not referred to EOIR[5] | 11,082 | 9,539 | 12,660 | 9,974 | 13,138 | 20,012 | 11,233 | 10,717 | 14,347 | 41,713 | 12,535 |
| Executed removal orders | 9,768 | 8,487 | 11,240 | 9,286 | 11,608 | 18,423 | 8,740 | 6,247 | 8,576 | 31,968 | 3,612 |
| ER CF claims referred to EOIR[6] | 37,655 | 36,912 | 80,243 | 58,815 | 82,368 | 78,090 | 12,603 | 38,301 | 35,648 | 93,132 | 19,949 |
| **EOIR Cases Started** | 37,277 | 36,616 | 78,712 | 57,168 | 77,810 | 72,182 | 11,871 | 32,470 | 29,132 | 77,135 | 13,747 |
| Still in EOIR proceedings[7] | 6,437 | 7,058 | 16,141 | 14,674 | 22,957 | 26,875 | 7,011 | 23,055 | 22,510 | 70,283 | 13,669 |
| EOIR case completion[8] | 30,840 | 29,558 | 62,571 | 42,494 | 54,853 | 45,307 | 4,860 | 9,415 | 6,622 | 6,852 | 78 |
| Failure to prosecute | 2 | 2 | 1 | 8 | 49 | 114 | 4 | 15 | 5 | 24 | 3 |
| Terminations / Dismissals[9] | 7,025 | 6,498 | 15,819 | 12,881 | 17,335 | 16,323 | 1,593 | 3,627 | 980 | 954 | 9 |
| Asylum granted or other EOIR relief from removal[10] | 6,581 | 6,598 | 11,156 | 6,936 | 8,924 | 7,365 | 1,477 | 1,417 | 894 | 447 | 3 |
| Relief on merits[11] | 4,874 | 5,815 | 9,731 | 6,055 | 8,040 | 6,393 | 1,117 | 1,217 | 760 | 302 | - |
| Relief not on merits[12] | 1,707 | 783 | 1,425 | 881 | 884 | 972 | 360 | 200 | 134 | 145 | 3 |
| Removal orders[13] | 17,232 | 16,460 | 35,595 | 22,669 | 28,545 | 21,505 | 1,786 | 4,356 | 4,743 | 5,427 | 63 |
| In absentia | 7,095 | 5,386 | 13,034 | 9,329 | 13,907 | 6,682 | 444 | 2,759 | 3,131 | 2,952 | 9 |
| Executed removal orders | 857 | 549 | 1,063 | 741 | 761 | 378 | 34 | 71 | 94 | 52 | - |
| Not in absensia | 10,137 | 11,074 | 22,561 | 13,340 | 14,638 | 14,823 | 1,342 | 1,597 | 1,612 | 2,475 | 54 |
| Executed removal orders | 4,951 | 4,651 | 6,591 | 5,495 | 6,734 | 10,206 | 601 | 324 | 662 | 1,478 | 13 |
| Appeals to BIA | 4,854 | 5,943 | 13,874 | 7,435 | 7,111 | 4,501 | 571 | 575 | 463 | 279 | - |
| Grants of relief + other favorable-to-noncitizen judgement | 450 | 460 | 746 | 516 | 430 | 470 | 128 | 46 | 45 | 34 | - |
| EOIR removal orders + other favorable-to-OPLA judge | 4,404 | 5,483 | 13,128 | 6,919 | 6,681 | 4,031 | 443 | 529 | 418 | 245 | - |

| MOST CURRENT OUTCOMES | MEXICO 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **260,781** | **230,784** | **231,342** | **155,356** | **188,247** | **206,191** | **269,504** | **617,043** | **753,002** | **608,786** | **163,088** |
| **T8 Encounters** | 260,781 | 230,784 | 231,342 | 155,356 | 188,247 | 206,191 | 123,569 | 45,285 | 76,124 | 267,674 | 163,088 |
| **Processed for Expedited Removal** | 121,730 | 111,583 | 109,033 | 68,895 | 86,918 | 84,703 | 53,540 | 8,970 | 19,175 | 30,454 | 12,270 |
| No fear claim[2] | 115,786 | 103,363 | 100,320 | 64,495 | 79,040 | 79,899 | 47,203 | 8,315 | 18,364 | 25,966 | 8,732 |
| No fear claim - confirmed removal or return | 115,454 | 103,156 | 100,132 | 64,335 | 78,879 | 79,845 | 47,152 | 8,255 | 18,258 | 25,792 | 8,641 |
| Reprocessed[3] | 980 | 1,446 | 1,093 | 448 | 1,847 | 393 | 409 | 153 | 288 | 509 | 1,036 |
| Confirmed removal or return | 449 | 601 | 346 | 144 | 319 | 178 | 116 | 35 | 58 | 79 | 20 |
| Credible fear claims[4] | 4,964 | 6,774 | 7,620 | 3,952 | 6,031 | 4,411 | 5,928 | 502 | 523 | 3,979 | 2,502 |
| Positive fear determinations | 3,114 | 3,771 | 4,936 | 2,761 | 3,813 | 1,830 | 1,306 | 214 | 198 | 1,897 | 983 |
| Negative fear determinations | 983 | 1,544 | 1,153 | 435 | 962 | 1,347 | 3,573 | 200 | 215 | 1,453 | 985 |
| Negative fear determinations appealed to EOIR | 770 | 1,136 | 871 | 335 | 648 | 837 | 2,124 | 158 | 177 | 993 | 657 |
| Negative fear determinations vacated by EOIR | 58 | 105 | 146 | 74 | 74 | 75 | 476 | 31 | 46 | 226 | 75 |
| Negative fear determinations upheld by EOIR | 712 | 1,031 | 725 | 261 | 574 | 762 | 1,648 | 127 | 131 | 767 | 582 |
| Case closures | 867 | 1,459 | 1,531 | 756 | 1,256 | 1,234 | 1,049 | 88 | 110 | 629 | 534 |
| Case closures referred to EOIR | 96 | 172 | 312 | 97 | 97 | 95 | 171 | 7 | 7 | 165 | 102 |
| Case closures not referred to EOIR | 771 | 1,287 | 1,219 | 659 | 1,159 | 1,139 | 878 | 81 | 103 | 464 | 432 |
| ER/CF claims not referred to EOIR[5] | 1,696 | 2,726 | 2,226 | 1,020 | 2,047 | 2,411 | 3,975 | 250 | 272 | 1,691 | 1,342 |
| Executed removal orders | 1,416 | 2,340 | 2,015 | 999 | 1,993 | 2,329 | 3,347 | 219 | 228 | 1,434 | 579 |
| ER CF claims referred to EOIR[6] | 3,268 | 4,048 | 5,394 | 2,932 | 3,984 | 2,000 | 1,953 | 252 | 251 | 2,288 | 1,160 |
| **EOIR Cases Started** | 3,244 | 4,003 | 5,258 | 2,843 | 3,805 | 1,923 | 1,711 | 208 | 225 | 1,956 | 854 |
| Still in EOIR proceedings[7] | 389 | 636 | 1,039 | 686 | 862 | 622 | 1,067 | 119 | 133 | 1,700 | 840 |
| EOIR case completion[8] | 2,855 | 3,367 | 4,219 | 2,157 | 2,943 | 1,301 | 644 | 89 | 92 | 256 | 14 |
| Failure to prosecute | - | 1 | - | 2 | 3 | 6 | - | 1 | - | - | 1 |
| Terminations / Dismissals[9] | 853 | 935 | 1,077 | 591 | 638 | 262 | 275 | 30 | 15 | 18 | - |
| Asylum granted or other EOIR relief from removal[10] | 366 | 379 | 400 | 218 | 233 | 86 | 29 | 5 | 9 | 8 | - |
| Relief on merits[11] | 212 | 263 | 280 | 163 | 199 | 57 | 15 | - | 1 | 5 | - |
| Relief not on merits[12] | 154 | 116 | 120 | 55 | 34 | 29 | 14 | 5 | 8 | 3 | - |
| Removal orders[13] | 1,636 | 2,052 | 2,742 | 1,346 | 2,069 | 947 | 340 | 53 | 68 | 230 | 13 |
| In absentia | 570 | 592 | 917 | 545 | 625 | 168 | 121 | 11 | 28 | 51 | 1 |
| Executed removal orders | 99 | 83 | 124 | 69 | 59 | 17 | 4 | 1 | 1 | 5 | - |
| Not in absensia | 1,066 | 1,460 | 1,825 | 801 | 1,444 | 779 | 219 | 42 | 40 | 179 | 12 |
| Executed removal orders | 618 | 845 | 1,032 | 483 | 1,083 | 682 | 164 | 29 | 29 | 157 | 10 |
| Appeals to BIA | 509 | 634 | 678 | 301 | 353 | 119 | 37 | 15 | 9 | 5 | - |
| Grants of relief + other favorable-to-noncitizen judgement | 25 | 30 | 34 | 25 | 11 | 9 | 3 | 3 | 3 | - | - |
| EOIR removal orders + other favorable-to-OPLA judge | 484 | 604 | 644 | 276 | 342 | 110 | 34 | 12 | 6 | 5 | - |

| MOST CURRENT OUTCOMES | NORTHERN CENTRAL AMERICA 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **192,853** | **111,080** | **174,285** | **149,418** | **232,810** | **537,319** | **92,557** | **582,432** | **430,368** | **374,705** | **135,259** |
| **T8 Encounters** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Processed for Expedited Removal** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim[2] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim - confirmed removal or return | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Reprocessed[3] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Confirmed removal or return | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Credible fear claims[4] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Positive fear determinations | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations appealed to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations vacated by EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations upheld by EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures referred to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures not referred to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER/CF claims not referred to EOIR[5] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER CF claims referred to EOIR[6] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **EOIR Cases Started** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Still in EOIR proceedings[7] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR case completion[8] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Failure to prosecute | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Terminations / Dismissals[9] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Asylum granted or other EOIR relief from removal[10] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief on merits[11] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief not on merits[12] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Removal orders[13] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| In absentia | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Not in absensia | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Appeals to BIA | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Grants of relief + other favorable-to-noncitizen judgement | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR removal orders + other favorable-to-OPLA judge | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| MOST CURRENT OUTCOMES | ALL OTHERS 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **18,353** | **17,589** | **33,281** | **32,017** | **38,719** | **134,646** | **54,424** | **379,153** | **1,003,786** | **1,067,843** | **317,295** |
| **T8 Encounters** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **Processed for Expedited Removal** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim[2] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim - confirmed removal or return | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Reprocessed[3] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Confirmed removal or return | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Credible fear claims[4] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Positive fear determinations | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations appealed to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations vacated by EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations upheld by EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures referred to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures not referred to EOIR | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER/CF claims not referred to EOIR[5] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER CF claims referred to EOIR[6] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **EOIR Cases Started** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Still in EOIR proceedings[7] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR case completion[8] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Failure to prosecute | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Terminations / Dismissals[9] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Asylum granted or other EOIR relief from removal[10] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief on merits[11] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief not on merits[12] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Removal orders[13] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| In absentia | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Not in absensia | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Appeals to BIA | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Grants of relief + other favorable-to-noncitizen judgement | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR removal orders + other favorable-to-OPLA judge | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

- Represents zero.
[1] Includes SW Border encounters by USBP and OFO. Excludes Unaccompanied Children (UC), Accompanied Minors (AM), OFO administrative encounters, and parolees released into the United States with Notice to Appear and a CBP One confirmati
[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data.
[3] Fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed by ICE into other dispositions.
[4] Individuals placed in ER and found to have a Credible Fear (CF) case in USCIS APSO system.
[5] Negative CF interviews not appealed to Executive Office for Immigration Review (EOIR), negative CF interviews affirmed by EOIR, and case closures not referred to EOIR. Cases result in final ER removal orders.
[6] USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.
[7] Cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, zero bond, BIA appeal, or decision rescinded.
[8] Cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.
[9] Completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.
[10] Completion codes for conditional grants of asylum, grants of asylum, adjustment of status under various statutory provisions, asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, fi
[11] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.
[12] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.
[13] Completion codes for removal order, grant of voluntary departure, withdrawal of far claim, abandonment, and denial.
Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the
Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of December 31, 2023.

Border encounters have shifted in recent years to include following that at a higher rate, and large numbers of non-Mexicans – who have historically been far more likely to assert their claims – and so the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB may become more limited. In contrast, as discussed in Section III.B.1.a.v of this preamble, from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 70 percent in February 2024. –DHS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

| Mexico | | | |
|---|---|---|---|
| **Expedited Removal Processing: Southwest Border** | February | March | Since May 12 |
| SW Border Encounters | 52,553 | 54,590 | 497,123 |
| Processed for ER | 9,579 | 12,032 | 60,071 |
| % Encounters processed for ER | 18% | 22% | 12% |
| ER processed in CBP Custody | 6,420 | 7,380 | 41,023 |
| Credible fear referrals | 2,172 | 1,820 | 6,409 |
| CFIs conducted | 2,146 | 1,752 | 6,265 |
| **CFI results** | 2,146 | 1,661 | 6,368 |
| Positive fear finding | 596 | 657 | 1,651 |
| Negative fear finding | 1,365 | 1,070 | 3,886 |
| Appealed to IJ | 221 | 263 | 602 |
| Pending or blank order | 1 | 1 | 4 |
| Affirmed | 180 | 188 | 483 |
| Vacated | 39 | 74 | 135 |
| Not appealed to IJ | 3,142 | 774 | 3,084 |
| Admin closed | 185 | 185 | 651 |
| Admin closed without CFI | 22 | 31 | 102 |
| **CBP repatriations** | 5,670 | 6,085 | 38,437 |
| No fear claim ER removals | 4,247 | 5,556 | 34,602 |
| Negative fear, IJ review | 0 | 0 | 0 |
| Negative fear, IJ affirmed | 1,318 | 662 | 3,455 |
| ER withdrawn VRs | 0 | 1 | 23 |
| Other | 105 | 66 | 581 |
| ER transfers to ICE for processing | 2,719 | 4,652 | 19,048 |
| Reprocessed with other dispositions | 30 | 48 | 255 |
| ER processed by ICE non-detained | 2,207 | 4,296 | 12,854 |
| ER processed in ICE Custody | 522 | 331 | 5,939 |
| Credible fear referrals | 506 | 501 | 5,566 |
| CFIs conducted | 469 | 538 | 4,843 |
| **CFI results** | 455 | 396 | 4,683 |
| Positive fear finding | 119 | 79 | 2,017 |
| Negative fear finding | 181 | 79 | 1,746 |
| Appealed to IJ | 86 | 25 | 960 |
| Pending or blank order | 6 | 8 | 88 |
| Affirmed | 74 | 11 | 767 |
| Vacated | 6 | 2 | 105 |
| Not appealed to IJ | 95 | 49 | 786 |
| Admin closed | 115 | 47 | 920 |
| Admin closed without CFI | 22 | 4 | 481 |
| ICE removals (REPATRIATIONS) | 239 | 63 | 2,668 |
| No fear claim ER removals | 0 | 0 | 9 |
| Negative fear, IJ review | 0 | 0 | 0 |
| Negative fear, IJ affirmed | 143 | 38 | 1,468 |
| Other | 96 | 25 | 1,083 |
| ER processed by ICE non-detained | 2,207 | 4,296 | 12,854 |
| Credible fear referrals | 898 | 2,157 | 5,642 |
| CFIs conducted | 817 | 925 | 3,982 |
| **CFI results** | 787 | 455 | 3,413 |
| Positive fear finding | 522 | 254 | 2,111 |
| Negative fear finding | 249 | 160 | 1,221 |
| Appealed to IJ | 230 | 98 | 1,071 |
| Pending or blank order | 43 | 36 | 139 |
| Affirmed | 154 | 51 | 744 |
| Vacated | 56 | 11 | 192 |
| Not appealed to IJ | 19 | 62 | 146 |
| Admin closed | 16 | 25 | 81 |
| Admin closed without CFI | 42 | 50 | 312 |
| ICE removals (REPATRIATIONS) | 799 | 572 | 3,490 |
| No fear claim ER removals | 731 | 568 | 2,910 |
| Negative fear, IJ review | 0 | 0 | 0 |
| Negative fear, IJ affirmed | 56 | 1 | 441 |
| Other | 12 | 3 | 139 |

Notes: All counts are based on removals of noncitizens. Population is limited to Mexican national single adults and family unit individuals encountered by CBP at the southwest land border, excluding OTCO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

| Share of ER claiming fear - Since May 12 | 10% |
|---|---|
| Share of SW ER claiming fear - February 2024 | 18% |

Note: It's too early to report on March fear claims because many of them will not have shown up in the data yet.

IFR_AR_007506

border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.
For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019, nearly 57 percent of people from northern Central America (i.e., El Salvador, Guatemala, and Honduras), and close to 90 percent of all other nationalities made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023.

**09 fear claims 2014-2019 claiming fear by citizenship**

| | |
|---|---|
| NCA | 57% |
| Other | 90% |

### Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims by Country

**TOTAL**

| MOST CURRENT OUTCOMES | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **471,989** | **359,453** | **438,908** | **336,791** | **439,776** | **878,156** | **416,485** | **1,578,628** | **2,187,156** | **2,051,374** | **615,642** |
| T8 Encounters | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | 1,109,854 | 1,488,394 | 615,642 |
| Processed for Expedited Removal | 228,049 | 180,592 | 227,911 | 160,305 | 214,667 | 223,200 | 91,719 | 84,687 | 119,665 | 207,197 | 82,719 |
| No fear claim[2] | 174,419 | 130,820 | 130,629 | 89,349 | 115,080 | 121,732 | 66,219 | 15,051 | 38,167 | 62,097 | 40,923 |
| No fear claim - confirmed removal or return | 166,051 | 129,846 | 127,921 | 86,688 | 110,087 | 118,756 | 63,698 | 10,956 | 28,260 | 53,931 | 28,823 |
| Reprocessed[3] | 4,893 | 3,321 | 4,379 | 2,167 | 4,081 | 3,366 | 1,664 | 20,618 | 31,503 | 10,255 | 9,312 |
| Confirmed removal or return | 1,006 | 1,012 | 819 | 418 | 669 | 607 | 650 | 415 | 507 | 363 | 83 |
| Credible fear claims[4] | 48,737 | 46,451 | 92,903 | 68,789 | 95,506 | 98,102 | 23,836 | 49,018 | 49,995 | 134,845 | 32,484 |
| Positive fear determinations | 35,051 | 33,972 | 73,871 | 53,666 | 74,438 | 70,879 | 8,462 | 33,710 | 28,362 | 81,147 | 16,170 |
| Negative fear determinations | 9,197 | 7,535 | 9,419 | 7,325 | 9,110 | 17,668 | 12,353 | 13,249 | 17,847 | 42,359 | 11,899 |
| Negative fear determinations appealed to EOIR | 7,348 | 6,260 | 7,629 | 5,898 | 6,745 | 14,295 | 9,729 | 12,812 | 16,798 | 34,582 | 10,038 |
| Negative fear determinations vacated by EOIR | 1,298 | 1,232 | 1,999 | 1,451 | 1,278 | 3,866 | 3,158 | 3,524 | 4,789 | 6,584 | 2,202 |
| Negative fear determinations upheld by EOIR | 6,050 | 5,028 | 5,630 | 4,447 | 5,467 | 10,429 | 6,571 | 9,288 | 12,009 | 27,998 | 7,836 |
| Case closures | 4,489 | 4,944 | 9,613 | 7,798 | 11,958 | 9,555 | 3,021 | 2,059 | 3,786 | 11,339 | 4,415 |
| Case closures referred to EOIR | 1,306 | 1,708 | 4,373 | 3,698 | 6,652 | 3,345 | 983 | 1,067 | 2,497 | 5,401 | 1,577 |
| Case closures not referred to EOIR | 3,183 | 3,236 | 5,240 | 4,100 | 5,306 | 6,210 | 2,038 | 992 | 1,289 | 5,938 | 2,838 |
| ER/CF claims not referred to EOIR[5] | 11,082 | 9,539 | 12,660 | 9,974 | 13,138 | 20,012 | 11,233 | 10,717 | 14,347 | 41,713 | 12,535 |
| Executed removal orders | 9,768 | 8,487 | 11,240 | 9,286 | 11,608 | 18,423 | 8,740 | 6,247 | 8,576 | 31,968 | 3,612 |
| ER/CF claims referred to EOIR[6] | 37,655 | 36,912 | 80,243 | 58,815 | 82,368 | 78,090 | 12,603 | 38,301 | 35,648 | 93,132 | 19,949 |
| **EOIR Cases Started** | 37,277 | 36,616 | 78,712 | 57,168 | 77,810 | 72,182 | 11,871 | 32,470 | 29,132 | 77,135 | 13,747 |
| Still in EOIR proceedings[7] | 6,437 | 7,058 | 16,141 | 14,674 | 22,957 | 26,875 | 7,011 | 23,055 | 22,510 | 70,283 | 13,669 |
| EOIR case completion[8] | 30,840 | 29,558 | 62,571 | 42,494 | 54,853 | 45,307 | 4,860 | 9,415 | 6,622 | 6,852 | 78 |
| Failure to prosecute | 2 | 2 | 1 | 8 | 49 | 114 | 4 | 15 | 5 | 24 | 3 |
| Terminations / Dismissals[9] | 7,025 | 6,498 | 15,819 | 12,881 | 17,335 | 16,323 | 1,593 | 3,627 | 980 | 954 | 9 |
| Asylum granted or other EOIR relief from removal[10] | 6,581 | 6,598 | 11,156 | 6,936 | 8,924 | 7,365 | 1,477 | 1,417 | 894 | 447 | 3 |
| Relief on merits[11] | 4,874 | 5,815 | 9,731 | 6,055 | 8,040 | 6,393 | 1,117 | 1,217 | 760 | 302 | - |
| Relief not on merits[12] | 1,707 | 783 | 1,425 | 881 | 884 | 972 | 360 | 200 | 134 | 145 | 3 |
| Removal orders[13] | 17,232 | 16,460 | 35,595 | 22,669 | 28,545 | 21,505 | 1,786 | 4,356 | 4,743 | 5,427 | 63 |
| In absentia | 7,095 | 5,386 | 13,034 | 9,329 | 13,907 | 6,682 | 444 | 2,759 | 3,131 | 2,952 | 9 |
| Executed removal orders | 857 | 549 | 1,063 | 741 | 761 | 378 | 34 | 71 | 94 | 52 | - |
| Not in absentia | 10,137 | 11,074 | 22,561 | 13,340 | 14,638 | 14,823 | 1,342 | 1,597 | 1,612 | 2,475 | 54 |
| Executed removal orders | 4,951 | 4,651 | 6,591 | 5,495 | 6,734 | 10,206 | 601 | 324 | 662 | 1,478 | 13 |
| Appeals to BIA | 4,854 | 5,943 | 13,874 | 7,435 | 7,111 | 4,501 | 571 | 575 | 463 | 279 | - |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 450 | 460 | 746 | 516 | 430 | 470 | 128 | 46 | 45 | 34 | - |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 4,404 | 5,483 | 13,128 | 6,919 | 6,681 | 4,031 | 443 | 529 | 418 | 245 | - |

**MEXICO**

| MOST CURRENT OUTCOMES | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **260,781** | **230,784** | **231,342** | **155,356** | **188,247** | **206,191** | **269,504** | **617,043** | **753,002** | **608,786** | **163,088** |
| T8 Encounters | 260,781 | 230,784 | 231,342 | 155,356 | 188,247 | 206,191 | 123,569 | 45,285 | 76,124 | 267,674 | 163,088 |
| Processed for Expedited Removal | 121,730 | 111,583 | 109,033 | 68,895 | 86,918 | 84,703 | 53,540 | 8,970 | 19,175 | 30,454 | 12,270 |
| No fear claim[2] | 115,786 | 103,363 | 100,320 | 64,495 | 79,040 | 79,899 | 47,203 | 8,315 | 18,364 | 25,966 | 8,732 |
| No fear claim - confirmed removal or return | 115,454 | 103,156 | 100,132 | 64,335 | 78,879 | 79,845 | 47,152 | 8,255 | 18,258 | 25,792 | 8,641 |
| Reprocessed[3] | 980 | 1,446 | 1,093 | 448 | 1,847 | 393 | 409 | 153 | 288 | 509 | 1,036 |
| Confirmed removal or return | 449 | 601 | 346 | 144 | 319 | 178 | 116 | 35 | 58 | 79 | 20 |
| Credible fear claims[4] | 4,964 | 6,774 | 7,620 | 3,952 | 6,031 | 4,411 | 5,928 | 502 | 523 | 3,979 | 2,502 |
| Positive fear determinations | 3,114 | 3,771 | 4,936 | 2,761 | 3,813 | 1,830 | 1,306 | 214 | 198 | 1,897 | 983 |
| Negative fear determinations | 983 | 1,544 | 1,153 | 435 | 962 | 1,347 | 3,573 | 200 | 215 | 1,453 | 985 |
| Negative fear determinations appealed to EOIR | 770 | 1,136 | 871 | 335 | 648 | 837 | 2,124 | 158 | 177 | 993 | 657 |
| Negative fear determinations vacated by EOIR | 58 | 105 | 146 | 74 | 74 | 75 | 476 | 31 | 46 | 226 | 75 |
| Negative fear determinations upheld by EOIR | 712 | 1,031 | 725 | 261 | 574 | 762 | 1,648 | 127 | 131 | 767 | 582 |
| Case closures | 867 | 1,459 | 1,531 | 756 | 1,256 | 1,234 | 1,049 | 88 | 110 | 629 | 534 |
| Case closures referred to EOIR | 96 | 172 | 312 | 97 | 97 | 95 | 171 | 7 | 7 | 165 | 102 |
| Case closures not referred to EOIR | 771 | 1,287 | 1,219 | 659 | 1,159 | 1,139 | 878 | 81 | 103 | 464 | 432 |
| ER/CF claims not referred to EOIR[5] | 1,696 | 2,726 | 2,226 | 1,020 | 2,047 | 2,411 | 3,975 | 250 | 272 | 1,691 | 1,342 |
| Executed removal orders | 1,416 | 2,340 | 2,015 | 999 | 1,993 | 2,329 | 3,347 | 219 | 228 | 1,434 | 579 |
| ER/CF claims referred to EOIR[6] | 3,268 | 4,048 | 5,394 | 2,932 | 3,984 | 2,000 | 1,953 | 252 | 251 | 2,288 | 1,160 |
| **EOIR Cases Started** | 3,244 | 4,003 | 5,258 | 2,843 | 3,805 | 1,923 | 1,711 | 208 | 225 | 1,956 | 854 |
| Still in EOIR proceedings[7] | 389 | 636 | 1,039 | 686 | 862 | 622 | 1,067 | 119 | 133 | 1,700 | 840 |
| EOIR case completion[8] | 2,855 | 3,367 | 4,219 | 2,157 | 2,943 | 1,301 | 644 | 89 | 92 | 256 | 14 |
| Failure to prosecute | - | 1 | - | 2 | 3 | 6 | - | 1 | - | - | 1 |
| Terminations / Dismissals[9] | 853 | 935 | 1,077 | 591 | 638 | 262 | 275 | 30 | 15 | 18 | - |
| Asylum granted or other EOIR relief from removal[10] | 366 | 379 | 400 | 218 | 233 | 86 | 29 | 5 | 9 | 8 | - |
| Relief on merits[11] | 212 | 263 | 280 | 163 | 199 | 57 | 15 | - | 1 | 5 | - |
| Relief not on merits[12] | 154 | 116 | 120 | 55 | 34 | 29 | 14 | 5 | 8 | 3 | - |
| Removal orders[13] | 1,636 | 2,052 | 2,742 | 1,346 | 2,069 | 947 | 340 | 53 | 68 | 230 | 13 |
| In absentia | 570 | 592 | 917 | 545 | 625 | 168 | 121 | 11 | 28 | 51 | 1 |
| Executed removal orders | 99 | 83 | 124 | 69 | 59 | 17 | 4 | 1 | 1 | 5 | - |
| Not in absentia | 1,066 | 1,460 | 1,825 | 801 | 1,444 | 779 | 219 | 42 | 40 | 179 | 12 |
| Executed removal orders | 618 | 845 | 1,032 | 483 | 1,083 | 682 | 164 | 29 | 29 | 157 | 10 |
| Appeals to BIA | 509 | 634 | 678 | 301 | 353 | 119 | 37 | 15 | 9 | 5 | - |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 25 | 30 | 34 | 25 | 11 | 9 | 3 | 3 | 3 | - | - |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 484 | 604 | 644 | 276 | 342 | 110 | 34 | 12 | 6 | 5 | - |

**NORTHERN CENTRAL AMERICA**

| MOST CURRENT OUTCOMES | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **192,855** | **111,080** | **174,285** | **149,418** | **212,810** | **557,319** | **92,557** | **582,432** | **430,368** | **374,705** | **135,259** |
| T8 Encounters | 192,855 | 111,080 | 174,285 | 149,418 | 212,810 | 557,319 | 55,492 | 188,350 | 82,390 | 234,547 | 135,259 |
| Processed for Expedited Removal | 94,089 | 56,606 | 99,467 | 70,176 | 99,738 | 91,669 | 24,978 | 5,891 | 16,319 | 49,944 | 37,819 |
| No fear claim[2] | 57,204 | 26,441 | 28,489 | 21,436 | 35,054 | 40,084 | 17,934 | 4,052 | 12,999 | 28,206 | 27,630 |
| No fear claim - confirmed removal or return | 49,433 | 25,737 | 26,153 | 19,144 | 30,343 | 37,403 | 15,615 | 1,786 | 7,934 | 24,011 | 18,374 |
| Reprocessed[3] | 3,424 | 1,304 | 2,363 | 1,398 | 1,688 | 1,903 | 760 | 295 | 966 | 746 | 2,364 |
| Confirmed removal or return | 397 | 248 | 354 | 192 | 227 | 253 | 409 | 51 | 69 | 112 | 49 |
| Credible fear claims[4] | 33,461 | 28,861 | 68,615 | 47,342 | 62,996 | 49,682 | 6,284 | 1,544 | 2,354 | 20,992 | 7,825 |
| Positive fear determinations | 23,168 | 20,870 | 54,407 | 36,111 | 46,770 | 33,966 | 1,244 | 634 | 950 | 8,419 | 3,170 |
| Negative fear determinations | 7,279 | 5,066 | 7,083 | 5,003 | 6,440 | 9,077 | 3,921 | 765 | 1,137 | 9,707 | 3,322 |
| Negative fear determinations appealed to EOIR | 5,751 | 4,275 | 5,660 | 3,820 | 4,584 | 6,644 | 3,077 | 666 | 945 | 6,499 | 2,759 |
| Negative fear determinations vacated by EOIR | 1,063 | 905 | 1,600 | 972 | 730 | 1,268 | 547 | 138 | 229 | 811 | 459 |
| Negative fear determinations upheld by EOIR | 4,688 | 3,370 | 4,060 | 2,848 | 3,854 | 5,376 | 2,530 | 528 | 716 | 5,688 | 2,300 |
| Case closures | 3,014 | 2,925 | 7,125 | 6,228 | 9,786 | 6,639 | 1,119 | 145 | 267 | 2,866 | 1,333 |
| Case closures referred to EOIR | 811 | 1,123 | 3,418 | 3,112 | 5,930 | 2,077 | 266 | 51 | 73 | 720 | 377 |
| Case closures not referred to EOIR | 2,203 | 1,802 | 3,707 | 3,116 | 3,856 | 4,562 | 853 | 94 | 194 | 2,146 | 956 |
| ER/CF claims not referred to EOIR[5] | 8,419 | 5,963 | 9,190 | 7,147 | 9,566 | 12,371 | 4,227 | 721 | 1,102 | 11,042 | 3,819 |
| Executed removal orders | 7,516 | 5,429 | 8,177 | 6,623 | 8,315 | 11,627 | 3,515 | 594 | 859 | 8,105 | 1,068 |
| ER/CF claims referred to EOIR[6] | 25,042 | 22,898 | 59,425 | 40,195 | 53,430 | 37,311 | 2,057 | 823 | 1,252 | 9,950 | 4,006 |
| **EOIR Cases Started** | 24,797 | 22,670 | 58,123 | 38,857 | 49,997 | 33,163 | 1,950 | 697 | 1,077 | 8,263 | 3,014 |
| Still in EOIR proceedings[7] | 4,614 | 4,553 | 11,792 | 10,295 | 15,854 | 13,586 | 1,227 | 457 | 707 | 7,576 | 2,996 |
| EOIR case completion[8] | 20,183 | 18,117 | 46,331 | 28,562 | 34,143 | 19,577 | 723 | 240 | 370 | 687 | 18 |
| Failure to prosecute | 2 | 1 | - | 4 | 45 | 67 | 1 | 2 | 1 | 4 | - |
| Terminations / Dismissals[9] | 4,884 | 4,401 | 12,816 | 9,491 | 10,523 | 5,475 | 273 | 46 | 32 | 37 | 3 |
| Asylum granted or other EOIR relief from removal[10] | 3,190 | 2,726 | 5,612 | 2,744 | 2,834 | 1,103 | 57 | 16 | 25 | 27 | - |
| Relief on merits[11] | 2,003 | 2,316 | 4,601 | 2,281 | 2,365 | 861 | 36 | 11 | 7 | 9 | - |
| Relief not on merits[12] | 1,187 | 410 | 1,011 | 463 | 469 | 242 | 21 | 5 | 18 | 18 | - |
| Removal orders[13] | 12,107 | 10,989 | 27,903 | 16,323 | 20,741 | 12,932 | 392 | 176 | 312 | 619 | 15 |
| In absentia | 4,826 | 3,799 | 10,652 | 7,600 | 11,695 | 5,117 | 107 | 76 | 137 | 281 | 2 |
| Executed removal orders | 513 | 301 | 703 | 496 | 504 | 189 | 6 | 1 | 2 | 3 | - |
| Not in absentia | 7,281 | 7,190 | 17,251 | 8,723 | 9,046 | 7,815 | 285 | 100 | 175 | 338 | 13 |
| Executed removal orders | 3,618 | 2,596 | 3,857 | 2,815 | 3,421 | 5,758 | 193 | 55 | 122 | 231 | 2 |
| Appeals to BIA | 3,283 | 3,990 | 11,043 | 4,930 | 4,188 | 1,630 | 49 | 26 | 58 | 51 | - |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 278 | 209 | 424 | 200 | 146 | 68 | 1 | 2 | 9 | 5 | - |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 3,005 | 3,781 | 10,619 | 4,730 | 4,042 | 1,562 | 48 | 24 | 49 | 46 | - |

**ALL OTHERS**

| MOST CURRENT OUTCOMES | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | **18,353** | **17,589** | **33,281** | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | #### | #### | [illegible] |
| T8 Encounters | 18,353 | 17,589 | 33,281 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Processed for Expedited Removal | 12,230 | 12,403 | 19,411 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim[2] | 1,429 | 1,016 | 1,820 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| No fear claim - confirmed removal or return | 1,164 | 953 | 1,636 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Reprocessed[3] | 489 | 571 | 923 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Confirmed removal or return | 160 | 163 | 119 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Credible fear claims[4] | 10,312 | 10,816 | 16,668 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Positive fear determinations | 8,769 | 9,331 | 14,528 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations | 935 | 925 | 1,183 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations appealed to EOIR | 827 | 849 | 1,098 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations vacated by EOIR | 177 | 222 | 253 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Negative fear determinations upheld by EOIR | 650 | 627 | 845 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures | 608 | 560 | 957 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures referred to EOIR | 399 | 413 | 643 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Case closures not referred to EOIR | 209 | 147 | 314 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER/CF claims not referred to EOIR[5] | 967 | 850 | 1,244 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | 836 | 718 | 1,048 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ER/CF claims referred to EOIR[6] | 9,345 | 9,966 | 15,424 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| **EOIR Cases Started** | 9,236 | 9,943 | 15,331 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Still in EOIR proceedings[7] | 1,434 | 1,869 | 3,310 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR case completion[8] | 7,802 | 8,074 | 12,021 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Failure to prosecute | - | - | 1 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Terminations / Dismissals[9] | 1,288 | 1,162 | 1,926 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Asylum granted or other EOIR relief from removal[10] | 3,025 | 3,493 | 5,144 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief on merits[11] | 2,659 | 3,236 | 4,850 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Relief not on merits[12] | 366 | 257 | 294 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Removal orders[13] | 3,489 | 3,419 | 4,950 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| In absentia | 1,699 | 995 | 1,465 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | 245 | 165 | 236 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Not in absentia | 1,790 | 2,424 | 3,485 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Executed removal orders | 715 | 1,210 | 1,702 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Appeals to BIA | 1,062 | 1,319 | 2,153 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 147 | 221 | 288 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 915 | 1,098 | 1,865 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

- Represents zero.
[1] Includes SW Border encounters by USBP and OFO. Excludes Unaccompanied Children (UC), Accompanied Minors (AM), OFO administrative encounters, and parolees released into the United States with Notice to Appear and a CBP One confirmation number, none of whom are amenable to expedited removal.
[2] No fear claim in CBP records and no associated record of a fear claim in USCIS APSO data.
[3] [illegible]
[4] [illegible]
[5] [illegible] final ER removal orders.
[6] [illegible]
[7] [illegible]
[8] [illegible] administrative completions.
[9] [illegible]
[10] [illegible] deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, and cancellation of removal.
[11] [illegible] cancellation of removal.
[12] [illegible]
[13] [illegible]
Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.
Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on routes data as of December 31, 2023.

border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.
Of note, according to OHSS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at and between SWB POEs. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from countries other than Mexico and northern Central America now account for the largest numbers of such encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

| Correlation coefficient between mean days and OTM % Apprehensions: | 0.909029 |
|---|---|

| Fiscal Year | Mean days for EOIR completion | OTM % of Apprehensions | OTM encounters |
|---|---|---|---|
| 2000 | 42 | 2% | 25,738 |
| 2001 | 109 | 2% | 29,902 |
| 2002 | 172 | 3% | 28,299 |
| 2003 | 211 | 4% | 39,478 |
| 2004 | 252 | 6% | 65,917 |
| 2005 | 283 | 13% | 166,071 |
| 2006 | 308 | 9% | 110,287 |
| 2007 | 283 | 8% | 72,206 |
| 2008 | 264 | 8% | 64,940 |
| 2009 | 267 | 9% | 53,870 |
| 2010 | 351 | 11% | 59,953 |
| 2011 | 389 | 14% | 57,049 |
| 2012 | 504 | 26% | 109,218 |
| 2013 | 671 | 35% | 172,050 |
| 2014 | 710 | 50% | 284,546 |
| 2015 | 791 | 43% | 191,196 |
| 2016 | 868 | 54% | 302,908 |
| 2017 | 795 | 56% | 233,680 |
| 2018 | 837 | 57% | 298,233 |
| 2019 | 835 | 76% | 740,162 |
| 2020 | 834 | 35% | 160,374 |
| 2021 | 1,463 | 62% | 1,079,092 |
| 2022 | 1,608 | 66% | 1,570,605 |
| 2023 | 1,369 | 73% | 340,038 |

Note: OIS calculated mean days from EOIR case received date to EOIR case completion date by pulling all EOIR case completions from OIS production data, and linking each completion to its case receipt date. In absentia removal orders and case completions that did not result in decisions, terminations, or closures were excluded from the analysis. OIS calculated OTMs as a % of encounters by dividing total non-Mexican SWB encounters by total SWB encounters, pulling from OIS production data.

Source: OIS persist December 2023.

Indeed, since 2021, DHS has seen a sharp increase in total SWB encounters of Mexican nationals, from a pre-pandemic (FY 2014 through FY 2019) average of approximately 239,000 to more than 717,000 in FY 2023.

March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* , https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

Total Encounters
Sum of cou Column Labels

| Row Label | Mexico | NTriangle | Other | Grand Total | | | | | |
|-----------|--------|-----------|-------|-------------|---|---|---|---|---|
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 | | | 65% | 29% | 6% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | | | 50% | 44% | 6% |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 | Mex pre-pandemic avg | 239,257 | 57% | 32% | 11% |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 | Mex 2023 | 717,333 | 46% | 41% | 13% |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 | | | 44% | 45% | 11% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | | | 43% | 50% | 8% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | | | 24% | 64% | 12% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | | | 65% | 23% | 12% |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 | | | 38% | 40% | 22% |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 | | | 34% | 23% | 43% |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 | | | 29% | 20% | 51% |
| 2024 | 385,680 | 267,831 | 687,288 | 1,340,799 | | | 29% | 20% | 51% |
| Grand Tot. | 4,617,753 | 3,940,371 | 3,805,932 | 12,364,056 | | | 37% | 32% | 31% |

Source: March 2024 OHSS Persist Dataset.

IFR_AR_007509

The percentage of Mexican nationals processed for expedited removal who claimed a fear of return averaged 6 percent in the pre-pandemic period (FY 2014 through FY 2019), and never exceeded 7 percent for any fiscal year.
OHSS Enforcement Lifecycle December 31, 2023.

% of encounters 2014-2019 processed for ER making fear claims
Mexico ▮▮▮ 6%

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims by Country**

| MOST CURRENT OUTCOMES | MEXICO | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q2 |
| Total Encounters¹ | 260,781 | 230,784 | 231,342 | 155,356 | 188,247 | 206,191 | 269,504 | 617,043 | 753,002 | 608,786 | 163,088 |
| TB Encounters | 260,781 | 230,784 | 231,342 | 155,356 | 188,247 | 206,191 | 123,569 | 45,265 | 76,124 | 267,674 | 163,088 |
| **Processed for Expedited Removal** | | | | | | | | | | | |
| No fear claim² | 125,730 | 111,383 | 109,033 | 68,895 | 86,918 | 84,705 | 53,540 | 8,570 | 19,175 | 30,454 | 12,270 |
| No fear claim - confirmed removal or return | 115,786 | 105,363 | 100,320 | 64,495 | 79,040 | 79,899 | 47,203 | 8,315 | 18,364 | 25,966 | 8,732 |
| | 115,454 | 103,156 | 100,132 | 64,335 | 78,879 | 79,845 | 47,152 | 8,255 | 18,258 | 25,792 | 8,641 |
| Fear claims withdrawn³ [based on APSO receipts] | 980 | 1,446 | 1,093 | 448 | 1,847 | 395 | 409 | 155 | 288 | 509 | 1,036 |
| Confirmed removal or return | 449 | 603 | 546 | 144 | 319 | 178 | 116 | 33 | 58 | 58 | 20 |
| Credible fear claims⁴ (APSO cases only) | 4,964 | 6,774 | 7,620 | 3,952 | 6,031 | 4,411 | 5,928 | 902 | 525 | 3,979 | 2,502 |
| % Processed for fear making fear claims | 4% | 6% | 7% | 6% | 7% | 5% | 11% | 6% | 3% | 15% | 20% |
| Positive fear determinations | 3,314 | 3,771 | 4,556 | 2,761 | 3,813 | 3,830 | 1,306 | 214 | 198 | 1,897 | 983 |
| Negative fear determinations | 983 | 1,544 | 1,153 | 435 | 962 | 1,347 | 3,573 | 200 | 215 | 1,453 | 985 |
| Negative fear determinations appealed to EOIR | 770 | 1,136 | 871 | 335 | 648 | 837 | 2,124 | 158 | 177 | 993 | 657 |
| Negative fear determinations vacated by EOIR | 58 | 105 | 146 | 74 | 74 | 75 | 476 | 31 | 46 | 226 | 75 |
| Negative fear determinations upheld by EOIR | 712 | 1,031 | 725 | 261 | 574 | 762 | 1,648 | 127 | 131 | 767 | 582 |
| Case closures | 967 | 1,439 | 1,331 | 756 | 1,256 | 1,234 | 1,049 | 88 | 110 | 629 | 554 |
| Case closures referred to EOIR | 96 | 172 | 312 | 97 | 97 | 95 | 171 | 7 | 7 | 163 | 102 |
| Case closures not referred to EOIR | 771 | 1,287 | 1,219 | 659 | 1,159 | 1,139 | 878 | 81 | 103 | 464 | 432 |
| ER/CF claims not referred to EOIR⁵ | 1,696 | 2,726 | 2,226 | 1,020 | 2,047 | 2,411 | 3,975 | 250 | 272 | 1,691 | 1,342 |
| Executed removal orders | 1,416 | 2,340 | 2,013 | 999 | 1,993 | 2,329 | 3,347 | 219 | 228 | 1,434 | 579 |
| Total referrals to EOIR⁶ (Includes closed cases, vacated negative and positive decisions) | 3,268 | 4,048 | 5,394 | 2,932 | 3,984 | 2,900 | 1,953 | 252 | 251 | 2,288 | 1,160 |
| **EOIR Cases Started** | 3,244 | 4,003 | 5,258 | 2,843 | 3,805 | 1,923 | 1,711 | 208 | 225 | 1,956 | 454 |
| Still in EOIR proceedings | 389 | 436 | 1,039 | 686 | 862 | 622 | 1,067 | 119 | 133 | 1,700 | 840 |
| EOIR cases completed | 2,855 | 3,567 | 4,219 | 2,157 | 2,943 | 1,301 | 644 | 89 | 92 | 256 | 14 |
| Failure to prosecute | - | - | 1 | - | 2 | 3 | 6 | - | - | - | 1 |
| Terminations / Dismissals | 653 | 933 | 1,077 | 591 | 638 | 262 | 275 | 30 | 15 | 18 | - |
| Asylum granted or other EOIR relief from removal | 566 | 579 | 400 | 218 | 233 | 86 | 29 | 5 | 9 | 8 | - |
| Relief on merits | 212 | 263 | 280 | 163 | 199 | 57 | 15 | - | 1 | 5 | - |
| Relief not on merits | 154 | 116 | 120 | 55 | 34 | 29 | 14 | 5 | 8 | 3 | - |
| Removal orders | 1,636 | 2,052 | 2,742 | 1,346 | 2,069 | 947 | 340 | 53 | 68 | 230 | 13 |
| In absentia | 570 | 592 | 917 | 545 | 625 | 168 | 121 | 11 | 26 | 51 | 1 |
| Not in absentia | 99 | 83 | 124 | 69 | 59 | 17 | 4 | 1 | 1 | 3 | - |
| Appeals to BIA | 1,066 | 1,460 | 1,825 | 801 | 1,444 | 779 | 219 | 42 | 40 | 179 | 12 |
| In absentia | 618 | 845 | 1,032 | 483 | 1,083 | 682 | 164 | 29 | 29 | 157 | 10 |
| Executed removal orders | 369 | 634 | 678 | 301 | 353 | 119 | 37 | 15 | 9 | 5 | - |
| Grants of relief + other favorable-to-noncitizen judgments appealed to BIA | 25 | 30 | 34 | 25 | 11 | 9 | 3 | 3 | 3 | - | - |
| EOIR removal orders + other favorable-to-OPLA judgements appealed to BIA | 484 | 604 | 644 | 276 | 342 | 110 | 34 | 12 | 6 | 5 | - |

- Represents zero.
¹ Includes unaccompanied children, accompanied minors, and OFO administrative cases including crewmembers, parolees, and withdrawals, none of whom are amenable to expedited removal. Exclusions make up 3.4 percent of total encounters between FY2013 and FY2023 Q3.
² No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed with other dispositions in ICE custody.
³ Fear claim in CBP custody but no associated record of a fear claim in USCIS APSO data; case results in an ER removal order.
⁴ Based on USCIS APSO check-ins.
⁵ Includes positive credible fear interviews, negative CF interviews vacated by EOIR, and case closures referred to EOIR.
⁶ Cases decided on merits includes grants of relief, including administrative closures and grants of prosecutorial discretion as "other" forms of relief.
Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.
Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of December 31, 2023.

But 29 percent of all Mexican nationals processed for expedited removal at the SWB from May 12, 2023, to March 31, 2024, made fear claims, including 39 percent in February 2024.
OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

| Mexico | | | |
| --- | --- | --- | --- |
| Expedited Removal Processing: Southwest Border | February | March | Since May 12 |
| SW Border Encounters | 52,333 | 54,590 | 497,123 |
| Processed for ER | 9,179 | 12,032 | 60,071 |
| % Encounters processed for ER | 18% | 22% | 12% |
| ER processed in CBP Custody | 6,420 | 7,180 | 41,023 |
| Credible fear referrals | 2,172 | 1,820 | 6,409 |
| CFIs conducted | 2,148 | 1,732 | 6,265 |
| CFI results | 2,146 | 1,661 | 6,268 |
| Positive fear finding | 598 | 437 | 1,631 |
| Negative fear finding | 1,363 | 1,039 | 3,886 |
| Appealed to IJ | 223 | 265 | 802 |
| Pending or blank order | 2 | 3 | 6 |
| Affirmed | 180 | 188 | 661 |
| Vacated | 39 | 74 | 135 |
| Not appealed to IJ | 1,142 | 774 | 3,084 |
| Admin closed | 185 | 185 | 651 |
| Admin closed without CFI | 22 | 31 | 102 |
| CBP repatriations | 5,670 | 6,085 | 38,437 |
| No fear claim ER removals | 4,247 | 5,356 | 34,602 |
| Negative fear; no IJ review | 0 | 0 | 0 |
| Negative fear; IJ affirmed | 1,318 | 662 | 3,433 |
| ER withdrawn VRs | 0 | 1 | 21 |
| Other | 105 | 66 | 381 |
| ER transfers to ICE for processing | 2,759 | 4,852 | 19,048 |
| Repossessed with other dispositions | 30 | 45 | 255 |
| ER processed by ICE non-detained | 2,207 | 4,296 | 12,854 |
| ER processed in ICE Custody | 522 | 511 | 5,939 |
| Credible fear referrals | 506 | 501 | 5,566 |
| CFIs conducted | 469 | 538 | 4,843 |
| CFI results | 455 | 396 | 4,683 |
| Positive fear finding | 159 | 79 | 2,017 |
| Negative fear finding | 181 | 70 | 1,746 |
| Appealed to IJ | 86 | 21 | 960 |
| Pending or blank order | 6 | 8 | 88 |
| Affirmed | 74 | 11 | 767 |
| Vacated | 6 | 2 | 105 |
| Not appealed to IJ | 95 | 49 | 786 |
| Admin closed | 115 | 47 | 920 |
| Admin closed without CFI | 22 | 4 | 481 |
| ICE removals (REPATRIATIONS) | 239 | 63 | 2,660 |
| No fear claim ER removals | 0 | 0 | 9 |
| Negative fear; no IJ review | 0 | 0 | 0 |
| Negative fear; IJ affirmed | 143 | 38 | 1,468 |
| Other | 96 | 25 | 1,183 |
| ER processed by ICE non-detained | 2,207 | 4,296 | 12,854 |
| Credible fear referrals | 898 | 2,157 | 5,662 |
| CFIs conducted | 817 | 925 | 3,982 |
| CFI results | 787 | 415 | 3,413 |
| Positive fear finding | 522 | 234 | 2,111 |
| Negative fear finding | 249 | 160 | 1,221 |
| Appealed to IJ | 230 | 98 | 1,075 |
| Pending or blank order | 43 | 36 | 139 |
| Affirmed | 151 | 51 | 744 |
| Vacated | 36 | 11 | 192 |
| Not appealed to IJ | 19 | 62 | 146 |
| Admin closed | 16 | 21 | 81 |
| Admin closed without CFI | 42 | 50 | 312 |
| ICE removals (REPATRIATIONS) | 799 | 572 | 3,490 |
| No fear claim ER removals | 731 | 568 | 2,910 |
| Negative fear; no IJ review | 0 | 0 | 0 |
| Negative fear; IJ affirmed | 56 | 3 | 441 |
| Other | 12 | 1 | 139 |

| | |
| --- | --- |
| Share of ER claiming fear - Since May 12 | 29% |
| Share of ER claiming fear - February 2024 | 39% |

Note: it's too early to report on March fear claims because many of them will not have shown up in the data yet.

Notes: All counts are based on month of encounter. Population is limited to Mexican national single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007511



Indeed, the Departments have applied the presumption effectively in credible fear screenings for the time in which the Circumvention of Lawful Pathways rule has been in effect.
In the post-May 12, 2023, period, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews has decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations or administrative closures that are not referred to EOIR, the median time from encounter to removal, in the same time frames, decreased 85 percent from 73 days to 11 days. Pre-pandemic medians based on OHSS analysis of OHSS Enforcement Lifecycle December 31, 2023; post-May 12 estimates based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024.

| | | DHS | | | | |
|---|---|---|---|---|---|---|
| | | Mexico | NCA | W. Hem | E. Hem | DHS Total |
| Encounter to Referral | Completed Count | 1,672 | 941 | 2,547 | 179 | 5,339 |
| | Median Days | 2 | 5 | 4 | 7 | 3 |
| | Pending Count | 7,372 | 5,260 | 4,080 | 304 | 17,016 |
| | Median Days | 1 | 1 | 1 | 1 | 1 |
| Referral to CFI Result | Completed Count | 1,574 | 869 | 2,326 | 166 | 4,935 |
| | Median Days | 4 | 4 | 4 | 13 | 4 |
| | Pending Count | 98 | 72 | 221 | 13 | 404 |
| | Median Days | 17 | 14 | 12 | 20 | 15 |
| Encounter to CFI Result | Completed Count | 1,616 | 913 | 2,428 | 172 | 5,129 |
| | Median Days | 6 | 12 | 11 | 20 | 10 |
| | Pending Count | 2,251 | 1,181 | 2,355 | 332 | 6,119 |
| | Median Days | 1 | 1 | 1 | 1 | 1 |
| Negative Fear to Removal | Completed Count | 552 | 146 | 110 | 30 | 808 |
| | Median Days | 2 | 8 | 5 | 51 | 4 |
| | Pending Count | 300 | 306 | 683 | 16 | 1,315 |
| | Median Days | 4 | 6 | 6 | 85 | 5 |
| Encounter to Removal | Completed Count | 552 | 146 | 110 | 30 | 808 |
| | Median Days | 10 | 18 | 15 | 115 | 11 |
| | Pending Count | 328 | 347 | 780 | 16 | 1,490 |
| | Median Days | 10 | 20 | 19 | 154 | 17 |

Note: Data are current through March 31, 2024. All Median processing times are limited to noncitizens in ER who make credible fear claims and exclude no-fear removals, noncitizens reprocessed into other (non-ER) processing dispostions, and people released without being removed.
DHS Encounter to Referral from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Referral to CFI Result from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Encounter to CFI Result from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Negative Fear to Removal from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
DHS Encounter to Removal from DHS Total refers to the events of encounters for the 28-days ending March 31, 2024.
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on April 2, 2024.

| Median Processing Times | 2014-19 |
|---|---|
| Encounter to Removal (no fear cases) | |
| Encounter to CF Referral | 13 |
| CF Referral to CIS Determination | 8 |
| Negative Determination to EOIR CFR Decision | |
| Comprehensive Negative Determination to Removal | 22 |
| Encounter to Removal (Negative Determinations only) | 73 |

Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023.

Expedited Removal Median Processing Times, FY 2014 - FY 2019 and May 12 - December 31, 2023

| | 2014-2019 | May 12, 2023 - March 31, 2024 | % change |
|---|---|---|---|
| Encounter to CF Referral | 13 | 3 | 77% |
| Referral to fear determination | 8 | 4 | 50% |
| Comprehensive Negative Fear to removal | 22 | 4 | 82% |
| Encounter to Removal | 73 | 11 | 85% |

In February 2024, USBP processed more than 33,000 individuals for expedited removal,
OHSS analysis of data downloaded from UIP on April 2, 2024.

| USBP Expedited Removal Processing: Southwest Border | February | March | Since May 12 |
|---|---|---|---|
| SW Border Encounters | 131,325 | 129,615 | 1,626,563 |
| Processed for ER | 33,228 | 28,466 | 293,360 |
| % Encounters processed for E... | 25% | 22% | 18% |
| ER processed in CBP Custo... | 12,911 | 12,253 | 112,316 |
| Credible fear referrals | 5,032 | 4,578 | 46,610 |
| CFIs conducted | 4,967 | 4,370 | 45,504 |
| CFI results | 4,947 | 4,034 | 45,068 |
| Positive fear finding | 1,410 | 1,295 | 18,202 |
| Negative fear finding | 3,077 | 2,385 | 22,668 |
| Appealed to IJ | 1,356 | 1,012 | 13,956 |
| Pending or blank order | 88 | 74 | 739 |
| Affirmed | 988 | 752 | 10,481 |
| Vacated | 280 | 186 | 2,716 |
| Not appealed to IJ | 1,721 | 1,373 | 8,712 |
| Admin closed | 460 | 354 | 4,198 |
| Admin closed without CFI | 61 | 57 | 887 |
| CBP repatriations | 10,609 | 8,733 | 86,644 |
| No fear claim ER removals | 7,874 | 7,670 | 65,665 |
| Negative fear; no IJ review | 0 | 0 | 19 |
| Negative fear; IJ affirmed | 2,426 | 966 | 17,235 |
| ER withdrawn VRs | 34 | 8 | 1,919 |
| Other | 275 | 89 | 1,806 |
| ER transfers to ICE for proc... | 20,317 | 16,213 | 181,044 |
| Reprocessed with other disp... | 63 | 114 | 724 |
| ER processed by ICE non-d... | 9,584 | 11,674 | 85,437 |
| ER processed in ICE Custo... | 10,670 | 4,425 | 94,883 |
| Credible fear referrals | 8,568 | 3,009 | 81,711 |
| CFIs conducted | 7,748 | 2,354 | 73,673 |
| CFI results | 7,041 | 1,466 | 71,909 |
| Positive fear finding | 3,837 | 853 | 40,730 |
| Negative fear finding | 2,732 | 491 | 25,409 |
| Appealed to IJ | 1,888 | 260 | 19,998 |
| Pending or blank order | 188 | 70 | 1,373 |
| Affirmed | 1,447 | 161 | 15,686 |
| Vacated | 253 | 29 | 2,939 |
| Not appealed to IJ | 844 | 231 | 5,411 |
| Admin closed | 472 | 122 | 5,770 |
| Admin closed without CFI | 514 | 32 | 6,132 |
| ICE removals (REPATRIAT... | 2,346 | 358 | 27,156 |
| No fear claim ER removals | 1,443 | 270 | 4,333 |
| Negative fear; no IJ review | 1 | 0 | 4 |
| Negative fear; IJ affirmed | 594 | 15 | 16,003 |
| Other | 308 | 73 | 6,816 |
| ER processed by ICE non-d... | 9,584 | 11,674 | 85,437 |
| Credible fear referrals | 4,290 | 4,755 | 28,040 |
| CFIs conducted | 3,928 | 2,137 | 22,493 |
| CFI results | 3,788 | 1,148 | 21,208 |
| Positive fear finding | 2,373 | 693 | 13,001 |
| Negative fear finding | 1,339 | 419 | 7,569 |
| Appealed to IJ | 1,227 | 258 | 7,015 |
| Pending or blank order | 206 | 86 | 1,034 |
| Affirmed | 730 | 128 | 4,110 |
| Vacated | 291 | 44 | 1,871 |
| Not appealed to IJ | 112 | 161 | 554 |
| Admin closed | 76 | 36 | 638 |
| Admin closed without CFI | 252 | 141 | 2,070 |
| ICE removals (REPATRIAT... | 3,244 | 1,335 | 36,360 |
| No fear claim ER removals | 3,063 | 1,331 | 34,220 |
| Negative fear; no IJ review | 0 | 0 | 0 |
| Negative fear; IJ affirmed | 158 | 3 | 1,889 |
| Other | 23 | 1 | 251 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by USBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March ?
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007513

11, 2024.

IFR_AR_007514

and USBP processed more than 28,000 in March 2024.
OHSS analysis of data downloaded from UIP on April 2, 2024.

| USBP Expedited Removal Processing: Southwest Border | February | March | Since May 12 |
|---|---|---|---|
| SW Border Encounters | 131,325 | 129,615 | 1,626,563 |
| Processed for ER | 33,228 | 28,466 | 293,360 |
| % Encounters processed for E | 25% | 22% | 18% |
| ER processed in CBP Custo | 12,911 | 12,253 | 112,316 |
| Credible fear referrals | 5,032 | 4,578 | 46,610 |
| CFIs conducted | 4,967 | 4,370 | 45,504 |
| CFI results | 4,947 | 4,034 | 45,068 |
| Positive fear finding | 1,410 | 1,295 | 18,202 |
| Negative fear finding | 3,077 | 2,385 | 22,668 |
| Appealed to IJ | 1,356 | 1,012 | 13,956 |
| Pending or blank order | 88 | 74 | 759 |
| Affirmed | 988 | 752 | 10,481 |
| Vacated | 280 | 186 | 2,716 |
| Not appealed to IJ | 1,721 | 1,373 | 8,712 |
| Admin closed | 460 | 354 | 4,198 |
| Admin closed without CFI | 61 | 57 | 887 |
| CBP repatriations | 10,609 | 8,733 | 86,644 |
| No fear claim ER removals | 7,874 | 7,670 | 65,665 |
| Negative fear; no IJ review | 0 | 0 | 19 |
| Negative fear; IJ affirmed | 2,426 | 966 | 17,235 |
| ER withdrawn VRs | 34 | 8 | 1,919 |
| Other | 275 | 89 | 1,806 |
| ER transfers to ICE for proc | 20,317 | 16,213 | 181,044 |
| Reprocessed with other disp | 63 | 114 | 724 |
| ER processed by ICE non-d | 9,584 | 11,674 | 85,437 |
| ER processed in ICE Custo | 10,670 | 4,425 | 94,883 |
| Credible fear referrals | 8,568 | 3,009 | 81,711 |
| CFIs conducted | 7,748 | 2,354 | 73,673 |
| CFI results | 7,041 | 1,466 | 71,909 |
| Positive fear finding | 3,837 | 853 | 40,730 |
| Negative fear finding | 2,732 | 491 | 25,409 |
| Appealed to IJ | 1,888 | 260 | 19,998 |
| Pending or blank order | 188 | 70 | 1,373 |
| Affirmed | 1,447 | 161 | 15,686 |
| Vacated | 253 | 29 | 2,939 |
| Not appealed to IJ | 844 | 231 | 5,411 |
| Admin closed | 472 | 122 | 5,770 |
| Admin closed without CFI | 514 | 32 | 6,132 |
| ICE removals (REPATRIAT | 2,346 | 358 | 27,156 |
| No fear claim ER removals | 1,443 | 270 | 4,333 |
| Negative fear; no IJ review | 1 | 0 | 4 |
| Negative fear; IJ affirmed | 594 | 15 | 16,003 |
| Other | 308 | 73 | 6,816 |
| ER processed by ICE non-d | 9,584 | 11,674 | 85,437 |
| Credible fear referrals | 4,290 | 4,755 | 28,040 |
| CFIs conducted | 3,928 | 2,137 | 22,493 |
| CFI results | 3,788 | 1,148 | 21,208 |
| Positive fear finding | 2,373 | 693 | 13,001 |
| Negative fear finding | 1,339 | 419 | 7,569 |
| Appealed to IJ | 1,227 | 258 | 7,015 |
| Pending or blank order | 206 | 86 | 1,034 |
| Affirmed | 730 | 128 | 4,110 |
| Vacated | 291 | 44 | 1,871 |
| Not appealed to IJ | 112 | 161 | 554 |
| Admin closed | 76 | 36 | 638 |
| Admin closed without CFI | 252 | 141 | 2,070 |
| ICE removals (REPATRIAT | 3,244 | 1,335 | 36,360 |
| No fear claim ER removals | 3,063 | 1,331 | 34,220 |
| Negative fear; no IJ review | 0 | 0 | 0 |
| Negative fear; IJ affirmed | 158 | 3 | 1,889 |
| Other | 23 | 1 | 251 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by USBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March ?
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007515

11, 2024.

IFR_AR_007516

Since May 2023, USCIS has completed about 3,300 credible fear interviews per week of individuals encountered at and between SWB POEs,
OHSS analysis of data downloaded from UIP on April 2, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| **SW Border Encounters** | **1,694,114** |
| **Processed for ER** | **316,288** |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | **120,709** |
| Credible fear referrals | 46,628 |
| CFIs conducted | 45,522 |
| **CFI results** | **45,086** |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,481 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| **CBP repatriations** | **95,037** |
| No fear claim ER removals | 74,040 |
| Negative fear; no IJ review | 19 |
| Negative fear; IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | **195,579** |
| **Reprocessed with other dispositions** | **836** |
| **ER processed by ICE non-detained** | **87,760** |
| **ER processed in ICE Custody** | **106,983** |
| Credible fear referrals | 93,630 |
| CFIs conducted | 84,045 |
| **CFI results** | **82,016** |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,839 |
| Admin closed without CFI | 7,179 |
| **ICE removals (REPATRIATIONS)** | **29,926** |
| No fear claim ER removals | 4,368 |
| Negative fear; no IJ review | 4 |
| Negative fear; IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | **87,760** |
| Credible fear referrals | 28,590 |
| CFIs conducted | 22,519 |
| **CFI results** | **21,229** |
| Positive fear finding | 13,009 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,112 |
| Vacated | 1,872 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,311 |
| **ICE removals (REPATRIATIONS)** | **36,803** |
| No fear claim ER removals | 34,600 |
| Negative fear; no IJ review | 0 |
| Negative fear; IJ affirmed | 1,893 |
| Other | 310 |

| | Total |
|---|---|
| USCIS Total CF interviews conducted | 152,086 |
| CFIs/week | 3,286 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 3...
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007517

1, 2024.

IFR_AR_007518

Additionally, compared to 1997, today's high levels of migration impose a severe strain on the credible fear process.  AOs and IJs must devote substantial resources to credible fear interviews and reviews.

USCIS closed or adjudicated an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009.  OHSS analysis of March 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023

**Nationwide**
**Credible Fear Claims: 2000-2023**

| Year | Encounters | SWB Encounters | SWB T8 encounters | Total APSO Global Credible Fear Claims[1] | Lifecycle Data SWB Credible Fear Claims[2] | Estimated Southwest Border Credible Fear Claims[3] | Percent ER Fear Claims | Percent Encounters fear claims | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 1,590,196 | 1,566,325 | 1,566,325 | 10,284 | - | N/A | | | | | |
| 2001 | 1,255,843 | 1,231,359 | 1,231,359 | 13,241 | - | N/A | | | | | |
| 2002 | 953,629 | 930,293 | 930,293 | 10,204 | - | N/A | | | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 6,480 | - | N/A | | | | | |
| 2004 | 1,530,801 | 1,211,633 | 1,211,633 | 8,230 | - | N/A | | | | | |
| 2005 | 1,440,160 | 1,269,176 | 1,269,176 | 9,696 | - | 8,167 | 84% | 1% | | 2023 SWB ERCF | 134,845 |
| 2006 | 1,296,706 | 1,168,340 | 1,168,340 | 5,660 | - | 4,767 | 84% | 0% | | 2010-2019 SWB ERCF | 52,356 |
| 2007 | 1,078,811 | 954,907 | 954,907 | 5,770 | - | 4,860 | 84% | 1% | | 2005-2009 SWB ERCF | 5,643 |
| 2008 | 946,642 | 792,535 | 792,535 | 5,753 | - | 4,846 | 84% | 1% | | | |
| 2009 | 779,816 | 619,010 | 619,010 | 6,617 | - | 5,575 | 84% | 1% | | | |
| 2010 | 692,904 | 527,372 | 527,372 | 11,030 | - | 9,290 | 84% | 2% | | | |
| 2011 | 553,597 | 403,073 | 403,073 | 14,405 | - | 12,133 | 84% | 3% | | | |
| 2012 | 560,572 | 426,125 | 426,125 | 18,625 | - | 15,691 | 84% | 4% | | | |
| 2013 | 626,412 | 489,612 | 489,612 | 43,231 | 35,959 | | 83.2% | 7% | 3,603 | 2,997 | |
| 2014 | 711,667 | 570,048 | 570,048 | 59,186 | 48,737 | | 82.3% | 9% | 4,932 | 4,061 | |
| 2015 | 591,831 | 444,856 | 444,856 | 55,411 | 46,451 | | 83.8% | 10% | 4,618 | 3,871 | |
| 2016 | 690,433 | 558,991 | 558,991 | 102,973 | 92,903 | | 90.2% | 17% | 8,581 | 7,742 | |
| 2017 | 526,807 | 415,199 | 415,199 | 88,448 | 68,789 | | 77.8% | 17% | 7,371 | 5,732 | |
| 2018 | 626,035 | 519,944 | 519,944 | 109,996 | 95,506 | | 86.9% | 18% | 9,158 | 7,959 | |
| 2019 | 1,084,644 | 977,229 | 977,229 | 118,387 | 98,102 | | 82.9% | 10% | 9,866 | 8,175 | |
| 2020 | 561,718 | 458,082 | 253,292 | 39,524 | 23,636 | | 60.3% | 5% | 3,294 | | |
| 2021 | 1,828,981 | 1,734,683 | 671,159 | 64,244 | 49,018 | | 76.3% | 3% | 5,354 | 4,085 | |
| 2022 | 2,617,845 | 2,378,944 | 1,299,437 | 75,264 | 49,995 | | 66.4% | 2% | 6,272 | 4,166 | |
| 2023 | 2,732,822 | 2,475,669 | 1,910,905 | 160,868 | 134,845 | | 83.8% | 5% | 13,406 | 11,237 | |
| 2024 | | | | | 100,319** | 32,484 | | 80.6% | | | |
| 2013-2019 [4] | | | | 577,532 | 486,467 | | 84% | | | 11,237 | |



[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border Fear Claims.

[2] OIS Lifecycle data on Total Southwest Border Fear Claims.

[3] Estimated Southwest Border Credible Fear Claims based on the proportion of

[4] The sum of credible fear claims for available matching data years. Used to estimate

Sources: APSO Global and OHSS Persist Data. ships, only one citizenship is reported. I

weekly average CFis: % increase from 2014-19

* FY2024 as of April 2nd, 2024

** Fy2024 as of December 31, 2023.

IFR_AR_007520

Based on the expertise of DHS in administering Form I-867B, it has determined that affirmative questions are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.
From 2014 through 2019, of total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. OHSS Enforcement Lifecycle December 31, 2023.

| SWB ER cases with EOIR case completions | 265,623 |
|---|---|
| case completions resulting in relief/protection from removal | 47,560 |
| % of case completions that are relief/protection | 18% |

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims**

| MOST CURRENT OUTCOMES | TOTAL | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 | |
| **Total Encounters**[1] | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 416,485 | 1,578,628 | 2,187,356 | 2,051,374 | 615,642 | |
| **T8 Encounters** | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | 1,109,854 | 1,488,394 | 615,642 | |
| **Proceed for Expedited Removal** | 228,049 | 190,392 | 227,911 | 161,305 | 214,667 | 223,200 | 91,719 | 84,687 | 319,665 | 207,197 | 92,719 | |
| No fear claim[2] | 174,419 | 130,820 | 130,629 | 89,349 | 115,090 | 121,732 | 66,219 | 15,051 | 38,167 | 62,097 | 40,523 | |
| No fear claim - confirmed removal or return | 166,051 | 129,846 | 127,921 | 86,688 | 110,087 | 118,756 | 63,698 | 10,956 | 28,260 | 53,931 | 28,823 | |
| Fear claims withdrawn[3] (based on APSO receipt) | 4,893 | 5,321 | 4,379 | 2,167 | 4,081 | 5,366 | 1,664 | 20,618 | 31,505 | 16,255 | 9,312 | |
| Confirmed removal or return | 1,006 | 1,012 | 819 | 418 | 669 | 607 | 690 | 415 | 307 | 363 | 85 | |
| Credible fear claims[4] (APSO cases only) | 48,737 | 46,451 | 92,903 | 68,789 | 95,506 | 96,102 | 23,836 | 49,018 | 49,993 | 134,845 | 52,884 | |
| Positive fear determinations | 55,051 | 33,572 | 73,871 | 53,666 | 74,438 | 70,879 | 8,462 | 33,730 | 28,362 | 80,147 | 16,270 | |
| Negative fear determinations | 9,197 | 7,555 | 9,419 | 7,325 | 9,110 | 17,668 | 12,353 | 13,249 | 17,847 | 42,559 | 11,899 | |
| Negative fear determinations appealed to EOIR | 7,348 | 6,260 | 7,629 | 5,898 | 6,745 | 14,295 | 9,729 | 12,812 | 16,798 | 34,562 | 10,038 | |
| Negative fear determinations vacated by EOIR | 1,298 | 1,232 | 1,999 | 1,451 | 1,278 | 3,866 | 3,158 | 3,524 | 4,789 | 6,584 | 2,202 | |
| Negative fear determinations upheld by EOIR | 6,050 | 5,028 | 5,630 | 4,447 | 5,467 | 10,429 | 6,571 | 9,288 | 12,009 | 27,998 | 7,836 | |
| Case closures | 4,489 | 4,944 | 9,613 | 7,798 | 11,958 | 9,555 | 5,021 | 2,039 | 3,786 | 11,339 | 4,415 | |
| Case closures referred to EOIR | 1,306 | 1,708 | 4,373 | 3,698 | 6,652 | 5,345 | 983 | 1,067 | 2,497 | 5,401 | 1,577 | |
| Case closures not referred to EOIR | 3,183 | 3,236 | 5,240 | 4,100 | 3,306 | 5,230 | 2,058 | 992 | 1,289 | 5,938 | 2,838 | |
| ER/CF claims not referred to EOIR[5] | 11,082 | 9,539 | 12,660 | 9,974 | 13,138 | 20,012 | 11,255 | 10,717 | 14,347 | 41,713 | 12,555 | |
| Executed removal orders | 9,768 | 8,487 | 11,240 | 9,286 | 11,698 | 18,423 | 8,740 | 6,247 | 8,576 | 31,968 | 5,612 | |
| Total referrals to EOIR[6] (Includes closed cases, vacated negative and positive decisions) | 37,655 | 36,912 | 86,243 | 58,815 | 82,368 | 76,090 | 12,603 | 38,301 | 35,648 | 93,132 | 19,949 | |
| **EOIR Cases Started** | 37,277 | 36,616 | 78,712 | 57,168 | 77,810 | 72,182 | 11,671 | 32,476 | 29,152 | 77,136 | 15,747 | |
| Still in EOIR proceedings | 6,437 | 7,058 | 16,141 | 14,674 | 22,957 | 26,875 | 7,011 | 23,055 | 22,510 | 70,283 | 15,669 | 0.6% |
| EOIR cases completed | 30,840 | 29,558 | 62,571 | 42,494 | 54,853 | 45,307 | 4,660 | 9,415 | 6,622 | 6,852 | 78 | |
| Failure to prosecute | 2 | 2 | 1 | 8 | 49 | 114 | 4 | 13 | 3 | 24 | 3 | |
| Terminations / Dismissals | 7,025 | 6,498 | 15,819 | 12,881 | 17,335 | 16,323 | 1,393 | 3,627 | 980 | 954 | 9 | |
| Asylum granted or other EOIR relief from removal | 6,581 | 6,398 | 11,156 | 6,956 | 8,924 | 7,365 | 1,477 | 1,417 | 894 | 447 | 3 | |
| Relief on merits | 4,874 | 5,815 | 9,731 | 6,055 | 8,040 | 6,393 | 1,117 | 1,217 | 740 | 302 | - | |
| Relief not on merits | 1,707 | 783 | 1,425 | 881 | 884 | 972 | 360 | 200 | 154 | 145 | 3 | |
| Removal orders | 17,232 | 16,460 | 35,595 | 22,669 | 28,545 | 21,505 | 1,786 | 4,356 | 4,745 | 5,427 | 63 | |
| In absentia | 7,095 | 5,386 | 13,034 | 9,329 | 13,907 | 6,682 | 444 | 2,759 | 3,131 | 2,952 | 9 | |
| Executed removal orders | 857 | 549 | 1,063 | 741 | 761 | 378 | 34 | 71 | 94 | 52 | - | |
| Not in absentia | 10,137 | 11,074 | 22,561 | 13,340 | 14,638 | 14,823 | 1,342 | 1,597 | 1,612 | 2,475 | 54 | |
| Executed removal orders | 4,351 | 4,651 | 6,335 | 5,495 | 6,734 | 10,206 | 603 | 324 | 662 | 1,478 | 13 | |
| Appeals to BIA | 4,854 | 5,943 | 13,874 | 7,455 | 7,111 | 4,501 | 571 | 575 | 463 | 279 | - | |
| Grants of relief + other favorable-to-noncitizen judgments appealed to BIA | 450 | 460 | 746 | 516 | 430 | 470 | 128 | 46 | 45 | 34 | - | |
| EOIR removal orders + other favorable-to-OPLA judgments appealed to BIA | 4,404 | 5,483 | 13,128 | 6,919 | 6,681 | 4,031 | 443 | 529 | 418 | 245 | - | |

- Represents zero.
[1] Excludes unaccompanied children, accompanied minors, and OFO administrative cases including crewmembers, parole, and withdrawals, none of whom are amenable to expedited removal. Exclusions made up 5.4 percent of total encounters between FY2015 and FY2023 Q3.
[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed with other dispositions in ICE custody.
[3] Fear claim in CBP custody but no associated record of a fear claim in an EIR removal order.
[4] Based on USCIS APSO clock-ins.

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on issues data as of November 20, 2023.
[5] Includes positive credible fear interviews, negative CF interviews vacated by EOIR, and case closures referred to EOIR.
[6] Cases decided on merits includes grants of relief, including administrative closures and grants of prosecutorial discretion as "other" grants of relief.
Notes: Encounters include USBP apprehensions and OFO administrative determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.
Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of November 20, 2023.

Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases—this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.
Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| SW Border Encounters | 1,694,114 |
| Processed for ER | 316,288 |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | **120,709** |
| Credible fear referrals | 46,628 |
| CFIs conducted | 45,522 |
| **CFI results** | **45,086** |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,481 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| **CBP repatriations** | **95,037** |
| No fear claim ER removals | 74,040 |
| Negative fear, no IJ review | 19 |
| Negative fear, IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | **195,579** |
| Reprocessed with other dispositions | 836 |
| **ER processed by ICE non-detained** | **87,760** |
| **ER processed in ICE Custody** | **106,983** |
| Credible fear referrals | 95,630 |
| CFIs conducted | 84,045 |
| **CFI results** | **82,056** |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,870 |
| Admin closed without CFI | 7,179 |
| **ICE removals (REPATRIATIONS)** | **29,926** |
| No fear claim ER removals | 4,368 |
| Negative fear, no IJ review | 4 |
| Negative fear, IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | **87,760** |
| Credible fear referrals | 28,590 |
| CFIs conducted | 22,519 |
| **CFI results** | **21,229** |
| Positive fear finding | 13,009 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,312 |
| Vacated | 1,672 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| **ICE removals (REPATRIATIONS)** | **36,803** |
| No fear claim ER removals | 34,600 |
| Negative fear, no IJ review | 0 |
| Negative fear, IJ affirmed | 1,893 |
| Other | 310 |

Total ER (excluding cases reprocessed out of I   333,452
Total Fear referrals   168,848
Total CFIs   152,086

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases – this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.
Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

Average number CFIs 2014-2019 | 75,000

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims**

| MOST CURRENT OUTCOMES | TOTAL | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
| Total Encounters | 471,989 | 319,453 | 438,908 | 336,791 | 439,776 | 878,136 | 416,485 | 1,378,628 | 2,287,356 | 2,031,374 | 655,642 |
| TS Encounters | | | | | | | | | | | |
| Processed for Expedited Removal | | | | | | | | | | | |
| No fear claim | | | | | | | | | | | |
| No fear claim - confirmed removal or return | | | | | | | | | | | |
| Fear claims withdrawn (based on APSO receipts) | | | | | | | | | | | |
| Confirmed removal or return | | | | | | | | | | | |
| Credible fear claims (APSO cases only) | | | | | | | | | | | |
| Positive fear determinations | | | | | | | | | | | |
| Negative fear determinations | | | | | | | | | | | |
| Negative fear determinations appealed to EOIR | | | | | | | | | | | |
| Negative fear determinations vacated by EOIR | | | | | | | | | | | |
| Negative fear determinations upheld by EOIR | | | | | | | | | | | |
| Case closures | | | | | | | | | | | |
| Case closures referred to EOIR | | | | | | | | | | | |
| Case closures not referred to EOIR | | | | | | | | | | | |
| ER/CF claims not referred to EOIR | | | | | | | | | | | |
| Executed removal orders | | | | | | | | | | | |
| Total referrals to EOIR (Includes closed cases, vacated negative and positive decisions) | | | | | | | | | | | |
| EOIR Cases Started | | | | | | | | | | | |
| Still in EOIR proceedings | | | | | | | | | | | |
| EOIR cases completed | | | | | | | | | | | |
| Failure to prosecute | | | | | | | | | | | |
| Terminations / Dismissals | | | | | | | | | | | |
| Asylum granted or other EOIR relief from removal | | | | | | | | | | | |
| Relief on merits | | | | | | | | | | | |
| Relief not on merits | | | | | | | | | | | |
| Removal orders | | | | | | | | | | | |
| In absentia | | | | | | | | | | | |
| Executed removal orders | | | | | | | | | | | |
| Not in absentia | | | | | | | | | | | |
| Executed removal orders | | | | | | | | | | | |
| Appeals to BIA | | | | | | | | | | | |
| Grants of relief + other favorable-to-noncitizen judgments appealed to BIA | | | | | | | | | | | |
| EOIR removal orders + other favorable-to-OPLA judgments appealed to BIA | | | | | | | | | | | |

- Represents zero.

[Footnotes]

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of November 26, 2023.

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of November 26, 2023.

Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard. OHSS analysis of data downloaded from UIP on April 2, 2024.

| Fear Screening by Circumventing Legal Pathways Rule | Mar-24 | | Since May 12 |
|---|---|---|---|
| | Total | % change vs. prev. month | |
| **Established Exception** | **440** | ▼ 7% | **6,242** |
| Positive Fear | 317 | ▼ 11% | 4,934 |
| Negative Fear | 98 | ▲ 3% | 1,194 |
| Administrative Closure | 25 | ▲ 39% | 114 |
| **Presumption Rebutted** | **1,064** | ▲ 29% | **13,719** |
| Positive Fear | 879 | ▲ 28% | 11,787 |
| Negative Fear | 161 | ▲ 42% | 1,666 |
| Administrative Closure | 24 | - flat - | 266 |
| **Subject to Presumption of Ineligibility for Asylum** | **11,362** | ▲ 22% | **108,037** |
| Positive Fear | 5,989 | ▲ 38% | 56,698 |
| Negative Fear | 5,082 | ▲ 6% | 49,239 |
| Administrative Closure | 291 | ▲ 49% | 2,100 |
| **Total** | **12,866** | ▲ 21% | **127,998** |
| Positive Fear | 7,185 | ▲ 33% | 73,419 |
| Negative Fear | 5,341 | ▲ 7% | 52,099 |
| Administrative Closure | 340 | ▲ 43% | 2,480 |

52% % subject to presumption that established positive fear

Notes: This report includes preliminary data pulled from a live system, table does not contain validated end-of-month numbers and will not match official OHSS, OIS, JIA, or USCIS reporting. Population includes non-detained individuals. Data are current through March 31, 2024.
Source: OHSS analysis of data pulled from USCIS Global at 2:30 PM on April 2, 2024.

Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard,
At this time, data on EOIR's grant rate under the Circumvention of Lawful Pathways rule is not available because only a small number of cases processed under that rule have been completed. From May 12 through November 30, 2023 (the most recent data for which fully linked records are available), a total of 61,000 SWB expedited removal cases have been referred to EOIR for section 240 removal proceedings, including 1,400 with case completions (2.2 percent).

| | |
|---|---|
| Post-May 12 ER cases resulting in referrals to EOIR | 60,652 |
| Post-May 12 ER cases resulting in referrals to EOIR with completed EOIR cases | 1,312 |
| Percent completed | 2.2% |

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims: Fiscal Years 2013 - 2024 YTD (November 2023)**

| MOST CURRENT OUTCOMES | Total | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 10/1/22 - 5/11/23 | 5/12/23 - 9/30/23 | 2023 | 2024* | Oct-23 | Nov-23 |
| Total encounters[1] | 436,363 | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 416,485 | 1,578,628 | 2,187,156 | 1,370,994 | 680,381 | 2,051,375 | 372,158 | 185,725 | 186,433 |
| T42 encounters | - | - | - | - | - | - | - | 193,311 | 1,057,230 | 1,077,302 | 562,980 | . | 562,980 | - | - | - |
| T8 encounters | 436,363 | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | 1,109,854 | 808,014 | 680,381 | 1,488,395 | 372,158 | 185,725 | 186,433 |
| Placed in ER (CBP ER dispositions) | 229,838 | 228,049 | 180,592 | 227,911 | 160,305 | 214,667 | 223,200 | 91,719 | 84,687 | 119,665 | 85,655 | 121,589 | 207,244 | 59,073 | 32,873 | 26,200 |
| No fear claim[2] | 191,194 | 174,278 | 130,771 | 130,602 | 89,323 | 115,061 | 121,706 | 66,195 | 15,038 | 38,148 | 21,205 | 41,147 | 62,352 | 26,945 | 12,830 | 14,115 |
| No Fear Claim - confirmed removal or return | 183,848 | 166,400 | 130,066 | 128,054 | 86,753 | 110,089 | 118,752 | 63,681 | 10,916 | 28,164 | 13,838 | 32,239 | 46,077 | 16,143 | 10,578 | 5,565 |
| Reprocessed[3] | 2,574 | 4,808 | 3,272 | 4,314 | 2,101 | 3,963 | 3,228 | 1,582 | 20,565 | 31,447 | 7,959 | 3,118 | 11,077 | 11,733 | 5,220 | 6,513 |
| APSO fear claims[4] | 36,070 | 48,963 | 46,549 | 92,995 | 68,881 | 95,643 | 98,266 | 23,942 | 49,084 | 50,070 | 56,491 | 77,324 | 133,815 | 20,395 | 14,823 | 5,572 |
| APSO fear claims with ER removal orders[5] | 4,095 | 11,139 | 9,581 | 12,707 | 10,019 | 13,243 | 20,141 | 11,367 | 10,821 | 14,476 | 13,248 | 28,671 | 41,919 | 8,396 | 5,529 | 2,867 |
| Confirmed departure | 3,680 | 9,856 | 8,540 | 11,286 | 9,336 | 11,672 | 18,496 | 8,740 | 6,240 | 8,574 | 10,765 | 19,567 | 30,332 | 1,300 | 1,128 | 172 |
| Referred to EOIR[6] | 31,975 | 37,824 | 36,968 | 80,288 | 58,862 | 82,400 | 78,125 | 12,575 | 38,263 | 35,594 | 43,243 | 48,653 | 91,896 | 11,999 | 9,294 | 2,705 |
| EOIR case not started | 299 | 406 | 343 | 1,591 | 1,747 | 4,734 | 6,466 | 866 | 7,292 | 6,939 | 6,907 | 11,564 | 18,471 | 4,602 | 3,030 | 1,572 |
| Still in EOIR proceedings[7] | 4,340 | 6,612 | 7,223 | 16,586 | 15,072 | 23,514 | 27,088 | 6,976 | 22,220 | 22,316 | 31,784 | 35,797 | 67,581 | 7,377 | 6,247 | 1,130 |
| EOIR case completion[8] | 27,336 | 30,806 | 29,402 | 62,111 | 42,043 | 54,152 | 44,571 | 4,732 | 8,751 | 6,339 | 4,552 | 1,292 | 5,844 | 20 | 17 | 3 |
| Relief[9] | 6,967 | 6,573 | 6,570 | 11,072 | 6,852 | 8,782 | 7,169 | 1,443 | 1,253 | 843 | 355 | 43 | 398 | 0 | 0 | 0 |
| Relief on merits[10] | 3,674 | 4,864 | 5,789 | 9,655 | 5,986 | 7,918 | 6,221 | 1,099 | 1,082 | 723 | 252 | 22 | 274 | 0 | 0 | 0 |
| Other relief[11] | 3,293 | 1,709 | 781 | 1,417 | 866 | 864 | 948 | 344 | 171 | 120 | 103 | 21 | 124 | 0 | 0 | 0 |
| Removal Order + VD[12] | 14,389 | 17,337 | 16,465 | 35,580 | 22,635 | 28,457 | 21,377 | 1,769 | 4,099 | 4,580 | 3,579 | 1,117 | 4,696 | 17 | 14 | 3 |
| In Absentia | 7,587 | 7,134 | 5,381 | 12,996 | 9,286 | 13,834 | 6,592 | 430 | 2,629 | 3,010 | 2,054 | 403 | 2,457 | 1 | 1 | 0 |
| No Confirmed departure | 6,578 | 6,312 | 4,868 | 12,013 | 8,622 | 13,149 | 6,262 | 401 | 2,566 | 2,926 | 2,013 | 402 | 2,415 | 1 | 1 | 0 |
| Confirmed departure | 1,009 | 822 | 513 | 983 | 664 | 685 | 330 | 29 | 63 | 84 | 41 | 1 | 42 | 0 | 0 | 0 |
| Not in Absentia | 6,802 | 10,203 | 11,084 | 22,584 | 13,349 | 14,623 | 14,785 | 1,339 | 1,470 | 1,570 | 1,525 | 714 | 2,239 | 16 | 13 | 3 |
| No Confirmed departure | 3,358 | 5,194 | 6,445 | 16,019 | 7,874 | 7,909 | 4,593 | 741 | 1,179 | 919 | 577 | 358 | 935 | 11 | 8 | 3 |
| Confirmed departure | 3,444 | 5,009 | 4,639 | 6,565 | 5,475 | 6,714 | 10,192 | 598 | 291 | 651 | 948 | 356 | 1,304 | 5 | 5 | 0 |
| Termination/Dismissal/closure/other[13] | 5,980 | 6,896 | 6,367 | 15,459 | 12,556 | 16,913 | 16,025 | 1,520 | 3,399 | 916 | 618 | 132 | 750 | 3 | 3 | 0 |
| **Median Processing Times** | 35% | 32% | 34% | 30% | 31% | 35% | 30% | 45% | 42% | 32% | 14% | 3% | 11% | | | |
| Encounter to Removal (no fear cases) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 19 | 6 | 7 | 4 | 4 | 1 |
| Encounter to CF Referral | 23 | 19 | 17 | 10 | 8 | 9 | 15 | 7 | 14 | 11 | 8 | 5 | 6 | 5 | 6 | 4 |
| CF Referral to CIS Determination | 8 | 7 | 7 | 7 | 7 | 8 | 12 | 10 | 20 | 18 | 12 | 9 | 11 | 10 | 12 | 6 |
| Negative Determination to EOIR CFR Decision | 19 | 15 | 15 | 13 | 14 | 15 | 16 | 12 | 13 | 10 | 6 | 4 | 5 | 3 | 3 | 3 |
| Comprehensive Negative Determination to Removal | 25 | 25 | 21 | 21 | 20 | 21 | 27 | 15 | 42 | 33 | 34 | 22 | 26 | 13 | 14 | 6 |
| Encounter to Removal (Negative Determinations only) | 80 | 70 | 63 | 72 | 68 | 64 | 91 | 49 | 101 | 75 | 61 | 45 | 51 | 29 | 30 | 12 |

[1] Includes SW Border encounters by USBP and OFO. Excludes Unaccompanied Children (UC), Accompanied Minors (AM), OFO administrative encounters, and parolees released into the United States with Notice to Appear and a CBP One confirmation number, none of whom are amenable to expedited removal.
[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data.
[3] Fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed by ICE into other dispositions.
[4] Individuals placed in ER and found to have a Credible Fear (CF) case in USCIS APSO system.
[5] Negative CF interviews not appealed to Executive Office for Immigration Review (EOIR), negative CF interviews affirmed by EOIR, and case closures not referred to EOIR. Cases result in final ER removal orders.
[6] USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.
[7] Cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, zero bond, BIA appeal, or decision rescinded.
[8] Cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.
[9] Completion codes for conditional grants of asylum, grants of asylum, adjustment of status under various statutory provisions, asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, and cancellation of removal.
[7] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.
[8] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.
[12] Completion codes for removal order, grant of voluntary departure, withdrawal of far claim, abandonment, and denial.
[13] Completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.
Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.
Source: DHS Office of Immigration Statistics Enforcement Lifecycle data as of November 30, 2023.

In addition, cases that are already completed are a biased sample of all future completions because in years since FY 2014, the median processing time for cases resulting in relief or other protection from removal has been, on average, about six times longer than the median processing time for cases resulting in removal orders, so reporting on the small data set of already completed cases would yield a relief rate that is artificially low. OHSS analysis of OHSS Enforcement Lifecycle Dataset December 31, 2023.

**EOIR Completions and Median Processing time by Year of Completion: Fiscal Years 2000 - 2024 YTD (Dec 2023)**

| MOST CURRENT OUTCOMES | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Completions** | **207,839** | **203,742** | **181,088** | **159,401** | **147,264** | **155,154** | **163,449** | **166,282** | **181,801** | **257,861** | **219,535** | **115,666** | **337,214** | **538,800** | **160,105** |
| *Median Processing Time* | *72* | *89* | *183* | *378* | *376* | *411* | *536* | *375* | *436* | *309* | *243* | *1,187* | *1,183* | *1,030* | *756* |
| Relief on merits[1] | 1,479 | 1,574 | 7,477 | 12,466 | 10,790 | 14,290 | 20,393 | 7,645 | 1,642 | 2,118 | 1,945 | 1,643 | 5,909 | 5,664 | 1,422 |
| *Median Processing Time* | *691* | *712* | *789* | *841* | *949* | *1,004* | *1,056* | *1,049* | *1,201* | *1,127* | *987* | *1,491* | *1,508* | *1,480* | *1,498* |
| Other relief[2] | 28,131 | 29,523 | 28,586 | 26,393 | 21,846 | 19,117 | 18,769 | 20,767 | 24,707 | 32,486 | 24,970 | 19,185 | 37,890 | 45,567 | 11,875 |
| *Median Processing Time* | *678* | *770* | *909* | *960* | *956* | *1,033* | *1,100* | *1,175* | *1,071* | *994* | *672* | *1,380* | *1,466* | *1,446* | *1,453* |
| Removal Order[3] | 126,030 | 117,911 | 93,043 | 72,124 | 69,219 | 71,600 | 71,203 | 92,632 | 110,735 | 171,602 | 154,804 | 35,853 | 106,613 | 230,356 | 63,096 |
| *Median Processing Time* | *18* | *21* | *25* | *60* | *69* | *106* | *162* | *176* | *288* | *225* | *193* | *700* | *567* | *484* | *414* |
| Absentia | 20,470 | 18,372 | 16,338 | 17,907 | 22,006 | 32,901 | 30,311 | 37,882 | 42,732 | 84,575 | 83,310 | 7,970 | 59,801 | 157,134 | 43,695 |
| *Median Processing Time* | *175* | *251* | *304* | *328* | *258* | *210* | *333* | *299* | *411* | *232* | *159* | *716* | *525* | *485* | *425* |
| Not absentia | 105,560 | 99,539 | 76,705 | 54,217 | 47,213 | 38,699 | 40,892 | 54,750 | 68,003 | 87,027 | 71,494 | 27,883 | 46,812 | 73,222 | 19,401 |
| *Median Processing Time* | *12* | *15* | *17* | *27* | *33* | *49* | *65* | *77* | *114* | *212* | *285* | *686* | *684* | *483* | *395* |
| Voluntary Departure | 25,422 | 28,615 | 25,039 | 17,850 | 13,672 | 9,921 | 9,180 | 13,803 | 22,223 | 26,764 | 15,922 | 4,983 | 6,163 | 8,574 | 1,835 |
| *Median Processing Time* | *190* | *187* | *196* | *335* | *271* | *133* | *162* | *116* | *146* | *169* | *159* | *839* | *1,049* | *543* | *272* |
| Failure to Prosecute | 472 | 473 | 356 | 360 | 235 | 43 | 10 | 90 | 542 | 4,673 | 1,674 | 345 | 1,213 | 1,213 | 467 |
| *Median Processing Time* | *1* | *1* | *1* | *1* | *1* | *1* | *1* | *1* | *1* | *1* | *1* | *1* | *1* | *13* | *30* |
| Terminate/Dismiss/closure/other[4] | 26,305 | 25,646 | 26,587 | 30,208 | 31,502 | 40,183 | 43,894 | 31,345 | 21,952 | 20,218 | 20,220 | 53,657 | 179,426 | 247,426 | 81,410 |
| *Median Processing Time* | *435* | *517* | *674* | *779* | *854* | *782* | *806* | *895* | *961* | *634* | *644* | *1,461* | *1,460* | *1,327* | *1,380* |

[1] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.
[2] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.
[3] Includes completion codes for removal order, withdrawal, abandonment, denial, and DHS negative fear decision affirmed.
[4] Includes completion codes for termination, dismissal, administrative closure, and other administrative completions.
Notes: Results based on OHSS analysis of EOIR data as of January 31, 2024.
Source: DHS Office of Homeland Security Statistics EOIR data.

compared to an 83 percent credible fear screen-in rate in the pre-pandemic period of 2014 to 2019.
OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

| | |
|---|---|
| FY 2014-19 SWB ER cases: | 1,234,724 |
| Claimed fear | 450,488 |
| comprehensive positive fear determinations | 374,083 |
| % of fear claims referred to EOIR | 83% |

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims**

| MOST CURRENT OUTCOMES | TOTAL | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
| **Total Encounters** | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 456,485 | 1,578,628 | 2,187,356 | 2,051,374 | 615,642 |
| T8 Encounters | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 525,398 | 1,109,854 | 1,488,594 | 615,642 |
| **Processed for Expedited Removal** | 229,049 | 180,102 | 227,911 | 160,305 | 214,667 | 225,200 | 93,719 | 84,687 | 319,665 | 207,197 | 82,719 |
| No fear claim⁴ | 174,419 | 130,820 | 130,629 | 89,349 | 115,080 | 121,752 | 66,219 | 15,031 | 38,167 | 62,097 | 40,923 |
| No fear claim - confirmed removal or return | 166,051 | 129,846 | 127,921 | 86,688 | 110,087 | 118,756 | 63,698 | 10,956 | 28,260 | 53,931 | 28,823 |
| Fear claims withdrawn¹ (based on APSO receipts) | 4,803 | 3,321 | 4,379 | 2,167 | 4,081 | 5,366 | 1,664 | 20,618 | 31,365 | 10,255 | 9,312 |
| Confirmed removal or return | 1,006 | 1,012 | 819 | 418 | 669 | 607 | 630 | 415 | 507 | 363 | 83 |
| Credible fear claims² (APSO cases only) | 48,737 | 46,451 | 92,903 | 68,789 | 95,506 | 98,102 | 25,836 | 49,038 | 49,995 | 134,845 | 32,484 |
| Positive fear determinations | 35,051 | 33,972 | 73,871 | 53,666 | 74,438 | 70,879 | 8,462 | 33,710 | 28,362 | 81,147 | 16,170 |
| Negative fear determinations | 9,197 | 7,335 | 9,419 | 7,325 | 9,110 | 17,668 | 12,353 | 13,249 | 17,847 | 42,359 | 11,899 |
| Negative fear determinations appealed to EOIR | 7,346 | 6,260 | 7,629 | 5,898 | 6,745 | 14,255 | 9,729 | 12,812 | 16,798 | 34,582 | 10,036 |
| Negative fear determinations vacated by EOIR | 1,298 | 1,232 | 1,999 | 1,451 | 1,274 | 3,866 | 3,158 | 3,524 | 4,789 | 6,584 | 2,262 |
| Negative fear determinations upheld by EOIR | 6,030 | 5,028 | 5,630 | 4,447 | 5,467 | 10,429 | 6,571 | 9,288 | 12,009 | 27,998 | 7,836 |
| Case closures | 4,489 | 4,944 | 9,613 | 7,798 | 11,958 | 9,555 | 3,021 | 2,059 | 3,786 | 11,339 | 4,415 |
| Case closures referred to EOIR | 1,306 | 1,708 | 4,373 | 3,698 | 6,652 | 5,345 | 983 | 1,067 | 2,497 | 5,401 | 1,577 |
| Case closures not referred to EOIR | 3,183 | 3,236 | 5,240 | 4,100 | 5,306 | 6,210 | 2,038 | 992 | 1,289 | 5,938 | 2,838 |
| ER/CF claims not referred to EOIR³ | 11,082 | 9,539 | 12,660 | 9,974 | 13,138 | 20,012 | 11,233 | 10,717 | 14,347 | 41,713 | 12,535 |
| Total referrals to EOIR⁵ (Includes closed cases, vacated negative and positive decisions) | 5,768 | 8,407 | 11,240 | 9,286 | 11,608 | 18,423 | 8,740 | 6,247 | 8,576 | 31,968 | 5,612 |
| **EOIR Cases Started** | 37,277 | 56,616 | 78,712 | 57,168 | 77,810 | 72,182 | 11,871 | 32,470 | 29,132 | 77,330 | 13,747 |
| Still in EOIR proceedings | 6,437 | 7,058 | 16,141 | 14,674 | 22,957 | 26,875 | 7,011 | 25,055 | 22,510 | 70,285 | 13,669 |
| EOIR cases completed | 30,840 | 29,558 | 62,571 | 42,494 | 54,853 | 45,307 | 4,860 | 9,415 | 6,622 | 6,852 | 78 |
| Failure to prosecute | 2 | 2 | 1 | 8 | 49 | 114 | 4 | 15 | 5 | 24 | 5 |
| Terminations / Dismissals | 7,025 | 6,498 | 15,619 | 12,881 | 17,335 | 16,323 | 1,395 | 3,627 | 980 | 954 | 5 |
| Asylum granted or other EOIR relief from removal | 6,581 | 6,598 | 11,156 | 6,936 | 8,924 | 7,363 | 1,477 | 1,417 | 894 | 447 | 3 |
| Relief on merits¹ | 4,874 | 5,815 | 9,731 | 6,055 | 8,040 | 6,393 | 1,317 | 1,217 | 760 | 502 | - |
| Relief not on merits | 1,707 | 783 | 1,425 | 881 | 884 | 972 | 360 | 200 | 134 | 145 | 3 |
| Removal orders | 17,232 | 16,460 | 35,595 | 22,669 | 28,545 | 21,505 | 1,786 | 4,356 | 4,743 | 5,427 | 65 |
| In absentia | 7,695 | 5,366 | 13,034 | 9,329 | 15,907 | 6,682 | 444 | 2,759 | 3,131 | 2,952 | 9 |
| Executed removal orders | 857 | 549 | 1,063 | 741 | 761 | 578 | 34 | 71 | 94 | 52 | - |
| Not in absentia | 10,137 | 11,074 | 22,561 | 13,340 | 14,638 | 14,823 | 1,342 | 1,597 | 1,612 | 2,475 | 56 |
| Executed removal orders | 4,551 | 4,651 | 6,591 | 3,493 | 6,734 | 10,206 | 601 | 328 | 662 | 1,478 | 13 |
| Appeals to BIA | 4,854 | 5,343 | 13,474 | 7,435 | 7,111 | 4,501 | 371 | 575 | 463 | 279 | - |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 450 | 460 | 746 | 516 | 430 | 470 | 128 | 86 | 45 | 34 | - |
| EOIR removal orders + other favorable-to-OPLA judgments appealed to BIA | 4,404 | 5,483 | 13,126 | 6,919 | 6,681 | 4,031 | 443 | 529 | 418 | 245 | - |

0.6%

- : Represents zero.

¹ Excludes unaccompanied children, accompanied minors, and OFO administrative cases including crewmembers, paroles, and withdrawals, none of whom are amenable to expedited removal. Exclusions made up 5.4 percent of total encounters between FY2015 and FY2023 Q3.

² No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases processed with other dispositions in ICE custody.

³ Fear claim in CBP custody but no associated record of a fear claim in USCIS APSO data; case results in an ER referral order.

⁴ Based on USCIS APSO dock-ins.

¹ Includes positive credible fear interviews, negative CF interviews vacated by EOIR, and case closures referred to EOIR.

¹ Cases decided on merits includes grants of relief, including administrative closure and grants of prosecutorial discretion as "other" forms of relief.

Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of November 20, 2023.

From 2014 through 2019, of SWB expedited removal cases with positive fear determinations, less than 25 percent of EOIR case completions ultimately resulted in a grant of protection or relief.
OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

|  | SWB ER cases with EOIR case completions | 265,623 |
|---|---|---|
| case completions resulting in relief/protection from removal | | 47,560 |
| % of case completions that are relief/protection | | 18% |

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims**

| MOST CURRENT OUTCOMES | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Encounters[1]** | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,356 | 456,485 | 1,578,628 | 2,387,156 | 2,051,374 | 615,642 |
| **TE Encounters** | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,356 | 223,174 | 321,398 | 1,109,854 | 1,488,594 | 615,642 |
| **Proceeded for Expedited Removal** | 226,049 | 180,592 | 227,311 | 160,305 | 214,667 | 223,200 | 91,719 | 84,687 | 119,665 | 207,197 | 82,719 |
| No fear claim[2] | 174,419 | 130,820 | 130,629 | 89,349 | 115,080 | 121,732 | 66,219 | 15,051 | 58,167 | 62,097 | 46,921 |
| No fear claim - confirmed removal or return | 166,051 | 129,846 | 127,921 | 86,688 | 110,087 | 118,756 | 63,698 | 10,956 | 28,260 | 33,551 | 28,823 |
| Fear claims withdrawn[3] (based on APSO receipts) | 4,893 | 3,321 | 4,379 | 2,167 | 4,081 | 3,366 | 1,664 | 20,618 | 31,303 | 10,255 | 9,312 |
| Confirmed removal or return | 1,066 | 1,012 | 819 | 418 | 669 | 607 | 650 | 415 | 507 | 563 | 83 |
| Credible fear claims[4] (APSO cases only) | 48,737 | 46,451 | 92,903 | 68,789 | 95,506 | 98,102 | 23,856 | 49,018 | 49,995 | 134,845 | 32,484 |
| Positive fear determinations | 35,051 | 33,972 | 73,871 | 53,666 | 74,438 | 70,879 | 8,462 | 33,710 | 28,362 | 81,147 | 16,170 |
| Negative fear determinations | 9,197 | 7,535 | 9,419 | 7,325 | 9,110 | 17,668 | 12,353 | 13,249 | 17,847 | 42,359 | 11,899 |
| Negative fear determinations appealed to EOIR | 7,346 | 6,260 | 7,629 | 5,898 | 6,745 | 14,295 | 9,729 | 12,812 | 16,708 | 34,582 | 10,038 |
| Negative fear determinations vacated by EOIR | 1,298 | 1,232 | 1,599 | 1,451 | 1,278 | 5,866 | 3,158 | 3,524 | 4,789 | 6,584 | 2,202 |
| Negative fear determinations upheld by EOIR | 6,050 | 5,028 | 5,630 | 4,447 | 5,467 | 10,429 | 6,571 | 9,288 | 12,069 | 27,998 | 7,836 |
| Case closures | 4,489 | 4,944 | 9,613 | 7,798 | 11,958 | 9,555 | 3,021 | 2,059 | 3,786 | 11,339 | 4,415 |
| Case closures referred to EOIR | 1,306 | 1,708 | 4,373 | 3,698 | 6,652 | 3,345 | 983 | 1,067 | 2,497 | 5,461 | 1,577 |
| Case closures not referred to EOIR | 3,183 | 3,236 | 5,240 | 4,100 | 5,306 | 6,210 | 2,038 | 992 | 1,289 | 5,938 | 2,838 |
| ER/CF claims not referred to EOIR[5] | 11,082 | 9,539 | 12,660 | 9,974 | 13,138 | 20,012 | 11,253 | 10,717 | 14,347 | 41,713 | 12,535 |
| Executed removal orders | 9,768 | 8,487 | 11,240 | 9,286 | 11,608 | 18,423 | 8,740 | 6,247 | 8,576 | 31,968 | 5,612 |
| **Total referrals to EOIR[6]** (Includes closed cases, vacated negative and positive decisions) | 37,655 | 36,912 | 80,243 | 58,815 | 82,368 | 76,090 | 12,603 | 38,301 | 55,648 | 93,132 | 19,949 |
| **EOIR Cases Started** | 37,277 | 36,616 | 78,712 | 57,168 | 77,810 | 72,382 | 11,871 | 32,470 | 29,132 | 77,135 | 13,747 |
| Still in EOIR proceedings | 6,437 | 7,058 | 16,141 | 14,674 | 22,957 | 26,875 | 7,011 | 23,053 | 22,510 | 70,283 | 13,669 |
| EOIR cases completed | 30,840 | 29,558 | 62,571 | 42,494 | 54,853 | 45,507 | 4,860 | 9,415 | 6,622 | 6,852 | 78 |
| Failure to prosecute | 2 | 2 | 1 | 8 | 49 | 114 | 4 | 15 | 5 | 24 | 3 |
| Terminations / Dismissals | 7,025 | 6,498 | 15,819 | 12,881 | 17,535 | 16,323 | 1,393 | 5,427 | 980 | 954 | 9 |
| Asylum granted or other EOIR relief from removal | 6,581 | 6,598 | 11,156 | 6,936 | 8,924 | 7,365 | 1,477 | 1,417 | 894 | 447 | 3 |
| Relief on merits | 4,874 | 5,815 | 9,731 | 6,055 | 8,040 | 6,393 | 1,117 | 1,217 | 760 | 502 | - |
| Relief not on merits | 1,707 | 783 | 1,425 | 881 | 884 | 972 | 360 | 200 | 134 | 145 | 3 |
| Removal orders | 17,232 | 16,460 | 35,595 | 22,669 | 28,345 | 21,505 | 1,786 | 4,356 | 4,743 | 5,427 | 63 |
| In absentia | 7,095 | 5,386 | 13,034 | 9,329 | 13,997 | 6,682 | 444 | 2,759 | 3,131 | 2,952 | 9 |
| Executed removal orders | 857 | 349 | 1,063 | 741 | 761 | 378 | 34 | 71 | 94 | 52 | - |
| Not in absentia | 10,137 | 11,074 | 22,561 | 13,340 | 14,638 | 14,823 | 1,342 | 1,597 | 1,612 | 2,475 | 54 |
| Executed removal orders | 4,951 | 4,651 | 6,395 | 5,493 | 6,734 | 10,296 | 601 | 324 | 662 | 1,478 | 13 |
| Appeals to BIA | 4,854 | 5,943 | 13,874 | 7,435 | 7,111 | 4,301 | 571 | 575 | 463 | 279 | - |
| Grants of relief + other favorable-to-noncitizen judgments appealed to BIA | 450 | 460 | 746 | 516 | 430 | 470 | 128 | 46 | 45 | 34 | - |
| EOIR removal orders + other favorable-to-DHS judgments appealed to BIA | 4,404 | 5,483 | 13,128 | 6,919 | 6,681 | 4,051 | 445 | 529 | 418 | 245 | - |

- Represents zero.
[1] Includes unaccompanied children, accompanied minors, and OFO administrative cases including crewmembers, parolee, and withdrawals, none of whom are amenable to expedited removal. Exclusions made up 5.4 percent of total encounters between FY2015 and FY2025 Q1.
[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed with other dispositions in ICE custody.
[3] Fear claim in CBP custody but no associated record of a fear claim in USCIS APSO data; case results in an ER removal order.
[4] Based on USCIS APSO clock-ins.
[5] Includes possible fear interviews, negative CF interviews vacated by EOIR, and case closures referred to EOIR.
[6] Cases decided on merits includes grants of relief, including administrative closures and grants of prosecutorial discretion as "other" forms of relief.
Notes: Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.
Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of November 20, 2023.

Although fewer noncitizens are screened in under the "reasonable possibility" standard applied in the context of the Circumvention of Lawful Pathways rule, that screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule

DHS OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

| Fear Screening by Circumventing Legal Pathways Rule | Mar-24 | | Since May 12 |
|---|---|---|---|
| | Total | % change vs. prev. month | |
| **Established Exception** | **440** | **▼ 7%** | **6,242** |
| Positive Fear | 317 | ▼ 11% | 4,934 |
| Negative Fear | 98 | ▲ 3% | 1,194 |
| Administrative Closure | 25 | ▲ 39% | 114 |
| **Presumption Rebutted** | **1,064** | **▲ 29%** | **13,719** |
| Positive Fear | 879 | ▲ 28% | 11,787 |
| Negative Fear | 161 | ▲ 42% | 1,666 |
| Administrative Closure | 24 | - flat - | 266 |
| **Subject to Presumption of Ineligibility for Asylum** | **11,362** | **▲ 22%** | **108,037** |
| Positive Fear | 5,989 | ▲ 38% | 56,698 |
| Negative Fear | 5,082 | ▲ 6% | 49,239 |
| Administrative Closure | 291 | ▲ 49% | 2,100 |
| **Total** | **12,866** | **▲ 21%** | **127,998** |
| Positive Fear | 7,185 | ▲ 33% | 73,419 |
| Negative Fear | 5,341 | ▲ 7% | 52,099 |
| Administrative Closure | 340 | ▲ 43% | 2,480 |

52% % subject to presumption that established positive fear

57% % of all cases subject to CLP that established positive fear

Notes: The expected columns (personnel) data pulled from a live system, and does not contain valuable expert review numbers and will be closed effect of CLP, CLP, if RHP, CLP as reported. Population includes non-detained individuals. Data are current through March 31, 2024.

Source: OHSS analysis of data pulled from USCIS Global at 2:30 PM on April 2, 2024.

The vast majority (94 percent) of individuals encountered by USBP during this period were Mexican nationals, and very few of those who were processed for expedited removal claimed a fear of return or an intent to seek asylum during that process—fewer than one percent of all CBP SWB enco OHSS analysis of March 2024 OHSS Persist Dataset.

**USBP SWB Encounters by Selected Citizenship, FY2000-FY2023**

| Year | Mexico | All Other | Total | Mexico Percent of Total |
|---|---|---|---|---|
| 2000 | 1,540,683 | 25,738 | 1,566,421 | 98% |
| 2001 | 1,201,510 | 29,902 | 1,231,412 | 98% |
| 2002 | 902,042 | 28,299 | 930,341 | 97% |
| 2003 | 867,256 | 39,478 | 906,734 | 96% |
| 2004 | 1,074,330 | 65,917 | 1,140,247 | 94% |
| 2005 | 1,016,433 | 154,958 | 1,171,391 | 87% |
| 2006 | 973,826 | 98,150 | 1,071,976 | 91% |
| 2007 | 800,720 | 58,016 | 858,736 | 93% |
| 2008 | 653,065 | 51,984 | 705,049 | 93% |
| 2009 | 495,573 | 45,278 | 540,851 | 92% |
| 2010 | 396,819 | 50,912 | 447,731 | 89% |
| 2011 | 280,580 | 46,997 | 327,577 | 86% |
| 2012 | 262,341 | 94,532 | 356,873 | 74% |
| 2013 | 265,409 | 148,988 | 414,397 | 64% |
| 2014 | 226,770 | 252,600 | 479,370 | 47% |
| 2015 | 186,017 | 145,316 | 331,333 | 56% |
| 2016 | 190,760 | 218,110 | 408,870 | 47% |
| 2017 | 127,938 | 175,978 | 303,916 | 42% |
| 2018 | 152,257 | 244,322 | 396,579 | 38% |
| 2019 | 166,458 | 685,050 | 851,508 | 20% |
| 2020 | 253,104 | 147,531 | 400,635 | 63% |
| 2021 | 608,051 | 1,051,171 | 1,659,222 | 37% |
| 2022 | 738,780 | 1,467,656 | 2,206,436 | 33% |
| 2023 | 579,146 | 1,466,692 | 2,045,838 | 28% |
| 2024 Q1-Q2 | 304,540 | 727,392 | 1,031,932 | 30% |

OHSS Persist March 2024.

Note: Encounters between POEs were not amenable to ER until Aug. 2004.
[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border.
[2] OIS Lifecycle data on Total Southwest Border Fear Claims.
[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data [Southwest Border]
[4] The sum of credible fear claims for available matching data years. Used to estimate the proportion of Lifecycle Data
Source: APSO Global and OHSS Lifecycle data
[5] The sum of credible fear claims for available matching data years. Used to estimate
Sources: APSO Global and OHSS Persist Data. ships, only one citizenship is reported. I
weekly average CFs: % increase from 2014-19
* FY2024 as of April 2nd, 2024
** Fy2024 as of December 31, 2023.

| 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|
| 170,621 | 155,961 | 103,856 | 111,963 | 113,448 |
| 142,040 | 123,054 | 89,034 | 83,853 | 84,837 |
| 121,908 | 97,571 | 78,730 | 76,719 | 82,860 |
| 142,491 | 125,502 | 101,178 | 98,989 | 99,986 |
| 148,688 | 125,226 | 99,490 | 105,093 | 107,620 |
| 133,964 | 113,311 | 76,274 | 67,636 | 67,631 |
| 112,773 | 97,196 | 79,997 | 75,766 | 69,142 |
| 99,518 | 77,048 | 60,492 | 56,806 | 56,142 |
| 65,129 | 57,593 | 52,600 | 50,986 | 51,084 |
| 62,351 | 54,038 | 39,308 | 32,363 | 33,717 |
| 42,739 | 37,543 | 32,909 | 29,520 | 30,216 |
| 46,680 | 43,020 | 36,808 | 32,833 | 33,699 |
| 54,771 | 50,500 | 40,790 | 40,006 | 41,125 |
| 59,383 | 69,033 | 66,572 | 48,833 | 39,766 |
| 38,299 | 40,684 | 38,620 | 38,610 | 42,419 |
| 48,271 | 54,987 | 45,168 | 46,658 | 51,569 |
| 15,768 | 19,940 | 21,657 | 25,014 | 30,569 |
| 51,019 | 51,790 | 43,096 | 40,005 | 46,551 |
| 109,413 | 144,113 | 104,310 | 81,748 | 62,608 |
| 17,106 | 23,237 | 33,029 | 40,949 | 50,007 |
| 178,795 | 180,597 | 189,034 | 213,593 | 209,840 |
| 235,785 | 241,136 | 207,834 | 200,162 | 204,087 |
| 211,992 | 206,690 | 144,556 | 183,479 | 232,963 |

matters.

IFR_AR_007532





From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period – May 2019 when USBP encounters peaked at 4,300 during that year's surge. OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) averaged approximately 1,500 per day during this period.

SWB Encounters, FY 2000 - FY 2024 YTD (March)

Average USBP daily encounters, FY2009-FY2020: 1,207
Number of months average daily >= 3,500: 1
CBP Daily encounters, FY2009-FY2020: 1,466

| Date | CBP monthly encounters | USBP monthly encounters | CBP daily encounters | USBP daily encounters |
|---|---|---|---|---|
| Oct-99 | 87,819 | 87,819 | 2,833 | 2,833 |
| Nov-99 | 74,362 | 74,362 | 2,479 | 2,479 |
| Dec-99 | 66,256 | 66,256 | 2,137 | 2,137 |
| Jan-00 | 175,383 | 175,383 | 5,658 | 5,658 |
| Feb-00 | 200,619 | 200,619 | 7,165 | 7,165 |
| Mar-00 | 209,311 | 209,311 | 6,752 | 6,752 |
| Apr-00 | 170,621 | 170,621 | 5,687 | 5,687 |
| May-00 | 155,961 | 155,961 | 5,031 | 5,031 |
| Jun-00 | 103,856 | 103,856 | 3,462 | 3,462 |
| Jul-00 | 111,963 | 111,963 | 3,612 | 3,612 |
| Aug-00 | 113,448 | 113,448 | 3,660 | 3,660 |
| Sep-00 | 96,822 | 96,822 | 3,227 | 3,227 |
| Oct-00 | 81,995 | 81,995 | 2,645 | 2,645 |
| Nov-00 | 67,217 | 67,217 | 2,241 | 2,241 |
| Dec-00 | 54,828 | 54,828 | 1,769 | 1,769 |
| Jan-01 | 124,586 | 124,586 | 4,019 | 4,019 |
| Feb-01 | 150,616 | 150,616 | 5,379 | 5,379 |
| Mar-01 | 169,904 | 169,904 | 5,481 | 5,481 |
| Apr-01 | 142,040 | 142,040 | 4,735 | 4,735 |
| May-01 | 123,054 | 123,054 | 3,969 | 3,969 |
| Jun-01 | 89,034 | 89,034 | 2,968 | 2,968 |
| Jul-01 | 83,853 | 83,853 | 2,705 | 2,705 |
| Aug-01 | 84,837 | 84,837 | 2,737 | 2,737 |
| Sep-01 | 59,448 | 59,448 | 1,982 | 1,982 |
| Oct-01 | 37,746 | 37,746 | 1,218 | 1,218 |
| Nov-01 | 32,694 | 32,694 | 1,090 | 1,090 |
| Dec-01 | 31,531 | 31,531 | 1,017 | 1,017 |
| Jan-02 | 79,647 | 79,647 | 2,569 | 2,569 |
| Feb-02 | 95,645 | 95,645 | 3,416 | 3,416 |
| Mar-02 | 126,906 | 126,906 | 4,094 | 4,094 |
| Apr-02 | 121,908 | 121,908 | 4,064 | 4,064 |
| May-02 | 97,571 | 97,571 | 3,147 | 3,147 |
| Jun-02 | 78,730 | 78,730 | 2,624 | 2,624 |
| Jul-02 | 76,719 | 76,719 | 2,475 | 2,475 |
| Aug-02 | 82,860 | 82,860 | 2,673 | 2,673 |
| Sep-02 | 68,384 | 68,384 | 2,279 | 2,279 |
| Oct-02 | 61,913 | 61,913 | 1,997 | 1,997 |
| Nov-02 | 47,919 | 47,919 | 1,597 | 1,597 |
| Dec-02 | 37,930 | 37,930 | 1,224 | 1,224 |
| Jan-03 | 87,002 | 87,002 | 2,807 | 2,807 |
| Feb-03 | 97,016 | 97,016 | 3,465 | 3,465 |
| Mar-03 | 98,625 | 98,625 | 3,181 | 3,181 |
| Apr-03 | 75,564 | 75,564 | 2,519 | 2,519 |
| May-03 | 88,845 | 88,845 | 2,866 | 2,866 |
| Jun-03 | 75,634 | 75,634 | 2,521 | 2,521 |
| Jul-03 | 79,396 | 79,396 | 2,561 | 2,561 |
| Aug-03 | 84,651 | 84,651 | 2,731 | 2,731 |
| Sep-03 | 72,239 | 72,239 | 2,408 | 2,408 |
| Oct-03 | 69,246 | 65,388 | 2,234 | 2,109 |
| Nov-03 | 62,452 | 57,942 | 2,082 | 1,931 |
| Dec-03 | 48,280 | 43,663 | 1,557 | 1,408 |
| Jan-04 | 98,764 | 92,751 | 3,186 | 2,992 |
| Feb-04 | 116,398 | 110,824 | 4,157 | 3,958 |
| Mar-04 | 162,530 | 155,089 | 5,243 | 5,003 |
| Apr-04 | 142,491 | 135,632 | 4,750 | 4,521 |
| May-04 | 125,502 | 118,815 | 4,048 | 3,833 |
| Jun-04 | 101,178 | 94,607 | 3,373 | 3,154 |
| Jul-04 | 98,069 | 92,152 | 3,163 | 2,973 |
| Aug-04 | 99,986 | 93,299 | 3,225 | 3,010 |
| Sep-04 | 85,877 | 80,089 | 2,863 | 2,670 |
| Oct-04 | 81,687 | 75,908 | 2,635 | 2,449 |
| Nov-04 | 70,617 | 65,110 | 2,354 | 2,170 |
| Dec-04 | 54,028 | 48,410 | 1,743 | 1,562 |
| Jan-05 | 101,552 | 93,029 | 3,276 | 3,001 |
| Feb-05 | 121,177 | 113,776 | 4,328 | 4,063 |
| Mar-05 | 150,892 | 142,044 | 4,867 | 4,614 |
| Apr-05 | 148,688 | 140,074 | 4,956 | 4,669 |
| May-05 | 125,226 | 115,817 | 4,040 | 3,736 |
| Jun-05 | 99,490 | 90,796 | 3,316 | 3,027 |
| Jul-05 | 105,093 | 94,964 | 3,390 | 3,063 |
| Aug-05 | 107,020 | 96,765 | 3,452 | 3,121 |
| Sep-05 | 103,177 | 93,718 | 3,439 | 3,124 |
| Oct-05 | 91,935 | 82,561 | 2,966 | 2,606 |
| Nov-05 | 78,817 | 70,954 | 2,627 | 2,365 |
| Dec-05 | 60,375 | 52,663 | 1,948 | 1,699 |
| Jan-06 | 110,987 | 101,262 | 3,580 | 3,267 |
| Feb-06 | 132,780 | 125,030 | 4,742 | 4,465 |
| Mar-06 | 169,077 | 160,696 | 5,454 | 5,184 |
| Apr-06 | 133,964 | 126,554 | 4,465 | 4,218 |
| May-06 | 113,311 | 105,443 | 3,655 | 3,401 |
| Jun-06 | 76,274 | 68,365 | 2,542 | 2,279 |
| Jul-06 | 67,636 | 59,633 | 2,182 | 1,924 |
| Aug-06 | 67,631 | 59,733 | 2,182 | 1,927 |
| Sep-06 | 65,571 | 58,082 | 2,186 | 1,936 |
| Oct-06 | 68,083 | 60,726 | 2,196 | 1,959 |
| Nov-06 | 58,199 | 51,592 | 1,940 | 1,720 |
| Dec-06 | 47,537 | 40,527 | 1,533 | 1,307 |
| Jan-07 | 79,794 | 72,000 | 2,574 | 2,323 |
| Feb-07 | 86,435 | 79,273 | 3,087 | 2,831 |
| Mar-07 | 122,450 | 114,136 | 3,950 | 3,682 |
| Apr-07 | 112,773 | 104,465 | 3,759 | 3,482 |
| May-07 | 97,196 | 88,510 | 3,135 | 2,855 |
| Jun-07 | 79,997 | 71,336 | 2,667 | 2,378 |
| Jul-07 | 75,766 | 66,793 | 2,444 | 2,155 |
| Aug-07 | 69,142 | 59,801 | 2,230 | 1,929 |
| Sep-07 | 57,556 | 49,577 | 1,919 | 1,653 |
| Oct-07 | 58,616 | 51,355 | 1,891 | 1,657 |
| Nov-07 | 48,693 | 42,208 | 1,623 | 1,407 |
| Dec-07 | 38,556 | 31,824 | 1,244 | 1,027 |
| Jan-08 | 66,471 | 59,034 | 2,144 | 1,904 |
| Feb-08 | 80,724 | 73,483 | 2,883 | 2,624 |
| Mar-08 | 97,774 | 89,769 | 3,154 | 2,896 |
| Apr-08 | 99,518 | 91,552 | 3,317 | 3,052 |
| May-08 | 77,048 | 69,240 | 2,485 | 2,234 |
| Jun-08 | 60,492 | 53,850 | 2,016 | 1,795 |
| Jul-08 | 56,806 | 49,468 | 1,832 | 1,596 |
| Aug-08 | 56,142 | 48,544 | 1,811 | 1,566 |
| Sep-08 | 51,713 | 44,722 | 1,724 | 1,491 |
| Oct-08 | 49,217 | 42,937 | 1,588 | 1,385 |
| Nov-08 | 38,450 | 32,782 | 1,282 | 1,093 |
| Dec-08 | 31,206 | 25,946 | 1,007 | 837 |
| Jan-09 | 50,737 | 44,503 | 1,637 | 1,436 |
| Feb-09 | 55,132 | 49,211 | 1,969 | 1,758 |
| Mar-09 | 74,323 | 67,342 | 2,398 | 2,172 |
| Apr-09 | 65,129 | 58,493 | 2,171 | 1,950 |
| May-09 | 57,593 | 50,883 | 1,858 | 1,641 |
| Jun-09 | 52,600 | 46,044 | 1,753 | 1,535 |
| Jul-09 | 50,986 | 43,841 | 1,645 | 1,414 |
| Aug-09 | 51,084 | 43,519 | 1,648 | 1,404 |
| Sep-09 | 42,666 | 35,350 | 1,422 | 1,178 |
| Oct-09 | 47,290 | 40,890 | 1,525 | 1,319 |
| Nov-09 | 39,064 | 32,815 | 1,302 | 1,094 |
| Dec-09 | 31,352 | 25,034 | 1,011 | 808 |
| Jan-10 | 40,741 | 34,784 | 1,314 | 1,122 |
| Feb-10 | 48,753 | 42,790 | 1,741 | 1,528 |
| Mar-10 | 69,152 | 61,361 | 2,231 | 1,979 |
| Apr-10 | 62,351 | 55,237 | 2,078 | 1,841 |
| May-10 | 54,018 | 47,045 | 1,743 | 1,518 |
| Jun-10 | 39,308 | 32,955 | 1,310 | 1,099 |
| Jul-10 | 32,363 | 25,609 | 1,044 | 826 |
| Aug-10 | 33,717 | 26,415 | 1,088 | 852 |
| Sep-10 | 29,310 | 22,796 | 977 | 760 |
| Oct-10 | 32,451 | 26,165 | 1,047 | 844 |
| Nov-10 | 28,516 | 22,405 | 951 | 747 |
| Dec-10 | 25,728 | 19,429 | 830 | 627 |
| Jan-11 | 29,737 | 23,926 | 959 | 772 |
| Feb-11 | 34,408 | 28,786 | 1,229 | 1,028 |
| Mar-11 | 48,920 | 42,014 | 1,578 | 1,355 |
| Apr-11 | 42,739 | 36,251 | 1,425 | 1,208 |
| May-11 | 37,543 | 31,236 | 1,211 | 1,008 |
| Jun-11 | 32,909 | 27,166 | 1,097 | 906 |
| Jul-11 | 29,520 | 23,170 | 952 | 747 |
| Aug-11 | 30,216 | 24,166 | 975 | 780 |
| Sep-11 | 28,386 | 22,863 | 946 | 762 |
| Oct-11 | 31,344 | 25,612 | 1,011 | 826 |
| Nov-11 | 28,617 | 23,368 | 954 | 779 |
| Dec-11 | 24,380 | 18,983 | 786 | 612 |
| Jan-12 | 30,798 | 25,714 | 993 | 829 |
| Feb-12 | 37,009 | 31,579 | 1,322 | 1,128 |
| Mar-12 | 48,538 | 42,218 | 1,566 | 1,362 |
| Apr-12 | 46,680 | 40,628 | 1,556 | 1,354 |
| May-12 | 43,020 | 36,966 | 1,388 | 1,192 |
| Jun-12 | 36,808 | 30,669 | 1,227 | 1,022 |
| Jul-12 | 32,833 | 26,978 | 1,059 | 870 |
| Aug-12 | 33,699 | 27,567 | 1,087 | 889 |
| Sep-12 | 32,399 | 26,591 | 1,080 | 886 |
| Oct-12 | 34,847 | 28,929 | 1,124 | 933 |
| Nov-12 | 33,159 | 27,636 | 1,105 | 921 |
| Dec-12 | 29,077 | 23,243 | 938 | 750 |
| Jan-13 | 32,485 | 26,921 | 1,048 | 868 |
| Feb-13 | 40,636 | 35,042 | 1,451 | 1,252 |
| Mar-13 | 54,010 | 47,293 | 1,742 | 1,526 |
| Apr-13 | 54,771 | 48,212 | 1,826 | 1,607 |
| May-13 | 50,500 | 43,856 | 1,629 | 1,415 |
| Jun-13 | 40,790 | 34,436 | 1,360 | 1,148 |
| Jul-13 | 40,006 | 33,230 | 1,291 | 1,072 |
| Aug-13 | 41,125 | 33,797 | 1,327 | 1,090 |
| Sep-13 | 38,206 | 31,802 | 1,274 | 1,060 |
| Oct-13 | 41,835 | 35,312 | 1,350 | 1,139 |
| Nov-13 | 38,692 | 31,896 | 1,290 | 1,063 |
| Dec-13 | 36,707 | 29,528 | 1,184 | 953 |
| Jan-14 | 35,200 | 28,668 | 1,135 | 925 |
| Feb-14 | 42,473 | 36,403 | 1,517 | 1,300 |
| Mar-14 | 57,548 | 49,596 | 1,856 | 1,600 |
| Apr-14 | 59,383 | 51,502 | 1,979 | 1,717 |
| May-14 | 69,033 | 60,683 | 2,227 | 1,958 |
| Jun-14 | 66,572 | 57,861 | 2,219 | 1,929 |
| Jul-14 | 48,833 | 40,708 | 1,575 | 1,313 |
| Aug-14 | 39,766 | 31,388 | 1,283 | 1,013 |
| Sep-14 | 34,006 | 25,825 | 1,134 | 861 |
| Oct-14 | 35,903 | 26,450 | 1,158 | 853 |
| Nov-14 | 33,024 | 24,641 | 1,101 | 821 |
| Dec-14 | 34,231 | 25,019 | 1,104 | 807 |
| Jan-15 | 30,179 | 21,514 | 974 | 694 |
| Feb-15 | 32,554 | 24,376 | 1,163 | 871 |
| Mar-15 | 39,162 | 29,791 | 1,263 | 961 |
| Apr-15 | 38,299 | 29,750 | 1,277 | 992 |
| May-15 | 40,684 | 31,576 | 1,312 | 1,019 |
| Jun-15 | 38,620 | 29,303 | 1,287 | 977 |
| Jul-15 | 38,610 | 28,388 | 1,245 | 916 |
| Aug-15 | 42,419 | 30,239 | 1,368 | 975 |
| Sep-15 | 41,171 | 30,286 | 1,372 | 1,010 |
| Oct-15 | 45,245 | 32,724 | 1,460 | 1,056 |
| Nov-15 | 45,387 | 32,838 | 1,513 | 1,095 |
| Dec-15 | 48,393 | 37,014 | 1,561 | 1,194 |
| Jan-16 | 33,396 | 23,758 | 1,077 | 766 |
| Feb-16 | 38,068 | 26,072 | 1,360 | 931 |
| Mar-16 | 45,779 | 33,316 | 1,477 | 1,075 |
| Apr-16 | 48,271 | 38,089 | 1,609 | 1,270 |
| May-16 | 54,987 | 40,337 | 1,774 | 1,301 |
| Jun-16 | 45,168 | 34,450 | 1,506 | 1,148 |
| Jul-16 | 46,658 | 33,723 | 1,505 | 1,088 |
| Aug-16 | 51,569 | 37,048 | 1,664 | 1,195 |
| Sep-16 | 56,070 | 39,501 | 1,869 | 1,317 |
| Oct-16 | 66,707 | 46,184 | 2,152 | 1,490 |
| Nov-16 | 63,366 | 47,211 | 2,112 | 1,574 |
| Dec-16 | 58,416 | 43,251 | 1,884 | 1,395 |
| Jan-17 | 42,458 | 31,576 | 1,370 | 1,019 |
| Feb-17 | 23,555 | 18,754 | 841 | 670 |
| Mar-17 | 16,592 | 12,195 | 535 | 393 |
| Apr-17 | 15,768 | 11,127 | 526 | 371 |
| May-17 | 19,940 | 14,519 | 643 | 468 |
| Jun-17 | 21,657 | 16,087 | 722 | 536 |
| Jul-17 | 25,014 | 18,187 | 807 | 587 |
| Aug-17 | 30,569 | 22,288 | 986 | 719 |
| Sep-17 | 31,157 | 22,537 | 1,039 | 751 |
| Oct-17 | 34,842 | 25,488 | 1,124 | 822 |
| Nov-17 | 39,031 | 29,085 | 1,301 | 970 |
| Dec-17 | 40,476 | 28,995 | 1,306 | 935 |
| Jan-18 | 35,865 | 25,975 | 1,157 | 838 |
| Feb-18 | 36,690 | 26,666 | 1,310 | 952 |
| Mar-18 | 50,213 | 37,390 | 1,620 | 1,206 |
| Apr-18 | 51,019 | 38,243 | 1,701 | 1,275 |
| May-18 | 51,790 | 40,339 | 1,671 | 1,301 |
| Jun-18 | 43,096 | 34,089 | 1,437 | 1,136 |
| Jul-18 | 40,005 | 31,299 | 1,290 | 1,010 |
| Aug-18 | 46,551 | 37,524 | 1,502 | 1,210 |
| Sep-18 | 50,366 | 41,486 | 1,679 | 1,383 |
| Oct-18 | 60,775 | 51,005 | 1,960 | 1,645 |
| Nov-18 | 62,463 | 51,857 | 2,082 | 1,729 |
| Dec-18 | 60,789 | 50,751 | 1,961 | 1,637 |
| Jan-19 | 58,313 | 47,979 | 1,881 | 1,548 |
| Feb-19 | 76,543 | 66,883 | 2,734 | 2,389 |
| Mar-19 | 103,730 | 92,833 | 3,346 | 2,995 |
| Apr-19 | 109,413 | 99,273 | 3,647 | 3,309 |
| May-19 | 144,113 | 132,856 | 4,649 | 4,286 |
| Jun-19 | 104,310 | 94,902 | 3,477 | 3,163 |
| Jul-19 | 81,748 | 71,978 | 2,637 | 2,322 |
| Aug-19 | 62,608 | 50,684 | 2,020 | 1,635 |
| Sep-19 | 52,424 | 40,507 | 1,747 | 1,350 |
| Oct-19 | 45,139 | 35,402 | 1,456 | 1,142 |
| Nov-19 | 42,642 | 33,524 | 1,421 | 1,117 |
| Dec-19 | 40,563 | 32,853 | 1,308 | 1,060 |
| Jan-20 | 36,583 | 29,205 | 1,180 | 942 |
| Feb-20 | 36,686 | 30,077 | 1,310 | 1,074 |
| Mar-20 | 34,457 | 30,389 | 1,112 | 980 |
| Apr-20 | 17,106 | 16,182 | 570 | 539 |
| May-20 | 23,237 | 21,593 | 750 | 697 |
| Jun-20 | 33,029 | 30,816 | 1,101 | 1,027 |
| Jul-20 | 40,949 | 38,556 | 1,321 | 1,244 |
| Aug-20 | 50,007 | 47,276 | 1,613 | 1,525 |
| Sep-20 | 57,668 | 54,762 | 1,922 | 1,825 |
| Oct-20 | 71,943 | 69,048 | 2,321 | 2,227 |
| Nov-20 | 72,113 | 69,169 | 2,404 | 2,306 |
| Dec-20 | 73,994 | 71,141 | 2,387 | 2,295 |
| Jan-21 | 78,414 | 75,316 | 2,529 | 2,430 |
| Feb-21 | 101,098 | 97,643 | 3,611 | 3,487 |
| Mar-21 | 173,277 | 169,216 | 5,590 | 5,459 |
| Apr-21 | 178,795 | 173,699 | 5,960 | 5,790 |
| May-21 | 180,597 | 172,654 | 5,826 | 5,569 |
| Jun-21 | 189,034 | 178,649 | 6,301 | 5,955 |
| Jul-21 | 213,593 | 200,658 | 6,890 | 6,473 |
| Aug-21 | 209,840 | 196,514 | 6,769 | 6,339 |
| Sep-21 | 192,001 | 185,515 | 6,400 | 6,184 |
| Oct-21 | 164,837 | 159,113 | 5,317 | 5,133 |
| Nov-21 | 174,845 | 167,015 | 5,828 | 5,567 |
| Dec-21 | 179,253 | 170,602 | 5,782 | 5,503 |
| Jan-22 | 154,874 | 147,877 | 4,996 | 4,770 |
| Feb-22 | 166,010 | 159,170 | 5,929 | 5,685 |
| Mar-22 | 222,574 | 211,181 | 7,180 | 6,812 |
| Apr-22 | 235,785 | 203,504 | 7,860 | 6,783 |
| May-22 | 241,136 | 224,370 | 7,779 | 7,238 |
| Jun-22 | 207,834 | 192,399 | 6,928 | 6,413 |
| Jul-22 | 200,162 | 181,834 | 6,457 | 5,866 |
| Aug-22 | 204,087 | 181,774 | 6,583 | 5,864 |
| Sep-22 | 227,547 | 207,597 | 7,585 | 6,920 |
| Oct-22 | 231,529 | 205,134 | 7,469 | 6,617 |
| Nov-22 | 235,173 | 207,680 | 7,839 | 6,923 |
| Dec-22 | 252,315 | 222,018 | 8,139 | 7,162 |
| Jan-23 | 157,358 | 129,513 | 5,076 | 4,178 |
| Feb-23 | 156,630 | 130,521 | 5,594 | 4,661 |
| Mar-23 | 193,249 | 163,672 | 6,234 | 5,280 |
| Apr-23 | 211,992 | 183,921 | 7,066 | 6,131 |
| May-23 | 206,690 | 171,382 | 6,667 | 5,528 |
| Jun-23 | 144,556 | 99,538 | 4,819 | 3,318 |
| Jul-23 | 183,479 | 132,642 | 5,919 | 4,279 |
| Aug-23 | 232,963 | 181,054 | 7,515 | 5,840 |
| Sep-23 | 269,735 | 218,763 | 8,991 | 7,292 |
| Oct-23 | 240,932 | 188,754 | 8,031 | 6,292 |
| Nov-23 | 242,413 | 191,119 | 8,080 | 6,371 |
| Dec-23 | 301,980 | 249,737 | 10,066 | 8,325 |
| Jan-24 | 176,189 | 124,204 | 5,684 | 4,007 |
| Feb-24 | 189,914 | 140,638 | 6,549 | 4,850 |
| Mar-24 | 189,371 | 137,480 | 6,109 | 4,435 |

Notes: Data on encounters at POE not available for Fys 2000-2003.
Source: March 2024 Persist Dataset

From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period—May 2019 when USBP encounters peaked at 4,300 during that year's surge.
For most of this period (from FY 2009 through FY 2018), the share of encounters processed for expedited removal and the share of those processed through expedited removal making fear claims generally increased, so that during FY 2018, 41 percent of SWB encounters were processed for expedited removal and 45 percent of those processed for expedited removal made fear claims, yielding an all-time high of 18 percent of all encounters making fear claims. OHSS analysis of OHSS Persist Dataset March 2024. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that the vast majority (84 percent) of all fear claims made in prior years were made by SWB encounters. Even if 100 percent of fear claims made before FY 2013 were made by SWB encounters, FY 2018 would represent the all-time

| Year | Encounter | SWB Enc | SWB T8 e | SWB CBP | SWB CBP | Total APS | Lifecycle E | Estimated | ER as % o | Fear claim | Fear Claim | Fear claims as % of assuming 100% of Fear claims originate at SWB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | #### | #### | #### | #### | NA | 10,284 | - | NA | | | | |
| 2001 | #### | #### | #### | #### | NA | 13,241 | - | NA | | | | |
| 2002 | 953,629 | 930,293 | 930,293 | 930,293 | NA | 10,204 | - | NA | | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 906,694 | NA | 6,480 | - | NA | | | | |
| 2004 | #### | #### | #### | #### | NA | 8,230 | - | NA | | | | |
| 2005 | #### | #### | #### | ####### | 81,450 | 9,696 | | 8,164 | 6% | 10% | 0.6% | 11.9% |
| 2006 | #### | #### | #### | ####### | 95,132 | 5,660 | | 4,766 | 8% | 5% | 0.4% | 5.9% |
| 2007 | #### | 954,907 | 954,907 | 954,928 | 92,551 | 5,770 | | 4,858 | 10% | 5% | 0.5% | 6.2% |
| 2008 | 946,642 | 792,535 | 792,535 | 792,553 | 107,684 | 5,753 | | 4,844 | 14% | 4% | 1% | 5.3% |
| 2009 | 779,816 | 619,010 | 619,010 | 619,123 | 103,107 | 6,617 | | 5,571 | 17% | 5% | 1% | 6.4% |
| 2010 | 692,904 | 527,372 | 527,372 | 527,419 | 111,935 | 11,030 | | 9,287 | 21% | 8% | 2% | 9.9% |
| 2011 | 553,597 | 401,073 | 401,073 | 401,073 | 125,101 | 14,405 | | 12,129 | 31% | 10% | 3% | 11.5% |
| 2012 | 560,572 | 426,125 | 426,125 | 426,125 | 175,319 | 18,629 | | 15,685 | 41% | 9% | 4% | 10.6% |
| 2013 | 626,412 | 489,612 | 489,612 | 489,612 | 230,003 | 43,231 | 35,991 | | 47% | 16% | 7% | |
| 2014 | 711,667 | 570,048 | 570,048 | 570,048 | 228,263 | 59,186 | 48,750 | | 40% | 21% | 9% | |
| 2015 | 591,831 | 444,856 | 444,856 | 444,856 | 180,682 | 55,411 | 46,387 | | 41% | 26% | 10% | |
| 2016 | 690,433 | 558,991 | 558,991 | 558,991 | 228,020 | 102,973 | 92,699 | | 41% | 41% | 17% | |
| 2017 | 526,807 | 415,199 | 415,199 | 415,199 | 160,401 | 88,448 | 68,722 | | 39% | 43% | 17% | |
| 2018 | 626,035 | 519,944 | 519,944 | 519,944 | 214,820 | 109,896 | 95,618 | | 41% | 45% | 18% | |
| 2019 | #### | 977,229 | 977,229 | 977,229 | 223,314 | 118,387 | 98,266 | | 23% | 44% | 10% | |
| 2020 | 561,718 | 458,082 | 253,292 | 458,066 | 91,770 | 39,524 | 23,942 | | 20% | 26% | 9% | |
| 2021 | #### | #### | 671,159 | ####### | 84,707 | 64,244 | 48,982 | | 5% | 58% | 7% | |
| 2022 | #### | #### | #### | ####### | 119,677 | 75,264 | 50,016 | | 5% | 42% | 4% | |
| 2023 | #### | #### | #### | ####### | 207,344 | 160,868 | 122,329 | | 8% | 59% | 6% | |
| 2013-2019 [4] | | | | | | | 577,532 | 486,433 | 84% | | | |

Note: Encounters between POEs were not amenable to ER until Aug. 2004.

[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border.

[2] OIS Lifecycle data on Total Southwest Border Fear Claims.

[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data [Southwest

[4] The sum of credible fear claims for available matching data years. Used to estimate the proportion of Lifecycle

Source: APSO Global and OHSS Lifecyle data

[4] The sum of credible fear claims for available matching data years. Used to

Source: APSO Global and OHSS Persist Data. ships, only one citizenship is (

weekly average CFIs: % increase from 2014-19

* FY2024 as of April 2nd, 2024

** Fy2024 as of December 31, 2023.

Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs even above 2,500 per day.
OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

SWB Encounters, FY 2000 - FY 2024 YTD (March)

| # months FY2009-20 with USBP average daily >= 2,500 | 4 |
|---|---|
| # months FY2009-20 with CBP average daily >= 2,500 | 6 |

| Date | CBP monthly encounters | USBP monthly encounters | CBP daily encounters | USBP daily encounters |
|---|---|---|---|---|
| Oct-99 | 87,819 | 87,819 | 2,833 | 2,833 |
| Nov-99 | 74,362 | 74,362 | 2,479 | 2,479 |
| Dec-99 | 66,256 | 66,256 | 2,137 | 2,137 |
| Jan-00 | 175,383 | 175,383 | 5,658 | 5,658 |
| Feb-00 | 200,619 | 200,619 | 7,165 | 7,165 |
| Mar-00 | 209,311 | 209,311 | 6,752 | 6,752 |
| Apr-00 | 170,621 | 170,621 | 5,687 | 5,687 |
| May-00 | 155,961 | 155,961 | 5,031 | 5,031 |
| Jun-00 | 103,856 | 103,856 | 3,462 | 3,462 |
| Jul-00 | 111,963 | 111,963 | 3,612 | 3,612 |
| Aug-00 | 113,448 | 113,448 | 3,660 | 3,660 |
| Sep-00 | 96,822 | 96,822 | 3,227 | 3,227 |
| Oct-00 | 81,995 | 81,995 | 2,645 | 2,645 |
| Nov-00 | 67,217 | 67,217 | 2,241 | 2,241 |
| Dec-00 | 54,828 | 54,828 | 1,769 | 1,769 |
| Jan-01 | 124,586 | 124,586 | 4,019 | 4,019 |
| Feb-01 | 150,616 | 150,616 | 5,379 | 5,379 |
| Mar-01 | 169,904 | 169,904 | 5,481 | 5,481 |
| Apr-01 | 142,040 | 142,040 | 4,735 | 4,735 |
| May-01 | 123,054 | 123,054 | 3,969 | 3,969 |
| Jun-01 | 89,034 | 89,034 | 2,968 | 2,968 |
| Jul-01 | 83,853 | 83,853 | 2,705 | 2,705 |
| Aug-01 | 84,837 | 84,837 | 2,737 | 2,737 |
| Sep-01 | 59,448 | 59,448 | 1,982 | 1,982 |
| Oct-01 | 37,746 | 37,746 | 1,218 | 1,218 |
| Nov-01 | 32,694 | 32,694 | 1,090 | 1,090 |
| Dec-01 | 31,531 | 31,531 | 1,017 | 1,017 |
| Jan-02 | 79,647 | 79,647 | 2,569 | 2,569 |
| Feb-02 | 95,645 | 95,645 | 3,416 | 3,416 |
| Mar-02 | 126,906 | 126,906 | 4,094 | 4,094 |
| Apr-02 | 121,908 | 121,908 | 4,064 | 4,064 |
| May-02 | 97,571 | 97,571 | 3,147 | 3,147 |
| Jun-02 | 78,730 | 78,730 | 2,624 | 2,624 |
| Jul-02 | 76,719 | 76,719 | 2,475 | 2,475 |
| Aug-02 | 82,860 | 82,860 | 2,673 | 2,673 |
| Sep-02 | 68,384 | 68,384 | 2,279 | 2,279 |
| Oct-02 | 61,913 | 61,913 | 1,997 | 1,997 |
| Nov-02 | 47,919 | 47,919 | 1,597 | 1,597 |
| Dec-02 | 37,930 | 37,930 | 1,224 | 1,224 |
| Jan-03 | 87,002 | 87,002 | 2,807 | 2,807 |
| Feb-03 | 97,016 | 97,016 | 3,465 | 3,465 |
| Mar-03 | 98,625 | 98,625 | 3,181 | 3,181 |
| Apr-03 | 75,564 | 75,564 | 2,519 | 2,519 |
| May-03 | 88,845 | 88,845 | 2,866 | 2,866 |
| Jun-03 | 75,634 | 75,634 | 2,521 | 2,521 |
| Jul-03 | 79,396 | 79,396 | 2,561 | 2,561 |
| Aug-03 | 84,651 | 84,651 | 2,731 | 2,731 |
| Sep-03 | 72,239 | 72,239 | 2,408 | 2,408 |
| Oct-03 | 69,246 | 65,388 | 2,234 | 2,109 |
| Nov-03 | 62,452 | 57,942 | 2,082 | 1,931 |
| Dec-03 | 48,280 | 43,663 | 1,557 | 1,408 |
| Jan-04 | 98,764 | 92,751 | 3,186 | 2,992 |
| Feb-04 | 116,398 | 110,824 | 4,157 | 3,958 |
| Mar-04 | 162,530 | 155,089 | 5,243 | 5,003 |
| Apr-04 | 142,491 | 135,632 | 4,750 | 4,521 |
| May-04 | 125,502 | 118,811 | 4,048 | 3,833 |
| Jun-04 | 101,178 | 94,607 | 3,373 | 3,154 |
| Jul-04 | 98,989 | 92,152 | 3,193 | 2,973 |
| Aug-04 | 99,986 | 93,299 | 3,225 | 3,010 |
| Sep-04 | 85,877 | 80,089 | 2,863 | 2,670 |
| Oct-04 | 81,687 | 75,908 | 2,635 | 2,449 |
| Nov-04 | 70,617 | 65,110 | 2,354 | 2,170 |
| Dec-04 | 54,028 | 48,410 | 1,743 | 1,562 |
| Jan-05 | 101,552 | 93,029 | 3,276 | 3,001 |
| Feb-05 | 121,177 | 113,776 | 4,328 | 4,063 |
| Mar-05 | 150,892 | 142,044 | 4,867 | 4,614 |
| Apr-05 | 148,688 | 140,074 | 4,956 | 4,669 |
| May-05 | 125,226 | 115,817 | 4,040 | 3,736 |
| Jun-05 | 99,490 | 90,796 | 3,316 | 3,027 |
| Jul-05 | 105,093 | 94,964 | 3,390 | 3,063 |
| Aug-05 | 107,620 | 96,765 | 3,471 | 3,121 |
| Sep-05 | 103,177 | 93,718 | 3,439 | 3,124 |
| Oct-05 | 91,935 | 82,561 | 2,966 | 2,696 |
| Nov-05 | 78,817 | 70,954 | 2,627 | 2,365 |
| Dec-05 | 60,375 | 52,663 | 1,948 | 1,699 |
| Jan-06 | 110,987 | 101,262 | 3,580 | 3,267 |
| Feb-06 | 132,780 | 125,030 | 4,742 | 4,465 |
| Mar-06 | 169,077 | 160,696 | 5,454 | 5,184 |
| Apr-06 | 133,964 | 126,554 | 4,465 | 4,218 |
| May-06 | 112,011 | 105,443 | 3,615 | 3,401 |
| Jun-06 | 76,274 | 68,365 | 2,542 | 2,279 |
| Jul-06 | 67,436 | 59,633 | 2,182 | 1,924 |
| Aug-06 | 67,631 | 59,733 | 2,182 | 1,927 |
| Sep-06 | 65,571 | 58,082 | 2,186 | 1,936 |
| Oct-06 | 68,985 | 60,726 | 2,196 | 1,959 |
| Nov-06 | 58,199 | 51,592 | 1,940 | 1,720 |
| Dec-06 | 47,537 | 40,527 | 1,533 | 1,307 |
| Jan-07 | 79,794 | 72,000 | 2,574 | 2,323 |
| Feb-07 | 86,455 | 79,273 | 3,087 | 2,831 |
| Mar-07 | 122,450 | 114,136 | 3,950 | 3,682 |
| Apr-07 | 112,773 | 104,465 | 3,759 | 3,482 |
| May-07 | 97,196 | 88,510 | 3,135 | 2,855 |
| Jun-07 | 79,997 | 71,336 | 2,667 | 2,378 |
| Jul-07 | 75,766 | 66,793 | 2,444 | 2,155 |
| Aug-07 | 69,142 | 59,801 | 2,230 | 1,929 |
| Sep-07 | 57,556 | 49,577 | 1,919 | 1,653 |
| Oct-07 | 58,616 | 51,355 | 1,891 | 1,657 |
| Nov-07 | 48,693 | 42,208 | 1,623 | 1,407 |
| Dec-07 | 38,556 | 31,824 | 1,244 | 1,027 |
| Jan-08 | 66,471 | 59,034 | 2,144 | 1,904 |
| Feb-08 | 80,724 | 73,483 | 2,883 | 2,624 |
| Mar-08 | 97,774 | 89,769 | 3,154 | 2,896 |
| Apr-08 | 99,518 | 91,552 | 3,317 | 3,052 |
| May-08 | 77,048 | 69,240 | 2,485 | 2,234 |
| Jun-08 | 60,492 | 53,850 | 2,016 | 1,795 |
| Jul-08 | 56,806 | 49,468 | 1,832 | 1,596 |
| Aug-08 | 56,142 | 48,544 | 1,811 | 1,566 |
| Sep-08 | 51,713 | 44,722 | 1,724 | 1,491 |
| Oct-08 | 49,217 | 42,937 | 1,588 | 1,385 |
| Nov-08 | 38,450 | 32,782 | 1,282 | 1,093 |
| Dec-08 | 31,206 | 25,946 | 1,007 | 837 |
| Jan-09 | 50,737 | 44,503 | 1,637 | 1,436 |
| Feb-09 | 55,132 | 49,211 | 1,969 | 1,758 |
| Mar-09 | 74,323 | 67,342 | 2,398 | 2,172 |
| Apr-09 | 65,129 | 58,493 | 2,171 | 1,950 |
| May-09 | 57,593 | 50,883 | 1,858 | 1,641 |
| Jun-09 | 52,600 | 46,044 | 1,753 | 1,535 |
| Jul-09 | 50,986 | 43,841 | 1,645 | 1,414 |
| Aug-09 | 51,084 | 43,519 | 1,648 | 1,404 |
| Sep-09 | 42,666 | 35,350 | 1,422 | 1,178 |
| Oct-09 | 47,290 | 40,890 | 1,525 | 1,319 |
| Nov-09 | 39,064 | 32,815 | 1,302 | 1,094 |
| Dec-09 | 31,352 | 25,034 | 1,011 | 808 |
| Jan-10 | 40,741 | 34,784 | 1,314 | 1,122 |
| Feb-10 | 48,752 | 42,790 | 1,741 | 1,528 |
| Mar-10 | 69,152 | 61,361 | 2,231 | 1,979 |
| Apr-10 | 62,351 | 55,237 | 2,078 | 1,841 |
| May-10 | 54,058 | 47,045 | 1,743 | 1,518 |
| Jun-10 | 39,308 | 32,955 | 1,310 | 1,099 |
| Jul-10 | 32,363 | 25,609 | 1,044 | 826 |
| Aug-10 | 33,717 | 26,415 | 1,088 | 852 |
| Sep-10 | 29,310 | 22,796 | 977 | 760 |
| Oct-10 | 32,951 | 26,163 | 1,063 | 844 |
| Nov-10 | 28,516 | 22,405 | 951 | 747 |
| Dec-10 | 25,728 | 19,429 | 830 | 627 |
| Jan-11 | 29,737 | 23,926 | 959 | 772 |
| Feb-11 | 34,408 | 28,786 | 1,229 | 1,028 |
| Mar-11 | 48,920 | 42,014 | 1,578 | 1,355 |
| Apr-11 | 42,759 | 36,251 | 1,425 | 1,208 |
| May-11 | 37,543 | 31,226 | 1,211 | 1,008 |
| Jun-11 | 32,909 | 27,166 | 1,097 | 906 |
| Jul-11 | 29,520 | 23,170 | 952 | 747 |
| Aug-11 | 30,216 | 24,166 | 975 | 780 |
| Sep-11 | 28,386 | 22,863 | 946 | 762 |
| Oct-11 | 31,344 | 25,612 | 1,011 | 826 |
| Nov-11 | 28,617 | 23,368 | 954 | 779 |
| Dec-11 | 24,380 | 18,983 | 786 | 612 |
| Jan-12 | 30,798 | 25,714 | 993 | 829 |
| Feb-12 | 37,009 | 31,579 | 1,322 | 1,128 |
| Mar-12 | 48,538 | 42,218 | 1,566 | 1,362 |
| Apr-12 | 46,680 | 40,628 | 1,556 | 1,354 |
| May-12 | 43,020 | 36,966 | 1,388 | 1,192 |
| Jun-12 | 36,808 | 30,669 | 1,227 | 1,022 |
| Jul-12 | 32,833 | 26,978 | 1,059 | 870 |
| Aug-12 | 33,699 | 27,567 | 1,087 | 889 |
| Sep-12 | 32,399 | 26,591 | 1,080 | 886 |
| Oct-12 | 34,847 | 28,929 | 1,124 | 933 |
| Nov-12 | 33,159 | 27,636 | 1,105 | 921 |
| Dec-12 | 29,077 | 23,243 | 938 | 750 |
| Jan-13 | 32,485 | 26,921 | 1,048 | 868 |
| Feb-13 | 40,636 | 35,042 | 1,451 | 1,252 |
| Mar-13 | 54,010 | 47,293 | 1,742 | 1,526 |
| Apr-13 | 54,771 | 48,212 | 1,826 | 1,607 |
| May-13 | 50,500 | 43,856 | 1,629 | 1,415 |
| Jun-13 | 40,790 | 34,436 | 1,360 | 1,148 |
| Jul-13 | 40,006 | 33,230 | 1,291 | 1,072 |
| Aug-13 | 41,125 | 33,797 | 1,327 | 1,090 |
| Sep-13 | 38,206 | 31,802 | 1,274 | 1,060 |
| Oct-13 | 41,835 | 35,312 | 1,350 | 1,139 |
| Nov-13 | 38,692 | 31,896 | 1,290 | 1,063 |
| Dec-13 | 36,707 | 29,528 | 1,184 | 953 |
| Jan-14 | 35,200 | 28,668 | 1,135 | 925 |
| Feb-14 | 42,473 | 36,403 | 1,517 | 1,300 |
| Mar-14 | 57,548 | 49,596 | 1,856 | 1,600 |
| Apr-14 | 59,383 | 51,502 | 1,979 | 1,717 |
| May-14 | 69,033 | 60,683 | 2,227 | 1,958 |
| Jun-14 | 66,572 | 57,861 | 2,219 | 1,929 |
| Jul-14 | 48,833 | 40,708 | 1,575 | 1,313 |
| Aug-14 | 39,766 | 31,388 | 1,283 | 1,013 |
| Sep-14 | 34,006 | 25,825 | 1,134 | 861 |
| Oct-14 | 35,903 | 26,450 | 1,158 | 853 |
| Nov-14 | 33,024 | 24,641 | 1,101 | 821 |
| Dec-14 | 34,231 | 25,019 | 1,104 | 807 |
| Jan-15 | 30,179 | 21,514 | 974 | 694 |
| Feb-15 | 32,554 | 24,376 | 1,163 | 871 |
| Mar-15 | 39,162 | 29,791 | 1,263 | 961 |
| Apr-15 | 38,299 | 29,750 | 1,277 | 992 |
| May-15 | 40,684 | 31,576 | 1,312 | 1,019 |
| Jun-15 | 38,620 | 29,303 | 1,287 | 977 |
| Jul-15 | 38,610 | 28,388 | 1,245 | 916 |
| Aug-15 | 42,419 | 30,239 | 1,368 | 975 |
| Sep-15 | 41,171 | 30,286 | 1,372 | 1,010 |
| Oct-15 | 45,245 | 32,724 | 1,460 | 1,056 |
| Nov-15 | 45,387 | 32,838 | 1,513 | 1,095 |
| Dec-15 | 48,393 | 37,014 | 1,561 | 1,194 |
| Jan-16 | 33,396 | 23,758 | 1,077 | 766 |
| Feb-16 | 38,068 | 26,072 | 1,360 | 931 |
| Mar-16 | 45,779 | 33,316 | 1,477 | 1,075 |
| Apr-16 | 48,271 | 38,089 | 1,609 | 1,270 |
| May-16 | 54,987 | 40,337 | 1,774 | 1,301 |
| Jun-16 | 45,168 | 34,450 | 1,506 | 1,148 |
| Jul-16 | 46,658 | 33,723 | 1,505 | 1,088 |
| Aug-16 | 51,569 | 37,048 | 1,664 | 1,195 |
| Sep-16 | 56,070 | 39,501 | 1,869 | 1,317 |
| Oct-16 | 66,707 | 46,184 | 2,152 | 1,490 |
| Nov-16 | 63,366 | 47,211 | 2,112 | 1,574 |
| Dec-16 | 58,416 | 43,251 | 1,884 | 1,395 |
| Jan-17 | 42,458 | 31,576 | 1,370 | 1,019 |
| Feb-17 | 23,555 | 18,754 | 841 | 670 |
| Mar-17 | 16,592 | 12,195 | 535 | 393 |
| Apr-17 | 15,768 | 11,127 | 526 | 371 |
| May-17 | 19,940 | 14,519 | 643 | 468 |
| Jun-17 | 21,657 | 16,087 | 722 | 536 |
| Jul-17 | 25,014 | 18,187 | 807 | 587 |
| Aug-17 | 30,569 | 22,288 | 986 | 719 |
| Sep-17 | 31,157 | 22,537 | 1,039 | 751 |
| Oct-17 | 34,842 | 25,488 | 1,124 | 822 |
| Nov-17 | 39,031 | 29,085 | 1,301 | 970 |
| Dec-17 | 40,476 | 28,995 | 1,306 | 935 |
| Jan-18 | 35,865 | 25,975 | 1,157 | 838 |
| Feb-18 | 36,690 | 26,666 | 1,310 | 952 |
| Mar-18 | 50,213 | 37,390 | 1,620 | 1,206 |
| Apr-18 | 51,019 | 38,243 | 1,701 | 1,275 |
| May-18 | 51,790 | 40,339 | 1,671 | 1,301 |
| Jun-18 | 43,096 | 34,089 | 1,437 | 1,136 |
| Jul-18 | 40,005 | 31,299 | 1,290 | 1,010 |
| Aug-18 | 46,551 | 37,524 | 1,502 | 1,210 |
| Sep-18 | 50,366 | 41,486 | 1,679 | 1,383 |
| Oct-18 | 60,775 | 51,005 | 1,960 | 1,645 |
| Nov-18 | 62,463 | 51,857 | 2,082 | 1,729 |
| Dec-18 | 60,789 | 50,751 | 1,961 | 1,637 |
| Jan-19 | 58,313 | 47,979 | 1,881 | 1,548 |
| Feb-19 | 76,543 | 66,883 | 2,734 | 2,389 |
| Mar-19 | 103,730 | 92,833 | 3,346 | 2,995 |
| Apr-19 | 109,413 | 99,273 | 3,647 | 3,309 |
| May-19 | 144,113 | 132,856 | 4,649 | 4,286 |
| Jun-19 | 104,310 | 94,902 | 3,477 | 3,163 |
| Jul-19 | 81,748 | 71,978 | 2,637 | 2,322 |
| Aug-19 | 62,608 | 50,684 | 2,020 | 1,635 |
| Sep-19 | 52,424 | 40,507 | 1,747 | 1,350 |
| Oct-19 | 45,139 | 35,402 | 1,456 | 1,142 |
| Nov-19 | 42,642 | 33,524 | 1,421 | 1,117 |
| Dec-19 | 40,563 | 32,853 | 1,308 | 1,060 |
| Jan-20 | 36,583 | 29,205 | 1,180 | 942 |
| Feb-20 | 36,686 | 30,077 | 1,310 | 1,074 |
| Mar-20 | 34,457 | 30,389 | 1,112 | 980 |
| Apr-20 | 17,106 | 16,182 | 570 | 539 |
| May-20 | 23,237 | 21,593 | 750 | 697 |
| Jun-20 | 33,029 | 30,816 | 1,101 | 1,027 |
| Jul-20 | 40,949 | 38,556 | 1,321 | 1,244 |
| Aug-20 | 50,007 | 47,276 | 1,613 | 1,525 |
| Sep-20 | 57,668 | 54,762 | 1,922 | 1,825 |
| Oct-20 | 71,943 | 69,048 | 2,321 | 2,227 |
| Nov-20 | 72,113 | 69,169 | 2,404 | 2,306 |
| Dec-20 | 73,994 | 71,141 | 2,387 | 2,295 |
| Jan-21 | 78,414 | 75,316 | 2,529 | 2,430 |
| Feb-21 | 101,098 | 97,643 | 3,611 | 3,487 |
| Mar-21 | 173,277 | 169,216 | 5,590 | 5,459 |
| Apr-21 | 178,795 | 173,699 | 5,960 | 5,790 |
| May-21 | 180,597 | 172,654 | 5,826 | 5,569 |
| Jun-21 | 189,034 | 178,649 | 6,301 | 5,955 |
| Jul-21 | 213,593 | 200,658 | 6,890 | 6,473 |
| Aug-21 | 209,840 | 196,514 | 6,769 | 6,339 |
| Sep-21 | 192,001 | 185,515 | 6,400 | 6,184 |
| Oct-21 | 164,837 | 159,113 | 5,317 | 5,133 |
| Nov-21 | 174,845 | 167,015 | 5,828 | 5,567 |
| Dec-21 | 179,253 | 170,602 | 5,782 | 5,503 |
| Jan-22 | 154,874 | 147,877 | 4,996 | 4,770 |
| Feb-22 | 166,010 | 159,170 | 5,929 | 5,685 |
| Mar-22 | 222,574 | 211,181 | 7,180 | 6,812 |
| Apr-22 | 235,785 | 203,504 | 7,860 | 6,783 |
| May-22 | 241,136 | 224,370 | 7,779 | 7,238 |
| Jun-22 | 207,834 | 192,399 | 6,928 | 6,413 |
| Jul-22 | 200,162 | 181,834 | 6,457 | 5,866 |
| Aug-22 | 204,087 | 181,774 | 6,583 | 5,864 |
| Sep-22 | 227,547 | 207,597 | 7,585 | 6,920 |
| Oct-22 | 231,529 | 205,134 | 7,469 | 6,617 |
| Nov-22 | 235,173 | 207,680 | 7,839 | 6,923 |
| Dec-22 | 252,315 | 222,018 | 8,139 | 7,162 |
| Jan-23 | 157,358 | 129,513 | 5,076 | 4,178 |
| Feb-23 | 156,630 | 130,521 | 5,594 | 4,661 |
| Mar-23 | 193,249 | 163,672 | 6,234 | 5,280 |
| Apr-23 | 211,992 | 183,921 | 7,066 | 6,131 |
| May-23 | 206,690 | 171,382 | 6,667 | 5,528 |
| Jun-23 | 144,556 | 99,538 | 4,819 | 3,318 |
| Jul-23 | 183,479 | 132,642 | 5,919 | 4,279 |
| Aug-23 | 232,963 | 181,054 | 7,515 | 5,840 |
| Sep-23 | 269,735 | 218,763 | 8,991 | 7,292 |
| Oct-23 | 240,932 | 188,754 | 8,031 | 6,292 |
| Nov-23 | 242,413 | 191,119 | 8,080 | 6,371 |
| Dec-23 | 301,980 | 249,737 | 10,066 | 8,325 |
| Jan-24 | 176,189 | 124,204 | 5,684 | 4,007 |
| Feb-24 | 189,914 | 140,638 | 6,549 | 4,850 |
| Mar-24 | 189,371 | 137,480 | 6,109 | 4,435 |

Notes: Data on encounters at POE not available for Fys 2000-2003.
Source: March 2024 Persist Dataset

Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs even above 2,500 per day.
OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

SWB Encounters, FY 2000 - FY 2024 YTD (March)

Mos. Apr. 2006 - Feb. 2021 with USBP average daily >= 5,000 | 0

| Date | CBP monthly encounters | USBP monthly encounters | CBP daily encounters | USBP daily encounters |
|---|---|---|---|---|
| Oct-99 | 87,819 | 87,819 | 2,833 | 2,833 |
| Nov-99 | 74,362 | 74,362 | 2,479 | 2,479 |
| Dec-99 | 66,256 | 66,256 | 2,137 | 2,137 |
| Jan-00 | 175,383 | 175,383 | 5,658 | 5,658 |
| Feb-00 | 200,619 | 200,619 | 7,165 | 7,165 |
| Mar-00 | 209,311 | 209,311 | 6,752 | 6,752 |
| Apr-00 | 170,621 | 170,621 | 5,687 | 5,687 |
| May-00 | 155,961 | 155,961 | 5,031 | 5,031 |
| Jun-00 | 103,856 | 103,856 | 3,462 | 3,462 |
| Jul-00 | 111,963 | 111,963 | 3,612 | 3,612 |
| Aug-00 | 113,448 | 113,448 | 3,660 | 3,660 |
| Sep-00 | 96,822 | 96,822 | 3,227 | 3,227 |
| Oct-00 | 81,995 | 81,995 | 2,645 | 2,645 |
| Nov-00 | 67,217 | 67,217 | 2,241 | 2,241 |
| Dec-00 | 54,828 | 54,828 | 1,769 | 1,769 |
| Jan-01 | 124,586 | 124,586 | 4,019 | 4,019 |
| Feb-01 | 150,616 | 150,616 | 5,379 | 5,379 |
| Mar-01 | 169,904 | 169,904 | 5,481 | 5,481 |
| Apr-01 | 142,040 | 142,040 | 4,735 | 4,735 |
| May-01 | 123,054 | 123,054 | 3,969 | 3,969 |
| Jun-01 | 89,034 | 89,034 | 2,968 | 2,968 |
| Jul-01 | 83,853 | 83,853 | 2,705 | 2,705 |
| Aug-01 | 84,837 | 84,837 | 2,737 | 2,737 |
| Sep-01 | 59,448 | 59,448 | 1,982 | 1,982 |
| Oct-01 | 37,746 | 37,746 | 1,218 | 1,218 |
| Nov-01 | 32,694 | 32,694 | 1,090 | 1,090 |
| Dec-01 | 31,531 | 31,531 | 1,017 | 1,017 |
| Jan-02 | 79,647 | 79,647 | 2,569 | 2,569 |
| Feb-02 | 95,645 | 95,645 | 3,416 | 3,416 |
| Mar-02 | 126,906 | 126,906 | 4,094 | 4,094 |
| Apr-02 | 121,908 | 121,908 | 4,064 | 4,064 |
| May-02 | 97,571 | 97,571 | 3,147 | 3,147 |
| Jun-02 | 78,730 | 78,730 | 2,624 | 2,624 |
| Jul-02 | 76,719 | 76,719 | 2,475 | 2,475 |
| Aug-02 | 82,860 | 82,860 | 2,673 | 2,673 |
| Sep-02 | 68,384 | 68,384 | 2,279 | 2,279 |
| Oct-02 | 61,913 | 61,913 | 1,997 | 1,997 |
| Nov-02 | 47,919 | 47,919 | 1,597 | 1,597 |
| Dec-02 | 37,930 | 37,930 | 1,224 | 1,224 |
| Jan-03 | 87,002 | 87,002 | 2,807 | 2,807 |
| Feb-03 | 97,016 | 97,016 | 3,465 | 3,465 |
| Mar-03 | 98,625 | 98,625 | 3,181 | 3,181 |
| Apr-03 | 75,564 | 75,564 | 2,519 | 2,519 |
| May-03 | 88,845 | 88,845 | 2,866 | 2,866 |
| Jun-03 | 75,634 | 75,634 | 2,521 | 2,521 |
| Jul-03 | 79,396 | 79,396 | 2,561 | 2,561 |
| Aug-03 | 84,651 | 84,651 | 2,731 | 2,731 |
| Sep-03 | 72,239 | 72,239 | 2,408 | 2,408 |
| Oct-03 | 69,246 | 65,388 | 2,234 | 2,109 |
| Nov-03 | 62,452 | 57,942 | 2,082 | 1,931 |
| Dec-03 | 48,280 | 43,663 | 1,557 | 1,408 |
| Jan-04 | 98,764 | 92,751 | 3,186 | 2,992 |
| Feb-04 | 116,398 | 110,824 | 4,157 | 3,958 |
| Mar-04 | 162,530 | 155,089 | 5,243 | 5,003 |
| Apr-04 | 142,491 | 135,632 | 4,750 | 4,521 |
| May-04 | 125,502 | 118,811 | 4,048 | 3,833 |
| Jun-04 | 101,178 | 94,607 | 3,373 | 3,154 |
| Jul-04 | 98,989 | 92,152 | 3,193 | 2,973 |
| Aug-04 | 99,986 | 93,299 | 3,225 | 3,010 |
| Sep-04 | 85,877 | 80,089 | 2,863 | 2,670 |
| Oct-04 | 81,687 | 75,908 | 2,635 | 2,449 |
| Nov-04 | 70,617 | 65,110 | 2,354 | 2,170 |
| Dec-04 | 54,028 | 48,410 | 1,743 | 1,562 |
| Jan-05 | 101,552 | 93,029 | 3,276 | 3,001 |
| Feb-05 | 121,177 | 113,776 | 4,328 | 4,063 |
| Mar-05 | 150,892 | 143,044 | 4,867 | 4,614 |
| Apr-05 | 148,688 | 140,074 | 4,956 | 4,669 |
| May-05 | 125,226 | 115,817 | 4,040 | 3,736 |
| Jun-05 | 99,490 | 90,796 | 3,316 | 3,027 |
| Jul-05 | 105,093 | 94,964 | 3,390 | 3,063 |
| Aug-05 | 107,620 | 96,745 | 3,472 | 3,121 |
| Sep-05 | 103,177 | 93,718 | 3,439 | 3,124 |
| Oct-05 | 91,935 | 83,561 | 2,966 | 2,696 |
| Nov-05 | 78,817 | 70,954 | 2,627 | 2,365 |
| Dec-05 | 60,375 | 52,663 | 1,948 | 1,699 |
| Jan-06 | 110,987 | 101,262 | 3,580 | 3,267 |
| Feb-06 | 132,780 | 125,030 | 4,742 | 4,465 |
| Mar-06 | 169,077 | 160,696 | 5,454 | 5,184 |
| Apr-06 | 133,964 | 126,554 | 4,465 | 4,218 |
| May-06 | 113,011 | 105,443 | 3,655 | 3,401 |
| Jun-06 | 76,274 | 68,565 | 2,542 | 2,279 |
| Jul-06 | 67,636 | 59,633 | 2,182 | 1,924 |
| Aug-06 | 67,631 | 59,733 | 2,182 | 1,927 |
| Sep-06 | 65,571 | 58,082 | 2,186 | 1,936 |
| Oct-06 | 68,983 | 60,726 | 2,196 | 1,959 |
| Nov-06 | 58,199 | 51,592 | 1,940 | 1,720 |
| Dec-06 | 47,507 | 40,527 | 1,533 | 1,307 |
| Jan-07 | 79,794 | 72,000 | 2,574 | 2,323 |
| Feb-07 | 86,435 | 79,273 | 3,087 | 2,831 |
| Mar-07 | 122,450 | 114,126 | 3,950 | 3,682 |
| Apr-07 | 112,773 | 104,465 | 3,759 | 3,482 |
| May-07 | 97,196 | 88,510 | 3,135 | 2,855 |
| Jun-07 | 78,997 | 71,336 | 2,667 | 2,378 |
| Jul-07 | 75,766 | 66,793 | 2,444 | 2,155 |
| Aug-07 | 69,142 | 59,801 | 2,230 | 1,929 |
| Sep-07 | 57,556 | 49,577 | 1,919 | 1,653 |
| Oct-07 | 58,616 | 51,355 | 1,891 | 1,657 |
| Nov-07 | 48,693 | 42,208 | 1,623 | 1,407 |
| Dec-07 | 38,556 | 31,824 | 1,244 | 1,027 |
| Jan-08 | 66,471 | 59,034 | 2,144 | 1,904 |
| Feb-08 | 80,724 | 73,483 | 2,883 | 2,624 |
| Mar-08 | 97,774 | 89,769 | 3,154 | 2,896 |
| Apr-08 | 99,518 | 91,552 | 3,317 | 3,052 |
| May-08 | 77,048 | 69,240 | 2,485 | 2,234 |
| Jun-08 | 60,492 | 53,850 | 2,016 | 1,795 |
| Jul-08 | 56,806 | 49,468 | 1,832 | 1,596 |
| Aug-08 | 56,142 | 48,544 | 1,811 | 1,566 |
| Sep-08 | 51,713 | 44,722 | 1,724 | 1,491 |
| Oct-08 | 49,217 | 42,937 | 1,588 | 1,385 |
| Nov-08 | 38,450 | 32,782 | 1,282 | 1,093 |
| Dec-08 | 31,206 | 25,946 | 1,007 | 837 |
| Jan-09 | 50,737 | 44,503 | 1,637 | 1,436 |
| Feb-09 | 55,132 | 49,211 | 1,969 | 1,758 |
| Mar-09 | 74,323 | 67,342 | 2,398 | 2,172 |
| Apr-09 | 65,129 | 58,493 | 2,171 | 1,950 |
| May-09 | 57,593 | 50,880 | 1,858 | 1,641 |
| Jun-09 | 52,600 | 46,044 | 1,753 | 1,535 |
| Jul-09 | 50,986 | 43,841 | 1,645 | 1,414 |
| Aug-09 | 51,084 | 43,519 | 1,648 | 1,404 |
| Sep-09 | 42,666 | 35,350 | 1,422 | 1,178 |
| Oct-09 | 47,290 | 40,890 | 1,525 | 1,319 |
| Nov-09 | 39,064 | 32,815 | 1,302 | 1,094 |
| Dec-09 | 31,352 | 25,034 | 1,011 | 808 |
| Jan-10 | 40,741 | 34,784 | 1,314 | 1,122 |
| Feb-10 | 48,753 | 42,790 | 1,741 | 1,528 |
| Mar-10 | 69,152 | 61,361 | 2,231 | 1,979 |
| Apr-10 | 62,351 | 55,237 | 2,078 | 1,841 |
| May-10 | 54,018 | 47,045 | 1,743 | 1,518 |
| Jun-10 | 39,308 | 32,955 | 1,310 | 1,099 |
| Jul-10 | 32,363 | 25,609 | 1,044 | 826 |
| Aug-10 | 33,717 | 26,415 | 1,088 | 852 |
| Sep-10 | 29,310 | 22,796 | 977 | 760 |
| Oct-10 | 32,451 | 26,165 | 1,047 | 844 |
| Nov-10 | 28,516 | 22,405 | 951 | 747 |
| Dec-10 | 25,728 | 19,429 | 830 | 627 |
| Jan-11 | 29,737 | 23,926 | 959 | 772 |
| Feb-11 | 34,408 | 28,786 | 1,229 | 1,028 |
| Mar-11 | 48,920 | 42,014 | 1,578 | 1,355 |
| Apr-11 | 42,739 | 36,251 | 1,425 | 1,208 |
| May-11 | 37,543 | 31,236 | 1,211 | 1,008 |
| Jun-11 | 32,909 | 27,166 | 1,097 | 906 |
| Jul-11 | 29,520 | 23,170 | 952 | 747 |
| Aug-11 | 30,216 | 24,166 | 975 | 780 |
| Sep-11 | 28,386 | 22,863 | 946 | 762 |
| Oct-11 | 31,344 | 25,612 | 1,011 | 826 |
| Nov-11 | 28,617 | 23,368 | 954 | 779 |
| Dec-11 | 24,380 | 18,983 | 786 | 612 |
| Jan-12 | 30,798 | 25,714 | 993 | 829 |
| Feb-12 | 37,009 | 31,579 | 1,322 | 1,128 |
| Mar-12 | 48,538 | 42,218 | 1,566 | 1,362 |
| Apr-12 | 46,680 | 40,628 | 1,556 | 1,354 |
| May-12 | 43,020 | 36,966 | 1,388 | 1,192 |
| Jun-12 | 36,808 | 30,669 | 1,227 | 1,022 |
| Jul-12 | 32,833 | 26,978 | 1,059 | 870 |
| Aug-12 | 33,699 | 27,567 | 1,087 | 889 |
| Sep-12 | 32,399 | 26,591 | 1,080 | 886 |
| Oct-12 | 34,847 | 28,929 | 1,124 | 933 |
| Nov-12 | 33,159 | 27,636 | 1,105 | 921 |
| Dec-12 | 29,077 | 23,243 | 938 | 750 |
| Jan-13 | 32,485 | 26,921 | 1,048 | 868 |
| Feb-13 | 40,636 | 35,042 | 1,451 | 1,252 |
| Mar-13 | 54,010 | 47,293 | 1,742 | 1,526 |
| Apr-13 | 54,771 | 48,212 | 1,826 | 1,607 |
| May-13 | 50,500 | 43,856 | 1,629 | 1,415 |
| Jun-13 | 40,790 | 34,436 | 1,360 | 1,148 |
| Jul-13 | 40,006 | 33,230 | 1,291 | 1,072 |
| Aug-13 | 41,125 | 33,797 | 1,327 | 1,090 |
| Sep-13 | 38,206 | 31,802 | 1,274 | 1,060 |
| Oct-13 | 41,835 | 35,312 | 1,350 | 1,139 |
| Nov-13 | 38,692 | 31,896 | 1,290 | 1,063 |
| Dec-13 | 36,707 | 29,528 | 1,184 | 953 |
| Jan-14 | 35,200 | 28,668 | 1,135 | 925 |
| Feb-14 | 42,473 | 36,403 | 1,517 | 1,300 |
| Mar-14 | 57,548 | 49,596 | 1,856 | 1,600 |
| Apr-14 | 59,383 | 51,502 | 1,979 | 1,717 |
| May-14 | 69,033 | 60,683 | 2,227 | 1,958 |
| Jun-14 | 66,572 | 57,861 | 2,219 | 1,929 |
| Jul-14 | 48,833 | 40,708 | 1,575 | 1,313 |
| Aug-14 | 39,766 | 31,388 | 1,283 | 1,013 |
| Sep-14 | 34,006 | 25,825 | 1,134 | 861 |
| Oct-14 | 35,903 | 26,450 | 1,158 | 853 |
| Nov-14 | 33,024 | 24,641 | 1,101 | 821 |
| Dec-14 | 34,231 | 25,019 | 1,104 | 807 |
| Jan-15 | 30,179 | 21,514 | 974 | 694 |
| Feb-15 | 32,554 | 24,376 | 1,163 | 871 |
| Mar-15 | 39,162 | 29,791 | 1,263 | 961 |
| Apr-15 | 38,299 | 29,750 | 1,277 | 992 |
| May-15 | 40,684 | 31,576 | 1,312 | 1,019 |
| Jun-15 | 38,620 | 29,303 | 1,287 | 977 |
| Jul-15 | 38,610 | 28,388 | 1,245 | 916 |
| Aug-15 | 42,419 | 30,239 | 1,368 | 975 |
| Sep-15 | 41,171 | 30,286 | 1,372 | 1,010 |
| Oct-15 | 45,245 | 32,724 | 1,460 | 1,056 |
| Nov-15 | 45,387 | 32,838 | 1,513 | 1,095 |
| Dec-15 | 48,393 | 37,014 | 1,561 | 1,194 |
| Jan-16 | 33,396 | 23,758 | 1,077 | 766 |
| Feb-16 | 38,068 | 26,072 | 1,360 | 931 |
| Mar-16 | 45,779 | 33,316 | 1,477 | 1,075 |
| Apr-16 | 48,271 | 38,089 | 1,609 | 1,270 |
| May-16 | 54,987 | 40,337 | 1,774 | 1,301 |
| Jun-16 | 45,168 | 34,450 | 1,506 | 1,148 |
| Jul-16 | 46,658 | 33,723 | 1,505 | 1,088 |
| Aug-16 | 51,569 | 37,048 | 1,664 | 1,195 |
| Sep-16 | 56,070 | 39,501 | 1,869 | 1,317 |
| Oct-16 | 66,707 | 46,184 | 2,152 | 1,490 |
| Nov-16 | 63,366 | 47,211 | 2,112 | 1,574 |
| Dec-16 | 58,416 | 43,251 | 1,884 | 1,395 |
| Jan-17 | 42,458 | 31,576 | 1,370 | 1,019 |
| Feb-17 | 23,555 | 18,754 | 841 | 670 |
| Mar-17 | 16,592 | 12,195 | 535 | 393 |
| Apr-17 | 15,768 | 11,127 | 526 | 371 |
| May-17 | 19,940 | 14,519 | 643 | 468 |
| Jun-17 | 21,657 | 16,087 | 722 | 536 |
| Jul-17 | 25,014 | 18,187 | 807 | 587 |
| Aug-17 | 30,569 | 22,288 | 986 | 719 |
| Sep-17 | 31,157 | 22,537 | 1,039 | 751 |
| Oct-17 | 34,842 | 25,488 | 1,124 | 822 |
| Nov-17 | 39,031 | 29,085 | 1,301 | 970 |
| Dec-17 | 40,476 | 28,995 | 1,306 | 935 |
| Jan-18 | 35,865 | 25,975 | 1,157 | 838 |
| Feb-18 | 36,690 | 26,666 | 1,310 | 952 |
| Mar-18 | 50,213 | 37,390 | 1,620 | 1,206 |
| Apr-18 | 51,019 | 38,243 | 1,701 | 1,275 |
| May-18 | 51,790 | 40,339 | 1,671 | 1,301 |
| Jun-18 | 43,096 | 34,089 | 1,437 | 1,136 |
| Jul-18 | 40,005 | 31,299 | 1,290 | 1,010 |
| Aug-18 | 46,551 | 37,524 | 1,502 | 1,210 |
| Sep-18 | 50,366 | 41,486 | 1,679 | 1,383 |
| Oct-18 | 60,775 | 51,005 | 1,960 | 1,645 |
| Nov-18 | 62,463 | 51,857 | 2,082 | 1,729 |
| Dec-18 | 60,789 | 50,751 | 1,961 | 1,637 |
| Jan-19 | 58,313 | 47,979 | 1,881 | 1,548 |
| Feb-19 | 76,543 | 66,883 | 2,734 | 2,389 |
| Mar-19 | 103,730 | 92,833 | 3,346 | 2,995 |
| Apr-19 | 109,413 | 99,273 | 3,647 | 3,309 |
| May-19 | 144,113 | 132,856 | 4,649 | 4,286 |
| Jun-19 | 104,310 | 94,902 | 3,477 | 3,163 |
| Jul-19 | 81,748 | 71,978 | 2,637 | 2,322 |
| Aug-19 | 62,608 | 50,684 | 2,020 | 1,635 |
| Sep-19 | 52,424 | 40,507 | 1,747 | 1,350 |
| Oct-19 | 45,139 | 35,402 | 1,456 | 1,142 |
| Nov-19 | 42,642 | 33,524 | 1,421 | 1,117 |
| Dec-19 | 40,563 | 32,853 | 1,308 | 1,060 |
| Jan-20 | 36,583 | 29,205 | 1,180 | 942 |
| Feb-20 | 36,686 | 30,077 | 1,310 | 1,074 |
| Mar-20 | 34,457 | 30,389 | 1,112 | 980 |
| Apr-20 | 17,106 | 16,182 | 570 | 539 |
| May-20 | 23,237 | 21,593 | 750 | 697 |
| Jun-20 | 33,029 | 30,816 | 1,101 | 1,027 |
| Jul-20 | 40,949 | 38,556 | 1,321 | 1,244 |
| Aug-20 | 50,007 | 47,276 | 1,613 | 1,525 |
| Sep-20 | 57,668 | 54,762 | 1,922 | 1,825 |
| Oct-20 | 71,943 | 69,048 | 2,321 | 2,227 |
| Nov-20 | 72,113 | 69,169 | 2,404 | 2,306 |
| Dec-20 | 73,994 | 71,141 | 2,387 | 2,295 |
| Jan-21 | 78,414 | 75,316 | 2,529 | 2,430 |
| Feb-21 | 101,098 | 97,643 | 3,611 | 3,487 |
| Mar-21 | 173,277 | 169,216 | 5,590 | 5,459 |
| Apr-21 | 178,795 | 173,699 | 5,960 | 5,790 |
| May-21 | 180,597 | 172,654 | 5,826 | 5,569 |
| Jun-21 | 189,034 | 178,649 | 6,301 | 5,955 |
| Jul-21 | 213,593 | 200,658 | 6,890 | 6,473 |
| Aug-21 | 209,840 | 196,514 | 6,769 | 6,339 |
| Sep-21 | 192,001 | 185,515 | 6,400 | 6,184 |
| Oct-21 | 164,837 | 159,113 | 5,317 | 5,133 |
| Nov-21 | 174,845 | 167,015 | 5,828 | 5,567 |
| Dec-21 | 179,253 | 170,602 | 5,782 | 5,503 |
| Jan-22 | 154,874 | 147,877 | 4,996 | 4,770 |
| Feb-22 | 166,010 | 159,170 | 5,929 | 5,685 |
| Mar-22 | 222,574 | 211,181 | 7,180 | 6,812 |
| Apr-22 | 235,785 | 203,504 | 7,860 | 6,783 |
| May-22 | 241,136 | 224,370 | 7,779 | 7,238 |
| Jun-22 | 207,834 | 192,399 | 6,928 | 6,413 |
| Jul-22 | 200,162 | 181,834 | 6,457 | 5,866 |
| Aug-22 | 204,087 | 181,774 | 6,583 | 5,864 |
| Sep-22 | 227,547 | 207,597 | 7,585 | 6,920 |
| Oct-22 | 231,529 | 205,134 | 7,469 | 6,617 |
| Nov-22 | 235,173 | 207,680 | 7,839 | 6,923 |
| Dec-22 | 252,315 | 222,018 | 8,139 | 7,162 |
| Jan-23 | 157,358 | 129,513 | 5,076 | 4,178 |
| Feb-23 | 156,630 | 130,521 | 5,594 | 4,661 |
| Mar-23 | 193,249 | 163,672 | 6,234 | 5,280 |
| Apr-23 | 211,992 | 183,921 | 7,066 | 6,131 |
| May-23 | 206,690 | 171,382 | 6,667 | 5,528 |
| Jun-23 | 144,556 | 99,538 | 4,819 | 3,318 |
| Jul-23 | 183,479 | 132,642 | 5,919 | 4,279 |
| Aug-23 | 232,963 | 181,054 | 7,515 | 5,840 |
| Sep-23 | 269,735 | 218,763 | 8,991 | 7,292 |
| Oct-23 | 240,932 | 188,754 | 8,031 | 6,292 |
| Nov-23 | 242,413 | 191,119 | 8,080 | 6,371 |
| Dec-23 | 301,980 | 249,737 | 10,066 | 8,325 |
| Jan-24 | 176,189 | 124,204 | 5,684 | 4,007 |
| Feb-24 | 189,914 | 140,638 | 6,549 | 4,850 |
| Mar-24 | 189,371 | 137,480 | 6,109 | 4,435 |

Notes: Data on encounters at POE not available for Fys 2000-2003.
Source: March 2024 Persist Dataset

Starting in 2014, families and UCs increased as a proportion of USBP encounters as well, reaching a high of 65 percent of encounters in 2019.
OHSS analysis of March 2024 OHSS Persist Dataset. Northern Central Americans accounted for 54 percent of encounters between POEs in 2017. Northern Central Americans' proportion of encounters between POEs continued to increase until it reached 71 percent of USBP encounters in 2019 but dropped at the onset of the pandemic, in 2020, to less than 26 percent. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

USBP SWB encounters by family status

| | SA | FM | UC | Total | SA | FM | UC | FM+ UC |
|---|---|---|---|---|---|---|---|---|
| 2013 | 362,706 | 12,934 | 38,757 | 414,397 | 88% | 3% | 9% | 12% |
| 2014 | 343,791 | 67,040 | 68,539 | 479,370 | 72% | 14% | 14% | 28% |
| 2015 | 251,531 | 39,834 | 39,968 | 331,333 | 76% | 12% | 12% | 24% |
| 2016 | 271,508 | 77,673 | 59,689 | 408,870 | 66% | 19% | 15% | 34% |
| 2017 | 186,861 | 75,620 | 41,435 | 303,916 | 61% | 25% | 14% | 39% |
| 2018 | 239,336 | 107,209 | 50,034 | 396,579 | 60% | 27% | 13% | 40% |
| 2019 | 301,818 | 473,670 | 76,020 | 851,508 | 35% | 56% | 9% | 65% |
| 2020 | 317,853 | 52,230 | 30,552 | 400,635 | 79% | 13% | 8% | 21% |
| 2021 | 1,063,301 | 451,082 | 144,839 | 1,659,222 | 64% | 27% | 9% | 36% |
| 2022 | 1,574,387 | 482,956 | 149,093 | 2,206,436 | 71% | 22% | 7% | 29% |
| 2023 | 1,293,009 | 621,310 | 131,519 | 2,045,838 | 63% | 30% | 6% | 37% |
| 2024 YTD | 571,496 | 400,571 | 59,865 | 1,031,932 | 55% | 39% | 6% | 45% |

Note: SA includes 6,363 encounters with unknown family status.
Source: OHSS Persist March 2024.

USBP SWB Encounters by Citizenship Grouping, FY 2013- FY 2024 Q2

| | Mexico | NTriangle | Other | Grand Total | | | |
|---|---|---|---|---|---|---|---|
| 2013 | 265409 | 137548 | 11440 | 414397 | 64% | 33% | 3% |
| 2014 | 226770 | 237860 | 14740 | 479370 | 47% | 50% | 3% |
| 2015 | 186017 | 133528 | 11788 | 331333 | 56% | 40% | 4% |
| 2016 | 190760 | 199401 | 18709 | 408870 | 47% | 49% | 5% |
| 2017 | 127938 | 162891 | 13087 | 303916 | 42% | 54% | 4% |
| 2018 | 152257 | 223604 | 20718 | 396579 | 38% | 56% | 5% |
| 2019 | 166458 | 607774 | 77276 | 851508 | 20% | 71% | 9% |
| 2020 | 253104 | 103816 | 43715 | 400635 | 63% | 25.9% | 11% |
| 2021 | 608051 | 683896 | 367275 | 1659222 | 37% | 41% | 22% |
| 2022 | 738780 | 520602 | 947054 | 2206436 | 33% | 24% | 43% |
| 2023 | 579146 | 447273 | 1019419 | 2045838 | 28% | 22% | 50% |
| 2024 | 304540 | 245992 | 481400 | 1031932 | 30% | 24% | 47% |

OHSS Persist unique encounters pivot Table March 2024

Finally, and as described in greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever, accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low. OHSS analysis of OIS Yearbook of Immigration Statistics 1990-1999 and OHSS analysis of March 2024 OHSS Persist Dataset. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

SW Total DIF encounters, FY 2000 - FY 2024Q2

| Year | Mexico | NCA | Other | Total | | Year | Mexico | NCA | Other |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,309 | 1,566,431 | | 2000 | 98% | 1% | 0% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | | 2001 | 98% | 2% | 1% |
| 2002 | 902,642 | 21,158 | 7,161 | 930,961 | | 2002 | 97% | 2% | 1% |
| 2003 | 867,216 | 30,348 | 9,140 | 906,734 | | 2003 | 96% | 3% | 1% |
| 2004 | 1,136,693 | 51,585 | 22,412 | 1,211,690 | | 2004 | 94% | 4% | 2% |
| 2005 | 1,100,170 | 114,041 | 52,030 | 1,266,247 | | 2005 | 87% | 9% | 4% |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 | | 2006 | 91% | 8% | 2% |
| 2007 | 842,713 | 52,640 | 19,317 | 914,928 | | 2007 | 92% | 6% | 2% |
| 2008 | 727,615 | 46,618 | 16,322 | 792,553 | | 2008 | 92% | 6% | 2% |
| 2009 | 565,253 | 39,856 | 13,934 | 619,123 | | 2009 | 91% | 6% | 2% |
| 2010 | 467,484 | 43,501 | 16,362 | 527,410 | | 2010 | 89% | 8% | 3% |
| 2011 | 344,024 | 40,506 | 16,543 | 405,073 | | 2011 | 86% | 10% | 4% |
| 2012 | 318,007 | 88,324 | 20,894 | 426,125 | | 2012 | 74% | 21% | 5% |
| 2013 | 317,162 | 145,442 | 31,608 | 488,612 | | 2013 | 65% | 29% | 6% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | | 2014 | 50% | 44% | 6% |
| 2015 | 255,692 | 142,341 | 48,803 | 444,856 | | 2015 | 57% | 32% | 11% |
| 2016 | 256,083 | 237,458 | 75,450 | 558,991 | | 2016 | 46% | 41% | 13% |
| 2017 | 182,519 | 187,530 | 46,141 | 415,199 | | 2017 | 44% | 45% | 11% |
| 2018 | 221,711 | 256,414 | 85,820 | 518,964 | | 2018 | 43% | 50% | 9% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | | 2019 | 24% | 64% | 12% |
| 2020 | 297,002 | 106,760 | 53,414 | 458,084 | | 2020 | 65% | 23% | 12% |
| 2021 | 655,605 | 703,351 | 378,943 | 1,736,899 | | 2021 | 38% | 40% | 22% |
| 2022 | 808,339 | 544,418 | 1,026,887 | 2,379,944 | | 2022 | 34% | 23% | 43% |
| 2023 | 717,333 | 495,266 | 1,263,050 | 2,475,649 | | 2023 | 29% | 20% | 51% |
| 2024Q2 | 385,680 | 267,651 | 687,288 | 1,340,769 | | 2024Q2 | 29% | 20% | 51% |

IPR_AR_007539



Finally, and as described in greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever, accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low. Nationality breakdown of border encounters are not available prior to 1980, but Mexican nationals accounted for 97 percent of encounters for all of 1980 through 1999 and never accounted for less than 96 percent in any fiscal year during that period.

Apprehensions of EWIs by Citizenship

| | Mexico | All Other | Total | MeX total |
|---|---|---|---|---|
| 1981 | 894,771 | 5,779 | 838,510 | 100% |
| 1982 | 970,806 | 31,657 | 932,463 | 96% |
| 1983 | 不明 | 32,250 | 不明 | 97% |
| 1984 | 不明 | 37,252 | 不明 | 97% |
| 1985 | 不明 | 8,357 | 不明 | 98% |
| 1986 | 不明 | 58,324 | 不明 | 97% |
| 1987 | 不明 | 31,891 | 不明 | 97% |
| 1988 | 943,147 | 42,102 | 985,479 | 96% |
| 1989 | 354,514 | 7,927 | 522,441 | 98% |
| 1990 | 不明 | 50,753 | 不明 | 86% |
| 1991 | 不明 | 41,305 | 不明 | 96% |
| 1992 | 不明 | 32,558 | 不明 | 97% |
| 1993 | 不明 | 36,247 | 不明 | 97% |
| 1994 | 不明 | 35,529 | 不明 | 97% |
| 1995 | 不明 | 31,314 | 不明 | 97% |
| 1996 | 不明 | 32,341 | 不明 | 98% |
| 1997 | 不明 | 31,694 | 不明 | 98% |
| 1998 | 不明 | 28,843 | 不明 | 98% |
| 1999 | 不明 | 39,318 | 不明 | 98% |
| 2001-2008 | 不明 | 625,387 | 不明 | 97% |
| 1981-200 | 不明 | 625,387 | 不明 | 97% |

Source: DIS Yearbook of Immigration Statistics, 1981-1999, "Deportable Aliens Located by Status at Entry and Region and Country of Nationality."

IPR_AR_007540

Between 2005 and 2015, the proportion of noncitizens encountered by CBP and processed for expedited removal who claimed fear ranged from 5 percent at the low end to 26 percent at the high c OHSS analysis of March 2024 OHSS Persist Dataset.

| Year | Encounter SWB Enco | SWB T8 er | SWB CBP | SWB CBP | Total APS | Lifecycle L | Estimated E | ER as % o | Fear claim: | Fear Claim | Fear claims as % of | assuming 100% of Fear claims originate at SWB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | #### | #### | #### | #### | NA | 10,284 | | NA | | | | |
| 2001 | #### | #### | #### | #### | NA | 13,241 | | NA | | | | |
| 2002 | 953,629 | 930,293 | 930,293 | 930,293 | NA | 10,204 | | NA | | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 906,694 | NA | 6,480 | | NA | | | | |
| 2004 | #### | #### | #### | #### | NA | 8,230 | | NA | | | | |
| 2005 | #### | #### | #### | 1,269,247 | 81,450 | 9,696 | | 8,164 | 6% | 10% | 0.6% | 11.9% |
| 2006 | #### | #### | #### | 1,168,358 | 95,132 | 5,660 | | 4,766 | 8% | 5% | 0.4% | 5.9% |
| 2007 | #### | 954,907 | 954,907 | 954,928 | 92,551 | 5,770 | | 4,858 | 10% | 5% | 0.5% | 6.2% |
| 2008 | 946,642 | 792,535 | 792,535 | 792,553 | 107,684 | 5,753 | | 4,844 | 14% | 4% | 1% | 5.3% |
| 2009 | 779,816 | 619,010 | 619,010 | 619,123 | 103,107 | 6,617 | | 5,571 | 17% | 5% | 1% | 6.4% |
| 2010 | 692,904 | 527,372 | 527,372 | 527,419 | 111,935 | 11,030 | | 9,287 | 21% | 8% | 2% | 9.9% |
| 2011 | 553,597 | 401,073 | 401,073 | 401,073 | 125,101 | 14,405 | | 12,129 | 31% | 10% | 3% | 11.5% |
| 2012 | 560,572 | 426,125 | 426,125 | 426,125 | 175,319 | 18,629 | | 15,685 | 41% | 9% | 4% | 10.6% |
| 2013 | 626,412 | 489,612 | 489,612 | 489,612 | 230,003 | 43,231 | 35,991 | | 47% | 16% | 7% | |
| 2014 | 711,667 | 570,048 | 570,048 | 570,048 | 228,263 | 59,186 | 48,750 | | 40% | 21% | 9% | |
| 2015 | 591,831 | 444,856 | 444,856 | 444,856 | 180,682 | 55,411 | 46,387 | | 41% | 26% | 10% | |
| 2016 | 690,433 | 558,991 | 558,991 | 558,991 | 228,020 | 102,973 | 92,699 | | 41% | 41% | 17% | |
| 2017 | 526,807 | 415,199 | 415,199 | 415,199 | 160,401 | 88,448 | 68,722 | | 39% | 43% | 17% | |
| 2018 | 626,035 | 519,944 | 519,944 | 519,944 | 214,820 | 109,896 | 95,618 | | 41% | 45% | 18% | |
| 2019 | #### | 977,229 | 977,229 | 977,229 | 223,314 | 118,387 | 98,266 | | 23% | 44% | 10% | |
| 2020 | 561,718 | 458,082 | 253,292 | 458,066 | 91,770 | 39,524 | 23,942 | | 20% | 26% | 9% | |
| 2021 | #### | #### | 671,159 | 1,734,699 | 84,707 | 64,244 | 48,982 | | 5% | 58% | 7% | |
| 2022 | #### | #### | #### | 2,378,944 | 119,677 | 75,264 | 50,016 | | 5% | 42% | 4% | |
| 2023 | #### | #### | #### | 2,475,669 | 207,344 | 160,868 | 122,329 | | 8% | 59% | 6% | |
| 2013-2019 | | | | | | | | | | | | |
| ⁴ | | | | | | 577,532 | 486,433 | 84% | | | | |

Note: Encounters between POEs were not amenable to ER until Aug. 2004.

[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border.

[2] OIS Lifecycle data on Total Southwest Border Fear Claims.

[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data [Southwest

[4] The sum of credible fear claims for available matching data years. Used to estimate the proportion of Lifecycle
Sources: APSO Global and OHSS Lifecycle data

[4] The sum of credible fear claims for available matching data years. Used to
Sources: APSO Global and OHSS Persist Data. ships, only one citizenship is re

weekly average CFIs: % increase from 2014-19

* FY2024 as of April 2nd, 2024

** Fy2024 as of December 31, 2023.

end.

IFR_AR_007542

Driven by the changing demographics at the border, both the percentage of those processed for expedited removal as well as the percentage of those processed for expedited removal who claimed a fear of return or an intent to seek asylum generally increased during this time frame. The percentage of those processed via expedited removal fell again in 2019 due to resource constraints. OHSS analysis of March 2024 OHSS Persist Dataset.

| Year | Encounter SWB | Enco | SWB T8 er | SWB CBP | SWB CBP Total | APSO | Lifecycle E | Estimated | ER as % o | Fear claim | Fear Claim | Fear claims as % of assuming 100% of Fear claims originate at SWB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | ##### | ##### | ##### | ##### | ##### | N/A | 10,264 | | | | | |
| 2001 | ##### | ##### | ##### | ##### | ##### | N/A | 13,241 | - | | | | |
| 2002 | 953,629 | 530,293 | 530,293 | 530,293 | | N/A | 10,264 | - | | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 906,694 | | N/A | 6,480 | - | | | | |
| 2004 | ##### | ##### | ##### | ##### | | N/A | 8,230 | - | | | | |
| 2005 | ##### | ##### | ##### | 1,269,247 | 81,450 | 9,696 | | 8,164 | 6% | 10% | 0.6% | 11.9% |
| 2006 | ##### | ##### | ##### | 1,168,358 | 95,132 | 5,660 | | 4,766 | 8% | 5% | 0.4% | 5.9% |
| 2007 | ##### | 554,907 | 554,907 | 954,928 | 92,551 | 5,770 | | 4,858 | 10% | 5% | 0.5% | 6.2% |
| 2008 | 946,642 | 792,535 | 792,535 | 792,553 | 107,684 | 5,753 | | 4,844 | 14% | 4% | 1% | 5.3% |
| 2009 | 779,816 | 619,010 | 619,010 | 619,123 | 103,107 | 6,617 | | 5,571 | 17% | 5% | 1% | 6.4% |
| 2010 | 692,904 | 527,372 | 527,372 | 527,419 | 111,935 | 11,030 | | 9,287 | 21% | 8% | 2% | 9.9% |
| 2011 | 553,597 | 401,075 | 401,075 | 401,073 | 125,101 | 14,405 | | 12,129 | 31% | 10% | 3% | 11.5% |
| 2012 | 560,572 | 426,125 | 426,125 | 426,125 | 175,319 | 18,629 | | 15,685 | 41% | 9% | 4% | 10.6% |
| 2013 | 626,412 | 489,612 | 489,612 | 489,612 | 230,003 | 43,231 | 55,991 | | 47% | 16% | 7% | |
| 2014 | 711,667 | 570,048 | 570,048 | 570,048 | 228,263 | 59,186 | 48,750 | | 40% | 21% | 9% | |
| 2015 | 591,831 | 444,656 | 444,656 | 444,856 | 180,682 | 55,411 | 46,387 | | 41% | 26% | 10% | |
| 2016 | 690,433 | 558,991 | 558,991 | 558,991 | 228,020 | 102,973 | 92,699 | | 41% | 41% | 17% | |
| 2017 | 526,807 | 415,199 | 415,199 | 415,199 | 160,401 | 88,448 | 68,722 | | 39% | 43% | 17% | |
| 2018 | 626,035 | 519,944 | 519,944 | 519,944 | 214,820 | 109,896 | 95,618 | | 41% | 45% | 18% | |
| 2019 | ##### | 977,229 | 977,229 | 977,229 | 223,314 | 116,387 | 99,266 | | 23% | 44% | 10% | |
| 2020 | 561,718 | 458,082 | 253,292 | 458,066 | 91,770 | 30,524 | 23,942 | | 20% | 26% | 9% | |
| 2021 | ##### | ##### | 671,159 | 1,734,699 | 84,707 | 64,244 | 48,982 | | 5% | 58% | 7% | |
| 2022 | ##### | ##### | ##### | 2,378,944 | 119,677 | 75,264 | 50,016 | | 5% | 42% | 4% | |
| 2023 | ##### | ##### | ##### | 2,475,669 | 207,344 | 160,868 | 122,329 | | 8% | 59% | 6% | |
| 2013-2019 | | | | | | | | | | | | |
| * | | | | | 577,332 | 486,453 | 84% | | | | | |

Note: Encounters between POEs were not amenable to ER until Aug. 2004.

[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border.

[2] OIS Lifecycle data on Total Southwest Border Fear Claims.

[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data 2Southwest

[4] The sum of credible fear claims for available matching data years. Used to estimate the proportion of Lifecycle

Sources: APSO Global and OHSS Lifecycle data.

[5] The sum of credible fear claims for available matching data years. Used to

Sources: APSO Global and OHSS Persist Data. ships, only one citizenship is rng

weekly average CFIs: % increase from 2014-19

* FY2024 as of April 2nd, 2024

** Fy2024 as of December 31, 2023.

This, in turn, has resulted in a steep increase in the number of credible fear interviews that USCIS is required to conduct.
The share of noncitizens encountered by CBP at and between POEs who were processed through expedited removal increased from 6 percent in FY 2005 to between 39 and 47 percent each year from FY 2012 to FY 2018, but then dropped in FY 2019 because DHS was unable to scale up expedited removal processing in proportion to the substantial increase in USBP encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

| Year | Encounter | SWB Enco | SWB T8 e | SWB CBP | SWB CBP | Total APS | Lifecycle L | Estimated | ER as % o | Fear claims | Fear Claim | Fear claims as % of assuming 100% of Fear claims originate at SWB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | ##### | ##### | ##### | ##### | NA | 10,284 | - | NA | | | | |
| 2001 | ##### | ##### | ##### | ##### | NA | 13,241 | - | NA | | | | |
| 2002 | 953,629 | 930,293 | 930,293 | 930,293 | NA | 10,204 | - | NA | | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 906,694 | NA | 6,480 | - | NA | | | | |
| 2004 | ##### | ##### | ##### | ##### | NA | 8,230 | - | NA | | | | |
| 2005 | ##### | ##### | ##### | 1,269,247 | 81,450 | 9,696 | | 8,164 | 6% | 10% | 0.6% | 11.9% |
| 2006 | ##### | ##### | ##### | 1,168,358 | 95,132 | 5,660 | | 4,766 | 8% | 5% | 0.4% | 5.9% |
| 2007 | ##### | 954,907 | 954,907 | 954,928 | 92,551 | 5,770 | | 4,858 | 10% | 5% | 0.5% | 6.2% |
| 2008 | 946,642 | 792,535 | 792,535 | 792,553 | 107,684 | 5,753 | | 4,844 | 14% | 4% | 1% | 5.3% |
| 2009 | 779,816 | 619,010 | 619,010 | 619,123 | 103,107 | 6,617 | | 5,571 | 17% | 5% | 1% | 6.4% |
| 2010 | 692,904 | 527,372 | 527,372 | 527,419 | 111,935 | 11,030 | | 9,287 | 21% | 8% | 2% | 9.9% |
| 2011 | 553,597 | 401,073 | 401,073 | 401,073 | 125,101 | 14,405 | | 12,129 | 31% | 10% | 3% | 11.5% |
| 2012 | 560,572 | 426,125 | 426,125 | 426,125 | 175,319 | 18,629 | | 15,685 | 41% | 9% | 4% | 10.6% |
| 2013 | 626,412 | 489,612 | 489,612 | 489,612 | 230,003 | 43,231 | 35,991 | | 47% | 16% | 7% | |
| 2014 | 711,667 | 570,048 | 570,048 | 570,048 | 228,263 | 59,186 | 48,750 | | 40% | 21% | 9% | |
| 2015 | 591,831 | 444,856 | 444,856 | 444,856 | 180,682 | 55,411 | 46,387 | | 41% | 26% | 10% | |
| 2016 | 690,433 | 558,991 | 558,991 | 558,991 | 228,020 | 102,973 | 92,699 | | 41% | 41% | 17% | |
| 2017 | 526,807 | 415,199 | 415,199 | 415,199 | 160,401 | 88,448 | 68,722 | | 39% | 43% | 17% | |
| 2018 | 626,035 | 519,944 | 519,944 | 519,944 | 214,820 | 109,896 | 95,618 | | 41% | 45% | 18% | |
| 2019 | ##### | 977,229 | 977,229 | 977,229 | 223,314 | 118,387 | 98,266 | | 23% | 44% | 10% | |
| 2020 | 561,718 | 458,082 | 253,292 | 458,066 | 91,770 | 39,524 | 23,942 | | 20% | 26% | 9% | |
| 2021 | ##### | ##### | 671,159 | 1,734,699 | 84,707 | 64,244 | 48,982 | | 5% | 58% | 7% | |
| 2022 | ##### | ##### | ##### | 2,378,944 | 119,677 | 75,264 | 50,016 | | 5% | 42% | 4% | |
| 2023 | ##### | ##### | ##### | 2,475,669 | 207,344 | 160,868 | 122,329 | | 8% | 59% | 6% | |
| 2013-2019 [4] | | | | | | | 577,532 | 486,433 | 84% | | | |

Note: Encounters between POEs were not amenable to ER until Aug. 2004.
[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border.
[2] OIS Lifecycle data on Total Southwest Border Fear Claims.
[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data [Southwest
[4] The sum of credible fear claims for avaliable matching data years. Used to estimate the proportion of Lifecycle
Sources: APSO Global and OHSS Lifecyle data
[4] The sum of credible fear claims for avaliable matching data years. Used to
Sources: APSO Global and OHSS Persist Data. ships, only one citizenship is rep
weekly average CFIs: % increase from 2014-19
* FY2024 as of April 2nd, 2024
** Fy2024 as of December 31, 2023.

In 2023, a record 59 percent of encounters at and between POEs on the SWB that were processed for expedited removal resulted in fear claims.  From 2016 to 2023, the percentage of SWB encounters processed for expedited removal who claimed a fear dipped below 41 percent just once, in FY 2020, the first year of the COVID-19 pandemic OHSS analysis of March 2024 OHSS Persist Dataset.

| Year | Encounter | SWB Encs | SWB EV-a | SWB CBP | SWB CBP | Total APM | Lifecycle E | Estimated / ER as % of | Fear claims | Fear Claim | Fear claims as % of screening | 100% of Fear claims originate at SWB |
|------|-----------|----------|----------|---------|---------|-----------|-------------|------------------------|-------------|------------|-------------------------------|------|
| 2000 | ##### | ##### | ##### | ##### | | N/A | 10,284 | | N/A | | | |
| 2001 | ##### | ##### | ##### | ##### | | N/A | 13,241 | | N/A | | | |
| 2002 | 955,629 | 936,255 | 936,255 | 936,255 | | N/A | 10,264 | | N/A | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 906,694 | | N/A | 6,480 | | N/A | | | |
| 2004 | ##### | ##### | ##### | ##### | | N/A | 8,230 | | N/A | | | |
| 2005 | ##### | ##### | ##### | 1,269,247 | 81,450 | 9,696 | 9,164 | 6% | 10% | 0.6% | 11.9% |
| 2006 | ##### | 954,907 | 954,907 | 1,168,358 | 95,132 | 5,660 | 4,746 | 8% | 5% | 0.4% | 5.9% |
| 2007 | ##### | 954,907 | 954,907 | 954,928 | 92,551 | 5,770 | 4,656 | 10% | 5% | 0.5% | 6.2% |
| 2008 | 946,642 | 702,535 | 702,535 | 792,553 | 107,684 | 5,753 | 4,844 | 14% | 4% | 1% | 5.3% |
| 2009 | 779,816 | 619,010 | 619,010 | 619,123 | 103,107 | 6,617 | 5,571 | 17% | 5% | 1% | 6.4% |
| 2010 | 692,904 | 527,372 | 527,372 | 527,419 | 114,935 | 11,050 | 9,287 | 21% | 8% | 2% | 9.9% |
| 2011 | 553,597 | 401,073 | 401,073 | 403,073 | 125,101 | 14,805 | 12,129 | 31% | 10% | 3% | 11.5% |
| 2012 | 564,572 | 426,125 | 426,125 | 426,125 | 175,319 | 18,020 | 15,685 | 41% | 9% | 4% | 10.6% |
| 2013 | 626,412 | 489,652 | 489,652 | 489,652 | 230,003 | 43,231 | 35,991 | 47% | 16% | 7% | |
| 2014 | 711,667 | 570,046 | 570,046 | 570,046 | 228,263 | 59,186 | 49,730 | 40% | 21% | 9% | |
| 2015 | 591,651 | 444,656 | 444,656 | 444,856 | 180,682 | 55,411 | 46,507 | 41% | 26% | 10% | |
| 2016 | 690,655 | 556,959 | 556,959 | 558,991 | 228,020 | 62,273 | 52,699 | 41% | 41% | 17% | |
| 2017 | 526,807 | 415,199 | 415,199 | 415,199 | 160,401 | 88,446 | 68,722 | 39% | 43% | 17% | |
| 2018 | 626,035 | 519,944 | 519,944 | 529,944 | 214,820 | 109,896 | 93,618 | 41% | 45% | 18% | |
| 2019 | 977,229 | 977,229 | 977,229 | 977,229 | 223,314 | 116,587 | 98,266 | 23% | 44% | 10% | |
| 2020 | 361,716 | 456,082 | 253,252 | 458,566 | 91,770 | 30,526 | 25,942 | 20% | 26% | 9% | |
| 2021 | ##### | ##### | 473,139 | 1,734,699 | 84,707 | 64,244 | 48,982 | 5% | 58% | 7% | |
| 2022 | ##### | ##### | ##### | 2,378,944 | 119,677 | 75,264 | 59,016 | 5% | 43% | 4% | |
| 2023 | ##### | ##### | ##### | 2,475,669 | 207,344 | 160,868 | 122,325 | 8% | 59% | 6% | |
| 2013-2019 | | | | | | | | | | | |
| | | | | | | | 577,532 | 496,453 | 84% | | | |

Note: Encounters between POEs were not amenable to ER until Aug. 2004.

[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unavailable. APSO Global data is not limited to Southwest Border.

[2] OIS Lifecycle data on Total Southwest Border Fear Claims.

[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data Drawdown.

[4] The sum of credible fear claims for available matching data years. Used to estimate the proportion of Lifecycle.
Source: APSO Global and OHSS Lifecycle data

[5] The sum of credible fear claims for available matching data years. Used to.
Source: APSO Global and OHSS Persist Data, ships, only one citizenship is rep.

weekly average CFs; % increase from 2014-10

\* FY2024 as of April 2nd, 2024

\*\* Fy2024 as of December 31, 2023.

IFR_AR_007545

sic.

IFR_AR_007546

Between May 12, 2023, and the end of March 2024, DHS processed a record number of individuals through expedited removal as it sought to maximize the consequences at the border, and 54 percent of noncitizens processed for expedited removal indicated a fear of persecution or intent to seek asylum. OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| **SW Border Encounters** | **1,694,114** |
| **Processed for ER** | **316,288** |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | **120,709** |
| Credible fear referrals | 46,628 |
| CFIs conducted | 45,522 |
| **CFI results** | **45,086** |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,481 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| **CBP repatriations** | **95,037** |
| No fear claim ER removals | 74,040 |
| Negative fear; no IJ review | 19 |
| Negative fear; IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | **195,579** |
| **Reprocessed with other dispositions** | **836** |
| **ER processed by ICE non-detained** | **87,760** |
| **ER processed in ICE Custody** | **106,983** |
| Credible fear referrals | 93,630 |
| CFIs conducted | 84,045 |
| **CFI results** | **82,016** |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,839 |
| Admin closed without CFI | 7,179 |
| **ICE removals (REPATRIATIONS)** | **29,926** |
| No fear claim ER removals | 4,368 |
| Negative fear; no IJ review | 4 |
| Negative fear; IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | **87,760** |
| Credible fear referrals | 28,590 |
| CFIs conducted | 22,519 |
| **CFI results** | **21,229** |
| Positive fear finding | 13,009 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,112 |
| Vacated | 1,872 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| **ICE removals (REPATRIATIONS)** | **36,803** |
| No fear claim ER removals | 34,600 |
| Negative fear; no IJ review | 0 |
| Negative fear; IJ affirmed | 1,893 |
| Other | 310 |

| | |
|---|---|
| Total fear claims | 168,848 |
| Total share making fear claims | 54% |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007548

In fact, USCIS conducted more interviews from SWB encounters during the span of ten and a half months after the lifting of the Title 42 public health Order than in any full fiscal year prior to 2023, and twice as many as the annual average from FY 2010 to FY 2019.
OHSS analysis of data downloaded from CBP UIP on April 2, 2024. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is only available since FY 2013; for the years prior to FY 2013 there was no full fiscal year in which the total number of USCIS fear claims was equal to the number of fear claims completed for SWB encounters processed for expedited removal between May 12, 2023, and March 31, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| **SW Border Encounters** | **1,694,114** |
| **Processed for ER** | **316,288** |
| % Encounters processed for ER | 19% |
| **ER processed in CBP Custody** | **120,709** |
| Credible fear referrals | 46,628 |
| CFIs conducted | 45,522 |
| **CFI results** | **45,086** |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,481 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| **CBP repatriations** | **95,037** |
| No fear claim ER removals | 74,040 |
| Negative fear; no IJ review | 19 |
| Negative fear; IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| **ER transfers to ICE for processing** | **195,579** |
| **Reprocessed with other dispositions** | **836** |
| **ER processed by ICE non-detained** | **87,760** |
| **ER processed in ICE Custody** | **106,983** |
| Credible fear referrals | 93,630 |
| CFIs conducted | 84,045 |
| **CFI results** | **82,016** |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,839 |
| Admin closed without CFI | 7,179 |
| **ICE removals (REPATRIATIONS)** | **29,926** |
| No fear claim ER removals | 4,368 |
| Negative fear; no IJ review | 4 |
| Negative fear; IJ affirmed | 17,620 |
| Other | 7,934 |
| **ER processed by ICE non-detained** | **87,760** |
| Credible fear referrals | 28,590 |
| CFIs conducted | 22,519 |
| **CFI results** | **21,229** |
| Positive fear finding | 13,009 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,112 |
| Vacated | 1,872 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| **ICE removals (REPATRIATIONS)** | **36,803** |
| No fear claim ER removals | 34,600 |
| Negative fear; no IJ review | 0 |
| Negative fear; IJ affirmed | 1,893 |
| Other | 310 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

| | Total |
|---|---|
| Total ER (excluding cases reprocessed out of | 315,452 |
| Total Fear referrals | 168,848 |
| Total CFIs | 152,086 |
| Max FY count SWB CFIs pre 2023 | 98,102 |
| Annual average 2010-2019 | 52,356 |

**Nationwide**

**Credible Fear Claims: 2000-2023**

| Year | Encounter | SWB Enco | SWB T8 er | Total APS( | Lifecycle D | Estimated Sou | Percent ER | Percent | Encounters | fear claims |
|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | ##### | ##### | ##### | 10,284 | - | NA | | | | |
| 2001 | ##### | ##### | ##### | 13,241 | - | NA | | | | |
| 2002 | 953,629 | 930,293 | 930,293 | 10,204 | - | NA | | | | |
| 2003 | 931,844 | 906,694 | 906,694 | 6,480 | - | NA | | | | |
| 2004 | ##### | ##### | ##### | 8,230 | - | NA | | | | |
| 2005 | ##### | ##### | ##### | 9,696 | - | 8,167 | 84% | 1% | | |
| 2006 | ##### | ##### | ##### | 5,660 | - | 4,767 | 84% | 0% | | |
| 2007 | ##### | 954,907 | 954,907 | 5,770 | - | 4,860 | 84% | 1% | | |
| 2008 | 946,642 | 792,535 | 792,535 | 5,753 | - | 4,846 | 84% | 1% | | |
| 2009 | 779,816 | 619,010 | 619,010 | 6,617 | - | 5,573 | 84% | 1% | | |
| 2010 | 692,904 | 527,372 | 527,372 | 11,030 | - | 9,290 | 84% | 2% | | |
| 2011 | 553,597 | 401,073 | 401,073 | 14,405 | - | 12,133 | 84% | 3% | | |
| 2012 | 560,572 | 426,125 | 426,125 | 18,629 | - | 15,691 | 84% | 4% | | |
| 2013 | 626,412 | 489,612 | 489,612 | 43,231 | 35,959 | | 83.2% | 7% | 3,603 | 2,997 |
| 2014 | 711,667 | 570,048 | 570,048 | 59,186 | 48,737 | | 82.3% | 9% | 4,932 | 4,061 |
| 2015 | 591,831 | 444,856 | 444,856 | 55,411 | 46,451 | | 83.8% | 10% | 4,618 | 3,871 |
| 2016 | 690,433 | 558,991 | 558,991 | 102,973 | 92,903 | | 90.2% | 17% | 8,581 | 7,742 |
| 2017 | 526,807 | 415,199 | 415,199 | 88,448 | 68,789 | | 77.8% | 17% | 7,371 | 5,732 |
| 2018 | 626,035 | 519,944 | 519,944 | 109,896 | 95,506 | | 86.9% | 18% | 9,158 | 7,959 |
| 2019 | ##### | 977,229 | 977,229 | 118,387 | 98,102 | | 82.9% | 10% | 9,866 | 8,175 |
| 2020 | 561,718 | 458,082 | 253,292 | 39,524 | 23,836 | | 60.3% | 5% | 3,294 | |
| 2021 | ##### | ##### | 671,159 | 64,244 | 49,018 | | 76.3% | 3% | 5,354 | 4,085 |
| 2022 | ##### | ##### | ##### | 75,264 | 49,995 | | 66.4% | 2% | 6,272 | 4,166 |
| 2023 | ##### | ##### | ##### | 160,868 | 134,845 | | 83.8% | 5% | 13,406 | 11,237 |
| 2024 | | | | 106319* | 32,484 | | 80.6% | | | |
| 2013-2019 [4] | | | | 577,532 | 486,447 | 84% | | | | 11,237 |

[1] Prior to 2000, APSO asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border.

[2] OIS Lifecycle data on Total Southwest Border Fear Claims.

[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data [Southwest Border] Credible Fear Claims to APSO Global Credible

[4] The sum of credible fear claims for avaliable matching data years. Used to estimate the proportion of Lifecycle Data [Southwest Border] Credible Fear Claims

Sources: APSO Global and OHSS Persist Data. ships, only one citizenship is report

weekly average CFIs: % increase from 2014-19

* FY2024 as of April 2nd, 2024

** Fy2024 as of December 31, 2023.

This means that DHS cannot impose consequences swiftly or predictably on most people encountered at the border, feeding the narrative pushed by smugglers that irregular migrants will be able to stay in the United States.
OHSS analysis of March 2024 OHSS Persist Dataset.

| CBP SW Border Encounters Book-Out Outcomes by Agency | Total CBP | | | | | | | | | USBP | | | | | | | | | OFO | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | USBP Releases | OFO Paroles | Other outcomes | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | USBP Releases | OFO Paroles | Other outcomes | Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocols | Transfers to ICE | Transfers to HHS | OFO Releases | OFO Paroles | Other outcomes |
| 5 | 206,690 | 25,259 | 32,445 | 0 | 31,639 | 8,511 | 77,850 | 30,795 | 191 | 171,382 | 22,944 | 31,580 | 0 | 30,929 | 8,059 | 77,850 | | 20 | 35,308 | 2,315 | 865 | 0 | 710 | 452 | | 30,795 | 171 |
| 6 | 144,556 | 31,924 | 0 | 0 | 29,311 | 6,160 | 36,551 | 40,373 | 237 | 99,538 | 29,200 | 0 | 0 | 28,098 | 5,648 | 36,551 | | 32 | 45,018 | 2,715 | 0 | 0 | 1,213 | 512 | | 40,373 | 205 |
| 7 | 183,479 | 30,363 | 0 | 0 | 26,831 | 9,544 | 70,462 | 46,094 | 185 | 132,642 | 27,418 | 0 | 0 | 25,775 | 8,970 | 70,462 | | 17 | 50,837 | 2,945 | 0 | 0 | 1,056 | 574 | | 46,094 | 168 |
| 8 (2023) | 232,963 | 33,431 | 0 | 0 | 38,649 | 13,047 | 101,651 | 45,965 | 220 | 181,054 | 30,368 | 0 | 0 | 36,638 | 12,381 | 101,651 | | 16 | 51,909 | 3,063 | 0 | 0 | 2,011 | 666 | | 45,965 | 204 |
| 9 | 269,735 | 27,957 | 0 | 0 | 27,418 | 12,601 | 155,961 | 45,489 | 309 | 218,753 | 25,336 | 0 | 0 | 25,428 | 12,011 | 155,961 | | 27 | 50,972 | 2,621 | 0 | 0 | 1,990 | 590 | | 45,489 | 282 |
| 10 | 240,932 | 28,651 | 0 | 0 | 31,923 | 10,451 | 122,680 | 47,028 | 199 | 188,754 | 26,348 | 0 | 0 | 30,022 | 9,677 | 122,680 | | 27 | 52,178 | 2,303 | 0 | 0 | 1,901 | 774 | | 47,028 | 172 |
| 11 | 242,413 | 25,213 | 0 | 0 | 27,581 | 11,687 | 131,259 | 46,498 | 175 | 191,119 | 22,794 | 0 | 0 | 26,152 | 10,852 | 131,259 | | 62 | 51,294 | 2,419 | 0 | 0 | 1,429 | 835 | | 46,498 | 113 |
| 12 | 301,980 | 21,557 | 0 | 0 | 28,347 | 12,591 | 191,807 | 47,513 | 165 | 249,737 | 19,114 | 0 | 0 | 27,174 | 11,607 | 191,807 | | 35 | 52,243 | 2,443 | 0 | 0 | 1,173 | 984 | | 47,513 | 130 |
| 1 | 176,189 | 25,739 | 0 | 0 | 25,195 | 7,460 | 70,426 | 47,189 | 180 | 124,204 | 23,129 | 0 | 0 | 24,170 | 6,452 | 70,426 | | 27 | 51,985 | 2,610 | 0 | 0 | 1,025 | 1,008 | | 47,189 | 153 |
| 2 (2024) | 189,314 | 27,655 | 0 | 0 | 31,316 | 9,004 | 76,953 | 44,807 | 179 | 140,638 | 25,271 | 0 | 0 | 30,324 | 8,035 | 76,953 | | 55 | 49,276 | 2,384 | 0 | 0 | 992 | 969 | | 44,807 | 124 |
| 3 | 189,371 | 30,156 | 0 | 0 | 26,425 | 7,414 | 78,051 | 46,920 | 405 | 137,480 | 27,435 | 0 | 0 | 25,241 | 6,524 | 78,051 | | 229 | 51,891 | 2,721 | 0 | 0 | 1,184 | 890 | | 46,920 | 176 |

2,379,222

| | | |
|---|---|---|
| Total Releases | 1,602,322 | |
| Q2 releases | 364,346 | |
| Release Percentage | 67% | |
| Release Percentage | 66% | |

| | | |
|---|---|---|
| CBP Releases | 1,113,651 | |
| Q2 releases | 225,430 | |
| Release Percentage | 61% | |
| Release Percentage | 56% | |
| Releases since Oct 1st | 65% | |

| | | |
|---|---|---|
| CBP Releases | 488,671 | |
| Q2 releases | 138,916 | |
| Release Percentage | 90% | |
| Release Percentage | 91% | |

Notes: In order to protect privacy, table cells are rounded to the nearest ten. Encounters are limited to SW Border (at and between ports of entry). Book-outs reported by encounter date. Records may not match Component reporting due to differences in reporting methodologies. Data are current as of January 31, 2024, future reporting may include updates to previous reports' data.
Source: Office of Homeland Security Statistics Persist Dataset.

Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings. OHSS analysis of March 2024 OHSS Persist Dataset.

| CBP SW Border Encounters Book-Out Outcomes by Agency | | USBP Total Encounters | T8 repatriations | T42 expulsions | Migrant Protection Protocol | Transfers to ICE | Transfers to HHS | USBP Releases | Other outcomes |
|---|---|---|---|---|---|---|---|---|---|
| 2023 | 5 | 171,382 | 22,944 | 31,580 | 0 | 30,929 | 8,059 | 77,850 | 20 |
| | 6 | 99,538 | 29,209 | 0 | 0 | 28,098 | 5,648 | 36,551 | 32 |
| | 7 | 132,642 | 27,418 | 0 | 0 | 25,775 | 8,970 | 70,462 | 17 |
| | 8 | 181,054 | 30,368 | 0 | 0 | 36,638 | 12,381 | 101,651 | 16 |
| | 9 | 218,763 | 25,336 | 0 | 0 | 25,428 | 12,011 | 155,961 | 27 |
| | 10 | 188,754 | 26,348 | 0 | 0 | 30,022 | 9,677 | 122,680 | 27 |
| | 11 | 191,119 | 22,794 | 0 | 0 | 26,152 | 10,852 | 131,259 | 62 |
| | 12 | 249,737 | 19,114 | 0 | 0 | 27,174 | 11,807 | 191,607 | 35 |
| 2024 | 1 | 124,204 | 23,129 | 0 | 0 | 24,170 | 6,452 | 70,426 | 27 |
| | 2 | 140,638 | 25,271 | 0 | 0 | 30,324 | 6,035 | 78,953 | 55 |
| | 3 | 137,480 | 27,435 | 0 | 0 | 25,241 | 6,524 | 78,051 | 229 |

|  |  |
|---|---|
| CBP Releases | 1,113,651 |
| Q2 Releases | 225,430 |
| Release Percentage | 83% |
| Release Percentage | 56% |

Notes: In order to protect privacy, table cells are rounded to the nearest ten. Encounters are limited to SW Border (at and between ports of entry). Book-outs reported by encounter date. Records may not match Component reporting due to differences in reporting methodologies. Data are current as of January 31, 2024; future reporting may include updates to previous reports' data.
Source: Office of Homeland Security Statistics Persist Dataset.



As a result of the changes to the nationalities and demographics being encountered at the border, and the associated increase in the rate of claiming fear by individuals encountered, the amount of resources required to deliver consequences quickly through referrals into expedited removal for the vast majority of individuals who claimed a fear in 2000 (when DHS's predecessor agency averaged 3,000 to 7,000 daily encounters between POEs) or in 2010 (when DHS averaged 1,000 to 2,000 daily encounters between POEs) was far lower than the amount of resources required to manage the same number of encounters today. March 2024 OHSS Persist Dataset. The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010. OHSS Persist Database March 31, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* , https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

SWB Total CBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 |

| | Mexico | NCA | Other |
|---|---|---|---|
| 2000 | 98% | 1% | 0% |
| 2001 | 98% | 2% | 1% |
| 2002 | 97% | 2% | 1% |
| 2003 | 96% | 3% | 1% |
| 2004 | 94% | 4% | 2% |
| 2005 | 87% | 9% | 4% |
| 2006 | 91% | 8% | 2% |
| 2007 | 92% | 6% | 2% |
| 2008 | 92% | 6% | 2% |
| 2009 | 91% | 6% | 2% |
| 2010 | 89% | 8% | 3% |
| 2011 | 86% | 10% | 4% |
| 2012 | 74% | 21% | 5% |
| 2013 | 65% | 29% | 6% |
| 2014 | 50% | 44% | 6% |
| 2015 | 57% | 32% | 11% |
| 2016 | 46% | 41% | 13% |
| 2017 | 44% | 45% | 11% |
| 2018 | 43% | 50% | 8% |
| 2019 | 24% | 64% | 12% |
| 2020 | 65% | 23% | 12% |
| 2021 | 38% | 40% | 22% |
| 2022 | 34% | 23% | 43% |
| 2023 | 29% | 20% | 51% |
| 2024Q2 | 29% | 20% | 51% |

Of course, as noted above, DHS has been experiencing much higher encounter levels.
Even as compared to the 2,100 to 7,200 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher. In FY 2023, these were 3,300 to 7,300 each daily encounters, and from October 2023 through March 2024, the corresponding numbers are 4,000 to 8,300. March 2024 OHSS Persist Dataset.

SWB Encounters, FY 2000 - FY 2024 YTD (March)

| | Low | High |
|---|---|---|
| Range of monthly encounters FY2000 | 2,137 | 7,165 |
| Range of monthly encounters FY2023 | 3,318 | 7,292 |
| Range of monthly encounters FY2024Q1-Q2 | 4,007 | 8,325 |

| Date | CBP monthly encounters | USBP monthly encounters | CBP daily encounters | USBP daily encounters |
|---|---|---|---|---|
| Oct-99 | 87,819 | 87,819 | 2,833 | 2,833 |
| Nov-99 | 74,362 | 74,362 | 2,479 | 2,479 |
| Dec-99 | 66,256 | 66,256 | 2,137 | 2,137 |
| Jan-00 | 175,383 | 175,383 | 5,658 | 5,658 |
| Feb-00 | 200,619 | 200,619 | 7,165 | 7,165 |
| Mar-00 | 209,311 | 209,311 | 6,752 | 6,752 |
| Apr-00 | 170,621 | 170,621 | 5,687 | 5,687 |
| May-00 | 155,961 | 155,961 | 5,031 | 5,031 |
| Jun-00 | 103,856 | 103,856 | 3,462 | 3,462 |
| Jul-00 | 111,963 | 111,963 | 3,612 | 3,612 |
| Aug-00 | 113,448 | 113,448 | 3,660 | 3,660 |
| Sep-00 | 96,822 | 96,822 | 3,227 | 3,227 |
| Oct-00 | 81,995 | 81,995 | 2,645 | 2,645 |
| Nov-00 | 67,217 | 67,217 | 2,241 | 2,241 |
| Dec-00 | 54,828 | 54,828 | 1,769 | 1,769 |
| Jan-01 | 124,586 | 124,586 | 4,019 | 4,019 |
| Feb-01 | 150,616 | 150,616 | 5,379 | 5,379 |
| Mar-01 | 169,904 | 169,904 | 5,481 | 5,481 |
| Apr-01 | 142,040 | 142,040 | 4,735 | 4,735 |
| May-01 | 123,054 | 123,054 | 3,969 | 3,969 |
| Jun-01 | 89,034 | 89,034 | 2,968 | 2,968 |
| Jul-01 | 83,853 | 83,853 | 2,705 | 2,705 |
| Aug-01 | 84,837 | 84,837 | 2,737 | 2,737 |
| Sep-01 | 59,448 | 59,448 | 1,982 | 1,982 |
| Oct-01 | 37,746 | 37,746 | 1,218 | 1,218 |
| Nov-01 | 32,694 | 32,694 | 1,090 | 1,090 |
| Dec-01 | 31,531 | 31,531 | 1,017 | 1,017 |
| Jan-02 | 79,647 | 79,647 | 2,569 | 2,569 |
| Feb-02 | 95,645 | 95,645 | 3,416 | 3,416 |
| Mar-02 | 126,906 | 126,906 | 4,094 | 4,094 |
| Apr-02 | 121,908 | 121,908 | 4,064 | 4,064 |
| May-02 | 97,571 | 97,571 | 3,147 | 3,147 |
| Jun-02 | 78,730 | 78,730 | 2,624 | 2,624 |
| Jul-02 | 76,719 | 76,719 | 2,475 | 2,475 |
| Aug-02 | 82,860 | 82,860 | 2,673 | 2,673 |
| Sep-02 | 68,384 | 68,384 | 2,279 | 2,279 |
| Oct-02 | 61,913 | 61,913 | 1,997 | 1,997 |
| Nov-02 | 47,919 | 47,919 | 1,597 | 1,597 |
| Dec-02 | 37,930 | 37,930 | 1,224 | 1,224 |
| Jan-03 | 87,002 | 87,002 | 2,807 | 2,807 |
| Feb-03 | 97,016 | 97,016 | 3,465 | 3,465 |
| Mar-03 | 98,625 | 98,625 | 3,181 | 3,181 |
| Apr-03 | 75,564 | 75,564 | 2,519 | 2,519 |
| May-03 | 88,845 | 88,845 | 2,866 | 2,866 |
| Jun-03 | 75,634 | 75,634 | 2,521 | 2,521 |
| Jul-03 | 79,396 | 79,396 | 2,561 | 2,561 |
| Aug-03 | 84,651 | 84,651 | 2,731 | 2,731 |
| Sep-03 | 72,239 | 72,239 | 2,408 | 2,408 |
| Oct-03 | 69,246 | 65,388 | 2,234 | 2,109 |
| Nov-03 | 62,412 | 57,942 | 2,080 | 1,931 |
| Dec-03 | 48,280 | 43,663 | 1,557 | 1,408 |
| Jan-04 | 98,764 | 92,751 | 3,186 | 2,992 |
| Feb-04 | 116,398 | 110,824 | 4,157 | 3,958 |
| Mar-04 | 160,530 | 155,089 | 5,243 | 5,003 |
| Apr-04 | 142,491 | 135,632 | 4,750 | 4,521 |
| May-04 | 125,502 | 118,812 | 4,048 | 3,833 |
| Jun-04 | 101,178 | 94,607 | 3,373 | 3,154 |
| Jul-04 | 98,989 | 92,152 | 3,193 | 2,973 |
| Aug-04 | 99,986 | 93,299 | 3,225 | 3,010 |
| Sep-04 | 85,877 | 80,089 | 2,863 | 2,670 |
| Oct-04 | 81,687 | 75,908 | 2,635 | 2,449 |
| Nov-04 | 70,617 | 65,110 | 2,354 | 2,170 |
| Dec-04 | 54,028 | 48,410 | 1,743 | 1,562 |
| Jan-05 | 100,552 | 94,029 | 3,276 | 3,033 |
| Feb-05 | 121,177 | 113,776 | 4,328 | 4,063 |
| Mar-05 | 150,892 | 143,044 | 4,867 | 4,614 |
| Apr-05 | 148,688 | 140,074 | 4,956 | 4,669 |
| May-05 | 125,226 | 115,817 | 4,040 | 3,736 |
| Jun-05 | 99,490 | 90,796 | 3,316 | 3,027 |
| Jul-05 | 105,093 | 94,964 | 3,390 | 3,063 |
| Aug-05 | 107,020 | 96,765 | 3,452 | 3,121 |
| Sep-05 | 103,177 | 93,718 | 3,439 | 3,124 |
| Oct-05 | 91,935 | 83,561 | 2,966 | 2,696 |
| Nov-05 | 78,817 | 70,954 | 2,627 | 2,365 |
| Dec-05 | 60,375 | 52,663 | 1,948 | 1,699 |
| Jan-06 | 110,987 | 101,262 | 3,580 | 3,267 |
| Feb-06 | 132,780 | 125,030 | 4,742 | 4,465 |
| Mar-06 | 168,077 | 160,696 | 5,454 | 5,184 |
| Apr-06 | 133,964 | 126,554 | 4,465 | 4,218 |
| May-06 | 113,251 | 105,443 | 3,653 | 3,401 |
| Jun-06 | 76,274 | 68,365 | 2,542 | 2,279 |
| Jul-06 | 67,636 | 59,633 | 2,182 | 1,924 |
| Aug-06 | 67,631 | 59,733 | 2,182 | 1,927 |
| Sep-06 | 65,571 | 58,082 | 2,186 | 1,936 |
| Oct-06 | 68,083 | 60,726 | 2,196 | 1,959 |
| Nov-06 | 58,199 | 51,592 | 1,940 | 1,720 |
| Dec-06 | 47,537 | 40,527 | 1,533 | 1,307 |
| Jan-07 | 79,764 | 72,000 | 2,574 | 2,323 |
| Feb-07 | 86,435 | 79,273 | 3,087 | 2,831 |
| Mar-07 | 122,450 | 114,136 | 3,950 | 3,682 |
| Apr-07 | 112,773 | 104,463 | 3,759 | 3,482 |
| May-07 | 97,186 | 88,510 | 3,135 | 2,855 |
| Jun-07 | 79,997 | 71,336 | 2,667 | 2,378 |
| Jul-07 | 75,766 | 66,793 | 2,444 | 2,155 |
| Aug-07 | 69,142 | 59,801 | 2,230 | 1,929 |
| Sep-07 | 57,556 | 48,577 | 1,919 | 1,653 |
| Oct-07 | 58,616 | 51,355 | 1,891 | 1,657 |
| Nov-07 | 48,693 | 42,208 | 1,623 | 1,407 |
| Dec-07 | 38,556 | 31,824 | 1,244 | 1,027 |
| Jan-08 | 66,471 | 59,034 | 2,144 | 1,904 |
| Feb-08 | 80,724 | 73,483 | 2,863 | 2,624 |
| Mar-08 | 97,774 | 89,749 | 3,154 | 2,896 |
| Apr-08 | 99,518 | 91,552 | 3,317 | 3,052 |
| May-08 | 77,048 | 69,240 | 2,485 | 2,234 |
| Jun-08 | 60,492 | 53,850 | 2,016 | 1,795 |
| Jul-08 | 56,806 | 49,468 | 1,832 | 1,596 |
| Aug-08 | 56,142 | 48,544 | 1,811 | 1,566 |
| Sep-08 | 51,713 | 44,722 | 1,724 | 1,491 |
| Oct-08 | 49,217 | 42,937 | 1,588 | 1,385 |
| Nov-08 | 38,450 | 32,782 | 1,282 | 1,093 |
| Dec-08 | 31,206 | 25,946 | 1,007 | 837 |
| Jan-09 | 50,737 | 44,503 | 1,637 | 1,436 |
| Feb-09 | 51,532 | 48,211 | 1,969 | 1,758 |
| Mar-09 | 74,503 | 67,343 | 2,398 | 2,172 |
| Apr-09 | 65,129 | 58,493 | 2,171 | 1,950 |
| May-09 | 57,593 | 50,883 | 1,858 | 1,641 |
| Jun-09 | 52,640 | 46,344 | 1,753 | 1,535 |
| Jul-09 | 50,986 | 43,841 | 1,645 | 1,414 |
| Aug-09 | 51,084 | 43,519 | 1,648 | 1,404 |
| Sep-09 | 42,666 | 35,350 | 1,422 | 1,178 |
| Oct-09 | 47,290 | 40,890 | 1,525 | 1,319 |
| Nov-09 | 39,064 | 32,815 | 1,302 | 1,094 |
| Dec-09 | 31,352 | 25,034 | 1,011 | 808 |
| Jan-10 | 40,741 | 34,784 | 1,314 | 1,122 |
| Feb-10 | 48,753 | 42,790 | 1,741 | 1,528 |
| Mar-10 | 69,152 | 61,361 | 2,231 | 1,979 |
| Apr-10 | 62,351 | 55,237 | 2,078 | 1,841 |
| May-10 | 54,018 | 47,045 | 1,743 | 1,518 |
| Jun-10 | 39,308 | 32,955 | 1,310 | 1,099 |
| Jul-10 | 32,363 | 25,609 | 1,044 | 826 |
| Aug-10 | 33,717 | 26,415 | 1,088 | 852 |
| Sep-10 | 29,310 | 22,796 | 977 | 760 |
| Oct-10 | 32,451 | 26,165 | 1,047 | 844 |
| Nov-10 | 28,516 | 22,405 | 951 | 747 |
| Dec-10 | 25,728 | 19,429 | 830 | 627 |
| Jan-11 | 29,737 | 23,926 | 959 | 772 |
| Feb-11 | 34,408 | 28,786 | 1,229 | 1,028 |
| Mar-11 | 48,920 | 42,014 | 1,578 | 1,355 |
| Apr-11 | 42,739 | 36,251 | 1,425 | 1,208 |
| May-11 | 37,543 | 31,236 | 1,211 | 1,008 |
| Jun-11 | 32,909 | 27,166 | 1,097 | 906 |
| Jul-11 | 29,520 | 23,170 | 952 | 747 |
| Aug-11 | 30,216 | 24,166 | 975 | 780 |
| Sep-11 | 28,386 | 22,863 | 946 | 762 |
| Oct-11 | 31,344 | 25,612 | 1,011 | 826 |
| Nov-11 | 28,617 | 23,368 | 954 | 779 |
| Dec-11 | 24,380 | 18,983 | 786 | 612 |
| Jan-12 | 30,798 | 25,714 | 993 | 829 |
| Feb-12 | 37,009 | 31,579 | 1,322 | 1,128 |
| Mar-12 | 48,538 | 42,218 | 1,566 | 1,362 |
| Apr-12 | 46,680 | 40,628 | 1,556 | 1,354 |
| May-12 | 43,020 | 36,966 | 1,388 | 1,192 |
| Jun-12 | 36,808 | 30,669 | 1,227 | 1,022 |
| Jul-12 | 32,833 | 26,978 | 1,059 | 870 |
| Aug-12 | 33,699 | 27,567 | 1,087 | 889 |
| Sep-12 | 32,399 | 26,591 | 1,080 | 886 |
| Oct-12 | 34,847 | 28,929 | 1,124 | 933 |
| Nov-12 | 33,159 | 27,636 | 1,105 | 921 |
| Dec-12 | 29,077 | 23,243 | 938 | 750 |
| Jan-13 | 32,485 | 26,921 | 1,048 | 868 |
| Feb-13 | 40,636 | 35,042 | 1,451 | 1,252 |
| Mar-13 | 54,010 | 47,293 | 1,742 | 1,526 |
| Apr-13 | 54,771 | 48,212 | 1,826 | 1,607 |
| May-13 | 50,500 | 43,856 | 1,629 | 1,415 |
| Jun-13 | 40,790 | 34,436 | 1,360 | 1,148 |
| Jul-13 | 40,006 | 33,230 | 1,291 | 1,072 |
| Aug-13 | 41,125 | 33,797 | 1,327 | 1,090 |
| Sep-13 | 38,206 | 31,802 | 1,274 | 1,060 |
| Oct-13 | 41,835 | 35,312 | 1,350 | 1,139 |
| Nov-13 | 38,692 | 31,896 | 1,290 | 1,063 |
| Dec-13 | 36,707 | 29,528 | 1,184 | 953 |
| Jan-14 | 35,200 | 28,668 | 1,135 | 925 |
| Feb-14 | 42,473 | 36,403 | 1,517 | 1,300 |
| Mar-14 | 57,548 | 49,596 | 1,856 | 1,600 |
| Apr-14 | 59,383 | 51,502 | 1,979 | 1,717 |
| May-14 | 69,033 | 60,683 | 2,227 | 1,958 |
| Jun-14 | 66,572 | 57,861 | 2,219 | 1,929 |
| Jul-14 | 48,833 | 40,708 | 1,575 | 1,313 |
| Aug-14 | 39,766 | 31,388 | 1,283 | 1,013 |
| Sep-14 | 34,006 | 25,825 | 1,134 | 861 |
| Oct-14 | 35,903 | 26,450 | 1,158 | 853 |
| Nov-14 | 33,024 | 24,641 | 1,101 | 821 |
| Dec-14 | 34,231 | 25,019 | 1,104 | 807 |
| Jan-15 | 30,179 | 21,514 | 974 | 694 |
| Feb-15 | 32,554 | 24,376 | 1,163 | 871 |
| Mar-15 | 39,162 | 29,791 | 1,263 | 961 |
| Apr-15 | 38,299 | 29,750 | 1,277 | 992 |
| May-15 | 40,684 | 31,576 | 1,312 | 1,019 |
| Jun-15 | 38,620 | 29,303 | 1,287 | 977 |
| Jul-15 | 38,610 | 28,388 | 1,245 | 916 |
| Aug-15 | 42,419 | 30,239 | 1,368 | 975 |
| Sep-15 | 41,171 | 30,286 | 1,372 | 1,010 |
| Oct-15 | 45,245 | 32,724 | 1,460 | 1,056 |
| Nov-15 | 45,387 | 32,838 | 1,513 | 1,095 |
| Dec-15 | 48,393 | 37,014 | 1,561 | 1,194 |
| Jan-16 | 33,396 | 23,758 | 1,077 | 766 |
| Feb-16 | 38,068 | 26,072 | 1,360 | 931 |
| Mar-16 | 45,779 | 33,316 | 1,477 | 1,075 |
| Apr-16 | 48,271 | 38,089 | 1,609 | 1,270 |
| May-16 | 54,987 | 40,337 | 1,774 | 1,301 |
| Jun-16 | 45,168 | 34,450 | 1,506 | 1,148 |
| Jul-16 | 46,658 | 33,723 | 1,505 | 1,088 |
| Aug-16 | 51,569 | 37,048 | 1,664 | 1,195 |
| Sep-16 | 56,070 | 39,501 | 1,869 | 1,317 |
| Oct-16 | 66,707 | 46,184 | 2,152 | 1,490 |
| Nov-16 | 63,366 | 47,211 | 2,112 | 1,574 |
| Dec-16 | 58,416 | 43,251 | 1,884 | 1,395 |
| Jan-17 | 42,458 | 31,576 | 1,370 | 1,019 |
| Feb-17 | 23,555 | 18,754 | 841 | 670 |
| Mar-17 | 16,592 | 12,195 | 535 | 393 |
| Apr-17 | 15,768 | 11,127 | 526 | 371 |
| May-17 | 19,940 | 14,519 | 643 | 468 |
| Jun-17 | 21,657 | 16,087 | 722 | 536 |
| Jul-17 | 25,014 | 18,187 | 807 | 587 |
| Aug-17 | 30,569 | 22,288 | 986 | 719 |
| Sep-17 | 31,157 | 22,537 | 1,039 | 751 |
| Oct-17 | 34,842 | 25,488 | 1,124 | 822 |
| Nov-17 | 39,031 | 29,085 | 1,301 | 970 |
| Dec-17 | 40,476 | 28,995 | 1,306 | 935 |
| Jan-18 | 35,865 | 25,975 | 1,157 | 838 |
| Feb-18 | 36,690 | 26,666 | 1,310 | 952 |
| Mar-18 | 50,213 | 37,390 | 1,620 | 1,206 |
| Apr-18 | 51,019 | 38,243 | 1,701 | 1,275 |
| May-18 | 51,790 | 40,339 | 1,671 | 1,301 |
| Jun-18 | 43,096 | 34,089 | 1,437 | 1,136 |
| Jul-18 | 40,005 | 31,299 | 1,290 | 1,010 |
| Aug-18 | 46,551 | 37,524 | 1,502 | 1,210 |
| Sep-18 | 50,366 | 41,486 | 1,679 | 1,383 |
| Oct-18 | 60,775 | 51,005 | 1,960 | 1,645 |
| Nov-18 | 62,463 | 51,857 | 2,082 | 1,729 |
| Dec-18 | 60,789 | 50,751 | 1,961 | 1,637 |
| Jan-19 | 58,313 | 47,979 | 1,881 | 1,548 |
| Feb-19 | 76,543 | 66,883 | 2,734 | 2,389 |
| Mar-19 | 103,730 | 92,833 | 3,346 | 2,995 |
| Apr-19 | 109,413 | 99,273 | 3,647 | 3,309 |
| May-19 | 144,113 | 132,856 | 4,649 | 4,286 |
| Jun-19 | 104,310 | 94,902 | 3,477 | 3,163 |
| Jul-19 | 81,748 | 71,978 | 2,637 | 2,322 |
| Aug-19 | 62,608 | 50,684 | 2,020 | 1,635 |
| Sep-19 | 52,424 | 40,507 | 1,747 | 1,350 |
| Oct-19 | 45,139 | 35,402 | 1,456 | 1,142 |
| Nov-19 | 42,642 | 33,524 | 1,421 | 1,117 |
| Dec-19 | 40,563 | 32,853 | 1,308 | 1,060 |
| Jan-20 | 36,583 | 29,205 | 1,180 | 942 |
| Feb-20 | 36,686 | 30,077 | 1,310 | 1,074 |
| Mar-20 | 34,457 | 30,389 | 1,112 | 980 |
| Apr-20 | 17,106 | 16,182 | 570 | 539 |
| May-20 | 23,237 | 21,593 | 750 | 697 |
| Jun-20 | 33,029 | 30,816 | 1,101 | 1,027 |
| Jul-20 | 40,949 | 38,556 | 1,321 | 1,244 |
| Aug-20 | 50,007 | 47,276 | 1,613 | 1,525 |
| Sep-20 | 57,668 | 54,762 | 1,922 | 1,825 |
| Oct-20 | 71,943 | 69,048 | 2,321 | 2,227 |
| Nov-20 | 72,113 | 69,169 | 2,404 | 2,306 |
| Dec-20 | 73,994 | 71,141 | 2,387 | 2,295 |
| Jan-21 | 78,414 | 75,316 | 2,529 | 2,430 |
| Feb-21 | 101,098 | 97,643 | 3,611 | 3,487 |
| Mar-21 | 173,277 | 169,216 | 5,590 | 5,459 |
| Apr-21 | 178,795 | 173,699 | 5,960 | 5,790 |
| May-21 | 180,597 | 172,654 | 5,826 | 5,569 |
| Jun-21 | 189,034 | 178,649 | 6,301 | 5,955 |
| Jul-21 | 213,593 | 200,658 | 6,890 | 6,473 |
| Aug-21 | 209,840 | 196,514 | 6,769 | 6,339 |
| Sep-21 | 192,001 | 185,515 | 6,400 | 6,184 |
| Oct-21 | 164,837 | 159,113 | 5,317 | 5,133 |
| Nov-21 | 174,845 | 167,015 | 5,828 | 5,567 |
| Dec-21 | 179,253 | 170,602 | 5,782 | 5,503 |
| Jan-22 | 154,874 | 147,877 | 4,996 | 4,770 |
| Feb-22 | 166,010 | 159,170 | 5,929 | 5,685 |
| Mar-22 | 222,574 | 211,181 | 7,180 | 6,812 |
| Apr-22 | 235,785 | 203,504 | 7,860 | 6,783 |
| May-22 | 241,136 | 224,370 | 7,779 | 7,238 |
| Jun-22 | 207,834 | 192,399 | 6,928 | 6,413 |
| Jul-22 | 200,162 | 181,834 | 6,457 | 5,866 |
| Aug-22 | 204,087 | 181,774 | 6,583 | 5,864 |
| Sep-22 | 227,547 | 207,597 | 7,585 | 6,920 |
| Oct-22 | 231,529 | 205,134 | 7,469 | 6,617 |
| Nov-22 | 235,173 | 207,680 | 7,839 | 6,923 |
| Dec-22 | 252,315 | 222,018 | 8,139 | 7,162 |
| Jan-23 | 157,358 | 129,513 | 5,076 | 4,178 |
| Feb-23 | 156,630 | 130,521 | 5,594 | 4,661 |
| Mar-23 | 193,249 | 163,672 | 6,234 | 5,280 |
| Apr-23 | 211,992 | 183,921 | 7,066 | 6,131 |
| May-23 | 206,690 | 171,382 | 6,667 | 5,528 |
| Jun-23 | 144,556 | 99,538 | 4,819 | 3,318 |
| Jul-23 | 183,479 | 132,642 | 5,919 | 4,279 |
| Aug-23 | 232,963 | 181,054 | 7,515 | 5,840 |
| Sep-23 | 269,735 | 218,763 | 8,991 | 7,292 |
| Oct-23 | 240,932 | 188,754 | 8,031 | 6,292 |
| Nov-23 | 242,413 | 191,119 | 8,080 | 6,371 |
| Dec-23 | 301,980 | 249,737 | 10,066 | 8,325 |
| Jan-24 | 176,189 | 124,204 | 5,684 | 4,007 |
| Feb-24 | 189,914 | 140,638 | 6,549 | 4,850 |
| Mar-24 | 189,371 | 137,480 | 6,109 | 4,435 |

Notes: Data on encounters at POE not available for Fys 2000-2003.
Source: March 2024 Persist Dataset

Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions. CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000. *See* OHSS analysis of March 2024 OHSS Persist Dataset. In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present.

| | OFO | USBP | Grand Total |
|---|---|---|---|
| 2000 | - | 1,566,421 | 1,566,421 |
| 2001 | - | 1,231,412 | 1,231,412 |
| 2002 | - | 930,341 | 930,341 |
| 2003 | - | 906,734 | 906,734 |
| 2004 | 71,446 | 1,140,247 | 1,211,693 |
| 2005 | 97,856 | 1,171,391 | 1,269,247 |
| 2006 | 96,382 | 1,071,976 | 1,168,358 |
| 2007 | 96,192 | 858,736 | 954,928 |
| 2008 | 87,504 | 705,049 | 792,553 |
| 2009 | 78,272 | 540,851 | 619,123 |
| 2010 | 79,688 | 447,731 | 527,419 |
| 2011 | 73,496 | 327,577 | 401,073 |
| 2012 | 69,252 | 356,873 | 426,125 |
| 2013 | 75,215 | 414,397 | 489,612 |
| 2014 | 90,678 | 479,370 | 570,048 |
| 2015 | 113,523 | 331,333 | 444,856 |
| 2016 | 150,121 | 408,870 | 558,991 |
| 2017 | 111,283 | 303,916 | 415,199 |
| 2018 | 123,365 | 396,579 | 519,944 |
| 2019 | 125,721 | 851,508 | 977,229 |
| 2020 | 57,431 | 400,635 | 458,066 |
| 2021 | 75,477 | 1,659,222 | 1,734,699 |
| 2022 | 172,508 | 2,206,436 | 2,378,944 |
| 2023 | 429,831 | 2,045,838 | 2,475,669 |

Note: Data on OFO encounters are not available prior to FY 2004.

Source:: March 2024 OHSS Persist.

Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.

Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

| Row Labels | NA | Repeat | Unique | Grand Total |
|---|---|---|---|---|
| **2013** | **12153** | **110603** | **366856** | **489612** |
| 10 | 659 | 8301 | 25887 | 34847 |
| 11 | 604 | 8082 | 24473 | 33159 |
| 12 | 598 | 6844 | 21635 | 29077 |
| 1 | 650 | 7643 | 24192 | 32485 |
| 2 | 641 | 9043 | 30952 | 40636 |
| 3 | 766 | 11818 | 41426 | 54010 |
| 4 | 786 | 12135 | 41850 | 54771 |
| 5 | 758 | 11486 | 38256 | 50500 |
| 6 | 879 | 9295 | 30616 | 40790 |
| 7 | 1927 | 8570 | 29509 | 40006 |
| 8 | 2001 | 9080 | 30044 | 41125 |
| 9 | 1884 | 8306 | 28016 | 38206 |
| **2014** | **25381** | **107240** | **437427** | **570048** |
| 10 | 1996 | 9676 | 30163 | 41835 |
| 11 | 2109 | 8516 | 28067 | 38692 |
| 12 | 2138 | 7632 | 26937 | 36707 |
| 1 | 1862 | 7607 | 25731 | 35200 |
| 2 | 1660 | 8515 | 32298 | 42473 |
| 3 | 2000 | 10725 | 44823 | 57548 |
| 4 | 1924 | 11424 | 46035 | 59383 |
| 5 | 2263 | 10923 | 55847 | 69033 |
| 6 | 2222 | 9231 | 55119 | 66572 |
| 7 | 2213 | 8568 | 38052 | 48833 |
| 8 | 2475 | 7593 | 29698 | 39766 |
| 9 | 2519 | 6830 | 24657 | 34006 |
| **2015** | **41383** | **77125** | **326348** | **444856** |
| 10 | 2433 | 7254 | 26216 | 35903 |
| 11 | 2583 | 6712 | 23729 | 33024 |
| 12 | 3348 | 6667 | 24216 | 34231 |
| 1 | 3168 | 5901 | 21110 | 30179 |
| 2 | 2571 | 6283 | 23700 | 32554 |
| 3 | 3323 | 7442 | 28397 | 39162 |
| 4 | 3228 | 6728 | 28343 | 38299 |
| 5 | 3406 | 6829 | 30449 | 40684 |
| 6 | 3409 | 6301 | 28910 | 38620 |
| 7 | 4175 | 5560 | 28875 | 38610 |
| 8 | 5421 | 5726 | 31272 | 42419 |
| 9 | 4318 | 5722 | 31131 | 41171 |
| **2016** | **53905** | **75488** | **429598** | **558991** |
| 10 | 6271 | 6056 | 32918 | 45245 |
| 11 | 5638 | 5778 | 33971 | 45387 |
| 12 | 3544 | 5925 | 38924 | 48393 |
| 1 | 3756 | 5012 | 24628 | 33396 |
| 2 | 6100 | 5294 | 26674 | 38068 |
| 3 | 5436 | 6789 | 33554 | 45779 |
| 4 | 3043 | 7373 | 37855 | 48271 |
| 5 | 6227 | 7721 | 41039 | 54987 |
| 6 | 2599 | 6608 | 35961 | 45168 |
| 7 | 3413 | 5812 | 37433 | 46658 |
| 8 | 3625 | 6249 | 41695 | 51569 |
| 9 | 4253 | 6871 | 44946 | 56070 |
| **2017** | **30007** | **52439** | **332753** | **415199** |
| 10 | 5259 | 7798 | 53650 | 66707 |
| 11 | 4414 | 7084 | 51868 | 63366 |
| 12 | 6212 | 5762 | 46442 | 58416 |
| 1 | 2465 | 5023 | 34970 | 42458 |
| 2 | 938 | 4115 | 18502 | 23555 |
| 3 | 1086 | 2740 | 12766 | 16592 |
| 4 | 1228 | 2563 | 11977 | 15768 |
| 5 | 1214 | 3141 | 15585 | 19940 |
| 6 | 1228 | 3199 | 17230 | 21657 |
| 7 | 1630 | 3292 | 20092 | 25014 |
| 8 | 2141 | 3845 | 24583 | 30569 |
| 9 | 2192 | 3877 | 25088 | 31157 |
| **2018** | **21560** | **59621** | **438763** | **519944** |
| 10 | 1842 | 4436 | 28564 | 34842 |
| 11 | 1815 | 4372 | 32844 | 39031 |
| 12 | 1773 | 4186 | 34517 | 40476 |
| 1 | 2030 | 4427 | 29408 | 35865 |
| 2 | 1702 | 4767 | 30221 | 36690 |
| 3 | 1710 | 6317 | 42186 | 50213 |
| 4 | 1635 | 6588 | 42796 | 51019 |
| 5 | 1568 | 5702 | 44520 | 51790 |
| 6 | 1491 | 4529 | 37076 | 43096 |
| 7 | 2088 | 4271 | 33646 | 40005 |
| 8 | 1999 | 5014 | 39538 | 46551 |
| 9 | 1907 | 5012 | 43447 | 50366 |
| **2019** | **19820** | **76484** | **880925** | **977229** |
| 10 | 1852 | 5645 | 53278 | 60775 |
| 11 | 1846 | 4904 | 55713 | 62463 |
| 12 | 1713 | 3948 | 55128 | 60789 |
| 1 | 1809 | 4410 | 52094 | 58313 |
| 2 | 1633 | 5513 | 69397 | 76543 |
| 3 | 1743 | 6846 | 95141 | 103730 |
| 4 | 1726 | 7218 | 100469 | 109413 |
| 5 | 1667 | 8572 | 133874 | 144113 |
| 6 | 1318 | 7522 | 95470 | 104310 |
| 7 | 1367 | 6359 | 74022 | 81748 |
| 8 | 1540 | 7152 | 53916 | 62608 |
| 9 | 1606 | 8395 | 42423 | 52424 |
| **2020** | **8849** | **149237** | **299980** | **458066** |
| 10 | 1524 | 8323 | 35292 | 45139 |
| 11 | 1433 | 7904 | 33305 | 42642 |
| 12 | 1271 | 7583 | 31709 | 40563 |
| 1 | 1055 | 7739 | 27789 | 36583 |
| 2 | 1108 | 7653 | 27925 | 36686 |
| 3 | 739 | 8384 | 25334 | 34457 |
| 4 | 112 | 7957 | 9037 | 17106 |
| 5 | 239 | 10961 | 12037 | 23237 |
| 6 | 308 | 14909 | 17812 | 33029 |
| 7 | 304 | 18762 | 21883 | 40949 |
| 8 | 370 | 23322 | 26315 | 50007 |
| 9 | 386 | 25740 | 31542 | 57668 |
| **2021** | **7736** | **603993** | **1122970** | **1734699** |
| 10 | 394 | 33060 | 38489 | 71943 |
| 11 | 379 | 34747 | 36987 | 72113 |
| 12 | 392 | 37382 | 36220 | 73994 |
| 1 | 569 | 36666 | 41179 | 78414 |
| 2 | 691 | 41755 | 58652 | 101098 |
| 3 | 639 | 57123 | 115515 | 173277 |
| 4 | 684 | 61710 | 116401 | 178795 |
| 5 | 693 | 69944 | 109960 | 180597 |
| 6 | 748 | 66603 | 121683 | 189034 |
| 7 | 870 | 60101 | 152622 | 213593 |
| 8 | 857 | 54155 | 154828 | 209840 |
| 9 | 820 | 50747 | 140434 | 192001 |
| **2022** | **37446** | **594941** | **1746557** | **2378944** |
| 10 | 878 | 48646 | 115313 | 164837 |
| 11 | 1210 | 46033 | 127602 | 174845 |
| 12 | 1222 | 43619 | 134412 | 179253 |
| 1 | 1210 | 42371 | 111293 | 154874 |
| 2 | 1163 | 50670 | 114177 | 166010 |
| 3 | 3985 | 61897 | 156692 | 222574 |
| 4 | 21256 | 59580 | 154949 | 235785 |
| 5 | 1366 | 60113 | 179657 | 241136 |
| 6 | 1210 | 52239 | 154385 | 207834 |
| 7 | 1257 | 43587 | 155318 | 200162 |
| 8 | 1260 | 43794 | 159033 | 204087 |
| 9 | 1429 | 42392 | 183726 | 227547 |
| **2023** | **18403** | **410600** | **2046666** | **2475669** |
| 10 | 1142 | 43308 | 187079 | 231529 |
| 11 | 1174 | 37262 | 196737 | 235173 |
| 12 | 1222 | 32659 | 218434 | 252315 |
| 1 | 1345 | 39103 | 116910 | 157358 |
| 2 | 1201 | 42374 | 113055 | 156630 |
| 3 | 1170 | 49817 | 142262 | 193249 |
| 4 | 1161 | 46797 | 164034 | 211992 |
| 5 | 1845 | 40933 | 163912 | 206690 |
| 6 | 1787 | 20547 | 122222 | 144556 |
| 7 | 2030 | 19001 | 162448 | 183479 |
| 8 | 2159 | 20201 | 210603 | 232963 |
| 9 | 2167 | 18598 | 248970 | 269735 |
| **2024** | **6701** | **85125** | **1248973** | **1340799** |
| 10 | 1025 | 15916 | 223991 | 240932 |
| 11 | 1052 | 14544 | 226817 | 242413 |
| 12 | 979 | 14839 | 286162 | 301980 |
| 1 | 1198 | 11701 | 163290 | 176189 |
| 2 | 1117 | 13806 | 174991 | 189914 |
| 3 | 1330 | 14319 | 173722 | 189371 |

Note: Unique encounters include encounters of individuals not previously encountered in the prior 365 days. Administrative encounters are not considered for removal proceedings and therefore not included in OHSS' analysis of unique versus repeat encounters.
Source: March 2024 OHSS Persist.

Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.

CBP held an average of 21,063 noncitizens in custody each day during December 2023, averaging 109 percent of CBP's daily custody capacity (21,064) roughly each day for the entire month. OHSS analysis of data downloaded from I2F on February 14, 2024.

"If pre-to-FY-identified prior to signature, "USBP held an average of 23,869 noncitizens in custody each day during December 2023, averaging 108 percent of CBP's daily custody capacity (21,062) roughly each day for the entire month" should have been "USBP held an average of 23,472 noncitizens in custody each day during December 2023, averaging 102 percent of USBP's daily custody capacity (21,042) roughly each day for the entire month."

CBP Total in Custody, 12/1/23 - 12/31/23

| Date | | | |
|---|---|---|---|
| 2023-12-01 | 271 | 17392 | 17653 |
| 2023-12-02 | 357 | 17342 | 17700 |
| 2023-12-03 | 411 | 18271 | 18682 |
| 2023-12-04 | 388 | 20235 | 20520 |
| 2023-12-05 | 327 | 21830 | 22158 |
| 2023-12-06 | 411 | 22100 | 22522 |
| 2023-12-07 | 405 | 23158 | 23672 |
| 2023-12-08 | 408 | 21467 | 21875 |
| 2023-12-09 | 417 | 23037 | 24024 |
| 2023-12-10 | 371 | 27335 | 27706 |
| 2023-12-11 | 388 | 25196 | 25588 |
| 2023-12-12 | 387 | 25097 | 24764 |
| 2023-12-13 | 460 | 26187 | 24647 |
| 2023-12-14 | 374 | 18988 | 19364 |
| 2023-12-15 | 390 | 19555 | 19806 |
| 2023-12-16 | 323 | 19080 | 19470 |
| 2023-12-17 | 420 | 23197 | 23517 |
| 2023-12-18 | 405 | 25771 | 24170 |
| 2023-12-19 | 443 | 25102 | 24427 |
| 2023-12-20 | 443 | 25795 | 26148 |
| 2023-12-21 | 453 | 25095 | 25898 |
| 2023-12-22 | 363 | 24473 | 24803 |
| 2023-12-23 | 337 | 24371 | 24354 |
| 2023-12-24 | 333 | 23538 | 23037 |
| 2023-12-25 | 321 | 23385 | 23703 |
| 2023-12-26 | 338 | 20380 | 21918 |
| 2023-12-27 | 342 | 20902 | 21244 |
| 2023-12-28 | 358 | 21166 | 21524 |
| 2023-12-29 | 335 | 21552 | 21879 |
| average | 373 | 23073 | 21063 |
| Capacity | 802 | 23342 | 21064 |
| % capacity | 43% | 102% | 109% |

OHSS analysis of data downloaded from I2F on February 14, 2024.

IFR_AR_007506

From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.
OHSS analysis of data downloaded from UIP on April 2, 2024.

| Expedited Removal Processing: Southwest Border | Since May 12 |
|---|---|
| SW Border Encounters | 1,694,114 |
| Processed for ER | 316,288 |
| % Encounters processed for ER | 19% |
| ER processed in CBP Custody | 120,709 |
| Credible fear referrals | 46,628 |
| CFIs conducted | 45,522 |
| CFI results | 45,086 |
| Positive fear finding | 18,202 |
| Negative fear finding | 22,669 |
| Appealed to IJ | 13,956 |
| Pending or blank order | 759 |
| Affirmed | 10,481 |
| Vacated | 2,716 |
| Not appealed to IJ | 8,713 |
| Admin closed | 4,215 |
| Admin closed without CFI | 887 |
| CBP repatriations | 95,037 |
| No fear claim ER removals | 74,040 |
| Negative fear; no IJ review | 19 |
| Negative fear; IJ affirmed | 17,236 |
| ER withdrawn VRs | 1,919 |
| Other | 1,823 |
| ER transfers to ICE for processing | 195,579 |
| Reprocessed with other dispositions | 836 |
| ER processed by ICE non-detained | 87,760 |
| ER processed in ICE Custody | 106,983 |
| Credible fear referrals | 93,630 |
| CFIs conducted | 84,045 |
| CFI results | 82,016 |
| Positive fear finding | 47,247 |
| Negative fear finding | 27,930 |
| Appealed to IJ | 21,849 |
| Pending or blank order | 1,491 |
| Affirmed | 17,098 |
| Vacated | 3,260 |
| Not appealed to IJ | 6,081 |
| Admin closed | 6,839 |
| Admin closed without CFI | 7,179 |
| ICE removals (REPATRIATIONS) | 29,926 |
| No fear claim ER removals | 4,368 |
| Negative fear; no IJ review | 4 |
| Negative fear; IJ affirmed | 17,620 |
| Other | 7,934 |
| ER processed by ICE non-detained | 87,760 |
| Credible fear referrals | 28,590 |
| CFIs conducted | 22,519 |
| CFI results | 21,229 |
| Positive fear finding | 13,009 |
| Negative fear finding | 7,575 |
| Appealed to IJ | 7,018 |
| Pending or blank order | 1,034 |
| Affirmed | 4,112 |
| Vacated | 1,872 |
| Not appealed to IJ | 557 |
| Admin closed | 645 |
| Admin closed without CFI | 2,111 |
| ICE removals (REPATRIATIONS) | 36,803 |
| No fear claim ER removals | 34,600 |
| Negative fear; no IJ review | 0 |
| Negative fear; IJ affirmed | 1,893 |
| Other | 310 |

| | Total | Daily Averages |
|---|---|---|
| ER (excluding cases reprocessed out of ER by IC | 315,452 | 974 |
| Fear referrals | 168,848 | 521.1358 |
| Total CFIs | 152,086 | 469.4012 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered by CBP at the southwest land border, excluding OFO encounters of people with CBP One appointments. Table includes encounters between May 12, 2023 and March 31, 2024.
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_AR_007557

IFR_AR_007558

During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b). Based on comprehensive CBP processing dispositions for single adults, family units, and UCs from contiguous countries encountered May 12, 2023 to March 31, 2024; data downloaded from UIP on April 2, 2024.

| | USBP | | | Percent of total by column | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mexico | OTM | Total | Mexico | OTM | Total | | |
| Total encounters | 475,538 | 1,176,746 | 1,664,229 | 5% | 0% | 2% | | Percent VR, reinstate, INA238(b) | 17% |
| Contiguous UCs | 25,721 | | 25,721 | 3% | 0% | 1% | | | |
| VR | 11,945 | | 11,945 | 0% | 0% | 0% | | | |
| Non-contiguous UCs | | | 0 | 0% | 0% | 0% | | | |
| SA + FM Encounters | 449,817 | 1,176,746 | 1,626,563 | 95% | 100% | 98% | | | |
| VR/withdraw | 190,556 | 8,712 | 199,268 | 40% | 1% | 12% | | | |
| Reinstatements | 37,474 | 29,777 | 67,251 | 8% | 3% | 4% | | | |
| Admin Removals | 162 | 511 | 673 | 0% | 0% | 0% | | | |
| | | | | 0% | 0% | 0% | | | |

Notes: Based on USBP encounters at the southwest land border May 12, 2023 - Mar. 31, 2024; table excludes non-contiguous UCs.
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on April 2, 2024.

IFR_AR_007559

This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.
At 1,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 1,250 encounters would not be subject to rapid repatriation, including 1,240 who would potentially be amenable to expedited removal. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 72 percent of people not subject to rapid repatriation and 73 percent of potentially amenable single adults and family units into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024. Applying the rule even more broadly based on a lower threshold would also raise countervailing considerations, see supra note 236, and so the Departments have struck the balance reflected in the ru

| | USBP | | | Percent of total by column | | |
|---|---|---|---|---|---|---|
| | Mexico | OTM | Total | Mexico | OTM | Total |
| Total encounters | 475,538 | 1,176,746 | 1,664,229 | | | |
| Contiguous UCs | 25,721 | | 25,721 | 5% | 0% | 2% |
| VR | 11,945 | | 11,945 | 3% | 0% | 1% |
| Non-contiguous UCs | | | 0 | 0% | 0% | 0% |
| SA + FM Encounters | 449,817 | 1,176,746 | 1,626,563 | 95% | 100% | 98% |
| VR/withdraw | 190,556 | 8,712 | 199,268 | 40% | 1% | 12% |
| Reinstatements | 37,474 | 29,777 | 67,251 | 8% | 3% | 4% |
| Admin Removals | 162 | 511 | 673 | 0% | 0% | 0% |
| | | | | 0% | 0% | 0% |
| Potentially Amenable to ER | | | | | | |
| ER | 47,526 | 240,528 | 288,054 | 10% | 20% | 17% |
| All Other | 174,099 | 897,218 | 1,071,317 | 37% | 76% | 64% |
| Total potentially amenable | 221,625 | 1,137,746 | 1,359,371 | 47% | 97% | 82% |
| Percent of potentially amenable | | | | | | |

Notes: Based on USBP encounters at the southwest land border May 12,
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on

| | |
|---|---|
| Encounter | 1500 |

Rapid non ER - Repatriations

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| UC VR | 3% | 0% | 1% |
| SA+FM VR/withdraw | 40% | 1% | 12% |
| Reinstatements | 8% | 3% | 4% |
| Admin Removals | 0% | 0% | 0% |
| **Total Rapid repatriations** | 50% | 3% | 17% |

**Not amenable to ER -total**

| | | | |
|---|---|---|---|
| Rapid Repatriations | 50% | 3% | 17% |
| Other Ucs | 3% | 0% | 1% |
| Total | 53% | 3% | 18% |
| | | | |

**ER Outcomes**

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Withdraw | 0% | 1% | 1% |
| No Fear | 73% | 44% | 49% |
| Comprehensive Negative fear | 12% | 17% | 16% |
| Comprehensive Positive fear | 15% | 39% | 35% |
| **Total ER removals/returns** | 85% | 62% | 65% |

Source: USBP ERCF table from tabs 64-66, percentages calculated as share

Current Population

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Total | 475,538 | 1,176,746 | 1,652,284 |
| UC | 25,721 | 0 | 25,721 |
| FM+SA | ###### | ######## | 1,626,563 |

Outcomes with 900 processed for ER

| | Mexico | OTM | Total | % of FM+SA | % total encounters | | |
|---|---|---|---|---|---|---|---|
| Total Encounters | 432 | 1,068 | 1,500 | | 100% | | |
| UC Encounters | 23 | - | 23 | | 2% | | |
| SA + FM Encounters | 408 | 1,068 | 1,477 | | 1% | | |
| | | | | | | | |
| Rapid Non-ER Repatriations | | | | | | | |
| Contiguous UC VR | 11 | - | 11 | | 98% | | |
| SA+FM VR/withdraw | 173 | 8 | 180 | 12% | 12% | | |
| SA+FM Reinstatements | 34 | 27 | 61 | 4% | 4% | | |
| SA+FM Admin Removals | 0 | 0 | 1 | 0% | 0% | | |
| **Total Non-ER Repatriations** | 218 | 35 | 252 | | | | |
| | | | | | | | |
| Population not quickly removed | 214 | 1,033 | 1,248 | | | 72% | share of people not quickly repatriated processed for ER |
| Amenable to ER | 201 | 1,033 | 1,236 | 84% | 82% | 73% | share of amenable population processed for ER |
| **Processed for ER** | **147** | **752** | **900** | 61% | 60% | | |
| ER Withdrawal | 0 | 6 | 6 | 0% | 0% | | |
| No Fear Removal | 107 | 330 | 437 | 30% | 29% | | |
| Negative Fear Removal | 17 | 127 | 144 | 10% | 10% | | |
| **Total ER removals** | **125** | **463** | **588** | | | | |
| | | | | | | | |
| Positive Fear NTA | 22 | 296 | 318 | 22% | 21% | | |
| Over-Capacity Releases | 55 | 281 | 336 | 23% | 22% | | |
| **SA+FM Removals** | **332** | **498** | **829** | **56%** | **55%** | | |
| **SA+FM Releases** | **76** | **576** | **654** | **44%** | **44%** | | |
| Total Removals | 343 | 498 | 839 | | **56.0%** | | |
| Total Releases | 89 | 576 | 667 | | **44.4%** | | |

As discussed previously, of those individuals encountered by USBP and placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found to have a credible fear and are ordered removed
OHSS analysis of data downloaded from UIP on April 2, 2024.

| USBP Apprehensions Expedited Removal Processing: Southwest Border | February | March | Since May 12 |
|---|---|---|---|
| SW Border Encounters | 131,325 | 129,615 | 1,626,563 |
| Processed for ER | 33,228 | 28,466 | 293,360 |
| % Encounters processed for E | 25% | 22% | 18% |
| Percent claiming fear | 63% | 48% | 61% |
| Percent of negative fear appe | 77% | 57% | 82% |
| Percent of negative fear appe | 17% | 14% | 18% |
| Total screen-in rate | 63% | 25% | 67% |
| Total Percent of ER referred | 40% | 12% | 40% |
| ER removal orders as share | 52% | 56% | 53% |
| ER referrals pending | 4% | 20% | 4% |
| Percent of ER removal order | 53% | 19% | 66% |
| ER processed in CBP Custo | 12,911 | 12,253 | 112,316 |
| Credible fear referrals | 5,032 | 4,578 | 46,610 |
| CFIs conducted | 4,967 | 4,370 | 45,504 |
| CFI results | 4,947 | 4,034 | 45,068 |
| Positive fear finding | 1,410 | 1,295 | 18,202 |
| Negative fear finding | 3,077 | 2,385 | 22,668 |
| Appealed to IJ | 1,356 | 1,012 | 13,956 |
| Pending or blank order | 88 | 74 | 759 |
| Affirmed | 988 | 752 | 10,481 |
| Vacated | 280 | 186 | 2,716 |
| Not appealed to IJ | 1,721 | 1,373 | 8,712 |
| Admin closed | 460 | 354 | 4,198 |
| Admin closed without CFI | 61 | 57 | 887 |
| CBP repatriations | 10,609 | 8,733 | 86,644 |
| No fear claim ER removals | 7,874 | 7,670 | 65,665 |
| Negative fear; no IJ review | 0 | 0 | 19 |
| Negative fear; IJ affirmed | 2,426 | 966 | 17,235 |
| ER withdrawn VRs | 34 | 8 | 1,919 |
| Other | 275 | 89 | 1,806 |
| ER transfers to ICE for proc | 20,317 | 16,213 | 181,044 |
| Reprocessed with other dispo | 63 | 114 | 724 |
| ER processed in ICE Custo | 10,670 | 4,425 | 94,883 |
| Credible fear referrals | 8,568 | 3,009 | 81,711 |
| CFIs conducted | 7,748 | 2,354 | 73,673 |
| CFI results | 7,041 | 1,466 | 71,909 |
| Positive fear finding | 3,837 | 853 | 40,730 |
| Negative fear finding | 2,732 | 491 | 25,409 |
| Appealed to IJ | 1,888 | 260 | 19,998 |
| Pending or blank order | 188 | 70 | 1,373 |
| Affirmed | 1,447 | 161 | 15,686 |
| Vacated | 253 | 29 | 2,939 |
| Not appealed to IJ | 844 | 231 | 5,411 |
| Admin closed | 472 | 122 | 5,770 |
| Admin closed without CFI | 514 | 32 | 6,132 |
| ICE removals (REPATRIAT | 2,346 | 358 | 27,156 |
| No fear claim ER removals | 1,443 | 270 | 4,333 |
| Negative fear; no IJ review | 1 | 0 | 4 |
| Negative fear; IJ affirmed | 594 | 15 | 16,003 |
| Other | 308 | 73 | 6,816 |
| ER processed by ICE non-de | 9,584 | 11,674 | 85,437 |
| Credible fear referrals | 4,290 | 4,755 | 28,040 |
| CFIs conducted | 3,928 | 2,137 | 22,493 |
| CFI results | 3,788 | 1,148 | 21,208 |
| Positive fear finding | 2,373 | 693 | 13,001 |
| Negative fear finding | 1,339 | 419 | 7,569 |
| Appealed to IJ | 1,227 | 258 | 7,015 |
| Pending or blank order | 206 | 86 | 1,034 |
| Affirmed | 730 | 128 | 4,110 |
| Vacated | 291 | 44 | 1,871 |
| Not appealed to IJ | 112 | 161 | 554 |
| Admin closed | 76 | 36 | 638 |
| Admin closed without CFI | 232 | 141 | 2,070 |
| ICE removals (REPATRIAT | 3,244 | 1,335 | 36,360 |
| No fear claim ER removals | 3,063 | 1,331 | 34,220 |
| Negative fear; no IJ review | 0 | 0 | 0 |
| Negative fear; IJ affirmed | 158 | 3 | 1,889 |
| Other | 23 | 1 | 251 |

Total ER outcomes

| | | | |
|---|---|---|---|
| Withdrawals | 1,919 | 1% | 1% |
| No fear claims | 136,275 | 49% | 46% |
| Comprehensive Negative fear | 44,954 | 16% | 15% |
| Comprehensive Positive fear | 99,154 | 35% | 34% |
| | 280,383 | | |
| Total amenable to rapid repatriation | | 65% | |

IFR_AR_007563











This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.
At 1,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 250 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 830 repatriations (sums do not add due to rounding), or 56 percent of encounters.

| | USBP | | | Percent of total by column | | |
|---|---|---|---|---|---|---|
| | Mexico | OTM | Total | Mexico | OTM | Total |
| Total encounters | 475,538 | 1,176,746 | 1,664,229 | | | |
| Contiguous UCs | 25,721 | | 25,721 | 5% | 0% | 2% |
| VR | 11,945 | | 11,945 | 3% | 0% | 1% |
| Non-contiguous UCs | | | 0 | 0% | 0% | 0% |
| SA + FM Encounters | 449,817 | 1,176,746 | 1,626,563 | 95% | 100% | 98% |
| VR/withdraw | 190,556 | 8,712 | 199,268 | 40% | 1% | 12% |
| Reinstatements | 37,474 | 29,777 | 67,251 | 8% | 3% | 4% |
| Admin Removals | 162 | 511 | 673 | 0% | 0% | 0% |
| | | | | 0% | 0% | 0% |
| Potentially Amenable to ER | | | | | | |
| ER | 47,526 | 240,528 | 288,054 | 10% | 20% | 17% |
| All Other | 174,099 | 897,218 | 1,071,317 | 37% | 76% | 64% |
| Total potentially amenable | 221,625 | 1,137,746 | 1,359,371 | 47% | 97% | 82% |
| Percent of potentially amenable | | | | | | |

Notes: Based on USBP encounters at the southwest land border May
Source: OHSS analysis of data pulled from CBP Unified Immigration

| | |
|---|---|
| Encounte | 1500 |

Rapid non ER - Repatriations

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| UC VR | 3% | 0% | 1% |
| SA+FM VR/withdraw | 40% | 1% | 12% |
| Reinstatements | 8% | 3% | 4% |
| Admin Removals | 0% | 0% | 0% |
| **Total Rapid repatriations** | 50% | 3% | 17% |

**Not amenable to ER -total**

| | | | |
|---|---|---|---|
| Rapid Repatriations | 50% | 3% | 17% |
| Other Ucs | 3% | 0% | 1% |
| Total | 53% | 3% | 18% |
| | | | |

**ER Outcomes**

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Withdraw | 0% | 1% | 1% |
| No Fear | 73% | 44% | 49% |
| Comprehensive Negative fear | 12% | 17% | 16% |
| Comprehensive Positive fear | 15% | 39% | 35% |
| **Total ER removals/returns** | 85% | 62% | 65% |

Source: USBP ERCF table from tabs 64-66, percentages calculated as

Current Population

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Total | 475,538 | 1,176,746 | 1,652,284 |
| UC | 25,721 | 0 | 25,721 |
| FM+SA | 449,817 | ########## | 1,626,563 |

Outcomes with 900 processed for ER

| | Mexico | OTM | Total | % of FM+SA | % total encounters |
|---|---|---|---|---|---|
| Total Encounters | 432 | 1,068 | 1,500 | | 100% |
| UC Encounters | 23 | - | 23 | | 2% |
| SA + FM Encounters | 408 | 1,068 | 1,477 | | 1% |
| | | | | | |
| Rapid Non-ER Repatriations | | | | | |
| Contiguous UC VR | 11 | - | 11 | | 98% |
| SA+FM VR/withdraw | 173 | 8 | 180 | 12% | 12% |
| SA+FM Reinstatements | 34 | 27 | 61 | 4% | 4% |
| SA+FM Admin Removals | 0 | 0 | 1 | 0% | 0% |
| **Total Non-ER Repatriations** | 218 | 35 | 252 | | |
| | | | | | |
| Population not quickly removed | 214 | 1,033 | 1,248 | | |
| Amenable to ER | 201 | 1,033 | 1,236 | 84% | 82% |
| **Processed for ER** | **147** | **752** | **900** | 61% | 60% |
| ER Withdrawal | 0 | 6 | 6 | 0% | 0% |
| No Fear Removal | 107 | 330 | 437 | 30% | 29% |
| Negative Fear Removal | 17 | 127 | 144 | 10% | 10% |
| **Total ER removals** | **125** | **463** | **588** | | |
| | | | | | |
| Positive Fear NTA | 22 | 296 | 318 | 22% | 21% |
| Over-Capacity Releases | 55 | 281 | 336 | 23% | 22% |
| **SA+FM Removals** | **332** | **498** | **829** | **56%** | **55%** |
| **SA+FM Releases** | **76** | **576** | **654** | **44%** | **44%** |
| Total Removals | 343 | 498 | 839 | | 56% |
| Total Releases | 89 | 576 | 667 | | 44% |

At the 2,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements described above, DHS would be able to place just 43 percent of the individuals who are not quickly repatriated into expedited removal—significantly less than the 70 percent under the 1,500-encounter threshold.
At 2,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 2,080 encounters would not be subject to rapid repatriation. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 43 percent of people not subject to rapid repatriation into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024.

| | USBP | | | Percent of total by column | | |
|---|---|---|---|---|---|---|
| | Mexico | OTM | Total | Mexico | OTM | Total |
| Total encounters | 475,538 | 1,176,746 | 1,664,229 | | | |
| Contiguous UCs | 25,721 | | 25,721 | 5% | 0% | 2% |
| VR | 11,945 | | 11,945 | 3% | 0% | 1% |
| Non-contiguous UCs | | | 0 | 0% | 0% | 0% |
| SA + FM Encounters | 449,817 | 1,176,746 | 1,626,563 | 95% | 100% | 98% |
| VR/withdraw | 190,556 | 8,712 | 199,268 | 40% | 1% | 12% |
| Reinstatements | 37,474 | 29,777 | 67,251 | 8% | 3% | 4% |
| Admin Removals | 162 | 511 | 673 | 0% | 0% | 0% |
| | | | | 0% | 0% | 0% |
| Potentially Amenable to ER | | | | | | |
| ER | 47,526 | 240,528 | 288,054 | 10% | 20% | 17% |
| All Other | 174,099 | 897,218 | 1,071,317 | 37% | 76% | 64% |
| Total potentially amenable | 221,625 | 1,137,746 | 1,359,371 | 47% | 97% | 82% |
| Percent of potentially amenable | | | | | | |

Notes: Based on USBP encounters at the southwest land border May 12,
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal

| Encounter | 2500 |
|---|---|

Rapid non ER - Repatriations

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| UC VR | 3% | 0% | 1% |
| SA+FM VR/withdraw | 40% | 1% | 12% |
| Reinstatements | 8% | 3% | 4% |
| Admin Removals | 0% | 0% | 0% |
| **Total Rapid repatriations** | 50% | 3% | 17% |

**Not amenable to ER -total**

| | | | |
|---|---|---|---|
| Rapid Repatriations | 50% | 3% | 17% |
| Other Ucs | 3% | 0% | 1% |
| Total | 53% | 3% | 18% |

**ER Outcomes**

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Withdraw | 0% | 1% | 1% |
| No Fear | 73% | 44% | 49% |
| Comprehensive Negative fear | 12% | 17% | 16% |
| Comprehensive Positive fear | 15% | 39% | 35% |
| **Total ER removals/returns** | 85% | 62% | 65% |

Source: USBP ERCF table from tabs 64-66, percentages calculated as

Current Population

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Total | 475,538 | 1,176,746 | 1,652,284 |
| UC | 25,721 | 0 | 25,721 |
| FM+SA | 449,817 | 1,176,746 | 1,626,563 |

Outcomes with 900 processed for ER

| | Mexico | OTM | Total | % of FM+SA | % total encounters | | |
|---|---|---|---|---|---|---|---|
| Total Encounters | 720 | 1,780 | 2,500 | | 100% | | |
| UC Encounters | 39 | - | 39 | | 2% | | |
| SA + FM Encounters | 681 | 1,780 | 2,461 | | 1% | | |
| | | | | | | | |
| Rapid Non-ER Repatriations | | | | | | | |
| Contiguous UC VR | 18 | - | 18 | | 98% | | |
| SA+FM VR/withdraw | 288 | 13 | 299 | 12% | 12% | | |
| SA+FM Reinstatements | 57 | 45 | 101 | 4% | 4% | | |
| SA+FM Admin Removals | 0 | 1 | 1 | 0% | 0% | | |
| **Total Non-ER Repatriations** | 363 | 59 | 419 | | | | |
| | | | | | | | |
| Population not quickly removed | 356 | 1,721 | 2,081 | | | 43% | share of people not quickly repatriated processed for ER |
| Amenable to ER | 335 | 1,721 | 2,060 | 84% | 82% | 44% | share of amenable population processed for ER |
| **Processed for ER** | **147** | **752** | **900** | 37% | 36% | | |
| ER Withdrawal | 0 | 6 | 6 | 0% | 0% | | |
| No Fear Removal | 107 | 330 | 437 | 18% | 17% | | |
| Negative Fear Removal | 17 | 127 | 144 | 6% | 6% | | |
| **Total ER removals** | **125** | **463** | **588** | | | | |
| | | | | | | | |
| Positive Fear NTA | 22 | 296 | 318 | 13% | 13% | | |
| Over-Capacity Releases | 189 | 969 | 1,160 | 47% | 46% | | |
| **SA+FM Removals** | **470** | **522** | **989** | **40%** | **40%** | | |
| **SA+FM Releases** | **211** | **1,265** | **1,478** | **60%** | **59%** | | |
| Total Removals | 488 | 522 | 1,007 | | **40.3%** | | |
| Total Releases | 231 | 1,265 | 1,499 | | **60.0%** | | |

This would, in turn, lead to a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States, with DHS only able to quickly remove or return substantially less than half of the individuals it encounters.
At 2,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 420 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 1,010 repatriations (sums do not add due to rounding), or 40 percent of encounters.

| | USBP | | | Percent of total by column | | |
|---|---|---|---|---|---|---|
| | Mexico | OTM | Total | Mexico | OTM | Total |
| Total encounters | 475,538 | 1,176,746 | 1,664,229 | | | |
| Contiguous UCs | 25,721 | | 25,721 | 5% | 0% | 2% |
| VR | 11,945 | | 11,945 | 3% | 0% | 1% |
| Non-contiguous UCs | | | 0 | 0% | 0% | 0% |
| SA + FM Encounters | 449,817 | 1,176,746 | 1,626,563 | 95% | 100% | 98% |
| VR/withdraw | 190,556 | 8,712 | 199,268 | 40% | 1% | 12% |
| Reinstatements | 37,474 | 29,777 | 67,251 | 8% | 3% | 4% |
| Admin Removals | 162 | 511 | 673 | 0% | 0% | 0% |
| | | | | 0% | 0% | 0% |
| Potentially Amenable to ER | | | | | | |
| ER | 47,526 | 240,528 | 288,054 | 10% | 20% | 17% |
| All Other | 174,099 | 897,218 | 1,071,317 | 37% | 76% | 64% |
| Total potentially amenable | 221,625 | 1,137,746 | 1,359,371 | 47% | 97% | 82% |
| Percent of potentially amenable | | | | | | |

Notes: Based on USBP encounters at the southwest land border May
Source: OHSS analysis of data pulled from CBP Unified Immigration

| Encounte | 2500 |
|---|---|

Rapid non ER - Repatriations

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| UC VR | 3% | 0% | 1% |
| SA+FM VR/withdraw | 40% | 1% | 12% |
| Reinstatements | 8% | 3% | 4% |
| Admin Removals | 0% | 0% | 0% |
| **Total Rapid repatriations** | 50% | 3% | 17% |

**Not amenable to ER -total**

| | | | |
|---|---|---|---|
| Rapid Repatriations | 50% | 3% | 17% |
| Other Ucs | 3% | 0% | 1% |
| Total | 53% | 3% | 18% |
| | | | |

**ER Outcomes**

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Withdraw | 0% | 1% | 1% |
| No Fear | 73% | 44% | 49% |
| Comprehensive Negative fear | 12% | 17% | 16% |
| Comprehensive Positive fear | 15% | 39% | 35% |
| **Total ER removals/returns** | 85% | 62% | 65% |

Source: USBP ERCF table from tabs 64-66, percentages calculated as

Current Population

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Total | 475,538 | 1,176,746 | 1,652,284 |
| UC | 25,721 | 0 | 25,721 |
| FM+SA | 449,817 | ########## | 1,626,563 |

Outcomes with 900 processed for ER

| | Mexico | OTM | Total | % of FM+SA | % total encounters |
|---|---|---|---|---|---|
| Total Encounters | 720 | 1,780 | 2,500 | | 100% |
| UC Encounters | 39 | - | 39 | | 2% |
| SA + FM Encounters | 681 | 1,780 | 2,461 | | 1% |
| | | | | | |
| Rapid Non-ER Repatriations | | | | | |
| Contiguous UC VR | 18 | - | 18 | | 98% |
| SA+FM VR/withdraw | 288 | 13 | 299 | 12% | 12% |
| SA+FM Reinstatements | 57 | 45 | 101 | 4% | 4% |
| SA+FM Admin Removals | 0 | 1 | 1 | 0% | 0% |
| **Total Non-ER Repatriations** | 363 | 59 | 419 | | |
| | | | | | |
| Population not quickly removed | 356 | 1,721 | 2,081 | | |
| Amenable to ER | 335 | 1,721 | 2,060 | 84% | 82% |
| **Processed for ER** | **147** | **752** | 900 | 37% | 36% |
| ER Withdrawal | 0 | 6 | 6 | 0% | 0% |
| No Fear Removal | 107 | 330 | 437 | 18% | 17% |
| Negative Fear Removal | 17 | 127 | 144 | 6% | 6% |
| **Total ER removals** | **125** | **463** | 588 | | |
| | | | | | |
| Positive Fear NTA | 22 | 296 | 318 | 13% | 13% |
| Over-Capacity Releases | 189 | 969 | 1,160 | 47% | 46% |
| **SA+FM Removals** | **470** | **522** | 989 | **40%** | **40%** |
| **SA+FM Releases** | **211** | **1,265** | **1,478** | **60%** | **59%** |
| Total Removals | 488 | 522 | 1,007 | | 40% |
| Total Releases | 231 | 1,265 | 1,499 | | **60%** |

For example, from FY 2013 through FY 2019, months with average daily USBP encounters of fewer than 1,500 per day resulted in a minimal level of releases due to capacity constraints at the border.
For FY 2013 to FY 2019, in months with fewer than 1,500 encounters between POEs, USBP released an average of 11 encounters per day. OHSS analysis of March 2024 OHSS Persist Dataset.

| Date | CBP monthly encounters | USBP monthly encounters | USBP monthly releases | CBP daily encounters | USBP daily encounters | USBP daily releases | |
|---|---|---|---|---|---|---|---|
| Oct-99 | 87,819 | 87,819 | | 2,833 | 2,833 | | |
| Nov-99 | 74,362 | 74,362 | | 2,479 | 2,479 | | |
| Dec-99 | 66,256 | 66,256 | | 2,137 | 2,137 | | |
| Jan-00 | 175,383 | 175,383 | | 5,658 | 5,658 | | |
| Feb-00 | 200,619 | 200,619 | | 7,165 | 7,165 | | |
| Mar-00 | 209,311 | 209,311 | | 6,752 | 6,752 | | |
| Apr-00 | 170,621 | 170,621 | | 5,687 | 5,687 | | |
| May-00 | 155,961 | 155,961 | | 5,031 | 5,031 | | |
| Jun-00 | 103,856 | 103,856 | | 3,462 | 3,462 | | |
| Jul-00 | 111,963 | 111,963 | | 3,612 | 3,612 | | |
| Aug-00 | 113,448 | 113,448 | | 3,660 | 3,660 | | |
| Sep-00 | 96,822 | 96,822 | | 3,227 | 3,227 | | |
| Oct-00 | 81,995 | 81,995 | | 2,645 | 2,645 | | |
| Nov-00 | 67,217 | 67,217 | | 2,241 | 2,241 | | |
| Dec-00 | 54,828 | 54,828 | | 1,769 | 1,769 | | |
| Jan-01 | 124,586 | 124,586 | | 4,019 | 4,019 | | |
| Feb-01 | 150,616 | 150,616 | | 5,379 | 5,379 | | |
| Mar-01 | 169,904 | 169,904 | | 5,481 | 5,481 | | |
| Apr-01 | 142,040 | 142,040 | | 4,735 | 4,735 | | |
| May-01 | 123,054 | 123,054 | | 3,969 | 3,969 | | |
| Jun-01 | 89,034 | 89,034 | | 2,968 | 2,968 | | |
| Jul-01 | 83,853 | 83,853 | | 2,705 | 2,705 | | |
| Aug-01 | 84,837 | 84,837 | | 2,737 | 2,737 | | |
| Sep-01 | 59,448 | 59,448 | | 1,982 | 1,982 | | |
| Oct-01 | 37,746 | 37,746 | | 1,218 | 1,218 | | |
| Nov-01 | 32,694 | 32,694 | | 1,090 | 1,090 | | |
| Dec-01 | 31,531 | 31,531 | | 1,017 | 1,017 | | |
| Jan-02 | 79,647 | 79,647 | | 2,569 | 2,569 | | |
| Feb-02 | 95,645 | 95,645 | | 3,416 | 3,416 | | |
| Mar-02 | 126,906 | 126,906 | | 4,094 | 4,094 | | |
| Apr-02 | 121,908 | 121,908 | | 4,064 | 4,064 | | |
| May-02 | 97,571 | 97,571 | | 3,147 | 3,147 | | |
| Jun-02 | 78,730 | 78,730 | | 2,624 | 2,624 | | |
| Jul-02 | 76,719 | 76,719 | | 2,475 | 2,475 | | |
| Aug-02 | 82,860 | 82,860 | | 2,673 | 2,673 | | |
| Sep-02 | 68,384 | 68,384 | | 2,279 | 2,279 | | |
| Oct-02 | 61,913 | 61,913 | | 1,997 | 1,997 | | |
| Nov-02 | 47,919 | 47,919 | | 1,597 | 1,597 | | |
| Dec-02 | 37,930 | 37,930 | | 1,224 | 1,224 | | |
| Jan-03 | 87,002 | 87,002 | | 2,807 | 2,807 | | |
| Feb-03 | 97,016 | 97,016 | | 3,465 | 3,465 | | |
| Mar-03 | 98,625 | 98,625 | | 3,181 | 3,181 | | |
| Apr-03 | 75,564 | 75,564 | | 2,519 | 2,519 | | |
| May-03 | 88,845 | 88,845 | | 2,866 | 2,866 | | |
| Jun-03 | 75,634 | 75,634 | | 2,521 | 2,521 | | |
| Jul-03 | 79,396 | 79,396 | | 2,561 | 2,561 | | |
| Aug-03 | 84,651 | 84,651 | | 2,731 | 2,731 | | |
| Sep-03 | 72,239 | 72,239 | | 2,408 | 2,408 | | |
| Oct-03 | 69,246 | 65,388 | | 2,234 | 2,109 | | |
| Nov-03 | 62,452 | 57,942 | | 2,082 | 1,931 | | |
| Dec-03 | 48,280 | 43,663 | | 1,557 | 1,408 | | |
| Jan-04 | 98,764 | 92,751 | | 3,186 | 2,992 | | |
| Feb-04 | 116,398 | 110,824 | | 4,157 | 3,958 | | |
| Mar-04 | 162,530 | 155,089 | | 5,243 | 5,003 | | |
| Apr-04 | 142,491 | 135,632 | | 4,750 | 4,521 | | |
| May-04 | 125,502 | 118,811 | | 4,048 | 3,833 | | |
| Jun-04 | 101,178 | 94,607 | | 3,373 | 3,154 | | |
| Jul-04 | 98,989 | 92,152 | | 3,193 | 2,973 | | |
| Aug-04 | 99,986 | 93,299 | | 3,225 | 3,010 | | |
| Sep-04 | 85,877 | 80,089 | | 2,863 | 2,670 | | |
| Oct-04 | 81,687 | 75,908 | | 2,635 | 2,449 | | |
| Nov-04 | 70,617 | 65,110 | | 2,354 | 2,170 | | |
| Dec-04 | 54,028 | 48,410 | | 1,743 | 1,562 | | |
| Jan-05 | 101,552 | 93,029 | | 3,276 | 3,001 | | |
| Feb-05 | 121,177 | 113,776 | | 4,328 | 4,063 | | |
| Mar-05 | 150,892 | 143,044 | | 4,867 | 4,614 | | |
| Apr-05 | 148,688 | 140,074 | | 4,956 | 4,669 | | |
| May-05 | 125,226 | 115,817 | | 4,040 | 3,736 | | |
| Jun-05 | 99,490 | 90,796 | | 3,316 | 3,027 | | |
| Jul-05 | 105,093 | 94,964 | | 3,390 | 3,063 | | |
| Aug-05 | 107,620 | 96,745 | | 3,472 | 3,121 | | |
| Sep-05 | 103,177 | 93,718 | | 3,439 | 3,124 | | |
| Oct-05 | 91,935 | 83,561 | | 2,966 | 2,696 | | |
| Nov-05 | 78,817 | 70,954 | | 2,627 | 2,365 | | |
| Dec-05 | 60,375 | 52,663 | | 1,948 | 1,699 | | |
| Jan-06 | 110,987 | 101,262 | | 3,580 | 3,267 | | |
| Feb-06 | 132,780 | 125,030 | | 4,742 | 4,465 | | |
| Mar-06 | 169,077 | 160,696 | | 5,454 | 5,184 | | |
| Apr-06 | 133,964 | 126,554 | | 4,465 | 4,218 | | |
| May-06 | 113,311 | 105,443 | | 3,655 | 3,401 | | |
| Jun-06 | 76,274 | 68,365 | | 2,542 | 2,279 | | |
| Jul-06 | 67,636 | 59,633 | | 2,182 | 1,924 | | |
| Aug-06 | 67,631 | 59,733 | | 2,182 | 1,927 | | |
| Sep-06 | 65,571 | 58,082 | | 2,186 | 1,936 | | |
| Oct-06 | 68,083 | 60,726 | | 2,196 | 1,959 | | |
| Nov-06 | 58,199 | 51,592 | | 1,940 | 1,720 | | |
| Dec-06 | 47,537 | 40,527 | | 1,533 | 1,307 | | |
| Jan-07 | 79,794 | 72,000 | | 2,574 | 2,323 | | |
| Feb-07 | 86,435 | 79,273 | | 3,087 | 2,831 | | |
| Mar-07 | 122,450 | 114,136 | | 3,950 | 3,682 | | |
| Apr-07 | 112,773 | 104,465 | | 3,759 | 3,482 | | |
| May-07 | 97,196 | 88,510 | | 3,135 | 2,855 | | |
| Jun-07 | 79,997 | 71,336 | | 2,667 | 2,378 | | |
| Jul-07 | 75,766 | 66,793 | | 2,444 | 2,155 | | |
| Aug-07 | 69,142 | 59,801 | | 2,230 | 1,929 | | |
| Sep-07 | 57,556 | 49,577 | | 1,919 | 1,653 | | |
| Oct-07 | 58,616 | 51,355 | | 1,891 | 1,657 | | |
| Nov-07 | 48,693 | 42,208 | | 1,623 | 1,407 | | |
| Dec-07 | 38,556 | 31,824 | | 1,244 | 1,027 | | |
| Jan-08 | 66,471 | 59,034 | | 2,144 | 1,904 | | |
| Feb-08 | 80,724 | 73,483 | | 2,883 | 2,624 | | |
| Mar-08 | 97,774 | 89,769 | | 3,154 | 2,896 | | |
| Apr-08 | 99,518 | 91,552 | | 3,317 | 3,052 | | |
| May-08 | 77,048 | 69,240 | | 2,485 | 2,234 | | |
| Jun-08 | 60,492 | 53,850 | | 2,016 | 1,795 | | |
| Jul-08 | 56,806 | 49,468 | | 1,832 | 1,596 | | |
| Aug-08 | 56,142 | 48,544 | | 1,811 | 1,566 | | |
| Sep-08 | 51,713 | 44,722 | | 1,724 | 1,491 | | |
| Oct-08 | 49,217 | 42,937 | | 1,588 | 1,385 | | |
| Nov-08 | 38,450 | 32,782 | | 1,282 | 1,093 | | |
| Dec-08 | 31,206 | 25,946 | | 1,007 | 837 | | |
| Jan-09 | 50,737 | 44,503 | | 1,637 | 1,436 | | |
| Feb-09 | 55,132 | 49,211 | | 1,969 | 1,758 | | |
| Mar-09 | 74,323 | 67,342 | | 2,398 | 2,172 | | |
| Apr-09 | 65,129 | 58,493 | | 2,171 | 1,950 | | |
| May-09 | 57,593 | 50,883 | | 1,858 | 1,641 | | |
| Jun-09 | 52,600 | 46,044 | | 1,753 | 1,535 | | |
| Jul-09 | 50,986 | 43,841 | | 1,645 | 1,414 | | |
| Aug-09 | 51,084 | 43,519 | | 1,648 | 1,404 | | |
| Sep-09 | 42,666 | 35,350 | | 1,422 | 1,178 | | |
| Oct-09 | 47,290 | 40,890 | | 1,525 | 1,319 | | |
| Nov-09 | 39,064 | 32,815 | | 1,302 | 1,094 | | |
| Dec-09 | 31,352 | 25,034 | | 1,011 | 808 | | |
| Jan-10 | 40,741 | 34,784 | | 1,314 | 1,122 | | |
| Feb-10 | 48,753 | 42,790 | | 1,741 | 1,528 | | |
| Mar-10 | 69,152 | 61,361 | | 2,231 | 1,979 | | |
| Apr-10 | 62,351 | 55,237 | | 2,078 | 1,841 | | |
| May-10 | 54,018 | 47,045 | | 1,743 | 1,518 | | |
| Jun-10 | 39,308 | 32,955 | | 1,310 | 1,099 | | |
| Jul-10 | 32,363 | 25,609 | | 1,044 | 826 | | |
| Aug-10 | 33,717 | 26,415 | | 1,088 | 852 | | |
| Sep-10 | 29,310 | 22,796 | | 977 | 760 | | |
| Oct-10 | 32,451 | 26,165 | | 1,047 | 844 | | |
| Nov-10 | 28,516 | 22,405 | | 951 | 747 | | |
| Dec-10 | 25,728 | 19,429 | | 830 | 627 | | |
| Jan-11 | 29,737 | 23,926 | | 959 | 772 | | |
| Feb-11 | 34,408 | 28,784 | | 1,229 | 1,028 | | |
| Mar-11 | 48,920 | 42,014 | | 1,578 | 1,355 | | |
| Apr-11 | 42,739 | 36,251 | | 1,425 | 1,208 | | |
| May-11 | 37,543 | 31,236 | | 1,211 | 1,008 | | |
| Jun-11 | 32,909 | 27,166 | | 1,097 | 906 | | |
| Jul-11 | 29,520 | 23,170 | | 952 | 747 | | |
| Aug-11 | 30,216 | 24,166 | | 975 | 780 | | |
| Sep-11 | 28,386 | 22,863 | | 946 | 762 | | |
| Oct-11 | 31,344 | 25,612 | | 1,011 | 826 | | |
| Nov-11 | 28,617 | 23,368 | | 954 | 779 | | |
| Dec-11 | 24,380 | 18,983 | | 786 | 612 | | |
| Jan-12 | 30,798 | 25,714 | | 993 | 829 | | |
| Feb-12 | 37,009 | 31,579 | | 1,322 | 1,128 | | |
| Mar-12 | 48,538 | 42,218 | | 1,566 | 1,362 | | |
| Apr-12 | 46,680 | 40,628 | | 1,556 | 1,354 | | |
| May-12 | 43,020 | 36,966 | | 1,388 | 1,192 | | |
| Jun-12 | 36,808 | 30,669 | | 1,227 | 1,022 | | |
| Jul-12 | 32,810 | 26,978 | | 1,058 | 870 | | |
| Aug-12 | 33,699 | 27,567 | | 1,087 | 889 | | |
| Sep-12 | 31,399 | 26,591 | | 1,080 | 886 | | |
| Oct-12 | 34,867 | 28,929 | | 1,124 | 933 | | |
| Nov-12 | 33,159 | 27,636 | | 1,105 | 921 | | |
| Dec-12 | 29,077 | 23,263 | | 938 | 750 | | |
| Jan-13 | 32,485 | 26,921 | | 1,048 | 868 | | |
| Feb-13 | 40,636 | 35,042 | | 1,451 | 1,252 | | |
| Mar-13 | 54,010 | 47,293 | | 1,742 | 1,526 | | |
| Apr-13 | 54,771 | 48,212 | | 1,826 | 1,607 | | |
| May-13 | 50,500 | 43,856 | | 1,629 | 1,415 | | |
| Jun-13 | 40,790 | 34,436 | | 1,360 | 1,148 | | |
| Jul-13 | 40,006 | 33,230 | | 1,291 | 1,072 | | |
| Aug-13 | 41,125 | 33,797 | | 1,327 | 1,090 | | |
| Sep-13 | 38,206 | 31,802 | | 1,274 | 1,060 | | |
| Oct-13 | 41,835 | 35,312 | 180 | 1,350 | 1,139 | 5.8 | 1% |
| Nov-13 | 38,692 | 31,896 | 133 | 1,290 | 1,063 | 4.4 | 0% |
| Dec-13 | 36,707 | 29,528 | 195 | 1,184 | 953 | 6.3 | 1% |
| Jan-14 | 35,200 | 28,668 | 164 | 1,135 | 925 | 5.3 | 1% |
| Feb-14 | 42,473 | 36,402 | 193 | 1,517 | 1,300 | 6.9 | 1% |
| Mar-14 | 57,548 | 49,596 | 467 | 1,856 | 1,600 | 15.1 | 1% |
| Apr-14 | 59,283 | 51,502 | 317 | 1,976 | 1,717 | 10.6 | 1% |
| May-14 | 69,033 | 60,683 | 1,451 | 2,227 | 1,958 | 46.8 | 2% |
| Jun-14 | 66,572 | 57,861 | 2,153 | 2,219 | 1,929 | 71.8 | 4% |
| Jul-14 | 48,823 | 40,708 | 820 | 1,575 | 1,313 | 26.5 | 2% |
| Aug-14 | 39,766 | 31,388 | 288 | 1,283 | 1,013 | 9.3 | 1% |
| Sep-14 | 34,066 | 25,825 | 175 | 1,136 | 861 | 5.8 | 1% |
| Oct-14 | 35,903 | 26,450 | 127 | 1,158 | 853 | 4.1 | 0% |
| Nov-14 | 33,024 | 24,641 | 126 | 1,101 | 821 | 4.2 | 1% |
| Dec-14 | 34,231 | 25,019 | 138 | 1,104 | 807 | 4.5 | 1% |
| Jan-15 | 30,179 | 21,514 | 204 | 974 | 694 | 6.6 | 1% |
| Feb-15 | 32,254 | 24,376 | 224 | 1,152 | 871 | 8.0 | 1% |
| Mar-15 | 39,162 | 29,791 | 224 | 1,263 | 961 | 7.2 | 1% |
| Apr-15 | 38,299 | 29,750 | 270 | 1,277 | 992 | 9.0 | 1% |
| May-15 | 40,684 | 31,576 | 222 | 1,312 | 1,019 | 7.2 | 1% |
| Jun-15 | 38,620 | 29,303 | 233 | 1,287 | 977 | 7.8 | 1% |
| Jul-15 | 38,610 | 28,388 | 348 | 1,245 | 916 | 11.2 | 1% |
| Aug-15 | 42,419 | 30,239 | 313 | 1,368 | 975 | 10.1 | 1% |
| Sep-15 | 41,171 | 30,286 | 248 | 1,372 | 1,010 | 8.3 | 1% |
| Oct-15 | 45,245 | 32,734 | 242 | 1,460 | 1,056 | 7.8 | 1% |
| Nov-15 | 46,387 | 32,838 | 212 | 1,513 | 1,095 | 7.1 | 1% |
| Dec-15 | 48,593 | 37,014 | 336 | 1,567 | 1,194 | 10.8 | 1% |
| Jan-16 | 33,396 | 23,758 | 215 | 1,077 | 766 | 6.9 | 1% |
| Feb-16 | 38,068 | 26,072 | 220 | 1,360 | 931 | 7.9 | 1% |
| Mar-16 | 45,779 | 33,316 | 246 | 1,477 | 1,075 | 7.9 | 1% |
| Apr-16 | 48,271 | 38,089 | 260 | 1,609 | 1,270 | 8.7 | 1% |
| May-16 | 54,987 | 40,337 | 353 | 1,774 | 1,301 | 11.4 | 1% |
| Jun-16 | 45,168 | 34,450 | 309 | 1,506 | 1,148 | 10.3 | 1% |
| Jul-16 | 46,658 | 33,723 | 472 | 1,505 | 1,088 | 15.2 | 1% |
| Aug-16 | 51,569 | 37,048 | 382 | 1,664 | 1,195 | 12.3 | 1% |
| Sep-16 | 56,070 | 39,501 | 567 | 1,869 | 1,317 | 18.9 | 1% |
| Oct-16 | 66,707 | 46,184 | 389 | 2,152 | 1,490 | 12.5 | 1% |
| Nov-16 | 63,366 | 47,211 | 338 | 2,112 | 1,574 | 11.3 | 1% |
| Dec-16 | 58,416 | 43,251 | 320 | 1,884 | 1,395 | 10.3 | 1% |
| Jan-17 | 42,458 | 31,576 | 240 | 1,370 | 1,019 | 7.7 | 1% |
| Feb-17 | 23,555 | 18,754 | 75 | 841 | 670 | 2.7 | 0% |
| Mar-17 | 16,592 | 12,195 | 39 | 535 | 393 | 1.3 | 0% |
| Apr-17 | 15,768 | 11,127 | 44 | 526 | 371 | 1.5 | 0% |
| May-17 | 19,940 | 14,519 | 69 | 643 | 468 | 2.2 | 0% |
| Jun-17 | 21,657 | 16,087 | 46 | 722 | 536 | 1.5 | 0% |
| Jul-17 | 25,014 | 19,187 | 41 | 807 | 587 | 1.3 | 0% |
| Aug-17 | 30,569 | 22,288 | 62 | 986 | 719 | 2.0 | 0% |
| Sep-17 | 31,107 | 22,537 | 45 | 1,037 | 751 | 1.5 | 0% |
| Oct-17 | 34,842 | 25,488 | 49 | 1,124 | 822 | 1.6 | 0% |
| Nov-17 | 39,031 | 29,085 | 46 | 1,301 | 970 | 1.5 | 0% |
| Dec-17 | 40,476 | 28,995 | 58 | 1,306 | 935 | 1.9 | 0% |
| Jan-18 | 35,865 | 25,975 | 36 | 1,157 | 838 | 1.2 | 0% |
| Feb-18 | 36,690 | 26,666 | 57 | 1,310 | 952 | 2.0 | 0% |
| Mar-18 | 50,213 | 37,390 | 71 | 1,620 | 1,206 | 2.3 | 0% |
| Apr-18 | 51,019 | 38,243 | 81 | 1,701 | 1,275 | 2.7 | 0% |
| May-18 | 51,790 | 40,339 | 123 | 1,671 | 1,301 | 4.0 | 0% |
| Jun-18 | 43,096 | 34,089 | 130 | 1,437 | 1,136 | 4.3 | 0% |
| Jul-18 | 40,005 | 31,299 | 115 | 1,290 | 1,010 | 3.7 | 0% |
| Aug-18 | 46,551 | 37,524 | 117 | 1,502 | 1,210 | 3.8 | 0% |
| Sep-18 | 50,366 | 41,486 | 150 | 1,679 | 1,383 | 5.0 | 0% |
| Oct-18 | 60,775 | 51,005 | 4,839 | 1,960 | 1,645 | 156.1 | 9% |
| Nov-18 | 62,463 | 51,857 | 5,868 | 2,082 | 1,729 | 195.6 | 11% |
| Dec-18 | 60,789 | 50,751 | 6,022 | 1,961 | 1,637 | 194.3 | 12% |
| Jan-19 | 58,313 | 47,979 | 3,774 | 1,881 | 1,548 | 121.7 | 8% |
| Feb-19 | 76,543 | 66,883 | 7,142 | 2,734 | 2,389 | 255.1 | 11% |
| Mar-19 | 103,730 | 92,833 | 21,758 | 3,346 | 2,995 | 701.9 | 23% |
| Apr-19 | 109,413 | 99,273 | 31,438 | 3,647 | 3,309 | 1,047.9 | 32% |
| May-19 | 144,113 | 132,856 | 61,304 | 4,649 | 4,286 | 1,977.5 | 46% |
| Jun-19 | 104,310 | 94,902 | 42,852 | 3,477 | 3,163 | 1,428.4 | 45% |
| Jul-19 | 81,748 | 71,978 | 31,022 | 2,637 | 2,322 | 1,000.7 | 43% |
| Aug-19 | 62,608 | 50,684 | 13,352 | 2,020 | 1,635 | 430.7 | 26% |
| Sep-19 | 52,424 | 40,507 | 6,750 | 1,747 | 1,350 | 225.0 | 17% |
| Oct-19 | 45,139 | 35,402 | 1,252 | 1,456 | 1,142 | 40.4 | 4% |
| Nov-19 | 42,642 | 33,524 | 1,231 | 1,421 | 1,117 | 41.0 | 4% |
| Dec-19 | 40,563 | 32,853 | 1,049 | 1,308 | 1,060 | 33.8 | 3% |
| Jan-20 | 36,583 | 29,205 | 917 | 1,180 | 942 | 29.6 | 3% |
| Feb-20 | 36,686 | 30,077 | 706 | 1,310 | 1,074 | 25.2 | 2% |
| Mar-20 | 34,457 | 30,389 | 492 | 1,112 | 980 | 15.9 | 2% |
| Apr-20 | 17,106 | 16,182 | 56 | 570 | 539 | 1.9 | 0% |
| May-20 | 23,237 | 21,593 | 66 | 750 | 697 | 2.1 | 0% |
| Jun-20 | 33,029 | 30,816 | 73 | 1,101 | 1,027 | 2.4 | 0% |
| Jul-20 | 40,949 | 38,556 | 106 | 1,321 | 1,244 | 3.4 | 0% |
| Aug-20 | 50,007 | 47,276 | 118 | 1,613 | 1,525 | 3.8 | 0% |
| Sep-20 | 57,668 | 54,762 | 264 | 1,922 | 1,825 | 8.8 | 0% |
| Oct-20 | 71,943 | 69,048 | 223 | 2,321 | 2,227 | 7.2 | 0% |
| Nov-20 | 72,113 | 69,169 | 195 | 2,404 | 2,306 | 6.5 | 0% |
| Dec-20 | 73,994 | 71,141 | 265 | 2,387 | 2,295 | 8.5 | 0% |
| Jan-21 | 78,414 | 75,316 | 1,545 | 2,529 | 2,430 | 49.8 | 2% |
| Feb-21 | 101,098 | 97,643 | 8,881 | 3,611 | 3,487 | 317.2 | 9% |
| Mar-21 | 173,277 | 169,216 | 26,624 | 5,590 | 5,459 | 858.8 | 16% |
| Apr-21 | 178,795 | 173,699 | 26,451 | 5,960 | 5,790 | 881.7 | 15% |
| May-21 | 180,597 | 172,654 | 27,347 | 5,826 | 5,569 | 882.2 | 16% |
| Jun-21 | 189,034 | 178,649 | 36,238 | 6,301 | 5,955 | 1,207.9 | 20% |
| Jul-21 | 213,593 | 200,658 | 62,397 | 6,890 | 6,473 | 2,012.8 | 31% |
| Aug-21 | 209,840 | 196,514 | 59,045 | 6,769 | 6,339 | 1,904.7 | 30% |
| Sep-21 | 192,001 | 185,515 | 44,258 | 6,400 | 6,184 | 1,475.3 | 24% |
| Oct-21 | 164,837 | 159,113 | 27,942 | 5,317 | 5,133 | 901.4 | 18% |
| Nov-21 | 174,845 | 167,015 | 40,445 | 5,828 | 5,567 | 1,348.2 | 24% |
| Dec-21 | 179,253 | 170,602 | 51,780 | 5,782 | 5,503 | 1,670.3 | 30% |
| Jan-22 | 154,874 | 147,877 | 43,646 | 4,996 | 4,770 | 1,407.9 | 30% |
| Feb-22 | 166,010 | 159,170 | 35,879 | 5,929 | 5,685 | 1,281.4 | 23% |
| Mar-22 | 222,574 | 211,181 | 56,129 | 7,180 | 6,812 | 1,810.6 | 27% |
| Apr-22 | 235,785 | 203,504 | 61,534 | 7,860 | 6,783 | 2,051.1 | 30% |
| May-22 | 241,136 | 224,370 | 72,755 | 7,779 | 7,238 | 2,346.9 | 32% |
| Jun-22 | 207,834 | 192,399 | 59,705 | 6,928 | 6,413 | 1,990.2 | 31% |
| Jul-22 | 200,162 | 181,834 | 65,614 | 6,457 | 5,866 | 2,116.6 | 36% |
| Aug-22 | 204,087 | 181,774 | 64,868 | 6,583 | 5,864 | 2,092.5 | 36% |
| Sep-22 | 227,547 | 207,597 | 105,007 | 7,585 | 6,920 | 3,500.2 | 51% |
| Oct-22 | 231,529 | 205,134 | 89,823 | 7,469 | 6,617 | 2,897.5 | 44% |
| Nov-22 | 235,173 | 207,680 | 107,280 | 7,839 | 6,923 | 3,576.0 | 52% |
| Dec-22 | 252,315 | 222,018 | 140,370 | 8,139 | 7,162 | 4,528.1 | 63% |
| Jan-23 | 157,358 | 129,513 | 23,098 | 5,076 | 4,178 | 745.1 | 18% |
| Feb-23 | 156,630 | 130,521 | 14,797 | 5,594 | 4,661 | 528.5 | 11% |
| Mar-23 | 193,249 | 163,672 | 25,917 | 6,234 | 5,280 | 836.0 | 16% |
| Apr-23 | 211,992 | 183,921 | 65,690 | 7,066 | 6,131 | 2,189.7 | 36% |
| May-23 | 206,690 | 171,382 | 77,850 | 6,667 | 5,528 | 2,511.3 | 45% |
| Jun-23 | 144,556 | 99,538 | 36,551 | 4,819 | 3,318 | 1,218.4 | 37% |
| Jul-23 | 183,479 | 132,642 | 70,462 | 5,919 | 4,279 | 2,273.0 | 53% |
| Aug-23 | 232,963 | 181,054 | 101,651 | 7,515 | 5,840 | 3,279.1 | 56% |
| Sep-23 | 269,735 | 218,763 | 155,961 | 8,991 | 7,292 | 5,198.7 | 71% |
| Oct-23 | 240,932 | 188,754 | 122,680 | 8,031 | 6,292 | 4,089.3 | 65% |
| Nov-23 | 242,413 | 191,119 | 131,260 | 8,080 | 6,371 | 4,375.3 | 69% |
| Dec-23 | 301,980 | 249,737 | 191,800 | 10,066 | 8,325 | 6,393.3 | 77% |
| Jan-24 | 176,189 | 124,204 | 70,426 | 5,684 | 4,007 | 2,347.5 | 59% |
| Feb-24 | 189,914 | 140,638 | 76,953 | 6,549 | 4,850 | 2,565.1 | 53% |
| Mar-24 | 189,371 | 137,480 | 78,051 | 6,109 | 4,435 | 2,601.7 | 59% |

Average number of daily USBP releases 2013-2019 in months with < 1,500 USBP encounters/day: 10.5

| CBP: 2009-2020 | USBP: 2009-2021 |
|---|---|
| 1,464 | 1,201 |

release rate

| Release rate: Feb 2019-July 2019 |
|---|
| 11% |
| 23% |
| 32% |
| 46% |
| 45% |
| 43% |

During that 7-year stretch, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 individuals released each day, while months in which daily encounters exceeded 2,500 resulted in approximately 1,300 releases each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings.
OHSS analysis of March 2024 OHSS Persist Dataset.

| Date | CBP monthly encounters | USBP monthly encounters | USBP monthly releases | CBP daily encounters | USBP daily encounters | USBP daily releases | |
|---|---|---|---|---|---|---|---|
| Oct-99 | 87,819 | 87,819 | | 2,833 | 2,833 | | |
| Nov-99 | 74,362 | 74,362 | | 2,479 | 2,479 | | |
| Dec-99 | 66,256 | 66,256 | | 2,137 | 2,137 | | |
| Jan-00 | 175,383 | 175,383 | | 5,658 | 5,658 | | |
| Feb-00 | 200,619 | 200,619 | | 7,165 | 7,165 | | |
| Mar-00 | 209,311 | 209,311 | | 6,752 | 6,752 | | |
| Apr-00 | 170,621 | 170,621 | | 5,687 | 5,687 | | |
| May-00 | 155,961 | 155,961 | | 5,031 | 5,031 | | |
| Jun-00 | 103,856 | 103,856 | | 3,462 | 3,462 | | |
| Jul-00 | 111,963 | 111,963 | | 3,612 | 3,612 | | |
| Aug-00 | 113,448 | 113,448 | | 3,660 | 3,660 | | |
| Sep-00 | 96,822 | 96,822 | | 3,227 | 3,227 | | |
| Oct-00 | 81,995 | 81,995 | | 2,645 | 2,645 | | |
| Nov-00 | 67,217 | 67,217 | | 2,241 | 2,241 | | |
| Dec-00 | 54,828 | 54,828 | | 1,769 | 1,769 | | |
| Jan-01 | 124,586 | 124,586 | | 4,019 | 4,019 | | |
| Feb-01 | 150,616 | 150,616 | | 5,379 | 5,379 | | |
| Mar-01 | 169,904 | 169,904 | | 5,481 | 5,481 | | |
| Apr-01 | 142,040 | 142,040 | | 4,735 | 4,735 | | |
| May-01 | 123,054 | 123,054 | | 3,969 | 3,969 | | |
| Jun-01 | 89,034 | 89,034 | | 2,968 | 2,968 | | |
| Jul-01 | 83,853 | 83,853 | | 2,705 | 2,705 | | |
| Aug-01 | 84,837 | 84,837 | | 2,737 | 2,737 | | |
| Sep-01 | 59,448 | 59,448 | | 1,982 | 1,982 | | |
| Oct-01 | 37,746 | 37,746 | | 1,218 | 1,218 | | |
| Nov-01 | 32,694 | 32,694 | | 1,090 | 1,090 | | |
| Dec-01 | 31,531 | 31,531 | | 1,017 | 1,017 | | |
| Jan-02 | 79,647 | 79,647 | | 2,569 | 2,569 | | |
| Feb-02 | 95,645 | 95,645 | | 3,416 | 3,416 | | |
| Mar-02 | 126,906 | 126,906 | | 4,094 | 4,094 | | |
| Apr-02 | 121,908 | 121,908 | | 4,064 | 4,064 | | |
| May-02 | 97,571 | 97,571 | | 3,147 | 3,147 | | |
| Jun-02 | 78,730 | 78,730 | | 2,624 | 2,624 | | |
| Jul-02 | 76,719 | 76,719 | | 2,475 | 2,475 | | |
| Aug-02 | 82,860 | 82,860 | | 2,673 | 2,673 | | |
| Sep-02 | 68,384 | 68,384 | | 2,279 | 2,279 | | |
| Oct-02 | 61,913 | 61,913 | | 1,997 | 1,997 | | |
| Nov-02 | 47,919 | 47,919 | | 1,597 | 1,597 | | |
| Dec-02 | 37,930 | 37,930 | | 1,224 | 1,224 | | |
| Jan-03 | 87,002 | 87,002 | | 2,807 | 2,807 | | |
| Feb-03 | 97,016 | 97,016 | | 3,465 | 3,465 | | |
| Mar-03 | 98,625 | 98,625 | | 3,181 | 3,181 | | |
| Apr-03 | 75,564 | 75,564 | | 2,519 | 2,519 | | |
| May-03 | 88,845 | 88,845 | | 2,866 | 2,866 | | |
| Jun-03 | 75,634 | 75,634 | | 2,521 | 2,521 | | |
| Jul-03 | 79,396 | 79,396 | | 2,561 | 2,561 | | |
| Aug-03 | 84,651 | 84,651 | | 2,731 | 2,731 | | |
| Sep-03 | 72,239 | 72,239 | | 2,408 | 2,408 | | |
| Oct-03 | 69,246 | 65,388 | | 2,234 | 2,109 | | |
| Nov-03 | 62,452 | 57,942 | | 2,082 | 1,931 | | |
| Dec-03 | 48,280 | 43,663 | | 1,557 | 1,408 | | |
| Jan-04 | 98,764 | 92,751 | | 3,186 | 2,992 | | |
| Feb-04 | 116,398 | 110,824 | | 4,137 | 3,958 | | |
| Mar-04 | 162,530 | 155,069 | | 5,243 | 5,003 | | |
| Apr-04 | 142,491 | 135,632 | | 4,750 | 4,521 | | |
| May-04 | 125,502 | 118,811 | | 4,048 | 3,833 | | |
| Jun-04 | 101,178 | 94,607 | | 3,373 | 3,154 | | |
| Jul-04 | 98,989 | 92,152 | | 3,193 | 2,973 | | |
| Aug-04 | 99,086 | 93,299 | | 3,196 | 3,010 | | |
| Sep-04 | 85,877 | 80,089 | | 2,863 | 2,670 | | |
| Oct-04 | 81,687 | 75,908 | | 2,635 | 2,449 | | |
| Nov-04 | 70,617 | 65,110 | | 2,354 | 2,170 | | |
| Dec-04 | 54,028 | 48,410 | | 1,743 | 1,562 | | |
| Jan-05 | 101,552 | 93,029 | | 3,276 | 3,001 | | |
| Feb-05 | 121,177 | 113,776 | | 4,328 | 4,063 | | |
| Mar-05 | 150,892 | 143,044 | | 4,867 | 4,614 | | |
| Apr-05 | 148,688 | 140,074 | | 4,956 | 4,669 | | |
| May-05 | 125,226 | 115,817 | | 4,040 | 3,736 | | |
| Jun-05 | 99,490 | 90,796 | | 3,316 | 3,027 | | |
| Jul-05 | 105,093 | 94,964 | | 3,390 | 3,063 | | |
| Aug-05 | 107,620 | 96,745 | | 3,472 | 3,121 | | |
| Sep-05 | 103,177 | 93,719 | | 3,439 | 3,124 | | |
| Oct-05 | 91,035 | 83,561 | | 2,936 | 2,696 | | |
| Nov-05 | 78,827 | 70,954 | | 2,627 | 2,365 | | |
| Dec-05 | 60,375 | 52,663 | | 1,948 | 1,699 | | |
| Jan-06 | 110,987 | 101,262 | | 3,580 | 3,267 | | |
| Feb-06 | 132,780 | 125,020 | | 4,742 | 4,465 | | |
| Mar-06 | 169,077 | 160,696 | | 5,454 | 5,184 | | |
| Apr-06 | 133,964 | 126,359 | | 4,465 | 4,212 | | |
| May-06 | 112,511 | 105,343 | | 3,631 | 3,401 | | |
| Jun-06 | 76,274 | 68,365 | | 2,542 | 2,279 | | |
| Jul-06 | 67,636 | 59,633 | | 2,182 | 1,924 | | |
| Aug-06 | 67,631 | 59,733 | | 2,182 | 1,927 | | |
| Sep-06 | 65,571 | 58,082 | | 2,186 | 1,936 | | |
| Oct-06 | 68,083 | 60,726 | | 2,196 | 1,959 | | |
| Nov-06 | 58,199 | 51,592 | | 1,940 | 1,720 | | |
| Dec-06 | 47,537 | 40,527 | | 1,533 | 1,307 | | |
| Jan-07 | 79,794 | 72,000 | | 2,574 | 2,323 | | |
| Feb-07 | 86,435 | 79,273 | | 3,087 | 2,831 | | |
| Mar-07 | 122,450 | 114,136 | | 3,950 | 3,682 | | |
| Apr-07 | 112,773 | 104,465 | | 3,759 | 3,482 | | |
| May-07 | 97,106 | 88,510 | | 3,133 | 2,855 | | |
| Jun-07 | 79,997 | 71,336 | | 2,667 | 2,378 | | |
| Jul-07 | 75,766 | 66,793 | | 2,444 | 2,155 | | |
| Aug-07 | 69,142 | 59,801 | | 2,230 | 1,929 | | |
| Sep-07 | 57,556 | 49,577 | | 1,919 | 1,653 | | |
| Oct-07 | 58,616 | 51,355 | | 1,891 | 1,657 | | |
| Nov-07 | 48,693 | 42,208 | | 1,623 | 1,407 | | |
| Dec-07 | 38,556 | 31,834 | | 1,244 | 1,027 | | |
| Jan-08 | 66,471 | 59,034 | | 2,144 | 1,904 | | |
| Feb-08 | 80,714 | 73,481 | | 2,783 | 2,534 | | |
| Mar-08 | 97,774 | 89,769 | | 3,154 | 2,896 | | |
| Apr-08 | 99,518 | 91,552 | | 3,317 | 3,052 | | |
| May-08 | 77,048 | 69,240 | | 2,485 | 2,234 | | |
| Jun-08 | 60,492 | 53,850 | | 2,016 | 1,795 | | |
| Jul-08 | 56,806 | 49,468 | | 1,832 | 1,596 | | |
| Aug-08 | 56,142 | 48,544 | | 1,811 | 1,566 | | |
| Sep-08 | 51,713 | 44,722 | | 1,724 | 1,491 | | |
| Oct-08 | 49,217 | 42,937 | | 1,588 | 1,385 | | |
| Nov-08 | 38,450 | 32,782 | | 1,282 | 1,093 | | |
| Dec-08 | 31,356 | 25,946 | | 1,011 | 837 | | |
| Jan-09 | 50,707 | 44,503 | | 1,637 | 1,436 | | |
| Feb-09 | 55,132 | 49,211 | | 1,969 | 1,758 | | |
| Mar-09 | 74,323 | 67,347 | | 2,398 | 2,172 | | |
| Apr-09 | 65,129 | 58,493 | | 2,171 | 1,950 | | |
| May-09 | 57,593 | 50,883 | | 1,858 | 1,641 | | |
| Jun-09 | 52,600 | 46,044 | | 1,753 | 1,535 | | |
| Jul-09 | 50,986 | 43,841 | | 1,645 | 1,414 | | |
| Aug-09 | 51,086 | 44,519 | | 1,648 | 1,436 | | |
| Sep-09 | 42,666 | 35,350 | | 1,422 | 1,178 | | |
| Oct-09 | 47,290 | 40,890 | | 1,525 | 1,319 | | |
| Nov-09 | 39,064 | 32,815 | | 1,302 | 1,094 | | |
| Dec-09 | 31,352 | 25,034 | | 1,011 | 808 | | |
| Jan-10 | 40,741 | 34,784 | | 1,314 | 1,122 | | |
| Feb-10 | 48,753 | 42,790 | | 1,741 | 1,528 | | |
| Mar-10 | 69,152 | 61,261 | | 2,231 | 1,976 | | |
| Apr-10 | 62,351 | 55,237 | | 2,078 | 1,841 | | |
| May-10 | 54,018 | 47,045 | | 1,743 | 1,518 | | |
| Jun-10 | 39,308 | 32,955 | | 1,310 | 1,099 | | |
| Jul-10 | 32,363 | 25,609 | | 1,044 | 826 | | |
| Aug-10 | 33,717 | 26,415 | | 1,088 | 852 | | |
| Sep-10 | 29,310 | 22,796 | | 977 | 760 | | |
| Oct-10 | 32,451 | 26,165 | | 1,047 | 844 | | |
| Nov-10 | 28,516 | 22,401 | | 951 | 747 | | |
| Dec-10 | 25,728 | 19,429 | | 830 | 627 | | |
| Jan-11 | 29,737 | 23,926 | | 959 | 772 | | |
| Feb-11 | 34,408 | 28,784 | | 1,229 | 1,028 | | |
| Mar-11 | 48,920 | 42,014 | | 1,578 | 1,355 | | |
| Apr-11 | 42,739 | 36,251 | | 1,425 | 1,208 | | |
| May-11 | 37,543 | 31,236 | | 1,211 | 1,008 | | |
| Jun-11 | 32,909 | 27,166 | | 1,097 | 906 | | |
| Jul-11 | 29,520 | 23,170 | | 952 | 747 | | |
| Aug-11 | 30,226 | 24,166 | | 975 | 780 | | |
| Sep-11 | 28,386 | 22,863 | | 946 | 762 | | |
| Oct-11 | 31,344 | 25,612 | | 1,011 | 826 | | |
| Nov-11 | 28,617 | 23,368 | | 954 | 779 | | |
| Dec-11 | 24,380 | 18,983 | | 786 | 612 | | |
| Jan-12 | 30,798 | 25,714 | | 993 | 829 | | |
| Feb-12 | 37,009 | 31,579 | | 1,322 | 1,128 | | |
| Mar-12 | 48,538 | 42,218 | | 1,566 | 1,362 | | |
| Apr-12 | 46,680 | 40,628 | | 1,556 | 1,354 | | |
| May-12 | 43,020 | 36,964 | | 1,388 | 1,192 | | |
| Jun-12 | 36,808 | 30,669 | | 1,227 | 1,022 | | |
| Jul-12 | 32,833 | 26,878 | | 1,059 | 867 | | |
| Aug-12 | 33,699 | 27,567 | | 1,087 | 889 | | |
| Sep-12 | 31,399 | 26,595 | | 1,047 | 886 | | |
| Oct-12 | 34,867 | 28,929 | | 1,124 | 933 | | |
| Nov-12 | 33,159 | 27,636 | | 1,105 | 921 | | |
| Dec-12 | 29,077 | 23,243 | | 938 | 750 | | |
| Jan-13 | 32,485 | 26,921 | | 1,048 | 868 | | |
| Feb-13 | 40,636 | 35,042 | | 1,451 | 1,252 | | |
| Mar-13 | 54,010 | 47,293 | | 1,742 | 1,526 | | |
| Apr-13 | 54,771 | 48,212 | | 1,826 | 1,607 | | |
| May-13 | 50,500 | 43,856 | | 1,629 | 1,415 | | |
| Jun-13 | 40,790 | 34,436 | | 1,360 | 1,148 | | |
| Jul-13 | 40,006 | 33,230 | | 1,291 | 1,072 | | |
| Aug-13 | 41,125 | 33,797 | | 1,327 | 1,090 | | |
| Sep-13 | 38,239 | 31,802 | | 1,275 | 1,060 | | |
| Oct-13 | 41,835 | 35,312 | 180 | 1,350 | 1,139 | 5.8 | 1% |
| Nov-13 | 38,692 | 31,896 | 133 | 1,290 | 1,063 | 4.4 | 0% |
| Dec-13 | 36,707 | 29,528 | 195 | 1,184 | 953 | 6.3 | 1% |
| Jan-14 | 35,200 | 28,668 | 169 | 1,135 | 925 | 5.5 | 1% |
| Feb-14 | 42,473 | 36,403 | 192 | 1,517 | 1,300 | 6.9 | 1% |
| Mar-14 | 57,548 | 49,596 | 447 | 1,856 | 1,600 | 14.4 | 1% |
| Apr-14 | 59,383 | 51,502 | 317 | 1,979 | 1,717 | 10.6 | 1% |
| May-14 | 69,033 | 60,683 | 1,455 | 2,227 | 1,958 | 46.9 | 2% |
| Jun-14 | 66,572 | 57,861 | 2,153 | 2,219 | 1,929 | 71.8 | 4% |
| Jul-14 | 48,833 | 40,708 | 820 | 1,575 | 1,313 | 26.5 | 2% |
| Aug-14 | 39,766 | 31,388 | 288 | 1,283 | 1,013 | 9.3 | 1% |
| Sep-14 | 34,006 | 25,825 | 175 | 1,134 | 861 | 5.8 | 1% |
| Oct-14 | 35,903 | 26,450 | 127 | 1,158 | 853 | 4.1 | 0% |
| Nov-14 | 33,024 | 24,641 | 126 | 1,101 | 821 | 4.2 | 1% |
| Dec-14 | 34,231 | 25,019 | 138 | 1,104 | 807 | 4.5 | 1% |
| Jan-15 | 30,179 | 21,514 | 204 | 974 | 694 | 6.6 | 1% |
| Feb-15 | 32,554 | 24,376 | 224 | 1,163 | 871 | 8.0 | 1% |
| Mar-15 | 39,162 | 29,791 | 224 | 1,263 | 961 | 7.2 | 1% |
| Apr-15 | 38,299 | 29,750 | 270 | 1,277 | 992 | 9.0 | 1% |
| May-15 | 40,684 | 31,576 | 222 | 1,312 | 1,019 | 7.2 | 1% |
| Jun-15 | 38,620 | 29,303 | 233 | 1,287 | 977 | 7.8 | 1% |
| Jul-15 | 38,610 | 28,388 | 348 | 1,245 | 916 | 11.2 | 1% |
| Aug-15 | 42,419 | 30,239 | 313 | 1,368 | 975 | 10.1 | 1% |
| Sep-15 | 41,171 | 30,286 | 248 | 1,372 | 1,010 | 8.3 | 1% |
| Oct-15 | 45,245 | 32,724 | 242 | 1,460 | 1,056 | 7.8 | 1% |
| Nov-15 | 45,387 | 32,838 | 212 | 1,513 | 1,095 | 7.1 | 1% |
| Dec-15 | 48,393 | 37,014 | 336 | 1,561 | 1,194 | 10.8 | 1% |
| Jan-16 | 33,396 | 23,758 | 215 | 1,077 | 766 | 6.9 | 1% |
| Feb-16 | 38,068 | 26,072 | 220 | 1,360 | 931 | 7.9 | 1% |
| Mar-16 | 45,779 | 33,316 | 246 | 1,477 | 1,075 | 7.9 | 1% |
| Apr-16 | 48,271 | 38,089 | 260 | 1,609 | 1,270 | 8.7 | 1% |
| May-16 | 54,987 | 40,337 | 353 | 1,774 | 1,301 | 11.4 | 1% |
| Jun-16 | 45,168 | 34,450 | 309 | 1,506 | 1,148 | 10.3 | 1% |
| Jul-16 | 46,658 | 33,723 | 472 | 1,505 | 1,088 | 15.2 | 1% |
| Aug-16 | 51,569 | 37,048 | 382 | 1,664 | 1,195 | 12.3 | 1% |
| Sep-16 | 56,070 | 39,501 | 567 | 1,869 | 1,317 | 18.9 | 1% |
| Oct-16 | 66,707 | 46,184 | 389 | 2,152 | 1,490 | 12.5 | 1% |
| Nov-16 | 63,366 | 47,211 | 338 | 2,112 | 1,574 | 11.3 | 1% |
| Dec-16 | 58,416 | 43,251 | 320 | 1,884 | 1,395 | 10.3 | 1% |
| Jan-17 | 42,458 | 31,576 | 240 | 1,370 | 1,019 | 7.7 | 1% |
| Feb-17 | 23,555 | 18,754 | 75 | 841 | 670 | 2.7 | 0% |
| Mar-17 | 16,592 | 12,195 | 39 | 535 | 393 | 1.3 | 0% |
| Apr-17 | 15,768 | 11,127 | 44 | 526 | 371 | 1.5 | 0% |
| May-17 | 19,940 | 14,519 | 69 | 643 | 468 | 2.2 | 0% |
| Jun-17 | 21,657 | 16,087 | 46 | 722 | 536 | 1.5 | 0% |
| Jul-17 | 25,014 | 18,187 | 41 | 807 | 587 | 1.3 | 0% |
| Aug-17 | 30,569 | 22,288 | 62 | 986 | 719 | 2.0 | 0% |
| Sep-17 | 31,157 | 22,537 | 45 | 1,039 | 751 | 1.5 | 0% |
| Oct-17 | 34,842 | 25,488 | 49 | 1,124 | 822 | 1.6 | 0% |
| Nov-17 | 39,031 | 29,085 | 46 | 1,301 | 970 | 1.5 | 0% |
| Dec-17 | 40,476 | 28,995 | 58 | 1,306 | 935 | 1.9 | 0% |
| Jan-18 | 35,865 | 25,975 | 36 | 1,157 | 838 | 1.2 | 0% |
| Feb-18 | 36,690 | 26,666 | 57 | 1,310 | 952 | 2.0 | 0% |
| Mar-18 | 50,213 | 37,390 | 71 | 1,620 | 1,206 | 2.3 | 0% |
| Apr-18 | 51,019 | 38,243 | 81 | 1,701 | 1,275 | 2.7 | 0% |
| May-18 | 51,790 | 40,339 | 123 | 1,671 | 1,301 | 4.0 | 0% |
| Jun-18 | 43,096 | 34,089 | 130 | 1,437 | 1,136 | 4.3 | 0% |
| Jul-18 | 40,005 | 31,299 | 115 | 1,290 | 1,010 | 3.7 | 0% |
| Aug-18 | 46,551 | 37,524 | 117 | 1,502 | 1,210 | 3.8 | 0% |
| Sep-18 | 50,366 | 41,486 | 150 | 1,679 | 1,383 | 5.0 | 0% |
| Oct-18 | 60,775 | 51,005 | 4,839 | 1,960 | 1,645 | 156.1 | 9% |
| Nov-18 | 62,463 | 51,857 | 5,868 | 2,082 | 1,729 | 195.6 | 11% |
| Dec-18 | 60,789 | 50,751 | 6,022 | 1,961 | 1,637 | 194.3 | 12% |
| Jan-19 | 58,313 | 47,979 | 3,774 | 1,881 | 1,548 | 121.7 | 8% |
| Feb-19 | 76,543 | 66,883 | 7,142 | 2,734 | 2,389 | 255.1 | 11% |
| Mar-19 | 103,730 | 92,833 | 21,758 | 3,346 | 2,995 | 701.9 | 23% |
| Apr-19 | 109,413 | 99,273 | 31,438 | 3,647 | 3,309 | 1,047.9 | 32% |
| May-19 | 144,113 | 132,856 | 61,304 | 4,649 | 4,286 | 1,977.5 | 46% |
| Jun-19 | 104,310 | 94,902 | 42,852 | 3,477 | 3,163 | 1,428.4 | 45% |
| Jul-19 | 81,748 | 71,978 | 31,022 | 2,637 | 2,322 | 1,000.7 | 43% |
| Aug-19 | 62,608 | 50,684 | 13,352 | 2,020 | 1,635 | 430.7 | 26% |
| Sep-19 | 52,424 | 40,507 | 6,750 | 1,747 | 1,350 | 225.0 | 17% |
| Oct-19 | 45,139 | 35,402 | 1,252 | 1,456 | 1,142 | 40.4 | 4% |
| Nov-19 | 42,642 | 33,524 | 1,231 | 1,421 | 1,117 | 41.0 | 4% |
| Dec-19 | 40,563 | 32,853 | 1,049 | 1,308 | 1,060 | 33.8 | 3% |
| Jan-20 | 36,583 | 29,205 | 917 | 1,180 | 942 | 29.6 | 3% |
| Feb-20 | 36,686 | 30,077 | 706 | 1,310 | 1,074 | 25.2 | 2% |
| Mar-20 | 34,457 | 30,389 | 492 | 1,112 | 980 | 15.9 | 2% |
| Apr-20 | 17,106 | 16,182 | 56 | 570 | 539 | 1.9 | 0% |
| May-20 | 23,237 | 21,593 | 66 | 750 | 697 | 2.1 | 0% |
| Jun-20 | 33,029 | 30,816 | 73 | 1,101 | 1,027 | 2.4 | 0% |
| Jul-20 | 40,949 | 38,556 | 106 | 1,321 | 1,244 | 3.4 | 0% |
| Aug-20 | 50,007 | 47,276 | 118 | 1,613 | 1,525 | 3.8 | 0% |
| Sep-20 | 57,668 | 54,762 | 264 | 1,922 | 1,825 | 8.8 | 0% |
| Oct-20 | 71,943 | 69,048 | 223 | 2,321 | 2,227 | 7.2 | 0% |
| Nov-20 | 72,113 | 69,169 | 195 | 2,404 | 2,306 | 6.5 | 0% |
| Dec-20 | 73,994 | 71,141 | 265 | 2,387 | 2,295 | 8.5 | 0% |
| Jan-21 | 78,414 | 75,316 | 1,545 | 2,529 | 2,430 | 49.8 | 2% |
| Feb-21 | 101,098 | 97,643 | 8,881 | 3,611 | 3,487 | 317.2 | 9% |
| Mar-21 | 173,277 | 169,216 | 26,624 | 5,590 | 5,459 | 858.8 | 16% |
| Apr-21 | 178,795 | 173,699 | 26,451 | 5,960 | 5,790 | 881.7 | 15% |
| May-21 | 180,597 | 172,654 | 27,347 | 5,826 | 5,569 | 882.2 | 16% |
| Jun-21 | 189,034 | 178,649 | 36,238 | 6,301 | 5,955 | 1,207.9 | 20% |
| Jul-21 | 213,593 | 200,658 | 62,397 | 6,890 | 6,473 | 2,012.8 | 31% |
| Aug-21 | 209,840 | 196,514 | 59,045 | 6,769 | 6,339 | 1,904.7 | 30% |
| Sep-21 | 192,001 | 185,515 | 44,258 | 6,400 | 6,184 | 1,475.3 | 24% |
| Oct-21 | 164,837 | 159,113 | 27,942 | 5,317 | 5,133 | 901.4 | 18% |
| Nov-21 | 174,845 | 167,015 | 40,445 | 5,828 | 5,567 | 1,348.2 | 24% |
| Dec-21 | 179,253 | 170,602 | 51,780 | 5,782 | 5,503 | 1,670.3 | 30% |
| Jan-22 | 154,874 | 147,877 | 43,646 | 4,996 | 4,770 | 1,407.9 | 30% |
| Feb-22 | 166,010 | 159,170 | 35,879 | 5,929 | 5,685 | 1,281.4 | 23% |
| Mar-22 | 222,574 | 211,181 | 56,129 | 7,180 | 6,812 | 1,810.6 | 27% |
| Apr-22 | 235,785 | 203,504 | 61,534 | 7,860 | 6,783 | 2,051.1 | 30% |
| May-22 | 241,136 | 224,370 | 72,755 | 7,779 | 7,238 | 2,346.9 | 32% |
| Jun-22 | 207,834 | 192,399 | 59,705 | 6,928 | 6,413 | 1,990.2 | 31% |
| Jul-22 | 200,162 | 181,834 | 65,614 | 6,457 | 5,866 | 2,116.6 | 36% |
| Aug-22 | 204,087 | 181,774 | 64,868 | 6,583 | 5,864 | 2,092.5 | 36% |
| Sep-22 | 227,547 | 207,597 | 105,007 | 7,585 | 6,920 | 3,500.2 | 51% |
| Oct-22 | 231,529 | 205,134 | 89,823 | 7,469 | 6,617 | 2,897.5 | 44% |
| Nov-22 | 235,173 | 207,680 | 107,280 | 7,839 | 6,923 | 3,576.0 | 52% |
| Dec-22 | 252,315 | 222,018 | 140,370 | 8,139 | 7,162 | 4,528.1 | 63% |
| Jan-23 | 157,358 | 129,513 | 23,098 | 5,076 | 4,178 | 745.1 | 18% |
| Feb-23 | 156,630 | 130,521 | 14,797 | 5,594 | 4,661 | 528.5 | 11% |
| Mar-23 | 193,249 | 163,672 | 25,917 | 6,234 | 5,280 | 836.0 | 16% |
| Apr-23 | 211,992 | 183,921 | 65,690 | 7,066 | 6,131 | 2,189.7 | 36% |
| May-23 | 206,690 | 171,382 | 77,850 | 6,667 | 5,528 | 2,511.3 | 45% |
| Jun-23 | 144,556 | 99,538 | 36,551 | 4,819 | 3,318 | 1,218.4 | 37% |
| Jul-23 | 183,479 | 132,642 | 70,462 | 5,919 | 4,279 | 2,273.0 | 53% |
| Aug-23 | 232,963 | 181,054 | 101,651 | 7,515 | 5,840 | 3,279.1 | 56% |
| Sep-23 | 269,735 | 218,763 | 155,961 | 8,991 | 7,292 | 5,198.7 | 71% |
| Oct-23 | 240,932 | 188,754 | 122,680 | 8,031 | 6,292 | 4,089.3 | 65% |
| Nov-23 | 242,413 | 191,119 | 131,260 | 8,080 | 6,371 | 4,375.3 | 69% |
| Dec-23 | 301,980 | 249,737 | 191,800 | 10,066 | 8,325 | 6,393.3 | 77% |
| Jan-24 | 176,189 | 124,204 | 70,426 | 5,684 | 4,007 | 2,347.5 | 59% |
| Feb-24 | 189,914 | 140,638 | 76,953 | 6,549 | 4,850 | 2,565.1 | 53% |
| Mar-24 | 189,371 | 137,480 | 78,051 | 6,109 | 4,435 | 2,601.7 | 59% |

Average number of daily USBP releases 2013-2019 in months with < 1,500 USBP encounters/day
10.5

Average number of daily USBP releases 2013-2019 in months with >= 2,500 USBP encounters/day
1,288.9

Average number of daily USBP releases 2013-2019 in months with 1500< releases < 2500encounters/day
209.1

| BP Encounters/day | Average Releases/day |
|---|---|
| < 1,500 | 11 |
| 1,501 - 2,500 | 209 |
| > 2,500 | 1,299 |

Max Releases percent FY 2013-2019 46%

During the 2013 to 2019 time frame—which forms the basis for the analysis in the preceding paragraph—the vast majority of encounters at the border were from Mexico, El Salvador, Guatemala, and Honduras—countries that are comparatively easy to return people to. OHSS analysis of March 2024 OHSS Persist Dataset.

SWB Total CBP encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total | | Mexico | NCA | Other | Mexico + NCA |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 | 2000 | 98% | 1% | 0% | 99.6% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | 2001 | 98% | 2% | 1% | 99% |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 | 2002 | 97% | 2% | 1% | 99% |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 | 2003 | 96% | 3% | 1% | 99% |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 | 2004 | 94% | 4% | 2% | 98% |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 | 2005 | 87% | 9% | 4% | 96% |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 | 2006 | 91% | 8% | 2% | 98% |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 | 2007 | 92% | 6% | 2% | 98% |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 | 2008 | 92% | 6% | 2% | 98% |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 | 2009 | 91% | 6% | 2% | 98% |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 | 2010 | 89% | 8% | 3% | 97% |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 | 2011 | 86% | 10% | 4% | 96% |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 | 2012 | 74% | 21% | 5% | 95% |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 | 2013 | 65% | 29% | 6% | 94% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | 2014 | 50% | 44% | 6% | 94% |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 | 2015 | 57% | 32% | 11% | 89% |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 | 2016 | 46% | 41% | 13% | 87% |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 | 2017 | 44% | 45% | 11% | 89% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | 2018 | 43% | 50% | 8% | 92% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | 2019 | 24% | 64% | 12% | 88% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | 2020 | 65% | 23% | 12% | 88% |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 | 2021 | 38% | 40% | 22% | 78% |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 | 2022 | 34% | 23% | 43% | 57% |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 | 2023 | 29% | 20% | 51% | 49% |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 | 2024Q2 | 29% | 20% | 51% | 49% |

Source: March 2024 OHSS Persist Dataset.

IFR_AR_007569

o.

IFR_AR_007570

Today, a much higher proportion of SWB encounters are from other countries that are comparatively much more difficult to return people to, including record numbers from the Eastern Hemisph
OHSS analysis of March 2024 OHSS Persist Dataset.

SWB Total CBP  encounters, FY 2000 - FY 2024Q2

| | Mexico | NCA | Other | Total | | Mexico | NCA | Other | Mexico + NCA |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 | 2000 | 98% | 1% | 0% | 99.6% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | 2001 | 98% | 2% | 1% | 99% |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 | 2002 | 97% | 2% | 1% | 99% |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 | 2003 | 96% | 3% | 1% | 99% |
| 2004 | 1,136,692 | 52,589 | 22,412 | 1,211,693 | 2004 | 94% | 4% | 2% | 98% |
| 2005 | 1,103,176 | 114,041 | 52,030 | 1,269,247 | 2005 | 87% | 9% | 4% | 96% |
| 2006 | 1,058,071 | 89,249 | 21,038 | 1,168,358 | 2006 | 91% | 8% | 2% | 98% |
| 2007 | 882,722 | 52,649 | 19,557 | 954,928 | 2007 | 92% | 6% | 2% | 98% |
| 2008 | 727,613 | 46,618 | 18,322 | 792,553 | 2008 | 92% | 6% | 2% | 98% |
| 2009 | 565,253 | 39,936 | 13,934 | 619,123 | 2009 | 91% | 6% | 2% | 98% |
| 2010 | 467,466 | 43,591 | 16,362 | 527,419 | 2010 | 89% | 8% | 3% | 97% |
| 2011 | 344,024 | 40,506 | 16,543 | 401,073 | 2011 | 86% | 10% | 4% | 96% |
| 2012 | 316,907 | 88,324 | 20,894 | 426,125 | 2012 | 74% | 21% | 5% | 95% |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 | 2013 | 65% | 29% | 6% | 94% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | 2014 | 50% | 44% | 6% | 94% |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 | 2015 | 57% | 32% | 11% | 89% |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 | 2016 | 46% | 41% | 13% | 87% |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 | 2017 | 44% | 45% | 11% | 89% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | 2018 | 43% | 50% | 8% | 92% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | 2019 | 24% | 64% | 12% | 88% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | 2020 | 65% | 23% | 12% | 88% |
| 2021 | 655,605 | 701,051 | 378,043 | 1,734,699 | 2021 | 38% | 40% | 22% | 78% |
| 2022 | 808,339 | 541,618 | 1,028,987 | 2,378,944 | 2022 | 34% | 23% | 43% | 57% |
| 2023 | 717,333 | 495,286 | 1,263,050 | 2,475,669 | 2023 | 29% | 20% | 51% | 49% |
| 2024Q2 | 385,680 | 267,831 | 687,288 | 1,340,799 | 2024Q2 | 29% | 20% | 51% | 49% |

Source: March 2024 OHSS Persist Dataset.

IFR_AR_007571

ere.

IFR_AR_007572

At the same time, the proportion of encounters involving family units and UCs, although still high, is lower today than it was during periods of high numbers of encounters and releases in FY 2019. UCs and family units accounted for 65 percent of USBP encounters in FY 2019, compared to 45 percent in FY 2024 through March.  OHSS analysis of March 2024 OHSS Persist Dataset.

USBP SWB encounters by family status

| | SA | FM | UC | Total | | SA | FM | UC | FM+ UC |
|---|---|---|---|---|---|---|---|---|---|
| 2013 | 362,706 | 12,934 | 38,757 | 414,397 | | 88% | 3% | 9% | 12% |
| 2014 | 343,791 | 67,040 | 68,539 | 479,370 | | 72% | 14% | 14% | 28% |
| 2015 | 251,531 | 39,834 | 39,968 | 331,333 | | 76% | 12% | 12% | 24% |
| 2016 | 271,508 | 77,673 | 59,689 | 408,870 | | 66% | 19% | 15% | 34% |
| 2017 | 186,861 | 75,620 | 41,435 | 303,916 | | 61% | 25% | 14% | 39% |
| 2018 | 239,336 | 107,209 | 50,034 | 396,579 | | 60% | 27% | 13% | 40% |
| 2019 | 301,818 | 473,670 | 76,020 | 851,508 | | 35% | 56% | 9% | 65% |
| 2020 | 317,853 | 52,230 | 30,552 | 400,635 | | 79% | 13% | 8% | 21% |
| 2021 | 1,063,301 | 451,082 | 144,839 | 1,659,222 | | 64% | 27% | 9% | 36% |
| 2022 | 1,574,387 | 482,956 | 149,093 | 2,206,436 | | 71% | 22% | 7% | 29% |
| 2023 | 1,293,009 | 621,310 | 131,519 | 2,045,838 | | 63% | 30% | 6% | 37% |
| 2024 YTD | 571,496 | 400,571 | 59,865 | 1,031,932 | | 55% | 39% | 6% | 45% |

Note: SA includes 6,363 encounters with unknown family status.
Source: OHSS Persist March 2024.

IFR_AR_007573

Since May 12, 2023, SWB daily POE encounters have averaged 1,650—largely because DHS has been incentivizing individuals to present at POEs in a safe, orderly manner. OHSS analysis of March 2024 OHSS Persist Dataset.

|  | OFO | USBP | Grand Total | Daily average |
|---|---|---|---|---|
| 5/12-31/23 | 25449 | 70400 | 95849 | 1272.45 |
| Jun-23 | 45018 | 99538 | 144556 | 1500.6 |
| Jul-23 | 50837 | 132642 | 183479 | 1694.567 |
| Aug-23 | 51909 | 181054 | 232963 | 1730.3 |
| Sep-23 | 50972 | 218763 | 269735 | 1699.067 |
| Oct-23 | 52178 | 188754 | 240932 | 1739.267 |
| Nov-23 | 51294 | 191119 | 242413 | 1709.8 |
| Dec-23 | 52243 | 249737 | 301980 | 1741.433 |
| Jan-24 | 51985 | 124204 | 176189 | 1732.833 |
| Feb-24 | 49276 | 140638 | 189914 | 1642.533 |
| Mar-24 | 51891 | 137480 | 189371 | 1729.7 |
|  |  |  |  | 1653.868 |

Source: March 2024 OHSS Persist Dataset.

This number has stayed relatively constant compared to the number of encounters between POEs, which have varied widely, from a low of 2,554 on May 21, 2023, to a high of 10,822 on December 18, 2023. OHSS analysis of March 2024 OHSS Persist Dataset.

CBP Encounters, May 1 - May 31, 2023

| | USBP | OFO | Total |
|---|---|---|---|
| 5/1/2023 | 7,913 | 881 | 8,794 |
| 5/2/2023 | 7,767 | 915 | 8,682 |
| 5/3/2023 | 8,624 | 890 | 9,514 |
| 5/4/2023 | 8,486 | 1,037 | 9,523 |
| 5/5/2023 | 9,184 | 899 | 10,083 |
| 5/6/2023 | 8,985 | 970 | 9,955 |
| 5/7/2023 | 8,779 | 920 | 9,699 |
| 5/8/2023 | 10,216 | 885 | 11,101 |
| 5/9/2023 | 10,802 | 802 | 11,604 |
| 5/10/2023 | 10,375 | 779 | 11,154 |
| 5/11/2023 | 9,836 | 915 | 10,751 |
| 5/12/2023 | 6,223 | 1,325 | 7,548 |
| 5/13/2023 | 4,339 | 1,354 | 5,693 |
| 5/14/2023 | 4,199 | 1,303 | 5,502 |
| 5/15/2023 | 3,737 | 1,310 | 5,047 |
| 5/16/2023 | 3,702 | 1,255 | 4,957 |
| 5/17/2023 | 2,836 | 1,311 | 4,147 |
| 5/18/2023 | 3,233 | 1,223 | 4,456 |
| 5/19/2023 | 2,960 | 1,254 | 4,214 |
| 5/20/2023 | 3,196 | 1,334 | 4,530 |
| 5/21/2023 | 2,554 | 1,279 | 3,833 |
| 5/22/2023 | 2,648 | 1,216 | 3,864 |
| 5/23/2023 | 3,503 | 1,214 | 4,717 |
| 5/24/2023 | 3,609 | 1,191 | 4,800 |
| 5/25/2023 | 3,497 | 1,272 | 4,769 |
| 5/26/2023 | 3,452 | 1,238 | 4,690 |
| 5/27/2023 | 3,305 | 1,225 | 4,530 |
| 5/28/2023 | 3,358 | 1,285 | 4,643 |
| 5/29/2023 | 3,313 | 1,255 | 4,568 |
| 5/30/2023 | 3,563 | 1,296 | 4,859 |
| 5/31/2023 | 3,179 | 1,277 | 4,456 |

Source: OHSS Persist March 2024

CBP Encounters, Dec. 1 - Dec. 31, 2023

| | USBP | OFO | Total |
|---|---|---|---|
| 12/1/2023 | 7,225 | 1,728 | 8,953 |
| 12/2/2023 | 7,591 | 1,719 | 9,310 |
| 12/3/2023 | 8,420 | 1,732 | 10,152 |
| 12/4/2023 | 8,575 | 1,635 | 10,210 |
| 12/5/2023 | 10,324 | 1,800 | 12,124 |
| 12/6/2023 | 8,248 | 1,728 | 9,976 |
| 12/7/2023 | 7,206 | 1,714 | 8,920 |
| 12/8/2023 | 5,865 | 1,733 | 7,598 |
| 12/9/2023 | 6,207 | 1,741 | 7,948 |
| 12/10/2023 | 7,945 | 1,713 | 9,658 |
| 12/11/2023 | 7,458 | 1,698 | 9,156 |
| 12/12/2023 | 8,319 | 1,783 | 10,102 |
| 12/13/2023 | 9,026 | 1,791 | 10,817 |
| 12/14/2023 | 8,616 | 1,726 | 10,342 |
| 12/15/2023 | 9,373 | 1,657 | 11,030 |
| 12/16/2023 | 8,647 | 1,606 | 10,253 |
| 12/17/2023 | 8,342 | 1,666 | 10,008 |
| 12/18/2023 | 10,822 | 1,688 | 12,510 |
| 12/19/2023 | 10,510 | 1,720 | 12,230 |
| 12/20/2023 | 10,562 | 1,692 | 12,254 |
| 12/21/2023 | 8,990 | 1,638 | 10,628 |
| 12/22/2023 | 8,655 | 1,703 | 10,358 |
| 12/23/2023 | 7,622 | 1,691 | 9,313 |
| 12/24/2023 | 6,761 | 1,603 | 8,364 |
| 12/25/2023 | 5,913 | 1,600 | 7,513 |
| 12/26/2023 | 5,936 | 1,578 | 7,514 |
| 12/27/2023 | 7,703 | 1,678 | 9,381 |
| 12/28/2023 | 8,293 | 1,678 | 9,971 |
| 12/29/2023 | 7,654 | 1,591 | 9,245 |
| 12/30/2023 | 7,029 | 1,696 | 8,725 |
| 12/31/2023 | 5,900 | 1,625 | 7,525 |

Source: OHSS Persist March 2024

CBP Encounters, Jan. 1 - Mar. 31, 2024

| | USBP | OFO | Total |
|---|---|---|---|
| 1/1/2024 | 2,605 | 1,611 | 4,216 |
| 1/2/2024 | 3,939 | 1,645 | 5,584 |
| 1/3/2024 | 4,006 | 1,732 | 5,738 |
| 1/4/2024 | 2,789 | 1,680 | 4,469 |
| 1/5/2024 | 3,054 | 1,682 | 4,736 |
| 1/6/2024 | 3,646 | 1,735 | 5,381 |
| 1/7/2024 | 2,731 | 1,682 | 4,413 |
| 1/8/2024 | 2,765 | 1,711 | 4,476 |
| 1/9/2024 | 3,303 | 1,652 | 4,955 |
| 1/10/2024 | 2,910 | 1,692 | 4,602 |
| 1/11/2024 | 3,746 | 1,753 | 5,499 |
| 1/12/2024 | 4,097 | 1,677 | 5,774 |
| 1/13/2024 | 4,158 | 1,678 | 5,836 |
| 1/14/2024 | 4,089 | 1,700 | 5,789 |
| 1/15/2024 | 3,942 | 1,605 | 5,547 |
| 1/16/2024 | 4,329 | 1,621 | 5,950 |
| 1/17/2024 | 4,229 | 1,651 | 5,880 |
| 1/18/2024 | 5,038 | 1,713 | 6,751 |
| 1/19/2024 | 5,024 | 1,715 | 6,739 |
| 1/20/2024 | 4,935 | 1,676 | 6,611 |
| 1/21/2024 | 3,596 | 1,620 | 5,216 |
| 1/22/2024 | 4,109 | 1,582 | 5,691 |
| 1/23/2024 | 4,097 | 1,694 | 5,791 |
| 1/24/2024 | 4,247 | 1,700 | 5,947 |
| 1/25/2024 | 4,883 | 1,794 | 6,677 |
| 1/26/2024 | 4,711 | 1,639 | 6,350 |
| 1/27/2024 | 4,394 | 1,655 | 6,049 |
| 1/28/2024 | 4,334 | 1,703 | 6,037 |
| 1/29/2024 | 4,708 | 1,694 | 6,402 |
| 1/30/2024 | 4,547 | 1,694 | 6,241 |
| 1/31/2024 | 5,243 | 1,643 | 6,886 |
| 2/1/2024 | 5,098 | 1,784 | 6,882 |
| 2/2/2024 | 4,748 | 1,767 | 6,515 |
| 2/3/2024 | 4,884 | 1,719 | 6,603 |
| 2/4/2024 | 4,874 | 1,799 | 6,673 |
| 2/5/2024 | 4,852 | 1,694 | 6,546 |
| 2/6/2024 | 5,297 | 1,703 | 7,000 |
| 2/7/2024 | 4,240 | 1,662 | 5,902 |
| 2/8/2024 | 4,983 | 1,710 | 6,693 |
| 2/9/2024 | 4,931 | 1,721 | 6,652 |
| 2/10/2024 | 5,196 | 1,751 | 6,947 |
| 2/11/2024 | 4,483 | 1,721 | 6,204 |
| 2/12/2024 | 4,506 | 1,693 | 6,199 |
| 2/13/2024 | 4,271 | 1,712 | 5,983 |
| 2/14/2024 | 4,279 | 1,614 | 5,893 |
| 2/15/2024 | 5,086 | 1,657 | 6,743 |
| 2/16/2024 | 4,627 | 1,649 | 6,276 |
| 2/17/2024 | 5,157 | 1,687 | 6,844 |
| 2/18/2024 | 5,001 | 1,731 | 6,732 |
| 2/19/2024 | 5,080 | 1,716 | 6,796 |
| 2/20/2024 | 4,763 | 1,673 | 6,436 |
| 2/21/2024 | 4,396 | 1,703 | 6,099 |
| 2/22/2024 | 4,314 | 1,663 | 5,977 |
| 2/23/2024 | 5,275 | 1,706 | 6,981 |
| 2/24/2024 | 5,951 | 1,639 | 7,590 |
| 2/25/2024 | 4,901 | 1,662 | 6,563 |
| 2/26/2024 | 5,088 | 1,717 | 6,805 |
| 2/27/2024 | 4,949 | 1,690 | 6,639 |
| 2/28/2024 | 4,882 | 1,716 | 6,598 |
| 2/29/2024 | 4,526 | 1,673 | 6,199 |
| 3/1/2024 | 5,447 | 1,667 | 7,114 |
| 3/2/2024 | 5,367 | 1,690 | 7,057 |
| 3/3/2024 | 5,394 | 1,646 | 7,040 |
| 3/4/2024 | 5,531 | 1,658 | 7,189 |
| 3/5/2024 | 5,476 | 1,681 | 7,157 |
| 3/6/2024 | 5,633 | 1,667 | 7,300 |
| 3/7/2024 | 5,128 | 1,702 | 6,830 |
| 3/8/2024 | 5,071 | 1,703 | 6,774 |
| 3/9/2024 | 4,772 | 1,672 | 6,444 |
| 3/10/2024 | 4,610 | 1,648 | 6,258 |
| 3/11/2024 | 4,309 | 1,602 | 5,911 |
| 3/12/2024 | 4,667 | 1,648 | 6,315 |
| 3/13/2024 | 4,384 | 1,662 | 6,046 |
| 3/14/2024 | 4,267 | 1,680 | 5,947 |
| 3/15/2024 | 4,301 | 1,690 | 5,991 |
| 3/16/2024 | 3,885 | 1,649 | 5,534 |
| 3/17/2024 | 3,541 | 1,652 | 5,193 |
| 3/18/2024 | 4,354 | 1,725 | 6,079 |
| 3/19/2024 | 3,759 | 1,688 | 5,447 |
| 3/20/2024 | 3,623 | 1,632 | 5,255 |
| 3/21/2024 | 3,997 | 1,666 | 5,663 |
| 3/22/2024 | 3,469 | 1,739 | 5,208 |
| 3/23/2024 | 3,778 | 1,697 | 5,475 |
| 3/24/2024 | 3,666 | 1,643 | 5,309 |
| 3/25/2024 | 4,127 | 1,718 | 5,845 |
| 3/26/2024 | 4,503 | 1,713 | 6,216 |
| 3/27/2024 | 4,298 | 1,728 | 6,026 |
| 3/28/2024 | 4,458 | 1,646 | 6,104 |
| 3/29/2024 | 3,990 | 1,690 | 5,680 |
| 3/30/2024 | 3,857 | 1,701 | 5,558 |
| 3/31/2024 | 3,818 | 1,659 | 5,477 |

Source: OHSS Persist March 2024

The vast majority of noncitizens who present at a SWB POE have done so after having registered with the CBP One app. OHSS analysis of March 2024 OHSS Persist Dataset.

SWB OFO Encounters May 12, 2023 - March 31, 2024

| | No CBP One Registation | CBP One Registration | Grand Total | | No CBP One Registation | CBP One Registration | Grand Total |
|---|---|---|---|---|---|---|---|
| May 12 - 31 | 4,601 | 20,848 | 25,449 | | 230 | 1,042 | 1,272 |
| June | 6,860 | 38,158 | 45,018 | | 229 | 1,272 | 1,501 |
| July | 6,145 | 44,692 | 50,837 | | 205 | 1,490 | 1,695 |
| August | 6,602 | 45,307 | 51,909 | | 220 | 1,510 | 1,730 |
| September | 7,373 | 43,599 | 50,972 | | 246 | 1,453 | 1,699 |
| October | 7,474 | 44,704 | 52,178 | | 249 | 1,490 | 1,739 |
| November | 7,573 | 43,721 | 51,294 | | 252 | 1,457 | 1,710 |
| December | 6,550 | 45,693 | 52,243 | | 218 | 1,523 | 1,741 |
| January | 7,058 | 44,927 | 51,985 | | 235 | 1,498 | 1,733 |
| February | 7,108 | 42,168 | 49,276 | | 237 | 1,406 | 1,643 |
| March | 7,670 | 44,221 | 51,891 | | 256 | 1,474 | 1,730 |
| | | | | | 234 | 1,420 | 1,654 |

OHSS Persist March 2024.

As described more fully above, DHS's internal projections suggest that SWB encounters may once again reach extremely elevated levels in the weeks to come, averaging in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments through the CBP OMID Southwest Border Encounter Projection, April 2024. Note that the OMID encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (i.e., encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023.

FOUO

Office of Homeland

Office of Homeland
Security Statistics

**FOUO**

**Projected encounters exclude OFO releases with CBP One appointments, but include other OFO.**

**Projected encounters exclude OFO releases with parole dispositions and/or CBP One appointments, but include other OFO paroles.**

**Key updates from previous version:** Updated the selection of missing average terms in the models and the assumptions in the high planning line. Added a low planning line. Updated the input data and maintained all other model/specification parameters from March 2024 projections. Detailed results are available within the breakdown of results by country.

**Workbook Details:** This workbook presents the most recent Blended Encounter Projections. The workbook contains the following worksheets:

- **Overview:** Current worksheet, providing details about the workbook and the projections.
- **Totals:** Encounter projections by Total, Family Type, and UC OTM.
  - Note: UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Daily Average:** Encounter projections by total, Family Type, and UC OTM.
  - Note: UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Planning, Low:** Encounter projections from the Blended planning line adjusted to assume increased impact of current enforcement and lawful migration processes. The adjustment lowers all countries to the lower bound of a 95% confidence interval. This line is also referred to as the Low planning line.
- **Blended, Models SME:** Encounter projections by select 14 countries plus Other, broken down by Total and Family Type. Results come from BSTS, and then a multiplier defined by the SME survey results. The multiplier based on the SME survey results is designed to update the statistical projection with realtime (subjective) insight gathered from SMEs, incorporating information not included in the statistical model.
- **Planning, Mod:** Encounter projections from the Blended planning line adjusted to assume moderately diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 68% confidence interval. This line is also referred to as the Moderate planning line.
- **Planning, High:** Encounter projections from the Blended planning line adjusted to assume substantially diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 95% confidence interval. This line is also referred to as the High planning line.
- **Graphs:** Graphs illustrate the daily averages by family type.

**The Blended Encounter Projections:** A mixed-methods approach that combines the knowledge and intel of subject matter expertise with mathematical, regression-based predictive models. More specifically, the current Blended Projections average, or 'blend', is:

- Bayesian Structural Time Series (BSTS) Model projections.
- LightGBM Model projections. (Results no reported in this round and not included in the Blended model.)
- Structured Subject Matter Expert (SME) Survey responses

**Model Specifications and Notes:**

- Uses a blend of encounters through:
  - BSTS Model: 2024-03-31
  - LightGBM Model: 2024-03-31
- Model Descriptions:
  - The BSTS Model was built using a machine learning approach and includes a 12-seasonal component, an autoregressive component (AR(1)), and a regression component.
    - The BSTS regression component includes the following predictors: Mexico Apprehensions (through Feb 2024), USA Unemployment (through Jan 2024), Fatalities (through Mar 2024), Disasters (through Apr 2024), Remittances (Mexico - through Feb 2024, Colombia - through Feb 2024, Nicaragua - through Feb 2024, Guatemala - through Mar 2024), and rates of Removals to TB Encounters (through Feb 2024).
    - The LightGBM Model was built using a machine learning approach and includes predictors from the BSTS.

**FOUO**

**Encounter projections by Total, Family Type, and UC OTM, Daily Average**

| | 24-Apr | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | 25-Jan | 25-Feb | 25-Mar | 25-Apr | 25-May | 25-Jun | 25-Jul | 25-Aug | 25-Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | | | | | | | | |

**Note:** Encounters exclude OFO Paroles and CBP One appointments. UC OTM are calculated by summing all non-Mexican UC encounter projections.

IPR_AR_007577

One app

IFR_AR_007578



The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including record levels at the southwest land border ("SWB").
According to March 2024 OHSS Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000, USBP completed 250,000 encounters along the SWB in December 2023, higher than any previous month on record. *See also* OHSS, *2022 Yearbook of Immigration Statistics*, tbls. 33 & 35, https://www.dhs.gov/ohss/topics/immigration/yearbook.

USBP SW Border Encounters, FY 2000 - December 2023

| | |
|---|---|
| **2000** | **1,566,601** |
| 10 | 87,819 |
| 11 | 74,363 |
| 12 | 66,250 |
| 1 | 171,284 |
| 2 | 209,619 |
| 3 | 209,211 |
| 4 | 170,621 |
| 5 | 155,965 |
| 6 | 103,854 |
| 7 | 112,963 |
| 8 | 113,448 |
| 9 | 95,812 |
| **2001** | **1,231,412** |
| 10 | 81,995 |
| 11 | 67,217 |
| 12 | 54,828 |
| 1 | 124,586 |
| 2 | 150,616 |
| 3 | 169,904 |
| 4 | 142,040 |
| 5 | 123,054 |
| 6 | 89,034 |
| 7 | 83,853 |
| 8 | 84,837 |
| 9 | 59,448 |
| **2002** | **930,341** |
| 10 | 37,746 |
| 11 | 32,694 |
| 12 | 31,531 |
| 1 | 79,647 |
| 2 | 95,645 |
| 3 | 126,906 |
| 4 | 121,908 |
| 5 | 97,571 |
| 6 | 78,730 |
| 7 | 76,719 |
| 8 | 82,860 |
| 9 | 68,384 |
| **2003** | **906,734** |
| 10 | 61,913 |
| 11 | 47,919 |
| 12 | 37,930 |
| 1 | 87,002 |
| 2 | 97,016 |
| 3 | 98,625 |
| 4 | 75,564 |
| 5 | 88,845 |
| 6 | 75,634 |
| 7 | 79,396 |
| 8 | 84,651 |
| 9 | 72,239 |
| **2004** | **1,140,247** |
| 10 | 65,388 |
| 11 | 57,942 |
| 12 | 43,663 |
| 1 | 92,751 |
| 2 | 110,824 |
| 3 | 155,089 |
| 4 | 135,632 |
| 5 | 118,811 |
| 6 | 94,607 |
| 7 | 92,152 |
| 8 | 93,299 |
| 9 | 80,089 |
| **2005** | **1,171,391** |
| 10 | 75,908 |
| 11 | 65,110 |
| 12 | 48,410 |
| 1 | 93,029 |
| 2 | 113,776 |
| 3 | 143,044 |
| 4 | 140,074 |
| 5 | 115,817 |
| 6 | 90,796 |
| 7 | 94,964 |
| 8 | 96,745 |
| 9 | 93,718 |
| **2006** | **1,071,976** |
| 10 | 83,561 |
| 11 | 70,954 |
| 12 | 52,663 |
| 1 | 101,262 |
| 2 | 125,030 |
| 3 | 160,696 |
| 4 | 126,554 |
| 5 | 105,443 |
| 6 | 68,365 |
| 7 | 59,633 |
| 8 | 59,733 |
| 9 | 58,082 |
| **2007** | **858,736** |
| 10 | 60,726 |
| 11 | 51,592 |
| 12 | 40,527 |
| 1 | 72,000 |
| 2 | 79,273 |
| 3 | 114,136 |
| 4 | 104,465 |
| 5 | 88,510 |
| 6 | 71,336 |
| 7 | 66,793 |
| 8 | 59,801 |
| 9 | 49,577 |
| **2008** | **705,049** |
| 10 | 51,355 |
| 11 | 42,208 |
| 12 | 31,824 |
| 1 | 59,034 |
| 2 | 73,483 |
| 3 | 89,769 |
| 4 | 91,552 |
| 5 | 69,240 |
| 6 | 53,850 |
| 7 | 49,468 |
| 8 | 48,544 |
| 9 | 44,722 |
| **2009** | **540,851** |
| 10 | 42,937 |
| 11 | 32,782 |
| 12 | 25,946 |
| 1 | 44,503 |
| 2 | 49,211 |
| 3 | 67,342 |
| 4 | 58,493 |
| 5 | 50,883 |
| 6 | 46,044 |
| 7 | 43,841 |
| 8 | 43,519 |
| 9 | 35,350 |
| **2010** | **447,731** |
| 10 | 40,890 |
| 11 | 32,815 |
| 12 | 25,034 |
| 1 | 34,784 |
| 2 | 42,790 |
| 3 | 61,361 |
| 4 | 55,237 |
| 5 | 47,045 |
| 6 | 32,955 |
| 7 | 25,609 |
| 8 | 26,415 |
| 9 | 22,796 |
| **2011** | **327,577** |
| 10 | 26,165 |
| 11 | 22,405 |
| 12 | 19,429 |
| 1 | 23,926 |
| 2 | 28,786 |
| 3 | 42,014 |
| 4 | 36,251 |
| 5 | 31,236 |
| 6 | 27,166 |
| 7 | 23,170 |
| 8 | 24,166 |
| 9 | 22,863 |
| **2012** | **356,873** |
| 10 | 25,612 |
| 11 | 23,368 |
| 12 | 18,983 |
| 1 | 25,714 |
| 2 | 31,579 |
| 3 | 42,218 |
| 4 | 40,628 |
| 5 | 36,966 |
| 6 | 30,669 |
| 7 | 26,978 |
| 8 | 27,567 |
| 9 | 26,591 |
| **2013** | **414,397** |
| 10 | 28,929 |
| 11 | 27,636 |
| 12 | 23,243 |
| 1 | 26,921 |
| 2 | 35,042 |
| 3 | 47,293 |
| 4 | 48,212 |
| 5 | 43,856 |
| 6 | 34,436 |
| 7 | 33,230 |
| 8 | 33,797 |
| 9 | 31,802 |
| **2014** | **479,370** |
| 10 | 35,312 |
| 11 | 31,896 |
| 12 | 29,528 |
| 1 | 28,668 |
| 2 | 36,403 |
| 3 | 49,596 |
| 4 | 51,502 |
| 5 | 60,683 |
| 6 | 57,861 |
| 7 | 40,708 |
| 8 | 31,388 |
| 9 | 25,825 |
| **2015** | **331,333** |
| 10 | 26,450 |
| 11 | 24,641 |
| 12 | 25,019 |
| 1 | 21,514 |
| 2 | 24,376 |
| 3 | 29,791 |
| 4 | 29,750 |
| 5 | 31,576 |
| 6 | 29,303 |
| 7 | 28,388 |
| 8 | 30,239 |
| 9 | 30,286 |
| **2016** | **408,870** |
| 10 | 32,724 |
| 11 | 32,838 |
| 12 | 37,014 |
| 1 | 23,758 |
| 2 | 26,072 |
| 3 | 33,316 |
| 4 | 38,089 |
| 5 | 40,337 |
| 6 | 34,450 |
| 7 | 33,723 |
| 8 | 37,048 |
| 9 | 39,501 |
| **2017** | **303,916** |
| 10 | 46,184 |
| 11 | 47,211 |
| 12 | 43,251 |
| 1 | 31,576 |
| 2 | 18,754 |
| 3 | 12,195 |
| 4 | 11,127 |
| 5 | 14,519 |
| 6 | 16,087 |
| 7 | 18,187 |
| 8 | 22,288 |
| 9 | 22,537 |
| **2018** | **396,579** |
| 10 | 25,488 |
| 11 | 29,085 |
| 12 | 28,995 |
| 1 | 25,975 |
| 2 | 26,666 |
| 3 | 37,390 |
| 4 | 38,243 |
| 5 | 40,339 |
| 6 | 34,089 |
| 7 | 31,299 |
| 8 | 37,524 |
| 9 | 41,486 |
| **2019** | **851,508** |
| 10 | 51,005 |
| 11 | 51,857 |
| 12 | 50,751 |
| 1 | 47,979 |
| 2 | 66,883 |
| 3 | 92,833 |
| 4 | 99,273 |
| 5 | 132,856 |
| 6 | 94,902 |
| 7 | 71,978 |
| 8 | 50,684 |
| 9 | 40,507 |
| **2020** | **400,635** |
| 10 | 35,402 |
| 11 | 33,524 |
| 12 | 32,853 |
| 1 | 29,205 |
| 2 | 30,077 |
| 3 | 30,389 |
| 4 | 16,182 |
| 5 | 21,593 |
| 6 | 30,816 |
| 7 | 38,556 |
| 8 | 47,276 |
| 9 | 54,762 |
| **2021** | **1,659,222** |
| 10 | 69,048 |
| 11 | 69,169 |
| 12 | 71,141 |
| 1 | 75,316 |
| 2 | 97,643 |
| 3 | 169,216 |
| 4 | 173,699 |
| 5 | 172,654 |
| 6 | 178,649 |
| 7 | 200,658 |
| 8 | 196,514 |
| 9 | 185,515 |
| **2022** | **2,206,436** |
| 10 | 159,113 |
| 11 | 167,015 |
| 12 | 170,602 |
| 1 | 147,877 |
| 2 | 159,170 |
| 3 | 211,181 |
| 4 | 203,504 |
| 5 | 224,370 |
| 6 | 192,399 |
| 7 | 181,834 |
| 8 | 181,774 |
| 9 | 207,597 |
| **2023** | **2,045,838** |
| 10 | 205,134 |
| 11 | 207,680 |
| 12 | 222,018 |
| 1 | 129,513 |
| 2 | 130,521 |
| 3 | 163,672 |
| 4 | 183,921 |
| 5 | 171,382 |
| 6 | 99,538 |
| 7 | 132,642 |
| 8 | 181,054 |
| 9 | 218,763 |
| **2024 YTD** | **1,031,932** |
| 10 | 188,754 |
| 11 | 191,119 |
| 12 | 249,737 |
| 1 | 124,204 |
| 2 | 140,638 |
| 3 | 137,480 |

Notes: Data for FY 2000 - FY 2003 are limited to USBP encounters between POEs.
Source: March 2024 OHSS Persist.

Even then, it can take weeks, months, or years to execute a removal order depending upon the facts of the individual case. OHSS analysis of March 2024 OHSS Persist Dataset.

**Median Days between EOIR Removal Order Dates and ICE ERO Removal Dates by Fiscal Year**

| Fiscal Year | Total | | | Not in absentia | | | In Absentia | | |
|---|---|---|---|---|---|---|---|---|---|
| | N Obs | Mean | Median | N Obs | Mean | Median | N Obs | Mean | Median |
| 2009 | 51,761 | 1,788 | 1,396 | 45,651 | 1,824 | 1,456 | 6,110 | 1,519 | 1,009 |
| 2010 | 107,297 | 686 | 42 | 98,116 | 649 | 31 | 9,181 | 1,087 | 519 |
| 2011 | 99,992 | 618 | 35 | 92,252 | 582 | 28 | 7,740 | 1,048 | 512 |
| 2012 | 75,547 | 592 | 40 | 69,846 | 547 | 32 | 5,701 | 1,145 | 630 |
| 2013 | 52,871 | 591 | 61 | 47,037 | 515 | 43 | 5,834 | 1,199 | 872 |
| 2014 | 45,621 | 543 | 52 | 40,462 | 455 | 36 | 5,159 | 1,231 | 1,119 |
| 2015 | 36,669 | 521 | 66 | 31,166 | 405 | 39 | 5,503 | 1,183 | 1,073 |
| 2016 | 36,334 | 409 | 52 | 31,621 | 324 | 37 | 4,713 | 980 | 827 |
| 2017 | 46,765 | 320 | 35 | 41,786 | 260 | 28 | 4,979 | 823 | 622 |
| 2018 | 49,601 | 272 | 34 | 45,053 | 228 | 28 | 4,548 | 707 | 469 |
| 2019 | 50,173 | 230 | 35 | 44,483 | 186 | 28 | 5,690 | 579 | 322 |
| 2020 | 31,845 | 203 | 30 | 28,224 | 155 | 24 | 3,621 | 575 | 368 |
| 2021 | 10,441 | 154 | 26 | 10,125 | 145 | 24 | 316 | 425 | 421 |
| 2022 | 13,171 | 129 | 40 | 11,277 | 101 | 31 | 1,894 | 298 | 283 |
| 2023 | 21,477 | 68 | 28 | 18,702 | 54 | 23 | 2,775 | 164 | 145 |
| 2024 | 9,786 | 25 | 17 | 9,225 | 24 | 16 | 561 | 55 | 48 |

Source: OHSS analysis of March 2024 OHSS Persist Dataset.

The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.
OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024. Almost all of this backlog is the result of cases filed since FY 2015. From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed. In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed. OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

Data is limited to fillings between FY2000 and March 31, 2024
By Filling Date
FIL_FY

| Frequency | Admin Close - NACARA Grant | Admin Close/Dismissal | Asylum Terminated | Deny/Referral | Grant | **Pending** | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | 173 | 4,204 | 154 | 19,898 | 17,083 | 17 | 41,529 | | |
| 2001 | 77 | 7,389 | 173 | 30,666 | 21,877 | 22 | 60,204 | | |
| 2002 | 36 | 6,426 | 152 | 33,878 | 18,391 | 49 | 58,932 | | |
| 2003 | 34 | 5,718 | 75 | 25,430 | 11,014 | 33 | 42,304 | | |
| 2004 | 40 | 3,472 | 45 | 15,472 | 8,783 | 18 | 27,830 | | |
| 2005 | 48 | 2,172 | 41 | 14,274 | 7,676 | 30 | 24,241 | | |
| 2006 | 12 | 2,259 | 19 | 12,987 | 7,918 | 27 | 23,222 | | |
| 2007 | 17 | 3,989 | 14 | 13,914 | 7,118 | 26 | 25,078 | | |
| 2008 | 15 | 2,946 | 15 | 14,344 | 7,409 | 23 | 24,752 | | |
| 2009 | 10 | 1,765 | 19 | 14,518 | 7,695 | 20 | 24,027 | | |
| 2010 | 8 | 2,827 | 14 | 16,085 | 9,186 | 30 | 28,150 | | |
| 2011 | 10 | 4,010 | 49 | 19,169 | 11,387 | 50 | 34,675 | | |
| 2012 | 9 | 5,637 | 103 | 20,742 | 14,882 | 106 | 41,479 | | |
| 2013 | 14 | 7,956 | 20 | 18,627 | 17,116 | 455 | 44,188 | AVG 2015-2023 | 156,198 |
| 2014 | 7 | 10,412 | 8 | 25,314 | 16,993 | 4,232 | 56,966 | | |
| 2015 | 4 | 14,578 | 7 | 33,748 | 16,046 | 19,173 | 83,556 | | |
| 2016 | 12 | 17,012 | - | 28,570 | 11,387 | 59,141 | 116,122 | | |
| 2017 | 7 | 18,250 | 3 | 28,370 | 10,481 | 83,936 | 141,047 | | |
| 2018 | 8 | 10,860 | 3 | 34,582 | 15,175 | 46,538 | 107,166 | | |
| 2019 | 8 | 8,400 | 2 | 29,516 | 13,775 | 46,978 | 98,679 | | |
| 2020 | 3 | 8,869 | - | 12,542 | 5,597 | 68,377 | 95,388 | | |
| 2021 | 3 | 5,027 | - | 10,245 | 3,148 | 45,355 | 63,778 | | |
| 2022 | 2 | 23,074 | - | 7,602 | 11,636 | 199,829 | 242,143 | | |
| 2023 | - | 45,687 | - | 531 | 10,088 | 401,593 | 457,899 | cases filed 2024 | 216,046 |
| 2024 (as of Mar | - | 23,347 | - | 13 | 785 | 191,901 | 216,046 | | |
| Total | 557 | 246,286 | 916 | 481,037 | 282,646 | **1,167,959** | 2,179,401 | | |

Source: OHHS analysis of USCIS Global data as of April 25, 2024

Data is limited to completions between FY2000 and March 31, 2024
By Completion Date
COMP_FY

| Frequency | Admin Clo | Admin Clo | Asylum Te | Deny/Refe | Grant | **Total** | | |
|---|---|---|---|---|---|---|---|---|
| 2000 | 7,433 | 12,484 | 53 | 21,396 | 16,429 | 57,795 | | |
| 2001 | 13,507 | 7,154 | 45 | 26,286 | 20,420 | 67,412 | | |
| 2002 | 16,086 | 13,492 | 32 | 33,167 | 18,633 | 81,410 | | |
| 2003 | 20,279 | 27,484 | 49 | 27,236 | 11,493 | 86,541 | | |
| 2004 | 22,696 | 52,270 | 75 | 21,907 | 9,999 | 106,947 | | |
| 2005 | 11,655 | 59,514 | 180 | 19,902 | 9,413 | 100,664 | | |
| 2006 | 21,171 | 20,328 | 132 | 19,975 | 9,588 | 71,194 | | |
| 2007 | 7,668 | 13,971 | 68 | 25,600 | 10,177 | 57,485 | | |
| 2008 | 4,435 | 9,201 | 85 | 21,686 | 9,563 | 44,970 | | |
| 2009 | 1,386 | 3,908 | 149 | 17,845 | 9,796 | 33,084 | | |
| 2010 | 434 | 2,897 | 91 | 16,165 | 8,906 | 28,493 | | |
| 2011 | 337 | 3,759 | 90 | 17,877 | 10,377 | 32,440 | | |
| 2012 | 253 | 4,572 | 56 | 18,670 | 12,731 | 36,282 | | |
| 2013 | 89 | 4,024 | 26 | 12,926 | 10,715 | 27,780 | AVG 2015 | 47,169 |
| 2014 | 188 | 5,196 | 31 | 12,009 | 10,144 | 27,568 | | |
| 2015 | 175 | 5,101 | 22 | 15,594 | 13,801 | 34,693 | | |
| 2016 | 141 | 5,932 | 32 | 12,716 | 9,119 | 27,940 | | |
| 2017 | 145 | 8,491 | 144 | 22,424 | 12,296 | 43,500 | | |
| 2018 | 123 | 13,266 | 49 | 42,015 | 16,393 | 71,846 | | |
| 2019 | 51 | 11,049 | 27 | 43,014 | 17,135 | 71,276 | | |
| 2020 | 61 | 14,529 | 33 | 28,442 | 9,957 | 53,022 | | |
| 2021 | 66 | 13,488 | 15 | 17,267 | 5,794 | 36,630 | | |
| 2022 | 55 | 13,337 | 14 | 15,684 | 7,577 | 36,667 | | |
| 2023 | 22 | 32,101 | 6 | 6,010 | 10,811 | 48,950 | cases filed | 78,382 |
| 2024 | 7 | 65,491 | 5 | 2,121 | 10,758 | 78,382 | | |
| Total | 128,463 | 423,039 | 1,509 | 517,934 | 292,025 | 1,362,971 | | |

As noted above, DHS's current internal projections suggest that total encounters will average in the range of 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.
OHSS Southwest Border Encounter Projection, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (i.e., encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023.

| | |
|---|---|
| July-Sept average low | 3,886 |
| July-Sept average high | 6,738 |

Office of Homeland Security Statistics

FOUO

Projected encounters exclude OFO releases wit
CBP One appointments, but include other OFO

**Projected encounters exclude OFO releases with parole dispositions and/or CBP One appointments, but include other OFO parolees.**

**Key updates from previous version:** Updated the selection of moving average terms in the models and the assumptions in the high planning line. Added a low planning line. Updated the input data and maintained all other model specification parameters from March 2024 projections. Detailed results are available with the breakdowns of results by country.

**Workbook Details:** This workbook presents the most recent Blended Encounter Projections. The workbook contains the following worksheets:

- **Overview**: Current worksheet, providing details about the workbook and the projections.
- **Totals**: Encounter projections by Total, Family Type, and UC OTM.
  - *Note:* UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Daily Average**: Encounter projections by Total, Family Type, and UC OTM.
  - *Note:* UC OTM are calculated by summing all non-Mexican UC encounter projections.
- **Planning, Low:** Encounter projections from the Blended planning line adjusted to assume increased impact of current enforcement and lawful migration processes. The adjustment lowers all countries to the lower bound of a 95% confidence interval. This line is also referred to as the Low planning line.
- **Blended, Models-SME**: Encounter projections by select 14 countries plus Other, broken down by Total and Family Type. Results come from BSTS, and then a multiplier defined by the SME survey results. The multiplier based on the SME survey results is designed to update the statisical projection with real-time (subjective) insight gathered from SMEs, incorporating information not included in the statistical model.
- **Planning, Mod**: Encounter projections from the Blended planning line adjusted to assume moderately diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 68% confidence interval. This line is also referred to as the Moderate planning line.
- **Planning, High**: Encounter projections from the Blended planning line adjusted to assume substantially diminished impact of current enforcement and lawful migration processes. The adjustment raises all countries to the upper bound of a 95% confidence interval. This line is also referred to as the High planning line.
- **Graphs**: Graphs illustrate the daily averages by family type.

**The Blended Encounter Projections:** A mixed-methods approach that combines the knowledge and intel of subject matter expertise with mathematical, regression-based predictive models. More specifically, the current Blended Projections average, or 'blend', the:

- Bayesian Structural Time Series (BSTS) Model projections.
- LightGBM Model projections. (Results not reported in this round and not included in the Blended model.)
- Structured Subject Matter Expert (SME) Survey responses

**Model Specifications and Notes:**

- Uses actuals of encounters through:
  - BSTS Model: **2024-03-31**
  - LightGBM Model: **2024-03-31**
- Model Descriptions:
  - The BSTS Model was built using a machine learning approach and includes: a 12-seasonal component, an autoregressive component (AR(1)), and a regression component.
    - The BSTS regression component includes the following predictors: Mexico Apprehensions (through Feb 2024), USA Unemployment (through Jan 2024), Fatalities (through Mar 2024), Disasters (through Mar 2024), Remittances (Mexico - through Feb 2024, Colombia - through Feb 2024, Nicaragua - through Feb 2024, Guatemala - through Mar 2024) and ratio of Removals by T8 Encounters (through Feb 2024).
  - The LightGBM Model was built using a machine learning approach and includes predictors from the BSTS.

FOUO

**Encounter projections by Total, Family Type, and UC OTM; Daily Average**

| | 24-Apr | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | 25-Jan | 25-Feb | 25-Mar | 25-Apr | 25-May | 25-Jun | 25-Jul | 25-Aug | 25-Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 4,063 | 4,262 | 3,565 | 3,600 | 3,655 | 4,403 | 3,784 | 3,894 | 4,832 | 3,053 | 3,830 | 4,118 | 4,502 | 4,471 | 3,703 | 3,670 | 3,643 | 4,337 | 3,966 |
| Blended (Models and SME) | 5,517 | 5,665 | 4,978 | 4,988 | 5,045 | 5,842 | 5,177 | 5,348 | 6,261 | 4,395 | 5,375 | 5,530 | 5,957 | 5,878 | 5,091 | 5,046 | 5,034 | 5,784 | 5,384 |
| Planning, Moderate | 6,271 | 6,394 | 5,732 | 5,718 | 5,775 | 6,596 | 5,907 | 6,102 | 6,991 | 5,125 | 6,182 | 6,260 | 6,711 | 6,607 | 5,844 | 5,775 | 5,764 | 6,537 | 6,127 |
| Planning, High | 6,995 | 7,095 | 6,456 | 6,418 | 6,475 | 7,320 | 6,607 | 6,826 | 7,691 | 5,825 | 6,958 | 6,960 | 7,435 | 7,308 | 6,568 | 6,476 | 6,464 | 7,261 | 6,841 |
| **FM** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 1,431 | 1,544 | 1,391 | 1,471 | 1,499 | 1,728 | 1,510 | 1,584 | 2,008 | 1,280 | 1,585 | 1,602 | 1,798 | 1,794 | 1,616 | 1,635 | 1,608 | 1,799 | 1,605 |
| Blended (Models and SME) | 1,960 | 2,061 | 1,899 | 1,980 | 2,011 | 2,260 | 2,023 | 2,120 | 2,534 | 1,727 | 2,139 | 2,114 | 2,328 | 2,309 | 2,093 | 2,126 | 2,113 | 2,332 | 2,118 |
| Planning, Moderate | 2,238 | 2,329 | 2,176 | 2,249 | 2,279 | 2,537 | 2,292 | 2,397 | 2,803 | 1,996 | 2,436 | 2,382 | 2,605 | 2,578 | 2,370 | 2,395 | 2,381 | 2,609 | 2,392 |
| Planning, High | 2,504 | 2,587 | 2,442 | 2,506 | 2,537 | 2,804 | 2,549 | 2,663 | 3,061 | 2,253 | 2,722 | 2,640 | 2,871 | 2,835 | 2,637 | 2,652 | 2,639 | 2,875 | 2,654 |
| **SA** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 2,423 | 2,501 | 1,985 | 1,941 | 1,982 | 2,483 | 2,103 | 2,110 | 2,594 | 1,645 | 2,040 | 2,297 | 2,487 | 2,456 | 1,895 | 1,843 | 1,860 | 2,346 | 2,166 |
| Blended (Models and SME) | 3,284 | 3,325 | 2,826 | 2,757 | 2,798 | 3,327 | 2,922 | 2,963 | 3,435 | 2,479 | 2,961 | 3,134 | 3,349 | 3,285 | 2,741 | 2,665 | 2,683 | 3,196 | 3,007 |
| Planning, Moderate | 3,728 | 3,754 | 3,269 | 3,186 | 3,227 | 3,770 | 3,351 | 3,406 | 3,864 | 2,908 | 3,436 | 3,563 | 3,792 | 3,714 | 3,184 | 3,094 | 3,112 | 3,639 | 3,444 |
| Planning, High | 4,153 | 4,166 | 3,695 | 3,598 | 3,639 | 4,196 | 3,763 | 3,832 | 4,276 | 3,320 | 3,892 | 3,975 | 4,218 | 4,126 | 3,610 | 3,506 | 3,524 | 4,065 | 3,864 |
| **UC** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 208 | 217 | 189 | 188 | 174 | 192 | 170 | 201 | 229 | 128 | 205 | 220 | 217 | 221 | 192 | 192 | 176 | 192 | 195 |
| Blended (Models and SME) | 272 | 279 | 253 | 251 | 236 | 256 | 232 | 265 | 292 | 189 | 275 | 283 | 281 | 284 | 257 | 255 | 238 | 256 | 259 |
| Planning, Moderate | 306 | 311 | 287 | 283 | 268 | 289 | 264 | 298 | 324 | 221 | 310 | 315 | 314 | 316 | 290 | 287 | 270 | 289 | 291 |
| Planning, High | 337 | 342 | 318 | 314 | 299 | 321 | 295 | 330 | 355 | 252 | 344 | 345 | 346 | 347 | 322 | 318 | 301 | 321 | 323 |
| **UC OTM** | | | | | | | | | | | | | | | | | | | |
| Planning, Low | 112 | 127 | 104 | 108 | 90 | 106 | 83 | 114 | 149 | 48 | 113 | 131 | 131 | 142 | 117 | 121 | 100 | 115 | 112 |
| Blended (Models and SME) | 172 | 185 | 163 | 166 | 147 | 165 | 140 | 174 | 208 | 105 | 178 | 189 | 191 | 200 | 176 | 178 | 158 | 175 | 171 |
| Planning, Moderate | 202 | 215 | 194 | 195 | 177 | 196 | 170 | 205 | 237 | 134 | 211 | 219 | 221 | 229 | 207 | 208 | 188 | 206 | 201 |
| Planning, High | 232 | 243 | 223 | 224 | 205 | 225 | 199 | 234 | 266 | 163 | 242 | 247 | 251 | 258 | 237 | 236 | 216 | 235 | 230 |

**Note:** Encounters exclude OFO Paroles and CBP One appointments. UC OTM are calculated by summing all non-Mexican UC encounter projections.

In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effects. OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

| | CBP Encounters | | | |
|---|---|---|---|---|
| Date | USBP | OFO | Total | Weekly Avg. |
| 11/01/2022 | 6,854 | 965 | 7,819 | |
| 11/02/2022 | 7,281 | 958 | 8,239 | |
| 11/03/2022 | 6,065 | 970 | 7,035 | |
| 11/04/2022 | 6,883 | 939 | 7,822 | |
| 11/05/2022 | 6,076 | 903 | 6,979 | |
| 11/06/2022 | 6,918 | 952 | 7,870 | |
| 11/07/2022 | 6,422 | 998 | 7,420 | 7,598 |
| 11/08/2022 | 7,486 | 952 | 8,438 | 7,686 |
| 11/09/2022 | 6,580 | 1,008 | 7,588 | 7,593 |
| 11/10/2022 | 7,222 | 897 | 8,119 | 7,748 |
| 11/11/2022 | 7,602 | 882 | 8,484 | 7,843 |
| 11/12/2022 | 6,578 | 933 | 7,511 | 7,919 |
| 11/13/2022 | 6,192 | 934 | 7,126 | 7,812 |
| 11/14/2022 | 6,959 | 932 | 7,891 | 7,880 |
| 11/15/2022 | 7,204 | 946 | 8,150 | 7,838 |
| 11/16/2022 | 7,261 | 956 | 8,217 | 7,928 |
| 11/17/2022 | 8,675 | 918 | 9,593 | 8,139 |
| 11/18/2022 | 7,028 | 940 | 7,968 | 8,065 |
| 11/19/2022 | 7,042 | 908 | 7,950 | 8,128 |
| 11/20/2022 | 6,368 | 598 | 6,966 | 8,105 |
| 11/21/2022 | 7,098 | 893 | 7,991 | 8,119 |
| 11/22/2022 | 7,115 | 881 | 7,996 | 8,097 |
| 11/23/2022 | 6,655 | 889 | 7,544 | 8,001 |
| 11/24/2022 | 6,553 | 842 | 7,395 | 7,687 |
| 11/25/2022 | 6,227 | 945 | 7,172 | 7,573 |
| 11/26/2022 | 7,162 | 889 | 8,051 | 7,588 |
| 11/27/2022 | 6,314 | 869 | 7,183 | 7,619 |
| 11/28/2022 | 6,805 | 941 | 7,746 | 7,584 |
| 11/29/2022 | 6,749 | 931 | 7,680 | 7,539 |
| 11/30/2022 | 8,327 | 910 | 9,237 | 7,781 |
| 12/01/2022 | 7,536 | 1,014 | 8,550 | 7,946 |
| 12/02/2022 | 8,737 | 927 | 9,664 | 8,302 |
| 12/03/2022 | 7,119 | 850 | 7,969 | 8,290 |
| 12/04/2022 | 7,100 | 884 | 7,984 | 8,404 |
| 12/05/2022 | 7,454 | 996 | 8,450 | 8,505 |
| 12/06/2022 | 7,421 | 995 | 8,416 | 8,610 |
| 12/07/2022 | 8,416 | 967 | 9,383 | 8,631 |
| 12/08/2022 | 8,394 | 1,044 | 9,438 | 8,758 |
| 12/09/2022 | 8,506 | 1,020 | 9,526 | 8,738 |
| 12/10/2022 | 8,187 | 980 | 9,167 | 8,909 |
| 12/11/2022 | 7,911 | 968 | 8,879 | 9,037 |
| 12/12/2022 | 7,822 | 992 | 8,814 | 9,089 |
| 12/13/2022 | 8,080 | 1,040 | 9,120 | 9,190 |
| 12/14/2022 | 8,288 | 1,030 | 9,318 | 9,180 |
| 12/15/2022 | 8,148 | 995 | 9,143 | 9,138 |
| 12/16/2022 | 6,862 | 1,018 | 7,880 | 8,903 |
| 12/17/2022 | 6,943 | 959 | 7,902 | 8,722 |
| 12/18/2022 | 6,908 | 876 | 7,784 | 8,566 |
| 12/19/2022 | 7,308 | 1,044 | 8,352 | 8,500 |
| 12/20/2022 | 8,579 | 1,010 | 9,589 | 8,567 |
| 12/21/2022 | 8,463 | 1,021 | 9,484 | 8,591 |
| 12/22/2022 | 8,101 | 1,016 | 9,117 | 8,587 |
| 12/23/2022 | 7,302 | 1,022 | 8,324 | 8,650 |
| 12/24/2022 | 6,247 | 888 | 7,135 | 8,541 |
| 12/25/2022 | 3,532 | 855 | 4,387 | 8,055 |
| 12/26/2022 | 5,019 | 896 | 5,915 | 7,707 |
| 12/27/2022 | 6,089 | 1,060 | 7,149 | 7,359 |
| 12/28/2022 | 5,917 | 1,043 | 6,960 | 6,998 |
| 12/29/2022 | 5,512 | 986 | 6,498 | 6,624 |
| 12/30/2022 | 4,736 | 995 | 5,731 | 6,254 |
| 12/31/2022 | 5,375 | 900 | 6,275 | 6,131 |
| Grand Total | 429,713 | 57,770 | 487,483 | |

Source: UIP CBP Encounters Dashboard
Notes: Data valid as of April 26, 2024. Data limited to Southwest border encounters.

| | |
|---|---|
| Week ending Nov. 15 | 7,838 |
| Week ending Dec. 15 | 9,138 |

In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effect OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

| Sum of count | Column Labels | | | | | | |
|---|---|---|---|---|---|---|---|
| Row Labels | Mexico | NTriangle | Other | Grand Total | | | |
| ⊟ 2013 | 42373 | 15521 | 4342 | 62236 | | | |
| 11 | 22886 | 8202 | 2071 | 33159 | | | |
| 12 | 19487 | 7319 | 2271 | 29077 | -12% | | |
| ⊟ 2014 | 41214 | 27985 | 6200 | 75399 | | | -2% |
| 11 | 21993 | 13604 | 3095 | 38692 | | | |
| 12 | 19221 | 14381 | 3105 | 36707 | -5% | | |
| ⊟ 2015 | 39194 | 20503 | 7558 | 67255 | | | |
| 11 | 19971 | 9606 | 3447 | 33024 | | | |
| 12 | 19223 | 10897 | 4111 | 34231 | 4% | | |
| ⊟ 2016 | 38603 | 43671 | 11506 | 93780 | | | |
| 11 | 19549 | 19162 | 6676 | 45387 | | | |
| 12 | 19054 | 24509 | 4830 | 48393 | 7% | | |
| ⊟ 2017 | 35688 | 68938 | 17156 | 121782 | | | |
| 11 | 20074 | 35424 | 7868 | 63366 | | | |
| 12 | 15614 | 33514 | 9288 | 58416 | -8% | | |
| ⊟ 2018 | 33416 | 40131 | 5960 | 79507 | | | |
| 11 | 17372 | 18758 | 2901 | 39031 | | | |
| 12 | 16044 | 21373 | 3059 | 40476 | 4% | | |
| ⊟ 2019 | 30916 | 80371 | 11965 | 123252 | | | |
| 11 | 16980 | 39568 | 5915 | 62463 | | | |
| 12 | 13936 | 40803 | 6050 | 60789 | -3% | | |
| ⊟ 2020 | 42502 | 26000 | 14703 | 83205 | | | |
| 11 | 22254 | 13189 | 7199 | 42642 | | | |
| 12 | 20248 | 12811 | 7504 | 40563 | -5% | | |
| ⊟ 2021 | 83534 | 48905 | 13668 | 146107 | | | |
| 11 | 44164 | 22172 | 5777 | 72113 | | | |
| 12 | 39370 | 26733 | 7891 | 73994 | 3% | | |
| ⊟ 2022 | 115321 | 98262 | 140515 | 354098 | | | |
| 11 | 63846 | 50238 | 60761 | 174845 | | | |
| 12 | 51475 | 48024 | 79754 | 179253 | 3% | | |
| ⊟ 2023 | 107738 | 66206 | 313544 | 487488 | | | |
| 11 | 59348 | 33185 | 142640 | 235173 | | | |
| 12 | 48390 | 33021 | 170904 | 252315 | | | |
| ⊟ 2024 | 133853 | 115252 | 295288 | 544393 | | | |
| 11 | 64814 | 52558 | 125041 | 242413 | | | |
| 12 | 69039 | 62694 | 170247 | 301980 | | | |
| Grand Total | 744352 | 651745 | 842405 | 2238502 | | | |

s.

IFR_AR_007585



# Haiti: Recent Developments and U.S. Policy

January 23, 2023

**Congressional Research Service**

https://crsreports.congress.gov

R47394



**Congressional Research Service**
*Informing the legislative debate since 1914*

**SUMMARY**

R47394

January 23, 2023

**Clare Ribando Seelke**
Specialist in Latin American Affairs

**Karla I. Rios**
Analyst in Latin American Affairs

# Haiti: Recent Developments and U.S. Policy

Haiti, located on the western third of the island of Hispaniola and bordering the Dominican Republic, is in the midst of interrelated political, security, and humanitarian crises. As of early 2023, Haiti lacks an elected president, legislature, and mayors following the July 2021 assassination of President Jovenel Moïse; the terms of the last ten elected senators expired in January 2023. A political standoff between de facto Prime Minister Ariel Henry's government and rival political and civil society leaders, many of whom have backed a proposal (the "Montana Accord") to form a transitional government, has prevented the country from scheduling elections to replace officials whose terms have expired.

The ongoing political impasse also has hindered Haiti's ability to respond to worsening security and humanitarian crises caused by rampant gang violence, food and fuel shortages, a resurgence of cholera, and an August 2021 earthquake that killed 2,000 people. In October 2022, Henry asked for a foreign security force to help reestablish control and enable humanitarian aid deliveries; many Haitian civil society groups oppose this request, and no country has offered to lead such a force. The Biden Administration and Congress may look to assess potential policy options for addressing the compound crises in Haiti, which continue to fuel instability and irregular U.S.-bound migration.

## U.S. Policy

U.S. policy in Haiti has aimed to support Haitians in their efforts to restore security, the rule of law, democratic institutions leading to free and fair elections, and economic and social stability. In FY2022, the Biden Administration allocated an estimated $219.2 million in foreign assistance for Haiti to support those goals, including increased support for the Haitian National Police. Haiti also receives significant U.S. humanitarian assistance, including at least $79.2 million in FY2022.

The Biden Administration's approach toward Haiti has evolved from supporting the Henry government to working with the United Nations (U.N.) and other international actors to push Henry, his rivals, and other stakeholders to reach an inclusive political accord. Since October 2022, the U.S. Treasury and State Departments have publicly sanctioned five current and former Haitian officials and denied visas to dozens of additional individuals and their family members.

The Administration also has sought to facilitate a broader international response to the deteriorating security and humanitarian situations in Haiti. In response to worsening conditions and Henry's request for international assistance, the United States and Mexico drafted a resolution to sanction gang leaders in Haiti and their financial backers; the U.N. Security Council passed this resolution in October 2022. Separately, the United States and Mexico proposed, but did not yet draft, a resolution to send a non-U.N.-led security assistance mission to Haiti. Since October 2022, the United States has supported Canada's sanctioning of additional politicians and business elites beyond those subject to U.S. sanctions, including former President Michel Martelly (2011-2016).

## Congressional Action

As in prior Congresses, the 117th Congress enacted legislation, appropriated and conditioned foreign assistance, and conducted oversight of U.S. policy toward Haiti. Congress enacted the Haiti Development, Accountability, and Institutional Transparency Initiative (HAITI Act) as part of the Consolidated Appropriations Act, FY2022 (P.L. 117-103, Division V). The act withheld aid to the central government of Haiti, until certain conditions were met. It also required U.S. agencies to measure the progress of post-disaster recovery and efforts to address corruption, governance, rule of law, and media freedoms in Haiti. The Consolidated Appropriations Act, FY2023 (P.L. 117-328, Division K), did not designate a total funding level for Haiti but includes similar conditions on foreign assistance as enacted in the HAITI Act. The explanatory statement accompanying P.L. 117-328 urged the Secretary of State to use "every appropriate diplomatic tool to press for dialogue" among political leaders and to take "strong legal action" against those engaged in human rights abuses, corruption, and other illicit activities. In addition, the 117th Congress held hearings on U.S. policy toward Haiti, U.S. treatment of Haitian migrants, Haiti's April 2022 selection as one of the priority countries of focus under the Global Fragility Act (P.L. 116-94), and Haitian-led solutions to the country's crises.

Moving forward, the 118th Congress may weigh in on U.S. foreign assistance, sanctions, and other policies aimed at ameliorating the crises in Haiti. Congressional interest in Haiti also may be reflected in broader concerns about irregular U.S.-bound migration.

IFR_AR_007928

# Contents

Introduction ................................................................................................................................. 1

Political Situation ......................................................................................................................... 2
    Background ............................................................................................................................. 2
    The Aftermath of President Moïse's Assassination ................................................................ 4
Security Crisis .............................................................................................................................. 5
Humanitarian Situation ................................................................................................................ 8
U.N. Presence in Haiti and Recent Action .................................................................................. 9
U.S. Policy and Issues for Congress ...........................................................................................11
    Foreign Assistance ............................................................................................................... 12
        Bilateral Assistance ....................................................................................................... 12
        Humanitarian Assistance ............................................................................................... 13
        Global Fragility Act Implementation ............................................................................ 14
        Donor Coordination ....................................................................................................... 15
    Trade Preferences ................................................................................................................. 15
    Sanctions: U.S. and Multilateral .......................................................................................... 16
    Indictments ........................................................................................................................... 17
    Migration Issues ................................................................................................................... 17
Outlook ....................................................................................................................................... 18

# Figures

Figure 1. Map of Haiti ................................................................................................................... 2
Figure 2. Criminal Dynamics in Haiti .......................................................................................... 6

# Tables

Table 1. U.S. Foreign Assistance to Haiti by Account: FY2018-FY2023 ................................... 13

# Contacts

Author Information ...................................................................................................................... 18

IFR_AR_007929

# Introduction

Haiti, a Caribbean country that shares the island of Hispaniola with the Dominican Republic (see **Figure 1**), has been of ongoing interest to Congress and successive U.S. presidential administrations because of its proximity to the United States, chronic instability, and vulnerability to natural disasters.[1] Although Haiti has endured corrupt, authoritarian leaders for much of its history, governance arguably had improved in the years prior to a 2010 earthquake.[2] That disaster killed more than 200,000 people and set development back decades. Despite extensive international support for Haiti's recovery, democratic institutions remain weak and the country continues to contend with extreme poverty; wide economic disparities; and both human-made and natural disasters, including an August 2021 earthquake that killed 2,000.

---

**Haiti at a Glance**

**Capital:** Port-au-Prince

**Population:** 12.2 million (2023, IMF est.)

**Languages:** French (official), Creole (official)

**Area:** 10,710 sq. miles, slightly larger than Massachusetts

**GDP:** $21.9 billion (2022, current prices, IMF est.)

**Real GDP Growth:** -1.8% (2021); -1.2% (2022); 0.5% (2023, forecast) (% change, constant prices, IMF)

**Per Capita GDP:** $1,790 (2023, current prices, IMF est.)

**Life Expectancy:** 60.4/66.1 years (male/female) (UNDP, 2021)

**Maternal Mortality Ratio:** 480/100,000 live births (UNDP, 2022)

**Sources:** International Monetary Fund (IMF); United Nations Development Programme (UNDP).

---

The situation in Haiti further deteriorated after the assassination of President Jovenel Moïse in July 2021 led to uncertainty over who would succeed him. Two days before the assassination, Moïse named Ariel Henry to be prime minister, but Henry was not sworn in. Since most legislators' terms had expired at the time of the assassination, the Haitian legislature lacked the quorum needed to select a president to serve out the remainder of Moïse's term, as outlined in the Haitian Constitution.

As of early 2023, Haiti still lacks an elected president, legislature, and local government. A political standoff between de facto Prime Minister Henry's government and opposition political and civil society leaders regarding how to form a transitional government to stabilize the country and convene elections persists. The standoff continues amid a worsening security crisis. Following a September 2022 announcement by Prime Minister Henry that fuel subsidies would end, protests and gang-led violence erupted.[3] After gangs took over the ports, highways, and main fuel terminal, the economy ground to a halt and humanitarian agencies lost access to some areas. In October, cholera resurfaced after a three-year hiatus. Henry requested international intervention in Haiti in October 2022, but the United Nations (U.N.) Security Council has not yet voted on a resolution responding to that request.[4]

The 118th Congress may consider options for responding to the interrelated political, security, and humanitarian crises in Haiti and the Henry government's request for international intervention. This report provides a brief overview of the situation in Haiti and U.S. policy responses to date.

---

[1] For background, see Laurent DuBois, *Haiti: the Aftershocks of History* (New York, NY: Picador, 2013); Philippe Girard, *Haiti: The Tumultuous History: From Pearl of the Caribbean to Broken Nation* (New York, NY: Palgrave MacMillan, 2005, 2010).

[2] International Crisis Group, *Consolidating Stability in Haiti,* Latin America/Caribbean Report No. 21, July 18, 2007.

[3] U.N. Security Council, "Letter Dated 8 October 2022 from the Secretary-General Addressed to the President of the Security Council," S/2022/747, October 10, 2022. Hereinafter, Security Council, S/2022/747.

[4] For a description of the type of resolution the United States and Mexico had envisioned in response to Henry's request, see United States Mission to the United Nations, "Remarks by Ambassador Linda Thomas-Greenfield at a U.N. Security Council Briefing on Haiti," October 17, 2022.

**Figure 1. Map of Haiti**



**Source:** Congressional Research Service (CRS).

# Political Situation

## Background

Haiti won independence from France in 1804, making it the second independent republic in the Western Hemisphere (after the United States). Since then, the country has experienced long periods of authoritarianism and political fragility, punctuated by foreign interventions and natural disasters.[5] After the fall of the brutal Duvalier dictatorship (1957-1986), attempts to consolidate democratic rule have had limited success.[6] In 1991, a military coup interrupted the term of Haiti's first president elected in free and fair elections, Jean-Bertrand Aristide of the center-left *Fanmi Lavalas* party (1991; 1994-1996; 2000-2004). The threat of a U.S. military intervention allowed Aristide to return three years later to complete his term. In 2000, Aristide began a second term

---

[5] Rocio Cara Labrador and Diana Roy, "Haiti's Troubled Path to Development," Council on Foreign Relations, September 2022 (hereinafter Labrador and Roy, "Haiti's Troubled Path"). Haiti reportedly paid an indemnity to France of some $560 million, which caused a significant drain on Haiti's finances well into the 20th century. Concerns about the indebted country's ability to pay its creditors prompted a U.S. intervention from 1915 to 1934. Lazaro Gamio et al., "Haiti's Lost Billions," *New York Times*, May 20, 2022; Hans Schmidt, *The United States Occupation of Haiti: 1915-1934* (Rutgers, NJ: Rutgers University Press, 1971).

[6] Fearing communist rule and/or instability on the island, successive U.S. presidential administrations recognized the regimes of François Duvalier (1957-1971) and his son, Jean-Claude Duvalier (1971-1987), despite concerns about the leaders' authoritarian tendencies. See U.S. Department of State, Office of the Historian, "U.S. Relations with Haiti" in *Foreign Relations of the United States, 1958-1960, American Republics*, vol. V, document 309, at https://history.state.gov/historicaldocuments/frus1958-60v05/d309; and U.S. Department of State, Office of the Historian, "Telegram from the Embassy in Haiti to the Department of State" in *Foreign Relations, 1977-1980, Mexico, Cuba, and the Caribbean*, vol. XXIII, document 253, August 14, 1978, at https://history.state.gov/historicaldocuments/frus1977-80v23/d253.

after the opposition boycotted the presidential election due to flawed parliamentary elections favoring *Fanmi Lavalas* in May 2000. In 2004, Aristide—facing an armed uprising against his rule as well as U.S. and international pressure—resigned and went into exile.[7]

From 2004 to 2017, the U.N. Stabilization Mission in Haiti (MINUSTAH), a peacekeeping force that grew to 13,000 at its peak, sought to restore order in the country; build the Haitian National Police (HNP); and, later, help with recovery after the 2010 earthquake. The legacy of MINUSTAH is complicated, as troops introduced cholera into the country and committed human rights and sexual abuses. This experience has led many Haitians to oppose the type of foreign military involvement requested by the Henry government.[8]

Haiti's most recent presidents, Michel Martelly (2011-2016) and his chosen successor, Jovenel Moïse (2017-July 2021), who represented the center-right *Tèt Kale* Party (PHTK), took office after disputed elections and administered governments allegedly rife with corruption.[9] Under Moïse, Haiti experienced political and social unrest, high inflation, anti-government protests, and gang violence. Like other Haitian politicians from across the political spectrum, Moïse allegedly provided money and arms to gangs in exchange for favors, including suppressing anti-government protests such as those that erupted in 2018 after announced fuel price hikes.[10] Government instability increased in 2019 after Haitian auditors issued two reports to the country's chief prosecutor alleging Moïse and other current and former officials had misappropriated and embezzled millions of dollars in public funds.[11]

Political gridlock between the executive and legislative branches led to the government not organizing scheduled October 2019 parliamentary elections. The terms of the entire lower Chamber of Deputies and two-thirds of the Senate expired in January 2020, as did the terms of all local government posts, without newly elected officials to take these positions.[12] Thereafter, Moïse ruled by decree, with some controversy over whether his term was to end in February 2021 or February 2022 (the State Department did not take a position on that dispute).[13]

---

[7] Daniel P. Erikson, "Haiti After Aristide: Still on the Brink," *Current History*, vol. 104, no. 679 (February 2005), pp. 83-90.

[8] Carla King et al., "'MINUSTAH Is Doing Positive Things Just as They Do Negative Things': Nuanced Perceptions of a UN Peacekeeping Operation Amidst Peacekeeper-Perpetrated Sexual Exploitation and Abuse in Haiti," *Conflict, Security & Development*, vol. 21, no. 6 (November 17, 2021), pp. 749-779. For how past interventions have influenced recent popular opinion in Haiti, see Rafael Bernal, "Human Rights Coalition to Biden: No Military Intervention in Haiti," *The Hill*, November 1, 2022.

[9] On Martelly and Moïse's elections, see Georges Fauriol, "Haiti's Problematic Electoral Dynamics," *Global Americans*, December 21, 2021. On Martelly and drug trafficking, see Jacqueline Charles and Michael Wilner, "Canada Sanctions Former Haiti President Michel Martelly, Two Former Prime Ministers," *Miami Herald*, November 21, 2022. On corruption in the Moïse government, see Maria Abi-Habib, "Haiti's Leader Kept a List of Drug Traffickers. His Assassins Came for It," *New York Times*, December 12, 2021.

[10] Chris Dalby, "International Sanctions Seek to Weaken Haiti's Patronage System Between Politicians, Gangs," *InSight Crime*, November 24, 2022. For Moïse officials' involvement in attacks on neighborhoods where protests occurred, see U.S. Department of the Treasury, "Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day," December 10, 2020.

[11] U.S. Department of State, "Appendix C: Major Corruption Cases in Haiti and Government of Haiti Efforts to Address Corruption," November 10, 2022, at https://www.state.gov/wp-content/uploads/2022/11/Appendix-C-Developments-in-Haiti-004977.pdf.

[12] The 10 remaining senators' terms expired on January 9, 2023.

[13] U.S. Department of State, "Appendix F: Alleged February 2021 Coup Against President Jovenel Moïse and U.S. and International Partner Efforts to Support Free and Fair Elections in Haiti," November 2022, at https://www.state.gov/wp-content/uploads/2022/11/Appendix-F-Developments-in-Haiti-004977.pdf.

IFR_AR_007932

On July 7, 2021, armed assailants assassinated President Moïse in his private home in Port-au-Prince. To this day, many details of the attack remain under investigation; however, the U.S. Federal Bureau of Investigation (FBI) has filed charges against three individuals for their role in a plot to kidnap or kill Moïse.[14] The FBI has also been supporting Haitian authorities' investigation of the crime, although threats to the safety of those authorities, turnover among the judges leading the investigation, and break-ins at judges' offices have occurred. By the end of 2022, Haitian police had arrested, but not charged, at least 23 people accused of planning the plot, including 18 former Colombian soldiers, members of Moïse's security team, a former rebel leader, a former divisional police inspector, and a Haitian-American pastor with long-standing ties to Florida.[15]

## The Aftermath of President Moïse's Assassination

Moïse's assassination gave rise to uncertainty about who would succeed him as president and who would serve as prime minister.[16] Under the Haitian Constitution (Article 149), if a president dies in the last two years of his term, the legislature should elect a provisional president to serve out the term.[17] As Haiti lacked (and continues to lack) a functioning legislature at the time of the assassination, the choice of who would succeed Moïse could not follow the prescribed constitutional order.

Three individuals laid claims to serve as prime minister: interim Prime Minister Claude Joseph; Ariel Henry, a neurosurgeon nominated to be prime minister two days before Moïse's death but not sworn in; and Joseph Lambert, then-president of the Haitian Senate. On July 8, the Haitian government requested security and investigative assistance from the United States. In response to that request, an inter-agency delegation traveled to Haiti on July 11. U.S. officials also met with all three claimants to prime minister. After days of jockeying among the claimants over who would become prime minister and who would fill key cabinet positions, Joseph agreed that Henry would be prime minister and he foreign minister on July 12.[18] Lambert separately gave up his quest to be prime minister; the U.S. government later sanctioned him for drug trafficking. On July 17, the United States, United Nations, and other international donors issued a statement calling for the formation of an "inclusive government" and encouraging Prime Minister-designate Ariel Henry to form such a government.[19]

In September 2021, Henry dismissed Haiti's electoral council. He and his supporters then proposed that Henry name a provisional electoral council to convene elections. They also proposed that Henry remain the single head of government until a new elected government takes office. By early 2023, Henry has yet to appoint that council, and many civil society and political actors within Haiti have opposed this proposal. Henry's irregular path to his position and

---

[14] U.S. Department of State, *Report to Congress on the Assassination of Former President of Haiti Jovenel Moïse*, (Div. V, P.L. 117-103), November 10, 2022, at https://www.state.gov/haiti-reports/.

[15] Jacqueline Charles, "Made in Miami: How a South Florida Plot to Oust Haiti's Jovenel Moïse Led to His Murder," *Miami Herald*, December 8, 2022; Jacqueline Charles, "Ex-Rebel Leader Known as 'the Torturer' Is Arrested in Haiti President's Assassination," *Miami Herald*, December 21, 2022.

[16] CRS Insight IN11699, *Haiti: Concerns After the Presidential Assassination*, by Maureen Taft-Morales.

[17] Haiti's Constitution of 1987 with Amendments Through 2012 is available in English at https://www.constituteproject.org/constitution/Haiti_2012.pdf?lang=en.

[18] CRS interview with State Department officials, January 9, 2023.

[19] U.N. Integrated Office in Haiti, "Core Group Press Release," July 17, 2021.

allegations of his possible involvement in Moïse's assassination, however, have eroded his credibility.[20] Henry has fired officials who have sought to question him about the Moïse case.[21]

As an alternative to Henry's proposal, numerous civil society organizations and political parties have sought to form an interim government. After months of broad consultations, the Citizen Conference for a Haitian Solution to the Crisis (widely known as the Montana Group) came to an agreement in August 2021.[22] The Montana Accord proposed a two-year interim government led by a president and prime minister, with oversight committees, to restore order, administer elections, and create a truth and justice commission to address past human rights violations. Although many civic leaders and political parties signed the accord, some did not (including some business groups, churches, and the PHTK and allied parties). U.S. officials have periodically criticized the Montana Group, including after it signed an agreement with the PEN coalition, a group whose signatories include U.S.-sanctioned former Senator Lambert.[23]

As of January 2023, Henry and the Montana Group have been unable to reach a negotiated solution. In October 2022, Henry and his advisers requested foreign intervention to address the worsening security and humanitarian crises.[24] Many Haitian political and civil society groups opposed the request, and critics maintain that Henry wants an intervention to help him remain in power and protect his and allied interests, much as past Haitian leaders did.[25] Recent U.S. and Canadian sanctions targeting Haitian politicians and business leaders, some of whom have opposed negotiations or reportedly have benefitted from the unrest, could spur renewed efforts to break the political impasse.[26]

Henry put forth a transition proposal in December 2022 named the "National Consensus for an Inclusive Transition and Transparent Elections." His government published a decree establishing a high transition council (HTC) to implement that transition plan in the state's official newsletter on January 17, 2023. It is yet unclear whether the plan will receive broad support.

## Security Crisis

Since Moïse's assassination, violent gangs have threatened to overwhelm the Haitian government and businesses, many of which have long been the gangs' primary benefactors. The symbiotic relationship between the gangs in Haiti and the country's political and economic elite is well established. Many of Haiti's past presidents and other prominent politicians have used and received support from gangs. Generally, gangs provide political elites with services such as campaign support, voter intimidation, bribery, fundraising, vandalism, and disruption (see depiction in **Figure 2**).[27] Former President Aristide relied on support from gangs known as

---

[20] Monique Beals, "Judge, Investigators say Haitian Prime Minister Involved in President's Assassination," *The Hill*, February 8, 2022.

[21] As an example, see "Haiti's PM Replaces The Prosecutor Who Wanted Him Charged In The President's Slaying," Associated Press (AP), September 14, 2021.

[22] Georges Fauriol, "Haiti: Betting on the Montana Accord," *Global Americans*, February 9, 2022.

[23] CRS interview with State Department officials, January 9, 2023.

[24] Catherine Osborn, "Haiti's Crisis Escalates," *Foreign Policy*, October 14, 2022.

[25] Jonathan M. Katz, "Haiti's Elites Keep Calling for the U.S. Marines," *Foreign Policy*, October 31, 2022.

[26] David C. Adams, "U.S. and Canada Turn to Sanctions Against Haitian Politicians and Businessmen Accused of Ties to Gangs," UnivisionNews, December 19, 2022 (hereinafter Adams, "U.S. and Canada Turn to Sanctions").

[27] Global Initiative Against Organized Crime, *Gangs of Haiti: Expansion, Power, and an Escalating Crisis,* October 2022. Hereinafter: Global Initiative, *Gangs of Haiti*.

*chimères*, and the Canadian government sanctioned former President Martelly for his role in financing gangs.[28]

The relationship between Haiti's economic elite and gangs is less apparent but no less significant than the ties between politicians and gangs. Business owners assert they have to support certain gangs as a defensive measure to protect their businesses and enable them to move merchandise throughout the country and abroad.[29] In addition, some of Haiti's top economic elites allegedly finance gangs to bolster both licit and illicit businesses. In December 2022, the Canadian government imposed sanctions on Gilbert Bigio, Reynold Deeb, and Sherif Abdallah, three elites who reportedly provided "illicit financial and operational support to armed gangs."[30]

Gangs have expanded their power in the wake of Moïse's assassination. They have exerted control over territory, highways, ports, and the delivery of humanitarian aid, challenging the authority of the HNP and other state institutions. Gangs were responsible for an October 2021 kidnapping of U.S. missionaries and a blockade of the country's primary fuel terminal from September to early November 2022.[31]

### Figure 2. Criminal Dynamics in Haiti



**Source:** CRS, based on a graphic from *InSight Crime* for the U.S. Agency for International Development, November 2021, at https://pdf.usaid.gov/pdf_docs/PA00ZF3H.pdf.

---

[28] Immigration and Refugee Board of Canada, *Haiti: The Chimères, Their Activities and Their Geographic Presence; the Treatment of the Chimères by the Authorities and the Presence of Group Members Within the Government and the Police (2006-May 2008)*, June 3, 2008; Harold Isaac and Brian Ellsworth, "Canada Sanctions Haiti Ex-President Martelly for Financing Gangs," Reuters, November 20, 2022.

[29] Alberto Arce and Rodrigo Abd, "In Haiti, the Difficult Relationship of Gangs and Business," Associated Press, October 21, 2021.

[30] Government of Canada, "Canada Imposes Sanctions Against Haitian Economic Elites," December 5, 2022.

[31] U.S. Department of Justice (DOJ), "Haitian Gang Leader Charged with Conspiracy to Commit Hostage Taking for Kidnapping of 16 U.S. Missionaries in Fall 2021," May 10, 2022; Henry Shuldiner, "From Negotiations to Sanctions, a Busy Time for Crime in Haiti," *InSight Crime*, November 11, 2022.

As of late 2021, the U.S. Agency for International Development (USAID) cited up to 200 gangs in Haiti, which reportedly controlled some 60% of Port-au-Prince at that time.[32] The G9 and Family (G9) and the G-PEP are two of Haiti's most powerful gang federations. From January to August 2022, as gangs clashed, police recorded 25.5% more homicides than the same period in 2021.[33] Kidnappings reached a record level in May 2022 and remain elevated. A wave of gang-related violence in Port-au-Prince in July 2022 resulted in more than 220 killings in one neighborhood. According to U.N. reports, gangs have used "collective rape" and other gender-based violence against women, children as young as 10, and the elderly to intimidate people.[34]

Although the State Department asserted that the HNP ranked among the "most trusted and effective institutions in Haiti" after MINUSTAH left the country, the U.N. Secretary-General described the police force in 2022 as "spread thin" and lacking weapons, equipment, and the capacity to use them.[35] Some studies also indicate the HNP has struggled with widespread criminal cooptation and infiltration. For example, a July 2022 International Crisis Group study estimated that 40% of the HNP has ties to gangs.[36] A 2021 report by Harvard Law School's International Human Rights Clinic documented state (primarily police) involvement in attacks on neighborhoods, which it termed "massacres," in which some 240 civilians died from 2018 to 2020.[37]

Even when police have sought to confront gangs and broader violence, the challenges have been daunting. In November 2022, the director of the HNP's training center was assassinated at that facility.[38] Also in November, the HNP temporarily lost control of a U.S.-delivered armored vehicle during a firefight with gangs that resulted in two deaths.[39]

Furthermore, impunity prevails in Haiti's weak justice system. In addition to failing to resolve Moïse's assassination, Haitian authorities have yet to arrest Jimmy Chérizier, a former HNP officer turned gang leader, or other Haitian officials implicated in the 2018 La Saline massacre of 71 people.[40] Gangs overtook several of Haiti's main courthouses in summer 2022, and many of the courthouses remain inoperable. Without functioning courts, Haitian prisons continue to hold

---

[32] U.S. Agency for International Development (USAID), *Mapping Haiti's Criminal Dynamics*, November 2021; Global Initiative, *Gangs of Haiti*.

[33] U.N. Security Council, U.N. Integrated Office in Haiti, *Report of the Secretary-General*, October 13, 2022.

[34] U.N. Integrated Office in Haiti (BINUH) and Office of the U.N. High Commissioner for Human Rights (OHCHR), *Sexual Violence in Port-au-Prince: A Weapon Used by Gangs to Instill Fear*, October 14, 2022. Hereinafter BINUH and OHCHR, *Sexual Violence*.

[35] U.S. Department of State, Bureau of International Narcotics and Law Enforcement Affairs, "Haiti Summary," at https://2017-2021.state.gov/bureau-of-international-narcotics-and-law-enforcement-affairs-work-by-country/haiti-summary/index.html; Security Council, S/2022/747.

[36] International Crisis Group, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, July 27, 2022.

[37] Harvard Law School International Human Rights Clinic, *Killing with Impunity: State-Sanctioned Massacres in Haiti*, April 2021, at http://hrp.law.harvard.edu/wp-content/uploads/2021/04/Killing_With_Impunity-1.pdf.

[38] Associated Press, "Head of Haiti's Police Academy Killed at Training Facility," November 25, 2022.

[39] Evens Sanon and Megan Janetsky, "Haitian Police Briefly Lose Control of Armored Car," Associated Press, November 11, 2022.

[40] Chérizier, then-Minister of the Interior Fednel Monchery, and President Moïse's Departmental Delegate Joseph Pierre Richard Duplan planned an attack carried out by gangs on protesters who had criticized the government. U.S. Department of the Treasury, "Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day," December 10, 2020.

inmates, 82% of whom were in pretrial detention in May 2021, in crowded conditions rife with violence and disease. Many inmates lack access to food, water, and medical care.[41]

In addition, corruption and a lack of control over the country's ports and borders have made Haiti a hub for drug and arms trafficking. In August 2022, the U.S. Department of Homeland Security (DHS) Homeland Security Investigations (HSI) office in Miami, FL, announced new initiatives to counter reported spikes in arms and munitions trafficking to Haiti.[42] In December 2022, the State Department sanctioned Rommel Bell, former customs director in Haiti, for corruption after Haiti's anti-corruption unit launched an investigation in early 2022 into Bell's alleged participation in illegal arms trafficking.[43]

# Humanitarian Situation

Haiti is a fragile country that is highly vulnerable to natural disasters due to its location and topography (exacerbated by deforestation and climate change), and the Haitian government's capacity to respond to such disasters is limited. A decade after the devastating 2010 earthquake, inadequate recovery efforts, combined with subsequent natural disasters (e.g., Hurricane Matthew, the 2021 earthquake) and disease outbreaks (e.g., cholera, Coronavirus Disease 2019 [COVID-19]) have further weakened the state's ability to protect and provide for its citizens.[44] The Fund for Peace's 2022 Fragile States Index ranked Haiti as the 11th most fragile state in the world due to various factors, including the state's lack of legitimacy and inability to deliver services, uneven economic development, and relatively low levels of social cohesion.[45]

In contrast to past humanitarian crises Haiti has endured, a political and security crisis is the primary driver of the current humanitarian emergency.[46] According to U.N. officials, as of December 2022, gang violence had displaced 155,000 people in Port-Au-Prince and trapped 19,000 in communities such as Cité Soleil.[47] Gang blockades of highways have limited humanitarian access, particularly to the southern peninsula but also to communities to the east and north of the capital. The G9 gang's blockade of the Varreux fuel terminal from mid-September to early November 2022 combined with broad unrest, caused businesses and hospitals to close. During that period, Haitians, fearful of encountering gang violence, sheltered in place amid a lack of water and sanitation services, fuel, electricity, and food. The U.N. Office for the Coordination of Humanitarian Affairs estimated that 5.2 million Haitians were in need of humanitarian aid as of the end of 2022.[48]

---

[41] BINUH and OHCHR, "*N Ap Mouri": Report on Conditions of Detention in Haiti,* May 2021.

[42] U.S. Department of Homeland Security, "Homeland Security Investigations (HSI) Announces Crackdown on Firearms, Ammunition Smuggling to Haiti, the Caribbean," August 19, 2022.

[43] U.S. Department of State, "Combating Global Corruption and Human Rights Abuses," December 2, 2022; Jacqueline Charles, "U.S. Sanctions More Haitians, Including the Relatives of People Accused of Corruption," *Miami Herald,* December 11, 2022.

[44] On recovery efforts, see Jonathan Katz, *The Big Truck That Went by: How the World Came to Save Haiti and Left Behind a Disaster* (New York, NY: St. Martin's Press, 2014); and Jacqueline Charles and José Antonio Iglesias, "Ten Years After Haiti's Earthquake: A Decade of Aftershocks and Unkept Promises," *Miami Herald*, January 8, 2020. On subsequent disasters, see Labrador and Roy, "Haiti's Troubled Path."

[45] The Fund for Peace, Fragile States Index, at https://fragilestatesindex.org/country-data/.

[46] UNOCHA, "Seven Things to Know About the Humanitarian Crisis in Haiti," October 26, 2022.

[47] Reuters, "U.N. Expects Haiti Sanctions Regime to be Running by January," December 8, 2022.

[48] U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA), *Global Humanitarian Overview 2023*, December 2022.

Some of the ongoing humanitarian concerns focus on food insecurity, health, protection, and education. In October 2022, the U.N. Food and Agriculture Organization (FAO) estimated that a record 4.7 million Haitians, roughly 50% of the population, faced acute levels of hunger and 19,000 people were experiencing "catastrophic" (most urgent) levels of hunger.[49] In October 2022, cholera resurfaced in Haiti, causing 300 deaths by December.[50] While cholera is preventable through vaccination and treatable with rehydration, gangs have reportedly prevented patient access to health facilities and denied medical staff entry to affected communities. Women and children in Haiti are extremely vulnerable to protection concerns. An October 2022 report by the U.N. Integrated Office in Haiti and the Office of the U.N. High Commissioner for Human Rights has described how gender-based violence by gangs against youth as young as 10 is widespread and increasing.[51] As of December 2022, due to increasing violence and cholera outbreaks, hundreds of thousands of students, already years behind due to COVID-19-related school closures, had not returned to school.[52]

# U.N. Presence in Haiti and Recent Action

The U.N. has had a continuous presence in Haiti for almost 19 years, with strong support and funding provided by successive U.S. presidential administrations. Following the collapse of the Aristide government in 2004, the U.N. Security Council established MINUSTAH to help restore order and train the HNP.[53] After the 2010 earthquake, the Security Council expanded MINUSTAH's size and mission.

A Security Council resolution ended MINUSTAH in 2017, citing Haiti's peaceful completion of a long-delayed electoral process in February 2017 as a milestone; critics argue, however, that a transitional government, not the U.N.-backed PHTK government, accomplished that goal.[54] The Security Council also praised MINUSTAH for supporting the political process, professionalizing the police, and improving security and stability in Haiti, achievements that proved short-lived. Haitian and international human rights and health experts criticized MINUSTAH for its role in introducing cholera to Haiti (a disease that had not been present in the country for more than a century) and for allegations of sexual abuse by some of its forces.[55] In 2016, then-Secretary-General Ban Ki-Moon apologized for the U.N.'s role in an outbreak that ultimately caused nearly 10,000 deaths; the U.N. also launched a $400 million fund to confront the epidemic.[56]

---

[49] U.N. Food and Agriculture Organization of the United Nations (FAO), "Catastrophic Hunger Levels Recorded for the First Time in Haiti," October 14, 2022.

[50] USAID, "Haiti-Complex Emergency," Fact Sheet #2, FY2023, December 16, 2022.

[51] BINUH and OHCHR, October 2022.

[52] U.N. Children's Fund (UNICEF), "UNICEF Haiti Humanitarian Situation Report: July-November 2022," December 16, 2022.

[53] U.N. Security Council, "Resolution 1542 (2004)/Adopted by the Security Council at Its 4961st Meeting, on 30 April 2004," S/RES/1542 (2004), June 1, 2004. MINUSTAH's original mission aimed to restore security and stability, promote political processes (including elections), strengthen institutions and rule-of-law-structures, and promote and protect human rights.

[54] U.N. Security Council, "Resolution 2350 (2017)/Adopted by the Security Council at Its 7924th Meeting, on 13 April 2017," S/RES/2350 (2017), April 13, 2017. Even with MINUSTAH present, Haiti experienced a constitutional crisis after Michel Martelly failed to convene elections to choose his successor. Georges Fauriol, 'A Cycle of Instability': Haiti's Constitutional Crisis," Center for Strategic and International Studies, February 8, 2021.

[55] For background, see CRS In Focus IF10502, *Haiti: Cholera, the United Nations, and Hurricane Matthew*, by Maureen Taft-Morales and Tiaji Salaam-Blyther.

[56] U.N. News, "U.N.'s Ban Apologizes to People of Haiti, Outlines New Plan to Fight Cholera Epidemic and Help

In 2017, the U.N. Mission for Justice Support in Haiti (MINUJUSTH) took MINUSTAH's place, focusing on strengthening judicial institutions, protecting human rights, increasing the HNP's professionalization, and reinforcing the rule of law. The mission also supported violence-reduction projects and income-generating activities for youth. During MINJUSTH's mandate, the number of HNP officers increased by 10% to 15,400 and courts reported a 300% increase in files processed on the day of their reception.[57] However, Haitians continued to report increased sexual violence and widespread cholera cases.[58]

In October 2019, the U.N. transitioned to a political office, the U.N. Integrated Office in Haiti (BINUH), for an initial one-year period that the U.N. Security Council twice extended. BINUH's mandate, which currently runs through July 2023,[59] is to advise the Haitian government on how to establish an inclusive national dialogue on reestablishing stability, security, and the rule of law so elections can be held, among other aims. The mission also emphasizes protecting and promoting human rights, including by documenting recent gender-based violence by gangs and producing reports from Haiti for the U.N. Secretary-General and Security Council.[60] BINUH coordinates with other U.N. agencies, funds, and programs, ranging from humanitarian agencies such as the World Food Program to a new U.N. Office on Drugs and Crime office in Haiti.

On October 6, 2022, Acting Prime Minister Henry and his ministers requested the deployment of an international force to help Haitian forces quell the security situation and allow humanitarian aid to flow. On October 8, 2022, U.N. Secretary-General António Guterres sent a letter to the Security Council recommending various approaches to respond to that request. Such approaches included deploying a non-U.N. rapid action force (probably composed of some military forces) to support the HNP, forming a multinational police task force, creating a multinational anti-gang force, expanding BINUH's budget and mandate, bolstering the HNP and the justice sector, and combating arms trafficking.[61] On October 17, 2022, the Security Council discussed a proposed resolution by the United States and Mexico, which would reportedly authorize the deployment of a non-U.N. multinational force to Haiti.[62] Few countries have publicly offered to send their forces to Haiti.[63] Nevertheless, at the January 2023 North American Leaders Summit, Canadian Prime Minister Justin Trudeau said that Canada, Mexico, the United States, and Caribbean leaders have been in contact to "ensure that if the situation starts to deteriorate once again, we will have options."[64]

On October 17, 2022, the Security Council also discussed a resolution sponsored by the United States and Mexico to establish a U.N. sanctions regime against gang leaders in Haiti and those

Communities," December 1, 2016. By the end of 2021, donors had contributed only $21.8 million to support the pledged $400 million fund. See U.N. Haiti Cholera Response Multi-Partner Trust Fund, *2021 Annual Report*.

[57] U.N. Mission for Justice Support in Haiti, "MINUJUSTH Completes Its Mandate, Putting an End to 15 Consecutive Years of Peacekeeping in Haiti," October 16, 2019.

[58] International Justice Resource Center, "U.N. Transitions from Peacekeeping to Governance, Amid Crisis in Haiti," October 17, 2019.

[59] For background, see BINUH, "Mandate," at https://binuh.unmissions.org/en/mandate.

[60] BINUH and OHCHR, *Sexual Violence.*

[61] Security Council, S/2022/747.

[62] United States Mission to the United Nations, "Remarks by Ambassador Linda Thomas-Greenfield at a U.N. Security Council Briefing on Haiti," October 17, 2022. Security Council Report, "Haiti: Briefing," in *What's in Blue* (blog), December 21, 2022 (hereinafter Security Council Report, "Haiti").

[63] International Crisis Group, *Haiti's Last Resort: Gangs and the Prospect of Foreign Intervention*, December 14, 2022.

[64] The White House, "Remarks by President Biden, Prime Minister Trudeau, and President López Obrador in Joint Press Conference," January 10, 2023.

who finance them. The Security Council unanimously approved the sanctions resolution (Resolution 2653) on October 21, 2022, and met on December 21, 2022, to follow up on implementation of that resolution.[65]

# U.S. Policy and Issues for Congress

U.S. policy goals in Haiti under the Biden Administration include supporting Haitian-led efforts to confront gangs and insecurity; resolving the political and constitutional crisis; reviving the economy; and addressing poverty and a lack of basic services (including health care and education), which have fueled irregular migration.[66] Diplomatically, the Biden Administration's approach to Haiti has evolved from supporting the Henry government to encouraging Henry, the Montana Group, and others to engage in dialogue to reach an inclusive political accord while addressing deteriorating conditions in the country.[67] Biden Administration officials traveled to Haiti in October 2022 to discuss how to respond to Henry's request for international assistance and to urge political actors to "rise above their differences" and chart a path to "improved security" and "democratic order."[68] Secretary of State Antony Blinken also announced additional assistance to address cholera, security assistance for the HNP, and new sanctions to hold Haitians accountable for "instigating violence and unrest."[69]

Since Moïse's assassination, U.S. Canada, U.N. officials and others, criticized for past interventions in the country, have emphasized their support for Haitian-led solutions to the country's political and security challenges. As those solutions have yet to emerge and conditions in Haiti have deteriorated, U.S. officials reportedly have pursued several courses of action. The U.S. government has sanctioned corrupt officials and encouraged other countries to do so; supported back-channel negotiations between Henry and other key stakeholders; and assessed whether a partner country would be willing to lead a non-U.N. "multinational force" funded by voluntary contributions to help stabilize the country.[70] President Biden and Prime Minister Trudeau discussed Haiti during the North American Leaders Summit, during which they stressed sanctions and other efforts to improve the situation in the country, but also potential other options. Rather than focusing on organizing some type of intervention, many Haitian human rights experts and civil society groups have asked U.S. officials to push Henry to reach a political agreement, likely with the Montana Group, before considering intervention proposals.[71]

On many U.S. policy issues, Congress has had a direct role in shaping policy or conducting oversight of policy development and implementation. Those policy issues include, but are not limited to, foreign assistance, trade preferences, sanctions policy, and migration.

---

[65] Security Council, "Resolution 2653 (2022), October 21, 2022; Security Council Report, "Haiti."

[66] U.S. Department of State, *Integrated Country Strategy: Haiti*, approved March 18, 2022, at https://www.state.gov/wp-content/uploads/2022/04/ICS_WHA_Haiti_Public.pdf (hereinafter State Department, *Integrated Country Strategy*).

[67] Brian A. Nichols, "U.S., Other Nations Can Redouble Efforts for a Democratic Haiti," *Miami Herald*, July 6, 2022.

[68] U.S. Department of State, Office of the Spokesperson, "Media Note: Assistant Secretary Brian A. Nichols to Visit Haiti," October 12, 2022.

[69] U.S. Department of State, Antony J. Blinken, Secretary of State, "Steps to Address the Humanitarian and Security Situation in Haiti," October 12, 2022.

[70] Adams, "U.S. and Canada Turn to Sanctions"; International Crisis Group, *Haiti's Last Resort: Gangs and the Prospect for Foreign Intervention*, briefing no. 48, December 14, 2022.

[71] Pierre Espérance, "As Haiti's Last 10 Lawmakers' Terms Expire, Political Transition Must Take Priority over Military Intervention," *Just Security*, December 15, 2022.

IFR_AR_007940

# Foreign Assistance

## Bilateral Assistance

Congress has appropriated foreign assistance to support Haiti's recovery from recurrent natural disasters and foster long-term stability, with a particular spike in assistance in the aftermath of a massive 2010 earthquake. Congress shapes U.S. policy toward Haiti through appropriations, conditions on appropriations, and reporting requirements linked to the disbursement of U.S. assistance.

Congress enacted the Haiti Development, Accountability, and Institutional Transparency Initiative (HAITI Act; H.R. 2471/S. 1104) as part of the FY2022 Consolidated Appropriations Act (P.L. 117-103). P.L. 117-103 did not designate an appropriations level for Haiti. The act required the State Department to withhold any funding for the central government of Haiti until a new president and parliament have taken office following free and fair elections or the Secretary of State has determined a transitional government representative of Haitian society is in place and it is in the U.S. interest to provide assistance. Notwithstanding those requirements, the act allowed U.S. agencies to provide assistance to support elections, anti-gang police and justice administration, public health, food security, water and sanitation, education, disaster relief and recovery, and other programs to meet basic human needs. The act prohibited U.S. funding for the Haitian army.

The HAITI Act also required U.S. agencies to measure the progress of post-disaster recovery and efforts to address corruption, governance, rule of law, and media freedoms in Haiti. The State Department submitted the reports required in P.L. 117-103 and made them public on November 10, 2022.[72]

Over the last five years, U.S. bilateral assistance to Haiti has ranged from a low of $180.3 million in FY2020 to an estimated $219.2 million provided in FY2022 (see **Table 1**). In March 2022, the State Department and USAID adopted a two-year Integrated Country Strategy to guide U.S. foreign assistance to Haiti for FY2022-FY2024.[73] The Administration requested $274.8 million in assistance for Haiti in FY2023, up from the estimated FY2022 allocation. Most of the FY2022 allocation funded health and other development activities, but it also increased support for the HNP (see **Table 1**). In the FY2023 budget proposal, the Administration requested funding to help Haiti recover from external shocks by making investments in the HNP, combating corruption, strengthening civil society, and providing services for marginalized people.[74]

The FY2023 Consolidated Appropriations Act (P.L. 117-328), enacted in December 2022, does not specify a comprehensive appropriations level for Haiti. The accompanying explanatory statement designates $8.5 million for reforestation efforts and "not less than" $5.0 million to help meet the sanitary, medical, and nutritional needs of Haitian prisoners. The act requires the State Department to withhold any aid to support the Haitian government until the Secretary of State certifies that a new president and parliament have taken office following free and fair elections or that a broadly representative transitional government is in place and it is in the U.S. interest to provide such assistance. The withholding requirement does not apply to aid intended to support free and fair elections; anti-gang police and justice administration; disaster relief and recovery;

---

[72] U.S. Department of State, Bureau of Western Hemisphere Affairs, "Haiti: Reports," November 10, 2022, at https://www.state.gov/haiti-reports/.

[73] State Department, *Integrated Country Strategy*.

[74] White House, *Budget of the U.S. Government, FY2023*, p. 91.

and education, public health, food security, and other basic human needs. As in prior years, the act prohibits assistance for the armed forces of Haiti.

The explanatory statement accompanying P.L. 117-328 also urges the Secretary of State to use "every appropriate diplomatic tool to press for dialogue" among political leaders and key stakeholders. In addition, it urges the Secretary of State to take "strong legal action" against those engaged in human rights abuses, corruption, and other illicit activities.[75]

### Table 1. U.S. Foreign Assistance to Haiti by Account: FY2018-FY2023

(appropriations in thousands of current U.S. dollars)

| Account | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 (Estimate) | FY2023 (Request) |
|---|---|---|---|---|---|---|
| DA | 32,000 | 51,000 | 51,000 | 52,000 | 56,000 | 111,000 |
| ESF | 8,500 | — | — | 14,800[a] | 5,500 | — |
| FFP | 3,244 | 11,719 | 7,996 | 3,110 | — | — |
| GHP (State) | 99,386 | 103,011 | 78,765 | 99,822 | 103,081 | 100,000 |
| GHP (USAID) | 24,200 | 24,500 | 24,500 | 24,500 | 24,500 | 34,500 |
| INCLE | 12,000 | 15,000 | 18,000 | 13,000 | 30,000 | 29,000 |
| IMET | 233 | 241 | 96 | 255 | 107 | 255 |
| FMF | 5,000 | — | — | — | — | — |
| Total | 184,563 | 205,471 | 180,357 | 207,487 | 219,188 | 274,755 |

**Sources:** U.S. Department of State**,** Congressional Budget Justification, Supplementary Tables-Foreign Operations, FY2020-FY2023; and U.S. Department of State, FY2022 Estimate Data, August 16, 2022.

**Notes:** DA = Development Assistance; ESF = Economic Support Fund; FFP = Food for Peace; GHP = Global Health Programs; INCLE = International Narcotics Control and Law Enforcement; IMET = International Military Education and Training; FMF = Foreign Military Financing. Additional FY2021 funding provided by the American Rescue Plan Act (P.L. 117-2).

## Humanitarian Assistance

The United States generally provides various forms of humanitarian assistance to Haiti. USAID's Bureau of Humanitarian Assistance (BHA) provided more than $92.1 million in humanitarian assistance to Haiti in FY2021 and at least $79.2 million in FY2022 through July 8, 2022.[76] Of the total amount of humanitarian assistance provided over the past two fiscal years, $152.8 million represented emergency funding, much of which responded to humanitarian needs (i.e., concerns about food; health; water, sanitation, and hygiene; and protection) exacerbated by an August 2021 earthquake that killed some 2,250 people and damaged 115,000 homes and other structures. BHA

---

[75] "Explanatory Statement Submitted by Mr. Leahy, Chair of the Senate Committee on Appropriations, Regarding H.R. 2617, Consolidated Appropriations Act, 2023," *Congressional Record*, vol. 168, no. 198—book II (December 20, 2022), p. S9299.

[76] USAID, Bureau for Humanitarian Assistance, "Haiti Assistance Overview," August 2022.

also provided $18.6 million in early recovery, risk reduction, and resilience programming.[77] The Department of Defense (DOD) worked with USAID to deliver some 600,000 relief supplies.[78]

As the humanitarian situation in Haiti worsened, USAID sent a Disaster Assistance Response Team (DART) team to the country in October 2022. The DART is coordinating the delivery of relief supplies to a portion of the estimated 5.2 million Haitians in need of humanitarian assistance.[79] Since October, USAID/BHA has helped transport 278 metric tons of relief supplies to Port-Au-Prince.

U.S. agencies also are helping Haiti respond to the COVID-19 pandemic and other health needs. Through June 2022, USAID and the State Department had provided at least $49 million in aid to help Haiti address the health and humanitarian impacts of COVID-19.[80] The United States has donated nearly 1.1 million COVID-19 vaccines to Haiti; 2.1% of Haitians had completed the recommended COVID-19 vaccination schedule as of December 2022.[81] In December 2022, DOD deployed the U.S. Naval Ship *Comfort* to deliver medical care to Haitians for several days as part of a multi-country deployment.[82]

## Global Fragility Act Implementation

The 116th Congress enacted the Global Fragility Act of 2019 (GFA; P.L. 116-94, Division J, Title V), which directed the executive branch to develop a 10-year strategy to prevent conflict globally and stabilize conflict-affected areas. It also directed the executive branch to select priority countries or regions to execute such efforts through 10-year plans. In April 2022, the Biden Administration announced one region and four priority countries for GFA implementation; Haiti was among them. The GFA also authorized three distinct funds: the Prevention and Stabilization Fund, the Complex Crisis Fund, and the Multi-Donor Global Fragility Fund. These funds support the updated prologue of the Global Fragility Strategy put forth by the Biden Administration and country implementation plans, which were due to Congress in December 2022.

Development experts have urged U.S. agencies to focus GFA efforts in Haiti on bolstering a Haitian-led solution that ensures citizen security, addresses Haiti's escalating impunity, and provides humanitarian and economic support for those affected by the country's interrelated political, economic, and security crises.[83]

Some Members of Congress have debated whether Haiti should receive some types of GFA-related funding. This debate may reflect, in part, the absence of viable government entities with whom to execute the GFA country plan (§505(a)). Although it did not appear in the FY2023 Omnibus Appropriations Act, the FY2023 Senate-introduced version of the FY2023 State and

---

[77] U.S. Department of State, "COVID-19 Vaccine Distribution," at https://www.state.gov/countries-areas/haiti/#covid_map_link; Pan American Health Organization, "COVID-19 Vaccination in the Americas," at https://ais.paho.org/imm/IM_DosisAdmin-Vacunacion.asp.

[78] U.S. Southern Command, "USNS Comfort Arrives in Haiti," December 13, 2022.

[79] USAID, "Haiti-Complex Emergency," Fact Sheet #1, FY2023, October 21, 2022; USAID, "Haiti-Complex Emergency," Fact Sheet #2, FY2023, December 16, 2022.

[80] USAID, "COVID-19: Latin America and the Caribbean," Fact Sheet #5, FY2022, June 30, 2022.

[81] U.S. Department of State, "COVID-19 Vaccine Distribution," at https://www.state.gov/countries-areas/haiti/#covid_map_link; and Pan American Health Organization, "COVID-19 Vaccination in the Americas," at https://ais.paho.org/imm/IM_DosisAdmin-Vacunacion.asp.

[82] U.S. Southern Command, "USNS Comfort Arrives in Haiti," December 13, 2022.

[83] Roger Mitchell, "Why the Global Fragility Act Matters for Haiti," *Modern Diplomacy*, August 25, 2022.

Foreign Operations Appropriations measure, S. 4662, would not have made Prevention and Stabilization funds available to Haiti.

### Donor Coordination

The United States is the leading bilateral donor in Haiti, and Congress has encouraged U.S. executive agencies to coordinate foreign assistance priorities with key countries and international organizations represented in Haiti. Active since 2004, the "Core Group" has shaped international responses to key events in Haiti, as when it called on Henry to form a "consensual and inclusive government" in July 2021.[84] In addition to the U.S. Ambassador, the Core Group comprises the Special Representative of the U.N. Secretary-General; the Ambassadors of Brazil, Canada, France, Germany, Spain, and the European Union (EU); and the Special Representative of the Organization of American States.

Many members of the Core Group (including the EU, Spain, and France) have expressed interest in contributing to a multi-donor basket fund on security that aims to support the long-term development of the HNP; Canada and the U.N. Development Program (UNDP) administer the fund. UNDP estimates the fund needs at least $28 million over two years to achieve its aims. Thus far, the U.S. government has donated $3 million and Canada has donated 10 million Canadian dollars in support of the fund.[85]

In October 2022, the U.S. and Canadian governments sped up the delivery of armored vehicles and other tactical equipment purchased by the Haitian government for the HNP.[86] Canada delivered additional armored vehicles in January 2023.

## Trade Preferences

Congress has extended unilateral trade preferences to Haiti through several trade preferences programs enacted since 1975. The Caribbean Basin Economic Recovery Act (P.L. 98-67, subsequently amended, with no expiration), for example, provides limited duty-free entry of selected Caribbean products as a core element of the U.S. foreign economic policy response to uncertain economic and political conditions in the region. The current Haiti-specific preference program, which expires in 2025, provides unilateral preferences to the country's apparel sector.[87] In 2021, $751.3 million (67.9%) of total U.S. imports from Haiti entered under the Haiti-specific preference program and $260.4 million (23.6%) entered under P.L. 98-67.[88]

During the 117th Congress, measures that would have extended duty-free treatment from 2025 to 2035 with respect to imports from Haiti under the Caribbean Basin Economic Recovery Act were introduced as the Haiti Economic Lift Program Extension Act of 2021 (S. 3279 in November 2021; H.R. 6136 in December 2021 and H.R. 9461 in December 2022).

---

[84] BINUH, "Core Group Press Release," July 17, 2021.

[85] U.S. Department of State, "United States and Canada Joint Statement on Support for the Haiti Security Basket Fund," September 23, 2022.

[86] Reuters, "U.S., Canada Deliver Armored Vehicles to Haitian Police to Fight Gangs," October 15, 2022.

[87] For a description of how the Haiti-specific preference programs have evolved and have affected Haitian exports and Haitian workers, see U.S. International Trade Commission, *U.S.-Haiti Trade: Impact of U.S. Preference Programs on Haiti's Economy and Workers*, December 2022.

[88] Ibid.

## Sanctions: U.S. and Multilateral

In 2020, as part of its policy toward Haiti, the U.S. government began to impose sanctions against those responsible for significant human rights abuses, corruption, and drug trafficking. In December 2020, pursuant to Executive Order (E.O.) 13818, which built upon and expanded the Global Magnitsky Human Rights Accountability Act (P.L. 114-328), U.S. Department of the Treasury imposed asset blocking and visa restrictions on Chérizier (the gang leader and former HNP officer) and two former Moïse Administration officials for involvement in the La Saline massacre.[89] In November 2022, the U.S. Department of the Treasury imposed sanctions pursuant to E.O. 14059 on Joseph Lambert, then-president of the Haitian senate, and former Senator Youri Latortue for involvement in drug trafficking.[90] Treasury imposed the same sanctions on Senator Rony Celestin and former Senator Richard Lenine in December 2022.[91] Pursuant to Section 7031(c) of P.L. 117-103, Division K, the State Department imposed visa restrictions on Senator Lambert for corruption and involvement in a gross violation of human rights.[92] The State Department also imposed visa restrictions on former Haitian Customs Director Rommel Bell and Senator Celestin for corruption.[93] Those subject to recent public sanctions represent a range of political parties. Dozens of officials and their families have privately had their visas revoked.

The United States has encouraged other international partners and the U.N. to sanction the financial backers of Haitian gangs, recognizing that targeted sanctions imposed in a multilateral manner may have a better chance of affecting change than unilateral sanctions.[94] U.S. sanctions have been closely coordinated with those announced by the Government of Canada, which also imposed sanctions on former President Martelly for drug trafficking—a move U.S. officials have "welcomed" but not yet replicated.[95] In October 2022, the U.N. Security Council unanimously approved Resolution 2653 imposing sanctions on Jimmy Chérizier for "engaging in acts that threaten the peace, security, and stability of Haiti."[96] It also mandated the creation of a panel of experts to recommend further individuals and entities to be subject to travel bans, asset seizures, and an arms embargo.

Toward the end of the 117th Congress, similar legislative measures, the Haiti Criminal Collusion Transparency Act of 2022 (H.R. 9147/S. 5083), were introduced in both chambers. The bills would have required the presidential administration to produce and release publicly an annual list

---

[89] E.O. 13818, "Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption," December 20, 2017; U.S. Department of the Treasury, "Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day," December 10, 2020.

[90] E.O. 14059, "Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade," December 15, 2021; U.S. Department of the Treasury, "Treasury Sanctions Corrupt Haitian Politicians for Narcotics Trafficking," November 4, 2022.

[91] U.S. Department of the Treasury, "U.S. Sanctions Additional Corrupt Haitian Politicians for Drug Trafficking," December 2, 2022.

[92] U.S. Department of State, Antony J. Blinken, Secretary of State, "Designation of Haitian Senate President, Joseph Lambert, for Involvement in Significant Corruption and a Gross Violation of Human Rights," December 4, 2022.

[93] U.S. Department of State, "Combating Global Corruption and Human Rights Abuses," December 9, 2022.

[94] U.S. Department of the Treasury, *Treasury 2021 Sanctions Review*, October 2021.

[95] Government of Canada, "Sanctions: Grave Breach of International Peace and Security in Haiti," updated December 19, 2022, at https://www.international.gc.ca/campaign-campagne/haiti-sanction/index.aspx?lang=eng; Jacqueline Charles and Michael Wilner, "Canada Sanctions Former Haiti President Michel Martelly, Two Former Prime Ministers," *Miami Herald*, November 21, 2022.

[96] U.N. Security Council, "Security Council Committee Established Pursuant to Resolution 2653 (2022) Concerning Haiti," at https://www.un.org/securitycouncil/sanctions/2653.

of Haitian political and economic elites tied to gangs. They also would have required the Secretary of State to identify which of those individuals may be subject to visa restrictions and sanctions pursuant to Section 7031(c) of annual Department of State, Foreign Operations, and Related Programs Appropriations legislation and Section 1263 of the Global Magnitsky Human Rights Accountability Act. Congress did not take further action on either bill. Similar legislation could be introduced and considered during the 118th Congress.

## Indictments

The U.S. Department of Justice (DOJ) has assisted Haitian officials investigating the Moïse assassination and selected cases involving those complicit in arms trafficking, gang violence, and drug trafficking in and through Haiti. DOJ has secured the extradition of two individuals allegedly complicit in Moïse's assassination, as well as a gang leader responsible for the 2021 kidnapping of U.S. missionaries. In November 2022, DOJ indicted seven leaders of five Haitian gangs, including additional individuals involved in the 2021 missionary kidnappings.[97]

## Migration Issues

Migration issues continue to be a high priority for U.S. policy and Congress. U.S. government apprehensions of Haitian migrants have risen notably, both at sea and on the U.S. Southwest border. In FY2022, U.S. Customs and Border Protection (CBP) encountered roughly 53,910 Haitians on the Southwest border, up from 47,255 encountered in FY2021.[98] Many of those Haitians had resided in third countries (particularly Brazil and Chile) since the 2010 earthquake and had few ties to Haiti.[99] CBP placed a majority of those individuals (77%) into Title 8 removal proceedings under immigration code, and many were released into the United States to await their immigration court proceedings. CBP expelled the other 22% of Haitians from the United States under Title 42 of the *U.S. Code*. In FY2022, the Coast Guard interdicted more than 7,175 Haitian migrants, compared with 1,527 Haitian migrants in FY2021.[100] Through September 2022, the International Organization for Migration assisted more than 21,215 Haitians repatriated to Haiti (69% of which were from the United States), many with few ties to the country.[101]

On January 5, 2023, the Department of Homeland Security announced the expansion of a set of new immigration policies to Haitians, Nicaraguans, and Cubans, which started in October 2022 for Venezuelans.[102] After January 5, 2023, Haitians who have a U.S. sponsor can apply for immigration parole and fly directly into the United States after U.S. vetting. In contrast, Haitians apprehended between ports of entry are now subject to the public health-related Title 42 policy, which allows DHS to expel migrants back to Mexico (in coordination with the government of

[97] U.S. Department of Justice, "Criminal Charges Unsealed Against Gang Leaders for Kidnappings of U.S. Citizens," November 7, 2020.

[98] U.S. Customs and Border Protection, "Nationwide Encounters," calculated by CRS using data available at https://www.cbp.gov/newsroom/stats/nationwide-encounters. Nearly 46% of migrants were encountered at ports of entry and 53% between ports of entry.

[99] Caitlyn Yates, *Haitian Migration Through the Americas: A Decade in the Making*, Migration Information Source, September 30, 2021.

[100] Skyler Shepard, "Coast Guard Repatriates 180 People to Haiti, 46 Children," CBS12, November 25, 2022.

[101] International Organization for Migration, "Migrant Returns and Reception Assistance in Haiti: Air & Sea, September 2022.

[102] DHS, "DHS Implements New Processes for Cubans, Haitians, and Nicaraguans and Eliminates Cap for Venezuelans," January 6, 2022.

Mexico). Mexico has agreed to receive up to a total of 30,000 migrants from those three countries per month.[103]

The United States also has taken steps to provide legal migration and protection pathways for some Haitians. Some 155,000 Haitians may be eligible for relief from removal under the Temporary Protected Status (TPS) designation announced in May 2021, and additional Haitians are eligible under the extension announced in December 2022.[104] In July 2022, the Biden Administration said it would resume the Haitian Family Reunification Parole Program, allowing certain U.S. citizens and legal permanent residents to seek parole for family members in Haiti.

# Outlook

The 118th Congress is likely to maintain a keen interest in developments in Haiti, as deteriorating security and humanitarian conditions in Haiti intersect with a broad range of U.S. interests and policy responses. As noted earlier, Congress has directly engaged with U.S. policy approaches toward Haiti in relation to foreign assistance, trade preferences, sanctions policy, and migration. Should the current crisis in Haiti continue, Congress may choose to consider and assess new policy approaches to address the situation in Haiti, including the potential for U.S.-backed international intervention, or other new engagements in Haiti.

# Author Information

Clare Ribando Seelke
Specialist in Latin American Affairs

Karla I. Rios
Analyst in Latin American Affairs

# Acknowledgments

This report draws from the past work of Maureen Taft-Morales, Specialist in Latin American Affairs.

---

[103] Government of Mexico, "Mexico Welcomes the Announcement of new US Actions to Achieve Orderly, Safe, Regular and Humane Migration," January 5, 2023.

[104] See CRS Report RS20844, *Temporary Protected Status and Deferred Enforced Departure*, by Jill H. Wilson.

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.





# UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

## Report on Asylum Seekers in Expedited Removal

### VOLUME II: EXPERT REPORTS

*As authorized by Section 605 of the International Religious Freedom Act of 1998*

PR_AR_008170

SUMMARY TABLE OF CONTENTS
REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL:
VOLUME II: EXPERT REPORTS

EVALUATION OF CREDIBLE FEAR REFERRAL IN EXPEDITED REMOVAL AT PORTS OF
ENTRY IN THE UNITED STATES.
Allen Keller, Barry Rosenfeld, Andrew Rasmussen, and Kim Reeves…………………………1

A-FILE AND RECORD OF PROCEEDING ANALYSIS OF EXPEDITED REMOVAL.
Kate Jastram and Tala Hartsough.………………………………………………………………44

REPORT ON CREDIBLE FEAR DETERMINATIONS.
Mark Hetfield……………………………………………………………………………………165

CONDITIONS OF CONFINEMENT FOR DETAINED ASYLUM SEEKERS SUBJECT TO
EXPEDITED REMOVAL.
Craig Haney………………………………………………………………………………………178

LEGAL ASSISTANCE FOR ASYLUM SEEKERS IN EXPEDITED REMOVAL: A SURVEY OF
ALTERNATIVE PRACTICES.
Charles Kuck………………………………………………………………………………..232

STATISTICAL REPORT ON EXPEDITED REMOVAL, CREDIBLE FEAR, AND WITHDRAWAL,
FY 2000-2003.
Cory Fleming and Fritz Scheuren………………………………………………………….281

STATISTICAL REPORT ON DETENTION, FY 2000-2003.
Cory Fleming and Fritz Scheuren…………………………………………………………..323

STATISTICAL REPORT ON IMMIGRATION COURT PROCEEDINGS, FY 2000-2004.
Susan Kyle, Cory Fleming, and Fritz Scheuren……………………………………………383

SELECTED STATISTICAL ANALYSES OF IMMIGRATION JUDGE RULINGS ON ASYLUM APPLICATIONS,
FY 2000-2003.
Patrick Baier………………………………………………………………………………...420

IFR_AR_008171

**DETAILED TABLE OF CONTENTS**
**REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL:**
**VOLUME II: EXPERT REPORTS**

EVALUATION OF CREDIBLE FEAR REFERRAL IN EXPEDITED REMOVAL AT PORTS OF
ENTRY IN THE UNITED STATES.
Allen Keller, Barry Rosenfeld, Andrew Rasmussen, and Kim Reeves

Overview…………………………………………………………………………………3

Background…………………………………………………………………………………4

I.    Study Methodology……………………………………………………………5
         Participants……………………………………………………………… 8
              Basis for Secondary Inspection and Case Outcome……………………… 9
              Use of Interpreters and Bilingual Officers…………………………………10
              Representativeness of Study Samples……………………………………11

II.   Use and Adherence to the I-867 Format……………………………………...13
              Relation to Credible Fear Referrals…………………………………………17
              Confirming Statements Made in Secondary Inspection Interviews……………18

III.  Expressing Fear and Referral………………………………………………20
              Officers Encouraging Aliens to Retract their Fear Claims……………………23

IV.   Understanding the Result of Secondary Inspection Interviews …………………25

V.    Officers' Behavior During Secondary Inspection Interviews ……………………26

VI.   Discussion of Findings………………………………………………………28
              Study Limitations………………………………………………………31
              Conclusion………………………………………………………………33

References Cited……………………………………………………………………35

Appendices…………………………………………………………………………36
              Appendix A: Demographic Characteristics of Samples……………………36
              Appendix B: Participant Cases Versus Non-participant Cases………………37
              Appendix C: Data Analyses Excluding San Ysidro…………………………40
              Appendix D: Aliens Who Expressed a Fear and Were Not Referred ……………43

A-FILES AND RECORD OF PROCEEDING ANALYSIS OF EXPEDITED REMOVAL.
Kate Jastram and Tala Hartsough

List of Tables……………………………………………………………………  46

IFR_AR_008172

List of Appendices……………………………………………………………………  47

A. Overview………………………………………………………………………  48

B. Summary of the Expedited Removal Process……………………………………...  51

C. Study Methodology……………………………………………………………...  53

D. Study Question 2 – Are immigration officers incorrectly failing to
 refer asylum seekers for a credible fear interview?....................................……………………  57

E. Study Question 3 – Are immigration officers incorrectly removing
asylum seekers to a country where they may be persecuted?................................................  61

F. Study Question 4 – Are immigration officers detaining asylum seekers
improperly or in inappropriate conditions?..............................................................................  71

G. Overall Data Limitations………………………………………………………...  84

H. Discussion of findings…………………………………………………………...  86

Appendices
        Appendix A: Summary of APSO Officer/Asylum Office Director Questionnaire......90
        Appendix B: Parole Guidelines Memo……………………………………………97
        Appendix C: Port of Entry Data Collection Instrument……………………………101
        Appendix D: Additional Analysis of Port of Entry Files National Sample…………106
        Appendix E: Analysis of Port of Entry files from JFK Airport……………………...108
        Appendix F: Hetfield Letter of 9.23.04…………………………………………….113
        Appendix G: Analysis of Port of Entry Files National Sample – Canadian Border...116
        Appendix H: Board of Immigration Appeals Data Collection Instrument…………117
        Appendix I: Additional Analysis of the Board of Immigration Appeals Sample…. 123
        Appendix J: Credible Fear Data Collection Instrument……………………………124
        Appendix K: Credible Fear Files Produced and Not Produced, By Location……..  136
        Appendix L: Additional Analysis of Credible Fear Files…………………………  137
        Appendix M: Examples of Parole Decision Documentation………………………  140
        Appendix N: Examples of Consular Notification…………………………………  158

REPORT ON CREDIBLE FEAR DETERMINATIONS.
Mark Hetfield

"Well Founded Fear" and the Role of the Asylum Corps………………………………  167

New "Credible Fear" Responsibilities of the Asylum Corps under IIRIRA………………..168

"Not Manifestly Unfounded" vs. "Credible Fear"………………………………………170

IFR_AR_008173

The High Credible Fear Rate May be Attributable to Procedures, not Standards.............171

Conclusion....................................................................................................................172

Table Set.......................................................................................................................173

CONDITIONS OF CONFINEMENT FOR DETAINED ASYLUM SEEKERS SUBJECT TO
EXPEDITED REMOVAL.
Craig Haney

I.     The Detention of Asylum Seekers Subject to Expedited Removal...................... 180

II.    Assessing Conditions of Confinement at the Detention Facilities in Which
       Asylum Seekers Subject to Expedited Removal are Housed............................182
       A.  The Facility Survey.........................................................................183
       B.  Interviews with Former Detainees......................................................189
       C.  Facility Tours...............................................................................191

III.   The Psychological Impact of Confinement................................................... 191
       A.  Dependence on Institutional Structure and Contingencies........................... 193
       B.  Hypervigilance, Interpersonal Distrust and Suspicion...............................194
       C.  Social Withdrawal and Self Isolation.................................................. 195
       D.  Diminished Sense of Self Worth and Personal Value................................195
       E.  Post-Traumatic Stress Reactions to the Pains of Imprisonment......................196

IV.    Special Psychological Issues for Asylum Seekers Subject to Expedited Removal..... 197

V.     Discussion, Alternatives, and Need for Further Study......................................199

Appendices
       Appendix A: Facilities in Sample......................................................................203
       Appendix B: Facilities Actually Surveyed and Those Visited by
       Commission Experts....................................................................................204
       Appendix C: Detention Center Questionnaire.....................................................206
       Appendix D: Comparison of DHS Detention Centers to Traditional
       Correctional Facilities..................................................................................216
       Appendix E: UNHCR Detention of Refugees and Asylum-Seekers –
       Executive Committee Conclusions .................................................................221
       Appendix F:  UNHCR Revised Guidelines on Applicable Criteria and
       Standards Relating to the Detention of Asylum Seekers....................................222

LEGAL ASSISTANCE FOR ASYLUM SEEKERS IN EXPEDITED REMOVAL: A SURVEY OF
ALTERNATIVE PRACTICES.
Charles Kuck

I.     Overview of Entry Process…………………………………………………………235

II.    Representation of Arriving Aliens and Asylum Seekers……………………………238
       A.  Introduction…………………………………………………………………………238
       B.  The Impact of Representation on Asylum Claims in Expedited Removal……….239
       C.  Approaches to Representation of Detained Asylum Seekers……………………240
       D.  Legal Representation Models……………………………………………………..241
       E.  The Future of Representation of Detained Asylum Seekers in
       Expedited Removal Proceedings……………………………………………………. 250

Appendices
       Appendix A: I-867AB Record of Sown Statement in Proceedings under Section
       235(b)(1) of the Act……………………………………………………………………. 252
       Appendix B: I-870 Record of Determination/Credible Fear Worksheet…………….254
       Appendix C: Affirmation Asylum Application Outcome and Representation Status
       by Asylum Office, FY 2000-2003……………………………………………………… 260
       Appendix D:  EOIR Legal Orientation Program DHS Briefing – July 20, 2004……. 261
       Appendix E: CCA Laredo Legal Assistance Documents……………………………. 273
       Appendix F: Exclusion Flow Chart…………………………………………………… 275
       Appendix G: Law Library and Related Resources……………………………………276
       Appendix H: Responses of Alberto Gonzales, Nominee to be Attorney General, to
       Questions of Senator Kennedy (Legal Orientation Program)………...…..................278

STATISTICAL REPORT ON EXPEDITED REMOVAL, CREDIBLE FEAR, AND WITHDRAWAL,
FY 2000-2003.
Cory Fleming and Fritz Scheuren

Preface………………………………………………………………………………….285

Descriptive Summary…………………………………………………………………….286

Sources and Limitation………………………………………………………………….292

Table Sets……………………………………………………………………………….294

STATISTICAL REPORT ON DETENTION, FY 2000-2003.
Cory Fleming and Fritz Scheuren

Preface………………………………………………………………………………….327

Descriptive Summary…………………………………………………………………….328

IFR_AR_008175

Sources and Limitations………………………………………………………………..334

Table Sets…………………………………………………………………………………336

STATISTICAL REPORT ON IMMIGRATION COURT PROCEEDINGS, FY 2000-2004.
Susan Kyle, Cory Fleming, and Fritz Scheuren

List of Basic Table Sets…………………………………………………………………..386

Preface…………………………………………………………………………………397

Descriptive Summary…………………………………………………………………389

Sources and Limitations…………………………………………………………………416

References………………………………………………………………………………...418

SELECTED STATISTICAL ANALYSES OF IMMIGRATION JUDGE RULINGS ON ASYLUM
APPLICATIONS, FY 2000-2003.
Patrick Baier

Preface…………………………………………………………………………………422

1.    Introduction……………………………………………………………………424

2.    Expedited Removal Data………………………………………………………424

3.    Acceptance Rates………………………………………………………………426

4.    Analysis of Variance (ANOVA)…………………………………………………429

5.    Sum of squares decomposition………………………………………………...432

6.    Conclusion……………………………………………………………………...441

References………………………………………………………………………………443

IFR_AR_008176

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

# EVALUATION OF CREDIBLE FEAR REFERRAL IN EXPEDITED REMOVAL AT PORTS OF ENTRY IN THE UNITED STATES

## FEBRUARY 2005

Allen Keller, M.D.[1,2], Andrew Rasmussen, Ph.D.[1,2], Kim Reeves[1,2], & Barry Rosenfeld, Ph.D.[2,3]

1    Bellevue/NYU Program for Survivors of Torture, New York, NY
2    New York University School of Medicine, New York, NY
3    Fordham University Department of Psychology, Bronx, NY

IFR_AR_008177

TABLE OF CONTENTS

Overview........................................................................................................3

Background....................................................................................................4

I.    Study Methodology ................................................................5
      Participants........................................................................8
             Basis for Secondary Inspection and Case Outcome ...........................9
             Use of Interpreters and Bilingual Officers.........................................10
             Representativeness of Study Samples................................................11

II.   Use and Adherence to the I-867 Format ................................13
      Relation to Credible Fear Referrals .......................................17
      Confirming Statements Made in Secondary Inspection Interviews...........18

III.  Expressing Fear and Referral................................................20
      Officers Encouraging Aliens to Retract their Fear Claims ...............23

IV.   Understanding the Result of Secondary Inspection Interviews ...................25

V.    Officers' Behavior During Secondary Inspection Interviews ...................26

VI.   Discussion of Findings ........................................................28
      Study Limitations..............................................................31
      Conclusion .......................................................................33

References Cited ...........................................................................35

Appendices...................................................................................36
      Appendix A: Demographic Characteristics of Samples ...........................36
      Appendix B: Participant Cases Versus Non-participant Cases.................37
      Appendix C: Data Analyses Excluding San Ysidro .............................40
      Appendix D: Aliens Who Expressed a Fear and Were Not Referred.................43

IFR_AR_008178

OVERVIEW

Between May and July of 2004, the Bellevue/NYU School of Medicine Program for Survivors of Torture conducted a study of Credible Fear referral in the Expedited Removal process.  Section 605 of the International Religious Freedom Act of 1998 authorized the United States Commission on International Religious Freedom (USCIRF) to appoint experts to study the treatment of asylum seekers subject to Expedited Removal.   Pursuant to this authority, the Commission appointed Dr. Allen Keller as the "lead" expert with regard to monitoring ports of entry.  Under Dr. Keller's supervision, and employing a methodology developed by the authors of this report in consultation with the other experts appointed by the Commission, two dozen trained research assistants observed more than 400 cases over several months in seven ports of entry (airports and border crossings) in the continental United States. The study integrated data from observations of Secondary Inspection interviews, independent interviews with aliens conducted by our research staff, and a review of official records from these interviews (A-files). A draft of this report was reviewed by Customs and Border Protection (CBP) administrators and port directors, and their comments were used in making revisions.

Our findings suggest that when procedures are followed, appropriate referrals are more likely to be made. However, there was frequent failure on the part of CBP officers to provide required information to aliens during the Secondary Inspection interview and occasional failures to refer eligible aliens for Credible Fear interviews when they expressed a fear of returning to their home countries. In addition, researchers noted a number of inconsistencies between their observations and the official records prepared by the investigating officers (A-files). Finally, on a handful of occasions, researchers observed overt attempts by CBP officers to coerce aliens to retract their fear claim and withdraw their applications for admission.

The results of this study shed light on the first three of the four questions posed to the Experts by the Congress in Section 605 of IRFA.  Those questions are, whether immigration officers exercising authority pursuant to the Expedited Removal provisions (Section 235(b)) of the Immigration and Nationality Act are, with respect to aliens who may be eligible for asylum, (1) improperly encouraging such aliens to withdraw their applications for admission; (2) incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution; (3) incorrectly removing such aliens to a country where they may be persecuted; or (4) are detaining such aliens improperly or under inappropriate conditions.

IFR_AR_008179

BACKGROUND

In 1996, the United States Congress passed the Illegal Immigration Reform and Immigration Responsibility Act. One of the results of this law was the creation of the Expedited Removal process for aliens entering the country by fraudulent means, misrepresentation, or without proper travel documents.  The Expedited Removal process, which was implemented in April of 1997, was intended to expeditiously identify and remove improperly documented aliens at ports of entry but, at the same time, ensure that bona fide asylum seekers would have access to an asylum hearing (GAO, 2000). All aliens entering the U.S. without proper travel documents or under fraud or misrepresentation are subject to immediate return (Expedited Removal) and are subsequently barred from entering the U.S. for a minimum of five years. However, if at the port of entry (i.e., during the Secondary Inspection interview) the alien states that he/she wishes to seek asylum or expresses fear of returning to the country he or she left, then the person is entitled to further consideration to determine the validity of his or her claim. This process begins with a referral for a Credible Fear interview with an asylum officer, who is charged with assessing the legitimacy of the alien's claimed fear. This initial screening process at ports of entry has been the subject of debate among legal scholars and human rights activists.

One of the primary concerns raised by critics of the Expedited Removal process is the possibility that individuals with a genuine asylum claim may not be identified by the screening procedures and will be erroneously returned to their native country, possibly facing further danger or even death (U.N. High Commissioner for Refugees, 2003). Human rights organizations have provided anecdotal reports of individuals fearing persecution who were removed at the time of entry into the U.S. (ABA, 2004; Lawyers Committee for Human Rights, 2000), and several lawsuits have been brought alleging mistreatment at ports of entry (Wang, personal communication, July 2004). The General Accounting Office (GAO) reviewed 365 case files randomly selected from 47,791 fiscal year 1999 case files of aliens who attempted entry at Los Angeles, John F. Kennedy, and Miami airports, and San Ysidro border station and were charged under the Expedited Removal provisions (GAO, 2000). Although this study showed that inspectors at these ports generally complied with established procedures, the reliance on archival data (i.e., official records or A-files) presupposes that official records provide a reliable account of the actual procedures, behaviors and interactions that occurred.

The present study was designed to overcome some of the limitations of GAO's methodology by integrating observational data and independent interviews in order to analyze the practices of Department of Homeland Security (DHS), Customs and Border Protection (CBP) officers at airport and land port border crossings across the U.S. This represents the first systematic study of the Expedited Removal process using direct observations of CBP officers and aliens during Secondary Inspection interviews and comparing these data with the official records generated from these interviews. The goals of this study were to assess the extent to which existing procedures enabled the identification of aliens with a credible fear of returning to their home country, to assess potential obstacles to accurate identification, and to assess the accuracy of data contained in the official records of these interviews. CBP administrators and port directors were consulted in the implementation of the study (e.g., optimal hours for collecting data) and, after reviewing a draft of the report, provided feedback.

IFR_AR_008180

I.    STUDY METHODOLOGY

Data were collected from seven sites across the country: Atlanta Hartsfield International Airport, Houston International Airport, John F. Kennedy International Airport (JFK), Los Angeles International Airport, Miami International Airport, Newark Liberty International Airport, and the San Ysidro Border Station. These sites were selected because of both the high volume of Secondary Inspections conducted and to obtain a representative cross-section of aliens entering the U.S. Across these sites, four sources of data were collected, some of which were integrated for subsequent analysis and others that were analyzed separately. Data collection involved a) observation of Secondary Inspection interviews conducted by CBP officers at several ports across the U.S. (JFK, Los Angeles, Miami, Newark, and San Ysidro), b) observation of videotaped Secondary Inspection interviews (Atlanta and Houston), c) interviews with aliens following a completed Secondary Inspection interview but prior to ultimate disposition (at JFK, Los Angeles, Miami, Newark, and San Ysidro), and d) review of official documents generated by CBP officials for all aliens who were interviewed or observed at the above-named locations (all sites). The decision to use live observation versus videotape was based on the availability of videotaped interviews at the sites as well as the amount and type of access provided to research staff.[1] When videotaped observations were reviewed, we provided extra videotapes to the ports of entry in order to permit retention of those videotapes that had been coded in case further review was necessary.[2] Prior to initiating data collection, the observational rating scale developed for this study was pilot-tested using videotaped Secondary Inspection interviews conducted at Houston International Airport. Because study investigators were prohibited from interfering with the tasks of CBP officers, no data were collected directly from the CBP officers (i.e., we did not interview officers about their opinion or decision-making).

In order to complete this large, multi-site research project, 26 research assistants were recruited and trained by the Principal Investigators (Drs. Keller and Rosenfeld), Project Coordinator (Dr. Rasmussen), and Site Supervisor (Ms. Reeves). Research assistants were recruited from local universities and graduate schools, and participated in an initial two-day orientation and training regarding immigration policies, study goals, past research findings, and the instruments and design involved in the current investigation. In addition, on-site supervision was provided on a regular basis by supervisory staff (Dr. Rasmussen and Ms. Reeves) in order to supplement this initial training and address general and site-specific research issues that arose during the course of the study. Efforts were made to recruit researchers that had experience with social and policy research, and were fluent in languages relevant to the particular ports of entry. In addition to English, the languages spoken by research staff included Spanish, French, Mandarin, Haitian Creole, Farsi, Serbo-Croatian, and German. When research interviews required fluency in a language that was not spoken by the available study personnel, telephonic interpreters were used. Study design logistics are presented in Table 1.1.[3]

---

[1] We requested permission to videotape all interviews at each site. Unfortunately, approval was given by DHS after data collection had already been completed at most sites.

[2] Standard procedure at both Atlanta and Houston was to retain videotapes for 90 days in case a need for review arose (although review reported to be extremely rare). All tapes were re-used after this 90 day period.

[3] Because this study presents data that concern individuals who may be in danger if they are identified or have been returned to their country of origin, data are presented with as little identifying information as possible.

IFR_AR_008181

Table 1.1: Study Design

| Study Site | Data | Study Period (# Weeks) | Number of Cases |
|---|---|---|---|
| Atlanta Int'l Airport | Video Obs. | All videotaped interviews conducted from May 30 to June 7, 2004 were reviewed | 43 |
| Houston Int'l Airport | Video Obs. Interview | A random subset of all videotaped interviews conducted from May 4, 2004 to June 20, 2004 were reviewed | 27 |
| JFK Int'l Airport (JFK) | Direct Obs. Interview | June 16 to July 7, 2004 (3 wks) Weds-Mon, 2pm-10pm | 13 |
| Los Angeles Int'l Airport | Direct Obs. Interview | July 7 to 25, 2004 (3 wks) Weds-Mon, 2pm-10pm | 27 |
| Miami Int'l Airport | Direct Obs. Interview | May 19 to June 27, 2004 (6 wks) Thurs-Mon, 6am-10pm | 110 |
| Newark Int'l Airport | Direct Obs. Interview | May 5 to June 13, 2004 (6 wks) Weds-Sun, 2pm-10pm | 32 |
| San Ysidro Border Station | Direct Obs. Interview | May 26 to July 5, 2004 (6 wks) Weds-Sun 9am-10pm | 191 |

Research assistants monitored the study sites for over 1500 hours, generating data on several hundred cases (described in detail below). The amount of time spent collecting data and the number of staff available varied across sites, ranging from a minimum of two researchers at Atlanta for a two-week period to a maximum of six researchers at Newark, Miami, and San Ysidro for six-week periods at each site. In all ports where live observation and interviews were conducted, staff were present during the hours and days in which the maximum volume of Secondary Inspections were conducted. As a result of space constraints and concerns about interference with port operations, USCIRF agreed to CBP requests to limit both the number of research assistants who could be present in a given site at any time, as well as the number of weeks that research staff could collect data.

National estimates of the number of aliens sent to Secondary Inspection per year approximate 10 million, and 90 percent of these individuals are ultimately allowed to enter the U.S. after being processed through an initial triage, usually at a counter in a large waiting room (Congressional Research Service Analysis of INS Workload Data, 2004). Our focus was confined to the 10 percent not allowed past this triage stage—i.e., those sent to Secondary Inspection interviews. Research assistants observed as many Secondary Inspection interviews that time and personnel restrictions allowed (provided they were informed that these interviews were occurring), and conducted independent interviews with aliens after the Secondary Inspection interviews were complete whenever possible. The length of observations ranged from 3 to 386 minutes, with an overall average of 54 minutes, although there was considerable variation across ports of entry. Interviews averaged 18 minutes at San Ysidro (range: 3 to 150) compared to 2 hours and 53 minutes at Houston (range: 79 to 380). Post-inspection interviews lasted, on average, one hour each. Roughly 10 percent of all observations were observed simultaneously by two researchers in order to assess the reliability of the ratings generated. Variables that could not be reliably rated were not used in subsequent data analysis (described below).

In sites where live observation was used to collect data (JFK, Los Angeles, Miami, Newark, and San Ysidro), aliens were asked to consent to allow research assistants to observe the Secondary Inspection interview.  Of the aliens who were asked to consent to live

IFR_AR_008182

observations, only two (0.4 percent) refused to allow an observer to be present. A substantially larger proportion of aliens refused to consent to an individual interview after completion of the Secondary Inspection interview, as 64 of the 266 aliens (24 percent) approached refused. The most common reason cited for refusing to participate in an individual interview was feeling tired (n=8), although 21 people did not offer an explanation for refusing to participate in the research interview. Because researchers at Atlanta and Houston reviewed videotaped Secondary Inspection interviews that had already been completed, no individual interviews were conducted at Atlanta and only four were conducted at Houston. Once interviews or observations were complete, researchers requested official immigration files (A-Files) prepared on the basis of these same secondary interviews in order to compare the A-Files of the Secondary Inspection interview and the direct observations of our research team. Thus, a maximum of three data sources were available for analysis: observation (direct or videotaped) of the Secondary Inspection interview, independent interview with the alien and official records produced on the basis of the Secondary Inspection interviews (A-files).

Although the study methodology centered around obtaining a consecutive sample of Secondary Inspection interviews conducted at the research sites, we deliberately under-sampled Mexican cases processed at San Ysidro. Because of the high volume of Mexicans involved in Expedited Removal at San Ysidro, and the potential for these data to dwarf data collected at the other sites, we included data from only a subset of all Mexican cases and prioritized observations and interviews of non-Mexican aliens. This under-sampling was handled in several ways. First, after collecting observational data on 200 Mexican cases (far exceeding the volume of cases from other sites), we stopped conducting individual interviews with individuals from Mexico in order to focus our resources on interviews with non-Mexican aliens (although direct observation of Secondary Inspection interviews continued). Second, in order to reduce the disparity between Mexican aliens and those from other countries, we included only a random subset of these cases in the dataset analyzed (roughly one fourth of all Mexican cases observed; n=150). Finally, a number of analyses were conducted twice, once using the total sample and once after eliminating the San Ysidro sample. The analyses excluding San Ysidro are noted throughout the report and can be found in Appendix C. Thus, although the sample described below still contains a large number of Mexican aliens interviewed or observed at San Ysidro, it contains only a fraction of all Mexican cases for which data were collected.

Logistical difficulties also hindered data collection at some sites. For example, JFK has five terminals that process international flights and most regularly conduct Secondary Inspection interviews at counters rather than in individual rooms. Because these factors presented methodological challenges not present at other sites, we were unable to collect a sufficient amount of data to estimate an accurate picture of the frequency of behaviors and processes at this site. We observed cases at one terminal only (Terminal Four), and scheduled our research assistants to be present during the late afternoon and evening (high traffic periods). Because of the limited number of cases, JFK data are excluded from port-by-port statistical analyses, although they are included in analyses using the total sample.

In several data collection sites (Atlanta, Houston, and San Ysidro), Secondary Inspection interviews (live or videotaped) were observed by two researchers in order to establish inter-rater reliability. At San Ysidro and Houston, two researchers observed every 10th secondary

IFR_AR_008183

investigation interview while at Atlanta every interview was observed by two raters. In total, 93 paired ratings were available for analysis. Inter-rater reliability varied across the data collected with many variables being reliably assessed and others that were more difficult to establish reliable coding. When reliability was unacceptable (Kappa coefficient below .4 or intraclass correlation coefficient below .6), variables were excluded from subsequent data analysis.[4] Of the data reported here, the average inter-rater reliability coefficient for dichotomous variables (Kappa) was .63 (range .42-1.00) and for variables with more than two categories (intra-class correlation coefficients) was .90 (range .65-1.00).

All data were initially entered into an Excel spreadsheet. Supervisory staff (Dr. Rasmussen and Ms. Reeves) monitored data entry, reviewing all data for incorrect entries and comparing 10 percent of all records against original sources to insure data accuracy. Excel spreadsheets were then converted to SPSS for subsequent data analyses.

**Participants**

In total, data were analyzed for 443 different cases across the seven data collection sites. These cases included 404 direct observations of Secondary Inspection interviews (341 live observations and 63 observations of videotaped interviews; because the same data was available from these two sources, these were collapsed into a single "observation" dataset for most analyses) and 194 individual interviews with aliens. Both interview and observation data were available for 155 cases; 39 cases had only an interview with our staff without direct observation of the CBP secondary investigation interview. A-files were available for 435 of these 443 cases (A-files were not provided for 8 cases). Figure 1 presents a schematic representation of the overlap between the three data sources.

Figure 1.1: Participant cases observed and interviewed





---

[4] This process resulted in the exclusion of relatively few variables with the exception of observational ratings of several officer behaviors (described in Section IV), where a moderate number of potential variables were excluded because of inadequate reliability. Much of the difficulty in establishing reliability for these variables was attributable to the low frequency of the behaviors although some were also subjective in nature, increasing the potential variability in rater coding. Variables that were analyzed are found in Section IV of this report.

IFR_AR_008184

Because some important differences emerged across sites while other issues were consistent across all or most sites, data are described in some places for the entire sample and in other instances are reported for specific sites.

Demographics for the three samples are presented in Appendix A. Males comprised 58 percent of the sample. Participants came from 56 countries, although the vast majority originated from Central and South America and the Caribbean (roughly 80 percent). Over half the cases from each sample resulted in an Expedited Removal while another 24 percent were labeled Withdrawals (i.e., the alien voluntarily returned to his or her country of origin without requesting asylum or being banned from re-entry); roughly one sixth of all cases resulted in a referral for a Credible Fear interview. The initial intent of this study was to focus on both Expedited Removal proceedings as well as the processing of aliens bearing documentation from a Visa Waiver Program (VWP) country who were suspected of actually being from a non-VWP country.[5] However, because only a small number of VWP refusal cases (i.e., where an individual bearing documentation from a VWP country was refused entry because of suspected fraud or misrepresentation) were found (n=19), these data were excluded from analyses.[6]

*Basis for Secondary Inspection and Case Outcome*

Because many aliens were unaware of the basis for their Secondary Inspection interview, data on the reasons for Secondary Inspection across the different ports of entry were taken only from cases in which direct observation of Secondary Inspection interviews occurred. Of note, these data were missing in five percent of cases (n=20). The most common reasons for a Secondary Inspection interview included clearly false or missing documents, cases in which the travel visa appeared suspicious or may have misrepresented the alien's intent, or when the alien had overstayed his or her visa during a previous visit to the U.S. Cases in which the CBP officer characterized the alien's documents (passport and/or visa) as false (i.e., were clearly

Table 1.2: Basis for the Secondary Inspection Interviews by Port of Entry

| Port of Entry | Objective | Discretionary | Prior Overstay | Other[a] | Total |
|---|---|---|---|---|---|
| Atlanta | 3 (7.1%) | 17 (40.4%) | 8 (19.0%) | 14 (33.0%) | 42 |
| Houston | 6 (23.0%) | 16(61.6%) | 2 (7.7%) | 2 (7.7%) | 26 |
| Los Angeles | 10 (50.0%) | 4 (20.0%) | 2 (10.0%) | 4 (20.0%) | 20 |
| Miami | 34 (36.2%) | 15 (16.0%) | 36 (38.3%) | 9 (9.6%) | 94 |
| Newark | 16 (53.4%) | 4 (13.3%) | 7 (23.3%) | 3 (10.0%) | 30 |
| San Ysidro | 107 (62.2%) | 52 (30.3%) | 1 (.6%) | 12 (7.0%) | 172 |
| Total | 176 | 108 | 56 | 44 | 384 |

[a] Other reasons included attempting to evade inspection, being arrested during prior visa extensions, and failing to register with immigration authorities on a prior visit.

---

[5] Under the standing interpretation of DHS regulations, aliens who use false passports from visa waiver countries will be returned unless they step forward and identify themselves as asylum-seekers. In contrast, aliens who use other false documents are subject to expedited removal, and must be asked if they have any fear of return before they can be expeditiously removed. (*See* 8 CFR 217.4; DHS Inspector Field Manual Section 15.7 (2003), In re Kanagasundram, BIA Interim Decision 3407 (1999)).

[6] Of the 19 VWP cases observed in the course of this study, three were referred for an "asylum only" interview (i.e., three requested asylum upon interview). Although this sample is small, the findings highlight the possibility that some individuals seeking asylum enter the U.S. bearing documentation from a VWP country.

IFR_AR_008185

fraudulent) or were absent (i.e., no passport) were subsequently classified as "objective" reasons for Secondary Inspection whereas cases in which a legal passport was presented but the CBP officer suspected that the visa did not accurately reflect the alien's intent (e.g., an adult traveling on a student visa who is suspected of intending to remain indefinitely) or that the alien committed a material misrepresentation as "discretionary" reasons for a Secondary Inspection interview. In addition, we categorized Prior Overstay as a separate category since these decisions are often at the discretion of the CBP officer, although the bases for such decisions are typically more objective than cases of misrepresentation. Ports of entry differed in reasons offered for a Secondary Inspection interview, with Houston and Atlanta being more likely to refer aliens based on discretionary reasons than other ports of entry (see Table 1.2).

Case outcome also varied by port of entry. In most ports, Expedited Removal comprised the vast majority of case outcomes although both Atlanta and Houston had much higher rates of withdrawals. The proportion of Credible Fear referrals was also much higher in Miami than in the other ports of entry studied (see Table 1.3).

Table 1.3: Case Outcome by Port of Entry

| Port of Entry | Expedited Removal | Withdrawal | Credible Fear Referral | Total |
|---|---|---|---|---|
| Atlanta | 13 (30.2%) | 30 (69.8%) | 0 | 43 |
| Houston | 11 (40.7%) | 14 (51.9%) | 2 (7.4%) | 27 |
| Los Angeles | 11 (40.7%) | 7 (25.9%) | 9 (33.3%) | 27 |
| Miami | 38 (34.5%) | 34 (30.9%) | 38 (34.5%) | 110 |
| Newark | 12 (37.5%) | 12 (37.5%) | 8 (25.0%) | 32 |
| San Ysidro | 168 (88.0%) | 10 (5.2%) | 13 (6.8%) | 191 |
| Total | 253 | 107 | 70 | 430 |

*Use of Interpreters and Bilingual Officers*

Less than one fifth of all cases (16.7 percent) were processed solely in English (i.e., when the alien spoke English). Cases were processed in 27 other languages, with the most common languages being Spanish (61.6 percent of all cases analyzed), followed by Portuguese (5.7 percent), Mandarin (4.1 percent), Haitian Creole (4.5 percent), and Arabic (1.1 percent). Information regarding the use of interpreters and bilingual officers are presented in Table 1.4 and 1.5. There was only one case processed during the study period in which a non-English speaking alien reported (during the interview with research staff) that no interpreter had been provided despite the inability of the interviewing officer to speak his language, however direct observation of this case did not occur[7].

Table 1.4: Interpreters, Bilingual officers, and interviews in English

| | Frequency | Percent |
|---|---|---|
| Interpreter used | 131 | 30.6 |
| Interview done in English | 79 | 18.5 |
| Interview done by bilingual officer only | 218 | 50.9 |
| Total | 428 | 100.0 |

---

[7] There were two cases where aliens were provided interpreters but only after repeated requests by the alien. In a third case, it is unclear whether an interpreter was provided after repeated requests by the alien.

IFR_AR_008186

Table 1.5: Number of cases and languages in which officers were bilingual

|  | Frequency | Percent |
|---|---|---|
| Spanish | 199 | 91.3 |
| Haitian Creole | 13 | 6.0 |
| Mandarin | 4 | 1.9 |
| Russian | 1 | 0.5 |
| French | 1 | 0.5 |

Types of interpreters used for those cases conducted in a language not shared between officer and alien by ports of entry are presented in Table 1.6. Clearly there were differences across sites, with Miami relying on telephonic interpretation, Atlanta on in-person staff, and Los Angeles, using all methods available.

Table 1.6: Type of Interpreters by Ports of Entry

|  | Atlanta | Houston | Los Angeles | Miami | Newark | San Ysidro | Total |
|---|---|---|---|---|---|---|---|
| Interviewing officer[a] | 2 (6.7%) | 1 (33.3%) | 4 (19.0%) | 2 (4.1%) | 2 (22.2%) | 1 (7.7%) | 12 (9.6%) |
| Another CBP officer | 0 | 1 (33.3%) | 3 (14.3%) | 1 (2.0%) | 1 (11.1%) | 1 (7.7%) | 7 (5.6%) |
| Telephonic interpreter | 0 | 0 | 5 (23.8%) | 46 (93.9%) | 5 (55.6%) | 11 (84.6%) | 67 (53.6%) |
| Airline employee | 3 (10.0%) | 0 | 5 (23.8%) | 0 | 1 (11.1%) | 0 | 9 (7.2%) |
| In-person interpreter | 24 (80.0%) | 0 | 3 (14.3%) | 0 | 0 | 0 | 27 (21.6%) |
| Unknown | 1 (3.3%) | 1 (33.3%) | 1 (4.8%) | 0 | 0 | 0 | 3 (2.4%) |
| Total cases | 30 | 3 | 21 | 49 | 9 | 13 | 125 |

[a]Interviewing officers both interviewed aliens themselves and interpreted for the primary officer

*Representativeness of study samples*

Most ports of entry provided basic demographic and case outcome information for cases that were processed during the study period but were not included in our study. Reasons for the failure to observe a Secondary Inspection interview or conduct a separate interview with the alien included the lack of research investigators on site at the time a case was processed, a volume of cases processed that exceeded the number of study investigators available, or a refusal on the part of the alien to participate in the study. Because the data provided varied somewhat across the study sites, comparisons were made on a port-by-port basis rather than using the aggregated dataset. Moreover, comparison data were not provided prior by Newark, and at Atlanta there was no comparison data because observations included all of the cases that were processed during the study period. Detailed data comparing cases observed during the course of the study versus those cases processed but not observed or interviewed are presented in Appendix B.

Across the sites that provided basic demographic data on Secondary Inspection interviews (Houston, JFK, Miami, San Ysidro), there were no significant differences in the gender or age of aliens who were observed or interviewed by our research staff compared to those processed but not included in our study. Case outcome differed between cases processed and those not observed at some ports of entry but not others. The proportion of Credible Fear referrals in our sample was greater at Miami and San Ysidro compared to cases not studied (i.e., we observed a disproportionately greater number of cases that resulted in a referral for Credible Fear interview) but there were no differences at the other sites. The proportion of Expedited Removals was greater among cases observed compared to those not observed at Houston but did

IFR_AR_008187

not appear to differ at other sites. There were no differences with regard to case outcome between cases included in this study and cases processed but not included at JFK and Los Angeles. Region of origin for aliens included in our study differed from those processed but not included at San Ysidro but not at the other study sites. At San Ysidro, the proportion of aliens from Latin America was lower in our sample than in the group not observed or interviewed, although this discrepancy was deliberate, due to our intentional under-sampling of Mexicans described above. Country of origin data were not available for JFK or Los Angeles. Given the modest, and non-systematic differences (with the exception of region of origin at San Ysidro), the data collected in the present study appears to provide a representative sample of the population of cases processed at these ports during the study period.

Relative to national statistics for 2000-2003 (summarized in Fleming and Scheuren, Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003), our sample includes a higher proportion of women, of Expedited Removal cases at airports, and includes four of the top ten countries of origin for Credible Fear cases for 2000-2003. In addition, the patterns of case outcomes at particular ports of entry were similar.

IFR_AR_008188

## II.    USE AND ADHERENCE TO THE I-867 FORMAT

The I-867A form provides information to arriving aliens concerning the Expedited Removal process, the consequences of providing false information, and the protections given by the U.S. for those individuals fleeing persecution. The I-867B form consists of questions designed to assess whether or not the alien has any fear of returning to his or her country—the "fear questions." CBP Expedited Removal Training Materials (September, 2003) state that "Form I-867A&B must be used in every case in which an alien is determined to be subject to Expedited Removal. It is <u>not</u> an optional form" (p. 15; emphasis in original). Box 2.1 reproduces the text provided in the I-867A and B forms.

Box 2.1: Information that officers are obliged to read to aliens

| I-867A | 2nd paragraph | You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, barred from reentry for a period of 5 years or longer. |
|---|---|---|
| | 3rd paragraph | This may be your only opportunity to present information to me and the Immigration and Naturalization Service [sic.] to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future. |
| | 4th paragraph | U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear. |
| I-867B Fear Questions | Question 1 | Why did you leave your home country or country of last residence? |
| | Question 2 | Do you have any fear or concern about being returned to your home country or being removed from the United States? |
| | Question 3 | Would you be harmed if you are returned to your home country or country of last residence? |

Although reading the I-867A form is a required element of every Secondary Inspection interview in which Expedited Removal will be applied, we observed many cases in which the requisite information was not provided to the alien. In many other cases the alien was simply handed a photocopy containing the necessary information but was not read the information or offered any further explanation (see Table 2.1). The column labeled "Not read but presented in text" refers to cases in which the I-867A form was given to the alien without instructions or explanation of its content (i.e., placed in front of them). This was a common practice at Houston, which accounted for virtually all of the cases in which this material was presented in written form (see Table 2.1).

IFR_AR_008189

Table 2.1: Information conveyed and questions asked from the I-867A and B forms

| Obligatory Statements | Read or Paraphrased | Observation Not read | Not read but presented in text | A-File Question/response in record | Question/response not in record |
|---|---|---|---|---|---|
| I867A 2nd paragraph | 278 (75.3%) | 72 (19.5%) | 19 (5.1%) | -- | -- |
| I867A 3rd paragraph | 206 (56.0%) | 142 (38.6%) | 20 (5.4%) | -- | -- |
| I867A 4th paragraph | 164 (44.1%) | 188 (50.5%) | 20 (4.5%) | -- | -- |
| I867B: Why did you leave...? | 325 (89.8%) | 37 (10.2%) | -- | 376 (95.2%) | 22 (5.5%) |
| I867B: Do you have any fear...? | 336 (94.1%) | 21 (5.9%) | -- | 379 (95.2%) | 19 (4.8%) |
| I867B: Would you be harmed..? | 311 (87.1%) | 46 (12.9%) | -- | 379 (95.2%) | 19 (4.8%) |
| I867B: At least one fear question asked | 362 (95.0%) | 19 (5.0%) | -- | 379 (94.8%) | 21 (5.3%) |

To examine the use and adherence to the I-867 format at each port of entry, these figures were obtained for each port of entry. Table 2.2 presents the same information as Table 2.1 port-by-port.[8]

Table 2.2: Information presented from the I-867A and B forms by Port of Entry

| Item Read or Paraphrased | Atlanta | Houston | Los Angeles | Miami[9] | Newark | San Ysidro |
|---|---|---|---|---|---|---|
| I867A 2nd paragraph | 37 (94.9%) | 22 (91.7%) | 12 (75.0%) | 86 (97.7%) | 19 (67.9%) | 120 (69.4%) |
| I867A 3rd paragraph | 35 (89.7%) | 23 (95.8%) | 12 (75.0%) | 87 (97.8%) | 14 (50.0%) | 55 (32.2%) |
| I867A 4th paragraph | 35 (89.5%) | 23 (95.8%) | 11 (68.8%) | 86 (96.6%) | 13 (46.4%) | 17 (9.7%) |
| Why did you leave..? | 34 (91.4%) | 20 (87.0%) | 17 (85.0%) | 71 (98.6%) | 25 (83.3%) | 157 (88.2%) |
| Do you have any fear..? | 34 (89.5%) | 22 (91.7%) | 18 (90.0%) | 69 (97.2%) | 29 (96.7%) | 163 (94.2%) |
| Would you be harmed..? | 33 (89.2%) | 20 (83.3%) | 17 (85.0%) | 70 (98.6%) | 26 (86.7%) | 144 (82.8%) |
| At least one fear question asked | 34 (91.4%) | 22 (91.6%) | 18 (90%) | 95 (96.9%) | 29 (96.7%) | 169 (94.4%) |

Rates of reading information in the three paragraphs of the I-867A form varied across ports of entry,[10] as did the rate associated with asking the third fear question ("Would you be harmed...?").[11] While rates for conveying this information were lower in Newark and Los Angeles than Miami, Houston and Atlanta, the lowest rates of compliance with I-867 requirements were observed at San Ysidro. At this site, aliens were read the 2nd paragraph from

---

[8] The number and corresponding percentages vary somewhat because of missing data.

[9] Language limitations of research assistants resulted in a number of missing cases for this variable at Miami.

[10] Categorical association was measured using chi-square analysis; $\chi^2$=36.12, p<.001; $\chi^2$=121.70, p<.001; and $\chi^2$=213.09, p<.001; for the 2nd, 3rd, and 4th paragraphs, respectively.

[11] Categorical association was measured using chi-square analysis; $\chi^2$=12.75, p<.05

IFR_AR_008190

the I-867A form in roughly two thirds of all cases but only one in ten aliens were read the 4th paragraph pertaining to U.S. providing protection to those fleeing persecution.[12] San Ysidro personnel reported (after data collection had been completed) that staff periodically show an informational video that contains I-867A content (in both Spanish and English) to aliens awaiting Secondary Inspection in lieu of reading the information. San Ysidro personnel reported that officers are expected to read the I-867A to the alien when this video is not shown. Because this video was not observed by our research staff, we could not determine whether aliens watched this video when officers did not read the I-867A, and there is no information in A-files to indicate whether or not the video was shown. Moreover, it is not clear if officers conducting Secondary Inspection interviews are aware of whether or not this video has been shown to an alien when they begin their Secondary Inspection interviews. For subsequent analyses, we compared those cases in which the officer was observed to read the I-867A information versus those that were either not read or presented only with a written copy of the information (consistent with CBP policy and DHS regulations that require officers to read this information to the aliens out loud, IFM 17.15(b)(2003) and 8 CFR 235.3(b)(2)(2004)).

In order to judge whether officers' adherence to the I-867A and B differed when a live observer was present versus when observations were videotaped, we compared data from videotaped observation sites (Atlanta and Houston) to those where live observation was used. Contrary to our expectation that the presence of study interviewers would result in greater compliance with established policies, two of the three I-867A paragraphs (the 2nd and 4th) were actually read more often in videotaped observations compared to direct observation.[13] There was no significant difference in the rates of asking the I-867B fear questions. These findings were largely unchanged when data from San Ysidro were excluded (see Appendix C).

Officer utilization of the I-867B questions was substantially greater than provision of the I-867A information, as these questions were only omitted in between six and 13 percent of all cases (see Table 2.1). However, despite the observation of a number of cases in which the I-867B Fear questions were not asked, official documents prepared during these interviews (A-files) indicated that questions were asked and answered in most of the cases in which our research team did not observe any such questioning (see Tables 2.3-2.5). Notably, in some cases where the file did *not* indicate that the question had been asked or answered, our observers documented that the question had actually been asked. In 37 of 356 cases observed, the first question regarding why the individual left his or her home country or country of last residence was not read to the individual being interviewed (data were missing in 48 cases). Yet in 32 of those 37 cases (86.5 percent), the A-file incorrectly indicated that the question had been asked and answered. Of note, there was no indication in any of these files that this question was deliberately omitted because the information had been offered spontaneously during an earlier portion of the interview. Moreover, for the subset of these 37 cases in which a second researcher observed the same interview, both observers agreed that the question had not been asked.

---

[12] All but 10 cases in the study sample at San Ysidro were subject to Expedited Removal proceedings. While there are ports of entry that regularly provide I-867 material to Withdrawal cases, there is some disagreement whether or not this practice is required. In any case, the 10 cases at San Ysidro (which were not provided I-867 information) are too few to substantially influence study results.

[13] The association between observation type and proportion of cases in which I-867A information was read to the alien was analyzed using the chi-square test of association; $\chi^2$=5.38, p < .05; $\chi^2$=0.37, p = .54; and $\chi^2$=6.61, p < .01 for the 2nd, 3rd, and 4th paragraphs, respectively.

IFR_AR_008191

Table 2.3: "Why did you leave..."

|           |     | Question in file | | Total |
|-----------|-----|------------------|----------|-------|
|           |     | Yes | No | |
| Question  | Yes | 304 (95.3%) | 15 (4.7%) | 319 |
| observed  | No  | 32 (86.5%) | 5 (13.5%) | 37 |
| Total     |     | 336 | 20 | 356 |

Table 2.4: "Do you have any fear..."

|           |     | Question in file | | Total |
|-----------|-----|------------------|----------|-------|
|           |     | Yes | No | |
| Question  | Yes | 324 (98.2%) | 6 (1.8%) | 330 |
| observed  | No  | 10 (47.6%) | 11 (52.4%) | 21 |
| Total     |     | 334 | 17 | 351 |

Table 2.5: "Would you be harmed..."

|           |     | Question in file | | Total |
|-----------|-----|------------------|----------|-------|
|           |     | Yes | No | |
| Question  | Yes | 300 (98.0%) | 6 (2.0%) | 306 |
| observed  | No  | 34 (75.6%) | 11 (24.4%) | 45 |
| Total     |     | 334 | 17 | 351 |

Because records of Secondary Inspection are relied upon in Credible Fear determinations and subsequent asylum hearings, we looked closely at any information concerning the consistency of A-files and observations of these cases. Although not asked to specifically note inconsistency in case notes, research assistants noted seven cases (out of 69 referred for a Credible Fear interview) in which, upon review of A-files, there were marked differences between what was observed and the information contained in the official records. In five cases considerable detail about the aliens' fears was not present in the A-file despite having been offered by the alien (and in one of these cases the officer specifically instructed the alien not to give details and to simply respond "yes" or "no" to questions). In three cases, the information recorded in A-files was qualitatively different from the responses observed in Secondary Inspection (e.g., one person responded to a fear question that "Falun Gong teaches me to help people" and the file states that this person simply answered "yes"). It should be emphasized that research assistants' notes were not structured to investigate inconsistency between A-file and observations, and therefore these discrepancies are likely to represent a conservative estimate of the actual magnitude of this phenomena.

**Relationship between I-867 and Credible Fear Referrals**

In order to investigate the impact of reading I-867 materials, we explored the relationship between providing this information and Credible Fear referrals. There was no association between whether the interviewing officer read the 2nd paragraph (pertaining to the potential for removal and a 5-year bar on re-entry) and Credible Fear referral. However, Credible Fear referrals were significantly associated with reading the 3rd and 4th paragraphs of the I-867 ("This may be your only opportunity to present information …" and "U.S. law provides protection to certain persons who face persecution, harm or torture …" respectively). These data are detailed in Tables 2.6 and 2.7. For the 3rd paragraph, the likelihood of being referred for a Credible Fear interview was four times greater when the information was read to aliens compared to cases in

16

which this information was not provided.[14] The odds of being referred for a Credible Fear interview increased seven times when the 4th paragraph was read to aliens relative to when it was not.[15]

Table 2.6: Association between 3rd paragraph ("This may be your only opportunity to present information…") and referral for Credible Fear

|  | Referred | Not referred |
|---|---|---|
| Read 3rd paragraph | 51 (24.8%) | 155 (75.2%) |
| Not read 3rd paragraph | 13 (8.0%) | 149 (92.0%) |

Table 2.7: Association between reading the 4th paragraph ("US law provides protection…") and referral for Credible Fear

|  | Referred | Not referred |
|---|---|---|
| Read 4th paragraph | 51 (31.1%) | 113 (68.9%) |
| Not read 4th paragraph | 13 (6.3%) | 195 (93.8%) |

With cases from San Ysidro excluded, associations between reading these paragraphs and referral showed a similar pattern of results, although the associations were no longer statistically significant because of the reduced sample size (see Appendix C).

In order to investigate whether the failure to ask the I-867 questions pertaining to fear had an impact on case outcome, we analyzed rates of referral for a Credible Fear interview among three sub-groups of individuals: those who were asked *both* fear-related questions ("Do you have any fear of returning …" and "Would you be harmed if you returned …"; n=327), those who were asked *neither* of these questions (n=20), and a third group who were asked only one of the two questions (n=35). As evident from Table 2.8, the likelihood of a Credible Fear referral increased with each additional fear question asked.[16]

Table 2.8: Fear inquired about directly by officer

|  | Referred | Not Referred |
|---|---|---|
| Both "Fear" and "Harm" asked | 59 (18.0%) | 268 (82.0%) |
| Either "Fear" or "Harm" asked | 3 (8.6%) | 32 (91.4%) |
| Neither Fear Question asked | 1 (5.3%) | 18 (94.7%) |

Of the 54 cases in which one or both of the fear questions were not asked, only four were referred for a Credible Fear interview. Eighteen of the 19 cases in which neither fear question was read either withdrew their application for admission to the U.S. or were ordered removed; only one was referred for a Credible Fear interview. Of the 35 cases in which one of the two questions were asked, 32 were ordered removed or withdrew their application for admission, and three were referred for a Credible Fear interview. With San Ysidro cases removed from the sample, these effects were roughly comparable (although again, the association was no longer statistically significant). In both the analyses with and without San Ysidro data, the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked (i.e., the

---

[14] This association was measured using the chi-square test of association; effect size was estimated with an odds ratio (OR); $\chi^2$=17.67, $p$<.01, OR=3.77.

[15] This association was measured using the chi-square test of association; effect size was estimated with an odds ratio (OR); $\chi^2$=34.83, $p$ < .001, OR=7.09

[16] Spearman's Rho ($\rho$)=.10, $t$=1.97, $p$ <.05, OR=2.14

IFR_AR_008193

likelihood was 4 times greater for individuals who were asked both fear questions compared to those who were asked neither question).[17]

**Confirming statements made in Secondary Inspection interviews**

The statements taken during Secondary Inspection interviews and recorded in the I-867 form comprise an official record of the content of interviews between officers and aliens. Following the conclusion of the Secondary Inspection interview, aliens are asked to sign a statement attesting that the transcript of the statements made is correct. Confirming the accuracy of the statements is thus a required step for those referred for a Credible Fear interview, since these statements may be introduced as evidence during subsequent proceedings. According to the regulations:

> Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on the Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. 8CFR 235.3(b)(2)(i)

Table 2.9: Observed being asked to confirm statements

|  | Frequency | Valid Percent |
|---|---|---|
| Yes | 319 | 84.4 |
| No | 59 | 15.6 |
| Total | 378 | 100.0 |

Table 2.10: Confirming statements and Referral for Credible Fear

|  | Referred | Not referred |
|---|---|---|
| Asked to confirm | 44 (13.8%) | 275 (86.2%) |
| Not asked to confirm | 15 (25.4%) | 44 (74.6%) |

Overall, 84.4 percent of aliens observed were asked to confirm the truth of statements recorded by officers during Secondary Inspection. However, *every* statement was signed by aliens being interviewed – 15.6 percent were simply not informed of the reason for their signature. Being asked to confirm the truth of their statements was significantly *less* common for individuals who were referred for a Credible Fear interview hearing compared to cases in which the alien was being removed.[18] More than a quarter of all aliens referred for a Credible Fear interview were not asked to confirm their statements, despite the potential use of these statements in subsequent asylum proceedings. With cases from San Ysidro removed, the rate of being asked to confirm statements was lower still (73.3 percent; the association between being asked to confirm statements and Credible Fear referral was not statistically significant when these data were excluded from the analysis; see Appendix C).

We also analyzed whether aliens actually read or had their statements read to them during the process of confirming the statement. In only 28.2 percent of cases, aliens were observed to

---

[17] Ordinal association was measured by Spearman's Rho; $\rho$=.10, $p$=.16; OR=1.91.

[18] $\chi^2$=5.11, $p < .05$, OR=.47. This finding is particularly worrisome given that Credible Fear referrals are precisely those instances in which the sworn statement may become relevant.

IFR_AR_008194

read their statements or had their statements read to them before signing the confirmation.[19] When analyzing only those cases in which aliens were actually asked to confirm their statements (319 cases, or 84.4 percent of all observations), the rate of reading statements is only slightly higher (29.8 percent). Reading statements to aliens was a problem identified at all ports of entry studied. There was no association between being informed of the content of statements and referral for a Credible Fear interview. Of note, when asked during our interviews whether the content of statements was accurate, several of the aliens who reported having read the statements indicated that they had identified errors in their accuracy. Unfortunately, because videotaped interviews were not possible in most ports of entry, and A-file records were not available during the time when research staff reviewed videotaped interviews, it was not possible to compare written statements against the actual interview transcript.

Table 2.11: Were the statements read and by whom

|  | Frequency | Valid Percent |
|---|---|---|
| Alien read statements | 34 | 9.1 |
| Interpreter read statements | 36 | 9.7 |
| Officer read statements | 30 | 8.0 |
| Statements not read | 268 | 71.8 |
| Total | 373 | 100.0 |

---

[19] Despite short Secondary Inspection interviews at San Ysidro, the rate of confirming statements was higher. However, when cases from San Ysidro were excluded the rate of reading statements was also higher, (46.2%; see Appendix C).

IFR_AR_008195

## III.    EXPRESSING FEAR AND REFERRAL

Referral for a Credible Fear interview is triggered when an alien expresses a fear of returning to his or her country of origin. In the process of this study we became aware of a significant discrepancy between DHS Regulations (8 CFR 235.3, 2004) and the CBP Inspectors' Field Manual (CBP, 2003) as to whether or not there are types of fear that need not result in a Credible Fear referral (versus a presumption that *any* expression of fear must result in a Credible Fear referral). Specifically, Federal Regulations require that a Credible Fear referral occur regardless of the nature of the fear expressed. The CBP Field Manual, however, indicates that instances where the fear would clearly not qualify an individual for asylum need not necessarily be referred. Because this study could not resolve these complex policy issues, we sought to analyze the relationship between Credible Fear referrals and the nature of fears expressed by the aliens.

Among all cases for which data were available, we identified 69 cases where a referral for a Credible Fear interview occurred.[20] Interestingly, in two of these cases no fear was expressed during the interview but the individual was referred for a Credible Fear interview nonetheless. Not surprisingly, the likelihood of a Credible Fear referral was significantly higher when an alien expressed some type of fear compared to cases in which he or she did not.[21] However, in roughly one sixth of cases in which an alien expressed a fear of returning to his or her native country, no referral for a Credible Fear interview was made and the alien was either ordered removed or allowed to withdraw his or her application for entry. Of note, these data reflect the combined sample of interview and/or observational data (i.e., including the 39 individuals for whom a research interview was available but were not observed in the secondary investigation interview conducted by CBP). Table 3.1 presents the relationship between expressed fear and Credible Fear referrals. This association was essentially unchanged when San Ysidro cases were excluded (see Appendix C).

Table 3.1: Expressing fear to officer and Referral for Credible Fear Interview

|  | Referred | Not referred |
| --- | --- | --- |
| Fear expressed to officer | 67 (84.8%) | 12 (15.2%) |
| No fear expressed to officer | 2 (0.6%) | 309 (99.4%) |

Twelve individuals who expressed a fear of returning to their native country to officers were nonetheless returned without a referral for a Credible Fear interview (i.e., to determine if the fear expressed was sufficiently severe and valid as to warrant an asylum hearing in front of an immigration judge). These cases represented roughly three percent of all cases observed by our research staff but nearly one sixth of all cases in which a fear was expressed to officers. In seven of these 12 cases, the A-file did not indicate that any fear had been expressed. These 12 cases were no more or less likely to have been read I-867A information, or to be directly asked about their fear. In addition, there were 10 cases in which aliens expressed fear during our research interview when they had not mentioned any fear to the interviewing officer when asked.

---

[20] This total did not include the 3 "Asylum Only" referrals of individuals arriving from Visa Waiver Program countries.
[21] Categorical association was measured using chi-square analysis and effect size estimated with an odds ratio (OR); $\chi^2=306.47$, $p < .0001$, $OR=862.63$

IFR_AR_008196

All of these individuals, when asked if they wanted to alert the CBP officer of their fear, declined (these cases are thus not included in among "Fear expressed to officer" in Table 3.1).[22]

In response to CBP concerns that aliens may be "prompted" to express fears to officers by the I-867B fear questions, we further examined A-files of the 79 cases in which aliens were observed to express fear directly to officers. For six cases, either A-files were missing Q & A records (n=4) or the entire A-files were missing at the time of review (n=2). For 73 cases we were able to determine whether or not fear was expressed before the I-867B questions had been asked, or was only stated in response to the fear questions. According to A-files, 50 of these individuals (63.3 percent) spontaneously expressed a fear of returning to their home country during the question and answer session or in response to the question "Why did you leave your home country or country of last residence." Three quarters of these (n=38), however, had been told that US provides protection to persecuted individuals (i.e., they were read the 4th paragraph of the I-867A). In another 17 cases (21.5 percent) aliens' fear claims appear in records only in response to asking directly about fear, and for six cases, no fear was recorded in the A-files (these individuals were all returned to their countries of origin). It should be noted that interpreting these findings as evidence that most aliens (at least two-thirds) who claim fear are not prompted by the fear questions must be done in light of our previous findings of considerable discrepancies between direct observation and the A-files (see Section II). Nevertheless, there was little evidence that aliens are prompted to claim fear by the I-867 information and questions.

Types of fear expressed by those individuals who expressed a fear to officers are presented in the Table 3.2, and abbreviated descriptions of the 12 individuals who expressed fear yet were not referred for a Credible Fear interview, as well as the ten individuals who expressed fear to our research assistants only, are provided in Appendix D. It should be noted that among the countries to which the 12 aliens who expressed fear were returned, five of them (of nine) are noted to have extrajudicial killings and human rights abuses in recent reports from the US Department of State and Amnesty International, and two of the countries have significant limitations on religious expression as cited in reports by the US Commission on International Religious Freedom.[23]

---

[22] Seven of the ten individuals who expressed fear in the research interview but did not express their fear to interviewing CBP officer were asked to explain why they withheld this information. Two with a fear of economic hardship reported that their understanding of the officers' questions were that they pertained only to "physical damage" and "life being in danger." A third with an economic fear stated that he though the officers would not care and were going to deport him anyways. A woman who was afraid for her sick child reported that she thought "there was nothing [the officer] could do about" her situation. Another reported that he thought he actually had informed the officer of his fear but then declined the opportunity to relate his fear to the officers when given the opportunity. Two did not provide an explanation as to why they did not inform the officer of their fear, although both expressed considerable distrust of the interviewing officers. One indicated a belief that the officers were lying to him and the second reported that officers "screamed" at her while she was waiting for her interview and that they were "very inconsiderate" during the interview (the research assistant observing the interview corroborated this report, noting that an officer in the secondary waiting area was "sarcastic, demeaning" and "repeatedly shouted at her"). Three cases were missing information as to why they did not express their fear.
[23] Because of concerns about the confidentiality of the participants, the countries are not identified—regions of origin for these participants are presented in Appendix D.

IFR_AR_008197

Table 3.2: Expressed Fear for those referred to a Credible Fear Interview

|  | Referred | Not referred |
|---|---|---|
| Political Persecution | 29 (43.3%) | 1 (8.3%) |
| Coercive Family Planning | 5 (7.5%) | 0 |
| Religious Persecution | 9 (13.4%) | 0 |
| Membership in a Particular Social Group[a] | 9 (13.4%) | 1 (8.3%) |
| Nationality | 2 (3.0%) | 0 |
| Race | 2 (3.0%) | 0 |
| Not Specified | 4 (6.0%) | 3 (25.0%) |
| Economic Hardship | 2 (3.0%) | 3 (25.0%) |
| Other | 5 (7.5%) | 4 (33.3%) |
| Total | 67 | 12 |

[a] This includes domestic violence and female genital mutilation.

In many of the cases in which fear was expressed during the Secondary Inspection interview but no referral was made, the nature of the fear expressed may not have been sufficient justification for an asylum hearing.[24] For example, three of the 12 cases in which aliens expressed fear directly to officers involved fears that were best characterized as economic hardship and one individual expressed a "fear" that concerned the health of a family member living in the U.S. However, two individuals articulated fears that may have formed the basis for a legitimate asylum claim, such as a fear of the government or concern about persecution by religious fundamentalists (one of these two individuals eventually declined referral for a Credible Fear interview after a lengthy discussion with interviewing officers).[25] Other cases involved individuals whose fears were more ambiguous, such as cases where the nature of the fear was not described or where the individual expressed fear of harm because of debts owed or using a false passport to leave the country.

In order to gage the prevalence of referring cases which may have formed the basis of an asylum claim, we identified instances involving a clearly articulated fear of political persecution, coercive family planning, religious persecution, persecution based on nationality or racial discrimination, membership in a particular social group (including violence against women). Of the 58 cases that fell into these six categories, two aliens (3.4 percent) were not referred for a Credible Fear interview. In addition, there were seven cases in which the nature of the fear was not specified, and three of these individuals were also returned. When these two groups were combined (i.e., possibly "legitimate" fears based on asylum law and those cases in which the

---

[24] Although our research methodology was not intended to ascertain the "validity" of fears expressed, we attempted to differentiate cases on the basis of the apparent legitimacy of the fears expressed in order to assess whether Credible Fear referral decisions were influenced by similar judgments made by CBP officers.

[25] One man from South Asia characterized himself as a political activist and expressed fear of Islamic fundamentalists who had threatened him in the past. He acknowledged having applied for asylum during a previous visit but had been denied and subsequently removed. The research team observer noted that this individual clearly articulated a fear of returning to his country because of political persecution but also stated that he did not want to be detained. He indicated that he would prefer to return to his country rather than face detention in the U.S. The investigating officer informed the man that he could not be returned if he claimed fear, and was asked a second time whether he indeed feared returning. Upon this second inquiry the man denied having a fear of harm and was subsequently returned. Another individual, a male from Central America, expressed a fear of the government. When the CBP officer asked for more information this man was unable to give further explanation and subsequently retracted his claim. Of note, the A-file from this case indicated that the man's concern pertained to his sons who were U.S. citizens and his wife who was ill. The file noted that his reply to the question about fear of harm was "it could be possible."

IFR_AR_008198

legitimacy of the fear could not be determined due to a lack of information) the rate of return was 7.7 percent (five of 65).[26] A more general reading of U.S. Expedited Removal policies, in which anyone answering affirmatively to one of the "fear questions" should be referred for a Credible Fear interview, would result in a substantially higher rate of erroneous removals (roughly 15 percent, 12 of 79).

**Officers encouraging aliens to retract their fear claims**

While most individuals who expressed fear during Secondary Inspection were referred for a Credible Fear interview, there were four cases (all at Houston) in which CBP officers appeared to encourage aliens to withdraw their applications for admission after they had expressed a fear of returning to their home country and one case (at San Ysidro) in which officers encouraged an alien to retract his fear claim and removed him. In two of these cases aliens withdrew their application for entry into the US. One case in which an alien withdrew involved a woman from Central America who spontaneously expressed a fear of her ex-husband, crying and asking the officer to help her. The interviewing officer repeatedly told her that if she did not cooperate she would be "in trouble" and refused to answer her questions. Before asking the I-867B fear questions, the officer warned her that she would not see her family for a long time if she made a fear claim. The A-file indicated that the alien's response to being asked about fear was, "Not a real fear. My ex-husband does not like me." Another woman from Central America claimed a fear but did not specify the basis of that fear. The CBP officer handling the case informed her that she needed to state a reason for her fear and added "we can't let everybody in." The alien asked how long she would be in custody and what would happen to her son. The officer reportedly responded, "If you say you're afraid you will go into detention for an unknown number of days until you have a hearing" and that she would not be able to have contact with her son (who lived in her home country).

Two other aliens were encouraged to retract their fear claims but did not and were ultimately referred for a credible fear interview. In one case a CBP officer told an African man that because he had tried to obtain an R-1 (Religious Worker) Visa, he *must not* have a fear of returning to his native country. This man had already expressed a fear of government officials because of his prior associations with Americans working in his country of origin. In addition, officers described in detail negative aspects of detention and repeatedly asked whether he had a fear of returning (despite his having already expressed such a fear), seemingly attempting to elicit a different (negative) response. The man maintained his request for admission and was eventually referred for a Credible Fear interview. Another potential withdrawal case involved a Central American man who feared being harmed by his in-laws, who had threatened him repeatedly. The officer told him, "What you are experiencing is a personal problem, not one the US offers people asylum for" and that "I know for sure you will be deported." The officer then told the alien that if he claimed fear he would be in detention for three months. The alien maintained his claim and was referred.

---

[26] Extrapolating from our sample, the "error rate" among expedited removal cases at these ports of entry (which are the busiest in the U.S.) , using this more conservative estimate and excluding cases that appear unlikely to justify a legitimate asylum claim, would likely fall between 1 and 13 percent (95% confidence interval: .01, .13).

IFR_AR_008199

There was one case in which officers encouraged an alien to retract his fear and then removed him via Expedited Removal (i.e., without the option of withdrawing). This South Asian man (who is referenced above in footnote 25) was a political activist and feared of Islamic fundamentalists who had threatened him in the past. He had reportedly applied for asylum during a previous visit but his application had been denied and he was subsequently removed. He clearly articulated a fear that "enemy parties would kill" him, stated that he also feared being detained in the US, and asked the officer for advice. The officer said she could not help him make a decision and that he had already taken up too much of her time. The supervisor told the officer to ask the "fear" question again and the alien then said no. The officer told him that he would be processed for removal, not for political asylum because he already asked for political asylum and had been denied.

In addition to the cases described above, there were cases in which CBP officers told aliens about other negative consequences of pursuing asylum claims that could have been prohibitive. Two were told that because they entered illegally they might not have a chance to present their cases. Five were told they would be held in detention for three weeks or more and three of these were told that detention would last at least one month. Because it was sometimes difficult to differentiate between appropriate factual responses to alien questions and deliberate attempts to discourage fear claims, we did not consider these disclosures to reflect deliberate coercion.

In addition to the above incidents, our researchers were informed of two incidents at San Ysidro in which asylum seekers were reportedly turned away at Primary Inspection. Five aliens we interviewed reported having been turned away at the border the previous day. These cases involved two African men and one African woman who claimed to be fleeing political persecution and two Middle Eastern man expressing fears of religious persecution by "people in power." These aliens reported having approached the CBP officer at Primary Inspection and requesting asylum but being told to "go away." One of the Africans stated that the CBP officer "told us to go back from where we came from," forcing them to return to Mexico. The next day, Primary Inspection officers stopped and handcuffed them briefly until the aliens refused to leave. One African reported that he cried and begged the officer to allow him to enter and all three were subsequently brought to the Secondary Inspection area. A Middle Eastern man described a similar incident, stating that a CBP officer at Primary Inspection refused him entry, telling him that he and his companion would need a Visa in order to proceed. The next day they returned and were brought to the Secondary Inspection area. In all of these cases, a referral for Credible Fear interview was subsequently made, albeit on the second attempt to enter the U.S.

IFR_AR_008200

IV.    UNDERSTANDING THE RESULT OF SECONDARY INSPECTION INTERVIEWS

In our interviews with aliens, research assistants also asked about the individual's understanding of what would happen to them after completion of the Secondary Inspection interview. This question is particularly important because section 17.15(a) of the Inspector Field Manual requires that the inspector "must be absolutely certain…that the alien has understood the proceedings against him or her." Nonetheless, nearly one third of the aliens we interviewed (n=56) reported having no knowledge of what was going to happen to them after the Secondary Inspection interview, despite having signed the statement (see Table 4.1). Understanding of the outcome of their interview did not vary by port of entry.

Table 4.1: Aliens' reports of what will happen to them next

|  | Frequency | Valid Percent |
|---|---|---|
| Expected to be returned to country of origin | 88 | 48.4 |
| Expected to be detained | 12 | 6.6 |
| Expected another interview | 8 | 4.4 |
| Did not know | 56 | 30.8 |
| Other | 12 | 6.6 |
| Expected nothing | 6 | 3.3 |
| Total | 182 | 100.0 |

Aliens' expectations regarding the outcome of their case was not associated with their case outcomes (see Table 4.2). Indeed, many aliens expected to be removed despite the fact that a large proportion of these individuals were actually going to be referred for a Credible Fear interview. More than half of the aliens referred for a Credible Fear interview expected to be returned to their country of origin while only one individual actually expected to have another interview.  Conversely, less than half of the individuals being removed were aware that this would be the outcome of their interview (despite having signed a statement indicating that they had been informed). Even among the subset of individuals who withdrew their application for admission to the U.S., roughly a third did not realize that they were going to be returned to their country of origin. In short, our interviews with aliens revealed considerable confusion about what was going to happen to them and this confusion was present regardless of the actual outcome of the case.

Table 4.2: Aliens' reports of what will happen to them next by case outcome

|  | Credible Fear referral | Expedited Removal | Withdrawal |
|---|---|---|---|
| Expected to be returned to country of origin | 23 (53.5%) | 41 (39.8%) | 24 (66.7%) |
| Expected to be detained | 2 (4.7%) | 8 (7.8%) | 2 (5.6%) |
| Expected another interview | 1 (2.3%) | 6 (5.8%) | 1 (2.8%) |
| Did not know | 11 (25.6%) | 38 (36.9%) | 7 (19.4%) |
| Other | 5 (11.6%) | 6 (5.8%) | 1 (2.8%) |
| Expected nothing | 1 (2.3%) | 4 (3.9%) | 1 (2.8%) |
| Total | 43 | 103 | 36 |

IFR_AR_008201

## V.    Officers' behavior during Secondary Inspection interviews

Research assistants were also instructed to note a number of behaviors that might arise during Secondary Inspection interviews. These behaviors included several behaviors thought to be consistent with aggressive or intimidating interrogation procedures, as well as behaviors that reflected positive or helpful behaviors on the part of the officer.[27] The frequency of these behaviors is presented in Tables 4.3 and 4.4.

Table 5.1: Aggressive or Intimidating Behaviors Observed during Secondary Inspection

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Raising voice | 41 (10.4%) | 13 (19.7%) |
| Interrupting | 40 (10.1%) | 10 (15.2%) |
| Grabbing/threatening touches | 1 (0.3%) | 0 |
| Accusations | 28 (7.1%) | 4 (6.1%) |
| Verbal threats | 20 (5.1%) | 2 (3.0%) |
| Sarcasm/Ridicule | 37 (9.4%) | 7 (10.6%) |
| Being demanding | 36 (9.1%) | 5 (7.6%) |
| Standing over alien | 9 (2.3%) | 1 (1.5%) |
| Leaving room without explanation | 63 (15.9%) | 9 (13.6%) |

Table 5.2: Helpful Behaviors Observed during Secondary Inspection Interviews

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Offering comforting words | 41 (10.4%) | 8 (12.1%) |
| Friendly joking | 61 (15.4%) | 14 (21.2%) |
| Small talk | 44 (11.2%) | 3 (4.6%) |
| Explaining actions | 96 (24.3%) | 16 (24.2%) |

Most of the behaviors characterized as aggressive or intimidating behaviors were observed relatively infrequently, rarely exceeding ten percent of all cases. Helpful behaviors, on the other hand, were more frequent. In addition, our observers noted a number of occasions where interviewing officers engaged in helpful or comforting behaviors that were not systematically coded in the study. For example, research assistants were particularly impressed with a number of the CBP officers in Miami, who appeared to go to great lengths to make the aliens being interviewed more comfortable. On one occasion, an officer interviewing a pregnant Caribbean woman, appeared particularly sensitive to her physical condition and was both reassuring and helpful. At Newark, officers took special care to explain the Credible Fear process to two African men fleeing ethnic violence, and offered refreshments at several points during the interview. At Houston, an officer took time to discuss personal concerns about removal with a woman from South America. At San Ysidro, the Middle Eastern men (discussed above in Section III) were offered refreshments almost immediately after their arrival in the Secondary Inspection area.

However, a number of other aggressive or intimidating behaviors that were not systematically assessed were also noteworthy. For example, while not necessarily inappropriate

---

[27] Some of these behaviors were not reliably coded, either because of ambiguous descriptions or because of exceptionally low frequency, and were excluded from subsequent analyses.

IFR_AR_008202

for criminal aliens, multiple occasions of shackling aliens being processed for Expedited Removal was observed at JFK. This practice was not observed at any other port of entry during the study period. It should be noted that during the preparation of this report, the CBP New York Field Office informed our staff that CBP has since issued clear guidelines as to the use of physical restraint and that shackling is now extremely rare at JFK. In Houston, there were a number of incidents observed (on videotape) that appeared to reflect frankly inappropriate behaviors. One Central American man was told that he was a "woman," and a "sissy," and that he sat "like a girl." In another incident, also at Houston, an officer referred to an alien who was not in the room as a "motherfucker" to a second officer, but in the presence of another alien who was involved in his own Secondary Inspection interview (which was occurring in English).

Of course, it is often difficult to accurately assess the appropriateness of officer behaviors outside of the context in which it occurs. Although not the focus of this study, we also coded aggressive or seemingly inappropriate behaviors on the part of the aliens being interviewed. Although inappropriate behavior on the part of aliens was occasionally noted, these behaviors typically comprised interruptions of the interviewing officers, raised voices, and a demanding tone. We did not observe any aggressive physical behaviors, disruptive behaviors, or threatening behaviors by aliens during the Secondary Inspection interview.[28]

---

[28] It is possible that problematic alien behaviors occurred outside of the Secondary Inspection interview itself. However, our observers, who were present for extended periods of time, did not record any such behaviors.

IFR_AR_008203

## VI.    DISCUSSION OF FINDINGS

Inspectors who work for the Bureau of Customs and Border Protection are the United States' first line of defense at the border, charged with the challenge of ensuring that inadmissible aliens are not permitted to enter. At the same time, inspectors are required to ensure that individuals fleeing persecution, including torture, are offered the opportunity to seek protection, in accordance with U.S. laws and treaty obligations toward refugees and asylum seekers. In guidance in implementing Expedited Removal, the Department of Homeland Security (and its predecessor, the Immigration and Naturalization Service) emphasizes to its inspectors the importance of both of these missions:

> "Because of the sensitivity of the program and the potential consequences of a summary (expedited) removal, you must take special care to ensure that the basic rights of all aliens are preserved, and that aliens who fear removal from the United States are given every opportunity to express any concerns at any point during the process. Since a removal order under this process is subject to very limited review, you must be absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her." (Inspector's Field Manual 17.15(a) (2003)."

Many inspectors who were observed during this study appeared to take this responsibility very seriously. In one particularly busy port of entry, Miami, in all but a very small number of cases observed, officers consistently demonstrated that most required procedures directly relating to the Credible Fear referral process were adhered to (one exception concerned reading sworn statements back to aliens, a problem area for all ports of entry). In other ports, however, inspectors' adherence to these procedures was more variable, with some requirements being fulfilled the majority of the time and others frequently being neglected.

This study is the first systematic evaluation of the Expedited Removal process utilizing direct observation of Secondary Inspection interviews with arriving aliens. This study attempted to address a number of important issues in the Expedited Removal process, including the extent to which required information is being presented to aliens, whether official documents (e.g., A-files) accurately recount the Secondary Inspection interview, and whether a significant risk of erroneous removals of aliens who might otherwise qualify for an asylum hearing exist. Shortcomings observed in this study include the frequent failure on the part of CBP officers to provide required information to aliens during the Secondary Inspection interview, occasional failures to refer eligible aliens for Credible Fear interviews when they expressed a fear of returning to their home countries, inconsistencies between the official records prepared by the investigating officers and the observations made by our research team, and on a handful of occasions, overt attempts to coerce aliens to retract their fear claim and withdraw their applications for admission.

In a large proportion of cases observed, CBP officers did not provide information contained in the I-867A form to aliens who were being processed. For example, in roughly half of all cases observed, officers did not read the obligatory paragraph informing aliens that U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. These statements are particularly important given that many aliens may not

understand the purpose of the Secondary Inspection interview and may not realize that this interview is their primary, if not sole opportunity to express concerns or seek asylum. The importance of these paragraphs is evident in the association between providing the I-867A information and referral for a Credible Fear interview, as individuals who did not receive this information were significantly less likely to be referred for a Credible Fear interview.

Although far less common, the finding that CBP officers did not specifically inquire about fear of returning to their country in approximately five percent of the cases observed may be of even greater concern. Given the potential importance of these questions in eliciting aliens' fears, it is unclear why some officers would fail to ask these questions. Particularly given the length of time typically used in Secondary Inspection interviews at the airports, the failure to ask these important and mandatory questions is simply inexplicable. Not surprisingly, the likelihood of a Credible Fear referral increased with each of the fear questions asked. If officers fail to provide an explanation and opportunity for aliens to express their concerns, this crucial step in the asylum process may not occur.

Even when the alien expressed a fear of return, referral for a Credible Fear interview was not guaranteed. One in six aliens who expressed a fear of return during the Secondary Inspection interview were placed in Expedited Removal or allowed to withdraw their application for admission. However, understanding the failure to refer aliens who expressed fear is complicated by the apparently conflicting positions expressed in different CBP guidelines. While some DHS regulations (8 CFR 235.3(b)(4)) indicate that any alien who expresses a fear must be referred for a credible fear interview, the Inspectors' Field Manual instructs that the case should not be referred if "the alien asserts a fear or concern which is clearly unrelated to an intention to seek asylum or a fear of persecution." Indeed, many of the cases that we observed in which an alien expressed fear but was not referred appeared to be "unrelated to an intention to seek asylum" (e.g., cases in which the alien expressed primarily economic concerns[29]). On the other hand, we observed some cases that appeared to be unequivocal cases of CBP error, returning precisely the sort of individuals that U.S. policy is designed to protect (e.g., a South Asian man who expressed fear of retaliation from religious fundamentalists because of his political affiliation). Although we would not deign to assess the credibility of the claims made by these individuals, it is clear that clarity is needed within CBP as to precisely when referral for a Credible Fear interview is warranted. When only the cases of fears voiced in Secondary Inspections that clearly fell into categories set out by asylum law were analyzed, we found an error rate of 3.4 percent, suggesting that a substantial number of individuals seeking asylum risk being returned, despite expressing a fear of return precisely as they are required (this rate increased to 7.2 percent when cases in which the nature of fear was not articulated were included). In essence, these findings suggest that some CBP officers make *de facto* assessments of the legitimacy of expressed fears, returning aliens that they perceive to be inappropriate and referring those that they perceive as warranting asylum (including two individuals who did not express any fear, but were from countries where legitimate fears are common). These practices suggest an important gap in the Expedited Removal process that should be addressed. However, even with absolute clarity regarding the procedures and policies (as apparently exists for the reading of the I-867 paragraphs and

---

[29] However, we should note that economic hardship may occur within a broader context of persecution, as acknowledged by the USCIS Credible Fear Manual: "The statement by an applicant that 'I left my country because I can't work' is insufficient to judge the merits if a case and should lead to further inquiry." (Eligibility, Part I, p. 24)

IFR_AR_008205

questions), our data suggest that errors will likely remain, albeit perhaps less frequently.

The lack of congruence between the observations of our research assistants and the official records prepared by the investigating officers (A-files) suggests that the asylum process itself may be compromised by the use of these documents as official transcripts. We found that when CBP officials failed to ask the relevant fear questions, the official record frequently indicated that these questions had been asked and answered, typically containing just the word "no" in response to fear questions that had not been asked. Likewise, on some occasions the A-files did not indicate that the relevant questions had been asked (i.e., were left blank) when our observers noted that they had been, or contained only a portion of the information that had been disclosed in response to a given question. These discrepancies, however, only reflect the most simplistic level of analysis, since the A-files might have provided incorrect information in many more cases but could not be detected because of our inability to simultaneously observe Secondary Inspection interviews and compare them with A-files. Nevertheless, these data demonstrate that A-files do not necessarily present an accurate record of Secondary Inspection interviews, despite the temptation to assume their accuracy. This issue is particularly important given the evidence observed in other studies in this report that the content of A-files is relied upon during the Credible Fear interview and subsequent Asylum hearings. Officials may present statements from the Secondary Inspection interview as evidence to impeach an aliens' testimony, citing contradictions between their statements and the official records as evidence of a changing story (see Jastram and Hartsough, A-file and Record of Proceeding Analysis of Expedited Removal, this report), when the "evidence" is an erroneous official record.

The safeguard against inaccurate A-file records, asking aliens to attest to the accuracy of their statements, also appears inadequate as currently implemented. Roughly one in six cases in which statements were taken by CBP officers and recorded in A-files were not confirmed by aliens, despite the presence of signatures in the required place. When they were asked to confirm their statements, most aliens were neither asked to read the statements, nor had their statements read to them, but were simply told to sign forms. Aliens were often told to sign documents with little or no explanation of what they were signing or what the implications might be, and in most cases these documents were written in a language they were not able to read (English). Failure to confirm statements was more common in cases where the individual was referred for Credible Fear interviews, despite the fact that these statements have the potential to be used in subsequent Asylum Interviews and Hearings.

It is impossible to know how the presence of our observers influenced the behavior of CBP officers. It certainly seems likely that compliance with required policies could be greater and inappropriate behaviors would be fewer when observers were monitoring their interviews. Thus, the rates of problems observed in this study likely underestimate the actual rate of problem behaviors and failures to adhere to established policies. We attempted to investigate the effect of our presence by comparing cases in which live observation was used to those in which videotaped interviews were reviewed. In this analysis, when the data from San Ysidro were excluded (since the border crossing is quite different in many respects from the airports), although different rates of reading required material remained, we found no significant differences in the rates of failure to ask required questions, or the frequency of referrals for a Credible Fear interview. This may reflect the fact that 24-hour video surveillance of the

IFR_AR_008206

interview rooms is not markedly different than live observation, indicating that both are vulnerable to the Hawthorne effect (where observers, by their mere presence, influence the behavior under investigation). Alternatively, officers may simply have behaved as they normally do, despite the presence of our research team. If so, the port-by-port variation observed in some variables may reflect differences in the training and supervision practices across ports. Ultimately, of course, we cannot know what the behavior of officers would be like without any form of observation. Nevertheless, given that it is virtually unimaginable that officers would have deliberately violated policies or required procedures *more often* while being monitored, it is likely that our observations represent some degree of underestimation of the problems observed in this study.

Perhaps most surprising is that, despite the presence of researchers observing Secondary Inspection interviews, our observers witnessed a number of incidents of seemingly serious problem behaviors. For example, our observers noted that on more than one occasion aliens were refused interpreters at Houston, even when they requested them. The report that aliens who claimed to have expressed a fear of persecution were initially turned away at the San Ysidro border crossing is an additional concern. In addition, aggressive or hostile interview techniques, sarcasm and ridicule of aliens, and verbal threats or accusations, while not common, were not infrequent in our sample. The fact that these behaviors occurred *while observers were present* suggests that such behavior may not even be perceived as problematic by some CBP officers.

## Study Limitations

In addition to the possibility that officer behavior and adherence to policies improved simply because our research team was present, a number of methodological issues limit the conclusiveness of this study. Perhaps the most significant issue pertains to sample size. Although our initial intent was to have researchers present in each site for three to four months, USCIRF and CBP agreed to limitations in terms of both the volume of research staff that could be present as well as the length of time that study investigators could remain in each site. Thus, many of the study sites yielded an inadequate sample to permit reliable comparisons across sites or to allow for an accurate estimate of the prevalence of problems observed. Estimates of the frequency with which aliens are removed despite having expressed a seemingly legitimate fear are thus limited (particularly when only the airport study sites are considered). Nonetheless, this study represents the largest systematic analysis of the Expedited Removal process and the only study to apply a multi-method approach to these important issues.

A second limitation to our study concerns the small number of Visa Waiver Program (VWP) refusal cases that were observed by our researchers. Our initial intent was to systematically analyze this subset of VWP cases along with ER cases, particularly because of our expectation that individuals with a legitimate asylum claim may enter the U.S. with documentation from a VWP country. That we observed three (of 19) VWP cases in which aliens were referred for an "asylum only" hearing to determine the legitimacy of their claim offers some support for this belief. However, the small number of VWP cases observed was inadequate to reliably assess the frequency with which this occurs or whether different problems exist in the processing of ER and VWP cases. Further research focusing specifically in VWP cases is necessary to clarify differences and similarities between these types of cases.

IFR_AR_008207

Another limitation in the present study was our reliance on live observations or one-time viewings of videotaped observations for most aspects of data collection. Our original intent was to videotape all Secondary Inspection interviews at all ports of entry during the study periods (i.e., to install cameras in those ports that did not already videotape and to archive videotapes in ports that already routinely videotape).[30] We also hoped to retain these videotapes after completion of the study, in order to permit re-analysis of the data whenever questions or important findings occurred. Such a method would have allowed, among other things, for a more detailed analysis of the accuracy of A-files, as well as help resolve observations that our researchers were unsure how to code. Although our inter-rater reliability data indicated that our researchers were quite consistent in their application of our coding system, reliability would have been further improved by the availability of videotapes (i.e., to review interactions that occurred too rapidly for the observer to perceive or when translation issues made comprehension difficult). Unfortunately, DHS administrators did not approve our request to videotape in advance of our required study timeline.[31]

At some sites, CBP officers themselves imposed additional study limitations. The most notable example was in Houston, where CBP officials were initially quite receptive.[32] Once data collection began, however, Houston CBP officers were less cooperative. Early in the data collection process it became clear that many aliens had been interviewed in the Secondary Inspection area but that CBP staff had not notified our research assistants. This omission was brought to the attention of the Chief, and we were permitted to remain in Houston for an additional week of data collection. However, our research assistants were still not informed when aliens were present to be interviewed, resulting in only four post-inspection interviews during the 4-week study period in which dozens of aliens were processed. Moreover, our researchers described a number of overtly hostile behaviors, including one incident where a CBP supervisor attempted to physically remove a research assistant, grabbing her arm and escorting her from an area that had been previously designated as open to our personnel. Although it is not clear how or if this tension impacted our study findings, it is possible that this small sample of interviews with aliens arriving at Houston was not representative of all arrivals to this port.

Data collection at JFK was also limited, largely by the structure of the Secondary Inspection facilities. Because JFK utilizes a counter with several interview stations, and processes a large volume of cases of which Expedited Removal cases comprise only a small subset, we were unable to determine which among the many cases in Secondary Inspection were Expedited Removal interviews. These logistical difficulties preclude us from drawing any conclusions about the frequency of behaviors or problems at JFK.

---

[30] Although Houston and Atlanta routinely videotape each Secondary Inspection interview, these videotapes are only archived for 2-3 months and then taped over. We requested these ports maintain copies of the videotapes our researchers reviewed, in case further review was desired, but we were not permitted to retain copies ourselves.

[31] CBP officials eventually approved videotaping but not until two months after data collection had begun and our time constraints did not permit the application of this technology (i.e., we were unable to install and test equipment in the limited time left for data collection).

[32] During the study design phase, Houston CBP staff allowed us to pilot our measurement instruments on videotaped Secondary Inspections and provided our research team with suggestions on how to best coordinate file review and live observations.

IFR_AR_008208

A final limitation concerns the prohibition to measure the opinions of the CBP officers themselves. As those charged with carrying out the credible fear referral provisions of Expedited Removal policy, it may be that there are some officers who rely on their opinions of asylum and asylum seekers rather than the provisions as set forth in regulations. While our researchers reported that most of the officers they encountered were professional and did not seem to let preconceptions about the legitimacy of the asylum process or asylum seekers affect their work, further research addressing officer knowledge, attitudes and behaviors and the relationship between Expedited Removal practices would be helpful.

**Conclusions**

Our findings suggest that when procedures are followed, appropriate referrals are more likely to be made. These findings present a picture of a system that, with several notable exceptions, generally seems to function by the rules set out for it. This conclusion is applicable to each port of entry in our study to varying degrees. Research assistants often expressed admiration for officers who were able to balance the twin duties of interrogating aliens without proper documents and then providing protection to them when necessary. This conflicting dual nature of CBP officers' role in the Expedited Removal process cannot be stressed enough, and it is with appreciation for the difficulty of this job, particularly in an era of heightened awareness and need for vigilance against international terrorism, that these findings are presented. While we cite shortcomings in the implementation of Expedited Removal, it is our hope that these observations will be perceived not as a criticism of CBP Inspectors, but as encouragement to better enforce those rules which are clear, and to more clearly articulate those which are not. This is particularly important with the creation of the Department of Homeland Security, in which INS inspection duties are being absorbed by many individuals who formerly worked as Customs or Agricultural inspectors.

This study identified a number of strengths and several disconcerting weaknesses in the Expedited Removal process concerning Credible Fear referral. Many ports employed practices which, if adopted by other ports, may result in much better compliance with CBP rules and reduce the chances that asylum seekers are returned to places where they may face persecution. For example, in Houston and Atlanta, the practice of videotaping all secondary inspections was associated with a higher tendency to comply with the requirement of explaining the Expedited Removal process to the alien, as articulated on the Form I-867A. In Atlanta and Los Angeles, the use of professional on-site interpreters was noteworthy, and may reduce the likelihood of communication problems during the interviews. Given that some asylum seekers come to the U.S. bearing documentation from Visa Waiver Program countries, the practices described by Newark and JFK personnel, in which all Visa Waiver Program cases are asked fear questions, appear appropriate and useful in identifying possible asylum seekers. Despite the high volume and short amount of time allotted for Secondary Inspection interviews, many San Ysidro officers were more diligent than some of those at airports. Finally, Miami International Airport deserves further study as a model. Without employing any of the above tools, Miami was much more compliant than any other port of entry in following the rules to ensure that asylum seekers are identified, and that aliens subject to Expedited Removal understand the nature of the proceedings.

IFR_AR_008209

As is clear in this report, DHS procedures designed to identify and refer asylum seekers subject to Expedited Removal are not always followed by immigration inspectors. Since these procedures are not always followed, it is impossible not to conclude that some proportion of individuals with a genuine asylum claim are turned away. Given the vulnerable nature of many aliens who seek asylum in the U.S., adherence to established protocol should be a minimum requirement.

IFR_AR_008210

## REFERENCES CITED

American Bar Association Commission on Immigration and the Leadership Conference on Civil Rights Education Fund (ABA), "American Justice Through Immigrants' Eyes", 2004.  Link: http://www.abanet.org/publicserv/immigration/Due_Process.html

Department of Homeland Security, Bureau of Customs and Border Protection (CBP), Inspector's Field Manual (M-450), Chapter 17.15 (September 2003).

Lawyers Committee for Human Rights, "Is this America - The Denial of Due Process to Asylum Seekers in the United States" (October 2000).

Letter to Mark Hetfield, USCIRF, from Phillip Huang, Staff Attorney, Lawyers Committee for Civil Rights of the San Francisco Bay Area (July 8, 2004).

Regulations: 8 CFR 235.3 (2004).

United Nations High Commissioner for Refugees (UNHCR), "Study of the U.S. Expedited Removal Process:  Report to the U.S. Department of Homeland Security" (24 October 2003) (Unreleased).

United States General Accounting Office (GAO), Report to Congressional Committees: ILLEGAL ALIENS Opportunities Exist to Improve the Expedited Removal Process (GAO/GGD-00-176) (September 1, 2000).

IFR_AR_008211

APPENDICES

## Appendix A: Demographic characteristics of samples

| | | Observed | | Interviewed | | File | |
|---|---|---|---|---|---|---|---|
| | | # | Valid % | # | Valid % | # | Valid % |
| Gender | | | | | | | |
| | Male | 237 | 58.7 | 110 | 56.7 | 253 | 58.2 |
| | Female | 167 | 41.3 | 84 | 43.3 | 182 | 41.8 |
| Region of Origin | | | | | | | |
| | Africa | 13 | 3.2 | 9 | 4.6 | 15 | 3.4 |
| | Americas | 332 | 82.2 | 160 | 82.5 | 358 | 82.3 |
| | Asia | 49 | 12.1 | 20 | 10.3 | 52 | 12.0 |
| | Europe | 9 | 2.2 | 5 | 2.6 | 9 | 2.1 |
| | Pacific Islands | 1 | .2 | | | 1 | .2 |
| Race: | | | | | | | |
| | Black | 49 | 12.4 | | | | |
| | White | 256 | 64.6 | | | | |
| | Asian | 38 | 9.6 | | | | |
| | Native Am. | 9 | 2.3 | | | | |
| | Mestizo | 44 | 11.1 | | | | |
| Latino ethnicity | | | | | | | |
| | Not Latino | 117 | 29.0 | | | | |
| | Latino | 286 | 71.0 | | | | |
| Marital status | | | | | | | |
| | Single | 93 | 48.2 | 120 | 61.9 | | |
| | Married | 100 | 51.8 | 74 | 38.1 | | |
| Religion | | | | | | | |
| | Buddhist | | | 6 | 3.1 | | |
| | Christian | | | 162 | 83.9 | | |
| | Hindu | | | 4 | 2.1 | | |
| | Jewish | | | 7 | 3.6 | | |
| | Muslim | | | 10 | 5.2 | | |
| | None | | | 4 | 2.1 | | |
| | Other | | | 6 | 3.1 | | |
| Education | | | | | | | |
| | No High School | | | 81 | 42.0 | | |
| | High School | | | 50 | 25.9 | | |
| | Some College | | | 29 | 15.0 | | |
| | College Degree | | | 23 | 11.9 | | |
| | Graduate/Professional Degree | | | 7 | 3.6 | | |
| | No Education | | | 3 | 1.6 | | |
| Case outcome | | | | | | | |
| | Credible Fear referral | 67 | 16.6 | 50 | 25.8 | 69 | 15.9 |
| | Expedited Removal | 241 | 59.7 | 102 | 52.6 | 261 | 60.0 |
| | Withdrawal | 96 | 23.8 | 42 | 21.6 | 105 | 24.1 |
| Mean age (SD) | | 33.3 (10.7) | | 34.0 (11.1) | | | |

IFR_AR_008212

## Appendix B: Participant cases versus non-participant cases

Houston

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Case outcome | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 0 | 0.0 | 2 | 7.4 |
| Expedited Removal | 3 | 10.3 | 11 | 40.7 |
| Withdrawal | 26 | 89.7 | 14 | 51.9 |
| Total | 29 | 100.0 | 27 | 100.0 |

The case outcomes between the two samples were significantly different[33]. Specifically, in our sample there were more Expedited Removal cases and fewer Withdrawals. In addition, there were two Credible Fear referral cases in our sample.

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Gender | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 19 | 65.5 | 19 | 70.4 |
| Female | 10 | 34.5 | 8 | 29.6 |
| Total | 29 | 100.0 | 27 | 100.0 |

Gender between the two samples did not differ.

| | Mean | Std. Deviation | Mean | Std. Deviation |
|---|---|---|---|---|
| Age | 32.86 | 11.04 | 32.70 | 11.00 |

These samples did not differ by age.

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Global Region | Frequency | Valid Percent | Frequency | Valid Percent |
| Africa | 1 | 3.4 | 1 | 3.7 |
| Americas | 22 | 75.9 | 22 | 81.5 |
| Asia | 6 | 20.7 | 4 | 14.8 |
| Total | 29 | 100.0 | 27 | 100.0 |

Global region of origin did not differ between the two samples.

John F. Kennedy

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Case outcome | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 18 | 11.4 | 1 | 7.7 |
| Expedited Removal | 94 | 59.5 | 11 | 84.6 |
| Withdrawal | 46 | 29.1 | 1 | 7.7 |
| Total | 158 | 100.0 | 13 | 100.0 |

The case outcomes between the two samples were not significantly different.

---

[33] $\chi^2$=10.14, p < .01

IFR_AR_008213

| Gender | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 100 | 63.3 | 9 | 69.2 |
| Female | 58 | 36.7 | 4 | 30.8 |
| Total | 160 | 100.0 | 14 | 100.0 |

Gender between the two samples did not differ.

Age and global region information was not available from JFK records.

Los Angeles

| Case outcome | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 21 | 29.6 | 9 | 33.3 |
| Expedited Removal | 22 | 31.0 | 11 | 40.7 |
| Withdrawal | 28 | 39.4 | 7 | 25.9 |
| Total | 71 | 100.0 | 27 | 100.0 |

Case outcome between the two samples did not differ. Gender, age, and global region information was not available from Los Angeles records.

Miami

| Case outcome | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 96 | 22.0 | 38 | 34.5 |
| Expedited Removal | 176 | 40.3 | 38 | 34.5 |
| Withdrawal | 165 | 37.8 | 34 | 30.9 |
| Total | 437 | 100.0 | 110 | 100.0 |

The proportion of Credible Fear cases among those we interviewed was higher than among those we did not interview[34].

| Gender | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 262 | 60.0 | 55 | 50.0 |
| Female | 175 | 40.0 | 55 | 50.0 |
| Total | 437 | 100.0 | 110 | 100.0 |

Gender between the two samples did not differ.

| | Mean | Std. Deviation | Mean | Std. Deviation |
|---|---|---|---|---|
| Age | 36.10 | 12.54 | 35.72 | 11.77 |

These samples did not differ by age.

---

[34] $\chi^2$=7.55, p < .05

IFR_AR_008214

| Global Region | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Africa | 4 | 0.9 | 0 | 0 |
| Americas | 386 | 88.3 | 96 | 87.3 |
| Asia | 36 | 8.2 | 11 | 10.0 |
| Europe | 11 | 2.5 | 3 | 2.7 |
| Total | 437 | 100.0 | 110 | 100.0 |

The two samples did not differ with regards to global region of origin.

San Ysidro

| Case outcome | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 9 | 1.7 | 13 | 6.8 |
| Expedited Removal | 531 | 98.2 | 168 | 88.0 |
| Withdrawal | 1 | 0.2 | 10 | 5.2 |
| Total | 541 | 100.0 | 191 | 100.0 |

The two samples differed by case outcome[35], with higher proportions of Credible Fear referrals and Withdrawals among the group we observed or interviewed.

| Gender | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 295 | 62.5 | 117 | 61.3 |
| Female | 177 | 37.5 | 74 | 38.7 |
| Missing | 69 | | 0 | 0.0 |
| Total | 541 | 100.0 | 197 | 100.0 |

The two samples did not differ on gender, although missing data on the group that was not observed or interviewed may have biased this finding.

| | Mean | Std. Deviation | Mean | Std. Deviation |
|---|---|---|---|---|
| Age | 29.82 | 9.13 | 30.78 | 9.61 |

These samples did not differ by age.

| Global Region | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Africa | 1 | 0.2 | 4 | 2.0 |
| Americas | 530 | 98.0 | 179 | 93.4 |
| Asia | 7 | 1.3 | 8 | 4.1 |
| Europe | 2 | 0.4 | 0 | 0.5 |
| Pacific Islands | 1 | 0.2 | 0 | 0.0 |
| Total | 541 | 100.0 | 191 | 100.0 |

The two samples differed by global region of origin[36], with a higher proportion of cases from Latin America among those we did not observe or interview.

---

[35] $\chi^2$= 37.95, $p$ < .001
[36] $\chi^2$= 14.68, $p$ < .01

IFR_AR_008215

**Appendix C: Data analyses excluding San Ysidro** (Tables correspond to tables in the report)

Table 2.1a: Information conveyed and questions asked from the I-867A and B forms

| Obligatory Statements | Observation | |
|---|---|---|
| | Read or Paraphrased | Not Read |
| I867A 2nd paragraph | 158 (80.6%) | 38 (19.4%) |
| I867A 3rd paragraph | 151 (76.6%) | 46 (23.4%) |
| I867A 4th paragraph | 147 (74.6%) | 50 (25.4%) |
| Why did you leave...? | 168 (91.3%) | 16 (8.7%) |
| Do you have any fear...? | 173 (94.0%) | 11 (6.0%) |
| Would you be harmed..? | 167 (91.3%) | 16 (8.7%) |
| At least one fear question asked | 196 (95.1%) | 10 (4.9%) |

Table 2.2a "Why did you leave…"

| | | Question in file | | Total |
|---|---|---|---|---|
| | | yes | no | |
| Question | yes | 158 (97.5%) | 4 (2.5%) | 162 |
| observed | no | 13 (81.3%) | 3 (18.8%) | 16 |
| Total | | 171 | 7 | 178 |

Table 2.3a "Do you have any fear…"

| | | Question in file | | Total |
|---|---|---|---|---|
| | | yes | no | |
| Question | yes | 165 (98.8%) | 2 (1.2%) | 167 |
| observed | no | 8 (72.7%) | 3 (27.3%) | 11 |
| Total | | 173 | 5 | 178 |

Table 2.4a "Would you be harmed…"

| | | Question in file | | Total |
|---|---|---|---|---|
| | | yes | no | |
| Question | yes | 160 (98.8%) | 2 (1.2%) | 162 |
| observed | no | 11 (73.3%) | 4 (26.7%) | 15 |
| Total | | 171 | 6 | 177 |

Table 2.6a: Association between 3rd paragraph ("This may be your only opportunity to present information…") and referral for Credible Fear[37]

| | Referred | Not referred |
|---|---|---|
| Read 3rd paragraph | 44 (29.1%) | 107 (70.9%) |
| Not read 3rd paragraph | 8 (17.4%) | 38 (82.6%) |

Table 2.7a: Association between reading the 4th paragraph ("US law provides protection…") and referral for Credible Fear[38]

| | Referred | Not referred |
|---|---|---|
| Read 4th paragraph | 43 (29.3%) | 104 (70.7%) |
| Not read 4th paragraph | 9 (18.0%) | 41 (82.0%) |

---

[37] $\chi^2$= 2.51, $p$ = .11, OR = 1.95
[38] $\chi^2$= 2.43, $p$ = .12, OR = 1.88

IFR_AR_008216

Table 2.8a: Fear inquired about directly by officer[39]

|  | Referred | Not Referred |
|---|---|---|
| "Fear" and "Harm" asked | 49 (26.2%) | 138 (73.8%) |
| "Fear" or "Harm" asked | 1 (12.5%) | 7 (87.5%) |
| Fear not asked | 1 (10.0%) | 9 (90.0%) |

Table 2.9a: Observed being asked to confirm statements

|  | Frequency | Valid Percent |
|---|---|---|
| No | 52 | 26.7 |
| Yes | 143 | 73.3 |
| Total | 195 | 100.0 |

Table 2.10a: Confirming statements and Referral for Credible Fear

|  | Referred | Not referred |
|---|---|---|
| Asked to confirm | 34 (72.3%) | 109 (73.6%) |
| Not asked to confirm | 13 (27.7%) | 39 (26.4%) |

Table 2.11a: Were the statements read and by whom: Observational sample.

|  | Frequency | Valid Percent |
|---|---|---|
| Alien read statements | 32 | 16.4 |
| Interpreter read statements | 36 | 18.5 |
| Officer read statements | 22 | 11.3 |
| Statements not read | 105 | 54.1 |
| Total | 195 | 100.0 |

Table 3.1a: Expressing fear and referral for Credible Fear Interview[40]

|  | Referred | Not referred |
|---|---|---|
| Fear expressed | 54 (93.1%) | 4 (6.9%) |
| No fear expressed | 2 (1.3%) | 153 (98.7%) |

Table 4.1a: Aliens' reports of what will happen to them next

|  | Frequency | Valid Percent |
|---|---|---|
| Will be removed | 63 | 56.8 |
| Will be detained | 4 | 3.6 |
| Will have another interview | 4 | 3.6 |
| Nothing will happen | 3 | 2.7 |
| Do not know | 29 | 26.1 |
| Other | 8 | 7.2 |
| Total | 111 | 100.0 |

---

[39] $r_s = .10$, $p = .16$

[40] $\chi^2 = 183.60$, $p < .0001$, OR = 1032.75

IFR_AR_008217

Table 5.1a: Aggressive or Intimidating Behaviors Observed during Secondary Inspection Interviews

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Raising voice | 35 (16.4%) | 13 (24.1%) |
| Interrupting | 35 (16.4%) | 10 (18.5%) |
| Grabbing/threatening touches | 1 (0.5%) | 0 |
| Accusations | 25 (11.7%) | 3 (5.6%) |
| Verbal threats | 18 (8.5%) | 1 (1.9%) |
| Sarcasm/Ridicule | 30 (14.1) | 7 (13.0%) |
| Being demanding | 33 (15.4%) | 5 (9.3%) |
| Standing over alien | 9 (4.2%) | 1 (1.9%) |
| Leaving room without explanation | 58 (27.1%) | 9 (16.7%) |

Table 5.2a: Helpful Behaviors Observed during Secondary Inspection Interviews

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Offering comforting words | 33 (15.4%) | 7 (13.0%) |
| Friendly joking | 48 (22.4%) | 11 (20.4%) |
| Small talk | 33 (15.5%) | 2 (3.8%) |
| Explaining actions | 75 (35.0%) | 16 (29.6%) |

IFR_AR_008218

## Appendix D: Aliens who expressed a fear and were not referred

| Port of Entry | Gender | Region of origin | Fear expressed to officer | Fear recorded in file | Case Outcome |
|---|---|---|---|---|---|
| Newark | female | South America | Economic Hardship | no | Expedited Removal |
| Miami | male | South America | Economic Hardship | no | Expedited Removal |
| Houston | female | Central America | Not specific | no | Withdrawal |
| Houston | female | Central America | Fears ex-husband (Social Group) | Fears ex-husband | Withdrawal |
| San Ysidro | male | Central America | Not Specific | no | Expedited Removal |
| San Ysidro | male | Central America | Police will harass him at border (Other) | "Yes, on the border because of police" | Expedited Removal |
| San Ysidro | male | East Asia | Economic Hardship | no | Expedited Removal |
| San Ysidro | male | Central America | Scared of government (Not Specific) | "It could be possible" | Expedited Removal |
| San Ysidro | male | Central America | Economic Hardship | "Yes, there's no jobs back home" | Expedited Removal |
| San Ysidro | female | Central America | Ill child in US (Other) | "My daughter is sick" | Expedited Removal |
| San Ysidro | male | South Asia | Threats by fundamentalist political party (Political Persecution) | no | Expedited Removal |
| San Ysidro | male | Central America | Does not know Mexico (Other) | no | Expedited Removal |

| Port of Entry | Gender | Region of origin | Fear expressed to researcher only | Fear recorded in file | Case Outcome |
|---|---|---|---|---|---|
| Newark | female | West Africa | Passport problems (Other) | no | Withdrawal |
| Miami | male | South America | Economic Hardship | no | Expedited Removal |
| Miami | female | South America | Not specific | no | Expedited Removal |
| Miami | male | South America | Economic Hardship | no | Expedited Removal |
| Miami | female | South America | Ill child in US (Other) | no | Expedited Removal |
| JFK | male | South America | Police would learn about US immigration case (Other) | no | Expedited Removal |
| JFK | male | Caribbean | Economic Hardship | no | Expedited Removal |
| San Ysidro | female | Central America | Economic Hardship | no | Withdrawal |
| San Ysidro | female | South America | Economic Hardship | no | Expedited Removal |
| San Ysidro | male | Central America | Economic Hardship | no | Expedited Removal |

IFR_AR_008219

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

# A-FILE AND RECORD OF PROCEEDING ANALYSIS OF EXPEDITED REMOVAL

FEBRUARY 2005

Kate Jastram
Tala Hartsough

Boalt Hall School of Law
University of California, Berkeley

IFR_AR_008220

TABLE OF CONTENTS

List of Tables……………………………………………………………………………..46

List of Appendices………………………………………………………………………..47

A. Overview ………………………………………………………………………………...48

B. Summary of the Expedited Removal Process………………………………………51

C. Study Methodology……………………………………………………………………53

D. Study Question 2 – Are immigration officers incorrectly failing to
 refer asylum seekers for a credible fear interview? ……………………………… 57

E. Study Question 3 – Are immigration officers incorrectly removing
asylum seekers to a country where they may be persecuted?........................................... 61

F. Study Question 4 – Are immigration officers detaining asylum seekers
improperly or in inappropriate conditions?........................................................................ 71

G. Overall Data Limitations………………………………………………………….....84

H. Discussion of findings ……………………………………………………………..86

IFR_AR_008221

LIST OF TABLES

Table 1: GAO 2000 and present study - source and number of files reviewed …………55

Table 2: Documentation regarding fear of return by outcome and
   manner of entry for national sample …………………………………………………61

Table 3. Legal standards for each step of the Expedited Removal process………………66

Table 4. Use of Expedited Removal records to undermine the
   asylum seeker's case ……………………………………………………………………68

Table 5: Length of detention……………………………………………………………...75

Table 6: Released cases and rates (in percents) by region of origin……………………...75

Table 7: Released cases and rates (in percents) by major country………………………..76

Table 8: Release rate & rate of recorded relative sponsor/community ties among those
   with identity established by asylum officer (USCIS) by region of origin………..82

Table 9: Release rate & rate of recorded relative sponsor/community ties among those
   with identity established by asylum officer (USCIS) by major country …………83

IFR_AR_008222

## LIST OF APPENDICES

Appendix A:   Summary of APSO Officer/Asylum Office Director Questionnaire

Appendix B:   Parole Guidelines Memo

Appendix C:   Port of Entry Data Collection Instrument

Appendix D:   Additional Analysis of Port of Entry Files National Sample

Appendix E:   Analysis of Port of Entry files from JFK Airport

Appendix F:   Hetfield Letter of 9.23.04

Appendix G:   Analysis of Port of Entry Files National Sample – Canadian Border

Appendix H:   Board of Immigration Appeals Data Collection Instrument

Appendix I:   Additional Analysis of the Board of Immigration Appeals Sample

Appendix J:   Credible Fear Data Collection Instrument

Appendix K:   Credible Fear Files Produced and Not Produced, By Location

Appendix L:   Additional Analysis of Credible Fear Files

Appendix M:   Examples of Parole Decision Documentation

Appendix N:   Examples of Consular Notification

IFR_AR_008223

A. OVERVIEW

The Study of Asylum Seekers in Expedited Removal (Study) was initiated by the United States Commission on International Religious Freedom (USCIRF) to respond to four questions posed by the International Religious Freedom Act (IRFA) of 1998.[1]  The four questions address the effects of Expedited Removal procedures on asylum claims.   Specifically, the Study is to determine whether immigration officers performing duties under section 235(b) of the Immigration and Nationality Act (8 U.S.C. 1225(b)) (INA) with respect to aliens who may be eligible to be granted asylum are engaging in any of the following conduct:

A) Improperly encouraging such aliens to withdraw their applications for admission.

(B) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution (within the meaning of section 235(b)(1)(B)(v) of such Act).

(C) Incorrectly removing such aliens to a country where they may be persecuted.

(D) Detaining such aliens improperly or in inappropriate conditions.

This file review is one of several components making up the USCIRF Expedited Removal Study.  Other elements of the Study included site visits to ports of entry and detention centers throughout the U.S.; direct observations at ports of entry[2]; questionnaires administered to officials at the eight asylum offices[3]; an analysis of conditions of detention[4];  an examination of representation issues[5]; and a statistical survey of the Expedited Removal process.[6]  All components of the Study have benefited greatly from the cooperation and assistance of the Department of Homeland Security, the Department of Justice, and detention officials in facilitating our work, as well as from the information and insights they shared with us.

For the file analysis component of the Study, we set the following goals in relation to three of the four Study questions.

---

[1] Sec. 605 of the International Religious Freedom Act of 1998 authorized the U.S. Commission on International Religious Freedom (USCIRF) to appoint experts to study the effects of Expedited Removal on asylum seekers, and specified four questions that such a study should address.  Pursuant to this authority, USCIRF appointed Prof. Kate Jastram as the lead expert for reviewing A-files and immigration court Records of Proceeding.

[2] Keller, Rasmussen, Reeves & Rosenfeld, *Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States*, 2005 (hereinafter Keller 2005).

[3] The questionnaire appears in Appendix A; a compilation of answers are on file at the USCIRF office.

[4] Haney, *Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal*, 2005 (hereinafter Haney 2005).

[5] Kuck, *Legal Assistance for Asylum Seekers in Expedited Removal: A Survey of Alternative Practices,* 2005 (hereinafter Kuck 2005).

[6] Baier, *Selected Statistical Analyses of Immigration Judge Rulings on Asylum Applications, FY 2000-2003*; Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003;* Fleming and Scheuren, *Statistical Report on Detention*, *FY 2000-2003* ; Kyle, Fleming and Scheuren, *Statistical Report on Immigration Court Proceedings, FY 2000-2004* (hereinafter Kyle, Fleming and Scheuren 2005)**.**

IFR_AR_008224

We did not attempt to answer the first Study question, which concerns immigration officers improperly encouraging asylum seekers to withdraw their applications for admission. In reviewing files, which are created by the immigration officer, we would not expect the immigration officer's improper behavior, if any, to be self-reported.[7]

The second Study question concerns failure to refer for a credible fear determination. Our goal in analyzing files was to determine if certain questions intended to identify asylum seekers eligible for such a determination were asked and answered. Without asking the questions and recording the answers, immigration officers would not know which aliens should be referred for a credible fear determination and might fail to make the correct referral.

The third Study question concerns whether asylum seekers are being incorrectly removed to a country where they may be persecuted. The decision on whether an asylum seeker is granted protection or is ordered removed from the U.S. is made by an immigration judge.[8] A mistaken decision by an immigration judge could result in the asylum seeker being incorrectly returned to persecution.

We therefore analyzed files containing transcripts of asylum hearings conducted by immigration judges. We examined the use of Expedited Removal records created by immigration officers at ports of entry and during the credible fear determination with the goal of assessing how they were used at the immigration court hearing. These Expedited Removal records do not contain the asylum seeker's full story, and can be inaccurate.[9] Reliance on them increases the risk of an incorrect decision that could return the asylum seeker to persecution.

---

[7] This question is more directly addressed by the component of the Study conducted through observations at ports of entry. *See* Keller 2005.

[8] Subject to review by the Board of Immigration Appeals and then a U.S. court of appeals. The immigration judge does not have jurisdiction over the claim until the asylum seeker is referred for a credible fear determination and is found to have a credible fear of persecution. Referral for a credible fear determination relates to the second Study question discussed below as well as to the component of the Study conducted through observations at ports of entry. *See* Keller 2005. Credible fear determinations are made by an asylum officer. We did not analyze these decisions in detail because there is a high rate of positive finding of credible fear. *See* Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal (FY2000-2003).*

[9] The reliability of these records is discussed below and is also addressed by the component of the Study conducted through observations at ports of entry. *See* Keller 2005.

IFR_AR_008225

The fourth Study question concerns, in part, the improper detention of asylum seekers.[10] Agency policy favors release of asylum seekers with a credible fear of persecution, provided that the agency determines that the asylum seekers are likely to appear for the removal hearing and do not pose a risk to the community.[11]  A decision to detain an asylum seeker who meets the release criteria or to release an asylum seeker who does not meet the criteria would be considered an improper use of DHS discretion. We analyzed files with the goal of understanding rates of release in association with these criteria.

To meet the goals described above, we studied three sets of files created by Department of Homeland Security and Department of Justice officials in the course of implementing Expedited Removal.  We had a particular focus on three major steps in the process: denial of admission at ports of entry; hearings on the merits of an asylum claim, and detention release decisions prior to a hearing on the merits of their claim for asylum seekers found to have a credible fear of persecution.

Section B of this report provides a brief sketch of how Expedited Removal works. Section C explains our Study methodology.

Section D sets forth our research on whether immigration officers fail to refer asylum seekers for credible fear interviews.  We found that, according to the electronic records that were available for our review that contained appropriate documentation, aliens who received Expedited Removal orders had given negative answers to the questions regarding fear of return. However, the problems we encountered in conducting the review leads to serious concern over

---

[10] The law provides that asylum seekers in Expedited Removal must be detained until it is determined that they have a credible fear of persecution.  After that point, DHS has the discretion to release them.  The statutory basis for release from detention of aliens seeking admission to the U.S. is set forth in INA § 212(d)(5)(A): "The Attorney General may, except as provided in subparagraph (B) or in section 214(f), in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  The statute is limited by the Regulations in 8 CFR § 235.3(b)(2)(iii): "Detention and parole of alien in Expedited Removal. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." and 8 CFR § 235.3(b)(4)(ii): "Detention pending credible fear interview. Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing. Such consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process."

[11] INS Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) from Michael A. Pearson, Executive Associate Commissioner for Field Operations, Office of Field Operations, to Regional Directors, District Directors, Asylum Office Directors, reproduced in 75 *Interpreter Releases* 270 (Feb. 23, 1998) (although the author's last name mistakenly appears as "Benson" in the version published in Interpreter Releases).  The memorandum is attached as Appendix B.

IFR_AR_008226

Customs and Border Protection's quality assurance capabilities with respect to this critical step of the Expedited Removal process.

Section E presents our research on whether asylum seekers are incorrectly returned to persecution. We found that immigration judges frequently rely on incomplete and sometimes unreliable records from the port of entry and the credible fear determination in making complex determinations on the substance of the claim. This reliance almost certainly increases the risk of an erroneous decision.

Section F discusses our research on whether asylum seekers are being improperly detained. We found that rates of release before the merits hearing vary. Our analysis revealed that parole criteria information as elicited and recorded by asylum officers appears to have had some correlation with whether an asylum seeker was released prior to the merits hearing. That is, those with identity and community ties information recorded by USCIS were more likely to be released than those with only identity but not community ties information recorded. Analysis further revealed that other factors such as place of origin and port of entry into the U.S. are associated with parole rates as well. We found that information on parole eligibility as elicited and recorded by USCIS is not necessarily reflected in ICE's release decisions. We also found that ICE's consideration of release and detention decisions is not uniformly documented in the files.

Section G sets forth the overall data limitations for our Study. Finally, Section H discusses our findings.

We provided a draft of Sections A through G as well as the Appendices to the concerned entities within the Department of Justice (DOJ) and the Department of Homeland Security (DHS), as well as to the Government Accountability Office (GAO). We are grateful for the very helpful comments received from the Executive Office for Immigration Review (DOJ), United States Citizenship and Immigration Services (DHS), Customs and Border Protection (DHS), and the GAO, which have been incorporated into the report where appropriate. The DHS Bureau of Immigration and Customs Enforcement (ICE) also received a draft of the report, but did not provide any oral or written feedback.

## B. SUMMARY OF THE EXPEDITED REMOVAL PROCESS

The Expedited Removal provisions of the Immigration and Nationality Act (INA)[12] allow Customs and Border Protection (CBP) inspectors at ports of entry and Border Patrol agents at certain locations near the border[13] to order the immediate removal of aliens they deem inadmissible on certain named grounds.[14] Aliens are subject to Expedited Removal if they

---

[12] INA Sec. 235(b).

[13] In August 2004, responsibility for Expedited Removal was extended to CBP Border Patrol agents in certain locations. Our file samples were drawn from periods prior to August 2004, so this report analyzes only the actions of inspectors, not Border Patrol agents.

[14] The grounds are set forth in Sec. 212(a) of the INA [8 U.S.C. 1182] either solely under the subsection relating to lack of valid entry documents (Sec. 212(a)(7)) or in combination with the subsection relating to misrepresentation (Sec. 212(a)(6)(C)). Aliens lack valid entry documents when they have no documents in their possession, when they have counterfeit or doctored documents, or when they are imposters to the documents in their possession. Aliens are

IFR_AR_008227

attempt to enter without proper documentation.  This can take the form of the alien having no documents or having false documents.  It can also take the form of having valid documents that were obtained by misrepresentation, for example, a visitor's visa acquired by an alien whose real intention is to remain in the U.S. and work.

In addition, it is important to know that asylum seekers with valid documents who promptly request asylum at a port of entry are also subject to Expedited Removal.[15]  This is because the alien's intention to remain, as evidenced by seeking asylum, is considered by inspectors to invalidate an otherwise legitimate visa.[16]

It is true that many aliens who are not entitled to be in the U.S. and who intend to evade normal immigration procedures will use false documents or documents obtained by misrepresentation.  However, many refugees fleeing from persecution will also use these types of documents, since they are often unable to obtain a passport or visa in their own name and must leave their country surreptitiously.[17]  Expedited Removal was intended to allow for the prompt and efficient removal of aliens attempting a fraudulent entry, while ensuring that asylum seekers would still have the opportunity to present their claim for protection to an immigration judge.

To address concerns that asylum seekers subject to Expedited Removal could be erroneously returned to their persecutors, inspectors are required to provide certain information to aliens regarding the possibility of obtaining protection in the U.S. and to ask certain questions designed to elicit any fear of return.  Any alien expressing a fear of returning to his or her country must be referred to a DHS Citizenship and Immigration Services (USCIS) asylum officer for a preliminary screening interview to determine if he or she has a credible fear of persecution.

If the asylum officer finds that the alien has a credible fear of persecution, the alien is scheduled for a removal hearing before an immigration judge.  The immigration judge hears the full claim, and is empowered to grant the asylum seeker's application for protection, or to enter an order of removal.  An appeal from this decision may be taken either by the asylum seeker or

---

also considered to lack valid entry documents when they have facially valid nonimmigrant documents but are intending to immigrate by applying for asylum.

[15] We had 18 such cases in our file review.  *See* Section F, below.  Another example recently in the news was the case of an 81-year-old minister from Haiti who died in DHS custody.  According to news accounts, the Rev. Joseph Dantica entered the U.S. with a valid passport and a multiple entry visitor's visa and requested "temporary asylum".  He was placed in Expedited Removal and detained in the Krome Detention Center.  The Rev. Dantica's request for humanitarian parole was denied; he was taken ill during his credible fear interview and died shortly thereafter.  See, Adams, "Haitian Pastor Dies on U.S. Doorstep", *St. Petersburg* (Florida) *Times*, Nov. 19, 2004 at A1, and Morris, "Asylum Seeker's Death Spurs Outcry", (South Florida), Nov. 18, 2004, at 1A.

[16] According to CBP's interpretation of the law, as articulated by INS, "Even in cases where a fraudulent document is not presented or a formal request for admission is not made, an alien who seeks asylum in the United States at a port of entry in most cases is inadmissible as an intending immigrant and therefore potentially subject to Expedited Removal."  Memorandum on "Aliens Seeking Asylum at Land Ports of Entry," from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, to INS Regional Directors, (Feb. 6, 2002).

[17] This necessity is widely recognized and acknowledged.  The Swedish diplomat Raoul Wallenberg is still remembered for his heroic rescue of the Jews of Budapest, by providing them with false travel documents to allow escape from the Nazis.  States are prohibited from penalizing refugees for their illegal entry or presence by art. 31 of the 1951 Convention relating to the Status of Refugees, which is binding on the U.S. through its ratification of the 1967 Refugee Protocol.

IFR_AR_008228

the government to the Board of Immigration Appeals (BIA) and then to the federal circuit courts of appeals.

If the asylum officer does not find the alien to have a credible fear of persecution or torture, the asylum officer will issue an Expedited Removal order. Aliens subject to Expedited Removal are required to be detained by DHS Immigration and Customs Enforcement (ICE), at least until they have established a credible fear of persecution. They are eligible for parole thereafter if they meet certain criteria. An immigration judge can review the asylum officer's determination that the alien does not have a credible fear of persecution, but there is no other administrative or judicial review of CBP, USCIS or ICE actions in Expedited Removal.

## C. STUDY METHODOLOGY

### 1. A-files and Board of Immigration Appeals Records of Proceeding

Between January 2004 and January 2005, we conducted a study of the Expedited Removal process by analyzing samples of Department of Homeland Security (DHS)[18] A-files[19] and Department of Justice (DOJ) Records of Proceeding[20] created in fiscal years 2002 - 2004. We analyzed a total of 855 files.[21]

The A-file contains the full administrative record of the alien's immigration status.[22] A-files are maintained as paper records. In addition, an electronic Enforcement Case Tracking System (ENFORCE) allows for biographical and case data to be incorporated into certain types of records and for that information to be used to complete some of the forms needed for case processing. ENFORCE does not, however, include all of the documents and information that may be contained in the A-file and was not designed for quality assurance purposes.[23]

---

[18] The INS was abolished by the Homeland Security Act of 2002 (6 USC 101 et seq.), and its components were absorbed into the Department of Homeland Security March 1, 2003.

[19] An A-file (alien file) is the series of records DHS keeps on certain individuals to document the history of their interaction with DHS in actions prescribed by the Immigration and Nationality Act and other regulations. Not all aliens dealing with DHS have an A-file. DHS may use the information in an A-file to grant or deny immigration-related benefits and to take action against people who violate immigration laws. Letter from Mr. Michael J. Hrinyak (CBP) to Mr. Mark Hetfield (USCIRF), Jan. 21, 2004, on file with the authors.

[20] A Board of Immigration Appeals (BIA) Record of Proceeding (ROP) is the record on appeal from an immigration judge decision, created by the DOJ's Executive Office for Immigration Review (EOIR).

[21] Both types of files are identified by the alien's A-number, a unique eight digit number -- similar to a Social Security number -- assigned for long term identification and tracking.

[22] "Beginning in 1944, Alien Registration records became the foundation document in a new series of INS records, the Alien Files, or A-Files. After April 1, 1944, INS maintained an individual case file on each immigrant to the United States, containing all papers, records, and documents relating to that immigrant. A-Files remain in DHS custody …." Available at: http://uscis.gov/graphics/aboutus/history/immrecs/AlReg.html. All agency actions and decisions with respect to a particular alien, and all applications and petitions filed by or on behalf of an alien, bear the alien's A-number and are recorded in the alien's A-file. The A-file itself follows an alien – physically when DHS has custody of the alien -- throughout his or her progress within the immigration system, whether the ultimate outcome is deportation or a grant of citizenship or some status in between. When an individual A-file is not in use in one of DHS' offices around the country, it is stored in the National Records Center.

[23] With DHS' nationwide implementation of ENFORCE on October 1, 2003, certain documents generated for specific A-files can be accessed at Headquarters or other offices. The documents may not be complete i.e., they do not contain signatures, handwritten notes, corrections, initials, etc., that may be included in the hard copy original.

IFR_AR_008229

Board of Immigration Appeals Records of Proceeding contain the full administrative record of removal proceedings concerning the alien and are maintained as paper records.[24]

## 2. File analysis as a data resource

Review of DHS' and DOJ's own administrative records is an initial step in ascertaining whether the agencies are carrying out their statutory duties with respect to asylum seekers subject to Expedited Removal. The General Accounting Office (GAO) in its 2000 report on Expedited Removal relied on A-file review as an important data source.[25] The GAO report provided valuable information and analysis of the Expedited Removal process, and remains a key reference tool for work on this topic. Its methodology and findings, although subject to their own limitations,[26] provided the starting point for the present Study.

The GAO report addressed the four Study questions from a systems perspective. Pursuant to an agreement with the Congressional committees concerned, it reviewed files to assess Immigration and Naturalization Service management controls over certain aspects of the Expedited Removal process.[27] While we also looked at systems from the perspective of quality assurance, we additionally examined elements of decision-making more closely tied to the statutory Study questions. We reviewed a larger number of files, representing more stages in the Expedited Removal process, and we collected a broader array of data.

Table 1 shows that the GAO examined 585 files of persons who were not referred for a credible fear determination; 45 files of persons who received a negative credible fear determination; and 133 files of persons who recanted ("dissolved") their claims, 39 of which had documentation on the reasons given for dissolving the claim. As detailed below, the present study analyzed 339 port of entry files, most of which were not referred for a credible fear determination; 163 files from the BIA; and 353 files of persons referred for a credible fear determination, including 32 aliens who dissolved their claims.

---

Although certain designated personnel have some access to ENFORCE, the system was not designed for quality assurance purposes, nor was it designed to produce documents through mass queries. Officers who have designated access and an event number may access an individual case, if that case was completed in ENFORCE. Letter from Mr. Michael J. Hrinyak (CBP) to Mr. Mark Hetfield (USCIRF), Jan. 21, 2004, on file with the authors.

[24]"The actual contents of the record on appeal vary from case to case, but generally include the following items: charging documents; hearing notices; notices of appearance; applications for relief and any accompanying documents; court-filed papers and exhibits; transcript of proceedings and oral decision of the Immigration Judge, if prepared; written memorandum order or decision of the Immigration Judge; Notice of Appeal; briefing schedules; briefs; motions; correspondence; and any prior decisions by the Board." *BIA Practice Manual*, Ch. 4 Appeals of Immigration Judge Decisions, Section 4.2 Record on appeal. Available at: http://www.usdoj.gov/eoir/bia/qapracmanual/pracmanual/chap4.pdf. These records originate in the local immigration court, and are forwarded to the BIA when the immigration judge's decision is appealed. When the BIA is finished with the appeal, the record is returned to the Immigration Court for storage or for further proceedings, depending on the Board's order.

[25]*See*, *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process*, GAO Report Sept 2000 GAO/GGD-00-176 (hereinafter GAO 2000), Appendix III.

[26] For an analysis of GAO 2000, *see* Musalo, Gibson, Knight & Taylor *Evaluation of the General Accounting Office's Second Report on Expedited Removal*, Oct 2000.

[27] GAO 2000, pp. 30-31.

IFR_AR_008230

**Table 1: GAO 2000 and present study -
source and number of files reviewed**

|  | GAO 2000 | Present Study |
|---|---|---|
| *Source and number of files reviewed* |  |  |
| Ports of entry | 585 | 339* |
| Negative credible fear | 45 | 0** |
| Dissolves | 39*** | 32 |
| BIA | 0 | 163 |
| Credible fear referrals | 0 | 321 |

\* An additional 435 port of entry A-files were examined by the observation component of the Study; *see* Keller 2005.

\*\* While not part of this research report, other researchers working with Commission experts also reviewed 50 negative credible fear determinations from FY2003-2004.

\*\*\* Plus an additional 94 files where the reason was not documented.

One goal of our file review, like that of the GAO, was to determine the extent to which required procedures were followed by locating the relevant forms in the files.[28] Maintaining a complete record in order to allow for internal review and quality assurance measures is particularly important given the lack of judicial review for Expedited Removal orders[29] or decisions on release from detention prior to the merits hearing.

Another goal of our file review was to explore how the Expedited Removal process prior to the full merits hearing before the immigration judge had an impact on the hearing itself. We were interested in the nature of the evidence considered by immigration judges in making complex factual and legal determinations. Like the GAO, we did not attempt to determine whether immigration judges applied the correct legal analysis to the facts in reaching a decision on the merits of the asylum claim.

We also sought to assess the factors that appeared to influence detention and release decisions, including the established criteria of identity and community ties, as well as other potential factors such as country of origin, gender, religion and port of entry.[30]

**3. Procedures for file analysis**

We developed a methodology for analyzing the files in consultation with the other experts appointed by USCIRF.[31] We recruited and trained[32] fifteen legal research associates, all

---

[28] The GAO found that INS generally followed its procedures for documenting the Expedited Removal process at selected ports and the credible fear process at selected asylum offices, GAO 2000, p. 7.

[29] With the exception of aliens claiming to be lawfully admitted permanent residents, refugees, or asylees. INA Sec. 235(b)(1)(C).

[30] The GAO report, covering some of the same ground, examined detention and release decisions by conducting a mail survey asking INS district offices about their respective detention policies. GAO 2000, p. 34.

IFR_AR_008231

of whom were upper level law students at Boalt Hall School of Law, University of California, Berkeley.[33]  Our *Desk Procedures for Electronic Data Collection* provided guidance about securing and collecting the data.[34]  The randomly distributed files were both spot checked and duplicate coded.[35]  After the data collection phase, when we narrowed down the variables to analyze further, one researcher was retained to assist the research coordinator in additional quality assurance work.[36]

---

[31] We wish to thank Dr. Fritz Scheuren and Dr. Patrick Baier of NORC for their assistance with the study's overall design and methodology.  We particularly thank Mr. Tad Stahnke, Mr. Mark Hetfield and Ms. Susan Kyle on the staff of the USCIRF for their invaluable assistance and support.  We also thank Mr. Dominic Lusinchi of Far West Research for statistical analysis and consulting services.  Finally, we wish to express our thanks to a great many people in DHS and DOJ, as well as detention officials, who took the time to help us understand their work.

[32] The legal research associates directly involved in analyzing the files received a minimum of 12 hours of specialized training regarding Study goals, past research findings, and relevant legal standards. Some legal research associates participated in site visits to assist in data collection.  They were also trained by discussing the data collection instruments during instrument development.  This was followed by a session of observing and coding a file with the research coordinator.  Training stressed the importance of collecting and reporting information fully and impartially. Unusual cases were brought to the attention of the research coordinator.  Outliers, however, were only removed from the sample in the analysis phase if they did not fit the definition of the sample.  For example, 2 cases referred for a credible fear determination were removed from the national port of entry sample – defined as Expedited Removal or withdrawal cases.  Legal research associates also conducted research on relevant legal standards and other issues pertinent to the Study, and participated in drafting sections of the Study.

[33] We would like to acknowledge the contributions of, and express our appreciation to, the following Boalt Hall students: Mr. Michael Burstein, Ms. Shelley Cavalieri, Ms. Carol Chacon, Ms. Amy Cucinella, Ms. Allison Davenport, Ms. Kathleen Glynn, Mr. Steven Herman, Ms. Olivia Horgan, Ms. Tara Lundstrom, Ms. Lauri Owen, Ms. Kyra Sanin, Ms. Rani Singh, Ms. Rebecca Tanner, Ms. Kaja Tretjak, and Ms. Kristie Whitehorse.

[34] The *Desk Procedures* are on file with the authors. The data collection instructions included general data formatting instructions, such as how to code blanks on a form.  It also included specific guidance, such as which forms usually document representation by an attorney.  We had weekly meetings to discuss and ensure uniform approaches to the data collection instruments.

[35] 7 percent of the port of entry sample was duplicate coded; 6 percent of the Board of Immigration Appeals sample was duplicate coded; 16 percent of the credible fear sample was duplicate coded.  These data were reviewed for clarification and discussion of data entry and coder variability.  The research coordinator used this information in individual meetings to inform the researchers of such inaccuracies and to clarify preferred interpretations among differently coded options.  Weekly meetings of the research team were opportunities to further smooth out inconsistencies in interpretation.  Of the over 500 values collected many were text (e.g., religion, port of entry) and narrative (e.g., comments about why referred to secondary inspection at port of entry) variables.  Others were numeric variables (e.g., did alien express fear according to sworn statement 1=yes/2=no).  Fifty-one variables with numeric values were used in this research report (some as the basis for additional categorical variables created during analysis).  These variables came from the three different file samples – 7 from port of entry, 31 from credible fear, and 13 from BIA.  These duplicate coded numeric variables were analyzed for inter-rater reliability.  Reliability was acceptable with Kappa coefficient above .4; only three variables had a Kappa coefficient between .4 and .6.  Of the numeric variables reported here, the average inter-rater reliability coefficient for the port of entry sample was .81 (range .73-1.00).  For the credible fear sample's numeric variables reported here, the average Kappa coefficient was .90 (range .41-1.00).  The average inter-rater reliability coefficient for the BIA sample's numeric variables reported here was .83 (range .41-1.00).

[36] This involved checking the individual variables for coder variability and where necessary continued spot checking for interpretation issues related to coder error or interpretation differences.  After clarification with the research coordinator, the researcher recoded where necessary.  Additionally, during the analysis phase, the creation of new variables dependent on the original coding provided still another opportunity to review the values for individually coded variables.

IFR_AR_008232

D. STUDY QUESTION 2 - ARE IMMIGRATION OFFICERS INCORRECTLY FAILING TO REFER ASYLUM SEEKERS FOR A CREDIBLE FEAR INTERVIEW?

Customs and Border Protection (CBP) inspectors are responsible for referring aliens who would otherwise receive Expedited Removal orders, or be allowed to withdraw their applications for admission, for a determination of whether they have a credible fear of persecution.[37] Such referrals are based on the alien indicating an intention to apply for asylum or a fear of return. Most Expedited Removal cases do not require or receive such a referral.

We examined electronic records relating to A-files created at ports of entry (POE) to determine whether inspectors had documented their questioning of aliens to see if the aliens feared return to their home countries.[38] Additional insight on reviewing port of entry files emerged when we encountered significant gaps and omissions in files generated electronically by ENFORCE, as detailed below.

The port of entry files (*n*=339) were comprised of two sets:

- one set of files ("national sample") consisting of a series of random samples drawn from all ports of entry, and
- a second set of files from a single airport ("JFK sample").

The JFK files were intended to allow comparison of the Expedited Removal process with Visa Waiver Program procedures in place at JFK. We analyzed the two sets of files separately. The national sample is discussed below.[39] The JFK sample is discussed in Appendix E.[40]

**1. Obtaining the Port of Entry File National Sample**

The national sample set of port of entry files consisted of four random samples of Expedited Removal or withdrawal cases. After Customs and Border Protection used the ENFORCE database to generate a list of all aliens subject to Expedited Removal at ports of entry in fiscal year 2004, we requested 240 such files.[41]

---

[37] The following describes the authority to refer given to inspectors at ports of entry: "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) and the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B)." INA Sec. 235(b)(1)(A)(ii).

[38] The data collection instrument for the POE File sample appears in Appendix C.

[39] Additional analysis of the port of entry national sample appears in Appendix D.

[40] We placed our JFK file sample discussion in Appendix E to avoid confusion with our main discussion of the national sample of port of entry files. JFK's Visa Waiver Program procedures are not part of Expedited Removal procedures. In addition, our national sample already includes randomly selected Expedited Removal cases from JFK.

[41] We requested 20 Expedited Removals of Mexican nationals; 100 Expedited Removals of aliens who were neither Mexican nor Canadian; 20 withdrawals of applications for admission of Mexican nationals; and 100 withdrawals of applications for admission of aliens who were neither Mexican nor Canadian. We deliberately did not sample Canadian nationals subject to Expedited Removal because it would be highly unlikely to find any asylum seekers among them. We chose to under sample Mexican nationals. In FY 2001-FY 2004, approximately 8 percent of aliens

In order to provide access to the records we requested, Customs and Border Protection attempted to use ENFORCE to produce the requested forms and documents, with the caveat that ENFORCE was only newly installed at many ports of entry, that full training had not yet been completed for all officers, and that there might be some systems problems that would result in some forms not being available through ENFORCE. In addition, not all documents used in the inspections process have yet been incorporated into ENFORCE, which was originally designed only for Investigations (now ICE) and Border Patrol cases.[42]

CBP advised us that although accessing case documents entailed many hours of work for them in retrieving this information at the Headquarters level, the alternatives would have been to manually request the A-files from the National Records Center or Files Control Officers and sort through each of those files for the appropriate documents, or send someone, at considerable expense, to the National Records Center to work with us to obtain the documents from the files housed there. CBP attempted to use ENFORCE as the most cost efficient and potentially effective method of assisting the Study. CBP advised us of the potential shortcomings of the ENFORCE system prior to attempting to provide the copies.[43]

Despite CBP's best efforts to respond to our inquiries, their concerns about the limitations of ENFORCE were borne out.[44] A large number of files, between 10 percent to 50 percent of various types of cases requested, contained neither data nor forms, just a cover sheet.[45] This was of concern because the files had been identified by ENFORCE as relevant to the study.

Customs and Border Protection expressed concern at the high percentage of files that were missing documents, and began the process of verifying whether the documentation was indeed available through ENFORCE but had not been generated along with the rest of the file, or was in the paper file, or in fact was missing from the file.[46]

---

in Expedited Removal proceedings were of Mexican nationality. Given our resource constraints, to sample them proportionately would have meant that we would have included only insignificant numbers of aliens from major refugee-producing countries.

[42] Letter from Mr. Michael J. Hrinyak (CBP) to Mr. Mark Hetfield (USCIRF), Jan. 21, 2004, on file with the authors.

[43] Id.

[44] For a full chronology of events relating to gathering study data through the ENFORCE system, *see* letter of Mr. Mark Hetfield (USCIRF), to Mr. Salvador Flores (CBP), dated Sept. 23, 2004, in Appendix F.

[45] Specifically, of the 240 files we requested, 148 files were received and 78 files had only a cover sheet. We then requested 88 additional files, of which 62 files were received and one file had only a cover sheet. Finally, we requested an additional 26 files, of which 26 were received. The final total of port of entry national sample files received was 236, over an initial period of three months. Of those 236 files, three were removed from the analysis because they actually resulted in credible fear referrals, and seven were removed from the sample because, while they were linked to ENFORCE-generated "event numbers" in the sample, they actually related to aliens not on the sample list. Additional files and documents are still being produced at the time of writing, in response to our preliminary finding that many files were missing documents. 41 files were re-sent (1 of the 3 national files previously reflecting a credible fear referral came with documents reflecting a removal order so it was reintroduced into the sample) bringing the total files analyzed to 227.

[46] CBP was able to re-send 41 of the port of entry files which were initially missing sworn statements in 27 cases with Expedited Removal orders, 10 withdrawal of application for admission cases, and 4 credible fear referrals. Of the 41 files re-sent, 7 contained no new documents. CBP generated 31 of the new files with ENFORCE and 10 were collected from the paper record at the National Record Center (including 3 sent in both formats).

IFR_AR_008234

A major concern that emerged from our experience with CBP's difficulties in producing all the requested documents from a given file is the ability of CBP to conduct its own quality assurance efforts in a timely and cost-effective manner.[47]

In analyzing the data, we separated out the cases in the national sample where the country of departure was Canada ($n$=43).[48] The remaining national sample ($n$=184) excludes the Canadian cases.  It is on this national file sample that we base our conclusions, unless otherwise indicated.[49]

## 2.  Documentation regarding fear of return in the port of entry file national sample

Inspectors must take a sworn statement from all aliens subject to Expedited Removal, prior to ordering their removal.[50]  Whenever possible, inspectors are to take a sworn statement from aliens who have been offered the possibility of withdrawing their application for admission in lieu of Expedited Removal.[51]

The sworn statement is taken on Forms I-867A Record of Sworn Statement and I-867B Jurat for Record of Sworn Statement.  Form I-867A contains information that must be given to

---

[47] In this second round of file collection, multiple forms, not limited to the sworn statements, that were initially missing from the ENFORCE file were later produced by ENFORCE.  Other files were incomplete in ENFORCE but contained more documentation in paper form at the NRC.  We received three examples of files generated by both ENFORCE and NRC for the second round in which the initial and re-sent ENFORCE record lacked the Form I-867 Record of Sworn Statement, yet it was re-sent again by the NRC with the sworn statement.  A fourth file even indicated two different case outcomes between the initial and second round receipt.  It initially came from ENFORCE, like all the files, and was quite sparse, indicating on one of two pages that the alien was "Detained for removal hearing/credible fear determination" with a check box on the Form I-259 Notice to Detain, Remove, or Present Alien.  The file thus summarily indicated a referral for a credible fear determination.  When it was re-sent from the National Record Center, however, the more complete file clearly showed the person had been ordered removed.  The one common form to the ENFORCE and NRC files in this case was the Form I-296 Notice to Alien Ordered Removed/Departure Verification, yet the there were two different versions with two dates and even two different photographs of the alien removed. While our follow up enquiry focused on the Forms I-867A & B and the I-877 (those related to mandatory screening for fear) many of the re-sent files contained other new forms, previously missing, such as the I-275 which documents the encounter at the port of entry.  In all, 34/41 of the re-sent files contained different documents than those initially received.  The one case received twice and reflecting two different outcomes was unique to those re-sent, but the pattern of the unreliability of ENFORCE was nonetheless present throughout.

[48] The Inspectors Field Manual 17.2.E.4.d.6) h. states that "In some routine land border withdrawal cases, the Form I-160A is used on the northern border."  The Form I-160A is an additional form used along the U.S.-Canada border to notify Canadian officials that an alien is being refused admission to the United States.  Otherwise the procedures in place for Expedited Removal do not vary from national policy at other ports of entry.  The Canadian cases provided only limited information relevant to the study, however, because 36 of the 43 files as printed from ENFORCE contained only Form I-160A, and did not contain Forms I-867A&B or I-877, or other relevant forms.

[49] Further information on the Canadian cases may be found in Appendix G.

[50] 8 CFR 235.3 (b)(2); Inspectors Field Manual 17.15 (b)(2).

[51] CBP noted that the Inspectors Field Manual specifies that such a sworn statement "should" be taken, not that it "shall" be taken.  E-mail from Ms. Linda Loveless (CBP) to Mr. Mark Hetfield (USCIRF), Nov. 17, 2004, on file with the authors.  However, the CBP Expedited Removal Training Materials instruct that, in withdrawal cases, sworn statements using Forms I-867A and B "should be taken whenever possible…This ensures that all the facts of the case are recorded, especially in potentially controversial cases, *and protects against accusations of coercing the alien into withdrawing, especially when there may have been an issue of fear of persecution"* Section II(E)(4)(i) of the CBP Expedited Removal Training Outline (September 2003). (emphasis added).

IFR_AR_008235

the alien about the Expedited Removal process, including notice that U.S. law provides protection to certain persons facing persecution, harm or torture.[52]  It also contains an advisory that the alien must tell the officer about any such concern because the alien may not have another chance. Form I-867B provides the jurat, as well as the required protection-related questions to be included in the sworn statement.[53]  We analyzed the port of entry file national sample for the presence and content of the required forms.[54]

Table 2 below shows the outcome, whether ordered removal or withdrawal permitted, for aliens subject to Expedited Removal based on how completely CBP inspectors documented screening them for fear of return.  The alien's documented response is indicated in parentheses.  Table 2 presents data separated by the manner of entry – air, and land or sea.[55]

The table shows a high rate of files containing documentation regarding screening for fear of return.  Only 3 out of 106 cases (2.8 percent)[56] of those who received Expedited Removal orders did not have documentation in the file showing that the person had been screened for fear of return.[57]

---

[52] Form I-867A contains the following advisory: "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country.  If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.  You will have the opportunity to speak privately and confidentially to another officer about your fear or concern.  That officer will determine if you should remain in the United States and not be removed because of that fear."

[53] Form I-867B contains the following four protection-related questions: "Why did you leave your home country or country of last residence?" "Do you have any fear or concern about being returned to your home country or being removed from the United States?" "Would you be harmed if you are returned to your home country or country of last residence?" "Do you have any questions or is there anything else you would like to add?"

[54] When the I-867B contained all four protection-related questions with answers entered under each one, we considered it "Full Screening." If the questions appeared on the I-867A, we considered that as "Full Screening" as well. When the I-867B included fewer than all four of the protection-related questions or answers, it was considered "Partial Screening."  When the I-867B was blank where answers should be recorded or when the pertinent form was missing from the file, it was considered "No Documentation of Screening."  In addition to the completeness of the screening for fear of return, we also assessed the alien's response.  "No Fear" is based on our assessment that none of the answers recorded on the form indicate fear of return to the alien's home country.  "Fear" is based on our assessment that at least one answer recorded on the form indicates fear of return to the alien's home country.

[55] Table 3 also allows the comparison of air arrivals to land or sea arrivals.  91 percent of Expedited Removals, and 89 percent of withdrawals, occur at sea and land ports of entry.  However, we deliberately under-sampled Mexican nationals subject to Expedited Removal in the sample.  Therefore, the vast majority of aliens in the sample subject to Expedited Removal (79 percent) came to the U.S. by air, and only 21 percent (39/184) came by land or sea.

[56] These three files were generated by ENFORCE, so it is possible that further searching would reveal that the paper files have the missing forms.

[57] The rate of withdrawal files missing documentation regarding screening for fear of return is higher.  For this category, 17 out of 78 files (22 percent) did not have such documentation in the file.  As noted above, a sworn statement for withdrawals is to be taken whenever possible, but in many cases, especially at land ports of entry, taking a sworn statement is not considered practical in simple cases, such as where an alien left his or her documentation at home and plans to return at a later date.

IFR_AR_008236

**Table 2: Documentation regarding fear of return by outcome and manner of entry for national sample**

| Manner of Entry | Screening | Ordered Removed | Withdrawal Permitted | Total |
|---|---|---|---|---|
| Air | Full Screening (No Fear) | 79 (96.3%) | 59 (93.7%) | 136 |
| | No Documentation of Screening (I-867B missing) | 2 (2.4%) | 4 (6.3%) | 6 |
| | No Documentation of Screening (I-867B blank) | 1 (1.2%) | 0 | 1 |
| | **Total (100%)** | **82** | **63** | **145** |
| Land Or Sea | Full Screening (No Fear) | 24 (100%) | 2 (13.3%) | 26 |
| | No Documentation of Screening (I-867B missing) | 0 | 13 (86.7%) | 13 |
| | **Total (100%)** | **24** | **15** | **39** |

**3. Conclusion**

On a positive note, none of the aliens in the national sample had a documented fear response to the protection-related questions. Because the national sample was made up of aliens who were not permitted to enter the U.S., this is a significant finding.

In a small number of cases of aliens expeditiously removed (*n*=3/106), the files did not contain documentation showing that the person had been asked the questions regarding fear of return. For these cases, we cannot determine whether the questions were asked but the answers were not documented in the file, or whether the questions were not asked. Either eventuality leads to a concern that the aliens might have been removed to a country where they fear persecution. Another possibility is that the paper files on these three cases do indeed contain the necessary documentation, but ENFORCE was not able to generate it.

In the process of conducting this review, we learned that ENFORCE is not designed for quality assurance purposes, nor can a paper review based on the files held in the National Records Center provide a timely and cost effective means of monitoring inspectors' work.

E. STUDY QUESTION 3 - ARE IMMIGRATION OFFICERS INCORRECTLY REMOVING ASYLUM SEEKERS TO A COUNTRY WHERE THEY MAY BE PERSECUTED?

Both U.S. and international law recognize the principle of *non-refoulement*, which prohibits the "[e]xpulsion or return of a refugee from one state to another, especially to one where his or her life or liberty would be threatened."[58] Respect for the principle of *non-refoulement* informs three of the four Study questions posed by IRFA. For example, the second

---

[58] Black's Law Dictionary (1996). The principle of *non-refoulement* with respect to refugees is codified in the 1951 Convention relating to the Status of Refugees, art. 33. The prohibition also appears in the Convention against Torture, art. 3, with respect to persons who face a substantial risk of torture. U.S. legislation protects against both kinds of harm. In addition, the United States has ratified the 1967 Protocol to the 1951 Refugee Convention, as well as to the Convention Against Torture.

IFR_AR_008237

Study question, in Section D above, concerns the proper identification of asylum seekers so that they are not mistakenly returned to harm before having a chance to present their claims. We interpreted the third Study question as more directly addressing the actual adjudication of these claims.  For this portion of our Study, we chose the Board of Immigration Appeals file sample to illuminate one particular aspect of the hearing process: the relationship between the determination on the merits and the earlier Expedited Removal screening phases.

## 1. Obtaining the Board of Immigration Appeals Records of Proceeding

The Board of Immigration Appeals[59] sample of Records of Proceeding, which included the transcript of the alien's immigration court proceeding, was kept in paper form in Falls Church, Virginia, at the BIA, the appellate body of the Department of Justice's Executive Office for Immigration Review (EOIR).[60]  The sample consisted of 170 Records of Proceeding of aliens placed in Expedited Removal proceedings, 163 of which were reviewed.[61]  Each Record of Proceeding had the following four characteristics: (1) there was a final order from an immigration judge regarding the asylum seeker's claim for protection[62], (2) the final order was appealed to the BIA,[63] (3) the Record of Proceeding should have contained a transcript of the

---

[59] Information about the BIA is available at http://www.usdoj.gov/eoir/biainfo.htm. BIA precedent decisions are binding on all Department of Homeland Security (DHS) officers and immigration judges; they can be modified or overruled by the Attorney General and the federal courts.  The BIA has historically followed the precedents set by federal circuit courts for cases arising within that circuit, and declined to follow such precedents outside the circuit jurisdiction when the BIA and circuit positions differ. (Germain, *AILA's Asylum Primer*, 3d ed. (2003) at 16).

[60] The samples were scanned by U.S. Commission on International Religious Freedom (USCIRF) staff between March 29 and May 18, 2004, and were sent to the research team on duplicate CDs.  In order to identify which Records of Proceeding to scan, the "A-numbers FY 02-03 List" was sent in electronic form by DHS' Citizenship and Immigration Services (USCIS) Office of Asylum.  The electronic file name was "APCLST38.TXT".  The file listed 16,633 people who were referred for credible fear interviews during fiscal years 2002-2003.  We then randomly ordered the A-numbers and listed them in batches of 50.  USCIRF staff scanned the corresponding Records of Proceeding in batches of 50, with the goal of collecting between 150 and 200.  The batches of 50 on the sample list did not necessarily yield 50 scanned Records of Proceeding, since they are sent to the immigration court below after the BIA renders its decision and would therefore no longer have been present at the time of scanning.

[61] Seven Records of Proceeding were not reviewed due to time constraints, and the late arrival of files from other samples that had to be coded.  The data collection instrument for the BIA Record of Proceeding sample appears in Appendix H.

[62] Relief from removal to a country where an alien may be persecuted or tortured can take the form of asylum, withholding of removal, or protection under the UN Convention Against Torture (CAT).  The application for any or all three forms of relief is completed using the same form and is adjudicated at one hearing.  The forms of relief differ in their durability, standard of proof, discretionary/mandatory nature, and statutory bars prohibiting their application.  The immigration judge order generally addresses each of the three claims separately, and the claims can separately be appealed by the alien or by the government.

[63] Once the BIA finishes an appeal, the Record of Proceeding is returned to the immigration court below for appropriate action.  Therefore, since the files were present at the BIA, nearly all of the cases in this sample were still pending a decision by the BIA.  Virtually all cases in the Board of Immigration Appeals file sample we reviewed were denials of asylum. This is consistent with the overall appeal rate.  For FY 2002-2003, the alien was the appealing party in 98.3 percent of appeals decided by the Board. Kyle, Fleming and Scheuren 2005, at 17. The Board of Immigration Appeals sample was particularly useful in providing insight into how Expedited Removal proceedings might contribute to denials of asylum claims. Of the 163 cases examined, 153 were appeals by the alien from a denial.  Two of the alien appeals were based on removal orders that did not involve the merits of the asylum claim, but were instead orders related to the ability to apply for asylum.  One involved a missed call-up date for filing an adjustment of status application under the Cuban Adjustment Act; the second involved the inability to prepare the written application for asylum. There were 7 cases of asylum grants appealed by the Department of

IFR_AR_008238

hearing before the immigration judge[64], and (4) the Record of Proceeding was physically located at the BIA at the time the sample was being collected, in order to facilitate collection.[65]

## 2. Reasons for studying the relationship between the three stages of Expedited Removal

The adjudication of asylum claims requires immigration judges to make complex determinations of fact and of probability.  It is important for the immigration judge to ascertain why the asylum seeker fled  - the factual determination – in order to come to a decision about what might happen if he or she is returned – the probability determination.  There is extensive statutory, regulatory, and case law interpreting the refugee definition[66], which must be applied by immigration judges on a case-by-case basis.  The stakes are high – a mistaken decision could mean death, if an asylum seeker is returned to persecution or torture. A key aspect of asylum adjudication is the assessment of credibility, since asylum seekers often lack documentary evidence to corroborate their claims.

The above description applies to all asylum adjudications.  Outside of Expedited Removal, asylum adjudication is carried out by USCIS asylum officers for affirmative cases[67], and by immigration judges in regular removal hearings.[68]

Whether prior DHS administrative records on an asylum applicant are available to asylum adjudicators as evidence varies on the procedural posture of the case.  There are

---

Homeland Security, and two DHS appeals from orders unrelated to the merits of the asylum claims. One was a termination of proceedings on a jurisdictional ground; the other was an order for the withdrawal of application for admission. One BIA case was appealed both by the government for granting Convention against Torture relief and by the alien for denying protection under the Immigration and Nationality Act.  The sample therefore included 93.9 percent cases where the appealing party was the alien, which is consistent with statistics provided by EOIR of all appeals decided by the Board.  Cases appealed by both parties are a fractional percent of cases decided by the Board.  Appeals by the alien made up 98.3 percent of the appeals decided in fiscal years 2002 and 2003.  USCIRF, *Study of Asylum Seekers in Expedited Removal: Statistical Report on Immigration Court Proceedings (FY 2000-2004)*, at 1-17. The high percentage of appeals by the alien does not represent the actual occurrence of denials of asylum claims, which is lower, 72 percent. Id. at 1-2.  Rather, it shows that many approved cases are not appealed by the government.

[64] While all immigration hearings are audiotape, only those on appeal are transcribed.

[65] Some basic information on the makeup of the Board of Immigration Appeals sample is as follows.  Women made up 34.4 percent of the BIA sample; men were 65.6 percent.  The percentage of women in the BIA sample is lower than the 42.8 percent of women in the random sample of credible fear A-files used to analyze detention and release, *see* Section F below.  The overall rate of release prior to the merits hearing was 77.9percent.  Approximately the same percentage of women (76.8 percent) as men (78.5 percent) in the sample was released prior to the hearing. The top five countries of origin represented were China (32.5 percent), Haiti (17.8 percent), Colombia (12.9 percent), Cuba (4.9 percent), and Iraq (4.9 percent). For further analysis of the sample, see Appendix I.

[66] A well-founded fear of persecution on account of race, religion, nationality, membership of a particular social group, and political opinion.

[67] "Affirmative" asylum cases refers to people already in the U.S. who voluntarily bring themselves to the attention of DHS by filing an application for asylum.  Such asylum seekers may have entered legally, or without inspection. They might also have entered with false documents but were not detected during the inspections process.  At the time of filing the application for asylum, they might be in status or might not.

[68] If an asylum officer is not able to approve an affirmative asylum application, the case will be referred to the immigration court for removal proceedings.  The asylum seeker may renew his or her application for asylum before the immigration judge.  In addition, aliens who have not filed a claim for asylum but who are placed in removal proceedings, may apply for asylum at that time as a defense against removal.

IFR_AR_008239

generally not any prior DHS records available to asylum officers deciding on affirmative applications, except perhaps Form I-94 showing the date and place of entry.  Immigration judges in regular removal hearings who are hearing asylum claims referred by the asylum office will have the asylum seeker's Request for Asylum in the United States on Form I-589 and the asylum officer's interview notes.[69]

In regular removal hearings immigration judges will also often be able to consider other DHS records such as Form I-213 Record of Deportable/Inadmissible Alien, which are generally introduced so that the government can meet its burden of proof in establishing that the person in proceedings is an alien and is not authorized to enter or to remain in the U.S.[70]

In removal hearings in the Expedited Removal context, however, immigration judges may have additional evidence – the DHS Expedited Removal record  - that is not available in other asylum adjudication situations.  At first glance, this would seem to be an advantage, allowing the immigration judge to test the asylum seeker's testimony against his or her earlier statements, to help in assessing credibility and to assist in detecting fraud.[71]  It might be expected that use of the prior Expedited Removal records would lead to better, more accurate, decisions by immigration judges.  However, our research, taken together with the observational component of the Study[72], shows that reliance on these records is in many cases unwarranted and could instead contribute to erroneous decisions.  Nor does the Immigration Judges Benchbook provide any specific guidance to judges on the use of Expedited Removal records, in contrast to particular provisions regarding the use of Forms I-213 or I-589.[73]

## 3. The evidentiary relationship between the three stages of Expedited Removal

After being found inadmissible at a port of entry, an alien in Expedited Removal is questioned on two occasions in order to enter into the asylum process.  These interactions are recorded on Department of Homeland Security forms and remain in the A-file.[74]  The alien is

---

[69] The use of the initial I-589 Request for Asylum and the Asylum Officer's notes by the ICE attorney or the immigration judge when an affirmative case is referred to the immigration court for a *de novo* hearing can be distinguished from the use of Expedited Removal records, since the prior records from Expedited Removal reflect a screening process and not a full assessment of the merits of an asylum claim.  Immigration judges in regular removal hearings who are hearing an asylum claim filed for the first time as a defense against removal obviously do not have a prior asylum application to review.

[70] Immigration Judge Benchbook, Part I, Ch. One, II.A.7.a.i. and II.A.7.c. (Oct. 2001).

[71] We are not suggesting that all asylum seekers tell all of the truth all the time.  Nor are we suggesting that statements made at the airport are always less reliable than the testimony at the hearing.  Some would argue that the real story is *more* likely to come out on the first telling, before the asylum seeker might be coached to describe a particular fact pattern.  Others would argue that the real story is *less* likely to come out on the first telling due to the influence of vulnerability, disorientation, exhaustion, fear, poor interpretation, lack of understanding of the process, etc.  What we are suggesting is that the Expedited Removal process is not designed to gather the asylum seeker's full story at the earlier screening stages before the merits hearing.

[72] See Keller 2005.

[73] Immigration Judge Benchbook, Part. 1, Ch. One, II.A.7.a.i. and 1.II.A.7.c. (Oct. 2001).

[74] The DHS forms I-867A Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act and I-867B Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act record the interaction between the alien and CBP inspector.  The DHS form I-870 Record of Determination/Credible Fear Worksheet records the alien's interview by the asylum officer and the outcome of that interview, the credible fear determination.

IFR_AR_008240

required to provide minimal information relevant to his or her asylum claim to the inspector at the port of entry during secondary inspection in order to obtain a referral for a credible fear determination.[75]   The alien is then required to provide information about his or her claim to the asylum officer during a brief credible fear interview in order to establish a credible fear of persecution.[76]   A positive credible fear determination is what allows the alien to proceed to a full removal hearing before an immigration judge where he or she may raise the defense of a claim for protection.

The DHS Expedited Removal record is narrow in scope.  The limited screening function of CBP inspectors and the credible fear determinations made by asylum officers require lower standards of proof than the well-founded fear of persecution standard for asylum applied by immigration judges during removal hearings.

Table 3 is a comparison of the legal standard an asylum seeker in Expedited Removal must meet at each step of the removal process.  There are three different standards, increasingly complex and difficult to meet, as the alien progresses from the port of entry, to the credible fear determination, and finally to the immigration court itself.

---

[75] Regarding the appropriate standard for CBP inspectors, the Office of Programs, INS, Memorandum: Supplemental Training Materials on Credible Fear Referrals (Feb. 6, 1998) instructs inspectors to refer applicants for credible fear interviews based on as little as an affirmative answer to one of the four "protection-related questions" on the form I-867B, "even if the applicant provides no additional information related to the fear of return."  A credible fear referral may also be based solely on non-verbal cues of fear of return.  Office of Programs, INS, Memorandum: Supplemental Training Materials on Credible Fear Referrals (Feb. 6, 1998) at 1-2.  In most cases, inspectors at ports of entry are only establishing inadmissibility and do not probe the fear issues.  Letter from Mr. Michael Hrinyak (CBP) to Mr. Mark Hetfield (USCIS), Jan. 21, 2005, on file with the authors.  A Study questionnaire administered to all eight regional asylum offices summarized the general agreement that port of entry statements are brief and do not contain the alien's full story.

[76] A Study questionnaire, attached as Appendix A, was administered to all eight regional asylum offices in the United States.  It found that the average time for a typical credible fear determination, without an interpreter, was 36 minutes; with an interpreter, it was 46 minutes.  The average time for a typical affirmative interview, without an interpreter, was 53 minutes; with an interpreter, it was 83 minutes.  When asked the purpose of the credible fear write-up (Form I-870) all eight asylum offices answered #1 and #2 but *not* #3.

#1 To justify the decision of a positive or negative credible fear determination;
#2 To record just the basics of a positive determination, to show whether the alien has met the threshold for credible fear.  The credible fear statement does not generally represent a complete description of the alien's asylum claim;
#3 To pursue and record every material detail of the alien's asylum claim.

IFR_AR_008241

**Table 3. Legal standards for each step of the Expedited Removal process**

| Stage of the Expedited Removal Process | Legal Standard |
|---|---|
| Port of Entry/Interior Interview <br> before Secondary Inspector or Border Patrol Officer (DHS Customs and Border Protection) | "If an alien subject to the Expedited Removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30."  8 CFR § 235.3(b)(4). |
| Credible Fear Interview <br> before Asylum Officer (DHS U.S. Citizenship and Immigration Services) | "[A] significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of [title 8]."  8 U.S.C. § 1225 (b)(1)(B)(v). |
| Merits Hearing <br> before Immigration Judge (DOJ Executive Office for Immigration Review) | *Refugee Definition*: "[A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is or unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). |
| | *Burden of Proof for Asylum*: Well-founded fear: a 'reasonable possibility' that the applicant will be persecuted. *INS v Cardoza-Fonseca*, 480 US 421 (1987).  The Supreme Court has ruled that a well-founded fear may be established "when there is less than a fifty percent chance of the occurrence taking place," and stated that an asylum applicant could meet his burden of proof even by establishing a one-in-ten chance of persecution. *INS v. Cardoza-Fonseca* at 440. |
| | *Burden of Proof for Restriction of Removal*:  Clear probability of persecution: more likely than not. *INS v. Stevic*, 467 US 407 (1984). |
| | *Burden of Proof for Protection under the Convention against Torture (CAT)*:  substantial grounds for believing the applicant would be in danger of being subjected to torture; more likely than not.  8 CFR 208.16(c)(2).  CAT, art. 3(1), and Foreign Affairs Reform and Restructuring Act (FARRA) of 1998, sec. 2242(a). |

Given the differing evidentiary requirements of the three stages, it seems likely that the alien would present more information at the merits hearing than was asked for or required at the port of entry or during the credible fear interview.  Case law recognizes the practical difference between an asylum seeker adding detail to the information recorded by an inspector or asylum officer and an asylum seeker contradicting the prior administrative record of his or her statements.  This distinction divides discrepancies which may be used to impeach an asylum

seeker's credibility (contradiction going to the heart of the claim) from those which may not (addition of detail).[77]

## 4. Use of Expedited Removal records in asylum adjudication

We read the transcripts of the merits hearings and the oral decisions not to second-guess the immigration judges' decisions on the merits, but to analyze their reliance on Expedited Removal records, given the potential of these records to confuse, rather than clarify, the asylum seeker's claim.[78]  The data collection instrument was designed to capture the incidents when the port of entry and credible fear statements were introduced, by the alien or the government, used as the basis of questioning, and compared to the alien's testimony during the removal hearing, either to bolster or impeach that testimony.[79]

The goal was to determine not only when Expedited Removal records were raised during the removal hearing but also when the discussion clearly -- by the judge's own account -- influenced the reasoning of the judge's opinion.[80]

Table 4 describes the use of Expedited Removal records to undermine the asylum seeker's presentation of his or her case.  In 81 of the 143 cases with transcripts (56.6 percent) the port of entry and/or credible fear record was used to impeach the alien's testimony.  In 56 of the 143 cases (39.2 percent) one or both prior records contributed to the denial of asylum.

It was interesting to note that most of the few cases in our sample that were granted asylum were from the cases where prior statements were not introduced at the hearing.  Of the 143 cases with transcripts, 134 were denials of all forms of relief.  Only nine cases had outcomes with some form of protection granted – seven were granted asylum relief and two were granted

---

[77] *See, Li v. Ashcroft*, 378 F.3d 959 (9th Cir. 2004); *Chen v. Ashcroft*, 376 F.3d 215, 224 (3d Cir. 2004).

[78] We were unable to code the use of prior statements in files that lacked one or both of the transcript of hearing or decision; 16 cases lacked the transcript of the removal hearing and/or the judge's oral decision.  Additionally, as described above, there were four cases whose outcomes were not based on adjudication of the asylum claim, so those cases did not provide information on the use of prior statements in adjudicating asylum claims.  Because of this makeup of the sample, only 143 files were useful in collecting complete data about the use of port of entry and credible fear statements in asylum adjudication.

[79] It should be noted that the Federal Rules of Evidence (FRE) do not apply in immigration court proceedings, thus we use the term "impeach" to refer to the general concept of calling into question an alien's testimony by contrasting it with prior statements.  Another aspect of the inapplicability of the FRE is that there is no requirement to introduce documents formally into evidence.  This created the potential for us to underreport the use of the prior statements when the immigration judge simply referred generally to earlier statements without the formal clarification of which document was under discussion.

[80] The data about use of the Expedited Removal administrative record as an element of the asylum denial were collected from the transcribed oral opinion of the immigration judge.  We did not attempt to read the judge's mind.  We read the transcripts of the judge's decisions to determine if the judge specifically cited as a factor in his or her opinion the port of entry record (Form I-867A&B) and/or the credible fear determination (Form I-870) with respect to the substance of the claim.  While the factors on which a judge bases a finding are often set forth in the opinion, the weight given to each factor is completely up to the judge and may not be explicitly explained.  When coding the use of the Expedited Removal administrative record as an element of the decision, we counted only when the judge specifically cited the record.  We neither quantified how many elements were cited by the judge nor evaluated the weight given to each element.  In addition, a judge may not necessarily cite every element influencing his or her decision, so the frequency of use of DHS records may be underreported in our Study.

relief under the Convention Against Torture (CAT).  Only three of the 81 cases where Expedited Removal records were used to impeach the alien were granted protection by the Immigration Judge (grant rate 3.7 percent), and two of these were the more limited protection provided by CAT.  This is in contrast to the six asylum grants out of 62 cases (grant rate 9.7 percent) where neither prior record was introduced to impeach.

Where the prior records were cited as an element of the decision, protection was almost always denied.  Of the seven asylum grants in the sample, the immigration judge in one case cited the Expedited Removal records as part of his positive credibility finding.  In the other six asylum grants, the Expedited Removal records were not cited.  When the prior Expedited Removal records were cited as an element of a negative credibility finding, the only subsequent grants of protection were two cases that obtained protection under the Convention against Torture (CAT).[81]  These two CAT cases occurred out of 56 total cases where a prior statement was used to draw an adverse credibility inference.

**Table 4. Use of Expedited Removal records to undermine asylum seeker's case**

|  | **Used to impeach during hearing** | **Contributed to denial of asylum** |
|---|---|---|
| Both I-867 & I-870 | 37 (25.8%) | 27 (18.9%) |
| I-867 only (port of entry) | 31 (21.7%) | 16 (11.2%) |
| I-870 only (credible fear) | 13 (9.1%) | 13 (9.1%) |
| **Subtotal: one or both DHS records** | **81\*** **(56.6%)** | **56\*\*\*** **(39.2%)** |
| **Neither DHS record** | **62\*\*** **(43.4%)** | **87\*\*\*\*** **(60.8%)** |
| **Total** | 143 (100%) | 143 (100%) |

\*1 granted asylum; 2 granted CAT protection. \*\*6 granted asylum.
\*\*\*2 granted CAT protection. \*\*\*\*7 granted asylum

In this sample, success at bolstering the credibility of the asylum seeker's testimony with the Expedited Removal records was infrequent ($n$=4/163).  Furthermore, the immigration judge's finding that the asylum seeker is credible is not dispositive of the case.  Three of the four cases in which prior records successfully aided credibility findings nevertheless resulted in asylum denials.

It is interesting to note that for both impeachment and denial, the port of entry record is used more often than the credible fear determination.  This may be because the port of entry

---

[81] Relief under CAT may be granted even when there is an adverse credibility finding in the asylum context.  See, *Taha v. Ashcroft*, 2004 WL 2626547 (9th Cir. 2004) (No. 02-73499), citing *Kamalthas v. INS*, 251 F.3d 1279 (9th Cir. 2001).

IFR_AR_008244

record, although less complete, purports to be the asylum seeker's sworn statement,[82] while the credible fear determination is the asylum officer's worksheet. The port of entry record was used 68 times versus the credible fear record being used 50 times to impeach, and the port of entry record was cited by the judge 43 times versus the credible fear record being cited 40 times to deny protection.[83]

After establishing the prevalence of immigration judges' reliance on Expedited Removal records, we then read the transcribed oral opinions to assess *how* the judges characterized the discrepancies they cited, that is, whether they were basing their decisions on contradictions or the addition of detail. The data show that both port of entry and credible fear records were contrasted with more detailed claims presented at removal hearings to discredit the alien's testimony on the basis of addition of detail.

In 23.3 percent of the cases in which the record made by the inspector was cited by the immigration judge in denying asylum, the judge characterized the discrepancy between the information recorded at the port of entry and the testimony during the removal hearing as the addition of detail.[84] The immigration judge characterized the discrepancy between the administrative record of the credible fear determination and the removal hearing testimony as the addition of detail in 25 percent of the cases in which the record of the credible fear determination was used as an element in the denial.[85]

---

[82] However, Keller 2005 documents that in 72 percent of cases observed (268/373) the sworn statement was not in fact reviewed by the alien, interpreter, or interviewing officer prior to the alien signing the form, even though the form indicates that the sworn statement was read by, or back to, and verified by, the alien (as required by the regulations. See 8 CFR 235.3(b)(2)(i)(2004).

[83] In order to assist immigration judges, Citizenship and Immigration Services revised its Form I-870, the Credible Fear Determination Worksheet, as of Nov. 21, 2003, to show that it is a summary of the alien's statement, not a verbatim record. The advisory appears at the beginning of Section III of Form I-870 and states: "The following notes are not a verbatim transcript of this interview. These notes are recorded to assist the individual officer in making a credible fear determination and the supervisory asylum officer in reviewing the determination. There may be areas of the individual's claim that were not explored or documented for purposes of the threshold screening." Customs and Border Protection, in response to a similar recommendation made by the Office of the United Nations High Commissioner for Refugees, declined to revise Forms I-867A and B. CBP did not agree that the form should contain warnings, and stated that trial attorneys or judges may determine the appropriate weight to be given to such statements in subsequent proceedings. U.S. Customs and Border Protection Response to Recommendations in UNHCR Expedited Removal Study, p. 4.

[84] An example of this was an immigration judge who made an adverse credibility determination because an asylum seeker had not told the airport inspector that he had been arrested. When the immigration judge challenged the asylum seeker as to how he could 'forget' that he had been in jail, the asylum seeker testified: "When I was in the Immigration Office, I did not forget that I had been put away in prison for four days. The fact is, they did not ask me about that." The judge determined that the detention had not occurred, and that the asylum seeker was not credible. The claim was denied. BIA Sample Random No. 0.207281716, on file with the authors. Of the 43 cases in which the I-867 was used as an element of the immigration judge's denial of asylum, 10 involved addition of detail between the I-867 and the applicant's testimony, 23 involved contradictions between the I-867 and the testimony, and 8 involved a change of claim between the I-867 and the testimony. Two cases involved usage of the I-867 independently (internal contradiction, lack of nexus).

[85] Of the 40 cases in which the I-870 was used as an element of the immigration judge's denial of asylum, 10 involved addition of detail between the I-870 and the applicant's testimony, 19 involved contradictions between the I-870 and the testimony, 3 involved both addition of detail and contradictions, and 2 involved a change of claim between the I-870 and the testimony. Two cases involved contradictions between the I-867 and I-870. Three involved usage of the I-870 independently. One partial transcript revealed only that the judge cited the I-870 as a factor, but not how it was used.

IFR_AR_008245

In addition to the incomplete nature of the prior records for the purpose of the immigration judge's credibility determination, there are also concerns regarding the reliability of these documents. Questioning at the port of entry is rarely videotaped[86] and there is no audio or video tape made of the asylum officer's interview. The port of entry monitoring component of this Study raised concerns relating to the accuracy of some records as compared to the actual exchange that researchers observed between the alien and the inspector. [87]

Overall, the data raise important questions about the extent to which immigration judges are taking into account the limitations of Expedited Removal records. Excessive reliance on these incomplete and sometimes unreliable records could contribute to erroneous decisions.[88]

## 5. Conclusion

Records of Proceeding analysis revealed that immigration judges often rely on Department of Homeland Security Expedited Removal records. Although immigration judges are accustomed to considering prior DHS records in other types of removal proceedings for simple factual determinations on matters such as establishing alienage, the specificity of the fear questions and the question-and-answer format of the port of entry records in the Expedited Removal context lead some judges to an unwarranted reliance on the prior records in the more complex matter of asylum adjudication.

Our findings reveal that the Expedited Removal record created during the Expedited Removal process is in many cases used by immigration judges and DHS trial attorneys to impeach aliens' credibility and undermine their claim. These records, therefore, continue to have an effect throughout the asylum process, despite their lack of reliability. Consequently, to minimize the risk that immigration judges mistakenly order an asylum seeker returned to persecution, it is critical that judges fully appreciate the limitations of the prior records.

---

[86] Atlanta, Houston and Las Vegas International Airports have a videotape system in place for secondary inspections. However, the videotapes are typically taped over after 60-90 days, and are usually not available either to the asylum seeker or to the government at the merits hearing. Secondary inspectors at three land ports of entry (Oroville, Washington: Peace Bridge and Champlain, New York) also have a videotape system; again, the videos are retained only for relatively brief periods of time. *See* Kuck 2005.

[87] Keller 2005 describes the cases of 12 aliens who expressed a fear of return, but were not referred for a credible fear determination. Seven of the 12 files indicated that the fear questions had been answered in the negative. In another 37 cases where at least one of the fear questions was not asked, 32 of the files indicated that the questions had been asked and answered.

[88] Some immigration judges are aware of the limitations of Expedited Removal records and treat them accordingly. One immigration judge stated that he would give "very little, if any, weight to the airport statement because of the lack of safeguards that the Third Circuit has indicated should be in place." Random No. 0.370647298, on file with the authors. The immigration judge was referring to *Balasubramanrim v. INS*, 143 F.3d 157 (3d Cir. 1998) (the airport statement is "not an application for asylum" and *Senathirajah v. INS*, 157 F.3d 210 (3d Cir. 1998) (a summarized record is less reliable than a verbatim account; statements that lack detail are less reliable; an alien who was interrogated in the country of origin might be reluctant to speak, and the record may be less reliable, and; if the record demonstrates a lack of understanding on the part of the asylum seeker, it is less reliable).

IFR_AR_008246

## F. STUDY QUESTION 4 - ARE IMMIGRATION OFFICERS DETAINING ASYLUM SEEKERS IMPROPERLY OR IN INAPPROPRIATE CONDITIONS?

Detention is prescribed by statute for asylum seekers referred for a credible fear determination.  If found to have a credible fear of persecution, asylum seekers who meet certain other criteria are eligible for release (parole) from detention[89] while their asylum case is under consideration.  Agency policy favors the release of eligible asylum seekers who have established a credible fear of persecution.[90]

To be eligible for parole, asylum seekers who have established a credible fear of persecution must also establish their identity, show that they are not a flight risk by demonstrating community ties, and must not be subject to any possible bars to asylum involving violence or misconduct.[91]  These criteria are drawn from internal agency guidelines, but are not set forth in regulations.  Detention and release decisions are committed to the discretion of the local Immigration and Customs Enforcement (ICE) Detention and Removal Operations (DRO) Field Office Director, and other Department of Homeland Security officials designated by the Secretary of Homeland Security.[92]

The release of eligible asylum seekers carries with it a number of benefits.  These include relieving an already vulnerable group of people from the burden of imprisonment[93], allowing them to benefit from the support of family and community members, facilitating their ability to obtain legal and other assistance,[94] and saving the government a considerable amount of money (thereby allowing scarce resources to be allocated where the need is greater).[95]

---

[89] Aliens subject to Expedited Removal who are released prior to their merits hearings are "paroled," though some DHS offices may refer to this as being released on the alien's own recognizance or "bonded" out of detention.  Our use of the term "release" refers to the period prior to the merits hearing, not to release following an immigration judge's order.

[90] INS Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) from Michael A. Pearson, Executive Associate Commissioner for Field Operations, Office of Field Operations, to Regional Directors, District Directors, Asylum Office Directors, reproduced in 75 *Interpreter Releases* 270 (Feb. 23, 1998).  The memorandum is attached as Appendix B.  *See also*, GAO 2000, pp. 62-67.

[91] Id.

[92] 8 CFR 212.5(b) (2004).

[93] Our file review revealed instances of the psychological burden of detention:  "…I asked him about his adjustment to incarceration.  He was observed to become restless and mildly irritable.  After complaining about the restrictions on his freedom of movement, responded, 'I feel like an animal'. . . .  He admitted that the uncertainty regarding his future had resulted in feelings of hopelessness, which he thought would disappear once he was released.  Several times during the conversation [name redacted] was observed to abruptly duck his head and curl his shoulders and arms inward.  The effect was that of someone attempting to make himself appear small." BIA Sample Random No. 0.319650868, on file with authors, at p. 3-4 (Psychological Evaluation of an alien who was eventually released prior to his merits hearing and later granted asylum).

[94] File review also revealed examples of the impact of detention on the ability to present one's case.  In a letter describing his luggage taken upon arrival an alien writes, "Though I had given thes informations many times from [four months prior], twice in written form and by explaining personally to The INS Officers 4 times now, I once again bring it to your kind notice that this bag contains all my paper works including my [name of country redacted] ID which I require very badly to produce in the courts [within two weeks time]." Credible Fear Sample Random No. 0.056123539 at p. 321;  *See also*, Haney 2005.

[95] See Haney 2005 (stating that the average cost of detention is $85 per night).  .

IFR_AR_008247

However, release also carries the risks that the asylum seeker may fail to appear for his or her hearing[96] or may pose a threat to public safety or to national security. Because of these strongly competing considerations, parole criteria necessarily reflect a desire to manage the risks of releasing an asylum applicant prior to the hearing on the merits of his or her claim.

Factors such as the asylum seeker's country or region of origin, gender, religion, and port of entry into the U.S. are not generally elements in the criteria for parole. These factors would not be expected to have an influence on the detention and release decisions made by Immigration and Customs Enforcement. In at least one recent instance, however, the Attorney General has cited country of origin (Haiti) as a relevant factor in whether to exercise discretion to release a detained asylum seeker.[97]
If such factors do appear to be associated with detention and release decisions, it raises the question of whether the decisions are arbitrary and therefore improper. Another example of improper detention would be the continued detention of an alien who is eligible for parole.

Examining A-files of asylum seekers referred for a credible fear determination allowed us to assess release decisions and their association both with information elicited by USCIS relating to parole criteria and with other factors that are not elements in the criteria for parole. Department of Homeland Security statistics indicate that release decisions are not uniform throughout field offices.[98] Variations in release rates may be due to differences in local parole policies, or differences in eligibility of the detained populations. Variations could also be linked to factors such as port of entry and gender, both of which are related to available bed space in detention facilities, or to the nationality or religion of the asylum seeker.

---

[96] The GAO found a rate of decisions issued for failure to appear of 42 percent, although the Department of Justice determined that the rate dropped to 34 percent as time went by, and would eventually be as low as 25 percent when all cases were completed, GAO 2000, p. 9. Statistics put together for this Study indicate a decisions issued for failure to appear rate of 22 percent, varying by nationality from a low of 7 percent for Chinese to 81 percent for Sri Lankans (many Sri Lankans are in transit to Canada). The failure to appear rate with Sri Lankans not considered is 15 percent. EOIR Summary Tables R & S, Kyle, Fleming and Scheuren 2005,.

[97] Specifically, the Attorney General found, "(a)s demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of (undocumented seafaring migrants from Haiti) into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a) (of the INA)." Matter of D-J-, 23 I&N Dec. 572 (A.G. 2003). D-J- involved an undocumented Haitian who arrived by sea. After D-J applied for a bond under 236(a), the Commissioner of the INS ordered that non-Cuban undocumented aliens who arrive by sea would no longer be eligible for bond under section 236(a) of the INA, but would instead be placed in Expedited Removal, pursuant to INS Order No. 2243-02, published at 67 FR 68924 (November 13, 2002). With such aliens now subject to Expedited Removal, it is at the discretion of the Secretary of Homeland Security (DHS), not the Attorney General, whether such aliens may be released from detention. While D-J- was "grandfathered" out of Expedited Removal proceedings, it is interesting to note that the Immigration Judge and the BIA, both of which are within the Department of Justice, granted D-J-'s application for bond, but the Attorney General reversed that determination at the request of the Under Secretary for Border and Transportation Security at DHS. Matter of D-J- at 573.

[98] See DRO Chart 7, Fleming and Scheuren, *Statistical Report on Detention*.

IFR_AR_008248

Finally, examining A-files of asylum seekers referred for a credible fear determination allowed us to assess whether and how detention and release decisions are documented.[99]  The criteria for release of an asylum seeker prior to the merits hearing are elicited and recorded first by a U.S. Citizenship and Immigration Services (USCIS) asylum officer and later considered by a local Immigration and Customs Enforcement (ICE) Field Office Director.  The recording of information relevant to release by USCIS is contained on the same form for every alien who is referred for a credible fear determination (the form I-870)  The documentation of release consideration by ICE is not standardized and varies by local field office.

## 1. Obtaining the credible fear files

The credible fear files were drawn from the same list of over 16,663 aliens referred for credible fear determinations during fiscal years 2002-2003 described in Section E above.[100]

In order to facilitate the file collection process, we, along with staff members of the U.S. Commission on International Religious Freedom (USCIRF), traveled to sites[101] with large concentrations of files to scan the files electronically. Nevertheless, despite the considerable resources expended by USCIRF to obtain files, collecting the files was a long and difficult process.[102]  Consequently, more than four months after the 491 files were requested, and after dozens of communications between USCIRF and DHS, 88 files were still missing.  More than five months after our initial request, U.S. Citizenship and Immigration Services (USCIS) delivered approximately half of the missing files. [103]

Despite our repeated requests to DHS and our readiness to perform the task of scanning the files, at the end of the study period we were still missing nearly 10 percent of the files requested, 45 out of 491.  These files were never provided to USCIRF in any form.

To examine detention and release decisions, we fully examined the 353 A-files drawn from the random sampling of all credible fear referral cases that were located in various DHS offices around the country. As detailed below in subsection 2, we first determined how long

---

[99] The data collection instrument for the Credible Fear File sample appears in Appendix J.

[100] There was an overlap of three cases between the two samples drawn from the superset list, i.e., there were three A-files from the credible fear files random sample on appeal at the Board of Immigration Appeals at the time that the BIA files sample was drawn. The credible fear A-files were randomly selected to produce a representative sample of aliens going through Expedited Removal who were referred from secondary inspection to the credible fear determination stage. Choosing every 34th file of the superset resulted in 491 files, which USCIRF requested on March 8, 2004.  After removing extraneous files, the resulting sample size was 461. The extraneous files consisted of 'reasonable fear' cases, another type of determination made by USCIS.  Correcting for these caused an adjustment of 30 files.

[101] Sites included Atlanta, Los Angeles, Miami, New York, Newark, Philadelphia and San Diego.

[102] These A-files are not available electronically and DHS does not have an efficient means of accessing copies of files unless they are located at the National Records Center.

[103] The final tally of the 461 credible fear files is as follows: 353 files were received and fully analyzed (we originally received 354 files, one of which proved to be another 'reasonable fear' case, so we excluded it from further analysis); 39 files were provided by USCIS only in 10 point summary form with no identifying information because they pertained to lawful permanent residents who are protected by privacy laws; and 23 files were received too late for review. A table showing which files were produced and not produced, by location of file, is in Appendix K.

IFR_AR_008249

asylum seekers in the sample were detained. In subsection 3, we then assessed rates of release prior to the merits hearing against various demographic and geographic variables, followed by an examination in subsection 4 of release rates for those who met the parole criteria as elicited and recorded by asylum officers on Form I-870. We chose to use this form because it reflects the first DHS information relating to parole eligibility factors and because this form is filled out for all asylum seekers in Expedited Removal.[104]

## 2. Length of detention of asylum seekers in sample

Since almost all aliens in Expedited Removal are detained at least until a positive credible fear determination is made, we calculated length of detention based on the date of arrival and the last documented date of detention entered in the file.[105]

Asylum seekers in our sample were detained, on average (mean), for 76 days. The median number of days of detention was 20: in other words, 50 percent of the cases were kept in detention for 20 days or less, and the other 50 percent for over 20 days.[106] The sample of cases shows considerable variation, and although a majority were released within a month (see Table 5 below), a substantial number of cases remained in custody for much longer periods. Fifteen percent of cases remain in custody longer than 6 months (180 days).[107]

---

[104] The I-870 Credible Fear Determination Worksheet is filled out for all asylum seekers in Expedited Removal who are referred from secondary inspection to a credible fear determination, unless they dissolve. Although Immigration and Customs Enforcement officers, and not U.S. Citizenship and Immigration Services asylum officers, make decisions on detention and release, file review revealed that there is no one form that is used by ICE officers comparable to the I-870 to record their decision-making process. While we found examples of various types of documents, some of them specific to particular offices, that shed light on ICE detention decisions, systematically mining the files for the detention decision-making process would require a different level of analysis to attempt meaningful comparisons.

[105] For an alien released prior to the merits hearing, the ending date of detention was the date of that release. For an alien not released prior to the merits hearing, the ending date of detention was the date of release due to a final grant or denial of their claim. For the small number of aliens in the sample with pending cases who were still being detained ($n=4$), we calculated the total length of detention as of the date the sample was drawn, with the result that the final length of detention for these aliens is unknown but will be underestimated. These four cases were all pending at the Board of Immigration Appeals level. We excluded cases that dissolved (n=32) since they are not representative of what asylum seekers experience in terms of length of detention.

[106] The large discrepancy between the mean (76) and the median (20) indicates that the mean is substantially influenced by cases in the upper end of the distribution. For this particular variable (days in detention), the mean is not a good measure of central tendency: it does not reflect well the "typical" time spent in detention.

[107] Our sample was therefore comparable to Immigration and Customs Enforcement statistics for FY 2003 cited in Haney 2005, p. 1, stating that the average length of detention for released asylum seekers in Expedited Removal was 64 days (our sample average was 76 days), and 32 percent (25.3 percent in our sample) were detained 90 days or longer.

**Table 5: Length of detention**

|  | Frequency | Percent | Cum. Percent |
|---|---|---|---|
| Never Detained | 2 | .6 | .6 |
| 30 days or less | 180 | 56.0 | 56.6 |
| 31-90 days | 58 | 18.1 | 74.8 |
| 91-180 days | 33 | 10.3 | 85.0 |
| >180 days | 48 | 15.0 | 100.0 |
| **Total** | **321** | **100.0** | **100.0** |

### 3. Factors associated with release rates

We then examined the release rates of asylum seekers[108] jointly with other relevant (mostly demographic) variables, such as country or region of origin, gender, religion, and port of entry.  Overall, 78 percent of the cases were released prior to the merits hearing, and 22 percent were not.

Table 6 presents released cases and rates (in percents) by region of origin.  The region with the highest rate of release prior to the merits hearing was East Asia (83/95=87.4 percent).  The region with the lowest rate of release prior to the merits hearing was South/Central Asia (2/13=15.4 percent).  Two regions out of the 8 had a release rate of less than 50 percent: Sub-Saharan Africa (4/11=36.4 percent) and South/Central Asia.  The other 6 regions all had release rates that were higher than 70 percent.  The asylum seeker's region of origin had a statistically significant effect on rates of release prior to the merits hearing.[109]

**Table 6: Released* cases and rates (in percents)**
**by region of origin**

| Region of Origin | Paroled | Not Paroled | Total (100%) |
|---|---|---|---|
| South America | 51 (81.0) | 12 (19.0) | 63 |
| Central America | 4 (80.0) | 1 (20.0) | 5 |
| Europe | 25 (71.4) | 10 (28.6) | 35 |
| Caribbean | 70 (81.4) | 16 (18.6) | 86 |
| East Asia | 83 (87.4) | 12 (12.6) | 95 |
| South/Central Asia | 2 (15.4) | 11 (84.6) | 13 |
| Middle East/North Africa | 11 (84.6) | 2 (15.4) | 13 |
| Sub-Saharan Africa | 4 (36.4) | 7 (63.6) | 11 |
| **Total** | **250 (77.9)** | **71 (22.1)** | **321** |

*Release prior to the merits hearing.

---

[108] Excluding those whose asylum claim was dissolved ($n$ = 32).
[109] Results of chi-square test: $\chi^2$ = 39.554, $df$ = 5, $p$ = 0.000.

IFR_AR_008251

Table 7 below clarifies the outcome for certain regions by providing release rates for the four major countries. These countries are the ones that supply the largest numbers of asylum seekers: between the four of them, they account for nearly 63 percent of the credible fear sample.[110] Table 7 shows that the release rate for asylum seekers from Cuba was 100 percent, while that of Haitians was 66 percent. Colombia and China fell in the middle, with 75 percent and 87 percent released prior to the merits hearing, respectively. The asylum seeker's country of origin had a statistically significant effect on rates of release prior to the merits hearing.[111]

**Table 7: Released[*] cases and rates (in percents) by major country**

| Major Country | Paroled | Not Paroled | Total (100%) |
|---|---|---|---|
| China | 81 (87.1) | 12 (12.9) | 93 |
| Colombia | 30 (75.0) | 10 (25.0) | 40 |
| Haiti | 27 (65.9) | 14 (34.1) | 41 |
| Cuba | 38 (100.0) | 0 | 38 |
| Other** | 74 (67.9) | 35 (32.1) | 109 |
| **Total** | **250 (77.9)** | **71 (22.1)** | **321** |

*Release prior to the merits hearing. ** Includes all other countries.

As shown by Tables 6 and 7 above, the differences in release rates among regions and among countries could not be attributed to chance alone. In both cases, the asylum seeker's origin appeared to make a difference in terms of the likelihood of being released prior to the merits hearing.

We also found that rates of release prior to the merits hearing varied significantly by gender, religious affiliation, and port of entry to the U.S.[112] As noted above, these factors are usually not elements of the parole criteria. Using region and country of origin as an example, we attempted to examine eligibility for parole as a possible explanation for variations in release rate.

## 4. Analyzing parole eligibility and release rates

*a. Reasons for difficulty in analyzing parole eligibility and release rates*

One difficulty with analyzing release decisions is the lack of uniform nationwide criteria and documentation. As noted above, internal agency guidelines establish the criteria of a positive credible fear determination, identity, community ties, and the absence of any possible bars to asylum involving violence or misconduct. Wide variations in release rates from district to district indicate that some districts may be applying more restrictive, and others more generous, criteria than those established by internal agency guidelines.[113]

---

[110] This percentage is based on the entire sample ($n$ = 353).
[111] Results of chi-square test: $\chi^2$ = 27.9561, $df$ = 3, $p$ = 0.000.
[112] For additional analysis of the credible fear file sample, see Appendix L.
[113] *See* DRO Chart 7,Aliens Released Prior to Merits Hearing, Fleming and Scheuren *Statistical Report on Detention*.

IFR_AR_008252

Information related to parole criteria is elicited in the first instance by U.S. Citizenship and Immigration Services (USCIS) during the credible fear determination. The asylum officer records information about identity, community ties, and possible bars to asylum on the I-870 Credible Fear Determination Worksheet. The information as elicited may then be considered by Immigration and Customs Enforcement (ICE) at the local field office level when making the discretionary decision whether to release an asylum seeker from detention.

We attempted to assess how the Department of Homeland Security applies the parole criteria. We examined the files for information that would indicate whether the alien was released prior to the merits hearing and for documentation on the decision-making process.[114] Although Immigration and Customs Enforcement (ICE) officers make detention and release decisions, there is no uniformity to the ICE documents in the files relating to these decisions.[115]

*b.  Variations in ICE documentation regarding detention and parole*

---

[114]A comparison from our file review may illustrate the challenges in analyzing ICE's process. Two men from the same country were each found to have a credible fear based on a religious claim. Each had an affidavit of support from a relative sponsor in the community. Each had an attorney and applied for parole. One was released prior to his merits hearing; the other was not. Credible Fear Sample Random Nos. 0.816431166 and 0.048158208, on file with authors. File review revealed more information about ICE's application of the parole criteria for the one who was *not* released for the duration of his case than for the one who was released within a month of his arrival. With regard to the alien who remained detained until he was granted protection, nine days after his parole application, there was a "Deportation Office Parole Recommendation" for continued custody. The form listed the parole criteria: First, credible fear was established. Second, identity was addressed, "Identity docs presented: Copies of identification card" with a conflicting comment at the bottom of the form that "The subject has not presented any identity documents on his behalf." There was no reference to identity documents in his file from a Western European country where he had previously sought asylum, that had been confirmed by that country. Third, community ties were "not verified." Even though his sponsor's information was listed, a comment indicated "relationship between the subject and the sponsor is not established." Fourth, there was an indication there was no criminal history. In the comments section, a further reason for the denial was that smugglers had been apprehended in one of the countries he transited and the authorities in that country wanted the asylum seeker's cooperation with their prosecution. A final statement on the Parole Recommendation form was, "The subject is likely to abscond or fail to appear for future hearings if he is released." The next document in the file related to his detention was the "Order to Detain or Release Alien" authorizing his release upon being granted withholding of removal.
For the alien who *was* released prior to his merits hearing, there was a similar parole application with only an affidavit of support. Confirmation that there was a positive credible fear determination and records of criminal data base checks precede the alien's parole release letter. The letter states, "We have concluded that your client meets the criteria for parole." There was no overall parole recommendation form that applied each of the criteria to the alien's circumstances. The file does not state how identity was established and if or how the relationship with the relative sponsor was verified. The next mention of identity documents in the file occurred six months later in the list of evidence submitted with his asylum application. This is not to suggest that ICE did not establish his identity before his release but that it could not be determined from the file what level of proof they required and how it was satisfied in the particular instance.

[115] The 1997 Guidance, however, may not have provided sufficient clarity as to the establishment and application of parole criteria for asylum seekers subject to Expedited Removal. In a memorandum provided to USCIRF by ICE-DRO, New York INS District Director Edward McElroy stated to INS Commissioner Doris Meissner, (dated Nov. 3, 1999), "I applaud the recommendation to issue written policy guidance from either the Executive Associate Commissioner for Field Operations or from you, Commissioner. I have frequently stated that I would comply with any written directives on the subject of parole…A written standardized review process will yield greater uniformity in the parole decisions made by all District Directors."

IFR_AR_008253

Documentation for releases granted prior to the merits hearing varies.[116]

### 1). Documentation of decisions granting parole

Letters authorizing release might reference the parole criteria as in the following example, although they do not specify how the criteria apply to the individual asylum seeker:[117]

> "The decision to release, or parole, an individual from detention is discretionary.  Under INS policy, however, an individual found to have a credible fear of persecution should generally be paroled whenever the individual can establish that he or she is likely to appear for all hearings or other immigration matters and that he or she poses no danger to the community.
>
> We have concluded that you meet the criteria for parole."

Other letters granting release might reference different standards than the criteria of establishing identity, community ties, and no danger to the community.  The following excerpt is from a memorandum that both requests and grants parole:

> "It is requested that [name redacted] be granted parole into the United States for Significant Public Benefit Parole, Pending Immigration hearing.
>
> I concur with your recommendation for Significant Public Benefit parole of this alien."

This type of documentation above typically appears in the file of a Cuban arrival by land; sometimes the standard cited is "Humanitarian Parole" instead of "Significant Public Benefit Parole."  The request is made by the supervisory deportation officer, and the approval is by the director for detention and removals.

### 2.) Documentation of decisions denying parole

Denials of parole requests also vary in their level of documentation.[118]  Denials generally go further into detail about the application of the parole criteria to the case at hand than do grants

---

[116] In our sample, about 80 percent of those released prior to the merits hearing had authorization for the release in the file.  Authorization included letters from district directors, parole review worksheets, orders to release, and others.  About 18 percent had something from DHS – post authorization – that documented they were being released.  An example of post-authorization documentation of release is the form I-830 Notice to EOIR of New Address.  About 2 percent did not have anything from DHS in the file about the release, but the file taken as a whole, e.g. documents from the alien or the alien's attorney, revealed that the person had been released.

[117] Full redacted examples of parole documentation appear in Appendix M.

[118] It should be noted that about 2/3 of the credible fear files relating to aliens who were not released prior to the merits hearing (excluding dissolved cases) contained neither a parole request nor a parole denial (46/70).  In these cases, the absence of documentation on review for parole eligibility allowed no insight into the decision to continue to detain.  In 4/70 cases there was no response to a request for parole; in 4/70 cases there was documentation from an immigration judge (DOJ) either denying bond or describing a lack of jurisdiction for the release decision instead of a parole decision by ICE.  Therefore, for over 75 percent (54/70) of the cases that remained in custody until the

IFR_AR_008254

of parole.  Some denials of parole requests include a checklist of criteria as in the following example, although they do not specify how the criteria apply to the individual asylum seeker.

> "The decision to release, or parole, an individual from detention is discretionary.  Under INS policy, however, an individual found to have a credible fear of persecution should generally be paroled whenever the individual can establish that he or she is likely to appear for all hearings and other immigration matters and that he or she poses no danger to the community.
>
> At the present time, the INS must deny your request for parole for the following reasons:
>
> o   You have not sufficiently established your identity and therefore INS cannot be assured that you will appear for immigration proceedings and other matters as required.
>
> o   You have not established sufficient ties to the community that assure INS either that you have a place to reside if you are released or that you will appear as required.
>
> o   Based on the particular facts of your case, including manner of entry, INS cannot be assured that you will appear for immigration hearings or other matters as required.
>
> o   Information in your file suggest that you may be engaged in or are likely to engage in criminal or other activities that may pose a danger to the community."

Other letters provide even less insight into the application of parole criteria, as in the following example:

---

merits hearing, the reason why ICE decided not to release these asylum seekers could not be ascertained.  The remaining 16 cases contained clear negative parole determinations, but while some of the files contained supporting evidence either submitted by the alien or generated by ICE, in only 9 percent of files (6/70) did ICE articulate the link between individualized evidence and ICE's justification for continued custody.  It is important to note that procedures for applying for parole are also unclear, and that asylum seekers in Expedited Removal need not necessarily "apply" for parole to be considered.  For example, in a memorandum from New York District Director Edward McElroy to INS Commissioner Doris Meissner, dated November 3, 1999, District Director McElroy notes, "As part of the routine review process, deportation officers at WCC (the INS Queens Detention Facility) review all cases granted credible fear for possible parole under emergent medical or humanitarian reasons.  They review all evidence the alien and his/her representative presented to the APSO to prove identity and community ties…Further, when a written parole request is received the entire case is reviewed again, including any additional evidence provided in the request…"  When ICE-DRO provided this memorandum to USCIRF, however, it advised "ICE is making this document available in order to provide a historical perspective of Expedited Removal releases from detention in the New York district.  However, ICE has not at this time adopted the concepts contained in this memorandum as its policy."  Letter from Mr. Victor Cerda, Acting Director of ICE Detention and Removal Operations, to Mr. Mark Hetfield (USCIRF) June 22, 2004, on file with the authors.  ICE-DRO has not, however, made it clear to the Expedited Removal Study what concepts it has adopted as its policy.

> "After careful review and consideration of all factors pertinent in your case, it does not appear to be in the public interest to parole your client into the United States at this time.  Therefore, your request for release from custody is denied."

*c. Information relevant to parole elibility elicited and recorded by USCIS*

As noted above, ICE's documentation of decisions to approve or deny release is not uniform or detailed.  In contrast, U.S. Citizenship and Immigration Services (USCIS) asylum officers consistently elicit and record information pertinent to the parole criteria on Form I-870, the Credible Fear Determination Worksheet,[119] making it a more useful form to compare across the sample.  We therefore analyzed the files for the I-870 and what it showed about at least the initial USCIS recording of information concerning parole eligibility.

### 1.) Identity

For the purpose of analysis, we examined whether the identity of the asylum seeker was established to an Asylum Officer to a reasonable degree of certainty, and whether the asylum seeker indicated that he or she had a sponsor in the U.S.[120]  Analysis shows that of the files containing the I-870, documentation indicated nearly all asylum seekers in the sample $(303/305=99$ percent$)$[121] were able to establish their identity to a reasonable degree of certainty.  However, approximately 75 percent of asylum seekers in this sample $(230/305)$ were placed in Expedited Removal because they had no documents or were suspected of presenting false documents.[122]  Therefore, for many asylum seekers in this sample, identity appeared to be an issue.

ICE and USCIS may be applying different criteria in order to verify identity. USCIS criteria for establishing identity are found in the Asylum Officer Basic Training Course.[123]

---

[119] The Asylum Officer Basic Training Course contains formal guidance about identity determination during the credible fear screening.  The AOBTC credible fear lesson also cross-references another lesson, "Asylum Eligibility Part I: Definition of Refugee; Definition of Persecution; and Eligibility Based on Past Persecution."  E-mail from Ms. Georgia Papas (USCIS) to Mr. Mark Hetfield (USCIRF), Dec.17, 2004.

[120] The analysis of parole information relevant to eligibility is based on $n$=305.  The 32 dissolved cases were excluded because the aliens dissolved their cases prior to the asylum officers' recording of information related to the parole criteria, which happens during the credible fear determination.  Sixteen other cases were excluded from this analysis because they had a missing $(n$=15$)$ or illegible $(n$=1$)$ record of the credible fear interview.

[121] This rate is in concordance with the rate for the past several years.  From FY2000 through FY2004, 93 percent of the cases stored in the credible fear database (APSS) indicated "yes" in the identity established field.  The percentage is higher if closed cases are not considered.  E-mail from Ms. Georgia Papas (USCIS) to Mr. Mark Hetfield (USCIRF), December 17, 2004.

[122] Of 305 cases in the sample that did not dissolve, and who had legible I-870s in the file, 114 were referred to secondary for suspected false documents (although this number includes those with a false visa in a valid passport), 16 were referred to secondary because of an immediate request for asylum (but had no documents), 100 were referred to secondary inspection because of no documents.

[123] While asylum officers and immigration judges have the benefit of making a face-to-face credibility determination with respect to identity, field offices may require documentary evidence for the purpose of granting parole.  Asylum Officer Basic Training Course, p. 10.  USCIS criteria for establishing identity are found in the Asylum Officer Basic Training Course, p. 10.  In addition, the asylum officer's assessment of how he or she applied the criteria must be

IFR_AR_008256

Consistent with the definition of credible fear as a *significant possibility* that the asylum seeker could establish eligibility for asylum, USCIS criteria for establishing identity to a reasonable degree of certainty state that the officer must elicit information in order to establish that there is a *significant possibility* that the applicant is who he or she claims to be.

We did not have ICE's criteria for establishing identity, nor was it summarized on any of the documentation we reviewed.   The criteria may vary as a result of the different institutional responsibilities borne by the two agencies.  It is, of course, the responsibility of Immigration and Customs Enforcement to determine the identity of the alien and to assess whether the other parole criteria have been met. [124]  This difference in criteria might help explain why one-in-five asylum seekers for whom USCIS elicited and recorded information on both identity and community ties were nevertheless detained by ICE up until the merits hearing.[125]

An interesting issue to note on the question of identity is the existence of asylum seekers who arrive bearing their own valid passports with valid entry visas and who identify themselves as asylum seekers.  There were 18 such cases in our credible fear file sample.[126]  Despite their candor and cooperation, these 18 asylum seekers, and presumably cases like them, were nevertheless placed into Expedited Removal, and were therefore detained.[127]

---

recorded on Form I-870.   Section IV of the I-870 reads in pertinent part: "Applicant's identity was determined with a reasonable degree of certainly (check the box(es) that applies): [ ]Applicant's own credible statements.  (If testimony is credible overall, this will suffice to establish the applicant's identity with a reasonable degree of certainty).  [ ] Passport which appears to be authentic.  [ ] Other evidence presented by applicant or in applicant's file (List)." OR "Applicant's identity was not determined with a reasonable degree of certainty.  (Explain on the continuation sheet.)"  In our sample, the asylum officer established identity through a valid passport in 16 cases, and through other documentary evidence such as a national identity card or birth certificate in 6 cases.

[124] According to the USCIS Asylum Division Credible Fear Process Procedures Manual (pp. 33-34), "APSOs (Asylum Pre-Screening Officers) do not make parole determinations, nor do they make recommendations on parole.  An APSO may, however, gather information during a credible fear  determination that a District Director (now known as an ICE Field Office Director) may consider in making a parole determination…Pursuant to 8 CFR 212.5(a), a District Director may exercise discretion to parole an alien from detention for urgent humanitarian reasons or for significant public benefit, assuming that the alien presents neither a security risk nor a risk of absconding."  The  manual then lists factors which a district director may take into account when making a parole decision, including, "but not limited to," "identity…established with a reasonable degree of certainty;" community ties; likelihood of absconding; medical condition; and whether an APSO found that a mandatory bar to asylum may apply.

[125] 218/274=80 percent release rate for those for whom an asylum officer recorded identity and relative sponsor/community ties.

[126] Six requested asylum in primary inspection, and another twelve volunteered that they were asylum seekers in secondary inspection.   Three of these eighteen were detained through their merits hearings.  In addition, the number of Transit Without Visa (TWOV) and International-to-International Transit Program (ITI) cases in our sample was 28.  Aliens in TWOV or ITI generally travel to a U.S. airport, with a valid passport but without a U.S. visa, for purposes of traveling from one country to another, stopping in the United States only to make a connecting flight.  Rather than making the connecting flight, however, these 28 individuals presented themselves for asylum at the airport, resulting in Expedited Removal proceedings.  While certain designated nationalities are excluded from these programs, on Aug. 2, 2003, TWOV and ITI was temporarily suspended in their entirety by the Secretaries of State and Homeland Security, citing a "credible security threat" that TWOV/ITI might be used by terrorists to "gain access to the United States or an aircraft en route to the United States….."  Suspension of Immediate and Continuous Transit Programs 68 FR 46926-46929 (Aug. 7, 2003).  The suspension of TWOV and ITI remains in effect as of Feb.1, 2005.

[127]According to CBP's interpretation of the law, as articulated by INS, "Even in cases where a fraudulent document is not presented or a formal request for admission is not made, an alien who seeks asylum in the United States at a

IFR_AR_008257

### 2.) Community ties

Additionally, the files show that of those who have established their identity to a reasonable degree of certainty ($n$=303), 90 percent provided information to the asylum officer regarding a relative sponsor or some kind of community tie (274/303). Analyzing the combination of identity and sponsorship showed that the observed differences in rates of release prior to the merits hearing were found to be statistically significant.[128]  In other words, an asylum seeker with credible fear and identity established by the asylum officer to a reasonable degree of certainty is more likely to be released if he or she indicated to the asylum officer that he or she had a relative sponsor and/or community tie [129] than if the asylum officer did not record information on a relative sponsor/community tie.[130]

### 3.) USCIS information regarding parole eligibility by region and major countries of origin

Table 8 shows, for each region, release rate taken from Table 6 and rate of recorded relative sponsor/community ties for those with identity established to a reasonable degree of certainty by USCIS.  Fewer than half of asylum seekers from South/Central Asia indicated having a sponsor or community ties in the U.S.: this was the only group that was below 50 percent.  All other regions were above the 50 percent mark in terms of sponsorship information recorded: they varied between a low of 70 percent (Sub- Saharan Africa) to a high of 100 precent (Caribbean and Central America).

**Table 8: Release rate & rate of recorded relative sponsor/community ties among those with identity established by asylum officer (USCIS) by region of origin**

| Region of Origin | Paroled | Sponsored |
|---|---|---|
| South America | 81.0% | 95.0% |
| Central America | 80.0% | 100.0% |
| Europe | 71.4% | 94.1% |
| Caribbean | 81.4% | 100.0% |
| East Asia | 87.4% | 85.7% |
| South/Central Asia | 15.4% | 45.5% |
| Middle East | 84.6% | 91.7% |
| Sub-Saharan Africa | 36.4% | 70.0% |

Table 8 shows that release rates varied significantly from region to region.  One possible explanation for these differences could be that regions with lower release rates also have a lower

---

port of entry in most cases is inadmissible as an intending immigrant and therefore potentially subject to Expedited Removal."  Memorandum on "Aliens Seeking Asylum at Land Ports of Entry," from Michael A. Pearson, Executive Associate Commissioner , Office of Field Operations, to INS Regional Directors, (Feb. 6, 2002).

[128] Result of chi-square test: $\chi^2$ = 5.321, $df$ = 1, $p$ = 0.021.

[129] 218/274=80 percent release rate for those whom an asylum officer recorded information on identity and relative sponsor/community ties.

[130] 18/29=62 percent release rate for those whom an asylum officer recorded information only on identity (not relative sponsor/community ties).

IFR_AR_008258

rate of cases eligible for parole.  Indeed, Table 8 shows that South/ Central Asia had the lowest rate of release prior to the merits hearing (15.4 percent).  Table 8 above shows that they also had the lowest apparent rate of parole eligibility according to the information elicited and recorded by U.S. Citizenship and Immigration Services.  However, we would expect their parole rate to be more congruent with the parole information elicited and recorded.  In other words, we would expect that somewhere near 45 percent  of them would be paroled because 45.5 percent  of them had the relevant parole information elicited and recorded by the asylum officer.  Instead, what we observe is a 30 point differential between the actual rate of release and the parole information elicited and recorded by USCIS.

Other similar, but less extreme, disparities exist in other regions.  For instance, 95 percent of South Americans had information recorded by an asylum officer concerning the eligibility criteria but only 81 percent  were released prior to the merits hearing; and 94 percent  of Europeans had information recorded by an asylum officer concerning the parole criteria, but only 71 percent  were released.  Only East Asia has a release rate (87 percent ) similar to the information recorded by an asylum officer (86 percent ).

Table 9 presents the release rate taken from Table 7 and rate of recorded relative sponsor/community ties for those with identity established to a reasonable degree of certainty by USCIS, broken down by major country.  Both Cuba and Haiti had the highest rate of sponsorship information recorded (100 percent ), while China had the lowest (85 percent ), but all four major countries had a high rate of parole eligibility information recorded.

Table 9 shows that Cuba had the highest rate of release prior to the merits hearing (100 percent ), while Haiti had the lowest (65.9 percent ).  For Cuban asylum seekers, release rate and the parole eligibility information as recorded by U.S. Citizenship and Immigration Services are the same: if the Cuban asylum seeker indicated having a sponsor or community ties, he or she was released.  In contrast, for Haitians, the chances of being released prior to the merits hearing (66 percent ) were only partially determined by the sponsorship and community ties information recorded (100 percent ).

**Table 9: Release Rate & rate of recorded relative sponsor/community ties among those with identity established by asylum officer (USCIS) by major country**

| Major Country | Paroled | Sponsored |
| --- | --- | --- |
| China | 87.1% | 85.4% |
| Colombia | 75.0% | 97.4% |
| Haiti | 65.9% | 100.0% |
| Cuba | 100.0% | 100.0% |

Only China, along with Cuba, had a rate of release prior to the merits hearing that is compatible with its parole eligibility information recorded (87 percent  *vs.* 85 percent , respectively).[131]

---

[131] Furthermore, parole eligibility information as recorded by USCIS is not enough, in some cases, to avoid a lengthy period of detention.  The asylum seeker's place of origin has a substantial influence on the length of one's detention.  While 50 percent  of parole eligible Cubans remain in detention for less than 7 days, only 25 percent  of parole eligible Haitians stay in detention for about a week.  On the high end, 25 percent  of parole eligible Cubans remain in detention more than 18 days (none longer than 196 days, the one extreme outlier in the distribution for

IFR_AR_008259

**5. Conclusion**

The law mandates the detention of asylum seekers subject to Expedited Removal until the credible fear determination has been made.[132]  After that point, agency policy favors release of those who are eligible for parole under internal guidelines.  Our file analysis revealed that parole criteria information as elicited and recorded by asylum officers appears to have had some correlation with whether an asylum seeker was released prior to the merits hearing.  That is, those with identity and community ties information recorded by USCIS were more likely to be released than those with only identity but not community ties information recorded.  Analysis further revealed that other factors such as place of origin and port of entry into the U.S. are associated with parole rates as well.

The files reviewed did not provide a clear and consistent way of comparing the decisions to detain or release made by Immigration and Customs Enforcement.  USCIS recording of information pertinent to parole criteria is uniformly documented on one form, the I-870.  In contrast, it was not clear upon review what criteria ICE employed and where and how they were applied and documented in the file.

G. OVERALL DATA LIMITATIONS

There are a number of general limitations in analyzing files.  The first is that written records prepared by a participant in a process, such as a Customs and Border Protection inspector, may not reflect what actually occurred in its entirety.  A second limitation is that where required forms are missing or required information is not recorded in the file, neither the Department of Homeland Security nor any outside reviewer is able to defend or criticize the actions taken and the decisions made, beyond the failure to document.  A third limitation is that the type of improper or incorrect behavior described in some Study questions is not likely to be recorded in official records by those engaged in it, leading to an underestimation of the problem or an inability to document it at all.

A limitation of this file review in particular was the difficulty we experienced in obtaining the files we requested.  Because the process of obtaining the files was so lengthy and labor-intensive, we were still negotiating with the Department of Homeland Security over

---

Cuba).  This is in contrast to the high end of the Haitian distribution where 25 percent  of parole eligible Haitians remain in detention longer than 211 days, a higher value than the one extreme outlier for Cuba.

[132] There are some countries which must be notified when an alien is being detained in the U.S.  One of the procedures followed, therefore, is the submitting of a Form I-264 Notice to Consular Officer Concerning Detention which identifies the alien and details the present location as well as place of entry to the U.S. and nature of proceedings.  (See examples in Appendix N).  Because asylum seekers subject to Expedited Removal are mandatorily detained, it is likely that a consular notification of someone charged under the Expedited Removal provisions will in fact also notify the consulate that a national of their country is an asylum seeker.  About 10 percent  of the credible fear sample (n=37/353) included an I-264 in the file.  Not all specified Expedited Removal charges or proceedings, but 27 did.  Furthermore, 3 of the forms specified "credible fear" as the nature of proceeding.  Beyond the official Form I-264, some ports also employed other means such as voicemail or non-uniform faxes to notify consulates.  These similarly could reveal the fact that an alien is seeking asylum.

IFR_AR_008260

individual files well after our cut-off date for analyzing individual files had passed. Some of the files we requested are still unaccounted for. The high number of files we received that were incomplete increased our difficulties. All of these factors served to diminish our intended sample size.

With respect to particular file samples, the port of entry records we examined may not have provided an accurate rendering of the events in secondary inspection. An inspector may have filled out the forms as though procedures were followed correctly, when in fact they may not have been. Conversely, an inspector may have taken the correct action but failed to document it. In the latter case, any failures of documentation mean that supervisory and management personnel at Customs and Border Protection cannot be sure that the inspectors' actions and decisions were correct and legally justified.

The asylum seeker is supposed to read and initial the completed form in secondary inspection, with the help of an interpreter if necessary. These requirements, however, are also administered by the inspector. Another limitation is that a written record in question-and-answer form such as the I-867B gives the appearance that the inspector asked all of the questions, and then recorded all of the alien's answers verbatim. However, the forms often provide only a summary of what is said during the inspections process. The form's question-and-answer format resembles a transcript, but inspectors are not always able to write down a complete verbatim record of their verbal interaction with the alien.

With respect to the Board of Immigration Appeals sample, it is important to reiterate that it is representative only of post-credible fear asylum cases on appeal. As post-credible fear asylum seekers are denied relief by the immigration judge 75 percent of the time, but file more than 97 percent of all appeals, this sample is not representative of the post-credible fear caseload of immigration judges. Indeed, while 25 percent of post-credible fear asylum seekers are granted relief by the immigration judge, less than 6 percent of the aliens in this sample were granted relief at their merits hearing. The frequencies cited for this caseload should not therefore be depicted as representative of all post-credible fear asylum hearings before immigration judges. Nevertheless, these files are believed to be reliable indicators of whether prior statements taken by the Department of Homeland Security are used against asylum seekers in immigration court.[133]

A further limitation of the Board of Immigration Appeals sample is that it under-represents the number of detained asylum seekers. This is because detained asylum seekers receive expedited consideration by the BIA, and their files therefore remain at the BIA for a shorter period of time than non-detained asylum seekers. We assumed that this under-representation of detained asylum seekers would not interfere with the validity of the sample for the purpose intended, but it cannot be taken as representative of both detained and non-detained asylum seekers.

Because of the small number of asylum grants in the BIA sample ($n = 7$), it was of limited value for comparing denials with grants. A further limitation is that we did not compare asylum merits hearings for cases that did not originate in Expedited Removal.

---

[133] Source of statistics: Kyle, Fleming and Scheuren 2005.

With respect to the credible fear sample, the credible fear A-files are not necessarily well-documented with respect to actions taken on detention and release.  Some files concerned asylum seekers who appeared to be eligible for release prior to their merits hearing, but were not released, without any indication of the reasoning.  In the case of aliens who were released, it was often unclear what the reasoning had been because, for example, there was no parole determination worksheet included in the file, just a form letter authorizing release.

Similarly, the last documented date of detention in the file does not reflect any subsequent release, or continued detention, so our usage of these dates under-estimates the length of detention.  However, all of the files were post-merits hearings, so we knew that the asylum seeker had not been released prior to the merits hearing.  Finally, approximately 10 percent of the files requested for the credible fear sample were never provided to us.

## H. DISCUSSION OF FINDINGS

Significant positive findings emerged from our analysis of A-files and Records of Proceedings relating to Expedited Removal.  Port of entry files that were fully documented showed the correct disposition of cases by Customs and Border Protection.  Files that indicated a positive response to a fear question were referred for a credible fear determination or an asylum-only hearing, as appropriate.  Files that indicated a negative response to the fear questions received an Expedited Removal order or an offer of withdrawal.

Records of Proceeding from the Executive Office for Immigration Review were easily obtained and well documented, which greatly facilitated the process of analyzing the transcripts of the hearings and the oral decisions of the immigration judges.  The United States Citizenship and Immigration Services Asylum Office recognized that their Form I-870, the Credible Fear Determination Worksheet, is often used in hearings on the merits of an asylum claim, and revised the form in 2003 to advise that it is not intended to serve as a verbatim transcript nor to explore all aspects of the asylum seeker's claim. Page 3 of the form under the Credible Fear Interview section states in bold type: "The following notes are not a verbatim transcript of this interview.  These notes are recorded to assist the individual officer in making a credible fear determination and the supervisory asylum officer in reviewing the determination.  There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening."

Information relevant to the criteria for release from detention prior to the merits hearing as elicited and recorded by United States Citizenship and Immigration Services asylum officers was consistently and clearly documented on Form I-870, the Credible Fear Determination Worksheet.  Form I-870 is well-designed to allow for documenting information pertinent not only to credible fear, but also to identity, community ties and any potential bars to asylum.  Form I-870 also provides for documenting the basis for the information recorded, such as whether identity is established by the asylum seeker's credible testimony or by a seemingly authentic passport or by some other document.  Asylum officers routinely complete Form I-870 fully.  Such clarity and consistency provide a valuable basis for understanding each individual file and additionally allow for evaluation of the file sample as a whole.

IFR_AR_008262

Certain areas of concern also emerged from the file analysis.  These include a 3 percent incidence of failure to document that aliens who received an order of Expedited Removal were asked the required fear questions at the port of entry; a 22 percent  incidence of failure to document that aliens who were permitted to withdraw their applications for admission were asked the required fear questions at the port of entry[134]; a lack of capacity to produce port of entry A-files relating to Expedited Removal for review in a timely and cost-effective manner; reliance by immigration judges on cursory DHS Expedited Removal records in denying requests for asylum in 39 percent  of cases; and a lack of consistency in documenting decisions on detention and release.  These areas of concern are discussed more fully below.

Eleven percent of port of entry A-files, including 3 percent  where the alien received an Expedited Removal order and 22 percent  where the alien withdrew his or her application for admission, lacked any indication that the required questions relating to fear of return had been asked.  While it is possible that the screening took place even though there is no documentation of it, the possibility that the screening did not take place cannot be ruled out.  What is certain in such cases is that in the absence of critical documentation, CBP supervisors cannot verify the correctness and accuracy of the decisions being made by inspectors.

Insufficient quality control capability follows from the concern about missing documentation.  Neither outside reviewers such as ourselves, nor an internal CBP quality assurance team, would be able to perform a prompt, cost-effective spot check of random port of entry files and find all the information needed.  The practical difficulties of file review and the considerable institutional resources needed to locate files, and specific forms within files, presumably pose an obstacle to quality assurance efforts.

Forms filled out by CBP inspectors and USCIS asylum officers are cited by immigration judges in denying asylum claims in 39 percent  of cases.  In the files we analyzed, such records appear to be accepted by some immigration judges as the asylum seeker's definitive 'statement' when they are actually only a summary of some of what the alien said during the preliminary screenings.  It is true that inconsistent statements made by an asylum seeker can indicate fraud, that other DHS records are used in regular removal proceedings, and that assessing credibility is a necessary part of the immigration judges' role.  However, the Expedited Removal records created by DHS may not serve well the purposes of detecting fraud and determining credibility.  Because of the nature of the forms themselves, the documents do not capture all the details of the asylum seeker's story. Yet due to the presence of the fear questions, the records can appear to provide an authoritative rendering of the heart of the claim.   These records stand in contrast to other DHS records that are generally introduced in regular removal proceedings to meet the government's burden in establishing alienage.  In asylum claims that originate in Expedited

---

[134] As discussed above, CBP interprets the Inspectors Field Manual to mean that a sworn statement "should" be taken but that it does not have to document withdrawals to the same extent.  The advantage of taking a sworn statement for withdrawal cases is that it "ensures that all the facts of the case are recorded, especially in potentially controversial cases, *and protects against accusations of coercing the alien into withdrawing, especially when there may have been an issue of fear of persecution"*  Section II(E)(4)(i) of the CBP Expedited Removal Training Outline (September 2003) (emphasis added).  A disadvantage to requiring sworn statements in all withdrawal cases, however, is that an insistence on full sworn statements may make inspectors less inclined to offer a discretionary withdrawal, which alleviates the five-year bar of an Expedited Removal order.

Removal, it is the asylum seeker's burden to prove his or her story, and reliance on the prior records risks hurting the bona fide applicant more than it helps the judge.

Finally, the decision-making process surrounding detention and release of asylum seekers prior to the hearing on the merits of their asylum claim is difficult to discern from the files.  It is not always obvious which parole criteria are used by which field office.  Nor is there consistent documentation by Immigration and Customs Enforcement of an individualized detention determination for each asylum seeker.  It was interesting to note that although USCIS does not make detention and release determinations, information pertinent to parole criteria is uniformly recorded by asylum officers on Form I-870.  Perhaps because of the lack of transparency in ICE detention decisions, such decisions can appear to be highly arbitrary.  Detention and release rates vary widely, most notably by the alien's region of origin and the port of entry, and often do not appear to correspond to parole criteria.

**Summary**

The introduction of Expedited Removal in 1997 and its subsequent administrative expansions has placed new powers and responsibilities on CBP inspectors and Border Patrol agents.  While working with limited resources, and under pressures that have only intensified since the terrorist attacks of 2001, inspectors and Border Patrol agents must make quick judgments that will have consequences for national security, immigration enforcement, and refugee protection.   Given the stakes of Expedited Removal for both the government and the alien, CBP inspectors and Border Patrol agents should be expected to follow scrupulously the minimal set of required procedures.  CBP supervisors should support their efforts with effective quality assurance measures.

Immigration judges responsible for assessing credibility and ruling on the merits of the case must contend with an administrative record that is deeply flawed when purporting to convey the alien's prior 'statements.'  The forms filled out by inspectors and asylum officers for screening purposes are often regarded as though they contain comprehensive if not verbatim transcripts of the alien's asylum claim.  The alien's own complete and considered testimony is then all too often seen as self-serving embellishment, lacking in credibility.  The result is that aliens seeking asylum in Expedited Removal face serious obstacles to establishing their credibility that other asylum seekers do not, obstacles put in their path by the Expedited Removal process itself.

Given the current limitations of the administrative records created in Expedited Removal, immigration judges should limit their use as evidence and assign little, if any, weight to their probative value.  To assist immigration judges in this regard, EOIR should include this information in their trainings and in peer review exercises.  As noted above, USCIS accepted the suggestion made by UNHCR that an advisory be place on the Form I-870 to aid in its accurate use.  The same suggestion was declined by CBP.  CBP should revise Form I-867B to include a prominently placed advisory similar to the one that USCIS has included in Form I-870.  This could lead to the more appropriate use of these statements in immigration court.

IFR_AR_008264

Finally, ICE officers charged with making detention and release decisions have operated under very difficult circumstances since 2001.  With the media criticism and Congressional scrutiny that led to the dismantling of INS itself in the aftermath of the terrorist attacks, the trend of decreasing ICE decisions granting parole to asylum seekers[135] is understandable, yet is still inimical to the proper exercise of the agency's discretion.  There are compelling reasons for the detention of some asylum seekers and compelling reasons for the release of others.  On the one hand, the government is obliged to protect national security and enforce immigration laws, not least through ensuring that asylum seekers appear for their hearings.  On the other hand, there is a humanitarian imperative to release vulnerable asylum seekers who merit release, coupled with a substantial cost savings to the government when unnecessary detention is avoided.

Given these conflicting interests, ICE could serve both of these interests by providing the greatest possible transparency and consistency in detention and release decisions.  This can be done by codifying the parole criteria into regulations, creating or modifying standard forms to be used for making detention and release decisions, and documenting the individualized determination in each case.  Uniform documentation requirements would assist ICE officers in handling more efficiently the high number of files they are responsible for, and would also provide a basis for quality assurance efforts.

---

[135] *See* DRO Table 7 (showing that in FY2001, 86.1 percent of asylum seekers where released prior to a final determination, but in FY2003 only 62.5 percent were so released) Fleming and Scheuren, *Statistical Report on Detention, FY 2000-2003.*

APPENDICES

**Appendix A**

**SUMMARY of APSO (Credible Fear) Supervisor/Asylum Office Director Questionnaire**
Monday, September 27, 2004

<u>Participating Asylum Officers:</u> Arlington (VA), Chicago, Houston, Los Angeles, Miami, New York, Newark, San Francisco
<u>Non-Participating Asylum Officers:</u> None

I.      **<u>Credible Fear Interview Process</u>**

    A.  How long does it take to conduct a Credible Fear Interview:
        Longest CFD interviews last:
        w/out interpreter:
        Range: 50-100 minutes
        Average: 68 minutes
        w/interpreter:
        Range: 45-150 minutes
        Average: 92 minutes

        Shortest CFD interviews last:
        w/out interpreter:
        Range: 20-30 minutes
        Average: 25 minutes
        w/interpreter:
        Range: 10-60 minutes
        Average: 28 minutes

        Typical CFD interview last:
        w/out interpreter:
        Range: 30-60 minutes
        Average: 36 minutes
        w/interpreter:
        Range: 15-90 minutes
        Average: 46 minutes

    B.  How long does it take to conduct an Affirmative Asylum Interview:
        Longest Affirmative interviews last:
        w/out interpreter:
        Range: 105-180 minutes
        Average: 140 minutes
        w/interpreter:
        Range: 120-240 minutes
        Average: 161 minutes

Shortest Affirmative interviews last:
w/out interpreter:
Range: 30-45 minutes
Average: 35 minutes
w/interpreter:
Range: 40-60 minutes
Average: 49 minutes
Typical Affirmative interview last:
w/out interpreter:
Range: 45-60 minutes
Average: 53 minutes
w/interpreter:
Range: 60-105 minutes
Average: 83 minutes

C.  How many CFD interviews is an asylum officer expected to do in a day?
RANGE:  The number of CFDs being done varied as much as only 3/wk to 15-20/day.

AVERAGE:  On average, most officers do about 3-4 such interviews per day.  But, almost all the offices noted that they have seen a significant decrease in the number of CFDs and Affirmative Interviews they have done over the years.

D.  How many affirmative asylum interviews is an asylum officer expected to do in a day?

The typical requirement is 18/ two-week period.  This is the MAXIMUM number that can be done in a two week period, and many offices reported that they were seeing less than 9/week.

E.  Are CFD interviews recorded (audio or video?)  If sometimes, explain….
No offices recorded CFD interviews.

F.  What kind of a record is made of the CFD interview (verbatim transcript, summary Q&A, summary notes…..)

All the offices indicated that the main write-up was a summary.  Often, this is done solely on the I-870 form.  Some offices indicate that the officers will take additional notes as well.  These additional notes may be a summary as well or mostly verbatim.

G.  Is there any notation or indication in the record as to whether or not the interview is a verbatim transcript of the interview?  Explain.

The I-870 form clearly indicates that it is a SUMMARY.  Separate notes taken by the officers are usually not marked whether they are verbatim or a summary. Negative CFDs often have more detailed notes than positive ones.

H.  How do you decide if an interpreter is needed for an interview, and what languages he or she needs to be able to interpret?  How are interpreters retained (i.e. AT&T Phone Line, Berlitz or other interpretation agencies, friends/relatives of the interviewee, detention center employees, DHS employees, etc.):

All of the asylum offices use LSA (Language Service Associates) as their main translation service.  The translation is done telephonically.  The general consensus was that LSA was able to provide adequate service almost all of the time.  In instances of rare dialects, the offices will try to work something out with LSA ahead of time or will use another service (AT&T, LLE Links, or Berlitz).   In one case, an alien spoke a rare Burmese dialect.  It took them a week and a half to find someone who could speak the language—an academic.  In another instances, an alien who spoke a rare Mongolian dialect was simply detained until they could accommodate him in the CFD interview.

As for determining whether an interpreter is needed, a variety of ways are used. Officers will ask the alien what language he speaks, refer to the interview done at secondary to see what language was used there, and simply deduce from early conversations with the alien (e.g., orientation meeting) whether the alien needs translation help.  In one office, an interpreter is ALWAYS used, even if the applicant says that he speaks English.

I.  What role, if any, do consultants, attorneys or representatives play in the credible fear interview?  (are they merely observers, do they advise the applicant, do they make a statement to the asylum officer?)

The percentage of aliens that have representation at the CF stage ranged from less than 5% to about 50%.  In many cases, their "attendance" is telephonic.

All offices allowed the representatives to:
1)  Consult with the alien ahead of time
2)  Ask questions or make a statement AFTER the main part of the interview was completed.

A few offices allowed the representative to ask questions during the interview.

IFR_AR_008268

J.  Does the asylum office play any role in identifying attorneys or representatives for the credible fear process?  If so, please describe that role.

Most offices simply provide the alien with a pro-bono list of attorneys at the airport, orientation or both.  Only one office, actually works with NGOs to make sure that each alien has representation.

## II.  **Impact of Detention on Credible Fear Process**
In your opinion, what role does detention play in the alien's ability to:

i.   Obtain representation
Responses to this question ranged from "no effect" to "some effect."  One office responded that it "certainly has an effect" and that aliens might have a hard time calling out to get representation, etc.

ii.  Gather documentation in support of claim
Most offices indicated that b/c the CFD standard is so low, aliens aren't required or even expected to have documents at this stage, so ultimately, this was not a major concern.

iii. Articulate claim effectively
Most offices believed detention had "no effect" on this.  One office stated that there was "some effect" due to the stress and anxiety the detainee is under in detention.  However, they believed that the effect is minimized by giving the alien time to "gather their thoughts."

iv.  Anything else that matters to the CFD process (specify)
Other issues mentioned:
1) Detention might make a person more likely to dissolve their claim.
2) Making phone calls and getting representation may be more difficult.
3) Detention may "be traumatizing" and "affect bonafide asylees who may have been traumatized."

## III.  **Impact of Prior Statements and Actions**
A.  What role does the Alien's Sworn Statement taken by the POE Inspector (Form I-867) play in the CFD?

The offices agreed that the Sworn Statement given in Secondary did not have a strong effect on the CFD.  Most used it only as background to get acquainted with the case.  Several offices stated that they would ask for clarification if a discrepancy was noted.  It was generally agreed that the Port of Entry statements are brief and do not contain the alien's full story.  One office did note that the alien might have to account for discrepancies when they go before the IJ.

*B.* How does the Alien's presentation of false documents at the POE affect the credibility assessment for purposes of the CFD?

All offices stated that presentation of false documents would have ZERO effect on a CFD.

IV. **Dissolves (Dissolution of Claims to Credible Fear)**

A. What are the procedures you must follow to process and accept a dissolve (what information must you tell the applicant, how do you convey that information, and what information must the applicant tell you before he can dissolve a claim to credible fear)?

Most offices really stressed making sure that the alien no longer had a fear. Several offices indicated that they would NOT let an alien dissolve if he indicated that he still had a fear but didn't want to be in detention any longer or missed his family. At least one office indicated that if an alien <u>insisted</u> that he be able to dissolve, they would allow him to do so even if he indicated he still had a fear.

The entire step-by-step process (according to one office) is listed below:

1) We make sure they have been given information on the credible fear process (M-44 Form)
2) We explain the penalty (5-year ban on returning to the country)
3) We type a memo to the file describing why they say they are withdrawing. At this point, we discuss their reasons for returning with them and try to make sure they're not afraid to return home.
4) We assure them of the right to change their mind and <u>any</u> time and to return to the CFD process.
5) We get supervisor approval
6) We read the completed forms to the, ask them if they have any questions, and have them sign the form
7) We do an I-60 and I-75
8) We give them a copy of all the documents
9) We close the file

*B.* What are the most common reasons aliens give for dissolving their claim to credible fear?

1) They don't want to be detained
2) Conditions have changed in their country
3) Misunderstanding at the POE and they never had a fear.
4) Want to go home, miss family.

**V.**

**Role of the CFD in the Larger Expedited Removal Process**

A.  What is the purpose of the Credible Fear Write-Up (form I-870) (Circle all that apply):    All offices answered #1 and #2 and NOT #3.

  *i.*  To justify the decision of a positive or negative CFD;

  *ii.*  To record just the basics of a positive determination, to show whether the alien has met the threshold for credible fear.  The credible fear statement does not generally represent a complete description of the alien's asylum claim;

  *iii.*  To pursue and record every material detail of the alien's asylum claim.

B.  What would be the benefits, obstacles and drawbacks to replacing the credible fear interview with an expedited asylum interview.  Instead of approving or denying Credible Fear, an asylum officer could approve an asylum claim, refer the claim to an immigration judge, or allow the alien to withdraw the claim at the POE…….

One office refused to answer and asked that HQ be contact for this question. Everyone else answered this questions, some with prompting because they felt uncomfortable discussing something hypothetical that would require policy change. Another office mentioned this was suggested by HQ 6-7 yrs ago but never came to fruition. They suggested a middle ground: Have asylum officers refer strong cases on to the affirmative asylum process, and cases with questions continue to refer on to IJs. Another office suggested that aliens should be detained in something resembling a half-way-house if they were to be given the access they needed to document such a claim, and that advocates must be involved.

Benefits:
- Asylum Office could grant the best cases asylum, and some aliens would be out of detention faster. (One office notes that only very famous people with very strong cases would be eligible.)
- Save time and manpower
- Decrease burden on court, and provide a more detailed account of alien's case for those referred onto IJ.

Drawbacks:
- Require regulatory change
- Detention – limited access to network necessary to prepare claim
  - Limits access to information, documentation, and forms
  - Hinders ability to gain representation, *necessary* for this process
  - Access to translators to assist with completing forms
  - Would need greater detention space
  - Could hinder alien's ability to express full claim
- Time – Affirmative claims take much longer to prepare and do for all parties involved
  - Aliens would be detained longer
  - Aliens needs more time to prepare an affirmative claim

IFR_AR_008271

- o  Asylum officers need more time to conduct in-depth face to face interviews (not all CFD are face to face) and create write-up
- Does not allow for proper work space for asylum officers (open, non-confrontational, creates trust) and asylum database and security system are not available in detention centers, only their office
- Logistically challenging on multiple levels
- Affirmative interview has higher standard than CFD. Also cases referred onto the IJ, the IJ would have a higher threshold to determine such cases compared to CFD referrals.

C.  What value does the CFD add to the overall Expedited Removal process?
It allows Expedited Removal to exist, makes it more credible and honest; it provides protection and creates the safety net for refugees or asylum seekers who have a claim. It allows aliens the opportunity to be pulled off the ER track. It allows the attorneys and IJs information about the alien before the trial and allows an alien with fear time in front of a judge; and it collects information on people entering the country (fingerprints, pictures, info.)

Suggestion: CFD could be more tailored for the parole process; it can not be used now for this purpose because it is too indiscriminate.

IFR_AR_008272

**Memorandum**

| Subject: | Date: |
|---|---|
| Expedited Removal:  Additional Policy Guidance | **December 30, 1997** |

| To: | From: |
|---|---|
| Regional Directors<br>District Directors<br>Asylum Office Directors | Office of Field Operations |

      The Expedited Removal Working Group,[*] which has been meeting regularly since April 1, 1997, was organized to identify and address policy questions, procedural and logistical problems and quality assurance concerns related to the expedited removal process.  Based on recommendations made by the Working Group following a series of site visits, the following guidance and instructions have been approved by the INS Policy Council and endorsed by Field Operations.  Please review and take the necessary steps for implementation.  Thank you for the tremendous effort you have devoted to ensuring the success of the expedited removal process.

**Expedited Removal Experts:**  Each region and each district will appoint an expedited removal "expert."  The expedited removal expert should be carefully selected for his or her ability to work effectively with headquarters and within the region or district to ensure close coordination and exchange of information, and to ensure that policy guidance is distributed, fully understood, and implemented.  The expert must be available to attend a regional seminar during the second quarter of Fiscal Year 1998, and conduct or facilitate training of all officers involved in the expedited removal process.  Experts will be required to remain in close contact with the Expedited Removal Working Group to communicate feedback and ensure distribution and implementation of future policy guidance and memoranda, and to work with each district to ensure that monthly statistics and DACS data entry are completed quickly and accurately.  Districts should submit their lists of nominees to the regional director no later than January 16, 1998.  The regional director

---

[*]The Expedited Removal Working Group is chaired by the Director of International Affairs, and is made up of representatives from the Offices of Inspections, Detention and Deportation, Asylum, Field Operations, and General Counsel, as well as specialists on the Deportable Alien Control System (DACS), Freedom of Information Act (FOIA), juveniles, records, and the Office of Policy and Planning.

IFR_AR_008273

will then inform Karlee Arey, Office of Field Operations, of the designated experts for each region and district. Karlee Arey can be reached through cc: Mail, or by calling 202-307-2180.

**Withdrawal Guidance:** The decision to issue an expedited removal order or to permit withdrawal of application for admission in lieu of a formal removal must be carefully considered and reviewed by every officer and supervisor handling expedited removal cases. Additional guidance on withdrawals is attached. Districts and asylum offices will ensure that all inspectors and asylum officers receive the memorandum and are properly trained in exercising this important discretionary authority. Training should be completed no later than the end of the second quarter of Fiscal Year 1998.

**Re-Interview of Individuals Prior to Departure:** The Office of International Affairs may, at its discretion, offer a second credible fear interview to any alien even if the alien has not established a credible fear before an asylum officer or after immigration judge review. Deportation officers will be informed of the second interview. Re-interviews will occur when the Office of International Affairs determines that the alien has made a reasonable claim that compelling new information concerning the case exists and should be considered. Districts should cooperate by continuing to detain the alien until the second adjudication, and potentially also a second review by the immigration judge, is completed. Please note that any alien who did not express fear of return at secondary inspection, but expresses a fear or requests asylum at any point before removal, should be referred for a credible fear interview.

**Monthly Reports and Database Entries:** It is critically important that every district and region ensure that monthly statistical reports are submitted in accordance with policy memoranda which have been distributed on this subject. See, Memorandum, "Distribution of guidance on changes to the Deportable Alien control System (DACS) that are effective April 1, 1997" (March 20, 1997); Memorandum, "Responsibilities and procedures for data entry of expedited removal cases into the Deportable Alien Control System" (March 18, 1997); Memorandum "Inspections' Responsibilities for Tracking of Expedited Removal Cases at Ports-of-Entry" (march 31, 1997); Memorandum "Monitoring Expedited Removal Reports and Quality Control" (July 18, 1997). Adequate statistics are required to document the implementation of the expedited removal program and analyze trends; without such statistics, continuing authority to implement expedited removal could be in jeopardy. Each district should ensure that every port-of-entry in the region is providing the required monthly reports to headquarters not later than the 10th of the month for the preceding month's statistics. Each district should also ensure that DACS entries are completed quickly and accurately. Questions concerning the monthly reports should be referred to Linda Loveless (202)616-7489, and questions concerning DACS should be referred to Karen Svegel-Maravich (202)514-3780.

**Parole Consideration for Detainees Who Meet the Credible Fear Standard:** Parole consideration for detainees who meet the credible fear standard, and accurate statistics on parole, are critical to the success of the expedited removal program. Below are basic guidelines on parole which should be implemented immediately:

> **The supervisory asylum officer must inform the district director (or the person designated by the district director to make parole decisions) of the outcome of all credible fear cases by faxing the completed I-870 (Record of Determination/ Credible Fear Worksheet) and interview notes as soon as the decision has been served on the applicant.**

> The district director (or the person designated by the district director to make parole decisions) should review the I-870 Record of Determination (which includes information on the detainee's identity and community ties), and any accompanying documentation, to make a parole determination. As soon as the parole determination has been made, the "District Director Decision" page of the I-870 should be faxed back to the supervisory asylum officer.

IFR_AR_008274

The following factors should be considered in making the parole determination:

> Parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct; for example, the applicant is an aggravated felon or a persecutor. For the purpose of parole determinations, cases involving the firm resettlement bar should receive the same treatment as cases where no bar exists. It should be noted that asylum officers are not making a parole recommendation when they determine that an alien meets the credible fear standard: the parole decision is the sole authority of the district director

> If there is some evidence or concern that an alien who meets the credible fear standard may be a security risk or subject to a terrorist bar, or may in some other way be a danger to the community if released, the supervisory asylum officer will inform the district director and district counsel by including a short memorandum with the I-870 Record of Determination, by sending a cc: mail, and by confirming receipt of the information with a telephone call. The supervisory asylum officer will also inform the Office of International Affairs, Asylum Division which will in turn inform Headquarters Field Operations of any evidence of a security risk or terrorist bar. Field Operations will check with Headquarters Intelligence, the FBI, and other appropriate agencies for law enforcement purposes, security measures, and appropriate detention. District directors should exercise extreme caution in considering parole for such cases until they receive information from Field Operations on the outcome of their investigation. The case should be referred for a regular 240 removal hearing and not delayed for the Field Operations investigation. Other bar cases will be flagged on the I-870 and with an accompanying memorandum: if an alien subject to a possible bar (other than firm resettlement) is paroled, the I-870 should be marked to indicate that the parole was for reasons unrelated to the asylum claim, such as a medical emergency.

**Guidance on Access to Interpretation, and Written, Videotaped, and Audiotaped Translations:**
Attached is guidance on access to telephonic interpreters which should be distributed to every port-of-entry and detention facility, with follow-up to confirm that adequate access to interpretation has been secured. Districts should also ensure that every port-of-entry and detention facility has clear copies of the twelve translations of the I-867A&B and M-444, or that the translations have been ordered from the forms centers as outlined in the attached guidance. In addition, the Expedited Removal Working Group will soon complete video and audio tapes of each of the translations of the I-867A&B and M-444. Each port-of-entry and detention facility should have the capacity to play these tapes to aliens in secondary inspection and when they arrive at the detention facility. Each port-of-entry and detention facility which does not already have the necessary equipment should purchase a television/ VCR unit, or an audio-tape player for standard cassette-sized tapes.

**Contingency Planning for Space Needs:** Service Processing Centers and contract facilities should review existing space and install additional telephone lines and jacks to prepare sufficient interview space for an emergency situation (such as boat interdictions) in which a large number of expedited removal cases need to be processed simultaneously. Provisional space should be roughly double the space used currently, on average, to conduct credible fear interviews, orientations, and consultations.

IFR_AR_008275

Michael A. Pearson
Executive Associate Commissioner
for Field Operations

IFR_AR_008276

**Appendix C**
**Port of Entry Data Collection Instrument**

| | | Comments on A-No.: _____ (please note row number below) |
|---|---|---|
| **Date File Coded** | | |
| **Coder ID** | | |
| **Start Time** | | |
| **Random Number** | | |
| **Part of Subsample? 1=yes; 2=no** | | |
| **If yes, rate of subsample:** | | |
| **A-Number  (8 digit number)** | | |
| **Name: Last, First** | | |
| **Gender    1=male/2=female** | | |
| **Date of BIRTH MM/DD/YY** | | |
| **Is the alien an unaccompanied minor? 1=yes/2=no** | | |
| **Ethnicity** | | |
| **Religion** | | |
| **Marital status 1=single; 2=married; 3=legally separated; 4=divorced; 5=widowed** | | |
| **How many children does alien have?** | | |
| **Country of Citizenship** | | |
| **Date of ARRIVAL MM/DD/YY** | | |
| **Port of Entry** | | |
| Entry by 1=air; 2=land; 3=sea | | |
| Country of departure | | |
| Accompanied by: | | |
| Did alien have 'In Transit Without Visa' status? 1=yes; 2=no | | |
| If yes, from where to where? | | |
| Destination country | | |
| **FILE INCLUDES    I-860** Notice and Order of Expedited Removal **(1=yes/2=no)** | | |
| A No. (File No.): | | |
| Date | | |
| Inadmissible under section 212(a)(6)(C)(i): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(6)(C)(ii): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(7)(A)(i)(I): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(7)(A)(i)(II): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(7)(B)(i)(I): (1=box checked; 2=box not checked) | | |

IFR_AR_008277

| | | |
|---|---|---|
| Inadmissible under section 212(a)(7)(B)(i)(II): (1=box checked; 2=box not checked) | | |
| Was Order of Removal activated by supervisory signature?    1=yes; 2=no | | |
| Title of officer | | |
| Was supervisory concurrence telephonic? 1=yes; 2=no; 3=n/a | | |
| **FILE INCLUDES I-863 Notice of Referral to IJ 1=yes; 2=no** | | |
| Date | | |
| A-No. (A File): | | |
| To immigration judge:  (number of box checked 1-7) | | |
| If box 3, which description is marked? (key in) | | |
| Date of Action | | |
| I-863 Comments | | |
| **FILE INCLUDES I-867A Record of Sworn Statement (1=yes; 2=no)** | | |
| A No. (File No.): | | |
| Place of Interview (At:) | | |
| Date of Sworn Statement MM/DD/YY | | |
| Language | | |
| Interpreter employed by (key in verbatim; UNK = left blank) | | |
| **FILE INCLUDES I-867B Jurat for Record of Sworn Statement     (1=yes; 2=no)** | | |
| Fear 1: Why did you leave…? (key in verbatim) | | |
| Fear 2: Do you have any fear or concern…? (key in verbatim) | | |
| Fear 3: Would you be harmed…? (key in verbatim) | | |
| Fear 4: …anything else…to add? (key in verbatim) | | |
| From your reading of the 4 Fear questions, did the alien express fear? (1=yes; 2=no) | | |
| If yes, fear of what? | | |
| Comment on and note any other part of the I-867A and B in which the alien expressed a basis for asylum. | | |
| **FILE INCLUDES I-877 Record of Sworn Statement (1=yes; 2=no)** | | |
| A No. (File No.): | | |
| Place of Interview (At:) | | |
| Date of Sworn Statement MM/DD/YY | | |
| Language | | |

| | | |
|---|---|---|
| Interpreter employed by (key in verbatim; UNK = left blank) | | |
| **Are Four Fear Questions in narrative of I-877? (1=yes/2=no)** | | |
| Fear 1: Why did you leave…? (key in verbatim) | | |
| Fear 2: Do you have any fear or concern…? (key in verbatim) | | |
| Fear 3: Would you be harmed…? (key in verbatim) | | |
| Fear 4: …anything else…to add? (key in verbatim) | | |
| From your reading of the 4 Fear questions, did the alien express fear? (1=yes; 2=no; 3=n/a) | | |
| If yes, fear of what? | | |
| Comment on and note any other part of the I-877 in which the alien expressed a basis for asylum. | | |
| **FILE INCLUDES I-213 Record of Deportable/Inadmissible Alien (1=yes; 2=no)** | | |
| A No. (File No.): | | |
| Date of Action | | |
| charges: (key in statutory sections) | | |
| Comments from I-213 Narrative, incl/ why referred to secondary insp. | | |
| **FILE INCLUDES I-275** Withdrawal of **Application for Admission/Consular Notification (1=yes; 2=no)** | | |
| A No. (File No.): | | |
| Date of I-275 (MM/DD/YY) | | |
| Basis for Action: Application for Admission W/drawn 1=box checked; 2=box NOT checked | | |
| Basis for Action: Visa/BCC Canceled 1=box checked; 2=box not checked | | |
| Basis for Action: VWPP Refusal 1=box checked; 2=box NOT checked | | |
| Basis for Action: Ordered removed (inadmissible) by IJ 1=box checked; 2=box NOT checked | | |
| Basis for Action: Ordered removed (inadmissible) by INS 1=box checked; 2=box NOT checked | | |
| Basis for Action: Waiver revoked 1=box checked; 2=box NOT checked | | |

IFR_AR_008279

| | | |
|---|---|---|
| Basis for Action: Departure required 1=box checked; 2=box NOT checked | | |
| If Basis for Action "Application for Admission Withdrawn," why did CBP exercise discretion to allow? | | |
| EXPIRED VISA - reason placed in proceedings:   1=yes; 2=no | | |
| FORMER OVERSTAY - reason placed in proceedings:   1=yes; 2=no | | |
| IMMIGRANT INTENT - reason placed in proceedings:   1=yes; 2=no | | |
| INADMISSIBLE BASED ON CRIME - reason placed in proceedings:   1=yes; 2=no | | |
| PASSPORT EXPIRING W/IN 6 MONTHS - reason placed in proceedings:    1=yes; 2=no | | |
| IMPROPER NONIMMIGRANT VISA FOR PURPOSE OF VISIT - reason placed in proceedings:   1=yes; 2=no | | |
| FALSE DOCS - reason placed in proceedings:   1=yes; 2=no | | |
| NO DOCS - reason placed in proceedings: 1=yes; 2=no | | |
| FACIALLY VALID DOCS BUT INTENDING TO APPLY FOR ASYLUM - reason placed in proceedings:   1=yes; 2=no | | |
| OTHER GROUND of INADMISSIBILITY: | | |
| Comments from I-275 Narrative, incl/ why referred to secondary insp. | | |
| **FILE INCLUDES I-264 Notice to Foreign Consulate (that detaining alien) 1=yes; 2=no** | | |
| Is the alien named on the I-264? 1=yes; 2=no; 3=n/a | | |
| Does the I-264 contain charges against the alien or any indication the alien is applying for asylum? 1=yes; 2=no; 3=n/a | | |
| **FILE INCLUDES I-862 Notice to Appear 1=yes; 2=no** | | |
| A No. (File No.): | | |
| Charges: (key in statutory sections) | | |
| **Was alien detained? 1=yes/2=no** | | |
| Place of detention | | |
| **Summarize Facts of case** | | |

IFR_AR_008280

| | | |
|---|---|---|
| **Port Disposition: was the Alien** <br> **1**=allowed to withdraw application for admission; **2**=ordered expeditiously removed; **3**=allowed to dissolve claim; **4**=referred to credible fear interview; **5**=referred to asylum only hearing; **6**=other (comment) | | |
| **If alien was ordered removed,** what form documents the ORDER? | | |
| Officer's bureau/title | | |
| Date of     REMOVAL ORDER | | |
| **If alien was ordered removed,** what form documents the DEPARTURE? | | |
| Officer's bureau/title | | |
| Date of DEPARTURE | | |
| Port of departure | | |
| Country removed to | | |
| Alien barred from entering U.S. for 0=no bar; 1=five years; 2=ten years; 3=twenty years; 4=any time | | |
| **Was alien represented** at any stage? 1=yes/2=no | | |
| Enter any comments on **representation** | | |
| Enter any comments on **change of claim** | | |
| **Any additional comments by coder** including overall impressions of case; points of interest (Reminder: Note interesting religious claims) | | |
| **Finish Time** | | |

IFR_AR_008281

**Appendix D**
**Additional Analysis of Port of Entry Files National Sample**

The national sample was drawn with the intention of analyzing files of aliens subject to expedited removal who were not referred into the asylum process. In other words, they were expeditiously removed or allowed to withdraw their applications for admission. The national sample's outcome[1] and other demographic information are described below.
Table A below presents the outcome by gender for the port of entry national sample.

**Table A: Outcome (%) by Gender for National Sample**

| Gender | Ordered Removed | Withdrawal Permitted | Total |
|---|---|---|---|
| Male | 67 (63.2) | 45 (57.7) | 112 (60.9) |
| Female | 39 (36.8) | 33 (42.3) | 72 (39.1) |
| **Total (100%)** | **105** | **78** | **184** |

The sample included 61 percent men and 39 percent women. Men constituted 63 percent of the random sample of aliens who were expeditiously removed, and 58 percent of the random sample of aliens who were permitted to withdraw their applications for admission. Women constituted 37 percent of the removals and 42 percent of the withdrawals.

Table B shows outcomes by major country for the national sample. To protect the anonymity of the results only percentages are provided in this table. Jamaica stands out with a rate of 11.4 percent of removals contrasted with only 1.3 percent of withdrawals.

**Table B: Outcome by Major Country for National Sample**

| Major Country | Ordered Removed | Withdrawal Permitted |
|---|---|---|
| Mexico‡ | 14.3% | 20.5% |
| Brazil† | 10.5% | 10.3% |
| Jamaica† | 11.4% | 1.3% |
| Costa Rica† | 4.8% | 5.1% |
| Guatemala† | 2.9% | 6.4% |
| El Salvador† | 3.8% | 2.6% |
| Balance‡ | 52.3% | 53.8% |

‡ Indicates that the sample size for this country is $n > 20$.

† Indicates that the sample size for this country is $n < 20$.

---

[1] When withdrawal of the application for admission is permitted, there is no penalty to the alien except visa cancellation. In contrast, the consequences of removal include at least a five year bar to entry. "Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible." INA Sec. 212. [8 U.S.C. 1182] (a)(9)(A)(i).

IFR_AR_008282

Table C describes the outcome (removal or withdrawal) by region of origin for those aliens who were not permitted to enter the U.S. With two exceptions, there were not significant differences in the treatment of aliens based on region of origin. The percentage of aliens in the sample from a region of origin ordered removed was generally close to the percentage of aliens from that region who were permitted to withdraw their application for admission.

**Table C: Outcome by region of origin for national sample**

| Region of Origin | Ordered Removed | Withdrawal Permitted | Total |
|---|---|---|---|
| South America | 23 (21.7) | 11 (14.1) | 34 |
| Central America | 32 (30.2) | 30 (38.5) | 62 |
| Europe | 8 (7.5) | 13 (16.7) | 21 |
| Caribbean* | 20 (18.9) | 1 (1.3) | 21 |
| East Asia | 0 | 4 (5.1) | 4 |
| Other Asia | 11 (10.4) | 6 (7.7) | 17 |
| Middle East | 5 (4.7) | 6 (7.7) | 11 |
| Africa | 5 (4.7) | 2 (2.6) | 7 |
| Pacific/Oceania | 0 | 4 (5.1) | 4 |
| Other/Unknown | 2 (1.9) | 1 (1.3) | 3 |
| **Total (100%)** | **106** | **78** | **184** |

\* Statistically significant ($z = 3.71$, $p = 0.000$).

The most notable exception to this generally consistent treatment were aliens from the Caribbean, who constituted almost 19 percent of the national sample of those ordered removed, but only 1.3 percent of the national sample of those permitted to withdraw. In contrast, Europeans were only 7.5 percent of those ordered removed, and 16.7 percent of those permitted to withdraw. Further analysis would be required in order to draw any conclusions as to the factors which may account for these exceptions.

IFR_AR_008283

Appendix E
**Analysis of Port of Entry Files from JFK Airport**

*Obtaining the port of entry file JFK sample*

The second set of port of entry files ($n$ = 112) consisted of electronic records relating to A-files from New York JFK Airport from fiscal year 2004, printed out by Customs and Border Protection staff at JFK from the ENFORCE system between April 2-27, 2004.  After reviewing a list of all fiscal year 2004 cases to date at the time of the sample, we requested electronic records representing approximately equal numbers of four types of cases: expedited removal cases, withdrawals[1], credible fear referrals, and visa waiver cases.[2]

One reason for requesting the JFK sample was to compare JFK Visa Waiver Program (VWP) refusal cases to expedited removal cases.   We were interested in examining JFK's practice of asking the expedited removal fear questions of Visa Waiver Program aliens prior to refusing them entry.[3]   Nationals of Visa Waiver Program countries do not require a visa to enter the U.S. for less than 90 days as non-immigrant visitors for business or pleasure, and are not subject to expedited removal.[4]  If an alien from a VWP country is found inadmissible, he or she is summarily returned home.[5]  Inspectors are not required to ask them the fear questions before returning them.

---

[1] As noted in the main report's discussion of port of entry files, CBP advised us that it is not mandatory to ask the protection-related questions in all withdrawal cases, therefore documentation of such screening would not be expected in all files relating to aliens permitted to withdraw their applications for admission.

[2] The JFK files, representing cases from January 1, 2004 to March 31, 2004,  consisted of (1) randomly selected A-files representing 33 of the 561 aliens who were expeditiously removed; (2) 30 randomly selected A-files of the 223 aliens subject to expedited removal who withdrew their applications for admission; (3) 30 randomly selected A-files out of the 45 aliens referred for credible fear ; and (4) 30 A-files representing all aliens believed to be from non-visa waiver countries but traveling on a VWP passport.  Of the 123 files requested, 114 were actually received.  Two of these were not included in the analysis (one since it was also included in the national sample, the second because it was a reinstatement of removal case, and was therefore not relevant to the study).   To combine the data from these samples, they would have to be re-weighted.  Producing combined results was not our purpose here so this has not been done.

[3] While aliens subject to expedited removal are specifically asked whether they fear return, VWP applicants in ports other than JFK and Newark are expected to proactively identify themselves as asylum seekers before being returned. *See* DHS U.S. Customs and Border Protection Response to Recommendations of the Study of the U.S. Expedited Removal Process by the United Nations High Commissioner for Refugees (Unreleased, 2004).

[4] The Visa Waiver Program currently has 27 countries, designated in part because their nationals have a low rate of refusal for U.S. visas: Andorra, Austria, Australia, Belgium, Brunei, Denmark, Finland, France, Germany, Iceland, Ireland, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovenia, Spain, Sweden, Switzerland, and the United Kingdom.  See http://www.cbp.gov/xp/cgov/travel/leavingarrivinginUS/nonimmigrant_arri_dep/vwp.xml.

[5] "Generally, a VWP applicant found to be inadmissible by the inspecting officer is refused entry into the United States without further administrative hearing."  *See* http://www.cbp.gov/xp/cgov/travel/leavingarrivinginUS/nonimmigrant_arri_dep/vwp.xml.

IFR_AR_008284

If a Visa Waiver Program alien expresses a fear of return on his or her own initiative, the inspector will make a referral directly to an immigration judge, for an "asylum-only" hearing.[6] The Board of Immigration Appeals has held that an imposter traveling on a false VWP country passport without actually being a national of that country may be processed under VWP procedures, meaning that inspectors are not required to conduct a fear screening.[7]  Some ports of entry, including JFK, informed experts working on the Expedited Removal Study that they nevertheless do screen Visa Waiver Program applicants for fear of return in the same manner as they screen aliens subject to expedited removal.

Like the national sample port of entry files, the JFK port of entry files as initially generated by ENFORCE had a significant rate of failure in producing complete files.  As noted with respect to the national sample, Customs and Border Protection expressed concern at the high percentage of files that were missing documents, and began the process of verifying whether the documentation was indeed in ENFORCE but had for some reason not been generated along with the rest of the file, or was in the paper file, or in fact was missing from the file.  CBP was able to re-send some of these port of entry files which were initially missing sworn statements.

### *Outcome by region of origin in the JFK port of entry sample*

The JFK sample was analyzed in two groups: aliens traveling with no visa, but on a passport of a country participating in the Visa Waiver Program (VWP), and aliens subject to expedited removal, i.e. aliens (not traveling on VWP country passports) arriving at the port of entry with false or no documents.

The two outcome categories "Ordered Removed" and "Withdrawal Allowed" were combined for analysis into the outcome "Refused Entry."  The outcome "Referred" means referral for a credible fear determination if the case is part of the expedited removal group, and referral for an asylum-only hearing if the case is part of the Visa Waiver Program group.

Table A below presents the outcome and region of origin distribution for the JFK sample.  Note that without weighting the outcome numbers, they do not represent the ratio of "Refused Entry" to "Referred."  The tables merely describe the JFK sample.  South America was most heavily represented in the JFK sample, with 25 percent of the cases ($n$=28/112).  Cases from the Caribbean comprised 17 percent of the JFK sample ($n$=19/112), followed by 16 percent from Africa ($n$=18/112) and 15 percent from Europe ($n$=17/112).  South/Central Asia as a region represented 12.5 percent of cases ($n$=14/112) and East Asia 8 percent ($n$=9/112).  Cases from the Middle East comprised 4 percent of the cases ($n$=5/112); Central America had the smallest representation, with 2 percent ($n$=2/112).

### Table A: Outcome and Region of Origin Distribution for JFK Sample

| Region of Origin | Refused Entry | Referred | Total |
|---|---|---|---|

---

[6] While known as an "asylum-only" hearing, any application for asylum before an immigration judge is also considered as an application for relief under "withholding of removal" as well as under the Convention Against Torture.  8 CFR 208.2(b), 208.3(b) (2004).

[7] See *Matter of Kanagasundram*, Int. Dec. 3407 (BIA 1999).

IFR_AR_008285

| | | | |
|---|---|---|---|
| South America* | 24 (31.2) | 4 (11.4) | 28 |
| Central America | 2 (2.6) | 0 (0.0) | 2 |
| Europe | 12 (15.6) | 5 (14.3) | 17 |
| Caribbean | 16 (20.8) | 3 (8.6) | 19 |
| East Asia* | 3 (3.9) | 6 (17.1) | 9 |
| South/Central Asia | 8 (10.4) | 6 (17.1) | 14 |
| Middle East | 4 (5.2) | 1 (2.9) | 5 |
| Africa* | 8 (10.4) | 10 (28.6) | 18 |
| **Total (100%)** | **77** | **35** | **112** |

\* Statistically significant. ($z = 2.24$, $p = 0.025$).

Table B below presents the outcome and arrival status of the JFK sample. The sample included 27 percent Visa Waiver Program cases and 73 percent expedited removal cases. The Visa Waiver Program group included 30 cases of which 21 were refused entry and 9 were referred for an asylum only hearing. The expedited removal group included 82 files, made up of 56 refusals and 26 referrals.

**Table B: Outcome and Arrival Status Distribution for JFK Sample**

| Arrival Status | Refused Entry | Referred | Total |
|---|---|---|---|
| Visa Waiver Program | 21 (27.3) | 9 (25.7) | 30 |
| Expedited Removal | 56 (72.7) | 26 (74.3) | 82 |
| **Total** | **77** | **35** | **112** |

*Documentation regarding fear of return in the port of entry file JFK sample*

In addition to the I-867B Jurat for Record of Sworn Statement used to record the secondary inspection of an alien in expedited removal, we also examined, for the Visa Waiver Program group of the JFK sample, the I-877 Record of Sworn Statement. The latter form records the secondary inspection of an alien arriving from a Visa Waiver Program country where aliens are not routinely asked the protection-related questions. Since Form I-877 does not include the pre-printed protection questions, we analyzed the narrative recorded on the form to see if immigration inspectors at JFK added the questions to the sworn statements recorded for applicants traveling on Visa Waiver Program country passports.

Table C is comprised of the Visa Waiver Program cases, and describes the documentation regarding fear of return for that group by outcome. The applicant's response to the protection-related questions is in parentheses. Although the sample is small, the finding is positive: it shows that none of the aliens who entered via the Visa Waiver Program that were reported to express a fear of return was refused entry, i.e. no one in the "Refused Entry" group had a recorded fear of return response.

IFR_AR_008286

However, there was no documentation of the protection-related questions having been asked in 23 percent of the cases; for 7/30 of them, the I-877 form was missing.  Full screening for fear of return is documented in only 53 percent of the files (16/30), partial screening with fear of return recorded in 7 percent of the files, and partial screening with no fear of return recorded in 17 percent of the files.

There are four people in the sample whose file did not document screening for fear of return but who were nonetheless referred to an asylum-only hearing.  This highlights the issues with ENFORCE in producing these files – it seems unlikely that referrals to an asylum-only hearing would be accomplished with no screening for fear of return taking place.  On a positive note, Table C highlights that screening aliens traveling with false visa waiver country passports does not result in "soliciting" asylum claims from most such aliens, yet it does identify aliens who are referred for an asylum hearing after claiming to have a fear of return.

**Table C: Documented Screening for Fear of Return by Outcome for JFK Sample (Visa Waiver Program Group)**

| Screening for Fear | Refused entry | Referred | Total |
|---|---|---|---|
| Full Screening (Fear) | 0 | 2 (22%) | 2 (7%) |
| Full Screening (No Fear) | 13 (62%) | 1 (11%) | 14(47%) |
| Partial Screening (Fear) | 0 | 2 (22%) | 2 (7%) |
| Partial Screening (No Fear) | 5 (24%) | 0 | 5 (17%) |
| No Documentation of Screening (I-877 Missing) | 3 (14%) | 4 (44%) | 7 (23%) |
| **Total (100%)** | **21** | **9** | **30** |

Table D presents how completely CBP inspectors documented screening for fear of return for the expedited removal group.  As with the Visa Waiver Program group, no asylum seeker subject to expedited removal with a documented expression of fear of return was refused entry.  In over 10 percent of cases for aliens refused entry, however, it was impossible to establish whether screening for fear took place due to a missing I-867B form.

**Table D: Documented Screening for Fear of Return by Outcome for JFK Sample (Expedited Removal Group)**

| Screening for Fear | Refused Entry | Referred | **Total** |
|---|---|---|---|
| Full Screening (Fear) | 0 | 22 (84.6) | 22 |
| Full Screening (No Fear) | 50 (89.3) | 2 (7.7) | 52 |
| No Documentation of Screening (I-867B Missing) | 6 (10.7) | 2 (7.7) | 8 |
| **Total (100%)** | **56** | **26** | **82** |

Table E below presents the outcome and gender distribution for the JFK sample.  The sample included 53 percent men and 47 percent women.  Note that without weighting the outcome numbers, they do not represent the ratio of "Refused Entry" to "Referred."  The tables merely describe the JFK sample.

IFR_AR_008287

**Table E: Outcome and Gender Distribution for JFK Sample**

| Gender | Refused entry | Referred | Total |
|---|---|---|---|
| Male | 39 (50.6) | 20 (58.8) | 59 (53.2) |
| Female | 38 (49.4) | 14 (41.2) | 52 (46.8) |
| **Total (100%)** | **77** | **34** | **111** |

Table F presents the outcome and gender distribution with the addition of arrival status. In the *Refused Entry* sample of the Visa Waiver Program nearly 62 percent were male. In contrast, in the *Referred* sample among Expedited Removal cases, 72 percent were female. The differences described are statistically significant.[8]

**Table F: Outcome by Gender and Arrival Status Distribution for JFK Sample**

| Arrival Status | Gender | Refused Entry | Referred | **Total** |
|---|---|---|---|---|
| Visa Waiver Program | Male | 13 (61.9) | 2 (22.2) | 15 |
| | Female | 8 (38.1) | 7 (77.8) | 15 |
| | **Total (100%)** | **21** | **9** | **30** |
| Expedited Removal | Male | 26 (46.4) | 18 (72.0) | 44 |
| | Female | 30 (53.6) | 7 (28.0) | 37 |
| | **Total (100%)** | **56** | **25** | **81** |

---

[8] VWP: $z = 1.99$, $p = 0.046$ (the test for the difference of proportion for independent samples is less reliable for smaller samples, such as $n<30$); ER: $z = -2.13$, $p = 0.033$.

IFR_AR_008288

**Appendix F**
**Mark Hetfield Letter to CBP on Sept. 23, 2004**

UNITED STATES COMMISSION ON
INTERNATIONAL RELIGIOUS FREEDOM

September 23, 2004

Mr. Salvador Flores
Program Manager
Immigration Policy and Programs, Office of Field Operations
Bureau of Customs and Border Protection (CBP)
Department of Homeland Security
1300 Pennsylvania Avenue, NW
Room 5.5-37
Washington, D.C. 20229

Dear Sal –

We are writing to you as our "expert" on the ENFORCE system. As you are aware, the Commission is conducting a study on Expedited Removal. Your familiarity with the ENFORCE system has been very helpful to the Commission in gathering the data for the study. We would, however, like to enlist your help in documenting some persistent problems which we have encountered in attempting to utilize the ENFORCE system for this purpose.

Section 605 of the International Religious Freedom Act of 1998 (IRFA) required the GAO, and authorized experts appointed by the US Commission on International Religious Freedom (USCIRF), to study the effect of Expedited Removal on individuals fleeing persecution. Specifically, IRFA authorized the Commission and the GAO to study whether, in expedited removal proceedings pursuant to section 235(b) of the Act, Immigration Officers were (1) improperly encouraging asylum seekers to withdraw applications for admission; (2) incorrectly failing to refer asylum seekers to credible fear interviews; (3) incorrectly removing asylum seekers to countries where they may be persecuted; and (4) detaining such aliens improperly or under inappropriate conditions.

IRFA provides that the Secretary of Homeland Security (as the Successor to the Attorney General on immigration matters) shall (with narrowly defined exceptions) provide the experts with "unrestricted access to all stages of all proceedings under section 235(b) of the (Immigration and Nationality) Act." Similarly, under section 203(b) of P.L. 106-55, the Commission "may secure directly from any Federal Department or agency such information as

113

the Commission considers necessary to carry out (its duties).  Upon request of the Chair of the Commission, the head of such department or agency shall furnish such information to the Commission, subject to applicable law."

To address the first three questions posed to the Commission by Congress in Section 605 of IRFA, the Commission has sought to review random selections of (1) A-files of aliens placed in Expedited Removal, as well as (2) files of those who would have been placed in Expedited Removal but who were instead permitted to withdraw their applications for admission to the U.S. In collecting data for this study, the recently implemented ENFORCE system has been a valuable tool.  ENFORCE has permitted CBP to generate a list of all aliens subject to Expedited Removal at ports of entry in FY2004, from which the Commission generated its random sample of cases.  Once we chose the random sample, CBP used the ENFORCE database to print the forms from which we needed data.

ENFORCE has significantly eased the burden of data collection for both CBP and USCIRF.  For credible fear files, USCIRF and DHS had to rely on gathering paper files individually from local DHS offices.  In contrast, ENFORCE allowed all of the requested files to be printed at CBP Headquarters.

Nonetheless, we are concerned that, for a large number of the files identified by ENFORCE as being relevant to Expedited Removal, many of the files themselves contained neither data nor forms – just a cover sheet. In the Commission report, which we are currently in the process of writing, we will need to explain the cause of this deficiency.  Consequently, we would greatly appreciate it if you would investigate this matter and advise us on the explanation for this occurrence.  We will need to document the reason for the "data gaps" in the Study.

Below is a chronology of events relating to gathering study data through the ENFORCE system.

**May 3, 2004:** USCIRF asks its Point of Contact at CBP, Linda Loveless, to provide lists of all aliens who (1) withdrew their applications for admission or (2) were expeditiously removed from ports of entry during FY2004 (From October 1, 2003 to present).

**June 20, 2004:** USCIRF receives spread sheets, run from ENFORCE, of all Expedited Removal, 29,957 ("ERs"), and Withdrawals Subject to Expedited Removal, 20,724 ("ER-WDs"), through May 19, 2004.

**July 26, 2004:** USCIRF provides CBP with a request for 240 files, including:
20 Mexican ERs
100 "Other-Than Mexican or Canadians" ("OTMC") ERs
20 Mexican ER-WDs
100 OTMC ER-WDs.
These files were randomly selected by USCIRF methodologist Fritz Scheuren from the list provided by CBP on June 20, 2004.

**August 16, 2004:** CBP notifies USCIRF that ENFORCE was able to print only 148 of the 240 files requested, providing only cover sheets for the missing files.

18/20 ER-WD Mexican
18/20 ER Mexican
33/100   ER-WD OTMC
79/100 ER OTMC

**August 16, 2004**: USCIRF submits an additional random sample of 1559 OTMC WD-ER and 40 OTMC ER cases to ensure 2 samples of 100 each, to ensure a statistically significant sample. CBP is asked to keep printing files down the list until it reaches a total of 100 OTMC ER-WDs and 100 OTMC ERs, including those files already printed.

**August 23, 2004:** USCIRF receives additional files from CBP to produce 100 file samples for each OTMC sample requested.  However, an audit determines that, while CBP now has a sample of 100 ER OTMC files, it still only has 74/100 ER files.

**September 9, 2004:** USCIRF requests that CBP continue to run down the OTMC ER-WD list provided on August 16 until the number of OTMC ER-WD cases successfully printed reaches 100.

The Commission is currently awaiting the additional 26 files from CBP to complete its sample of 100 OTMC ER-WDs.  I understand that those files will be ready for the Commission this afternoon.

To date, of the 20 Mexican ER files requested, 18 files printed for a 10% fail rate.  Of the 20 Mexican WD files requested, 18 files printed for a 10% fail rate.  Of the 123 OTMC ER files requested, 100 files printed for a 19% fail rate.  Of the 150 OTMC ER-WD files requested, 74 files printed for a 50% fail rate.  A report of the files printed and not printed by ENFORCE is attached, as well as a report of all of the files requested to date.

USCIRF is currently drafting the Expedited Removal Study requested by Congress, and expects to release the report before the end of the calendar year.  CBP will have the opportunity to review applicable sections of the report prior to its finalization and release.  In order to complete the first draft of the report, however, it is important for the Commission to understand why ENFORCE – which seems to have such tremendous potential as a quality assurance tool – had such a high failure rate in printing cases (particularly since the list of cases itself was generated by ENFORCE).

We look forward to hearing from you, and appreciate all of the assistance CBP has given us throughout the Study.

Sincerely,
Mark Hetfield
Immigration Counsel

Enc.

**Appendix G**
**Analysis of Port of Entry Files National Sample – Canadian Border**

As noted in the report, we separated Canadian border cases from the rest of the national sample due to much more limited file receipts.  The Canadian cases are briefly described below in Tables A and B.  Table A describes the country of origin of aliens subject to expedited removal who attempt entry to the United States from Canada.  The regions have been sorted in order of frequency.  It is evident from Table A that aliens who attempt entry at the Canadian border ports of entry represent a variety of regions, some containing refugee-producing countries.[1]

**Table A: Region of Origin (Canada Group)**

| Region of Origin | Frequency | Percent |
|---|---|---|
| East Asia | 11 | 25.6 |
| Other Asia | 7 | 16.3 |
| Africa | 7 | 16.3 |
| Europe | 5 | 11.6 |
| Central America | 3 | 7.0 |
| Caribbean | 3 | 7.0 |
| South America | 2 | 4.7 |
| Middle East | 2 | 4.7 |
| Unknown | 2 | 4.7 |
| Pacific/Oceania | 1 | 2.3 |
| **Total** | **43** | **100.0** |

Table B presents the results of the screening for fear process by outcome for the Canada group.  Our file review revealed one case of an alien expressing fear who was refused entry.  That person, however, was not returned to his country of origin in the Middle East, but was returned to Canada pursuant to the agreement between the U.S. and Canada.  Table B shows that with the limited forms generated by ENFORCE it is not possible to tell whether inspectors at Canadian land borders are taking sworn statements from those who are refused admission to the U.S.

**Table B: Documentation regarding fear of return by Outcome (Canada Group)**

| Screening for Fear | Ordered Removed | Withdrawal Permitted | Total |
|---|---|---|---|
| Full Screening (Fear) | 1 | 0 | 1 |
| Full Screening (No Fear) | 1 | 0 | 1 |
| No Documentation of Screening (I-867B Missing) | 1 | 40 | 41 |
| **Total** | **3** | **40** | **43** |

---

[1] As discussed in the report, the national sample deliberately excluded cases concerning Canadian nationals.

**Appendix H**
**Board of Immigration Appeals Data Collection Instrument**

| | | Comments on A-No.: _____ (please note row number below) |
|---|---|---|
| Date File Coded | | |
| Coder ID | | |
| Start Time | | |
| Random Number | | |
| A-Number | | |
| Name: Last, First | | |
| Gender        1=male/2=female | | |
| Date of BIRTH MM/DD/YY | | |
| Is the alien an unaccompanied minor? 1=yes/2=no | | |
| Ethnicity | | |
| Religion | | |
| Marital status 1=single; 2=married; 3=legally separated; 4=divorced; 5=widowed | | |
| How many children does alien have? | | |
| Country of Citizenship | | |
| Date of ARRIVAL MM/DD/YY | | |
| Port of Entry | | |
| Entry by 1=air; 2=land; 3=sea | | |
| Country of departure | | |
| Accompanied by: | | |
| Did alien have 'In Transit Without Visa' status? 1=yes; 2=no | | |
| If yes, from where to where? | | |
| Destination country | | |
| Charge(s) (from I-862, I-863, or I-860; key in charge and from which form) | | |
| FILE INCLUDES I-867A Record of Sworn Statement (1=yes; 2=no) | | |
| FILE INCLUDES I-867B Jurat for Record of Sworn Statement (1=yes; 2=no) | | |
| FILE INCLUDES I-870 Record of Determination/ Credible Fear Work Sheet (1=yes; 2=no) | | |
| FILE INCLUDES I-589 Application for Asylum and for Withholding of Removal 1=yes; 2=no | | |
| A-Number | | |
| Part A.I.16 Religion: key in | | |

| | | |
|---|---|---|
| Part B.1. Basis for asylum grounds-Race: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Religion: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Nationality: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Political opinion: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Membership in a particular social group: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Torture Convention: 1=box checked; 2=box not checked | | |
| Comments about claim from I-589 and attached Declaration | | |
| **FILE INCLUDES transcript of MASTER CALENDAR hearing(s): 1=yes; 2=no** | | |
| A-number | | |
| IJ name | | |
| Location of Imm Ct | | |
| Date of first **Master Calendar hearing** | | |
| Was alien **detained** at time of first Master Calendar Hearing? 1=yes; 2=no | | |
| If alien was detained at time of first Master Calendar Hearing, where?  (Detention Center and City) | | |
| Was alien **represented** at first Master Calendar Hearing? | | |
| If represented at first Master Calendar Hearing, name of attorney (note if attorney in different state than alien) | | |
| If represented at Master Calendar Hearing, was attorney present? | | |
| Was first Master Calendar Hearing 1=live; 2=video; 3=audio | | |
| If first Master Calendar Hearing was by video or audio, where were applicant, attorney, and judge? | | |
| **Total Number of Master Calendar Hearings/ Continuances before Merits/Individual Removal hearing** | | |
| Number of Continuances requested by Alien | | |
| Number of Continuances requested by DHS | | |
| Number of Continuances requested by IJ | | |
| Explain Continuances | | |

IFR_AR_008294

| | | |
|---|---|---|
| Was alien **represented** at times continuances were requested? | | |
| Was alien **detained** at times continuances were requested? | | |
| Was a **Change of Venue** requested? 1=yes; 2=no | | |
| Change of Venue requested by 1=alien; 2=DHS | | |
| Change of Venue 1=granted; 2=denied | | |
| If Change of Venue denied, explain | | |
| **FILE INCLUDES transcript of IJ ORAL DECISION: 1=yes; 2=no** | | |
| **FILE INCLUDES transcript of MERITS/ INDIVIDUAL (REMOVAL) HEARING: 1=yes; 2=no** | | |
| A-number | | |
| IJ name | | |
| Location of Imm Ct | | |
| Date of **Merits/ Individual Hearing** | | |
| Was alien **detained** at time of Merits/Individual Hearing? 1=yes; 2=no | | |
| If alien was detained at time of Merits/Individual Hearing, where?  (Detention Center and City) | | |
| Was alien **represented** at Merits/Individual Hearing? | | |
| If represented at Merits/Individual Hearing, name of attorney (note if attorney in different state than alien) | | |
| If represented at Merits/Individual Hearing, was attorney present? | | |
| Was Merits/Individual Hearing 1=live; 2=video; 3=audio | | |
| If Merits/Individual Hearing was by video or audio, where were applicant, attorney, and judge? | | |
| **I-867** (Airport Statement) cited in IJ merits opinion as element of decision: 1=yes; 2=no | | |
| Transcript Page | | |
| Summarize | | |
| I-867 entered as exhibit: 1=yes; 2=no | | |
| Transcript Page | | |
| I-867 entered as exhibit by 1=alien; 2=government | | |
| objection raised: 1=yes; 2=no | | |
| objection raised by 1=alien; 2=government | | |
| questioning re: I-867 allowed: 1=yes; 2=no | | |
| Transcript Page | | |

IFR_AR_008295

| | | |
|---|---|---|
| questioning re: I-867 allowed by 1=alien; 2=government; 3=judge | change to who questions | |
| I-867 used to impeach alien: 1=yes; 2=no | | |
| Transcript Page | | |
| I-867 used to buttress alien: 1=yes; 2=no | | |
| Transcript Page | | |
| **I-870** (Credible Fear interview) cited in IJ merits opinion as element of decision: 1=yes; 2=no | | |
| Transcript Page | | |
| Summarize | | |
| I-870 entered as exhibit: 1=yes; 2=no | | |
| Transcript Page | | |
| I-870 entered as exhibit by 1=alien; 2=government | | |
| objection raised: 1=yes; 2=no | | |
| objection raised by 1=alien; 2=government | | |
| questioning re: I-870 allowed: 1=yes; 2=no | | |
| Transcript Page | | |
| questioning re: I-870 allowed by 1=alien; 2=government; 3=judge | | |
| Transcript Page | | |
| I-870 used to impeach alien: 1=yes; 2=no | | |
| Transcript Page | | |
| I-870 used to buttress alien: 1=yes; 2=no | | |
| Transcript Page | | |
| **Other statement by alien** (I-589 or other) cited in IJ merits opinion as element of decision: 1=yes; 2=no | | |
| If yes, which statement? | | |
| Transcript Page | | |
| Does judge criticize alien for **translation** of documents? (1=yes; 2=no) | | |
| Transcript Page | | |
| Summarize | | |
| Does judge criticize alien for **lack of evidence of asylum** claim? 1=yes; 2=no | | |
| Transcript Page | | |
| Summarize | | |
| If criticized for lack of evidence of asylum claim, what evidence was submitted? | | |
| If criticized for lack of evidence of asylum claim, what evidence was missing? | | |
| Does judge determine alien's **identity**? (1=yes/2=no) | | |
| Was identity established by the alien's credible testimony? (1=yes/2=no) | | |
| Was identity established with passport? (1=yes/2=no) | | |

IFR_AR_008296

| | | |
|---|---|---|
| Was identity established with other evidence? (1=yes/2=no) | | |
| List other evidence | | |
| Does judge criticize alien for **lack of evidence of identity**?  (1=yes; 2=no) | | |
| Transcript Page | | |
| Summarize | | |
| If criticized for lack of evidence of identity, what evidence was submitted? | | |
| If criticized for lack of evidence of identity, what evidence was missing? | | |
| Does judge criticize alien for **failing to authenticate** original documents? (1=yes/2=no) | | |
| Transcript Page | | |
| Summarize | | |
| Does judge criticize alien for **poorly completed forms**?  (1=yes; 2=no) | | |
| Transcript Page | | |
| Summarize | | |
| **Asylum** relief: 1=granted; 2=denied; 3=n/a | | |
| **Withholding** of Removal relief: 1=granted; 2=denied; 3=n/a | | |
| **Torture Convention** relief: 1=granted; 2=denied; 3=n/a | | |
| **FILE INCLUDES Order of IJ re: Removal Proceedings 1yes; 2=no** | | |
| A-number | | |
| IJ Name | | |
| Location of Imm Ct | | |
| Date of decision | | |
| Disposition: key in text of order | | |
| Appeal 1=waived; 2=reserved | | |
| **FILE INCLUDES Appeal to BIA 1=yes; 2=no** | | |
| A-number | | |
| Date of appeal | | |
| Basis for appeal | | |
| Appealing Party 1=alien; 2=DHS | | |
| Was alien detained at time of Appeal? (1=yes; 2=no) | | |
| If alien was detained at time of Appeal, where?  (Detention Center and City) | | |
| Was alien represented at time of Appeal? | | |
| If represented at Appeal, name of attorney (note if attorney in different state than alien) | | |

IFR_AR_008297

| | | |
|---|---|---|
| **FILE INCLUDES Order of BIA 1=yes; 2=no** | | |
| Date of BIA decision | | |
| Order of IJ was 1=affirmed; 2=vacated | | |
| BIA ordered alien: | | |
| BIA streamlining: 1=dismissed upon "initial screening"; 2=affirmance without opinion; 3=brief order affirming 4=brief order modifying; 5=brief order remanding | | |
| BIA streamlining: 1=one judge; 2=three judge panel; 3=en banc | | |
| **Summarize Facts of case** | | |
| **Summarize Procedural History/ Posture -** what happened to the Alien and what is pending?  Incl/ dates of master hearings and merits hearings | | |
| **Last authority alien appeared in front of:** 1=CBP (Airport Inspector); 2=CIS (Asylum Officer); 3=EOIR (IJ Level); 4=EOIR (BIA Level); 5=other | | |
| **Alien's case is pending at:** 1=CBP (Airport Inspector); 2=CIS (Asylum Officer); 3=EOIR (IJ Level); 4=EOIR (BIA Level); 5=other | | |
| **Case Disposition: was the Alien 1**=allowed to withdraw application for admission; **2**=ordered removed; **3**=allowed to dissolve claim; **4**=granted asylum; **5**=other (e.g. case not yet resolved, comment) | | |
| **Any additional comments by coder** including overall impressions of case; points of interest (Reminder: Note interesting religious claims) | | |
| **Finish Time** | | |

IFR_AR_008298

**Appendix I**
**Additional Analysis of the Board of Immigration Appeals Sample**

The regional makeup of the Board of Immigration Appeals sample, including the top five countries of origin, appears in Table A.  The largest regional representation was from Asia, with 36.8 percent of the sample.  The high number of Chinese cases accounts for the majority of the Asian cases.  Caribbean cases, 22.7 percent, were from Cuba and Haiti.  Central and South America made up 17.2 percent of the sample.  Europe was 9.8 percent of the sample; Africa 8.0 percent; Middle Eastern cases 5.5 percent.

**Table A. Gender and Detention Status of the BIA Sample – Regions of Origin**

|  | Asia (China & South Asia) | Caribbean | Central & South America | Europe | Africa | Middle East | Total |
|---|---|---|---|---|---|---|---|
| Detained Men | 8 (34.8%) | 6 (26.1%) | 2 (8.7%) | 3 (13.0%) | 2 (8.7%) | 2 (8.7%) | 23 (100%) |
| Paroled Men | 33 (39.3%) | 14 (16.7%) | 19 (22.6%) | 6 (7.1%) | 5 (6.0%) | 7 (8.3%) | 84 (100%) |
| Detained Women | 4 (30.8%) | 5 (38.4%) | 1 (7.7%) | 1 (7.7%) | 2 (15.4%) | 0 | 13 (100%) |
| Paroled Women | 15 (34.9%) | 12 (27.9%) | 6 (13.95%) | 6 (13.95%) | 4 (9.3%) | 0 | 43 (100%) |
| Total: | 60 (36.8%) | 37 (22.7%) | 28 (17.2%) | 16 (9.8%) | 13 (8.0%) | 9 (5.5%) | 163 (100%) |

Rates of release prior to the merits hearing for the top five countries of origin in the sample show that Haitians have by far the lowest rate, 62.1 percent.  Cuba's rate of release is 100 percent, while Colombia is 95.2 percent, Iraq is 87.5 percent, and China is 84.9 percent.

IFR_AR_008299

**Appendix J**
**Credible Fear Data Collection Instrument**

| | | Comments on A-No.: _____ (please note row number below) |
|---|---|---|
| **Date File Coded** | | |
| **Coder ID** | | |
| **Start Time** | | |
| **Random Number** | | |
| **Part of Subsample? 1=yes; 2=no** | | |
| **If yes, rate of subsample:** | | |
| **A-Number        (8 digit number)** | | |
| **Name: Last, First** | | |
| **Gender        1=male/2=female** | | |
| **Date of BIRTH MM/DD/YY** | | |
| **Is the alien an unaccompanied minor? 1=yes/2=no** | | |
| **Ethnicity** | | |
| **Religion** | | |
| **Marital status 1=single; 2=married; 3=legally separated; 4=divorced; 5=widowed** | | |
| **How many children does alien have?** | | |
| **Country of Citizenship** | | |
| **Date of ARRIVAL MM/DD/YY** | | |
| **Port of Entry** | | |
| Entry by 1=air; 2=land; 3=sea | | |
| Country of departure | | |
| Accompanied by: | | |
| Did alien have 'In Transit Without Visa' status? 1=yes; 2=no | | |
| If yes, from where to where? | | |
| Destination country | | |
| **FILE INCLUDES    I-860 Notice and Order of Expedited Removal (1=yes/2=no)** | | |
| A No. (File No.): | | |
| Date | | |
| Inadmissible under section 212(a)(6)(C)(i): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(6)(C)(ii): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(7)(A)(i)(I): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(7)(A)(i)(II): (1=box checked; 2=box not checked) | | |

IFR_AR_008300

| | | |
|---|---|---|
| Inadmissible under section 212(a)(7)(B)(i)(I): (1=box checked; 2=box not checked) | | |
| Inadmissible under section 212(a)(7)(B)(i)(II): (1=box checked; 2=box not checked) | | |
| Was Order of Removal activated by supervisory signature?    1=yes; 2=no | | |
| Title of officer | | |
| Was supervisory concurrence telephonic? 1=yes; 2=no; 3=n/a | | |
| **FILE INCLUDES I-863 Notice of Referral to IJ 1=yes; 2=no** | | |
| Date | | |
| A-No. (A File): | | |
| To immigration judge:  (number of box checked 1-7) | | |
| If box 3, which description is marked?  (key in) | | |
| Date of Action | | |
| I-863 Comments | | |
| **FILE INCLUDES I-867A Record of Sworn Statement (1=yes; 2=no)** | | |
| A No. (File No.): | | |
| Place of Interview (At:) | | |
| Date of Sworn Statement MM/DD/YY | | |
| Language | | |
| Interpreter employed by (key in verbatim; UNK = left blank) | | |
| **FILE INCLUDES I-867B Jurat for Record of Sworn Statement    (1=yes; 2=no)** | | |
| Fear 1: Why did you leave…? (key in verbatim) | | |
| Fear 2: Do you have any fear or concern…? (key in verbatim) | | |
| Fear 3: Would you be harmed…? (key in verbatim) | | |
| Fear 4: …anything else…to add? (key in verbatim) | | |
| From your reading of the 4 Fear questions, did the alien express fear? (1=yes; 2=no) | | |
| If yes, fear of what? | | |
| Comment on and note any other part of the I-867A and B in which the alien expressed a basis for asylum. | | |
| **FILE INCLUDES I-877 Record of Sworn Statement (1=yes; 2=no)** | | |
| A No. (File No.): | | |

IFR_AR_008301

| | | |
|---|---|---|
| Place of Interview (At:) | | |
| Date of Sworn Statement MM/DD/YY | | |
| Language | | |
| Interpreter employed by (key in verbatim; UNK = left blank) | | |
| **Are Four Fear Questions in narrative of I-877? (1=yes/2=no)** | | |
| Fear 1: Why did you leave…? (key in verbatim) | | |
| Fear 2: Do you have any fear or concern…? (key in verbatim) | | |
| Fear 3: Would you be harmed…? (key in verbatim) | | |
| Fear 4: …anything else…to add? (key in verbatim) | | |
| From your reading of the 4 Fear questions, did the alien express fear? (1=yes; 2=no; 3=n/a) | | |
| If yes, fear of what? | | |
| Comment on and note any other part of the I-877 in which the alien expressed a basis for asylum. | | |
| **FILE INCLUDES I-213 Record of Deportable/Inadmissible Alien (1=yes; 2=no)** | | |
| A No. (File No.): | | |
| Date of Action | | |
| charges: (key in statutory sections) | | |
| Comments from I-213 Narrative, incl/ why referred to secondary insp. | | |
| **FILE INCLUDES I-275 Withdrawal of Application for Admission/Consular Notification (1=yes; 2=no)** | | |
| A No. (File No.): | | |
| Date of I-275 (MM/DD/YY) | | |
| Basis for Action: Application for Admission W/drawn 1=box checked; 2=box NOT checked | | |
| Basis for Action: Visa/BCC Canceled 1=box checked; 2=box not checked | | |
| Basis for Action: VWPP Refusal 1=box checked; 2=box NOT checked | | |
| Basis for Action: Ordered removed (inadmissible) by IJ 1=box checked; 2=box NOT checked | | |
| Basis for Action: Ordered removed (inadmissible) by INS 1=box checked; 2=box NOT checked | | |

IFR_AR_008302

| | | |
|---|---|---|
| Basis for Action: Waiver revoked 1=box checked; 2=box NOT checked | | |
| Basis for Action: Departure required 1=box checked; 2=box NOT checked | | |
| If Basis for Action "Application for Admission Withdrawn," why did CBP exercise discretion to allow? | | |
| EXPIRED VISA - reason placed in proceedings:   1=yes; 2=no | | |
| FORMER OVERSTAY - reason placed in proceedings:   1=yes; 2=no | | |
| IMMIGRANT INTENT - reason placed in proceedings:   1=yes; 2=no | | |
| INADMISSIBLE BASED ON CRIME - reason placed in proceedings:   1=yes; 2=no | | |
| PASSPORT EXPIRING W/IN 6 MONTHS - reason placed in proceedings:    1=yes; 2=no | | |
| IMPROPER NONIMMIGRANT VISA FOR PURPOSE OF VISIT - reason placed in proceedings:   1=yes; 2=no | | |
| FALSE DOCS - reason placed in proceedings:   1=yes; 2=no | | |
| NO DOCS - reason placed in proceedings: 1=yes; 2=no | | |
| FACIALLY VALID DOCS BUT INTENDING TO APPLY FOR ASYLUM - reason placed in proceedings:   1=yes; 2=no | | |
| OTHER GROUND of INADMISSIBILITY: | | |
| Comments from I-275 Narrative, incl/ why referred to secondary insp. | | |
| **FILE INCLUDES I-264 Notice to Foreign Consulate (that detaining alien) 1=yes; 2=no** | | |
| Is the alien named on the I-264? 1=yes; 2=no; 3=n/a | | |
| Does the I-264 contain charges against the alien or any indication the alien is applying for asylum? 1=yes; 2=no; 3=n/a | | |
| **FILE INCLUDES I-870 Record of Determination/ Credible Fear Work Sheet (1=yes; 2=no)** | | |
| District Office Code | | |
| Asylum Office Code | | |
| A Number | | |
| 1.3 Date of detention | | |
| 1.4 Place of detention | | |

IFR_AR_008303

| | | |
|---|---|---|
| 1.5 Date of AO orientation | | |
| 1.6 explain delay | | |
| 1.7 Date of interview | | |
| 1.9 Date M-444 signed | | |
| 1.10 consultants? 1=yes; 2=no | | |
| 1.13 Consultant(s) present at interview (1=box checked; 2=box not checked) | | |
| 1.14 other(s) present at interview (1=box checked; 2=box not checked) | | |
| list others | | |
| 1.15 No one other than applicant and AO present at interview (1=box checked; 2=box not checked | | |
| 1.16 Language used by applicant in interview (key in) | | |
| 1.17 Interpreter Service used?  1=yes; 2=no | | |
| Time Started | | |
| Time Ended | | |
| 2.10 race/ethnicity | | |
| 2.11 religion | | |
| 2.13 Marital status 1=single; 2=married; 3=legally separated; 4=divorced; 5=widowed | | |
| 2.14 spouse arrived w/ (1=yes; 2=no) | | |
| 2.15 spouse included in claim (1=yes; 2=no) | | |
| 2.17 Children 1=yes; 2=no | | |
| 2.18 Did any children arrive with alien? 1=yes; 2=no | | |
| 2.18 Are any children included in alien's claim? 1=yes; 2=no | | |
| 2.18 list locations of children | | |
| 2.19 medical condition 1=yes; 2=no | | |
| 2.22 Relative, sponsor or other community ties? 1=yes; 2=no | | |
| 2.23 Relationship | | |
| 3.1a alien or family mistreated in country of return? 1=yes; 2=no | | |
| Comments from 3.1a (verbatim) | | |
| 3.1b fear harm in country of return? 1=yes; 2=no | | |
| comments from 3.1b (verbatim) | | |
| 3.1c if YES to a or b, reason Race? (1=box checked; 2=box not checked) | | |
| 3.1c if YES to a or b, reason Religion? (1=box checked; 2=box not checked) | | |
| 3.1c if YES to a or b, reason Nationality? (1=box checked; 2=box not checked) | | |

IFR_AR_008304

| | | |
|---|---|---|
| 3.1c if YES to a or b, reason Membership in a particular social group? (1=box checked; 2=box not checked) | | |
| 3.1c if YES to a or b, reason Political Opinion? (1=box checked; 2=box not checked) | | |
| comments from 3.1c (verbatim) | | |
| 4.1 applicant credible (1=box checked; 2=box not checked) | | |
| 4.2 Applicant NOT Credible: 1=box checked; 2=box not checked | | |
| 4.3 Testimony internally inconsistent: 1=box checked; 2=box not checked | | |
| 4.4 Testimony lacked detail: 1=box checked; 2=box not checked | | |
| 4.5 Testimony not consistent with country conditions: 1=box checked; 2=box not checked | | |
| 4.6 Nexus Race: 1=box checked; 2=box not checked | | |
| 4.7 Nexus Religion: 1=box checked; 2=box not checked | | |
| 4.8 Nexus Nationality: 1=box checked; 2=box not checked | | |
| 4.9 Nexus Membership in a Particular Social Group: 1=box checked; 2=box not checked | | |
| 4.9 Define Social Group (verbatim) | | |
| 4.13 Nexus Political Opinion: 1=box checked; 2=box not checked | | |
| 4.11 Nexus Coercive Family Planning: 1=box checked; 2=box not checked | | |
| 4.12 No nexus: 1=box checked; 2=box not checked | | |
| Any comments on Nexus handwritten in (e.g. "imputed" next to political opinion) - key in verbatim | | |
| 4.13 Credible fear of persecution established: 1=box checked; 2=box not checked | | |
| 4.14 Credible fear of torture established: 1=box checked; 2=box not checked | | |
| 4.15 Credible fear of persecution NOT established + no significant possibility w/holding or CAT eligible: 1=box checked; 2=box not checked | | |
| 4.16 Applicant could be subject to Bar(s): 1=yes; 2=no | | |

IFR_AR_008305

| | | |
|---|---|---|
| 4.17 Particularly Serious Crime: 1=box checked; 2=box not checked | | |
| 4.18 Security Risk: 1=box checked; 2=box not checked | | |
| 4.19 Aggravated Felon: 1=box checked; 2=box not checked | | |
| 4.20 Persecutor: 1=box checked; 2=box not checked | | |
| 4.21 Terrorist: 1=box checked; 2=box not checked | | |
| 4.22 Firmly Resettled: 1=box checked; 2=box not checked | | |
| 4.23 Serious Non-Political Crime: 1=box checked; 2=box not checked | | |
| 4.24 Applicant does NOT appear subject to bar(s) 1=box checked; 2=box not checked | | |
| 4.25 Identity determined w/ reasonable certainty: 1=box checked; 2=box not checked | | |
| 4.26 Applicant's credible statements: 1=box checked; 2=box not checked | | |
| 4.27 Passport: 1=box checked; 2=box not checked | | |
| 4.28 Other evidence: 1=box checked; 2=box not checked | | |
| 4.28 List other evidence | | |
| 4.29 Applicant's identity NOT determined w/ reasonable certainty: 1=box checked; 2=box not checked | | |
| 5.3 Decision date | | |
| 5.5 Signed by Supervisory AO? 1=yes; 2=no | | |
| 5.6 Date supervisor approved decision | | |
| **Version of I-870** used (enter date at bottom right of form) **Note: If 1997 version**, continue with 9.25 - 9.40, Summary and Details of DD Release Decision. **Note: If 1999** version, continue with 7.01 - 7.19, DD Release Decision. **(end worksheets)** | | |
| **FILE INCLUDES I-869 Record of Negative CF Finding/Request for Review by IJ  1=yes; 2=no** | | |
| File No.: | | |
| found not credible 1=box checked; 2=box not checked | | |
| testimony internally inconsistent 1=box checked; 2=box not checked | | |

IFR_AR_008306

| | | |
|---|---|---|
| testimony not consistent with country conditions 1=box checked; 2=box not checked | | |
| testimony not consistent with documentation 1=box checked; 2=box not checked | | |
| testimony vague/lacked detail 1=box checked; 2=box not checked | | |
| not established cf 1=box checked; 2=box not checked | | |
| not expressed cf 1=box checked; 2=box not checked | | |
| harm not persecution 1=box checked; 2=box not checked | | |
| harm not well-founded 1=box checked; 2=box not checked | | |
| harm not on account of 1=box checked; 2=box not checked | | |
| subject to bar(s) 1=box checked; 2=box not checked | | |
| aggravated felony 1=box checked; 2=box not checked | | |
| other bar 1=box checked; 2=box not checked | | |
| other reason 1=box checked; 2=box not checked | | |
| Review by IJ 1=requested; 2=not requested | | |
| **File includes HQ Review of CF Finding 1=yes; 2=no** | | |
| Reason for HQ Review | | |
| CF Finding 1=affirmed by HQ; 2=vacated by HQ | | |
| HQ Review comments | | |
| **FILE INCLUDES Order of IJ re: CF Review Proceedings 1=yes; 2=no** | | |
| Location of Imm Ct | | |
| A-Number 8 digits | | |
| Date of decision | | |
| CF Finding 1=affirmed IJ; 2=vacated by IJ | | |
| IJ Name | | |
| IJ Review comments incl/ reasoning | | |
| **FILE INCLUDES form: Request for Dissolution of Credible Fear Process (no form#) 1=yes; 2=no** | | |
| A-Number 8 digits | | |

| | | |
|---|---|---|
| Stated reason - key in verbatim | | |
| Date of Dissolve (Date AO signs) | | |
| Signed by Supervisory AO? 1=yes; 2=no | | |
| Date signed by Supervisory AO | | |
| Language | | |
| interpreter used: | | |
| Reasons for Dissolving Claim: 1=recanted fear; 2=avoid detention; 3=reunite family; 4=other | | |
| **FILE INCLUDES I-862 Notice to Appear 1=yes; 2=no** | | |
| A No. (File No.): | | |
| Charges: (key in statutory sections) | | |
| **FILE INCLUDES I-589 Application for Asylum and for Withholding of Removal 1=yes/2=no** | | |
| A-Number | | |
| Part A.I.16 Religion: key in | | |
| Part B.1. Basis for asylum grounds-Race: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Religion: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Nationality: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Political opinion: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Membership in a particular social group: 1=box checked; 2=box not checked | | |
| Part B.1. Basis for asylum grounds-Torture Convention: 1=box checked; 2=box not checked | | |
| Representation: EOIR-28 on file? 1=yes; 2=no | | |
| Comments about claim from I-589 and attached Declaration | | |
| **FILE INCLUDES transcript of IJ Hearing on the Merits/Removal Proceedings: 1=yes; 2=no** | | |
| type of hearing | | |
| IJ name | | |
| Location of Imm Ct | | |
| Date of hearing | | |

IFR_AR_008308

| | | |
|---|---|---|
| I-867 cited in IJ opinion as element of decision: 1=yes; 2=no | | |
| I-867 entered as exhibit: 1=yes; 2=no | | |
| I-867 entered as exhibit by 1=alien; 2=government | | |
| objection raised: 1=yes; 2=no | | |
| objection raised by 1=alien; 2=government | | |
| questioning re: I-867 allowed: 1=yes; 2=no | | |
| questioning re: I-867 allowed by 1=alien; 2=government; 3=judge | | |
| I-867 used to impeach: 1=yes; 2=no | | |
| I-867 used to buttress: 1=yes; 2=no | | |
| I-870 cited in IJ opinion as element of decision: 1=yes; 2=no | | |
| I-870 entered as exhibit: 1=yes; 2=no | | |
| I-870 entered as exhibit by 1=alien; 2=government | | |
| objection raised: 1=yes; 2=no | | |
| objection raised by 1=alien; 2=government | | |
| questioning re: I-870 allowed: 1=yes; 2=no | | |
| questioning re: I-870 allowed by 1=alien; 2=government; 3=judge | | |
| I-870 used to impeach: 1=yes; 2=no | | |
| I-870 used to buttress: 1=yes; 2=no | | |
| Asylum relief: 1=granted; 2=denied | | |
| Withholding of Removal relief: 1=granted; 2=denied | | |
| Torture Convention relief: 1=granted; 2=denied | | |
| **FILE INCLUDES Order of IJ re: Hearing on the Merits/Removal Proceedings 1=yes; 2=no** | | |
| IJ Name | | |
| Location of Imm Ct | | |
| A-Number 8 digits | | |
| Date of decision | | |
| Disposition: key in text of order | | |
| Appeal 1=waived; 2=reserved | | |
| **FILE INCLUDES Order of BIA 1=yes; 2=no** | | |
| Date of BIA decision | | |
| Order of IJ was 1=affirmed; 2=vacated | | |
| BIA streamlining: 1=dismissed upon "initial screening"; 2=affirmance without opinion; 3=brief order affirming 4=brief order modifying; 5=brief order remanding | | |
| BIA streamlining: 1=one judge; 2=three judge panel; 3=en banc | | |

IFR_AR_008309

| | | |
|---|---|---|
| **Was alien detained? 1=yes/2=no** | | |
| Place of detention | | |
| Detention start date | | |
| **Was alien released from detention? 1=yes; 2=no** | | |
| **If alien was released** from detention, what is the documentation? | | |
| What were the grounds for release? | | |
| What was the **date** of release? (Detention end date) | | |
| Who authorized the release, incl/ title? | | |
| What was the Bond amount ($) if any? | | |
| **If alien was  not released** from detention, what is the last documented date of detention? | | |
| Describe documentation | | |
| **Summarize Facts of case** | | |
| **Summarize Procedural History/Posture -** what happened to the Alien and what is pending?  Incl/ dates of master hearings and merits hearings | | |
| **Last authority alien appeared in front of:** 1=CBP (Airport Inspector); 2=CIS (Asylum Officer); 3=EOIR (IJ Level); 4=EOIR (BIA Level); 5=other | | |
| **Alien's case is pending at:** 1=CBP (Airport Inspector); 2=CIS (Asylum Officer); 3=EOIR (IJ Level); 4=EOIR (BIA Level); 5=other | | |
| **Port Disposition: was the Alien 1**=allowed to withdraw application for admission; **2**=ordered expeditiously removed; **3**=allowed to dissolve claim; **4**=referred to credible fear interview; **5**=referred to asylum only hearing; **6**=other (comment) | | |
| **Case Disposition: was the Alien 1**=allowed to withdraw application for admission; **2**=ordered removed; **3**=allowed to dissolve claim; **4**=granted asylum; **5**=other (e.g. case not yet resolved, comment) | | |
| **If alien was ordered removed,** what form documents the ORDER? | | |
| Officer's bureau/title | | |
| Date of       REMOVAL ORDER | | |

IFR_AR_008310

| | | |
|---|---|---|
| **If alien was ordered removed,** what form documents the DEPARTURE? | | |
| Officer's bureau/title | | |
| Date of DEPARTURE | | |
| Port of departure | | |
| Country removed to | | |
| Alien barred from entering U.S. for 0=no bar; 1=five years; 2=ten years; 3=twenty years; 4=any time | | |
| Enter any comments on **change of venue and continuances** | | |
| **Was alien represented** at any stage? 1=yes/2=no | | |
| Enter any comments on **representation** | | |
| Enter any comments on **change of claim** | | |
| **Any additional comments by coder** including overall impressions of case; points of interest (Reminder: Note interesting religious claims) | | |
| **Finish Time** | | |

IFR_AR_008311

**Appendix K**
**Credible fear A-files produced and not produced from Department of Homeland Security for USCIRF Study, by location of file**

| Location | Complete Files Received | Complete Files Outstanding | LPR Summaries |
|---|---|---|---|
| Arlington | 1 | 0 | 0 |
| Atlanta | 7 | 2 | 0 |
| Baltimore | 0 | 1 | 0 |
| Boston | 4 | 2 | 0 |
| Burlington | 1 | 0 | 0 |
| Chicago | 4 | 1 | 0 |
| Cincinnati | 1 | 0 | 0 |
| Cleveland | 1 | 0 | 0 |
| Denver | 1 | 0 | 0 |
| Detroit | 4 | 0 | 0 |
| El Paso | 1 | 0 | 0 |
| Harlingen | 0 | 1 | 0 |
| Hartford | 0 | 0 | 1 |
| Houston | 4 | 0 | 0 |
| Las Vegas | 0 | 1 | 1 |
| Los Angeles | 18 | 0 | 0 |
| Los Angeles Asylum | 2 | 0 | 0 |
| Lost | 0 | 2 | 0 |
| Miami | 56 | 3 | 16 |
| Miami Asylum | 1 | 0 | 0 |
| National Record Center | 171 | 21 | 14 |
| New Orleans | 0 | 1 | 0 |
| New York | 65 | 0 | 0 |
| Newark | 8 | 2 | 1 |
| Newark Asylum | 1 | 1 | 0 |
| Philadelphia | 5 | 0 | 0 |
| Phoenix | 1 | 0 | 1 |
| San Diego | 12 | 0 | 0 |
| San Francisco | 3 | 2 | 0 |
| San Juan | 1 | 0 | 0 |
| Seattle | 3 | 0 | 0 |
| Texas Service Center (SSC) | 0 | 5 | 4 |
| Vermont Service Center (ESC) | 1 | 0 | 1 |
| Total | 377 | 45 | 39 |

IFR_AR_008312

**Appendix L**
**Additional analysis of Credible Fear Files**

Males constitute 57 percent of the asylum seekers in the credible fear sample; their rate of release (134/183=73 percent) (see Table A) is significantly[1], lower than that of female asylum seekers (116/138=84 percent).

**Table A: Released\* cases and rates (in percents) by gender**

| Gender | Paroled | Not Paroled | Total (100%) |
|--------|---------|-------------|--------------|
| Male | 134 (73.2) | 49 (26.8) | 183 |
| Female | 116 (84.1) | 22 (15.9) | 138 |
| **Total** | **250 (77.9)** | **71 (22.1)** | **321** |

\*Release prior to the merits hearing.

Table B presents the results of release rates by religious affiliation.[2] Christians are the largest category, representing 57 percent of the total (183/321). The second largest category is Buddhists (56/321=17 percent). Buddhists have the highest rate of release prior to the merits hearing (50/56=89.3 percent) among asylum seekers who indicate a religious affiliation. Muslims[3] have the lowest rate of release (5/12=41.7 percent): the only religious group with a rate below 50 percent. The differences in release rates between religious groups are statistically significant; they cannot be attributed to chance alone.[4]

**Table B: Released\* cases and rates (in percents) by religious affiliation**

| Religious Affiliation | Paroled | Not Paroled | Total (100%) |
|-----------------------|---------|-------------|--------------|
| Buddhist | 50 (89.3) | 6 (10.7) | 56 |
| Christian | 140 (76.5) | 43 (23.5) | 183 |
| Hindu | 9 (56.3) | 7 (43.8) | 16 |
| Muslim | 5 (41.7) | 7 (58.3) | 12 |
| Other | 4 (57.1) | 3 (42.9) | 7 |
| None | 36 (92.3) | 3 (7.7) | 39 |
| Unknown | 6 (75.0) | 2 (25.0) | 8 |
| **Total** | **250 (77.9)** | **71 (22.1)** | **321** |

\*Release prior to the merits hearing.

---

[1] Results of chi-square test: $\chi^2 = 5.361$, $df = 1$, $p = 0.021$.

[2] Religious affiliation was self reported during the credible fear determination and asylum application. None refers to the indication "none" on the I-870 Credible Fear Determination Worksheet and I-589 Application for Asylum ($n$=39). Unknown refers to the absence of a recorded religious affiliation ($n$=8).

[3] Muslims make up the second smallest contingent of religious asylum seekers after "Other".

[4] Results of chi-square test: $\chi^2 = 24.427$, $df = 4$, $p = 0.000$.

IFR_AR_008313

As Table B above illustrates, there is a relatively large contingent of asylum seekers with no religious affiliation (39/321=12 percent). This contingent has the highest rate of release (36/39=92.3 percent) in the credible fear sample.

The final variable examined in combination with release rates is the asylum seeker's port of entry.[5] Table C displays a summary of this crosstabulation. Of the six major ports of entry, 4 are airports[6] and 2 are land ports.[7] The entire credible fear sample was distributed among 41 ports of entry. Nearly three-quarters of asylum seekers arrived in the U.S. by air (74 percent), followed by land entry (21 percent), and last, by sea (5 percent).

Forty-two percent of asylum seekers in the sample[8] entered the U.S. through Miami International Airport. All of the six major ports of entry, with the exception of JFK, have rates of release prior to the merits hearing that are above the average: from a low of 84 percent (MIA) to a high of 100 percent (Brownsville, TX). JFK, which receives only 2.5 percent (8/321) of asylum seekers, is characterized by a low rate of release. Only 25 percent of asylum seekers arriving at JFK are released prior to the merits hearing (2/8). The release rate at JFK is statistically different from the ones in the other five major ports of entry, but those five are not different from one another in terms of release rate.[9]

**Table C: Released\* cases and rates (in percents) by port of entry**

| Port of Entry | Paroled | Not Paroled | Total (100%) |
|---|---|---|---|
| Miami | 114 (83.8) | 22 (16.2) | 136 |
| Los Angeles | 32 (91.4) | 3 (8.6) | 35 |
| San Ysidro, CA | 24 (85.7) | 4 (14.3) | 28 |
| Brownsville, TX | 22 (100.0) | 0 | 22 |
| Chicago | 17 (89.5) | 2 (10.5) | 19 |
| JFK | 2 (25.0) | 6 (75.0) | 8 |
| Other Air | 19 (50.0) | 19 (50.0) | 38 |
| Other Land | 16 (88.9) | 2 (11.1) | 18 |
| Seaport | 4 (23.5) | 13 (76.5) | 17 |
| **Total** | **250 (77.9)** | **71 (22.1)** | **321** |

\*Release prior to the merits hearing.

Land ports of entry, which receive 21 percent of asylum seekers, have the highest rate of release (62/68=91 percent, not shown in table) compared to other modes of entry. Brownsville, Texas,

---

[5] The port of entry variable was created by first listing the major ports of entry (defined by those with ten or more cases in the credible fear sample) as separate categories (77 percent of asylum seekers). The remainder was then classified by their mode of entry: air, land, or sea. After removing the dissolved cases ($n$=32) from analysis, the six major ports of entry included one (JFK) with less than ten cases in the sample.

[6] Miami International Airport, Los Angeles International Airport, Chicago O'Hare International Airport, and New York JFK International Airport.

[7] San Ysidro, California and Brownsville, Texas.

[8] Excluding the dissolved cases (n=32).

[9] Results of chi-square test: $\chi^2 = 26.205$, $df = 4$, $p = 0.000$.

IFR_AR_008314

one of the major border entry points, has the highest release rate in the credible fear sample (22/22=100 percent).  The average rate of release prior to the merits hearing for airports is 78 percent (184/236, not shown in table).  Five percent of all asylum seekers in the sample entered the U.S. by sea.  Only the combined seaports have a rate of release lower than JFK in the credible fear sample.  Their rate of release prior to the merits hearing is the lowest by type of entry with 23.5 percent (4/17).

IFR_AR_008315

**Appendix M**
**Examples of Parole Decision Documentation**

      Appendix M contains a collection of letters from the credible fear sample documenting individual decisions release or continued custody.  The letter quoted in the report sub-section, "Variations in ICE documentation regarding detention and parole," are in this appendix, as well as other examples, including denial documentation for Random No. 0.048158208 (third from last letter, dated April 11, 2003, with documentation).  Where there is supporting documentation such as a parole recommendation form, it is attached behind the decision letter.  It should be noted that the last two letters in the appendix, dated April 30, 2003, and May 28, 2003, which apply two different sets of criteria, are from the same A-file.



**United States Department of Justice**
**Immigration and Naturalization Service**

A ▮▮▮▮▮▮▮▮▮▮

Dear Mr. Mrs. ▮▮▮▮▮▮▮▮

We have considered you for release from INS custody. A review of your file indicates that you attempted to enter the United States on ▮▮▮▮▮▮ and were found inadmissible because you did not possess valid immigration documents. On ▮▮▮▮▮▮ an INS Asylum Officer determined that you had a credible fear of persecution.

The decision to release, or parole, an individual from detention is discretionary. Under INS policy, however, an individual found to have a credible fear of persecution should generally be paroled whenever the individual can establish that he or she is likely to appear for all hearings or other immigration matters and that he or she poses no danger to the community.

We have concluded that you meet the criteria for parole. Your release from custody is conditioned on the following requirements:

1. That you appear in person at the time and place specified, upon each and every request of the Service.
2. That you furnish written notice to the Service office handling your case of any change in residence within 48 hours of such change.
3. That you abide by all local, state and federal laws, regulations and ordinances.

Sincerely



**Acting District Director**



U.S. Department of Justice
Immigration and Naturalization Service

January 15, 2003

MEMORANDUM FOR ████████████████

  ACTING DIRECTOR
  FOR DETENTION AND REMOVALS

FROM:      Supervisory Deportation Officer ████████████████

SUBJECT:  Significant Public Benefit Parole, Pending Immigration hearing

  On ██████████████████████████████████████ presented himself for admission into the United
States at the Port of Entry, ████████████  The subject stated that he feared to return to ██████ and that he wanted to
apply for asylum.  He was then processed and sent to the ███████████████████████████████████ o
await a hearing before an asylum officer.

  It is requested that ██████████████ be granted parole into the United States for Significant Public Benefit
Parole, Pending Immigration hearing.

                            _Significant Public benefit_
I concur with your recommendation for ~~humanitarian~~ parole of this alien.

ADDR

                                                    CC:Afile

41



**U.S. Department of Justice**
Immigration and Naturalization Service

Attorney at Law

RE: A# ▮▮▮▮▮
In Service Custody

Dear Mr. ▮▮▮▮▮▮▮,

    We have considered you for release from INS custody. A review of your file indicates that you attempted to enter the United States on ▮▮▮▮▮▮▮▮ and were found inadmissible ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ You expressed a fear of returning to ▮▮▮▮▮▮. On ▮▮▮▮▮▮ an INS Asylum Office determined that you had a credible fear of persecution. Your court hearing with the Immigration Judge is scheduled on ▮▮▮▮▮▮.

    The decision to release, or parole, an individual from detention is discretionary. Under INS policy, however, an individual found to have a credible fear of persecution should generally be paroled whenever the individual can establish that he or she is likely to appear for all hearings and other immigration matters and that he or she poses no danger to the community.

    At the present time, the INS must deny your request for parole for the following reasons:

☑ You have not sufficiently established your identity and therefore INS cannot be assured that you will appear for immigration proceedings and other matters as required.

☐ You have not established sufficient ties to the community that assure INS either that you have a place to reside if you are released or that you will appear as required.

☑ Based on the particular facts of your case, including manner of entry, INS cannot be assured that you will appear for immigration hearings or other matters as required.

Page 2

A

❑ Information in your file suggest that you may be engaged in or are likely to engage in criminal or other activities that may pose a danger to the community.

  You may renew your request for parole at any time.  If you wish to renew your request, you should submit additional material that responds to the ground for denial of your present request, as identified in this letter.  For example, proof of identity is routinely established through documents such as passports, birth certificates or identity cards.  It can also be established through affidavits that provide specific information about you, such as where you lived, or who your family or clan is, who the leaders of your community are, and other specific information that will help the INS verify your nationality, clan membership or other relevant identity issue.

  If you need to demonstrate that you have established community ties, you should provide specific information from relatives or other persons in the United States who are willing to provide for you and who can ensure that you will appear for all immigration hearings.  If the INS believes you may pose a danger to the community, you should provide specific information about your manner of entry or activities that show that you will not pose a risk to the community.

  Finally, parole may in some cases be granted based on a medical condition or other urgent humanitarian need.  You should include any relevant information about your health or other special needs you may have in any subsequent request.

       Sincerely,

       District Director

IFR_AR_008320

Department of Homeland Security



**U.S. Immigration
and Customs
Enforcement**

December 4, 2003

Law Office

RE:

Dear Mr.

We have considered your client, Mr. _____ for release from DHS custody. A review of his file indicates that he has been found inadmissible.

The decision to release or parole an individual from detention is discretionary. Under DHS policy an individual should generally be paroled however, the individual must establish that he or she is likely to appear for all hearings or other immigration proceedings and that he or she poses no danger to the community.

At the present time, the DHS must deny your request for parole for the following reasons:

✓ You have not sufficiently established your identity and therefore DHS cannot be assured that you will appear for immigration proceedings and other matters as required.

____ You have not established sufficient ties to the community that assures DHS either that you have a place to reside if you are released or that you will appear as required.

✓ Based on the particular facts of your case, including manner of entry, DHS cannot be assured that you will appear for immigration hearings or other matters as required.

____ Information in your file suggests that you may be engaged in or likely to engage in criminal or other activities that may pose a danger to the community.

✓ Other: There is other sufficient information to indicate your asylum claim may be suspect.

IFR_AR_008321

You may renew your request for parole at any time. If you wish to renew your request, you should submit additional material that responds to the ground for denial of your present request, as identified in this letter. For example, proof of identity is routinely established through documents such as passports, birth certificates or identity cards. It can also be established through detailed affidavits that provide specific information about you, such as where you lived, who your family or clan is, who the leaders of your community are, and other specific information that will help the DHS verify your nationality, clan membership or other relevant identity issue.

If you need to demonstrate that you have established community ties, you should provide specific information from relatives or other persons in the United States who are willing to provide for you and can ensure that you will appear for all immigration hearings. If the DHS believes that you may pose a danger to the community, you should provide specific information about your manner of entry or activities that show that you will not pose a risk to the community.

Finally, parole may in some cases be granted on a medical condition or other urgent humanitarian need.  You should include any relevant information about your health or other specific needs you may have in any subsequent request.

Sincerely,



Interim Field Office Director

PAROLE, WAIVER & DEFERRAL APPROVAL FORM

The following individual has been checked in the following data base systems prior to Approval by the authorizing official, (ADD Inspections, ADD Examinations, if appropriate, DDD or DD) for a

_Expedited Removal w/ Cnd Fea_

(Type of action)

Name of Applicant ___[redacted]___

Date of Birth ___[redacted]___

Country of Citizenship ___[redacted]___

Permanent Resident ___ Yes ✓ No  A# ___[redacted]___

## RESULTS

| | NEGATIVE | POSITIVE |
|---|---|---|
| IBIS (TECS) | ✓ | ____ |
| NCIC | ✓ | ____ |
| NIIS | ✓ | ____ |
| CIS | ✓ | ____ |
| NAILS | ✓ | ____ |
| DACS | ✓ | ____ |
| CLAIMS 3 (Service Center Application) | ✓ | ____ |

Data base systems checks performed by Officer ___[redacted]___

Approval Granted by: _____

Authorizing Official & Title

_____ Check if approval granted telephonically

Date_____ Time of approval _____

IFR_AR_008323



**U.S DEPARTMENT OF JUSTICE**
**Immigration and Naturalization Service**



March 27, 2003

Attorney at Law



RE:

Dear

This letter is in response to your request for release on parole/bond for your client, ▮▮▮▮▮▮▮. Title 8 C.F.R. 212.5 states the guidelines for which the District Director may grant parole.

After careful review and consideration of all factors pertinent in your case, it does not appear to be in the public interest to parole your client into the United States at this time. Therefore, your request for release from custody is denied.

Sincerely,



*for* Interim Director



**U.S. Department of Justice**
Immigration and Naturalization Service

APR 1 1 2003



Attorney at Law

Re:

A

Dear Mr. ▮:

    We have considered your client, ▮▮▮▮▮▮, for release from the Bureau of
Immigration and Customs Enforcement's (BICE) custody. A review of your client's file
indicates that he attempted to enter the United States on ▮▮▮▮▮▮ and was found
inadmissible pursuant to Section 212(a)(6)(C)(i) and Section 212 (a)(7)(A)(i)(I) of the
Immigration and Nationality Act, as amended. On ▮▮▮▮▮▮, an Asylum Officer
determined that your client had a credible fear of persecution.

    The decision to release, or parole, an individual from detention is discretionary.
Under BICE policy, however, an individual found to have a credible fear of persecution
should generally be paroled whenever the individual can establish that he or she is likely
to appear for all hearings and other immigration matters and that he or she poses no
danger to the community.

    At the present time, the BICE must deny your client's request for parole for the
following reasons:

    X    Your client has not sufficiently established his identity and
         therefore BICE cannot be assured that he will appear for
         immigration proceedings and other matters as required.

    X    Your client has not established sufficient ties to the community
         that assure BICE either that he has a place to reside if he is
         released or that he will appear as required.

IFR_AR_008325**357**

Re:     **Page 2**

A

   X    Based on the particular facts of your client's case, including manner of entry, BICE cannot be assured that he will appear for immigration hearings or other matters as required.

   ___    Information in your client's file suggests that he may be engaged in, or is likely to engage in, criminal or other activities that may pose a danger to the community.

   ___    Other:

You may renew your client's request for parole at any time. If you wish to renew his request, you should submit additional material that responds to the ground for denial of your present request, as identified in this letter. For example, proof of identity is routinely established through documents, such as passports, birth certificates or identity cards. It can also be established through detailed affidavits that provide specific information about your client, such as where he lived, who your client's family or clan is, who the leaders of his community are, and other specific information that will help the BICE verify his nationality, clan membership or other relevant identity issue.

If you need to demonstrate that your client has established community ties, you should provide specific information from relatives or other persons in the United States who are willing to provide for your client and who can ensure that he will appear for all immigration hearings. If the BICE believes your client may pose a danger to the community, you should provide specific information about his manner of entry or activities that show that he will not pose a risk to the community.

Finally, parole may in some cases be granted based on a medical condition or other urgent humanitarian need. You should include any relevant information about your client's health or other special needs he may have in any subsequent request.

Sincerely,



Interim District Director for Interior Enforcement

# NOTICE TO ALIENS
## DETAINED BY THIS SERVICE UNDER A FINAL ORDER OF REMOVAL/DEPORTATION

**CONTINUATION OF CUSTODY FOR INADMISSIBLE OR CRIMINAL ALIENS, 8 CFR Sec. 241.4:** The district director may continue in custody any alien inadmissible under section 212(a) of the Immigration & Nationality Act (ACT) or removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in the amount sufficient to ensure the alien's appearance for removal. The district director may consider, but is not limited to considering, the following factors:

1.) The nature and seriousness of the alien's criminal convictions;
2.) Other criminal history;
3.) Sentence(s) imposed and time actually served;
4.) History of failures to appear for courts (defaults);
5.) Probation history;
6.) Disciplinary problems while incarcerated;
7.) Evidence of rehabilitative effort or recidivism;
8.) Equities in the United States; and
9.) Prior immigration violations and history;

I ACKNOWLEDGE RECEIPT OF THIS NOTICE

(DATE)

**CONTINUATION OF CUSTODY FOR OTHER ALIENS:** Any alien removable under any section of the Act other than section 212(a), 237(a)(1)(C), 237(a)(2), or 237(a)(4) may be detained beyond the removal period, in the discretion of the district director, unless the alien demonstrates to the satisfaction of the district director that he or she is likely to comply with the removal order and is not a risk to the community;

**DETAINEES MAY PROVIDE CLEAR AND CONVINCING EVIDENCE IN WRITING THAT THEIR RELEASE WOULD NOT POSE A DANGER TO THE COMMUNITY OR A SIGNIFICANT FLIGHT RISK.**

151

CONSULAR NOTIFICATION

8 CFR 236.1 (e)

**(e) Privilege of communication.** Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States. Existing treaties with the countries listed below require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in removal proceedings, whether or not requested by the alien and even if the alien requests that no communication be undertaken in his or her behalf. When notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

Albania 1/    Antigua    Armenia
Azerbaijan    Bahamas    Barbados
Belarus    Belize    Brunei
Bulgaria    China (People's Republic of) 2/    Costa Rica
Cyprus    Czech Republic    Dominica
Fiji    Gambia, The    Georgia
Ghana    Grenada    Guyana
Hungary    Jamaica    Kazakhstan
Kiribati    Kuwait    Kyrgyzstan

Malaysia    Malta    Mauritius
Moldova    Mongolia    Nigeria
Philippines    Poland    Romania
Russian Federation    St. Kitts/Nevis    St. Lucia
St. Vincent/Grenadines    Seychelles    Sierra Leone
Singapore    Slovak Republic    South Korea
Tajikistan    Tanzania    Tonga
Trinidad/Tobago    Turkmenistan    Tuvalu
Ukraine    United Kingdom 3/    U.S.S.R. 4/
Uzbekistan    Zambia

Consulate Notification made

Date: _____    Time: _03:53_

Officer: _____

_Closed_

ALL OTHER COUNTRIES: alien advised of above rights to communicate with Consulate

Name: _____

A# _____

Served by: _____

Date: _____

IFR_AR_008328

354

## _DEPORTATION OFFICE. PAROLE RECOMMENDA. ON_

**DETAINEE NAME:** ▮▮▮▮▮

**A #** ▮▮▮▮▮▮     **NATIONALITY** ▮▮▮▮

**DOCUMENTS AT ARRIVAL:** _Impostor to a United States passport_

**CREDIBLE FEAR ESTABLISHED:**___    **Date of CF:** ▮▮▮▮
**IDENTITY DOCS PRESENTED:** Copies of identification card

**COMMUNITY TIES:**____ _Not verified_____

**NAME:**____▮▮▮▮▮____

**RELATION:**___ Cousin____

**ADDRESS:**____▮▮▮▮____

▮▮▮▮▮▮     Home # _____

**LPR**_____     **USC** _XXXXXXX_____     **OTHER**_____

**FINGERPRINTS CLEARED NEGATIVE:** _Yes_____

**NEXT COURT HEARING**___▮▮▮▮___    Master_____    Individual_XXXXXXX_____

**PAROLE RECOMMENDATION:**_____    **CONTINUE CUSTODY**_XXXXXXXXXX_____

COMMENTS: Subject arrived on ▮▮▮▮▮▮ ▮▮▮▮ applied for admission as a USC. The subject was an impostor to a US passport in the name of ▮▮▮▮. The subject has claimed asylum in ▮▮▮▮ prior to arriving in the United States. The subject was smuggled through ▮▮▮ and the authorities there have the smuggler apprehended and would like to question the subject to help their prosecution case against the smuggler. The subject has not presented any identity documents on his behalf. The relationship between the subject and the sponsor is not established. The subject is likely to abscond or fail to appear for future hearings if he is released. Continued custody is recommended.

IFR_AR_008329

**355**

**PAROLE RECOMMENDATION**                    **PAGE 2**

A #



**DEPORTATION OFFICER**

I DO / DO NOT CONCUR

**SUPERVISORY DEPORTATION OFFICER**

I DO / DO NOT CONCUR

**ASSISTANT OFFICER-IN-CHARGE**

I DO / DO NOT CONCUR

**OFFICER-IN-CHARGE**

IFR_AR_008330**356**



**United States Department of Justice**
**Immigration and Naturalization Service**



Dear Mr. ▓▓▓▓                                    April 30, 2003
A▓▓▓▓▓▓▓

We have considered you for release from INS custody. A review of your file indicates that you attempted to enter the United States on ▓▓▓▓▓▓ and were found inadmissible because <u>you were not then in possession of valid entry documents.</u> On ▓▓▓▓▓▓ an INS Asylum Officer determined that you had a credible fear of persecution.

The decision to release, or parole, an individual from detention is discretionary. Under INS policy, however, an individual found to have a credible fear of persecution should generally be paroled whenever the individual can establish that he or she is likely to appear for all hearings and other immigration matters and that he or she poses no danger to the community.

At the present time, the INS must deny your request for parole for the following reasons:

    ___    You have not sufficiently established your identity and therefore INS cannot be assured that you will appear for immigration proceedings and other matters as required.

    ___    You have not established sufficient ties to the community that assure INS either that you have a place to reside if you are released or that you will appear as required.

    _X_    Based on the particular facts of your case, including manner of entry, INS cannot be assured that you will appear for immigration hearings or other matters as required.

    ___    Information in your file suggests that you may be engaged in, or are likely to engage in, criminal or other activities that may pose a danger to the community.

    ___    Other:

You may renew your request for parole at any time. If you wish to renew your request, you should submit additional material that responds to the ground for denial of your present request, as identified in this letter. For example, proof of identity is routinely established through documents, such as passports, birth certificates or identity cards. It can also be established through detailed affidavits that provide specific information about you, such as where you lived, who your family or clan is, who the leaders of your community are, and other specific information that will help the INS verify your nationality, clan membership or other relevant identity issue.

IFR_AR_00833108

If you need to demonstrate that you have established community ties, you should provide specific information from relatives or other persons in the United States who are willing to provide for you and who can ensure that you will appear for all immigration hearings. If the INS believes you may pose a danger to the community, you should provide specific information about your manner of entry or activities that show that you will not pose a risk to the community.

Finally, parole may in some cases be granted based on a medical condition or other urgent humanitarian need. You should include any relevant information about your health or other special needs you may have in any subsequent request.

Sincerely



Officer In Charge



**US Department of Justice**
Immigration and Naturalization Service

May 28, 2003

Law Office of ███████████
██████████████████
████████████

RE: ████████████
A:███████

Dear Mr.████████

This letter is in response to your request for parole for ████████.

Section 212(d)(5)(A) of the Immigration and Nationality Act, reads, in part, "The Attorney General may, in his discretion, parole into the United States temporarily, under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, any alien applying for admission…" Title 8 CFR, Section 212.5(a) adds that an alien could be paroled, "provided the aliens present neither a security risk nor a risk of absconding.

Mr. ██████ last entered the United States on or about █████████████ at or near █████ ███████████ At that time, Mr. ██████ was not in possession of any valid entry documents. Mr. ██████ requested asylum and his case was referred to the asylum unit at ██████. On █████████████ an asylum officer determined that Mr. ████████ had established a credible fear of return and referred his case to the Immigration Court. Mr. ████is scheduled to appear before the Immigration Judge on ██████████.

The facts of the case do not provide an urgent humanitarian reason or significant public benefit that would allow parole to be granted in this matter. Accordingly, your request for parole for Mr. ██████ is denied. If you have any additional questions, please contact deportation officer ████████████████████████████

Sincerely,



Officer In Charge

**Appendix N**
**Examples of Consular Notification**

IFR_AR_008334

U.S. Department of Justice

Immigration and Naturalization Service

## Notice to Consular Officer Concerning Detention

File No.

Date: 7/23/02

To: Colombian Consulate

The person identified below claims to be a national of your country and is being detained by this Service. He or she may be contacted at the following address:

United States Immigration and Naturalization Service

International Airport

INS contact officer:

Watch Officer

Telephone.

| Name | | Date of birth | |
|------|--|---------------|--|
| Place of birth | | Sex | M |
| Nature of Proceedings | E12F Creadible fear hearing | | |
| Date of entry to U.S. | July 23 2002 | Place of entry to U.S. | |
| Present location | Detention Center | | |
| Evidence of nationality | | | |
| Name of father | | | |
| Address of father | | | |
| Name of mother | | | |
| Address of mother | | | |

Sincerely,

Form I-364 (Rev 6-14-00) Y

159

IFR_AR_008335

UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
INTERNATIONAL AIRPORT

NOTICE TO                                          PLEASE ADDRESS REPLY TO

Mr.
People's Republic Of China

                                                   AND REFER TO THIS FILE NO.

        The person identified below claims to be a national of your country and is being detained by this Service.

| NAME: | DATE OF BIRTH: |
|---|---|
| PLACE OF BIRTH: | SEX: M |
| NATURE OF PROCEEDINGS: Credible Fear Er | |
| DATE OF ENTRY TO U.S.: 4/18/2002 | PLACE OF ENTRY: |
| PRESENT LOCATION: DETENTION CENTER | |
| DOCUMENTARY PROOF OF NATIONALITY (if any): | |
| NAME OF FATHER (if living) | ADDRESS: |
| NAME OF MOTHER (if living): | ADDRESS: |

                                    Sincerely yours,

                                    Supervisory Immigration Inspector

Form I-264
(REV. 10/1/95)

IFR_AR_008336

## PRIVILEGE OF COMMUNICATION NOTIFICATION

As a non- U.S. citizen who is being arrested or detained, you are entitled to have us notify your country's consular representatives here in the United States. A consular official from your country may be able to help you obtain legal counsel, and may contact your family and visit you in detention, among other things. If you want us to notify your country's consular officials, you can request this notification now, or at any time in the future. After your consular officials are notified, they may call or visit you. Do you want us to notify your country's consular officials? *Please circle "yes' or "no"*

**YES**                                                    **NO**

_____              4-19-02
**Signature of person being arrested/detained**          Date

_____ (name of interpreter) certify that I am fluent in both <u>CHINESES</u>   and English language, that I interpreted the above information from English to <u>CHINESE</u> completely and accurately, and that the recipient understood my interpretation.

Signature of interpreter                            04/19/02
                                                   **Date**

Signature/Title                                    **04/19/020**
                                                   **Date**

IFR_AR_008337

## CONSULAR NOTIFICATION ( Mandatory)

Because of your nationality, we are required to notify your country's consular representatives here in the United States that you have been arrested or detained. After your consular officials are notified, they may call or visit you. You are not required to accept their assistance, but they may be able to help you obtain legal counsel and may contact your family and visit you in detention, among other things. We will be notifying your country's consular officials as soon as possible. Do you understand what I have stated to you? *Please circle "yes' or "no"*

**YES**                                              **NO**

4-19-02

_____                     _____
Signature of person being arrested/detained        Date



(name of interpreter) certify that I am fluent in both <u>CHINESE</u>   and English language, that I interpreted the above information from English to <u>CHINESE</u> completely and accurately, and that the recipient understood my interpretation.

Signature of Interpreter                        <u>04/19/02</u>
                                                Date


Signature/Title                                 <u>04/19/02</u>
                                                Date

162

IFR_AR_008338

~4x cl)

**U.S. Department of Justice**
Immigration and Naturalization Service

**Notice to Consular Officer Concerning Detention**

File No. _
Date:  January 27, 2003

To

⌐ **Consulate of**
   **GEORGIA**

   **FAX** _____  ⌐

└                            ┘

The person identified below **claims to be a** national of your country and is **being** detained by this Service.  He or she may be contacted at the following address:

United States Immigration and Naturalization Service

   International Airport
   _____
   _____

INS contact officer:

_____

Telephone:

_____

| Name | | Date of Birth | |
|---|---|---|---|
| Place of Birth | | Sex | F |
| Nature of Proceedings | 212(a)(6)(C)(i) 212(a)(7)(A)(i)(I) | | |
| Date of entry to U.S. | January 27, 2003 | Place of entry to U.S. | |
| Present location | Service Processing Center, | | |
| Evidence of nationality | | | |
| Name of father | | | |
| Address of father | | | |
| Name of mother | | | |
| Address of mother | | | |

Sincerely,

Form I-264 (Rev. 6-24-66) Y

IFR_AR_008339

**U.S. Department of Justice**

Immigration and Naturalization Service

## Notice to Consular Officer Concerning Detention

File No. _____

Date: September 12, 2003

To:

┌ **Consulate of** ┐
   **CHINA**

   **FAX** _____
└                              ┘

The person identified below claims to be a national of your country and is being detained by this Service. He or she may be contacted at the following address:

United States Immigration and Naturalization Service          INS contact officer:

International Airport                                          _____

_____                                             Telephone:

_____                                             _____

_____

| Name | | Date of Birth | |
|---|---|---|---|
| Place of Birth | | Sex | M |
| Nature of Proceedings | 212(a)(7)(A)(i)(I) | | |
| Date of entry to U.S. | September 12, 2003 | Place of entry to U.S. | |
| Present location | Service Processing Center, | | |
| Evidence of nationality | NONE | | |
| Name of father | | | |
| Address of father | | | |
| Name of mother | | | |
| Address of mother | | | |

Sincerely, /|

Form I-264 (Rev 6-24-66) Y

164 *went through at 14:57*

# Study on Asylum Seekers in Expedited Removal

*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

## Report on Credible Fear Determinations

February 2005

Mark Hetfield

IFR_AR_008341

TABLE OF CONTENTS

"Well Founded Fear" and the Role of the Asylum Corps………………………………167

New "Credible Fear" Responsibilities of the Asylum Corps under IIRIRA……………168

"Not Manifestly Unfounded" vs. "Credible Fear"……………………………………170

The High Credible Fear Rate May be Attributable to Procedures, not Standards………171

Conclusion………………………………………………………………………………172

Table Set…………………………………………………………………………………...173

| Table | Name |
|---|---|
| Asylum Table 1.0 | Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2004 |
| Asylum Table 1.1 | Arlington Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |
| Asylum Table 1.2 | Chicago Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |
| Asylum Table 1.3 | Houston Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |
| Asylum Table 1.4 | Los Angeles Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |
| Asylum Table 1.5 | Miami Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |
| Asylum Table 1.6 | Newark Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |
| Asylum Table 1.7 | New York Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |
| Asylum Table 1.8 | San Francisco Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003 |

IFR_AR_008342

# REPORT ON CREDIBLE FEAR DETERMINATIONS
By Mark Hetfield

**"Well Founded Fear" and the Role of the Asylum Corps**

One of the Study questions asked in Section 605 of the International Religious Freedom Act of 1998 (IRFA) is whether immigration officers, exercising Expedited Removal authority, are incorrectly removing bona fide asylum seekers to countries where they may be persecuted. To prevent this from happening, Congress designed the "credible fear" screening, to ensure that any alien who expressed a fear of return or intention to apply for asylum would be referred to an asylum officer for a "credible fear screening." Any alien found to have a "credible fear" of persecution would not be involuntarily removed without a full asylum hearing.

The credible fear determination established a new role for asylum officers. Under the regulations, if an alien is in non-expedited removal proceedings, any asylum claim must be raised with an immigration judge in an adversarial hearing, with government counsel present to cross-examine the alien. However, if an asylum seeker is in the United States and is not in proceedings, regardless of his or her manner of entry and current immigration status or lack thereof, the Asylum Corps ("the Corps") has primary jurisdiction over the asylum application.[1] The asylum officer, after a non-adversarial interview with the applicant, will grant asylum to the applicant if the officer finds that the alien is otherwise eligible and meets the refugee definition.[2] If not, the asylum officer will usually initiate removal proceedings, and refer the alien to an immigration judge.[3]

Asylum officers are specialists in asylum and refugee law, and are trained in international human rights law, non-adversarial interview techniques, and other relevant national and international refugee laws and principles. Moreover, U.S. Citizenship and Immigration Services (USCIS), which houses the Corps, must ensure that asylum officers have access to information pertinent to the persecution or torture of persons in other countries to enable them to make well-informed decisions on asylum applications.[4] According to recent DHS statistics, the Asylum Corps has a 29 percent approval rate for asylum applications.[5]

---

[1] 8 CFR 208.2(a) and (b) (2004).

[2] The applicant must meet the refugee definition in section 101(a)(42) of the Immigration and Nationality Act (INA), 8 USC 1101(a)(42) (2004), and be otherwise eligible for asylum in accordance with section 208 of the Act, 8 USC 1158 (2004). Under the INA, a "refugee" is "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such a person last habitually resided, and who is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion…"

[3] There are some instances, however, in which an asylum officer will deny the application and not refer the alien to an immigration judge. *See* 8 CFR 208.14(c) (2004).

[4] *See* 8 CFR 208.1(b) (2004).

[5] For fiscal years 2000-2004. *See* Appendix C in Kuck, *Legal Assistance for Asylum Seekers in Expedited Removal: A Survey of Alternative Practices*, Feb 2005.

IFR_AR_008343

**New "Credible Fear" Responsibilities of the Asylum Corps under IIRIRA**

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), however, gave asylum officers a new statutory responsibility:  to interview arriving aliens without proper travel documents, who were not expeditiously removed by the inspector because they expressed a "fear of return"[6]  to the immigration inspector.  Under IIRIRA, asylum officers are now to determine whether that fear is "credible," and whether it is tied to either torture or one of the five grounds for protection under the refugee definition. [7]  Thus, asylum officers are not to adjudicate the asylum claim of an arriving alien subject to Expedited Removal, but rather are to determine whether the claim warrants a full hearing before an immigration judge.

While an asylum officer may not grant asylum under current Expedited Removal regulations, if the asylum officer does not find credible fear he or she is to order the alien removed.  The negative credible fear determination may then be reviewed by an immigration judge.[8]  In other words, when the asylum officer finds credible fear, the alien will have the opportunity to present his or her asylum claim before an immigration judge.  And when an asylum officer denies credible fear, the alien will still have an opportunity to have an immigration judge review the negative credible fear finding.  There are, therefore, protections in place to help ensure that a *bona fide* asylum seeker will not be returned to a country where he or she may face persecution.

As Asylum Chart 1 shows, in the first years of Expedited Removal, the credible fear approval rates of asylum officers were initially at 83 percent in FY98 and at 89 percent in FY99.  Since that time they have stabilized at around 93 percent.  Asylum Chart 1 below provides summary information for each fiscal year, FY1998 to FY2004, on credible fear adjudications by the Asylum Corps.

---

[6] Or an "intention to apply for asylum."  Section 235(b)(1)(A)(ii) of the Immigration and Nationality Act, 8 USC 1225(b)(1)(A)(ii) (2004).

[7] "Credible Fear" is defined as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and other such facts as are known to the officer, that the alien could establish eligibility for asylum under section 208."  Section 235(b)(1)(B)(v) of the Immigration and Nationality Act, 8 USC  1225(b)(1)(B)(v) (2004)

[8] 8 CFR 208.30(g)(ii) (2004).



*Based on Asylum Table 1.0.*

Similarly, negative credible fear rates have also stabilized - asylum officers have found negative credible fear in only 1-2 percent of cases referred to them.  A larger number of cases, however (ranging between 3 percent to 8 percent), decide to "dissolve"[9] their asylum claims.  In such "dissolved" cases, no credible fear determination is made by the asylum officer.

According to Senator Orrin Hatch, who chaired the Senate Judiciary Committee when it considered the legislation, "The (credible fear) standard... is intended to be a low screening standard for admission into the usual full asylum process."[10] The primary benefits to the alien from a positive credible fear screening are (a) a delay in removal in order to have a full asylum hearing and (b) eligibility to be considered for release from detention.  Furthermore, as some DHS officials and asylum advocates remarked to the Study, the non-adversarial credible fear interview is the first time that the asylum seeker has had the asylum process explained to him or her, and that it helps give them a better understanding of this process.[11]  The screening, however, is also designed to benefit the Government, by allowing it to avoid expending unnecessary detention or immigration court resources for aliens who do not have a credible asylum claim.

---

[9] A "dissolve" is when an applicant referred for a credible fear determination indicates that he does not wish to pursue an asylum claim.

[10] 142 Cong. Rec. S11491-92 (September 27, 1996).

[11] In a survey which the Study conducted of all eight asylum offices, Asylum Office Directors and APSO (Asylum Pre-Screening Officer) supervisors were asked what value the credible fear determination (CFD) adds to the overall Expedited Removal process.  The answers were that the CFD allows expedited removal to exist, and makes the process more credible and honest; provides protection and creates the safety net for refugees or asylum seekers who have a claim; allows aliens the opportunity to be "pulled off the Expedited Removal track;" allows attorneys and immigration judges to gather information before the asylum hearing and allows an alien with a fear of return to appear in front of a judge; and is a useful exercise in collecting information of arriving aliens,  The suggestion was also made that, if Credible Fear Determinations were less "indiscriminate" they would be more useful for making parole determinations.  Appendix A, Jastram and Hartsough, *A-file and Record of Proceeding Analysis of Expedited Removal*, Feb 2005.

IFR_AR_008345

**"Not Manifestly Unfounded" vs. "Credible Fear"**

To better understand the "credible fear" standard, it is useful to compare it to the international asylum screening standard known as "not manifestly unfounded."  At one point during the consideration of the IIRIRA legislation, the Senate version included the latter standard.[12]  This standard, while not ultimately enacted by the Congress, is the screening standard frequently cited by the United Nations High Commissioner for Refugees (UNHCR).

The credible fear standard ultimately enacted by Congress constitutes a higher standard than the "not manifestly unfounded" screening standard favored by the UNHCR,[13] which applies criteria of (1) "not clearly fraudulent" (as opposed to the credible fear criterion of "a significant possibility that the applicant would be found to be credible") and (2) "not related to the criteria for the granting of refugee status" (as opposed to the USCIS criterion requiring that the applicant show a "significant possibility" that the applicant can establish nexus between the fear alleged and a protected ground (race, religion, nationality, membership in a particular social group, coercive family planning, or political opinion) or to torture.

**CHART: Comparison of Requirements for
"Credible Fear" and "Not Manifestly Unfounded" Standards**

|  | **"Not Manifestly Unfounded" Standard** | **"Credible Fear" Standard** |
|---|---|---|
| **Credibility Requirement** | "Claim not clearly fraudulent" | "Significant possibility applicant would be found credible in asylum hearing" |
| **Nexus Requirement** | "Claim related to criteria for refugee status" | "Significant possibility applicant can establish nexus to a protected ground (race, religion, nationality, membership in a particular social group, coercive family planning, or political opinion, ) or to torture" |

According to USCIS guidance, form I-870, and as documented in all 321 positive credible fear files and all 50 negative credible fear findings reviewed for the Study,[14] the credible

---

[12] "…in light of statements and evidence produced by the alien in support of the alien's claim, and of such other facts as are known to the officer about country conditions, a claim by the alien that the alien is eligible for asylum under section 208 *would not be manifestly unfounded*." (emphasis added) 1995 H.R. 2202; 104 H.R. 2202 §236(b)(8), as amended and approved by the Senate on May 2, 1996.

[13] UNHCR Executive Committee Conclusion No. 30 (1983) established the standard of "manifestly unfounded" to identify asylum claims that "are considered so obviously without foundation as not to merit full examination at every level of the procedure."  The Conclusion defines "manifestly unfounded" applications as "clearly fraudulent or not related to the criteria for the granting of refugee status laid down in the 1951 United Nations Convention…nor to any other criteria justifying the granting of asylum."

[14] Jastram and Hartsough, *A-file and Record of Proceedings Analysis of Expedited Removal*, Feb 2005.

IFR_AR_008346

fear determination includes (1) screening for credibility as well as (2) nexus between the harm alleged and the 5 grounds for asylum (plus torture).

From the documentation collected in the Study, it appears that each positive credible fear determination, and every negative credible fear determination reviewed by our researchers, was well-documented in the file on Form I-870, with the asylum officer making findings on (1) the applicant's credibility and (2) specifying the protected ground with nexus to the fear claim.

**The High Credible Fear Rate May be Attributable to Procedures, not Standards**

Credible fear findings, positive and negative, are documented in the file as applying screening criteria which take into account nexus and credibility.  Nevertheless, there are some procedural issues that warrant further discussion. These procedures may result in disproportionately high findings of credible fear, in spite of an appropriate screening standard.

Specifically, from the onset, negative credible fear findings have been subject to 100 percent quality assurance review by the Asylum Unit at Headquarters, as opposed to random quality assurance reviews for positive credible fear determinations.  Since the beginning of FY2002, positive credible fear determinations have been subject to little or no review by Headquarters, but negative credible fear determinations are still reviewed in 100 percent of all cases, with 20 percent of negative findings changed after Headquarters review.[15]

In addition, in July 2000, procedures were "streamlined."  Prior to that date, asylum officers were required to write a complete account of all credible fear interviews in a Q&A format.  Since July 2000, only negative credible fear determinations were subject to such extensive documentation requirements.[16]  Furthermore, in certain circumstances, particularly when an alien is being detained at a remote site which would be costly or difficult for an asylum officer to travel to, the asylum officer may interview the alien by telephone.  A positive credible fear determination may be made in a telephonic interview.  Once, however, it becomes evident that the alien does not have a credible fear of persecution or torture, the telephonic interview must be terminated and an "in-person" interview must be scheduled and conducted.[17]

While the Form I-870 Record of Determination/Credible Fear Worksheet is a useful instrument for quality assurance purposes, it is not, nor does it pretend to be, a transcript of the credible fear interview. The extra documentation required for a negative credible fear

---

[15] E-mail from Georgia Papas, USCIS Asylum Division to Mark Hetfield, USCIRF, November 10, 2004.  The USCIS Asylum Office informed the Study on February 2, 2005, however, that Headquarters is currently reviewing 100 percent of credible fear determinations made by asylum officers interviewing aliens placed in Expedited Removal after being apprehended by the Border Patrol, under the inland procedures announced on August 11, 2004. *See* 69 Federal Register 154, p. 48877 (August 11, 2004).

[16] *See* Form I-870, which instructs the asylum officer, "Typed Question and Answer (Q&A) interview notes and a summary and analysis of the claim must be attached to this form for all negative credible fear determinations.  These Q&A notes must reflect that the applicant was asked to explain any inconsistencies or lack of detail on material issues and that the applicant was given every opportunity to establish a credible fear."  According to USCIS, the rationale for retaining this requirement only for negative credible fear determinations was to assist the immigration judges in their review of the decision.

[17] USCIS Credible Fear Manual, p. 12 (April 2002).

IFR_AR_008347

determination - the typewritten Question and Answer (Q&A) Format - is substantially more labor-intensive for the asylum officer. Under USCIS rules, at the conclusion of an interview which will result in a negative credible fear determination, the asylum officer must read the Q&A back to the applicant, and make any corrections requested by the alien.[18]    Neither the I-870 nor the Q&A, however, is backed by any recording of the conversation, nor by the certification of any witness to the interview (An interpreter may be present, but neither the interpreter nor any other witness certifies that the asylum officer followed the procedure requiring that (s)he read the summary of the claim back to the applicant).

When the streamlining change took effect in July 2000, most asylum offices were already denying less than 2 percent of all credible fear cases.  The one exception, however, was Houston, which was denying 14 percent of credible fear referrals (See Asylum Table 1.3).  The year that "streamlining" went into effect, however, Houston's negative credible fear rate dropped from 14 percent to 2 percent, and has remained below 1 percent since that time.

It is important to note, however, that in spite of the high screen-in rate and the scrutiny to which negative credible fear determinations are subject, immigration judges reviewing negative credible fear determinations still find credible fear in approximately 10 percent of cases they review.[19]  This demonstrates that EOIR review provides a meaningful quality assurance check on the credible fear process.

## Conclusion

The credible fear process would be much more effective by subjecting negative and positive determinations to similar quality assurance procedures to ensure against bias built into the credible fear decision-making process.  Under current policy, negative credible fear determinations are subject to 100% Headquarters review, and require considerable additional time and effort by the asylum officer.  Positive credible fear determinations, however, are subject to virtually no Headquarters review and are much faster for the asylum officer to complete, given the lack of a Q&A.

Under these circumstances, there may be an incentive for asylum officers to approve disproportionate numbers of credible fear claims.  Modification of quality assurance procedures is necessary to help ensure that asylum officers are not biased toward improper findings of credible fear, so that aliens without a credible and colorable asylum claim will not unnecessarily remain in the United States - in detention at government expense - awaiting an asylum hearing. The credible fear definition is an appropriate screening standard as defined by Congress and described on the Form I-870, but the review procedures seem to encourage positive credible fear findings even where a negative one may be warranted.

---

[18] USCIS Credible Fear Manual, p. 12 (April 2002).

[19] Kyle, Fleming, and Scheuren, *Statistical Report on Immigration Court Proceedings, FY2000-2004*, (February 2005), Chart 5.

IFR_AR_008348

**Asylum Table 1.0: Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2004**

Source: CIS Asylum Office

| FY | Credible Fear Found Number | Credible Fear Found Percent | Credible Fear Not Found Number | Credible Fear Not Found Percent | Dissolve & Withdrawal Number | Dissolve & Withdrawal Percent | Other Number | Total Adjudicated[a] Number |
|---|---|---|---|---|---|---|---|---|
| 1998 | 2747 | 83% | 125 | 4% | 394 | 12% | 38 | 3304 |
| 1999 | 5762 | 89% | 144 | 2% | 446 | 7% | 111 | 6463 |
| 2000 | 9285 | 93% | 150 | 2% | 392 | 4% | 144 | 9971 |
| 2001 | 12932 | 94% | 119 | 1% | 433 | 3% | 205 | 13689 |
| 2002 | 9124 | 92% | 112 | 1% | 535 | 5% | 140 | 9911 |
| 2003 | 5681 | 90% | 48 | 1% | 531 | 8% | 54 | 6314 |
| 2004 | 7241 | 94% | 31 | 0.4% | 370 | 5% | 57 | 7699 |
| Total | 52772 | 92% | 729 | 1% | 3101 | 6% | 749 | 57351 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other
(*) equals values of 3 or less, suppressed for confidentiality.
(-) equals values of 0.

**Asylum Table 1.1: Arlington Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003**

Source: CIS Asylum Office

| FY | Credible Fear Found Number | Credible Fear Found Percent | Credible Fear Not Found Number | Credible Fear Not Found Percent | Dissolve & Withdrawal Number | Dissolve & Withdrawal Percent | Other Number | Total Adjudicated[a] Number |
|---|---|---|---|---|---|---|---|---|
| 1998 | 55 | 81% | 6 | 9% | 7 | 10% | - | 68 |
| 1999 | 71 | 76% | 4 | 4% | 12 | 13% | 6 | 93 |
| 2000 | 191 | 75% | 5 | 2% | 52 | 20% | 7 | 255 |
| 2001 | 303 | 77% | - | - | 89 | 23% | * | 395 |
| 2002 | 199 | 67% | * | * | 97 | 33% | - | 298 |
| 2003 | 136 | 68% | * | * | 63 | 31% | * | 201 |
| Total | 955 | 73% | 15 | 1% | 320 | 24% | 13 | 1310 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other
(*) equals values of 3 or less, suppressed for confidentiality.
(-) equals values of 0.

IFR_AR_008349

**Asylum Table 1.2: Chicago Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003**

Source: CIS Asylum Office

| FY | Credible Fear Found | | Credible Fear Not Found | | Dissolve & Withdrawal | | Other | Total Adjudicated[a] |
|----|--------|---------|--------|---------|--------|---------|--------|--------|
| | Number | Percent | Number | Percent | Number | Percent | Number | Number |
| 1998 | 206 | 93% | * | * | * | - | 2 | 222 |
| 1999 | 578 | 92% | 10 | 2% | - | - | 24 | 625 |
| 2000 | 1008 | 97% | 12 | 1% | - | - | 5 | 1041 |
| 2001 | 831 | 95% | 18 | 2% | 21 | 2% | 4 | 874 |
| 2002 | 611 | 98% | * | * | 8 | 1% | * | 621 |
| 2003 | 199 | 92% | * | * | 12 | 6% | 5 | 217 |
| Total | 3433 | 95% | 45 | 1% | 81 | 2% | 41 | 3600 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other

(*) equals values of 3 or less, suppressed for confidentiality.

(-) equals values of 0.

**Asylum Table 1.3: Houston Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003**

Source: CIS Asylum Office

| FY | Credible Fear Found | | Credible Fear Not Found | | Dissolve & Withdrawal | | Other | Total Adjudicated[a] |
|----|--------|---------|--------|---------|--------|---------|--------|--------|
| | Number | Percent | Number | Percent | Number | Percent | Number | Number |
| 1998 | 148 | 76% | 34 | 17% | 12 | 6% | * | 195 |
| 1999 | 224 | 74% | 41 | 14% | 35 | 12% | * | 303 |
| 2000 | 679 | 90% | 15 | 2% | 58 | 8% | 5 | 757 |
| 2001 | 559 | 81% | * | * | 31 | 5% | 96 | 687 |
| 2002 | 2011 | 96% | 8 | 0.4% | 60 | 3% | 7 | 2086 |
| 2003 | 1335 | 95% | * | * | 72 | 5% | * | 1410 |
| Total | 4956 | 91% | 101 | 2% | 268 | 5% | 113 | 5438 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other

(*) equals values of 3 or less, suppressed for confidentiality.

(-) equals values of 0.

IFR_AR_008350

**Asylum Table 1.4: Los Angeles Asylum Office Credible Fear Finding by Fiscal Year,**
**FY 1998-2003**
Source: CIS Asylum Office

| FY | Credible Fear Found | | Credible Fear Not Found | | Dissolve & Withdrawal | | Other | Total Adjudicated[a] |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Number |
| 1998 | 523 | 73% | 49 | 7% | 113 | 16% | 27 | 712 |
| 1999 | 1565 | 93% | 32 | 2% | 53 | 3% | 25 | 1675 |
| 2000 | 3321 | 96% | 26 | 1% | 32 | 1% | 72 | 3451 |
| 2001 | 4316 | 97% | 39 | 1% | 47 | 1% | 31 | 4433 |
| 2002 | 2159 | 93% | 9 | 0.4% | 44 | 2% | 108 | 2320 |
| 2003 | 693 | 88% | * | * | 68 | 9% | 24 | 787 |
| Total | 12577 | 94% | 157 | 1% | 357 | 3% | 287 | 13378 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other
(*) equals values of 3 or less, suppressed for confidentiality.
(-) equals values of 0.

**Asylum Table 1.5: Miami Asylum Office Credible Fear Finding by Fiscal Year,**
**FY 1998-2003**
Source: CIS Asylum Office

| FY | Credible Fear Found | | Credible Fear Not Found | | Dissolve & Withdrawal | | Other | Total Adjudicated[a] |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Number |
| 1998 | 627 | 90% | 9 | 1% | 60 | 9% | 4 | 700 |
| 1999 | 1717 | 94% | 13 | 1% | 77 | 4% | 26 | 1833 |
| 2000 | 2495 | 97% | 40 | 2% | 37 | 1% | 5 | 2577 |
| 2001 | 5185 | 99% | 27 | 1% | 9 | 0.2% | 32 | 5253 |
| 2002 | 3105 | 96% | 80 | 2% | 48 | 1% | 10 | 3243 |
| 2003 | 2524 | 95% | 23 | 1% | 92 | 3% | 6 | 2645 |
| Total | 15653 | 96% | 192 | 1% | 323 | 2% | 83 | 16251 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other
(*) equals values of 3 or less, suppressed for confidentiality.
(-) equals values of 0.

IFR_AR_008351

**Asylum Table 1.6: Newark Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003**

Source: CIS Asylum Office

| FY | Credible Fear Found | | Credible Fear Not Found | | Dissolve & Withdrawal | | Other | Total Adjudicated[a] |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Number |
| 1998 | 470 | 90% | 5 | 1% | 48 | 9% | * | 524 |
| 1999 | 483 | 74% | 26 | 4% | 131 | 20% | 17 | 657 |
| 2000 | 642 | 80% | 27 | 3% | 104 | 13% | 32 | 805 |
| 2001 | 818 | 82% | 23 | 2% | 124 | 12% | 37 | 1002 |
| 2002 | 609 | 74% | 10 | 1% | 186 | 23% | 13 | 818 |
| 2003 | 425 | 70% | 17 | 3% | 148 | 24% | 15 | 605 |
| Total | 3447 | 78% | 108 | 2% | 741 | 17% | 115 | 4411 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other

(*) equals values of 3 or less, suppressed for confidentiality.

(-) equals values of 0.

**Asylum Table 1.7: New York Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003**

Source: CIS Asylum Office

| FY | Credible Fear Found | | Credible Fear Not Found | | Dissolve & Withdrawal | | Other | Total Adjudicated[a] |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Number |
| 1998 | 497 | 76% | 13 | 2% | 140 | 21% | * | 653 |
| 1999 | 759 | 87% | 13 | 1% | 94 | 11% | * | 869 |
| 2000 | 550 | 82% | 12 | 2% | 90 | 13% | 18 | 670 |
| 2001 | 532 | 83% | 9 | 1% | 99 | 15% | * | 641 |
| 2002 | 255 | 77% | * | * | 76 | 23% | * | 333 |
| 2003 | 165 | 70% | * | * | 67 | 29% | * | 235 |
| Total | 2758 | 81% | 49 | 1% | 566 | 17% | 28 | 3401 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other

(*) equals values of 3 or less, suppressed for confidentiality.

(-) equals values of 0.

IFR_AR_008352

**Asylum Table 1.8: San Francisco Asylum Office Credible Fear Finding by Fiscal Year, FY 1998-2003**
Source: CIS Asylum Office

| FY | Credible Fear Found | | Credible Fear Not Found | | Dissolve & Withdrawal | | Other | Total Adjudicated[a] |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Number |
| 1998 | 221 | 96% | 6 | 3% | * | 1% | - | 230 |
| 1999 | 305 | 91% | 4 | 1% | 21 | 6% | 4 | 334 |
| 2000 | 399 | 96% | 13 | 3% | 3 | 1% | - | 415 |
| 2001 | 388 | 96% | * | * | 13 | 3% | * | 404 |
| 2002 | 175 | 91% | * | * | 16 | 8% | - | 192 |
| 2003 | 204 | 95% | * | * | 9 | 4% | - | 214 |
| Total | 1692 | 95% | 27 | 2% | 65 | 4% | 5 | 1789 |

[a]Total cases adjudicated includes Credible Fear Found, Credible Fear Not Found, Dissolves, Withdrawals, and Other

(*) equals values of 3 or less, suppressed for confidentiality.

(-) equals values of 0.

IFR_AR_008353

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL

*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

## CONDITIONS OF CONFINEMENT FOR DETAINED ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL

FEBRUARY 2005

Craig Haney, Ph.D.

IFR_AR_008354

TABLE OF CONTENTS

I.    The Detention of Asylum Seekers Subject to Expedited Removal....................180

II.   Assessing Conditions of Confinement at the Detention Facilities in Which
      Asylum Seekers Subject to Expedited Removal are Housed...........................182
      A. The Facility Survey.........................................................................183
      B. Interviews with Former Detainees......................................................189
      C. Facility Tours...............................................................................191

III.  The Psychological Impact of Confinement...............................................191
      A. Dependence on Institutional Structure and Contingencies.........................193
      B. Hypervigilance, Interpersonal Distrust and Suspicion.............................194
      C. Social Withdrawal and Self Isolation.................................................195
      D. Diminished Sense of Self Worth and Personal Value...............................195
      E. Post-Traumatic Stress Reactions to the Pains of Imprisonment...................196

IV.   Special Psychological Issues for Asylum Seekers Subject to Expedited Removal...197

V.    Discussion, Alternatives, and Need for Further Study..................................199

Appendices
      Appendix A: Facilities in Sample.........................................................203
      Appendix B: Facilities Actually Surveyed and Those Visited by
      Commission Experts.........................................................................204
      Appendix C: Detention Center Questionnaire............................................206
      Appendix D: Comparison of DHS Detention Centers to Traditional Correctional
      Facilities....................................................................................216
      Appendix E: UNHCR Detention of Refugees and Asylum-Seekers – Executive
      Committee Conclusions.....................................................................221
      Appendix F:  UNHCR Revised Guidelines on Applicable Criteria and Standards
      Relating to the Detention of Asylum Seekers.............................................222

IFR_AR_008355

# CONDITIONS OF CONFINEMENT FOR DETAINED
# ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL

Detention is a critical issue for asylum seekers subject to Expedited Removal in the United States.  In FY2003, asylum seekers constituted only 6 percent of the 230,000 aliens in the custody of the Department of Homeland Security (DHS).[1]  However, all asylum seekers subject to Expedited Removal are, by law, detained until a credible fear determination has been made in their case.[2]  Even after the Credible Fear determination, which normally occurs between two and fourteen days after an alien's arrival, it is at the discretion of the DHS Bureau of Immigration and Customs Enforcement (ICE) Office of Detention and Removal Operations (DRO) to determine whether to release an asylum seeker prior to his or her hearing before an immigration judge.   According to ICE, the average length of detention for released asylum seekers in Expedited Removal was 64 days, and 32 percent were detained for 90 days or longer. [3]

Detention is clearly a significant factor in an asylum seeker's experience in the Expedited Removal process.  Consequently, Congress authorized the United States Commission on International Religious Freedom to appoint experts to examine the conditions under which these asylum seekers are confined.[4]   This report attempts to describe those conditions.

## I.    THE DETENTION OF ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL

The rationale for detaining asylum seekers who are subject to Expedited Removal has several components. For one, section 235 (b) (1) (B) (iii) (IV) of the Immigration and Nationality Act provides that any alien subject to Expedited Removal procedures "shall be detained pending a final determination of credible fear of persecution and, if found to have such a fear, until removed." If credible fear is found (a process that can take between 48 hours to two weeks), ICE District Directors may parole at their discretion those aliens who meet the credible fear standard, can establish identity and community ties, and who are not subject to possible bars to asylum involving violence or other misconduct.

Since, by definition, aliens who are placed in Expedited Removal proceedings either have no documents, faulty documents, or ones that an immigration inspector has determined were fraudulently obtained, detention serves the purpose of detaining aliens until their identity can be determined. Moreover, since ICE is charged with the responsibility of insuring that asylum seekers subject to Expedited Removal actually appear for their asylum hearings, and that they appear for their removals (if asylum is not granted), detention helps to insure that both goals are met.

---

[1] Fact Sheet – ICE Office of Detention and Removal (May 4, 2004) (available at www.ice.gov); and Report to Congress, Detained Asylum Seekers, Fiscal Year 2003, Prepared by U.S. Immigration and Customs Enforcement Office of Detention and Removal and the Department of Homeland Security, Management Directorate, Office of Immigration Statistics.

[2] Section 235(b)(1)(B) of the Immigration and Nationality Act ("The INA"), 8 USC 1225(b)(1)(B) (2004).

[3] Report to Congress, Detained Asylum Seekers, FY2003.

[4] Section 605 of the International Religious Freedom Act of 1998, 22 USC 6474 (2004).

IFR_AR_008356

However, it also is possible that asylum seekers who are subject to Expedited Removal are held in detention unnecessarily (i.e., when less onerous measures could accomplish the same goals equally well), for too long a period of time (i.e., when they otherwise could be paroled pending the adjudication of their asylum hearings), or that the conditions under which they typically are detained are inappropriate (i.e., the nature of their confinement may be psychologically harmful or otherwise interfere with their successful integration into U.S. society or the home country to which they are removed). This report addresses the latter concern—the nature and appropriateness of the actual conditions under which asylum seekers subject to Expedited Removal are detained.

It is important to acknowledge at the outset that this report analyzes the conditions of confinement for post-credible fear asylum seekers largely in reference to their similarity with traditional correctional environments. There are several reasons for this. For one, the issue of whether the detention of asylum seekers subject to Expedited Removal "criminalizes" them—by treating them in much the same way as criminals are treated in our society—has been the subject of much controversy in the United States and abroad.[5] Examining whether and to what extent the conditions under which post-credible fear asylum seekers are kept approximates conditions in the nation's penal system helps to clarify that debate.

In addition, both the letter and spirit of the DRO detention standards appear to embody a traditional correctional system approach to the housing and treatment of post-credible fear asylum seekers. These standards clearly model those in use in traditional prisons and jails and, in fact, explicitly refer to the Bureau of Prisons and American Correctional Association (ACA) Standards for Adult Local Detention Facilities.[6] The use of traditional correctional standards for the detention of asylum seekers in the Expedited Removal process contributes to the sense that they are being criminalized by the nature of the conditions in which they are confined.

On the other hand, despite their heavy reliance on a traditional correctional approach, the DRO standards and guidelines also were designed to be flexible in their application. That is: "Since the standards as written could not be imposed on IGSA (Intergovernmental Service Agreement) facilities, which house diverse groups of individuals, the format of the standards was altered so that they could be more flexible. The new standards will be required for all facilities holding INS detainees, but they include flexibility to allow IGSAs to use alternate means of

---

[5] The Executive Committee of United Nations High Commissioner for Refugees (UNHCR), of which the United States is a member, in its Conclusion 44 (1986), expressed that, "in view of the hardship which it involves, detention (of asylum seekers) should normally be avoided." *See* Appendix E. It also stressed "the importance for national legislation and/or administrative practice, to make the necessary distinction between the situation of refugees and asylum seekers, and that of other aliens," and that "refugees and asylum seekers shall, whenever possible, not be accommodated with persons detained as common criminals..." The UNHCR Guidelines on Applicable Criteria and Standards relating to the Detention of Asylum-Seekers (1999) reiterated that the detention of asylum seekers is "inherently undesirable…(and) should only be resorted to in cases of necessity;" emphasizing the importance of "the use of separate detention facilities to accommodate asylum-seekers. The use of prisons should be avoided. If separate detention facilities are not used, asylum-seekers should be accommodated separately from convicted criminals or prisoners on remand. There should be no co-mingling of the two groups." *See* Appendix F.
[6] "The standards are based on current INS detention policies, Bureau of Prisons' Program Statements, and the widely accepted ACA Standards for Adult Local Detention Facilities, but are tailored to serve the needs of INS detainees." INS News Release, INS to Adopt New Detention Standards, November 13, 2000.

IFR_AR_008357

meeting the standards if necessary."[7] Thus, at the same time the DRO standards incorporate a traditional corrections approach to detention, and some of the facilities in which aliens are detained are actual jails, they seem to contemplate the possibility of using different, alternative approaches to the handling of asylum seekers subject to Expedited Removal.

Moreover, it is clear that the specific conditions of confinement in DRO detention facilities are not dictated by the nature of the alien population housed in them. For example, there is a dramatic contrast between the approach to the detention of post-credible fear asylum in the Queens Contract Detention Facility, which is structured and operated much like a traditional jail or correctional facility, and the Broward Transitional Center, which appears to be a much more humane and far less intrusive form of confinement that bears only minimal resemblance to a traditional prison or jail. Coincidentally, despite their dramatic differences in conditions and approach, both facilities are operated by the same parent company, GEO (Global Expertise in Outsourcing, formerly part the Wackenhut Corporation).

In fact, the dramatic differences between these two facilities appear to be largely a function of the terms of the ICE contracts under which they each operate, rather than differences in the nature of the populations served. Thus, the nature of the conditions under which the group of asylum seekers subject to Expedited Removal are kept appears to be a policy choice, rather than a detention-related mandate.

II.    ASSESSING CONDITIONS OF CONFINEMENT AT THE DETENTION FACILITIES IN WHICH ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL ARE HOUSED

The present descriptions and assessment of the conditions under which asylum seekers are housed are based on several sources. The *primary* data source consisted of a series of structured interviews conducted by telephone with administrators who worked at 19 pre-selected detention facilities throughout the United States (described in detail below).[8] The results of the facility survey also were supplemented with direct observations that were conducted at 4 detention facilities (Broward Transitional Center, Elizabeth Detention Center, Krome SPC, and the Laredo Contract Detention Center), and with two group interviews that were conducted with former DHS detainees (one organized in New York City by Human Rights First, and another in Miami by Florida Immigrant Advocacy Center). In addition, the results were verified and compared with: 16 unreleased monitoring reports by the United Nations High Commissioner for Refugees (UNHCR) that ICE authorized to be shared with the Commission; 30 unreleased monitoring reports of site visits to detention facilities by the American Bar Association (ABA)

---

[7] ibid.

[8] It is important to note at the outset that these data are limited in several ways. For one, although facilities in which the great majority of post-credible fear asylum seekers are housed were surveyed, not every facility was included. Although unlikely, it is possible that the facilities that were not included in the survey differed in some important respects from those that were, altering the accuracy of the overall descriptions. Second, and more importantly, as our primary data source, the survey depended *entirely* on information provided by the facility administrators themselves. Aside from the possible tendency for administrators to portray their own facilities in a positive light, the descriptions and accounts on which we relied in the survey were entirely those who operated the facilities rather than, for example, those of the detainees who were housed in them. In institutional settings, these two perspectives often differ from one another; conditions and procedures are not always experienced by inmates in exactly the way they are intended by administrators.

IFR_AR_008358

that ICE authorized be shared with Commission experts; information obtained from visits of other Commission experts in the course of the Study.[9] Finally, Commission researchers interviewed 39 asylum seekers who had decided to "dissolve" their asylum claims while in detention. Those interviews were evaluated to determine what effect, if any, detention conditions might have had on the aliens' decision to dissolve their asylum claim. They, too, were used to supplement the facility survey.[10]

## A. The Facility Survey

As noted above, the primary data source was a survey of a sample of facilities where asylum seekers subject to Expedited Removal were detained. The sample of surveyed facilities was designed to represent the different types of institutions currently used by the Department of Homeland Security for this purpose and also to include ones that encompassed a large percentage of the population of post-credible fear asylum seekers currently in DHS custody.[11] Thus, the total of 19 facilities were located in 12 different states and included 6 county jails, 5 DHS run facilities, 7 private contract facilities, and one special county-run detention facility for alien families (Berks County). The institutions surveyed housed more than 70 percent of all aliens subject to Expedited Removal in FY 2003. Overall, the facilities that were surveyed were responsible for housing approximately 5585 alien men and 1015 women. (A list of the sampled facilities appears in Appendix A.) The cost of detaining an alien at these facilities varied from

---

[9] These included visits by Commission expert to: the Queens New York Contract Facility; the Comfort Inn, Miami, Florida; San Pedro Detention Facility; Otay Mesa Detention Facility (CCA), San Diego, California; Mira Loma Detention Facility, Lancaster, California; Kenosha County Jail, Kenosha, Wisconsin; Florence SPC, Florence, Arizona; Piedmont Regional Jail, Farmville, Virginia; Aguadilla, Puerto Rico; Guaynabo-MDC, Puerto Rico; and Office of Refugee Resettlement (ORR) juvenile contract facilities in Chicago, Illinois, and San Diego, California.

[10] In a letter dated June 22, 2004 from Acting DRO Director Victor Cerda to USCIRF Immigration Counsel Mark Hetfield, Mr. Cerda indicated that ICE was providing the ABA and UNHCR reports to the Commission for "informational purposes only," as they are not as comprehensive as DHS's own monitoring reviews. As Mr. Cerda pointed out, the UNHCR and ABA reports are based on short facility tours, while the DRO monitoring reports are the result a much more comprehensive two to three day inspection of individual detention facilities. Immediately upon receipt of the letter, USCIRF made the first of many repeated requests to ICE for an opportunity to review the DRO inspection reports. ICE, however, never made those reports available to Commission experts.

[11] As Appendix A indicates, we had intended to survey 22 facilities. Three facilities (Ozaukee, Guaynabo, and Orleans) declined to participate. Consequently, we did not include any data or reach any conclusions pertaining to those facilities. However, note that in one case—the Ozaukee County Jail—an inspection done in September, 2003 by another outside agency that looked at many of the same issues reached many of the same overall conclusions that we did about the facilities we surveyed. Among other things, the other agency inspection reported "[d]etainee complaints about jail conditions and treatment by guards as disrespectful, rude, and unprofessional."

Reasons for the failure to participate varied. For example, after making and breaking several appointments with Commission staff to complete the survey, Ozaukee county ultimately refused to cooperate. On the other hand, MDC Guaynabo, a facility run by the Bureau of Prisons (BOP), was unable to participate in the survey because, in spite of a number of requests made by Commission staff to BOP at the US Department of Justice, the facility was not able to get the necessary clearance from Washington in time to participate. While in Puerto Rico interviewing aliens in Expedited Removal proceedings, USCIRF Immigration Counsel Mark Hetfield was given a tour of the facility by BOP officials. Hetfield reported that, while the facility was cleaner and had more extensive programming, access to outdoor recreation and natural light, and privacy than virtually any other adult facility visited in connection with the Study (except for Broward), the facility was clearly run as a high security correctional institution. Thus, Guaynabo detainees were permitted contact attorney visits and supervised personal visits, but were strip searched after each one. Moreover, criminal detainees were co-mingled with asylum seekers with no distinction whatsoever.

A list of the facilities actually included in the sample, and from which they data on which this report relies were obtained, appears in Appendix B.

IFR_AR_008359

between \$30 to \$200 per detainee per day, with an average cost of approximately \$83.[12] This estimate is similar to the one reported in the EOIR Legal Orientation Executive Summary—that is, that overall "[t]he average cost to DHS for each detainee is \$85 per day."

To begin the survey, administrators at each facility were asked a series of preliminary questions designed to elicit information about the cost of housing detainees there, and information about the gender and legal status of the detainees themselves.[13] Questions then focused at length on specific aspects of the conditions under which detainees lived, the particular procedures that governed the detainees' day-to-day behavior, and other aspect of the institutional environment in which they were housed. By design, the survey addressed a standard set of characteristics or dimensions of institutional life, intended to determine the extent to which aliens housed in these detention facilities may be subjected to conditions of confinement that were similar to those of in-custody inmates housed in traditional jails and prisons.

*1) Special Treatment of Alien Detainees*

One important initial issue concerned whether any special forms of treatment and protection were provided to post-credible fear asylum seekers who were in DHS detention— including whether the non-criminal and criminal aliens were kept separate from one another, whether aliens were kept separate from jail inmates (in those facilities that housed both), and whether the detention staff had any special knowledge or training that would enable them to address the special needs and unique status of asylum seekers.

More than half (13/18) of the facilities where male aliens were detained reported that they housed detainees both with and without criminal convictions. Similarly, more than half of the facilities that housed female aliens (10/13) had detainees who had been convicted of one or more criminal offense as well as those who had none. Of the facilities that housed male or female detainees who had criminal convictions with detainees who had none, 11 not only allowed some contact or interaction between both groups but also provided for shared sleeping quarters where both groups were co-mingled. Among the 8 facilities that housed non-DHS jail inmates (either sentenced or awaiting trial), 7 permitted some contact between them and the detained aliens and, in the case of 4 facilities, this included shared sleeping quarters.

Several questions addressed the issue of whether detention facility staff had special knowledge and received special training with respect to asylum seekers. In only one of the detention facilities were the line officers or guards explicitly told which specific inmates were asylum seekers. In addition, staff at very few of the facilities were given any specific training that was designed to sensitize them to the special needs or concerns of asylum seekers, and in even fewer facilities did they receive any training to enable them to recognize or address any of the special problems from which victims of torture and other forms of trauma might suffer or the

---

[12] Note: In the case of several private contract facilities, the daily cost per detainee was reduced once the facility began to operate above a certain population level. The standard cost—not exceeding the lower population level— was used in calculating the overall average. In the case of one facility, Mira Loma, only a range was provided by the administrator and the midpoint of that range was used. Two facilities (Berks County Family Shelter and San Pedro) did not report average costs.

[13] A copy of the entire questionnaire appears in Appendix C.

IFR_AR_008360

special difficulties they might experience in the course of their detention. Specifically, only 3 of the facilities in the sample reported that staff members received "some cultural sensitivity training" and only one—Broward —reported that its staff received any training with respect to what asylum seekers "might have gone through." In addition to the lack of specific training among line staff, only a small number of facilities (5/19) reported that *anyone* on-site—including higher level officials and administrators—had received such training.

## 2) *Use of Correctional Models of Security, Surveillance, and Control*

The first series of detailed confinement-related questions posed in the survey pertained to the basic security arrangements and procedures that were in use at the particular detention facilities. On the whole, responses indicated that these facilities were extremely secure and highly security-conscious.

All of the detention facilities but one had secure barriers (locked doors and/or gates) that separated the housing units from the initial entrance into the facility itself. The number of such security barriers ranged from 1 to 8, with a mean of 3.7 security barriers between the entrance and the detainee housing units. All but one employed special security procedures that restricted general access to the detainees' housing units and to their individual cells or sleeping areas.

Similarly, all of the detention facilities but one employed multiple inmate "counts" during the day by which the detainees' whereabouts were formally monitored. The number of such counts ranged from 2 to 10, and averaged 5 counts per day in the 18 facilities that used them.[14] All of the facilities but 5 reported that they used strip or other kinds of invasive searches on detainees as a standard procedure during the time they were processed into the facility. All but 3 reported using strip or invasive searches for security-related reasons during the detainees' subsequent confinement. In addition, all of the facilities reported that guards conducted security-related searches of the detainees' general living or housing areas. Some reported that these searches occurred as frequently as once a day, although in most facilities once a week or less was the norm.

The facilities also reported a heavy emphasis on the direct monitoring and surveillance of the detainees. Specifically, all but three of the facilities reported that there were fixed and secure guard stations in the detainee housing or living areas, and virtually all (18/19) had constant sight and/or sound surveillance in the housing units themselves (which typically meant the nearly constant presence of a facility staff member). In addition, most (14/19) had surveillance cameras operating inside the detainee housing units, and all but one had surveillance cameras in operation elsewhere in the facility.[15] All of the detention facilities used 24-hour surveillance lighting (i.e., there were key areas inside the institutions where the lights were never turned off).

---

[14] One facility—the Yuba County Jail—reported "hourly safety checks" in addition to three "actual head counts" per day. We used only the head counts in this calculation.

[15] Many of the facilities reported the use of numerous surveillance cameras throughout. For example, the Yuba County Jail reported that it had approximately 70 surveillance cameras were in regular operation.

IFR_AR_008361

*3)  Restricted Movement and Segregated Confinement*

Prisons and jails are characterized by the limitations they place on the liberty of inmates. Indeed, it is one of their defining qualities. The freedom of movement of post-credible fear detainees in the facilities that were surveyed was restricted in a number of important respects. For one, virtually all of the detention facilities (18/19) reported using physical restraints with the detainees. In some instances the use of restraints was reported as rare and minimal, in others it appeared to be frequent and more extensive. For example, the Tri-County Jail in Ullin, Illinois reported that the staff used "handcuffs, belly chains, and leg shackles… when detainees leave the facility." On a day-to-day basis, detainees in virtually all (17/19) of the facilities were restricted in their movement outside of their direct housing units, and only a few (4) allowed detainees to have access to other housing or living areas within the facility. In addition, all of the facilities but 2 reported that they required the detainees to have staff escorts whenever they moved throughout the facility. The only areas within the institutions to which detainees were given relatively unrestricted, unescorted access were the dayrooms that were attached to their living areas.

The use of segregation, isolation, or solitary confinement for disciplinary reasons was widespread among the detention facilities that were sampled. All but 3 of them reported that they used some form of this kind of specialized, punitive confinement in response to certain kinds of disciplinary infractions by the detainees.

*4)  Limitations on Privacy and Personal Freedom*

Significant limitations were reported in the amount of privacy, personal freedom, and individuality that detainees were afforded in virtually all of these facilities. Thus, detainees in only a few of the detention facilities (4/19) had access to private, individual toilets that they could use when no one else was present. In only slightly more of the facilities (5/19) were detainees able to shower privately (i.e., outside the presence of others). Very few detainees had the opportunity to be alone in their cells or rooms (something that was possible in only 4 facilities). In addition, detainees at very few facilities (4/19) were given any opportunity to personalize their living quarters by decorating them, and the overwhelming majority of the facilities (16/19) required detainees to wear uniforms rather than street clothes. Similarly, only 2 of the facilities permitted detainees to have personal hygiene items that were not sold at the facility commissary or provided by the government. In fact, there were 6 detention facilities— about a third of the sample—that did not extend commissary privileges of any kind to the detainees.

*5)  Pursuit of Legal Claims*

The detention facilities that were surveyed did acknowledge the importance of allowing the detainees to pursue their legal claims in several ways. For example, all of the facilities reported providing the detainees with at least some kind of law library access, and in 5 of them such access was described as essentially unlimited. (However, in *none* of the facilities visited by the experts were all the legal materials listed in the DHS detention standards—listed in Appendix E—present and up-to-date, a problem consistently reported by the UNHCR and ABA monitoring reports as well.) Virtually all (18/19) of the facilities reported that "know your rights"

presentations were conducted, either by their own staff (5), NGO representatives (8), or both (5).[16] The great majority also indicated that the "know your rights" handouts were issued or made available to detainees. Most facilities reported handbooks were available in English and Spanish, with Chinese (6), French (4), and Creole (4) also covered in several of the facilities.[17]

*6) Access to Programming and Meaningful Activity*

There were a significant number of restrictions placed on the detainees' opportunities to engage in meaningful activities or programs of any kind while they were confined. The degree of the restrictions varied according to the nature of the activity. Thus, virtually all of the facilities reported that they provided detainees with some opportunity for what they characterized as outdoor recreation or exercise. (The one exception—Oakland County Jail—provided 3 hours per week in an indoor gym at the facility.) However, the number of hours of outdoor exercise per week varied widely from as many as 40 (in a few facilities where detainees were reported to have virtually unlimited daytime outdoor access) to as few as one hour to an hour and a half per day (the rule in 8 facilities). In virtually every case in which outdoor exercise was provided (15/18), the facilities reported that the detainees were still in a circumscribed, confined environment (described in one case as a "small concrete slab that is well fenced in with razor wire").[18]

In terms of other activities routinely available to detainees, no detention facility provided detainees with access to the internet. Moreover, a majority (11/19) of the facilities reported that they had no educational or vocational training activities whatsoever available in which detainees could participate. Among the 8 facilities that offered some kind of programming activity, most offered ESL classes, and several gave the detainees an opportunity to participate in several kinds of classes (e.g., in "life skills" or art).

On the other hand, all of the facilities but 2 allowed detainees to work. In most of the detention facilities where work was allowed (12/17), detainees were paid. However, in each case the rate of pay for their labor was very minimal—$1 per day.

*7) Access to Religious, Mental Health, and Medical Services*

In addition to meaningful activity and programming, incarcerated persons often have special needs that arise from time to time and that must be addressed by specialized personnel. The special services available to detainees at the facilities that were surveyed varied. For

---

[16] In some instances, these presentations were infrequent. For example, the Yuba County Jail reported that the UC Davis law school provided "know your rights" presentations "when they chose," but this averaged only about three times per year. Given the fact that the average stay in detention is 64 days, "know your rights" presentations that occurred approximately three times per year would fail to reach a large segment of the detained asylum seeker population.

[17] We note that here, as with all of the data presented concerning access to services and the like, we were unable to directly assess the quality of the "know your rights" presentations, the materials that were distributed, or the accuracy of the translations.

[18] It should be noted that the nature of these outdoor facilities appeared to vary widely. In the inspection of the Elizabeth facility, for example, Commission researchers noted that the cramped, enclosed exercise area hardly was "outdoor" at all, even though it was characterized as such in the survey results.

IFR_AR_008363

example, most (13/19) of the detention facilities had at least one full-time chaplain (another had a part-time chaplain), virtually all had weekly religious services that detainees were permitted to attend, most conducted special religious services in conjunction with certain religious holidays, and all but one facility accommodated at least some religious or special diets.

On the other hand, even though all facilities employed some kind of mental health screening at the time detainees were being processed into the institution, and most made mental health services available to detainees who requested it later on, only 5 of the facilities had any full-time mental health staff members. Among the 14 that reported having no full-time mental health staff was the large Mira Loma facility where as many as 1200 DHS detainees can be held at a time. The survey did not address the issue of whether detainees had access to ongoing therapy or mental health counseling, if so, on what basis, or the quality of the care that actually was provided.[19] Nonetheless, the lack of full-time mental health staff in many of these facilities raised concerns about these issues.

Moreover, in only 2 of 19 facilities did mental health staff members conduct regular rounds or make any kind of effort to directly monitor the mental health status of the detainees. Most of the facilities did report that they had special suicide prevention procedures in the case of detainees who were suspected of being suicidal, although in most instances this consisted of placing the detainee in a segregation or isolation unit.[20]

Medical care tended to be handled more consistently. Thus, the overwhelming majority of the facilities reported that at least one full-time nurse was present, and nearly half (8/19) had full-time physician coverage.

*8)  Contact with the Outside World*

Finally, significant limitations were placed on the detainees' contact with the outside world in most of the detention facilities that were surveyed. For one, in virtually all of the facilities (except one), there were limitations placed on the frequency and length of the social visits that were permitted. In fact, the majority of the facilities (11/19) limited visiting days to only 1-2 days per week; only 4 permitted visiting every day. In addition, 10 facilities reported that visiting was restricted to 1 hour or less per visit, and only 2 placed no time limits on the lengths of social visits. The majority of the detention facilities (11/19) prohibited any kind of contact visiting with social or family visitors, which meant that visits often occurred behind plexi-glass windows. However, attorney visiting was handled more generously: attorney visitation was unlimited in all of the facilities and, in all but 2 facilities, they were allowed to be contact visits.

---

[19] For example, note that a Bellevue/NYU study of detained asylum seekers reported that "most of the asylum seekers interviewed (69 percent) reported that they wanted counseling for their mental health problems although few received such services… Among those who wanted counseling, only 6 (13 percent) reported receiving counseling from someone provided by the detention facility." Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, From <u>Persecution to Prison: The Health Consequences of Detention for Asylum Seekers</u> (2003), at p. 63.

[20] It should be noted that confinement in isolation is likely to exacerbate depression and, for this reason, generally is not regarded as an appropriate response to suicidality.

IFR_AR_008364

Detainees at all facilities were permitted phone calls, although these were outgoing phone calls only, and even in-coming calls from attorneys were prohibited. Only a few facilities placed limits on number and length of calls (except on the basis of phone availability), and some provided pro bono calling privileges on a limited basis. Virtually every facility placed limitations on the kind of mail detainees could receive (only one reported it did not). Incoming letters were opened in every facility, and 6 detention facilities even placed restrictions on the number of letters detainees could send out in a week.[21]

*Summary*

Appendix D contrasts the characteristics of the alien detention facilities in which detained asylum seekers are housed (as measured in the survey described above) with those of traditional jails and prisons that are intended for accused and/or convicted criminals. Indeed, as one chief administrator of a detainee-only facility put it, "the people here are all our prisoners."[22] Thus, Appendix D shows that, in most critical respects, the DHS detention facilities are structured and operated much like standardized correctional facilities. Indeed, in some instances, actual criminal justice institutions—in this case, county jails—are operated as dual use facilities that simultaneously house asylum seekers and criminal offenders, side-by-side. Even in those DHS or contract detention facilities that explicitly are designed to house only alien detainees, the physical structure, day-to-day operations, and treatment of residents appear to be corrections-based in virtually all important respects. Moreover, there were few systematic differences between the several types of facilities. That is, whether they were county jails, DHS run facilities, or private contract facilities, they were operated in more or less the same way. With the exception of the Broward Transitional Center (a private contract facility) and the Berks Family Shelter (a county run detention facility), the facilities employed similar rules, with similar conditions of confinement, that greatly resembled traditional correctional settings.

## B. Interviews with Former Detainees

The results of the facility surveys were supplemented by face-to-face interviews conducted in Miami and, especially, New York, with asylum seekers who had been in detention but subsequently were released. The interviewees (who, in the case of those in New York, had been confined either in the Elizabeth Detention Center or the Queens Contract Detention Facility and, in the case of those in Miami, had been confined either in Krome SPC or the Broward Transitional Center) recalled many painful and even traumatic aspects of their detention. Several complained of physical as well as mental abuse suffered in the course of their detention. One of them summarized the hardships of institutional life this way:

> You had to put on a uniform, were taken to a dormitory to live, had no privacy—and even had to shower in the presence of a guard (who could be a male or female—it didn't matter). You must conform to all the arbitrary regulations—eat what you are given, when you are given it, and get used to being searched each time you leave your dormitory. They can touch you anywhere.

---

[21] In some instances, the limitations were placed on mailing by indigent detainees. For example, the Yuba County Jail allows indigents to send a maximum of two letters per week free of charge.

[22] Interview at Laredo Processing Center, September 22, 2004.

IFR_AR_008365

Another former detainee said, "you have to endure many cultural violations in the detention center. In my country, we are not supposed to see our elders naked. But we had to there. And you are afraid, you don't know the law here." In addition to fear, many talked about depression at the prospect of what they worried would be indefinite detention. Indeed, some encountered asylum seekers in the facilities who already had been detained for several years without release. They reported that deep concerns about their own uncertain fate in the asylum process affected them psychologically during their confinement. Yet there was no active monitoring of their mental or emotional condition.

The adverse treatment took a toll on a number of the persons interviewed. One of them said:

I felt really isolated and humiliated. I felt like a person who had no value. At any time, the security guards made us do whatever they wanted. I felt traumatized by my treatment. My blood pressure went higher and my medical problems worsened there.

Other former detainees described the conditions in the facilities as "psychologically degrading… stressful and depressing." They also reported that they could be placed in isolation—in essence, solitary confinement—for trivial offenses such as verbal disagreements with other detainees.

A number of those interviewed told compelling stories of the torture and persecution in their home countries that had led them to seek asylum in the United States. Yet they felt that their treatment in detention, while they awaited the resolution of their asylum case, added to their pre-existing emotional distress. As one of them put it: "The whole detention system is there to break you down further. The time you spend there prolongs your trauma. And you are not even allowed to cry. If you do, they take you to isolation." Another said, "I fled my country because of this. I broke down and cried when it happened here."

Other former detainees spoke of being "treated like children" at the detention facilities, of having very little to do, and being "treated like a criminal." Even at Broward—which otherwise was an exception to the very severe conditions in the other detention facilities—at least one former detainee noted that many of the women were depressed and that there were several suicide attempts during the period she was kept there.

Language barriers were described as a consistent problem. A number of the former detainees reported that even when there were translations provided for important legal documents, there were few if any key facility staff members (for example, in mental health) who spoke the language of many of the detainees. This made effective communication extremely difficult.

IFR_AR_008366

## C. Facility Tours

The tours of the facilities confirmed the fact that, except for the Broward Transitional Center, these detention units are structured and run much like traditional correctional institutions. There is a high premium placed on security and surveillance, and this is evident from the moment anyone enters the facilities themselves. Indeed, at Krome, for example, the security exceeded the level that exists at most correctional facilities. There were armed guards stationed at the entrance to the facility and it was impossible to even drive into the parking lot without first showing them proper identification. Once inside, in each of these facilities, the characteristic sounds of slamming gates and locked doors closing behind serve to remind visitors and residents that they are in a high security correctional environment.

The atmosphere inside the facilities that were examined by Commission researchers were unmistakably somber. The stark conditions appeared to have a direct effect on the residents. As one official at the Elizabeth Detention Center acknowledged, "mental health is a big problem. Sometimes people get very depressed, and just getting them a change of scenery, getting them out of this place for a while, improves their mental health." He went on to note that:

> Detention itself is really depressing. But when you don't know when you are getting out, that's really bad. I worked in a federal correctional facility and, although the inmates were not happy, they at least knew when they were getting out and had something definite to look forward to. Here, they don't.

Again, with the exception of Broward, the detention facilities that were inspected looked very much like county jail facilities that exist throughout the United States—physically drab, lacking personalized decorations and the like, and without much open space or common programming areas for meaningful activities in which detainees could participate.   Most of the so-called "recreation" areas were cramped and restricted (with the exception of the outdoor recreation areas at Broward, Mira Loma, Florence, Laredo and Krome), and they had little if any exercise equipment. The libraries were small and sparse, and appeared to have comparatively few volumes (most of which were in written in English). The dayrooms were drab and uninviting.

Interestingly, all of the facilities that were inspected, except Broward, used standard correctional nomenclature for their isolation unit—"SHU" (the correctional acronym for "special housing unit")—that is employed in most prisons and jails in the United States. Moreover, the SHU units in these detention facilities appear to be structured and to operate in very much the same way as in traditional correctional settings. That is, they were run as punishment units that subjected detainees to virtually around-the-clock enforced isolation, in extremely sparse cells, and under heightened levels of deprivation.

## III.   THE PSYCHOLOGICAL IMPACT OF CONFINEMENT

The fact that the detention facilities that were surveyed and inspected so closely resembled traditional correctional institutions poses a number of concerns. Adaptation to prison-like environments is difficult for virtually everyone confined in them. Most people experience

IFR_AR_008367

incarceration as painful and even traumatic. The experience also can have long-term consequences. Beyond the psychological effects of trauma, life in a prison-like environment requires people to change and adjust in ways that may prove difficult for them to relinquish upon release. That is, in the course of coping with the deprivations of life in a prison or jail, and adapting to the extremely atypical patterns and norms of living and interacting with others that incarceration imposes, many people are permanently changed.

Psychological reactions to the experience of living in a prison-like environment vary from individual to individual, making generalizations difficult. It is certainly *not* the case that everyone who is incarcerated is disabled or psychologically harmed by it. But few people end the experience unchanged by it. Among the commonsense generalizations that have been corroborated by research is the fact that persons who have psychological vulnerabilities *before* their incarceration are likely to suffer more problems later on, and that the greater the level of deprivation and harsh treatment and the longer they persist, the more negative the psychological consequences.

Perhaps the most comprehensive summary of research on the effects of living in a prison-like environment included these findings: that "physiological and psychological stress responses… were very likely [to occur] under crowded prison conditions"; inmates are "clearly at risk" of suicide and self mutilation; that "a variety of health problems, injuries, and selected symptoms of psychological distress were higher for certain classes of inmates than probationers, parolees, and, where data existed, for the general population"; that imprisonment produced "increases in dependency upon staff for direction and social introversion," "deteriorating community relationships over time," and "unique difficulties" with "family separation issues and vocational skill training needs." [23] The same literature review found that a number of problematic psychological reactions occurred after relatively brief exposure to a prison-like environment. For example, higher levels of anxiety have been found in inmates after eight weeks in jail than after one, and measurable increases in psychopathological symptoms have been found to occur after only 72 hours of confinement. Research in which college student participants were placed in a simulated prison-like environment also found that extreme reactions occurred after only a short period—less than a week—of incarceration. [24]

The term "institutionalization" is used to describe the process by which inmates are shaped and transformed by the institutional environments in which they live. Sometimes called "prisonization" when it occurs in prison-like settings, it is the shorthand expression for the broad negative psychological effects of incarceration. Thus, prisonization involves a unique set of psychological adaptations that typically occur—in varying degrees—in response to the extraordinary demands of prison life. [25] In general terms, this process involves the incorporation of the norms of prison life into one's habits of thinking, feeling, and acting.

---

[23] James Bonta and Paul Gendreau, P., Reexamining the Cruel and Unusual Punishment of Prison Life, 14 Law and Human Behavior 347-372 (1990), at pages 353-359.

[24] Haney, Craig, Banks, William, & Zimbardo, Philip, Interpersonal Dynamics in a Simulated Prison, 1 International Journal of Criminology and Penology 69 (1973).

[25] For example, see: Donald Clemmer, The Prison Community. New York: Hold, Rinehart & Winston (1958); Erving Goffman, Asylums: Essays on the Social Situation of Mental Patients and Other Inmates. New York: Anchor (1961); Lynne Goodstein, Inmate Adjustment to Prison and the Transition to Community Life, Journal of Research on Crime and Delinquency, 16, 246-272 (1979); Barbara Peat, Barbara and Thomas Winfree, Reducing the Intra-Institutional Effects of "Prisonization": A Study of a Therapeutic Community for Drug-Using Inmates, Criminal

Persons who enter prison-like environments for the first time must adapt to an often harsh and rigid institutional routine. They are deprived of privacy and liberty, assigned to what they experience as a diminished, stigmatized status, and live under extremely sparse material conditions. For many of them, the experience is stressful, unpleasant, and difficult to tolerate. However, in the course of becoming institutionalized, persons gradually become more accustomed to the wide range of restrictions, deprivations, and indignities that institutional life imposes.

The various psychological mechanisms that must be employed to adjust become increasingly "natural"—that is, second nature—and, to a degree, are internalized. To be sure, the process of institutionalization can be subtle and difficult to discern as it occurs. Many people who have become institutionalized are unaware that it has happened to them. Few of them consciously decide to allow the transformation to occur, but it occurs nonetheless.

There are several components to the psychological process of adaptation that can have adverse long-term consequences for incarcerated persons after their release. They are summarized below.[26]

## A. Dependence on Institutional Structure and Contingencies

Living in prison-like environments requires people to relinquish the freedom and autonomy to make many of their own choices and decisions. Over time, they must temper or forego the exercise of self-initiative and become increasingly dependent on institutional contingencies. In the final stages of the process, some inmates come to depend on institutional decision makers to make choices for them and they rely on the structure and schedule of the institution to organize their daily routine. In extreme cases, their decision-making capacity is more significantly impaired. Thus, some prisoners lose the ability to routinely initiate behavior on their own and cannot exercise sound judgment in making their own decisions. Profoundly institutionalized persons may even become extremely uncomfortable and disoriented when and if previously cherished freedoms, autonomy, and opportunities to "choose for themselves" are finally restored.

A slightly different aspect of this process involves developing a subtle dependency on the institution to control or limit one's behavior. Correctional institutions force inmates to adapt to

---

Justice and Behavior, 19, 206-225 (1992); C. Thomas and D. Peterson, A Comparative Organizational Analysis of Prisonization, Criminal Justice Review (6): 36-43 (1981); Charles Tittle, Institutional Living and Self Esteem, Social Problems, 20, 65-77 (1972).

[26] Some of these issues are discussed at greater length in: Craig Haney, The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment, in J. Travis & M. Waul (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press (2003); Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); and Craig Haney and Donald Specter, Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times, in J. Ashford, B. Sales, & W. Reid (Eds.), Treating Adult and Juvenile Offenders with Special Needs (pp. 51-79). Washington, D.C.: American Psychological Association (2001).

IFR_AR_008369

an elaborate network of typically very clear boundaries and rigid behavioral constraints. The consequences for violating these bright-line rules and prohibitions can be swift and severe. The use of continuous and increasingly sophisticated surveillance devices and practices means that prison-like environments are quick to detect and punish even minor infractions.

Institutional settings surround inmates so thoroughly with *external* limits, immerse them so deeply in a network of rules and regulations, and accustom them so completely to such highly visible systems of monitoring and restraints that *internal* controls may atrophy. Thus, institutionalization or prisonization renders some people so dependent on external constraints that they gradually cease relying on their own self-imposed internal organization to guide their actions or restrain their conduct. If and when this external structure is taken away, severely institutionalized persons may find that they no longer know how to do things on their own, or how to refrain from doing those things that are ultimately harmful or self- destructive.

## B.  Hypervigilance, Interpersonal Distrust and Suspicion

In addition, because many prison-like environments keep people under conditions of severe deprivation, some inmates accommodate by exploiting others. In such an environment, where the possibility of being taken advantage of or exploited is very real, inmates learn quickly to become hypervigilant, always alert for signs of threat or personal risk. Many inmates learn to become interpersonally cautious, even distrustful and suspicious. They attempt to keep others at a distance, for fear that they will become a victim themselves. For some inmates, these survival strategies develop quickly, become reflexive and automatic, and are difficult to relinquish upon release.

Distancing oneself from others also requires carefully measured emotional responses. Many incarcerated persons struggle to control and suppress their reactions to events around them; emotional over-control and a generalized lack of spontaneity may result. Persons who over-control their emotional responses risk alienation from themselves and others. They may develop a form of emotional flatness that is chronic and debilitating in social interactions and intimate relationships.

The alienation and social distancing from others serves as a defense against the interpersonal exploitation that can occur in prison-like settings. However, it also occurs in response to the lack of interpersonal control that inmates have over their immediate environment, making emotional investments in relationships risky and unpredictable. The disincentive against engaging in open, candid, trusting communication with others that prevails in prison-like settings leads some persons to withdrawal from authentic social interactions altogether.[27] Obviously, such an extreme adaptation will create special problems when inmates attempt to reintegrate and adjust to settings outside the institution.

---

[27] For example, see: C. Jose-Kampfner, Coming to Terms with Existential Death: An Analysis of Women's Adaptation to Life in Prison, <u>Social Justice</u>, <u>17</u>, 110-XXX (1990); R. Sapsford, Life Sentence Prisoners: Psychological Changes During Sentence, <u>British Journal of Criminology</u>, <u>18</u>, 128-145 (1978).

IFR_AR_008370

## C.  Social Withdrawal and Self Isolation

Some incarcerated persons learn to create psychological and physical safe havens through social invisibility, by becoming as inconspicuous and unobtrusively disconnected as possible from the people and events around them. The self-imposed social withdrawal often means that they retreat deeply into themselves, trust virtually no one, and adjust to prison stress by leading isolated lives of quiet desperation. One researcher found not surprisingly that prisoners who were incarcerated for longer periods of time and those who were punished more frequently by being placed in solitary confinement were more likely to believe that their world was controlled by "powerful others."[28] Such beliefs are consistent with an institutional adaptation that undermines autonomy and self-initiative.

In more extreme cases, especially when combined with apathy and the loss of the capacity to initiate behavior on one's own, the pattern closely resembles clinical depression. Inmates who are afforded little or no meaningful programming in institutional settings lack pro-social or positive activities in which to engage during their incarceration. If they also are denied access to gainful employment where they can obtain meaningful and marketable job skills and earn adequate compensation, or are allowed to work only in settings where they are assigned to menial tasks that they perform for only a few hours a day, then they are more likely to become lethargic and depressed. The longer the period of exposure to prison-like environments, the greater the likelihood that this particular psychological adaptation will occur. Indeed, one early analyst wrote that the long-term prisoners manifest "a flatness of response which resembles slow, automatic behavior of a very limited kind, and he is humorless and lethargic."[29] In fact, another researcher analogized the plight of long-term women prisoners to that of persons who are terminally-ill, whose experience of this "existential death is unfeeling, being cut off from the outside… (and who) adopt this attitude because it helps them cope."[30]

## D.  Diminished Sense of Self-Worth and Personal Value

As noted above, inmates often are denied basic privacy rights and lose control over the most mundane aspects of their day-to-day existence. Prisoners generally have no choice over when they get up or have lights out, when, what, or where they eat, whether and for how long they shower or can make a phone call, and most of the other countless daily decisions that persons in free society naturally take for granted in their lives. Many inmates feel infantalized by this loss of control.

Prison-like environments also typically confine persons in small, sometimes extremely cramped and deteriorating spaces. The 60 square foot average cell size in the United States is roughly the size of a king-size bed. Inmates who are double-celled or assigned to dormitory-style housing typically have no privacy and have little or no control over the identity of the person with whom they must share small living spaces and negotiate intimate forms of daily contact this

---

[28] Hannah Levenson, Multidimensional Locus of Control in Prison Inmates, Journal of Applied Social Psychology, 5, 342-347 (1975).

[29] A. Taylor, Social Isolation and Imprisonment, Psychiatry, 24, 373-XXX (1961), at p. 373.

[30] C. Jose-Kampfner, Coming to Terms with Existential Death: An Analysis of Women's Adaptation to Life in Prison, Social Justice, 17, 110-XXX (1990), at p. 123.

IFR_AR_008371

requires. The degraded conditions under which they live serve as constant reminders of their compromised social status and their stigmatized social role as inmates.

A diminished sense of self-worth and personal value may result. In extreme cases of institutionalization, the symbolic meaning that can be inferred from this externally imposed substandard treatment and confinement in degraded circumstances is internalized. That is, inmates may come to think of themselves as "the kind of person who deserves" no more than the degradation and stigma to which they have been subjected during their incarceration.

## E.  Post-Traumatic Stress Reactions to the Pains of Imprisonment

For some inmates, life in a prison-like environment is so stark and psychologically painful as to be traumatic. In extreme cases, the trauma is severe enough to produce post-traumatic stress reactions after release. Thus, former inmates may experience unexplained emotional reactions in response to stimuli that are psychologically reminiscent of painful events that occurred during incarceration. They may suffer free floating anxiety, an inability to concentrate, sleeplessness, emotional numbing, isolation, and depression that are connected to their prison traumas. Some may relive especially stressful or fear-arousing events that traumatized them during incarceration. In fact, psychiatrist Judith Herman has suggested that a new diagnostic category—what she termed "complex PTSD"— be used to describe the trauma-related syndrome that prisoners are likely to suffer in the aftermath of their incarceration, because it is a disorder that comes about as a result of "prolonged, repeated trauma or the profound deformations of personality that occur in captivity."[31]

Moreover, it is now clear that certain prior experiences—ones that pre-date confinement in prison-like environments—may predispose inmates to these post-traumatic reactions. The literature on these predisposing experiences has grown vast over the last several decades. A "risk factors" model helps to explain the complex interplay of earlier traumatic events (such as abusive mistreatment and other forms of victimization) in the backgrounds and social histories of many incarcerated persons. As Masten and Garmezy noted in the seminal article outlining this model, the presence of these background risk factors and traumas in earlier in life increases the probability that someone will be plagued by a range of other problems later on.[32]

To those persons who already have experienced a series of earlier, severe traumas, life in a harsh, punitive, and often uncaring prison-like environment may represent a kind of "re-traumatization" experience. That is, time spent in prison-like environments may rekindle not only bad memories but also the disabling psychological reactions and consequences of those earlier damaging experiences.

---

[31] See: Judith Herman, A New Diagnosis, in J. Herman (Ed.), Trauma and Recovery.  New York: Basic Books (1992); and Judith Herman, Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma, in G. Everly & J. Lating (Eds.), Psychotraumatology: Key Papers and Core Concepts in Post-Traumatic Stress (pp. 87-100). New York: Plenum (1995).

[32] Ann Masten and Norman Garmezy, Risk, Vulnerability and Protective Factors in Developmental Psychopathology, in F. Lahey and A Kazdin (Eds.), Advances in Clinical Child Psychology (pp. 1-52). New York: Plenum (1985).

IFR_AR_008372

The various psychological consequences of institutionalization that have been described above are not always immediately obvious once the structural and procedural pressures that created them have been removed. Indeed, persons who leave a prison-like environment and are fortunate enough to return to moderately structured and especially supportive settings—stable family, work, helpful forms of agency supervision, supportive communities—may experience relatively unproblematic transitions. However, those who return to difficult and stressful circumstances that lack supportive structure and services are at a greater risk of post-incarceration adjustment problems. In these cases, the negative aftereffects of institutionalization often appear first in the form of *internal* chaos, disorganization, stress, and fear. Because the process of institutionalization has taught most people to cover or mask these internal states, and to suppress feelings or reactions that may indicate vulnerability or dysfunction, the outward appearance of normality and adjustment may hide a range of common but serious problems that are likely to be encountered in free society.

IV.   SPECIAL PSYCHOLOGICAL ISSUES FOR ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL

Because many asylum seekers have suffered severe and sometimes very recent trauma and abusive treatment preceding their detention in the United States, their incarceration would be expected to have more severe psychological consequences. These prior trauma histories—ones that often include torture, imprisonment under inhumane conditions in their native countries, and exposure to other extreme kinds of abuse—mean that a number of asylum seekers who are subject to Expedited Removal will enter the United States in fragile psychological states. As a result, they will be more vulnerable to emotional crises than the average person who is exposed to the rigors of institutional life. Indeed, there is reason to expect that, for many of these post-credible fear asylum seekers, the painful and traumatic aspects of detention (as outlined above) will represent a form of "re-traumatization" whose long-term consequences may be deeper and more long-lasting. In fact, one study of a sample of detained asylum seekers indicated that more than four of five manifested symptoms of clinical depression, three quarters had anxiety-related symptoms, and that fully half showed signs of post-traumatic stress disorder.[33]

In addition to the increased painfulness of incarceration for an already vulnerable population of detainees, several longer-term consequences for this group of asylum seekers may be of special concern. For one, some of those subjected to the Expedited Removal process may decide to terminate their asylum application, despite credibly fearing return to their home country, because they are traumatized and disheartened by their experiences in detention. Indeed, to study this potential problem, as part of the evaluation of consequences of current detention

---

[33] Keller, A., Rosenfeld, B., Trinh-Sherwin, C., Meserve, C., Sachs, E., Leviss, J., Singer, E., Smith, H., Wilkinson, J., Kim, G., Allden, K., & Ford, D., Mental Health of Detained Asylum Seekers, The Lancet, 362, 1721-1723 (2003). A number of detailed and comprehensive reports have raised a broad set of concerns about the detention of asylum seekers in the United States. For example, see: Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers (2003); Amnesty International, Lost in the Labyrinth: Detention of Asylum Seekers. New York: Amnesty International (1999). Human Rights Watch, Locked Away: Immigration Detainees in Jails in the United States. New York: Human Rights Watch (1998).

IFR_AR_008373

practices, the results of interviews conducted by Commission researcher with 39 asylum seekers who decided to "dissolve" their asylum claims while in detention were reviewed.

Many of the interviewees indicated that the nature of their post-credible fear detention and treatment was one of the factors that led to their decision to terminate their application. They expressed these concerns in a variety of ways, ranging from one detainee who said that he terminated his asylum application because "it is not worth it to sit in jail while applying for asylum," to another who said that "I need to help my children and I cannot do so from jail," to one who preferred to go home "because detention is affecting my head and my spirit," and a fourth who acknowledged that detention "instills fear in people" and that locking down "human beings who are not harming anybody" is "not right."

Others complained that "when I found out the conditions of my compatriots, and how they are waiting months after months in detention, I decided I would prefer to go back." Another asylum seeker who attributed his decision to terminate his asylum claim directly to his detention experience put it succinctly: "I'm not used to living in prison. This situation is not good for me... I can't live in jail any longer."

Of course, it was impossible to tell whether these detention-related explanations were genuine as opposed to, say, detainees finally concluding or conceding that their asylum claims had no merit. Yet there was no obvious advantage or benefit for a detainee to cite detention conditions as the reason for dissolving his or her asylum claim. Nonetheless, explanations based on the harshness of detention were commonplace among the 39 persons interviewed in this portion of the study. Asylum seekers who terminated said that they were "sick and tired of prison," that they'd never been incarcerated before and didn't think they deserved such treatment, and that they "didn't know I'd be imprisoned," sometimes for months or years. These comments suggest that some number of asylum seekers who might otherwise qualify for asylum could be deterred from continuing to pursue their claims because they are forced to remain in detention in the course of the asylum process.

Finally, detained post-credible fear asylum seekers—whether they ultimately are granted asylum or are returned to their home countries—may suffer from long-term psychological consequences of detention. In recent years, a large literature has developed that examines the aftereffects of incarceration.[34] The literature on the aftereffects of incarceration in general suggests that— especially for persons who lack access to significant social and economic resources when they are released, who may have begun their period in detention with special psychological vulnerabilities, and who are likely to re-enter free society without any adequate transitional services to assist them in the difficult post-institutional adjustment process— successful reintegration often proves a difficult if not impossible task. Many people released from traditional prisons and jails cannot find productive work or sustain meaningful social and personal relationships; an unusually high number eventually engage in criminal activity and return to custody. Most experts believe that their continued social and economic marginality is at least in part the result of the lasting psychological effects of incarceration. Asylum seekers held

---

[34] For example, see the various studies and references described and cited in in J. Travis & M. Waul (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities. Washington, DC: Urban Institute Press (2003).

IFR_AR_008374

in jail-like conditions may suffer from exactly the same kinds of post-incarceration adjustment problems, exacerbated by the additional problems they will encounter attempting to integrate into a strange and unfamiliar culture (in those cases where asylum is granted and they assume residency in the United States).

## V.    DISCUSSION, ALTERNATIVES, AND NEED FOR FURTHER STUDY

The data from this Study, however, raises a number of questions about the conditions of confinement under which asylum seekers who are subject to Expedited Removal are detained. Even under the best of conditions and most humane practices, incarceration is psychologically stressful and potentially harmful. As long as procedures are used to insure that post-credible fear asylum seekers appear at asylum hearings and removal proceedings, policies that minimize the number of asylum seekers in Expedited Removal who are kept in detention, shorten the length of time during which they are detained, and keep those who are detained under the most humane possible conditions will reduce the psychological risks of incarceration and lessen the potential damage that may be done to this already vulnerable group of people.

These questions warrant further study.  As DHS endeavors to improve the detention environment for those asylum seekers whom it must detain, there should be a careful, systematic assessment of the impact of detention on asylum seekers that not only documents the administrators' descriptions of conditions at each facility (as our Report did), but supplements that assessment with detailed inspections of a representative sample of facilities by knowledgeable researchers (with experience in evaluating correctional environments), and extended interviews (including mental health assessments) of a representative sample of asylum seeking detainees

Forcing asylum seekers to become dependent on institutional structures and contingencies (which, in extreme cases, means they may relinquish self-initiative and self-generated internal behavioral controls), and increasing the likelihood that some will become distrustful, fearful, and hypervigilant in jail-like settings where they are kept seems ill-advised. Subjecting them to conditions where some of them will feel the need to withdraw and isolate themselves from others, in addition to experiencing the enforced social isolation from their families that often occurs, is likely to impair their social relationships and future adjustment. So, too, will exposing them to conditions of confinement that diminish their sense of self worth and personal value by placing them in deprived circumstances where they have little or no control over mundane aspects of their day-to-day lives. The possibility that detained asylum seekers will experience post-traumatic stress disorder, or have pre-existing medical or psychological conditions exacerbated is a serious concern. Especially because of the vulnerabilities with which many of them initially enter detention facilities, high incidences of clinical syndromes—pre-existing or acquired during confinement—are likely.

Some asylum seekers subjected to Expedited Removal will have their petitions denied and will be returned to countries where they must re-establish themselves. Others will be granted asylum and face the challenge of integrating into a free but complex society. In neither case will the process of transition be facilitated by long periods of potentially damaging incarceration.

IFR_AR_008375

Of course, the exact nature of the conditions of confinement under which persons are housed matter. This study identified a number of severe jail-like conditions that went beyond anything necessary to insure the safe and secure housing of persons pending hearings and removal proceedings. Given the severity of the conditions of confinement identified in the present study, the Physicians for Human Rights study conclusion that "the psychological health of detained asylum seekers is extremely poor and worsens the longer asylum seekers remain in detention" is not surprising.[35]

In addition, staff members in the overwhelming majority of detention facilities surveyed received little or no client-appropriate training. As noted above, only one of 19 facilities surveyed provided its staff with any specialized training designed to sensitize them to the unique background and potential trauma histories of asylum seekers. Instead, the overwhelming majority of staff members have received jail-appropriate training in security and custody-related matters. Many have become accustomed to working with a domestic criminal population who have little in common with asylum seekers. This is especially true in the case of women and children asylum seekers, whose trauma histories and emotional needs may be more severe and require more specialized training.[36]

Many of the facilities surveyed appeared to fall short of existing ICE detention guidelines. Moreover, while DHS and contract facilities make an effort to carry out the guidelines, other facilities run by other government agencies are not required to follow them. For example, the guidelines make an effort to separate asylum seekers from criminals and criminal aliens. According to the guidelines: "The classification system shall assign detainees to the least restrictive housing unit consistent with facility safety and security. By grouping detainees with comparable records together, and isolating those at one classification level from all others, the system reduces noncriminal and nonviolent detainees' exposure to physical and psychological danger."[37] However, the guidelines are not binding on detention facilities operated by local, state, or federal government agencies through intergovernmental service agreements (IGSAs). Consequently, our survey found that, in IGSA facilities, asylum seekers are frequently co-mingled or even sleep next to criminal aliens, detainees awaiting criminal trial, and convicts.

On the other hand, we were very impressed with the Broward Transitional Center "non-jail-like" model of detention, which appeared to have achieved a much more appropriate balance between security concerns and the mental health and emotional needs of asylum seekers subject to Expedited Removal. Broward detainees were regarded less as criminals and more as human beings whose past trauma and future transition into free society warranted caring, respectful treatment. The detainees were given a significant amount of freedom (despite being confined in a secure detention facility), their ability to maintain and strengthen family ties was supported (through a liberal contact visiting policy), and the likelihood that they would suffer various forms of social, psychological, and cognitive deterioration associated with incarceration was minimized

---

[35] Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, From <u>Persecution to Prison: The Health Consequences of Detention for Asylum Seekers</u> (2003), at p. 5.

[36] As stated in the UNHCR Guidelines on Applicable Criteria and Standards relating to the Detention of Asylum-Seekers (1999), "The detention of asylum-seekers is, in the view of UNHCR, inherently undesirable.  This is even more so in the case of vulnerable groups such as single women, children, unaccompanied minors and those with special medical or psychological needs." *See* Appendix F.

[37] INS Detention Standard: Detainee Classification System (p. 5) (2003).

IFR_AR_008376

(through a full range of activities and programs in which detainees can participate on a daily basis).

The Broward model is still a form of detention, to be sure, and it is experienced as such by the detainees who are kept there. However, it appears to be designed to reduce the harmful effects of incarceration as much as possible.

Staff members who were interviewed at Broward believed that their model was transferable to other facilities in which post-credible fear asylum seekers are held and we concur. We would anticipate that the transfer of the Broward model would meet pockets of resistance among more traditionally trained correctional staff and administrators. Yet, just as at Broward itself (whose administration and staff includes former correctional personnel), committed leadership and active guidance has resulted in the creation of a model facility, run and staffed by persons who appeared to take great pride in the alternative model of detention they had created and were devoted to its continuing success. Moreover, along with the Broward administrators with whom we discussed this issue, we saw no reason why the model could not be extended to detention facilities in which male as well as female detainees were housed.

In terms of cost, it is worth noting that, according to our survey, use of Broward costs DRO $83 per night per alien.   This is slightly less expensive than the national average per ICE detention bed.  (And the much more prison-like facility operated in Queens by GEO, the same contractor which manages Broward, costs ICE an average of $200 per night.  The cost of bed space in the New York metropolitan area, however, is considerably more expensive than in South Florida.).

Finally, the present report was written without an opportunity to systematically study the implementation and effects of the newly implemented Intensive Supervision Appearance Program (ISAP).[38] The increased use of electronic monitoring and related alternatives offers the obvious advantage of providing security and surveillance data without the corresponding economic as well as psychological costs of incarceration. At the same time, however, it is important to note that several of the asylum seekers in the Expedited Removal process that we interviewed who currently were participating in ISAP complained about the conditions that were imposed on them. That is, in discussions with a small number of persons enrolled in the program in the Miami area, complaints were expressed to the effect that unrealistic limits were set on times and distances that they could travel that, in turn, restricted or prevented participants from working and otherwise engaging in normal daily routines.

The use of monitoring devices such as ankle bracelets also constitutes a form of criminalizing post-credible fear asylum seekers—albeit on a more mild basis than detention in jail-like settings. The issue of whether ISAP (with or without electronic monitoring) is being

---

[38] In September, 2002, an Electronic Monitoring Device Program (EMD) contract was awarded to ADT, and initially piloted in Anchorage, Detroit, Miami, Seattle, Portland, Orlando, and Chicago. On March 22, 2004, an ISAP contract was awarded to Behavioral Interventions, Inc., of Boulder, Colorado, providing for the community supervision of up to 1600 aliens. A total of 8 ICE field offices—in Baltimore, Philadelphia, Miami, St. Paul, Denver, Kansas City, San Francisco, and Portland—have implemented this program.

IFR_AR_008377

used with asylum seekers who would otherwise qualify for and likely have been granted parole without any such conditions merits further study.[39] That is, it is important to determine whether alternatives to detention (such as electronic monitoring) are being used as genuine alternatives to detention—in which case they would lessen the criminalization of this population of asylum seekers, and reduce the psychological risks of incarceration for them. If, on the other hand, these programs actually are being implemented as alternatives to parole, then they are extending potential criminalizing and other adverse effects to persons who would not otherwise be subjected to them.

---

[39] "Parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct…" Office of Field Operations Memorandum, December 30, 1997.

APPENDICES

**Appendix A**: Facilities in Sample

| FACILITY NAME | LOCATION | Managed By |
|---|---|---|
| **Etowah County Jail** | Gadsen, Alabama | Local Gov't |
| **Florence SPC** | Florence, Arizona | DHS |
| **Otay Mesa** | Otay Mesa, California | Corrections Corporation of America |
| **Mira Loma** | Lancaster, California | Los Angeles County Sheriffs |
| **Oakland City Jail** | Oakland, California | Local Gov't |
| **San Pedro SPC** | San Pedro, California | DHS |
| **Yuba County Jail** | St. Marysville, California | Local Gov't |
| **Krome SPC** | Miami, Florida | DHS |
| **Broward Transitional Center** | Pompano Beach, Florida | Global Expertise in Outsourcing (formerly Wackenhut) |
| **Tri-County Jail** | Ullin, Illinois | Local Gov't |
| **Orleans Parish Jail** | New Orleans, Louisiana | Local Gov't |
| **Tensas Parish Detention Center** | Waterproof, Louisiana | Emerald Correctional Management |
| **Elizabeth Contract** | Elizabeth, New Jersey | Corrections Corporation of America |
| **Queens Contract** | Queens, New York | Global Expertise in Outsourcing (formerly Wackenhut) |
| **Berks Family Shelter** | Leesport, Pennsylvania | Local Gov't (County) |
| **Aguadilla SPC** | Aguadilla, Puerto Rico | DHS |
| **Guaynabo** | Guaynabo, Puerto Rico | Fed. Gov't (Bureau of Prisons) |
| **Laredo Contract Detention Facility** | Laredo, Texas | Corrections Corporation of America |
| **Port Isabel SPC** | Los Fresnos, Texas | DHS |
| **Arlington County Jail** | Arlington, Virginia | Local Gov't |
| **Piedmont Regional Jail** | Farmville, Virginia | Local Gov't |
| **Ozaukee County Jail** | Ozaukee, Wisconsin | Local Gov't |

**Ozaukee, Guaynabo, and Orleans did not complete interviews (Ozaukee refused.)

IFR_AR_008379

**Appendix B**: Facilities Actually Surveyed and Those Visited by Commission Experts

In alphabetical order, the 19 facilities that were surveyed were:

Aguadilla SPC (Puerto Rico)

Arlington County Jail (Virginia)

Berks County Family Shelter (Pennsylvania)

Broward Transitional Center (Florida)

Elizabeth Detention Center (New Jersey)

Etowah County Jail (Alabama)

Florence Staging Facility (Arizona)

Krome SPC (Florida)

Laredo Contract Detention Facility (Texas)

Mira Loma (California)

Oakland City Jail (California)

Otay Mesa Detention Facility (California)

Piedmont Regional Jail (Virginia)

Port Isabel (Texas)

Queens Contract Detention Facility (New York)

San Pedro SPC (California)

Tensas Parish Detention Center (Louisiana)

Tri-County Jail (Illinois)

Yuba County Detention Facility (California)

IFR_AR_008380

In alphabetical order, the 18 facilities visited by Commission experts:

Aguadilla, Puerto Rico

Broward Detention Center, Miami, Florida

Comfort Inn, Miami, Florida

Elizabeth Contract Detention Center, Elizabeth, New Jersey

Florence SPC, Florence, Arizona

Guaynabo-MDC, Puerto Rico

Kenosha County Jail, Kenosha, Wisconsin

Krome, SPC, Miami, Florida

Laredo Contract Detention Center, Laredo, Texas

Mira Loma Detention Facility, Lancaster, California

Oakland County Jail, Oakland, California

Otay Mesa Detention Facility (CCA), San Diego, California

Piedmont Regional Jail, Farmville, Virginia

Queens New York Contract Facility

San Pedro Detention Facility, San Pedro, California

Yuba City Jail, Yuba City, California

In addition, Office of Refugee Resettlement (ORR) juvenile contract facilities in Chicago, Illinois, and San Diego, California.

IFR_AR_008381

**Appendix C:**

<u>DETENTION CENTER QUESTIONNAIRE</u>          **Researcher Name:** _____

**NAME OF FACILITY:**

**ADDRESS OF FACILITY:**

**POINT OF CONTACT:**
(E-mail, telephone number)

**TYPE OF FACILITY:**          Local Jail
(Circle One)          State Prison
          Federal Prison
          Private Contract Facility (Contractor name:
          _____)
          Run by DHS ("Service Processing Center")

**Number of Beds at Facility:**
(A) Number of beds for alien men in DHS custody:
(B) Number of beds for alien women in DHS custody:
(C) Number of beds for men who are NOT in DHS custody (specify whose custody they are in if not DHS (US Marshall's Service, Local, State of Federal Prison system, etc.):
(D) Number of beds for women not in DHS custody (specify):

**Cost charged to DHS per detainee per night:** _____

**Nature of Population at Facility (check all that apply):**
☐  Alien men **without** known criminal convictions
☐  Alien women **without** known criminal convictions
☐  Criminal alien men (detained post conviction for administrative purposes, not serving
   time)
☐  Criminal alien women
☐  Criminal men serving sentences or awaiting trial
☐  Criminal women serving sentences or awaiting trial

**(IF THERE ARE ANY MEN HOUSED AT FACILITY) If facility has criminals serving time or individuals awaiting trial, to what extent do male convicts and male non-criminal aliens intermingle?**
☐  Share sleeping quarters

IFR_AR_008382

☐ Housed separately, no interaction.
☐ Housed separately, but some interaction (specify: at rec time, meal time, or other)

**(IF THERE ARE ANY MEN HOUSED AT FACILITY)If facility has criminal aliens detained post conviction, to what extent do male criminal aliens and non-criminal male aliens intermingle?**
☐ Share sleeping quarters
☐ Housed separately, no interaction.
☐ Housed separately, but some interaction (specify: at rec time, meal time, or other)

**(IF THERE ARE ANY WOMEN HOUSED AT FACILITY) If facility has criminals serving time or individuals awaiting trial, to what extent do female convicts and female non-criminal aliens intermingle?**
☐ Share sleeping quarters
☐ Housed separately, no interaction.
☐ Housed separately, but some interaction (specify: at rec time, meal time, or other)

**(IF THERE ARE ANY WOMEN HOUSED AT FACILITY)If facility has criminal aliens detained post conviction, to what extent do female criminal aliens and non-criminal female aliens intermingle?**
☐ Share sleeping quarters
☐ Housed separately, no interaction.
☐ Housed separately, but some interaction (specify: at rec time, meal time, or other)

**<u>ASYLUM-SPECIFIC QUESTIONS:</u>**

**Are the guards at the facility aware of who is an asylum seeker or who is not?**
☐ Guards are told who is an asylum seeker (credible fear) and who is not.
**Explain:**

☐ Guards are not specifically told who is seeking asylum and who is not, but they generally know.
**Explain:**

☐ Guards do not generally know who is seeking asylum and who is not.

**Do guards receive any special training on dealing with:**

   (A) Asylum seekers
   (B) Victims of torture and trauma?

**Explain**:

IFR_AR_008383

**Do other personnel at the facility receive such training?  Explain:**

**Are aliens with convictions for immigration related offenses such as Entry Without Inspection or Use of False Documents treated as "criminal aliens" at the facility?**
☐ Yes, they are housed with criminal aliens
☐ Yes, they are not permitted to reside at the facility because this facility does not house criminal aliens
☐ No, aliens with immigration-related offenses such as those are not regarded as "criminal aliens" by this facility

## I.    SECURITY, SURVEILLANCE, AND "PUNISHMENT"

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| How many security barriers (locked gates and/or doors) have to be opened from the outside by staff in order to reach the detainee's housing units? | | |
| | | |
| Are restrictions placed on who can enter a detainee's cell or individual housing area?  Is access to the housing units themselves restricted? | | YES |
| | | |
| Are in-cell or housing unit counts preformed? How often? | | YES |
| | | |
| Does the staff conduct strip searches or other kinds of invasive | | YES |

IFR_AR_008384

| | | |
|---|---|---|
| **searches during in processing of the detainees?** | | |
| | | |
| **Are detainees ever strip-searched for security purposes? Under what circumstances?** | | YES |
| | | |
| **Are searches of the detainees' general living areas performed? Under what circumstances and how often?** | | YES |
| | | |
| **Are there fixed and secure guard stations in the detainees' housing units?** | | YES |
| | | |
| **Is there constant sight and sound surveillance in the detainees' housing units?** | | YES |
| | | |
| **Are there surveillance cameras in use within the detainees' housing units? Where?** | | YES |
| | | |
| **Are there surveillance cameras anywhere else within the facility? Where?** | | YES |
| | | |
| **Is there 24-hour surveillance lighting anywhere in the facility?** | | YES |
| | | |
| **Are physical restraints used with detainees? Under what circumstances?** | | YES |

IFR_AR_008385

| | | |
|---|---|---|
| **Are detainees ever placed in isolation/ segregation for disciplinary reasons? What kind of problems?** | | YES |

II.   ABILITY TO MOVE ABOUT WITHIN DETENTION

| **ATTRIBUTE OF CONFINEMENT** | **TREATMENT OF ASYLUM SEEKERS** | JAIL |
|---|---|---|
| **Are restrictions placed on detainees' movements outside of their housing units? Please explain any such limitations.** | | YES |
| **Is detainee access to non-assigned housing units or living areas limited?  If so, how?** | | YES |
| **Are escorts required when detainees move through the facility? When?** | | YES |
| **Is detainee access to the dayroom restricted?  How?  Are escorts required for access to day rooms?** | | YES |

III.    HOUSING AND LIVING SPACE CONDITIONS

| **ATTRIBUTE OF CONFINEMENT** | **TREATMENT OF ASYLUM SEEKERS** | JAIL |
|---|---|---|
| **Do detainees have access to private, individual toilets with no one else  present?** | | NO |
| | | |

IFR_AR_008386

| | | |
|---|---|---|
| **Do detainees have the use of private individual showers where no one else is present?** | | NO |
| | | |
| **Do detainees have opportunities to be alone in their cells or rooms?** | | NO |
| | | |
| **Are restrictions placed on the detainees' ability to personalize/decorate their living quarters? If so, what?** | | YES |
| | | |
| **May detainees wear their own street clothes? (Please describe uniforms or other standard-issue clothing.)** | | NO |
| | | |
| **Are different uniforms or colors issued to different classes of detainees? (Please explain color coding)** | | YES |
| | | |
| **Can detainees have personal hygiene items that are not provided by the government or sold at the commissary (canteen)? (If yes, are there any limitations on such items?)** | | NO |
| | | |
| **Are there any limitations placed on detainees' ability to purchase items at the commissary? (Please explain any limitations.)** | | YES |

IFR_AR_008387

IV.    OCCUPATIONAL, RECREATIONAL, EDUCATIONAL, RELIGIOUS, AND LEGAL

OPPORTUNITIES

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| Is detainee access to the law library restricted? (Eg: time restrictions, printing restrictions, etc.) | | YES |
| | | |
| Do detainees have access to the internet? If so, are there any restrictions? | | NO |
| | | |
| Are "Know Your Rights" presentations conducted at the Detention Center? If so, by whom (detention center or NGO) and how often? | | |
| | | |
| Are copies of Know Your Rights handouts issued to or made available to detainees? In what languages?  *REQUEST A COPY of handbook and list of pro bono representatives and attorneys that aliens receive | | |
| | | |
| What type of outdoor recreation do detainees receive? (Where, how often, and confined or escort??) | | |

IFR_AR_008388

| What programming opportunities (eg: education classes, vocational training) are provided to the detainees? | | |
|---|---|---|
| | | |
| Are detainees allowed to work?  If so, are they paid for their work?  How much? | | YES |
| | | |
| Religious Services:<br><br>Please describe religious opportunities for detainees: | Check all that apply:<br>☐ Full-time chaplain or other clergy at facility<br>☐ Part-time chaplain or other clergy at facility<br>☐ Weekly services at facility (specify denomination(s):<br>☐ Holiday services at facility (specify denominations:)<br>☐ Detainees permitted to travel escorted to off-site religious services on holidays (explain):<br>☐ Detainees permitted to travel unescorted to off-site religious services on holidays (explain):<br>☐ Detainees permitted to travel unescorted to off-site religious services weekly (explain):<br>☐ Detainees permitted to travel escorted to off-site religious services weekly (explain):<br>☐ Other on site-regularly scheduled religious services – explain:<br>☐ Other on-site ad hoc scheduled religious services – explain<br>☐ Special Religious Diets Accommodated (kosher/halal/vegetarian) Y/N EXPLAIN: | |

V.      HEALTH ISSUES (Mental Health, Doctor, Dentist)

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| Is segregation or isolation used when a detainee may be suicidal?  If not, what is done in this situation? | | YES |
| | | |
| How many fulltime | | |

IFR_AR_008389

| | | |
|---|---|---|
| **mental health staff do detainees have access to at the facility where they are confined?** | | |
| | | |
| **Is there a mandatory mental health assessment at intake?** | | |
| | | |
| **Are services available upon request of the detainee?** | | |
| | | |
| **Do mental health personnel make regular rounds or must a detainee ask for assessment?** | | |
| | | |
| **What kind of fulltime medical staff is available to detainees?** | | |
| | | |
| **Is there a mandatory medical health assessment at intake?** | | |
| | | |
| **Do detainees have access to dental staff at the facility?** | | |

## VI.    VISITS, PHONECALLS, AND CORRESPONDENCE

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| **Are limitations placed on the frequency and length of visits detainees are allowed to have?  What are they?** | | YES |
| | | |
| **Are limitations placed on the length and frequency of ATTORNEY visits?** | | |

IFR_AR_008390

| | | |
|---|---|---|
| **What are they?** | | |
| | | |
| **Are detainees allowed to have contact visits? Under what circumstances? Limitations?** | | NO |
| | | |
| **Are detainees permitted to place telephone calls?  Are calls limited in frequency and duration?** | | YES<br>YES |
| | | |
| **Are calls to lawyers treated differently than other calls?** | | |
| | | |
| **How are telephone calls paid for and at what rate?** | | |
| | | |
| **What limitations are placed on detainees' rights to send and receive correspondence?  Is correspondence to lawyers treated any differently?** | | |
| | | |
| **At what rate are indigents allowed to send correspondence?** | | |

IFR_AR_008391

**Appendix D**

I.    SECURITY, SURVEILLANCE, AND "PUNISHMENT"

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| **Multiple security barriers (locked gates and/or doors) must be traversed to reach the detainee's housing unit** | 95% | YES |
| | | |
| **Restrictions are placed on access to cells or individual housing areas** | 95% | YES |
| | | |
| **Multiple in-cell or housing unit counts are performed** | 95% | YES |
| | | |
| **Staff conducts strip searches or other kinds of invasive searches during in-processing** | 74% | YES |
| | | |
| **Detainees are subjected to strip-searches for security purposes** | 84% | YES |
| | | |
| **Regular searches of the detainees' general living areas are performed** | 100% | YES |
| | | |
| **There are fixed and secure guard stations in the detainees' housing units** | 84% | TYPICALLY |
| | | |
| **There is constant sight and/or sound surveillance in the detainees' housing units** | 95% | YES |

IFR_AR_008392

| | | |
|---|---|---|
| **There are surveillance cameras in use within the detainees' housing units** | 74% | TYPICALLY |
| | | |
| **There are surveillance cameras in use in other areas of the facility** | 95% | TYPICALLY |
| | | |
| **There is 24-hour surveillance lighting elsewhere in the facility** | 100% | TYPICALLY |
| | | |
| **Physical restraints used with detainees** | 95% | YES |
| | | |
| **Detainees may be placed in isolation/ segregation for disciplinary reasons** | 84% | TYPICALLY |
| | | |

II.    ALIEN'S ABILITY TO MOVE ABOUT WITHIN DETENTION

| **ATTRIBUTE OF CONFINEMENT** | **TREATMENT OF ASYLUM SEEKERS** | <u>JAIL</u> |
|---|---|---|
| **Restrictions are placed on detainees' movement outside of their housing units.** | 90% | YES |
| | | |
| **Detainee have restricted access to non-assigned housing units or living areas** | 79% | YES |
| | | |
| **Escorts are required when detainees move through the facility** | 90% | YES |
| | | |

IFR_AR_008393

### III.    HOUSING AND LIVING SPACE CONDITIONS

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| Detainees lack access to private, individual toilets where no one else is present | 79% | VARIES |
| | | |
| Detainees lack private individual showers where no one else is present | 74% | YES |
| | | |
| Detainees lack opportunities to be alone in their cells or rooms | 79% | VARIES |
| | | |
| Restrictions are placed on the detainees' ability to personalize/decorate their living quarters | 79% | VARIES |
| | | |
| Detainees wear uniforms rather than their own street clothes | 84% | YES |
| | | |
| Detainees are prohibited from having personal hygiene items that are not provided by the government or sold at the commissary or canteen | 90% | YES |
| | | |

### IV.    OCCUPATIONAL, RECREATIONAL, EDUCATIONAL, RELIGIOUS, AND LEGAL OPPORTUNITIES

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| Detainee access to the law library is restricted | | YES |

IFR_AR_008394

|  | 74% |  |
|---|---|---|
|  |  |  |
| **Detainees are denied any access to the internet** | 100% | YES |
|  |  |  |
| **Detainees have only restricted access to outdoor recreation** | 84% | YES |
|  |  |  |
| **Detainees are restricted to outside exercise in areas that are circumscribed and confined, with security restrictions** | 83% | YES |
|  |  |  |
| **Detainees are prohibited from meaningful programming opportunities (e.g., education classes, vocational training)** | 58% | VARIES |
|  |  |  |
| **Detainees are permitted to work but are paid nothing or a trivial amount (e.g., $1/day) for their labor** | 90% | VARIES |

V.    MENTAL AND MEDICAL HEALTH ISSUES

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| **Facility fails to provide for routine mental health monitoring so that even those detainees who do not request services are** | 90% | TYPICALLY |

IFR_AR_008395

| | | |
|---|---|---|
| **seen periodically by mental health staff** | | |
| | | |
| **Mental health contact is limited by the absence of a full-time psychologist or psychiatrist** | 74% | VARIES |
| | | |
| **Custody staff lacks specialized training to recognize and address unique mental health needs of detainee population** | 95% | YES |
| | | |
| **Medical care is limited by the absence of a full-time physician** | 58% | VARIES |

VI.    VISITS, PHONECALLS, AND CORRESPONDENCE

| ATTRIBUTE OF CONFINEMENT | TREATMENT OF ASYLUM SEEKERS | JAIL |
|---|---|---|
| **Limitations are placed on the frequency and length of visits that detainees may have** | 95% | YES |
| | | |
| **Detainees are prohibited from having contact visits with family and friends** | 58% | TYPICALLY |
| | | |
| **Limitations are placed on detainees' rights to send and receive correspondence** | 100% | YES |

IFR_AR_008396

# Appendix E

**Detention of Refugees and Asylum-Seekers**
Date: 13 Oct 1986 | Executive Committee Conclusions
Document symbol: No. 44 (XXXVII) - 1986



The Executive Committee,

Recalling Article 31 of the 1951 Convention relating to the Status of Refugees.

Recalling further its Conclusion No. 22 (XXXII) on the treatment of asylum-seekers in situations of large-scale influx, as well as Conclusion No. 7 (XXVIII), paragraph (e), on the question of custody or detention in relation to the expulsion of refugees lawfully in a country, and Conclusion No. 8 (XXVIII), paragraph (e), on the determination of refugee status.

Noting that the term "refugee" in the present Conclusions has the same meaning as that in the 1951 Convention and the 1967 Protocol relating to the Status of Refugees, and is without prejudice to wider definitions applicable in different regions.

(a)    Noted with deep concern that large numbers of refugees and asylum-seekers in different areas of the world are currently the subject of detention or similar restrictive measures by reason of their illegal entry or presence in search of asylum, pending resolution of their situation;

(b)    Expressed the opinion that in view of the hardship which it involves, detention should normally be avoided. If necessary, detention may be resorted to only on grounds prescribed by law to verify identity; to determine the elements on which the claim to refugee status or asylum is based; to deal with cases where refugees or asylum-seekers have destroyed their travel and/or identity documents or have used fraudulent documents in order to mislead the authorities of the State in which they intend to claim asylum; or to protect national security or public order;

(c)    Recognized the importance of fair and expeditious procedures for determining refugee status or granting asylum in protecting refugees and asylum-seekers from unjustified or unduly prolonged detention;

(d)    Stressed the importance for national legislation and/or administrative practice to make the necessary distinction between the situation of refugees and asylum-seekers, and that of other aliens;

(e)    Recommended that detention measures taken in respect of refugees and asylum-seekers should be subject to judicial or administrative review;

(f)    Stressed that conditions of detention of refugees and asylum seekers must be humane. In particular, refugees and asylum-seekers shall, whenever possible, not be accommodated with persons detained as common criminals, and shall not be located in areas where their physical safety is endangered;

(g)    Recommended that refugees and asylum-seekers who are detained be provided with the opportunity to contact the Office of the United Nations High Commissioner for Refugees or, in the absence of such office, available national refugee assistance agencies;

(h)    Reaffirmed that refugees and asylum-seekers have duties to the country in which they find themselves, which require in particular that they conform to its laws and regulations as well as to measures taken for the maintenance of public order;

(i)    Reaffirmed the fundamental importance of the observance of the principle of non-refoulement and in this context recalled the relevance of Conclusion No. 6 (XXVIII).

IFR_AR_008397

**Appendix F**



**OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES GENEVA**

# UNHCR REVISED GUIDELINES ON APPLICABLE CRITERIA AND STANDARDS RELATING TO THE DETENTION OF ASYLUM SEEKERS[1]

## (February 1999)

### Introduction

1. The detention of asylum-seekers is, in the view of UNHCR inherently undesirable. This is even more so in the case of vulnerable groups such as single women, children, unaccompanied minors and those with special medical or psychological needs. Freedom from arbitrary detention is a fundamental human right and the use of detention is, in many instances, contrary to the norms and principles of international law.

2. Of key significance to the issue of detention is Article 31 of the 1951 Convention[2]. Article 31 exempts refugees coming directly from a country of persecution from being punished on account of their illegal entry or presence, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence. The Article also provides that Contracting States shall not apply to the movements of such refugees restrictions other than those which are **necessary,** and that any restrictions shall only be applied until such time as their status is regularised**,** or they obtain admission into another country.

3. Consistent with this Article, detention should only be resorted to in cases of **necessity**. The detention of asylum-seekers who come "directly" in an irregular manner should, therefore, not be automatic, or unduly prolonged. This provision applies not only to recognised refugees but also to asylum-seekers pending determination of their illegal status, or presence. The Article also provides that recognition of refugee status does not make an individual a refugee but declares him to be one. Conclusion No. 44(XXXVII) of the Executive Committee on the Detention of Refugees and Asylum-Seekers examines more concretely what is meant by the term "**necessary**". This Conclusion also provides guidelines to States on the use of detention and recommendations as to certain procedural guarantees to which detainees should be entitled.

IFR_AR_008398

4. The expression "**coming directly**" in Article 31(1), covers the situation of a person who enters the country in which asylum is sought directly from the country of origin, or from another country where his protection, safety and security could not be assured. It is understood that this term also covers a person who transits an intermediate country for a short period of time without having applied for, or received, asylum there. No strict time limit can be applied to the concept "**coming directly**" and each case must be judged on its merits. Similarly, given the special situation of asylum-seekers, in particular the effects of trauma, language problems, lack of information, previous experiences which often result in a suspicion of those in authority, feelings of insecurity, and the fact that these and other circumstances may vary enormously from one asylum seeker to another, there is no time limit which can be mechanically applied or associated with the expression "**without delay**". The expression "**good cause**", requires a consideration of the circumstances under which the asylum-seeker fled. The term "asylum-seeker" in these guidelines applies to those whose claims are being considered under an admissibility or pre-screening procedure as well as those who are being considered under refugee status determination procedures. It also includes those exercising their right to seek judicial and/or administrative review of their asylum request.

5. Asylum-seekers are entitled to benefit from the protection afforded by various International and Regional Human Rights instruments which set out the basic standards and norms of treatment. Whereas each State has a right to control those entering into their territory, these rights must be exercised in accordance with a prescribed law which is accessible and formulated with sufficient precision for the regulation of individual conduct. For detention of asylum-seekers to be lawful and not arbitrary, it must comply not only with the applicable national law, but with Article 31 of the Convention and international law. It must be exercised in a non-discriminatory manner and must be subject to judicial or administrative review to ensure that it continues to be necessary in the circumstances, with the possibility of release where no grounds for its continuation exist.3

6. Although these guidelines deal specifically with the detention of asylum-seekers the issue of the detention of stateless persons needs to be highlighted.4   While the majority of stateless persons are not asylum-seekers, a paragraph on the detention of stateless persons is included in these guidelines in recognition of UNHCR's formal responsibilities for this group and also because the basic standards and norms of treatment contained in international human rights instruments applicable to detainees generally should be applied to both asylum-seekers and stateless persons. The inability of stateless persons who have left their countries of habitual residence to return to them, has been a reason for unduly prolonged or arbitrary detention of these persons in third countries. Similarly, individuals whom the State of nationality refuses to accept back on the basis that nationality was withdrawn or lost while they were out of the country, or who are not acknowledged as nationals without proof of nationality, which in the circumstances is difficult to acquire, have also been held in prolonged or indefinite detention only because the question of where to send them remains unresolved.

**Guideline 1: Scope of the Guidelines.**

IFR_AR_008399

These guidelines apply to all asylum-seekers who are being considered for, or who are in, detention or detention-like situations. For the purpose of these guidelines, UNHCR considers detention as: **confinement within a narrowly bounded or restricted location, including prisons, closed camps, detention facilities or airport transit zones, where freedom of movement is substantially curtailed, and where the only opportunity to leave this limited area is to leave the territory**. There is a qualitative difference between detention and other restrictions on freedom of movement.

Persons who are subject to limitations on domicile and residency are not generally considered to be in detention.

When considering whether an asylum-seeker is in detention, the cumulative impact of the restrictions as well as the degree and intensity of each of them should also be assessed.

**Guideline 2: General Principle**

**As a general principle asylum-seekers should not be detained.**

According to Article 14 of the Universal Declaration of Human Rights, the right to seek and enjoy asylum is recognised as a basic human right. In exercising this right asylum-seekers are often forced to arrive at, or enter, a territory illegally. However the position of asylum-seekers differs fundamentally from that of ordinary immigrants in that they may not be in a position to comply with the legal formalities for entry. This element, as well as the fact that asylum-seekers have often had traumatic experiences, should be taken into account in determining any restrictions on freedom of movement based on illegal entry or presence.

**Guideline 3: Exceptional Grounds for Detention.**

Detention of asylum-seekers may exceptionally be resorted to for the reasons set out below as long as this is clearly prescribed by a national law which is in conformity with general norms and principles of international human rights law. These are contained in the main human rights instruments.5

There should be a presumption against detention. Where there are monitoring mechanisms which can be employed as viable alternatives to detention, (such as reporting obligations or guarantor requirements [see Guideline 4]), these should be applied **first** unless there is evidence to suggest that such an alternative will not be effective in the individual case. Detention should therefore only take place after a full consideration of all possible alternatives, or when monitoring mechanisms have been demonstrated not to have achieved the lawful and legitimate purpose.

In assessing whether detention of asylum-seekers is necessary, account should be taken of whether it is reasonable to do so and whether it is proportional to the objectives to be achieved. If judged necessary it should only be imposed in a non discriminatory manner for a minimal period.6

IFR_AR_008400

The permissible exceptions to the general rule that detention should normally be avoided must be prescribed by law. In conformity with EXCOM Conclusion No. 44 (XXXVII) the detention of asylum-seekers may only be resorted to, if **necessary:**

**(I) to verify identity.**

This relates to those cases where identity may be undetermined or in dispute.

**(ii) to determine the elements on which the claim for refugee status or asylum is based.**

This statement means that the asylum-seeker may be detained exclusively for the purposes of a preliminary interview to identify the basis of the asylum claim.7 This would involve obtaining essential facts from the asylum-seeker as to why asylum is being sought and would not extend to a determination of the merits or otherwise of the claim. This exception to the general principle cannot be used to justify detention for the entire status determination procedure, or for an unlimited period of time.

**(iii) in cases where asylum-seekers have destroyed their travel and /or identity documents or have used fraudulent documents in order to mislead the authorities of the State, in which they intend to claim asylum.**

What must be established is the absence of good faith on the part of the applicant to comply with the verification of identity process. As regards asylum-seekers using fraudulent documents or travelling with no documents at all, detention is only permissible when there **is an intention** to mislead, or a refusal to co-operate with the authorities. Asylum-seekers who arrive without documentation because they are unable to obtain any in their country of origin should not be detained solely for that reason.

**(iv) to protect national security and public order.**

This relates to cases where there is evidence to show that the asylum-seeker has criminal antecedents and/or affiliations which are likely to pose a risk to public order or national security should he/she be allowed entry.

Detention of asylum-seekers which is applied for purposes other than those listed above, for example, as part of a policy to deter future asylum-seekers, or to dissuade those who have commenced their claims from pursuing them, is contrary to the norms of refugee law. It should not be used as a punitive or disciplinary measure for illegal entry or presence in the country. Detention should also be avoided for failure to comply with the administrative requirements or other institutional restrictions related residency at reception centres, or refugee camps. Escape from detention should not lead to the automatic discontinuation of the asylum procedure, or to return to the country of origin, having regard to the principle of non- refoulement.8

**Guideline 4: Alternatives to Detention**.

IFR_AR_008401

Alternatives to the detention of an asylum-seeker until status is determined should be considered. The choice of an alternative would be influenced by an individual assessment of the personal circumstances of the asylum-seeker concerned and prevailing local conditions.

Alternatives to detention which may be considered are as follows:

**(i) Monitoring Requirements.**

<u>Reporting Requirements</u>: Whether an asylum-seeker stays out of detention may be conditional on compliance with periodic reporting requirements during the status determination procedures. Release could be on the asylum-seeker's own recognisance, and/or that of a family member, NGO or community group who would be expected to ensure the asylum-seeker reports to the authorities periodically, complies with status determination procedures, and appears at hearings and official appointments.

<u>Residency Requirements</u>: Asylum-seekers would not be detained on condition they reside at a specific address or within a particular administrative region until their status has been determined. Asylum-seekers would have to obtain prior approval to change their address or move out of the administrative region. However this would not be unreasonably withheld where the main purpose of the relocation was to facilitate family reunification or closeness to relatives. <u>9</u>

**(ii) Provision of a Guarantor/ Surety.** Asylum seekers would be required to provide a guarantor who would be responsible for ensuring their attendance at official appointments and hearings, failure of which a penalty most likely the forfeiture of a sum of money, levied against the guarantor.

**(iii) Release on Bail.** This alternative allows for asylum-seekers already in detention to apply for release on bail, subject to the provision of recognisance and surety. For this to be genuinely available to asylum-seekers they must be informed of its availability and the amount set must not be so high as to be prohibitive.

**(iv) Open Centres.** Asylum-seekers may be released on condition that they reside at specific collective accommodation centres where they would be allowed permission to leave and return during stipulated times.

These alternatives are not exhaustive. They identify options which provide State authorities with a degree of control over the whereabouts of asylum-seekers while allowing asylum-seekers basic freedom of movement.

**Guideline 5: Procedural Safeguards.**<u>10</u>

If detained, asylum-seekers should be entitled to the following minimum procedural guarantees:

IFR_AR_008402

(i)  to receive prompt and full communication of any order of detention, together with the reasons for the order, and their rights in connection with the order, in a language and in terms which they understand;

(ii)  to be informed of the right to legal counsel. Where possible, they should receive free legal assistance;

(iii)  to have the decision subjected to an automatic review before a judicial or administrative body independent of the detaining authorities. This should be followed by regular periodic reviews of the necessity for the continuation of detention, which the asylum-seeker or his representative would have the right to attend;

(iv)  either personally or through a representative, to challenge the necessity of the deprivation of liberty at the review hearing, and to rebut any findings made. Such a right should extend to all aspects of the case and not simply the executive discretion to detain;

(v)  to contact and be contacted by the local UNHCR Office, available national refugee bodies or other agencies and an advocate. The right to communicate with these representatives in private, and the means to make such contact should be made available.

Detention should not constitute an obstacle to an asylum-seekers' possibilities to pursue their asylum application.

**Guideline 6: Detention of Persons under the Age of 18 years.**11

In accordance with the general principle stated at Guideline 2 and the UNHCR Guidelines on Refugee Children, **minors who are asylum-seekers should <u>not</u> be detained.**

In this respect particular reference is made to the Convention on the Rights of the Child in particular:

- Article 2 which requires that States take all measures appropriate to ensure that children are protected from all forms of discrimination or punishment on the basis of the status, activities, expressed opinions, or beliefs of the child's parents, legal guardians or family members;

- Article 3 which provides that in any action taken by States Parties concerning children, the best interests of the child shall be a primary consideration;

- Article 9 which grants children the right not to be separated from their parents against their will;

- Article 22 which requires that States Parties take appropriate measures to ensure that minors who are seeking refugee status or who are recognised refugees, whether accompanied or not, receive appropriate protection and assistance;

- Article 37 by which States Parties are required to ensure that the detention of minors be

used only as a measure of last resort and for the shortest appropriate period of time.

Unaccompanied minors should not, as a general rule, be detained. Where possible they should be released into the care of family members who already have residency within the asylum country. Where this is not possible, alternative care arrangements should be made by the competent child care authorities for unaccompanied minors to receive adequate accommodation and appropriate supervision. Residential homes or foster care placements may provide the necessary facilities to ensure their proper development, (both physical and mental), is catered for while longer term solutions are being considered.

All appropriate alternatives to detention should be considered in the case of children accompanying their parents. Children and their primary caregivers should not be detained unless this is the only means of maintaining family unity.

If none of the alternatives can be applied and States do detain children, this should, in accordance with Article 37 of the Convention on the Rights of the Child, be as a measure of last resort, and for the shortest period of time.

If children who are asylum-seekers are detained at airports, immigration-holding centres or prisons, they must not be held under prison- like conditions. All efforts must be made to have them released from detention and placed in other accommodation. If this proves impossible, special arrangements must be made for living quarters which are suitable for children and their families.

During detention, children have a right to education which should optimally take place outside the detention premises in order to facilitate the continuation of their education upon release. Provision should be made for their recreation and play which is essential to a child's mental development and will alleviate stress and trauma.

Children who are detained, benefit from the same minimum procedural guarantees (listed at Guideline 5) as adults. A legal guardian or adviser should be appointed for unaccompanied minors.12

**Guideline 7: Detention of Vulnerable Persons.**

Given the very negative effects of detention on the psychological well being of those detained, active consideration of possible alternatives should precede any order to detain asylum-seekers falling within the following vulnerable categories:13

Unaccompanied elderly persons.

Torture or trauma victims.

Persons with a mental or physical disability.

IFR_AR_008404

In the event that individuals falling within these categories are detained, it is advisable that this should only be on the certification of a qualified medical practitioner that detention will not adversely affect their health and well being. In addition there must be regular follow up and support by a relevant skilled professional. They must also have access to services, hospitalisation, medication counselling etc. should it become necessary.

**Guideline 8: Detention of Women.**

Women asylum-seekers and adolescent girls, especially those who arrive unaccompanied, are particularly at risk when compelled to remain in detention centres. As a general rule the detention of pregnant women in their final months and nursing mothers, both of whom may have special needs, should be avoided.

Where women asylum-seekers are detained they should be accommodated separately from male asylum-seekers, unless these are close family relatives. In order to respect cultural values and improve the physical protection of women in detention centres, the use of female staff is recommended.

Women asylum-seekers should be granted access to legal and other services without discrimination as to their gender,14 and specific services in response to their special needs15. In particular they should have access to gynaecological and obstetrical services.

**Guideline 9: Detention of Stateless Persons.**

Everyone has the right to a nationality and the right not to be arbitrarily deprived of their nationality.16

Stateless persons, those who are not considered to be nationals by any State under the operation of its law, are entitled to benefit from the same standards of treatment as those in detention generally.17 Being stateless and therefore not having a country to which automatic claim might be made for the issue of a travel document should not lead to indefinite detention. Statelessness cannot be a bar to release. The detaining authorities should make every effort to resolve such cases in a timely manner, including through practical steps to identify and confirm the individual's nationality status in order to determine which State they may be returned to, or through negotiations with the country of habitual residence to arrange for their re-admission.

In the event of serious difficulties in this regard, UNHCR's technical and advisory service pursuant to its mandated responsibilities for stateless persons may, as appropriate, be sought.

**Guideline 10: Conditions of Detention**18

Conditions of detention for asylum-seekers should be humane with respect shown for the inherent dignity of the person. They should be prescribed by law.

Reference is made to the applicable norms and principles of international law and standards on the treatment of such persons. Of particular relevance are the 1988 UN Body of Principles for the

IFR_AR_008405

Protection of all Persons under any form of Detention or Imprisonment, 1955 UN Standard Minimum Rules for the Treatment of Prisoners, and the 1990 UN Rules for the Protection of Juveniles Deprived of their Liberty.

The following points in particular should be emphasised:

(i)  the initial screening of all asylum seekers at the outset of detention to identify trauma or torture victims, for treatment in accordance with Guideline 7.

(ii)  the segregation within facilities of men and women; children from adults(unless these are relatives);

(iii).  the use of separate detention facilities to accommodate asylum-seekers. The use of prisons should be avoided. If separate detention facilities are not used, asylum-seekers should be accommodated separately from convicted criminals or prisoners on remand. There should be no co-mingling of the two groups;

(iv)  the opportunity to make regular contact and receive visits from friends, relatives, religious, social and legal counsel. Facilities should be made available to enable such visits. Where possible such visits should take place in private unless there are compelling reasons to warrant the contrary;

(v)  the opportunity to receive appropriate medical treatment, and psychological counselling where appropriate;

(vi)  the opportunity to conduct some form of physical exercise through daily indoor and outdoor recreational activities;

(vii)  the opportunity to continue further education or vocational training;

(viii)  the opportunity to exercise their religion and to receive a diet in keeping with their religion;

(ix)  the opportunity to have access to basic necessities i.e. beds, shower facilities, basic toiletries etc.;

(x)  access to a complaints mechanism, (grievance procedures) where complaints may be submitted either directly or confidentially to the detaining authority. Procedures for lodging complaints, including time limits and appeal procedures, should be displayed and made available to detainees in different languages.

## **Conclusion.**

The increasing use of detention as a restriction on the freedom of movement of asylum seekers on the grounds of their illegal entry is a matter of major concern to UNHCR, NGOs, other agencies as well as Governments. The issue is not a straight-forward one and these guidelines

have addressed the legal standards and norms applicable to the use of detention. Detention as a mechanism which seeks to address the particular concerns of States related to illegal entry requires the exercise of great caution in its use to ensure that it does not serve to undermine the fundamental principles upon which the regime of international protection is based.

1. These Guidelines address exclusively the detention of asylum seekers. The detention of refugees is generally covered by national law and subject to the principles, norms and standards contained in the 1951 Convention, and the applicable human rights instruments. 2. The Geneva Convention of 28 July 1951 Relating to the Status of Refugees. 3. Views of the Human Rights Committee on Communication No. 560/1993, 59th Session, CCPR/C/D/560/1993. 4. UNHCR has been requested to provide technical and advisory services to states on nationality legislation or practice resulting in statelessness. EXCOM Conclusion No. 78(XLVI) (1995), General Assembly Resolution 50/152,1996. See also Guidelines: Field Office Activities Concerning Statelessness.(IOM/66/98-FOM70/98). 5. Article 9(1) International Covenant on Civil and Political Rights.(ICCPR) Article 37(b) UN Convention on the Rights of the Child.(CRC) Article 5(1) European Convention for the Protection of Human Rights and Fundamental Freedoms.(ECHR) Article 7(2) American Convention on Human Rights 1969.(American Convention) Article 5 African Charter on Human and People's Rights. (African Charter) 6. Article 9(1), Article 12 ICCPR, Article 37(b) CRC Article 5(1)(f) ECHR Article 7(3) American Convention Article 6 African Charter. EXCOM Conclusion No. 44(XXXVII) 7. EXCOM Conclusion No. 44 (XXXVII) 8. Sub Committee of the Whole of International Protection Note EC/SCP/44 Paragraph 51(c). 9. Art 16, Art 12 UDHR 10. Article 9(2) and (4) ICCPR Article 37(d) CRC Article 5(2) and (4) ECHR Article 7(1) African Charter. Article 7(4) and (5) American Convention EXCOM Conclusion no. 44 (XXXVII) UN Body of Principles for the Protection of All Persons under any Form of Detention or Imprisonment. 1988 UN Standard Minimum Rules for the Treatment of Prisoners 1955 11. See also UN Rules for the Protection of Juveniles Deprived of their Liberty 1990 12. An adult who is familiar with the child's language and culture may also alleviate the stress and trauma of being alone in unfamiliar surroundings. 13. Although it must be recognised that most individuals will be able to articulate their claims, this may not be the case in those who are victims of trauma. Care must be taken when dealing with these individuals as their particular problems may not be apparent, and it will require care and skill to assess the situation of a person with mental disability or a disoriented older refugee who is alone. 14. See UNHCR Guidelines on The Protection of Refugee Women. 15. Women particularly those who have travelled alone may have been exposed to violence and exploitation prior to and during their flight and will require counselling. 16. Art 15 UDHR. See EXCOM No. 78(XLVI) 17. Article 10(1) ICCPR 1988 UN Body of Principles for the Protection of All Persons under any Form of Detention or Imprisonment. UN Standard Minimum Rules for the Treatment of Prisoners 1955 1990 UN Rules for the Protection of Juveniles Deprived of their Liberty 18. Article 10(1) ICCPR 1988 UN Body of Principles for the Protection of All Persons under any Form of Detention or Imprisonment. 1955 UN Standard Minimum Rules for the Treatment of Prisoners. 1990 UN Rules for the Protection of Juveniles Deprived of their Liberty.

IFR_AR_008407

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

# LEGAL ASSISTANCE FOR ASYLUM SEEKERS IN EXPEDITED REMOVAL: A SURVEY OF ALTERNATIVE PRACTICES

## DECEMBER 2004

Charles H. Kuck

IFR_AR_008408

TABLE OF CONTENTS

I.    Overview of Entry Process……………………………………………………… 235

II.   Representation of Arriving Aliens and Asylum Seekers……………………………238
      A.  Introduction…………………………………………………………………..238
      B.  The Impact of Representation on Asylum Claims in Expedited Removal……... 239
      C.  Approaches to Representation of Detained Asylum Seekers…………………...240
      D.  Legal Representation Models…………………………………………………...241
      E.  The Future of Representation of Detained Asylum Seekers in Expedited
      Removal Proceedings…………………………………………………………………250

Appendices
      Appendix A: I-867AB Record of Sown Statement in Proceedings under
      Section 235(b)(1) of the Act……………………………………………………..252
      Appendix B: I-870 Record of Determination/Credible Fear Worksheet……………254
      Appendix C: Affirmation Asylum Application Outcome and Representation
      Status by Asylum Office, FY 2000-2003………………………………………..260
      Appendix D:  EOIR Legal Orientation Program DHS Briefing – July 20, 2004…...261
      Appendix E: CCA Laredo Legal Assistance Documents…………………………...273
      Appendix F: Exclusion Flow Chart………………………………………………...275
      Appendix G: Law Library and Related Resources…………………………………823
      Appendix H: Responses of Alberto Gonzales, Nominee to be Attorney General,
      to the Questions of Senator Kennedy (Legal Orientation Program)………………..278

IFR_AR_008409

## LEGAL ASSISTANCE FOR ASYLUM SEEKERS IN EXPEDITED REMOVAL:
## A SURVEY OF ALTERNATIVE PRACTICES

### By Charles H. Kuck

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRAIRA), which took effect April 1, 1997, created the Expedited Removal process. Congress established Expedited Removal to address the perception that the asylum system was vulnerable to abuse by individuals arriving at ports of entry with false or no documents.[1] The Expedited Removal process, one of the major immigration reform measures included in IIRAIRA, constitutes a significant departure from prior law. It is a process that limits the rights of non-citizens at ports of entry and increases the authority of Department of Homeland Security (DHS) inspectors and Asylum Officers, who are now authorized to issue orders of removal which are not subject to appeal or other external review. Prior to the creation of Expedited Removal, orders of removal were issued only by immigration judges and were subject to administrative and judicial review. On November 13, 2002, Attorney General Ashcroft extended Expedited Removal beyond ports of entry to undocumented non-Cuban aliens who, within two years prior to apprehension, entered the United States by sea.[2] On August 11, 2004, the Secretary of Homeland Security expanded Expedited Removal authority to Border Patrol agents who apprehend aliens within 100 miles of the border within 14 days after an entry without inspection.[3]

The International Religious Freedom Act of 1998 (IRFA) authorized the United States Commission on International Religious Freedom (USCIRF) to appoint experts to conduct a study to answer four questions relating to the impact of Expedited Removal on asylum claims.[4] Specifically, the Study is to determine whether immigration officers performing duties under section 235(b) of the Immigration and Nationality Act (8 U.S.C. 1225(b)) (INA), with respect to aliens who may be eligible to be granted asylum, are engaging in any of the following conduct:

A) Improperly encouraging such aliens to withdraw their applications for admission.

(B) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution (within the meaning of section 235(b)(1)(B)(v) of such Act).

(C) Incorrectly removing such aliens to a country where they may be persecuted.

(D) Detaining such aliens improperly or in inappropriate conditions.

---

[1] *See, e.g.,* Cooper, "Procedures for Expedited Removal and Asylum Screening Under [IIRAIRA]," 29 Conn. L. Rev. 1501, 1501-02 (1997).

[2] Notice Designating Aliens subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act Notice, 67 FR 68924 (November 13, 2002).

[3] Notice Designating Aliens for Expedited Removal, 69 FR 48877 (August 11, 2004).

[4] H.R. 2431, P.L.105-292 Sec. 605 of the International Religious Freedom Act of 1998 authorized the U.S. Commission on International Religious Freedom (USCIRF) to appoint experts to study the effects of Expedited Removal on asylum seekers, and specified four questions that such a study should address. Pursuant to this authority, USCIRF appointed Charles Kuck, Esq as the lead expert for exploring legal representation issues.

IFR_AR_008410

This report addresses legal representation for asylum seekers in the Expedited Removal process, as it relates to the third and fourth study questions; namely, whether barriers to representation, particularly those faced by detained aliens in Expedited Removal, may result in the incorrect removal of asylum seekers to countries where they may be persecuted, and whether conditions of detention may create unnecessary or inappropriate barriers to representation. This report also explores various approaches currently employed to meet the need for legal assistance by such aliens, supported by both the government and the private sector.

## I.    OVERVIEW OF ENTRY PROCESS

Upon entry to the United States, an "arriving alien"[5] is subject to "inspection" by an officer of the DHS Bureau of Customs and Border Protection ("CBP"). The inspecting officer is required to make a review of the person's entry documents in primary inspection and determine whether or not the person is admissible to the United States, using as the standard, the legal inadmissibility requirements found in 8 U.S.C. § 1182, et. seq.  If the primary inspecting officer is not convinced of the arriving alien's admissibility, or if the arriving alien appears inadmissible, the alien is referred to secondary inspection.  In the secondary inspection, a CBP officer will examine the arriving alien and his documents. If the CBP officer determines the alien lacks authentic or appropriate travel documents, he will initiate the Expedited Removal process described in 8 U.S.C. §1225. As part of the Expedited Removal process, the CBP officer is required to ask the arriving alien a series of questions, which are designed to ascertain whether the arriving alien has a fear of immediate return to the home country.[6]

An arriving alien without proper documents is subject to being "expeditiously removed" unless he or she demonstrates a "credible fear" of return to his or her home country.  Thus, an alien expressing a fear of return to the immigration inspector must be referred to an asylum officer, who then determines whether that fear is "credible."  Credible fear is defined by statute as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum . . . ."[7]

Understanding the prior "exclusion" process is essential to understanding the changes made by Expedited Removal.  The charts accompanying this text show the basic procedures involved in the exclusion process.[8]  Prior to 1997, all aliens who were deemed inadmissible to the United States at the time of their application for entry had the opportunity to appear before an immigration judge to challenge the finding of inadmissibility or, in the alternative, to accept an offer made at the discretion of the immigration inspector to withdraw his application for

---

[5] 8 CFR 1.1(q) (2004), defined an arriving alien as someone who is requesting admission to the United States at either a land, sea or air port of entry.
[6] *See* Form I-867B (attached as Appendix A);*See* also *A-file and Record of Proceeding Analysis of Expedited Removal*, Jastram & Hartsough, Feb. 2005; *Evaluation of Credible Fear Referral in Expedited Removal at Port of Entry in United States*, Keller et al.Feb. 2005.

[7] 8 U.S.C. §1225(b)(1)(B)(v), Immigration & Nationality Act ("INA"); §235(b)(1)(B)(v)**.**
[8] See *The Asylum Application Process for Exclusion Proceedings Used before April 1, 1997*, prepared by Charles Kuck & Susan Kyle (Feb. 2005).  (Attached as Appendix F).

IFR_AR_008411

admission.[9]  For those aliens who sought to challenge their exclusion by the Immigration Inspector, the Legacy INS had the authority to detain them until their hearing, but often released these aliens after issuing them a Form I-122, ("Notice to Applicant for Admission Detained for Hearing Before Immigration Judge").  The immigration judge was authorized to admit aliens whom he or she determined were actually admissible to the United States, and to hear arriving aliens' claims for asylum.

Prior to the advent of Expedited Removal, inspectors were not required to ask the alien about a fear of return.  They also did not, however, have the authority to remove the alien, but only to offer withdrawal or refer him or her directly to the immigration judge, where (s)he could apply for asylum.

At the exclusion hearing before an immigration judge, the alien was entitled to representation (at his or her own expense) in the presentation of his request for admission and in his request for asylum.  These exclusion proceedings were recorded for transcription purposes and the parties had the opportunity to appeal the determination to the Board of Immigration Appeals ("BIA").[10]

After the 1993 bombing of the World Trade Center, however, questions were raised about whether immigration inspectors could protect our borders if they were not authorized to turn away improperly documented aliens.  There were also concerns that, due to a shortage of detention capacity as well as Immigration Judge backlogs, detaining the alien until his or her hearing was often not a viable option.  Under these circumstances, there was growing concern that terrorists and other aliens without valid identity documents could exploit the system to enter and disappear into the United States.  Human rights advocates, however, argued that bona fide asylum seekers are often forced to flee without proper documents.  They asserted that authorizing Immigration Inspectors to summarily remove arriving aliens would result in the refoulement (i.e. return) of *bona fide* asylum seekers to countries where they may face persecution. [11]

As shown in the attached chart of the Expedited Removal entry process, there were substantial changes made by Congress in an effort to address all of these concerns.  See Chart 2. Under the current Expedited Removal process, arriving aliens whom CBP determines lack the appropriate travel documents are processed for immediate removal, e.g. departing on the next available flight to their country of origin.  The CBP Inspectors are authorized to offer a withdrawal of entry to the arriving alien, but the alien himself can not make such a request.[12] Prior to finalizing the Expedited Removal order, the CBP Inspector must ask a series of questions[13] that are designed to ascertain whether the alien has a fear of return to his/her home

---

[9] Accepting a withdrawal of an application for admission was a longstanding discretionary practice of INS, though this practice was not codified until 1996. *See* 8 U.S.C. §1225(a)(4), INA §235(a)(4).

[10] Id.

[11] For a detailed account of the public policy debate surrounding asylum reform and IIRIRA, *see* Phillip Schrag, *A Well-Founded Fear: The Congressional Battle to Save Political Asylum in America*, Routledge (2000).

[12] *Illegal Immigration Reform and Immigrant Responsibility Act of 1996*, Pub. L. No. 104-208.

[13] See Form I-867B (attached as Appendix A); see also *Evaluation of Credible Fear Referral in Expedited Removal at Port of Entry in United States*, Keller et. al., Feb. 2005. and *A-file and Record of Proceeding Analysis of Expedited Removal*, Jastram et. al. Feb. 2005. for an explanation and analysis of the Four Questions.

IFR_AR_008412

country. Arriving Aliens who are found to have a fear of return are then placed in a detention facility, where they will wait, for 48 hours or more, for a credible fear interview with a DHS U.S. Citizenship and Immigrations Services ("USCIS") Asylum Officer.

The alien may neither contact nor be represented by an attorney or other representative before or during the Expedited Removal process at the port of entry. If the inspector refers the alien for a credible fear determination, the alien may contact an attorney or representative during the minimum 48 hour period between the inspection process at the port of entry ("POE") and the credible fear interview. The alien must do so, however from the facility where he has been placed in mandatory detention. During the credible fear interview, the alien may not be "represented" by counsel, though an attorney or representative may observe the interview.

While a "record" of the questioning by the CBP Inspector is maintained in the alien's file, the questioning is not typically taped or independently transcribed.[14] Nor, at ports of entry, may the applicant's attorney "witness" the interview (though counsel may be present at the Credible Fear Interview). Rather, the interview is memorialized by the interviewing officer him or herself, who types a record of the conversation using the Form I-867A and B or I-870.[15] While the regulations require that the accuracy of the sworn statement taken at the port of entry be ensured by "having the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction,"[16] our Study found that nearly 72 percent of the time the alien neither read the statement, nor was the statement read back to him or her.[17] Our Study found, further, that INS trial attorneys use these statements to impeach the applicant's testimony in 48 percent of the cases reviewed, and that the port of entry statement was cited by the Immigration Judge in his decision to deny the application nearly 32 percent of the time.[18]

---

[14] *See* e-mail message from Linda M. Loveless (CBP) to Mark Hetfield (USCIRF), Dec 4, 2003 (stating that the CBP Offices at the Atlanta, Las Vegas and Houston Airport Ports of Entry have a videotape system in place, ostensibly to monitor the performance of CBP Inspectors during the interview process. However the videotapes used during these interviews are typically taped over after approximately 60-90 days, and are usually not available to either the alien or the government at a subsequent hearing. Secondary inspections are also videotaped at three land ports of entry: Oroville in Washington State and Peace Bridge and Champlain in New York State. In Oroville tapes are retained for only 30 days, in the other two sites they are kept for approximately six months).

[15] See sample, attached as Exhibit A; *See also Evaluation of Credible Fear Referral in Expedited Removal at Port of Entry in United States*, Keller et. al., Feb. 2005 (contending that while Form I-867A and B purports to be certified by the alien as being a "full true and correct" record of the interrogation during the secondary inspection process, the component of this Study which involved the monitoring of ports found issues relating to the reliability of the document); see also CBP Response to Recommendations of UNHCR Study on U.S. Expedited Removal, issued 10/23/2003, Section A-7(2) (stating that in the past, CBP has rejected proposals that the form include warnings that it is not a verbatim transcript, noting that "trial attorneys or judges may determine the appropriate weight to be given to such statements in subsequent proceedings"); but see Form I-870 (Attached as Appendix B), (showing that the I-870 was revised on November 21, 2003 to state the following caveat: "The following notes are not a verbatim transcript of this interview. These notes are recorded to assist the individual officer in reviewing the determination. There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening").

[16] 8 CFR 235.3(b)(2)(i) (2004).

[17] *See* Keller, et al.

[18] *See* Jastram, et al.

IFR_AR_008413

## II.    REPRESENTATION OF ARRIVING ALIENS AND ASYLUM SEEKERS

### A.    Introduction

Prior to the enactment of IIRAIRA, aliens who were denied admission into the United States were afforded a full hearing with the right to counsel, the right to present evidence, and to question witnesses on the record before an Immigration Judge pursuant to former section INA § 240.[19]   Before the implementation of IIRIRA, aliens had access to legal counsel prior to the removal (exclusion) hearing.   IRIRA did not include any provisions which specifically limited an asylum seeker's right to an attorney; nonetheless, Expedited Removal has had the effect of significantly restricting an alien's right to counsel.  This is because of DHS's increased detention of asylum seekers in the Expedited Removal context.  The changes to INA §240 (renumbered now to INA §235) have authorized secondary inspectors and their supervisors to make removal decisions previously made only by Immigration Judges, and before an alien is permitted to contact legal counsel.

While an alien/asylum-seeker may consult with persons of his choice prior to the credible fear interview, there is no right to "representation," nor does the alien have the right to have counsel present at the immigration judge's review of the negative credible fear determination.[20] Not until after the alien/asylum-seeker is found to have a credible fear of persecution or torture (after a credible fear interview), may an attorney fully represent him or her at an asylum hearing before an immigration judge.[21]  While an alien/asylum seeker will not have access to counsel at the primary or secondary inspection process, or likely not even at the credible fear determination, the alien is asked to sign legal documents which will have a bearing on a subsequent claim for asylum.  As discussed earlier, these documents are frequently used as a sort of "record of proceedings" by DHS Immigration and Customs Enforcement (ICE) attorneys and Immigration Judges.[22]

---

[19] 8 U.S.C. §1225, Immigration & Nationality Act.

[20] INA § 235(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4). *See* Executive Office for Immigration Review, Interim Operating Policy and Procedure Memorandum 97-3: Procedures for Credible Fear and Claimed Status Reviews, at 4 (Mar. 25, 1997) (proclaiming that immigration judges have the discretion as to whether consultants may be present at this review.  If counsel is allowed to be present, nothing entitles him or her to make an opening statement, call and question witnesses, cross examine, object to written evidence, or make a closing argument); *but see* Expedited Removal Training Materials, page 4 (explaining that aliens in secondary (inspection) are not entitled to representation and do not have the right to an attorney, unless criminal proceedings are contemplated, nor are aliens entitled to contact family, friends, or others in the United States, concerning their situation.  However, in some cases, it may be beneficial to permit such communication if it may assist in the case or allay concerns").

[21] *See* Section II, Inspector Field Manual (2003)2.9 Dealing with Attorneys and Other Representatives (asserting that no applicant for admission, either during primary or secondary inspection has a right to be represented by an attorney - unless the applicant has become the focus of a criminal investigation and has been taken into custody.  An attorney who attempts to impede in any way on your inspection should be courteously advised of this regulation.  This does not preclude you, as an inspecting officer, to permit a relative, friend, or representative access to the inspectional area to provide assistance when the situation warrants such action).  A more comprehensive treatment of this topic is contained in the Adjudicator's Field Manual, Chapter 12, and 8 CFR 292.5(b).  The alien's right to counsel is a statutory right,  8 USC §1362, Immigration and Nationality Act §292.

[22] *See* Jastram, et al.; Keller et al.

## B.    The Impact of Representation on Asylum Claims in Expedited Removal

Asylum seekers in Expedited Removal who have legal counsel tend to be much more successful in applying for asylum than those who proceed without an attorney.   Of those individuals found to have a credible fear, who were subsequently represented by counsel, 25 percent were granted asylum by an Immigration Judge;[23] whereas, only 2 percent of those not represented by counsel were granted asylum.[24]  One could argue that these statistical differences are attributable to attorneys representing only those applicants with the most meritorious cases. The statistics, however, also indicate that success rates of unrepresented asylum seekers are only marginally higher in areas with the lowest rates of legal representation than for those in areas with the highest rates of representation.[25]   Immigration courts with the highest rates of representation tend to be in major metropolitan areas.  Those with the lowest rates of representation tend to be courts, predominantly located within the detention centers themselves, in more rural areas. It therefore seems that the ability of an alien to obtain counsel is more closely associated with geographic location than with the merits of the asylum claim.  Obviously, being represented by counsel appears to play a role in the ultimate decision on asylum.

The key difference between the affirmative asylum process and Expedited Removal is found in the latter's adversarial nature.[26]  An alien who is already in the United States may apply for asylum affirmatively and undergo a non-adversarial "interview" with an asylum officer, bring an attorney with him, and provide his own interpreter.  In contrast, an asylum seeker in Expedited Removal proceedings must first pass through his initial interview at the port of entry, typically after a long journey.  (S)he must then engage in a credible fear interview after being given 48 hours or so to adjust to his new surroundings in a jail-like detention facility, and identify a person of his choosing with whom to "consult."[27] Then, if successful in obtaining a credible fear finding, the alien must claim asylum in court, where he is opposed by a DHS Trial Attorney who is generally there to argue the DHS position that the applicant should be removed from the United States.[28]  It is only at this late stage where the applicant may be represented by counsel.  Unlike a non-adversarial affirmative asylum proceeding, each asylum seeker subject to Expedited Removal needs to argue the merits of his case before an immigration judge and against a DHS "trial attorney." Consequently, it should be noted that unrepresented asylum seekers in affirmative proceedings are granted asylum 24 percent of the time, in contrast to the 2 percent grant rate of unrepresented asylum seekers who are referred to adversarial proceedings after being placed in Expedited Removal.[29]

Detained asylum seekers who are not conversant in English may have difficulty finding legal counsel,  even more difficulty conducting legal research and representing themselves in immigration court.  Moreover, for "security reasons" commonly cited by prisons, no detention

---

[23] *Statistical Report on Immigration Court Proceedings, FY 2000-2004*, Kyle, Fleming, and Scheuren, (Feb. 2005), tables 3-2 to 3-12.
[24] See id.
[25] See id.
[26] See id. at table V;(reporting an acceptance rate for Expedited Removal of 25 percent for represented aliens and 2 percent for unrepresented aliens, table P&Q).
[27] *See* 8 CFR 235.3(b)(4)(ii) (2004).
[28] *Supra note 12.*
[29] Appendix C.

IFR_AR_008415

facility provides aliens with internet access to conduct research to document their asylum claims.[30] While the DHS detention standards have an extensive list of legal reference materials which should be maintained in the law libraries of detention centers, visits by the U.S. Commission on International Religious Freedom Expedited Removal Study ("USCIRF Study") experts consistently found that many of the materials on the list were not in the law libraries, and that, when present, they were years out of date.[31]

All of these factors clearly affect the ability of the alien to effectively present an asylum claim and make the Immigration Judge's task particularly difficult, putting additional strains on court time and resources. As EOIR stated after reviewing earlier drafts of this report:

> All judges prefer represented to non-represented cases. Non-represented cases are more difficult to conduct. They require far more effort on the part of the judge. Judges struggle with the alien's difficulties in completing the I-589 (Application for Asylum) in a language they may not be familiar with. The skeletal information provided by the alien must be expanded on by the judge, while maintaining impartiality…[32]

As noted in regulations controlling the Immigration Court process, every alien is entitled to legal representation of his or her own choosing, however, they have no right to legal counsel paid for by the government.[33] While waiting for (and often following) a credible fear interview, asylum seekers are detained in one of the 185 or so different jails or detention facilities currently operated or under contract with the DHS.[34] Moreover, as noted in the Report on Condition of Confinement at Detention Facilities,[35] many of the custodial immigration facilities for these asylum seekers are located in rural parts of the United States, where few lawyers visit and even fewer maintain a practice.[36] In this report, we did not examine, nor do we allege, that DHS is in violation with its detention standards with regard to access to legal counsel. The practical effect of detention in remote locations, however, is to restrict asylum seekers' legally authorized right to counsel.

## C.    Approaches to Representation of Detained Asylum Seekers

There have been various piecemeal approaches to solving the problem of unrepresented asylum seekers detained by ICE during the removal process. The general approach, however, is market-based. Asylum-seekers' ability to retain counsel – paid or pro bono – is generally dependent on the availability of legal services in the geographic areas where they are detained.

---

[30] *See* Haney, *Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal*, (Feb. 2005).
[31] Human rights reference materials, while included in the DHS Detention Standards and critical to any asylum claim, were either missing or years out-of-date in every facility visited. In some facilities, a Lexis CD-ROM took the place of the law library, but the CD did not contain the human rights materials listed in the Detention Standards, nor did any of the facilities offer instruction to detainees on the use of the Lexis CD-ROM. See Appendix G, *Law Library and Related Resources* (listing of materials from the DHS Detention Standards).
[32] Letter to Mark Hetfield, USCIRF, from Marta Rothwarf, Assoicate General Counsel, Executive Office for Immigration Review (EOIR), January 19, 2005.
[33] 8 C.F.R. § 1003.16(b).
[34] *Supra note 12.*
[35] See, Haney.
[36] Fleming and Scheuren, *Statistical Report on Detention, FY 2000-2003*, (Feb. 2005).

Many of the 185 detention facilities are located in rural areas without access to counsel of any kind[37], let alone attorneys trained in and experienced with asylum cases, and most detention facilities do not provide ready access to communication with outside counsel.[38]  Consequently, many detained asylum seekers are left unrepresented at their merits hearing.[39]

As noted previously, an unrepresented asylum seeker in the Expedited Removal process has only a 2 percent likelihood of being granted asylum, versus 25 percent chance for asylum seekers with attorneys.   In contrast, 26 percent of unrepresented asylum seekers outside of Expedited Removal -  who apply through the non-adversarial affirmative process - are granted asylum.[40] Consequently, it appears that an asylum seeker in Expedited Removal without representation is vulnerable to being incorrectly removed to a country where he or she may be persecuted.  This vulnerability appears to be greater for those asylum seekers who are detained.

## D.    Legal Representation Models

Recognizing the problems with asylum seekers trying to navigate this adversarial process unassisted, several organizations, together with the Executive Office for Immigration Review (EOIR) and ICE, have made efforts to increase and facilitate representation, or at least legal orientation and counseling, of detained asylum seekers.[41]  A number of these programs, representing different models for securing legal assistance, are described below.  All have the potential, if more broadly applied, to help ensure that the Expedited Removal process will not cause *bona fide* asylum seekers to be returned incorrectly to their persecutors.

Some of these models apply exclusively to asylum seekers in Expedited Removal proceedings, others also apply to other detained aliens as well.

### 1.    EOIR's Legal Orientation Program

In 2002, the EOIR began a Legal Orientation Program ("LOP") to provide a "rights" presentation to detainees and to increase pro bono representation.  In its first year of operation in select DHS Detention facilities with Immigration Courts, the LOP has increased the productivity of  the Immigration Judges. Effectively informing detained immigrants of their legal rights (or lack of available options), helps to clear Court dockets for cases to be heard on the merits.[42]

---

[37] Id.

[38] See Haney (reporting that while every facility is required to provide telephones through which detainees can call collect to counsel, the rates for these calls is typically significantly higher than market rates.  Furthermore, none of the detention facilities surveyed in the course of this Study permitted detainees to accept incoming calls, making it particularly difficult for attorneys to contact clients, and impossible to return their calls) See also INS Detention Standards, Detainee Handbook p 12, and Visitation p11 (Attached as Appendix ) (stating that detention facilities, are required to post a list of pro bono legal organizations in all detention housing areas and other appropriate areas).

[39] See Kyle, Fleming, and Scheuren, Tables P and Q (showing that according to Statistics for FY2003, approximately 22 percent of asylum seekers are unrepresented nationwide, but at some major detention facilities in more rural areas, as many as 85 percent of asylum seekers are not represented).

[40] See Appendix C.

[41] See discussion infra Section B 1-7.

[42] See EOIR *Pro Bono Program Update* Memorandum from Pro Bono Coordinator (December 2003) (Attached as Appendix D); see also *http://www.usdoj.gov/eoir/probono/MajorInitiatives.htm#DetRightsPres* (last visited Dec. 2004).

IFR_AR_008417

Through LOP orientations, representatives from nonprofit organizations provide comprehensive explanations about immigration court procedures along with other basic legal information to large groups of detained individuals. The orientations are normally comprised of three components: 1) the interactive group presentation, which is open to general questions; 2) the individual orientation, where non-represented individuals can briefly discuss their cases with experienced counselors; and 3) the referral/self-help component, where those with potential relief, or those who wish to voluntarily depart the country or request removal are referred to pro bono counsel, or given self-help legal materials and basic training through group workshops, where appropriate.[43]

It must be noted, however, the status of funding for this program, which is not limited to asylum seekers, is often unclear. In FY2002 and FY2003, Congress allocated $1 million each year to INS, and in FY2004 to ICE, for non-governmental agencies to provide 'live presentations' to persons in INS detention prior to their first hearing before an immigration judge.  These presentations provide immigration detainees with essential information about immigration court procedures and the availability of legal remedies to assist detainees in distinguishing between meritorious cases and frivolous cases."[44]  According to EOIR, the leadership of the Senate Immigration Subcommittee recommended, and INS agreed, that EOIR was better positioned to implement the requirement, and that obvious benefits would accrue to their legal and detention personnel once the program was operational.[45]   EOIR reports that the Legal Orientation Program has, since its inception, enjoyed strong support from INS and then ICE Headquarters, as well as from the ICE Officers in Charge at each of the seven detention facilities served by the program.[46]

With these funds, EOIR was able to provide comprehensive legal orientation to over 17,000 detained respondents, representing approximately 20 percent of the total population of detained aliens, at six detention facilities in its first full year of operation. [47]   Since that time, EOIR has expanded to a seventh cite (El Paso, Texas), and expects to provide legal orientation to over 20,000 aliens.

---

[43] See Executive Office of Immigration Review website: *http://www.usdoj.gov/eoir/probono/MajorInitiatives.htm* (last update 11/29/2004).
[44] This language is taken from House Conference Report No. 108-10, *Making further continuing appropriations for the Fiscal Year 2003, and for Other Purposes* (Pub L. No. 108-7) .The language in the conference report is very similar to the Conference reports for FY2002 and FY2004, although the latter does not make specific reference to non-governmental organizations.  *See* Conference Report for Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act for Fiscal Year 2002 (Pub. L. No. 107-77) as well as the FY2004 Homeland Security Appropriations Conference Report Accompanying H.R. 2555 (Pub.L. No. 108-90).
[45] *See* Letter from Senators Hatch, Leahy, Brownback and Kennedy to Attorney General John Ashcroft (November 30, 2001).
[46] Letter from Marta Rothwarf, Assoicate General Counsel, Executive Office for Immigration Review (EOIR) to Mark Hetfield  (January 19, 2005).
[47]*Id;.*  For more information about the program and its effectiveness, see Executive Office of Immigration Review website: *http://www.usdoj.gov/eoir/probono/MajorInitiatives.htm* (last update 11/29/2004); see also Appendix D (exemplifying EOIR's exceptional efforts to promote pro bono representation.  EOIR recognizes the importance of legal representation and undertakes an effort, locally and nationally, to encourage aliens to seek representation.  As noted, the lack of attorneys in many areas where detention facilities are located severely hamper detained aliens right to counsel).

IFR_AR_008418

Although ICE transferred $1 million to EOIR, as directed by Congress, in FY2004, it has yet to transfer the FY2003 funding to EOIR, citing budgetary shortfalls.  On February 1, 2005, ICE confirmed that it will transfer $1 million to EOIR for Legal Orientation Programs for FY2005.  The funding owed to ICE for FY2003, however, remains in question.[48]

According to EOIR, the LOP (also known as "Group Rights Presentation Programs") made by non-governmental organizations to detained populations "demonstrated that they are beneficial to all parties involved.  These programs result in greater judicial efficiency for EOIR, less time for aliens in DHS detention, and greater access for detained aliens to legal information, counseling, and pro bono representation."[49]

EOIR statistics further demonstrate that, after receiving the presentations, detained individuals make better-informed decisions on proceeding with their cases, and are more likely to obtain representation, that non-profit organizations reach a wider audience of people with minimal resources, and that cases are more likely to be completed faster, resulting in fewer court hearings and less time spent in detention (either because of case completion or removal).[50]  In EOIR's July 27, 2004 briefing to USCIRF staff and experts, EOIR's LOP was shown to have reduced the processing times for detained cases by 1.5 to 3 days at an average cost of $85 per day for detention.[51]  This reduction, as modest as it seems, when applied to the seven facilities in which EOIR's LOP program is in effect, pays for the program over the course of the year.[52]

EOIR has been working to further develop and expand upon the use of legal orientations to immigrants detained by the DHS.  The LOP is currently funding comprehensive Legal Orientation Programs at six major DHS detention facilities in: Eloy, Arizona; Port Isabel, Texas; Batavia, New York; Seattle, Washington; Lancaster, California; and Aurora, Colorado.  EOIR notes that with $1 million in additional funding, that it could expand the LOP to seven more detention centers[53]

---

[48] See, The American Lawyer, On a Shoestring, July 2004 (referencing a letter sent by Asa Hutchinson, Undersecretary of Border and Transportation Security at the Department of Homeland Security, to Senators Edward Kennedy and Sam Brownback.  Subsequently on February 1, 2005, ICE  confirmed that it will pay the  funds in FY2005); see also EOIR/USCIRF Meeting Notes, July 27, 2004 ;In a written question submitted to Attorney General nominee Alberto R. Gonzales during his nomination hearing on January 18, 2005, Senator Edward M. Kennedy asked Mr. Gonzales what he would do, as Attorney General, to ensure that DHS transfers the $2 million owed to EOIR for these programs for FY2003 and FY2005, and what he would do to increase funding for "these highly successful programs so they reach even greater numbers of detainees."  Mr. Gonzales' response was that he "would work with (his) colleagues at the Department of Homeland Security to ensure that any money that is owed to EOIR is transferred and to determine the extent to which funding may be increased in future years."  See Appendix H.
[49] See EOIR Pro Bono Program Update Memorandum from Pro Bono Coordinator (December 2003); see also http://www.usdoj.gov/eoir/probono/MajorInitiatives.htm#DetRightsPres  (last update 11/29/2004).
[50] See EOIR Pro Bono Program Update Memorandum from Pro Bono Coordinator (December 2003); see also http://www.usdoj.gov/eoir/probono/MajorInitiatives.htm#DetRightsPres  (last update 11/29/2004).
[51] See EOIR/USCIRF Meeting Notes, July 27 2004.
[52] See EOIR LOP Executive Summary and Statistical Analysis (Attached as Appendix D).   In a subsequent letter to USCIRF, EOIR explained that, while the information provided in the Executive Summary and Statistical Analysis are accurate, at this time it is not possible for EOIR to isolate all factors affecting the measured result.  EOIR is actively working to improve the program's performance measurement system.
[53] See EOIR Legal Orientation Program DHS Briefing (EOIR, July 20, 2004) (Attached as Appendix D)  (stating that with extra funding the program could expand such sites as: Aguadilla, Puerto Rico; Bradenton and Miami

IFR_AR_008419

2.      *Florence Immigrant and Refugee Rights Project*

The Florence Project is a nonprofit legal service organization that provides free legal services to men, women and children detained by the Florence, Arizona ICE Service Processing Center. The Florence Project was created in 1989, prior to the advent of Expedited Removal. Concerned that indigent people in deportation proceedings were in danger of having their rights disregarded, local Immigration Judge John McCarrick urged Phoenix area attorneys to fill the gap in representation left by the absence of a public defender system in immigration proceedings for those who could not afford an attorney. In response to this call, Attorney Chris Brelje, supported and encouraged by his law firm Lewis and Roca, spent a year establishing the project.[54]

Although originally called the Florence Asylum Project, the organization changed its name to the Florence Immigrant and Refugee Rights Project (FIRRP) to reflect the range of legal issues facing detained immigrants. With services first in Florence, FIRRP expanded its reach to include legal services first at the Eloy Detention Center in 1998, then at the Southwest Key Facility in Phoenix for detained children in late 2000. In January 2001 the Integrated Social Services Program was added to address the diverse mental health and social needs of people FIRRP serves. [55]

The Florence Project provides early and accurate legal information in the form of legal orientation presentations to aliens in Eloy, Florence, and the Southwest Key facilities in Phoenix, Arizona.  The Eloy facility's presentations are largely funded by the EOIR Legal Orientation Program (LOP); the other sites are primarily dependent on private funding.  This presentation enables aliens to make informed decisions about whether and how to proceed with their immigration case.  FIRRP contributes to the efficiency of the removal process by equipping aliens to determine up front whether or not there is a basis for them to proceed with their claim. With FIRRP's assistance, aliens who realize there is no legal relief available are less likely to proceed with their claim, reducing their time in, and the government's expenses for, detention. Moreover, by understanding the process better, aliens counseled by FIRRP who decide to proceed are more likely to avoid unnecessary continuances and other demands on the court's time.

For individuals who continue to the final stages of a case, FIRRP provides, at a minimum, assistance with documents and in-depth training on how to represent oneself in immigration court. In many instances, staff attorneys provide representation before immigration judges and on appeal if necessary, all at no charge to the individual. FIRRP also advocates for its clients outside of court, with deportation officers and other staff at the detention facilities.[56]

---

(Krome) Florida; El Centro, San Diego and San Pedro, California; Houston and Laredo, Texas;  Las Vegas, Nevada; and York County, Pennsylvania).
[54] See the Florence Immigrant and Refugee Rights Project website *http://www.firrp.org/* (last visited 12/10/2004).
[55]  Id.
[56]  Id.

IFR_AR_008420

The Florence Project became a "Justice Efficiency Model" that was studied by EOIR in 1998. The model, founded to assist detained aliens while making immigration proceedings more efficient, has been used and modified by other organizations working with the similar populations, including those participating in the EOIR Legal Orientation Program.[57]

3.    *Human Rights First's Asylum Legal Representation Program*

In the New York and New Jersey area, Human Rights First (formerly the Lawyers Committee for Human Rights) has created a pro bono program to match detained asylum seekers with pro bono counsel. The clients of the Asylum Legal Representation Program cannot afford counsel. Volunteer lawyers learn about international human rights law and have the chance to represent individual clients at an asylum interview or a hearing before an immigration judge. The cases are assigned to pro bono volunteers through the Representation Program.[58]

Asylum seekers benefiting from this program are held primarily at two contract detention facilities in the New York – New Jersey area: the two hundred bed facility in Queens, New York, run by the GEO Group Inc. (formerly, the Wackenhut Corporation), and the three hundred bed facility in Elizabeth, New Jersey, run by Corrections Corporation of America. Asylum seekers are sometimes detained in county or local jails in New Jersey as well. The New York – New Jersey area has significant refugee and immigrant populations, and the organizations that provide legal services to indigent asylum seekers are faced with a legal representation need that is much larger than they can meet.[59]

The non-profit organizations in the area work collaboratively with each other, and in cooperation with ICE Detention officials. At the two facilities, several local legal organizations take turns, for periods of several months, in providing new arrivals with legal orientation presentations, initial consultations, and assistance in finding legal counsel. At the Queens facility, this work is performed by Catholic Charities, the Hebrew Immigrant Aid Society (HIAS), and Human Rights First. At the Elizabeth facility, this role is played by American Friends Service Committee, HIAS, the Catholic Legal Immigration Network (CLINIC), and Human Rights First.[60]

When Human Rights First plays this role, an attorney from its office will travel to the detention facility once or twice a week to meet with new arrivals. The attorney describes the Expedited Removal, asylum application and immigration court processes to the asylum seekers and explains how those who are indigent can try to find pro bono legal representation. The attorney will meet with any detainees who would like to meet individually. In these meetings, the detainees can ask specific questions about their situations. The attorney, in turn, will learn more about the asylum seeker's case. With the asylum seeker's permission, his or her request for

---

[57] See *EOIR's Evaluation of Rights Presentation, available at http://www.usdoj.gov/eoir/statspub/rightspresmain.htm* (last visited 1/28/05).
[58] See Human Rights First website *http://www.humanrightsfirst.org/asylum/probono/probono.htm*. (last visited 12/10/2004).
[59] *Informational Interview with the Asylum Program Director*, Human Rights First.
[60] Id.

IFR_AR_003421

representation will be forwarded to the legal organizations in the collaborative representation project.[61]

During the consultations, the attorney may assist asylum seekers in other ways. The attorney may advise the asylum seeker on steps she needs to take with respect to her asylum case or may answer questions about the individual's eligibility for asylum. Many asylum seekers also have questions about detention. The attorney will explain the process for seeking release on parole, but also explain that these facilities seldom release asylum seekers from detention until after the Immigration Judge has ruled on their application.[62]

After the request for representation is circulated (with the asylum seeker's permission), to the collaborative representation project, one of the organizations may decide to conduct a full interview to determine if they can take the case on for representation. Before taking on a case, an organization will send a representative to the detention facility to meet with the asylum seeker. This representative will conduct an extensive interview; the interview will assist the organization in deciding whether it can represent the asylum seeker.[63]

When Human Rights First decides to take on a case for representation, it recruits and trains pro bono lawyers to handle the case. Human Rights First's legal staff also provides significant support to the pro bono attorneys, reviewing their submissions, discussing case strategy and answering frequent questions. Because of the significant work involved in detained cases, including the added travel time, Human Rights First generally encourages two or more attorneys to work on a detained asylum case.[64]

Local legal organizations have formed two unique collaborative projects (the first was started in New York and a second developed subsequently in New Jersey) that are supported by several local foundations. Current funding, however, does not completely fill the need for representation in these areas. Several organizations have had to decrease the number of asylum seekers they assist as they are faced with financial challenges or competing needs; and one organization has had to suspend its ability to take on new cases entirely.[65]

4.    *Capital Area Immigrants Rights (CAIR) Coalition*

In an attempt to enhance access to legal advice and assistance, the Department of Homeland Security has partnered with a non-governmental organization in Arlington, Virginia. A little over three years ago, the Capital Area Immigrants' Rights (CAIR) Coalition, in conjunction with the United Nations High Commissioner for Refugees (UNHCR), developed a model with the Arlington, Virginia Asylum Office to provide legal assistance to individuals in the Expedited Removal process

---

[61] Id.

[62] Id.

[63] Id.

[64] See, Acer, Eleanor, *Making a Difference: A Legacy of Pro Bono Representation*, Journal of Refugee Studies, September 2004, Vol. 17: 347-366.

[65] *Supra note 60.*

who had asserted a fear of returning to their country of nationality.[66]  After the individual is detained and before the scheduling of a credible fear interview, an Asylum Officer asks the individual if he or she has an attorney. If the alien is unrepresented, the Asylum Officer asks if the individual wants CAIR Coalition to seek an attorney to accompany the alien to the credible fear interview.  If the individual answers affirmatively, CAIR Coalition is designated as the organization that will make a legal appearance at the interview. A fax is sent to CAIR Coalition, providing the date and location of the credible fear interview.[67]

CAIR Coalition developed a list of volunteer lawyers, law students, and others who were trained to assist individuals at the credible fear interview. A request for legal assistance at the credible fear interview is sent to the volunteer list. The volunteer explains the Expedited Removal process, credible fear, and immigration detention to the alien seeking representation. After the interview, a summary of the individual's claim is presented to a CAIR Coalition staff member. The CAIR Coalition staff attorney screens and reviews the claim to see if the alien appears to be eligible for relief. If the claim appears meritorious, the summary is circulated to a list of pro bono attorneys for the purpose of securing representation for the actual asylum hearing before the immigration judge.[68]

The Arlington Asylum Office has a significantly higher-than-average rate of aliens "dissolving" their asylum claims at the time of the credible fear interview. [69]  According to that office, this might be one way in which the CAIR Coalition contributes to the efficiency of the Expedited Removal process; namely, by aliens dissolving their credible fear claims when an attorney advises them that they may not meet the criteria for asylum. [70]

The success of this model has resulted in higher rates of representation for detained asylum seekers before the Arlington and Baltimore Immigration Courts. In addition, the Arlington Asylum Office has requested that this model be extended to the Atlanta area.[71] It is in the process of being implemented there with the assistance of various large law firms, including Alston & Bird LLP, as well as Atlanta non-profits, including Catholic Social Services.[72]

5.    *Law School Clinical Programs*

Another type of program created by the private sector to provide legal assistance to asylum seekers is one in which second and third year law students enrolled in law school provide

---

[66] See 8 CFR 100.4(f)(3) (2004) (establishing that the Arlington Asylum Office is part of U.S. Citizenship and Immigration Services (USCIS) within DHS. The Arlington Asylum office has jurisdiction over the District of Columbia, the western portion of the State of Pennsylvania within the jurisdiction of the Pittsburgh suboffice, and the States of Maryland, West Virginia, North Carolina, Georgia, Alabama and South Carolina).

[67] Information received from Detention Project Director, CAIR Coalition. For more information see the CAIR Coalition Website, *http://www.caircoalition.org/about.htm* (last visited 12/10/2004).

[68] Id.

[69] *See* DHS Table 11, Fleming and Scheuren (reporting that in FY2003, over 30 percent of asylum seekers referred for credible fear dissolved their asylum claim before the Arlington Asylum office.  Compare this to a national rate of under 8 percent for the same period of time).

[70] Meeting between USCIRF Immigration Counsel Hetfield, Dr. Fritz Scheuren and the Arlington Asylum Office (March 23, 2004).

[71] Atlanta is under the jurisdiction of the USCIS Asylum Office in Arlington, Virginia.

[72] Id.

IFR_AR_008423

attorney services.  This program is exemplified by the Clinic for Asylum, Refugee and Emigrants Services (CARES) at Villanova University School of Law in Villanova, Pennsylvania, where law students represent asylum seekers in detention.  Most of CARES' clients entered the country without proper travel documents and have asserted a fear of returning to their country of nationality.  They are then processed in accordance with the Expedited Removal rules.  Students enrolled in CARES travel up to two hours each way to county jails in York and Berks Counties in rural Pennsylvania to represent their asylum clients.  Many of the clients are unaccompanied minors and families with minor children.[73]

When the clinic learns about detained asylum seekers who need legal representation (most of the referrals are from the Pennsylvania Immigration Resource Center (PIRC)), a team of two students typically travel to the detention center to conduct an intake interview with the clients.  If the clinic accepts the case, the students represent the clients throughout the process, beginning with the credible fear interview and through the hearing on the merits of the asylum claim. CARES receives additional help from Students enrolled in Villanova's undergraduate Department of Modern Languages with interpretation and translation.[74]

*6.        Private Detention Facility Representation*

        At least one of the private detention facility contractors to ICE, Corrections Corporation of America ("CCA") is under contract with DHS to provide private counsel to speak to ICE detainees.  At its Laredo, Texas facility, ICE has contracted with CCA to hire a local attorney to assist the detainees, at the detainee's request, with legal matters pertaining to their detention. While originally  envisioned as legal access to detainees to resolve problems with the facility (e.g., food, medical care issues, etc.), the attorney retained by CCA in Laredo, when requested by the detainee, helps the detainee understand the immigration process, obtains forms or documents the detainee specifically requests and provides a translation of the forms.  This attorney may also do legal research for the detainee and give his advice to the detainee on the likelihood of success on the merits of his case.  His primary purpose, however, is to facilitate a resolution to detention-related problems in the facility. Accordingly, this attorney does not represent aliens in immigration court proceedings, nor is he a specialist in immigration law. [75]

        In a discussion with the attorney hired by CCA to carry out its part of the DHS contract, we were informed that his practice is not an immigration law centered practice. Further, he does not provide a general rights presentation, and can only go to the facility to talk to the detainee when a detainee so requests.  The attorney indicated that he spent less time in 2004, than in previous years, on matters related to detention issues for CCA.  He also specifically noted that he does not become retained counsel on any these cases, and that he is limited in the scope of the

---

[73] Information received from CARES representative (2004); for more information see Villanova University's School of Law website, *http://www.law.vill.edu/currentstudents/clinicsandexternships/caresclinic.asp* (last visited 12/10/2004).
[74] Id.
[75] See CCA Inmate Orientation Handbook at 11-12; see also "Request for Attorney/Paralegal Conference" form (Attached as Exhibit E) (showing that in fact, in the "Inmate Orientation Handbook" that  CCA provides each detainee, under "Legal Assistance" they note that CCA has retained counsel to assist inmates is clearly designed for internal prison issues, not necessarily for the complicated issues related to immigration law, or asylum cases in particular).

IFR_AR_008424

representation he provides. Finally, he pointed out that there are few immigration lawyers in the Laredo area and that he is not aware of anyone who practices asylum law.[76]

7.      *The Overseas Processing Entity Model of the Department of State*

At DHS, Refugee and Asylum adjudications are administered by the USCIS Office of Refugees, Asylum, and International Operations (ORAIO).  Both programs aim to protect aliens who meet the definition of a "refugee" under U.S. law.[77]  There are some notable differences, however.  The obvious one is that refugee applicants apply outside of the United States, while aliens must be physically located within the United States to apply for asylum.  Another important distinction, however, is that asylum seekers must prepare their own asylum applications or, from within the detention center, find and retain an attorney to assist them.  In contrast, refugee applicants are generally required by the US Refugee Program to complete their forms with the assistance of a caseworker working for an agency under contract with the Department of State.[78]

These agencies are known as Overseas Processing Entities (OPEs), and were formerly known as Joint Voluntary Agencies (JVAs).  The OPE prepares cases for DHS adjudication, including screening applicants to determine whether an individual appears to meet the requirements to receive a refugee interview; reviewing an individual's refugee characteristics; conducting family history interviews; and compiling documentation needed for DHS adjudication.  Most importantly, while the OPE does not "represent" refugee applicants in the attorney-client sense, the OPE does assist the applicant with completing the Form I-590 (Registration for Classification as Refugee), and with articulating the applicant's refugee claim.  The Refugee Application is intended to elicit the same information as the Form I-589 Application for Asylum.  It is somewhat ironic that, while asylum applicants must fill out their own applications or find legal counsel to do so, refugee applicants overseas are generally not permitted to fill out the refugee application on their own.  Form filling and case preparation is done with the assistance of the OPE, working under contract with the Department of State.[79]

In a recent report on the Refugee Program commissioned by the Department of State, David Martin commented that, in preparing the refugee application for submission to DHS, an OPE caseworker "typically questions the applicant to capture the full particulars of the refugee claim and to record it in the file that will be presented to the DHS officer. This too may require considerable skill and up to several hours of time, because refugees often have only a dim idea of which parts of their background are salient for the specific purposes of the DHS refugee determination." [80]

---

[76] Conversation between author and DHS contract attorney (Dec. 7, 2004).
[77]   See 8 USC 1101(a)(42)(2004) Immigration and Nationality Act (defining what it means to be classified as a refugee).
[78] These agencies are generally overseas offices of "voluntary agencies" based in the United States, or the Geneva-based International Organization for Migration.
[79] Section 3.3 of the USCIS Refugee Officer's Field Manual (2003).
[80] *The United States Refugee Admissions Program:  Reforms for a New Era of Refugee Resettlement*, David A. Martin (July 8, 2004)*, available at,*  http://www.state.gov/g/prm/refadm/rls/rpts/36958.htm (last visited 1/28/2005).

IFR_AR_008425

In the U.S. Refugee program, the operating assumption of the government seems to be that a refugee applicant cannot successfully complete the application without assistance. Seeing that only 2 percent of unrepresented asylum applicants in Expedited Removal are ultimately successful in their asylum application, the same assumption may be applicable to asylum seekers in Expedited Removal.

If asylum seekers were concentrated in greater numbers in fewer detention facilities, the OPE may provide a useful model for asylum seekers in Expedited Removal. Such a system could have potential in the context of explaining the credible fear determination process to aliens, assisting them with finding counsel, as well as with more expeditious preparation of their asylum applications.

E.    **The Future of Representation of Detained Asylum Seekers in Expedited Removal Proceedings**

A continued problem reported by all NGOs and pro bono organizations is the shrinking pool of available funding to run these programs. For example, there is at least one major provider of services to asylum seekers that is disengaging from providing representation. As a result of funding difficulties, the Hebrew Immigrant Aid Society (HIAS), a major service provider in the New York/New Jersey area, is no longer accepting new clients.[81]

Some organizations are restructuring how these types of services are provided. CLINIC, a national organization dedicated to the training of Catholic Charities and Catholic Social Services agencies in providing immigration services to the poor and detained asylum seekers, is currently restructuring how these services are provided. CLINIC is now seeking not only alternate private sources of funding, but also is creating new programs to better support and provide representation, including turning over CLINIC affiliates to Diocesan partners, to ensure continued funding while still providing support to allow these organization to focus on maintaining the standards of representation. However, many social service organizations report that they require continued funding from the private sector- funding which is becoming increasingly scarce.[82]

The biggest potential source of representation remains the private bar. Indisputably, there are available a number of private attorneys willing to take the case of asylum seekers who can pay for such services. However, for those unable to pay, or for those detained asylum seekers in rural detention facilities unable to contact competent counsel, representation is difficult to obtain. One obvious solution is an expansion of programs similar to those done where larger private law firms provide pro bono assistance, usually through newer attorneys. In fact, a recent Supreme Court case on immigration law was handled by pro bono counsel and established case law likely

---

[81] Conversation with HIAS representative (Dec. 2004).
[82] Conversation with CLINC representative (Dec. 2004).

IFR_AR_008426

to impact thousands of similar cases.[83]  Access to Representation in any form, but particularly through competent immigration counsel is an essential element to a fair, just, and rapid asylum process.

Congress requested that this study address whether asylum seekers in Expedited Removal are being incorrectly removed to countries where they may be persecuted, and whether such asylum seekers are being detained under inappropriate conditions.   The conditions of detention clearly create certain impediments that make it difficult for asylum seekers to effectively represent themselves or obtain representation.  Moreover, *bona fide* asylum seekers who navigate the adversarial Expedited Removal process unassisted by legal counsel seem particularly vulnerable to being incorrectly removed.  The models discussed above, if more widely and consistently applied, would help protect bona fide asylum seekers from this danger, without undermining the efficiency of the process.

---

[83] Leocal v. Ashcroft, 125 S. Ct. 377 (2004).  Leocal's case fit the criteria for review by the BIA Pro Bono Project, a collaborative effort of four non-governmental agencies (Catholic Legal Immigration Network, Inc., the American Immigration Law Foundation, the Capital Area Immigrants' Rights Coalition, and the National Immigration Project of the National Lawyer's Guild) and the Executive Office for Immigration Review.  The Project matches pro bono counsel with unrepresented detainees who have cases pending before the BIA.

Through the BIA Project, Leocal's case was matched with a team of pro bono attorneys at King & Spaulding, which represented him before the BIA, Eleventh Circuit Court of Appeals and ultimately the U.S. Supreme Court. Without the pro bono representation of King & Spaulding, it is unlikely that Leocal's case would have progressed beyond the BIA and onto the Supreme Court, meaning that the unanimous decision that allowed for Leocal to return to the country and his family would not have happened.

"Considering the complexity of immigration law, the law's severe penalties, and the fact that most immigrants lack the money to hire attorneys, anyone who is at risk of being removed from the U.S. should be able to secure legal representation," says Donald Kerwin, Executive Director of the Catholic Legal Immigration Network, Inc. "The Supreme Court's 9 - 0 ruling in favor of a man who would have been otherwise separated from his family clearly demonstrates that the system needs to take into account the potentially tragic consequences of denying immigrants legal representation."

IFR_AR_008427

**Appendix A**

**U.S. Department of Justice**

Immigration and Naturalization Service

# Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act

Statement by: _____

In the case of: _____

Date of Birth:_____     Gender (circle one):   Male   Female

At: _____     Date: _____

Before: _____
<div style="text-align:center">(Name and Title)</div>

In the _____ language.  Interpreter _____ Employed by_____

I am an officer of the United States Immigration and Naturalization Service.  I am authorized to administer the immigration laws and to take sworn statements.  I want to take your sworn statement regarding your application for admission to the United States.  Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States.  This may result in your being denied admission and immediately returned to your home country without a hearing.   If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to  me and the Immigration and Naturalization Service to make a decision.  It is very important that you tell me the truth.  If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country.  If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.   You will have the opportunity to speak privately and confidentially to another officer about your fear or concern.  That officer will determine if you should remain  in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Immigration and Naturalization Service.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Q:  Do you understand what I've said to you?

A.

Q.   Do you have any questions?

A.

Q.    Are you willing to answer my questions at this time?

A.

Q.  Do you swear or affirm that all the statements you are about to make are true and complete?

A.

Page 1 of _____

IFR_AR_008428

**U.S. Department of Justice**

**Immigration and Naturalization Service**

**Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act**

Q:   Why did you leave your home country or country of last residence?

A.

Q.   Do you have any fear or concern about being returned to your home country or being removed from the United States?

A.

Q.   Would you be harmed if you are returned to your home country or country of last residence?

A.

Q.   Do you have any questions or is there anything else you would like to add?

A.

I have read (or have had read to me) this statement, consisting of _____ pages (including this page).  I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above-named officer of the Immigration and Naturalization Service.  I have initialed each page of this statement (and the corrections noted on page(s) _____).

Signature: _____

Sworn and subscribed to before me at _____
on _____.

_____
Officer, United States Immigration and Naturalization Service

Witnessed by: _____

Page _____ of _____

I-867B (4-1-97)

253

IFR_AR_008429

**Appendix B**

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Record of Determination/Credible Fear Worksheet**

| | | | |
|---|---|---|---|
| District Office Code | Asylum Office Code | Alien's File Number | Alien's Last/ Family Name |

| | | |
|---|---|---|
| Asylum Officer's Last Name | Asylum Officer's First Name | Alien's Nationality |

*All statements in italics must be read to the applicant*

**SECTION I:**                    **INTERVIEW PREPARATION**

1.1 ___ ___/___ /___ ___

Date of arrival [MM/DD/YY]

1.2 _____

Port of arrival

1.3 ___ ___/___ /___ ___

Date of detention [MM/DD/YY]

1.4 _____

Place of detention

1.5 ___ ___/___ /___ ___

Date of AO orientation [MM/DD/YY]

1.6 _____

If orientation more than one week from date of detention, explain delay

1.7 ___ ___ / ___ ___ / ___ ___

Date of interview [MM/DD/YY]

1.8 _____

Interview site

1.9 ☐ Applicant received and signed **Form M-444** and relevant *pro bono* list on      ___ ___ / ___ ___ / ___ ___

Date signed [MM/DD/YY]

1.10 Does applicant have consultant(s)?     ☐ Yes     ☐ No

1.11 If yes, consultant(s) name, address, telephone number and relationship to applicant

_____

_____

1.12 Persons present at the interview (check which apply)

1.13 ☐ Consultant(s)

1.14 ☐ Other(s), list: _____

1.15 ☐ No one other than applicant and asylum officer

1.16 Language used by applicant in interview:

1.17 _____     ☐ Yes   ☐ No     _____     _____

Interpreter Service, Interpreter ID Number.     Interpreter Has Forms     Time Started     Time Ended

1.18 _____     ☐ Yes   ☐ No     _____     _____

Interpreter Service, Interpreter ID Number.     Interpreter Has Forms     Time Started     Time Ended

1.19 _____     ☐ Yes   ☐ No     _____     _____

Interpreter Service, Interpreter ID Number.     Interpreter Has Forms     Time Started     Time Ended

1.20 ☐ Interpreter **was not changed** during the interview

1.21 ☐ Interpreter **was changed** during the interview for the following reason(s):

1.22 ☐ Applicant requested a female interpreter replace a male interpreter, or *vice versa*

1.23 ☐ Applicant found interpreter was not competent     1.24 ☐ Applicant found interpreter was not neutral

1.25 ☐ Officer found interpreter was not competent     1.26 ☐ Officer found interpreter was not neutral

1.27 ☐ Bad telephone connection

1.28 ☐ Asylum officer read the following paragraph to the applicant at the beginning of the interview:

IFR_AR_008430

| Alien's File Number: |
|---|

*The purpose of this interview is to determine whether you may be eligible for asylum or protection from removal to a country where you fear persecution or torture. I am going to ask you questions about why you fear returning to your country or any other country you may be removed to. It is very important that you tell the truth during the interview and that you respond to all of my questions. This may be your only opportunity to give such information. Please feel comfortable telling me why you fear harm. U.S. law has strict rules to prevent the disclosure of what you tell me today about the reasons why you fear harm. The information you tell me about the reasons for your fear will not be disclosed to your government, except in exceptional circumstances. The statements you make today may be used in deciding your claim and in any future immigration proceedings. It is important that we understand each other. If at any time I make a statement you do not understand, please stop me and tell me you do not understand so that I can explain it to you. If at any time you tell me something I do not understand, I will ask you to explain.*

## SECTION II:                    BIOGRAPHIC INFORMATION

2.1 _____
Last Name/ Family Name [ALL CAPS]

2.2 _____     2.3 _____
First Name                             Middle Name

2.4 ___ /___ /___ ___     2.5 Gender ☐ Male     ☐ Female
Date of birth [MM/DD/YY]

2.6 _____
Other names and dates of birth used

2.7 _____     2.8 _____
Country of birth                      Country (countries) of citizenship (list all)

2.9 _____
Address prior to coming to the U.S. (List Address, City/Town, Province, State, Department and Country).

2.10 _____     2.11 _____     2.12 _____
Applicant's race or ethnicity     Applicant's religion     All languages spoken by applicant

2.13 Marital status:     ☐ Single     ☐ Married     ☐ Legally separated     ☐ Divorced     ☐ Widowed

2.14 Did spouse arrive with applicant?     ☐ Yes     ☐ No

2.15 Is spouse included in applicant's claim?     ☐ Yes     ☐ No

2.16 If currently married (including common law marriage) list spouse's name, citizenship, and present location **(if with applicant, provide A-Number)**:

_____
_____

2.17 Children:     ☐ Yes     ☐ No

2.18 List any children (*Use the continuation section to list any additional children*):

| Date of birth (MM/DD/YY) | Name | Citizenship | Present location (if w/PA, list A-Numbers) | Did child arrive with PA? | Is child included in PA's claim? |
|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | ☐ Yes ☐ No | ☐ Yes ☐ No |
| _____ | _____ | _____ | _____ | ☐ Yes ☐ No | ☐ Yes ☐ No |
| _____ | _____ | _____ | _____ | ☐ Yes ☐ No | ☐ Yes ☐ No |

Form I-870 (Rev. 11/2/2023) Page 2

**Alien's File Number:**

| | | | | Yes | No | Yes | No |
|---|---|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | ☐ | ☐ | ☐ | ☐ |
| _____ | _____ | _____ | _____ | ☐ | ☐ | ☐ | ☐ |
| _____ | _____ | _____ | _____ | ☐ | ☐ | ☐ | ☐ |

IFR_AR_008432

Form I-830 (Rev. 11/2/08) Page 3

| Alien's File Number: |
| --- |

2.19  Does applicant claim to have a medical condition (physical or mental), or has the officer observed any indication(s) that a medical condition exists? If YES, answer questions 2.20 and 2.21 and explain below.  ☐ Yes  ☐ No

2.20  Has applicant notified the facility of medical condition?  ☐ Yes  ☐ No
2.21  Does applicant claim that the medical condition relates to torture?  ☐ Yes  ☐ No
2.22  Does the applicant have a relative, sponsor or other community ties, including spouse or child already listed above?  ☐ Yes  ☐ No
2.23  If YES, provide information on relative or sponsor (use continuation section, if necessary):

Name _____  Relationship _____

Address _____  Telephone Number _____
☐ Citizen   ☐ Legal Permanent Resident   ☐ Other

**SECTION III:**            **CREDIBLE FEAR INTERVIEW**
**The following notes are not a verbatim transcript of this interview.**
**These notes are recorded to assist the individual officer in making a credible fear determination**
**and the supervisory asylum officer in reviewing the determination.**
**There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening.**

The asylum officer must elicit sufficient information related to both credible fear of persecution and credible fear of torture to determine whether the applicant meets the threshold screening. Even if the asylum officer determines in the course of the interview that the applicant has a credible fear of persecution, the asylum officer must still elicit any additional information relevant to a fear of torture. Asylum officers are to ask the following questions and may use the continuation sheet if additional space is required. If the applicant replies YES to any question, the asylum officer must ask follow-up questions to elicit sufficient details about the claim in order to make a credible fear determination.

3.1  a. *Have you or any member of your family ever been mistreated or threatened by anyone in any country to which you may be returned?*
☐ Yes  ☐ No _____

b. *Do you have any reason to fear harm from anyone in any country to which you may be returned?*
☐ Yes  ☐ No

c. If YES to questions *a* and/or *b*, was it or is it because of any of the following reasons? (Check each of the following boxes that apply).
☐ Race  ☐ Religion  ☐ Nationality  ☐ Membership in a particular social group  ☐ Political Opinion

| Alien's File Number: |
| --- |

3.2　☐　At the conclusion of the interview, the asylum officer must read the following to applicant:

If the Department of Homeland Security determines you have a credible fear of persecution or torture, your case will be referred to an immigration court, where you will be allowed to seek asylum or withholding of removal based on fear of persecution or withholding of removal under the Convention Against Torture. The Field Office Director in charge of this detention facility will also consider whether you may be released from detention while you are preparing for your hearing. *If the asylum officer determines that you do not have a credible fear of persecution or torture, you may ask an Immigration Judge to review the decision. If you are found not to have a credible fear of persecution or torture and you do not request review, you* **may be removed** *from the United States as soon as travel arrangements can be made. Do you have any questions?*

_____
_____

3.3　☐　At the conclusion of the interview, the asylum officer must read a summary of the claim, consisting of the responses to Questions 3.1 a-c and information recorded in the Additional Information/Continuation section, to applicant.

****Typed Question and Answer (Q&A) interview notes and a summary and analysis of the claim must be attached to this form for all negative credible fear decisions. These Q&A notes must reflect that the applicant was asked to explain any inconsistencies or lack of detail on material issues and that the applicant was given every opportunity to establish a credible fear.

## SECTION IV:　　　　　　　　　　　CREDIBLE FEAR FINDINGS

### A.　Credible Fear Determination:

Credibility

4.1　☐　There is a significant possibility that the assertions underlying the applicant's claim could be found credible in a full asylum or withholding of removal hearing.

4.2　☐　Applicant found **not** credible because (check boxes 4.3-4.5, which apply):

　　　4.3　☐　Testimony was internally inconsistent on material issues.

　　　4.4　☐　Testimony lacked sufficient detail on material issues.

　　　4.5　☐　Testimony was not consistent with country conditions on material issues.

Nexus

4.6　☐　Race　4.7　☐　Religion　4.8　☐　Nationality　4.9　☐　Membership in a Particular Social Group

　(Define the social group): _____

4.10　☐　Political Opinion　4.11　☐　Coercive Family Planning [CFP]　4.12　☐　No Nexus

Credible Fear Finding

4.13　☐　Credible fear of **persecution** established.

**OR**

4.14　☐　Credible fear of **torture** established.

**OR**

4.15　☐　Credible fear of persecution NOT established and there is not a significant possibility that the applicant could establish eligibility for withholding of removal or deferral of removal under the Convention against Torture.

### B.　Possible Bars:

4.16　☐　Applicant could be subject to a bar(s) to asylum or withholding of removal (check the box(es) that applies and explain on the continuation sheet):

　　　4.17　☐　Particularly Serious Crime　4.18　☐　Security Risk　4.19　☐　Aggravated Felon

　　　4.20　☐　Persecutor　4.21　☐　Terrorist　4.22　☐　Firmly Resettled

　　　4.23　☐　Serious Non-Political Crime Outside the United States

4.24　☐　Applicant does **not** appear to be subject to a bar(s) to asylum or withholding of removal.

IFR_AR_008434

| Alien's File Number: |
|---|

**C.**       **Identity:**

4.25   ☐  Applicant's identity was determined with a reasonable degree of certainty (check the box(es) that applies):

    4.26   ☐  Applicant's own credible statements. (If testimony is credible overall, this will suffice to establish the applicant's identity with a reasonable degree of certainty).

    4.27   ☐  Passport which appears to be authentic.

    4.28   ☐  Other evidence presented by applicant or in applicant's file (List): _____

            _____

4.29   ☐  Applicant's identity was **not** determined with a reasonable degree of certainty.  (Explain on the continuation sheet.)

**SECTION V:**              **ASYLUM OFFICER / SUPERVISOR NAMES AND SIGNATURES**

5.1  _____   5.2  _____   5.3  ____ ___ / ____ / ____
     Asylum officer name and ID CODE (print)      Asylum officer's signature              Decision date

5.4  _____   5.5  _____   5.6  ____ ___ / ____ / ____
     Supervisory asylum officer name             Supervisor's  signature                Date supervisor approved
                                                decision

**ADDITIONAL INFORMATION/CONTINUATION**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

IFR_AR_008435

**Appendix C**

**Affirmative Asylum Application Outcome and Representation Status by Asylum Office, FY 2000-2003**
Source: USCIS Asylum Division

| Asylum Office | Total Adjudicated* | | Granted Asylum | | | Total Adjudicated* |
|---|---|---|---|---|---|---|
| | Rep. | Unrep. | Rep. | Unrep. | Total | |
| ZSF | 43% | 57% | 51% | 43% | 46% | 26,393 |
| ZAR | 38% | 62% | 55% | 35% | 42% | 22,838 |
| ZMI | 15% | 85% | 38% | 33% | 34% | 33,548 |
| **Mean** | **34%** | **66%** | **38%** | **24%** | **28%** | **27,994** |
| ZNK | 38% | 62% | 26% | 18% | 21% | 20,381 |
| **Median** | **37%** | **63%** | **36%** | **17%** | **24%** | **24,451** |
| ZLA | 26% | 74% | 54% | 16% | 26% | 70,061 |
| ZNY | 40% | 60% | 20% | 16% | 18% | 26,063 |
| ZHN | 33% | 67% | 24% | 15% | 18% | 12,483 |
| ZCH | 37% | 63% | 34% | 14% | 21% | 12,188 |
| Total | 31% | 69% | 41% | 24% | 29% | 223,955 |

 * Includes cases granted, denied, referred, rejected, closed, and marked no show.

IFR_AR_008436

**EOIR Legal Orientation Program**
**DHS Briefing - July 20, 2004**

A.     Congressional Appropriation of $1m to INS - FY'02; DHS - FY'03 and FY'04
         – Transferred to EOIR FY'02 and FY'04 - Administered by Pro Bono Program
         – Norwich University '04 BPA - $977,500 includes:
            *7 Programs for '04        *Administration        *Travel
            *Training Conference *Database                  *Evaluation

B.     Sites where EOIR-funded Legal Orientation Programs are being carried out for all
         detainees prior to appearing in immigration court:

1     Aurora (Denver), Colorado (since 6/30/03) - Lutheran Immigrant and Refugee
         Services (LIRS) in conjunction with the Rocky Mountain Immigrant Advocacy
         Network (RMIAN)($146,700);
         –     # Group Orientations through 6/29/04 - 156
         –     # Attendees - 2,382
         –     # Individual Orientations - 739

2     Batavia, New York (since 2/21/03) - Volunteer Lawyers Project (VLP) of the Erie
         County Bar Association ($60,120);
         –     # Group Orientations through 02/20/04 - 156
         –     # Attendees - 701
         –     # Individual Orientations - 393

3      Eloy, Arizona (since 3/7/03) - Florence Immigrant and Refugee Rights Project
         (FIRRP)($149,639);
         –     # Group Orientations through 3/06/04 - 270
         –     # Attendees -  4,238
         –     # Individual Orientations - 2,562

4     Lancaster, California - (since 5/27/03) - Catholic Legal Immigration Network, Inc.
         (CLINIC)($124,819);
         –     # Group Orientations through 5/26/04 - 108
         –     # Attendees - 3,399
         –     # Individual Orientations - 424

5     Port Isabel (Los Fresnos), Texas (since 2/18/03) - American Bar Association
         (ABA) through ProBAR (South Texas Asylum Representation
         Project)($136,600);
         –     # Group Orientations through 2/17/04 - 234
         –     # Attendees - 5,218
         –     Individual Orientations - 781
         –     # Projected detainees served in 12 months - 5,950

6    Seattle, Washington (since 3/17/03) - Northwest Immigrant Rights Project (NWIRP)($129,800);
   –    # Group Orientations through 3/16/04 - 127
   –    # Attendees - 1,103
   –    # Individual Orientations - 671

**Total # detained aliens served in 1st Year of LOP - 17,041**

C.    7th site added under FY '04 funding - El Paso, Texas, by the Catholic Legal Immigration Network, Inc. (CLINIC)($108,222 for 9 months)
   –    # Estimated detainees served in 12 months - 3,850

D.    Non EOIR-funded - Florence, Arizona - Florence Immigrant and Refugee Rights Project (FIRRP) [the creators of the "Justice Efficiency Model", since 1990)
   –    # Estimated detainees served in past 12 months - 2,150

E.    Possible future EOIR LOP sites:

   1    Aguadilla, Puerto Rico - # estimated detainees served in 12 months - 735

   2    Bradenton, Florida - # estimated detainees served in 12 months - 1,860

   3    El Centro, California - # estimated detainees served in 12 months - 2,200

   4    Houston, Texas - # estimated detainees served in 12 months - 1,740

   5    Laredo, Texas - # estimated detainees served in 12 months - 2,360

   6    Las Vegas, Nevada - # estimated detainees served in 12 months - 1,100

   7    Miami (Krome), Florida - # estimated detainees served in 12 months - 2,975

   8    Newark, New Jersey - # estimated detainees served in 12 months - 1,930

   9    San Diego, California - # estimated detainees served in 12 months - 3,870

   10    San Pedro, California - # estimated detainees served in 12 months - 1,590

   11    York County, Pennsylvania - # estimated detainees served in 12 months - 1,675
*The "estimated detainees served in 12 months" is based upon 70% of EOIR's detained proceeding completion data for the past fiscal year. Based upon first year's statistics under the LOP, an average of 30% of detained aliens in proceedings are either released under bond prior to their initial removal hearing, or decline to attend the Legal Orientation Program.

                                    IFR_AR_008438

## Detained Completions with and without Applications and Grant Rate

| | Total Completions | Detained w/o Apps | Detained w/ Apps | % w/ Apps | Grants | Denials | Detained w/ Apps. Grant Rate |
|---|---|---|---|---|---|---|---|
| **PIS** | | | | | | | |
| 2/18/01-2/17/02 | 7,293 | 7,243 | 50 | 1% | 10 | 9 | 53% |
| 2/18/02-2/17/03 | 6,432 | 6,343 | 89 | 1% | 18 | 20 | 47% |
| **2/18/03-2/17/04** | **6,854** | **6,735** | **119** | **2%** | **60** | **30** | **67%** |
| **BTV** | | | | | | | |
| 2/21/01-2/20/02 | 855 | 781 | 74 | 9% | 18 | 46 | 28% |
| 2/21/02-2/20/03 | 894 | 792 | 102 | 11% | 22 | 53 | 29% |
| **2/21/03-2/20/04** | **899** | **794** | **105** | **12%** | **26** | **52** | **33%** |
| **EAZ** | | | | | | | |
| 3/7/01-3/6/02 | 6,371 | 5,869 | 502 | 8% | 197 | 237 | 45% |
| 3/7/02-3/6/03 | 7,886 | 7,370 | 516 | 7% | 160 | 280 | 36% |
| **3/7/03-3/6/04** | **7,430** | **6,805** | **625** | **8%** | **227** | **330** | **41%** |
| **AIR** | | | | | | | |
| 3/17/01-3/16/02 | 2,514 | 2,315 | 199 | 8% | 54 | 111 | 33% |
| 3/17/02-3/16/03 | 2,165 | 1,995 | 170 | 8% | 40 | 84 | 32% |
| **3/17/03-3/16/04** | **1,881** | **1,725** | **156** | **8%** | **43** | **67** | **39%** |
| **LAN** | | | | | | | |
| 5/27/01-5/26/02 | 5,905 | 5,615 | 290 | 5% | 83 | 126 | 40% |
| 5/27/02-5/26/03 | 5,070 | 4,637 | 433 | 9% | 86 | 257 | 25% |
| **5/27/03-5/26/04** | **4,784** | **4,326** | **458** | **10%** | **112** | **238** | **32%** |
| **WSI** | | | | | | | |
| 6/22/01-6/21/02 | 2,785 | 2,696 | 89 | 3% | 30 | 38 | 44% |
| 6/22/02-6/21/03 | 2,913 | 2,855 | 58 | 2% | 18 | 29 | 38% |
| **6/22/03-6/21/04** | **2,648** | **2,530** | **118** | **4%** | **34** | **62** | **35%** |

**Bold = Updated Information**

6/21/04

IFR_AR_008439

## AVERAGE PROCESSING TIME

| | Received Date to Proceedings Completion Date | Received Date to First Hearing Date | First Hearing Date to Proceeding Completion Date |
|---|---|---|---|
| **PIS** | | | |
| 2/18/01-2/17/02 | 24 | 15 | 9 |
| 2/18/02-2/17/03 | 23 | 11 | 13 |
| **2/18/03-2/21/04** | **22** | **10** | **12** |
| **BTV** | | | |
| 2/21/01-2/20/02 | 24 | 8 | 17 |
| 2/21/02-2/20/03 | 28 | 7 | 21 |
| **2/21/03-2/20/04** | **25** | **6** | **19** |
| **EAZ** | | | |
| 3/7/01-3/6/02 | 30 | 12 | 19 |
| 3/7/02-3/6/03 | 23 | 14 | 9 |
| **3/7/03-3/6/04** | **21** | **12** | **9** |
| **AIR** | | | |
| 3/17/01-3/16/02 | 16 | 7 | 10 |
| 3/17/02-3/16/03 | 14 | 4 | 9 |
| **3/17/03-3/16/04** | **11** | **3** | **8** |
| **LAN** | | | |
| 5/27/01-5/26/02 | 22 | 13 | 9 |
| 5/27/02-5/26/03 | 25 | 12 | 13 |
| **5/27/03-5/26/04** | **19** | **8** | **11** |
| **WSI** | | | |
| 6/22/01-6/21/02 | 13 | 6 | 7 |
| 6/22/02-6/21/03 | 12 | 5 | 7 |
| **6/22/03-6/21/04** | **16** | **5** | **11** |

**Bold = Updated Information**

6/21/04

IFR_AR_008440

**U.S. Department of Justice**
Executive Office for Immigration Review
*Office of General Counsel*
5107 Leesburg Pike, Suite 2600
Falls Church, Virginia 22041



# Pro Bono Program Update - December 2003

To:            **All Board Members and Staff**

From:        **Steven Lang, Pro Bono Coordinator**

I am pleased to send all of you this update on the Pro Bono Program.  Since April of 2000, the Pro Bono Program has worked to improve the level and quality of *pro bono* representation.  This has been carried out primarily through initiatives which facilitate access to information and create new incentives for attorneys and law students to take on *pro bono* cases before the immigration courts and Board of Immigration Appeals (BIA).  The Program has also continued to perform an important community relations role, with the Coordinator often serving as liaison between our agency and the non-profit legal community on issues related to legal assistance for indigent aliens.

In these difficult budget times, the Pro Bono Program has limited its focus over the past year to three major initiatives - the Legal Orientation Program, the BIA Pro Bono Project, and interagency initiatives aimed at improving access to *pro bono* legal services for Unaccompanied Alien Children.  The Program also continues to promote and develop two earlier initiatives - the Pro Bono Program webpage, and the Model Hearing Program (MHP).

Many of the Program's accomplishments owe their success to the numerous Board and Clerk's Office staff, Immigration Judges and Court Administrators whose interest and active involvement in the Program have helped to shape its approach and direction.  Our agency has long recognized the mutual benefits derived from strong *pro bono* participation in immigration proceedings.  I look forward to your comments, suggestions, and enthusiasm throughout this next year as we strive to meet future challenges and goals.


I.     <u>**Legal Orientation Programs**</u>

In FY'02, Congress appropriated $1 million to the INS for "Legal Orientation Programs."  The Pro Bono Program lead efforts to transfer these funds to EOIR, as well as to determine the best available means of funding such programs across the country.  These funds have recently been renewed.  We are currently in the process of evaluating program performance and reviewing proposals for continued, as well as new funding.

EOIR's past experience with Legal Orientation Programs (also known as "Rights Presentations") demonstrated that they are beneficial to all parties involved.  These programs result in greater judicial efficiency for EOIR, less time for aliens in DHS detention, and greater access for detained aliens to legal information, counseling, and *pro bono* representation.

Through such orientations, representatives from nonprofit organizations provide comprehensive explanations about immigration court procedures along with other basic legal information to large groups of detained

265

IFR_AR_008441

individuals. The orientations are normally comprised of three components: 1) the interactive group orientation, which is open to general questions; 2) the individual orientation, wherein non-represented individuals can briefly discuss their cases with experienced counselors; and 3) the self-help component, wherein those detainees who wish to pursue claims for relief are provided with self-help legal materials and assistance through group workshops, where appropriate.

EOIR currently maintains a contract (Blanket Purchase Agreement - BPA) with Norwich University to carry out a comprehensive Legal Orientation Presentation Training Program at six detention sites across the country. Serving as the Contracting Officer's Technical Representative (COTR), the Pro Bono Coordinator has worked with Norwich University, six non-profit agency subcontractors, EOIR components, DHS and local detention facility representatives to implement the programs at the following sites:

| | Detention/Immigration Court | Subcontractor |
|---|---|---|
| 1. | Port Isabel, Texas | American Bar Association (through ProBAR) |
| 2. | Eloy, Arizona | Florence Immigrant & Refugee Rights Project (FIRRP) |
| 3. | Batavia, New York | Erie County Bar Association VLP |
| 4. | Seattle, Washington | Northwest Immigrant Rights Project (NWIRP) |
| 5. | Lancaster, California | Catholic Legal Immigration Network, Inc. (CLINIC) |
| 6. | Aurora, Colorado | Lutheran Immigrant & Refugee Services (LIRS), together with the Rocky Mountain Immigrant Advocacy Network (RMIAN) |

More than 23,000 detainees are expected to benefit from the program in the first 12 months of full operation, or roughly 20 percent of all DHS detainees who appear before the Immigration Courts each year. As of the end of August 2003, preliminary results have shown an **average decrease in detained proceeding completion times of 1.5 days per detainee** (from receipt to proceeding completion date), with three of the **newest sites averaging 2.2 days** (from first Master Calendar hearing to proceeding completion date) as compared to the 12-month period preceding each sites' start date.

## II.     The BIA Pro Bono Project.

Since its implementation in January of 2001, the Project has succeeded in recruiting over 350 attorneys, law students and Accredited Representatives to write appeal briefs for over 250 USICE detainees who would have otherwise appeared without representation before the BIA. The Project was recently expanded to include certain non-detained case appeals, as well.

Under the Project, the Catholic Legal Immigration Network (CLINIC), Capital Area Immigrant Rights (CAIR) Coalition, American Immigration Law Foundation (AILF) and National Lawyers Guild send experienced volunteer attorney "screeners" to the BIA Clerk's Office every week to review selected case appeal transcripts. After review, the screeners write redacted summaries for cases they believe to be most suitable for *pro bono* representation. These summaries are e-mailed to participating *pro bono* representatives throughout the country who may select cases in which to enter as counsel. Those representatives who accept a case under the Project receive a copy of the file, as well as additional time to file the appeal brief.

Legal representation in many of these cases has already had a meaningful impact. Since attorneys or accredited representatives usually identify and argue the issues better on appeal, immigrants with meritorious cases have a greater chance of success. Representation also reduces procedural errors and enables the BIA to provide a more effective and timely case review. Special thanks to the Clerk's Office this past year for their great assistance in facilitating key elements of the Project.

IFR_AR_008442

### III.    Unaccompanied Alien Children in DHS/ORR Custody

Since early 2003, the Pro Bono Program, together with OCIJ, has been working with the newly-created Division for Unaccompanied Children's Services at the Office of Refugee Resettlement (ORR) to discuss, among other matters, new initiatives aimed at improving legal assistance for this special population.

EOIR's involvement with ORR was anticipated by Section 462 of the Homeland Security Act in "developing a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child," and in "compiling, updating, and publishing at least annually a state-by-state list of professionals or other entities qualified to provide guardian and attorney representation services for unaccompanied alien children."

Efforts are currently underway to develop and implement a pilot program in Chicago which would combine greater pro bono attorney involvement with a new volunteer 'Guardian Ad Litem' (GAL) component.  The GAL would function *in loco parentis* in the context of any immigration court proceedings to encourage the child to participate to the fullest extent possible.  The GAL would also make a determination as to the best interests of the child which may be offered to the attorney and/or immigration court as a recommendation.

Together with ORR, the Pro Bono Program has also formed an interagency pro bono committee to better coordinate national and local pro bono efforts to assist these children.

### IV.    Pro Bono Program Webpage

The Pro Bono Program has steadily expanded its heavily-visited internet webpage (#1 after the Homepage).  The webpage currently includes an online version of the "List of Free Legal Service Providers," and a variety of links to governmental and non-governmental sites, including bar associations, law school immigration clinics, human rights groups and *pro bono* organizations providing access to asylum documentation and self-help legal materials (http://www.usdoj.gov/eoir/probono/probono.htm).

Also found on the Pro Bono Program webpage are the recently-posted "Immigration Court Representation Summaries."  These concise reports provide detailed information regarding the number of case completions, as well as custody status, nationality, language, and forms of relief requested by individuals in removal proceedings.  The reports are designed to assist *pro bono* groups in their efforts to assess the needs of their local communities in order to better direct their services.

### V.    Model Hearing Program

The Model Hearing Program is an educational program developed by the Pro Bono Program to improve the quality of advocacy before the court, as well as increase levels of *pro bono* representation.  Model Hearings consist of small-scale 'mock' trial training sessions held in the immigration court and presented by volunteer immigration judges. The training sessions, carried out in cooperation with partnering bar associations and/or *pro bono* agencies, provide practical and relevant 'hands-on' immigration court training to small groups of attorneys/law students with an emphasis on practice, procedure and advocacy skills.  Participants receive training materials and CLE credit, and agree to perform a minimal level of *pro bono* representation throughout the year.  Since June of 2001, over 13 Model Hearing training sessions were held in the following court locations: San Diego, Dallas, York, Cleveland, Newark and New York City.  Special thanks to the immigration court judges and staff in York, Pennsylvania, New York City, and Dallas for their help in facilitating Model Hearings this past year.

IFR_AR_008443

**EOIR Legal Orientation Program - FY 2004**

1.    SCOPE

The Executive Office for Immigration Review (EOIR) requires a Contractor to provide Legal Orientation Training Programs to aliens detained by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (BICE, a legacy agency of the Immigration and Naturalization Service, INS) who are in immigration proceedings before the EOIR. The legal orientation programs will be locally performed by non-governmental non-profit organizations (NGOs) that regularly provide legal services to aliens.

2.    BACKGROUND

A.    EOIR was established in January 1983. Under delegated authority of the Attorney General of the United States, EOIR administers and interprets Federal immigration laws and regulations through the conduct of Immigration Court proceedings, appellate reviews, and administrative hearings in individual cases. EOIR carries out these responsibilities through its three main components:

   (1)    The Office of the Chief Immigration Judge (OCIJ), which oversees all the Immigration Courts and their proceedings throughout the United States;

   (2)    The Board of Immigration Appeals (BIA), which hears appeals of decisions made in individual cases by Immigration Judges, DHS District Directors, or other immigration officials; and

   (3)    The Office of the Chief Administrative Hearing Officer (OCAHO), which resolves cases concerning employer sanctions, document fraud, and immigration-related employment discrimination.

B.    The Office of the Chief Immigration Judge supervises and directs the activities of over 50 Immigration Courts throughout the United States. Immigration Courts are located in federal buildings, private buildings, correctional institutions, and DHS-operated/contracted detention centers. Immigration Judges conduct immigration hearings at these courts, and at designated 'detail' sites, to resolve various immigration matters.

C.    In FY2002, nearly 230,000 cases were completed by the immigration courts. Approximately one third of these cases involved detained aliens in DHS custody, of which close to 80% proceeded *pro se* (without legal representation).

D.    Although there are various types of immigration proceedings before the court, the vast majority are Removal proceedings, which are scheduled as either Master Calendar or Individual Hearings. In Master Calendar hearings, Immigration Judges are required to ensure that aliens proceeding *pro se* have a clear understanding of the charges against them, their procedural rights during the hearing process, and their options for relief. In addition, Immigration Judges attempt to provide adequate time for *pro se* aliens to assemble facts, documents, and witnesses which may be helpful in the aliens' pursuit of relief

IFR_AR_008444

from removal.  As a result, the additional time required by detained *pro se* aliens often places a great burden on the court's dockets and reduces the efficiency of the Master Calendar hearing process.

E.     Also known as Legal Rights Presentations, or "Rights Presentations," the Legal Orientation Program (LOP) concept was created in 1989 and pioneered in the early 1990s as the "Justice Efficiency Model" by the Florence Immigrant and Refugee Rights Project in Florence, Arizona, in conjunction with the local Immigration Court.  Conducted by non-profit agencies in DHS detention facilities, these programs effectively disseminate legal information and improve access to *pro bono* counsel to detainees while at the same time reducing government costs per detained alien and increasing the efficiency of Immigration Court proceedings.  Rights Presentations can also have the effect of reducing behavioral problems at the detention facility. The model has been commended by the U.S. Senate, the U.S. Commission on Immigration Reform, national advocacy groups, the American Bar Association, the DHS and EOIR for the benefits it can provide to all parties involved in Immigration Court proceedings - the detained alien, the government, and the non-profit legal sector.

F.     In 1998, EOIR funded 90-day pilot projects at three DHS Service Processing Centers - Florence (AZ), Port Isabel (TX), and San Pedro (CA) - to implement Rights Presentation programs to detained aliens before their first (initial) Master Calendar Hearing.  The EOIR evaluation of the pilot projects concluded that the Rights Presentation programs resulted in faster completions and increased availability of representation to detainees with potentially meritorious claims to relief, and recommended that the government expand them to all INS (DHS) detention facilities.

G.     In FY 2002, Congress appropriated $1 million to the Department of Justice to carry out "legal orientation programs."  These programs were to be used "for non-governmental agencies to provide live presentations to persons in INS [DHS] detention prior to their first hearing before an immigration judge."  Presentations were to include essential information about immigration court procedures and the availability of legal remedies to assist detainees in distinguishing between meritorious cases and frivolous cases.  EOIR is currently carrying out these programs at six DHS detention sites across the country.

H.     In FY 2004, Congress appropriated $1 million to the Department of Homeland Security for "legal orientation programs."  These funds were recently transferred to EOIR to continue conducting legal orientation programs across the country.

3.     STATEMENT OF WORK

A.     To conduct Legal Orientation Training Programs for aliens detained by the DHS in order to measurably:
       (1)     Increase the efficiency of Immigration Court proceedings;
       (2)     Decrease the duration of detention;
       (3)     Increase an individual's ability to make a timely decision about his or her immigration case through receipt of early and accurate legal information

IFR_AR_008445

and orientation; and
(4)     Facilitate access to legal counsel.

B.      Legal Orientation Programs shall include the following elements:
(1)     Group orientations;
(2)     Individual orientations;
(3)     Self-help workshops;
(4)     Dissemination of written and taped legal orientation materials; and
(5)     Programs to promote and facilitate *pro bono* representation for detained aliens who seek legal assistance through the legal orientation program.

C.      All elements stated above at 3.B shall be performed by one or more on-site trainer(s), who must either be licensed attorneys, BIA Accredited Representatives or legal assistants/paralegals, law students, law school graduates or other trained volunteers working under the direct supervision of such licensed attorneys or Accredited Representatives.

D.      At the end of the contract period, the Contractor will provide a report on all services performed and data to assist the Contract Officer Technical Representative (COTR) in evaluating and quantifying the costs, savings, benefits, and other effects of the legal orientation programs on the immigration court process.

E.      The specific tasks to be provided are as follows:

(1)     Identify the immigration courts and/or detention facility sites at which legal orientation programs will be conducted.

(2)     Establish plans for program operation for no less than 12 months.

(3)     The trainer(s) will review in advance available information on individuals scheduled to attend the group orientation in order to make necessary preparations for the orientation.

(4)     Provide group orientations to all detained aliens (with reasonable exceptions to be approved by the COTR) regardless of representation status prior to their initial Master Calendar Hearing in the Immigration Court. Additional group orientations may be made to detained aliens prior to subsequent hearings. Group orientations will review the range of rights available and alert individuals to their alternatives or the lack thereof. Group orientations will also include group question and answer periods at the conclusion of each orientation in which the trainer(s) will respond to general concerns of individuals.

(5)     Arrange for suitable space in which to conduct the group orientations, which may include the EOIR Immigration Court or other space within the detention facility. Where a contract detention facility, or state or county jail is involved, the Government will make its best effort to facilitate access to a suitable space.

IFR_AR_008446

(6)     Group orientations must be made in the language(s) most appropriate for the majority of detained aliens present at the orientation.  The Government will not provide interpreters for the purpose of the group orientation.

(7)     The trainer(s) shall state at the beginning of each group orientation that the views expressed by the trainer(s) do not necessarily represent the views of EOIR, the Department of Justice, or the United States Government.  In addition, the trainer(s) shall not, in any manner, either speak, or appear to speak, on behalf of EOIR, the Department of Justice, or the United States Government.

(8)     Within a short period following the group orientation, the trainer(s) will conduct individual orientations when requested by unrepresented individuals to assist them in understanding their legal situations.  The trainer(s) may respond to specific concerns/questions of an individual, educating the individual as to the law and applicable procedure.

(9)     The trainer shall explain to all individuals receiving an individual orientation that the trainer(s) is/are not their attorney or representative.  In addition, the trainer shall not, in any manner, either speak, or appear to speak, on behalf of EOIR, the Department of Justice, or the United States Government.  The trainer shall also obtain written consent from the individual prior to disclosing any confidential detainee information to other parties.  This written consent shall state, in effect, that the detained individual understands that the trainer is not their attorney or representative, that the individual has willingly given his/her information, and that the individual authorizes it's disclosure to other parties for the purpose of obtaining pro bono/volunteer legal assistance.

(10)    All reasonable efforts must be made by the trainer(s) to conduct the individual orientation in the appropriate language of the detained alien.  The Government will not provide interpreters for the purpose of the individual orientation.

(11)    The trainer(s) will distribute appropriate written legal orientation and other relevant and informative materials to individuals, as well as make available any relevant taped materials.  All such materials intended for distribution under this agreement must be pre-approved by the COTR.  In consultation with the COTR, the Contractor may develop additional appropriate written and/or taped legal orientation materials of a general nature for use at the particular site as it deems necessary.

(12)    The Contractor will also provide 'self-help' training 'workshops' when needed for unrepresented individuals interested in pursuing relief from removal, or subject to special procedures (i.e. Temporary Protected Status, reinstatement of a previous order of removal/deportation, "reasonable fear" or "credible fear" proceedings, and aliens eligible for post-removal order review).  The purpose of the self-help workshop is to educate and assist the group in understanding the relevant law and

IFR_AR_008447

procedures to be followed in pursuing particular forms of relief, or in understanding special procedures in place, that may apply to their own legal situation.

(13) The Contractor will also implement local programs to promote and facilitate *pro bono* representation (both at the Immigration Court and BIA level) for detained aliens who request such assistance through the legal orientation programs. This includes working closely with individuals providing *pro bono* representation to detained aliens to facilitate representation, and to improve the delivery of legal services.

(14) The Contractor may recruit, coordinate and train local *pro bono* attorneys, accredited representatives, law students or law graduates to carry out the above task at 3.E(13). However, the Contractor may not engage in services performed in the supervision or direction of pro bono representatives in case-specific legal matters, nor in the indirect preparation of case specific papers.

(15) To implement each program, the Contractor will coordinate with the COTR and on-site representatives at each program location. On-site representatives may include officials from the DHS, EOIR, or other individuals deemed necessary by the Contractor or the COTR.

(16) The Contractor will maintain records on the number of group and individual orientations made and self-help training workshops conducted, the number of individuals served (by attending a group orientation as well as by individual orientation), and other data as deemed necessary by the Contractor or the COTR, and will assist the COTR in evaluating the effect of the legal orientation programs upon the following:
    (1) Access to *pro bono* representation for individuals pursuing claims for relief; and
    (2) Provision of comprehensive legal services at an appropriate level to all detained individuals at the selected sites;

F.    Contract funds are specifically restricted to the services outlined within this Blanket Purchase Agreement (BPA), and may not be used to provide "representation" within the meaning of 8 C.F.R. §1.1(m), and as proscribed by §292 of the Immigration and Nationality Act, 8 USC 1362.

IFR_AR_008448

# Appendix E



Laredo, TX 78040

In addition, it is CCA's policy to encourage informal resolution of inmate complaints. If the issue cannot be informally resolved inmate can request a CCA Inmate Grievance form (14-A). This form is available at each post location.

## RECREATION PROGRAM

Outdoor recreation facilities and activities are available to all inmates as well as leisure time dayroom activities. Inmates are encouraged to initiate activities and, through the approval and guidance of the staff, assist in the managing of the activity.

The following rules and regulations apply to all inmates participating in any form of recreational activity. The Recreation Supervisor will coordinate all activities and may utilize inmates as program assistants, referees and coaches. All discrepancies will be brought to the attention of a Detention Officer or the Recreation Supervisor. The staff member's decision is final.

Violation of any rule or regulation may result in disciplinary action, expulsion from the activity or recreation area. The following rules include main areas of concern. Additional verbal orders may be given and will be followed.

1) "Horseplay" or "rough" play will not be tolerated.
2) Do not sit on equipment if it is not specifically designed for such. Abuse of equipment or the recreational area will not be tolerated. Do not attempt to repair broken or damaged equipment; contact a staff member.
3) All activities will be conducted in designated areas only.
4) Appropriate dress wear must be maintained while in outside recreation.
5) Do not block any entrance or exit leading in or out of the building or hallways.
6) All safety rules will be adhered to. Safety devices will be used at all times.
7) All injuries will be immediately reported to any staff member before leaving the recreational area.
8) Inmates with medical restrictions will not be allowed to participate in strenuous physical activities while in recreation.
9) During recreation, you are not allowed to grab or touch the perimeter fence.
10) At no times are you to contact the outside perimeter officer, any questions or concerns will be addressed to the inside detention officer.

## VISITATION

All visitors will be required to present the following legal documents to be eligible for visitation:

Foreigners: Current legal status, Border Crossing Card, Resident Alien Card, VISA/Passport

U.S. Citizens: (Current State Drivers License/Identification Card is required. Any visitor under the age of eighteen (18) must be accompanied by his/her legal guardian (proof required). All

Inmate Orientation Handbook
Corrections Corporation of America
Laredo Processing Center
12

Revised October 2002

---

## INMATE MAIL

Outgoing mail inspection will be conducted in accordance with the procedure set forth by the contracting agency and applicable Federal law. Outgoing general mail is to be placed in the locked mailbox located in your housing area (legal mail may be sealed before being placed into the mailbox). Be sure you have your full name, ID number, housing assignment and proper return address on your outgoing mail. Inmate mail will be collected daily Monday through Friday by a staff member. (Excluding Holiday's)

Incoming mail will be processed by the mail officer (opened and inspected for money orders or contraband in your presence) and delivered to you in your housing area, Monday through Friday. Incoming mail must have a complete return address, your full name, ID number and housing assignment number on it. (Excluding Holiday's)

Books and publications will be received from PUBLISHERS ONLY. Packages WILL NOT BE ACCEPTED unless prior approval is obtained. Unauthorized items received in the mail will be destroyed or returned at the inmate's expense. No explicit publication and pornography material allowed.

## INDIGENT SUPPLIES

If you are indigent (having less than $3.00 in you account for thirty (30) days or more) you may receive indigent supplies (stamps and writing materials) by sending a Request for Services form to the Shift Supervisor. YOUR FORM MUST BE SENT TO THE SHIFT SUPERVISOR NO LATER THAN TUESDAY EVENING IN ORDER FOR YOU TO RECEIVE YOUR SUPPLIES ON THURSDAY. Indigent inmates may mail up to five (5) pieces of mail each week.

Hygiene products toothpaste, bar of soap will be distributed as scheduled. Toothbrushes and razors distributed on exchange only.

## LEGAL ASSISTANCE

The U. S. Supreme Court in Bounds v. Smith determined that a prison meets the access to courts requirement by the use of a library, a person trained in the law, or a combination of both.

CCA retains an attorney to provide legal assistance to inmates housed at CCA. Assistance may be provided by the attorney pursuant to inmates' completion of written request for Attorney Conference form (14-8A or equivalent) which is available at each post location.

The necessary envelopes and postage will be provided to the inmate to forward by mail the request for attorney form to the attorney. Inmates may send form 14-8A to be following address:

Inmate Orientation Handbook
Corrections Corporation of America
Laredo Processing Center
11

Revised October 2002

IFR_AR_008449

Form 14-8A
REVISED: 12/01/02

**CONFIDENTIAL**
**REQUEST FOR ATTORNEY/PARALEGAL CONFERENCE**

INMATE/RESIDENT NAME: _____    DATE: _____
                                              (Print Name)
Inmate/Resident ID# and Housing Assignment: _____

**TYPE OF LEGAL CONCERN:** (check one)

_____ Motion to Proceed In Forma Pauperis
_____ Motion for Appointment of Counsel
_____ Petitions for Writs of Habeas Corpus
_____ Petitions for Post Conviction Relief
_____ Condition of Confinement/ Civil Rights Complaint (attach grievance)

Briefly describe your legal issues and specify if you have a court imposed deadline and the date:
*(Use additional sheets if needed)*

_____

_____

_____

_____

The attorney/paralegal services in the above specified areas of law include assistance in preparation of initial legal documents (such as petitions, complaints, motions for the appointment of counsel and motions to proceed in forma pauperis). The attorney/paralegal services do not include typing, photocopying and making court appearances. If your legal matter involves CCA and if in your best interest, the attorney/paralegal should attempt to resolve any dispute with CCA informally before instituting more formal procedures. If the initial pleading involves a 42 USC sec. 1983 or condition of confinement claim, you should have first availed yourself to the Inmate Grievance System because the court will likely dismiss the suit if you failed to exhaust administrative remedies available through the grievance process.

Please note that the attorney/paralegal is retained by and his/her fee is paid by CCA which in no way changes the attorney/paralegal's duty to advise or assist you. The attorney is bound by the disciplinary rules of the Supreme Court of this state in providing legal services to you including confidentiality between you and the attorney/paralegal.

Acknowledged:

_____        _____
Signature of Inmate/Resident                      Date

**ATTORNEY'S RESPONSE** (May be attached)

_____

_____

_____

IFR_AR_008450

## Appendix F

### The Asylum Application Process for Arriving Aliens Presenting Documents that are Missing, False or Obtained by Misrepresentation
### Used before April 1, 1997



*Federal court appeal process available after decision from Board of Immigration Review (BIA)

Prepared for USCIRF Study of Asylum Seekers in Expedited Removal by Charles Kuck and Susan Kyle          February 2005

IFR_AR_008451

**Appendix G**
**Law Library and Related Resources**

http://www.ice.gov/graphics/dro/opsmanual/legal.pdf

"Facilities holding INS detainees shall permit detainees acess to a law library, and provided legal material, facilities, equipment and document copying privileges, and the opportunity to prepare legal documents."

List of Legal Reference Materials for Detention Facilities:

1.  Constitution of the United States of America: Analysis and Interpretation. Updated: Supplements and revised editions are published irregularly.

2.  United States Code, Title 8, Aliens and Nationality.Updated: Annual pocket parts

3.  Code of Federal Regulations, Title 8, Aliens and Nationality. Updated: Published annually

4.  Bender's Immigration and Nationality Act Service. Updated: Monthly

5.  Bender's INS Regulation Service. Updated: Monthly

6.  Administrative Decisions Under Immigration & Nationality Laws. Board of Immigration Appeals (BIA) decisions consisting of 20 bound volumes and loose-leaf Interim decisions.

7.  Immigration Law and Defense, by the National Lawyers Guild. Updated: Annual subscription

8.  Immigration Law and Crimes, by the National Immigration Project of the National Lawyers Guild. Updated: Annual subscription

9.  Guide for Immigration Advocates.Updated: Published irregularly

10. Country Reports on Human Practices. Submitted by the Department of State to the Committee on Foreign Affairs of the U.S. House of Representatives and the Committee on Foreign Relations of the U.S. Senate. Updated: Published annually in February

11. Human Rights Watch World Report. One bound volume. Updated: Annually

12. UNHCR Handbook on Procedures and Criteria for Determining Refugee Status. Updated: Irregularly

13. Considerations for Asylum Officers Adjudicating Asylum Claims From Women. Updated: Irregularly

IFR_AR_008452

14.  Immigration and Naturalization Service Basic Law Manual Updated:  Irregularly

15.  Lawyer's Committee Handbook on Representing Asylum Applicants. Updated: Irregularly

16.  Rights of Prisoners.  2nd edition by Michael B. Mushlin. Updated:  Annual pocket parts

17.  Federal Habeas Corpus, Practice & Procedure.  2nd Edition by James S. Liebman Updated:  Annual pocket parts

18.  Federal Civil Judicial Procedure and Rules.  Paperback volume. Updated:  Published annually

19.  United States Code, Title 28.  Rules  Appellate procedure pamphlets I + II. Updated:  Annually

20.  Federal Criminal Code and Rules.  Paperback volume. Updated:  Published annually

21.  Criminal Procedure (Hornbook).  By LaFave. Updated:  Published irregularly

22.  Legal  Research  in  a  Nutshell.  5th  edition  by Morris L. Cohen, published 1992. Updated:  Published irregularly

23.  Legal  Research  &  Writing:  Some  Starting  Points.  4th edition by William P. Statsky, Updated:  Published irregularly

24.  Black's Law Dictionary.  1990, latest standard edition, one hardbound volume. Updated:  Published irregularly

25.  Spanish-English Law Dictionary, By Solis.  1992. Updated:  Published irregularly

26.  Directory  of  Nonprofit  Agencies that Assist Persons in Immigration Matters. Updated:  Irregularly

27.  Other  Translation  Dictionaries  Depending  on  the  Most Common Languages Spoken by the Detainee Population.

28.  Detainee Handbook and Detainee Orientation Materials.

29.  Self-Help Materials.  Materials provided by outside organization after clearance by District Counsel.

30.  Telephone  books  (Yellow  pages)  for  local  areas and nearby metropolitan areas where counsel may be located.

IFR_AR_008453

Responses of Alberto R. Gonzales
Nominee to be Attorney General
to the Written Questions of Senator Edward Kennedy

## I. HUMAN RIGHTS ISSUES INVOLVED IN THE WAR ON TERRORISM

1) **Did you participate in meetings in which specific interrogation techniques were discussed?**

Response: As I noted in my testimony before the Committee, I recall participating in some discussions regarding the manner in which we could question enemy combatant terrorists for information that might save American lives.

If so:    i.  **Please provide details, including the specific interrogation techniques that were mentioned at such meetings.**

           ii.  **Did you raise any objection – either during any such meeting or afterwards – to the use of these techniques? Please provide details.**

If not:    i.  **Why didn't you raise objections to the use of these techniques?**

           ii.  **In retrospect, do you believe you should have raised objections at the time those techniques were discussed?**

Response: I believe that during these discussions, representatives from agencies raised concerns that certain terrorists had information that might save American lives. There was a desire to explore certain methods of questioning these terrorists, but there was concern that nothing be done that would violate the law. I do not have a specific recollection about each individual method of questioning discussed. It is quite likely that not all the methods were discussed since our discussions were not intended to provide approval of certain methods of questioning. I have no specific recollection of raising objections to the use of particular methods of questioning. But my role was not to decide whether or not certain methods of questioning should be adopted as a policy matter; it was for others to decide whether a particular method of eliciting information from terrorists was something to employ under the directives of the President that we should do everything that we lawfully can to win the war against the terrorists. Nor was it my role to make the ultimate decision whether a particular method was legal. That responsibility rested with the Department of Justice. For me to provide details about the method of questioning terrorists mentioned in meetings that I attended would entail discussing classified information, which I am not at liberty to do.

(a) **Please identify all notes, memoranda, e-mail, audio-recordings, or documents of any kind which reflect:**

        i.    **The occurrence and substance of such meetings;**

1

IFR_AR_008454

Access to representation also results in a more efficient immigration court process that saves time and money for the government while also benefiting the child.

**Question:**    Federal funding is now used by the Justice Department to provide grants to faith-based and private non-profit organizations to provide legal services to victims of domestic violence and sexual assault.  Will you support federal funding to award grants to non-profit organizations to provide legal representation to these most vulnerable children?  If not, why shouldn't we provide the same authority to award grants to nonprofit organizations so they may represent unaccompanied immigrant minors.

If you do not support such funding, what changes will you propose to ensure that the best interests of these children are fully protected and respected?

Response: The plight of unaccompanied minors who are sent to the United States is an extraordinarily heart-rending issue.  Many of these abandoned children arrive in the United States after having suffered abuse, neglect, and violence.  If confirmed, I would carefully review and consider any proposal, whether regulatory or legislative in nature, to ensure that unaccompanied minors receive the services they need and are not further victimized after they arrive in the United States.

## VII.   LEGAL ORIENTATION PROGRAMS

In 2002, Congress appropriated $ 1 million for legal orientation programs in order to increase the efficiency and effectiveness of immigration removal proceedings. The programs are funded through appropriations to DHS, which are then transferred to EOIR.
Legal orientation presentations provide immigration detainees with essential information about immigration court procedures and the availability of legal remedies.  The programs help identify immigration detainees with meritorious cases that can be referred to legal assistance agencies, at no cost to the government.  The programs also help convince detainees without relief not to challenge their removal, thereby needlessly protracting their immigration proceedings and deportation. These programs have resulted in greater judicial efficiency, fewer detention expenses, and greater access for aliens to legal information. EOIR has calculated that these programs result in an annual saving of approximately $8 million dollars by reducing detention by more than 4 days per alien in sites with these programs. In its first full year, these programs reached 17,000 detainees, comprising approximately 20% of the detention proceedings completed by immigration judges in fiscal year 2003. Despite the benefits and efficiencies generated by the programs, DHS failed to transfer the FY 2003 appropriations to EOIR, and I understand may not transfer the funding for fiscal year 2005.

**Question:**    As Attorney General, what will you do to ensure that DHS transfers the $2 million owed to EOIR for these programs?  What will you do to increase funding

35

IFR_AR_008455

for these highly successful programs so they reach even greater numbers of detainees?

Response: If confirmed, I would work with my colleagues at the Department of Homeland Security to ensure that any money that is owed to EOIR is transferred and to determine the extent to which funding may be increased in future years.

## VIII.    USE OF SECRET EVIDENCE

**In the past, the Department of Justice has used classified evidence in immigration proceedings, and not made it available to the defendant and or to defense counsel. In some cases where classified evidence was used to deport an individual, it was later discovered that the evidence was incorrect or discredited.**

**Question:    Will the Department of Justice again use classified evidence in immigration proceedings?  What step will you take to avoid the types of mistakes made in the past?**

Response:  Current federal law specifically permits the use of classified evidence in immigration proceedings with respect to detention decisions and decisions on applications for various forms of immigration relief, such as asylum or cancellation of removal.  However, my understanding is that this is done only rarely and that immigration judges have not used classified evidence for purposes of determining whether or not an alien is deportable.  I know that the issues relating to the use of classified evidence in immigration proceedings have been the subject of considerable attention both in Congress and among the affected federal agencies in the past, and, if confirmed, I would conduct a review of the Department's policies in this regard.

## CIVIL RIGHTS

### I.  Voting Rights Act

The Voting Rights Act is critical to ensuring ballot access for all Americans, regardless of race, ethnicity or proficiency in English.  Private citizens can enforce the Act's non-discrimination provisions, but Justice Department enforcement is critical to its effectiveness.  Unfortunately, in recent years the Department has cut back its enforcement actions.  In 2004, the Civil Rights Division did not file a single case alleging racial or ethnic discrimination against minority voters.  In 2003, the Division filed only one such case, and only two in 2002.  That is not a satisfactory record, given the widespread discrimination against minority voters in state, local and federal elections across the country.

1.    During your hearing, you stated that you believe strongly in protecting voting rights.  Will you commit that if you are confirmed as Attorney General, the Department will vigorously enforce Section 2 of the Voting Rights Act while also maintaining its role in enforcing other voting and civil rights laws?

IFR_AR_008456

STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

STATISTICAL REPORT ON EXPEDITED REMOVAL,
CREDIBLE FEAR, AND WITHDRAWAL, FY 2000-2003

FEBRUARY 2005

U.S. Department of Homeland Security Office of Immigration Statistics
Special Tabulations Prepared with Assistance from the
U.S. Department of Homeland Security, including
U.S. Immigration and Customs Enforcement –
Office of Detention and Removal Operations (ICE-DRO),
U.S. Customs and Border Protection (CBP), and
U.S. Citizenship and Immigration Services (USCIS)

Assembled and Introduced by Cory Fleming and Fritz Scheuren
NORC University of Chicago

IFR_AR_008457

TABLE OF CONTENTS

Preface…………………………………………………………………………………285

Descriptive Summary……………………………………………………………….286

Sources and Limitation…………………………………………………………...292

**Table Sets**

**National Data**…………………………………………………………..                 295
DHS Table 1(a):  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at All Ports of Entry (Air, Land, Sea & Other), FY 2000-
03 (Alternative 1)

DHS Table 1(b):  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at All Ports of Entry (Air, Land, Sea & Other), FY 2000-
03 (Alternative 2)

**National Data by Year**…………………………………………………...                 297
DHS Table 2:  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at All Ports of Entry (Air, Land, Sea & Other) by Year

**Airport Data**…………………………………………………………..                 298
DHS Table 3:  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at the Nation's Airports, FY 2000-03

DHS Table 4: Aliens Referred for Credible Fear Interviews at Nation's Airports
by Year

**Data by Individual Airport**…………………………………………...                 300
DHS Table 5.0:  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at Atlanta, FY 2000-03

DHS Table 5.1:  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at Chicago, FY 2000-03

DHS Table 5.2:  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at Dallas, FY 2000-03

DHS Table 5.3:  Aliens Expeditiously Removed, Referred for Credible Fear
Interview or Withdrew at Houston, FY 2000-03

IFR_AR_008458

DHS Table 5.4(a):  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Los Angeles, FY 2000-03 (Alternative 1)

DHS Table 5.4(b):  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Los Angeles, FY 2000-03 (Alternative 2)

DHS Table 5.5:  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Miami, FY 2000-03

DHS Table 5.6:  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at New York, FY 2000-03

DHS Table 5.7:  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Newark, FY 2000-03

DHS Table 5.8:  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at San Francisco, FY 2000-03

DHS Table 5.9:  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Washington, FY 2000-03


**Data for Southern Land Ports of Entry (POEs)**……………………………..     311
DHS Table 6: Aliens Expeditiously Removed or Referred for Credible Fear Interview at Southern Land Ports of Entry, FY 2000-03


**Data for Northern Land Ports of Entry (POEs)**……………………………….     312
DHS Table 7(a): Aliens Expeditiously Removed or Referred for Credible Fear Interview at Northern Land Ports of Entry, FY 2000-03 (Alternative 1)

DHS Table 7(b): Aliens Expeditiously Removed or Referred for Credible Fear Interview at Northern Land Ports of Entry, FY 2000-03 (Alternative 2)


**Data By Top 3 Southern Land POEs and Top 3 Northern Land POEs**……...     314
DHS Table 8.0: Aliens Expeditiously Removed or Referred for Credible Fear Interview or Withdrew at San Ysidro, FY 2000-03

DHS Table 8.1: Aliens Expeditiously Removed or Referred for Credible Fear Interview or Withdrew at Hidalgo, FY 2000-03

DHS Table 8.2: Aliens Expeditiously Removed or Referred for Credible Fear Interview or Withdrew at Calexico, FY 2000-03

IFR_AR_008459

DHS Table 8.3: Aliens Expeditiously Removed or Referred for Credible Fear Interview or Withdrew at Champlain, FY 2000-03

DHS Table 8.4: Aliens Expeditiously Removed or Referred for Credible Fear Interview or Withdrew at Niagara Falls, FY 2000-03

DHS Table 8.5: Aliens Expeditiously Removed or Referred for Credible Fear Interview or Withdrew at Buffalo, FY 2000-03

DHS Table 9: Countries of Citizenship for Aliens Referred for Credible Fear Interview Claims, FY 2000-03

**Data by Country of Citizenship**……………………………………………… 321
DHS Table 10: Countries of Citizenship for Aliens Referred for Credible Fear Interview Claims by Fiscal Year

**Data by Asylum Office and Year**…………………………………………….. 322
DHS Table 11: Aliens Referred for Credible Fear Interviews by Asylum Office and Year

IFR_AR_008460

PREFACE

The Study of Asylum Seekers in Expedited Removal (the Study) was undertaken by experts appointed by the US Commission on International Religious Freedom (the Commission) to respond to four questions posed by the International Religious Freedom Act (IRFA) of 1998. Specifically, the Study is to determine whether immigration officers performing duties under section 235(b) of the Immigration and Nationality Act (INA) (8 U.S.C. 1225(b)) with respect to aliens, who may be eligible to be granted asylum, are engaging in any of the following conduct:

(A) Improperly encouraging such aliens to withdraw their applications for admission.

(B) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution (within the meaning of section 235(b)(1)(B)(v) of such Act).

(C) Incorrectly removing such aliens to a country where they may be persecuted.

(D) Detaining such aliens improperly or in inappropriate conditions.

The Study has several components, including collection of statistics; thorough sample file review; direct observations of the removal process; surveys of Department of Homeland Security (DHS) officials and detention center personnel; as well as interviews with individuals seeking asylum.

The present report consists of a compilation of administrative data tabulated by the experts for the Study with support from the U.S. Department of Homeland Security, including the Office of Detention and Removal Operations (DRO) at Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and the U.S. Customs and Inspection Service (USCIS). DRO, CBP, and USCIS reviewed an earlier draft of this report and provided comments that have been taken into account in the final report. The compilation and accompanying descriptive summaries were prepared under my general direction by Cory Fleming and Fritz Scheuren. Let me also take this opportunity to express my deep appreciation for the care, diligence, speed, and expertise of the DHS staff, including Michael Hoefer and Jim Fitzsimmons of the Office of Immigration Statistics, John Bjerke and Hal Griffin of DRO, Salvador Flores of CBP, and especially Linda Loveless of CBP and Georgia Papas of USCIS.

Mark Hetfield
Commission on International Religious Freedom                    February 2005

IFR_AR_008461

# Special Tabulations Prepared with Assistance from the U.S. Department of Homeland Security

## DESCRIPTIVE SUMMARY

This Report consists of a compilation of special tabulations produced with assistance from many offices within the U.S. Department of Homeland Security (DHS). The table sets accompanying this summary were designed as background for the Study of Asylum Seekers in Expedited Removal (the Study) being undertaken by experts designated by the U.S. Commission on International Religious Freedom (the Commission), pursuant to section 605 of the International Religious Freedom Act of 1998 (IRFA).

The tabulations are quite extensive and hence some summarization of them is warranted. The tables begin by providing an overview of aliens who: (1) are expeditiously removed, (2) referred for a credible fear interview upon arrival at a port of entry (POE) in the U.S., or (3) are subject to Expedited Removal but are permitted to withdraw their application for admission. These data lay out the geographical and demographic make-up of those aliens seeking asylum in the U.S during a four-year period from FY 2000-2003.

DHS Charts 1-3 summarize some of the data displayed in DHS Table 1. (Note that all charts in this summary are based on data presented in the tables.) Among other data, DHS Table 1 shows aliens referred for credible fear interviews make up a very small proportion (5 percent) of those subject to Expedited Removal for entering the United States without the appropriate documentation. DHS Table 1 also shows that, while nearly 90 percent of aliens subject to Expedited Removal are inspected at land and sea ports of entry, 86 percent of all aliens who are referred for credible fear are inspected at airports.

IFR_AR_008462



*Based on DHS Table 1.*



*Based on DHS Table 1.*

DHS Table 1 also shows that, during this period of time, significantly more men (64.2 percent) were referred for a credible fear interview than women.

IFR_AR_008463



*Based on DHS Table 1.*

DHS Table 1 also shows that the vast majority (85.1 percent) of aliens expeditiously removed from the U.S. were of Mexican nationality.  However, the People's Republic of China (29 percent) tops the list as the country of citizenship for the largest number of aliens referred for credible fear interviews during that same time period.

DHS Table 2 shows a substantial rise in the number of aliens referred for credible fear interviews at airports from FY 2000 to FY 2001, then a drop after FY 2001 back to about the FY 2000 level, followed by a much steeper drop for FY 2003. This contrasts with the number at land, sea and other ports of entry (POEs). Overall, these latter POEs remained relatively flat from FY 2000 to FY 2001, then increased by a small amount in FY 2002 before decreasing in FY 2003.

IFR_AR_008464



*Based on DHS Table 2.*

As is implicit above, a high percentage of aliens who are referred for a credible fear determination, arrive in the U.S. via airports (as opposed to land ports, seaports or other means). Beginning with DHS Table 3, subsequent tables report the number of alien arrivals at the top 10 airports in the nation and how their request for asylum was managed.

DHS Table 4 shows that in the aggregate for four years, Miami International Airport processed more credible fear claims than any other airport in the country, nearly double the number of the Los Angeles International Airport where the next largest number of claims was made.



*Based on DHS Table 2.*

IFR_AR_008465

A comparison of the aggregate counts from FY 2000-2003 of each processing category are shown below, as taken from DHS Table 5.



*Based on DHS Tables 5.0 – 5.9.*

The top land ports of entry at both the southern and northern borders of the U.S. are also reported for each year from FY 2000 to FY 2003.  DHS Table 6 summarizes the southern land ports and DHS Table 7 the northern land ports. Notice the change in scales between these two charts, as there are many more alien arrivals through the southern ports.



*Based on DHS Table 6.*

IFR_AR_008466



*Based on DHS Tables 7(a) & 7(b).*

In the DHS Table 8 series, the management of alien arrivals for the top 3 southern and northern POEs is expanded and further details given for each port.



*Based on DHS Tables 8.0 – 8.5.*

DHS Table 9 provides detailed information for the entire period FY 2000 to FY 2003 on the top 10 countries of citizenship for aliens referred for credible fear interview claims.

IFR_AR_008467



*Based on DHS Table 9.*

DHS Table 10 provides summary information for each fiscal year, FY 2000 to FY 2003, on the top countries of citizenship for aliens referred for credible fear interview claims. Finally, in DHS Table 11, the table shows the disposition of credible fear interviews.

There are two other tabular reports of compiled administrative data that may also be worth consulting to round out what is readily available from the existing administrative system about the Expedited Removal process. These provide DHS detention statistics and statistics from the Department of Justice.[1]

SOURCES AND LIMITATIONS OF DATA

No integrated statistical reporting system with respect to Expedited Removal currently operates within the Department of Homeland Security. Different offices use different data management systems, and the interoperability among these systems is not always apparent. In some offices, paper systems for counting applications are still maintained. The efforts to convert these operational systems into a single unified information system appear to be in many places still in its infancy.

The fiscal years covered in this report span the period before and after the creation of DHS. In our work, naturally, we found many efforts still underway to adapt these earlier standalone systems in this post 9/11 world.

Notwithstanding these difficulties, with the expert assistance of the DHS staff, we were in most instances able to roughly reconcile the disparate sources so as to display comparable

---

[1] Cory Fleming and Fritz Scheuren, *Statistical Report on Detention, FY 2000-2003*, February 2005; Susan Kyle, Cory Fleming, and Fritz Scheuren, *Statistical Report on Immigration Court Proceedings*, FY 2000-2004, February 2005.

IFR_AR_008468

information on the Expedited Removal process in a way that we found useful for the Commission's purposes.

In a few instances (DHS Tables 1, 5.4, and 7), duplicate versions of the same tabulation had to be provided. These different versions of the tables reflect differences in data received from the offices within the Department of Homeland Security, and the two versions—(a) and (b)—are provided to indicate the degree of potential error in the counts. Such differences reflect the complexities of managing very large data sets in a systematic fashion across many different offices within a department, and are not unexpected, especially given the early stage of integration. Despite these differences, we remain convinced that, for the most part, percentage distributions can be relied upon, as well as relative changes over time.

Confidentiality requirements by DHS restrict the public versions of these tables to reporting only cell counts of six (6) or more. All nonzero cells of less than 6 are asterisked (*). Zero cells have been identified by a dash (-). Summary totals in the tables have also been examined to be sure that indirect disclosure (e.g., disclosure by subtraction) did not occur.

As a check on our work, we reviewed the earlier GAO report on Expedited Removal[2] and found that for the year 2000 which overlapped between the two studies, the results shown here are comparable.

As a further check the regular reports that DHS and its predecessor organizations produced were also examined, notably the annual Immigration and Naturalization Service (INS) and later DHS, reports for the years tabulated here. For those readers interested in the setting that Expedited Removal data sit in, these reports are highly recommended, if only for their definitions and for an understanding of the much larger missions that DHS has, especially in the post 9/11 world.

---

[2] United States General Accounting Office. 2000. *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process*. GAO/GGD-00-176.

IFR_AR_008469

Table Sets

IFR_AR_008470

DHS Table 1(a): Aliens Expeditiously Removed, Referred for Credible Fear Interview, or Withdrew
at All Ports of Entry (Air, Land, Sea & Other), FY 2000-03

| | Expeditiously removed (1) | | | Referred for credible fear interview | | Withdrew (2) | | Total |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent | Number | Percent | |
| **All** | **233,503** | **100.0%** | | **36,566** | **100.0% (3)** | **542,255** | **100.0%** | **812,324** |
| Airports | 37,296 | 16.0% | | 31,506 | 86.2% (4) | 26,309 | 4.9% | **95,111** |
| Land/Sea/Other | 196,207 | 84.0% | | 5,060 | 13.8% (5) | 515,946 | 95.1% | **717,213** |
| | | | | | | | | |
| **Gender - All** | **233,497** | **100.0%** | | **37,430** | **100.0% (3)** | | | |
| Female | 100,353 | 43.0% | | 13,394 | 35.8% | NA | NA | NA |
| Male | 133,144 | 57.0% | | 24,036 | 64.2% | NA | NA | NA |
| | | | | | | | | |
| **Age - All** | **233,485** | **100.0%** | | **37,430** | **100.0% (3)** | | | |
| 0-17 | 1,488 | 0.6% | | 2,450 | 6.5% | NA | NA | NA |
| 18-19 | 21,255 | 9.1% | | 3,320 | 8.9% | NA | NA | NA |
| 20-29 | 119,623 | 51.2% | | 17,458 | 46.6% | NA | NA | NA |
| 30-39 | 59,004 | 25.3% | | 10,168 | 27.2% | NA | NA | NA |
| 40-49 | 22,575 | 9.7% | | 3,068 | 8.2% | NA | NA | NA |
| 50+ | 9,477 | 4.1% | | 940 | 2.5% | NA | NA | NA |
| unknown | 63 | 0.0% | | 26 | 0.1% | NA | NA | NA |

| Country of citizenship | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **All** | **234,021** | **100.0%** | | **39,422** | **100.0% (3)** | NA | NA | NA |
| Mexico | 199,079 | 85.1% | China | 11,451 | 29.0% | NA | NA | NA |
| Brazil | 4,705 | 2.0% | Colombia | 4,389 | 11.1% | NA | NA | NA |
| Dominican Republic | 3,602 | 1.5% | Cuba | 4,093 | 10.4% | NA | NA | NA |
| Jamaica | 2,053 | 0.9% | Haiti | 3,909 | 9.9% | NA | NA | NA |
| Guatemala | 1,979 | 0.8% | Sri Lanka | 2,310 | 5.9% | NA | NA | NA |
| Peru | 1,729 | 0.7% | Albania | 981 | 2.5% | NA | NA | NA |
| Canada | 1,478 | 0.6% | Iraq | 969 | 2.5% | NA | NA | NA |
| Colombia | 1,469 | 0.6% | Guyana | 711 | 1.8% | NA | NA | NA |
| Ecuador | 1,414 | 0.6% | El Salvador | 587 | 1.5% | NA | NA | NA |
| El Salvador | 1,383 | 0.6% | India | 557 | 1.4% | NA | NA | NA |
| Other countries | 15,130 | 6.5% | Other countries | 9,465 | 24.0% | NA | NA | NA |

Source (s): Immigration and Customs Enforcement-Office of Detention and Removal Operations (ICE-DRO), U.S. Customs and Border Protection (CBP),
and Office of International Affairs- Asylum Division, U.S. Citizenship and Immigration Services (USCIS) at the U.S. Department of Homeland Security.
Also, the Executive Office for Immigration Review (EOIR), U.S.Department of Justice

(1) Figures do not include aliens referred for credible fear interviews or legal status cases.
(2) Breakdown of withdrawals not available. Includes only withdrawals of aliens subject to expedited removal.
(3) Figures for number of credible fear cases vary from ICE-DRO (36,566 & 36,721), EOIR (37,430), and CIS (39,422).
(4) Figures include number of cases at airports primarily, though some cases also come from seaports.
(5) Figures includes number of cases at land and seaports primarily, though some cases also come from airports.

IFR_AR_008471

DHS Table 1(b):  Aliens Expeditiously Removed, Referred for Credible Fear Interview, or Withdrew
at All Ports of Entry (Air, Land, Sea & Other), FY 2000-03

| | Expeditiously removed (1) | | | Referred for credible fear interview | | Withdrew (2) | | Total |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent | Number | Percent | |
| **All** | **233,503** | **100.0%** | | **36,566** | **100.0% (3)** | **542,255** | **100.0%** | **812,324** |
| Airports | 37,296 | 16.0% | | 31,506 | 86.2% (4) | 26,309 | 4.9% | **95,111** |
| Land/Sea/Other | 196,207 | 84.0% | | 5,060 | 13.8% (5) | 515,946 | 95.1% | **717,213** |
| | | | | | | | | |
| **Gender - All** | **233,497** | **100.0%** | | **37,430** | **100.0% (3)** | NA | NA | NA |
| Female | 100,353 | 43.0% | | 13,394 | 35.8% | NA | NA | NA |
| Male | 133,144 | 57.0% | | 24,036 | 64.2% | NA | NA | NA |
| | | | | | | | | |
| **Age - All** | **233,485** | **100.0%** | | **37,430** | **100.0% (3)** | NA | NA | NA |
| 0-17 | 1,488 | 0.6% | | 2,450 | 6.5% | NA | NA | NA |
| 18-19 | 21,255 | 9.1% | | 3,320 | 8.9% | NA | NA | NA |
| 20-29 | 119,623 | 51.2% | | 17,458 | 46.6% | NA | NA | NA |
| 30-39 | 59,004 | 25.3% | | 10,168 | 27.2% | NA | NA | NA |
| 40-49 | 22,575 | 9.7% | | 3,068 | 8.2% | NA | NA | NA |
| 50+ | 9,477 | 4.1% | | 940 | 2.5% | NA | NA | NA |
| unknown | 63 | 0.0% | | 26 | 0.1% | NA | NA | NA |
| | | | | | | | | |
| **Country of citizenship** | | | | | | | | |
| **All** | **234,021** | **100.0%** | | **36,721** | **100.0% (3)** | NA | NA | NA |
| Mexico | 199,079 | 85.1% | China | 11,133 | 30.3% | NA | NA | NA |
| Brazil | 4,705 | 2.0% | Colombia | 4,026 | 11.0% | NA | NA | NA |
| Dominican Republic | 3,602 | 1.5% | Cuba | 3,978 | 10.8% | NA | NA | NA |
| Jamaica | 2,053 | 0.9% | Haiti | 3,848 | 10.5% | NA | NA | NA |
| Guatemala | 1,979 | 0.8% | Sri Lanka | 2,244 | 6.1% | NA | NA | NA |
| Peru | 1,729 | 0.7% | Iraq | 963 | 2.6% | NA | NA | NA |
| Canada | 1,478 | 0.6% | Albania | 939 | 2.6% | NA | NA | NA |
| Colombia | 1,469 | 0.6% | Guyana | 711 | 1.9% | NA | NA | NA |
| Ecuador | 1,414 | 0.6% | India | 513 | 1.4% | NA | NA | NA |
| El Salvador | 1,383 | 0.6% | El Salvador | 473 | 1.3% | NA | NA | NA |
| Other countries | 15,130 | 6.5% | Other countries | 7,893 | 21.5% | NA | NA | NA |

Source (s):  Immigration and Customs Enforcement-Office of Detention and Removal Operations (ICE-DRO), U.S. Customs and Border Protection (CBP),
and Office of International Affairs- Asylum Division, U.S. Citizenship and Immigration Services (USCIS) at the U.S. Department of Homeland Security.
Also, the Executive Office for Immigration Review (EOIR), U.S.Department of Justice

(1) Figures do not include aliens referred for credible fear interviews or legal status cases.
(2) Breakdown of withdrawals not available.  Includes only withdrawals of aliens subject to expedited removal.
(3) Figures for number of credible fear cases vary from ICE-DRO (36,566 & 36,721), EOIR (37,430), and CIS (39,422).
(4) Figures include number of cases at airports primarily, though some cases also come from seaports.
(5) Figures includes number of cases at land and seaports primarily, though some cases also come from airports.

IFR_AR_008472

**DHS Table 2:  Aliens Expeditiously Removed, Referred for Credible Fear Interview,
or Withdrew at Ports of Entry (Air, Land, Sea & Other) by Year**

| | Expeditiously removed (1) | Referred for credible fear interview | Withdrew (2) | Total |
|---|---|---|---|---|
| **Airports - All** | **37,296** | **31,506** | **26,309** | **95,111** |
| FY 2000 | 9,990 | 8,303 | 6,783 | 25,076 |
| FY 2001 | 10,329 | 10,995 | 5,938 | 27,262 |
| FY 2002 | 8,966 | 7,670 | 6,493 | 23,129 |
| FY 2003 | 8,011 | 4,538 | 7,095 | 19,644 |
| | | | | |
| **Land/Sea/Other - All** | **196,207** | **5,030** | **515,946** | **717,183** |
| FY 2000 | 76,263 | 1,363 | 117,946 | 195,572 |
| FY 2001 | 58,726 | 1,325 | 128,085 | 188,136 |
| FY 2002 | 25,893 | 1,504 | 148,682 | 176,079 |
| FY 2003 | 35,325 | 838 | 121,233 | 157,396 |

Source(s): Immigration and Customs Enforcement-Office of Detention and Removal Operations  (ICE-DRO),
U.S. Customs and Border Protection (CBP), and Office of International Affairs- Asylum Division,
U.S. Citizenship and Immigration Services (USCIS) at the U.S. Department of Homeland Security

(1) Figures do not include aliens referred for credible fear interviews or legal status cases.
(2) Includes only withdrawals of aliens subject to expedited removal.

IFR_AR_008478

**DHS Table 3:  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew
at the Nation's Airports, FY 2000-03**

| | Expeditiously removed (1) | | | Referred for credible fear interview | | | Withdrew | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent | | Number | Percent | | Number |
| **All Airports** | **37,296** | **100.0%** | | **31,506** | **100.0%** | | **26,309** | **100.0%** | | **95,111** |
| **Airports** | | | | | | | | | | |
| New York (JFK) | 10,983 | 33.2% | Miami | 12,953 | 41.1% | Atlanta | 6,060 | 23.0% | Miami | 18,801 |
| Miami | 5,848 | 17.7% | Los Angeles | 6,565 | 20.8% | New York (JFK) | 3,187 | 12.1% | New York (JFK) | 16,186 |
| Los Angeles | 4,140 | 12.5% | Chicago | 2,269 | 7.2% | Newark | 2,929 | 11.1% | Los Angeles | 13,628 |
| Atlanta | 2,871 | 8.7% | New York (JFK) | 2,016 | 6.4% | Los Angeles | 2,923 | 11.1% | Atlanta | 9,441 |
| Chicago | 2,731 | 8.3% | San Francisco | 814 | 2.6% | Houston | 2,884 | 11.0% | Chicago | 6,438 |
| Houston | 2,617 | 7.9% | Newark | 701 | 2.2% | Chicago | 1,438 | 5.5% | Newark | 5,828 |
| Newark | 2,198 | 6.6% | Atlanta | 510 | 1.6% | San Francisco | 1,018 | 3.9% | Houston | 5,753 |
| Dallas | 1,714 | 5.2% | Washington | 269 | 0.9% | Washington | 888 | 3.4% | San Francisco | 2,663 |
| San Francisco | 831 | 2.5% | Houston | 252 | 0.8% | Seattle | 771 | 2.9% | Dallas | 2,428 |
| Washington | 543 | 1.6% | Dallas | 74 | 0.2% | Dallas | 640 | 2.4% | Washington | 1,700 |
| | | | | | | | | | Seattle | 771 |
| Other airports | 2,820 | 8.5% | Other airports | 5,083 | 16.1% | Other airports | 3,571 | 13.6% | Other airports | 11,474 |

Source:  Office of Detention and Removal Operations - Immigration and Customs Enforcement at U.S. Department of Homeland Security

(1) Figures do not include aliens referred for credible fear interviews or legal status cases.

IFR_AR_008474

**DHS Table 4:  Aliens Referred for Credible Fear Interviews
at Nation's Airports by Year**

|  | FY 2000 | FY 2001 | FY 2002 | FY 2003 | Total |
|---|---|---|---|---|---|
| **All** | **8,303** | **10,995** | **7,670** | **4,538** | **31,506** |
|  |  |  |  |  |  |
| **Airports** |  |  |  |  |  |
| Miami | 2,251 | 5,059 | 3,335 | 2,308 | 12,953 |
| Los Angeles | 2,502 | 2,704 | 1,155 | 204 | 6,565 |
| Chicago | 842 | 742 | 513 | 172 | 2,269 |
| New York (JFK) | 733 | 749 | 323 | 211 | 2,016 |
| San Francisco | 177 | 321 | 156 | 160 | 814 |
| Newark | 280 | 221 | 92 | 108 | 701 |
| Atlanta | 120 | 194 | 106 | 90 | 510 |
| Washington | 112 | 65 | 55 | 37 | 269 |
| Houston | 54 | 75 | 59 | 64 | 252 |
| Dallas | 19 | 20 | 26 | 9 | 74 |
| Other | 1,213 | 845 | 1,850 | 1,175 | 5,083 |

Source:  Office of Detention and Removal Operations - Immigration and Customs Enforcement
at U.S. Department of Homeland Security

IFR_AR_008475

**DHS Table 5.0: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdraw at Atlanta, FY 2000-2003**

POE Total, FY 2000-2003    9,442

**Expeditiously removed (1)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| Mexico | 362 | 222 | 115 | 92 | 791 |
| Brazil | 106 | 109 | 124 | 78 | 417 |
| Peru | 57 | 88 | 83 | 23 | 251 |
| Guatemala | 43 | 40 | 52 | 73 | 208 |
| El Salvador | 41 | 58 | 44 | 47 | 190 |
| Costa Rica | 34 | 30 | 30 | 41 | 135 |
| Colombia | 24 | 50 | 33 | 26 | 133 |
| Jamaica | 11 | 16 | 22 | 26 | 75 |
| Panama | 14 | 20 | 13 | 7 | 54 |
| Venezuela | 9 | 17 | 14 | 7 | 47 |
| Other countries | 135 | 169 | 138 | 129 | 571 |
| All | 836 | 819 | 668 | 549 | 2,872 |

**Referred for credible fear interview**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| China, People's Republic | 8 | 11 | 41 | 34 | 94 |
| Sri Lanka | 30 | 53 | 22 | 7 | 83 |
| Colombia | 4 | 24 | 7 | 5 | 57 |
| Albania | 7 | 13 | 5 | 4 | 30 |
| Nigeria | 5 | 4 | - | - | 13 |
| Somalia | 13 | - | - | - | 13 |
| Yugoslavia | 12 | - | - | - | 12 |
| Cameroon | * | - | 8 | * | * |
| El Salvador | * | 8 | - | - | * |
| Lebanon | - | 10 | - | - | 10 |
| Other countries | 41 | 71 | 30 | 40 | 182 |
| All | 120 | 194 | 106 | 90 | 510 |

**Withdrew (2)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| (all countries) | NA | NA | NA | NA | NA |
| All | 1,028 | 1,226 | 1,698 | 2,108 | 6,060 |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

DHS Table 5.1: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Chicago, FY 2000-2003

POE Total, FY 2000-2003    6,440

| | Expeditiously removed (1) | | | | | | Referred for credible fear interview | | | | | | Withdrew | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| All | 865 | 816 | 588 | 464 | 2,733 | | 842 | 742 | 513 | 172 | 2,269 | | 217 | 329 | 423 | 469 | 1438 |
| **Country of citizenship** | | | | | | | | | | | | | | | | | |
| | 527 | 455 | 324 | 237 | 1,543 | Mexico / China, People's Republic | 581 | 457 | 392 | 153 | 1,583 | | NA | NA | NA | NA | NA |
| | 72 | 59 | 62 | 24 | 217 | Poland / Sri Lanka | 120 | 151 | 51 | - | 322 | | NA | NA | NA | NA | NA |
| | 9 | 19 | 14 | 37 | 79 | Brazil / Albania | 47 | 31 | 23 | 7 | 108 | | NA | NA | NA | NA | NA |
| | 13 | 36 | 10 | 18 | 77 | Pakistan / Pakistan | 25 | 46 | 4 | - | 75 | | NA | NA | NA | NA | NA |
| | 30 | 14 | 17 | 11 | 72 | India / Yugoslavia, former | 15 | * | * | 4 | * | | NA | NA | NA | NA | NA |
| | 25 | 28 | 5 | 4 | 62 | Guatemala / Bangladesh | 6 | 14 | 4 | - | 20 | | NA | NA | NA | NA | NA |
| | 13 | 21 | 9 | 8 | 51 | Czechoslovakia, former / India | 8 | 7 | - | - | 15 | | NA | NA | NA | NA | NA |
| | 16 | 25 | 7 | * | * | Jamaica / Colombia | 6 | 6 | - | - | 12 | | NA | NA | NA | NA | NA |
| | * | 25 | * | * | * | Costa Rica / Somalia | 8 | * | - | - | * | | NA | NA | NA | NA | NA |
| | * | * | 12 | 9 | * | Lithuania / Eritrea | - | * | 6 | - | * | | NA | NA | NA | NA | NA |
| | 160 | 134 | 128 | 116 | 632 | Other countries / Other countries | 26 | 30 | 37 | 8 | 134 | | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.

(2) Figures not available.

*-Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008477

**DHS Table 5.2: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Dallas, FY 2000-2003**

POE Total, FY 2000-2003    2,436

| Country of citizenship | Expeditiously removed (1) | | | | | | Referred for credible fear interview | | | | | | Withdrew | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| **All** | 585 | 477 | 393 | 267 | 1,722 | | 19 | 20 | 26 | 9 | 74 | 174 | 178 | 192 | 96 | 640 |
| Mexico | 394 | 254 | 180 | 98 | 926 | Eritrea | - | - | 11 | - | 11 | NA | NA | NA | NA | NA |
| Peru | 28 | 53 | 38 | 42 | 161 | China, People's Republic | 8 | - | - | - | 8 | NA | NA | NA | NA | NA |
| Guatemala | 24 | 14 | 36 | 33 | 107 | El Salvador | - | - | 5 | - | 5 | NA | NA | NA | NA | NA |
| El Salvador | 14 | 26 | 30 | 10 | 80 | Sri Lanka | - | 5 | - | - | 5 | NA | NA | NA | NA | NA |
| Brazil | 11 | 11 | 19 | 21 | 62 | Somalia | - | - | - | * | * | NA | NA | NA | NA | NA |
| Costa Rica | 18 | 8 | 11 | 7 | 44 | | | | | | | NA | NA | NA | NA | NA |
| Chile | 8 | 8 | 17 | 8 | 41 | | | | | | | NA | NA | NA | NA | NA |
| Belize | 5 | 13 | 5 | 5 | 28 | | | | | | | NA | NA | NA | NA | NA |
| India | 9 | 4 | 4 | * | NA | | | | | | | NA | NA | NA | NA | NA |
| Venezuela | 6 | 8 | 5 | - | 19 | | | | | | | NA | NA | NA | NA | NA |
| Other countries | 68 | 78 | 48 | 43 | 254 | Other countries | 11 | 15 | 10 | 9 | 45 | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

*- Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008478

**DHS Table 5.3: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Houston, FY 2000-2003**

POE Total, FY 2000-2003    5,757

| | Expeditiously removed (1) | | | | | | Referred for credible fear interview | | | | | | Withdrew | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| **All** | 825 | 841 | 548 | 407 | 2,621 | | 54 | 75 | 59 | 64 | 252 | 1,284 | 838 | 485 | 277 | 2,884 |
| **Country of citizenship** | | | | | | | | | | | | | | | | |
| Mexico | 368 | 317 | 179 | 130 | 994 | Colombia | 11 | 19 | 13 | 9 | 52 | NA | NA | NA | NA | NA |
| Guatemala | 95 | 108 | 75 | 20 | 298 | China, People's Republic | 8 | 6 | 13 | * | * | NA | NA | NA | NA | NA |
| El Salvador | 77 | 80 | 51 | 37 | 245 | Sri Lanka | - | 13 | * | - | * | NA | NA | NA | NA | NA |
| Ecuador | 71 | 89 | 31 | 23 | 214 | Albania | - | - | * | 12 | * | NA | NA | NA | NA | NA |
| Peru | 28 | 39 | 50 | 31 | 148 | El Salvador | 9 | - | 4 | - | 13 | NA | NA | NA | NA | NA |
| Colombia | 54 | 38 | 23 | 16 | 131 | Guatemala | 6 | 4 | * | - | * | NA | NA | NA | NA | NA |
| Honduras | 31 | 36 | 26 | 18 | 111 | Liberia | - | - | - | 9 | 9 | NA | NA | NA | NA | NA |
| Costa Rica | 18 | 12 | 10 | 23 | 63 | Ecuador | - | 4 | 4 | - | * | NA | NA | NA | NA | NA |
| Brazil | 8 | 36 | 5 | 6 | 55 | Sierra Leone | 4 | * | * | - | * | NA | NA | NA | NA | NA |
| Belize | 7 | 12 | 11 | 7 | 37 | Mexico | - | * | - | - | * | NA | NA | NA | NA | NA |
| Other countries | 68 | 74 | 87 | 96 | 325 | Other countries | 16 | 33 | 38 | 34 | 178 | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less.  Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008479

**DHS Table 5.4(a): Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Los Angeles, FY 2000-2003**

POE Total, FY 2000-2003    13,649

| Country of citizenship | Expeditiously removed (1) | | | | | Referred for credible fear interview | | | | | Withdrew | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total | |
| All | 1,175 | 1,211 | 954 | 821 | 4,161 | 2,502 | 2,704 | 1,155 | 204 | 6,565 | 660 | 493 | 934 | 836 | 2,9 | N |
| Mexico | 456 | 311 | 257 | 212 | 1,236 | 2,008 | 2,160 | 908 | 71 | 5,147 | NA | NA | NA | NA | NA | N |
| China, People's Republic | 163 | 361 | 166 | 24 | 714 | 261 | 232 | 48 | 17 | 558 | NA | NA | NA | NA | NA | N |
| Guatemala | 116 | 95 | 55 | 38 | 304 | - | 10 | 98 | 58 | 166 | NA | NA | NA | NA | NA | N |
| Philippines | 57 | 39 | 126 | 80 | 302 | 46 | 65 | - | - | 111 | NA | NA | NA | NA | NA | N |
| Brazil | 99 | 114 | 15 | 22 | 250 | 15 | 23 | 19 | 6 | 63 | NA | NA | NA | NA | NA | N |
| Indonesia | 66 | 78 | 51 | 37 | 232 | 20 | 30 | - | 5 | 55 | NA | NA | NA | NA | NA | N |
| El Salvador | 62 | 38 | 43 | 57 | 200 | 11 | 27 | 9 | - | 47 | NA | NA | NA | NA | NA | N |
| Peru | 39 | 44 | 84 | 31 | 198 | 10 | 29 | 4 | - | 43 | NA | NA | NA | NA | NA | N |
| India | 43 | 20 | 35 | 37 | 135 | 6 | 18 | 9 | - | 33 | NA | NA | NA | NA | NA | N |
| Korea (South) | - | 24 | 28 | 29 | 81 | 6 | 21 | 5 | - | 32 | NA | NA | NA | NA | NA | N |
| Other countries | 74 | 87 | 94 | 254 | 509 | 119 | 89 | 55 | 47 | 310 | NA | NA | NA | NA | NA | N |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less.  Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008480

**DHS Table 5.4(b): Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Los Angeles, FY 2000-2003**

POE Total, FY 2000-2003    14,233

**Expeditiously removed (1)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 1,369 | 1,392 | 1,138 | 846 | 4,745 |
| Mexico | 456 | 311 | 257 | 212 | 1,236 |
| China, People's Republic | 163 | 361 | 166 | 24 | 714 |
| Guatemala | 116 | 95 | 55 | 38 | 304 |
| Philippines | 57 | 39 | 126 | 80 | 302 |
| Brazil | 99 | 114 | 15 | 22 | 250 |
| Indonesia | 66 | 78 | 51 | 37 | 232 |
| El Salvador | 62 | 38 | 43 | 57 | 200 |
| Peru | 39 | 44 | 84 | 31 | 198 |
| India | 43 | 20 | 35 | 37 | 135 |
| Korea (South) | - | 24 | 28 | 29 | 81 |
| Other countries | 268 | 268 | 278 | 279 | 1,093 |

**Referred for credible fear interview**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 2,502 | 2,704 | 1,155 | 204 | 6,565 |
| China, People's Republic | 1,868 | 1,862 | 806 | 66 | 4,602 |
| Sri Lanka | 252 | 239 | 49 | 16 | 556 |
| Armenia | * | 9 | 72 | 51 | * |
| Pakistan | 45 | 63 | * | - | * |
| India | 16 | 21 | 15 | * | 52 |
| Albania | 19 | 26 | * | 5 | * |
| Eritrea | 11 | 31 | 7 | * | * |
| Ethiopia | 9 | 23 | 5 | * | * |
| Bangladesh | 6 | 21 | 6 | - | 33 |
| Afghanistan | 5 | 23 | - | - | 28 |
| Other countries | 271 | 386 | 195 | 66 | 1,294 |

**Withdrew**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 660 | 493 | 934 | 836 | 2,923 |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |
| | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.

(2) Figures not available.

* - Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries**.

IFR_AR_008481

**DHS Table 5.5: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Miami, FY 2000-2003**

POE Total, FY 2000-2003    19,262

**Expeditiously removed (1)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| **All** | 1,001 | 1,569 | 1,549 | 1,730 | 5,849 |
| Brazil | 143 | 261 | 595 | 679 | 1,678 |
| Colombia | 86 | 136 | 124 | 139 | 485 |
| Peru | 82 | 164 | 127 | 112 | 485 |
| Dominican Republic | 61 | 255 | 45 | 28 | 389 |
| Bolivia | 21 | 105 | 128 | 97 | 351 |
| Ecuador | 57 | 115 | 71 | 61 | 304 |
| Jamaica | 34 | 73 | 55 | 73 | 235 |
| Guatemala | 26 | 43 | 59 | 51 | 179 |
| Venezuela | 19 | 38 | 45 | 73 | 175 |
| Nicaragua | 9 | 25 | 19 | 41 | 94 |
| Costa Rica | 4 | 10 | 23 | 39 | 76 |
| Other countries | 459 | 344 | 258 | 337 | 1,398 |

**Referred for credible fear interview** and **Withdrew**

| Country of citizenship | Referred FY 00 | FY 01 | FY 02 | FY 03 | Total | Withdrew FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **All** | 2,251 | 5,059 | 3,335 | 2,308 | 12,953 | 363 | 66 | 23 | 8 | 460 |
| Colombia | 191 | 1,897 | 974 | 391 | 3,453 | NA | NA | NA | NA | NA |
| Haiti | 831 | 969 | 711 | 747 | 3,258 | NA | NA | NA | NA | NA |
| China, People's Republic | 553 | 733 | 572 | 360 | 2,218 | NA | NA | NA | NA | NA |
| Guyana | 19 | 141 | 252 | 234 | 646 | NA | NA | NA | NA | NA |
| Albania | 25 | 113 | 150 | 57 | 345 | NA | NA | NA | NA | NA |
| Turkey | 75 | 153 | 27 | 21 | 276 | NA | NA | NA | NA | NA |
| Ecuador | 49 | 97 | 86 | 39 | 271 | NA | NA | NA | NA | NA |
| El Salvador | 4 | 112 | 106 | 34 | 256 | NA | NA | NA | NA | NA |
| India | 15 | 166 | 49 | 17 | 247 | NA | NA | NA | NA | NA |
| Sri Lanka | 114 | 99 | 6 | 13 | 232 | NA | NA | NA | NA | NA |
| Georgia | - | - | 32 | 191 | 223 | NA | NA | NA | NA | NA |
| Other countries | 375 | 579 | 370 | 204 | 1,528 | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008482

**DHS Table 5.6: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at New York, FY 2000-2003**

POE Total, FY 2000-2003    16,189

| | Expeditiously removed (1) | | | | | Referred for credible fear interview | | | | | Withdrew | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| All | 2,787 | 2,917 | 2,927 | 2,355 | 10,986 | 733 | 749 | 323 | 211 | 2,016 | 652 | 567 | 920 | 1,048 | 3,187 |
| **Country of citizenship** | | | | | | | | | | | | | | | |
| Dominican Republic | 374 | 640 | 698 | 302 | 2,014 | 151 | 114 | 16 | 9 | 290 | NA | NA | NA | NA | NA |
| Brazil | 336 | 360 | 292 | 372 | 1,360 | 89 | 40 | 23 | 19 | 171 | NA | NA | NA | NA | NA |
| Jamaica | 222 | 282 | 225 | 204 | 933 | 51 | 64 | 21 | 11 | 147 | NA | NA | NA | NA | NA |
| Trinidad & Tobago | 87 | 124 | 147 | 137 | 495 | 16 | 37 | 39 | 6 | 98 | NA | NA | NA | NA | NA |
| Ecuador | 191 | 103 | 57 | 35 | 386 | 7 | 49 | 34 | 7 | 97 | NA | NA | NA | NA | NA |
| India | 103 | 107 | 73 | 91 | 374 | 50 | 21 | 8 | 10 | 89 | NA | NA | NA | NA | NA |
| Poland | 80 | 87 | 83 | 63 | 313 | 20 | 21 | 12 | 19 | 72 | NA | NA | NA | NA | NA |
| Colombia | 96 | 85 | 51 | 37 | 269 | 39 | 19 | 5 | 5 | 68 | NA | NA | NA | NA | NA |
| Ghana | 94 | 54 | 44 | 69 | 261 | 19 | 40 | 4 | - | 63 | NA | NA | NA | NA | NA |
| Pakistan | 49 | 51 | 74 | 68 | 242 | 18 | 22 | 7 | 10 | 57 | NA | NA | NA | NA | NA |
| Other countries | 1,155 | 1,024 | 1,183 | 977 | 4,339 | 273 | 322 | 154 | 115 | 864 | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement–Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less.  Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008483

DHS Table 5.7: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Newark, FY 2000-2003

POE Total, FY 2000-2003    5,838

**Expeditiously removed (1)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 658 | 674 | 466 | 410 | 2,208 |
| Dominican Republic | 64 | 157 | 128 | 107 | 456 |
| Ecuador | 121 | 113 | 51 | 41 | 326 |
| Jamaica | 57 | 45 | 50 | 28 | 180 |
| Colombia | 86 | 44 | 19 | 21 | 170 |
| Costa Rica | 45 | 41 | 24 | 48 | 158 |
| Brazil | 45 | 57 | 24 | 8 | 134 |
| Peru | 38 | 31 | 28 | 19 | 116 |
| India | 23 | 12 | 6 | 40 | 81 |
| Mexico | 18 | 19 | 19 | 6 | 62 |
| Guatemala | 10 | 25 | 8 | 5 | 48 |
| Other countries | 151 | 130 | 109 | 87 | 477 |

**Referred for credible fear interview**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 280 | 221 | 92 | 108 | 701 |
| Sri Lanka | 60 | 57 | 18 | * | NA |
| Colombia | 25 | 23 | 11 | 18 | 77 |
| Albania | 31 | 18 | - | - | 49 |
| China, People's Republic | 19 | 11 | - | 7 | 37 |
| Ghana | 13 | - | * | * | * |
| Somalia | 11 | 7 | - | - | 18 |
| Yugoslavia, former | 12 | 5 | - | - | 17 |
| Romania | - | 8 | - | 8 | 16 |
| India | 5 | 5 | 5 | - | 15 |
| Nigeria | 11 | 4 | - | - | 15 |
| Other countries | 93 | 83 | 58 | 75 | 457 |

**Withdrew**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 983 | 537 | 600 | 809 | 2,929 |
| Dominican Republic | NA | NA | NA | NA | NA |
| Ecuador | NA | NA | NA | NA | NA |
| Jamaica | NA | NA | NA | NA | NA |
| Colombia | NA | NA | NA | NA | NA |
| Costa Rica | NA | NA | NA | NA | NA |
| Brazil | NA | NA | NA | NA | NA |
| Peru | NA | NA | NA | NA | NA |
| India | NA | NA | NA | NA | NA |
| Mexico | NA | NA | NA | NA | NA |
| Guatemala | NA | NA | NA | NA | NA |
| Other countries | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement–Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.

(2) Figures not available.

*- Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008484

DHS Table 5.8: Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at San Francisco, FY 2000-2003

POE Total, FY 2000-2003    2,666

| | Expeditiously removed (1) | | | | | | Referred for credible fear interview | | | | | | Withdrew | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| **All** | 161 | 141 | 176 | 356 | 834 | | 177 | 321 | 156 | 160 | 814 | 413 | 415 | 190 | - | 1,018 |
| **Country of citizenship** | | | | | | | | | | | | | | | | |
| Philippines | 28 | 13 | 62 | 167 | 270 | China, People's Republic | 91 | 51 | 85 | 119 | 346 | NA | NA | NA | NA | NA |
| Mexico | 70 | 56 | 40 | 74 | 240 | Sri Lanka | 47 | 133 | 32 | 9 | 221 | NA | NA | NA | NA | NA |
| Guatemala | 6 | 14 | 8 | 6 | 34 | Armenia | - | 10 | 15 | 12 | 37 | NA | NA | NA | NA | NA |
| Indonesia | 7 | 6 | 9 | 9 | 31 | Afghanistan | 6 | 30 | - | - | 36 | NA | NA | NA | NA | NA |
| China, People's Republic | 8 | 5 | * | 7 | * | Albania | 8 | 23 | 4 | - | 35 | NA | NA | NA | NA | NA |
| Peru | 4 | * | * | 13 | * | Pakistan | * | 17 | - | - | * | NA | NA | NA | NA | NA |
| India | 5 | * | 8 | 5 | * | India | - | 9 | 4 | * | * | NA | NA | NA | NA | NA |
| El Salvador | * | 6 | 4 | 4 | * | Colombia | * | * | - | 6 | * | NA | NA | NA | NA | NA |
| Mongolia | - | - | 4 | 12 | 16 | Ethiopia | - | 8 | - | - | 8 | NA | NA | NA | NA | NA |
| Thailand | * | * | 5 | 5 | * | Indonesia | - | 4 | - | * | * | NA | NA | NA | NA | NA |
| Other countries | 33 | 41 | 36 | 54 | 243 | Other countries | 25 | 36 | 16 | 14 | 131 | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.

(2) Figures not available.

*- Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries**.

IFR_AR_008485

DHS Table 5.9:  Aliens Expeditiously Removed, Referred for Credible Fear Interview or Withdrew at Washington, FY 2000-2003

POE Total, FY 2000-2003    1,700

**Expeditiously removed (1)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 75 | 82 | 94 | 292 | 543 |
| El Salvador | 11 | 16 | 25 | 34 | 86 |
| Brazil | * | * | - | 53 | * |
| Guatemala | 8 | 10 | 11 | 24 | 53 |
| Ghana | * | 5 | 5 | 19 | * |
| Costa Rica | 18 | 5 | * | * | * |
| India | * | 5 | * | 10 | * |
| Mexico | 5 | 4 | * | 6 | * |
| Pakistan | - | * | * | 13 | * |
| Czechoslovakia, former | - | * | 4 | 8 | * |
| Nigeria | - | - | * | 12 | * |
| Other countries | 33 | 37 | 49 | 113 | 404 |

**Referred for credible fear interview**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 112 | 65 | 55 | 37 | 269 |
| Cameroon | 18 | 10 | 15 | 11 | 54 |
| Ethiopia | 10 | 12 | 5 | 4 | 31 |
| Albania | 19 | * | 4 | - | * |
| China, People's Republic | 6 | 5 | - | - | 11 |
| Afghanistan | - | - | 8 | - | 8 |
| Sudan | 4 | 4 | - | - | 8 |
| El Salvador | - | 4 | - | * | * |
| Sierra Leone | 6 | - | - | - | 6 |
| Congo, Democratic Republic | 5 | - | - | - | 5 |
| Somalia | 5 | - | - | - | 5 |
| Other countries | 39 | 30 | 23 | 22 | 141 |

**Withdrew**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 191 | 145 | 155 | 397 | 888 |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |
|  | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.

(2) Figures not available.

\* - Total number from country is three or less.  Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

IFR_AR_008486

**DHS Table 6: Aliens Expeditiously Removed or Referred for Credible Fear Interview at Southern Land Ports of Entry, FY 2000-03**

| | Expeditiously removed | | Referred for credible fear interview | | Withdrew | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **All Southern Land POEs** | 175,981 | 100.0% | 4,479 | 100.0% | 293,820 | 100.0% |

**Ports of entry**

| Expeditiously removed | Number | Percent | Referred for credible fear interview | Number | Percent | Withdrew | Number | Percent |
|---|---|---|---|---|---|---|---|---|
| San Ysidro, CA | 85,936 | 48.8% | San Ysidro, CA | 2,976 | 66.4% | San Ysidro, CA | 92,838 | 31.6% |
| Calexico, CA | 23,879 | 13.6% | Hidalgo, TX | 1,016 | 22.7% | Juarez-Lincoln Bridge, TX | 47,738 | 16.2% |
| Nogales, AZ | 17,883 | 10.2% | Calexico, CA | 147 | 3.3% | Laredo, TX | 40,715 | 13.9% |
| Paso Del Norte Bridge, TX | 7,751 | 4.4% | Paso Del Norte Bridge, TX | 73 | 1.6% | Paso del Norte, TX | 22,846 | 7.8% |
| Douglas, AZ | 6,510 | 3.7% | Otay Mesa, CA | 66 | 1.5% | Del Rio, TX | 22,420 | 7.6% |
| Other | 34,022 | 19.3% | Other | 201 | 4.5% | Other | 67,263 | 22.9% |

**Country of citizenship**

| Expeditiously removed | Number | Percent | Referred for credible fear interview | Number | Percent | Withdrew | Number | Percent |
|---|---|---|---|---|---|---|---|---|
| Mexico | 144,113 | 81.9% | Cuba | 1,261 | 28.2% | | NA | NA |
| Guatemala | 436 | 0.2% | Iraq | 770 | 17.2% | | NA | NA |
| Brazil | 325 | 0.2% | China, People's Republic | 376 | 8.4% | | NA | NA |
| Honduras | 287 | 0.2% | Ukraine | 332 | 7.4% | | NA | NA |
| El Salvador | 255 | 0.1% | Armenia | 151 | 3.4% | | NA | NA |
| Korea | 123 | 0.1% | Guatemala | 149 | 3.3% | | NA | NA |
| Belize | 76 | 0.0% | El Salvador | 121 | 2.7% | | NA | NA |
| Dominican Republic | 75 | 0.0% | Bulgaria | 108 | 2.4% | | NA | NA |
| Jamaica | 70 | 0.0% | Honduras | 61 | 1.4% | | NA | NA |
| Colombia | 59 | 0.0% | Russia | 56 | 1.3% | | NA | NA |
| Other countries | 30,162 | 17.1% | Other countries | 1,094 | 24.4% | | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

IFR_AR_008487

**DHS Table 7(a): Aliens Expeditiously Removed or Referred for Credible Fear Interview at Northern Land Ports of Entry, FY 2000-03**

| | Expeditiously removed | | | Referred for credible fear interview | | | Withdrew | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent | | Number | Percent |
| **All Northern Land POEs** | 2,238 | 100.0% | | 162 | 100.0% | | 221,573 | 100.0% |
| | | | | | | | | |
| **Port of entry** | | | | | | | | |
| Niagara Falls, NY | 831 | 37.1% | Champlain, NY | 57 | 35.2% | Niagara Falls, NY | 90,009 | 40.6% |
| Champlain, NY | 234 | 10.5% | Niagra Falls, NY | 50 | 30.9% | Peace Bridge, NY | 28,927 | 13.1% |
| Calais, ME | 180 | 8.0% | Buffalo, NY | 30 | 18.5% | Champlain, NY | 14,864 | 6.7% |
| Peace Bridge, NY | 155 | 6.9% | Blaine, WA | 7 | 4.3% | Blaine, WA | 13,774 | 6.2% |
| Port Huron, MI | 145 | 6.5% | St. John, ND | 7 | 4.3% | Blaine, WA - Pacific Hwy | 11,445 | 5.2% |
| Other | 693 | 31.0% | Other | 11 | 6.8% | Other | 62,554 | 28.2% |
| | | | | | | | | |
| **Country of citizenship** | | | | | | | | |
| Canada | 734 | 32.8% | Cuba | 27 | 16.7% | | NA | NA |
| Pakistan | 83 | 3.7% | Haiti | 24 | 14.8% | | NA | NA |
| India | 65 | 2.9% | Argentina | 12 | 7.4% | | NA | NA |
| Mexico | 57 | 2.5% | Hungary | 6 | 3.7% | | NA | NA |
| Jamaica | 32 | 1.4% | China, People's Republic | 5 | 3.1% | | NA | NA |
| Malaysia | 28 | 1.3% | Sri Lanka | 3 | 1.9% | | NA | NA |
| Guyana | 23 | 1.0% | Other countries | 85 | 52.5% | | NA | NA |
| Israel | 22 | 1.0% | | | | | NA | NA |
| Haiti | 19 | 0.8% | | | | | NA | NA |
| Korea | 18 | 0.8% | | | | | NA | NA |
| Other countries | 1,157 | 51.7% | | | | | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

IFR_AR_008488

**DHS Table 7(b): Aliens Expeditiously Removed or Referred for Credible Fear Interview at Northern Land Ports of Entry, FY 2000-03**

| | Expeditiously removed | | Referred for credible fear interview | | Withdrew | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **All Northern Land POEs** | 1,471 | 100.0% | 162 | 100.0% | 221,573 | 100.0% |

**Port of entry**

| Expeditiously removed | Number | Percent |
|---|---|---|
| Niagara Falls, NY | 774 | 52.6% |
| Champlain, NY | 231 | 15.7% |
| Calais, ME | 176 | 12.0% |
| Peace Bridge, NY | 151 | 10.3% |
| Port Huron, MI | 139 | 9.4% |
| Other | 0 | |

| Referred for credible fear interview | Number | Percent |
|---|---|---|
| Champlain, NY | 57 | 35.2% |
| Niagra Falls, NY | 50 | 30.9% |
| Buffalo, NY | 30 | 18.5% |
| Blaine, WA | 7 | 4.3% |
| St. John, ND | 7 | 4.3% |

| Withdrew | Number | Percent |
|---|---|---|
| Niagara Falls, NY | 90,009 | 40.6% |
| Peace Bridge, NY | 28,927 | 13.1% |
| Champlain, NY | 14,864 | 6.7% |
| Blaine, WA | 13,774 | 6.2% |
| Blaine, WA - Pacific Hwy | 11,445 | 5.2% |

**Country of citizenship**

| Expeditiously removed | Number | Percent |
|---|---|---|
| Canada | 734 | 49.9% |
| Pakistan | 83 | 5.6% |
| India | 65 | 4.4% |
| Mexico | 57 | 3.9% |
| Jamaica | 32 | 2.2% |
| Malaysia | 28 | 1.9% |
| Guyana | 23 | 1.6% |
| Israel | 22 | 1.5% |
| Haiti | 19 | 1.3% |
| Korea | 18 | 1.2% |
| Other countries | 390 | 26.5% |

| Referred for credible fear interview | Number | Percent |
|---|---|---|
| Cuba | 27 | 16.7% |
| Haiti | 24 | 14.8% |
| Argentina | 12 | 7.4% |
| Hungary | 6 | 3.7% |
| China, People's Republic | 5 | 3.1% |
| Sri Lanka | 3 | 1.9% |
| Other countries | 85 | 52.5% |

| Withdrew | Number | Percent |
|---|---|---|
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |
| | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

IFR_AR_008489

**DHS Table 8.0: Aliens Expeditiously Removed or Referred for Credible Fear Interview at San Ysidro, FY 2000-2003**

POE Total, FY 2: 182,285

**Expeditiously removed (1)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 37,298 | 26,506 | 7,180 | 15,487 | 86,471 |
| Mexico | 36,909 | 26,067 | 6,898 | 15,007 | 84,881 |
| Guatemala | 77 | 109 | 37 | 78 | 301 |
| Brazil | 18 | 73 | 77 | 90 | 258 |
| El Salvador | 58 | 41 | 19 | 58 | 176 |
| Korea | 6 | 27 | 16 | 61 | 110 |
| Honduras | 12 | 24 | 10 | 42 | 88 |
| Belize | 15 | 19 | 23 | 15 | 72 |
| Jamaica | 41 | 13 | 9 | * | * |
| Peru | 5 | 12 | 9 | 10 | 36 |
| Colombia | 13 | 9 | 5 | 7 | 34 |
| Other countries | 144 | 112 | 77 | 119 | 452 |

**Referred for credible fear interview**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 874 | 997 | 734 | 371 | 2,976 |
| Iraq | 232 | 156 | 327 | 47 | 762 |
| China, People's Republic | 69 | 99 | 90 | 84 | 342 |
| Ukraine | 140 | 143 | 19 | 13 | 315 |
| Cuba | 19 | 45 | 63 | 69 | 196 |
| Armenia | 60 | 46 | 33 | 9 | 148 |
| Guatemala | 43 | 52 | 16 | 23 | 134 |
| Bulgaria | 17 | 49 | 24 | 18 | 108 |
| El Salvador | 38 | 42 | 15 | 13 | 108 |
| Honduras | 17 | 17 | 6 | 12 | 52 |
| Iran | 13 | 21 | 9 | 6 | 49 |
| Other countries | 226 | 327 | 132 | 77 | 762 |

**Withdrew (2)**

| Country of citizenship | FY 00 | FY 01 | FY 02 | FY 03 | Total |
|---|---|---|---|---|---|
| All | 28,349 | 29,465 | 19,921 | 15,103 | 92,838 |
| (all countries) | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for Other countries.

314

IFR_AR_008490

DHS Table 8.1: Aliens Expeditiously Removed or Referred for Credible Fear Interview at Hidalgo, FY 2000-2003

POE Total, FY 2000-: 18,053

| | Expeditiously removed (1) | | | | | Referred for credible fear interview | | | | | | Withdrew (2) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| All | 2,425 | 1,849 | 710 | 833 | 5,817 | | 185 | 77 | 557 | 197 | 1,016 | 3,017 | 3,041 | 2,499 | 2,663 | 11,220 |
| **Country of citizenship** | | | | | | | | | | | | | | | | |
| Mexico | 2,357 | 1,833 | 666 | 792 | 5,648 | Cuba | 178 | 68 | 554 | 189 | 989 | NA | NA | NA | NA | NA |
| Honduras | 15 | * | * | 6 | * | Honduras | - | - | * | * | * | NA | NA | NA | NA | NA |
| Guatemala | 11 | 4 | * | 4 | * | | | | | | | NA | NA | NA | NA | NA |
| El Salvador | 7 | * | * | 4 | * | | | | | | | NA | NA | NA | NA | NA |
| Brazil | * | * | * | 5 | * | | | | | | | NA | NA | NA | NA | NA |
| Colombia | * | * | * | - | * | | | | | | | NA | NA | NA | NA | NA |
| Belize | 4 | - | * | - | * | | | | | | | NA | NA | NA | NA | NA |
| Costa Rica | * | * | * | - | * | | | | | | | NA | NA | NA | NA | NA |
| Dominican Republic | * | * | * | - | * | | | | | | | NA | NA | NA | NA | NA |
| Poland | * | - | * | - | * | | | | | | | NA | NA | NA | NA | NA |
| Other countries | 31 | 12 | 44 | 22 | 169 | Other countries | 7 | 9 | 3 | 8 | 27 | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection at U.S. Department of Homeland Security

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other c**

315

IFR_AR_008491

**DHS Table 8.2: Aliens Expeditiously Removed or Referred for Credible Fear Interview at Calexico, FY 2000-2003**

POE Total, FY 2000  29,385

| Country of citizenship | Expeditiously removed (1) | | | | | Referred for credible fear interview | | | | | (Country) | Withdrew (2) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| All | 8,317 | 7,155 | 3,801 | 4,337 | 23,610 | 51 | 48 | 22 | 26 | 147 | | 1,319 | 2,388 | 1,249 | 672 | 5,628 |
| Mexico | 8,280 | 7,107 | 3,766 | 4,296 | 23,449 | * | 11 | 10 | 5 | * | Cuba | NA | NA | NA | NA | NA |
| Guatemala | 7 | 7 | 8 | 11 | 33 | * | 5 | * | 10 | * | China, People's Republic | NA | NA | NA | NA | NA |
| Honduras | 8 | 10 | * | 6 | * | 11 | * | - | - | * | Ukraine | NA | NA | NA | NA | NA |
| El Salvador | * | 12 | 4 | 6 | * | * | 9 | - | - | 9 | El Salvador | NA | NA | NA | NA | NA |
| Brazil | * | 4 | 5 | - | * | 13 | - | - | - | 13 | Russia | NA | NA | NA | NA | NA |
| Korea | - | - | * | 8 | * | 5 | - | - | - | 5 | Guatemala | NA | NA | NA | NA | NA |
| Chile | * | 5 | * | * | * | - | - | 4 | - | 4 | Colombia | NA | NA | NA | NA | NA |
| Ecuador | * | * | 5 | * | * | - | * | - | - | * | Honduras | NA | NA | NA | NA | NA |
| Paraguay | - | * | * | * | * | - | * | - | - | * | Peru | NA | NA | NA | NA | NA |
| Peru | * | - | * | * | * | | | | | | | NA | NA | NA | NA | NA |
| Other countries | 22 | 10 | 13 | 10 | 128 | 22 | 23 | 8 | 11 | 116 | Other countries | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries**.

IFR_AR_008492

**DHS Table 8.3: Aliens Expeditiously Removed or Referred for Credible Fear Interview at Champlain, FY 2000-2003**

POE Total, FY 2000-20003          15,152          15,152

| Country of citizenship | Expeditiously removed (1) | | | | | Referred for credible fear interview | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| All | 86 | 61 | 57 | 27 | 231 | | 30 | 19 | 8 | - | 57 |
| Canada | 41 | 21 | 29 | 12 | 103 | Haiti | 16 | * | 5 | - | * |
| Haiti | 8 | 4 | 4 | * | * | Cuba | - | 5 | - | - | 5 |
| St. Vincent & the Grenadines | * | 6 | * | * | * | Sri Lanka | * | - | - | - | * |
| Mexico | 4 | - | * | * | * | | | | | | |
| El Salvador | * | 6 | - | * | * | | | | | | |
| France | * | - | * | * | * | | | | | | |
| Congo, Republic | * | - | * | * | * | | | | | | |
| Jamaica | * | - | * | * | * | | | | | | |
| Peru | * | - | * | - | * | | | | | | |
| Costa Rica | - | * | * | * | * | | | | | | |
| Other countries | 33 | 24 | 24 | 15 | 128 | Other countries | 14 | 14 | 3 | - | 52 |

| | Withdrew (2) | | | | |
|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| All | 3,700 | 3,333 | 3,758 | 4,073 | 14,864 |
| Canada | NA | NA | NA | NA | NA |
| Haiti | NA | NA | NA | NA | NA |
| St. Vincent & the Grenadines | NA | NA | NA | NA | NA |
| Mexico | NA | NA | NA | NA | NA |
| El Salvador | NA | NA | NA | NA | NA |
| France | NA | NA | NA | NA | NA |
| Congo, Republic | NA | NA | NA | NA | NA |
| Jamaica | NA | NA | NA | NA | NA |
| Peru | NA | NA | NA | NA | NA |
| Costa Rica | NA | NA | NA | NA | NA |
| Other countries | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement–Office of Detention and Removal Operations, and U.S. Customs and Border Protection

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

*-Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries**

IFR_AR_008493

**DHS Table 8.4: Aliens Expeditiously Removed or Referred for Credible Fear Interview at Niagra Falls, FY 2000-2003**

POE Total, FY 2000-:  90,833

| Country of citizenship | Expeditiously removed (1) | | | | | Referred for credible fear interview | | | | | | Withdrew (2) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| **All** | 325 | 215 | 130 | 104 | 774 | - | 16 | 20 | 14 | 50 | | 25,562 | 23,247 | 23,100 | 18,100 | 90,009 |
| Canada | 115 | 66 | 50 | 41 | 272 | - | 7 | 12 | * | * | Cuba | NA | NA | NA | NA | NA |
| Pakistan | 22 | 26 | 11 | 4 | 63 | - | - | * | 9 | * | Argentina | NA | NA | NA | NA | NA |
| India | 27 | 7 | 12 | 5 | 51 | - | 6 | - | - | 6 | Hungary | NA | NA | NA | NA | NA |
| Mexico | 19 | 18 | * | 4 | * | | | | | | | NA | NA | NA | NA | NA |
| Malaysia | 4 | 11 | 11 | * | * | | | | | | | NA | NA | NA | NA | NA |
| Guyana | 18 | * | * | * | * | | | | | | | NA | NA | NA | NA | NA |
| Jamaica | 10 | 4 | * | * | * | | | | | | | NA | NA | NA | NA | NA |
| Korea | 14 | * | * | * | * | | | | | | | NA | NA | NA | NA | NA |
| Israel | * | 7 | * | * | * | | | | | | | NA | NA | NA | NA | NA |
| Philippines | 5 | * | * | 8 | * | | | | | | | NA | NA | NA | NA | NA |
| Other countries | 91 | 76 | 46 | 42 | 388 | - | 3 | 8 | 5 | 44 | | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less.  Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Other countries.**

318

IFR_AR_008494

**DHS Table 8.5:  Aliens Expeditiously Removed or Referred for Credible Fear Interview at Buffalo, FY 2000-2003**

**POE Total, FY 2000-20003**        97

| Country of citizenship | Expeditiously removed (1) | | | | | Referred for credible fear interview | | | | | | Withdrew (2) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 00 | FY 01 | FY 02 | FY 03 | Total | | FY 00 | FY 01 | FY 02 | FY 03 | Total | FY 00 | FY 01 | FY 02 | FY 03 | Total |
| **All** | 32 | 22 | 8 | 5 | 67 | | 3 | 16 | 5 | 6 | 30 | - | - | - | - | - |
| Canada | 17 | 7 | 5 | * | * | Cuba | - | 7 | - | - | 7 | NA | NA | NA | NA | NA |
| Jamaica | * | * | * | - | * | | | | | | | NA | NA | NA | NA | NA |
| Trinidad & Tobago | * | * | * | - | * | | | | | | | NA | NA | NA | NA | NA |
| India | * | * | - | - | * | | | | | | | NA | NA | NA | NA | NA |
| Australia | * | * | - | * | * | | | | | | | NA | NA | NA | NA | NA |
| Guyana | * | * | - | - | * | | | | | | | NA | NA | NA | NA | NA |
| Nigeria | * | - | - | - | * | | | | | | | NA | NA | NA | NA | NA |
| Pakistan | * | * | - | - | * | | | | | | | NA | NA | NA | NA | NA |
| Ukraine | - | * | - | * | * | | | | | | | NA | NA | NA | NA | NA |
| Argentina | - | * | - | - | * | | | | | | | NA | NA | NA | NA | NA |
| Other countries | 15 | 15 | 3 | 5 | 67 | Other countries | 3 | 9 | 5 | 6 | 23 | NA | NA | NA | NA | NA |

Source: U.S. Immigration and Customs Enforcement-Office of Detention and Removal Operations, and U.S. Customs and Border Protection

(1) Figures do not include cases referred for credible fear interviews or legal status cases.
(2) Figures not available.

* - Total number from country is three or less.  Due to privacy concerns of the individuals involved, these numbers have been suppressed and are included in the total for **Othe**

IFR_AR_008495

**DHS Table 9: Countries of Citizenship for Aliens Referred for Credible Fear Claims, FY 2000-03**

| Country of Citizenship | Pending Beginning | Cases Received | Credible Fear Found | % | Not Found | % | Dissolved | % | Closed Withdrawn (1) | % | Other | % | Pending End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **1,843** | **39,422** | **37,022** | **93.91%** | **429** | **1.16%** | **1,741** | **4.4%** | **150** | **0.38%** | **543** | **1.38%** | **1,380** |
| China | 486 | 11,451 | 11,447 | 29.04% | 54 | 0.14% | 18 | 0.05% | 12 | 0.03% | 108 | 0.27% | 298 |
| Colombia | 88 | 4,389 | 4,016 | 10.19% | 43 | 0.11% | 299 | 0.76% | 20 | 0.05% | 11 | 0.03% | 88 |
| Cuba | 287 | 4,093 | 3,979 | 10.09% | * | | 9 | 0.02% | - | | 120 | 0.30% | 270 |
| Haiti | 72 | 3,909 | 3,845 | 9.75% | 38 | 0.10% | 28 | 0.07% | * | | 17 | 0.04% | 52 |
| Sri Lanka | 140 | 2,310 | 2,341 | 5.94% | * | | * | | - | | 38 | 0.10% | 64 |
| Albania | 48 | 981 | 950 | 2.41% | * | | 20 | 0.05% | - | | 15 | 0.04% | 41 |
| Iraq | 202 | 969 | 970 | 2.46% | - | | * | | * | | * | | 194 |
| Guyana | 10 | 743 | 702 | 1.78% | 10 | 0.03% | 28 | 0.07% | * | | * | | 8 |
| El Salvador | 42 | 587 | 451 | 1.14% | 42 | 0.11% | 95 | 0.24% | 7 | 0.02% | 10 | 0.03% | 24 |
| India | 10 | 557 | 505 | 1.28% | 12 | 0.03% | 32 | 0.08% | * | | 8 | 0.02% | 8 |
| Other countries | 458 | 9,433 | 7,816 | 19.83% | 230 | 0.58% | 1,212 | 3.07% | 111 | 0.28% | 216 | 0.55% | 333 |

Source: U.S. Department of Homeland Security, Citizenship and Immigration Services

(1) Refers to withdrawals made at the time of the Credible Fear Interview, not at the Port of Entry (POE).

* - Total number from country is three or less. Due to privacy concerns of the individuals involved, these numbers have been hidden.

IFR_AR_008496

**DHS Table 10:  Countries of Citizenship for Aliens Referred for Credible Fear Claims by Fiscal Year**

| | Pending Beginning | Cases Received | Credible Fear Found | Credible Fear Not Found | Dissolved | Closed Withdrawn (1) | Other | Pending End |
|---|---|---|---|---|---|---|---|---|
| **Country of Citizenship, FY 2000** | | | | | | | | |
| **All** | **402** | **10,315** | **9,285** | **150** | **373** | **19** | **144** | **746** |
| China | 179 | 4,024 | 3,952 | 26 | 7 | - | 47 | 171 |
| Haiti | 27 | 1,064 | 1,045 | 7 | 3 | - | 10 | 26 |
| Sri Lanka | 58 | 987 | 985 | 1 | - | - | 15 | 44 |
| Cuba | 14 | 557 | 491 | - | 4 | - | 8 | 68 |
| Colombia | 4 | 342 | 260 | 9 | 43 | 3 | 1 | 30 |
| Iraq | 6 | 263 | 79 | - | 1 | - | - | 189 |
| Albania | 11 | 250 | 232 | 1 | 7 | - | 6 | 15 |
| Ukraine | 2 | 185 | 175 | - | 6 | - | 1 | 5 |
| Somalia | 12 | 166 | 160 | - | 1 | - | 2 | 15 |
| Yugoslavia | 3 | 151 | 123 | - | 1 | - | 13 | 17 |
| Pakistan | 5 | 142 | 106 | 2 | 20 | - | 4 | 15 |
| Other countries | 81 | 2,184 | 1,677 | 104 | 280 | 16 | 37 | 151 |
| **Country of Citizenship, FY 2001** | | | | | | | | |
| **All** | **772** | **13,140** | **12,932** | **119** | **400** | **33** | **205** | **223** |
| China | 178 | 3,838 | 3,916 | 25 | 3 | 3 | 19 | 50 |
| Colombia | 29 | 2,222 | 2,133 | 6 | 57 | 4 | 6 | 45 |
| Haiti | 31 | 1,081 | 1,095 | 6 | 1 | - | 3 | 7 |
| Sri Lanka | 52 | 1,008 | 1,040 | 2 | 1 | - | 12 | 5 |
| Cuba | 71 | 410 | 377 | 1 | 1 | - | 94 | 8 |
| Albania | 16 | 380 | 372 | - | 8 | - | 2 | 14 |
| India | 3 | 314 | 306 | 2 | 2 | - | 3 | 4 |
| Iraq | 190 | 291 | 477 | - | - | - | 2 | 2 |
| El Salvador | 10 | 222 | 184 | 11 | 23 | 1 | 2 | 11 |
| Pakistan | 17 | 200 | 178 | 5 | 16 | 1 | 6 | 11 |
| Other countries | 175 | 3,174 | 2,854 | 61 | 288 | 24 | 56 | 66 |
| **Country of Citizenship, FY 2002** | | | | | | | | |
| **All** | **353** | **9,867** | **9,124** | **112** | **493** | **42** | **140** | **309** |
| China | 86 | 2,403 | 2,407 | 2 | 3 | 3 | 34 | 40 |
| Cuba | 13 | 2,166 | 1,974 | 1 | 3 | - | 12 | 189 |
| Colombia | 46 | 1,240 | 1,130 | 23 | 117 | 4 | 3 | 9 |
| Haiti | 9 | 752 | 739 | 12 | 3 | - | 2 | 5 |
| Iraq | 5 | 355 | 356 | - | - | 1 | 2 | 1 |
| Guyana | 1 | 257 | 242 | 8 | 7 | - | - | 1 |
| Sri Lanka | 19 | 253 | 251 | - | - | - | 10 | 11 |
| Albania | 14 | 243 | 241 | 2 | 3 | - | 5 | 6 |
| El Salvador | 17 | 175 | 134 | 15 | 29 | 3 | 7 | 4 |
| Armenia | 1 | 160 | 151 | 1 | - | - | 1 | 8 |
| Other countries | 142 | 1,863 | 1,499 | 48 | 328 | 31 | 64 | 35 |
| **Country of Citizenship, FY 2003** | | | | | | | | |
| **All** | **316** | **6,100** | **5,681** | **48** | **475** | **56** | **54** | **102** |
| China | 43 | 1,186 | 1,172 | 1 | 5 | 6 | 8 | 37 |
| Haiti | 5 | 1,012 | 966 | 13 | 21 | 1 | 2 | 14 |
| Cuba | 189 | 960 | 1,137 | - | 1 | - | 6 | 5 |
| Colombia | 9 | 585 | 493 | 5 | 82 | 9 | 1 | 4 |
| Guyana | 1 | 289 | 273 | 1 | 12 | 1 | 2 | 1 |
| Georgia | - | 205 | 203 | - | 1 | - | 1 | - |
| Armenia | 8 | 117 | 119 | 2 | 1 | 1 | - | 2 |
| Albania | 7 | 108 | 105 | - | 2 | - | 2 | 6 |
| El Salvador | 4 | 91 | 67 | 2 | 22 | 3 | - | 1 |
| Ukraine | 4 | 69 | 57 | 1 | 11 | 2 | 1 | 1 |
| Other countries | 46 | 1,478 | 1,089 | 23 | 317 | 33 | 31 | 31 |

Source: U.S. Department of Homeland Security, Citizenship and Immigration Services

(1) Refers to withdrawals made at the time of the Credible Fear Interview, not at the Port of Entry (POE).

IFR_AR_008497

DHS Table 11: Aliens Referred for Credible Fear Interviews by Asylum Office and Year

| Asylum Office | Cases Received | | | | Credible Fear | | | | | | | | Closed | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Found | | | | Not Found | | | | Dissolved | | | | Withdrawn (1) | | | | |
| | FY 00 | FY 01 | FY 02 | FY 03 | FY 00 | FY 01 | FY 02 | FY 03 | FY 00 | FY 01 | FY 02 | FY 03 | FY 00 | FY 01 | FY 02 | FY 03 | FY 00 | FY 01 | FY 02 | FY 03 | |
| Total | 10,315 | 13,140 | 9,867 | 6,100 | 9,285 | 12,932 | 9,124 | 5,681 | 150 | 119 | 112 | 48 | 373 | 400 | 493 | 475 | 19 | 33 | 42 | 56 | 78,764 |
| **Asylum Office** | | | | | | | | | | | | | | | | | | | | | |
| Arlington | 269 | 395 | 284 | 202 | 191 | 303 | 199 | 136 | 5 | - | 2 | 1 | 51 | 87 | 96 | 62 | 1 | 2 | 1 | 1 | 2,288 |
| Chicago | 1,025 | 856 | 613 | 216 | 1,008 | 831 | 611 | 199 | 12 | 18 | 1 | 1 | 16 | 14 | 2 | - | - | 7 | 6 | 12 | 5,448 |
| Houston | 816 | 616 | 2,275 | 1,220 | 679 | 559 | 2,011 | 1,335 | 15 | 1 | 8 | 2 | 57 | 31 | 60 | 70 | - | - | - | 2 | 9,758 |
| Los Angeles | 3,717 | 4,048 | 2,203 | 765 | 3,321 | 4,316 | 2,159 | 693 | 26 | 39 | 9 | 2 | 30 | 40 | 32 | 55 | 2 | 7 | 12 | 13 | 21,488 |
| Miami | 2,585 | 5,217 | 3,177 | 2,658 | 2,495 | 5,185 | 3,105 | 2,524 | 40 | 27 | 80 | 23 | 23 | 7 | 39 | 72 | 14 | 2 | 9 | 20 | 27,302 |
| Newark | 817 | 982 | 777 | 603 | 642 | 818 | 609 | 425 | 27 | 23 | 10 | 17 | 103 | 121 | 186 | 147 | 1 | 3 | - | 1 | 6,312 |
| New York | 671 | 628 | 332 | 232 | 550 | 532 | 255 | 165 | 12 | 9 | 1 | 1 | 90 | 98 | 75 | 67 | - | 1 | 1 | - | 3,720 |
| San Francisco | 415 | 398 | 206 | 204 | 399 | 388 | 175 | 204 | 13 | 2 | 1 | 1 | 3 | 2 | 3 | 2 | - | 11 | 13 | 7 | 2,447 |

Source: U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services

(1) Refers to withdrawals made at the time of the Credible Fear Interview, not at the Port of Entry (POE).

IFR_AR_008498

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

# STATISTICAL REPORT ON DETENTION, FY 2000-2003

## FEBRUARY 2005

Special Tabulations Prepared with Assistance from the
U.S. Department of Homeland Security,
U.S. Bureau of Immigration and Customs Enforcement -
Office of Detention and Removal Operations (ICE-DRO)

Assembled and Introduced by Cory Fleming and Fritz Scheuren
NORC University of Chicago

IFR_AR_008499

TABLE OF CONTENTS

Preface…………………………………………………………………………327

Descriptive Summary……………………………………………………………328

Sources and Limitations…………………………………………………………334

**Table Sets**

**Length of Stay in Detention**……………………………………………...    337
DRO Table 1. Length of Stay in Detention for Aliens Referred for Credible Fear
Interview, FY 2000-2003

**Country of Citizenship of Aliens in Detention**……………………………………    338
DRO Table 2.0. Country of Citizenship for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2000

DRO Table 2.1. Country of Citizenship for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2001

DRO Table 2.2. Country of Citizenship for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2002

DRO Table 2.3. Country of Citizenship for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2003

**Gender and Age of Aliens in Detention**………………………………………...    350
DRO Table 3.0.  Gender and Age of Aliens Referred for Credible Fear Interview
at Port of Entry, FY 2000

DRO Table 3.1.  Gender and Age of Aliens Referred for Credible Fear Interview
at Port of Entry, FY 2001

DRO Table 3.2.  Gender and Age of Aliens Referred for Credible Fear Interview
at Port of Entry, FY 2002

DRO Table 3.3.  Gender and Age of Aliens Referred for Credible Fear Interview
at Port of Entry, FY 2003

**Detention Facilities**………………………………………………………    358
DRO Table 4.0  Location of Aliens Detained for Credible Fear Interview by Fiscal
Year, FY 2000-2003

IFR_AR_008500

DRO Table 4.1.  Detention Facilities for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2000-2003

**Number of Facilities During Detention**……………………………………...    367
DRO Table 5.0.  Number of Facilities for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2000

DRO Table 5.1.  Number of Facilities for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2001

DRO Table 5.2.  Number of Facilities for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2002

DRO Table 5.3.  Number of Facilities for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2003

**Length of Detention at Port of Entry**…………………………………………..    371
DRO Table 6.0.  Length of Detention for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2000

DRO Table 6.1.  Length of Detention for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2001

DRO Table 6.2.  Length of Detention for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2002

DRO Table 6.3.  Length of Detention for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2003

**Type and Rate of Release from Detention**………………………………………    375
DRO Table 7.0.  Type and Rate of Release for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2000

DRO Table 7.1.  Type and Rate of Release for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2001

DRO Table 7.2.  Type and Rate of Release for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2002

DRO Table 7.3.  Type and Rate of Release for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2003

IFR_AR_008501

**Disposition of Cases**…………………………………………………………….. 379
DRO Table 8.0.  Disposition of Cases for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2000

DRO Table 8.1.  Disposition of Cases for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2001

DRO Table 8.2.  Disposition of Cases for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2002

DRO Table 8.3.  Disposition of Cases for Aliens Referred for Credible Fear
Interview at Port of Entry, FY 2003

IFR_AR_008502

PREFACE

The Study of Asylum Seekers in Expedited Removal (the Study) was undertaken by experts appointed by the US Commission on International Religious Freedom (the Commission) to respond to four questions posed by the International Religious Freedom Act (IRFA) of 1998. Specifically, the Study is to review whether immigration officers performing duties under section 235(b) of the Immigration and Nationality Act (INA) (8 U.S.C. 1225(b)) with respect to aliens, who may be eligible to be granted asylum, are engaging in any of the following conduct:

> (A) Improperly encouraging such aliens to withdraw their applications for admission.

> (B) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution (within the meaning of section 235(b)(1)(B)(v) of such Act).

> (C) Incorrectly removing such aliens to a country where they may be persecuted.

> (D) Detaining such aliens improperly or in inappropriate conditions.

The Study has several components, including collection of statistics; thorough sample file review; direct observations of the removal process; surveys of Department of Homeland Security (DHS) officials and detention center personnel; as well as interviews with individuals seeking asylum.

The present report consists of a compilation of administrative data tabulated by the experts for the Study with support from the U.S. Department of Homeland Security, Bureau of Immigration and Customs Enforcement (ICE), Office of Detention and Removal Operations (ICE-DRO). ICE reviewed an earlier draft of this report and provided comments that have been taken into account in the final report. The compilation and accompanying descriptive summaries were prepared under my general direction by Cory Fleming and Fritz Scheuren. Let me also take this opportunity to express my deep appreciation for the care, diligence, speed, and expertise of the ICE staff, Michael Hoefer, Teresa Logue, Susan Mathias, and particularly Elizabeth Herskovitz and John Bjerke.

Mark Hetfield
Commission on International Religious Freedom                    February 2005

IFR_AR_008503

# Special Tabulations Prepared with Assistance from the U.S. Department of Homeland Security

### DESCRIPTIVE SUMMARY

This Report consists of a compilation of special tabulations produced with assistance from the Office of Detention and Removal Operations (DRO) within the U.S. Department of Homeland Security. The tables and charts included here were designed as background for the Study of Asylum Seekers in Expedited Removal (the Study) being undertaken by experts designated by the U.S. Commission on International Religious Freedom (the Commission), pursuant to section 605 of the International Religious Freedom Act of 1998 (IRFA).

The tabulations are quite extensive, and some explanation of them is appropriate. Table 1, summarized in DRO Chart 1 (below), shows the total number of aliens in detention after being referred for credible fear interviews rose from FY 2000 to FY 2001, and then dropped in FY 2002 and again in FY 2003.



*Based on DRO Table 1.*

IFR_AR_008504

The DRO Table 2 series shows the total number of aliens referred for credible fear interview at a U.S. port of entry (POE) and denotes the country of citizenship. The People's Republic of China leads the list of countries of citizenship for all four fiscal years studied. As all aliens awaiting credible fear determinations must be detained by law, the finding that between 193 and 489 aliens were "not detained" each year is likely due to DHS data entry (or other) error.

The DRO Table 3 series, as summarized by DRO Chart 2 below, examines the age and gender of aliens referred for a credible fear interview at POEs who were detained. Not unexpectedly, the largest number of aliens being detained after being referred for a credible fear interview fell into the 25-34 age cohort, followed closely by the 18-24 age cohort.



*Based on DRO Tables 3.0-3.2.*

The DRO Table 4 series looks at the type of detention facilities where aliens are placed, including service processing centers, federal prisons, state and local jails and contract facilities. DHS is increasingly utilizing private contract facilities to detain asylum seekers subject to Expedited Removal proceedings, and decreasing its reliance on state and local jails.

The DRO Table 5 series, summarized in DRO Chart 3 below, details the number of facilities an alien referred for a credible fear interview may stay in during the asylum process. Over the course of four years (FY 2000-2003), the vast majority of detainees stayed in only facility; however, a significant number (about 9 percent) were held in three or more facilities.



*Based on DRO Tables 5.0-5.3.*

The DRO Table 6 series shows the length of detention stay for aliens referred for a credible fear interview. While most detainees are held less than 90 days, the average length of stay is considerable. In FY 2003, it was over two months (64 days) overall.

The DRO Table 7 series, as illustrated by DRO Chart 4 below, demonstrates that all major DHS Districts - except Harlingen, Texas - detained fewer aliens referred for credible fear in FY 2003 than in FY 2001. Los Angeles stands out, where the number of asylum seekers detained declined by more than 90 percent between FY 2001 and FY 2003.



*Based on DRO Tables 7.0-7.3.*

The DRO Table 7 series, as illustrated by DRO Charts 4, 5, 6 and 7, further examines the type and rate of release for aliens referred for a credible fear determination. In the aggregate

IFR_AR_008506

over FY 2000-2003, the INS District Offices in Miami and Los Angeles have the highest caseloads of aliens referred for credible fear who are detained. Of those POEs with the heaviest volume of credible fear referrals, Harlingen, Texas was the only site with an increase in comparing pre- and post- 9/11 case loads.



*Based on DRO Tables 8.0-8.3.*



*Based on DRO Tables 8.0-8.3.*

IFR_AR_008507

Most interestingly, DRO Chart 7 shows the significant disparity among INS districts regarding the release of asylum seekers subject to Expedited Removal. In FY 2001, while 86 percent of aliens were released from detention prior to their asylum hearing, two districts, Harlingen and Los Angeles, released 98 percent of asylum seekers, while Honolulu, Newark and Houston released fewer than 20 percent. After 9/11, however, the national release rate dropped by 27 percent, with only 62.5 percent of asylum seekers released prior to their asylum hearings in FY 2003. That year, Harlingen was still releasing almost 98 percent of asylum seekers prior to hearing, but Los Angeles was releasing only 30 percent. New Jersey released even fewer asylum seekers than before (less than 4 percent). New Orleans released the smallest percentage of asylum seekers of the major districts, releasing only 0.5 percent of asylum seekers from detention (down from 71.1 percent in FY 2001). DRO Chart 8 shows the variation in these release rates for FY 2003.

IFR_AR_008508

**DRO Chart 7. Aliens Released Prior to Immigration Judge's Final Decision on Asylum Claim Comparison of FY 2001 to FY 2003**

| INS District Office | FY 2001 | | | FY 2003 | | |
|---|---|---|---|---|---|---|
| | Released * | Held * | % | Released | Held | % |
| Miami, FL | 4,966 | 156 | 97.0% | 1,835 | 502 | 78.5% |
| Los Angeles, CA | 2,722 | 56 | 98.0% | 76 | 179 | 29.8% |
| San Diego, CA | 969 | 73 | 93.0% | 305 | 98 | 75.7% |
| Chicago, IL | 659 | 35 | 95.0% | 120 | 28 | 81.1% |
| Harlingen, TX | 293 | 6 | 98.0% | 620 | 15 | 97.6% |
| San Francisco, CA | 264 | 58 | 82.0% | 93 | 67 | 58.1% |
| Philadelphia, PA | 192 | 94 | 67.1% | 71 | 44 | 61.7% |
| New York, NY | 149 | 397 | 27.3% | 18 | 197 | 8.4% |
| Atlanta, GA | 125 | 112 | 52.7% | 55 | 139 | 28.4% |
| Newark, NJ | 77 | 397 | 16.2% | 14 | 377 | 3.6% |
| Washington, DC | 58 | 36 | 61.7% | 21 | 42 | 33.3% |
| Boston, MA | 58 | 15 | 79.5% | 3 | 6 | 33.3% |
| Detroit, MI | 50 | 15 | 76.9% | 6 | 6 | 50.0% |
| El Paso, TX | 39 | 37 | 51.3% | 47 | 16 | 74.6% |
| New Orleans, LA | 32 | 13 | 71.1% | 1 | 190 | 0.5% |
| San Juan, PR | 30 | 8 | 78.9% | 70 | 27 | 72.2% |
| St. Paul, MN | 19 | 22 | 46.3% | 0 | 2 | 0.0% |
| Buffalo, NY | 17 | 24 | 41.5% | 18 | 15 | 54.5% |
| Baltimore, MD | 14 | 22 | 38.9% | 2 | 34 | 5.6% |
| Phoenix, AZ | 13 | 42 | 23.6% | 27 | 48 | 36.0% |
| Houston, TX | 10 | 58 | 14.7% | 14 | 54 | 20.6% |
| Seattle, WA | 9 | 30 | 23.1% | 9 | 22 | 29.0% |
| Dallas, TX | 8 | 22 | 26.7% | 5 | 6 | 45.5% |
| Portland, OR | 5 | 2 | 71.4% | 2 | 0 | 100.0% |
| San Antonio, TX | 3 | 1 | 75.0% | 109 | 7 | 94.0% |
| Honolulu, HI | 2 | 9 | 18.2% | 1 | 2 | 33.3% |
| Denver, CO | 2 | 3 | 40.0% | 3 | 1 | 75.0% |
| Portland, ME | 2 | 3 | 40.0% | NA | NA | NA |
| Cleveland, OH | 1 | 0 | 100.0% | 0 | 1 | 0.0% |
| Helena, MT | 0 | 2 | 0.0% | 0 | 1 | 0.0% |
| Omaha, NE | 0 | 0 | NA | NA | NA | NA |
| Kansas City, MO | NA | NA | NA | 0 | 4 | 0.0% |
| **TOTAL** | **10,788** | **1,748** | **86.1%** | **3,545** | **2,130** | **62.5%** |

*\* **Released** is defined as those aliens released on bond (BOND), own recognizance (OR), or paroled (PARO). **Held** is defined as aliens Not Released/Unknown, Deported (DEP), Voluntary Departure (VD), and Case Terminated (TERM). The percentage was calculated using N=Released and D=Released + Held. Aliens who withdraw their application for admission or dissolve their asylum claims before an asylum officer (WITH), are released into the custody of the U.S. Marshals Service (USM), or are released under order of supervision (OS) have been excluded from these statistics. (See DRO Tables 7.0-7.3 for further information.)*

IFR_AR_008509



*Based on DRO Tables 7.3.*

The DRO Table 8 series breaks aliens referred for credible fear interview into two categories, "detained at some point" and "not detained."  According to the Table 8 series, between 2.4 percent and 5 percent of aliens referred for credible fear were "never detained." According to DHS, these statistics are probably the result of data input error, as aliens referred for credible fear must, by law, be detained until the time of their credible fear determination.[1]

SOURCES AND LIMITATIONS OF THE DATA

No integrated statistical reporting system on detention currently operates with the U.S. Department of Homeland Security.  Different field offices use different data management systems, and the interoperability among these systems is not always apparent.  In some offices, paper systems for counting applications are still maintained.  The efforts to convert these operational detention systems to a single unified information system appear to be still in their infancy in many places.

---

[1] While detention of all aliens referred for credible fear is mandatory, there were significant discrepancies in FY 2003 between statistics kept by CBP in PAS (Performance Analysis System) and statistics kept by ICE in its APSS (Automated Prisoner Scheduling System) database.  According to PAS, in FY 2003 there were 1408 aliens in Hidalgo, Texas referred for a credible fear interview.  According to APSS, however, there were only 833.  Similarly, according to PAS, in Brownsville, Texas there were 2613 aliens referred for credible fear interviews in FY 2003. According to APSS data, there were only 1956.  The DHS Office of Immigration Statistics reports that these discrepancies are largely attributable to local ICE decisions not to detain Cubans subject to Expedited Removal. DHS has informed us that Cuban nationals subject to Expedited Removal are now being detained up until their credible fear hearing.  Since the Cuban nationals who were not detained were never entered into the APSS database, however, they are not among the aliens counted in Table 8 series as having been "referred for credible fear but not detained."

IFR_AR_008510

The fiscal years covered in this report span the period before and after the creation of currently configured Office of Detention and Removal Operations.  In our work, naturally, we found many efforts still underway to adapt earlier standalone systems in this post 9/11 world.

Notwithstanding these difficulties and with the expert assistance of the DRO staff, we were able to display comparable information on the Expedited Removal  process across DRO and other elements of DHS, in a way useful for the Commission's purposes.  Despite the complexities of managing very large data sets in a systematic fashion across many different offices within a department, the overall DRO results presented here fairly represent detention data for the Expedited Removal process.  Certainly, percentage distributions can be relied upon as well as relative changes over time.

Confidentiality requirements by DRO restrict the public versions of these tables to reporting only cell counts of six (6) or more.  All nonzero cells of less than 6 are asterisked (*).  Zero cells have been identified by a dash (-).  Summary totals in the tables have also been examined to be sure that indirect disclosure (e.g., disclosure by subtraction) did not occur.

As a check on our work, we reviewed the earlier GAO report on Expedited Removal[2] and found that for the year 2000, which overlapped between the two studies, the results are comparable.

As a further check, the regular reports that DHS and its predecessor organizations produced were also examined, notably the annual INS and later DHS reports for the years tabulated here.  For those readers interested in the setting that Expedited Removal  data sit in, these reports are highly recommended, if only for their definitions and for an understanding of the much larger missions that DHS and its Office of Detention and Removal Operations has, especially in the post 9/11 world.

---

[2] United States General Accounting Office.  2000. *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process*.  GAO?/GGD-00-176.

IFR_AR_008511

TABLE SETS

IFR_AR_008512

**DRO Table 1.  Length of Stay in Detention for Aliens Referred for Credible Fear Interview by Fiscal Year**

Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

**FY 2000**

| | | |
|---|---|---|
| Credible Fear cases | **10,342** | |
| Never detained | 305 | |
| Detained 30 days or fewer | 5,778 | |
| Detained 31-90 days | 2,865 | |
| Detained 91-180 days | 822 | 1 still detained |
| Detained more than 180 days | 572 | 4 still detained |

**FY 2001**

| | | |
|---|---|---|
| Credible Fear cases | **12,956** | |
| Never detained | 312 | |
| Detained 30 days or fewer | 8,127 | |
| Detained 31-90 days | 3,056 | |
| Detained 91-180 days | 848 | 3 still detained |
| Detained more than 180 days | 613 | 13 still detained |

**FY 2002**

| | | |
|---|---|---|
| Credible Fear cases | **9,752** | |
| Never detained | 492 | |
| Detained 30 days or fewer | 6,104 | |
| Detained 31-90 days | 1,661 | 1 still detained |
| Detained 91-180 days | 698 | 1 still detained |
| Detained more than 180 days | 797 | 35 still detained |

**FY 2003**

| | | |
|---|---|---|
| Credible Fear cases | **6,005** | |
| Never detained | 196 | |
| Detained 30 days or fewer | 2,933 | |
| Detained 31-90 days | 1,123 | 1 still detained |
| Detained 91-180 days | 856 | |
| Detained more than 180 days | 897 | 160 still detained |

IFR_AR_008513

**DRO Table 2.0. Country of citizenship for aliens referred for credible fear interview at port of entry, FY 2000**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| **Total** | **10,336** | **10,030** | **306** |
| | | | |
| China, People's Republic | 3,945 | **3,853** | 92 |
| Haiti | 1,072 | **1,053** | 19 |
| Sri Lanka | 999 | **968** | 31 |
| Cuba | 563 | **545** | 18 |
| Colombia | 350 | **341** | 9 |
| Iraq | 301 | **291** | 10 |
| Albania | 256 | **239** | 17 |
| Ukraine | 191 | **187** | 4 |
| Somalia | 171 | **168** | 3 |
| Yugoslavia | 153 | **143** | 10 |
| Pakistan | 139 | 135 | 4 |
| Guatemala | 113 | 110 | 3 |
| Sierra Leone | 103 | 102 | 1 |
| Ghana | 107 | 101 | 6 |
| El Salvador | 94 | 91 | 3 |
| Lebanon | 90 | 89 | 1 |
| Nigeria | 87 | 81 | 6 |
| Turkey | 81 | 80 | 1 |
| Ecuador | 79 | 79 | 0 |
| India | 80 | 77 | 3 |
| Armenia | 74 | 73 | 1 |
| Ethiopia | 62 | 61 | 1 |
| Mexico | 57 | 56 | 1 |
| Peru | 59 | 56 | 3 |
| Russia | 54 | 47 | 7 |
| Sudan | 49 | 47 | 2 |
| Bangladesh | 46 | 46 | 0 |
| Brazil | 49 | 43 | 6 |
| Niger | 45 | 41 | 4 |
| Cameroon | 40 | 40 | 0 |
| Afghanistan | 45 | 39 | 6 |
| Guyana | 38 | 38 | 0 |
| Jamaica | 42 | 37 | 5 |
| Iran | 36 | 36 | 0 |
| Honduras | 34 | 34 | 0 |
| Bulgaria | 29 | 29 | 0 |
| Congo, Democratic Republic | 31 | 29 | 2 |
| Eritrea | 27 | 27 | 0 |
| Congo, Republic | 27 | 25 | 2 |
| Guinea | 26 | 22 | 4 |
| Jordan | 19 | 19 | 0 |

IFR_AR_008514

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Cote d'Ivoire | 18 | 18 | 0 |
| Kenya | 18 | 17 | 1 |
| Romania | 17 | 16 | 1 |
| Algeria | 15 | 15 | 0 |
| Liberia | 15 | 15 | 0 |
| Bolivia | 14 | 14 | 0 |
| Dominican Republic | 14 | 14 | 0 |
| Egypt | 14 | 14 | 0 |
| Indonesia | 14 | 14 | 0 |
| Dominica | 13 | 13 | 0 |
| Poland | 13 | 13 | 0 |
| Angola | 12 | 11 | 1 |
| Macedonia | 11 | 11 | 0 |
| Nicaragua | 11 | 11 | 0 |
| Philippines | 11 | 11 | 0 |
| Belarus | 10 | 10 | 0 |
| Uganda | 10 | 10 | 0 |
| Venezuela | 9 | 9 | 0 |
| Chile | 8 | 8 | 0 |
| France | 9 | 8 | 1 |
| Gambia, The | 8 | 8 | 0 |
| Israel | 8 | 8 | 0 |
| Rwanda | 12 | 8 | 4 |
| Burundi | 8 | 7 | 1 |
| Panama | 7 | 7 | 0 |
| Senegal | 6 | 6 | 0 |
| Syria | 6 | 6 | 0 |
| Tanzania | 6 | 6 | 0 |
| Burma | 5 | 5 | 0 |
| Canada | 5 | 5 | 0 |
| Kazakhstan | 6 | 5 | 1 |
| Lithuania | 7 | 5 | 2 |
| United Kingdom | 5 | 5 | 0 |
| Yemen | 5 | 5 | 0 |
| Costa Rica | 4 | 4 | 0 |
| Germany | 4 | 4 | 0 |
| Mauritania | 4 | 4 | 0 |
| Nepal | 4 | 4 | 0 |
| Thailand | 4 | 4 | 0 |
| Togo | 4 | 4 | 0 |
| Uzbekistan | 4 | 4 | 0 |
| Vietnam | 4 | 4 | 0 |
| Azerbaijan | 3 | 3 | 0 |
| Bosnia-Herzegovina | 3 | 3 | 0 |
| Cambodia | 3 | 3 | 0 |
| Estonia | 4 | 3 | 1 |
| Georgia | 3 | 3 | 0 |
| Paraguay | 3 | 3 | 0 |
| South Africa | 3 | 3 | 0 |

IFR_AR_008515

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Trinidad & Tobago | 3 | 3 | 0 |
| Argentina | 3 | 2 | 1 |
| Burkina Faso | 2 | 2 | 0 |
| Croatia | 2 | 2 | 0 |
| Czechoslovakia | 3 | 2 | 1 |
| Denmark | 2 | 2 | 0 |
| Hungary | 2 | 2 | 0 |
| Ireland | 2 | 2 | 0 |
| Korea | 4 | 2 | 2 |
| Latvia | 2 | 2 | 0 |
| Mali | 2 | 2 | 0 |
| Moldova | 4 | 2 | 2 |
| Portugal | 2 | 2 | 0 |
| Slovak Republic | 2 | 2 | 0 |
| Sweden | 2 | 2 | 0 |
| Bahamas, The | 1 | 1 | 0 |
| Bahrain | 1 | 1 | 0 |
| Barbados | 1 | 1 | 0 |
| Fiji | 1 | 1 | 0 |
| Greece | 1 | 1 | 0 |
| Hong Kong | 1 | 1 | 0 |
| Japan | 1 | 1 | 0 |
| Kuwait | 1 | 1 | 0 |
| Kyrgyzstan | 1 | 1 | 0 |
| Laos | 1 | 1 | 0 |
| Libya | 1 | 1 | 0 |
| Madagascar | 1 | 1 | 0 |
| Malaysia | 1 | 1 | 0 |
| Mongolia | 1 | 1 | 0 |
| Morocco | 1 | 1 | 0 |
| Saudi Arabia | 1 | 1 | 0 |
| Soviet Union | 1 | 1 | 0 |
| Spain | 1 | 1 | 0 |
| Suriname | 1 | 1 | 0 |
| Tajikistan | 1 | 1 | 0 |
| Tunisia | 1 | 1 | 0 |
| Turkmenistan | 1 | 1 | 0 |
| United Arab Emirates | 1 | 1 | 0 |
| Zimbabwe | 1 | 1 | 0 |
| St0 Vincent & the Grenadines | 1 | 0 | 1 |
| | | | |
| Unknown | 7 | 6 | 1 |

IFR_AR_008516

**DRO Table 2.1 Country of citizenship for aliens referred for credible fear interview at port of entry, FY 2001**

Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| **Total** | **12,963** | **12,650** | **313** |
| | | | |
| China, People's Republic | 3,819 | **3,779** | 40 |
| Colombia | 2,199 | **2,169** | 30 |
| Haiti | 1,062 | **1,053** | 9 |
| Sri Lanka | 974 | **949** | 25 |
| Albania | 374 | **345** | 29 |
| Cuba | 405 | **345** | 60 |
| India | 307 | **304** | 3 |
| Iraq | 266 | **261** | 5 |
| El Salvador | 223 | **222** | 1 |
| Pakistan | 196 | **189** | 7 |
| Ukraine | 186 | 183 | 3 |
| Turkey | 173 | 173 | 0 |
| Guyana | 160 | 160 | 0 |
| Lebanon | 138 | 137 | 1 |
| Ecuador | 133 | 129 | 4 |
| Guatemala | 111 | 108 | 3 |
| Bangladesh | 99 | 98 | 1 |
| Afghanistan | 92 | 91 | 1 |
| Brazil | 92 | 91 | 1 |
| Ethiopia | 91 | 88 | 3 |
| Sudan | 86 | 86 | 0 |
| Niger | 88 | 81 | 7 |
| Peru | 84 | 80 | 4 |
| Eritrea | 76 | 76 | 0 |
| Sierra Leone | 74 | 73 | 1 |
| Somalia | 71 | 69 | 2 |
| Armenia | 69 | 68 | 1 |
| Bulgaria | 68 | 68 | 0 |
| Iran | 63 | 63 | 0 |
| Ghana | 62 | 60 | 2 |
| Nigeria | 58 | 57 | 1 |
| Mexico | 60 | 54 | 6 |
| Jamaica | 51 | 49 | 2 |
| Poland | 40 | 40 | 0 |
| Yugoslavia | 44 | 40 | 4 |
| Dominican Republic | 40 | 36 | 4 |
| Guinea | 38 | 36 | 2 |
| Cameroon | 35 | 35 | 0 |
| Honduras | 36 | 35 | 1 |
| Jordan | 34 | 34 | 0 |
| Macedonia | 36 | 34 | 2 |

341

IFR_AR_008517

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Russia | 35 | 34 | 1 |
| Romania | 33 | 31 | 2 |
| Congo, Democratic Republic | 29 | 29 | 0 |
| Bolivia | 28 | 27 | 1 |
| Venezuela | 25 | 24 | 1 |
| Indonesia | 23 | 23 | 0 |
| Dominica | 21 | 21 | 0 |
| Georgia | 20 | 19 | 1 |
| Congo, Republic | 15 | 15 | 0 |
| Egypt | 15 | 15 | 0 |
| Israel | 16 | 15 | 1 |
| Nicaragua | 15 | 15 | 0 |
| Algeria | 15 | 14 | 1 |
| Syria | 14 | 14 | 0 |
| Angola | 14 | 13 | 1 |
| Korea | 13 | 13 | 0 |
| Uganda | 15 | 13 | 2 |
| Rwanda | 12 | 12 | 0 |
| Kenya | 11 | 11 | 0 |
| Argentina | 12 | 9 | 3 |
| Liberia | 10 | 9 | 1 |
| Chile | 8 | 8 | 0 |
| Gambia, The | 8 | 8 | 0 |
| Nepal | 8 | 8 | 0 |
| Senegal | 8 | 8 | 0 |
| Belize | 7 | 7 | 0 |
| Cote d'Ivoire | 7 | 7 | 0 |
| Morocco | 7 | 7 | 0 |
| Panama | 7 | 7 | 0 |
| Philippines | 7 | 7 | 0 |
| Togo | 7 | 7 | 0 |
| Yemen | 7 | 7 | 0 |
| Zimbabwe | 7 | 7 | 0 |
| Lithuania | 6 | 6 | 0 |
| Mali | 7 | 6 | 1 |
| Tanzania | 10 | 6 | 4 |
| Trinidad & Tobago | 7 | 6 | 1 |
| Costa Rica | 5 | 5 | 0 |
| Mauritania | 5 | 5 | 0 |
| Vietnam | 5 | 5 | 0 |
| Belarus | 4 | 4 | 0 |
| Hungary | 13 | 4 | 9 |
| Moldova | 5 | 4 | 1 |
| Bosnia-Herzegovina | 4 | 3 | 1 |
| Canada | 6 | 3 | 3 |
| Czechoslovakia | 3 | 3 | 0 |
| Germany | 3 | 3 | 0 |
| Kyrgyzstan | 3 | 3 | 0 |
| Thailand | 3 | 3 | 0 |

IFR_AR_008518

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Uruguay | 4 | 3 | 1 |
| Uzbekistan | 3 | 3 | 0 |
| Azerbaijan | 2 | 2 | 0 |
| Burkina Faso | 2 | 2 | 0 |
| Burma | 3 | 2 | 1 |
| Burundi | 6 | 2 | 4 |
| Cambodia | 2 | 2 | 0 |
| Estonia | 2 | 2 | 0 |
| Fiji | 2 | 2 | 0 |
| Ireland | 2 | 2 | 0 |
| Italy | 2 | 2 | 0 |
| Kazakhstan | 2 | 2 | 0 |
| Libya | 2 | 2 | 0 |
| Slovak Republic | 2 | 2 | 0 |
| Spain | 2 | 2 | 0 |
| Suriname | 3 | 2 | 1 |
| Antigua-Barbuda | 1 | 1 | 0 |
| Australia | 1 | 1 | 0 |
| Bahamas, The | 1 | 1 | 0 |
| Belgium | 1 | 1 | 0 |
| Bhutan | 1 | 1 | 0 |
| Chad | 1 | 1 | 0 |
| France | 1 | 1 | 0 |
| Japan | 1 | 1 | 0 |
| Malawi | 1 | 1 | 0 |
| Paraguay | 1 | 1 | 0 |
| Saudi Arabia | 1 | 1 | 0 |
| Slovenia | 1 | 1 | 0 |
| South Africa | 2 | 1 | 1 |
| Soviet Union | 1 | 1 | 0 |
| Taiwan | 1 | 1 | 0 |
| Tunisia | 1 | 1 | 0 |
| United Kingdom | 1 | 1 | 0 |
| Zambia | 2 | 1 | 1 |
| Mongolia | 2 | 0 | 2 |
| Norway | 1 | 0 | 1 |
| | | | |
| Unknown | 18 | 17 | 1 |

IFR_AR_008519

**DRO Table 2.2. Country of citizenship for aliens referred for credible fear interview at port of entry, FY 2002**

Source:  Office of Detention and Removal Operations, U0S0 Department of Homeland Security

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| **Total** | **9,749** | **9,260** | **489** |
| | | | |
| China, People's Republic | 2,327 | **2,313** | 14 |
| Cuba | 2,185 | **1,791** | 394 |
| Colombia | 1,230 | **1,221** | 9 |
| Haiti | 760 | **760** | 0 |
| Iraq | 348 | **346** | 2 |
| Guyana | 268 | **267** | 1 |
| Sri Lanka | 249 | **243** | 6 |
| Albania | 236 | **227** | 9 |
| El Salvador | 169 | **164** | 5 |
| Armenia | 161 | **158** | 3 |
| Ecuador | 121 | 120 | 1 |
| India | 105 | 103 | 2 |
| Brazil | 94 | 94 | 0 |
| Niger | 94 | 94 | 0 |
| Dominican Republic | 82 | 82 | 0 |
| Dominica | 81 | 81 | 0 |
| Peru | 73 | 69 | 4 |
| Guatemala | 64 | 63 | 1 |
| Ghana | 47 | 47 | 0 |
| Georgia | 45 | 45 | 0 |
| Bolivia | 47 | 44 | 3 |
| Ukraine | 43 | 43 | 0 |
| Mexico | 48 | 42 | 6 |
| Cameroon | 41 | 41 | 0 |
| Nigeria | 34 | 34 | 0 |
| Eritrea | 33 | 33 | 0 |
| Turkey | 33 | 33 | 0 |
| Pakistan | 31 | 31 | 0 |
| Bulgaria | 30 | 29 | 1 |
| Ethiopia | 28 | 27 | 1 |
| Russia | 26 | 26 | 0 |
| Indonesia | 23 | 23 | 0 |
| Honduras | 22 | 22 | 0 |
| Sierra Leone | 22 | 22 | 0 |
| Argentina | 24 | 21 | 3 |
| Jamaica | 19 | 19 | 0 |
| Venezuela | 20 | 19 | 1 |
| Bangladesh | 18 | 18 | 0 |
| Guinea | 17 | 16 | 1 |
| Romania | 16 | 16 | 0 |
| Yugoslavia | 16 | 16 | 0 |

IFR_AR_008520

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Iran | 15 | 15 | 0 |
| Liberia | 15 | 15 | 0 |
| Poland | 16 | 15 | 1 |
| Somalia | 17 | 15 | 2 |
| Kenya | 13 | 13 | 0 |
| Congo, Democratic Republic | 11 | 11 | 0 |
| Gambia, The | 11 | 11 | 0 |
| Congo, Republic | 11 | 10 | 1 |
| Lebanon | 10 | 10 | 0 |
| Nicaragua | 11 | 10 | 1 |
| Egypt | 10 | 9 | 1 |
| Korea | 9 | 9 | 0 |
| Lithuania | 9 | 9 | 0 |
| Philippines | 10 | 9 | 1 |
| Burma | 10 | 8 | 2 |
| Israel | 8 | 8 | 0 |
| Jordan | 8 | 8 | 0 |
| Senegal | 8 | 8 | 0 |
| Burundi | 7 | 7 | 0 |
| Costa Rica | 7 | 7 | 0 |
| Moldova | 7 | 7 | 0 |
| Rwanda | 7 | 7 | 0 |
| Uzbekistan | 7 | 7 | 0 |
| Zimbabwe | 8 | 7 | 1 |
| Afghanistan | 13 | 6 | 7 |
| Angola | 6 | 6 | 0 |
| Chile | 6 | 6 | 0 |
| Macedonia | 6 | 6 | 0 |
| Mali | 6 | 6 | 0 |
| Sudan | 7 | 6 | 1 |
| Togo | 6 | 6 | 0 |
| Azerbaijan | 5 | 5 | 0 |
| Czechoslovakia | 5 | 5 | 0 |
| Uganda | 5 | 5 | 0 |
| Belarus | 4 | 4 | 0 |
| Cambodia | 4 | 4 | 0 |
| Canada | 6 | 4 | 2 |
| Mongolia | 4 | 4 | 0 |
| Taiwan | 5 | 4 | 1 |
| Trinidad & Tobago | 4 | 4 | 0 |
| Cote d'Ivoire | 3 | 3 | 0 |
| Croatia | 3 | 3 | 0 |
| Mauritania | 3 | 3 | 0 |
| Tanzania | 3 | 3 | 0 |
| Belize | 2 | 2 | 0 |
| Central African Republic | 2 | 2 | 0 |
| Estonia | 2 | 2 | 0 |
| Fiji | 2 | 2 | 0 |
| France | 2 | 2 | 0 |

IFR_AR_008521

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Italy | 2 | 2 | 0 |
| Panama | 2 | 2 | 0 |
| Slovak Republic | 2 | 2 | 0 |
| Thailand | 2 | 2 | 0 |
| United Kingdom | 2 | 2 | 0 |
| Vietnam | 2 | 2 | 0 |
| Algeria | 1 | 1 | 0 |
| Grenada | 1 | 1 | 0 |
| Laos | 1 | 1 | 0 |
| Latvia | 1 | 1 | 0 |
| Morocco | 1 | 1 | 0 |
| Nepal | 1 | 1 | 0 |
| New Zealand | 1 | 1 | 0 |
| Paraguay | 1 | 1 | 0 |
| Slovenia | 1 | 1 | 0 |
| South Africa | 1 | 1 | 0 |
| Soviet Union | 1 | 1 | 0 |
| Spain | 1 | 1 | 0 |
| Sweden | 1 | 1 | 0 |
| Tajikistan | 1 | 1 | 0 |
| | | | |
| Unknown | 34 | 33 | 1 |

IFR_AR_008522

**DRO Table 2.3. Country of citizenship for aliens referred for
credible fear interview at port of entry, FY 2003**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| **Total** | **5,986** | **5,793** | **193** |
| | | | |
| China, People's Republic | 1,152 | **1,140** | 12 |
| Haiti | 998 | **995** | 3 |
| Cuba | 956 | **864** | 92 |
| Colombia | 560 | **554** | 6 |
| Guyana | 274 | **273** | 1 |
| Georgia | 199 | **197** | 2 |
| Armenia | 116 | **116** | 0 |
| Albania | 106 | **101** | 5 |
| El Salvador | 88 | **85** | 3 |
| Ukraine | 68 | **65** | 3 |
| Guatemala | 66 | 64 | 2 |
| Brazil | 62 | 62 | 0 |
| Sri Lanka | 59 | 58 | 1 |
| India | 58 | 56 | 2 |
| Iraq | 54 | 54 | 0 |
| Honduras | 50 | 50 | 0 |
| Ecuador | 49 | 49 | 0 |
| Nigeria | 53 | 48 | 5 |
| Peru | 50 | 47 | 3 |
| Bolivia | 46 | 46 | 0 |
| Dominican Republic | 44 | 44 | 0 |
| Mexico | 52 | 40 | 12 |
| Ghana | 38 | 37 | 1 |
| Venezuela | 37 | 34 | 3 |
| Turkey | 33 | 33 | 0 |
| Bulgaria | 28 | 28 | 0 |
| Cameroon | 28 | 28 | 0 |
| Cote d'Ivoire | 27 | 27 | 0 |
| Jamaica | 27 | 27 | 0 |
| Liberia | 27 | 25 | 2 |
| Burma | 22 | 21 | 1 |
| Ethiopia | 21 | 21 | 0 |
| Congo, Republic | 20 | 20 | 0 |
| Guinea | 21 | 20 | 1 |
| Argentina | 34 | 19 | 15 |
| Niger | 22 | 18 | 4 |
| Pakistan | 18 | 17 | 1 |
| Senegal | 16 | 16 | 0 |
| Nicaragua | 15 | 15 | 0 |
| Russia | 15 | 15 | 0 |
| Sierra Leone | 15 | 15 | 0 |

IFR_AR_008523

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Yugoslavia | 15 | 15 | 0 |
| Costa Rica | 13 | 13 | 0 |
| Lebanon | 17 | 12 | 5 |
| Romania | 12 | 12 | 0 |
| Iran | 11 | 11 | 0 |
| Israel | 12 | 11 | 1 |
| Gambia, The | 10 | 10 | 0 |
| Indonesia | 11 | 10 | 1 |
| Uzbekistan | 10 | 10 | 0 |
| Egypt | 9 | 9 | 0 |
| Congo, Democratic Republic | 8 | 8 | 0 |
| Kenya | 8 | 8 | 0 |
| Korea | 8 | 8 | 0 |
| Poland | 9 | 8 | 1 |
| Togo | 8 | 8 | 0 |
| Nepal | 7 | 7 | 0 |
| Singapore | 7 | 7 | 0 |
| Vietnam | 7 | 7 | 0 |
| Chile | 6 | 6 | 0 |
| Czechoslovakia | 7 | 6 | 1 |
| Mongolia | 6 | 6 | 0 |
| Somalia | 6 | 6 | 0 |
| Tanzania | 6 | 6 | 0 |
| Belize | 5 | 5 | 0 |
| Burundi | 5 | 5 | 0 |
| Mauritania | 5 | 5 | 0 |
| South Africa | 5 | 5 | 0 |
| Sudan | 5 | 5 | 0 |
| Uganda | 5 | 5 | 0 |
| Belarus | 4 | 4 | 0 |
| Macedonia | 4 | 4 | 0 |
| Benin | 3 | 3 | 0 |
| Cambodia | 3 | 3 | 0 |
| Central African Republic | 3 | 3 | 0 |
| Eritrea | 3 | 3 | 0 |
| Malaysia | 3 | 3 | 0 |
| Thailand | 3 | 3 | 0 |
| Trinidad & Tobago | 4 | 3 | 1 |
| Zimbabwe | 3 | 3 | 0 |
| Algeria | 2 | 2 | 0 |
| Angola | 2 | 2 | 0 |
| Canada | 3 | 2 | 1 |
| Chad | 2 | 2 | 0 |
| Czech Republic | 2 | 2 | 0 |
| Dominica | 2 | 2 | 0 |
| Latvia | 2 | 2 | 0 |
| Mali | 2 | 2 | 0 |
| Paraguay | 2 | 2 | 0 |
| Philippines | 2 | 2 | 0 |

IFR_AR_008524

| Country of Citizenship | Total | Detained at some point | Not detained |
|---|---|---|---|
| Saudi Arabia | 2 | 2 | 0 |
| Soviet Union | 2 | 2 | 0 |
| Tunisia | 2 | 2 | 0 |
| Afghanistan | 1 | 1 | 0 |
| Australia | 1 | 1 | 0 |
| Azerbaijan | 1 | 1 | 0 |
| Bahamas, The | 1 | 1 | 0 |
| Bangladesh | 1 | 1 | 0 |
| Barbados | 1 | 1 | 0 |
| Botswana | 1 | 1 | 0 |
| Burkina Faso | 1 | 1 | 0 |
| Gabon | 1 | 1 | 0 |
| Germany | 1 | 1 | 0 |
| Grenada | 1 | 1 | 0 |
| Italy | 1 | 1 | 0 |
| Jordan | 1 | 1 | 0 |
| Kyrgyzstan | 1 | 1 | 0 |
| Lithuania | 1 | 1 | 0 |
| Moldova | 1 | 1 | 0 |
| Morocco | 1 | 1 | 0 |
| Panama | 1 | 1 | 0 |
| Rwanda | 1 | 1 | 0 |
| Slovenia | 1 | 1 | 0 |
| Spain | 1 | 1 | 0 |
| Suriname | 1 | 1 | 0 |
| Syria | 1 | 1 | 0 |
| Turkmenistan | 1 | 1 | 0 |
| Zambia | 1 | 1 | 0 |
| | | | |
| Unknown | 34 | 32 | 2 |

IFR_AR_008525

**DRO Table 3.0. Gender and age of aliens referred for
credible fear interview at port of entry, FY 2000**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Gender & Age | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **Total** | **10,336** | **100.0%** | **10,030** | **97.0%** | **306** | **3.0%** |
| | | | | | | |
| Female | 3,627 | 35.1% | 3,481 | 34.7% | 146 | 47.7% |
| Male | 6,709 | 64.9% | 6,549 | 65.3% | 160 | 52.3% |
| | | | | | | |
| Unknown age | 3 | | 3 | | 0 | |
| 0 | 26 | | 24 | | 2 | |
| 1 | 23 | | 19 | | 4 | |
| 2 | 29 | | 24 | | 5 | |
| 3 | 28 | | 24 | | 4 | |
| 4 | 22 | | 20 | | 2 | |
| 5 | 17 | | 13 | | 4 | |
| 6 | 25 | | 19 | | 6 | |
| 7 | 30 | | 24 | | 6 | |
| 8 | 29 | | 20 | | 9 | |
| 9 | 41 | | 29 | | 12 | |
| 10 | 33 | | 28 | | 5 | |
| 11 | 22 | | 17 | | 5 | |
| 12 | 29 | | 23 | | 6 | |
| 13 | 23 | | 15 | | 8 | |
| 14 | 19 | | 18 | | 1 | |
| 15 | 34 | | 30 | | 4 | |
| 16 | 54 | | 51 | | 3 | |
| 17 | 89 | | 88 | | 1 | |
| 18 | 478 | | 474 | | 4 | |
| 19 | 469 | | 462 | | 7 | |
| 20 | 635 | | 627 | | 8 | |
| 21 | 658 | | 646 | | 12 | |
| 22 | 646 | | 635 | | 11 | |
| 23 | 570 | | 562 | | 8 | |
| 24 | 519 | | 511 | | 8 | |
| 25 | 444 | | 433 | | 11 | |
| 26 | 455 | | 441 | | 14 | |
| 27 | 467 | | 455 | | 12 | |
| 28 | 426 | | 418 | | 8 | |
| 29 | 441 | | 425 | | 16 | |
| 30 | 359 | | 350 | | 9 | |
| 31 | 405 | | 395 | | 10 | |
| 32 | 323 | | 314 | | 9 | |
| 33 | 289 | | 280 | | 9 | |
| 34 | 261 | | 253 | | 8 | |
| 35 | 251 | | 242 | | 9 | |

IFR_AR_008526

| Gender & Age | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 36 | 255 | | 248 | | 7 | |
| 37 | 207 | | 200 | | 7 | |
| 38 | 141 | | 138 | | 3 | |
| 39 | 147 | | 146 | | 1 | |
| 40 | 141 | | 136 | | 5 | |
| 41 | 100 | | 98 | | 2 | |
| 42 | 113 | | 107 | | 6 | |
| 43 | 68 | | 65 | | 3 | |
| 44 | 71 | | 71 | | 0 | |
| 45 | 58 | | 58 | | 0 | |
| 46 | 48 | | 45 | | 3 | |
| 47 | 50 | | 49 | | 1 | |
| 48 | 41 | | 41 | | 0 | |
| 49 | 25 | | 24 | | 1 | |
| 50 | 19 | | 19 | | 0 | |
| 51 | 26 | | 24 | | 2 | |
| 52 | 23 | | 23 | | 0 | |
| 53 | 11 | | 11 | | 0 | |
| 54 | 13 | | 13 | | 0 | |
| 55 | 15 | | 15 | | 0 | |
| 56 | 7 | | 7 | | 0 | |
| 57 | 13 | | 13 | | 0 | |
| 58 | 12 | | 12 | | 0 | |
| 59 | 9 | | 9 | | 0 | |
| 60 | 6 | | 6 | | 0 | |
| 61 | 6 | | 6 | | 0 | |
| 62 | 6 | | 6 | | 0 | |
| 63 | 4 | | 4 | | 0 | |
| 64 | 9 | | 7 | | 2 | |
| 65 | 2 | | 2 | | 0 | |
| 66 | 4 | | 3 | | 1 | |
| 68 | 1 | | 1 | | 0 | |
| 69 | 3 | | 3 | | 0 | |
| 70 | 5 | | 4 | | 1 | |
| 71 | 1 | | 0 | | 1 | |
| 72 | 1 | | 1 | | 0 | |
| 73 | 1 | | 1 | | 0 | |
| 78 | 1 | | 1 | | 0 | |
| 83 | 1 | | 1 | | 0 | |

IFR_AR_008527

**DRO Table 3.1. Gender and age of aliens referred for
credible fear interview at port of entry, FY 2001**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Gender & Age | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **Total** | **12,963** | **100.0%** | **12,650** | **97.6%** | **313** | **2.4%** |
| | | | | | | |
| Female | 4,048 | 31.2% | 3,879 | 30.7% | 169 | 54.0% |
| Male | 8,915 | 68.8% | 8,771 | 69.3% | 144 | 46.0% |
| | | | | | | |
| 0 | 67 | | 53 | | 14 | |
| 1 | 57 | | 52 | | 5 | |
| 2 | 45 | | 34 | | 11 | |
| 3 | 60 | | 55 | | 5 | |
| 4 | 41 | | 37 | | 4 | |
| 5 | 53 | | 50 | | 3 | |
| 6 | 45 | | 41 | | 4 | |
| 7 | 50 | | 45 | | 5 | |
| 8 | 47 | | 44 | | 3 | |
| 9 | 49 | | 47 | | 2 | |
| 10 | 43 | | 42 | | 1 | |
| 11 | 43 | | 38 | | 5 | |
| 12 | 39 | | 35 | | 4 | |
| 13 | 48 | | 45 | | 3 | |
| 14 | 24 | | 23 | | 1 | |
| 15 | 41 | | 40 | | 1 | |
| 16 | 40 | | 39 | | 1 | |
| 17 | 69 | | 68 | | 1 | |
| 18 | 579 | | 569 | | 10 | |
| 19 | 629 | | 618 | | 11 | |
| 20 | 678 | | 670 | | 8 | |
| 21 | 680 | | 673 | | 7 | |
| 22 | 686 | | 671 | | 15 | |
| 23 | 680 | | 673 | | 7 | |
| 24 | 632 | | 623 | | 9 | |
| 25 | 609 | | 604 | | 5 | |
| 26 | 530 | | 515 | | 15 | |
| 27 | 519 | | 509 | | 10 | |
| 28 | 541 | | 533 | | 8 | |
| 29 | 508 | | 491 | | 17 | |
| 30 | 503 | | 489 | | 14 | |
| 31 | 456 | | 443 | | 13 | |
| 32 | 425 | | 417 | | 8 | |
| 33 | 362 | | 359 | | 3 | |
| 34 | 331 | | 326 | | 5 | |
| 35 | 344 | | 333 | | 11 | |
| 36 | 349 | | 344 | | 5 | |

IFR_AR_008528

| Gender & Age | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 37 | 292 | | 280 | | 12 | |
| 38 | 253 | | 248 | | 5 | |
| 39 | 193 | | 185 | | 8 | |
| 40 | 188 | | 182 | | 6 | |
| 41 | 166 | | 164 | | 2 | |
| 42 | 152 | | 150 | | 2 | |
| 43 | 115 | | 112 | | 3 | |
| 44 | 96 | | 95 | | 1 | |
| 45 | 87 | | 86 | | 1 | |
| 46 | 63 | | 63 | | . | |
| 47 | 81 | | 78 | | 3 | |
| 48 | 75 | | 73 | | 2 | |
| 49 | 48 | | 45 | | 3 | |
| 50 | 40 | | 39 | | 1 | |
| 51 | 26 | | 24 | | 2 | |
| 52 | 29 | | 29 | | . | |
| 53 | 27 | | 26 | | 1 | |
| 54 | 21 | | 21 | | . | |
| 55 | 15 | | 14 | | 1 | |
| 56 | 13 | | 13 | | . | |
| 57 | 9 | | 9 | | . | |
| 58 | 17 | | 17 | | . | |
| 59 | 11 | | 9 | | 2 | |
| 60 | 5 | | 5 | | . | |
| 61 | 6 | | 6 | | . | |
| 62 | 3 | | 2 | | 1 | |
| 63 | 7 | | 6 | | 1 | |
| 64 | 4 | | 4 | | . | |
| 65 | 3 | | 3 | | . | |
| 66 | 2 | | 2 | | . | |
| 67 | 2 | | 2 | | . | |
| 68 | 3 | | 3 | | . | |
| 69 | 2 | | 2 | | . | |
| 70 | 1 | | 1 | | . | |
| 72 | 2 | | 1 | | 1 | |
| 74 | 1 | | 1 | | . | |
| 75 | 1 | | 1 | | . | |
| 77 | 1 | | . | | 1 | |
| 78 | 1 | | 1 | | . | |

IFR_AR_008529

**DRO Table 3.2. Gender and age of aliens referred for
credible fear interview at port of entry, FY 2002**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Gender & Age | Total Count | Total Percent | Detained at some point Count | Detained at some point Percent | Not detained Count | Not detained Percent |
|---|---|---|---|---|---|---|
| **Total** | **9,749** | **100.0%** | **9,260** | **95.0%** | **489** | **5.0%** |
| Female | 3,826 | 39.2% | 3,511 | 37.9% | 315 | 64.4% |
| Male | 5,922 | 60.7% | 5,748 | 62.1% | 174 | 35.6% |
| Unknown | 1 | 0.0% | 1 | 0.0% | . | |
| Unknown age | 2 | | 1 | | 1 | |
| 0 | 47 | | 17 | | 30 | |
| 1 | 31 | | 23 | | 8 | |
| 2 | 46 | | 25 | | 21 | |
| 3 | 37 | | 24 | | 13 | |
| 4 | 50 | | 40 | | 10 | |
| 5 | 45 | | 24 | | 21 | |
| 6 | 43 | | 27 | | 16 | |
| 7 | 39 | | 26 | | 13 | |
| 8 | 28 | | 22 | | 6 | |
| 9 | 23 | | 13 | | 10 | |
| 10 | 53 | | 36 | | 17 | |
| 11 | 48 | | 32 | | 16 | |
| 12 | 38 | | 27 | | 11 | |
| 13 | 31 | | 23 | | 8 | |
| 14 | 32 | | 25 | | 7 | |
| 15 | 38 | | 30 | | 8 | |
| 16 | 49 | | 46 | | 3 | |
| 17 | 43 | | 37 | | 6 | |
| 18 | 410 | | 402 | | 8 | |
| 19 | 401 | | 398 | | 3 | |
| 20 | 442 | | 438 | | 4 | |
| 21 | 400 | | 390 | | 10 | |
| 22 | 412 | | 404 | | 8 | |
| 23 | 429 | | 424 | | 5 | |
| 24 | 444 | | 438 | | 6 | |
| 25 | 437 | | 428 | | 9 | |
| 26 | 404 | | 393 | | 11 | |
| 27 | 411 | | 400 | | 11 | |
| 28 | 400 | | 386 | | 14 | |
| 29 | 347 | | 336 | | 11 | |
| 30 | 386 | | 363 | | 23 | |
| 31 | 349 | | 337 | | 12 | |
| 32 | 325 | | 313 | | 12 | |
| 33 | 293 | | 281 | | 12 | |
| 34 | 261 | | 251 | | 10 | |

IFR_AR_008530

| Gender & Age | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 35 | 259 | | 246 | | 13 | |
| 36 | 295 | | 286 | | 9 | |
| 37 | 262 | | 244 | | 18 | |
| 38 | 225 | | 215 | | 10 | |
| 39 | 189 | | 184 | | 5 | |
| 40 | 140 | | 133 | | 7 | |
| 41 | 138 | | 133 | | 5 | |
| 42 | 105 | | 102 | | 3 | |
| 43 | 96 | | 90 | | 6 | |
| 44 | 96 | | 95 | | 1 | |
| 45 | 77 | | 76 | | 1 | |
| 46 | 80 | | 79 | | 1 | |
| 47 | 65 | | 64 | | 1 | |
| 48 | 47 | | 45 | | 2 | |
| 49 | 48 | | 46 | | 2 | |
| 50 | 42 | | 41 | | 1 | |
| 51 | 34 | | 34 | | . | |
| 52 | 27 | | 27 | | . | |
| 53 | 27 | | 25 | | 2 | |
| 54 | 33 | | 32 | | 1 | |
| 55 | 31 | | 31 | | . | |
| 56 | 23 | | 23 | | . | |
| 57 | 20 | | 20 | | . | |
| 58 | 19 | | 18 | | 1 | |
| 59 | 15 | | 14 | | 1 | |
| 60 | 9 | | 8 | | 1 | |
| 61 | 22 | | 21 | | 1 | |
| 62 | 10 | | 10 | | . | |
| 63 | 4 | | 4 | | . | |
| 64 | 5 | | 5 | | . | |
| 65 | 9 | | 9 | | . | |
| 66 | 4 | | 3 | | 1 | |
| 67 | 4 | | 4 | | . | |
| 68 | 3 | | 3 | | . | |
| 69 | 1 | | 1 | | . | |
| 70 | 2 | | 1 | | 1 | |
| 71 | 1 | | 1 | | . | |
| 72 | 2 | | 1 | | 1 | |
| 73 | 1 | | 1 | | . | |
| 74 | 1 | | 1 | | . | |
| 75 | 1 | | 1 | | . | |
| 76 | 2 | | 2 | | . | |
| 79 | 1 | | 1 | | . | |

IFR_AR_008531

**DRO Table 3.3. Gender and age of aliens referred for credible fear interview at port of entry, FY 2003**

Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Gender & Age | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **Total** | **5,986** | **100.0%** | **5,793** | **96.8%** | **193** | **3.2%** |
| Female | 2,316 | 38.7% | 2,207 | 38.1% | 109 | 56.5% |
| Male | 3,670 | 61.3% | 3,586 | 61.9% | 84 | 43.5% |
| 0 | 23 | | 18 | | 5 | |
| 1 | 20 | | 18 | | 2 | |
| 2 | 18 | | 18 | | . | |
| 3 | 27 | | 22 | | 5 | |
| 4 | 32 | | 24 | | 8 | |
| 5 | 19 | | 16 | | 3 | |
| 6 | 17 | | 14 | | 3 | |
| 7 | 28 | | 24 | | 4 | |
| 8 | 26 | | 20 | | 6 | |
| 9 | 27 | | 21 | | 6 | |
| 10 | 22 | | 19 | | 3 | |
| 11 | 16 | | 14 | | 2 | |
| 12 | 17 | | 14 | | 3 | |
| 13 | 23 | | 19 | | 4 | |
| 14 | 17 | | 11 | | 6 | |
| 15 | 16 | | 11 | | 5 | |
| 16 | 22 | | 19 | | 3 | |
| 17 | 30 | | 27 | | 3 | |
| 18 | 186 | | 182 | | 4 | |
| 19 | 221 | | 220 | | 1 | |
| 20 | 231 | | 229 | | 2 | |
| 21 | 241 | | 237 | | 4 | |
| 22 | 260 | | 258 | | 2 | |
| 23 | 259 | | 254 | | 5 | |
| 24 | 299 | | 293 | | 6 | |
| 25 | 295 | | 287 | | 8 | |
| 26 | 270 | | 265 | | 5 | |
| 27 | 245 | | 239 | | 6 | |
| 28 | 239 | | 236 | | 3 | |
| 29 | 245 | | 242 | | 3 | |
| 30 | 230 | | 226 | | 4 | |
| 31 | 233 | | 230 | | 3 | |
| 32 | 197 | | 195 | | 2 | |
| 33 | 188 | | 186 | | 2 | |
| 34 | 157 | | 154 | | 3 | |
| 35 | 152 | | 146 | | 6 | |
| 36 | 176 | | 170 | | 6 | |

IFR_AR_008532

| Gender & Age | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 37 | 154 | | 151 | | 3 | |
| 38 | 134 | | 126 | | 8 | |
| 39 | 115 | | 112 | | 3 | |
| 40 | 96 | | 91 | | 5 | |
| 41 | 90 | | 88 | | 2 | |
| 42 | 81 | | 75 | | 6 | |
| 43 | 75 | | 74 | | 1 | |
| 44 | 57 | | 55 | | 2 | |
| 45 | 59 | | 54 | | 5 | |
| 46 | 51 | | 50 | | 1 | |
| 47 | 37 | | 35 | | 2 | |
| 48 | 39 | | 37 | | 2 | |
| 49 | 44 | | 43 | | 1 | |
| 50 | 37 | | 37 | | . | |
| 51 | 31 | | 30 | | 1 | |
| 52 | 27 | | 27 | | . | |
| 53 | 20 | | 18 | | 2 | |
| 54 | 14 | | 14 | | . | |
| 55 | 18 | | 16 | | 2 | |
| 56 | 14 | | 14 | | . | |
| 57 | 11 | | 11 | | . | |
| 58 | 9 | | 9 | | . | |
| 59 | 6 | | 6 | | . | |
| 60 | 9 | | 9 | | . | |
| 61 | 6 | | 6 | | . | |
| 62 | 4 | | 4 | | . | |
| 63 | 3 | | 3 | | . | |
| 64 | 5 | | 4 | | 1 | |
| 65 | 2 | | 2 | | . | |
| 66 | 1 | | 1 | | . | |
| 67 | 2 | | 2 | | . | |
| 68 | 2 | | 2 | | . | |
| 69 | 1 | | 1 | | . | |
| 70 | 1 | | 1 | | . | |
| 71 | 2 | | 2 | | . | |
| 73 | 1 | | 1 | | . | |
| 80 | 1 | | 1 | | . | |
| 82 | 1 | | 1 | | . | |
| 86 | 1 | | 1 | | . | |
| 87 | 1 | | 1 | | . | |

IFR_AR_008533

**DRO Table 4.0:  Location of Aliens Detained for Credible Fear Interview by Fiscal Year, FY 2000-2003**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| | FY 2000 | | FY 2001 | | FY 2002 | | FY 2003 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Service Processing Centers | 6,028 | 42.8% | 8,450 | 45.1% | 6,650 | 48.7% | 3,975 | 38.0% | 25,103 | 45.0% |
| Federal Prisons | 119 | 0.8% | 71 | 0.4% | 87 | 0.6% | 149 | 3.0% | 426 | 0.8% |
| State and Local Jails | 5,485 | 38.9% | 6,685 | 35.7% | 3,905 | 28.6% | 2,491 | 22.5% | 18,566 | 33.3% |
| Contract Facilties | 2,464 | 17.5% | 3,512 | 18.8% | 3,006 | 22.0% | 2,748 | 36.6% | 11,730 | 21.0% |
| **Total** | **14,096** | | **18,718** | | **13,648** | | **9,465** | | **55,825** | |

IFR_AR_008534

**DRO Table 4.1. Detention facilities for aliens referred for**
**credible fear interview at port of entry, FY 2000**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| **Total all stays** | **14,096** | **18,718** | **13,648** | **9,363** |
| | | | | |
| **Alabama** | **3** | **21** | **24** | **138** |
| Cherokee County Jail | - | 6 | 6 | 5 |
| Escambia County Detention Center | - | - | - | 1 |
| Etowah County Jail (Al) | 3 | 15 | 18 | 132 |
| **Alaska** | **4** | **-** | **1** | **1** |
| Cook Inlet Pretrial, Anch | 1 | - | 1 | 1 |
| State Cor Ctr Annex Ancho | 3 | - | - | - |
| **Arizona** | **63** | **108** | **69** | **124** |
| CCA Cent.Az.Det.Ctr. (C.C.A.-Usm Contract) | 1 | 3 | 1 | 14 |
| CCA, Florence Correctional Center | 7 | 22 | 6 | 10 |
| Eloy Federal Contract Fac (INS & Bop Contract) | 2 | 2 | 10 | 70 |
| Florence Staging Facility | 25 | 55 | 2 | 27 |
| Florence SPC | 21 | 21 | 33 | 1 |
| Southwest Key Juvenile Sh | 5 | 3 | 15 | 2 |
| Tucson INS Hold Room (Holding Area) | 2 | 2 | 2 | - |
| **California** | **5,086** | **6,567** | **3,361** | **1,479** |
| Barrett Honor Camp | 213 | 24 | - | - |
| Bhc Cedar Vista (Hosp.) (Hospital) | 2 | - | - | - |
| Casa San Juan (Catholic Charities) | 108 | 118 | 117 | 39 |
| Corr.Corp.Of America - San Diego (Private) | 637 | 782 | 663 | 440 |
| Descanso Detention Fac. | 73 | 16 | - | - |
| El Centro SPC | 48 | 183 | 42 | 18 |
| Glenn County Jail | 4 | 6 | 2 | 6 |
| Hosana Girls Ranch | 3 | - | - | 5 |
| Hosanna Homes For Boys | 12 | 7 | 10 | 9 |
| Imperial County Jail | 5 | 60 | - | - |
| Kern County Jail (Lerdo) | 87 | 34 | 5 | 15 |
| LOS Cust Case | 687 | 1,404 | 811 | 281 |
| LOS Padrinos Juvenile Hall | 15 | 22 | 29 | 2 |
| Marin Co. Jail | 53 | 19 | - | - |
| Marin Juvenile Hall | - | 1 | - | - |
| Mira Loma Det.Center (County Contract Fac.) | 1,513 | 1,888 | 637 | 82 |
| North County Jail | 13 | 3 | - | - |
| Oakland City Jail | 120 | 291 | 153 | 157 |
| Pacific Furlough Facility (Contract) | - | 103 | - | - |
| Sacramento County Jail | 1 | 37 | 12 | 2 |
| San Mateo Juvenille Hall | - | 2 | 1 | - |
| San Diego County Juv.Hall | - | - | - | 1 |
| San Pedro SPC | 8 | - | - | - |
| | 1,063 | 836 | 574 | 105 |
| Santa Ana City Jail | 1 | 37 | 8 | - |
| Santa Ana County Jail | 15 | 73 | 48 | 56 |
| Santa Clara County Jail | 1 | - | - | 5 |
| Santa Rita Jail | - | - | - | 1 |

IFR_AR_008535

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| Snd District Staging | 309 | 314 | 90 | 64 |
| Southwest Keys Juv. Fac. (Private Facility) | 11 | 6 | 9 | 10 |
| Tehama County Jail | 1 | - | - | - |
| Wackenhut Corrections Corp | - | - | 1 | 37 |
| Westminster Custody | - | - | 2 | 2 |
| Yolo County Jail | 5 | - | - | - |
| Yuba County Jail | 78 | 301 | 147 | 142 |
| **Colorado** | **14** | **6** | **2** | **4** |
| Denver Contract Det. Fac. | 14 | 6 | 2 | 4 |
| **Connecticut** | **18** | **15** | **3** | **2** |
| Hartford Corr Center | 9 | 7 | 3 | 1 |
| Hartford Office | 1 | - | - | - |
| Laffayette Sheriff's Lock | - | 1 | - | - |
| York Corr Inst | 8 | 7 | - | 1 |
| **Florida** | **2,715** | **6,688** | **4,601** | **3,490** |
| Bay County | 1 | - | 1 | 2 |
| Boystown (Arch Dioceses) | 18 | 19 | 17 | 13 |
| Bradenton Detention Center (Igsa, 2 Yr Contract) | 5 | 11 | 1 | 6 |
| Cedars Medical Center (Hospital) | 3 | - | - | - |
| Citrus County Jail | 2 | - | - | - |
| Clay County Jail | 3 | 1 | 2 | 2 |
| Columbia Kendal Hospital | | 1 | 5 | 6 |
| Comfort Suites Hotel | 2 | 1,089 | 1,033 | 714 |
| Dade County Correctional | - | - | 1 | - |
| Ft Lauderdale City Jail | 2 | 3 | 1 | 1 |
| Hillsborough County Jail | 3 | 4 | - | - |
| Indian River County Jail | 1 | - | - | - |
| Jackson Memorial Hospital | 1 | 1 | 3 | 9 |
| Krome North SPC | 2,628 | 4,605 | 2,976 | 2,073 |
| Monroe County Jail | 2 | 2 | 4 | 1 |
| Orange County Jail | 26 | 26 | 3 | 18 |
| Palm Beach County Jail | 11 | 4 | 1 | 12 |
| Palmetto Hospital | | 16 | 22 | 8 |
| Sarasota County Jail | - | - | - | 2 |
| Turner Guiford Knight (Tgk) Jail | 1 | 900 | 440 | 36 |
| US Marshals,S.Dist.Fl | - | 6 | - | 8 |
| Wackenhut Corrections Corp | 1 | | 89 | 578 |
| Wakulla County Jail | - | - | - | 1 |
| Windmoor Hosp.(Harborview) (Hospital) | 5 | - | - | - |
| Women's Detention Center | - | - | 2 | - |
| **Georgia** | **210** | **301** | **269** | **336** |
| Atlanta Dist. Hold Rm | - | - | - | 61 |
| Atlanta Pretrial Detn Ctr | 2 | 18 | 14 | 21 |
| Chatham Co Jail | - | - | - | 1 |
| Colquitt County Jail | 3 | 20 | 33 | 54 |
| Csc So.Fulton Munic.Jail (Municipal Jail) | 36 | - | - | - |
| Dekalb Co Jail | 157 | 165 | - | - |
| Ga Baptist Children Home (Private Juvenile Facility) | 6 | 4 | 3 | 2 |
| Harris County Jail | - | 3 | 34 | 45 |
| Kennesaw City Jail | 2 | 55 | 82 | 117 |
| Lincoln County Jail | 1 | - | 2 | - |
| Paulding Co Georgia | 3 | 30 | 87 | 30 |

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| Walker County Jail | | 6 | 14 | 5 |
| **Guam** | **8** | **6** | **21** | **3** |
| Department Of Corrections | 8 | 5 | 16 | 3 |
| Department Of Youth Affairs (Secure Nonsecure) | - | 1 | 5 | - |
| **Hawaii** | **56** | **59** | **37** | **2** |
| Honolulu Federal Detention Center | 1 | 6 | 31 | 2 |
| INS District Office | 55 | 53 | 6 | - |
| **Idaho** | **1** | **2** | **-** | **2** |
| Ada County Jail | - | 1 | - | - |
| Bonneville Co. Jail | 1 | - | - | - |
| Haile Det. Center | - | - | - | 1 |
| Twin Falls County Jail | - | 1 | - | 1 |
| **Illinois** | **1,882** | **1,589** | **1,273** | **347** |
| Blue Island P.D. | 13 | - | - | - |
| Brookfield Police Dept. | 49 | 30 | 42 | 3 |
| Calumet City P.D. | 10 | - | - | - |
| Coles County Jail | 3 | 29 | 28 | 1 |
| Cumberland County Jail | 1 | 3 | 23 | - |
| Dewitt County Jail | - | 5 | - | - |
| Dupage County Jail | 457 | 230 | 142 | 47 |
| Elgin Police Dept. Jail | 21 | 20 | 28 | 2 |
| Ford County Jail | 2 | 48 | 31 | 11 |
| INS Airport Hold | 547 | 466 | 293 | 64 |
| Juvenile Facility, Chi (Tia Contract Fac.) | 39 | 10 | 10 | - |
| Mchenry County Sheriff's (Police) | 240 | 311 | 162 | 68 |
| Mundelein Police Dept. | 32 | 14 | 7 | - |
| North Chicago P.D. | 79 | 61 | 55 | 6 |
| Ogle County Jail | 19 | 22 | 18 | - |
| Rock Island County Jail | - | 30 | 10 | - |
| Sangamon County Jail | - | 5 | - | - |
| Stickney Police Dept. | 31 | - | - | - |
| Stone Park Police Dept. | 166 | 181 | 171 | 75 |
| Tri-County Jail | 59 | 95 | 213 | 70 |
| Waukegan City Jail | 37 | 29 | 40 | - |
| Western Springs Police Dp | 77 | - | - | - |
| **Indiana** | **3** | **2** | **43** | **-** |
| Marion County Jail | 3 | - | - | - |
| St. Joseph County Jail | - | 2 | 43 | - |
| **Iowa** | **2** | **1** | **-** | **-** |
| Linn County Jail | 1 | 1 | - | - |
| Pottawattamie County Jail | 1 | - | - | - |
| **Kentucky** | **6** | **-** | **3** | **8** |
| Boone County Jail | 3 | - | 1 | 4 |
| Fayette County Detention Center | - | - | - | 1 |
| Grayson County Jail, Ky | - | - | - | 2 |
| Kenton County Jail | 3 | - | 2 | - |
| Warren County Regional | - | - | - | 1 |
| **Louisiana** | **133** | **49** | **69** | **462** |
| Avoyelles Women's Corr Cn | 13 | 2 | 3 | 9 |
| Calcasieu Parish Prison | - | 2 | - | - |
| Concordia Parish C C | 1 | - | - | 30 |
| Nol D D & P | 1 | 7 | 7 | 7 |

IFR_AR_008537

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| Oakdale Fed.Det.Center | 1 | 1 | 3 | 3 |
| Orleans Parish Juvenile Fac | 3 | - | | |
| Orleans Parish Sheriff | 81 | 27 | 18 | 162 |
| Pine Prairie Correctional Center | 2 | 6 | 15 | 11 |
| Plaquemines Parish Det. Center | - | - | - | 14 |
| Tangipahoa Parish Jail | 26 | - | - | 8 |
| Tensas Parish Det. Cntr. | 5 | 4 | 23 | 218 |
| **Maine** | **-** | **4** | **1** | **1** |
| Cumberland County Jail | - | 3 | 1 | 1 |
| Maine Dept Of Corrections | | 1 | - | - |
| **Maryland** | **78** | **86** | **86** | **62** |
| Bal D D & P | - | - | - | 1 |
| Carroll County Detention Center | 12 | 13 | 18 | 8 |
| Dorchester Co Det Cntr | 2 | 3 | 11 | 10 |
| Howard County Det Cntr | 14 | 35 | 32 | 20 |
| Knight Protective (Contract Guard Serv.) | 8 | 5 | 4 | |
| St. Mary's Co Det Cntr | 4 | 1 | 3 | 1 |
| Wicomico Co Det | 32 | 19 | 11 | 12 |
| Worcester Co. Jail | 6 | 10 | 7 | 10 |
| **Massachusetts** | **113** | **105** | **33** | **29** |
| Boston Police Dept | 32 | 13 | - | - |
| Boston SPC | 15 | 11 | 3 | 6 |
| Bristol Cnty Ndartmouth | 18 | 27 | 9 | 14 |
| Greenfield House Of Corr. | - | 2 | 1 | - |
| Nashua St. Jail | 19 | 7 | - | - |
| Norflk Cnty Dedham | 1 | - | - | 4 |
| Plymouth County H.O.C. | 5 | 8 | 11 | 3 |
| Ramada Hotel | 21 | 37 | 9 | |
| Suffolk Hoc Sbay | 2 | - | - | 2 |
| **Michigan** | **219** | **123** | **86** | **32** |
| Belleville Pd, Belvil, Mi | 66 | 38 | 30 | 6 |
| Calhoun Co., Battle Cr,Mi | 32 | 14 | 8 | 7 |
| Dearborn Police Dept. | 4 | - | - | - |
| Det Pd 3rd Prec | 1 | - | - | - |
| Det Pd 4th Prec. | 1 | - | - | - |
| Det Pd 5th Prec. | 2 | - | - | - |
| Det Pd 7th Prec. | 1 | - | - | - |
| Detroit Police 1st Pct. | 10 | - | - | - |
| Monroe Co., Monroe, Mi. | 90 | 59 | 47 | 11 |
| Monroe County,Youthcenter | - | - | 1 | - |
| St.Clair Co.,Pt.Huron,Mi. | - | 1 | - | - |
| U.S. Immigration, Detroit | 11 | 7 | - | - |
| Van Buren County Jail, Mi | 1 | 4 | - | - |
| Van Buren Township Pd | - | - | - | 8 |
| **Minnesota** | **74** | **80** | **30** | **2** |
| Anoka County Jail | 1 | - | - | - |
| Carver Co. Juvy Detention | - | 1 | - | - |
| Carver County Jail | 28 | 31 | 9 | 2 |
| Hennipen County Workhouse | 2 | - | - | - |
| Kittson Co. Jail | 1 | - | - | - |
| Minn.C.F., Rush City | 18 | 14 | 7 | - |
| Minn.C.F, Oak Park Hgts | - | 1 | - | - |

IFR_AR_008538

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| Ramsey Adc Annex, Spm | 2 | 1 | 2 | - |
| Ramsey County Jail | - | 2 | - | - |
| Sherburne County Jail | 19 | 26 | 9 | - |
| Sibley County Jail, Mn | 1 | - | - | - |
| Washington County Jail | 2 | 3 | 3 | - |
| Wright Co. Jail | - | 1 | - | - |
| **Missouri** | **8** | **-** | **-** | **4** |
| Mississippi County Detention Cente | 4 | - | - | 4 |
| Warren County Justice Ctr | 4 | - | - | - |
| **Montana** | **2** | **4** | **1** | **1** |
| Chouteau County Jail | 1 | - | - | - |
| Hel District Custody | - | 1 | - | - |
| Jefferson County Jail | 1 | 2 | - | 1 |
| Missoula County | - | 1 | - | - |
| Toole County | - | - | 1 | - |
| **Nevada** | **23** | **8** | **6** | **32** |
| Las Vegas City Jail | 8 | 4 | 2 | 17 |
| North Las Vegas | 14 | 4 | 4 | 15 |
| Washoe County Jail | 1 | - | - | - |
| **New Hampshire** | **21** | **3** | **-** | **-** |
| Hillsborough County Jail | 13 | - | - | - |
| Nh State Prison For Women | 3 | - | - | - |
| Rockingham County Jail | 5 | 3 | - | - |
| **New Jersey** | **633** | **603** | **568** | **446** |
| Bergen County Jail | 1 | 4 | - | 4 |
| Camden County Jail | | 1 | - | - |
| Elizabeth Contract D.F. (INS Contract Det Fac) | 591 | 505 | 511 | 416 |
| Hudson County Jail | 23 | 49 | 22 | 14 |
| Middlesex County Jail | 2 | 6 | 6 | 3 |
| New INS Os Hold Room (Holding Area) | | 1 | 22 | - |
| Passaic County Jail | 11 | 24 | 2 | 1 |
| Sussex County Jail | 5 | 13 | 5 | 8 |
| **New Mexico** | **2** | **2** | **-** | **-** |
| Santa Fe Cornell Det. Fac. | 2 | - | - | - |
| Torrance Estancia, Nm | - | 2 | - | - |
| **New York** | **674** | **689** | **389** | **277** |
| Albany County Jail | 3 | 5 | 2 | 1 |
| Buffalo SPC (INS Owned 7 Operated) | 13 | 25 | 27 | 26 |
| Clinton County Jail | 10 | 9 | 6 | 6 |
| Colombia County Jail | - | 3 | - | - |
| Erie Co Holding Center | 6 | 1 | 4 | 4 |
| Erie County Correctional | - | 1 | 9 | - |
| Franklin County Jail | 3 | 1 | 1 | 1 |
| Genesee County Jail | 2 | - | 1 | 6 |
| Holiday Inn, (With 7 Yr.Old Boy) | 85 | 64 | 7 | 6 |
| INS Wackenhut Con Fac, NY | 534 | 551 | 317 | 218 |
| Madison County Jail | - | 5 | 1 | 1 |
| Montgomery County Jail | 2 | 2 | - | - |
| Niagara County Jail | | 1 | 2 | 5 |
| Oneida County Jail | 1 | 1 | 1 | - |
| Orleans County Jail | - | - | 8 | 3 |
| Schnectady County Jail | 3 | 1 | 3 | - |

IFR_AR_008539

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| Schoharie County Jail | - | 1 | - | - |
| Varick Street SPC | 11 | 18 | - | - |
| Wyoming County Jail | 1 | - | - | - |
| **North Carolina** | **3** | **7** | **12** | **9** |
| Forsyth County Jail | - | 2 | - | - |
| Johnston County Detention Center | - | 1 | - | - |
| Mecklenburg (Nc) Co Jail | 3 | 4 | 12 | 9 |
| **Ohio** | **2** | **2** | **-** | **4** |
| Bedford Heights City | 1 | - | - | - |
| Maple Heights City Jail | 1 | - | - | 1 |
| Medina County Jail | - | 1 | - | - |
| North Royalton City Jail | - | 1 | - | - |
| Seneca County Jail | - | - | - | 2 |
| Trumbull County Jail | - | - | - | 1 |
| **Oklahoma** | **-** | **1** | **-** | **-** |
| Canadian County, El Reno, (County Jail) | - | 1 | - | - |
| **Oregon** | **19** | **16** | **10** | **11** |
| Columbia County Jail | - | - | 1 | - |
| Grant County Jail | 3 | 5 | 3 | - |
| Medford Sub-Office | - | 1 | - | - |
| Northern Oregon Corr.Fac. | 8 | 3 | 3 | 11 |
| Northern Oregon Juv.Det. (Juvenile Det. Fac.) | - | 2 | - | - |
| Portland District Office | - | 4 | 2 | - |
| Yamhill County Correction | 8 | 1 | 1 | |
| **Pennsylvania** | **214** | **370** | **220** | **152** |
| Allegheny Co. Jail | 2 | 3 | 3 | - |
| Bedford County Jail | 2 | 8 | - | - |
| Berks Co. Juvi | 8 | 5 | 8 | 7 |
| Berks County Family Shelter | - | 123 | 61 | 70 |
| Berks County Jail, Pa | 8 | 7 | 4 | 7 |
| Berks County Secured Juvenile | - | 1 | 3 | - |
| Cambria County Jail, Pa | 2 | 1 | 1 | - |
| Carbon County Correctionl | 8 | 2 | 1 | - |
| Erie County Jail, Pa | - | 1 | 1 | - |
| Lackawana Cnty Jail, Pa | - | - | 1 | - |
| Lehigh County Jail, Pa | 2 | - | - | - |
| Montgomery Cnty Jail, Pa | 3 | 4 | 5 | - |
| Phi District Office | 1 | 1 | - | - |
| Philadelphia Detention Ct | 1 | - | - | - |
| Pike County Jail | - | 1 | - | 2 |
| Roundhouse Phi, Pa | - | - | 2 | - |
| York County Jail, Pa | 177 | 213 | 130 | 66 |
| **Puerto Rico** | **53** | **77** | **104** | **544** |
| Airport DDP | 22 | 32 | 44 | 175 |
| Airport Hotel, Saj. (Hotel) | - | - | 6 | 12 |
| Aquadilla SPC | 8 | 19 | 11 | 239 |
| Guaynabo Mdc (San Juan) | 23 | 26 | 43 | 118 |
| **Rhode Island** | **34** | **33** | **7** | **-** |
| Aci, Cranston Ri | 33 | 33 | 7 | - |
| Wyatt Detention Center (Private Operation) | 1 | - | - | - |
| **South Carolina** | **7** | **5** | **1** | **2** |
| Charleston County Correct | 3 | 2 | - | 1 |

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| Columbia Care Center (Hospital) | 4 | 3 | - | 1 |
| York County Detention Center | - | - | 1 | - |
| **Tennessee** | **14** | **23** | **29** | **6** |
| Blount County Justice Ctr | - | - | - | 2 |
| Davidson Co. Sheriff Dept | 1 | - | - | - |
| Memphis Shelby County Juv | - | 2 | - | - |
| Shelby Co. Sheriff Office | 4 | 2 | 5 | - |
| Western Tennessee Det. Fac. | 9 | 19 | 24 | 4 |
| **Texas** | **775** | **579** | **1,926** | **969** |
| Bedford City Jail | 3 | 10 | 8 | - |
| Big Spring Corr. Center (Cornell-Bop Contract) | - | 1 | - | - |
| Brazoria County Det. Ctr | 12 | 10 | 16 | 1 |
| Cameron County Jail | - | - | - | 1 |
| Catholic Charities (Hou) (Catholic Charities) | 1 | - | 1 | 5 |
| Charter Palms Hospital | - | 1 | 1 | - |
| Comal Cty Jail | 5 | 2 | 2 | - |
| Dallas County Jail | 24 | 16 | 15 | 5 |
| Denton County Jail | 7 | 8 | 12 | 1 |
| El Paso SPC | 40 | 92 | 38 | 66 |
| Euless City Jail | 10 | 6 | 10 | 8 |
| Ft. Bend County Jail | 18 | 10 | 3 | - |
| Grayson County Jail | - | 7 | - | - |
| Guadalupe Cty Jail | 1 | - | 1 | 2 |
| Hays County Juvenile Center | - | - | 1 | - |
| Houston Contract Det.Fac. (C.C.A.) | 80 | 76 | 75 | 55 |
| Hudspeth County Jail | 2 | - | - | - |
| Hutto CCA (Private Contractor) | - | - | - | 1 |
| Ies Shelter (Juvenile Shelter) | 27 | 9 | 17 | 1 |
| Jefferson County Jail | 1 | - | - | 10 |
| Johnson County Jail | 1 | 1 | - | - |
| Karnes Cty Corr Ctr (Public Private) | 7 | 1 | - | - |
| Laredo Contract Det. Fac. (INS Contract Fac.) | 3 | 6 | 60 | 130 |
| Liberty Cty Juv Det Cente | - | 1 | - | - |
| Mansfield L.E. Center | - | 1 | - | - |
| Navarro Co Justice Ctr | 2 | 4 | 2 | - |
| Newton County Corr. Ctr. | 6 | 7 | 31 | 33 |
| Port Isabel SPC | 519 | 294 | 1,614 | 639 |
| Roger Hashem Juvenile Justice Ctr. | - | - | 1 | - |
| Rolling Plains Detention Center | 1 | 8 | 12 | 6 |
| Southwest Key - Houston | - | - | - | 2 |
| Valley Baptist Hospital | - | 2 | 3 | 2 |
| Wackenhut Facility (Private Contractor) | 1 | 2 | 3 | 1 |
| Walker County Jail | - | 1 | - | - |
| West Oaks Hospital | 1 | - | - | - |
| Wharton County Jail | 2 | 3 | - | - |
| Wilson County Jail | 1 | - | - | - |
| **U.S. Virgin Islands** | **-** | **6** | **1** | **51** |
| St T Criminal Just Complx (Local Not Federal) | - | 1 | - | - |
| St X Golden Grove (Female Detainees) | - | 5 | 1 | 51 |
| **Vermont** | **-** | **2** | **10** | **-** |
| Franklin County Jail, Vt | - | 2 | 9 | - |
| Vt. Dept. Of Corrections | - | - | 1 | - |

IFR_AR_008541

| Facility and state | FY 2000 Asylum seekers1 | FY 2001 Asylum seekers1 | FY 2002 Asylum seekers1 | FY 2003 Approximate Stay Count |
|---|---|---|---|---|
| **Virginia** | **420** | **269** | **160** | **148** |
| Alexandria City Jail | 4 | 3 | 3 | - |
| Arlington Co Jail | 49 | 58 | 41 | 52 |
| Central Va Regional Jail | 7 | 15 | 6 | - |
| Clarke Fred'k Winch. (Regional Jail) | 7 | - | 2 | - |
| Fairfax Co Jail | 20 | - | 4 | - |
| Hampton Roads Regional Jail | 1 | 2 | 2 | 14 |
| No. Va. Juvenile Det | 1 | - | - | - |
| Pamunkey Reg Jail (Regional Jail) | 41 | 27 | 14 | 26 |
| Piedmont Reg Jail (Regional Jail) | 77 | 74 | 39 | 27 |
| Portsmouth City Jail | 1 | 5 | 7 | - |
| Prince William (Regional Jail) | 70 | 13 | 13 | 9 |
| Rapp Sec Center (Regional Jail) | 54 | 28 | 21 | 12 |
| Riverside Reg Jail (Regional Jail) | 42 | 28 | 7 | 8 |
| Virginia Beach | 46 | 16 | 1 | - |
| **Washington** | **368** | **83** | **60** | **57** |
| Catholic Social Services (Foster Care Inst.) | - | - | - | 1 |
| Econolodge Motel | - | 3 | 3 | - |
| Forks City Jail | 11 | 5 | 8 | 4 |
| Martin Hall Juvenile (Juvenile Facility) | 11 | - | - | - |
| Regional Justice Center | 44 | - | 1 | - |
| Seatac Fed.Det.Center | 94 | 31 | 10 | 18 |
| Seattle Contract Det.Fac. | 180 | 42 | 37 | 34 |
| Yakima County | 28 | 2 | 1 | - |
| **Wisconsin** | **136** | **124** | **132** | **126** |
| Dodge County Jail, Juneau | - | - | 9 | 43 |
| Kenosha County Jail | - | - | 13 | 23 |
| Ozaukee County Jail | - | - | 64 | 53 |
| Racine County Jail | 55 | 94 | 13 | 2 |
| St. Croix County Jail | 7 | - | - | - |
| Walworth County Jail | 74 | 25 | 27 | 5 |
| Waukesha County Jail | - | 5 | 6 | - |

[1]An individual alien is counted only once for each facility. Additional detention periods by the alien in that facility are not included in this table.

IFR_AR_008542

**DRO Table 5.0. Number of facilties for aliens referred for**
**credible fear interview at port of entry, FY 2000**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Facilities per detainee | Count | Percent |
|---|---|---|
| **Total detainees** | **10,030** | |
| | | |
| 1 | 7,502 | 74.80% |
| 2 | 1,656 | 16.51% |
| 3 | 504 | 5.02% |
| 4 | 175 | 1.74% |
| 5 | 90 | 0.90% |
| 6 | 39 | 0.39% |
| 7 | 30 | 0.30% |
| 8 | 14 | 0.14% |
| 9 | 6 | 0.06% |
| 10 | 5 | 0.05% |
| 11 | 3 | 0.03% |
| 12 | 3 | 0.03% |
| 14 | 1 | 0.01% |
| 15 | 2 | 0.02% |

Interpretation: 7,502 asylum seekers who had a detention stay were
detained in only 1 facility; 1,656 asylum seekers were detained in 2
facilities; etc.

IFR_AR_008543

**DRO Table 5.1. Number of facilties for aliens referred for**
**credible fear interview at port of entry, FY 2001**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Facilities per detainee | Count | Percent |
|---|---|---|
| **Total detainees** | **12,650** | |
| | | |
| 1 | 9,744 | 77.03% |
| 2 | 1,953 | 15.44% |
| 3 | 534 | 4.22% |
| 4 | 248 | 1.96% |
| 5 | 91 | 0.72% |
| 6 | 27 | 0.21% |
| 7 | 21 | 0.17% |
| 8 | 16 | 0.13% |
| 9 | 5 | 0.04% |
| 10 | 4 | 0.03% |
| 11 | 1 | 0.01% |
| 12 | 1 | 0.01% |
| 13 | 3 | 0.02% |
| 15 | 1 | 0.01% |
| 22 | 1 | 0.01% |

IFR_AR_008544

**DRO Table 5.2. Number of facilties for aliens referred for**
**credible fear interview at port of entry, FY 2002**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Facilities per detainee | Count | Percent |
|---|---|---|
| **Total detainees** | **9,260** | |
| | | |
| 1 | 7,137 | 77.07% |
| 2 | 1,400 | 15.12% |
| 3 | 406 | 4.38% |
| 4 | 152 | 1.64% |
| 5 | 79 | 0.85% |
| 6 | 37 | 0.40% |
| 7 | 15 | 0.16% |
| 8 | 8 | 0.09% |
| 9 | 6 | 0.06% |
| 10 | 11 | 0.12% |
| 11 | 3 | 0.03% |
| 12 | 1 | 0.01% |
| 13 | 1 | 0.01% |
| 14 | 1 | 0.01% |
| 17 | 1 | 0.01% |
| 19 | 1 | 0.01% |
| 22 | 1 | 0.01% |

IFR_AR_008545

**DRO Table 5.3. Number of facilties for aliens referred for credible fear interview at port of entry, FY 2003**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Facilities per detainee | Count | Percent |
|---|---|---|
| **Total detainees** | **5,793** | |
| | | |
| 1 | 3,977 | 68.65% |
| 2 | 981 | 16.93% |
| 3 | 353 | 6.09% |
| 4 | 211 | 3.64% |
| 5 | 150 | 2.59% |
| 6 | 63 | 1.09% |
| 7 | 25 | 0.43% |
| 8 | 9 | 0.16% |
| 9 | 8 | 0.14% |
| 10 | 7 | 0.12% |
| 11 | 3 | 0.05% |
| 12 | 2 | 0.03% |
| 13 | 4 | 0.07% |

IFR_AR_008546

**DRO Table 6.0. Length of detention for aliens referred for**
**credible fear interview at port of entry, FY 2000**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

Length of stay for asylum seekers who have been released from detention:

| | |
|---|---|
| <90 days | 8,456 |
| 91-180 days | 847 |
| >180 days | 587 |
| Total | 9,890 |

Length of stay for asylum seekers who were detained but the detention
status in April 2003 is unknown:

| | |
|---|---|
| <90 days | 72 |
| 91-180 days | 7 |
| >180 days | 5 |
| Total | 84 |

Length of stay for asylum seekers still in detention on April 7, 2003:

| | | | |
|---|---|---|---|
| <90 days | 11 | including | 11  with orders of removal |
| 91-180 days | 7 | | 6 |
| >180 days | 38 | | 31 |
| Total | 56 | | 48 |

Asylum seekers detained and released before filing for asylum:          3

Asylum seekers never detained:                                        303

Total asylum seekers:                                              10,336

IFR_AR_008547

**DRO Table 6.1. Length of detention for aliens referred for
credible fear interview at port of entry, FY 2001**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

Length of stay for asylum seekers who have been released from detention:

| | |
|---|---|
| <90 days | 10,941 |
| 91-180 days | 895 |
| >180 days | 602 |
| Total | 12,438 |

Length of stay for asylum seekers who were detained but the detention
status in April 2003 is unknown:

| | |
|---|---|
| <90 days | 111 |
| 91-180 days | 5 |
| >180 days | 6 |
| Total | 122 |

Length of stay for asylum seekers still in detention on April 7, 2003:

| | | | |
|---|---|---|---|
| <90 days | 9 | including | 4  with orders of removal |
| 91-180 days | 9 | | 6 |
| >180 days | 72 | | 60 |
| Total | 90 | | 70 |

Asylum seekers detained and released before filing for asylum:          7

Asylum seekers never detained:                         306

Total asylum seekers:                         12,963

IFR_AR_008548

**DRO Table 6.2. Length of detention for aliens referred for**
**credible fear interview at port of entry, FY 2002**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

Length of stay for asylum seekers who have been released from detention:

| | |
|---|---|
| <90 days | 7,637 |
| 91-180 days | 736 |
| >180 days | 477 |
| Total | 8,850 |

Length of stay for asylum seekers who were detained but the detention
status in April 2003 is unknown:

| | |
|---|---|
| <90 days | 34 |
| 91-180 days | 3 |
| >180 days | 7 |
| Total | 44 |

Length of stay for asylum seekers still in detention on April 7, 2003:

| | | | |
|---|---|---|---|
| <90 days | 5 | including | 3 with orders of removal |
| 91-180 days | 8 | | 3 |
| >180 days | 353 | | 193 |
| Total | 366 | | 199 |

Asylum seekers detained and released before filing for asylum:            4

Asylum seekers never detained:                                          485

Total asylum seekers:                                                  9,749

IFR_AR_008549

**DRO Table 6.3. Length of detention for aliens referred for
credible fear interview at port of entry, FY 2003**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

Length of stay for asylum seekers who have been released from detention:

|          |       |         |       |
|----------|-------|---------|-------|
| <90 days | 3,882 | average | 23.8  |
| 91-180 days | 885 | average | 128.7 |
| >180 days | 497  | average | 263.0 |
| Total    | 5,264 | average | 64.0  |

Length of stay for asylum seekers whose detention records are unresolved:

|             |    |
|-------------|----|
| <90 days    | 21 |
| 91-180 days | 11 |
| >180 days   | 5  |
| Total       | 37 |

Length of stay for asylum seekers still in detention on March 7, 2004:

|             |     |           |     |                     |
|-------------|-----|-----------|-----|---------------------|
| <90 days    | 9   | including | 4   | with orders of removal |
| 91-180 days | 50  |           | 14  |                     |
| >180 days   | 433 |           | 217 |                     |
| Total       | 492 |           | 235 |                     |

Asylum seekers detained and released before filing for asylum:          5

Asylum seekers never detained:                                        188

Total asylum seekers:                                              5,986

IFR_AR_008550

**DRO Table 7.0. Type and rate of release for aliens referred for credible fear interview at port of entry, FY 2000**

Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| INS District Office | Total Detained | Total Released | Percent Released | BOND | DEP | OR | OS | PARO | TERM | USM | VD | WITH | Not released or unknown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **10,030** | **9,890** | **98.6%** | **1,869** | **1,004** | **1,020** | **70** | **5,346** | **494** | **24** | **12** | **51** | **140** |
| Anchorage, AK | 1 | 0 | 0.0% | | | | | | | | | | 1 |
| Atlanta, GA | 196 | 194 | 99.0% | 5 | 73 | 25 | 4 | 75 | 4 | 8 | | | 2 |
| Baltimore, MD | 36 | 34 | 94.4% | 2 | 18 | | 1 | 9 | 3 | | 1 | | 2 |
| Boston, MA | 79 | 72 | 91.1% | | 13 | 1 | 1 | 53 | 4 | | | | 7 |
| Buffalo, NY | 26 | 23 | 88.5% | 3 | 12 | 3 | | 2 | 1 | | | 2 | 3 |
| Chicago, IL | 851 | 845 | 99.3% | | 27 | 2 | 1 | 813 | | 1 | | 1 | 6 |
| Cleveland, OH | 2 | 2 | 100.0% | 1 | 1 | | | | | | | | |
| Dallas, TX | 26 | 22 | 84.6% | 4 | 9 | 2 | | 3 | 4 | | | | 4 |
| Denver, CO | 12 | 12 | 100.0% | 1 | 5 | 1 | | 5 | | | | | |
| Detroit, MI | 107 | 105 | 98.1% | 86 | 5 | | 9 | 2 | 2 | | | 1 | 2 |
| El Paso, TX | 35 | 34 | 97.1% | 5 | 12 | 11 | 2 | 2 | 1 | | 1 | | 1 |
| Harlingen, TX | 542 | 540 | 99.6% | 10 | 4 | 22 | | 502 | 2 | | | | 2 |
| Honolulu, HI | 11 | 10 | 90.9% | 1 | 2 | 1 | 1 | | 5 | | | | 1 |
| Houston, TX | 96 | 93 | 96.9% | 4 | 57 | 3 | 3 | 4 | 6 | | 2 | 14 | 3 |
| Kansas City, MO | 4 | 4 | 100.0% | | 4 | | | | | | | | |
| Los Angeles, CA | 2,604 | 2,549 | 97.9% | 1,080 | 33 | 917 | 23 | 474 | 15 | 2 | 3 | 2 | 55 |
| Miami, FL | 2,543 | 2,537 | 99.8% | 62 | 77 | 2 | 3 | 2,386 | 1 | 6 | | | 6 |
| New Orleans, LA | 93 | 90 | 96.8% | 21 | 36 | 1 | | 16 | 9 | 6 | | 1 | 3 |
| New York, NY | 524 | 520 | 99.2% | | 211 | | | 161 | 147 | | | 1 | 4 |
| Newark, NJ | 504 | 496 | 98.4% | | 192 | | 2 | 90 | 185 | | 2 | 25 | 8 |
| Omaha, NE | 2 | 2 | 100.0% | 1 | | | 1 | | | | | | |
| Philadelphia, PA | 155 | 148 | 95.5% | 3 | 24 | 10 | 1 | 99 | 11 | | | | 7 |
| Phoenix, AZ | 55 | 54 | 98.2% | 5 | 28 | | 3 | 8 | 10 | | | | 1 |
| Portland, OR | 4 | 4 | 100.0% | | 4 | | | | | | | | |
| San Antonio, TX | 4 | 4 | 100.0% | 1 | | 1 | | 1 | 1 | | | | |
| San Diego, CA | 962 | 954 | 99.2% | 325 | 33 | 8 | 2 | 557 | 26 | | 2 | 1 | 8 |
| San Francisco, CA | 189 | 188 | 99.5% | 135 | 9 | | 3 | 21 | 20 | | | | 1 |
| San Juan, PR | 26 | 25 | 96.2% | 9 | 6 | | | 10 | | | | | 1 |
| Seattle, WA | 176 | 167 | 94.9% | 76 | 51 | 6 | 8 | 3 | 20 | 1 | 1 | 1 | 9 |
| St. Paul, MN | 35 | 33 | 94.3% | 2 | 13 | 1 | | 7 | 8 | | | 2 | 2 |
| Washington, DC | 130 | 129 | 99.2% | 27 | 45 | 3 | 2 | 43 | 9 | | | | 1 |

DEP= released for removal from the United States
OR= released on recognizance
OS= released on an order of supervision
PARO= paroled into the United States
TERM= released, case terminated
USM= released to U.S. Marshals
VD= released for voluntary departure from the United States
WITH= released, alien withdraws application

IFR_AR_008551

**DRO Table 7.1. Type and rate of release for aliens referred for credible fear interview at port of entry, FY 2001**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| INS District Office | Total Detained | Total Released | Percent Released | BOND | DEP | OR | OS | PARO | TERM | USM | VD | WITH | Not released or unknown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **12,650** | **12,438** | **98.3%** | **1,966** | **1,173** | **345** | **51** | **8,477** | **351** | **8** | **12** | **55** | **212** |
| Atlanta, GA | 245 | 240 | 98.0% | 1 | 106 | 16 | 6 | 108 | 1 | 1 | . | 1 | 5 |
| Baltimore, MD | 40 | 36 | 90.0% | 9 | 17 | . | 4 | 5 | 1 | . | . | . | 4 |
| Boston, MA | 74 | 69 | 93.2% | 2 | 9 | 2 | 1 | 54 | 1 | . | . | . | 5 |
| Buffalo, NY | 42 | 37 | 88.1% | 4 | 19 | 1 | . | 12 | . | . | . | 1 | 5 |
| Chicago, IL | 696 | 692 | 99.4% | 2 | 31 | . | 2 | 657 | . | . | . | . | 4 |
| Cleveland, OH | 1 | 1 | 100.0% | . | . | . | . | 1 | . | . | . | . | . |
| Dallas, TX | 31 | 27 | 87.1% | 7 | 13 | 1 | 1 | . | 4 | . | 1 | . | 4 |
| Denver, CO | 5 | 5 | 100.0% | 2 | 3 | . | . | . | . | . | . | . | . |
| Detroit, MI | 70 | 66 | 94.3% | 42 | 7 | 2 | 5 | 6 | 4 | . | . | . | 4 |
| El Paso, TX | 78 | 76 | 97.4% | 6 | 27 | 9 | 2 | 24 | 8 | . | . | . | 2 |
| Harlingen, TX | 299 | 295 | 98.7% | 4 | 2 | 1 | . | 288 | . | . | . | . | 4 |
| Helena, MT | 3 | 2 | 66.7% | . | 1 | . | . | . | . | 1 | . | . | 1 |
| Honolulu, HI | 11 | 8 | 72.7% | 2 | 4 | . | . | . | 2 | . | . | . | 3 |
| Houston, TX | 83 | 81 | 97.6% | 6 | 45 | 1 | 2 | 3 | 9 | . | 2 | 13 | 2 |
| Los Angeles, CA | 2,784 | 2,775 | 99.7% | 1,134 | 37 | 254 | 6 | 1,334 | 8 | . | 2 | 1 | 9 |
| Miami, FL | 5,123 | 5,038 | 98.3% | 9 | 69 | 4 | 1 | 4,953 | . | . | 2 | . | 85 |
| New Orleans, LA | 51 | 50 | 98.0% | 16 | 12 | . | 2 | 16 | . | 4 | . | . | 1 |
| New York, NY | 546 | 538 | 98.5% | . | 285 | . | . | 149 | 104 | . | . | . | 8 |
| Newark, NJ | 509 | 486 | 95.5% | 3 | 252 | 1 | 1 | 73 | 121 | . | 1 | 34 | 23 |
| Omaha, NE | 1 | 1 | 100.0% | . | . | . | . | . | . | 1 | . | . | . |
| Philadelphia, PA | 289 | 276 | 95.5% | 12 | 42 | 8 | . | 172 | 36 | . | 3 | 3 | 13 |
| Phoenix, AZ | 58 | 55 | 94.8% | 5 | 34 | . | 2 | 8 | 5 | . | . | 1 | 3 |
| Portland, ME | 5 | 4 | 80.0% | 1 | 2 | . | . | 1 | . | . | . | . | 1 |
| Portland, OR | 7 | 7 | 100.0% | 5 | . | . | . | . | 2 | . | . | . | . |
| San Antonio, TX | 5 | 5 | 100.0% | 1 | 1 | 1 | 1 | 1 | . | . | . | . | . |
| San Diego, CA | 1,048 | 1,040 | 99.2% | 472 | 54 | 37 | 6 | 460 | 10 | . | 1 | . | 8 |
| San Francisco, CA | 329 | 326 | 99.1% | 151 | 45 | 1 | 6 | 112 | 10 | 1 | . | . | 3 |
| San Juan, PR | 38 | 33 | 86.8% | 3 | 3 | . | . | 27 | . | . | . | . | 5 |
| Seattle, WA | 41 | 35 | 85.4% | 2 | 10 | 6 | 2 | 1 | 14 | . | . | . | 6 |
| St. Paul, MN | 43 | 42 | 97.7% | 11 | 12 | . | 1 | 8 | 9 | . | . | 1 | 1 |
| Washington, DC | 95 | 92 | 96.8% | 54 | 31 | . | 1 | 4 | 2 | . | . | . | 3 |

DEP= released for removal from the United States
OR= released on recognizance
OS= released on an order of supervision
PARO= paroled into the United States
TERM= released, case terminated
USM= released to U.S. Marshals
VD= released for voluntary departure from the United States
WITH= released, alien withdraws application

IFR_AR_008552

**DRO Table 7.2. Type and rate of release for aliens referred for credible fear interview at port of entry, FY 2002**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| INS District Office | Total Detained | Total Released | Percent Released | BOND | DEP | OR | OS | PARO | TERM | USM | VD | WITH | Not released or unknown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **9,260** | **8,850** | **95.6%** | **1,223** | **1,337** | **63** | **33** | **5,942** | **185** | **13** | **10** | **44** | **410** |
| Atlanta, GA | 170 | 156 | 91.8% | 1 | 75 | 6 | . | 71 | 2 | . | . | 1 | 14 |
| Baltimore, MD | 41 | 33 | 80.5% | 1 | 30 | 1 | . | 1 | . | . | . | . | 8 |
| Boston, MA | 23 | 18 | 78.3% | . | 3 | . | . | 15 | . | . | . | . | 5 |
| Buffalo, NY | 44 | 38 | 86.4% | . | 17 | . | . | 21 | . | . | . | . | 6 |
| Chicago, IL | 504 | 489 | 97.0% | . | 17 | 1 | . | 466 | 3 | 1 | 1 | . | 15 |
| Dallas, TX | 29 | 24 | 82.8% | 10 | 11 | . | . | 2 | . | . | 1 | . | 5 |
| Denver, CO | 2 | 2 | 100.0% | . | 2 | . | . | . | . | . | . | . | . |
| Detroit, MI | 48 | 27 | 56.3% | 22 | 3 | . | . | 1 | . | . | . | 1 | 21 |
| El Paso, TX | 33 | 30 | 90.9% | 2 | . | 2 | 1 | 16 | 7 | . | 2 | . | 3 |
| Harlingen, TX | 1,627 | 1,623 | 99.8% | 5 | 1 | 4 | . | 1,613 | . | . | . | . | 4 |
| Helena, MT | 1 | 1 | 100.0% | . | 1 | . | . | . | . | . | . | . | . |
| Honolulu, HI | 12 | 11 | 91.7% | 2 | 3 | 1 | . | 1 | 4 | . | . | . | 1 |
| Houston, TX | 104 | 97 | 93.3% | 6 | 61 | 1 | . | 3 | 1 | 1 | 3 | 21 | 7 |
| Los Angeles, CA | 1,250 | 1,117 | 89.4% | 381 | 57 | 24 | 1 | 605 | 44 | 5 | . | . | 133 |
| Miami, FL | 3,110 | 3,088 | 99.3% | 6 | 265 | . | 3 | 2,807 | 3 | . | 1 | 3 | 22 |
| New Orleans, LA | 69 | 56 | 81.2% | 8 | 32 | 6 | 1 | 4 | 5 | . | . | . | 13 |
| New York, NY | 309 | 289 | 93.5% | . | 223 | . | . | 29 | 37 | . | . | . | 20 |
| Newark, NJ | 511 | 473 | 92.6% | 2 | 382 | 1 | . | 28 | 43 | . | . | 17 | 38 |
| Philadelphia, PA | 159 | 135 | 84.9% | 2 | 40 | . | . | 79 | 14 | . | . | . | 24 |
| Phoenix, AZ | 40 | 34 | 85.0% | . | 18 | . | 2 | 14 | . | . | . | . | 6 |
| Portland, ME | 1 | 1 | 100.0% | . | 1 | . | . | . | . | . | . | . | . |
| Portland, OR | 2 | 2 | 100.0% | 1 | 1 | . | . | . | . | . | . | . | . |
| San Antonio, TX | 59 | 58 | 98.3% | 39 | 3 | 1 | . | 12 | 2 | 1 | . | . | 1 |
| San Diego, CA | 776 | 742 | 95.6% | 608 | 26 | 5 | 4 | 91 | 8 | . | . | . | 34 |
| San Francisco, CA | 168 | 160 | 95.2% | 103 | 17 | 1 | 20 | 18 | 1 | . | . | . | 8 |
| San Juan, PR | 52 | 49 | 94.2% | . | 2 | . | 1 | 46 | . | . | . | . | 3 |
| Seattle, WA | 40 | 30 | 75.0% | 2 | 13 | 8 | . | . | 4 | . | 2 | 1 | 10 |
| St. Paul, MN | 13 | 8 | 61.5% | 3 | 2 | . | . | 1 | 2 | . | . | . | 5 |
| Washington, DC | 63 | 59 | 93.7% | 19 | 31 | 1 | . | 3 | 5 | . | . | . | 4 |

DEP= released for removal from the United States
OR= released on recognizance
OS= released on an order of supervision
PARO= paroled into the United States
TERM= released, case terminated
USM= released to U.S. Marshals
VD= released for voluntary departure from the United States
WITH= released, alien withdraws application

IFR_AR_008553

**DRO Table 7.3. Type and rate of release for aliens referred for credible fear interview at port of entry, FY 2003**

Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| INS District Office | Total Detained | Total Released | Percent Released | BOND | DEP | OR | OS | PARO | TERM | USM | VD | WITH | Not Released |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **5,793** | **5,264** | **90.9%** | **479** | **1,388** | **78** | **56** | **2,988** | **197** | **27** | **16** | **35** | **529** |
| Atlanta, GA | 197 | 122 | 61.9% | 1 | 64 | 4 | 3 | 50 | . | . | . | . | 75 |
| Baltimore, MD | 37 | 28 | 75.7% | . | 25 | . | 1 | 2 | . | . | . | . | 9 |
| Boston, MA | 10 | 8 | 80.0% | 1 | 3 | 1 | . | 1 | 1 | 1 | . | . | 2 |
| Buffalo, NY | 37 | 37 | 100.0% | . | 13 | . | 4 | 18 | 2 | . | . | . | . |
| Chicago, IL | 164 | 147 | 89.6% | . | 8 | 5 | 16 | 115 | 2 | . | 1 | . | 17 |
| Cleveland, OH | 2 | 2 | 100.0% | . | 1 | . | 1 | . | . | . | . | . | . |
| Dallas, TX | 11 | 10 | 90.9% | . | 3 | 1 | . | 4 | . | . | 2 | . | 1 |
| Denver, CO | 4 | 3 | 75.0% | . | . | . | . | 3 | . | . | . | . | 1 |
| Detroit, MI | 16 | 14 | 87.5% | 6 | 3 | . | . | . | 1 | 4 | . | . | 2 |
| El Paso, TX | 65 | 64 | 98.5% | 2 | 4 | . | 2 | 45 | 11 | . | . | . | 1 |
| Harlingen, TX | 636 | 629 | 98.9% | 33 | 7 | . | 1 | 587 | 1 | . | . | . | 7 |
| Helena, MT | 1 | 1 | 100.0% | . | 1 | . | . | . | . | . | . | . | . |
| Honolulu, HI | 3 | 3 | 100.0% | 1 | 1 | . | . | . | 1 | . | . | . | . |
| Houston, TX | 89 | 76 | 85.4% | 6 | 39 | 3 | 2 | 5 | 2 | . | . | 19 | 13 |
| Kansas City, MO | 4 | 1 | 25.0% | . | 1 | . | . | . | . | . | . | . | 3 |
| Los Angeles, CA | 259 | 232 | 89.6% | 11 | 105 | 31 | 3 | 34 | 44 | . | 3 | 1 | 27 |
| Miami, FL | 2,345 | 2,261 | 96.4% | 1 | 403 | 1 | 3 | 1,833 | 11 | . | 4 | 5 | 84 |
| New Orleans, LA | 198 | 92 | 46.5% | 1 | 77 | . | . | . | 5 | 7 | 2 | . | 106 |
| New York, NY | 215 | 195 | 90.7% | . | 152 | . | . | 18 | 25 | . | . | . | 20 |
| Newark, NJ | 400 | 345 | 86.3% | 2 | 293 | . | . | 12 | 29 | . | . | 8 | 55 |
| Philadelphia, PA | 118 | 98 | 83.1% | 24 | 9 | 1 | 1 | 46 | 15 | . | . | 2 | 20 |
| Phoenix, AZ | 78 | 71 | 91.0% | . | 39 | . | 3 | 27 | 2 | . | . | . | 7 |
| Portland, OR | 2 | 2 | 100.0% | . | . | 2 | . | . | . | . | . | . | . |
| San Antonio, TX | 129 | 126 | 97.7% | 21 | . | . | . | 88 | 4 | 13 | . | . | 3 |
| San Diego, CA | 411 | 365 | 88.8% | 262 | 40 | 20 | 6 | 23 | 12 | 2 | . | . | 46 |
| San Francisco, CA | 164 | 154 | 93.9% | 88 | 36 | . | 4 | 5 | 21 | . | . | . | 10 |
| San Juan, PR | 97 | 90 | 92.8% | . | 18 | . | . | 70 | . | . | 2 | . | 7 |
| Seattle, WA | 35 | 31 | 88.6% | 1 | 13 | 8 | 4 | . | 5 | . | . | . | 4 |
| St. Paul, MN | 2 | 2 | 100.0% | . | 2 | . | . | . | . | . | . | . | . |
| Washington, DC | 64 | 55 | 85.9% | 18 | 28 | 1 | 1 | 2 | 3 | . | 2 | . | 9 |

DEP= released for removal from the United States
OR= released on recognizance
OS= released on an order of supervision
PARO= paroled into the United States
TERM= released, case terminated
USM= released to U.S. Marshals
VD= released for voluntary departure from the United States
WITH= released, alien withdraws application

IFR_AR_008554

**DRO Table 8.0. Disposition of cases for aliens referred for**
**credible fear interview at port of entry, FY 2000**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Case disposition | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **Total** | **10,336** | **100.0%** | **10,030** | **97.0%** | **306** | **3.0%** |
| | | | | | | |
| Granted asylum | 1,899 | 18.4% | 1,838 | 18.3% | 61 | 19.9% |
| Removed from the U.S. | 919 | 8.9% | 904 | 9.0% | 15 | 4.9% |
| Unexecuted removal order | 3,718 | 36.0% | 3,653 | 36.4% | 65 | 21.2% |
| Other closure[1] | 1,268 | 12.3% | 1,201 | 12.0% | 67 | 21.9% |
| | | | | | | |
| Pending | 2,532 | 24.5% | 2,434 | 24.3% | 98 | 32.0% |

Includes actions by INS (or succeeding DHS component) through early April, 2003,
and actions by the Exicutive Office for Immigration Review through early April, 2003.

[1]"Other closure" includes other forms of relief, withdrawal of application for admission
to the United States, administrative closure through case termination.

IFR_AR_008555

**DRO Table 8.1. Disposition of cases for aliens referred for
credible fear interview at port of entry, FY 2001**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Case disposition | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **Total** | **12,963** | **100.0%** | **12,650** | **97.6%** | **313** | **2.4%** |
| | | | | | | |
| Granted asylum | 1,644 | 12.7% | 1,628 | 12.9% | 16 | 5.1% |
| Removed from the U.S. | 1,065 | 8.2% | 1,048 | 8.3% | 17 | 5.4% |
| Unexecuted removal order | 3,229 | 24.9% | 3,181 | 25.1% | 48 | 15.3% |
| Other closure[1] | 1,006 | 7.8% | 908 | 7.2% | 98 | 31.3% |
| | | | | | | |
| Pending | 6,019 | 46.4% | 5,885 | 46.5% | 134 | 42.8% |

Includes actions by INS (or succeeding DHS component) through early April, 2003,
and actions by the Excutive Office for Immigration Review through early April, 2003.

[1]"Other closure" includes other forms of relief, withdrawal of application for admission
to the United States, administrative closure through case termination.

IFR_AR_008556

**DRO Table 8.2. Disposition of cases for aliens referred for**
**credible fear interview at port of entry, FY 2002**
Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Case disposition | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **Total** | **9,749** | **100.0%** | **9,260** | **95.0%** | **489** | **5.0%** |
| | | | | | | |
| Granted asylum | 395 | 4.1% | 390 | 4.2% | 5 | 1.0% |
| Removed from the U.S. | 1,148 | 11.8% | 1,146 | 12.4% | 2 | 0.4% |
| Unexecuted removal order | 1,517 | 15.6% | 1,486 | 16.0% | 31 | 6.3% |
| Other closure[1] | 474 | 4.9% | 441 | 4.8% | 33 | 6.7% |
| | | | | | | |
| Pending | 6,215 | 63.8% | 5,797 | 62.6% | 418 | 85.5% |

Includes actions by INS (or succeeding DHS component) through early April, 2003, and actions by the Excutive Office for Immigration Review through early April, 2003.

[1]"Other closure" includes other forms of relief, withdrawal of application for admission to the United States, administrative closure through case termination.

IFR_AR_008557

**DRO Table 8.3. Disposition of cases for aliens referred for credible fear interview at port of entry, FY 2003**

Source:  Office of Detention and Removal Operations, U.S. Department of Homeland Security

| Case disposition | Total | | Detained at some point | | Not detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **Total** | **5,986** | **100.0%** | **5,793** | **96.8%** | **193** | **3.2%** |
| | | | | | | |
| Granted asylum | 312 | 5.2% | 310 | 5.4% | 2 | 1.0% |
| Removed from the U.S. | 1,237 | 20.7% | 1,229 | 21.2% | 8 | 4.1% |
| Unexecuted removal order | 934 | 15.6% | 886 | 15.3% | 48 | 24.9% |
| Other closure | 431 | 7.2% | 392 | 6.8% | 39 | 20.2% |
| | | | | | | |
| Pending | 3,072 | 51.3% | 2,976 | 51.4% | 96 | 49.7% |

Includes actions by INS (or succeeding DHS component) through December 2003, and actions by the Excutive Office for Immigration Review through December 2003.

IFR_AR_008558

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

# STATISTICAL REPORT ON IMMIGRATION COURT PROCEEDINGS, FY 2000-2004

## FEBRUARY 2005

Special Tabulations Prepared with Assistance from the
U.S. Department of Justice (DOJ)
Executive Office for Immigration Review (EOIR)

Assembled and Introduced by Susan Kyle, Cory Fleming, and Fritz Scheuren
NORC University of Chicago

IFR_AR_008559

TABLE OF CONTENTS

List of Basic Table Sets……………………………………………………………………..386

Preface………………………………………………………………………………………397

Descriptive Summary………………………………………………………………………398

Sources and Limitations……………………………………………………………………416

References……………………………………………………………………………………418

| Tables | Title | |
|---|---|---|
| A | Outcome of Cases of Aliens Referred to EOIR Post Credible Fear Determination by Nationality, FY 2000-2004………………………… | 399 |
| B | **Miami:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004…………... | 400 |
| C | **New York:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004… | 400 |
| D | **Elizabeth & Queens** (Detention Facilities)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004……………………………………… | 401 |
| E | **San Diego:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004… | 401 |
| F | **Krome** (Detention facility)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004……………………………………………………… | 401 |
| G | **Newark:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004………… | 402 |
| H | **San Francisco:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004… | 402 |
| I | **Los Angeles:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004… | 402 |
| J | **Chicago:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004…………... | 403 |

IFR_AR_008560

| Tables | Title | |
|--------|-------|---|
| K | **Atlanta:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004…………... | 403 |
| L | **Lancaster** (Mira Loma Detention Facility)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004…………………………………………… | 403 |
| M | **Houston:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004…………... | 404 |
| N | **San Pedro** (Detention Facility)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004…………………………………………… | 404 |
| P | Representation Status of Aliens Granted Asylum or CAT Relief by Base City with Highest Percentage of Represented Aliens, FY 2000-2004……………………………………………………… | 409 |
| Q | Representation Status of Aliens Granted Asylum or CAT Relief by Base City with Highest Percentage of Unrepresented Aliens, FY 2000-2004……………………………………………………… | 409 |
| R | Decision for Failure to Appear (FTA) of Released Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2003……………. | 411 |
| S | Decision for Failure to Appear (FTA) of Released Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2003……………... | 411 |
| T | Outcome of Appeals for Asylum Seekers Subject to Expedited Removal by Alien Appeal, FY 2001-2004…………………………… | 415 |
| U | Outcome of Appeals for Asylum Seekers Subject to Expedited Removal by Government Appeal, FY 2001-2004…………………….. | 415 |
| V | Affirmative Asylum EOIR Case Completions by Dispositions, FY 2000-2003…………………………………………………… | 416 |

IFR_AR_008561

**Basic Table Sets** (Available only at www.uscirf.gov)

**Outcomes of Immigration Court Asylum Proceedings**

| |
|---|
| Basic EOIR Table 1-1: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Pre-FY 2000** |
| Basic EOIR Table 1-2: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **FY 2000** |
| Basic EOIR Table 1-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **FY 2001** |
| Basic EOIR Table 1-4: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **FY 2002** |
| Basic EOIR Table 1-5:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **FY 2003** |
| Basic EOIR Table 1-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **FY 2004** |
| Basic EOIR Table 1.1-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Atlanta** Immigration Court, **Pre-FY 2000** |
| Basic EOIR Table 1.1-2: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Atlanta** Immigration Court, **FY 2000** |
| Basic EOIR Table 1.1-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Atlanta** Immigration Court, **FY 2001** |
| Basic EOIR Table 1.1-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Atlanta** Immigration Court, **FY 2002** |
| Basic EOIR Table 1.1-5:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Atlanta** Immigration Court, **FY 2003** |
| Basic EOIR Table 1.1-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Atlanta** Immigration Court, **FY 2004** |
| Basic EOIR Table 1.1-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Atlanta** Immigration Court, **FY 2000 – FY 2003** |
| Basic EOIR Table 1.2-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Chicago** Immigration Court, **Pre-FY 2000** |

Basic EOIR Table 1.2-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Chicago** Immigration Court, **FY 2000**

Basic EOIR Table 1.2-3: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Chicago** Immigration Court, **FY 2001**

Basic EOIR Table 1.2-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Chicago** Immigration Court, **FY 2002**

Basic EOIR Table 1.2-5:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Chicago** Immigration Court, **FY 2003**

Basic EOIR Table 1.2-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Chicago** Immigration Court, **FY 2004**

Basic EOIR Table 1.2-7: Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Chicago** Immigration Court, **FY 2000 – FY 2003**

Basic EOIR Table 1.3-1: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Elizabeth & Queens** (Detention Facilities) Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.3-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Elizabeth & Queens** (Detention Facilities) Immigration Court, **FY 2000**

Basic EOIR Table 1.3-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Elizabeth & Queens** (Detention Facilities) Immigration Court, **FY 2001**

Basic EOIR Table 1.3-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Elizabeth & Queens** (Detention Facilities) Immigration Court, **FY 2002**

Basic EOIR Table 1.3-5:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Elizabeth & Queens** (Detention Facilities) Immigration Court, **FY 2003**

Basic EOIR Table 1.3-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Elizabeth & Queens** (Detention Facilities) Immigration Court, **FY 2004**

IFR_AR_008563

Basic EOIR Table 1.3-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Elizabeth & Queens** (Detention Facilities) Immigration Court, **FY 2000 - FY 2003**

Basic EOIR Table 1.4-1: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Houston** Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.4-2: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Houston** Immigration Court, **FY 2000**

Basic EOIR Table 1.4-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Houston** Immigration Court, **FY 2001**

Basic EOIR Table 1.4-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Houston** Immigration Court, **FY 2002**

Basic EOIR Table 1.4-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Houston** Immigration Court, **FY 2003**

Basic EOIR Table 1.4-6: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Houston** Immigration Court, **FY 2004**

Basic EOIR Table 1.4-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Houston** Immigration Court, **FY 2000 – FY 2003**

Basic EOIR Table 1.5-1: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Krome** (Detention Facility) Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.5-2: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Krome** (Detention Facility) Immigration Court, **FY 2000**

Basic EOIR Table 1.5-3: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Krome** (Detention Facility) Immigration Court, **FY 2001**

Basic EOIR Table 1.5-4: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Krome** (Detention Facility) Immigration Court, **FY 2002**

Basic EOIR Table 1.5-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Krome** (Detention Facility) Immigration Court, **FY 2003**

Basic EOIR Table 1.5-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Krome** (Detention Facility) Immigration Court, **FY 2004**

Basic EOIR Table 1.5-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Krome** (Detention Facility) Immigration Court, **FY 2000 - FY 2003**

Basic EOIR Table 1.6-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Lancaster** (Mira Loma Detention Facility) Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.6-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Lancaster** (Mira Loma Detention Facility)Immigration Court, **FY 2000**

Basic EOIR Table 1.6-3: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Lancaster** (Mira Loma Detention Facility)Immigration Court, **FY 2001**

Basic EOIR Table 1.6-4: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Lancaster** (Mira Loma Detention Facility)Immigration Court, **FY 2002**

Basic EOIR Table 1.6-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Lancaster** (Mira Loma Detention Facility)Immigration Court, **FY 2003**

Basic EOIR Table 1.6-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Lancaster** (Mira Loma Detention Facility)Immigration Court, **FY 2004**

Basic EOIR Table 1.6-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Lancaster** (Mira Loma Detention Facility)Immigration Court, **FY 2000 - FY 2003**

Basic EOIR Table 1.7-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Los Angeles** Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.7-2: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Los Angeles** Immigration Court, **FY 2000**

Basic EOIR Table 1.7-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Los Angeles** Immigration Court, **FY 2001**

IFR_AR_008565

Basic EOIR Table 1.7-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Los Angeles** Immigration Court, **FY 2002**

Basic EOIR Table 1.7-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Los Angeles** Immigration Court, **FY 2003**

Basic EOIR Table 1.7-6: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Los Angeles** Immigration Court, **FY 2004**

Basic EOIR Table 1.7-7: Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Los Angeles** Immigration Court, **FY 2000 – FY 2003**

Basic EOIR Table 1.8-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Miami** Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.8-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Miami** Immigration Court, **FY 2000**

Basic EOIR Table 1.8-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Miami** Immigration Court, **FY 2001**

Basic EOIR Table 1.8-4: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Miami** Immigration Court, **FY 2002**

Basic EOIR Table 1.8-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Miami** Immigration Court, **FY 2003**

Basic EOIR Table 1.8-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Miami** Immigration Court, **FY 2004**

Basic EOIR Table 1.8-7: Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Miami** Immigration Court, **FY 2000 – FY 2003**

Basic EOIR Table 1.9-1: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Newark** Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.9-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Newark** Immigration Court, **FY 2000**

Basic EOIR Table 1.9-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Newark** Immigration Court, **FY 2001**

Basic EOIR Table 1.9-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Newark** Immigration Court, **FY 2002**

Basic EOIR Table 1.9-5:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Newark** Immigration Court, **FY 2003**

Basic EOIR Table 1.9-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Newark** Immigration Court, **FY 2004**

Basic EOIR Table 1.9-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Newark** Immigration Court, **FY 2000 – FY 2003**

Basic EOIR Table 1.10-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **New York** Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.10-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **New York** Immigration Court, **FY 2000**

Basic EOIR Table 1.10-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **New York** Immigration Court, **FY 2001**

Basic EOIR Table 1.10-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **New York** Immigration Court, **FY 2002**

Basic EOIR Table 1.10-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **New York** Immigration Court, **FY 2003**

Basic EOIR Table 1.10-6: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **New York** Immigration Court, **FY 2004**

Basic EOIR Table 1.10-7: Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **New York** Immigration Court, **FY 2000 - FY 2003**

Basic EOIR Table 1.11-1: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Diego** Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.11-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Diego** Immigration Court, **FY 2000**

Basic EOIR Table 1.11-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Diego** Immigration Court, **FY 2001**

IFR_AR_008567

Basic EOIR Table 1.11-4: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Diego** Immigration Court, **FY 2002**

Basic EOIR Table 1.11-5:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Diego** Immigration Court, **FY 2003**

Basic EOIR Table 1.11-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Diego** Immigration Court, **FY 2004**

Basic EOIR Table 1.11-7: Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **San Diego** Immigration Court, **FY 2000 - FY 2003**

Basic EOIR Table 1.12-1: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Francisco** Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.12-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Francisco** Immigration Court, **FY 2000**

Basic EOIR Table 1.12-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Francisco** Immigration Court, **FY 2001**

Basic EOIR Table 1.12-4: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Francisco** Immigration Court, **FY 2002**

Basic EOIR Table 1.12-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Francisco** Immigration Court, **FY 2003**

Basic EOIR Table 1.12-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Francisco** Immigration Court, **FY 2004**

Basic EOIR Table 1.12-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **San Francisco** Immigration Court, **FY 2000 - FY 2003**

Basic EOIR Table 1.13-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Guaynabo** Immigration Court, **Pre-FY 2000**

IFR_AR_008568

Basic EOIR Table 1.13-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Guaynabo** Immigration Court, **FY 2000**

Basic EOIR Table 1.13-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Guaynabo** Immigration Court, **FY 2001**

Basic EOIR Table 1.13-4: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Guaynabo** Immigration Court, **FY 2002**

Basic EOIR Table 1.13-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Guaynabo** Immigration Court, **FY 2003**

Basic EOIR Table 1.13-6: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **Guaynabo** Immigration Court, **FY 2004**

Basic EOIR Table 1.13-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **Guaynabo** Immigration Court, **FY 2000 - FY 2003**

Basic EOIR Table 1.14-1:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Pedro** (Detention Facility) Immigration Court, **Pre-FY 2000**

Basic EOIR Table 1.14-2:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Pedro** (Detention Facility) Immigration Court, **FY 2000**

Basic EOIR Table 1.14-3:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Pedro** (Detention Facility) Immigration Court, **FY 2001**

Basic EOIR Table 1.14-4:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Pedro** (Detention Facility) Immigration Court, **FY 2002**

Basic EOIR Table 1.14-5: Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Pedro** (Detention Facility) Immigration Court, **FY 2003**

Basic EOIR Table 1.14-6:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal By Nationality and Application Decision, **San Pedro** (Detention Facility) Immigration Court, **FY 2004**

Basic EOIR Table 1.14-7:  Outcome of Cases for Asylum Seekers Subject to Expedited Removal by Immigration Judge and Application Decision, **San Pedro** (Detention Facility) Immigration Court, **FY 2000 - FY 2003**

**EOIR Review of Negative Credible Fear Determinations**

Basic EOIR Table 2-1: Negative Credible Fear Review Completions By Type of Decision and Nationality, **FY 2000**

Basic EOIR Table 2-2: Negative Credible Fear Review Completions By Type of Decision and Nationality, **FY 2001**

Basic EOIR Table 2-3: Negative Credible Fear Review Completions By Type of Decision and Nationality, **FY 2002**

Basic EOIR Table 2-4: Negative Credible Fear Review Completions By Type of Decision and Nationality, **FY 2003**

Basic EOIR Table 2-5:  Negative Credible Fear Review Completions By Type of Decision and Base City, **FY 2000**

Basic EOIR Table 2-6: Negative Credible Fear Review Completions By Type of Decision and Base City, **FY 2001**

Basic EOIR Table 2-7: Negative Credible Fear Review Completions By Type of Decision and Base City, **FY 2002**

Basic EOIR Table 2-8: Negative Credible Fear Review Completions By Type of Decision and Base City, **FY 2003**

**Immigration Court Asylum Proceeding Outcomes for Represented/Unrepresented Aliens**

Basic EOIR Table 3-1: Outcome of Completed Cases for Asylum Seekers Subject to Expedited Removal By Representation Status and Fiscal Year, **FY 2000 - FY 2004**

Basic EOIR Table 3-2:  Outcome of **Represented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **Pre-FY 2000**

Basic EOIR Table 3-3:  Outcome of **Unrepresented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **Pre-FY 2000**

Basic EOIR Table 3-4:  Outcome of **Represented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2000**

Basic EOIR Table 3-5:  Outcome of **Unrepresented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2000**

Basic EOIR Table 3-6:  Outcome of **Represented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2001**

IFR_AR_008570

| |
|---|
| Basic EOIR Table 3-7:  Outcome of **Unrepresented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2001** |
| Basic EOIR Table 3-8:  Outcome of **Represented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2002** |
| Basic EOIR Table 3-9:  Outcome of **Unrepresented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2002** |
| Basic EOIR Table 3-10:  Outcome of **Represented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2003** |
| Basic EOIR Table 3-11:  Outcome of **Unrepresented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2003** |
| Basic EOIR Table 3-12: Outcome of **Represented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2004** |
| Basic EOIR Table 3-13:  Outcome of **Unrepresented** Asylum Seekers Subject to Expedited Removal By Base City and Application Decision, **FY 2004** |

**Failure to Appear Frequencies for Released Aliens**

| |
|---|
| Basic EOIR Table 4-1:  Decisions for Failure to Appear of Released Asylum Seekers Subject to Expedited Removal, **FY 2000 – FY 2004** |
| Basic EOIR Table 4-2:  Decisions for Failure to Appear of Released Asylum Seekers Subject to Expedited Removal By Nationality, **FY 2000 – FY 2003** |
| Basic Table 4-3:  Asylum Applications by Sri Lankans in Canada **2001-2003** |

**Withdrawals of Asylum Applications by Detention Status**

| |
|---|
| Basic EOIR Table 5-1:  Asylum Withdrawals By Custody Status By Fiscal Year Completed |
| Basic EOIR Table 5-2:  Convention Against Torture (CAT) Withdrawals by Custody Status By Fiscal Year Completed |

**Outcome of Appeals**

| |
|---|
| Basic EOIR Table 6:  Outcome of Appeals for Asylum Seekers Subject to Expedited Removal By Appealing Party, **FY 2000 – FY 2004** |

IFR_AR_008571

**Outcome of Affirmative Asylum Cases Referred to EOIR**

| Basic EOIR 7: Affirmative Asylum Applications Referred to EOIR, Case Completions by Disposition **FY 2000 – FY 2003** |
| --- |

PREFACE

     The Study of Asylum Seekers in Expedited Removal (the Study) was undertaken by experts appointed by the U.S. Commission on International Religious Freedom (the Commission) to respond to four questions posed by Congress in Section 605 of the International Religious Freedom Act (IRFA) of 1998. Specifically, the Study is to determine whether immigration officers performing duties under section 235(b) of the Immigration and Nationality Act (INA) (8 U.S.C. 1225(b)) with respect to aliens, who may be eligible to be granted asylum, are engaging in any of the following conduct:

     (A) Improperly encouraging such aliens to withdraw their applications for admission.

     (B) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution (within the meaning of section 235(b)(1)(B)(v) of such Act).

     (C) Incorrectly removing such aliens to a country where they may be persecuted.

     (D) Detaining such aliens improperly or in inappropriate conditions.

     The Study has several components, including collection of statistics; thorough sample file review; direct observations of the removal process; surveys of Department of Homeland Security (DHS) officials and detention center personnel; as well as interviews with individuals seeking asylum.

     The present report consists of a compilation of administrative data tabulated by the experts for the Study with support from the U.S. Department of Justice Executive Office for Immigration Review (EOIR). EOIR reviewed an earlier draft of this report and provided comments that have been taken into account in the final report. The compilation and accompanying descriptive summaries were prepared under my general direction by Susan Kyle, Cory Fleming, and Fritz Scheuren. Let me also take this opportunity to express my deep appreciation for the care, diligence, speed, and expertise of the EOIR team including Deputy Chief Immigration Judge Thomas Pullen, Ana Mann, Steven Lang, Charles Adkins-Blanche, Pam Calvert, Isabelle Chewning, Brett Endres, Cecelia Espenoza, and especially Marta Rothwarf.

Mark Hetfield
Immigration Counsel
U.S. Commission on International Religious Freedom                    February 2005

IFR_AR_008573

# Special Tabulations Prepared with Assistance from the U.S. Department of Justice

## DESCRIPTIVE SUMMARY

This Report consists of a compilation of special tabulations produced with assistance from the Executive Office of Immigration Review (EOIR) within the U.S. Department of Justice (DOJ). The tables included here were designed as background for the Study of Asylum Seekers in Expedited Removal (the Study) being undertaken by experts designated by the U.S. Commission on International Religious Freedom (the Commission), pursuant to section 605 of the International Religious Freedom Act (IRFA)of 1998.

The tabulations are quite extensive and hence some summarization is warranted.  The charts provide an overview of immigration court proceedings for asylum seekers subject to Expedited Removal: (1) the outcomes of immigration court asylum proceedings; (2) EOIR review of negative credible fear determinations; (3) immigration court asylum proceeding outcomes for represented and unrepresented aliens; (4) failure to appear frequencies for released aliens; (5) withdrawals of asylum applications by detention status; (6) the outcome of appeals before the Board of Immigration Appeals (BIA); and (7) the outcome of cases referred to EOIR from the Affirmative Asylum process (for comparative purposes).  The data lay out the geographical composition of aliens seeking asylum in the U.S and the court proceedings during a five-year period from fiscal year (FY) 2000-2004.  The data universe is based on the number of credible fear receipts from the Department of Homeland Security (DHS) in FY 2000-2003 matched with the correlating EOIR completed cases, which span pre-FY 2000-2004.[1]

Confidentiality requirements restrict the public versions of these basic and text tables to report only cell counts of six (6) or more for nationality statistics. All nationality nonzero cells of less than 6 are asterisked (*). Zero cells are identified by a dash (-). Percentages representing less than six (6) divided by the total are represented by a pound (#).  Summary totals have also been examined to ensure indirect disclosure does not occur.

The data examine the outcomes of cases of asylum seekers subject to Expedited Removal by nationality, application decision, and fiscal year during pre-FY 2000-2004 (basic table set 1).[2] Text table A reveals 28 percent of aliens were granted relief from FY 2000-2004, similar to 30 percent cite by GAO in 2000.[3]

---

[1] Since the data reflects completed EOIR cases over time, in some cases FY 2000 has fewer cases than subsequent years because many cases received in FY 2000 were completed after FY 2000.

[2] Note that all charts and text tables in this summary are based on data presented in the table sets, available at www.uscirf.gov.

[3] United States General Accounting Office, *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process*, GAO/GGD-00-176, September 2000.

IFR_AR_008574

Table A.  Outcome of Cases of Aliens Referred to EOIR Post Credible Fear Determination by Nationality, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted[a] | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| | | FY 2000-2004 | | | |
| China | 2285 | 37 | * | 25% | 9277 |
| Colombia | 407 | * | 8 | 13% | 3152 |
| Cuba | 35 | * | 2495 | 82% | 3079 |
| Haiti | 292 | * | * | 11% | 2675 |
| Sri Lanka | 374 | 23 | - | 22% | 1785 |
| Iraq | 464 | 29 | - | 61% | 803 |
| Albania | 199 | * | * | 31% | 652 |
| Guyana | 16 | - | - | 3% | 510 |
| El Salvador | * | 6 | * | 3% | 476 |
| India | 62 | * | * | 15% | 448 |
| Other | 1554 | 84 | 18 | 24% | 6978 |
| Total | 5690[n] | 197 | 2528 | 28% | 29835 |

(*) = 5 or less, (-) = 0, [a] CAT: Convention Against Torture, [n]rounded total >5688 & <5693
Based on Basic EOIR Tables 1.

Chart 1 below shows the top ten nationalities and their rate of relief granted, including asylum, Convention Against Torture (CAT) withholding or deferral, and adjustment of status granted.  The *total cases completed* consists of applications for asylum granted, CAT withholding or deferral granted, adjustment of status granted, asylum or CAT relief withdrawn, and ordered removed including deportation order, exclusion order, removal order, voluntary departure orders, and Immigration and Naturalization Service (INS) or DHS Expedited Removal orders.



Note: China n=9277, Colombia n=3152, Cuba n=3079, Haiti n=2675, Sri Lanka n=1785, Iraq n=803, Albania n=652, Guyana n=510, El Salvador n=476, India n=448, Other n=6978, Total n=29835
Based on Basic EOIR Tables 1.

IFR_AR_008575

The same case outcome classification information as basic table 1 is further divided by 14 immigration courts in jurisdictions visited by Commissioners and/or Commission experts in the course of the Study (basic table sets 1.1 to 1.14).[4] These 14 immigration courts[5] represent 83 percent of the total cases adjudicated from FY 2000-2004 for asylum seekers subject to Expedited Removal.[6] Below are 13 summary tables listing the top five nationalities in each immigration court[7].

Table B. **Miami:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| Cuba | 14 | * | 2155 | 87% | 2505 |
| Haiti | 190 | * | * | 11% | 1705 |
| Colombia | 195 | - | 8 | 12% | 1642 |
| Sri Lanka | - | - | - | - | 291 |
| Guyana | 6 | - | - | 2% | 264 |
| Other | 173 | * | 12 | 13% | 1403 |
| Total | 578 | * | 2176 | 35% | 7810 |

(*) = 5 or less, (-) = 0
Based on Basic EOIR Tables 1.8.

Table C. **New York:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| China | 1625 | 25 | - | 25% | 6542 |
| Sri Lanka | 7 | * | - | 4% | 214 |
| Colombia | 64 | - | - | 31% | 205 |
| Albania | 76 | * | - | 60% | 128 |
| Guyana | * | - | - | # | 76 |
| Other | 148 | * | 8 | 28% | 572 |
| Total | 1925[a] | 33 | 8 | 25% | 7736 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total, [a]rounded total >1920 & <1925
Based on Basic EOIR Tables 1.10.

---

[4] Basic tables 1.1-7 to 1.14-7 discuss case outcome by Immigration Judge and application decision for FY 2000-2003. These tables are discussed in *Selected Statistical Analysis of Immigration Judge Rulings on Asylum Applications, FY 2000-2003*, Baier, February 2005.

[5] EOIR determined that providing the complete data for all immigrations courts nationwide would be too large a task; hence a (non-random) sample of 14 courts was selected and provided for the Study. This report does not aim to make any inferences to other courts not part of this study.

[6] The percentage determined by the total number of cases adjudicated in the 14 courts (the aggregate of basic EOIR tables 1.1-2 to 1.14-6) divided by the total number of cases adjudicated nationally (the aggregate of basic EOIR tables 1-2 to 1-6).

[7] Guaynabo is not included in the summary tables because the majority of the sample would be suppressed to adhere to the confidentiality rule of five (5).

IFR_AR_008576

Table D.  **Elizabeth and Queens** (Detention Facilities)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| Sri Lanka | 207 | * | - | 56% | 370 |
| Colombia | 12 | * | - | 5% | 256 |
| China | 66 | - | - | 29% | 225 |
| Nigeria | 26 | * | - | 17% | 155 |
| Haiti | 6 | - | - | 6% | 106 |
| Other | 372 | 8 | - | 28% | 1360 |
| Total | 689 | 12 | - | 28% | 2472 |

(*) = 5 or less, (-) = 0
Based on Basic EOIR Tables 1.3.

Table E.  **San Diego:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| Iraq | 239 | 16 | - | 66% | 389 |
| Ukraine | 17 | * | - | 13% | 150 |
| China | 8 | - | - | 8% | 101 |
| Guatemala | 6 | * | - | 12% | 57 |
| El Salvador | - | - | - | - | 47 |
| Other | 62 | 8 | 16 | 16% | 531 |
| Total | 332 | 28 | 16 | 29% | 1275 |

(*) = 5 or less, (-) = 0
Based on Basic EOIR Tables 1.11.

Table F.  **Krome** (Detention Facility)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| Haiti | 28 | * | - | 7% | 404 |
| Colombia | * | - | - | # | 173 |
| Guyana | * | - | - | # | 57 |
| Dominican Republic | - | - | - | - | 28 |
| Ecuador | - | - | - | - | 25 |
| Other | 13 | * | - | 7% | 206 |
| Total | 47 | * | - | 6% | 893 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total
Based on Basic EOIR Tables 1.5.

IFR_AR_008577

Table G. **Newark:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| China | 77 | * | - | 28% | 283 |
| Colombia | 14 | - | - | 8% | 170 |
| Haiti | 6 | * | - | 11% | 72 |
| Sri Lanka | 8 | - | - | 15% | 54 |
| Albania | 8 | - | - | 30% | 27 |
| Other | 42 | * | 7 | 21% | 253 |
| Total | 155 | 9 | 7 | 20% | 859 |

(*) = 5 or less, (-) = 0
Based on Basic EOIR Tables 1.9.

Table H. **San Francisco:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| Sri Lanka | 84 | 9 | - | 37% | 254 |
| China | 62 | * | - | 47% | 134 |
| India | 32 | * | * | 51% | 67 |
| Afghanistan | 29 | * | - | 84% | 37 |
| El Salvador | - | * | * | # | 37 |
| Other | 126 | 9 | 6 | 51% | 276 |
| Total | 333 | 23 | 8 | 45% | 805 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total
Based on Basic EOIR Tables 1.12.

Table I. **Los Angeles:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| Sri Lanka | * | - | - | # | 147 |
| China | 49 | * | - | 40% | 128 |
| Armenia | 10 | * | - | 16% | 82 |
| Colombia | 20 | * | - | 40% | 52 |
| Cuba | * | - | 37 | 76% | 50 |
| Other | 121 | * | * | 37% | 345 |
| Total | 202 | 11 | 40ª | 31% | 804 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total, ªrounded total >37 & <42
Based on Basic EOIR Tables 1.7.

IFR_AR_008578

Table J. **Chicago:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| China | 17 | - | * | 12% | 151 |
| Sri Lanka | - | * | - | # | 73 |
| Ukraine | - | - | - | - | 39 |
| Albania | 12 | - | * | 34% | 38 |
| Pakistan | * | - | - | 14% | 35 |
| Other | 69 | * | 11 | 28% | 290 |
| Total | 103 | * | 13 | 19% | 626 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total
Based on Basic EOIR Tables 1.2.

Table K. **Atlanta:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| China | * | - | - | # | 159 |
| Sri Lanka | 8 | - | - | 10% | 79 |
| Colombia | - | - | - | - | 61 |
| Haiti | * | - | - | # | 36 |
| El Salvador | - | - | - | - | 29 |
| Other | 25 | * | * | 12% | 243 |
| Total | 37 | * | * | 7% | 607 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total
Based on Basic EOIR Tables 1.1.

Table L. **Lancaster** (Mira Loma Detention Facility)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| China | 19 | * | - | 18% | 119 |
| Armenia | * | - | - | # | 40 |
| Sri Lanka | 7 | * | - | 23% | 39 |
| India | * | - | - | # | 13 |
| Colombia | - | - | - | - | 12 |
| Other | 16 | * | - | 22% | 88 |
| Total | 46 | 8 | - | 17% | 311 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total
Based on Basis EOIR Tables 1.6.

IFR_AR_008579

Table M. **Houston:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| Colombia | 8 | - | - | 10% | 78 |
| China | * | - | - | 13% | 23 |
| Cuba | * | - | 8 | 41% | 22 |
| El Salvador | - | - | - | - | 21 |
| Sri Lanka | * | * | - | 33% | 18 |
| Other | 31 | - | - | 23% | 133 |
| Total | 48 | * | 8 | 19% | 295 |

(*) = 5 or less, (-) = 0
Based on Basic EOIR Tables 1.4.

Table N. **San Pedro** (Detention Facility)**:** Outcome of Cases of Top 5 Nationalities of Aliens Referred to EOIR Post Credible Fear Determination, FY 2000-2004

| Nationality | Asylum Granted | CAT Withholding or Deferral Granted | Adjustment Granted | Granted Relief | Total Cases Completed |
|---|---|---|---|---|---|
| China | 16 | - | - | 25% | 63 |
| Armenia | 26 | - | - | 53% | 49 |
| El Salvador | - | * | - | # | 16 |
| Mexico | - | - | - | - | 11 |
| Colombia | * | - | - | # | 8 |
| Other | 20 | * | - | 35% | 65 |
| Total | 64 | * | - | 33% | 212 |

(*) = 5 or less, (-) = 0, (#) = percentage representing 5 or less/total
Based on Basic EOIR Tables 1.14.

   Through analyzing the above text tables, three nationalities were determined to appear most frequently in these courts, China, Colombia, and Haiti.  Chart 2, 3, and 4 below reveal the disparity between the rate of relief granted to asylum seekers subject to Expedited Removal by the national total and these three nationalities.  Grant rates for asylum seekers from the People's Republic of China follow the respective court averages closer than Colombians or Haitians.  Colombian and Haitian grant rates differ significantly from the Miami, Newark, and Elizabeth and Queens immigration court averages. Additionally, San Francisco, Miami, and New York grant rates are significantly higher than those of Krome and Atlanta.[8]

---

[8]Differences from city to city may be explained by different approaches by different courts, but may also be attributed to other factors. For example, a certain city may receive many members of a certain nationality, who may then move to another area and not appear for court in that city. A large number of cases denied for failure to appear would reveal a low grant rate. In contrast, a "destination city", which attracts members of certain nationalities, may have a higher grant rate attributable to a higher appearance rate. For an examination of variations among judges within the same courts See *Selected Statistical Analysis of Immigration Judge Rulings on Asylum Applications, FY 2000-2003*, Baier, Feb. 2005.

IFR_AR_008580



Based on Basic EOIR Tables 1.1-1.14.



Based on Basic EOIR Tables 1.1-1.14.



Based on Basic EOIR Tables 1.1-1.14.

IFR_AR_008581

Whereas basic table sets 1 and 1.1-1.14 show the outcome of immigration court asylum proceedings, the Study also analyzed the decisions of the immigration court review of negative credible fear determinations by asylum officers separated by nationality and base city, FY 2000-2003 (basic table set 2).  While the vast majority of such negative credible fear determinations are affirmed by immigration judges, regardless of nationality or location, the percentage of vacated cases is not insignificant, as seen below in Chart 5.



Affirmed: Immigration Judge agrees with negative credible fear determination
Vacate: Immigration Judge overturns negative credible fear determination
Based on Basic EOIR Tables 2.

Additionally, chart 6 shows the number of Salvadorian cases reviewed are more than double the number of cases reviewed of any other nationality.



Based on Basic EOIR Tables 2.

IFR_AR_008582