When examining the number of negative credible fear reviews by base city in Chart 7, Miami overshadows all other cities 3 to 1, reflecting the significantly higher number of credible fear referrals in Miami.[9]



Based on Basic EOIR Tables 2.

The Study further analyzed the outcome of cases for asylum seekers subject to Expedited Removal during pre-FY 2000-2004 by adding the relationship of representation status and base city (basic table set 3). This information is summarized for FY 2000-2004 in basic table 3-1. Nearly all aliens granted asylum were represented by an attorney or a BIA accredited representative (98 percent of 5,693 total cases). Whereas when the total cases adjudicated[10] are combined the percentage of represented aliens decreases (78 percent of 29,835). Chart 8 below shows that while about 25 percent of adjudicated cases concerned unrepresented aliens, this population was granted asylum or CAT relief less than 2.3 percent of the time.

---

[9] See Chart 3, Credible Fear Claims Made at Top 10 Airports, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal FY 2000-2003*, Felming and Scheuren, Feb. 2005.
[10] Total cases adjudicated includes asylum granted, CAT withholding or deferral granted, application for asylum or CAT relief withdrawn, ordered removed, and adjustments of status granted.

IFR_AR_008583



Based on Basic EOIR Table 3-1.                    *Adjustments and Withdrawals not included.

Further details on representation status by base city, pre-FY 2000-2004 are provided in basic tables 3-2 to 3-13. Text tables P[11] and Q[12] show that the ratio of unrepresented aliens generally fared nearly as poorly in sites with low rates of legal representation as in the sites with high rates of legal representation. Only in the smallest site represented, Imperial, California, did unrepresented asylum seekers do as well or better than the national average of represented asylum seekers.

---

[11] Base cities chosen by selecting the top 15 cities with the highest percentage of represented aliens, with total adjudicated cases > 20.

[12] Base cities chosen by selecting the top 15 cities with the highest percentage of unrepresented aliens, with total adjudicated cases > 20.

IFR_AR_008584

Table P.  Representation Status of Aliens Granted Asylum or CAT Relief by Base City with Highest Percentage of Represented Aliens, FY 2000-2004

| Base City | Rep Total Adj | Unrep Total Adj | Rep Asylum or CAT Granted | Unrep Asylum or CAT granted | Total Adjudicated |
|---|---|---|---|---|---|
| Memphis, TN | 85% | 15% | 23% | 13% | 104 |
| Lancaster, CA | 82% | 18% | 19% | 12% | 311 |
| Hartford, CT | 83% | 17% | 25% | 12% | 149 |
| Detroit, MI | 88% | 12% | 34% | 12% | 585 |
| Bloomington (St. Paul), MN | 81% | 19% | 35% | 9% | 117 |
| San Francisco, CA | 86% | 14% | 50% | 8% | 805 |
| **Mean** | 86% | 14% | 31% | 5% | 2575 |
| New York City, NY | 94% | 6% | 27% | 3% | 7737 |
| Seattle, WA | 88% | 12% | 27% | 2% | 334 |
| **Median** | 85% | 15% | 27% | 2% | 323 |
| **Average (all cases)** | 78% | 22% | 25% | 2% | 29835 |
| Elizabeth, NJ | 82% | 18% | 31% | 1% | 1423 |
| Boston, MA | 81% | 19% | 26% | 1% | 539 |
| Newark, NJ | 85% | 15% | 22% | 1% | 866 |
| Honolulu, HI | 95% | 5% | 67% | - | 107 |
| Phoenix, AZ | 93% | 7% | 68% | - | 70 |
| Philadelphia, PA | 93% | 7% | 19% | - | 293 |
| Varick SPC, NY | 82% | 18% | 8% | - | 177 |

Ranked by Top 15 highest percentage of unrepresented aliens granted asylum or CAT relief        (-) = 0
Based on Basic EOIR Table 3-2 to 3-12.

Table Q.  Representation Status of Aliens Granted Asylum or CAT Relief by Base City with Highest Percentage of Unrepresented Aliens, FY 2000-2004

| Base City | Rep Total Adj | Unrep Total Adj | Rep Asylum or CAT Granted | Unrep Asylum or CAT granted | Total Adjudicated |
|---|---|---|---|---|---|
| Imperial, CA | 57% | 43% | 17% | 33% | 21 |
| El Centro SPC, CA | 26% | 74% | 7% | 9% | 58 |
| El Paso SPC, TX | 58% | 42% | 30% | 8% | 92 |
| Houston SPC, TX | 57% | 43% | 25% | 6% | 162 |
| **Mean** | 52% | 48% | 23% | 5% | 1925 |
| Florence SPC, AZ | 44% | 56% | 41% | 5% | 72 |
| Port Isabel SPC, TX | 15% | 85% | 13% | 4% | 54 |
| New Orleans, LA | 60% | 40% | 23% | 4% | 198 |
| Orlando, FL | 62% | 38% | 35% | 4% | 353 |
| **Median** | 57% | 43% | 23% | 4% | 82 |
| San Antonio, TX | 38% | 62% | 15% | 4% | 87 |
| Harlingen, TX | 48% | 52% | 28% | 4% | 52 |
| East Mesa, CA | 52% | 48% | 23% | 3% | 77 |
| **Average (all cases)** | 78% | 22% | 25% | 2% | 29835 |
| Krome North SPC, FL | 60% | 40% | 8% | 2% | 893 |
| Atlanta, GA | 61% | 39% | 9% | 1% | 599 |
| El Paso, TX | 55% | 45% | 57% | - | 38 |
| Batavia SPC, NY | 57% | 43% | 11% | - | 47 |

Ranked by Top 15 highest percentage of unrepresented aliens granted asylum or CAT relief        (-) = 0
Based on Basic EOIR Table 3-2 to 3-13.

IFR_AR_008585

The frequency of court decisions based on failure to appear (FTA) of asylum seekers subject to Expedited Removal, released from DHS custody, is broken down by fiscal year and nationality for FY 2000-2003 (basic table set 4). In text table R, the top 14 nationalities are ranked by highest frequency of decision based on FTA, and in text table S by the total number of FTA.[13] This frequency is based on the total FTA in relation to the total immigration court decisions made. This however, is not a measurement of the number of aliens who failed to appear for court. Rather, it is a measurement of the number of orders issued for a failure to appear out of the total number of orders issued. In addition, according to EOIR, an alien who changes venue may be ordered removed in the original court on the basis of failure to appear, but then subsequently appear in court at the second venue. FTA statistics are not adjusted for appearances in subsequent years at a second venue. Nevertheless, the frequencies are useful to indicate nationalities with higher and lower propensities to appear for their hearings.

As is evident from text tables R and S, Sri Lankan nationals have by far the highest number of negative decisions for FTA. While only 6 percent of total immigration judge decisions for released aliens relate to Sri Lankan applicants, 28 percent of immigration judge decisions for FTA related to Sri Lankan applicants. The national total shown below, 22 percent, is significantly lower than the rate reported by GAO in 2000, 42 percent.[14] This is likely due to the statistics for the Study represent a longer duration of time, more than four years, while the GAO statistics represent a 30 month snapshot. A disproportionate number of cases completed within such a snapshot are likely to be closures for FTA, since many cases that proceed to an asylum merits hearing are not decided in the same year they are commenced.

---

[13] Nationalities were selected with more than 100 total FTA.

[14] United States General Accounting Office, *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process*, GAO/GGD-00-176, September 2000, 6. It is interesting to note that the Department of Justice commented to GAO that the high FTA rate calculated by GAO was attributable to the relatively short time frame of the study; and that "over time more cases will be closed in which aliens will have appeared for their removal hearings, and consequently, this would result in a reduction of the failure to appear rate, to as low as 25 percent."

IFR_AR_008586

Table R: Failure to Appear for Released Aliens Referred to EOIR Post Credible Fear, FY 2000-2003

| Nationality | Failures to Appear (FTA) | | | Total IJ Decisions for Released Aliens Plus Administrative Closures | FTA Decision Freq. |
|---|---|---|---|---|---|
| | In Absentia Orders | Administrative Closures | Total FTA | | |
| Sri Lanka | 876 | 33 | 909 | 1118 | 81% |
| Dominican Republic | 64 | * | * | 82 | 79% |
| Ecuador | 120 | * | * | 156 | 79% |
| Georgia | 60 | - | 60 | 89 | 67% |
| El Salvador | 88 | 22 | 110 | 167 | 66% |
| Turkey | 105 | - | 105 | 165 | 64% |
| Brazil | 56 | - | 56 | 90 | 62% |
| Guyana | 162 | - | 162 | 263 | 62% |
| Ukraine | 71 | * | * | 123 | 60% |
| India | 73 | * | * | 160 | 47% |
| Colombia | 427 | * | * | 1284 | 34% |
| Haiti | 157 | 29 | 186 | 1591 | 12% |
| Cuba | 81 | 17 | 98 | 1144 | 9% |
| China | 432 | 26 | 458 | 6348 | 7% |
| Other | 250 | 24 | 274 | 1958 | 14% |
| Total ALL Nationalities | 3022 | 165 | 3187 | 14738 | 22% |

(*) = 5 or less, (-) = 0
Ranked highest to lowest by Top 14 nationalities with highest frequency of decision based on FTA
Based on Basic EOIR Table 4-2.

Table S: Failure to Appear for Released Aliens Referred to EOIR Post Credible Fear, FY 2000-2003

| Nationality | Failures to Appear (FTA) | | | Total IJ Decisions for Released Aliens Plus Administrative Closures | FTA Rank |
|---|---|---|---|---|---|
| | In Absentia Orders | Administrative Closures | Total FTA | | |
| Sri Lanka | 876 | 33 | 909 | 1118 | 1 |
| China | 432 | 26 | 458 | 6348 | 2 |
| Colombia | 427 | * | * | 1284 | 3 |
| Haiti | 157 | 29 | 186 | 1591 | 4 |
| Guyana | 162 | - | 162 | 263 | 5 |
| Ecuador | 120 | * | * | 156 | 6 |
| El Salvador | 88 | 22 | 110 | 167 | 7 |
| Turkey | 105 | - | 105 | 165 | 8 |
| Cuba | 81 | 17 | 98 | 1144 | 9 |
| India | 73 | * | * | 160 | 10 |
| Ukraine | 71 | * | * | 123 | 11 |
| Dominican Republic | 64 | * | * | 82 | 12 |
| Georgia | 60 | - | 60 | 89 | 13 |
| Brazil | 56 | - | 56 | 90 | 14 |
| Other | 250 | 24 | 274 | 1958 | |
| Total ALL Nationalities | 3022 | 165 | 3187 | 14738 | |

(*) = 5 or less, (-) = 0
Ranked highest to lowest by Top 14 nationalities with highest total number of decisions based on FTA
Based on Basic EOIR Table 4-2.

IFR_AR_008587

A variety of sources reported that the high failure to appear rate among Sri Lankans is attributable to their desire to use the U.S. as a transit country to apply for asylum in Canada, where there is a strong Sri Lankan Community. Consequently, the Study obtained statistics from the United Nations High Commission on Refugees (UNHCR) Canada office in Ottawa (basic table 4-3), to examine whether there is a correlation between the Sri Lankans who fail to appear for asylum proceedings in the U.S. and Sri Lankans who apply for asylum in Canada. Indeed, the number of Sri Lankan asylum seekers in Canada applying at the boarder and inland is consistently higher than the number of Sri Lankan FTAs in the U.S. Also note that in preparation for the implementation of the U.S.-Canada Safe Third Country Agreement, in January 2003 Canada made it less attractive for aliens to apply for asylum at the border.[15] In addition to the overall decrease in applicants, there was an increase in the number of Sri Lankan asylum applicants applying in the interior of Canada while the number of Sri Lankan asylum applicants applying at the border decreased.



Based on Basic Table 4-3.

The Study also examined detention and asylum withdrawal rates over pre-FY 2000-2004 (basic table set 5). Chart 10 below shows withdrawal rates are significantly higher for detained aliens and there is no significant change of withdrawal rates over time.

---

[15] Specifically, on January 23, 2003 Citizenship and Immigration Canada (CIC) directed that, after scheduling asylum claimants for asylum interviews at land border posts, Canadian immigration officials would no longer seek assurances from the United States that the asylum seeker would not be detained while waiting in the United States for his or her Canadian asylum interview. U.S. Committee for Refugees, "Canada" in, *World Refugee Survey 2004*, (2004). This appeared to be a step in preparation for the U.S.-Canada Safe Third Country Agreement, officially known as the "Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries."

IFR_AR_008588



Chart 10. Withdrawal of Asylum Applications Post Credible Fear Determination by Custody Status & Fiscal Year, FY 2000-2004

Note: Detained n=4614, Non-detained n=15575, FY 2000 n=849, FY 2001 n=3965, FY 2002 n=6172, FY 2003 n=6561, FY 2004 n=2642, Total n=20249
Based on Basic EOIR Tables 5.

The appealing party and outcome of asylum cases of aliens subject to Expedited Removal before the Board of Immigration Appeals (BIA) during pre-FY 2000-2004 is illustrated in basic table 6. When an alien or DHS disagrees with an immigration judge's decision in an asylum case, either party may appeal the decision to the BIA. The BIA is not a separate appellate entity, but is the administrative appellate authority located within EOIR, the same organization which administers the immigration judges.[16]

Appeals by the alien made up 98 percent of the appeals decided from FY 2002 – 2004. The high percentage of appeals by the alien does not represent the actual occurrence of denials of asylum claims, which is lower, 72 percent. Rather, it shows that many approved cases are not appealed by the government. Chart 11 further shows a significant increase in the number of asylum cases subject to Expedited Removal brought before the BIA from FY 2002 to 2003. In FY 2004, the BIA received and adjudicated 50 percent more cases than in 2001.[17] As shown in Chart 12, while 23 percent of appeals brought by aliens referred for credible fear were sustained

---

[16] According to EOIR, while the Board "is a component of EOIR, the Board nevertheless is comprised of independent adjudicators. No one in EOIR, not even the Chairman of the Board, may influence the Board's decision making authority. The Board's decisions are governed only by law or regulation, and Board members are charged to exercise their independent judgment and discretion." See 8 C.F.R. 1003.1(d) (2004).

[17] Figures provided by EOIR, January 12, 2005. In 2001, the Board received 27,900 new appeals and adjudicated 31,800. By 2004 the Board received 41,300 new cases and adjudicated 48,700. Letter to Mark Hetfield, USCIRF, from Marta Rothwarf, Associate General Counsel, Executive Office for Immigration Review (EOIR), January 12, 2005.

IFR_AR_008589

in 2001, in the last three years the BIA has sustained on average 3 percent of appeals brought by such aliens.[18]  The sustain rate for the government, with a much smaller number of appeals filed, is significantly higher, averaging 19 percent in the last three years.  Appeals in which both the alien and the government filed an appeal or the appeal was certified to the BIA constituted less than a fraction of 1 percent of all appeals heard, and are not included in the summary table.[19]



Based on EOIR Table 6.



Note: Alien n=7171, Government n=160, FY 2001 n=331, FY 2002 n=1280, FY 2003 n=2813, FY 2004 n=2951
Based on Basic EOIR Table 6.

---

[18] In a Memorandum written to Board Members on March 15, 2002, BIA chairman Lori Scialabba authorized the use of single Board Member affirmance without opinion, for asylum, withholding of removal, and CAT cases.

[19] It is important to note that EOIR does not maintain statistics of whether the BIA decision results in the removal or relief for the alien, just whether the appeal was sustained or dismissed.  An alien's appeal does not necessarily mean the alien was denied relief by the Immigration Judge.  For example the alien may be appealing a decision in which (s)he was denied asylum but granted protection against removal under the Convention Against Torture.

IFR_AR_008590

Table T: Outcome of Appeals for Asylum Seekers Subject to Expedited Removal by Alien Appeal, FY 2001-2004

| FY Appeal Decided | Alien Appeal | | | | Total Cases Adjudicated |
|---|---|---|---|---|---|
| | Sustain | Dismiss | Remand | Other | |
| FY 2001 | 23% | 66% | - | 16% | 291 |
| FY 2002 | 2% | 93% | - | 5% | 1251 |
| FY 2003 | 3% | 94% | - | 4% | 2750 |
| FY 2004 | 4% | 93% | 1% | 4% | 2879 |

(-) = 0
Based on Basic EOIR Table 6.

Table U: Outcome of Appeals for Asylum Seekers Subject to Expedited Removal by Government Appeal, FY 2001-2004

| FY Appeal Decided | Government Appeal | | | | Total Cases Adjudicated |
|---|---|---|---|---|---|
| | Sustain | Dismiss | Remand | Other | |
| FY 2001 | 2% | 79% | - | 18% | 38 |
| FY 2002 | 19% | 45% | - | 35% | 20 |
| FY 2003 | 12% | 55% | - | 31% | 51 |
| FY 2004 | 27% | 55% | 2% | 14% | 51 |

(-) = 0
Based on Basic EOIR Table 6.

The Study analyzed national statistics on the outcome of affirmative asylum cases for FY 2000-2003 (basic table 7). Affirmative asylum applicants are not, by definition, Expedited Removal cases. Rather, they are applications filed by asylum seekers who have already entered the U.S. Asylum applicants in immigration court face a DHS attorney who usually argues against approving the application for asylum. In contrast, affirmative asylum seekers are interviewed in a non-adversarial hearing by an asylum officer. The asylum officer will either approve the application or refer it to an immigration judge for further consideration in an adversarial removal proceeding.

Shortly after the implementation of Expedited Removal, the Department of Justice considered implementing a proposal to allow asylum officers to approve asylum for eligible applicants at the time of the credible fear determination, also a non-adversarial interview. Asylum seekers for whom asylum officers found a credible fear who had not yet demonstrated eligibility for asylum would be referred to an immigration judge for an adversarial asylum proceeding. One concern with this proposal was that an asylum officer's decision to refer, rather than approve, an application from an asylum seeker subject to Expedited Removal might prejudice the immigration judge. The Study requested the statistics in text table V to determine the extent to which immigration judges approve affirmative cases which are referred, but not approved, by asylum officers.

Immigration judges approve asylum for approximately 20 percent of affirmative asylum applicants referred to them, approximately the same approval rate as asylum seekers referred to immigration judges after a positive credible fear determination, 19 percent, as illustrated in basic

IFR_AR_008591

table set 1.[20]  These statistics do not demonstrate that immigration judges are prejudiced by an asylum officers decision to refer, rather than approve, an affirmative asylum application.

Table V: Affirmative Asylum EOIR Case Completions by Disposition, FY 2000 - 2003

| FY | Grant | % Grant | Deny | % Deny | Abandon | % Abandon | Withdraw | % Withdraw | Other** | % Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 6,701 | 18% | 10,570 | 28% | 3,624 | 10% | 6,883 | 18% | 9,960 | 26% | 37,738 |
| 2001 | 6,781 | 21% | 8,558 | 27% | 3,390 | 11% | 4,890 | 15% | 8,511 | 26% | 32,130 |
| 2002 | 7,665 | 20% | 9,904 | 26% | 3,924 | 10% | 6,741 | 18% | 9,706 | 26% | 37,940 |
| 2003 | 9,910 | 20% | 12,794 | 26% | 3,926 | 8% | 12,392 | 25% | 10,146 | 21% | 49,168 |
| Total | 31,057 | 20% | 41,826 | 27% | 14,864 | 9% | 30,906 | 20% | 38,323 | 24% | 156,976 |

**Includes Administrative Closures and Asylum Applications Not Acted On
Based on Basic EOIR Table 7.

SOURCES AND LIMITATIONS

Unlike the Department of Homeland Security (DHS), the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) has one statistical reporting system.  However, no integrated statistical reporting system currently operates between DHS and DOJ.  To create the universe of files used to create the basic tables DHS provided EOIR with a file of 40,694 credible fear receipts for the period October 1, 1999 through September 30, 2003.  EOIR manipulated the file to eliminate duplicate records, and was left with a file of 40,206 records.  Of these, EOIR was able to match 36,799 in its ANSIR system (91.5 percent).

Although the source data from DHS was based on receipts, the EOIR data reflects the completion of each EOIR case.  Fiscal years reflected in the basic tables indicate the year EOIR completed the case.  Due to this, the number of cases for FY 2000 is smaller than following years because many cases received in FY 2000 were completed in subsequent years.  Additionally, FY 2004 was not complete at the time of EOIR reporting, thus the relevant FY 2004 computations may not be complete.  Even though the DHS data file covered the period FY 2000 - FY 2003, basic tables show some pre-2000 completions because of anomalies in matching the file.  The charts in this report include FY 2000-2004, while the complete basic table set includes tables initiating from pre FY 2000.

The basic tables that discuss the outcome of cases have minor discrepancies where a few cases that did not fit into the designed categories.[21]  Also the categories created are not mutually exclusive; the same case may be counted in more than one category.[22]  For this reason some of these cases may be counted more than once in such basic tables.

---

[20] Text table V represents cases referred to EOIR from the DHS Asylum Office.  The category *other* includes administrative closures and asylum application not acted on.
[21] Cases granted some other form of relief.
[22] For example, an alien who withdraws an application for relief may subsequently file for another form of relief, or may be ordered removed by the Immigration Judge.  Another possible example is an alien was ordered removed for a failure to appear in one court, then subject to another order in another court in a subsequent year.

IFR_AR_008592

To calculate the withdrawals of asylum application by detention status EOIR matched the above DHS records to its ANSIR system and found that 1,950 aliens withdrew their asylum application or their application for relief under CAT (basic table set 5).  Some aliens actually withdrew applications for both types of relief, therefore are counted twice.

To create statistics for the Board of Immigration Appeal (BIA) (basic table 6) EOIR took the file of 36,799 ANSIR records, and matched it to the Board of Immigration Appeals Processing System. Of the cases identified in the ANSIR system, 10,399 had filed appeals, of which 7,419 had been decided by the BIA as of the date of the report.

With the expert assistance of the EOIR staff, we were in able to display comparable information on the adjudication of aliens subject to Expedited Removal in a way that is useful for the Study's purposes.

Confidentiality requirements restrict the public versions of tables representing nationality to report only cell counts of six (6) or more. All nonzero cells of less than 6 are asterisked (*). Zero cells have been identified by a dash (-).  Percentages representing less than five (5) divided by the total are represented by a pound (#).  Summary totals in the tables have also been examined to be sure that indirect disclosure (e.g., disclosure by subtraction) did not occur.

IFR_AR_008593

REFERENCES

1. American Statistical Society: Privacy, Confidentiality, and Data Security, (http://www.amstat.org/comm/cmtepc/) accessed November 2004.

2. Patrick Baier, *Selected Statistical Analysis of Immigration Judge Rulings on Asylum Applications, FY 2000-2003*, February 2005.

3. Cory Fleming and Fritz Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*, February 2005.

4. Statistical Policy Office, Office of Information and Regulatory Affairs, Office of Management and Budget, *Statistical Policy Working Paper 22 - Report on Statistical Disclosure Limitation Methodology*, May 1994.

5. United States General Accounting Office, *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process*, GAO/GGD-00-176, September 2000.

6. U.S. Committee on Refugees, "Canada" *World Refugee Survey 2004*, 2004.

# BASIC TABLE SETS

The EOIR Table Sets are over 200 pages in length, therefore not included with this report. The Table Sets are available at **www.uscirf.gov**.

The Table Sets are summarized in the above report.

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
### *As Authorized by Section 605 of the International Religious Freedom Act of 1998*

## SELECTED STATISTICAL ANALYSES OF IMMIGRATION JUDGE RULINGS ON ASYLUM APPLICATIONS, FY 2000-2003

FEBRUARY 2005

Patrick Baier
National Opinion Research Center (NORC)

IFR_AR_008596

TABLE OF CONTENTS

Preface………………………………………………………………………..422

1.  Introduction…………………………………………………………………424

2.  Expedited Removal Data…………………………………………………...424

3.  Acceptance Rates………………………………………………………..426

4.  Analysis of Variance (ANOVA)……………………………………………...429

5.  Sum of squares decomposition…………………………..……………………432

6.  Conclusion……………….……………………………………………… 441

References………………………………………………………………443

IFR_AR_008597

# Preface

The *Study of Asylum Seekers in Expedited Removal* (the Study) was undertaken by the *U.S. Commission on International Religious Freedom* (the Commission) to respond to four questions posed by Congress in Section 605 of the *International Religious Freedom Act* (IRFA) of 1998.

Specifically, the Study is to determine whether immigration officers performing duties under section 235(b) of the *Immigration and Nationality Act* (INA) (8 U.S.C. 1225(b)) with respect to aliens who may be eligible to be granted asylum are engaging in any of the following conduct:

(A) Improperly encouraging such aliens to withdraw their applications for admission.

(B) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution (within the meaning of section 235(b)(1)(B)(v) of such Act).

(C) Incorrectly removing such aliens to a country where they may be persecuted.

(D) Detaining such aliens improperly or in inappropriate conditions.

The Study has several components, including direct data collection, thorough sample file reviews, direct observations of the removal process, and interviews with individuals seeking asylum. The study also made a systematic effort to review previous studies, notably the 2000 *General Accounting Office* (GAO) Study and to compile statistical tabulations that either already existed or which were requested by the Commission from administrative data available from the agencies involved in Expedited Removal.

The present report presents an analysis of administrative data tabulated by the Commission for the Study from the U.S. Department of Justice, *Executive Office for Immigration Review* (EOIR). The compilation and accompanying descriptive summaries were prepared under my general direction by Patrick Baier with assistance from Fritz Scheuren, Cory Fleming and Susan Kyle.

IFR_AR_008598

Let me also take this opportunity to again express my deep appreciation for the care, diligence, speed, and expertise of the EOIR staff led by Marta Rothwarf. These were Amy Dale, Kevin Chapman, Scott Rosen, and especially Isabelle Chewning, Brett Endress and Cecelia Espenoza.

Mark Hetfield
Immigration Counsel
U.S. Commission on International Religious Freedom
October 2004

IFR_AR_008599

# 1   Introduction

This report analyzes data about asylum applications, collected during the Fiscal Years 2000 to 2003 at fourteen (14) U.S. Immigration Courts: Atlanta, Chicago, Elizabeth (including Queens), Houston, Krome, Lancaster, Los Angeles, Miami, Newark, New York City, San Juan (Guaynabo), San Francisco, San Diego, and San Pedro. The report presents statistical summaries and highlights statistically significant differences in decisions on asylum applications, both across courts and among the judges at an individual court.

There are significant differences in the acceptance rates of asylum applications from court to court. However, the assignment of asylum cases to courts is clearly not random, but is determined by the applicant's port of entry. Whether the observed differences are due to the different profiles of asylum seekers at different courts, or whether other reasons are involved is subject for further research. Similarly the data shows differences in the decisions reached by individual judges at a court, but again this report refrains from interpreting these differences beyond a mathematical analysis of their statistical significance.

In Section 2 below, the data underlying these analyses is described. Section 3 determines the acceptance rates for asylum applications found at different courts. Section 4 is a brief introduction to Analysis of Variance (ANOVA), the main tool used for studying the effect of courts and judges on the outcome of asylum applications. This section is technical and not necessary for a broad understanding if the findings presented in this report. The following Section 5 applies these techniques to courts and judges. Concluding remarks are made in Section 6.

# 2   Expedited Removal Data

The expedited removal data for this report were provided as a collection of tables [4], one for each of the 14 immigration courts, which display summary data of decisions made by the individual judges at the court. The identities of the judges or of the applicants were not revealed on the tables, and only

IFR_AR_008600

summary data were displayed.

The data used for this analysis comprise the time period of Fiscal Year 2000 through Fiscal Year 2003. The *Department of Homeland Security* (DHS) provided EOIR with a file of 40,694 credible fear receipts for the period October 1, 1999 through September 30, 2003. EOIR manipulated the file to eliminate duplicate records, and was left with a file of 40,206 records. Of these, EOIR was able to match 36,799 in its ANSIR system (91.5%) [4].

The categories shown in the tables classify the primary outcomes of these selected cases as follows:

1. Asylum granted

2. *Convention Against Torture* (CAT) withholding or deferral granted

3. Application for asylum or CAT relief withdrawn

4. Ordered removed

5. Adjustment of status granted

There were a few cases that did not fit into these categories; e.g., cases granted some other form of relief. Note also that these categories are not mutually exclusive; the same case may be counted in more than one category. For example an alien who withdraws an application for relief may subsequently file for another form of relief, or may be ordered removed by the Immigration Judge. For this reason some of these cases may be counted more than once in this table [4]. It was not possible to identify such multiple entries, and here lies a potential source of non-sampling error.

This report is concerned with the data from fourteen (14) courts.[1] Included are only the cases where the judge either granted asylum to the applicant, or a removal order was issued. Other outcomes, such as deferrals, withdrawals or adjustments of status were excluded. Removal Orders include

---

[1] The EOIR determined that providing the complete data from all immigration courts nationwide would be a too large task; hence a (non-random) sample of 14 courts was selected and provided for this study. This report does not aim to make any inferences to other courts not part of this study.

IFR_AR_008601

the decisions of: Deportation Order, Exclusion Order, Removal Order, Voluntary Departure Orders, and DHS Expedited Removal Orders affirmed by an Immigration Judge [4].

# 3    Acceptance Rates

This section provides summaries of the data used for the analyses in this report in Subsection 3.1. Displayed are the numbers of accepted and rejected asylum applications by court. Subsection 3.2 displays graphically the corresponding acceptance rates, together with confidence intervals around the estimates.

## 3.1    Summary data by court

The table below lists the 14 immigration courts which are part of this study. The data used are summarized by court. The more detailed data at the level of individual judges used for this analysis is available separately [3, 4].

**Table 1.** Data Summary by Court

| Code | Court | Number of Judges | Asylum granted | Ordered Removed | Total |
|------|-------|------------------|----------------|-----------------|-------|
| ATL | Atlanta, GA | 12 | 37 | 516 | 553 |
| CHI | Chicago, IL | 9 | 103 | 494 | 597 |
| ELZ | Elizabeth, NJ [2] | 14 | 689 | 1407 | 2096 |
| HOU | Houston, TX | 8 | 48 | 236 | 284 |
| KRO | Krome, FL | 10 | 47 | 789 | 836 |
| LAN | Lancaster, CA | 5 | 46 | 241 | 287 |
| LOS | Los Angeles, CA | 53 | 202 | 548 | 750 |
| MIA | Miami, FL | 25 | 578 | 4676 | 5254 |
| NEW | Newark, NJ | 9 | 155 | 585 | 740 |
| NYC | New York City, NY | 64 | 1925 | 5386 | 7311 |
| SAJ | Guaynabo, PR | 12 | *[3] | * | 51 |
| SFO | San Francisco, CA | 37 | 333 | 374 | 707 |
| SND | San Diego, CA | 11 | 332 | 868 | 1200 |
| SPD | San Pedro, CA | 9 | 64 | 109 | 173 |

IFR_AR_008602

## 3.2   Acceptance rates by court

The acceptance rate $p_i$ at court $i$ is

$$p_i = \frac{a_i}{a_i + r_i}$$

where $a_i$ is the total number of accepted cases at court $i$ (from column "Asylum granted"), and correspondingly $r_i$ are the total rejections (see column "Ordered removed").

Figure 1 shows estimated acceptance rates for the fourteen different immigration courts, together with two-sided 95% confidence intervals around the estimates. The vertical lines indicate the point estimates of $p_i$ for the courts, while the horizontal bars are 95% confidence limits around the acceptance rates.

For example, the acceptance rate for Atlanta (ATL) is estimated to be $p_{\text{ATL}} = 6.6\%$, and from the size of the sample we can estimate the margin of error to be $\pm 2\%$. The overall average of 21.89% is displayed as a vertical line through the data. Newark is the court closest to this average.

The interpretation of this statistical data is as follows. If we assume that every immigration court consistently applies the same policies and procedures over time, and that any factors that may influence decisions (legal or administrative procedures, personnel appointments, political events, etc.) remain constant, we can model the decision made on an application as a "binomial variable" (a variable that has only two possible outcomes - success or failure). Such variables are completely determined by a single parameter: The probability of a "success" (acceptance of an asylum application). Under the assumptions outlined above we can treat the value of $p_i$ (the success or acceptance rate at court $i$) as a characteristic of the court.

We have the (nearly) complete data for a fixed period of time and therefore we can directly compute the acceptance rate, at least for this period of

---

[2]Includes Queens, NY

[3]∗ = five or fewer cases. According to DHS confidentiality policies, the actual number is not disclosed.

[4]The percentage corresponds to five or fewer cases and hence cannot be disclosed under DHS rules.

IFR_AR_008603

**Figure 1.**   Court Acceptance Rates



IFR_AR_008604

time. However, it is common to consider such data as coming from a theoretical "super-population" of all possible asylum cases that might come to the court, and use the collected data to estimate what the acceptance rate for this hypothetical super-population would be.

Statistically, this amounts to treating the sample as a random sample from an infinite population to which we can make an inference (see [1]).

# 4   Analysis of Variance (ANOVA)

This section starts with a brief and informal introduction to Analysis of Variance (ANOVA) - by way of examples and without mathematical detail - in Subsection 4.1. ANOVA is discussed in more detail in most basic textbooks on mathematical statistics. A good (but by far not the only) reference is [2]. The following Subsection 4.2 introduces some nomenclature needed to put the judge data into the framework of ANOVA.

## 4.1   An informal introduction to ANOVA

Analysis of variance is a technique that enables the statistician to identify "effects" that cause the data to vary and to determine the significance of these effects. Mathematically, ANOVA is very similar to (linear) regression, but it can be more generally applied to categorical variables as well as numeric variables. The "downside" is that it does not allow for as simple a graphical illustration as the regression line in linear regression, and hence it is often perceived as somewhat abstract.

We think of the decision by an immigration judge on an asylum application as a "random variable." Of course, this is not to suggest that the judge would toss a coin to come to his decision, but just that we do not know the merits of a case and the considerations made by the ruling judge, hence, lacking this knowledge, the judge's decision appears like a random variable to us.

However, we do have some basic information about the cases - the court where the case was submitted and which judge ruled on the case. In Figure

IFR_AR_008605

1 we see that acceptance rates differ significantly across courts. There are also differences in the acceptance rates of individual judges, as shown in the diagrams on pages 14 and 15. ANOVA allows us, loosely speaking, to quantify "how much of the overall variability in the decisions is accounted for by the court (and judge)."

The general idea is that the random variable of interest (the decision made on an asylum application) can be "modeled" by one or more known variables (the court and judge to which the case was referred), up to an error term. The better the model, the smaller the error term.

> **Example.** *Suppose the members of a national farmers' union report their annual corn crop yield per acre to their organization. The nationwide data is likely to display more variability than the data within a state or region, because relevant factors such as climate, temperature, soil condition etc. are relatively uniform within a small region, but not across geographically distant regions. Hence we expect to find different regional averages in the reported data, and the data within a region will be more tightly centered around its local (regional) mean or average. In other words, the data within a single region will have smaller variance than the nationwide data, because the effects of regional differences on the data are factored out.*

ANOVA is a mathematical procedure of decomposing the variance into a component that comes from the model (variance between regions) and an error component (part of the overall variance that cannot be explained by regional differences).

If more auxiliary information is available about the population (e.g. farming methods employed by a farmer), it might be possible to strengthen the model and "explain" an even larger component of the variance. Once the best fitting model is found, the remaining "error component" is the remaining uncertainty or variability about which we cannot make any predictions.

IFR_AR_008606

## 4.2   Application to the asylum data

We have a population of $N = 20,839$ asylum cases (the total number of cases where a decision was made to either grant asylum or order the removal of an applicant; other cases, such as deferrals, were excluded).

The population is divided into courts ($n = 14$ courts) and within courts it is further divided by judge, where every judge is at only one court and the number of judges per court varies.

In order to avoid unstable estimates for judges who hear only very few cases, at each court the judges with the fewest cases were combined and treated as one single judge, so that each "judge" had at least 14 cases, but still retaining at least two judges per court to be able to look at effects across judges.[5]

The following table shows how this collapsing was done. We use

$$
\begin{aligned}
n_o &= \text{Original number of judges} \\
n_c &= \text{Number of judges collapsed} \\
n_f &= \text{Final number of judges after collapsing} \\
n_1 &= \text{Minimum number of cases per judge after collapsing} \\
n_2 &= \text{Upper bound on the number of cases per judge} \\
&\quad\ \ \text{below which judges were combined}
\end{aligned}
$$

---

[5]The judges were ordered by their number of processed cases. The judges with the fewest cases were combined and treated as one single judge for the analysis. The general rule for determining how many judges should be collapsed was to use the minimum number of judges so that both the combined "pseudo judge" and all the remaining judges had 14 cases or more. In some cases, the next smallest judge was included in addition if this judge would have otherwise been an outlier with respect to the number of processed cases; in other words, if the range of the judge sizes could be reduced by expanding the collapse. While this decision rule is somewhat *ad hoc*, it was deemed to be appropriate for brining the data into a form where a meaningful analysis of judge and court effects could be performed.

IFR_AR_008607

**Table 2.**  Judges and number of cases per judge.

| Court | $n_o$ | $n_c$ | $n_f$ | $n_1$ | $n_2$ |
|-------|-------|-------|-------|-------|-------|
| ATL | 12 | 9 | 4 | 43 | 15 |
| CHI | 9 | 2 | 8 | 22 | 20 |
| ELZ | 14 | 9 | 6 | 52 | 14 |
| HOU | 8 | 2 | 7 | 26 | 20 |
| KRO | 10 | 6 | 5 | 28 | 12 |
| LAN | 5 | 2 | 4 | 17 | 12 |
| LOS | 53 | 29 | 25 | 15 | 10 |
| MIA | 25 | 2 | 24 | 19 | 18 |
| NEW | 9 | 2 | 8 | 46 | 45 |
| NYC | 64 | 24 | 41 | 18 | 11 |
| SAJ | 12 | 11 | 2 | 15 | 5 |
| SFO | 37 | 21 | 17 | 14 | 7 |
| SND | 11 | 2 | 10 | 53 | 46 |
| SPD | 9 | 8 | 2 | 72 | 63 |

(See Table 1 for the court abbreviations.) The original number of judges $n_o$ can be determined from $n_c$ and $n_f$ as

$$n_o = n_c + n_f - 1.$$

# 5    Sum of squares decomposition

The decomposition of the sum of squares, the basic mathematical procedure underlying ANOVA, is carried out in Subsections 5.1 and 5.2. Subsection 5.3 derives the mean square errors and Subsection 5.4 the $F$-ratios. Mean squares are normalized by the degrees of freedom to make them comparable and determine the significance of effects from the quantiles of a standard $F$-distribution.

## 5.1    Court effects

We label population elements (applications) by triples $(i, j, k)$ where $1 \leq i \leq n = 14$ is the court, $1 \leq j \leq n_i$ is the $j$-th judge at court $i$ (where there are

IFR_AR_008608

a total of $n_i$ judges), and $1 \leq k \leq n_{ij}$ is the $k$-th case heard by judge $j$ at court $i$.

Let $x_{ijk}$ be a binomial variable with $x_{ijk} = 1$ if case $(i, j, k)$ is accepted and $x_{ijk} = 0$ otherwise.

In total, 4562 out of 20839 cases have been accepted, which gives us an overall acceptance rate of

$$p = \frac{\sum\limits_{i,j,k} x_{ijk}}{\sum\limits_{i,j,k} 1} = \frac{4562}{20839} = 21.89\%.$$

Let $p_i$ be the acceptance rate at court $i$ and $p_{ij}$ the acceptance rate for judge $j$ at court $i$.

$$p_i = \frac{\sum\limits_{j=1}^{n_i} \sum\limits_{k=1}^{n_{ij}} x_{ijk}}{\sum\limits_{j=1}^{n_i} n_{ij}},$$

$$p_{ij} = \frac{1}{n_{ij}} \sum\limits_{k=1}^{n_{ij}} x_{ijk}$$

Note that the overall acceptance rate is just the overall average or mean of the "flag" variable $x$, and the acceptance rate for a court is accordingly the average or mean over just that court, and similarly by judge.

$$p = \bar{x}_{\cdots}, \quad p_i = \bar{x}_{i,\cdots}, \quad p_{ij} = \bar{x}_{ij,\cdot} \ .$$

A one-way analysis of variance (using the stratification by court only) can be carried out by decomposing the total sum of squares (squared differences from the mean), given in (1) below.

$$SS_{\text{Tot}} = \sum_{i=1}^{n} \sum_{j=1}^{n_i} \sum_{k=1}^{n_{ij}} (x_{ijk} - p)^2 \qquad (1)$$

The variance of $x$ is the total sum of squares divided by the degrees of freedom ($df = N - 1$, where $N$ is the total number of cases), or roughly the average (rather than total) square deviation.

$$\text{Var}(x) = \frac{SS_{\text{Tot}}}{N - 1}.$$

IFR_AR_008609

However, the algebra is simpler if we decompose the sum of squares of $x$, rather than the variance.

Recall the definitions

$$SS_{\text{Court}} = \sum_{i=1}^{n} n_i (p_i - p)^2 \qquad (2)$$

$$SS_{\text{Err}} = \sum_{i=1}^{n} \left( \sum_{j,k} (x_{ijk} - p_i)^2 \right) \qquad (3)$$

We then have

$$SS_{\text{Tot}} = SS_{\text{Court}} + SS_{\text{Err}}.$$

This differs from the common look of the ANOVA formulas only in the fact that the inner summation in (3) is indexed jointly by $(j, k)$; however, if we relabeled the pairs $(j, k)$ by a single variable, say $m$, the above would just reduce to the known formulas for one-way ANOVA. This would be the standard one way ANOVA using only the court to model responses, but not the judge.

A calculation of this simple one-way model yields

$$SS_{\text{Tot}} = 3563.30$$
$$SS_{\text{Court}} = 196.03$$
$$SS_{\text{Err}} = 3367.27.$$

## 5.2   Judge effects

We cannot carry out a two-way ANOVA here that would include the judges as independent variables, because the second stratifier, judge, is only defined within a court. Hence we need to use a nested effect to incorporate the judges. First, we display graphically the different acceptance rates for each judge, separately by court.

The judges are ordered by ascending acceptance rate. The "combined" judges are identified by a (‡). Their ordered ranks are as follows: Atlanta (4), Chicago (5), Elizabeth (4), Houston (2), Krome (5), Lancaster (1), Los Angeles (16), Miami (1), Newark (5), New York (27), Guaynabo (2), San Francisco (3), San Diego (1), San Pedro (1).

IFR_AR_008610

















IFR_AR_008611













IFR_AR_008612

In order to grasp these differences mathematically, we restrict attention to the term in parentheses in the formula (3) for $SS_{\text{Err}}$. Note that within a fixed court (for fixed $i$), the judge at that court is a stratifying variable, and we can further decompose the sum of squares by splitting the term in parentheses into a model and an error term. Hence

$$
\begin{aligned}
SS_{\text{Err}} &= \sum_{i=1}^{n} \left( \sum_{j=1}^{n_i} n_{ij}(p_{ij} - p_i)^2 + \sum_{j=1}^{n_i} \sum_{k=1}^{n_{ij}} (x_{ijk} - p_{ij})^2 \right) \\
&= \sum_{i=1}^{n} \left( SS_{\text{Judge},i} + SS_{\text{Err},i}^{(2)} \right) \\
&= SS_{\text{Judge}} + SS_{\text{Err}}^{(2)}
\end{aligned}
$$

By incorporating judges like this we can "model an additional component of the sum of squares" and hence reduce the error term further. We thus get

$$
\begin{aligned}
SS_{\text{Mod}}^{(2)} &= SS_{\text{Court}} + SS_{\text{Judge}} \\
&= SS_{\text{Court}} + \sum_{i=1}^{n} SS_{\text{Judge},i} \\
&= \sum_{i=1}^{n} \left( n_i(p_i - p)^2 + \sum_{j=1}^{n_i} n_{ij}(p_{ij} - p_i)^2 \right) \quad (4) \\
SS_{\text{Err}}^{(2)} &= \sum_{i=1}^{n} SS_{\text{Err},i}^{(2)} \\
&= \sum_{i=1}^{n} \left( \sum_{j=1}^{n_i} \sum_{k=1}^{n_{ij}} (x_{ijk} - p_{ij})^2 \right) \quad (5)
\end{aligned}
$$

If we carry out these calculations for the given data set, we obtain

$$
\begin{aligned}
SS_{\text{Tot}}^{(2)} &= 3563.30 & (6) \\
SS_{\text{Mod}}^{(2)} &= 371.78 + 196.03 = 567.81 & (7) \\
SS_{\text{Err}}^{(2)} &= 2995.49. & (8)
\end{aligned}
$$

To interpret this decomposition, we need to do further calculations with the sums of squares. This will take the rest of this section.

437

IFR_AR_008613

## 5.3   Mean squares

The reason for considering sums of squares rather than variances was that the formulas need not be adjusted for different "degrees of freedom"[6] associated with the model and error terms. However, as it stands, the absolute values of the model and error components do not give us direct information about the significance of effects.

We can calculate the mean squares for the model and the error by dividing the sum of squares through the appropriate degrees of freedom.

The simple one-way ANOVA ($df(\mathrm{Mod}) = 14 - 1 = 13$) has

$$MS_{\mathrm{Court}} \;\; = \;\; \frac{SS_{\mathrm{Court}}}{df(\mathrm{Court})} = \frac{196.03}{13} = 15.08 \tag{9}$$

$$MS_{\mathrm{Err}} \;\; = \;\; \frac{SS_{\mathrm{Err}}}{df(\mathrm{Err})} = \frac{3367.27}{20825} = 0.16. \tag{10}$$

The corresponding "root mean square error (RMSE)" is

$$\mathrm{RMSE} = \sqrt{MS_{\mathrm{Err}}} = \sqrt{0.16} = 0.40.$$

For the two-way model we get

$$MS^{(2)}_{\mathrm{Mod}} \;\; = \;\; \frac{SS^{(2)}_{\mathrm{Mod}}}{df^{(2)}(\mathrm{Mod})} = \frac{567.81}{162} = 3.51 \tag{11}$$

$$MS^{(2)}_{\mathrm{Err}} \;\; = \;\; \frac{SS^{(2)}_{\mathrm{Err}}}{df^{(2)}(\mathrm{Err})} = \frac{2995.49}{20676} = 0.14 \tag{12}$$

with root mean square error RMSE= $\sqrt{0.14} = 0.38$. Note the degrees of freedom are

$$df^{(2)}(\mathrm{Mod}) = \left( \sum_{i,j} n_{ij} \right) - 1 = 162,$$

---

[6]The "degrees of freedom" of a statistic, e.g. the mean or sum of squares of a sample, are roughly the number of input variables whose value can be varied freely without changing the statistic. For example, for an $n$-tuple $(x_1, \ldots, x_n)$ to attain a prescribed mean $\mu$ we can arbitrarily assign values to $n - 1$ of the variables, say, $x_1, \ldots, x_{n-1}$. Then $x_n = n\mu - (x_1 + \ldots + x_{n-1})$ is determined by the requirement that the mean be $\mu$. Hence this statistic, like the sum of squares, has $n - 1$ degrees of freedom. More precisely, if the statistic can be given as a continuously differentiable function $f(x_1, \ldots, x_n)$ of its input variables, then $df = \dim(\ker(Df(x)))$ where $x$ is a regular point of $f$ (that is a point where the derivative $Df(x)$ has maximal rank).

IFR_AR_008614

and consequently

$$df^{(2)}(\text{Err}) = N - df^{(2)}(\text{Mod}) - 1 = 20676.$$

From the mean squares we can construct $F$-ratios which allow us to determine the significance of effects.

## 5.4 $F$-ratios

The $F$-ratio is commonly defined as

$$F = \frac{MS_{\text{Mod}}}{MS_{\text{Err}}}.$$

Under the null-hypothesis

$$H_0 \colon p_{i1} = p_{i2} = \ldots = p_{in_i}$$

the $F$-ratio is a statistic whose distribution is an $F$-distribution. This distribution depends on two parameters, the degrees of freedom of the model and error terms. A large $F$-ratio (beyond the 95%-quantile of the $F$-distribution) would lead us to reject the null-hypothesis.

From our decomposition of the sum of squares into a court term, a judge term, and an error term, we get the following values

$$F_{\text{Court}} = \frac{MS_{\text{Court}}}{MS_{\text{Err}}} = \frac{15.08}{0.16} = 93.26 \tag{13}$$

$$F_{\text{Mod}}^{(2)} = \frac{MS_{\text{Mod}}^{(2)}}{MS_{\text{Err}}^{(2)}} = \frac{3.51}{0.14} = 24.19 \tag{14}$$

See (9) and (10) for (13), and (11) and (12) for (14). Both of those values are highly significant, even at a 99.9% confidence level, in other words, the $p$-values satisfy $p \ll 0.001$. This means that, given the observed data, we can be almost certain that the acceptance rates across courts, respectively judges (within and across) courts are not the same.

Finally, let us look at individual courts and the effect of judges by court. Note that we can write

$$MS_{\text{Mod}}^{(2)} = \frac{SS_{\text{Court}}}{df^{(2)}(\text{Mod})} + \sum_{i=1}^{n} \frac{SS_{\text{Judge},i}}{df^{(2)}(\text{Mod})}$$

IFR_AR_008615

$$= \frac{1}{df^{(2)}(\text{Mod})} \sum_{i=1}^{n} \left[ n_i(p-p_i)^2 + \sum_{j=1}^{n_i} n_{ij}(p_i - p_{ij})^2 \right]$$

$$= \frac{df(\text{Court})}{df^{(2)}(\text{Mod})} MS_{\text{Court}} + \sum_{i=1}^{n} \frac{df(\text{Judge},i)}{df^{(2)}(\text{Mod})} MS_{\text{Judge},i}.$$

We obtain the following values for the judge effects within individual courts:

**Table 3.** Sum of squares, mean squares, and $F$-ratios by court.

| Court | $SS_{\text{Judge},i}$ | $df$ | $MS_{\text{Judge},i}$ | $SS_{\text{Err},i}$ | $df$ | $MS_{\text{Err},i}$ | $F$-Ratio |
|---|---|---|---|---|---|---|---|
| ATL | 2.1706 | 3 | 0.7235 | 32.3538 | 549 | 0.0589 | 12.28 |
| CHI | 1.2779 | 7 | 0.1826 | 83.9516 | 589 | 0.1425 | 1.28 |
| ELZ | 18.6264 | 5 | 3.7253 | 443.8846 | 2090 | 0.2124 | 17.54 |
| HOU | 0.9452 | 6 | 0.1575 | 38.9421 | 277 | 0.1406 | 1.12 |
| KRO | 2.0980 | 4 | 0.5245 | 42.2596 | 831 | 0.0509 | 10.31 |
| LAN | 2.2894 | 3 | 0.7631 | 36.3378 | 283 | 0.1284 | 5.94 |
| LOS | 19.4101 | 24 | 0.8088 | 128.1846 | 725 | 0.1768 | 4.57 |
| MIA | 57.2373 | 23 | 2.4886 | 457.1761 | 5230 | 0.0874 | 28.47 |
| NEW | 6.8462 | 7 | 0.9780 | 115.6875 | 732 | 0.1580 | 6.19 |
| NYC | 238.3106 | 40 | 5.9578 | 1179.8334 | 7270 | 0.1623 | 36.71 |
| SAJ | 0.0013 | 1 | 0.0013 | 2.8222 | 49 | 0.0576 | 0.02 |
| SFO | 11.9307 | 16 | 0.7457 | 164.2249 | 690 | 0.2380 | 3.13 |
| SND | 10.6269 | 9 | 1.1808 | 229.5197 | 1190 | 0.1929 | 6.12 |
| SPD | 0.0096 | 1 | 0.0096 | 40.3141 | 171 | 0.2358 | 0.04 |
| Total | 371.7802 | 149 | 0.0025 | 2995.4921 | 20676 | 0.1449 | 24.19 |

There are only four courts, Chicago (CHI), Houston (HOU), Guaynabo (SAJ) and San Pedro (SPD), where the judge effects are insignificant, even at low confidence levels. That is, there is no indication in the available data that different judges accept asylum applications at different rates. In the two last cases, however, Guaynabo and San Pedro, all judges except the one with the largest number of cases were collapsed, so that only two "judges" were left to compare. Hence the judge effect is only of limited use since it essentially compares the judge with the largest number of cases against all others.

On the other side, the judge effects for five courts, Atlanta (ATL), Elizabeth (ELZ), Krome (KRO), Miami (MIA), and New York City (NYC), are

IFR_AR_008616

highly significant, even at a 99.9% confidence level[7].

Note that the total sum of squares from this table plus the sum of squares from the one way ANOVA yields (see (5)) the sum of squares for the model using the nested judge effect.

$$\sum_{i=1}^{n} SS_{\text{Judge},i} + SS_{\text{Court}} = 371.78 + 196.03 = 567.81.$$

The corresponding degrees of freedom are

$$\sum_{i=1}^{n} df(\text{Judge}, i) + df(\text{Court}) = 149 + 14 - 1 = 162$$

and hence we can calculate the value

$$MS_{\text{Mod}}^{(2)} = \frac{567.81}{162} = 0.14,$$

as given in (7).

# 6    Conclusion

We observe that the overall variability in the decisions made on immigration and asylum applications can be modeled to some extent by the court where an application is processed and the judge handling it.

Obviously, great care is needed in drawing conclusions from the observed differences across courts since these may well be caused by differences in the

---

[7]For a judge who handles $n_{ij}$ cases the number of granted applications is a $B(n_{ij}, p_{ij})$ distributed binomial variable. For large $n_{ij}$ we can use the normal approximation to model this variable and test the null hypothesis $H_0 \colon p_{i1} = \ldots = p_{in_i}$. In calculating the $F$ ratios and their significance, we need to issue a note of caution that some of the judges (even after collapsing) had too few cases for their observed acceptance rate to attain normality. This makes the individual comparison of such judges to other judges and the calculation of type I and type II errors more difficult, especially since the standard error $\sqrt{\frac{p_{ij}(1-p_{ij})}{n_{ij}}}$ of a binomial variable depends on its mean $p_{ij}$. However, all courts were large enough overall so that a very large $F$-ratio is still a strong indicator for the failing of the null hypothesis.

IFR_AR_008617

applicant populations arriving at different courts, due to their geographic location and connection to global travel routes.

However, arguably, within a court the assignment of cases to judges may be "random" (in the sense that there is no association between the case itself and the judge whom it is assigned to). This would suggest that there should be no "judge effect." However, this is not supported by the data, and further research into the causes seems warranted.

IFR_AR_008618

# References

[1] W.G. Cochran. *Sampling Techniques.* 3rd edition, Wiley, New York, 1977.

[2] R.V. Hogg, A.T. Craig. *Introduction to Mathematical Statistics.* 4th edition, Macmillan, New York, 1978.

[3] C. Fleming, S. Kyle, and F. Scheuren. Study of Asylum Seekers in Expedited Removal. *Statistical Report on Immigration Court Proceedings (FY 2000-2004).*

[4] U.S. Commission on International Religious Freedom. EOIR Tables - Judge Data, provided as a collection of Excel tables `EOIR_Tables_1.`$n$`-7(xxx).xls`

IFR_AR_008619



# Department of Homeland Security Border Security Metrics Report: 2021

*April 27, 2022*



IFR_AR_008622

IFR_AR_008623

# Message from the Acting Assistant Secretary for Border and Immigration Policy in the Office of Strategy, Policy, and Plans

The "Department of Homeland Security Border Security Metrics Report" is submitted pursuant to the Fiscal Year (FY) 2017 National Defense Authorization Act (NDAA), which directs that "Not later than 180 days after the date of the enactment of this section, the Secretary [of Homeland Security] shall develop metrics, informed by situational awareness, to measure the effectiveness of security" between ports of entry, at ports of entry, in the maritime environment and to measure the effectiveness of the aviation assets and operations of Air and Marine Operations of U.S. Customs and Border Protection. The Act further directs the Secretary to annually assess, report, and implement the specified metrics.

The outcome-based performance metrics called for by the Act are the most comprehensive, rigorous set of border security metrics required of the Department of Homeland Security (DHS) to date. Through previous efforts, DHS has established processes and procedures to collect and analyze essential data to meet most, but not all, of the Act's requirements. This 2021 report (with 2020 data) identifies which metrics are still unavailable; DHS commits to continuing efforts to comply with all the measures of the Act.

Thank you for your continuing support and commitment to strengthening the operating effectiveness of DHS.

Pursuant to congressional requirements, this notification is being provided to the following Members of Congress:

**The Honorable Gary C. Peters**
*Chairman, Senate Committee on Homeland Security and Governmental Affairs*

**The Honorable Rob Portman**
*Ranking Member, Senate Committee on Homeland Security and Governmental Affairs*

**The Honorable Bennie G. Thompson**
*Chairman, House Committee on Homeland Security*

**The Honorable John Katko**
*Ranking Member, House Committee on Homeland Security*

Inquiries relating to this report may be directed to the DHS Office of Legislative Affairs at (202) 447-5890.

Sincerely,

Blas Nuñez-Neto
*Acting Assistant Secretary for Border and Immigration Policy*
*Office of Strategy, Policy, and Plans*



# DHS Border Security Metrics Report: 2021

# Table of Contents

I.     LEGISLATIVE LANGUAGE ................................................................................................ 5

II.    INTRODUCTION ........................................................................................................... 6

III.   SEC. 1092 BORDER SECURITY METRICS ...................................................................... 8

§ 1092(b) Metrics for Securing the Border between Ports of Entry ............................................. 8

§ 1092(c) Metrics for Securing the Border at Ports of Entry ..................................................... 34

§ 1092(d) Metrics for Securing the Maritime Border ............................................................... 45

§ 1092(e) Air and Marine Security Metrics in the Land Domain ............................................... 53

IV.   CONCLUSION ......................................................................................................... 64

Appendix A – Repeated Trials Model Methodology ................................................................. 65

Appendix B – Drugs Seizures – All Ports of Entry ................................................................... 71

Appendix C – Privately Owned Vehicle and Commercially Owned Vehicle Wait Times ............. 73

Appendix D – Infrastructure Capacity Utilization Rate at Each Land POE ............................... 80

Appendix E – Frequency of Secondary Inspections at Each Land POE .................................... 84

Appendix F – Potentially High-Risk Containers Reviewed, Assessed, or Scanned – Maritime POE ................................ 87

IFR_AR_008625

# I.   LEGISLATIVE LANGUAGE

Section 1092 of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2017, signed into law December 23, 2016, directs the Secretary of Homeland Security to provide specific "Metrics for Securing the Border Between Ports of Entry," "Metrics for Securing the Border At Ports of Entry," "Metrics for Securing the Maritime Border," and "Air and Marine Security Metrics in the Land Domain" annually to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate.  The NDAA further directs that the Secretary, "in accordance with applicable privacy laws, make data related to apprehensions, inadmissible aliens, drug seizures, and other enforcement actions available to the public, law enforcement communities, and academic research communities."[1]

---

[1]   Throughout this report, all references to the NDAA are to the FY 2017 NDAA, unless otherwise noted.

IFR_AR_008626     **5**

# II.  INTRODUCTION

Border security is critically important to the national security of the United States.  On February 2, 2021, President Joseph R. Biden signed Executive Order 14010 on "Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border."  The order directed plans to address irregular migration across the Southwest Border by implementing a comprehensive three-part plan for safe, lawful, and orderly migration in the region.  The plan will include efforts to address the underlying causes of migration through a strategy to confront the instability, violence, and economic insecurity that currently drives migrants from their homes; collaboration with regional partners to shore up other countries' capacity to provide protection and opportunities to asylum seekers and migrants closer to home; and changes to ensure that Central American refugees and asylum seekers have access to legal avenues to the United States.  These changes are not expected to transform the situation at the border overnight, but are intended to keep the country safe, strong, and prosperous in a manner that aligns with American values.[2]

As directed by the FY 2017 NDAA, this report describes the efforts of the Department of Homeland Security (DHS or the Department) to measure its border security inputs, outputs, and outcomes.  These metrics are essential to the effective and efficient management of the Department, including management of new and ongoing activities and investments in border enforcement as the administration implements President Biden's comprehensive plan for orderly migration.

Comprehensive and rigorous performance management data provide Departmental leadership with the foundation to support responsible, evidence-based decision-making for resource allocation and investments and for operational and mission management.  Further, DHS implementation of this approach provides unifying border security goals under the Department's mission to secure and manage U.S. borders.  Ultimately, the border security metrics described in this report are designed to assess the ability of the Department's border security policies and investments to achieve these goals.

For analytic purposes, the metrics included in this report may be divided into three categories:

- Inputs:  Resources acquired or expended to secure the border.  Examples of border security inputs include the number of U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers and U.S. Border Patrol (USBP) agents deployed, border infrastructure, and number of aircraft committed to the border security mission.

- Outputs:  Specific actions taken to secure the border.  Examples of border security outputs include border crossers apprehended, travelers admitted or denied admission at ports of entry (POEs), asylum seekers identified and referred for protection procedures, and weight of narcotics seized.  Outputs may also be defined as rates, such as the rate at which intending unlawful border crossers are apprehended or interdicted, and the accuracy of screening results for travelers and goods at POEs.

- Outcomes:  The ultimate impacts of border security policies.  The most important border security outcomes are the numbers of successful unlawful entries and quantities of illegal goods entering the United States, and the ease with which lawful travelers and goods pass through POEs.

In general, border security inputs and outputs are directly observable and can be measured with a high degree of reliability.  Policymakers have direct control over resource allocation and data on inputs are available in budget and acquisitions documents.  Operational agencies also track enforcement activities as part of their case management process.  In short, the Department knows exactly how many agents it deploys, how many noncitizens[3] it apprehends, and how

---

[2]  The White House, "FACT SHEET: President Biden Outlines Steps to Reform Our Immigration System by Keeping Families Together, Addressing the Root Causes of Irregular Migration, and Streamlining the Legal Immigration System," February 2, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/02/fact-sheet-president-biden-outlines-steps-to-reform-our-immigration-system-by-keeping-families-together-addressing-the-root-causes-of-irregular-migration-and-streamlining-the-legal-immigration-syst/.

[3]  This report uses the word "noncitizen" to refer to individuals described under section 101(a)(3) of the Immigration and Nationality Act (INA).  Where "alien" was originally used in a title, statutory language, or name, it has been kept as such.

IFR_AR_008627

many travelers it admits. *Input and output metrics* tend to provide insight into the level and type of enforcement effort undertaken—what the Department is doing—that are useful for workload management and tactical decision-making; but in and of themselves these metrics typically provide limited insight into the state of border security.

*Outcome metrics* often provide more insight than inputs and outputs when it comes to evaluating border security and may be powerful tools for policy and program evaluation. Many outcome metrics are difficult to measure directly because some intending border crossers actively seek to evade detection, and some flows are undetected and therefore can never be measured directly. This challenge is nearly universal when measuring unlawful activities, which is why law enforcement agencies typically rely on crime reports as indicators of total criminal activities, for example. Measuring border security outcomes is also difficult because of the diversity and complexity of the enforcement mission along the United States' 6,000 miles of land borders, 95,000 miles of coastline, and 350 POEs. Moreover, enforcement outcomes only partially depend on border security policies, since immigration flows also reflect numerous factors outside of enforcement agencies' control, including the broader set of U.S. immigration policies and numerous economic, demographic, and other structural factors.

Historically, DHS and the legacy Immigration and Naturalization Service (INS) addressed these measurement challenges by relying on noncitizen apprehensions (an output metric) as a proxy measure of unlawful entries between POEs (an outcome metric). More recently, CBP and DHS have initiated new estimation strategies to better model unknown flows. These efforts have focused primarily on border security between POEs in the land domain (NDAA § 1092(b)), a domain that has been identified by Congress and the last several administrations as a top enforcement priority.

Some of this research continues to be refined, as DHS validates certain modeling assumptions and quantifies the uncertainty around its new estimation techniques. This report marks the third year that the Department has included measures of the statistical uncertainty around metrics of the partial apprehension rate (PAR) and the sensitivity of DHS model-based estimates of unlawful entries. In addition, many of the metrics in this report remain limited to the Southwest Border. The Department's future work on border metrics will continue to refine these new indicators of border security between POEs and expand data collection and methodologies to the Northern Border, while also developing additional indicators of border security, including those still identified as incomplete in this report.

Consistent with previous versions of the Border Security Metrics Report (BSMR), this year's report includes data running through the end of FY 2020. As such, many of the data related to border apprehensions reflect a steep drop in apprehensions and admissions through POEs occurring in FY 2020 as a result of the COVID pandemic compared to FY 2019.

Pursuant to the NDAA, this report covers a mix of input, output, and outcome metrics between POEs, at POEs, in the maritime domain, and with respect to air and marine security in the land domain for FY 2020. This report includes the following information for each border security metric:

- Definition of the metric and a brief description of how the metric contributes to the Department's understanding of border security;

- Discussion of the Department's current methodology for producing the metric and related methodological limitations; and

- Data for FY 2020, along with historical data where possible, and brief discussion of implications for the current state of border security.

The following sections of this report provide this information for each metric directed by the NDAA. In addition to the specific metrics identified in NDAA § 1092(b)–(e), this report includes supplemental metrics that inform the Department's assessment of the state of border security between POEs, as directed by NDAA § 1092(g)(3)(D).

Throughout the rest of this report, years refer to the federal fiscal year (October 1–September 30), unless otherwise noted. Numbers in the text of this report are rounded to the nearest hundred (for numbers between 1,000 and 10,000) or nearest thousand (for numbers between 10,001 and 1 million); please refer to data tables for precise figures.

# III. SEC. 1092 BORDER SECURITY METRICS

## § 1092(b) Metrics for Securing the Border between Ports of Entry

### § 1092(b)(1)(A)(i) Attempted unlawful border crosser apprehension rate

**Definition**

In general, the attempted unlawful border crosser apprehension rate is defined as the proportion of attempted border crossers apprehended by USBP:

$$\text{Apprehension Rate} = \frac{\text{Apprehensions}}{\text{Unlawful Entry Attempts}}$$

While USBP has reliable administrative data on apprehensions, the Department does not have an exact count of unlawful entry attempts since an unknown number of unlawful border crossers evade detection. As a result of this so-called "denominator problem," the Department must estimate the apprehension rate. Current methodologies allow DHS to produce two apprehension rate estimates:

- *Model-based* apprehension *rate* (AR$_{\text{Model-based}}$) − Based on statistical modeling, the estimated share of all attempted unlawful border crossers between land POEs that is apprehended.

- *Observational* apprehension *rate* (AR$_{\text{Observational}}$) − Based on direct (unlawful border crossers observed by USBP) and indirect (residual evidence of a border crosser (e.g., footprints)) observations of attempted unlawful border crossers, the estimated share of observed attempted unlawful border crossers that is apprehended.

The apprehension rate is an output metric that describes the difficulty of unlawfully crossing the border successfully.

A conceptual limitation of apprehension rate data is that they include information about border *apprehensions* but exclude information about *turn backs* (subjects who, after making an unlawful entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away) (see further discussion of NDAA § 1092(b)(1)(A)(iv), below). In this sense, measures of the apprehension rate understate USBP's overall enforcement success rate. On the other hand, some analysts consider information about turn backs difficult to interpret since an unknown share of turn backs make additional entry attempts.

**Methodology and Limitations**

**Model-based apprehension rate**

The model-based apprehension rate is based on the repeated trials model (RTM) methodology. As explained in detail in Appendix A, the RTM methodology yields an estimated PAR for Southwest Border crossers, which focuses on a relatively small share of attempted unlawful border crossers. This report includes significant updates to the PAR methodology given COVID and Title 42 policies (see Appendix A).

Following the calculation of the PAR, the model consists of four additional steps. First, all attempted unlawful border crossers are divided into two groups, which are labeled *impactable* and *non-impactable* by traditional DHS enforcement policies. Impactable border crossers include adults without children who are not asylum seekers and (prior to 2017) who are not from Cuba. Noncitizens in this group are described as impactable because they are generally subject to the full range of DHS and Department of Justice (DOJ) enforcement consequences, and therefore potentially impacted by

existing border enforcement. Non-impactable border crossers include unaccompanied children (UC), family units (FM), individuals who request asylum, and (prior to 2017) Cubans. Noncitizens in this group are described as non-impactable because, historically, they have usually been released into the United States with a Notice to Appear in immigration court for removal proceedings on a future date. These noncitizens are assumed generally to be non-impactable by traditional DHS enforcement activities at the border because even if they are apprehended, they are typically unlikely to be immediately removed.[4]

Second, the $AR_{\text{Model-based}}$ methodology assumes an apprehension rate for each of these two groups: 1) all attempted unlawful border crossers in the impactable population are assumed to be apprehended at the PAR generated by the RTM methodology; and 2) all unlawful border crossers in the non-impactable population are assumed to intentionally present themselves to a USBP agent or OFO officer and therefore to have a 100 percent apprehension rate. Notably, these assumptions do not reflect the actual behavior of all border crossers, as noted below, but they serve to construct a probability model.

Third, the PAR is used to calculate the total number of impactable noncitizens making unlawful entry attempts. The methodology assumes (in the previous step) that all impactable noncitizens are apprehended at the PAR rate generated by the RTM methodology:

$$PAR = \frac{Apprehensions_{\text{Impactable}}}{Attempts_{\text{Impactable}}}$$

Mathematically, this equation can be rearranged to define the total number of impactable noncitizens making an unlawful entry attempt as follows:

$$Attempts_{\text{Impactable}} = \frac{Apprehensions_{\text{Impactable}}}{PAR}$$

Since non-impactable noncitizens are assumed to have a 100 percent apprehension rate, the number of entry attempts of non-impactable noncitizens is equal to the number of their apprehensions.

Finally, the total apprehension rate is calculated as a weighted average of the total numbers of impactable and non-impactable noncitizens attempting unlawful entry times their respective apprehension rates:

$$AR_{\text{Model-based}} = \frac{(Attempts_{\text{Impactable}} * PAR) + (Attempts_{\text{Non-impactable}} * 100\%)}{Attempts_{\text{Impactable}} + Attempts_{\text{Non-impactable}}}$$

The current $AR_{\text{Model-based}}$ methodology makes assumptions that cannot be fully validated. First, the $AR_{\text{Model-based}}$ methodology builds on the RTM's PAR, and so incorporates all the RTM methodology assumptions and associated limitations discussed in Appendix A. In addition, the current $AR_{\text{Model-based}}$ methodology also assumes the entire cohort of border crossers can be divided into impactable and non-impactable groups, that the entire impactable group is apprehended at the same rate as RTM noncitizens included in the PAR analysis, and that the entire non-impactable group is apprehended 100 percent of the time. Each of these additional assumptions introduces potential biases into the estimated apprehension rate. Assumptions about non-impactable noncitizens may have an especially large impact on $AR_{\text{Model-based}}$ in recent years as non-impactables have come to represent a larger share of all encounters than has historically been the case. The current version of this report includes a sensitivity analysis at the end of Appendix A that quantifies the potential impact of these assumptions on the model-based apprehension rate.

---

[4]  Cubans were considered non-impactable between 1995 and January 2017 because they were routinely granted parole into the United States if they reached U.S. soil, under the "wet foot/dry foot" policy. The wet foot/dry foot policy was the name given to a former interpretation of the 1995 revision of the application of the Cuban Adjustment Act of 1966. The Obama Administration terminated the special parole component of the wet foot/dry foot policy in January 2017.

**Observational apprehension rate**

The observational apprehension rate is calculated as the ratio of USBP apprehensions to the sum of apprehensions and observed (directly or indirectly) *got aways*:

$$AR_{Observational} = \frac{Apprehensions}{Apprehensions + Got\ Aways}$$

Got aways are defined as subjects at the Southwest Border who, after making an unlawful entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

Since 2014, USBP has implemented a standard, Southwest Border-wide methodology for determining when to report a subject as a got away. Some subjects are observed directly as evading apprehension or turning back; others are acknowledged as got aways or turn backs after agents follow evidence that indicate entries have occurred such as foot sign (i.e., tracks), sensor activations, interviews with apprehended subjects, camera views, and communication between and among stations and sectors. The scope of these data includes all areas of the Southwest Border at or below the northernmost law enforcement posture (typically a USBP checkpoint) within a given area of responsibility, and those individuals apprehended less than 30 days after entering the United States.

In an effort to maintain reliable best practices, command staff at all Southwest Border stations ensure all agents are aware of and utilize proper definitions for apprehensions, got aways, and turn backs at their respective stations. They also ensure the necessary communication takes place between and among sectors and stations to minimize double counting when subjects cross more than one station's area of responsibility. In addition to station-level safeguards, designated USBP Headquarters components validate data integrity by utilizing various data quality reports.

The primary limitation to $AR_{Observational}$ is that the denominator excludes an unknown number of unobserved got aways. Over the past several years, DHS has invested millions of dollars in technology that has facilitated the ability to see and detect more at the border. Improvements in situational awareness give DHS an ever-increasing, real-time ability to understand how much unlawful activity agents are encountering at the immediate border and their ability to respond. As a result, while there have generally been substantially fewer overall border entries in recent years, agents are currently interdicting slightly lower percentages of the total known flow. This observation reflects USBP's increased domain awareness—through technological advances, the agency has improved its awareness of unlawful entry attempts (known got aways)—rather than experienced a reduction in enforcement effectiveness. Increasing situational awareness narrows the gap between the known and unknown flow and puts DHS in a position to build ever better observational estimates of border security.

An additional methodological limitation is that the estimated count of got aways aggregates potentially subjective observations from thousands of individual agents. USBP has taken steps to establish reliable turn back and got away methodologies, as discussed above.

**Ongoing Modeling Efforts**

Other model-based estimation methodologies can supplement the Department's current RTM. USBP has contracted with Johns Hopkins University Applied Physics Lab to develop a different approach by examining each station along the Southwest Border from an operational perspective. The method utilizes modeling and simulation of operational data and conditions and incorporates terrain and sensor models; resource deployment of infrastructure and agents; and the movement of both USBP Agents and border threats across known trails and patrol routes. Analysis was completed for all line stations along the Southwest Border for 2019, with ongoing analysis and refinements continuing with 2020 data. Additional operational elements are being built into the model to support new border security technologies and geographical areas.

*Available Data and Discussion*

Table 1 provides the estimated model-based apprehensions rate for 2000 to 2020 and the estimated observational apprehension rate for 2006 to 2020, the years for which these data are available.

**Table 1.**

**Model-Based and Observational Apprehension Rates, FY 2000 to 2020**

| Fiscal Year | Model-based Apprehension Rate | Model-based Apprehension Rate, Lower Bound | Model-based Apprehension Rate, Upper Bound | Observational Apprehension Rate |
|---|---|---|---|---|
| 2000 | 42.5 | NA | NA | NA |
| 2001 | 41.1 | NA | NA | NA |
| 2002 | 35.7 | NA | NA | NA |
| 2003 | 32.5 | NA | NA | NA |
| 2004 | 36.1 | NA | NA | NA |
| 2005 | 35.7 | NA | NA | NA |
| 2006 | 37.7 | NA | NA | 63.9 |
| 2007 | 38.5 | NA | NA | 64.6 |
| 2008 | 41.0 | 39.6 | 42.5 | 68.3 |
| 2009 | 42.9 | 41.4 | 44.5 | 71.3 |
| 2010 | 42.4 | 40.7 | 44.2 | 74.9 |
| 2011 | 42.3 | 39.5 | 45.5 | 79.8 |
| 2012 | 45.6 | 41.6 | 50.6 | 77.6 |
| 2013 | 50.6 | 46.0 | 56.1 | 71.0 |
| 2014 | 63.2 | 57.7 | 70.0 | 75.0 |
| 2015 | 66.9 | 60.9 | 74.2 | 76.9 |
| 2016 | 76.4 | 70.6 | 83.3 | 79.6 |
| 2017 | 71.9 | 66.5 | 78.3 | 74.9 |
| 2018 | 77.0 | 71.3 | 83.6 | 75.8 |
| 2019 | 89.5 | 85.2 | 94.1 | 85.0 |
| 2020 | 66.2 | 60.2 | 74.2 | 74.8 |

Notes: Model-based apprehension rate estimates for years prior to 2020 update previously reported estimates; see Appendix A for details. The lower and upper bounds are based on a 95 percent confidence interval.
NA – no data available.
Source: DHS Office of Immigration Statistics (OIS) analysis of USBP data and OIS RTM.

Overall, both available measures of the apprehension rate indicate that USBP apprehends the majority of intending border crossers, and that the apprehension rate has substantially increased over the last decade.

The model-based apprehension rate went from 42 percent in 2000 and a low point of 33 percent in 2003 to a high of 72 percent in 2019 before falling to 60 percent in 2020. Increases in the model-based apprehension rate have been sharpest since 2012, reflecting increases during this period in the estimated at-the-border deterrence rate, the estimated apprehension rate for impactable border crossers (i.e., the PAR), and an increase in the share of border crossers who are non-impactable and therefore assumed to be apprehended 100 percent of the time. (See discussion of NDAA §1092(g)(3)(D) Other Appropriate Information for the deterrence rate and of non-impactables as a share of border crossers.)

The observational apprehension rate has also shown improvements since 2006. Despite its limitations, the upward trend in $AR_{Observational}$ is noteworthy because it independently reinforces the upward trend observed in the model-based estimate. Moreover, with increasing situational awareness along the border during this period, it is likely that CBP detects an increasing share of total got aways over time, as noted above. As a result, the upward trend in $AR_{Observational}$ likely underestimates the actual increase in the total share of attempted border crossers that are apprehended.

IFR_AR_008632

### § 1092(b)(1)(A)(ii) Detected unlawful entries

***Definition***

*Detected unlawful entries* – The total number of attempted unlawful border crossers between land POEs who are directly or indirectly observed or detected by USBP.

Detected unlawful entries are an outcome metric that describes the numbers of noncitizens detected crossing or attempting to cross the border unlawfully. Detected unlawful entries are not a comprehensive outcome metric since they exclude undetected unlawful entries, as discussed below. The ratio of detected to undetected unlawful entries, also discussed below, is an output metric that describes the Department's ability to detect unlawful entries.

***Methodology and Limitations***

The number of detected unlawful entries is calculated as the sum of turn backs, got aways, apprehensions, and U.S. Code Title 42 (T42) encounters. Turn backs are defined as subjects who, after making an unlawful entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away. Got aways are defined as subjects who, after making an unlawful entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents. Apprehensions are defined as inadmissible noncitizens arrested by USBP under U.S. Code Title 8 immigration enforcement authority. T42 encounters are noncitizens expelled from the United States in accordance with orders from the Centers for Disease Control and Prevention (CDC) under its Title 42 public health authority. T42 expulsions are not based on immigration status and are tracked separately from apprehensions.

Turn backs and got aways are observational estimates; USBP records total and by-sector estimates of turn backs and got aways based on direct and indirect observations as described above. Apprehensions and T42 encounters are nationwide totals calculated based on based on CBP administrative records captured during enforcement processing; USBP apprehension and T42 data are considered a reliable count of law enforcement actions.

The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents. USBP has taken steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

***Available Data and Discussion***

Figure 1 depicts available data on estimated detected unlawful entries for 2006 to 2020, the years for which data are available. As the figure indicates, estimated detected unlawful entries (the sum of apprehensions, T42 encounters, observed turn backs, and observed got aways) fell from 2.0 million in 2006 to 548,000 in 2011, after which it stabilized between 500,000 and 800,000 until 2019 when it reached 1.1 million. In 2020, detected unlawful entries dropped to 671,000, back within the previous range and a 67 percent decrease from 2006.

IFR_AR_008633

**Figure 1.**

**Estimated Detected Unlawful Entries Between POEs, FY 2006 to 2020**



Notes: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred. Previous versions of this report misreported nationwide apprehensions as Southwest Border apprehensions for some years; data have been corrected to reflect nationwide totals for all years.

Source: OIS analysis of USBP data.

## § 1092(b)(1)(A)(iii) Estimated undetected unlawful entries

### Definition

*Undetected unlawful entries* – An estimate of the number of attempted unlawful border crossers between land POEs who are not directly or indirectly observed or detected by USBP. By assumption, undetected unlawful entries evade apprehension and enter the United States unlawfully.

Undetected unlawful entries are an outcome metric that describe the numbers of noncitizens who completely evade detection and successfully enter the United States unlawfully. Undetected unlawful entries are not a comprehensive outcome metric since the metric excludes detected unlawful entries, discussed above. The ratio of detected to total unlawful entries (i.e., the probability of detection) is an output metric that describes the Department's ability to detect unlawful entries, as discussed below. At present, this methodology only exists for the Southwest Border between POEs.

### Methodology and Limitations

Currently, the Department's best available methodology for estimating undetected unlawful entries builds on the RTM methodology to produce a model-based estimate of total successful unlawful entries. The estimated number of undetected unlawful entries is calculated as the difference between the model-based estimate of total successful unlawful entries and USBP's observational estimate of got aways (i.e., *detected* successful unlawful entries):

$$\textit{Undetected Unlawful Entries} = \textit{Total Successful Unlawful Entries} - \textit{Detected Got Aways}$$

As explained in detail in Appendix A, the RTM methodology yields an estimated PAR for Southwest Border crossers. Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps.

First, as in the calculation of the model-based apprehension rate discussed above, all attempted unlawful border crossers are divided into impactable and non-impactable groups (also see NDAA §1092(g)(3)(D) Other Appropriate Information). Second, based on the assumption that impactable noncitizens are apprehended at the same rate as RTM noncitizens included in the PAR analysis, the PAR is used to estimate the odds of successful entry for noncitizens within

the impactable population group.[5] Third, the number of successful unlawful entries is estimated based on the number of impactable noncitizens apprehended multiplied by the odds of successful entry among this group. Because non-impactable noncitizens are assumed to be apprehended 100 percent of the time (i.e., no noncitizen successfully enters without being apprehended) only impactable noncitizens contribute to the estimated count of successful unlawful entries.

$$Total\ Successful\ Unlawful\ Entries = \ Apprehensions\ of\ Impactable\ Noncitizens * Odds\ of\ Successful\ Entry$$

The estimated number of undetected unlawful entries is derived from the observational estimate of detected unlawful entries (with limitations discussed above) and the model-based estimate of total successful unlawful entries. This latter model-based estimate is in turn derived from the RTM methodology and the model-based apprehension rate, with additional limitations discussed above. (See Appendix A for further discussion of the assumptions involved in the estimate of total successful unlawful entries, including a sensitivity analysis for the most recent estimate.)

### *Available Data and Discussion*

Figure 2 depicts available data on estimated undetected unlawful entries. As the figure indicates, estimated undetected unlawful entries fell from over one million in 2006 to (technically) zero in 2018 and 2019 and rising to 69,000 in 2020. This does not necessarily mean that *zero* noncitizens successfully crossed the border without being detected. These findings are made possible by fact that the estimate of undetected entries is derived from two distinct data sources: detected entries is based on CBP's observational estimate of turn backs and got aways (and administrative data on apprehensions); total entries is based on OIS' repeated trials model. Neither component of the estimate is believed to produce an exact count. The finding of zero undetected entries in 2018 and 2019 simply reflects the fact that the RTM model-based methodology yields a slightly lower estimate of total successful unlawful entries than does CBP's observational estimate of got-aways.

**Figure 2.**

**Estimated Southwest Border Undetected Unlawful Entries, FY 2006 to 2020**



Notes: Data for years prior to 2020 update previously reported estimates; see Appendix A for details. The lower and upper bounds are based on a 95 percent confidence interval.
Source: OIS analysis of USBP data and OIS RTM.

---

[5]  Mathematically, *odds of successful entry* $= \left( \frac{1 - PAR}{PAR} \right)$.

IFR_AR_008635

## § 1092(b)(1)(A)(iv) Turn backs

### Definition

*Turn backs* – An estimate of the number of subjects who, after making an unlawful entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away.

Turn backs are an output metric that USBP uses for tactical decision-making.

Turn backs also contribute to several other border security metrics, including detected unlawful entries, discussed above, and the unlawful border crossing effectiveness rate, discussed below.

### Methodology and Limitations

Turn backs are a nationwide observational estimate; USBP records total and by-sector estimates of turn backs based on direct and indirect observations as described above.

The primary limitation to detected turn backs is that the estimate aggregates potentially subjective observations from thousands of individual agents. USBP has taken steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above. In addition, some unlawful border crossers might enter the United States to drop off drug loads or to act as decoys to lure agents away from a certain area and then return to Mexico, and therefore may be misidentified as turn backs.[6] However, USBP believes these instances are too infrequent to have a substantial impact on the total number of turn backs.

### Available Data and Discussion

The number of turn backs has decreased 14 percent since 2010, but increased 28 percent since 2019, the first year over year increase since 2015–2016. This increase was entirely due to increases in turn backs at the Southwest Border, as both Coastal and Northern Border turn backs decreased from 2019. However, Coastal Border turn backs increased by nearly 12 times the rate of 2010 turn backs, and Northern Border turn backs were at their second highest in history at a total of 219, compared to 0 in 2010.

**Table 2a.**

**USBP Turn Backs between POEs by Border, FY 2010 to 2020**

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Coastal Border | 98 | 0 | 0 | 1,804 | 3,002 | 3,440 | 5,665 | 1,957 | 413 | 1,443 | 1,175 |
| Northern Border | 0 | 21 | 51 | 34 | 20 | 32 | 9 | 56 | 121 | 228 | 219 |
| Southwest Border | 150,005 | 121,007 | 121,079 | 156,433 | 147,025 | 105,670 | 108,601 | 89,985 | 112,231 | 98,729 | 127,593 |
| **Nationwide Total** | **150,103** | **121,028** | **121,130** | **158,271** | **150,047** | **109,142** | **114,275** | **91,998** | **112,765** | **100,400** | **128,987** |

Notes: Previous versions of this table misreported total turn backs as being only turn backs at the Southern Border in some years; the current table corrects this error. Data for 2013-2020 as of end of year dates; data for 2010-2012 as of July 30, 2021 (end of year data snapshots only began as of 2013).
Source: USBP.

## § 1092(b)(1)(A)(v) Got aways

### Definition

*Got aways* – An estimate of the number of subjects who, after making an unlawful entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

---

[6] U.S. Government Accountability Office (GAO), "Border Patrol: Goals and Measures Not Yet in Place to Inform Border Security Status and Resource Needs," GAO-13-330T, February 26, 2013, p. 15.

IFR_AR_008636

15

*Total successful unlawful entries* – An estimate of the total number of subjects who cross the border unlawfully and who enter the United States without being apprehended.

### Methodology and Limitations

Got aways are an observational estimate; USBP records total and by-sector estimates of got aways based on direct and indirect observations as described above. Got aways are recorded by USBP at all borders; see Table 2b.

The number of got aways has decreased 12 percent since 2010, and 10 percent since 2019. Though got aways decreased at all borders compared to 2019, the 2020 decrease was almost entirely driven got aways the Southwest Border, which accounted for over 99 percent of all got aways. Northern Border got aways decreased by 34 percent 2019 to 2020, while Coastal Border got aways decreased by 1 percent. However, Coastal Border turn backs were at their second highest level since 2010, at over two and a half times the level of 2010. Northern Border turn backs were also at their second highest level since 2010, at over eighteen times the level of 2010.

**Table 2b.**
**USBP Detected Got Aways between POEs by Border, FY 2010 to 2020**

|                    | 2010    | 2011   | 2012    | 2013    | 2014    | 2015    | 2016    | 2017    | 2018    | 2019    | 2020    |
|--------------------|---------|--------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| Coastal Border     | 351     | 682    | 610     | 577     | 594     | 681     | 572     | 533     | 496     | 935     | 926     |
| Northern Border    | 16      | 39     | 21      | 35      | 53      | 43      | 41      | 67      | 239     | 441     | 289     |
| Southwest Border   | 155,232 | 85,505 | 104,474 | 171,051 | 161,424 | 100,771 | 106,030 | 103,694 | 127,944 | 150,090 | 135,593 |
| **Nationwide Total** | **155,599** | **86,226** | **105,105** | **171,663** | **162,071** | **101,495** | **106,643** | **104,294** | **128,679** | **151,466** | **136,808** |

Note:  Data for 2013-2020 as of end of year dates; data for 2010-2012 as of July 30, 2021 (end of year data snapshots only began as of 2013).
Source:  USBP.

As the vast majority of got aways occur at the Southwest Border, the remainder of this section refers exclusively to the Southwest Border between POEs.

The primary methodological limitation of got aways is that the estimate aggregates potentially subjective observations from thousands of individual agents.  USBP has taken steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Conceptually, the got aways metric is limited to flows observed (directly or indirectly); the metric is not a comprehensive measure of successful unlawful entries.  USBP's recent work to increase situational awareness, including using Geospatial Intelligence, gives the Department growing confidence in its count of got aways.  As situational awareness continues to improve, observed got aways will become an increasingly comprehensive measure of successful unlawful entries.  USBP and DHS are working to refine USBP's observational methodology and to more precisely describe the gap between observed and unobserved got aways.

The current methodology for estimating total successful unlawful entries is based on the RTM methodology.  As explained in detail in Appendix A, the RTM methodology yields an estimated PAR for Southwest Border crossings, which focuses on a relatively small share of attempted unlawful border crossers.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps, as described above: attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group multiplied by the number of apprehensions of impactable noncitizens.

Each assumption involved in using the PAR to estimate total successful unlawful entries introduces methodological limitations and potential biases.  See Appendix A for a discussion of the impact of these assumptions.

IFR_AR_008637

### Available Data and Discussion

Figure 3 depicts detected got aways at the Southwest Border between POEs for 2006 to 2020, as well as the estimated total successful unlawful entries for 2000 to 2020. As the figure illustrates, estimated total successful unlawful entries declined from over 2.1 million to 200,000 between 2000 and 2020, a 91 percent decrease. Estimated got aways declined from 615,000 to 135,000 between 2006 and 2019, a 78 percent decrease.

**Figure 3.**

**Southwest Border Got Aways and Estimated Total Successful Unlawful Entries between POEs, FY 2000 to 2020**



Notes: Data for estimated total successful unlawful entries for years prior to 2020 update previously reported estimates; see Appendix A for details. The lower and upper bounds are based on a 95 percent confidence interval.

Source: OIS analysis of USBP data and OIS RTM.

Notably, the model-based estimate of total successful unlawful entries declined at a faster rate than observed got aways, with the model-based estimate falling 88 percent between 2006 and 2020 (the period for which both data series are available) versus a 78 percent decrease for detected got aways during this period. Relatedly, the two series have substantially converged over this time-period, with observed got aways accounting for 35 percent of total estimated successful unlawful entries in 2006 versus over 100 percent in 2018 and 2019 and 66 percent in 2020. As noted above, the use of separate methodologies to estimate observed got aways and total successful unlawful entries yields findings that cannot be fully reconciled for recent years, but DHS interprets the overall convergence of these trends to suggest that USBP detects an increasingly comprehensive share of all attempted unlawful border crossers.

### § 1092(b)(1)(B) A measurement of situational awareness achieved in each U.S. Border Patrol sector

#### Definition

*Situational awareness* – Knowledge and understanding of current unlawful cross-border activity.

Situational awareness is an output metric that describes the Department's awareness of unlawful cross-border activity.

USBP refines the NDAA definition of situational awareness as its ability to perceive elements within the environment, comprehend their meaning, and project future status. This definition is inclusive of unlawful activity as well as legitimate activity, as both can have an influence on operational performance.

IFR_AR_008638

*Methodology and Limitations*

USBP is refining measures for situational awareness as part of a larger effort to measure performance and success in securing the U.S. border between the ports of entry. This larger effort has led to the development of a comprehensive metric framework with a hierarchical structure and methodology by which USBP can broadly measure several indicators, providing a more comprehensive picture of USBP's performance and operating environment.

The situational awareness element includes measures of operational performance and of technology systems used. To enhance situational awareness, USBP must consistently strive for two enduring states: increased perception of all factors in the operational environment; and the ability to comprehend the impact those factors have on operations, both currently and in the future. Achievement in these areas requires USBP to execute on mission essential tasks, including its abilities to predict, detect, identify, classify, track, respond, and resolve.

USBP plans to meet the intent of the NDAA § 1092(b)(1)(B) through the metrics developed as part of the metric framework. USBP anticipates being able to report on situational awareness in future versions of the BSMR. In the interim, a number of the Department's existing metrics are informed by the Department's awareness of migrants and other threats in the near border regions and approaches. (See discussion in report's sections for NDAA § 1092(b)(1)(A)(ii)–(v) and § 1092(b)(1)(D).)

## § 1092(b)(1)(C) Unlawful border crossing effectiveness rate

### Definition

*Unlawful border crossing effectiveness rate* – The estimated percentage of all attempted unlawful border crossers interdicted by USBP, where interdictions include apprehensions, T42 encounters, and turn backs.

The unlawful border crossing effectiveness rate is an output metric that describes how difficult it is for unlawful border crossers to enter the United States without being interdicted.

### Methodology and Limitations

The unlawful border crossing effectiveness rate is calculated by dividing the number of apprehensions, turn backs, and T42s between land POEs by the sum of the number of apprehensions, turn backs, T42s, and total estimated successful unlawful entries.

$$\text{Effectiveness Rate} = \frac{\text{Apprehensions} + \text{Turn Backs} + \text{Title 42s}}{\text{Apprehensions} + \text{Turn Backs} + \text{Title 42s} + \text{Successful Unlawful Entries}}$$

The NDAA calls for an effectiveness rate that incorporates USBP's observational estimate of turn backs and DHS's current model-based estimate of total estimated successful unlawful entries. This measure would confront the methodological challenges associated with each of its component parts, as discussed above.

The unlawful border crossing effectiveness rate is conceptually similar to the estimated apprehension rate, with the difference being that the effectiveness rate includes data on turn backs, T42s, and apprehensions while the apprehension rate focuses exclusively on apprehensions. An advantage to examining the effectiveness rate, rather than the apprehension rate, is that the effectiveness rate more completely captures USBP's actual enforcement practices, including both efforts to turn back border crossers and efforts to apprehend them. However, some analysts consider the effectiveness rate (along with the interdiction effectiveness rate, or IER) to be an ambiguous indicator of enforcement success given an unknown share of turn backs make additional entry attempts.

The unlawful border crossing effectiveness rate is also conceptually similar to USBP's IER, which USBP reports in its Annual Performance Report pursuant to the Government Performance and Results Act Modernization Act (GPRAMA) of 2010. The unlawful border crossing effectiveness rate differs from the IER in that the former includes total estimated successful unlawful entries in its denominator and IER only includes known got aways.

The calculation for IER was adjusted in 2020 to allow for inclusion of T42s, a significant portion of the population. In accordance with the Performance Measure Definition approved by DHS in August 2020, IER calculations include T42 encounters as a successful law-enforcement outcome to an unlawful entry.

$$\text{Interdiction Effectiveness Rate (IER)} = \frac{\textit{Apprehensions + Turn Backs + Title 42s}}{\textit{Apprehensions + Turn Backs + Title 42s + Got Aways}}$$

A limitation of IER is that changes in the Department's situational awareness make changes in IER somewhat difficult to interpret. In particular, increases in the share of noncitizens apprehended or turned back may be offset by gains in the share of intending border crossers observed by USBP (i.e., in the accuracy of the observational got away estimate).

Despite its shortcomings as an analytic tool, only the IER is currently available for analysis at the sector level. While a Southwest Border-wide estimate has been developed for the model-based apprehension rate, sector-level estimates of unlawful entries and attempts for this metric have not yet been produced and validated by DHS.

### Available Data and Discussion

Table 3 summarizes interdiction effectiveness rates by Southwest Border sector for 2014 to 2020.

**Table 3.**

**Interdiction Effectiveness Rate by Southwest Border Sector, FY 2014 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | SW Border Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | 72% | 76% | 85% | 92% | 74% | 80% | 89% | 75% | 91% | 80% |
| 2015 | 77% | 73% | 83% | 90% | 74% | 82% | 88% | 80% | 95% | 81% |
| 2016 | 70% | 79% | 81% | 89% | 78% | 83% | 89% | 82% | 96% | 83% |
| 2017 | 67% | 72% | 81% | 91% | 72% | 80% | 87% | 71% | 96% | 79% |
| 2018 | 54% | 73% | 83% | 91% | 69% | 81% | 85% | 75% | 97% | 80% |
| 2019 | 61% | 85% | 86% | 93% | 70% | 89% | 81% | 76% | 99% | 86% |
| 2020 | 57% | 74% | 85% | 88% | 81% | 80% | 81% | 72% | 91% | 80% |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.

Source: OIS analysis of USBP data.

The 2020 interdiction effectiveness rate was 80 percent in 2020, one percent below the 2014-2020 average. The effectiveness rate decreased across all sectors compared to 2019 except for Laredo, which increased by eleven percentage points. The largest decrease from 2019 to 2020 was in Del Rio, which decreased by eleven percentage points, followed by Rio Grande Valley and Yuma, which decreased by nine and eight percentage points respectively. These decreases across sectors are in part due to 2020 having some of the highest recidivism rates in recent history. In addition, the decreases likely reflect increased situational awareness (i.e., a larger share of got aways observed) rather than a drop in the share of intending crossers being apprehended or turned back. On the Northern Border, the physical security concern does not focus on the apprehension rate of unlawful entrants, since the number of such attempted and successful entries is small.

## § 1092(b)(1)(D) Probability of detection rate

### Definition

*Estimated probability of detection* – The estimated probability that DHS detects attempted unlawful border crossers between land POEs.

The estimated probability of detection is an output metric that describes the ability of attempted unlawful border crossers to enter without being detected. Because successful unlawful entry estimates are available only for the Southwest Border between POEs, data in this section refer exclusively to this region.

IFR_AR_008640

*Methodology and Limitations*

The estimated probability of detection is defined as the ratio of detected unlawful entries to estimated total unlawful entries:

$$Probability\ of\ Detection = \frac{Detected\ Unlawful\ Entries}{Estimated\ Total\ Unlawful\ Entries}$$

As described above, the number of detected unlawful entries is calculated as the sum of turn backs, got aways, and apprehensions, a mix of observational estimates and administrative data. The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents. USBP has taken steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Estimated total unlawful entries is calculated as the sum of turn backs, apprehensions, and the model-based estimate of total successful unlawful entries. As described above, the methodology for estimating total successful unlawful entries begins with the RTM methodology's partial apprehension rate, discussed in detail in Appendix A. Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps: attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful unlawful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group multiplied by the apprehension count among impactable noncitizens.

Each additional assumption involved in using the PAR to estimate total successful unlawful entries introduces additional methodological limitations and potential biases. Appendix A discusses the impact of these limitations on the Department's estimate of total successful unlawful entries.

*Available Data and Discussion*

Figure 4 depicts the estimated probability of detection for 2006 to 2019, the years for which data are available. As the figure indicates, the estimated probability increased from 63 percent in 2006 (when an estimated 2.0 million unlawful border crossers were detected out of an estimated 3.2 million total unlawful border crossers) to a high of 100 percent in 2018 and 2019 before falling to 91 percent in 2020. As noted above, the finding of a 100 percent detection rate is made possible by fact that the Department uses separate methodologies to estimate total unlawful entries and total detected entries. The Department does not believe these findings mean that all intending border crossers are detected, but interprets the overall trend depicted in Figure 4 to reflect that USBP has detected an increasing share of intending border crossers over these years.

**Figure 4.**

**Southwest Border Between POEs Estimated Probability of Detection, FY 2006 to 2020**



Notes: Data for estimated total successful unlawful entries for years prior to 2020 update previously reported estimates; see Appendix A for details. The lower and upper bounds are based on a 95 percent confidence interval.

Source: OIS analysis of USBP data and OIS RTM.

## § 1092(b)(1)(E) Apprehensions in Each U.S. Border Patrol Sector

### *Definition*

*Title 8 Apprehension* (T8) – The arrest of an inadmissible noncitizen by USBP under T8 immigration enforcement authority.

*Title 42 (T42) Encounter* – The encounter of a noncitizen under T42 authority. CDC issued a series of orders under its authorities at 42 U.S.C. §§ 265, 268, and 42 C.F.R. § 71.40 beginning on March 20, 2020, which suspended the right to introduce certain persons (covered noncitizens, as defined in the orders) into the United States from countries or places where COVID-19 exists in order to protect the public health from an increased risk of the introduction of COVID-19. As a result of the CDC orders, USBP began expelling certain noncitizens who would otherwise be introduced into a congregate setting in a port of entry (POE) or USBP station at or near the land and adjacent coastal borders, subject to certain exceptions as outlined in the orders. Expulsions under T42 authority are not based on immigration status and are tracked separately from apprehensions.

*Total USBP Encounters* – The sum of T8 apprehensions and T42 encounters.

This BSMR interprets the reporting requirement for apprehensions in each USBP sector to encompass total USBP encounters by sector. In the following "Available Data and Discussion" data tables of this section, apprehensions and T42s are together summarily referred to as "apprehensions."

Apprehensions and T42 encounters are output metrics which provide information used for program planning and operational purposes, among other uses. Historically, the Department has also used apprehensions as a proxy indicator of unlawful entries, an outcome metric.

For many years, DHS and the legacy INS also used apprehensions as a proxy indicator of successful unlawful border crossings, i.e., an outcome metric. Over the long-term and across multiple locations, apprehensions are a problematic indicator of enforcement outcomes given the relationship between apprehensions and successful unlawful entries depends on the apprehension rate, which changes over time and may also differ by location. But in the short term, and

IFR_AR_008642    21

in a fixed geographic area, DHS continues to view changes in apprehensions (or apprehensions and T42 encounters) as a useful outcome indicator because short-term changes in total encounters are more likely to be driven by changes in the number of unlawful border crossing attempts than by changes in the apprehension rate.

### Methodology and Limitations

Apprehensions and T42s are recorded in administrative record systems with a unique identifier created for each apprehension and T42. USBP's count of apprehensions and T42s is considered reliable.

The apprehensions and T42s displayed below are event counts, meaning each apprehension or T42 of the same noncitizen in a year is counted separately. In other words, these data do not represent the count of unique noncitizens apprehended.

### Available Data and Discussion

Table 4 provides counts of total apprehensions and T42s by USBP sector for 2020, broken out by type.

**Table 4.**

**Total Apprehensions by Title, FY 2020**

| Title | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Blaine, WA |
|---|---|---|---|---|---|---|---|---|---|---|
| T8 | 4,060 | 18,596 | 11,712 | 29,842 | 22,498 | 48,908 | 24,890 | 37,771 | 5,331 | 170 |
| T42 | 4,567 | 21,746 | 15,775 | 24,554 | 28,927 | 41,295 | 28,387 | 28,303 | 3,473 | 57 |
| Total | 8,627 | 40,342 | 27,487 | 54,396 | 51,425 | 90,203 | 53,277 | 66,074 | 8,804 | 227 |

**Table 4 (Continued)**

| Title | Buffalo, NY | Detroit, MI | Grand Forks, ND | Houlton, ME | Havre, MT | Spokane, WA | Swanton, VT | Miami, FL | New Orleans, LA | Ramey, PR | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| T8 | 174 | 454 | 217 | 87 | 26 | 229 | 470 | 1,302 | 572 | 356 | **207,665** |
| T42 | 128 | 1 | 10 | 17 | 4 | 7 | 104 | 0 | 0 | 0 | **197,355** |
| Total | 302 | 455 | 227 | 104 | 30 | 236 | 574 | 1,302 | 572 | 356 | **405,020** |

Source: OIS Statistical Immigration Data.

Apprehensions were relatively evenly split between T8 apprehensions (52 percent) and T42 encounters (49 percent). However, this trend was largely driven by the Southwest Border; T42s only made up 9 percent of Northern Border apprehensions, and there were no T42 Coastal Border apprehensions.

Tables 4a-4c summarize Southwest, Northern, and Coastal Border apprehensions and T42s by USBP sector.

IFR_AR_008643

**Table 4a.**

**Southwest Border Apprehensions by USBP Sector, FY 2010 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2010** | 5,288 | 14,694 | 32,562 | 12,251 | 35,287 | 59,766 | 68,565 | 212,202 | 7,116 | **447,731** |
| **2011** | 4,036 | 16,144 | 30,191 | 10,345 | 36,053 | 59,243 | 42,447 | 123,285 | 5,833 | **327,577** |
| **2012** | 3,964 | 21,720 | 23,916 | 9,678 | 44,872 | 97,762 | 28,461 | 120,000 | 6,500 | **356,873** |
| **2013** | 3,684 | 23,510 | 16,306 | 11,154 | 50,749 | 154,453 | 27,496 | 120,939 | 6,106 | **414,397** |
| **2014** | 4,096 | 24,255 | 14,511 | 12,339 | 44,049 | 256,393 | 29,911 | 87,915 | 5,902 | **479,371** |
| **2015** | 5,031 | 19,013 | 12,820 | 14,495 | 35,888 | 147,257 | 26,290 | 63,397 | 7,142 | **331,333** |
| **2016** | 6,366 | 23,078 | 19,448 | 25,634 | 36,562 | 186,830 | 31,891 | 64,891 | 14,170 | **408,870** |
| **2017** | 6,002 | 13,476 | 18,633 | 25,193 | 25,460 | 137,562 | 26,086 | 38,657 | 12,847 | **303,916** |
| **2018** | 8,045 | 15,833 | 29,230 | 31,561 | 32,641 | 162,262 | 38,591 | 52,172 | 26,244 | **396,579** |
| **2019** | 9,637 | 57,269 | 35,138 | 182,143 | 38,378 | 339,135 | 58,049 | 63,490 | 68,269 | **851,508** |
| **2020** | 8,627 | 40,342 | 27,487 | 54,396 | 51,425 | 90,203 | 53,277 | 66,074 | 8,804 | **400,635** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.

Source: OIS Statistical Immigration Data.

Total Southwest Border apprehensions were 7 percent below the 2010-2020 average. Apprehensions decreased across Southwest sectors from 2019-2020 except in Laredo and Tucson. The largest numeric decrease was in the Rio Grande Valley Sector with 250,000 fewer apprehensions in 2020 than in 2019, while the largest percentage decrease was in Yuma, where apprehensions declined by 87 percent. Rio Grande Valley and Tucson Sector together accounted for 39 percent of all apprehensions in 2020. In contrast, El Paso and Yuma—major sectors for apprehensions in 2019—reported considerably lower numbers, with El Paso reporting 54,000 apprehensions in 2020, compared to 180,000 apprehensions in 2019 (a 71 percent decrease), and Yuma reporting 9,000 apprehensions in 2020, as compared to 68,000 in 2019 (a 88 percent decrease).

**Table 4b.**

**Northern Border Apprehensions by USBP Sector, FY 2017 to 2020**

| Fiscal Year | Blaine, WA | Buffalo, NY | Detroit, MI | Grand Forks, ND | Houlton, ME | Havre, MT | Spokane, WA | Swanton, VT | Total |
|---|---|---|---|---|---|---|---|---|---|
| **2017** | 288 | 447 | 1,070 | 496 | 30 | 39 | 208 | 449 | **3,027** |
| **2018** | 359 | 384 | 1,930 | 461 | 52 | 47 | 347 | 736 | **4,316** |
| **2019** | 524 | 537 | 1,322 | 412 | 52 | 77 | 428 | 1,056 | **4,408** |
| **2020** | 227 | 302 | 455 | 227 | 104 | 30 | 236 | 574 | **2,155** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.

Source: OIS Statistical Immigration Data.

Northern Border apprehensions represented about half a percent of total USBP apprehensions in 2020 and were at their lowest point for the 2017-2020 period. Swanton was the leading Northern Border sector with 570 noncitizens apprehended, closely followed by Detroit, the next leading sector (460 apprehensions). Havre, MT reported the fewest apprehensions in 2020 (30).

**Table 4c.**

**Coastal Border Apprehensions by USBP Sector, FY 2017 to 2020**

| Fiscal Year | Miami, FL | New Orleans, LA | Ramey, PR | Total |
|---|---|---|---|---|
| **2017** | 2,280 | 920 | 388 | **3,588** |
| **2018** | 2,169 | 798 | 280 | **3,247** |
| **2019** | 1,891 | 1,132 | 562 | **3,585** |
| **2020** | 1,302 | 572 | 356 | **2,230** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.
Source: OIS Statistical Immigration Data.

Coastal Border apprehensions represented just over half a percent of total USBP apprehensions in 2020. Though this proportion is larger than in recent years, this signifies a decrease in Southwest Border apprehensions, rather than an increase in Coastal Border apprehensions (in fact, total Coastal Border apprehensions were at their lowest point in the 2017-2020 period). Of the 2,200 coastal apprehensions, 58 percent occurred in the Miami Sector (1,300). Ramey reported the fewest apprehensions in 2020 (360).

### § 1092(b)(1)(F) Apprehensions of unaccompanied children

#### Definition

*Unaccompanied child* (UC) – A child who has no lawful immigration status in the United States; has not attained 18 years of age, and with respect to whom; 1) there is no parent or legal guardian in the United States; or 2) no parent or legal guardian in the United States is available to provide care and physical custody (6 U.S.C. § 279(g)(2)).

This BSMR interprets the reporting requirement for apprehensions in each USBP sector to encompass total USBP encounters by sector. In the following "Available Data and Discussion" data tables of this section, apprehensions and T42s are together summarily referred to as "apprehensions."

UC apprehensions and T42 encounters are output metrics that provide information used for program planning and operational purposes, among other uses. Historically, the Department has also used apprehensions as a proxy indicator of unlawful entries, an outcome metric.

#### Methodology and Limitations

Apprehensions and T42s are recorded in administrative record systems with a unique identifier created for each apprehension. Since 2008, USBP systems have included a flag for children who are found to meet the legal definition of a UC. USBP's count of apprehensions and T42 encounters is considered reliable, but some outside analysts have raised questions about agents' ability to reliably distinguish among older children and young adults (e.g., to distinguish between individuals who are 17 and 18 years of age) and to confirm whether children are traveling alone or in family groups.[7]

USBP began collecting data on UCs apprehended between POEs in 2008; data are unavailable for earlier years.

#### Data and Discussion

Table 5 provides counts of UC apprehensions and T42 encounters at the Southwest Border by citizenship and by USBP sector for 2020, broken out by type.

---

[7]  OIG-10-12 Department of Homeland Security Office of Inspector General. *Age Determination Practices for Unaccompanied Alien Children in ICE Custody.* November 2009

IFR_AR_008645

**Table 5.**

**USBP Total Southwest Border Apprehensions of UCs by Title, FY 2020**

| Title | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| T8 | 272 | 1,344 | 737 | 2,881 | 1,647 | 7,097 | 1,043 | 4,061 | 536 | **19,618** |
| T42 | 253 | 855 | 870 | 1,954 | 994 | 3,158 | 812 | 1,887 | 151 | **10,934** |
| Total | 525 | 2,199 | 1,607 | 4,835 | 2,641 | 10,255 | 1,855 | 5,948 | 687 | **30,552** |

Source:  OIS Statistical Immigration Data.

About one third of UC apprehensions were T42s (36 percent), while the remainder were T8s (64 percent).  Rio Grande Valley had the majority of both T8s (36 percent) and T42s (29 percent). The fewest T8s occurred in Big Bend (1 percent) while the fewest T42s occurred in Yuma (1 percent).

Tables 5a–5d provide counts of UC apprehensions and T42s at the Southwest Border by citizenship and by USBP sector for 2010 to 2020.

**Table 5a.**

**USBP Total Southwest Border Apprehensions of UCs, FY 2010 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2010** | 197 | 1,014 | 448 | 1,011 | 1,570 | 4,977 | 980 | 7,998 | 216 | **18,411** |
| **2011** | 189 | 1,113 | 457 | 697 | 1,608 | 5,236 | 549 | 5,878 | 222 | **15,949** |
| **2012** | 168 | 1,618 | 498 | 659 | 2,658 | 10,759 | 524 | 7,239 | 280 | **24,403** |
| **2013** | 125 | 2,135 | 434 | 744 | 3,795 | 21,553 | 656 | 9,070 | 247 | **38,759** |
| **2014** | 256 | 3,268 | 662 | 1,029 | 3,800 | 49,959 | 954 | 8,262 | 351 | **68,541** |
| **2015** | 839 | 2,285 | 668 | 1,662 | 2,459 | 23,864 | 1,084 | 6,019 | 1,090 | **39,970** |
| **2016** | 951 | 2,689 | 1,379 | 3,885 | 2,953 | 36,714 | 1,553 | 6,302 | 3,266 | **59,692** |
| **2017** | 811 | 1,349 | 1,531 | 3,926 | 2,033 | 23,708 | 1,551 | 3,659 | 2,867 | **41,435** |
| **2018** | 989 | 1,297 | 2,715 | 5,461 | 2,879 | 23,757 | 2,491 | 5,023 | 5,424 | **50,036** |
| **2019** | 779 | 3,621 | 2,688 | 16,159 | 2,521 | 34,523 | 3,335 | 5,105 | 7,289 | **76,020** |
| **2020** | 525 | 2,199 | 1,607 | 4,835 | 2,641 | 10,255 | 1,855 | 5,948 | 687 | **30,552** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.
Source:  OIS Statistical Immigration Data.

**Table 5b.**

**USBP Southwest Border Apprehensions of UCs from Mexico, FY 2010 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2010** | 180 | 772 | 404 | 947 | 886 | 2,787 | 950 | 6,485 | 204 | **13,615** |
| **2011** | 183 | 801 | 427 | 663 | 1,022 | 3,009 | 523 | 4,893 | 192 | **11,713** |
| **2012** | 137 | 911 | 418 | 616 | 1,369 | 4,361 | 480 | 5,405 | 246 | **13,943** |
| **2013** | 104 | 1,082 | 328 | 654 | 1,652 | 6,366 | 598 | 6,241 | 194 | **17,219** |
| **2014** | 102 | 821 | 278 | 698 | 1,354 | 7,081 | 740 | 4,394 | 166 | **15,634** |
| **2015** | 73 | 798 | 397 | 823 | 1,299 | 3,243 | 823 | 3,412 | 144 | **11,012** |
| **2016** | 118 | 867 | 610 | 1,149 | 1,515 | 3,389 | 851 | 3,293 | 134 | **11,926** |
| **2017** | 166 | 512 | 688 | 768 | 1,112 | 2,791 | 702 | 2,004 | 134 | **8,877** |
| **2018** | 190 | 541 | 1,162 | 806 | 1,545 | 2,466 | 1,164 | 2,118 | 144 | **10,136** |
| **2019** | 224 | 575 | 1,021 | 1,004 | 1,526 | 2,530 | 1,374 | 2,039 | 194 | **10,487** |
| **2020** | 291 | 924 | 1,333 | 1,964 | 2,024 | 3,122 | 1,653 | 2,825 | 219 | **14,355** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.
Source:  OIS Statistical Immigration Data.

**Table 5c.**

**USBP Southwest Border Apprehensions of UCs from Northern Triangle Countries, FY 2010 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 16 | 238 | 42 | 58 | 598 | 2,057 | 28 | 1,326 | 8 | 4,371 |
| 2011 | 6 | 307 | 29 | 32 | 528 | 2,030 | 25 | 927 | 28 | 3,912 |
| 2012 | 29 | 701 | 70 | 40 | 1,228 | 6,229 | 44 | 1,753 | 34 | 10,128 |
| 2013 | 18 | 1,044 | 104 | 80 | 2,028 | 14,696 | 48 | 2,731 | 36 | 20,785 |
| 2014 | 151 | 2,422 | 379 | 290 | 2,329 | 42,020 | 209 | 3,727 | 178 | 51,705 |
| 2015 | 760 | 1,479 | 269 | 824 | 1,113 | 20,260 | 255 | 2,497 | 930 | 28,387 |
| 2016 | 824 | 1,806 | 641 | 2,685 | 1,382 | 32,935 | 625 | 2,904 | 3,091 | 46,893 |
| 2017 | 633 | 821 | 667 | 3,093 | 858 | 20,620 | 701 | 1,639 | 2,722 | 31,754 |
| 2018 | 798 | 741 | 1,238 | 4,563 | 1,091 | 20,893 | 825 | 2,839 | 5,201 | 38,189 |
| 2019 | 544 | 2,857 | 1,382 | 14,664 | 944 | 30,873 | 1,666 | 2,978 | 6,840 | 62,748 |
| 2020 | 226 | 1,161 | 109 | 2,554 | 599 | 6,831 | 137 | 3,044 | 371 | 15,032 |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred. Northern Triangle counties include El Salvador, Guatemala, and Honduras.
Source: OIS Statistical Immigration Data.

**Table 5d.**

**USBP Southwest Border Apprehensions of UCs from All Other Countries, FY 2010 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 1 | 4 | 2 | 6 | 86 | 133 | 2 | 187 | 4 | 425 |
| 2011 | 0 | 5 | 1 | 2 | 58 | 199 | 1 | 58 | 2 | 326 |
| 2012 | 2 | 6 | 10 | 5 | 61 | 169 | 0 | 82 | 0 | 335 |
| 2013 | 3 | 9 | 2 | 10 | 115 | 491 | 10 | 98 | 17 | 755 |
| 2014 | 3 | 25 | 5 | 41 | 117 | 858 | 5 | 141 | 7 | 1,202 |
| 2015 | 6 | 8 | 2 | 15 | 47 | 361 | 6 | 110 | 16 | 571 |
| 2016 | 9 | 16 | 128 | 51 | 56 | 390 | 77 | 105 | 41 | 873 |
| 2017 | 12 | 16 | 176 | 65 | 63 | 297 | 148 | 16 | 11 | 804 |
| 2018 | 1 | 15 | 315 | 92 | 243 | 398 | 502 | 66 | 79 | 1,711 |
| 2019 | 11 | 189 | 285 | 491 | 51 | 1,120 | 295 | 88 | 255 | 2,785 |
| 2020 | 8 | 114 | 165 | 317 | 18 | 302 | 65 | 79 | 97 | 1,165 |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.
Source: OIS Statistical Immigration Data.

Total USBP UC apprehensions at the Southwest Border in 2020 reached the lowest point since 2012 and were less than a half of the level of the previous year due to new rules and regulation on immigration and travel due to the pandemic. About half of these children (49 percent) were from the Northern Triangle countries of El Salvador, Guatemala, and Honduras. The number of UCs from Mexico (14,000) entering at the Southwest Border was up 37 percent from 2019. At the same time, apprehensions at the Southwest Border of UCs from the Northern Triangle (15,000) were down 76 percent from 2019. While apprehensions of UCs from countries other than Mexico and the Northern Triangle represent a small portion of total UC Southwest Border apprehensions, and the count of UCs from other countries decreased 2019–2020, their share of the total reached an all-time high of 4 percent in 2020.

The leading countries of citizenship of UCs from countries other than Mexico and the Northern Triangle were Ecuador (592), India (196), and Nicaragua (100).

Nearly all UC apprehensions in 2020 (over 99 percent) occurred along the Southwest Border. Only 39 UCs were apprehended across the Northern Border, while 18 were apprehended along the Coastal Border.

### § 1092(b)(1)(G) Apprehensions of family unit aliens

#### Definition

*Family unit member* (FM) – A member of a group consisting of a noncitizen minor with his or her adult noncitizen parent or legal guardian.  For example, a mother and child apprehended together are counted as two FM noncitizens.

This BSMR interprets the reporting requirement for apprehensions in each USBP sector to encompass total USBP encounters by sector. In the following "Available Data and Discussion" data tables of this section, apprehensions and T42s are together summarily referred to as "apprehensions."

FM apprehensions and T42 encounters are output metrics that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of unlawful entries, an outcome metric.

#### Methodology and Limitations

Apprehensions and T42s are recorded in administrative record systems with a unique identifier created for each apprehension and T42.  USBP's count of apprehensions and T42s is considered reliable, but agents may not always be able to reliably identify FMs.

USBP began collecting data on FMs apprehended between POEs in 2012; data on FMs are unavailable for earlier years.

#### Data and Discussion

Table 6 provides counts of FM apprehensions and T42 encounters at the Southwest Border by citizenship and by USBP sector for 2020, broken out by type.

**Table 6.**
**USBP Total Southwest Border Apprehensions of FMs by Title, FY 2020**

| Title | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **T8** | 314 | 5,639 | 828 | 9,209 | 572 | 9,062 | 4,042 | 9,967 | 2,547 | **42,180** |
| **T42** | 68 | 2,064 | 229 | 1,346 | 1,319 | 2,604 | 963 | 1,064 | 393 | **10,050** |
| **Total** | 382 | 7,703 | 1,057 | 10,555 | 1,891 | 11,666 | 5,005 | 11,031 | 2,940 | **52,230** |

Source:  OIS Statistical Immigration Data.

About one fifth of FM apprehensions were T42s (19 percent), while the remainder were T8s (81 percent).  Tucson had the majority of T8s (24 percent) while Rio Grande Valley had the majority of T42s (26 percent). Big Bend had both the fewest T8s (1 percent) and the fewest T42s (1 percent).

Tables 6a–6d provide counts of apprehensions and T42s by FM status and by USBP sector for 2012 to 2020.

IFR_AR_008648

**Table 6a.**

**Total Southwest Border Apprehensions of FMs, FY 2012 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | 76 | 349 | 1,127 | 265 | 1,825 | 2,625 | 1,373 | 3,254 | 222 | **11,116** |
| 2013 | 102 | 711 | 365 | 298 | 1,688 | 7,265 | 1,576 | 2,630 | 220 | **14,855** |
| 2014 | 176 | 4,950 | 630 | 562 | 3,591 | 52,326 | 1,723 | 3,812 | 675 | **68,445** |
| 2015 | 807 | 2,141 | 675 | 1,220 | 1,372 | 27,409 | 1,550 | 2,930 | 1,734 | **39,838** |
| 2016 | 1,051 | 3,549 | 1,593 | 5,664 | 1,640 | 52,006 | 2,863 | 3,139 | 6,169 | **77,674** |
| 2017 | 941 | 2,453 | 1,798 | 8,609 | 865 | 49,896 | 2,944 | 2,042 | 6,074 | **75,622** |
| 2018 | 741 | 2,829 | 3,539 | 12,312 | 597 | 63,278 | 4,408 | 4,954 | 14,554 | **107,212** |
| 2019 | 2,931 | 32,835 | 7,873 | 132,909 | 1,169 | 211,631 | 16,174 | 16,199 | 51,961 | **473,682** |
| 2020 | 382 | 7,703 | 1,057 | 10,555 | 1,891 | 11,666 | 5,005 | 11,031 | 2,940 | **52,230** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.

Source: OIS Statistical Immigration Data.

**Table 6b.**

**Southwest Border Apprehensions of FMs from Mexico, FY 2012 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | 56 | 218 | 699 | 241 | 1,623 | 1,555 | 1,325 | 2,940 | 194 | **8,851** |
| 2013 | 90 | 177 | 294 | 267 | 1,116 | 1,690 | 1,343 | 2,216 | 163 | **7,356** |
| 2014 | 61 | 141 | 260 | 213 | 779 | 1,832 | 1,213 | 1,057 | 83 | **5,639** |
| 2015 | 40 | 174 | 196 | 188 | 713 | 1,326 | 854 | 696 | 89 | **4,276** |
| 2016 | 38 | 229 | 163 | 224 | 518 | 1,392 | 346 | 487 | 84 | **3,481** |
| 2017 | 37 | 118 | 158 | 213 | 363 | 815 | 257 | 256 | 54 | **2,271** |
| 2018 | 56 | 144 | 233 | 167 | 292 | 706 | 373 | 226 | 64 | **2,261** |
| 2019 | 41 | 347 | 262 | 1,454 | 489 | 1,073 | 687 | 1,111 | 540 | **6,004** |
| 2020 | 91 | 662 | 327 | 1,635 | 1,531 | 1,185 | 1,286 | 2,475 | 725 | **9,917** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.

Source: OIS Statistical Immigration Data.

**Table 6c.**

**Southwest Border Apprehensions of FMs from Northern Triangle Countries, FY 2012 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | 10 | 120 | 12 | 19 | 175 | 989 | 31 | 130 | 3 | **1,489** |
| 2013 | 8 | 522 | 40 | 23 | 522 | 5,354 | 39 | 254 | 19 | **6,781** |
| 2014 | 100 | 4,753 | 337 | 291 | 2,767 | 49,790 | 351 | 2,553 | 392 | **61,334** |
| 2015 | 764 | 1,929 | 470 | 1,002 | 602 | 25,296 | 617 | 2,127 | 1,556 | **34,363** |
| 2016 | 1,005 | 3,233 | 1,380 | 4,634 | 827 | 49,919 | 1,615 | 2,496 | 5,298 | **70,407** |
| 2017 | 900 | 2,290 | 1,502 | 7,134 | 477 | 48,732 | 2,414 | 1,755 | 5,941 | **71,145** |
| 2018 | 680 | 2,665 | 3,243 | 11,870 | 295 | 61,809 | 3,877 | 4,712 | 14,358 | **103,509** |
| 2019 | 2,873 | 28,554 | 7,104 | 111,673 | 594 | 201,266 | 14,157 | 14,560 | 49,765 | **430,546** |
| 2020 | 242 | 3,481 | 150 | 3,473 | 280 | 9,334 | 574 | 6,908 | 1,283 | **25,725** |

Notes: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred. Northern Triangle countries are El Salvador, Guatemala, and Honduras.

Source: OIS Statistical Immigration Data.

IFR_AR_008649

**Table 6d.**

**Southwest Border Apprehensions of FMs from All Other Countries, FY 2012 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2012** | 10 | 11 | 416 | 5 | 27 | 81 | 17 | 184 | 25 | **776** |
| **2013** | 4 | 12 | 31 | 8 | 50 | 221 | 194 | 160 | 38 | **718** |
| **2014** | 15 | 56 | 33 | 58 | 45 | 704 | 159 | 202 | 200 | **1,472** |
| **2015** | 3 | 38 | 9 | 30 | 57 | 787 | 79 | 107 | 89 | **1,199** |
| **2016** | 8 | 87 | 50 | 806 | 295 | 695 | 902 | 156 | 787 | **3,786** |
| **2017** | 4 | 45 | 138 | 1,262 | 25 | 349 | 273 | 31 | 79 | **2,206** |
| **2018** | 5 | 20 | 63 | 275 | 10 | 763 | 158 | 16 | 132 | **1,442** |
| **2019** | 17 | 3,934 | 507 | 19,782 | 86 | 9,292 | 1,330 | 528 | 1,656 | **37,132** |
| **2020** | 49 | 3,560 | 580 | 5,447 | 80 | 1,147 | 3,145 | 1,648 | 932 | **16,588** |

Note: T42s are included in 2020, but not other years, as 2020 is the first year T42 encounters occurred.

Source: OIS Statistical Immigration Data.

Total FM apprehensions increased six-fold between 2012 (the first year for which data are available) and 2014, fell from 68,000 to 40,000 between 2014 and 2015, almost tripled between 2015 and 2018 (107,000), more than quadrupled between 2018 and 2019 (474,000), and fell significantly in 2020 (52,000). Drops in 2020 occurred across all Southwest Border sectors except Laredo. The largest numbers of apprehensions occurred in the Rio Grande Valley (12,000), Tucson (11,000), and El Paso (11,000) sectors.

As with UC apprehensions, the growth in FM apprehensions was driven largely by families from the Northern Triangle, which accounted for just under half (49 percent) of the total. However, other trends in 2020 made it an atypical year. Mexican FMs made up nearly a fifth of the total FM population, the highest proportion since 2013. Inversely, Northern Triangle FMs made up the lowest proportion of total FMs since 2013 (49 percent, down from 91 percent in 2019). FMs from countries other than Mexico and the Northern Triangle made up the largest proportion of FMs since data has been available; whereas other countries have made up no more than 8 percent of FMs 2012-2019, they made up 32 percent of all FM apprehensions in 2020.

In 2020, the leading countries of citizenship of FMs from countries other than Mexico and the Northern Triangle were Brazil (6,018), Haiti (4,052), and Ecuador (1,897).

Northern and Coastal Border apprehensions represented a small portion of FM apprehensions in 2020. A total of 155 FMs were apprehended across the Northern Border, while 28 were apprehended along the Coastal Border.

### § 1092(b)(1)(H) Between the ports illicit drugs seizure rate

#### Definition

*Between the ports illicit drugs seizure rate* – For each type of illicit drug seized by USBP between POEs, the ratio of the illicit drugs seized in any year relative to the average amount seized in the immediately preceding 5 years.

The illicit drug seizure rate is an output metric, which compares trends in activity data over time.

#### Methodology and Limitations

Between the ports drug seizure data are obtained from USBP administrative records. These data are considered reliable.

Pursuant to the definition of the illicit drug seizure rate directed by NDAA § 1092(b)(1)(H), the drug seizure rate describes the ratio of each year's seizures relative to illicit drugs seizures in the preceding 5 years; the metric does not describe the rate at which illicit drugs are seized.

*Available Data and Discussion*

Drug seizure trends varied in 2019 by type of illicit drug. Marijuana seizures continued a 5-year pattern of declines, from 872,000 kilograms in 2014 and 209,000 kilograms in 2018 to 117,000 kilograms in 2020, an illicit drug seizure rate of 29 percent. Seizures of cocaine and heroin in 2020 were at their highest in a decade, both in terms of total seizures and in terms of 5-year averages. Seizures of methamphetamines were also at an all-time high of 9,400 kilograms in 2020, for an illicit drug seizure rate of 205 percent. Seizures of fentanyl more than doubled from 151 kilograms in 2019 to 367 kilograms in 2020, over four times the number of seizures as in 2017 (the first full year data were available).

**Table 7.**

**Illicit Drugs Seized Relative to Preceding 5 Years (Illicit Drug Seizure Rate) between POEs, FY 2010 to 2020**

| Drug Type | Rate/ Amt | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Marijuana | Rate | 140% | 128% | 104% | 106% | 78% | 66% | 60% | 45% | 29% | 22% | 29% |
| | Kg seized | 1,102,792 | 1,147,458 | 1,043,201 | 1,102,285 | 872,052 | 697,764 | 586,972 | 390,648 | 209,120 | 120,803 | 116,773 |
| Cocaine | Rate | 88% | 86% | 111% | 44% | 47% | 134% | 64% | 123% | 93% | 157% | 174% |
| | Kg seized | 4,744 | 4,519 | 5,516 | 2,085 | 2,066 | 5,089 | 2,483 | 4,239 | 2,971 | 5,288 | 6,967 |
| Heroin | Rate | 200% | 245% | 13% | 19% | 20% | 20% | 33% | 177% | 88% | 126% | 1281% |
| | Kg seized | 132.0 | 181.3 | 12.2 | 16.3 | 17.2 | 14.7 | 16.0 | 27.0 | 16.1 | 22.8 | 247.7 |
| Methamphetamines | Rate | NA | NA | 407% | 226% | 178% | 230% | 211% | 199% | 174% | 179% | 205% |
| | Kg seized | 427 | 837 | 1,685 | 1,624 | 1,783 | 2,922 | 3,730 | 4,685 | 5,132 | 6,534 | 9,432 |
| Fentanyl | Rate | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| | Kg seized | NA | NA | NA | NA | NA | NA | 48 | 82 | 176 | 151 | 367 |

Notes: Data for prior years updated from to represent most recent numbers. USBP began tracking methamphetamine seizures in 2007, so the drug seizure rate cannot be calculated for 2010 and 2011 as defined in the NDAA. USBP began tracking fentanyl seizures in July 2016 so it is not possible to calculate a drug seizure rate as defined by the NDAA for 2016 to 2020.

NA – no data available.

Source: OIS analysis of USBP data.

## § 1092(b)(1)(I) Estimates of the impact of the consequence delivery system on recidivism

### Definition

*Consequence delivery system* (CDS) – A process implemented by USBP to uniquely evaluate each apprehended subject, identify the most effective and efficient consequences, and deliver these consequences to impede and deter further unlawful activity.

*Recidivist rate* – The share of subjects apprehended by USBP who are apprehended more than once in the same fiscal year.

The annual recidivist rate is an output metric that offers insight into what share of repatriated noncitizens are deterred from making additional unlawful entry attempts but does not account for unknown attempts/entries. USBP uses the annual recidivist rate as one of its 13 metrics of the effectiveness of enforcement consequences under the CDS.

### Methodology and Limitations

Since 2007, USBP has collected biometric data (including fingerprints and digital photographs) from most unlawful border crossers it apprehends. For the purpose of this report, these data are used to identify subjects apprehended more than once a year. USBP data on re-apprehensions in the same year are considered reliable. The annual recidivist rate is defined as the number of unique subjects apprehended multiple times in a year divided by the total number of unique subjects in the year:

IFR_AR_008651

$$Annual\ Recidivist\ Rate = \frac{Number\ of\ Unique\ Subjects\ Apprehended\ Multiple\ Times}{Total\ Number\ of\ Unique\ Subjects}$$

The annual recidivism rate is an indicator of the probability that individuals previously apprehended make subsequent attempts at unlawful re-entry; a drop in the annual recidivism rate very likely reflects a reduction in re-apprehensions. This measure has the further advantages that USBP can calculate annual recidivism based strictly on its own apprehension data and that the rate can be reliably calculated at the end of each year. These features make the annual recidivism rate a useful measure for USBP performance management and an important operational measure.

Nonetheless, as the GAO has argued, if the goal is to accurately describe the share of individuals previously apprehended who make additional unlawful entry attempts, the current measure of recidivism could be strengthened in at least two ways: 1) count re-apprehensions based on the date on which a subject is removed or returned, rather than that the date of apprehension; 2) count re-apprehensions that occur within a fixed period of time defined by the subject's repatriation date, rather than by the year.[8] When based on a 1-year window, these refinements yield a more expansive definition of the recidivism rate that DHS refers to as the "Total One-Year Recidivism Rate;" DHS anticipates that in the future, this report will include estimates of the impact of CDS on both the annual recidivism rate and a longer-term recidivism rate.

Interpreting recidivism rates must be done with caution. While declines in recidivism may suggest greater deterrence and/or improvements by USBP, changes in the overall flow may be the result of more first-attempt border crossers, thus driving down the recidivism rate. Therefore, changes to the recidivism rate should be examined alongside the overall flow. Furthermore, changes to push factors over time may also play a role in decreasing subsequent entry attempts.

Additionally, the impact of CDS on recidivism within a given year is not solely a measure of USBP or DHS consequences and operations. All enforcement actions that occur after apprehension and processing subjects into a consequence are controlled and timed by other components and government agencies. Some subjects are never returned and therefore would not be represented in the metric. For example, a subject who remains in the United States, pending the conclusion of immigration court proceedings for several years, has been successfully prevented from re-entry—but that success results from the failure to complete a repatriation. Thus, recidivism, calculated as described here, is influenced by court schedules and the operational ability of other immigration components as well as USBP consequences.

### Available Data and Discussion

Since the implementation of CDS in 2012, six out of nine Southwest Border sectors have seen decreases in annual recidivism rates, including drops of five or more percentage points in the El Centro, San Diego, Tucson, and Yuma Sectors. The largest percentage decreases in recidivism were observed in the sectors of El Centro (from 38 percent in 2012 to 23 percent in 2020) and Yuma (from 18 percent in 2012 to 6 percent in 2020). Nearly all sectors saw a slightly higher recidivism rate in 2020 compared to 2019, increasing by an average of 4 percent across sectors. Only Laredo Sector and Tucson Sector saw modest decreases in recidivism (less than 2 percent).

---

[8]  GAO, "Border Patrol: Actions Needed to Improve Oversight of Post-Apprehension Consequences," GAO-17-66, January 2017, pp. 13-17.

IFR_AR_008652

**Table 8.**

**CDS Recidivism Rate by Sector, FY 2012 to 2020**

| Fiscal Year | Big Bend, TX | Del Rio, TX | El Centro, CA | El Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2012** | 6.90% | 6.80% | 38.28% | 8.12% | 13.35% | 12.73% | 30.49% | 19.32% | 18.20% | **16.60%** |
| **2013** | 7.58% | 7.28% | 35.94% | 10.22% | 12.27% | 11.62% | 32.34% | 21.24% | 17.01% | **15.73%** |
| **2014** | 6.74% | 5.22% | 32.63% | 11.16% | 11.59% | 11.81% | 32.46% | 18.59% | 13.26% | **14.06%** |
| **2015** | 4.95% | 6.14% | 31.70% | 8.63% | 11.82% | 12.66% | 31.35% | 15.71% | 11.32% | **14.02%** |
| **2016** | 5.59% | 6.73% | 24.52% | 8.32% | 13.01% | 9.93% | 27.34% | 15.73% | 5.37% | **12.27%** |
| **2017** | 4.73% | 5.51% | 22.73% | 6.22% | 13.29% | 8.27% | 21.76% | 12.46% | 3.77% | **10.48%** |
| **2018** | 7.65% | 5.05% | 22.70% | 4.37% | 14.03% | 8.25% | 21.36% | 14.05% | 2.68% | **10.81%** |
| **2019** | 5.84% | 3.26% | 20.84% | 3.04% | 15.43% | 4.87% | 17.55% | 11.45% | 1.88% | **6.65%** |
| **2020** | 5.93% | 10.33% | 23.49% | 11.65% | 15.29% | 11.63% | 25.43% | 9.48% | 5.59% | **13.29%** |

Source: USBP.

Recidivism data are not available to calculate the impact of CDS at the Northern Border or coastal boundaries.

### Understanding the Demands of Title 42 Encounters and the Effect on Recidivism

As of March 21, 2020, to provide the most accurate analysis of recidivism, the recidivism rate reported in accordance with the GPRAMA of 2010 includes subjects encountered and processed under Title 42 authority. That authority stems from administrative guidance related to public health efforts in support of the March 2020 order, *Order Suspending Introduction of Persons From a Country Where a Communicable Disease Exists*,[9] and related orders issued by the Centers for Disease Control and Prevention (CDC) and Department of Health and Human Services (HHS). For FY 2020, in an effort to diminish the spread of COVID-19, the CDC/HHS order required persons subject to it to be expelled from the United States as expeditiously as possible under Title 42 authority, rather than being apprehended and processed under Title 8 authority.

Under the CDC/HHS order, the determination on whether a subject becomes a T42 encounter or a T8 apprehension is made after initial processing, which includes biometric collection such as fingerprints. If the initial processing and records check reveals no outstanding criminal warrants or indication of national-security threat, the subject is expelled from the United States to Mexico, Canada, or the subject's country of citizenship.

From a USBP standpoint, T42s do not face the CDS. In effect, no consequence is applied because the subject was not apprehended. USBP totals on T8 apprehensions and T42 encounters do not co-mingle; therefore, the CDS recidivism rate does not include T42s.

Although Title 42 procedures were in place for only the third and fourth quarters of 2020 (and the final 9 days of the second quarter), T42s constituted 49 percent of the year's total Southwest Border encounters (197,355 of 405,020). When T42s are included in calculating a comprehensive recidivism rate among all those encountered between the ports of entry, the number rises to 26 percent[10] in comparison to the CDS recidivism rate of 13 percent.

### § 1092(b)(1)(J) Examination of each consequence under the CDS

### Definition

*Consequence* – An administrative, programmatic, or criminal justice process imposed on a subject following the subject's apprehension. CDS is designed to identify, for any given subject, the ideal consequences to deliver to impede and deter further unlawful activity.

---

[9]  For full text of order, see order 85 FR 16567 at https://www.federalregister.gov/documents/2020/03/24/2020-06241/order-suspending-introduction-of-persons-from-a-country-where-a-communicable-disease-exists.

[10]  Based on USBP FY 2020 GPRAMA results.

**Methodology and Limitations**

USBP's current methodology for assessing the CDS involves analyzing the effectiveness and efficiency of each enforcement consequence. One of the key effectiveness metrics is the annual recidivism rate, which is calculated separately for each enforcement consequence.

Under the CDS, USBP specifically targets noncitizens with more extensive records of unlawful border crossing behaviors for consequences that are designed to have a greater deterrent impact. As a result, differences in recidivism rates by enforcement consequence may reflect differences in the propensity of the targeted population to make further re-entry attempts, in addition to the possible impact of each consequence on recidivism.

An additional limitation of currently available data is that they are based on apprehension data for a given year, not repatriation data. Depending on the consequence and the timing of the apprehension, some individuals may not be repatriated to their country of origin during the fiscal year of their apprehension, and therefore may not have an opportunity to attempt re-entry. For example, long waits to appear in immigration courts for non-detained noncitizens mean very few noncitizens issued warrants of arrest and notices to appear (WA/NTA) are removed in the same year as their apprehension, which results in artificially low recidivism rates for noncitizens subject to that consequence. DHS and CBP are working to refine their analysis of CDS and will seek to address these limitations in a subsequent version of this report.

***Available Data and Discussion***

Table 9 summarizes recidivism rates by different consequences for 2012 to 2020.

**Table 9.**

**Annual Recidivism Rate by Consequence, FY 2012 to 2020**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Voluntary Return | 27.06 | 28.61 | 30.5 | 27.03 | 24.55 | 24.65 | 25.31 | 29.19 | 18.49 |
| Warrant of Arrest/Notice to Appear | 3.83 | 1.44 | 0.6 | 0.89 | 0.41 | 0.36 | 0.47 | 1.33 | 8.35 |
| Expedited Removal | 16.44 | 16.66 | 17.54 | 18.08 | 15.46 | 13.5 | 14.1 | 12.96 | 15.89 |
| Reinstatement of Removal | 15.88 | 16.42 | 15.8 | 15.41 | 16.62 | 15.02 | 15.64 | 13.39 | 13.62 |
| Alien Transfer Exit Program | 23.82 | 25.48 | 28.63 | 27.17 | 28.8 | 27.89 | 31.68 | 16.67 | 71.43 |
| Criminal Consequence Initiative | 10.3 | 9.26 | 8.24 | 6.67 | 8.36 | 6.17 | 9.25 | 9.0 | 9.2 |
| Standard Prosecution | 9.09 | 10.17 | 9.18 | 8.79 | 8.16 | 6.98 | 9.05 | 11.15 | 9.45 |
| Operation Against Smugglers Initiative on Safety and Security | 10.24 | 18.04 | 18.25 | 22.97 | 30.93 | NA | NA | NA | NA |

Notes: The Operation Against Smugglers Initiative on Safety and Security program was discontinued after 2016.
NA – no data available.
Source: USBP

While these data should be interpreted with caution for the reasons identified above, some trends are noteworthy. For example, with the exception of WA/NTA for the reasons noted above, the more punitive consequence programs such as the criminal consequence initiative[11] and standard prosecution[12] generally showed lower recidivism rates (both 9 percent) than less punitive programs like voluntary return (18 percent). Recidivism rates by consequence changed significantly in several categories between 2019 and 2020; the most significant difference was in the Alien Transfer Exit Program,[13] where recidivism increased by 55 percent from 2019 to 2020.

---

[11] The Criminal Consequence Initiative (formerly known as Operation Streamline) is a criminal prosecutions program through which noncitizens are charged with unlawful entry under 8 U.S.C. §1326 or unlawful re-entry under 8 U.S.C. §1327 in an expedited criminal proceeding before a magistrate judge.

[12] Standard prosecution refers to CBP's referral of a noncitizen to the Department of Justice to face criminal charges for unlawful entry, unlawful re-entry, and/or another criminal offense through standard criminal proceedings.

[13] The Alien Transfer Exit Program (ATEP) repatriates certain noncitizens into regions different from their entry locations to disrupt future coordination with smugglers.

IFR_AR_008654

## § 1092(c) Metrics for Securing the Border at Ports of Entry

### § 1092(c)(1)(A)(i) Total inadmissible travelers at ports of entry

#### Definition

*Inadmissible noncitizen* – A noncitizen seeking admission at a POE who is ineligible for admission pursuant to INA § 212(a).

*Known inadmissible noncitizens* – Noncitizens seeking admission at a POE who are found by OFO to be inadmissible.

*Total attempted inadmissible noncitizens* – The estimated number of inadmissible noncitizens who attempt to enter the United States. Total attempted inadmissible noncitizens include known inadmissible noncitizens and successful improper entries at POEs.

Inadmissible noncitizens and known inadmissible noncitizens are output metrics that describe OFO officer workload. Known inadmissible noncitizens may also be used as a proxy indicator of total attempted inadmissible noncitizens, which is an outcome metric.

#### Methodology and Limitations

Known inadmissible noncitizens are recorded in OFO administrative records with a unique identifier created for each inadmissibility determination. OFO's count of known inadmissible noncitizens is considered reliable.

The Department continues to improve the Compliance Examination (COMPEX) program. As of 2020, the program was capable of estimating undetected major infractions at POEs. However, it is unable to reliably estimate successful unlawful entries due to the nature of the survey. The hindrance is the sample size and number of positive COMPEX findings, which is currently not sufficient when it comes to reliably estimating the successful unlawful entries. OFO cannot currently accommodate increased sampling due to CBP's responsibility of balancing the facilitation of legitimate trade and travel and our fiduciary responsibility to the American taxpayer. It is highly unlikely that we will ever be able to provide data for successful unlawful entries due to the nature of the survey.

#### Available Data and Discussion

An average of 240,000 noncitizens were identified as inadmissible at POEs between 2010 and 2020, with the highest numbers observed in 2016 (293,000). Inadmissible noncitizens decreased 56,000 from 2019 to 2020.

**Table 10.**

**Known Inadmissible Noncitizens at POEs, FY 2010 to 2020**

| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|------|------|------|
| 231,306 | 216,355 | 197,362 | 205,920 | 224,927 | 254,637 | 292,614 | 216,157 | 279,009 | 288,523 | 232,374 |

Source: OFO.

### § 1092(c)(1)(A)(ii) Refusal and interdiction rates at ports of entry

#### Definition

*Refusal rate* – The share of all travelers seeking admission at a POE found inadmissible. Refusal rate is an output metric that describes OFO officer workload.

*POE interdiction rate* – The share of attempted inadmissible noncitizens found inadmissible. POE interdiction rate is an output metric that describes the difficulty of entering the United States unlawfully through a POE.

### Methodology and Limitations

The refusal rate is calculated by dividing known inadmissible noncitizens (i.e., noncitizens found inadmissible by OFO officers at POEs) by the total number of travelers (i.e., all persons seeking entry at POEs):

$$\text{Refusal Rate} = \frac{\text{Inadmissibility Determinations}}{\text{Travelers}}$$

Data on inadmissibility determinations and total travelers are obtained from OFO administrative records; these data are considered reliable.

The Department continues to improve the Compliance Examination (COMPEX) program. As of 2020, the program was capable of estimating undetected major infractions at POEs. However, it is unable to reliably estimate successful unlawful entries due to the nature of the survey. The hindrance is the sample size and number of positive COMPEX findings, which is currently not sufficient when it comes to reliably estimating the successful unlawful entries. OFO cannot currently accommodate increased sampling due to CBP's responsibility of balancing the facilitation of legitimate trade and travel and our fiduciary responsibility to the American taxpayer. It is highly unlikely that we will ever be able to provide data for successful unlawful entries due to the nature of the survey.

### Available Data and Discussion

The number of travelers at POEs continuously increased from 2011 to 2018 (from 340 million to 414 million) before declining slightly in 2019 (to 410 million) and experienced a large decrease in 2020 (to 238 million). The number of known inadmissible noncitizens has consistently been small compared to travelers coming through POEs, with the refusal rate hovering within a range of 0.5-0.9 percent throughout this period. The year 2020 had the highest refusal rate and the lowest number of travelers at POEs in a decade.

**Table 11.**
**Inadmissible Noncitizens and Refusal Rate at POEs, FY 2010 to 2020**

| Fiscal Year | Passengers | Inadmissibles | Refusal Rate |
|---|---|---|---|
| 2010 | 352,980,607 | 231,306 | 0.07% |
| 2011 | 340,364,884 | 216,355 | 0.06% |
| 2012 | 351,551,007 | 197,362 | 0.06% |
| 2013 | 362,333,988 | 205,920 | 0.06% |
| 2014 | 374,974,750 | 224,927 | 0.06% |
| 2015 | 383,200,225 | 254,637 | 0.07% |
| 2016 | 390,592,745 | 292,614 | 0.07% |
| 2017 | 397,407,840 | 216,157 | 0.05% |
| 2018 | 413,878,570 | 279,009 | 0.07% |
| 2019 | 410,287,338 | 288,523 | 0.07% |
| 2020 | 237,965,621 | 232,374 | 0.09% |

Source: OFO.

## § 1092(c)(1)(A)(iii) Unlawful entries at ports of entry

### Definition

*Successful unlawful entries* – The estimated number of inadmissible noncitizens who improperly enter the United States through POEs.

Successful unlawful entries are an outcome metric.

*Methodology and Limitations*

The Department continues to improve the Compliance Examination (COMPEX) program. As of 2020, the program was capable of estimating undetected major infractions at POEs. However, it is unable to reliably estimate successful unlawful entries due to the nature of the survey. The hindrance is the sample size and number of positive COMPEX findings, which is currently not sufficient when it comes to reliably estimating the successful unlawful entries. OFO cannot currently accommodate increased sampling due to CBP's responsibility of balancing the facilitation of legitimate trade and travel and our fiduciary responsibility to the American taxpayer. It is highly unlikely that we will ever be able to provide data for successful unlawful entries due to the nature of the survey.

## § 1092(c)(1)(B) Illicit drugs seized at ports of entry

*Definition*

*Drug seizures* – Seizures of illicit drugs by CBP officers at POEs.

Drug seizures are an output metric. Drug seizures may also be interpreted as a proxy indicator of illicit drug inflows through POEs, an outcome metric.

*Methodology and Limitations*

Drugs seizure data are obtained from OFO administrative records, measured in kilograms. These data are considered reliable.

*Available Data and Discussion*

Detailed drug seizure data at POEs are contained in Appendix B. Total seizures fell from 401,000 kilograms in 2015 and 368,000 kilograms in 2016 to a recent low of 250,000 kilograms in 2018 and then rising to 274,000 kilograms in 2019 and 346,000 kilograms in 2020.

## § 1092(c)(1)(C) Port of entry illicit drug seizure rate

*Definition*

*POE illicit drug seizure rate* – For each type of illicit drug seized by OFO at POEs, the ratio of illicit drugs seized in a single year to the average amount seized in the immediately preceding 5 years.

*Methodology and Limitations*

POE drug seizure data are obtained from OFO administrative records. These data are considered reliable.

Pursuant to the definition of the illicit drug seizure rate directed by NDAA § 1092(c)(1)(C), the drug seizure rate describes recent seizure trends (i.e., current year compared to the previous 5 years); the measure does not describe the rate at which illicit drugs are seized.

The drug seizure rate is an output metric, which compares trends in activity data over time. Drug seizures may be interpreted as a proxy indicator of illicit drug inflows through POEs, an outcome metric.

*Available Data and Discussion*

Marijuana seizures at POEs declined from a recent high of 273,000 kilograms in 2015 to 131,000 kilograms in 2019, before rising slightly to 147,000 kilograms in 2020. Cocaine seizures in 2020 were at a record low, totaling 19,000 kilograms, or 22 percent below the average level from 2010 to 2019 (25,000 kilograms). Heroin seizures maintained about the same level in 2020 as in 2019, increasing 79 percent since 2010. Methamphetamine seizures were at their highest levels since at least 2010, up more than twelve-fold compared to 2010 (from 3,400 to nearly 43,000 kilograms).

IFR_AR_008657

Fentanyl seizures were also at their highest levels in 2020 (1,800 kilograms), up 665 percent since 2016, the first full year in which data were available.

**Table 12.**

**POE Illicit Drug Seizure Rate, FY 2010 to 2020**

| Drug Type | Rate/Amt | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Marijuana | Rate | 93% | 96% | 87% | 82% | 78% | 119% | 99% | 72% | 62% | 65% | 78% |
| | Kg seized | 246,567 | 255,216 | 237,085 | 215,705 | 198,670 | 273,434 | 233,827 | 166,221 | 135,814 | 131,328 | 147,405 |
| Cocaine | Rate | 112% | 88% | 77% | 88% | 85% | 76% | 116% | 137% | 105% | 178% | 72% |
| | Kg seized | 28,099 | 23,551 | 20,531 | 20,976 | 20,559 | 17,396 | 23,958 | 28,275 | 23,407 | 40,464 | 19,344 |
| Heroin | Rate | 139% | 160% | 154% | 143% | 134% | 162% | 97% | 87% | 116% | 115% | 106% |
| | Kg seized | 1,323 | 1,615 | 1,718 | 1,822 | 1,963 | 2,732 | 1,916 | 1,758 | 2,361 | 2,461 | 2,369 |
| Methamphetamines | Rate | 188% | 222% | 244% | 260% | 201% | 190% | 193% | 201% | 229% | 160% | 181% |
| | Kg seized | 3,445 | 4,700 | 6,460 | 9,512 | 10,639 | 13,192 | 17,137 | 22,885 | 33,567 | 31,110 | 42,709 |
| Fentanyl | Rate | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | 281% |
| | Kg seized | NA | NA | NA | NA | NA | 32 | 270 | 882 | 860 | 1,154 | 1,799 |

Note:  OFO began tracking fentanyl seizures partway through 2015 so it is not possible to calculate a drug seizure rate as defined by the NDAA for 2015 to 2019.
Source:  OIS analysis of OFO data.

## § 1092(c)(1)(D) Major infractions at ports of entry

### Definition

*Major infractions* — OFO defines major infractions to include all offenses subject to criminal arrest, including arrests related to terrorism, drugs, immigration crimes (including zero tolerance arrests), currency, merchandise, and agriculture products. These major infractions are not equivalent to arrests of individuals, as each individual may be charged with multiple infractions and not all infractions may ultimately lead to an arrest. In addition, OFO includes National Crime Information Center (NCIC) hits and Terrorist Screening Database (TSDB) hits, among others, as major infractions.

*Known major infractions* — The number of major infractions interdicted by OFO.  Known major infractions are an output metric.

*Undetected major infractions* — The estimated number of major infractions not interdicted by OFO.  Undetected major infractions are an outcome metric.

### Methodology and Limitations

Known major infractions are recorded in OFO administrative records and are considered reliable. For the purpose of this report, OFO has updated its reporting methodology to limit data to passenger-related infractions, excluding infractions involving mailed goods and other non-passenger-related events.

Undetected major infractions are estimated through COMPEX, which conducts comprehensive audits on a statistical sample of travelers who were processed by CBP without secondary inspection and admitted into the United States.  The randomly selected travelers undergo a systematic series of checks to reveal any admissibility, customs, or agriculture infractions.  The rate of infractions found within the sample is applied to the population of travelers processed by CBP without secondary inspections.  The program to develop these estimates operates at 19 airports and all privately owned vehicle (POV) crossings and is being expanded to pedestrian operations.  Numbers reported below are for the airports and POV crossings within the program.  Estimates are limited to the assumption that CBP secondary inspections and comprehensive audits find all infractions.  This assumption is likely more valid for customs-related screenings at airports than passenger screening given the 100 percent search of all baggage.  Additionally, true random sampling is more likely at POV lanes where automated systems select vehicles for additional screening—these automated systems do not yet exist for airports.

IFR_AR_008658

CBP implemented major enhancements to COMPEX in 2015 and 2016, but some reviewers still recommend that the program expand its audit sample size to produce more reliable findings.[14]  Nonetheless, COMPEX provides the best available estimate of undetected major infractions.

### Available Data and Discussion

OFO officers made 197,000 seizures based on major infractions at POEs in 2020, nearly meeting the record high number of seizures in 2019 (209,000) and nearly four times the average number of seizures 2010-2018. The infraction rate in 2020 was the highest in at least a decade.

**Table 13.**

**Known Major Infractions at POEs, FY 2010 to 2020**

| Fiscal Year | Passengers | Seizure Counts | Infraction Rate |
|:---:|:---:|:---:|:---:|
| 2010 | 352,980,607 | 61,146 | 0.02% |
| 2011 | 340,364,884 | 54,548 | 0.02% |
| 2012 | 351,551,007 | 47,521 | 0.01% |
| 2013 | 362,333,988 | 51,391 | 0.01% |
| 2014 | 374,974,750 | 42,190 | 0.01% |
| 2015 | 383,200,225 | 44,380 | 0.01% |
| 2016 | 390,592,745 | 53,545 | 0.01% |
| 2017 | 397,407,840 | 45,601 | 0.01% |
| 2018 | 413,878,570 | 54,420 | 0.01% |
| 2019 | 410,287,338 | 208,711 | 0.05% |
| 2020 | 237,965,621 | 196,629 | 0.08% |

Note: This table updates previous versions of this report to align reported values with passenger-related known major infractions (i.e., excluding non-passenger-related incidents).
Source:  OFO.

The estimated number of undetected major infractions at airports in 2020 was at its second lowest point since at least 2011. Undetected major infractions in passenger vehicle lanes were also at their second lowest point since at least 2011.

**Table 14.**

**Estimated Undetected Major Infractions at POEs, FY 2011 to 2020**

| Fiscal Year | Air | POV |
|:---:|:---:|:---:|
| 2011 | 12,506 | 36,149 |
| 2012 | 14,970 | 32,499 |
| 2013 | 16,114 | 28,659 |
| 2014 | 13,334 | 12,376 |
| 2015 | 14,852 | 27,432 |
| 2016 | 16,158 | 29,251 |
| 2017 | 12,386 | 30,295 |
| 2018 | 8,736 | 29,879 |
| 2019 | 12,755 | 29,163 |
| 2020 | 10,538 | 23,999 |

Source:  OFO.

---

[14]  Homeland Security Systems Engineering and Development Institute, "Compliance Measurement Examination (COMPEX) Refinement Recommendations: A Statistical Analysis," June 30, 2017.

### § 1092(c)(1)(E) Cocaine seizure effectiveness rate

#### Definition

*Cocaine seizure effectiveness rate* — The amount of cocaine seized by OFO at land POEs compared to the total estimated flow of cocaine through land POEs.

Cocaine seizures are an output metric. Some analysts also treat seizures as a proxy indicator of total attempts to import cocaine, an outcome metric. Seizure effectiveness rate (i.e., cocaine seized as compared to the total estimated cocaine flow) is an output metric.

#### Methodology and Limitations

Seizure data are obtained from OFO administrative records and is considered reliable. Estimates of the total cocaine flow are provided by the Defense Intelligence Agency (DIA).[15] The U.S. Government does not have an estimate of the share of the total cocaine flow that passes through land POEs, but the U.S. Drug Enforcement Agency's National Drug Threat Assessment states that the Southwest Border remains the key entry point for the majority of the cocaine entering the United States.

The DIA estimate is based on a U.S. Government estimate of cocaine departing South America towards the United States, and additionally incorporates estimates of cocaine movement, cocaine production, and U.S. consumption derived from various U.S. Government agencies. The estimated amount of cocaine available to enter the United States (estimated flow in Table 15) is derived by finding the difference between the estimated amount of cocaine departing South America toward the United States and the sum of documented cocaine removals, consumption in the Transit Zone, and documented departures from the Transit Zone towards non-United States destinations.

#### Available Data and Discussion

Total seizures dropped to 19,000 kilograms in 2019, the lowest in the 2016-2020 period and down 35 percent from the 2016 to 2019 average. Land seizures dropped to 7,000 kilograms in 2019, the lowest in the period and down 18 percent from the 2016 to 2019 average. Estimated flow rose to 905,000 kilograms, but was still down 15 percent from the 2016 to 2019 average. The drop in total seizures and rise in estimated flows resulted in the seizure effectiveness rate halving from the previous year to 2.1 percent.

**Table 15.**

**Cocaine Seizures and Estimated Flows at Land POEs, FY 2016 to 2020**

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Total Seizures | 24,017 | 28,299 | 25,800 | 40,500 | 19,344 |
| Land Seizures | 9,100 | 10,800 | 10,000 | 9,000 | 7,021 |
| Estimated Flow | 1,274,000 | 1,136,000 | 1,187,000 | 849,000 | 905,000 |
| Seizure Effectiveness Rate | 1.89% | 2.49% | 2.17% | 4.77% | 2.14% |

Notes: Seizures and estimated flows in kilograms. DIA data on estimated flow does not provide a breakout for land flows, and seizure effectiveness rate is calculated as the ratio of total seizures to total estimated flow. Estimated Flow for 2019 was updated to account for events that were discovered/entered late in the DIA source database.
Source: OFO and DIA.

---

[15] Previous versions of this report included estimates of total cocaine flow provided by the Office of National Drug Control Policy (ONDCP).

### § 1092(c)(1)(F)(i) Average wait times and traffic volume

#### *Definition*

*Average wait time* — Average minute wait time for vehicles to pass through a land POE.

*Private vehicle volume* — The number of private vehicles passing through a land POE per year.

*Commercial vehicle volume* — The number of commercial vehicles passing through a land POE per year.

Average wait time is an outcome metric describing the ease of crossing the border. Vehicle volume is an output metric.

#### *Methodology and Limitations*

OFO uses two primary methodologies for calculating vehicle wait times at the border: line-of-sight and automated technology such as Bluetooth and Radio Frequency Identification. Ports using line-of-site methodology manually record wait times once per hour at the top of each hour using the Border Wait Time Administrative Tool. For ports using automated technology, wait times are recorded automatically in 5–10-minute increments every hour, which OFO averages prior to reporting out. OFO records wait times for 72 land border crossings, excluding small border POEs with negligible wait times. In March 2018, OFO leadership updated CBP's policy guidance for measuring and recording wait times at CBP land border POEs. The updated policy consolidates all previously issued policy regarding manual and automated wait time reporting and further clarifies Active Land Management as a means to more effectively manage traffic flow, primary inspections, and associated resource allocations.

OFO records counts of Privately Owned Vehicles (POV) and Commercially Owned Vehicles (COV) as administrative data in its Operations Management Report (OMR); these data are considered reliable.

#### *Available Data and Discussion*

Data on average wait times and counts of private and commercial vehicles for each land POE for which data are available are contained in Appendix C1 and C2. Comparisons should be made with caution given the differences in flow and type of traffic at each port.

Notably, POV wait times remained relatively stable between 2019 and 2020, with no increase larger than 8 minutes at any POE. The most notable improvement in POV wait times occurred in Laredo, TX, where the average wait time fell to 14 minutes in 2020, down from 21 minutes in 2019. Average POV wait times increased nine POEs, with the highest increase in Douglas, AZ (32 minutes in 2020, up from 24 minutes in 2019).

COV wait times are consistently lower and vary more from year to year for each station when compared to POV wait times. The most notable decrease in 2020 was at Otay Mesa, where COV wait times decreased by 17 minutes. The largest increase in 2020 at Blaine, Border Crossing, where there was a modest 2-minute increase in wait time.

### § 1092(c)(1)(F)(ii) Infrastructure capacity utilization rate

#### *Definition*

*Infrastructure capacity utilization rate* — Average number of vehicles processed per booth, per hour at each land POE.

The infrastructure capacity utilization rate is an output metric that describes OFO's ability to process traffic relative to the physical and staffing capacity.

#### *Methodology and Limitations*

Data are obtained from OFO administrative records. The data comes from CBP systems with booth hours and throughput as calculated fields. The hours serve as a proxy metric for the number of CBP officer hours spent processing and are

IFR_AR_008661

measured on a one-for-one basis. Throughput is then calculated by summing all vehicles that passed through a site in a year and then dividing it by total booth hours.

**Available Data and Discussion**

Detailed infrastructure capacity utilization rate data are contained in Appendix D.

Each OFO land POE is unique in terms of staffing authorizations and physical layouts. Land POEs may be physically constrained by the available space around them and so unable to expand to yield greater capacity. Land POEs in the United States are also impacted by the adjoining Canadian and Mexican land POE management decisions on staffing and physical layouts. Both the OFO Mission Support Facilities Division and the CBP Office of Facilities and Asset Management are working on establishing methods to determine resourcing decisions for land POEs.

**Table 16.**

**Average Infrastructure Capacity Utilization Rate, FY 2012 to 2020**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| OFO National Average | 43.1 | 43.5 | 45.3 | 46.6 | 47.4 | 49.6 | 51.1 | 50.6 | 48.8 |
| Northern Border | 36.2 | 38.2 | 39.0 | 35.7 | 34.6 | 36.3 | 37.2 | 37.0 | 35.6 |
| Southern Border | 47.7 | 46.8 | 49.1 | 53.0 | 54.4 | 56.6 | 58.6 | 58.2 | 52.8 |

Note: Table depicts average vehicles processed per lane, per hour.
Source: OFO.

In general, the Southwest Border reports higher utilization rates because of higher flows through the POEs. The overall utilization rate approximately in 2020 was approximately 2 vehicles less than in 2019. Overall, CBP processed an average of 48.8 vehicles per lane, per hour in 2020 (35.8 on the Northern Border; 52.8 on the Southwest Border). Stanton Street in the El Paso Field Office averaged 131 vehicles per hour, per lane in 2020—once again the highest in the country by a sizeable margin (see Appendix D) at 56 vehicles per lane more than the next highest location in 2020. However, Stanton Street only processes travelers eligible for the Secure Electronic Network for Travelers Rapid Inspection (SENTRI) trusted traveler program, which are faster to process than other classes of travelers.

### § 1092(c)(1)(F)(iii) Secondary examination rate

**Definition**

*Secondary examination rate* — Percentage of passengers subject to secondary inspection at each land POE.

Secondary examination rate is an output metric that describes OFO workload and practices.

**Methodology and Limitations**

Data are obtained from OFO administrative records. Secondary examination rate is determined by the recorded number of passengers sent for secondary inspection versus the total number of recorded passengers.

**Available Data and Discussion**

Frequency of secondary inspections data is contained in Appendix E.

Among the Northern Border POEs, the average secondary inspection rate was 4.1 percent in 2020, up from an average of 3.5 percent in 2019. The Southern Border Secondary Inspection Rate averaged 3.8 percent in 2020, up from 3.1 percent in 2019. The highest secondary inspection rates were reported at Northern Border POEs, including Port Angeles, WA (29 percent), Morgan, MT (28 percent), and Oroville, WA (21 percent). Certain smaller land POEs have high secondary examination rates due to a low volume of traffic that allows officers increased time to thoroughly examine a larger share of passengers.

## § 1092(c)(1)(F)(iv) Secondary examinations effectiveness rate

OFO conducts traveler and cargo-related secondary examinations for a variety of discretionary and mandatory investigative and enforcement reasons, including but not limited to CBP Officer enforcement referrals, alerts, subject complexity, Non-Intrusive Inspection Systems Program inspection, and compliance examinations spanning a broad range of laws, rules, and regulations from multiple government agencies. Not all referred examinations are expected to result in significant enforcement results, such as disposals, fines and penalties, seizures, or arrests. Secondary examinations are often fully effective when they find no violations of any kind, as with compliance examinations or referrals due to subject complexity; and public awareness of CBP secondary inspection capabilities also serves as a deterrent to unlawful activity. For these reasons, CBP is unable to categorize a given secondary examination as "effective" or "ineffective" and does not calculate a secondary examinations effectiveness rate.

## § 1092(c)(1)(G)(i) Number of potentially "high-risk" cargo containers

### Definition

*Potentially high-risk cargo containers* – Shipping containers carrying cargo shipments identified as potentially high-risk using National Targeting Center (NTC) CBP national security criteria.

Potentially high-risk cargo containers are an output metric that describes OFO workload.

### Methodology and Limitations

All international cargo shipments coming to the United States via the sea, land, and air modes of transportation are screened by CBP using the Automated Targeting System (ATS) to identify those shipments that may be considered potentially high-risk according to CBP national security criteria. Any cargo container traveling via the maritime environment carrying a shipment identified as potentially high-risk is identified for immediate review and assessed or scanned prior to lading at a Container Security Initiative member foreign port of origin or at arrival at a U.S. POE. Assessing, resolving, and when required, scanning and physically inspecting cargo found to be potentially high-risk, ensures the safety of the public and minimizes the impact to the trade through the effective use of risk-focused targeting.

CBP's NTC continuously refines, improves, and revises the security criteria applied by the ATS, which in turn improves the focus and currency of the risk assessment applied.

### Available Data and Discussion

The NTC's process of continual review and refinement of the security criteria applied and ATS methodology has led to realignment in the total number of maritime cargo containers identified as potentially high-risk since 2013. In 2020, the number of high-risk cargo containers increased for the first time since 2013, but was still at the second lowest level during the period, over ten times less than the number in 2013.

**Table 17.**
**Potentially High-Risk Cargo Containers at Seaports, FY 2013 to 2020**

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| 89,598 | 74,509 | 72,974 | 71,815 | 36,209 | 18,625 | 6,667 | 8,683 |

Note: Data for 2019 corrected due to previous typo.
Source: OFO.

IFR_AR_008663

## § 1092(c)(1)(G)(ii) Ratio of potentially high-risk cargo containers scanned relative to high-risk containers entering in previous fiscal year

### Definition

*Ratio of potentially high-risk cargo containers scanned* – The ratio of potentially high-risk containers scanned relative to the number of potentially high-risk containers entering in the previous year.

The ratio of potentially high-risk containers scanned is an output metric, which compares trends in activity data over time. Ratio of high-risk containers scanned may also be interpreted as a proxy indicator of high-risk containers successfully scanned and entering through POEs, an outcome metric.

### Methodology and Limitations

Inspection data are obtained from OFO administrative records. These data include potentially high-risk cargo containers reviewed, assessed, or scanned. These three methods of inspection are not currently distinguishable with available data sources.

The ratio compares potentially high-risk containers in one year to the number entering in the previous year and should not be confused with the percentage of potentially high-risk containers scanned relative to the number entering in the current year.

A container is considered "high-risk" if even one shipment within it is designated high-risk. One container may have multiple high-risk shipments within it, which could cause the same container to be reviewed or scanned multiple times.

### Available Data and Discussion

The ratio of potentially high-risk containers reviewed, assessed, or scanned relative to the previous year's entries is contained in Appendix F.

With respect to the percentage scanned, all sea POEs reported 100 percent scanning of all 1,675 high-risk cargo containers in 2020 or indicated that no high-risk containers passed through the POE.

## § 1092(c)(1)(G)(iii) Potentially high-risk cargo containers scanned upon arrival at a U.S. POE

### Definition

*Potentially high-risk containers scanned upon arrival at a U.S. POE* – Shipping containers carrying cargo shipments identified as potentially high-risk using NTC security criteria that are reviewed, assessed, or scanned upon arrival at a U.S. POE.

The number of potentially high-risk containers scanned upon arrival at a POE is an output metric that describes OFO workload.

### Methodology and Limitations

Inspection data are obtained from OFO administrative records. These data include potentially high-risk cargo containers reviewed, assessed, or scanned. These three methods of inspection are not currently distinguishable with available data sources.

The ATS targeting system provides an assessment of the security of shipments, as defined by bills of lading, not individual containers. A large shipment may span several containers or conversely one container may contain many individual shipments. A container is considered potentially "high-risk" if even one shipment within it is designated as high-risk. A single container may have multiple high-risk shipments within it, which could cause the same container to be flagged for review or scanning multiple times.

*Available Data and Discussion*

Data on high-risk containers may be found in Appendix F.

In 2020, a total of 8,683 high-risk containers arrived at POEs.  One hundred percent of these shipments were reviewed, assessed, or scanned, including 7,829 reviewed for NTC national security criteria upon arrival at the U.S. port, and 3,968 were processed at the designated foreign ports of origin through the Container Security Initiative (CSI) agreement with host governments.

## § 1092(c)(1)(G)(iv) Potentially high-risk cargo containers scanned before arrival at a U.S. POE

### Definition

*Potentially high-risk containers scanned before arrival at a U.S. POE* – Shipping containers carrying cargo shipments identified as potentially high-risk using NTC security criteria that are reviewed, assessed, or scanned before arrival at a U.S. POE.

The number of potentially high-risk containers scanned before arrival at a POE is an output metric that describes OFO workload.

### Methodology and Limitations

Inspection data are obtained from OFO administrative records.  In OFO/CSI's unique scope of operations, officers target, mitigate, and examine high-risk Bills of Lading (BOLs).  Subsequently, CSI collects data and reports key performance metrics in terms of BOLs, not containers.  Current data sources that report on BOLs scanned also include records of BOLs reviewed or assessed.

### Available Data and Discussion

In 2020, 92,000 high-risk BOLs were scanned before arrival at a POE, a decrease of 12 percent from 2019 and the second lowest number scanned since 2013.

**Table 18.**
**High-Risk Bills of Lading Scanned Before Arrival at U.S. POE, FY 2013 to 2020**

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|
| 103,999 | 117,453 | 126,223 | 113,326 | 117,453 | 81,397 | 103,670 | 91,629 |

Source: OFO.

IFR_AR_008665

# § 1092(d) Metrics for Securing the Maritime Border

## § 1092(d)(1)(A) Situational awareness in the maritime environment

### Definition

*Situational awareness* — The NDAA calls for DHS to develop a metric for situational awareness based on "knowledge and understanding of current unlawful cross-border activity," including "(A) Threats and trends concerning illicit trafficking and unlawful crossings; (B) The ability to forecast future shifts in such threats and trends; (C) The ability to evaluate such threats and trends at a level sufficient to create actionable plans; and (D) The operational capability to conduct persistent and integrated surveillance of the international borders of the United States."[16]

Situational awareness is an output metric.

### Methodology and Limitations

To improve the efficiency, effectiveness, and accountability of DHS aviation programs, the Department is developing the ability to analyze and report flight hour data consistently across components and assess the contribution of aviation activity to DHS missions. In 2019, DHS Headquarters conducted a "Flight Hour Study" of historical U.S. Coast Guard (USCG) and CBP Air and Marine Operations (AMO) data in accordance with the DHS Agency Reform Plan, a response to Executive Order 13781.[17] This is an ongoing and multi-year effort that the Department will continue to report on in future versions of this report.

In the interim, the Department reports on the following operational activity metrics contributing to maritime domain situational awareness:

- CBP Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Cutter Hours Contributing to Situational Awareness or Interdiction
- CBP Boat Hours Contributing to Situational Awareness or Interdiction
- USCG Boat Hours Contributing to Situational Awareness or Interdiction
- CBP Tethered Aerostat Radar System (TARS) Radar Operating Hours
- Number of Vessel Manifests Screened by Coastwatch

From the onset of reporting flight hour metrics in the Border Security Metrics Report, AMO's methodology for reporting mission hours inside/outside the transit zone is as follows:

- Inside Transit Zone — CBP: All mission hours flown by maritime patrol aircraft (B350; DHC-8; P-3) in coordination with Joint Interagency Task Force South (JIATF-S)
- Outside Transit Zone — CBP: All mission hours flown by maritime patrol aircraft (B350; DHC-8; P-3) in coordination with agencies other than JIATF-S

USCG revised its methodology for reporting mission hours inside/outside the transit zone in 2020.

Mission hours inside the transit zone are defined to include:

- All mission hours for JIATF-S;
- Drug interdiction hours for Pacific Area, Atlantic Area, District 7, District 11, and Sector San Juan; and

---

[16] National Defense Authorization Act of 2017 § 1092(a)(7).

[17] Executive Order 13781 of March 13, 2017, Comprehensive Plan for Reorganizing the Executive Branch

- Migrant interdiction hours for Pacific Area, Atlantic Area, District 7, District 8, District 11, Sector Jacksonville, Sector Key West, Sector Miami, Sector San Juan, Sector St. Petersburg, Sector Los Angeles/Long Beach, Sector San Diego, and Sector Corpus Christi.

Mission hours outside the transit zone are defined to include:

- All drug interdiction hours *other* than Pacific Area, Atlantic Area, District 7, District 11, and Sector San Juan; and
- Migrant Interdiction hours *other* than Pacific Area, Atlantic Area, District 7, District 8, District 11, Sector Jacksonville, Sector Key West, Sector Miami, Sector San Juan, Sector St. Petersburg, Sector Los Angeles/Long Beach, Sector San Diego, and Sector Corpus Christi.

### *Available Data and Discussion*

In comparison to 2019, CBP aircraft hours in 2020 decreased by 264 hours (4 percent) inside the transit zone and increased by 2,400 hours (20 percent) outside the transit zone.

**Table 19a.**

**CBP Aircraft Flight Hours Inside/Outside Transit Zone, FY 2016 to 2020**

|  | 2016 | 2017 | 2018 | 2019 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Inside Transit Zone – CBP | 6,420 | 6,273 | 6,528 | 6,583 | 6,583 | 6,319 |
| Outside Transit Zone – CBP | 13,188 | 12,422 | 17,576 | 11,711 | 11,711 | 14,080 |

Source: AMO.

The USCG reported 11,000 aircraft flight hours inside the transit zone in 2020 and 2,000 aircraft flight hours outside the transit zone. The breakdown of hours flown inside and outside the transit zone cannot be compared to previous years because of USCG's change to its reporting methodology.

**Table 19b.**

**USCG Aircraft Flight Hours Inside/Outside Transit Zone, FY 2012 to 2020**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Inside Transit Zone – USCG | 15,623 | 14,358 | 14,150 | 15,086 | 13,891 | 12,398 | 11,288 | 10,290 | 10,740 |
| Outside Transit Zone – USCG | 2,591 | 2,135 | 2,754 | 3,719 | 3,409 | 2,117 | 2,322 | 2,658 | 2,360 |

Note: In 2020, USCG changed their methodology for reporting missions inside/outside the transit zone; see accompanying text.
Source: USCG.

The USCG reported 113,000 cutter underway hours inside the transit zone and 9,000 cutter underway hours outside the transit zone in 2020. The breakdown of hours inside and outside the transit zone cannot be compared to earlier years due to the changes in USCG's reporting methodology.

**Table 20.**

**USCG Cutter Underway Hours Inside/Outside Transit Zone, FY 2012 to 2020**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Inside Transit Zone | 122,513 | 104,095 | 115,287 | 128,208 | 121,456 | 126,306 | 108,173 | 115,826 | 112,986 |
| Outside Transit Zone | 4,294 | 2,999 | 1,931 | 3,474 | 11,189 | 9,057 | 7,178 | 2,611 | 9,431 |

Source: USCG.

In 2020, CBP recorded no (zero) boat underway hours within the transit zone, down from 28 the previous year, but at the same level as 2016 and 2018. CBP's boat underway hours outside the transit zone totaled 35,000 hours in 2020, up 6 percent from 2019.

**Table 21a.**

**CBP Boat Underway Hours Inside/Outside Transit Zone, FY 2016 to 2020**

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Inside Transit Zone | 0 | 9 | 0 | 28 | 0 |
| Outside Transit Zone | 40,241 | 34,451 | 36,110 | 33,287 | 35,444 |

Note: CBP maritime hours include AMO underway hours.

Source: AMO.

The USCG reported 10,000 boat underway hours inside the transit zone in 2020 and 1,800 boat hours outside the transit zone. The breakdown of hours inside and outside the transit zone cannot be compared to earlier years due to the changes in USCG's reporting methodology.

**Table 21b.**

**USCG Boat Underway Hours Inside/Outside Transit Zone, FY 2012 to 2020**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Inside Transit Zone | 10,977 | 16,599 | 11,116 | 12,631 | 11,008 | 9,557 | 8,928 | 11,472 | 9,912 |
| Outside Transit Zone | 6,014 | 6,617 | 4,551 | 3,520 | 3,137 | 2,949 | 2,884 | 1,549 | 1,788 |

Source: USCG.

CBP's AMO uses TARS to provide long-range detection of low-altitude aircraft and maritime traffic at the radar's maximum range. The elevated sensor mitigates curvature of the earth and terrain-masking limitations. Following hurricane damage in 2017, TARS hours were lower 2018 to 2019, but began recovering in 2020, with 6,100 surveillance hours from Cudjoe Key, FL (a rebound to pre-2017 levels) and 5,200 hours from Lajas, PR (the third most hours since 2012).

**Table 22.**

**Total Operational Hours for TARS Radars, FY 2012 to 2020**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Cudjoe Key, FL | 5,752 | 6,289 | 6,165 | 6,306 | 4,886 | 5,728 | 2,448 | 3,239 | 6,140 |
| Lajas, PR | 0 | 0 | 12,301 | 5,049 | 4,559 | 3,922 | 2,105 | 5,449 | 5,251 |

Note: TARS site at Lajas, Puerto Rico crashed in 2011; CBP re-established operations in May 2014.

Source: CBP administrative records.

USCG Coastwatch screened 103,000 vessel manifests for National Security Concerns in 2020, down 10 percent from 2019 and down 14 percent from the 2012 to 2019 average.

**Table 23.**

**Vessel Manifests Screened by Coastwatch for National Security Concerns Prior to Arrival at U.S. POEs, FY 2012 to 2020**

| 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| 118,098 | 126,112 | 124,661 | 122,133 | 117,736 | 115,006 | 117,575 | 114,088 | 102,925 |

Source: USCG.

### § 1092(d)(1)(B) Known maritime migrant flow rate

#### *Definition*

*Known maritime migrant flow* – Total maritime migrant flow interdicted, identified directly or indirectly but not interdicted, or otherwise believed to have unlawfully entered the United States

*Known maritime migrant interdiction rate* – Total migrant interdictions in the maritime domain as a share of the known migrant flow.

Known maritime migrant flow is an outcome metric. Known maritime migrant interdiction rate is an output metric.

#### *Methodology and Limitations*

Migrant flow data are obtained from USCG and CBP administrative records. The USCG maintains a robust accounting of USCG, international partner, and domestic partner interdictions and sightings of undocumented maritime migrants. The USCG relies upon its partners to report their interdictions to the USCG for compilation in the database. At times, undocumented maritime migrants are counted by both USCG and CBP (or other partners) when interdicted as agencies often cooperate during these operations. In certain limited cases undocumented maritime migrant interdictions by partners are not reported to the USCG, and these cases are not accounted for in the tables below. Additionally, while partners report cases to the USCG when undocumented maritime migrants are apprehended on shore or evidence is found of their arrival on shore, some migrants arrive without being apprehended and leave no evidence. These cases are never reported and are also excluded from the known maritime migrant flow figures below.

Total migrant interdiction data (i.e., interdictions by DHS and its international partners) are only available beginning in 2014; as a result, the known migrant interdiction rate is also limited to the years since 2014.

To improve the efficiency, effectiveness, and accountability of DHS aviation and marine programs, the Department will provide de-conflicted data when interdictions involve assets from multiple components in future versions of this report. The Department will also report metrics on coordinated operations. This may be coordinated through a working group already convened to validate maritime CBP seizure data.

#### *Available Data and Discussion*

The interdiction rate decreased in 2020 compared to 2019, despite the known migrant flow increasing. Interdictions fell from 86 percent in 2019 to 66 percent in 2020, the lowest rate since data were available, and 7 percent below the next lowest rate during the 2014 to 2020 period. At the same time, the known flow in 2020 increased by 368 migrants (5 percent) compared to 2020.

**Table 24.**

**Migrants Interdictions in the Maritime Domain by DHS Component, Known Maritime Migrant Flow, and Known Maritime Migrant Interdiction Rate, FY 2010 to 2020**

| Fiscal Year | USCG | CBP | DHS and Partners | Known Migrant Flow | Interdiction Rate |
|---|---|---|---|---|---|
| 2010 | 2,121 | NA | NA | 4,443 | NA |
| 2011 | 2,458 | NA | NA | 4,566 | NA |
| 2012 | 2,732 | NA | NA | 5,298 | NA |
| 2013 | 2,093 | NA | NA | 7,631 | NA |
| 2014 | 3,587 | NA | 7,752 | 10,631 | 72.9% |
| 2015 | 3,825 | NA | 6,028 | 8,057 | 74.8% |
| 2016 | 6,326 | 2,683 | 8,167 | 10,319 | 79.3% |
| 2017 | 2,512 | 1,229 | 3,952 | 4,760 | 83.0% |
| 2018 | 1,671 | 1,224 | 3,603 | 5,007 | 72.0% |
| 2019 | 2,369 | 1,518 | 6,634 | 7,082 | 86.1% |
| 2020 | 1,958 | 2,162 | 4,947 | 7,450 | 66.4% |

Note: Some interdictions may be counted by both USCG and CBP as some migrant interdictions involve assets from both agencies. Interdictions by DHS and partners include international partners. Data pulls are from CG-MLE's Migrant Data, but data from 2010-2016 cannot be replicated.

NA – no data available.

Source: USCG and CBP.


## § 1092(d)(1)(C) Illicit drugs removal rate

### Definition

*Illicit drugs removal rate* – The ratio of illicit drugs removed by DHS maritime security in 1 year, including drugs abandoned at sea, relative to the average amount removed or abandoned in the immediately preceding 5 years.

The illicit drug removal rate is an output metric which compares trends in activity data over time.

### Methodology and Limitations

Drug removals are obtained from USCG administrative records; these data are considered reliable.

Pursuant to the definition of the illicit drug removal rate directed by NDAA § 1092(d)(1)(C), the illicit drug removal rate describes recent trends in drugs removed or abandoned at sea (i.e., current year compared to previous 5 years); the metric does not describe the rate at which illicit drugs are removed.

Non-commercial maritime drug removals include those seized by the USCG, CBP, other law enforcement agencies, and international partners as well as those disrupted or abandoned by drug trafficking organizations. At present, only USCG data are reported, but the Department has convened a work group to validate maritime CBP seizure data, which will be included in future versions of this report.

### Available Data and Discussion

The illicit drug removal rate varies significantly by year and drug type. After four straight years of decreasing seizure totals, marijuana removals rose in 2019 and 2020, reaching the highest rate in 2020 since 2014. Methamphetamine seizures rose to a record 532 kilograms in 2020, nearly twice the previous record of 274 kilograms in 2019. USCG removed 3.3 kilograms of heroin in 2020, down 9 percent from 2019 and down 78 percent from the 2010 to 2019 average.

**Table 25.**

**Ratio of Drugs Removed or Abandoned at Sea Relative to Previous Five Fiscal Years (Illicit Drug Removal Rate), FY 2010 to 2020**

| Drug Type | Rate/Amt | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Marijuana | Rate | 141% | 127% | 337% | 137% | 154% | 100% | 61% | 32% | 36% | 108% | 142% |
| | Kg seized | 16,662 | 17,799 | 56,511 | 36,745 | 49,231 | 35,499 | 23,865 | 12,743 | 11,434 | 28,704 | 31,920 |
| Cocaine | Rate | 0% | 0% | 0% | 0% | 100% | 75% | 8,110% | 291% | 0% | 300% | 371% |
| | Kg seized | 0 | 0 | 0 | 0 | 14.6 | 2.2 | 272.5 | 168.5 | 0.04 | 274.4 | 531.9 |
| Heroin | Rate | 0% | 72% | 381% | 157% | 0% | 578% | 225% | 351% | 209% | 14% | 13% |
| | Kg seized | 0 | 1.8 | 10.9 | 7.9 | 0 | 23.8 | 20.0 | 44.0 | 40.0 | 3.6 | 3.3 |

Notes:  Data only includes removals by USCG.  OIS defines the methamphetamine illicit drug removal rate for 2014 to be 100 percent on the basis of average seizures equaling zero for the previous five years.

Source:  OIS analysis of USCG data.

## § 1092(d)(1)(D) Cocaine removal effectiveness rate

### Definition

*Cocaine removal effectiveness rate* – The amount of cocaine removed by DHS inside and outside the maritime transit zone compared to total estimated flow of cocaine through the maritime domain.

Cocaine removals is an output metric.  Removals may also be used as a proxy indicator of total attempts to import cocaine, an outcome metric.  Cocaine removal effectiveness rate (i.e., cocaine seized as compared to the total estimated cocaine flow) is an output metric.

### Methodology and Limitations

Drug removal data obtained from the JIATF-S and USCG administrative records through the Consolidated Counter Drug Database (CCDB) are considered reliable.  Flow quantities provided by the DIA are considered the best estimates available based on intelligence reporting and case data.[18]  Additionally, while other government estimates for production in major cocaine-producing countries in South America and consumption of cocaine within the United States do not align with the estimated non-commercial maritime flow figures inside the transit zone derived from the CCDB, this metric was derived based upon the non-commercial maritime flow estimates.

For the purposes of this metric, based upon where the data were gathered, the transit zone is defined by the JIATF-S area of responsibility.  Non-commercial maritime drug removals include those seized by USCG and other law enforcement agencies, and international partners, as well as those disrupted by anti-drug trafficking operations.  The cocaine removal rate is based on estimates of non-commercial maritime cocaine flow from the CCDB.  Outside the transit zone data are not considered as robust about intelligence on flow.  As a result, the interdiction rate for cocaine outside the transit zone is not considered reliable.

The Department has convened a work group to validate maritime CBP seizure data, which will be included in future versions of this report.

### Available Data and Discussion

Table 26 summarizes available data on cocaine removed by DHS for 2012 to 2020.

---

[18]  Previous versions of this report included estimates of total cocaine flow provided by ONDCP.

**Table 26.**

**Cocaine Removed by DHS Relative to the Total Estimated Flow in the Maritime Transit Zone, FY 2012 to 2020**

| Location | Rate/Amt | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Inside Transit Zone | Rate | 16% | 9% | 14% | 15% | 9% | 1% | 8% | 13% | 11% |
| | Kg removed | 143,800 | 118,000 | 146,500 | 199,300 | 254,800 | 28,300 | 257,500 | 281,800 | 213,800 |
| | Estimated Flow | 893,600 | 1,334,500 | 1,081,900 | 1,358,700 | 2,940,700 | 2,882,100 | 3,036,100 | 2,238,600 | 1,959,300 |
| Outside Transit Zone | Rate | 49% | 19% | 50% | 73% | 28% | NA | NA | NA | NA |
| | Kg removed | 21,300 | 15,100 | 13,200 | 39,000 | 17,700 | NA | NA | NA | NA |
| | Estimated Flow | 43,800 | 81,500 | 26,200 | 53,200 | 62,300 | NA | NA | NA | NA |

Notes: Derived from Consolidated Counterdrug Database (CCDB). Estimated flow (primary cocaine movement) in the transit zone is measured in kilograms, and includes commercial and non-commercial air, land, and maritime (all certainties). Data are limited to USCG removals and data are not available (NA) for removals or estimate flow outside the transit zone after 2016. Data in prior years updated in 2020 due to maturing data. In 2020, the Coast Guard Maritime Law Enforcement Policy Office developed a set of business rules to ensure the numbers remain standard across the board over time from 2020 onwards.

Source: The Interdiction Committee (TIC) via CCDB.

The breakdown of cocaine removal inside and outside the transit zone cannot be compared to earlier years due to the changes in USCG's reporting methodology; see notes under Table 26 and Figure 5.

Documented non-commercial maritime cocaine flow in the transit zone increased significantly in 2016 to over 2.9 million kilograms, more than double the 1.4 million kilograms in 2015. Peace talks between the Government of Colombia and various insurgent groups in 2016 resulted in reductions or cessations of coca eradication efforts in Colombia. The reduced eradication efforts enabled a surge in cocaine production and subsequent maritime flow throughout the transit zone. Documented cocaine flow remained at heightened levels through 2020 through there was a relative decrease in documented non-commercial maritime cocaine flow to 2.0 million kilograms in 2020. The decrease was due in part to a reduction in awareness coupled with increased interagency collaboration and intelligence fusion successes that decreased the risk of inadvertently double counting events.

**Figure 5.**

**Flow and Removal of Cocaine in the Maritime Transit Zone, FY 2012 to 2020**



Notes: Partner nation cocaine removals are partner-nation-only seizures and losses in the transit zone (primary and subsequent movement). Data in prior years updated in 2020 due to maturing data. In 2020, the Coast Guard Maritime Law Enforcement Policy Office developed a set of business rules to ensure the numbers remain standard across the board over time from 2020 onwards.

Source: TIC via CCDB.

IFR_AR_008672

### § 1092(d)(1)(E) DHS maritime threat response rate

*Definition*

*DHS maritime threat response rate* – The ability of DHS maritime security components to respond to and resolve known maritime threats, whether inside or outside a transit zone, by placing assets on-scene, relative to the total number of known threats.

**Methodology and Limitations**

Currently, these data only exist for threats associated with cocaine response activity.  Further, DHS data are part of a larger set of interagency data and may not be able to be separated from the larger interagency dataset, which is currently assessed and reconciled on a cycle and process outside of DHS that does not support submission at this time.  DHS, in cooperation with interagency partners, is exploring options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the NDAA. This working group plans to have a metric available for subsequent versions of this report.

### § 1092(d)(1)(F) Intergovernmental maritime threat response rate

*Definition*

*Intergovernmental maritime threat response rate* – The ability of DHS maritime security components or other U.S. Government entities to respond to and resolve known maritime threats, whether inside or outside a transit zone, relative to the total number of known threats.

**Methodology and Limitations**

Currently, these data only exist for threats associated with cocaine response activity.  Further, DHS data are part of a larger set of interagency data and may not be able to be separated from the larger interagency dataset, which is currently assessed and reconciled on a cycle and process outside of DHS that does not support submission at this time.  In cooperation with interagency partners, DHS is exploring options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the NDAA. This working group plans to have a metric available for subsequent versions of this report.

# § 1092(e) Air and Marine Security Metrics in the Land Domain

## § 1092(e)(1)(A) Flight hour effectiveness rate

### Definition

*Flight hour effectiveness rate in the land domain* – Number of flight hours flown by CBP AMO in the land domain as a percentage of AMO's unconstrained flight hour requirements.

Flight hour effectiveness rate is an output metric.

### Methodology and Limitations

The flight hour effectiveness rate is determined by dividing the total hours flown by the number of flight hour requirements determined during the annual collection process. The flight hour requirements for the subsequent year are collected by CBP AMO operating locations based on unconstrained requirements collected from USBP, ICE, and other partner agencies, as well as internal CBP AMO requirements.

The AMO unconstrained flight hour requirement is not a validated DHS metric.

### Available Data and Discussion

AMO flew 74,000 hours in the land domain in 2020, a drop of 3,800 hours from the 2016 to 2019 average. The flight hour effectiveness rate (26 percent) was maintained 2019 to 2020.

**Table 27.**

**Flight Hour Effectiveness Rate, FY 2016 to 2020**

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Unconstrained Flight Hour Requirement | 295,225 | 242,185 | 284,644 | 284,644 | 284,644 |
| Hours Flown | 79,872 | 78,066 | 78,226 | 74,552 | 73,879 |
| Unconstrained Flight Hour Effectiveness Rate | 27% | 32% | 27% | 26% | 26% |

Source: AMO.

## § 1092(e)(1)(B) Funded flight hour effectiveness rate

### Definition

*Funded flight hour effectiveness rate* – Number of flight hours flown by AMO as a percentage of the number of flight hours funded by Congress.

Funded flight hour effectiveness rate is an output metric.

### Methodology and Limitations

Flight hour data are obtained from AMO administrative records. The funded flight hour effectiveness rate is determined by dividing the total hours flown by the number of flight hours funded by Congress.

*Available Data and Discussion*

AMO's funded flight hour effectiveness rate was slightly over 100 percent for each year 2016 to 2020.

Table 28.

**Funded Flight Hour Effectiveness Rate, FY 2016 to 2020**

|  | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|
| Hours flown | 79,872 | 78,066 | 78,226 | 74,552 | 73,879 |
| Hours funded | 79,774 | 77,769 | 77,111 | 74,174 | 73,697 |
| Effectiveness rate | 100% | 100% | 101% | 101% | 100% |

Source: AMO.

## § 1092(e)(1)(C) AMO readiness rate

### Definition

*AMO readiness rate* — The percentage of mission requests that AMO was able to fulfill, excluding those requests that could not be fulfilled for reasons beyond AMO's control.

AMO readiness rate is an output metric.

### Methodology and Limitations

Mission data are obtained from AMO administrative records. The rate is determined by dividing the missions flown by the total number of mission requests minus missions cancelled for weather-related reasons and other factors beyond AMO control.

AMO's readiness rate was 89 percent in 2020, with 4,400 out of 38,000 in-scope missions cancelled due to causes within AMO control. The 2020 readiness rate was at its highest level in 2020 since 2016, the first year for which data were available.

Table 29.

**AMO Missions Cancelled and Readiness Rate, FY 2016 to 2020**

|  | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|
| Total missions requested by partner agencies | 42,761 | 41,944 | 45,684 | 42,933 | 46,233 |
| Missions not cancelled for reasons beyond AMO control | 38,081 | 37,626 | 41,701 | 36,632 | 37,688 |
| Missions cancelled within AMO control | 6,716 | 7,308 | 7,029 | 6,301 | 4,465 |
| Missions cancelled – asset availability | 4,978 | 4,496 | 3,757 | 2,942 | 2,464 |
| Missions cancelled – crew availability | 1,738 | 2,812 | 3,272 | 3,359 | 2,001 |
| Readiness rate due to causes within AMO control | 82% | 81% | 83% | 83% | 89% |

Source: AMO.

## § 1092(e)(1)(D) AMO weather-related cancellation rate

### Definition

*AMO weather-related cancelation rate* — The number of missions cancelled by AMO due to weather as a percentage of total planned AMO missions.

AMO weather-related cancelation rate is an output metric.

IFR_AR_008675

*Methodology and Limitations*

Mission data are obtained from AMO administrative records. The weather-related cancelation rate is calculated by dividing the number of missions cancelled due to weather by the total number of missions requested by AMO's partner agencies.

*Available Data and Discussion*

AMO was forced to cancel 3,000 missions in 2020 due to weather out of 46,000 total missions requested by partner agencies. This resulted in a weather-related cancellation rate of 6 percent, down one percentage point from the 2019 rate and equal to the 2018 rate.

**Table 30.**

**AMO Weather-Related Cancellation Rate, FY 2016 to 2020**

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Total missions requested by partner agencies | 42,761 | 41,944 | 45,684 | 42,933 | 46,233 |
| Missions cancelled – weather | 3,083 | 3,122 | 2,930 | 2,892 | 2,960 |
| Cancellation rate due to weather | 7% | 7% | 6% | 7% | 6% |

Source: AMO.

## § 1092(e)(1)(E) AMO individuals detected

*Definition*

*AMO individuals detected* – Number of individuals detected by CBP AMO with unmanned aerial systems and manned aircraft.

AMO individuals detected is an output metric.

*Methodology and Limitations*

Data are obtained from AMO administrative records. The Department's currently available data on detections by unmanned aircraft are limited to the number of Vehicle and Dismount Exploitation Radar (VADER) detections, and current data on detections from manned aircraft are limited to detections leading to apprehensions and arrests.

These data exclude certain detections because AMO does not presently track data from all sensors on unmanned and manned aircraft. For this reason, the Department considers the current AMO individuals detected metric to be a work in progress and expects to provide more comprehensive data on AMO detections as part of subsequent reports.

*Available Data and Discussion*

AMO detected 41,000 individuals via manned aircraft and 17,000 individuals via unmanned aircraft in 2020. Total detections in 2020 were down 17 percent compared to 2019, while individuals detected by unmanned aircraft were down 5 percent from 2019.

**Table 31.**

**Individuals Detected by AMO by Aircraft Type, FY 2016 to 2020**

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Manned | 54,879 | 35,374 | 41,061 | 51,219 | 40,520 |
| Unmanned | 7,908 | 10,711 | 18,081 | 18,169 | 17,351 |
| Total | 62,787 | 46,085 | 59,142 | 69,388 | 57,871 |

Source: AMO.

IFR_AR_008676

### § 1092(e)(1)(F) AMO apprehensions assisted

#### Definition

*AMO apprehensions assisted* — USBP apprehensions assisted by AMO using unmanned aerial systems and manned aircraft.

AMO apprehensions assisted is an output metric.

#### Methodology and Limitations

Data are obtained from AMO administrative records. The metric consists of AMO enforcement flight hours and arrests that are attributed to manned and unmanned aircraft operations. These data are based on Aircraft Enforcement Hours (non-maritime), therefore excluding DHC-8, P-3, and Maritime Enforcement Aircraft (MEA) operations occurring in the maritime domain.

#### Available Data and Discussion

In 2020, AMO flew 60,000 manned enforcement flight hours that assisted in the apprehension of 40,000 individuals, and 7,700 unmanned enforcement flight hours that assisted in the apprehension of 5,300 individuals. The number of both manned and unmanned flight hours were up from 2019 (13 percent and 8 percent respectively), but the number of apprehensions were down in both cases (10 percent and 11 percent respectively) compared to 2019.

**Table 32.**
**AMO Enforcement Flight Hours and Apprehensions Assisted by Aircraft Type, FY 2017 to 2020**

| Description | 2017 | | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
| | Enforcement Flight Hours | Apprehensions | Enforcement Flight Hours | Apprehensions | Enforcement Flight Hours | Apprehensions | Enforcement Flight Hours | Apprehensions |
| Manned | 55,572 | 32,872 | 55,541 | 39,548 | 53,591 | 44,022 | 60,762 | 39,737 |
| Unmanned | 6,771 | 2,362 | 6,852 | 6,314 | 7,178 | 6,030 | 7,725 | 5,363 |
| Total | 62,343 | 35,234 | 62,393 | 45,862 | 60,769 | 50,052 | 68,487 | 45,100 |

Source: AMO.

### § 1092(e)(1)(G) Illicit drug seizures assisted by AMO

#### Definition

*Illicit drug seizures assisted by AMO* — The number and quantity of illicit drug seizures assisted by AMO using unmanned aerial systems and manned aircraft.

Illicit drug seizures assisted is an output metric.

#### Methodology and Limitations

Drug seizure data are obtained from AMO administrative records. The metric consists of the total number of events and quantity in pounds of drug seizures using manned and unmanned systems. A "drug event" is defined as a single law enforcement action resulting in a drug seizure(s). These data are based on non-maritime enforcement flight hours and therefore exclude DHC-8, P-3, and MEA operations occurring in the maritime domain.

#### Available Data and Discussion

AMO flew 61,000 manned enforcement flight hours and 7,700 unmanned hours in 2020, more hours flown in both cases when compared to 2019. The increase in manned and unmanned flight hours resulted in a substantial increase in drug events and drug seizures. Manned flights encountered 13 times as many drug events in 2020 compared to 2019

IFR_AR_008677

and seized 19,000 more kilograms of drugs. Unmanned flight hours in 2020 resulted in 78 times as many drug events compared to 2019, with nearly 4 times as many kilograms seized.

**Table 33.**

**AMO Enforcement Flight Hours, Illicit Drug Events, and Drug Seizures by Aircraft Type, FY 2017 to 2020**

| Description | 2017 | | | 2018 | | | 2019 | | | 2020 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Enforcement Flight Hours | Drug Events | Drug Seizures (kg) | Enforcement Flight Hours | Drug Events | Drug Seizures (kg) | Enforcement Flight Hours | Drug Events | Drug Seizures (kg) | Enforcement Flight Hours | Drug Events | Drug Seizures (kg) |
| Manned | 55,572 | 1,649 | 143,737 | 55,541 | 1,612 | 204,645 | 53,591 | 723 | 100,879 | 60,762 | 9,435 | 120,088 |
| Unmanned | 6,771 | 108 | 18,874 | 6,852 | 85 | 16,375 | 7,178 | 26 | 1,978 | 7,725 | 2,038 | 6,981 |
| Total | 62,343 | 1,757 | 162,611 | 62,393 | 1,697 | 221,021 | 60,769 | 748 | 102,857 | 68,487 | 11,473 | 127,069 |

Note: Data are limited to non-maritime enforcement flight hours.
Source: AMO.

### § 1092(e)(1)(H) AMO actionable intelligence

#### Definition

*AMO actionable intelligence* – The number of times that actionable intelligence related to border security was obtained using unmanned aerial systems and manned aircraft.

AMO is in the process of creating a dashboard of historic data on sensor surveillance to help inform measure development.

### § 1092(g)(3)(D) Other appropriate information

Pursuant to NDAA § 1092(g)(3)(D), this section provides three additional metrics of border security between POEs: 1) selected characteristics of USBP apprehensions; 2) the estimated at-the-border deterrence rate; and 3) estimated border crossing costs.

### Selected Characteristics of Recent USBP Apprehensions

#### Definition

Historically, most individuals apprehended between POEs along the Southwest Border have been Mexican adults, and very few of them have sought asylum or other forms of humanitarian relief from removal. In recent years, the profile of USBP apprehensions has changed in important ways, as growing shares of individuals apprehended are: 1) from countries other than Mexico (primarily the Northern Triangle countries of El Salvador, Guatemala, and Honduras), 2) UCs or children and adults traveling together as FMs, and/or 3) seeking asylum or other forms of protection from removal by claiming fear of removal to their countries of citizenship.

These shifting characteristics have an important impact on border security and USBP border enforcement because existing enforcement policies were largely designed with the more traditional noncitizen profile in mind. For example, many consequences under CBP's Consequence Delivery Program such as the Mexican Interior Repatriation Program are only applicable to Mexican nationals. And UCs, FMs, and noncitizens found to have a credible fear generally cannot be expeditiously removed and have been considered "not impactable" by traditional USBP enforcement efforts because upon apprehension they have typically been released into the United States with a Notice to Appear in immigration court on a future date. More generally, the drivers of migration from countries other than Mexico and for noncitizens who may seek humanitarian relief or protection from removal may be different from those that motivated earlier generations of unlawful border crossers, potentially causing U.S. policymakers to rethink their policy response.

IFR_AR_008678

To monitor these changing dynamics, the Department tracks two main sets of characteristics:

- *Apprehensions by citizenship* — The share of noncitizens apprehended by USBP from Mexico, El Salvador, Guatemala, Honduras, and all other countries.

- *Apprehensions by "non-impactable noncitizens"* — The share of noncitizens who are UCs from countries other than Mexico or Canada, FMs, express a fear of being returned to their home countries (asylum seekers), or are Cubans arriving by land prior to January 2017 under the wet foot/dry foot policy. These groups of noncitizens are considered non-impactable for purposes of the Department's model-based estimate of unlawful entries because they have generally been exempted from many of the policy responses CBP undertakes at the border to prevent unlawful entries and deter repeat migration attempts, including most administrative forms of removal.[19]  (See Appendix A.)

Apprehensions is an output metric.

### Methodology and Limitations

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension. Apprehensions by citizenship, UC status, and FM status are generally considered reliable, though agents may not always be able to accurately identify UCs or FMs.

### Available Data and Discussion

In recent years, the demographics of apprehensions have started to shift from consisting overwhelmingly of Mexican nationals to a growing share of border crossers from other areas, namely Northern Triangle countries. As recently as 2009, Mexicans accounted for 92 percent of Southwest Border apprehensions. Their share fell below 50 percent for the first time ever in 2014, remained below 50 percent in each of the 4 years 2016 to 2019, and fell to an all-time low of 20 percent in 2019 before rising to 50 percent in 2020, the highest proportion since 2015. The increasing proportion of Mexican apprehensions from 2019–2020 is partially due to the substantial decrease in Northern Triangle Country apprehensions, both in terms of count and proportion of the total. Each Northern Triangle Country made up less than half of the proportion of total apprehensions in 2020 compared to 2019. In terms of total count, Salvadorian apprehensions decreased by 88 percent, Guatemalan apprehensions by 88 percent, and Honduran apprehensions decreased by 91 percent. Apprehensions of all other country nationals decreased by 54 percent in terms of total count from 2019–2020, but nearly doubled in terms of proportion.

**Table 34.**

**USBP Southwest Border Apprehensions by Citizenship, FY 2010 to 2020**

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mexico | 396,819 | 280,580 | 262,341 | 265,409 | 226,771 | 186,017 | 190,760 | 127,938 | 152,257 | 166,458 | 102,337 |
| El Salvador | 13,123 | 10,368 | 21,903 | 36,957 | 66,419 | 43,392 | 71,848 | 49,760 | 31,369 | 89,811 | 10,609 |
| Guatemala | 16,831 | 17,582 | 34,453 | 54,143 | 80,473 | 56,691 | 74,601 | 65,871 | 115,722 | 264,168 | 32,296 |
| Honduras | 12,231 | 11,270 | 30,349 | 46,448 | 90,968 | 33,445 | 52,952 | 47,260 | 76,513 | 253,795 | 23,200 |
| All Other | 8,727 | 7,777 | 7,827 | 11,440 | 14,740 | 11,788 | 18,709 | 13,087 | 20,718 | 77,276 | 35,166 |
| **Total** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** | **303,916** | **396,579** | **851,508** | **203,608** |

Source: OIS Statistical Immigration Data.

---

[19] The Trump Administration took a number of steps broadly designed to deter the three main groups of "non-impactable" noncitizens, including by imposing limits on when and where noncitizens arriving at the Southwest Border may apply for asylum, expanding family detention, adopting "zero tolerance" policies to increase border prosecutions (at one point resulting in a large number of family separations), imposing limits on UCs' ability to be reunified with family members in the United States, and requiring certain noncitizens to remain in Mexico during the pendency of their asylum proceedings. Despite these policies, OIS has found that majorities of asylum seekers, FMs, and UCs apprehended at the Southwest Border in 2017 to 2019 remained in the United States in unresolved status as of March 31, 2020. See Marc Rosenblum and Hongwei Zhang, "FY 2020 Enforcement Lifecycle Report," DHS, December 2020.

Along with the shift from Mexico to Northern Triangle countries, the other noteworthy trend in Southwest Border apprehensions in recent years has been the rising share of noncitizens with potential humanitarian claims who are therefore considered non-impactable by traditional border enforcement policies. However, 2020 interrupted this trend both in terms of count and share of total apprehensions. For example, the proportion of noncitizens apprehended by USBP and eventually making fear claims (i.e., initiating the credible fear process or filing an asylum application) decreased more than four-fold from 2019 to 2020, and total non-impactable apprehensions dropped by over half a million during that single-year period. The number of UCs also decreased in 2020 to the lowest levels since at least 2013, and made up only 11 percent of all apprehensions, the second lowest proportion of apprehensions since 2013, the first year in which data were reported. FM apprehensions decreased by more than a factor of nine in 2020 compared to 2019. These decreases occurred despite a nearly ten-fold decrease in total apprehensions from 2019 to 2020. Notably however, apprehensions do not count for all border encounters, as they exclude Title 42 encounters (see Table 4).

These significant changes to recent trends were due to a variety of factors, notably new policies such as Title 42, Migrant Protection Protocols, and COVID-19 border restrictions, each of which limited entry into the United States.  In addition, 2019 was a year with record high numbers of non-impactable apprehensions, so comparison with 2020 (a year with record low numbers in several categories of non-impactable apprehensions) is particularly stark.

**Table 35.**
**USBP Southwest Border Apprehensions by Non-Impactable Status, FY 2013 to 2020**

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Non-Impactables | 68,941 | 162,367 | 97,977 | 168,749 | 138,833 | 189,972 | 603,341 | 80,791 |
| Fear Claims | 35,670 | 47,544 | 39,214 | 79,438 | 56,349 | 78,822 | 90,623 | 20,715 |
| UC | 38,759 | 68,541 | 39,970 | 59,692 | 41,435 | 50,036 | 76,020 | 30,552 |
| FM | 12,940 | 67,060 | 39,838 | 77,674 | 75,622 | 107,212 | 473,682 | 52,230 |
| Cuban | 73 | 98 | 106 | 78 | 32 | NA | NA | NA |
| **Total Apprehensions** | **156,383** | **345,610** | **217,105** | **385,631** | **312,271** | **426,042** | **1,243,666** | **184,288** |

Notes:  Table rows are not mutually exclusive categories; individuals may be counted as FM/UC as well as Cuban and/or fear claimants.  OIS updated methodology for calculating non-impactables and fear claims in 2020; all years in the table have been updated to match this methodology to improve accuracy and enable comparison between years.
NA – no data available.
Source:  OIS Statistical Immigration Data.

## At-the-Border Deterrence

### Definition

*Deterrence* – the estimated share of noncitizens who, following a failed unlawful entry attempt, are deterred from making a subsequent reentry and decide instead to return home or otherwise remain in Mexico.

The deterrence rate is an output metric associated with the difficulty of crossing the border unlawfully because it reflects decisions by people who had already decided to migrate unlawfully to abandon their effort.

### Methodology and Limitations

As with the apprehension or interdiction rate, deterrence cannot be observed directly.

DHS currently estimates deterrence based on migrant surveys; the Department believes surveys and interviews are some of the only ways to directly measure deportees' intentions to make a further unlawful entry attempt.  The most important survey data on deterrence comes from the Colegio de la Frontera Norte International Border Survey (EMIF, by its Spanish acronym), which interviews deportees immediately at repatriation facilities upon their removal to Mexico and asks them about their intentions to return to the United States.  The EMIF survey has asked deportees about their intention to attempt another trip to the United States within the next 7 days each year since 1993 and began asking migrants about their intention to attempt another trip within the next 90 days in 2012.

While the EMIF survey is well respected, the survey is not weighted to match the actual population of Mexican deportees or to account for the enforcement consequences they are subjected to, but is weighted instead based on numbers reported by the Mexican Migration Institute. Analyses by the National Research Council and the Pew Research Center of the EMIF-Norte (EMIF-N) survey, of which the Returned module is a subset, found the EMIF-N's weighted number of Mexican nationals to be considerably smaller than reported by DHS.[20, 21] Thus, in its work for DHS to develop a model-based apprehension rate and estimate of successful unlawful entries, the Institute for Defense Analyses (IDA) Corporation used a combination of EMIF and CBP data to build a regression model of 90-day deterrence for all USBP apprehensions since 2000 that accounts for relevant characteristics of Mexican deportees.[22] IDA's model for the years 2000−2007 (i.e., before CBP's implementation of the CDS) focuses exclusively on deportees' demographic characteristics, and its model for 2008 forward also incorporates data on noncitizens' enforcement histories and anticipated future consequences.

In addition to the standard concerns about the validity of survey samples and survey instruments, questions about deterrence are especially hard to measure accurately given the ever-evolving enforcement environment.  In particular, the survey measures deportees' intention to make a further entry attempt or not at the time of their repatriation, but an unknown portion of those who indicate that they will try again may in fact be deterred before making another entry attempt (and vice versa).  A further limitation is that the EMIF data are restricted to Mexican Northern Border deportees and cannot be assumed to apply to migrants from other regions/countries because they face different trade-offs and geographic barriers when considering a re-entry attempt.

### Available Data and Discussion

The EMIF survey data describe relatively limited deterrence levels prior to 2007 (17−30 percent in responses to the 7-day survey question), and substantial growth in the deterrence rate since that time.  According to EMIF's survey results, more than 74 percent of respondents in each year since 2012 have indicated they will not attempt to re-enter within 7 days, and more than 55 percent have indicated they will not attempt re-entry within 90 days, including all-time high proportions of 86 percent from 2017 to 2019 (Figure 6).  EMIF survey weights are applied for the 7-day EMIF weights and the 90-day EMIF weights.

---

[20] National Research Council, 2013, *Options for Estimating Illegal Entries at the U.S.-Mexico Border*, Washington, DC: The National Academies Press, https://doi.org/10.17226/13498.

[21] Jeffery Passel, D'Vera Cohn, and Ana Gonzalez-Barrera, "Appendix C. Methodology," *Net Migration from Mexico Falls to Zero—and Perhaps Less*, Pew Research Center, April 2012.

[22] John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.

IFR_AR_008681

**Figure 6.**

**EMIF Survey Data on at-the-Border-Deterrence for Mexican Deportees, FY 2000 to 2020**



Notes: EMIF did not collect survey responses from April 2020 to June 2020. July 2020 to September 2020 EMIF data is used to impute values and responses for the missing months.
Source:  OIS analysis of Colegio de la Frontera Norte EMIF data.

Figure 7 depicts IDA's regression model of deterrence that accounts for migrant characteristics and enforcement consequences.  OIS updated the IDA regression model for the years 2012 to 2020 to incorporate EMIF 90-day survey data.  Starting in the 2019 version of this report, OIS used the upper and lower bounds of the regression model's predicted values to construct a 95 percent confidence interval around the estimated deterrence rate for the years for which an updated regression model is available (i.e., for 2012 to 2019).  Starting in the 2021 version of this report, OIS incorporated the EMIF survey weights as part of the regression model.  Overall, regression model predicts 90-day deterrence rates of 11–24 percent for the years 2000 to 2010, climbing to a high of 71 percent in 2020.  The 95 percent confidence interval consistently describes a range of 5 to 8 percentage points (i.e., plus or minus 2.5–4 percentage points on either side of the estimated deterrence rate). See Appendix A for a detailed discussion.

Because EMIF did not collect survey responses from April 2020 to June 2020, July 2020 to September 2020 EMIF data was used to impute the values and responses for the missing months. The July 2020 to September 2020 data was duplicated and time shifted to fill in the data gap, which likely decreases the deterrence rate due to the higher re-encounter rate with those subject to T42 expulsions compared to T8 apprehensions as well as a below average number of apprehensions in April and May of 2020. In addition, data from T42 encounters is less complete than for T8 apprehensions which necessitated deriving some information from available data, such as site information based on OFO field office and port name.

**Figure 7.**

**Model-Based 90-Day Deterrence Model, FY 2000 to 2020**



Note: The lower and upper bounds are based on a 95 percent confidence interval.

Source: OIS analysis of DHS RTM.

## Border Crossing Costs

### Definition

*Percent hiring smuggler* — The share of migrants who hire a smuggler.

*Border crossing costs* — The average fees that smugglers charge.

Smuggling usage and average smuggling fees are output metrics associated with the difficulty of crossing the border unlawfully. It is likely that migrants will only tolerate higher fees to the extent that smugglers provide an essential and successful service. Smugglers often also compete to attract customers by offering their services at the lowest profitable rate, so higher fees typically indicate rising costs to smugglers. Rising smuggling fees also often reflect an increased risk to smugglers of a criminal conviction; smugglers usually pass this risk along to customers in the form of higher fees.

### Methodology and Limitations

The only available data on smuggling fees come from migrant surveys and USBP custodial interviews. These data may be subject to response bias if migrants are reluctant to admit to hiring a smuggler, but such bias is likely to be broadly consistent over time, so changes in survey/interview data should reflect changes in the difficulty of crossing the border.

### Available Data and Discussion

One finding across multiple surveys is that smuggler usage rates have increased steadily over the last 5 decades. Specifically, smuggler usage rates climbed from 40-50 percent during the 1970s, to 59 percent in the late 1970s and early 1980s, 70-80 percent in the 1980s to 1990s, 80 to 93 percent in the 1990s to 2000s, and 95 percent for first-time crossers surveyed in 2006. Similarly, USBP interviews indicate that 80-95 percent of unlawful border crossers hired a smuggler in recent years, a pattern partly driven by transnational criminal organizations' (TCOs) control of crossing points along the Mexican side of the border.

IFR_AR_008683

**Figure 8.**
**Border Crossing Cost Estimates, FY 2000 to 2020**



Note: There are methodology differences between the categories, but all categories have been inflation-adjusted to FY 2020 dollars. Estimates for 2000 to 2019 update previously reported estimates. EMIF did not collect survey responses from April 2020 to June 2020. July 2020 to September 2020 EMIF data is used to impute values and responses for the missing months.

Source: USBP apprehension records, EMIF.

Survey results also indicate steady increases in fees paid to migrant smugglers. Averaging across the available sources depicted in Figure 8 and additional data from the Mexican Migration Project,[23] smuggling fees increased by 5 percent per year during the 1980s, 1 percent per year during the 1990s, 5 percent per year during the 2000s, and 11 percent per year during the 2010s—though USBP data indicate a 15 percent drop between 2018 and 2019—and a decrease of 2 percent from 2019 to 2020.

These numeric trends may understate the actual increase in border crossing costs during the 2010s. Custodial interviews conducted by subject matter experts within CBP have found that smuggling fees are often paid in stages. The range of smuggling fees also differs greatly depending on tactics and procedures utilized by TCOs in various border crossing locations. Initial fees required to approach staging locations along the border were often lower than $100 prior to the late 2000s, and an additional $1,000-$3,000 in fees were charged upon delivery to the destination. More recently, smuggling fees for Mexicans and Central Americans reportedly have increased partially due to enhanced security measures in Mexico; fees have been as high as $1,300 for the initial staging payment and up to $12,000 at the destination. Custodial interviews also find evidence of an increase in alternative forms of payment in exchange for passage, including migrants being required to participate in smuggling controlled substances or other illicit items across the border or to work off debts upon arrival in the United States, as well as reports of harsh negotiations concerning payment plans with family members.

---

[23] The Mexican Migration Project, mmp.opr.princeton.edu

# IV. CONCLUSION

DHS recognizes that its ability to accurately measure its border security outcomes, outputs, activities, and inputs is essential to the effective and efficient management of the Department. The metrics contained in this report are the baseline that DHS uses to measure its progress towards meeting the border security mission. As such, the Department will continue to refine these metrics through internal and external engagement and collaboration, including with Congress. DHS looks forward to updating Congress on this progress through periodic briefings and formally with the submission of future BSMRs.

IFR_AR_008685

# Appendix A — Repeated Trials Model Methodology

The Department's current model-based estimates of the apprehension rate, total number of successful unlawful entries, and related metrics such as undetected unlawful entries, build on research conducted for the Department of Homeland Security (DHS) by the Institute for Defense Analyses (IDA) based on long-standing social science research on the Repeated Trials Model (RTM) methodology.[24]  The Department views some of IDA's assumptions as problematic and continues to work to validate and refine the modeling methodology, as discussed below.

### The Institute for Defense Analyses RTM Methodology

Based on IDA's work for DHS, the primary building block for the model-based apprehension rate and total estimated successful unlawful entries is an estimated apprehension rate for a particular subset of border crossers that DHS refers to as a partial apprehension rate (PAR).  The approach focuses on unlawful border crossers who are apprehended and removed to the Mexican border and who make a subsequent re-entry attempt.  The logic of the PAR is to use Customs and Border Protection's (CBP) U.S. Border Patrol's (USBP) biometric data to assess what share of migrants who make repeated entry attempts is subsequently re-apprehended.

The PAR methodology consists of three main steps (Figure A1).  First, the model identifies a subset of unlawful border crossers who are candidates to attempt re-entry, the RTM population.  Under IDA's methodology, this group excludes all

**Figure A1.**
**Partial Apprehension Rate Methodology**



Source: OIS adaptation of Bailey et al. 2016.

---

[24]  For a full discussion of IDA's model-based estimate, see John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.  Also see Thomas J. Espenshade, "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier," *International Migration Review* (1995): 545-565; Joseph Chang, "CBP Apprehensions at the Border," Homeland Security Studies and Analysis Institute, 2006.

IFR_AR_008686

non-Mexicans, those removed to the Mexican interior or remotely through the Alien Transfer Exit Program, noncitizens who have ever requested asylum, those facing criminal charges, and children under 18 years of age.

The second step in calculating the PAR is to distinguish between deportees who return home or otherwise remain in Mexico versus those who attempt to re-enter the United States. IDA estimates this share based on the survey of recent deportees in the Colegio de la Frontera Norte International Border Survey (EMIF, by its Spanish acronym), as discussed above (see NDAA § 1092(g)(3)(D) Other Appropriate Information, At-the-Border Deterrence).

Third, by definition, the RTM methodology assumes deportees who are not deterred following an apprehension always make a subsequent reentry attempt. Thus, by observing in DHS administrative records how many migrants from the RTM population are re-apprehended, the model infers the number that successfully re-enters. The ratio of re-apprehensions to successful re-entries is used to estimate the PAR.

The PAR model confronts important limitations at each point in the modeling process. The most notable and challenging to overcome is the assumption of the RTM that subjects who are not deterred will always attempt re-entry until successful. One problem with this assumption is the lack of reliable data on who is deterred. IDA relies primarily on the EMIF survey (modified to better reflect the demographic characteristics and enforcement histories of the actual RTM population) to estimate the deterrence rate. While the EMIF is widely recognized as one of the best migrant surveys available, its results are still dependent on the characteristics of the sample, the quality of the survey instrument, and the honesty of the respondents. More fundamentally, the EMIF survey asks recent deportees about their *intentions* to re-enter the United States, and it therefore does not take account of shifting border enforcement efforts, potential changes in behavior by individuals who have been exposed to consequence programs, or other deterrent factors along the border. The structure of the RTM methodology means that any resulting undercount in the estimate of the deterred population results in a downward bias in the PAR.

Second, the RTM population represents a shrinking share of Southwest Border apprehensions. Mexican adults quickly deported to the nearest border accounted for 95 percent of apprehensions when the RTM methodology was developed in the 1990s. But changes in the composition of border flows (i.e., rising numbers of Central Americans and asylum seekers); changes in CBP's enforcement strategy to emphasize criminal charges, lateral repatriation, and other enforcement consequences; and IDA's restrictive modeling choices mean that only 20 percent of Southwest Border apprehensions are used to estimate the PAR in recent years. In addition, because the RTM sample excludes noncitizens who are more likely to surrender to USBP (i.e., noncitizens with a higher apprehension rate), the PAR is biased downwards as an indicator of the overall apprehension rate; this bias may be substantial given the number of noncitizens excluded from the RTM sample.

Third, IDA makes somewhat restrictive assumptions about which re-apprehensions to include in the final stage of the PAR calculation. In particular, IDA excludes apprehensions occurring at check points and other remote locations and those occurring more than 4 days after an unlawful entry. Given USBP's defense-in-depth strategy, which places resources at and across the border, these assumptions result in a slight further downward bias in the PAR.

## Refinements to IDA's Model-Based Estimate and Impacts on Reported Metrics

Despite these limitations, the Department views the RTM methodology as a promising approach to estimating an apprehension rate that takes great advantage of USBP's collection of biometric data since 2000. In implementing the RTM methodology to produce reportable metrics, the Department made refinements to IDA's approach in each of the four Border Security Metrics Reports (BSMRs) for 2017 to 2019 and 2021. These refinements had modest impacts on certain reported metrics, and certain metrics were further affected by the inclusion of updated historical data. No substantive updates were made to the RTM methodology for the 2020 BSMR, but the Department continues to update historic removal and return data, which results in modest changes to previous estimates of the PAR and of the number of unlawful entries as explained below.

DHS made two refinements to IDA's approach to estimating the PAR when preparing metrics for the 2017 BSMR. First, the Department included a broader set of Mexican deportees in its definition of the RTM sample included in the calculation of the PAR: IDA's sample was defined to include Mexicans 18 years of age and older repatriated to the border

who had not been detained in the United States, who had never claimed asylum, and who had not been identified as suspected smugglers; the Department expanded the definition of the RTM sample by excluding only those noncitizens who claimed asylum with USBP and by including Cubans apprehended after January 2017, at which point the wet foot/dry foot policy was terminated. Second, while IDA only counted apprehensions occurring in the immediate border region within 4 days of a migrant's unlawful entry in its calculation of the re-apprehension rate, the Department also included apprehensions at CBP checkpoints and elsewhere in the border region occurring within 30 days of an unlawful entry. As a result of the changes to the RTM sample, the deterrence rate shifted for most years, leading to adjustments in the PAR for all prior years as well. Depending on the year, these adjustments may have increased or decreased the PAR, largely depending on the change in deterrence.

The Department made one additional change to IDA's approach when preparing the 2018 BSMR, in this case by refining the methodology for using the PAR to estimate total unlawful entries. IDA's model of total unlawful entries assumes that non-impactable noncitizens present themselves to border enforcement agents (and therefore have a 100 percent apprehension rate), and that all impactable noncitizens are apprehended at the same rate as the RTM population (i.e., at the PAR). Thus, the estimated number of total unlawful entries is the product of the number of impactable noncitizens apprehended times the PAR-derived odds of successful entry. In producing the 2018 BSMR, the Department discovered that the software code provided by IDA and used to produce the 2017 estimates mistakenly calculated the estimated total number of unlawful entries as the product of the *RTM population* and the PAR-derived odds of successful entry. The Department corrected that error for the 2018 report, resulting in an upwards-revision of historical estimates of the number of unlawful entries.

In addition to this methodological change, the Department also included updated data in the 2018 BSMR that resulted in an upwards revision of recent historical PAR estimates. First, the Department included the most current removal and return data from Immigration and Customs Enforcement (ICE). Because recent ICE data include certain repatriations occurring in previous years, this updated information increases the number of USBP apprehensions identified as re-apprehensions, raising the PAR. Second, the Department also identified certain additional noncitizens as suspected smugglers. Eliminating these frequent border crossers from the RTM population reduces the number of re-apprehensions and has a modest downward effect on the PAR. Third, the Department included updated EMIF data in calculating the estimated deterrence rate; these updates resulted in modest increases in the estimated deterrence rate and therefore an upward adjustment in the PAR.

In preparing the 2019 BSMR, OIS updated IDA's regression model of the 90-day deterrence rate as described above, a change which resulted in slight downward revisions to the PAR (see NDAA § 1092(g)(3)(D) Other appropriate information, At-the-Border Deterrence).

The most noteworthy improvements to the 2019 BSMR were the addition of a confidence interval around the PAR and a sensitivity analysis to estimate how three core assumptions of the RTM methodology affect the Department's estimates of the model-based apprehension rate and of successful unlawful entries. These improvements were maintained in following reports.

In preparing the 2021 BSMR, OIS updated IDA's regression model to use EMIF's reported survey weights and to use robust standard errors. Previous years had omitted the use of the survey weights in the regression model and in reporting on the survey data. While other research has found that the EMIF survey weights yield undercounts relative to DHS administrative data, their complete omission contributed to biases of varying direction and magnitude. For comparison using the 2020 model, the original model had estimated deterrence rates 1 to 3 percent higher and the estimated PAR up to 7 percent higher compared to the updated model. The updated regression model also yielded much larger confidence intervals than the original model, which had a range of 3 to 5 percent compared to a range of 5 to 8 percent for the updated model, in part due to the updated model using robust standard errors. In addition, OIS corrected the alignment of the EMIF survey questions over time which previously resulted in some time spans being incorrectly recoded as years instead of months and omitted reported years entirely. Because the EMIF survey was not conducted for April 2020 to June 2020, data was imputed based on the EMIF data from July 2020 to September 2020.

As Figure A2 indicates, the 95 percent confidence interval around the PAR ranged from a low of plus or minus 2.5 percent in 2008 to a high of plus or minus 4.1 in 2014.

**Figure A2.**
**Partial Apprehension Rate, FY 2000 to 2020**



Notes:  Estimates for 2000 to 2019 update previously reported estimates due to both updating the PAR model and ICE removal and return data lag.  In preparing this report, OIS updated ICE removal and return data with the latest available information.
Source:  OIS RTM.

Table A1 describes the sensitivity of the 2020 model-based apprehension rate reported in Table 1 and the estimated undetected unlawful entries depicted in Figure 2.  The first panel relaxes the assumption about RTM deterrence.  The middle row of the panel (in gray) depicts the baseline model based on the deterrence rate predicted by the 90-day regression model (.60), and the other rows of the panel allow the deterrence rate to fluctuate to the upper and lower bounds of the 95 percent confidence interval.  Given the assumptions of the RTM methodology, these changes in the deterrence rate have a large impact on the RTM population apprehension rate (i.e., the PAR), which translates into substantial changes in the total model-based apprehension rate and estimated successful unlawful entries.  Assuming the regression model overestimates deterrence by four percentage points causes the total apprehension rate to fall to 60 percent and total successful unlawful entries to increase by 32 percent to 270,000; assuming the regression model underestimates deterrence by four percentage points causes the total apprehension rate to increase to 74 percent and total successful unlawful entries to fall 32 percent to 139,000.

IFR_AR_008689

**Table A1.**

**Univariate Sensitivity Analysis of RTM Methodology Assumptions**

| Assumption | Alternative Assumptions | Model-Based Apprehension Rate | Estimated Successful Unlawful Entries |
|---|---|---|---|
| RTM noncitizens deterred as predicted by 90-day regression model | 0.67 | 60% | 270,348 |
| | 0.69 | 63% | 240,176 |
| | 0.71 | 66% | 204,763 |
| | 0.73 | 70% | 169,350 |
| | 0.75 | 74% | 139,177 |
| Non-RTM population apprehended at same rate as RTM PAR | 0.50 | 63% | 231,773 |
| | 0.55 | 65% | 217,044 |
| | 0.60 | 66% | 204,763 |
| | 0.65 | 67% | 194,367 |
| | 0.70 | 68% | 185,453 |
| All non-impactable noncitizens present themselves | 1.00 | 66% | 204,763 |
| | 0.95 | 66% | 209,582 |
| | 0.90 | 65% | 214,936 |
| | 0.85 | 64% | 220,920 |
| | 0.80 | 64% | 227,652 |

Source: OIS.

The second and third panels of the table also highlight the baseline model. The second panel assumes the non-RTM population is apprehended at rates up to ten percentage points above or below the calculated PAR; and the third panel assumes non-impactable noncitizens are apprehended at rates as low as 80 percent. (A total non-impactable apprehension rate of 80 percent corresponds with 50 percent of non-impactable noncitizens presenting themselves to authorities and 50 percent attempting to evade detection and being apprehended at the same 60 percent rate as the RTM population.) Relaxing these assumptions has a more modest impact on the model's predictions. Figure A3 illustrates the variation in ranges resulting from the different modeling assumptions in Table A1.

**Figure A3.**

**Univariate Sensitivity Analysis of RTM Methodology Assumptions**



Notes: The vertical line represents the estimate from the baseline model. For each assumption being tested the highest and lowest values from Table A1 are shown as a range.
Source: OIS.

IFR_AR_008690

Table A2 depicts the interactions among these three assumptions on the model-based apprehension rate and estimated unlawful entries. The first column of the table depicts variation in the assumed deterrence rate of four percentage points in either direction, a range based on the 95 percent confidence interval. Mathematically, changes in deterrence yield variation in the PAR, depicted in the second column. In the interactive analysis, these changes in the PAR affect the non-RTM apprehension rate, which is amplified by the decision to relax the assumption of a common apprehension rate for non-RTM and RTM noncitizens by five percentage points in either direction. Table A2 continues to allow the non-impactable apprehension rate to range from 0.8 to 1.0 percent.

**Table A2.**
**Interactive Sensitivity Analysis of RTM Methodology Assumptions**

| Non-RTM Apprehension Rate | Non-Impactable Apprehension Rate | Model-Based Apprehension Rate | Estimated Successful Unlawful Entries |
|---|---|---|---|
| Low (.48) | Low (.80) | 56% | 309,036 |
| Low (.48) | Med (.90) | 57% | 296,320 |
| Low (.48) | High (1.0) | 58% | 286,147 |
| Med (.53) | Low (.80) | 58% | 293,238 |
| Med (.53) | Med (.90) | 59% | 280,521 |
| Med (.53) | High (1.0) | 60% | 270,348 |
| High (.58) | Low (.80) | 59% | 280,147 |
| High (.58) | Med (.90) | 60% | 267,431 |
| High (.58) | High (1.0) | 61% | 257,258 |
| Low (.55) | Low (.80) | 63% | 239,933 |
| Low (.55) | Med (.90) | 64% | 227,217 |
| Low (.55) | High (1.0) | 65% | 217,044 |
| Med (.60) | Low (.80) | 64% | 227,652 |
| Med (.60) | Med (.90) | 65% | 214,936 |
| Med (.60) | High (1.0) | 66% | 204,763 |
| High (.65) | Low (.80) | 65% | 217,256 |
| High (.65) | Med (.90) | 66% | 204,540 |
| High (.65) | High (1.0) | 67% | 194,367 |
| Low (.64) | Low (.80) | 70% | 171,306 |
| Low (.64) | Med (.90) | 72% | 158,589 |
| Low (.64) | High (1.0) | 73% | 148,416 |
| Med (.69) | Low (.80) | 71% | 162,067 |
| Med (.69) | Med (.90) | 73% | 149,350 |
| Med (.69) | High (1.0) | 74% | 139,177 |
| High (.74) | Low (.80) | 72% | 154,077 |
| High (.74) | Med (.90) | 74% | 141,361 |
| High (.74) | High (1.0) | 75% | 131,188 |

Source: OIS.

In general, allowing the deterrence to fluctuate continues to have the greatest impact on the model's predictions, yielding an average difference of seven percentage points in the overall model-based apprehension rates and 66,000 unlawful entries between three panels of Table A2. Allowing for reasonable variation across all three core RTM assumptions, Table A2 describes a range of 19 percentage points in the model-based apprehension rate and a range of 178,000 successful unlawful entries.

# Appendix B – Drugs Seizures – All Ports of Entry

**Table B1.**

**OFO Drug Seizures at Ports of Entry (POEs), FY 2013 to 2020**

| DRUG | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Grand Total** | 342,010.02 | 311,159.31 | 401,114.04 | 367,979.37 | 305,296.78 | 250,280.72 | 273,730.62 | 346,177.67 |
| COCA PRODUCTS, TEA BAGS OR LIQUOR | 112.31 | 335.66 | 370.24 | 210.93 | 163.27 | 332.80 | 540.69 | 733.59 |
| COCAINE | 20,975.89 | 20,558.85 | 17,396.18 | 23,958.40 | 28,274.78 | 23,407.44 | 40,463.76 | 19,343.51 |
| CRYSTAL METHAMPHETAMINES | 1,526.52 | 1,742.38 | 1,627.55 | 2,129.00 | 1,925.08 | 7,512.88 | 26,735.29 | 28,459.53 |
| DIHYDROCODEINONE (HYDROCODONE) | 4.29 | 11.24 | 2.98 | 14.45 | 7.84 | 19.06 | 14.91 | 27.34 |
| DIMETHYLTRYPTAMINE | NA | NA | NA | NA | NA | NA | NA | 2,467.08 |
| ECSTASY | 104.26 | 111.04 | 104.02 | 708.11 | 521.60 | 514.04 | 1,005.85 | 961.58 |
| EPHEDRINE | 5.10 | 28.57 | 42.10 | 13.50 | 5.61 | 15.54 | 240.99 | 26.14 |
| FENETHYLLINE-(CAPTAGON-AMPHETAMINE) | NA | NA | NA | 1.22 | 0.04 | 1.73 | 1.84 | 0.06 |
| FENTANYL | NA | NA | 31.94 | 270.42 | 881.73 | 859.53 | 1,154.25 | 1,799.42 |
| GAMMA HYDROXY BUTYRATE | 33.09 | 73.31 | 48.68 | 483.76 | 741.00 | 789.90 | 383.36 | 274.81 |
| HASH,LIQUID (HASH OIL) | 0.13 | 13.98 | 0.77 | 0.45 | 1.51 | 46.71 | 1,136.48 | 679.71 |
| HASHISH | 58.10 | 117.11 | 82.43 | 75.24 | 54.47 | 64.15 | 58.03 | 704.80 |
| HEROIN | 1,821.95 | 1,963.17 | 2,732.06 | 1,915.70 | 1,757.62 | 2,360.95 | 2,461.48 | 2,368.55 |
| KETAMINE | 88.58 | 77.78 | 43.69 | 150.59 | 144.53 | 286.74 | 432.09 | 514.23 |
| KHAT (CATHA EDULIS) | 84,023.03 | 67,478.21 | 66,953.87 | 70,087.11 | 61,856.29 | 26,854.02 | 15,451.77 | 50,783.74 |
| KRATOM (MITRAGYNINE OR 7-HYDROXYMITRAGYNINE) | NA | NA | NA | NA | 27.18 | 0.52 | 2,675.22 | NA |
| LSD | 3.00 | 7.02 | 3.57 | 2.41 | 9.55 | 50.36 | 254.01 | 328.79 |
| MARIJUANA | 215,705.43 | 198,669.60 | 273,433.73 | 233,827.24 | 166,221.35 | 135,814.31 | 131,328.19 | 147,405.38 |
| MARIJUANA PLANTS | 7.97 | 0.66 | 0.25 | 1.64 | 1.81 | 721.21 | 3.04 | 2.94 |
| MDPV-(METHYLENEDIOXYPYROVALERONE) | 336.13 | 225.68 | 233.11 | 41.75 | 27.31 | 19.06 | 23.40 | 20.40 |
| MEPHEDRONE | 11.82 | 9.11 | 5.72 | 2.66 | 26.83 | 1.09 | 2.45 | 3.76 |
| METHAMPHETAMINE | 7,985.05 | 8,896.50 | 11,564.19 | 15,008.03 | 20,959.61 | 26,054.22 | 31,109.70 | 42,709.36 |
| METHYLONE | 322.27 | 829.42 | 315.71 | 40.44 | 13.90 | 100.98 | 19.12 | 10.55 |
| METHYLPHENIDATE (RITALIN) | 20.03 | 15.14 | 13.69 | 12.30 | 12.62 | 8.03 | 4.15 | 3.95 |
| MORPHINE | 31.52 | 213.71 | 19.29 | 520.21 | 20.55 | 31.33 | 137.15 | 69.82 |
| N-BENZYLPIPERAZINE (BZP TABLETS) | 87.78 | 1.61 | 1.32 | 0.10 | 1.03 | NA | 0.00 | 0.03 |
| NEXUS/2 CB | 0.09 | 0.11 | 1.26 | 0.06 | 1.44 | 0.98 | 1.81 | 2.33 |
| OPIUM | 1,289.80 | 1,637.34 | 652.98 | 905.89 | 1,065.28 | 1,148.11 | 1,111.44 | 1,704.70 |
| OTHER DRUGS, PRESCRIPTIONS, CHEMICALS | 4,134.39 | 5,117.21 | 22,328.40 | 12,985.85 | 11,445.96 | 11,146.97 | 14,039.40 | 10,204.68 |
| OXYCODONE (OXYCONTIN) | 13.17 | 11.14 | 6.46 | 21.57 | 45.05 | 20.32 | 66.41 | 60.32 |
| PARAMETHOXYAMPHETAMINE | NA | NA | NA | NA | 0.03 | NA | 0.05 | 0.00 |
| PEYOTE | NA | NA | NA | NA | 0.35 | 35.70 | 58.08 | 190.06 |
| PRECURSOR CHEMICALS EXCEPT EPHEDRINE | 739.27 | 748.20 | 1,293.69 | 3,377.95 | 648.52 | 1,443.16 | 1,168.64 | 32,471.81 |

*See footnotes at end of table.*

**Table B1 (Continued)**

| DRUG | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|------|
| PSILOCYN OR PSILOCYBIN MUSHROOMS | 23.38 | 24.11 | 16.18 | 45.78 | 53.99 | 58.96 | 169.15 | 487.17 |
| ROHYPNOL | 0.74 | 0.04 | 0.00 | 0.08 | 0.02 | 0.00 | 0.01 | 0.03 |
| STEROIDS | 470.05 | 554.53 | 581.16 | 613.21 | 1,394.27 | 1,592.87 | 1,255.01 | 1,163.10 |
| SYNTHETIC CANNABINOIDS - ALL TYPES | 2,074.37 | 1,686.67 | 1,206.82 | 550.79 | 6,984.75 | 8,964.99 | 222.94 | 194.37 |
| THAI STICKS | NA | NA | NA | NA | NA | NA | NA | 0.01 |
| YABA | 0.47 | 0.18 | NA | 2.53 | 0.03 | 2.04 | 0.45 | NA |

Notes: Drug seizures in kilograms. Tea bags included in this table are used to carry coca products. This table updates previous versions of this report with more current information. Began tracking Dimethyltryptamine and Thai Sticks seizures in 2020.
NA – no data available.
Source: OFO.

IFR_AR_008693

# Appendix C – Privately Owned Vehicle (POV) and Commercially Owned Vehicle (COV) Wait Times

**Table C1.**

**OFO POV Wait Times (minutes) and Total Annual Flow, FY 2013 to 2020**

| Port/Wait Time/POV Volume | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| ALEXANDRIA BAY, NY | | | | | | | | |
| POV Wait Times[1] | 3.50 | 2.96 | 2.06 | 1.33 | 1.00 | 1.10 | 2.14 | 0.73 |
| POVs[2] | 673,549 | 651,511 | 616,656 | 590,028 | 587,319 | 590,900 | 589,270 | 233,568 |
| ANDRADE, CA | | | | | | | | |
| POV Wait Times | 30.74 | 24.03 | 24.28 | 27.64 | 26.88 | 31.48 | 40.61 | 47.61 |
| POVs | 391,430 | 432,810 | 507,060 | 507,775 | 577,425 | 581,576 | 579,707 | 386,083 |
| BLAINE, WA | | | | | | | | |
| POV Wait Times | 13.66 | 14.69 | 10.03 | 8.97 | 9.24 | 12.31 | 12.97 | 6.48 |
| POVs | 4,943,096 | 4,922,160 | 4,428,536 | 3,958,264 | 3,780,471 | 4,130,656 | 3,957,432 | 1,668,658 |
| BROWNSVILLE, TX | | | | | | | | |
| POV Wait Times | 16.84 | 16.77 | 14.83 | 15.69 | 14.03 | 23.67 | 35.98 | 33.56 |
| POVs | 4,270,287 | 4,290,311 | 4,333,905 | 4,560,557 | 4,848,508 | 4,784,458 | 4,520,679 | 3,383,828 |
| BUFFALO-NIAGARA FALLS NY | | | | | | | | |
| POV Wait Times | 6.07 | 6.83 | 4.05 | 2.92 | 2.81 | 3.59 | 4.44 | 1.64 |
| POVs | 5,903,904 | 5,570,269 | 5,033,036 | 4,783,004 | 4,814,967 | 5,000,166 | 4,860,255 | 2,011,808 |
| CALAIS, ME | | | | | | | | |
| POV Wait Times | 1.34 | 1.27 | 0.76 | 0.15 | 0.19 | 0.18 | 0.22 | 0.02 |
| POVs | 1,024,748 | 951,270 | 837,046 | 754,443 | 755,846 | 674,323 | 661,808 | 288,828 |
| CALEXICO, CA | | | | | | | | |
| POV Wait Times | 44.25 | 51.00 | 45.06 | 49.55 | 53.11 | 58.50 | 51.26 | 58.91 |
| POVs | 4,162,467 | 4,061,872 | 4,248,230 | 4,345,665 | 4,383,164 | 4,469,030 | 4,876,600 | 4,240,445 |
| CALEXICO-EAST | | | | | | | | |
| POV Wait Times | 38.00 | 38.33 | 31.42 | 38.98 | 43.62 | 44.67 | 42.72 | 45.10 |
| POVs | 3,099,340 | 3,317,290 | 3,585,327 | 3,765,429 | 3,883,571 | 3,688,968 | 3,278,842 | 2,046,324 |
| CHAMPLAIN-ROUSES POINT | | | | | | | | |
| POV Wait Times | 2.95 | 2.29 | 2.67 | 1.69 | 1.58 | 2.05 | 3.31 | 1.29 |
| POVs | 1,152,220 | 1,144,152 | 1,051,232 | 1,015,105 | 1,004,351 | 1,031,529 | 1,011,173 | 396,711 |
| COLUMBUS, NM | | | | | | | | |
| POV Wait Times | 5.21 | 5.53 | 4.97 | 5.11 | 4.30 | 5.11 | 9.21 | 9.79 |
| POVs | 324,216 | 347,209 | 398,242 | 420,004 | 395,718 | 353,225 | 358,294 | 307,231 |
| DEL RIO, TX | | | | | | | | |
| POV Wait Times | 8.01 | 7.62 | 6.83 | 6.91 | 6.48 | 9.67 | 22.06 | 17.89 |
| POVs | 1,257,513 | 1,325,289 | 1,415,109 | 1,508,476 | 1,586,009 | 1,640,034 | 1,517,965 | 1,181,780 |
| DERBY LINE, VT | | | | | | | | |
| POV Wait Times | 2.26 | 2.34 | 1.85 | 2.01 | 3.84 | 2.18 | 1.79 | 0.26 |
| POVs | 731,031 | 715,719 | 633,409 | 581,261 | 598,819 | 493,073 | 479,985 | 186,908 |
| DETROIT, MI | | | | | | | | |
| POV Wait Times | 3.65 | 4.77 | 3.64 | 4.47 | 3.66 | 4.76 | 4.79 | 2.13 |
| POVs | 4,123,134 | 4,050,011 | 4,065,843 | 4,043,076 | 4,058,742 | 3,996,538 | 4,091,085 | 2,229,627 |

*See footnotes at end of table.*

**Table C1 (Continued)**

| Port/Wait Time/POV Volume | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| DOUGLAS, AZ | | | | | | | | |
| POV Wait Times | 11.80 | 9.27 | 11.23 | 12.16 | 11.70 | 16.63 | 23.87 | 31.69 |
| POVs | 1,438,842 | 1,559,934 | 1,576,761 | 1,610,973 | 1,707,958 | 1,785,264 | 1,599,791 | 1,112,007 |
| EAGLE PASS, TX | | | | | | | | |
| POV Wait Times | 14.84 | 20.12 | 15.56 | 18.16 | 17.79 | 18.90 | 21.10 | 22.61 |
| POVs | 2,358,313 | 2,382,221 | 2,661,638 | 2,745,267 | 2,662,299 | 2,715,217 | 2,871,922 | 2,110,120 |
| EL PASO, TX | | | | | | | | |
| POV Wait Times | 22.39 | 19.75 | 22.98 | 27.97 | 19.39 | 24.59 | 33.56 | 23.18 |
| POVs | 7,110,330 | 7,505,652 | 7,883,264 | 7,886,013 | 7,766,464 | 8,549,738 | 7,060,731 | 5,592,324 |
| EL PASO, TX (Ysleta Only)[3] | | | | | | | | |
| POV Wait Times | 21.57 | 18.70 | 23.11 | 25.46 | 23.89 | 23.05 | 44.10 | 31.25 |
| POVs | 3,453,040 | 3,935,394 | 4,221,858 | 4,627,376 | 4,819,225 | 3,972,228 | 3,705,814 | 2,750,033 |
| HIDALGO,TX | | | | | | | | |
| POV Wait Times | 19.91 | 22.69 | 23.34 | 21.21 | 18.04 | 17.51 | 31.36 | 28.47 |
| POVs | 4,801,943 | 4,616,193 | 4,555,289 | 4,709,838 | 4,539,801 | 4,343,664 | 4,125,596 | 2,890,585 |
| HIGHGATE SPRINGS/ALBURG | | | | | | | | |
| POV Wait Times | 3.52 | 3.96 | 4.13 | 4.57 | 4.22 | 4.94 | 3.16 | 0.95 |
| POVs | 508,699 | 542,595 | 715,598 | 703,063 | 633,903 | 474,497 | 476,599 | 187,332 |
| HOULTON, ME | | | | | | | | |
| POV Wait Times | 2.89 | 2.46 | 1.74 | 1.17 | 1.22 | 1.59 | 1.40 | 0.61 |
| POVs | 353,898 | 332,670 | 274,641 | 228,101 | 228,663 | 228,890 | 219,014 | 93,778 |
| INTERNATIONAL FALLS, MN | | | | | | | | |
| POV Wait Times | 1.47 | 1.34 | 2 | 1.24 | 1.34 | 1.30 | 1.26 | 0.08 |
| POVs | 528,065 | 520,066 | 475,435 | 438,938 | 413,508 | 371,358 | 366,644 | 147,538 |
| JACKMAN, ME | | | | | | | | |
| POV Wait Times | 0.32 | 0.37 | 0.32 | 0.2 | 0.46 | 0.39 | 0.29 | 0.02 |
| POVs | 170,549 | 168,871 | 157,521 | 162,978 | 144,428 | 146,393 | 147,938 | 58,031 |
| LAREDO, TX | | | | | | | | |
| POV Wait Times | 15.49 | 17.59 | 16.28 | 17.13 | 19.95 | 17.48 | 21.04 | 13.77 |
| POVs | 4,865,686 | 5,220,223 | 5,220,174 | 5,191,369 | 4,991,204 | 5,081,662 | 5,183,480 | 3,740,570 |
| LUKEVILLE, AZ | | | | | | | | |
| POV Wait Times | 5.52 | 5.05 | 7.59 | 5.30 | 2.63 | 4.19 | 5.22 | 2.10 |
| POVs | 283,790 | 301,206 | 345,760 | 363,712 | 376,827 | 409,444 | 425,046 | 280,474 |
| LYNDEN, WA | | | | | | | | |
| POV Wait Times | 11.09 | 9.82 | 6.86 | 6.12 | 6.00 | 6.33 | 7.23 | 5.00 |
| POVs | 785,818 | 770,393 | 586,913 | 514,823 | 491,420 | 582,792 | 575,240 | 232,649 |
| MADAWASKA, ME | | | | | | | | |
| POV Wait Times | 3.03 | 3.43 | 1.31 | 0.74 | 0.99 | 0.97 | 0.70 | 0.29 |
| POVs | 621,258 | 576,490 | 509,814 | 439,970 | 404,221 | 382,828 | 367,403 | 173,806 |
| MASSENA, NY | | | | | | | | |
| POV Wait Times | 0.58 | 0.27 | 0.11 | 0.09 | 0.01 | 0.00 | 0.01 | 0.00 |
| POVs | 909,705 | 907,255 | 856,281 | 826,625 | 855,787 | 875,867 | 874,503 | 627,194 |
| NACO, AZ | | | | | | | | |
| POV Wait Times | 2.52 | 2.21 | 2.28 | 2.22 | 2.54 | 2.84 | 4.96 | 10.08 |
| POVs | 280,984 | 296,828 | 295,635 | 302,423 | 295,296 | 302,614 | 337,228 | 251,496 |
| NOGALES, AZ | | | | | | | | |
| POV Wait Times | 16.68 | 15.65 | 18.43 | 24.57 | 24.53 | 32.10 | 47.39 | 44.63 |
| POVs | 3,063,822 | 3,297,865 | 3,426,736 | 3,487,436 | 3,728,827 | 3,686,058 | 3,401,852 | 2,425,247 |

*See footnotes at end of table.*

IFR_AR_008695

**Table C1 (Continued)**

| Port/Wait Time/POV Volume | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| NORTON, VT | | | | | | | | |
| POV Wait Times | 0.05 | 0.05 | 0.04 | 0.08 | 0.05 | 0.01 | 0.01 | 0.00 |
| POVs | 81,311 | 74,512 | 49,154 | 32,530 | 30,574 | 31,913 | 26,030 | 7,047 |
| OGDENSBURG, NY | | | | | | | | |
| POV Wait Times | 0.6 | 0.84 | 0.82 | 0.30 | 0.34 | 0.29 | 0.52 | 0.21 |
| POVs | 387,000 | 375,022 | 320,537 | 287,061 | 292,808 | 300,233 | 292,973 | 127,488 |
| OTAY MESA | | | | | | | | |
| POV Wait Times | 45.68 | 43.03 | 29.39 | 38.32 | 38.07 | 38.32 | 52.54 | 49.33 |
| POVs | 5,987,273 | 6,901,172 | 6,747,483 | 7,597,903 | 8,213,614 | 8,103,641 | 6,760,388 | 5,152,742 |
| PEMBINA, ND | | | | | | | | |
| POV Wait Times | 1.75 | 1.86 | 1.69 | 1.58 | 1.56 | 1.98 | 2.41 | 0.79 |
| POVs | 375,628 | 369,328 | 330,996 | 289,745 | 277,247 | 264,732 | 253,682 | 100,748 |
| POINT ROBERTS, WA | | | | | | | | |
| POV Wait Times | 5.69 | 6.11 | 5.46 | 5.13 | 4.34 | 6.90 | 4.66 | 3.10 |
| POVs | 1,190,608 | 1,201,275 | 1,071,337 | 945,103 | 912,239 | 1,012,392 | 973,659 | 406,929 |
| PORT HURON, MI | | | | | | | | |
| POV Wait Times | 2.3 | 3.8 | 3.06 | 2.31 | 2.91 | 3.45 | 6.73 | 2.35 |
| POVs | 2,032,553 | 2,002,506 | 1,745,713 | 1,548,257 | 1,565,333 | 1,553,250 | 1,474,568 | 616,818 |
| PRESIDIO, TX | | | | | | | | |
| POV Wait Times | 6.52 | 9.36 | 7.12 | 10.21 | 8.24 | 8.08 | 12.63 | 9.71 |
| POVs | 594,488 | 608,805 | 659,374 | 663,522 | 685,190 | 714,221 | 700,806 | 548,129 |
| PROGRESO, TX | | | | | | | | |
| POV Wait Times | 10.71 | 10.19 | 8.99 | 9.97 | 9.06 | 11.61 | 29.69 | 30.48 |
| POVs | 1,050,675 | 1,160,275 | 1,120,611 | 1,231,782 | 1,244,424 | 1,240,840 | 1,250,485 | 994,358 |
| RIO GRANDE CITY, TX | | | | | | | | |
| POV Wait Times | 6.68 | 5.64 | 4.92 | 5.12 | 3.41 | 4.57 | 14.77 | 12.37 |
| POVs | 350,796 | 354,036 | 371,252 | 412,908 | 402,949 | 413,914 | 427,898 | 320,496 |
| ROMA, TX | | | | | | | | |
| POV Wait Times | 5.62 | 5.24 | 4.65 | 4.59 | 5.32 | 6.45 | 14.16 | 9.45 |
| POVs | 682,289 | 698,610 | 726,931 | 796,790 | 803,877 | 785,690 | 713,422 | 558,038 |
| SAN LUIS, AZ | | | | | | | | |
| POV Wait Times | 31.88 | 27.58 | 35.73 | 45.9 | 51.13 | 46.46 | 78.20 | 79.31 |
| POVs | 2,906,578 | 2,952,286 | 3,100,024 | 3,036,398 | 3,157,647 | 3,336,725 | 2,894,655 | 2,332,379 |
| SANTA TERESA | | | | | | | | |
| POV Wait Times | 11.79 | 8.19 | 10.83 | 14.52 | 13.78 | 18.93 | 36.33 | 34.85 |
| POVs | 403,158 | 459,875 | 513,207 | 595,354 | 617,641 | 554,948 | 573,975 | 426,919 |
| SAN YSIDRO | | | | | | | | |
| POV Wait Times | 81.41 | 69.25 | 32.14 | 50.14 | 46.69 | 48.63 | 64.49 | 57.84 |
| POVs | 11,292,152 | 11,299,741 | 14,357,503 | 13,959,170 | 13,569,163 | 14,588,551 | 14,485,331 | 12,690,027 |
| SAULT STE. MARIE, MI | | | | | | | | |
| POV Wait Times | 3.03 | 2 | 1.34 | 1.75 | 1.84 | 0.95 | 1.12 | 0.12 |
| POVs | 1,003,253 | 972,312 | 830,907 | 716,718 | 665,145 | 713,180 | 665,497 | 278,967 |
| SUMAS, WA | | | | | | | | |
| POV Wait Times | 9.11 | 10.08 | 7.19 | 6.09 | 5.60 | 6.46 | 6.30 | 2.67 |
| POVs | 1,214,398 | 1,159,314 | 962,169 | 850,004 | 834,808 | 918,412 | 882,912 | 370,765 |
| SWEETGRASS, MT | | | | | | | | |
| POV Wait Times | 5.08 | 4.04 | 4.45 | 5.66 | 6 | 6 | 6.42 | 4.11 |
| POVs | 310,011 | 305,537 | 286,072 | 268,807 | 233,922 | 197,349 | 188,327 | 95,687 |

*See footnotes at end of table.*

**Table C1 (Continued)**

| Port/Wait Time/POV Volume | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| TECATE, CA | | | | | | | | |
| POV Wait Times | 39.99 | 32.63 | 23.2 | 29.83 | 31.16 | 30.77 | 39.75 | 39.21 |
| POVs | 737,060 | 789,642 | 891,068 | 943,208 | 1,037,241 | 1,085,274 | 1,014,570 | 663,887 |
| TORNILLO-FABENS,TX | | | | | | | | |
| POV Wait Times | 5.84 | 5.54 | 4.51 | 4.36 | 3.97 | 4.59 | 10.57 | 8.22 |
| POVs | 300,796 | 285,988 | 273,302 | 300,922 | 320,121 | 358,415 | 442,325 | 366,131 |

[1] BorderStat.

[2] Operations Management Report (OMR).

[3] Ysleta was categorized as its own port distinct from El Paso, TX starting in 2019.  Data for prior years have been updated to reflect this split out.

Source:  OFO.

IFR_AR_008697

**Table C2.**

**OFO COV Wait Times (minutes) and Total Annual Flow, FY 2013 to 2020**

| Port/Wait Time/COV Volume | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| CBP-WELLESLEY ISLAND, POE | | | | | | | | |
| COV Wait Times[1] | 0.83 | 0.85 | 1.06 | 0.97 | 0.65 | 0.60 | 0.77 | 1.38 |
| COVs[2] | 179,788 | 189,229 | 200,287 | 207,309 | 204,264 | 198,288 | 192,050 | 182,766 |
| BLAINE, BORDER CROSSING, CARS | | | | | | | | |
| COV Wait Times | 7.53 | 7.8 | 8.63 | 9.24 | 8.96 | 9.45 | 8.65 | 10.84 |
| COVs | 349,315 | 363,622 | 379,487 | 366,821 | 367,121 | 372,040 | 373,326 | 337,663 |
| CBP-LOS INDIOS, BORDER STATION | | | | | | | | |
| COV Wait Times | 3.22 | 3.18 | 0.85 | 0.52 | 0.91 | 1.10 | 6.73 | 2.18 |
| COVs | 30,398 | 32,305 | 25,031 | 26,971 | 24,754 | 33,563 | 59,552 | 52,001 |
| CBP-LOS TOMATES, PASENGER XING | | | | | | | | |
| COV Wait Times | 12.20 | 16.30 | 18.00 | 11.71 | 12.44 | 16.37 | 17.18 | 7.26 |
| COVs | 178,944 | 178,303 | 178,876 | 188,244 | 197,127 | 214,595 | 225,147 | 215,680 |
| BUFFALO, PEACE BRIDGE | | | | | | | | |
| COV Wait Times | 6.19 | 7.54 | 6.74 | 6.68 | 6.41 | 6.64 | 6.75 | 4.05 |
| COVs | 613,651 | 557,340 | 578,345 | 615,681 | 573,721 | 557,609 | 522,691 | 494,332 |
| CBP-LEWISTON, QUEENSTON BRIDGE | | | | | | | | |
| COV Wait Times | 1.42 | 3.15 | 2.28 | 2.01 | 3.19 | 3.86 | 4.56 | 3.50 |
| COVs | 319,971 | 342,855 | 336,203 | 344,598 | 387,059 | 386,233 | 393,703 | 341,476 |
| CBP-CALAIS, POE PASSENGER | | | | | | | | |
| COV Wait Times | 0.00 | 0.01 | 0.01 | 0.00 | 0.00 | 0.01 | 0.12 | 0.03 |
| COVs | 64,448 | 61,437 | 64,576 | 65,112 | 62,861 | 64,737 | 64,529 | 63,208 |
| CBP-CALEXICO, EAST BORDER XING | | | | | | | | |
| COV Wait Times | 12.70 | 8.44 | 6.72 | 6.33 | 8.95 | 11.45 | 13.78 | 11.87 |
| COVs | 322,648 | 324,855 | 333,640 | 349,411 | 356,368 | 373,631 | 386,324 | 384,289 |
| CBP-CHAMPLAIN, PORT OF ENTRY | | | | | | | | |
| COV Wait Times | 0.45 | 0.55 | 0.51 | 0.39 | 0.24 | 1.15 | 1.89 | 0.70 |
| COVs | 275,042 | 280,008 | 295,032 | 310,599 | 309,327 | 309,757 | 300,857 | 280,193 |
| COLUMBUS, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 1.74 | 3.3 | 3.16 | 3.34 | 2.75 | 3.61 | 7.73 | 9.11 |
| COVs | 11,192 | 14,242 | 13,849 | 13,842 | 15,299 | 16,401 | 17,577 | 18,726 |
| CBP-DEL RIO, INTL BRIDGE POE | | | | | | | | |
| COV Wait Times | 1.74 | 1.54 | 1.19 | 1.03 | 0.81 | 1.53 | 7.27 | 1.64 |
| COVs | 67,282 | 68,358 | 69,854 | 73,163 | 74,904 | 76,796 | 73,300 | 67,603 |
| DERBY LINE, PORT OF ENTRY | | | | | | | | |
| COV Wait Times | 0.44 | 0.33 | 0.3 | 0.51 | 1.54 | 1.14 | 0.14 | 0.05 |
| COVs | 91,767 | 94,862 | 97,948 | 100,367 | 95,469 | 89,905 | 88,719 | 88,155 |
| CBP-DETROIT, AMBASSADOR BRIDGE | | | | | | | | |
| COV Wait Times | 7.78 | 10.07 | 7.57 | 7.73 | 5.66 | 7.90 | 7.91 | 6.54 |
| COVs | 1,479,931 | 1,501,712 | 1,495,532 | 1,566,289 | 1,555,472 | 1,557,632 | 1,520,248 | 1,352,415 |
| DETROIT, WINDSOR TUNNEL | | | | | | | | |
| COV Wait Times | 2.82 | 3.64 | 2.22 | 2.32 | 2.44 | 3.22 | 3.81 | 1.96 |
| COVs | 43,407 | 39,217 | 35,188 | 34,350 | 26,367 | 22,336 | 19,855 | 13,400 |
| DOUGLAS, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 2.11 | 1.65 | 5.49 | 3.94 | 3.27 | 1.56 | 2.25 | 0.74 |
| COVs | 32,053 | 33,319 | 32,286 | 30,896 | 31,098 | 28,148 | 26,917 | 25,633 |
| CBP-EAGLE PASS, BRIDGE 2 | | | | | | | | |
| COV Wait Times | 9.02 | 10.46 | 8.07 | 4.91 | 4.87 | 4.08 | 2.19 | 1.55 |
| COVs | 116,281 | 133,050 | 140,813 | 154,253 | 167,503 | 172,720 | 179,323 | 149,865 |

*See footnotes at end of table.*

**Table C2 (Continued)**

| Port/Wait Time/COV Volume | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| CBP-EL PASO, YSLETA PORT ENTRY | | | | | | | | |
| COV Wait Times | 10.2 | 9.05 | 6.86 | 16.96 | 17.15 | 18.91 | 27.12 | 25.44 |
| COVs | 421,523 | 440,468 | 315,245 | 402,902 | 506,370 | 529,394 | 561,437 | 585,162 |
| EL PASO, BOTA POE | | | | | | | | |
| COV Wait Times | 13.11 | 12.91 | 19.52 | 22.22 | 16.94 | 17.33 | 25.90 | 17.77 |
| COVs | 312,332 | 314,394 | 436,697 | 353,831 | 273,013 | 267,243 | 241,291 | 159,570 |
| PHARR, PORT OF ENTRY | | | | | | | | |
| COV Wait Times | 15.59 | 20.03 | 18.45 | 20.58 | 27.06 | 32.76 | 43.11 | 27.92 |
| COVs | 505,137 | 523,472 | 541,352 | 561,428 | 591,362 | 642,706 | 649,300 | 653,083 |
| CBP-HIGHGATE SPRINGS, POE | | | | | | | | |
| COV Wait Times | 0.07 | 0.03 | 0.06 | 0.05 | 0.06 | 0.33 | 0.15 | 0.27 |
| COVs | 86,583 | 90,496 | 90,606 | 92,173 | 35,094 | 95,933 | 94,583 | 95,396 |
| CBP-HOULTON, PASSENGER PROC | | | | | | | | |
| COV Wait Times | 0.81 | 0.9 | 0.75 | 0.82 | 0.94 | 0.98 | 0.86 | 0.86 |
| COVs | 84,035 | 85,061 | 82,476 | 88,443 | 92,477 | 92,836 | 89,267 | 88,181 |
| CBP-INTL FALLS, BORDER CROSSNG | | | | | | | | |
| COV Wait Times | 0.01 | 0.01 | 0.06 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 |
| COVs | 18,228 | 17,081 | 14,793 | 16,905 | 18,935 | 17,678 | 17,025 | 14,949 |
| CBP-JACKMAN, BORDER STATION | | | | | | | | |
| COV Wait Times | 0.05 | 0.07 | 0.04 | 0.02 | 0.03 | 0.03 | 0.01 | 0.00 |
| COVs | 35,592 | 35,475 | 37,380 | 34,182 | 35,094 | 33,843 | 31,986 | 28,285 |
| COLUMBIA, LAREDO VEH-PED XING | | | | | | | | |
| COV Wait Times | 5.26 | 4.61 | 4.97 | 5.39 | 3.86 | 1.05 | 9.44 | 4.10 |
| COVs | 368,168 | 375,511 | 358,162 | 352,896 | 483,020 | 394,395 | 420,803 | 380,560 |
| INS-LAREDO BRIDGE #4 *HIST* | | | | | | | | |
| COV Wait Times | 22.45 | 20.82 | 23.34 | 16.77 | 14.72 | 21.97 | 26.19 | 18.89 |
| COVs | 1,450,247 | 1,551,526 | 1,642,833 | 1,714,408 | 1,646,107 | 1,889,268 | 1,947,314 | 1,877,219 |
| LUKEVILLE, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 2.00 | 11.43 | 0.00 | 0.44 | 0.05 | 0.00 | 0.02 | 0.10 |
| COVs | 26 | 75 | 93 | 152 | 196 | 268 | 301 | 422 |
| LYNDEN, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 4.65 | 4.11 | 5.14 | 5.43 | 4.95 | 4.84 | 5.02 | 3.65 |
| COVs | 46,100 | 43,566 | 43,069 | 46,651 | 44,279 | 42,968 | 43,418 | 51,147 |
| CBP-MADAWASKA, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 2.95 | 3.43 | 1.30 | 0.74 | 0.95 | 0.95 | 0.70 | 0.32 |
| COVs | 25,250 | 21,557 | 16,006 | 16,609 | 15,539 | 3,403 | 2,144 | 1,847 |
| CBP-MASSENA, PORT OF ENTRY | | | | | | | | |
| COV Wait Times | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| COVs | 29,024 | 24,214 | 22,241 | 24,552 | 27,256 | 26,967 | 26,092 | 24,298 |
| CBP-NACO, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 0.64 | 0.55 | 0.59 | 0.57 | 0.70 | 1.80 | 2.61 | 0.54 |
| COVs | 3958 | 3661 | 3018 | 3201 | 3579 | 3124 | 3289 | 3429 |
| NOGALES WEST, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 12.24 | 19.01 | 11.88 | 16.69 | 17.03 | 15.93 | 17.86 | 14.81 |
| COVs | 312536 | 310239 | 320554 | 328921 | 334661 | 337468 | 349101 | 342197 |
| NORTON, BORDER CROSSING, POE | | | | | | | | |
| COV Wait Times | 0.02 | 0.01 | 0.02 | 0.07 | 0.03 | 0.01 | 0.00 | 0.00 |
| COVs | 10,581 | 10,831 | 11,390 | 11,512 | 12,609 | 12,219 | 11,646 | 8,997 |

*See footnotes at end of table.*

**Table C2 (Continued)**

| Port/Wait Time/COV Volume | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| OGDENSBURG, PORT OF ENTRY | | | | | | | | |
| COV Wait Times | 0.00 | 0.00 | 0.15 | 0.15 | 0.17 | 0.08 | 0.12 | 0.11 |
| COVs | 34,912 | 37,455 | 37,818 | 37,918 | 39,279 | 41,133 | 40,848 | 37,078 |
| OTAY MESA, EXPORT OUTBOUND | | | | | | | | |
| COV Wait Times | 32.92 | 35.34 | 31.71 | 33.75 | 37.04 | 34.34 | 55.31 | 38.37 |
| COVs | 831,836 | 800,493 | 822,691 | 873,599 | 927,111 | 961,736 | 953,782 | 887,758 |
| CBP-PEMBINA, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 4.19 | 4.05 | 4.16 | 4.21 | 3.93 | 3.92 | 4.78 | 4.34 |
| COVs | 218,493 | 228,966 | 218,095 | 215,866 | 214,214 | 222,710 | 221,051 | 213,689 |
| POINT ROBERTS, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 1.41 | 1.22 | 1.12 | 1.49 | 1.00 | 1.73 | 1.06 | 0.04 |
| COVs | 17,174 | 17,748 | 18,286 | 15,449 | 13,560 | 14,608 | 12,303 | 6,236 |
| CBP-PORT HURON, BLUE WATER BRG | | | | | | | | |
| COV Wait Times | 2.62 | 5.03 | 4.60 | 3.40 | 5.97 | 7.11 | 11.33 | 5.86 |
| COVs | 719,204 | 760,651 | 797,688 | 833,276 | 830,905 | 818,994 | 821,917 | 723,797 |
| PRESIDIO, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 0.37 | 0.41 | 0.29 | 0.01 | 0.02 | 0.03 | 1.10 | 1.12 |
| COVs | 9,610 | 10,194 | 9,490 | 7,407 | 8,551 | 8,807 | 9,812 | 9,482 |
| PROGRESO, INTERNATIONAL BRIDGE | | | | | | | | |
| COV Wait Times | 15.8 | 11.01 | 8.92 | 5.86 | 4.26 | 2.31 | 33.92 | 23.28 |
| COVs | 45,103 | 39,928 | 37,965 | 45,580 | 53,223 | 50,065 | 52,874 | 52,847 |
| RIO GRANDE CITY, POE INTL BR | | | | | | | | |
| COV Wait Times | 0.18 | 0.39 | 0.11 | 0.67 | 0.20 | 1.05 | 1.79 | 2.18 |
| COVs | 26,878 | 31,733 | 30,673 | 34,722 | 37,545 | 37,608 | 40,666 | 40,042 |
| ROMA, BORDER CROSSING | | | | | | | | |
| COV Wait Times | 0.57 | 0.73 | 1.16 | 0.97 | 1.10 | 1.11 | 1.46 | 1.75 |
| COVs | 7,029 | 7,778 | 7,949 | 7,455 | 7,638 | 7,677 | 10,956 | 19,732 |
| SAN LUIS, II POE LAND BORDER | | | | | | | | |
| COV Wait Times | 0.00 | 0.01 | 0.28 | 0.59 | 1.65 | 1.59 | 2.01 | 2.59 |
| COVs | 34,133 | 31,658 | 33,699 | 31,499 | 32,808 | 28,105 | 34,228 | 39,803 |
| SANTA TERESA, PASSENGER OPS | | | | | | | | |
| COV Wait Times | 8.2 | 8.3 | 10.66 | 14.6 | 14.32 | 14.94 | 9.28 | 8.61 |
| COVs | 80,692 | 84,615 | 95,932 | 106,708 | 113,357 | 116,064 | 127,443 | 134,701 |
| CBP-SAULT ST MARIE, POE | | | | | | | | |
| COV Wait Times | 3.04 | 1.97 | 1.34 | 1.37 | 1.79 | 0.91 | 0.90 | 0.11 |
| COVs | 40,827 | 39,255 | 37,323 | 39,636 | 41,501 | 40,979 | 39,951 | 38,418 |
| SUMAS, PORT OF ENTRY | | | | | | | | |
| COV Wait Times | 3.66 | 4.32 | 4.27 | 5.67 | 4.70 | 3.89 | 2.50 | 2.87 |
| COVs | 141,337 | 148,016 | 152,845 | 157,690 | 156,956 | 159,024 | 153,942 | 152,118 |
| CBP-SWEETGRASS, BORDER LANE | | | | | | | | |
| COV Wait Times | 4.71 | 4.14 | 3.55 | 4.45 | 3.85 | 3.40 | 4.60 | 5.00 |
| COVs | 133,295 | 143,836 | 134,786 | 127,829 | 127,310 | 128,527 | 140,195 | 131,089 |
| TECATE, PORT OF ENTRY | | | | | | | | |
| COV Wait Times | 9.57 | 13.74 | 12.60 | 16.32 | 17.14 | 12.25 | 16.96 | 7.91 |
| COVs | 45,625 | 51,736 | 51,965 | 55,414 | 58,221 | 61,713 | 63,484 | 64,739 |

[1] Wait Times for COVs in regular COV Lanes.
[2] All COVs processed in regular COV and FAST Lanes.
Source: OFO.

IFR_AR_008700

# Appendix D − Infrastructure Capacity Utilization Rate at Each Land POE

**Table D1.**

**Number of Vehicles Processed by OFO Field Office per Booth-Hour, FY 2013 to 2020**

| Field Office | Port | Crossing | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Boston | | Beecher | 21.5 | 21.7 | 24.1 | 27.3 | 30.5 | 28 | 28.3 | NA |
| | BEECHER FALLS, VT | Canaan | 16 | 16.4 | 14.8 | 15.2 | 15.8 | 15.8 | 15.5 | 18.1 |
| | | Pittsburg | 30.2 | 36.5 | 38.5 | 39 | 46.5 | 43.5 | NA | NA |
| | BRIDGEWATER, ME | Bridgewater | 20.1 | 19.1 | 16.1 | 14.9 | 14.9 | 14.7 | 15.0 | 16.6 |
| | | Ferry Pt | 58.7 | 54.5 | 48.6 | 45.2 | 46.3 | 46.7 | 46.4 | 42.2 |
| | CALAIS, ME | Int'l Ave | 29.7 | 28.2 | 21.8 | 20.9 | 21.3 | 20.4 | 20.6 | 19.4 |
| | | Milltown | 36.9 | 35 | 30.5 | 24.7 | 24.9 | 24.7 | 24.2 | 23.4 |
| | | Beebe | 17.2 | 17.3 | 15.3 | 15 | 17.1 | 15.6 | 15.4 | 18.2 |
| | DERBY LINE, VT | Derby Line | 28.5 | 30.6 | 28 | 27.7 | 29 | 25.6 | 26.8 | 24.6 |
| | | Derby Line 5 | 37.8 | 37.6 | 30.7 | 26.5 | 27.4 | 29.1 | 26.9 | 25.8 |
| | | North Troy | 18.6 | 18.7 | 16.4 | 15.8 | 18 | 16.6 | 16.0 | 16.9 |
| | EASTPORT, ME | Eastport | 19.9 | 14.6 | NA | NA | NA | NA | NA | NA |
| | | Lubec | 28.1 | 28.4 | 27.1 | 27.2 | 27.5 | 27.4 | 26.6 | 20.0 |
| | FORT FAIRFIELD, ME | Easton | 55.6 | 55.8 | 92.7 | NA | NA | NA | NA | NA |
| | | Ft Fairfield | 28 | 26.9 | 21.3 | 19.5 | 19.6 | 19.3 | 19.1 | 20.5 |
| | FORT KENT, ME | Estcourt | 17.9 | 18.8 | 20.2 | 29.4 | 69.4 | NA | NA | 52.5 |
| | | Ft Kent | 30.9 | 29.8 | 25.7 | 21.8 | 21.1 | 21.5 | 20.8 | 22.4 |
| | HIGHGATE SPRINGS/ ALBURG | Alburg | 17.6 | 18.3 | 16.4 | 16 | 16.8 | 17.3 | 17.4 | 21.0 |
| | | Highgate | 34.1 | 34.4 | 32.8 | 32.8 | 32.9 | 28.0 | 29.4 | 29.7 |
| | | Morses Line | 16.3 | 17.9 | 16.3 | 16.2 | 16.2 | 17.2 | 17.7 | 23.6 |
| | HOULTON, ME | Houlton | 37.4 | 37.6 | 31.1 | 29.5 | 34.8 | 33.9 | 29.9 | 27.8 |
| | | Monticello | 75 | NA | NA | NA | NA | NA | NA | NA |
| | | Orient | 27.2 | 27.1 | 24 | 25.1 | 43.7 | 41.6 | NA | NA |
| | JACKMAN, ME | Coburn Gore | 16 | 16.2 | 14.4 | 14.6 | 15.1 | 15.6 | 15.7 | 17.1 |
| | | Jackman | 17.1 | 20 | 15.7 | 15.9 | 17.4 | 17.6 | 17.8 | 16.9 |
| | | St Aurelie | 27.8 | 24.3 | 22.7 | 21.5 | 23.3 | 21.7 | 20.9 | 19.8 |
| | | St Just | 70.5 | 60.1 | 69.7 | 63.2 | 59.4 | 41.4 | NA | 46.7 |
| | | St Pamphile | 41.4 | 36.8 | 41.8 | 44.8 | 53.7 | NA | NA | NA |
| | | St Zacharie | 28.1 | 27.5 | 32.9 | 31.4 | 40.4 | NA | NA | 43.1 |
| | LIMESTONE, ME | Limestone | 15.2 | 15.8 | 18.7 | 21.6 | 24.2 | 24.6 | 24.6 | 38.5 |
| | MADAWASKA, ME | Madawaska | 55.9 | 51.7 | 45.5 | 41.6 | 43.8 | 45.1 | 45.5 | 44.2 |
| | NORTON, VT | Norton | 19.4 | 19.3 | 16.3 | 16.8 | 17.9 | 18.1 | 19.5 | 32.2 |
| | RICHFORD, VT | E Richford | 36.1 | 36.3 | 38.2 | 31.1 | 37.1 | 56.8 | NA | 28.0 |
| | | Pinnacle | 30 | 29.1 | 28.5 | 30 | 35.4 | 32.4 | NA | NA |
| | | Richford | 20 | 20.9 | 17.1 | 15.7 | 14.9 | 15.1 | 14.8 | 16.0 |
| | | W Berkshire | 14.8 | 16.6 | 15.4 | 15.7 | 15.3 | 14.7 | 14.2 | 14.3 |
| | VAN BUREN, ME | Hamlin | 24.7 | 24.1 | 19.1 | 15.3 | 15.5 | 15.7 | 16.8 | 18.3 |
| | | Van Buren | 25.7 | 25.1 | 21.3 | 18.5 | 18.8 | 18.6 | 18.5 | 19.8 |
| | VANCEBORO, ME | Vanceboro | 14 | 14.3 | 14.8 | 17.6 | 20.2 | 20.3 | 21.0 | 36.4 |

*See footnotes at end of table.*

DHS Office of Immigration Statistics

IFR_AR_008701

**Table D1 (Continued)**

| Field Office | Port | Crossing | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Buffalo | ALEXANDRIA BAY, NY | 1000 Island Br | 32.4 | 33 | 27.9 | 28.8 | 30.7 | 30.5 | 28.5 | 26.3 |
| | BUFFALO-NIAGARA FALLS NY | Lewiston | 40.8 | 41.9 | 38.1 | 38 | 40.4 | 42.0 | 43.8 | 39.4 |
| | | Peace Bridge | 40.9 | 41.5 | 38.3 | 37.3 | 36.6 | 35.9 | 36.4 | 33.7 |
| | | Rainbow | 39.8 | 41 | 35.3 | 33.7 | 36.8 | 38.3 | 39.6 | 37.2 |
| | | Whirlpool | 59.4 | 59.5 | 49.9 | 45.3 | 47.2 | 49.7 | 47.9 | 44.2 |
| | CAPE VINCENT, NY | Cape Vincent | 12.1 | 14.1 | 13 | 12.5 | 13.3 | 12.8 | 13.2 | 25.4 |
| | CHAMPLAIN-ROUSES POINT | Cannons | 16.7 | 17.3 | 17 | 18.3 | 17.9 | 17.7 | 19.2 | 33.6 |
| | | Champlain | 34 | 35 | 32.9 | 31.2 | 32.4 | 33.5 | 34.9 | 29.8 |
| | | Mooers | 17.5 | 17.4 | 15.3 | 15.1 | 15.1 | 15.7 | 15.8 | 17.1 |
| | | Overtons | 20.1 | 20.3 | 18.3 | 17.3 | 17.7 | 17.6 | 18.5 | 17.8 |
| | | Rouses Pt | 21.7 | 22.2 | 19.3 | 18.7 | 20.1 | 20.3 | 20.7 | 17.4 |
| | MASSENA, NY | Massena | 45.5 | 47 | 45.5 | 42.2 | 46.2 | 44.7 | 46.8 | 44.2 |
| | OGDENSBURG, NY | Ogdensburg | 40.6 | 40.3 | 34.7 | 34.8 | 35.9 | 35.6 | 36.3 | 34.6 |
| | TROUT RIVER, NY | Burke | NA | NA | NA | NA | NA | NA | NA | NA |
| | | Chateaugay | 14.4 | 15.1 | 14 | 14.2 | 14.5 | 14.3 | 14.5 | 16.3 |
| | | Churubusco | 18.9 | 21.3 | 23.7 | 27.2 | 36.6 | 40.6 | NA | NA |
| | | Ft Covington | 18.5 | 19.2 | 17.4 | 16.2 | 16.4 | 17.3 | 16.3 | 16.1 |
| | | Trout River | 14.5 | 14.9 | 14.2 | 13.8 | 14.4 | 14.7 | 14.8 | 16.9 |
| Chicago | TOLEDO, OH | Sandusky | NA | 12.6 | NA | NA | NA | NA | NA | NA |
| Detroit | ALGONAC, MI | Algonac | 10.7 | 15.7 | 13.4 | 13.3 | NA | NA | NA | NA |
| | DETROIT, MI | Ambassador | 36 | 36.1 | 36.6 | 37.9 | 39 | 41.9 | 42.9 | 39.9 |
| | | Windsor | 36.9 | 39.5 | 42.7 | 43.9 | 46.9 | 50.0 | 51.8 | 47.4 |
| | PORT HURON, MI | Marine City | 14.1 | 20.5 | 16 | 16.2 | NA | NA | NA | NA |
| | | Port Huron | 42.8 | 42.2 | 38 | 34.8 | 38.9 | 41.5 | 42.4 | 39.1 |
| | SAULT STE. MARIE, MI | SSM | 41 | 42 | 38.6 | 40.2 | 40.9 | 41.6 | 41.7 | 37.7 |
| El Paso | COLUMBUS, NM | Antelope | 5.4 | 7.5 | 6.6 | 7 | 8.1 | 8.7 | 9.1 | 8.9 |
| | | Columbus | 32.7 | 28.4 | 29.9 | 32.6 | 37.7 | 41.1 | 42.2 | 35.5 |
| | EL PASO, TX | BOTA | 44.2 | 48.3 | 50.3 | 51 | 54.3 | 55.5 | 52.5 | 47.5 |
| | | PDN | 38 | 39.9 | 44 | 43.5 | 46.5 | 47.9 | 45.8 | 40.9 |
| | | Stanton St | 110.1 | 119.6 | 114.9 | 123.2 | 132 | 133.0 | 148.8 | 131.2 |
| | | Ysleta | 45.9 | 49.7 | 53.4 | 56.3 | 59.7 | 62.5 | 65.9 | 57.5 |
| | PRESIDIO, TX | Presidio | 41.1 | 40.9 | 43.5 | 44.1 | 45.7 | 47.5 | 48.7 | 47.3 |
| | SANTA TERESA | St Teresa | 30.4 | 32.5 | 35.2 | 36.6 | 37.4 | 38.3 | 38.9 | 37.2 |
| | TORNILLO, TX | Ft Hancock | 14.9 | 15 | 14.5 | 15.2 | 15.7 | 17.1 | 20.8 | 19.6 |
| | | Tornillo | 32.9 | 29 | 29.8 | 33.1 | 34.3 | 35.1 | 41.1 | 35.5 |
| Laredo | BROWNSVILLE, TX | B&M | 52.7 | 57.6 | 56.8 | 58 | 67 | 67.2 | 63.1 | 57.7 |
| | | Gateway | 42.7 | 42.3 | 41.8 | 46.1 | 51.1 | 50.8 | 48.3 | 49.1 |
| | | Los Indios | 35.5 | 36.4 | 34.1 | 39.1 | 42.6 | 44.5 | 45.0 | 44.1 |
| | | Veterans | 50.1 | 51.2 | 49.5 | 52.1 | 58.1 | 61.0 | 59.6 | 53.4 |
| | DEL RIO, TX | Amistad | 25.6 | 24.6 | 25.7 | 21.9 | 23 | 29.3 | 44.0 | 44.2 |
| | | Del Rio | 47.5 | 48.2 | 51.8 | 56.2 | 62.5 | 64.1 | 64.2 | 53.5 |
| | EAGLE PASS, TX | Eagle Pass I | 51.9 | 51.5 | 51.4 | 52.5 | 54.5 | 54.2 | 52.5 | 46.4 |
| | | Eagle Pass II | 47.2 | 49.5 | 49.3 | 51 | 52.5 | 51.0 | 48.1 | 39.7 |
| | HIDALGO, TX | Anzalduas | 57.7 | 55.9 | 51.5 | 52.1 | 52.3 | 50.1 | 52.1 | 47.3 |
| | | Hidalgo | 46.3 | 47.6 | 49.6 | 48.2 | 48.9 | 47.7 | 49.5 | 44.8 |
| | | Pharr | 53.1 | 50.7 | 47.4 | 46.8 | 48.7 | 47.8 | 52.1 | 43.2 |
| | LAREDO, TX | Col Solidarity | 29.2 | 30.4 | 29.8 | 32 | 34.7 | 37.2 | 35.0 | 26.4 |
| | | Convent | 26.2 | 29.7 | 34.8 | 37.3 | NA | 64.9 | 68.5 | 60.9 |
| | | Lincoln-J | 41.2 | 41.6 | 45.7 | 46 | 46.8 | 44.0 | 33.7 | 28.3 |

*See footnotes at end of table.*

**Table D1 (Continued)**

| Field Office | Port | Crossing | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Laredo (cont.) | PROGRESO, TX | Donna | 41.2 | 42.5 | 42.2 | 42.8 | 44.1 | 46.6 | 49.4 | 45.2 |
| | | Progresso | 33.7 | 33.8 | 33.2 | 36.6 | 37.2 | 38.1 | 38.2 | 33.9 |
| | RIO GRANDE CITY, TX | Los Ebanos | 16.2 | 15.8 | 14.8 | 15.4 | 14.7 | 14.8 | 14.5 | 14.6 |
| | | Rio Grande | 32.6 | 32.5 | 33.6 | 37.6 | 41.5 | 43.6 | 45.1 | 41.8 |
| | ROMA, TX | Falcon Dam | 14.7 | 15.1 | 15.4 | 17.3 | 18.7 | 20.0 | 21.6 | 21.5 |
| | | Roma | 35.3 | 35.9 | 37.7 | 40.7 | 41.4 | 43.4 | 40.7 | 39.4 |
| Portland | ALCAN, AK | Alcan | 16.3 | 16.3 | 13.8 | 17.5 | 20.6 | 20.9 | 16.8 | 23.1 |
| | DALTON CACHE, AK | Dalton | 17.2 | 17.6 | 16.6 | 15.7 | 14.4 | 14.1 | 14.2 | 30.2 |
| | KETCHIKAN, AK | Ketchikan | 12.9 | 13.6 | 13.3 | 13.5 | 14 | 14.4 | 13.6 | 11.7 |
| | SKAGWAY, AK | Skagway | 23.4 | 24.6 | 20.5 | 20.6 | 22 | 24.2 | 25.3 | 25.3 |
| San Diego | ANDRADE, CA | Andrade | 32.5 | 35.6 | 39.8 | 42.6 | 45.8 | 49.6 | 49.6 | 43.4 |
| | CALEXICO-EAST | Calexico/E | 60.8 | 65.2 | 71.1 | 74.9 | 78.7 | 74.2 | 71.5 | 61.9 |
| | CALEXICO, CA | Calexico/W | 48.9 | 49.3 | 53.1 | 55.1 | 57.6 | 57.6 | 65.2 | 63.4 |
| | OTAY MESA | Otay Mesa | 63.7 | 74.3 | 76.9 | 81.4 | 79.2 | 84.9 | 83.9 | 75.1 |
| | SAN YSIDRO | San Ysidro | 52.4 | 56.9 | 72.2 | 69.6 | 71.1 | 77.5 | 78.6 | 74.6 |
| | TECATE, CA | Tecate | 55.7 | 57.7 | 59.5 | 65.3 | 73.2 | 75.8 | 74.6 | 71.6 |
| San Juan | MAYAGUEZ, PR | Mayaguez | NA | 33 | NA | NA | NA | NA | NA | NA |
| Seattle | AMBROSE, ND | Ambrose | 88 | NA | NA | NA | NA | NA | NA | 59.7 |
| | ANTLER, ND | Antler | 15 | 17.1 | 22.2 | 22.6 | 27.3 | 25.9 | NA | 33.2 |
| | BAUDETTE, MN | Baudette | 28.8 | 29.7 | 28.3 | 28.3 | 29.9 | 30.6 | 29.0 | 28.2 |
| | BLAINE, WA | Pacific Hwy | 65.4 | 68.7 | 59.7 | 55.4 | 59.3 | 64.2 | 58.4 | 49.4 |
| | | Peace Arch | 79.3 | 83.1 | 70.6 | 63.5 | 66.4 | 64.7 | 60.7 | 54.4 |
| | BOUNDARY, WA | Border Patrol | 24.8 | 23.1 | 18.1 | 15.6 | 15 | 15.4 | 15.9 | 16.4 |
| | CARBURY, ND | Carbury | 12.1 | 13.2 | 14.7 | 16.3 | 15.4 | 15.7 | 15.5 | 16.6 |
| | DANVILLE, WA | Danville | 17 | 16.9 | 15.7 | 15.3 | 15.1 | 14.8 | 14.6 | 15.8 |
| | DEL BONITA, MT | Del Bonita | 12.6 | 15.6 | 15.6 | 15.4 | 15.6 | 15.7 | 14.1 | 14.7 |
| | DUNSEITH, ND | Dunseith | 15 | 15.5 | 13.8 | 13.6 | 13.8 | 13.6 | 13.8 | 13.1 |
| | EASTPORT, ID | Eastport ID | 20.3 | 23.7 | 21.1 | 23.1 | 21.9 | 23.9 | 20.0 | 15.9 |
| | FERRY, WA | Ferry | 17.4 | 17.8 | 21.3 | 16.4 | 17.2 | 16.7 | 15.1 | 27.6 |
| | FORTUNA, ND | Fortuna | 18.5 | 22.1 | 18.4 | 19.9 | 19.5 | 16.9 | 17.5 | 23.9 |
| | FRONTIER, WA | Frontier | 14.6 | 15.2 | 14.2 | 13.8 | 13.9 | 13.9 | 13.7 | 14.5 |
| | GRAND PORTAGE, MN | Grand Portage | 38.5 | 39.6 | 36.8 | 34.4 | 35 | 35.4 | 34.0 | 28.7 |
| | HANSBORO, ND | Hansboro | 21.4 | 25.9 | 32.2 | 29.3 | 31.5 | 26.3 | NA | 37.9 |
| | INTERNATIONAL FALLS, MN | Int'l Falls | 38.3 | 41.1 | 39.5 | 38.4 | 40.6 | 38.7 | 37.0 | 39.5 |
| | LANCASTER, MN | Lancaster | 14.2 | 14.1 | 13.1 | 12.7 | 13 | 12.5 | 12.5 | 13.0 |
| | LAURIER, WA | Laurier | 16.2 | 16.3 | 16.5 | 15.5 | 14.9 | 15.5 | 15.2 | 14.6 |
| | LYNDEN, WA | Lynden | 51.7 | 53.1 | 43.4 | 40.8 | 42.2 | 47.3 | 45.8 | 47.2 |
| | MAIDA, ND | Maida | 17.3 | 18.4 | 20.7 | 23 | 27.8 | 23.7 | NA | 44.1 |
| | METALINE FALLS | Metaline | 12.1 | 12.7 | 12.7 | 12.8 | 13.1 | 13.3 | 12.2 | 12.2 |
| | MORGAN, MT | Morgan | 16.6 | 18.3 | 19.9 | 22.8 | 21.9 | 21.7 | NA | 28.3 |
| | NECHE, ND | Neche | 16.5 | 16.4 | 14.9 | 14.8 | 14.6 | 14.6 | 14.7 | 16.9 |
| | NIGHTHAWK, WA | Nighthawk | 15.2 | 17.3 | 22.1 | 22.5 | 24.7 | 26.4 | NA | NA |
| | NOONAN, ND | Noonan | 13.1 | 13.3 | 12.8 | 12.9 | 13.7 | 13.9 | 13.8 | 16.6 |
| | NORTHGATE, ND | Northgate | 12.4 | 12.8 | 13.1 | 14.1 | 15.3 | 15.5 | 16.3 | 17.7 |
| | OPHEIM, MT | Opheim | 60.4 | 54.7 | 60.5 | 68.9 | 63.7 | 65.2 | NA | NA |
| | OROVILLE, WA | Oroville | 24.9 | 23.8 | 20.6 | 20.9 | 20.5 | 20.0 | 19.2 | 16.5 |
| | PEMBINA, ND | Pembina | 28 | 29.9 | 26.8 | 26.9 | 27.9 | 28.6 | 28.5 | 27.7 |
| | PIEGAN, MT | Piegan | 19.9 | 22 | 19.9 | 21.1 | 20 | 20.6 | 22.1 | 16.6 |

*See footnotes at end of table.*

IFR_AR_008703

**Table D1 (Continued)**

| Field Office | Port | Crossing | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Seattle (cont.) | PINECREEK, MN | Pine Creek | 29.7 | 34.1 | 43.3 | 48.1 | 65.2 | 69.7 | NA | NA |
| | POINT ROBERTS, WA | Pt Roberts | 78.4 | 82.6 | 84.2 | 78.7 | 77.4 | 83.9 | 79.4 | 58.0 |
| | PORTAL, ND | Portal | 17 | 17.4 | 15.3 | 14.5 | 14.7 | 14.8 | 14.3 | 16.5 |
| | PORTHILL, ID | Porthill | 35.1 | 35.4 | 30.1 | 26.2 | 25.9 | 28.5 | 26.2 | 24.3 |
| | RAYMOND, MT | Raymond | 13.1 | 14.3 | 14.3 | 13.7 | 14 | 14.0 | 14.6 | 17.3 |
| | ROOSVILLE, MT | Roosville | 28.6 | 30.1 | 26.8 | 24.9 | 25.7 | 26.5 | 26.7 | 22.3 |
| | ROSEAU, MN | Roseau | 12.6 | 12.9 | 12.2 | 12.3 | 12.7 | 12.6 | 12.5 | 15.0 |
| | SARLES, ND | Sarles | 39.8 | 51.8 | 53.8 | 41.4 | 44.8 | 33.3 | NA | 41.4 |
| | SCOBEY, MT | Scobey | 29 | 26.6 | 33.8 | 42.4 | 42.2 | 40.0 | NA | NA |
| | SHERWOOD, ND | Sherwood | 13.6 | 14.7 | 14.6 | 15.2 | 15.9 | 15.4 | 16.2 | 18.3 |
| | ST JOHN, ND | St. John | 13.3 | 14.1 | 16.1 | 17.7 | 18.8 | 19.8 | 17.9 | 26.0 |
| | SUMAS, WA | Sumas | 51.8 | 53.7 | 49.5 | 46.1 | 47.7 | 49.2 | 44.0 | 38.5 |
| | SWEETGRASS, MT | Sweetgrass | 27.9 | 30.3 | 27.1 | 27.4 | 28.6 | 28.5 | 26.5 | 24.8 |
| | TURNER, MT | Turner | 13.4 | 15 | 17.2 | 18.8 | 19.9 | 21.0 | 19.0 | 17.4 |
| | WALHALLA, ND | Walhalla | 13.8 | 14.4 | 13.2 | 13.1 | 13.1 | 13.0 | 13.1 | 14.8 |
| | WARROAD, MN | OARS | NA | 13.8 | 24.5 | NA | NA | NA | NA | NA |
| | | Warroad | 17.5 | 17.8 | 17.6 | 17.7 | 19.2 | 19.2 | 17.8 | 17.8 |
| | WESTHOPE, ND | Westhope | 14.2 | 15.9 | 16.9 | 19.5 | 21.6 | 22.2 | 20.3 | 25.2 |
| | WHITLASH, MT | Whitlash | 59.6 | NA | 55.4 | 72.3 | NA | 55.2 | NA | NA |
| | WILDHORSE, MT | Wildhorse | 12.3 | 13.2 | 12.6 | 12.9 | 13 | 13.1 | 14.1 | 19.4 |
| | WILLOW CREEK, MT | Willow Creek | 17.1 | 19.1 | 35.5 | 41.1 | 49 | 39.2 | NA | 44.2 |
| Tucson | DOUGLAS, AZ | Douglas | 42.9 | 40.6 | 40.2 | 40.2 | 42.3 | 43.2 | 41.9 | 35.5 |
| | LUKEVILLE, AZ | Lukeville | 28 | 29.6 | 30.5 | 33.6 | 37.4 | 38.9 | 38.7 | 31.6 |
| | NACO, AZ | Naco | 33.6 | 37 | 38.7 | 37.9 | 37.8 | 40.0 | 41.5 | 34.8 |
| | NOGALES, AZ | Deconcini | 44.4 | 46.1 | 48.7 | 51.7 | 52.3 | 54.6 | 49.9 | 41.9 |
| | | Mariposa | 36.6 | 39.2 | 39.9 | 40.4 | 41.7 | 44.4 | 38.4 | 32.2 |
| | SAN LUIS, AZ | San Luis | 40.2 | 43.3 | 45.4 | 48.2 | 48.6 | 51.8 | 53.1 | 49.9 |
| | SASABE, AZ | Sasabe | 18 | 16.8 | 15.3 | 15.1 | 16 | 15.6 | 15.1 | 15.9 |

Notes:  As of 2019, OFO no longer reports on the crossings of Burke at Trout River, NY, Sandusky at Toledo, OH, Mayaguez at Mayaguez, PR, and OARS at Warroad, MN.  These crossings are retained for historical purposes.
Source:  OFO.

IFR_AR_008704

# Appendix E – Frequency of Secondary Inspections at Each Land POE

**Table E1.**

**OFO Northern Land Border Passenger Inspection Rate, FY 2013 to 2020**

| Secondary Exam Rate | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Northern Land** | **7.70%** | **7.67%** | **7.50%** | **7.30%** | **7.23%** | **3.44%** | **3.47%** | **4.14%** |
| Alcan, AK | 0.95% | 0.87% | 5.20% | 5.48% | 6.69% | 2.67% | 4.19% | 2.85% |
| Alexandria Bay, NY | 6.94% | 7.09% | 7.74% | 8.36% | 4.81% | 4.43% | 5.00% | 4.49% |
| Ambrose, ND | 3.54% | 4.15% | 2.49% | 2.73% | 3.07% | 1.69% | 6.01% | 1.75% |
| Anacortes, WA | 2.15% | 2.32% | 2.36% | 2.12% | NA | 2.38% | 6.81% | 5.46% |
| Antler, ND | 3.54% | 3.38% | 2.42% | 2.36% | 2.74% | 25.99% | 3.15% | 8.06% |
| Bar Harbor, ME | NA | NA | NA | NA | NA | 1.73% | NA | 2.66% |
| Baudette, MN | 5.84% | 5.69% | 6.04% | 7.08% | 3.83% | 4.38% | 6.00% | 4.29% |
| Beecher Falls, VT | 10.04% | 11.14% | 11.23% | 10.80% | 3.55% | 1.90% | 2.02% | 2.34% |
| Blaine, WA | 10.66% | 10.05% | 9.42% | 8.08% | 7.85% | 3.35% | 3.52% | 4.21% |
| Boundary, WA | 9.86% | 9.03% | 11.76% | 8.82% | 3.64% | 3.30% | 2.05% | 2.16% |
| Bridgewater, ME | 1.93% | 2.20% | 2.21% | 2.08% | 2.12% | 2.00% | 2.52% | 3.18% |
| Buffalo-Niagara Falls, NY | 5.99% | 5.96% | 6.08% | 6.87% | 5.72% | 2.78% | 2.75% | 2.93% |
| Calais, ME | 3.28% | 3.22% | 3.50% | 4.00% | 3.79% | 2.60% | 2.72% | 2.81% |
| Cape Vincent, NY | 2.21% | 2.47% | 2.25% | 1.46% | 1.94% | 0.56% | 0.57% | 0.84% |
| Carbury, ND | 25.12% | 24.77% | 25.61% | 25.92% | 4.67% | 3.76% | 2.47% | 2.53% |
| Champlain-Rouses Point, NY | 20.04% | 21.37% | 21.94% | 15.43% | 7.50% | 4.42% | 4.02% | 4.64% |
| Dalton Cache, AK | 2.86% | 1.65% | 2.91% | 1.39% | 3.83% | 1.14% | 1.38% | 1.14% |
| Danville, WA | 2.92% | 5.85% | 1.37% | 1.69% | 2.24% | 1.36% | 2.51% | 2.68% |
| Del Bonita, MT | 3.07% | 2.49% | 2.47% | 2.60% | 3.79% | 2.17% | 3.91% | 4.80% |
| Derby Line, VT | 3.43% | 3.67% | 3.89% | 4.23% | 4.67% | 2.40% | 3.10% | 3.68% |
| Detroit, MI | 8.27% | 8.76% | 7.61% | 6.56% | 3.80% | 3.01% | 2.76% | 3.18% |
| Dunseith, ND | 4.77% | 3.65% | 2.62% | 3.32% | 4.76% | 5.51% | 6.07% | 6.06% |
| Eastport, ID | 7.03% | 15.04% | 6.85% | 10.83% | 8.58% | 5.57% | 6.05% | 5.42% |
| Eastport, ME | 1.15% | 1.87% | 2.70% | 3.31% | 2.95% | 1.36% | 1.30% | 1.00% |
| Ferry, WA | 7.44% | 12.96% | 4.20% | 5.01% | 4.47% | 2.29% | 3.96% | 3.79% |
| Secondary Exam Rate | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Fort Fairfield, ME | 1.33% | 1.14% | 1.64% | 1.67% | 1.88% | 1.15% | 1.06% | 1.10% |
| Fort Kent, ME | 3.64% | 3.07% | 3.64% | 3.94% | 3.49% | 2.07% | 2.08% | 1.96% |
| Fortuna, ND | 9.24% | 9.29% | 7.37% | 7.12% | 4.31% | 3.90% | 4.22% | 7.61% |
| Friday Harbor, WA | 9.64% | 11.14% | 10.09% | 8.41% | 0.61% | 30.49% | 21.23% | NA |
| Frontier, WA | 5.84% | 4.93% | 7.74% | 3.34% | 4.52% | 3.21% | 3.42% | 2.15% |
| Grand Portage, MN | 2.69% | 1.70% | 1.45% | 1.41% | 3.13% | 3.02% | 3.42% | 4.38% |
| Hannah, ND | 10.01% | 8.09% | 15.12% | 8.35% | 13.51% | 9.74% | 8.47% | 9.32% |
| Hansboro, ND | 5.71% | 6.11% | 3.43% | 2.99% | 5.28% | 4.75% | 3.98% | 5.42% |
| Highgate Springs-Alburg, VT | 2.82% | 4.82% | 5.31% | 4.06% | 7.94% | 4.88% | 4.68% | 4.98% |
| Houlton, ME | 3.39% | 3.13% | 3.25% | 3.89% | 3.90% | 2.38% | 2.92% | 2.85% |
| International Falls-Ranier, MN | 7.56% | 5.55% | 6.41% | 5.44% | 2.77% | 2.71% | 4.29% | 5.07% |
| Jackman, ME | 4.11% | 4.21% | 4.44% | 5.37% | 4.95% | 3.42% | 5.42% | 6.22% |
| Ketchikan, AK | 2.99% | 1.41% | 1.44% | 3.40% | 1.11% | 1.73% | 2.28% | 2.27% |
| Lancaster, MN | 8.90% | 9.40% | 11.07% | 11.10% | 6.56% | 3.32% | 4.64% | 7.93% |

*See footnotes at end of table.*

**Table E1 (Continued)**

| Secondary Exam Rate | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Laurier, WA | 1.80% | 1.83% | 2.59% | 7.76% | 4.03% | 2.10% | 2.22% | 2.09% |
| Limestone L, ME | 1.99% | 1.61% | 2.41% | 2.03% | 2.25% | 1.67% | 1.36% | 1.04% |
| Lynden, WA, WA | 3.19% | 3.44% | 5.48% | 4.37% | 6.31% | 5.94% | 5.84% | 12.32% |
| Madawaska, ME | 1.75% | 1.80% | 2.22% | 1.85% | 2.51% | 1.47% | 1.53% | 1.49% |
| Maida, ND | 12.52% | 16.94% | 18.00% | 16.46% | 7.59% | 5.07% | 8.50% | 9.83% |
| Massena, NY | 2.62% | 2.89% | 2.63% | 2.88% | 1.89% | 2.92% | 2.83% | 3.38% |
| Metaline Falls, WA | 12.42% | 10.32% | 6.81% | 6.29% | 6.19% | 4.22% | 4.89% | 6.72% |
| Morgan, MT | 11.48% | 7.77% | 10.73% | 7.69% | 16.87% | 44.84% | 37.36% | 28.33% |
| Neche, ND | 6.12% | 8.92% | 12.34% | 13.06% | 6.78% | 5.52% | 5.84% | 6.83% |
| Nighthawk, WA | 1.26% | 1.57% | 0.77% | 1.13% | 4.08% | 2.33% | 2.21% | 4.14% |
| Noonan, ND | 9.02% | 6.92% | 9.19% | 10.13% | 3.21% | 2.51% | 4.57% | 3.31% |
| Northgate, ND | 2.14% | 3.25% | 3.21% | 2.79% | 3.72% | 2.92% | 2.95% | 5.23% |
| Secondary Exam Rate | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Norton, VT | 13.02% | 13.79% | 17.08% | 23.18% | 2.84% | 1.51% | 1.48% | 1.67% |
| Ogdensburg, NY | 7.78% | 8.32% | 8.48% | 9.18% | 4.07% | 5.56% | 5.76% | 10.51% |
| Opheim, MT | 0.49% | 1.08% | 5.52% | 5.04% | 11.40% | 8.66% | 5.58% | 5.98% |
| Oroville, WA | 16.28% | 18.86% | 18.65% | 15.66% | 11.46% | 15.41% | 15.61% | 20.97% |
| Pembina, ND | 13.98% | 7.50% | 6.95% | 7.12% | 7.55% | 7.16% | 6.36% | 7.08% |
| Piegan, MT | 10.64% | 13.46% | 6.25% | 5.94% | 6.34% | 2.18% | 1.49% | 3.13% |
| Pinecreek, MN | 9.50% | 9.96% | 12.98% | 13.06% | 7.25% | 6.83% | 8.53% | 15.65% |
| Point Roberts, WA | 9.32% | 9.26% | 6.63% | 4.95% | 3.98% | 1.95% | 1.81% | 1.58% |
| Port Angeles, WA | 1.88% | 2.48% | 2.42% | 2.68% | NA | 28.09% | 8.53% | 28.62% |
| Port Huron, MI | 7.45% | 7.34% | 7.85% | 11.41% | 3.94% | 12.48% | 3.04% | 0.60% |
| Portal, ND | 12.82% | 15.85% | 12.02% | 12.67% | 10.87% | 3.22% | 22.32% | 10.09% |
| Porthill, ID | 14.77% | 14.56% | 14.24% | 15.04% | 3.92% | 3.18% | 11.28% | 4.75% |
| Portland, ME | NA | 4.08% | 3.95% | 2.06% | 1.49% | 1.71% | 1.14% | NA |
| Raymond, MT | 5.77% | 4.10% | 6.60% | 16.67% | 15.44% | 5.61% | 3.19% | 5.40% |
| Richford, VT | 13.12% | 3.08% | 5.79% | 5.96% | 5.31% | 2.81% | 2.84% | 2.66% |
| Roosville, MT | 3.35% | 3.08% | 3.41% | 4.08% | 6.11% | 3.58% | 3.16% | 3.89% |
| Roseau, MN | 9.64% | 10.39% | 9.38% | 8.10% | 7.15% | 6.60% | 8.36% | 9.78% |
| Sarles, ND | 17.57% | 17.15% | 20.64% | 15.77% | 9.80% | 5.54% | 8.26% | 9.36% |
| Sault Sainte Marie, MI | 3.95% | 2.70% | 3.22% | 2.74% | 2.32% | 2.06% | 2.05% | 2.60% |
| Scobey, MT | 1.75% | 1.79% | 1.98% | 3.89% | 11.65% | 9.19% | 8.23% | 6.27% |
| Sherwood, ND | 1.70% | 2.82% | 1.88% | 2.24% | 1.69% | 1.38% | 1.61% | 2.00% |
| Skagway, AK | 2.08% | 1.70% | 4.10% | 4.03% | 8.10% | 3.03% | 4.39% | 5.61% |
| St. John, ND | 32.22% | 32.29% | 32.22% | 32.30% | 3.07% | 5.17% | 3.83% | 7.37% |
| Sumas, WA | 7.03% | 8.06% | 8.70% | 10.20% | 4.76% | 2.38% | 2.48% | 2.51% |
| Sweetgrass, MT | 10.27% | 5.80% | 2.71% | 2.40% | 9.32% | 5.09% | 6.17% | 7.10% |
| Trout River, NY | 1.73% | 1.53% | 1.52% | 1.46% | 2.13% | 1.30% | 1.37% | 1.76% |
| Turner, MT | 5.93% | 4.83% | 5.92% | 7.76% | 4.87% | 3.60% | 8.74% | 10.13% |
| Van Buren, ME | 3.17% | 2.67% | 3.15% | 3.82% | 3.11% | 2.19% | 1.95% | 2.44% |
| Vanceboro, ME | 3.79% | 7.06% | 15.86% | 29.83% | 12.29% | 3.13% | 3.04% | 2.40% |
| Walhalla, ND | 12.29% | 15.35% | 15.99% | 12.56% | 6.66% | 4.52% | 5.09% | 5.77% |
| Warroad, MN | 10.15% | 8.73% | 5.94% | 4.27% | 3.35% | 3.42% | 3.42% | 2.85% |
| Westhope, ND | 12.98% | 7.97% | 6.70% | 10.77% | 2.39% | 3.75% | 4.13% | 3.81% |
| Whitlash, MT | 1.07% | 1.34% | 1.25% | 1.93% | 3.25% | 3.59% | 2.81% | 3.08% |
| Wildhorse, MT | 1.34% | 1.38% | 2.36% | 2.47% | 5.51% | 3.52% | 3.27% | 6.72% |
| Willow Creek, MT | NA | NA | NA | NA | 8.21% | 12.36% | 7.67% | 11.13% |

Source: OFO.

**Table E2.**

**OFO Southwest Land Border Passenger Inspection Rate, FY 2013 to 2020**

| SW POEs Secondary Exam Rate | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Southwest Land** | **12.60%** | **11.82%** | **12.06%** | **11.88%** | **12.20%** | **3.38%** | **3.05%** | **3.76%** |
| Andrade, CA | 4.71% | 6.71% | 7.14% | 4.03% | 3.59% | 2.55% | 2.65% | 2.74% |
| Boquillas, TX | NA | NA | NA | NA | 1.09% | 0.67% | 1.16% | 0.58% |
| Brownsville, TX | 15.61% | 14.89% | 15.45% | 15.96% | 5.33% | 4.72% | 4.21% | 5.19% |
| Calexico East, CA | 5.70% | 5.26% | 4.23% | 3.68% | 2.77% | 2.49% | 2.27% | 2.94% |
| Calexico, CA | 16.49% | 15.20% | 16.32% | 12.78% | 3.28% | 3.10% | 2.81% | 3.69% |
| Columbus, NM | 28.38% | 28.06% | 22.89% | 27.41% | 5.93% | 6.41% | 3.45% | 5.02% |
| Del Rio, TX | 6.46% | 6.49% | 4.55% | 4.38% | 2.46% | 5.47% | 4.83% | 5.93% |
| Douglas, AZ | 6.26% | 5.68% | 5.74% | 6.68% | 3.93% | 3.79% | 3.71% | 5.05% |
| Eagle Pass, TX | 10.84% | 11.69% | 12.11% | 13.84% | 3.48% | 3.73% | 3.26% | 3.93% |
| El Paso, TX | 13.18% | 14.34% | 17.99% | 16.83% | 2.87% | 2.55% | 2.22% | 2.68% |
| Hidalgo, TX | 19.08% | 16.25% | 16.79% | 16.84% | 5.30% | 4.99% | 4.13% | 4.96% |
| Laredo, TX | 34.31% | 30.82% | 28.18% | 28.15% | 3.00% | 3.35% | 3.25% | 4.77% |
| Lukeville, AZ | 2.62% | 2.17% | 1.87% | 2.08% | 6.00% | 4.19% | 3.96% | 4.60% |
| Naco, AZ | 4.20% | 5.34% | 4.91% | 4.28% | 4.42% | 4.00% | 3.51% | 5.56% |
| Nogales, AZ | 9.66% | 9.67% | 9.82% | 9.76% | 3.66% | 3.10% | 2.99% | 3.68% |
| Otay Mesa, CA | 6.05% | 4.58% | 4.74% | 4.57% | 3.86% | 3.43% | 3.12% | 1.43% |
| Otay-Cross Border, CA (UFA[1]) | NA | NA | NA | NA | NA | 1.48% | 1.20% | 3.64% |
| Presidio, TX | 9.61% | 11.89% | 9.58% | 8.32% | 3.50% | 3.06% | 2.76% | 2.76% |
| Progreso, TX | 8.00% | 8.72% | 9.18% | 7.99% | 3.56% | 3.13% | 3.30% | 4.39% |
| Rio Grande City, TX | 12.67% | 10.89% | 8.63% | 8.69% | 4.46% | 4.81% | 4.85% | 7.43% |
| Roma, TX | 18.94% | 17.40% | 16.24% | 15.12% | 4.63% | 3.28% | 3.14% | 3.90% |
| San Luis, AZ | 15.07% | 14.26% | 16.06% | 16.65% | 3.12% | 2.75% | 2.81% | 2.91% |
| San Ysidro, CA | 2.37% | 2.13% | 1.99% | 2.75% | 4.48% | 5.92% | 4.61% | 4.59% |
| Santa Teresa, NM | 15.55% | 9.80% | 8.03% | 7.71% | 3.99% | 3.19% | 2.74% | 3.28% |
| Sasabe, AZ | 6.05% | 5.69% | 5.41% | 5.53% | 6.05% | 6.73% | 11.63% | 17.27% |
| Tecate, CA | 6.59% | 6.66% | 6.43% | 5.43% | 4.41% | 3.08% | 2.74% | 2.95% |
| Tornillo, TX | NA | NA | NA | NA | 8.83% | 7.46% | 6.56% | 7.56% |
| Valley International Airport, TX (UFA) | NA | NA | NA | NA | 0.98% | NA | 1.27% | NA |
| Ysleta, TX | NA | NA | NA | NA | NA | NA | 2.39% | 2.90% |

[1] User Fee Airport.

Source: OFO.

# Appendix F − Potentially High-Risk Containers Reviewed, Assessed, or Scanned − Maritime POE

**Table F1.**

**Potentially High-Risk Containers Reviewed, Assessed, or Scanned from FY 2016 to 2020 (with comparison of Ratio of FY 2020 to 2019)**

| Port of Unloading | Total Number of High-Risk Containers | | | | | Ratio of 2020-2019 |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 1401 - NORFOLK, VA | 2,411 | 1,313 | 687 | 170 | 240 | 1.41 |
| 1404 - RICHMOND-PETERSBURG, VA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1409 - CHARLESTON, WV | 2 | 1 | 0 | 0 | 0 | 0.00 |
| 1501 - WILMINGTON, NC | 111 | 76 | 19 | 4 | 8 | 2.00 |
| 1511 - BEAUFORT-MOREHEAD CTY, NC | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1512 - CHARLOTTE, NC | 2 | 0 | 4 | 0 | 0 | 0.00 |
| 1601 - CHARLESTON, SC | 2,563 | 1,734 | 1,095 | 257 | 330 | 1.28 |
| 1604 - COLUMBIA, SC | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1701 - BRUNSWICK, GA | 0 | 1,619 | 0 | 0 | 0 | 0.00 |
| 1703 - SAVANNAH, GA | 2,910 | 0 | 933 | 222 | 359 | 1.62 |
| 1704 - ATLANTA, GA | 15 | 947 | 0 | 0 | 0 | 0.00 |
| 1101 - PHILADELPHIA, PA | 333 | 25 | 248 | 90 | 21 | 0.23 |
| 1102 - CHESTER, PA | 22 | 47 | 16 | 0 | 1 | 0.00 |
| 1103 - WILMINGTON, DE | 23 | 0 | 0 | 3 | 0 | 0.00 |
| 1104 - PITTSBURGH, PA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1105 - PAULSBORO, NJ | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1107 - CAMDEN, NJ | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1108 - PHIL. INTERNATIONAL AIR | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1195 - UPS HUB, PHILADELPHIA, PA | 0 | 930 | 0 | 0 | 0 | 0.00 |
| 1303 - BALTIMORE, MD | 1,673 | 0 | 333 | 185 | 186 | 1.01 |
| 1305 - BWI AIRPORT | 2 | 13 | 0 | 0 | 0 | 0.00 |
| 0101 - PORTLAND, ME | 31 | 0 | 19 | 3 | 0 | 0.00 |
| 0103 - EASTPORT, ME | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0105 - VANCEBORO, ME | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0107 - FORT FAIRFIELD, ME | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0131 - PORTSMOUTH, NH | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0132 - BELFAST, ME | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0152 - SEARSPORT, ME | 0 | 681 | 0 | 0 | 0 | 0.00 |
| 0401 - BOSTON, MA | 551 | 0 | 105 | 31 | 47 | 1.52 |
| 0403 - WORCESTER, MA | 0 | 24 | 0 | 0 | 0 | 0.00 |
| 0405 - NEW BEDFORD, MA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0406 - PLYMOUTH | 0 | 1 | 0 | 0 | 0 | 0.00 |
| 0407 - FALL RIVER, MA | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 0408 - SALEM, MA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0410 - BRIDGEPORT, CT | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0412 - NEW HAVEN, CT | 0 | 0 | 0 | 0 | 0 | 0.00 |

*See footnotes at end of table.*

**Table F1 (Continued)**

| Port of Unloading | Total Number of High-Risk Containers | | | | | Ratio of 2020-2019 |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 0413 - NEW LONDON, CT | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0501 - NEWPORT, RI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0502 - PROVIDENCE, RI | 6 | 0 | 0 | 0 | 0 | 0.00 |
| 0701 - OGDENSBURG, NY | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0715 - TROUT RIVER, NY | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0901 - BUFFALO-NIAGARA FALLS | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0903 - ROCHESTER, NY | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 0904 - OSWEGO, NY | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 1002 - ALBANY, NY | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3327 - VANCOUVER, BC, CANADA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3501 - MINNEAPOLIS-ST. PAUL, MN | 3 | 0 | 0 | 0 | 0 | 0.00 |
| 3510 - DULUTH, MN | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3701 - MILWAUKEE, WI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3702 - MARINETTE, WI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3703 - GREEN BAY, WI | 0 | 1 | 0 | 0 | 0 | 0.00 |
| 3901 - CHICAGO, IL | 64 | 2 | 3 | 0 | 2 | 0.00 |
| 4101 - CLEVELAND, OH | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 4102 - CINCINNATI, OH | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 4103 - COLUMBUS, OH | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 4105 - TOLEDO, OH | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 4106 - ERIE, PA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 4110 - INDIANAPOLIS, IN | 2 | 0 | 0 | 0 | 0 | 0.00 |
| 4115 - LOUISVILLE, KY | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 4122 - ASTABULA/CONNEAUT | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 4501 - KANSAS CITY, MO | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 3801 - DETROIT, MI | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 3802 - PORT HURON, MI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3803 - SAULT STE. MARIE, MI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3804 - SAGINAW/BAY CITY, MI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3806 - GRAND RAPIDS, MI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3808 - ESCANABA, MI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3809 - MARQUETTE, MI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3815 - MUSKEGON, MI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2101 - PORT ARTHUR, TX | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2102 - SABINE, TX | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2103 - ORANGE, TX | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2104 - BEAUMONT, TX | 0 | 4,224 | 0 | 0 | 0 | 0.00 |
| 5301 - HOUSTON, TX | 7,003 | 0 | 2,539 | 779 | 887 | 1.14 |
| 5306 - TEXAS CITY, TX | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 5310 - GALVESTON, TX | 0 | 1 | 0 | 0 | 0 | 0.00 |
| 5311 - FREEPORT, TX | 9 | 0 | 4 | 0 | 0 | 0.00 |
| 5312 - CORPUS CHRISTI, TX | 0 | 0 | 0 | 5 | 0 | 0.00 |
| 5313 - PORT LAVACA, TX | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 5501 - DALLAS/FT WORTH, TX | 2 | 0 | 0 | 0 | 0 | 0.00 |
| 5504 - OKLAHOMA CITY, OK | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 2301 - BROWNSVILLE, TX | 0 | 3,308 | 0 | 0 | 0 | 0.00 |
| 2704 - LOS ANGELES, CA | 10,673 | 3,658 | 1,751 | 590 | 878 | 1.49 |
| 2709 - LONG BEACH, CA | 7,631 | 0 | 1,598 | 588 | 707 | 1.20 |

*See footnotes at end of table.*

IFR_AR_008709

**Table F1 (Continued)**

| Port of Unloading | Total Number of High-Risk Containers | | | | | Ratio of 2020-2019 |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 2711 - EL SEGUNDO, CA | | 130 | 0 | 0 | 0 | 0.00 |
| 2713 - PORT HUENEME, CA | 16 | 0 | 55 | 0 | 0 | 0.00 |
| 2720 - LOS ANGELES INT AIRPORT | 2 | 0 | 0 | 0 | 0 | 0.00 |
| 2722 - LAS VEGAS, NV | 1 | 3,838 | 0 | 0 | 0 | 0.00 |
| 5201 - MIAMI, FL | 5,649 | 2,327 | 1,590 | 403 | 304 | 0.75 |
| 5203 - PORT EVERGLADES, FL | 3,200 | 147 | 1,277 | 181 | 321 | 1.77 |
| 5204 - WEST PALM BEACH, FL | 303 | 0 | 17 | 10 | 44 | 4.40 |
| 5205 - FORT PIERCE, FL | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 5210 - FT LAUDERDALE INTL AIRPORT | 0 | 56 | 0 | 0 | 0 | 0.00 |
| 1901 - MOBILE, AL | 85 | 4 | 18 | 1 | 2 | 2.00 |
| 1902 - GULFPORT, MS | 22 | 0 | 0 | 0 | 0 | 0.00 |
| 1903 - PASCAGOULA, MS | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2001 - MORGAN CITY, LA | 27 | 295 | 0 | 0 | 3 | 0.00 |
| 2002 - NEW ORLEANS, LA | 350 | 0 | 145 | 34 | 23 | 0.68 |
| 2004 - BATON ROUGE, LA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2006 - MEMPHIS, TN | 2 | 0 | 0 | 0 | 0 | 0.00 |
| 2007 - NASHVILLE, TN | 2 | 0 | 0 | 0 | 0 | 0.00 |
| 2010 - GRAMERCY, LA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2017 - LAKE CHARLES, LA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2097 - NASHVILLE, TN CARTAGE-CON | 0 | 450 | 0 | 0 | 0 | 0.00 |
| 1001 - NEW YORK, NY | 6,069 | 5,562 | 389 | 230 | 200 | 0.87 |
| 4601 - NEW YORK/NEWARK AREA | 10,773 | 0 | 3,749 | 1,621 | 2,845 | 1.76 |
| 4602 - PERTH AMBOY, NJ | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2901 - ASTORIA, OR | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2902 - NEWPORT, OR | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2903 - COOS BAY, OR | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2904 - PORTLAND, OR | 4 | 0 | 0 | 0 | 2 | 0.00 |
| 2905 - LONGVIEW, WA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2908 - VANCOUVER, WA | 9 | 0 | 0 | 0 | 0 | 0.00 |
| 3101 - JUNEAU, AK | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3102 - KETCHIKAN, AK | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3103 - SKAGWAY, AK | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3106 - DALTON CIRCLE, AK | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3115 - SITKA, AK | 0 | 12 | 0 | 0 | 0 | 0.00 |
| 3126 - ANCHORAGE, AK | 21 | 4 | 0 | 1 | 0 | 0.00 |
| 3127 - KODIAK, AK | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3307 - DENVER, CO | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 2501 - SAN DIEGO, CA | 56 | 0 | 0 | 0 | 0 | 0.00 |
| 2805 - MONTEREY, CA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2809 - SAN FRANCISCO, CA | 6 | 0 | 0 | 0 | 0 | 0.00 |
| 2810 - STOCKTON, CA | 0 | 1,816 | 0 | 0 | 0 | 0.00 |
| 2811 - OAKLAND, CA | 3,235 | 0 | 782 | 318 | 521 | 1.64 |
| 2812 - RICHMOND, CA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2820 - MARTINEZ, CA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2830 - CAQUINEZ STRAIT, CA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 2835 - SACRAMENTO INTL AIRPORT | 0 | 219 | 0 | 0 | 0 | 0.00 |
| 3201 - HONOLULU, HI | 352 | 0 | 71 | 32 | 41 | 1.28 |
| 3202 - HILO, HI | 0 | 0 | 0 | 0 | 0 | 0.00 |

*See footnotes at end of table.*

IFR_AR_008710

**Table F1 (Continued)**

| Port of Unloading | Total Number of High-Risk Containers | | | | | Ratio of 2020-2019 |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| 3203 - KAHULUI, HI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3303 - SALT LAKE CITY, UT | 3 | 2 | 0 | 0 | 0 | 0.00 |
| 4904 - FAJARDO, PR | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 4907 - MAYAGUEZ, PR | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 4908 - PONCE, PR | 0 | 685 | 0 | 0 | 0 | 0.00 |
| 4909 - SAN JUAN, PR | 1,560 | 0 | 193 | 276 | 174 | 0.63 |
| 5101 - CHARLOTTE AMALIE, VI | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 5104 - CHRISTIANSTED, VI | 0 | 819 | 0 | 0 | 0 | 0.00 |
| 3001 - SEATTLE, WA | 1,934 | 783 | 502 | 265 | 241 | 0.91 |
| 3002 - TACOMA, WA | 2,015 | 0 | 407 | 333 | 279 | 0.84 |
| 3003 - ABERDEEN, WA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3004 - BLAINE, WA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3005 - BELLINGHAM, WA | 0 | 19 | 0 | 0 | 0 | 0.00 |
| 3006 - EVERETT, WA | 10 | 0 | 7 | 0 | 0 | 0.00 |
| 3007 - PORT ANGELES, WA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3008 - PORT TOWNSEND, WA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3010 - ANACORTES, WA | 0 | 0 | 0 | 0 | 0 | 0.00 |
| 3029 - SEATTLE-TACOMA INTL AIRPORT | 1 | 0 | 0 | 0 | 0 | 0.00 |
| 3604 - INTERNATIONAL FALLS, MN | 0 | 44 | 0 | 0 | 0 | 0.00 |
| 1801 - TAMPA, FL | 136 | 143 | 18 | 4 | 1 | 0.25 |
| 1803 - JACKSONVILLE, FL | 375 | 1 | 37 | 23 | 13 | 0.57 |
| 1805 - FERNANDINA BEACH, FL | 7 | 14 | 7 | 4 | 0 | 0.00 |
| 1816 - PORT CANAVERAL, FL | 37 | 6 | 0 | 0 | 0 | 0.00 |
| 1818 - PANAMA CITY, FL | 22 | 0 | 0 | 1 | 1 | 1.00 |
| 1819 - PENSACOLA, FL | 0 | 235 | 0 | 0 | 0 | 0.00 |
| 1821 - PORT MANATEE, FL | 7 | 0 | 7 | 3 | 2 | 0.67 |
| 1822 - FORT MYERS | 3 | 0 | 0 | 0 | 0 | 0.00 |
| 2605 - PHOENIX, AZ | 3 | 0 | 0 | 0 | 0 | 0.00 |

Notes:  Potentially high-risk containers are identified based on the maximum (highest) score within the Best Arrival Date and Best Arrival Date +1 day.  The container counts are for the containerized shipments only (non-containerized data are excluded).  The report provides a distinct count of containers at individual port level.  The rolled-up totals across the ports or field office(s) may include duplicate container counts.
Source: OFO.

IFR_AR_008711

IFR_AR_008712

U.S. Department of Homeland Security
*Office of Immigration Statistics*

IFR_AR_008713

| Source | Scope | Additional notes |
|---|---|---|
| | | UIP is the Department's primary environment for sharing real-time and near real-time data among CBP, ICE, USCIS, and OIS. OIS receives a daily subject-level snapshot of CBP encounters current through 06:00 of the previous day. A notable limitation of very recent UIP data is that it has not yet been subject to CBP's ongoing data quality controls, which get locked in on a monthly basis. UIP data may update by as uch as 10-15 percent between same-day reporting and final CBP records at the end of the fiscal year, with the most common including increases in total encounter (as a result of records that are entered after 06:00) and changes in processing dispositions. |
| CBP Unified Immigration Portal (UIP) | Person-level records available from start of FY 2019 through current date for CBP encounters and custody data | |
| OIS Production data | Person-level records for:<br>- USBP data beginning FY 2000<br>- OFO data beginning FY 2005<br>- ICE ERO data beginning FY 2009<br>- DOJ/AOIR data beginning FY 2000 | OIS ingests component data, cleans and validates according to set rules, and uses production data for official reporting. |
| OIS Persist Dataset | Linked person-level records for FY 2013 - November 2022 | OIS uses a data matching program to link Production data from 21 DHS and DOJ immigraion data systems. Linked records allow analytic reporting on on unique individuals using information pulled from multiple data systems. |
| OIS Persist Data: Unique encounters | Analytic program leveraging the Persist dataset that allows reporting on unique versus repeat border encounters | The Unique Encounters program is run monthly after the Persist Dataset update. Unique encounter data was only available through October 2022 at the tim this rule was drafted. |

IFR_AR_009000

| OIS Enforcement Lifecycle | OIS has developed the Enforcement Lifecycle to provide an end-to-end view of immigration enforcement processing by linking records across 22 different operational data systems from CBP, DOJ/EOIR, ICE and USCIS with a nexus to border enforcement. OIS uses individual and event identifiers from each source system to match records and assigns a new person-level identifier to each unique individual appearing in one or more dataset. OIS sorts the matched records by unique individual and date, yielding a comprehensive person-centric dataset that includes one row for each event. The Enforcement Lifecycle methodology groups each initial enforcement action to its associated final enforcement outcome or to its most current interim event initial actions that remain in an unresolved status. In most cases, the most current interim event is the latest event (by calendar date) linked to the initial action. When multiple interim events occur on the same day and in certain other scenarios, OIS identifies the most current enforcement event based on which event takes logical precedence in the immigration enforcement processes. The Lifecycle data also includes select information about intermediate enforcement events, including detention book-ins and releases and APSO fear claims. | Methodology has been validated with DHS components and DOJ. For additional details see https://www.dhs.gov/immigration-statistics/special-reports/enforcement-lifecycle |
| Historic CBP data | Publicly avaiable data pulled from CBP website | Includes many data elements that predate OIS Production data for which OIS does not have detailed person-level records |
| OIS Yearbook of Immigration Statistics | Publicly avaiable data available on OIS website | Includes many data elements that predate OIS Production data for which OIS does not have detailed person-level records |

IFR_AR_009001

For the 30 days ending December 24, 2022, total daily encounters along the SWB consistently fluctuated between approximately 7,100 and 9,700 per day, averaging approximately 8,500 per day, with encounters exceeding 9,000 per day on 12 different occasions during this 30- day stretch.

3 DHS Office of Immigration Statistics (''OIS'') analysis of data downloaded from the U.S. Customs and Border Protection (''CBP'') Unified Immigration Portal (''UIP'') on January 4, 2023.

SWB Encounters, November 25 - December 24, 2022

| Date | Encounters | | |
|--------|------|---------|-------|
| | | Low | 7,102 |
| 25-Nov | 7173 | High | 9,668 |
| 26-Nov | 8050 | Average | 8,532 |
| 27-Nov | 7170 | | |
| 28-Nov | 7747 | | |
| 29-Nov | 7683 | | |
| 30-Nov | 9235 | | |
| 1-Dec | 8554 | | |
| 2-Dec | 9668 | | |
| 3-Dec | 7967 | | |
| 4-Dec | 7988 | | |
| 5-Dec | 8360 | | |
| 6-Dec | 8407 | | |
| 7-Dec | 9356 | | |
| 8-Dec | 9419 | | |
| 9-Dec | 9508 | | |
| 10-Dec | 9165 | | |
| 11-Dec | 8866 | | |
| 12-Dec | 8789 | | |
| 13-Dec | 9112 | | |
| 14-Dec | 9299 | | |
| 15-Dec | 9127 | | |
| 16-Dec | 7824 | | |
| 17-Dec | 7901 | | |
| 18-Dec | 7785 | | |
| 19-Dec | 8358 | | |
| 20-Dec | 9544 | | |
| 21-Dec | 9438 | | |
| 22-Dec | 9072 | | |
| 23-Dec | 8284 | | |
| 24-Dec | 7102 | | |

Source: Data pulled from UIP on January 4, 2023.

IFR_AR_009002

As the demographics of border encounters have shifted in recent years to include larger numbers of non-Mexicans—who are far more likely to make asylum claims— and as the time required to process and remove noncitizen

6 For noncitizens encountered at the SWB in FY 2014–FY 2019 who were placed in expedited removal, 6 percent of Mexican nationals made fear claims that were referred to USCIS for adjudication, compared to 57 percent of people from Northern Central America, and

|  | Mexico | NCA | Other |
|---|---|---|---|
| Total placed in ER | 584,459 | 512,937 | 138,435 |
| ER: subset making APSO fear claims | 33,618 | 291,437 | 125,269 |
| % of ER making fear claims | 6% | 57% | 90% |

Source: OIS Enforcement Lifecycle through 9/30/22.

| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Encounters[1] | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 416,485 | ######## | ######## | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | 273,438 |
| T8 Encounters | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | ######## | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | 124,061 |
| Placed in ER (ER Dispositions)[2] | 236,062 | 229,165 | 180,589 | 227,910 | 160,303 | 214,667 | 223,197 | 91,719 | 84,687 | 119,664 | 150,114 | 122,801 | 111,696 | 109,181 | 68,916 | 87,069 | 84,796 | 53,712 |
| APSO fear claims[3] | 36,025 | 48,649 | 46,387 | 92,689 | 68,700 | 95,633 | 98,266 | 23,946 | 48,559 | 44,840 | 2,664 | 4,934 | 6,768 | 7,594 | 3,922 | 6,037 | 4,363 | 5,956 |
| Referred to EOIR[4] | 32,000 | 37,793 | 36,951 | 80,202 | 58,784 | 82,418 | 78,182 | 12,640 | 38,126 | 31,114 | 2,136 | 3,307 | 4,067 | 5,394 | 2,912 | 3,981 | 1,951 | 1,960 |
| Still in proceedings[5] | 6,931 | 9,870 | 10,675 | 26,405 | 23,776 | 36,896 | 37,644 | 8,040 | 28,395 | 20,493 | 259 | 602 | 871 | 1,418 | 986 | 1,311 | 790 | 1,228 |
| EOIR case completion[6] | 25,069 | 27,923 | 26,276 | 53,797 | 35,008 | 45,522 | 40,538 | 4,600 | 9,731 | 10,621 | 1,877 | 2,705 | 3,196 | 3,976 | 1,926 | 2,670 | 1,161 | 732 |
| Relief[7] | 6,471 | 5,640 | 5,374 | 8,335 | 4,693 | 5,933 | 5,119 | 957 | 367 | 103 | 305 | 303 | 288 | 272 | 127 | 168 | 47 | 14 |
| Relief on merits[8] | 3,451 | 4,631 | 5,264 | 8,195 | 4,629 | 5,878 | 5,081 | 954 | 362 | 101 | 77 | 215 | 264 | 251 | 119 | 161 | 42 | 14 |
| Other relief[9] | 3,020 | 1,009 | 110 | 140 | 64 | 55 | 38 | 3 | 5 | 2 | 228 | 88 | 24 | 21 | 8 | 7 | 5 | |
| Removal Order + VD[10] | 13,977 | 17,306 | 16,556 | 35,422 | 21,900 | 25,397 | 19,034 | 1,799 | 2,015 | 1,210 | 1,070 | 1,704 | 2,098 | 2,767 | 1,310 | 1,944 | 882 | 275 |
| Absentia | 7,115 | 6,907 | 5,213 | 12,768 | 8,832 | 11,916 | 4,561 | 262 | 1,104 | 678 | 401 | 569 | 588 | 890 | 520 | 533 | 95 | 45 |
| Confirmed departure | 666 | 563 | 401 | 683 | 424 | 442 | 231 | 22 | 11 | 5 | 33 | 41 | 52 | 70 | 31 | 25 | 7 | 4 |
| No confirmed departure | 6,449 | 6,344 | 4,812 | 12,085 | 8,408 | 11,474 | 4,330 | 240 | 1,093 | 673 | 368 | 528 | 536 | 820 | 489 | 508 | 88 | 41 |
| Not absentia | 6,862 | 10,399 | 11,343 | 22,654 | 13,068 | 13,481 | 14,473 | 1,537 | 911 | 532 | 669 | 1,135 | 1,510 | 1,877 | 790 | 1,411 | 787 | 230 |
| Confirmed departure | 3,329 | 4,905 | 4,611 | 6,503 | 5,609 | 6,791 | 10,503 | 724 | 319 | 224 | 458 | 608 | 850 | 1,030 | 485 | 1,103 | 698 | 180 |
| No confirmed departure | 3,533 | 5,494 | 6,732 | 16,151 | 7,459 | 6,690 | 3,970 | 813 | 592 | 308 | 211 | 527 | 660 | 847 | 305 | 308 | 89 | 50 |
| Terminate/Dismiss/closure/other[11] | 4,621 | 4,977 | 4,346 | 10,040 | 8,415 | 14,192 | 16,385 | 1,844 | 7,349 | 9,308 | 502 | 698 | 810 | 937 | 489 | 558 | 232 | 443 |

Notes: Results based on source data as of October, 2022 and OIS Enforcement Lifecycle methodology as of May 31, 2021. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.

[1] Excludes Accompanied Minors (AM), Unaccompanied  and OFO administrative cases including, crewmembers, parolee, and withdrawals.

[2] Includes the following dispositions:'ER', 'ER/CF', 'ER/LR', 'VWP/CF', 'STW/CF', 'WD/ER'

[3] Includes individulas placed in ER and found to have a credible fear case in APSO.

[4] Includes USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[5] Includes 'EOIR BIA Appeal', 'EOIR Change of Venue', 'EOIR Fear Vacated', 'EOIR Rescinded', 'EOIR Transfer', 'EOIR Zero Bond' and cases with no EOIR case outcome.

[6] Includes cases with the following EOIR outcomes: 'Terminated/Dismissal/Other', 'Relief not on merit', 'Relief on merit', and 'Final order/voluntary departure'.

[7] Includes cases with relief on merits and other types of relief.

[8] Includes cases with the following EOIR outcomes: 'EOIR Granted Relief', 'EOIR Withholding'

[9] Includes cases with the following EOIR outcomes: 'EOIR TPS', 'EOIR PD - Admin Close'.

[10] Includes cases with the following EOIR outcomes:'EOIR Removal Order','EOIR VD','EOIR Withdraw','EOIR Abandonment','EOIR Deny','EOIR Fear Affirmed'.

[11] Includes cases with the following EOIR outcomes: 'EOIR Admin Close', 'EOIR Failure to Prosecute', 'EOIR Terminated', 'EOIR Other'.

IFR_AR_009003

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

IFR_AR_009004

s ineligible for protection has grown (during which time individuals become eligible to apply for employment authorization), the apprehension of border crossers has had limited deterrent effec

90 percent of all other nationalities. OIS analysis of Enforcement Lifecycle data as of September 30, 2022. Of note, according to OIS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immi

| FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 621,695 | 764,734 | 118,844 | 193,670 | 111,654 | 175,034 | 150,057 | 213,694 | 559,163 | 90,956 | 586,427 | 426,639 | 26,849 | 17,350 | 16,766 | 32,127 | 31,105 | 37,503 | 113,061 | 52,091 | 370,495 | 995,783 |
| 44,006 | 74,246 | 118,844 | 193,670 | 111,654 | 175,034 | 150,057 | 213,694 | 559,163 | 55,665 | 190,013 | 82,172 | 26,849 | 17,350 | 16,766 | 32,127 | 31,105 | 37,503 | 113,061 | 43,448 | 287,379 | 953,436 |
| 8,797 | 18,932 | 74,046 | 94,379 | 56,737 | 99,629 | 70,347 | 99,938 | 91,907 | 24,988 | 16,312 | 5,802 | 11,902 | 11,985 | 12,156 | 19,100 | 21,040 | 27,660 | 46,494 | 13,019 | 70,088 | 84,420 |
| 343 | 247 | 24,064 | 33,498 | 28,883 | 68,579 | 47,358 | 63,213 | 49,906 | 6,350 | 1,500 | 2,150 | 9,297 | 10,217 | 10,736 | 16,516 | 17,420 | 26,383 | 43,997 | 11,640 | 46,716 | 42,443 |
| 164 | 93 | 20,914 | 25,176 | 22,947 | 59,491 | 40,233 | 53,553 | 37,441 | 2,080 | 790 | 1,117 | 8,950 | 9,310 | 9,937 | 15,317 | 15,639 | 24,884 | 38,790 | 8,600 | 37,172 | 29,904 |
| 81 | 66 | 5,069 | 7,130 | 7,050 | 19,763 | 17,358 | 25,715 | 19,453 | 1,399 | 536 | 757 | 1,603 | 2,138 | 2,754 | 5,224 | 5,432 | 9,870 | 17,401 | 5,413 | 27,778 | 19,670 |
| 83 | 27 | 15,845 | 18,046 | 15,897 | 39,728 | 22,875 | 27,838 | 17,988 | 681 | 254 | 360 | 7,347 | 7,172 | 7,183 | 10,093 | 10,207 | 15,014 | 21,389 | 3,187 | 9,394 | 10,234 |
| 2 | | 3,217 | 2,664 | 2,126 | 4,007 | 1,696 | 1,708 | 593 | 21 | 6 | 1 | 2,949 | 2,673 | 2,960 | 4,056 | 2,870 | 4,057 | 4,479 | 922 | 359 | 102 |
| 1 | | 1,047 | 1,927 | 2,055 | 3,899 | 1,645 | 1,670 | 577 | 20 | 6 | | 2,327 | 2,489 | 2,945 | 4,045 | 2,865 | 4,047 | 4,462 | 920 | 355 | 101 |
| 1 | | 2,170 | 737 | 71 | 108 | 51 | 38 | 16 | 1 | | 1 | 622 | 184 | 15 | 11 | 5 | 10 | 17 | 2 | 4 | 1 |
| 37 | 12 | 9,765 | 12,122 | 11,033 | 27,779 | 15,495 | 18,178 | 10,847 | 400 | 106 | 111 | 3,142 | 3,480 | 3,425 | 4,876 | 5,095 | 5,275 | 7,305 | 1,124 | 1,872 | 1,087 |
| 1 | | 5,055 | 4,681 | 3,687 | 10,474 | 7,154 | 9,959 | 3,391 | 68 | 18 | 45 | 1,659 | 1,657 | 938 | 1,404 | 1,158 | 1,424 | 1,075 | 149 | 1,085 | 633 |
| | | 483 | 368 | 211 | 460 | 294 | 269 | 83 | 2 | | | 150 | 154 | 138 | 153 | 99 | 148 | 141 | 16 | 11 | 5 |
| 1 | | 4,572 | 4,313 | 3,476 | 10,014 | 6,860 | 9,690 | 3,308 | 66 | 18 | 45 | 1,509 | 1,503 | 800 | 1,251 | 1,059 | 1,276 | 934 | 133 | 1,074 | 628 |
| 36 | 12 | 4,710 | 7,441 | 7,346 | 17,305 | 8,341 | 8,219 | 7,456 | 332 | 88 | 66 | 1,483 | 1,823 | 2,487 | 3,472 | 3,937 | 3,851 | 6,230 | 975 | 787 | 454 |
| 29 | 10 | 2,439 | 3,605 | 2,569 | 3,763 | 2,828 | 3,433 | 5,983 | 263 | 65 | 46 | 432 | 692 | 1,192 | 1,710 | 2,296 | 2,255 | 3,822 | 281 | 225 | 168 |
| 7 | 2 | 2,271 | 3,836 | 4,777 | 13,542 | 5,513 | 4,786 | 1,473 | 69 | 23 | 20 | 1,051 | 1,131 | 1,295 | 1,762 | 1,641 | 1,596 | 2,408 | 694 | 562 | 286 |
| 44 | 15 | 2,863 | 3,260 | 2,738 | 7,942 | 5,684 | 7,952 | 6,548 | 260 | 142 | 248 | 1,256 | 1,019 | 798 | 1,161 | 2,242 | 5,682 | 9,605 | 1,141 | 7,163 | 9,045 |

r. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

IFR_AR_009005

gration proceedings and the lower share of noncitizens being removed, and the growth in non-Mexican encounters at the SWB. Both trends accelerated in the 2010s, as non-Mexicans became the majority of border encounters, and they have accelerated further since FY 20

IFR_AR_009006

21, as people from countries other than Mexico and Northern Central America now account for the largest numbers of border encounters.

IFR_AR_009007

Of note, according to OIS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings and the lower share of noncitizens being removed, and the growth in non-Mexican encounte

| | Mean days for EOIR completion | OTM % of Apprehensions | OTM encounters |
|---|---|---|---|
| 2000 | 42 | 2% | 25,738 |
| 2001 | 110 | 2% | 29,902 |
| 2002 | 173 | 3% | 28,299 |
| 2003 | 211 | 4% | 39,478 |
| 2004 | 252 | 6% | 65,917 |
| 2005 | 284 | 13% | 166,071 |
| 2006 | 308 | 9% | 110,287 |
| 2007 | 282 | 8% | 72,206 |
| 2008 | 262 | 8% | 64,940 |
| 2009 | 265 | 9% | 53,870 |
| 2010 | 347 | 11% | 59,953 |
| 2011 | 385 | 14% | 57,049 |
| 2012 | 500 | 26% | 109,218 |
| 2013 | 658 | 35% | 172,050 |
| 2014 | 668 | 50% | 284,546 |
| 2015 | 741 | 43% | 191,196 |
| 2016 | 813 | 54% | 302,908 |
| 2017 | 743 | 56% | 233,680 |
| 2018 | 790 | 57% | 298,233 |
| 2019 | 772 | 76% | 740,162 |
| 2020 | 742 | 35% | 160,374 |
| 2021 | 1,359 | 62% | 1,079,092 |
| 2022 | 1,526 | 66% | 1,570,605 |
| 2023 | 1,263 | 73% | 340,038 |



0.904738328

Note: OIS calculated mean days from EOIR case received date to EOIR case completion date by pulling all EOIR case completions from OIS production data, and linking each completion to its case receipt date. In absentia removal orders and case c

Source: OIS analysis of OIS EOIR and CBP Production data.

IFR_AR_009008

rs at the SWB.  Both trends accelerated in the 2010s, as non-Mexicans became the majority of border encounters, and they have accelerated further since FY 2021, as people from countries other than Mexico and Northern Central America now account for the largest numl

completions that did not result in decisions, terminations, or closures were excluded from the analysis. OIS calculated OTMs as a % of encounters by dividing total non-Mexican SWB encounters by total SWB encounters, pulling from OIS produc

IFR_AR_009009

bers of border encounters.

ction data.

IFR_AR_009010

In the weeks between the November announcement that the Title 42 public health Order would be lifted and the December 19 stay order that kept the Title 42 public health Order in place, encounter rates jumped from an average of 7,700 per week (early November) to 8,600 per week (mid-December).

10 OIS analysis of CBP UIP data downloaded January 13, 2023.

| Date | SWB Encounters | | |
|------|------|------|------|
| 1-Nov | 7814 | Average encounters two weeks ending 11/15/22 | 7,748 |
| 2-Nov | 8233 | Average enbcounters two weeks ending 12/24/22 | 8,623 |
| 3-Nov | 7023 | Number of days 11/15 - 12/24 > 9K encounters | 13 |
| 4-Nov | 7809 | | |
| 5-Nov | 6983 | | |
| 6-Nov | 7868 | | |
| 7-Nov | 7411 | | |
| 8-Nov | 8396 | | |
| 9-Nov | 7558 | | |
| 10-Nov | 8092 | | |
| 11-Nov | 8480 | | |
| 12-Nov | 7485 | | |
| 13-Nov | 7102 | | |
| 14-Nov | 7889 | | |
| 15-Nov | 8136 | Announcement date | |
| 16-Nov | 8193 | | |
| 17-Nov | 9565 | | |
| 18-Nov | 7890 | | |
| 19-Nov | 7891 | | |
| 20-Nov | 6925 | | |
| 21-Nov | 7974 | | |
| 22-Nov | 7941 | | |
| 23-Nov | 7523 | | |
| 24-Nov | 7359 | | |
| 25-Nov | 7151 | | |
| 26-Nov | 7990 | | |
| 27-Nov | 7111 | | |
| 28-Nov | 7728 | | |
| 29-Nov | 7668 | | |
| 30-Nov | 9215 | | |
| 1-Dec | 8550 | | |
| 2-Dec | 9668 | | |
| 3-Dec | 7967 | | |
| 4-Dec | 7988 | | |
| 5-Dec | 8375 | | |
| 6-Dec | 8412 | | |
| 7-Dec | 9359 | | |
| 8-Dec | 9419 | | |
| 9-Dec | 9516 | | |
| 10-Dec | 9166 | | |
| 11-Dec | 8868 | | |
| 12-Dec | 8802 | | |
| 13-Dec | 9115 | | |
| 14-Dec | 9309 | | |
| 15-Dec | 9129 | | |
| 16-Dec | 7863 | | |
| 17-Dec | 7904 | | |
| 18-Dec | 7788 | | |
| 19-Dec | 8354 | | |
| 20-Dec | 9578 | | |
| 21-Dec | 9458 | | |
| 22-Dec | 9102 | | |
| 23-Dec | 8321 | | |
| 24-Dec | 7133 | | |
| 25-Dec | 4391 | | |
| 26-Dec | 5909 | | |
| 27-Dec | 7137 | | |

IFR_AR_009011

| 28-Dec | 6942 |
|--------|------|
| 29-Dec | 6503 |
| 30-Dec | 5733 |
| 31-Dec | 6248 |

Data downloaded from UIP 1/13/23

IFR_AR_009012

While a number of factors make it particularly difficult to precisely project the numbers of migrants who would seek to cross the border, without authorization, after the lifting of the Title 42 public health Order, DHS encounter proj

11 DHS SWB Encounter Planning Model generated January 6, 2023. The complexity of international migration limits the Department's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual unce

| | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 |
|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | |
| **Projection** | 6,938 | 7,724 | 7,849 | 7,943 | 8,335 | 8,404 | 8,092 | 8,418 | 8,902 |
| Upper 68% | 7,749 | 8,786 | 8,996 | 9,268 | 9,740 | 9,972 | 9,714 | 10,138 | 10,776 |
| Lower 68% | 6,127 | 6,662 | 6,702 | 6,618 | 6,930 | 6,836 | 6,469 | 6,697 | 7,028 |
| Upper 95% | 8,528 | 9,805 | 10,097 | 10,541 | 11,089 | 11,477 | 11,271 | 11,790 | 12,575 |
| Lower 95% | 5,348 | 5,643 | 5,600 | 5,346 | 5,582 | 5,331 | 4,912 | 5,045 | 5,229 |

Release Date: **2023-01-06**

<u>Key updates from previous version: Returns to 50-50 weight. Averages across assumptions of Title 42 ending in April-October 2023. Decomposes Hybrid based on last 3 month proportions. Adds Cuba, Nicaragua, and Haiti to the list of countries exposed to Title 42. Uses Hybrid released in early November, before T42 expectations were incorporated.</u>

**Workbook Details:** This workbook presents the most recent Blended Encounter Projections. The workbook contains the following worksheets:

- **Overview**: Current worksheet, providing details about the workbook and the projections.
- **Blended Totals**: Encounter projections by Total, Family Type, and HHS Referrals. Upper and lower bounds of confidence intervals are calculated at the family type level.
  - *Note:* HHS Referrals are estimated by summing all non-Mexican UC encounter projections. This estimate is likely to be a slight underestimate because there are usually a small number of Mexican UCs who do get referred to HHS.

**The Blended Encounter Projections:** A mixed-methods approach that combines the knowledge and intel of subject matter expertise with mathematical, regression-based predictive models. More specifically, the current Blended Projections average, or 'blend', the:

- Hybrid Model.
- Bayesian Structural Time Series (BSTS) Model projections.

**Model Specifications and Notes:**

- Weights:
  - Hybrid Model projections, **weighted 50%.**
  - BSTS Model projections, **weighted 50%.**
- Uses actuals of encounters through:
  - Hybrid Model: **2022-11-06.**
  - BSTS Model: **2022-11-30.**
- Model Descriptions:
  - The Hybrid Model combines field level intelligence, SME analysis of relevant policies and factors, historic monthly change, and current and past trends. It also has a specific focus on accounting for expectations of the consequences of ending Title 42.

IFR_AR_009013

- Broken down into results by country with the last 3 month country-family type proportions.
- The BSTS Model was built using a machine learning approach and includes: a 12-seasonal component, a semi-local linear trend, an autoregressive component (AR(1)), and a regression component.
    - The BSTS regression component includes the following predictors: Mexico Apprehensions (through Oct 2022), USA Unemployment (through Oct 2022), and ratio of Removals by T8 Encounters (through Oct 2022).

IFR_AR_009014

jections and planning models suggest that encounters could rise to 11,000–13,000 encounters per day, absent policy changes and absent a viable mechanism for removing Cuban, Haitian, Nicaraguan, and Venezuelan (''CHNV'') natic

rtainty due to ongoing changes in the major migration source countries (i.e., the shift from Mexico and Northern Central America to new countries of origin, discussed further below), the growing impact of climate change on migration, political instability in several source countri

IFR_AR_009015

nals who do not have a valid protection claim.

es, the evolving recovery from the COVID pandemic, and uncertainty generated by border-related litigation, among other factors. The DHS Office of Immigration Statistics (OIS) leads an interagency SWB Encounter Projections Working Group that generates encounter projectio

ns every 2–4 weeks, using the best data and modeling available. The enterprise encounter projection utilizes a mixed method blended model that combines a longstanding subject matter expert model produce

IFR_AR_009017

… which couple new parole processes with prompt returns of those who cross the SWB without utilizing these processes, are deterring irregular migration from those countries…

13 Encounters of Cubans, Haitians, and Nicaraguans between ports of entry at the southwest border declined from 928 on January 5 (the day of the announcement) to just 92 on January 22—a decline of 92 percent. Encounters of other noncitizens began to rebound from their typi

| | | | | | | | CHN change Jan 5 - Jan 22 | -92% |
| | | | | | | | All other change Jan 5 -Jan 22 | 40% |

USBP encounters by selected citizenships

| | Cuba | Haiti | Nicaragua | CHN | All non-CH | Total USBP encounter | 3-day CHN |
|---|---|---|---|---|---|---|---|
| 1-Jan | 289 | 3 | 175 | 467 | 2283 | 2750 | |
| 2-Jan | 487 | 1 | 203 | 691 | 2384 | 3075 | |
| 3-Jan | 795 | 1 | 251 | 1047 | 2873 | 3920 | |
| 4-Jan | 592 | 3 | 170 | 765 | 2664 | 3429 | |
| 5-Jan | 591 | 3 | 334 | 928 | 2721 | 3649 | |
| 6-Jan | 625 | | 175 | 800 | 2821 | 3621 | |
| 7-Jan | 679 | 2 | 172 | 853 | 2887 | 3740 | |
| 8-Jan | 574 | | 117 | 691 | 2726 | 3417 | |
| 9-Jan | 450 | 1 | 124 | 575 | 3007 | 3582 | |
| 10-Jan | 161 | 1 | 102 | 264 | 3824 | 4088 | |
| 11-Jan | 189 | 5 | 160 | 354 | 3986 | 4340 | |
| 12-Jan | 113 | | 158 | 271 | 4033 | 4304 | |
| 13-Jan | 80 | | 155 | 235 | 4039 | 4274 | |
| 14-Jan | 112 | 6 | 95 | 213 | 4287 | 4500 | |
| 15-Jan | 66 | | 122 | 188 | 3650 | 3838 | |
| 16-Jan | 19 | 4 | 91 | 114 | 3790 | 3904 | |
| 17-Jan | 42 | | 122 | 164 | 4229 | 4393 | |
| 18-Jan | 26 | 2 | 82 | 110 | 4468 | 4578 | |
| 19-Jan | 56 | | 102 | 158 | 4193 | 4351 | |
| 20-Jan | 23 | 1 | 87 | 111 | 4389 | 4500 | |
| 21-Jan | 29 | 3 | 41 | 73 | 4207 | 4280 | |
| 22-Jan | 33 | 4 | 55 | 92 | 3807 | 3899 | |

UIP data downloaded 1/23/23

IFR_AR_009018

cal seasonal drop, increasing by 40 percent during the same period. OIS analysis of CBP UIP data downloaded January 23, 2023.

IFR_AR_009019

A large informal encampment formed in Tijuana, Mexico, and Ukrainian encounters averaged just under 940 per day in the two weeks prior to the announcement of U4U.

20 OIS analysis of data pulled from CBP UIP on December 9, 2022.

After U4U launched and Ukrainian citizens with approved applications were provided the option to fly directly into the United States— coupled with the return to Mexico pursuant to the Title 42 public health Order of Ukrainians

21 Id.

| Ukraine SWB encounters | | | |
|---|---|---|---|
| 1-Apr | 474 | | |
| 2-Apr | 557 | | |
| 3-Apr | 578 | average UKR encounters in two weeks ending 4/20 | 937.5714 |
| 4-Apr | 593 | Average UKR encounters in two weeks ending 5/10 | 12.4 |
| 5-Apr | 601 | | |
| 6-Apr | 780 | | |
| 7-Apr | 831 | | |
| 8-Apr | 1052 | | |
| 9-Apr | 838 | | |
| 10-Apr | 1004 | | |
| 11-Apr | 834 | | |
| 12-Apr | 1171 | | |
| 13-Apr | 1274 | | |
| 14-Apr | 1100 | | |
| 15-Apr | 1089 | | |
| 16-Apr | 941 | | |
| 17-Apr | 986 | | |
| 18-Apr | 543 | | |
| 19-Apr | 804 | | |
| 20-Apr | 659 | | |
| 21-Apr | 773 | | |
| 22-Apr | 687 | | |
| 23-Apr | 742 | | |
| 24-Apr | 818 | | |
| 25-Apr | 312 | | |
| 26-Apr | 10 | | |
| 27-Apr | 4 | | |
| 28-Apr | 8 | | |
| 29-Apr | 5 | | |
| 30-Apr | 8 | | |
| 1-May | 14 | | |
| 2-May | 21 | | |
| 3-May | 27 | | |
| 4-May | 11 | | |
| 5-May | 3 | | |
| 6-May | 24 | | |
| 7-May | 20 | | |
| 8-May | 6 | | |
| 9-May | 14 | | |
| 10-May | 9 | | |

IFR_AR_009020

| | |
|---|---|
| 11-May | 6 |
| 12-May | 17 |
| 13-May | 13 |
| 14-May | 3 |
| 15-May | 6 |
| 16-May | 35 |
| 17-May | 18 |
| 18-May | 18 |
| 19-May | 21 |
| 20-May | 10 |
| 21-May | 4 |
| 22-May | 9 |
| 24-May | 3 |
| 25-May | 2 |
| 26-May | 14 |
| 27-May | 2 |
| 28-May | 27 |
| 29-May | 7 |
| 30-May | 1 |
| 31-May | 10 |

Source: UIP downloaded 12/9/22

IFR_AR_009021

who sought to cross irregularly at the land border—daily SWB encounters of Ukrainians dropped to an average of just over 12 per day in the two weeks ending May 10, 2022

IFR_AR_009022

Similarly, within a week of the announcement of the Venezuela parole process on October 12, 2022, the number of Venezuelans encountered at the SWB fell drastically, from an average of over 1,100 a day from October 5–1[

22 USBP encountered an average of 225 Venezuelans per day in November 2022 and 199 per day in December 2022. OIS analysis of data pulled from CBP UIP on January 23, 2023. Data are limited to USBP encounters to exclude those being paroled in through ports of

Data are limited to USBP encounters to exclude those being paroled in through ports of entry. USBP encountered an average of 225 Venezuelans per day in November 2022 and 199 per day in December 2022; OIS analysis o[

USBP encounters of Venezuela nationals

| Date | Encounters | | Average | |
|------|-----------|---|---------|---|
| 1-Oct | 1240 | Average encounters 10/5 - 10/11/22 | 1137 |
| 2-Oct | 1510 | Average encounters 10/18 - 10/24 | 170 |
| 3-Oct | 1366 | Average encounters 11/23 - 11/29 | 67 |
| 4-Oct | 1260 | Average encounter 1/16 - 1/22 | 28 |
| 5-Oct | 1139 | Average encounters Nov. 2022 | 225 |
| 6-Oct | 1174 | Average encounters Dec. 2022 | 199 |
| 7-Oct | 1083 | | |
| 8-Oct | 1006 | | |
| 9-Oct | 1202 | | |
| 10-Oct | 1224 | | |
| 11-Oct | 1128 | | |
| 12-Oct | 796 | | |
| 13-Oct | 1256 | | |
| 14-Oct | 1056 | | |
| 15-Oct | 834 | | |
| 16-Oct | 484 | | |
| 17-Oct | 298 | | |
| 18-Oct | 187 | | |
| 19-Oct | 158 | | |
| 20-Oct | 159 | | |
| 21-Oct | 132 | | |
| 22-Oct | 145 | | |
| 23-Oct | 160 | | |
| 24-Oct | 247 | | |
| 25-Oct | 296 | | |
| 26-Oct | 415 | | |
| 27-Oct | 301 | | |
| 28-Oct | 408 | | |
| 29-Oct | 405 | | |
| 30-Oct | 331 | | |
| 31-Oct | 430 | | |
| 1-Nov | 412 | | |
| 2-Nov | 331 | | |
| 3-Nov | 305 | | |
| 4-Nov | 348 | | |
| 5-Nov | 250 | | |
| 6-Nov | 239 | | |
| 7-Nov | 265 | | |
| 8-Nov | 263 | | |

| Date | Value |
|---|---|
| 9-Nov | 262 |
| 10-Nov | 262 |
| 11-Nov | 341 |
| 12-Nov | 193 |
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |
| 18-Nov | 212 |
| 19-Nov | 91 |
| 20-Nov | 118 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 81 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 87 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 126 |
| 5-Dec | 120 |
| 6-Dec | 84 |
| 7-Dec | 144 |
| 8-Dec | 49 |
| 9-Dec | 87 |
| 10-Dec | 101 |
| 11-Dec | 161 |
| 12-Dec | 113 |
| 13-Dec | 157 |
| 14-Dec | 116 |
| 15-Dec | 145 |
| 16-Dec | 91 |
| 17-Dec | 146 |
| 18-Dec | 189 |
| 19-Dec | 231 |
| 20-Dec | 254 |
| 21-Dec | 362 |
| 22-Dec | 723 |
| 23-Dec | 267 |
| 24-Dec | 301 |
| 25-Dec | 253 |

IFR_AR_009024

| | |
|---|---|
| 26-Dec | 234 |
| 27-Dec | 350 |
| 28-Dec | 232 |
| 29-Dec | 257 |
| 30-Dec | 261 |
| 31-Dec | 327 |
| 1-Jan | 309 |
| 2-Jan | 280 |
| 3-Jan | 270 |
| 4-Jan | 366 |
| 5-Jan | 143 |
| 6-Jan | 98 |
| 7-Jan | 77 |
| 8-Jan | 61 |
| 9-Jan | 70 |
| 10-Jan | 73 |
| 11-Jan | 56 |
| 12-Jan | 57 |
| 13-Jan | 35 |
| 14-Jan | 50 |
| 15-Jan | 40 |
| 16-Jan | 43 |
| 17-Jan | 21 |
| 18-Jan | 28 |
| 19-Jan | 25 |
| 20-Jan | 33 |
| 21-Jan | 24 |
| 22-Jan | 25 |

UIP Data downloaded 1.23.23

IFR_AR_009025

l to under 200 per day from October 18–24, and further declined to 67 per day as of the week ending November 29, 2022, and 28 per day the week ending January 2:
entry.

of data pulled from CBP UIP on January 10, 2023.

IFR_AR_009026

Between the announcement of these processes on January 5, 2023, and January 21, the number of daily encounters between ports of entry of Cuban, Haitian, and Nicaraguan nationals dropped from 928 to 92, a 92 percent decline.

23 OIS analysis of data pulled from CBP UIP on January 23, 2023.

CHN change Jan 5 - Jan 22    **-92%**

USBP encounters by selected citizenships

| | Cuba | Haiti | Nicaragua | CHN |
|---|---|---|---|---|
| 1-Jan | 289 | 3 | 175 | 467 |
| 2-Jan | 487 | 1 | 203 | 691 |
| 3-Jan | 795 | 1 | 251 | 1047 |
| 4-Jan | 592 | 3 | 170 | 765 |
| 5-Jan | 591 | 3 | 334 | **928** |
| 6-Jan | 625 | | 175 | 800 |
| 7-Jan | 679 | 2 | 172 | 853 |
| 8-Jan | 574 | | 117 | 691 |
| 9-Jan | 450 | 1 | 124 | 575 |
| 10-Jan | 161 | 1 | 102 | 264 |
| 11-Jan | 189 | 5 | 160 | 354 |
| 12-Jan | 113 | | 158 | 271 |
| 13-Jan | 80 | | 155 | 235 |
| 14-Jan | 112 | 6 | 95 | 213 |
| 15-Jan | 66 | | 122 | 188 |
| 16-Jan | 19 | 4 | 91 | 114 |
| 17-Jan | 42 | | 122 | 164 |
| 18-Jan | 26 | 2 | 82 | 110 |
| 19-Jan | 56 | | 102 | 158 |
| 20-Jan | 23 | 1 | 87 | 111 |
| 21-Jan | 29 | 3 | 41 | 73 |
| 22-Jan | 33 | 4 | 55 | **92** |

UIP data downloaded 1/23/23

IFR_AR_009027

Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in excess of one million per year, with USBP averaging 1.2 million encounters per year from Fiscal Year (''FY'') 1983 th

29 OIS analysis of historic USBP data. Encounter data prior to 2005 are only available for U.S. Border Patrol. All numbers in this paragraph are likewise therefore limited to USBP encounters.

By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with USBP averaging fewer than 400,000 encounters per year from 2011–2018.

30 *Id.*

These gains were subsequently reversed, however, as USBP SWB encounters more than doubled between 2017 and 2019 to reach a 12-year high.

31 *Id.*

Following a steep drop in the first months of the COVID–19 pandemic, encounters almost doubled again in 2021 as compared to 2019, increased by an additional one-third between 2021 and 2022, and reached an all-time high of 2.

32 *Id* . As discussed in the following section, encounter data from March 2020 through the current data somewhat overstate flows to the border since repeat encounters have been markedly higher during the period that Title 42 expulsions have been completed.

USBP SWB Encounters

| Year | Encounters | | |
|------|-----------|---|---|
| 1960 | 21,022 | | |
| 1961 | 21,745 | average FY1983-2006 | 1,190,461 |
| 1962 | 21,103 | average FY2011-2018 | 377,364 |
| 1963 | 29,644 | Factor increase from 2017-2019 | 2.80 |
| 1964 | 32,519 | Factor increase from 2019-2021 | 1.95 |
| 1965 | 40,020 | Factor increase from 2021-22 | 1.33 |
| 1966 | 62,640 | 2022 all time high | 2,206,437 |
| 1967 | 73,973 | | |
| 1968 | 96,641 | | |
| 1969 | 137,968 | | |
| 1970 | 201,780 | | |
| 1971 | 263,991 | | |
| 1972 | 321,326 | | |
| 1973 | 441,066 | | |
| 1974 | 571,606 | | |
| 1975 | 512,264 | | |
| 1976 | 607,499 | | |
| 1977 | 733,193 | | |
| 1978 | 789,441 | | |
| 1979 | 795,798 | | |
| 1980 | 690,554 | | |
| 1981 | 749,808 | | |
| 1982 | 745,820 | | |
| 1983 | 1,033,974 | | |
| 1984 | 1,058,276 | | |
| 1985 | 1,183,351 | | |
| 1986 | 1,615,844 | | |
| 1987 | 1,122,067 | | |
| 1988 | 942,561 | | |
| 1989 | 852,506 | | |
| 1990 | 1,049,321 | | |
| 1991 | 1,077,876 | | |
| 1992 | 1,145,574 | | |
| 1993 | 1,212,886 | | |
| 1994 | 979,101 | | |
| 1995 | 1,271,390 | | |

IFR_AR_009028

| | |
|------|-----------|
| 1996 | 1,507,020 |
| 1997 | 1,368,707 |
| 1998 | 1,516,680 |
| 1999 | 1,537,000 |
| 2000 | 1,643,679 |
| 2001 | 1,235,718 |
| 2002 | 929,809 |
| 2003 | 905,065 |
| 2004 | 1,139,282 |
| 2005 | 1,171,396 |
| 2006 | 1,071,972 |
| 2007 | 858,638 |
| 2008 | 705,005 |
| 2009 | 540,865 |
| 2010 | 447,731 |
| 2011 | 327,577 |
| 2012 | 356,873 |
| 2013 | 414,397 |
| 2014 | 479,370 |
| 2015 | 331,333 |
| 2016 | 408,870 |
| 2017 | 303,916 |
| 2018 | 396,579 |
| 2019 | 851,508 |
| 2020 | 400,635 |
| 2021 | 1,659,206 |
| 2022 | 2,206,437 |

Source: USBP historic data
Note: Data are limited to USBP encounters.

IFR_AR_009029

rough FY 2006

.2 million USBP SWB encounters in FY 2022

IFR_AR_009030

Encounters in the first quarter of FY 2023 (October–December 2022) exceeded the same period in FY 2022 by more than a third, and non- Mexican encounters in this same period were up 61 percent over the previous year.

33 OIS Persist data through December 31, 2022.

| Sum of co | Column Labels | | | | |
|---|---|---|---|---|---|
| Row Label | Mexico | NTriangle | Other | Grand Tot | OTM |
| **2022** | **808340** | **541618** | **1028987** | **2378945** | 1570605 |
| 10 | 66049 | 51036 | 47752 | 164837 | 98788 |
| 11 | 63846 | 50238 | 60761 | 174845 | 110999 |
| 12 | 51475 | 48024 | 79754 | 179253 | 127778 |
| 1 | 60341 | 31677 | 62856 | 154874 | 94533 |
| 2 | 71850 | 39436 | 54724 | 166010 | 94160 |
| 3 | 88132 | 46008 | 88434 | 222574 | 134442 |
| 4 | 82568 | 43999 | 109218 | 235785 | 153217 |
| 5 | 77454 | 50178 | 113505 | 241137 | 163683 |
| 6 | 66730 | 57948 | 83156 | 207834 | 141104 |
| 7 | 55692 | 48504 | 95966 | 200162 | 144470 |
| 8 | 60772 | 38575 | 104740 | 204087 | 143315 |
| 9 | 63431 | 35995 | 128121 | 227547 | 164116 |
| **2023** | **173723** | **101009** | **442932** | **717664** | 543941 |
| 10 | 66220 | 35005 | 130052 | 231277 | 165057 |
| 11 | 59320 | 33208 | 142368 | 234896 | 175576 |
| 12 | 48183 | 32796 | 170512 | 251491 | 203308 |
| **Grand Tot** | **3688450** | **3278261** | **2298526** | **9265237** | 5576787 |

| | Total | OTM |
|---|---|---|
| Percent increase between FY22Q1 and FY23Q1 | 38% | 61% |

source: OIS Persist through December 2022

Shifts in migrants' demographics have accelerated the increase in flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reason
34 According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. On Mexican migrants from this era's demographics and economic

|      | Apprehensions of EWIs: total | Apprehensions of EWIs: Mexican nationals | Mx% total |
|------|-----------|-----------|------|
| 1981 | 898,550   | 894,771   | 100% |
| 1982 | 902,463   | 870,806   | 96%  |
| 1983 | 1,190,198 | 1,157,948 | 97%  |
| 1984 | 1,196,353 | 1,159,101 | 97%  |
| 1985 | 1,300,691 | 1,291,734 | 99%  |
| 1986 | 1,720,321 | 1,661,997 | 97%  |
| 1987 | 1,166,983 | 1,133,092 | 97%  |
| 1988 | 985,479   | 943,147   | 96%  |
| 1989 | 922,443   | 914,516   | 99%  |
| 1990 | 1,131,454 | 1,080,699 | 96%  |
| 1991 | 1,161,495 | 1,120,099 | 96%  |
| 1992 | 1,225,993 | 1,193,455 | 97%  |
| 1993 | 1,294,256 | 1,258,009 | 97%  |
| 1994 | 1,064,068 | 1,029,039 | 97%  |
| 1995 | 1,365,171 | 1,330,017 | 97%  |
| 1996 | 1,620,033 | 1,586,492 | 98%  |
| 1997 | 1,499,267 | 1,463,573 | 98%  |
| 1998 | 1,627,748 | 1,598,903 | 98%  |
| 1999 | 1,654,011 | 1,614,492 | 98%  |
| 2000 | 1,763,371 | 1,728,422 | 98%  |

OIS Yearbooks, various years
Note: Limited to USBP. Data pulled from PDF copies of OIS Yearbook of Immigration Statistics, various years. Reported percentages are based on annual tables describing apprehensions of persons who entered without inspection by citizensh

IFR_AR_009032

s

: motivations, see Jorge Durand et al., ''The New Era of Mexican Migration to the United States,'' 86 The Journal of American History, no. 2, 518 (1999) (addressing the demographics and economic motivations of Mexican migrants from this era).

hip. Since these data required manual processing, only a representative sample of years are included in the table.

IFR_AR_009033

Beginning in the 2010s, a growing share of migrants have been from Northern Central America (''NCA'') and, since the late 2010s, from countries throughout the Americas.

36 According to OIS Production data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total enc

Total encounters by citizenship grouping

| | Mexico | N. Central | Other Cou | Total | | Mexico | N. Central | Other Cou | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | 467,461 | 43,590 | 16,362 | 527,413 | | 89% | 8% | 3% | 100% |
| 2011 | 344,013 | 40,505 | 16,540 | 401,058 | | 86% | 10% | 4% | 100% |
| 2012 | 316,890 | 88,322 | 20,893 | 426,105 | | 74% | 21% | 5% | 100% |
| 2013 | 317,559 | 140,441 | 31,607 | 489,607 | | 65% | 29% | 6% | 100% |
| 2014 | 285,499 | 248,063 | 36,483 | 570,045 | | 50% | 44% | 6% | 100% |
| 2015 | 253,656 | 142,341 | 48,855 | 444,852 | | 57% | 32% | 11% | 100% |
| 2016 | 255,669 | 227,456 | 75,403 | 558,528 | | 46% | 41% | 14% | 100% |
| 2017 | 180,929 | 187,534 | 46,117 | 414,580 | | 44% | 45% | 11% | 100% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | | 43% | 50% | 8% | 100% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | | 24% | 64% | 12% | 100% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | | 65% | 23% | 12% | 100% |
| 2021 | 655,591 | 701,049 | 378,043 | 1,696,569 | | 39% | 41% | 22% | 100% |
| 2022 | 808,340 | 541,618 | ####### | 2,378,945 | | 34% | 23% | 43% | 100% |

| | NCA | All other |
|---|---|---|
| FY10-13 average | 17% | 5% |
| FY14-19 average | 46% | 10% |

OIS Production data

IFR_AR_009034

ounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 p

IFR_AR_009035

ercent of total encounters in FY 2014–FY 2019.

IFR_AR_009036

As the make-up of border crossers has expanded from Mexican single adults to single adults and families from throughout the hemisphere (and beyond), the number of encounters has increased; those encountered also have be

37 For noncitizens encountered at the SWB in FY 2014–FY 2019 who were placed in expedited removal, 6 percent of Mexican nationals made fear claims that were referred to USCIS for adjudication compared to 57 percent of people from Northern Central America and

|  | Mexico | NCA | Other |
|---|---|---|---|
| Total placed in ER | 584,459 | 512,937 | 138,435 |
| ER: subset making APSO fear claims | 33,618 | 291,437 | 125,269 |
| % of ER making fear claims | 6% | 57% | 90% |

Source: OIS Enforcement Lifecycle hrough 9/30/22.

| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Encounters[1] | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 416,485 | ###### | ###### | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | 273,438 |
| T8 Encounters | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 223,174 | 521,398 | ###### | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | 124,061 |
| Placed in ER (ER Dispositions)[2] | 236,062 | 229,165 | 180,589 | 227,910 | 160,303 | 214,667 | 223,197 | 91,719 | 84,687 | 119,664 | 150,114 | 122,801 | 111,696 | 109,181 | 68,916 | 87,069 | 84,796 | 53,712 |
| APSO fear claims[3] | 36,025 | 48,649 | 46,387 | 92,689 | 68,700 | 95,633 | 98,266 | 23,946 | 48,559 | 44,840 | 2,664 | 4,934 | 6,768 | 7,594 | 3,922 | 6,037 | 4,363 | 5,956 |
| Referred to EOIR[4] | 32,000 | 37,793 | 36,951 | 80,202 | 58,784 | 82,418 | 78,182 | 12,640 | 38,126 | 31,114 | 2,136 | 3,307 | 4,067 | 5,394 | 2,912 | 3,981 | 1,951 | 1,960 |
| Still in proceedings[5] | 6,931 | 9,870 | 10,675 | 26,405 | 23,776 | 36,896 | 37,644 | 8,040 | 28,395 | 20,493 | 259 | 602 | 871 | 1,418 | 986 | 1,311 | 790 | 1,228 |
| EOIR case completion[6] | 25,069 | 27,923 | 26,276 | 53,797 | 35,008 | 45,522 | 40,538 | 4,600 | 9,731 | 10,621 | 1,877 | 2,705 | 3,196 | 3,976 | 1,926 | 2,670 | 1,161 | 732 |
| Relief[7] | 6,471 | 5,640 | 5,374 | 8,335 | 4,693 | 5,933 | 5,119 | 957 | 367 | 103 | 305 | 303 | 288 | 272 | 127 | 168 | 47 | 14 |
| Relief on merits[8] | 3,451 | 4,631 | 5,264 | 8,195 | 4,629 | 5,878 | 5,081 | 954 | 362 | 101 | 77 | 215 | 264 | 251 | 119 | 161 | 42 | 14 |
| Other relief[9] | 3,020 | 1,009 | 110 | 140 | 64 | 55 | 38 | 3 | 5 | 2 | 228 | 88 | 24 | 21 | 8 | 7 | 5 | |
| Removal Order + VD[10] | 13,977 | 17,306 | 16,556 | 35,422 | 21,900 | 25,397 | 19,034 | 1,799 | 2,015 | 1,210 | 1,070 | 1,704 | 2,098 | 2,767 | 1,310 | 1,944 | 882 | 275 |
| Absentia | 7,115 | 6,907 | 5,213 | 12,768 | 8,832 | 11,916 | 4,561 | 262 | 1,104 | 678 | 401 | 569 | 588 | 890 | 520 | 533 | 95 | 45 |
| Confirmed departure | 666 | 563 | 401 | 683 | 424 | 442 | 231 | 22 | 11 | 5 | 33 | 41 | 52 | 70 | 31 | 25 | 7 | 4 |
| No confirmed departure | 6,449 | 6,344 | 4,812 | 12,085 | 8,408 | 11,474 | 4,330 | 240 | 1,093 | 673 | 368 | 528 | 536 | 820 | 489 | 508 | 88 | 41 |
| Not absentia | 6,862 | 10,399 | 11,343 | 22,654 | 13,068 | 13,481 | 14,473 | 1,537 | 911 | 532 | 669 | 1,135 | 1,510 | 1,877 | 790 | 1,411 | 787 | 230 |
| Confirmed departure | 3,329 | 4,905 | 4,611 | 6,503 | 5,609 | 6,791 | 10,503 | 724 | 319 | 224 | 458 | 608 | 850 | 1,030 | 485 | 1,103 | 698 | 180 |
| No confirmed departure | 3,533 | 5,494 | 6,732 | 16,151 | 7,459 | 6,690 | 3,970 | 813 | 592 | 308 | 211 | 527 | 660 | 847 | 305 | 308 | 89 | 50 |
| Terminate/Dismiss/closure/other | 4,621 | 4,977 | 4,346 | 10,040 | 8,415 | 14,192 | 16,385 | 1,844 | 7,349 | 9,308 | 502 | 698 | 810 | 937 | 489 | 558 | 232 | 443 |

Notes: Results based on source data as of October, 2022 and OIS Enforcement Lifecycle methodology as of May 31, 2021. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter

[1] Excludes Accompanied Minors (AM), Unaccompanied  and OFO administrative cases including, crewmembers, parolee, and withdrawals.

[2] Includes the following dispositions:'ER', 'ER/CF', 'ER/LR', 'VWP/CF', 'STW/CF', 'WD/ER'

[3] Includes individulas placed in ER and found to have a credible fear case in APSO.

[4] Includes USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[5] Includes 'EOIR BIA Appeal', 'EOIR Change of Venue', 'EOIR Fear Vacated', 'EOIR Rescinded', 'EOIR Transfer', 'EOIR Zero Bond' and cases with no EOIR case outcome.

[6] Includes cases with the following EOIR outcomes: 'Terminated/Dismissal/Other', 'Relief not on merit', 'Relief on merit', and 'Final order/voluntary departure'.

[7] Includes cases with relief on merits and other types of relief.

[8] Includes cases with the following EOIR outcomes: 'EOIR Granted Relief', 'EOIR Withholding'

[9] Includes cases with the following EOIR outcomes: 'EOIR TPS', 'EOIR PD - Admin Close'.

[10] Includes cases with the following EOIR outcomes:'EOIR Removal Order','EOIR VD','EOIR Withdraw','EOIR Abandonment','EOIR Deny','EOIR Fear Affirmed'.

[11] Includes cases with the following EOIR outcomes: 'EOIR Admin Close', 'EOIR Failure to Prosecute', 'EOIR Terminated', 'EOIR Other'.

IFR_AR_009037

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

IFR_AR_009038

en more likely to seek asylum and other forms of relief
90 percent of all other nationalities. OIS analysis of Enforcement Lifecycle data as of September 30, 2022.

| FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 621,695 | 764,734 | 118,844 | 193,670 | 111,654 | 175,034 | 150,057 | 213,694 | 559,163 | 90,956 | 586,427 | 426,639 | 26,849 | 17,350 | 16,766 | 32,127 | 31,105 | 37,503 | 113,061 | 52,091 | 370,495 | 995,783 |
| 44,006 | 74,246 | 118,844 | 193,670 | 111,654 | 175,034 | 150,057 | 213,694 | 559,163 | 55,665 | 190,013 | 82,172 | 26,849 | 17,350 | 16,766 | 32,127 | 31,105 | 37,503 | 113,061 | 43,448 | 287,379 | 953,436 |
| 8,797 | 18,932 | 74,046 | 94,379 | 56,737 | 99,629 | 70,347 | 99,938 | 91,907 | 24,988 | 5,802 | 16,312 | 11,902 | 11,985 | 12,156 | 19,100 | 21,040 | 27,660 | 46,494 | 13,019 | 70,088 | 84,420 |
| 343 | 247 | 24,064 | 33,498 | 28,883 | 68,579 | 47,358 | 63,213 | 49,906 | 6,350 | 1,500 | 2,150 | 9,297 | 10,217 | 10,736 | 16,516 | 17,420 | 26,383 | 43,997 | 11,640 | 46,716 | 42,443 |
| 164 | 93 | 20,914 | 25,176 | 22,947 | 59,491 | 40,233 | 53,553 | 37,441 | 2,080 | 790 | 1,117 | 8,950 | 9,310 | 9,937 | 15,317 | 15,639 | 24,884 | 38,790 | 8,600 | 37,172 | 29,904 |
| 81 | 66 | 5,069 | 7,130 | 7,050 | 19,763 | 17,358 | 25,715 | 19,453 | 1,399 | 536 | 757 | 1,603 | 2,138 | 2,754 | 5,224 | 5,432 | 9,870 | 17,401 | 5,413 | 27,778 | 19,670 |
| 83 | 27 | 15,845 | 18,046 | 15,897 | 39,728 | 22,875 | 27,838 | 17,988 | 681 | 254 | 360 | 7,347 | 7,172 | 7,183 | 10,093 | 10,207 | 15,014 | 21,389 | 3,187 | 9,394 | 10,234 |
| 2 | | 3,217 | 2,664 | 2,126 | 4,007 | 1,696 | 1,708 | 593 | 21 | 6 | 1 | 2,949 | 2,673 | 2,960 | 4,056 | 2,870 | 4,057 | 4,479 | 922 | 359 | 102 |
| 1 | | 1,047 | 1,927 | 2,055 | 3,899 | 1,645 | 1,670 | 577 | 20 | 6 | | 2,327 | 2,489 | 2,945 | 4,045 | 2,865 | 4,047 | 4,462 | 920 | 355 | 101 |
| 1 | | 2,170 | 737 | 71 | 108 | 51 | 38 | 16 | 1 | | 1 | 622 | 184 | 15 | 11 | 5 | 10 | 17 | 2 | 4 | 1 |
| 37 | 12 | 9,765 | 12,122 | 11,033 | 27,779 | 15,495 | 18,178 | 10,847 | 400 | 106 | 111 | 3,142 | 3,480 | 3,425 | 4,876 | 5,095 | 5,275 | 7,305 | 1,124 | 1,872 | 1,087 |
| 1 | | 5,055 | 4,681 | 3,687 | 10,474 | 7,154 | 9,959 | 3,391 | 68 | 18 | 45 | 1,659 | 1,657 | 938 | 1,404 | 1,158 | 1,424 | 1,075 | 149 | 1,085 | 633 |
| | | 483 | 368 | 211 | 460 | 294 | 269 | 83 | 2 | | | 150 | 154 | 138 | 153 | 99 | 148 | 141 | 16 | 11 | 5 |
| 1 | | 4,572 | 4,313 | 3,476 | 10,014 | 6,860 | 9,690 | 3,308 | 66 | 18 | 45 | 1,509 | 1,503 | 800 | 1,251 | 1,059 | 1,276 | 934 | 133 | 1,074 | 628 |
| 36 | 12 | 4,710 | 7,441 | 7,346 | 17,305 | 8,341 | 8,219 | 7,456 | 332 | 88 | 66 | 1,483 | 1,823 | 2,487 | 3,472 | 3,937 | 3,851 | 6,230 | 975 | 787 | 454 |
| 29 | 10 | 2,439 | 3,605 | 2,569 | 3,763 | 2,828 | 3,433 | 5,983 | 263 | 65 | 46 | 432 | 692 | 1,192 | 1,710 | 2,296 | 2,255 | 3,822 | 281 | 225 | 168 |
| 7 | 2 | 2,271 | 3,836 | 4,777 | 13,542 | 5,513 | 4,786 | 1,473 | 69 | 23 | 20 | 1,051 | 1,131 | 1,295 | 1,762 | 1,641 | 1,596 | 2,408 | 694 | 562 | 286 |
| 44 | 15 | 2,863 | 3,260 | 2,738 | 7,942 | 5,684 | 7,952 | 6,548 | 260 | 142 | 248 | 1,256 | 1,019 | 798 | 1,161 | 2,242 | 5,682 | 9,605 | 1,141 | 7,163 | 9,045 |

r. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

IFR_AR_009039

The application of Title 42 authorities at the land border also has altered migratory patterns, in part by incentivizing individuals who are expelled—without being issued a removal order, which, unlike a Title 42 expulsion order, ca

39 According to OIS analysis of OIS Persist Data through June 30, 2022, a total of 39 percent of noncitizens expelled under the Title 42 authority between March 2020 and May 2022 were reencountered within one month, compared to 5 percent of those repatriated after issua

Counts

| | total Repatriations | | 1-Month Rencounters | | 12-month Reencounters | |
| | T8 Repatriations | T42 Expulsions | T8 Repatriations | T42 Expulsions | T8 Repatriations | T42 Expulsions |
|---|---|---|---|---|---|---|
| Mexico | 174,054 | 1,274,129 | 13,864 | 550,612 | 32,147 | 657,273 |
| NCA | 47,747 | 700,585 | 520 | 230,901 | 6,783 | 284,217 |
| Other | 95,198 | 143,349 | 952 | 43,647 | 3,906 | 47,147 |
| Total | 316,999 | 2,118,063 | 15,336 | 825,160 | 42,836 | 988,637 |

Rates

| | 1-Month Rencounters | | 12-month Reencounters | |
| | T8 Repatriations | T42 Expulsions | T8 Repatriations | T42 Expulsions |
|---|---|---|---|---|
| Mexico | 8% | 43% | 18% | 52% |
| NCA | 1% | 33% | 14% | 41% |
| Other | 1% | 30% | 4% | 33% |
| Total | 5% | 39% | 14% | 47% |

Source: OIS analysis of Persist Dataset as of June 30, 2022.
Note: OIS linked each repatriation (removal, return, or expulsion) to any future SWB encounters and calculated the proportion of repatriations that could be linked to a re-encounter of the same unique individual within 12 mont

IFR_AR_009040

rries immigration consequences—to try to re-enter, often multiple times.

nce of a removal order issued pursuant to Title 8 authorities; and 12-month re-encounter rates were 47 percent for Title 42 expulsions compared to 14 percent for Title 8 repatriations. Persons expelled under the Title 42 authority were more likely to be reencountered than those re

ths of the initial repatriation date.

IFR_AR_009041

patriated after issuance of a removal order issued pursuant to Title 8 authorities, regardless of citizenship or family status.

IFR_AR_009042

For this reason, the growth in encounters since 2021 is best assessed by comparing unique encounters—defined as the number of individuals who are encountered in a given year, instead of the total number of encounters, which c

40 The period FY 2014–FY 2019 is chosen as the comparison period because these were the first years in which non-Mexicans consistently accounted for a large and growing share of SWB encounters. The period since FY 2021 focuses on unique encounters, defined as perso

| Row Label: NA | | Repeat | Unique | Grand Total | |
|---|---|---|---|---|---|
| 2013 | 12,153 | 111,906 | 365,553 | 489,612 | 23% |
| 2014 | 25,381 | 108,969 | 435,698 | 570,048 | 19% |
| 2015 | 41,383 | 78,574 | 324,899 | 444,856 | 18% |
| 2016 | 53,905 | 77,986 | 427,100 | 558,991 | 14% |
| 2017 | 30,007 | 54,275 | 330,917 | 415,199 | 13% |
| 2018 | 21,560 | 63,874 | 434,510 | 519,944 | 12% |
| 2019 | 19,820 | 83,250 | 874,159 | 977,229 | 9% |
| 2020 | 8,849 | 149,215 | 300,002 | 458,066 | 33% |
| 10 | 1,524 | 8,542 | 35,073 | 45,139 | 19% |
| 11 | 1,433 | 8,116 | 33,093 | 42,642 | 19% |
| 12 | 1,271 | 7,797 | 31,495 | 40,563 | 19% |
| 1 | 1,055 | 7,885 | 27,643 | 36,583 | 22% |
| 2 | 1,108 | 7,831 | 27,747 | 36,686 | 21% |
| 3 | 739 | 8,481 | 25,237 | 34,457 | 25% |
| 4 | 112 | 7,884 | 9,110 | 17,106 | 46% |
| 5 | 239 | 10,866 | 12,132 | 23,237 | 47% |
| 6 | 308 | 14,739 | 17,982 | 33,029 | 45% |
| 7 | 304 | 18,542 | 22,103 | 40,949 | 45% |
| 8 | 370 | 23,072 | 26,565 | 50,007 | 46% |
| 9 | 386 | 25,460 | 31,822 | 57,668 | 44% |
| 2021 | 7,736 | 600,170 | 1,126,777 | 1,734,683 | 35% |
| 2022 | 37,446 | 600,070 | 1,741,429 | 2,378,945 | 25% |
| 2023 | 3,580 | 116,734 | 597,350 | 717,664 | 16% |

% Repeat
15% FY13-2/2020
28% Since April 2020

Source: OIS Persist Dataset based on data through November 2022

IFR_AR_009043

can include a single migrant who sought to enter multiple times and is counted as an encounter each time—in recent months to those in the pre-pandemic period of FY 2014–FY 2019

ons not previously encountered in the 12 months prior to the referenced encounter date, because Title 42 has contributed to much higher repeat encounter rates, as 28 percent of SWB encounters since April 2020 have been repeat encounters, where repeat encounters are def

IFR_AR_009044

ined as encounters of individuals previously encountered in the preceding 12 months, compared to 15 percent of SWB encounters in FY 2013 through February 2020. OIS Persist Dataset based on data through December 31, 2022. (Detailed data on repeat versus unique en

IFR_AR_009045

counters are not available before FY 2013.)

IFR_AR_009046

The number of unique encounters increased sharply in FY 2021 to 1,126,888 (and 1,734,683 total encounters) from an average of 471,216 unique encounters (and 581,045 total encounters) per year in FY 2014–FY 2019.

41 OIS Persist Dataset based on data through December 31, 2022.

Notably, both the number and percentage of unique encounters from countries other than Mexico and NCA contributed to a big share of this increase, rising sharply in FY 2021 to 322,123 (representing 29 percent of unique encounter

42 Id.

This trend continued in FY 2022, with unique encounters reaching 1,741,506 (2,378,945 total encounters). This increase was largely driven by nationals of countries other than Mexico and NCA, accounting for 972,191 unique encou

43 Id.

<u>Unique</u> SWB Encounters by Selected citizenships

| | Mex | NCA | CHNV | BCEP | All Other | Total | | All non-Mx/non-NCA | Mex | NCA | CHNV | BCEP | All Other | Mex+NCA | All Others |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY2013 | 215,224 | 123,717 | 12,451 | 5,458 | 8,706 | 365,556 | | 26,615 | 59% | 34% | 3% | 1% | 2% | 93% | 7% |
| FY2014 | 193,766 | 224,207 | 2,540 | 6,495 | 8,697 | 435,705 | | 17,732 | 44% | 51% | 1% | 1% | 2% | 96% | 4% |
| FY2015 | 179,939 | 128,459 | 1,733 | 4,740 | 10,028 | 324,899 | | 16,501 | 55% | 40% | 1% | 1% | 3% | 95% | 5% |
| FY2016 | 181,555 | 214,084 | 8,089 | 8,292 | 15,081 | 427,101 | 2014-19 avg  471,216 | 31,462 | 43% | 50% | 2% | 2% | 4% | 93% | 7% |
| FY2017 | 123,264 | 176,723 | 12,553 | 6,883 | 11,495 | 330,918 | | 30,931 | 37% | 53% | 4% | 2% | 3% | 91% | 9% |
| FY2018 | 153,079 | 245,458 | 11,443 | 8,247 | 16,283 | 434,510 | | 35,973 | 35% | 56% | 3% | 2% | 4% | 92% | 8% |
| FY2019 | 165,252 | 598,214 | 56,981 | 33,076 | 20,640 | 874,163 | | 110,697 | 19% | 68% | 7% | 4% | 2% | 87% | 13% |
| FY2020 | 178,841 | 80,604 | 15,855 | 14,883 | 9,830 | 300,013 | | 40,568 | 60% | 27% | 5% | 5% | 3% | 86% | 14% |
| FY2021 | 315,968 | 488,797 | 169,436 | 123,330 | 29,357 | 1,126,888 | | 322,123 | 28% | 43% | 15% | 11% | 3% | 71% | 29% |
| FY2022 | 397,032 | 372,283 | 605,690 | 246,172 | 120,329 | 1,741,506 | | 972,191 | 23% | 21% | 35% | 14% | 7% | 44% | 56% |
| FY23Q1 | 98,121 | 74,699 | 240,487 | 113,537 | 70,506 | 597,350 | | 424,530 | 16% | 13% | 40% | 19% | 12% | 29% | 71% |

Source: OIS Unique Encounters pivot table, December 2022 data

average 14-19  40,549          2013-2018 average  7%
                               14-19 average  8%

<u>Total</u> SWB Encounters by Selected Citizenships

| | Mex | NCA | CHNV | BCEP | All Other | Total | | All non-Mx/non-NCA | Mex | NCA | CHNV | BCEP | All Other | Mex+NCA | All Others |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY2013 | 317,562 | 140,442 | 16,320 | 5,728 | 9,560 | 489,612 | | 31,608 | 65% | 29% | 3% | 1% | 2% | 94% | 6% |
| FY2014 | 285,502 | 248,063 | 20,009 | 6,745 | 9,729 | 570,048 | | 36,483 | 50% | 44% | 4% | 1% | 2% | 94% | 6% |
| FY2015 | 253,660 | 142,341 | 32,640 | 5,023 | 11,192 | 444,856 | | 48,855 | 57% | 32% | 7% | 1% | 3% | 89% | 11% |
| FY2016 | 256,083 | 227,458 | 49,747 | 8,805 | 16,898 | 558,991 | 2014-19 avg  581,045 | 75,450 | 46% | 41% | 9% | 2% | 3% | 87% | 13% |
| FY2017 | 181,519 | 187,539 | 26,365 | 7,149 | 12,627 | 415,199 | | 46,141 | 44% | 45% | 6% | 2% | 3% | 89% | 11% |
| FY2018 | 221,711 | 258,413 | 11,671 | 8,473 | 19,676 | 519,944 | | 39,820 | 43% | 50% | 2% | 2% | 4% | 92% | 8% |
| FY2019 | 237,067 | 623,569 | 58,138 | 34,452 | 24,003 | 977,229 | | 116,593 | 24% | 64% | 6% | 4% | 2% | 88% | 12% |
| FY2020 | 297,692 | 106,760 | 23,023 | 20,144 | 10,447 | 458,066 | | 53,614 | 65% | 23% | 5% | 4% | 2% | 88% | 12% |
| FY2021 | 655,591 | 701,049 | 184,716 | 162,430 | 30,897 | 1,734,683 | | 378,043 | 38% | 40% | 11% | 9% | 2% | 78% | 22% |
| FY2022 | 808,340 | 541,618 | 626,410 | 253,351 | 149,226 | 2,378,945 | | 1,028,987 | 34% | 23% | 26% | 11% | 6% | 57% | 43% |
| FY23Q1 | 173,723 | 101,009 | 252,204 | 117,149 | 73,579 | 717,664 | | 442,932 | 24% | 14% | 35% | 16% | 10% | 38% | 62% |

average 14-19  60,557          2013-2018 average  10%
                               14-19 average  10%

IFR_AR_009047

s), from an average of 40,549 per year (8 percent of unique encounters) in FY 2014–FY 2019

nters (1,028,987 total encounters) in FY 2022 (56 percent of unique encounters; 43 percent of total encounters) and 424,530 unique encounters (442,932 total encounters) in the first three months of FY 2023 (71 percent of unic

IFR_AR_009048

ɟue encounters; 62 percent of total encounters⟩

IFR_AR_009049

Migrant populations from these newer source countries have included large numbers of families and children.

44 A total of 65 percent of unique NCA encounters and 40 percent of all other unique non-Mexican encounters were unaccompanied children or family unit individuals in FY 2021–FY 2023Q1, compared to 13 percent of unique Mexican encounters. OIS Persist Dataset b

| Row Label | Mexico | | | | | Mexico To | NTriangle | | | | | NTriangle | Other | | | | | Other Tot | Grand Total |
| | AM | UAC | FMUA | SA | UNK | | AM | UAC | FMUA | SA | UNK | | AM | UAC | FMUA | SA | UNK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | | 10752 | 3809 | 162879 | 37784 | 215224 | | 21238 | 6720 | 93763 | 1996 | 123717 | | 947 | 709 | 9485 | 15474 | 26615 | 365556 |
| 2014 | | 9432 | 2934 | 136475 | 44925 | 193766 | | 53921 | 60233 | 102753 | 7300 | 224207 | | 1294 | 1472 | 11390 | 3576 | 17732 | 435705 |
| 2015 | | 8533 | 3127 | 117502 | 50777 | 179939 | | 30340 | 33763 | 58048 | 6308 | 128459 | | 688 | 1186 | 9307 | 5320 | 16501 | 324899 |
| 2016 | | 8570 | 12067 | 139731 | 21187 | 181555 | | 51925 | 79834 | 73145 | 9180 | 214084 | | 964 | 5974 | 21270 | 3254 | 31462 | 427101 |
| 2017 | | 6469 | 8696 | 106977 | 1122 | 123264 | | 37070 | 84271 | 54200 | 1182 | 176723 | | 1005 | 7064 | 22614 | 248 | 30931 | 330918 |
| 2018 | 516 | 7695 | 19614 | 125248 | 6 | 153079 | 129 | 43968 | 126473 | 74672 | 216 | 245458 | 16 | 1686 | 9554 | 24693 | 24 | 35973 | 434510 |
| 2019 | 162 | 7583 | 30784 | 126706 | 17 | 165252 | 20 | 63294 | 432297 | 102346 | 257 | 598214 | 27 | 2933 | 48731 | 58990 | 16 | 110697 | 874163 |
| 2020 | 358 | 8357 | 20425 | 149696 | 5 | 178841 | 8 | 14223 | 23500 | 42825 | 48 | 80604 | 35 | 1061 | 18248 | 21218 | 6 | 40568 | 300013 |
| 2021 | 1378 | 13851 | 22041 | 278692 | 6 | 315968 | 102 | 106702 | 233987 | 147796 | 210 | 488797 | 87 | 6783 | 167833 | 147384 | 36 | 322123 | 1126888 |
| 2022 | 1977 | 16783 | 28786 | 349472 | 14 | 397032 | 80 | 109091 | 113364 | 149620 | 128 | 372283 | 215 | 9242 | 357964 | 604726 | 44 | 972191 | 1741506 |
| 2023 | 514 | 4045 | 21712 | 71848 | 2 | 98121 | 32 | 25125 | 18359 | 31150 | 33 | 74699 | 70 | 4977 | 146095 | 273368 | 20 | 424530 | 597350 |

| | Mexico | | | | N. Central America | | | | All Others | | | |
| | UC | FM | SA | UC+FM | UC | FM | SA | UC+FM | UC | FM | SA | UC+FM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 5% | 2% | 76% | 7% | 17% | 5% | 76% | 23% | 4% | 3% | 36% | 6% |
| 2014 | 5% | 2% | 70% | 6% | 24% | 27% | 46% | 51% | 7% | 8% | 64% | 16% |
| 2015 | 5% | 2% | 65% | 6% | 24% | 26% | 45% | 50% | 4% | 7% | 56% | 11% |
| 2016 | 5% | 7% | 77% | 11% | 24% | 37% | 34% | 62% | 3% | 19% | 68% | 22% |
| 2017 | 5% | 7% | 87% | 12% | 21% | 48% | 31% | 69% | 3% | 23% | 73% | 26% |
| 2018 | 5% | 13% | 82% | 18% | 18% | 52% | 30% | 69% | 5% | 27% | 69% | 31% |
| 2019 | 5% | 19% | 77% | 23% | 11% | 72% | 17% | 83% | 3% | 44% | 53% | 47% |
| 2020 | 5% | 11% | 84% | 16% | 18% | 29% | 53% | 47% | 3% | 45% | 52% | 48% |
| 2021 | 4% | 7% | 88% | 11% | 22% | 48% | 30% | 70% | 2% | 52% | 46% | 54% |
| 2022 | 4% | 7% | 88% | 11% | 29% | 30% | 40% | 60% | 1% | 37% | 62% | 38% |
| 2023 | 4% | 17% | 79% | 21% | 32% | 25% | 43% | 56% | 1% | 34% | 65% | 35% |

FM+UC FY14-19 avg: **13%**    FM+UC FY14-19 avg: **69%**    FM+UC FY14-19 avg: **34%**
FM+UC FY21-23Q1 avg: **13%**    FM+UC FY21-23Q1 avg: **65%**    FM+UC FY21-23Q1 avg: **40%**

Source: OIS Persist Dataset Through December 31, 2022

IFR_AR_009050

ased on data through December 31, 2022.

IFR_AR_009051

Much of this shift is driven by a significant increase in unique encounters of CHNV nationals, which jumped more than ten-fold from an average of 15,557 in FY 2014–FY 2019 to 169,436 in FY 2021, with total CHNV enco

45 OIS Persist Dataset based on data through December 31, 2022.

CHNV unique encounters increased sharply again in FY 2022 to 605,690 (626,410 total encounters), constituting 35 percent of all unique encounters in FY 2022 and 26 percent of total encounters that year.

46 *Id.*

Overall, unique encounters of CHNV nationals rose 257 percent between FY 2021 and FY 2022 (with total CHNV encounters rising 239 percent), unique encounters of Brazilians, Colombians, Ecuadorans, and Peruvians inc

47 *Id* . Of note, OIS utilizes a rigorous record matching methodology to generate unique encounter data, and the program is only run monthly upon receipt of CBP's official monthly encounter data. (The official encounter data are also only produced monthly after the rea

These trends continued in the first 3 months of FY 2023, with CHNV countries accounting for 40 percent of unique encounters October– December 2022 and Brazilians, Colombians, Ecuadorans, and Peruvians climbing to 1

48 *Id.*

Unique SWB Encounters by Selected citizenships

| | Mex | NCA | CHNV | BCEP | All Other | Total | | Mx+NCA | | Mex | NCA | CHNV | BCEP | All Other | | | Mex | NCA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY2013 | 215,224 | 123,717 | 12,451 | 5,458 | 8,706 | 365,556 | | 338,941 | | 59% | 34% | 3% | 1% | 2% | | 2013 | 317,562 | 140,442 |
| FY2014 | 193,766 | 224,207 | 2,540 | 6,495 | 8,697 | 435,705 | | 417,973 | | 44% | 51% | 1% | 1% | 2% | | 2014 | 285,502 | 248,063 |
| FY2015 | 179,939 | 128,459 | 1,733 | 4,740 | 10,028 | 324,899 | | 308,398 | | 55% | 40% | 1% | 1% | 3% | | 2015 | 253,660 | 142,341 |
| FY2016 | 181,555 | 214,084 | 8,089 | 8,292 | 15,081 | 427,101 | | 395,639 | | 43% | 50% | 2% | 2% | 4% | | 2016 | 256,083 | 227,458 |
| FY2017 | 123,264 | 176,723 | 12,553 | 6,883 | 11,495 | 330,918 | | 299,987 | | 37% | 53% | 4% | 2% | 3% | | 2017 | 181,519 | 187,539 |
| FY2018 | 153,079 | 245,458 | 11,443 | 8,247 | 16,283 | 434,510 | | 398,537 | | 35% | 56% | 3% | 2% | 4% | | 2018 | 221,711 | 258,413 |
| FY2019 | 165,252 | 598,214 | 56,981 | 33,076 | 20,640 | 874,163 | | 763,466 | | 19% | 68% | 7% | 4% | 2% | | 2019 | 237,067 | 623,569 |
| FY2020 | 178,841 | 80,604 | 15,855 | 14,883 | 9,830 | 300,013 | | 259,445 | | 60% | 27% | 5% | 5% | 3% | | 2020 | 297,692 | 106,760 |
| FY2021 | 315,968 | 488,797 | 169,436 | 123,330 | 29,357 | 1,126,888 | | 804,765 | | 28% | 43% | 15% | 11% | 3% | | 2021 | 655,591 | 701,049 |
| FY2022 | 397,032 | 372,283 | 605,690 | 246,172 | 120,329 | 1,741,506 | | 769,315 | | 23% | 21% | 35% | 14% | 7% | | 2022 | 808,340 | 541,618 |
| FY 23 Q1 | 98,121 | 74,699 | 240,487 | 113,537 | 70,506 | 597,350 | | 172,820 | | 16% | 13% | 40% | 19% | 12% | | FY 23 Q1 | 173,723 | 101,009 |
| | | | | | | | | | | | | | | | | | | |
| FY14-19 avg | 166,143 | 264,524 | 15,557 | 11,289 | 13,704 | 471,216 | | | | | | | | | | | 239,257 | 281,231 |
| Fy14-19 to Fy21 chg | | | 10.89 | | | | | | | | | | | | | | | |
| FY21-FY22 chg | 26% | -24% | 257% | 100% | 310% | 55% | | -4% | | | | | | | | | | |

Source: OIS Unique Encounters pivot table, December 2022 data
Persist

IFR_AR_009052

...ounters increasing from an average of 33,095 to 184,716

...reased 100 percent (with total encounters increasing 56 percent), and unique encounters of Mexican and NCA nationals fell 4 percent (with total encounters falling 0.5 percent)

...l-time data go through extensive quality control.) OIS has only extended its person-level record matching back to 2013. For these reasons, unique encounter records are only available for encounters occurring between 2013 and December 2022. Most references in this preamble repo...

...9 percent

| ...ps | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CHNV | BCEP | All Other | Total | | Mx+NCA | | Mex | NCA | CHNV | BCEP | All Other |
| 16,320 | 5,728 | 9,560 | 489,612 | | 458,004 | | 65% | 29% | 3% | 1% | 2% |
| 20,009 | 6,745 | 9,729 | 570,048 | | 533,565 | | 50% | 44% | 4% | 1% | 2% |
| 32,640 | 5,023 | 11,192 | 444,856 | | 396,001 | | 57% | 32% | 7% | 1% | 3% |
| 49,747 | 8,805 | 16,898 | 558,991 | | 483,541 | | 46% | 41% | 9% | 2% | 3% |
| 26,365 | 7,149 | 12,627 | 415,199 | | 369,058 | | 44% | 45% | 6% | 2% | 3% |
| 11,671 | 8,473 | 19,676 | 519,944 | | 480,124 | | 43% | 50% | 2% | 2% | 4% |
| 58,138 | 34,452 | 24,003 | 977,229 | | 860,636 | | 24% | 64% | 6% | 4% | 2% |
| 23,023 | 20,144 | 10,447 | 458,066 | | 404,452 | | 65% | 23% | 5% | 4% | 2% |
| 184,716 | 162,430 | 30,897 | 1,734,683 | | 1,356,640 | | 38% | 40% | 11% | 9% | 2% |
| 626,410 | 253,351 | 149,226 | 2,378,945 | | 1,349,958 | | 34% | 23% | 26% | 11% | 6% |
| 252,204 | 117,149 | 73,579 | 717,664 | | 274,732 | | 24% | 14% | 35% | 16% | 10% |
| | | | | | | | | | | |
| 33,095 | 11,775 | 15,688 | 581,045 | | | | 6% | | | |
| | | | | | | | | | | |
| 239% | 56% | | | | -0.5% | | | | | |

IFR_AR_009053

ort on total encounter data, instead of unique encounter data, since it allows analysis of more recent numbers as well as longer historic comparisons. To the extent we are relying on unique encounters, the text will explicitly say so.

IFR_AR_009054

USBP SWB Encounters 1960-202[2]



| FY | Total |
|------|-----------|
| 1960 | 21,022 |
| 1961 | 21,745 |
| 1962 | 21,103 |
| 1963 | 29,644 |
| 1964 | 32,519 |
| 1965 | 40,020 |
| 1966 | 62,640 |
| 1967 | 73,973 |
| 1968 | 96,641 |
| 1969 | 137,968 |
| 1970 | 201,780 |
| 1971 | 263,991 |
| 1972 | 321,326 |
| 1973 | 441,066 |
| 1974 | 571,606 |
| 1975 | 512,264 |
| 1976 | 607,499 |
| 1977 | 733,193 |
| 1978 | 789,441 |
| 1979 | 795,798 |
| 1980 | 690,554 |
| 1981 | 749,808 |
| 1982 | 745,820 |
| 1983 | 1,033,974 |
| 1984 | 1,058,276 |
| 1985 | 1,183,351 |
| 1986 | 1,615,844 |
| 1987 | 1,122,067 |
| 1988 | 942,561 |
| 1989 | 852,506 |
| 1990 | 1,049,321 |
| 1991 | 1,077,876 |
| 1992 | 1,145,574 |
| 1993 | 1,212,886 |
| 1994 | 979,101 |
| 1995 | 1,271,390 |
| 1996 | 1,507,020 |
| 1997 | 1,368,707 |
| 1998 | 1,516,680 |
| 1999 | 1,537,000 |
| 2000 | 1,643,679 |
| 2001 | 1,235,718 |
| 2002 | 929,809 |

IFR_AR_009055

| | |
|---|---|
| 2003 | 905,065 |
| 2004 | 1,139,282 |
| 2005 | 1,171,396 |
| 2006 | 1,071,972 |
| 2007 | 858,638 |
| 2008 | 705,005 |
| 2009 | 540,865 |
| 2010 | 447,731 |
| 2011 | 327,577 |
| 2012 | 356,873 |
| 2013 | 414,397 |
| 2014 | 479,370 |
| 2015 | 331,333 |
| 2016 | 408,870 |
| 2017 | 303,916 |
| 2018 | 396,579 |
| 2019 | 851,508 |
| 2020 | 400,635 |
| 2021 | 1,734,683 |
| 2022 | 2,378,945 |

Source: OIS analysis of USBP data
OIS Production data through December 31, 2022

IFR_AR_009056

Total SWB Encounters

| | Mexico | N. Central Amer | Other Countrie | Total |
|---|---|---|---|---|
| Oct-09 | 42,989 | 3,091 | 1,210 | 47,290 |
| Nov-09 | 35,172 | 2,626 | 1,266 | 39,064 |
| Dec-09 | 27,639 | 2,458 | 1,255 | 31,352 |
| Jan-10 | 37,547 | 2,097 | 1,097 | 40,741 |
| Feb-10 | 44,745 | 2,799 | 1,208 | 48,752 |
| Mar-10 | 63,812 | 3,952 | 1,388 | 69,152 |
| Apr-10 | 56,634 | 4,320 | 1,396 | 62,350 |
| May-10 | 47,083 | 5,404 | 1,529 | 54,016 |
| Jun-10 | 32,902 | 5,057 | 1,349 | 39,308 |
| Jul-10 | 26,837 | 4,220 | 1,306 | 32,363 |
| Aug-10 | 27,696 | 4,322 | 1,698 | 33,716 |
| Sep-10 | 24,405 | 3,244 | 1,660 | 29,309 |
| Oct-10 | 28,827 | 2,213 | 1,411 | 32,451 |
| Nov-10 | 24,750 | 2,415 | 1,351 | 28,516 |
| Dec-10 | 21,998 | 2,226 | 1,502 | 25,726 |
| Jan-11 | 26,706 | 1,830 | 1,200 | 29,736 |
| Feb-11 | 30,621 | 2,520 | 1,264 | 34,405 |
| Mar-11 | 43,294 | 4,025 | 1,599 | 48,918 |
| Apr-11 | 37,260 | 4,118 | 1,359 | 42,737 |
| May-11 | 32,157 | 3,817 | 1,568 | 37,542 |
| Jun-11 | 27,186 | 4,420 | 1,303 | 32,909 |
| Jul-11 | 23,766 | 4,399 | 1,354 | 29,519 |
| Aug-11 | 24,311 | 4,586 | 1,317 | 30,214 |
| Sep-11 | 23,137 | 3,936 | 1,312 | 28,385 |
| Oct-11 | 25,433 | 4,559 | 1,351 | 31,343 |
| Nov-11 | 22,484 | 4,789 | 1,343 | 28,616 |
| Dec-11 | 18,817 | 3,955 | 1,603 | 24,375 |
| Jan-12 | 25,277 | 4,104 | 1,417 | 30,798 |
| Feb-12 | 28,957 | 6,385 | 1,665 | 37,007 |
| Mar-12 | 38,609 | 8,150 | 1,778 | 48,537 |
| Apr-12 | 35,335 | 9,384 | 1,958 | 46,677 |
| May-12 | 29,824 | 11,193 | 2,001 | 43,018 |
| Jun-12 | 24,363 | 10,291 | 2,154 | 36,808 |
| Jul-12 | 22,102 | 8,772 | 1,954 | 32,828 |
| Aug-12 | 23,063 | 8,692 | 1,944 | 33,699 |
| Sep-12 | 22,626 | 8,048 | 1,725 | 32,399 |
| Oct-12 | 24,727 | 8,053 | 2,067 | 34,847 |
| Nov-12 | 22,885 | 8,202 | 2,071 | 33,158 |
| Dec-12 | 19,487 | 7,319 | 2,271 | 29,077 |
| Jan-13 | 23,722 | 6,366 | 2,397 | 32,485 |
| Feb-13 | 27,934 | 10,252 | 2,450 | 40,636 |
| Mar-13 | 36,566 | 14,467 | 2,976 | 54,009 |
| Apr-13 | 36,097 | 15,807 | 2,867 | 54,771 |
| May-13 | 31,274 | 15,973 | 3,253 | 50,500 |



| | | | |
|---|---|---|---|
| Jun-13 | 24,750 | 13,101 | 2,939 | 40,790 |
| Jul-13 | 23,454 | 13,725 | 2,826 | 40,005 |
| Aug-13 | 24,389 | 14,049 | 2,686 | 41,124 |
| Sep-13 | 22,274 | 13,127 | 2,804 | 38,205 |
| Oct-13 | 24,713 | 14,051 | 3,070 | 41,834 |
| Nov-13 | 21,993 | 13,604 | 3,095 | 38,692 |
| Dec-13 | 19,219 | 14,381 | 3,105 | 36,705 |
| Jan-14 | 21,217 | 11,664 | 2,319 | 35,200 |
| Feb-14 | 23,615 | 16,276 | 2,582 | 42,473 |
| Mar-14 | 30,450 | 24,098 | 2,999 | 57,547 |
| Apr-14 | 29,811 | 26,498 | 3,074 | 59,383 |
| May-14 | 27,317 | 38,055 | 3,661 | 69,033 |
| Jun-14 | 22,443 | 40,642 | 3,488 | 66,573 |
| Jul-14 | 21,532 | 24,274 | 3,027 | 48,833 |
| Aug-14 | 22,031 | 14,577 | 3,158 | 39,766 |
| Sep-14 | 21,158 | 9,943 | 2,905 | 34,006 |
| Oct-14 | 23,011 | 9,675 | 3,216 | 35,902 |
| Nov-14 | 19,970 | 9,606 | 3,447 | 33,023 |
| Dec-14 | 19,223 | 10,897 | 4,111 | 34,231 |
| Jan-15 | 19,326 | 7,227 | 3,626 | 30,179 |
| Feb-15 | 21,223 | 8,162 | 3,169 | 32,554 |
| Mar-15 | 25,027 | 10,385 | 3,750 | 39,162 |
| Apr-15 | 22,765 | 11,940 | 3,594 | 38,299 |
| May-15 | 22,332 | 14,241 | 4,110 | 40,683 |
| Jun-15 | 20,264 | 14,358 | 3,998 | 38,620 |
| Jul-15 | 19,245 | 14,771 | 4,594 | 38,610 |
| Aug-15 | 20,646 | 15,737 | 6,036 | 42,419 |
| Sep-15 | 20,624 | 15,342 | 5,204 | 41,170 |
| Oct-15 | 21,202 | 17,075 | 6,968 | 45,245 |
| Nov-15 | 19,549 | 19,162 | 6,676 | 45,387 |
| Dec-15 | 19,046 | 24,509 | 4,830 | 48,385 |
| Jan-16 | 18,212 | 10,184 | 4,963 | 33,359 |
| Feb-16 | 20,383 | 10,219 | 7,421 | 38,023 |
| Mar-16 | 25,011 | 13,687 | 7,045 | 45,743 |
| Apr-16 | 25,580 | 17,752 | 4,877 | 48,209 |
| May-16 | 24,506 | 21,893 | 8,544 | 54,943 |
| Jun-16 | 20,944 | 19,579 | 4,592 | 45,115 |
| Jul-16 | 19,159 | 21,977 | 5,433 | 46,569 |
| Aug-16 | 20,334 | 25,044 | 6,138 | 51,516 |
| Sep-16 | 21,743 | 26,375 | 7,916 | 56,034 |
| Oct-16 | 23,630 | 32,718 | 10,334 | 66,682 |
| Nov-16 | 20,051 | 35,423 | 7,863 | 63,337 |
| Dec-16 | 15,581 | 33,514 | 9,286 | 58,381 |
| Jan-17 | 16,021 | 20,399 | 5,974 | 42,394 |
| Feb-17 | 12,272 | 9,303 | 1,945 | 23,520 |
| Mar-17 | 10,838 | 4,438 | 1,286 | 16,562 |
| Apr-17 | 11,017 | 3,640 | 1,040 | 15,697 |

IFR_AR_009058

| | | | |
|---|---|---|---|
| May-17 | 12,737 | 5,669 | 1,447 | 19,853 |
| Jun-17 | 12,939 | 7,298 | 1,342 | 21,579 |
| Jul-17 | 13,658 | 9,906 | 1,396 | 24,960 |
| Aug-17 | 15,892 | 12,680 | 1,943 | 30,515 |
| Sep-17 | 16,293 | 12,546 | 2,261 | 31,100 |
| Oct-17 | 17,504 | 14,881 | 2,457 | 34,842 |
| Nov-17 | 17,372 | 18,758 | 2,901 | 39,031 |
| Dec-17 | 16,044 | 21,373 | 3,059 | 40,476 |
| Jan-18 | 18,150 | 15,658 | 2,057 | 35,865 |
| Feb-18 | 19,119 | 15,591 | 1,980 | 36,690 |
| Mar-18 | 24,482 | 22,671 | 3,060 | 50,213 |
| Apr-18 | 22,883 | 25,030 | 3,106 | 51,019 |
| May-18 | 19,338 | 28,554 | 3,898 | 51,790 |
| Jun-18 | 16,026 | 23,466 | 3,604 | 43,096 |
| Jul-18 | 15,284 | 20,453 | 4,268 | 40,005 |
| Aug-18 | 17,679 | 24,354 | 4,518 | 46,551 |
| Sep-18 | 17,830 | 27,624 | 4,912 | 50,366 |
| Oct-18 | 19,537 | 36,064 | 5,174 | 60,775 |
| Nov-18 | 16,980 | 39,568 | 5,915 | 62,463 |
| Dec-18 | 13,936 | 40,803 | 6,050 | 60,789 |
| Jan-19 | 16,565 | 36,222 | 5,526 | 58,313 |
| Feb-19 | 17,902 | 52,381 | 6,260 | 76,543 |
| Mar-19 | 22,317 | 72,722 | 8,691 | 103,730 |
| Apr-19 | 21,535 | 76,214 | 11,664 | 109,413 |
| May-19 | 23,126 | 104,158 | 16,829 | 144,113 |
| Jun-19 | 20,852 | 67,268 | 16,190 | 104,310 |
| Jul-19 | 18,603 | 49,395 | 13,750 | 81,748 |
| Aug-19 | 21,245 | 30,386 | 10,977 | 62,608 |
| Sep-19 | 24,469 | 18,388 | 9,567 | 52,424 |
| Oct-19 | 23,275 | 14,210 | 7,654 | 45,139 |
| Nov-19 | 22,254 | 13,189 | 7,199 | 42,642 |
| Dec-19 | 20,248 | 12,811 | 7,504 | 40,563 |
| Jan-20 | 21,871 | 8,688 | 6,024 | 36,583 |
| Feb-20 | 22,094 | 9,350 | 5,242 | 36,686 |
| Mar-20 | 21,310 | 9,120 | 4,027 | 34,457 |
| Apr-20 | 11,995 | 3,801 | 1,310 | 17,106 |
| May-20 | 18,988 | 2,941 | 1,308 | 23,237 |
| Jun-20 | 27,458 | 3,753 | 1,818 | 33,029 |
| Jul-20 | 32,150 | 6,270 | 2,529 | 40,949 |
| Aug-20 | 36,920 | 9,652 | 3,435 | 50,007 |
| Sep-20 | 39,129 | 12,975 | 5,564 | 57,668 |
| Oct-20 | 46,784 | 19,676 | 5,467 | 71,931 |
| Nov-20 | 44,164 | 22,172 | 5,777 | 72,121 |
| Dec-20 | 39,370 | 26,733 | 7,891 | 74,017 |
| Jan-21 | 40,793 | 27,949 | 9,672 | 78,425 |
| Feb-21 | 44,256 | 44,933 | 11,909 | 100,424 |
| Mar-21 | 62,504 | 85,651 | 25,122 | 173,158 |

IFR_AR_009059

| | | | | |
|---|---|---|---|---|
| **Apr-21** | 65,597 | 79,301 | 33,897 | 173,701 |
| **May-21** | 70,874 | 69,045 | 40,678 | 172,625 |
| **Jun-21** | 64,908 | 76,861 | 47,265 | 178,549 |
| **Jul-21** | 59,959 | 94,484 | 59,150 | 199,777 |
| **Aug-21** | 56,397 | 91,925 | 61,518 | 209,840 |
| **Sep-21** | 59,985 | 62,319 | 69,697 | 192,001 |
| **Oct-21** | 66,049 | 51,036 | 47,752 | 164,837 |
| **Nov-21** | 63,846 | 50,238 | 60,761 | 174,845 |
| **Dec-21** | 51,475 | 48,024 | 79,754 | 179,253 |
| **Jan-22** | 60,341 | 31,677 | 62,856 | 154,874 |
| **Feb-22** | 71,850 | 39,436 | 54,724 | 166,010 |
| **Mar-22** | 88,132 | 46,008 | 88,434 | 222,574 |
| **Apr-22** | 82,568 | 43,999 | 109,218 | 235,785 |
| **May-22** | 77,454 | 50,178 | 113,505 | 241,137 |
| **Jun-22** | 66,730 | 57,948 | 83,156 | 207,834 |
| **Jul-22** | 55,692 | 48,504 | 95,966 | 200,162 |
| **Aug-22** | 60,772 | 38,575 | 104,740 | 204,087 |
| **Sep-22** | 63,431 | 35,995 | 128,121 | 227,547 |
| **Oct-22** | 66,220 | 35,005 | 130,052 | 231,277 |
| **Nov-22** | 59,320 | 33,208 | 142,368 | 234,896 |
| **Dec-22** | 48,183 | 32,796 | 170,512 | 251,491 |

OIS Production data through December 31, 2022

IFR_AR_009060

In the week leading up to the October 12, 2022, announcement, the United States was encountering approximately 1,100 Venezuelans between ports of entry at its SWB every day; numbers fell sharply within weeks and avera
60 OIS analysis of data pulled from CBP UIP on January 23, 2023.

USBP encounters of Venezuela nationals

| Date | Encounters | | | |
|---|---|---|---|---|
| 1-Oct | 1240 | Average encounters 10/5 - 10/11/22 | 1,137 |
| 2-Oct | 1510 | Average encounters 11/23 - 11/29 | 67 |
| 3-Oct | 1366 | Average encounters 1/16 - 1/22 | 28 |
| 4-Oct | 1260 | | |
| 5-Oct | 1139 | | |
| 6-Oct | 1174 | | |
| 7-Oct | 1083 | | |
| 8-Oct | 1006 | | |
| 9-Oct | 1202 | | |
| 10-Oct | 1224 | | |
| 11-Oct | 1128 | | |
| 12-Oct | 796 | | |
| 13-Oct | 1256 | | |
| 14-Oct | 1056 | | |
| 15-Oct | 834 | | |
| 16-Oct | 484 | | |
| 17-Oct | 298 | | |
| 18-Oct | 187 | | |
| 19-Oct | 158 | | |
| 20-Oct | 159 | | |
| 21-Oct | 132 | | |
| 22-Oct | 145 | | |
| 23-Oct | 160 | | |
| 24-Oct | 247 | | |
| 25-Oct | 296 | | |
| 26-Oct | 415 | | |
| 27-Oct | 301 | | |
| 28-Oct | 408 | | |
| 29-Oct | 405 | | |
| 30-Oct | 331 | | |
| 31-Oct | 430 | | |
| 1-Nov | 412 | | |
| 2-Nov | 331 | | |
| 3-Nov | 305 | | |
| 4-Nov | 348 | | |
| 5-Nov | 250 | | |
| 6-Nov | 239 | | |
| 7-Nov | 265 | | |
| 8-Nov | 260 | | |
| 9-Nov | 262 | | |
| 10-Nov | 262 | | |
| 11-Nov | 338 | | |

IFR_AR_009061

| Date | Value |
|------|-------|
| 12-Nov | 192 |
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |
| 18-Nov | 210 |
| 19-Nov | 90 |
| 20-Nov | 116 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 80 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 86 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 126 |
| 5-Dec | 120 |
| 6-Dec | 84 |
| 7-Dec | 144 |
| 8-Dec | 49 |
| 9-Dec | 87 |
| 10-Dec | 101 |
| 11-Dec | 161 |
| 12-Dec | 113 |
| 13-Dec | 157 |
| 14-Dec | 116 |
| 15-Dec | 145 |
| 16-Dec | 91 |
| 17-Dec | 146 |
| 18-Dec | 189 |
| 19-Dec | 231 |
| 20-Dec | 254 |
| 21-Dec | 362 |
| 22-Dec | 723 |
| 23-Dec | 267 |
| 24-Dec | 301 |
| 25-Dec | 253 |
| 26-Dec | 234 |
| 27-Dec | 350 |
| 28-Dec | 232 |

IFR_AR_009062

| | |
|---|---|
| 29-Dec | 257 |
| 30-Dec | 262 |
| 31-Dec | 327 |
| 1-Jan | 309 |
| 2-Jan | 280 |
| 3-Jan | 270 |
| 4-Jan | 366 |
| 5-Jan | 143 |
| 6-Jan | 98 |
| 7-Jan | 77 |
| 8-Jan | 61 |
| 9-Jan | 70 |
| 10-Jan | 73 |
| 11-Jan | 56 |
| 12-Jan | 57 |
| 13-Jan | 35 |
| 14-Jan | 50 |
| 15-Jan | 40 |
| 16-Jan | 43 |
| 17-Jan | 21 |
| 18-Jan | 28 |
| 19-Jan | 25 |
| 20-Jan | 33 |
| 21-Jan | 24 |
| 22-Jan | 25 |

UIP data downloaded 1.23.23

IFR_AR_009063

ged 67 Venezuelans per day the week ending November 29, 2022, and 28 per day the week ending January 22, 202?

IFR_AR_009064

In the first weeks after the announcement, encounters of Cubans, Haitians, and Nicaraguans (''CHNs'') between ports of entry on the SWB declined from 928 on the day of the announcement (January 5, 2023) to just 92 on Janu
64 OIS analysis of CBP UIP data downloaded January 23, 2023. SWB encounters typically fall in the weeks between Christmas and mid-January, a pattern also observed in the 2022–2023 cycle. Total SWB encounters between ports of entry averaged 7,728 per day for Dece

| Row Labels | CUBA | HAITI | NICAR | CHN | Non-CHN | Total |
|---|---|---|---|---|---|---|
| 1-Dec | 1275 | 2 | 1336 | 2613 | 4919 | 7532 |
| 2-Dec | 1614 | 1 | 1720 | 3335 | 5403 | 8738 |
| 3-Dec | 1464 | | 1426 | 2890 | 4225 | 7115 |
| 4-Dec | 1712 | 1 | 1298 | 3011 | 4090 | 7101 |
| 5-Dec | 1320 | 2 | 1594 | 2916 | 4456 | 7372 |
| 6-Dec | 1151 | | 1571 | 2722 | 4691 | 7413 |
| 7-Dec | 1698 | 1 | 1809 | 3508 | 4876 | 8384 |
| 8-Dec | 1690 | | 1813 | 3503 | 4870 | 8373 |
| 9-Dec | 1943 | | 1592 | 3535 | 4959 | 8494 |
| 10-Dec | 1787 | 1 | 1758 | 3546 | 4631 | 8177 |
| 11-Dec | 1487 | 1 | 1606 | 3094 | 4803 | 7897 |
| 12-Dec | 1463 | 2 | 1699 | 3164 | 4644 | 7808 |
| 13-Dec | 1459 | 2 | 1548 | 3009 | 5060 | 8069 |
| 14-Dec | 1601 | | 1555 | 3156 | 5122 | 8278 |
| 15-Dec | 1547 | 2 | 1447 | 2996 | 5132 | 8128 |
| 16-Dec | 1178 | | 700 | 1878 | 4964 | 6842 |
| 17-Dec | 1444 | | 996 | 2440 | 4499 | 6939 |
| 18-Dec | 1398 | 2 | 909 | 2309 | 4598 | 6907 |
| 19-Dec | 1538 | 1 | 867 | 2406 | 4896 | 7302 |
| 20-Dec | 1336 | 1 | 1201 | 2538 | 6027 | 8565 |
| 21-Dec | 1341 | | 1122 | 2463 | 5963 | 8426 |
| 22-Dec | 1131 | 1 | 933 | 2065 | 6018 | 8083 |
| 23-Dec | 1729 | | 817 | 2546 | 4748 | 7294 |
| 24-Dec | 1181 | | 1004 | 2185 | 4055 | 6240 |
| 25-Dec | 586 | 5 | 290 | 881 | 2650 | 3531 |
| 26-Dec | 944 | 3 | 501 | 1448 | 3562 | 5010 |
| 27-Dec | 1383 | 1 | 493 | 1877 | 4199 | 6076 |
| 28-Dec | 1056 | 1 | 590 | 1647 | 4251 | 5898 |
| 29-Dec | 1176 | | 390 | 1566 | 3946 | 5512 |
| 30-Dec | 705 | | 397 | 1102 | 3634 | 4736 |
| 31-Dec | 1280 | 1 | 380 | 1661 | 3684 | 5345 |
| 1-Jan | 289 | 3 | 175 | 467 | 2283 | 2750 |
| 2-Jan | 487 | 1 | 203 | 691 | 2384 | 3075 |
| 3-Jan | 795 | 1 | 251 | 1047 | 2873 | 3920 |
| 4-Jan | 592 | 3 | 170 | 765 | 2664 | 3429 |
| 5-Jan | 591 | 3 | 334 | 928 | 2721 | 3649 |
| 6-Jan | 625 | | 175 | 800 | 2821 | 3621 |
| 7-Jan | 679 | 2 | 172 | 853 | 2887 | 3740 |
| 8-Jan | 574 | | 117 | 691 | 2726 | 3417 |
| 9-Jan | 450 | 1 | 124 | 575 | 3007 | 3582 |
| 10-Jan | 161 | 1 | 102 | 264 | 3824 | 4088 |
| 11-Jan | 189 | 5 | 160 | 354 | 3986 | 4340 |

| | CHN | Non-CHN | Total |
|---|---|---|---|
| 12/1 - 12/24 | 2,826 | 4,902 | 7,728 |
| 12/25 - 1/1 | 1,331 | 3,526 | 4,857 |
| 1-Jan | 467 | 2,283 | 2,750 |
| 1/1 - 1/22 | 642 | 3,017 | 3,660 |
| % change 1/1 - 1/22 | -80% | 67% | 42% |

IFR_AR_009065

| | | | | | | |
|---|---|---|---|---|---|---|
| 12-Jan | 113 | | 158 | 271 | 4033 | 4304 |
| 13-Jan | 80 | | 155 | 235 | 4039 | 4274 |
| 14-Jan | 112 | 6 | 95 | 213 | 4287 | 4500 |
| 15-Jan | 66 | | 122 | 188 | 3650 | 3838 |
| 16-Jan | 19 | 4 | 91 | 114 | 3790 | 3904 |
| 17-Jan | 42 | | 122 | 164 | 4229 | 4393 |
| 18-Jan | 26 | 2 | 82 | 110 | 4468 | 4578 |
| 19-Jan | 56 | | 102 | 158 | 4193 | 4351 |
| 20-Jan | 23 | 1 | 87 | 111 | 4389 | 4500 |
| 21-Jan | 29 | 3 | 41 | 73 | 4207 | 4280 |
| 22-Jan | 33 | 4 | 55 | 92 | 3807 | 3899 |

UIP data downloaded Jan. 23, 2023

IFR_AR_009066

uary 22—a decline of 92 percent. The decline in encounters of nationals of these countries occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop

ember 1–24, 2022, and then dropped to an average of almost 4,900 per day between December 25, 2022 and January 1, 2023, including a low of 2,750 on the first. Similarly, encounters of Cubans, Haitians, and Nicaraguans between ports of entry averaged 2,828 per day D

IFR_AR_009067

IFR_AR_009068

ecember 1–24 and dropped to an average of just over 1,300 per day December 25–January 1, including a low of 467 on January 1. Yet while encounters of all groups rebounded after New Year's, CHN and non-CHN nationals have diverged since the announcement of the

IFR_AR_009069

IFR_AR_009070

new processes, with encounters of non-CHN nationals increasing 67 percent January 1–22 and encounters of CHN nationals falling back below their New Year's day level. Id.

IFR_AR_009071

For the 30 days ending December 24, 2022, total daily encounters along the SWB consistently fluctuated between approximately 7,100 and 9,700, averaging approximately 8,500 per day, with encounters exceeding 9,000

66 OIS analysis of data pulled from CBP UIP on January 4, 2023.

SWB Encounters, November 25 - December 24, 2022

| | | | |
|---|---|---|---|
| | | Low | 7,102 |
| 25-Nov | 7173 | High | 9,668 |
| 26-Nov | 8050 | Average | 8,532 |
| 27-Nov | 7170 | | |
| 28-Nov | 7747 | | |
| 29-Nov | 7683 | | |
| 30-Nov | 9235 | | |
| 1-Dec | 8554 | | |
| 2-Dec | 9668 | | |
| 3-Dec | 7967 | | |
| 4-Dec | 7988 | | |
| 5-Dec | 8360 | | |
| 6-Dec | 8407 | | |
| 7-Dec | 9356 | | |
| 8-Dec | 9419 | | |
| 9-Dec | 9508 | | |
| 10-Dec | 9165 | | |
| 11-Dec | 8866 | | |
| 12-Dec | 8789 | | |
| 13-Dec | 9112 | | |
| 14-Dec | 9299 | | |
| 15-Dec | 9127 | | |
| 16-Dec | 7824 | | |
| 17-Dec | 7901 | | |
| 18-Dec | 7785 | | |
| 19-Dec | 8358 | | |
| 20-Dec | 9544 | | |
| 21-Dec | 9438 | | |
| 22-Dec | 9072 | | |
| 23-Dec | 8284 | | |
| 24-Dec | 7102 | | |

Source: Data pulled from UIP on January 4, 2023.

IFR_AR_009072

per day on twelve different occasions during this 30-day period

IFR_AR_009073

Despite the sharp decrease in Venezuelan migration encountered at the U.S. border in the wake of implementation of the Venezuela process, the baseline number of total SWB encounters remained high throughout the end of 2022–
65 OIS Persist Dataset based on data through December 2022.

| FY | SWB encounters | Daily average |
|------|---------------|---------------|
| 2014 | 570,048 | 1,562 |
| 2015 | 444,856 | 1,219 |
| 2016 | 558,991 | 1,531 |
| 2017 | 415,199 | 1,138 |
| 2018 | 519,944 | 1,425 |
| 2019 | 977,229 | 2,677 |
| overall average | | 1,592 |

OIS Persist Dataset based on data through December 2022

—and significantly higher than the historical average of less than 1,600 encounters per day from 2014–2019.

IFR_AR_009075

Nationals from these two countries accounted for over 83,000 SWB encounters in the 30 days ending December 24, 2022—an average of approximately 2,770 a day, as compared to an average of approximately 1,570 a day in the

74 OIS Persist Dataset based on data through October 2022, and OIS analysis of data pulled from CBP UIP on January 4, 2023.

Cubans and Nicaraguans together accounted for just over 32 percent of total encounters during the more recent time period.

75 OIS analysis of data pulled from CBP UIP on January 4, 2023.

Persist for 30 days ending 4/1/2022, persist through Oct. 2022

| | Cuba | Nicaragua | Total |
|---|---|---|---|
| 2/26/2022 | 660 | 451 | 1111 |
| 2/27/2022 | 704 | 363 | 1067 |
| 2/28/2022 | 614 | 580 | 1194 |
| 3/1/2022 | 696 | 596 | 1292 |
| 3/2/2022 | 675 | 583 | 1258 |
| 3/3/2022 | 854 | 483 | 1337 |
| 3/4/2022 | 963 | 499 | 1462 |
| 3/5/2022 | 1013 | 612 | 1625 |
| 3/6/2022 | 1202 | 359 | 1561 |
| 3/7/2022 | 894 | 535 | 1429 |
| 3/8/2022 | 1161 | 437 | 1598 |
| 3/9/2022 | 846 | 504 | 1350 |
| 3/10/2022 | 684 | 374 | 1058 |
| 3/11/2022 | 911 | 647 | 1558 |
| 3/12/2022 | 1034 | 573 | 1607 |
| 3/13/2022 | 1196 | 590 | 1786 |
| 3/14/2022 | 971 | 538 | 1509 |
| 3/15/2022 | 958 | 559 | 1517 |
| 3/16/2022 | 1173 | 530 | 1703 |
| 3/17/2022 | 1183 | 455 | 1638 |
| 3/18/2022 | 1103 | 491 | 1594 |
| 3/19/2022 | 1117 | 542 | 1659 |
| 3/20/2022 | 1517 | 524 | 2041 |
| 3/21/2022 | 1450 | 641 | 2091 |
| 3/22/2022 | 1273 | 545 | 1818 |
| 3/23/2022 | 1090 | 463 | 1553 |
| 3/24/2022 | 1123 | 667 | 1790 |
| 3/25/2022 | 952 | 444 | 1396 |
| 3/26/2022 | 992 | 542 | 1534 |
| 3/27/2022 | 1288 | 486 | 1774 |
| 3/28/2022 | 866 | 503 | 1369 |
| 3/29/2022 | 967 | 475 | 1442 |
| 3/30/2022 | 1214 | 586 | 1800 |
| 3/31/2022 | 1028 | 302 | 1330 |
| 4/1/2022 | 1064 | 490 | 1554 |
| 4/2/2022 | 1113 | 451 | 1564 |
| 4/3/2022 | 1164 | 398 | 1562 |
| 4/4/2022 | 1172 | 385 | 1557 |

47483 # 30 days ending 4/1/22
1573 average a day for 30 days ending 3/31

UIP for 30 days ending 12/24/2022, pulled 1/4/2023
Both USBP and OFO

Count of C Column Labels

| Row Label | CUBA | NICAR | C+N Total | Grand Total |
|---|---|---|---|---|
| 25-Nov | 987 | 1304 | 2291 | 7173 |
| 26-Nov | 1387 | 1277 | 2664 | 8050 |
| 27-Nov | 827 | 1692 | 2519 | 7170 |
| 28-Nov | 1008 | 1341 | 2349 | 7747 |
| 29-Nov | 1048 | 1064 | 2112 | 7683 |
| 30-Nov | 1599 | 1698 | 3297 | 9235 |
| 1-Dec | 1277 | 1336 | 2613 | 8554 |
| 2-Dec | 1614 | 1722 | 3336 | 9668 |
| 3-Dec | 1464 | 1426 | 2890 | 7967 |
| 4-Dec | 1714 | 1298 | 3012 | 7988 |
| 5-Dec | 1325 | 1594 | 2919 | 8360 |
| 6-Dec | 1154 | 1572 | 2726 | 8407 |
| 7-Dec | 1699 | 1809 | 3508 | 9356 |
| 8-Dec | 1697 | 1813 | 3510 | 9419 |
| 9-Dec | 1948 | 1592 | 3540 | 9508 |
| 10-Dec | 1787 | 1758 | 3545 | 9165 |
| 11-Dec | 1488 | 1606 | 3094 | 8866 |
| 12-Dec | 1451 | 1702 | 3153 | 8789 |
| 13-Dec | 1459 | 1551 | 3010 | 9112 |
| 14-Dec | 1603 | 1556 | 3159 | 9299 |
| 15-Dec | 1547 | 1453 | 3000 | 9127 |
| 16-Dec | 1179 | 700 | 1879 | 7824 |
| 17-Dec | 1445 | 997 | 2442 | 7901 |
| 18-Dec | 1398 | 910 | 2308 | 7785 |
| 19-Dec | 1538 | 868 | 2406 | 8358 |
| 20-Dec | 1334 | 1204 | 2538 | 9544 |
| 21-Dec | 1343 | 1122 | 2465 | 9438 |
| 22-Dec | 1131 | 935 | 2066 | 9072 |
| 23-Dec | 1729 | 817 | 2546 | 8284 |
| 24-Dec | 1182 | 1004 | 2186 | 7102 |

83083 # 30 days ending Dec 8
2769 average a day

8512 Average a day for week ending D
2359 Cuba/Nic week ending 12/8

32%

| | | | |
|---|---|---|---|
| **4/5/2022** | 1165 | 430 | 1595 |
| **4/6/2022** | 1169 | 486 | 1655 |
| **4/7/2022** | 1007 | 417 | 1424 |
| **4/8/2022** | 1384 | 491 | 1875 |
| **4/9/2022** | 1448 | 332 | 1780 |

IFR_AR_009077

30 days preceding the April 1, 2022, CDC termination order

ec 24

IFR_AR_009078

Specifically, the DHS Office of Immigration Statistics planning model assumes that, without a meaningful policy change, border encounters could rise, and potentially rise dramatically— up to as high as 13,000 a day— subsequent to

76 DHS SWB Encounter Planning Model generated January 6, 2023.

| | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 |
|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | |
| **Projection** | 6,938 | 7,724 | 7,849 | 7,943 | 8,335 | 8,404 | 8,092 | 8,418 | 8,902 |
| Upper 68% | 7,749 | 8,786 | 8,996 | 9,268 | 9,740 | 9,972 | 9,714 | 10,138 | 10,776 |
| Lower 68% | 6,127 | 6,662 | 6,702 | 6,618 | 6,930 | 6,836 | 6,469 | 6,697 | 7,028 |
| Upper 95% | 8,528 | 9,805 | 10,097 | 10,541 | 11,089 | 11,477 | 11,271 | 11,790 | 12,575 |
| Lower 95% | 5,348 | 5,643 | 5,600 | 5,346 | 5,582 | 5,331 | 4,912 | 5,045 | 5,229 |

Release Date: **2023-01-06**

Key updates from previous version: Returns to 50-50 weight. Averages across assumptions of Title 42 ending in April-October 2023. Decomposes Hybrid based on last 3 month proportions. Adds Cuba, Nicaragua, and Haiti to the list of countries exposed to Title 42. Uses Hybrid released in early November, before T42 expectations were incorporated.

**Workbook Details:** This workbook presents the most recent Blended Encounter Projections.  The workbook contains the following worksheets:

- **Overview**: Current worksheet, providing details about the workbook and the projections.
- **Blended Totals**: Encounter projections by Total, Family Type, and HHS Referrals. Upper and lower bounds of confidence intervals are calculated at the family type level.
  - *Note:* HHS Referrals are estimated by summing all non-Mexican UC encounter projections.  This estimate is likely to be a slight underestimate because there are usually a small number of Mexican UCs who do get referred to HHS.

**The Blended Encounter Projections:** A mixed-methods approach that combines the knowledge and intel of subject matter expertise with mathematical, regression-based predictive models.  More specifically, the current Blended Projections average, or 'blend', the:

- Hybrid Model.
- Bayesian Structural Time Series (BSTS) Model projections.

**Model Specifications and Notes:**

- Weights:
  - Hybrid Model projections, **weighted 50%.**
  - BSTS Model projections, **weighted 50%.**
- Uses actuals of encounters through:
  - Hybrid Model: **2022-11-06.**
  - BSTS Model: **2022-11-30.**
- Model Descriptions:
  - The Hybrid Model combines field level intelligence, SME analysis of relevant policies and factors, historic monthly change, and current and past trends. It also has a specific focus on accounting for expectations of the consequences of ending Title 42.

IFR_AR_009079

on accounting for expectations of the consequences of ending Title 42.

- Broken down into results by country with the last 3 month country-family type proportions.

o The BSTS Model was built using a machine learning approach and includes: a 12-seasonal component, a semi-local linear trend, an autoregressive component (AR(1)), and a regression component.

- The BSTS regression component includes the following predictors: Mexico Apprehensions (through Oct 2022), USA Unemployment (through Oct 2022), and ratio of Removals by T8 Encounters (through Oct 2022).

IFR_AR_009080

the lifting of the Title 42 public health Order

IFR_AR_009081

In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,50[

77 OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

Since then, encounters for both countries have fluctuated but remain well below the pre-August 4, 2021, numbers; in November 2022, encounters averaged 481 per day for Guatemala and 433 per day for Honduras.

78 OIS Persist Dataset based on data through November 2022.

|  | Guatemala | Honduras |
|---|---|---|
| Jan-21 | 13137 | 11232 |
| Daily | 424 | 362 |

Source: OIS Persist as of November 2022.

| | Guatemala | Honduras |
|---|---|---|
| 30-day average on 8/4/21 | 1,249 | 1,502 |
| Change from Jan - Aug | 195% | 315% |
| 30-day on 10/3/22 | 776 | 873 |
| Change from August 4 | 38% | 42% |
| Nov-22 | 14433 | 12996 |
| Daily | 481 | 433 |

Source: OIS Persist as of November 2022.

| EVENT_DATE | Guatemala | Honduras | Guatemala | Honduras |
|---|---|---|---|---|
| 1-Apr | 1,434 | 1,863 | | |
| 2-Apr | 1,121 | 1,581 | | |
| 3-Apr | 839 | 1,138 | | |
| 4-Apr | 745 | 1,312 | | |
| 5-Apr | 896 | 1,181 | | |
| 6-Apr | 1,362 | 2,055 | | |
| 7-Apr | 1,082 | 1,331 | | |
| 8-Apr | 1,090 | 1,432 | | |
| 9-Apr | 986 | 1,379 | | |
| 10-Apr | 989 | 1,257 | | |
| 11-Apr | 763 | 1,015 | | |
| 12-Apr | 815 | 1,114 | | |
| 13-Apr | 1,280 | 1,319 | | |
| 14-Apr | 1,139 | 1,269 | | |
| 15-Apr | 1,112 | 1,420 | | |
| 16-Apr | 851 | 1,040 | | |
| 17-Apr | 912 | 1,078 | | |
| 18-Apr | 844 | 1,232 | | |
| 19-Apr | 977 | 1,106 | | |
| 20-Apr | 1,299 | 1,437 | | |
| 21-Apr | 1,040 | 1,268 | | |
| 22-Apr | 1,109 | 1,309 | | |
| 23-Apr | 977 | 1,155 | | |
| 24-Apr | 702 | 1,005 | | |
| 25-Apr | 748 | 930 | | |
| 26-Apr | 837 | 1,081 | | |
| 27-Apr | 1,103 | 1,270 | | |
| 28-Apr | 1,052 | 1,346 | | |
| 29-Apr | 995 | 1,124 | | |
| 30-Apr | 954 | 1,158 | | |
| 1-May | 671 | 916 | 924 | 1,130 |
| 2-May | 716 | 706 | 928 | 1,127 |
| 3-May | 889 | 1,229 | 914 | 1,118 |
| 4-May | 961 | 1,201 | 909 | 1,117 |
| 5-May | 1,054 | 1,164 | 902 | 1,102 |
| 6-May | 860 | 1,025 | 899 | 1,095 |
| 7-May | 901 | 1,184 | 902 | 1,091 |
| 8-May | 783 | 1,056 | 908 | 1,091 |
| 9-May | 579 | 837 | 910 | 1,092 |
| 10-May | 760 | 910 | 896 | 1,074 |



| Date | | | | |
|---|---|---|---|---|
| 11-May | 796 | 1,007 | 891 | 1,068 |
| 12-May | 933 | 1,019 | 877 | 1,054 |
| 13-May | 869 | 1,050 | 873 | 1,051 |
| 14-May | 997 | 1,237 | 874 | 1,044 |
| 15-May | 880 | 973 | 880 | 1,058 |
| 16-May | 781 | 839 | 884 | 1,060 |
| 17-May | 992 | 956 | 880 | 1,059 |
| 18-May | 1,015 | 1,218 | 873 | 1,048 |
| 19-May | 1,037 | 1,137 | 864 | 1,045 |
| 20-May | 889 | 907 | 854 | 1,035 |
| 21-May | 882 | 1,101 | 859 | 1,041 |
| 22-May | 684 | 888 | 871 | 1,054 |
| 23-May | 872 | 1,059 | 871 | 1,050 |
| 24-May | 727 | 798 | 872 | 1,048 |
| 25-May | 924 | 1,356 | 868 | 1,048 |
| 26-May | 966 | 1,125 | 865 | 1,041 |
| 27-May | 992 | 1,239 | 853 | 1,033 |
| 28-May | 822 | 1,029 | 853 | 1,033 |
| 29-May | 721 | 1,014 | 869 | 1,047 |
| 30-May | 679 | 860 | 873 | 1,055 |
| 31-May | 820 | 1,091 | 888 | 1,060 |
| 1-Jun | 1,065 | 1,123 | 890 | 1,064 |
| 2-Jun | 886 | 1,098 | 890 | 1,058 |
| 3-Jun | 1,005 | 1,129 | 879 | 1,048 |
| 4-Jun | 928 | 1,181 | 878 | 1,054 |
| 5-Jun | 778 | 814 | 883 | 1,064 |
| 6-Jun | 514 | 936 | 889 | 1,077 |
| 7-Jun | 799 | 1,073 | 891 | 1,074 |
| 8-Jun | 1,046 | 1,257 | 892 | 1,081 |
| 9-Jun | 880 | 1,130 | 903 | 1,089 |
| 10-Jun | 1,260 | 1,171 | 906 | 1,087 |
| 11-Jun | 981 | 1,130 | 918 | 1,094 |
| 12-Jun | 870 | 869 | 934 | 1,106 |
| 13-Jun | 660 | 925 | 954 | 1,123 |
| 14-Jun | 870 | 1,157 | 957 | 1,122 |
| 15-Jun | 924 | 1,141 | 961 | 1,132 |
| 16-Jun | 1,162 | 1,345 | 962 | 1,125 |
| 17-Jun | 1,075 | 1,134 | 967 | 1,131 |
| 18-Jun | 1,086 | 1,364 | 979 | 1,140 |
| 19-Jun | 1,208 | 1,135 | 992 | 1,157 |
| 20-Jun | 972 | 1,025 | 1,008 | 1,168 |
| 21-Jun | 1,052 | 1,112 | 1,013 | 1,174 |
| 22-Jun | 1,347 | 1,416 | 1,015 | 1,185 |
| 23-Jun | 1,332 | 1,302 | 1,008 | 1,188 |
| 24-Jun | 1,015 | 1,349 | 1,005 | 1,189 |
| 25-Jun | 1,085 | 1,398 | 1,017 | 1,215 |
| 26-Jun | 1,022 | 1,054 | 1,038 | 1,223 |

IFR_AR_009083

| | | | | |
|---|---|---|---|---|
| 27-Jun | 959 | 1,191 | 1,048 | 1,231 |
| 28-Jun | 1,082 | 1,297 | 1,052 | 1,236 |
| 29-Jun | 1,076 | 1,375 | 1,060 | 1,244 |
| 30-Jun | 1,307 | 1,402 | 1,046 | 1,242 |
| 1-Jul | 1,207 | 1,295 | 1,040 | 1,240 |
| 2-Jul | 960 | 1,442 | 1,049 | 1,248 |
| 3-Jul | 783 | 1,207 | 1,073 | 1,280 |
| 4-Jul | 833 | 1,234 | 1,075 | 1,289 |
| 5-Jul | 1,150 | 1,587 | 1,086 | 1,300 |
| 6-Jul | 1,127 | 1,164 | 1,085 | 1,304 |
| 7-Jul | 1,099 | 1,318 | 1,078 | 1,311 |
| 8-Jul | 1,174 | 1,424 | 1,087 | 1,314 |
| 9-Jul | 1,107 | 1,357 | 1,084 | 1,322 |
| 10-Jul | 866 | 1,118 | 1,098 | 1,337 |
| 11-Jul | 781 | 1,053 | 1,113 | 1,355 |
| 12-Jul | 1,158 | 1,127 | 1,113 | 1,364 |
| 13-Jul | 1,377 | 1,865 | 1,108 | 1,365 |
| 14-Jul | 909 | 1,440 | 1,117 | 1,384 |
| 15-Jul | 1,272 | 1,472 | 1,107 | 1,378 |
| 16-Jul | 1,129 | 1,460 | 1,105 | 1,386 |
| 17-Jul | 856 | 1,338 | 1,149 | 1,409 |
| 18-Jul | 1,364 | 1,458 | 1,165 | 1,426 |
| 19-Jul | 1,119 | 1,380 | 1,181 | 1,441 |
| 20-Jul | 1,385 | 1,489 | 1,186 | 1,460 |
| 21-Jul | 1,503 | 1,644 | 1,175 | 1,467 |
| 22-Jul | 1,364 | 1,681 | 1,184 | 1,474 |
| 23-Jul | 1,167 | 1,321 | 1,205 | 1,477 |
| 24-Jul | 1,288 | 1,931 | 1,228 | 1,496 |
| 25-Jul | 788 | 1,223 | 1,249 | 1,502 |
| 26-Jul | 946 | 1,280 | 1,247 | 1,515 |
| 27-Jul | 2,281 | 1,886 | 1,257 | 1,535 |
| 28-Jul | 1,568 | 1,811 | 1,257 | 1,531 |
| 29-Jul | 1,566 | 1,833 | 1,250 | 1,527 |
| 30-Jul | 1,439 | 1,974 | 1,255 | 1,533 |
| 31-Jul | 902 | 1,485 | 1,279 | 1,553 |
| 1-Aug | 1,209 | 1,652 | 1,289 | 1,564 |
| 2-Aug | 1,437 | 1,297 | 1,309 | 1,556 |
| 3-Aug | 1,512 | 1,815 | 1,320 | 1,555 |
| 4-Aug | 1,786 | 1,768 | 1,321 | 1,556 |
| 5-Aug | 1,066 | 1,560 | 1,312 | 1,545 |
| 6-Aug | 1,401 | 1,916 | 1,315 | 1,537 |
| 7-Aug | 1,173 | 1,286 | 1,304 | 1,528 |
| 8-Aug | 894 | 1,239 | 1,312 | 1,528 |
| 9-Aug | 998 | 1,310 | 1,298 | 1,527 |
| 10-Aug | 1,524 | 1,637 | 1,290 | 1,515 |
| 11-Aug | 1,445 | 1,465 | 1,281 | 1,499 |
| 12-Aug | 1,974 | 1,635 | 1,270 | 1,487 |

IFR_AR_009084

| | | | | |
|---|---|---|---|---|
| 13-Aug | 1,245 | 1,411 | 1,260 | 1,460 |
| 14-Aug | 1,302 | 1,508 | 1,276 | 1,455 |
| 15-Aug | 858 | 1,125 | 1,282 | 1,464 |
| 16-Aug | 948 | 1,087 | 1,260 | 1,455 |
| 17-Aug | 1,030 | 1,203 | 1,236 | 1,426 |
| 18-Aug | 1,355 | 1,378 | 1,218 | 1,404 |
| 19-Aug | 968 | 1,446 | 1,197 | 1,367 |
| 20-Aug | 1,266 | 1,277 | 1,193 | 1,357 |
| 21-Aug | 1,106 | 1,212 | 1,197 | 1,349 |
| 22-Aug | 822 | 967 | 1,184 | 1,347 |
| 23-Aug | 991 | 1,102 | 1,162 | 1,320 |
| 24-Aug | 1,257 | 1,092 | 1,125 | 1,286 |
| 25-Aug | 1,129 | 1,550 | 1,112 | 1,261 |
| 26-Aug | 1,634 | 1,605 | 1,083 | 1,219 |
| 27-Aug | 849 | 952 | 1,063 | 1,202 |
| 28-Aug | 1,023 | 1,153 | 1,058 | 1,190 |
| 29-Aug | 798 | 873 | 1,054 | 1,181 |
| 30-Aug | 784 | 1,177 | 1,038 | 1,165 |
| 31-Aug | 1,324 | 1,427 | 1,027 | 1,152 |
| 1-Sep | 1,058 | 1,238 | 987 | 1,128 |
| 2-Sep | 841 | 1,014 | 968 | 1,106 |
| 3-Sep | 686 | 735 | 950 | 1,084 |
| 4-Sep | 682 | 818 | 957 | 1,085 |
| 5-Sep | 523 | 645 | 959 | 1,087 |
| 6-Sep | 575 | 771 | 957 | 1,078 |
| 7-Sep | 748 | 899 | 940 | 1,063 |
| 8-Sep | 874 | 1,020 | 938 | 1,048 |
| 9-Sep | 1,034 | 1,161 | 917 | 1,030 |
| 10-Sep | 1,113 | 1,092 | 897 | 1,013 |
| 11-Sep | 782 | 890 | 892 | 1,006 |
| 12-Sep | 668 | 772 | 886 | 1,004 |
| 13-Sep | 775 | 834 | 873 | 1,000 |
| 14-Sep | 1,057 | 1,159 | 861 | 969 |
| 15-Sep | 1,023 | 1,137 | 830 | 943 |
| 16-Sep | 957 | 950 | 820 | 933 |
| 17-Sep | 863 | 914 | 806 | 921 |
| 18-Sep | 901 | 994 | 816 | 924 |
| 19-Sep | 640 | 759 | 818 | 919 |
| 20-Sep | 493 | 676 | 810 | 903 |
| 21-Sep | 675 | 780 | 797 | 883 |
| 22-Sep | 801 | 1,023 | 789 | 875 |
| 23-Sep | 882 | 996 | 776 | 873 |
| 24-Sep | 774 | 607 | 774 | 868 |
| 25-Sep | 697 | 825 | 777 | 873 |
| 26-Sep | 548 | 654 | 783 | 877 |
| 27-Sep | 592 | 799 | 782 | 878 |
| 28-Sep | 1,119 | 954 | 778 | 869 |

IFR_AR_009085

| Date | | | | |
|---|---|---|---|---|
| 29-Sep | 841 | 1,018 | 762 | 855 |
| 30-Sep | 1,066 | 944 | 740 | 839 |
| 1-Oct | 671 | 648 | 728 | 829 |
| 2-Oct | 596 | 776 | 725 | 828 |
| 3-Oct | 322 | 660 | 724 | 832 |
| 4-Oct | 608 | 695 | 709 | 815 |
| 5-Oct | 603 | 785 | 698 | 805 |
| 6-Oct | 769 | 897 | 683 | 796 |
| 7-Oct | 726 | 918 | 666 | 784 |
| 8-Oct | 752 | 761 | 654 | 770 |
| 9-Oct | 553 | 719 | 655 | 771 |
| 10-Oct | 437 | 634 | 663 | 776 |
| 11-Oct | 420 | 568 | 666 | 773 |
| 12-Oct | 576 | 746 | 665 | 761 |
| 13-Oct | 766 | 954 | 655 | 747 |
| 14-Oct | 609 | 664 | 646 | 743 |
| 15-Oct | 680 | 839 | 639 | 733 |
| 16-Oct | 505 | 675 | 641 | 731 |
| 17-Oct | 363 | 539 | 643 | 729 |
| 18-Oct | 549 | 596 | 633 | 719 |
| 19-Oct | 649 | 780 | 635 | 717 |
| 20-Oct | 737 | 812 | 621 | 707 |
| 21-Oct | 774 | 705 | 623 | 707 |
| 22-Oct | 774 | 660 | 622 | 699 |
| 23-Oct | 570 | 589 | 638 | 704 |
| 24-Oct | 500 | 487 | 640 | 707 |
| 25-Oct | 482 | 504 | 641 | 703 |
| 26-Oct | 610 | 611 | 642 | 697 |
| 27-Oct | 668 | 738 | 638 | 683 |
| 28-Oct | 820 | 654 | 628 | 673 |
| 29-Oct | 901 | 945 | 636 | 671 |
| 30-Oct | 654 | 637 | 644 | 679 |
| 31-Oct | 725 | 663 | 659 | 686 |
| 1-Nov | 550 | 548 | 661 | 688 |
| 2-Nov | 809 | 782 | | |
| 3-Nov | 670 | 788 | | |
| 4-Nov | 622 | 681 | | |
| 5-Nov | 812 | 699 | | |
| 6-Nov | 611 | 511 | | |
| 7-Nov | 453 | 465 | | |
| 8-Nov | 798 | 650 | | |
| 9-Nov | 666 | 868 | | |
| 10-Nov | 870 | 778 | | |
| 11-Nov | 646 | 811 | | |
| 12-Nov | 676 | 858 | | |
| 13-Nov | 555 | 771 | | |
| 14-Nov | 531 | 478 | | |

IFR_AR_009086

| | | |
|---|---|---|
| **15-Nov** | 581 | 635 |
| **16-Nov** | 915 | 649 |
| **17-Nov** | 757 | 687 |
| **18-Nov** | 790 | 738 |
| **19-Nov** | 585 | 570 |
| **20-Nov** | 605 | 707 |
| **21-Nov** | 596 | 547 |
| **22-Nov** | 630 | 657 |
| **23-Nov** | 849 | 800 |
| **24-Nov** | 754 | 592 |
| **25-Nov** | 815 | 877 |
| **26-Nov** | 674 | 628 |
| **27-Nov** | 600 | 539 |
| **28-Nov** | 640 | 647 |
| **29-Nov** | 581 | 514 |
| **30-Nov** | 828 | 631 |

IFR_AR_009088

IFR_AR_009089

IFR_AR_009090

IFR_AR_009091

IFR_AR_009092

IFR_AR_009093

2 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of return flights, average daily encounters fell by 38 percent for Guatemala and 42 percent for Hon

IFR_AR_009094

duras, as shown in Figure 3 below.

IFR_AR_009095

Returns have proven to be effective, but the Departments do not believe that they are sufficient. For instance, while the numbers of encounters of Guatemalan and Honduran nationals have fallen, in the 30 days ending Decemb

79 OIS analysis of data pulled from CBP UIP on January 3, 2023.

|         | Guatemala | Honduras |      |                  |     |
|---------|-----------|----------|------|------------------|-----|
| 24-Nov  | 525       | 549      | 1074 | December average | 968 |
| 25-Nov  | 341       | 370      | 711  |                  |     |
| 26-Nov  | 477       | 332      | 809  |                  |     |
| 27-Nov  | 384       | 345      | 729  |                  |     |
| 28-Nov  | 532       | 505      | 1037 |                  |     |
| 29-Nov  | 561       | 482      | 1043 |                  |     |
| 30-Nov  | 542       | 479      | 1021 |                  |     |
| 1-Dec   | 562       | 459      | 1021 |                  |     |
| 2-Dec   | 557       | 493      | 1050 |                  |     |
| 3-Dec   | 432       | 393      | 825  |                  |     |
| 4-Dec   | 395       | 399      | 794  |                  |     |
| 5-Dec   | 510       | 487      | 997  |                  |     |
| 6-Dec   | 590       | 330      | 920  |                  |     |
| 7-Dec   | 598       | 409      | 1007 |                  |     |
| 8-Dec   | 787       | 476      | 1263 |                  |     |
| 9-Dec   | 515       | 358      | 873  |                  |     |
| 10-Dec  | 537       | 383      | 920  |                  |     |
| 11-Dec  | 650       | 369      | 1019 |                  |     |
| 12-Dec  | 423       | 381      | 804  |                  |     |
| 13-Dec  | 602       | 565      | 1167 |                  |     |
| 14-Dec  | 608       | 461      | 1069 |                  |     |
| 15-Dec  | 495       | 501      | 996  |                  |     |
| 16-Dec  | 580       | 557      | 1137 |                  |     |
| 17-Dec  | 425       | 471      | 896  |                  |     |
| 18-Dec  | 409       | 389      | 798  |                  |     |
| 19-Dec  | 482       | 449      | 931  |                  |     |
| 20-Dec  | 665       | 496      | 1161 |                  |     |
| 21-Dec  | 557       | 519      | 1076 |                  |     |
| 22-Dec  | 534       | 531      | 1065 |                  |     |
| 23-Dec  | 564       | 420      | 984  |                  |     |
| 24-Dec  | 371       | 427      | 798  |                  |     |

NEED TO CONFIRM: UIP for 30 days ending 12/24/2022, pulled 1/4/2023

er 24, 2022, CBP encountered an average of around 970 nationals from these two countries each day

IFR_AR_009097

Of the nine SWB USBP sectors, four were over capacity, at 100 to 128 percent, with three more at capacity levels between 68 and 99 percent as of December 24, 2022, prior to the implementation of the parole processes for Cubans, 90 OIS analysis of data pulled from CBP UIP on December 24, 2022.

| Custody Summary | | | | | | |
|---|---|---|---|---|---|---|
| Sector | Count in Custody | | | | Capacity | % Capacity |
| | SA | FM | UC | Total | | |
| San Diego | 1,406 | 512 | 27 | 1,945 | 1,966 | 99% |
| El Centro | 478 | 136 | 8 | 622 | 512 | 121% |
| Yuma | 939 | 691 | 20 | 1,650 | 1,291 | 128% |
| Tucson | 547 | 424 | 45 | 1,016 | 1,191 | 85% |
| El Paso | 1,157 | 1,089 | 153 | 2,399 | 2,392 | 100% |
| Big Bend | 4 | 0 | 1 | 5 | 542 | 1% |
| Del Rio | 1,388 | 612 | 98 | 2,098 | 1,845 | 114% |
| Laredo | 870 | 373 | 10 | 1,253 | 2,155 | 58% |
| RGV | 1,612 | 858 | 298 | 2,768 | 4,045 | 68% |
| **USBP Total** | **8,401** | **4,695** | **660** | **13,756** | **15,939** | **86%** |
| San Diego FO | 101 | 82 | 8 | 191 | 386 | 49% |
| Tucson FO | 0 | 0 | 0 | 0 | 96 | 0% |
| El Paso FO | 5 | 3 | 1 | 9 | 137 | 7% |
| Laredo FO | 6 | 0 | 1 | 7 | 283 | 2% |
| **OFO Total** | **112** | **85** | **10** | **207** | **902** | **23%** |
| **Grand Total** | **8,513** | **4,780** | **670** | **13,963** | **16,841** | **83%** |

**Source:** UIP Custody Fact Table as of 12/24/22.

IFR_AR_009098

Haitians, and Nicaraguans

IFR_AR_009099

Increased flows are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors. In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double (94 percent increase) the number of m

91 OIS Persist Dataset based on data through October 2022.

| FY | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | Total | DRT+EPT+YAZ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 5,288 | 14,694 | 32,562 | 12,251 | 35,287 | 59,766 | 68,565 | 212,202 | 7,116 | 447,731 | 34,061 |
| 2011 | 4,036 | 16,144 | 30,191 | 10,345 | 36,053 | 59,243 | 42,447 | 123,285 | 5,833 | 327,577 | 32,322 |
| 2012 | 3,964 | 21,720 | 23,916 | 9,678 | 44,872 | 97,762 | 28,461 | 120,000 | 6,500 | 356,873 | 37,898 |
| 2013 | 3,684 | 23,510 | 16,306 | 11,154 | 50,749 | 154,453 | 27,496 | 120,939 | 6,106 | 414,397 | 40,770 |
| 2014 | 4,096 | 24,255 | 14,511 | 12,339 | 44,049 | 256,392 | 29,911 | 87,915 | 5,902 | 479,370 | 42,496 |
| 2015 | 5,031 | 19,013 | 12,820 | 14,495 | 35,888 | 147,257 | 26,290 | 63,397 | 7,142 | 331,333 | 40,650 |
| 2016 | 6,366 | 23,078 | 19,448 | 25,634 | 36,562 | 186,830 | 31,891 | 64,891 | 14,170 | 408,870 | 62,882 |
| 2017 | 6,002 | 13,476 | 18,633 | 25,193 | 25,460 | 137,562 | 26,086 | 38,657 | 12,847 | 303,916 | 51,516 |
| 2018 | 8,045 | 15,833 | 29,230 | 31,561 | 32,641 | 162,262 | 38,591 | 52,172 | 26,244 | 396,579 | 73,638 |
| 2019 | 9,637 | 57,269 | 35,138 | 182,143 | 38,378 | 339,135 | 58,049 | 63,490 | 68,269 | 851,508 | 307,681 |
| 2020 | 8,627 | 40,342 | 27,487 | 54,396 | 51,425 | 90,203 | 53,277 | 66,074 | 8,804 | 400,635 | 103,542 |
| 2021 | 37,266 | 259,294 | 59,231 | 193,918 | 112,241 | 549,077 | 142,459 | 191,232 | 114,488 | 1,659,206 | 567,700 |
| 2022 | 31,948 | 480,932 | 72,378 | 307,844 | 106,843 | 468,124 | 176,290 | 251,984 | 310,094 | 2,206,437 | 1,098,870 |

FY22:FY21   94%

FY22:FY14   11.38995

igrants as compared to FY 2021 and an eleven-fold increase over the average for FY 2014–FY 2019, primarily as a result of increases from CHNV countries

IFR_AR_009101

As of December 24, 2022, these three sectors were each operating at the limits of, or over, their safe operating capacity, given space limitations, at 100 to 128 percent.

92 OIS analysis of data pulled from CBP UIP on December 24, 2022.

| Custody Summary | | | | | | |
|---|---|---|---|---|---|---|
| **Sector** | **Count in Custody** | | | | **Capacity** | **% Capacity** |
| | **SA** | **FM** | **UC** | **Total** | | |
| San Diego | 1,406 | 512 | 27 | 1,945 | 1,966 | 99% |
| El Centro | 478 | 136 | 8 | 622 | 512 | 121% |
| Yuma | 939 | 691 | 20 | 1,650 | 1,291 | 128% |
| Tucson | 547 | 424 | 45 | 1,016 | 1,191 | 85% |
| El Paso | 1,157 | 1,089 | 153 | 2,399 | 2,392 | 100% |
| Big Bend | 4 | 0 | 1 | 5 | 542 | 1% |
| Del Rio | 1,388 | 612 | 98 | 2,098 | 1,845 | 114% |
| Laredo | 870 | 373 | 10 | 1,253 | 2,155 | 58% |
| RGV | 1,612 | 858 | 298 | 2,768 | 4,045 | 68% |
| **USBP Total** | **8,401** | **4,695** | **660** | **13,756** | **15,939** | **86%** |
| San Diego FO | 101 | 82 | 8 | 191 | 386 | 49% |
| Tucson FO | 0 | 0 | 0 | 0 | 96 | 0% |
| El Paso FO | 5 | 3 | 1 | 9 | 137 | 7% |
| Laredo FO | 6 | 0 | 1 | 7 | 283 | 2% |
| **OFO Total** | **112** | **85** | **10** | **207** | **902** | **23%** |
| **Grand Total** | **8,513** | **4,780** | **670** | **13,963** | **16,841** | **83%** |

**Source:** UIP Custody Fact Table as of 12/24/22.

IFR_AR_009102

A full 83 percent of the people who were subject to ER and claimed fear from 2014 to 2019 were referred to an IJ for section 240 proceedings, but only 15 percent of those cases that were completed were granted asylum or some ot

97 OIS Enforcement Lifecycle data through September 30, 2022. Referrals to an IJ include positive credible fear findings by U.S. Citizenship and Immigration Services (''USCIS'') asylum officers, negative fear findings that are vacated by an IJ, and USCIS case closures that a

See counts and footnotes at bottom of page; unhide columns to see additional years and OTM population.

| | Total |
|---|---|
| | **FY14-FY19** |
| Total Encounters[1] | 2,925,074 |
| T8 Encounters | 2,925,074 |
| % T8 Placed in ER | 42% |
| % ER resulting in APSO fear claims (% claiming fear) | 36% |
| % APSO fear claims Referred to EOIR | 83% |
| % EOIR referrals still in proceedings | 39% |
| % EOIR referrals completed | 61% |
| Relief as % of case completions | 15% |
| Relief on merits as % of completions | 15% |
| Other relief as % of completions | 1% |
| Removal Order + VD as % of completions | 59% |
| Absentia order as % of completions | 22% |
| Confirmed departure as % of absentia order | 5% |
| Not absentia as % of completions | 37% |
| Confirmed departure as % of non absentia orders | 46% |
| Confirmed departures as % of all removal orders | 31% |
| Terminate/Dismiss/closure/other as % of completions | 25% |
| **Outcomes as Shares of EOIR referrals** | |
| Relief as % of referrals to EOIR | 9% |
| Removals as % of referrals to EOIR | 11% |
| Unexecuted Removal order as % of referrals to EOIR | 25% |
| Terminate/Dismiss/closure/other as % of referrals to EOIR | 16% |
| Still in Proceedings as % of Referrals to EOIR | 39% |
| **Outcomes as shares of EOIR Case Completions** | |
| Relief as % Completions | 15% |
| Removal Orders + VD as % of Completions | 59% |
| Removals as % completions | 18% |
| Unexecuted Removal order as % of Completions | 41% |
| Terminate/Dismiss/closure/other as % of Completions | 25% |
| **Relief on Merits as % of cases decided on merits** | 28% |

| | Total |
|---|---|
| | FY14-FY19 |
| Total Encounters[1] | 2,925,074 |
| T8 Encounters | 2,925,074 |
| Placed in ER (CBP ER Dispositions) | 1,235,831 |
| APSO fear claims[2] | 450,324 |

IFR_AR_009103

| | |
|---|---|
| Referred to EOIR[3] | 374,330 |
| Still in proceedings[4] | 145,266 |
| EOIR case completion[5] | 229,064 |
| Relief[6] | 35,094 |
| Relief on merits[7] | 33,678 |
| Other relief[8] | 1,416 |
| Removal Order + VD[9] | 135,615 |
| Absentia | 50,197 |
| Confirmed departure | 2,744 |
| No confirmed departure | 47,453 |
| Not absentia | 85,418 |
| Confirmed departure | 38,922 |
| No confirmed departure | 46,496 |
| Terminate/Dismiss/closure/other[10] | 58,355 |

Notes: Results based on source data as of October, 2022 and OIS Enforcement Lifecycle methodology as of December 7, 2022. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.

[1] Excludes accompanied minors, unaccompanied children, and OFO administrative cases including, crewmembers, parolee, and withdrawals.

[2] Includes individulas placed in ER and found to have a credible fear case in USCIS APSO system.

[3] Includes USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[4] Includes cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, Zero Bond, BIA appeal, or recision rescinded.

[5] Includes cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

[6] Includes cases with completion codes for relief on merits and other types of relief.

[7] Includes completion  codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[8] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.

[9] Includes completion codes for removal order, voluntary departure, withdrawal, abandonment, denial, and DHS fear decision affirmed.

[10] Includes completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

IFR_AR_009104

ther form of protection

re placed in section 240 proceedings. Grants of relief or protection include grants of asylum, statutory withholding of removal, withholding or deferral of removal under the CAT regulations, cancellation of removal, and adjustment of status under various statutory provisio

IFR_AR_009105

Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

IFR_AR_009106

ns. While only 15 percent of all case completions result in relief or protection, OIS estimates that 28 percent of cases decided on their merits are grants of relief. Cases of relief decided on their merits include grants of asylum and other grants of status under statutory provi

IFR_AR_009107

IFR_AR_009108

sions (i.e., excluding withholding of removal, deferral of removal, cancellation of removal, and claimed status reviews); and the percentage of cases decided on their merits is calculated by divid

IFR_AR_009109

Indeed, 39 percent of all SWB credible fear referrals to EOIR from FY 2014 to FY 2019 remain in EOIR proceedings today.

99 OIS Enforcement Lifecycle data through September 30, 2022.

As of FY 2022 year-end, more than a quarter (26 percent) of EOIR cases resulting from SWB encounters making credible fear claims from as long ago as FY 2014 remained in proceedings, one-third (33 percent) of EOI[R]

100 Id.

See counts and footnotes at bottom of page; unhide columns to see additional years and OTM population.

| | Total | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY14-FY19 | FY20 | FY21 |
| Total Encounters[1] | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 416,485 | 1,578,617 |
| T8 Encounters | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 223,174 | 521,398 |
| % T8 Placed in ER | 54% | 49% | 50% | 52% | 48% | 49% | 25% | 42% | 41% | 16% |
| % ER resulting in APSO fear claims (% claiming fear) | 15% | 21% | 26% | 41% | 43% | 45% | 44% | 36% | 26% | 57% |
| % APSO fear claims Referred to EOIR | 89% | 78% | 80% | 87% | 86% | 86% | 80% | 83% | 53% | 79% |
| % EOIR referrals still in proceedings | 22% | 26% | 29% | 33% | 40% | 45% | 48% | 39% | 64% | 74% |
| % EOIR referrals completed | 78% | 74% | 71% | 67% | 60% | 55% | 52% | 61% | 36% | 26% |
| Relief as % of case completions | 26% | 20% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% |
| Relief on merits as % of completions | 14% | 17% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% |
| Other relief as % of completions | 12% | 4% | 0% | 0% | 0% | 0% | 0% | 1% | 0% | 0% |
| Removal Order + VD as % of completions | 56% | 62% | 63% | 66% | 63% | 56% | 47% | 59% | 39% | 21% |
| Absentia order as % of completions | 28% | 25% | 20% | 24% | 25% | 26% | 11% | 22% | 6% | 11% |
| Confirmed departure as % of absentia order | 9% | 8% | 8% | 5% | 5% | 4% | 5% | 5% | 8% | 1% |
| Not absentia as % of completions | 27% | 37% | 43% | 42% | 37% | 30% | 36% | 37% | 33% | 9% |
| Confirmed departure as % of non absentia orders | 49% | 47% | 41% | 29% | 43% | 50% | 73% | 46% | 47% | 35% |
| Confirmed departures as % of all removal orders | 29% | 32% | 30% | 20% | 28% | 28% | 56% | 31% | 41% | 16% |
| Terminate/Dismiss/closure/other as % of completions | 18% | 18% | 17% | 19% | 24% | 31% | 40% | 25% | 40% | 76% |
| **Outcomes as Shares of EOIR referrals** | | | | | | | | | | |
| Relief as % of referrals to EOIR | 20% | 15% | 15% | 10% | 8% | 7% | 7% | 9% | 8% | 1% |
| Removals as % of referrals to EOIR | 12% | 14% | 14% | 9% | 10% | 9% | 14% | 11% | 6% | 1% |
| Unexecuted Removal order as % of referrals to EOIR | 31% | 31% | 31% | 35% | 27% | 22% | 11% | 25% | 8% | 4% |
| Terminate/Dismiss/closure/other as % of referrals to EOIR | 14% | 13% | 12% | 13% | 14% | 17% | 21% | 16% | 15% | 19% |
| Still in Proceedings as % of Referrals to EOIR | 22% | 26% | 29% | 33% | 40% | 45% | 48% | 39% | 64% | 74% |
| **Outcomes as shares of EOIR Case Completions** | | | | | | | | | | |
| Relief as % Completions | 26% | 20% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% |
| Removal Orders + VD as % of Completions | | | | | | | | 59% | | |
| Removals as % completions | 16% | 20% | 19% | 13% | 17% | 16% | 26% | 18% | 16% | 3% |
| Unexecuted Removal order as % of Completions | 40% | 42% | 44% | 52% | 45% | 40% | 20% | 41% | 23% | 17% |
| Terminate/Dismiss/closure/other as % of Completions | 18% | 18% | 17% | 19% | 24% | 31% | 40% | 25% | 40% | 76% |
| **Relief on Merits as % of cases decided on merits** | 33% | 31% | 32% | 27% | 26% | 30% | 26% | 28% | 38% | 28% |
| | 11% | 11% | 11% | 8% | 9% | 8% | 11% | 9% | 3% | 1% |

| | Total | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY14-FY19 | FY20 | FY21 |
| Total Encounters[1] | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 416,485 | 1,578,617 |
| T8 Encounters | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 223,174 | 521,398 |
| Placed in ER (CBP ER Dispositions) | 236,062 | 229,165 | 180,589 | 227,910 | 160,303 | 214,667 | 223,197 | 1,235,831 | 91,719 | 84,687 |

IFR_AR_009110

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| APSO fear claims[2] | 36,025 | 48,649 | 46,387 | 92,689 | 68,700 | 95,633 | 98,266 | 450,324 | 23,946 | 48,559 |
| Referred to EOIR[3] | 32,000 | 37,793 | 36,951 | 80,202 | 58,784 | 82,418 | 78,182 | 374,330 | 12,640 | 38,126 |
| Still in proceedings[4] | 6,931 | 9,870 | 10,675 | 26,405 | 23,776 | 36,896 | 37,644 | 145,266 | 8,040 | 28,395 |
| EOIR case completion[5] | 25,069 | 27,923 | 26,276 | 53,797 | 35,008 | 45,522 | 40,538 | 229,064 | 4,600 | 9,731 |
| Relief[6] | 6,471 | 5,640 | 5,374 | 8,335 | 4,693 | 5,933 | 5,119 | 35,094 | 957 | 367 |
| Relief on merits[7] | 3,451 | 4,631 | 5,264 | 8,195 | 4,629 | 5,878 | 5,081 | 33,678 | 954 | 362 |
| Other relief[8] | 3,020 | 1,009 | 110 | 140 | 64 | 55 | 38 | 1,416 | 3 | 5 |
| Removal Order + VD[9] | 13,977 | 17,306 | 16,556 | 35,422 | 21,900 | 25,397 | 19,034 | 135,615 | 1,799 | 2,015 |
| Absentia | 7,115 | 6,907 | 5,213 | 12,768 | 8,832 | 11,916 | 4,561 | 50,197 | 262 | 1,104 |
| Confirmed departure | 666 | 563 | 401 | 683 | 424 | 442 | 231 | 2,744 | 22 | 11 |
| No confirmed departure | 6,449 | 6,344 | 4,812 | 12,085 | 8,408 | 11,474 | 4,330 | 47,453 | 240 | 1,093 |
| Not absentia | 6,862 | 10,399 | 11,343 | 22,654 | 13,068 | 13,481 | 14,473 | 85,418 | 1,537 | 911 |
| Confirmed departure | 3,329 | 4,905 | 4,611 | 6,503 | 5,609 | 6,791 | 10,503 | 38,922 | 724 | 319 |
| No confirmed departure | 3,533 | 5,494 | 6,732 | 16,151 | 7,459 | 6,690 | 3,970 | 46,496 | 813 | 592 |
| Terminate/Dismiss/closure/other[10] | 4,621 | 4,977 | 4,346 | 10,040 | 8,415 | 14,192 | 16,385 | 58,355 | 1,844 | 7,349 |

Notes: Results based on source data through September 30, 2022 and OIS Enforcement Lifecycle methodology as of December 7, 2022. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border b

[1] Excludes accompanied minors, unaccompanied children, and OFO administrative cases including, crewmembers, parolee, and withdrawals.

[2] Includes individulas placed in ER and found to have a credible fear case in USCIS APSO system.

[3] Includes USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[4] Includes cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, Zero Bond, BIA appeal, or recision rescinded.

[5] Includes cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

[6] Includes cases with completion codes for relief on merits and other types of relief.

[7] Includes completion  codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[8] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.

[9] Includes completion codes for removal order, voluntary departure, withdrawal, abandonment, denial, and DHS fear decision affirmed.

[10] Includes completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

IFR_AR_009111

R cases resulting from FY 2016 encounters remained in proceedings, and almost half (48 percent) of EOIR cases resulting from FY 2019 encounters remained in proceeding

| OTMs | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | **FY14-FY19** | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 |
| 2,187,156 | 145,693 | 211,020 | 128,420 | 207,161 | 181,162 | 251,197 | 672,224 | 1,651,184 | 143,047 | 956,922 | 1,422,422 | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 |
| 1,109,854 | 145,693 | 211,020 | 128,420 | 207,161 | 181,162 | 251,197 | 672,224 | 1,651,184 | 99,113 | 477,392 | 1,035,608 | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 |
| 11% | 59% | 50% | 54% | 57% | 50% | 51% | 21% | 39% | 38% | 16% | 10% | 52% | 47% | 48% | 47% | 44% |
| 37% | 39% | 41% | 58% | 72% | 71% | 70% | 68% | 64% | 64% | 64% | 44% | 2% | 4% | 6% | 7% | 6% |
| 69% | 90% | 79% | 83% | 88% | 86% | 88% | 81% | 85% | 59% | 79% | 70% | 80% | 67% | 60% | 71% | 74% |
| 66% | 22% | 27% | 30% | 33% | 41% | 45% | 48% | 39% | 64% | 75% | 66% | 12% | 18% | 21% | 26% | 34% |
| 34% | 78% | 73% | 70% | 67% | 59% | 55% | 52% | 61% | 36% | 25% | 34% | 88% | 82% | 79% | 74% | 66% |
| 1% | 27% | 21% | 22% | 16% | 14% | 13% | 13% | 16% | 24% | 4% | 1% | 16% | 11% | 9% | 7% | 7% |
| 1% | 15% | 18% | 22% | 16% | 14% | 13% | 13% | 15% | 24% | 4% | 1% | 4% | 8% | 8% | 6% | 6% |
| 0% | 12% | 4% | 0% | 0% | 0% | 0% | 0% | 1% | 0% | 0% | 0% | 12% | 3% | 1% | 1% | 0% |
| 11% | 56% | 62% | 63% | 66% | 62% | 55% | 46% | 59% | 39% | 21% | 11% | 57% | 63% | 66% | 70% | 68% |
| 6% | 29% | 25% | 20% | 24% | 25% | 27% | 11% | 22% | 6% | 11% | 6% | 21% | 21% | 18% | 22% | 27% |
| 1% | 9% | 8% | 8% | 5% | 5% | 4% | 5% | 5% | 8% | 1% | 1% | 8% | 7% | 9% | 8% | 6% |
| 5% | 27% | 37% | 43% | 42% | 37% | 28% | 35% | 37% | 34% | 9% | 5% | 36% | 42% | 47% | 47% | 41% |
| 42% | 46% | 46% | 38% | 26% | 42% | 47% | 72% | 44% | 42% | 33% | 41% | 68% | 54% | 56% | 55% | 61% |
| 19% | 27% | 31% | 28% | 19% | 27% | 26% | 55% | 29% | 37% | 15% | 18% | 46% | 38% | 43% | 40% | 39% |
| 88% | 18% | 17% | 15% | 18% | 24% | 32% | 41% | 26% | 36% | 76% | 88% | 27% | 26% | 25% | 24% | 25% |
| | | | | | | | | | | | | | | | | |
| 0% | 21% | 15% | 15% | 11% | 8% | 7% | 7% | 10% | 9% | 1% | 0% | 14% | 9% | 7% | 5% | 4% |
| 1% | 12% | 14% | 12% | 8% | 10% | 8% | 13% | 10% | 5% | 1% | 1% | 23% | 20% | 22% | 20% | 18% |
| 3% | 31% | 31% | 31% | 36% | 27% | 22% | 11% | 25% | 9% | 4% | 3% | 27% | 32% | 29% | 31% | 27% |
| 30% | 14% | 12% | 11% | 12% | 14% | 17% | 21% | 15% | 13% | 19% | 30% | 24% | 21% | 20% | 17% | 17% |
| 66% | 22% | 27% | 30% | 33% | 41% | 45% | 48% | 39% | 64% | 75% | 66% | 12% | 18% | 21% | 26% | 34% |
| | | | | | | | | | | | | | | | | |
| 1% | 27% | 21% | 22% | 16% | 14% | 13% | 13% | 16% | 24% | 4% | 1% | 16% | 11% | 9% | 7% | 7% |
| | | | | | | | | | | | | | | | | |
| 2% | 15% | 19% | 18% | 12% | 17% | 14% | 25% | 17% | 15% | 3% | 2% | 26% | 24% | 28% | 28% | 27% |
| 9% | 41% | 43% | 45% | 53% | 46% | 40% | 21% | 41% | 25% | 17% | 9% | 31% | 39% | 37% | 42% | 41% |
| 88% | 18% | 17% | 15% | 18% | 24% | 32% | 41% | 26% | 36% | 76% | 88% | 27% | 26% | 25% | 24% | 25% |
| 16% | 35% | 32% | 34% | 28% | 27% | 32% | 27% | 30% | 42% | 29% | 16% | 10% | 16% | 15% | 12% | 13% |

1%

| OTMs | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY14-FY19 | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 |
| 2,187,156 | 145,693 | 211,020 | 128,420 | 207,161 | 181,162 | 251,197 | 672,224 | 1,651,184 | 143,047 | 956,922 | 1,422,422 | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 |
| 1,109,854 | 145,693 | 211,020 | 128,420 | 207,161 | 181,162 | 251,197 | 672,224 | 1,651,184 | 99,113 | 477,392 | 1,035,608 | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 |
| 119,664 | 85,948 | 106,364 | 68,893 | 118,729 | 91,387 | 127,598 | 138,401 | 651,372 | 38,007 | 75,890 | 100,732 | 150,114 | 122,801 | 111,696 | 109,181 | 68,916 |

IFR_AR_009112

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 44,840 | 33,361 | 43,715 | 39,619 | 85,095 | 64,778 | 89,596 | 93,903 | 416,706 | 17,990 | 48,216 | 44,593 | 2,664 | 4,934 | 6,768 | 7,594 | 3,922 |
| 31,114 | 29,864 | 34,486 | 32,884 | 74,808 | 55,872 | 78,437 | 76,231 | 352,718 | 10,680 | 37,962 | 31,021 | 2,136 | 3,307 | 4,067 | 5,394 | 2,912 |
| 20,493 | 6,672 | 9,268 | 9,804 | 24,987 | 22,790 | 35,585 | 36,854 | 139,288 | 6,812 | 28,314 | 20,427 | 259 | 602 | 871 | 1,418 | 986 |
| 10,621 | 23,192 | 25,218 | 23,080 | 49,821 | 33,082 | 42,852 | 39,377 | 213,430 | 3,868 | 9,648 | 10,594 | 1,877 | 2,705 | 3,196 | 3,976 | 1,926 |
| 103 | 6,166 | 5,337 | 5,086 | 8,063 | 4,566 | 5,765 | 5,072 | 33,889 | 943 | 365 | 103 | 305 | 303 | 288 | 272 | 127 |
| 101 | 3,374 | 4,416 | 5,000 | 7,944 | 4,510 | 5,717 | 5,039 | 32,626 | 940 | 361 | 101 | 77 | 215 | 264 | 251 | 119 |
| 2 | 2,792 | 921 | 86 | 119 | 56 | 48 | 33 | 1,263 | 3 | 4 | 2 | 228 | 88 | 24 | 21 | 8 |
| 1,210 | 12,907 | 15,602 | 14,458 | 32,655 | 20,590 | 23,453 | 18,152 | 124,910 | 1,524 | 1,978 | 1,198 | 1,070 | 1,704 | 2,098 | 2,767 | 1,310 |
| 678 | 6,714 | 6,338 | 4,625 | 11,878 | 8,312 | 11,383 | 4,466 | 47,002 | 217 | 1,103 | 678 | 401 | 569 | 588 | 890 | 520 |
| 5 | 633 | 522 | 349 | 613 | 393 | 417 | 224 | 2,518 | 18 | 11 | 5 | 33 | 41 | 52 | 70 | 31 |
| 673 | 6,081 | 5,816 | 4,276 | 11,265 | 7,919 | 10,966 | 4,242 | 44,484 | 199 | 1,092 | 673 | 368 | 528 | 536 | 820 | 489 |
| 532 | 6,193 | 9,264 | 9,833 | 20,777 | 12,278 | 12,070 | 13,686 | 77,908 | 1,307 | 875 | 520 | 669 | 1,135 | 1,510 | 1,877 | 790 |
| 224 | 2,871 | 4,297 | 3,761 | 5,473 | 5,124 | 5,688 | 9,805 | 34,148 | 544 | 290 | 214 | 458 | 608 | 850 | 1,030 | 485 |
| 308 | 3,322 | 4,967 | 6,072 | 15,304 | 7,154 | 6,382 | 3,881 | 43,760 | 763 | 585 | 306 | 211 | 527 | 660 | 847 | 305 |
| 9,308 | 4,119 | 4,279 | 3,536 | 9,103 | 7,926 | 13,634 | 16,153 | 54,631 | 1,401 | 7,305 | 9,293 | 502 | 698 | 810 | 937 | 489 |

y year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

IFR_AR_009113

| Mexico | | | | | |
|---|---|---|---|---|---|
| FY18 | FY19 | **FY14-FY19** | FY20 | FY21 | FY22 |
| 188,579 | 205,932 | 1,273,890 | 273,438 | 621,695 | 764,734 |
| 188,579 | 205,932 | 1,273,890 | 124,061 | 44,006 | 74,246 |
| 46% | 41% | 46% | 43% | 20% | 25% |
| 7% | 5% | 6% | 11% | 4% | 1% |
| 66% | 45% | 64% | 33% | 48% | 38% |
| 33% | 40% | 28% | 63% | 49% | 71% |
| 67% | 60% | 72% | 37% | 51% | 29% |
| 6% | 4% | 8% | 2% | 2% | 0% |
| 6% | 4% | 7% | 2% | 1% | 0% |
| 0% | 0% | 1% | 0% | 1% | 0% |
| 73% | 76% | 68% | 38% | 45% | 44% |
| 20% | 8% | 20% | 6% | 1% | 0% |
| 5% | 7% | 7% | 9% | 0% | #DIV/0! |
| 53% | 68% | 48% | 31% | 43% | 44% |
| 78% | 89% | 64% | 78% | 81% | 83% |
| 58% | 80% | 47% | 67% | 78% | 83% |
| 21% | 20% | 24% | 61% | 53% | 56% |
| | | | | | |
| 4% | 2% | 6% | 1% | 1% | 0% |
| 28% | 36% | 23% | 9% | 18% | 11% |
| 20% | 9% | 26% | 5% | 5% | 2% |
| 14% | 12% | 17% | 23% | 27% | 16% |
| 33% | 40% | 28% | 63% | 49% | 71% |
| | | | | | |
| 6% | 4% | 8% | 2% | 2% | 0% |
| | | | | | |
| 42% | 61% | 32% | 25% | 35% | 37% |
| 31% | 15% | 36% | 12% | 10% | 7% |
| 21% | 20% | 24% | 61% | 53% | 56% |
| 10% | 5% | 12% | 6% | 3% | 0% |

| Mexico | | | | | |
|---|---|---|---|---|---|
| FY18 | FY19 | FY14-FY19 | FY20 | FY21 | FY22 |
| 188,579 | 205,932 | 1,273,890 | 273,438 | 621,695 | 764,734 |
| 188,579 | 205,932 | 1,273,890 | 124,061 | 44,006 | 74,246 |
| 87,069 | 84,796 | 584,459 | 53,712 | 8,797 | 18,932 |

IFR_AR_009114

| | | | | | |
|---|---|---|---|---|---|
| 6,037 | 4,363 | 33,618 | 5,956 | 343 | 247 |
| 3,981 | 1,951 | 21,612 | 1,960 | 164 | 93 |
| 1,311 | 790 | 5,978 | 1,228 | 81 | 66 |
| 2,670 | 1,161 | 15,634 | 732 | 83 | 27 |
| 168 | 47 | 1,205 | 14 | 2 | |
| 161 | 42 | 1,052 | 14 | 1 | |
| 7 | 5 | 153 | | 1 | |
| 1,944 | 882 | 10,705 | 275 | 37 | 12 |
| 533 | 95 | 3,195 | 45 | 1 | |
| 25 | 7 | 226 | 4 | | |
| 508 | 88 | 2,969 | 41 | 1 | |
| 1,411 | 787 | 7,510 | 230 | 36 | 12 |
| 1,103 | 698 | 4,774 | 180 | 29 | 10 |
| 308 | 89 | 2,736 | 50 | 7 | 2 |
| 558 | 232 | 3,724 | 443 | 44 | 15 |

IFR_AR_009115

Excluding *in absentia* orders, the mean completion time for EOIR cases completed in FY 2022 was 4.2 years.

101 OIS analysis of DOJ EOIR data.

Mean completion time for cases completed in 2022:   **4.18**

| | | **COMPLETION FY** | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| Cases Completed - | **N** | 67,463 | 98,165 | 116,921 | 141,103 | 143,610 | 150,338 | 160,531 | 178,555 | 190,706 | 197,721 | 189,417 | 187,812 | 167,593 | 146,487 | 136,051 | 134,254 | 146,378 | 140,878 | 153,261 | 193,029 |
| | **Mean days** | 42 | 110 | 173 | 211 | 252 | 284 | 308 | 282 | 262 | 265 | 347 | 385 | 500 | 658 | 668 | 741 | 813 | 743 | 790 | 772 |
| | **Median days** | 14 | 29 | 48 | 52 | 55 | 45 | 53 | 36 | 22 | 26 | 46 | 60 | 142 | 373 | 354 | 446 | 532 | 358 | 381 | 317 |
| | **Mean years** | 0.1 | 0.3 | 0.5 | 0.6 | 0.7 | 0.8 | 0.8 | 0.8 | 0.7 | 0.7 | 1.0 | 1.1 | 1.4 | 1.8 | 1.8 | 2.0 | 2.2 | 2.0 | 2.2 | 2.1 |
| | **Median years** | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 1.0 | 1.0 | 1.2 | 1.5 | 1.0 | 1.0 | 0.9 |

Notes: Completion time calculated by linking completed cases to their associated EOIR case receipt dates. Completed cases includes Final order/voluntary departure not in absentia, Terminated/Dismissal, Other completions, Relief on merit, Relief
Source: OIS analysis of EOIR Production Data received October 2022



IFR_AR_009116

| 2020 | 2021 | 2022 | 2023 | All |
|---|---|---|---|---|
| 152,976 | 117,696 | 294,955 | 4,791 | ###### |
| 742 | 1,359 | 1,526 | 1,263 | 575 |
| 305 | 1,112 | 1,291 | 1,113 | 168 |
| 2.0 | 3.7 | 4.2 | 3.5 | |
| 0.8 | 3.0 | 3.5 | 3.0 | |

f not on merit.

4.394247

IFR_AR_009117

For all SWB encounters from FY 2014 to FY 2019 that claimed fear and were referred to EOIR, only 9 percent had been granted relief by the end of FY 2022, and only 11 percent had an executed removal order—leaving 80 perce

102 OIS Enforcement Lifecycle data through September 30, 2022. Here and throughout this discussion, references to removal orders and removal orders with or without confirmed removals include IJ grants of voluntary departures with or without confirmed departures.

See counts and footnotes at bottom of page; unhide columns to see additional years and OTM population.

| | Total | | | | | | | | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY14-FY19 | | | | | | | |
| Total Encounters[1] | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 416,485 | ###### | ###### | 145,693 | 211,020 | 128,420 | 207,161 |
| T8 Encounters | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 223,174 | 521,398 | ###### | 145,693 | 211,020 | 128,420 | 207,161 |
| % T8 Placed in ER | 54% | 49% | 50% | 52% | 48% | 49% | 25% | 42% | 41% | 16% | 11% | 59% | 50% | 54% | 57% |
| % ER resulting in APSO fear claims (% claiming fear) | 15% | 21% | 26% | 41% | 43% | 45% | 44% | 36% | 26% | 57% | 37% | 39% | 41% | 58% | 72% |
| % APSO fear claims Referred to EOIR | 89% | 78% | 80% | 87% | 86% | 86% | 80% | 83% | 53% | 79% | 69% | 90% | 79% | 83% | 88% |
| % EOIR referrals still in proceedings | 22% | 26% | 29% | 33% | 40% | 45% | 48% | 39% | 64% | 74% | 66% | 22% | 27% | 30% | 33% |
| % EOIR referrals completed | 78% | 74% | 71% | 67% | 60% | 55% | 52% | 61% | 36% | 26% | 34% | 78% | 73% | 70% | 67% |
| Relief as % of case completions | 26% | 20% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% | 1% | 27% | 21% | 22% | 16% |
| Relief on merits as % of completions | 14% | 17% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% | 1% | 15% | 18% | 22% | 16% |
| Other relief as % of completions | 12% | 4% | 0% | 0% | 0% | 0% | 0% | 1% | 0% | 0% | 0% | 12% | 4% | 0% | 0% |
| Removal Order + VD as % of completions | 56% | 62% | 63% | 66% | 63% | 56% | 47% | 59% | 39% | 21% | 11% | 56% | 62% | 63% | 66% |
| Absentia order as % of completions | 28% | 25% | 20% | 24% | 25% | 26% | 11% | 22% | 6% | 11% | 6% | 29% | 25% | 20% | 24% |
| Confirmed departure as % of absentia order | 9% | 8% | 8% | 5% | 5% | 4% | 5% | 5% | 8% | 1% | 1% | 9% | 8% | 8% | 5% |
| Not absentia as % of completions | 27% | 37% | 43% | 42% | 37% | 30% | 36% | 37% | 33% | 9% | 5% | 27% | 37% | 43% | 42% |
| Confirmed departure as % of non absentia orders | 49% | 47% | 41% | 29% | 43% | 50% | 73% | 46% | 47% | 35% | 42% | 46% | 46% | 38% | 26% |
| Confirmed departures as % of all removal orders | 29% | 32% | 30% | 20% | 28% | 28% | 56% | 31% | 41% | 16% | 19% | 27% | 31% | 28% | 19% |
| Terminate/Dismiss/closure/other as % of completions | 18% | 18% | 17% | 19% | 24% | 31% | 40% | 25% | 40% | 76% | 88% | 18% | 17% | 15% | 18% |
| **Outcomes as Shares of EOIR referrals** | | | | | | | | | | | | | | | |
| Relief as % of referrals to EOIR | 11% | 15% | 15% | 10% | 8% | 7% | 7% | 9% | 8% | 1% | 0% | 21% | 15% | 15% | 11% |
| Removals as % of referrals to EOIR | 31% | 14% | 14% | 9% | 10% | 9% | 14% | 11% | 6% | 1% | 1% | 12% | 14% | 12% | 8% |
| Unexecuted Removal order as % of referrals to EOIR | 36% | 31% | 31% | 35% | 27% | 22% | 11% | 25% | 8% | 4% | 3% | 31% | 31% | 31% | 36% |
| Terminate/Dismiss/closure/other as % of referrals to EOIR | 0% | 13% | 12% | 13% | 14% | 17% | 21% | 16% | 15% | 19% | 30% | 14% | 12% | 11% | 12% |
| Still in Proceedings as % of Referrals to EOIR | 78% | 26% | 29% | 33% | 40% | 45% | 48% | 39% | 64% | 74% | 66% | 22% | 27% | 30% | 33% |
| **Outcomes as shares of EOIR Case Completions** | | | | | | | | | | | | | | | |
| Relief as % Completions | 14% | 17% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% | 1% | 15% | 18% | 22% | 16% |
| Removal Orders + VD as % of Completions | | | | | | | | 59% | | | | | | | |
| Removals as % completions | 40% | 42% | 44% | 52% | 45% | 40% | 20% | 41% | 23% | 17% | 9% | 41% | 43% | 45% | 53% |
| Unexecuted Removal order as % of Completions | 46% | 55% | 60% | 61% | 61% | 61% | 76% | 63% | 74% | 85% | 93% | 44% | 54% | 58% | 60% |
| Terminate/Dismiss/closure/other as % of Completions | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Relief on Merits as % of cases decided on merits** | 33% | 31% | 32% | 27% | 26% | 30% | 26% | 28% | 38% | 28% | 16% | 35% | 32% | 34% | 28% |

| | Total | | | | | | | | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY14-FY19 | | | | | | | |
| Total Encounters[1] | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 416,485 | ###### | ###### | 145,693 | 211,020 | 128,420 | 207,161 |
| T8 Encounters | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 2,925,074 | 223,174 | 521,398 | ###### | 145,693 | 211,020 | 128,420 | 207,161 |
| Placed in ER (CBP ER Dispositions) | 236,062 | 229,165 | 180,589 | 227,910 | 160,303 | 214,667 | 223,197 | 1,235,831 | 91,719 | 84,687 | 119,664 | 85,948 | 106,364 | 68,893 | 118,729 |
| APSO fear claims[2] | 36,025 | 48,649 | 46,387 | 92,689 | 68,700 | 95,633 | 98,266 | 450,324 | 23,946 | 48,559 | 44,840 | 33,361 | 43,715 | 39,619 | 85,095 |
| Referred to EOIR[3] | 32,000 | 37,793 | 36,951 | 80,202 | 58,784 | 82,418 | 78,182 | 374,330 | 12,640 | 38,126 | 31,114 | 29,864 | 34,486 | 32,884 | 74,808 |

IFR_AR_009118

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Still in proceedings[4] | 6,931 | 9,870 | 10,675 | 26,405 | 23,776 | 36,896 | 37,644 | 145,266 | 8,040 | 28,395 | 20,493 | 6,672 | 9,268 | 9,804 | 24,987 |
| EOIR case completion[5] | 25,069 | 27,923 | 26,276 | 53,797 | 35,008 | 45,522 | 40,538 | 229,064 | 4,600 | 9,731 | 10,621 | 23,192 | 25,218 | 23,080 | 49,821 |
| Relief[6] | 6,471 | 5,640 | 5,374 | 8,335 | 4,693 | 5,933 | 5,119 | 35,094 | 957 | 367 | 103 | 6,166 | 5,337 | 5,086 | 8,063 |
| Relief on merits[7] | 3,451 | 4,631 | 5,264 | 8,195 | 4,629 | 5,878 | 5,081 | 33,678 | 954 | 362 | 101 | 3,374 | 4,416 | 5,000 | 7,944 |
| Other relief[8] | 3,020 | 1,009 | 110 | 140 | 64 | 55 | 38 | 1,416 | 3 | 5 | 2 | 2,792 | 921 | 86 | 119 |
| Removal Order + VD[9] | 13,977 | 17,306 | 16,556 | 35,422 | 21,900 | 25,397 | 19,034 | 135,615 | 1,799 | 2,015 | 1,210 | 12,907 | 15,602 | 14,458 | 32,655 |
| Absentia | 7,115 | 6,907 | 5,213 | 12,768 | 8,832 | 11,916 | 4,561 | 50,197 | 262 | 1,104 | 678 | 6,714 | 6,338 | 4,625 | 11,878 |
| Confirmed departure | 666 | 563 | 401 | 683 | 424 | 442 | 231 | 2,744 | 22 | 11 | 5 | 633 | 522 | 349 | 613 |
| No confirmed departure | 6,449 | 6,344 | 4,812 | 12,085 | 8,408 | 11,474 | 4,330 | 47,453 | 240 | 1,093 | 673 | 6,081 | 5,816 | 4,276 | 11,265 |
| Not absentia | 6,862 | 10,399 | 11,343 | 22,654 | 13,068 | 13,481 | 14,473 | 85,418 | 1,537 | 911 | 532 | 6,193 | 9,264 | 9,833 | 20,777 |
| Confirmed departure | 3,329 | 4,905 | 4,611 | 6,503 | 5,609 | 6,791 | 10,503 | 38,922 | 724 | 319 | 224 | 2,871 | 4,297 | 3,761 | 5,473 |
| No confirmed departure | 3,533 | 5,494 | 6,732 | 16,151 | 7,459 | 6,690 | 3,970 | 46,496 | 813 | 592 | 308 | 3,322 | 4,967 | 6,072 | 15,304 |
| Terminate/Dismiss/closure/other[10] | 4,621 | 4,977 | 4,346 | 10,040 | 8,415 | 14,192 | 16,385 | 58,355 | 1,844 | 7,349 | 9,308 | 4,119 | 4,279 | 3,536 | 9,103 |

Notes: Results based on source data through September 30, 2022 and OIS Enforcement Lifecycle methodology as of December 7, 2022. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of e

[1] Excludes accompanied minors, unaccompanied children, and OFO administrative cases including, crewmembers, parolee, and withdrawals.

[2] Includes individulas placed in ER and found to have a credible fear case in USCIS APSO system.

[3] Includes USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[4] Includes cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, Zero Bond, BIA appeal, or recision rescinded.

[5] Includes cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

[6] Includes cases with completion codes for relief on merits and other types of relief.

[7] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[8] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.

[9] Includes completion codes for removal order, voluntary departure, withdrawal, abandonment, denial, and DHS fear decision affirmed.

[10] Includes completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

IFR_AR_009119

nt in some degree of limbo

| | OTMs | | | | | | | Mexico | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY17 | FY18 | FY19 | **FY14-FY** | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | **FY14-FY** | FY20 | FY21 | FY22 |
| 181,162 | 251,197 | 672,224 | ####### | 143,047 | 956,922 | ####### | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | ####### | 273,438 | 621,695 | 764,734 |
| 181,162 | 251,197 | 672,224 | ####### | 99,113 | 477,392 | ####### | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | ####### | 124,061 | 44,006 | 74,246 |
| 50% | 51% | 21% | 39% | 38% | 16% | 10% | 52% | 47% | 48% | 47% | 44% | 46% | 41% | 46% | 43% | 20% | 25% |
| 71% | 70% | 68% | 64% | 47% | 64% | 44% | 2% | 4% | 6% | 7% | 6% | 7% | 5% | 6% | 11% | 4% | 1% |
| 86% | 88% | 81% | 85% | 59% | 79% | 70% | 80% | 67% | 60% | 71% | 74% | 66% | 45% | 64% | 33% | 48% | 38% |
| 41% | 45% | 48% | 39% | 64% | 75% | 66% | 12% | 18% | 21% | 26% | 34% | 33% | 40% | 28% | 63% | 49% | 71% |
| 59% | 55% | 52% | 61% | 36% | 25% | 34% | 88% | 82% | 79% | 74% | 66% | 67% | 60% | 72% | 37% | 51% | 29% |
| 14% | 13% | 13% | 16% | 24% | 4% | 1% | 16% | 11% | 9% | 7% | 7% | 6% | 4% | 8% | 2% | 2% | 0% |
| 14% | 13% | 13% | 15% | 24% | 4% | 1% | 4% | 8% | 8% | 6% | 6% | 6% | 4% | 7% | 2% | 1% | 0% |
| 0% | 0% | 0% | 1% | 0% | 0% | 0% | 12% | 3% | 1% | 1% | 0% | 0% | 0% | 1% | 0% | 1% | 0% |
| 62% | 55% | 46% | 59% | 39% | 21% | 11% | 57% | 63% | 66% | 70% | 68% | 73% | 76% | 68% | 38% | 45% | 44% |
| 25% | 27% | 11% | 22% | 6% | 11% | 6% | 21% | 21% | 18% | 22% | 27% | 20% | 8% | 20% | 6% | 1% | 0% |
| 5% | 4% | 5% | 5% | 8% | 1% | 1% | 8% | 7% | 9% | 8% | 6% | 5% | 7% | 7% | 9% | 0% | #DIV/0! |
| 37% | 28% | 35% | 37% | 34% | 9% | 5% | 36% | 42% | 47% | 47% | 41% | 53% | 68% | 48% | 31% | 43% | 44% |
| 42% | 47% | 72% | 44% | 42% | 33% | 41% | 68% | 54% | 56% | 55% | 61% | 78% | 89% | 64% | 78% | 81% | 83% |
| 27% | 26% | 55% | 29% | 37% | 15% | 18% | 46% | 38% | 43% | 40% | 39% | 58% | 80% | 47% | 67% | 78% | 83% |
| 24% | 32% | 41% | 26% | 36% | 76% | 88% | 27% | 26% | 25% | 24% | 25% | 21% | 20% | 24% | 61% | 53% | 56% |
| | | | | | | | | | | | | | | | | | |
| 8% | 7% | 7% | 10% | 9% | 1% | 0% | 14% | 9% | 7% | 5% | 4% | 4% | 2% | 6% | 1% | 1% | 0% |
| 10% | 8% | 13% | 10% | 5% | 1% | 1% | 23% | 20% | 22% | 20% | 18% | 28% | 36% | 23% | 9% | 18% | 11% |
| 27% | 22% | 11% | 25% | 9% | 4% | 3% | 27% | 32% | 29% | 31% | 27% | 20% | 9% | 26% | 5% | 5% | 2% |
| 14% | 17% | 21% | 15% | 13% | 19% | 30% | 24% | 21% | 20% | 17% | 17% | 14% | 12% | 17% | 23% | 27% | 16% |
| 41% | 45% | 48% | 39% | 64% | 75% | 66% | 12% | 18% | 21% | 26% | 34% | 33% | 40% | 28% | 63% | 49% | 71% |
| | | | | | | | | | | | | | | | | | |
| 14% | 13% | 13% | 15% | 24% | 4% | 1% | 4% | 8% | 8% | 6% | 6% | 6% | 4% | 7% | 2% | 1% | 0% |
| | | | | | | | | | | | | | | | | | |
| 46% | 40% | 21% | 41% | 25% | 17% | 9% | 31% | 39% | 37% | 42% | 41% | 31% | 15% | 36% | 12% | 10% | 7% |
| 61% | 60% | 76% | 62% | 70% | 85% | 93% | 62% | 68% | 73% | 71% | 66% | 74% | 88% | 72% | 92% | 96% | 100% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 27% | 32% | 27% | 30% | 42% | 29% | 16% | 10% | 16% | 15% | 12% | 13% | 10% | 5% | 12% | 6% | 3% | 0% |

| | OTMs | | | | | | | Mexico | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY17 | FY18 | FY19 | FY14-FY | FY20 | FY21 | FY22 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY14-FY | FY20 | FY21 | FY22 |
| 181,162 | 251,197 | 672,224 | ####### | 143,047 | 956,922 | ####### | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | ####### | 273,438 | 621,695 | 764,734 |
| 181,162 | 251,197 | 672,224 | ####### | 99,113 | 477,392 | ####### | 290,670 | 260,970 | 231,033 | 231,747 | 155,629 | 188,579 | 205,932 | ####### | 124,061 | 44,006 | 74,246 |
| 91,387 | 127,598 | 138,401 | 651,372 | 38,007 | 75,890 | 100,732 | 150,114 | 122,801 | 111,696 | 109,181 | 68,916 | 87,069 | 84,796 | 584,459 | 53,712 | 8,797 | 18,932 |
| 64,778 | 89,596 | 93,903 | 416,706 | 17,990 | 48,216 | 44,593 | 2,664 | 4,934 | 6,768 | 7,594 | 3,922 | 6,037 | 4,363 | 33,618 | 5,956 | 343 | 247 |
| 55,872 | 78,437 | 76,231 | 352,718 | 10,680 | 37,962 | 31,021 | 2,136 | 3,307 | 4,067 | 5,394 | 2,912 | 3,981 | 1,951 | 21,612 | 1,960 | 164 | 93 |

IFR_AR_009120

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22,790 | 35,585 | 36,854 | 139,288 | 6,812 | 28,314 | 20,427 | 259 | 602 | 871 | 1,418 | 986 | 1,311 | 790 | 5,978 | 1,228 | 81 | 66 |
| 33,082 | 42,852 | 39,377 | 213,430 | 3,868 | 9,648 | 10,594 | 1,877 | 2,705 | 3,196 | 3,976 | 1,926 | 2,670 | 1,161 | 15,634 | 732 | 83 | 27 |
| 4,566 | 5,765 | 5,072 | 33,889 | 943 | 365 | 103 | 305 | 303 | 288 | 272 | 127 | 168 | 47 | 1,205 | 14 | 2 | |
| 4,510 | 5,717 | 5,039 | 32,626 | 940 | 361 | 101 | 77 | 215 | 264 | 251 | 119 | 161 | 42 | 1,052 | 14 | 1 | |
| 56 | 48 | 33 | 1,263 | 3 | 4 | 2 | 228 | 88 | 24 | 21 | 8 | 7 | 5 | 153 | | 1 | |
| 20,590 | 23,453 | 18,152 | 124,910 | 1,524 | 1,978 | 1,198 | 1,070 | 1,704 | 2,098 | 2,767 | 1,310 | 1,944 | 882 | 10,705 | 275 | 37 | 12 |
| 8,312 | 11,383 | 4,466 | 47,002 | 217 | 1,103 | 678 | 401 | 569 | 588 | 890 | 520 | 533 | 95 | 3,195 | 45 | 1 | |
| 393 | 417 | 224 | 2,518 | 18 | 11 | 5 | 33 | 41 | 52 | 70 | 31 | 25 | 7 | 226 | 4 | | |
| 7,919 | 10,966 | 4,242 | 44,484 | 199 | 1,092 | 673 | 368 | 528 | 536 | 820 | 489 | 508 | 88 | 2,969 | 41 | 1 | |
| 12,278 | 12,070 | 13,686 | 77,908 | 1,307 | 875 | 520 | 669 | 1,135 | 1,510 | 1,877 | 790 | 1,411 | 787 | 7,510 | 230 | 36 | 12 |
| 5,124 | 5,688 | 9,805 | 34,148 | 544 | 290 | 214 | 458 | 608 | 850 | 1,030 | 485 | 1,103 | 698 | 4,774 | 180 | 29 | 10 |
| 7,154 | 6,382 | 3,881 | 43,760 | 763 | 585 | 306 | 211 | 527 | 660 | 847 | 305 | 308 | 89 | 2,736 | 50 | 7 | 2 |
| 7,926 | 13,634 | 16,153 | 54,631 | 1,401 | 7,305 | 9,293 | 502 | 698 | 810 | 937 | 489 | 558 | 232 | 3,724 | 443 | 44 | 15 |

ncounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

IFR_AR_009121

Prior to 2011, the overall share of total SWB encounters who were processed for expedited removal and claimed fear never exceeded 2 percent.

103 OIS analysis of historic CBP and USCIS data.

| | SWB Encounters (CBP) | CF Fear Claims completed (APSO) | CF as % SWB Encounters |
|---|---|---|---|
| FY 2000 | 1,566,421 | 10,094 | 1% |
| FY 2001 | 1,231,412 | 13,294 | 1% |
| FY 2002 | 930,341 | 9,893 | 1% |
| FY 2003 | 906,734 | 6,145 | 1% |
| FY 2004 | 1,140,247 | 7,659 | 1% |
| FY 2005 | 1,269,230 | 9,696 | 1% |
| FY 2006 | 1,168,309 | 5,008 | 0% |
| FY 2007 | 954,396 | 5,189 | 1% |
| FY 2008 | 792,409 | 5,112 | 1% |
| FY 2009 | 619,123 | 5,312 | 1% |
| FY 2010 | 527,419 | 8,569 | 2% |
| FY 2011 | 401,073 | 11,390 | 3% |
| FY 2012 | 426,125 | 13,203 | 3% |
| FY 2013 | 489,612 | 35,608 | 7% |
| FY 2014 | 570,048 | 48,138 | 8% |
| FY 2015 | 444,856 | 46,471 | 10% |
| FY 2016 | 558,991 | 91,351 | 16% |
| FY 2017 | 415,199 | 79,020 | 19% |
| FY 2018 | 519,944 | 96,834 | 19% |
| FY 2019 | 977,229 | 103,295 | 11% |
| FY 2020 | 458,066 | 33,567 | 7% |
| FY 2021 | 1,734,683 | 44,809 | 3% |
| FY 2022 | 2,378,945 | 56,092 | 2% |

Source: CBP and APSO production data October 2022.

Note that the numerator in this calculation includes all USCIS CF claims with case completions, including fear claims not originating at the border. As such, the reported percentages provide a ceiling on the share of SWB encounte

rs making fear claims, and the historic rates may be somewhat lower (i.e., strengthening the point made in the main text).

IFR_AR_009123

By 2013, with increasing numbers of non- Mexican encounters, the rate had climbed to 15 percent of people placed in ER making fear claims that were referred to USCIS asylum officers (36,025 referrals).

104 OIS analysis of Enforcement Lifecycle data through September 30, 2022.

By comparison, in 2019—prior to the implementation of the Title 42 public health Order— further growth in non-Mexican encounters meant that 44 percent of people placed in ER claimed fear, resulting in 98,266 credible fear adjudi

105 *Id.*

See counts and footnotes at bottom of page.

| | Total | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | **FY14-FY** | FY20 | FY21 | FY22 |
| Total Enco | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | ####### | 416,485 | ####### | ####### |
| T8 Enco | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | ####### | 223,174 | 521,398 | ####### |
| % T8 P | 54% | 49% | 50% | 52% | 48% | 49% | 25% | 42% | 41% | 16% | 11% |
| % ER | 15% | 21% | 26% | 41% | 43% | 45% | 44% | 36% | 26% | 57% | 37% |
| % A | 89% | 78% | 80% | 87% | 86% | 86% | 80% | 83% | 53% | 79% | 69% |
| % | 22% | 26% | 29% | 33% | 40% | 45% | 48% | 39% | 64% | 74% | 64% |
| % | 78% | 74% | 71% | 67% | 60% | 55% | 52% | 61% | 36% | 26% | 34% |
| | 26% | 20% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% | 1% |
| | 14% | 17% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% | 1% |
| | 12% | 4% | 0% | 0% | 0% | 0% | 0% | 1% | 0% | 0% | 0% |
| | 56% | 62% | 63% | 66% | 63% | 56% | 47% | 59% | 39% | 21% | 11% |
| | 28% | 25% | 20% | 24% | 25% | 26% | 11% | 22% | 6% | 11% | 6% |
| | 9% | 8% | 8% | 5% | 5% | 4% | 5% | 5% | 1% | 1% | 1% |
| | 27% | 37% | 43% | 42% | 37% | 30% | 36% | 37% | 33% | 9% | 5% |
| | 49% | 47% | 41% | 29% | 43% | 50% | 73% | 46% | 47% | 16% | 42% |
| | 29% | 32% | 30% | 20% | 28% | 28% | 56% | 31% | 41% | 16% | 19% |
| | 18% | 18% | 17% | 19% | 24% | 31% | 40% | 25% | 40% | 76% | 88% |
| **Outcomes as Shares of EOIR referrals** | | | | | | | | | | | |
| Relie | 20% | 15% | 15% | 10% | 8% | 7% | 7% | 9% | 8% | 1% | 0% |
| Remo | 12% | 14% | 14% | 9% | 10% | 9% | 14% | 11% | 6% | 1% | 1% |
| Unex | 31% | 31% | 31% | 35% | 27% | 22% | 11% | 25% | 8% | 4% | 3% |
| Term | 14% | 13% | 12% | 13% | 14% | 17% | 21% | 16% | 15% | 19% | 30% |
| Still i | 22% | 26% | 29% | 33% | 40% | 45% | 48% | 39% | 64% | 74% | 66% |
| **Outcomes as shares of EOIR Case Completions** | | | | | | | | | | | |
| Relie | 26% | 20% | 20% | 15% | 13% | 13% | 13% | 15% | 21% | 4% | 1% |
| Removal Orders + VD as % of Completions | | | | | | | | 59% | | | |
| Rem | 16% | 20% | 19% | 13% | 17% | 16% | 26% | 18% | 16% | 3% | 2% |
| Und | 40% | 42% | 44% | 52% | 45% | 40% | 20% | 41% | 23% | 17% | 9% |
| Term | 18% | 18% | 17% | 19% | 24% | 31% | 40% | 25% | 40% | 76% | 88% |
| **Relief** | 33% | 31% | 32% | 27% | 26% | 30% | 26% | 28% | 38% | 28% | 16% |

| | Total | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY14-FY | FY20 | FY21 | FY22 |
| Total Enco | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | ####### | 416,485 | ####### | ####### |
| T8 Enco | 436,363 | 471,990 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | ####### | 223,174 | 521,398 | ####### |
| Placed | 236,062 | 229,165 | 180,589 | 227,910 | 160,303 | 214,667 | 223,197 | ####### | 91,719 | 84,687 | 119,664 |

IFR_AR_009124

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| APSO | 36,025 | 48,649 | 46,387 | 92,689 | 68,700 | 95,633 | 98,266 | 450,324 | 23,946 | 48,559 | 44,840 |
| Ref | 32,000 | 37,793 | 36,951 | 80,202 | 58,784 | 82,418 | 78,182 | 374,330 | 12,640 | 38,126 | 31,114 |
| St | 6,931 | 9,870 | 10,675 | 26,405 | 23,776 | 36,896 | 37,644 | 145,266 | 8,040 | 28,395 | 20,493 |
| EO | 25,069 | 27,923 | 26,276 | 53,797 | 35,008 | 45,522 | 40,538 | 229,064 | 4,600 | 9,731 | 10,621 |
| | 6,471 | 5,640 | 5,374 | 8,335 | 4,693 | 5,933 | 5,119 | 35,094 | 957 | 367 | 103 |
| | 3,451 | 4,631 | 5,264 | 8,195 | 4,629 | 5,878 | 5,081 | 33,678 | 954 | 362 | 101 |
| | 3,020 | 1,009 | 110 | 140 | 64 | 55 | 38 | 1,416 | 3 | 5 | 2 |
| | 13,977 | 17,306 | 16,556 | 35,422 | 21,900 | 25,397 | 19,034 | 135,615 | 1,799 | 2,015 | 1,210 |
| | 7,115 | 6,907 | 5,213 | 12,768 | 8,832 | 11,916 | 4,561 | 50,197 | 262 | 1,104 | 678 |
| | 666 | 563 | 401 | 683 | 424 | 442 | 231 | 2,744 | 22 | 11 | 5 |
| | 6,449 | 6,344 | 4,812 | 12,085 | 8,408 | 11,474 | 4,330 | 47,453 | 240 | 1,093 | 673 |
| | 6,862 | 10,399 | 11,343 | 22,654 | 13,068 | 13,481 | 14,473 | 85,418 | 1,537 | 911 | 532 |
| | 3,329 | 4,905 | 4,611 | 6,503 | 5,609 | 6,791 | 10,503 | 38,922 | 724 | 319 | 224 |
| | 3,533 | 5,494 | 6,732 | 16,151 | 7,459 | 6,690 | 3,970 | 46,496 | 813 | 592 | 308 |
| | 4,621 | 4,977 | 4,346 | 10,040 | 8,415 | 14,192 | 16,385 | 58,355 | 1,844 | 7,349 | 9,308 |

Notes: Results based on source data as of October, 2022 and OIS Enforcement Lifecycle methodology as of <u>December 7, 2022</u>. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Tabl

[1] Excludes accompanied minors, unaccompanied children, and OFO administrative cases including, crewmembers, parolee, and withdrawals.

[2] Includes individulas placed in ER and found to have a credible fear case in USCIS APSO system.

[3] Includes USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[4] Includes cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, Zero Bond, BIA appeal, or recision rescinded.

[5] Includes cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

[6] Includes cases with completion codes for relief on merits and other types of relief.

[7] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[8] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.

[9] Includes completion codes for removal order, voluntary departure, withdrawal, abandonment, denial, and DHS fear decision affirmed.

[10] Includes completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

ications.

IFR_AR_009126

le is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times.

IFR_AR_009127

Despite this dramatic increase in the number of people claiming fear since 2013, the percent who are ultimately granted asylum or other forms of protection has remained static or even fallen over this period, with IJ asylum gra
106 OIS analysis of DOJ EOIR Review of Asylum Adjudication Statistics as of October 2022.



ant rates in FY 2013– FY 2017 consistently falling between 12 and 17 percent, down from 24–38 percent in FY 2008–FY 2012

IFR_AR_009129

The Venezuela process has dramatically impacted migratory flows throughout the region, and as of January 22, 2023, more than 14,300 Venezuelans have come to the United States lawfully pursuant to this process.
115 OIS analysis of CBP data provided January 23, 2023.

Total through 1/12/2    **14,366**

| Arrival Date | 0-17 | | Total for 0-17 | 18-30 | | Total for 18-30 | 31-44 | | Total for 31-44 | 45-60 | | Total for 45-60 | 61 and over | | Total for 61 and over | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | F | M | | F | M | | F | M | | F | M | | F | M | | |
| 10/22/2022 | 0 | 0 | | 1 | 1 | 2 | 0 | 1 | 1 | 0 | 0 | | 0 | 0 | | 3 |
| 10/23/2022 | 0 | 0 | | 1 | 0 | 1 | 1 | 2 | 3 | 0 | 0 | | 0 | 0 | | 4 |
| 10/24/2022 | 0 | 0 | | 1 | 0 | 1 | 1 | 2 | 3 | 0 | 0 | | 0 | 0 | | 4 |
| 10/25/2022 | 3 | 1 | 4 | 2 | 2 | 4 | 2 | 4 | 6 | 0 | 0 | | 0 | 0 | | 14 |
| 10/26/2022 | 1 | 3 | 4 | 5 | 11 | 16 | 2 | 5 | 7 | 3 | 3 | 6 | 0 | 0 | | 33 |
| 10/27/2022 | 2 | 4 | 6 | 11 | 15 | 26 | 5 | 14 | 19 | 1 | 2 | 3 | 4 | 0 | 4 | 58 |
| 10/28/2022 | 8 | 16 | 24 | 18 | 7 | 25 | 20 | 14 | 34 | 7 | 3 | 10 | 3 | 0 | 3 | 96 |
| 10/29/2022 | 6 | 8 | 14 | 14 | 24 | 38 | 8 | 12 | 20 | 7 | 7 | 14 | 1 | 2 | 3 | 89 |
| 10/30/2022 | 11 | 6 | 17 | 17 | 25 | 42 | 13 | 23 | 36 | 5 | 3 | 8 | 6 | 0 | 6 | 109 |
| 10/31/2022 | 11 | 7 | 18 | 16 | 19 | 35 | 9 | 14 | 23 | 1 | 3 | 4 | 2 | 2 | 4 | 84 |
| 11/1/2022 | 11 | 12 | 23 | 22 | 24 | 46 | 17 | 30 | 47 | 10 | 5 | 15 | 6 | 1 | 7 | 138 |
| 11/2/2022 | 4 | 12 | 16 | 19 | 25 | 44 | 15 | 26 | 41 | 10 | 10 | 20 | 3 | 1 | 4 | 125 |
| 11/3/2022 | 9 | 9 | 18 | 20 | 31 | 51 | 14 | 32 | 46 | 16 | 9 | 25 | 13 | 4 | 17 | 157 |
| 11/4/2022 | 13 | 15 | 28 | 30 | 31 | 61 | 22 | 25 | 47 | 8 | 12 | 20 | 7 | 4 | 11 | 167 |
| 11/5/2022 | 12 | 18 | 30 | 31 | 52 | 83 | 21 | 38 | 59 | 12 | 9 | 21 | 23 | 4 | 27 | 220 |
| 11/6/2022 | 7 | 9 | 16 | 26 | 31 | 57 | 14 | 19 | 33 | 13 | 8 | 21 | 18 | 4 | 22 | 149 |
| 11/7/2022 | 16 | 3 | 19 | 19 | 21 | 40 | 11 | 19 | 30 | 10 | 9 | 19 | 15 | 6 | 21 | 129 |
| 11/8/2022 | 8 | 14 | 22 | 25 | 28 | 53 | 15 | 23 | 38 | 17 | 7 | 24 | 10 | 3 | 13 | 150 |
| 11/9/2022 | 13 | 18 | 31 | 34 | 28 | 62 | 13 | 14 | 27 | 16 | 18 | 34 | 13 | 4 | 17 | 171 |
| 11/10/2022 | 17 | 24 | 41 | 17 | 24 | 41 | 22 | 21 | 43 | 16 | 8 | 24 | 13 | 5 | 18 | 167 |
| 11/11/2022 | 26 | 21 | 47 | 42 | 27 | 69 | 25 | 33 | 58 | 29 | 21 | 50 | 23 | 14 | 37 | 261 |
| 11/12/2022 | 20 | 20 | 40 | 30 | 40 | 70 | 26 | 44 | 70 | 18 | 14 | 32 | 9 | 10 | 19 | 231 |
| 11/13/2022 | 14 | 19 | 33 | 26 | 23 | 49 | 26 | 18 | 44 | 21 | 14 | 35 | 15 | 6 | 21 | 182 |
| 11/14/2022 | 17 | 7 | 24 | 17 | 12 | 29 | 18 | 18 | 36 | 16 | 9 | 25 | 12 | 9 | 21 | 135 |
| 11/15/2022 | 14 | 17 | 31 | 22 | 26 | 48 | 21 | 23 | 44 | 15 | 12 | 27 | 12 | 7 | 19 | 169 |
| 11/16/2022 | 20 | 22 | 42 | 29 | 27 | 56 | 26 | 35 | 61 | 19 | 17 | 36 | 23 | 13 | 36 | 231 |
| 11/17/2022 | 14 | 23 | 37 | 29 | 31 | 60 | 25 | 28 | 53 | 24 | 13 | 37 | 18 | 12 | 30 | 217 |
| 11/18/2022 | 23 | 26 | 49 | 29 | 42 | 71 | 31 | 33 | 64 | 31 | 19 | 50 | 19 | 14 | 33 | 267 |
| 11/19/2022 | 9 | 22 | 31 | 22 | 24 | 46 | 23 | 28 | 51 | 15 | 8 | 23 | 19 | 6 | 25 | 176 |
| 11/20/2022 | 24 | 28 | 52 | 33 | 38 | 71 | 25 | 23 | 48 | 21 | 19 | 40 | 30 | 10 | 40 | 251 |
| 11/21/2022 | 12 | 19 | 31 | 26 | 34 | 60 | 20 | 23 | 43 | 15 | 11 | 26 | 19 | 3 | 22 | 182 |
| 11/22/2022 | 24 | 29 | 53 | 32 | 24 | 56 | 31 | 31 | 62 | 18 | 13 | 31 | 25 | 12 | 37 | 239 |
| 11/23/2022 | 29 | 26 | 55 | 27 | 19 | 46 | 30 | 28 | 58 | 18 | 18 | 36 | 24 | 12 | 36 | 231 |
| 11/24/2022 | 19 | 25 | 44 | 35 | 27 | 62 | 32 | 43 | 75 | 19 | 17 | 36 | 17 | 10 | 27 | 244 |
| 11/25/2022 | 28 | 26 | 54 | 27 | 37 | 64 | 35 | 38 | 73 | 20 | 9 | 29 | 7 | 9 | 16 | 236 |
| 11/26/2022 | 10 | 11 | 21 | 18 | 20 | 38 | 18 | 27 | 45 | 17 | 12 | 29 | 23 | 11 | 34 | 167 |
| 11/27/2022 | 2 | 2 | 4 | 0 | 2 | 2 | 8 | 4 | 12 | 4 | 1 | 5 | 1 | 1 | 2 | 25 |
| 11/28/2022 | 11 | 10 | 21 | 11 | 14 | 25 | 13 | 17 | 30 | 13 | 8 | 21 | 9 | 4 | 13 | 110 |
| 11/29/2022 | 9 | 12 | 21 | 15 | 18 | 33 | 15 | 12 | 27 | 12 | 13 | 25 | 14 | 8 | 22 | 128 |
| 11/30/2022 | 23 | 17 | 40 | 28 | 33 | 61 | 23 | 34 | 57 | 25 | 19 | 44 | 21 | 11 | 32 | 234 |

IFR_AR_009130

| Date | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/1/2022 | 25 | 32 | 57 | 28 | 30 | 58 | 34 | 37 | 71 | 33 | 12 | 45 | 33 | 10 | 43 | 274 |
| 12/2/2022 | 26 | 29 | 55 | 30 | 35 | 65 | 28 | 45 | 73 | 20 | 20 | 40 | 18 | 14 | 32 | 265 |
| 12/3/2022 | 24 | 30 | 54 | 25 | 32 | 57 | 33 | 23 | 56 | 24 | 22 | 46 | 34 | 13 | 47 | 260 |
| 12/4/2022 | 19 | 16 | 35 | 24 | 30 | 54 | 27 | 21 | 48 | 19 | 18 | 37 | 21 | 10 | 31 | 205 |
| 12/5/2022 | 20 | 19 | 39 | 20 | 20 | 40 | 33 | 26 | 59 | 20 | 15 | 35 | 19 | 8 | 27 | 200 |
| 12/6/2022 | 21 | 16 | 37 | 28 | 28 | 56 | 28 | 31 | 59 | 22 | 24 | 46 | 13 | 11 | 24 | 222 |
| 12/7/2022 | 25 | 34 | 59 | 20 | 38 | 58 | 21 | 25 | 46 | 23 | 18 | 41 | 25 | 11 | 36 | 240 |
| 12/8/2022 | 23 | 31 | 54 | 16 | 15 | 31 | 30 | 25 | 55 | 20 | 18 | 38 | 26 | 9 | 35 | 213 |
| 12/9/2022 | 31 | 28 | 59 | 25 | 27 | 52 | 27 | 21 | 48 | 31 | 18 | 49 | 27 | 12 | 39 | 247 |
| 12/10/2022 | 17 | 23 | 40 | 23 | 30 | 53 | 25 | 33 | 58 | 17 | 11 | 28 | 15 | 12 | 27 | 206 |
| 12/11/2022 | 16 | 12 | 28 | 21 | 18 | 39 | 19 | 16 | 35 | 22 | 10 | 32 | 17 | 9 | 26 | 160 |
| 12/12/2022 | 15 | 24 | 39 | 16 | 14 | 30 | 21 | 16 | 37 | 14 | 10 | 24 | 15 | 4 | 19 | 149 |
| 12/13/2022 | 15 | 13 | 28 | 20 | 16 | 36 | 10 | 15 | 25 | 16 | 8 | 24 | 16 | 6 | 22 | 135 |
| 12/14/2022 | 18 | 25 | 43 | 14 | 21 | 35 | 27 | 28 | 55 | 23 | 14 | 37 | 10 | 9 | 19 | 189 |
| 12/15/2022 | 23 | 22 | 45 | 19 | 20 | 39 | 23 | 27 | 50 | 22 | 14 | 36 | 10 | 5 | 15 | 185 |
| 12/16/2022 | 29 | 35 | 64 | 20 | 26 | 46 | 38 | 34 | 72 | 16 | 18 | 34 | 15 | 11 | 26 | 242 |
| 12/17/2022 | 14 | 26 | 40 | 19 | 23 | 42 | 29 | 16 | 45 | 16 | 7 | 23 | 14 | 8 | 22 | 172 |
| 12/18/2022 | 19 | 11 | 30 | 8 | 24 | 32 | 21 | 24 | 45 | 15 | 16 | 31 | 14 | 7 | 21 | 159 |
| 12/19/2022 | 10 | 9 | 19 | 16 | 15 | 31 | 15 | 10 | 25 | 15 | 5 | 20 | 10 | 4 | 14 | 109 |
| 12/20/2022 | 22 | 20 | 42 | 25 | 16 | 41 | 21 | 17 | 38 | 20 | 17 | 37 | 8 | 5 | 13 | 171 |
| 12/21/2022 | 16 | 29 | 45 | 9 | 12 | 21 | 23 | 15 | 38 | 19 | 14 | 33 | 12 | 6 | 18 | 155 |
| 12/22/2022 | 20 | 18 | 38 | 11 | 9 | 20 | 19 | 15 | 34 | 10 | 9 | 19 | 14 | 5 | 19 | 130 |
| 12/23/2022 | 11 | 8 | 19 | 12 | 9 | 21 | 15 | 12 | 27 | 13 | 10 | 23 | 9 | 11 | 20 | 110 |
| 12/24/2022 | 20 | 21 | 41 | 19 | 15 | 34 | 17 | 20 | 37 | 13 | 5 | 18 | 13 | 4 | 17 | 147 |
| 12/25/2022 | 12 | 15 | 27 | 9 | 6 | 15 | 11 | 9 | 20 | 8 | 6 | 14 | 4 | 5 | 9 | 85 |
| 12/26/2022 | 8 | 12 | 20 | 10 | 7 | 17 | 7 | 15 | 22 | 5 | 6 | 11 | 11 | 2 | 13 | 83 |
| 12/27/2022 | 10 | 10 | 20 | 18 | 12 | 30 | 13 | 9 | 22 | 11 | 5 | 16 | 11 | 6 | 17 | 105 |
| 12/28/2022 | 14 | 17 | 31 | 19 | 12 | 31 | 19 | 19 | 38 | 12 | 9 | 21 | 14 | 4 | 18 | 139 |
| 12/29/2022 | 14 | 16 | 30 | 18 | 17 | 35 | 19 | 18 | 37 | 13 | 15 | 28 | 20 | 5 | 25 | 155 |
| 12/30/2022 | 16 | 25 | 41 | 21 | 16 | 37 | 26 | 18 | 44 | 13 | 11 | 24 | 11 | 7 | 18 | 164 |
| 12/31/2022 | 10 | 12 | 22 | 14 | 16 | 30 | 11 | 16 | 27 | 11 | 7 | 18 | 3 | 5 | 8 | 105 |
| 1/1/2023 | 1 | 2 | 3 | 0 | 6 | 6 | 6 | 4 | 10 | 2 | 3 | 5 | 4 | 3 | 7 | 31 |
| 1/2/2023 | 1 | 2 | 3 | 1 | 2 | 3 | 2 | 1 | 3 | 1 | 1 | 2 | 1 | 0 | 1 | 12 |
| 1/3/2023 | 0 | 0 | | 2 | 0 | 2 | 0 | 0 | | 0 | 0 | | 1 | 1 | 2 | 4 |
| 1/4/2023 | 7 | 7 | 14 | 6 | 7 | 13 | 5 | 6 | 11 | 6 | 3 | 9 | 1 | 1 | 2 | 49 |
| 1/5/2023 | 5 | 5 | 10 | 7 | 5 | 12 | 8 | 7 | 15 | 10 | 4 | 14 | 7 | 2 | 9 | 60 |
| 1/6/2023 | 4 | 3 | 7 | 10 | 5 | 15 | 3 | 5 | 8 | 3 | 4 | 7 | 6 | 3 | 9 | 46 |
| 1/7/2023 | 0 | 0 | | 2 | 2 | 4 | 2 | 3 | 5 | 3 | 2 | 5 | 1 | 1 | 2 | 16 |
| 1/8/2023 | 4 | 2 | 6 | 4 | 6 | 10 | 2 | 2 | 4 | 6 | 0 | 6 | 6 | 1 | 7 | 33 |
| 1/9/2023 | 6 | 3 | 9 | 11 | 8 | 19 | 9 | 8 | 17 | 6 | 5 | 11 | 5 | 5 | 10 | 66 |
| 1/10/2023 | 12 | 9 | 21 | 22 | 17 | 39 | 11 | 10 | 21 | 13 | 7 | 20 | 12 | 9 | 21 | 122 |
| 1/11/2023 | 14 | 12 | 26 | 20 | 22 | 42 | 27 | 13 | 40 | 17 | 10 | 27 | 9 | 7 | 16 | 151 |
| 1/12/2023 | 15 | 21 | 36 | 25 | 19 | 44 | 32 | 25 | 57 | 19 | 22 | 41 | 13 | 4 | 17 | 195 |
| 1/13/2023 | 25 | 17 | 42 | 28 | 34 | 62 | 22 | 29 | 51 | 28 | 17 | 45 | 22 | 13 | 35 | 235 |
| 1/14/2023 | 11 | 11 | 22 | 18 | 23 | 41 | 22 | 22 | 44 | 21 | 8 | 29 | 16 | 4 | 20 | 156 |
| 1/15/2023 | 12 | 14 | 26 | 20 | 15 | 35 | 21 | 20 | 41 | 21 | 15 | 36 | 12 | 5 | 17 | 155 |
| 1/16/2023 | 16 | 15 | 31 | 25 | 18 | 43 | 17 | 20 | 37 | 25 | 13 | 38 | 13 | 6 | 19 | 168 |

IFR_AR_009131

| 1/17/2023 | 17 | 13 | **30** | 18 | 16 | **34** | 20 | 20 | **40** | 14 | 10 | **24** | 11 | 7 | **18** | 146 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/18/2023 | 19 | 25 | **44** | 38 | 27 | **65** | 32 | 23 | **55** | 24 | 19 | **43** | 19 | 7 | **26** | 233 |
| 1/19/2023 | 27 | 30 | **57** | 23 | 34 | **57** | 34 | 32 | **66** | 36 | 26 | **62** | 22 | 13 | **35** | 277 |
| 1/20/2023 | 38 | 35 | **73** | 42 | 46 | **88** | 47 | 44 | **91** | 29 | 28 | **57** | 29 | 12 | **41** | 350 |
| 1/21/2023 | 33 | 24 | **57** | 41 | 33 | **74** | 38 | 28 | **66** | 21 | 16 | **37** | 15 | 8 | **23** | 257 |
| 1/22/2023 | 23 | 26 | **49** | 31 | 29 | **60** | 32 | 30 | **62** | 24 | 22 | **46** | 14 | 9 | **23** | 240 |
| **Total** | **1,353** | **1,475** | **2828** | **1,798** | **1,900** | **3698** | **1,778** | **1,886** | **3664** | **1,387** | **1,010** | **2397** | **1,198** | **581** | **1779** | **14,366** |

Data provided by CBP PSDP ATA report 1/23/23.

IFR_AR_009132

The Venezuela process, for example, has sharply reduced Venezuelan migratory flows throughout the region and channeled these flows into a lawful process to come to the United States.

192 Encounters of Venezuelan nationals between ports of entry fell from an average of 1,100 per day the week before the announcement of the Venezuela parole process on October 12, 2022, to an average of 67 per day the week ending November 29, 2022 and 28 per day the we...

**USBP encounters of Venezuela nationals**

| Date | Encounters | | Average | Value |
|------|-----------|---|---------|-------|
| 1-Oct | 1240 | | Average encounters 10/5 - 10/11/22 | 1,137 |
| 2-Oct | 1510 | | Average encounters 11/23 - 11/29 | 67 |
| 3-Oct | 1366 | | Average encounters 1/16 - 1/22 | 28 |
| 4-Oct | 1260 | | | |
| 5-Oct | 1139 | | | |
| 6-Oct | 1174 | | | |
| 7-Oct | 1083 | | | |
| 8-Oct | 1006 | | | |
| 9-Oct | 1202 | | | |
| 10-Oct | 1224 | | | |
| 11-Oct | 1128 | | | |
| 12-Oct | 796 | | | |
| 13-Oct | 1256 | | | |
| 14-Oct | 1056 | | | |
| 15-Oct | 834 | | | |
| 16-Oct | 484 | | | |
| 17-Oct | 298 | | | |
| 18-Oct | 187 | | | |
| 19-Oct | 158 | | | |
| 20-Oct | 159 | | | |
| 21-Oct | 132 | | | |
| 22-Oct | 145 | | | |
| 23-Oct | 160 | | | |
| 24-Oct | 247 | | | |
| 25-Oct | 296 | | | |
| 26-Oct | 415 | | | |
| 27-Oct | 301 | | | |
| 28-Oct | 408 | | | |
| 29-Oct | 405 | | | |
| 30-Oct | 331 | | | |
| 31-Oct | 430 | | | |
| 1-Nov | 412 | | | |
| 2-Nov | 331 | | | |
| 3-Nov | 305 | | | |
| 4-Nov | 348 | | | |
| 5-Nov | 250 | | | |
| 6-Nov | 239 | | | |
| 7-Nov | 265 | | | |
| 8-Nov | 260 | | | |
| 9-Nov | 262 | | | |
| 10-Nov | 262 | | | |
| 11-Nov | 338 | | | |

IFR_AR_009133

| Date | Value |
|------|-------|
| 12-Nov | 192 |
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |
| 18-Nov | 210 |
| 19-Nov | 90 |
| 20-Nov | 116 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 80 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 86 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 126 |
| 5-Dec | 120 |
| 6-Dec | 84 |
| 7-Dec | 144 |
| 8-Dec | 49 |
| 9-Dec | 87 |
| 10-Dec | 101 |
| 11-Dec | 161 |
| 12-Dec | 113 |
| 13-Dec | 157 |
| 14-Dec | 116 |
| 15-Dec | 145 |
| 16-Dec | 91 |
| 17-Dec | 146 |
| 18-Dec | 189 |
| 19-Dec | 231 |
| 20-Dec | 254 |
| 21-Dec | 362 |
| 22-Dec | 723 |
| 23-Dec | 267 |
| 24-Dec | 301 |
| 25-Dec | 253 |
| 26-Dec | 234 |
| 27-Dec | 350 |
| 28-Dec | 232 |

IFR_AR_009134

| | |
|---|---|
| 29-Dec | 257 |
| 30-Dec | 262 |
| 31-Dec | 327 |
| 1-Jan | 309 |
| 2-Jan | 280 |
| 3-Jan | 270 |
| 4-Jan | 366 |
| 5-Jan | 143 |
| 6-Jan | 98 |
| 7-Jan | 77 |
| 8-Jan | 61 |
| 9-Jan | 70 |
| 10-Jan | 73 |
| 11-Jan | 56 |
| 12-Jan | 57 |
| 13-Jan | 35 |
| 14-Jan | 50 |
| 15-Jan | 40 |
| 16-Jan | 43 |
| 17-Jan | 21 |
| 18-Jan | 28 |
| 19-Jan | 25 |
| 20-Jan | 33 |
| 21-Jan | 24 |
| 22-Jan | 25 |

IFR_AR_009135

ek ending January 22, 2023. OIS analysis of UIP data downloaded on January 23, 2023.

IFR_AR_009136

The U4U process also sharply reduced irregular flows of Ukrainian citizens to Mexico and to the SWB, and channeled them instead into a lawful process.

193 Encounters of Ukrainian nationals fell from an average of 875 per day the week before the announcement of U4U on April 21, 2022, to an average of 10 per day the week ending May 2. OIS analysis of UIP data downloaded on December 9, 2022.

| Ukraine SWB encounters | |
|---|---|
| 1-Apr | 474 |
| 2-Apr | 557 |
| 3-Apr | 578 |
| 4-Apr | 593 |
| 5-Apr | 601 |
| 6-Apr | 780 |
| 7-Apr | 831 |
| 8-Apr | 1052 |
| 9-Apr | 838 |
| 10-Apr | 1004 |
| 11-Apr | 834 |
| 12-Apr | 1171 |
| 13-Apr | 1274 |
| 14-Apr | 1100 |
| 15-Apr | 1089 |
| 16-Apr | 941 |
| 17-Apr | 986 |
| 18-Apr | 543 |
| 19-Apr | 804 |
| 20-Apr | 659 |
| 21-Apr | 773 |
| 22-Apr | 687 |
| 23-Apr | 742 |
| 24-Apr | 818 |
| 25-Apr | 312 |
| 26-Apr | 10 |
| 27-Apr | 4 |
| 28-Apr | 8 |
| 29-Apr | 5 |
| 30-Apr | 8 |
| 1-May | 14 |
| 2-May | 21 |
| 3-May | 27 |
| 4-May | 11 |
| 5-May | 3 |
| 6-May | 24 |
| 7-May | 20 |
| 8-May | 6 |
| 9-May | 14 |
| 10-May | 9 |
| 11-May | 6 |
| 12-May | 17 |

| | |
|---|---|
| UKR average week ending 4.20 | 875 |
| UKR average week ending 5.2 | 10 |

| | |
|---|---|
| 13-May | 13 |
| 14-May | 3 |
| 15-May | 6 |
| 16-May | 35 |
| 17-May | 18 |
| 18-May | 18 |
| 19-May | 21 |
| 20-May | 10 |
| 21-May | 4 |
| 22-May | 9 |
| 24-May | 3 |
| 25-May | 2 |
| 26-May | 14 |
| 27-May | 2 |
| 28-May | 27 |
| 29-May | 7 |
| 30-May | 1 |
| 31-May | 10 |

Source: UIP downloaded 12/9/22

Data pulled from UIP on 12/5/2022

IFR_AR_009138

For comparison, from 2014 to 2019—before travel was curtailed by the COVID–19 pandemic and the application of the Title 42 public health Order at the border—CBP, on average, processed 326 inadmissible individuals each day 194 OIS Persist Dataset based on data through November 2022.

| | OFO Inadmissibles | Daily Average |
|---|---|---|
| **2014** | **90,678** | 248 |
| **2015** | **113,523** | 311 |
| **2016** | **150,121** | 411 |
| **2017** | **111,283** | 305 |
| **2018** | **123,365** | 338 |
| **2019** | **125,721** | 344 |

| | | |
|---|---|---|
| 2014-19 | 119,115 | 326 |

Source: OIS Persist Pivot table November 2022.

at ports of entry along the entire SWB

IFR_AR_009140

Given limited ICE detention capacity, individuals who are not determined to pose a national-security or public-safety threat generally are released during the course of these proceedings…

202 OIS estimates that 88 percent of noncitizens encountered at the SWB in FY 2014–FY 2019 who were placed in expedited removal and made fear claims resulting in their referral to section 240 proceedings were released from detention prior to the completion of their remova

**Detention Histories for Persons Placed in ER and establishing Credible Fear**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |  |
|---|---|---|---|---|---|---|---|---|
| Continuously Detained by ICE | 5,632 | 5,178 | 7,228 | 6,656 | 7,488 | 11,120 | 43,302 | 12% |
| Released Prior to EOIR Case Completion | 32,161 | 31,773 | 72,974 | 52,128 | 74,930 | 67,062 | 331,028 | 88% |
| Total | 37,793 | 36,951 | 80,202 | 58,784 | 82,418 | 78,182 | 374,330 | 100% |

Source: OIS analysis of Enforcement Lifecycle through 9/30/2022.

Note: Continuously detained by ICE includes 73 people with records of having completed CF interviews and being repatriated directly by CBP without booking into ICE custody. Released prior to EOIR case completion includes 4,488 people with records

l proceedings. OIS analysis of Enforcement Lifecycle data as of September 30, 2022.

of having completed CF interviews but never being booked in to ICE detention (and not beging repatriated directly by CBP).

IFR_AR_009142

CBP anticipates that use of the CBP One app will enable CBP to schedule appointments for—and process—multiple times more noncitizens at the border than the prepandemic (2014–2019) daily number of inadmissible noncitizen

No footnote

|  | OFO Inadmissibles | Daily Average |
|---|---|---|
| **2014** | **90,678** | 248 |
| **2015** | **113,523** | 311 |
| **2016** | **150,121** | 411 |
| **2017** | **111,283** | 305 |
| **2018** | **123,365** | 338 |
| **2019** | **125,721** | 344 |

| 2014-19 | 119,115 | 326 |
|---|---|---|

Source: OIS Persist Dataset based on data through November 2022

IFR_AR_009143

ns seeking to enter the United States at land border ports of entry

IFR_AR_009144



# RAIO DIRECTORATE – OFFICER TRAINING

## *RAIO Combined Training Program*

# CROSS-CULTURAL COMMUNICATION AND OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN INTERVIEW

### TRAINING MODULE

DATE (see schedule of revisions): 12/20/2019

IFR_AR_009803

*This Page Left Blank Intentionally*

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 2 of 26

IFR_AR_009804

RAIO Directorate – Officer Training / *RAIO Combined Training Program*

---

# CROSS-CULTURAL COMMUNICATION AND OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN INTERVIEW

## Training Module

---

## MODULE DESCRIPTION

Through interactive communication exercises, this module describes how cultural differences may create barriers to effective communication and provides techniques for recognizing and overcoming those barriers.

## TERMINAL PERFORMANCE OBJECTIVE(S)

Given the field situation of interviewing an applicant for asylum or refugee status (and witnesses, if any), you will be able to elicit in a non-adversarial manner all relevant information necessary to adjudicate the asylum request and to issue documents initiating removal proceedings, if required.

Given written and role-play asylum and refugee scenarios, the trainee will correctly identify inter-cultural issues that may create barriers to communication.

## ENABLING PERFORMANCE OBJECTIVES

1.  Explain factors that may impede communication at an interview.

2.  Explain issues that may arise in interviewing individuals from different cultures.

3.  Explain techniques for effective communication across cultural barriers.

## INSTRUCTIONAL METHODS

-   Interactive presentation, practical exercises, discussion

## METHOD(S) OF EVALUATION

-   Multiple choice exam

USCIS: RAIO Directorate – Officer Training
*RAIO Combined Training Program*
DATE (see schedule of revisions): 12/20/2019
Page 3 of 26

IFR_AR_009805

## REQUIRED READING

1.

2.

**Required Reading – International and Refugee Adjudications**

**Required Reading – Asylum Adjudications**

**Additional Resources**

1. Kalin, Walter. "Troubled Communication: Inter-cultural Misunderstanding in the Asylum Hearing," International Migration Review, guest editor: Dennis Gallagher (Summer, 1986), p. 230-239.

2. Lawyers Committee for Human Rights. Guidelines for Immigration Lawyers Working with Interpreters: Extending Legal Assistance Across Language Barriers (New York, NY: June 1995), 5 p.

3. Rubin, Joan and Thompson, Irene. How to be a More Successful Language Learner: Toward Learner Autonomy (Boston, Massachusetts: Heinle & Heinle Publishers, 1994), p. 37-41.

**Additional Resources – International and Refugee Adjudications**

**Additional Resources – Asylum Adjudications**

## CRITICAL TASKS

| Task/ Skill # | Task Description |
|---|---|
| C3 | Skill in tailoring communications to diverse audiences (e.g., cross-cultural, management) (4) |
| IR3 | Skill in responding to cultural behavior in an appropriate way (e.g., respectful, accepting of cultural differences) (4) |
| ITK6 | Knowledge of principles of cross-cultural communications (e.g., obstacles, sensitivity, techniques for communication) (4) |

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 4 of 26

IFR_AR_009806

**SCHEDULE OF REVISIONS**

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|------|---------------------------|-----------------------------|---------|
| 12/12/2012 | Entire Lesson Plan | Lesson Plan published | RAIO Training |
| 05/10/2013 | Throughout document | Corrected minor typos, formatting, cites identified by OCC-TKMD. | LGollub, RAIO Training |
| 11/23/2015 | Throughout document | Corrected broken links and minor typos | RAIO Training |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

USCIS: RAIO Directorate – Officer Training
RAIO Combined Training Program
DATE (see schedule of revisions): 12/20/2019
Page 5 of 26

IFR_AR_009807

## Table of Contents

1   INTRODUCTION ...........................................................................................8

2   COMMUNICATING ACROSS A SECOND LANGUAGE ....................................8

2.1   Overview .........................................................................................................8

2.2   Communication ...............................................................................................9

2.3   Verbal Communication - Linguistic ................................................................10

2.3.1 The Danger of Mistranslation ........................................................................10
2.3.2 The Development of Language .......................................................................10

2.4   Verbal Communication - Paralinguistic ..........................................................11

2.5   Non-Verbal Communication ...........................................................................13

3   INTER-CULTURAL COMMUNICATION ........................................................13

3.1   Overview .......................................................................................................13

3.2   No Two People Are Alike ...............................................................................13

3.3   Inter-Cultural Miscommunication ...................................................................14

4   STRESS AND PERSONAL AGENDAS .............................................................16

4.1   Stress .............................................................................................................16

4.2   Agendas .........................................................................................................18

4.3   How Stress and Personal Agendas Can Negatively Affect the Interview Process ................19

4.4   Ways to Minimize the Negative Effects of Stress and Personal Agendas ...........19

5   OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN
    INTERVIEW ...............................................................................................20

5.1   Additional Factors ..........................................................................................20

6   CONCLUSION ..............................................................................................21

7   SUMMARY ..................................................................................................21

PRACTICAL EXERCISES .....................................................................................23

OTHER MATERIALS ...........................................................................................24

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                          Page 6 of 26

IFR_AR_009808

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS...........................................25

Required Reading.................................................................................................25

Additional Resources.........................................................................................25

Supplements.......................................................................................................25

## SUPPLEMENT B – ASYLUM ADJUDICATIONS ...........................................................26

Required Reading.................................................................................................26

Additional Resources.........................................................................................26

Supplements.......................................................................................................26

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 7 of 26

IFR_AR_009809

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.

# 1    INTRODUCTION

This lesson explains how communicating through a second language, cultural factors, stress, and "personal agendas" can affect the interview process. The lesson also includes ways that you, the interviewing officer, can minimize the negative effects that these factors can have at an interview.

# 2    COMMUNICATING ACROSS A SECOND LANGUAGE[1]

## 2.1    Overview

English is not the first language of most of the interviewees you will encounter. Although some interviews are conducted entirely in English, at most interviews there is an interpreter who interprets what the interviewee says into English and what you say into a language the interviewee can understand. Not only does this increase the time spent conducting the interview, but it also creates a situation in which miscommunication can occur.

---

[1] This section of the lesson plan is based in part on a presentation entitled, "Dimensions of Language and Culture," by Susan Raufer (currently the Director at the Newark Asylum Office) as part of studies in World Issues at the Experiment in International Living (World Learning), Brattleboro, VT and used with the author's permission.

USCIS: RAIO Directorate – Officer Training                     DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 8 of 26

IFR_AR_009810

Interpreting from one language to another is not simply a word-for-word interpretation. The language structure and vocabulary of a culture evolve as an expression of what is necessary and important in that culture; therefore, language and culture are closely intertwined. Although there are literal translations between languages for many words, there are many other words in some languages that do not have lexical equivalents in other languages and which need to be translated by multiple words or phrases. (For example, Alaska natives have many different words for "snow." A translation into English using only the word "snow" would not capture the exact meaning of what had been said.) In addition, communication does not involve merely the spoken word; tone of voice, "body language," and other factors contribute to the message that is conveyed.

You need to be aware of the potential for miscommunication when a second language is used, and to attempt to keep the possibility of miscommunication at a minimum.

## 2.2   Communication

Communication can be broken down into two components, verbal and non-verbal.

### Verbal

- Linguistic
  - vocabulary
  - grammar
- Paralinguistic
  - manipulation of speech: e.g., volume of speech, rate of speech, pitch/tone, stress
  - extra-speech sounds: e.g.,  groans, sighs, laughter, crying, whistling, and other sounds such as "huh" and "uh"

### Non-verbal

- Movements that substitute for language, i.e. body language
  - facial expressions (smiles, frowns, etc.)
  - eye contact
  - body movement
  - posture
  - physical distance
  - use of environment (tapping fingers on tabletop, drawing, etc.)
  - touching
  - use of silence; timing

### Written language

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                    Page 9 of 26

IFR_AR_009811

For purposes of this training, we will not discuss written language; whenever non-verbal communication is discussed below, it refers only to body language.

## 2.3    Verbal Communication - Linguistic

### 2.3.1    The Danger of Mistranslation

"The enormous danger of failing to communicate in the modern world is dramatically illustrated by the circumstances surrounding the bombing of Hiroshima. There is evidence that the first atom bomb might never have been dropped if a Japanese translator had not erred in the translation of one word. The word *mokusatsu*, used by the Japanese cabinet in their reply to the Potsdam surrender ultimatum was rendered 'ignore' rather than correctly, 'withholding comment pending decision.' Thinking the Japanese had rejected the ultimatum, the Allies went ahead with the nuclear bombardment."[2]

### 2.3.2    The Development of Language

People develop and build for themselves a language to meet their specific needs. This language acts as a grid through which the individual perceives the world. This also constrains the ways in which the individual categorizes and conceptualizes different phenomena. Examples of ways in which different languages have evolved include the following.

*Tense*

Although English has several past tenses, it does not have the same specific past tenses that some other languages may have. For example, Sukima, a Tanzanian language, has the following past tenses which English does not have.

- Immediate past - Used when something happened less than 2 hours ago.

- Proximate past - Used when something happened this morning.

- Intermediate past - Used when something happened two days ago.

- Remote past - Used when something happened any time more than two days ago.

Some languages may have past and future tenses, but these tenses may not always be used in everyday speech. Instead, a "time" word may be used with a present tense verb. (e.g., Khmer [Cambodian]-speakers often do not use the marker for past or future tenses when conversing, but rather use the present tense along with a time-marking word such as "last year," "tomorrow," "in a while," "next week," etc., to denote the past or future. This is sometimes done in English also: "I'm leaving tomorrow.")

---

[2] Frank M. Grittner, Teaching Foreign Languages, Harper and Row, NY, 1977, p. 33, citing to Lincoln Kinnear Barnett, The Treasure of Our Tongue, New York, Knopf, 1964, p. 292.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 10 of 26

IFR_AR_009812

### Person

- English - I, you (singular and plural)

- French - one form of "I", two forms of "you"

- Thai - several forms of "I" and "you", the use of which depends on the sex of the speaker, his or her relation to the other person, and the situation; in addition, there are forms of "I" and "you" which are used only by the king and royal family

### Gender

- English - no gender (one form of "the")

- Spanish - masculine and feminine (the = el, la)

- French - masculine and feminine (the = le, la)

### Use of terms [3]

- In Moré, spoken in Burkina Faso, cold, hunger, or thirst "has" a person. ("Cold has me.")

- In the Ama-Zulu culture, women are not allowed to mention the names of certain of their husband's relatives. Instead, they must use a substitute, often a descriptive term. For example, a woman cannot refer to her husband's brother by name but rather might call him "younger father" or "small father," or "the father of ____ (naming one of his children)."

- Even the words that form the names cannot be used. For example, Chief Buthelezi's father's name was "Mathole Mnyama" which means "calf" (Mathole) and "dark" or "black" (Mnyama). Not only is the chief's wife not able to refer to her father-in-law by his name, but she also cannot use the words for "calf," "black," or "dark," or even "nyama" which means "meat." If she wants to refer to a black dress, for example, she must use another term such as "color like night."

Differences between languages such as those noted above can create problems when the exchange of information must be done through an interpreter.

## 2.4    Verbal Communication - Paralinguistic

**Manipulation of Speech**

---

[3] For additional information on the use of terminology between different versions of languages, see RAIO Training module, *Interviewing – Working with an Interpreter*.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 11 of 26

IFR_AR_009813

The way people manipulate their speech may convey a message. Consider the implications if an interviewee's manipulation of speech regarding the following issues is misinterpreted at an interview.

### Pitch (tone)

Pitch is not very important in English; it usually remains constant during speech. In other languages such as Chinese, Lao, Vietnamese, Thai, words may be determined by the pitch. For example in Mandarin, the word "ma" has different meanings, depending on the tone used.

- ma (high tone, level) = mother
- ma (high tone, rising) = jute
- ma (low tone, rising) = horse
- ma (low tone, falling) = scold

In Thai, depending on the tone used, "kow" can have several meanings, including "rice," "white," and "I."

### Stress

Stress is more important in English than pitch and usually affects sentences rather than individual words. Consider the meaning of the following sentence with the stress falling on different words: "The military put my brother in jail."

Stress in some languages affects individual words. For example, placing the stress on different parts of the following Spanish word alters the meaning of the word.

- te'rmino - terminal
- term'ino - I finish
- termino' - he finished

### Volume of speech

Volume of speech can indicate anger, surprise, distress, etc. The situation, setting, and culture often dictate the appropriate volume.

### Rate of speech

When someone speaks quickly it may indicate nervousness, or it may be that the person's normal speech is fast. Likewise, there may be various reasons why someone might speak slowly.

### Extra-speech sounds

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                          Page 12 of 26

IFR_AR_009814

When and how extra-speech sounds such as groans, laughter, etc., are used is usually culturally determined. For example, when it is appropriate to laugh or cry is often determined by one's culture. This has implications for interviews as interviewees may laugh or cry at what may appear to you to be inappropriate moments.

## 2.5    Non-Verbal Communication

Non-verbal communication is very often culturally determined. The individuals within a culture usually know the meanings of the non-verbal signals in their own culture. The same signals, however, can have very different meanings in other cultures.

The next section of this lesson discusses non-verbal communication across cultures. Please also refer to the background reading for information on this topic.

## 3    INTER-CULTURAL COMMUNICATION

## 3.1    Overview

In addition to bringing other languages to the interview, interviewees bring their cultural backgrounds.[4] You also bring you own cultural background to the interview and view things through your own cultural perspective.

The individuals you interview will be from many different cultural backgrounds. Most will be from a cultural background that is different from your own. Although there are many similarities between cultures, there are also many differences, and these differences can affect the interview process.

It is impossible to understand the cultural norms of all the people you will encounter. Anthropologists and others spend many years immersed in other cultures and still are not able to learn all the nuances of the culture. You can, however, become sensitive to some of the potential problems that you may encounter and which are related to cultural differences, and learn techniques that you can use when interviewing persons from other cultures.

## 3.2    No Two People Are Alike

Even two people within the same culture will not react exactly the same in similar situations. One's ways of interacting with people and coping with situations are developed by prior experiences, family background, age and sex, culture, etc. No two people are alike – not even people who are from the same family and who share a common culture.

---

[4] Each person at the interview - interpreter, legal representative, etc. - brings his or her cultural background to the interview.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 13 of 26

IFR_AR_009815

We bring to every situation our "personal baggage" of how we expect others to act and think.[5] We sometimes misinterpret the words and actions of others because we unconsciously expect that the meanings behind their words and actions are the same as our own meanings if we were in a similar situation. Misunderstandings arise, feelings are hurt, and problems are encountered due to such misinterpretations. Even when we make a conscious effort to be sensitive to other cultures, we may still miscommunicate because of the difficulty in picking up on the cultural cues of others.

In the RAIO context, the consequences of misinterpretation at an interview can be grave.

## 3.3   Inter-Cultural Miscommunication

**Perceptions of other cultures**

Most people have had little or no training in inter-cultural interactions. Therefore, in an encounter with someone from a culture other than our own, we rely on our assumptions about how other persons from our own culture act, as well as on our perceptions of how individuals from the other culture act.

These perceptions are formed by what we have heard or learned in school, through the media, and through other vicarious experiences, as well as any actual contact with persons from the other culture. We may have developed ideas about persons from certain cultures that have little basis in actual fact.

In addition, we have fewer points of common reference with someone from a different culture than we have with someone from our own culture and we may find it difficult to understand someone with whom there are only a few or no common points of reference.

Our "personal baggage" is sometimes magnified when dealing with persons from other cultures because we often know very little about their cultures, and may have misconceptions about them.

Both interviewers and interviewees (as well as others at an interview) bring with them to the interview culturally based perceptions of the world.

**Cultural perceptions at an interview**

Interviewees also have preconceived ideas of immigration officers.

Culture dictates certain behavior. You need to keep constantly in mind that you cannot assume that an interviewee's actions and words have the same meanings as they have in your culture.

---

[5] For additional information on "Personal baggage," see RAIO Training module, *Interviewing – Introduction to the Non-Adversarial Interview*.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 14 of 26

IFR_AR_009816

## *Examples*

- Certain body language may differ from culture to culture. Many hand gestures used in one culture to beckon people, to point to people or objects, to indicate agreement, to wave, etc., can have different meanings in other cultures, some of which are very insulting. Ways of non-verbally indicating "yes" and "no" also vary from culture to culture. What may be a gesture to indicate affirmation may indicate a negative response in another culture.

- The physical distance between two people who are engaged in conversation differs from culture to culture. In some cultures, a foot of space is sufficient between two people; in other cultures, much more space is needed for the people involved to feel comfortable.

- The amount of physical contact also varies from culture to culture. For example, in some cultures, individuals of the same sex who are not romantically involved hold hands when walking or talking. In other cultures, this is rarely done.

- Sitting so that the sole of your shoe faces someone is considered very rude in some cultures, whereas in other cultures, this is not an issue.

- Time is measured differently and holds different importance in various cultures. Time in some cultures may be measured in terms of planting seasons rather than months, weeks, and days as it is in other cultures. Being on time for all functions is highly valued in some cultures while in others, it is expected that people will arrive after the announced starting time for events, especially social functions such as parties.

- Women's roles vary greatly from one culture to another. In some cultures, very few women hold positions of authority, power, and respect in the workforce; in other cultures, women have a more active role in this area. In certain cultures, many women have little contact with men other than male family members and defer to men; in other cultures, women interact openly and freely with men.

- People's reactions to grief differ widely from individual to individual as well as from culture to culture.[6] Some people may have difficulty speaking about the death of a loved one without crying while other people may be able to discuss events surrounding the death of a loved one without exhibiting any outward signs of emotion.

- "Saving face" rules many of the actions of people from some cultures; people may do the utmost possible to avoid losing face or putting someone else in a situation

---

[6] A particular reaction to grief may also indicate that the applicant is suffering from Post-Traumatic Stress Disorder or other trauma-related condition. For additional information, see RAIO Training module, *Interviewing Survivors of Torture*.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                Page 15 of 26

IFR_AR_009817

where that person would lose face. In other cultures, being "forthright" in interactions often takes precedence over saving face.

> ➢ For example, if an individual is asked to give directions to a location but does not know how to get to the location, he or she may point the questioner in a particular direction in order to avoid not being able to give assistance.

- Gift-giving is a way of assuring that things get done in some cultures; gifts are expected and are given to thank people for performing a service or act, or in anticipation of a particular service or act. In other cultures, such practices may be viewed as inappropriate or may be seen as a form of bribery. In addition, in some cultures, if you admire a possession of someone, you may receive it as a gift; not accepting it may offend the giver.

- Eye contact varies from culture to culture. What may be considered a normal length of time for eye contact in one culture, may, in another culture, be termed "staring" and considered rude, causing the other person to feel uncomfortable.

- In some cultures, the left hand is only used for bathroom functions, and so giving or receiving anything with the left hand is considered extremely rude.

**Application of knowledge of cultural differences**

There are many such examples, and it would be impossible to list or understand all of them. The point is not to try and learn about every situation and cultural nuance, but to recognize that our expectations about how people react and what they say are often culture-bound. It is not uncommon for individuals to make judgments based on preconceived ideas of cultures. You must try as much as possible to recognize and put aside any preconceived ideas about how people act and the meanings of their actions in order to avoid making decisions based on cultural misperceptions.

# 4    STRESS AND PERSONAL AGENDAS

## 4.1    Stress

People deal with stressful situations in ways that vary in degree of intensity. For example, a job interview, taking a test, becoming a parent, and the death of a loved one are all stressful situations. An interview before a U.S. government official involving a possible benefit, can be a stressful situation for all of the individuals involved. Each person responds to stress differently and has developed personal mechanisms for handling stress, and you and the interviewees bring this to the interview. For example:

*Interviewee*

- Future depends on the interview

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 16 of 26

IFR_AR_009818

- Is nervous about an interview with a government official

- Is dealing with an unfamiliar environment

- Is worried about communicating through an interpreter (concerned that information may not be communicated correctly)

- May be apprehensive about retelling painful or humiliating experiences (See RAIO Training module, *Interviewing – Interviewing Survivors of Torture or Other Severe Trauma.*)

- May be concerned about forgetting important information or becoming confused

- May be suffering from Post-Traumatic Stress Disorder or other trauma-related condition, in which case his or her stress level may be heightened

### *Officer*

- Concerned you may not get all of the necessary information (especially if you are new to the position)

- Concerned about time pressure—the next interviewee may have arrived

### *Interpreter*

- Has heavy responsibility to interpret accurately

- May not speak English or the interviewee's language well

- May be under time pressure to interpret for another interviewee or to leave quickly in order to be on time for work

- May also have experienced trauma; the interviewee's story may trigger symptoms in the interpreter relating to his or her own trauma

### *Representative (trusted adult in the context of children's interviews), etc.*

- Concerned that the interviewee will have difficulty answering questions due to the stress of the interview or because the interviewee may be suffering from Post-Traumatic Stress Disorder, etc.

- Afraid of surprises: interviewee tells you something that the legal representative has not yet heard

- May have another appointment – anxious to complete interview

- Concerned you will not elicit all pertinent information

**How people react to stress**

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*    Page 17 of 26

IFR_AR_009819

Each person brings to the interview his or her individual ways of reacting to and dealing with stress. This can interfere with the interview process. Some of the ways people react to stress include:

- Change in voice and speech patterns

- Forgetfulness

- Need to feel in control

- Deference to authority

- Defensiveness

In stressful situations, individuals may easily remember the least important things and forget what is most important. This addition to the dynamic of the interview can result in miscommunication and misunderstanding.

## 4.2     Agendas

In addition to the interview being stressful for all concerned, each person has a personal "agenda" which, whether an appropriate or inappropriate agenda, may impede open communication. Agendas may be conscious or unconscious.

### *Applicant*

- To the get story out; not to forget anything; to avoid discussing particularly painful or humiliating experiences

- To convince the interviewer to grant the requested benefit

- In the case of fraud, to present a convincing claim which is untrue—not to get caught in a lie

### *Officer*

- To finish the interview in an established amount of time

- Not to overlook any procedural points

- Not to miss any important facts

- To focus on the important issues and not spend time on non-relevant topics

- Not to let previous interviews have an impact on your approach to the current interview

- In cases where you suspect a lack of credibility or fraud, to remain neutral in tone, demeanor, and attitude

### *Interpreter*

- To interpret correctly

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 18 of 26

IFR_AR_009820

- To understand all of the interviewer's words without having to ask for clarification and appearing not to know English well

- To help the applicant present a good claim

- To please the person who hired him or her

- To project a professional image

- To avoid losing face

### *Representative*

- To present the applicant in a favorable light

- To make sure the applicant doesn't forget to relate any important information

- To notice if any points are missed by the interviewer

- To be allowed to make comments on behalf of the applicant

- To distance himself or herself from fraud if he or she discovers fraud during the interview; to help cover-up the fraud if he or she is involved in the fraud

## 4.3    How Stress and Personal Agendas Can Negatively Affect the Interview Process

Agendas may help both you and the interviewee get out all of the important information. There are often situations, however, in which stress and agendas can have an adverse impact on an interview.

The individuals at the interview are often overwhelmed by dealing with the stressful environment of the interview and may be too intently focused on pursuing their personal agendas. This can result in the following:

- Material facts of testimony missing

- Inaccuracy in interpretation or the appearance of inaccuracy

- Appearance of incredibility on the part of the interviewee, such as nervous demeanor and inconsistent testimony or appearance of inconsistent testimony

- Attention not entirely focused on questions and/or responses and therefore what is said is not accurately heard and understood

- "Pushiness" to get points across

- Impatience; non-adversarial nature of the interview is jeopardized

## 4.4    Ways to Minimize the Negative Effects of Stress and Personal Agendas

You are in control of the interview; the interviewee has little control over how stressful the interview is. Therefore, you need to be aware of your actions during the interview and

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                Page 19 of 26

IFR_AR_009821

adapt your behavior to fit the situation in order to minimize as much as possible the negative effects of stress and personal agendas. To this end, you can:

1. Attempt to put the interviewee and others at ease at the beginning of the interview.

2. Assure the interviewee that he or she will be given a full opportunity to present his or her claim.

3. Explain the process of the interview and the roles of each person so that everyone will know what to expect.

4. Focus on the interviewee and listen to what he or she is saying.

5. Have patience when the interviewee does not answer a question. Keep in mind the variety of factors that may have prevented the interviewee from hearing or understanding the questions. Remember that although the interview process may become routine for you, it is not routine for the interviewee and others who may be present. You may need to give the interviewee a few seconds of silence to organize his or her thoughts.[7]

6. Recognize your own agendas, such as the need to get all the information within a certain amount of time, but do not let that interfere with your ability to listen to the interviewee. Consciously set aside inappropriate agendas.

7. Use your time wisely during the interview so you do not feel rushed near the end of your time: structure and pace the interview, and avoid discussing information that is irrelevant to the interview at hand.

# 5    OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN INTERVIEW

## 5.1    Additional Factors

There are a number of other factors that may impede communication at an interview:

- The interviewee may be suffering from Post-Traumatic Stress Disorder or other trauma-related condition that may impair his or her ability to follow your questioning, to answer questions, and to relate his or her story in a credible manner.[8]

- The interviewee may be experiencing physical discomfort or impaired cognitive ability due to torture or other abuse he or she experienced (or may have a physical condition unrelated to such abuse but which may cause physical pain or discomfort).

---

[7] For additional information on the use of silence during the interview, see RAIO Training modules, *Interviewing – Eliciting Testimony* and *Interviewing Survivors of Torture*.

[8] For additional information, see RAIO Training module, *Interviewing Survivors of Torture*.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 20 of 26

IFR_AR_009822

- The environment of the interview may not put the interviewee at ease during the interview. For example:

  ➢ The interviewee may not feel comfortable disclosing information to you because he or she is of the same or different sex as you

  ➢ The interpreter may be someone to whom the interviewee feels uncomfortable telling parts of his or her story

  ➢ You or the physical environment may remind the interviewee of the place where he or she was abused in his or her country at the hands of a government official

- Something about the interviewee or his or her story may trigger a response in you that may distract you momentarily from your task of conducting a non-adversarial interview.

## 6    CONCLUSION

You cannot possibly be aware of all of the factors that impede communication at a particular interview; each interview is unique, and each interviewee is unique. What you can do, however, is to be aware that a number of factors may impede communication, and when communication appears to be impaired, you should attempt to discern what the problem may be and attempt to alleviate it.

## 7    SUMMARY

### Communicating Across a Second Language

Although some interviews are conducted entirely in English, there is usually an interpreter who interprets what the interviewee says into English and what you, the interviewing officer, say into a language the applicant can understand. Interpreting from one language to another is not simply a word-for-word interpretation between two languages.

Although there are literal translations between languages for many words, there are many other words in some languages that do not have lexical equivalents in other languages and that need to be translated by using more than one word. In addition, communication does not involve merely the spoken word; tone of voice, "body language" and other factors contribute to the message that is conveyed. You need to be aware of the potential for miscommunication when a second language is used, and to attempt to keep the possibility of miscommunication at a minimum.

### Inter-Cultural Communication

Culture plays an especially important role in the communication at an immigration interview. There are many differences between cultures regarding body language, physical closeness, views of time, women's roles, reactions to grief, etc.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 21 of 26

IFR_AR_009823

Because of the many differences between individuals, it is often difficult to determine how someone will react in a given situation. We often misinterpret the meanings of the words and actions of others because we assign our own meanings to their words and actions, and our meanings may not be the same as theirs. You need to keep in mind the effects of culture in evaluating an interviewee's behavior.

**Stress and Personal Agendas**

Interviews with a U.S. government official are stressful situations, and the individuals at an interview bring with them the methods they have devised for dealing with stress, any personal agendas they may have, their cultural backgrounds, and their "personal baggage." In addition, an interviewee may be affected by trauma experienced in his or her country or during the flight from the country. All of these factors influence the behavior of the individuals at an interview, and may impede communication.

You must attempt to reduce the stress of the others at the interview and recognize the existence of possible agendas in order to assist the flow of communication. You also need to recognize your own ways of dealing with stress and personal agendas and minimize any negative effect your own stress and agendas may have on the interview process.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 22 of 26

IFR_AR_009824

## PRACTICAL EXERCISES

There are several practical exercises that will be conducted during this class. The materials for the exercises will be distributed during class.

---

### Practical Exercise # 1

- **Title**:

- **Student Materials**:

---

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 23 of 26

IFR_AR_009825

# OTHER MATERIALS

There are no Other Materials for this module.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 24 of 26

IFR_AR_009826

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

There is no International and Refugee Adjudications Supplement for this module.

## REQUIRED READING

1.

2.

## ADDITIONAL RESOURCES

1.

2.

## SUPPLEMENTS

| International and Refugee Adjudications Supplement |
| :---: |
| **Module Section Subheading** |

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 25 of 26

IFR_AR_009827

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

There is no Asylum Adjudications Supplement for this module.

## REQUIRED READING

    1.

    2.

## ADDITIONAL RESOURCES

    1.

    2.

## SUPPLEMENTS

<div style="border:1px solid black; background-color:#FFFFCC;">

**Asylum Adjudications Supplement**

**Module Section Subheading**

</div>

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                    Page 26 of 26

IFR_AR_009828



# RAIO DIRECTORATE – OFFICER TRAINING

## *RAIO Combined Training Program*

# GENDER-RELATED CLAIMS

## TRAINING MODULE

*This Page Left Blank Intentionally*

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 2 of 52

IFR_AR_009970

RAIO Directorate – Officer Training / *RAIO Combined Training Program*

<div style="border:1px solid black; background:#eaf5e1; text-align:center;">

# GENDER-RELATED CLAIMS

## Training Module

</div>

## MODULE DESCRIPTION:

This module provides guidance on gender-related factors you must consider when interviewing and adjudicating claims related to gender, including claims based on violations of societal norms associated with gender.[1]

## TERMINAL PERFORMANCE OBJECTIVE(S)

You, the Officer, will identify and assess gender-related factors when adjudicating claims involving gender or violations of societal norms associated with gender.

## ENABLING LEARNING OBJECTIVES

1. Evaluate gender-related claims by applying appropriate legal, policy, procedural, and international guidance.

2. Evaluate factors related to gender that must be considered in determining eligibility for a gender-related claim.

3. Assess factors that may inhibit an applicant's ability to present fully a gender- related claim, including the use of an interpreter.

4. Apply effective interviewing techniques to fully elicit sensitive issues related to gender in a non-adversarial manner.

5. Evaluate factors related to gender that must be considered in evaluating credibility.

6. Evaluate factors related to gender that may affect an applicant's ability to relocate within his or her country.

---

[1] Violations of social norms associated with gender are also addressed in RAIO Training Module, *Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims*.

## INSTRUCTIONAL METHODS

Classroom lecture, practical exercises

## METHOD(S) OF EVALUATION

Written Test

## REQUIRED READING

1. Coven, Phyllis. INS Office of International Affairs, *Considerations For Asylum Officers Adjudicating Asylum Claims From Women (Asylum Gender Guidelines)*, Memorandum to INS Asylum Officers, HQASM Coordinators (Washington, DC: 26 May 1995).

**Required Reading – International and Refugee Adjudications**

**Required Reading – Asylum Adjudications**

## ADDITIONAL RESOURCES

1. Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva: January 1992), P 57 (including the 1951 Convention and the 1967 Protocol; other UNHCR-provided materials).

2. United Nations High Commissioner for Refugees (UNHCR). Conclusions on the International Protection of Refugees adopted by the Executive Committee of the UNHCR Programme (Geneva: 1993), p.173.

3. United Nations High Commissioner for Refugees, Guidelines on International Protection: Application of the Exclusion Clauses:  Article 1F of the 1951 Convention relating to the Status of Refugees.  HCR/GIP/03/05, 4 September 2003, 9pp.

4. United Nations High Commissioner for Refugees, Guidelines on International Protection: Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses).  HCR/GIP/03/03, 10 February 2003, 8 pp.

5. United Nations High commissioner for Refugees, Guidelines on International Protection: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees.  HCR/GIP/02/01, 7 May 2002, 10 pp.

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*    Page 4 of 52

IFR_AR_009972

6. United Nations High Commissioner for Refugees, Guidelines on International Protection: "Internal Flight or Relocation Alternative" within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees.  HCR/GIP/03/04, 23 July 2003, 8 pp.

7. United Nations High Commissioner for Refugees, Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees.  HCR/GIP/02/02, 7 May 2002, 5 pp.

**Additional Resources – International and Refugee Adjudications**

**Additional Resources – Asylum Adjudications**

## CRITICAL TASKS

SOURCE: The Tasks listed below are from the Asylum Division's 2001 Revalidation. These tasks will need to be modified to reflect the results of the RAIO Directorate – Officer Training Validation study.

| Task/ Skill  # | Task Description |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                  Page 5 of 52

IFR_AR_009973

**SCHEDULE OF REVISIONS**

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|------|---------------------------|------------------------------|---------|
| 5/16/2013 | Throughout document | Corrected minor typos, formatting, cites identified by OCC-TKMD. | L. Gollub RAIO Training |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*    Page 6 of 52

IFR_AR_009974

## TABLE OF CONTENTS

1    INTRODUCTION ............................................................................................................ 10

2    GENDER-RELATED ISSUES ...................................................................................... 10

2.1    Overview of Gender-Related Persecution:  Women's Human Rights ........................ 10

2.2    International and National Guidelines Relating to Women and Children .................... 11

2.3    State and Non-State Agents of Persecution ............................................................... 13

2.4    Torture and Psychological Trauma ............................................................................ 13

3    GENDER-BASED PERSECUTION EXPERIENCES ................................................ 14

3.1    Restrictive Social Norms ........................................................................................... 14

3.2    Economic and Social Rights ...................................................................................... 15

3.3    Reporting, Law Enforcement, and Access to State Protection .................................. 15

4    TYPES OF GENDER-BASED HARM ........................................................................ 16

4.1    Sexual Violence ......................................................................................................... 16

4.2    Female Genital Mutilation (FGM) ............................................................................ 18

    4.2.1   Types of FGM ................................................................................................ 18

    4.2.2   Short and Long Term Consequences of FGM ............................................... 19

4.3    Forced and Early Marriage ........................................................................................ 19

4.4    Domestic Violence ..................................................................................................... 21

4.5    Human Trafficking ..................................................................................................... 22

4.6    Honor Crimes ............................................................................................................. 23

5    INTERVIEWING CONSIDERATIONS ...................................................................... 24

5.1    Pre-Interview File Review ......................................................................................... 24

5.2    Considerations Related to Gender and Culture .......................................................... 24

5.3    Suggested Interview Techniques ............................................................................... 26

5.4    Examples of Questions to Elicit Sensitive Information ............................................. 27

6    LEGAL ANALYSIS – ASYLUM AND REFUGEE CASES ....................................... 28

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                       Page 7 of 52

IFR_AR_009975

6.1    Persecution and Agent of Persecution ................................................................. 28

    6.1.1   Persecution ............................................................................................... 28

    6.1.2   Agent of Persecution ............................................................................... 31

6.2    Nexus .................................................................................................................. 32

    6.2.1   Overview .................................................................................................. 32

    6.2.2   Political Opinion ...................................................................................... 34

    6.2.3   Religion .................................................................................................... 36

    6.2.4   Particular Social Group ............................................................................ 36

    6.2.5   Race and Nationality ................................................................................ 37

6.3    Internal Relocation ............................................................................................. 37

    6.3.1   Ability to Travel ....................................................................................... 38

    6.3.2   Economic Circumstances ......................................................................... 38

    6.3.3   Social Circumstances ............................................................................... 39

7    CREDIBILITY .......................................................................................................... 39

7.1    Detail .................................................................................................................. 39

7.2    Consistency ......................................................................................................... 40

7.3    Plausibility .......................................................................................................... 40

7.4    Demeanor ............................................................................................................ 41

8    EVIDENTIARY CONSIDERATIONS .......................................................................... 41

9    CONCLUSION ........................................................................................................... 41

10    SUMMARY ............................................................................................................... 42

10.1   Gender-Related Issues ........................................................................................ 42

10.2   International and National Guidelines Relating to Women Refugees................... 42

10.3   Types of Gender-Based Harm ............................................................................. 42

    10.3.1  Rape and Other Sexual Violence ............................................................. 43

    10.3.2  Female Genital Mutilation (FGM)........................................................... 43

    10.3.3  Forced Marriage ...................................................................................... 43

    10.3.4  Domestic Violence ................................................................................... 43

    10.3.5  Human Trafficking ................................................................................... 43

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program    Page 8 of 52

IFR_AR_009976

10.3.6 Honor Crimes .................................................................................................. 43

10.4 Interviewing Considerations ................................................................................ 44

10.5 Legal Analysis – Persecution and Agent of Persecution ..................................... 44

10.5.1 Persecution .................................................................................................... 44

10.5.2 Agent of persecution ..................................................................................... 44

10.6 Legal Analysis – Nexus ....................................................................................... 45

10.7 Legal Analysis – Internal Relocation .................................................................. 45

10.8 Credibility ............................................................................................................ 45

PRACTICAL EXERCISES ............................................................................................... 47

OTHER MATERIALS ...................................................................................................... 50

SUPPLEMENT A – REFUGEE AFFAIRS DIVISION ......................................................... 51

Required Reading ......................................................................................................... 51

Additional Resources ................................................................................................... 51

Supplements ................................................................................................................. 51

SUPPLEMENT B – ASYLUM DIVISION .......................................................................... 52

Required Reading ......................................................................................................... 52

Additional Resources ................................................................................................... 52

Supplements ................................................................................................................. 52

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                    Page 9 of 52

IFR_AR_009977

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

# 1    INTRODUCTION

This lesson provides guidance on special factors you must consider when interviewing applicants with gender-based claims.  Gender-related claims most commonly arise in the context of female claimants seeking refugee protection.  However, it is important to note that the forms of gender-based persecution described in this lesson can, and often are, inflicted on both females *and* males.  Although the lesson often focuses on female applicants, you should keep in mind that the issues presented in this lesson may also impact male applicants, albeit less frequently.  The discussion in this lesson will address the way gender-based claims may differ within the protection context.

# 2    GENDER-RELATED ISSUES

## 2.1    Overview of Gender-Related Persecution:  Women's Human Rights

The Executive Office of the United Nations High Commissioner for Refugees (UNHCR) specifically addresses the need for special training on gender-related issues.[2]  It calls upon States to adopt a gender-sensitive interpretation of the 1951 Convention and its 1967 Protocol.[3]  UNHCR also provides guidelines for those adjudicating refugee protection claims in order to ensure that all gender-related claims are recognized as such and given the proper consideration.[4]

---

[2] UNHCR Executive Committee Conclusion No. 98 (LIV) (2003).

[3] UNHCR Executive Committee Conclusion No. 85 (LIV) (2003).

[4] UNHCR *Guidelines on International Protection No. 1, Gender-Related Persecution within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees* (May 2002).

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 10 of 52

IFR_AR_009978

## 2.2    International and National Guidelines Relating to Women and Children

In recognition of the particular vulnerability of women and children, international bodies and national governments have issued several documents in an effort to enhance their protection. UNHCR has provided guidance on gender-related persecution within the context of Article IA(2) of the 1951 Convention and its 1967 Protocol. Immigration authorities in Canada, the United States, and Australia have all issued guidelines for adjudicators in evaluating gender-based claims.

The chart below provides a timeline of the various guidelines enacted over the years to specifically protect vulnerable populations. (move the mouse over each document name for a brief overview of the document. Control + click for the entire document.)

### Table 1 - Evolution of Guidelines on Gender-Related Claims



Of particular note, in 1995 the Immigration and Naturalization Service (INS), predecessor of the U.S. Citizenship and Immigration Services (USCIS), issued Asylum Gender Guidelines, instructing Asylum Officers on issues to consider when interviewing and evaluating gender-

related claims.[5]  The guidelines are not binding on adjudicators outside of USCIS.  However, they have been cited in asylum decisions by immigration judges, the Board of Immigration Appeals, and federal courts.   In July 1995, INS issued a memorandum, *Follow Up on Gender Guidelines Training*, to further clarify guidance following a nation-wide training on this topic.[6]  In February 2001, INS also issued *Gender Guidelines for Overseas Refugee Processing*, which provided additional guidance in the overseas context and techniques for interviewing gender-related cases.[7]

On May 7, 2002, the UNHCR issued *Guidelines on International Protection: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*.  The Guidelines recognize that while "gender-related persecution" has no legal meaning *per se*, gender can influence and dictate the type of persecution suffered and the reasons for the treatment.  The Guidelines provide legal interpretative guidance for adjudicators in determining gender-related claims and offer recommendations for interviewing applicants with gender-based claims.  The Guidelines are not binding on Officers adjudicating refugee or asylum claims, but, to the extent that they are consistent with U.S. law, are persuasive authority for the examination of gender-related claims.

The human rights of all individuals, regardless of gender, are guaranteed within international instruments such as the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. However, due to discriminatory interpretations and applications, these instruments have not always provided sufficient protection to women who may be viewed negatively or harmed for transgressing social norms and refusing to conform to ascribed gender roles.  Accordingly, over time other international instruments have been created to outline rights and protections specifically for women.

The Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW)[8] defines discrimination as:

> [a]ny distinction, exclusion or restriction made on the basis of sex, which has the effect or purpose of impairing or nullifying the recognition, enjoyment or exercise by women, irrespective of their marital status, on a basis of equality of men and women, of human

---

[5] Coven, Phyllis. INS Office of International Affairs, *Considerations For Asylum Officers Adjudicating Asylum Claims From Women (Asylum Gender Guidelines)*, Memorandum to INS Asylum Officers, HQASM Coordinators (Washington, DC: 26 May 1995), 19 p.  Note that this memo was addressed to Asylum Officers.  Refugee Officers have specific guidelines, as well.  See Weiss, Jeffrey L., Office of International Affairs, Gender *Guidelines for Overseas Refugee Processing*, Memorandum to all Overseas District Directors (Washington, DC: 23 February 2001), 2 pp. plus attachment.

[6] Melville, Rosemary, Asylum Division, Office of International Affairs, *Follow Up On Gender Guidelines Training*, Memorandum to Asylum Office Directors, SAOs, AOs, (Washington, DC: 7 July 1995), 2 pp. plus attachments.

[7] Weiss, Jeffrey L., Office of International Affairs, Gender *Guidelines for Overseas Refugee Processing*, Memorandum to all Overseas District Directors (Washington, DC: 23 February 2001), 2 pp. plus attachment.

[8] To date, the U.S. has not ratified CEDAW.

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 12 of 52

IFR_AR_009980

rights and fundamental freedoms in the political, economic, social, cultural, civil or any other field.[9]

The Declaration on the Elimination of Violence against Women (Declaration) defines violence against women as "any act of gender-based violence that results in, or is likely to result in, physical, sexual or psychological harm or suffering to women, including threats of such acts, coercion or arbitrary deprivation of liberty, whether occurring in public or in private life."[10] Recognizing that violence against women occurs in both public and private settings, the Declaration states that violence against women includes any violence that occurs "in the family, within the general community or perpetrated or condoned by the State, wherever it occurs."[11]

## 2.3    State and Non-State Agents of Persecution

Intimidation and harassment of individuals as a strategy of gaining power and control over vulnerable populations occurs both within the public context of community and society, as well as within the private sphere of home and family life.  However, States are generally obliged to protect their citizens from persecution.  Specifically, under international law, States parties to specific human rights covenants may be responsible "for private acts if they fail to act with due diligence to prevent violations of rights or to investigate and punish acts of violence."[12]  "Where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection."[13]

## 2.4    Torture and Psychological Trauma

Both men and women who are persecuted throughout the world often suffer torture and psychological trauma for a variety of reasons.  "The severity of the harm inflicted upon women by private individuals can be as damaging as that inflicted on women who are tortured by agents of the state."[14]  Many of the practices described in the sections below induce acute psychological trauma, in which women live in constant fear of harm amongst multiple possible and actual abusers, including close relatives and primary care givers.

Many abuses in the family or community are intentionally inflicted.  In addition, such abuses are often inflicted for similar reasons to torture in custody.  Torture in custody is often used not only to extract confessions but also to instill profound dread into victims, to break their will, to

---

[9] Convention on the Elimination of All Forms of Discrimination Against Women, adopted by the UN General Assembly in 1979.

[10] Declaration on the Elimination of Violence against Women, Article 1.

[11] Declaration on the Elimination of Violence against Women, Article 2.

[12] General Recommendations made by the Committee on the Elimination of Discrimination against Women, General Recommendation 19, point 9.

[13] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, Dec. 2011, HCR/IP/4/Eng/REV.3.

[14] Amnesty International, Broken Bodies, shattered minds; torture and ill-treatment of women, London, 2001 p. 5

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                    Page 13 of 52

IFR_AR_009981

punish them and to demonstrate the power of the perpetrators. Similar purposes characterize acts of torture in the family or the community. The perpetrators may seek to intimidate women into obedience or to punish women for allegedly bringing shame on relatives by their disobedience.[15]

You should keep in mind that perpetrators of violence against women may be other women. For example, many girls experience pressure from female relatives to submit to female genital mutilation (FGM) or forced marriage. Concepts of gender inequality are often internalized and perpetuated by older women against younger generations.

## 3    GENDER-BASED PERSECUTION EXPERIENCES

In many societies, women hold significantly different positions than men. Experiences that give rise to women leaving their homelands are often different than the experiences of men. To properly evaluate the claims of women, you must be sensitive to certain unique aspects of their experiences and circumstances. You must also understand how to consider the experiences and circumstances in the context of refugee, asylum and immigration law.

### 3.1   Restrictive Social Norms

Social norms refer to the customary rules that govern behavior in groups and societies.[16] In many countries around the world, women and girls face particularly restrictive social norms within their society and culture. For many women and girls, violence and discrimination at the hands of family members and the larger society is a reality.

Though some are subject to the brutality of individual family members, others suffer violence because cultural practices sanction the violence and make it legitimate and acceptable within the greater society. These structural forms of abuse are not always seen to constitute violence and are often embedded in the economic and social life of the community. Because of the link to notions of culture, these forms of violence are tenacious and extremely difficult to eradicate.

The type of violence and discrimination that women suffer under the guise of cultural practice are diverse and varied. Some cultural practices result in murder or severe pain and suffering, irretrievably transforming women's lives. Honor killings, female genital mutilation, bride burning, the pledging of young children to be concubines or sex slaves, are just a few examples of the types of practices that shock the conscience because they involve physical violence and brutality. [17]

Discrimination against women may be entrenched in a country or society, leading to unequal status within constitutions, legislation, cultural ideology, institutions, the workplace, schools, community and the home.

---

[15] Amnesty International, Broken bodies, shattered minds; Torture and ill-treatment of women, London 2001 p. 6.
[16] Social Norms, Ststandford Encyclopedia of Philosophy, http://plato.stanford.edu/entries/social-norms/ (March 1, 2011).
[17] Special Rapporteur on Violence Against Women,
http://www.unhcr.ch/huricane/huricane/nsf/view01/666287371B645B1C1256BA0004AADF5?opendocument

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 14 of 52

IFR_AR_009982

## 3.2    Economic and Social Rights

In some countries women do not have access to the same social and economic rights as men. They may have limited access to formal education and healthcare; they are not able to own land or property, inherit, work outside the home, travel freely, hold a bank account in their own name or obtain credit, among other things. As a result, women are often wholly or partially dependent on their male relatives, physically and psychologically, making it difficult for them to escape violence within the home and community, and seek protection and redress. Their position, status and treatment in society often make it difficult for them to relocate to another area without the support of male relatives or a family network. In addition, it may not be economically feasible for a woman to relocate if she has been deprived of the opportunity to pursue an education or if her ability to work outside the home has been severely restricted.

Poverty and unemployment may force women and girls into trafficking and/or smuggling situations, at times leading to prostitution for survival; "prostitutes are especially vulnerable to violence because their status, which may be unlawful, tends to marginalize them."[18]

## 3.3    Reporting, Law Enforcement, and Access to State Protection

Historically, countries where women are socially and economically dependent on male relatives underreport abuses against women, particularly because most women are dependent on their abusers for subsistence. A woman who has made a complaint may be identified as a "trouble maker" and become vulnerable to further harassment.[19] Women may be ostracized, face extreme stigma or reprisals for reporting practices which are considered culturally acceptable and for bringing dishonor to the family by making "private" matters public.

There may also be practical difficulties in reporting abuses, such as the attitudes of law enforcement officials or a lack of legislation supporting women's rights. Cultures of gender inequality are often internalized to the point where women are not aware of their rights. Further, law enforcement officials and government entities often lack the sensitivity, professionalism and training to handle complaints of violence against women, and may use informal justice systems or cultural pressure to encourage women to return to an abusive situation rather than undertake serious investigations. In some countries women may be arrested and imprisoned "for their own protection."[20] Attitudes amongst some law enforcement officials show that they down-play the significance of violence against women, perceiving acts of sexual violence within the family to be largely consensual and viewing domestic violence as a private, family matter rather than a criminal offense.[21]

---

[18] General Recommendations made by the Committee on the Elimination of all Forms of Discrimination against Women, General Recommendation No. 19.

[19] Daily Dawn, Woman accuses police of harassment, 10 October 2007, available from http://archives.dawn.com/2007/10/10/nat44.htm

[20] Amnesty International, Afghanistan: Women still under attack – a systematic failure to protect (May 2005).

[21] Human Rights Watch, A Question of Security: Violence against Palestinian Women and Girls (November 2006) at p. 61.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 15 of 52

IFR_AR_009983

In some countries gender discrimination is prevalent within legislation and the formal court system.  Women may not have access to the same types of social or legal protections available to men.  For example, requests for protection from abuse may be ignored if the abuser is a woman's husband or father.   In many countries, a woman's testimony in court is not accorded the same legal weight as a man's testimony. [22]

Where legislation prohibiting violence against women does exist, women are often unable to access its protection and there is a failure by the State to prosecute the perpetrators.  Women's access to financial resources to pursue legal protection may be limited. The law may also criminalize female victims of violence, e.g., rape victims may be detained and prosecuted as adulterers and victims of trafficking may be prosecuted as prostitutes.[23]

## 4     TYPES OF GENDER-BASED HARM

The types of harm that women suffer vary across a broad range of countries, cultures and classes.  Forms of harm that are unique to, or more common to, women, include, but are not limited to:

- Sexual Violence
- Female Genital Mutilation (FGM)
- Forced and Early Marriage
- Domestic Violence
- Human Trafficking
- Slavery
- Honor Crimes
- Infanticide
- Forced Abortion
- Bride Burning

The sections below address certain types of harm most often directed at women, though the list is not exhaustive.  You should keep in mind that though these types of harm are most often directed at women, sexual violence can be, and often is, perpetrated against men as well.

## 4.1     Sexual Violence

---

[22] *See, e.g.,* U.S. Department of State Human Rights Report: Saudi Arabia (2010) at p. 35.

[23] Pearson, E., Human Traffic Human Rights:  Redefining Victim Protection, Anti-Slavery International, London, 2002.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 16 of 52

IFR_AR_009984

Sexual violence is defined as "any act of a sexual nature which is committed on a person under circumstances which are coercive. Sexual violence is not limited to a physical invasion of the human body and may include acts which do not involve penetration or even physical contact."[24] Much like beatings, torture or other forms of physical violence, sexual violence is a serious form of harm and may rise to the level of persecution, such as in the case of rape. For asylum and refugee status, sexual violence must be perpetrated on account of a protected characteristic. It is important for you to remember that the appearance of sexual violence in a claim does not mean that the claim is an instance of purely "personal harm."

Rape is an act of violence serving non-sexual needs or aims. Rape is not based on a need for a sexual relationship; it is based on a desire to degrade, control or terrorize the victim or the victim's community and is perpetrated against both males and females. Rape has long been an integral part of conflict, used as a tactical weapon to terrorize civilian communities, to achieve ethnic cleansing, to seek revenge against an enemy, and to suppress political opposition.[25]

> The rape of one woman is translated into an assault upon the community through the emphasis placed in every culture on a woman's virtue: the shame of the rape humiliates…all those associated with the survivor.[26]

In an extensive investigation of rape in a wide range of countries, including former Yugoslavia, India (Kashmir), Haiti, Somalia, and Peru, Human Rights Watch found that:

> Of all the abuses committed in war or by repressive regimes, rape in particular is inflicted predominantly against women. Although men also are raped, efforts to document human rights abuse reveal that women are overwhelmingly the targets. Despite how pervasive it is, rape has often been a hidden element of strife, whether political or military, a fact that is inextricably linked to its largely gender-specific character. That this abuse is committed by men against women has contributed to its being narrowly portrayed as sexual or personal in nature, a characterization that depoliticizes sexual abuse in conflict and results in its being ignored as a crime.
>
> Yet rape in conflict or under repressive regimes is neither incidental nor private. It routinely serves a strategic function and acts as a tool for achieving specific military or political objectives. Like other human rights abuses, rape serves as a means of harming, intimidating and punishing individual women. Further, rape almost always occurs in connection with other forms of violence or abuse against women or their families.

---

[24] *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, September 2, 1998, at ¶ 688.

[25] See Human Rights Watch Women's Rights Project, *The Human Rights Watch Global Report on Women's Human Rights* (1995); Giller, Joan E. MA, MB, MRCOG; Swiss, Shana MD, *Rape as a Crime of War – A Medical Perspective*, JAMA (Vol. 270, No.5, 4 August 1993), pp 612-615. Human Rights Watch/Africa Human Rights Watch Women's Rights Project, *Shattered Lives - Sexual Violence During the Rwandan Genocide and its Aftermath* (September 1996).

[26] Pearson, E., Human Traffic Human Rights: Redefining Victim Protection, Anti-Slavery International, London, 2002.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                Page 17 of 52

IFR_AR_009985

Far from being an isolated sexual or private act, rape often occurs alongside other politically motivated acts of violence.[27]

Note that the historic portrayal of rape as "sexually" or "personally" motivated influences the way that many women articulate the assailant's motives for attacking her. An applicant may initially characterize the attack as motivated by sexual desire, but you should make efforts to elicit any evidence that the assault occurred on account of a protected ground. The following exchange, quoted in *Shoafera v. INS*[28], recognizes that rape is not primarily motivated by sexual desire, and is instructive on how to elicit relevant information about a sensitive incident:

> [Q.] Now, with regard to the rape, do you have any idea—and I know this is a difficult question, but do you have any idea why Hagos Belay did this to you?
> [A.] I just--He probably was attracted to me. I don't know.
> Q. Aside from the fact that he may have been attracted to you, can you think of any other circumstances or factors that might have made you an easier target for him, or someone who he felt he could do this to?
> A. 'Cause I'm an Amhara. If I was a Tigrean he wouldn't do it.

## 4.2    Female Genital Mutilation (FGM)

Female genital mutilation (FGM) is a custom involving the cutting or removal of all or part of the female genitalia. The origins of FGM are unknown. It predates Christianity and Islam and is not required by the Bible or the Koran. FGM crosses religious, ethnic and cultural boundaries.

FGM can expose women to serious and potentially life threatening physical complications. Factors that allow for the continued practice of FGM include traditional beliefs, superstition, the role of women in the society and the belief that FGM will suppress and control sexual behavior. It may be performed on infants, children, adolescents, single, married, pregnant, or post-partum women, and corpses.[29]

FGM is most prevalent in Africa. It is practiced in at least twenty-eight African countries as well as in several Middle East countries, including Egypt, Oman, Saudi Arabia, Yemen and the United Arab Emirates. It is found in India, Pakistan, Indonesia and Malaysia, as well as within small indigenous groups in Peru, Mexico and Brazil.

### 4.2.1    Types of FGM

---

[27] Human Rights Watch Women's Rights Project, The Human Rights Watch Global Report on Women's Human Rights (1995).

[28] *Shoafera  v. INS,* 228 F.3d 1070 (9th Cir. 2000) (reversing the immigration judge who held that the applicant's comment that the rape was on account of her ethnicity was "speculative," despite supporting testimony by her sister and country conditions information).

[29] United States Department of State, Office of the Under Secretary for Global Affairs, Office of the Senior Coordinator for International Women's Issues, Female Genital Mutilation (FGM) (Washington, DC: Feb. 1, 2000, updated June 27, 2001).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 18 of 52

IFR_AR_009986

Some people refer to the practice of FGM as "circumcision." Circumcision is only one type of FGM, and it is the least physically traumatic and dangerous. Only a small percentage of women subjected to FGM are circumcised. The vast majority of women suffer more drastic and dangerous forms of FGM.

   1. Circumcision

The clitoral prepuce or tip of the clitoris is cut away. About five percent of the women who undergo FGM undergo circumcision.

   2. Excision

The clitoris and/or prepuce are partially or totally cut away. In addition, all, or part of, the labia minora are cut away. This is the most commonly practiced type of FGM.

   3. Infibulation

The clitoris, the prepuce, the labia minora and a part of the labia majora are cut away. The edges of the labia majora are then sewn, pinned, or brought together with an adhesive in order for scar tissue to form.

## 4.2.2    Short and Long Term Consequences of FGM

FGM can have devastating and harmful consequences for a woman throughout her life.

Those performing FGM have varying degrees of expertise. FGM is often performed without anesthesia, under unsanitary conditions, by non-medical personnel. The type of procedure, the degree of sterility and the expertise of the individual performing the procedure affect the degree of harm experienced. However, long-term serious harm may result even when the least damaging procedure (circumcision) is performed by qualified surgeons in sterile operating rooms.[30]

Short-term consequences include: bleeding, post-operative shock, infection, tetanus, damage to other organs and death.

Long-term consequences include retention of blood in the abdomen and swelling of the stomach, chronic infections of the bladder and vagina, extremely painful menstruation, child-birth obstruction, risk of HIV infection, psychological problems and sexual dysfunction.

## 4.3    Forced and Early Marriage

---

[30] United States Department of State, Office of the Under Secretary for Global Affairs, Office of the Senior Coordinator for International Women's Issues, Female Genital Mutilation (FGM) (Washington, DC: Feb. 1, 2000, updated June 27, 2001)

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                            Page 19 of 52

IFR_AR_009987

Forced marriage is arranged and enforced against the victim's wishes. International human rights documents recognize that the right to marry is a fundamental human right, and they also mandate that "no marriage shall be legally entered into without the full and free consent of both parties." However, some women and girls are married against their will in forced marriages.[31]

In some circumstances, a forced marriage may be determined to be persecution,[32] although you will still need to establish a nexus to a protected characteristic. It is important to distinguish between forced marriages and arranged marriages. Arranged marriages are an important tradition in many cultures and are often entered into willingly, even in situations where the girl might not have reached 18 years of age. Factors to consider in determining whether a marriage was or would be forced include the type and level of coercion to which an applicant was or would be subjected, the applicant's ability to avoid the marriage at all, and the nature of the consequences for the applicant if she were to refuse to submit to the marriage.

Forced marriage takes place throughout the world and occurs for a variety of reasons stemming from issues such as poverty, gender discrimination, and lack of security.[33] A family may sell or offer a daughter in marriage to alleviate the financial burden on the family, to settle a debt, to provide the daughter with a "better life," or to afford additional wives for the male family members. In some contexts, forced marriage may provide a method to atone for criminal conduct or as punishment to the perpetrator of a gender-based crime such as rape. Forced marriage may serve the purpose of uniting two families or adhering to religious and cultural traditions. Families may wish to force their daughters to marry to protect them from rape or to keep their virginity intact.[34]

Forced marriage violates numerous human rights. It provides an arena in which sexual abuse, sexual exploitation, domestic violence, forced labor, and slavery often go unnoticed. Women in forced marriages may have fewer educational and work opportunities and their freedom of movement may be restricted. In some cultures, women and girls may be subjected to FGM prior to the forced marriage. A woman's attempt to refuse the forced marriage may result in abusive or harmful treatment.[35]

---

[31] United Nations, Covenant on Consent to Marriage, Minimum Age for Marriage and Registration at Marriage, G.A. Res. 1763(A)(XVII), U.N. GAOR, Nov. 7, 1962 (Note the United States has not ratified this treaty); United Nations, Universal Declaration of Human Rights, G.A. Res. 217(a)(III), U.N. GAOR, Dec. 10, 1948.

[32] See, e.g., Bi Xia Qu v. Holder, 618 F.3d 602, 607-09 (6th Cir. 2010)(finding women in China who have been subjected to forced marriage and involuntary servitude constitute a particular social group and that the applicant suffered past persecution).

[33] See, e.g., For Somali Women, Pain of Being a Spoil of War, New York Times, December 27, 2011, describing how militants are forcing families to hand over girls for short-term forced marriages which "are essentially sexual slavery."
[34] UNHCR, Sexual and Gender-based Violence Refugees, Returnees and Internally Displaced Persons (May 2003) at 24; Elizabeth Warner, Behind the Wedding Veil: Child Marriage as a Form of Trafficking in Girls, 12 Am. U.J. Gender Soc. Pol'y & L. 233 (2004)

[35] Id; The Forum on Marriage and the Rights of Women and Girls, Early Marriage: Sexual Exploitation & the Human Rights of Girls (Nov. 2001); Sexual and Gender-based Violence Refugees, Returnees and Internally Displaced Persons at 18.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                               Page 20 of 52

IFR_AR_009988

Forced marriage poses particular human rights concerns for girls, who are subject to early marriage. Early marriage is one which takes place before a child reaches the age of majority. According to the Convention on the Rights of the Child, a girl under the age of 18 is a minor and cannot give informed consent.[36] Thus, under this standard, it might be possible to consider any underage marriage as forced. It would not constitute persecution, however, unless the applicant experienced it, or her treatment within it, as serious harm.

Although most countries have minimum age requirements for marriage, the age for girls is often two or three years lower than the age for boys and national age requirements may be ignored at the local level. For example, in most of Africa, Asia, Latin America, and the Middle East, girls are often married before the age of 18.

## 4.4    Domestic Violence

Violence against mothers, sisters and daughters, like other forms of violence against women, is often related to the historically more powerful position of men in the family and in society, the perceived inferiority of women, and unequal status granted by laws and societal norms. In many societies, the police, the court system, and even the laws may condone the practice, allow for it, and at best may simply do nothing to prevent it or to punish the perpetrator. For example, in some countries, there is no legal recognition that sexual assault is a crime, if committed by a husband against his wife.[37]

Speaking to the extent and scope of domestic violence in certain societies, a Special Rapporteur on violence against women reported to the UN Commission on Human Rights:

> There are many different types of domestic violence. Young girls are often the victims of sexual assault within the family. Elderly family members and the infirm may also be subject to ill treatment. In extended families, mothers-in-law are often violent towards their daughters-in-law. Though there are many incidents of assault directed against the husband, studies show that they are not so frequent and rarely result in serious injury.[38]

Although most battered women engage in various forms of resistance to abuse, there are many factors that may make it difficult for a battered woman to leave her abuser. Fear of losing her children is one such factor as socio-economic factors may make it impossible for a woman to support herself and her children without assistance from her husband. Other factors include fear of arrest themselves and the stigma of leaving their husbands caused by cultural, religious and social norms. Leaving the batterer also could pose an even greater threat to a woman's safety than staying, unless she can escape to a place where the batterer has no access to her.

---

[36] Early Marriage: Sexual Exploitation & the Human Rights of Girls; Convention on the Rights of the Child, G.A.Res 44/25, U.N.GAOR, Nov. 20, 1989.

[37] United Nations Commission on Human Rights, Violence Against Women, its Causes and Consequences, Preliminary Report by the Special Rapporteur Ms Radhika Coomaraswamy, 22 November 1994; United Nations Commission on Human Rights, Violence Against Women, Report by the Special Rapporteur, 24 February 2000.

[38] Id. p. 22.

USCIS: RAIO Directorate – Officer Training                        DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 21 of 52

IFR_AR_009989

At the point that separation (or the decision to separate) occurs, the risk of violence to the battered woman increases, a phenomenon referred to as "separation abuse." When battered women are killed, they are more likely to be killed after having left the relationship.[39]

Therefore, for some women, staying with the batterer may actually be a strategy to protect herself or her children.

## 4.5    Human Trafficking

"Trafficking in persons" is defined as the recruitment, harboring, transportation, provision, or obtaining of persons by means of the threat or use of force or other forms of coercion, or fraud for the purpose of exploitation.[40]  Exploitation includes, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labor or services, slavery or practices similar to slavery, servitude or removal of organs.[41]

Trafficked women are bought and sold as commodities; they are held against their will and subjected to sexual slavery, forced labor or forced marriage, for the profit of their trafficker. Traffickers use various control mechanisms including repeated rape by the agent and his associates to erode a girl's sense of "self" and to break her will.  Agents will use physical and psychological abuse against the victim and make threats towards her family.  Agents create debt bondage by imposing debts for the journey, accommodation, clothes and make-up.  Women can be imprisoned and isolated by their traffickers.  Agents withhold passports and identity papers. Because a woman's immigration status is often as an illegal entrant, she may fear law enforcement officials. Women may believe that the law enforcement agencies are complicit in the trafficking of women.  Traffickers also instill this fear to deter escape.[42]

Women are lured into trafficking in different ways, often by deception or force.  Women may be made false promises of jobs as nannies, waitresses, etc., through bogus recruitment agencies, only to discover en route or upon arrival that they have been deceived.  The trafficker may pretend to be romantically interested in a woman, developing a coercive relationship in which the woman finds that her "boyfriend" forces her to have sex with his "friends."  Women may be drugged and abducted.  Some girls are trafficked with family involvement.  While some parents may innocently believe they are sending their child to receive an education, other parents are aware that they are selling their child into slavery.[43]

---

[39] Mary Ann Dutton, The Dynamics of Domestic Violence:  Understanding the Response from Battered Women, 68 Fla.B.J. 24, Oct 1994.

[40] See  RAIO Training Module, *Detecting Possible Victims of Trafficking*.  *See also* Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime.

[41] *Id*.

[42] *See* Department of State, Trafficking in Persons Report (2010).

[43] The International Association of Chiefs of Police (IACP), The Crime of Human Trafficking:  A Law Enforcement Guide to Identification and Investigation, p. 7.

---

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 22 of 52

IFR_AR_009990

A more detailed discussion of trafficking and smuggling is available in the RAIO Training Module, Detecting Possible Victims of Trafficking.

## 4.6    Honor Crimes

In some cultures women are perceived to be the keepers of a family's honor, conditioning women and girls to be self-controlled, show deference to men throughout their lives, and present subservient behavior.  A woman is considered to bring shame on her family and community if she does not adhere to strict social norms of behavior and conduct.  Honor crimes are acts carried out to "restore" a family's honor.  Perpetrators may be members of a woman's family or community.  Abuses involving the concept of honor are prevalent throughout the world and are factors in other types of persecution listed in this section, including, but not limited to, FGM and domestic violence.

Examples of honor crimes include, but are not limited to, stoning, abduction, imprisonment, rape, poisoning, acid attacks, disfigurement, forced marriage, murder, or attempts to coerce the victim to commit suicide.  Women also may suffer reprisal attacks as a result of another relative's perceived behavior.[44]

The family may go to great lengths to pursue women (and men) accused of violating a family's honor.  Families employ bounty hunters, private detectives and social networks to pursue victims and searches may persist over years.  In cultures with extended family networks over a large geographical area, relocation may offer no real protection.  In patriarchal societies, women without family or male relatives may create suspicion in a new community, attracting further stigmatization and persecution.  It may be difficult for a woman to integrate and support herself economically.  In many countries there are few shelters or other resources available to women who seek to escape harm and access to those resources may be impeded by cultural factors or considered taboo. Women may be at risk of being arrested "for their own protection"[45] or prosecuted for adultery.

Acts deemed to transgress a family's honor may include, but are not limited to, having sex before or outside marriage, losing virginity, even as a result of rape. Some societies do not make a clear distinction between rape and consensual sexual relations and will hold a woman who has been raped fully responsible for losing her virginity or committing "adultery." [46] Other acts of transgression include refusing to accept a forced marriage, being suspected of having an affair,[47] attracting gossip within the community, seeking an education, being assertive and outgoing in behavior or inappropriate dress.[48]

---

[44] BBC, Acquittals in Pakistan gang rape, April 21, 2011.

[45] UNICEF, Innoceti Digest, Early Marriage:  Child Spouse, No. 7 March 2001.

[46] See, e.g., Afghanistan: Woman Jailed on Charges of 'Forced Adultery' Is Released, NY Times, Dec. 14, 2011.

[47] Sarhan v. Holder, 658 F.3d 649 (7th Cir. 2011).

[48] See, e.g., Afghanistan: Woman Jailed on Charges of 'Forced Adultery' Is Released, NY Times, Dec. 14, 2011; Witness to Truth: Report of the Sierra Leone Truth and Reconciliation Commission, Vol. II, Chapter III, ¶. 336-7 at 171 (2004)(describing how under Sierra Leonean customary law, "[f]amilies usually settle crimes of rape and sexual violence by

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                                    Page 23 of 52

IFR_AR_009991

Victims of rape may be murdered for bringing shame upon their family, or victims may be forced to marry their rapists to appease family honor.[49]  Controlling women through the concept of honor is permitted in many countries.  Even in countries where honor crimes are illegal, lesser sentences may be given if the crime was committed in the name of honor.[50]

# 5  INTERVIEWING CONSIDERATIONS

The purpose of this section is to emphasize the importance of creating an interview environment that allows applicants to discuss freely the elements and detail of their claims and to identify issues that may be related to a female applicant's gender.  This section should be considered in conjunction with the RAIO Modules on Interviewing.

## 5.1  Pre-Interview File Review

Prior to the interview, you may have the opportunity to review the information in the case file.  You should take this time to identify any gender-related issues involved in the claim.  You are expected to conduct interviews involving gender-related claims in a non-adversarial manner and with sensitivity.  Due to the very delicate and personal issues arising from sexual abuse, some applicants may have inhibitions about disclosing past experiences to an interviewer of the opposite sex.

To the extent that personnel resources permit, you should honor an applicant's request for an interviewer of a particular sex.  If a pre-interview review of the case file indicates that the case may involve sensitive gender-related issues, you should consult with your supervisor prior to the interview to evaluate whether it would be more appropriate for an Officer of the opposite sex to conduct the interview.

## 5.2  Considerations Related to Gender and Culture

Cultural factors, such as the expected role of a woman in her society, may significantly affect an applicant's testimony.  In order to properly elicit and evaluate testimony, you must be aware of such factors when eliciting testimony at the interview.

1.  Cultural norms may exacerbate reluctance to relate sensitive information.

---

accepting monetary compensation or by the offender being compelled to enter into marriage with the minor victim.  The Commission recommends…end[ing] the practice under customary law of compelling women and girls who have been raped to enter into marriage with the offender."

[49] *Id*.

[50] Human Rights Watch, Jordan:  Victims Jailed in Honor Crime Cases, April 2004.

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                               Page 24 of 52

IFR_AR_009992

Due to strict cultural norms in many countries, applicants may be reluctant to disclose experiences of sexual violence. This may be especially true for women from societies that place extreme importance on preserving a woman's virginity. With regard to sexual assault, this type of harm perpetrated on men, as well as women is seen as a violation of community or family morality. The combination of shame, feelings of responsibility and blame for having been victimized in this way can seriously limit a man's or a woman's ability to discuss or even to mention such experiences.

2.   Cultural norms may limit an applicant's knowledge of other family members' activities

In some cultures, men normally do not share the details of their political, military or even social activities with spouses, sisters, daughters or mothers. Women from such cultures may be able to present only vague testimony about experiences of male relatives, even husbands. Some women may not be able to explain which male relatives were politically active or, if they are aware of the relative's political activity, may be unable to provide any details about it.

3.   Presence of relatives may inhibit testimony

For a variety of reasons, the presence of relatives, particularly a husband, father, or child, may impede an applicant's willingness to discuss gender-related persecutory acts or fears. For example:

- The applicant's relatives may not be aware of the harm experienced by the applicant. She may wish that the relative remain unaware of her experiences, or she may be ashamed to say what she has experienced or fears in front of a relative.
- The applicant's claim may be based, in part, on fear of the relative who is present.
- In some cases, a woman may be accustomed to having a male relative speak for her and may try to defer to that male relative in the interview, or the male relative may insist on speaking for the applicant, in which case you should remind the relative that the applicant must answer the question herself.

While the presence of a relative may inhibit testimony, as described above, in other cases a woman may be more comfortable testifying with the presence of a relative, male or female. Therefore, to the extent possible, the choice of whether to be interviewed alone or with a relative present should be left to the applicant. She should be asked her preference directly, and in the absence of any relatives, when possible, prior to the interview.

If the applicant elects for the relative to be present at the interview, you should exercise sound judgment during the interview; determining whether the presence of the relative is impeding communication. If it appears that the relative's presence is interfering with open communication, the relative should be asked to wait in the waiting room.

USCIS: RAIO Directorate – Officer Training                        DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 25 of 52

IFR_AR_009993

4.  Interpreters may inhibit testimony

Testimony on sensitive issues such as sexual abuse may be diluted when received through the filter of an interpreter.  The applicant may not feel comfortable discussing gender-related issues with an interpreter, especially one of the opposite sex.  The same holds true for the interpreter; even if the applicant feels comfortable using a particular interpreter, the interpreter may be inhibited about discussing gender-related issues or using certain terms.  For example, the interpreter may substitute the word "harm" for "rape," because the interpreter is not comfortable discussing rape or because of cultural taboos.  *See also* RAIO Training Module, *Interviewing – Working with an Interpreter*.

## 5.3    Suggested Interview Techniques

In all cases, you must use your utmost care to assure that all interviews are conducted in a non-adversarial and open atmosphere that allows for the discussion of various issues, including past experiences and fears of future harm and its ramifications.

Some techniques that may be employed (discussed in greater detail in the lessons on interviewing) include the following:

*   Begin with easy topics to establish rapport and give the applicant time to become accustomed to the interview.

*   If the applicant becomes upset, pause to allow the applicant to regain composure.

*   Acknowledge how difficult it may be for the applicant to answer certain questions by assuring the applicant that it is all right to let you know when something is difficult to discuss in detail.

Note:  In the protection context, it is necessary for you to elicit a certain level of detail in order to establish credibility.  The applicant may be able to provide sufficient detail about certain parts of the claim to establish credibility, without providing minute detail on particularly sensitive topics.  Example:  The applicant provides detail about circumstances of arrest and conditions of detention, but finds it extremely painful to provide detailed description of certain torture she endured during detention.  You do not need to press for detail about the torture if the applicant's testimony about the arrest and the general conditions of detention is credible.

*   Temporarily switch from the sensitive topic to something less sensitive, remembering to return to the sensitive topic later if more information is required.

*   Approach the issue from a different angle.  For example, ask about events that led up to the traumatic experience and how the applicant felt after the experience, instead of asking about the specifics of the traumatic incident.

*   Switch the focus to another victim the applicant has testified about and then return to the applicant's experience.

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 26 of 52

IFR_AR_009994

- Ask open-ended questions to explore the applicant's claim, then ask specific follow-up questions, as needed, to establish the credibility of the claim. Be mindful that your tone of voice and questions don't come across as judgmental, as that may place the applicant on the defensive and possibly impede the flow of communication.

- Emphasize the confidential nature of the interview.

- Remind the applicant that in order to evaluate eligibility for the benefit, you need to understand the applicant's history, including the harm she may have experienced.

## 5.4    Examples of Questions to Elicit Sensitive Information

If you suspect the applicant may have been sexually abused but is not forthcoming, you may try to help the applicant relax by reassuring her of the confidentiality of the process and by acknowledging that the interview process may be difficult for her.

- "I understand that it is difficult to talk about such things. I know that women in your country often have bad experiences. Everything we talk about here is completely confidential. No one in your country (family) will know what you tell me today, unless you tell them yourself. Is there anything else you want to tell me?"

In some instances country conditions reports may reflect that individuals in the applicant's country may be ostracized for being raped. However, where no such country conditions information exists, you should still attempt to elicit testimony about any potential harm by asking questions like:

- "Would anything happen to you if your family and community found out what happened to you while you were detained?"

In cases where sexual assault is alleged and the applicant has difficulty providing details, you may focus on the circumstances surrounding the incident.

- "You said you were assaulted. I understand that this is difficult to talk about, but it would be helpful for me to understand more about what happened.

  ➢ Where were you at the time?

  ➢ Were you alone?

  ➢ What happened to your sister who was with you?

  ➢ Did that also happen to you?

  ➢ Did you tell anyone about the incident?

  ➢ What did the attacker say to you?

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 27 of 52

IFR_AR_009995

> ➢ Do you remember what you did immediately after the assault?"

You should always ask questions one at a time and give the applicant sufficient time to fully answer.

In cases where applicants fear the stigma or other social consequences of being seen as a rape victim, it may help to remind the applicant that everything she or he says in the interview is kept confidential.

## 6    LEGAL ANALYSIS – ASYLUM AND REFUGEE CASES

### 6.1    Persecution and Agent of Persecution

Neither this lesson, nor the component-specific lessons on this subject provide guidance that expands the statutory definition of a refugee. The legal criteria used to evaluate a female asylum or refugee applicant's eligibility for immigration benefits, whether the claim is gender-based or not, is the same criteria used in all other asylum and refugee adjudications. However, because female applicant's experiences are often different than those of men, it is useful to discuss how those experiences fit into the legal framework of established asylum and refugee law.

### 6.1.1    Persecution

As explained in greater detail in RAIO Training Modules, *Refugee Definition* and *Definition of Persecution and Eligibility Based on Past Persecution*, the term "persecution" is not defined by treaty, statute, or regulation, and you must rely on guidance from various sources, including international human rights norms, to evaluate whether harm constitutes persecution. To be eligible for asylum or refugee status, the applicant must also establish that the persecution is "on account of" a protected characteristic in the refugee definition. This section focuses on the type of harm that may constitute persecution. The requirement that the persecution be on account of a protected characteristic ("Nexus") will be discussed in the next section.

1. General Considerations

In evaluating whether harm constitutes persecution in a gender-related case, you should consider the same factors as in an asylum or refugee case that is not related to gender. The relevant considerations are:

- Whether the harm the applicant experienced and/or fears is serious enough to constitute persecution by objective standards,

- Whether the applicant would experience the harm in question as serious harm, and

- Whether the persecutor is the government (or agent of the government) or an entity that the government is unable or unwilling to control.

USCIS: RAIO Directorate – Officer Training                        DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 28 of 52

IFR_AR_009996

The fact that a practice is widespread, (e.g., domestic violence, FGM, rape as part of an occupation during war) is not relevant to determining whether the alleged acts constitute persecution.[51]

1. Rape and Other Sexual Violence

Rape constitutes harm serious enough to amount to persecution.   Other sexual violence may constitute persecution, depending on the degree of harm experienced by the applicant.  In some countries a woman may experience severe discrimination and social ostracism because she was raped.  The ostracism is further harm after the rape, and may itself be sufficiently serious to constitute persecution.[52] In other words, even if the harm of the original rape was not "on account of" a protected ground, societal perception of a rape victim and the social consequences arising from that perception may give rise to a well-founded fear of persecution on a protected ground, most likely membership in a particular social group.  *See* RAIO Training Module, *Nexus – Particular Social Group*.

2. Torture, Beatings, and Inhuman Treatment

Female asylum and refugee applicants may have experienced or fear the same types of "traditional" persecution experienced by male applicants, such as torture, beatings, and other inhuman treatment.  Note that rape in detention is a form of torture that occurs to both men and women.

3. Female Genital Mutilation (FGM)

Harm resulting from FGM is sufficiently serious to constitute persecution. FGM has been internationally recognized as a violation of women's and female children's rights and is criminalized under federal law.  The U.S Court of Appeals, Second Circuit stated that FGM involves the infliction of "grave harm constituting persecution."[53]   Thus it is clearly serious harm by objective standards.  The applicant's testimony that she experienced or would experience FGM as serious harm is best and sufficient evidence on this point.

Note that even if a woman has been subjected to FGM in the past, it is a form of harm that is capable of repetition.[54] Moreover, a woman is not required to show that she would undergo the

---

[51] *See Mohammed v. Gonzales*, 400 F.3d 785, 796, n.15 (9th Cir. 2005) (rejecting the government's argument that the widespread practice and acceptance of FGM in Somalia meant that FGM could not form a basis for a past persecution claim. The court stated that the approach to analyzing refugee claims does not change because a type of harm is commonly accepted and practiced.)

[52] *See Shoafera v. INS*, 228 F.3d 1070 (9th Cir. 2000) (rape by gov't official constitutes persecution).

[53] *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996);  *Matter of A-T-*, 24 I&N Dec. 296 (BIA 2007) (vacated in part, *Matter of A-T-*, 24 I&N Dec. 617 (A.G.2008)); *Abankwah v. INS*, 185 F.3d 18 (2d Cir. 1999) *citing to* Report of the Committee on the Elimination of All Forms of Discrimination Against Women, General Recommendation No. 14, U.N. GAOR, 45th Sess., Supp. No. 38, at 80, ¶ 438, U.N. Doc. A/45/38; and The Beijing Declaration and The Platform for Action, Fourth World Conference on Women, Beijing, China, 4-15 September 1995, U.N. Doc. DPI/1776/Wom (1996) ¶¶ 112-113.

[54] *Matter of A-T-*, 24 I&N Dec. 617, 621 (AG 2008)(vacating BIA's determining that FGM was a one-time act incapable of repetition and that future harm need not be in the identical form as the original harm).

USCIS: RAIO Directorate – Officer Training                              DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                              Page 29 of 52

IFR_AR_009997

identical form of past harm to establish well-founded fear in cases in which the past harm (*e.g.*, FGM) is unlikely to be repeated.[55]  Consideration of the enduring harm, in such circumstances, is also appropriate to the analysis of whether there are compelling reasons arising from the severity of the past persecution to grant asylum status in the absence of a well-founded fear.[56]

In *Matter of A-K-*, the BIA clarified that an applicant cannot establish eligibility for asylum based **solely** on a fear that his or her child would be subject to FGM.   The rationale is that an applicant must establish persecution that is targeted at him or herself.  An applicant may certainly be affected by his or her child undergoing FGM.  But, in most cases, the persecutor is directing the FGM at the child, not the parent.  However, a parent who actively opposes FGM and takes affirmative steps to keep a child from undergoing the procedure could conceivably suffer *other* harm on account of this political or religious opinion.

Also, the harm must be on account of a protected characteristic.  When a child is being subjected to FGM, it is generally not because of a parent's protected characteristic.  Rather, the FGM is imposed on the child because of the child's characteristic of being a female who has not yet undergone FGM as practiced by his or her culture.[57]  If, however, there were evidence that the child would be targeted for FGM *in order* to punish the parent for the parent's opposition to FGM (or for some other protected reason), this might be distinguishable from the scenario discussed in *Matter of A-K-*.

4.  Forced Marriage

In some circumstances, forced marriage may constitute persecution.  However, it is important to note the distinction between forced marriage and arranged marriage.   Arranged marriage is not considered persecution as both parties willingly enter into the arrangement, even if reluctantly.  Forced marriage, on the other hand, may constitute persecution as one or both parties do not consent to the arrangement.  You should also consider whether the consequences for refusal would constitute persecution.[58]

NOTE:  You should keep in mind that in addition to asylum and refugee cases, you may encounter victims of forced marriage in the family petition context (e.g., I-130 and I-730).

Asylum and refugee claims involving forced marriage often include allegations that the applicant was subjected to FGM or fears being subjected to FGM. You must analyze whether

---

[55] *Id.* at 622.

[56] *See Matter of S-A-K- and H-A-H-*, 24 I&N Dec. 464 (BIA 2008).  *See also Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005).  This consideration exists primarily within the asylum context since a refugee applicant need not establish a well founded fear of return if she or he has established past persecution.

[57] *Matter of A-K-*, 24 I&N Dec. 275 (BIA 2007).

[58] *See* United Nations, Convention on Consent to Marriage, Minimum Age for Marriage and Registration at Marriages, G.A. Res. 1763(A)(XVII), U.N. GAOR, Nov. 7, 1962 (Note the United States has not ratified this treaty); United Nations, Universal Declaration of Human Rights, G.A. Res. 217(a)(III), U.N. GAOR, Dec. 10, 1948.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                          Page 30 of 52

IFR_AR_009998

the FGM or forced marriage, or both, were inflicted (or would be inflicted) on account of a protected characteristic. *See* RAIO Training Module, *Nexus – Particular Social Group*.

### 5.  Forced Abortion and Forced Sterilization

The INA provides that forced abortion and forced sterilization, or persecution for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, constitute harm amounting to persecution that is on account of political opinion.[59]

### 6.  Discrimination and Harassment

Discrimination and harassment may amount to persecution if the adverse practices or treatment accumulates to the level of persecution, or is so serious that that it leads to consequences of a substantially prejudicial nature.  An applicant's deprivation of educational opportunities, the right to work, the right not to be forced into marriage, and other deprivations of internationally recognized rights may constitute persecution, depending on how such deprivations affect the applicant's well-being.

### 7.  Violation of Fundamental Beliefs

The U.S. Court of Appeals, Third Circuit indicated that "the concept of persecution is broad enough to include governmental measures that compel an individual to engage in conduct that is not physically painful or harmful but is abhorrent to that individual's deepest beliefs."[60]

In *Fatin v. INS*, the court considered whether the asylum applicant's opposition to strict Iranian dress codes would constitute persecution.  In that case, the court found that the record before it failed to establish that obeying the strict dress codes would be "so profoundly abhorrent" as to amount to persecution, but left open the possibility that other applicants could make such a case.[61]

## 6.1.2   Agent of Persecution

As in any other asylum or refugee claim, in order to establish persecution, the applicant must demonstrate that the persecutor is the government (including agents of the government) or an entity that the government is unable or unwilling to control.  The persecutor may be a rebel group, a clan, a tribe, or a family member, such as a brother, father, or husband.[62]

In evaluating whether a government is unwilling or unable to control the infliction of harm or suffering, you should consider whether the government protection that is available is reasonably effective.  Factors to consider include whether the government takes reasonable steps to control

---

[59] INA § 101(a)(42)(B); *Matter of X-P-T-*, 21 I&N Dec. 634 (BIA 1996).

[60] *Fatin v. INS*, 12 F.3d 1233, 1242 (3d Cir. 1993).

[61] *Id.  See also Sharif v INS*, 87 F.3d 932 (7th Cir. 1996) (finding that applicant failed to meet this standard because she did not offer evidence that conforming to Iranian law caused her serious harm).

[62] *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996)

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                          Page 31 of 52

IFR_AR_009999

the infliction of harm or suffering and whether the applicant has reasonable access to the existing state protection. Evidence that the government does not respond to requests for protection is a strong indication that state protection is unavailable.[63]

In some cases, an applicant may establish that state protection is unavailable even when she did not actually seek protection. For example, the evidence may indicate that the applicant would not have received assistance if she had sought it.  Country conditions information may reveal that government officials in the applicant's country view violence perpetrated by a family member, clan member, or tribal member as a "private" dispute for which governmental intervention is inappropriate.

Or, evidence may establish that seeking protection would have placed an applicant at even greater risk of persecution. For example, country conditions information shows that women from Pakistan who report rape to the authorities are often themselves arrested and jailed under laws prohibiting sexual relations outside of marriage, and may be subject to verbal and physical abuse. Therefore, a woman from Pakistan may reasonably fear reporting a rape and seeking state protection from the person who raped her.[64]

You often must consult country conditions information to evaluate whether state protection is available to an applicant who suffered or fears persecution from a non-governmental entity.

## 6.2    Nexus

The "nexus" requirement, discussed in the RAIO Training Modules, *Nexus and the Protected Grounds*, and *Nexus – Particular Social Group,* applies equally to female and male applicants and to all claims, including those related to gender.  Because "nexus" is discussed in detail in other modules, this section focuses on common nexus issues raised in gender-related claims, explaining how the analysis may be formulated, taking into account the social circumstances of female applicants.

### 6.2.1    Overview

To be eligible for asylum or refugee status, the applicant must provide some evidence, direct or circumstantial, that the persecutor is motivated to persecute the applicant because the persecutor perceives the applicant to possess a protected characteristic.  The persecutor's perception can be either because the applicant actually has such a characteristic, or because the persecutor incorrectly imputes it to the applicant.[65]

---

[63] *See, e.g., Matter of S-A-*, 22 I&N Dec. 1328 (BIA 2000) (finding applicant had established a state action where country conditions evidence showed that applying to the police would have been futile and dangerous and that legal remedies were generally unavailable to women).

[64] *See* U.S. Department of State, "Pakistan," Country Reports on Human Rights Practices for 2005 (Washington, DC: U.S. Government Printing Office, Mar. 8, 2006); Matter of S-A-, 22 I&N Dec. 1328  (BIA 2000)

[65] *INS v. Elias-Zacarias*, 502 U.S. 478 (1992); RAIO Training Module, *Nexus – Particular Social Group.*

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                    Page 32 of 52

IFR_AR_010000

Evidence about patterns of violence in the society against individuals similarly situated to the applicant may be relevant to the "nexus to a protected ground" determination.  For example, in a domestic violence claim, an adjudicator would consider evidence that the abuser uses violence to enforce power and control over the applicant because of the social status that a woman may acquire when she is in a domestic relationship. This would include any direct evidence about the abuser's own actions; as well as any circumstantial evidence that such patterns of violence are (1) supported by the legal system or social norms in the country in question, and (2) reflect a prevalent belief within society, or within relevant segments of society.[66]

Such circumstantial evidence (in addition to the direct evidence regarding the abuser's statements or actions) would be relevant to determining whether the abuser believes he has the authority to abuse and control the victim "on account of" her status in the relationship.  Further, in domestic violence cases, there is often no evidence that the abuser would seek to harm other women who share the same social status in a domestic relationship.  Rather, it often appears that the abuser is motivated only to harm his own spouse or partner. While evidence of motivation to harm others who share the applicant's protected trait may help to establish nexus, it is not required.  Where other evidence shows that the persecutor harms the victim because of her status within the relationship, the absence of a motivation to harm others with that trait does not undermine a finding of nexus.

There are two factors to consider when evaluating "nexus." The first is whether the harm is "on account of" a protected characteristic. The second is whether the applicant possesses or is believed to possess a protected characteristic.

1.  "On account of"

The "on account of" requirement focuses on the motivation of the persecutor.  The persecutor must be motivated to harm the applicant on account of a protected characteristic.  However, the persecutor may have mixed motivations in harming the applicant.    In refugee processing cases, the persecutor must be motivated, at least in part, by a protected characteristic. [67]  For more on these standards, *see* RAIO Training Module, *Nexus and the Protected Grounds\**.  In asylum adjudications, as long as at least one central reason motivating the persecutor is the applicant's possession or perceived possession of a protected characteristic, the applicant may establish the harm is "on account of" a protected characteristic.  This "one central reason" standard was added to the statute by the REAL ID Act, and applies only to asylum adjudications.  The Board has explained, however, that the "one central reason" language should be interpreted consistent with prior Board precedent that allows nexus to be established where the persecutor has mixed motivations.[68]

2.  Protected Characteristics ("Five Grounds")

---

[66] *See Matter of S-A-,* 22 I&N Dec. 1328 (BIA 2000) (noting that in Morocco, a father's power over his daughter is unfettered).

[67] *Matter of Fuentes*, 19 I&N Dec. 658, 662 (BIA 1988);  *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996)

[68] Matter of *J-B-N- & S-M-,* 24 I&N Dec. 208, 214 (BIA 2007)

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                     Page 33 of 52

IFR_AR_010001

As the Court of Appeals for the Ninth Circuit has noted, "gender" is not specifically listed as one of the five enumerated characteristics in the refugee definition. However, an asylum or refugee applicant may present a claim that is based on one of the five protected characteristics and that is at the same time related to the woman's gender. Additionally, gender may be one of the characteristics included in the formulation of a particular social group.[69]

## 6.2.2   Political Opinion

1. Actual Political Opinion

There are a few important points you should bear in mind when evaluating women asylum or refugee applicants' claims. First, women often express political opinions in the traditional sense of actively participating in political institutions within a country, such as political parties, and organizing or participating in political demonstrations. Even in countries with extremely restrictive norms and laws governing women's behavior, some women may risk severe harm by taking such actions.

Second, women may also engage in more non-traditional political expression than men, because of their situation in society. For example, a woman may cook and provide food for an opposition group or rebel forces, rather than campaign for the group or fight with the rebel forces. Or women may organize to try to obtain release of male relatives detained for political reasons.

Third, opposition to institutionalized discrimination of women, expressions of independence from male social and cultural dominance in society, and refusal to comply with traditional expectations of behavior associated with gender (such as dress codes and the role of women in the family and society) may all be expressions of political opinion. Feminism is a political opinion and may be expressed by refusing to comply with societal norms that subject women to severely restrictive conditions.[70]

2. Imputed Political Opinion

- Activities of Family Members

In evaluating why a persecutor may have harmed or seek to harm an applicant, it may be important to inquire into any political activities of the applicant's family members and whether the government has attributed a family member's political views to the applicant. For example, if the applicant's husband is involved in opposition political activities, the authorities might assume that the applicant has assisted her husband and shares his political views.

- Violation of Social Norms

---

[69] *Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996); *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993); Asylum Gender Guidelines.

[70] *Fatin*, 12 F.3d at 1242.

USCIS: RAIO Directorate – Officer Training                     DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                         Page 34 of 52

IFR_AR_010002

In some cases, a political opinion may be attributed to a woman who refuses to comply with social norms or laws governing behavior based on gender. For example, authorities might attribute a feminist political opinion to a woman who refuses to participate in an arranged marriage or who otherwise attempts to live outside the constraints governing the role of women in her society. It is important for you to elicit information regarding how the feared persecutor views the woman for such behavior.

Violation of social norms may also indicate persecution on account of religion. The Board of Immigration Appeals considered the case of a young Moroccan woman whose father repeatedly abused her. He burned her thighs to discourage her from wearing short skirts, brutally beat her for giving directions to a man on the street, and forbade her from leaving the house, all because of his religious viewpoint about the proper role of women in society. The Board found that the applicant, in wearing western-style clothing and interacting with men, was demonstrating that her religious beliefs were different than those of her father. Although both were Islamic, the Board determined that the father persecuted the daughter on account of her religion.[71]

- Applicants Living in Theocracies

In some cases, a political opinion may be imputed to an asylum or refugee applicant who resides in a theocracy, if she displays behavior that is considered contrary to societal norms. Where tenets of the governing religion in such a country require certain kinds of behavior, contrary behavior may be perceived by the government as evidence of an unacceptable political opinion, because it is perceived as being in opposition to the national law.[72]

Cases involving female applicants who flee theocracies may be complex. You must determine whether the applicant is subject to legitimate prosecution for violating the laws of the country (including an assessment of whether the law itself is persecutory), or whether there is evidence that the applicant is perceived as holding an adverse political (or religious) opinion and punished as a result.[73]

- Imputing a Political Opinion as a Means of Control

In one case, the court found an applicant eligible for asylum based on persecution on account of imputed political opinion because an army sergeant who had in effect enslaved the applicant threatened to tell the authorities that she supported the guerrillas. Although the sergeant knew that the applicant did not support the guerrillas, he used the threat to terrorize the applicant into submission and keep control over her. Because of his position in society, it was found that the

---

[71] *Matter of S-A-*, 22 I&N Dec. 1328 (BIA 2000).

[72] Punishment for refusal to comply with laws established in a theocracy may also constitute persecution on account of religion. *See* section on religion. *See also* RAIO Training Module, *Nexus and the Protected Grounds*\*, section on prosecution vs. persecution.

[73] *See, e.g.*, *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996)(finding that evidence in the record failed to establish applicant would be subject to persecution as opposed to prosecution for violating Iranian laws governing conduct and dress of women.); *Fatin v. INS*, 12 F.3d 1233(3d Cir. 1993).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 35 of 52

IFR_AR_010003

sergeant would be believed by the authorities and therefore the applicant's fear of future persecution on account of imputed political opinion was reasonable.[74]

### 6.2.3  Religion

The notion of freedom of religion encompasses the freedom to hold and express a belief system of one's choice and the right not to be subjected to coercion that impairs the freedom to have or adopt a religion or belief of one's choice.[75]

Just as in claims involving political opinion or imputed political opinion, the relevant inquiry in evaluating whether an applicant has established a connection between the harm she suffered and/or fears and religion, is how the persecutor views the woman.  The fact that the persecutor may target a woman because of the persecutor's religious beliefs about how a woman should behave does not, in itself, establish that the persecutor is targeting the woman because of the woman's religious beliefs or religious beliefs imputed to her.  However, a woman may, through her behavior, demonstrate that her beliefs are at odds with those of the persecutor.[76]

Certain religions assign particular roles to women; if a woman does not fulfill her assigned role she may be viewed as having "incorrect" religious views and punished.  Such punishment would be considered to be "on account of" religion.

As explained in the section above on persecution, the U.S. Court of Appeals for the Third Circuit has indicated that forced compliance with laws that fundamentally are abhorrent to a person's deeply-held religious convictions may constitute persecution.[77]

### 6.2.4  Particular Social Group

The factors to consider in evaluating whether an applicant is a member of a particular social group and whether harm is on account of that group membership are discussed in detail in another module.[78]  The purpose of this section is to focus on gender-specific issues related to particular social group.

The BIA has held that members of a particular social group must share a "common, immutable characteristic" that the members "cannot change, or should not be required to change because such characteristic is fundamental to their individual identities or conscience."[79]  The group must also reflect social distinctions, such that the persecutor is not motivated by purely personal reasons, but rather is influenced by broader social mores or factors ("social visibility" or "social

---

[74] *Lazo-Majano v. INS*, 813 F.2d 1432 (9th Cir. 1987).

[75] Universal Declaration of Human Rights (Art. 18); The International Covenant on Civil and Political Rights (Art. 18).

[76] *See Matter of S-A-*, 22 I&N Dec. 1328 (BIA 2000).

[77] *Fatin v. INS*, 12 F. 3d 1233 (3d Cir. 1993).

[78] *See* RAIO Training Module, *Nexus – Particular Social Group*.

[79] *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006).

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                Page 36 of 52

IFR_AR_010004

distinction" element).  This element can be satisfied by evidence that the society in question meaningfully distinguishes individuals who have the shared characteristic from individuals who do not have it.

Gender is an immutable trait and has been recognized as such by the BIA and some federal courts.  Further, there may be circumstances in which an applicant's marital status or status within a family could be considered immutable.  A father-daughter relationship, or a marriage in which a woman could not reasonably be expected to divorce because of religious, cultural or legal constraints, are examples of such immutable traits.  Any intimate relationship could also be immutable if the evidence indicates that the relationship is one that the victim could not reasonably be expected to leave.  Note that the particular social groups identified by the courts prior to the BIA's 2006 decision in *Matter of C-A-* emphasized a "social distinction" consideration  in the analysis of "particular social group."  However, an examination of the facts reveals that the society's perception of the group members was a factor in deciding these cases.[80]

Though some circuits have discussed gender as a basis of a particular social group, few have found an individual to be eligible for asylum on the basis of a particular social group defined solely by the applicant's gender.  Generally, this is because the persecutor was not motivated to harm the applicant solely because of her gender, but because of her gender and some other characteristic she possessed.

## 6.2.5   Race and Nationality

A female applicant's claim may be based on persecution or feared persecution on account of her race or nationality, or a combination of race or nationality and other characteristics in the refugee definition.

The U.S. Court of Appeals for the Ninth Circuit, found an applicant who was raped by a policeman to be eligible for asylum because she had been persecuted on account of her ethnicity.  The applicant testified that the Tigrean policeman had raped her because she was Amharic, her sister's testimony supported her claim, and documents submitted on her behalf also supported that conclusion."[81]

## 6.3   Internal Relocation

An applicant does not have a well-founded fear of persecution if he or she could avoid persecution by relocating to another part of the applicant's country of origin or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances it would be reasonable to expect the applicant to do so.[82]  You should remember that in some circumstances it is unreasonable to expect that applicants could relocate within their own

---

[80] See, e.g., *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *Niang v. Gonzales*, 422 F.3d 1187, 1199 (10th Cir. 2005); *Mohammed v. Gonzales*, 400 F.3d 785, 797 (9th Cir. 2005).  See also  *Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007).
[81] *Shoafera v. INS*, 228 F.3d 1070 (9th Cir. 2000)
[82] 8 C.F.R. 208.13(b)(2)(ii)

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 37 of 52

IFR_AR_010005

country.  For example, if the government is the feared persecutor, then the threat is presumed to be countrywide and it would be unreasonable to assume the applicant has the ability to relocate. The same reasoning would apply in situations where the feared persecutor is a group operating countrywide that the government is unable or unwilling to control.  In assessing reasonableness, you may also consider other serious harm the applicant may face in the place of suggested relocation; any ongoing civil strife within the applicant's home country; the administrative, economic, or judicial infrastructure of that country; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.[83] For a more detailed discussion, see RAIO Training Module, *Well-Founded Fear*.

The crucial aspect of analyzing the internal flight alternative is an inquiry as to whether relocation would be reasonable under all the circumstances.  Reasonable relocation possibilities for a woman may vary substantially from the relocation possibilities for a man from the same country.

Legal restrictions and cultural or social norms governing women's behavior must be considered in evaluating whether it would be reasonable for a female applicant to relocate within her country. Keep in mind also that women may have other vulnerabilities even in the absence of specific laws or norms restricting their movement; for example, in a very corrupt country, where a man might have to give a bribe in order to secure a residence permit, a woman may be more likely to be coerced or forced into giving sexual "favors".  Likewise, in countries with high rates of trafficking, women who do not have the protection of their families or communities may be particularly vulnerable.

### 6.3.1   Ability to Travel

In evaluating whether it would be reasonable for a woman to relocate within her country, you must consider whether there are significant restraints on a woman's right to travel.  For example:

- Saudi women may not undertake domestic travel alone, may not legally drive, and risk arrest for riding in a vehicle driven by a male who is not a close relative.[84]
- If there is civil strife or war ongoing in the woman's country, she may be particularly vulnerable if she travels outside the area in which she is protected by family or clan.

You should inquire into whether there are any legal or social constraints on the applicant's ability to travel.  This information should be elicited during the interview and also may be found in country conditions information.

### 6.3.2   Economic Circumstances

---

[83] *Id.*
[84] U.S. Department of State.  "Saudi Arabia," Country Reports on Human Rights Practices for 2006 (Washington, DC:  U.S. Government Printing Office, Mar. 6, 2007)

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 38 of 52

IFR_AR_010006

You should consider whether it would be reasonable to expect a woman to survive economically, if she were to relocate within her country to avoid future persecution. In many parts of the world, women are still economically dependent on men and availability of employment opportunities is quite restricted for women.

### 6.3.3   Social Circumstances

In some countries, a woman living outside the protection of her father, spouse, or clan may be vulnerable to attack and/or damaging social stigma. For example, in some countries it is assumed that a woman living on her own or with other unrelated women is a prostitute. In other countries, women are not allowed to rent an apartment, open a bank account or own property. Therefore, you must be aware of conditions for women living on their own in the applicant's country to evaluate whether internal relocation to avoid future persecution is reasonable.

## 7   CREDIBILITY

Cultural differences and norms governing women's behavior, as well as the effects of trauma, may present special difficulties in evaluating credibility of female asylum and refugee applicants.[85]

### 7.1   Detail

An applicant's gender may affect her ability to provide detailed testimony in a number of ways. In evaluating the amount of detail an applicant should be expected to provide regarding any element of a claim, you should take into account the applicant's social background and role in society. When an applicant is not able to provide detail about certain aspects of her claim, you should inquire into the reason why she is unable to do so.

Some factors that may limit a female applicant's ability to provide detail include the following.

1.   Social Constraints May Limit Access to Information

Social constraints governing gender roles may restrict a woman's role in an opposition organization and she therefore may be unable to provide many details about the organization, even if she is a member of the organization. Although a woman may take great risks to further the goals of the organization, male members of the organization may limit the female members' knowledge of the detailed workings and structure of the organization.

A woman who may be at risk of persecution because of her relationship to a male family member may be unable to provide detail about the activities of the male family member that placed the family at risk. In many societies it is normal for a male family member not to discuss

---

[85] As explained in the RAIO Training Module, *Credibility*, when evaluating credibility, you must consider "the totality of the circumstances" including all relevant factors, such as detail, consistency and plausibility. All of these factors may be affected by circumstances related to an applicant's gender.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 39 of 52

IFR_AR_010007

his "public" activities (such as political activities, or activities in a union or religious organization) with female members of the family, even with his wife.

### 2. Effects of Trauma

As discussed in other modules and earlier in this module, effects of trauma may have a significant impact on an applicant's ability to present details about her claim. The effect of trauma on an applicant's ability to present a credible claim is not unique to gender. However, because persecution directed against women may involve sexual harm, you need to be sensitive to the possibility that a woman is reluctant to provide detail about certain experiences because those experiences may be difficult to discuss, particularly with a male officer or through a male interpreter.

### 3. Gender Roles

A woman's cultural and social background may also affect her ability or the ease with which she discusses her history with a stranger. In some cultures, women live secluded lives and may only rarely have contact with strangers, particularly strangers of the opposite sex. When women in such societies do encounter strangers, they may be accustomed to having male relatives speak for them. This may result in an applicant providing only short, limited answers to questions you pose.

### 4. Education Level

In some countries or cultures, women are denied the opportunity to obtain an education, or for a variety of reasons, may only be able to obtain a very limited education. In many refugee-producing countries, the literacy rate for women is quite low. A lack of education can affect a woman's ability to express herself or her understanding of the context of the social situation. A woman with little or no education may be unable to clearly express her claim, or may express it in a confused or halting manner creating the false impression that she is being evasive.

## 7.2  Consistency

Given some women's limited literacy skills, coupled with the fact that women in some societies may be accustomed to having male relatives conduct all "public" activities for them, female asylum or refugee applicants may sign or mark applications that have been completed by a male relative who did not allow them to review it for accuracy. As in any asylum or refugee case, you should always inquire into who prepared the application for the applicant and whether the applicant had an opportunity to review it for accuracy before signing.

## 7.3  Plausibility

You should exercise care in evaluating the plausibility of the claims by someone from a different culture when behavior or life choices are being evaluated. What may seem implausible behavior to you could be plausible in the applicant's culture, or given conditions in the applicant's country.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                              Page 40 of 52

IFR_AR_010008

## 7.4    Demeanor

As explained in the RAIO Training Module, *Credibility*, demeanor is often an unreliable and misleading indicator of credibility.  This may be particularly true in cases involving torture or sexual violence.  While some individuals who have been tortured become emotionally overcome when recalling their ordeals, others may exhibit no emotion at all.  Because there are such a wide variety of emotional reactions to recounting experiences of torture, you should not expect the asylum or refugee applicant to manifest any particular emotion when recounting traumatic experiences.

In some cultures, keeping the head down and avoiding eye contact are signs of respect.  For many women, making eye contact and speaking clearly and directly are considered highly inappropriate conduct and should not be viewed as indicators of lack of credibility.

## 8    EVIDENTIARY CONSIDERATIONS

The same evidentiary rules apply to female applicants, whether or not the claim is gender-related, as apply to male applicants.  Testimony alone may be sufficient to establish eligibility if it is credible, persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee.  However in some cases, additional corroboration of material facts may be required.  "[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided or an explanation should be given as to why such information was not presented or as to why such corroboration cannot be provided."[86]

In evaluating whether an applicant should be expected to provide documentation, you must take into account the applicant's situation in the country she fled and the circumstances under which she fled.  For a number of reasons, a female asylum or refugee applicant might not have access to identity documents or other documentary proof of her claim. For example, women in the applicant's country may not be afforded full rights of citizenship, or an applicant's means of support may have been dependent upon a male relative who had control over any documents pertaining to the female applicant.

It may be unreasonable to expect a woman from a refugee-producing country to have documentation of sexual violence she suffered.  Because of strong cultural stigma attached to rape, "women survivors of sexual violence often are reluctant to seek medical assistance or to file police reports, because they do not want it known that they were raped."[87]

## 9    CONCLUSION

---

[86] INA § 208(b)(1)(B)(ii); 8 CFR § 208.13(a); *Diallo v. INS*, 232 F.3d 279 (2d. Cir. 2000); *Matter of          S-M-J-*, 21 I&N Dec 722 (BIA 1997).
[87] Human Rights Watch Women's Rights Project, *The Human Rights Watch Global Report on Women's Human Rights*  (August 1995)  http://www.hrw.org/sites/default/files/reports/general958.pdf

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 41 of 52

IFR_AR_010009

Understanding the role of gender and how to evaluate gender-based claims is important for all Officers within the RAIO Directorate. Although not all of the divisions will encounter gender-based issues on a routine basis, you should familiarize yourself with the types of potential gender-based issues that could arise in the course of adjudicating cases. Being familiar with the terminology and applicable laws and regulations relevant to the adjudications will help you recognize and adjudicate gender-based claims and make legally sufficient decisions.

# 10 SUMMARY

## 10.1 Gender-Related Issues

Women often suffer types of harm unique to women or much more commonly experienced by women than men, and at times women may suffer harm solely because of their gender. In many societies, women are subject to much greater social restrictions and harsher penalties for social violations than are men.

Furthermore, social constraints placed on women in many countries pose great obstacles to accessing the protection of the state or fleeing harm.

## 10.2 International and National Guidelines Relating to Women Refugees

Recognizing the particular vulnerability of women, international bodies and national governments have issued several documents in an effort to enhance their protection. These documents may be helpful reference tools for you in evaluating gender-based claims, including determining whether a type of harm experienced or feared by a woman seeking protection has been condemned by the international community as contrary to international human rights norms.

Some of those instruments and documents are:

- Declaration on Elimination of Discrimination Against Women (1967)
- Convention on the Elimination of All Forms of Discrimination Against Women (1979)
- UNHCR Guidelines on the Protection of Refugee Women (1991)
- Declaration on the Elimination of Violence Against Women (1993)
- INS Asylum Gender Guidelines (1995)
- UNHCR Guidelines on International Protection: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees (2002)

## 10.3 Types of Gender-Based Harm

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 42 of 52

IFR_AR_010010

The types of harm that women suffer vary across a broad range of countries, cultures, and social classes. You will confront particular types of harm in the claims of women interviewed.

### 10.3.1 Rape and Other Sexual Violence

Rape and other forms of sexual assault are acts of violence serving non-sexual needs or aims. Rape is based on a desire to degrade, control, and/or terrorize a victim or her community. Rape of women civilians has long been an integral part of conflict, used as a tactical weapon to terrorize civilian communities.

### 10.3.2 Female Genital Mutilation (FGM)

Female genital mutilation (FGM) is a custom of unknown origins involving the cutting or removal of all or part of the female genitalia. This practice can have devastating and harmful consequences for a woman throughout her life.

### 10.3.3 Forced Marriage

Forced marriage takes place against the victim's wishes and without the informed consent of both parties. The practice occurs throughout the world and may arise out of gender discrimination. Forced marriage constitutes a human rights violation and may constitute persecution where the applicant experiences it as serious harm.

### 10.3.4 Domestic Violence

Violence against women by relatives is related to the historically more powerful position of men in the family and society. In many societies, the police, the court system, and laws may condone the practice, allow for it, or may simply do nothing to prevent it or punish perpetrators. Although most battered women make efforts to avoid or resist abuse, there are many factors that make it difficult for a battered woman to leave her abuser.

### 10.3.5 Human Trafficking

Women and men are sometimes victims of human trafficking, a circumstance that involves their exploitation as forced laborers or prostitutes, among other types of harm. They are held against their will, either physically or psychologically. A victim of human trafficking is sometimes lured into her position by deception such as false promises of employment or under false pretenses that the trafficker is romantically interested in the victim. Traffickers often withhold their victims' passports and identity documents. More information is available in the RAIO Training Module, Detecting Possible Victims of Trafficking.

### 10.3.6 Honor Crimes

In some cultures, women are perceived to be the keepers of their families' honor. The family and society consider that a woman has brought shame on her family if she does not adhere to strict social norms of behavior and conduct. Families carry out honor crimes to restore honor to their families. Perpetrators may be members of the woman's family or her community.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                              Page 43 of 52

IFR_AR_010011

Honor crimes include: stoning, abduction, imprisonment, rape, poisoning, acid attacks, disfigurement, forced marriage, murder, and attempts to coerce the victim to commit suicide. A woman may be subjected to these honor crimes for engaging in, or for being accused of engaging in, sex before or outside of marriage, even as a result of rape; refusing to agree to a forced marriage; assertiveness; or wearing inappropriate clothing. Even in countries where honor crimes are illegal, lax enforcement or lesser sentences may be given to perpetrators of these crimes.

## 10.4    Interviewing Considerations

Cultural factors, such as the expected role of a woman in her society, may significantly affect an applicant's testimony. Cultural norms may exacerbate a reluctance to discuss an issue or limit an applicant's knowledge on a particular subject. The presence of certain people, such as family members or interpreters, may inhibit an applicant's testimony.

You must use your utmost care to assure that the interview is conducted in a non-adversarial manner and to employ questioning techniques that both encourage testimony and put the applicant at ease.

## 10.5    Legal Analysis – Persecution and Agent of Persecution

The Asylum Gender Guidelines do not expand the statutory definition of a refugee. The legal criteria used to evaluate a female asylum or refugee applicant's eligibility for asylum or refugee status is the same criteria used in all other protection adjudications.

### 10.5.1    Persecution

When considering whether the harm that an applicant has suffered or fears rises to the level of persecution, keep in mind that rape and FGM are serious enough forms of harm to amount to persecution. According to statute, forced abortion and forced sterilization and other serious harm imposed for resistance to a coercive population control program constitute harm amounting to persecution.

Discrimination and harassment may amount to persecution if the adverse practices or treatment accumulate to the level of persecution, or is so serious that it leads to consequences of a substantially prejudicial nature. Some case law has also indicated that being compelled to engage in conduct that is abhorrent to an individual's deeply-held beliefs may constitute persecution.

### 10.5.2    Agent of persecution

As in any other asylum or refugee claim, in order to establish persecution, the applicant must demonstrate that the persecutor is the government (including agents of the government) or an

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 44 of 52

IFR_AR_010012

entity that the government is unable or unwilling to control. The persecutor may be a rebel group, a clan, a tribe, or a family member, such as a brother, father, or husband.

In evaluating whether a government is unwilling or unable to control the infliction of harm or suffering, you should consider whether the government provides reasonably effective protection. Factors to consider include whether the government takes reasonable steps to control the infliction of harm or suffering and whether the applicant has reasonable access to existing state protection.

Evidence that the government does not respond to requests for protection is a strong indication that state protection is unavailable. In some cases, an applicant may establish that state protection is unavailable even when she did not actually seek protection.

Keep in mind also that, while the existence of laws on the books criminalizing domestic abuse and government agencies or initiatives devoted to addressing the problem are factors which may serve to indicate a willingness and ability to protect victims of domestic violence, they are not in and of themselves proof that such protection exists and is effective.

## 10.6    Legal Analysis – Nexus

The "nexus" requirement applies equally to female and male applicants and to all claims, including those in which gender is an element.

When examining claims based on female applicants' political opinion, you must remember that in addition to expressing political opinions in the traditional sense of actively participating in political institutions within a country, women also express their political opinion in more non-traditional ways, such as cooking or providing food to rebel forces. Women also express political opinions when they oppose or challenge institutionalized discrimination or restrictive social norms.

The BIA has recognized gender as an immutable trait that could form the basis of a particular social group, as have a few federal courts. However, most courts analyzing gender-related social groups consider gender along with other characteristics.

## 10.7    Legal Analysis – Internal Relocation

Determinations regarding whether a female applicant could avoid future harm through internal relocation must take into consideration the legal restrictions and cultural or social norms governing women's behavior. This includes a woman's ability to travel, her economic circumstances, and her social circumstances.

## 10.8    Credibility

Cultural differences and norms governing women's behavior, as well as the effects of trauma, may present special difficulties in evaluating credibility of female asylum and refugee applicants. For example, social constraints controlling access to information, the effects of

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                            Page 45 of 52

IFR_AR_010013

trauma, or customs of social interaction may limit a woman's ability to provide detailed testimony about certain aspects of her claim.  Also, as women from certain countries are less likely to be literate than their male compatriots, they may not have the ability to review the asylum or refugee application for accuracy.

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 46 of 52

IFR_AR_010014

## PRACTICAL EXERCISES

---

### Practical Exercise # 1

- **Title:** Analysis of Harm in a Gender-Related Claim

- **Student Materials:**  Gender Fact Pattern

  Applicant is a 22-year old woman from country X, which is engaged in a civil war between the government and rebel forces.  When she was about 9 years old in 1993, rebel forces began going to Applicant's village and demanding that men join them.  They often would kidnap men to join their forces, and men who resisted were killed.  The rebel forces took about 20 men from the village, which was about 1 per family.

  A few years later, the military began coming to the village.   They would beat men, women and children.  They also would rape women.  Over the next several years, soldiers raped someone in village every 8 – 15 days.  Applicant claimed that the military targeted the village and retaliated against residents based on the mistaken belief that the villagers had voluntarily joined the rebels and therefore the village supported the rebels.

  When Applicant was 19, soldiers came to her home at night.  They beat her father and mother.  The soldiers told her father that they wanted to "eat and to be with a woman."  They tied Applicant's father behind the house and forced her mother into the kitchen to cook.  Applicant was then left alone with three soldiers who beat and raped her.  After the soldiers left, the Applicant's parents sent her to stay with an aunt in a nearby village. Fearing further harm, Applicant fled her country.

  When asked why she thought she and her family were assaulted, Applicant testified, "I think they were attacking us because the guerrillas had taken my brother away, so they thought we were in favor of the guerillas."  When asked why she believed there was a connection between her brother's kidnapping and her rape so many years later, she responded, "Because the guerillas continued to kidnap people from the town.  So for the same reason, the military soldiers thought that all the persons they took away, that they were in agreement with the guerillas."

  **Analyze whether the harm Applicant experienced was persecution on account of a protected characteristic.   What additional information would be helpful in making this determination?**

---

**Practical Exercises**                                                                 Gender Related Claims

---

<div style="border:1px solid">

### Practical Exercise # 2

- **Title:** Interviewing a Gender-Related Case

- **Student Materials:**     Excerpt of Interview Notes; Country Conditions Information

Q. Why are you afraid to return to Pakistan?
A. I would be killed absolutely.
Q. Who would kill you and why?
A. My brothers. They would kill me. I have shamed them.
Q. Why would they kill you?
A. I have dishonored them. Brought shame on my family.
Q. What do you mean? How have you dishonored them?
A. They will say that I had intimate relations and I am not married.
Q. Why will they think that?
A. My neighbor violated me. He made me submit. I didn't want to and now I am pregnant and no one will believe me.
Q. What do you mean when you say no one will believe you?
A. My neighbor, he will deny it. He will say he didn't touch me – or he will say I asked for it.
Q. I know this is difficult to talk about, but I must ask you, did he rape you?
A. Yes. (Applicant begins to cry).
Q. Describe to me what happened.
A. They will say I have dishonored the family.
Q. When did your neighbor harm you?
A. It was in October – last October.
Q. Why do you think your brothers would harm you because of this?
A. I am not married. It is illegal. They won't believe me that I was forced.
Q. Have you told anyone in your family what happened?
A. No.
Q. Why not?
A. It is too shameful.
Q. Did you tell the police?
A. No. They would arrest me. No one will believe me.
Q. Do you know any other women who have been raped?
A. No.  But my cousin got pregnant when she was not married and she died.
Q. How did she die?
A. They said it was an accident, that she fell down the stairs. But I know that she was killed by my uncle and his sons.
Q. How do you know this?
A. After she died, my oldest brother said that her family did the right thing, that they saved the family honor.

</div>

---

USCIS: RAIO Directorate – Officer Training                     DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 48 of 52

IFR_AR_010016

**Practical Exercises**                                    Gender Related Claims

---

Q.  Why does this mean she was killed?

A.  What else could it mean?  My brothers had been very upset when they learned she was pregnant.  They said terrible things about her.  Called her terrible names.  They talked to my cousins who were also very upset.  They said she brought shame upon the entire family and that something had to be done.  Then she suddenly had an accident.  I don't believe it was an accident.

Q.  Was there an investigation?

A.  There never is.

**After reviewing the excerpt from the notes above, answer the following questions:**

1.  **What other questions should be asked?**

2.  **Are there better ways to have asked any of the above questions?**

3.  **On these facts and, in light of country conditions, can the applicant establish eligibility for asylum?**

---

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                        Page 49 of 52

IFR_AR_010017

# OTHER MATERIALS

There are no other materials for this module.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                          Page 50 of 52

IFR_AR_010018

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### REQUIRED READING

1. Weiss, Jeffrey L., Office of International Affairs, Gender *Guidelines for Overseas Refugee Processing*, Memorandum to all Overseas District Directors (Washington, DC: 23 February 2001), 2 pp. plus attachment.

### ADDITIONAL RESOURCES

1.

2.

### SUPPLEMENTS

**International and Refugee Adjudications Supplement**

**There are no supplements.**

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                Page 51 of 52

IFR_AR_010019

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### REQUIRED READING

1.

2.

### ADDITIONAL RESOURCES

1. Melville, Rosemary, Asylum Division, Office of International Affairs, *Follow Up On Gender Guidelines Training*, Memorandum to Asylum Office Directors, SAOs, AOs, (Washington, DC: 7 July 1995), 2 p. plus attachments.

2. Weiss, Jeffrey L., Office of International Affairs, *Gender Guidelines for Overseas Refugee Processing*, Memorandum to all Overseas District Directors (Washington, DC: 23 February 2001), 2 pp. plus attachment.

### SUPPLEMENTS

<div style="border:1px solid; background:#ffffcc; padding:1em;">

**Asylum Adjudications Supplement**

**There are no supplements.**

</div>

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                        Page 52 of 52

IFR_AR_010020



# RAIO DIRECTORATE – OFFICER TRAINING

*RAIO Combined Training Program*

# GUIDANCE FOR ADJUDICATING LESBIAN, GAY, BISEXUAL, TRANSGENDER, AND INTERSEX (LGBTI) REFUGEE AND ASYLUM CLAIMS

TRAINING MODULE

*This Page Left Blank Intentionally*

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 2 of 68

IFR_AR_010022

RAIO Directorate – Officer Training / *RAIO Combined Training Program*

# GUIDANCE FOR ADJUDICATING LESBIAN, GAY, BISEXUAL, TRANSGENDER, AND INTERSEX (LGBTI) REFUGEE AND ASYLUM CLAIMS

## Training Module

## MODULE DESCRIPTION:

This module provides guidelines for adjudicating and considering immigration benefits, petitions, protections, or other immigration-related requests by lesbian, gay, bisexual, transgender, and intersex, (LGBTI) individuals. The module addresses the legal analysis of claims that involve LGBTI applicants as well as related interviewing considerations.

## FIELD PERFORMANCE OBJECTIVE(S)

When interviewing in the field, you (the Officer) will elicit all relevant information from an LGBTI applicant to properly adjudicate and consider the immigration benefit, petition, protection, or other immigration-related request before you.

## INTERIM PERFORMANCE OBJECTIVES

1. Summarize the developments in U.S. law that focus on LGBTI applicants.

2. Describe the types of harm that may be present in refugee and asylum claims involving LGBTI issues.

3. Describe how membership in a particular social group is analyzed when looking at the refugee or asylum claims involving LGBTI issues.

   Identify factors to consider when evaluating evidence presented by LGBTI applicants.

5. Identify factors that may hinder an interview of an LGBTI applicant.

6. Identify methods and techniques to put an LGBTI applicant at ease during an interview.

   Use sensitive questioning and listening techniques that aid in eliciting information from LGBTI applicants.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 3 of 68

IFR_AR_010023

## INSTRUCTIONAL METHODS

- Interactive presentation
- Discussion
- Practical exercises

## METHOD(S) OF EVALUATION

- Multiple-choice exam
- Observed practical exercises

## REQUIRED READING

1. *Matter of Toboso-Alfonso*, 20 I&N Dec. 819, 822-23 (BIA 1990).

2. UN High Commissioner for Refugees (UNHCR), *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees,* 23 October 2012, HCR/GIP/12/01, available at: http://www.refworld.org/docid/50348afc2.html Legal Memorandum, Stephen H. Legomsky, USCIS Chief Counsel, *General Guidance to the Field in Same-Sex Marriage Cases*, (July 26, 2013).

3. USCIS Policy Memorandum on Adjudication of Immigration Benefits for Transgender Individuals, August 10, 2012, *available at* http://connect.uscis.dhs.gov/workingresources/immigrationpolicy/Documents/PM-602-0061.1.pdf.

   Memorandum from William R. Yates, Associate Director for Operations, USCIS, *Adjudication of Petitions and Applications Filed by or On Behalf Of, or Document Requests by, Transsexual Individuals* (April 16, 2004).

   **Required Reading – International and Refugee Adjudications**

   **Required Reading – Asylum Adjudications**

## ADDITIONAL RESOURCES

1. LGBTI-related Case Law

   Immigration Equality, *Immigration Equality Asylum Manual, available at* http://immigrationequality.org/get-legal-help/our-legal-resources/immigration-equality-asylum-manual/.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 4 of 68

IFR_AR_010024

3. Immigration Equality, *Immigration Equality Draft Model LGBT Asylum Guidance*, (2010), *available at* http://www.immigrationequality.org/wp-content/uploads/2011/07/ImEq-Draft-Model-LGBT-Asylum-Guidance-2004.pdf.

4. International Lesbian, Gay, Bisexual, Trans and Intersex Association-Europe, *Annual Review of the Human Rights Situation of Lesbian, Gay, Bisexual, Trans and Intersex People in Europe 2015*, May 2015, *available at*: http://www.ilga-europe.org/sites/default/files/Attachments/01_full_annual_review_updated.pdf.

5. Amnesty International, *Making Love a Crime: Criminalization of Same-Sex Conduct in Sub-Saharan Africa*, June 24, 2013, *available at*: http://www.amnestyusa.org/research/reports/making-love-a-crime-criminalization-of-same-sex-conduct-in-sub-saharan-africa?page=show.

6. International Gay and Lesbian Human Rights Commission, *When Coming Out is a Death Sentence: Exposing Persecution of LGBT Individuals in Iraq*, November 19, 2014, *available at*: http://iglhrc.org/content/exposing-persecution-lgbt-individuals-iraq.

7. *Statement by the President on the UN Human Rights Council Resolution on Human Rights, Sexual Orientation, and Gender Identity*. The White House, Office of the Press Secretary, June 17, 2011, *available at* http://www.whitehouse.gov/the-press-office/2011/06/17/statement-president-un-human-rights-council-resolution-human-rights-sexu.

8. Memorandum from David A. Martin, INS General Counsel, *Seropositivity for HIV and Relief From Deportation*, (Feb. 16, 1996).

9. International Gay and Lesbian Human Rights Commission (IGLHRC), *Nowhere to Turn: Blackmail and Extortion of LGBT People in Sub-Saharan Africa* (2011), *available at* http://www.iglhrc.org/binary-data/ATTACHMENT/file/000/000/484-1.pdf.

10. Aengus Carroll and Lucas Paoli Itaborahy, International Lesbian, Gay Bisexual, Trans and Intersex Association, *State Sponsored Homophobia: A World Survey of Laws Prohibiting Same-Sex Activity Between Consenting Adults*, May 2015, *available at*: http://old.ilga.org/Statehomophobia/ILGA_State_Sponsored_Homophobia_2015.pdf.

   American Psychiatric Association, *Therapies Focused on Attempts to Change Sexual Orientation: Reparative or Conversion Therapies Position Statement*, March 2000, *available at* http://www.psych.org/Departments/EDU/Library/APAOfficialDocumentsandRelated/PositionStatements/200001.aspx. [scroll down the page and click on the year-2000, then click on "Therapies focused on attempts to change sexual orientation."]

12. Victoria Neilson, *Applying Gender-Based Asylum Jurisprudence to Lesbian Asylum Claims*, 16 Stanford Law & Policy Review 417 (2005), *available at*

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 5 of 68

IFR_AR_010025

http://www.immigrationequality.org/wp-content/uploads/2011/08/Neilson-Website-Version-Lesbian-article.pdf.

13. Ellen A. Jenkins, *Taking the Square Peg Out of the Round Hole: Addressing the Misclassification of Transgender Asylum Seekers*, 40 Golden Gate U.L. Rev. (2009), *available at* http://digitalcommons.law.ggu.edu/cgi/viewcontent.cgi?article=2008&context=ggulrev.

**Additional Resources – International and Refugee Adjudications**

**Additional Resources – Asylum Adjudications**

**CRITICAL TASKS**

SOURCE: The Tasks listed below are from the legacy Asylum Division's 2001 Revalidation. These tasks will need to be modified to reflect the results of the RAIO Directorate – Officer Training Validation study.

| Task/ Skill # | Task Description |
|---|---|
| ILR6 | Knowledge of U.S. case law that impacts RAIO (3) |
| ILR9 | Knowledge of policies and procedures for processing lesbian, gay, bisexual, transgender, and intersex (LGBTI) claims (3) |
| ILR14 | Knowledge of nexus to a protected characteristic (4) |
| ILR15 | Knowledge of the elements of each protected characteristic (4) |
| ILR20 | Knowledge of the criteria for refugee classification (4) |
| ILR21 | Knowledge of the criteria for establishing a well-founded fear (WFF) (4) |
| ILR22 | Knowledge of the criteria for establishing credibility (4) |
| ITK4 | Knowledge of strategies and techniques for conducting non-adversarial interviews (e.g., question style, organization, active listening) (4) |
| ITK5 | Knowledge of strategies and techniques for communicating with survivors of torture and other severe trauma (4) |
| ITK6 | Knowledge of principles of cross-cultural communication (e.g., obstacles, sensitivity, techniques for communication) (4) |
| ITK8 | Knowledge of policies, procedures and guidelines for working with an interpreter (4) |
| RI1 | Skill in identifying issues of claim (4) |
| RI2 | Skill in identifying the information required to establish eligibility (4) |
| RI3 | Skill in conducting research (e.g. legal, background, country conditions) (4) |
| ITS3 | Skill in framing interview questions and requests for information (4) |
| ITS4 | Skill in asking appropriate follow-up questions (4) |
| ITS6 | Skill in conducting non-adversarial interviews (4) |
| ITS8 | Skill in confronting applicant with credibility issues (4) |

### SCHEDULE OF REVISIONS

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|------|---------------------------|------------------------------|---------|
| 11/06/2015 | Throughout document | Added some discussion of recent cases; fixed links | RAIO Training |
| 12/20/2019 | Entire Lesson Plan; section 7.3 (Corroborating Evidence) | Minor edits to reflect changes in organizational structure of RAIO; minor update to reflect change in USCIS policy related to REAL ID provisions; updated links; no other substantive updates | RAIO Training |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## Table of Contents

**1  INTRODUCTION** ...................................................................................................**10**

**2  LEGAL ANALYSIS – OVERVIEW** ..........................................................................**13**

**3  LEGAL ANALYSIS – NEXUS AND THE FIVE PROTECTED GROUNDS** ..................**13**

3.1  Membership in a Particular Social Group – Defining the Group .........................14

    3.1.1  Possession or Imputed Possession of a Protected Characteristic................14
    3.1.2  Particular Social Group – Immutable or Fundamental Characteristic.......15
    3.1.3  Particular Social Group – Social Distinction ............................................16

3.2  "On Account Of"/Nexus .....................................................................................18

    3.2.1  The Persecutor's Motive and the Applicant's Experience .......................18
    3.2.2  Prosecution vs. Persecution .....................................................................19

**4  LEGAL ANALYSIS – PERSECUTION AND ELIGIBILITY BASED ON PAST PERSECUTION** ....**19**

4.1  Types of Harm That May Befall Sexual Minorities ............................................19

4.2  Agents of Persecution .........................................................................................24

4.3  Internal Relocation .............................................................................................24

**5  LEGAL ANALYSIS – WELL FOUNDED FEAR** ......................................................**26**

5.1  Objective Elements .............................................................................................26

5.2  Fear of Future Persecution ..................................................................................27

5.3  Refugees *Sur Place* ...........................................................................................27

**6  INTERVIEW CONSIDERATIONS** ..........................................................................**28**

6.1  Pre-Interview Considerations ..............................................................................29

    6.1.1  File Review ..............................................................................................29
    6.1.2  How the Presence of Family and Relatives May Affect the Interview .....29
    6.1.3  How the Presence of Interpreters May Affect the Interview ....................30
    6.1.4  Reviewing Biographical Information with the Applicant .........................30

6.2  Suggested Techniques for Eliciting Testimony ...................................................31

    6.2.1  Setting the Tone and Putting the Applicant at Ease .................................31
    6.2.2  Explore all possible grounds ....................................................................33
    6.2.3  Sample Questions .....................................................................................34

IFR_AR_010028

**7    EVIDENCE ASSESSMENT** ........................................................................................**40**

7.1    Credibility Considerations During the Interview ...............................................41

    7.1.1    Plausibility ...............................................................................................41
    7.1.2    Consistency ..............................................................................................43
    7.1.3    Detail ........................................................................................................45

7.2    Country of Origin Information ..........................................................................45

7.3    Corroborating Evidence ...................................................................................46

**8    CONCLUSION** .......................................................................................................**48**

**9    SUMMARY** ............................................................................................................**49**

9.1    LGBTI and HIV Terminology ...........................................................................49

9.2    Legal Analysis – Nexus and the Five Protected Characteristics ........................49

9.3    Legal Analysis – Types of Persecution .............................................................49

9.4    Legal Analysis – Well-Founded Fear ...............................................................50

9.5    Legal Analysis – One-Year Filing Deadline (asylum only) ...............................50

9.6    Interviewing Considerations ............................................................................50

9.7    Burden of Proof and Evidence – Credibility .....................................................52

9.8    Burden of Proof and Evidence – Country of Origin Information ........................52

**PRACTICAL EXERCISES** ................................................................................................**53**

**OTHER MATERIALS** ......................................................................................................**54**

**SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS** ..............................**63**

Required Reading .....................................................................................................63

Additional Resources ...............................................................................................63

Supplements ............................................................................................................63

**SUPPLEMENT B – ASYLUM ADJUDICATIONS** ...............................................................**64**

Required Reading .....................................................................................................64

Additional Resources ...............................................................................................64

Supplements ............................................................................................................64

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                        Page 9 of 68

IFR_AR_010029

> Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.
>
> For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.
>
> You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

# 1    INTRODUCTION

It has been over 25 years since Fidel Armando Toboso Alfonso, a gay man from Cuba, was granted withholding of deportation in the United States based on his sexual orientation.[1] The *Toboso-Alfonso* decision paved the way for hundreds of lesbian, gay, bisexual, and transgender individuals as well as individuals with intersex conditions (LGBTI) to obtain refugee and asylum status in the United States. In 2011, the United Nations marked another "significant milestone in the long struggle for equality, and the beginning of a universal recognition that LGBT[I] persons are endowed with the same inalienable rights – and entitled to the same protections – as all human beings"[2] by passing a Resolution on Human Rights, Sexual Orientation, and Gender Identity.

In 2013, the Supreme Court held that section 3 of the Defense of Marriage Act, which had limited the terms "marriage" and "spouse" to opposite-sex marriage for purposes of federal law, was unconstitutional.[3] Then, in 2015, the Supreme Court struck down state laws denying marriage licenses to couples of the same sex, legalizing same-sex marriage throughout the United States.[4] Legally valid marriages between couples of the same sex are now treated the same as all other marriages under the Immigration and Nationality Act (INA) for all purposes, including the processing of derivative refugees and asylees under INA 207 and 208.[5]

---

[1] *Matter of Toboso-Alfonso*, 20 I&N Dec. 819, 822-23 (BIA 1990).

[2] *Statement by the President on the UN Human Rights Council Resolution on Human Rights, Sexual Orientation, and Gender Identity*, The White House, Office of the Press Secretary, June 17, 2011.

[3] *U.S. v. Windsor*, 133 S. Ct. 2675 (2013).

[4] *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

[5] *Matter of Zeleniak*, 26 I&N Dec. 158 (BIA 2013), reversing a DOMA-based denial of a Petition for Alien Relative because the "Supreme Court's ruling in *Windsor* has therefore removed section 3 of the DOMA as an impediment

IFR_AR_010030

The increasing number of refugee and asylum (protection) claims related to LGBTI and HIV-positive status has resulted in the need for greater awareness of the issues involved in these claims and training on their adjudication.[6] Interviews with LGBTI or HIV-positive refugee and asylum applicants require the individual "to discuss some of the most sensitive and private aspects of human identity and behavior"[7] – sexual orientation, gender identity, and life-threatening illness. These topics may be particularly difficult for applicants to discuss with government officials, where the applicant may have previously had negative encounters with government officials and as a result have a fear of authority.[8]

All officers in the RAIO Directorate should be familiar with the contents of this training module as it constitutes primary field guidance for interviewing LGBTI applicants and analyzing their claims. This module seeks to: 1) increase awareness about the issues sexual minorities face; 2) foster discussion about LGBTI issues; and, 3) provide consistent legal and interview guidance regarding these issues.

The RAIO LGBTI Training Module is the result of a collaborative effort between USCIS and non-governmental organizations (NGOs).

The module first addresses the legal issues you, the interviewing officer, must consider when analyzing cases and making protection determinations. Second, because establishing eligibility for refugee and asylum status presents its own challenges, the module covers the factors you must take into account when interviewing LGBTI individuals. Third, the module addresses proper techniques for assessing credibility.

### *A Note about Terminology*

The terminology involving LGBTI issues is still evolving. For purposes of this module, the term "sexual minorities" and the acronym "LGBTI" are used interchangeably as umbrella terms to refer to issues involving sexual orientation, gender identity, and intersex conditions. The following are some essential LGBTI definitions. For a more comprehensive set of definitions, please click the hyperlink to the LGBTI Glossary located in the "Other Materials" section of this module.

---

to the recognition of lawful same-sex marriages and spouses of the marriage is valid under the laws of the State where it was celebrated."; Legal Memorandum, Stephen H. Legomsky, USCIS Chief Counsel, *General Guidance to the Field in Same-Sex Marriage Cases* (July 26, 2013).

[6] UN High Commissioner for Refugees (UNHCR), *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, 23 October 2012, HCR/GIP/12/01, paragraph 1.

[7] *Immigration Equality Draft Model LGBT Asylum Guidance*, Immigration Equality 2010.

[8] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                            Page 11 of 68

IFR_AR_010031

> The use of the term homosexual is limited in this module. It has a somewhat derogatory connotation within the LGBTI community as it has historically been used in a medical context to describe being gay or lesbian as an illness.[9]

Sexual orientation is the emotional, physical, and romantic attraction a person feels towards another person.[10] The term gay is used to mean men who are attracted to men. The term lesbian is used to mean women who are attracted to women, although homosexual women also sometimes use the term gay to describe themselves. The term gay people or gay community is often used to include both men and women who are attracted to members of the same sex. The term heterosexual or straight is used to mean men or women who are attracted to the opposite sex. The term bisexual is used to mean men or women who are attracted to both sexes.

Gender is what society values as the roles and identities of being male or female. Sex is the assignment of one's maleness or femaleness on the basis of anatomy and reproductive organs. Gender and sex are assigned to every individual at birth. Gender identity is an individual's internal sense of being male, female, or something else. Since gender identity is internal, one's gender identity is not necessarily visible to others. Gender expression is how a person expresses one's gender identity to others, often through behavior, clothing, hairstyles, voice, or body characteristics.[11] Transgender is a term used for people whose gender identity, expression, or behavior is different from those typically associated with their assigned sex at birth. Some transgender people dress in the clothes of the opposite gender; others undergo medical treatment, which may include taking hormones and/or having surgery to alter their gender characteristics.

Intersex refers to a condition in which an individual is born with a reproductive or sexual anatomy and/or chromosome pattern that does not seem to fit typical definitions of male or female. The conditions that cause these variations are sometimes grouped under the terms "intersex" or "DSD" (Differences of Sex Development). Individuals with these conditions were previously referred to as "hermaphrodites," but this term is considered outmoded and should not be used unless the applicant uses it. These conditions may be apparent at birth, may appear at puberty, or may be discovered in a medical examination. Intersex is not the same as transgender, although an intersex person may identify themselves as transgender. Keep in mind that an intersex person may identify as male or female, and as lesbian, gay, bisexual, or heterosexual.[12]

---

[9] See Immigration Equality Draft Model LGBT Asylum Guidance, 2010.

[10] For more information about sexual orientation, see American Psychological Association (APA), Answers to Your Questions: A Better Understanding of Sexual Orientation and Homosexuality, (2008), available at http://www.apa.org/pubinfo/answers.html.

[11] For more information on transgender identity, see https://transequality.org/issues/resources/frequently-asked-questions-about-transgender-people (National Center for Transgender Equality).

[12] For more information on intersex conditions, see the Advocates for Informed Choice website at www.aiclegal.wordpress.com.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                        Page 12 of 68

IFR_AR_010032

> Transgender is a gender identity, not a sexual orientation. Therefore, a transgender person may have a heterosexual, bisexual, gay, or lesbian sexual orientation.

It is also important to be familiar with the issues and terminology related to the Human Immunodeficiency Virus (HIV) and Acquired Immunodeficiency Syndrome (AIDS). USCIS has encountered claims from applicants who fear persecution because they were incorrectly perceived as gay, based on the fact that they were HIV-positive. We have also encountered claims where the persecutor incorrectly assumed that the applicant was HIV-positive based on the fact that the applicant was gay or was perceived to be gay. Because such claims involve overlapping and related issues, they are being addressed within the same module.

A person who was exposed to HIV and developed anti-bodies to the virus is HIV-positive.[13] AIDS describes people with HIV who have either experienced certain infections or whose T-cells (infection fighting blood cells) have dropped below 200. Not everyone who is HIV-positive has AIDS, but everyone who has AIDS is HIV-positive.[14] HIV is not spread by casual contact. It is only spread through contact with bodily fluids primarily through sex or sharing intravenous needles.

> An applicant may prefer to use other terminology regarding their HIV status such as "person living with HIV." You should use the term most preferable to the applicant.

## 2     LEGAL ANALYSIS – OVERVIEW

This module does not expand the statutory definition of a refugee. The legal criteria used to evaluate an LGBTI applicant's eligibility for asylum or refugee status are the same criteria used in all other protection adjudications. However, because LGBTI applicants' experiences are often different from those of others, it is useful to discuss how these experiences fit into the legal framework of established refugee and asylum law.

## 3     LEGAL ANALYSIS – NEXUS AND THE FIVE PROTECTED GROUNDS

As explained in greater detail in the RAIO training module, *Nexus and the Five Protected Grounds*, to be eligible for asylum or refugee status, the applicant must establish that the

---

[13] For more information about HIV see http://www.gmhc.org/hiv-info/hivaids-basics, (Gay Men's Health Crisis website).

[14] *See Immigration Equality Draft Model LGBT Asylum Guidance*, Immigration Equality 2004.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 13 of 68

IFR_AR_010033

persecution suffered or feared was or will be motivated "on account of" his or her actual or imputed possession of a protected characteristic. This is known as the nexus requirement and it applies equally to LGBTI applicants. The type of harm that may constitute persecution in the context of LGBTI claims will be discussed later in this module.

Depending on the facts of the case, claims relating to sexual orientation and gender identity are primarily recognized under membership in a particular social group but may overlap with other grounds, in particular religion and political opinion.[15]

The nexus analysis first requires consideration of whether the persecutor perceives the applicant as possessing a protected characteristic (either because the applicant does possess it or because the persecutor imputes it to the applicant); then whether the persecutor acted or would act against the applicant because of the persecutor's perception of that protected characteristic.

## 3.1    Membership in a Particular Social Group – Defining the Group

When deciding if the persecutor perceives in an applicant an actual or imputed characteristic that can define a cognizable particular social group (PSG), you must first identify the characteristics that define the group of which the applicant claims to be a member; then explain why that group does or does not form a PSG within the meaning of the refugee definition.

### 3.1.1    Possession or Imputed Possession of a Protected Characteristic

Particular social groups based on sexual minority status are well-recognized in case law as providing a valid basis for a protection claim. As mentioned previously, in 1990, the Board of Immigration Appeals (BIA) in *Matter of Toboso-Alfonso*, recognized persons identified as homosexuals by the Cuban Government as a cognizable particular social group.[16] Toboso-Alfonso was a gay man who was subjected to detention and forced labor by the Cuban government for being gay.

Four years later, the U.S. Attorney General designated *Toboso-Alfonso* "as precedent in all proceedings involving the same issue or issues."[17]

---

[15] UN High Commissioner for Refugees (UNHCR), *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, 23 October 2012, HCR/GIP/12/01, paragraphs 42-43; 50.

[16] *See* Toboso-Alfonso.

[17] Attorney General, Order number 1895 (June 19, 1994).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                         Page 14 of 68

IFR_AR_010034

While the BIA has not specifically issued a precedential decision on claims by other sexual minorities, many U.S. Circuit Courts of Appeals have. Claims involving actual or imputed sexual minority status may qualify under the particular social group category and may involve applicants who:

- identify as gay or lesbian[18]

- are viewed as a sexual minority, regardless of whether the persecutor or society involved distinguishes between sexual orientation, gender, and sex.

- are transgender[19] (note that even if a transgender applicant identifies as heterosexual, he or she may be perceived as gay or lesbian)

- are "closeted" gays and lesbians

- test positive for HIV, regardless of their sexual orientation[20]

- are viewed as "effeminate" or "masculine" but identify as heterosexual

- are not actually gay but are thought to be gay by others[21]

- are from throughout the world, not just Cuba.[22]

- are not subject to the kind of government registration requirements that were involved in *Toboso-Alfonso*

For a comprehensive list of court cases involving LGBTI asylum and refugee issues, click LGBTI-Related Case Law found in the "Other Materials" section of this module.

## 3.1.2    Particular Social Group – Common Immutable Characteristic

To determine if an applicant is a member of a PSG, you must decide whether:

The applicant is a member of a group individuals who share a common, immutable characteristic, meaning it is one that members of the group either cannot change or should not be required to change because it is fundamental to the member's identity or conscience. The defining characteristic can be a shared innate characteristic or a shared past experience.[23]

---

[18] *See, e.g., Karouni v. Gonzales*, 399 F.3d 1163 (9th Cir 2005); *Pitcherskaia v. INS*, 118 F.3d 641 (9th Cir. 1997); *Nabulawala v. Gonzales*, 481 F.3d 1115 (8th Cir. 2007).

[19] *Hernandez-Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000).

[20] *Seropositivity for HIV and Relief From Deportation*, Memorandum, David A. Martin, INS General Counsel. (Feb. 16, 1996).

[21] *Amanfi v. Ashcroft*, 328 F.3d 719 (3d Cir. 2003).

[22] This will depend on country of origin information. LGBTI claims are put forward from all over the world.

[23] *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985).

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 15 of 68

IFR_AR_010035

Sexual orientation, gender identity, and having an intersex condition can be classified as immutable. They are characteristics that an individual cannot change about him or herself or should not be required to change.[24] Even if these traits can be changed, they are traits that are so fundamental to a person's identity that he or she should not be required to change them.

Harm imposed because an applicant was imputed to belong to a sexual minority may also qualify as "on account of" a protected ground, whether that imputation is correct or not.

### 3.1.3    Particular Social Group – Social Distinction

When analyzing whether or not the particular social group is cognizable, you must also determine whether the group is socially distinct, i.e., whether the actual or imputed characteristic is "easily recognizable and understood by others to constitute a social group."[25]

Some adjudicators mistakenly believe that social distinction requires that the applicant "look gay or act gay." *See* Section 7.1.1, *Evidence Assessment, Credibility Considerations, Plausibility* below. In *Matter of M-E-V-G-* and *Matter of W-G-R-*, a pair of precedent decisions issued in 2014, the BIA clarified that the "social distinction" requirement does not require literal or ocular visibility. Rather, it means that the society in question distinguishes individuals who share this trait from individuals who do not.[26] It is not necessary for the group to identify explicitly and outwardly in order for the social distinction requirement to be met. For example, the fact that the LGBTI community in a country exists mainly in hiding does not prevent such a group for establishing social distinction in the society.

For purposes of the "social distinction" analysis, you must examine the evidence, including country conditions. For social distinction, an examination of the relevant evidence is necessary to determine whether the society in question distinguishes sexual minorities from other individuals in a meaningful way. In *Toboso-Alfonso*, for example, the record established that the Cuban government registered and maintained files on homosexuals, the applicant suffered harm because of his homosexual status, and suspected homosexuals were subjected to physical examinations, interrogations, and beatings. As the BIA noted in *Matter of M-E-V-G-*, this evidence was sufficient to demonstrate that the group was distinct within Cuban society.[27] While government registration of individuals as "homosexuals" would, in general, establish social distinction, it is not required. Information about discriminatory attitudes or behavior toward sexual minorities would also be an example of evidence of social distinction.

---

[24] *See Matter of Toboso-Alfonso*, 20 I&N Dec. at 822.

[25] *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006).

[26] *Matter of M-E-V-G-*, 26 I&N Dec. 227, 234 (BIA 2014); *Matter of W-G-R-*, 26 I&N Dec. 208, 216 (BIA 2014).

[27] *M-E-V-G-*, 26 I&N Dec. at 234.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                            Page 16 of 68

IFR_AR_010036

### 3.1.4    Particular Social Group – Particularity

Applicants seeking to establish membership in a particular social group must also establish that the group is defined with sufficient particularity. This requirement relates to the group's boundaries. The group must be discrete and have definable boundaries. The group should not be defined so broadly so as to make it difficult to distinguish group members from others in society and should not be outlined so narrowly so that it does not constitute a meaningful grouping. In *Matter of M-E-V-G-*, the BIA noted that the proposed group in *Toboso-Alfonso*, "homosexuals in Cuba," was sufficiently particular because it was a discrete group with well-defined boundaries.

---

**Possible Social Group Formulations**

It is important to remember that, in order to conduct an accurate assessment of nexus, a particular social group should not be formulated too broadly or too narrowly. Rather, it should refer to the trait that the persecutor perceives the applicant to possess.

Because LGBTI claims involve individuals with a variety of characteristics, and because the persecutors in given cases may perceive the applicants' traits in a variety of ways, the appropriate formulation will depend on the facts of the case, including evidence about how the persecutor and the society in question view the applicant and people like the applicant.

Consider the following as possible ways to formulate the group:

➢ Sexual minorities in Country X. This may be an appropriate particular social group in cases where the persecutor in question perceives any sexual minority as "outside the norm" but does not necessarily distinguish between orientation, gender, and sex. It might also be appropriate where there are a variety of traits involved in the claim, but the persecutor's animus toward those different traits stems from a more general animus toward all sexual minorities. This might be the case, for example, in a situation where an applicant has an intersex condition or has undergone Sex Reassignment Surgery (SRS) in the United States after having been harmed in the past for simply being perceived as gay. This prevents the need to analyze past and future harm for two separate groups when past and future harm are both based on the applicant's sexual minority status. (Example: "sexual minorities in Mexico" in lieu of "transgender Mexican women perceived as homosexual Mexican men cross-dressing as women.");

➢ Gay, lesbian, transgender, or HIV-positive (choose one) / men or women (choose one) / from Country X (choose one) (Example: "Lesbian women from

---

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 17 of 68

IFR_AR_010037

Uganda."); or

➢ Men or women (choose one) / from Country X (choose one) / <u>imputed to be</u> gay, lesbian, transgender, or HIV-positive (choose one) (Example: "men from Ghana imputed to be gay.")

## 3.2    "On Account Of"/Nexus

### 3.2.1    The Persecutor's Motive and the Applicant's Experience

The "on account of" requirement focuses on the motivation of the persecutor. The persecutor in most LGBTI cases seeks to harm the individual based on the individual's perceived or actual sexual orientation, on the persecutor's belief that the applicant transgresses traditional gender boundaries, or on the persecutor's more general animus toward sexual minorities of any kind. In some situations, the persecutor may have been trying to "cure" the applicant of his or her sexual orientation or gender identity.[28] Most persecutors may not have been making the distinction between gay, lesbian, bisexual, transgender, intersex, or HIV-positive. They may simply have harmed or want to harm the applicant based on their perception that the applicant is gay or a sexual minority that is "outside the norm."

The applicant must provide some evidence, direct or circumstantial, that the persecutor is motivated to act against the applicant because he or she possesses or is believed to possess one or more of the protected characteristics in the refugee definition.[29] For example, in an LGBTI claim, you would consider evidence that the persecutor harmed or tried to change the applicant because the persecutor knows or believes the applicant belongs to a sexual minority.

This evidence may include the applicant's testimony regarding:

- what the persecutor said or did to the applicant

- what the persecutor said or did to others similar to the applicant

- the context of the act of persecution (for example, if the applicant was attacked in a gay bar or while holding hands with a same-sex partner)

- reliable Country of Origin Information (COI) that corroborates such testimony

It is critical that you ask the applicant questions about what the persecutor may

---

[28] *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *Pitcherskaia v. INS*.

[29] *Elias-Zacarias v. INS*, 502 U.S. 478 (1992).

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 18 of 68

IFR_AR_010038

> have said to him or her when the harm was inflicted or when the threats were made.

As with other types of refugee or asylum claims, there is no malignant intent required on the part of the persecutor, as long as the applicant experiences the abuse as harm.[30] State and non-state actors may inflict harm on LGBTI persons with the intention of curing or treating them, for example, through what is effectively medical abuse or forced marriage.[31] (*See Types of Harm That May Befall Sexual Minorities, Forced Psychiatric or Other Efforts to "Cure" Homosexuality* below.)

### 3.2.2 Prosecution vs. Persecution

The U.S. Supreme Court has made it clear that intimate sexual activity between consenting adults is a constitutionally protected activity.[32] This constitutional principle, while not directly applicable to the analysis of an asylum or refugee claim, is consistent with the recognition that punishing conduct or sexual activity between consenting adults of the same sex is tantamount to punishing a person simply for being gay. If a law exists in another country that prohibits intimate sexual activity between consenting adults, enforcement of the law itself may constitute persecution and not simply prosecution.[33]

## 4  LEGAL ANALYSIS – PERSECUTION AND ELIGIBILITY BASED ON PAST PERSECUTION

In evaluating whether harm constitutes persecution in an LGBTI-related case, you should consider the same factors as in any other protection case. The relevant considerations are: 1) does the harm rise to the level of persecution; 2) is the harm inflicted on account of a protected ground; and 3) is the persecutor the government or an individual or entity from which the government is unable or unwilling to provide reasonable protection?

Because the amount of harm that rises to the level of persecution is discussed in detail in the RAIO Training module, *Definition of Persecution and Eligibility Based on Past Persecution*, this section focuses on the types of harm directed at sexual minorities.

### 4.1  Types of Harm That May Befall Sexual Minorities

---

[30] *Kasinga*.

[31] *Pitcherskaia*.

[32] *Lawrence v. Texas*, 539 U.S. 558 (2003).

[33] *Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005).

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*    Page 19 of 68

IFR_AR_010039

The types of harm directed at LGBTI applicants vary and include the same types of harm that are directed at other applicants. LGBTI individuals, however, may face unique harm or may be more vulnerable to specific types of harm than other applicants.[34]

When considering whether harm will amount to persecution, you must not only consider the objective degree of harm or whether the harm rises to the level of persecution, but also whether the applicant personally experienced or would experience the act(s) as serious harm.[35] You must evaluate the opinions and feelings of each applicant individually. Because each case is unique and each applicant has his or her own psychological makeup, interpretations of what amounts to persecution vary widely.[36]

While discrimination is often a fundamental part of claims made by LGBTI individuals, applicants also frequently reveal having experienced serious physical and sexual violence. These incidents of harm must be assessed in their totality. They must be analyzed in light of prevailing attitudes with regard to sexual orientation and gender identity in the country of origin.

## Violation of Fundamental Rights

Being compelled to abandon or conceal one's sexual orientation or gender identity may cause significant psychological and other harms that may amount to persecution.[37] LGBTI persons who live in fear of being publicly identified often conceal their sexual orientation in order to avoid the severe consequences of such exposure - including the risk of incurring harsh criminal penalties, arbitrary arrests, physical and sexual violence, dismissal from employment, and societal disapproval.

## Criminal Penalties

---

[34] *See* UN High Commissioner for Refugees (UNHCR), *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, 23 October 2012, HCR/GIP/12/01, paragraphs 20-25.-

[35] *See* RAIO Training module, *Definition of Persecution and Eligibility Based on Past Persecution*, "Whether the Harm Experienced Amounts to Persecution, General Considerations, Individual Circumstances."

[36] *Id.*; UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, paragraphs 40, 51, and 52, reedited Geneva, January 1992.

[37] UN High Commissioner for Refugees (UNHCR), *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, 23 October 2012, HCR/GIP/12/01, paragraph 33.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 20 of 68

IFR_AR_010040

In some countries, homosexuality is criminalized and, if discovered by the authorities, a lesbian or gay man may be arrested or imprisoned based on her or his sexual orientation.[38]

In some countries, individuals accused of consensual sex with a member of the same sex may be subject to prosecution and even death.[39] For example, in Mauritania any Muslim male who engages in a sexual act with another male is subject to death by stoning; in Kenya, the Penal Code explicitly states that engaging in a consensual sexual act between two men is a felony and punishable by up to imprisonment for five years.[40]

In other countries, there may not be laws that actually prohibit homosexuality, but authorities may still persecute people because of their sexual orientation.[41] Thus, applicants have been arrested, detained, beaten, sexually assaulted, and/or forced to pay bribes by police or army officials because of their sexual orientation, even if a non-discriminatory legal basis is used as a pretext for the action.[42]

## Rape and Sexual Violence

Because LGBTI people are often perceived as undermining gender norms, they are at heightened risk for sexual violence in many countries.[43] Rape and sexual assault are types of harm that rise to the level of persecution.[44] Other types of sexual violence, for example being forced to perform sexual acts upon another, may also constitute persecution.[45] Some applicants may have been raped as a measure to "correct" their behavior or status or as a means of punishing them for being gay or "outside the norm."

## Beatings, Torture, and Inhumane Treatment

Many LGBTI people are subjected to severe forms of physical violence. An applicant may have been the victim of repeated physical violence that the police never investigated

---

[38] Aengus Carroll and Lucas Paoli Itaborahy, International Lesbian, Gay Bisexual, Trans and Intersex Association, *State Sponsored Homophobia: A World Survey of Laws Prohibiting Same-Sex Activity Between Consenting Adults*, May 2015, *available at:* https://www.refworld.org/docid/50ae380e2.html.

[39] *Id.*

[40] *Id.*

[41] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[42] *Maldonado v. Att'y Gen. of U.S.*, 188 F. App'x 101, 103 (3d Cir. 2006); *see also Nowhere to Turn: Blackmail and Extortion Of LGBT People in Sub-Saharan Africa*. International Gay and Lesbian Human Rights Commission IGLHRC.

[43] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[44] *See, e.g., Haider v. Holder*, 595 F.3d 276, 287-288 (6th Cir. 2010); *Ndonyi v. Mukasey*, 541 F.3d 702, 710 (7th Cir. 2008); *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1088 (9th Cir. 2005).

[45] *Ayala v. U.S. Atty Gen.*, 605 F.3d 941 (11th Cir. 2010).

or that the police themselves perpetrated.[46] Many applicants have been seriously harmed by members of their own family.[47]

Claims made by LGBTI persons often reveal exposure to physical and sexual violence, extended periods of detention, medical abuse, the threat of execution, and honor killing. Generally, these are acts of harm that would rise to the level of persecution.

LGBTI individuals can also experience other forms of physical and psychological harm, including harassment, threats of harm, vilification, intimidation, and psychological violence that can rise to the level of persecution, depending on the individual circumstances of the case and the impact on the particular applicant.

### Forced Medical Treatment

The case of an individual with an intersex condition may involve the applicant's fear or history of non-consensual surgery and other non-consensual medical treatment. In other cases, the applicant's fear may involve the lack of medical care in their home country.

### Forced Psychiatric Treatment or Other Efforts to "Cure" Homosexuality

Many cultures see homosexuality as a disease, a mental illness, or a severe moral failing. Forced efforts to change an individual's fundamental sexual orientation or gender identity may rise to the level of persecution; for example, such "treatments" as forced institutionalization, electroshock therapy, and forced drug injections could cause harm serious enough to constitute persecution. It is important to remember that there is no requirement that harm be inflicted with the intent to harm the victim.[48] Rather, you should assess whether it is objectively serious harm and was experienced as serious harm by the applicant.

### Discrimination, Harassment, and Economic Harm

Many LGBTI people are disowned by their families if their sexual orientation or transgender identity becomes known.[49] It is important to consider such mistreatment within the context of the applicant's culture. In many countries, it is virtually impossible for an unmarried person to find housing outside of his or her family home. Likewise, in many cultures, it would be impossible for a woman to find employment on her own. In such cultures, being disowned by one's family in and of itself could be found to rise to the level of persecution, since it would have such severe consequences.

---

[46] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[47] *Gonzalez-Posadas v. Att'y Gen. of the U.S.*, 781 F.3d 677, 680 (3d Cir. 2015); *Ixtlilco-Morales v. Keisler*, 507 F.3d 651 (8th Cir. 2007).

[48] *See Kasinga* and *Pitcherskaia*.

[49] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 22 of 68

IFR_AR_010042

Some applicants may have been threatened by neighbors or had their property vandalized. Others may have been repeatedly fired from jobs and found it impossible to engage in any form of employment once their sexual orientation became known. While being fired from a job generally is not considered persecution, if an individual can demonstrate that his or her LGBTI status would make it impossible to engage in any kind of gainful employment, this may constitute persecution. For example, in many countries transgender people face such severe discrimination that the only way they can survive is by engaging in prostitution.

Discrimination and harassment may amount to persecution if cumulatively they are sufficiently severe.[50] This may be the case, for example, where an LGBTI person is consistently denied access to normally available services in his or her private life or workplace, such as education, welfare, health, and access to the courts.

## Forced Marriage

LGBTI persons may be unable to engage in meaningful relationships, be forced into arranged marriages, or experience extreme pressure to marry.[51] They may fear that failure to marry will reveal them to be LGBTI to their family and to the public at large. Societal and cultural restrictions that require them to marry individuals in contravention of their sexual orientation may violate their fundamental right to marry and may rise to the level of persecution.[52] For instance, a lesbian who has no physical or emotional attraction to men and is forced to marry a man may experience this as persecution. Likewise, a gay man who is in no way attracted to women who is forced to marry a woman may experience this as persecution.

## Gender-Based Mistreatment

Any LGBTI individual may experience gender-based mistreatment. For instance, lesbians often experience harm as a result of their gender as well as their sexual orientation. The types of harm that a lesbian may suffer will frequently parallel the harms in claims filed by women in general more closely than the harms in gay male asylum claims.[53] Likewise, before "coming out," transgender men are generally raised as girls and may experience the same types of harm. In many parts of the world persecution faced by lesbians may be

---

[50] See _Kadri v. Mukasey_, 543 F.3d 16 (1st Cir. 2008); _Matter of T-Z-_, 24 I&N Dec. 163, 169-71 (BIA 2007) (adopting the standard applied in _Matter of Laipenieks_, 18 I&N Dec. 433 (BIA 1983), rev'd on other grounds, 750 F.2d 1427 (9th Cir. 1985); _but see Lopez-Amador v. Holder_, 649 F.3d 880, 885 (8th Cir. 2011) (officer's verbal harassment of alien [perceived to be a lesbian] was not persecution).

[51] UN High Commissioner for Refugees (UNHCR), _Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees_, 23 October 2012, HCR/GIP/12/01, paragraph 23.

[52] _Id._

[53] See Victoria Neilson, _Applying Gender-Based Asylum Jurisprudence to Lesbian Asylum Claims_, 16 Stanford Law & Policy Review 417 (2005).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
_RAIO Combined Training Program_                                                    Page 23 of 68

IFR_AR_010043

less visible than that encountered by gay men. Lesbians and transgender women may be particularly vulnerable to rape by attackers who wish to punish them for their sexual identity. This can include retaliation by former partners or husbands. In addition, gay men may experience harm as a result of their gender or sexual orientation.

Transgender individuals may be more visible and may be viewed as transgressing societal norms more than gay men or lesbians. Therefore, they may be subject to increased discrimination and persecution and may be vulnerable even in regions where lesbians and gay men may have greater protections.[54]

## 4.2    Agents of Persecution

The second step in the analysis of whether harm constitutes persecution is to determine if the agent of persecution is the government or a nongovernment actor. It is well established that an applicant can qualify for refugee or asylum status whether the persecutor is the government or an individual or entity from whom the government is unable or unwilling to provide reasonable protection. While the applicant must show a nexus between the harm and a protected ground, he or she is not required to show that the government was unwilling to control those actors because of the applicant's protected characteristic, such as being LGBTI.[55]

In LGBTI cases governmental agents of persecution may include the police, military, or militias. Family, relatives, neighbors, and other community members are examples of non-governmental agents of persecution.

> In asylum processing, if the applicant establishes past persecution on account of one of the five protected grounds, he or she is presumed to have a well-founded fear of persecution in the future. The burden then shifts to USCIS to show that there has been a fundamental change in circumstances or that the applicant can reasonably relocate within the country of origin. If USCIS does not meet this burden, it must be concluded that the applicant's fear is well-founded.
>
> To be eligible for resettlement as a refugee in the United States, an applicant must establish either past persecution or well-founded fear of persecution on account of a protected ground. Therefore, in general, a refugee applicant who is found to have suffered past persecution but who does not have a well-founded fear of future persecution is still able to establish that he or she meets the refugee definition. There is no rebuttable presumption or burden shifting as there is in asylum

---

[54] *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1083 (9th Cir. 2015); Ellen A. Jenkins, *Taking the Square Peg Out of the Round Hole: Addressing the Misclassification of Transgender Asylum Seekers,* 40 Golden Gate U.L. Rev. (2009).

[55] *Doe v. Holder*, 736 F.3d 872 (9th Cir. 2013).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                Page 24 of 68

IFR_AR_010044

processing.

## 4.3    Internal Relocation and Fundamental Change of Circumstances

The issue of internal relocation arises when determining whether an applicant has established a well-founded fear or, in the context of asylum, whether the presumption of a well-founded fear is rebutted by the reasonable possibility of internal relocation. In the asylum context, once an applicant has established past persecution, the burden then shifts to the Government to show that internal relocation is reasonable. In cases where the persecutor is a government or government sponsored, there is a presumption that internal relocation is not reasonable. In some cases there may be evidence to rebut that presumption, such as, for example, evidence that the government's authority is limited to certain parts of the country.[56] Homophobia, "whether expressed in laws or people's attitudes and behavior, often tends to exist nationwide."[57] A law of general applicability, such as a penal code that criminalizes homosexual conduct, which is enforceable in the place of persecution, would normally also be enforceable in other parts of the country of origin.[58]

Where a nongovernmental actor is the persecutor, the government's inability or unwillingness to protect the applicant in one part of the country may also be evidence that it is unwilling or unable to do so in other parts of the country.[59] He or she should not have to depend on anonymity to avoid the reach of the persecutor. While a major capital city "in some cases may offer a more tolerant and anonymous environment, the place of relocation must be more than a 'safe haven.'" The applicant must also be able to access a minimum level of political, civil, and socioeconomic rights.[60] Thus, he or she must be able to access the protection in a genuine and meaningful way. The existence of LGBTI-related nongovernmental organizations does not in itself provide protection from persecution.

In the asylum context, the presumption of a well-founded fear of future persecution also can be rebutted by a preponderance of the evidence that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of

---

[56] Ellen A. Jenkins, *Taking the Square Peg Out of the Round Hole: Addressing the Misclassification of Transgender Asylum Seekers*, 40 Golden Gate U.L. Rev. (2009).

[57] UNHCR *Guidance Note on Refugee Claims Relating to Sexual Orientation and Gender Identity* at paragraph 33.

[58] *Id*.

[59] UN High Commissioner for Refugees (UNHCR), *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, 23 October 2012, HCR/GIP/12/01, paragraph 54.

[60] *Id*. at paragraph 56.

USCIS: RAIO Directorate – Officer Training                              DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                    Page 25 of 68

IFR_AR_010045

persecution. In making this determination, you must weigh all available evidence, including current country conditions and the circumstances of the individual applicant. Country condition reports can be particularly useful in examining whether there has been a fundamental change after a long absence from a country. For example, in *Neri-Garcia v. Holder*, the Tenth Circuit affirmed an immigration judge's determination of a fundamental change in circumstances based on country reports for 2009 and 2010 of a "growing social acceptance in Mexico" toward sexual minorities, even with continued discrimination.[61] The court, in applying a deferential standard of review that was limited to the record evidence, took into account that the petitioner failed to introduce evidence to counter these country reports, other than his and a witness's assertions that conditions had not changed in nearly twenty years.[62] In contrast, with a different record of evidence, the Seventh Circuit in *Rosiles-Camarena v. Holder*, suggested that both case-specific facts and country-wide conditions should be taken into account in examining the risk of a sexual minority applicant returning to Mexico.[63] In that case, the court noted the petitioner's contention of greater risk of harm to him than "a statistical risk of death for homosexuals as a group," due to such factors as his planning to live openly with his same-sex partner if returned to Mexico, being HIV-positive, not benefiting from familial support in Mexico, and being unfamiliar with the country's contemporary customs as he had spent the bulk of his life in the United States.[64] Further, on a somewhat separate point, in *Avendano-Hernandez v. Lynch*, in examining country conditions information as it related to a fear of torture by a transgender woman from Mexico, the Ninth Circuit ruled that the Board "erred in assuming that recent anti-discrimination laws in Mexico have made life safer for transgender individuals while ignoring significant record evidence of violence targeting them."[65]

# 5    LEGAL ANALYSIS – WELL FOUNDED FEAR

LGBTI-specific issues may also arise in cases where the applicant has not experienced past persecution, but may nevertheless have a well-founded fear of persecution. Because well-founded fear is discussed in detail in the ADOTC and RDOTC *Well-Founded Fear* lessons, this section focuses on common well-founded fear issues raised in LGBTI claims.

## 5.1    Objective Elements

---

[61] *Neri-Garcia v. Holder,* 696 F.3d 1003, 1007 (10th Cir. 2012).

[62] *See id.* at 1008.

[63] *Rosiles-Camarena v. Holder*, 735 F.3d 534, 539 (7th Cir. 2013) (examining facts related to the likelihood of future persecution, rather than a fundamental change in circumstances).

[64] *Id.*

[65] *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1075 (9th Cir. 2015).

An applicant may qualify for asylum or refugee status even if he or she was not persecuted in the past but has a well-founded fear of future persecution. To establish well-founded fear, the applicant must have a subjectively genuine fear and an objectively reasonable fear of return.

The existence of certain objective elements in a particular claim will not necessarily undermine the applicant's subjective fear or credibility. For example, just because a country permits an LGBTI organization to exist or allows an annual public LGBTI event does not mean that LGBTI people are free from ongoing violence and harm in that country.

Some countries with laws that state that their citizens and nationals are guaranteed religious, political, or other freedoms often do not enforce these protections. Similarly, some countries have anti-discrimination laws that seemingly protect LGBTI individuals, but in reality the laws are not enforced or are openly disregarded.

## 5.2    Fear of Future Persecution

An applicant should not be expected to suppress his or her sexual orientation or gender identity in order to avoid future persecution.[66] Conversely, LGBTI applicants who have concealed their sexual minority status in their home countries might not have experienced harm that rises to the level of persecution.[67] These applicants need not show that the persecutor knew about their sexual orientation before leaving, only that the persecutor may become aware of it if they return. In addition, it is not reasonable to expect an applicant to conceal his or her sexual minority status.

## 5.3    Refugees *Sur Place*

A *sur place* claim for refugee status may arise as a consequence of events that have occurred in the applicant's country of origin since his or her departure, or as a consequence of the applicant's activities since leaving his or her country of origin. This may also occur where he or she has been "outed" to members of his or her family back home or where his or her LGBTI status or views on sexual orientation have been publicly

---

[66] *Karouni v. Gonzales*, at 1173 (reasoning that to require the respondent to abstain from future homosexual acts if he wished to avoid persecution would effectively force him "to change a fundamental aspect of his human identity" …. and forsake the intimate contact and enduring personal bond that the Due Process Clause of the Fourteenth Amendment protects from impingement in this country and that 'ha[ve] been accepted as an integral part of human freedom in many other counties.'")

[67] UN High Commissioner for Refugees (UNHCR), *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, 23 October 2012, HCR/GIP/12/01, paragraphs 30, 57.

expressed, for example by taking part in advocacy campaigns, demonstrations, or other human rights activism on behalf of LGBTI individuals.

Additionally, LGBTI applicants might have left the country of origin for a reason other than their sexual orientation, for example to pursue employment and educational opportunities in the United States and have "come out" after arrival in the country of asylum or first refuge. These applicants may qualify for refugee or asylum status if they can demonstrate a well-founded fear of future persecution.

You should carefully consider whether the applicant's sexual orientation or gender identity may come to the attention of the authorities or relatives in the country of origin and the ensuing risk of persecution. Keep in mind that in making this analysis, it is not appropriate to assume that an individual who is lesbian, gay, or bisexual could "go back in the closet" or that a transgender individual who is living in their "corrected gender" could go back to living in the gender he or she was assigned at birth.[68]

As with all claims based solely on a fear of future persecution, the claim must meet the four elements in the *Mogharrabi* test. *See RAIO training module Well-Founded Fear*.

In the asylum context, there are some one-year filing deadline issues that may arise specifically in the context of LGBTI *sur place* claims. *See* Asylum Adjudications Supplement - One-Year Filing Deadline, below.


## 6    INTERVIEW CONSIDERATIONS

It is important to create an interview environment that allows applicants to freely discuss the elements and details of their claims and to identify issues that may be related to sexual orientation or imputed sexual orientation. Like most gender-based claims, LGBTI claims involve very private topics that are difficult for applicants to talk about openly. LGBTI applicants may hesitate to talk about past experiences and may be afraid they will be harmed again because of their actual or perceived sexual orientation or gender identity. For many, it will be very difficult to talk about something as private as sexual orientation, gender identity, or HIV-positive status. Furthermore, discussing some of these issues may also be challenging for you. It is therefore especially important for you to create an interview environment that is open and non-judgmental so that the applicant feels comfortable explaining the details of his or her claim.[69]

This section should be considered along with the guidance contained in the RAIO *Interviewing* modules, which also address issues related to sexual minorities.

The following may help you interact more meaningfully with LGBTI applicants during an interview.

---

[68] *Id*; *see also* Karouni v. Gonzales, 399 F.3d at 1173.

[69] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 28 of 68

IFR_AR_010048

## 6.1    Pre-Interview Considerations

### 6.1.1    File Review

Before the interview, when you review each file, be mindful of any LGBTI-related issues in the claim. Due to the delicate and personal issues that surround sexual abuse, sexual orientation, and gender identity, some applicants may have inhibitions about disclosing past experiences to an interviewer of a particular sex. Some LGBTI applicants may be more comfortable discussing their experiences with officers of a particular gender, particularly in cases involving rape, sexual abuse, or other sexual violence.

To the extent that personnel resources permit, an applicant's request for an interviewer of a particular sex should be honored. If a pre-interview review of the file indicates that the case may involve sensitive LGBTI-related issues, you may consult with your supervisor or team leader prior to the interview to evaluate whether it would be more appropriate for an officer of a particular sex to conduct the interview. You may also wish to confirm at the beginning of the interview that the applicant feels comfortable discussing all aspects of the claim with you.

### 6.1.2    How the Presence of Family and Relatives May Affect the Interview

For a variety of reasons, the presence of relatives may help or impede an applicant's willingness to discuss LGBTI-related persecutory acts or fears. For example:

- The applicant's relatives may not be aware of the harm he or she experienced. He or she may wish that the relative remain unaware of those experiences or may be ashamed to say what he or she has experienced or fears in front of a relative. In addition, the applicant's claim may be based, in part, on fear of the relative who is present.

- Or, the applicant may want a family member or significant other present during the interview. Sometimes having a loved one present can provide support to the applicant when recounting traumatic events.[70]

Therefore, to the extent possible, the choice of whether to be interviewed alone or with a relative present should be left to the applicant. The applicant should be asked his or her preference, when possible, in private, prior to the interview.

If the applicant elects for the relative to be present at the interview, you should exercise sound judgment during the interview, determining whether the presence of the relative is impeding communication. If it appears that relative's presence is interfering with open communication, the relative should be asked to wait in the waiting room.

---

[70] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                     Page 29 of 68

IFR_AR_010049

In some cases, an applicant will bring a partner to the interview to testify as corroboration of the applicant's sexual orientation or gender identity. If you feel that this corroboration would be helpful, the partner should be permitted to testify. You may exercise discretion and request that the witness's testimony be submitted in writing.

### 6.1.3    How the Presence of Interpreters May Affect the Interview

Interpreters play a critical role in ensuring clear communication between you and an LGBTI applicant. The actions of an interpreter can affect the interview as much as those of the interviewing Officer. As in all interviews, you should confirm that the applicant and the interpreter fully understand each other.

As explained in greater detail in the RAIO training module *Working with an Interpreter,* an applicant's testimony on sensitive issues such as sexual abuse may be diluted when received through the filter of an interpreter. The applicant may not feel comfortable discussing such LGBTI issues with an interpreter of the same nationality, ethnicity, or clan, etc.

The same holds true for the interpreter; even if the applicant feels comfortable using a particular interpreter, the interpreter may be inhibited about discussing LGBTI-related issues or using certain terms. For example, the interpreter may substitute the word "harm" for "rape" because the interpreter is not comfortable discussing rape due to cultural taboos.[71]

### 6.1.4    Reviewing Biographical Information with the Applicant

For transgender applicants, it is best to ask at the beginning of the interview what pronoun the applicant feels more comfortable with and to ask if there is a name he or she prefers using. For example, if an individual with a female appearance who has described her claim as based on transgender identity, has filled in the biographical information of the application form with an obviously male name, you should ask if there is a name she would prefer that you use.

One of the biographical information questions on the forms is "gender." Since this issue may be sensitive and go to the heart of the applicant's claim, it may be better to come back to this question at the end of the interview after the applicant has described the steps he or she has taken to "transition," rather than at the beginning of the interview. The early part of the interview should be devoted, in part, to putting the applicant at ease. If you immediately question the legitimacy of the "gender" box that he or she has checked off, the applicant may be uncomfortable for the rest of the interview.

---

[71]*See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 30 of 68

IFR_AR_010050

USCIS has issued guidance explaining the process for issuing initial or amended documentation reflecting the applicant's post-transition gender. [72] It is important to note that proof of sex reassignment surgery is *not* required and USCIS will not ask for records relating to any such surgery. [73]

When going through the biographical information on the application form at the beginning of the interview, it is appropriate for you to inquire whether the applicant has legally changed his or her name. If yes, you can request the legal name change documents. If no, you should explain why it is necessary to use the legal name on the form, but that during the interview you will refer to the applicant by the name that the applicant feels most comfortable using.[74]

**Note**: If the applicant provides any new name or gender information, additional database systems may need to be updated and further security checks may be required. Please refer to USCIS and division procedures for updating name and gender information.

## 6.2    Suggested Techniques for Eliciting Testimony

### 6.2.1    Setting the Tone and Putting the Applicant at Ease

While you must conduct all of your interviews in a non-adversarial manner, it is crucial when interviewing LGBTI applicants that you set a tone that allows the applicant to testify comfortably and that promotes a full discussion of the applicant's past experiences. You must conduct the interview in an open and nonjudgmental atmosphere designed to elicit the most information from the applicant.

You should be mindful that for many people there is no topic more difficult to discuss with a stranger than matters relating to sexual orientation, gender identity, and serious illness.[75] Furthermore, many applicants have been physically and sexually abused, harassed, tormented, and humiliated over many years because of their actual or perceived sexual orientation or gender identity.

> Asking questions about difficult or private issues is a sensitive balancing act you face in all interviews. On the one hand, you need to obtain detailed testimony from the applicant. On the other hand, you do not want to badger or traumatize the applicant. The most important thing to understand is that this may be a difficult

---

[72] USCIS Policy Memorandum on *Adjudication of Immigration Benefits for Transgender Individuals*, August 10, 2012.

[73] *Id.*

[74] *Id.*

[75] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 31 of 68

IFR_AR_010051

> topic for the applicant to talk about and to be respectful in discussing sexual orientation, gender identity, and serious illness.[76]

You can help alleviate some of the applicant's reluctance to discuss some of these issues by incorporating the following suggestions into your interviews:

**Remind the applicant that the interview is confidential.** It can also help to ease the applicant's nervousness if you explain confidentiality to the interpreter in the presence of the applicant.

**Be particularly sensitive when questioning the applicant about past sexual assault.** Applicants may be reluctant to talk about actual or perceived sexual orientation or to disclose experiences of sexual violence. This may be especially true for LGBTI applicants who are not "out of the closet" or where the applicant was sexually assaulted. In many societies, sexual assault is seen as a violation of community or family morality for which the victim is held responsible. The combination of shame and feelings of responsibility and blame for having been victimized in this way can seriously limit an LGBTI applicant's ability to discuss or even to mention such experiences.[77]

> **Explore all relevant aspects of the claim, even if they may be difficult to discuss.** While you must be sensitive as you interview an applicant regarding such delicate topics, at the same time you must not shy away from your duty to elicit sufficient testimony to make an informed adjudication. This may include instances involving sexual violence. It is critical that you ask all necessary and relevant follow-up questions to help the applicant develop his or her claim.[78]
>
> It is important to remember that in the nexus analysis, the relevant inquiry is not whether the applicant actually possesses the protected trait. Rather, it is whether the persecutor believes the applicant possesses the trait (either because the applicant does possess it or because the persecutor imputes it to the applicant). Thus, the issue is not whether the applicant actually is LGBTI, but whether the persecutor believes that he or she is, either because the applicant possesses the characteristic or because the persecutor imputes it to the applicant.
>
> It is not necessary to probe the details of the applicant's personal life beyond what is necessary to make this specific determination. So, once you have established that the persecutor perceives the applicant to have a protected trait, further inquiry into the specific nature of the applicant's LGBTI status is not necessary to establish

---

[76] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[77] *See* RAIO Training Module, *Gender Related Claims*.

[78] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 32 of 68

IFR_AR_010052

> inclusion in a particular social group.

**Try to use the same language that the applicant has used in his or her own application.** If an applicant refers to himself as "gay," you should use this term, rather than "homosexual" and vice versa. The most important thing is to understand what a difficult topic this may be for the applicant to discuss and to be respectful.[79]

**Do not assume that being a sexual minority is a lifestyle or a choice.** This will help you avoid asking questions in a way that may put the applicant on the defensive and result in the applicant holding back information rather than imparting it.[80]

**Become familiar with the legal issues, terminology, and questioning techniques specific to the LGBTI community.** You can use this information to help the applicant tell his or her own story.

**Be mindful that the applicant and the interpreter may not be familiar with many of these issues or terms.** While many LGBTI individuals in the United States embrace their LGBTI identity and have a language to talk about these issues, for many LGBTI individuals who come from countries where topics of sexuality are taboo, the way that applicants express themselves may be different from what an interviewer would expect from an LGBTI person in the United States.[81]

The fact that an applicant may be uncomfortable with these terms may be a result of the fact that he or she comes from a culture where there is no word for homosexuality or transgender identity. It may be a result of his or her own ingrained homophobia from growing up in a culture where such terms were the equivalent of insults.[82]

**Become well-versed in country of origin information.** This allows you to ask relevant follow-up questions. The more you know about the applicant's country of origin, the less likely you will be to miss important facts. Additionally, awareness of country conditions may also assist you in conducting the interview with cultural sensitivity and may help you put the applicant at ease during the interview. If the applicant notices that you took the time to try to understand the situation he or she faces in the country of origin as an LGBTI individual, he or she may be more inclined to talk in detail about his or her experiences and fears.

## 6.2.2   Explore all possible grounds

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 33 of 68

IFR_AR_010053

Many LGBTI applicants may not know that their sexual orientation, gender identity, HIV-positive status, or intersex condition is the basis for a protection claim and may be reluctant to talk about these topics because they are so private. This is especially true where applicants are not represented. They may only put forward the elements of their past experiences that their family or members of their communities recommend.

---

For example, an applicant from Colombia appears before you for an interview. The majority of claims you have adjudicated from Colombia involve fear of the FARC. The applicant tells you about all of the instances when he has had contact with the FARC. At the end of the interview you have already begun to analyze the case and despite being credible, your assessment is that the applicant has not established nexus, past persecution, or well-founded fear.

When you ask the applicant if there is any other reason he fears returning to Colombia, he appears to have something more to say, but hesitates. You suspect that there may be an issue that the applicant has not put forward. In this situation it would be appropriate to try to explain to the applicant that there is more than one ground for asylum or refugee status.

"Refugee (or asylum) status is a case-by-case determination made based on an individual's unique circumstances and is not just for people fleeing because of political opinion. Individuals who are afraid to return because of their religion, sexual orientation, clan membership, or because of domestic violence may also be eligible. Are there any other circumstances affecting you that you would like to tell me about?"

It is important to remember that the applicant would still be required to provide credible testimony regarding past harm and/or fear of future harm on account of one of the five protected grounds.

---

### 6.2.3   Sample Questions

The following are appropriate types of questions to elicit testimony and assess credibility in LGBTI cases. Please note that these questions are intended as starting points and should not be used as a substitute for all necessary lines of inquiry and follow-up questions during your adjudication. In other words, it is good to have a general outline of questions you need to ask or questions you need the answers to, but not a script. Remember, credible testimony alone may be enough and, other than reliable country of origin information, is often the only other evidence the applicant submits to you.

*Sexual Orientation*

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 34 of 68

IFR_AR_010054

## Appropriate Lines of Inquiry

The most common LGBTI claims are based on sexual orientation and involve gay men, and to a lesser extent lesbian women. If the applicant was aware that he or she was lesbian, gay, or bisexual while in the country of origin, it is important to ask about his or her personal experience and his or her awareness of any similarly situated people.[83] The applicant should be able to describe what it was like identifying with his or her sexual orientation. Likewise, the applicant should be able to describe his or her first relationship, and the harm he or she suffered or fears in the home country. Keep in mind that this might only be true if the person is "out."

These questions focus on the possession or perceived possession of a protected characteristic. You must also ask about past harm and fear of future harm.

The following are some suggested questions when adjudicating claims that involve the applicant's sexual orientation:[84]

- When did you first realize you were gay (or lesbian or bisexual)?
- Did you tell anyone?
- Why/why not?
- If yes, when?
- How did they react?
- Did you know other gay people in your home country?
- If yes, how were they treated?
- Did you hear about other gay people in your home country?
- If yes, how were they treated?
- Have you met any other gay people?
- Where?
- Does your family know you're gay?
- If yes, what was their reaction when they found out?
- Have you ever been in a relationship?
- How did you and your partner meet?
- Are you still together/ in touch?
- How do lesbian [or gay, or bisexual] people meet one another in your

---

[83] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[84] *Id.*

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                  Page 35 of 68

IFR_AR_010055

country?

- Were you involved in any LGBTI organizations in your country?

- Are you involved in any LGBTI organizations here?

- When you say people in your country want to kill people like you, can you explain what you mean by "people like you?"

**Inappropriate Lines of Inquiry**

The applicant's specific sexual practices are not relevant to the claim for asylum or refugee status. Therefore, asking questions about "what he or she does in bed" is never appropriate.[85] If the applicant begins to volunteer such information, you should politely tell him or her that you do not need to hear these intimate details in order to fairly evaluate the claim.

### *Gender Identity*[86]

**Appropriate Lines of Inquiry**

A transgender applicant may identify as straight, lesbian, gay, or bisexual, and that gender identity has to do with the person's inner feelings about his or her sexual identity.[87] Most transgender people consider themselves to be male or female. Therefore, do not think of "transgender" as a gender.

Male to female (M to F) transgender individuals were assigned the male gender at birth and consider themselves to be female. They are called transgender women.[88] Female to male (F to M) transgender individuals were assigned the female gender at birth and consider themselves to be male. They are called transgender men.[89]

Some individuals do not subscribe to the male/female gender binary. They may identify with neither gender, with a third gender, or with a combination of both genders. These individuals may or may not identify with the broader transgender community but may also face harm because of their gender identity.

When interviewing an applicant who is transgender or has another claim based on gender identity, start off with easy questions and gradually ease into asking the more sensitive ones; be cognizant not to put words in the applicant's mouth. It is important to remember

---

[85] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[86] For further reading, see National Center for Transgender Equality, *Questionable Questions About Transgender Identity* https://transequality.org/issues/resources/questionable-questions-about-transgender-identity (last updated: Sept. 2, 2016).

[87] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[88] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[89] *Id.*

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 36 of 68

IFR_AR_010056

that being transgender involves an overall dissatisfaction with the gender assigned at birth; it is not about having one particular surgery. In many cases it will be appropriate to ask the applicant about the steps he or she has taken to transition gender.[90] This question should be framed as one question among many that elicits the applicant's expression of his or her gender identity, as it is perceived by the persecutor and the society in which the applicant lived.[91]

The most important thing to remember is to be respectful and nonjudgmental. If you feel that it is necessary to ask a question that the applicant may perceive as intrusive, you should explain why the answer to the question is legally necessary. If you are confused about the applicant's self-identification, you should respectfully admit to feeling confused and ask the applicant to explain in his or her own words.[92]

The following are some suggested questions that, depending on the facts, may be appropriate when adjudicating a claim that involves the applicant's gender identity:[93]

- When did you first realize you were transgender? Or: When did you first realize that although you were born as a male (female) you felt more like a female (male)?

- How did you realize this?

- Did you know other transgender people in your country? Or: Did you know other people who felt like you in your country?

- If yes, how were they treated?

- Did you hear about other transgender people in your country?

- If yes, how were they treated?

- When did you begin to transition from a man to a woman or woman to a man?

- What steps have you taken to transition?

- Do you now live full-time as a man (or woman?) When did you begin to live full-time as a man (or woman)?

- Does your family know you're transgender?

- If yes, how did they react when they found out?

Many transgender applicants will not have begun to live full-time in their corrected gender until they have come to the United States.[94] In many cases, a person may discuss past mistreatment in terms of perceived sexual orientation. In these cases, it is appropriate to ask questions that pertain to sexual orientation as well as gender identity.

---

[90] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[91] *Id.*

[92] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[93] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[94] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

## Inappropriate Lines of Inquiry

If an applicant testifies that he or she was not accepted in his or her home country because "people think I look like a girl, but I'm a guy," do not follow up by asking "So, what are you?" Furthermore, do not put words in the applicant's mouth by asking such questions as: "You haven't had any surgery or anything like that, right? So you're a male who looks effeminate?"[95]

If the applicant has not indicated that he or she was harmed or fears being harmed for being gay, do not begin by asking the applicant if he or she is gay. It is important to remember that gender identity and sexual orientation are two different issues. A transgender applicant may also be gay, lesbian, or bisexual, but that is not necessarily the case. It is also important to remember that even if the applicant is heterosexual, he or she may be perceived as homosexual because he or she does not fit the societal norms for his or her gender. Instead, focus on the problems the applicant experienced in the country of origin and address the issue of sexual orientation later, if necessary.

This approach also ensures that your questioning is tailored to eliciting information that allows you to determine what trait the persecutor, and the society in question, perceives in the applicant. Since this is the evidence required to analyze the nexus requirement and the social distinction of the relevant social group, lines of questioning that focus on what the applicant experienced and how he or she was or would be viewed will likely be the most effective.

### *HIV Status*

## Appropriate Lines of Questioning

You should be mindful that HIV is a very serious illness and that many individuals, especially those from countries with fewer treatment options, see an HIV diagnosis as a death sentence. It is therefore imperative for you to be extremely sensitive in asking about the applicant's HIV status.[96]

If an applicant's case is based in whole or in part on his or her HIV-positive status, you will need to ask questions about this. It is appropriate to ask about the applicant's state of health, current treatment regimen, and the availability of treatment in the home country.[97]

In some cases, the applicant's HIV status may be directly related to the persecution, for example, where a lesbian was raped and believes this was her only possible risk for HIV exposure. If the applicant's HIV status is related to the harm the applicant suffered, it will be relevant for you to ask questions about this as well.

---

[95] *Id.*

[96] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[97] *Id*.

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                Page 38 of 68

IFR_AR_010058

Many cases involve an applicant's fear of harm based on the fact that his or her HIV-positive status may lead community members to assume, whether correctly or not, that he or she is gay.[98] If a claim is not based on the applicant's sexual orientation or gender identity and HIV status is not mentioned, it is not appropriate for you to ask the applicant if he or she is HIV-positive.

Some cases will involve an applicant's fear of violence, stigma, and extreme discrimination based on his or her HIV-positive status. In other instances, the applicant's primary fear may be the lack of medical care in his or her home country.

It is important to keep in mind that if an applicant's case is based on sexual orientation or gender identity and is not based on his or her HIV status, that you should not presume that he or she is HIV-positive.

**Inappropriate Lines of Questioning**

Generally, the risk factor for HIV infection is not relevant to the applicant's claim, so it is not appropriate to ask the applicant how he or she thinks that he or she contracted HIV.[99]

In some asylum cases, an applicant's HIV status may also be relevant to a one-year filing deadline exception, for example, if the applicant was extremely ill during his or her first year in the United States or the applicant may not have been diagnosed until several years after entering the United States. (*See* Asylum Adjudications Supplement – One-Year Filing Deadline, below).

*Intersex Conditions*

**Appropriate Lines of Inquiry**

When questioning applicants with intersex conditions, use the same type of sensitive questioning techniques suggested for sexual orientation, gender identity, and HIV-positive status claims.

Some intersex people will never have heard of anyone else like themselves, but others will. There are some intersex conditions that run in families or are more common in certain populations. Where the condition is known in a given culture, an applicant should be able to describe how people like them are treated. Where the condition is known to run in a family (but not throughout the culture), the entire family may face stigma, or family members may be on the lookout for signs of the condition in order to keep the family secret. For example, Androgen Insensitivity Syndrome (AIS) is an inherited condition. People with this condition will have a typical-looking female body, but will be infertile and will have only a shallow vaginal opening or none at all. Female relatives of an

---

[98] *Id.*

[99] *Id.*

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 39 of 68

IFR_AR_010059

affected woman may be carriers and can pass it on to their children. Normally it is not discovered until puberty when the girl does not menstruate.

Many persons with intersex conditions may have difficulty understanding and articulating their own physical conditions and medical history. Therefore, some of these questions may be more appropriate for parents or families of young intersex children who face persecution.

The following are some suggested questions that, depending on the facts, may be appropriate when adjudicating a claim that involves the applicant's intersex condition:

- When did you first learn about your condition?

- How did you learn about it?

- Did you tell anyone?

- Why/why not?

- If yes, when?

- How did they react?

- Does your family know about your condition?

- If yes, how did they react when they found out?

- Did you go to a doctor or other medical professional?

- Have you ever received medical treatment for your condition?

- What were you told about your condition?

- How much do you understand about your condition?

- Did you know other people with similar conditions in your country? Or did you know other people like you in your country?

- If yes, how were they treated?


# 7    EVIDENCE ASSESSMENT

As explained in greater detail in the RAIO training modules *Eliciting Testimony* and *Evidence,* while the burden of proof is on the applicant to establish eligibility, equally important is your duty to elicit all relevant testimony. Establishing eligibility means the applicant must establish past persecution or a well-founded fear of future persecution based on actual or imputed (perceived) sexual orientation or gender identity. Your duty includes always recognizing the non-adversarial nature of the adjudication, applying interviewing techniques that best allow you to elicit detailed testimony from an LGBTI applicant, and diligently conducting relevant country of origin information research.

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*    Page 40 of 68

IFR_AR_010060

In addition to the applicant's testimony, reliable country of origin information may be the only other type of evidence available to you when you make your decision in a case involving LGBTI applicants. It is important to remember that reliable information regarding the treatment of LGBTI individuals may sometimes be difficult to obtain and that the absence of such information should not lead you to presume that LGBTI individuals are not at risk of mistreatment.

## 7.1　Credibility Considerations During the Interview

If an applicant is seeking refugee or asylum status based on his or her sexual orientation, gender identity, intersex condition, or HIV-positive status, he or she will be expected to establish that the persecutor views the applicant as a sexual minority or HIV-positive, either because the applicant actually has such status or because the persecutor imputes it to him or her. Under either basis, the critical point to establish is what trait the persecutor perceived in the applicant.

Credible testimony alone may be enough to satisfy the applicant's burden. Sexual minority or imputed sexual minority claims tend to rely heavily on the applicant's own testimony to establish all of the elements of the claim. Therefore, your job will be to fully and fairly elicit all testimony with regard to the harm the applicant suffered or fears based on his or her actual status as a sexual minority or perceived status as a sexual minority.

### 7.1.1　Plausibility

The fact that an applicant testifies about events that may appear unlikely or unreasonable does not mean it is implausible that the events actually occurred. You must take care not to rely on your views of what is plausible based on your own experiences, which are likely to be quite different from the applicant's.

#### What if the Applicant is Married or Has Children?

An applicant may have gotten married in his/her home country and/or have children.[100] This, by itself, does not mean that the applicant is not gay. "Many applicants describe enormous social pressure to marry and being forced into a marriage by their family or society. Other applicants, while grappling with their sexual identity, have tried to lead a heterosexual life and 'fit in' within their society."[101]

Even in the United States, it is not uncommon for lesbians or gay men to marry people of the opposite sex in an effort to conform to societal norms.[102] While some lesbians and gay

---

[100] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

[101] *Id.*

[102] *Id.*

men may feel that they have always known their sexual orientation, many others do not
come to terms with their sexual identity until much later in life. [103]

If you have concerns about the credibility of an LGBTI applicant who is married, it may
be appropriate to ask the applicant a few questions surrounding the reasons for marriage.
If the applicant is able to provide a consistent and reasonable explanation of why he or
she is married and/or has children, that portion of the testimony should be found credible.

## What if the Applicant Does Not Appear to be Familiar With LGBTI Terminology?

While most Americans are accustomed to reading and hearing about LGBTI issues in the
news, these terms may be unfamiliar to applicants from other cultures. "Some countries
do not even have words for different sexual orientations other than homophobic slurs.
The fact that an applicant may be uncomfortable with these terms may be a result of his
or her own ingrained homophobia from growing up in a country where such terms were
the equivalent of vile curses."[104] Therefore, you should not assume that it is implausible
for an applicant to be gay, lesbian, or transgender if he or she is not familiar with LGBTI
terms.

## What if The Applicant Does Not "Look" or "Act" Gay?

Some applicants with LGBTI-related claims will not "look" or "act" gay.[105] If an
applicant provides detailed testimony about his or her experiences in the country of
origin,[106] it would be inappropriate to expect the applicant to fit a stereotypical notion for
how LGBTI people should look or behave.

While there are some individuals who identify as gay who may also consider themselves
effeminate and some individuals who identify as lesbian who may also consider
themselves masculine, many men who identify as gay will not consider themselves
effeminate and many women who identify as lesbians will not consider themselves
masculine.

For some LGBTI people, the harm they suffer, especially in their youth before accepting
their LGBTI identity, may be related to their feminine characteristics (for males) or their
masculine characteristics (for females). Regardless of whether the applicant was "out" at

---

[103] *Id.*

[104] *Id.*

[105] *Shahinaj v. Gonzales*, 481 F.3d 1027 (8th Cir. 2007) (remanding case to new Immigration Judge in part because
IJ had improperly relied on his own stereotypes and found an Albanian applicant's claim to be gay not credible
because he did not exhibit gay "mannerisms," "dress" or "speech"); *Razkane v. Holder*, 562 F.3d 128 (10th Cir.
2008) (rejecting IJ's finding that applicant's appearance was not gay enough for persecution to be likely to occur).
*See also Ali v. Mukasey*, 529 F.3d 478 (2d Cir. 2008) (rejecting IJ's conclusion that a "dangerous criminal" could
not be identified as a "feminine . . .homosexual" in his native Guyana).

[106] *See* Credibility-Detail below for appropriate credibility considerations.

the time he or she was harmed, this harm may, in many cases, be considered related to his or her LGBTI status.[107]

In some cases, an applicant will testify that he or she was harmed or fears future harm because his or her appearance makes his or her LGBTI identity apparent, that is, he or she fits the accepted stereotype for LGBTI people in his or her culture. Cultural signals about a person's sexual orientation or gender identity may vary between individuals from other countries and your own. Thus, if an applicant tells you that he or she appears obviously LGBTI, it is necessary to ask the applicant appropriate follow-up questions to explore what the applicant means.

Whether or not an applicant claims that his or her LGBTI identity is apparent, it is appropriate for you to elicit testimony about why the applicant fears harm. For example, in many countries, the fact that a person is unmarried or childless after young adulthood may result in others questioning his or her sexual orientation. In other countries, the only way for LGBTI people to meet other LGBTI people is to go to gay clubs, or parks, which may put them at higher risk of being identified as a sexual minority. For transgender applicants, having identity documents that do not match their name or outward gender appearance may put them at risk. (See *Interviewing Considerations* above for appropriate lines of questioning to determine credibility.)

As discussed above, it is important to remember that gender identity and sexual orientation are distinct concepts. While it may be obvious from the appearance of some transgender individuals that they are transgender, other transgender individuals may "pass," or blend in quite well as their corrected gender. By way of contrast, transgender people who are at the beginning of their transition also may not "look transgender."[108] In these cases, as in other categories of protection cases, you should not base your decision on the applicant's outward appearance. Instead, you should elicit relevant testimony about the applicant's identity and, if appropriate, request corroborating evidence.

### What if Country of Origin Information Does Not Address LGBTI Issues?

The fact that little or no corroboration of mistreatment against LGBTI individuals is included in reports that generally address human rights violations does not render the applicant's claim of past harm or fear of future harm implausible in light of or inconsistent with country of origin information.[109] The weight to be given to the fact that country conditions information fails to corroborate a claim will depend on the specific allegations, the country, and the context of the claim.

### 7.1.2    Consistency

---

[107] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[108] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[109] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

USCIS: RAIO Directorate – Officer Training                     DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 43 of 68

IFR_AR_010063

## Claims Not Initially Put Forth

An LGBTI individual may initially assert a claim based on another protected ground such as political opinion or religion and later reveal that he or she was harmed or fears harm based on his or her sexual orientation. This may be because the applicant was reluctant to talk about his or her sexual orientation or gender identity or because he or she was unable to articulate a connection to a particular protected ground.

There may be situations where the applicant does not initially put forward a claim based on sexual orientation or gender identity but does so later on. For example, a newly arrived applicant may not feel comfortable or safe revealing his or her sexual orientation or gender identity to an Immigration Officer during primary or secondary inspection or to an officer during a Credible Fear interview. Then, he or she may subsequently reveal this information on his or her asylum application.

In the case of Dominic Moab, a gay asylum seeker from Liberia, the IJ denied the case and the BIA affirmed, in part because Mr. Moab "failed to mention his homosexuality to the immigration officers at the airport or to the examining official during his credible fear interview."[110] The Seventh Circuit remanded the case, finding that the BIA had not considered the fact that, for several reasons, "airport interviews… are not always reliable indicators of credibility" including that "it is unclear, what if any follow-up questions were posed" and he may "not have wanted to mention his sexual orientation for fear that revealing this information could cause further persecution…."[111]

In overseas refugee processing, an applicant may not initially tell the referring agency, such as UNHCR or the Resettlement Support Center (RSC) about being gay or transgender, but then subsequently tell the USCIS Interviewing Officer about his or her LGBTI status. If you are confronted with such a scenario, do not automatically assume the applicant is not credible but follow the guidance above about what information the application should generally be able to relay.

It is important to take into account all of the factors mentioned in this module in assessing the applicant's ability to articulate his or her claim. When exploring these claims, remember that the applicant may have other grounds upon which he or she may qualify for refugee status or asylum. If a claim can clearly be established on another ground, that may form the basis for the decision.

As with all other credibility determinations, you must give the applicant the opportunity to explain any inconsistencies or omissions in his or her case. In a situation where an applicant does not initially mention his or her sexual orientation or gender identity and later does as a basis for protection, you would ask for an explanation:

---

[110] *Moab v. Gonzales*, 500 F. 3d 656, 657 (7th Cir. 2007).

[111] *Id*. at 660 (citing *Dong v. Gonzales*, 421 F.3d 573, 579 (7th Cir. 2005).

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 44 of 68

IFR_AR_010064

"Help me understand. Why are you telling me this now, but did not mention it to the officer at the airport? Or to UNHCR or the RSC?"

**Seemingly Inconsistent Use of LGBTI Terms**

If the application form states in one place that the applicant is bisexual, but he or she testifies that he or she is homosexual, do not assume this is a contradiction. It is appropriate to provide the applicant with an opportunity to explain the apparent inconsistency, but do not pursue an adversarial line of questioning such as: "Homosexual? Your application says bisexual. Well, which is it – homosexual or bisexual?"

### 7.1.3    Detail

An essential component of an LGBTI claim is that the applicant must establish that the persecutor perceived him or her to be a sexual minority. This perception can be based on the applicant's actual status, or on a status imputed to the applicant. Where the persecutor's perception is based on a status that the applicant in fact has, appropriate details about the applicant's experience as LGBTI may help to substantiate the claim.

It is important to remember however, that the ultimate legal question is whether the persecutor targets the victim because the persecutor perceives a protected trait in the victim. Questions about the applicant's sexual orientation should be filtered through that lens. The purpose of establishing LGBTI status is to show why the persecutor perceived this trait in the individual. In a claim based on imputation of the protected trait, the reasons why the persecutor viewed the applicant as having that trait will be different, and it would be those different reasons that the applicant would have to establish.

As with any other type of refugee or asylum case, an applicant's detailed, consistent, credible testimony may be sufficient to prove his or her sexual orientation.

The applicant should be able to describe his or her experiences identifying as LGBTI. He or she should be able to explain when he or she first began to feel attracted to members of the same sex, if and when he or she first engaged in a romantic or sexual relationship with a member of the same sex, how this made him or her feel, whether he or she told other people or kept this aspect of his or her identity secret, etc.[112]

Acceptable lines of questioning to develop the applicant's claim and to test credibility are listed above in *Sample Questions*.

## 7.2    Country of Origin Information

---

[112] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2004.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 45 of 68

IFR_AR_010065

Country of origin information on LGBTI issues can sometimes be more difficult to find than on other issues.[113] You should not conclude that if these issues are not mentioned that no problems exist. Many organizations that report on human rights issues lack sufficient contacts within local LGBTI communities to know what LGBTI individuals experience in their countries, or do not have the resources to investigate and/or monitor all types of human rights violations in a particular country.

Often the countries where homosexuality is most taboo have the least country conditions information available. In many countries, for example those with conservative, religious governments, there is little or no mention of the existence of LGBTI citizens in any media. This may also be true in countries with antidemocratic, authoritarian governments, where LGBTI groups may not be allowed to exist.

Where there is a lack of sufficiently specific country of origin information, you may have to rely on the applicant's testimony alone to make your decision.[114]

Useful resources in gathering information on LGBTI claims include:

➤ The *International Gay and Lesbian Human Rights Commission* at http://iglhrc.org/

➤ The International Lesbian and Gay Association (http://ilga.org/) website, which contains a legal survey where you can search legal codes and country conditions.

➤ The Human Rights Watch LGBT division and HIV division at www.hrw.org/en/category/topic/lgbt-rights

➤ Refugee, Asylum, and International Operations Directorate (RAIO)Library at https://u95026.eos-intl.net/U95026/OPAC/Index.aspx

➤ Council on Global Equality at http://www.globalequality.org/

➤ European Country of Origin Information Network at https://www.ecoi.net/

## 7.3    Corroborating Evidence

In some situations, where it is necessary to establish that the persecutor perceived a protected trait in the applicant, you may ask the applicant to provide evidence that corroborates his or her sexual orientation, gender identity, or HIV-positive status. Pursuant to amendments to INA section 208 made by the REAL ID Act of 2005, an applicant for asylum must provide this evidence unless he or she does not have the

---

[113] *See Id.*

[114] UNHCR *Guidance Note on Refugee Claims Relating to Sexual Orientation and Gender Identity.*

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                          Page 46 of 68

IFR_AR_010066

evidence and cannot reasonably obtain the evidence. Although the REAL ID Act did not explicitly amend INA section 207, which addresses applications for refugee status, as a matter of policy, USCIS applies the same standards to refugee adjudications.[115]

> It is very important to remember that because of the different ways overseas refugee and asylum applicants obtain interviews with USCIS, the evidence that refugee applicants can reasonably obtain compared with the corroborating evidence some asylum seekers can reasonably obtain varies greatly.

### Corroborating Sexual Orientation

You may ask the applicant to provide evidence that corroborates his or her sexual orientation as a means of establishing that the persecutor perceived or would perceive the protected trait in the applicant. The applicant's detailed, consistent, credible testimony may be sufficient to establish this status. The applicant must provide this evidence unless he or she does not have the evidence and cannot reasonably obtain the evidence.[116] Again, it is important to remember that the evidence refugee applicants can reasonably obtain varies greatly compared with the evidence some asylum applicants can reasonably obtain. Examples include a letter from a current or ex-partner; a letter from a friend with whom the applicant has discussed his or her sexual orientation; a letter from a family member; proof that he or she is involved in an LGBTI political or social organization; or a psychological evaluation, etc.[117]

There may be situations where the applicant will not be able to provide any corroboration, for example, if he or she is no longer in contact with an ex-partner in his or her country, where his or her family has disowned him or her, and where he or she does not yet know any LGBTI people in the United States or the country of first asylum. As in any other case, the applicant should not automatically be denied for lack of corroboration. Rather, it is appropriate for you to question the applicant about why corroboration is unavailable, and factor this explanation into your decision-making process.

### Corroborating Transgender Identity

---

[115] Rex W. Tillerson, Department of State, et al., *Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities*, Memorandum to the President (Washington, DC; October 23, 2017).

[116] *See Eke v. Mukasey*, 512 F.3d 372 (7th Cir. 2008)(holding that the BIA did not err in requiring alien to corroborate his claim of persecution based on membership in social group of homosexual men.) In *Eke v. Mukasey*, the respondent argued that the Immigration Judge and the Board erred "by requiring him to corroborate his claim of persecution based on his membership in the social group of homosexual men." *Id.* at 381. The court rejected this argument, reasoning that there "is nothing in the nature of [applicant's] claims that would compel us to find that corroborating evidence was unavailable to him." *Id.*

[117] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 47 of 68

IFR_AR_010067

Again you may ask the applicant to provide evidence that corroborates his or her transgender identity as a means of establishing that the persecutor perceived or would perceive the protected trait in the applicant. The applicant's detailed, consistent, credible testimony may be sufficient to establish this status. The applicant should be able to describe his or her experience identifying as a transgender individual. That is he or she should be able to explain when he or she first started to feel "different" or uncomfortable with the gender he or she was assigned at birth; ways in which his or her behavior and feelings differed from gender norms; steps he or she has taken to express the gender that he or she feels comfortable with, etc.

It may be appropriate to elicit information about what steps the applicant has taken in his or her transition but remember how personal and difficult it will be for the applicant to talk about these issues.

A number of transgender individuals receive necessary medical treatment to help their outward appearance correspond with their internal identity. Bear in mind, however, that the treatment plan for every transgender person is different. There is not a single surgery which transforms a transsexual from one gender to another. If a transgender applicant is receiving treatment from a medical doctor or mental health professional (such as counseling, hormones, implants, or other surgeries), it is reasonable to expect corroboration of this treatment.[118]

Many transgender individuals do not receive ongoing treatment, however. Some transgender individuals self-administer hormones, while others identify with their chosen gender without undergoing any medical treatment as part of their transition. Many others would like to access transition-related medical care but cannot, because of immigration status or lack of financial resources. In any event, an applicant should be able to corroborate any treatment he or she has received from a medical professional or explain why such corroboration is not available.[119]

**Corroborating HIV-Positive Status**

An applicant who is requesting refugee or asylum status in whole or in part based on being HIV-positive, should generally be able to provide some external corroboration that he or she is HIV-positive, such as a letter from a doctor or the results of an HIV test. You may ask for such corroboration as a means of determining that the persecutor did or would perceive this trait in the applicant. Again, this expectation may vary in the context of overseas refugee processing.

# 8    CONCLUSION

---

[118] *See Immigration Equality Draft Model LGBT Asylum Guidance*, 2010.

[119] *Id.*

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 48 of 68

IFR_AR_010068

Adjudicating LGBTI refugee and asylum claims presents certain unique challenges. It is important to remember to be sensitive to the issues, familiar with the terminology, and familiar with relevant country of origin information. By definition, these claims involve the most private of matters – sexual orientation, gender identity, and sometimes serious illness. Always remain respectful and nonjudgmental, and do not be afraid to acknowledge to yourself and to the applicant that these are sensitive topics that are difficult to discuss. Familiarize yourself with the legal nuances involved in these types of cases and do your best to elicit all relevant details without re-traumatizing the applicant or being insensitive.

# 9    SUMMARY

## 9.1    LGBTI and HIV Terminology

Becoming familiar with relevant terminology helps you become more aware of the nuances involved in adjudicating LGBTI claims. It is important to be familiar with the terminology but also to keep in mind that the applicant may come from a culture where sensitivity to these issues is not as high as in other countries and may not be familiar with the terms himself or herself. The terms "sexual minorities" and LGBTI are used in this module interchangeably to refer to both sexual orientation and gender identity.

## 9.2    Legal Analysis – Nexus and the Five Protected Characteristics

LGBTI refugee and asylum claims are primarily analyzed under the ground membership in a particular social group. Sexual orientation, gender identity (or the right to live in one's "corrected gender"), and having an intersex condition can be classified as a common immutable characteristic that the individual should not be required to change. Social distinction does not require that the trait be literally visible to the eye. Where there are clear benchmarks for delineating the group, the group is defined with sufficient particularity.

Ways to formulate the PSG have included "sexual minority from Russia," "gay man from Columbia," "lesbian from Iran," or "transgender female from Mexico." Ask questions about what the persecutor may have said to him or her and about the circumstances surrounding the harm inflicted on or threats made against the applicant.

## 9.3    Legal Analysis – Types of Persecution

The two questions you must ask yourself to determine whether the applicant suffered or fears persecution are: 1) did the harm rise to the level of persecution; and, 2) did the applicant experience the incident as harm? Examples of harm that LGBTI applicants may have faced or fear and that may rise to level of persecution include: physical and sexual

violence; execution; imprisonment; forced marriage; long-term, systemic discrimination; threats of violence and to "out" the applicant; and forced psychiatric treatment.

Lesbians may have suffered the harms that befall many women in addition to harms that befall members of the LGBTI community. Transgender individuals may be more visible and may be more commonly viewed as transgressing societal norms than gay men or lesbians. They may be subjected to increased discrimination and persecution.

## 9.4    Legal Analysis – Well-Founded Fear

The fact that LGBTI organizations are permitted to hold a parade once a year or the mere existence of LGBTI organizations does not mean that LGBTI people are free from ongoing violence and harm in that country.

An applicant who was forced to conceal his or her sexual orientation or gender identity in the home country in order to avoid harm and did not suffer harm that rose to the level of persecution may still qualify for refugee or asylum status if he or she has a well-founded fear of future persecution. In some cases, the experience of having to conceal sexual orientation or gender identity may itself result in suffering severe enough to constitute persecution. Some LGBTI applicants come to the United States for work or study and subsequently "come out" to themselves and to others.

## 9.5    Legal Analysis – One-Year Filing Deadline (asylum only)

In many instances an individual does not "come out" as lesbian, gay, bisexual, or transgender until he or she is in the country where he or she sees that it is possible to live an open life as an LGBTI person. If an individual has recently "come out," this may qualify as an exception to the one-year filing deadline based on changed circumstances.

An individual may qualify for a one-year exception based upon serious illness, for example being diagnosed as HIV-positive.

LGBTI individuals who suffer from internalized homophobia and transphobia or who may have been subjected to coercive mental health treatment to "cure" them in their home countries may find it especially difficult to seek the mental health treatment they may need to proceed with their applications. Also, many LGBTI asylum-seekers in the United States live with extended family members or with members of the very community they fear.

## 9.6    Interviewing Considerations

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                    Page 50 of 68

IFR_AR_010070

It is important to create an interview environment that allows applicants to freely discuss the elements and details of their claims. LGBTI claims involve very private topics that are difficult for the applicants to talk openly about and may be difficult to discuss.

You may help to set the applicant at ease by reminding him or her that the interview is confidential. You may also specifically remind the interpreter, in the presence of the applicant, that the interpreter must also keep all information confidential.

The early part of the interview should be devoted, in part, to putting the applicant at ease, while reviewing the biographical information on the application. For transgender applicants, it may be better to come back to the question about "gender" at the end of the interview as this issue may be sensitive and go to the heart of the claim.

It is important to conduct the interview in an open and nonjudgmental atmosphere. Try to use the same language that the applicant has used. For example if the applicant refers to himself as gay, you should use this term rather than homosexual and vice versa. Become familiar with the legal issues, terminology, and country of origin information to help the applicant to tell his or her own story.

Keep in mind that while you have familiarized yourself with LGBTI-related terms, neither the applicant nor the interpreter may be as familiar with them as you are. You may then have to adjust the formulation of your questions accordingly.

It is never appropriate to ask questions about the applicant's specific sexual practices or about "what he or she does in bed." If the applicant begins to testify graphically about sexual practices, you should politely tell him or her that you do not need to hear these intimate details in order to fairly evaluate the claim.

If the applicant was "out" as lesbian, gay, or bisexual in the home country, he or she should be able to provide details about his or her experiences there; what it was like coming to terms with his or her sexual orientation; and, if relevant, to describe his or her first relationship. The applicant may also be able to provide details as to his or her awareness of people who are similarly situated in the home country.

Keep in mind that sexual orientation and gender identity are two different concepts. A transgender applicant may identify as straight, lesbian, gay, or bisexual. Being transgender involves an overall dissatisfaction with the gender assigned at birth; it is not about having one particular surgery. If you were confused about an applicant's self-identification, you should respectfully admit to feeling confused and ask the applicant to explain in his or her own words.

When interviewing an applicant who is HIV-positive, be mindful that it may be appropriate to ask about the applicant's state of health, current treatment regimen, and the availability of treatment in the home country. DO NOT ask the applicant where he or she may have contracted HIV.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                          Page 51 of 68

IFR_AR_010071

## 9.7    Burden of Proof and Evidence – Credibility

An applicant's credible testimony may be the only evidence available for you to take into consideration when adjudicating LGBTI-related refugee and asylum claims. If the applicant is seeking refugee status or asylum based on his or her sexual orientation, gender identity, or HIV-positive status, he or she will be expected to establish that the persecutor perceived this protected trait in him or her. In some cases, the reason for the persecutor's perception is that the applicant is actually gay, lesbian, or bisexual, transgender, or HIV-positive. In other cases, where the applicant does not identify as LGBTI but is only imputed to be, he or she will need to establish the other reasons why he or she was perceived that way.

The fact that an applicant was married or has children does not mean that it is impossible that the applicant is gay. Even in the United States, it is not uncommon for lesbians or gay men to marry people of the opposite sex in an effort to conform to societal norms.

Do not assume that an applicant must conform to a particular stereotype in order to be lesbian or gay. A man may identify as gay and not appear or consider himself effeminate. A woman may identify as lesbian and not appear or consider herself masculine. This does not mean that it is not plausible that he or she is gay or lesbian.

If an applicant does not initially tell the first official he or she comes into contact with about his or her sexual orientation or gender identity and subsequently reveals this in his or her claim, do not automatically assume that the applicant is not credible. Instead, follow the guidance about what testimony such an applicant should reasonably be expected to provide and try to elicit that information.

## 9.8    Burden of Proof and Evidence – Country of Origin Information

For various reasons, detailed, reliable country of origin information may be difficult to obtain. This does not render the applicant's claim of past harm or fear future harm implausible in light of or inconsistent with country of origin information.

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program    Page 52 of 68

IFR_AR_010072

## PRACTICAL EXERCISES

NOTE: Practical Exercises will be added at a later date.

---

### Practical Exercise # 1

- **Title:**

- **Student Materials:**

---

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                          Page 53 of 68

IFR_AR_010073

# OTHER MATERIALS

# LGBTI Terminology/Glossary[120]

There are a number of terms that may be used by LGBTI applicants in their protection claims. Although not all LGBTI applicants will use these terms, it will be important for you to be familiar with these terms prior to conducting an interview. The glossary is divided into sections that distinguish between sexual orientation terms and gender identity terms, and also includes medical and legal terms. This glossary is comprised of terms generally used by the LGBTI community and others in the United States.

Please note: The definition of the term intersex sometimes overlaps with sexual orientation, gender identity, and medical issues and is therefore found in its own separate section.

## Sexual Orientation Terms[121]

**Bisexual** – (noun or adjective) a man or woman who has an enduring emotional and/or physical attraction to both sexes. It is important to understand that although bisexual individuals may feel attraction to members of either sex, they cannot "choose" whom (or which gender) to feel attracted to any more so than a heterosexual or homosexual individual can.

**"Closeted"** – (adjective) describes a person who keeps his or her sexual orientation secret. Also, "living in the closet."

**"Come Out"** – (verb) the process by which an individual comes to terms with his or her sexual orientation. For most people this process first involves self-acceptance ("coming out" to one's self) and then may involve telling other people ("coming out" to others.) It is important to remember, however, that some people choose not to "come out" to others for fear of their safety. Some people realize as children that they are lesbian or gay, whereas others may not come out to themselves until they are adults. Many lesbian and gay people enter into opposite sex marriages before coming to terms with their sexual orientation.

**Gay** – (adjective) a man who has an enduring emotional and/or physical attraction to men. Some women who are attracted to women use the term gay to describe themselves as well.

---

[120] Immigration Equality and HIAS Refugee Trust of Kenya.

[121] For more general information about sexual orientation, see http://www.apa.org/pubinfo/answers.html on the American Psychological Association website.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 54 of 68

IFR_AR_010074

**Heterosexual –** see "Straight" below

**Homosexual –** (noun or adjective) an individual who has an enduring emotional or physical attraction to members of the same sex. This term is often considered clinical with a slightly derogatory connotation within the LGBTI community.

**Homophobia –** (noun) deeply ingrained feelings of prejudice toward lesbian, gay and bisexual people; the irrational fear, based upon myths and stereotypes, of homosexuals or those perceived to be homosexual.

**Lesbian –** (noun or adjective) a woman who has an enduring emotional or physical attraction to women; homosexual women also sometimes use the term "gay" to describe themselves.

**"Outed" –** (verb) the involuntary disclosure of a person's lesbian or gay sexual orientation. For example, an applicant may say, "My cousin saw me with my partner and then he 'outed' me to the whole community."

**Sexual Orientation –** (noun) an umbrella term that describes an individual's enduring romantic and/or physical attraction to those of a particular sex; an aspect of human identity developed in the early stages of a person's life that is highly resistant to change.

**Straight –** (noun) (also heterosexual) or an individual's enduring romantic and/or physical attraction to individuals of the opposite sex.

## Gender Identity Terms[122]

**Birth Sex –** (noun) the gender that an individual was assigned at birth which is usually indicated on his or her original birth certificate.

**"Corrected Gender" –** (noun) the gender with which a transgender individual identifies. For example, for an MTF transgender woman, female would be her "corrected gender."

**FTM –** (noun) a female to male transsexual; that is, an individual assigned the female gender at birth who now identifies as male. Also referred to as a transgender man or transman.

**Gender –** (noun) the social construction of what society values as the roles and identities of being male or female; assigned at birth to every person; does not always align with gender identity.

---

[122] For more information about transition, see World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, available at https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf (Vol. 7, 2012).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                    Page 55 of 68

IFR_AR_010075

**Gender Identity** – (noun) a person's inner sense of being male or female, both, or neither, resulting from a combination of genetic and environmental influences.

**Gender Roles** – (noun) what a given society considers "masculine" or "feminine" behaviors and attitudes; how individuals express their assigned gender or the gender they identify with. For example, a traditional gender role for a man is to be competitive, athletic, and aggressive. A traditional gender role for a woman is to want to have and take care of children. Gender roles in many societies have expanded in recent years for both men and women.

**Heterosexism** – (noun) the assumption that everyone is or ought to be heterosexual and that a person's gender identity will be fixed at birth in accordance to his or her birth sex.

**Hormone Therapy** – (noun) one medical step that a transgender person may take to transition. For transgender men this involves taking testosterone. For transgender women this involves taking estrogen.

**MTF** – (noun) a male to female transsexual, that is an individual assigned the male gender at birth who now identifies as female. Also referred to as a transgender woman or transwoman.

**"Passing"** – (verb) a transgender person living in his or her corrected gender without it being readily apparent that he or she is transgender.

**Sex** (noun) – biological maleness or femaleness; the division of male and female on the basis of reproductive organs.

**Sex Reassignment Surgery (SRS)** – (noun) refers to any of more than two dozen potential surgeries that a transgender person may undergo. Not all transsexuals choose or can afford SRS. This is a preferred term to "sex change operation."

**Transgender**[123] – (adjective) an umbrella term for people whose gender identity and/or gender expression differs from the sex they were assigned at birth or the stereotypes associated with that sex. The term may include transsexuals and others who do not conform to gender stereotypes. Many people who fit the definition of "transsexual" below, continue to refer to themselves as transgender. Transgender is a gender identity, not a sexual orientation. Thus, like any other man or woman, a transgender person may have a heterosexual, bisexual, or homosexual orientation.

**Transition** – (noun or verb) the process of changing a gender expression from one gender to another. This process may be very different for different people. It may involve

---

[123] For more information, see National Center for Transgender Equality, *Understanding Transgender People: The Basics*, July 9, 2016, *available at* https://transequality.org/issues/resources/understanding-transgender-people-the-basics.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                      Page 56 of 68

IFR_AR_010076

"coming out" as transgender to one's self and to others; living in one's chosen gender; changing legal documents; and/or accessing necessary medical treatment.

The medical treatment that transgender people receive is specific to each individual. There is no one specific procedure that changes a person's gender. Rather, medical transition is a process which may include any number of possible treatments such as: hormone therapy, electrolysis, and surgeries such as, hysterectomy, mastectomy, and genital reconstruction.

**Transsexual** – (adjective) is a term used for people who seek to live in a gender different from the one assigned to them at birth. They may seek medical treatment to "transition." It is important to note, however, that being "transsexual" does not necessarily mean that a person has undergone any particular surgery or treatment.

**Transvestite** or **"Cross-Dresser"** (noun) - means an individual who chooses to wear clothes generally associated with the opposite sex. Sometimes this is related to transgender identity, and sometimes it is not. Note, however, that Spanish language articles often refer to transgender people as "travestis" which translates to "transvestites." "Transvestite" is considered an outmoded term and should not be used by the interviewer unless the applicant himself or herself uses it.

**Transphobia** (noun) – deeply ingrained feelings of prejudice toward transgender people; the irrational fear, based on myths and stereotypes, of people who are transgender or are perceived to be a transgender person.

## Intersex Terms

**Intersex**[124] (noun, adjective) – Intersex refers to a condition in which an individual is born with a reproductive or sexual anatomy and/or chromosome pattern that does not seem to fit typical definitions of male or female. The conditions that cause these variations are sometimes grouped under the terms "intersex" or "DSD" (Differences of Sex Development). These conditions include androgen insensitivity syndrome, some forms of congenital adrenal hyperplasia, Klinefelter's syndrome, Turner's syndrome, hypospadias, and many others. Individuals with this condition were previously referred to as "hermaphrodites," but this term is considered outmoded and should not be used unless the applicant uses it.

## Legal Terms

**Civil Union** – formal recognition of committed same-sex relationships recognized by some states and foreign countries. Similar to but not the same as marriage. Civil unions

---

[124] For more information on intersex issues, see the Advocates for Informed Choice website, https://aiclegal.wordpress.com/.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 57 of 68

IFR_AR_010077

confer many of the same rights, benefits, and privileges enjoyed by opposite sex marriages such as estate planning or medical decisions.

**Domestic Partnership** – A civil or legal contract recognizing a partnership or a relationship between two people which confers limited benefits to them by their employer.

**Sodomy Laws** – laws that prohibit consensual, adult, private, noncommercial sex. Used mostly against gays and lesbians.

## Medical Terms Related to HIV

**AIDS or Acquired Immunodeficiency Syndrome** - is the medical term used for people with the HIV virus who have either experienced certain opportunistic infections (such as PCP pneumonia or Kaposi's Sarcoma), or whose T-cells (infection fighting blood cells) have dropped below 200.

**CD4 Count or T-Cell Count** – this is a test used to measure the well-being of the immune system of an individual who is HIV-positive. People with healthy immune systems generally have between 800-1200 T-cells. If T-cells drop below 200, a person is considered to have AIDS.

**HIV-Positive** [125] – means that a person has been exposed to the Human Immunodeficiency Virus (HIV) and developed anti-bodies to the virus. Once a person has tested positive for HIV, he or she will always test positive for HIV, regardless of his or her health.

Not everyone who is HIV-positive has AIDS, but everyone who has AIDS is HIV-positive. HIV is transmitted through the transfer of bodily fluids from an infected individual to an uninfected individual. People are primarily infected with HIV through sexual contact which involves the exchange of bodily fluids; from sharing intravenous drug paraphernalia; during childbirth and breast-feeding; and from receiving contaminated blood transfusions. There is no risk of HIV transmission from casual contact, such as shaking hands or sharing a drinking glass.

---

[125] For more information about HIV see http://www.gmhc.org/ on the Gay Men's Health Crisis website.

# LGBTI-Related Case Law[126]

## 2015

*Avendano-Hernandez v. Lynch*, --- F.3d ----, (9th Cir. 2015) (transgender woman from Mexico)

*Gonzalez-Posadas v. Att'y Gen. of the U.S.*, 781 F.3d 677 (3d Cir. 2015) (gay man from Honduras)

## 2014

*Malu v. U.S. Att'y Gen.*, 764 F.3d 1282 (11th Cir. 2014) (lesbian from Democratic Republic of the Congo)

*Konou v. Holder*, 750 F.3d 1120 (9th Cir. 2014) (gay man from the Marshall Islands)

## 2013

*Doe v. Holder*, 736 F.3d 871 (9th Cir. 2013) (gay man from Russia)

*Rosiles-Camarena v. Holder*, 735 F.3d 534 (7th Cir. 2013) (HIV positive man from Mexico)

*Vitug v. Holder*, 723 F.3d 1056 (9th Cir. 2013) (gay man from Philippines)

## 2012

*R.K.N. v. Holder*, 701 F.3d 535 (8th Cir. 2012) (HIV positive man from Kenya)

*Vrljicak v. Holder*, 700 F.3d 1060 (7th Cir. 2012) (gay man from Serbia)

*Matter of M-H-*, 26 I&N Dec. 46 (BIA 2012) (gay man from Pakistan)

*Neri-Garcia v. Holder*, 696 F.3d 1003 (10th Cir. 2012) (gay man from Mexico)

*Desai v. Attorney Gen. of U.S.*, 695 F.3d 267 (3rd Cir. 2012) (HIV positive man from India)

*Omondi v. Holder*, 674 F.3d 793 (8th Cir. 2012) (gay man from Kenya)

---

[126] In descending order by year.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 59 of 68

IFR_AR_010079

## 2011

*Lopez-Amador v. Holder, 649 F.3d 880* (8th Cir. 2011) (lesbian from Venezuela)

*Castro-Martinez v. Holder*, 641 F.3d 1103 (9th Cir. 2011) (amended by *Castro-Martinez v. Holder*, WL 6016162, Dec. 5, 2011 (9th Cir. 2011) (gay man from Mexico)

## 2010

*Todorovic v. Att'y Gen. of the U.S.*, 621 F.3d 1318 (11th Cir. 2010) (gay man from Serbia)

*Ayala v. Att'y Gen. of the U.S.*, 605 F.3d 941 (11th Cir. 2010) (gay, HIV+ man from Venezuela)

*Eneh v. Holder*, 601 F.3d 943 (9th Cir. 2010) (man living with AIDS from Nigeria)

*Aguilar-Mejia v. Holder*, 616 F.3d 699 (7th Cir. August 6, 2010) (HIV+ man from Mex./Guatemala)

## 2009

*N-A-M- v. Holder*, 587 F.3d 1052 (10th Cir. 2009) (M to F transsexual woman from El Salvador)

*Martinez v. Holder*, 557 F.3d 1059 (9th Cir. 2009) (gay man from Guatemala)

*Pangilinan v Holder*, 568 F.3d 708 (9th Cir. 2009) (transsexual woman from the Philippines)

*Manani v. Filip*, 552 F.3d 894 (8th Cir. 2009) (HIV+ woman from Kenya)

## 2008

*Razkane v. Holder*, 562 F.3d 1283 (10th Cir. 2008) (gay man from Morocco)

*Bromfield v. Mukasey*, 543 F.3d 1071 (9th Cir. 2008) (gay man from Jamaica)

*Eke v. Mukasey*, 512 F.3d 372 (7th Cir. 2008) (gay man from Nigeria)

*Bosede v. Mukasey*, 512 F.3d 946 (7th Cir. 2008) (HIV+ man from Nigeria)

*Ali v. Mukasey*, 529 F.3d 478 (2nd Cir. 2008) (gay man from Guyana)

*Kadri v. Mukasey*, 543 F.3d 16 (1st Cir. 2008) (gay man from Indonesia)

## 2007

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 60 of 68

IFR_AR_010080

**Other Materials**                     Guidance for Adjudicating LGBTI Refugee and Asylum Claims

*Jean-Pierre v. Att'y Gen. of the U.S.*, 500 F.3d 1315 (11th Cir. 2007) (HIV+ man from Haiti)

*Morales v. Gonzales*, 478 F.3d 972 (9th Cir. 2007) (transgender woman from Mexico)

*Nabulwala v. Gonzales*, 481 F.3d 1115 (8th Cir. 2007) (lesbian woman from Uganda)

*Shahinaj v. Gonzales*, 481 F.3d 1027 (8th Cir. 2007) (gay man from Albania)

*Ixtlilco-Morales v. Keisler*, 507 F.3d 651 (8th Cir. 2007) (gay man from Mexico)

*Moab v. Gonzales*, 500 F.3d 656 (7th Cir. 2007) (gay man from Liberia)

*Lavira v. Att'y Gen. of the U.S.*, 478 F.3d 158 (3d. Cir. 2007) (HIV+ man from Haiti) *overruled by* *Pierre v. Attorney Gen. of U.S.*, 528 F.3d 180 (3d Cir. 2008).

*Joaquin-Porras v. Gonzales*, 435 F.3d 172 (2d. Cir. 2006) (gay man from Costa Rica)

## 2006

*Ornelas Chavez v. Gonzales*, 458 F.3d 1052 (9th Cir. 2006) (transgender woman from Mexico)

## 2005

*Salkeld v. Gonzales*, 420 F.3d 804 (8th Cir. 2005) (gay man from Peru)

*Boer-Sedano v. Gonzales*, 418 F.3d 1082 (9th Cir. 2005) (gay man with AIDS from Mexico)

*Karouni v. Gonzales*, 399 F.3d 1163 (9th Cir. 2005) (gay, HIV+ man from Lebanon)

*Kimumwe v. Gonzales*, 431 F.3d 319 (8th Cir. 2005) (gay man from Zimbabwe)

*Galicia v. Ashcroft*, 396 F.3d 446 (1st Cir. 2005) (gay man from Guatemala)

## 2004

*Reyes-Reyes v. Ashcroft*, 384 F.3d 782 (9th Cir. 2004) (gay man with female sexual identity from El Salvador)

*Gebremaria v. Ashcroft*, 378 F.3d 734 (8th Cir. 2004) (HIV+ woman from Ethiopia)

*Molathwa v. Ashcroft*, 390 F.3d 551 (8th Cir. 2004) (gay man Botswana)

## 2003

USCIS: RAIO Directorate – Officer Training                     DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                   Page 61 of 68

IFR_AR_010081

*Amanfi v. Ashcroft*, 328 F.3d 719 (3rd Cir. 2003) (man imputed to be gay from Ghana)

### 1990-2000

*Hernandez-Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000) (gay man with female sexual identity from Mexico) overruled by *Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005)

*Pitcherskaia v. INS*, 118 F.3d 641 (9th Cir. 1997) (lesbian woman from Russia)

*Matter of Toboso-Alfonso*, 20 I&N Dec. 819 (BIA 1990) (gay man from Cuba)

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 62 of 68

IFR_AR_010082

**Supplement A**
**International and Refugee Adjudications** Guidance for Adjudicating LGBTI Refugee and Asylum Claims

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### REQUIRED READING

1. *Medical Examination of Aliens – Removal of Human Immunodeficiency Virus (HIV) Infection from Definition of Communicable Disease of Public Health Significance*. Centers for Disease Control and Prevention (CDC) and U.S. Department of Health and Human Services (HHS). 74 FR 56547-62 (Nov. 2, 2009). Final rule, January 4, 2010, *available at* http://www.cdc.gov/immigrantrefugeehealth/laws-regs/hiv-ban-removal/final-rule.html.

### ADDITIONAL RESOURCES

See Additional Resources listed at the beginning of this module.

### SUPPLEMENTS

There are no international and refugee adjudications supplements for this training module.

USCIS: RAIO Directorate – Officer Training    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*    Page 63 of 68

IFR_AR_010083

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### REQUIRED READING

    See Required Reading listed at the beginning of this module.

### ADDITIONAL RESOURCES

    See Additional Resources listed at the beginning of this module.

### SUPPLEMENTS

---

**Asylum Adjudications Supplement – One-Year Filing Deadline**

This module does not alter the legal criteria used to evaluate the one-year filing deadline. There are, however, some factual scenarios that may arise specifically in the context of LGBTI claims that are useful to discuss within the legal framework of established guidance on the one-year filing deadline.

**Changed Circumstances Specific to LGBTI Applicants**

**Changed Country Conditions**

As with any other type of asylum claim, if conditions in the applicant's country of origin have changed substantially, the applicant may be able to establish a changed circumstances exception to the one year filing deadline.[127] For example, after the applicant came to the U.S., a fundamentalist government may have come to power and instituted criminal sanctions for consensual homosexual activity.

**"Coming Out" as LGBTI**

In many instances an individual does not feel comfortable accepting himself or

---

[127] *See* Victoria Neilson and Aaron Morris, The Gay Bar: The Effect of the One-Year Filing Deadline on Lesbian, Gay, Bisexual, Transgender, and HIV-Positive Foreign Nationals Seeking Asylum or Withholding of Removal, 8 New York City Law Review 233 (Summer 2005), *available at* http://www.asylumlaw.org/docs/sexualminorities/GayBar091798.pdf.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 64 of 68

IFR_AR_010084

herself as LGBTI until he or she is in a country where the applicant can see that it is possible to live an open life as an LGBTI person. If an individual has "come out" as lesbian, gay, bisexual, or transgender, the applicant may be able to establish a changed circumstances exception.

### Recent Steps in Gender Transitioning

As noted above, transitioning from the gender assigned at birth to the gender with which the applicant identifies is a process which may involve many steps. At some point during this process, the applicant may realize that he or she could no longer "pass" as his or her birth gender and therefore may become more fearful of returning to his or her country of origin. For example, a transgender woman (MTF) may have recently had breast implants which would now make it impossible to "pass" as male.

### Recent HIV Diagnosis

Some individuals will apply for asylum only after they have been diagnosed with HIV. For some applicants, the claim will be based wholly on his or her HIV status and the fear of persecution upon return to the country of origin. For other individuals who may also be LGBTI, the HIV diagnosis may materially affect their eligibility for asylum. Many countries do not have confidentiality laws protecting HIV status, so some LGBTI people fear that their HIV status could become widely known. In many countries, being HIV-positive is equated with being LGBTI, and so their LGBTI identity would become known.

In *Manini v. Filip* 552 F.3d 894, (8th Cir. 2009), a Kenyan woman entered the U.S. in October 2001, was diagnosed with HIV in January 2003, and filed affirmatively for asylum in May 2004. The Asylum Office accepted her recent HIV diagnosis as a "changed circumstance," but found that the 16 month delay in filing after the diagnosis fell outside the "reasonable period of time" required by law. The BIA upheld the decision and the Eight Circuit found that it lacked jurisdiction to review the one year issue. *See also Ixtlilco-Morales v. Keisler*, 507 F.3d 651 (8th Cir. 2007), where the Eight Circuit also accepted the applicant's recent HIV diagnosis as a changed circumstance but upheld the BIA and IJ decisions to deny the case on other grounds.

The following are some suggested lines of questioning when adjudicating a claim that involves the applicant's HIV status:[128]

- When did you learn that you are HIV-positive?

- How did you feel when you received your diagnosis?

---

[128] *Id.*

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 65 of 68

IFR_AR_010085

- Does your family know that you're HIV-positive?

- How did they react?

- Have you experienced any HIV-related symptoms?

- Have you ever been hospitalized because of HIV?

- Are you taking any HIV-related medications?

- When did you begin taking them?

- Do you experience any side effects from the medications?

- Have you ever seen a mental health provider because of your diagnosis?

**Extraordinary Circumstances Specific to LGBTI**

### HIV-Positive Status

Applicants who are HIV-positive may exhibit life-threatening symptoms and require hospitalization. An individual may be able to establish an extraordinary circumstances exception based upon serious illness, if the illness was present during the first year following arrival into the United States. Additionally, many individuals living with HIV experience extreme depression and other mental health issues as a result of their diagnosis which may affect the applicant's ability to timely file and/or may affect what period of time is "reasonable" to file after an HIV diagnosis.

### PTSD or Other Mental Health Issues

As with any other asylum seekers, LGBTI applicants may suffer from Post Traumatic Stress Disorder (PTSD) or other mental health issues which make it difficult to file within a year of entry into the United States. LGBTI individuals who suffer from internalized homophobia and transphobia, or who have been subjected to coercive mental health treatment to "cure" them in their home countries, may find it especially difficult to access the mental health treatment that they may need to proceed with their applications.

Example: The applicant, a transgender male from Honduras, suffered severe and continuous sexual and other physical abuse for many years as well as familial and societal discrimination and ostracism on account of his sexual orientation. He last entered the US in 2003 but did not file for asylum until 2009. The applicant credibly explained that he felt isolated and was afraid to come forward sooner because he was ashamed and fearful of ostracism by friends and colleagues and society in general. According to medical reports he submitted, he suffered from PTSD as a result of the years of trauma he suffered in Honduras. His PTSD can be

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                    Page 66 of 68

IFR_AR_010086

seen as an extraordinary circumstance related to the delay in filing during the year after he arrived; the 5-year delay afterwards may also be considered reasonable based on that medical condition.[129]

LGBTI individuals may have fled to the United States leaving behind a partner. This may result in emotional or psychological distress that could affect their ability to file in a timely manner. With the repeal of DOMA, if the applicant is legally married, he or she would be able to sponsor a same-sex partner for immigration benefits. Given, however, that many countries do not permit same sex marriage the applicant may also be dealing with the possible permanent separation from a partner by coming to the United States.[130]

### Severe Family or Community Opposition or Isolation

LGBTI people who arrive in the United States may stay with extended family members or with other members of their community. Being surrounded by family or community members may make it impossible for the LGBTI applicant to timely file for fear that if the family member learns of the applicant's LGBTI identity, he or she will be thrown out of the home, the applicant's family at home will be told, and/or the applicant and his or her family will be disgraced.

Extreme isolation within a particular immigrant community may qualify as an exception. Foreign nationals who have newly arrived in the United States may be steered to immigration attorneys from within their own cultural community. While some applicants may be aware that they can seek asylum in the United States based on their political beliefs or religion, many foreign nationals are not aware that sexual orientation or transgender identity might form the basis of an asylum claim.[131] This problem may be compounded for LGBTI individuals who come to the U.S. and immediately take up residence in an immigrant community with people from their own country. An LGBTI applicant could be fearful of disclosing his or her LGBTI status to any community member, and might be informed by members of his community that his or her only option to legalize would be to marry.

For example, a gay Tunisian man who was admitted to the United States on a non-immigrant visa is helped by men from Egypt and other Arab immigrant communities to find housing and employment. These men are not aware that the

---

[129] See Asylum Lesson Plan, *One-Year Filing Deadline*, Section VII, *Credibility*, Subsection B, *Totality of the Circumstances*, Subsection c, *Extraordinary Circumstances*.

[130] See: AAPM section III.E. "Dependents."

[131] *See Explore All Possible Grounds* in Section 6, *Interview Considerations*, and *Claims Not Initially Put Forward* in Section 7, *Burden of Proof and Evidence* above.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 67 of 68

IFR_AR_010087

applicant is gay and tell him that asylum is generally not a means for legalizing one's status in the United States. It is not until the applicant meets a gay man from the United States that he becomes aware that he may be a refugee under U.S. law.

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 68 of 68

IFR_AR_010088



# RAIO DIRECTORATE – OFFICER TRAINING

### *RAIO Combined Training Program*

# INTERVIEWING – INTRODUCTION TO THE NON-ADVERSARIAL INTERVIEW

## TRAINING MODULE

IFR_AR_010147

*This Page Left Blank Intentionally*

RAIO Directorate – Officer Training / *RAIO Combined Training Program*

# INTERVIEWING – INTRODUCTION TO THE NON-ADVERSARIAL INTERVIEW
## Training Module

## MODULE DESCRIPTION

This module describes the main components of an interview for all RAIO adjudications.

## TERMINAL PERFORMANCE OBJECTIVE(S)

During an interview, you (the Officer) will be able to elicit in a non-adversarial manner all relevant information to properly adjudicate a claim or request.

## ENABLING PERFORMANCE OBJECTIVES

1.  Distinguish adversarial from non-adversarial interview methods.

2.  Conduct an interview in a professional manner.

3.  Identify the components of an interview for RAIO adjudications.

4.  Explain the purpose of the interview for RAIO adjudications.

5.  Explain the responsibilities and roles of all parties involved in the interview.

6.  Demonstrate the "Introduction" component of an interview during the mock interview scenario.

7.  Explain confidentiality provisions that apply to the interview and adjudication.

8.  Administer oath to interviewees and interpreters during the mock interview.

9.  Advise the interviewee of post-interview procedures and what to expect next in the process.

## INSTRUCTIONAL METHODS

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 3 of 48

IFR_AR_010149

- Interactive presentation
- Practical exercises

## METHOD(S) OF EVALUATION

- Multiple Choice Exam
- Mock Interview Exam

## REQUIRED READING

**Required Reading – International and Refugee Adjudications**

**Required Reading – Asylum Adjudications**

## ADDITIONAL RESOURCES

1. Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, HQCOU 120/12.8 (Jun. 21, 2001).

2. Fisher, Ronald P. and Geiselman, R. Edward. "The Cognitive Interview method of conducting police interviews: Eliciting extensive information and promoting Therapeutic Jurisprudence," *International Journal of Law and Psychiatry 33*, 2010, pp. 321–328.

3. Memorandum from Joseph E. Langlois, Director, Asylum Division, to Asylum Office Directors and Deputy Directors, *Fact Sheet on Confidentiality*, HQASM 120/12.8 (Jun. 15, 2005).

4. Memon, Amina; Meissner, Christian A.; and Fraser, Joanne. "The Cognitive Interview: A Meta-Analytic Review and Study Space Analysis of the Past 25 Years," *Psychology, Public Policy and the Law 16, no. 4*, 2010, pp. 340–372.

**Additional Resources – International and Refugee Adjudications**

**Additional Resources – Asylum Adjudications**

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 4 of 48

IFR_AR_010150

**CRITICAL TASKS**

| Task/ Skill # | Task Description |
|---|---|
| ITK1 | Knowledge of policies, procedures and guidelines for conducting non-adversarial interviews (e.g., confidentiality, conditions) (4) |
| ITK3 | Knowledge of the roles and responsibilities of parties involved in the interview process (4) |
| ITK4 | Knowledge of strategies and techniques for conducting non-adversarial interviews (e.g., question style, organization, active listening) (4) |
| ITK9 | Knowledge of procedures and guidelines for administering oaths (4) |
| ITS6 | Skill in conducting non-adversarial interviews (4) |
| ITS8 | Skill in confronting applicant with credibility issues (4) |
| IR1 | Skill in interacting with others in a professional manner (e.g., respectful, courteous) (4) |
| IR4 | Skill in building rapport with others (4) |
| SCM1 | Skill in maintaining a professional demeanor in stressful situations (e.g., potentially dangerous encounters, emergency situations, threats to personal safety) (4) |
| SCM3 | Skill in identifying potential sources of conflict (4) |
| SCM4 | Skill in managing situations involving conflict (4) |

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 5 of 48

IFR_AR_010151

## SCHEDULE OF REVISIONS

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|------|---------------------------|------------------------------|---------|
| 06/06/2013 | Throughout document | Corrected minor typos, formatting, cites identified by OCC-TKMD. | MMorales, RAIO Training |
| 10/01/2013 | Throughout document | Corrected bad links due to move of RDOT Curriculum Library | LG, RAIO Training |
| 1/10/2015 | Throughout document | Fixed links | RAIO Training |
| 11/25/2015 | Throughout document | Corrected links | RAIO Training |
| 3/24/2017 | Throughout document | Updated link to I-590 SOP in RAD supplement; made minor revisions suggested by divisions; updated table of contents. | RAIO Training |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                                Page 6 of 48

IFR_AR_010152

## Table of Contents

1   INTRODUCTION .................................................................................................................9

2   AUTHORITY .....................................................................................................................10

3   PURPOSE OF THE INTERVIEW .........................................................................................11

3.1   Elicit Information ..........................................................................................................11

3.2   Provide Information .......................................................................................................12

4   IMPORTANCE OF THE INTERVIEW ...................................................................................12

5   THE PARTICIPANTS AND THEIR ROLES ...........................................................................13

5.1   The Officer ...................................................................................................................13

5.2   The Interviewee ............................................................................................................13

5.3   The Interpreter ..............................................................................................................14

5.4   The Representative ........................................................................................................14

5.5   Other Participants .........................................................................................................14

6   THE NON-ADVERSARIAL NATURE OF THE INTERVIEW .....................................................15

7   THE COMPONENTS OF AN INTERVIEW .............................................................................16

7.1   Pre-Interview Preparation .............................................................................................16

7.2   Introduction to the Interview ........................................................................................17

7.3   Oath .............................................................................................................................24

7.4   Verification of Basic Biographic Information ...............................................................24

7.5   Testimony .....................................................................................................................26

7.6   Closing Statement/Comment/Questions by Interviewee and/or Representative ...............27

8   OUTSIDE FACTORS THAT CAN AFFECT THE INTERVIEW ..................................................28

8.1   Stress ...........................................................................................................................28

8.2   Time Constraints ...........................................................................................................29

8.3   Your Personal Experiences ...........................................................................................29

9   INTERVIEWING BEST PRACTICES ....................................................................................29

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 7 of 48

IFR_AR_010153

9.1  Be Organized ..................................................................................................29

9.2  Interview, Don't Interrogate ...........................................................................31

9.3  Maintain Control of the Interview ..................................................................34

9.4  Practices to Avoid ...........................................................................................35

**10  CONCLUSION** .......................................................................................................**35**

**11  SUMMARY** .............................................................................................................**36**

11.1 Authority ........................................................................................................36

11.2 The Purpose of the Interview .........................................................................36
    11.2.1 To Gather Information ..............................................................................36
    11.2.2 To Provide Information .............................................................................36

11.3 Importance of the Interview ...........................................................................37

11.4 The Participants and Their Roles ...................................................................37

11.5 The Components of an Interview .....................................................................37

11.6 Interviewing Tips ...........................................................................................38

**PRACTICAL EXERCISES** ................................................................................................**40**

**OTHER MATERIALS** ......................................................................................................**41**

**SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS** .........................**42**

Required Reading ...................................................................................................42

Additional Resources .............................................................................................42

Supplements ...........................................................................................................42

**SUPPLEMENT B – ASYLUM ADJUDICATIONS** ............................................................**45**

Required Reading ...................................................................................................45

Additional Resources .............................................................................................45

Supplements ...........................................................................................................45

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                Page 8 of 48

IFR_AR_010154

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

Officers in the RAIO Directorate conduct interviews primarily to determine eligibility for immigration benefits or requests; to corroborate information provided by applicants, petitioners, and beneficiaries; and/or to establish whether a person understands the consequences of his or her actions.

The modules of the RAIO Directorate – Officer Training Program and the division-specific training courses constitute primary field guidance for all officers who conduct interviews for the RAIO Directorate. The USCIS Adjudicator's Field Manual (AFM) also provides guidance for officers when conducting interviews, particularly for officers serving in RAIO's international offices. There may be some instances where the guidance in the AFM conflicts with guidance provided by the RAIO Directorate. If this is the case, you should follow the RAIO guidance. Further guidance regarding interviews for specific applications will be discussed during division-specific trainings.

In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.

# 1   INTRODUCTION

This is the first in a series of interviewing modules that discuss various topics including how to elicit testimony, the proper procedures for taking notes, and considerations when conducting an interview through an interpreter. This module outlines the basic principles and components of conducting a non-adversarial interview. Please refer to the other interviewing modules for additional guidance on conducting RAIO interviews.

- Interviewing – Eliciting Testimony

- Interviewing – Note-Taking

- Interviewing – Working with an Interpreter

- Interviewing – Interviewing Survivors of Torture

The following is a non-exhaustive list of immigration benefits, petitions, protection determinations, and other immigration-related requests you may encounter as an officer in the RAIO directorate:

- G-646 Sworn Statement of Refugee Applying for Admission into the United States

- I-130 Petition for Alien Relative

- I-131 Application for Travel Document

- I-407 Abandonment of Permanent Resident Status

- I-589 Application for Asylum and Withholding of Removal

- I-590 Registration for Classification as Refugee

- I-600 Petition to Classify Orphan as Immediate Relative

- I-604 Determination on Child for Adoption

- I-730 Refugee/Asylee Relative Petition

- I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (NACARA)

- N-400 Application for Naturalization (Military Naturalizations)

- Boarding letters

- Credible fear determination

- Reasonable fear determination

## 2   AUTHORITY

The following provides the authority on interviewing for all officers who conduct interviews for the RAIO Directorate.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                          Page 10 of 48

IFR_AR_010156

- 8 C.F.R. § 103.2(b)(9) gives the authority to USCIS to require that an applicant, petitioner, sponsor, beneficiary, or other individual appear for an interview.

- 8 C.F.R. § 208.9(b) requires that Asylum Officers conduct interviews in a non-adversarial manner. Although this regulation applies only to Asylum Officers, as a matter of policy, officers in the RAIO Directorate must conduct all interviews in a non-adversarial manner.

- 8 C.F.R. § 207.2(b) requires that each applicant 14 years and older appear in person before an Immigration Officer for an inquiry under oath to determine his or her eligibility for admission as a refugee.

- INA § 287(b) gives the authority to USCIS officers to administer oaths and to take and consider evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United States.

## 3    PURPOSE OF THE INTERVIEW

The main purpose of the interview is to elicit and provide information related to eligibility for an immigration benefit or for some other official purpose. The interview also provides an opportunity for the interviewee to ask questions that he or she may have and to present relevant information [Asylum Adjudicaitons Supplement – Purpose of the Interview].

### 3.1    Elicit Information

The main reasons that you will elicit information during an interview are to:

- Verify the identity of those present at the interview.

- Determine whether to proceed with the interview (which may depend on jurisdiction, the availability of an interpreter, the presence of an attorney of record, or other factors).

- Determine eligibility for a benefit being sought (if the interview relates to an application for a benefit).

- Determine whether the interviewee is subject to any bars or grounds of inadmissibility.

- Evaluate the credibility of the interviewee.

- Identify whether fraud may be involved.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                    Page 11 of 48

IFR_AR_010157

Eliciting testimony involves more than simply asking questions and receiving responses. You will likely need to actively draw out information from the interviewee that has a bearing on the purpose of the interview, such as an interviewee's eligibility for a benefit.[1]

## 3.2    Provide Information

In addition to obtaining information during the interview, you also provide information to the interviewee and to others who may be present, such as derivative family members, interpreters, and in some circumstances, witnesses or the interviewee's representative. The information you provide includes:

- The purpose of the interview and the interview process

- The roles and responsibilities of all persons involved in the interview

- What the interviewee can expect to happen after the interview

If the interviewee has questions, you will also provide information in response to those questions.


## 4    IMPORTANCE OF THE INTERVIEW

The importance of the interview cannot be overstated.

- The interview is an important part of your adjudication or determination and is one of the main tools you use to gather the information necessary to make a correct decision.

- The interview may be the only opportunity for you to elicit and clarify information upon which to base a decision.

- The decision you make, based on the information you gather at the interview, may have serious consequences.

  - Your decision may affect whether the interviewee is reunited with close family members.

  - In the protection context, an interviewee wrongly found ineligible for the benefit sought may eventually be returned to the country from which he or she fled and may thereby face persecution or even death.

  - Your decision regarding the grant of an immigration benefit could have implications for U.S. national security.

---

[1] For additional information, see RAIO Training module, *Eliciting Testimony*.

- Interviewees may shape their opinion of the U.S. Government based on their interactions with you. While you may not remember every person you interview, this interview may be a pivotal point in an interviewee's life, and he or she will likely remember you and his or her impression of you and the U.S. Government for years to come.

Because of the importance of the interview, you must conduct yourself in a professional manner at all times, treating the interviewee with respect and courtesy. You must constantly strive to conduct organized, focused, and well-planned interviews.

# 5     THE PARTICIPANTS AND THEIR ROLES

A number of individuals may be present at an interview, each with a different role. The roles of the possible participants, outlined below, are discussed throughout this module.

## 5.1     The Officer

You are a representative of the U.S. Government and as such, you must project a competent, professional, and courteous image, and uphold the integrity of the U.S. immigration system. With this in mind, you are to conduct non-adversarial interviews in the manner described throughout this module.

Officers within RAIO include:

- International and Refugee Affairs Division (IRAD): Adjudications Officers, Overseas Adjudications Officers, Overseas Adjudications Specialists, and Supervisory Adjudications Officers (including Field Office Directors, District Directors, Deputy District Directors, and Branch Chiefs), Refugee Officers, Supervisory Refugee Officers, Fraud Detection and National Security (FDNS) Officers, and officers from other USCIS components who are detailed to IRAD to conduct refugee interviews. (Note: guidance in this module also applies to non-officers, such as Office of Chief Counsel [OCC] attorneys, who are detailed to IRAD to conduct refugee interviews)

- Asylum Division: Asylum Officers (including Senior Asylum Officers and Training Officers), Supervisory Asylum Officers (including Asylum Office Directors, Deputy Directors), and FDNS Officers

In most cases, when conducting interviews, you are both the fact-finder and the decision-maker. You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.

## 5.2     The Interviewee

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                              Page 13 of 48

IFR_AR_010159

The interviewee may be the principal applicant, a derivative family member, or witness in the case. The interviewee's role is to provide testimony and, when appropriate, other evidence.[2]

## 5.3    The Interpreter

The interpreter's role is to accurately interpret between the language of the interviewee and the language of the officer (English). The interpreter is not a witness and should not offer testimony, nor should the interpreter attempt to clarify the officer's or interviewee's statements or questions.[3]

## 5.4    The Representative

An applicant or petitioner may be represented by an attorney in the United States, an attorney outside the United States (in matters occurring outside the geographical confines of the United States), or an accredited representative of a recognized organization.[4] In addition, whenever an examination is required, the person involved has the right to be represented by an attorney or representative.[5] This does not provide any applicant for admission the right to representation, in either primary or secondary inspection or in an interview regarding a request for classification as a refugee, unless the applicant is the focus of a criminal investigation and has been taken into custody.[6]

The representative must file a properly completed Form *G-28 Notice of Entry of Appearance as Attorney or Accredited Representative* or Form *G-28I Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States*, which must be signed by the applicant or petitioner.

Because of the non-adversarial nature of the process, described below, the role of the representative during the interview is minimal. You control the interview and will ask most of the questions. You may allow the representative to comment or ask questions during the course of the interview to clarify specific points. After your last question, you should give the attorney an opportunity to offer a closing statement. You have the discretion to limit the length of the closing statement, or in rare circumstances, require that a statement be submitted in writing instead.[7]

## 5.5    Other Participants

---

[2] 8 C.F.R. § 208.9(b).

[3] For additional information, see RAIO Training module, *Interviewing — Working with an Interpreter.*

[4] 8 C.F.R. § 103.2(a)(3).

[5] 8 C.F.R. § 292.5(b).

[6] Memorandum from Grover Joseph Rees III, INS Office of the General Counsel, to Jan C. Ting, Office of International Affairs, *Representation of an Applicant for Admission to the United States as a Refugee During an Eligibility Hearing* (Nov. 9, 1992).

[7] 8 C.F.R. § 208.9(d).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                  Page 14 of 48

IFR_AR_010160

In some interviews the applicant has another person present. In the case of children, this may be a "trusted adult" who participates in order to help the child feel at ease.[8] In interviews of children or individuals with disabilities who may be unable to state their claim, a "trusted individual" may assist by testifying about the applicant's circumstances.

## 6    THE NON-ADVERSARIAL NATURE OF THE INTERVIEW

It is well established that a non-adversarial approach in which the interviewer builds rapport is the most effective interview style for eliciting credible information.[9]

A non-adversarial proceeding is one in which the parties are not opposing each other. It differs from an adversarial proceeding, such as civil and criminal court proceedings, in which parties oppose each other by advocating their mutually exclusive positions before a neutral arbiter until one side prevails and the other side loses. A removal proceeding before an immigration judge is generally an adversarial proceeding because the Immigration and Customs Enforcement (ICE) attorney represents DHS in removal proceedings.[10]

In conducting an interview for an immigration benefit as well as other RAIO interviews, you are usually the only person who questions the interviewee. With a request for a benefit, the primary intent of USCIS is to determine whether the principal interviewee qualifies for a benefit. It is not the role of the interviewer to oppose the principal interviewee's request or application. Because the process is non-adversarial, it is inappropriate for you to interrogate or argue with any interviewee. You are a neutral decision-maker, not an advocate for either side. In this role you must effectively elicit information from the interviewee in a non-adversarial manner, to determine whether he or she qualifies for the benefit.

Additionally, RAIO interprets the term "non-adversarial interview" to encompass not only the manner of questioning as described above, but also the tone and atmosphere in which you must conduct interviews. It is your job to maintain a neutral and professional demeanor even when confronted with interpretation problems, a difficult or challenging interviewee or representative, or an interviewee whom you suspect is being evasive or untruthful. Your personal feelings about the participants in the interview should not affect the quality of your interview or your decision.

---

[8] Memorandum from Jeff Weiss, INS Office of International Affairs, to Asylum Officers, Immigration Officers, and Headquarters Coordinators (Asylum and Refugees), *Guidelines for Children's Asylum Claims*, 120/11.6 (Dec. 10, 1998); for additional information, see RAIO Training module, *Children's Claims*.

[9] Amina Memon, et al., "The Cognitive Interview: A Meta-Analytic Review and Study Space Analysis of the Past 25 Years," *Psychology, Public Policy and the Law 16*, no. 4, 2010, pp. 340–372; Ronald P. Fisher and R. Edward Geiselman, "The Cognitive Interview method of conducting police interviews: Eliciting extensive information and promoting Therapeutic Jurisprudence," *International Journal of Law and Psychiatry 33*, 2010, pp. 321–328.

[10] USCIS, Adjudicator's Field Manual (AFM), Appendix 15-2 *Non-Adversarial Interview Techniques*.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 15 of 48

IFR_AR_010161

The non-adversarial nature of the interview allows the applicant to present a claim in an unrestricted manner, within the inherent constraints of an interview before a government official. An interview before a government official may be intimidating to an applicant for various reasons, including, but not limited to, the following:

1. Prior negative experiences with authority figures

2. Trauma from sudden flight from the country of origin, or other causes

3. Perceived or real differences between the applicant's culture and the culture of the government official conducting the interview

4. Fear of sharing information of a highly personal or sensitive nature

## 7 THE COMPONENTS OF AN INTERVIEW

Although you will develop your own interview style, the following components are required components of every officer's interviews:

- Pre-Interview Preparation
- Introduction
- Oath
- Verification of Basic Biographical Information
- Testimony
- Closing Statement/Comment/Questions by Interviewee and/or Representative
- Conclusion

### 7.1 Pre-Interview Preparation

Preparing for the interview helps you identify the issues to focus on and to formulate meaningful questions to ask during the interview to gather the facts needed to support your decision. Before each interview you must analyze the case and assess the evidence in the record by reviewing the file, performing security checks, and, in many instances, reviewing relevant country of origin information.

As you review the file, you should read the application and any accompanying statements and supporting documents. You should also cross-check names and aliases of the principal interviewees and dependents against other documents in the file and available databases.  In addition, you must be alert to indications that you will need to follow special procedural guidance or modify your questioning techniques; for example, when interviewing children, possible trafficking victims, or individuals who may pose a threat to national security [Asylum Adjudications Supplement – Pre-Interview Preparation].

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                      Page 16 of 48

IFR_AR_010162

This preparation helps you to establish the chronology of events of a case, determine lines of questioning, and, where relevant, identify gaps, inconsistencies, or potential bars you will need to address during the interview[11] [International and Refugee Adjudications Supplement – Pre-Interview Preparation].

As noted below in *Interviewing Tips*, an outline or checklist of the main points you want to address in the interview may be helpful. You may create such a checklist yourself for each case or use common checklists created by each division. Before a refugee or asylum interview, you could write a chronology of events leading to the interviewee's departure from his or her country and refer to it during the interview. If using an outline, checklist, or chronology, be sure that it does not distract you from asking necessary follow-up questions during the interview or from actively listening to and evaluating the interviewee's responses or questions.

It is essential that the interviewee appreciate the importance and seriousness of the proceedings. Therefore, the setting in which the interview takes place must be orderly and official in appearance.[12]

> Before beginning an interview, you should take particular care to remove from the interview area all files and documentation relating to other interviewees. This ensures confidentiality and prevents documents from being placed in the wrong file.

## 7.2    Introduction to the Interview

The introduction to the interview includes greeting the parties and explaining what will happen during the interview. You will develop your own style for handling the introduction. Your manner during the introduction sets the tone for the interview. The introduction is your best opportunity to establish rapport[13] with the interviewee. Your introduction should help put the interviewee at ease, thus facilitating the flow of information and allowing you to elicit the information that you need throughout the interview. Whatever approach you choose, you must conduct the entire interview in a non-adversarial manner.

**Greet the Parties**

You should greet the interviewee and any other participants present at the interview and establish the identities of all parties. You should introduce yourself and any other

---

[11] *See also* European Asylum Curriculum (EAC) #6 – Interview Techniques, Sub-module 1: Conducting the Interview, Unit 1.1 Preparation of the Case, "Case preparation."

[12] USCIS, Adjudicator's Field Manual (AFM), Chapter 15.2 *Interview Environment*.

[13] For additional information on establishing rapport, see RAIO Training module, *Interviewing - Eliciting Testimony*.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 17 of 48

IFR_AR_010163

participants who may not know each other. Before escorting the interviewee to your interview space, verify the identity of the interviewee and any dependents, as well as that of the interpreter when appropriate. In situations where the interviewee is escorted by another person to your interview space, do this as soon as the interviewee arrives.

**Determine Who Will Be Present During the Interview**

You have the discretion to decide who will be present at the interview.

- Dependents

Dependents may remain with the principal interviewee during the interview at your discretion. In certain types of cases, dependents must be interviewed individually. In these situations, you should interview the dependents separately, apart from the principal interviewee and other dependents. When it is not required that dependents be interviewed separately or offer testimony, you should defer to the principal interviewee's preference as to whether their dependents remain present during the interview. However, in protection interviews it is generally better to interview the principal applicant without dependents present, as noted below.

In interviews where the principal applicant is unable to testify due to disability or incapacity, it is permissible for a third party to testify on his or her behalf.[14]

- Sensitive Topics

As noted above, you should defer to the interviewee's preference when determining whether dependents will remain in the interview. However, after the interview has begun, an interviewee may be reluctant to request that dependents leave the room. You should therefore be alert for signs that an interviewee may be uncomfortable discussing certain issues with others present. In some cases (e.g., involving domestic violence or sexual abuse), you may ask to speak with the interviewee alone first to determine whether the interviewee would prefer to be interviewed without the dependents present.

In protection interviews it is best to make it your practice to interview the principal applicant without dependents present. Even if topics under discussion do not appear to be sensitive, it is usually troubling for children to see their parent display her or his vulnerabilities and an inability to protect them. Furthermore, many men feel reluctant to express personal fears in front of their families, and if their dependents remain in the interview, you may not adequately elicit all of the applicant's concerns.

Some interviewees may request that a relative or friend be present at the interview for moral support. You may allow such individuals to remain. In particular, children may have a "trusted adult" present during the interview. However, you must also explain to any accompanying individual that he or she is not the interviewee's representative, and

---

[14] For additional information on specific procedures, refer to Division procedure manuals.

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                                    Page 18 of 48

IFR_AR_010164

that he or she must not become involved in the interview process. You should also watch for any red flags which may suggest problems or irregularities with the relationship between the "trusted adult" and the child, and should consult your supervisor if you suspect any wrongdoing on the part of the "trusted adult" or other accompanying adult. *See also* "Trafficking or Other Forms of Coercion," below.

- Validity of Family Relationships

In some interviews, you will have to determine whether the relationship between the primary applicant and a relative listed on the application form is genuine.

*Example*

> In the adjudication of a Form I-590, *Registration for Classification as Refugee*, where the primary applicant has listed seven minor dependent children, you may interview some of the children separately to ensure that they are in fact part of the same family unit. If you believe that some or all of the relationships are not as claimed on the I-590, it is best to interview each child separately, so that blame for a denial does not fall on one or two children, who may be harmed as a result.

- Trafficking or Other Forms of Coercion

You may become concerned that the interviewee is in a vulnerable situation in relation to another party present at the interview. These are sensitive situations, and you must proceed with caution. While you may attempt to interview an interviewee apart from a suspected trafficker who may represent himself or herself as a party to the interview (such as a guardian, companion, or interpreter), you must also ensure that you are not violating the interviewee's right to representation or exposing the interviewee to possible reprisal from the trafficker. In such situations you should seek supervisory guidance before separating an interviewee from another party to the interview.[15]

- National Security Risks

If you discover during your interview preparation or during the interview that the interviewee may have provided support to a terrorist group or may have been involved in a terrorist activity or in another act that could negatively impact public safety or national security, contact your supervisor.[16]

**Explain the Purpose of the Interview**

You must explain that the purpose of the interview is to:

---

[15] For additional information, see RAIO Training module, *Detecting Possible Victims of Trafficking.*

[16] For additional information, see the specific procedures for your division and RAIO Training module, *National Security: Terrorism Related Inadmissibility Grounds.*

- Give the interviewee an opportunity to explain why he or she submitted the application or requested the benefit.

- Allow the interviewee to present evidence of eligibility.

- Allow you to gather necessary information from the interviewee and any witnesses.

- Provide information to the interviewee concerning the application process.

**Explain Confidentiality**

All asylum and refugee interviews are confidential.[17] Asylum confidentiality standards are formalized in the regulations. In the asylum context, absent the applicant's consent, you are generally prohibited from disclosing information contained in or pertaining to any asylum application to individuals other than the applicant. This includes acknowledging the existence of an asylum application. This restriction on disclosure does not apply to releasing information to the applicant's representative. The regulation also has exceptions on the prohibition on disclosure for certain U.S. Government officials and certain U.S. courts with a need to know the information.[18] Confidentiality provisions for asylum applicants contained in 8 C.F.R. § 208.6 also apply to the beneficiaries of I-730 petitions, whether they are following-to-join asylees or refugees. They also generally govern the disclosure of information related to credible fear and reasonable fear determinations, as well as to applications for withholding or deferral of removal under Article 3 of the Convention Against Torture, which are encompassed within the asylum application. [19]

As a matter of policy, adjudications in the refugee context follow the same confidentiality guidelines as asylum, with one limited exception:

- When a credibility issue arises based on conflicting testimony by family members who are part of the same case or a cross-referenced case, information provided by one family member should be shared with another family member to give the applicant(s) an opportunity to explain the discrepancies.

---

[17] Immigration and Nationality Act (INA) § 245A(c)(5); Memorandum from Barbara L. Strack, Chief, Refugee Affairs Division and Joanna Ruppel, Chief, International Operations Division, USCIS, to Refugee Affairs Division, *Information Consent Form for Use in Refugee Interviews*, 120/6 (Jun. 17, 2009).

[18] The Secretary may disclose asylum related information  Only your supervisor or upper management may decide whether an exception on the prohibition on disclosure exists. For additional information, refer to the *Identity and Security Check Procedures Manual* (ISCPM).

[19] *See Asylum Confidentiality Memos*: Memorandum from Joseph E. Langlois, Director, Asylum Division, to Asylum Office Directors and Deputy Directors, *Fact Sheet on Confidentiality*, HQASM 120/12.8 (Jun. 15, 2005); and Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, HQCOU 120/12.8 (Jun. 21, 2001).

---

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 20 of 48

IFR_AR_010166

You are required to safeguard information and may not disclose it unless one of the exceptions to the disclosure restrictions applies. You must know if any prohibitions on disclosure exist for the benefit being adjudicated, and inform interviewees of the applicable confidentiality provisions.

Interviewees may be hesitant to disclose information if they believe it is not confidential because:

- Descriptions of past events may be highly personal.

- Interviewees may fear harm to themselves or others as a result of disclosing certain information.

- Interviewees may fear for the lives and safety of family members and friends.

Remember that many interviewees are from countries where the government does not value or protect the privacy of its citizens. Therefore, it may be difficult for some interviewees to understand the term "confidentiality." In the overseas refugee context, officers are provided specific language to assist the applicant in understanding confidentiality and what it means to waive confidentiality or otherwise disclose information under certain circumstances.[20]

**Explain Other Aspects of the Interview Process**

You can help alleviate some of the interviewee's nervousness by explaining the process of the interview so that the interviewee will know what to expect. The interviewee should be informed that:

- It is important that you and the interviewee understand each other.

- The interviewee must answer your questions truthfully and to the best of his or her knowledge.

- The interviewee must tell you if he or she does not know the answer to a question, rather than guess at or supply an answer he or she thinks you want to hear.

- It is crucial that the interviewee understand each question and if he or she does not understand a question, he or she must let you know so that you may clarify it. (Due to cultural barriers or fear of authority figures, many interviewees will not ask for clarification when they do not understand your question.)

- He or she should not ask the interpreter for help or clarification, because the interpreter's role is only to interpret what each party says.

---

[20] See Memorandum from Barbara L. Strack, Chief, Refugee Affairs Division and Joanna Ruppel, Chief, International Operations Division, USCIS, to Refugee Affairs Division, *Information Consent Form for Use in Refugee Interviews*, 120/6 (Jun. 17, 2009).

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                     Page 21 of 48

IFR_AR_010167

- You will take notes during the interview to remember what was said during the interview.

- The interviewee may ask questions at any time during the interview.

- All the information in the notes is also confidential and will not be shared with unauthorized individuals.

- You will allow the interviewee time at the end of the interview to make any additional statements, including information that you did not ask about that he or she thinks is important and would like to add.

- You will carefully consider the information the interviewee provides to determine eligibility for the benefit.

- At the end of the interview, you will tell the interviewee how he or she will be notified of the decision on the case.

**Advise the Interpreter**

The interpreter's role is to interpret as accurately as possible what the officer and interviewee say during the interview. You must advise the interpreter that he or she is a conduit of communication and must not add nor detract from your statements or the interviewee's statements. Officers in the RAIO Directorate should follow their division-specific guidance when advising interpreters about confidentiality requirements and their oath to interpret truthfully and accurately.[21] [International and Refugee Adjudications Supplement – Interpreters for Refugee Interviews]

**If a Representative Is Present at the Interview**

If a representative is present, you must:

- Review form G-28 *Notice of Entry of Appearance as Attorney or Accredited Representative* or form G-28I *Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States* to verify that it has been properly executed;[22] or

- If the representative and/or the interviewee have not signed the form, ask them to do so at the interview; or

- If no form is in the file, ask the representative to submit one before beginning the interview.

---

[21] For additional information, see RAIO Training module, *Interviewing – Working with an Interpreter*.

[22] 8 C.F.R. § 292.4.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                          Page 22 of 48

IFR_AR_010168

You also must verify that the representative at the interview is the same person who signed the G-28 or G-28I. If the representative present is not the representative listed on the G-28, follow the guidance below.

- If the representative appearing at the interview is from the same office as the representative who submitted the G-28, he or she must sign the form and correct any information on it, as appropriate.

- If the representative appearing at the interview is not from the same office as the representative who submitted the G-28, he or she must submit a new G-28.

You must clarify with the interviewee whether the new representative is representing him or her for purposes of the interview only or is replacing the original representative, in which case you should annotate the original G-28 to reflect the change in representation.

If the representative has submitted a G-28 or G-28I but is not present, you must inform the interviewee that he or she has a right to have a representative present at the interview. If the interviewee wishes to proceed without the representative, the interviewee must sign a waiver form before the interview can be conducted. If the interviewee does not wish to proceed without the representative, you must reschedule the interview.

### *Cooperative Relationship Between the Representative and the Officer*

You and the representative are not adversaries. Therefore, some actions that may be appropriate for attorneys in an adversarial setting may not be appropriate in the non-adversarial interview, where you and the representative share a cooperative role in developing and clarifying the merits of the interviewee's claim.

In certain instances it may be appropriate for the representative to comment during the course of the interview to clarify issues. Such comments may be helpful and should not be discouraged. However, you must retain control of the interview. If the representative repeatedly interrupts or otherwise disrupts the interview, ask the representative to refrain from interrupting and explain that he or she will have an opportunity at the end of the interview to ask questions and make comments.

If you encounter a representative who is unaware of the non-adversarial nature of the interview, you may need to advise the attorney of his or her role in this proceeding. In doing so, you must always conduct yourself professionally.

You must inform the representative that he or she will be allowed to make a closing statement, comment on the evidence presented, and ask the interviewee additional questions. You have the discretion, however, to limit the length of the statement or request that it be submitted in writing, in lieu of an oral statement at the end of the

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 23 of 48

IFR_AR_010169

interview.[23]  You also have the discretion to have the attorney suggest questions for you to ask rather than allowing the attorney to question the interviewee directly.

## 7.3    Oath

Interviewees and witnesses must be placed under oath before testifying. You must place all interviewees under oath before asking any questions related to the claim or application. You, the interviewee, and the interpreter should stand during the administration of the oath unless physically unable to do so.

The oath should be administered in a way that impresses upon the interviewee the importance of the occasion and the testimony he or she is about to give. A suggested explanation of the oath follows:

> "I am now going to place you under oath. This means that I am going to ask you to vow or promise to tell the truth. Once you are placed under oath, I will expect that what you tell me will be the truth to the best of your knowledge."

The Refugee Affairs Division has developed specific language for the oath [International and Refugee Adjudications Supplement – Oaths].

The fact that the interview is being conducted under oath or affirmation should be recorded in the interview notes. If a verbatim question-and-answer statement is taken, the exact wording of the oath or affirmation should be included in the statement [Asylum Adjudications Supplement – Oath].

If an interpreter is present, you must administer a separate oath to the interpreter.

## 7.4    Verification of Basic Biographic Information

You must verify with the interviewee all of the biographical information on the application form. Techniques for gathering this information are elaborated in RAIO Training module, *Interviewing – Eliciting Testimony*.

**Review the Form**

You must verify and, if necessary, update or correct information on the form. Someone other than the interviewee may have completed the form, or information about the interviewee may have changed since the form was filed. As a result, some of the information on the form may not be correct [Refugee and International Adjudications Supplement – Review the Application Form]. Please keep in mind that the interviewee may not be aware of all of the information that has been submitted on his or her behalf. Any corrections must be made in red ink and numbered. At the end of the interview, the interviewee must provide a signature to confirm all changes made to the form.

---

[23] 8 C.F.R. §208.9(d).

IFR_AR_010170

You must be certain that the form contains the interviewee's full and correct name, plus any aliases (for refugee interviews, see Standard Operating Procedure for Form I-590). Aliases are any other names the interviewee has used, including maiden names, nicknames, hyphenated names, abbreviated names, baptismal names, and alternate order of first and last names. You must also note any variation in birth date that the interviewee has used. Different calendars and cultural practices can lead to confusion about dates of birth. You must confirm all dates in addition to places of birth, address, and entry information, and you must confirm that all other biographical information on the form is current and correct.

You must also compare information on the form with other documentation in the file and documents presented by the interviewee at the interview, such as birth certificates, marriage and divorce certificates, death certificates, school records, baptismal certificates, and passports. If the interviewee has dependents, verify that the biographical information for each is also correct.

**Review Documents**

The interviewee may submit documents with his or her application or petition and may bring additional documents to the interview.

Although interviewees are not always required to submit identity documents, you must ask the interviewee and dependents if they have such documents. Examples include identity documents from the interviewee's country, the United Nations High Commissioner for Refugees (UNHCR), the United States, or other governmental sources.

If the interviewee does not have identity documents, and he or she is from a population that ordinarily possesses identity documents, you should ask the interviewee to explain why he or she does not have these documents.

If the interviewee submits an original document with copies of the document, you should retain the copies for the file, write or stamp on the copies "original seen and returned," and sign and date each copy below this statement.[24]

Similarly, if the interviewee presents an original document for which there are copies in the file, you should write or stamp on the file copies that the "original was seen and returned" and sign and date the file copies. If the interviewee has only photocopies of a document, you should write on the copies retained for the file "from photocopy," and sign and date each one. You should also inquire as to why the applicant does not possess the original document.

---

[24] For additional information, see RAIO Training modules, *Evidence* and *Fraud.*

Guidance on how to proceed if you encounter a document that appears to be fraudulent is provided in RAIO Training module, *Fraud*.

**Correct the Form**

Any corrections to the form must be made in red ink on the record copy of the form, crossing out the original information so that it is still legible. This includes corrections to a personal statement attached to the Form I-589 in asylum processing and the Resettlement Support Center (RSC) case history attached to the Form I-590 in overseas refugee processing.

At the beginning of the interview, you should ask the interviewee and the interviewee's representative, if any, if they would like to make any corrections on the personal statement or RSC Case History.

The corrections must be numbered so that they can be explained to the interviewee before he or she signs the form at the end of the interview to verify that the application form is accurate. If the interviewee does not alert you to any corrections before the interview begins, and his or her testimony is inconsistent with information on the form, you must address material credibility concerns with the interviewee. However, it is important to remember that the applicant may not have prepared this form and may not be fully aware of its contents.[25]

## 7.5 Testimony

Because this is a non-adversarial proceeding and you are the fact-finder in the case, you are responsible for eliciting all relevant information from the interviewee.[26] Although you must cover all of the information requested in the application form, you should not simply ask the interviewee the same questions as those on the form. Instead, you should use a variety of techniques that provide the interviewee an opportunity to speak in his or her own words.[27]

**Allow Applicant to Clarify Inconsistencies**

If any of the information in the form conflicts with the interviewee's interview testimony, or if you notice inconsistencies within the interviewee's interview testimony, you must give him or her an opportunity to explain the discrepancies. You must correct the application form when necessary, advising the interviewee of the corrections.

You must pursue all relevant lines of questioning, until you are certain that you have sufficient pertinent information to make a determination on the interviewee's claim. You

---

[25] For additional information, see RAIO Training modules, *Credibility* and *Evidence*.

[26] 8 C.F.R. § 208.9(b); UNHCR Handbook, para. 196.

[27] For additional information on methods and issues related to eliciting testimony, see RAIO Training module *Interviewing – Eliciting Testimony*.

must also allow the interviewee to ask questions as appropriate and to submit additional documents at the interview in support of his or her claim.

You must learn to distinguish between the likelihood that the interviewee is confused and the possibility that his or her non-responsiveness is an attempt to receive a benefit by fraud. If the interviewee does not appear to understand your question, you should ascertain whether there is a problem with the interpretation or with your phrasing of the question. However, if the interviewee appears to understand your question and is being evasive or non-responsive, or presents inconsistent or implausible testimony, you must confront the interviewee and give him or her an opportunity to explain. Proper confrontation of an interviewee is not hostile or challenging. By confronting an interviewee, you merely make the interviewee aware of your concerns, and provide the opportunity to address them.[28]

## 7.6    Closing Statement/Comment/Questions by Interviewee and/or Representative

As noted above, at the end of the interview, you should allow the interviewee and, if present, the representative, to make final comments or ask questions after you have finished asking your questions.

**Signatures on Form**

You and the interviewee must sign the record copy of the form. You must note the corrections made to the form, explain them to the interviewee, and inform the interviewee that, by signing the application, he or she is affirming that all the information in the form is true and correct as of the date of the interview.

**Requests to Submit Additional Documents**

In certain cases, you may request that the interviewee submit additional documentation as evidence in support of his or her claim.[29]

**Explanation of the Next Steps in the Process**

In most cases, you will not inform the interviewee of the decision at the end of the interview. Instead, you will advise the interviewee as to how he or she will receive the decision. These procedures vary, depending on the form type and interview location.

**Exit Procedures**

At every interview location, you must follow local exit procedures at the conclusion of the interview. Before beginning your first interview, you should be familiar with the local procedures. For example, in most locations a waiting area is set apart from the interview

---

[28] For additional information, see RAIO Training modules, *Credibility* and *Evidence*.

[29] For additional information, see RAIO Training module, *Evidence*.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 27 of 48

IFR_AR_010173

spaces and other offices. You may be required to escort the interviewee back to the waiting area rather than allow the interviewee to find his or her own way back unescorted. In other locations it may be standard procedure to allow the interpreter, when present, to escort the interviewee back to the waiting area.

# 8    OUTSIDE FACTORS THAT CAN AFFECT THE INTERVIEW

Multiple factors may interfere with your ability to conduct the interview or may affect the interviewee's ability to testify.

## 8.1    Stress

An immigration interview, no matter what type, can be a stressful situation for all of the individuals involved. People respond to stress in different ways and develop personal mechanisms for handling stress. These factors can affect both you and the interviewee during an interview.

You, as the interviewing officer, may have days when you are distracted by personal issues or other professional issues. You must recognize your own distractions and minimize their effect on the interview.

The interviewee may find the interview stressful for a number of reasons. He or she may be:

- Anxious because his or her future may depend on the outcome

- Anxious about the unknown (not knowing what will happen during the interview)

- Concerned that he or she will not be able to answer the questions asked

- Fearful of dealing with a government official or being in an unfamiliar environment

- Concerned about communicating through an interpreter

- Worried about forgetting important information

- Concerned that his or her application or request may be denied

- Apprehensive about retelling painful or humiliating experiences

- Suffering from a physical ailment such as dementia, or a trauma-related condition such as Post-Traumatic Stress Disorder (PTSD)[30]

---

[30] For additional information, see RAIO Training module, *Interviewing Survivors of Torture and Other Severe Trauma*.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                        Page 28 of 48

IFR_AR_010174

All of these factors have the potential to increase the interviewee's level of stress or otherwise impede the smooth flow of the interview.

The interpreter, representative, witness, or other participants in the interview may have their own concerns, such as their ability to interpret correctly, or to represent or testify on behalf of the interviewee in such a way as to assist the interviewee most effectively. In some cases, those accompanying the interviewee may have an ulterior motive to commit fraud on behalf of the interviewee.

You are responsible for monitoring your stress level as well as identifying and mitigating the stressors that may affect all other participants at the interview.

## 8.2     Time Constraints

As the interviewing officer, you are obligated to collect as much relevant information as possible within the time period allocated by your division or local office to conduct an interview.  The tasks and time involved in completing a particular interview may increase when:

- A complicated story takes additional time to fully elicit

- A potential bar or ground of inadmissibility needs to be explored

- Several dependents on the case require interview and processing, and/or

- A dependent must be added or deleted

To accomplish all of the required tasks successfully, you must work expeditiously within predetermined time constraints. Always be mindful of the need to gather enough information to make a legally sufficient adjudication.

## 8.3     Your Personal Experiences

During the interview, you should not allow your personal life experiences and biases to influence you either in favor of or against the interviewee. You should never approach the interview with a preconceived notion of the outcome.

## 9     INTERVIEWING BEST PRACTICES

The following tips may help you to maintain control and elicit all necessary information at the interview.[31]

## 9.1     Be Organized

---

[31] For additional information, *see* RAIO Training Modules, *Cross-cultural Communication* and *Interviewing – Working with an Interpreter.*

As you prepare for the interview, create an organized environment that will help you capture all of the information you need. You and the interviewee must remember a significant amount of information; the fewer distractions, the easier it will be.

Your desk should be clean and free of clutter, including papers from other files, with only those items that are necessary for processing the case visible to the applicant. Have all supplies and necessary papers (notepad, checklists/outlines) within easy access during the interview. This will remove unnecessary distractions and allow you and the interviewee to concentrate on the interview. It is also helpful to have a box of tissues nearby in case the interviewee becomes emotional during the interview.

### Use an Outline or Checklist

Before you begin conducting interviews, ask your supervisor if he or she recommends an outline or checklist that other officers have used. Another option is to prepare your own outline or checklist based on Standard Operating Procedures (SOP) for different form types. For example, for protection interviews, your outline or checklist might include background, past harm, possession of a protected characteristic, awareness, capability, inclination, military service, firm resettlement, and whether mandatory bars or grounds of inadmissibility apply. Using an outline or checklist may prevent omissions of important lines of questioning. Even experienced officers sometimes forget to ask certain questions. You should review the outline or checklist before the interview and look at it again before ending the interview to ensure that everything has been covered.

> Outlines or checklists are merely the starting point for the information you must elicit during the interview. They should not be used as a substitute for all necessary lines of questioning and follow-up questions during your adjudication. Do not let an outline or checklist distract you from asking necessary follow-up questions during the interview or from actively listening to and evaluating the interviewee's responses or questions.

### Develop Time Management Skills

Before adjudicating a new form type, you should learn about the adjudication, both from procedures manuals and from experienced colleagues who are able to adjudicate the same form efficiently. You can learn methods that streamline the process without negatively affecting the quality of the adjudication. Your colleagues can help you to develop interviewing skills that will allow you to quickly and efficiently gather all relevant information needed for a legally sufficient adjudication.

### Record Questions as They Arise as a Reminder to Ask Them Later in Interview

During the interview, jot down questions that arise but are not appropriate to ask at that moment, as a reminder to ask those questions when it is appropriate. This allows you to

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                        Page 30 of 48

IFR_AR_010176

focus on what the interviewee is saying, rather than on the question you plan to ask later. Use a notepad or piece of paper at the side of the desk, or create a place on your computer document to jot down any specific questions or lines of questioning that come to mind that you want to ask later. Refer to these notes later in the interview to be reminded of the additional questions that you need to ask.[32]

**Have a Map or Atlas at Hand**

The interviewee may be able to identify important locations on a map, such as where he or she lived, moved, or traveled. Keep in mind, however, that some interviewees may never have seen a map and may not know how to read one. In addition, some interviewees may never have traveled beyond their villages or towns. Their view of "distance" may be confined to the distance between their home and their field or the market. Furthermore, such interviewees may not measure distance in terms of miles or linear measurements, but rather according to another form of measurement, such as the length of time it takes to arrive at a destination, or landmarks along the way.

## 9.2    Interview, Don't Interrogate

Your questioning must be done in a professional, non-threatening, and non-accusatory manner.

**Treat the Interviewee with Respect**

As an officer in the RAIO Directorate, you should treat the interviewee with respect regardless of his or her eligibility for the benefit being sought. Similarly, you must treat the interviewee with respect even if he or she is not forthcoming with information during the interview, or does not seem to understand the process. You cannot know all of the factors that motivated the interviewee to apply for the benefit he or she is seeking, or what events have transpired in the interviewee's life before this moment. For these reasons, you should treat every interviewee with respect and consideration.

You must not show impatience or incredulity, even though you may have heard similar stories from many interviewees or you find the interviewee's testimony implausible.

Even the most self-possessed officer may feel annoyed if it appears that an interviewee is not being truthful during an interview, but you must refrain from expressing emotions such as annoyance either verbally or non-verbally.

**Maintain a Neutral Tone throughout the Interview**

It is important that you always maintain a neutral tone, even when frustrated. You occasionally may be frustrated with interviewees who are long-winded, discuss issues

---

[32] For additional information, see RAIO Training module, *Interviewing - Note Taking*.

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                    Page 31 of 48

IFR_AR_010177

irrelevant to the claim, are confused by your questions, or appear to be fabricating a claim.

**Be Non-Judgmental and Non-Moralistic**

Some information you gather during an interview may shed a negative light on the interviewee. How an interviewee reacts to or handles a particular situation may differ from how you think the situation should have been handled. The interviewee may have left family members behind in difficult or dangerous circumstances, or the interviewee may belong to an organization for which you have little respect.

Although you may feel offended by some interviewees' actions, you must put personal feelings aside and avoid passing moral judgments on interviewees in order to make neutral, legally sound decisions.

**Create a Comfortable Atmosphere**

Create an atmosphere in which the interviewee can freely express his or her claim. You should attempt to put the interviewee at ease at the beginning of the interview and continue to do so throughout the interview. Physical discomfort may also impede communication. If the interviewee has been testifying for an extended period of time, it may be appropriate to suggest that you take a break to use the restroom or get a drink of water.

**Treat Each Interviewee as an Individual**

Although many claims may be similar, each claim must be evaluated on its own merits, and each interviewee must be treated as an individual. You must approach each interviewee without any predisposition to grant or deny the benefit sought.

**Be Mindful of Potential Biases**

Everyone develops individual preferences, biases, and prejudices based on personal life experiences. This influences how you view others and how you perceive circumstances, either negatively or positively. You must make continual efforts to become aware of instances in which this can influence your approach to interviews, either positively or negatively, such that it becomes "personal baggage."

The following types of biases encountered in other interview settings, such as job applicant interviews, may also apply in a RAIO interview setting.

- **Halo effect:** The interviewee's strength in one area causes you to view the other areas positively without fully considering or exploring them.

- **First impression:** The interviewee is judged before having a fair chance to respond to your questions.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 32 of 48

IFR_AR_010178

- **Stereotype:** Because you perceive the interviewee as fitting into a certain category, you believe that he or she is not qualified for the benefit.

- **Similarity:** Your decision on eligibility is muddied after confusing the interviewee's personal similarity to yourself with his or her qualifications for the benefit.

- **Contrast:** Your judgment in the interviewee's case is based on how well others answered questions in previous interviews.

- **Excessive harshness:** You focus unfairly only on the negative factors in the interviewee's case, disregarding all strengths in his or her claim.

Being aware will allow you to recognize how your biases may interfere with the interview process. You must make an effort to prevent "personal baggage" from negatively affecting your ability to interview in a non-adversarial and neutral manner.

**Have Patience**

Remember that although the interview process may become routine for you, it is not routine for the interviewee and may not be routine for others present. You should take time to explain the process and allow time for the interviewee to gather his or her thoughts.

**Ensure That All Parties to the Interview Remain Non-Adversarial**

If, during the course of the interview, the interviewee or any other party to the interview becomes agitated, shouts, or otherwise loses composure, you must re-establish order. Calmly and in a moderate tone of voice remind the parties that this is a non-adversarial interview, and that this applies to all parties. If this does not defuse the situation, you should not continue the interview until the problem can be resolved. You may need to ask a colleague or supervisor to intercede. Under no circumstances should you respond in kind to anger or frustration from the interviewee, representative, interpreter, or other participant at the interview, as this will only exacerbate the problem.

**Do Not Intimidate, Harass, or Embarrass the Interviewee**

Your tone of voice and facial expressions must remain neutral throughout the interview process. You must not argue against the interviewee's statements, raise your voice, use rapid-fire questioning, roll your eyes, or use a hostile, deprecating, or incredulous tone with any interviewee.

You may be tempted to do all of these with some interviewees if you notice serious credibility problems during an interview. If the interviewee does not appear to understand your question, you should ascertain whether there is a problem with the interpretation or with the way in which you articulated the question. However, if the interviewee appears to understand your question and is evasive or non-responsive, or presents inconsistent or implausible testimony, you must probe the interviewee's credibility by confronting him

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                      Page 33 of 48

IFR_AR_010179

or her with the specific credibility problem and by giving him or her an opportunity to explain.

Confronting an interviewee does not require you to challenge or become hostile toward the interviewee. Rather, confronting an interviewee merely makes him or her aware of your specific concerns and gives the interviewee the opportunity to address the concerns.[33]

The non-adversarial nature of the interview allows the interviewee to present a claim in as unrestricted a manner as possible, within the inherent constraints of an interview before a government official. An interview with a government official may be intimidating to an interviewee. Interviewees may feel vulnerable and threatened during an interview with you, as a representative of the U.S. Government, because of:

- Negative experiences with authority figures

- Differences between the interviewee's culture and yours

- Fear of exposing highly personal or sensitive information

- Trauma due to a variety of reasons, including sudden flight from the country of persecution

- Fear of an agent or trafficker who smuggled the interviewee, if the interviewee was trafficked

## 9.3   Maintain Control of the Interview

During the entire interview, you must not only remain alert to information from the interviewee, but must also be aware of more general factors affecting the flow of communication.

**Promote Effective Exchange of Information**

To the extent that it is possible, try to eliminate factors that limit or prevent an effective exchange of information during the interview. If the interviewee appears to be uncomfortable disclosing part of the claim in front of family members, you may ask family members to wait in the waiting room. If the interpreter is having difficulty interpreting a question, think of a different way to ask the question or obtain the information. Always be on the lookout for anything you can do that can facilitate the flow of information.

**Keep the Interview Focused**

In order to conduct efficient interviews, you should limit questions to topics that are relevant to the purpose of the interview.

---

[33] For additional information, see RAIO Training module, *Evaluating Evidence*.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                              Page 34 of 48

IFR_AR_010180

## 9.4    Practices to Avoid

- Do not over-empathize with the interviewee.

- Do not ask questions that are not relevant to the adjudication in question.

- Do not eat, drink, answer the phone, or engage in other personal behavior during the interview.

## 10    CONCLUSION

You play multiple roles in the adjudication process. As both the fact finder and neutral decision-maker, you must elicit testimony from the applicant, maintain a neutral tone throughout the process, and create an atmosphere in which the interviewee can freely express his or her claim. The interview is your opportunity to probe into all material elements of the interviewee's claim to determine eligibility for the benefit sought. You must develop strong interviewing skills that allow you to elicit expeditiously and efficiently all necessary testimony to make a decision.

Although you will develop your own style over time, for each interview you must:

- Thoroughly prepare, including file review, country of origin research, security checks, and electronic data base searches, before inviting the interviewee into your office

- Greet the parties and establish rapport

- Explain the interview process

- Place parties under oath, as necessary

- Verify identity, address, contact, and all biographical information on the forms

- Correct errors or update information that may have changed since the form was completed

- Elicit testimony regarding the claim and ask all relevant follow-up questions

- Confront the interviewee with material credibility issues and allow him or her an opportunity to explain

- Allow the interviewee and representative to make final comments and ask questions to provide information not already covered during interview

- Sign the application form and obtain all necessary signatures

- Advise the interviewee of the decision notification process

USCIS: RAIO Directorate – Officer Training          DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                    Page 35 of 48

IFR_AR_010181

# 11    SUMMARY

## 11.1    Authority

The following authorizes USCIS officers to conduct interviews:

- 8 C.F.R. § 103.2(b)(9) gives the authority to USCIS to require that an applicant, petitioner, sponsor, beneficiary, or other individual appear for an interview.

- 8 C.F.R. § 208.9(b) requires that Asylum Officers conduct interviews in a non-adversarial manner. Although this regulation applies only to Asylum Officers, as a matter of policy, officers in the RAIO Directorate must conduct interviews in a non-adversarial manner.

- 8 C.F.R. § 207.2(b) gives the authority to USCIS to require that each applicant 14 years and older appear in person before an Immigration Officer for an inquiry under oath to determine his or her eligibility for admission as a refugee.

- INA § 287(b) gives the authority to USCIS officers to administer oaths and to take and consider evidence concerning the privilege of any person to enter, reenter, pass through or reside in the United States.

## 11.2    The Purpose of the Interview

### 11.2.1    To Gather Information

At an interview you elicit information to:

- Verify the identity of those present at the interview

- Determine whether to proceed with the interview, based on factors such as jurisdiction and availability of accurate interpretation

- Evaluate credibility and determine eligibility for the benefit being sought

- Determine whether the interviewee is subject to any bars or grounds of inadmissibility

### 11.2.2    To Provide Information

At an interview you provide information to the interviewee about:

- The purpose of the interview and the interview process

- The roles and responsibilities of all persons involved in the interview

- What the interviewee can expect to happen during and after the interview

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 36 of 48

IFR_AR_010182

## 11.3    Importance of the Interview

- The interview, as the basis for your determination, may be the only opportunity for you to obtain accurate and complete information from the interviewee.

- The interview may be the only opportunity for you to elicit and clarify information upon which to base a decision.

- The decision you make, based on the information you gather at the interview, may have serious consequences.

- Interviewees may shape their opinion of the U.S. Government based on their interactions with you.

## 11.4    The Participants and Their Roles

### The Officer

You are a representative of the U.S. Government and must project a competent, professional, and courteous image, and uphold the integrity of the U.S. immigration system.

### The Interviewee

The interviewee may be a principal applicant, a derivative family member, or a witness in the case.

### The Interpreter

The interpreter's role is to accurately interpret between the language of the interviewee and English.

### The Representative

An applicant or petitioner may be represented by an attorney in the United States, an attorney outside the United States (in matters occurring outside the geographical confines of the United States), or an accredited representative of a recognized organization.

### Other Parties

Other parties may be present at the interview, depending on the circumstances. For example, some children or applicants with disabilities may need the assistance of a relative or guardian to present their claim.

## 11.5    The Components of an Interview

- Pre-Interview Preparation

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                                    Page 37 of 48

IFR_AR_010183

- Introduction

- Oath

- Verification of Basic Biographical Information

- Testimony

- Closing Statement/Comments/Questions by Interviewee and/or Representative

- Conclusion

## 11.6   Interviewing Tips

- Be organized
  - ➢ Use an outline or checklist to ensure that all necessary information is covered.
  - ➢ Develop time-management skills.
  - ➢ Record questions as they arise as a reminder to ask them later in interview.
  - ➢ Have a map or atlas at hand.

- Interview, don't interrogate
  - ➢ Treat the interviewee with respect.
  - ➢ Maintain a neutral tone throughout the interview.
  - ➢ Be non-judgmental and non-moralistic.
  - ➢ Create a comfortable atmosphere.
  - ➢ Treat each interviewee as an individual.
  - ➢ Be mindful of potential biases.
  - ➢ Have patience.
  - ➢ Ensure that all parties to the interview remain non-adversarial.
  - ➢ Do not intimidate, harass, or embarrass the interviewee.

- Maintain control of the interview
  - ➢ Promote effective exchange of information.
  - ➢ Keep the interview focused.
  - ➢ Treat the applicant with respect.
  - ➢ Maintain a neutral tone throughout the interview.
  - ➢ Be non-judgmental and non-moralistic.
  - ➢ Create an atmosphere in which the interviewee can freely express his or her claim.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                      Page 38 of 48

IFR_AR_010184

> ➢ Treat each interviewee as an individual.

> ➢ Be mindful of potential biases.

> ➢ Have patience.

- Practices to avoid

> ➢ Do not over-empathize with the interviewee.

> ➢ Do not ask questions that are not relevant to the adjudication in question.

> ➢ Do not eat, drink, answer the phone, or engage in other personal behavior during the interview.

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 39 of 48

IFR_AR_010185

# PRACTICAL EXERCISES

There are no Practical Exercises for this module.

IFR_AR_010186

# OTHER MATERIALS

There are no Other Materials for this module.

USCIS: RAIO Directorate – Officer Training                          DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 41 of 48

IFR_AR_010187

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### REQUIRED READING

None

### ADDITIONAL RESOURCES

None

### SUPPLEMENTS

> **International and Refugee Adjudications Supplement – Interpreters for Refugee Interviews**
>
> The Resettlement Support Centers (RSCs) provide interpreters for most USCIS Refugee Interviews and I-730 interviews. The RSC seeks to recruit dispassionate interpreters who have no interest in U.S. resettlement. The RSC provides an orientation for the interpreters used at USCIS interviews, including the requirement to interpret accurately and completely and maintain the confidential nature of the interview. The RSC makes every effort not to use interpreters from the same refugee camp population or urban refugee population as the population being interviewed; however, this may not be possible at times in particular locations or in certain circumstances. For example, an interpreter may be used from the refugee camp population or urban refugee population if the interview site is very remote and there are no interpreters available in the local population, or if the interviewee's language is not spoken widely outside the interviewee's ethnic group.  For these same reasons, it may not be possible to find an interpreter in the local population who is not interested in resettlement to the United States, and at some interview locations, the interpreters themselves may be applicants to the United States Refugee Admissions Program (USRAP).
>
> **Interpreter's Oath**
>
> The interpreter must be placed under oath ("Do you solemnly swear or affirm that you will interpret all statements made during the interview completely and truthfully and that you will keep all information confidential?") If the same

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 463 of 660

**Supplement A**
**International and Refugee Adjudications**     Interviewing – Introduction to the Non-Adversarial Interview

interpreter is used for more than one interview, the interpreter needs to be placed under oath only prior to the first interview. The interviewee should be told during the introduction or at the time of his or her oath that the interpreter has already taken an oath to interpret completely and keep all information confidential.

The interpreter should generally stand and raise his or her right hand when taking the oath. However, some interpreters may have objections to using the term "swear" or object to raising their right hands. The officer should adapt the oath to accommodate such objections, ensuring that the interpreter understands that he or she is promising, under the law, to interpret completely and truthfully and to keep the information in the interview confidential (e.g., using "affirm" rather than "solemnly swear" in the following: "Do you affirm that you will interpret all statements made during the interview completely and truthfully and that you will keep all information confidential?"). USCIS Refugee Affairs Division, Standard Operating Procedures: Introduction, Section 8 "Administer the Oath," 19 August 2009.

---

**International and Refugee Adjudications Supplement – Oaths**

The International and Refugee Affairs Division has instituted several requirements for administering the oath to an applicant, including standard language. Applicants must stand and raise their right hand for the administration of the oath. An exception may be made if the applicant is elderly or incapacitated. The officer administering the oath should also stand and raise his or her right hand. As some applicants may have religious objections to using the term "swear" or "so help me God," the required oath for applicants is:

> "Do you solemnly swear or affirm that the statements you are about to make will be the truth, the whole truth, and nothing but the truth?"

Some applicants may have objections to using the term "swear" or object to raising their right hands. The officer should adapt the oath to accommodate such objections, ensuring that the applicant understands that he or she is promising, under the law, to tell the truth. USCIS Refugee Affairs Division, Standard Operating Procedures: Introduction, Section 8 "Administer the Oath," 19 August 2009.

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                              Page 43 of 48

IFR_AR_010189

**International and Refugee Adjudications  Supplement – Review the Application Form**

See *Pilot Standard Operating Procedure for Form I-590: Registration for Classification as a Refugee* (October 30, 2015).

**International and Refguee Adjudications Supplement - Pre-Interview Preparation**

The following are examples of tools used in the interview process:

- Revised NCTC Check Requirements for Visas 92/93

- Naturalization NQP5 Checklists

USCIS: RAIO Directorate – Officer Training                DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                          Page 44 of 48

IFR_AR_010190

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### REQUIRED READING

1. Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, HQCOU 120/12.8 (Jun. 21, 2001).

2. Memorandum from Joseph E. Langlois, Director, Asylum Division, to Asylum Office Directors and Deputy Directors, *Fact Sheet on Confidentiality*, HQASM 120/12.8 (Jun. 15, 2005).

### ADDITIONAL RESOURCES

None

### SUPPLEMENTS

> **Asylum Adjudications Supplement – Purpose of the Interview**
>
> In this lesson, students will learn about the purpose, components, and non-adversarial nature of the asylum interview, as well as the roles of the representative and the applicant. The lesson will also cover eliciting the basic biographical information on the I-589, such as date and place of birth and information pertaining to entry into the United States.
>
> **Definition**
>
> At asylum interviews (unlike defensive proceedings before an immigration judge, the Board of Immigration Appeals, or the Federal courts) there is no government official present arguing in opposition to the asylum applicant. Neither the Asylum Officer nor the representative cross-examines the applicant and witnesses (if any), as in defensive proceedings. The officer is not an advocate for either side; rather, the officer is a neutral decision-maker.

USCIS: RAIO Directorate – Officer Training                        DATE (see schedule of revisions): 12/20/2019
RAIO Combined Training Program                                    Page 45 of 48

IFR_AR_010191

### Asylum Adjudications Supplement - Pre-Interview Preparation

- **Review file and DHS computer systems to:**

  ➢ Determine who is included in the application

  ➢ Determine which version of the I-589 the applicant submitted

  ➢ Ascertain whether the file is complete

  If the file is missing any documents, such as photographs or photocopies of documents, the officer should request that the applicant provide the missing documents.

  The officer should also determine whether there is a "Notice of Entry of Appearance as Attorney or Representative" (Form G-28) in the file and whether it is properly completed.

  If there is no G-28 in the file, but if it appears that the applicant is represented, the officer should ask the representative and applicant to complete a G-28 during the interview.

  ➢ Determine whether there is any indication that the application is not within the jurisdiction of the Asylum Office.

  ➢ Determine when the applicant claims to have entered the United States and when he or she filed the asylum application.

  The officer should be prepared to inquire into whether the applicant's I-589 was filed in timely fashion, i.e., within one year of the last arrival into the United States, and whether an exception to that filing requirement may apply.

  ➢ Become familiar with the applicant's background and claim.

  The officer must read the information on the I-589 and review any supporting documents.

  An applicant may have submitted extensive background information on country of origin information. It is not necessary to review all of the information prior to the interview, as this can be very time-consuming. However, the Asylum Officer must look through the information and read any information that specifically pertains to the applicant or his or her claim.

  ➢ Identify issues to cover during the interview.

  A review of the file allows the officer to identify lines of questioning and specific

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                        Page 46 of 48

IFR_AR_010192

questions to ask during the interview.

> ➢ Determine whether the applicant may be in any "special status" (e.g., ABC, Mendez).

The procedures for handling certain cases, such as cases involving ABC class members, are different from other cases. Officers must be aware at the outset of the interview whether the case is governed by special procedures, in order to follow correct procedures.

- **Review country of origin information**

If the officer is unfamiliar with country of origin information relevant to the applicant's claim, the officer should quickly look up basic conditions in that country, referring to the electronic database Refworld, annual Department of State human rights reports, or information in the office library. A review of country of origin information can assist the Asylum Officer to focus on relevant elements of a claim and disregard that which is irrelevant.

- **Review procedures, if necessary**

The officer may find it necessary to review specific procedures prior to interviewing some applicants (e.g., ABC cases, sensitive cases), if he or she is unfamiliar with the particular procedures involved in interviewing these applicants.

---

**Asylum Adjudications Supplement – Oath**

Applicants and any witnesses must be placed under oath prior to giving testimony. Some applicants may have religious objections to using the term "swear." Other applicants may object to the phrase "so help me God." The officer must adapt the oath to accommodate the applicant, ensuring that the applicant understands that he or she is promising, under the law, to tell the truth.

The applicant must also sign a statement acknowledging that he or she swears or affirms to tell the truth and understands the penalties for misrepresentation. The applicant should not be made to sign the form without a brief explanation of the significance of the oath and the acknowledgement of the penalties for misrepresentation.

The interpreter must sign a statement (interpreter's oath), which puts the interpreter under oath. At the officer's discretion, he or she may administer the oath to the interpreter in addition to having him or her sign the interpreter's oath.

The interpreter monitor must also be placed under oath. The oath given to the

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                             Page 47 of 48

IFR_AR_010193

interpreter monitor should be translated for the applicant by the applicant's interpreter.

- **<u>Oaths if you suspect a national security risk</u>**

  If you have identified an individual who may be a national security risk, you must use Q&A format and take his or her testimony as a sworn statement [see RAIO Training module, *Interviewing – Note Taking;* AOBTC Lesson Plan, *Mandatory Bars to Asylum and Discretion*].

USCIS: RAIO Directorate – Officer Training                    DATE (see schedule of revisions): 12/20/2019
*RAIO Combined Training Program*                                                    Page 48 of 48

IFR_AR_010194

You are viewing:

# **ARCHIVED** CONTENT

Information released online from January 20, 2009 to January 20, 2017.

**NOTE:** Content in this archive site is **NOT UPDATED**, and links may not function. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

Go to the current State.gov website for up-to-date information. (http://www.state.gov/)

---

# U.S. Department of State
## Diplomacy in Action

# U.S. Commemorations Pledges

Fact Sheet
Bureau of Population, Refugees, and Migration
Washington, DC
June 24, 2013

---

*An Update – June 2013*

The United States Government announced 28 pledges at the UNHCR Commemorations Ministerial on December 7, 2011. The pledges address five themes ranging from asylum and detention, to vulnerable populations, to refugee resettlement and statelessness. To date, the USG has fulfilled 25 pledges (though these efforts are ongoing, in many instances) and is making progress on the remaining pledges. The U.S. Government is committed to fulfilling its remaining pledges. It is through the full implementation of Member States' collective pledges that we will reap true benefits, and, as responsible governments, enable UNHCR to better serve its beneficiaries for generations to come.

## 1) ASYLUM, ADJUDICATION, DETENTION

### INTERPRETATION OF THE REFUGEE DEFINITION - PLEDGE FULFILLED

**The U.S. Government (USG) pledges to provide ongoing, comprehensive training to all Immigration Judges and Members of the Board of Immigration Appeals and their legal staff in refugee law and related legal disciplines, as well as in country of origin analysis and application.**

*Update: The Board of Immigration Appeals' (BIA) in-house training schedule for calendar year 2012 includes a host of trainings that fulfill the above pledge. The topics for the trainings include: Personal Circumstances & Asylum Eligibility: When does an alien's changed personal circumstances constitute a new claim for asylum?; Human Trafficking: Trends & Relief; Particular Social Groups: A Defining Challenge; Emerging Issues in Asylum Law: Religious and Economic Persecution Claims; The Law of Discretion in Immigration Cases; Immigration Law: Federal Court Trends and Updates; Special Topics in Asylum Law: Firm Resettlement & Internal Relocation; and Understanding and Applying The Violence Against Women Act. The BIA in-house training schedule for calendar year 2013 includes a host of trainings that continue to fulfill the above pledge. The topics for the trainings include: Exploring the Terrorism-Related Inadmissibility Grounds*

PR_AR_01 11401

*Under the Immigration and Nationality Act; Special Topics in Asylum Law: Sexual Orientation Based Asylum Claims; Federal Court Trends and Update – 2013; Circuit Court Survey: Fact Finding and the Board of Immigration Appeals' Clearly Erroneous Standard of Review; Issues and Pitfalls in Reviewing Immigration Judge Decisions on Motions to Reopen; Constitutional Challenges in Immigration Proceedings; Emerging Issues in Asylum Law: The Development of Nexus Analysis; and Waivers of Inadmissibility: An Overview of Recent Developments. The trainings are presented live to BIA employees and recorded via digital audio recording and video. The recordings are made available to Immigration Judges nationwide and for anyone who misses the live trainings. Board Members and BIA legal staff will also be provided with video and written materials pertaining to the International Religious Freedom Act. The U.S. Department of Justice (DOJ) is also developing a separate training curriculum specifically for the Immigration Judges, who will be provided Religious Persecution Country Conditions Updates. The topics to be covered include: Federal Court & BIA Trends and Update; Conversation with a Survivor of Torture: A Personal Story of Many; Introducing the Istanbul Protocol: Standards for Documenting Instances of Torture; Particular Social Groups: A Defining Challenge; Emerging Issues in Asylum Law: Religious and Economic Persecution Claims; Forensic Evidence of Forced Sterilization and Coercive Population Control Practices; Special Topics in Asylum Law: Sexual Orientation Based Asylum Claims; and Country Condition Updates. In addition, a variety of asylum related materials and resources, including from UNHCR, will be distributed to the Immigration Judges.*

## BARS TO ADMISSIBILITY AND ASYLUM ELIGIBILITY

**The U.S. Government pledges to:**

**Significantly reduce, through the issuance and application of exemptions to exclusion based on national security grounds, cases that are on hold for a review of eligibility for an exemption to exclusion by the end of fiscal year 2012. ~ Pledge fulfilled**

***Update****: The U.S. Department of Homeland Security (DHS) Secretary Janet Napolitano signed new exercises of the exemption authority that authorize U.S. Citizenship and Immigration Services (USCIS) to exempt individuals on a case-by-case basis for the provision of medical care under certain circumstances. The Secretary also recently signed an exercise of her exemption authority for applicants with existing immigration benefits, such as asylees and refugees in the United States. The exemption will allow USCIS to release up to an estimated 75 percent of the cases currently on hold and proceed with the adjudications of the underlying benefit applications. The majority of the affected applicants whose cases will be released for adjudication are asylees and refugees with pending applications for legal permanent resident status, or "green cards." Those who are granted the exemption will be able to continue down the path to full U.S. citizenship. In addition, two new group-based exercises of the exemption authority were signed by Secretary Napolitano during the year that authorize USCIS to exempt certain individuals having activities and associations with the Kosovo Liberation Army or who were involved in the 1991 Iraqi uprisings against the Saddam Hussein regime. Continuing into fiscal year 2013, Secretary Napolitano has recently authorized an exemption for applicants with activities or associations with the Farabundo Marti para la Liberacion Nacional (FMLN) and the Nationalist Republican Alliance (ARENA). In addition, DHS has continued to reduce the number of cases on hold by applying existing exemptions, consider new exemptions, and focus Department resources on case research.*

**Undertake a review, to be completed by the end of calendar year 2012, to examine current interpretations of the terms under the national security exclusion grounds, for example, the meaning of material support, to better ensure that those in need of protection retain eligibility for it.**

***Update:*** *In progress.*

IFR_AR_011162

**Work with Congress to eliminate the one-year filing deadline for submission of asylum applications.**

*Update: DHS continues to support legislation to eliminate the one year filing deadline and supports the current legislative proposals contained in S.744.*

## DETENTION

**The U.S. Government pledges to:**

**Continue to provide UNHCR reasonable access to conduct review of detention and**
parole decision-making for persons of concern to UNHCR, including parole determinations for arriving asylum seekers in expedited removal. ~ Pledge fulfilled

*Update: DHS provided access to UNHCR to complete its review on the parole process, and has continued to work with UNHCR on parole process improvements. Over the last six months, DHS worked with UNHCR to revise the Immigration and Customs Enforcement (ICE) Form 71-012 "Parole Advisal and Scheduling Notification Form." On August 17, 2012, ICE Enforcement and Removal Offices (ERO) began using the new form in all of its field offices. Form 71-012 now gives arriving aliens or their representative expanded information on documents they may want ICE to consider as part of its assessment whether to parole the alien from detention. Documents may be submitted concerning:*

*(1) The arriving alien's identity;*

*(2) Whether the arriving alien is likely to appear for all scheduled hearings and enforcement appointments (including for removal from the United States if so ordered); or*

*(3) Whether the arriving alien does not present a security risk to the United States or a danger to the community.*

**Work with UNHCR and other stakeholders on improved detainee release practices, including consideration of a Detainee Release Notification flier that explains to detainees their legal obligations and provides information on issues such as phone calls, personal property, medical services and community organizations that serve immigrant populations. Review and amend, as necessary, current policies to better ensure that individuals in immigration detention, including asylum seekers, are released from detention in a safe and responsible manner, time, and place. ~ Pledge fulfilled**

*Update: DHS has issued the 2011 Performance-Based National Detention Standards, which includes improved detainee release practices. Implementation of these new standards has commenced. DHS is also revising the Detainee Detention Facility Handbook to give detainees notice of policies and practices surrounding release from ICE detention facilities. ICE's revised Performance-Based National Detention Standards also improves conditions of confinement for detainees in various ways, including by improving medical and mental health services, increasing access to legal services, enhancing processes for reporting and responding to complaints, and strengthening protections for vulnerable detainee populations (including women, individuals with mental illness, and victims of abuse). ICE has also issued a new Transfer Directive that prohibits the long-distance transfer within the agency's detention system of detainees with family members or attorneys in the area or pending immigration proceedings, unless absolutely necessary. In addition, ICE has initiated nationwide deployment of a new Risk Classification Assessment system designed to screen all individuals apprehended or detained by ICE for a number of special vulnerabilities impacting custody and classification determinations, including whether a person is a victim of persecution or torture, sexual abuse or violent crime, or human trafficking.*

IFR_AR_011163

## INTERDICTION

**The U.S. Government pledges to implement updated training to U.S. Coast Guard law enforcement personnel participating in migrant interdiction operations by the end of calendar year 2012. This training will focus on identifying manifestations of fear by interdicted migrants. Pledge fulfilled**

*Update:* USCIS and U.S. Coast Guard (USCG) HQ staff created a draft PowerPoint-based training aid and filmed a series of manifestation of fear recognition vignettes in May 2012 to be incorporated into the training aid. On December 21, 2012, USCG implemented the use of the Manifestation of Fear video to all units deploying in support of migrant interdiction operations. The video demonstrates different ways a migrant might express a verbal or non-verbal manifestation of fear at sea. In February 2013, the Refugee Affairs Division conducted screenings of the video for situational awareness with the Department of State Bureau of Population, Refugees and Migration (PRM), USCG and UNHCR.

## 2) VULNERABLE POPULATIONS

## CHILDREN

**The Best Interests of Children**

**The U.S. Government pledges to:**

**Assist UNHCR with the deployment of eight trained and competent staff to conduct Best Interest Determinations (BID) in line with UNHCR guidance, subject to applicable laws and regulations. ~ Pledge fulfilled**
*Update:* All eight BID officers have been deployed.

**Facilitate UNHCR's review of U.S. practices regarding the screening of unaccompanied children at the southwest border during 2012. ~ Pledge fulfilled**
*Update:* DHS facilitated UNHCR's review in Laredo, TX in January 2012 and in San Diego, CA in December, 2012, which focused on screening of unaccompanied children (UAC). UNHCR provided a report and recommendations pertaining to Laredo, and is finalizing its report and recommendations pertaining to San Diego. .

**Update existing guidance on both procedure and substance for the adjudication of asylum claims brought by children. ~ Pledge fulfilled**
**Promote the availability of pro bono legal counsel for persons of concern to UNHCR – in particular unaccompanied children and those with diminished mental capacity. ~ Pledge fulfilled**
*Update:* The Department of Health and Human Services (HHS), DHS and DOJ are collaborating to facilitate UAC access to counsel. DOJ oversees programs and initiatives to improve access to legal information and assistance principally through four main initiatives: 1) the Legal Orientation Program (LOP); 2) the Legal Orientation Program for Custodians of Unaccompanied Alien Children (LOPC); 3) the Board of Appeals Pro Bono Project; and 4) the Model Hearing Program (MHP).

The LOP is currently operating at 26 sites (24 of which are ICE detention facilities), serving over 64,000 individuals per year. The purpose of this program is to assist detained respondents in making better informed decisions earlier in removal proceedings, and to improve access to basic legal services for indigent aliens. The LOPC provides legal orientation presentations to the adult care givers (custodians) of unaccompanied children in EOIR removal proceedings.

IER_AR_011164

*The purpose of the program is to inform the children's custodians of their responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking. HHS has issued policies and trainings regarding LOPC to staff and grantees caring for UAC. HHS ensures that UAC caseworkers register sponsors with the LOPC program (currently operating at 14 sites) if one is available in the sponsor's area. If there is not an available site, caseworkers refer sponsors to the call center. The BIA Pro Bono Project was created to increase pro bono representation for individuals with cases on appeal. Since its start, the Project has succeeded in securing pro bono counsel for over 700 aliens around the country - primarily those in DHS custody. The MHP is an educational program developed to improve the quality of advocacy before the court, as well as increase levels of pro bono representation. Since June of 2001, well over 50 Model Hearing training sessions have been held in immigration courts across the country. Additional information on these four programs is available upon request.*

*In addition to these programs, DOJ has pro bono liaison judges designated for each court location. The objective of the Pro Bono Liaison Judge is to meet with local pro bono groups and stakeholders to discuss ideas and facilitate efforts to increase the level and quality of pro bono representation before the court. DOJ works with the pro bono liaison judges to provide additional technical assistance and help coordinate their efforts with other agency programs and initiatives. UAC in HHS custody are afforded access to attorneys. All UAC are given names and contact information of legal service providers in the jurisdiction where the UAC is placed, who may provide pro bono services to UAC. Additionally, HHS contracts with a non-profit national legal service provider, who in turn sub-contracts with seventeen local legal service providers nationwide who provide UAC in HHS custody with "Know Your Rights" presentations, and screen UAC for immigration relief. Those UAC who are eligible for immigration relief are either represented by the local legal service provider or referred to pro bono counsel. The local legal service providers also make "Friend of Court" appearances at immigration courts during juvenile hearings to assist UAC with courtroom procedure and to explain immigration court processes to UAC in child-friendly terms.*

*Additionally, HHS's national legal service provider also provides UAC who transition out of HHS custody to a sponsor with referrals to one of two legal service providers for assistance with the UAC's immigration case. HHS's legal service contract also provides for an independent Child Advocate program.*

*In consultation with the legal service providers HHS plans to unveil a Legal Resource Guide for UAC in HHS custody to educate UAC of their rights, the various types of immigration relief, and an explanation on how to file routine paperwork with DHS and immigration courts (e.g. changes of address or change of venue motions).*

*In April, DOJ and DHS announced a nationwide policy to implement new procedural protections for unrepresented immigration detainees with serious mental disorders or conditions that may render them mentally incompetent to represent themselves in immigration proceedings. Of particular note with regard to this pledge, EOIR has committed to making available qualified representatives to all detainees who are deemed mentally incompetent to represent themselves in immigration proceedings. We expect these new procedures to be fully operational on a national basis by the end of 2013. Please see the press release at the following link: http://www.justice.gov/eoir/press/2013/SafeguardsUnrepresentedImmigrationDetainees.html.*

**Cultural Orientation Curriculum for Youth ~ Pledge fulfilled**

IFR_AR_011165

**The U.S. Government pledges to provide cultural orientation to unaccompanied refugee minors who are preparing to travel to the United States and to encourage the continued use of similar curriculum after arrival in the United States.**

*Update:* The U.S. Government has implemented provision of overseas cultural orientation for unaccompanied refugee minors, utilizing a curriculum that addresses the specific needs of these individuals. Once these minors are resettled to the United States, they receive additional cultural orientation training. The U.S. Government also provides cultural orientation for refugee youth ages 8–18 traveling with parents or other adult family members.

**Education in Emergencies ~ Pledge fulfilled**

**The U.S. Government pledges to increase its support to international efforts relating to equitable access to education for youth in crisis and conflict environments and its involvement in shaping the agenda on education of youth in emergencies, particularly through ongoing Women, Peace and Security efforts.**

*Update:* The U.S. has included a commitment on the pledge in the U.S. National Action Plan on Women, Peace and Security; the White House report states the following:

*In the narrative:* "Education can also mitigate the effects of conflict and provide the basis for long term economic growth and stability. Out of 70 million primary school-aged children not in school, nearly 40 million live in countries affected by armed conflict. It is therefore critical to restore education sites, services and system-wide capacity for children and youth, particularly girls, in conflict-affected or insecure environments. We are working to increase equitable access to education in crisis and conflict environments for 15 million learners, including those with disabilities, by 2015. **Conflict Prevention:** The United States Government will promote women's roles in conflict prevention, improve conflict early-warning and response systems through the integration of gender perspectives, and invest in women and girls' health, education, and economic opportunity to create conditions for stable societies and lasting peace."

*In the Framework:*

*Outcome 4.2: Women and girls participate in economic recovery, and have increased access to health care and education services.* Promote access to primary, secondary and vocational education for children and youth in countries affected by violence or conflict, with special incentives for the attendance and retention of girls, taking into account related special protection needs.

*Outcome 5.1: Gender and protection issues are explicitly and systematically integrated and evaluated as part of responses to crisis and disaster.* Promote access to education in emergencies consistent with international guidelines and best practices.

We continue to support education programs for children and youth in places like Ethiopia and Iraq as well as at the onset of emergencies, most recently in response to the Syria crisis. We will continue to ensure that education is part of our multi-sectoral response to children and youth in crises.

**Women ~ Pledges fulfilled**

IFR_AR_011166

**Services for Victims of Sexual and Gender Based Violence**

**The U.S. Government pledges to provide refugee service providers and mainstream social service programs in the United States with additional training relating to sexual and gender based violence, including violence that amounts to a form of torture, as well as information on services available to survivors of torture.**

*Update:* *In 2012, the Department of Health, Office of Refugee Resettlement (ORR) completed a three-year grant cycle and announced new funding opportunities for direct services to survivors of torture and technical assistance to service providers. The funding announcement emphasized the importance of addressing psychosocial and health consequences of torture, domestic violence and other forms trauma. ORR awarded approximately $11 million to 31 grantees under this funding announcement.*

*ORR worked with its technical assistance providers to identify training resources that address sexual and gender-based violence among refugee populations. These training resources include a four-part video that raises awareness about rape as a weapon of war and an instructional webinar that increases clinicians' capacity to provide therapeutic services to individuals who survived sexual and gender-based violence.*

*ORR also partnered with the Family Violence Prevention Services Administration (FVPSA) to co-host a nationwide webinar focused on culturally relevant and multi-lingual services that address domestic violence in refugee families. ORR plans to continue developing new partnerships in advocacy of those who have suffered sexual and physical violence as a result of gender inequality.*

**Microenterprise Development Opportunities**

**The U.S. Government pledges to provide refugee women in the United States with training opportunities on how to establish and manage businesses including, home-based childcare services.**

*Update:* *ORR awarded approximately $5.8 million under the "Discretionary Funds for Refugee Childcare Microenterprise Development" Project. Thirteen organizations received continuation funding totaling approximately $2.2 million and twenty-one grantees were awarded new grants totaling approximately $3.6 million. These organizations are charged with assisting refugee women to establish licensed child care businesses within their homes. The project focuses on childcare quality of care standards and microenterprise principles. The program offers training and technical assistance as ongoing support for these 13 organizations and the women they serve. In addition, a mainstream social service agency awarded nearly $1M to three refugee resettlement organizations to administer a similar childcare microenterprise program. ORR continues to support a refugee Microenterprise program with 18 grantees at $4 million supporting a host of entrepreneurial endeavors.*

**Lesbian, Gay, Bisexual, and Transgender (LGBT) ~ Pledges fulfilled**

**Electronic Resource Center**

**The U.S. Government pledges to develop an electronic resource center that catalogues available community resources and identifies supportive communities for LGBT refugees resettled in the United States.**

IFR_AR_011167

*Update:* ORR awarded Heartland Alliance of Chicago $250,000 in a technical assistance grant for the second year in a row to maintain and expand their resource website at the following link: www.RainbowWelcome.org (http://www.rainbowwelcome.org/). Over a hundred resources are available with links to services, reports, webinars, videos, presentations, and critical resources for both service providers and refugees/asylees. The site allows refugees and asylees who may not have advanced computer skills to easily access and navigate resources; plus resources are offered in Arabic, Spanish, and French. The resource site is meant to empower LGBT refugees/asylees to assume an active role in their resettlement, ensuring they have the opportunity to advocate for themselves and gain access to critical services and information. Heartland Alliance International provides LGBT trainings and webinars to educate and provide technical assistance and resources to grantees of the refugee, Survivors of Torture, and Unaccompanied Children's programs. Heartland Alliance is also working to add a component for unaccompanied children and resources that are pertinent to LGBT youth to the website.

**Provision of Targeted Services**

**The U.S. Government pledges to add language to one or more grant announcements that identifies LGBT refugees as a vulnerable population in need of targeted services.**

*Update:* ORR has incorporated language in several discretionary grant funding opportunity announcements to ensure the inclusion of the LGBT refugee community. For example, through the Preferred Communities (PC) grant, ORR funded one grantee to serve LGBT refugees in two sites. The program offers intensive case management, assistance with health care, mental health needs, housing, etc. ORR funded another PC grantee to develop local site capacity to serve the mental health needs of newly arriving refugees including LGBT individuals in three locations.

**Urban Refugees ~ Pledges fulfilled**

**The U.S. Government pledges to:**

**Expand U.S. diplomacy and humanitarian programming to protect and assist refugees in urban areas. In conducting humanitarian diplomacy on behalf of urban refugees, the United States will seek to ensure recognition of refugees' status and legal rights, consistent with obligations and commitments countries have assumed under international human rights and refugee law, and to address practical and administrative obstacles to enjoyment of those rights.**

*Update:* The U.S. Department of State, Bureau of Population, Refugees, and Migration (PRM) Principal Deputy Assistant Secretary traveled jointly with Assistant High Commissioner Lim to Addis Ababa and Kampala in July 2012 to examine challenges and progress made to date in responding to refugees in urban areas. PRM briefed NGO partners on this trip in September. PRM has developed a policy brief on refugee protection in urban areas that is now publicly available on its website at: //2009-2017.state.gov/documents/organization/187237.pdf (//2009-2017.state.gov/documents/organization/187237.pdf). Additionally, PRM has begun expanding urban programming in 2012 in places such as Kampala and Nairobi.

**Develop practical guidance for programming U.S. humanitarian assistance for refugees in urban areas by the end of 2012. This guidance will draw on best practices in order to maximize program effectiveness.**

IFR_AR_011168

*Update: PRM has developed a set of questions, drawn from established best practices, for PRM program officers and Refugee Coordinators to use while monitoring partners' performance in urban areas. In 2012, PRM funded an initiative by the Joint IDP Profiling Service (JIPS) and Tufts University to expand the capacity of JIPS to profile urban refugees. As part of this project, JIPS and Tufts are conducting profiling studies in two cities (New Delhi and Quito) and will publicly share its data so that PRM and partners can more effectively target interventions in these areas.*

**Support enhancement of UNHCR's institutional capacity to implement its urban refugee policy, including through staff training and other efforts, subject to applicable laws and regulations.**
*Update: In 2012, PRM funded UNHCR's development of its e-learning program for staff in urban areas.*

**3) RESETTLEMENT, PROTECTION, INTEGRATION**
**Protection and Integration**

**The U.S. Government pledges to:**

**Make adjustments to the procedures for determining when an asylum seeker becomes eligible to apply for work authorization while his or her claim is pending, including the process to re-start the "clock" that determines when an asylum seeker becomes eligible to work legally.**
*Update: DHS/USCIS is currently awaiting final court approval of a nationwide class action settlement, which will implement several important changes regarding employment authorization for asylum applicants. The settlement would help ensure that certain individuals who seek to file or have already filed an asylum application will be entitled to new procedures for crediting time toward employment authorization eligibility. Pending final approval of the settlement, the USG is limited in its response.*

**Strengthening Global Resettlement Capacity ~ Pledges fulfilled**

**The U.S. Government pledges to:**

**Enhance the delivery of comprehensive durable solutions, notably in protracted refugee situations, by working with Member States, UNHCR and other partners to promote increased opportunities for refugee resettlement, the participation of new resettlement countries, improved integration outcomes for resettled refugees, and the strategic use of resettlement to unlock the other durable solutions of voluntary repatriation and local integration.**
*Update: This is on-going through leadership in Working Group on Resettlement and Annual Tripartite Consultations on Resettlement fora.*

**Undertake a multi-year twinning program with Uruguay and Bulgaria to strengthen global resettlement capacity.**
*Update: This is on-going. In 2012, PRM funded NGO participation from Bulgaria and Uruguay in the Australia Working Group on Resettlement, as well as participation of Bulgaria NGO representative in a study tour of U.S. resettlement sites and participating agencies.*

IFR_AR_011169

**4) PARTNERSHIPS, TRAINING, CAPACITY-BUILDING**

**The U.S. Government pledges to work with UNHCR in fiscal year 2012 to strengthen local partner capacity, particularly in humanitarian emergencies, through facilitating partnerships between international and national actors. ~ Pledge fulfilled**

*Update: In 2012, PRM funded a UNHCR proposal whose goal is to strengthen capacity for national and local NGOs to operate in complex emergency environments. The project is progressing well and is in phase three out of four. PRM is continuing to follow the implementation of this project closely.*

**5) STATELESSNESS**

**Statelessness Among Women and Children ~ Pledges fulfilled**

**The U.S. Government pledges to:**

**Focus U.S. diplomacy on preventing and resolving statelessness among women and children, including efforts to raise global awareness about discrimination against women in nationality laws and to mobilize governments to repeal nationality laws that discriminate against women.**

*Update: The U.S. Department of State continues efforts to promote women's equal right to nationality through the Women's Nationality Initiative (WNI) launched by Secretary Clinton in late 2011. American embassies in Benin, Nepal and Qatar, the initial focus countries for the WNI, continue to work to engage government officials, coordinate with multilateral partners, and support civil society groups to promote women's nationality rights and help address the consequences of statelessness. The U.S. Department of State is also funding research focused on the impacts of statelessness on women and children to increase awareness and knowledge of these issues. This includes a project investigating the relationship between statelessness and vulnerability to trafficking in persons in Thailand.*

**Promote a child's right to nationality through multilateral and bilateral engagement, including efforts to promote universal birth registration.**

*Update: The United States, along with Slovakia, Botswana, Mexico, Turkey, Iraq, and Colombia, introduced a resolution on "The Right to a Nationality: Women and Children" at the 20th session of the Human Rights Council. The resolution was adopted by consensus and widely supported by countries from diverse geographic regions, with a total of 49 co-sponsors. The United States joined consensus on the "Arbitrary Deprivation of Nationality" resolution at the same session. At the 46th session of the UN Commission on Population and Development, the United States successfully incorporated language into the "New trends in migration: demographic aspects" resolution, which recognizes the right to a nationality for all migrants including children.*

**Statelessness and Citizenship ~ Pledges fulfilled!**

**The U.S. Government pledges to:**

**Actively work with Congress to introduce legislation that provides a mechanism for stateless persons in the United States to obtain permanent residency and eventually citizenship.**

*Update: DHS continues to support the current legislative proposals contained in S.744 to reduce statelessness.*

IFR_AR_011170

**Consider the revision of administrative policies to allow the circumstance of stateless persons to inform decision-making regarding their detention, reporting requirements, and opportunity to apply for work authorization.**

*Update:* *During the year, DHS met with UNHCR on statelessness and continues to review whether any policy changes are necessary. In response to UNHCR's request to tailor reporting requirements for stateless aliens to their individual circumstances and risk, ICE issued new reporting guidance to all ICE ERO Field Office Directors on August 23, 2012. Effectively immediately, ICE ERO Field Offices are authorized to use discretion in establishing reporting requirements of aliens released on an Order of Recognizance or Order of Supervision. The guidance states that each alien's case and reporting requirements may be reassessed and modified based on the alien's level of compliance, ICE's detention enforcement priorities, or changes to the circumstances of the individual case as a matter of discretion. At a minimum, however, aliens released on an Order of Recognizance or Order of Supervision must report at least once per year. This guidance supersedes the Victor X. Cerda memorandum on Orders of Supervision dated November 12, 2004.*

//

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

IFR_AR_011171

| | |
|---|---|
| From: | BLANCHARD-JR, KENNETH W |
| To: | BP Field Chiefs; BP Field Deputies |
| Cc: | |
| | Immigration |
| | Prosecution & Custody OPS; OPSCENTRALSECTORS |
| Subject: | Guidance Regarding Family Units Moving Forward Under Title 42 |
| Date: | Saturday, May 21, 2022 12:41:54 PM |

Chiefs,

**\*This guidance goes into effect at 1201 hours, May 23, 2022, EST\***

Manifestation of Fear of Expulsion
This guidance clarifies previous guidance implementing the Centers for Disease Control and Prevention's (CDC) *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* ("CDC Order") to ensure that it is consistent with the opinion of the U.S. Court of Appeals for the District of Columbia Circuit in *Huisha Huisha v. Mayorkas*, which found that the Government may expel family units (i.e., plaintiffs), but only to places where they are not likely to be persecuted or tortured.

Consistent with the DC Circuit's decision, covered noncitizens who are part of a family unit and who have manifested a fear of returning or being sent to the country to which they would be expelled should not be expelled without an appropriate screening by USCIS to determine whether they are more likely than not to be persecuted or tortured.

In determining whether a noncitizen has manifested a fear, CBP officers and agents should consider all available information within the scope of their operations. CBP personnel shall not make a qualitative evaluation of the noncitizen's fear or its basis. Once CBP officers and agents identify that a noncitizen manifests a fear, they should record the manifestation in CBP Form I-213. Noncitizens who manifest a fear of returning or being sent to the country to which they would be expelled will either be excepted from the CDC Order and processed under Title 8 or referred for appropriate exception screening by U.S. Citizenship and Immigration Services to determine whether the noncitizen is more likely than not to be persecuted or tortured in the country to which they would be expelled.

Covered noncitizens who are part of a family unit under the CDC Order may manifest a fear of returning to or being sent to the country to which they would be expelled in a number of ways, which may be verbal or non-verbal. Manifestations of fear may include, but are not limited to, the following:

1. A statement from the noncitizen that they have a fear of returning to or being sent to the country to which they would be expelled;
2. A statement from the noncitizen that they were previously harmed by persons in the country to which they would be expelled;
3. A statement from the noncitizen that they will be harmed by persons in the country to which they would be expelled;
4. Non-verbal actions such as hysteria, trembling, unusual behavior, incoherent speech patterns, self-inflicted harm, panic attacks, or an unusual level of silence.

If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, then CBP officers and agents should refer the matter to a supervisor.  Note that a noncitizen can only manifest a fear for themselves or members of their family unit; they may not manifest fear on behalf of noncitizens outside their family unit.

If you have any questions regarding this guidance, please feel free to reach out to myself or the IPC.

Respectfully,

Kenny Blanchard
Acting Deputy, Operations Directorate
█████████████

IMMIGRATION & THE BORDER

# Misinformation fuels false hopes among migrants after deadly fire in Mexico

Rumors the U.S. would open its border after the fire in Mexico's migrant detention center are just one example of false information encouraging more activity at the border.



— U.S. Border Patrol agents process migrants at the border in Ciudad Juárez, Mexico, on Wednesday.

Guillermo Arias / AFP - Getty Images



March 30, 2023, 6:08 PM EDT

**By Nicole Acevedo and Albinson Linares, Noticias Telemundo**

IFR_AR_011638

MEXICO CITY – Migrants stuck at Mexico's northern border for months hoping to get into the U.S. are becoming more vulnerable to misinformation after a deadly fire at a government-run detention center killed at least 39 people this week.

Over 1,000 migrants lined up outside international bridges to El Paso, Texas, on Wednesday afternoon after false information spread on social media and by word of mouth that the U.S. would allow them to enter the country.

**Lea en español aquí**

The migrants, most of them Venezuelans, "surrendered themselves" to U.S. authorities, El Paso Chief Patrol Agent Anthony "Scott" Good tweeted. Most migrants, including Venezuelans, won't be allowed to seek asylum in the U.S. by crossing the border under current immigration policies.

The incident prompted the U.S. Consulate in Ciudad Juárez to share a social media post in Spanish telling migrants, "Do not let yourself be deceived."

"The rumors about the opening of the border after the tragedy in Ciudad Juárez are completely false. Law enforcement policies and security measures to restrict access to people without documents into the U.S. remain in effect," the post said. "The border is closed for irregular migration!"

IFR_AR_011639



—    Over 1,000 migrants surrendered themselves to Border Patrol agents in El Paso, Texas.

@USBPChiefEPT via Twitter

The U.S. has expanded the use of a pandemic-related policy known as Title 42 to expel migrants who cross the border. On May 11, the policy will be replaced with one that largely bans asylum for anyone who travels through Mexico without having sought protection there first.

## 'You can't compete with hope'

Betty Camargo, the state programs director for the Border Network for Human Rights, said she was in touch with a migrant leading a group of others to the border Wednesday in hope of being allowed to enter the U.S.

The migrant told Camargo many of them felt angry, afraid and unsafe after the fire in Estancia Provisional de Ciudad Juárez killed 39 people and injured dozens more in one of the deadliest

IFR_AR_011640

migrant tragedies near the U.S.-Mexico border in recent years.

"While we were trying to explain to them that the rumors are not true, sometimes you can't compete with hope," Camargo said.

Questions grow after video shows deadly migrant center fire



It isn't the first time misinformation has led a large number of migrants to show up at different ports of entry. Two weeks ago, large groups of migrants clashed with federal agents at the Paso Del Norte international bridge, also known as the Santa Fe Bridge, which connects Ciudad Juárez and El Paso.

## Recommended



WEATHER

**Tornado flips cars, damages homes in coastal Florida city**

IFR_AR_011641



GUNS IN AMERICA

**Texas A&M baseball player shot by stray bullet during game, police say**

At the time, Camilo Cruz, a spokesperson from the International Organization for Migration, a United Nations agency, attributed the congregation of migrants to a "rumor that they were going to let them pass en masse, especially those who arrived with children," The Associated Press reported.

Blanca Navarrete, the director of Comprehensive Human Rights in Action, an organization in Ciudad Juárez providing services to migrants, said a Peruvian woman who had acted on the rumors stopped by her office Wednesday on her way to El Paso.

The woman and her young son had been walking for so long that the boy's last pair of shoes had broken and he couldn't keep going. Navarrete told the woman the rumors the U.S. was letting everyone in weren't true.

Navarrete said the rumor started after an anonymous user posted the message in a Facebook group used by migrants trying to navigate CBP One, an app asylum-seekers need to use to first get pre-screened and then get appointments with specific dates and U.S. ports of entry. The message then spread on WhatsApp and by word of mouth.

Troubles with the CBP One app have also created a sense of hopelessness among many migrant families trying to get asylum appointments. Gabriela Muñoz Cano, a project manager for Las Americas Advocacy Center in Ciudad Juárez, said she has families who have been trying to get an appointment through the app since January.

As they run out of resources to stay safely in Ciudad Juárez, migrants are becoming more vulnerable to misinformation about getting to the U.S., Muñoz Cano said. Scammers posing as lawyers ask migrants for money to supposedly help them get appointment in the app, she said. Getting appointments through CBP One, however, is free.

## 'Many lies out there'

While Facebook can help migrants stay in touch and get information along their journeys, it's also where misinformation targeting migrants on the border flourishes, particularly in Spanish.

IFR_AR_011642

Last year, the Tech Transparency Project identified two Facebook groups, with the same moderator, that were generating "a steady stream of content targeting migrants in Mexico." It also found "an abundance of posts spreading misinformation about immigration law, conditions along the route to the United States, and the opportunities available to migrants to the U.S.," particularly on Facebook and WhatsApp.

That kind of misinformation reached the social media feed of Carmen González, 23, in Venezuela. González said she and other friends began their journey from Venezuela to Mexico after they saw a post falsely claiming Venezuelans could enter the U.S. without being deported.

"We always see things on Instagram and Facebook telling us to travel, that people are getting into the United States," González, now stranded in Ciudad Juárez, said in Spanish. "You get excited, and then you go on that trip, you struggle a lot and then they don't let you in.

"I tell people now not to believe what they read on Facebook, because many lies are told there," she added.

People see things on social media, including accounts of people who "found out that something worked for someone," and start traveling "without immigration documentation and without plans," said Lorena Cano, the legal coordinator at the Institute for Women in Migration, a civil association defending migrant women's rights.

In February, large groups of migrants showed up at a specific mile marker near the U.S.-Canada border after false information emerged that both countries had reached an agreement and that the U.S. was going to bus migrants to Canada.

The misinformation appeared first on social media and was later spread, Camargo said, by someone who went to shelters and even by someone migrants described as an immigration official. When many of the migrants showed up at the mile marker, they realized it wasn't true.

"They're playing with their livelihood," Camargo said. "Migrants are not only being stripped from their right to migrate – they are slowly being stripped of their hope."

*Nicole Acevedo reported from New York and Albinson Linares from Mexico City.*

---

    Nicole Acevedo

Nicole Acevedo is a reporter for NBC News Digital. She reports, writes and produces stories for NBC Latino and NBCNews.com.

IFR_AR_011643

Albinson Linares, Noticias Telemundo

**Sponsored Stories**                                          by Taboola

ULAW ATTORNEYS

nally, House Passes Billions for Camp Lejeune Families

RSELL

e Clever Design Allows You To Enjoy The Fun Of Puzzles With Your Family!

LLETGENIUS

ternet Deals in Washington Starting at $20

ONEL

Must Have For Your Laptop!

SPONSORED / TRULAW ATTORNEYS

## Finally, House Passes Billions for Camp Lejeune Families

Did you or a loved one serve or live at Camp Lejeune from 1953 to 1987?

SPONSORED / SURSELL

## The Clever Design Allows You To Enjoy The Fun Of Puzzles With Your Family!

SPONSORED / WALLETGENIUS

## Internet Deals in Washington Starting at $20

IFR_AR_011644

There's a lot to love about satellite TV. Rural customers love the ability to enjoy high-quality programming whether they live in a service area or not. City dwellers stand to gain too.

SPONSORED / HAONEL

## A Must Have For Your Laptop!

SPONSORED / HOT SALE 70% OFF

## The Most Popular Products In 2023 Will Bring You Back To Nature.

Aqua socks protect against sharp shell cuts, sandy feet, and pool slips to make your holiday more fun.

SPONSORED / TECH GADGETS

## The Cordless Handheld Car Vacuum Cleaner Is Taking District Of Columbia By Storm

Super suction get rid of all the dust you couldn't reach before!

SPONSORED / DOGFOODDISCOVERY.COM

## 3 Toxic Foods for Dogs: the One Meat You Should Never Feed Your Dog

SPONSORED / VITAMIX

## New Mom? Busy Parents? Here's What to Gift this Mother's Day

SPONSORED / HTTPS://ZOKIV.COM/

## Experience the beauty and precision of our 3D wooden mechanical hummingbird!

A work of art that you can make yourself, a collectible that feels the charm of machinery

SPONSORED / MOTHER'S DAY GIFT GUIDE

## Here Are The Top 8 Gifts That Will Make Mom's Day This Mother's Day

SPONSORED / CLASSMATES

## Look For Any High School Yearbook, It's Free

Rewind the good times. Every yearbook is a window into the past

IFR_AR_011645

SPONSORED / COMPACT SUV DEALS FOR SENIORS

## These Prices For Seniors On Compact SUVs May Surprise You

SPONSORED / BOAT CHARTER DEALS | TOP SEARCHES

## These Boat Charters Are So Cheap They're Almost Being Given Away

Find huge discounts on Boat Charters now

SPONSORED / JOBSPANDA.NET

## Costco Is Hiring Senior Citizens (See Salaries)

A new initiative - Senior Citizens can now work at Costco and earn up to $47/hr. No prior experience needed. Apply today!

## More From NBC News

NBC NEWS / POLITICS

## RNC Chair Ronna McDaniel: 2024 GOP candidates must

NBC NEWS / NEWS

**Man resumed date after killing fake parking attendant, records show**

NBC NEWS / SHOP

**Here are the best ways to keep your tech clean, straight from tech experts**

IFR_AR_011646

SPONSORED / ARTPIX 3D

## Say "Love You, Mom!" with These Unique Photo Crystal Gifts

Personalized Mother's Day gifts

SPONSORED / RONUY

## Say Goodbye to Unreachable Dirt and Dust!

SPONSORED / BATHS ON CLEARANCE | SEARCH ADS

## Luxury Walk-In Tubs Are Selling For Pennies On The Dollar

SPONSORED / HOME SAVINGS CENTER

## Luxury Walk-In Tubs Are Now More Affordable Than Ever

Find exclusive savings offers here.

NBC NEWS / POLITICS

## A Montana lawmaker suggested she'd rather risk her

NBC NEWS / POLITICS

**'I think he's in trouble': Growing number of Ron DeSantis donors and allies hope for a**

NBC NEWS / NEWS

IFR_AR_011647

**Teen charged after 'intentionally' running over 70-year-old while listening to song about murder, police say**

ABOUT                                CA NOTICE

CONTACT                              TERMS OF SERVICE

HELP                                 NBC NEWS SITEMAP

CAREERS                              ADVERTISE

AD CHOICES                           SELECT SHOPPING

PRIVACY POLICY                       SELECT PERSONAL FINANCE

YOUR PRIVACY CHOICES

© 2023 NBC UNIVERSAL

IFR_AR_011648



ENGLISH



SEARCH

ABOUT US    PROGRAMS    ANALYSIS    THEMES    NEWS    GET INVOLVED    **DONATE**



📰 **15 DEC 2023** | **NEWS**

# Weekly U.S.-Mexico Border Update: Senate negotiations, migration trends

*by*    **Adam Isacson**

*With this series of weekly updates, WOLA seeks to cover the most important developments at the U.S.-Mexico border. See*



IFR_AR_011649

*past weekly updates here.*

SHARE     TWEET

SIGN UP TO GET
THE LATEST ON
ANALYSIS &
POLICY

SIGN UP

## THIS WEEK IN BRIEF:

- **White House giving ground on asylum in Senate negotiations**

With more input from the White House and the Department of Homeland Security (DHS), a small group of senators continues to negotiate a deal that might water down the right to seek asylum at the border, a Republican demand for passage of a S110.5 billion Biden administration request for Ukraine and Israel aid, the border, and other priorities. Migrant rights defenders are alarmed by reports that the administration and Democratic legislators might agree to a provision that would expel asylum seekers, Title 42-style, if daily Border Patrol apprehensions exceed a certain threshold. Congress was set to adjourn on December 14; the House gaveled out, but the Senate remains in session in order to give negotiators more time.

- **Migrant arrivals remain high, though perhaps not for long**

With nearly 10,000 Border Patrol migrant apprehensions per day, December 1-7 was one of the busiest weeks ever at the U.S.-Mexico border. Arrivals of asylum seekers are heaviest in Border Patrol's Tucson, Del Rio, and San Diego sectors, where Customs and Border Protection (CBP) has partially or fully closed three ports of entry. More recent data point to a modest slowdown in migrant arrivals compared to the first week of the month. So do reports of reduced, though still historically high, levels of northbound migration through Honduras and Panama.

### THE FULL UPDATE:

### WHITE HOUSE GIVING GROUND ON ASYLUM IN SENATE NEGOTIATIONS

Ukraine President Volodymyr Zelenskyy was on Capitol Hill on the morning of December 12, pleading for assistance included in a budget package currently stuck in Congress. Republican legislators are demanding, as the price for their support, new restrictions on asylum and other migration. "Has border simply been an excuse to kill Ukraine?

IFR_AR_011650

6/1/24, 8:14 PM
Case 1:24-cv-01702-RC Document 53-3 Filed 09/27/24 Page 495 of 660
Weekly U.S.-Mexico Border Update: Senate negotiations, migration trends - WOLA

Democrats are asking themselves that question," said
Senate Majority Leader Chuck Schumer (D-New York).

Later that day, Homeland Security Secretary Alejandro
Mayorkas spent about two hours on Capitol Hill meeting
with three senators among a small group trying to
negotiate a **border-for-Ukraine-aid deal** (James Lankford,
R-Oklahoma; Chris Murphy, D-Connecticut; and Kyrsten
Sinema, I-Arizona.) Sinema cited "substantive progress" and
Murphy struck a similar note.

The senators met late into the evening on December 13
and 14 as well, with further input from Mayorkas and the
White House. The U.S. Congress is scheduled to adjourn for
the year on December 14. The House of Representatives
ended its 2023 session as scheduled, and its Republican
leadership indicated little willingness to reconvene before
the second week of January. **Senate Majority Leader
Chuck Schumer (D-New York) is requiring the upper
chamber to remain in session during the week of
December 18**, in order to give negotiators time to work out
a deal.

**Some Democrats and the White House are signaling a
willingness to give ground** on parts of the hardline
Republican border agenda. Under particular discussion are
limits on the right to seek asylum on U.S. soil, which dates
back to the United States's 1968 ratification of the 1951
Refugee Convention and passage of the 1980 Refugee Act.

The restrictions that the Biden administration might accept
include:

- A new authority to allow **summary expulsion of
migrants** without processing their asylum claims, a
measure resembling the pandemic-era Title 42
expulsion authority, but without a public health
justification. This proposal, first revealed by *CBS News*
on December 12, would require Mexico to be willing
to take back expelled migrants, as it did for some
nationalities during the pandemic.

One of the negotiators, Sen. Thom Tillis (R-North
Carolina), said that this expulsions proposal would
work on a "stadium is full" model: once a day's Border
Patrol apprehensions reach a certain level, asylum
would be shut off. Tillis suggested a threshold of

IFR_AR_011651

"south of 3,000" apprehensions per day, which is lower than any monthly average since January 2021.

● A nationwide expansion, beyond the border region, of " expedited removal," a rapid screening procedure in lieu of immigration court, which requires asylum seekers to defend their claims before an asylum officer, usually a few days after arriving, with little access to counsel or ability to prepare their cases. That would come with a requirement that migrants being screened **prove a higher standard of fear** of death, torture, or persecution.

At *Slow Boring*, the American Immigration Council's Dara Lind explained why expanding expedited removal would have "no implications for short-term border security, or the handling of new asylum cases, and will in no way alleviate the logistical burdens the administration is wrestling with."

● Mandating "the **detention** of certain migrants", *CBS News* reported, "who are allowed into the country pending the adjudication of their claims." Unnamed DHS officials told *NBC News* that mandatory detentions "would break the border" as detention facilities filled up.

"First thing's first is asylum," Sen. Lankford told *Face the Nation* on December 10. "Right now, people come in and say, I want to request asylum. There's so many people, and the cartels know it, and the smugglers know that they can throw thousands of people a day. There's no way to process that." On *Meet the Press*, Sen. Murphy said, "We are willing to talk about tightening some of the rules, so that you don't have 10,000 people arriving a day. Our resources are not equipped to be able to handle that number of people. So, let's reduce the number of people who are coming here, but let's not shut down the border completely to legitimate claims."

The administration continues to resist restrictions to the 1950s-era authority to issue humanitarian parole, to force asylum seekers to "remain in Mexico," that other proposals Republicans have floated. It is unclear where the administration stands on codifying a ban on asylum for people who could have sought it in transit through other countries.

IFR_AR_011652

**Progressive legislators and migrants' rights defense groups** voiced outrage at what the administration appears willing to go along with in order to move the emergency budget request. The Congressional Hispanic Caucus and Congressional Progressive Caucus held a well-attended December 13 press conference outside the Capitol. "Alienating the progressive wing of the party is almost a necessary ingredient of finishing a border deal," *Politico* observed.

Many human rights organizations (including WOLA) have vocally opposed the asylum concessions. On December 11, similar statements came from Sen. Alex Padilla (D-California), chairman of the Judiciary Subcommittee on Immigration, and Rep. Nanette Barragán (D-California), chairwoman of the Congressional Hispanic Caucus; and from the Congressional Asian Pacific American Caucus.

As the House and Senate near adjournment of their 2023 sessions, House Speaker Mike Johnson (R-Louisiana) has said he would reconvene next week if negotiators reached a Ukraine-border deal, but sounded pessimistic about that happening. Senate Minority Leader Mitch McConnell (R-Kentucky) said "it is practically impossible" to reach a deal before the holidays.

## MIGRANT ARRIVALS REMAIN HIGH, THOUGH PERHAPS NOT FOR LONG

In a December 13 press conference, Mexican President Andrés Manuel López Obrador shared a slide showing that U.S. Border Patrol **apprehensions at the U.S.-Mexico border increased** from 53,016 during the first week of November to 69,462 during the first week of December, or 31 percent. At nearly 10,000 apprehensions per day, December 1-7 was one of the border's busiest weeks ever. The top Border Patrol sectors during that week were Tucson, Arizona (19,935), Del Rio, Texas (15,702), and San Diego, California (12,062).

IFR_AR_011653



*Captured from a Mexican Presidency video*

**Migration may have declined a bit** since then, as it often does as the end-of-year holidays draw near. Border Patrol apprehended 8,253 migrants border-wide on December 12, a high figure but down from over 10,200 7 days earlier.

Migration is also reduced, though still high, further south along the U.S.-bound migration route. Citing data from Honduras's migration agency, the UN Refugee Agency (UNHCR) noted **a sharp drop in migration through Honduras** from October (a record 102,008 migrants registered) to November (59,787), the fewest in a month since July. Honduras registered 15,533 migrants during the first 10 days of December, so the per-day average has fallen from 3,291 in October, to 1,993 in November, to 1,553 in December.

Migrants from Haiti (35,529 to 5,438) decreased most sharply from October to November, an apparent consequence of U.S. action against charter flights from Haiti to Nicaragua, just south of Honduras. Migration from number-one country Venezuela also fell (34,547 to 26,440). Of 187 migrants whom UNHCR polled last month, 96 percent got their information from WhatsApp and only 38 percent had eaten three meals the day before.

**Panama** has yet to publicize November data about migration through the Darién Gap. A December 4 Foreign Ministry document, however, cited "more than 480,000" migrants passing through the treacherous region so far this year. That is under 30,000 additional migrants added to the total as of the end of October (458,228); even if the

IFR_AR_011654

actual November total was 40,000, it would be the lightest month in the Darién since June. UNHCR and the International Organization for Migration (IOM) reported on December 7 that Panama had counted its 500,000th migrant passing through the Darién Gap in 2023, more than doubling the record set in 2022.

Though numbers may decrease from current levels at the U.S.-Mexico border, right now Border Patrol is struggling to process arriving asylum seekers in its Tucson, Del Rio, and San Diego sectors. In order to free up officers to help with migrant processing, CBP, Border Patrol's parent agency, has closed its PedWest pedestrian border crossing at the busy **San Ysidro** port of entry south of San Diego. People are waiting four or five hours in Tijuana to cross at San Ysidro. Tijuana's municipal migration office estimated that about 5,000 migrants are staying in the city's 40-plus recognized shelters. About 70 percent are citizens of Mexico fleeing from the country's interior.

One of two bridges into Eagle Pass, Texas remains closed for the same reason, as is the entire port of entry in tiny Lukeville, Arizona. "Because **Lukeville** is so remote, Border Patrol staffing is light, so traffickers in the region controlled by Mexico's Sinaloa cartel steer people there," the Associated Press noted. Arizona Gov. Katie Hobbs (D) visited the Lukeville area and called for the border crossing's reopening, pledging to deploy the state's National Guard if the situation continues. Hobbs sent President Joe Biden a letter calling for "$512,529,333 in reimbursements for ongoing border operations resulting from the federal government's failure to secure the Arizona border." Arizona Senators Mark Kelly (D) and Kyrsten Sinema sent a letter urging President Biden to deploy the National Guard to help reopen Lukeville.

Mexico's foreign ministry issued a statement calling on CBP to reopen the three temporarily closed facilities. In an effort to slow migrant arrivals in the Tucson Sector, Mexico's national and state governments are launching a "Migration Containment Plan" in the state of Sonora, with increased military and police filters and road checkpoints at bus stations and on main roads.

Near **Jacumba Hot Springs, California**, just over an hour's drive east of San Diego, "a total daily average of 800 people are in three camps," Agence France-Presse found. "The

IFR_AR_011655

lucky ones have tents," *ABC News* reported. "However, most sleep on the gravel and use their clothes to shield them from the elements and their backpacks as pillows."

Several organizations filed a detailed complaint on December 11 with the DHS Office of Civil Rights and Civil Liberties, finding that in both San Ysidro and Jacumba, "Border Patrol agents are still detaining asylum seekers in dangerous, exposed conditions, and are failing to provide the adequate food, water, sanitation, shelter, and medical care required under the law."

## OTHER NEWS

- A CBP release reported that a Guatemalan woman died on September 15 after falling from the 30-foot Trump-era border wall near Otay Mesa, southeast of San Diego. In mid-November, the *New York Times* reported that 350 victims of wall falls had been admitted in 2023 to the U.C. San Diego Health trauma center, up from zero in the 3 years before the wall's 2019 renovation.

- Deaths of women migrants increased sharply during a record year for migrant deaths in Border Patrol's El Paso Sector (far west Texas and all of New Mexico). Normally, men are the vast majority of recovered remains, but in New Mexico in 2023, of 78 bodies whose gender could be determined, 40 were female, the *El Paso Times* found.

- The Ciudad Juárez-based *La Verdad* reported from several parts of Mexico about the severe toll that migrating across Mexico takes on women.

- San Diego U.S. District Court Judge Dana Sabraw approved a court settlement, in litigation brought by the ACLU, that would prohibit any revival of a "family separation" policy at the U.S.-Mexico border for the next eight years.

- "Under the Biden administration (as in past administrations), children are ordered to appear in immigration court against trained government prosecutors, even if they have no lawyer to represent them," finds a new report from the UCLA Center for Immigration Law and Policy.

IFR_AR_011656

- CBP's Office of Professional Responsibility released an annual report, covering 2022, about internal investigations and employee accountability. The report found no increase in disciplinary actions taken against agency personnel compared to 2021. The National Use of Force Review Board looked at five serious use-of-force incidents and recommended no discipline.

- Texas's state Department of Public Safety (DPS) concluded its investigation into mid-2023 whistleblower claims that personnel were ordered to push asylum seekers back to the Rio Grande and deny them water and first aid. DPS reported that it found no wrongdoing.

- A December 8 DHS statement noted that the Department has removed nearly 13,000 citizens of Venezuela from the United States. Some have been returned to Venezuela aboard eight deportation flights, the rest have been deported to Mexico under the Biden administration's post-Title 42 asylum rule.

- The directors of two UN agencies, UNHCR and IOM, published a column at Time arguing that efforts to deter migrants don't work and that "the right strategy would tackle every stage of the journey, through a comprehensive and route-based approach of engagement."

- A Washington Post editorial (citing WOLA) called for more processing of migrants and more assistance to countries along the U.S.-bound migration route that could be giving in-transit migrants greater opportunity to settle there.

- A CBS News poll found 20 percent of U.S. respondents naming "immigration and the Border" to be the "most important problem facing the United States." Only "inflation" (27 percent) scored higher.

- An NPR analysis of Republican presidential candidates' positions on border and migration showed unanimity on most issues, but some disagreement over the harshest proposals.

- Mexico's migration agency (INM) is facing a funding shortfall until at least the end of the year; an agent told the daily Milenio, "INM agents no longer even approach the migrants…in Ciudad Juarez, no Mexican authority is present for the dozens of migrants who wait, along the

IFR_AR_011657

Rio Bravo, for a break in patrolling by the Texas National Guard to cross a barbed wire fence." Still, the agency returned 47 unaccompanied Guatemalan minors back to Guatemala over the December 9-10 weekend.

- *Voice of America* reported that shakedowns and harassment from corrupt Guatemalan police have made migrants' transit through the country "hellish." (See a longer mid-November investigation of this in Spain's *El País*.)

- The Niskanen Center obtained data about the "Safe Mobility Offices" that the U.S. government has established this year in Colombia, Costa Rica, Ecuador, and Guatemala. Though operating so far at a small scale, these "SMOs" have referred 10,000 migrants to the U.S. Refugee Admissions Program, and about 2,500 refugees have arrived in the United States so far.

- At his *Americas Migration Brief* newsletter, Jordi Amaral laid out "Five Migration Trends in the Americas to Watch in 2024": maritime migration, Haiti's crisis, climate change, integration efforts, and upcoming elections.

**Related Content**

**Weekly U.S.-Mexico Border Update: Asylum executive order, Mexico crackdown, Border Patrol centennial, South America migration**

31 MAY 24 | NEWS

**Weekly U.S.-Mexico Border Update: Border Act Fails, Migration Keeps Dropping, Texas Updates**

24 MAY 24 | NEWS

**Weekly U.S.-Mexico Border Update: Mexico blocks migration, U.S. legislation, migrant**

**Weekly U.S.-Mexico Border Update: April dip in migration, drug seizure data, investigations published**

3 MAY 24 | NEWS

**Weekly U.S.-Mexico Border Update: Migration declined in March, Mayorkas impeachment**

IFR_AR_011658

removals,
nationalities

26 APR 24 | NEWS

thwarted, Darién
Gap, National Guard
in Texas

19 APR 24 | NEWS

## FOLLOW OUR NETWORKS

  


## CONTACT WOLA

Washington Office on Latin
America
1666 Connecticut Ave NW,
Suite 400
Washington, DC 20009

Tel: (202)797-2171

## HELP US CREATE REAL IMPACT

DONATE

The Washington Office on
Latin America (WOLA) is
recognized in the United
States as tax exempt under
section 501(c)(3) of the
Internal Revenue Code.

🔍 Click here to search all of WOLA's analy    SEARCH

| ABOUT US | PROGRAMS | ANALYSIS | NEWS | GET INVOLVED |
| --- | --- | --- | --- | --- |
| Our Mission | Central America | Publications | Latest News | Events |
| Our Impact | Colombia | Commentary | Press Room | Internships |
| Staff | Cuba | Videos | | Jobs |
| History | Mexico | Podcast | | Donate |
| Board of Directors | South America | | | Contact |
| Finances | Venezuela | | | |
| | Citizen Security | | | |
| | Drug Policy | | | |
| | Women and Incarceration | | | |
| | Migration & Border Security | | | |

IFR_AR_011659

Defense

Oversight

Washington Office on Latin America, 1666 Connecticut Ave NW, Suite 400, Washington, DC 20009

IFR_AR_011660

American Immigration Council
(https://www.americanimmigrationcouncil.org)

Home (/)

# Your Rights Under Al Otro Lado v. Mayorkas

You may have an additional opportunity to seek asylum in the United States!

Traducir Página: Espanol   | Paj tradui: Kreyòl   | Translate page to: English

**Please read this page if you:**

✓  traveled to the U.S./Mexico border before July 16, 2019 to seek asylum, and

✓  placed or tried to place your name on an asylum waiting list, or tried and were unable to enter the United States at a port of entry, and

✓  were deported from the United States.

Watch the video (https://www.youtube.com/watch?v=h-yqI9r6fpo) from Al Otro Lado Org to learn more.

IFR_AR_011707

AOL v. Mayorkas (English): https://www.facebook.com/ayudalistadeespera



**If you meet the requirements below, please complete this survey (https://mobilepathways.formtitan.com/ftproject/ft03c05c0e108f40d1b44e4e34678c0c2c) to contact the lawyers in the case to see if you qualify to return to the United States to seek asylum again.**

 **Link to Survey (https://mobilepathways.formtitan.com/ftproject/ft03c05c0e108f40d1b44e4e34678c0c2c)**

## What is *Al Otro Lado v. Mayorkas*?

*Al Otro Lado v. Mayorkas* is a lawsuit against the United States government challenging its "metering" policies at land ports of entry at the border between the United States and Mexico.

Under metering, asylum seekers were stopped from crossing into the U.S. at ports of entry. Some asylum seekers were told that the port was full and could not process them. Others were required to put their name on a waitlist in Mexico and could not enter the U.S. to seek asylum until their number was called.

A court has prohibited the U.S. government from applying a rule known as the "third country transit rule" to deny asylum to certain people who were metered.

The court decision in *Al Otro Lado v. Mayorkas* prohibits the U.S. government from applying this rule to asylum seekers who arrived at the United States-Mexico border before July 16, 2019 but were not allowed to cross the border until July 16 or after due to "metering."

IFR_AR_011708

**You have rights under this court decision if you meet all 5 of the following requirements:**

✓ Traveled to the United States-Mexico border AND either

    a. tried to enter the United States to seek asylum through a land port of entry at the U.S./Mexico border before July 16, 2019 OR

    b. put your name (or tried to or had someone else put your name) on a waitlist before July 16, 2019;

✓ Were unable to cross the border into the United States until July 16, 2019 or after that date due to metering;

✓ Are not a Mexican citizen or national;

✓ Were denied asylum or failed your credible fear interview in the United States because of the Transit Ban; and

✓ Still wish to seek asylum in the United States.

*If you meet the above requirements, complete this survey (https://mobilepathways.formtitan.com/ftproject/ft03c05c0e108f40d1b44e4e34678c0c2c) to contact the lawyers in the case to see if you qualify to return to the United States to seek asylum again.*

# You may have been subject to metering if:

- You arrived at a land port of entry at the U.S./Mexico border and were told that you had to wait to enter the United States or that the port of entry did not have the capacity to process you; or
- You signed up or wrote your name on a wait list in Mexico (or tried to do so or had someone else do so for you) after arriving at a border town close to the border between the United States and Mexico.

*Metering is not the same as the "Remain in Mexico" program or, as the government calls it, "Migrant Protection Protocols" or "MPP."*

# What is the "third country transit rule"?

The U.S. government implemented the "third country transit rule", frequently called the "Transit Ban," on July 16, 2019. It is no longer in effect[*], but it established that, with a few exceptions, a person was not eligible for asylum if they:

1. were from a country that is not Mexico;
2. did not seek asylum or some other form of legal protection in Mexico or another country through which they traveled on the way to the United States; and

IFR_AR_011709

3. entered the United States through a land port of entry between the United States and Mexico on July 16, 2019 or after that date.

\* Please note that the Biden Administration proposed a similar rule in February 2023, but the Al Otro Lado v. Mayorkas court order does not cover the new rule. The court order only applies to the rule implemented on July 16, 2019

**If you meet the requirements above, please complete this survey (https://mobilepathways.formtitan.com/ftproject/ft03c05c0e108f40d1b44e4e34678c0c2c) to communicate with the team of attorneys on the Al Otro Lado v. Mayorkas case, to analyze your case and determine if you may be eligible to return to the United States to seek asylum.**

# Contact

You may also contact us on WhatsApp, over the phone, or at the email address below.

WhatsApp (text only)

415-818-1851

(https://web.whatsapp.com/send?phone=4158181851)

415-581-8998

(tel:415-581-8998)

meteringclass@splcenter.org

(mailto:meteringclass@splcenter.org)

IFR_AR_011710











# More on *Al Otro Lado v. Mayorkas*



LITIGATION

Challenging Customs and Border Protection's Unlawful Practice of Turning Away Asylum Seekers
(https://www.americanimmigrationcouncil.org/litigation/challenging-customs-and-border-protections-unlawful-
practice-turning-away-asylum-seekers)

IFR_AR_011712



SOCIAL MEDIA

Ayuda Lista de Espera - AOL v. Mayorkas Facebook Page (https://www.facebook.com/ayudalistadeespera)

IFR_AR_011713

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 512 of 660



TEMPLATE MATERIALS

*Al Otro Lado v. Mayorkas* Lawsuit: Template Materials In Support of Preliminary Injunction Relief
(https://www.americanimmigrationcouncil.org/content/metering)

1331 G St. NW, Suite 200, Washington, D.C., 20005 | 202-507-7500
Registered 501(c)(3). EIN: 52-1549711
Copyright American Immigration Council. All rights reserved.
Photo Credits (/content/photo-credits) | Sitemap (/sitemap) | Terms of Use (/terms-of-use)

IFR_AR_011714

# The Forty Year Crisis: A Legislative History of the Refugee Act of 1980

DEBORAH E. ANKER* & MICHAEL H. POSNER**

*This article analyzes the legal responses of the United States to issues of refugee and asylum policy in the post-World War II period that culminated in the enactment of the Refugee Act of 1980. The authors describe the consensus for a humanitarian, nondiscriminatory policy which led to the passage of the Refugee Act. This legislative history demonstrates the effort to develop a coherent and flexible refugee admission policy and to create statutory mechanisms to mediate the conflict between the executive and legislative branches over the control and standards for refugee admissions. The article evaluates the implementation of the Refugee Act, proposals by recent administrations for reform, and offers a series of recommendations for future refugee and asylum policy.*

*"In good measure, our country's humanitarian tradition of extending a welcome to the world's homeless has been accomplished in spite of, not because of our laws relating to refugees."*[1]

---

\* Member of the Massachusetts Bar. B.A., Brandeis University, 1969; J.D., Northeastern University, 1975; Chairperson of Boston Immigration Committee of the National Lawyers Guild; Member of the Committee on Asylum and Refugees of the American Immigration Lawyers Association. Currently Ms. Anker is Director of the International Institute of Boston.

\*\* Member of the California and Illinois Bars. B.A., University of Michigan 1972; J.D., University of California at Berkley (Boalt Hall) 1975. Currently Mr. Posner is Executive Director of the Lawyer's Committee for International Human Rights in New York City. (The authors wish to express their gratitude for editorial assistance to Ms. Sue Kaplan, Harvard Law School; Mr. Evan Slavitt attorney with the Antitrust Division of the United States Department of Justice; and Professor Michael Schwartz, Sociology Department, State University of New York at Stonybrook, New York).

1. Statement of Congresswoman Elizabeth Holtzman, *Hearings on H.R. 2816 Before the Subcomm. on Immigration, Refugees and International Law of the*

IFR_AR_011719

The series of refugee crises which have erupted during the past four decades has evolved into a chronic, worldwide condition. Beginning with the people displaced by World War II, and continuing through the Hungarians, the Palestinians, the Cubans, the Vietnamese, the Haitians and the Afghani, the United States has struggled to define its proper role in coping with the refugee problem. Not only were the mechanisms for dealing with the refugee problem at issue, the very definition of a refugee constantly changed. Further, the developmental process of such mechanisms exemplifies the tug of war between Congress and the Executive to control the resolution of the problem.

With the coalescence of United States power in the international arena following World War II, the American political leadership projected the country's image as a haven for refugees from persecution. While the United States attempted to build new alliances with nations in different parts of the world, foreign policy aims were continually frustrated by the restrictive and xenophobic immigration policy embodied in the national origins system and codified in the Immigration and Nationality Act of 1952 (INA).[2] Moreover, while the INA defined immigration quotas along ethnic lines, inhibiting the United States' ability to offer refuge to certain nationalities, it also made no separate provision for the admission of refugees. The national quotas were characterized as a slur to those people with whom the United States was trying to build alliances. At the same time the United States was unable to respond adequately to the international refugee crisis through a specific and permanent refugee admission policy. Gradually, the United States publicly assumed responsibility for refugees who were fleeing new conflicts in the developing world as well as those displaced following World War II. The instability of the post-war era evolved into a chronic condition and the United States found itself a leader in a world that by 1980 had a population of over fifteen million refugees.[3]

When the permanent refugee admission quota was finally written into law in 1965,[4] its geographic, ideological and numerical qualifications were already completely inadequate to deal with

---

*House Comm. of the Judiciary*, 96th Cong., 1st Sess. (1979) [hereinafter cited as *Hearings on H.R. 2816*].

2. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163. (Codified as 8 U.S.C. §§ 1101-1157 (1952)).

3. Figures *reprinted* in *United States Refugee Programs: Hearings before the Senate Comm. on the Judiciary*, 96th Cong., 2d Sess. 381 (1980) [hereinafter cited as *U.S. Refugee Programs*].

4. The Immigration and Nationality Act Amendments of 1965, Pub. L. No. 89-239, 79 Stat. 911 (1965) [hereinafter cited as the 1965 Amendments]. These amendments were repealed in part by 8 U.S.C. §§ 1157-1159 (1980).

10

IFR_AR_011720

the scope of the refugee problem. The permanent statute constrained the implementation of broader goals, and the executive branch looked to other legal mechanisms for the admission of refugees. Such a mechanism emerged through the use of the Attorney General's parole authority contained in section 212(d)(5) of the INA.[5] The friction between the flexibility of this *ad hoc* admission procedure, administered by the executive branch, and the carefully delineated statute, passed by the Congress, was the source of repeated conflict between the two branches of government.

The culmination of these developments was the Refugee Act of 1980 (Refugee Act),[6] the most comprehensive United States law ever enacted concerning refugee admissions and resettlement. This legislation, the result of extensive efforts by Congress and the executive branch, creates for the first time a legal framework for the admission of refugees to the United States that is coherent, comprehensive and practical. The Refugee Act incorporates the international definition of refugee from the United Nations Convention Relating to the Status of Refugees (UN Convention).[7] In so doing, it eliminates the geographical and ideological preferences that have dominated our system for the past three decades. By adopting a universal approach to refugee admissions consistent with international standards and norms, the new law places primary emphasis on "special humanitarian concerns".[8] On the other hand, the Refugee Act is a recognition that the United States cannot accept an unlimited number of refugees from around the world. It creates the basis for a refugee policy that considers the existing limitations on our nation's resources and the practical problems in administering such a program while maintaining our national humanitarian commitment. The Refugee Act also establishes, for the first time, the legal status and statutory rights of asylum.[9] It mandates a uniform asylum proce-

---

5. 8 U.S.C. § 1182(d)(5) (1952) (amended 1980).

6. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. (Codified as 8 U.S.C. §§ 1157-1159 (1980)).

7. United Nations Conventions Relating to the Status of Refugees (1951) as incorporated into U.S. law by the United Nations Protocol Relating to the Status of Refugees (1967). 19 U.S.T. 6223, T.I.A.S. No. 6577 (entered into force with respect to the United States on November 1, 1968) [hereinafter cited in UN Convention].

8. 8 U.S.C. §§ 1101-1157 (1980).

9. 8 U.S.C. § 1158 (1980).

11

dure be established to evaluate asylum applications on a systematic and equitable basis.

This article focuses on three principal aspects of the United States' refugee and asylum policy. First, it traces refugee programs of the United States dating back to post-World War II admissions from Europe. Second, it examines the legislative history of the Refugee Act, a history showing the evolution of a consensus for the humanitarian, nondiscriminatory policy finally embodied in the Refugee Act. The history also highlights the purpose of the Refugee Act, which is to move away from *ad hoc* refugee admission procedures and to create mechanisms to resolve the ongoing friction between the Executive and Congress over control of and standards for refugee admissions. Third, with the legislative history of the Refugee Act as background, the article evaluates the implementation of the Refugee Act and advances a number of specific recommendations.

These recommendations address problems in implementing existing law. We believe that the Refugee Act provides a sound and practical legislative base from which a successful refugee policy can be developed. Accordingly, we do not recommend nor do we believe that it would be wise to modify the Refugee Act as enacted in 1980.

REFUGEE LAW AND POLICY, 1948-1969[10]

From the end of World War II until 1970, the history of refugee admissions into the United States is the story of a series of temporary responses to emergency crises. The national origins framework[11] established for immigration quotas insured that any legislative or administrative measures for refugees would be created on an *ad hoc* basis. As time passed, however, the divergency in approach between the executive and the legislative branches became striking. Insofar as Congress was willing to make exceptions to the restrictive immigration policy of the post-war era, refugees were admitted within narrowly circumscribed limits to

---

10. The material in this section is based in part upon the following: a) P. Glist, History of the Seventh Preference (unpublished, on file with Hogan & Hartson, Washington, D.C.); b) a background discussion of U.S. refugee laws and policies contained in the House Report on the Refugee Act of 1979, H.R. REP. No. 608, 96th Cong., 1st Sess. (1979) [hereinafter cited as H.R. REP. No. 608]; c) SEN. COMM. ON THE JUDICIARY, A REPORT UPON THE FORMATION OF THE SELECT COMMISSION ON IMMIGRATION AND REFUGEE POLICY: U.S. IMMIGRATION LAW AND POLICY: 1952-1979, 96th CONG., 1st Sess. (Comm. Print 1979) [hereinafter cited as U.S. IMMIGRATION LAW AND POLICY: 1952-1979].

11. The national origins quota system was repealed by 1965 Amendments, Pub. L. No. 89-239, 79 Stat. 911 (1965), see note 4 *supra*. For discussion of the national origins system see note 18 *infra*.

12

Case 1:24-cv-01702-RC     Document 53-1     Filed 09/27/24     Page 517 of 660

discharge responsibilities towards persons uprooted by the war, or as a gesture to the anti-communist preoccupation of the Cold War Era. Each legislative enactment was not to be viewed as "any precedent or commitment."[12] The executive branch, on the other hand, viewed refugee admissions as an instrument of foreign policy. As a result, it had a more expansive perspective on the United States' responsibilities in refugee crises, and began to bypass the formal immigration limits through the device of the Attorney General's parole authority.

*The Displaced Persons Act of 1948*

Congress enacted the first refugee legislation of the post-war era, the Displaced Persons Act of 1948,[13] only after eighteen months of executive pressure.[14] Eligibility requirements were highly selective. The Act provided sanctuary only for certain displaced, forced laborers from states conquered by Germany and for certain refugees who qualified under the United Nations (UN) refugee standards, particularly those who had fled Nazi or Fascist persecution and those fleeing Soviet persecution. Technical cut-off dates precluded the issuance of visas to ninety percent of the displaced Jews who entered Germany, Austria and Italy.[15] These limits were modified to some extent by subsequent amendments to the Act in 1950 and 1951.[16]

---

12. *See, e.g.*, Conf. Rep., 83rd Cong., 1st Sess., *reprinted in* [1953] U.S. CODE CONG. & AD. NEWS 2122-23, which assured that the 1953 Refugee Relief Act, Pub. L. No. 203, 67 Stat. 400 (1953) was an "emergency relief measure designed to implement certain phases of American foreign policy. It is not intended to represent any precedent or commitment on the part of the Congress or the Government of the United States to participate as an immigrant receiving country in any international endeavors aimed at a permanent solution of the problem: of surplus populations as it now apparently exists in certain parts of Europe and Asia."

13. Pub. L. No. 80-774, 62 Stat. 1009 (1948).

14. *See* S. REP. No. 950, 80th Cong., 2d Sess., *reprinted in* [1948] U.S. CODE CONG. & AD. NEWS 2028, 2035; H.R. REP. No. 1854, 80th Cong., 2d Sess. 7 (1948).

15. S. REP. No. 950; H.R. REP. No. 1854, *supra* note 14; President's Press Release of June 25, 1948, upon the signing of Pub. L. No. 80-774, 62 Stat. 1009 (1948). The 1948 Displaced Persons Act was severely criticized by Truman for adopting these technical cut-off dates.

16. Amendment to Displaced Persons Act of 1948, Pub. L. No. 81-555, 64 Stat. 219 (1950). The amendment permitted new visas to be issued to anti-communist refugees as an encouragement to anti-communists within the Soviet sphere; to take in refugees from the People's Republic of China; to change the cut-off dates previously used to prevent Jewish immigration (although only upon assurances that the changes benefitted Soviet dissenters and that few "racial outcasts" would immigrate). See H.R. REP. No. 581, 81st Cong., 1st Sess. 15 (1950). The Displaced

13

IFR_AR_011723

*The Refugee Relief Act of 1953*

The INA[17] made some modification in the national origins system in effect since 1924 but like its predecessor contained no specific provision for the admission of refugees.[18]  As a result, refugees had to be admitted through special enactments outside the permanent admissions scheme.  The emphasis in these measures was less on broad humanitarian goals than on giving encouragement and support to anti-communists.  In furtherance of this policy, Congress formulated the Refugee Relief Act of 1953[19] to allow admission of refugees including victims of natural calamities and those from communist-dominated parts of Europe and the Middle East.  Special allotments were provided for Sweden, Iran, and Greece (countries viewed as bulwarks of democracy against Soviet expansionism).[20]  The Refugee Relief Act was extended in 1957,[21] and visas were issued to "refugee escapees" defined as victims of racial, religious, or political persecution who were from communist or communist-dominated countries or a country in the Middle East.

With each of these legislative initiatives Congress maintained a circumscribed policy and repeatedly ignored appeals by the State Department to broaden the refugee admission criteria.  When over 200,000 Hungarians fled Hungary following the Soviet invasion of that country in October 1956, President Eisenhower found existing immigration legislation inadequate to deal with the scope of the commitment the United States was called upon to make.

---

Persons Act was amended again by Pub. L. No. 82-60, 65 Stat. 96 (1951), thereby extending the Act an additional 6 months.

17.  8 U.S.C. §§ 1101-1157 (1952).

18.  The 1952 Act modified and carried forward provisions of the two prior major immigration laws.  The Immigration Act of 1917, 39 Stat. 874 (1917), set forth qualitative exclusion grounds.  The Immigration Act of 1924, 43 Stat. 153 (1924), for the first time provided numerical immigration restrictions based on maintaining proportions of different races and nationals in the population through the use of a "national origins" formula.  (The 1952 Act also included provisions of the Internal Security Act of 1950, 64 Stat. 987.)  The modified formula of the 1952 Act "set the annual quota for an area at 1/6 of 1 percent of the number of inhabitants in the continental United States in 1920 whose ancestry or national origin was attributable to that area."  U.S. IMMIGRATION LAW AND POLICY: 1952-1979, *supra* note 10, at 7.  The national origins quota system was combined with a four-category selection system in the allocation of visas to Eastern Hemisphere countries.  There were no numerical restrictions placed on Western Hemisphere immigration.

19.  *See* note 12 *supra*.

20.  H.R. REP. No. 608, *supra* note 10, at 2.  The 209,000 visas issued under the Act of 1953 were made available for these specific categories of refugees, separate and distinct from visas available under the national origins quotas of the 1952 immigration law.  During the approximately three and a half years that the 1953 Act was in effect some 189,000 refugees were either admitted or adjusted their status to immigrant.

21.  Pub. L. No. 85-316, 71 Stat. 639 (1957).

14

With the "eyes of the world . . . fixed on Hungary" the United States could not afford to make a mere token gesture.[22] In late November 1956, President Eisenhower announced an offer of asylum to a total of 21,500 Hungarian refugees. Sixty-five hundred of this number received visas under the expiring Refugee Relief Act. Following informal discussions with congressional leaders, the President authorized the admission of the remaining refugees by requesting the Attorney General to exercise his parole authority.[23] The Attorney General's power to parole aliens into the United States is contained in section 212(d)(5) of the INA which (prior to the enactment of the Refugee Act) read as follows:

> The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any applicant for admission to the United States.[24]

Section 212(d)(5) was originally enacted to authorize the parole of otherwise inadmissible aliens. Derived from early administrative practice and operational instructions, it was designed to overcome some of the stringent entry requirements contained in the INA without allowing the alien the legal protections granted with formal entry into the United States.[25] While both the prior administrative practice and the legislative history of the INA indicate a purpose to benefit *individual* aliens in emergency situations, the 1956 Hungarian crisis heralded "the first, but by no means the last," use of the parole provision for the *mass* admission of refugees.[26]

---

22. *See* H.R. Doc. No. 85, 85th Cong., 1st Sess. 1 (1957).

23. The State Department was informed by spokespeople of both the House and Senate Judiciary Committees that parole was "the proper and lawful instrumentality for coping with the emergency in a manner consistent with the policy outlined by the President. . ." *See Hearings on H.R. 7700 Before the Subcomm. on Immigration and Naturalization of the House Comm. on the Judiciary*, 90th Cong., 1st Sess. 485 (1964) [hereinafter cited as *Hearings on H.R. 7700*].

24. 8 U.S.C. § 1182(d)(5) (1952) (amended 1980).

25. For an excellent discussion of the administrative and legislative history of the parole authority, see Comment, *Refugee-Parolee: The Dilemma of the Indochina Refugee*, 13 SAN DIEGO L. REV. 175 (1975), and Kap, *Refugees Under United States Immigration Law*, 24 CLEVELAND STATE L. REV. 528 (1975).

26. U.S. IMMIGRATION LAW AND POLICY: 1952-1979, *supra* note 10, at 18. A total of 38,000 Hungarian refugees were eventually resettled in the United States utiliz-

15

*The Fair Share Law of 1960*

Congress acquiesced to executive leadership in paroling refugees by enacting the Fair Share Law of 1960.[27] The Attorney General gained the authority to admit, under the mandate of the United Nations High Commissioner for Refugees (UNHCR), a fair share of the refugees remaining in refugee camps in Europe. That "fair share" was specified to be twenty-five percent of the number of similar refugees resettled in nations other than the United States. Allowance was also made for adjustment of status after two years presence in the United States.[28] Other provisions were highly restrictive. For example, a State Department suggestion to extend the terms of the Act to certain non-Europeans was rejected.[29] The Fair Share Law was criticized for its discrimination against certain groups of refugees and for its failure to establish by permanent statute a refugee admission procedure.[30]

*The Refugee Assistance Act of 1962*

In 1961 and 1962, the practice of wholesale parole of refugees was adopted.[31] Also in 1962, Congress passed the Migration and Refugee Assistance Act of 1962.[32] This Act was to provide for the resettlement needs of Cubans as well as to establish better fund-

---

ing the parole authority. The parole authority represented the one statutory mechanism with sufficient flexibility to circumvent the structures of the legislative enactments. One serious drawback, however, was that these refugees, were not legally admitted into the United States; subsequent legislation was required to allow for their adjustment of status.

27. Pub. L. No. 86-648, 74 Stat. 504(1960). Congress has been accused of taking a contradictory attitude toward the use of the parole authority for refugee admissions. On the one hand, it has criticized the Executive's use of the authority for refugee admission programs, but has also "endorsed" that use by subsequently enacting legislation for the adjustment of status of refugees paroled under various programs. *See* note 26 *supra*. The "Fair Share Law" is only one, albeit major, example of congressionally mandated and approved parole. In fact, on a number of occasions Congress itself had initiated a refugee parole request. Congress has not necessarily been critical of refugee parole in the abstract, but rather has been wary of the unfettered and unmonitored use of parole for refugee admissions by the Executive.

28. H.R. REP. NO. 608, *supra* note 10, at 3.

29. S. REP. NO. 1651, 86th Cong., 2d Sess., *reprinted in* [1960] U.S. CODE CONG. & AD. NEWS 3124, 3140. The State Department had proposed that the definition of "refugee" be broadened by deleting the requirement that refugees fall under the mandate of the UNHCR. That proposal was rejected with a terse reminder that the Act's "primary aim . . . is to contribute to the closing of the remaining displaced persons and refugee camps in Europe, such aim coinciding with the determined camp liquidation program of the United Nations High Commissioner for Refugees". *Id.* at 3140.

30. *See, e.g.*, comments made on the floor of the House of Representatives recorded at 106 CONG. REC. 14387(1960).

31. *See* U.S. IMMIGRATION LAW AND POLICY: 1952-1979, *supra* note 10, at 46.

32. Act of June 28, 1962, Pub. L. No. 87-510, 76 Stat. 121(1962)

16

ing and coordination for international refugee assistance programs. The Migrations and Refugee Assistance Act had a limited effect on refugee admission policy. This legislation is, however, significant for refugees because it was the first measure to validate and adopt a nondiscriminatory definition of refugee. In omitting any special reference to refugees from communist-dominated areas or "cold war" responsibilities, the statute also broadened our national perspective on the origin and cause of refugee movements, and implied our willingness to assist all who had fled their homes. This was important in view of developing refugee problems in Africa and elsewhere.[33] The more limited congressional view was beginning to broaden.

*The 1965 Amendments to the INA: Creation of the Seventh Preference for Refugees*

The first permanent statutory basis for the admission of refugees was established by the 1965 Amendments to the INA.[34] These amendments represented legislative recognition of the permanent nature of the refugee crisis and the United States' responsibility to contribute to its alleviation. In most respects, however, the amendments were essentially a codification of the restrictive refugee standards developed for emergency relief since 1948. Section 203(a)(7)[35] provided for the use of up to six percent of the total Eastern Hemisphere immigration quota (10,200 visas) for the conditional entry of refugees as a new seventh "preference" category for admission.

The basic eligibility standards for the refugee preference were derived from the Refugee Escape Act of 1957.[36] A provision of the 1953 Act[37] for victims of natural calamities was also included.

To come within the ambit of section 203(a)(7) the alien had to prove: 1) departure from a communist-dominated country or from a country within the general area of the Middle East; 2) the departure constituted a flight; 3) such flight was caused by persecution or fear of persecution on account of race, religion, or political opinion; and 4) an inability or unwillingness to return. Further-

---

33. A. SCHWARTZ, THE OPEN SOCIETY 142 (1968), *cited in* U.S. IMMIGRATION LAW AND POLICY: 1952-1979, *supra* note 10, at 48.
34. *See* note 4 *supra*.
35. *See* 8 U.S.C. § 1153(a)(7) (1952) (repealed by 8 U.S.C. § 1101(c)(7) (1980)).
36. Pub. L. No. 85-316, 71 Stat. 639 (1957).
37. *See* note 12 *supra*.

17

more, the application could only be made through an immigration officer in a noncommunist or noncommunist-dominated country. Those who met ideological and geographical qualifications were still excluded if they did not find their way to a noncommunist country where the Immigration and Naturalization Service (INS) had established a processing office.[38]

Under section 203(a)(7) aliens were admitted as conditional entrants. The provision for conditional entry admission status was derived from the Fair Share Law[39] which had created a legislatively endorsed parole status for refugees. While conditional entry was not a legal admission to the United States, a refugee entering under that section could acquire permanent resident status after two years in the United States without special legislation.[40]

The 1965 Amendments repealed the national origins system and substituted a system of priorities based primarily on reunification of families and job skills. This substitution represented "the most far-reaching revisions of immigration policy."[41] In terms of reform of refugee admission policy, however, the amendments were of limited effect because of the restriction imposed based on geography and ideology. Proposals to extend refugee relief to North Africa were rejected along with an administration suggestion to reserve a pool of visas for emergency refugee relief free of geographic restrictions.[42]

By creating a permanent refugee admission provision in section 203(a)(7), Congress attempted to reassert its primacy in dealing with the refugee problem and stated its express intent that parole authority return to its original use for "emergent, individual, and

---

38. The 1965 Amendments *supra* note 4. *See* 8 C.F.R. 235.9(a) (1981) for INS processing centers.

39. Pub. L. No. 86-648, 74 Stat. 540 (1960).

40. In contrast see note 26 *supra*. Nonimmigrants physically present in the U.S. after two years who met the same eligibility requirements also could apply for classifications as refugees and for permanent resident status.

41. See IMMIGRATION LAWS OF THE UNITED STATES, 21-22 (3d ed. 1975). Harper at 38 (1975) *cited in* U.S. IMMIGRATION LAW AND POLICY: 1952-1979, supra note 10, at 51.

42. *See, e.g., Hearings on H.R. 7700, supra* note 23, at 559; *Hearings on H.R. 2580 Before the Subcomm. of the House Comm. on the Judiciary*, 88th Cong., 2d Sess. 68(1965).

The Administration's recommendations would have been to reserve up to twenty percent of the visas available for refugees whose "sudden dislocation would require special treatment". Kennedy, *The Immigration Act of 1965*, 367 THE ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE 140(1966). Sen. Kennedy, then Chairman of the Subcommittee to Investigate Problems connected with Refugees and Escapees of the Committee on the Judiciary of the U.S. Senate, also advocated a flexible refugee admission policy. 111 CONG. REC. 28033 (1965) (remarks of Sen. Kennedy).

18

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 523 of 660

isolated" situations.[43] At the same time Congress recognized that the parole authority could still be utilized for the admission of refugees "if such were deemed in the national interest of our country."[44]

Congress failed in its efforts, however, because the permanent refugee admission provision of section 203(a)(7) was inadequate even as it was written. Despite the legislative admonition, the parole authority continued to be required on a supplemental basis. This was dramatically illustrated by President Johnson signing the 1965 Amendments while simultaneously announcing the Cuban airlift program, which thereby initiated an open-ended invitation for thousands of Cuban refugees to enter the United States.[45] In the years following 1965, the Executive continued to use parole authority for refugee admissions, often to circumvent the obsolete numerical and geographical restrictions imposed by Congress.[46]

The use of parole as the major vehicle for refugee admissions became increasingly awkward as it was never designed for that purpose. In essence, the use of parole authority camouflaged an unstated, hidden and *ad hoc* refugee admission policy. Critics argued that the use of parole violated the legislative intent of the INA, and that no standardized procedures had been developed to structure and guide its implementation. In partial mitigation of those attacks, a practice evolved whereby the Attorney General would consult with ranking members of the Judiciary Committees of the House and Senate.[47] Gradually the consultation procedure

---

43. S. REP. No. 748, 89th Cong., 1st Sess., 3335 (1965).

44. In floor debate, Sen. Thurmond cautioned that despite language in the House report scoring the past use of parole authority to admit refugees, and "attempt(ing) to exclude its application to large groups of refugees, . . . I would expect this general rule of thumb would not forego in all cases the use of Section 212(d)(5) of the INA for the conditional entry of refugees, if such were deemed in the national interest of our country". 111 CONG. REC. 24237 (1965).

45. Signing of the Immigration bill, the President's remarks at the ceremony on Liberty Island, with his offer of asylum for Cuban refugees, Oct. 3, 1965. 1 WEEKLY COMP. OF PRES. DOC. 364-67 (Oct. 11, 1965).

46. As previously discussed, the parole authority was used as a supplemental device in later years to avoid the numerical limits set by the statute. *See, e.g.*, the discussion of the 1970 Czechoslovakian and Polish refugee parole programs note 52 *infra*. Parole has been used since 1972 for the admission of Soviet and other Eastern European refugees. See discussion note 92 *infra*.

In addition, parole has been used for the admission of refugees ineligible under the ideological and geographic limitations of the statute. *See, e.g.*, the discussion of the Ugandan and Chilean parole programs notes 76 and 91 respectively *infra*.

47. Some early parole programs were initiated either without prior congres-

IFR_AR_011729

became more institutionalized and hearings were often held on specific parole requests.[48] No formal guidelines, however, existed on the conduct of the consultations or the dimensions of the congressional role.[49]

### EARLY REFUGEE REFORM PROPOSALS 1970-1976

The Refugee Act was not a minerva springing from the heads of Senator Edward Kennedy and Congresswoman Elizabeth Holtzman. It was, instead, the culmination of various attempts during the 1970's to complete the tasks begun with passage of the 1965 Amendments to the INA.

While the 1965 Amendments represented a dramatic change in the principles underlying immigration admission policy, compromises made during the legislative process had left many gaps. The amendments did not, for example, include Western Hemisphere selection priorities in conformity with the Eastern Hemisphere preference system, nor did they create a worldwide immigration numerical ceiling. The first congressional efforts to change refugee policy emerged as parts of other bills that were attempting to satisfy the objectives of the 1965 Amendments.

Various refugee reform provisions appeared in omnibus immigration bills introduced through 1976 in the 94th Congress. These reform proposals constituted a new approach to the definition of refugee, as well as to how, and by whom, the admission of refugees was to be controlled. While none was adopted into law, the evolution of these different refugee proposals and the hearings in which they were discussed helped to define the parameters of the debate that finally resulted in refugee reform in 1980. These hearings reveal the disparate interests of various congressional committees and executive departments (particularly State and Justice), and the compromises made as negotiations progressed.

---

sional approval or with informal congressional endorsement. See note 23, *supra*, for discussion of the original parole of Hungarian refugees in 1956.

48. *Proposed Amendments to the Immigration and Nationality Act: Hearings on H.R. 9112, H.R. 15092 and H.R. 173370 Before Subcomm. No. 1 of the House Comm. on the Judiciary*, 91st Cong., 1st Sess. 40 (1970) [hereinafter cited as *INA Hearings*].

49. In addition to the lack of guidelines on consultation, the parole authority had no predefined eligibility criteria; these conditions were entirely a matter of the Attorney General's discretion. Parole thus became a highly politicized admission device. For example, the Hungarians were admitted under liberal eligibility criteria consisting of flight from Hungary after October 23, 1956, and qualification under the regular provisions of the immigration law. *See* Swing, *Hungarian Escapee Program*, 6 I. & N. REP. 43(1965). Chinese refugees paroled from Hong Kong in 1962, on the other hand, were subjected to far more restrictive requirements. *See* In Chai, 12 I. & N. Dec. 81(1967).

20

In July and August of 1970 a House Judiciary Subcommittee conducted hearings on three bills which proposed various refugee reforms.[50] Congressman Peter Rodino, in his opening statement at the hearings, expressed the spirit in which the refugee reform aspects of these bills were being offered:

> Since World War II, the Congress has enacted several major statutes authorizing the admission of refugees, but it was not until the 1965 amendments that a refugee provision became part of the permanent law. Although this provision was laudable, it was obvious that this provision was inadequate . . . . The position of the United States as a world leader demands that we, with other countries of the free world, be in a position to offer asylum to the oppressed. We must be able to take quick, effective, and affirmative action to permit the orderly entry into the United States of a fair share of refugees seeking freedom. We must uphold America's tradition as an asylum for the oppressed.[51]

That same year inherent problems had become evident with the regular refugee admission provisions in the seventh preference supplemented by the parole authority. In less than six months, the 10,200 seventh preference numbers for 1970 already had been exhausted by Czechoslovakian and Polish refugees. Members of Congress, including every member of the House Judiciary Committee, approached a reluctant Attorney General to urge him to exercise his parole authority. Attorney General Mitchell doubted his authority because of the legislative history of the 1965 amendments. As Congressman Rodino stated, "[i]n agreeing with this request, the Attorney General advised the Committee that legislation in the refugee field was urgently needed and that the general parole authority would be invoked for refugees only temporarily."[52]

At the same time Congress encouraged this use of the parole authority, it disapproved unmonitored exercise of that authority for refugee admissions by the Executive and the Attorney General. In these 1970 hearings, for example, subcommittee members noted the lack of prior congressional consultation in the mass admission of Hungarians and Cubans. Representatives of the Exec-

---

50. *INA Hearings*, *supra* note 48. One bill was introduced in the Senate by Sen. Kennedy. S. 3202, 91st Cong., 1st Sess., 115 CONG. REC. 36964 (1969). Three bills were introduced in the House: H.R. 15093, 91st Cong., 1st Sess., 115 CONG. REC. 36942 (1969) (Companion bill to S. 3202 introduced by Congressman Feighan); H.R. 9112, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969) Congressman Celler; H.R. 17370, 91st Cong., 2d Sess., 116 CONG. REC. 13823(1970) Congressman Rodino. Congressmen Celler's and Rodino's bills contained similar refugee provisions.

51. *INA Hearings*, *supra* note 48, at 57.

52. *Id*. at 58.

21

utive conceded that not until after 1965 had that branch begun consulting with Congress before initiating a refugee parole program.[53]

In attempting to address the inadequacy of the 1965 Amendments Congress reviewed the refugee provisions of the bills considered during the 91st Congress. The bills had three major objectives: to adopt a refugee definition which would embody a changed admission policy; to establish a new numerical framework; and to create a statutory mechanism for refugee admissions which would include flexible procedures, usable standards, and a system of consultations with Congress. Each of the bills contained a definition of refugee without ideological or geographical restriction.[54] A refugee was defined in three parts, including: 1) an alien fleeing persecution from a communist-dominated country; 2) an alien fleeing persecution from *any* country; and 3) an alien uprooted by natural calamity or military operations and who is unable to return to his usual place of abode. In the second part of the definitions two of the bills required that to be a refugee an alien must "in the opinion of the Attorney General [have a] well-founded reason for being unwilling to return to any country due to persecution or fear of persecution."[55] Senator Kennedy's and Congressman Feighan's bill more closely tracked the language of the UN's Protocol[56] by expanding the bases of persecution and eliminating any reference to the Attorney General's discretionary finding. In support of his bill Senator Kennedy stated:

> A comprehensive asylum policy for refugees is long overdue. We should . . . broaden the definition of a refugee from its present European and

---

53. *Id.* at 200.

54. In the same sections the bills also eliminated the requirement that a refugee be admitted from a third country and they prohibited the admission of an alien refugee who was firmly settled. *See* companion bills of Kennedy and Feighan, S. 3202/H.R. 15093 § 6(a), 91st Cong., 1st Sess., 115 CONG. REC. 36964 (1969); Celler's H.R. 9112 § 9, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969); Rodino's 17370 § 9, 91st Cong., 2d Sess., 116 CONG. REC. 13823 (1970).

55. Celler's H.R. 9112 § 9, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969); Rodino's H.R. 17370 § 9, 91st Cong., 2d Sess., 116 CONG. REC. 13823 (1970).

56. *See* note 54 *supra* for provisions of congressional bills. Pursuant to U.S. accession to the UN Convention, *supra* note 7, regulations were promulgated to protect the right to apply for political asylum (prior to 8 C.F.R. § 208 (1980)). This right has been in addition to 8 U.S.C. 1253(h) (1952) regarding relief from deportation based upon a claim of persecution. *See* Note, *Judicial Review of Administrative Stays of Deportation: Section 243(h) of the Immigration and Nationality Act of 1952*, 1976 WASH. U.L.Q., 59., 114-20. Article I of the UN Convention states:

> [O]wing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country of his former habitual residence . . . is unable or, owing to such, fear is unwilling to return to it.

22

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

cold war framework, to include the homeless throughout the world—in South America, southern Africa, and elsewhere. I would strongly suggest a definition similar to that contained in the convention relating to the status of refugees of the United Nations High Commissioner for Refugees. Its inclusion in the basic immigration statute is a logical extension of accession by the United States, to the United Nations Protocol Relating to the Status of Refugees in 1968.[57]

The Kennedy/Feighan definition was generally supported at the hearings with the exception of State Department witnesses who expressed some ambivalence, revealing the contradictory pull of foreign policy concerns. While State Department witnesses called for a liberal asylum policy, they cautioned that "despite the overriding importance of the humanitarian side of the picture, the broadened definition could present some difficulties to the United States."[58] They were reluctant to endorse an expanded definition of refugee which might imply that a country "persecutes some of its inhabitants,"[59] a matter of considerable sensitivity. The State Department had been essentially satisfied with the procedures that had evolved because continued access to open-ended parole authority readily met foreign policy needs. If the broadened definition were adopted, the State Department insisted upon a strong role for the President or Secretary of State in defining and restricting the types of admissions "after a determination was made that it was in the interests of the United States."[60]

As their second objective, the bills attempted to create an admission mechanism with sufficient numerical flexibility to be responsive both to the unpredictable nature of refugee crises and to the perceived humanitarian responsibility of the United States in world affairs. Two different models to achieve this aim were proposed. Congressmen Celler's and Rodino's bills repealed the seventh preference and provided for admission of refugees outside the numerical immigration preference system. Through an amendment to the parole power the Attorney General would have permanent statutory authorization to parole alien refugees without predefined numerical, ideological or geographical limits.[61] This amended device would become the means of refugee admissions, and the Attorney General's job would be "inestimably eas-

---

57. *Hearings*, *supra* note 48, at 87.
58. *Id*. at 168.
59. *Id*.
60. *Id*. at 167.
61. *See* note 55 *supra*.

23

ier" by lending legislative weight to the use of parole.[62] Congressman Rodino, commenting upon the combined effect of the new definition and the amended parole provision, stated:

> This global authority in the absence of restrictions as to the number of refugees who could be accepted would provide maximum flexibility in the pursuit of humanitarian and foreign policy objectives. The United States would be better able to cope with any arising emergency or other type of refugee problems in a manner consistent with broader objectives.[63]

Senator Kennedy and Congressman Feighan in their bill also favored legitimization of the Attorney General's parole power but as an emergency provision only. They wanted, however, to maintain and improve the seventh preference with a nondiscriminatory refugee definition and to apply it worldwide in an expanded numerical framework.[64] Thus, they proposed that refugees constitute ten percent as opposed to six percent of the worldwide ceiling. Senator Kennedy explained at the hearings that his desire to maintain a numerically fixed regular refugee admission category sprang from practical considerations regarding present economic problems of the United States and potential difficulties in developing political and popular support for this legislation.[65]

Both State Department and Justice Department witnesses testified in favor of the Kennedy/Feighan[66] model. They viewed the United States as unique among nations of the world in having a regular statutory provision for the admission of refugees which "along with its forerunners over the past twenty-five years represent an historical commitment to the admission of refugees in an orderly and systematic way."[67] A refugee preference establishing the admission of a set number and fair share of the world's refugees emphasized the United States' humanitarian concerns for refugees and, according to State Department witnesses, "its elimination might well be misinterpreted."[68] At the same time, voluntary agencies involved in the resettlement of refugees testified in

---

62. *Western Hemisphere Immigration: Hearings on H.R. 981 Before the Subcomm. No. 1 of the House Comm. on the Judiciary*, 93d Cong., 1st Sess. 249 (1973) [hereinafter cited as *Hearings on H.R. 981*]. In recognition of the foreign policy dimensions of the refugee admission process, and past practice with refugee parole programs, Congressman Rodino's bill conditioned the parole of refugees upon a determination by the Attorney General after consultation with the Secretary of State that such parole would promote the national interest. This was viewed as consistent with the Migration and Refugees Assistance Act of 1962, *supra* note 32, governing the use of funds for assistance in behalf of various categories of refugees.

63. *INA Hearings*, *supra* note 48, at 58.

64. Kennedy's S. 3202 § 7/Feighan's H.R. 15092 § 6(a), 91st Cong., 1st Sess., 115 CONG. REC. 36964 (1969).

65. *Id.* at 89.

66. *Id.* at 161.

67. *Id.* at 96.

68. *Id.* at 92.

24

IFR_AR_011734

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

favor of maintaining a refugee preference. These agencies were wary of leaving all the determination to the administrative course and wanted an assurance of at least a fixed number of refugee admissions.[69]

The general need for congressional participation in the refugee admissions process was the third major focus of the 1970 hearings. The legislative proposals were evidence that subcommittee members supported increased numerical and procedural flexibility in refugee admissions. At the same time, Congress wanted control over admissions. Both Congressman Celler's and Congressman Rodino's bills provided for semiannual reports to Congress by the Attorney General listing individual paroled aliens and for congressional veto and subsequent termination of the parole authorization by congressional enactment within ninety days of such report.[70] Neither Congressmen Celler's nor Rodino's bills, however, were reported on favorably by the House Judiciary Committee, and the Kennedy/Feighan bill died in Senate subcommittee.[71]

During the 93rd Congress, Congressman Rodino again introduced legislation (H.R. 981)[72] with two main goals: Western Hemisphere reform and a worldwide quota on United States immigration. H.R. 981 contained refugee provisions very similar to those in Rodino's previous bill (H.R. 17370), calling for a numerically unrestricted and legislatively endorsed parole mechanism as the exclusive means of refugee admission. Significantly, Rodino modified the refugee definition to more clearly conform with the UN Convention.

While maintaining the tripartite definition of refugee, H.R. 981 amended the second part to refer to an alien fleeing from and unwilling to return to any country owing to a well founded fear of

---

69. *Id.* at 181.

70. Celler's H.R. 9112 § 9, 91st Cong., 1st Sess., 115 CONG. REC. 6731 (1969); Rodino's H.R. 17370 § 9, 91st Cong., 2d Sess., 116 CONG. REC. 13823 (1970).

71. The Senate Subcommittee on Immigration and Naturalization which had jurisdiction over the legislation was headed by Sen. Eastland. Sen. Eastland was also Chair of the full Senate Judiciary Committee. Sen. Kennedy, as Chair of the Subcommittee to Investigate Problems connected with Refugees and Escapees, had no legislative jurisdiction. Sen. Eastland was known to be hostile to refugee reform efforts, and his chairmanship of the Committee and Subcommittee until 1978 was certainly a significant inhibiting factor in passage of a refugee reform measure. Conversation with Jerry M. Tinker, former Counsel for Immigration and Refugee Affairs, Committee on the Judiciary, U.S. Senate (Sept. 8, 1980).

72. H.R. 981 § 9, 93rd Cong., 1st Sess., 119 CONG. REC. 61 (1973).

25

IFR_AR_011735

persecution "by reason of race, religion, nationality, or membership in a particular social group, or of political opinion."[73] In this respect, Congressman Rodino's H.R. 981 more closely paralleled Senator Kennedy's former bill than his own earlier proposal. Furthermore, while the bills introduced by Congressmen Rodino and Celler in the 91st Congress had provided that fear of persecution was to be established in the opinion of the Attorney General, H.R. 981 contained no comparable qualification allowing for the Attorney General's discretionary finding. Although the Department of Justice urged inclusion of this limitation during subcommittee hearings,[74] the phrase remained out of the bill in the final markup. Unlike its posture in earlier hearings, the State Department officially endorsed the broadened refugee definition, although only in general terms.[75]

During the 1973 hearings on H.R. 981, discomfort with the aberrant use of the parole authority for refugees was more evident than it had been in the 1970 hearings. This was due in part to the launching of additional parole programs in the interim: the parole of 200 Soviet Jews in 1972, resulting from a request to the Attorney General by the House Judiciary Committee, and the parole of 1500 Ugandan Asians based on a recommendation by the State Department.[76] While Attorney General Mitchell's objections to the exercise of his parole authority were less strenuous in these instances, subcommittee members expressed considerable concern over the lack of congressional involvement in the decision-making process surrounding parole requests. The Attorney General's office was already committed to a policy of consultation with Congress on refugee parole. The State Department, which initiated most of the requests, for the first time promised to have regular, formal hearings. The State Department, however, was reluctant to make consultation a statutory requirement.[77] The tension surrounding the consultation issue markedly escalated.

When H.R. 981 was reported out by the House Judiciary Committee, the worldwide ceiling and preference system for the Western Hemisphere were proposed.[78] The refugee definition had been clarified and liberalized. In response to the urgings of Jus-

---

73. *Id.* In contrast see note 55 *supra.* See enumeration of the basis of persecution track language of the UN Convention.

74. *Hearings on H.R. 981*, supra note 62, at 95.

75. *Id.* at 97.

76. *Id.* at 161. In 1973, 200 Soviet Jews who succeeded in leaving the USSR were paroled into the U.S. INS ANN. REP. 5 (1973-74). On September 30, 1972, a decision was made to parole into the U.S. 1000 Ugandan Asians. An additional 500 were added to the parole program on April 3, 1973. INS ANN. REP. 5 (1973-74).

77. *Hearings on H.R. 981, supra* note 62, at 163.

78. *See* H.R. REP. No. 461, 93d Cong., 1st Sess. (1973).

26

IFR_AR_011736

tice Department witnesses,[79] the redundant definition including both refugees from *communist* countries and refugees from *any country* was deleted.[80] The model of a permanent refugee preference with a back-up emergency parole provision had been adopted,[81] but with an explicit requirement for consultation among the Secretary of State, the Attorney General and Congress. As with the bills in the 91st Congress, refugees were to be admitted as conditional entrants without geographic or ideological restrictions under an amended refugee definition in conformity with the UN Convention.

The House bill proposed a broad and nondiscriminatory refugee policy. The effect of amended H.R. 981 would have created a refugee preference without ideological restriction for the Western Hemisphere. A specific intent to provide for refugees from the Western Hemisphere who were fleeing right-wing dictatorships (as opposed to those from Cuba) was emphasized during floor debates on the bill on September 25, 1973. As stated in these debates, "recent events in Latin America, particularly in Chile and Argentina . . . seem to indicate the need for this important revision in the law. Now the beleagured peoples of these lands will have the opportunity to escape to freedom."[82]

In the amended H.R. 981 the provision for an open-ended parole authority as the vehicle for refugee admissions had been abandoned. Instead, refugees were to be accommodated "within the preference system and within the immigration limit"[83] as seventh preference conditional entrants.

Specific authorization was given to the Attorney General for the parole of groups or classes of refugees beyond those permitted under the conditional entry provision, but only under what the House report described as "exceptional or emergency circumstances."[84] Moreover, a group or class of refugees still had to satisfy the definition of refugee, the Secretary of State had to recommend the group for parole and find parole in the national[85]

---

79. *Hearings on H.R. 981*, *supra* note 62, at 95.
80. *See* H.R. 981 § 5, 93d Cong., 1st Sess., 119 CONG. REC. 31359 (1973).
81. *See* H.R. REP. No. 1553, 94th Cong., 2d Sess. 25 (1976).
82. 119 CONG. REC. 31363 (1973) (remarks of Rep. Holtzman). The reference was to the overthrow of the Allende government in Chile by a military coup and to a military coup in Argentina.
83. *Id.*
84. *See* note 78 *supra*, at 11.
85. H.R. 981 § 6, 93rd Cong., 1st Sess., 119 CONG. REC. 61 (1973).

27

IFR_AR_011737

interest, and the Attorney General had to consult with Congress.

Congress wanted to avoid the possible creation of mass refugee parole programs without prior congressional consultation. The House report cited a history of the use of parole authority for mass refugee admission programs, criticizing the parole provision for being "simultaneously ambiguous and far too broad."[86] The Committee strongly expressed its desire that this authority be brought under congressional control, asserting the importance of consultation in the administration of the parole function. The Committee report further stated that consultation meant, at a minimum, consultations by the Departments of State and Justice with the appropriate judiciary subcommittees.[87]

In the final analysis, Committee members were willing to maintain a flexible refugee admission policy if Congress was duly informed and consulted. When the bill was debated on the floor, Congressman Rodino reiterated this position, stating, "unless there is full consultation by the Department of State and Justice with the Congress regarding use of the flexible refugee parole authority, we will necessarily have to return to a more restrictive position."[88]

On September 26, 1973, the House passed H.R. 981[89] but the Senate Judiciary Committee took no action on the bill. In the 94th Congress, however, two bills[90] were again introduced which contained refugee provisions identical to those in the earlier version of H.R. 981, which the House had passed. Hearings were held on these bills as well as an administration bill (containing no new refugee parole provisions) in September, October, and December of 1975 and in March of 1976.[91] The complexity of the refugee

---

86. *See* note 78 *supra*, at 12.

87. *Id.* at 25.

88. 119 CONG. REC. 31365(1973). It is significant that while the committee had written in the amended H.R. 981 requirement of consultation for emergency group parole, the provision in the original bill for a detailed report on paroled aliens as well as for a congressional veto had been eliminated.

89. 119 CONG. REC. 31477 (1973).

90. The two bills H.R. 981, 94th Cong., 1st Sess., 131 CONG REC. 504 (1975) and H.R. 367, 94th Cong., 1st Sess., 121 CONG REC. 193 (1975), introduced by Rodino and Eilberg respectively, concerned Western Hemisphere immigration reform and contained refugee provisions identical to the earlier H.R. 981. The Administration's bill was H.R. 10323, 94th Cong., 1st Sess., 121 CONG. REC. 33719 (1975). *See* H.R. REP. No. 1553, 94th Cong., 2d Sess. 25 (1976).

91. *Proposed Amendment to the Immigration and Nationality Act: Hearings on H.R. 367 Before the House Comm. on the Judiciary*, 94th Cong., 1st Sess. 74 (1974-75) [hereinafter cited as *Hearings on H.R. 367*]. The initiation of Chilean and Indochinese parole programs in the previous year may have dampened congressional enthusiasm for the proposed reforms. Following the coup in that country, a Chilean parole program involving at different times foreign nationals in Chile, Chilean refugees in Peru and internally detained political prisoners had been con-

28

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

question and the need for action on other proposals led to questions as to the propriety of immediate action on refugee reform. While the UN refugee definition was again endorsed by a variety of witnesses testifying at these 1975-1976 hearings, Congressman Eilberg, new Chairman of the Subcommittee, voiced some doubts as to the advisability of broadening the definition in light of an expansive parole authority. He was most disturbed with the *ad hoc* nature for the consideration of parole in each emergency and the need for uniform standards and criteria "to help prepare Congress and INS for future emergencies."[92] Eilberg questioned whether "in view of the nature of the emergencies that we have faced and the troubles that exist in various parts of the world right now [it would be] practical to adopt the UN definition without further deliberation."[93] INS Commissioner Chapman agreed that "the time [had] come to standardize the procedure and principles under which a refugee situation is handled in the future."[94] He also agreed with the recommendation of Chairman Eilberg to separate the refugee provisions from the rest of the bills and to consider the refugee matter separately.[95]

Subsequent to these hearings, the subcommittee markup resulted in a clean bill which became Public Law No. 94-571.[96] The bill as passed was "non-controversial remedial legislation" limited to that aspect of immigration law in most urgent need of reform, "the inequitable regulation of Western Hemisphere immigra-

sidered. Consultation hearings with the Immigration Subcommittees of the House and Senate had taken place. This was one of the first parole programs involving refugees from a right-wing dictatorship and, thus, tested United States commitment to a broadened refugee policy.

The proposed Chilean program had generated considerable controversy but minimal action on the part of the Department of State, INS and Congress. While the plight of the Chileans was being deliberated in subcommittee hearings in the Spring of 1975, the evacuation of Indochina precipitated a request for one of the largest parole programs ever, resulting in emergency congressional consultation. The difference in scale between the Chilean and Indochinese programs, the discrepancies in their criteria for admission, and their differing administration epitomized the problems inherent in the amorphous, discretionary parole mechanism. For an excellent discussion of the Chilean parole programs, see Note, *Behind the Paper Curtain: Asylum Policy versus Asylum Practice*, 7 N.Y.U. REV. OF L. AND SOC. CHANGE 107(1978).

92. *Hearings on H.R. 367*, *supra* note 91, at 74.

93. *Id.*

94. *Id.* at 75.

95. *Id.*

96. Act of Oct. 20, 1976, Pub. L. No. 94-571, 90 Stat. 2703 (1976).

29

IFR_AR_011739

tion."[97] Public Law No. 94-571 extended the seventh preference to the Western Hemisphere, a measure of limited utility since the former restrictive refugee definition was retained.

Action on refugee reform, like other components of the overall 1965 package, was postponed. However, the issues and structure of the debate had been well laid out in these early hearings and bills. Congress was increasingly supportive of a nondiscriminatory refugee definition and policy; each bill introduced was more closely in conformity with the terms of the UN Convention. The wide latitude of the Executive's authority in refugee admissions led to a demand for more congressional control and a statutory consultation requirement in refugee programs, a pervasive theme throughout this six-year debate. At the same time Congress was calling for legislative action the Executive was relatively content with the *status quo*. The State Department, in particular, acknowledged the administrative problems in the parole provisions but was jealous of the prerogative it had by virtue of this undefined authority. These were the tensions that had surfaced and remained to be resolved. The problems consequent to the massive Indochinese parole program would crystalize these issues even further and provide the final motivation for the statutory formulation of a new refugee policy.

### THE INDOCHINESE PAROLE PROGRAM AND THE 1977-1978 HEARINGS ON THE ADMISSION OF REFUGEES

In 1976, over 130,000 refugees were evacuated from Indochina. Most were paroled and resettled in the United States. While the Indochinese as refugees from communism were technically eligible for conditional entry, the magnitude of the exodus and the resettlement effort made parole the only feasible method for their admission.[98]

The use of the parole authority as a vehicle for Indochinese admissions further underscored the inadequacies of the *ad hoc* procedures which were not supported by specific policy or planned objectives. It was apparent from the time of the 1975 evacuation that a regular flow of refugees would be leaving Indochina for a foreseeable period, yet the unstructured nature of the parole mechanism encouraged the executive branch to avoid planning for this apparent inevitability. Instead, "the Executive was put in the position of waiting repeatedly until the number of refugees in

---

97. H.R. REP. No. 1553, *supra* note 90, at 7.
98. SEN. COMM. ON THE JUDICIARY, REVIEW OF U.S. REFUGEE RESETTLEMENT PROGRAMS AND POLICIES, 96th Cong., 1st Sess. 10 (Comm. Print 1979) [hereinafter cited as REVIEW OF U.S. REFUGEE RESETTLEMENT 1979].

30

IFR_AR_011740

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

the countries of first asylum reached crisis proportions and then declaring an emergency which required yet another special program."[99]

The sequence of *ad hoc* parole programs,[100] the elimination of refugee clauses from the 1976 Act, an announcement by the Ford Administration of a moratorium on new parole programs[101] and a pledge by President Ford to cooperate in legislative efforts at refugee reform, motivated a new congressional effort to formulate a refugee law. The immediate result was the initiation of hearings in 1977 (continuing through 1978) before the House Subcommittee on Immigration, Citizenship and International Law on admission of refugees into the United States.[102] During these hearings two bills (H.R. 3056 and H.R. 7175) "to review the procedures for the admission of refugees" were considered.[103]

Concurrently, the Indochinese crisis continued to escalate, and the plight of the boat people received increasing world attention. The Carter Administration, not considering itself bound by President Ford's moratorium, initiated yet another parole program in 1977. Informal consultation with Congress on this program, involving 15,000 Vietnamese boat and land refugees, occurred during these 1977 congressional hearings on refugees. The Subcommittee disapproved of the confused procedures involved

---

99. 125 CONG. REC. S.3037 (1979) (Remarks of Sen. Kennedy) The Indochinese parole program was the most dramatic but not the only example of the problem (at least as perceived by certain congressional members) of the use of the parole authority for refugee admissions. The insufficiency of the seventh preference numbers could no longer be viewed as a sporadic occurrence, but the parole authority was regularly being used as a "supplementary" provision. Thus, for example, a major and on-going Soviet refugee program was being developed during this period. In January of 1977, 4,000 Soviet refugees were paroled into the U.S.; an additional 5,000 were authorized in December of 1977. By the end of the hearings on the Admission of Refugees (note 102 *infra*), an additional 12,000 person parole program was authorized from the Soviet Union and other Eastern European countries. *See* U.S. IMMIGRATION LAW AND POLICY: 1952-1979 *supra* note 10, at 107.

100. For a description of the different parole programs with varied selection criteria initiated through May 1976, see Review of U.S. Refugee Resettlement 1979, *supra* note 98 at 10-11.

101. *Id.* at 11.

102. *Hearings on H.R. 3056 Before the Subcomm. on Immigration, Citizenship and Int'l Law of the House Comm. on the Judiciary*, 95th Cong., 1st Sess. (1977) [hereinafter cited as *Hearings on Admission of Refugees into the United States*]. *Admission of Refugees, Part II: Indochinese Refugees and U.S. Refugee Policy*, 95th Cong., 1st & 2d Sess. (1977-78) [hereinafter cited as *Admission of Refugees, Part II*].

103. H.R. 3056, 95th Cong., 1st Sess., 123 CONG. REC. 3413 (1977); H.R. 7175, 95th Cong., 1st Sess., 123 CONG. REC. 14648 (1977).

31

IFR_AR_011741

in the request, the lack of selection criteria, and the abandonment of those criteria formulated in the 1976 program.[104] While Chairman Eilberg pressed for more formal consultation procedures, the Administration viewed the existing informal requirement of consultation with Congress as an impediment to effective response to the emergency at hand.[105] Subcommittee members complained that they received no facts or figures during consultations on emergency parole requests "so that about all that the Administration was accomplishing at various points in these various programs was conveying to us their sense of emergency but certainly no sense of refugee policies."[106]

Chairman Eilberg criticized the Administration for initiating the parole request without a proper presentation of facts, either by the State Department to the Attorney General or by the Attorney General to the Congress. Even the informal procedures were being ignored. In fact, Subcommittee members came to view the Attorney General as a mere conduit for White House requests, a scheme which successfully insulated the White House from accountability. Congressman Eilberg complained that, over the preceeding year, he had repeatedly requested the INS and the Attorney General to establish guidelines and regulations governing the conditions for parole, but had received no response. The Subcommittee saw the parole request as "a classic case, which demonstrates the need for legislation."[107] The impetus for refugee reform deepened as the Executive, as well as the Congress, was

---

104. Description of the criteria found in *The Indochinese Exodus, A Humanitarian Dilemma*, GAO Report to Congress, May 24, 1979 [hereinafter cited as GAO Report].

105. *Admission of Refugees, Part II, supra* note 102, at 25. In fact the subcommittee had not acted for several months on the May 1976 parole request. This congressional "sabotage" was cited during later hearings as a reason for executive branch resistance to formalized consultation procedures. *See, e.g., The Refugee Act of 1979: Hearings on S. 643 Before the Sen. Comm. on the Judiciary*, 96th Cong., 1st Sess. 36 (1979).

106. *Hearings on Admission of Refugees into the United States, supra* note 102, at 9.

107. *Admission of Refugees, Part II, supra* note 102, at 28. The previous Attorney General, Edward Levi, had agreed not to grant parole if a majority of either the House or Senate Judiciary Committees disapproved. But Attorney General Bell, when questioned during the hearings, made it clear that while consultation with Congress was essential, he still had the ultimate authority and responsibility to exercise the parole power. At the same time the Attorney General reiterated his own discomfort with the unguided nature of the parole authority. *Id.*, at 23. In testimony before the House Committee on the Judiciary on Nov. 28, 1978, he summarized these problems. "I am not comfortable about the use of the parole authority in . . . situations where I have exercised that authority in the past. Nor is this discomfort unique to me. Every Attorney General before me, faced with such requests, has voiced similar reservations because the intent of Congress, in establishing the parole authority, was to provide a safety valve for unusual, individual cases of compelling need that could not otherwise be met. It was not to provide

32

experiencing the effect of a poorly focused and unorganized refugee admission policy. The absence of a coherent refugee policy, as demonstrated by the use of sporadic, *ad hoc* parole actions, created needless uncertainties for voluntary agencies and for United States officials participating in resettlement.[108] In addition, it confused other nations, causing them to become less motivated to share in refugee relief.[109]

Congress, in response to the severe limitations and consequences of the existing *ad hoc* policy, considered bills during the 1977-1978 hearings (H.R. 3056 and its successor H.R. 7175),[110] which contained more explicit and elaborate structures for refugee admission than had earlier bills. In many respects, the two bills were a compendium of previously debated legislation. The refugee definition closely resembled the UN Convention definition, which received for the first time the unambiguous endorsement of the State Department.[111] The bill contained a ban against firmly resettled refugees,[112] a provision which had appeared in every reform proposal since the 91st Congress. Like the admissions models that had been agreed upon in the earlier hearings, the bill set out a two-tier admissions structure. It included a numerically defined "normal flow" admission category of 20,000 annually accompanied by a separate provision for emergency admissions initiated only after consultation with the House Judiciary Committee and the Senate Judiciary Committee.[113]

---

the means to end-run the other provisions of the immigration law." REVIEW OF U.S. REFUGEE RESETTLEMENT 1979, *supra* note 98, at 9.

108. *See, e.g.*, GAO REPORT, *supra* note 104, at 6.

109. *Admission of Refugees, Part II*, *supra* note 102, GAO Report, *supra* note 104, at 6. As Attorney General Bell stated: As a result [of the *ad hoc* nature of the U.S. Refugee policy] we are unable to give clear signals to other nations about the extent of our ability to meet world refugee needs. We are unable to plan effectively . . . . Finally and most regrettably—individual refugees are hostage to a system that necessitates that their plight build to tragic proportions so as to establish the imperative to act.

110. H.R. 3056, 95th Cong., 1st Sess., 123 CONG. REC. 3413 (1977).

111. *Id*. at § 42. For State Dept. endorsement, *see Hearings on Admission of Refugees into the United States*, *supra* note 102, at 78.

112. *Id*. at § 207(a).

113. *Id*. With the creation of a separate refugee admission process, the seventh preference was to be repealed. The later bill (H.R. 7175) specifically provided for a commensurate reduction in the Eastern and Western Hemisphere quotas. The six percent of the annual Eastern and Western Hemisphere quotas which was allocated to the seventh preference was reassigned to second preference spouses and unmarried sons and daughters of lawful permanent residents. In a provision similar that in the seventh preference, H.R. 3056/H.R. 7175 provided that up to 5,000 of

33

There were, however, major changes signifying the heightened conflict between the Executive and the Congress over two major issues. First, Congress had become increasingly committed to numerical limits. This commitment reflected a growing antagonism within the United States to increased immigration in general, a feeling crystallized by the very large number of Indochinese admitted into the country since 1975. The Executive, on the other hand, wanted unfettered autonomy in deciding the number of refugees admitted while maintaining its ability to be politically selective in excluding some nationalities altogether and allowing extremely generous quotas for others.

The second dimension of the conflict involved competition between the two branches for control over refugee decision-making. Congressional bills consistently sought formalized consultation, and veto power or legislative review over executive action. The Executive persistently sought maximum insulation from congressional oversight. Thus, the Congress' call for limitations was not simply a reflection of a new restrictionist attitude, but an expression of its felt need to structure and control executive decision-making.

The congressional reaction to this conflict was to move away from the flexibility of earlier bills. H.R. 3056, for the first time, contained numerical and categorical limitations on emergency admissions and retained more power and access to information in Congress.[114] Parole as a vehicle for emergency admissions was rejected as too tainted by past executive abuse to receive statutory legitimization. The parole authority was specifically amended to prohibit the parole of a refugee.[115] Instead, the bill established two emergency refugee categories which were to be the exclusive basis for triggering the President's authority to initiate a refugee admission program.[116]

The formulas for these categories, however, were based on past practices. The emergency refugee categories in H.R. 3056 were intended to be modeled on the two principle types of past parole programs: a refugee emergency determined by the President to be of special concern to the United States would authorize the President to admit 20,000 refugees; an appeal from an international refugee organization would enable the President to admit

---

the 20,000 total refugee admissions could be used to adjust the status of non-immigrant aliens who had been in the U.S. for 2 years and qualified as refugees. Both of these concepts were incorporated into the Refugee Act. 8 U.S.C. § 1151(a) (1980); 8 U.S.C. § 1159(b) (1980).

114. H.R. 3056, 95th Cong., 1st Sess., § 123 CONG. REC. 3413 (1977).
115. *Id.* at § 212(d)(5).
116. *Id.* at § 207(b).

34

                                  *Refugee Act of 1980*

fifteen percent of the total involved, or 5,000 refugees, whichever is less. The President was required to solicit the cooperation of the international community in resettling refugees and, in the latter event, to make a determination that other countries in the international community would accept their fair share for resettlement.

Congress attempted to retain more authority than it had in the past. Any emergency refugee program decision had to be made in consultation with the House and Senate Judiciary Committees upon a determination that the emergency admissions would significantly promote the national interest, were justified by grave humanitarian concerns and were not possible under the regular admission provisions.[117] The congressional veto provision was restored,[118] as well as a detailed reporting requirement similar to that contained in the earlier version of H.R. 981 in the 93rd Congress.[119] In reaction to the perfunctory nature of recent consultations and the incongruity and inadequacy of the Attorney General's role as the Executive's agent, responsibility for emergency admissions was shifted from the Attorney General's office to the President. By this transfer, Congress attempted to institutionalize the White House's role and thereby allow the President to draw on the entire resources of the executive branch. Consequently, consultations would be more effective, involving the actual rather than figurehead decision-makers in the executive branch.[120]

While Congressman Eilberg urged numerical and categorical limits on refugee admissions, State and Justice Department witnesses continued to advocate autonomous executive jurisdiction over emergency programs. Numerical and categorical limits on emergency refugee admissions were attacked as antithetical to the nature of international refugee crises which necessitated flexibility.[121]

---

117. *Id.*

118. *Id.*

119. *Id.* at 207(d). The reporting requirements varied to some extent from those provided in H.R. 981. However, the bill did require detailed reports as to each alien admitted under the emergency provisions.

120. *Id.* at 207(b); *Hearings Admission of Refugees into the United States*, *supra* note 102, at 67. This shift in authority was incorporated into the Refugee Act, see 8 U.S.C. § 1157(b)(1980).

121. The voluntary agencies also opposed the emergency provision. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 124-25.

35

IFR_AR_011745

The Executive's position on numerical limits, however, was not always clear or internally consistent. State Department representatives, for example, maintained their support for a "normal flow" admission category deducted from the overall hemispheric totals in order to leave the absolute numerical limits unchanged "until there is a more solid basis for determining the optimum rate of annual migration to the United States."[122] At the same time, they conceded that the emergency procedures would have to be invoked on a regular basis to accommodate backlogs in ongoing programs (e.g., Soviet refugees awaiting refugee processing in Rome) resulting from the inadequacy of the 20,000 normal flow limit.[123]

In the face of strong congressional support for numerical limits, the State Department compromised and for the first time advocated a statutory consultation.[124] It made a proposal which, with some modifications, would be adopted in the 1980 legislation.[125] State Department witnesses suggested that the terms of an emergency refugee program, including admission quotas, could be "settled between the executive and legislative branch in advance of implementation, through the consultative process provided in the bill."[126]

The Subcommittee, however, was wary of continuing to allow the Executive discretion without enforceable, delineated standards, and a stronger consultation mechanism. H.R.7175 thus provided a specific definition of consultation as personal contact between the President and "appropriate members of the Committee . . . to review the emergent refugee situation, to project the extent of possible United States participation therein" and to pro-

---

122. *Id.* at 61. The State Department argued that the 20,000 number did not represent any actual increase (although the seventh preference allowed for only 17,400 annually). Under the proposed law, accompanying spouse and children would be charged to the new refugee quota, whereas before many had entered the U.S. as non-preference immigrants.

123. *Id.* Congressman Eilberg criticized the Executive's failure to evaluate the social and economic impact to immigration and refugee policy and what he perceived to be the Executive's inability rationally to consider the numerical scope of refugee admissions. Congressional and executive representatives agreed that a "wide ranging study of immigration policy" was necessary; in fact, H.R. 7175 proposed the creation of a Select Commission on Immigration and Refugee Policy. H.R. 7175, 95th Cong., 1st Sess. § 5, 123 CONG. REC. 14648 (1977). But there was strongly voiced sentiment in the Subcommittee to the effect that continuation of *ad hoc* procedures and further procrastination of refugee reform in order to await the results of such a study was intolerable: "We have every intention of moving this legislation in this Congress". *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 71.

124. *Id.* at 68.

125. *See* 8 U.S.C. § 1157(a)(b)(d) (1980).

126. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 70.

36

IFR_AR_011746

vide the committees with specified types of information.[127] A similar provision would appear later in the Refugee Act.[128]

Congressionally imposed selection standards were established by the bill's requirement of a presidential determination that an emergency admission of "special concern" to the United States, "will significantly promote the national interest. . . ," and is "justified by grave humanitarian concerns."[129] The intended meaning of these terms was suggested by legislative attempts to articulate some general principles and cull some standards from the practice of past parole programs, in order to establish guidelines for future emergency admission policies.

During the hearings, State Department witnesses in defining the "special concern" terminology, repeatedly referred to fundamental humanitarian traditions and principles. When questioned about American "special concern" in Latin America, Assistant Secretary of State for Humanitarian Affairs Patricia Derian responded:

> There are large numbers of people throughout Latin America who have gone from their homeland to another country because they are fleeing for their lives because of political views . . . the special concern of the United States is humanitarian. And also it is connected with our "Human Rights" policy as well.
>
> When we go and ask governments to release people who have been in detention for long periods with no charges, no chance to defend themselves in the orderly method of due process, we have encouraged them to change and try the people or to release them from detention, particularly in the cases of some people who are being abused and mistreated. And these are the cases of special humanitarian and policy concern for us.[130]

When asked what factors were considered by the Department of State in determining American response to appeals from international rescue organizations, a State Department witness stated, "the humanitarian factors, [and] to what extent is it an emergency." He continued:

> We consider our national security, the extent of our concern and interest in particular refugee groups, the interest or lack of interest among the refugees in coming to the United States, our capacity to absorb the refugees—that is, voluntary agency willingness and capacity to provide sponsorships; and . . . resettleability of the refugees in question. Those

---

127. H.R. 7175, 95th Cong., 1st Sess. § 207(b)(4), 123 CONG. REC. 14648 (1977).

128. 8 U.S.C. § 1157(e) (1980).

129. H.R. 3056 § 207(b), 95th Cong., 1st Sess., 123 CONG. REC. 3413 (1977); H.R. 7175 § 207(b), 95th Cong., 1st Sess., 123 CONG. REC. 14648 (1977). For similar section in Refugee Act *see* 8 U.S.C. § 1157(b) (1980).

130. *Admission of Refugees, Part II, supra* note 102, at 269.

37

IFR_AR_011747

are some of the factors that are taken into account.[131]

These humanitarian goals were emphasized repeatedly during the hearings as the underlying basis for post-war refugee policy. Humanitarian concern was cited by one State Department witness as the rationale for much of the American foreign policy interest in refugees:

> [W]e should remember that the United States is a land of immigrants, and since the founding of the Republic we have had a special national heritage of concern for the uprooted and persecuted. . . beyond our national ethos of humanitarian concern for the uprooted and persecuted, there are solid foreign policy reasons why we should involve ourselves substantially and regularly in resolving refugee problems . . . it is decidedly in our foreign policy interest to project in countries around the world the image of U.S. humanitarian assistance for refugees. Such humanitarian assistance is a glowing example of the purposes and processes of the free democracy which we are, and of the free society which makes such assistance possible.[132]

Congressman Eilberg himself was confronted with the primacy of the humanitarian factor in admitting refugees. He introduced a list of factors that he believed had been considered in past parole programs and proposed that these be incorporated as statutory guideposts for future determination. Many in fact did appear in the ultimate legislation.[133] Among these factors were: 1) the United States' relationship with the first asylum countries; 2) pressures exerted in the asylum country; 3) pressure exerted by UNHCR; 4) pressures exerted by the voluntary agencies; 5) foreign policy considerations; and 6) domestic considerations such as the unemployment rate and domestic conditions in general. When asked to comment on these factors, General Chapman, the Commissioner of Immigration responded:

> I think each of those is a significant factor. I believe omitted, however, is the most important of all and that's our national tradition of humanitarian concern. It seems to me that it is on that basis and from that point of our national drive and tradition that we have admitted most of the refugees over the past years.[134]

The Executive's interest in maintaining maximum flexibility and a broad humanitarian stance was apparent from its reactions to other parts of H.R. 3056 and H.R. 7175. Executive witnesses objected to the congressional veto because sudden termination of previously agreed upon programs would be "disruptive of a harmonious" relationship between the two branches and could place the United States in "an awkward international position of being

---

131. *Id.* at 47.

132. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 16.

133. 8 U.S.C. § 1157(c) (1980).

134. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 91.

38

unable to honor a commitment to participate in a refugee resettlement of a multilateral character."[135]  State Department witnesses also criticized the "fair share" limitation in the bill.

> We fully agree that the resettlement of refugees is a matter of international concern and that we must vigorously encourage international participation in refugee problems.  To hold back until this participation is assured however, could deny our role as a leader in the field of humanitarian concerns in the international community.  In addition, the United States should not turn its back on refugees simply because other nations may do so.[136]

Justice Department witnesses commented that "humanitarian concerns present in emergent refugee situations should not be made subject to numerical limits inflexibly set by statute."[137]

The executive branch was also concerned about the limitations of the definition of "refugee".  While adopting the UN definition generally, the bills precluded those whose primary motivation for fleeing was economic.[138]  This qualification was sharply and uniformly criticized.  State Department and Justice Department witnesses explained the mixed nature of most refugees' motivation, and the ability of governments to impose economic sanctions for political reasons.  An explicit statutory exclusion of economic refugees might eliminate many bona fide refugees.  "Economic advantage is at least part of the attraction which brings many to our shores, and the chance that the confused refugee in his first dealings with an American officer might admit this to his permanent detriment suggests that the provision not be in the bill."[139]  Others saw the distinction as "spurious" and at least potentially "invidious."[140]

While the statutory definition of refugee in the House bill referred to a person outside the persecuting country, State Department and other executive branch witnesses repeatedly testified to

---

135.  *Id.* at 79.  The view was also expressed that the legislative veto was unconstitutional "since Congress would both retain control over enforcement of the legislation in violation of the principle of separation of powers and also be able to repeal a power given to the President without giving the Executive the opportunity to exercise the right of veto conferred by Article I".  Letter from Office of Legal Counsel, Department of Justice, to Congressman Eilberg, quoted in *Admission of Refugees, Part II*, *supra* note 102, at 225.

136.  *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 79.

137.  *Id.* at 82.

138.  H.R. 3056, 95th Cong., 1st Sess. § 207(a), 123 CONG. REC. 3413 (1977).

139.  *Admission of Refugees, Part II*, *supra* note 102, at 174.

140.  *Id.* at 154.

39

the need to assist persons still within their country of nationality. An absolute bar on the use of the parole power was opposed by these witnesses because of its potential usefulness in assisting those applying for entrance at the border and those outside the persecuting country but within a third country where there might be imminent danger of repatriation.[141]  Parole, it was contended, should be available for these situations, and the INS should plan to have additional offices in new locales to accommodate the geographically and ideologically broader group which would be seeking admission.[142]

Another focus of discussion was Congressman Eilberg's proposal that the withholding of deportation provisions of section 243 (h) of the INA[143] be made available in exclusion as well as deportation proceedings.[144]  In Eilberg's proposal, however, this relief was to be unavailable to those who entered illegally, unless they presented themselves without delay to an immigration officer and could demonstrate good cause for the illegal entry. Aliens who engaged in the persecution of others also would be ineligible for this relief.[145]

While INS, State Department and other witnesses supported Congressman Eilberg's proposal on the extension of section 243 (h) benefits to excludable aliens, they strenuously opposed the exclusion of illegal entrants. The qualification was characterized as excessively harsh treatment which would be "out of character with our traditional concern for refugees and could conflict with

---

141. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 80.

142. *Id.* at 76, 92-93.

143. 8 U.S.C. § 1253(h) (1965) (amended 1980).

144. The INA makes a fundamental distinction between those aliens who have effected an entry into the U.S. (whether with a visa or without a visa and without being inspected by immigration officers) and those who have attempted but have not accomplished a formal entry. The former if alleged to be in violation of their status are subject to deportation proceedings under 8 U.S.C. § 1252 (1952). The latter are subject to exclusion proceeding under 8 U.S.C. § 1226 (1952).

As early as 1958, the Supreme Court had held that aliens in exclusion proceedings did not have access to section 243(h). Leng May Ma v. Barber, 357 U.S. 185 (1958). However, the unavailability of section 243(h) or asylum procedures in exclusion hearings had been the subject of administrative and judicial challenges. *See* Matter of Pierre, 14 I. & N. Dec. 467 (1973), vacated and remanded on other grounds, 434 U.S. 962 (1978). Congressman Eilberg's legislative proposal was an obvious response to this litigation, which also resulted in a change in INS procedures. For a more complete discussion, see 56 *Interpreter Release* 189 (1979).

145. The latter exception encompassed those "who have engaged in the persecution of individuals on account of the individuals' race, religion, nationality, membership of a particular social group, or political opinion". It also excluded from the benefits of section 243(h) aliens "who in the opinion of the Attorney General, constitute a danger to the community or to the security of the United States". This was incorporated into the Refugee Act. 8 U.S.C. § 1253(h) (1980).

40

our obligations under the Protocol."[146]

The INS did not initially see the need for a statutory asylum procedure given the proposed reforms in section 243 (h),[147] but Subcommittee members were uncomfortable with continuing to leave the matter to administrative regulation. The Subcommittee advocated a statutory provision in order to prevent dilatory abuse of existing procedures by aliens, and to assure the alien applying for asylum basic due process protections. To support its position, the Subcommittee referred to its report which criticized, on due process grounds, procedures followed by INS in adjudicating Haitian asylum and section 243(h) claims. Because the politicized nature of executive practice in the asylum area concerned Congress, some members supported statutory asylum procedures in order to assure the extension of the asylum remedy to those fleeing persecution from noncommunist countries.[148]

An emerging consensus and a more precise outline of what was to be the Refugee Act of 1980 became apparent in the final session of the hearings in April 1978. In that session the Administration finally responded officially to Congressman Eilberg's proposals on refugee legislation. Compelled by its need to preserve credibility in the international community and to bring order into the refugee admission process, the Administration gave its concrete support to the legislative effort. By this time the Administration achieved some long-term perspectives on its major parole programs and therefore simultaneously requested ongoing parole authorization for Indochinese, Eastern European and Soviet refugees "until new refugee legislation was passed."[149] A major force behind refugee reform, Senator Kennedy a month earlier had introduced legislation in the Senate (S. 2751) which paralleled some of the Administration's positions. This legislation provided the immediate impetus for the Administration to come forth with concrete proposals.[150]

---

146. *Hearings on Admission of Refugees into the United States*, *supra* note 102, at 63.

147. *Id.* at 94.

148. *Id.* at 126-30.

149. *Admission of Refugees, Part II*, *supra* note 102, at 217.

150. Sen. Kennedy's S.2751 95th Cong., 2d Sess., 124 CONG. REC. 3746 (1978) (called the Refugee and Displaced Persons Act of 1978) was introduced in the Senate on March 15, 1978. It represented the broadest and most flexible approach to refugee admission policy, giving more discretionary authority to the Executive than the Administration itself was advocating at the time. The refugee definition

41

The Administration's official response, presented on this last day of the hearings, was similar to those views advanced earlier in the hearings by representatives of the State and Justice Departments. There was only one significant change: a new numerical framework was proposed for the "normal flow" admission category. The Administration suggested that the "normal flow" refugee admission be set at "up to 50,000", 20,000 to be taken from the worldwide immigration ceiling plus 30,000 additional admissions. The overall worldwide ceiling including refugees would accordingly be raised from 290,000 to 320,000. The Administration argued that 50,000 refugee allocation represented the actual average number of refugees admitted in recent years and did not involve any numerical increase.[151] Accommodation of the 50,000 within the "normal flow" category would avoid recurring reliance on emergency procedures which would only be utilized in new, unforeseen emergency conditions. The Administration endorsed and extended the "special concern" terminology and supported an inclusive, flexible interpretation. Congressman Eilberg's bill had used "special concern" only in reference to emergency admissions. The Administration, however, suggested that priority in allocating the 50,000 "normal flow" numbers be given to refugees who were, in the opinion of the Attorney General, of "special concern" to the United States. In order to assure that allocations were made in the best interests of the United States, the Administration agreed to report to Congress on this determination at the beginning of each fiscal year in order to keep Congress informed.[152] At the end of testimony, the Administration expressed its readiness "to sit down . . . and negotiate the points of difference remaining between [the Executive and Congress]."[153]

included an alien "uprooted by catastrophic natural calamity, civil disturbance or military operations and who is unable to return to his usual place of abode". The bill allowed for a normal flow of 40,000 "refugees and displaced persons" annually to be admitted as permanent residents with immigrant visas. Emergency admissions were authorized upon recommendation of the Secretary of State to the Attorney General, after consultation with the appropriate congressional committee representatives. The Attorney General could implement an emergency admission program immediately after consultation with Congress (or within thirty days of making a request for consultation). Thus, Congress not only would have lacked a veto power but also would have been statutorily prevented from delaying an emergency program. Emergency admissions had to be "not possible or practical" under the regular admission procedures, "justified by emergent or humanitarian reasons", or "in the public interest". The parole authority was expanded to allow parole for "humanitarian reasons", rather than further restricted as it was under Congressman Eilberg's bill. For a detailed discussion of Sen. Kennedy's role regarding the Refugee Act and its legislative history see Kennedy, *The Refugee Act of 1980*, 15 INT'L MIGRATION REV. 41 (1981).

151. *See Admission of Refugees, Part II*, *supra* note 102, at 217.

152. *Id.* at 218-20.

153. *Id.* at 220. At approximately the same time as the Administration indi-

42

*Refugee Act of 1980*
                          SAN DIEGO LAW REVIEW

REFUGEE ACT OF 1980

*H.R. 2816/S. 643: The Administration's Bill*

From November 1978 through February 1979, intensive consultations occurred between the executive branch and congressional committee staff aimed at drafting a consensus refugee bill. As a result of those deliberations and continuing pressure on the Administration by Kennedy,[154] the Administration's proposed bill was introduced by Senator Kennedy in the Senate as S. 643,[155] and in the House as H.R. 2816[156] by Congressman Rodino and Congresswoman Holtzman. The bill[157] included the universal nondiscriminatory definition of refugee, which since 1970 had remained the area of greatest consensus in the refugee reform debate. Following the specific intention of the bill's sponsors, the proposed definition closely paralleled the UN Convention.[158]

The President's suggestion of up to 50,000 annual admissions as the "normal flow" had been adopted. These 50,000 "normal flow" numbers were to be allocated among groups of refugees the President determined to be of "special concern" to the United States.[159]

For the first time, however, a second annual admissions category was created. The bill provided that in addition to a "normal flow" of up to 50,000, the President could admit an additional specific number of groups of refugees of "special concern" to the United States if that extra number were foreseeable at the begin-

---

cated to the House Subcommittee its willingness to seriously consider a refugee bill, Sen. Kennedy found out that he was to assume the Chair of the Senate Judiciary Committee, following Sen. Eastland's resignation. The major road block to reform in the Senate had, thus, been removed.

154. S. REP. NO. 250, 96th Cong., 1st Sess. 3 (1979) (hereinafter cited as S. REP. No. 250).

155. S. 643, 96th Cong., 2d Sess., 125 CONG. REC. 2630 (1979).

156. H.R. 2816, 96th Cong., 1st Sess., 125 CONG. REC. 10554 (1979).

157. S. REP. NO. 256, *supra* note 154. This bill for the first time not only addressed the refugee admissions issues but also included a Title III and Title IV under what is now the Refugee Act, 8 U.S.C. §§ 1521-1525 (1980) involving temporary and transitional assistance to refugees. It became one of the important purposes of the Refugee Act to eliminate discrimination in domestic refugee assistance programs, to rationalize those programs, and to make them consistent with a nondiscriminatory refugee admissions policy. *Id.* (remarks of Sen. Kennedy); *see also Id.* at 19-37. This article, however, focuses exclusively upon Titles I and II of the Act, involving the refugee admissions and asylum provisions.

158. H.R. 2816, 96th Cong., 1st Sess. § 201, CONG. REC. (1979).

159. *Id.* at § 207(a)(1).

43

ning of the year.[160] The additional annual admission category was created in order to accommodate exceptional and continuing crises, such as the mass exodus of the "boat people" from Southeast Asia. This category would allow for orderly entry into the United States without setting an artificially higher number for "normal flow" refugee admissions, thus obviating the need for third category emergency procedures. That third category was created for unforeseeable admissions "in response to [an] emergency refugee situation" that might arise after the beginning of the fiscal year and could not be accommodated under the annual admission procedures.[161] These emergency admissions numbers were also to be allocated among groups of "special concern" to the United States.

The bill's consultation requirements were less inclusive than those contained in Congressman Eilberg's bill of the previous year. Prior consultation was required to consider only the number of refugees admitted under the additional admissions and emergency admissions clauses.[162] No consultation was required to review the conferral of "special concern" status upon particular groups of refugees or the allocation of numbers among them. The consultation process itself was not described in detail and the bill did not contain a provision for a congressional veto.

In the case of refugees admitted under the additional annual admissions category, the "designated representatives of the President" were required to provide the Judiciary Committee members a description of the number "and an explanation of the reasons for believing that the admission of more than 50,000 refugees of "special concern" to the United States is in the national interest."[163] For consultations under the emergency provisions, the Judiciary Committee members were to be furnished with "a description of the unforeseen emergency refugee situation" and estimates of the number of prospective refugees and the cost of their resettlement.[164]

Admissions under the additional annual admissions category had to be justified by humanitarian concerns or be "otherwise in the national interest." Emergency admissions had to be justified by "grave humanitarian concerns" or be "otherwise in the national interest."[165] The bill allowed for waivers of certain grounds of excludability, including most significantly the public charge

---

160. *Id.* at § 207(a)(2).
161. *Id.* at § 208(a).
162. *Id.* at §§ 207(a)(2) and 208(a).
163. *Id.*
164. *Id.*
165. *Id.* at §§ 207(a)(2) and 208(a).

44

and literacy requirements of the law.[166]

Some of the changes in section 243(h)[167] proposed in prior bills[168] were incorporated into the new bill. These authorized the Attorney General to withhold "the deportation or return of any alien to any country where such alien's life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion."[169] Thus, the protections of this section were extended to apply in exclusion as well as deportation hearings. The proposed section 243(h) also enlarged the bases of persecution to include "nationality and membership in a particular social group." Both of these represented movements towards consonance with the UN Convention.

Unlike the earlier version of Congressman Eilberg's bill, no formal limitations were placed on the parole authority. In the section-by-section analysis of the Administration's bill, however, it was clearly stated that this authority could be used for refugee admissions only if there were "compelling reasons in the public interest related to the individual refugee."[170]

### House and Senate Judiciary Committee Consideration of the Bill

H.R. 2816 was referred to the Subcommittee on Immigration, Citizenship and International Law which held hearings on the bill in May of 1979.[171] In the Senate, a hearing on S. 643 was held before the Committee on the Judiciary on March 14, 1979.[172] Much of the testimony heard during that hearing was similar to testimony offered during House Subcommittee hearings.[173] Congressional consideration of this bill in House Subcommittee and Senate Judiciary Committee hearings focused on five areas: the refugee definition, allocation of refugee numbers to those of "spe-

---

166. *Id.* at §§ 207(a)(3), 207(b)(2), 209 and 210(b).
167. 8 U.S.C. § 1253(h) (1965) (amended 1980).
168. *See* note 144 *supra* and accompanying text.
169. H.R. 2816, 96th Cong., 1st Sess., 125 CONG. REC. 12376 (1979).
170. 125 CONG. REC. 2633 (1979).
171. *Hearings on H.R. 2816, supra* note 1.
172. *Hearings on S. 643, supra* note 105. Note that the Senate Subcommittee on Immigration had been abolished by Sen. Kennedy when he assumed the Chair of the Committee on the Judiciary. *See also* note 153 *supra.*
173. The Senate hearings were briefer and involved less controversy. The administration's bill, from the time it was first introduced in the Senate through floor amendments in September of 1979, underwent a simpler and smoother process than its companion bill in the House. See notes 150, 153-54 *supra* for Sen. Kennedy's role in advancing the legislation.

IFR_AR_011755

cial concern," section 243(h), the need for a statutory asylum provision, and the need for a consultation procedure.

The intent to implement a broad, nondiscriminatory refugee policy embodied in the new UN definition was evidenced during committee and subcommittee hearings in both houses. In testifying before the Senate Judiciary Committee, Ambassador Clark criticized the current law's treatment of refugee problems as "inadequate, discriminatory and totally out of touch with today's needs."[174] Describing the diversity of the refugee population he stated, "[w]hile the plight of the boat people in Southeast Asia presents today's most dramatic case, it must not blind us to the hardships of refugees fleeing oppression and persecution in Eastern Europe, Africa, the Middle East, and Latin America."[175] In other parts of the hearing record, the new refugee definition was lauded as installing "a more universal standard based on uprootedness rather than ideology."[176]

While a more general agreement was apparent, Congress continued to focus on monitoring the Executive's power in refugee admissions as it had in earlier hearings. During the House Subcommittee hearing, one major change recommended was an explicit statement of the bill's purpose "to implement and/or reinforce the Convention and Protocol Relating to the Status of Refugees."[177] In addition, witnesses from Amnesty International and other organizations wanted explicit inclusion of displaced persons, political detainees and in general those persons still within their country of nationality within the definition of "refugee."[178] Administration witnesses made it clear that the new refugee definition did not, as in former law, require third country processing of refugee applications. There was nothing, however, in the new bill specifically allowing for processing within the persecuting country. The reference to displaced persons contained in some prior bills, particularly S. 3751,[179] did not appear in the Administration's bill. Amnesty International testified:

> Unless the definition of "refugee" is expanded, it appears that . . . [these] political prisoners, and those displaced from their homes by civil strife will not be eligible for admission to the United States as refugees . . . [g]iven the failure of the Hemispheric Parole Program to even scratch the surface of the political refugee problem in Argentina and other countries of Latin America, Amnesty has great fears that prisoners of conscience will be merely ignored unless a particular individual is seen to be

---

174. *Hearing on S. 643*, *supra* note 90, at 9.
175. *Id*. at 11.
176. *Id*. at 187, *quoting* Washington Post, March 12, 1979.
177. *Hearings on H.R. 2816*, *supra* note 1, at 168 (testimony of A. Whitney Ellsworth and Hurst Hannum, Amnesty International).
178. *Id*. at 169.
179. *See* note 150 *supra*.

46

relevant to the political context of the moment and therefore becomes a "compelling" case whose admission is "required".[180]

Witnesses also focused upon practical problems resulting from the inaccessibility of INS processing centers:

> The definitions . . . don't now require that a person make his application within a third country, but in fact it would be impossible for a person in a country where he is suffering persecution, to be pre-cleared, screened or processed by the Immigration and Naturalization Service.[181]

Another major controversial provision of the bill was allocations of refugee numbers to those of "special concern." Some witnesses expressed the fear that this represented a return to ideological restrictions.[182] This suspicion was reinforced by official pronouncements. The section-by-section analysis, for example stated, "[i]n recent years the refugees who have been a special concern to the United States have included Cubans, Soviets, Eastern Europeans and Indochinese."[183] In attempting to clarify this language, Ambassador Clark referred to traditional considerations for refugee admissions, testifying that special attention would be paid to "whether the refugees have cultural, historical or especially family ties to the United States" or "[w]hether we have a special responsibility because of previous U.S. political involvement with the refugee or his country of origin."[184] At the same time Ambassador Clark explained that the factors he had listed were "simply a summarization of what we've been doing, rather than anything written in stone in terms of projections of the future."[185]

Despite these assurances, subcommittee members and nongovernmental organizations thought that even to suggest that the United States would limit its assistance to refugees of "special concern" would undercut the universal humanitarian standards of the Refugee Act. Witnesses recommended that "special need, and not special political concern, should be the dominant crite-

---

180. *Hearings on H.R. 2816, supra* note 1, at 171.

181. *Id.* at 187 (testimony of David Carliner, American Civil Liberties Union).

182. *See Id.* at 182 (dialogue between Congresswoman Holtzman and Mr. Ellsworth of Amnesty International in which "special concern" was seen as referring to "geopolitical concerns" and a return to "the national origins policy in our immigration law").

183. *See* note 170 *supra.*

184. *Hearings on H.R. 2816, supra* note 1, at 24-25.

185. *Id.* at 26.

47

rion."[186] It was suggested that an important factor to be considered in determining "special concern" was whether refugees were "from a country wherein there exists a consistent pattern of gross violations of internationally recognized human rights".[187]

While dissatisfied with the "special concern" terminology, several members of Congress nonetheless desired statutorily articulated standards. As in earlier hearings, members of Congress insisted upon the need for statutory devices to control the exercise of executive discretion. Chairwoman Holtzman noted:

> I want you to focus on the special concern provisions. I do not think that it is sufficient to come here and say that special concern is a terrible provision because it will provide certain limitations when in fact by selecting 50,000 people out of thirteen million refugees you have to apply some kind of standards and limitations.
>
> The question is whether this discretion will be given completely to any President . . . or whether standards will be set . . . . I agree with you that the decisions with regard to refugees have essentially been political decisions but I don't think you solve that problem even if you take the term "special concern" out of the statute.[188]

The same mistrust of the Executive's use of politically motivated selection criteria that incited controversy over the "special concern" terminology reinforced earlier demands for universal statutory asylum procedures and mandatory requirements in the section 243(h) provisions.[189] Thus, the Administration's proposed section 243(h) provision was criticized for allowing the discretionary withholding of the return of the alien, "[d]espite the mandatory nature of the United States' obligations under international law."[190] Section 243(h) procedures were characterized as "woefully inadequate."[191] Even amended to reflect this concern, section 243(h) was not to be substituted for a statutory asylum provision which would establish the right to apply for asylum either within or outside the United States:

> It seems that it shouldn't be necessary to claim asylum through a procedure designed to allow one to withhold deportation under section 243(h). Those are not necessarily the same questions. There may be many reasons to withhold deportation of an alien, but asylum procedures should be separate. Although the right of asylum has been regarded as an historic tenet of American political policy, it has not been set forth in any statutory provision . . . . In as much as it, in fact, has been woven into the fabric of American history and has achieved international acceptance as a policy in the declarations of the United Nations, it seems appropriate to reinforce that policy by stating it explicitly as a purpose of the "Refugee

---

186. *Id.* at 177 (testimony of Whitney Ellsworth and Hurst Hannum, Amnesty International).

187. *Id.* at 174.

188. *Id.* at 69.

189. 8 U.S.C. § 1253(h) (1980).

190. *Id.* at 193.

191. *Id.* at 169.

48

Act of 1979".[192]

The congressional focus upon the dimensions of its role in the refugee admission process was again reflected in discussions on the proposed consultation provisions. This was especially the case since the veto provisions of the former bills had been eliminated, and there was no explicit description of the consultation process as had appeared in Congressman Eilberg's H.R. 2816.[193] Members of the House Subcommittee felt that the consultation provision's informality and nonspecificity would discourage "good faith, real efforts" to obtain congressional input into presidential decisions to raise the numerical limit over 50,000.[194] House members also were critical about their lack of participation in decisions allocating numbers and their inability to influence changes after the beginning of the fiscal year. The Executive's decision to raise the numbers of admissions was qualified only by the required determination that the increase was "in the national interest" or justified by "humanitarian" concerns. Administration witnesses admitted that these terms created no discernable limits, since they were impossible to define.[195]

In response to these objections Attorney General Bell, representing the Administration, attempted to define the implicit congressional control in the statutory consultation process:

> This morning we are in the process of making legislative history and I will give you my view of what the consultation process means, or ought to mean. There are legal writings on this approach. I would treat the consultation process as a report-and-wait provision. Report-and-wait provisions are prone to the law of legislative veto. The executive department and the President, by consulting, reports to the Congress what he wants to do and gives it a certain period of time within which not only to consult but to act, if it wishes to act. You might say we don't agree with that; we want to block that. But I wouldn't make it a set number of days in which the Congress has to act. That's beyond the spirit of a good faith consultation. However, the period of consultation ought to be long enough for the Congress to decide whether or not it agrees.[196]

Despite this statement by the Attorney General, giving Congress an implicit veto power, the Administration insisted upon flexibility and undefined statutory language. Thus, while the "report-and-wait" provision was written into the legislative history,

---

192. *Id.* at 184-86.
193. *See* notes 127-28 *supra* and accompanying text.
194. *Hearings on H.R. 2816, supra* note 1, at 65.
195. *Id.* at 25.
196. *Id.* at 24.

49

the Administration did not want it written into the law.[197] But when the suggestion was made to write in detailed description and definition of consultation, as had appeared in the earlier Eilberg bill, the Attorney General had no objection.[198]

*The House and Senate Reports*

Following these committee and subcommittee hearings, amendments to the original Administration bill were incorporated into the House[199] and Senate reports[200] on the Refugee Act of 1979. The House and Senate reports reflected different standpoints in the historic struggle over control between executive and congressional forces. The provisions of the House bill attempted to transfer significant power in refugee admission to Congress. Senate leaders, on the other hand, wanted to maintain the flexibility of the admission procedures and not compromise that flexibility by imposing rigid congressional control mechanisms.[201]

There was consistent agreement, however, on certain principles: to strengthen and emphasize the humanitarian and nondiscriminatory underpinnings of the legislation, and further buttress the asylum provisions.[202]

The refugee definition reported out by the House Committee contained an additional Section "B", specifically referring to those persecuted or threatened with persecution in their own country.[203] While the language of the definition did not literally cover them, the Committee's intent was to provide for detainees and political prisoners. According to the Committee report:

---

197. *Id.* at 30.

198. *Id.* at 64-65.

199. H. REP. No. 608, *supra* note 10; Bill introduced in the House of Representatives as H.R. 2816, 96th Cong., 1st Sess., 125 CONG. REC. 12376 (1979).

200. S. REP. No. 256, *supra* note 157; Bill introduced in the Senate as S.643, 96th Cong., 1st Sess., 125 CONG. REC. 12021 (1979).

201. The Senate Comm. on the Judiciary, under the leadership of Sen. Kennedy, had advocated a greater executive branch role in the refugee admission process. See note 150 *supra*.

202. In the House, subcommittee mark-up on H.R. 2816 took place on August 1, 1979, during which Congresswoman Holtzman offered an amendment in the nature of a substitute making significant changes in the original legislation. After a single subcommittee amendment was approved, the bill with amendments was referred to the full committee mark-up on September 13 and 19, 1979. The committee ordered the bill favorably reported to the House with an amendment by a vote of 20-6. When H.R. 2816 was reported out of the full House committee important changes had been made reflecting many of the areas of discussion during subcommittee hearings in May. See H.R. REP. No. 608, *supra* note 10, at 7.

On the senate side, the Judiciary Committee, meeting in open session on July 10, 1979, considered and amended the bill. See S. REP. No. 258, *supra* note 157, at 3.

203. The proposed § 101(a)(42)(B) covered "any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing".

50

IFR_AR_011760

*Refugee Act of 1980*
                                        SAN DIEGO LAW REVIEW

> While these individuals are not covered by the U.N. Convention, the Committee believes it is essential in the definition to give the United States sufficient flexibility to respond to situations involving political or religious dissidents and detainees throughout the world.[204]

In explaining the rationale of the provision the Committee referred to Chilean and Cuban prisoners brought directly to the United States and to the hemispheric parole programs for prisoners in Argentina and other Latin American countries, as well as to the evacuation of Saigon in 1975. Members noted that coverage for these "refugees" was noncontroversial; Administration witnesses had indicated their intention to encompass detainees in the original refugee definition written in S. 643/H.R. 2816.[205]

The Senate Committee bill specifically amended the definition of refugee to include "displaced persons." This was done "to insure maximum flexibility in responding to the needs of the homeless who are of concern to the United States."[206]

In the House Committee's version a further amendment was added to the refugee definition to exclude from eligibility for refugee status those who had engaged in the persecution of others. This was viewed as consistent with the UN Protocol which by its terms does not apply to those who "committed a crime against peace, a war crime, or a crime against humanity."[207]

The amendment was also consistent with recently enacted legislation allowing for the deportation of Nazi war criminals,[208] as well as provisions in earlier refugee reform proposals.[209]

The annual and emergency admission provisions were changed in several important respects from the original, Administration version. For example, in the Administration's bill the allocation determination to refugee groups of "special concern" was exclusively within the President's authority, whereas, the House Com-

---

204. H.R. REP. No. 608 *supra* note 10.

205. *Id.*

206. S. REP. No. 256, *supra* note 157, at 4. As in the House version, Part A of the new definition referred to those outside the persecuting country and conformed to the UN Protocol. The Senate Committee's Part B referred to "any person who has been displaced by military or civil disturbance or uprooted because of arbitrary detention of the threat of persecution, and who is unable to to return to his usual place of abode".

207. H.R. 2816, 96th Cong., 1st Sess. § 201(a)(42), 125 CONG. REC. 12367 (1979); 8 U.S.C. § 1101(a)(42) (1980). H.R. REP. No. 608, *supra* note 10, at 10.

208. Act of October 30, 1978, Pub. L. No. 95-549, 92 Stat. 2065 (1978).

209. *See, e.g.*, H.R. 7175, 95th Cong., 1st Sess. § 243(h) 123 CONG. REC. 14648 (1977).

51

mittee bill required that the allocation of refugee admissions to those of "special humanitarian concern" be based on a determination made by the President, *after consultation with Congress*.[210] In effect, the House Committee bill sought to make consultation mandatory as to allocations of refugee admissions in *all* cases, not just with respect to numbers of refugees when such numbers exceeded 50,000.

While amendments made by the House Committee reinforced the role of Congress, many of the Senate changes increased the Executive's power. One example increasing the Executive's power was a change in the provisions for increased refugee admissions. In an added provision for "periodic discussions,"[211] the Senate bill attempted to cover the situation in which after the initial consultation and the submission of the budget request, the President became aware of the need for additional refugee admissions. He could then "conduct additional consultations regarding possible adjustments of estimated normal flow numbers."[212] The provision thus created additional flexibility in the admission process by giving the President a second opportunity to increase the number of annual refugee admissions.

The House and Senate Committee versions of the emergency admission provisions were essentially the same, adopting the Administration's bill language, with the exception that the House report "limited [emergency admissions] to circumstances which are unforeseen prior to the beginning of the fiscal year."[213] The House Committee noted that, while it was not adopting a rigid numerical ceiling on emergency admissions, "the Committee amendment does limit the President's authority to admit refugees under this provision to a maximum twelve month period."[214] The Senate bill contained no similar time restriction but rather the Senate report described the need for unfettered emergency powers. "In such emergency circumstances the consultation process

---

210. H.R. 2816, 96th Cong., 1st Sess. § 207(b), 125 CONG. REC. 12367 (1979); adopted in the Refugee Act at 8 U.S.C. § 1157(b) (1980). The language of the Senate Committee's bill did not require consultation as to allocations.

The Senate report, however, stated "[t]he admission numbers will be allocated to groups of refugees of special concern to the United States" as determined by the President in consultation with Congress". S. REP. No. 256, *supra* note 185, at 5.

211. "[T]here shall be periodic discussions between designated representatives of the President and members of Committee on the Judiciary regarding the progress of refugee admissions and the possible need for adjustment in the allocation of admissions among groups or classes of refugees." S. 643, 96th Cong., 1st Sess. § 207(a)(1), 125 CONG. REC. 12021 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1157(d) (1980)).

212. S. REP. No. 256, *supra* note 157, at 5.

213. H.R. 2816, 96th Cong., 1st Sess. § 207(a)-(b), 125 CONG. REC. 12367 (1979).

214. H.R. REP. NO., *supra* note 157, at 12.

52

. . . should be viewed as urgent by both the executive and legislative branches."[215]

The House Committee sought to limit further the Executive's authority to admit refugees in emergencies by adopting Congressman Eilberg's proposed restriction on the use of the parole authority for refugee admissions,[216] prohibiting its use for refugees unless specific justification could be found for the particular alien. By contrast, the Senate version made no statutory change in the parole authority. While the section-by-section analysis in the Senate report expressed the Committee's intent to limit the use of parole for refugee admissions, it still allowed for the parole of refugees by group.

> Once the bill takes effect, however, the Attorney General does not anticipate using this authority with respect to refugees unless he determines that compelling reasons in the public interest related to individual or groups of refugees require that they be paroled into the United States, rather than admitted in accordance with . . . [the annual and emergency admission provisions in the bill].[217]

In the House Committee's version, the consultation provision was strengthened in several respects. The House report stated "the Committee cannot over-emphasize the importance it attaches to consultation."[218] As noted above, a consultation requirement was added for allocations decisions.[219] The Committee's bill also required the President to designate a cabinet member[220] to participate in consultations with the Judiciary Committee. The Committee incorporated the definition of the consultation process contained in Congressman Eilberg's former H.R. 7175,[221] setting forth information that had to be submitted as part of the consultation process, including descriptions of resettlement plans and "the anticipated economic, social and demographic impact of the admission of the refugees in question."[222] The House Committee report went on to state that the former, nonstatutory consultation process, involving consultation with the Chairpersons of the full

---

215. S. REP. No., *supra* note 150, at 10.
216. *See* note 115 *supra* and accompanying text. *See* 8 U.S.C. § 1253(d)(5)(B) (1980).
217. S. REP. No. 256, *supra* note 157, at 17.
218. H.R. REP. No. 608, *supra* note 10, at 14.
219. *See* note 210 *supra* and accompanying text.
220. H.R. 2816, 96th Cong., 1st Sess. § 207(e) 125 CONG. REC. 12367 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1157(e) (1980)).
221. *See* note 127 *supra*.
222. H.R. 2816, 96th Cong., 1st Sess. § 207(e) 125 CONG. REC. 12367 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1157(e) (1980)).

53

IFR_AR_011763

House and Senate Judiciary Committees, and the House Subcommittees on Immigration, Refugees and International Law, as well as ranking minority members of the committees and subcommittees, would be followed. According to the House Committee report, the information required in the defined consultation provision would be submitted by the Executive at least two weeks in advance; the consultation process itself would not take longer than fifteen to twenty days.[223] The House report stated the Committee members' belief that "the Administration cannot move ahead to admit additional refugees after consultation, until some response has been received from the consultative members."[224] The report referred to Attorney General Bell's testimony regarding the implicit "report-and-wait" requirement as support for its position.[225]

In the Senate Committee's version, the consultation process was defined similarly, with a description of the "personal contact" required between the Executive and the Judiciary Committees.[226] Generally, however, the Senate version and report proposed a more flexible consultation process. Rather than stressing the "report-and-wait" provision, the Senate report emphasized the intent of the Committee members *not* to create "a statutory definition of what action is required of the Judiciary Committee of Congress to conclude the consultation process."[227]

The discussions during the hearings regarding the "special concern" terminology resulted in important amendments. The House Committee's bill changed the term "special concern" to "special humanitarian concern"[228] as the standard to be applied in determining allocation of refugee admissions. By making this change "the Committee intend[ed] to emphasize that the plight of the refugees themselves as opposed to national origins or political considerations should be paramount in determining which refugees are to be admitted to the United States.[229] At the same time, the need for flexibility was reiterated:

> The legislation does not—and cannot—further define this phrase. The Committee believes that any attempt to do so would unnecessarily restrict future public policy decisions. The Committee recognizes that determining which refugees are of "special humanitarian concern" to the United States will be a matter to be considered, debated and decided at the time

---

223. H.R. REP. No. 608, *supra* note 10, at 14-15.

224. *Id.* at 15.

225. *Id. See* note 196 *supra* and accompanying text.

226. S.643, 96th Cong., 1st Sess. § 207(a)(2), 125 CONG. REC. 12021 (1979).

227. S. REP. No. 256, *supra* note 157, at 7.

228. H.R. 2816, 96th Cong., 1st Sess. § 207(a) 125 CONG. REC. 12367 (1979) (same language in Refugee Act, 8 U.S.C. § 1157(a) (1980)).

229. H.R. REP. No. 608, *supra* note 10, at 13.

54

refugee situations develop.[230]

In enumerating the factors that could be considered in utilizing the "special humanitarian concern" standard, the House Committee had been influenced by the Amnesty International testimony.[231] The Committee emphasized humanitarian considerations, placing the plight of the refugees and the pattern of human rights violations in the country of origin as the first factors to be weighed.[232]

Although the term "special concern" was retained in the Senate Committee version as a selection guide in refugee admissions, in defining this term the Senate report made some significant changes which emphasized the humanitarian factors (from the original section-by-section analysis). As in the House report, human rights concerns were stressed. When setting out the guidelines from the past for selecting refugees of the "special concern," the report referred not only to admissions from countries where the United States had had "historic, cultural, or direct involvement" but also noted that refugees had been admitted "to promote family reunion; to respond to human rights concerns embodied in the Universal Declaration of Human Rights; to fulfill foreign policy interests; and when no other country [had] responded to the needs of the homeless. . . ."[233] The report underscored the need for a broader, more inclusive refugee policy. Thus, when giving past examples of countries from which the United States had accepted refugees of "special concern," the report added to those listed in the section-by-section analysis of the original bill,[234] including those "from the Middle East, Uganda, Lebanon, Latin America and elsewhere."[235]

In response to testimony at the hearing advocating the protections of a statutory asylum scheme,[236] both the House and Senate Committee's versions provided a statutory mandate for the Attorney General to establish asylum procedures "for an alien physically present in the United States or at a land border or port of

---

230. *Id.* at 13.
231. *See* note 186 *supra* and accompanying text.
232. H.R. REP. No. 508, *supra* note 8, at 13-14.
233. *Id.* at 15.
234. *See* note 170 *supra*.
235. H.R. REP. No. 608, *supra* note 10, at 15.
236. *See* notes 189-192 *supra* and accompanying text.

55

IFR_AR_011765

entry, irrespective of such alien's status. . . ."[237]  The House Committee bill authorized the Attorney General to grant asylum if he determined that the alien was a refugee within the meaning of the bill.[238]  At the same time, the House and Senate Committees eliminated the discretionary element in the withholding provision making its provisions mandatory.[239]  The House bill created certain specified exceptions to the withholding provisions, but these were all explained as consistent with the UN Convention.[240]

*House and Senate Floor Action*

H.R. 2816 was discussed on the floor of the House of Representatives on December 13, 1979, and further debated and amended a week later.[241]  The Senate bill, S. 643 as amended and reported out of the Senate Judiciary Committee, was debated and amended on the floor of the Senate on September 6, 1979.[242]

The formal introduction of the bill in the House, debate and amendments, occurred on December 20, 1979.[243]  Debate centered on congressional control over refugee admissions numbers and strengthening of the consultation process.  The liberalization that had been achieved in committee on the refugee admission evoked opposition on the House floor.  The members supported a nondiscriminatory policy.  At the same time, they were fearful that the effect would be to enact an expansive admission policy not tempered by ascertainable numerical limits nor by meaningful congressional control over the action of the Executive.  These perennial fears had not been allayed.  The first floor amendments, introduced by Congressman Fascell,[244] modified the House Com-

---

237.  H.R. 2816, 96th Cong., 1st Sess. § 208(a), 125 CONG. REC. 12367 (1979); S.643, 96th Cong., 1st Sess. § 207(b), 125 CONG. REC. 12021 (1979).

238.  H.R. 2816, 96th Cong., 1st Sess. § 208(a) 125 CONG. REC. 12367 (1979) (similar provision in Refugee Act, 8 U.S.C. § 1158 (1980)).  The House report stated, "The Committee wishes to insure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law. . .  The Committee intends to monitor closely the Attorney General's implementation of the section so as to insure the rights of those it seeks to protect".  H.R. REP. No. 608, *supra* note 10, at 17-18.  The Senate Committee bill, § 207(b), made the grant of asylum mandatory upon the appropriate showing, whereas the House version left the decision to grant asylum within the Attorney General's discretion.  S. REP. No. 256, *supra* note 157, at 8-9.

239.  H.R. 2816, 96th Cong., 1st Sess. § 203(e), 125 CONG. REC. 12367 (1979); S.643, 96th Cong., 1st Sess. § 203(e), 125 CONG. REC. 12021 (1979).

240.  H.R. REP. No. 608, *supra* note 10, at 16.

241.  125 CONG. REC. 11965 (1979).

242.  *See* note 200 *supra*.

243.  *See* note 199 *supra*.

244.  *Id.* at 12369.  Two other amendments offered by Congressman Fascell involved the conduct of resettlement assistance programs.  Another established a new Title IV of H.R. 2816.  It provided federal reimbursement to the states for so-

56

mittee's amended refugee definition which allowed those still within the persecuting country to qualify as refugees. Congressman Fascell stated his view that the Committee change went beyond the UN definition and potentially opened the numerical floodgates. Under Congressman Fascell's amendment, those still within the persecuting country could only qualify for refugee status after being specially designated by the President in consultation with Congress.[245]

An amendment to the admissions provision of the legislation was introduced by Congressman Butler. This "sunset clause" amendment[246] provided that after 1982 the "normal flow" refugee admissions be returned to 17,400, the number of refugee admissions under the current provisions of section 203(a)(7) of the INA.[247] Congressman Sessenbrenner, in approving this amendment, made two major criticisms of the bill: first, refugee policy was left uncoordinated with the legal immigration policy for nonrefugee immigrants; second, the legislation would be passed prior to the report of the Select Commission on Immigration and Refugee Policy.[248] By sunsetting the increased flow of refugees at the end of fiscal year 1982, "it will give Congress an opportunity to review the report of that Commission and its recommendations and hopefully enact a permanent policy relating to both refugees and nonrefugee [*sic*] immigrants."[249] Both amendments, accepted by

---

cial services provided asylum applicants who had submitted applications prior to November 1, 1979. While not specifically limited to Haitian asylum applicants the amendment was aimed at providing assistance to southern Florida for the costs resulting from the influx of these refugees.

All of Congressman Fascell's amendments were accepted by the House, along with an amendment offered by Congressman Danielson involving the time limits for reimbursement for certain types of domestic assistance to refugees. See REFUGEE PROGRAMS AND POLICIES, *supra* note 10, at 49-50.

245. As to refugees still within the persecuting country, Congressman Fascell's amendment would allow them to be admitted "in such special circumstances as the President after appropriate consultation . . . may specify". 125 CONG. REC. H12369 (1979). This amendment was incorporated into the Refugee Act, 8 U.S.C. § 1101(a)(42)(B) (1980).

246. 125 CONG. REC. 12369 (1979).

247. *See* 8 U.S.C. § 1153(a)(7) (1952) repealed by 8 U.S.C. § 1101(c)(7) (1980).

248. Act of October 5, 1978, Pub. L. No. 95-412, 92 Stat. 907 (1979) established the Select Commission on Immigration and Refugee Policy whose mandate was to study and evaluate "existing laws, policies and procedures governing the admission of immigrants and refugees to the United States and to make such administrative and legislative recommendations to the President and the Congress as are appropriate". The deadline for the final report was originally Sept. 30, 1980, but was extended to March 1, 1981.

249. 125 CONG. REC. H12370 (1979).

57

Congresswoman Holtzman, were adopted.

Further amendments introduced on the House floor were designed to strengthen the consultation mechanism. An amendment, introduced by Congressman Hyde, provided for "a hearing to review the proposal to increase refugee admissions" to be held "unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals." Such a hearing was to take place in the case of decisions to increase the "normal flow" above 50,000 (the second annual admissions category), as well as for emergency admissions "to the extent that time and the nature of the emergency refugee situation permit."[250] The amendment was adopted, unopposed by Congresswoman Holtzman. "[T]here is no substitute for public scrutiny, public disclosure, public debate on an issue of such importance, as the admission of refugees to the United States."[251]

The most controversial amendment was offered by Congressman Moorehead. Characterizing the consultation language as "illusory," Congressman Moorehead resurrected the congressional veto from earlier proposed refugee reform bills.[252] The amendment provided that a presidential determination to increase the number of refugees admitted above 50,000 would not go into effect if at the end of fifteen days of continuous session either house passed a resolution stating in substance that it did not approve the determination. The veto would not apply to an emergency determination but would apply only to a foreseeable influx of refugees. The Congressman emphasized that the veto provision would not affect emergency admissions where there was immediate danger to human lives.[253] Congressman Fish, in supporting the amendment, emphasized just how narrow the scope of the amendment was:

> Several months before the beginning of the fiscal year, the President would make a determination if he wishes to ask for the admission of refugees in addition to the 50,000 normal flow. That is where the one-House veto comes into play. It affects no other part of the admission process, or, I might add, of the allocation process, which is also subject to consultation with the Committees on the Judiciary. . . . I think when we read this amendment, together with the Sunset Amendment that has been accepted today and the enlarged consultation amendment, that we are restoring control over admission of aliens to the Congress, the branch of government that is given sole control over immigration by the Constitution.[254]

---

250. *Id.* at 12371. This amendment was incorporated into the Refugee Act in § 207(d)(3)(B).

251. *Id.*

252. *See* discussion of Congressman Eilberg's H.R. 3056 and H.R. 7175 *supra* note 118 and accompanying text.

253. 125 CONG. REC. 12372-73 (1979).

254. *Id.* at 12374-75.

58

The amendment, although opposed by Congresswoman Holtzman, was also adopted in the bill as passed. The amended committee bill was then passed on a roll call vote of 328 to 47 and was sent to conference committee.[255]

On the floor of the Senate, four amendments were offered by Senator Huddleston, "the only discernable opponent of the committee-reported bill."[256] However, the differences among Senator Huddleston and Senator Kennedy, the other committee sponsors, and the Administration had been resolved prior to floor debate.[257] As a result, the amendments were all accepted without opposition. As in the case of the amendments offered on the House floor, the major focus of these amendments was to strengthen congressional control and to narrow the scope of the Executive's discretionary powers. The first amendment, for example, was similar to that offered by Congressman Hyde.[258] It required the Judiciary Committees to hold public hearings on a proposal to increase the "normal flow" above 50,000. In addition, it required the submission of a report to Congress within thirty days after the hearing. In offering the amendment, Senator Huddleston stated: "[m]embers of Congress will have the opportunity to either agree or disagree with the proposal at the hearings . . . , I believe that this amendment will firmly establish the principle that Congress, as a whole, will establish immigration policy for the country in an informed and open manner."[259] Senator Huddleston's second amendment substituted the term "special responsibility" for "special concern" as a selection criteria to be used by the Executive in determinations to raise the "normal flow" of refugee admissions above 50,000. He stated that the term would have a narrow meaning, encompassing those with a "close social, economic, cultural or political association that is not shared with other groups of refugees."[260]

Senator Huddleston's third amendment was a "sunset provision,"[261] providing that after 1982, the number of refugees admit-

---

255. *Id.* at 12410. This passage was vacated, and the House passed S. 643 amended with the House-passed language of H.R. 2816 policies, *See* REFUGEE PROGRAMS AND POLICIES, *supra* note 98, at 10.

256. REFUGEE PROGRAMS AND POLICIES *supra* note 98, at 47-48.

257. *Id.*

258. *See* note 250 *supra.*

259. 125 CONG. REC. 12020 (1979).

260. *Id.*

261. *Id.* at 12021. In light of the congressional intent to emphasize humanita-

59

IFR_AR_011769

ted "be set exclusively by the consultation process."[262] Finally, the Senator further amended the "purpose section" of the Act to state that the new immigration quotas established by this Act should be subjected to a timely review and reevaluation taking into consideration the recommendations of the Select Commission. Senator Huddleston stated that the amendment was being added in order to assure that the Select Commission could carry out its mission and to dramatize the fact that "the increased quota [was] highly controversial."[263]

*The Conference Report*

In its statement of purpose, the final Conference report on the bill adopted the basic structure of the Senate version except that the term "special humanitarian concern" was substituted for "special concern."[264] It expressed the purpose of the bill in terms of "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands" and provided that "the objectives of [the] Act [were] to provide a permanent and systematic procedure for the admission to this country of refugees . . . and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who [were] admitted."[265]

Definition of Refugee

The conference committee adopted the House provision incorporating the UN definition, as well as Congressman Fascell's amendment including presidentially specified persons within their own countries who are persecuted or fear persecution.[266] Both House and Senate sponsors emphasized that the purpose was to create a nondiscriminatory definition of refugee and to make United States law conform to the UN Convention.[267] The provision for "presidentially specified persons" was meant to cover "displaced persons" within their own country in order to

---

rian concerns in the legislation, it is significant that this amendment was not adopted by the Conference Committee.

262. For similar House amendment, see note 246 *supra*, and the Refugee Act, 8 U.S.C. § 1157(a)(2) (1980).

263. 125 CONG. REC. 12021 (1979).

264. S. REP. No. 590, 96th Cong., 2d Sess. 1 (1980) (hereinafter cited as S. REP. No. 590).

265. *Id*. at 19. 8 U.S.C. § 1521 n. on Congressional Policies and Objectives (1980). For a section-by-section discussion of the Refugee Act see 57 INTERPRETER RELEASES 133-39 (1980); Anker, *The Refugee Act of 1980*, 9 IMMIGRATION NEWSLETTER 2 (1980).

266. 8 U.S.C. § 1101(a)(42) (1980).

267. S. REP. No. 590, *supra* note 264, at 19.

60

provide for situations such as the 1975 evacuation of Saigon, "state of seige" detainees in Argentina, and Cuban political prisoners. Specifically excluded were persons within their own country who themselves engaged in persecution.[268]

The bar to refugees who were firmly resettled, which had been included in refugee reform bills since 1970, was retained in the Conference bill. The conferees stated their expectation that regulations regarding firm resettlement would be promulgated by the Attorney General in consultation with the Secretary of State. They further directed the Attorney General to submit periodic reports detailing those refugees "denied admission under the 'firmly resettled' criteria or who are admitted to the United States after having travelled to another country for resettlement."[269]

### Admission of Refugees

The Conference Committee report provides for 50,000 refugee admissions annually through 1982 as the "normal flow" refugee admissions, with allocations to be determined by the President in consultation with Congress. If there is an anticipated need for more than 50,000 admissions at the beginning of any year through 1982, the additional number and allocation would be determined during the consultation process.[270]

The Senate's sunset provision was adopted; it provided that, after fiscal year 1982, the number and nature of admissions would be determined exclusively through the consultation process without a predetermined "normal flow."[271]

These admissions numbers were to be allocated principally among "refugees of special humanitarian concern to the United States."[272] The conferees thus adopted the House language emphasizing the intended humanitarian basis of refugee admission policy. All reference to "special concern" and "special responsibility" had been eliminated.

The refugee admission mechanism created in the bill was intended to be the exclusive means for mass refugee admissions, and the parole authority was accordingly modified. The Confer-

---

268. 8 U.S.C. § 1101(a)(42) (1980).
269. S. REP. No. 590, *supra* note 264, at 19.
270. 8 U.S.C. § 1157(a)(1) (1980).
271. 8 U.S.C. § 1157(a)(2) (1980).
272. 8 U.S.C. § 1157(a)(3) (1980).

61

IFR_AR_011771

ence adopted the House amendment limiting the use of parole for individual refugees and requiring a determination that "compelling reasons in the public interest . . . require that the alien be paroled into the United States rather than be admitted as a refugee."[273] The Conference provided for a sixty-day delay in the effective date of these parole provisions in order "to make it clear that existing refugee parole programs will continue until a consultation on future refugee admission programs is held under the terms of this legislation."[274]

For refugees admitted under either the annual or emergency procedures, the bill creates a new conditional status of refugee, allowing for adjustment of status after one year (as opposed to two years as provided in the House bill).[275] The conferees stated that this new "refugee" admission status was intended to be different from either the present "conditional entry" or "parolee" status.[276]

Senator Kennedy, later expanding upon the Conference report on the Senate floor, explained that it was the conferees' intent that aliens in countries outside the United States, qualified as refugees and seeking to be admitted to the United States, need not apply exclusively to an immigration officer. He considered one of the most important effects of the new Act that applications for refugee status could be processed by consular officers in American Embassies, as well as by INS officers-in-charge.[277]

### Asylum Provisions

The Conference report adopted the House amendment on asylum procedure, providing for the establishment of procedures for a discretionary grant of asylum to an alien physically present in the United States or at a land border or port of entry, regardless of status.[278] The mandatory nature of the Senate provision was eliminated. Asylum could be terminated due to a change in the political condition in the alien's country of nationality.

The provision for the adjustment of status for asylees adopted by the conferees was essentially that which had appeared in both the Senate and House versions.[279] The Conference bill, however, allowed for application for adjustment of status after one year of physical presence in the United States rather than two.

---

273. 8 U.S.C. § 1182(d)(5) (1980).
274. S. REP. NO. 590, *supra* note 264, at 21.
275. 8 U.S.C. §§ 1157(c), 1159 (1980).
276. S. REP. NO. 590, *supra* note 264, at 21.
277. 126 CONG. REC. 1754 (1980).
278. 8 U.S.C. § 1158 (1980).
279. 8 U.S.C. § 1159(b) (1980).

62

IFR_AR_011772

The conference bill adopted the House amendment of the withholding provision, mandating withholding except under four specific conditions.[280] The conferees were careful, however, to note their intent to conform with international law; the four specific conditions are those set forth in the UN Convention.

> The Conference substitute adopted the House provision with the understanding that it is based directly upon the language of the Protocol and it is intended that the language be construed consistent with the Protocol.[281]

## Final House Passage

The major issue during the House debates on the Conference bill was the failure to include the legislative veto provision. Congressman Butler suggested the bill be sent back to "clean it up and do it right. . . ."[282] Congressman Rodino, disappointed that the veto had been eliminated, nevertheless voiced his strong support for the bill, characterizing it as "one of the most important pieces of humanitarian legislation ever enacted by a United States Congress. . . . [It] confirm[ed] what this Government and the American people are all about. . . . By their deep dedication and untiring efforts, the United States once again . . . demonstrated its concern for the homeless, the defenseless, and the persecuted peoples who fall victim to tyrannical and oppressive governmental regimes."[283] One of the last members to comment on the bill, Congresswoman Chisholm expressed her hope that the 50,000 number be distributed equitably and would "not be tainted with ideological, geographical or racial or ethnic biases."[284] She pointed out that of the "1.4 to 1.5 million refugees that have entered this country since World War II, . . . fewer than 2,000 have been from Latin America and Africa."[285] The elimination of the legislative veto had, however, struck a nerve in the Congress. The bill passed by a narrow 207 to 192 margin with 34 house members abstaining.[286]

---

280. *See* note 240 *supra*; 8 U.S.C. § 1253(h) (1980).

281. S. REP. NO. 590, *supra* note 264, at 20.

282. 126 CONG. REC. 1519 (1980).

283. *Id.* at 1522.

284. *Id.* at 1523.

285. *Id.* at 1524.

286. *Id.* at 1528.

63

*Final Senate Passage*

In contrast, the Conference bill met very little resistance in the Senate and, in fact, was adopted unanimously. The only Senator to express misgivings was Senator Thurmond who felt that it encouraged welfare dependence and regretted the elimination of the one-house veto provision. He still, however, voted for the bill.[287]

### PROBLEMS IN IMPLEMENTATION

It is in light of this history, and legislative intent, that implementation of the Refugee Act and development of future refugee admission and asylum policy must be viewed. What is most clear from this history is that the Refugee Act is the product of years of debate and compromise. The consensus that is reflected in the Refugee Act represents careful consideration of deep, historic, humanitarian and foreign policy interests of the United States. The major emphasis of the legislation on a nondiscriminatory policy and meaningful congressional participation in decisionmaking cannot be ignored.

Since the Refugee Act passed, a number of significant events have occurred which underscore some key areas of historic concern. Only weeks after passage of the Refugee Act, the influx of over 120,000 Cubans to Florida began, a process which brought into question some of the most basic premises of the Refugee Act and United States policy in general. In addition to these Cubans, more than 20,000 Haitians had arrived in the Miami, Florida area. This massive influx of people into the United States as a country of first asylum raised serious questions about United States policy which are not easily solvable, either under the previous law or the new Refugee Act.[288] The Refugee Act was designed primarily to control the admission of refugees through an orderly admissions process, and these mass claims for asylum have severely strained the existing legal framework.[289]

In an effort to respond to this crisis and as a result of various pressures from the Cuban and Haitian communities in the United States, a broad range of religious, civil rights, social services groups and others, the Carter Administration adopted a special

---

287. *Id.* at 1753-55.

288. At first the Cubans were admitted as refugees under the emergency provisions of the Refugee Act, 8 U.S.C. § 1157(b) (1980); *Presidential Determination No. 18-16*, 45 Fed. Reg. 28,049 (1980). This was later changed, see note 290 *infra*.

289. This article does not specifically consider the issue of treating the U.S. as a country of "first asylum"; the concerns which are raised by the arrival on our shores of large number of asylum seekers. This subject deserves careful and separate treatment. Yet many of the problems in implementation that are discussed here are highly relevant to this general issue.

64

IFR_AR_011774

Cuban-Haitian entry program as an interim measure.[290]

This temporary measure did not solve the larger set of problems associated with the mass influx of people from particular countries seeking political asylum. Others will undoubtedly want to focus specific attention on the mass asylum phenomenon in the future. What is important to emphasize in the context of the Refugee Act is that the problems raised by mass influx of asylum seekers will not be solved by overly simplistic changes in the law. While there have been and will continue to be emergency measures proposed and perhaps adopted to address this issue, the phenomenon cannot be prevented in the future. People with a fear of persecution will continue to come to this country, in search of freedom and a better life. This year they may be from Haiti, El Salvador or Iran; in the next five years from Pakistan, Guatemala, Poland or Iran.

Since the adoption of the Refugee Act and the Cuban-Haitian crisis of 1980, two major governmental proposals have been made on United States immigration policy. Both these proposals have examined current refugee and asylum policy.

In March of 1981 the United States Select Commission on Immigration and Refugee Policy (Select Commission) released its report entitled *U.S. Immigration Policy and the National Interest*.[291] In July 1981, the Reagan Administration's Interagency Task Force on Immigration and Refugee Policy made public a series of their proposals for immigration reform.[292]

Significantly, both groups have endorsed the general principles and terms of the Refugee Act.[293] At the same time, both reports suggest a number of specific proposals which threaten to severely undercut certain basic principles of the Refugee Act and notions of fundamental fairness and due process which are basic to our system.

Moreover, since the Refugee Act's enactment, both the INS and the State Department have promulgated implementing regula-

---

290. U.S. Dep't of State, *Cuban-Haitian Arrivals in the U.S.*, DEP'T OF STATE BULL. 193 (1980).

291. SELECT COMM'N ON IMMIGRATION AND REFUGEE POLICY, U.S. IMMIGRATION POLICY AND THE NATIONAL INTEREST, JOINT COMM. REP. NO. 88 (1981) (hereinafter cited as REPORT OF THE SELECT COMM'N).

292. U.,S. DEP'T OF JUSTICE, REPORT OF THE TASK FORCE ON IMMIGRATION AND REFUGEE POLICY 2-3 (1981) (hereinafter cited as REPORT OF THE TASK FORCE).

293. REPORT OF THE SELECT COMM'N, *supra* note 291, at 2-3.

IFR_AR_011775

tions and operation instructions.[294] In addition the first two consultations with Congress regarding the annual admission of refugees have occurred.[295]

In the following pages we will examine the manner in which the Refugee Act has been implemented to date, examine several of the proposals for modifications in the Refugee Act and make a number of comments and recommendations regarding what we perceive to be useful changes in current refugee and asylum practices.

*Terms of the Refugee Definition*

The first element to consider in terms of implementation is the definition of the term "refugee", as adopted by the Refugee Act. In determining who should be given refugee status, it is important to realize that the vast majority of migrants do not leave their countries unless forced to do so by extreme circumstances. There are many reasons that may compel a person to flee his country, but a refugee is set apart from the other migrants because his motivation stems from a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[296] This key phrase of the definition embodies a complex assessment of the alien's subjective perceptions and his objective background situation.[297]

The subjective element included an assessment of the applicant's personality and beliefs. The political or religious convictions of one person may make government policy intolerable. Another person with no such convictions might find the same conditions acceptable. As rated by the UNHCR:

> The essential elements in the evaluation of the subjective feeling are the questions of the degree of that fear and its credibility. In testing the subjective element it may be necessary to examine the background of the applicant and his family and his position in the environment, his membership of a particular racial, religious, national, social or political group, his own interpretation of the situation and an account of his per-

---

294. INS Interim Regulations on Refugee and Asylum Procedures, 45 Fed. Reg. 37,392 (1981); U.S. Dep't of State Interim Guidelines for Processing of Refugee Applications (1980) (unpublished guidelines on file with Office of Refugee Coordinator, U.S. Department of State, Washington, D.C.).

295. U.S. DEP'T OF STATE, REPORT TO CONGRESS ON PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS FOR FISCAL YEAR 1980 (1980), *reprinted in* U.S. Refugee *Programs supra* note 3, at 66 (hereinafter cited as PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1980); U.S. COORDINATOR FOR REFUGEE AFFAIRS, REPORT TO CONGRESS ON PROPOSED REFUGEE ADMISSIONS FOR FISCAL YEAR 1981 (1980) (hereinafter cited as PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1981).

296. 8 U.S.C. § 1101(a)(42) (1980).

297. OFFICE OF THE UNITED NATIONS HIGH COMM'R FOR REFUGEES, HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS (1979) (hereinafter cited as UN HANDBOOK).

IFR_AR_011776

sonal experience and observation.[298]

The applicant's frame of mind cannot be considered in isolation but also must be viewed in the context of the objective conditions that exist in his country of origin:

> The fear must be well-founded either on personal experience or some other concrete facts and the examiner is to decide whether the supporting evidence is credible, plausible and sufficient to constitute "well-founded fear" for a given person, making an objective appraisal of the circumstances which have been invoked.[299]

Such circumstances need not have affected the applicant personally. He may have a well-founded fear of persecution if relatives, friends, or other members of the same racial or social group have been persecuted.

The term "persecution" itself requires further analysis. Here again, subjective elements and individual circumstances will, in part, determine whether actions or threats amount to persecution. Persecution may take the form of specific hostile acts or it may consist of an accumulation of adverse circumstances such as discrimination existing in an atmosphere of insecurity and fear. In general, the definition of refugee implies that persecution must emanate from the government itself and not from the local populace. But "where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection."[300]

Persecution must also be distinguished from punishment imposed for a violation of the laws of the applicant's native country. In general, a fugitive from justice is not a refugee. But, where punishment is excessive for the reasons mentioned in the definition or where the law itself or its application is discriminatory, such a person may be considered a refugee. Finally, an applicant with strong dissenting political beliefs who is falsely accused of a "nonpolitical" crime on trumped-up charges will also fall within the definition.

Persecution may also take the form of economic deprivation if that deprivation can be considered to have a political basis. Al-

---

298. LEGAL DIVISION, OFFICE OF THE UNITED NATIONS HIGH COMM'R FOR REFUGEE STATUS, ELIGIBILITY—A GUIDE FOR THE STAFF OF THE OFFICE OF THE UNITED NATIONS COMM'R FOR REFUGEES 69 (1962) (hereinafter cited as ELIGIBILITY GUIDE).
299. *Id.*
300. UN HANDBOOK, *supra* note 297, at 18-19.

67

though a pure economic migrant (*i.e.* one who is motivated by exclusively economic considerations) does not qualify under the definition, the distinction between economic and political motivation is often blurred or artificial.[301]

Both the motivation of the applicant and the conditions in his country of origin may involve interrelated economic and political factors. The relative importance of economic and political considerations to the individual applicant should be examined along the continuum of possible motivating forces. The applicant must be considered a refugee only if his *primary* motivation is political.

The effect of the interrelation of economic deprivation and political oppression on the applicant may be divided into three analytical categories. First, the government may use economic measures to effect persecution "on account of race, religion, nationality, membership in a particular social group or political opinion. . . ." Thus, the Soviet dissident who is denied permission to work can clearly be considered a refugee.

Second, active objection to the economic situation may in itself be a political act. The country's economic and political problems may be symptoms of the same oppression or violation of human rights. The economic structure may entail political repression or the political system may require oppressive economic measures to insure its survival. Thus, it should be recognized that the trade unionist or farmer who objects to the extortion of government security forces is acting in the political as well as the economic realm.

Finally, the applicant may be directly affected by the political-economic system as described above but may not react politically or see his problem in a political framework. The initial processing of the Haitian applicants is an example of the need for sensitivity in the examination of such a group of applicants. In *Haitian Refugee Center v. Civiletti*,[302] Judge King stated that "[m]uch of Haiti's poverty is a result of Duvalier's efforts to maintain power. Indeed it could be said that Duvalier had made his country weak so that he could be strong."[303] The mass exodus of Haitian intellectuals and professionals that resulted in an inadequate system of education, medical care, and public administration was the outcome of a deliberate government policy of instilling fear among

301. The concerns and mistrust of disallowing refugee status to so-called "economic immigrants" was central to congressional debate on the Refugee Act. As a result of these concerns a congressional proposal to explicitly exclude "economic immigrants" from the "refugee" definition was rejected. See notes 138-40 *supra* and accompanying text.

302. Haitian Refugee Center v. Civiletti, 403 F. Supp. 442 (S.D. Fla. 1980).

303. *Id.*

68

the elite. The government's fiscal system, in which fifty percent of public revenues were not subject to any form of accounting, resulted in disorganization, inefficiency and corruption. The lack of security due to legal and political uncertainties provided disincentives to workers and reduced the import of private capital. Judge King concluded: "[t]o broadly classify all of the class of plaintiffs as economic refugees; [*sic*] as has been repeatedly done, is therefore somewhat callous. Their economic situation is a political condition."[304]

Clearly not all poor Haitians, or other applicants who would fall within this third category, are refugees, but many who do not express themselves in political terms have, in fact, fled for political reasons. Such an understanding of the applicant's position depends on a sensitive fact-finding process that can deduce the implicit political content of the alien's story and can incorporate complex information on the objective conditions existing in the country of origin.

Compliance with the letter and spirit of the new definition requires a careful understanding of the motivations, beliefs, situation and experience of the applicant. Assessment of these factors is particularly difficult since asylum applicants frequently do not speak English and are almost always unfamiliar with American legal procedures and customs. Many are deeply fearful and suspicious of government officials and resist the open discussion of their circumstances that is so important to a just resolution of their applications.

*The Allocation Process*

Considering this legislative history, the initial implementation of the Refugee Act already suggests several areas where federal authorities have failed to incorporate adequately this "universal refugee standard" in immigration practice. One major element of this problem is the annual refugee allocations process and its implementation.

The Carter Administration's first Annual Report to Congress on April 15, 1980 revealed that of 114,284 refugees admitted into the United States during the first six months of fiscal year 1980, only 120 were from Africa, and only sixty-four from all of Latin

---

304. *Id.*

IFR_AR_011779

America outside of Cuba. The Administration projected that during the second half of fiscal 1980, despite the enactment of the Refugee Act, only 946 refugees would be admitted from Latin America outside of Cuba and only 1,380 from Africa.[305] When viewed in comparison to a projected total annual admission of 230,700, the allocation of 2,500 from all of Africa and Latin America (outside of Cuba) neither constitutes fair, equitable treatment nor primary reliance on humanitarian concerns as mandated by the Refugee Act.

The Administration's April 15, 1980 Report to Congress indicated its intention to continue this geographically discriminatory refugee policy in the future. While devoting considerable attention to the situation in Indochina, from where an estimated 168,000 refugees will be admitted, and Eastern Europe, from where 38,000 refugees will come, there was virtually no discussion of the current situations in Latin America or Africa.

The second consultation in September 1980 reflected a continuation of the discriminatory allocation process. Of 217,000 proposed admissions for fiscal year 1981 only 4,000 were from Latin America (including 2,500 Cubans, half of whom will come from Spain) and 3,000 from Africa. By contrast, the Office of the United States Coordinator for Refugee Affairs proposed the admission of 168,000 people from Indochina and 33,000 from the Soviet Union.[306]

Considering the political instability and on-going violations of basic human rights occurring in countries throughout the Caribbean, Central and South America, 1,500 annual refugee admissions from this entire region fails completely to respond to this crisis. When viewed in comparison to the projected total admission of 217,000 people, the figures for Latin America, Africa and Asia (outside of Indochina) neither constitute equitable treatment nor primary reliance on "humanitarian concerns" as mandated by the Refugee Act.

The long-term character of the refugee problem in the Western Hemisphere cannot be ignored or under-emphasized. The influx in the last year of tens of thousands of Cubans, Haitians, Salvadorians and others from the Caribbean, Central and South America, cannot be dismissed as an isolated or unique occurrence. As long as political, social and economic conditions create instability in these countries, people will leave and seek a better life. Not all can or should be considered refugees under the strict

---

305. PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1980, *supra* note 295, at 66.

306. PROPOSED REFUGEE ADMISSIONS AND ALLOCATIONS-1981, *supra* note 295, at 160.

70

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

provisions of our law. But as recent patterns have clearly demonstrated, a refusal to recognize the dimensions of the problem in our own hemisphere will not stop people from coming here. Any solution to the problem of uncontrolled entry (mass first asylum) must include some provision for the admission of a certain number of people from refugee-producing countries. While every effort must be made to admit a certain number of people from refugee-producing countries, it is also essential that the procedures adopted assure refuge to those facing the greatest threat of severe persecution such as physical torture or death. While increased refugee admissions will not necessarily stop others from coming here illegally, failure to take such action seriously undermines a strict enforcement policy.

It is not realistic to suggest, as the Select Commission has done, that Latin American allocations can be low, in part, because of a regional tendency "to focus upon local resettlement."[307] The massive influx of Haitians, Cubans, Salvadorians, Nicaraguans, Guatemalans and others clearly refutes this notion, particularly with regard to people who are fleeing countries in our own region, particularly in Central America and the Caribbean.

A more constructive suggestion proposed by the Select Commission is that "[s]pecific numbers be provided for political prisoners, victims of torture and persons under threat of death regardless of their geographic origin."[308] This standard seems sensible, especially when applied to victims of particularly severe physical abuse, as a preferred category for assistance. Yet, it should be applied in the first instance on a worldwide basis when determining refugee admissions, and not as a residual category to allow a few thousand admissions after the bulk of the allocation numbers have been determined on other groups.

A revised allocation formula does not require any change in the law, but simply a carefully considered policy to modify current admissions policy. In this regard it should be emphasized that an equitable admissions program does not mean that a greater number of refugees must or should be admitted to the United States in future years. Rather, it requires only that the allocations be equitably determined so that refugees in search of a new

---

307. REPORT OF THE SELECT COMM'N, *supra* note 291, at 160.
308. *Id.*

71

IFR_AR_011781

home are treated humanely and fairly regardless of their national origin.

*Organizational Structures for Admissions*

Allocation problems have been exacerbated by federal regulations promulgated in June 1980. Section 207.4 of these regulations requires an INS officer-in-charge to approve every application for refugee status (Form I-590).[309] However, because there are no INS overseas offices outside of Europe and Hong Kong, this requirement severely restricts refugee determinations.

In an effort to develop some interim solution to this problem, on July 18, 1980 the State Department promulgated interim guidelines for the processing of refugees' applications by consular officials.[310] These guidelines allow consular officers in Africa and Latin America to conduct initial screening of individual refugee applicants and cable information to an INS officer-in-charge who will make the final determination. This procedure seems cumbersome and unnecessary. There is no reason why consular officers cannot make these determinations themselves, working in consultation with the voluntary agencies that are assisting in resettlement.

Recently promulgated INS operating instructions on asylum procedures and State Department interim guidelines to consular officers also suggest that the concept of a nonideologically or geographically based refugee policy has not been completely understood or accepted. On June 16, 1980 the INS Central Office issued operating instructions on asylum and refugee adjustments.[311] Section 208.8 of those instructions creates a preferred category of asylum cases which are termed "immediate-action cases." Under this provision an application for asylum is reviewed immediately, the applicant interviewed expeditiously and the asylum request is decided promptly, subject only to communications with INS central and regional officials and with the State Department. These communications can be carried out by phone and presumably asylum can be granted within a matter of hours. Yet, the benefits of this special provision are limited to several classes of applicants including foreign diplomats, those facing a "serious threat of forcible repatriation", *any national of the Soviet Union*" or any national of fourteen nations (all communist-bloc countries, though not Yugoslavia, Afghanistan or Ethiopia) who is part of an official visit for formal cultural or athletic exchange. (section

---

309. INS Interim Regulations, *supra* note 294.
310. U.S. Dep't of State Interim Guidelines, *supra* note 294.
311. INS O.I. § 208 (1980), *supra* note 294.

72

208.8(a)). The effect of these latter provisions is to reintroduce the discriminatory treatment of refugees from noncommunist countries, despite the clear legislative intent to the contrary.[312]

Similarly, paragraph ten of the State Department interim guidelines is also unfairly discriminatory. It describes those refugees who are deemed to be of special interest to the United States. The list includes close relatives of persons in the United States, persons of "special humanitarian concern," former employees of American organizations or American individuals, and persons trained in the United States or trained abroad under United States auspices.[313] These criteria, which seem arbitrary at best, will have a tremendous impact on decisions concerning admissions. Such a determination of United States priorities should be subject to input from Congress, from nongovernmental and voluntary agencies, from the UNHCR and from the public.

In examining the implementation of the Refugee Act, Congress should review these and other provisions and urge amendments to any regulations or operating instructions that undermine the basic legislative intent of the Act. Congress should also strongly encourage the development of uniform, practical adminstrative procedures.

### *Role of INS District Offices*

The first phase of the asylum application process is perhaps the most critical. It is vital at this stage that the applicants be given an initial opportunity to explain the relevant facts of his claim in a nonadversarial setting. A judicial hearing—an event which most Americans find threatening—cannot provide this opportunity. We therefore propose that the local INS offices process asylum applications in the first instance along the lines proposed by the UNHCR in comments dated March, 1980:

> (1)  The applicant for asylum should submit at the local INS office his application in the form of a written statement of the relevant facts and motives in his own way. In addition, the applicant should complete a questionnaire concerning his personal data, his passport, relevant visa information, etc.
>
> (2)  The local INS office then should invite the applicant to participate in an interview which shall be recorded in the form of a Sworn Statement. It shall be conducted by the responsible INS official for asylum matters in that district. This interview should be conducted on the basis of guide-

---

312. *Id.*
313. U.S. Dep't of State Interim Guidelines, *supra* note 294.

IFR_AR_011783

lines issued by the INS central office in cooperation with the State Department. The guidelines should be designed to enable the local INS official to take into account special circumstances with respect to the nationality of the applicant.[314]

The district office procedures should be designed to help applicants to understand the requirements for establishing a political asylum claim and to provide the evidence necessary to substantiate such a claim. As noted by the UNHCR:

> A refugee often tells his story in nonpolitical terms. Some refugees are politically inarticulate in the sense of not being able to express their political views though they may have very definite opinions for which they have had to suffer. Others do not wish to discuss politics because they have had too much of it and prefer not to be personally involved. There are also some who are afraid to say what they think. In such latter cases their silence may well be the result of fear of persecution and it may be necessary to reveal the applicant's psychological attitudes by indirect questioning without the use of political terms or such technical expressions as "fear" and "persecution."[315]

In such cases refugees particularly need the advice and support of an attorney. Legal counsel gives substantial assistance in presenting evidence and conducting cross-examination at the hearing. Finally and perhaps most importantly, the expertise of a lawyer is often vital in the preparation of the application for asylum (Form I-589) which includes the organization of affidavits and documentary evidence so that the client is represented as fairly as possible. Therefore, the limiting of legal counsel that is inherent in the Administration's proposed policy (contained in Report of the Task Force) jeopardizes the applicant's right to due process and fundamental fairness.

To ensure that applicants receive the sympathetic assistance necessary to a fair resolution of their claims, asylum cases should be separated out from routine immigration cases and handled by specially trained officials. The practice of considering asylum cases under routine immigration procedures ignores the unique and often complex nature of these cases. Consequently, the rights of aliens to effectively present their claims for asylum are often thwarted. In the larger district offices, this may require the appointment of an Asylum Admissions Officer, an idea presented in the Select Commission Report of March 1981[316] and by the Interagency Task Force in July 1981.[317] The need for coordination at a supervisory level is particularly apparent in a large district office such as New York, where an unwieldy administrative structure often creates additional problems. As a matter of course,

---

314. Office of the United Nation High Comm'n for Refugees, U.S. Asylum Procedures (1980) (unpublished comments).
315. Eligibility Guide, *supra* note 298, at 67.
316. REPORT OF THE SELECT COMM'N, *supra* note 291, at 173-74.
317. REPORT OF THE TASK FORCE, *supra* note 292, at 1.

74

these cases are transferred repeatedly within a district office, resulting in lengthy delays, general confusion, and, all too often, loss or misplacement of files.

The Asylum Admissions Officers would supervise all aspects of asylum cases within each office and would also maintain ongoing communications with the State Department. Before beginning their assignments, every supervisor would undergo extensive training as to existing laws and regulations relating to asylum, current State Department and UNHCR practices. Each asylum supervisor would also be required to be familiar with recent directives affecting various groups of aliens and would work with the officers assigned to conduct asylum interviews. Finally, the Asylum Admissions Officer would conduct an in-house training program designed to help officials deal with the particular problems involved in gathering information from refugees, many of whom have suffered persecution and physical mistreatment. In the Administration's recently disclosed policy proposal, the Asylum Admission Officer would make final administrative decisions thus limiting the advisory and appellate roles presently included in the process. Such a decisionmaking responsibility is not included in the Select Commission's concept of an Asylum Admission Officer and serves to hinder the fairness of the application.

Interim federal regulations on asylum, dated June 2, 1980 raise a number of serious issues regarding INS implementation of the Refugee Act.[318] Many of these issues were raised in comments submitted to the INS by various public-interest and human rights organizations in July 1980. A summary of the most critical points follows:

1. We believe that every asylum applicant should have the opportunity for an initial interview with a district director, and that this opportunity should not depend on whether the applicant manages to apply for asylum before the government begins exclusion or deportation proceedings. Accordingly, the district director should have jurisdiction in all cases. The result could be achieved by a provision requiring the immigration judge to remand to the district director any case in which an application for asylum has been filed.

2. Section 208.7 provides that the district director must seek an advisory opinion from the State Department's Bureau of Human

---

318. INS Interim Regulations, *supra* note 294.

IFR_AR_011785

Rights and Humanitarian Affairs (BHRHA) in all cases. We suggest that the State Department only be consulted and asked to advise INS in those cases where the district office has doubts on factual questions. (See the section on Refugee Review Board on pages 79-81). It is unrealistic to think that BHRHA will have sufficient staff to consider carefully every application for asylum in the country.

3. Furthermore, mandatory reference may encourage district directors to shift the responsibility for decisionmaking; if an overworked State Department fails to respond or responds negatively after a cursory review, district directors may feel relieved from the burden of the careful review necessary to reach a fair determination. Finally, the procedure is costly; it often creates an additional layer of review where none is necessary.

4. The regulations provide no appeal from the denial of an asylum application by a district director (section 208.8(c)). No exception is made for cases in which the BHRHA recommends asylum but the district director denies it. A change granting a right of appeal to the INS regional commissioner in all cases would give asylum applicants a right already accorded in much less sensitive and critical proceedings, such as applications for changes in nonimmigrant status (*e.g.* from visitor status to student status under 8 C.F.R. section 103.1(m)(12)(a) (1980)). At the very least, in cases where the BHRHA recommends asylum and the district director denies it, the application should be certified to the INS regional commissioner for final decision (the procedure under prior regulations).

5. Section 208.8(f) of the regulations provides that the grant of asylum shall be for one year and that the asylee shall be interviewed annually to determine continued eligibility. This provision makes the asylee's position unnecessarily precarious and is totally inconsistent with the UN Convention and Protocol Relating to the Status of Refugees, to which the United States is a party. The UN Convention makes asylum a legal status which can only be withdrawn upon the occurrence of certain specified events.

6. To grant asylum only in one-year increments subject to a yearly eligibility review will make finding employment and otherwise leading a normal existence impossible for many applicants. The yearly review will also place a large and unnecessary burden on the INS in terms of both time and money.[319]

---

319. Unpublished comments to the June 2, 1980 Interim Regulations were submitted by a number of organizations including the Lawyers Committee for International Human Rights, the Alien Rights Law Project of the Washington Lawyers

76

Again federal asylum regulations should also provide that applicants have a right to assistance from counsel or another representative of their choosing in preparing their questionnaires and applications and in making sworn statements to INS officials. As mentioned above, assistance from a lawyer or other trusted person may be the only means by which many applicants will be able to fully state their cases. For this assistance to be meaningful, counsel must, of course, be permitted to participate in the interview, (*i.e.* to clarify questions or to object to improperly transcribed answers). To fairly implement the right to counsel, applicants should be notified of this right and advised of the existence of free legal service programs in the district. It is also important that the regulations provide adequate time during the asylum proceeding for the preparation of the claim. Efficiency is not served by oppressive deadlines which may lead to unjust decisions.

### *Role of the United Nations High Commissioner for Refugees*

The problems being discussed are global in nature and demand an internationally coordinated response. Thus, the United States should seek at every opportunity to increase international participation in this process and encourage various resettlement efforts in different countries. This process can best be accomplished by relying more closely on the office of the UNHCR which, since its formation following World War II, has developed into a highly respected and professional international agency—a world expert in refugee matters.

Although the expertise and impartiality of the UNHCR make it uniquely qualified to evaluate claims for asylum and to insure that the United States is complying with international standards, its participation has been largely ignored under existing United States law and practice. The UNHCR has reviewed some individual cases that have been referred to it by the State Department and occasionally has undertaken a more systematic review (*e.g.* with Haitian and Cuban refugees) but its role has not been formally incorporated into the United States asylum process. By

Committee for Civil Rights Under Law, the National Lawyers Guild, the International Human Rights Law Group and the American Council of Voluntary Agencies. (Comments on file with the Lawyers Committee for International Human Rights, N.Y., N.Y.).

IFR_AR_011787

adopting the Protocol Relating to the Status of Refugees, the United States made a commitment to abide by international law in its treatment of refugees. Congress gave meaning to this commitment by adopting the Refugee Act of 1980 which, as stated above, conforms the definition of "refugee" to that contained in the Protocol. It is now incumbent on the executive branch to make good our intention to comply with international standards by conforming the administration of our refugee law with the advice of UNHCR.

In a number of countries, including Canada and Australia, the Office of the High Commissioner participates directly in procedures established for the determination of refugee status. Such participation is based on Article 35 of the UN Convention and the corresponding Article II of the 1967 Protocol which provide for the cooperation by the contracting states with the High Commissioner's office.[320] Both the Canadian and the Australian models also illustrate the possibility of giving nongovernmental organizations a role in the advisory process.[321]

In light of the procedures adopted by these and other countries and considering the authority and qualification of the UNHCR, we make the following recommendations to provide a formal mechanism for the incorporation of UNHCR into United States refugee and asylum policy:

1. The legal advisor of the State Department or the General Counsel of the INS should consult on a regular basis with representatives from the UNHCR concerning international instruments and their implementation. Such a consultation would allow for clarification of definitional questions and insure that administrative procedures and subsequent guidelines conform to United States international obligations.

2. To insure that the procedures and guidelines are carefully and sensitively applied, the UNHCR should have a formal role in training INS and State Department personnel.

3. The UNHCR should have jurisdiction to give advisory opinions in individual refugee cases. These cases would be submitted by the individual applicant who should be informed that he has a right to contact the UNHCR. Approval for review would be at the discretion of the UNHCR. In selecting cases and in presenting an advisory opinion, the UNHCR should have access to the applicant's entire file. The advisory opinion ultimately reached should

---

320. UN Convention, *supra* note 7.
321. B. Jackman & B. Knaza, Refugees (1980) (unpublished paper presenting a detailed description of the Canadian system. On file with the Lawyers Committee for International Human Rights, N.Y., N.Y.).

IFR_AR_011788

then be submitted to the State Department and become part of the record of the case. The role of the UNHCR could best be incorporated into the United States process in the context of a refugee review board.

*Board for the Determination of Refugee Status*

We recommend the establishment of a "Board for the Determination of Refugee Status and Asylum" (Board). Such a board, which is also suggested by the Select Commission,[322] would serve multiple functions such as:

1.  Helping to develop and clarify refugee and asylum standards and procedures;

2.  Overseeing and reviewing all aspects of implementation of the Refugee Act;

3.  Participating in the executive review and determination of annual refugee allocations;

4.  Reviewing applications for political asylum deemed frivolous by the district officer; and

5.  Consulting with Congress and the Executive when emergency situations arise.

The proposed Board would be composed of seven members: three representatives of the executive branch, including an official of the State Department (representing the BHRHA, Office of the Refugee Coordinator, Office of the Legal Advisor and Bureau of Consular Affairs); an official from the Department of Justice (representing the INS); and perhaps a representative of the Executive Office of the White House. The Board would also include three public members that could represent the various voluntary and church-related agencies that participate in the resettlement process, other charitable, civic, labor and business representatives and perhaps a representative from a nongovernmental human rights organization. These three positions could rotate annually or biannually in order to provide each group with a chance to participate in this process. The seventh member of the Board would be from the office of the UNHCR. The UNHCR would participate in an advisory capacity and would serve in much the same role as it does in Canada, Australia and other countries.

The Board would meet regularly to examine overall United

322. REPORT OF THE SELECT COMM'N, *supra* note 291, at 169-71.

79

States refugee and asylum policy, concentrating on the following areas:

1. *Development and clarification of refugee and asylum standards and procedures.*

As discussed earlier, in the initial period following the passage of the Refugee Act a number of problems and questions have arisen concerning the standards for determining refugee status, and in developing procedures to make and carry out these determinations. A number of the areas mentioned in this report will require careful and ongoing discussion and study. While the Commission should be able to make a significant initial contribution to that process, ongoing review is critical. The mandate of the Board can and should include these functions. In this context the Board would consider, for example, the criteria for selecting refugees and help to interpret concepts such as "special humanitarian concern" and "national interest."

2. *Overview of the implementation of the Refugee Act.*

For similar reasons, it is essential that ongoing review of the implementation of the Refugee Act be incorporated into the work of the Board. Issues such as the processing of refugees by consular officers overseas could be monitored by the Board at regular intervals. INS processing of asylum applications would be reviewed periodically. The Board would also make recommendations concerning the training of INS personnel and consular officials, and examine organizational structures of these agencies. It would report annually to Congress and the Executive, with specific recommendations for reform.

3. *Participation in the review and determination of annual refugee allocations.*

The Board would have an important advisory and consultative role in the annual refugee allocation process. In this regard we propose that three months prior to the official consultation process provided for by section 207 of the Refugee Act, the Board would hold public hearing examining the worldwide refugee situation in order to formulate an appropriate allocation formula. These hearings would formalize input of the United Nations, various voluntary agencies, human rights organizations, and other concerned groups and individuals, thus helping to broaden and depoliticize the decisionmaking process. These hearings would constitute a world survey of refugees similar to the annual State Department evaluation of human rights. Following the hearings, the Board would be in a position to report on its findings to members of Congress, and to participate, formally and informally, in the consultation process.

80

4. *Review of frivolous cases.*

We propose that three members of the Board, one from the executive branch, one from the public-interest groups, and the UNHCR representative, be involved in reviewing those cases that the district office had deemed frivolous. In such cases the Board would serve an appellate function. If the Board agreed with INS that the cases were frivolous, the applicant would be subject to immediate deportation proceedings. If, as may occasionally happen, the Board disagreed with INS and concluded that a case had merit or needed further information, it would be referred to the State Department for an advisory opinion.

5. *Consultation with Congress and the Executive when emergency situations arise.*

The Board could also be utilized to examine various policy considerations in emergency situations. Thus, for example, the recent crisis involving Cubans and Haitians in Florida could have been evaluated by the Board, which could then have issued a report making observations and recommendations to assist the Congress and the Executive in this crisis.

This outline of potential roles for the Board is by no means definitive. The concept of a refugee board should be flexible in nature and its mandate broad enough to allow it to respond to changing circumstances. Most importantly, the Board provides an opportunity to develop an open and ongoing evaluation of United States refugee policy, a task that can be accomplished most effectively with the cooperation and active participation of the UNHCR and various nongovernmental organizations whose daily work makes them uniquely qualified to contribute to this process.

*The Role of the State Department*

The input of the State Department is important in the evaluation of the objective basis of the applicant's fear of persecution based on race, religion, nationality, membership in a social group or political opinion. An applicant's background cannot be assessed without a current understanding of the political and social situation in his native country. Although the State Department's view of particular countries may be colored by foreign policy considerations, it is still the only government agency charged with the responsibility of gathering and analyzing this necessary information. We therefore believe that the State Department's view

81

should be sought except in cases where their district director has sufficient information to grant asylum.

The Department must have a formal role in the decisionmaking process, not just an option to comment. Such a role can be instituted by mandatory State Department review of unclear cases and through the Department's participation in the "Board for the Determination of Refugee Status and Asylum" mentioned in the preceding section. Procedures have been set forth in the interim regulations to give the State Department a formal role. The regulations provide that the district director must seek an advisory opinion from the BHRHA in all cases. We believe that clearly meritorious cases need not be referred to the BHRHA. Given the problems of staff size and budgetary constraints, the BHRHA cannot consider every application for asylum in the country. Mandatory reference of clearly meritorious cases will detract from the State Department's consideration of truly difficult cases, encourage district directors to shift responsibility for decisionmaking, and unnecessarily burden the administrative process.

In light of these problems, we make the following recommendations for efficient use of State Department resources:

1. The district directors should be instructed to grant asylum in clearly meritorious cases without reference to the BHRHA and to pass on cases deemed frivolous to the Board also without consulting the BHRHA.

2. The district offices should be required to report their determination in asylum cases to both the BHRHA and the Board. This would allow the State Department to monitor treatment of asylum applicants throughout the country without participating directly in each decision.

3. In order to prevent undue delay in the resolution of asylum applications, the regulations should provide that if the State Department fails to respond or set forth reasons requiring an extension within the present forty-five day limit, and if the applicant so requests, the district director shall decide the case without the advisory opinion.

4. The role and training of consular officers should be reexamined. The procedures outlined in the State Department's July 18, 1980 Interim Guidelines[323] for the processing of refugee applications by consular officers are cumbersome and time consuming. We recommend that consular officers be given independent jurisdiction to make refugee determinations without references to the INS officer-in-charge. This responsibility represents a new under-

---

323. *See* note 294 *supra.*

82

taking for consular officers who traditionally have been concerned with the processing of visa applications. For this reason, it is important that the consular officials be trained and supervised. We propose that the Foreign Service Institute, with the assistance of the UNHCR and nongovernmental organizations, provide the necessary education for prospective officers and training sessions for present officers.

5. Nongovernmental and voluntary organizations should also play a role in providing the officers with information necessary to determine difficult refugee cases. While the State Department section 502(b) Human Rights Country Reports[324] often provide valuable information, they are prepared by a political entity that is also concerned with other foreign policy considerations. Thus, it is crucial that they not be the sole source of information in determining current conditions in a particular area of the world. Reports by Amnesty International and other such groups may be equally if not more informative and should be used by all overseas consular posts. Coordination of the consular officer's work concerning refugees could be provided by a supervisory official on each continent who would be responsible for an up-to-date and detailed knowledge of regulations and operating instructions, an understanding of the social and political climate in each country, and informing the consular officers of new guidelines and procedures.

6. A procedure for appeal of decisions in questionable cases should be established. Neither section 208 of the June INS Interim Regulations nor the subsequently promulgated interim guidelines for consular officers[325] provide a right to appeal to applicants for refugee status. This omission deserves serious consideration by the Select Commission. Refugee cases can, and often do, involve the physical safety of applicants and their families. Yet the current regulations, which grant unfettered discretion to State Department consular officials and INS overseas officers-in-charge, fail to allow any review of these decisions. This policy increases the probability of uncorrected errors and abuses of discretion. These problems are especially serious in the initial

---

324. Published pursuant to §§ 116(d) and 502(b) of the Foreign Assistance Act of 1961 as amended, 22 U.S.C. §§ 2151-2396 (1961). See, e.g., U.S. DEP'T OF STATE, COUNTRY REPORT ON HUMAN RIGHTS (1981).

325. INS Interim Regulations and U.S. Dep't of State Interim Guidelines, *supra* note 294.

IFR_AR_011793

period, since consular officials are undertaking these responsibilities for the first time, presumably without any formal training, or detailed written instructions as to how to gather information in these cases.

A second complicating factor is the cumbersome and time-consuming procedure that involves the participation of both consular officials and INS overseas officers. Presumably the final decision in these cases will be made by INS officers who will be relying on a cable summary of each case. Often applicants will be thousands of miles away in areas where existing conditions are likely to be unfamiliar to INS officers. According to several administration proposals which are yet to be aired, the new policy will greatly diminish the appeals process by limiting the right to appeal to those applicants who are in status.

We recommend, in view of the difficulties enumerated above, that Congress should enact an appropriate appeals procedure which would allow review of decisions in all questionable cases.

### *The Consultation Process*

Clear legislative intent to "assure that Congress has a proper and substantial role in all decisions on refugee admissions" is apparent from the emphasis on the consultation process in section 207 of the Refugee Act and the explicit definition of the procedure provided by section 207(e).[326]

The Refugee Act deliberately institutionalizes what was previously an informal, *ad hoc* process of consultation. Section 207 requires consultation between the President and Congress concerning the allocation of refugee numbers. It specifies that discussions shall occur between "[c]abinet-level representatives of the President" and members of the Judiciary Committees of the House and Senate. The stated purpose of the consultation is:

---

326. 8 U.S.C. § 1157(e) (1980). Congress is to be provided, "to the extent possible", with the information listed below:

   (1)  A description of the nature of the refugee situation.
   (2)  A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.
   (3)  A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.
   (4)  An analysis of the anticipated social, economic and demographic impact of their admission to the United States.
   (5)  A description of the extent to which other countries will admit and assist in the resettlement of such refugees.
   (6)  An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.
   (7)  Such additional information as may be appropriate or requested by such members.

84

[t]o review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest . . . .[327]

The consultation process allows for more informed decision making concerning the allocation of refugee numbers and helps in the implementation of a coherent refugee policy.

If this goal is to be accomplished and if the consultation is to be meaningful, Congress should be informed in detail of the Administration's refugee plan well in advance of the official consultation. We believe that "at least two weeks in advance of discussions . . . ," as provided by Section 207(e), is an insufficient period of time. As pointed out by several members of the Select Commission, Congress must have time to evaluate the proposal, allow public scrutiny of the numbers and obtain the views of nongovernmental organizations, human rights groups and the UNHCR. For these reasons, we recommend that the allocation numbers be submitted thirty days before the formal consultation process occurs. Prior to congressional evaluation, the proposed "Board for the Determination of Refugee Status and Asylum" would hold hearings in an effort to institutionalize input from the UNHCR, voluntary agencies and nongovernmental organizations (such as Amnesty International). These hearings could provide a forum to review the world refugee situation and to gather information on human rights conditions that may help predict future refugee problems. Once the proposed allocation numbers are submitted to Congress, Congress could then hold informal hearings subsequent to those of the Board but prior to the formal consultation. Here, the allocation figures could be evaluated in light of the findings of the Board and the testimony of the participants. Only within this expanded time framework can Congress responsibly perform its role in refugee admissions decisions.

*Summary of Recommendations*

To highlight, some of the more general recommendations are briefly summarized below:

1. Amend regulations and instructions:

In light of the legislative intent of the Act, administrative regulations and operating instructions concerning refugee and asylum

---

327. 8 U.S.C. § 1157(e) (1980).

IFR_AR_011795

processing should be amended to eliminate any ideological or geographical bias. Determination of United States priorities concerning criteria for decisionmaking should be subject to public review, input from Congress as well as nongovernmental and voluntary agencies and the UNHCR.

2. Role of the INS District Offices:

The district director should have jurisdiction in all asylum cases. Thus, the immigration judge should be required to remand to the district director any case in which an application for asylum has been filed. Asylum cases should be separated from routine immigration cases and handled by specially trained officials. In larger district offices an asylum officer should be appointed and trained. The officer would maintain ongoing communications with the State Department, work with officers assigned to conduct asylum interviews and conduct an in-house training program. Regulations should provide applicants with the right to assistance from counsel when preparing their applications and during their interviews. Applicants should be notified of this right and advised of the existence of free legal service programs in the district.

3. Role of the UNHCR:

The legal advisor of the State Department or the General Counsel of the INS should consult on a regular basis with representatives from the UNHCR concerning international instruments and their implementation. To insure that the procedures and guidelines are carefully and sensitively applied, the UNHCR should have a formal role in training INS and State Department personnel. The UNHCR should have jurisdiction to give advisory opinions in individual refugee cases. These cases would be submitted by the individual applicant who should be informed that he has a right to contact the UNHCR and approved for review at the discretion of the UNHCR. In selecting cases and in presenting an advisory opinion, the UNHCR should have access to the applicant's entire file. The advisory opinion ultimately reached should then be submitted to the State Department and become part of the record of the case.

4. Development of a refugee board:

A "Board for the Determination of Refugee Status and Asylum" composed of three representatives of the executive branch, three public members representing voluntary and church-related agencies, and one representative from the UNHCR should be established. This Board would:

a. help to develop and clarify refugee and asylum standards and procedures;

86

   b.  oversee and review all aspects of implementation of the
       Refugee Act;
   c.  participate in the executive review and determination of an-
       nual refugee allocations;
   d.  review those applications for asylum deemed frivolous by
       the district officer; and
   e.  consult with Congress and the Executive when emergency
       situations arise.
   5.  Role of the State Department:
The district directors should be instructed to consult the State
Department only in cases where they have doubts on factual
questions;
The district offices should be required to report their determina-
tion of asylum cases to the BHRHA. This would allow the State
Department to monitor treatment of asylum applicants through-
out the country without participating directly in each decision;
In order to prevent undue delay in the resolution of asylum appli-
cations, the regulations should provide that if the State Depart-
ment fails to respond or set forth reasons requiring an extension
within the present forty-five day limit, and if the applicant so re-
quests, the district director shall decide the case without the advi-
sory opinion.
   The role and training of consular officers should be reexamined.
In the procedures outlined in the State Department's July 18, 1980
Interim Guidelines for the processing of refugee applications, con-
sular officers should be given independent jurisdiction to make
refugee determinations without reference to the INS officer-in-
charge. Before undertaking this new responsibility, consular offi-
cials should be trained and a supervisory system be established.
   The UNHCR and nongovernmental and voluntary organizations
should play a role in the education of consular officers and in pro-
viding them with information necessary to determine difficult ref-
ugee cases. The State Department section 502(b) Human Rights
Country Reports which are influenced by foreign policy and polit-
ical considerations should not be the sole source of information in
determining current conditions in particular areas of the world.
   Coordination of the consular officers' work concerning refugees
could be provided by a supervisory official on each continent who
would be responsible for knowledge of regulations and operating
instructions, and for understanding of the social and political cli-

87

IFR_AR_011797

mate in each country and informing the consular officers of new guidelines and procedures. In order to protect the safety of applicants and their families and to prevent uncorrected erorrs or abuses of discretion, a procedure for appeal of decisions in questionable cases should be established. This is particularly important if INS overseas officers relying on cable summaries are to make the final decision in cases referred to them by consular officers.

6. Role of the allocation process:

A fundamental reevaluation of the allocation process should be undertaken. The allocation of refugee numbers thus far indicates that the geographical and ideological biases embodied in earlier law will be difficult to eliminate. The Commission should give careful consideration to this issue, and advise Congress and the President as to how the allocations process should be modified to ensure fair considerations of all applications.

7. Role of the consultation process:

If the official consultation process provided by the Act is to be meaningful, Congress should be provided with the proposed allocation numbers and the administration analysis of the refugee situation ninety days before the formal consultation is to take place. This would allow time for the proposed "Board for the Determination of Refugee Status and Asylum" to hold hearings, and for Congress to evaluate the proposal, obtain the views of nongovernmental organizations, human rights groups and the UNHCR, and hold its own informal hearings.

<div align="center">CONCLUSION</div>

Throughout the four decades which have passed since the end of World War II, the United States has attempted to define its role in dealing with the refugee problem through administrative and legislative efforts. The result of these efforts is reflected in the enactment of the Refugee Act of 1980. During these past four decades, debate and compromise have taken place in the legislative arena among competing forces interested in refugee and asylum policy. The participating forces have been the Executive, Congress and various nongovernmental agencies concerned with refugee resettlement and human rights.

The records from their past debates are replete with references to certain principles which became increasingly persistent themes. The Refugee Act attempts to embody these themes by recognizing that principled, humanitarian considerations must inform refugee selection procedures; that the expediency of perceived, short-term foreign policy interests should not be the

88

*Refugee Act of 1980*
SAN DIEGO LAW REVIEW

exclusive or even primary criteria in refugee admission policy, nor should politicized decisionmaking dictate asylum determinations; and that Congress and the public must be assured of an appropriate, functional role. The legislation provides a sound basis from which a comprehensive, objective and fair refugee and asylum policy can be instituted. The key to the fulfillment of these goals lies in the implementation of the Refugee Act in a manner that does not violate its purpose or the legislative history that produced it. The recommendations set forth above can provide the guidance necessary to such implementation.

IFR_AR_011799

IFR_AR_011800

5/4/23, 10:00 PM
Stars align for Cuban migrants as record numbers seek better life in US | Cuba | The Guardian
Case 1:24-cv-01702-RC Document 53-1 Filed 09/27/24 Page 595 of 660



**The Observer**

🕐 This article is more than **10 months old**

# Stars align for Cuban migrants as record numbers seek better life in US

The journey to America, often via Nicaragua, has become more viable – and many are taking their chances at the border

**Ed Augustin** *in Havana*

Sun 12 Jun 2022 07.00 EDT

ne morning last spring, 22-year-old Ernesto Hernández set out from the outskirts of Havana on a rickety boat hoping to cross the Florida Straits. The plan was to leave behind a dilapidating communist-ruled island in which he saw no future, and sail into an American dream.

Nobody has heard from him, or the other six people onboard, since.

"We all know he drowned," said Camilo Soria, 22, a childhood friend. "I heard adults talking about things like this when I was a kid, but you don't really know what it means until you lose somebody."

IFR_AR_011891

The number of Cubans leaving the island will reach an all-time high this year, analysts predict. The US Coast Guard has intercepted nearly 2,000 Cubans since October. But far more are flying to the Latin American mainland before journeying up to the US-Mexico border: 114,000 have crossed into the US since October, according to US Customs and Border Protection – 1% of the island's entire population).

Following a crackdown on protesters who flooded the island's streets in unprecedented numbers last summer, some Cubans are emigrating for political reasons. But with the island's economy mired in a deep crisis with no end in sight, the vast majority are leaving for a better life.

Soria, who is studying sports science at the University of Havana, says he knows about 40 people – friends, classmates, neighbours – who have left in recent years.

Does he want to leave too? "Yes, of course," he answered in a recent phone interview, before revealing he was standing in line outside the Mexican embassy in Havana, trying to get his papers in order.

Trump's "maximum pressure" policy towards Cuba, mostly left in place by the Biden administration, succeeded in driving down people's living standards. The pandemic was the last straw: for two years now, standing for hours in line for basic goods like chicken has become a dreary new normal.

And for now at least, the stars have aligned for those who want to leave.

"If you can get to the US border you are going to get in," said Andrew Selee, the president of the Migration Policy Institute, a Washington thinktank.

As US-Cuban relations have soured, cooperation on migration has broken down. Since the Trump administration shuttered consular services at the US embassy in Havana 2017 after diplomats reported mysterious health incidents, legal migration to the US has been largely shut off: Washington has an accord with the island to issue an annual 20,000 migratory visas, but has issued barely any.

Meanwhile, Cuba has stopped accepting flights carrying "excludables" from the US, leaving the Biden administration with no way to deport. "That's the primary deterrence the US has for people who cross unauthorized," said Selee. "They don't have that at the moment."

The journey for Cuban migrants, while still treacherous, has also become more viable.

IFR_AR_011892

5/4/23, 10:00 PM
Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 597 of 660
Stars align for Cuban migrants as record numbers leave island to arrive in US | Cuba | The Guardian

Historically, people tried to cross the 90-mile strait by sea using rafts, hijacked ferries or even floating pickup trucks. Legal avenues to leave were scant; government inspectors would make an inventory of people's possessions – even counting up the cutlery – before granting exit visas.

But these days the Communist party has eased travel restrictions, and the primary problem has switched from getting a visa to leave the island, to getting a visa for another country.

That changed last November when Daniel Ortega's government allowed Cubans to travel visa-free to Nicaragua (seemingly to create a bargaining chip with the US while the ruling clique negotiates for sanctions relief). This has created a land bridge to the US for wealthier Cubans – those with a car or a house to sell, or with family on the outside. They can now buy a $4,000 one-way ticket to Managua and then make their way overland to the southern border.

Rather than sneak across, Cubans tend to approach immigration officials to claim asylum. With border crossings from all nationalities into the US are on course to break all records this year, authorities are overwhelmed, which has added to the backlog in asylum cases.



📷 Migrants from Cuba arrive in the US after crossing the Rio Grande. Photograph: Dario Lopez-Mills/AP

IFR_AR_011893

"That's an enormous advantage for Cubans," said William LeoGrande, professor of government at American University. "Because once they are in, the clock starts to run … If they are in the US for a year and a day they become eligible to request permanent residence – a privilege that no [other] nationality has."

Rafael Hernández, editor of the state-linked social science journal Temas, said obtaining US permanent residence under the Cuban Adjustment Act is simple.

"It's like taking out a wisdom tooth – just something you have to go through," he said.

But the journey is by no means without risk: experts say Cubans are among the nationalities most likely to get kidnapped when nearing the Mexican side of the border. Criminal groups know that they will have paid thousands to get this close, and most likely have family in the US to fork out a ransom.

Dayane Medina, 32, and her husband Manuel last year sold their house, their children's toys, and most of their clothes to buy Mexican visas.

Their plan was to reunite with her grandmother in Jacksonville, Florida, by crossing the border near the city of Mexicali. For $21,000 a "coyote" (people trafficker) had arranged for them to walk into the US by waiting for the sluice gates to close before crossing a dam with their three- and five-year-old daughters.

But haunted by stories of shootings, rapes and robberies, she has had a change of heart. Now she is set on staying in Mexico.

"The road is too uncertain," she said in a phone interview. "There's always fear when children are involved."

---

I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest – not profit motives.

And we avoid the trap that befalls much US media - the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in

IFR_AR_011894

5/4/23, 10:00 PM
Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 599 of 660
Cuba migration for Cuban migrants as record numbers leave the island | Migration | The Guardian

the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible. And as a global news organization, we're able to provide a fresh, outsider perspective on US politics – one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone – whether they can afford to pay for news, or not.

**If you can, please consider supporting the Guardian today. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

| Single | Monthly | Annual |
|--------|---------|--------|
| $5 per month | $7 per month | Other |

Continue  →     Remind me in June

IFR_AR_011895

Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 600 of 660

# Most viewed

IFR_AR_011896

Personality and Individual Differences 107 (2017) 190–194



Contents lists available at ScienceDirect

## Personality and Individual Differences

journal homepage: www.elsevier.com/locate/paid



# Acquiescence response styles: A multilevel model explaining individual-level and country-level differences



Beatrice Rammstedt *, Daniel Danner, Michael Bosnjak

*GESIS – Leibniz Institute for the Social Sciences, Germany*

ARTICLE INFO

*Article history:*
Received 2 September 2016
Received in revised form 9 November 2016
Accepted 15 November 2016
Available online 29 November 2016

*Keywords:*
Acquiescence
Multilevel model
Individual-level determinants
Country-level determinants
European Social Survey

ABSTRACT

Acquiescence has been found to distort the psychometric quality of questionnaire data. Previous research has identified various determinants of acquiescence at both the individual and the country level. We aimed to synthesize the scattered body of knowledge by concurrently testing a multilevel model encompassing a set of presumed predictors of acquiescence. Based on a representative sample comprising almost 40,000 respondents from 20 European countries, we analyzed the effects of the country-level indicators economic wealth, corruption level, and collectivism and the individual-level indicators age, gender, educational attainment, and conservatism. Results revealed that 15% of the variance in acquiescence was due to country-level variations in corruption levels and collectivism. Differences among individuals within countries could be partially explained by conservatism and educational attainment.

© 2016 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

Acquiescence—that is, the tendency to respond to descriptions of conceptually distinct attributes or attitudes with agreement/affirmation (agreement acquiescence) or disagreement/opposition (counter-acquiescence) regardless of their content—has been widely recognized as a threat to the validity of questionnaire-based data (e.g., Rammstedt, Goldberg, & Borg, 2010; Soto, John, Gosling, & Potter, 2008). Specifically, acquiescence can affect mean levels in item responding, thereby yielding misleading mean differences. For example, Van Vlimmeren, Moors, and Gelissen (2015) showed that country-level differences in trust in NATO differed substantially before and after controlling for acquiescence. Such effects of acquiescence on mean-level differences can occur if acquiescence differentially affects item responding across countries. Moreover, acquiescence may blur the intended factorial structure of a questionnaire by biasing item variances and covariances (Rammstedt et al., 2010). Finally, it has been shown that acquiescence can substantially bias the associations between personality items and behavioral criteria, thereby attenuating predictive validity (Danner, Aichholzer, & Rammstedt, 2015).

Given the threats that acquiescence poses to the validity of questionnaire-based data, the overall aim of the study reported here was to summarize and integrate the available body of knowledge with regard to central socio-demographic and social indicators into one single conceptual model encompassing the presumed determinants of acquiescence.

In what follows, we begin by summarizing the reported evidence on individual-level determinants and then address country-level predictors.

### 1.1. Individual-level predictors of acquiescent responding

Numerous studies have revealed that individuals differ systematically in their tendency to acquiesce. However, the empirical evidence is not univocal. While some studies have suggested that age is positively related to acquiescence (e.g., Meisenberg & Williams, 2008; Weijters, Geuens, & Schillewaert, 2010), others have failed to find evidence in support of this notion (e.g., Eid & Rauber, 2000). Findings with regard to possible effects of gender on acquiescent responding are even more heterogeneous. Some studies have suggested that women show, on average, a higher tendency toward acquiescent responding than men (e.g., Weijters et al., 2010), whereas others have found no gender effect (e.g., Marin, Gamba, & Marin, 1992). However, a broad consensus exists that educational attainment is a source of systematic differences in the tendency to acquiesce. Results of several studies have indicated that acquiescence appears to be more frequent among persons with a lower level of educational attainment (e.g., Narayan & Krosnick, 1996; Rammstedt et al., 2010; Rammstedt & Kemper, 2011). It has been suggested that persons with relatively low education have less clear self-concepts, smaller vocabularies, and less developed verbal comprehension skills than more highly educated persons. This may make them relatively uncertain when it comes to responding to questionnaire items, and may thus leave more room for the influence of systematic response biases (e.g., Goldberg, 1963). For some countries (e.g., Germany), this inverse effect of education on acquiescence has been widely replicated. Moreover, there is evidence to suggest that this effect can be replicated in several other countries, albeit with some exceptions (Danner et al.,

* Corresponding author at: GESIS – Leibniz Institute for the Social Sciences, PO Box 12 21 55, 68072 Mannheim, Germany.
*E-mail address:* beatrice.rammstedt@gesis.org (B. Rammstedt).

http://dx.doi.org/10.1016/j.paid.2016.11.038
0191-8869/© 2016 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

IFR_AR_011905

2015; Rammstedt, Kemper, & Borg, 2013). However, results do not indicate a simple generalizability of the inverse effect of education on acquiescence across all countries (Meisenberg & Williams, 2008; Rammstedt et al., 2013). Rather, countries appear to differ systematically in this regard. Moreover, Smith and Fischer (2008) were able to show that individual-level interdependence, used as a proxy for a collectivistic cultural orientation, was positively related to acquiescence. Taken together, the literature on individual-level determinants of acquiescence partially supports the role of age, gender, level of educational attainment, and degree of conservatism in acquiescent responding.

## 1.2. Country-level predictors of acquiescent responding

In addition to individual differences in acquiescent responding, recent research has identified cross-national differences in the tendency to acquiesce, as reflected by mean-level differences (e.g., Javeline, 1999; Johnson, Kulesa, Cho, & Shavitt, 2005). For example, Van Herk, Poortinga, and Verhallen (2004) investigated acquiescent response tendencies in six European countries. The results revealed that respondents in the Mediterranean countries scored higher on acquiescence than those in the Northwestern European countries. A worldwide investigation of acquiescence was conducted by Meisenberg and Williams (2008). Based on the World Value Survey conducted in 80 countries, they showed that response styles were most prevalent in less developed countries and that—at the country level—acquiescence could best be explained by the country's corruption level. The authors interpreted their findings by suggesting that people who live in corrupt societies tend to be subservient to powerful others—a tendency that carries over into their survey responses. A similar effect was reported by Smith (2004), suggesting that acquiescence is significantly less pronounced in certain European countries than in countries with lower levels of economic development such as Panama, Nigeria, or the Philippines.

In addition, there is a broad consensus that response styles are systematically related to cultural variables (Hofstede, 2001; Schwartz, 1994) and that they tend to be more pronounced in traditional cultures (Javeline, 1999). Specifically, several studies have suggested that the prevalence of acquiescence differs across countries and depends on cultural orientations. For example, a study by Johnson et al. (2005) indicated that collectivistic cultures are especially prone to acquiescent responding. The authors hypothesized that members of collectivistic nations experienced greater cultural pressure to acquiesce (Smith & Fischer, 2008). Support for this association was also provided by Harzing (2006), who investigated 26 countries from all major cultural clusters in the world. However, Grimm and Church (1999) could not confirm the effect of collectivism on acquiescence response style.

In sum, the results of cross-national comparative research suggest that there are systematic differences between countries with regard to the mean tendency to acquiesce and that these differences are a function of the country's social and economic situation and its cultural orientations—in particular, the degree to which collectivistic values are endorsed. Thus, we expect that individual differences at the country level can be explained by these variables.

## 1.3. Assessing acquiescent responding

Even though the nature of, and the reasons for, acquiescence are still unclear, different approaches are used to investigate a person's tendency toward acquiescence. Some studies—especially those that use only positively keyed items—use the percentage or ratio of items agreed with (e.g. Harzing, 2006). For this approach, too, different methods of including and weighting the responses are employed across studies. Instead of using only positively keyed items, recent studies (e.g. Johnson et al., 2005, Rammstedt & Kemper, 2011; Rammstedt & Farmer, 2013; Rammstedt et al., 2010, 2013; Soto et al., 2008) have used, whenever possible, pairs of positively and negatively coded items assessing the same construct (e.g., *Prefer to be with others* and *Like to be all by oneself*).

Persons with a high tendency toward acquiescence should have comparatively higher mean scores across these item pairs than those with a lower tendency to acquiesce. Even though some studies report only a weak consistency of acquiescence across different scales in general (e.g. Ferrando, Condon, & Chico, 2004), other studies report latent correlations $r > 0.71$ between acquiescence indicators of such pairs of negatively and positively keyed items (Danner et al., 2015).

## 1.4. The present study

As summarized above, past research has yielded evidence of individual-level determinants (age, gender, and educational attainment) and country-level predictors (economic development, degree of collectivism, corruption level) of the tendency to acquiesce. However, previous studies have yielded inconsistent findings with regard to these characteristics. These inconsistencies may be due to the fact that most of these studies used highly selective samples that were not representative of the respective populations. In addition, to date no study has concurrently and systematically investigated these country-level and individual-level characteristics, taking into account the multilevel interrelationships between them.

The present study aimed to fill this gap by investigating potential determinants of acquiescence by simultaneously analyzing the different country-level and individual-level characteristics and by relying on data that were representative of the population in 20 European countries. Specifically, we investigated the impact on the tendency toward acquiescent responding of the country-level characteristics economic wealth (GDP), corruption level, and level of collectivism in combination with the individual characteristics age, gender, educational level, and degree of conservatism. Individual-level and country-level predictors can be combined in one multilevel model where respondents ($i$) are nested within countries ($j$), and differences in acquiescence at the respondent level are modeled as acquiescence $_{ij}$ = $\beta_{0j}$ + $\beta_1$(age) + $\beta_2$(gender) + $\beta_3$(education) + $\beta_4$(conservatism) + $\varepsilon_{ij}$, and differences at the country level are modeled as $\beta_{0j}$ = $\gamma_{00}$ + $\gamma_{01}$ (wealth) + $\gamma_{02}$(corruption) + $\gamma_{03}$(collectivism) + $\upsilon_{0j}$.

## 2. Method

### 2.1. Data source

The present analyses are based on data of the European Social Survey (ESS; www.europeansocialsurvey.org/data). The ESS is a cross-national survey that investigates changes in social structure, conditions, and attitudes in Europe. A key aim of the ESS is to implement high quality standards in its methodology. These high quality standards are especially relevant for the translation and adaptation of the questionnaires to guarantee comparability across the different countries. The survey has been conducted every two years since 2001.

To test our conceptual multilevel model, we selected Round 1 of the ESS (European Social Survey Round 1 Data, 2002) as a data source because it included several contrasting item pairs that had already been used in an earlier study as an indicator for acquiescence (Johnson, Mohler, Harkness, & Braun, 2010).

### 2.2. Samples

The 2002 round of the ESS collected data from 22 European countries. For the present analyses, only those countries for which all relevant indicators were available were included. Therefore, Italy and Luxembourg were excluded from our analyses because conservatism was not assessed in these countries. A list of the countries included in our analyses can be found in Table 1. In each country, a sample representative of the population aged 15 years and over was drawn. Design weights provided in the data set were applied to adjust for different selection probabilities. The number of interviews conducted ranged

IFR_AR_011906

**Table 1**
Sample characteristics for the 20 countries investigated.

| | N | Country indicators | | | Individual indicators | | | | Acquiescence | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | GDP | CL | Collectivism | Age (M) | Female (%) | LE (M) | Conservatism (M) | Mean | SD |
| Austria | 2257 | 198 | 7.8 | 55 | 46.59 | 54 | 2.92 | 2.88 | | |
| Belgium | 1899 | 244 | 7.1 | 75 | 44.83 | 49 | 3.05 | 2.71 | 3.28 | 0.38 |
| Switzerland | 2040 | 216 | 8.5 | 68 | 47.56 | 52 | 3.32 | 2.96 | 3.24 | 0.32 |
| Czech Republic | 1360 | 148 | 3.7 | 58 | 51.91 | 52 | 3.10 | 2.50 | 3.38 | 0.36 |
| Germany | 2919 | 1939 | 7.3 | 67 | 47.31 | 52 | 3.36 | 2.83 | 3.27 | 0.30 |
| Denmark | 1506 | 130 | 9.5 | 74 | 46.43 | 49 | 3.31 | 3.07 | 3.08 | 0.34 |
| Spain | 1729 | 720 | 7.1 | 51 | 48.60 | 53 | 2.39 | 2.36 | 3.44 | 0.36 |
| Finland | 2000 | 110 | 9.7 | 63 | 45.63 | 52 | 2.89 | 2.75 | 3.36 | 0.38 |
| France | 1503 | 1327 | 6.3 | 71 | 47.32 | 55 | 2.96 | 2.80 | 3.45 | 0.40 |
| United Kingdom | 2052 | 1329 | 8.7 | 89 | 48.57 | 53 | 2.78 | 2.80 | 3.28 | 0.32 |
| Greece | 2566 | 178 | 4.2 | 35 | 49.66 | 57 | 2.30 | 2.03 | 3.59 | 0.37 |
| Hungary | 1685 | 107 | 4.9 | 80 | 46.14 | 52 | 2.81 | 2.45 | 3.44 | 0.37 |
| Ireland | 2046 | 80 | 6.9 | 70 | 45.71 | 54 | 2.90 | 2.53 | 3.35 | 0.33 |
| Israel | 2499 | 114 | 7.3 | 54 | 41.77 | 54 | 3.31 | 2.45 | 3.33 | 0.37 |
| Netherlands | 2364 | 395 | 9 | 80 | 48.07 | 56 | 2.98 | 2.85 | 3.15 | 0.33 |
| Norway | 2036 | 119 | 8.5 | 69 | 45.82 | 46 | 3.44 | 3.01 | 3.16 | 0.31 |
| Poland | 2110 | 318 | 4 | 60 | 42.9 | 51 | 2.94 | 2.26 | 3.48 | 0.32 |
| Portugal | 1511 | 150 | 6.3 | 27 | 47.86 | 58 | 1.88 | 2.78 | 3.58 | 0.34 |
| Sweden | 1999 | 214 | 9.3 | 71 | 46.26 | 49 | 2.93 | 3.17 | 3.21 | 0.28 |
| Slovenia | 1519 | 33 | 6 | 20 | 44.42 | 52 | 2.94 | 2.51 | 3.35 | 0.33 |
| Mean | 1980 | 145 | 7.1 | 62 | 46.67 | 53 | 2.93 | 2.69 | 3.34 | 0.34 |
| SD | 409 | 139 | 1.9 | 18 | 2.28 | 3 | 0.38 | 0.29 | 0.14 | 0.03 |

Notes. GDP = gross domestic product in billion EUR adjusted for purchasing power; CL = Corruption level from 0 (highly corrupt) to 10 (very clean); collectivism scale from 0 (collectivistic) to 100 (individualistic); age = mean age; LE = level of education from 1 (less than lower secondary education) to 5 (tertiary education completed); conservatism from 1 (individualistic) to 6 (conservative).

between 1360 in the Czech Republic and 2919 in Germany, with a total sample size of 39,600 respondents.

ESS questionnaires are administered as face-to-face interviews. Participation is voluntary and not usually incentivized—although some countries offer small incentives in order to increase participation. (For a detailed description of the samples and the assessment design, see European Social Survey Round 1 Data, 2002).

### 2.3. Measures and procedure

#### 2.3.1. Individual-level characteristics

##### 2.3.1.1. Demographics.
Respondents' age was assessed in ESS Round 1 via the year of birth. Gender was assessed in ESS Round 1 with a dichotomous variable (1 = men, 2 = women). Levels of educational attainment were assessed in all countries on the basis of the national education system. Later, the ESS researchers harmonized these national data into one variable with reference to the International Standard Classification of Education (ISCED) 1997 levels, which yielded five categories: (1) "Less than lower secondary education (ISCED 0–1)"; (2) "Lower secondary education completed (ISCED 2)"; (3) "Upper secondary education completed (ISCED 3)"; (4) "Post-secondary, non-tertiary education completed (ISCED 4)"; (5) "Tertiary education completed (ISCED 5)".

##### 2.3.1.2. Conservatism.
As a supplement to the ESS, the Portrait Values Questionnaire (PVQ; Schwartz, Melech, Lehmann, Burgess, & Harris, 2001) was administered, allowing, among other things, the assessment of the higher order value dimension conservatism, which overlaps strongly with the cultural orientation collectivism as defined by Hofstede (see, e.g., Schwartz & Ros, 1996). The conservatism dimension includes the lower order scales conformity, tradition, and security. It includes items such as "She/he believes that people should do what they're told" (conformity). All items are to be answered on a six-point scale ranging from not like me at all to very much like me. Cronbach's alpha ranged between 0.67 (Hungary) and 0.78 (Austria).

#### 2.3.2. Country-level characteristics

##### 2.3.2.1. Economic wealth.
As an indicator for the economic wealth of each country, the logarithm of its gross domestic product (GDP, adjusted for purchasing power) averaged across the years 1990 to 2002 (as suggested by Meisenberg & Williams, 2008), was used. Information was retrieved from the World Development Indicators of the World Bank (data.worldbank.org/data-catalog/world-development-indicators).

##### 2.3.2.2. Corruption level.
A measure of the corruption level per country was obtained based on averaged scores of Transparency International's Corruption Perceptions Index for the years 1999–2005 (transparency. org).

##### 2.3.2.3. Collectivism.
Country-level scores on an individualism-collectivism scale for the 20 countries investigated in the present study were taken from Hofstede (2001).

#### 2.3.3. Acquiescence

As an indicator of acquiescent responding, an acquiescence measure was constructed on the basis of eight pairs of survey responses from the ESS questionnaire. These item pairs, which constituted sets of statements that clearly represented opposing opinions, stem from different question blocks within the ESS questionnaire and are intended to measure different constructs ranging from socio-political evaluations to attitudes toward migrants. A full list of these item pairs can be found in Table S1. All items were to be answered on a five-point Likert scale ranging from agree strongly to disagree strongly.

In line with earlier research (Aichholzer, 2014; Billiet & McClendon, 2000; Danner et al., 2015; Rammstedt et al., 2010; Rammstedt & Kemper, 2011; Rammstedt & Farmer, 2013), we scored the acquiescence scale by averaging all 16 items. Given that eight items were positively keyed and eight were negatively keyed, the resulting mean score does not reflect any construct variance but rather only acquiescence (and random measurement error). We estimated the reliability of the acquiescence index by subtracting each item from its opposing item and subsequently calculated Cronbach's alpha.

IFR_AR_011907

Cronbach's alpha was 0.47 on average and varied between 0.39 (Denmark) and 0.58 (Greece).[1]

Table 1 provides an overview of the distribution of the different indicators investigated in the 20 countries.

## 3. Results

In a first step, we investigated whether the 20 countries differed in their tendency toward acquiescent responding. We specified a baseline multilevel model with respondents ($i$) being nested within countries ($j$), acquiescence$_{ij} = \beta_{0j} + \varepsilon_{ij}$ that allowed acquiescence differences between countries, $\beta_{0j} = \gamma_{00} + \upsilon_{0j}$. The model parameters were estimated using the residual maximum likelihood estimator implemented in SAS 9.3. The model revealed an intra-class correlation of ICC = 0.15, which indicates that 15% of the total acquiescence variance can be explained by systematic country differences. Hence, the 20 European countries investigated differed systematically in their mean tendency toward acquiescent responding. On average, the highest acquiescence scores were found in Greece, followed by Portugal and Poland; the lowest mean acquiescence scores were found in Norway, the Netherlands, and Denmark (see Table 1).

In a second step, we concurrently investigated different possible determinants of these between-country and within-country differences in acquiescent responding: We conducted a second multilevel analysis with age, gender, educational level, and the degree of conservatism as individual factors: acquiescence$_{ij} = \beta_{0j} + \beta_1(age) + \beta_2(gender) + \beta_3(education) + \beta_4(conservatism) + \varepsilon_{ij}$. At the country level, we investigated economic wealth, corruption level, and degree of collectivism: $\beta_{0j} = \gamma_{00} + \gamma_{01}(wealth) + \gamma_{02}(corruption) + \gamma_{03}(collectivism) + \upsilon_{0j}$. The intercorrelations between the individual-level predictor variables and between the country-level predictors are shown in Table S2. They indicate that GDP and collectivism, in particular, are moderately interrelated ($-0.42$). The results of the second multilevel model fitted to the data are shown in Table 2.

With the exception of GDP, all country-level predictors contributed significantly to explaining the tendency to acquiesce. The highest—and following Cohen (1992) a large — effect on acquiescence was estimated for the country's corruption level ($\eta = 0.473$): The higher the level of corruption, the greater was the tendency toward acquiescence in that country. A country's level of collectivism also had a large effect on acquiescence ($\eta = 0.187$): The more collectivistic the country, the higher was the overall tendency to acquiesce. In addition to the country's cultural orientation, the individual's degree of conservatism was the strongest predictor of acquiescence at the individual level ($\eta = 0.045$) although this effect was small to moderate in size. Further variance in acquiescence could be explained by the individual's level of education ($\eta = 0.029$). Thus, at the individual level, respondents with a low degree of conservatism and with a lower level of educational attainment exhibited a higher tendency toward acquiescent responding. Most likely due to the large sample size, the effect of age and gender was also statistically significant. However, age contributed only marginally ($\eta = 0.004$) to explaining the variance in our model, and gender did not explain a substantial portion of the variance at all. Overall, at respondent level, education, age, gender, and degree of conservatism explained 10% of acquiescent responding, and at country level, wealth, degree of collectivism, and corruption level explained 74% of acquiescent responding.

To ensure that our results were not due to capitalizing on chance and that they were not biased by the correlation between GDP, collectivism, and conservatism at the country level, in particular, we conducted a set of robustness checks. First, we cross-validated the results of the multilevel analyses by randomly splitting each country sample into two subsamples and then replicated the analyses for both splits. The pattern of

## Table 2
Acquiescence regressed on country-level and respondent-level predictors.

| Level | Predictor | Regression coefficient ($b$) | $p$ Value | Partial variance explained at country level | Partial variance explained at respondent level |
|---|---|---|---|---|---|
| Country | GDP | 0.013 | 0.450 | 0.000[b] | 0.000 |
| | Collectivism | 0.002 | 0.041 | 0.187 | 0.000 |
| | Corruption[a] | 0.039 | 0.001 | 0.473 | 0.000 |
| Respondent | Education | −0.043 | <0.001 | 0.176 | 0.029 |
| | Age | 0.001 | <0.001 | 0.000[b] | 0.004 |
| | Gender | −0.010 | 0.002 | 0.000[b] | 0.000 |
| | Conservatism | 0.073 | <0.001 | 0.085 | 0.045 |
| Complete model | | | | 0.737 | 0.097 |

[a] For the regression analysis, the corruption index was multiplied by $-1$, so that a high value on the corruption scale corresponds to a high level of corruption in that country. Gender: 1 = male, 2 = female. Variance explained at country level was calculated as [$\upsilon_{0j}$(without predictor) $-\upsilon_{0j}$(with predictor)] / $\upsilon_{0j}$(without predictor). Variance explained at respondent level was calculated as [$\varepsilon_{ij}$(without predictor) $-\varepsilon_{ij}$(with predictor)] / $\varepsilon_{ij}$(without predictor).

[b] Values <0 were fixed to 0.

results was very similar for both splits, which suggests no effect of capitalization on chance (see Table S3). In addition, we investigated the biasing effect of the intercorrelations of our predictors at the country level. We therefore excluded each of these three variables in turn from the analyses. The pattern of the results was highly comparable to that originally found (see Table S4). We also investigated whether the association between acquiescence and age, gender, education, or conservatism differed between countries and specified the associations as random effects which did not change the pattern of results (all $\Delta\beta < 0.002$). Finally, we also investigated whether our measure of acquiescence and our conservatism measure were invariant across countries. In particular, we investigated configural invariance (same factor structure), metric invariance (same factor loadings), and scalar invariance (same factor loadings and same intercepts) with multi-group structural equation models. The metric invariance models showed acceptable model fits (RMSEA < 0.07, SRMR ≤ 0.05), whereas the scalar invariance model revealed a poor model fit for both scales (RMSEA > 0.11, SRMR > 0.10). Likewise, the change in RMSEA (ΔRMSEA < 0.015) and SRMR (ΔSRMR < 0.030) also suggest accepting metric invariance for both scales (Chen, 2007).[2]

## 4. Discussion

The aim of the present study was to develop and test a comprehensive model encompassing individual-level determinants and country-level predictors of the tendency toward acquiescent responding in surveys.

Our results corroborate systematic differences in acquiescence between countries: 15% of the variance in acquiescence could be explained by country differences, while the remaining 85% was due to individual variations among the respondents within countries. Thus, the European countries included in our study differed substantially in their tendency toward acquiescence. With our set of predictors we were able to explain three-quarters of the country-level differences. The most central indicator explaining these differences in acquiescence between countries was the corruption level of the respective countries, followed by differences in their respective cultural orientations. The higher the corruption level and the level of collectivism of a country, the greater was the overall

---

[1] Even though these reliability estimates are too low to make inferences about individual respondents, they are in line with previous research (e.g., Danner et al., 2015) and thus can be seen as sufficient for regression analyses.

[2] We did not use $\chi^2$-difference tests because in large samples (as the ESS) the $\chi^2$-difference test is likely to be statistically significant even if the magnitude of the differences is not meaningful.

IFR_AR_011908

tendency to acquiesce. By contrast, the economic wealth of the country had no significant additional effect on acquiescence. These results support Meisenberg and Williams' (2008) assumption that people living in corrupt societies are more subservient to powerful others. However, it has to be kept in mind that the present study investigated only European and thus comparatively wealthy countries. It needs, therefore, to be investigated in future studies if economic wealth has an additional effect on acquiescence based on a more heterogeneous set of countries.

Individual indicators such as educational level and degree of conservatism differed systematically across the countries and thus contributed to the explanation of the between-country differences in this response style.

Moreover, besides these differences between countries, our results revealed systematic differences between subpopulations: Some subpopulations within countries were more prone to acquiescence than others. Ten percent of these individual differences could be explained by our set of predictors. In line with previous research (e.g., Narayan & Krosnick, 1996; Rammstedt et al., 2010), our results revealed that—across all countries—individuals with lower levels of educational attainment and less conservative individuals were more prone to acquiescent responding than higher educated and more conservative individuals.

In contrast, the effect reported in earlier studies (see Weijters et al., 2010) that females have, on average, a higher tendency toward acquiescence could not be replicated. Rather, we found a statistically significant but not substantial effect of gender that indicated a slightly greater tendency toward acquiescence on the part of males compared to females.

Earlier findings with regard to the effects of age on acquiescence were inconsistent. While some studies suggested that older individuals have a greater tendency toward acquiescence (e.g., Meisenberg & Williams, 2008; Weijters et al., 2010), others identified no substantial effect of age (e.g., Eid & Rauber, 2000). Our results support these albeit somewhat contradictory findings insofar as we found a small statistically, but not meaningful, significant effect of age in the suggested direction.

In sum, our results support the notion that the corruption level and the cultural orientation of a country, in particular, explain cross-national differences in acquiescent responding. Taking these indicators into account, the economic wealth of a country was not found to contribute to the explanation of cross-national differences. This contrasts with findings of previous studies that did not control for other indicators.

Overall, our study substantially contributes to an understanding of cross-national differences in acquiescent responding. Systematic cross-national response artifacts, as detected in our study, may be misinterpreted as substantive differences across countries or cultures. Therefore, before drawing any conclusions from cross-national surveys, due caution should be taken to reduce acquiescence ex ante (e.g., by using balanced scales; Billiet & McClendon, 2000) or to control for acquiescence ex post (e.g., by using ipsatized data; Brown & Maydeu-Olivares, 2011). Typical areas of application for such ex-ante or post-hoc measures aimed at reducing acquiescence are all questionnaire-based data collections performed in multinational, multicultural, and multiregional contexts. Examples include, but are not limited to, international employee surveys (e.g., Johnson et al., 2005), cross-national media usage studies (e.g., Kuru & Pasek, 2016), and cross-cultural health surveys (Shavitt et al., 2016). In all these areas, variations in acquiescence carry the danger of being misinterpreted as differences in organizational commitment, media exposure habits, or health-related compliance. Therefore, mindfully considering and correcting for acquiescence should yield a more accurate picture about 'true' differences, and help to prevent deriving inappropriate subsequent measures.

## Appendix A. Supplementary data

Supplementary data to this article can be found online at http://dx.doi.org/10.1016/j.paid.2016.11.038.

## References

Aichholzer, J. (2014). Random intercept EFA of personality scales. *Journal of Research in Personality, 53*, 1–4.

Billiet, J. B., & McClendon, M. J. (2000). Modeling acquiescence in measurement models for two balanced sets of items. *Structural Equation Modeling, 7*, 608–628.

Brown, A., & Maydeu-Olivares, A. (2011). Item response modeling of forced-choice questionnaires. *Educational and Psychological Measurement, 71*, 460–502.

Chen, F. F. (2007). Sensitivity of goodness of fit indexes to lack of measurement invariance. *Structural Equation Modeling, 14*, 464–504.

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112*, 151–159.

Danner, D., Aichholzer, J., & Rammstedt, B. (2015). Acquiescence in personality questionnaires: Relevance, domain specificity, and stability. *Journal of Research in Personality, 57*, 119–130.

Eid, M., & Rauber, M. (2000). Detecting measurement invariance in organizational surveys. *European Journal of Psychological Assessment, 16*, 20–30.

European Social Survey Round 1 Data (2002). *Data file edition 6.4.* Norway: Norwegian Social Science Data Services (Data Archive and distributor of ESS data for ESS ERIC).

Ferrando, P. J., Condon, L., & Chico, E. (2004). The convergent validity of acquiescence: An empirical study relating balanced scales and separate acquiescence scales. *Personality and Individual Differences, 37*, 1331–1340.

Goldberg, L. R. (1963). A model of item ambiguity in personality assessment. *Educational and Psychological Measurement, 23*, 467–492.

Grimm, S. D., & Church, A. T. (1999). A cross-cultural study of response biases in personality measures. *Journal of Research in Personality, 33*, 415–441.

Harzing, A. -W. (2006). Response styles in cross-national survey research: A 26-country study. *International Journal of Cross Cultural Management, 6*, 243–266.

Hofstede, G. (2001). *Culture's consequences* (2nd ed.). Thousand Oaks, CA: Sage.

Javeline, D. (1999). Response effects in polite cultures: A test of acquiescence in Kazakhstan. *Public Opinion Quarterly, 63*, 1–28.

Johnson, T., Kulesa, P., Cho, Y. I., & Shavitt, S. (2005). The relationship between culture and response styles: Evidence from 19 countries. *Journal of Cross-Cultural Psychology, 36*, 264–277.

Johnson, T. P., Mohler, P. P., Harkness, J., & Braun, M. (2010). *Cultural values and survey response styles in the European Social Survey.* (Paper presented at the XVII World Congress of Sociology, Gothenburg, Sweden, July 2010).

Kuru, O., & Pasek, J. (2016). Improving social media measurement in surveys: Avoiding acquiescence bias in Facebook research. *Computers in Human Behavior, 57*, 82–92.

Marin, G., Gamba, R. J., & Marin, B. V. (1992). Extreme response style and acquiescence among Hispanics: The role of acculturation and education. *Journal of Cross-Cultural Psychology, 23*, 498–509.

Meisenberg, G., & Williams, A. (2008). Are acquiescent and extreme response styles related to low intelligence and education? *Personality and Individual Differences, 44*, 1539–1550.

Narayan, S., & Krosnick, J. A. (1996). Education moderates some response effects in attitude measurement. *Public Opinion Quarterly, 60*, 58–88.

Rammstedt, B., & Farmer, R. (2013). The impact of acquiescence on the evaluation of personality structure. *Psychological Assessment, 25*, 1137–1145.

Rammstedt, B., & Kemper, C. J. (2011). Measurement equivalence of the Big Five: Shedding further light on potential causes of the educational bias. *Journal of Research in Personality, 45*, 121–125.

Rammstedt, B., Goldberg, L. R., & Borg, I. (2010). The measurement equivalence of Big Five factor markers for persons with different levels of education. *Journal of Research in Personality, 44*, 53–61.

Rammstedt, B., Kemper, C. J., & Borg, I. (2013). Correcting Big Five measurements for acquiescence: An 18-country cross-cultural study with representative samples. *European Journal of Personality, 27*, 71–81.

Schwartz, S. (1994). Are there universal aspects in the content and structure of values? *Journal of Social Issues, 50*, 19–45.

Schwartz, S. H., & Ros, M. (1996). Values in the West: A theoretical and empirical challenge to the individualism-collectivism cultural dimension. *World Psychology, 1*, 91–122.

Schwartz, S. H., Melech, G., Lehmann, A., Burgess, S., & Harris, M. (2001). Extending the cross-cultural validity of the theory of basic human values with a different method of measurement. *Journal of Cross-Cultural Psychology, 32*, 519–542.

Shavitt, S., Cho, Y. I., Johnson, T. P., Jiang, D., Holbrook, A., & Stavrakantonaki, M. (2016). Culture moderates the relation between perceived stress, social support, and mental and physical health. *Journal of Cross-Cultural Psychology, 47*, 956–980.

Smith, P. B. (2004). Acquiescent response bias as an aspect of cultural communication style. *Journal of Cross-Cultural Psychology, 35*, 50–61.

Smith, P. B., & Fischer, R. (2008). Acquiescence, extreme response bias and culture: A multilevel analysis. In F. J. R. van de Vijver, D. A. van Hemert, & Y. H. Poortinga (Eds.), *Multilevel analysis of individuals and cultures* (pp. 285–314). New York: Lawrence Erlbaum.

Soto, C. J., John, O. P., Gosling, S. D., & Potter, J. (2008). The developmental psychometrics of Big Five self-reports: Acquiescence, factor structure, coherence, and differentiation from ages 10 to 20. *Journal of Personality and Social Psychology, 94*, 718–737.

Van Herk, H., Poortinga, Y. H., & Verhallen, T. M. M. (2004). Response styles in rating scales: Evidence of method bias in data from six EU countries. *Journal of Cross-Cultural Psychology, 35*, 346–360.

Van Vlimmeren, E., Moors, G., & Gelissen, J. (2015). *Developing a diagnostic tool for detecting response styles, and a demonstration of its use in comparative research of single item measurements.* (Paper presented at the 6th Conference of the European Survey Research Association (ESRA), Reykjavik).

Weijters, B., Geuens, M., & Schillewaert, N. (2010). The stability of individual response styles. *Psychological Methods, 15*, 96–110.

IFR_AR_011909

☰  🔍     **B B C**     ⊙ Watch Live   Register     Sign In

Home   News   Sport   Business   Innovation   Culture   Travel   Earth   Video   Live

# TikTok and Title 42 rumours fuel human smuggling at the US border

8 July 2023

**By Bernd Debusmann Jr,** BBC News, Washington

Share 



Getty Images

Migrant on his mobile at the US-Mexico border

**Stepping into the brown waters of the Rio Grande, a small group of migrants is all smiles as they look off into the distance - the end of their long and dangerous journey into the US is just hundreds of feet away.**

"Crossing the river safely," reads a message splayed across the top of the video, which includes the Spanish-language hashtag #AmericanDream. "Write to me and I'll give you more information."

The video is one of hundreds on social media that promise to help migrants start a new life in the US, securely and cheaply.

IFR_AR_011910

And while they seem innocent - even friendly - experts say they are deceptive. "This is advertised people smuggling," said Ed Calderon, a former Mexican police officer who specialises in the border's underworld. "And it's out in the open".

Experts say these video clips - on platforms including TikTok, YouTube and WhatsApp - are the public face of a highly sophisticated, multi-billion dollar illegal industry that has taken advantage of confusion over changes in US immigration policies to spread disinformation and drive demand for their services.

Business is booming in the wake of the 11 May expiry of Title 42, a Donald Trump-era policy that allowed the US to swiftly deport people without an asylum hearing, using the coronavirus pandemic as justification.

The new approach encourages legal pathways, while at the same time also implementing strict penalties for those who cross illegally.

US officials say since **Title 42** expired, migrant detentions have fallen by 70%, as more people come to the country legally.

Falling figures, however, do not mean falling profits for the criminal organisations that help migrants cross the border undetected.

"It's like Christmas for these smugglers right now," Mr Calderon told the BBC, adding that there is a perception among many migrants that successfully crossing the border without being detained is more difficult.

"That's all because of their propaganda, and it allows them to raise prices."

Mr Calderon's assessment was echoed by Adam Isacson, a migration and border expert from the Washington Office on Latin America, who said that demand for the services of smugglers is likely up "among those who want to enter the United States undetected" after Title 42.

"If numbers dip because of a tough new policy change, that absolutely raises the price of smuggling services," he added. x

The videos splashed across social media come in various forms, and are in many cases far from subtle.

Some are testimonials from seemingly satisfied customers, supposedly speaking from safe houses or city streets in the US.

"Here we are in New York City," the Venezuelan-accented narrator of one such video says while walking down a Manhattan street. "I'd like to thank my companions for getting me here safe and sound."

The caption of the video, from a "travel agency", asks viewers to send a message requesting help getting to the US without a visa.

Others show camouflaged smugglers leading groups of migrants through harsh terrain, or using ladders to swiftly get over border barriers. Many promise door-to-door services from as far away as South America to final destinations in the US.



Getty Images

Migrants often pay thousands of dollars to smugglers to reach and cross the US-Mexico border.

Almost universally, they include a phone number to WhatsApp or a promise that more details - including price and payment plans - will be revealed in response to private messages.

The clandestine nature of the industry means that there are no reliable statistics on how many migrants find their smugglers on social media, or which posts are genuine or not.

Guadalupe Correa-Cabrera, an associate professor at George Mason University who researches smuggling organisations, said that social media allows criminals to create a constant "sense of urgency" among migrants.

This, in turn, can ultimately drive migrants into the hands of smugglers, even among migrants who do not contact them online.

"Migrants are out of their comfort zone, and the trip can be horrible. There's a lot of things that take place in their psyche too," she said. "Smuggling networks understand that and work, organically, to feed misinformation, to feed the fear, so that the migrants try to make it however they can."

Experts say that prices for smuggling services vary enormously and often are determined by what the smugglers perceive a migrant - or their family - can pay, either up front or in instalments over time.

US officials have warned that migrants who don't pay are often forced to work for the cartels, sometimes as prostitutes, drivers or drug-runners. Some are simply held hostage in secret stash houses until the fees are fully paid, or threaten their families in the US or back home.

"It's a giant industry, and it's a cartel industry," Mr Calderon said. "Smuggling people across the border is one of their biggest money makers right now".

Mr Calderon estimated that even the most basic packages - which he described as a "let's see if we can get there" trip - would start at between $5,000 and $8,000 for a family of four starting in Mexico.

Current and former law enforcement sources in the US and Mexico estimated that typical prices are now around $15,000, rising to between $50,000 and $60,000 for many migrants coming from outside of Latin America. The BBC was unable to independently verify these prices.

IFR_AR_011912

The issue of disinformation on social media has increasingly caught the eye of US officials.

- <u>How Biden and Trump's border policies compare</u>
- <u>What happens at the border after Title 42 ends?</u>
- <u>Why Indians are fleeing halfway around the world</u>

Just ahead of Title 42's expiry, for example, Homeland Security Secretary Alejandro Mayorkas warned would-be migrants of falling to lies meant to "lure vulnerable people to the Southern Border".

Additionally, the Department of Homeland Security launched a "geo-targeted" digital advertising campaign on social media platforms across Central and South America. The ads are designed to reach migrants via their mobile devices, and direct them to government-run landing pages that clarify facts about US immigration policies and provide warnings about the dangers.

US officials have told the BBC the ads are still running even after the recent policy changes.

TikTok, for its part, has said it has a "zero tolerance" approach to human smuggling and has dedicated "significant investment" to finding and removing such content, with offending accounts permanently banned. The two videos mentioned in this story have already been removed, only to be swiftly replaced by others with similar content.

Alex Pacheco, a former Customs and Border Patrol (CBP) supervisor with 20 years' experience on the force, said that social media rumours are likely to continue to run rampant, with smugglers keen to exploit migrants' anxieties about the impact of domestic US policies and events on the border.

Mr Pacheco believes this trend will become even more evident as the US heads towards the 2024 presidential election.

"They'll always say that people need to cross now. Some people would have been told that the price will go up if you don't cross before Title 42, for example," Mr Pacheco said.

"Now they'll probably say that there may be a new administration, that the new president won't be Joe Biden, or that the border will go back to how it was in the previous administration… this all benefits the criminal organisation," he added.

"That's capitalism."

---

**How Biden and Trump's border policies compare**
**Migrant family reunited after four years apart**
**'They'd rather die than return to Nicaragua'**

---

People smuggling     Mexico–US border     Smuggling     US immigration     Mexico

United States

**Related**

IFR_AR_011913

**Why the BBC could track down a people-smuggling kingpin before the police**

17 May 2024   **NEWS**   BBC InDepth

**Migrant-smuggler arrested after BBC investigation**

13 May 2024   **NEWS**   World

**How we found Europe's most wanted migrant-smuggler**

10 May 2024   **NEWS**   Middle East

## More

6 hrs ago

### Trump's White House bid goes on, lawyer tells BBC

Donald Trump's lawyer Alina Habba tells the BBC he would run for president even if he was in jail.



6 hrs ago   **NEWS**   US & Canada

8 hrs ago

### Trump would run for president from jail, his lawyer says

Alina Habba says Donald Trump will run for office even if he is jailed and "nothing will change" following his conviction for falsifying business records.



8 hrs ago   **NEWS**   US & Canada

18 hrs ago

### UK ambassador left post after 'pointing gun at staff'

A video posted on social media claims to show Jon Benjamin aiming a weapon at another man, while looking down the rifle's sight.



18 hrs ago   **NEWS**   UK

18 hrs ago

### Philippine president warns China against 'acts of war'

He warned China not to cross a red line as their standoff in the South China Sea escalates.



18 hrs ago   **NEWS**   World

21 hrs ago

### Biden unveils Israeli proposal to end Gaza war

It would begin with a six-week ceasefire and the withdrawal of IDF forces from populated areas.



21 hrs ago   **NEWS**   World

IFR_AR_011914



⊙ Watch Live

Home    News    Sport    Business    Innovation    Culture    Travel    Earth    Video    Live    Audio    Weather    BBC Shop

BBC in other languages ▼

Terms of Use    About the BBC    Privacy Policy    Cookies    Accessibility Help    Contact the BBC    Advertise with us    Do not share or sell my info

Contact technical support

Copyright 2024 BBC. All rights reserved.  The *BBC* is *not responsible for the content of external sites.* **Read about our approach to external linking.**

IFR_AR_011915

_(/)_    

Get Help (/get-help)     Donate (https://www.tahirih.org/donate/)

- LinkedIn (https://www.linkedin.com/company/tahirih-justice-center)
- YouTube (http://www.youtube.com/channel/UCijnWEiM_0yc0-DHoRQoWdQ)
- Instagram (https://www.instagram.com/tahirihjustice/)
- Twitter (https://twitter.com/tahirihjustice)
- Facebook (http://www.facebook.com/pages/Tahirih-Justice-Center/142257595231)

Search

About Us (/about-us)     What We Do (/what-we-do)

Who We Serve (/who-we-serve)     Get Involved (/get-involved)     Give (/give)

News (/news-media)     Locations (/locations)

Tahirih Updates

# Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way

February 21st, 2023

IFR_AR_011937



**Focus Area Filter:** Direct Services (https://www.tahirih.org/focus_area/direct-services/), Policy Advocacy (https://www.tahirih.org/focus_area/policy-advocacy/)
**Location Filter:** National (https://www.tahirih.org/location/national/)
**Topic Filter:** Asylum (https://www.tahirih.org/tag/asylum/), Fair Immigration Laws (https://www.tahirih.org/tag/fair-immigration-laws/)
This article was originally published on February 21, 2023.

**Washington, D.C.** – Today, the Department of Homeland Security issued a proposed rule that would drastically limit eligibility for asylum for many people seeking safety at our Southern border. Under these new regulations, a person seeking asylum at a U.S. port of entry on the Southern border who does not have an appointment or traveled through another country without applying for protection there first will be considered ineligible for asylum here – with few exceptions. **This asylum ban cuts off a critical path to safety for survivors and sends them back to dangerous conditions where they often face further violence and trauma.**

"The purpose of asylum is to protect, not punish, people in desperate circumstances fleeing for their lives," said **Casey Carter Swegman, Director of Public Policy**. "While the administration has repeatedly promised to promote a fair and humane asylum system, the impact of this new rule will mean that many survivors of gender-based and other violence will be swiftly sent back into harm's way. This rule would extinguish the last beacon of hope for some of the world's most vulnerable people."

Deciding whether someone *could have* successfully obtained protection from another country or made an appointment is a matter best left to a U.S. asylum officer or immigration judge in the context of a fair hearing that promotes due process. An outright ban simply keeps out those who might qualify under the law.

Everyone who comes to the U.S. seeking safety – no matter where they are from or how they arrived – must be given a fair chance to show why they fear persecution in their home country, and policies that aim to stop migrants from seeking asylum in the U.S. like this latest asylum ban rarely succeed at deterring migration (https://immigrationimpact.com/2021/04/02/immigrants-coming-to-the-border-deterrence-policies/). Instead, they greatly exacerbate the risk and prevalence of gender-based violence (GBV) at the border harming the most vulnerable groups of people, including women, girls, and LGBTQIA+ individuals.

It is a fact that **migrants turned away at the U.S.-Mexico border are more vulnerable to GBV at the hands of cartels and other organized crime groups.** In our recent study (https://www.tahirih.org/wp-content/uploads/2022/10/Oxfam_Tahrih_Surviving-Deterrence_English_2022.pdf), service providers noted that between 30% and 90% of their clients have experienced GBV while at the border, and 68% indicated that their clients frequently report that they have been raped and/or sexually assaulted at the border. President Biden has stated that ending violence against women is the cause of his life (https://www.whitehouse.gov/briefing-room/statements-releases/2022/11/23/statement-by-president-joe-biden-on-the-occasion-of-international-day-for-the-elimination-of-violence-against-women-2/) and this administration has positioned itself as champions of that cause and yet immigrant survivors seeking asylum continue to be forgotten.

President Biden and Congress must stop pointing fingers and work together to fix our broken immigration system instead of doubling down on harmful, failed policies that place migrants at increased danger.

For media inquiries, please email Karla Flores at media@tahirih.org (mailto:media@tahirih.org).

*The Tahirih Justice Center is a national, nonprofit organization that serves immigrant survivors of gender-based violence. By amplifying the experiences of survivors in communities, courts, and Congress, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity.*

MORE Tahirih Updates

Project Empower: A Guaranteed Income Program for Survivors of Gender-Based Violence (https://www.tahirih.org/news/project-empower-a-guaranteed-income-program-for-survivors-of-gender-based-violence/)

February 15th, 2023

First-of-its-Kind Guaranteed Income Pilot Provided Financial Support and Long-Term Stability to Domestic Violence Survivors and their Children (https://www.tahirih.org/news/first-of-its-kind-guaranteed-income-pilot-provided-financial-support-and-long-term-stability-to-domestic-violence-survivors-and-their-children/)

February 15th, 2023

## Latest News

- Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way (https://www.tahirih.org/news/bidens-asylum-ban-will-continue-to-place-survivors-in-harms-way/)

  Today, the Department of Homeland Security issued a proposed rule that would drastically limit eligibility for asylum for many people seeking safety at our Southern border. Under these new regulations, a person seeking asylum at a U.S. port of entry on the Southern border who does not have an appointment or traveled through another country without applying for protection there first will be considered ineligible for asylum here – with few exceptions. This asylum ban cuts off a critical path to safety for survivors and sends them back to dangerous conditions where they often face further violence and trauma.

  February 21, 2023

- Project Empower: A Guaranteed Income Program for Survivors of Gender-Based Violence (https://www.tahirih.org/news/project-empower-a-guaranteed-income-program-for-survivors-of-gender-based-violence/)

  Project Empower is a first-of-its-kind guaranteed income (GI) program designed to support immigrant survivors of gender-based violence. This program offered unconditional, regular cash transfers of $1000 per month to 10 [...]

  February 15, 2023

- **Survivor Voices**

  -  (https://www.tahirih.org/survivor-voices/camila/)

  Camila (https://www.tahirih.org/survivor-voices/camila/)

  "I hope my story is helpful to someone else...and can inspire many women to be stronger. We need to help young women identify toxic relationships, so that there are fewer Camilas that go through such difficult things, let alone have our children suffer."

  November 21, 2022

  - 

  (https://www.tahirih.org/survivor-voices/brenda/)

  Brenda (https://www.tahirih.org/survivor-voices/brenda/)

  When I was 15 years old, I left my parents' home in Mexico. I was sexually abused by my stepfather, and I thought I would be safer moving out with [...]

  November 14, 2022

IFR_AR_011941

POLITICS

# Asylum seekers face decision to split up families or wait indefinitely under new border policy

IFR_AR_012388

2/27/23, 12:20 PM
Asylum seeking families consider separation amid shortage of mobile app appointments - Los Angeles Times
Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 618 of 660



Russian asylum seekers warm up by a small fire at the U.S.-Mexico border fence near Somerton, Ariz., on Dec. 26. (Rebecca Noble / AFP via Getty Images)

BY ANDREA CASTILLO | STAFF WRITER

FEB. 24, 2023 **UPDATED** 2:20 PM PT



WASHINGTON —  Inside a tent near the Rio Grande in Matamoros, Mexico, Jeyson woke up every day for a month before 3 a.m. to fill out applications to request asylum for his family of four through a U.S. government mobile app.

The 25-year-old from Venezuela eventually secured appointments for himself and his wife, but the slots filled up so quickly that he couldn't get two more for their children. They weren't worried though — they had heard about families in similar situations being waved through by border officials.

IFR_AR_012389

Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 619 of 660

Instead, he said, a U.S. Customs and Border Protection agent told them last week that because each member of the family did not have an appointment: "You two can enter, but not your children." Jeyson asked The Times to withhold his last name out of fear for his family's safety.

ADVERTISEMENT

Now many families like Jeyson's have found themselves confronted with a seemingly impossible decision: Wait indefinitely for enough appointments for the whole family, or split up. It is unclear just how many migrants have been affected.

IFR_AR_012390

Case 1:24-cv-01702-RC Document 53-1 Filed 09/27/24 Page 620 of 660



Venezuelan and Nicaraguan migrants are transferred by agents of the Border Patrol after crossing the Rio Grande from Ciudad Juarez, Chihuahua state, Mexico, to El Paso, Texas, to ask for political asylum on Dec. 27. (Herika Martinez / AFP via Getty Images)

The CBP One mobile application, which was rolled out last month, was intended to reduce the number of illegal crossings between ports of entry. Now the only government-sanctioned way to request humanitarian protection at the border, it requires all members of a family to have confirmed appointments. But with such high demand, families have found it practically impossible to secure enough slots.

Migrants and advocates near the Texas, Arizona and California borders said that initially, CBP agents overlooked the requirement and accepted families as long as at least one person had a registered appointment. Earlier this month, however, as demand for appointments grew, agents began enforcing the policy.

"Now what you have is a system that privileges single people," said Priscilla Orta, a supervising attorney at Lawyers for Good Government in Brownsville, Texas.

IFB_AR_012391

2/27/23, 12:20 PM    Asylum-seeking families consider separation amid shortage of mobile app appointments - Los Angeles Times

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 621 of 660

Migrants in northern Mexico near the U.S. border say they've encountered a variety of technical issues while attempting to secure appointments with border agents: Daily appointments run out within minutes on the app, which has been prone to crashing and is unavailable in most languages. Users of the app have also reported that the facial recognition feature has failed to capture users with darker skin or fidgeting babies.

The Department of Homeland Security, which oversees CBP, said errors during submission are due to appointments no longer being available, not problems with facial recognition, and that the feature thwarts scammers who could book appointments to later sell them. CBP said it has updated the face capture process to resolve the issue, now allowing migrants to submit still photos during registration.

DHS spokesman Luis Miranda said the free app cuts out smugglers, decreases migrant exploitation and improves security and efficiency. He said CBP updated the app this week to make it easier for family units to secure appointments by releasing them in larger batches at fewer intervals of time. For example, instead of 20 appointments released every 15 seconds, 40 appointments could be released every 30 seconds, giving families a better chance to compete before the slots run out.

"DHS is committed to family unity," he said. "The CBP One app is a transparent and publicly accessible way to schedule appointments for migrants seeking to arrive at a land port of entry."

Seeking asylum is a legal right under U.S. and international law, regardless of how someone arrives on U.S. soil. But under a pandemic-era public health policy called Title 42, migrants are prevented from seeking asylum at the border. On Jan. 12, immigration authorities started allowing migrants to request exceptions to the policy if they met certain "vulnerability criteria" such as having immediate safety or medical concerns.

Use of Title 42 at the border is expected to end on May 23, and officials have said they are negotiating a deal to deport non-Mexican migrants to Mexico after that time. On

IFR_AR_012392

Tuesday, the Biden administration announced a policy that would limit asylum access for migrants who cross into the U.S. without authorization and fail to apply for protections on the way to the southern border.

Meanwhile, many migrants live in unsanitary tent encampments without regular access to food and clean water. Human Rights First has tracked more than 13,480 reports of violent attacks on migrants blocked in or expelled to Mexico, including murder, kidnapping and rape, since President Biden took office in January 2021.

DHS is under federal court order to track and report the number of people allowed into the country through exceptions. Filings show nearly 21,900 people used CBP One to enter the U.S. in January, a slight decrease from just over 23,000 people who entered under a similar process in December. Republican-led states that sued to keep Title 42 in place have closely monitored those monthly reports and in November filed a motion accusing DHS of increasing exceptions without properly notifying the court, which the federal government denied.

IFR_AR_012393

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 623 of 660



Mostly Haitian migrants prepare to board a bus taking them from a shelter to a U.S. port of entry to start legal paperwork in Reynosa, Tamaulipas state, Mexico, on the border with McAllen, Texas, on May 19. (Pedro Pardo / AFP via Getty Images)

DHS officials said that border agents have occasionally used their discretion to allow unscheduled family members entry, but that large numbers of people recently began showing up with just one appointment scheduled for an entire family. The agency hasn't seen an indication that any particular group is being disadvantaged based on appointment data, officials said, and more improvements to streamline scheduling will roll out soon.

Pedro de Velasco, advocacy director at the Kino Border Initiative, a Catholic humanitarian aid group based in Nogales, Ariz., disagreed that migrants intentionally failed to schedule enough appointments. He said CBP should dedicate some employees to process migrants who need help troubleshooting the app, much like cashiers available to help customers who get stuck when using the self-checkout line at a grocery

IFR_AR_012394

store. He also recommended the agency designate appointments each day for larger families.

Tom Cartwright, who tracks deportation flights for the organization Witness at the Border, said DHS should publicly communicate all changes to the process so applicants aren't left in the dark and have a clear understanding of the requirements.

Applying for asylum through the app is a two-step process: Migrants must first register and then schedule an appointment, which could require trying daily until a sufficient number of spots are secured. Many migrant families were unaware that they should register as individuals under the same group.

Jean, 31, of Haiti, who asked to be identified by his first name for his safety, had scheduled two appointments last week in Laredo, Texas, which was six hours from the shelter in Reynosa, Mexico, where his family has lived for the past three months. He, his wife and daughter rode two buses to avoid cartel-controlled roads and paid about $300 in transportation and lodging to get to the appointments, only to be turned back. Despite daily attempts on the app for the past week, they haven't been able to secure three new appointments.

"It's too complicated, too difficult," he said of the app. "Now we have nothing. When I returned here, I asked a woman for a little food to eat."

Jeyson said his family's journey to the U.S.-Mexico border was harrowing. They left Venezuela in September after government-affiliated armed groups threatened them, he said, crossed the dangerous jungle between Colombia and Panama, were jailed three times in southern Mexico and arrived in Matamoros to find migrant shelters full.

Some days, they don't eat, he said. The squalid living conditions at their tent encampment, where hundreds of migrants share five portable toilets, left his son with an eye infection and his wife with a urinary tract infection.

IFR_AR_012395

Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 625 of 660

Penniless and too afraid to travel to a different city, Jeyson hoped four spots would open up at the Brownsville, Texas, port of entry. On the international bridge last week, they and several other families tearfully pleaded with a CBP agent, who replied that he would start taking photos of those who refused to leave, Jeyson said. His family fled, forgetting a suitcase that contained all their spare clothes.

Jeyson's wife has since managed to secure a single appointment for next month. Their new plan is for her to go alone and Jeyson to stay behind with their children until he can get three additional appointments.

"We already risked it all," he said. "What can we do? We are hopeful that we can get three appointments. Three, in the end, is less than four."

Advocates said some parents are making the decision to leave their children in the care of extended family or friends and keep their appointments with CBP.

Jeyson said another couple from the tent encampment did just that, leaving their five children at the border bridge and entering the U.S. after managing to get only two appointments.

Children who are unaccompanied by a parent are exempt from Title 42. Those in the care of adults who are not their legal guardian — even if they are extended family — are separated until a guardian can be properly vetted. Jeyson said he watched as the children walked up to a border agent and were taken into custody.

Felicia Rangel-Samponaro, director of the Sidewalk School, a nonprofit that offers education, medical care and other assistance to migrants in Mexican border towns, has organized sessions with parents at various shelters and encampments in Matamoros and Reynosa to explain what will happen if they send their child across the border unaccompanied.

IFR_AR_012396

2/27/23, 12:20 PM    Asylum seeking families consider family separation amid shortage of mobile-app appointments - Los Angeles Times

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 626 of 660

"We don't want them to think you cross and then your child crosses and will come back to you a day later," she said. "We were surrounded by parents who were showing us, one after the other, how they have an appointment but their child does not."

Rangel-Samponaro recommended to parents that they cancel the appointment and restart their search. But after the sessions, some parents told her they would separate from their kids anyway.

"Family separation has never stopped," she said, referencing the Trump administration's "zero tolerance" border policy that led to [thousands of migrant children being taken from their parents](#), prompting outrage and investigation. "The only difference here is that CBP One is now doing it instead of the other ways it's been done since 2018."

POLITICS    WORLD & NATION    CALIFORNIA    IMMIGRATION AND THE BORDER

---



## Get Group Therapy

Life is stressful. Our weekly mental wellness newsletter can help.

> Enter email address

> SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.



Andrea Castillo

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Andrea Castillo covers immigration. Before joining the Los Angeles Times, she covered immigrant, ethnic and LGBT communities for the Fresno Bee. She got her

IFR_AR_012397

start at the Oregonian in Portland. A native of Seattle, she's been making her way down the West Coast since her graduation from Washington State University.

 Latest in Politics

**READ MORE**

## Supreme Court to decide fate of Obama-era Consumer Financial Protection Bureau

---

### MORE FROM THE LOS ANGELES TIMES



POLITICS

**Supreme Court to decide fate of Obama-era Consumer Financial Protection Bureau**

2 hours ago



BOOKS

**How free-market extremism became America's default mode**

2 hours ago

IFR_AR_012398



**CALIFORNIA**

### California lawmakers revive effort to ban involuntary servitude as punishment for crimes

Feb. 27, 2023



**CALIFORNIA**

### Column: Newsom cares more about almond growers than California's salmon fishery

Feb. 27, 2023

IFR_AR_012399

**SUBSCRIBERS ARE READING** ›

FOOD

FOR SUBSCRIBERS

19 cafes that make L.A. a world-class coffee destination

---

CALIFORNIA

Photos: Snow, heavy rain pummel Southern California

---

CALIFORNIA

Rain, snow, high winds batter SoCal; 5 and 14 freeways closed, roads flooded

---

**LATEST POLITICS** ›

POLITICS

Jimmy Carter's final foe: A parasitic worm that preyed on millions in Africa and Asia

Feb. 27, 2023

---

POLITICS

Weeks after Ohio rail derailment, President Biden has no plans to visit

Feb. 26, 2023

---

POLITICS

Column: Jimmy Carter's presidency looks better now than in 1980. Is there a lesson for Joe Biden?

Feb. 26, 2023

---

POLITICS

IFR_AR_012400

Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 630 of 660

Russia's war on Ukraine grinds into second year as Putin gambles on the long game

**Feb. 26, 2023**

---

POLITICS

Why scammers who stole billions in unemployment benefits may get away with fraud

**Feb. 24, 2023**

---

Subscribe for unlimited access

Site Map

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the L. A. Times?

Bestcovery

---

MORE FROM THE L.A. TIMES

IFR_AR_012401

Crossword

Obituaries

Recipes

L.A. Times Compare

L.A. Times Store

Wine Club

About/Contact

For the Record

L.A. Times Careers

Manage Subscription

Reprints and
Permissions

Site Map

Copyright © 2023, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

IFR_AR_012402




Planet Money & How I Built This

 

DONATE

POLITICS

# Negotiators release $118 billion border bill as GOP leaders call it dead in the House

UPDATED FEBRUARY 4, 2024 · 9:52 PM ET

By Deirdre Walsh, Claudia Grisales



Left: Sen. James Lankford, R-Okla., speaks on border security and Title 42 during a press conference at the Capitol on May 11, 2023. Right: Sen. Chris Murphy, D-Conn., at a press conference on Jan. 23 in Washington, D.C.

*Kevin Dietsch/Getty Images; Samuel Corum/Getty Images*

After months of negotiations, a trio of Senate negotiators unveiled a $118 billion bipartisan agreement to overhaul some key Biden administration immigration policies. But the legislation is already hitting a brick wall in the House where GOP leaders are declaring it "dead on arrival."

"The deal creates a real opportunity for Congress to address our borders and make progress to a more efficient and well-resourced system," Senate Major...

NPR_AR_012582

Leader Chuck Schumer, D-N.Y., told reporters after details of the proposal were released.

The bill is part of a national security funding package that includes additional money for Ukraine and Israel. But as the issue of the border becomes a central flashpoint in the 2024 presidential campaign, and former President Trump publicly urges GOP lawmakers to oppose the deal, the prospects for the bill reaching President Biden's desk seem bleak.

**Sponsor Message**

The bill includes:

- Just over $20 billion for border provisions, including expansions to existing policies and new policies. That includes $650 million for the border wall, approximately $4 billion to hire new asylum officers and additional funds to provide counsel for unaccompanied children.

- $60.06 billion in security aid for Ukraine.

- $14.1 billion in aid for Israel.

- $10 billion in humanitarian assistance for civilians in Gaza, the West Bank, Ukraine and "other populations caught in conflict zones."

- $2.33 billion for refugees from the war in Ukraine.

IFR_AR_012583

- $4.83 billion for allies to "deter aggression by the Chinese government" in the Indo-Pacific region.

The proposal installs several tools to address the border, including: requiring the president shut down the border if the numbers of migrants hits a specific threshold; adjusting the rules for who qualifies for asylum; expediting the process for deciding asylum claims; and allowing migrants authorization to work while awaiting adjudication of their asylum claim.

For several months Oklahoma Republican Sen. Jim Lankford, Connecticut Democratic Sen. Chris Murphy and Arizona independent Sen. Kyrsten Sinema have worked on a plan to address the record number of migrants crossing the U.S.-Mexico border.

---

POLITICS

## If the border deal gets through Senate Republicans, it could still fail in the House

LISTEN · 3:42    ( PLAYLIST )    Download

Transcript

Schumer said Sunday that he plans to move the bill this week, with a key vote on Wednesday. "Senators must shut out the noise from those who want this agreement to fail for their own political agendas," Schumer wrote in a statement.

But House Speaker Mike Johnson, R-La., has already made clear that the bill has no future beyond the Senate.

"I've seen enough. This bill is even worse than we expected, and won't come close to ending the border catastrophe the President has created. As the lead Democrat negotiator proclaimed: Under this legislation, 'the border never closes.' If this bill reaches the House, it will be dead on arrival," Johnson posted on X, the social media site formerly known as Twitter.

> I've seen enough. This bill is even worse than we expected, and won't come close to ending the border catastrophe the President has created. As the lead Democrat negotiator proclaimed: Under this legislation, "the border never closes."
>
> If this bill reaches the House, it will be...

IFR_AR_012584

— Speaker Mike Johnson (@SpeakerJohnson) February 5, 2024

The bill is not the type of comprehensive immigration legislation that Congress considered but failed to advance more than a decade ago. Instead, negotiators focused their time on addressing the discreet problems facing border officials and border towns as record numbers of migrants continue to cross the U.S. border with Mexico.

In a statement, Biden said while the bipartisan agreement doesn't address everything he wanted, the reforms are essential for making the border more orderly, secure, fair and humane. He pointed to key provisions in the proposal, including new presidential emergency authority to shut down the border when it becomes overwhelmed and make the asylum process fairer and more efficient.

"If you believe, as I do, that we must secure the border now, doing nothing is not an option. Working with my administration, the United States Senate has done the hard work it takes to reach a bipartisan agreement," Biden said. "Now, House Republicans have to decide. Do they want to solve the problem? Or do they want to keep playing politics with the border?"

Before the bill was unveiled, Biden vowed recently, while campaigning in South Carolina, he would sign it and shut down the border.

## The proposal directs the president to shut down the border in moments of high migrant traffic

Sinema characterized the bill as ending "catch and release" policies. The bill would require those crossing the border illegally to be detained or immediately

IFR_AR_012585

returned to Mexico, Sinema told reporters on Sunday.

"We actually have to change the outdated policies that have allowed our border crisis to get too out of control," she said.

She said the bill also includes higher standards for asylum and would speed up the process for asylum seekers to ensure a hearing on their case within six months.

She clarified that there would be a mandated border shutdown when migrant traffic reaches 5,000 "approaches" per day, and the president would have the option to institute a shutdown at earlier points.

---

POLITICS
## Despite pressure from Trump, Senate border negotiations forge ahead



LISTEN · 3:39        PLAYLIST        Download

Transcript

Sinema told reporters on a call Sunday that the new provisions would have shut down the border every single day this year.

"Every single day this calendar year has been over that 4,000 threshold, and many of the days have been over the 5,000 threshold," Sinema said. "If this law were already in effect, the border would have been closed every single day this year."

Lankford and other negotiators have raised concerns about misinformation surrounding the bill.

"This body is really good at tweaking old things, we're not good at creating something brand new," Lankford said.

IFR_AR_012586

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 637 of 660

The legislation also adds some restrictions around the ability of migrants to claim asylum. The bill also narrows the president's authority to parole those migrants who are permitted to enter as they await court hearings to adjudicate their asylum claims.

In response to a push from Democratic governors and mayors who are dealing with a significant wave of migrants in their states and cities, the bill includes work permits for migrants so they can gain jobs as their cases are processed. Texas Gov. Greg Abbott claims his administration has sent more than 100,000 migrants to cities like Los Angeles, Denver and New York.

The president sent Congress an emergency funding package in October asking for over $100 billion for aid to Ukraine, Israel and efforts to support Taiwan against Chinese aggression. The proposal also requested additional money to beef up security at the southwest border, but Republicans quickly decided that any new money had to be linked to border policy changes.



**POLITICS**

**Senate border negotiations forge ahead despite pressure from Trump**

## Election-year politics impacts fate of the bill

Senate Minority Leader Mitch McConnell has argued that Congress should seize this moment to force the Biden administration to agree to a new law.

"If this were not divided government we wouldn't have an opportunity to do anything about the border — in fact, I don't think we'd get 60 votes for any border plan if we had a fully Republican government, so this is a unique opportunity where divided government has given us an opportunity to get an outcome," McConnell said.

But just a day later McConnell told a closed-door meeting of Senate Republicans that the politics of the issue had shifted. He pointed to a statement from Trump, the party's likely presidential nominee, opposing a Senate deal.

IFR_AR_012587

McConnell publicly supported the negotiators moving forward, but the episode made it clear that the Republican Party, largely behind Trump, was not prepared to cross him on an already politically thorny issue he has made a signature of his campaign.

---



**THE NPR POLITICS PODCAST**

**Border Deal: Action Item Or Campaign Fodder?**

House Speaker Johnson, in a letter to House GOP colleagues days before it was announced, said the proposal's main structure meant it was "dead on arrival," and it's unclear whether he would even bring the measure to the House floor for a vote. Many hard-right House GOP lawmakers dismissed the Senate work product before it was finalized. One conservative, Rep. Marjorie Taylor Greene, R-Ga., signaled she would move to oust the speaker if he advanced the bill, since it is part of a national security package that includes money for Ukraine.

Many Republican lawmakers argued Biden has the authority now to shut down the border and any new legislation should wait until after the 2024 election.

*-- NPR's Jasmine Garsd contributed to this story*

IFR_AR_012588

6/2/24, 1:14 PM
Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 639 of 660
Senate negotiators reach bipartisan deal on border policy : NPR



# Get political news and analyses that matter

The NPR Politics newsletter explains the big news coming out of Washington.

| Email address | SUBSCRIBE |

[See more subscription options](#)

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy.
NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR



**POLITICS**

**What did Trump say? Explaining the former president's favorite talking points**

IFR_AR_012589



LAW

**Michael Cohen, Trump's ex-fixer, testifies about hush money payment to Stormy Daniels**



LAW

IFR_AR_012590

6/2/24, 1:14 PM
Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 641 of 660
Senate negotiators reach bipartisan deal on border policy

**Democratic Sen. Bob Menendez goes on trial in New York on federal corruption**



POLITICS

**Biden will keep Trump's China tariffs, and add new ones on electric vehicles**



MIDDLE EAST CRISIS — EXPLAINED

**U.S. report says it's 'reasonable to assess' that Israel has violated humanitarian law**

IFR_AR_012591



LAW

**Steve Bannon loses his appeal of his contempt of Congress conviction**

## Popular on NPR.org



IFR_AR_012592

SHOTS - HEALTH NEWS

**Why writing by hand beats typing for thinking and learning**



SPACE

**There's still a chance to see the Northern Lights from lower latitudes**



SCIENCE

**The first person to receive a genetically modified pig kidney transplant has died**

IFR_AR_012593



**OBITUARIES**

**Roger Corman, the B-movie legend who launched A-list careers, dies at 98**



**SPACE**

**The huge solar storm is keeping power grid and satellite operators on edge**

IFR_AR_012594



BUSINESS

**With 'bleisure' and fewer workers, the American hotel is in recovery**

## NPR Editors' Picks



BUSINESS

## Why investors are doubling down on Truth Social despite Trump's historic conviction



WORLD

## What does the death of a jailed Jesuit priest say about India's democracy under Modi?



SHOTS - HEALTH NEWS

IFR_AR_012596

**As Republicans probe COVID's origins, some see an attack on science; others say it's long overdue**



POLITICS

**Vintage Trump remarks after convictions renew dilemma for news media and voters alike**



IFR_AR_012597

HEALTH

**7 surprising facts about dreams -- why we have them and what they mean**



CULTURE

**How grief taught award-winning producer Jack Antonoff to be less cynical**

**READ & LISTEN**

Home

News

Culture

Music

Podcasts & Shows

**CONNECT**

Newsletters

Facebook

Instagram

Press

Public Editor

Corrections

Contact & Help

**ABOUT NPR**

Overview

Diversity

**GET INVOLVED**

Support Public Radio

Sponsor NPR

IFR_AR_012598

6/2/24, 1:14 PM
Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 649 of 660
Senate negotiators reach bipartisan deal on border policy : NPR

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2024 npr

IFR_AR_012599





# Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.

Hundreds of thousands of migrants from Haiti, Venezuela, and elsewhere risk their lives each year to cross the Darién Gap between Colombia and Panama. Images from along the journey show the dangers they face.

John Moore/Getty Images

By **Diana Roy**, Author and **Sabine Baumgartner**, Photo Editor

February 01, 2024

The Darién Gap is an imposing obstacle on one of the world's most dangerous migration routes. The remote, roadless crossing on the border between Colombia and Panama consists of more than sixty miles of dense rain forest, steep mountains, and vast swamps. It is the only overland path connecting Central and South America. Over the past few years, it has become a leading transit point for migrants in search of work and safety in the United States, as authorities have cracked down on other routes by air and sea.

IFR_AR_012611



DARIÉN PROVINCE, PANAMA: Migrants cross the Chucunaque River by boat to the Indigenous village of La Peñita. There, they are offered medical care at a government-run reception center before continuing their journey north. Luis Acosta/AFP/Getty Images

However, migrants face many challenges on this land journey northward, including treacherous terrain, exposure to disease, and violence at the hands of criminal groups. As the number of migrants grows, so too does the impact on Indigenous communities whose lands they often traverse. Government officials and international aid organizations have sought to manage the crisis by setting up temporary housing and providing basic services to those arriving in Panama, where resources are rapidly being depleted. UN officials warn of a deepening humanitarian emergency after more than half a million migrants made the trek in 2023.

IFR_AR_012612

# Migrants Under Pressure

Economic insecurity, political upheaval, violence, and climate change are driving record numbers of migrants from their home countries, according to UN experts. At the same time, the lifting of COVID-19 border restrictions has reopened many travel routes across Latin America. Most migrants are ultimately headed for the southern U.S. border, where they hope the Joe Biden administration will grant them asylum. But many coming from the Caribbean and South America first have to cross the sixty-mile-wide Darién Gap, the only break in the Pan-American Highway that otherwise stretches uninterrupted from Alaska to the southern tip of Argentina.

IFR_AR_012613

According to the Panamanian government, a record number of more than 520,000 migrants [link in Spanish] crossed the Darién Gap en route to the United States in 2023, over double the number reported the year before and up from just a couple hundred people annually a decade ago. Approximately one-fifth of those who made the crossing were children. The majority of migrants were from Venezuela, followed by Ecuador and Haiti, but some hailed from as far away as Angola, Bangladesh, and Pakistan.

DARIÉN GAP: After spending the night at a base camp in Las Tekas, Colombia, hundreds of Haitian migrants begin their hike through the dense rain forest. Some of them had paid the Gulf Clan, a Colombian paramilitary group, upward of $80 to drive them to the camp. John Moore/Getty Images

Experts say the number of people risking their lives to cross the gap is expected to increase as socioeconomic conditions continue to worsen across the region. Since a devastating earthquake rocked Haiti in 2010, for instance, tens of thousands of Haitians moved to South America, where they have faced discrimination and economic difficulties.  In 2021, 61 percent of migrants traversing the Darién Gap were from Haiti. That number dropped to about 9 percent in 2023, though the country continues to endure gang violence, political instability, and the effects of frequent natural disasters. Meanwhile, the number of Venezuelans crossing the gap has sharply increased as the humanitarian situation in their home country grows more dire.

## Beginning the Journey

The first stop on the journey north is the coastal town of Necocli, Colombia, on the shore of the Gulf of Urabá. Most migrants already in the region travel on foot or take local transportation to get there. But for those coming from Africa and the Caribbean, the route is more complicated. Under mounting pressure from the United States to contain illegal immigration, the Mexican government has expanded its visa requirements, making it more difficult for people to fly directly to the U.S.-Mexico border. Instead, they will now often fly into Brazil or Ecuador, where visa policies are more lax, before heading for Necocli. To bypass the Darién Gap entirely, some African migrants are flying to Nicaragua before heading north.

IFR_AR_012615

NECOCLÍ, COLOMBIA: Thousands of migrants, mostly from Haiti, camp out on the beach as they wait to take a boat to Panama. Some are left waiting for weeks in precarious conditions and with few possessions. Raul Arboleda/AFP/Getty Images

Necoclí is a major transit point for migrants seeking to enter Panama. While the number of migrants crossing the border slowed at the start of the COVID-19 pandemic, the relaxation of travel restrictions across the region has seen thousands of migrants flood the small town. The influx has strained local infrastructure, resources, and services, and contributed to food and water shortages. Another starting point is the port city of Turbo about an hour south of Necoclí that regained popularity in 2023 after it was largely unused for years.

NECOCLÍ: The lifting of many COVID-19 border and travel restrictions across Latin America has resulted in an influx of migrants to the coastal town. In August 2021, the mayor's office declared a state of emergency after the town's water and sewage systems became dangerously stressed. Raul Arboleda/AFP/Getty Images

While waiting to take an hour-long ferry ride to Acandí, a town about five miles from the Panama border, migrants take shelter in hotels or makeshift camps on the beach. Most have few possessions; any leftover money is often spent buying food and camping gear from street vendors.

IFR_AR_012617

NECOCLÍ: Left: With the little money they have, migrants often buy food from local street vendors, who have hiked up their prices. Right: Migrants wait to board the ferry to Acandí. Raul Arboleda/AFP/Getty Images

NECOCLÍ: Migrants from Haiti board a boat headed for the Colombia-Panama border. Overcrowded boats have capsized while carrying migrants across the Gulf of Urabá. John Moore/Getty Images

Some have been forced to wait weeks for the ferry. The Ombudsman's Office of Colombia, a government agency responsible for overseeing the protection of civil and human rights, has been tasked with addressing the backup in Necoclí.

NECOCLÍ: A crowd of Haitian migrants pleads with Colombian police after the ferry ticket office temporarily closes. John Moore/Getty Images

## Faced with Danger

Once in Acandí, migrants will head for the Darién Gap jungle, a dangerous hike that can take ten or more days. Many pay to be led by local guides, or "coyotes." Along the route are smugglers and criminal groups, including members of the Revolutionary Armed Forces of Colombia (FARC) and the Gulf Clan, a paramilitary group and Colombia's largest drug cartel. These groups often extort and sexually assault migrants. "Deep in the jungle, robbery, rape, and human trafficking are as dangerous as wild animals, insects and the absolute lack of safe drinking water," Jean Gough, then regional director for Latin America and the Caribbean at the UN Children's Fund (UNICEF), said

in an October 2021 news release. "Week after week, more children are dying, losing their parents, or getting separated from their relatives while on this perilous journey." UNICEF estimated that half of the children who crossed in the first six months of 2023 were under five years old.

LAS TEKAS, COLOMBIA: Left: Migrants settle in at a base camp ahead of their hike through the Darién Gap, a trip that can take ten or more days. Right: A woman from Haiti spends the night in a tent. John Moore/Getty Images

The environment presents an equally large challenge. The Darién Gap is one of the wettest regions in the world, and frequent rainfall can trigger landslides in the mountainous terrain. Temperatures can reach 95°F (35°C) with high humidity, exacerbating persistent thirst and hunger. The area's wildlife, including crocodiles and venomous snakes, add to the dangers migrants face.

IFR_AR_012620