

DARIÉN GAP: Migrants travel by foot through the jungle as there is no road. Many of them will pay guides to accompany them for part of the journey. John Moore/Getty Images

"The journey was really quite hard, especially when the rain came. It was just mud, rivers and going up mountainsides non-stop," one Haitian migrant told Al Jazeera. "There were pregnant women, we had to walk in rivers … children were fainting, and even men, at times, who couldn't continue."

DARIÉN GAP: The rough terrain and steep trails of the gap make the journey even more challenging.
John Moore/Getty Images

DARIÉN GAP: Left: The journey requires crossing several rivers, where the water can reach waist high. Strong currents have swept away some migrants. Right: Frequent rest breaks are needed as migrants face the breaking point of exhaustion. John Moore/Getty Images

Aside from SENAFRONT, Panama's national border service, there is no police force in the area and no formal road, making it difficult to stop arms and drug trafficking, or find help. According to the International Committee of the Red Cross, more than sixty migrants died trying to cross the gap in the first six months of 2023, though officials say the actual figure is likely to be much higher.

AGUA FRÍA, PANAMA: The bodies of fifteen migrants who died trying to cross the Darién Gap are buried at the Guayabillo cemetery. Arnulfo Franco/AP Photo

IFR_AR_012623

# Heading for the United States

While there are several route options, migrants usually exit the jungle at Bajo Chiquito, a small village in eastern Panama. (Another common exit point is the Indigenous village of Canaán Membrillo.) There, they are met by international humanitarian organizations such as Doctors Without Borders and UNICEF, which have set up reception centers to provide medical care and mental health services, as well as access to essentials such as water, hygiene, and sanitation.

BAJO CHIQUITO, PANAMA: A group of migrants arrives by boat at the village, exhausted and in need of medical care. Ivan Pisarenko/AFP/Getty Images

Panamanian authorities have also set up infrastructure to temporarily house migrants and provide them with basic services, but officials say more assistance is needed. According to then Foreign Minister Erika Mouynes, the government lacks the money needed to provide long-term humanitarian support to migrants. Rather than deport them, Panamanian authorities and international organizations, with financial assistance from the United States, focus on providing migrants with essential services. It is in Panama that they are registered as migrants and biometrically screened by authorities for the first time on their journey. Most then quickly resume their trek to the north.

BAJO CHIQUITO: Left: Migrants camp in the village while they prepare to continue north. Right: Panamanian authorities transport migrants to a reception center, where they are offered temporary housing and basic services. Luis Acosta/AFP/Getty Images, Ivan Pisarenko/AFP/Getty Images

But to get to the United States, migrants have to cross half a dozen more borders, where they face the risk of being stopped or deported. Even if they reach the southern U.S. border—a journey of roughly 2,500 miles over Central America alone—many are turned away or expelled back to their home countries. In April 2023, U.S. officials announced they had struck a deal with Colombia and Panama to shut down the Darién Gap route; the proposed sixty-day plan was pitched as part of a broader effort to stem an expected surge in illegal migration at the U.S.-Mexico border. As part of the plan launched in June, Panama's government will dedicate some 1,200 immigration agents, border police, and naval air service members to combat transnational organized crime in the jungle.

But migrant numbers have only grown, as hundreds of thousands of people continue to flee worsening poverty and unrest in the so-called Northern Triangle countries of El Salvador, Guatemala, and Honduras, and beyond. In September 2023, Panamanian authorities announced that they were increasing migrant deportations and implementing stricter requirements for foreigners seeking short-term stays in the country. The surge across the Darién Gap is reflected in an influx at the southern U.S. border, where U.S. border authorities reported that they apprehended close to 2.5 million people during fiscal year 2023, a record high, while northern cities such as New York are also struggling to manage the arrivals.

JUÁREZ, MEXICO: A family of Haitian migrants crosses the Rio Grande on their way to the United States, where they hope to receive asylum under the Joe Biden administration. David

Peinado/NurPhoto/Getty Images

**Recommended Resources**

In this YouTube Short, CFR Senior Fellow Shannon K. O'Neil explains why hundreds of thousands of Latin American migrants traverse the Darién Gap annually.

This Backgrounder examines how foreign intervention, political instability, and natural disasters have stymied Haiti's development.

A report by Human Rights Watch documents how a lack of safe and legal pathways have pushed migrants to cross the Darién Gap.

This video by PBS NewsHour follows special correspondent Nadja Drost and videographer Bruno Federico as they travel through the Darién Gap in August 2020.

At this CFR event, panelists discuss climate change's implications for mass migration.

This CFR InfoGuide examines the global migrant crisis and the strains it is placing on the international refugee system.

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 8 of 200

**The New York Times** | https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html

## Confusion on the Border as Appeals Court Rules Against Trump's 'Remain in Mexico' Policy

The court upheld an injunction blocking a policy that requires asylum applicants to wait in Mexico until their cases are decided. But a stay on the order means the policy could remain in effect.

 **By Caitlin Dickerson**

Published Feb. 28, 2020   Updated Oct. 29, 2021

A federal appeals court found a central pillar of the Trump administration's immigration agenda legally invalid on Friday, ruling that asylum seekers must be allowed into the United States while their cases weave through American immigration courts.

The court stayed its decision, however, in order to allow the government time to appeal the ruling.

After a year in which nearly a million migrants crossed the southwestern border, jamming processing facilities and defying President Trump's attempts to curtail immigration, border crossings have dropped sharply in recent months, in part because of the administration's "Remain in Mexico" policy, the subject of Friday's court ruling. The decision from the United States Court of Appeals for the Ninth Circuit, if allowed to stand, would eliminate one of the administration's key levers for controlling the arrival of new asylum seekers.

A three-judge panel in San Francisco upheld an injunction blocking the policy, which has required people applying for asylum at the border to wait in Mexico while their claims for protection are reviewed, a process that often takes months or years.

The judges gave lawyers in the case until Monday to respond to the stay.

Since the "Remain in Mexico" restrictions were rolled out early in 2019, more than 59,000 asylum seekers have been turned back by American authorities into Mexican border cities, where kidnappings and violence have surged. Because shelters in Mexico are scant and overrun, many of the migrants are living in vast tent encampments exposed to the elements. Powerful Mexican drug cartels have moved in to exploit them.

"It's a resounding rejection," Judy Rabinovitz of the American Civil Liberties Union, who was the lead lawyer representing the plaintiffs, said of the court's ruling earlier Friday. She added, "The policy is a disgrace, it's illegal, it's morally indefensible, and it needs to stop."

Chad Wolf, acting secretary of homeland security, said U.S. border officials have continued to process meritorious asylum claims and reduced fraudulent and invalid claims.

"Should this ruling stand, the safety and security of our border communities, international relationships and regional stability is at risk," he said in a statement.

"This nationwide injunction is grave and reckless, rewrites the laws passed by Congress and undermines the U.S. Constitution," he said.

Lawyers who brought the challenge represented a group of 11 asylum seekers who had been returned to Mexico and several legal advocacy organizations. The plaintiffs won a nationwide injunction, but because a higher court stayed the ruling, the policy has continued to expand — most recently taking effect in Nogales, Ariz., in December.

IFR_AR_012647



These families from Honduras heard rumors that people in the Remain in Mexico Program might be allowed into the United States and went to the bridge to find out. Cengiz Yar for The New York Times

Friday's appeals court ruling, before it was stayed, prompted widespread celebration among those who had been fighting the policy, followed by hours of confusion over when and how it might go into effect. Mr. Wolf said his department was working with the Justice Department "to expeditiously appeal this inexplicable decision." Human rights organizers in the Mexican border cities where asylum seekers are clustered — including Tijuana, Ciudad Juárez and Matamoros — scrambled to analyze the opinion, while also trying to maintain calm among the thousands of migrants now held up in those cities to prevent a panicked rush toward the United States.

Migrants held in Mexico under the policy began gathering at several international bridges. About 50 collected Friday evening at the Paso Del Norte bridge in Ciudad Juárez, hoping to cross into El Paso, but Mexican authorities closed the bridge to all traffic.

A 28-year-old man from Cuba, who was among those trying to cross, said he would wait for an opportunity. "If God wants us to, we will cross," said the man, who did not want his name published for fear of jeopardizing his asylum case. "I'm going to wait here."

Late Friday, the Customs and Border Protection agency said it had halted processing of new cases under the program, but that was before the stay. "We are continuing to utilize every tool at C.B.P.'s disposal to ensure the integrity of our immigration system and processing programs," the agency said in a statement.

The policy at issue is known formally as "migrant protection protocols" — though the lawyers who challenged it argued that it did just the opposite by placing vulnerable people in harm's way. Instead of safeguarding people fleeing persecution abroad, as is required under federal law, the policy banished them to perilous conditions in a different place, the lawyers said.

Government lawyers defended the policy based on a little-known provision of the 1996 federal immigration law allowing the American government to return some migrants to contiguous countries while their cases for entry into the United States are being processed.

They argued that the provision could be applied to asylum seekers, and that the United States had fulfilled its legal duty to protect people fleeing persecution by conducting a screening to identify possible fears before it sends people back to Mexico.

But those challenging the policy countered that asylum seekers are exempt from the legal provision, and said the government's provisions for screening to determine whether migrants had a credible fear of persecution was insufficient. They pointed to cases of people who had been kidnapped or raped while they were waiting in Mexico and were told afterward by American authorities that their fear of residing in Mexico was not credible.

In a 2-to-1 opinion on Friday, the appeals court judges said the policy violated the federal government's obligation to avoid returning migrants to dangerous places, and they concluded that the legal provision invoked by the government in creating the policy was never meant to be applied to asylum seekers.

They found that the policy was "invalid in its entirety" and concluded that a lower-court ruling that initially enjoined its implementation was "not an abuse of discretion." The stay issued Friday night, the court said, would remain in effect pending review of the government's petition for an immediate appeal.

IFR_AR_012648

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 10 of 200

Judge William A. Fletcher, an appointee of President Bill Clinton, wrote the opinion, joined by Judge Richard A. Paez, also a Clinton appointee. Judge Ferdinand F. Fernandez, nominated to the court by President George Bush, dissented.

In a separate ruling on Friday, the same panel of appeals court judges rejected another of the Trump administration's attempts to restrict asylum. In that case, the judges reviewed a policy that blocks anyone who entered the United States illegally — as opposed to presenting themselves at a legal port of entry — from applying for asylum.

The court found unanimously that the policy runs counter to asylum law, which states that people can apply for the status regardless of where they enter the country. That policy had been enjoined by a district court judge shortly after it was announced, and the appeals court on Friday reaffirmed the injunction.

"What's especially significant is that, in both cases, the court found that the administration ignored Congress," said Lee Gelernt, deputy director of the American Civil Liberties Union's Immigrants' Rights Project, who argued the case.

The administration took additional steps last year to make it harder to apply for asylum, signing a deal with Guatemala to resettle asylum seekers there, instead of in the United States. It also adopted a policy requiring most applicants from Central America to first seek asylum in another country along their route of travel.

That policy is also being challenged in federal court.

The policies are part of a constellation of measures undertaken by the Trump administration to help stem the record number of migrant families, mainly from Central America, who began crossing the border in the fall of 2018.

The influx led to overcrowded detention facilities and overwhelmed immigration courts, prompting President Trump to double down on his pledges to build a wall and clamp down on immigration across the southwestern border.



The Migration Protection Protocols Immigration Hearing Facility in Laredo, Texas.   Tamir Kalifa for The New York Times

Taken together, the policies have effectively shrunk the American asylum system to a fraction of what it once was. By the end of the 2019 fiscal year, in October, overall border apprehensions had shrunk to 60,781, from a high of 144,116 in May.

The news that the "Remain in Mexico" policy might be invalidated sparked chaos in some areas of the border, where some migrants have been living for months in filthy and crime-ridden areas, with little hope of entering the United States. Emma Obando, 42, had been cooking plantains for her two sons in the Matamoros tent encampment on Friday when a crying woman ran toward her, yelling to everyone she passed, "We should go; we should cross right now because they have undone the law of M.P.P."

Ms. Obando has been living in Matamoros with her 7- and 10-year-old sons, the elder of whom has autism, since September, after having fled their home in Honduras. She said many migrants flocked to the border after hearing news of the court ruling on Friday, but soon after, organizers called them off, instead advising people not to "make a big fuss" yet, and to prepare their government documents instead.

Eventually, Ms. Obando said, the mood calmed. She decided to try crossing into the United States with her sons on Saturday.

IFR_AR_012649

10/3/22, 7:25 PM    Confusion on Border as Appeals Court Sides Against Trump's 'Remain in Mexico' Policy - The New York Times

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 11 of 200

Mexican officials and civic leaders were also trying to make sense of how the ruling might impact their communities.

"There are various unknowns, various questions," said Dirvin Luis García Gutiérrez, the head of the migration program for the population agency in the state of Chihuahua.

He said that Ciudad Juárez, where more than 19,700 migrants have been returned under the program, was currently supporting a transient population of between 13,000 and 15,000 migrants, including migrants returned under the program as well as those who are still waiting to cross into the United States to apply for asylum.

In an immigration court in downtown San Diego on Friday morning, more than a dozen migrants who had been subjected to "Remain in Mexico" were in court for their asylum hearings when the appeals court's opinion was released. Most were not represented by lawyers and had little guidance on how to proceed.

When the "Remain in Mexico" program was initially enjoined by a federal judge in California in April of last year, migrants who had been in court on that day ended up spending more than two weeks in government holding cells while officials decided how to proceed. When the injunction was stayed, the migrants were returned to Mexico, allowed to enter the United States only for their court hearings.

Government officials moved quickly to reverse the decision. It appeared clear that, whatever the immediate outcome, the issue would ultimately be decided by the United States Supreme Court.

Hundreds of asylum seekers who have been returned to Mexico have since given up their claims, accepting free transportation provided by the American government and the United Nations back to their homes in Central America. But others have vowed to continue with their cases.

Yoleydi Gonzalez Jimenez, 26, arrived from Cuba with her husband in the Mexican city of Matamoros in September and has been living in a tent encampment at the end of an international bridge into the United States ever since. With little access to public bathrooms, the camp smells of human waste.

Ms. Gonzalez Jimenez wears socks with her flip-flops to keep warm. A donated air mattress covered with pink and purple sheets fills the tent that has become the couple's home. Their few possessions are stacked on top and become soaked with water that seeps inside when it rains.

"I can't give up after all the time I've been waiting here, even though I feel like I'm going to die," she said after a court hearing in December. Her next hearing was scheduled in Brownsville, Texas. Until then, she was told, she would have to go back to Mexico.

Reporting was contributed by Max Rivlin-Nadler, Manny Fernandez, Zolan Kanno-Youngs and Kirk Semple.

IFR_AR_012650


Human Rights First

Donate

AUTHORITARIANISM / SYSTEMIC INJUSTICE

# NEW REPORT DOCUMENTS DEVASTATING TOLL OF COURT-ORDERED REIMPLEMENTATION OF REMAIN IN MEXICO

WASHINGTON, DC -- A new report, Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived, finds that asylum seekers subjected to the court-ordered reimplementation of the Remain in Mexico (RMX) policy suffered kidnappings and other violent attacks in Mexico. The report comes as the federal district court in Texas that had enjoined the initial termination of Remain in Mexico considers a request by Trump-aligned attorneys general to force the Biden administration to halt the policy's end again.

**WASHINGTON, DC —** A new **report**, *Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived*, finds that asylum seekers subjected to the court-ordered reimplementation of the Remain in Mexico (RMX) policy suffered kidnappings and other violent attacks in Mexico. The report comes as the federal district court in Texas that had enjoined the initial termination of Remain in Mexico considers a request by Trump-aligned attorneys general to force the Biden administration to halt the policy's **end** again.

"The Remain in Mexico policy was, and remains, an unmitigated human rights and refugee protection disaster. U.S. policies that return asylum seekers to Mexico cannot be implemented lawfully, safely, or humanely," said **Kennji Kizuka, associate director for refugee protection research at Human Rights First and co-author of the report.** "Just like the initial policy, the court-ordered reimplementation of Remain in Mexico delivered asylum seekers to brutal, targeted attacks. This policy should never be resurrected by a future administration, adopted in law by Congress, or again forced by the courts into use."

*Fatally Flawed* draws on interviews conducted by Human Rights First with asylum seekers returned to Mexico as well as nearly 2,700 interviews conducted by pro bono legal staff with migrants and asylum seekers enrolled in RMX during the court-ordered reimplementation ("RMX 2.0"). These interviews reveal brutal attacks on asylum seekers, including kidnappings, rapes, torture, and other violence after returning to Mexico under the court-imposed reimplementation of RMX.

"Every day that asylum seekers are forced to wait in Mexico for the policy to be fully unwound is another day they are at risk of being kidnapped, raped, or tortured," said **Julia Neuser, research and policy associate attorney at Human Rights First and co-author of the report.** "The Biden administration was right to end this brutal policy that returned thousands of asylum seekers to horrific violence."

Key findings from the **report** include:

- Staggering statistics of targeted violence in Mexico against migrants and asylum seekers. Of nearly 2,700 interviews reviewed by Human Rights First of people initially enrolled in RMX during its court-ordered reimplementation: ~~~~~~~~~~~~~~ nt (1,109 people) reported violent attacks in Mexico.

Skip to content

IFR_AR_013607

12/10/22, 10:09 AM    New Report Documents Devastating Toll of Court-ordered Reimplementation of Remain in Mexico - Human Rights First

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 13 of 200

 Human Rights First

Donate

- Despite steps announced by the Department of Homeland Security (DHS) to "**enhance**" security, kidnappings, rapes, and other violent assaults continued against people after DHS had returned them to Mexico under RMX 2.0. Recent attacks include: a Nicaraguan woman kidnapped and sexually assaulted, a Venezuelan asylum seeker beaten and shot at, a teenage girl sexually assaulted, and two Nicaraguans kidnapped by a cartel and forced to watch as cartel members put a gun in another man's mouth and threatened to kill him.

- RMX 2.0 remained a due process farce:
  -Only **five percent** of people returned under RMX 2.0 had a lawyer – an even lower rate than the eight percent represented during RMX under the Trump administration.
  -Recent government data shows only **63** asylum seekers in RMX 2.0 have been granted relief out of 1,600 completed cases. This rate is nearly identical to the **4.1 percent** grant rate for RMX cases completed during the Trump administration.

- Of those subjected to RMX 2.0, **78 percent** were from Cuba, Nicaragua, and Venezuela – countries from which many refugees are fleeing.

- Black and Indigenous migrants continue to be targeted for kidnappings, violence and discrimination in Mexico due to their race and/or Indigenous identity.

- Mexican police, immigration officers, and other government authorities continue to be responsible, often in collusion with cartels, for brutal attacks on migrants and asylum seekers after being returned to, or while passing through, Mexico.

---

**PRESS**

Published on September 15, 2022

**SHARE**

in  f  𝕏  🔗

**RELATED POSTS**    ←  →

Skip to content

**IFR_AR_013608**



Donate

Skip to content

IFR_AR_013609

12/10/22, 10:09 AM New Report Documents Devastating Toll of Court-ordered Reimplementation of Remain in Mexico - Human Rights First

Case 1:24-cv-01702-RC Document 53-2 Filed 09/27/24 Page 15 of 200



**Human Rights First**

Donate

Last Name

Email Address

submit.

Human Rights First is a nonpartisan, 501(c)(3). We do not favor or oppose any candidate for public office.

IFR_AR_013610

**US-Mexico border**

🕐 This article is more than **1 year old**

# Migrant surges hint at chaos at US-Mexico border once Title 42 expires

Critics of Covid migration restriction, ending next week, say it illegally prevents asylum claims and places migrants in danger



📷 Migrants queue near the US-Mexico border wall to turn themselves in to US border patrol agents in El Paso, Texas, on 13 December 2022. Photograph: José Luis González/Reuters

**Joanna Walters** *and agency*

Fri 16 Dec 2022 06.00 EST

More than 1,500 undocumented people hurried across the US-Mexico border into west Texas all at once last weekend, surprising the city of El Paso, which is no stranger to dealing with migration.

The group included many Nicaraguans, who said they were freed by Mexican authorities after being kidnapped last week.

　　　　　The sudden rush of families, in particular, wading across the Rio Grande, trying to hold their minimal luggage and children

IFR_AR_014183

up out of the water, came after a difficult few months for all parties at the border amid fluctuating policy and confusing messages from the Biden administration.

Next Wednesday, restrictions implemented by former president Donald Trump at the start of the coronavirus pandemic that have blocked hundreds of thousands of migrants are to end.

This follows a federal court ruling that the restriction, known as Title 42 after the relevant portion of US federal public health code, is unlawful.

If the restrictions are indeed lifted, there will probably be additional surges of people entering the US after being stuck south of the border with an attendant escalation of chaos, at least temporarily. This will be a challenge for the migrants in personal terms, after what they have already been through to reach and then wait at the border, and for Joe Biden in political terms, as many fellow Democrats fret with frustration and Republicans, who refuse to cooperate on immigration reforms via Congress, make yet more hay.

But the long legal wrangling over Title 42 could yet delay this timeline once again. So what is Title 42 and what is happening at the border?

# Blocking the border

In March 2020, US health authorities issued an order, known as Title 42, that allows federal border agents to expel migrants crossing the US-Mexico border back to Mexico or other countries. It was brought about to stem the spread of Covid but was kept in effect long after vaccines were distributed and the pandemic ebbed. It was just one of Trump's hardline anti-immigration measures.

Many critics have bitterly denounced the order, arguing it unlawfully prevents migrants from claiming asylum, while the US immigration system is inhumane and counterproductive. It also subjects migrants to greater hardship and horrendous hazards. Vulnerable migrants are preyed on by organized criminals in Mexico who kidnap, extort, rob and rape them, while blocked border crossings push them to risk death by drowning and injury from climbing border barriers or from exposure to the heat of the desert or suffocation in a smuggler's airless vehicle during dangerous clandestine crossings. Supporters of the hardline policy say it suppresses migration into the US. But it has been an especially deadly year at the border.

# Title 42 and Biden

Joe Biden campaigned on a promise to reverse Trump's restrictive asylum policies.

However, he left the Title 42 rule in place for more than a year, exempting unaccompanied children but allowing US authorities to send hundreds of thousands of other migrants, including families, back to Mexico.

There have been record numbers of apprehensions at the border, and many migrants try to cross again and again after being expelled to Mexico. It has caused operational and political problems for the administration, which says the immigration legal system has long been "broken". There have been tragic and brutal scenes.

Mexico accepts Mexicans, Guatemalans, Salvadorans, Hondurans and Venezuelans expelled back across the border under Title 42, but other nationalities are generally let into the US to pursue their immigration cases.

This week, a large group of about 1,500 migrants lined up at the border near El Paso, Texas, waiting to be processed.

Mario D'Agostino, El Paso's deputy city manager, told reporters on Tuesday that the arrivals were "unsustainable" and that the city had asked the Biden administration to consider processing migrants at military bases or increasing flights to move migrants to other parts of the border.

A US Department of Homeland Security spokesperson said the department is "working according to plan to quickly decompress the El Paso area".

People are variously fleeing political oppression, gang violence, deepening poverty, the climate crisis, failed states and war – sometimes several of these situations at the same time.

# What's next?

The Centers for Disease Control and Prevention announced in April that it would end Title 42, saying it was no longer needed as a health measure.

But a federal judge in Louisiana blocked the termination after a legal challenge brought by a group of two dozen states with Republican

attorneys general, who argued that increased migration would saddle their states with costs.

In a separate lawsuit, brought by the American Civil Liberties Union and other groups on behalf of migrant families who argue they were harmed by Title 42, a Washington DC-based judge struck down the rule as unlawful on 15 November, and gave the government until 21 December to prepare.

Then a coalition of Republican state attorneys general sought to intervene. In arguments similar to those made in the Louisiana case, the states said that ending Title 42 would "cause an enormous disaster at the border" and leave them shouldering the cost of services for new arrivals.

If the court of appeals for the DC circuit denies the states' motion, they could appeal the matter to the US supreme court, which has a rightwing supermajority.

## What did Biden do then?

The Biden administration stuck with the 21 December termination of Title 42 but nevertheless appealed the DC court decision so as to be able to use public health rules such as Title 42 in future.

And the government is discussing other measures to "secure" the border, such as barring single adults from seeking asylum there and accelerated asylum screenings in border patrol custody.

The Biden administration also said it will increase the use of expedited removal, a fast-track deportation process, if Title 42 is terminated. Those ejected under Title 42 were summarily expelled, not deported.

Those plans will probably go on hold if the various states' latest effort to keep Title 42 in place succeeds.

**Most viewed**

IFR_AR_014187

IFR_AR_014188

IFR_AR_014189

IFR_AR_014190

IFR_AR_014191

**The New York Times** | https://www.nytimes.com/2023/05/07/us/title-42-border-migrants.html

## An End to Pandemic Restrictions Could Bring Thousands to the Border

Title 42, the policy that has allowed the swift expulsion of many migrants at the southern border, will lift on Thursday. Officials are bracing for a new immigration surge.

 

**By Miriam Jordan and Michael D. Shear**

May 7, 2023

EL PASO — The Biden administration is preparing to lift an emergency health rule that has been used to prevent hundreds of thousands of migrants from entering the United States, setting the stage for what could be a new immigration surge that inflames political tensions and strains resources across the southern border.

Barring a last-minute legal challenge, the Trump-era policy known as Title 42 will expire at 11:59 p.m. Eastern on Thursday. It was put in place three years ago under the premise of preventing the spread of Covid-19.

Border agents, state and local officials and even President Biden's top aides in Washington are all bracing for the arrival of tens of thousands of migrants in the coming days. Already, people have begun crossing into U.S. border towns, anticipating the end of Title 42, which since 2020 has allowed the government to swiftly expel citizens of several countries back to Mexico.

Three cities in Texas — Brownsville, Laredo and El Paso — have declared a state of emergency. Outside the Sacred Heart Catholic Church in downtown El Paso last week, a tableau of human misery fanned out for several blocks, with destitute migrants occupying every spit of sidewalk.

In just days, the numbers there have soared to about 2,000 people from a few dozen, and more keep arriving. Families sleep on collapsed cardboard boxes at night, affixing sheets to fences to create shade during the day. Able-bodied men are asking for bus money to reach Houston, Denver and Orlando, where they said jobs await; little children roam the alleyways scavenging for food and begging for change.



IFR_AR_014192

Outside the Sacred Heart Catholic Church in downtown El Paso.  Justin Hamel for The New York Times



In El Paso, many of those staying on the sidewalk outside Sacred Heart church said they had entered the United States through gaps in the border.   Justin Hamel for The New York Times

"It's a real crisis," said Father Rafael Garcia, surveying the crowd sprawling in every direction one day last week. "If this is now, what is it going to look like after May 11? How is this going to unfold?"

That question is at the heart of a monumental challenge with a grim history. When the pandemic-inspired restrictions end, border officials will resume an immigration system that has largely failed for decades, but with the added pressure of three years of pent-up demand. About 35,000 migrants are amassed in Ciudad Juárez, another 15,000 in Tijuana and thousands more elsewhere on the Mexican side of the 2,000-mile-long border.

White House officials said they have worked for months to prepare for a likely surge. They have built temporary facilities to house thousands more migrants, hired contractors and cut processing time for people in custody.  They have also taken steps to encourage a more orderly flow of migration.

A tough new rule that disqualifies asylum seekers who did not seek protection first in another country will go into effect on Thursday. At the same time, the administration is working with the United Nations and other countries to open processing centers in Colombia and Guatemala to encourage migrants to apply for refuge in the United States or other countries without trekking to the border. Recently, programs were added for migrants from a handful of other countries.

The president last week ordered 1,500 troops to assist at the border. But even so, officials are expecting a crush of people in the days ahead. Mr. Biden is up against global shifts in migration patterns, and economic forces and social unrest that are relentlessly driving people north. And inside the United States, the debate over how to fix the nation's broken immigration system remains polarized and overheated, posing serious political risk for everyone involved as the 2024 election season begins.

No one is certain what will happen after Thursday. The federal government is expecting as many as 13,000 migrants each day immediately after the measure expires, up from about 6,000 on a typical day. But asked what is likely to happen, one official posted along the border told reporters, "I have no idea" and said of a possible surge: "I think it's already here."

IFR_AR_014193



While migrants in droves have crossed in recent days, even more are expected to seek entry after Title 42 is lifted.  Justin Hamel for The New York Times

IFR_AR_014194



Justin Hamel for The New York Times

Even while Title 42 has been in place along both the southern and northern borders of the United States, the number of people unlawfully entering the country has climbed precipitously and their profile has changed: More people from far-flung nations in economic distress or political turmoil, such as Venezuela, China, India and Russia, have been braving an arduous journey to reach the doorstep of America.

The impact of the increase in migrant crossings — more than 3 million in the first 18 months of the Biden administration and the most in decades — has reached beyond the border. Mayors in New York, Washington D.C., and elsewhere have said the influx has strained their resources, a situation made worse by Republican governors in Florida, Texas and Arizona who have bused migrants to those cities.

While migrants in droves have crossed in recent days, uncertain about their chances in the post Title-42 border regime or goaded by smugglers, even more are expected to seek entry after the measure is lifted, aware that they will not immediately be returned to Mexico if they turn themselves in, or betting that overworked border agents will not catch them if they run.

IFR_AR_014195

Those who are captured will enter a border processing system that is already crowded in many places. In the Rio Grande Valley, where the Border Patrol has a capacity for 4,600 migrants, officials reported having 6,000 in custody as of May 4, about two-thirds of them from Venezuela. A college baseball field in Brownsville, Texas, has been turned into a makeshift processing center.

Republicans are poised to use the scenes to bolster their political attacks on Mr. Biden and Democrats, accusing them of failing to secure the border. This week, House Republicans are poised to vote on a bill to revive aggressive Trump-era immigration policies that Democrats have long denounced as cruel. The Republicans are also moving toward impeachment charges against the Homeland Security secretary, Alejandro Mayorkas, as a way of dramatizing their accusations.



In just days, the number of migrants in El Paso has soared from a few dozen people to about 2,000, and more keep arriving.  Justin Hamel for The New York Times

IFR_AR_014196



Many Venezuelans in El Paso said they had run out of money, or been robbed, en route to the border and needed assistance reaching their U.S. destinations.   Justin Hamel for The New York Times

Last month, Representative Mark E. Green of Tennessee, the Republican chairman of the House Homeland Security Committee, told donors to "get the popcorn" for hearings aimed at exposing Mr. Mayorkas's "dereliction of duty and his intentional destruction of our country through the open southern border."

"It's going to be fun," Mr. Green told the room.

But for Mr. Biden, some of the fiercest criticism is coming from allies on the left, who say they are deeply disappointed in the measures the administration has adopted to limit the number of migrants admitted. The new rule requiring migrants to apply for asylum in the country they travel through on their way to the United States, they say, would illegally deny many even the chance to apply for refuge in America. The administration argues that more migrants now can apply legally, without risking a dangerous passage to the border.

Lee Gelernt, a lawyer for the A.C.L.U., said his organization will go to court immediately to block the new rules. Senator Robert Menendez, a Democrat from New Jersey, said aggressive alternatives do not address the broader forces causing people to migrate.

"The administration has gone down the rabbit hole that enforcement is the only way to deal with this challenge, and the problem with that is that it won't solve the problem," he said.

Eleanor Acer, the director of the refugee protection program at Human Rights First, said she was relieved that the Trump-era pandemic restrictions at the border were ending. But she said the new asylum rules were "illegal, immoral and totally counterproductive."



A migrant camp in Ciudad Juárez.  Justin Hamel for The New York Times

IFR_AR_014198



The Mexican National Guard in downtown Ciudad Juárez.  Justin Hamel for The New York Times

Once the expulsion measure expires, some migrants will face prolonged detention, formal deportation and a five-year ban on entry into the United States. But making those determinations requires authorities to process migrants one by one, a cumbersome task that involves keeping large numbers of people in custody for days, in facilities that already are overwhelmed.

Last week there were days when more than 20,000 migrants were in U.S. custody, double the capacity. In El Paso, some 5,000 migrants were being held in processing facilities designed for fewer than half as many.

"We are getting prepared now for the unknown. The unknown is how many people will come here," Oscar Leeser, the mayor of El Paso, told reporters on Thursday.

"Federal immigration laws are broken, and they didn't break during this administration or the last administration," he added. "We have to figure out where we are heading. There is no light at end of the tunnel."

El Paso County has opened a large center where each day, 1,200 migrants released from U.S. custody can get help arranging onward travel. Nonprofit shelters are already full; the city is preparing to open two vacant schools, and it could also set up cots in the civic center.

But many of those who work on the border said no amount of preparation would suffice.

"We have been holding this wave off, and this wave is going to come crashing," said Ruben Garcia, director of Annunciation House, a large shelter that is at capacity. "How long will it last? Clearly until many people come across from the buildup in Mexico. But many more are likely on their way."

On a recent day, International Rescue Committee staffers advised migrants gathered for free lunch at the cathedral in Ciudad Juárez to use a mobile application to make an appointment at a U.S. port of entry, rather than risk their lives by crossing the Rio Grande or climbing over the wall.

But the app, introduced by the Biden administration in February to bring some order to the border, thus far has offered an extremely limited number of appointments and has been plagued by technical glitches.



El Paso County has opened a large center where each day, 1,200 migrants released from U.S. custody can get help arranging onward travel. Justin Hamel for The New York Times



In El Paso, nonprofit shelters are already at capacity; the city is preparing to open two vacant schools, and it could also set up cots in the civic center.  Justin Hamel for The New York Times

Frustration with the app coupled with fear of being stranded in a violent Mexican border city, where migrants have been targeted for extortion and 40 of them died in a blaze at a detention facility last month, has pushed droves to cross the border in recent days at great risk.

In El Paso, many of those staying on the sidewalk outside Sacred Heart church said they had entered through gaps in the concertina wire that rims the riverbank, scaled the 30-foot-tall steel border wall and then evaded U.S. agents under the cover of darkness. They displayed arms with gashes and swollen ankles to prove it.

Because they had not turned themselves in and been processed by U.S. authorities, they were not eligible to stay in most shelters or to receive assistance from city or county facilities.

"The app is a joke; it's a lie," said William, 30, who said he had tried to use it again and again. So he decided to turn himself in, only to be expelled three times under Title 42. That morning, at 2:30 a.m., he had made it to El Paso undetected.

Like him, the vast majority by the church were Venezuelans. With little or no money, many said they hoped that somehow they would get help with transportation to places where they planned to make a fresh start.

"We don't want anything from the American government," said Daniel, 28, who like others asked that his last name be withheld because he had slipped into the country without being processed. "We just want to work."

Eileen Sullivan contributed reporting from Washington.

IFR_AR_014201

The New York Times | https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html

## Smuggling Migrants at the Border Now a Billion-Dollar Business

With demand for smugglers on the rise, organized crime has moved in, with cruel and violent results.

 **By Miriam Jordan**

July 25, 2022

CARRIZO SPRINGS, Texas — From the street, the little brown house was unremarkable yet pleasant. A bright yellow toy school bus and red truck hung on the hog-wire fence, and the home's facade featured a large Texas lone star. But in the backyard was a gutted mobile home that a prosecutor later described as a "house of horrors."

It was discovered one day in 2014, when a man called from Maryland to report that his stepfather, Moises Ferrera, a migrant from Honduras, was being held there and tortured by the smugglers who had brought him into the United States. His captors wanted more money, the stepson said, and were pounding Mr. Ferrera's hands repeatedly with a hammer, vowing to continue until his family sent it.

When federal agents and sheriff's deputies descended on the house, they discovered that Mr. Ferrara was not the sole victim. Smugglers had held hundreds of migrants for ransom there, their investigation found. They had mutilated limbs and raped women.

"What transpired there is the subject of science fiction, of a horror movie — and something we simply don't see in the United States," the prosecutor, Matthew Watters, told a jury when the accused smugglers went on trial. Organized crime cartels, he said, had "brought this terror across the border."

But if it was one of the first such cases, it was not the last. Migrant smuggling on the U.S. southern border has evolved over the past 10 years from a scattered network of freelance "coyotes" into a multi-billion-dollar international business controlled by organized crime, including some of Mexico's most violent drug cartels.

IFR_AR_014202



The American leader of a smuggling ring with ties to a Mexican cartel owned the little brown house. Prosecutors said he ordered the torture of migrants in a trailer behind the house.  Christopher Lee for The New York Times

The deaths of 53 migrants in San Antonio last month who were packed in the back of a suffocating tractor-trailer without air conditioning — the deadliest smuggling incident in the country to date — came as tightened U.S. border restrictions, exacerbated by a pandemic-related public health rule, have encouraged more migrants to turn to smugglers.

While migrants have long faced kidnappings and extortion in Mexican border cities, such incidents have been on the rise on the U.S. side, according to federal authorities.

More than 5,046 people were arrested and charged with human smuggling last year, up from 2,762 in 2014.

Over the past year, federal agents have raided stash houses holding dozens of migrants on nearly a daily basis.

Title 42, the public health order introduced by the Trump administration at the beginning of the coronavirus pandemic, has authorized the immediate expulsion of those caught crossing the border illegally, allowing migrants to cross repeatedly in the hope of eventually succeeding. This has led to a substantial escalation in the number of migrant encounters on the border — 1.7 million in fiscal 2021 — and brisk business for smugglers.

In March, agents near El Paso rescued 34 migrants from two cargo containers without ventilation on a single day. The following month, 24 people being held against their will were found in a stash house.

IFR_AR_014203

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/25/24   Page 37 of 200



The dense brush in South Texas conceals migrants and smugglers trying to evade detection by U.S. authorities. "You could hide a million elephants here," said Jerry Martinez, a captain in the Dimmit County Sheriff's Office.  Christopher Lee for The New York Times

Law enforcement agents have engaged in so many high-speed chases of smugglers lately in Uvalde, Texas — there were nearly 50 such "bailouts" in the town between February and May — that some school employees said they failed to take a lockdown order seriously during a mass shooting in May because so many previous lockdowns had been ordered when smugglers raced through the streets.

Teófilo Valencia, whose 17- and 19-year-old sons perished in the San Antonio tragedy, said he had taken out a loan against the family home to pay the smugglers $10,000 for each son's transport.

Fees typically range from $4,000, for migrants coming from Latin America, to $20,000, if they must be moved from Africa, Eastern Europe or Asia, according to Guadalupe Correa-Cabrera, an expert on smuggling at George Mason University.

For years, independent coyotes paid cartels a tax to move migrants through territory they controlled along the border, and the criminal syndicates stuck to their traditional line of business, drug smuggling, which was far more profitable.

That began to change around 2019, Patrick Lechleitner, the acting deputy director at U.S. Immigration and Customs Enforcement, told Congress last year. The sheer number of people seeking to cross made migrant smuggling an irresistible moneymaker for some cartels, he said.

The enterprises have teams specializing in logistics, transportation, surveillance, stash houses and accounting — all supporting an industry whose revenues have soared to an estimated $13 billion today from $500 million in 2018, according to Homeland Security Investigations, the federal agency that investigates such cases.

IFR_AR_014204

12/6/22, 12:26 PM
Smuggling Migrants at the Border Now a Billion-Dollar Business - The New York Times
Case 1:24-cv-01702-RC Document 53-2 Filed 09/27/24 Page 38 of 200



Rigs hauling migrants blend with the 20,000 trucks that travel daily on the I-35 freeway to and from Laredo, the country's busiest land port. Christopher Lee for The New York Times

Migrants are moved by plane, bus and private vehicles. In some border regions, such as the Mexican state of Tamaulipas, smugglers affix color-coded bands to the wrists of migrants to designate that they belong to them and what services they are receiving.

"They are organizing the merchandise in ways you could never imagine five or 10 years ago," said Ms. Correa-Cabrera.

Groups of Central American families who crossed the Rio Grande recently into La Joya, Texas, wore blue bracelets with the logo of the Gulf Cartel, a dolphin, and the word "entregas," or "deliveries" — meaning they intended to surrender to U.S. authorities and seek asylum. Once they had crossed the river, they were no longer the cartel's business.

Previously, migrants entering Laredo, Texas, waded across the river on their own and faded into the dense, urban landscape. Now, according to interviews with migrants and law enforcement officials, it is impossible to cross without paying a coyote connected to the Cartel del Noreste, a splinter of the Los Zetas syndicate.

Smugglers often enlist teenagers to transport arrivals to stash houses in working-class neighborhoods. After they gather several dozen people, they load the migrants onto trucks parked in Laredo's vast warehouse district around Killam Industrial Boulevard.

"Drivers are recruited at bars, strip joints, truck stops," said Timothy Tubbs, who was deputy special agent in charge of Homeland Security Investigations for Laredo until he retired in January.



IFR_AR_014205

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 39 of 200



"Before smugglers controlled the Rio Grande, some migrants crossed back and forth daily," said Timothy Tubbs, a retired agent with Homeland Security Investigations in Laredo, Texas, a busy smuggling corridor.  Christopher Lee for The New York Times

IFR_AR_014206

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/25/24    Page 40 of 200

Rigs hauling migrants blend with the 20,000 trucks that travel daily on the I-35 freeway to and from Laredo, the country's busiest land port. Border Patrol agents posted at checkpoints inspect only a fraction of all the vehicles to ensure traffic keeps flowing.

The tractor-trailer discovered on June 27 with its tragic cargo had passed through a checkpoint about 30 miles north of Laredo without arousing suspicions. By the time it stopped three hours later on a remote road in San Antonio, most of the 64 people inside had already died.

The driver, Homero Zamorano Jr., one of two men indicted on Thursday in connection with the tragedy, said that he was unaware that the air-conditioning system had failed.

The 2014 incident at the stash house in Texas resulted in the arrest of the perpetrators and a subsequent trial, providing an unusually vivid look at the brutal tactics of smuggling operations. Though kidnapping and extortion happen with some frequency, such trials with cooperating witnesses are relatively rare, federal law enforcement officials say. Fearing deportation, undocumented relatives of kidnapped migrants seldom call the authorities.

That case began in the thick brush country eight miles from the Rio Grande, in Carrizo Springs, a popular transit point for people trying to elude detection. "You could hide a million elephants here, this brush is so thick," said Jerry Martinez, a captain in the Dimmit County Sheriff's Office.

Mr. Ferrera, 54, the torture victim, first migrated to the United States in 1993, heading to construction sites in Los Angeles and San Francisco, where he made more than 10 times what he earned back in Honduras. He returned home a few years later.



Moises Ferrera lost mobility in his right hand after smugglers struck it repeatedly with a hammer. "I came here for a better life, to help my family," he said in court testimony. "This is how my hand ended up. This hand's not any good now to work with."  Amanda Andrade-Rhoades for The New York Times

"In those days, you didn't need a coyote," he said in an interview from his home in Maryland. "I came and went a couple times."

IFR_AR_014207

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 41 of 200

When he set out in early 2014, Mr. Ferrera knew that he would have to hire a smuggler to breach the border. In Piedras Negras, Mexico, a man promised to guide him all the way to Houston. Mr. Ferrera's stepson, Mario Pena, said he wired $1,500 as payment.

After reaching Texas, Mr. Ferrera and several other migrants were delivered to the trailer in Carrizo Springs.

Before long, Mr. Ferrera's stepson received a call demanding an additional $3,500. He said he did not have any more money.

The calls became frequent and menacing, Mr. Pena recalled in an interview; the smugglers let him hear the sound of his stepfather's shrieks and groans as a hammer came down on his fingers.

Mr. Pena managed to wire $2,000 via Western Union, he said, but when the captors realized they could not collect the cash because it was a Sunday, they intensified their assaults.

Mr. Pena called 911.

Law enforcement agents found Mr. Ferrera in the trailer "severely, severely physically harmed, with lots of blood all over him, laying on a sofa" in the living room, according to testimony by one of the agents, Jonathan Bonds.

Another migrant, stripped down to his underwear, was squirming in pain, his bludgeoned hand held aloft, in the front bedroom. In the rear bedroom, agents encountered a nude woman, another migrant, who had just been raped by a smuggler who emerged naked from the bathroom.

The house's owner, Eduardo Rocha Sr., who went by Lalo and was identified as the leader of the smuggling ring, was arrested along with several others, including his son, Eduardo Rocha Jr. The younger Mr. Rocha testified that their cell was affiliated with the Los Zetas cartel and that over two years it had funneled hundreds of migrants into the United States and collected hundreds of thousands of dollars.

The elder Mr. Rocha was sentenced to life in prison. His son and the man who had carried out most of the physical abuse received 15- and 20-year sentences.

Mr. Ferrera testified at their trial. As a victim of a crime who had assisted law enforcement, he was allowed to remain in the United States. But his new life had come with a cost, which he displayed when he held up his right arm for the jury, the fingers now lifeless. "This is how my hand ended up," he said.

Susan C. Beachy contributed research.

IFR_AR_014208



**How social media misleads migrants about the - Arizona Daily Star, The (Tucson, AZ) - October 12, 2023 - page C001**

October 12, 2023 | Arizona Daily Star, The (Tucson, AZ) | José Ignacio Castañeda Perez The Arizona Republic | Page C001

A black ski mask conceals the man's face.

The anonymous YouTube channel host almost always sports a black baseball cap embellished with the channel's logo above his mask. The hat depicts a stylized orange and red emblem of a desert vista with the words "aventuras por el desierto," meaning adventures through the desert.

The channel had nearly 9,000 subscribers and a catalog of 180 videos that offered advice, stories and tips on the process of crossing the Arizona-Mexico border.

Videos walked viewers through how much they would have to pay in smuggling fees and advice on how to cross without a guide or "coyote."

Bold yellow and green font was typically splayed across the videos' thumbnails, usually with a clickbait-like title. "I was arrested by state police in Sonoyta" and "this is how sicarios work in the desert" are only a couple recent video titles.

YouTube has guidelines to restrict content that spreads misinformation and the sale of illegal or regulated goods, including human smuggling, from being uploaded to the site. The channel's name and branding, purportedly for desert adventures, is seemingly set up to bypass the restrictions.

The channel was taken down by YouTube after the platform was reached for comment.

"We terminated the channel in question for violating our policies prohibiting content that encourages dangerous and illegal activities, such as human smuggling," Javier Hernandez, YouTube spokesperson, said in a written statement.

"We enforce this policy equally for everyone, and channels that repeatedly violate or are dedicated to violative content are terminated."

The channel is only one of hundreds of digital avenues that spread information and misinformation among migrant networks considering the journey to the U.S.-Mexico border.

Human smugglers use TikTok, WhatsApp, Instagram and Facebook to offer their services to cross

IFR_AR_014209

the border, according to the Tech Transparency Project, a watchdog research initiative.

Smugglers post prices, routes and discounts on Facebook groups and pages with thousands of members. Smugglers often spread false rumors and misinformation about U.S. immigration policies and how easy the journey will be, according to the watchdog group.

"It's not an adventure; It's a very difficult journey," said Guadalupe Correa-Cabrera, professor with the Schar School of Policy and Government at George Mason University.

The content advertised on social media is often only a complementing factor to the already present driving factors in migrants' home countries, Correa-Cabrera said. It's an incentive as part of the whole human smuggling industry, she added.

"(Migrants) combine their reality with the aspiration with what is presented in the media," Correa-Cabrera said. "That is misinformation, that is nefarious because it presents things in a way that are not going to be."

A new poll by America's Voice found that disinformation about "open borders" contributes to Central American migration to the U.S. The poll, released Sept. 26, found that more than one in four Central American respondents heard and approximately one in five believed rhetoric that the "border is open."

Social media was the most used source of information about the border among respondents from ages 16-24, according to the poll. Of the young respondents, who are the ages most likely to consider migrating, 71% reported having heard U.S. officials or politicians say the border is open through social media.

The poll surveyed 600 people living in El Salvador, Guatemala, Honduras and Nicaragua in July.

In March, large groups of migrants were confronted by federal agents on the Paso del Norte International Bridge, which connects Ciudad Juárez with El Paso after a false rumor spread that migrants would be allowed to pass through en masse.

About a month later, rumors on social media spread among migrants in Ciudad Juárez that the Title 42 health restriction would be lifted for Venezuelan migrants. The pandemic-era restriction allowed border officials to rapidly expel migrants arriving at the country's borders for over three years.

The false information came from Breitbart News, a right-wing outlet, that alleged the Biden

administration ordered border officials to lift the restriction for Venezuelans.

'A false sense of calm'

The majority of the desert adventure YouTube videos focused on crossing from Sonoyta, Sonora, into the Organ Pipe Cactus National Monument and the Cabeza Prieta National Wildlife Refuge near Lukeville and Ajo.

In recent months, the area has become a busy crossing corridor for migrants who often surrender to Border Patrol agents in large groups.

The Border Patrol's Tucson Sector remained the busiest sector along the Southwest border in August after claiming the title in July.

The sector documented 48,754 migrant encounters in August, representing a 24% increase from the month prior, according to U.S. Customs and Border Protection data.

The YouTube channel's name may mislead viewers about the reality of traversing the remote and deadly swath of Arizona's border. The desert expanse is notorious for its lethal temperatures and unforgiving terrain — not a desert adventure.

"It's like watching a television commercial," said Ray Rede, assistant special agent in charge for U.S. Homeland Security Investigations in Sells, Arizona.

"They're putting their best light forward. It's not going to be a safe journey."

Humanitarian volunteers in the area often come across migrants suffering from heat distress as temperatures reached up to 115 degrees in the summer. On Aug. 17, an older male migrant from Bangladesh died after suffering medical distress upon crossing the border near Lukeville.

The exploitation of social media channels to promote crossing the border creates a false sense of security among migrants considering the journey, according to Rede.

"It's almost like they're advertising a vacation package and it's everything but a vacation package," Rede said. "They almost sensationalize it and bring a false sense of calm."

More than a decade ago, smugglers had a much closer and more familiar relationship with migrants considering the journey. People in the community knew and trusted smugglers.

make the trip.

With the advent of social media, the process has become much more disconnected. It's become easier for people to coordinate their journey without ever meeting, knowing or seeing who they're talking to, Rede said.

"Social media has expanded the marketing efforts of the smuggling organizations," Rede said. "Now, they can reach the masses."

CBP continuously has pushed their social media messaging, urging migrants not to trust social media rumors and information from unofficial sources. The agency repeatedly underscores that the border is not open to unlawful migration.

Copyright 2023, Arizona Daily Star, All Rights Reserved.

6/2/24, 1:05 PM
Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 46 of 200
Mexico is stopping nearly three times as many migrants now, helping keep U.S. border crossings down



EXCLUSIVE

IMMIGRATION

# Mexico is stopping nearly three times as many migrants now, helping keep U.S. border crossings down

Biden administration officials say the increased help from Mexico in slowing migration is proof their relationship with Mexico is more productive than Trump's approach.



— Migrants arrive in El Ceibo, Guatemala, from Mexico after being deported.

Johan Ordonez / AFP via Getty Images file

May 15, 2024, 6:30 AM EDT

## By Julia Ainsley and Chloe Atkins

Mexico is stopping nearly three times as many migrants who have crossed its southern border as it was a year ago, a trend that U.S. officials say has helped blunt the surge in crossings of the U.S.

IFR_AR_014219

border usually seen at this time of year.

Biden administration officials also point to the increased help from Mexico in slowing migration as proof that their relationship with their southern neighbors is more effective than the Trump administration's.

Former President Donald Trump has derided President Joe Biden's record and claimed that his administration was more successful at controlling the border.

Early last year, Mexico interdicted roughly 100,000 migrants at its southern border or inside Mexico per month, while the U.S. was apprehending over 193,000 migrants monthly at the U.S.-Mexico border. This year, more migrants are being stopped inside Mexico than in the U.S., with over 280,000 being interdicted in Mexico and 189,000 in the U.S. in March, according to figures obtained by NBC News.

The Mexican government doesn't publicly share its migrant interdiction numbers like the U.S. does.

The high numbers of migrants stopped in Mexico show how chaotic the U.S. border could become if Mexico cannot sustain its interdiction efforts. Another spike in border crossings could hurt Biden in the coming election.

**Top border officials under investigation over ties to tequila maker**
01:59



FR_AR_014220

According to Customs and Border Protection officials, April's figures, which have yet to be publicly released, are expected to continue to show relatively low numbers compared to the seasonal uptick typically seen in April and May.It isn't known how many of the migrants Mexico intercepts are actually deported. Many migrants are stopped by Mexican officials at the Guatemala-Mexico border and promptly returned to Guatemala, immigration advocates told NBC News.

Many others are being stopped in northern Mexico and bused to the southern end of the country. From there, they can't use the CBP One app on their mobile phones to make appointments for U.S. asylum hearings, since the app doesn't work south of Mexico City, said Amy Fischer, director of refugee and migrant rights at Amnesty International USA.

"In one way, they are doing the dirty work of the U.S. in order to keep people from accessing the U.S. southern border and exercising their right to seek safety," Fischer said.

Certain groups, like unaccompanied children and migrants traveling as families, receive special protection under Mexican law that limits their deportation.

U.S. officials say Mexico's willingness to interdict more migrants, a costly process, is in large part due to increased dialogue between the two countries on issues like immigration, fentanyl and illegal firearms trafficking.

Both Biden and Mexican President Andrés Manuel López Obrador, known as AMLO, recognized the severity of the problem at the end of last year when Mexico's funding to stop migrants ran low and the number of migrants crossing the U.S.-Mexico border surged to record highs.

IFR_AR_014221

Record migrant crossings push Border Patrol past capacity
02:08



At the end of December, Biden held a call with López Obrador and sent Homeland Security Secretary Alejandro Mayorkas and Secretary of State Antony Blinken to Mexico to meet with their counterparts. Since then, Mexico has interdicted at least 270,000 migrants each month.

"President Biden and President AMLO have developed a relationship in which they talk about the shared challenges [of migration], and they both jointly recognize the shared challenges," a senior Biden administration official said. "They've had multiple conversations and multiple calls over the last couple of years tackling and talking about this issue."

The Trump administration threatened Mexico with increased tariffs and disruptions in trade if it didn't comply with policies like Remain in Mexico, which forced immigrants seeking asylum in the U.S. to wait in poor conditions in northern Mexico.

"We have treated Mexico with respect as a sovereign equal," the senior Biden administration official said. "That's a difference with this administration's approach."

## A history of cooperation

The Biden administration isn't the first to work jointly with Mexico to address migration and other border issues.

IFR_AR_014222

In 2008, during George W. Bush's administration, the Merida Initiative – a security agreement between the U.S. and Mexico – was launched to reduce violence and fight drug trafficking. Congress approved $1.5 billion for the initiative over two years, enabling the purchase of equipment like helicopters and other aircraft to support the efforts of Mexican law enforcement.

During the Obama administration, the U.S. and Mexico expanded cooperation to include combating transnational criminal organizations by providing forensic equipment and training to Mexican law enforcement and improving immigration enforcement in Mexico.

Town divided over migrant influx
02:41



The Trump administration focused on reducing synthetic drug production and refining border interdiction and port security. In 2018, it reportedly wanted to pay Mexico $20 million to help deport thousands of migrants who entered Mexico in hope of reaching the U.S. The sum, according to CNN and The New York Times, would be used to fund bus and airplane tickets to send migrants back to their home countries. In 2019, Trump stopped threatening tariffs against Mexico after it agreed to crack down on crossings of its southern border. Mexico deployed 6,000 troops to its border with Guatemala to intercept migrants.

During the Biden administration, the U.S. and Mexico announced a new security cooperation agreement in 2021 called the Bicentennial Framework. The Bicentennial Framework replaced the

IFR_AR_014223

Case 1:24-cv-01702-RC          Document 53-2          Filed 09/27/24          Page 51 of 200

Merida Initiative and emphasized preventing transborder crime by minimizing human and arms trafficking and disrupting illicit drug supply chains.

 **Julia Ainsley**

Julia Ainsley is homeland security correspondent for NBC News and covers the Department of Homeland Security and the Justice Department for the NBC News Investigative Unit.

 **Chloe Atkins**

Chloe Atkins reports for the NBC News Investigative Unit, based in New York. She frequently covers crime and courts, as well as the intersection of reproductive health, politics and policy.

IFR_AR_014224

# TIME

SUBSCRIBE

**WORLD   MIGRATION**

# Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023

**6 MINUTE READ**



Migrants are seen here crossing the Darién Gap in September, 2023. Per a U.N. report, half a million people made the journey this year.   LUIS ACOSTA—Getty Images

BY **MALLORY MOENCH**

DECEMBER 22, 2023 12:42 PM EST

A n unprecedented half a million people migrated north across the Darién Gap, a dangerous stretch of jungle between Colombia and Panama, this year—more than double the number last year—in a sign of an escalating humanitarian crisis, the U.N. recently reported.

Laurent Duvillier, UNICEF's spokesperson for Latin America and the Caribbean based in Panama, tells TIME that many—driven to leave their homes by poverty, crime, or discrimination—aim to seek asylum in the U.S. or Canada, though they may never get there. This analysis is supported by refugee protection organization HIAS, with a spokesperson telling TIME that, by the group's estimations, between 90 to 95% of those crossing the Darién Gap aim to reach the U.S.

Nearly one in four people who made the treacherous journey across the Darién in 2023 were children, the U.N. said. As of Friday, 84 children died or went missing while migrating across Latin America and the Caribbean this year, the International Organization for Migration said.

The spike has alarmed aid groups, who say the stats underscore dire conditions in the countries people are leaving. "We've never seen this before," Duvillier tells TIME in a phone call. "It's just unprecedented, and it's going to continue."



**BRANDED CONTENT**

IFR_AR_014435

# Supporting Our Heroes: TAPS Makes A Difference For Military Families ⬈

BY GILLETTE

The journey on foot through the roadless jungle, across rain-swollen rivers and thick foliage, takes seven to 10 days, Duvillier says, adding that coyotes, human smugglers who charge migrants for their passage, deceive their customers that the journey is easy.

Often, children arrive at UNICEF's support centers dehydrated, with infectious diseases and skin rashes, Duvillier says. Some minors show up alone, separated from their parents on the journey and vulnerable to exploitation and child labor, and UNICEF tries to reunite them with their families.

"When they arrive in Panama, they have very little left but the clothes that they're wearing," Duvillier says. "You can see on their faces, they are survivors."

Adults are also at risk of violence, robbery, human trafficking, extortion, and kidnapping by criminal gangs, the U.N. said. Many are LGBTQ or domestic-abuse survivors, HIAS said in September. One in four people they served traveled with survivors of physical, psychological, or sexual violence, and 23% reported abuse on the journey.

Most migrants crossing the Darién are from Venezuela, Haiti, Ecuador, and other Central and South American countries, but some are from as far as sub-saharan Africa, the Middle East and Asia, the U.N. said.

Migration north has spiked for multiple reasons, experts say. In Ecuador, expanding criminal gang activity has pushed entire families to leave. Protests and violence have rocked Haiti, where more than 50% of the population lives under the poverty line. In Venezuela, inflation has skyrocketed.

Additionally, climate change has strengthened hurricanes and broadened their impact inland, pushing more people to leave, Duvillier says: "When you lose

IFR_AR_014436

everything, you have no reason to stay."

The surge across the Darién Gap has been reflected in an influx at the U.S. border and, eventually, in metropolises like New York City. Mayor Eric Adams visited the Darién Gap in October to discourage further migrants from making the trip.

U.S. Customs and Border Protection recorded more than 2.4 million apprehensions along its southwest land border this past fiscal year. Monthly crossings hit a high in September with more than 269,000, but dipped down to 240,988 in October.

The U.S. government reverted back to pre-pandemic rules, with some new stricter regulations, for people seeking asylum who crossed the border illegally in May, and the Department of Homeland Security reported it had removed or returned 355,000 individuals between then and October.

Amid high unlawful border crossings, President Joe Biden is now trying to pass a bill that includes both border security funding and a military aid package for Ukraine and Israel. Republicans have pushed for border policy changes, including stricter security measures, in exchange for approving billions for Ukraine, putting pressure on Biden to negotiate.

The Biden Administration has blamed Congress for not passing comprehensive immigration reform, and said in September it's doing its best using "limited tools." That included adding military personnel to the border, expanding detention facilities, speeding up deportations, accelerating work authorization for asylum seekers and extending temporary protection for some.

In October, the administration moved forward with building another section of border wall in Texas. During a White House meeting with the press, Biden told reporters that the funding for this was previously appropriated, noting that he had tried to get Congress to redirect that money. When asked if he believes a border wall works, Biden replied "No."

TIME reached out to the Department of Homeland Security to ask if the Biden Administration has any comment regarding the U.N.'s report about the high numbers making the Darién Gap crossing, and if there are any plans in place regarding the situation.

In response, a department spokesperson tells TIME: "The Biden-Harris Administration has led the largest expansion of lawful pathways in decades, while continuing to enforce consequences for those who do not use these pathways to come to the United States. We continue to work closely with international partners throughout the region, including the Governments of Colombia and Panama, to address the humanitarian emergency happening in the Darién, and we are targeting the smuggling networks that prey on vulnerable migrants."

"We know what approach works—expanding lawful pathways and delivering consequences for those who do not use them. We ask Congress to pass the supplemental funding request, which will significantly enhance our ability to secure the border and expand legal avenues for migration from the region."

The International Organization for Migration and UNHCR have urged that a comprehensive regional approach is needed to address the "failing" global immigration system. The heads of the two organizations criticized governments that have cracked down on asylum seekers, arguing doing so often violates human rights and leads to riskier migration in an editorial for TIME.

Instead, the world must invest in development to address the reasons people are leaving their homes, support countries along migration routes who host a disproportionate number of asylum seekers, and expand legal migration options in wealthy destination countries to prevent more dangerous, criminal alternatives, the agencies argued.

Duvillier says migrants, especially children, must be protected, and transit countries should integrate migrants by issuing them documentation, arguing that failing to do so can push people into criminality.

# DeepDive with TIMEAI

Darién Gap    ↳    Humanitarian Crisis in Latin America    ↳

Migrant Crisis    ↳

"It's not one country fixing it," Duvillier says. "It's the entire region that needs to turn what is often misperceived as a threat into an opportunity for growth and political and social stability."

## MORE MUST-READS FROM TIME

- How **Selena Gomez** Is Revolutionizing the Celebrity Beauty Business
- **TIME100 Most Influential Companies** 2024
- **Javier Milei's Radical Plan** to Transform Argentina
- How Private Donors Shape **Birth-Control** Choices
- The **Deadly Digital Frontiers** at the Border
- What's the Best **Measure of Fitness?**
- The 31 **Most Anticipated Movies** of Summer 2024
- Want Weekly Recs on What to Watch, Read, and More? Sign Up for **Worth Your Time**

**CONTACT US AT** LETTERS@TIME.COM

**Vet Warns Washington: "If Your Dog Licks Its Paws, Watch This Immediately"**

Most dog owners don't know this.

Ultimate Pet Nutrition | Sponsored

Learn Mor

**Buying Nvidia in 2024? Wall Street Legend Issues Urgent A.I. Stock Warning**

Chaikin Analytics | Sponsored

IFR_AR_014439

**Donald Trump Guilty Verdict: Here Are the Reactions**

TIME

**Amazon's Worst Nightmare: Thousands Canceling Prime for This Clever Hack**

This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.

**Coupon Code Finder** | Sponsored

**Buying Nvidia? Wall Street Legend Issues Urgent A.I. Stock Warning**

**Chaikin Analytics** | Sponsored

**Vet Warns Americans: "If Your Dog Licks Its Paws, Watch This Immediately"**

Most dog owners don't know this.

**Ultimate Pet Nutrition** | Sponsored

Learn Mor

**Washington Traders, Avoid This Stock**

Avoid common pitfalls with our free report on stocks. Get yours today.

**Zacks Investment Research** | Sponsored

**Edema Experts Baffled: New Device Drains Fluid Faster Than Furosemide**

**Health Insight Journal** | Sponsored

Learn Mor

**The Most Realistic PC Game of 2024**

A Stunning Fantasy Role-Playing Game. It Is So Beautiful It's Worth Installing Just To See

**Raid: Shadow Legends** | Sponsored

Install Nov

**Zelensky Fires Bodyguard Chief After Foiled Assassination Attempt**

TIME

IFR_AR_014440

## A New Portrait of Kate Middleton Has Divided Public Opinion

TIME

## New Neuropathy Device Leaves Experts Speechless (It's Genius!)

Health Insight Journal | Sponsored

Learn Mor

## 7 Ways to Retire Comfortably With $500k

How long will your portfolio last in retirement? For those with a $500k portfolio, get this guide and ongoing insights.

Fisher Investments | Sponsored

Learn Mor

## People in Washington are Loving Martha Stewart's Meal Kit

Martha Stewart & Marley Spoon | Sponsored

## Biden Reacts to Trump Blaming Him For Hush-Money Verdict

TIME

## Why Eminem's 'Houdini' Is Exciting Fans and Revolting Critics

TIME

## Leave Furosemide Behind: This New Device Helps Drain Edema Fluid (Works Fast)

Health Insight Journal | Sponsored

Learn Mor



   

IFR_AR_014441

| | |
|---|---|
| Home | Entertainment |
| U.S. | Ideas |
| Politics | Science |
| World | History |
| Health | Sports |
| Business | Magazine |
| Tech | The TIME Vault |
| Personal Finance by TIME Stamped | TIME For Kids |
| Shopping by TIME Stamped | TIME CO2 |
| Future of Work by Charter | Coupons |
| | |
| TIME Edge | Press Room |
| Video | TIME Studios |
| Masthead | U.S. & Canada Customer Care |
| Newsletters | Global Help Center |
| Subscribe | Contact the Editors |
| Digital Magazine | Reprints and Permissions |
| Give a Gift | Site Map |
| Shop the TIME Store | Media Kit |
| Careers | Supplied Partner Content |
| Modern Slavery Statement | About Us |

© 2024 TIME USA, LLC. All Rights Reserved. Use of this site constitutes acceptance of our Terms of Service, Privacy Policy (Your Privacy Rights) and Do Not Sell or Share My Personal Information.

TIME may receive compensation for some links to products and services on this website. Offers may be subject to change without notice.

IFR_AR_014442

**The New York Times**

https://www.nytimes.com/2022/05/03/world/americas/cuban-migration-united-states.html

# Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat

Political repression and escalating economic difficulties on the island, along with a new visa-free travel policy in Nicaragua, are some of the factors driving the change.

 

**By Maria Abi-Habib and Eileen Sullivan**

Published May 3, 2022   Updated May 4, 2022

> **Want to stay updated on what's happening in Cuba and Nicaragua?** Sign up for Your Places: Global Update, and we'll send our latest coverage to your inbox.

Cuban migrants are arriving to the United States in the highest numbers seen in four decades, with about 150,000 expected to arrive this year, according to senior American officials, as the economic and political situation on the island grows more desperate.

For decades, Cubans trying to flee repression, food insecurity and economic devastation boarded rickety boats, risking their lives to get to American shores.

Now they are coming in record numbers, but this time on foot, their flight aided by Nicaragua, which dropped visa requirements late last year for Cubans, giving them a toehold in Central America to journey overland through Mexico to the United States. American officials have accused Nicaragua's authoritarian president, Daniel Ortega, of enacting the policy to pressure the United States to drop sanctions on his country.

IFR_AR_014443

The surge in Cubans trying to cross the southern border represents just a portion of migrants who have at times overwhelmed border officials as undocumented crossings continue to rise under the Biden administration. March set a record for the number of people caught crossing illegally in a single month in two decades: 221,303.

Since October — the start of the federal government's 2022 fiscal year — nearly 79,000 Cubans have arrived at the United States' southern border, more than in the previous two years combined, according to Customs and Border Protection figures. In March, more than 32,000 Cubans arrived at the border, most of them flying first to Nicaragua then traveling overland to the United States, according to a senior State Department official, who spoke on the condition of anonymity because of ongoing dialogue with the Cuban government.

The official said visa-free travel to Nicaragua was encouraging migrants to spend their life savings to pay smugglers for the journey, and added that some were falling prey to trafficking by criminal groups.

IFR_AR_014444

Case 1:24-cv-01702-RC   Document 53-2   Filed 08/27/24   Page 63 of 200



A swimming instructor in Estelí, Nicaragua, teaches would-be migrants how to swim, in anticipation of crossing the Rio Grande, the border between Mexico and the United States.  Maynor Valenzuela/Reuters

The numbers are the highest since the Mariel boatlift in 1980, when 125,000 Cubans migrated to the United States after the island nation opened its seaports to American vessels to evacuate anyone who wanted to leave.

Public discontent in Cuba has been simmering since mass protests erupted last summer across the country over escalating inflation, chronic food and drug shortages and ongoing power outages. During the Obama administration, the United States eased restrictions on travel and remittances to Cuba significantly, but they were resurrected under former President Donald J. Trump, dealing a harsh economic blow.

The demonstrations caught the Communist government by surprise and it has responded by imposing one of the biggest crackdowns in decades. More than 700 Cubans have been charged for taking part in protests, including some teenagers JSR_AR_014445

who received 30 years in prison.

The deteriorating political and economic conditions are feeding the growing exodus.

Nicaragua's government dropped its Cuba visa requirement in November, opening a land route for migrants reluctant to embark on the dangerous sea journey to American shores. Since then the number of flights to Managua from Havana has soared.

"I think we are seeing governments try to weaponize migration because they know it causes political disruptions in receiving countries," said Andrew Selee, the president of the Migration Policy Institute, a research institute in Washington.

Mr. Selee and other analysts said Nicaragua was likely using Cuban migrants to press the United States to lift sanctions on Mr. Ortega and his inner circle. The move has been compared to Belarus dropping visa requirements for Iraqis last year to facilitate their entry into the European Union, in retaliation for sanctions the bloc had levied on Belarus for its disputed election.

"They're not fools," Mr. Selee said. "The government in Managua knew that this would force the U.S. to come to the bargaining table at some point."  Still, it is unclear if the looser migration rules would yield any changes in U.S. policy.

Nicaragua's government did not respond to questions sent by The Times. Cuba's government did not respond to requests for comment.

IFR_AR_014446



Asylum seekers from Venezuela and Cuba being processed after crossing the border from Mexico in Yuma, Ariz., in February. Go Nakamura/Reuters

Many Cubans are desperate to leave, even if it means going into debt to go on a perilous journey. Cubans describe selling whatever they have — homes, clothing and furniture — and taking loans with steep interest rates to raise the thousands of dollars they need to get to the United States, even though the average salary on the island is about $46 a month.

Zenen Hernández, 35, was one of 414 Cubans who crossed the Rio Grande into the United States on April 5, out of a total of 1,488 undocumented migrants who crossed that section of the Texas border (about 245 miles) that day.

"Food and medicine are scarce," Mr. Hernández said, describing conditions in Cuba. "It's only poverty."

The Cuban government blames the United States' decades-long embargo of the nation for its economic woes.

IFR_AR_014447

The economy there was dismal before the pandemic hit, but Mr. Hernández scraped by, selling bread and chips. By the summer of 2020, the situation had become untenable. When Nicaragua opened its borders to Cubans, he decided it was time to go.

"I had to sell my house," he said.

The cost was steep: $16,000 for the flight to Nicaragua and the ensuing 1,800-mile trek to reach the United States — often on foot — through the jungles, mountains and rivers of Central America and Mexico. Along the way, migrants are routinely threatened and extorted by the police and preyed upon by criminal organizations that kidnap and beat them for ransom.

When Mr. Hernández was asked to describe his trip, he choked up recalling the miserable journey.

"I don't have words," he said. "They rob you — the police, the smugglers. They rob you."

Pent-up demand for legal crossings is another factor increasing migration. In 2017, the Trump administration slashed staffing at the United States Embassy in Cuba after a series of unexplained health problems that became known as "Havana syndrome" affected American personnel there.

The drawdown forced Cubans to apply for visas from the American embassy in Guyana, a trip too expensive for many. The move also prevented the United States from upholding its commitment to provide 20,000 immigrant visas to Cubans annually, part of a 1994 agreement between the countries to provide a legal pathway and discourage illegal migration.

This week, the United States Embassy in Havana will hold the first interviews for immigrant visa applicants since 2017, one of the senior American officials said.

IFR_AR_014448



The Trump administration reduced staffing at the United States Embassy in Havana after personnel were affected by mysterious health incidents. Amanda Perobelli/Reuters

The first high-level talks between Cuba and the United States since 2018 took place in late April, focused on restoring regular migration channels. The Cuban government asked the United States to uphold the agreement to issue 20,000 immigrant visas annually; the American government requested that Havana start accepting Cuban deportees who have arrived illegally.

The American official said the two sides would likely meet again in six months.

"If the talks are successful, they will get back to a formula that worked before, providing a real, feasible legal channel for Cubans to come to the U.S. in exchange for the deportation of those who don't use the legal channel," said Mr. Selee, of the Migration Policy Institute. "Migration is a rare point of cooperation between the countries that has really worked."

For decades, Cubans who migrated to the United States enjoyed preferential treatment. Those caught at sea were turned back but those who reached U.S. soil were allowed to stay, under a policy commonly referred to as "wet-foot, dry-foot."

IFR_AR_014449

President Obama ended the policy in 2017.

The bilateral talks came ahead of the Summit of the Americas in Los Angeles in June, where countries will try to agree on a regional framework for migration and shore up financial support for Latin American countries with large migrant populations. Colombia received $800 million last year in loans from multilateral lenders, including the World Bank, to support the 1.7 million Venezuelan migrants it hosts, the type of support the summit will look to extend throughout the region.

Although the Biden administration has maintained that only democratic governments will be invited to the summit, Cuba was invited to the previous two, in 2015 and 2018, and is hoping for an invitation this year.

But American officials said that was yet to be decided, sparking ire from the Cuban government.

"The United States resorts once again to all kinds of resources and lies to assert the right won by Cuba and its people to be present at these Summits on an equal footing with the rest of the countries in the region," Cuba's foreign minister, Bruno Rodriguez, tweeted on April 25. This is "something shameful."

Bryan Avelar and Frances Robles contributed reporting.

**Maria Abi-Habib** is the bureau chief for Mexico, Central America and the Caribbean. She has reported from across South Asia and the Middle East for The New York Times. Find her on Twitter:  More about Maria Abi-Habib

**Eileen Sullivan** is a Washington correspondent covering the Department of Homeland Security. Previously, she worked at the Associated Press where she won a Pulitzer Prize for investigative reporting. More about Eileen Sullivan

A version of this article appears in print on , Section A, Page 10 of the New York edition with the headline: Record Numbers of Cuban Migrants Now Coming to U.S. via Mexico

**Sign up for The Interpreter newsletter, for Times subscribers only.**  Original analysis on the week's biggest global stories, from columnist Amanda Taub. Get it in your inbox.

IFR_AR_014450

**The Washington Post**

*Democracy Dies in Darkness*

# New surge of migrants strains U.S. capacity ahead of May 11 deadline

By Reyes Mata III and Nick Miroff

April 28, 2023 at 5:13 p.m. EDT

EL PASO — A new migration surge has stretched U.S. Border Patrol stations and holding cells beyond capacity just two weeks ahead of the day the Biden administration plans to lift pandemic-era health restrictions, projecting an even larger influx.

More than 20,000 migrants were in Border Patrol custody Friday morning, more than twice the rated capacity of the agency's detention facilities along the southern border, according to data obtained by The Washington Post. About 7,000 migrants are being held in the Rio Grande Valley of South Texas, the most overcrowded Customs and Border Protection sector.

Much of the latest surge has been driven by thousands of Venezuelan adults and children crossing the river into Texas in recent days by wading, swimming and cramming into smugglers' rafts.

"I never expected we'd be in this position here in Eagle Pass," Maverick County Sheriff Tom Schmerber said in an interview. "We can't stop it."

IFR_AR_014480

U.S. agents have recorded more than 8,000 migrant apprehensions along the southern border on some days this week, and officials say illegal crossings are expected to surpass 10,000 per day after May 11, the date the White House is planning to lift the emergency public health restrictions known as Title 42, which have been in place since March 2020.

When the volume of border crossings has overwhelmed authorities in recent years, they have resorted to providing migrants with instructions to report to immigration offices in U.S. cities. The mass releases of apprehended migrants are widely viewed as an incentive to additional illegal entries.

Some municipal leaders, such as New York Mayor Eric Adams (D), have said they can no longer handle the arrival of so many migrants from the border who need shelter and assistance.

Biden officials want to avoid the kind of chaos they faced in Del Rio, Tex., in 2021 when thousands of mostly-Haitian migrants forded the Rio Grande to set up a makeshift camp that created a humanitarian emergency.

Homeland Security Secretary Alejandro Mayorkas told reporters this week the Biden administration has had 18 months to prepare for Title 42's end, anticipating illegal crossings will rise because "smugglers are seeking to take advantage of this change and already are hard at work spreading disinformation that the border will be open."

IFR_AR_014481

"The smugglers' propaganda is false," he said firmly. "Let me be clear: Our border is not open and will not be open after May 11th."

The Title 42 measures have allowed U.S. authorities to rapidly expel migrants to their home countries or back to Mexico without giving them a chance to seek asylum. The government has used the restrictions to make more than 2.6 million expulsions over the past three years, CBP data show. But roughly the same number have been exempted from the policy, often allowed in the United States with pending claims for asylum or another form of humanitarian refuge.

Troy A. Miller, the acting CBP commissioner, told a congressional subcommittee last week that his agency has holding capacity for about 8,500 migrants along the Mexico border.

The government is currently spending $991 million per year on emergency "soft-sided" facilities, he said, referring to the large air-conditioned tents where CBP can detain migrants for processing when holding cells inside Border Patrol stations are maxed out.

A Government Accountability Office report last year criticized border officials for failing to coordinate migrant releases with U.S. Immigration and Customs Enforcement, after lines stretching for hours or days formed outside ICE processing centers. The agency's New York office is so backlogged that migrants have been issued appointments into the year 2033.

Mayorkas and other Biden officials say they plan to respond to the influx after the policy ends by ramping up deportations and imposing the kind of legal consequences — including the threat of criminal prosecution — whose use was limited by the Title 42 process.

Venezuelan migrants are among the most challenging for the Homeland Security officials, because deportations are severely limited as a result of U.S. tensions with the government of President Nicolás Maduro. More than 7 million Venezuelans — nearly a quarter of the country's population — have left their homeland during the past decade of Maduro's rule, according to U.N. estimates.

Most have resettled in South America, but record numbers have been hiking through the Darien Gap jungle region between Colombia and Panama. The Biden administration has deployed CBP advisers to work with Panamanian and Colombian authorities on a 60-day campaign to turn migrants back.

CBP reported a 25 percent jump in unlawful crossings from February to March, attributing the increase to historic seasonal trends, while noting Border Patrol arrests were lower overall last month compared with March 2022. But for U.S. officials tracking border trends, the CBP daily in-custody numbers are a key indicator of the government's ability to cope with migration pressures.

In December, when CBP reported more than 252,000 border encounters, the highest total ever, the average number of migrants held per day in Border Patrol custody was 12,377, statistics show.

IFR_AR_014482

The daily average dropped to 4,847 in January, the month U.S. officials implemented new control measures through a deal with the Mexican government, allowing U.S. authorities to send up to 30,000 migrants from Cuba, Haiti, Nicaragua and Venezuela back across the border.

Biden officials touted the agreement and their expansion of legal opportunities for migrants to live and work in the United States as the best formula for managing the border, pointing to a decline of more than 90 percent in the number of migrants from the four nations attempting to enter illegally.

But after a deadly fire last month at an immigration detention facility in the border city of Ciudad Juárez, the Mexican government put new limits on the U.S.'s ability to return Venezuelans.

Migrants in Ciudad Juárez said this week they are desperate to leave Mexico and frustrated with the limited opportunities offered by the United States for legal entry.

"I think now is the time," said Haidelys Aguilera, a 29-year-old Venezuelan waiting near the riverbank.

Aguilera said she had registered her family with a U.S. mobile app for migrants seeking to enter the United States legally, but she was growing impatient. That afternoon, her 2-year-old son had wandered off, and a frenzy of screams from nearby motorists alerted his father that the boy had walked into the street. A bus screeched to a halt to avoid the child.

Angel Antonio Graterol Garces, a 41-year-old Venezuelan, said he was motivated to cross now, before Title 42 expires, and he could face harsher consequences for arriving illegally.

"That makes us criminals, just people looking for a better life," he said. "We become animals who are being chased."

Graterol was staying in a migrant camp set up outside the charred former Mexican detention center where 40 were killed in the March 27 fire.

About 100 tents lined the street leading to the building, and memorials for the victims were draped from a perimeter fence. Most of the migrants in the camp were also from Venezuela, and said they were awaiting Title 42's end for a chance to enter the United States.

Some migrants believe that when the policy ends, U.S. border enforcement will be suspended, according to Graterol, repeating the kind of false rumor Biden officials have been trying to dispel.

"We're not using the app. It does not work at all anyways," he said, referring to the mobile app, CBP One. "If it worked, do you think we would all be here, just sitting like this?" He gestured to the rows of tents lining the street.

Other migrants in Ciudad Juárez said the city's police have forced them away from the downtown area, and U.S. border agents shouting from across the river told them to walk eastward toward a designated spot for migrants seeking asylum.

IFR_AR_014483

This area is known as "door number 40" — a section of the border wall with large gates that open into the United States. A crowd of about 50 migrants gathered there on a recent afternoon along the border wall, waiting for a Border Patrol van to pick them up.

The crossings into residential neighborhoods have heightened tensions in El Paso.

Henry Candelaria, who lives about a mile from door number 40, told U.S. officials meeting with El Paso residents this week that the situation was out of control.

Candelaria said he was preparing his morning coffee on a recent Sunday when he saw a man in his backyard and confronted him. The man jumped the fence in a neighbor's yard, but the neighbor's dogs chased him back.

"As soon as he jumped over, I took him down, and both me and my daughter pinned him to the ground. We put a chokehold on him," said Candelaria, adding that he told the man: "You'd better settle down because we have a gun."

"The guy saw we were loaded and he thought about it and stopped fighting," Candelaria said.

Texas State Troopers and Border Patrol agents arrived, he said, and took the man into custody.

*Miroff reported from Washington. Arelis R. Hernández in San Antonio contributed to this report.*

IFR_AR_014484

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 74 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

20 Geo. Immigr. L.J. 167

**Georgetown Immigration Law Journal**
Winter, 2006

**Article**

Michele R. Pistone, John J. Hoeffner [a1]

Copyright © 2006 by The Georgetown Immigration Law Journal; Michele R. Pistone, John J. Hoeffner

# RULES ARE MADE TO BE BROKEN: HOW THE PROCESS OF EXPEDITED REMOVAL FAILS ASYLUM SEEKERS

Expedited removal, whereby a person arriving in the United States can be removed within forty-eight hours and barred from returning for up to five years without any judicial oversight or review, [1] is one of the greatest powers any agency of the United States government possesses. This power was originally granted to the Immigration and Naturalization Service (INS) in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). [2] Since the expedited removal provisions of IIRIRA became effective in April 1997, the INS and its successor agency, Customs and Border Protection (CBP) -- a division of the Department of Homeland Security (DHS) [3] -- have removed more than 500,000 persons from the United States via the expedited removal process. [4] This Article examines and explains the impact of the expedited removal process on genuine asylum seekers and explores possibilities for improving the system.

In addition to the potentially enormous consequences for individuals subject to expedited removal -- genuine asylum seekers who are wrongly removed, for example, are by definition at risk of suffering persecution, torture or death -- what makes the expedited removal authority perhaps **\*168** uniquely weighty is not simply the lack of judicial oversight, but the near absence of oversight of any kind. This combination of circumstances does not exist with other substantial powers. The criminal justice authority, an analogous power in terms of its focus on individuals and its impact on them, is circumscribed by appellate review, the right to trial by jury and the right to counsel, as well as by the accessibility of the process to the press and public. Expedited removal, however, typically takes place out of public view, with only CBP inspectors -- acting as judge, jury and oftentimes prosecutor -- present.

The importance of the expedited removal process to the individuals affected and the unreviewable finality of CBP's decisions make it imperative that CBP err as little as possible. Yet, to ensure removal and due to economic and security-based concerns, CBP also expects to make and *implement* most of its deportation decisions under expedited removal within forty-eight hours of an applicant's arrival. [5] There is considerable tension between high speed and high accuracy and fairness, and no one could reasonably expect perfection from any system that is subjected to these dueling demands. Some errors, in other words, may be necessary evils.

The history of the development of expedited removal makes clear that the inherent conflict between speedy decision-making and accurate and fair decision-making was well understood at the procedure's inception. [6] The formidable task that befell those charged with creating the administrative rules to implement the mostly vague directive of Congress was to make expedited removal approximate, *as much as possible*, the much lengthier and more considered review formerly available as a matter of course in formal hearings before immigration judges. At those hearings, the goals of accuracy and fairness in decision-making were advanced by, among other things, affording applicants for admission the right to present witnesses and evidence in support of their defense to removal, the right to cross-examine any government witnesses, and the right to be represented by counsel (at no expense to the government). In addition, the deportation decisions of immigration judges were subject to review by the Board of Immigration Appeals and the federal courts. [7]

Under expedited removal, these rights had to be approximated rather than duplicated because duplication would destroy the summary nature of the **\*169** process. Full rights could not be afforded without ignoring both congressional legislative intent as

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

IFR_AR_014506

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 75 of 200

well as substantial congressional sentiment, which would have preferred "expedited exclusion to be done at the airport within an hour after the person arrive[d]." [8] After much negotiation both inside and outside the INS, [9] exactly such a form of approximate justice emerged in the compromise set of final regulations promulgated by the agency in December 2000. [10]

To the extent that this set of regulations applied to potential asylum seekers, it provided the following safeguards against immigration inspectors erroneously deporting persons with genuine claims of asylum through the expedited removal process. First, in place of a broad right to develop evidence and present witnesses, applicants were to be allowed to offer their own statements and whatever documentary evidence they happened to be carrying with them. Second, rather than relying on judges, lawyers or others (such as previously admitted immigrants) to provide -- inside or outside of the courtroom -- a statement of the law, [11] immigration inspectors would be required to read aloud a short statement to the newly-arrived applicant; the statement purposely avoided the word "asylum," but did generally note the existence of protections available to persons who feared being returned to their home country. Third, in place of giving the applicant or his or her lawyer time to develop the record, as well as the benefit of clarifying questions that were frequently posed by judges in deportation proceedings, immigration inspectors would be required to ask and record the answers to three specific questions designed to elicit evidence of a possible claim of asylum. Fourth, in place of a verified record established by court reporters or audiotaping, upon the completion of an interview, immigration inspectors would have the applicant read and sign the inspector's record of the meeting. Finally, instead of a right to appeal adverse decisions to the Board of Immigration Appeals and the federal courts, including the United States Supreme Court, the regulations provided for a single review by a second-line supervisor.

In almost every particular, the promise of these carefully drawn and negotiated compromise safeguards has been broken through a failure to apply them adequately and with consistency. As a result of the failure to apply established regulations, more genuine asylum seekers have been erroneously deported to their homelands than was required by the balance struck in **\*170** IIRIRA between speedy and accurate decision-making. Indeed, a recent two-volume report by the bipartisan United States Commission of International Religious Freedom (USCIRF) indicates that the deficiencies of the expedited removal program continue to date. [12] In documenting "serious problems" in the program, [13] the USCIRF report confirms a smaller study conducted in 2000 by the General Accounting Office (GAO). The GAO's 2000 report is graciously titled *Opportunities Exist to Improve the Expedited Removal Process*. [14]

It is cause for great concern that, five years later, many of the same "opportunities" are still available. The persistence of problems in the expedited removal program represents, first of all, a continuing violation of the United States' obligations under an international treaty to which it is a signatory -- the Protocol Relating to the Status of Refugees. [15] Moreover, mistakes made during expedited removal inspections potentially subject deported individuals to persecution -- including imprisonment, torture and death -- and actually will result in such persecution in at least some cases. In addition, even if they escape persecution, persons erroneously deported via expedited removal are still likely to be subjected to a five-year bar on returning to the United States. [16] Depending on one's individual circumstances, this too could be a considerable hardship.

Some commentators have looked at these lamentable consequences and suggested that the elimination of the expedited removal process is the only appropriate solution. As early as 1999, for example, the Advisory Committee on Religious Freedom Abroad, which reported to the Secretary of State and to the President of the United States, called for the "[r]epeal of expedited removal," noting that repeal "should be a high priority for the Administration." [17] Many other persons and groups have **\*171** issued similar calls. [18]

The rationale behind these calls for repeal is not entirely without basis, for to some extent speed will always be at war with accuracy. But the mere fact that a process is imperfect does not mean that it is appropriate to discard it -- as engineers say, the standard of measurement for assessing adequacy is not perfection; rather, the standard is the alternative. In this case, in these times, many thoughtful students of expedited removal have seen no other alternative that addresses as well as expedited removal the security concerns that were presented in stark relief on September 11, 2001.

Yet, while many of the harms caused by expedited removal may be regarded and accepted as necessary evils, one cannot rest comfortably with those conclusions without quantifying the extent of the harms. Few things in life are appropriate *no matter what*; accordingly, in assessing the wisdom of expedited removal it matters, or should matter, whether genuine asylum seekers are erroneously deported only occasionally, or by the hundreds, or by the thousands. Indeed, if the latter figure is correct, even the most ardent supporters of expedited removal might reconsider their position.

IFR_AR_014507

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 76 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

Before any group so acts, however, they may appropriately ask whether it is possible to create an expedited removal system less prone to error. Many of the "necessary" evils of the expedited removal process may not be so necessary after all, and may be avoided in ways short of repealing the authority. If this is true, those persons most sensitive to security and other concerns that provided the rationales for expedited removal may become the staunchest supporters of expedited removal's reform.

After briefly outlining the expedited removal process in Part I, the remainder of this Article will explore both of these issues -- first, the estimated number of erroneously deported asylum seekers, and then, whether and how this number could be reduced. As for the first issue, limiting ourselves to the data found in the two most extensive studies of expedited removal, and then only to errors that stem from a failure to follow already established regulations, Parts II and III will demonstrate the likelihood that tens of thousands of persons have been wrongly deported via expedited removal and that many thousands have been wrongly denied asylum. In other words, though based on conservative premises, our estimate is that more genuine refugees have mistakenly been deported pursuant to the expedited removal authority than even the most vocal opponents feared.

The implications of this showing are enormous. They certainly place a **\*172** high burden upon all responsible officials, but especially upon continued proponents of expedited removal, to work to ensure that harms resulting from the process are reduced as soon and as much as possible. How might this be accomplished?

In addressing this question, Part IV argues that improvement must begin with a change in the culture of the responsible agency. Part IV lists a number of ways to try to achieve this end, and makes some other suggestions as well. We think the reforms we suggest will reduce the likelihood of mistakes in the future. We also think that, as currently practiced, the expedited removal process is troubled enough that substantial reforms have become an absolute necessity. If such reforms fail, or worse, are never even attempted, and the present failed system continues, the entire premise of expedited removal -- that it can achieve widely acceptable levels of accuracy and fairness -- will have been undermined. Remaining supporters of expedited removal will be forced to argue that, although the mistaken expulsion of thousands of legitimate asylum seekers has been shown by experience to be an expected element of the expedited removal regime, the unexpectedly disappointing status quo is but a necessary evil outweighed by other concerns. Should this course of events come to pass, one need not imagine that it is only against a standard of perfection that expedited removal will be deemed by most observers to have fallen short.

## I. OVERVIEW OF THE EXPEDITED REMOVAL PROCESS

CBP inspects persons seeking admission to the United States at border crossings, airports and seaports. There are two phases in the inspections process: a primary and a secondary interview. At the primary interview, CBP officers inspect a traveler's identity and travel documents, such as passports, visas, or permanent residency cards. Non-citizens are questioned about their travel purposes and intentions, including the "applicant's intended length of stay and whether the applicant intends to remain permanently." [19] Most persons pass quickly through this stage and are allowed to leave the port of entry and enter the country. Approximately 300 million applicants for admission are processed annually via the primary inspection process. [20]

When the primary inspector believes that an individual is ineligible for admission, the inspector sends the person to a secondary inspection area. Most of the seven to ten million persons sent to secondary inspection each year are processed without an extensive interview and are allowed to enter the country after additional document screening and security checks through **\*173** various databases. [21] Approximately ten percent, however, are subject to a more probing interview by a secondary inspector in a secondary inspection interview. [22] If no secondary inspector is immediately available, applicants may be restrained with handcuffs and sometimes with shackles until the interview begins. [23]

The secondary interview typically lasts about an hour. [24] During the interview, the inspector can review any documents an individual is carrying, but passengers arriving by sea or air are not allowed to retrieve documents from checked luggage. [25] Moreover, applicants cannot seek the help of a lawyer or assistance from friends or family during the interview. As a result, the process places a premium on the ability of an applicant to verbalize his or her story, a requirement that is especially problematic when, as is sometimes the case, the interview is conducted in a language that the applicant does not adequately understand. [26] At the end of the interview, the inspector may either allow the individual to enter the country, deny admission, or send him or her to a "credible fear" interview, the last alternative being reserved for possible asylum applicants. [27]

IFR_AR_014508

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 77 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

Regarding the denial of admission, expedited removal laws expressly authorize secondary inspectors to deny admission to persons who arrive at an airport, seaport or land border without proper travel documents [28] or who carry documents that CBP officials suspect have been procured **\*174** through fraud. [29] Such persons may be deported "without further hearing or review," [30] subject only to a supervisor's approval of the order. [31] IIRIRA further forbids courts from reviewing expedited removal decisions. [32]

Unfortunately, the nature of their claims makes genuine asylum seekers -- who by definition are fleeing persecution based on race, religion, nationality, political opinion or membership in a particular social group -- disproportionately likely to find themselves in a secondary inspection interview. The government that normally grants travel documents is the government from which they are fleeing. For such individuals, to carry travel documents, or to show authentic identifying documents to government officials, could be dangerous; accordingly, asylum seekers often do not carry any documents that would properly identify them. In addition, asylum seekers fleeing *imminent* harm may not have had time to obtain the usual documents. As a result, asylum seekers often come to the United States without valid travel documents, and hence such potential asylees become ensnared in the secondary inspection process.

For asylum seekers without proper travel documents, the secondary inspection interview is the most critical stage of the expedited removal process. At this stage they must indicate either a fear of persecution or the intent to apply for asylum. Failure to do so subjects them to expedited removal. On the other hand, individuals who request asylum or give secondary inspectors information about their fear of return are required to be removed from the secondary inspection area and sent to detention centers. [33] There, asylum seekers are interviewed once again -- this time by an asylum officer. [34] At this interview, asylum applicants must prove that they have a "credible fear of persecution." [35] Those applicants who are able to meet this **\*175** burden of proof are eligible to apply to an immigration judge for asylum protection. [36] Those who do not establish a credible fear to the satisfaction of the asylum officer are entitled to an extremely limited review by an immigration judge. [37] An immigration judge's affirmation of the asylum officer's negative credible fear determination will, in most cases, subject the applicant to deportation within forty-eight hours, the same fate that awaits persons who receive deportation orders by secondary inspectors.

## II. SOURCES OF ERROR IN THE EXPEDITED REMOVAL PROCESS

Part II will demonstrate that, in practice, the extensive protections formerly offered in deportation proceedings have, in many applications of the expedited removal process, been replaced by precisely ... nothing. Even in the abbreviated fashion envisioned by DHS regulations, the law is not explained, the facts are not explored, verification is inadequate and supervisory review is effectively absent. As a result, a randomness and arbitrariness has been introduced into the expedited removal process that is wholly at odds with the expectations of its sponsors.

Part II(A) examines secondary inspectors' failure to follow regulations designed to identify genuine asylum seekers; Part II(B) discusses similar failures by local supervisors, as well as by higher-level managers.

### A. *The Record Established by Secondary Inspectors is Incomplete and Unreliable*

Numerous flaws pervade the secondary inspection process. First, secondary inspectors fail to provide applicants for admission with crucial information about the proceedings against them and the possible availability of protection. Second, inspectors fail to ask mandatory questions designed to elicit information about possible claims of asylum. Third, contrary to requirements, individuals who express credible fear during a secondary inspection interview sometimes are not referred to an asylum officer, but rather are expeditiously removed. Fourth, in a large majority of the cases, interview subjects sign the sworn statement portion of the I-867B form used in expedited removal cases without reviewing it. Fifth, in a disturbing finding by the only group allowed to widely observe secondary inspection interviews, the forms completed by officers more than occasionally contained assertions never communicated by the applicant. Sixth, in other cases, the **\*176** completed forms lacked important information communicated by the applicant. Finally, several studies have documented instances of inspectors refusing to provide interpretive assistance.

IFR_AR_014509

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    4

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 78 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

## 1. *Inspectors Fail to Communicate Required Information*

CBP training materials state that secondary inspectors must use the I-867A & B forms "in every case in which an alien is determined to be subject to Expedited Removal." [38]  The following paragraphs of the I-867A must be read to persons subject to expedited removal:

> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, barred from reentry for a period of 5 years or longer.

> This may be your only opportunity to present information to me and the Immigration and Naturalization Service [sic] to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear. [39]

Nothing is more crucial in preventing the deportation of genuine asylum seekers via expedited removal than ensuring that the I-867A information is communicated; hence, the controlling regulation requires that the information be read out-loud by the secondary inspector or a translator. [40]  The need to do this is particularly acute in the case of the paragraph that informs individuals that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their **\*177** home country." Many victims of persecution are from countries that tightly control information about the ability of victims of persecution to seek refuge in other countries. Thus, for this or other reasons, many applicants for admission are unaware of their right to ask for protection from return and must affirmatively be told about this right by the inspections officer. [41]

The same paragraph also contains important information stating that expressions of fear about returning home will be treated confidentially. Especially given the prevalence of post-traumatic stress disorder (PTSD) among true victims of persecution, [42] as well as the fear that inspectors may relay claims of persecution back to the home government (and thereby possibly endanger the applicant, if returned, or his or her family), many applicants may need to receive the assurance of confidentiality before they will communicate with their interrogators.

The other paragraphs of the I-867A form are also important and failure to read them reduces the accuracy of the secondary inspection process as well. [43]  Unfortunately, if an inspector fails to read the form aloud, or any part of it, nothing is likely to be done because the omission will likely never be revealed; the file reviewed by supervisors does not require any assurance that the I-867A was read. It is perhaps unsurprising, then, that the form often is not read at all.

The recent report by USCIRF notes both the extent of the failure to read the I-867A aloud and the consequences of this omission. For example, with respect to the failure to read the paragraph informing the applicant of the availability of protection to people who face persecution, the report states:

> DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has **\*178** a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this

IFR_AR_014510

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 79 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

information were seven times more likely to be referred for a credible fear determination than those who were not. [44]

The magnitude of these numbers is stunning, especially when one realizes that the officers knew that they were being observed by USCIRF staff and, as the USCIRF report notes, "It certainly seems likely that compliance with required policies could be greater and inappropriate behaviors would be fewer when observers were monitoring their interviews." [45] In all events, the demonstrated widespread disregard of the requirement that the I-867A be read aloud obviously represents a substantial failure.

### 2. *Inspectors Order Expedited Removal Based on Incomplete Statements*

Inspection officers are also required to ask three questions found on the I-867B and record the answers. Those three questions, which are meant to elicit information relevant to whether a credible fear referral is warranted (and are therefore known as "fear" questions) [46] are:

> • Why did you leave your home country or country of last residence?

> • Do you have any fear or concern about being returned to your home country or being removed from the United States?

> • Would you be harmed if you are returned to your home country or country of last residence? [47]

Despite their mandatory nature, every study of the expedited removal process and the mandatory questions shows that secondary inspectors repeatedly fail to ask, or fail to record the answer to, one or more of the questions. [48] The latest study, by USCIRF, found that between 5% and 15% of I-867B's **\*179** are incomplete in this manner. [49] A comparison with the 2000 GAO study suggests compliance with this requirement has declined considerably in recent years. [50] It is unclear whether the decline is due to a decrease in inspector diligence, a lessening of supervisory vigilance, or both. In any event, the trend is unmistakable, and is an unquestionably negative development. [51] Indeed, as discussed below in Part II(A)(5), the compliance failure in this particular respect is greater than the numbers above indicate: the USCIRF study found, through its direct observation of interviews, that the CBP's file record indicating the percentage of times that fear questions had been asked substantially overstated the actual level of compliance during the interviews. [52]

### 3. *Inspectors Issue Removal Orders to Individuals who Express Fear During Secondary Inspections*

DHS regulations state the following:

> If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer *shall not proceed further* with removal of the alien until the alien has been referred for [a credible fear] interview by an asylum officer in accordance with 8 CFR 208.30. [53]

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 80 of 200

Both the GAO and USCIRF studies found evidence that this regulation has not always been obeyed. Thus, in a random sample of 365 case files reviewed by the GAO, seven case files indicated that an individual was ordered removed despite having expressed a fear of return. [54] USCIRF's study shows an even higher level of disregard for the regulation. In that study, "[o]ne in six aliens who expressed a fear of return during the Secondary Inspection interview were placed in Expedited Removal or allowed to withdraw their application for admission." [55] Withdrawal is at the discretion of immigration officers; however, the request for withdrawal of an application for admission must be made "strictly voluntar[ily]" by the applicant and "not be coerced in **180 any way." [56] Distressingly, USCIRF's researchers witnessed several persons withdraw after expressing fear, with the withdrawals seemingly as a result of improper encouragement by inspectors. [57]

The issuance of expedited removal orders to individuals who express fear during secondary inspections is problematic because it violates the treaty obligation of *non-refoulement*, which prohibits the return of a refugee "from one state to another, especially to one where his or her life would be threatened." [58] Because secondary inspectors are not qualified to assess "fear" in the asylum context, as will be discussed in Part II(B)(5), they must not do so. Rather, they should simply record the applicants' expressions of fear and pass the cases on to asylum officers. As will be shown in Part II(B)(5), confusion among supervisors and upper-level managers appears to cause at least some of the confusion on the inspector level. Inspectors, therefore, may not deserve criticism for doing the wrong thing. Nonetheless, when inspectors evaluate and judge levels and types of fear, the wrong thing *is* being done.

### 4. *Inspectors Allow Sworn Statements to be Signed Without Being Verified*

Given the high stakes involved in removing individuals from the United States without a judicial hearing and barring them from returning to the country for up to five years, the regulations seek to ensure that all information about an applicant for admission that is recorded on the I-867B sworn statement is accurate and verified. To achieve this goal, the regulations have incorporated three safeguards into the inspection process.

First, inspectors are required to "have the alien read (or have read to him or her)" the statement as it is recorded on the form. [59] The regulations also contemplate the possibility that corrections will be made to the statement, thereby eliminating any errors, misstatements or misunderstandings between an applicant's stated answers and the written record. Finally, the regulations also require the applicant to "sign and initial each page of the statement and each correction." [60] This last requirement is an effort to have the applicant **181 confirm the truth of the statement, [61] much as a deponent in litigation is called upon to certify the truth of a deposition transcript after it is read to or by him. [62]

In practice, however, there is a major difference between signing an I-867 and signing a deposition transcript. The deposition transcript will almost always be in a language the deponent understands; the deposition, after all, purports to be his or her own words. The same is not true of the I-867. That form is written in English, which a substantial majority of persons caught in the expedited removal process do not speak. In fact, in the cases observed by the USCIRF researchers, it was possible to conduct interviews in English less than 20% of the time. [63]

The language difference does not present an insurmountable obstacle to fulfilling the purpose of the signature requirement. It simply means that the I-867 will have to be translated before it is signed. However, in practice, the I-867 often is signed without being translated.

Thus, the USCIRF study found that, while there was 100% compliance with the signature requirement, [64] 72% of the signers neither read their statement nor had it read to them. [65] This large majority signed the form in front of them -- as people often do -- without knowing or checking its contents. Contrary to the intent of the signature requirement, therefore, the presence of a signature does little to ensure the reliability of the sworn statement.

One might regard this as the failure of the signers, not the inspectors, given that typically the burden is on a signatory to make sure that he or she understands a document before signing it. [66] In this case, however, the burden is on the inspectors to be "absolutely certain ... that the alien has understood the proceedings against him or her." [67] Moreover, in the majority of cases, it is impossible for signatories to read the document on his or her own initiative. Inspectors provide interpreters only when

IFR_AR_014512

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 81 of 200

"necessary"[68] and, in the USCIRF study, interpretation was provided 81% of the time.[69] However, the statements were read back to the applicants only 17.7 % of the time,[70] meaning **\*182** that more than 63% of the time the signatories could not know what was in the document, and that this fact necessarily was known to the inspectors who had procured interpreters or themselves had to speak to applicants in a language other than English.

In the vast majority of cases, then, the signature establishes nothing more than that an applicant for admission sat in front of an inspector as the latter wrote up a sworn statement. The consequences of this general failure to treat the signature requirement as anything more than a technical exercise are substantial. First, an undetected misinterpretation or misunderstanding could result in a secondary inspector ordering removal of an applicant who has a viable asylum claim. Second, the same misunderstanding could cause a supervisor to approve a removal order he might otherwise reject. Third, because the I-867B will become part of the official record of the case sent on to credible fear interviews with asylum officers and will then be reviewed and often given substantial weight by immigration judges and government attorneys as they deliberate the merits of asylum claims, undetected misunderstandings could come back to haunt even persons who successfully avoid expedited removal.[71] Finally, the signature requirement and the requirement that inspectors be "absolutely certain ... that the alien has understood the proceedings" have a secondary purpose of protecting the dignitary interests of applicants. As one scholar has written in a study of social security disability insurance, "claimant control over the processing of a claim ... is important to the development of an adjudicatory process that maintains or fosters dignity and self-respect."[72] Allowing an applicant a chance to review his or her statement and to make changes to it before signing certainly could give the applicant the sense of control that can foster dignity.

### 5. *Inspectors Falsely Attribute Statements to Applicants*

USCIRF's recent congressionally-mandated study of the expedited removal process is "the first systematic evaluation of the Expedited Removal process utilizing direct observation of Secondary Inspection interviews with arriving aliens."[73] The results of USCIRF's study suggest that previous studies based mainly or exclusively on archival data[74] are very likely to have **\*183** substantially underestimated the rate of noncompliance with applicable regulations.

Thus, the USCIRF report states that "[s]tudy researchers found that the file often indicated that all four fear questions were asked of the alien, even when they were not."[75] The discrepancies were substantial. For example, the USCIRF researchers observed thirty-seven cases in which the first "fear" question was not asked. However, in thirty-two of those cases, the applicant's file nonetheless "incorrectly noted that the question had been asked and answered."[76] This suggests that actual noncompliance with the requirement to ask the first mandatory question on the I-867B was almost *seven* times the rate indicated by the record files.

### 6. *Inspectors Fail to Include Important Information Conveyed by Applicants*

In some cases, inspectors fail to note significant information offered by the applicant on the I-867B.[77] The most egregious example of this occurs -- with distressing frequency, according to USCIRF -- when an individual expresses fear at secondary inspection but the officer fails to record the fear and orders expedited removal.[78]

The failure to record important information can create a problem even for an individual who passes secondary inspection and moves to a credible fear interview before an asylum officer and an asylum hearing before an immigration judge. Immigration judges often deny an asylum claim on the ground "that the applicant was not credible because the alien's testimony in court reflected additional detail not found in the original document from the port of entry."[79] Because the I-867B is "less than reliable" in constituting a comprehensive record of the applicant's statement, this ground may be factually wrong. Accordingly, secondary inspectors' failure to include significant facts on the I-867B may "lead to the incorrect removal of asylum seekers to countries where they may face persecution,"[80] even when an inspector decides against ordering expedited removal.

### **\*184** 7. *Inspectors Fail to Provide Adequate Interpretive Assistance*

DHS regulations require that interpretive assistance be used, if necessary, at secondary inspection.[81] The authors of the USCIRF report were surprised to find that, "despite the presence of researchers observing Secondary Inspection interviews, our

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 82 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

observers ... noted that on more than one occasion aliens were refused interpreters ... even when they requested them."[82]  In this respect, the USCIRF report confirms findings by several other studies.[83]

Such refusals, even if only occasional, obviously are troubling. Not only do the refusals elevate the risk that an inspector will miss an applicant's statement of fear and issue a removal order, but they also could eventually hurt applicants who survive secondary inspection. A record compiled by an inspector struggling to get by without an interpreter, or including statements by an applicant struggling to communicate in an unfamiliar language, is clearly susceptible to being tainted by affirmative misstatements and crucial omissions. As noted above in Part II(A)(6), such problems can cause immigration judges to find credibility issues where none truly exist, and could thus ultimately result in the erroneous return of genuine asylum seekers to countries where they may be persecuted.

Moreover, much more than occasionally, inspectors provide inadequate interpretive assistance. In Los Angeles, for example, interpretation is provided by airline personnel nearly 25% of the time[84] and, as CBP itself recognizes, such interpretation can be problematic.[85]  The potential problems include deliberate inaccuracy, as the national or quasi-national nature of many airlines can foster a bias among airline personnel against a person alleging persecution by the airline employee's state; unintentional incompetence, as an untrained interpreter may inappropriately summarize statements or attempt to resolve ambiguities on his or her own; and incompleteness, as an applicant may be reluctant to speak openly in front of a known state employee. An interpreter inadequate for any of these reasons can create the same difficulties as a complete failure to provide any interpreter at all.

### B. *Supervisory Review of the Expedited Removal Process Is Ineffective*

Supervisory review of expedited removal orders also suffers from serious shortcomings. This review must be performed by an official at or above "the  **\*185**  level of second line supervisor, or a person acting in that capacity."[86]  It is conducted primarily through a review of the I-867B. In theory, no expedited removal orders can be carried out unless approved by a supervisor. Unfortunately, in practice, this requirement and other regulations are sometimes ignored. Moreover, other actions are taken as well -- including actions by upper-level managers -- that make supervisory review of expedited removal orders ineffective.

### 1. *Supervisors Accept Incomplete Sworn Statements*

It has already been noted in Part II(A)(2) that secondary inspectors sometimes do not ask or do not record answers to the mandatory questions listed on the I-867B. The secondary inspectors' supervisors compound the error during their own review, by either failing to notice the omissions or simply ignoring the inspectors' errors.

This deficiency has persisted throughout the lifetime of the expedited removal program. The continued and increased existence of the problem, despite being specifically identified as an issue in government studies published in 1998, 2000, and 2005,[87] suggests a certain over-optimism among those proponents of expedited removal who thought that supervisory review would adequately approximate review by the Board of Immigration Appeals and the federal courts.

Indeed, this suggestion only becomes stronger as one becomes more familiar with the particulars of the I-867B. The space provided for answering, or at least to begin to answer, the mandatory questions of the I-867B is on the face of the form.[88]  It seems impossible that one would overlook this space unless one has not looked at all. This suggests that the supervisors' failure to address the omissions is not only a problem in itself, but also a sign of larger problems -- most of all, it suggests a general unsuitability of supervisors acting as "courts" of last resort.

### 2. *In Some Cases, No Record Documents that Any Review Was Conducted*

The GAO has reported that supervisors at some of the busiest airports in the United States completely failed to review expedited removal orders in up to three percent of the cases.[89]  In such cases, the failure to review an expedited removal order effectively constitutes a decision to deport the applicant based on the un-reviewed assessment of a single secondary inspection officer working in a demonstrably flawed system.

IFR_AR_014514

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                9

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 83 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

**\*186  3. *Supervisory Reviews Are Sometimes Conducted by Unauthorized Officials***

As previously noted, a second line supervisor must perform supervisory review.[90] However, this requirement is sometimes violated when the supervisory review is conducted by "someone other than the second line supervisor [signing] the order of removal."[91] Presumably, the intent of this rule is to ensure that the review of a secondary inspector's removal order is conducted by someone who understands the importance (and finality) of the review, and is adequately trained to perform it. Too often, it seems, these assumptions do not reflect reality, but that unfortunate fact only underscores the seriousness of the failure to comply with the second line inspector rule. After all, as flawed as second line supervisor review seems to be, there is absolutely no reason to believe that an individual not empowered by the regulation to undertake the responsibility of review will perform even as well as a second line supervisor.

**4. *Supervisors Rely on Inadequate Telephonic Review of Records***

CBP policies allow expedited removal orders to be approved by telephone if an appropriate supervisor is not present.[92] In practice, supervisory review in many airports is conducted by telephone at least occasionally and perhaps in the vast majority of cases. For example, eighty of the ninety-four case files at JFK International Airport in New York reviewed by the GAO included evidence of telephonic supervisory review.[93]

There are at least two problems with telephonic supervisory review. First, telephonic review inevitably lessens the overall quality of the review process. Second, telephonic review makes it impossible to conduct with confidence any systematic study of the review process.

The first problem results from the reality that a telephone conversation about a written record is not the same as compliance with the regulatory requirement that a supervisor review "the sworn statement and any answers and statements made by the alien"[94] unless these parts of the record are read verbatim over the telephone. It is, of course, theoretically possible to read the statement and answers verbatim over the telephone, but it is quite certain that it is not done very often. The supervisory review is by a "high level supervisor"[95] who has many other responsibilities; after all, out of every 10,000 persons who arrive at ports of entry, in only one or two cases, on **\*187** average, will the supervisor be called upon to exercise his or her responsibility to review and approve orders for expedited removal.[96] Under these circumstances, when an inspector calls for approval of an expedited removal order, it is unlikely that the supervisor is leisurely waiting by the telephone, ready and willing to listen to a possibly lengthy verbatim reading of an applicant's statement. Rather, if the supervisor is available at all, the press of other demands likely encourages a less structured conversation, in which secondary inspectors, perhaps prompted by supervisors at certain points (e.g., "was there fear?," "did he sign it?," etc.), briefly and contemporaneously summarize their interviews.

Such summaries often could omit or mischaracterize important facts that a verbatim reading of the record would reveal. An abbreviated conversation, for example, easily could overlook a failure to answer one or more of the fear questions. Do abbreviated conversations of the sort posited here actually happen? Surely the demonstrated frequency with which fear questions actually do go unanswered, and the impossibility of overlooking the failure to answer if one actually conducted a verbatim reading, constitutes powerful circumstantial evidence that the answer is "yes." Moreover, for a proponent of telephonic review to argue that the answer is "no" would, if successful, be to win the battle but to lose the war over the appropriateness of the current system -- it would mean that high level supervisors are approving deportations despite being expressly and routinely made aware that forms are incomplete in crucial respects.

More likely, we think, than that cynical view, is that abbreviated, i.e. non-verbatim, telephonic reviews are, above all, good faith responses to substantial time pressures. In addition, supervisors and secondary inspectors can find common ground in the fact that non-verbatim telephonic review has the additional bureaucratic appeal of lessening accountability on both ends of the line. When non-verbatim telephonic supervision is utilized, there is no written record of what is communicated to the supervisor. One cannot tell whether a supervisor made a mistake in evaluating the facts, or if the secondary inspector omitted or mischaracterized facts. Unfortunately, as the lack of accountability dawns on employees, the incentive to work carefully is lessened. Indeed, in the past and perhaps still, the lack of accountability was **\*188** reinforced by the failure of supervisors to keep any record establishing that a review took place, despite training guidance recommending that approving officials keep a log of telephonic concurrence to ensure that all cases are properly approved.[97]

IFR_AR_014515

In sum, telephonic review thus not only fails as a means of conducting an effective review, it succeeds far too well in masking the particular source of any errors that may be made. Absent any changes in procedure, this baleful combination has the unfortunate consequence of making systematic review by others, including even higher-ranking CBP officials, both necessary *and* impossible.

**5. *High-Level Managers and Supervisors Have Inexcusably Confused the Standard to be Applied When Applicants Express Fear in the Secondary Inspections Interview***

CBP claims that certain expressions of fear in an expedited removal hearing should *not* result in a referral for a credible fear determination. CBP's claim finds expression in section 17.15(b) of the CBP Inspectors' Field Manual, which authorizes inspectors to deport, via expedited removal, even persons who have expressed fear in response to the I-867B's fear questions when the fear "would clearly not qualify that individual for asylum." [98] This instruction is vulnerable on numerous grounds.

The first objection to allowing inspectors to evaluate the adequacy of an applicant's fear assertion is that it flatly contradicts the DHS regulation it is intended to facilitate. As noted previously, that regulation states:

> If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer *shall not proceed further* with removal of the alien until the alien has been referred for [a credible fear] interview by an asylum officer in accordance with 8 CFR 208.30. [99]

The statute this regulation is meant to implement states that, upon an expression of fear, "the officer *shall refer* the alien for an interview by an asylum officer ...." [100] As far as the action required upon an expression of fear is concerned, the regulation thus differs from the statute it is implementing only in that the regulation's command "not [to] proceed further" makes explicit what is obviously implicit in the statute.

A strict constructionist might hold that CBP's interpretations of the statute **\*189** and regulation are self-refuting. To claim, as CBP does, that the "shall" in the statute means "may" and that the unqualified direction in the regulation that an inspector "shall not proceed further" actually allows an inspector to proceed further might be characterized as a step through the looking glass into an Alice in Wonderland world where words "mean just what [we] choose [them] to mean -- neither more nor less." [101] Our view is more flexible, though not infinitely so. Perhaps there is room to proceed further but, at the very least, one's call for flexibility must make sense in the larger statutory scheme.

Accordingly, to consider another example, calls to flexibly interpret the express statutory command that inadmissible persons without proper travel documents "shall [be] removed ... without further hearing or review," [102] might appropriately be viewed with at least initial skepticism. When engaging in statutory interpretation, one must always keep in mind the possibility that Congress actually meant exactly what it said. Certainly the government's position has always been that -- except for certain expressly articulated exceptions -- Congress meant exactly what it said when it framed the core expedited removal power to deport "without further hearing or review."

The same might be said of the proscription against "proceed[ing] further" once a fear is articulated. Indeed, just as the power to deport "without further hearing or review" is at the core of expedited removal's effectiveness, at the core of the asylum protection that provides the main exception to expedited removal's jurisdiction over travelers without papers is the ability to halt the process with an expression of fear. Thus, one might conclude that the rule and its exception each might be interpreted in the same way, as absolute in their respective spheres.

With its claim that secondary inspectors can "proceed further" in some cases, CBP has rejected this parallel interpretation. Whether such a position is sensible depends upon practical questions of implementation and the compatibility of the position with the overall regulatory scheme. Considered in the light of these concerns, the CBP policy is objectionable in the extreme.

IFR_AR_014516

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 85 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

Ironically, another section of the CBP Inspector's Field Manual best explains the most fundamental practical objection:

> The alien may convey fear of violence or harm, a need for protection, an indication of harm to, or disappearance of, relatives or associates, or dangerous conditions in his or her country. Even disputes of a personal nature sometimes may relate to asylum, such as domestic violence, sexual or child abuse, child custody problems, coercive marriage or family planning practices, or forced female genital mutilation. All officers should recognize that sometimes unusual cases have been found eligible for asylum that may not have initially appeared to relate **\*190** to the five grounds contained in the definition of refugee, such as AIDS victims who face government persecution, land or money disputes with wealthy persons or persons in power, whistle blowers, witnesses to crime and even organized crime connections. Do not make judgment decisions concerning any fear of persecution, torture, or return. If in doubt, refer to an asylum officer for a determination. Any alien who by any means indicates a fear of persecution or return may not be removed from the United States until the alien has been interviewed by an asylum officer. [103]

To paraphrase, asylum determinations require the special training of asylum officers. Because inspection officers do not have that training, they must recognize their limitations and refrain from making any judgments when fear is mentioned, except the judgment to refer the matter to an asylum officer.

This recognition of the limitations of inspectors has long been understood as demanding a low fear threshold at secondary inspections. Thus, when the I-867B was being developed, an early draft included a fear question asking, "what is the nature of [your] fear or concern [about being sent home]?" The proposed question was eliminated from the form after it was noted that "inspectors lacked training that would enable them to distinguish between qualifying and non-qualifying types of fears." [104] Indeed, at the time, INS officials not only acknowledged inspectors' present lack of training in asylum law, they also expressed that "inspectors would not be trained in the nuances of asylum law" in the future. [105]

Time has proven this belief entirely well founded. Reports by the USCIRF and others confirm that secondary inspectors are still not trained in asylum law and thus remain unable to distinguish between qualifying and non-qualifying fears. [106] Under these circumstances, the only policy that sufficiently safeguards against the erroneous deportation of genuine asylum seekers is the one implied by the Field Manual quotation noted above: a sort of "beep test" in which, in the words of former INS General Counsel David Martin, once "the interviewee mentions fear of return, the beep sounds (figuratively) and the case is identified for referral to an asylum officer." [107]

The problem is that this understanding -- which is the only understanding that can adequately protect genuine asylum seekers -- has never been fully **\*191** accepted within the immigration services; indeed, it has been actively resisted. Section 17.5(b) of the Manual, which authorizes an inspector to ignore an individual's assertion of fear when it "clearly would not qualify that individual ... for asylum," constitutes the formal expression of the resistance. That section provides the legal grounding for a pattern of training and supervision that, from the start, has confused secondary inspection officers and caused an inconsistent and erroneous application of the fear standard.

Thus, the 2000 GAO study that found file evidence of erroneous deportation of individuals who asserted a fear also revealed evidence that inspection officers' training left them uncertain as to whether or not they were required to "refer any alien claiming a fear of returning to his/her country to an asylum officer." [108] Although at the time an INS official conceded that additional training and clarification of the fear standard might be needed, [109] based on the USCIRF study, five years later that confusion clearly persists.

For example, in twelve sample cases directly observed by the USCIRF staff, individuals who expressed fear -- and who, therefore, "under DHS regulations ... should have been referred for a credible fear interview" [110] -- were not so referred. [111] In five of these cases, there was no basis whatsoever for concluding that the expressed fear was non-qualifying. In two other cases, USCIRF deemed the fear "ambiguous," making them precisely the kinds of cases that demand what the inspectors concededly lack -- the ability to make nuanced legal judgments. Finally, while one case was not characterized by USCIRF, the report suggests that the claims of fear in four other cases were more suspect; in three of these four cases, the expressed fear related to economic hardship. However, experienced asylum practitioners often find that ostensibly "economic" cases may in fact offer grounds for

IFR_AR_014517

asylum. A potential client may start by talking about economic hardship, for instance, and only later reveal membership in a persecuted ethnic group suffering from economic hardship rooted in the persecution of him or his group. [112]

In none of the twelve observed cases, accordingly, can the fear expressed **\*192** clearly be classified as non-qualifying. The best that can be said on behalf of the Field Manual standard allowing inspectors some discretion, is that its application yields secondary inspection results that are often, but not necessarily always, wrong. (Actually, the results *are* always wrong because an appropriate policy would require a credible fear referral upon any invocation of fear. Our point is that, even on its own terms, the Field Manual policy produces demonstrably erroneous decisions.) This entirely predictable result -- predictable because inspectors so obviously lack the training (as well as the time) to distinguish properly among types of fear -- illustrates the reason why a more demanding fear showing was rejected by the regulations of the parent agency in the first place, i.e., because it would necessarily introduce a disconcerting element of randomness into a process that does, after all, potentially involve life-or-death decisions. [113]

In addition to endangering genuine asylum seekers, the Field Manual's amended fear policy produces other entirely predictable harms as well. In Part II(A)(1), we discussed the paragraphs of the I-867A that must be read to all persons subject to expedited removal; the final mandatory paragraph bears re-reading:

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear. [114]

The incompatibility of this paragraph with the fear position articulated in §17.15(b) of the Field Manual is jarring. As the I-867A indicates, CBP's approved policy is for a secondary inspector to promise an individual that "[i]f you fear or have a concern about being removed," "another officer [will speak to you] about your fear or concern" and that "[t]hat officer will determine if you should remain in the United States." In the twelve cases noted above (and in potentially thousands of unobserved cases) the following scenario occurred: an individual admitted a fear and was then ordered removed immediately by the very inspector who just promised the chance to talk "privately and confidentially" to another officer who would make the removal decision.

**\*193** Given this scenario, the collateral consequences of the Field Manual's fear policy -- to the reputation of the United States, to the coherence of the regulatory scheme, to the perceived fairness of the secondary inspection process, to the integrity of the process, to inspectors' own sense of integrity, to the willingness of inspectors to read a "mandatory" paragraph that they know is sometimes a lie, and to the development of an institutional culture that values truth-telling -- are evidently serious and universally unwelcome. It is apparent that the managers responsible for development of the Field Manual did not think through all the collateral implications of the policy granting additional discretion, nor did they adequately appreciate the inability of secondary inspectors to make the distinctions the new policy required, or appropriately weigh the risks the policy creates for genuine asylum seekers. And, most fundamentally, they ignored the plain meaning of the regulation that their Field Manual ended up flouting, even though a plain meaning reading would yield a result both more consistent with the remainder of the regulatory scheme and more workable in practice, given the capabilities of secondary inspectors. [115]

## III. THE CONSEQUENCES OF CBP'S RULE-BREAKING ARE SIGNIFICANT

In Part III, we quantify the human toll of CBP's failure to follow the rules governing the treatment of possible asylum seekers in expedited removal. Our calculation is extremely conservative, and almost certainly underestimates the total number of genuine asylum seekers wrongly deported since the implementation of expedited removal. For example, we do not include in our calculation deportations via expedited removal of genuine asylum seekers caused by: (1) the inappropriate exertion of pressure on asylum seekers to withdraw their applications for admission; [116] (2) the failure to use interpreters or the use of inadequate or inappropriate interpreters; [117] (3) the conditions at secondary inspection, which are not conducive to full disclosure (e.g., the handcuffing and shackling of asylum seekers); [118] (4) the reliance by judges on inaccurate or incomplete sworn statements as the basis for making adverse credibility findings and denying asylum protection; [119] (5) the "push back" of asylum seekers

IFR_AR_014518

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 87 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

at primary inspection; [120] (6) the failure of appropriate or sometimes any supervisors to review expedited removal orders and **\*194** I-867s; [121] and (7) mistakes made because of inadequate telephonic review of I-867 forms by supervisors. [122] Nor do we adjust any figures to account for the operation of the Hawthorne effect -- "where observers, by their mere presence, influence the behavior under investigation" -- even though it is a virtual certainty that that effect has caused an underestimation of many of the rules violations witnessed during the USCIRF study, [123] just as it is a virtual certainty that every one of the seven problems noted above have caused genuine asylum seekers to be returned erroneously to homelands where they may be persecuted.

Rather, we limit ourselves to the following three acts of noncompliance: (1) failure to read the mandatory paragraphs of the I-867A; [124] (2) failure to refer individuals who indicated a fear of return to credible fear interviews; [125] and (3) failure to ask and/or record the answers to the mandatory fear questions of the I-867B. [126] In calculating the number of persons wrongly deported via expedited removal in a typical year, we have averaged figures for the last four years to arrive at an annual total of approximately 71,000 applicants for admission placed into the expedited removal process, with approximately 10,000 of those applicants referred by inspectors to credible fear interviews. [127] We have averaged figures over a multi-year period because the figures tend to vary considerably from year-to-year; we have selected the particular four-year period of 2000-2003 because that is the time period selected by the USCIRF to serve as a comparative basis for some of its own data collection efforts. [128] It is also the most recent four-year set of data available.

## A. *The Consequences of Failing to Read Mandatory Information from the I-867A*

As explained in detail in Part II(A)(1), secondary inspectors are required to read mandatory scripted language to each of the 71,000 applicants for admission who are put into the expedited removal process in an average year. However, the USCIRF found that "in approximately half of inspections observed, inspectors failed to inform" the applicants for admission of the mandatory scripted information. [129] According to the USCIRF report, those **\*195** who "did receive this information were seven times more likely to be referred for a credible fear determination than those who were not." [130]

The impact of this failure is shocking. It means that, annually, approximately 35,500 applicants for admission are not read the required script. If people who are read the script are seven times more likely to be referred to credible fear interviews, then approximately 8750 out of our annual average of 10,000 people referred for credible fear interviews come from the half that received the mandatory information, while only 1250 come from the group that does not receive this information. The difference of 7500 constitutes the number of individuals each year who are not referred to credible fear interviews because of this failure alone.

## B. *The Consequences of Failing to Refer Individuals Who Mention Fear to Credible Fear Interviews*

As discussed in Part II(A)(3), many individuals have been subjected to expedited removal because of the failure of secondary inspectors to refer all individuals who mention a fear of return to credible fear interviews. Specifically, according to the USCIRF study, 15.2% of individuals who mention fear are not so referred. [131] In an average year, that means that approximately 1751 individuals who express a fear of return and hence should be referred to credible fear interviews are instead deported immediately via expedited removal. [132]

## C. *The Consequences of Failing to Ask and/or Record Answers to the Fear Questions*

As Part II(A)(2) details, the mandatory fear questions are designed to elicit information relevant to whether applicants for admission should be sent to credible fear interviews or expeditiously removed. The USCIRF report found that the questions effectively achieve the intended result. Specifically, the USCIRF report found that "the likelihood of referral for a Credible Fear interview was roughly doubled for each [of the two explicit] fear question[s] asked" (i.e., the likelihood was 4 times greater for individuals who were asked both fear questions compared to those who were asked neither question.) [133]

In particular, 18% of the applicants who were asked both explicit fear questions were referred for credible fear interviews, while the comparative **\*196** figure for those who were asked only one of the questions was 8.6%, and the percentage for those asked

**RULES ARE MADE TO BE BROKEN: HOW THE...**, 20 Geo. Immigr. L.J. 167

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 88 of 200

neither question was only 5.3%. [134]  Additionally, 5% of the time, neither question was asked, while only one question was asked an additional 9% of the time. [135]  An extrapolation from these figures, and our average annual base of 71,000 applicants placed into the expedited removal process, leaves us with an expected shortfall of approximately 1052 persons per year who should have been referred to a credible fear interview, but were not because of this failure. [136]

In conclusion, based on the USCIRF report's findings, the total number of applicants for admission who are not referred to credible fear interviews because of these three failures amounts to more than 10,300 persons each year -- a figure that exceeds the total number of individuals actually referred by inspectors for credible fear interviews in an average year. Given the very small percentage of credible fear referrals that result in a negative credible fear determination, the likely effect is that approximately 10,000 persons per year are erroneously subject to a five-year bar on returning to the United States [137] and thousands are erroneously deported to face persecution. [138]  The latter figure suggests that, over the entire course of expedited removal's almost nine-year history and based only on our partial accounting of the damage, approximately 20,000 genuine asylum seekers have been refused entry by the United States because those in charge of the process have broken the rules meant to protect persons fleeing persecution abroad.

## IV. RECOMMENDATIONS

Given the serious nature of the harm caused, reform of the expedited removal process is urgently needed. In approaching this task, we agree with Professor Jerry Mashaw, who wrote in his analysis of the administration of the social security disability program that "[c]riticism and the reformist instinct must be harnessed to an appreciation of reality." [139]  In formulating our suggested reforms, we must appreciate the overwhelming reality that the culture in which expedited removal occurs is an enforcement culture,  **\*197**  meaning that CBP (as well as its parent department, DHS) focuses on enforcing the rules restricting illegal immigration, as opposed to maximizing legal immigration or providing services to immigrants and potential immigrants. By its nature, especially after the events of September 11, 2001, this culture will resist initiatives that are perceived as failing to serve the enforcement mission. [140]

A realistic plan for reform, accordingly, must do more than recommend the issuance of certain diktats from above. Plenty of diktats already exist, and every study conducted of the expedited removal system has found that those diktats are often ignored on the ground. Simply designing a better mousetrap, in other words, is not enough.

Three years ago, Professor Lenni Benson introduced into the administrative law literature a striking metaphor to clarify this concept. She characterized the various diktats from above -- "the statutory provisions, regulations, and implementing forms and instructions" -- as a map and only a map. She argued that "[t]he map is not the territory," [141] but rather, the territory is the reality that the map symbolically represents, as the bureaucratic implementation is the reality that the diktats theoretically describe. Reform that focuses exclusively on making a better map, with no regard for the territory, carries with it a great and quite predictable risk of failure. A better map won't help you if, on the ground, "you can't get to there from here." [142]

Our aim is to offer recommendations that will allow the expedited removal process to arrive, in fact, at a place where thousands of genuine asylum seekers will no longer unnecessarily be put at risk of deportation. In order to  **\*198**  accomplish this goal, we have focused first on the territory, with several recommendations we think will have the effect of changing the ground environment in a way that will ultimately make CBP more receptive to following diktats from above. After this, we offer some changes of the map-making variety. The latter changes are important, but the former are really the *sine qua non* of effective reform.

Our hope is that people on all sides of the debate will embrace our recommendations because the need for effective reform has never been so obvious or necessary as it is now. The need is more obvious than ever due to the disclosures of the USCIRF report, which demonstrate, to a disturbing degree, both the unreliability of the file records upon which prior studies have primarily been based, and the great likelihood that the file records underestimate to a significant extent the scale of CBP's noncompliance with established requirements. And the need for effective reform is now more necessary than ever due to recent and perhaps future expansions of the expedited removal power. When it began, expedited removal was limited to persons who had just arrived at ports of entry, such as airports. Expansions in 2002 and 2004 extended expedited removal to "undocumented non-Cubans who entered the United States by sea within the prior two years" and to "undocumented aliens apprehended within 14 days

IFR_AR_014520

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 89 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

after entry and within 100 miles of the border, in the Tucson and Laredo Border Patrol sectors," respectively. [143] Subsequent DHS initiatives further extended the latter policy "across the entire southwest border" in 2005, and to the entire U.S.-Canadian border and to all U.S. coastal areas in 2006. [144] With the extensions, officers inexperienced in expedited removal, working in offices similarly inexperienced, are beginning to exercise the awesome and unappealable power of deporting arriving persons and banning them from returning for five years or more. In sum, there is no better time than the present to get it right, and we are now better prepared to do so because we have a better picture of what can and has gone wrong.

### A. *Reforming the Culture*

Contrary to general belief, bureaucratic culture is easy to change. The difficulty lies in making the change an improvement. A top-down, heavy-handed approach is likely to be counter-productive. In reality, inspectors at **\*199** the border -- and their managers -- have a complicated job balancing the "quite different, almost opposite, organizational objectives" of enforcement and service. [145] Anyone seeking to alter that balance has to be aware of the delicacy of the task. The potential for orders from above to be misinterpreted at ground level is significant. When the Social Security Administration (SSA), for example, desired to make social security disability awards more definite for certain claimants by classifying particular medical conditions as per se disabling, it simultaneously and quite unintentionally sent the undesired message that other conditions were "presumptively nondisabling." [146]

Immigration officials are aware of this problem. Indeed, at least one may have learned from the SSA example noted above, when a strikingly similar issue came up during discussions about the rules to govern expedited removal. As recalled in Professor Philip Schrag's insightful memoir/study of IIRIRA's origins, passage and aftermath:

> Some advocates echoed the call that Pistone and I had made for a "problem list" of countries from which people would be assumed to be escaping. A senior INS official dismissed this suggestion, saying that if there were such a list, the inspectors would immediately deport anyone who was not from a country on the list. I suggested that they could be trained to use better judgment than that, but the official said that I was "bucking human nature." [147]

All things considered, the INS official may have been right. The flip side of a generally commendable caution about the unintended effects of managerial communications, however, is that it may lead to the conclusion that certain deeply rooted, habitual and serious problems simply cannot be effectively addressed. In this mindset, any proposed cure may be thought likely to be worse than the disease.

In many contexts, the choice between a caution that may let acknowledged problems fester, and action that may create new problems, can be a difficult one. We appreciate the difficulty, but think there may be a way to sidestep it in this case. An extension of Professor Benson's metaphor may illuminate our approach.

Our concern is to change things on the ground, not simply on the map. Because of CBP's strong enforcement culture, for asylum seekers that **\*200** ground is far drier and more inhospitable than it should be. A flood of directives from above might change this, but as with all flooding, consequences are unpredictable. CBP officials, appropriately, are cautious about taking any actions that might wash away their enforcement culture or leave it buried underwater. On the other hand, the enforcement culture is strong enough -- dry enough, let's say -- that a light sprinkling of directives is likely to have no more permanent or substantial effect than a brief summer shower on a hot desert floor. But what if we followed the lead of people who live in dry climates? They typically construct irrigation systems that control and direct the flow of water, allowing it to be absorbed into and transform the soil day-by-day, drop-by-drop. We advocate a structural approach that will have a similar effect, slowly changing the situation on the ground through a steady application of forces that, over time, can counter the dominant enforcement culture, without running the risk of uncontrolled and sudden change.

### 1. *Regularize and Expand the Use of External Studies*

We have lobbied against, thought and written extensively about, and closely followed the literature on expedited removal for nearly a decade. We have carefully read GAO studies, ABA reports, and other writings on the subject. Still, in many ways, the

USCIRF report came as a revelation. From the 2000 GAO study, we knew inspectors sometimes failed to record answers to the mandatory questions of the I-867B, but we did not know that inspectors sometimes made up answers to questions that were never asked. We now know that they do. From the 2000 GAO study, we knew supervisors sometimes overlooked mentions of fear in approving expedited removal orders, but we did not know that inspectors sometimes failed to include mentions of fear in the I-867B sworn statement before recommending expedited removal. Again, we now know that they do. And the revelations do not end there; unfortunately, we could go on and on. Neither the alarming frequency with which I-867A information is not conveyed, for example, nor the overwhelming frequency with which the sworn statement is not read back to applicants before being signed, were known before the USCIRF report was published.

Information is power, it is rightly said, and there is no question that revelations of the sort uncovered by the USCIRF study give power to those who would want to modify CBP's enforcement culture as it affects potential asylum seekers. Such revelations attract the attention of Congress and the press, provide impetus for scholarly articles such as this, and furnish solid grounds for demanding future studies of the process. All of these means may be utilized to attract allies and disarm opponents of reform. In this sense, to the extent that they uncover excesses of an enforcement culture, external studies can act as a type of counterforce to the dominant enforcement culture that allows rules protective of asylum seekers to be broken so often and with **\*201** such apparent impunity.

But we underestimate the reach of that counterforce if we limit it to motivating *outside* forces to take action and exert pressure on CBP. Although bureaucracies may lean very strongly in one direction or the other, no large organization is an absolute monolith; indeed, during the development of the regulations governing expedited removal, more than one INS official suggested differences between their own positions and that of the inspectors. [148] External studies that reveal problems in a program can be helpful in moderating the dominant culture by providing new information to powerful, relatively sympathetic officials, by strengthening the apparent merits of their position in internal debates, and by giving the sympathetic officials a reason not to easily capitulate to the hardliners in their agency in the interests of maintaining internal peace. Such capitulation loses a lot of its charm when the result is not peace but merely a change in the place of battle (e.g., to a seat in a committee room before a hostile Senator).

Thus, external studies -- whether by USCIRF, the GAO, non-governmental organizations or independent scholars -- can prove valuable by strengthening the hands and increasing the resolve of moderate forces within the agency, as well as by motivating elements of the larger political culture to action. The influence of any particular study, naturally, will depend upon the robustness of its findings. Another determinant of influence will be the recentness of the findings. Both factors are, to some degree, within the control of the agency under review. CBP, and the INS before it, rebuffed numerous attempts to study expedited removal. Moreover, even congressionally mandated studies, such as the ones of expedited removal by the GAO and USCIRF, are dependent in numerous ways upon the cooperation of the agency being studied. CBP, for example, affected the robustness and scope of the USCIRF study by, among other things, limiting sample size and prohibiting interviews of front-line CBP officers. [149] By virtue of its efforts along these lines, for a long time CBP was able to keep expedited removal "opaque not only to the outside world, but even within the [DHS]." [150]

The lesson for the future is that, if controlling the excesses of the CBP's enforcement culture depends on making the process transparent enough so that the excesses can be known, the larger political culture must rouse itself at least enough to demand such transparency. We know from history that CPB is unlikely to reveal its inner workings on its own initiative. However, the larger political culture -- that is, Congress and anyone who might influence Congress -- even if generally sympathetic to CBP's enforcement mission, may not regard its own interests as identical to CBP's in this case. And indeed, the two are not similarly situated in several important respects. The **\*202** larger political culture is more desirous of studies that provide information because (1) it is more starved for that information, and (2) the cost of gathering the information is minimal for the larger political culture but substantial for the CBP, in terms of logistical planning and executive time, among other costs.

How much information should the larger political culture demand? Given the disappointing findings of the USCIRF study and CBP's apparent inability to fix problems identified in past studies, despite the passage of a number of years, we think the trend should be toward more information and not less. Congress should authorize a regular schedule of studies with the idea of continuing them until substantial improvement is shown. A mix of studies is appropriate -- some of broad scope in subject matter and geographic focus and others more narrowly focused. Because of the demonstrated unreliability of the information contained in the files, most studies should utilize direct observation to a substantial extent.

IFR_AR_014522

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 91 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

As studies accumulate, they may collectively help to produce a change in CBP's enforcement culture, at least if the studies' results indicate a continuation of the serious problems previously uncovered. Of course, bureaucracies are well versed in ways to ignore studies that they do not like. To prevent this from happening, Congress should require CBP to respond formally to at least some of the studies. [151] In addition, regularizing the schedule of studies also will make it harder for CBP to ignore the studies' results.

## 2. *Employ Testers to Assess Compliance*

Another technique that may be used to change CBP's culture is to regularly employ testers, i.e., actors who would go through the expedited removal process to test whether CBP inspectors are following the rules. Congress should require CBP to employ testers and to report the results annually. The testers would pose as regular travelers arriving at the primary inspections area with a group of passengers from an international air flight. They would present fraudulent documents and at the proper time indicate that they fear return to their home countries. The testers would be trained on the proper expedited removal procedures and have practice identifying common mistakes made by inspectors.

The use of testers could improve the expedited removal process in several ways. First, as the knowledge that testers are being used spreads, it may **\*203** increase inspector diligence. This would be especially likely if individual inspectors who do not comply with the rules are held accountable for such non-compliance. Moreover, the testers' experiences could cumulatively reveal trends in non-compliance, such as whether inspectors are less likely to follow the rules during certain shifts, during peak periods, during slow periods, at certain ports of entry or when travelers are arriving from certain countries. Finally, as noted previously, one of the great advantages CBP has in maintaining the support of the larger political culture is that it gets to deport its mistakes. Testers, however, will not disappear; indeed, they may re-appear as they do in other contexts, such as in investigations of housing discrimination, to provide powerful anecdotal evidence of the excesses of CBP's enforcement culture. In various ways, therefore, testers can directly and indirectly help bring about a change in that enforcement culture.

## 3. *Videotape Secondary Inspection Interviews*

The institution of a policy of routinely videotaping secondary inspection interviews from the beginning of the I-867AB process until after the applicant signs the sworn statement would provide yet another means of providing a counterbalance to the dominant enforcement culture. In particular, the availability of videotape could make studies of the expedited removal process both more comprehensive and less intrusive to the ordinary workings of the office. This would have numerous positive effects.

First, as a practical matter, it would allow for more studies to be conducted, since the viewing of videotapes would be less disruptive to ports than having to accommodate observers. As noted earlier in Part V(A)(1), maintaining a regular schedule of studies is important because it makes it more difficult for officials to ignore the results. Second, the larger sample sizes made practical by the availability of videotapes would add to the robustness of studies' findings and, therefore, make the studies a more effective counterweight to the dominant enforcement culture. Not only would the results be more definitive because a larger sample size tends to increase statistical significance, but the ability to check and re-check the videotapes would increase the reliability of the findings by decreasing the risk that otherwise undetectable measurement quirks of individual observers could skew study results. In addition, the availability of videotaping would enhance reliability by eliminating measurement distortions caused by the Hawthorne effect; if the videotaping is universal, the events being viewed are occurring exactly as they ordinarily do.

Videotaping would also provide several other advantages. As with the use of testers, the mere fact that inspectors know that they are being taped would add an additional element of self-policing into the process. [152] Further, a **\*204** sample of the videotapes could be reviewed periodically as supervisory and training tools to ensure that inspectors know how to follow, and are following, CBP rules and policies. Finally, the taped record of an interview could protect an inspector from specious allegations of misconduct or allow an applicant a means of proving a meritorious claim.

The recommendation for universal videotaping is a realistic one. In fact, CBP is already videotaping secondary inspections at the Houston and Atlanta ports of entry. [153] CBP, accordingly, should expand its videotaping program to all ports of entry, as well as to any other location in which expedited removal interviews take place.

IFR_AR_014523

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 92 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

**4.** *The Senior Asylum Officer Must Be an Asylum Advocate*

Our last recommendation in this subsection must begin with a word of praise for the Department of Homeland Security. DHS Secretary Michael Chertoff recently announced the creation of a Senior Asylum Officer position, to be located within a new Directorate of Policy. The Senior Asylum Officer position, which was filled in February 2006 with the appointment of Igor V. Timofeyev, will be responsible for Department-wide coordination of policies, regulations and practices that impact asylum seekers. [154] The appointment of Mr. Timofeyev is a promising decision. Whether the promise will be fulfilled, however, is another matter entirely.

The key determinant of success or failure in this regard resides in the particulars of how the Senior Asylum Officer position is conceived. If it is regarded primarily as the position responsible for justifying current policies and practices to parties interested in and concerned with asylum, the position will be a great disappointment. In its coordination function, it may bring some consistency to currently divergent practices across DHS and, all else being equal, that is a good thing, but little else in the way of achievement is likely.

On the other hand, the position could achieve a great deal if, in its conception, it is regarded as a means to correct the systematic skew of CBP and DHS toward enforcement concerns when those concerns intersect with the interests of asylum seekers. Such a conception of the office would indicate a great deal of administrative sophistication in the upper levels of DHS. It would suggest a recognition of the truth that "tasks that are not part of the core mission ... need special protection," [155] and represent a determination **\*205** to provide such protection.

There is precedent for conceiving an office in this manner. The Internal Revenue Service (IRS), for example, has a National Taxpayer Advocate, a high-level position charged with protecting taxpayer rights and recommending legislation to remedy problems that unnecessarily burden taxpayers. [156] As the name implies, the Taxpayer Advocate is meant to balance a systematic skew in the IRS in favor of the tax payee.

In addition to ensuring consistent legal interpretations and monitoring emerging developments, a Senior Asylum Officer position so conceived could undertake a number of initiatives to protect genuine asylum seekers from an overly enthusiastic enforcement culture and to help change the environment in which asylum decisions take place. For example, the Senior Asylum Officer could play a role in formulating, selecting and approving studies of the expedited removal process, as well as serve as a high-level liaison between researchers and DHS officials. He also could play a role in developing quality assurance procedures. Until now, "quality assurance" in the CBP was something of a misnomer, as it relied "entirely on 'self-reporting' by immigration inspectors." [157] Hopefully, the Senior Asylum Officer's different perspective will cause him to demand more from a quality assurance program than the finding that all the inspectors are above average (which is all that may be discovered when relying entirely on self-reporting).

Furthermore, the Senior Asylum Officer could advocate for the development and release of better statistical information, as immigration statistics are notoriously confusing and incomplete. [158] In addition, he could review training programs and manuals to ensure that they effectively convey, and fairly and accurately reflect, the law. The Senior Asylum Officer could also ensure that responsible agencies within DHS respond to the findings and recommendations of any studies that are conducted. Finally, his office could be publicized as an alternative point of contact for persons who have witnessed incidents of mistreatment of asylum seekers. In all these roles, the Senior Asylum Officer could act as a counterforce to the dominant enforcement culture at DHS and CBP.

**B.** *Changing the Rules*

In addition to the above-referenced means of effectuating structural change, various specific rule changes would also decrease the risk that genuine asylum seekers would be returned to face possible persecution in their homeland. We offer some practical examples below. None of our examples, we concede, are likely to have a substantial effect in the absence of **\*206** a change in the overall cultural landscape of CBP. However, we do not think implementation of our suggestions should be postponed pending movement on the cultural front. First, the new rules we propose may have a marginally positive effect even if implemented immediately in the current dominant enforcement culture. Second, pre-cultural change implementation would provide additional important measures of CBP's compliance or noncompliance when reviewed by future researchers.

IFR_AR_014524

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 93 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

#### 1. *Require Inspectors to Confirm in Writing that Required Information Was Read to Applicants*

As explained in Part II(A)(1), the requirement that inspectors read to all applicants for admission the information on the I-867A is vital to ensuring that asylum seekers understand the importance and finality of the secondary inspection interview. Yet, the statement often is not read. Under current practices, absent observation of the interviews by third parties, such failures go undetected.

The USCIRF report recognized the importance of this problem, but was content to rely on additional training, combined with the use of videotape and testers, as a solution.[159] The USCIRF suggestions are good ones, but we recommend that this specific problem also be addressed more directly. In particular, to increase the likelihood that inspectors read the required statement, they should be required to confirm in writing that the statement was indeed read to the applicant for admission. Form I-870, which is used by asylum officers during credible fear interviews, provides a good model for this proposed requirement.[160] Question 1.28 on Form I-870 contains a box that the asylum officer must check to confirm that he or she read a required paragraph to the applicant; in substance, the required paragraph of the I-870 is similar to the mandatory paragraphs of the I-867A. The I-867 could easily be amended to provide a similar assurance that the inspector read each mandatory paragraph aloud to the applicant for admission.

Amending the I-867 in this manner would promote diligence among inspectors and add to the effectiveness of supervisory review. As it now stands, busy inspectors have little incentive to comply fully with the mandatory reading requirement, and supervisors have no way of checking inspectors who fail to do so. Given the importance of the I-867 information, remedying these deficiencies in some way seems long overdue.

#### 2. *Telephonic Supervisory Reviews Should Be Banned*

While USCIRF did not make any recommendations as to the conduct of the supervisory review process, CBP should also revise its policy that allows **\*207** supervisors to review I-867 sworn statements over the telephone. As noted in Part II(B)(4), telephonic review lessens the overall accuracy and accountability of the review process. Given the important check that supervisory review is designed to play in preventing the removal of individuals who express a fear of return, it is vital that supervisors have as much information about the secondary interview as is available, and that the information is presented fully, accurately and adequately.

The very nature of a telephonic review suggests that important information will not be presented fully or adequately. For busy supervisors, it is likely tedious to listen to the sworn statement aloud, difficult to pick up on subtle nuances of the statement, and infuriatingly time-consuming to try to go back and forth in the statement to see how different parts of it relate to each other. There is a strong temptation to shortcut the process, particularly in the harried environment of secondary inspection. Requiring review of the record in written form reduces these temptations and, in all events, enhances accountability when the temptation proves too much to resist; the contents of the written record can later be reviewed while the content of a telephone conversation cannot.

Requiring review of the written record is a practical reform. In addition to enhancing the effectiveness of the review process, it would also be more efficient. Most importantly, it would save time, largely eliminating the time wasted in coordinating schedules to arrange a phone call. Secondary inspectors' time also would be saved because they would ordinarily be removed from the review process entirely. Similarly, as most people can read faster than they can talk, supervisors would save time, too -- assuming, that is, that the telephonic review constituted a full review of the record. If it did not, of course, that lessens the efficiency argument, but heightens the argument that a telephonic review tends to be an inadequate review.

Despite the relative efficiency of a written review, in the past there has been a tendency to rely on telephonic review, particularly in those ports of entry in which supervisors are not stationed near the inspectors. If physical distance were ever a justification for the practice of telephonic review, it is no longer so. The transcript and answers to questions on most sworn statements are electronically processed. Inspectors could be required to send the transcript through a computer network to the supervisor, who would be able to access it wherever he or she is physically stationed.[161]

IFR_AR_014525

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 94 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

Moreover, even if the electronic transfer of files is not feasible in certain ports of entry, fax machines could be used. Indeed, equipping ports of entry with fax machines would itself be cost efficient, as the cost **\*208** of a fax machine is minimal compared to the expense of having two people do the job of one -- and do it more slowly -- over and over and over again.[162]


### 3. *Any Statement of Fear Should Result in a Credible Fear Referral*

As discussed in Parts II(A)(3) and (B)(5), individuals who express a fear of return have nonetheless been expeditiously removed despite a clear regulatory directive prohibiting inspecting officers from proceeding any further with removal in such cases. The USCIRF report recognizes this problem and recommends that CBP "[r]econcile conflicting guidance to require that any expression of fear ... must result" in referral of the case to an asylum officer.[163] We agree with this recommendation, except to the extent that it is modified by USCIRF's additional recommendation that a new procedural step be recognized between the secondary inspection interview and a referral to a credible fear interview when the inspector has doubts about the adequacy of the applicant's expression of fear. We think it is fair to describe USCIRF's position as recognizing a different procedural track for what we shall call "fear, but" cases, where fear of return has been expressed, but for some reason the inspector does not think the fear is enough to warrant a credible fear interview. The new procedural middle step would involve "contact with an asylum officer to speak to the alien via a telephonic interpretation service to determine whether or not the alien needs to be referred [for a credible fear interview]."[164]

While the USCIRF's call to clarify the fear standard is a welcome one, recognition of the "fear, but" standard, with its attendant telephonic asylum interview, is problematic. The idea is concededly premised on the incompetence of inspectors to distinguish between "fear" cases that require a credible fear interview with an asylum officer and "fear" cases that do not require such an interview. The problem of this incompetence was originally and wisely resolved by requiring credible fear referrals in all such cases. We believe that USCIRF's proposal is less a solution to this problem of inspector-level incompetence than an addition to it.

USCIRF assumes that asylum officers would be competent to decide properly the "fear, but" cases identified by inspectors in the less welcoming environment of secondary inspection. Careful consideration reveals this assumption to be erroneous. In its proposed middle-step interview, USCIRF clearly expects asylum officers to delve into the nature of the fear expressed by the applicant -- not merely confirm the utterance of a fear of return. But **\*209** exploring the nature of an applicant's fear is exactly what an asylum officer does in a *credible fear interview*; by its very nature, therefore, this middle-step interview is essentially a quasi-credible fear interview. There are already regulations, however, detailing the conditions thought necessary to an accurate determination of the nature of an applicant's fear.

Thus, the statute that created the expedited removal system expressly mandates that the inspecting officer "refer the alien for an interview by an asylum officer under subparagraph (B)" when a fear of persecution or an intention to apply for asylum is indicated.[165] The subparagraph (B) interview must be conducted pursuant to several specific rules designed to create conditions that will encourage full disclosure by the applicant for admission, including the right to reschedule the interview because of illness, fatigue or other impediments;[166] the right "to consult a person ... of the alien's choosing prior to the interview";[167] the right to present evidence;[168] and the right to have present at the interview a representative who, in the asylum officer's discretion, may be permitted to "present a statement at the end of the interview."[169] None of these rights would be available in the proposed telephonic interview with an asylum officer, and all of them are otherwise mandated because they were thought necessary to accurately determine whether the nature of the applicant's fear satisfied the "credible fear" standard.

The interview contemplated by USCIRF, accordingly, is essentially an unreliable, second-class, credible fear interview. As to the system-wide impact that this second-class interview might have in practice, three possibilities emerge. First, if it rarely is used, the minor gain in efficiency that might be achieved would hardly seem worth the muddling of what otherwise would be an extremely clear standard. Second, if the second-class interview is used frequently and often leads to an inspector-authorized deportation, enforcement-minded inspectors untrained in asylum law will have a powerful incentive to advance the enforcement objective by shifting the forum for investigating the nature of an applicant's fear from the official credible fear interview, with all its accompanying rights, to a makeshift forum of dubious accuracy with no specified rights. Finally, if the second-class interview is used frequently and often leads to an official credible fear interview, rather than to an inspector-authorized deportation, the system will become less efficient by requiring, in many cases, asylum officers to conduct two interviews instead of one.

In sum, maintaining a low and certain threshold for the fear standard is itself an important safeguard for ensuring that genuine asylum seekers are not erroneously returned to their homelands. Speculating that the combined **\*210** efforts of an inadequately trained inspector and an asylum officer handicapped by unfavorable conditions will somehow discern the truth seems an unwise and unacceptable gamble. Accordingly, the only appropriate understanding of the fear standard -- that any mention of fear requires a referral to a credible fear interview -- should be reasserted, without qualification or modification.

### 4. *Require Re-interviewing by Supervisors in Certain Circumstances*

Finally, as a means of urging diligence in completing the sworn statement, CBP should consider requiring *immediate* supervisors to re-interview applicants for admission when the record of the secondary inspection interview is facially incomplete, such as when the fear questions have not all been asked and answered. Beyond signaling upper management's interest in the issue, instituting this rule would create the right incentives to ensure diligence throughout the CBP hierarchy. Second-line supervisors would want their operation to run efficiently, without unnecessary duplication; immediate supervisors would want to please their supervisors and to spend their time supervising rather than doing the job of a front-line inspector; and inspectors would prefer not to have to deal with an angry boss (or bosses). Once the immediate supervisor re-interviewed the applicant, the completed file would be returned to a second-line supervisor for another review (or, if appropriate, sent to an asylum officer for a credible fear interview). In some cases, staffing considerations might make this recommendation impractical; perhaps this is why the recommendation has not been made before. But CBP can hardly contend that our proposed rule is overly strict, as the immigration service is notorious for returning paperwork for even minor omissions. [170]

### V. CONCLUSION

Under the best of circumstances -- meaning when every required safeguard is fully implemented and all pertinent information is accurately recorded by an inspector and carefully reviewed by a supervisor, all pursuant to appropriate written direction from above -- the expedited removal process established by IIRIRA would still call upon immigration inspectors to deny entry more quickly, more often, and with less information and training than the old system of experienced judges whose mistakes, in all events, were subject to multiple layers of review by even more experienced judges. Given this, only the most naive persons, and probably not even they, would deny that, even implemented under ideal circumstances, the expedited removal system is more prone to error than the concededly less-than-perfect system that preceded it.

**\*211** Hence, far too often -- to note a partial list of shortcomings -- the reality of expedited removal is one in which *mandatory* information does not get disseminated, *mandatory* questions do not get asked, *mandatory* credible fear referrals are not made, and *mandatory* supervisory reviews are but a mockery of the judicial hearings they were intended to replace. As a result of the failure to perform these mandatory requirements, thousands of genuine asylum seekers have been erroneously returned to their homelands to face possible imprisonment, torture, or other manners of persecution.

Faced with these facts, no one can take refuge in the hope that the promise of expedited removal can be salvaged without substantial reform. Various blueprints for successful reform might be drawn, but no plan can possibly succeed without taking CBP's enforcement bias into consideration. A successful plan must understand and counterbalance that bias.

This demands, most of all, that the process be made more transparent to, and open to the influence of, persons outside CBP, DHS and the entire federal government. The means used to provide this necessary transparency can and should be varied, and should include: regularly scheduled studies by various organizations and individuals; improved record-keeping, especially the exact record provided by videotaping; the recruitment and use of testers, who can provide a unique and valuable perspective on a process that has largely been hidden from view; and greater influence over and oversight of the process by persons, such as the Senior Asylum Officer, who are not part of the enforcement culture. When more transparency is attained by these means, but not before, it will again become possible to hope that the expedited removal process will work as planned.

We are under no illusions that our recommendations, if implemented, will make expedited removal a perfect system. Fast food and instant coffee aren't perfect, either. And there is no denying that the system demands a lot from inspectors who traditionally merely *processed* applications for admission rather than *judged* them, as they do now. Given all this, eternal vigilance in the form of constant oversight may be the price of mediocrity only. Regrettably, however, it is a sad but true commentary on where we stand now that attaining mediocrity would be a tremendous improvement, indeed -- one that might best be measured by nothing less than the saving of many vulnerable lives.

## Footnotes

a1 Michele R. Pistone is a Professor of Law, Director of the Clinical Program, and the founding Director of the Clinic for Asylum, Refugee and Emigrant Services at Villanova University School of Law. John J. Hoeffner, her husband, is an attorney residing in Villanova, Pa.

1 INA § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A) (2005).

2 Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 100 Stat. 3009 (codified in numerous sections of 8 U.S.C.).

3 DHS was established by the Homeland Security Act of 2002. Pursuant to that Act, the INS was abolished on March 1, 2003, and its functions were absorbed by DHS, and distributed among its various sub-parts, such as CBP.

4 *See* U.S. DEP'T OF HOMELAND SEC., 2003 YEARBOOK OF IMMIGRATION STATISTICS 149 (2004) (noting 421,976 expedited removals from 1997 to 2003).

5 U.S. GEN. ACCOUNTING OFFICE, PUBL'N. NO. GAO/GGD-98-81, ILLEGAL ALIENS: CHANGES IN THE PROCESS OF DENYING ALIENS ENTRY INTO THE UNITED STATES 44 (1998) [hereinafter CHANGES IN THE PROCESS] (estimating that 95% of aliens who received removal orders were removed within 48 hours of their arrival).

6 *See generally* PHILIP A. SCHRAG, A WELL-FOUNDED FEAR: THE CONGRESSIONAL BATTLE TO SAVE POLITICAL ASYLUM IN AMERICA 193-224 (2000) [hereinafter A WELL-FOUNDED FEAR] (detailing the perspectives of numerous parties formally or informally involved in shaping IIRIRA and the administrative response to it, and the parties' attempts to anticipate and rebut opposing arguments that would sacrifice unduly accuracy, for example, for the sake of speed).

7 8 U.S.C. § 1105a (repealed 1996).

8 A WELL-FOUNDED FEAR, *supra* note 6, at 204 (quoting an unnamed INS official).

9 *See id.* at 193-213.

10 Asylum Procedures, 65 Fed. Reg. 76,121 (Dec. 6, 2001).

11 "Throughout his or her time in the secondary inspection area, the alien is not permitted to meet with, or contact, counsel (or anyone else other than Customs and Border Patrol personnel)." U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, 1 REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL: FINDINGS AND RECOMMENDATIONS 21 (2005) [hereinafter USCIRF REPORT, vol. 1]. The USCIRF report was published in two volumes; the title of the second volume differs slightly from the first volume's title. *See* U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, 2 REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL: EXPERT REPORTS (2005) [hereinafter USCIRF REPORT, vol. 2].

12 USCIRF is an independent federal agency charged with monitoring religious freedom worldwide. It was established by the International Religious Freedom Act of 1998. Section 605 of that Act authorized USCIRF's recent study on

IFR_AR_014528

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 97 of 200

the implementation of expedited removal, and granted USCIRF "virtually unrestricted access to Expedited Removal proceedings." USCIRF REPORT, vol. 1, *supra* note 11, at 3.

13    *Id.* at 10.

14    U.S. GEN ACCOUNTING OFFICE, PUBL'N. NO. GAO/GGD-00-176, OPPORTUNITIES EXIST TO IMPROVE THE EXPEDITED REMOVAL PROCESS (Sept. 2000) [hereinafter OPPORTUNITIES EXIST]. As was the USCIRF report, the 2000 GAO report also was authorized by the International Religious Freedom Act of 1998, Pub. L. No. 105-292, 112 Stat. 2812. OPPORTUNITIES EXIST studies issues related to "expedited removal and those who claimed a fear of persecution or torture in their home country." OPPORTUNITIES EXIST, *supra* at 4. In particular, the report addresses "INS' management controls over (1) the expedited removal process and (2) the credible fear determination process, including those determinations relating to aliens' decisions to recant their claims of a fear of persecution or torture." *Id.*

15    Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6224, 606 U.N.T.S. 267 [hereinafter Refugee Protocol]. The Refugee Protocol holds that, by ratifying it, signatories are bound by Articles 2-34 of the 1951 Convention Relating to the Status of Refugees. *Id.* at art. I(1).

16    INA § 212(a)(9)(A)(i), 8 U.S.C. § 1182(a)(9)(A)(i) (2005).

17    ADVISORY COMM. ON RELIGIOUS FREEDOM ABROAD, FINAL REPORT TO THE SECRETARY OF STATE AND TO THE PRESIDENT 45 (1999).

18    THE LAWYERS COMM. FOR HUMAN RIGHTS, IS THIS AMERICA? THE DENIAL OF DUE PROCESS TO ASYLUM SEEKERS IN AMERICA, app. 4 (2000) [hereinafter IS THIS AMERICA?] (listing over fifty groups who called for the general repeal of expedited removal, including Amnesty International USA, the American Civil Liberties Union, the American Immigration Law Foundation, Human Rights Watch, and the National Council of La Raza); American Immigration Lawyers Association, *America's Borders: From Our Consulates to Our Ports of Entry Balancing Our Security and Economic Needs*, AILA's IMMIGRATION THIS WEEK (May 26, 2005) (suggesting repeal would enhance U.S. security); *see also* Anthony Lewis, *A Bad Time for Civil Liberties*, 5 ANN. SURV. INT'L & COMP. L. 1 (1999).

19    INA § 235(a)(5), 8 U.S.C. § 1225(a)(5) (2005).

20    USCIRF REPORT, vol. 1, *supra* note 11, at 32 (reporting 332 million primary inspections in 2001, and 265 million in 2003); OPPORTUNITIES EXIST, *supra* note 14, at 20 (noting 28.3 million primary inspections per month from April 1, 1997, to September 30, 1999).

21    USCIRF REPORT, vol. 2, *supra* note 11, at 6 (reporting that "the number of aliens sent to Secondary Inspection per year approximate 10 million, and 90 percent of these individuals are ultimately allowed to enter the U.S. after being processed through an initial triage"); OPPORTUNITIES EXIST, *supra* note 14, at 20 (noting that from April 1, 1997 to September 30, 1999, a monthly average of 601,000 individuals were sent to secondary inspection).

22    *See* OPPORTUNITIES EXIST, *supra* note 14, at 18-19; USCIRF REPORT, vol. 2, *supra* note 11, at 6.

23    *See* Michele R. Pistone & Philip G. Schrag, *The New Asylum Rule: Improved But Still Unfair*, 16 GEO. IMMIGR. L.J. 1, 61-62 (2001) [hereinafter Pistone & Schrag] (noting "the nearly universal use of oppressive restraints"); IS THIS AMERICA?, *supra* note 18, at 26 (stating that the vast majority of persons in the expedited removal process was restrained); Rachel L. Swarns, *U.N. Report Cites Harassment of Immigrants Who Sought Asylum at American Airports*,

IFR_AR_014529

N.Y. TIMES, Aug. 13, 2004, at A11 (stating that "asylum seekers were routinely handcuffed and restrained with belly chains and leg restraints"). *But see* USCIRF REPORT, vol. 2, *supra* note 11, at 27 (noting that recent CBP guidelines have now made shackling extremely rare even at JFK International Airport, the place where it was most often practiced).

24    USCIRF REPORT, vol. 2, *supra* note 11, at 6.

25    *See* Pistone & Schrag, *supra* note 23, at 39 n.217.

26    USCIRF REPORT, vol. 2, *supra* note 11, at 31 (noting that "on more than one occasion aliens were refused interpreters ... even when they requested them"); Swarns, *supra* note 23, at A11 (citing U.N. report stating that certified translators often were not provided for asylum seekers who did not speak English). *See also* Pistone & Schrag, *supra* note 23, at 55 (noting "reluctance of INS inspectors to call upon interpreters during secondary inspections").

27    In limited cases, the inspections officer can also allow the individual to withdraw his or her application for admission, thereby achieving the same result of removal while avoiding an official record of denial of admission. Withdrawal might be preferable to an individual who does not want an order of removal on his record because the order of removal can result in a five-year bar on returning to the United States. INA § 212(a)(9)(A), 8 U.S.C. § 1182(a)(9)(A)(i) (2005).

28    *See* INA § 212(a)(7), 8 U.S.C. § 1182(a)(7) (2005).

29    *See* INA § 212(a)(6)(C), 8 U.S.C. § 1182(a)(6)(C) (2005).

30    INA § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A)(i) (2005); 8 C.F.R. § 235.3(b)(5) (2005).

31    8 C.F.R. § 235.4(b)(7) (2005). Specifically, the applicable regulation states:

[A]ny removal order entered by a [secondary inspector] must be reviewed and approved by the appropriate supervisor before the order is considered final. Such supervisory review shall not be delegated below the level of a second line supervisor, or a person acting in that capacity. The supervisory review shall include a review of the sworn statement and any answers and statements made by the alien regarding a fear of removal or return.

*Id*.

32    *See* INA § 235(b)(1)(C), 8 U.S.C. § 1225(b)(1)(C) (2005); 8 C.F.R. § 235.3(b)(5) (2005).

33    The detention centers may be owned and managed by DHS (or, more specifically, by Immigration and Customs Enforcement ("ICE"), another component of DHS). ICE also may rent bed space in prisons run by other authorities. For a discussion of these prisons under ICE's predecessor agency, the INS, see Michele R. Pistone, *Justice Delayed Is Justice Denied*, 12 HARV. HUM. RTS. J. 197, 204 (1999).

34    INA § 235(b)(1)(B), 8 U.S.C. § 1225(b)(1)(B) (2005). An asylum officer is specially trained in asylum and refugee law and in the human rights conditions in foreign countries. 8 C.F.R. § 208.1 (b) (2005).

35    INA § 235(b)(1)(A)(ii), 8 U.S.C. § 1225(b)(1)(A)(ii) (2005). The term "credible fear of persecution" is statutorily defined to mean "that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA § 235(b)(1)(B)(v), 8 U.S.C. § 1225(b)(1)(B)(v) (2005).

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 99 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

36    The asylum seeker is issued a Form I-862, Notice to Appear, for full consideration of the claim for protection at removal proceedings pursuant to section 240 of the INA. 8 C.F.R. § 208.30(f) (2005); *see also* INA § 240, 8 U.S.C. § 1229a (2005).

37    *See* Pistone & Schrag, *supra* note 23, at 41-42 (detailing limitations of the review process).

38    USCIRF REPORT, vol. 2, *supra* note 11, at 13.

39    *See id.* at 252 (copy of I-867A); *see also id.* at 13 (noting obligatory paragraphs).

40    8 C.F.R. § 235.3(b)(i) (2005) (stating "[t]he examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A"); *see* USCIRF REPORT, vol. 2, *supra* note 11, at 15 (noting that CBP's manual also expressly requires that the I-867A be read aloud).

41    *See* Pistone & Schrag, *supra* note 23, at 25-26 (noting that eventual asylum seekers can even live in the United States for years without learning of the availability of asylum protection).

42    *See, e.g.*, Mark Van Ommeren et al., *Culture, Trauma, and Psychotrauma Programmes*, 350 THE LANCET 595 (1997) (noting "increased rates of post-traumatic stress disorder ... among Turkish, Palestinian, and Bhutanese survivors of torture"); Pistone & Schrag, *supra* note 23 at 49 n.272 (collecting studies showing elevated levels of PTSD among refugees). Victims of PTSD may be reluctant to discuss the source of their trauma, especially absent the establishment of a "trusting relationship" with an interrogator. *See* Derrick Silove et al., *Anxiety, Depression and PTSD in Asylum-Seekers: Associations with Pre-Migration Trauma and Post-Migration Stressors*, 170 BRIT. J. PSYCHIATRY 351, 351 (1997) (noting requirement of "trusting relationships"). A promise of confidentiality can be a start toward establishing that relationship, and thus a start toward communicating the information that may qualify one for asylum.

43    For example, confusion about the expedited removal process is widespread even among people who have been through it. USCIRF REPORT, vol. 2, *supra* note 11, at 25. Thus, the paragraph noting that "[t]his may be your only opportunity to present information" may provide new information to applicants, which might be important in motivating them to talk of possible persecution, especially combined with the remaining paragraph's notification of apparent inadmissibility and warning of a five-year bar. *Cf.* Balasubramanrim v. INS, 143 F.3d 157, 162-63 (3d Cir. 1998) (noting that "an arriving alien who has suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country").

44    USCIRF REPORT, vol. 1, *supra* note 11, at 6.

45    USCIRF REPORT, vol. 2, *supra* note 11, at 30. The report continues by noting that "[t]hus, the rates of problems observed in this study likely underestimate the actual rate of problem behaviors and failures to adhere to established policies." *Id.* The phenomenon by which observers, by their mere presence, affect examined behaviors is known as the Hawthorne effect.

46    *Id.* at 13.

47    *Id.* The I-867B also contains a fourth mandatory question: "Do you have any questions or is there anything else you would like to add?" *Id.* at 253. This catch-all question may sometimes be considered a "fear" question, *see* USCIRF Report, vol. 1, *supra* note 11, at 55 (referring to the "four fear questions"), but its intended scope is broader -- to make

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 100 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

sure the applicant understands the process as much as to elicit further information. Perhaps the USCIRF report focuses on the first three questions for this reason. *See, e.g.*, USCIRF Report, vol. 2, *supra* note 11, at 13-16.

48    *See* USCIRF REPORT, vol. 2, *supra* note 11, at 14-16; OPPORTUNITIES EXIST, *supra* note 14, at 39-40; CHANGES IN THE PROCESS, *supra* note 5, at 43.

49    USCIRF REPORT, vol. 2, *supra* note 11, at 14-16 (indicating, at Table 2.1, that a file review showed approximately a 95% compliance rate for each question, meaning that a minimum of 5% and a maximum of 15% of all I-867B's failed to contain an answer to at least one fear question).

50    OPPORTUNITIES EXIST, *supra* note 14, at 39-40.

51    One related bright spot is that while the 1998 and 2000 GAO studies revealed incorrect forms being used by inspectors and accepted by supervisors in some instances, *see* OPPORTUNITIES EXIST, *supra* note 14, at 44; CHANGES IN THE PROCESS, *supra* note 5, at 43, the USCIRF study recorded no such instances.

52    USCIRF REPORT, Vol. 2, *supra* note 11, at 15-16; *see* USCIRF REPORT, vol. 1, *supra* note 11, at 54.

53    8 C.F.R. § 235.3(b)(4) (2005) (emphasis added).

54    OPPORTUNITIES EXIST, *supra* note 14, at 40.

55    USCIRF REPORT, vol. 2, *supra* note 11, at 29.

56    USCIRF REPORT, vol. 1, *supra* note 11, at 5-6 (quoting CBP training materials) (internal quotation marks omitted); *see also* 8 C.F.R. § 235.4 (2005) (stating that "[t]he alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission.").

57    USCIRF REPORT, vol. 1, *supra* note 11, at 5-6, 50-51; USCIRF REPORT, vol. 2, *supra* note 11, at 23-24; *See* Swarns, *supra* note 23, at All (noting report by the U.N. High Commissioner for Refugees describing "instances in which inspectors encouraged asylum seekers not to pursue asylum").

58    BLACK'S LAW DICTIONARY 1080 (8th ed. 2004); *see* Refugee Protocol, *supra* note 15, 19 U.S.T. 6224, 606 U.N.T.S. 267 (constituting U.S. treaty obligation). The Refugee Act of 1980 incorporated the United States' treaty obligation of *non-refoulement* into U.S. law. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

59    8 C.F.R. § 235.3(b)(2)(i) (2005).

60    *Id.*

61    USCIRF REPORT, vol. 2, *supra* note 11, at 18.

62    FED. R. CIV. P. 30(e), (f)(1).

IFR_AR_014532

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 101 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

[63]  USCIRF REPORT, vol. 2, *supra* note 11, at 10 tbl. 1.4.

[64]  *Id.* at 18. The 100% performance represents an improvement over prior measures of compliance with the signature requirement. *See* OPPORTUNITIES EXIST, *supra* note 14, at 41 tbl. 2.5 (noting compliance percentages as low as 95%); CHANGES IN THE PROCESS, *supra* note 5, at 44 (noting compliance percentages as low as 97%).

[65]  USCIRF REPORT, vol. 2, *supra* note 11, at 19 tbl. 2.11.

[66]  E. ALLAN FARNSWORTH, CONTRACTS § 4.26, at 295 (1982) (stating that "the law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms," (internal quotation marks omitted)).

[67]  CBP Inspector's Field Manual § 17.15(a).

[68]  8 C.F.R. § 235.3(b)(2)(i) (2005) ("[I]nterpretative assistance shall be used if necessary to communicate with the alien.").

[69]  USCIRF REPORT, vol. 2, *supra* note 11, at 10 tbl. 1.4.

[70]  *Id.* at 19 tbl. 2.11.

[71]  *Id.* at 67-70 ("Our findings reveal that the Expedited Removal record created during the Expedited Removal process is in many cases used by immigration judges and DHS trial attorneys to impeach aliens' credibility and undermine their claim").

[72]  JERRY L. MASHAW, BUREAUCRATIC JUSTICE 133 (1983).

[73]  USCIRF REPORT, vol. 2, *supra* note 11, at 28.

[74]  *See, e.g.,* OPPORTUNITIES EXIST, *supra* note 14, at 32-33; CHANGES IN THE PROCESS, *supra* note 5, at 4; CENTER FOR HUMAN RIGHTS AND INTERNATIONAL JUSTICE, THE EXPEDITED REMOVAL STUDY: REPORT ON THE FIRST THREE YEARS OF IMPLEMENTATION OF EXPEDITED REMOVAL 1-2 (May 2000) [hereinafter EXPEDITED REMOVAL STUDY]. For years, except for the mandated GAO reports, which relied mainly on a review of paper files, the INS resisted almost all outside review of the expedited removal process. Indeed, for several years, it declined not only repeated requests to conduct "on-site observations of the process" but also, until 2000, "denied access to statistical data on expedited removal." *Id.* at 2. The one exception that was made to the veil of secrecy placed over the expedited removal process might well be regarded as the exception that proves the rule: the United Nations High Commissioner for Refugees was granted access to "more than 100 interviews with asylum seekers at airports," but only "on the condition that [its] report not be released to the public." Swarns, *supra* note 23, at All (discussing leaked report).

[75]  USCIRF REPORT, vol. 1, *supra* note 11, at 55. For an explanation of the fourth "fear" question, see *supra*, note 47.

[76]  USCIRF REPORT, vol. 2, *supra* note 11, at 15.

[77]  *Id.* at 16.

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 102 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

78    *Id.* at 20.

79    USCIRF REPORT, vol. 1, *supra* note 11, at 57.

80    *Id.* Although widespread, the practice of relying on the record created at secondary inspections has its detractors. *Id.* at 75 (stating that the sworn statement on the I-867B is not reliable, and therefore recommending that the form include a disclaimer noting that it is not a transcript and is "not intended to go into detail" (internal quotation marks omitted)); *see also* Aravinthan Balasubramanrim v. INS, 143 F.3d 157, 162-63 (3d Cir. 1998) (rejecting the reliance of the Board of Immigration Appeals on the record of a secondary inspections interview because, *inter alia*, it "may not be reliable").

81    8 C.F.R. § 235.3(b)(2)(i) (2005).

82    USCIRF REPORT, vol. 2, *supra* note 11, at 31.

83    *See, e.g.*, AMERICAN BAR ASSOCIATION, AMERICAN JUSTICE THROUGH IMMIGRANTS' EYES 10-11 (2004) (detailing instances of interpretive services being denied); Swarns, *supra* note 23, at All (citing confidential U.N. report stating that certified translators often were not provided for asylum seekers who did not speak English). *See also* EXPEDITED REMOVAL STUDY, *supra* note 74, at 72 (noting instance of inspectors refusing to believe applicants' inability to speak English).

84    USCIRF REPORT, vol. 2, *supra* note 11, at 11 tbl. 1.6.

85    CBP Inspector's Field Manual § 17.15(b)(3).

86    8 C.F.R. § 235.3(b)(7) (2005).

87    USCIRF REPORT, vol. 2, *supra* note 11, at 14-16; OPPORTUNITIES EXIST, *supra* note 14, at 39-40, 46; CHANGES IN THE PROCESS, *supra* note 5, at 43.

88    *See* USCIRF REPORT, vol. 2, *supra* note 11, at 253 (copy of the I-867B).

89    OPPORTUNITIES EXIST, *supra* note 14, at 40-41.

90    8 C.F.R. § 235.3(b)(7) (2005).

91    OPPORTUNITIES EXIST, *supra* note 14, at 44.

92    *Id.* at 41; CBP Inspector's Field Manual § 17.15(b)(3).

93    OPPORTUNITIES EXIST, *supra* note 14, at 41.

94    8 C.F.R. § 235.3(b)(7) (2005).

IFR_AR_014534

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 103 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

95    David A. Martin, *Two Cheers for Expedited Removal in the New Immigration Laws*, 40 VA. J. INT'L L. 673, 682 (2000).

96    Approximately 300 million people will arrive at U.S. ports in a given year. Approximately 3.3% of this group, or ten million people, will be directed to secondary inspections. Ten percent of this ten million, i.e., one million, will go through a long interview and truly be at risk of being immediately deported. In 2003, 43,336 of the latter group actually were ordered deported via expedited removal (almost double this number were given permission to withdraw). In other words, 4.3% of persons truly at risk of receiving expedited removal orders actually received them; .43% of persons diverted for any length to secondary inspections actually were deported via expedited removal; and .013% of persons -- or 1.3 persons out of every 10,000 -- who arrived hoping to enter the country were given expedited removal orders. *See* USCIRF REPORT, vol. 1, *supra* note 11, at 32 (statistical information); USCIRF REPORT, vol. 2, *supra* note 11, at 6 (noting 90% of persons sent to secondary inspection pass through quickly).

97    OPPORTUNITIES EXIST, *supra* note 14, at 41.

98    CBP Inspector's Field Manual § 17.15 (2003); *see* USCIRF REPORT, vol. 1, *supra* note 11, at 6, 53-54; USCIRF REPORT, vol. 2, *supra* note 11, at 20.

99    8 C.F.R. § 235.3(b)(4) (2005) (emphasis added).

100   INA § 235(b)(1)(A)(ii), 8 U.S.C. § 1225(b)(1)(A)(ii) (2005) (emphasis added).

101   LEWIS CARROLL, THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE, *in* THE ANNOTATED ALICE 129, 213 (2000) (quoting Humpty Dumpty).

102   8 U.S.C. § 1225(b)(1)(A)(i) (2005).

103   CBP Inspector's Field Manual § 17.15(d) (2001).

104   A WELL-FOUNDED FEAR, *supra* note 6, at 217. For what it is worth, one of the authors of this Article (Pistone) was intimately involved with many of the events described in Professor Schrag's *A Well-Founded Fear*, and can often confirm his account based on first-hand knowledge. The path of the I-867B's development is one such event. *See id.* at 105-10.

105   A WELL-FOUNDED FEAR, *supra* note 6, at 216.

106   USCIRF REPORT, vol. 1, *supra* note 11, at 74; *see* Swarns, *supra* note 23, at 11 (noting report by the United Nations High Commissioner for Refugees that found inspectors "often lacked an understanding of asylum law").

107   Martin, *supra* note 95, at 681-82. Professor Martin was INS General Counsel from 1995 to 1998, the time period in which expedited removal was passed into law and implemented.

108   OPPORTUNITIES EXIST, *supra* note 14, at 43.

109   *Id.* at 40.

110   USCIRF REPORT, vol. 1, *supra* note 11, at 54.

IFR_AR_014535

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 104 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

111    USCIRF REPORT, vol. 2, *supra* note 11, at 21-23. Incidentally, "among the countries to which the 12 aliens who expressed fear were returned, five of them (of nine) are noted to have extrajudicial killings and human rights abuses in recent reports ..., and two of the countries have significant limitations on religious expression ...." *Id.* at 21.

112    Indeed, in recognition of this fact, the Credible Fear Manual of the U.S. Citizenship and Immigration Services, the component of DHS responsible for "service" functions such as the naturalization process, as well as evaluating asylum claims through its corps of asylum officers and immigration judges, *see* USCIRF REPORT, vol. 1, *supra* note 11, at 28, instructs those officers that "[t]he statement by an applicant that 'I left my country because I can't work' is insufficient to judge the merits of a case and should lead to further inquiry." USCIRF REPORT, vol. 2, *supra* note 11, at 29 n.29. *See* Lukwago v. Ashcroft, 329 F.3d 157, 168 (3d Cir. 2003) ("defin[ing] persecution as including ... 'economic restrictions so severe that they constitute a real threat to life or freedom'" (quoting Lin v. INS, 238 F.3d 239, 244 (3d Cir. 2001))).

113    Indeed, given the similarity of the stakes, the introduction of this element of randomness into the asylum process should be no more acceptable as a policy matter than were the standardless death penalty determinations invalidated by the Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 239 (1972) and *Gregg v. Georgia*, 428 U.S. 153, 199 (1976).

114    *See* USCIRF REPORT, vol. 2, *supra* note 11, at 13, Box 2.1.

115    A grant of discretion might be justified in extremely narrow circumstances, e.g., if an interviewee responded to the question, "Do you have any fear about being returned to your home country ...?" by stating, "Yes, because I have a fear of flying." To this point, however, CBP has shown no ability or inclination to so confine the grant.

116    *See supra* notes 56-57 and accompanying text.

117    *See supra* Part II(A)(7).

118    Pistone & Schrag, *supra* note 23, at 61-63; *see also supra* note 23 and accompanying text.

119    USCIRF REPORT, vol. 1, *supra* note 11, at 44; USCIRF REPORT, vol. 2, *supra* note 11, at 67-70.

120    USCIRF REPORT, vol. 1, *supra* note 11, at 54-55; USCIRF REPORT, vol. 2, *supra* note 11, at 24. Such incidents can occur at a land crossing -- although not at an airport, for example -- as in the former location a primary inspector can informally deny entry and then simply tell an asylum seeker to leave.

121    *See supra* Parts II(B)(2) & (3).

122    *See supra* Part II(B)(4).

123    USCIRF REPORT, vol. 2, *supra* note 11, at 30-31.

124    *See supra* Part II(A)(1).

125    *See supra* Part II(A)(3).

126    *See supra* Part II(A)(2).

127 U.S. DEPARTMENT OF HOMELAND SECURITY, 2003 YEARBOOK OF IMMIGRATION STATISTICS 149 (2004).

128 *See* USCIRF REPORT, vol. 2, *supra* note 11, at 12.

129 USCIRF REPORT, vol. 1, *supra* note 11, at 6.

130 USCIRF REPORT, vol. 1, *supra* note 11, at 6.

131 USCIRF REPORT, vol. 1, *supra* note 11, at 54; USCIRF REPORT, vol. 2, *supra* note 11, at 20.

132 The 15.2% figure indicates that of every 8,480 persons who are appropriately referred, 1,520 persons are not. Adjusting these numbers for our annual approximate base of 10,000 appropriate referrals yields a total of 1,751 additional persons who are improperly deported through the expedited removal process each year.

133 USCIRF REPORT, vol. 2, *supra* note 11, at 17-18.

134 USCIRF REPORT, vol. 2, *supra* note 11, at 17 tbl. 2.8.

135 USCIRF REPORT, vol. 1, *supra* note 11, at 54.

136 Out of an expected 6390 people (9% of 71,000) asked only one question, the difference between a referral rate of 18% and a referral rate of 8.6% is 601 (1105 minus 549). Similarly, out of an approximate 3,550 people (5% of 71,000) asked neither question, the difference between a referral rate of 18% and a referral rate of 5.3% is 451 (639 minus 188). Adding together the two sums yields a result of 1052 individuals.

137 In recent years, only about 1% of persons referred to credible fear hearings are given a negative credible fear determination, USCIRF REPORT, vol. 2, *supra* note 11, at 173 tbl. 1.0, and subsequently removed pursuant to the expedited removal power. Accordingly, very few persons who are referred to a credible fear hearing end up being subjected to the five-year ban.

138 Twenty-five percent of asylum seekers with counsel are granted asylum. *Id.* at 241. With the assistance of paid counsel, pro bono attorneys, human rights organizations, and law school clinical programs, almost 80% of all asylum applicants are represented by counsel at their hearings. *Id.* at 241 n.39; *see also id.* at 241-48 (noting several types of legal assistance available to asylees).

139 MASHAW, *supra* note 72, at 20.

140 *See* Andrew I. Schoenholtz, *Refugee Protection in the United States Post-September 11*, 36 COLUM. HUM. RTS. L. REV. 323, 329-32 (2005) (discussing enhanced "enforcement focus" after September 11, 2001); Angelo A. Paparelli & John C. Valdez, *September 11 Ushers in a New Era in Immigration Law and Practice, Part II*, 7 BENDER'S IMMIGR. BULL. 427, 427 (Apr. 15, 2002) (noting that the INS's planned reorganization in 2002 contained "ominous signs that the INS's major focus will be more on enforcement and less on service"). Paparelli and Valdez rightly characterize the post-September 11 movement toward greater enforcement as "ominous" because, even before that day, "the agency ha[d] become completely enforcement-minded." Mirta Ojito, *Change in Laws Sets Off Big Wave of Deportations*, N.Y. TIMES, Dec. 15, 1998, at A1; *see* Daniel W. Sutherland, *The Federal Immigration Bureaucracy: The Achilles Heel of Immigration Reform*, 10 GEO. IMMIGR. L.J. 109, 119-20 (1996) (quoting former officials and others to the effect

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 106 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

that enforcement and service clash, "the enforcement mentality almost always wins"); Demetrios Papademetriou et al., *Reorganizing the Immigration Function: Toward a New Framework for Accountability,* 75 INTERPRETER RELEASES 501, 504 (1998) (noting that "enforcement goals always seem to take precedence over service goals"). Indeed, in the aftermath of 9-11, some evidence suggests that under the DHS even service activities have taken on the characteristics of an enforcement program. *See* Louie Gilot, *Immigration changes; Citizenship office will put legacy of old INS on ICE,* EL PASO TIMES, Mar. 20, 2004, at 1A (noting claim that "enforcement is getting in the way of service"); Ernesto Londoño, *Immigration changes in works,* DALLAS MORNING NEWS, Mar. 30, 2004, at 1B (noting "[e]nhanced background checks introduced after 9-11 are leading to more arrests of felons who apply for immigration benefits"); Vicki Kemper & Ricardo Alonso-Zaldivar, *U.S. Tries to Speed Flow of Immigration Paperwork,* L.A. TIMES, June 18, 2004, at A18 (noting post-9-11 requirement of "full security checks" has slowed processing).

[141]    Lenni Benson, *Breaking Bureaucratic Borders: A Necessary Step Toward Immigration Law Reform,* 54 ADMIN. L. REV. 203, 211 (2002).

[142]    *Id.* at 218.

[143]    USCIRF REPORT, vol. 1, *supra* note 11, at 2.

[144]    Press Release, U.S. Dep't of Homeland Security, DHS Expands Expedited Removal Authority Along Southwest Border (Sept. 14, 2005), *available at* http://www.dhs.gov/dhspublic/display?content=4816; Press Release, DHS Streamlines Removal Process Along Entire U.S. Border, U.S. Department of Homeland Security (Jan. 30, 2006). In between the 2005 and 2006 DHS initiatives, a legislative proposal to expand expedited removal to "all border patrol sectors on the southern border of the United States" was passed in the U.S. House of Representatives. *See* Border Patrol, Antiterrorism, and Illegal Immigrant Control Act of 2005, H.R. 4427, § 407 (passed Dec. 16, 2005).

[145]    *Immigration Issues: Making Needed Policy and Management Decisions on Immigration Issues: Hearing Before the Subcomm. On Information, Justice, Transportation, and Agriculture of the H. Comm. on Gov't Operations,* 103rd Congress 1 (1993) (statement of Henry R. Wray, Director, Administration of Justice Issues, General Accounting Office).

[146]    MASHAW, *supra* note 72, at 66. Similarly, when SSA undertook additional review of one state agency whose award rate for disability claims placed it among the more generous states, the agency lurched within six months to a position as one of the least generous states, as examiners became convinced that they were "required to interpret all policies in the most stringent fashion." *Id.* at 159-60.

[147]    A WELL-FOUNDED FEAR, *supra* note 6, at 200.

[148]    A WELL-FOUNDED FEAR, *supra* note 6, at 204.

[149]    USCIRF REPORT, vol. 2, *supra* note 11, at 31-33.

[150]    USCIRF REPORT, vol. 1, *supra* note 11, at 76.

[151]    Requiring a formal response may be particularly useful in averting extreme cases of bureaucratic denial, of which a recent statement by the chief of the Border Patrol, David V. Aguilar, might stand as a paradigmatic example. Against the clear contrary showing by USCIRF, Mr. Aguilar asserted that if cases of immigration officers subjecting persons arriving in the United States to expedited removal without asking the mandatory fear questions "exist at all, I am very confident that they are very small and very isolated .... The training of our agents is very involved, and there are safeguards in

IFR_AR_014538

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 107 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

place within the process to ensure that nobody falls through the cracks." Rachel L. Swarns, *Rights Groups Criticize Speedy Deportations*, N.Y. TIMES, Feb. 20, 2006, at A9.

152    USCIRF REPORT, vol. 2, *supra* note 11, at 33.

153    *Id.*

154    Press Release, Homeland Security Secretary Michael Chertoff Announces Six-Point Agenda for Department of Homeland Security (July 13, 2005), *available at* http://www.dhs.gov/dhspublic/display?content=4598 (last visited Jan. 30, 2006); Press Release, DHS Names Senior Advisor for Refugee and Asylum Policy (Feb. 7, 2006) available at http://www.dhs.gov/dhspublic/display? content=5392.

155    JAMES Q. WILSON, BUREAUCRACY: WHAT GOVERNMENT AGENCIES DO AND WHY THEY DO IT 371 (1989).

156    CHARLES O. ROSSOTTI, MANY UNHAPPY RETURNS: ONE MAN'S QUEST TO TURN AROUND THE MOST UNPOPULAR ORGANIZATION IN AMERICA 138-39, 275 (2005) (describing the purpose and performance of the National Taxpayer Advocate).

157    USCIRF REPORT, vol. 1, *supra* note 11, at 74.

158    *Id.* at 73.

159    USCIRF REPORT, vol. 1, *supra* note 11, at 74.

160    *See* USCIRF REPORT, vol. 2, *supra* note 11, at 254 (copy of Form I-870).

161    The only complications that might arise from this approach are the supervisor's ability to check that the sworn statement was signed, and to note corrections that might have been made to the form by the applicant. Neither complication seems insurmountable. The inspector could otherwise confirm that the form was signed, and corrections by the applicant could be noted through the use of the "track changes" function common to most word-processing programs.

162    In fact, the future cost might be truly minimal; the CBP Inspector's Field Manual suggests that inspectors' workplaces already are equipped with fax machines. *See* CBP Inspector's Field Manual § 17.15(b)(3).

163    USCIRF REPORT, vol. 1, *supra* note 11, at 74.

164    *Id.*

165    8 U.S.C. § 1225(b)(1)(A)(ii) (2005).

166    8 C.F.R. § 208.30(d)(1) (2005).

167    8 C.F.R. § 208.30(d)(4) (2005).

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 108 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

168    *Id.*

169    *Id.*

170    *See* A WELL-FOUNDED FEAR, *supra* note 6, at 195; Suzanne Lee, *Technology Helps Immigrants Deal with the INS*, ASIAN WEEK., Nov. 8-15, 2001, *available at* http://www.asianweek.com/2001_11_09/news_ins.html.

20 GEOILJ 167

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

IFR_AR_014540

Case 1:24-cv-01702-RC    Document 52-3    Filed 09/27/24    Page 109 of 200

*Los Angeles Times*

WORLD & NATION

# Asylum seekers are gathering at the U.S.-Mexico border. This is why



Migrants this week in El Paso warm themselves by a fire at dawn after spending the night outside the U.S.-Mexico border fence. (John Moore / Getty Images)

BY LEILA MILLER  |  STAFF WRITER

DEC. 23, 2022 12:22 PM PT



CIUDAD JUAREZ, Mexico  —  The first time Mari Marin Bastidas tried to claim asylum at the U.S. border, she was turned away by authorities who said a police report

ICE_ARP_014543

slow the spread of COVID-19 meant her case would not even get a hearing.

Dejected, she returned to her home in the state of Michoacan in western Mexico.

Two years later, she is back at the border to try again. Word has been spreading that the policy, known as Title 42, is about to be lifted.



A smuggler carries a migrant across the Rio Grande near a high-traffic border crossing area in El Paso. (John Moore / Getty Images)

ADVERTISEMENT

IFR_AR_014544

"I decided to come because of the opportunity that is opening up," said Bastidas, 29. "I'm not going back anymore."

The fate of the policy now rests with the U.S. Supreme Court as anxiety and confusion build on both sides of the border. In Ciudad Juarez, untold numbers of asylum seekers have been gathering in recent weeks. Across the Rio Grande in El Paso, the mayor has declared a state of emergency in anticipation of a massive influx.

Bastidas, along with her 8-year-old daughter and two brothers, was among scores of migrants waiting along a narrow section of the river.

Some waded across to present themselves to border agents, either not realizing that Title 42 was still in effect or willing to take their chances anyway.

Bastidas and her family decided to wait and made their way to a migrant shelter nearby. They had $500 to carry them over for now.

They plan to claim asylum based on a fear of a local gang that she said had threatened her family for failing to pay a monthly extortion fee of roughly $400. Another brother had been killed several years ago by gang members running a similar scheme.

ADVERTISEMENT

IFR_AR_014545



Colombian migrant Jaider, 18, holds his puppy, Trucha, while looking over the Rio Grande into El Paso. He said he had carried the dog for his entire overland journey from Colombia. (John Moore / Getty Images)

Before Title 42, the United States considered all asylum claims, which often meant releasing migrants into the U.S. until a court rules on their cases — a process that can take years because of a large backlog. A small minority of asylum claims are ultimately accepted. Fleeing poverty is not a valid basis for a claim.

Under Title 42, a decades-old public health measure that the Trump administration resurrected in the early days of the pandemic, asylum seekers can be quickly expelled.

The Biden administration has opposed the policy in court while continuing to use it with help from Mexico, which agreed to accept Central Americans, and later Venezuelans, who the United States turned away.

IFR_AR_014546

But last month, a federal judge ruled that Title 42 was being used arbitrarily and was no longer justified as a pandemic health measure. He ordered it be lifted by Dec. 21.

Some 19 Republican-led states appealed to the Supreme Court, arguing that ending the policy would result in a surge of new migrants, and on Monday — two days before the deadline — Chief Justice John G. Roberts Jr. ruled that it would remain in place until the high court decided the case. If the policy falls, it is possible that the Biden administration could find new ways to limit asylum seekers.

ADVERTISEMENT

Still, El Paso has been bracing for the day when asylum seekers can no longer be summarily turned away.

IFR_AR_014547



Migrants turning themselves in to U.S. officials stand behind a razor wire barrier by Mexico's border with El Paso. (Christian Chavez / Associated Press)

At one popular crossing spot along the Rio Grande, members of the Texas Army National Guard lined the riverbank with razor wire this week as a deterrent, and were standing watch next to their Humvees.

But already, 1,500 migrants a day on average are being taken into Border Patrol custody in the El Paso region, according to the Department of Homeland Security. After their fingerprints and basic information are recorded, many are expelled under Title 42. Some may be transferred to an immigration detention facility.

Others who might qualify for a Title 42 exemption — usually on humanitarian grounds or because Mexico limits how many migrants it accepts from various countries — may be released and allowed to remain in the United States, often with a court date.

IFR_AR_014548

This week, more than 50 migrants were staying at the Annunciation House shelter just north of the border. With cots in the chapel and playroom, the shelter has room for 60.

ADVERTISEMENT



Migrants eat and wait for help while camping on a street in downtown El Paso. (Andres Leighton / Associated Press)

IFR_AR_014549

Most move out within 48 hours to live with relatives or friends. Others have been bused to religious communities across the country that have offered to take them in.

The quick turnaround is important to make room for new migrants, said Ruben Garcia, who founded and runs the shelter.

"If we're having a difficult time dealing with the number of people who are arriving and we haven't even lifted Title 42, can you imagine what's going to happen when Title 42 gets lifted?" he said.

In anticipation, the city has opened up its convention center for temporary housing. About 200 of the 1,000 beds there were filled on Thursday night.

Still, some migrants are already living on the streets.

Not far from the convention center — where ice skaters glided around a large rink beside a lit-up Christmas tree — dozens of Venezuelan migrants had set up camp along two blocks of sidewalk. Sheets of cardboard served as mattresses. Locals dropped off donations of clothes.

ADVERTISEMENT

A 26-year-old named Yesimar — she spoke on condition that her last name not be used, because she had just crossed the border illegally — wrapped herself in a

ISSF_AR_014550

blanket. It was 7 p.m. and the temperature had dropped to 40 degrees.

She and her husband fled Venezuela five years ago and had been living in Peru. It took them three months to reach the U.S. border. With Title 42 still in place, they felt they had no choice but to sneak across.

They came through a space in the border fence and ducked into a McDonald's to change clothes and take a breath after eluding authorities.



A migrant crosses over a border fence after evading law enforcement in El Paso. (Eric Thayer/ Bloomberg via Getty Images)

"The truth is that they don't give us the opportunity to come into this country," Yesimar said. "We never came with the idea of coming in illegally."

Back in Ciudad Juarez, many more migrants are waiting it out.

IFR_AR_014551

ADVERTISEMENT

Alexander Diaz, his wife and their 3-year-old son were down to about $100. The 24-year-old Venezuelan has been giving $2 haircuts to fellow migrants in an alley close to the Rio Grande.

The family found a spot at a shelter, but the bathroom doesn't work. "Imagine, putting up with the cold, without a shower," Diaz said.

IFR_AR_014552



Migrants spend the night outside the border fence while waiting to make asylum claims in El Paso. (John Moore / Getty Images)

Jesús Carrera, 22, said he makes $15 a day washing car windows at a stoplight. A generous local gave him and other migrants a place to sleep, and he speaks daily to his mother in Venezuela, who urges him to come home. He hasn't seen her since leaving the country six years ago in hopes of escaping poverty.

He tried to claim asylum at the U.S. border in October but was expelled under Title 42 and moved to the Mexican state of Chiapas. He arrived at the border again last weekend because he thought the policy was ending.

"I'm asking God to change my luck," he said. "It's time."

Rosalia Castro Sosa, a Sears saleswoman from southern Mexico, arrived in Ciudad Juarez on Wednesday, thinking that Title 42 had been lifted as scheduled.

IFR_AR_014553

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 120 of 200

ADVERTISEMENT

She immediately crossed the river and turned herself in, waiting for hours in the cold in a long line for officials to take down her information. Then they dropped her off at the Mexican side of a border bridge.



Migrants step into the Rio Grande in Ciudad Juarez, Mexico. (Christian Chavez / Associated Press)

IFR_AR_014554

Waiting for the policy to be lifted, Sosa moved into a church shelter. She has made some cash by opening the door for customers entering convenience stores. A local restaurant fed her in exchange for waiting tables. She hopes to work in the U.S. to finance an ear operation for her 9-year-old son.

"In the name of God, I'm going to get there," she said. "I don't know how, but I will."

At the Good Samaritan shelter, many of the 73 migrants there were waiting to see a doctor. Migrants can stay for months as they wait for appointments with immigration officials, and in that time children attend school — where they take English classes. Migrants can also receive therapy.

Pastor Juan Fierro, who runs the shelter, said he viewed the end of Title 42 with skepticism.

ADVERTISEMENT

"How many times have they said it'd be over?" he said.

*Miller reported from Ciudad Juarez and El Paso. Special correspondent Gabriela Minjares in Ciudad Juarez and Times staff writer Hamed Aleaziz in Healdsburg, Calif., contributed to this report.*

IFR_AR_014555

WORLD & NATION    MEXICO & THE AMERICAS    IMMIGRATION AND THE BORDER



## Must-read stories from the L.A. Times

Get the day's top news with our Today's Headlines newsletter, sent every weekday morning.

Enter email address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.



Leila Miller

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Leila Miller is a foreign correspondent for the Los Angeles Times based in Mexico City. She joined the newsroom in 2018 and spent several years working on the criminal justice team. She was also part of the team that was a 2020 Pulitzer finalist for its coverage of the Conception boat fire off the Channel Islands. Born in Argentina but raised in Los Angeles, Miller is a graduate of Oberlin College and Columbia University's School of Journalism.

IFR_AR_014556

Case 1:24-cv-01702-RC Document 53-3 Filed 09/27/24 Page 123 of 200

**MORE FROM THE LOS ANGELES TIMES**



WORLD & NATION

### South Korea's leader calls for stealth drones to monitor North Korea

1 hour ago



WORLD & NATION

### Companies welcome end to China quarantines for visitors

1 hour ago



CALIFORNIA

### I'm Mexican American. But the L.A. City Council audio leak reminded me that I'm Oaxacan too

2 hours ago



WORLD & NATION

### Why is a Swedish billionaire buying up California's video gaming empire?

Dec. 27, 2022

IFR_AR_014557

Subscribe for unlimited access

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the
L. A. Times?

Bestcovery

Copyright © 2022, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Personal Information

IFR_AR_014558

6/1/24, 10:09 PM                    Strained U.S. Immigration System Draws More and More Asylum Claims - The New York Times

**The New York Times** | https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html

NEWS ANALYSIS

# One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay

Seeking asylum has become the surest way for migrants to stay in the U.S. The underfunded immigration system can't keep up, so cases languish for years.

 **By Miriam Jordan**
Miriam Jordan has reported on migrants, the border and the U.S. immigration system for more than a decade.

Jan. 31, 2024

> **Sign up for the Trump on Trial newsletter.** The latest news and analysis on the trials of Donald Trump in New York, Florida, Georgia and Washington, D.C. Get it sent to your inbox.

For decades, single young men, mainly from Mexico and later Central America, did their best to sneak past U.S. border agents to reach Los Angeles, Atlanta and other places hungry for their labor.

Today, people from around the globe are streaming across the southern border, most of them just as eager to work. But rather than trying to elude U.S. authorities, the overwhelming majority of migrants seek out border agents, sometimes waiting hours or days in makeshift encampments, to surrender.

Being hustled into a U.S. Border Patrol vehicle and taken to a processing facility is hardly a setback. In fact, it is a crucial step toward being able to apply for asylum — now the surest way for migrants to stay in the United States, even if few will ultimately win their cases.

IFR_AR_014559

We are living in an era of mass migration — fueled by conflict, climate change, poverty and political repression and encouraged by the proliferation of TikTok and YouTube videos chronicling migrants' journeys to the United States. Some six million Venezuelans have fled their troubled country, the largest population displacement in Latin America's modern history. Migrants from Africa, Asia and South America are mortgaging their family land, selling their cars or borrowing money from loan sharks to embark on long, often treacherous journeys to reach the United States.

In December alone, more than 300,000 people crossed the southern border, a record number.

It is not just because they believe they will be able to make it across the 2,000 mile southern frontier. They are also certain that once they make it to the United States they will be able to stay.

Forever.

IFR_AR_014560

Case 1:24-cv-01702-RC Document 53-2 Filed 09/27/24 Page 127 of 200



Rather than trying to elude U.S. authorities, the overwhelming majority of migrants seek out border agents, sometimes waiting hours or days in makeshift encampments to surrender. Mark Abramson for The New York Times

And by and large, they are not wrong.

The United States is trying to run an immigration system with a fraction of the judges, asylum officers, interpreters and other personnel that it needs to handle the hundreds of thousands of migrants crossing the border and flocking to cities around the country each year. That dysfunction has made it impossible for the nation to expeditiously decide who can remain in the country and who should be sent back to their homeland.

"I don't know anyone who has been deported," Carolina Ortiz, a migrant from Colombia, said in an interview in late December at an encampment outside Jacumba Hot Springs, about 60 miles southeast of San Diego and a stone's throw

IFR_AR_014561

from the hulking rust-colored barrier that separates the United States from Mexico.

For most migrants, the United States still represents the land of opportunity. Many come seeking work, and they are going to do whatever it takes to work, even if that means filing a weak asylum claim, several lawyers said.

To qualify for asylum, applicants must convince a judge that returning to their home country would result in harm or death on the basis of their race, religion, nationality, political opinion or membership in a particular social group.

Ms. Ortiz, 40, said she intended to apply for asylum based on violence in Colombia. Her chances of winning are slim, because violence alone typically does not meet the standard for persecution. Even so, she will be shielded from deportation while her claim is pending and will qualify for a work permit.

Underfunded immigration courts that adjudicate claims are strained by the swelling caseload, so applications languish for years, and all the while, migrants are building lives in the United States.

Ms. Ortiz, a nurse, said she had borrowed "millions," in Colombian pesos (several thousand dollars) to pay the smugglers who brought her to the doorstep of the United States, a gap in the wall championed by former President Donald J. Trump. She waited two days in the cold, desert winds lashing her tent, for agents to come and take her.

When agents showed up, they transported Ms. Ortiz to a facility where she was given paperwork that said she had entered the country illegally, had been placed in deportation proceedings and must appear before an immigration judge.

IFR_AR_014562

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 129 of 200



A migrant encampment in Jacumba Hot Springs, Calif. Families wait to be picked up by border agents and taken to facilities, where they usually get released with instructions to report to immigration court.
Erin Schaff/The New York Times

The court date was Feb. 19, 2026.

She was then released. In Ms. Ortiz's mind, everything was going according to plan. "I wanted to do everything the right way," she said, after arriving in Colorado a few days later. She had been assigned an "alien" number used to track immigration cases.

Most asylum claims are ultimately rejected. But even when that happens, years down the road, applicants are highly unlikely to be deported. With millions of people unlawfully in the country, U.S. deportation officers prioritize arresting and expelling people who have committed serious crimes and pose a threat to public safety.

IFR_AR_014563

Nearly 2.5 million people crossed the southern border in fiscal year 2023, more than live in most U.S. cities. That has made the border an ever more contentious issue, for mayors and governors grappling with large influxes of migrants, and for Republican leaders eager to lay the blame at the foot of President Biden as he campaigns for re-election.

Mike Johnson, the Republican speaker of the House, has insisted that nothing should be more important to the United States than securing the border. "We must insist — must insist — that the border be the top priority," Mr. Johnson told reporters earlier this month after a meeting with President Biden and other congressional leaders.

The president has signaled a willingness to agree to most Republican demands, though the prospects for a deal diminished last week after Mr. Trump, the front-runner for the Republican nomination, expressed vociferous opposition to the terms.

But some proponents of tougher enforcement say that a crackdown at the border is not enough.

"We do need more boots on the ground. We do need more border infrastructure," said Michael Neifach, a border security expert who was principal legal adviser to Immigration and Customs Enforcement during the George W. Bush administration.

"But you can't fix this by just doing that," he said. "We need to understand that the border is not the end of it."

The U.S. immigration system has not undergone an overhaul in almost 40 years. And it has been a decade since Republicans and Democrats in Congress last engaged in serious negotiations to try to make top-to-bottom changes to the system.

Instead, stoking concern over immigration has become a vital part of the political playbook for Mr. Trump and many Republican leaders. They call for increasing enforcement at the border but say little about the rest of the ossified, broken immigration system.

IFR_AR_014564

Strained U.S. Immigration System Draws More and More Asylum Claims - The New York Times



A Texas National Guard soldier placing concertina wire along the border with Mexico in El Paso. Many Republican leaders call for bolstering enforcement at the border but say little about the rest of the ossified, broken immigration system.   Todd Heisler/The New York Times

"Politicians want to fund border patrol agents, fencing and other visible aspects of border enforcement," said Doris Meissner, director of the U.S. immigration policy program at the Migration Policy Institute, a nonpartisan think tank.

"But until resources are bolstered for other immigration functions, the border problem cannot be solved," said Ms. Meissner, a former chief of the U.S. Immigration and Naturalization Service.

Over the last 13 years, Congress has substantially increased funding for Customs and Border Protection, to $21.7 billion in fiscal year 2023 from $8 billion in 2006.

But less visible components of the immigration system have not seen commensurate investment. And with the asylum process now the de facto system for so many of the people unlawfully entering the United States, a shortage of

IFR_AR_014565

asylum officers, immigration judges and deportation officers has far-reaching consequences.

Republicans in Congress have held up approving more aid to Ukraine and Israel until Democrats agree to more funding for the border. As part of its $110 billion aid request to Congress, the Biden administration is seeking $14 billion to add both more agents along the border and more people to process and decide asylum claims. But the fate of negotiations is uncertain, and even if a deal is reached, experts say the additional resources will still fall well short.

In a functioning system, most migrants seeking asylum would be interviewed at the border to assess whether they have a credible fear of persecution if they were forced to return to their home countries. It is intended as the first step in the asylum process, and migrants who are found to lack a credible claim can be swiftly deported.

About 500 such interviews are being conducted a day — more than ever. But those represent only a fraction of the migrants who arrive — often 5,000 or more. Most people crossing the border never undergo that initial screening. They are released with a court date in a city, often years in the future.

If migrants tell judges they had been living in desperate poverty and came to the United States in search of work, the migrants could be rapidly deported. So migrants apply for asylum, knowing that gives them a fighting chance to stay.

Under U.S. law, asylum seekers can remain in the United States at least until their cases are concluded.

IFR_AR_014566

Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 133 of 200



Hundreds of migrants wait in Texas to turn themselves in to U.S. border authorities after crossing the Rio Grande that separates the United States and Mexico. Ivan Pierre Aguirre for The New York Times

In 2012, there were 300,000 pending asylum cases in the United States. There are that many cases now in New York State alone. All told, more than three million cases are languishing in immigration courts, a million more than just a year ago.

Some 800 immigration judges are on the bench, up from about 520 in 2020. But the increase in judges came after years of inaction, and in that time the backlogs ballooned, according to TRAC, the Transactional Records Access Clearinghouse, a research group at Syracuse University.

Even with more judges on the bench, it can take several years for an asylum case to be decided. The Congressional Research Service has estimated that it would take about 1,000 more judges to clear the current backlog by fiscal year 2032.

"No matter how hard we work, day in and day out, the volume just keeps getting larger," said Mimi Tsankov, president of the National Association of Immigration Judges.

IFR_AR_014567

6/1/24, 10:09 PM

Case 1:24-cv-01702-RC Strained U.S. Immigration System Draws More and More Asylum Claims - The New York Times Document 53-2 Filed 09/27/24 Page 134 of 200

When Dana Leigh Marks joined the immigration court in San Francisco in 1987, there were about 800 cases before every judge. By the time she retired in 2021, each judge had a caseload of about 4,000. Today, that number is about 5,000.

"It's going to take years to unwind the backlogs unless something really dramatic is done," Ms. Marks said, adding that making more work visas available would slash the number of asylum petitions clogging dockets.

If a decision is not rendered in 150 days, virtually impossible today, asylum applicants automatically become eligible for an employment authorization card.

Applicants from countries mired in political upheaval or run by military dictators, such as Eritrea or Myanmar, are likely to be granted asylum. But claims from many other countries are far less likely to be granted. Last year, only 4 percent of Mexican cases, 7 percent of Honduran and 29 percent of Venezuelan were granted.

Until a few years ago, Katy Chavez, an immigration lawyer in North Carolina, used to receive a handful of calls a year from people seeking her services to apply for asylum. Now she receives a couple dozen a month. Many are migrants who had fled profound economic hardships.

"They are calling because they want their work permit," she said. "They don't even understand what asylum is."

**Miriam Jordan** reports from a grass roots perspective on immigrants and their impact on the demographics, society and economy of the United States. More about Miriam Jordan

IFR_AR_014568

## The Washington Post

*Democracy Dies in Darkness*

ENTERPRISE

# The border is tougher to cross than ever. But there's still one way into America.

By Nick Miroff and Carolyn Van Houten

October 24, 2018 at 10:43 a.m. EDT

*[This story has been optimized for offline reading on our apps. For a richer experience, you can find the full version of this story here. An Internet connection is required.]*

HIDALGO COUNTY, Tex. — Crouched low in the brush along the riverbank, Border Patrol agent Robert Rodriguez watched the Mexican side of the Rio Grande, waiting. A norteño ballad drifted from a radio somewhere on a nearby farm, and two pigs cooled themselves at the water's edge, wading to their bellies. For a moment, one of the border's busiest places for illegal crossings looked placid.

Then a raft appeared.

Within seconds it was in the water, a teenage guide steering the current while his boss, an older man, stood watch on the bank. In less than a minute, the teenager delivered a woman and a boy to the U.S. side and they climbed out, shoes sinking in the wet silt.

Rodriguez stepped onto the path to stop them, but the woman and the boy did not run. They wanted to be captured. This is how it works now.

The era of mass migration by Mexican laborers streaming into California and the deserts of Arizona is over. Billions spent on fencing, sensors, agents and drones have hardened the border and made it tougher than ever to sneak into the United States. The migrants coming today are increasingly Central Americans seeking asylum or some form of humanitarian protection, bearing stories of torture, gang recruitment, abusive spouses, extortionists and crooked police.

IFR_AR_014569

They know the quickest path to a better life in the United States is now an administrative one — not through mountains or canyons but through the front gates of the country's immigration bureaucracy.

Last year, U.S. immigration courts received nearly 120,000 asylum claims from migrants facing deportation, a fourfold increase from 2014. Those filings have pushed the number of pending cases before U.S. immigration courts to more than 750,000, collapsing the system and upending President Trump's sweeping promises to lock down the border.

The extraordinary surge of asylum seekers is testing the limits of whom, exactly, the United States is willing to protect, challenging the stone-carved ideal of America as the place that welcomes the tired and poor, "yearning to breathe free."

It has also presented Trump with one of the most vexing policy challenges of his presidency, and virtually every measure taken so far has made the problem worse.

Trump this spring deployed a nuclear option — separating parents from their children — in an attempt to stop families from coming. It backfired. The controversy generated by the policy and its abrupt rollback six weeks later handed smuggling guides across Central America a potent sales pitch. They now tell potential customers the Americans do not jail parents who bring children — and to hurry up before they might start doing so again.

Families asking for mercy constitute a greater-than-ever portion of those taken into custody. More than half of all arrests along the Mexican border last month were migrant family members or unaccompanied minors, up from 13 percent in 2013.

This spring, Trump fixated on a caravan of asylum seekers traveling through Mexico, about 300 of whom eventually crossed into the United States. Now, a much larger procession of as many as 7,000 Central Americans is trekking north toward the border, despite threats from the president to stop them with U.S. troops and sever aid to their countries.

There is a sinking feeling, among Department of Homeland Security officials, that more caravans are yet to come and that they will only get larger.

Families are coming in caravans and on their own because it works. Only 1.4 percent of migrant family members from Guatemala, Honduras and El Salvador who crossed the border illegally in 2017 have been deported to their home countries, according to DHS officials.

The United States has neither the detention space nor the legal authority to hold children long enough to process their parents' claims, so families are typically released from custody to await court hearings that could be months, even years, into the future.

Trump has long derisively referred to this as "catch and release" and used it as an attack line against Democrats. But in the months since ending family separation, Trump has now made it his de facto policy.

IFR_AR_014570

The administration has drafted plans to add thousands of detention beds in an attempt to hold parents with children longer. DHS officials have also proposed new rules that would allow the government to withdraw from a 1997 federal court agreement limiting the amount of time children can be held in immigration jails to 20 days.

But in the meantime, so many families are coming through high-volume corridors such as the Rio Grande Valley that Rodriguez and other agents have come to describe them as "non-impactables," because they say there is nothing they can do to stop them.

As Rodriguez radioed another agent to pick up the woman and the boy, she handed him her Honduran identification card. Cecilia Ulloa was 25. Darwin, her son, was 13. The math took a moment to sink in, and Ulloa appeared to recognize a familiar look of confusion.

"My stepfather," she said. "It started when I was 10."

After a decade in prison for rape, her stepfather was free now, stalking them, blaming her for ruining his life, Ulloa said. "He's going to kill us."

Police in Honduras had told her there was nothing they could do, she said, so she and her son left for the United States. They wanted asylum.

Chances were they would be denied. But it could take months, or longer, for the U.S. immigration system to determine whether Ulloa and her son deserve protection. They would probably not be sent back to Honduras anytime soon.

# Credible fear

Some migrants' stories of gang threats and police indifference have a rehearsed quality, suggesting they are concocted. The smuggling guides who charge $10,000 or more for the trip provide transportation and meals, but also coaching, including the key words migrants should say to convince U.S. asylum officers that their fears meet credibility standards.

But there are many with no need to make things up. The countries they are running from have some of the highest murder rates in the world. Their criminal justice systems barely function. Some have been victimized already.

Lisa Brodyaga, an immigration lawyer in South Texas who has worked with Central American migrants since the late 1970s, said adult asylum seekers who appear before immigration judges "are almost all being deported."

"I think judges felt freer to follow their gut under Obama than they do now," she said.

IFR_AR_014571

Migrants have adapted just as quickly. As asylum officers and immigration judges reject more claims, the number of single adults who arrive claiming fear of persecution is dropping. The fastest-growing portion comprises parents coming with children, preventing their long-term detention and significantly reducing the likelihood they will be deported.

Last month, border agents arrested 16,658 individuals who arrived as members of "family units," an all-time high, up from 9,247 in July.

Migrant advocates have documented cases of rejected asylum applicants being killed after they were sent back. But a full picture is difficult to obtain because U.S. government statistics do not track what happens to deportees once they leave the United States.

DHS officials point to improving public-safety statistics from Central America as evidence that the asylum trend is not driven by worsening violence.

Those fleeing lawlessness and crime are also lured north by job opportunities and the desire to reunite with parents, siblings and other relatives already living here. The United States offers not only safety but also a chance at a dramatically better life.

And with the U.S. unemployment rate at a 50-year low and employers across the Midwest desperate for labor, the Trump-era economy is undermining the Trump-era immigration agenda.

"Migrants from Central America seek asylum in the U.S. to escape gangs, violence and lack of opportunity," said Doris Meissner, who is policy director at the Migration Policy Institute and ran the U.S. immigration system under President Bill Clinton. "This mixture of humanitarian and economic migration is happening in other parts of the world, too."

"However, only some of those in peril are actually eligible for asylum," said Meissner, co-author of the new report "The U.S. Asylum System in Crisis." "Granting them protection but keeping asylum systems from being overwhelmed or misused requires broad solutions, including attacking the reasons people flee."

For people like Ulloa and her son, here's how it works.

Those who cross the border and turn themselves in are interviewed by a U.S. asylum officer to determine whether they have a "credible fear" of facing persecution back home. The Supreme Court has ruled that an asylum-seeker's fear is considered "well-founded" if there is a 10 percent chance they will face persecution, and those who potentially qualify are referred to an immigration judge.

Between Oct. 1, 2017 — the start of the 2018 fiscal year — and June 30, the period for which the most recent statistics are available, the government received more than 73,000 credible-fear claims, up from 5,000 during all of 2009. Of those 73,000 who were interviewed, 76 percent were found to have a credible fear of return.

IFR_AR_014572

The finding does not mean that a judge will eventually grant asylum. Justice Department statistics show that fewer than 10 percent of Central American applicants are awarded asylum, but the process of applying offers a shield from deportation and a toehold, however tenuous, in the United States.

Trump officials view this as a too-permissive approach to asylum claims that amounts to a mile-wide loophole in the American immigration system. U.S. generosity is being exploited by smugglers and cheats, they say, and the dysfunction encourages more to make a dangerous journey.

Under Trump, asylum denial rates have reached their highest levels in more than a decade. But nearly half of those rulings are issued in absentia, because the applicant does not appear in court.

That is the breach Trump officials see: If asylum seekers think their case is likely to be denied, they can drop out of the court system and disappear, remaining in the United States illegally. The latest Justice Department figures show U.S. courts issued more than 40,000 removal orders in absentia during the government's 2017 fiscal year, nearly twice as many as in 2014.

"Saying a few simple words — claiming a fear of return — has transformed a straightforward arrest for illegal entry and immediate return too often into a prolonged legal process, where an alien may be released from custody into the United States and possibly never show up for an immigration hearing," Attorney General Jeff Sessions said in a September speech to a group of 44 newly hired immigration judges that he said was the largest class in history.

"Our system was not designed to handle thousands of new asylum claims every month from individuals who illegally flood across the border," he said. "But that is what has been happening, and it has overwhelmed the system."

# 'Private' violence

In the absence of a physical wall, the Trump administration is laying down new legal barriers to the asylum process. The U.S. immigration court system is a branch of the Justice Department, not the judiciary, and the attorney general effectively functions as a one-man Supreme Court. In June, Sessions issued a sweeping ruling that overturned the case of a Guatemalan domestic-violence victim who had demonstrated that police failed to protect her from spousal abuse and rape.

Sessions's ruling said asylum laws are meant to shelter those facing persecution for political or religious beliefs, or their membership in a well-defined social group, not those fleeing what he called "private" forms of violence.

"The mere fact that a country may have problems effectively policing certain crimes — such as domestic violence or gang violence — or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim," Sessions wrote.

IFR_AR_014573

Under Sessions, the Justice Department has attempted to reduce the court backlog by adding dozens of immigration judges and imposing quotas that compel them to process more cases. It has taken steps to prioritize the claims of the most recent arrivals, as a way to discourage asylum seekers from taking advantage of the court backlog. And it has instructed judges and asylum officers to take a more adversarial approach to migrants' claims.

U.S. asylum laws were shaped in the aftermath of World War II, when the United States and other Western nations developed international treaties based on the principle of "non-refoulement" — that those fleeing persecution should not be sent back to places where they are likely to killed or persecuted.

Applicants who reached U.S. soil could prove eligibility for asylum on the basis of past persecution or a fear of future abuse on the basis of their "race, religion, nationality, membership in a particular social group or political opinion."

In practice, historians and immigration scholars say, political considerations have often superseded humanitarian ones. During the Cold War, refugees fleeing communist and left-wing governments in Vietnam, Cuba and Nicaragua were welcomed in large numbers, while those escaping U.S.-friendly military dictatorships in El Salvador and Guatemala were denied.

"The United States has never solely pursued asylum on the basis of humanitarian principles," said Roberto Suro, a migration expert at the University of Southern California and former director of the Pew Hispanic Center. "American approaches have always been ad hoc and driven largely by foreign policy concerns and domestic policy concerns."

Sessions has directed judges and asylum officers to adhere to a narrower definition of "membership in a social group" — the category had been used in recent years to grant protection to victims of domestic violence.

"An alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family or other personal circumstances," Sessions wrote. "Yet the asylum statute does not provide redress for all misfortune."

The president demonstrated even less patience this spring, when a large group of asylum-seeking Central American families formed a caravan to travel northward. Trump took their journey as a personal affront.

"We cannot allow all of these people to invade our Country," he wrote on Twitter. "When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."

More than 400 caravan members eventually crossed, according to DHS statistics. Among them was Carlos Aldana, who now lives with his partner and young daughters outside Seattle, waiting to see a judge. The monitoring device strapped to his leg has been on so long he barely notices it anymore.

"We go to the park. We go to church and the grocery store," Aldana said. "It's beautiful here."

His family's asylum claim epitomizes the intertwined push-and-pull factors that bring Central Americans to the United States — and that make it unlikely he, his partner and their two daughters will be allowed to stay.

IFR_AR_014574

The family had a small farm near the Caribbean coast, on land purchased with money sent home by a brother working in the United States. When traces of gold were found on the property, Aldana said, he and his siblings invested in mining equipment and began digging.

Then a local crime boss found out about their discovery. He showed up at the property with a carload of men, offering to "go into business together," Aldana said. Aldana's family declined, and the man returned and said he had heard others were planning to kill them. He offered protection. Again, Aldana and his siblings refused.

The threats worsened. Then one of Aldana's brothers was killed. Aldana said his family was too scared to go to the police. "They work for him," he said of the gangster.

The family fled to another part of Honduras and attempted to start over, but a year later the man found them and the threats resumed, Aldana said.

This time Aldana and his family fled to southern Mexico. They were arrested by Mexican authorities and sent back to Honduras. They tried to start over again.

Worried that he was putting the whole family in danger, another of Aldana's brothers bid farewell and left. His body was found a few months later, tortured and mutilated. Aldana reported the crime to police, but they made no arrests, he said.

Aldana fled with his family to Mexico a second time, then found out about the caravan. Like others who joined, they saw it as a safe, affordable way to reach the border.

Along the journey, the caravan's legal advisers warned Aldana he would probably not qualify for asylum because he had been deported from the United States once before, in 2008, when he attempted to come illegally at age 19.

But he crossed anyway, and like so many Central Americans, his urge to flee is hard to separate from the desire for a better life in the United States.

"I feel safe here. I just want to be able to stay, so my girls don't have to grow up in a place like that," he said of Honduras. "I don't ever want to go back."

# 'The most horrifying stories'

Asylum seekers who make their claims at official border crossings — not on the banks of the Rio Grande — are not breaking the law. But U.S. agents have to let them cross the bridge first.

On a recent morning in South Texas, immigration lawyer Jennifer Harbury walked across the river into Mexico under a blazing sun, waiting for a nun to pick her up. They drove to a Reynosa migrant shelter in a bullet-scarred neighborhood full of cartel lookouts and stash houses used by smugglers to stage illegal crossings.

Harbury is an irritant to U.S. border officials as well as the cartels. She provides free legal advice and assistance to asylum seekers, so the nuns who run the shelter call her often to see whether she can help migrant families desperate for legal advice. Harbury's pro bono work takes profits away from traffickers, because they charge a "tax" of several hundred dollars to those who cross illegally along the river. They earn nothing from the migrants Harbury escorts to the official border crossing.

Harbury is one of the activists who also help asylum seekers stranded in the no man's land on the pedestrian bridge over the river. In recent months, U.S. officers have been turning migrants away, telling them to come back later. Harbury and others have criticized the practice as unlawful, but DHS officials say that port officers have multiple responsibilities and that busy border crossings have capacity limits.

It was Harbury who provided ProPublica with the surreptitious audio recording of a child screaming for her mother that dealt a severe blow to the family-separation policy. She has absorbed the stories of thousands of asylum seekers over the decades and increasingly views her job with the urgency of an emergency responder. She intends to help as many asylum seekers enter the United States as possible, because she believes she is saving their lives.

"These people have the most horrifying stories I have ever heard," she said. "I don't think people have better claims than those running from the cartels."

The shelter in Reynosa was crowded with newly deported Mexicans, many still carrying their belongings in plastic bags provided by the U.S. government. Immigration and Customs Enforcement had dropped off 85 deportees the previous night, and several complained harshly of bad food and abysmal conditions in U.S. detention.

The nuns had asked Harbury to help a young mother stranded for more than a week, Maria Magdalena Gonzalez, 21, and her son, Emiliano, 3. A gangster in Gonzalez's home state of Guerrero was threatening to kill her for rejecting his advances, she said. But when she and her son tried to approach the U.S. border crossing a few days earlier to seek asylum, they had been turned away.

With more and more Central Americans showing up at the port of entry, U.S. officers had set up an impromptu checkpoint over the middle of the Rio Grande, blocking them from setting foot on the U.S. side to start the asylum process.

Those who fail to cross are put at risk, because cartel lookouts ply the Mexican side of the bridge, watching for Central Americans who have been turned away. The migrants are prime targets for kidnapping because criminal groups assume they have relatives living in the United States with enough money to pay a ransom.

Harbury was there to make sure Gonzalez and her son weren't rejected again.

A nun drove them to the bridge over the river, and Harbury walked alongside them until a Mexican immigration official stood in the way. He had been looking for asylum seekers from Central America, but Gonzalez and her son were Mexican, so there was nothing he could do to detain them.

IFR_AR_014576

He told Harbury the U.S. agents had not been letting asylum seekers through, or were making others wait three or four days to be allowed to approach the American side.

Harbury, Gonzalez and the boy continued walking until three American officers blocked them halfway across the bridge. "We want asylum," Gonzalez said softly, more a question than a demand. An agent told her to stand aside and wait.

Harbury asked how long, and the officers said it could be several hours, perhaps days. She sat down on the pavement with Gonzalez and the boy. "We'll wait," she said.

The officers appeared to notice a reporter taking notes and called a supervisor. He arrived and waved everyone through.

Gonzalez reached the inspection booth and pushed her paperwork forward. Harbury gave her a hug and an invitation to dinner. Then the officers directed Gonzalez and her son to an adjacent waiting room.

"They made it," Harbury said.

She waved goodbye through the glass. The room wasn't full, not even close. There were more than 60 chairs in the waiting area, and all but two were empty.

**University of California, Hastings College of the Law**
**UC Hastings Scholarship Repository**

Faculty Scholarship

2008

# The Implementation of the One-Year Bar to Asylum

Karen Musalo
*UC Hastings College of the Law*, musalok@uchastings.edu

Marcelle Rice

Follow this and additional works at: http://repository.uchastings.edu/faculty_scholarship

Recommended Citation

Karen Musalo and Marcelle Rice, *The Implementation of the One-Year Bar to Asylum*, 31 *Hastings Int'l & Comp. L. Rev.* 693 (2008).
Available at: http://repository.uchastings.edu/faculty_scholarship/568

This Article is brought to you for free and open access by UC Hastings Scholarship Repository. It has been accepted for inclusion in Faculty Scholarship
by an authorized administrator of UC Hastings Scholarship Repository. For more information, please contact marcusc@uchastings.edu.



**Faculty Publications**
**UC Hastings College of the Law Library**

| | |
|---|---|
| **Author:** | Karen Musalo |
| **Source:** | Hastings International and Comparative Law Review |
| **Citation:** | 31 Hastings Int'l & Comp. L. Rev. 693 (2008). |
| **Title:** | *The Implementation of the One-Year Bar to Asylum* |

Originally published in HASTINGS INTERNATIONAL AND COMPARATIVE LAW REVIEW. This article is reprinted with permission from HASTINGS INTERNATIONAL AND COMPARATIVE LAW REVIEW and University of California, Hastings College of the Law.

IFR_AR_014607

# Center for Gender & Refugee Studies:
# The Implementation of the
# One-Year Bar to Asylum[†]

By Karen Musalo[*] and Marcelle Rice[**]

## I. Introduction

### A. *The One-Year Bar to Asylum*

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). This provision of this law relating to the one-year bar was codified in the Immigration and Nationality Act (INA) § 208(a)(2)(B); 8 U.S.C. § 1158(a)(2)(B). IIRIRA contains a provision commonly known as "the one-year bar" to asylum. This provision requires any individual seeking asylum to apply within one year of her arrival in the United States.

The statute outlines certain exceptions to the one-year bar. According to the statute the Attorney General "may"[1] waive the application of the one-year bar where the applicant demonstrates "to the satisfaction of the Attorney General" that: (1) changed circumstances exist which materially affect the applicant's eligibility for asylum, or (2) extraordinary circumstances exist and relate to the delay in filing.

---

† This article is a companion piece with Dr. Stuart Lustig's article.
* Clinical Professor at U.C. Hastings, College of the Law, and Director of the Center for Gender & Refugee Studies. She would like to thank her co-author, Marcelle Rice, as well as members of the CGRS staff, and students in the U.C. Refugee and Human Rights Clinic, whose research and analysis made this article possible – most notably Neela Otoku Chakravartula, Meghan Hafner, Kaitlin Kalna, Stephen Knight and Shin-Ming Wong.
** Associate immigration lawyer at the Law Office of Robert L. Lewis in Oakland, California, and a project-based consulting attorney with CGRS. She would like to thank Karen Musalo and Stephen Knight for their thoughtful mentorship. She is also grateful to the individuals who have shared information about their cases.

1. The use of the word "may" indicates that the Attorney General can deny an application for protection even where he is satisfied that the asylum seeker meets the statutory exceptions.

693

IFR_AR_014608

IIRIRA also contains a provision prohibiting federal court review of agency one-year bar determinations; INA § 208(a)(3); 8 U.S.C. 1158(a)(3).[2] Congress subsequently enacted section 106 of the Real ID Act, which mandates that no provision of the INA shall be construed "to preclude review of constitutional claims or questions of law" in the federal courts; INA § 242(a)(2)(D) (as amended). The courts of appeals are just beginning to address the interplay of section 208(a)(3) and section 242(a)(2)(D).[3] Consensus is growing that section 208(a)(3) restored legal and constitutional jurisdiction over questions relevant to the one-year bar, including mixed questions of law and fact.

### B. This Article's Objectives

The Center for Gender and Refugee Studies (CGRS) is the nation's leading organization supporting women asylum-seekers fleeing gender related harm. CGRS's mission is to impact the development of law and policy to protect these women. CGRS provides training and technical support to attorneys, engages in appellate advocacy, and develops and implements strategies to impact national policy. Of salience to this article, CGRS also tracks asylum decisions. CGRS has thus developed an extensive catalog of decisions including many one-year bar determinations.

This article presents case summaries compiled from NGOs and practitioners in order to offer insight into the current application of the one-year bar. The scarcity of federal court review makes a random sample of cases unobtainable. The data referenced herein therefore presents invaluable information regardless of its anecdotal character.

---

2. Decisions interpreting this statutory provision to completely bar federal court review abound. See, e.g., Ismailov v. Reno, 263 F.3d 851 (8th Cir. 2001); Hakeem v. INS, 273 F.3d 812 (9th Cir. 2001); Fahim v. U.S. Atty. Gen., 278 F.3d 1216 (11th Cir. 2002).

3. See, e.g., Ramadan v. Gonzales, 479 F.3d 646 (9th Cir. 2007) (finding jurisdiction over questions of law which include the application of law to undisputed facts, namely whether changed circumstances excused untimely filing in an asylum application, and relying on the doctrine of constitutional avoidance to interpret Congressional intent to restore judicial review); see also Liu v. INS, 475 F.3d 135 (2d Cir. 2007) (finding jurisdiction to review whether any rational trier of fact would be compelled to conclude that the petitioner timely filed his asylum application); Chen v. U.S. DOJ, 471 F.3d 315, 326-27 (2d Cir. 2006); Nakimbugwe v. Gonzales, 475 F.3d 281 (5th Cir. 2007) (finding jurisdiction where the Immigration Judge misinterpreted federal regulations regarding the one-year bar).

IFR_AR_014609

### C. Legislative Intent Behind the One-Year Bar

Congress' paramount objective in enacting the one-year bar was to prevent fraud.[4]    Wide concern existed that undocumented immigrants were abusing the asylum process in order to obtain permission to work and access other societal benefits.  Some saw "defensive applications"[5] for asylum as insincere.[6]  The country's growing anti-immigrant sentiment also influenced passage of the one-year bar.

Of equal import to Congressional one-year bar proponents was ensuring that the United States remain a safe haven for legitimate asylum seekers fleeing persecution in their home countries.[7]  One senator voiced concern about adequate protection, stating that Congress will "have to pay close attention to how this provision is interpreted."[8] Another senator, Orrin Hatch, assured the Senate that the statutory list of exceptions to the one-year bar was non-exhaustive and therefore "legitimate claims of asylum [would not be] returned to persecution, particularly for technical difficulties."[9] He indicated that he was also prepared to reconsider the time limit if it was not implemented fairly.[10]  Representatives in the House shared these concerns.  The Chief House sponsor, Representative Bill McCollum, expressed his understanding that "the Immigration Service would be required to tell people who came in that ... [they can apply for

---

4.  See 141 Cong. Rec. E1635 (daily ed. Aug. 3, 1995), cited in Leena Khandwala et al., The One-Year Bar: Denying Protection to Bona Fide Refugees, Contrary to Congressional Intent and Violative of International Law, Immigr. Briefings, Aug. 2005, at 4 (citing Michele R. Pistone, Asylum Filing Deadlines: Unfair and Unnecessary, 10 Geo Immigr. L.J. 95, 101-102 (1996); Daniel Horne & Ari Weitzhandler, Asylum Law After the Illegal Immigration Reform and Immigrant Responsibility Act, 97-04 Immigr. Briefings 1, 2 (1997)).

5. Defensive asylum applications are those applications submitted after the individual is already in removal proceedings.

6.  See Celia Dugger, Immigration Bills' Deadlines May Imperil Asylum Seekers, N.Y. Times, Feb. 12, 1996, at B1 (quoting Rep. Charles Schumer: "If you believe enough in America to claim asylum, you ought to come forward and not wait till someone says, 'Gotcha'"), cited in Khandwala et al., supra note 4, at 4 (citing Pistone, supra note 4, at 101).

7.  See Khandwala et al., supra note 4, at 5 (passage was "protection oriented").

8.  See 142 Cong. Rec. S11840 (daily ed. Sept. 30, 1996), cited in Khandwala et al., supra note 4, at 5.

9.  See 142 Cong. Rec. S11838, S11840 (daily ed. Sept. 30, 1996), cited in Khandwala et al., supra note 4, at 5.

10.  See supra note 8.

IFR_AR_014610

asylum and they have one year to do so]."[11] No such advisory ever came about.[12]

## D. *Reactions by Other Authorities*

The United Nations High Commissioner for Refugees (UNHCR) opposed the enactment of the one-year bar.[13] The legacy agency Immigration and Naturalization Service (INS), now Department of Homeland Security (DHS), also opposed it. The INS expressed its apprehension that the filing deadline would "frustrate and hamper efforts [by the agency to reform]."[14] According to the INS, the deadline was unnecessary. The INS had already taken substantial steps to reduce fraud. These included revoking the automatic issuance of work permits, increasing the speed of adjudications, and referring non-meritorious claims to Immigration Court. The acting Deputy Attorney General also opposed the one-year bar's passage.[15]

## E. *DHS's One-Year Bar Regulations*

After its enactment, DHS promulgated regulations controlling application of the one-year bar. These regulations have assumed atypical importance because of the near absence of guidance from either the Board of Immigration Appeals (BIA) or the federal

---

11. See Comments of Rep. Betty McCollum on Pork (America's Talking Television Broadcast Nov. 15, 1995) cited in Khandwala et al., *supra* note 4, at 5, (citing Pistone, *supra* note 4, at 101).

12. The fact that immigrants often have no knowledge of asylum, let alone of a filing deadline is made clear by one IJ's comment that if lack of knowledge about asylum provided an exception to the deadline, "then the statute essentially would never apply." *See* Matter of Anon. (A# redacted) (Immigration Court, Sept. 7, 2004) (CGRS case no. NC0001) (denying the asylum application, but granting withholding of removal to a young Burmese man who endured more than three years of torture while imprisoned for political activism). *See also* Matter of Anon. (A# redacted) (Immigration Court, Feb. 2, 2006) (CGRS case no. 61897) (Peruvian survivor of severe domestic violence at the hands of her domestic partner who worked for the police delayed applying for several years because she did not know the possibility existed) (on file with CGRS).

13. *See* Letter from Rene van Rooyen, UNHCR Representative, to Senator Henry Hyde (Aug. 25, 1995), *cited in* Khandwala et al., *supra* note 4, at 4 (citing Pistone, *supra* note 4, at 103).

14. *See* FDCH Political Transcripts, [sic] *Holds News Conference on the Asylum Reform Efforts* (Jan. 4, 1996), *cited in* Khandwala et al., *supra* note 4, at 4.

15. *See* Letter from Jamie S. Gorelick, Deputy Attorney General, to Sen. Henry Hyde (Sept. 15, 1995), *cited in* Khandwala et al., *supra* note 4, at 4.

IFR_AR_014611

courts.[16] These regulations require the applicant to prove that an exception to the one-year bar applies.[17]

For a *changed circumstance* to provide an exception to the one-year bar, the regulations require that it be material to the asylum claim. An applicant must also file within a "reasonable period of time" of the changed circumstances. The regulations provide a non-exhaustive list of examples of such circumstances: a change in conditions in country of nationality; a change in applicant's circumstances; a change in U.S. law; and termination of dependent status in an immediate relative's application for asylum.

Under the regulations, for an *extraordinary circumstance* to warrant an exception to the one-year bar, it must not be intentionally created by the applicant. The asylum seeker must apply within a reasonable period of time given the extraordinary circumstance. The regulation's non-exhaustive list of examples of such circumstances include: serious illness, mental or physical disability, legal disability, death or serious illness of legal representative, death or serious illness of an immediate family member, and the prior possession of an alternative legal status.

### F. The Asylum Office's One-Year Bar Guidance

In its Asylum Officer Training Manual (Manual), the INS outlined additional considerations and standards relevant to the one-year bar determination.[18] As is also the case with the regulations, the paucity of one-year bar jurisprudence has significantly increased the Manual's influence.

Importantly, the Manual mandates a "flexible and inclusive" approach to evaluating exceptions to the one-year bar. The Manual explains that an applicant must prove by *clear and convincing evidence* that she is applying within one year of her entry into the United States. On the other hand, the applicant must only prove *to the satisfaction* of the AO that an exception excuses the untimely filing.

---

16. *See* Khandwala et al., *supra* note 4, at 5-6. The jurisdiction-stripping provision in the INA, combined with the BIA's practice of "affirmance without opinion," has suspended the development of relevant precedent. The BIA has issued two published opinions and a mere handful of unpublished decisions. *Id.*

17. 8 C.F.R. § 208.4 (a)(4) & (5) (2006).

18. INS, Asylum Officer Training Manual - Lesson Plan Overview: One Year Filing Deadline (Nov. 2001), *available at* http://asylumlaw.org/docs/unitedstates/asylum_officer_training_oneyear_112001.pdf., *cited in* Khandwala et al., *supra* note 4, at 3-4.

IFR_AR_014612

698                 Hastings Int'l & Comp. L. Rev.               [Vol. 31:2

The Manual also provides examples of extraordinary circumstances, beyond those described in the regulations. Among the Manual's examples are: severe family or spousal opposition, extreme isolation, profound language barriers, and profound difficulties in cultural acclimatization. It also mandates that all one-year bar referrals address whether or not conditions have changed in the applicant's home country.

The INS also provides guidance for evaluating whether the duration of time between the changed/extraordinary circumstance and the filing is "reasonable." The Manual describes this analysis as fact-specific and governed by a reasonable person standard. Germane facts include the applicant's education and legal sophistication, the time it took to obtain legal assistance, any effects of persecution or illness, the date the applicant took notice of the changed circumstance, and *any other* relevant factors. The Manual indicates that the applicant should receive the benefit of the doubt in this evaluation. It also indicates that a delay of longer than six months will usually be considered unreasonable.

### G. The Impact of the One-Year Bar

Between 1999 and 2005, Asylum Officers (AOs) denied at least 35,429 claims on account of the one-year bar.[19] Prior to 1996 less than half of all successful claims at *Human Rights First* were filed within one year of the applicant's entry.[20] The *East Bay Sanctuary Covenant (EBSC)* reports that the one-year bar is implicated in approximately eighty percent of its asylum cases.[21] CGRS undertook a survey of hundreds of post-1996 *Survivors International (SI)* case files. Somewhere between 33 percent and 44 percent of these applications were filed out of time.[22]

---

19. *See* conversation with Andrew Schoenholtz, Deputy Director of the Institute for the Study of International Migration, Summer 2006; *see also* Andrew I. Schoenholtz, *Refugee Protection in the United States Post-September 11th,* 36 Colum. Hum. Rts. L. Rev. 323, at 338 n. 62 (2005), *cited in* Shonali Some, *One Year Bar*, May, 2007 (unpublished manuscript, on file with the CGRS).

20. *See* Michael R. Pistone, & Philip G. Schrag, *The New Asylum Rule: Improved but Still Unfair*, 16 Geo. Immgr. L.J. 1, 9 (2001), *cited in* Shome, *supra* note 19, at 3 (The organization's former name was Lawyer's Committee for Human Rights).

21. *See* interview with East Bay Sanctuary Covenant Asylum Program Coordinator Michael Smith, June 27, 2007 (on file with CGRS).

22. Of 231 applications examined, approximately 77 were clearly filed after one year. Twenty-four more cases may have been filed out of time, but limited documentation made confirmation impossible. *Id.*

IFR_AR_014613

Sources also indicate that the application of the one-year bar is increasingly rigid. The percentage of timeliness denials is on the rise. In 1998, 37 percent of late filers were denied asylum, while 51 percent were denied between October 2000 and June 2001.[23] These figures demonstrate the breadth of the one-year bar's impact.

## II. The One-Year Bar is Applied in a Manner that Frustrates Congressional Intent

Narrative and data compiled by CGRS, and detailed below, illustrate that current application of the one-year bar is stringent. Congress' intent that the timeliness rule be applied flexibly is contravened. The Manual's principles of flexibility, inclusiveness and applicant-specific analysis are also ignored. The Manual's additional examples of exceptions are not applied. The regulations' non-exhaustive list of exceptions are narrowly construed, ignored, and applied as if they were prerequisites for relief.

### A. The One-Year Bar Does Not Prevent Fraud

CGRS's database contains countless examples where an AO or IJ explicitly finds an applicant credible, but denies asylum because of the one-year bar. Obviously, in such cases no fraud is at issue. An example is:

- A Taiwanese woman whose husband severely abused both her and her children. After making savage death threats, her husband was jailed in the United States and then deported. He was not placed in custody in Taiwan. The Taiwanese authorities had previously failed to protect the applicant from attempted murder at his hands. The applicant applied for asylum, arguing that her husband's deportation constitute a changed-circumstance exception to the one-year bar. The IJ found the woman credible but denied asylum, in part for failure to satisfy the one-year bar.[24]

CGRS's database also includes numerous cases where the

---

23. *See* Pistone & Schrag, *supra*, note 20, at 2.

24. *See* Matter of Anon. (A# redacted) (Immigration Court, July 3, 2003) (CGRS case no. 992) (the applicant later obtained alternative relief with a U visa)(on file with CGRS).

IFR_AR_014614

applicant was denied asylum because of the one-year bar, but granted a different form of protection from persecution, such as withholding of removal (withholding) or relief under the Convention Against Torture (CAT).    An applicant for withholding or CAT must demonstrate at least a *51 percent* chance that she will be persecuted or tortured in her home country, while an applicant for asylum need only show a *10 percent* chance of persecution.  This means that an IJ has not only determined that such claims are non-fraudulent, but these claims have passed an even more rigorous test than that required for asylum.

Unfortunately for the withholding or CAT recipient, these forms of relief come with strict limitations.  Unlike an asylee, this recipient is ineligible for many societal benefits, lacks any path toward residency or citizenship, and, above all, has no way to bring her child or spouse to the United States to join her.

Examples of CAT or withholding recipients who were denied asylum include:

- A Gambian mother who was married against her will at the age of 15, forcibly subjected to female genital cutting (FGC), suffered years of domestic violence and rape, witnessed domestic violence against her children, and finally escaped to the United States.  As part of her asylum application, she submitted evidence of her diagnosis with Post Traumatic Stress Disorder (PTSD), resulting from the years of abuse.  In spite of this, the IJ denied asylum because of the one-year bar and granted withholding.  The BIA reversed on appeal.[25]

- A Guatemalan domestic violence victim, suffering from PTSD as a result of her abuse.  Because the applicant had maintained employment and paid her bills since her arrival in the U.S., the IJ concluded that her PTSD could not have prevented the applicant from meeting the filing deadline.  The IJ denied asylum and granted CAT and withholding instead.[26]

- A Tanzanian woman whose parents were involved in an opposition political party.  A local policeman demanded

---

25.  *See* Matter of Anon. (A# redacted) (Immigration Court, Feb. 14, 2005) (CGRS case no. 3064)(on file with CGRS).

26.  *See* Matter of Anon. (A# redacted) (Immigration Court, Apr. 18, 2006) (CGRS case no. 3904)(on file with CGRS).

IFR_AR_014615

that the applicant marry him and undergo FGC, despite the fact that she was already married. Because of the applicant's refusal to submit to his demands, her parents were placed in police custody without charge, and tortured. The applicant was then taken into custody in exchange for her parents' release. She was raped, burned, slapped, beaten, starved, deprived of water, and left naked in her cell. She escaped to the United States where she sought shelter and food among strangers who exploited her for financial gain. She filed for asylum 18 months after her arrival. The IJ denied asylum because of the one-year bar, but granted CAT relief. Because neither withholding nor CAT provides a recipient with an opportunity to petition for an immediate relative, the applicant will never be able to reunite with her children who remain in Tanzania.[27]

- A woman from Mali who feared that both she and her three daughters would be forcibly subjected to FGC in her home country. The IJ granted CAT relief but denied asylum because of the filing deadline.[28]

- A Russian lesbian who was sexually assaulted by classmates, expelled from school, and subjected to treatment aimed at "curing" her of her orientation. Her partner was brutally beaten by her own father for having a relationship with the applicant. The applicant came to the United States on a J-1 visa. She applied for asylum after one year and shortly after learning that her partner had been raped and beaten to the point of mental incapacitation. She was granted withholding but denied asylum because she did not file within one year of arrival.[29]

- A woman from the Kikuyu tribe in Kenya. She escaped FGC because her parents opposed the practice. Members of Mungiki sect attacked and raped her because she was one of very few girls in her village who had not undergone FGC. She joined women's groups and educated women and girls about FGC and forced marriage. While helping a girl escape a forced marriage, the applicant was caught,

---

27. *See* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. 1394)(on file with CGRS).

28. *See* Matter of Anon. (A# redacted) (Immigration Court, Apr. 15, 2006) (CGRS case no. 3893)(on file with CGRS).

29. *See* Matter of Anon. (A# redacted) (Immigration Court, July 28, 2004) (CGRS case no. 2920)(on file with CGRS).

IFR_AR_014616

imprisoned and tortured for one week. An IJ granted withholding but denied asylum because the applicant failed to meet the filing deadline.[30]

- A Somali woman fleeing FGC and persecution on account of membership in a minority ethnic clan was smuggled into the U.S. and had no proof of the date she entered. She received withholding and was denied asylum because of the one-year bar.[31]

- An Ethiopian woman who had experienced FGC and other harm due to an imputed connection to an anti-government political group could not establish clear and convincing proof of her entry within one year of application. The IJ denied asylum because of the one-year bar but granted CAT and withholding.[32]

- A 12-year-old indigenous girl fled Guatemala, fearing persecution on account of her actual and imputed political opinion arising out of her father's involvement in the Guatemalan army. She performed agricultural labor to survive until she filed for asylum at the age of 20. By the time of her hearing, she had become a single mother. The IJ denied asylum because of the one-year bar but granted withholding and another form of relief known as Cancellation of Removal.[34]

These examples illustrate that it is common for an IJ to deny asylum based on the deadline and then – in the same opinion – find that it is more likely than not that a woman will face persecution or torture in her home country. Clearly, therefore, the one-year bar is adversely impacting *bona fide*, i.e., non-fraudulent claims. The cases above happened to also meet the requirements for withholding or CAT. Other applicants with equally non-fraudulent claims, barred from asylum by the one-year problem, are unable to meet the heightened burden of proof for withholding or CAT and are denied

---

30. *See* Matter of Anon. (A# redacted) (Immigration Court, Apr. 15, 2005) (CGRS case no. 3154); *see also* Matter of Anon. (A # redacted) (Asylum Office) (East Bay Sanctuary case *B-J-* & *M-*)(on file with CGRS).

31. *See* Matter of Anon. (A# redacted) (Immigration Court, June 1, 2005) (CGRS case no. 2512)(on file with CGRS).

32. *See* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. NC0013)(on file with CGRS).

34. *See* Matter of Anon. (A# redacted) (Immigration Court, May 8, 2006) (CGRS case no. 378)(on file with CGRS).

IFR_AR_014617

all forms of relief (An example is the case of a 10-year-old Pakistani girl as discussed in part C.)

## B. Cases that Meet the Plain Letter of the Regulatory Exceptions are Denied

Another pattern is apparent in CGRS's compilation of cases. Adjudicators deny cases that meet the plain letter of the regulatory exceptions.

### i. Adjudicators Ignore PTSD-Related Avoidance Symptoms Despite the Regulatory Exception

Despite Congress' clear intent to protect victims of persecution who suffer the psychological remnants of trauma, despite the regulations' explicit mandate that the effects of any mental disorders be considered in the one-year bar determination, and despite unchallenged expert testimony in individual cases, adjudicators frequently ignore or reject evidence of the impact of psychological disorders when considering exceptions to timely filing.

Adjudicators commonly misunderstand or ignore the phenomena of "avoidance symptoms" typically experienced by trauma victims who suffer from PTSD.[35] The American Medical Association and the American Psychiatric Association note that individuals suffering from PTSD habitually avoid "people places, thoughts, or activities that bring back memories of the trauma."[36] An IJ who accepts that an applicant is suffering from a psychological disorder, but rejects the causal connection between the disorder and the delay in filing fails to recognize the phenomenon of avoidance symptoms. Some adjudicators conclude that if PTSD did not prevent an applicant from worshiping, giving birth, marrying, working, or studying in her first year after arrival, then it cannot have delayed the application for asylum.[37] This overlooks the glaring fact that the asylum seeking process requires the applicant to describe – at length – none other

---

35. *See* Khandwala et al., *supra* note 4, at 7.

36. *See* PTSD Patient Page 286 JAMA 630, 630 (2001), *cited in* Shome, *supra* note 19, at 4; *see also* Diagnostic Manual, American Psychiatric Association, 309.81 Posttraumatic Stress Disorder (2000), *cited in* Shome, *supra* note 19, at 4.

37. To satisfy the extraordinary circumstances exception to the one-year bar, the applicant must demonstrate that her mental disorder "directly related" to her delay in filing. 8 C.F.R. §208.4 (a)(5) (2006).

IFR_AR_014618

than those events which traumatized her, on numerous occasions and before governmental officials. Worship, childbearing, marriage, employment and education require nothing of the sort.

Examples include:

- A Kenyan woman from the Mungiki sect who fled to the United States in fear of being subjected to FGC. She applied for asylum after the one-year deadline but submitted an evaluation by a psychologist, who diagnosed her with PTSD and Major Depressive Disorder (MDD). The evaluation stated that the applicant's psychological conditions seriously impaired her ability to function. The AO concluded that the applicant's disorders could not have directly related to her delay in filing because the applicant attended church during her first year in the United States.[38] See also the case of the Guatemalan domestic violence victim with PTSD described above, where the IJ concluded that the applicant's PTSD could not have delayed her filing where she paid bills and maintained employment after her arrival.[39]

- A woman from Nepal who was a victim of domestic violence. She was denied asylum for untimeliness, despite her PTSD diagnosis. The IJ concluded that PTSD could not be the cause of the untimeliness because the applicant still suffered from PTSD when she filed for asylum. The Nepali applicant received withholding.[40]

- A Kenyan woman whose mother and grandmother helped her escape FGC as a child. She was subsequently forced to marry a man with three other wives. While raping her to punish her for failing to conceive, her husband discovered she had not undergone FGC. When her husband and tribal elders attempted to subject her to FGC, the applicant attempted suicide. She was unconscious and hospitalized for four months. When she recovered her husband beat and raped her again. When the applicant fled to her pastor's house, her husband burned the house down. The

---

38. *See* Matter of Anon. (A# redacted) (Immigration Court, Apr. 22, 2005) (CGRS case no. 3267)(on file with CGRS).

39. *See* Matter of Anon. (A# redacted) (Immigration Court, Apr. 18, 2006) (CGRS case no. 3904); *see also* Matter of Anon. (A# redacted) (Immigration Court, Oct. 8, 2002) (CGRS case no. NC0003)(on file with CGRS).

40. *See* Matter of Anon. (A# redacted) (Immigration Court, June 18, 2002) (CGRS case no. 2545) (on file with CGRS).

IFR_AR_014619

> applicant fled to the U.S. on a tourist visa and applied for
> asylum after the one-year deadline had passed. The IJ
> accepted her diagnosis of PTSD but rejected her
> contention that it was directly related to her delay in filing.
> The IJ reasoned that the applicant had exhibited
> "entrepreneurial skills" by caring for children to raise
> money while she was homeless and isolated, and because
> her *pro se* application was well written and articulate.
> Asylum was denied. She received withholding.[41]

Even more alarming are those cases where the failure to recognize psychological trauma results in the denial of *all* relief. In such cases, the applicant is sent back to the country of persecution.

### ii. *Adjudicators Replace Expert Testimony with Personal Speculation and Conjecture about the Behavioral Impacts of Psychological Disorders*

Despite the significance Congress assigned to the residual effects of trauma, and notwithstanding expert testimony to the contrary, IJs regularly reject the idea that psychological disorders delay applications.

An example is:

> • An Albanian teenager who was kidnapped by a trafficker,
> held captive, and raped and battered while plans were
> made to traffic her into prostitution. The adolescent
> escaped but could not return home for fear of being
> recaptured. She fled to the United States, entered as an
> unaccompanied minor, and applied for asylum 13 months
> after entering the country (and while still a minor). In
> immigration court, she presented the testimony of a clinical
> psychologist who diagnosed the applicant with PTSD and
> MDD. The clinical psychologist testified that the
> applicant's psychological conditions prevented her from
> speaking about the trauma she had been subjected to.
> Despite this expert testimony, the IJ concluded that the
> applicant could easily have rectified her feelings of shame
> by seeking out an attorney. The BIA dismissed the young
> woman's appeal.[42]

---

41. *See* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. 3123)(on file with CGRS).
42. *See* Matter of Anon. (A# redacted) (Immigration Court, Feb. 5, 2004) (CGRS case no. 1034)(on file with CGRS).

IFR_AR_014620

　　　　　　Hastings Int'l & Comp. L. Rev.　　　　　　[Vol. 31:2

In the aforementioned case the IJ's disregard for expert testimony and reliance on personal speculation and conjecture is conspicuous. The same flaw is apparent, although not as explicit, in the overwhelming number of cases where an IJ fails to find extraordinary circumstances despite credible expert testimony that: (1) the applicant suffers from a medically recognized psychological disorder and (2) that disorder caused the delay in filing.

The pattern continues:

- A South African woman appealed to that country's police but received no protection from beatings and rape at the hands of her domestic partner. Her partner kidnapped their son and used access to the child as leverage for demands. The woman fled to the United States with her son and applied for asylum. She feared that her partner would beat, rape, and kill her for taking their child. She submitted a psychologist's assessment diagnosing her with PTSD. Despite the expert evidence, the IJ applied the one-year deadline, and barred her application. The IJ concluded that she did meet the requirements for withholding.[43]

- A Mexican homosexual man who entered the country without inspection at 18 years old, applied for asylum and presented evidence of his PTSD diagnosis. As a child, an older sibling subjected him to physical, mental and sexual abuse. He witnessed harassment and discrimination against homosexuals in Mexico, as well as the authorities' unwillingness to protect such individuals. In the United States, the traumatized young man asked immigration attorneys about legal protection on the basis of sexual orientation but was given no encouragement. Finally, in 2000, he learned about the possibility of asylum for gay men from Mexico. He applied, but his legal representative failed to indicate his sexual orientation in the application. Too traumatized to tell the AO about the abuse he had endured, the applicant was referred to immigration court where he accepted a stipulation for withholding.[44]

---

43. *See* Matter of Anon. (A# redacted) (Immigration Court, June 12, 2006) (CGRS case no. 4000)(on file with CGRS).

44. *See* Matter of Anon. (A# redacted) (Immigration Court, Mar. 31, 2005) (CGRS case no. NC0007)(on file with CGRS).

IFR_AR_014621

### iii. Refusal to Recognize the Effects of Trauma Creates Senseless Outcomes

The failure to recognize that PTSD and other psychological disorders may delay an individual's application for asylum can produce illogical and incongruous results as a matter of policy. Most PTSD conditions recorded in the CGRS database are triggered by incidents of past persecution. Therefore applicants suffering from PTSD are more likely to have *already* experienced physical and emotional harm than other applicants, who may base their claims on their reasonable fear of *future* harm. The failure to apply the PTSD exception to the one-year deadline thus means that cases involving past persecution will be rejected at a higher rate than cases based solely on the fear of future persecution. This is not the outcome anyone envisioned.

The lack of recognition of reduced mental capacity is out of step with policy in other areas of American law. American criminal law acknowledges that reduced mental capacity reduces culpability because it hampers decision-making.[45] Refugees, the innocent victims of violence and torture, deserve no less consideration than criminals.

### iv. Unaccompanied Minors are Denied Asylum for Failure to File Within One Year Despite the Regulatory Exception

Despite the fact that the regulation designates unaccompanied minor status among its list of examples of extraordinary circumstances excusing untimely filing, adjudicators apply the one-year bar to preclude claims presented by unaccompanied minors. The case of the Albanian teenager described above is one example of this.

In a landmark case in 2002, the *en banc* BIA held that entrance as an unaccompanied minor does not provide a *per se* exception to the one-year bar. *See Matter of Y-C-*, 23 I & N Dec. 286 (BIA 2002). In that case, the applicant entered without inspection at the age of fifteen and was detained for the duration of the year following his arrival. The applicant submitted a written application for asylum five

---

45. *See* U.S. Federal Criminal Sentencing Guidelines, § 5K2.13. Diminished Capacity (Policy Statement), *cited in* Shome, *supra* note 19, at 7; *see also* United States v. Cantu (1993, CA9 Wash) 12 F.3d 1506 (holding that "reduced mental capacity" under § 5K2.13 comprehends ... behavioral disturbances that impair formation of reasoned judgments, and defendant suffering from post-traumatic stress disorder, an emotional illness, was eligible for [downward sentencing] departure if his ailment distorted his reasoning and interfered with his ability to make considered decisions), *cited in* Shome, *supra* note 19, at 7.

IFR_AR_014622

months after his release, and just after his seventeenth birthday. The IJ rejected that application. The minor filed another application five months later. The IJ rejected the second application as untimely. The Board found that this particular applicant's status as an unaccompanied minor, together with his year-long detention, did constitute extraordinary circumstances. The Board held, however, that "we are not required to excuse the respondent's tardy filing *merely* because the regulation includes unaccompanied minor status as a *possible* extraordinary circumstance." *Id.* at 288 (emphasis added). Six concurring Board members wrote separately - but made no objection regarding the absence of a *per se* rule for unaccompanied minors.

### v. Applicants with Seriously Ill Immediate Family Members are Denied Asylum for Failure to File Within One Year, Despite the Regulatory Exception

CGRS's database contains numerous examples of applicants whose immediate family members fell ill during the critical one-year period post arrival. Adjudicators routinely fail to apply the regulatory exception for applicants with seriously ill immediate family members.

An example is a female victim of domestic violence from Jordan who left her husband while visiting the United States. For this transgression of cultural norms, she feared honor-killing in Jordan. After leaving her husband, she and her *terminally ill* minor child took up residence in a shelter. Her application for asylum was denied for failure to present an exception to the deadline. She was granted deferred action.[46]

### vi. Cases Based on a Changed Circumstance are Denied for Failure to File Within One Year, Despite the Statutory and Regulatory Exception

Despite clear Congressional intent to the contrary, adjudicators often deny claims arising from a changed circumstance. The case of the Russian lesbian who applied shortly after learning that her partner was beaten and raped to the point of mental incapacity (above), is one example of this. Another example is that of an

---

46. *See* Matter of Anon. (A# redacted) (Immigration Court, Jan. 15, 2005) (CGRS case no. 2562)(on file with CGRS).

IFR_AR_014623

Afghan woman who gave birth to two children out of wedlock in the United States. As a result she feared honor-killing by her father and brothers in Pakistan. She also feared harm in Afghanistan for transgressing cultural norms there. She asserted an exception to the one-year bar based on the changed circumstance of the birth of her two children out of wedlock. Asylum was denied. She received withholding.[47]

## C. Adjudicators Interpret the Non-Exhaustive List of Exceptions as Exhaustive

Contrary to Congressional intent that the analysis be applicant-specific (above), and the plain language of the regulations, the regulatory list of exceptions to the one-year bar is being interpreted as exhaustive. One example is the case of the 10-year-old daughter of Shi'a Muslim parents from Pakistan. Her parents fled Pakistan with her after receiving death threats and attempts on their lives. The girl's father submitted an asylum application and the family's attorney assured the girl and her mother that they would "automatically" be granted asylum if the father/husband was. The girl's father was eventually granted withholding and denied asylum. Upon learning that the girl and her mother could not benefit from his status, they submitted their own applications for asylum. By this time, more than one year had passed since their entry. The IJ reasoned that because status as an *"unaccompanied* minor," was among the regulation's enumerated extraordinary circumstance, the 10-year-old's status as an *accompanied* minor could not be an exception. The IJ denied all relief and ordered the girl removed from the United States. He granted her mother withholding of removal.[48]

## D. DHS and DOJ Inconsistently Apply a Presumptive Definition of a 'Reasonable' Period of Time Within Which to File After a Changed/Extraordinary Circumstance

DHS's stated position is that waiting longer than six months after a changed or extraordinary circumstance is presumptively unreasonable.[49] This presumption is not in accordance with the

---

47. *See* Matter of Anon. (A# redacted) (Immigration Court, June 15, 2002) (CGRS case no. 654)(on file with CGRS).

48. *See* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. NC0011)(on file with CGRS).

49. *See* INS, Asylum Officer Training Manual, *supra* note 18.

IFR_AR_014624

710                 Hastings Int'l & Comp. L. Rev.                [Vol. 31:2

statute. When Congress enacted the one-year bar, it made explicit its understanding that 12 months is a reasonable time within which to file for asylum. The Afghan applicant described above, for example, had no reason to fear persecution in Afghanistan prior to the birth of her first child out of wedlock. After the occurrence of the facts that give rise to her claim, she too should be allowed one year within which to file. There is no reason to obligate her to apply for asylum more quickly than another applicant. The Department of Justice (DOJ) also appears to have embraced the six-month presumption in denying asylum claims.[50] It does not, however, apply the logical inverse counterpart of that presumption where it would benefit the applicant.

For example:

- A Yemeni man applied for asylum within five weeks of learning that his application for an extension of visitor status had been denied. He was denied asylum when an IJ determined that his *five-week* long delay was not reasonable. The IJ also found that the applicant's pending extension application was not an "event or factor beyond the alien's control" and therefore was not an extraordinary circumstance. The BIA affirmed the IJ's denial. The U.S. Court of Appeals for the Ninth Circuit denied his petition for review, stating that the applicant could have filed during his first year in the United States.[51]

- A woman from Togo filed an asylum application five months after her student visa reinstatement application was denied. Her application for asylum was denied for failure to satisfy the one-year bar despite her fear that her parents would force her, like her two older sisters, to undergo FGC. The Immigration Judge granted asylum after the case was referred.[52]

---

50. *See* 65 Fed. Reg. 76, 121, 76, 123 (Dec. 6, 2000) (to be codified at 8 C.F.R. pt. 208).

51. *See* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. NC0008) (on file with CGRS); Al-Haiki v. Gonzales, No 04-76593, 05-74155 slip op. (9th Cir. June 1, 2007) (denying petition for review); Al-Haiki v. Gonzales, No 04-76593, 05-74155 slip op. (9th Cir. July 9, 2007) (denying petition for rehearing and request for rehearing en banc).

52. *See* Matter of Anon. (A# redacted) (Asylum Office March 2004) (CGRS case no. 4517), reversed by Matter of Anon. (A# redacted) (Immigration Court, Dec. 19, 2006) (CGRS case no. 4517)(on file with CGRS).

IFR_AR_014625

## III. The Current Application of the One-Year Bar Returns *Bona Fide* Refugees to Countries Where They Fear Persecution

As the examples above demonstrate, in many of the cases where an applicant is denied asylum for failure to apply within one year, no other form of relief is available. Attorneys report that the one-year bar is the sole reason that many of their cases fail. This, together with the inflexible application of the statutory exceptions, places the U.S. in violation of its international obligations. The United States ratified the 1967 U.N. Protocol Relating to the Status of Refugees, which incorporates the 1951 Convention Relating to the Status of Refugees. Congress brought domestic law into accordance with international law *via* the 1980 Refugee Act.[53] The 1967 Protocol states that "no Contracting State shall expel or *refoule* (return) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of race, religion, nationality . . ." In returning an asylum applicant to her home country for the sole reason that she failed to apply within one year of arrival, we are not only refusing her protection for "technical difficulties," as Senator Abraham feared might happen (above), we are returning her to the frontier of a territory where her life or freedom would be threatened on account of a protected ground.

One example of this is a Guinean woman, who was forcibly subjected to FGC at the age of 6. She then refused an arranged marriage to a man 50 years her senior. Her uncle beat her and threatened her life for refusing. The applicant fled to the United States where she gave birth to two daughters. If returned to Guinea she risked death for dishonoring her family and feared that her daughters would be subjected to FGC. The IJ denied asylum because of the one-year bar and ordered her removed to Guinea.[54]

The UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees, (Handbook) states that technical problems should not bar consideration of a legitimate asylum claim.[55] Indeed, the United States is the only one of the top

---

53. *See* INS v. Cardoza-Fonseca, 480 U.S. 421 (1987).

54. *See* Matter of Anon. (A# redacted) (Immigration Court, Sept. 19, 2005) (CGRS case no. 3301)(on file with CGRS).

55. United Nations High Commission for Refugees Handbook on Procedures

IFR_AR_014626

712                    Hastings Int'l & Comp. L. Rev.              [Vol. 31:2

five refugee-receiving countries that mechanically applies a time bar to asylum applications.[56] (Spain has a *de jure* timeliness rule but it is not automatically administered).[57] Notably, the recently adopted European Union Asylum Procedure Directive includes no time bar.[58]

## IV. The One-Year Bar Causes Numerous Other Adverse Policy Consequences

### A. Limited Federal Jurisdiction and the BIA Practice of 'Affirming Without Opinion' Invites Caprice

The jurisdiction stripping provisions of the INA applicable to one-year bar determinations discussed above, have meant a near absence of guidance from the federal courts.[59] Together with the BIA's recent practice of affirming IJ decisions without opinion, this means that judicial or quasi-judicial guidance on these complicated legal issues is scant. The BIA has published only two decisions on the one-year bar.[60] There are also only a handful of unpublished BIA cases on point.

This deficit of published decisions frustrates Congress' aim to oversee the implementation of the one-year bar. It also allows arbitrariness to go unchecked. The outcome of a one-year bar determination is likely to turn on which IJ is assigned to the case. According to practitioners, IJs vary widely in the weight they assign to psychological evaluations and differ dramatically in the degree to which they understand why an asylum seeker might not come forward immediately.[61] Other attorneys report that the level of sympathy a

---

and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees at ¶ 190.

56. *See* United Nations High Commission for Refugees, Asylum Levels and Trends in Industrialized Countries, 5 (2005).

57. Conversation with Spanish refugee attorney Carmen Miguel Juan, *cited in* Shome *supra* note 19, at 6 (on file with CGRS).

58. *See* Council Directive 2005/85/EC of December 1, 2005, available at <http://eur-lex.europa.eu/LexUriServ/site/en/oj/2005/l_326/l_32620051213en00130034 .pdf>(visited March 28, 2008).

59. As noted briefly in Part I above, the Real ID Act significantly impacts the INA's jurisdiction-stripping provisions. *See, e.g., Ramadan v. Gonzales,* 479 F.3d 646 (9th Cir. 2007); *see also* Chen v. U.S. DOJ, 471 F.3d 315, 326-27 (2d Cir. 2006).

60. Matter of A-M-, 23 I. & N. Dec. 737 (BIA 2005) and Matter of Y-C-, 23 I. & N. Dec. 286 (BIA 2002).

61. *See* Shin-Ming Wong & Neela Otoku Chakravartula, How the One-Year Filing Deadline Has Affected Asylum Seekers in the United States 2 (May, 2007)

IFR_AR_014627

case garners determines the outcome of the case's one-year issue.[62] Several prototypes of caprice stand out:

- A Kenyan woman whom the police persecuted for her involvement with a political opposition group. The applicant also feared forcible FGC after two of her sisters were subjected to it and one died from complications. The applicant fled to the United States. After arrival, she married a U.S. citizen. Her husband filed an immigration petition on her behalf but soon began to drink heavily and was verbally abusive. The applicant attempted reconciliation with her husband but he withdrew his petition and asserted that the marriage had been fraudulent. By this time one year had already passed. The IJ found that the applicant "should have known" that her marriage was faltering and that she would need to find an alternative status in order to maintain a lawful presence. The IJ applied the one-year bar to deny her asylum claim, but granted withholding and CAT. On cross appeal the BIA sustained the denial of asylum and reversed the grants.[63]

- A Gambian woman was subjected to FGC against her will before she fled to the United States in 1994, three years before the one-year bar came into effect. A non-lawyer helped her fill out her asylum application. While in the U.S., she later gave birth to seven U.S. citizen children, including several daughters. She feared that they would also be forced to undergo FGC. Her retained lawyer promised but failed to update her application to include FGC in her claim. He later disappeared requiring her to make many court appearances without counsel. In 2003,

---

(unpublished manuscript, on file with CGRS) (*citing* interviews with Cara Jobson, immigration attorney (Oct. 24, 2006), Alison Dixon, immigration attorney (Oct. 25, 2006), and Paul O'Dwyer, immigration attorney (Sept. 28, 2006)).

62. According to one attorney, all of her clients who had undergone FGC were granted an exception to the deadline. *Id.* Another attorney reports that "normative" judgments determine the outcome of timeliness verdicts. *Id.*

63. *See* Matter of Anon. (A# redacted) (Immigration Court, Sept. 2, 2004) (CGRS case no. 4244); reversed in part by Matter of Anon. (A# redacted) (Board of Immigration Appeals, July 27, 2006)(on file with CGRS). The BIA remanded for an order of removal. The IJ granted voluntary departure and denied the applicant's motion to reconsider and reopen the earlier decision. See Matter of Anon. (A# redacted) (Immigration Court, January 4, 2007) (CGRS case no. 4244) (CGRS case no. 4244). The appeal of the denial of the motion to reconsider is pending before the BIA (on file with CGRS).

IFR_AR_014628

she obtained new representation and immediately filed an amended application and supporting documents that included the FGC claim. Neither the government attorney nor the IJ objected to the amended application. A few months later, the case was transferred to another IJ for the merits hearing. The IJ found the applicant eligible for asylum but held that the applicant should have filed an amended application within one year of IIRIRA's effective date, and found that no exceptions applied. The IJ also found her ineligible for withholding. After her attorneys filed an extensive brief on appeal, the BIA remanded and ordered the IJ to grant asylum.[64]

## B. The One-Year Bar Causes Inefficiency and Waste

### i. The One-Year Bar Causes Excessive Referrals from the Asylum Office

Asylum practitioners report that the one-year bar causes most of their referrals to Immigration Court.[65] A survey of two years of cases referred to *Survivors International* confirms this as well. One practitioner reports that AOs refer cases under the one-year bar where they are otherwise reluctant to grant.[66] This surge in referrals undermines the very purpose the Asylum Office was created. The former INS established this office to make the asylum process more humane and more efficient.[67]

If the one-year bar shifts the burden of adjudicating asylum claims from the Asylum Office to the Immigration Court, the outcome is waste and inefficiency. When an IJ re-adjudicates an affirmative asylum claim, not only is the case presented and determined twice (once before the AO and once before the IJ), but three separate government employees take part in the adjudication: the AO, the IJ, and the DHS Trial Attorney (TA). When an AO

---

64. *See* Matter of Anon. (A# redacted) (Immigration Court, Oct. 6, 2003) (CGRS case no. 1162)(on file with CGRS).

65. Wong & Chakravartula, *supra* note 61, at 8 (*citing* interviews with Alice Hall, immigration attorney (Oct. 25, 2006) and Joye Wiley, immigration attorney (Oct. 4, 2006)).

66. *See id.* at 9 (*citing* interview with Alison Dixon, immigration attorney (Oct. 25, 2006)).

67. *Id.* at 8 (*citing* INS Opens Asylum Offices Amid Large Backlogs, Charges of Inadequate Funding, 68 No. 13 Interpreter Releases 401 (1991)).

IFR_AR_014629

adjudicates the claim, the cost to the taxpayers is the salary of one government employee, rather than three.

Another result of this shift is the squandering of expertise. IJs are responsible for all immigration cases and lack the AO's particular focus on, and training in, asylum matters. Even within the interview process before the AO, the one-year bar determination is highly resource intensive. Representatives report that "virtually the entire interview" is taken up with testimony about the one-year bar.[68]

### C. The One-Year Bar Deters Legitimate Asylum Claims

Where the one-year bar is at issue, attorneys may discourage clients from filing – even where arguable exceptions exist. Affirmative applicants[69] have much to lose by coming forward and a low likelihood of prevailing if the one-year bar is implicated.

Documented examples of attorney discouragement include:

- An applicant with severe symptoms indicative of PTSD and MDD, was told by her prior attorney that no refuge was available to her in the United States because of the one-year bar.[70]

- An applicant who entered the country as an unaccompanied minor and was diagnosed with PTSD and MDD. Despite the existence of two sets of facts giving rise to independent exceptions, the NGO that counseled her also told the applicant no relief was available.[71]

### D. The One-Year Bar Disproportionately Impacts Detained Persons

Physicians for Human Rights reports that detained asylum seekers have "extremely high symptom levels of anxiety, depression and post-traumatic stress disorder."[72] Together with limited access to

---

68. *See* Interview with Josh Caplan EBSC, CGRS Refugee Rights Clinic, Spring 2006, *cited in* Shome, *supra* note 19, at 2 (on file with CGRS).

69. "Affirmative applicants" are those asylum seekers who are not in removal proceedings and are contemplating bringing themselves to the attention of the immigration authorities by submitting an asylum application.

70. *See* Matter of Anon. (A# redacted) (CGRS one-year bar case no. 51761)(on file with CGRS).

71. *See* Matter of Anon. (A# redacted) (CGRS one-year bar case no. 51758)(on file with CGRS).

72. *See* Physicians for Human Rights and the Bellevue/NYU Program for

IFR_AR_014630

counsel, this means that these individuals are more likely to delay their applications. The case of *Y-C-*, above, illustrates this point. There, the unaccompanied, detained minor did not apply until five months after his release.[73] It is conceivable that this delay would have been avoided if there were in fact a notice program like the one Representative McCollum envisioned ("the Immigration Service would be required to tell people who came in [about asylum and the one-year bar]").[74] Detained persons may also experience greater difficulty obtaining the psychological services necessary to both their recovery and their asylum claim.

### E. The One-Year Bar Disproportionately Impacts Unaccompanied Minors

The *Y-C-* case described above provides precedent for adjudicators to deny the applications of unaccompanied minors for failure to submit an application within twelve months of entry. While the Board found that an exception applied in that particular case, the majority outlined the rule that "we are not required to excuse [an unaccompanied minor's] tardy filing merely because the regulation includes unaccompanied minor status as a possible extraordinary circumstance."[75] Unaccompanied minor status will therefore not always excuse untimely filing. An example is the case of the psychologically impaired Albanian teenager who filed one month late and was denied.[76]

### F. The One-Year Bar Disproportionately Impacts Groups of Applicants Where Stigma Delays Filing

A victim of persecution may delay applying for asylum or may not divulge crucial information to her attorney where certain cultural stigmas impair disclosure. Such victims include women, victims of sexual violence, rape survivors, victims of domestic violence, lesbian, bisexual, gay and transgender persons, and HIV-positive individuals. Because applicants often hire immigration attorneys from the same

---

Survivors of Torture, *From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers* at 1 (2003).

73. Matter of Y-C-, 23 I & N Dec. at 286.

74. *See* Comments of Rep. McCollum, *supra* note 11.

75. Matter of Y-C-, 23 I & N Dec. at 288.

76. *See* Matter of Anon. (A# redacted) (Immigration Court, Feb. 5, 2004) (CGRS case no. 1034) (on file with CGRS).

IFR_AR_014631

cultural background, the same obstacles to disclosure apply.

Eighty percent of gender-based asylum claims involve a diagnosis of PTSD.[77] These individuals are therefore more likely to experience trauma-based obstacles to timely filing. Many victims experience feelings of shame, as documented in *SI's* case files. For example, in one *SI* case, a victim of incest, physical abuse and rape found it very difficult to relate these things and only did so when it appeared she had no other choice.[78]

Victims of stigma-inducing persecution may also fear revealing past events to current partners. In many cultures shame attaches to victims of rape. In others, domestic violence is not discussed. An example is:

> • A Guatemalan domestic violence victim survived attempted murder by her influential husband, who followed her to the United States. The woman was afraid to tell the authorities about her husband because of his influence. She also had difficulty telling her lawyer what had happened to her because he was male.[79]

Lesbian, gay, bisexual and transgender persons also experience greater obstacles to timely filing.[80] Individuals are often not aware that protection exists for persons with these characteristics.[81] Until 1990, U.S. law continued to designate homosexuality as a ground of inadmissibility. U.S. anti-sodomy laws were first found to be unconstitutional as recently as 2003. Immigration policies restrict entry for HIV-positive individuals to this day.

---

77. Preliminary findings in a study conducted by Survivors International (on file with CGRS).

78. *See* Matter of Anon. (A# redacted) (CGRS one-year bar case no. 61913) (on file with CGRS).

79. *See* Matter of Anon. (A# redacted) (Asylum Office, date unknown) (CGRS one-year bar case no. 51761); *see also* Matter of Anon. (A# redacted) (CGRS one-year bar case no. 51762); *see also* Matter of Anon. (A# redacted) (CGRS one-year bar case no. 51759); *see also* Matter of Anon. (A# redacted) (Asylum Office, August, 2006) (CGRS one-year bar case no. 61913); *see also* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. MW0008)(on file with CGRS).

80. *See* Wong & Chakravartula, *supra* note 61, at 6-7 (*citing* Victoria Neilson & Aaron Morris, *The Gay Bar: The Effect of the One-Year Filing Deadline on Lesbian, Gay, Bisexual, Transgender, and HIV-Positive Foreign Nationals Seeking Asylum or Withholding of Removal*, 8 N.Y. CITY L. REV. 233 (2006)).

81. *See e.g.,* Matter of Anon. (A# redacted) (did not seek asylum) (CGRS case no. MW0007)(on file with CGRS).

IFR_AR_014632

718                    Hastings Int'l & Comp. L. Rev.                [Vol. 31:2]

The case of a Malaysian lesbian illustrates this pattern of delay. Familial and societal pressure led the lesbian applicant to marry a husband. Her husband was mentally and physically abusive. The applicant fled to the United States, where she isolated herself from both the Asian and the lesbian community for fear of rejection and condemnation. She sought immigration assistance soon after entering the country but sexual orientation had not yet been recognized as a basis for asylum. Years passed before the applicant filed. She testified that she could not have testified clearly to her lesbian identity at time of first entry and was still struggling with her lesbian identity, despite having had a female partner for many years. The applicant was granted asylum at the Immigration Court.[82]

### G.  The One-Year Bar Disproportionately Impacts Socio-economically Disadvantaged Persons

While asylum applicants have the right to representation in immigration proceedings, that representation is at their own expense. Because the vast majority of applicants are not permitted to work lawfully in this country and many have exhausted their resources in flight, asylum applicants have limited funds. Many appear without counsel. Lack of experience with the American legal system and unfamiliarity with the language add to their difficulty in establishing the date of entry by clear and convincing evidence.

Impoverished applicants who enter the country through the desert on foot, or as stowaways, do so without inspection and have no plane ticket to prove their date of entry.[83] Even if the applicant has a lawyer, the advocate spends a significant portion of the interview soliciting testimony regarding the border crossing date in order to meet the "clear and convincing" standard.[84]

Relevant instances include:

- A 21- year-old Sikh man who fled India after multiple detentions and tortures. He entered without inspection and applied for asylum. The applicant submitted news

---

82.  *See* Matter of Anon. (A# redacted) (Immigration Court, Jan. 7, 2005) (CGRS case no. NC0006).

83.  Wong & Chakravartula, *supra* note 61, at 3 (*citing* Letter of Complaint from East Bay Sanctuary Covenant (Mar. 17, 2003)(on file with CGRS)).

84.  *See id.* at 4 (*citing* interview with Michael Smith, Asylum Program Coordinator, East Bay Sanctuary Covenant (Nov. 10, 2006))(on file with CGRS).

IFR_AR_014633

reports and published photographs of himself outside of the U.S. less than one year before he entered. Notwithstanding this documentary evidence, the IJ held that the applicant was not credible, and that he had not met his burden of proving the date of entry. The BIA affirmed the IJ's decision without opinion and denied the applicant's motion to reconsider.[85]

- An Ethiopian woman fearing FGC and harm based on her imputed political opinion applied for asylum within six months of entering the country, but her testimony about her entry date was unreliable because of the extreme stress of her border crossing. The IJ found that she had not carried her burden of showing that she had applied within one year of her entry by clear and convincing evidence. The IJ denied asylum and granted withholding.[86]

Where an individual is subject to the one-year bar, but exceptions may apply, cost is also an obstacle. Establishing an exception to the deadline is resource intensive. The exceptions are highly technical, requiring expert assistance. Necessary psychological evaluations are costly, averaging between $650 and $1,000, and more if the expert's testimony is required.[87]

## H. The One-Year Bar Begets Covert "Settlements" with DHS

Attorneys report that DHS counsel sometimes offer withholding or CAT in exchange for the applicant's withdrawal of the asylum claim.[88] Examples include:

- An applicant was raped and beaten over a number of years. A psychologist diagnosed her with PTSD, MDD, chronic insomnia and chronic pain. The psychologist explained that these conditions delayed her application for asylum and affected her ability to explain why she applied late. The AO referred her to Immigration Court where the

---

85. *See* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. NC0009).

86. *See* Matter of Anon. (A# redacted) (Immigration Court, date unknown) (CGRS case no. NC0013).

87. *See supra* note 21.

88. *See id.* at 2 (*citing* interview with Joyce Wiley, immigration attorney (Oct. 4, 2006) and Cara Jobson, immigration attorney (Oct. 24, 2006)).

IFR_AR_014634

TA offered withholding if she withdrew her asylum claim. The applicant agonized over the choice, as it would strand her minor children in the home country. She accepted the offer, after which the TA remarked that she really must have had a well-founded fear of persecution.[89]

- A woman from Mali was subjected to FGC as a child. After the birth of her daughter in the United States she submitted an asylum claim based on her fear that her daughter would also be subjected to that fate. The TA negotiated with the applicant. The TA would not oppose a grant of withholding in exchange for withdrawal of the asylum claim. Terrified of losing her asylum claim and being forced to return to Mali, the applicant agreed to withholding, stranding her 7-year-old child in Mali with no prospect for reunification. The applicant must report periodically to removal officers and reapply annually to renew authorization to work.[90]

- A Filipina woman, suffering from PTSD after years of sexual and physical domestic violence at the hands of her husband (a political hit-man, charged with two murders) accepted the Trial Attorney's offer to not oppose withholding, in exchange for withdrawal of the asylum claim. Her husband maintains custody of their daughter. After the applicant was granted withholding, the United States Citizenship and Immigration Service denied her daughter's application for parole into the United States.[91]

- A gay Mexican male accepted withholding at the Immigration Court after referral from the AO (above).

- An Uzbekistani asylum seeker accepted a compromise of withholding in exchange for dropping the asylum claim because of one-year bar issues.[92]

---

89. *See* Matter of Anon. (A# redacted) (Immigration Court, June 15, 2003) (CGRS case no. NC0021); *See also* Matter of Anon. (A# redacted) (CGRS one year bar case no. 51706)(on file with CGRS).

90. *See* Matter of Anon. (A# redacted) (Immigration Court, May 13, 2005) (CGRS case no. 970)(on file with CGRS).

91. *See* Matter of Anon. (A# redacted) (Immigration Court, March 15, 2004) (CGRS case no. 1256)(on file with CGRS).

92. *See* Matter of Anon. (A# redacted) (Immigration Court, date unavailable) (CGRS case no. 3748)(on file with CGRS).

IFR_AR_014635

Outside the asylum area, the settlement of cases can be a useful and appropriate means to clear crowded dockets and enable parties to avoid protracted litigation. But in dealing with refugees fleeing persecution, it is not clear that offering an asylum applicant withholding is an appropriate use of DHS's prosecutorial discretion. The fact that a terrified, psychologically stressed, financially impoverished applicant accepts a "deal" does not necessarily mean that the United States is fulfilling its international obligations under the Refugee Convention or that DHS is providing *bona fide* refugees with the safe haven Congress envisioned.

## I. The Refugee Population is Shifted into Withholding and CAT Statuses

As the examples listed in previous sections demonstrate, many individuals who would receive asylum, but for the one-year bar, instead receive the protection of withholding or relief under the CAT. Withholding and CAT prevent removal from the United States and entitle the recipient to a work permit. These statuses do not, however, provide any path to lawful permanent residence or citizenship. This gives rise to a growing class of persons with no future return to their home countries, no path to citizenship in their adopted country, and no foreseeable ability to vote and partake in the political process in their new home.

Most importantly, unlike asylum, these statuses do not allow the protected person to petition for reunification with her child or spouse. In many cases, this means that a protected person is powerless to help her child escape ongoing persecution in her country of origin. One example of this is the case of the Gambian mother described above whose children remain in Gambia where they are beaten and abused by their father. Another is that of the woman from Mali described above, with a U.S.-citizen-infant-daughter and a 7-year-old in Mali, who accepted DHS's non-opposition to a grant of withholding and duly withdrew her asylum claim.

These women are the "lucky" ones. Even more troublesome is the fate of those individuals who cannot show the 51 percent likelihood of persecution necessary for withholding or CAT relief. Such individuals may well have been able to show a 10 percent likelihood of persecution, but are instead returned to countries where they have a reasonable fear of persecution after a 12-month technicality triggers an automatic denial.

IFR_AR_014636

### J. The One-Year Bar Penalizes Applicants Who Seek Other Forms of Relief During the First Year of Entry

Asylum applicants who attempt to maintain or obtain alternative lawful status during their first year are penalized. For example, a Hindu preacher from Bangladesh, like the Yemeni visitor described above, was penalized for relying on an alternative immigration status before submitting an asylum application. The Hindu preacher experienced torture, violence, harassment, beatings, and was forced to violate his religious beliefs in Bangladesh. He came to the United States and was working with a religious organization. He believed that he would be granted a religious worker visa but it was denied. Receiving the denial, he applied for asylum but was precluded for tardiness. He was found to qualify for withholding and did not appeal the asylum denial. His wife remains in Bangladesh and is at risk. The preacher has no means of reuniting with his wife.[93]

This contravenes DOJ's own published policy:

> The Department does not wish to force a premature application for asylum in cases in which an individual believes circumstances in his country may improve, thus permitting him to return to his country. For example, an individual admitted as a student who expects that the political situation in her country may soon change for the better as a result of recent elections may wish to refrain from applying for asylum until absolutely necessary.[94]

## VI. Recommendations

The examples listed above demonstrate that legislative intent is frustrated by the current application of the one-year bar. The one-year bar has no impact on fraudulent claims. It does, however, cause the *refoulement* of legitimate refugees, in violation of international obligations. The one-year bar, in its current form, leads to arbitrary and disparate outcomes, deters *bona fide* claims, and squanders precious administrative resources. CGRS therefore recommends

---

93. *See* Matter of Anon. (A# redacted) (CGRS case no. MW0001)(on file with CGRS).

94. 65 Fed. Reg. at 76, 121-01.

IFR_AR_014637

abandoning the one-year bar in its entirety. This would place the U.S. in the same position as the other top refugee-receiving countries.

Other measures to consider include: (1) reducing the burden of proof required to establish the date of entry, (2) requiring asylum officers to reach a claim's merits despite the implication of the one-year bar, (3) replacing the "one-year" bar with a "reasonable period" bar,[95] (4) expanding the non-exhaustive list of examples of exceptional and changed circumstances, and (5) making application of the bar non-obligatory.

Another suggestion is to craft legal presumptions out of the already enumerated examples. For example, today an applicant bears the burden of demonstrating that: (1) she entered the country as an unaccompanied minor, (2) this status related to the delay in filing and (3) she filed within a reasonable period of time given her minor status.

With the presumption, an applicant with PTSD could be required to present a credible expert diagnosis. Having made that showing, she would be entitled to a presumption that she qualifies for an exception to the one-year bar. The DHS could then rebut this presumption by demonstrating that the tardiness of her application was unrelated to her traumatized state, or that she did not file within a reasonable period of time given her condition.

Likewise, an unaccompanied minor would also presumptively be excused from the one-year deadline. DHS could then rebut the presumption with a showing that the applicant intentionally created her condition, that her failure to timely apply was unrelated to her unusual status, or that she did not apply within a reasonable period of time given her minor age and lack of guardian.

As the cases discussed herein demonstrate, the one-year bar has harsh humanitarian consequences. The Gambian woman with withholding will never reunite with her children or save them from their abusive father. The Albanian adolescent who escaped from sexual slavery, entered as an unaccompanied minor and documented her PTSD condition was nonetheless denied relief. The Mexican mother and daughter were denied asylum because they applied for asylum five months after police helped them escape from imprisonment by their abusive family member. These and countless

---

95. This solution would avoid arbitrary results that ensue where, for example, an applicant applies 366 days after arrival.

IFR_AR_014638

724                          Hastings Int'l & Comp. L. Rev.                          [Vol. 31:2

other similar cases shock the conscience and indicate that the time has come for the oversight and reassessment that Senator Hatch and other legislators contemplated when they enacted the one-year bar.

IFR_AR_014639

 **Politics**

WatchListenLive TV

# First on CNN: Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says

By Priscilla Alvarez, CNN

🕐 5 minute read · Updated 11:48 PM EDT, Wed July 27, 2022

53 migrants were found dead in Texas. Hear from their loved ones

Video Ad Feedback

01:26 - Source: CNN

**(CNN)** — Human smugglers frequently misrepresent immigration policies and conditions along the US-Mexico border in Facebook and WhatsApp social media posts targeting US-bound migrants, according to a report

IPR_AR_014931

"The misinformation has led people in the region to think it's a lot easier to get into the United States than it is in reality," said Katie Paul, director of the Tech Transparency Project. Migrants are aware of the risks and deception on platforms, Paul noted, but the volume of it makes it more difficult to decipher what is true.



**RELATED ARTICLE**
Migrants from multiple countries overwhelm US-Mexico border, adding to Biden administration's challenges

Posts on Facebook and WhatsApp, which are included in the report, claim that border authorities are letting pregnant women into the US, display favorable conditions for border crossings by misrepresenting the state of rivers where migrants will have to pass and offer fake documents.

"Some of the false information posted online about environmental conditions appeared to influence survey respondents' decision-making about their own migration attempts," states the report, which includes interviews with migrants.

Migrants, who were interviewed in a survey and who provided some of the posts, said they were aware of the misinformation being disseminated and the accompanying risks, according to anecdotes included in the report.

"What smugglers will do is they will infiltrate those online communities. They will provide information – very oftentimes manufactured information – that there's an opportunity to enter the US," said John Cohen, who previously served as temporary head of the Department of Homeland Security's intelligence division.

"They'll seek to organize large groups of migrants who will then travel to the southern border and present en masse," Cohen added, referring to smugglers.

Last month, the Biden administration also launched an "unprecedented" operation to disrupt human smuggling networks. The operation included deploying hundreds of personnel throughout Latin America and a multimillion-dollar investment. From April 1 through July 22, authorities arrested 3,533 individuals connected to human smuggling networks and 262 busts, including stash houses, tractor trailers, and compartment and rail car loads, according to the Department of Homeland Security.

The Biden administration continues to rely on a Trump-era public health authority, known as Title 42, that allows authorities to turn away migrants at the US-Mexico border. The administration tried to end the authority, but a lower court blocked them from doing so, prompting confusion among migrants.

TTP_AR_014932

migrants. Interviewers with the group met migrants in Guatemala, where they were beginning their trip north, and along the border.

Interviewers asked migrants to name social media accounts, pages, or groups they followed, and analysts later reviewed those sources, the report states.

Of the 200 migrants interviewed, many said they received information about migrating and the journey to the US southern border via word of mouth and platforms, like Facebook and WhatsApp.

The posts at times look like travel ads, listing a series of services and guarantees or promising easy journeys. Most pages use descriptors like "coyote," a commonly used term used for human smugglers, to signal the service being offered.

Pages are also sometimes categorized as "travel company" or "product/service." Smugglers also advertise on local buy-sell groups where ads show up along with posts about motorcycles and furniture, according to the report.

Facebook's policy prohibits content that "offers to provide or facilitate human smuggling."

A Meta spokesperson said the platform removes misinformation when flagged by experts and outlined efforts to fact check information. The spokesperson also noted that WhatsApp, which is an encrypted messaging service, relies on users reporting misinformation.

Migrants who had arrived at the Arizona-Mexico described treacherous conditions in their journey to the US southern border in interviews with CNN. A Peruvian migrant who traveled with his family, including two-year-old daughter, told CNN he felt deceived by the smugglers, adding the travels were more difficult than anticipated. He and his family paid $800 just to cross the river into the US.

A Colombian migrant similarly shared the challenges of coming to the US. He had paid $16,000 to a smuggler for the journey.

Guadalupe Correa-Cabrera, a professor at George Mason University who studies human smuggling, said smuggling fees can range from $3,000 to $20,000, depending on the circumstances. But in general, migrants will have to pay a fee to cross the US-Mexico border.

"Most of them need a smuggler sooner or later," Correa-Cabrera said. "The majority of them pay the smuggler at the border. Some pay different smuggling networks along the route."

 **RELATED ARTICLE**

IFR_AR_014953

Government spokespeople in Washington DC and at our overseas Embassies," a State Department spokesperson said in a statement.

"We also continuously broadcast such messages via social media in Mexico, Central America, and in other high-emigration countries in the Western Hemisphere, including, in many countries, through the use of paid social-media boosting," the spokesperson added.

US Customs and Border Protection also launched a digital ad campaign in May to dissuade migrants from journeying north. The initial two-month ad buy was intended to reach migrants on social media and other digital platforms.

PAID CONTENT

RECOMMENDED BY outbrain|



**Dr Gapin: Building Muscle After 50 Comes Down To One Thing**

Sponsored: AHF

**Dermatologist Reveals what's Hiding in your Pillowcase.**

Sponsored: Blissy



**Bill Maher makes prediction**



**Trump conviction heralds a**



**Former adviser to Melania**

IFR_AR_014954



**Urologist Reveals the Root Cause of ED in Men Over 50**

Sponsored: Men's Health WG



**Urologist: Building Muscle After 60 Comes Down To This 1 Thing**

Sponsored: alphahealthsecrets.com



**If You Need To Kill Time On Your Computer, This Vintage Game Is A Must…**

Sponsored: Forge of Empires



**Take 1 Shot Of Olive Oil At Night, Here's Why**

Sponsored: enrichyourfood.com

This amazing puzzle game is perfect for



It's never been easier to make your

IFR_AR_014955

 attempts to dox ...

 **Opinion:** Menendez case sounds the alarm on foreign influence on ...

 Live Nation says that a hacker is trying to sell Ticketmaster ...

**NEWS & BUZZ**

 Trump and his allies braced for a guilty verdict. Then the bombshell arrived

 Chad Daybell is sentenced to death in 'doomsday' triple-murder case

 Jennifer Lopez cancels tour to be with family: 'I wouldn't do this ...

**Search for**

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Watch

Listen

CNN Underscored

Coupons

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

IFR_AR_014957

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2024 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

IFR_AR_014958

IFR_AR_014959

IFR_AR_014960

IFR_AR_014961



 

NPR    wlrn    ○                                                                      DONATE

NATIONAL

# Despite a fortified border, migrants will keep coming, analysts agree. Here's why.

APRIL 22, 2024 · 5:04 PM ET

 Sergio Martínez-Beltrán

**3-Minute Listen**                                                    PLAYLIST  Download



Border Patrol picks up a group of people seeking asylum from an aid camp near Sasabe, Arizona, on Wednesday, March 13, 2024.

IFR_AR_015093

5/27/24, 3:10 PM

Migrants will keep coming to the U.S. and Texas. Here's why.

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 190 of 200

Justin Hamel/Bloomberg via Getty Images

The U.S. southern border is as fortified as ever and Texas is carrying out its own enforcement to stop people from crossing illegally, yet observers and analysts agree on this: migrants not only will continue to come, but their numbers will likely increase in the coming months.

The expected surge can be attributed not only to seasonal migration patterns, but an increase of people displaced by war, poverty, and climate factors in all continents.

And why do these analysts say this?

They keep a close eye on the Darién Gap in Panama and the borders between Central American countries, two key points to gauge the number of people venturing up north.

"In most countries (outward) migration has increased ... particularly in Venezuela, and that's not really reflected yet in the U.S. numbers," said Adam Isacson, an analyst of border and migration patterns at the Washington Office on Latin America, a nonpartisan research and advocacy organization based in Washington D.C.

Despite Mexico's cracking down on migrants, Isacson said people are still making their way up north, even if they need to pause for months at different points during their journey.

"There must be a huge number of people from Venezuela bottled up in Mexico right now," he said.

The Darién Gap serves as a good barometer for migration flows.

This 100-mile-long tropical jungle between Colombia and Panama has claimed the lives of hundreds of migrants, according to a report from the Migration Policy Institute, a Washington, D.C.-based think tank.

Yet the dangers at this jungle are not a deterrent, said Ariel Ruiz Soto, a senior policy analyst with this organization. The majority of people migrating are from Venezuela.

IFR_AR_015094

"The reason why I referred to Venezuelans in particular is because they represent a key challenge for removals from Mexico and from the United States to Venezuela," Ruiz Soto said.

Mexico and the U.S. had been flying Venezuelan migrants back to the South American country. However, earlier this year, Venezuelan President Nicolás Maduro stopped accepting flights from the U.S. in response to economic sanctions imposed by the Biden administration.

Panama reported a 2% increase in crossings through the Darién Gap in February compared to the previous month.



Aerial view showing migrants walking through the jungle near Bajo Chiquito village, the first border control of the Darien Province in Panama, on September 22, 2023.
*LUIS ACOSTA/AFP via Getty Images*

## What the numbers show

IFR_AR_015095

Analysts are projecting the increase in the remaining months of the fiscal year, even though U.S. Customs and Border Protection reported a 2.2% decrease in encounters with migrants along the Southern border in March. An encounter is every time a migrant is picked up by immigration authorities.

These numbers are consistent with cyclical patterns of illegal crossings that dip in the winter months, followed by more migrants attempting to get to the U.S. as warm weather arrives, said Ruiz Soto.

In a statement, CBP Spokesperson Erin Waters said the agency remains vigilant to "continually shifting migration patterns" amid "historic global migration."

Waters said the agency has also been partnering with Mexico to curb the flow of people migrating to the U.S.

Mexico has commissioned its National Guard to patrol its borders with Guatemala and the U.S.

"CBP continues to work with our partners throughout the hemisphere, including the Government of Mexico, and around the world to disrupt the criminal networks who take advantage of and profit from vulnerable migrants," Waters said.

## Where are migrants crossing the border?

For the last few months, more migrants are attempting to cross through Arizona instead of Texas, according to CBP.

In 2023, the El Paso and Del Rio sector in Texas saw more crossings than any other place across the 2,000-mile Southern border. But this year the Tucson sector in Arizona has seen a 167% increase in crossings, more than any other.

Tiffany Burrow, operations director at Val Verde Border Humanitarian Coalition, an assistance organization for newly border crossers in Del Rio, said she has seen the shift.

"It's empty," Burrow said, pointing to her organizations' office. "There are no migrants."

In March, she helped only three migrants after they were released by CBP pending their court date. In December, they helped 13,511 migrants.

IFR_AR_015096

Burrow said that's how migration works — it ebbs and flows.

"We have to be ready to adapt," Burrow said.



Texas Department of Safety Troopers patrol on the Rio Grande along the U.S.-Mexico border.
*Eric Gay/AP*

## Texas' role

Burrow and other immigrant advocates are closely observing Texas' ramping up of border enforcement.

In 2021 Gov. Greg Abbott launched Operation Lone Star initiative and deployed the Texas National Guard. Last year the state started lining up razor wire in sections of the Rio Grande.

Texas is also asking the courts to be allowed to implement a law passed last year by the Republican-controlled legislature, known as SB4, which requires local and state police to arrest migrants they suspect are in the country illegally.

IFR_AR_015097

It might be too early to know if all these efforts will have an impact on migration patterns, analysts said, considering that Texas saw the highest number of illegal crossings last year.

But, Mike Banks, special advisor on border matters to Abbott, said the state's efforts are fruitful.

Texas has spent over $11 billion in this initiative.

"The vast majority of the United States' southern border is in Texas, and because of Texas' efforts to secure the border, more migrants are moving west to illegally cross the border into other states," said Mike Banks in a statement to NPR.

Ruiz Soto, from the Migrant Policy Institute, said the impact of Texas' policies on arrivals "is likely to be minimal over the long term."

Carla Angulo-Pasel, an assistant professor who specializes in border studies and international migration at the University of Texas at Rio Grande Valley, said that even with Texas' policies in place, migrants are likely to continue to cross.

"You can't claim, as much as I think Gov. Abbott wants to claim, that Operation Lone Star is going to somehow mean that you're going to see less numbers in Texas because that hasn't held true," Angulo-Pasel said. "We could also argue that things are going to progressively get more and more as the spring months progress."

## Were you expecting a paywall? Not our style.

We are on a mission to create a more informed public. To make that happen, we need you to do something extraordinary: donate. Your dollars will be transformed into news, shows, and more. And, all that trustworthy journalism will be freely available to everyone. Can you help?

♥ YES, I'LL DONATE

IFR_AR_015098

5/27/24, 3:10 PM    Migrants will keep coming to the U.S. and Mexico. Here's why : NPR

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 195 of 200

## More Stories From NPR



UP FIRST NEWSLETTER

**A hidden danger in Gaza; a Haitian gang leader speaks up**



NATIONAL

**In W. Va. primary, establishment candidates for governor highlight culture war issues**

IFR_AR_015099



**BUSINESS**

**With 'bleisure' and fewer workers, the American hotel is in recovery**



**NATIONAL**

**Counterfeit fentanyl pills are becoming a lot more common in law enforcement seizures**

IFR_AR_015100

5/27/24, 3:10 PM    Migrants will keep coming to the US, and we are Here to stay. Here's why : NPR

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 197 of 200



MY UNSUNG HERO

**'Here's the money. Buy a house': A kind family receives kindness in return**



SHOTS - HEALTH NEWS

**Want to protect your kids' eyes from myopia? Get them to play outside**

**Popular on NPR.org**

IFR_AR_015101

5/27/24, 3:10 PM
Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 198 of 200
Migrants will keep coming to the U.S. and why? Here's some : NPR



SHOTS - HEALTH NEWS
**Why writing by hand beats typing for thinking and learning**



SPACE
**There's still a chance to see the Northern Lights from lower latitudes**

IFR_AR_015102

5/27/24, 3:10 PM

Migrants will keep coming to the U.S. border. Here's why : NPR

Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 199 of 200



**SCIENCE**

**The first person to receive a genetically modified pig kidney transplant has died**



**OBITUARIES**

**Roger Corman, the B-movie legend who launched A-list careers, dies at 98**

IFR_AR_015103

5/27/24, 3:10 PM    Migrants will keep coming to the U.S. and Mexico. Here's why : NPR

Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 200 of 200



SPACE

**The huge solar storm is keeping power grid and satellite operators on edge**



NATIONAL

**Controlled demolition planned at Baltimore bridge collapse site**

IFR_AR_015104