5/27/24, 3:10 PM
Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 12 of 513
Migrants would rather come to the U.S. legally, but they can't agree. Here's why : NPR

## NPR Editors' Picks



SPORTS

**Bill Walton, a Hall of Fame player who became a star broadcaster, dies of cancer at 71**



IBR_AR_015185

5/27/24, 3:10 PM
Case 1:24-cv-01702-RC Document 53-3 Filed 09/27/24 Page 2 of 513
Migrants will keep coming to the US illegally as we agree. Here's why : NPR

WORLD

## U.S. lawmakers vow support for Taiwan and its president after China's military drills



NATIONAL

## Nebraska activists seek to put opposing abortion questions on the ballot



MIDDLE EAST CRISIS — EXPLAINED

IFR_AR_015106

5/27/24, 3:10 PM
Case 1:24-cv-01702-RC  Document 53-3  Filed 09/27/24  Page 3 of 513
Migrants would rather come to the U.S. illegally. We agree. Here's why : NPR

**An Israeli airstrike killed 45 Palestinians in an encampment for displaced people**



ASIA

**Papua New Guinea tells the U.N. that a landslide buried more than 2,000 people**



WE, THE VOTERS

**After leaving a so-called 'abortion desert,' this doctor worries about what's next**

IFR_AR_015107

## READ & LISTEN

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

## CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

---

terms of use

privacy

your privacy choices

text only

© 2024 npr

IFR_AR_015108



# Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions

## Seth J. Hill[1] and Margaret E. Roberts[2]

[1] Department of Political Science, University of California San Diego, 9500 Gilman Drive #0521, La Jolla, CA 92093-0521, USA.
E-mail: sjhill@ucsd.edu, www.sethjhill.com.
[2] Department of Political Science and Halıcıoğlu Data Science Institute, University of California San Diego, 9500 Gilman Drive
#0521, La Jolla, CA 92093-0521, USA. E-mail: meroberts@ucsd.edu, www.margaretroberts.net.

## Abstract

Scholars, pundits, and politicians use opinion surveys to study citizen beliefs about political facts, such as the current unemployment rate, and more conspiratorial beliefs, such as whether Barack Obama was born abroad. Many studies, however, ignore acquiescence-response bias, the tendency for survey respondents to endorse any assertion made in a survey question regardless of content. With new surveys fielding questions asked in recent scholarship, we show that acquiescence bias inflates estimated incidence of conspiratorial beliefs and political misperceptions in the United States and China by up to 50%. Acquiescence bias is disproportionately prevalent among more ideological respondents, inflating correlations between political ideology such as conservatism and endorsement of conspiracies or misperception of facts. We propose and demonstrate two methods to correct for acquiescence bias.

*Keywords*: political beliefs, misperceptions, rumors and conspiracies, acquiescence-response bias, survey methodology

The rise of social media and the spread of partisan news and disinformation have increased the importance of conspiratorial beliefs and factual misperceptions. Scholars have responded to these trends by estimating the incidence, sources, and correlates of these beliefs.[1] Social scientists and journalists express concern that the public is misinformed about public affairs and unable to distinguish truth from innuendo. Findings generate news headlines such as "Even If It's 'Bonkers,' Poll Finds Many Believe QAnon And Other Conspiracy Theories" (National Public Radio 2020) and "Half of Americans Believe in 9/11 Conspiracy Theories" (Gohse 2016).

The evidence generating these troubling conclusions, however, comes from opinion surveys, a measurement tool that existing research finds poses many challenges to studying political beliefs. Survey responses can be influenced by partisan cheerleading, shirking, lack of incentives, expressive responding, survey trolling, social desirability bias, and idiosyncratic error (e.g., Ansolabehere, Rodden, and Snyder 2008; Berinsky 2018; Bullock *et al.* 2015; Graham and Huber 2020; Krosnick 1991; Lopez and Hillygus 2018; Prior and Lupia 2008; Smallpage *et al.* 2022). These challenges can specifically influence issues surrounding rumors and misperceptions (e.g., Graham 2022; Westwood *et al.* 2022).

Here, we demonstrate an additional first-order challenge to measuring conspiratorial and political beliefs. We return to an old literature on "acquiescence-response bias"—the phenomenon where survey respondents are more likely to answer True, Agree, and Yes than False, Disagree, or No regardless of the question asked. We find that acquiescence-response bias can have important effects not only on estimates of the population rate of beliefs, but also on the correlation between beliefs and individual characteristics such as education and political ideology.

*Political Analysis (2023)*
vol. 31: 575–590
DOI: 10.1017/pan.2022.28

**Published**
9 January 2023

**Corresponding author**
Seth J. Hill

**Edited by**
Jeff Gill

© The Author(s), 2023. Published by Cambridge University Press on behalf of the Society for Political Methodology. This is an Open Access article, distributed under the terms of the Creative Commons Attribution licence (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted re-use, distribution and reproduction, provided the original article is properly cited.

---

1  For recent examples, see Allcott and Gentzkow (2017), Berinsky (2017), Flynn, Nyhan, and Reifler (2017), Guess, Nyhan, and Reifler (2020), Huang (2017), Jerit and Zhao (2020), Lazer *et al.* (2018), Oliver and Wood (2014), Pennycook and Rand (2019), Nyhan and Reifler (2010), and Vosoughi, Roy, and Aral (2018).

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015111

The current literature studying conspiracies, misperceptions, and disinformation could benefit from increased attention to acquiescence bias. Studies often measure beliefs by asking survey respondents if they endorse or agree with a particular statement. For example, does the respondent "Agree or Disagree" that 9/11 was a conspiracy by global elites? Is the rumor that Barack Obama was born abroad "True or False?" "Yes or no, is the following statement correct?" To document the typicality of such questions, we reviewed 60 published articles that study predictors of false beliefs summarized in a recent review of psychological drivers of misinformation (Ecker *et al.* 2022, "Drivers of False Beliefs" section). Twenty-eight of the cited studies fielded survey questions that asked about a conspiratorial or false statement and 27 of the 28 asked the question with an Agree–Disagree, Yes–No, or True–False instrument. When questions are written so that the acquiescent response indicates endorsement of a false belief or conspiracy theory, the bias can cause overestimates of the population rate of endorsement.

In addition, acquiescence bias is thought to be a dispositional trait driven by personality, education, or life experience (Schuman and Presser 1981). Some respondents might default to the acquiescent option as they try to answer survey questions that they have not before encountered or about which they are uncertain. This means that acquiescence bias varies across the population in ways that correlate with individual characteristics—for example, with partisanship, ideology, or education. Correlation between acquiescence bias and individual characteristics then biases estimates of correlations between individual characteristics and conspiratorial and false beliefs.

We first present new evidence that acquiescence bias can impact the inferences scholars draw from survey evidence on political beliefs, sometimes causing overestimates of 40 and 50 percentage points. Across six new surveys, we fielded the same questions asked in recent studies about political rumors and facts along with our own questions on political beliefs. We fielded surveys to thousands of respondents in the United States and China sampled from different online survey firms (Lucid, Qualtrics, and NORC) as well as Mechanical Turk. We asked about beliefs on matters of objective statistics, such as GDP growth and currency exchange rates, as well as beliefs of conspiratorial nature such as airplane contrails being government-sponsored chemicals. We used different instruments to elicit beliefs: binary True/False, agreement Likert scales, and continuous subjective probabilities, with and without monetary incentives for accuracy. We find evidence of acquiescence bias across all factors. Because our surveys cover a range of topics, samples, elicitation instruments, and types of misperceptions and conspiracies, we have greater confidence that acquiescence bias contaminates inferences for scholars across many settings and that our results are not driven by one or two idiosyncratic wordings or samples.

To estimate the incidence of acquiescence bias, we implement a simple research design. For each question on each survey, we fielded both the version of the question from the original study and an alternative version. The alternative version flips the meaning of the agreeable response so that acquiescence bias works in the opposite direction as it does in the original item. Instead of eliciting respondent beliefs that "Pope Francis endorsed Donald Trump," the alternative question elicited beliefs that "Pope Francis did not endorse Donald Trump." As best we could, we wrote each alternative version to be logically equivalent to the original wording. Absent acquiescence bias, respondents should return the same rate of endorsement to each version of the question.

We find that survey respondents do not return the same rate of endorsement to the two versions on the majority of questions across samples, topics, instruments, and types of belief. The magnitude of difference can be substantively large. Thus, inferences about the magnitude of conspiracy theory endorsement or misperception of political facts can depend importantly on whether the question is worded with affirmative belief measured with an acquiescent response. We also find large acquiescence bias on questions fielded to respondents in China and on questions about

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015112

democratic norms and the transition of power following the 2020 American presidential election (asked in Clayton *et al.* 2021).[2]

We then show how acquiescence bias obscures estimates of correlations between characteristics of individuals and conspiratorial thinking. For example, we find that acquiescence bias magnifies the partisan differences of beliefs in conspiracy theories. We field questions from a highly cited work on fake news and rumors (Allcott and Gentzkow 2017) and find that partisan differences for some beliefs are halved in the alternative version.

In recent years, many prominent studies and news stories have reported on troubling magnitudes of conspiracy theory beliefs by ideological conservatives (e.g., Garrett and Bond 2021). We find that subjects who identify as very conservative exhibit larger acquiescence bias than those with less ideological identification. Our results suggest that existing conclusions are driven in part by greater acquiescence bias by survey respondents with conservative leanings. We also find greater acquiescence bias by strong liberals relative to less ideological subjects.

After documenting bias in both extent and correlation, we present two simple and easy-to-use methods to correct for acquiescence bias. The first method generates estimates of both the population rate of the belief purged of acquiescence bias and of the average magnitude of bias. The second method generates estimates of population correlations between characteristics and conspiratorial beliefs purged of acquiescence bias. Each method rests on a simple assumption that acquiescence bias is on average symmetric between positive- and negative-keyed questions. To implement the fix, scholars simply field two versions of each question, one positive- and one negative-keyed, and apply the statistical correction.

## 1 Acquiescence-Response Bias

Acquiescence bias—"the tendency to endorse any assertion made in a question, regardless of its content" (Krosnick 1999, 552)—inflates endorsement and agreement in survey response. Acquiescence bias has long been appreciated by psychologists and varies in magnitude across the population (e.g., Billiet and McClendon 2000; Krosnick 1999; Schuman and Presser 1981; Watson 1992). Schuman and Presser (1981, Chapter 8) summarize three interpretations of this heterogeneity. First, tendency to agree might be an individual personality trait generated by genes and environment. Second, acquiescence bias might follow from status differentials between participant and surveyor. Third, acquiescence bias might be a heuristic response rule for participants when they do not know how to respond to a question.

Because magnitude of acquiescence bias correlates with individual characteristics such as education, inferences about the relationship between political characteristics and beliefs might also be inaccurate in the presence of acquiescence bias. This problem, in fact, was appreciated by survey researchers in political science in the 1960s. The authors of *The American Voter* found that acquiescence bias undermined conclusions others had drawn about the psychological authoritarianism scale. They showed that the existing finding that those with less education were more authoritarian was due only to the higher rate of acquiescence bias among those with less education (Campbell *et al.* 1960, 512–514).

Acquiescence bias is a common concern in psychometrics where researchers construct psychology indices based on responses to multiple Agree/Disagree Likert items. To improve measurement and validity, psychologists field multiple items thought related to the underlying index. But, if all items are coded such that the agree response indicates one end of the index and disagree the other, then the subset of respondents who exhibit acquiescence bias will be improperly placed toward the agree end of the index.[3]

---

2   It is important to note that the beliefs measured in China do not touch on the Chinese Communist Party or sensitive domestic political issues, suggesting against acquiescence bias driven by repression.

3   The symmetry of the response scale may also be consequential, as shown in Sutton and Douglas (2022).

*Seth J. Hill and Margaret E. Roberts* | Political Analysis

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015113



Psychometricians use a variety of techniques to ameliorate acquiescence bias when scaling indices. These solutions generally field multiple items to construct within-subject corrections. Methods applied include Item Response Theory models, factor analysis, or simple summing across within-subject randomization. For a review, see Billiet and McClendon (2000).

Unfortunately, psychometric methods for scaling indices can be less useful for social scientists interested in beliefs about specific items. Of the 28 studies we mentioned above that surveyed respondents about conspiratorial beliefs, only 3 created indices of belief. Most studies were interested in particular beliefs or specific sets of questions. While some studies are careful to include both true and false statements in the survey, no studies used within-question randomization by negating the statement, the approach we propose below. Furthermore, most of the studies subsequently conducted separate analyses of true and false statements, making it difficult to balance acquiescence bias across the two types of statements.

Social scientists often ask questions about political beliefs giving respondents agreeable response options ("True," "Yes," "Agree," "Likely so," etc.). If acquiescence arises as a heuristic response when subjects do not know how to answer, bias could be prevalent when (a) asking about topics the subject has not before encountered such as political rumors or conspiracies, or (b) eliciting beliefs about complicated matters of fact beyond the subject's personal experience (e.g., Schaffner 2020).[4] The consequences of bias increase in the rarity of the target belief. The smaller the fraction of the population that holds a belief—e.g., when asking about outlandish conspiracies—the more likely agreeable responses are due to acquiescence bias rather than actual belief.

For example, what should we conclude if we found that 30% of subjects respond "True" to the question "True or False: Changes to the health care system enacted by Congress and the Obama administration created 'death panels' which have the authority to determine whether or not a gravely ill or injured person should receive health care?" It might be that 30% did not know how to respond to the question and so used the agreeable response "True" as a default, that 30% truly believe that the Obama administration created death panels, or that it is one of the many combinations of the two types that sum to 30%. Acquiescence bias poses a fundamental threat to inference about political conspiracies and factual beliefs about politics.

## 2  Measuring Acquiescence Bias in Studies of Conspiracies, Rumors, and Facts

In this section, we provide a broad overview of our data and initial results before presenting details on different elicitation methods, studies, and sample populations.

To understand the extent of acquiescence bias in studies of conspiracies, rumors, and facts, we fielded six surveys in China and the United States eliciting subject beliefs about political conspiracies and politically relevant facts. Details of all surveys are in Section B of the Supplementary Material.

We asked three types of questions: (1) questions fielded by other scholars on conspiracies and beliefs in rumors, (2) questions fielded by other scholars on beliefs in political facts, and (3) questions of interest to our own substantive research agendas on factual beliefs and political learning in which we elicited probabilistic beliefs (e.g., Hill 2017). In total, we asked 53 questions across the six surveys. All surveys included at least one attention check, and data were not collected and/or not analyzed for respondents who failed these checks.[5] We present results on conspiratorial beliefs in the main text and on misperceptions and political facts in the Supplementary Material.

---

4  We might be especially concerned about acquiescence bias when eliciting beliefs about complicated or controversial quantities such as political rumors and facts. For example, Westwood *et al.* (2022) find that survey satisficing—or random responses by disengaged survey takers—and question wording can result in overestimating support for political violence in surveys.

5  Acquiescence bias may be larger for surveys where attention checks do not filter out responses.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015114

We fielded two versions of each question. First, we fielded the version as written by the original study, we call this version "positive-keyed." Second, we fielded an alternative version that was the negative of the original question so that the agreeable response had the opposite meaning ("negative-keyed"). For example, Allcott and Gentzkow (2017) asked a nationally representative sample after the 2016 election "At the time of the 2016 election, would your best guess have been that this statement was true?":

Pope Francis endorsed Donald Trump.

The response options were "Yes, true," "Not sure," or "No, false." We randomized whether our respondents received the original version or the alternative version:

Pope Francis DID NOT endorse Donald Trump.

It is important to note that positive-keyed does not mean the content of the statement or conspiracy theory is positive, but rather that the agreeable response option aligns with the original version of the question. In other words, some positive-keyed questions include a "NOT" phrase, and some negative-keyed questions do not. For example, the positive-keyed question of the conspiracy theory surrounding Barack Obama's birth certificate is phrased, "President Barack Obama was not really born in the United States and does not have an authentic Hawaiian birth certificate," because this was the original version of the question; whereas the negative-keyed version is phrased, "President Barack Obama was born in the United States and has an authentic Hawaiian birth certificate."

Randomization occurred at the subject-question level, so each subject received a mix of positive-keyed and negative-keyed questions. Creating a negated version of each item was not always trivial. In the Supplementary Material, we limit analysis to unambiguous negations without consequence to substantive conclusions. We present question wordings in Tables A1–A4 in the Supplementary Material.

For each question with an Agree/Disagree, True/False, or Yes/No response, we calculated the proportion of subjects agreeing with the positive-keyed statement—the original version of the conspiracy theory, rumor, or fact. For ease of comparison, we recode the negated question so that responses have the same target belief as the original, an endorsement of the statement presented in the positive-keyed version. We then code "don't know" and "not sure" responses as not agreeing. To make this concrete, suppose that a statement had three response options: True, False, and Don't Know. We code as agreement either answering True to the positive-keyed version or False to the negative-keyed version. In each case, Don't Know is pooled with disagreement.[6]

Absent acquiescence bias, the two percentages should be equivalent, subject to sampling variability. Acquiescence bias, in contrast, would push responses to the two versions in opposite directions with greater estimated endorsement for the positive-keyed wording.

The American National Election Studies (ANES) in recent years, to its credit, has fielded an instrument to elicit beliefs on misinformation with a feature to counteract acquiescence bias. This instrument is similar in spirit to our approach. In a first question, the instrument asks the respondent to indicate which of the two versions, roughly positive- and negative-keyed, they believe more likely true. In a second question, the instrument asks how confident they are in that position.[7] We discuss the benefits to this approach in Section D of the Supplementary Material and conclude that the instrument is likely to more effectively mitigate acquiescence bias than the instruments commonly fielded by other researchers. We also show, however, that scholars might want to use our methods with the ANES instrument to mitigate acquiescence bias in the second confidence question.

---

6  For the questions where we elicited probabilistic beliefs, where we ask respondents the probability they believe something to be true, we averaged the probability reported of agreeing with the positive-keyed statement.

7  See, e.g., https://electionstudies.org/anes_timeseries_2020_questionnaire_20210719/.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015115





| | | |
|---|---|---|
| 1 Pope endorse (US 2020) * | 20 FBI Clinton charges (US 2020) * | 39 ZTE Fine (China 2019) * |
| 2 US created coronavirus (US 2020) | 21 Coronavirus weapon (US 2020) | 40 Scholarships (China 2019) |
| 3 Ireland asylum (US 2020) * | 22 Clinton stumbled (US 2020) * | 41 Hong Kong Work Week (China 2019) * |
| 4 FBI agent (US 2020) | 23 Beyonce rally (US 2020) * | 42 Exports (China 2019) * |
| 5 Contrails conspiracy (US 2020) * | 24 Trump concede (US 2020) * | 43 Military Parade (China 2019) * |
| 6 Vitamin C (US 2020) * | 25 Clinton deplorables (US 2020) * | 44 Overseas Students (China 2019) * |
| 7 Hand wash (US 2020) * | 26 FBI director (US 2020) * | 45 Jobs 2016 (US 2016) * |
| 8 Violence for votes (US 2020) * | 27 Accept election loss (US 2020) * | 46 GDP 2014 (US 2016) * |
| 9 RuPaul groped (US 2020) | 28 Obama birth (China 2021) * | 47 Currency devaluation (US 2016) * |
| 10 9/11 conspiracy (US 2020) * | 29 GMO Bioterrorism (China 2021) * | 48 Jobs 2016 (US 2017-18) * |
| 11 Clinton Foundation (US 2020) | 30 Soros conspiracy (China 2021) * | 49 Currency devaluation (US 2017-18) * |
| 12 Pence vulgar (US 2020) | 31 9/11 conspiracy (China 2021) * | 50 GDP 2014 (US 2017-18) * |
| 13 Iraq conspiracy (US 2020) * | 32 GMO Increase Yield (China 2021) * | 51 Food stamps 2018 (US 2017-18) * |
| 14 Obama birth certificate (US 2020) * | 33 2016 GDP Growth (China 2017) * | 52 Currency devaluation (US 2020) * |
| 15 Soros conspiracy (US 2020) | 34 Qualcomm Fine (China 2017) * | 53 Food stamps 2018 (US 2020) * |
| 16 Death panels (US 2020) * | 35 Currency devaluation (China 2017) * | |
| 17 Immigrant pop Canada (US 2020) * | 36 Military Spending (China 2017) * | |
| 18 Immigrant pop US (US 2020) * | 37 IMF Currency Basket (China 2017) * | |
| 19 Iraq WMD (US 2020) * | 38 GDP 2015 (China 2017) * | |

**Figure 1.** Effect of question wording on agreement with rumors and facts. "*" indicates positive and negative-keyed estimates statistically distinct at $p < .05$ two-tailed.

In Figure 1, we present the results of the 53 survey questions we fielded. On the x-axis, we plot the estimated agreement with the conspiracy theory, rumor, or fact when the question is positive-keyed. On the y-axis, we plot estimated agreement with the conspiracy theory, rumor, or fact when the question is negative-keyed, the negated form of the original version. Note that the responses of the negative-keyed version have been recoded, so they exist on the same scale as the positive-keyed and, therefore, absent bias the points in this plot should fall approximately on the 45 degree line.

All but one point falls below the 45 degree line, meaning that the positive-keyed version of the question has a larger estimate of endorsement than the negative-keyed version.[8] In some

---

8 The probability of 52 out of 53 points falling randomly below the 45 degree line if there were equal probability of falling on either side of the line, is quite close to zero, on the order of $1 \times 10^{-16}$.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015116

questions, the points are quite close to the line; for example, Question 21 fielded in the United States on whether the Chinese government created the coronavirus as a biological weapon does not exhibit large amounts of acquiescence bias. In other questions, the positive-keyed version of the question produces a drastically larger estimate of belief. For example, Question 26 on whether or not the FBI director alerted Congress about new emails on Hillary Clinton's server on October 28, 2016 yielded an agreement of 64% when asked in the positive-keyed version, but only 22% when asked in a negative-keyed version.

## 2.1   Refielding of Previous Surveys

In two studies fielded in 2020 and 2021, we asked about conspiratorial and factual beliefs in online surveys in the United States and China.[9] The first was fielded using the online survey platform Lucid, which provided a nationally representative sample of 2,055 respondents in December 2020. The second was fielded using the online survey platform Qualtrics in China in March–April 2021. Qualtrics provided a quota-based sample matched to population targets. We present details on the two samples in Section B of the Supplementary Material.

*2.1.1   Rumors and Conspiracies.*   We roughly categorize our questions into three types. For rumors and conspiracies in the United States, we field questions of Allcott and Gentzkow (2017), who analyze consumption of fake news and its relation to beliefs about conspiracy theories, Berinsky (2017), who considers misinformation surrounding national health care policy, Clayton *et al.* (2021), who present results from survey experiments on population endorsement of democratic norms, Oliver and Wood (2014), who examine conspiracy theories and paranoia, and Jamieson and Albarracin (2020), who consider misinformation and media consumption about the COVID-19 pandemic.

In China, we ask questions similar to Cui and Shoemaker (2018), who study attitudes toward conspiracies and facts about genetically modified food in China. We also ask questions related to some U.S. conspiracies from Oliver and Wood (2014) to the China sample. Although we ask the same questions, we do not pool respondents from the two countries in any individual-level regressions so that we do not make comparisons of covariates in the two samples.

The studies we based our surveys upon fielded different question designs. Some used binary True/False response options while others used Agree/Disagree with between two and seven categories. We used the original response options in our surveys, but for presentation here, we compute for each item the percentage of responses indicating agreement, meaning "True," "Agree," or "Yes," with or without qualification ("definitely" as well as "probably").

The circled dots in Figure 1 represent results for the rumor and conspiracy theory items (see also Figure A1 in the Supplementary Material). The difference between percentage agreeing to positive- and negative-keyed versions varies across questions from 43 points on the Obama born abroad question in China to −12.5 points on the Oliver and Wood (2014) question on government planning of the 9/11 terrorist attacks.[10] All but this one difference is positive. In general, the questions in the China sample had greater levels of acquiescence bias than the U.S. sample, perhaps because many of the conspiracies asked were related to the United States and so were unfamiliar to respondents.

On some questions, the divergent estimates from the original versus negated version of the question are of political importance. In the original question of Allcott and Gentzkow, our sample indicates more than half (53%) believed "At the third presidential debate, Donald Trump refused to say whether he would concede the election if he lost" versus less than one third (32%) in the negated version. In the original question of Clayton *et al.*, our sample indicates that 80% of the public believes "Presidential candidates should accept the outcome of elections even if

---

9   As in the United States, there is a growing literature about belief in rumors and conspiracies in China (Chen *et al.* 2020; Chen, Jin, and Shao 2022; Huang 2017; Wang and Huang 2021).
10   We suspect the latter result might be due to poor phrasing in negation on our part.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015117

they narrowly lose," whereas only 52% disagree that "Presidential candidates need not accept the outcome of elections if they narrowly lose." The percentage who agreed that "Sometimes regular people need to be a little violent to make sure votes are counted correctly" was double (24% vs. 12%) the percentage who disagreed that "Regular people DO NOT need to be a little violent to make sure votes are counted correctly."[11]

In Section C of the Supplementary Material, we summarize results for misperceptions about political facts, which are also presented in Figure 1. We find similar levels of acquiescence bias as for conspiratorial beliefs, even when respondents are provided with monetary incentives for correct answers.

The results here and in the Supplementary Material show that acquiescence bias can be of substantive importance for conclusions (a) about population beliefs about objective facts, (b) for different instruments that elicit beliefs, and (c) does not seem to be resolved by the use of incentives. While acquiescence bias does not always influence inferences about conspiratorial or factual beliefs, in many cases scholars would come to substantively different conclusions about population beliefs if they asked a positive- rather than a negative-keyed question. These biases exist across instruments of measurement, source of population samples, topics, and in both the United States and in China.

## 3    Robustness of Main Findings to Question Negation and Country of Sample

Not all original questions yielded a simple alternative wording of unambiguous logical equivalence. Skeptical readers might wonder if the divergence in rates of endorsement between positive- and negative-keyed versions is due to logical non-equivalence rather than acquiescence bias. To evaluate this possibility, we reproduce Figure 1 in Section F of the Supplementary Material for 35 questions that we identified of unambiguous logical equivalence. The alternative version of these questions simply adds or subtracts the word "not" along with minor modification of verb tenses. Figure A4 in the Supplementary Material reproduces the pattern of Figure 1 with all items below the 45 degree line and many far below. We find that, if anything, ambiguous alternative question wordings lead to less acquiescence bias with mean magnitudes of 8.9 (unambiguous) and 7.3 (ambiguous). We also find that our results hold separately for U.S. and China samples (Table A6 in the Supplementary Material).

## 4    Correlates of Conspiracy Theory Beliefs and Acquiescence Bias

In addition to the incidence of conspiratorial beliefs and misperceptions in the population, correspondence between such beliefs and citizen characteristics interests scholars. For example, Allcott and Gentzkow (2017) report that having beliefs aligned with the partisan or ideological implications of a news headline corresponds to greater endorsement of the veracity of that headline. We replicate the Allcott and Gentzkow (2017) finding first with responses from our subjects assigned the original version of the question. We then compare conclusions with analysis of negative-keyed questions.

Table 1 presents ordinary least-squares (OLS) regression results of the relationship between subject ideological alignment with the news headline (as coded by the original authors) and endorsement of the news headline, for both positive-keyed and negative-keyed versions of the questions we repeated from Allcott and Gentzkow (2017) in our U.S. 2020 survey. As before, we recode responses to negative-keyed versions so that "agreement" indicates agreement with the

---

11    Some of our readers have reacted that the Clayton *et al.* (2021) questions read more like opinions than beliefs. We fielded the items thinking about the construct as "beliefs about how democracies operate" but acknowledge the alternative classification is also reasonable.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015118

**Table 1.** Analysis of responses to questions we repeated from Allcott and Gentzkow (2017) in our U.S. 2020 survey. Correlation between aligned ideology and belief in news headlines, positive-keyed versus negative-keyed items. Left two regression show results for all news headlines, and right two regression show results only for items labeled by Allcott and Gentzkow (2017) as "Big Fake." Standard errors clustered on the respondent in parentheses.

| | *Dependent variable: Agreement with the conspiratorial headline* | | | |
| --- | --- | --- | --- | --- |
| | Pos keyed | Neg keyed | Pos keyed, big fake | Neg keyed, big fake |
| Aligned | 0.094 | 0.069 | 0.150 | 0.083 |
| | (0.008) | (0.009) | (0.011) | (0.013) |
| | | | | |
| Constant | 0.550 | 0.410 | 0.380 | 0.380 |
| | (0.006) | (0.007) | (0.009) | (0.009) |
| | | | | |
| No. of observations | 8,411 | 7,020 | 4,262 | 3,445 |
| $R^2$ | 0.015 | 0.008 | 0.040 | 0.013 |
| Adjusted $R^2$ | 0.015 | 0.008 | 0.039 | 0.012 |

original wording of the question. Following Allcott and Gentzkow (2017), we code agreement with the original wording as 1, "Don't know" as .5, and disagreement as 0. Standard errors are clustered on the respondent because each answers more than one question.

The negative-keyed questions (columns 2 and 4) suggest substantively smaller correlation between ideological alignment and reported belief. The magnitude of decline is especially large among the subset of news headline described by Allcott and Gentzkow (2017) as "Big Fake," fake news stories that were mentioned in at least three mainstream media articles. Among these stories, the relationship to ideological alignment is 45% smaller with the negative-keyed question.

The cause of the divergent correlations in Table 1 is that acquiescence bias varies substantially between groups. We evaluate how bias varies by four characteristics of the respondent drawn from existing work on acquiescence bias and misperceptions. First, we consider how it varies with political ideology. Second, we consider the relationship with age and education, two factors that the older survey methodology literature on acquiescence bias suggests. Third, we consider variation with respondent aptitude at numerical thinking following the measurement instrument of Frederick (2005) and arguments about the relationship between reasoning and accepting fake news made by Pennycook and Rand (2019) and Stanley *et al.* (2021).

In Table 2, we present regressions pooling positive- and negative-keyed questions and interacting an indicator of positive-keyed with ideological alignment and with characteristics of the subject. We find substantively large interactions with ideological alignment. Questions aligned with respondent ideology exhibit more acquiescence bias, especially for "Big Fake" statements.

In Tables A7 and A8 in the Supplementary Material, we evaluate how acquiescence bias affects correlations for questions from Oliver and Wood (2014) and Jamieson and Albarracin (2020). We find similar results. The magnitudes of correlation between endorsement of conspiracies and covariates and between misperception of facts and covariates depend on whether the question was fielded as original or negated.

In sum, for each of the studies that we refielded, we find that magnitude of acquiescence bias varies by characteristics of the respondent. Acquiescence bias for these questions is more common among very conservative subjects, very liberal subjects, younger subjects, those with innumeracy, and those with lower education.

Seth J. Hill and Margaret E. Roberts | Political Analysis

IFR_AR_015119

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

**Table 2.** Analysis of responses to questions we repeated from Allcott and Gentzkow (2017) in our U.S. 2020 survey. Impact of Allcott and Gentzkow (2017) question wording on belief varies by ideological alignment. Left regression is all statements, and right regression is "Big Fake" statements. Standard errors clustered on the respondent in parentheses.

| | Dependent variable: Agreement with the conspiratorial headline | | | |
| | All | Big fake | All | Big fake |
|---|---|---|---|---|
| Aligned | 0.069 | 0.083 | 0.069 | 0.083 |
| | (0.009) | (0.013) | (0.009) | (0.012) |
| Pos keyed | 0.140 | −0.006 | 0.170 | 0.140 |
| | (0.010) | (0.013) | (0.023) | (0.029) |
| Numeracy | | | −0.005 | −0.022 |
| | | | (0.007) | (0.009) |
| Age | | | −0.0002 | −0.001 |
| | | | (0.0003) | (0.0004) |
| Education | | | 0.00002 | 0.00002 |
| | | | (0.00001) | (0.00002) |
| Pos keyed × Aligned | 0.024 | 0.068 | 0.025 | 0.069 |
| | (0.012) | (0.016) | (0.012) | (0.016) |
| Pos keyed × Numeracy | | | −0.002 | −0.007 |
| | | | (0.010) | (0.012) |
| Pos keyed × Age | | | −0.001 | −0.003 |
| | | | (0.0004) | (0.001) |
| Pos keyed × Education | | | −0.0001 | −0.00003 |
| | | | (0.00002) | (0.00002) |
| Constant | 0.410 | 0.380 | 0.420 | 0.450 |
| | (0.007) | (0.009) | (0.015) | (0.020) |
| No. of observations | 15,431 | 7,707 | 15,419 | 7,701 |
| $R^2$ | 0.046 | 0.029 | 0.048 | 0.060 |
| Adjusted $R^2$ | 0.046 | 0.029 | 0.047 | 0.059 |

## 5  Accounting for Acquiescence Bias

Fielding positive- and negative-worded versions of 53 questions eliciting beliefs shows that acquiescence bias influences survey estimates of three quantities of interest to political scientists: rates of endorsement of conspiracies, rates of political misperceptions, and correlations between features of individuals and their beliefs. In this section, we present two simple statistical procedures to estimate (a) population beliefs controlling for acquiescence bias and (b) correlations purged of acquiescence bias.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015120

Our methods correct sample data to provide an acquiescence-free estimate of population quantities. We show how random assignment of positive- and negative-keyed versions of each item allows for estimation of the magnitude of and a correction for bias.

Consider a conspiratorial or factual statement about the world, for example, that Barack Obama was born in the United States. Let the random variable $Y_i$ represent the response by subject $i$ to a measurement instrument—e.g., a survey question—used to measure subject $i$'s belief about the statement. Let $Y_i^*$ be the subject's belief about the statement could it be elicited without acquiescence bias.

Our replication studies strongly suggest that the response $Y_i$ in many cases is perturbed by acquiescence bias such that $E(Y_i) \neq Y_i^*$. To characterize the bias $E(Y_i - Y_i^*)$, define $Y_i(p)$ and $Y_i(n)$ as the responses of subject $i$ were she asked the positive-keyed ($p$) or negative-keyed ($n$) version of the measurement instrument. $Y_i(p)$ and $Y_i(n)$ should be coded so that increasing values indicate increasing endorsement of the belief, not increasing agreement with the question asked. For example, if question version $p$ is "True or False: Barack Obama was born in the United States" and version $n$ is "True or False: Barack Obama was not born in the United States," and if $Y_i(p) = 1$ represents response "True" and $Y_i(p) = 0$ represents the response "False," then $Y_i(n) = 1$ would represent "False" and $Y_i(n) = 0$ would represent "True." For both versions, the original response "True" is the agreeable response possibly subject to acquiescence bias.

The data-generating process of subject $i$ measured response $Y_i$ is

$$Y_i(p) = Y_i^* + \delta_i,$$
$$Y_i(n) = Y_i^* - \delta_i \qquad (1)$$

with $\delta_i$ acquiescence bias for subject $i$.

Let $D_i$ represent the version of instrument fielded such that $D_i = 1$ if $i$ responds to the positive-key version $p$ and $D_i = -1$ if $i$ responds to the negative-key version $n$. We then consolidate (1) into

$$Y_i(D_i) = Y_i^* + D_i \delta_i. \qquad (2)$$

The observed response $Y_i(D_i)$ is the acquiescence-free belief $Y_i^*$ plus (when $D_i = 1$) or minus (when $D_i = -1$) the subject's acquiescence-bias $\delta_i$. Given data-generating Equation (2), consider an OLS regression of $Y$ on $D$ with a representative sample from the target population

$$Y_i = \alpha + \beta D_i + \varepsilon_i$$

with $\varepsilon_i$ an independent and identically distributed error term. When the expected value of $\varepsilon_i$ is zero, the coefficient $\alpha$ estimates the population average belief $E(Y_i^*)$ purged of acquiescence bias. The coefficient $\beta$ estimates the population average acquiescence bias $\Delta = E(\delta_i)$ under the usual assumptions for ordinary least-squares regression. This regression might also use post-stratification survey weights to target a population-level average in the presence of individual heterogeneity (assuming random assignment of $D$).

## 5.1  Correlates

In addition to population rates, our method can be extended to mitigate bias in correlations. To model the relationship between beliefs and characteristics of the subject, substitute the quantity $Y_i^*$ in Equation (2) with the linear combination $x_i' \gamma$, $x$ a $k$-vector of covariates and $\gamma$ a $k$-vector of coefficients. Thus, $\gamma$ represents the expected correspondence between individual characteristics $x_i$ and acquiescence-free beliefs $Y_i^*$. This substitution leads to the updated data-generating process

$$Y_i(D_i) = x_i' \gamma + D_i \delta_i. \qquad (3)$$

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015121

To see the problem of acquiescence bias for estimating correlates of political beliefs, consider a sample of size $\mathcal{N}$. Define the $\mathcal{N}$-vectors $Y$, $D$, and $\delta$ for the sample values of $Y_i$, $D_i$, and $\delta_i$. Define $X$ the $\mathcal{N}$-by-k matrix of covariates. The OLS estimate of $\gamma$ is

$$\hat{\gamma} = (X'X)^{-1}X'Y.$$

Substituting the known data-generating process of $Y$, we have

$$\hat{\gamma} = (X'X)^{-1}X'(X\gamma + D\delta)$$
$$= \gamma + (X'X)^{-1}X'D\delta. \tag{4}$$

The OLS estimator of the $k$ correlations $\gamma$ is biased by the second term in (4), the covariance between $x_i$ and $\delta_i$. Covariance between $x_i$ and $\delta_i$ was exactly the problem diagnosed by the *The American Voter* discussed in Section 1; because studies had fielded only positive-keyed versions of questions measuring authoritarianism, correlation between acquiescence bias and education inflated estimates of the relationship between authoritarianism and education.

Equation (4) suggests two options to ameliorate bias in $\hat{\gamma}$. In each, the analyst assigns at-random positive- and negative-keyed versions of each item. In the first solution, regress $Y_i$ on covariates of interest $x_i$, a variable $D_i$ taking the values 1 and $-1$ indicating version positive and negative, and an interaction between $D_i$ and $x_i$:

$$Y_i = \beta_0 + \beta_1 x_i + \beta_2 D_i + \beta_3 D_i x_i + \epsilon_i.$$

The coefficient(s) on $x_i$, $\beta_1$, estimates the correlation between $x_i$ and $Y_i^*$ free of acquiescence bias. The coefficient $\beta_2$ is an estimate of average acquiescence bias, and the coefficient(s) $\beta_3$ estimate heterogeneity of acquiescence bias related to $x_i$. As before, one could estimate this regression with post-stratification survey weights.

Second, the analyst can implement weighted least-squares (WLS) without including the variable $D_i$ in the regression. When the vector $D$ is perfectly balanced—when the number of positive- and negative-keyed responses is exactly equal—its expected value is zero because one $D_i = 1$ offsets each $D_i = -1$. When the vector $D$ is assigned at random, the expected covariance of $D_i$ and $\delta_i$ is zero. When the covariance of $D_i$ and $\delta_i$ is zero, the expected values of their product, $D_i \delta_i$, is zero. Therefore, the expected value of the bias terms in (4) is zero when $D$ is balanced and assigned at random.

To achieve exact balance on $D$, define the matrix $W$ with elements on the diagonal $\frac{N}{2N}$ for the $N$ subjects asked question version $p$ and $\frac{N}{2\bar{N}}$ for the $\bar{N}$ subjects asked question version $n$, off-diagonal cells zero, $N + \bar{N} = \mathcal{N}$. Then

$$\hat{\gamma}_{WLS} = (X'WX)^{-1}X'WY \tag{5}$$

is an unbiased estimate of $\gamma$. If the dataset includes post-stratification weights, the values $N$ and $\bar{N}$ should be the sum of the weights in each assignment rather than the count of observations, and the diagonals of the weight matrix $W$ should be the product of the terms above and the original survey weight. With survey weights, the regression method is likely to be easier to implement than weighting.[12]

We emphasize that these fixes depend on the untested assumption that acquiescence bias does not vary by key. Because of this assumption, we recommend that researchers present analysis separately by version of the question in addition to implementing the proposed solutions.

---

12  A reader has noted a third method: run two separate regressions on the positive- and negative-keyed samples, then combine coefficient estimates by precision-weighted averages.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015122



**Figure 2.** Coefficient indicating the correlation between very conservative and belief in the conspiracy theory. Questions refielded from Allcott and Gentzkow (2017), Oliver and Wood (2014), and Jamieson and Albarracin (2020). The thick and thin lines extend to 84% and 95% confidence intervals.

## 6   Applying the Method

We apply the WLS approach to examine the correlation between ideology and belief in conspiracy theory in each of the studies. For each question, we calculated the weights for positive-keyed and negative-keyed responses as $\frac{N}{2N}$ and $\frac{N}{2N}$. Because of the large number of items, we present coefficient plots instead of regression tables. While we plot and discuss the correlation between conspiratorial belief and the subject identifying as very conservative in the main body, we apply the method to coefficients for very liberal, numeracy, age, and education and present full regression tables in Section I of the Supplementary Material.

In Figure 2, we plot coefficients, 84% confidence intervals (thick line), and 95% confidence intervals (thin line) on the *very conservative* indicator for each question for (1) the sample assigned the positive-keyed version of the question, (2) the sample assigned the negative-keyed version of the question, and (3) the WLS method combining the two (point with solid line). To be consistent with the original coding in Allcott and Gentzkow (2017), we coded agreement with the original version of the question as 1, don't know as .5, and 0 as disagreement, although coding don't know as zero produces very similar results. We shade the background for coefficients where we would reject the null hypothesis of no relationship between very conservative and agreement with one question wording but not reject with another. For half of the questions, the result of this statistical test depends on question wording.

## 7   Recommendations and Conclusion

We believe that our evidence suggests that acquiescence bias causes substantively important problems for research on political conspiracies and beliefs. We hope to have brought this

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015123

587

challenge to the attention of scholars and to have provided knowledge and methods to improve future research. We see as particularly promising the possibility that acquiescence bias might be related to findings on framing effects (e.g., Druckman 2001) if different frames might be keyed in positive versus negative directions. We would also be interested to see new work on the potential influence of acquiescence bias on survey measurement of citizen policy views.

While we do not believe there is a one-size-fits-all recommendation because each topic of interest will have its own idiosyncracies, our investigation brings forward a set of suggested practices.

First, we recommend fielding both positive- and negative-keyed instruments to elicit beliefs. Examining differences in estimates and presenting them to readers should be the first practice. We would then, in general, recommend combining results from the two instruments with one of our proposed estimators.

Second, we would encourage scholars to consider multiple-choice or other instruments without agreeable responses. This approach, however, presents the first-order challenge of selecting the appropriate set of response options. In Section G of the Supplementary Material, we analyze an alternative multiple-choice approach we fielded in our surveys similar to the suggestion in Clifford, Kim, and Sullivan (2019). We do not find evidence that the approach is superior but would advocate future research.

The third option is to field an instrument similar to recent American National Election Studies misinformation items (see Section D of the Supplementary Material). We would advocate future research to determine the trade-offs between the ANES two-question approach and our single-question approach. We show in the Supplementary Material that both approaches can benefit from our WLS statistical fix. One challenge for future work is that there is no absolute benchmark with which to evaluate different instruments.

We close with a more general recommendation. Measurement challenges should be of central concern for scholars interested in sensitive or complicated political beliefs. Best practice in survey research is to pilot, test, and evaluate different measurement instruments. Too often scholars put one question on a survey without testing and validating and then assume the responses to that particular item accurately reflect the beliefs of their subjects. We encourage scholars to consider how the choice of instrument might materially influence the inferences they draw about political conspiracies and beliefs.

## Funding and Research with Human Subjects

Data collected for the 2017–2018 U.S. study by Time-Sharing Experiments for the Social Sciences, NSF Grant 0818839, Jeremy Freese and James Druckman, Principal Investigators. We thank in part UC San Diego (UCSD), Academic Senate Research Award for support. In addition, for support for some of our surveys, we thank the "China from the Ground Up" project under the auspices of the China Data Lab at UCSD, supported by the Carnegie Corporation of New York, Henry Luce Foundation, and private donors to the 21st Century China Center. The experiments presented here are approved by the UCSD Human Research Protections Program.

## Acknowledgments

We thank participants at APSA, the UC Riverside Behavior Conference, the faculty seminar at UCSD Political Science, the UCSD Cognitive Psychology lunch, SMAPP Global, NYU, John Bullock, Taylor Carlson, Alex Coppock, Tiberiu Dragu, Matt Gentzkow, Matt Graham, Andy Guess, Haifeng Huang, Greg Huber, Brendan Nyhan, Doug Rivers, Arturas Rozenas, Jake Shapiro, Chris Tausanovitch, Dustin Tingley, Lynn Vavreck, and Yiqing Xu for feedback. We also thank Yingjie Fan, Zhenyun Guo, and Kennedy Middleton for excellent research assistance.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015124


## Data Availability Statement

Replication code for this article is available in Hill and Roberts (2022) at https://doi.org/10.7910/DVN/TVJCTX.

## Supplementary Material

For supplementary material accompanying this paper, please visit https://doi.org/10.1017/pan.2022.28.

## References

Allcott, H., and M. Gentzkow. 2017. "Social Media and Fake News in the 2016 Election." *Journal of Economic Perspectives* 31 (2): 211–236.

Ansolabehere, S., J. Rodden, and J. M. Snyder. 2008. "The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting." *American Political Science Review* 102 (2): 215–232.

Berinsky, A. J. 2017. "Rumors and Health Care Reform: Experiments in Political Misinformation." *British Journal of Political Science* 47 (2): 241–262.

Berinsky, A. J. 2018. "Telling the Truth about Believing the Lies? Evidence for the Limited Prevalence of Expressive Survey Responding." *The Journal of Politics* 80 (1): 211–224.

Billiet, J. B., and M. J. McClendon. 2000. "Modeling Acquiescence in Measurement Models for Two Balanced Sets of Items." *Structural Equation Modeling* 7 (4): 608–628.

Bullock, J. G., A. S. Gerber, S. J. Hill, and G. A. Huber. 2015. "Partisan Bias in Factual Beliefs about Politics." *Quarterly Journal of Political Science* 10 (4): 519–578.

Campbell, A., P. E. Converse, W. E. Miller, and D. E. Stokes. 1960. *The American Voter*. New York: Wiley.

Chen, K., A. Chen, J. Zhang, J. Meng, and C. Shen. 2020. "Conspiracy and Debunking Narratives about COVID-19 Origins on Chinese Social Media: How It Started and Who Is to Blame." Harvard Kennedy School Misinformation Review.

Chen, K., Y. Jin, and A. Shao. 2022. "Science Factionalism: How Group Identity Language Affects Public Engagement With Misinformation and Debunking Narratives on a Popular Q&A Platform in China." Social Media+ Society 8.1.

Clayton, K., N. T. Davis, B. Nyhan, E. Porter, T. J. Ryan, and T. J. Wood. 2021. "Elite Rhetoric Can Undermine Democratic Norms." *Proceedings of the National Academy of Sciences of the United States of America* 118 (23): e2024125118.

Clifford, S., Y. Kim, and B. W. Sullivan. 2019. "An Improved Question Format for Measuring Conspiracy Beliefs." *Public Opinion Quarterly* 83 (4): 690–722.

Cui, K., and S. P. Shoemaker. 2018. "Public Perception of Genetically-Modified (GM) Food: A Nationwide Chinese Consumer Study." *npj Science of Food* 2 (1): 1–8.

Druckman, J. N. 2001. "On the Limits of Framing: Who Can Frame?" *Journal of Politics* 63 (4): 1041–1066.

Ecker, U. K., et al. 2022. "The Psychological Drivers of Misinformation Belief and its Resistance to Correction." *Nature Reviews Psychology* 1 (1): 13–29.

Flynn, D., B. Nyhan, and J. Reifler. 2017. "The Nature and Origins of Misperceptions: Understanding False and Unsupported Beliefs about Politics." *Political Psychology* 38: 127–150.

Frederick, S. 2005. "Cognitive Reflection and Decision Making." *Journal of Economic Perspectives* 19 (4): 25–42.

Garrett, R., and R. M Bond. 2021. "Conservatives' Susceptibility to Political Misperceptions." *Science Advances* 7 (23): eabf1234.

Gohse, T. 2016. "Half of Americans Believe in 9/11 Conspiracy Theories." http://www.livescience.com/56479-americans-believe-conspiracy-theories.html.

Graham, M. H. 2022. "Measuring Misperceptions?" *American Political Science Review*, 1–23. doi:10.1017/S0003055422000387.

Graham, M. H., and G. A. Huber. 2020. "The Expressive Value of Answering Survey Questions." In *The Politics of Truth in a Polarized Era*, edited by D. C. Barker and E. Suhay. New York: Oxford University Press.

Guess, A. M., B. Nyhan, and J. Reifler. 2020. "Exposure to Untrustworthy Websites in the 2016 US Election." *Nature Human Behaviour* 4 (5): 472–480.

Hill, S. J. 2017. "Learning Together Slowly: Bayesian Learning about Political Facts." *Journal of Politics* 79 (4): 1403–1418.

Hill, S. J., and M. E. Roberts. 2022. "Replication Data for: Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions." Harvard Dataverse. https://doi.org/10.7910/DVN/TVJCTX

Huang, H. 2017. "A War of (Mis)Information: The Political Effects of Rumors and Rumor Rebuttals in an Authoritarian Country." *British Journal of Political Science* 47 (2): 283–311.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015125

Jamieson, K. H., and D. Albarracin. 2020. "The Relation between Media Consumption and Misinformation at the Outset of the SARS-CoV-2 Pandemic in the US." *Harvard Kennedy School Misinformation Review* 1.

Jerit, J., and Y. Zhao. 2020. "Political Misinformation." *Annual Review of Political Science* 23 (1): 77–94.

Krosnick, J. A. 1991. "Response Strategies for Coping with the Cognitive Demands of Attitude Measures in Surveys." *Applied Cognitive Psychology* 5 (3): 213–236.

Krosnick, J. A. 1999. "Survey Research." *Annual Review of Psychology* 50: 537–567.

Lazer, D. M., et al. 2018. "The Science of Fake News." *Science* 359 (6380): 1094–1096.

Lopez, J., and D. S. Hillygus. Why So Serious?: Survey Trolls and Misinformation (March 14, 2018). Available at SSRN: https://ssrn.com/abstract=3131087 or http://doi.org/10.2139/ssrn.3131087.

National Public Radio. 2020. "Even If It's "Bonkers," Poll Finds Many Believe QAnon and Other Conspiracy Theories." http://www.npr.org/2020/12/30/951095644/even-if-its-bonkers-poll-finds-many-believe-qanon-and-other-conspiracy-theories.

Nyhan, B., and J. Reifler. 2010. "When Corrections Fail: The Persistence of Political Misperceptions." *Political Behavior* 32 (2): 303–330.

Oliver, J., and T. J. Wood. 2014. "Conspiracy Theories and the Paranoid Style(s) of Mass Opinion." *American Journal of Political Science* 58 (4): 952–966.

Pennycook, G., and D. G. Rand. 2019. "Lazy, Not Biased: Susceptibility to Partisan Fake News Is Better Explained by Lack of Reasoning than by Motivated Reasoning." *Cognition* 188: 39–50.

Prior, M., and A. Lupia. 2008. "Money, Time, and Political Knowledge: Distinguishing Quick Recall and Political Learning Skills." *American Journal of Political Science* 52 (1): 169–183.

Schaffner, B. F. 2020. "QAnon and Conspiracy Beliefs." Institute for Strategic Dialogue. www.isdglobal.org/isd-publications/qanon-and-conspiracy-beliefs/.

Schuman, H., and S. Presser. 1981. *Questions and Answers in Attitude Surveys*. San Diego: Academic Press.

Smallpage, S. M., A. M. Enders, H. Drochon, and J. E. Uscinski. 2022. "The Impact of Social Desirability Bias on Conspiracy Belief Measurement across Cultures." *Political Science Research and Methods*: 1–15.

Stanley, M. L., N. Barr, K. Peters, and P. Seli. 2021. "Analytic-Thinking Predicts Hoax Beliefs and Helping Behaviors in Response to the COVID-19 Pandemic." *Thinking and Reasoning* 27 (3): 464–477.

Sutton, R. M., and K. M. Douglas. 2022. "Agreeing to Disagree: Reports of the Popularity of Covid-19 Conspiracy Theories Are Greatly Exaggerated." *Psychological Medicine* 52 (4): 791–793.

Vosoughi, S., D. Roy, and S. Aral. 2018. "The Spread of True and False News Online." *Science* 359 (6380): 1146–1151.

Wang, C., and H. Huang. 2021. "When Fake News Becomes Real: The Consequences of False Government Denials in an Authoritarian Country." *Comparative Political Studies* 54 (5): 753–778.

Watson, D. 1992. "Correcting for Acquiescent Response Bias in the Absence of a Balanced Scale: An Application to Class Consciousness." *Sociological Methods & Research* 21 (1): 52–88.

Westwood, S., J. Grimmer, M. Tyler, and C. Nall. 2022. "Current Research Overstates American Support for Political Violence." *Proceedings of the National Academy of Sciences* 119 (12): e2116870119.

IFR_AR_015126

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

6/2/24, 1:04 PM
Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 21 of 513
US and Mexico will boost deportation flights and enforcement to crack down on illegal migration | AP News

**Ensono is recognized as a leader** across three key mainframe
service categories for the fourth consecutive year.

Explore the ISG Provider Lens™ for Mainframe Services
& Solutions Report

Download Now

EVEN WHEN THE NEWS IS FREE, JOURNALISM IS NOT.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE

U.S. NEWS

## US and Mexico will boost deportation flights and enforcement to crack down on illegal migration



President Joe Biden waves as he walks out of the White House in Washington, Thursday, April 25, 2024, before departing on a tr

Read More



BY **SEUNG MIN KIM**

Updated 2:13 PM EDT, April 30, 2024

WASHINGTON (AP) — President Joe Biden and Mexican President Andrés Manuel López Obrador are moving swiftly on new steps to crack down on illegal migration that include tougher enforcement on railways, on buses and in airports as well as increased repatriation flights for migrants from both the U.S. and Mexico.

The two leaders previewed the measures in a statement following a call on Sunday, which centered on their joint efforts to "effectively manage" migration and the U.S.-Mexico border. Biden and López Obrador said they are directing their national security aides to "immediately implement concrete measures" to reduce the number of illegal border crossings.

IFR_AR_015127

John Kirby, the White House's national security spokesman, said the U.S. and Mexico will increase enforcement measures that would prevent major modes of transportation from being used to facilitate illegal migration to the border, as well as the number of repatriation flights that would return migrants to their home countries. Kirby also said the U.S. and Mexico would be "responding promptly to disrupt the surges."

Arrests at the U.S.-Mexico border [have actually declined in recent months](#), countering the usual seasonal trends that show migration tends to climb as weather conditions improve. U.S. officials have credited Mexican authorities, who have expanded their own enforcement efforts, for the decrease.

**READ MORE**



**Biden is said to be finalizing plans for migrant limits as part of a US-Mexico border clampdown**

IFR_AR_015128



**Former intel agency chief set to become the Netherlands' next prime minister in hard right coalition**



**Poland rolls out plans for fortifications along its border with Russia and Belarus**

"The teamwork is paying off," Kirby said Tuesday. But he cautioned: "Now we recognize, May, June, July, as things get warmer, historically those numbers have increased. And we're just going to continuously stay at that work with Mexican authorities."

IFR_AR_015129

Arrests are up sharply in April on at least one part of the border, San Diego, which appears to have emerged as the busiest corridor for illegal crossings. Arrests in that area totaled 9,513 in the week ended Friday, the third straight increase from 6,695 arrests the first week of April, according to Patricia McGurk-Daniel, the U.S. Border Patrol's San Diego sector chief.

The fresh steps come as Biden deliberates whether to take executive action that would further crack down on the number of migrants arriving at the southern U.S. border.

Since the collapse of border legislation in Congress earlier this year, the White House has not ruled out Biden issuing an executive order on asylum rules to try to reduce the number of migrants at the border. Any unilateral action would likely lean on a president's authority under Section 212(f) of the Immigration and Nationality Act, which offers broad powers to block entry of certain immigrants if their entry is deemed detrimental to the national interest.

Biden administration officials have been poring over various options for months, but the Democratic president has made no decision on how to proceed with any executive actions. White House aides have seen little immediate urgency for the president to take any action, considering the number of illegal border crossings has declined since a record high of 250,000 in December.

The call occurred on Sunday at Biden's request, López Obrador said during his daily news conference Monday in Mexico City.

"We talk periodically," López Obrador said. "I seek him out, he seeks me out, we chat."

The Mexican leader said the two countries have made progress in controlling unauthorized migration by persuading many migrants not to use illegal methods to move from country to country. López Obrador also applauded a January decision by the U.S. Supreme Court that allowed Border Patrol agents to resume cutting razor wire that Texas had installed along the border to try to deter migration.

IFR_AR_015130

——

Associated Press writers Elliot Spagat in San Diego and Maria Verza in Mexico City contributed to this report.



**SEUNG MIN KIM**

Seung Min is a White House reporter.

𝕏  ✉

ADVERTISEMENT



IFR_AR_015131

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/282532862

# Acquiescence Response Bias — Yeasaying and Higher Education

**Article**  *in*  The Australian Educational and Developmental Psychologist · September 2015

DOI: 10.1017/edp.2015.11

CITATIONS
16

READS
355

2 authors:

Shane Costello
Monash University (Australia)
**36** PUBLICATIONS   **469** CITATIONS

SEE PROFILE

John Roodenburg
Monash University (Australia)
**36** PUBLICATIONS   **216** CITATIONS

SEE PROFILE

All content following this page was uploaded by Shane Costello on 22 August 2022.

The user has requested enhancement of the downloaded file.

IFR_AR_015162

# Acquiescence Response Bias — Yeasaying and Higher Education

Shane Costello and John Roodenburg

*Faculty of Education, Monash University, Melbourne, Australia*

Acquiescence response bias is the tendency to agree to questionnaires irrespective of item content or direction, and is problematic for both researchers and clinicians. Further research is warranted to clarify factors relating to the confounding influence of acquiescence. Building on previous research that investigated the interaction between acquiescence, age, and secondary education, the current study has considered the role of adult higher educational achievement and acquiescence. Using the Big Five Inventory (BFI), acquiescence scores were calculated for a sample of 672 Australian adults (age $M = 41.38$, $SD = 12.61$). There was a significant inverse relationship between the variance in acquiescence scores and formal education. The greatest difference was found between the lowest education groups and the highest education groups, with the variance of the lower groups more than twice as large as the higher groups. The confounding influence of acquiescence was demonstrated using the BFI and targeted rotation to an ideal matrix, where worse model fit was found in the lower education group compared to the higher group. Implications for both researchers and clinicians are explored.

■ **Keywords:** acquiescence, response bias, education, measurement error, Big Five inventory

Observed scores of latent traits are derived from true scores and measurement error (Spearman, 1904). When Spearman penned his immutable theory, the mantra of modern psychometrics was born, challenging researchers to continually strive to reduce measurement error. To this end, a variety of methods have been employed, including standardised administration and rigorous statistical evaluation of measures. Others have taken the opposite approach, pausing to consider what meaning may lie within the error itself. One such area of interest to psychometricians is acquiescence response bias, and the current study considers acquiescence and considers what role education may play in this source of measurement 'error'.

Acquiescence is the tendency of an individual to consistently agree to questionnaire items, irrespective of item directionality (Jackson & Messick, 1965; Javeline, 1999). Acquiescence's less agreeable cousin (termed *counter-acquiescence*) creates the opposite pattern of response, with a tendency towards disagreement regardless of item directionality. Acquiescence is problematic for both researchers and clinicians,

Received 21 April 2015; Accepted 18 August 2015; First published online 30 September 2015

**Address for correspondence:** Shane Costello, Krongold Building, Faculty of Education, 57 Scenic Boulevard, Clayton Campus, Monash University VIC 3800, Australia. Email: shane.costello@monash.edu.

Shane Costello and John Roodenburg

introducing a source of error into the measurement of the construct of interest that varies within individuals (Rammstedt & Farmer, 2013). A pattern of responses that leads an individual to be biased towards the upper or lower end of a measurement scale challenges the validity of the measure. For clinicians, an inaccurate measure may negatively affect client outcomes, while researchers may draw inaccurate conclusions from research using measures confounded by acquiescence.

There are two conflicting positions in regard to acquiescence. The traditional position holds that acquiescence is an artefact of little interest, confounding the measured constructs with error that is best removed or controlled for (Nunnally, 1978). Other researchers consider acquiescence to be a trait worthy of further investigation within the context of individual differences — a trait that maintains a certain degree of stability, consistency, and generalisability across settings (Eysenck & Eysenck, 1963; Morf & Jackson, 1972).

As a trait, acquiescence is both temporally stable (Billiet & Davidov, 2008) and able to significantly alter the covariance of item pairs, irrespective of item content (Bentler, Jackson, & Messick, 1971; McCrae, Herbst, & Costa, 2001). The confounding effect of acquiescence on both predictor and outcome variables can lead to inflated predictive validity (Rammstedt & Farmer, 2013). To a certain extent, the effect of acquiescence is somewhat mitigated by scales that contain balanced numbers of positively and negatively worded items; however, researchers disagree as to the true effectiveness of balanced item sets in controlling for acquiescence (Sonderen, Sanderman, & Coyne, 2013). Acquiescence has been shown to account for up to 10% of the variance in factor structures (Hendriks, 1997; ten Berge & Hofstee, 1999).

Meisenberg and Williams (2008) conducted a large, cross-cultural study into acquiescence at both the individual and country level. At the individual level, acquiescence was greatest in older individuals, those with less education, and those from low socio-economic backgrounds. At the country level, higher acquiescence was also associated with lower intelligence, corruption, and lack of political freedom and democracy. It was suggested that acquiescence was facilitated by a lack of self-confidence or assertiveness and the desire to comply, rather than directly by intelligence. Given the somewhat circular relationship between intelligence and education (Hatch, Feinstein, Link, Wadsworth, & Richards, 2007), the mechanism by which acquiescence operates is not yet fully understood. Increased academic achievement may foster traits such as confidence (Stankov & Lee, 2014), resulting in a lower tendency to acquiesce.

Several studies have shown a relationship between education and acquiescence. Rammstedt, Goldberg, and Borg (2010) found that acquiescence bias was worse in lower education groups, and that a five-factor model of personality was considerably less well defined in the lower group. After accounting for acquiescence, the structure emerged equally well in the lower and higher education groups, although it should be noted that the study only considered secondary education levels. Specifically, the study compared only those who had completed lower secondary school; those with intermediate secondary school education; and higher secondary education, including those with university entrance qualifications.

To investigate whether acquiescence was related to reading comprehension, Rammstedt and Kemper (2011) conducted a study using an instrument presented verbally. A consistent pattern of acquiescence was demonstrated, with larger variance evident in the lower education group. This is consistent with the findings of Meisenberg and Williams (2008), who suggested that intelligence was not directly implicated in

IFR_AR_015164

acquiescence. These results support the suggestion that acquiescence is more than simply measurement error that may have resulted from difficulties in reading comprehension or intelligence.

While education has been shown to play a role in acquiescence, it is worth considering the extent to which age may confound educational achievement. Acquiescence has been shown to decrease in absolute magnitude as age increased from 10 and 20 years (Soto, John, Gosling, & Potter, 2008), and this effect was independent of any item complexity due to word comprehension. When considering adult educational achievement within an Australian context, it is possible but highly unlikely that many individuals would have completed a higher degree such as a doctor of philosophy before the age of 24 years (allowing 4 years for undergraduate study and 4 years for doctoral studies after completing school at age 17 years). When considering the highest level of education achieved, any impact of age cannot be simply ignored, given that higher levels of education are generally not able to be attained by younger adults. For this reason, any consideration of acquiescence and adult educational achievement would be best conducted after accounting for any variance explained by age alone.

The aim of the current study was to investigate the stability of age-corrected acquiescence in adults of differing educational achievements within an Australian context. It was expected that acquiescence would reduce as formal education increased. Similarly, it was expected that due to the confounding nature of acquiescence, the factor structure of a five-factor model of personality would emerge with greater clarity in higher educated individuals compared with those of lower levels of education.

## Method

### Participants

Online survey data were collected from 672 participants using a snowball method of recruiting. Participation was restricted to residents of Australia who were over the age of 18 years. The survey was collected with the approval of the Monash University Human Research Ethics Committee. The demographic distribution of the sample is provided in Table 1.

Details of participants' self-reported highest education level attained were collected in free form, and recoded into five categories. Categorisation was conducted with the intent to maximise the equivalency within educational achievement groups in an Australian context. Categorising most levels of achievement, such as whether a participant had or had not completed high school, was straightforward, differing primarily in the language used (such as year or grade) and geographical differences (such as High School Certificate or Victorian Certificate of Education for New South Wales and Victoria respectively). Vocational and technical qualifications completed through Technical and Further Education (TAFE) training were combined in one category. Examples of the educational achievements by category are provided in Table 2, and the descriptive statistics of the categories are provided in Table 3.

### Materials

The Big Five Inventory (BFI; John, Naumann, & Soto, 2008) was used to obtain personality self-reports. The 44 BFI items are short, easy to understand phrases that assess personality traits related to each of the Big Five factors of personality: Extraversion, Agreeableness, Conscientiousness, Neuroticism, and Openness to Experience.

IFR_AR_015165

Shane Costello and John Roodenburg

**TABLE 1**

Demographic Details for Sample (*N* = 672)

| Demographic | | N | % |
|---|---|---|---|
| Gender | Male | 167 | 24.90% |
| | Female | 505 | 75.10% |
| | Total | 672 | 100% |
| Age | Minimum | 18 | — |
| | Maximum | 74 | — |
| | Mean | 41.32 | — |
| | Standard deviation | 12.70 | — |
| Education | Did not complete high school | 55 | 8.18% |
| | TAFE certificate or diploma | 164 | 24.40% |
| | Completed high school (Year 12) | 84 | 12.50% |
| | Bachelor degree | 266 | 39.58% |
| | Postgraduate or higher degree | 103 | 15.33% |
| | Total | 672 | 100% |
| Employment | Student | 85 | 12.65% |
| | Part- or full-time work | 457 | 68.01% |
| | Not currently in the work force | 71 | 10.57% |
| | Retired | 17 | 2.53% |
| | Did not state | 42 | 6.25% |
| | Total | 672 | 100% |

**TABLE 2**

Examples of Education Groups

| Category | Example |
|---|---|
| Did not complete high school | Years less than 12 |
| | Grades less than 12 |
| | Form less than 6 |
| | Junior Certificate |
| TAFE certificate or diploma | Certificate I-IV |
| | Advanced certificate |
| | Diploma |
| | Advanced diploma |
| | Trade |
| Completed high school | Year 12 |
| | Grade 12 |
| | Form 6 |
| | Senior Certificate |
| | High School Certificate (HSC) |
| | Victorian Certificate of Education (VCE) |
| Bachelor degree | Bachelor degree |
| | Double/combined bachelor degree |
| Postgraduate qualification | Graduate certificate |
| | Graduate diploma |
| | Postgraduate diploma |
| | Honours degree |
| Higher degree | Master degree |
| | Professional doctorate |
| | Doctor of philosophy |

Note: TAFE = Technical and Further Education.

IFR_AR_015166

**TABLE 3**
Descriptive Statistics by Education Group

| Category | Male | | Female | | Age (years) | | | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | Mean | SD | Min | Max |
| Did not complete high school | 15 | 27.3% | 40 | 72.7% | 41.64 | 11.54 | 19 | 65 |
| TAFE certificate or diploma | 36 | 28.8% | 89 | 71.2% | 42.32 | 11.84 | 18 | 68 |
| Completed high school | 20 | 23.5% | 65 | 76.5% | 35.79 | 13.49 | 18 | 63 |
| Bachelor degree | 53 | 26.1% | 150 | 73.9% | 40.07 | 12.8 | 20 | 74 |
| Postgraduate qualification | 18 | 17.6% | 84 | 82.4% | 44.71 | 11.89 | 23 | 73 |
| Higher degree | 25 | 24.5% | 77 | 75.5% | 44.03 | 11.98 | 25 | 72 |

The BFI scales have shown substantial internal consistency, retest reliability, and clear factor structure, as well as considerable convergent and discriminant validity with longer Big Five measures, and substantial agreement between self and peer reports (Rammstedt & John, 2007). Each item was rated on a scale ranging from 1 (*strongly disagree*) to 7 (*strongly agree*).

Procedures

With the exception of the targeted rotation for the five factor model fit, all statistical analyses were conducted using SPSS version 22. Prior to any analysis, the data was screened for missing and extreme values. Imputation of missing values was conducted using the SPSS expectation-maximisation (EM) imputation algorithm, which uses a maximum likelihood approach to iteratively generate values using a normal distribution (Little & Rubin, 2002; Pigott, 2001). The extent of missing data was minimal, with a mean rate of missing data of 1.06% across all items, and no item missing more than 1.9%. No significant difference was obtained between variable means both before and after applying the EM imputation method (Little's MCAR $\chi^2 = 1.346$, $df = 1.371$, $p = .68$), and therefore it was concluded there was no pattern for the missing data.

Hofstee, ten Berge, and Hendriks (1998) described a method of determining individual acquiescence scores, using logically and semantically opposite pairs of items, and taking the grand average of each individual's responses over the set, expressed as a deviation from the midpoint score. Consider the semantic pair 'bfi1 (talkative) – bfi21 (quiet)', and an individual who might score them 2 and 7 respectively. Acquiescence was taken to be the deviation of the sum of scores from 8 (as the scale midpoint was 4), therefore 8-(2+7) = -1, indicating a slight tendency to acquiesce for that item pair. The acquiescence score of each individual participant would represent an unweighted mean over the pairs of items. Soto et al. (2008) identified 16 opposing item pairs within the BFI, and these item pairs were used to estimate acquiescence. Using an acquiescence score that is anchored at the scale midpoint, negative scores indicate the presence of acquiescence while positive scores indicate the presence of counter-acquiescence.

## Results

Calculating Acquiescence

To evaluate the appropriateness of the opposing item pairs for determining acquiescence, bivariate correlations between pairs were calculated. A minimum correlation

Shane Costello and John Roodenburg

**TABLE 4**

Correlations Between Age and Acquiescence by Level of Education Group

| Category | N | R | $R^2$ | p |
|---|---|---|---|---|
| Did not complete high school | 55 | .40 | .16 | .002 |
| TAFE certificate or diploma | 124 | .16 | .02 | .08 |
| Completed high school | 85 | .41 | .17 | <.001 |
| Bachelor degree | 203 | .21 | .04 | .003 |
| Postgraduate qualification | 102 | .17 | .03 | .10 |
| Higher degree | 103 | .37 | .14 | <.001 |

score of -.316 (negative correlations expected due to item reversal) was established, which is 10% of the shared variance between items. Correlations between all item pairs exceeded -.316, $p < .001$, with the exception of item pair bfi30 (values artistic, aesthetic experiences) and bfi41 (has few artistic interests), which contained only 9% shared variance. Consequently, the total acquiescence score was calculated using 15 item pairs, rather than the 16 pairs identified by Soto et al. (2008).

Hofstee et al. (1998) recommend that the reliability of acquiescence (as determined by coefficient alpha over the item pairs) needs to be high if the acquiescence score is to be meaningful. For each of the item pairs, acquiescence was taken to be the deviation of the sum of scores from 8 (as the midpoint of the scale was 4). Since 8 is a constant for all variables, there was no need to incorporate it into any computation of alpha, and a total score of 8 for any item pair can be interpreted as an absence of acquiescence. Coefficient alpha over the pairs of items was .78, suggesting that acquiescence was quite consistent over the 15 item pairs and that acquiescence could be considered a single factor.

## Investigating Age and Acquiescence

The relationship between age and acquiescence was considered. A bivariate correlation between age and acquiescence revealed a significant positive relationship ($R = .27$, $p < .001$), suggesting that acquiescence reduces with age. Bivariate correlations were then calculated for age and acquiescence for each level of education achievement group separately. Each relationship was significant, and the results demonstrated a clear interaction between age and level of education achievement group. The results of the correlations are presented in Table 4.

Participant age explained a significant amount of variance, particularly in the lowest and highest education achievement groups. Given that age acts as a confounding variable in educational achievement, the decision was made to regress participants' acquiescence scores on age, leaving the remaining unstandardised residuals as a measure of acquiescence free from any relationship with age.

## Individual Differences in Acquiescence

Previous research suggests that level of education achievement is related to individual differences in acquiescence. This was investigated in the current study by comparing age-residualised acquiescence scores across six levels of educational achievement. As expected, variance in acquiescence scores was larger in lower education groups, and

IFR_AR_015168

**TABLE 5**

Mean Acquiescence Scores by Education Group

| Group | N | Mean | SD | Min | Max |
| --- | --- | --- | --- | --- | --- |
| Did not complete high school | 55 | − 0.01 | 0.80 | − 2.22 | 1.94 |
| TAFE/Vocational education | 124 | − 0.13 | 0.80 | − 2.57 | 1.94 |
| Completed high school | 85 | − 0.01 | 0.75 | − 1.95 | 1.62 |
| Bachelor degree | 203 | − 0.03 | 0.64 | − 1.98 | 1.78 |
| Postgraduate degree | 102 | 0.09 | 0.55 | − 1.52 | 1.55 |
| Higher degree | 102 | 0.15 | 0.52 | − 1.26 | 1.23 |



**FIGURE 1**

Variance in acquiescence scores by level of education group.

demonstrated a consistent trend towards lower acquiescence scores with increasing levels of educational achievement. Levene's test for the equality of variances was significant, $F(5, 665) = 5.25$, $p < .001$, providing further support for the differences in variance across levels of education (see Figure 1).

A oneway analysis of variance (ANOVA) was conducted for acquiescence and education group, and a significant difference was noted with $F(5, 665) = 2.36$, $p = .04$. Given that Levene's test was significant, post-hoc analyses were conducted using the Games-Howell test, which accounts for unequal variances. The only significant mean difference in acquiescence was between the TAFE ($M = -0.13$, $SD = 0.80$) and higher degrees groups ($M = 0.15$, $SD = 0.52$), with the TAFE group demonstrating higher levels of acquiescence than the higher degrees group, $p = .02$, $d = -.41$, 95% CI [-.31,-.55], which was a small-to-moderate effect size according to Cohen (1992). The descriptive statistics are presented in Table 5.

Factor Structure in Education Groups

To investigate the extent to which acquiescence impacts the factorial validity of the BFI, participants were separated into two groups. The lower education group included

IFR_AR_015169

Shane Costello and John Roodenburg

participants who had not completed high school, completed TAFE or vocational studies, and those who completed high school. The higher education group included those who had completed bachelor degrees and higher qualifications. The lower group contained 71 males and 194 females (mean age 40.08 years, *SD* 12.64) while the higher group contained 96 males and 311 females (mean age 42.22 years, *SD* 12.53).

To be consistent with previous research using the BFI, principal components analysis with Varimax rotation was conducted for each group. Procrustes rotation to an ideal a priori structure was used (Hopwood & Donnellan, 2010; McCrae, Zonderman, Costa, Bond, & Paunonen, 1996), which compares the rotated solution to an ideal matrix where items either load completely or not at all, providing an estimate of how well items fit. Kaiser-Meyer-Olkin values of .846 and .897 for the lower and higher groups respectively (Kaiser, 1970, 1974), and significant Bartlett's Test of Sphericity (Bartlett, 1954) results supported the factorability of the correlation matrix. Cattell's (1966) scree test and Parallel Analysis (Watkins, 2000) suggested that up to six components could be retained; however, in accordance with personality theory only five components were extracted.

The five-factor models explained 52.61% and 52.69% of the variance in the data for the lower and higher groups respectively. Following Procrustes rotation using Orthosim version 2.01 (Barrett, 2006), the overall model fit was .84 for the lower group and .89 for the higher group. Factor level congruences were also considerably better for the higher education group, with the facets of Extraversion and Neuroticism demonstrating the highest increase. At the item level, the lower education group had 13 items with less than adequate congruence, while the higher education had 7 items. While item level congruences can be somewhat lower, factor congruence and overall congruence values of .85 and above indicate similarity between the actual factor matrix and the hypothesised ideal factor matrix (Barrett, 2005; Hastie, Tibshirani, & Friedman, 2009; Mulaik, 1972; ten Berge, 1986). The communalities, loadings, and congruences can be found in Tables 6 and 7.

## Discussion

The aim of the study was to investigate the role of education in trait acquiescence. Given that participants' highest level of education achieved was confounded by age, acquiescence was considered after the effects of age had been controlled. As level of education increased, the variance in acquiescence reduced, with the most noticeable change occurring between TAFE education (such as certificates, diplomas and trade qualifications) and postgraduate qualifications (such as postgraduate diplomas and honour degrees). As expected, when the factor structure of the BFI was compared between the lower and higher educational achievement groups, poorer model fit, factor congruence, and item congruence was noted in the lower group compared to the higher group.

Soto et al. (2008) investigated the change in acquiescence from 10 to 20 years of age and found that acquiescence variance reduced with age. In comparison, the current study found that while age did significantly correlate with acquiescence, only 7.29% of the variance was shared overall. The age-acquiescence variance differed across educational achievement groups, and the removal of age-related variance allowed for a more thorough investigation of the influence of education alone. While Soto et al. found a relationship between age and acquiescence, the current study demonstrated

IFR_AR_015170

**TABLE 6**

PCA With Varimax and Procrustes Congruences for Lower Education Group ($N = 265$)

| Item | Communalities | EXT | AGR | CON | NEU | OPE | Congruence |
|------|---------------|-----|-----|-----|-----|-----|------------|
| bfi1 | .73 | **.84** | .09 | − .02 | .06 | .08 | .96 |
| bfi6 | .63 | − **.68** | − .06 | .02 | .40 | .11 | .83 |
| bfi11 | .48 | **.44** | − .02 | .26 | − .29 | .37 | .74 |
| bfi16 | .55 | **.46** | .18 | .26 | − .09 | .48 | .71 |
| bfi21 | .64 | − **.71** | − .01 | .00 | .34 | .13 | .87 |
| bfi26 | .53 | **.46** | − .35 | .29 | − .18 | .28 | .77 |
| bfi31 | .63 | − **.60** | − .05 | − .03 | .49 | .16 | .74 |
| bfi36 | .67 | **.79** | .12 | .08 | − .14 | .08 | .96 |
| bfi2 | .49 | .16 | − **.63** | .03 | .26 | − .05 | .87 |
| bfi7 | .60 | .10 | **.65** | .28 | .08 | .30 | .84 |
| bfi12 | .52 | .24 | − **.57** | − .15 | .34 | .02 | .75 |
| bfi17 | .53 | .20 | **.68** | .08 | .04 | .15 | .95 |
| bfi22 | .38 | .34 | **.46** | .18 | .15 | .00 | .80 |
| bfi27 | .51 | − .19 | − **.60** | .04 | .32 | .10 | .86 |
| bfi32 | .63 | .05 | **.72** | .24 | .10 | .21 | .91 |
| bfi37 | .60 | .16 | − **.68** | − .06 | .34 | .03 | .85 |
| bfi42 | .37 | .33 | **.45** | .22 | .00 | .08 | .80 |
| bfi3 | .69 | .09 | .18 | **.79** | .11 | .15 | .91 |
| bfi8 | .45 | .29 | − .22 | − **.35** | .36 | .25 | .61 |
| bfi13 | .47 | .10 | .30 | **.61** | − .05 | − .01 | .86 |
| bfi18 | .53 | .11 | .02 | − **.56** | .32 | .33 | .81 |
| bfi23 | .47 | .00 | − .20 | − **.52** | .38 | .10 | .80 |
| bfi28 | .61 | .09 | .11 | **.74** | − .02 | .23 | .91 |
| bfi33 | .70 | .05 | .06 | **.81** | − .06 | .20 | .95 |
| bfi38 | .54 | .13 | .04 | **.71** | − .15 | .03 | .94 |
| bfi43 | .55 | .15 | .01 | − **.48** | .47 | .29 | .71 |
| bfi4 | .53 | − .22 | − .05 | − .21 | **.66** | .04 | .88 |
| bfi9 | .46 | .31 | .06 | .20 | − **.48** | .30 | .68 |
| bfi14 | .60 | − .11 | − .26 | .11 | **.71** | .04 | .92 |
| bfi19 | .58 | − .10 | .02 | − .12 | **.75** | − .04 | .96 |
| bfi24 | .48 | .15 | .03 | .28 | − **.58** | .19 | .81 |
| bfi29 | .61 | − .02 | − .38 | − .05 | **.68** | .08 | .86 |
| bfi34 | .47 | .09 | .05 | .47 | − **.34** | *.35* | .45 |
| bfi39 | .59 | − .27 | .06 | − .08 | **.71** | − .03 | .91 |
| bfi5 | .65 | .12 | − .06 | .26 | − .11 | **.74** | .90 |
| bfi10 | .52 | .03 | .09 | .09 | .01 | **.71** | .98 |
| bfi15 | .43 | − .04 | − .06 | .09 | .09 | **.64** | .97 |
| bfi20 | .54 | .10 | .14 | − .09 | .10 | **.70** | .93 |
| bfi25 | .62 | .07 | − .07 | .16 | − .14 | **.75** | .94 |
| bfi30 | .45 | − .07 | .15 | − .05 | .03 | **.65** | .98 |
| bfi35 | .27 | .02 | − .02 | .19 | .34 | − **.34** | .65 |
| bfi40 | .49 | − .05 | .06 | .08 | .05 | **.69** | .99 |
| bfi41 | .09 | .17 | − .14 | .13 | .09 | − **.14** | .53 |
| bfi44 | .40 | − .04 | .12 | − .11 | − .01 | **.61** | .97 |
| Factor congruence | | .81 | .89 | .86 | .76 | .87 | |

Note: Theorised primary loadings are bolded; where an actual primary loading differs it has been italicised.

IER_AR_015171

Shane Costello and John Roodenburg

**TABLE 7**
PCA with Varimax and Procrustes Congruences for Higher Education Group ($N = 407$)

| Item | Communalities | EXT | AGR | CON | NEU | OPE | Congruence |
|------|---------------|-----|-----|-----|-----|-----|------------|
| bfi1 | .72 | **.80** | .20 | − .05 | .06 | .18 | .95 |
| bfi6 | .72 | − **.82** | − .11 | − .01 | .17 | .01 | .96 |
| bfi11 | .52 | **.49** | .03 | .26 | − .27 | .37 | .71 |
| bfi16 | .60 | **.53** | .18 | .16 | − .15 | .48 | .72 |
| bfi21 | .77 | − **.87** | − .04 | .03 | .11 | .04 | .98 |
| bfi26 | .50 | **.57** | − .21 | .06 | − .15 | .32 | .85 |
| bfi31 | .69 | − **.76** | − .16 | − .10 | .27 | .07 | .90 |
| bfi36 | .71 | **.75** | .24 | .01 | − .09 | .28 | .90 |
| bfi2 | .50 | .04 | − **.44** | − .06 | .53 | .14 | .67 |
| bfi7 | .43 | .12 | **.53** | .24 | .02 | .28 | .81 |
| bfi12 | .47 | .11 | − **.56** | − .11 | .34 | .13 | .84 |
| bfi17 | .47 | .20 | **.60** | .03 | − .13 | .23 | .90 |
| bfi22 | .40 | .15 | **.61** | .08 | − .09 | − .03 | .97 |
| bfi27 | .58 | − .47 | − **.52** | − .06 | .27 | .11 | .73 |
| bfi32 | .63 | .10 | **.70** | .23 | .00 | .29 | .88 |
| bfi37 | .43 | .01 | − **.56** | − .16 | .30 | .08 | .88 |
| bfi42 | .50 | .12 | **.66** | .17 | .00 | .14 | .94 |
| bfi3 | .55 | .05 | .16 | **.71** | − .01 | .15 | .95 |
| bfi8 | .43 | .03 | − .14 | − **.54** | .29 | .19 | .83 |
| bfi13 | .53 | .01 | .32 | **.66** | − .05 | .02 | .90 |
| bfi18 | .63 | − .03 | .07 | − **.69** | .27 | .27 | .88 |
| bfi23 | .48 | − .08 | − .17 | − **.62** | .25 | − .05 | .90 |
| bfi28 | .51 | − .04 | .09 | **.67** | − .05 | .23 | .94 |
| bfi33 | .58 | .05 | .05 | **.74** | − .13 | .09 | .98 |
| bfi38 | .48 | .13 | .13 | **.63** | − .18 | .10 | .92 |
| bfi43 | .49 | .03 | − .06 | − **.54** | .41 | .18 | .79 |
| bfi4 | .56 | − .21 | − .15 | − .20 | **.67** | .06 | .87 |
| bfi9 | .60 | .12 | .10 | .13 | − **.73** | .19 | .92 |
| bfi14 | .61 | − .18 | − .23 | − .07 | **.72** | − .01 | .90 |
| bfi19 | .69 | − .12 | .02 | − .13 | **.81** | − .04 | .97 |
| bfi24 | .50 | .02 | .14 | .19 | − **.67** | .02 | .91 |
| bfi29 | .59 | − .21 | − .36 | − .08 | **.64** | .05 | .79 |
| bfi34 | .48 | .04 | − .01 | .18 | −**0.6** | .28 | .86 |
| bfi39 | .54 | − .28 | .07 | − .17 | **.65** | − .09 | .88 |
| bfi5 | .64 | .17 | .05 | .02 | − .14 | **.77** | .94 |
| bfi10 | .46 | .16 | − .01 | .00 | − .02 | **.66** | .95 |
| bfi15 | .48 | − .07 | − .09 | .02 | .06 | **.68** | .99 |
| bfi20 | .53 | .06 | .10 | − .07 | .14 | **.70** | .96 |
| bfi25 | .60 | .08 | − .02 | .03 | − .20 | **.75** | .95 |
| bfi30 | .35 | .06 | .12 | .07 | − .06 | **.57** | .95 |
| bfi35 | .26 | − .07 | .09 | .30 | .21 | − **.34** | .67 |
| bfi40 | .43 | − .02 | .15 | .01 | − .01 | **.64** | .97 |
| bfi41 | .09 | − .02 | − .06 | .00 | .03 | − **.29** | .96 |
| bfi44 | .31 | .07 | − .03 | .06 | .10 | **.54** | .96 |
| Factor congruence | | .90 | .89 | .92 | .85 | .90 | |

Note: Theorised primary loadings are bolded.

IFR_AR_015172

that age contributed relatively little to acquiescence, and after the removal of the influence of age, education continued to play a significant role in acquiescence.

With the current study, increases in formal education were associated with a decrease in the absolute magnitude of acquiescence variance. The most notable decrease occurred between completion of high school and postgraduate levels. There was a marginal increase between those who had not completed high school and those who had completed a TAFE qualification, and further increases in education led to a reduction in acquiescence variance. The trend towards a reduction in variance slowed as education progressed beyond bachelor to postgraduate degrees, which offers valuable insight into the impact of education on acquiescence. The change in trend suggests that there may be some inherent ceiling effect in the relationship between acquiescence and education. This variance doubtlessly contributed to the difference in model fit between the lower and higher education groups, demonstrating an inherent risk in the use of highly educated samples in psychometric research.

Interestingly, there was very little difference in mean acquiescence scores found across educational groups. Given that the mean acquiescence scores deviated little from zero, this suggests that there is no real tendency towards a prevalence of acquiescence or counter-acquiescence across groups. While a significant mean difference was noted between the TAFE group and higher degree group, the implications for this difference are only likely to be evident when administering an instrument developed and validated solely in one of these populations for the other. For example, an instrument with balanced positive and negative items that was developed for use in a higher degree population (who have a slight tendency to counter-acquiesce) will likely demonstrate inflated mean results in a TAFE population (who have a slight tendency to acquiesce).

The factorial validity of the BFI was shown to be less in the lower education group compared to the higher group. This is consistent with previous research by Rammstedt et al. (2010), who found that the hypothesised Big Five factor structure emerged well in samples with university entrance qualifications and higher, and poorly in samples of lower education. In the current study, the overall fit of the lower education group to the hypothesised model was marginal at best, with a high number of items demonstrating poor fit. The higher education group demonstrated much better fit to the hypothesised model despite the confounding influence of acquiescence in the data. This demonstrates the risk posed by psychometric validation of instruments using samples drawn from higher educated populations — when variables such as response bias are not accounted for, even a robust and well validated instrument such as the BFI will not necessarily perform as intended. The results of the lower education group in the current study are likely to be inflated, given that the group also included individuals who had completed high school. Due to sample size limitations, it was deemed necessary to include those who had completed high school in this group; however, it is likely that had the sample size been sufficient and a qualitatively different lower group able to be selected, the factorial validity would have been even lower.

Is the difference in variance between educational groups actually due to underlying differences in cognitive abilities rather than education? It is beyond the scope of this study to comment definitively; however, some discussion is warranted. Early research by Messick and Frederiksen (1958) found that the relationship between acquiescence and education was moderated by reading ability. To investigate this further,

IFR_AR_015173

Rammstedt and Kemper (2011) tested acquiescence using a verbally administered version of the BFI to eliminate any effects of reading ability. Acquiescence was found to be larger in both magnitude and variance in the lower education group compared to the higher education group, which was consistent with the results in the current study, suggesting that reading ability does not play a substantial role in acquiescence. Hatch et al. (2007) suggested that there was a somewhat circular relationship between cognitive abilities and educational achievement, and from the perspective of psychometric investigations, the fact that a relationship between educational achievement and acquiescence has been identified may serve as a functional explanation at this time. However, the extent to which acquiescence may be shaped by education or cognitive ability is not able to be inferred from the current study.

One of the challenges with determining a value for acquiescence is the influence of differences in item-pair responses, which is derived from meaningful differences between items within a construct. For example, an individual's acquiescence score of -1 for one item-pair may suggest a tendency to acquiesce, or it may reflect a meaningful difference on items within that construct. To a considerable extent, this was managed in the current study through the averaging of 15 pairs of opposing items, which was found to form a reliable measure of acquiescence. However, the extent to which meaningful construct differences confound a nested measure of acquiescence is yet to be quantified.

Quantifying educational achievement remains a challenge for researchers. Within the current sample, slightly more than 12% of the participants stated that they were students, and for this subset, the highest educational level attained does not necessarily reflect the highest level that will be attained in the future. Similarly, the current highest level of education attained is not a limiting factor of potential achievement for any participant. If formal education itself plays a role in shaping acquiescence, we believe that any confounding impact of including students was at least minimal in the current study, given the relatively small number of participants who indicated that they were currently studying.

The order in which educational achievement groups were presented is worthy of further comment. It is a challenging concept to accept that education can be agglomerated in a manner that depicts a linear progression from lower to higher levels. For example, the time taken to achieve similar educational standards may vary considerably, such as the student who undertakes a double degree part time over a number of years, compared to the diligent student who completes a conventional degree within 3 years. Within the TAFE and vocational qualification group, courses may vary from several weeks up to 2 years, and therefore equivalency within the educational groups is somewhat limited. However, given the limited sample sizes so commonly encountered in research, it was necessary to apply some degree of agglomeration for the purposes of improving interpretability. Future research with access to larger samples may improve on this process, and aid in further understanding the impact of education on acquiescence.

Similarly, in the current study, the levels of education were separated into two groups to investigate the model fit of the BFI. Due to the current sample size, the groups were separated at the completion of secondary school level. Given the trend in acquiescence scores, it would have been preferable to investigate the model fit by comparing three or more education groups, with a more clearly defined lower

IFR_AR_015174

education group. This is a limitation in the current study, and future research will seek to address this by investigating model fit across a more homogenous lower education group.

The implications of acquiescence affect both researchers and clinicians alike. For researchers engaged in the development of psychological assessment tools, the current study serves to highlight again the importance of developing scales that allow for the measurement of acquiescence, as well as highlighting the risk to generalisability of research that has focused on more highly educated populations such as university students. The extent to which constructs are confounded by acquiescence varies across levels of education, and what may operate as a sound measure in a highly educated population may be considerably less valid in a different population. For clinicians, the knowledge that education plays a discrete and measurable role in response style can be used to better aid interpretation of psychological instruments. The results of the current study may serve to highlight risk factors that challenge the validity of an instrument; specifically, the education of the instrument rater.

The tendency to agree or disagree with questionnaire items regardless of directionality or content has been shown to be a reliable individual difference that is related to formal education, although the exact mechanism remains unclear. As formal education increases, acquiescence decreases, becoming less problematic and demonstrating some evidence of a ceiling effect in individuals who have reached a postgraduate level of education. For this knowledge to be of use, researchers are challenged to consider the use of appropriate item-pairs in instruments so as to allow for individual acquiescence scores to be calculated. Building on this practice will allow for greater evaluation and better practices in interpretation, perhaps through controlling or removal of acquiescence prior to calculating normative values for clinical use. In the immediate absence of such values, clinicians are challenged to ensure that they are aware of client educational achievement as a screen for likelihood of exhibiting response bias.

## Financial Support

This research received no specific grant from any funding agency, commercial, or not-for-profit sectors. The data used in this research was collected in the course of a Doctor of Philosophy program, for which the first author receives an Australian Postgraduate Award scholarship.

## Conflicts of Interest

None.

## Ethical Standards

The authors assert that all procedures contributing to this work comply with the ethical standards of the relevant national and institutional committees on human experimentation and with the Helsinki Declaration of 1975, as revised in 2008.

## References

Barrett, P. (2005). Person-target profiling. In A. Beauducel et al. (Eds.), *Multivariate research strategies: A festschrift for Werner Wittmann* (pp. 63–118). Aachen, Germany: Shaker Verlag GmbH.

IFR_AR_015175

Shane Costello and John Roodenburg

Barrett, P. (2006). Orthosim 2.01. Auckland NZ: Author.

Bartlett, M. (1954). A note on the multiplying factors for various chi square approximations. *Journal of the Royal Statistical Society (Series B), 16*, 296–298.

Bentler, P.M., Jackson, D.N., & Messick, S. (1971). Identification of content and style: A two dimensional interpretation of acquiescence. *Psychological Bulletin, 76*, 186–204.

Billiet, J.B., & Davidov, E. (2008). Testing the stability of an acquiescence style factor behind two inter-related substantive variables in a panel design. *Sociological Methods and Research, 36*, 542–562. doi:10.1177/0049124107313901

Catell, R. (1966). The scree test for number of factors. *Multivariate Behavioural Research, 1*, 245–276.

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112*, 155–159. doi:10.1037/0033-2909.112.1.155

Eysenck, S.B.G., & Eysenck, H.J. (1963). Acquiescence response set in personality questionnaires. *Life Sciences, 2*, 144–147. doi: http://dx.doi.org/10.1016/0024-3205(63)90026-2

Hastie, T., Tibshirani, R., & Friedman, J. (2009). *The elements of statistical learning: Data mining, inference, and prediction* (2nd ed.). New York, NY: Springer.

Hatch, S.L., Feinstein, L., Link, B.G., Wadsworth, M.E.J., & Richards, M. (2007). The continuing benefits of education: Adult education and midlife cognitive ability in the British 1946 birth cohort. *The Journals of Gerontology Series B: Psychological Sciences and Social Sciences, 62*, S404–S414.

Hendriks, A.A. (1997). *The construction of the Five-Factor Personality Inventory (FFPI)* (Unpublished doctoral thesis). Rijksuniversiteit Groningen, Groningen, The Netherlands.

Hofstee, W.K.B., ten Berge, J.F., & Hendriks, A.A. (1998). How to score questionnaires. *Personality and Individual Differences, 25*, 897–909.

Hopwood, C.J., & Donnellan, M.B. (2010). How should the internal structure of personality inventories be evaluated? *Personality and Social Psychology Review, 14*, 332–346. doi:10.1177/1088868310361240

Jackson, P.W., & Messick, S. (1965). The person, the product, and the response: Conceptual problems in the assessment of creativity. *Journal of Personality, 33*, 309–329. doi:10.1111/j.1467-6494.1965.tb01389.x

Javeline, D. (1999). Response effects in polite cultures: A test of acquiescence in Kazakhstan. *Public Opinion Quarterly, 63*, 1–28. doi:10.1086/297701

John, O.P., Naumann, L.P., & Soto, C.J. (2008). Paradigm shift to the integrative Big Five trait taxonomy: History, measurement, and conceptual issues. In O.P. John, R.W. Robins, & L.A. Pervin (Eds.), *Handbook of personality: Theory and research*. New York, NY: Guilford Press.

Kaiser, H. (1970). A second generation little jiffy. *Psychometrika, 35*, 401–415.

Kaiser, H. (1974). An index of factorial simplicity. *Psychometrika, 39*, 31–36.

Little, R.J.A., & Rubin, D.B. (2002). *Statistical analysis with missing data*. New York, NY: Wiley.

McCrae, R., Herbst, J.H., & Costa, P.T. (2001). Effects of acquiescence on personality factors structures. In R. Riemann, F.M. Spinath, & F. Ostendorf (Eds.), *Personality and temperament: Genetics, evolution, and structure* (pp. 217–231). Berlin, Germany: Pabst Science.

McCrae, R., Zonderman, A., Costa, P., Bond, M., & Paunonen, S. (1996). Evaluating replicability of factors in the Revised NEO Personality Inventory: Confirmatory factor analysis versus Procrustes rotation. *Journal of Personality and Social Psychology, 70*, 552–566. doi:10.1037/0022-3514.70.3.552

Meisenberg, G., & Williams, A. (2008). Are acquiescent and extreme response styles related to low intelligence and education? *Personality and Individual Differences, 44*, 1539–1550. doi:http://dx.doi.org/10.1016/j.paid.2008.01.010

Messick, S., & Frederiksen, N. (1958). Ability, acquiescence, and 'authoritarianism'. *Psychological Reports, 4*, 687–697. doi:10.2466/pr0.1958.4.3.687

Morf, M.E., & Jackson, D.N. (1972). An analysis of two response styles: True responding and item endorsement. *Educational and Psychological Measurement, 32*, 329–353. doi:10.1177/001316447203200210

Mulaik, S. (1972). *The foundations of factor analysis*. New York, NY: McGraw-Hill.

Nunnally, J.C. (1978). *Psychometric theory*. New York, NY: McGraw-Hill.

Pigott, T.D. (2001). A review of methods for missing data. *Educational Research and Evaluation, 7*, 353–383.

Rammstedt, B., & Farmer, R.F. (2013). The impact of acquiescence on the evaluation of personality structure. *Psychological Assessment, 25*, 1137–1145. doi:10.1037/a0033323

IFR_AR_015176

Rammstedt, B., Goldberg, L.R., & Borg, I. (2010). The measurement equivalence of Big-Five factor markers for persons with different levels of education. *Journal of Research in Personality, 44*, 53–61. doi:http://dx.doi.org/10.1016/j.jrp.2009.10.005

Rammstedt, B., & John, O.P. (2007). Measuring personality in one minute or less: A 10-item short version of the Big Five Inventory in English and German. *Journal of Research in Personality, 41*, 203–212. doi:10.1016/j.jrp.2006.02.001

Rammstedt, B., & Kemper, C.J. (2011). Measurement equivalence of the Big Five: Shedding further light on potential causes of the educational bias. *Journal of Research in Personality, 45*, 121–125. doi:http://dx.doi.org/10.1016/j.jrp.2010.11.006

Sonderen, E., Sanderman, R., & Coyne, J.C. (2013). Ineffectiveness of reverse wording of questionnaire items: Lets learn from cows in the rain. *PLoS One, 8*, e68967. doi:10.1371/journal.pone.0068967

Soto, C.J., John, O.P., Gosling, S.D., & Potter, J. (2008). The developmental psychometrics of big five self-reports: acquiescence, factor structure, coherence, and differentiation from ages 10 to 20. *Journal of Personality and Social Psychology, 94*, 718–737. doi:10.1037/0022-3514.94.4.718

Spearman, C. (1904). The proof and measurement of association between two things. *The American Journal of Psychology, 15*, 72–101.

Stankov, L., & Lee, J. (2014). Quest for the best non-cognitive predictor of academic achievement. *Educational Psychology, 34*, 1–8. doi:10.1080/01443410.2013.858908

ten Berge, J.F. (1986). Rotation to perfect congruence and the cross validation of component weights across populations. *Multivariate Behavioral Research, 21*, 41–64. doi:10.1207/s15327906mbr2101_3

ten Berge, J.F., & Hofstee, W.K.B. (1999). Coefficients alpha and reliabilities of unrotated and rotated components. *Psychometrika, 64*, 83–90.

Watkins, M. (2000). *MonteCarlo PCA for parallel analysis*. State College, PA: Ed & Psych Associates.

IFR_AR_015177

View publication stats



  

Planet Money & How I Built This

 WAMU 88.5

DONATE

## NATIONAL

# Smugglers are bringing migrants to a remote Arizona crossing, overwhelming agents

DECEMBER 10, 2023 · 2:39 AM ET

By The Associated Press



Hundreds of migrants gather along the border wall Tuesday, Dec. 5, 2023, in Lukeville, Ariz. The U.S. Border Patrol says it is overwhelmed by a shift in human smuggling routes.

*Ross D. Franklin/AP*

Gerston Miranda and his wife were among thousands of migrants recently arriving at this remote area on Arizona's southern border with Mexico, squeezing into

ER_AR_015213

United States through a gap in the wall and walking overnight about 14 miles (23 kilometers) with two school-aged daughters to surrender to Border Patrol agents.

"There is no security in my country," said the 28-year-old from Ecuador, who lost work when his employer closed due to extortion by criminals. "Without security you cannot work. You cannot live."

A shift in smuggling routes has brought an influx of migrants here from countries as diverse as Senegal, Bangladesh and China, prompting the Border Patrol to seek help from other federal agencies and drawing scrutiny to an issue critical in next year's presidential elections.

**Sponsor Message**



IFR_AR_015214



A sign shows the port of entry closed as thousands of migrants surge along the border Tuesday, Dec. 5, 2023, in Lukeville, Ariz.
*Ross D. Franklin/AP*

With hundreds of migrants crossing daily in the area, the U.S. government on Monday indefinitely shut down the nearby international crossing between Lukeville, Arizona, and Sonoyta, Mexico, to free Customs and Border Protection officers assigned to the port of entry to help with transportation and other support. The agency also has partially closed a few other border ports of entry in recent months, including a pedestrian crossing in San Diego and a bridge in Eagle Pass, Texas.

Critics of the move, including Arizona Democratic Gov. Katie Hobbs; the state's two U.S. senators, the governor of Mexico's Sonora state and the leadership of the nearby Tohono O'odham Nation, said it could harm trade and tourism. Hobbs urged President Joe Biden to reassign the 243 National Guard members already in the Tucson sector to help reopen the Lukeville crossing.

The morning after it was closed, about a dozen Border Patrol agents in olive green uniforms watched over some 400 migrants who had spent the night by the towering wall of steel bollards, wrapped in shiny Mylar blankets they later discarded among saguaro cactus and Palo Verde trees.

Three or four times as many CBP field operations officers in navy blue uniforms helped the migrants into white vans for a short drive to a canopied field intake center. From there, agents took migrants for processing to the Border Patrol's Ajo station, a half-hour north, or to other locations such as Tucson.



IFR_AR_015215

Case 1:24-cv-01702-RC　Document 53-3　Filed 09/27/24　Page 45 of 513



Members of the U.S. Border Patrol and U.S. Customs and Border Protection organize a group of migrants as hundreds of migrants gather along the border Tuesday, Dec. 5, 2023, in Lukeville, Ariz.
*Ross D. Franklin/AP*

U.S. authorities have been so short-handed in Arizona that they have used charter flights to transfer some migrants from Tucson to three Texas border cities for processing, according Witness at the Border, an advocacy group that analyzes flight data.

Federal air marshals who provide security on commercial flights, and even Federal Protective Service officers who guard U.S. government buildings, are being diverted to the border, officials have said, without saying exactly where they are going.

"We are seeing a lot of different kinds of uniforms down here," humanitarian aid worker Tom Wingo said in Lukeville.

Nonprofit groups worry about the migrants' well-being.

"This is a humanitarian crisis that's happening in our own backyard," said Dora Rodriguez, chairperson of the Tucson nonprofit Humane Borders, which keeps

IFR_AR_015216

water tanks on the border for migrants. "There are hundreds of people, including infants and children, who are stranded in remote areas of the desert for days."

The Lukeville area's popularity as a place to cross the border from Mexico into the U.S. emerged in recent months. It's one of the most striking examples of migrants shifting to a remote area, putting the Border Patrol on its heels. In 2019, Antelope Wells, New Mexico, became a popular spot. This year also has seen hundreds of migrants camping in the mountains of Jacumba Hot Springs, California, waiting for agents to process them.

Because Lukeville is so remote, Border Patrol staffing is light, so traffickers in the region controlled by Mexico's Sinaloa cartel steer people there. The arrivals last week included 41-year-old Luiz Velazquez, his wife and their three children from Zacatecas, a Mexican state plagued by drug cartel violence.

Heat-related illness was a major concern several months ago when daytime temperatures climbed into the triple digits. The worry now is overnight temperatures in the 40s, in a place where the closest hospitals and nonprofit migrant shelters are nearly two hours away.



IFR_AR_015217

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 47 of 513



A man from Kenya washes his face and fill his water bottle as hundreds of migrants gather along the border Tuesday, Dec. 5, 2023, in Lukeville, Ariz.
*Ross D. Franklin/AP*

Chris Clem, a retired Yuma, Arizona, sector chief, said it is part of smugglers' strategy to stretch agents as thinly as possible, forcing highway checkpoints to close and other resources to be diverted for processing migrants. The remoteness creates "enormous strain" on the Border Patrol, he said.

Art Del Cueto, a Tucson-based vice president with the National Border Patrol Council, said the union wants stricter measures to deter migrants from coming. He said it's not so much a matter of too few agents, but one of too many migrants.

Heading into next year's presidential elections, the border is a top issue for voters, especially Republicans, and immigration issues could be a liability for Biden, a Democrat, as he runs for reelection.

A national AP-NORC poll conducted in November found about half of U.S. adults say increasing security at the U.S.-Mexico border should be a "high priority" for the federal government, with 3 in 10 calling it a "moderate priority." Republicans were more likely than Democrats to call it a high priority.

Biden's approach to immigration combines new legal pathways to enter the country with more restrictions on asylum for those who cross the border illegally. Former President Donald Trump, the GOP front-runner for the 2024 nomination, has promised even tougher hardline immigration policies in a second term.

FFR_AR_015218

Additional funding for border security has been held up in Congress over a package to provide additional aid to Israel and Ukraine in their wars against Hamas and Russia.

John Modlin, the Border Patrol's Tucson sector chief, said Friday that the agency made 18,900 arrests for illegal crossings the previous week in the sector that includes most of Arizona's border with Mexico. That translates to a daily average of 2,700 arrests, well above October's daily average of less than 1,800 and barely 700 in December 2022.

The 2020 census listed Lukeville's population as 35, but the mobile home park where many residents lived now appears abandoned, with boarded up buildings and a scattering of old manufactured homes. A previously busy service station and store that sold ice and snacks to travelers was closed indefinitely on Monday.

The Lukeville border crossing is also popular among U.S. residents driving from Arizona to the popular resort of Puerto Peñasco, or Rocky Point. Nicknamed "Arizona's beach," it is about 62 miles (100 kilometers) south of the border on the northern shores of the Sea of Cortez.

Americans who want to travel to Puerto Peñasco now must cross through Nogales, a three-hour drive to the east, or San Luis, a two-hour drive to the west.

Alfonso Durazo, the governor of Mexico's Sonora state has asked officials of both countries to "undertake all necessary efforts necessary to resume as soon as possible the extraordinary commercial, tourist and social relationship that have historically distinguished Sonora and Arizona."

"The solution is not to close border crossings," Durazo said.

immigration      border security

IFR_AR_015219

## Were you expecting a paywall? Not our style.

We are on a mission to create a more informed public. To make that happen, we need you to do something extraordinary: donate. Your dollars will be transformed into news, shows, and more. And, all that trustworthy journalism will be freely available to everyone. Can you help?

Select an amount

**$5/MONTH**    **$15/MONTH**    **$30/MONTH**    **$100/MONTH**    Give a different amount

## More Stories From NPR



UP FIRST NEWSLETTER
**A hidden danger in Gaza; a Haitian gang leader speaks up**

IFR_AR_015220



**NATIONAL**

**In W. Va. primary, establishment candidates for governor highlight culture war issues**



**BUSINESS**

**With 'bleisure' and fewer workers, the American hotel is in recovery**

IFR_AR_015221



NATIONAL

**Counterfeit fentanyl pills are becoming a lot more common in law enforcement seizures**



MY UNSUNG HERO

**'Here's the money. Buy a house': A kind family receives kindness in return**

IFR_AR_015222

6/2/24, 1:01 PM
Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 52 of 513
Smugglers are bringing migrants to a remote Arizona border crossing : NPR



SHOTS - HEALTH NEWS

**Want to protect your kids' eyes from myopia? Get them to play outside**

## Popular on NPR.org



IFR_AR_015223

SHOTS - HEALTH NEWS

## Why writing by hand beats typing for thinking and learning



SPACE

## There's still a chance to see the Northern Lights from lower latitudes



SCIENCE

## The first person to receive a genetically modified pig kidney transplant has died

IFR_AR_015224



**OBITUARIES**

**Roger Corman, the B-movie legend who launched A-list careers, dies at 98**



**SPACE**

**The huge solar storm is keeping power grid and satellite operators on edge**

IFR_AR_015225

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 55 of 513



NATIONAL
## Controlled demolition planned at Baltimore bridge collapse site

## NPR Editors' Picks



FR_AR_015226

BUSINESS

## Why investors are doubling down on Truth Social despite Trump's historic conviction



WORLD

## What does the death of a jailed Jesuit priest say about India's democracy under Modi?



SHOTS - HEALTH NEWS

IFR_AR_015227

6/2/24, 1:01 PM
Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 57 of 513
Smugglers are bringing migrants to a remote Arizona border crossing : NPR

**As Republicans probe COVID's origins, some see an attack on science; others say it's long overdue**



POLITICS

**Vintage Trump remarks after convictions renew dilemma for news media and voters alike**



IFR_AR_015228

6/2/24, 1:01 PM
Smugglers are bringing migrants to a remote Arizona border crossing : NPR
Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 58 of 513

HEALTH

**7 surprising facts about dreams -- why we have them and what they mean**



CULTURE

**How grief taught award-winning producer Jack Antonoff to be less cynical**

READ & LISTEN

Home

News

Culture

Music

Podcasts & Shows

CONNECT

Newsletters

Facebook

Instagram

Press

Public Editor

Corrections

Contact & Help

ABOUT NPR

Overview

Diversity

GET INVOLVED

Support Public Radio

Sponsor NPR

IFR_AR_015229

6/2/24, 1:01 PM
Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 59 of 513
Smugglers are bringing migrants to a remote Arizona border crossing : NPR

**NPR Network**

**NPR Careers**

**Accessibility**

**NPR Shop**

**Ethics**

**NPR Events**

**Finances**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2024 npr

IFR_AR_015230



# Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border



IFR_AR_015332

# Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border

June 2023

***Authors:***

Steven Dudley – Project Director

Parker Asmann – Project Manager

Victoria Dittmar – Lead Investigator


***Layout and Design:***

Ana Isabel Rico, Juan José Restrepo, and María Isabel Gaviria – Graphic Design

Elisa Roldán – Creative Direction


***Editing:***

Chris Dalby – Managing Editor

Diego García, and María Luisa Valencia – Translation

Christopher Newton and Isaac Norris – Fact-checking



*Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*

## Table of Contents

**1** **Executive Summary** ............................................................. 4

**2** **Major Findings** ......................................................... 5

**3** **Background and Context**....................................... 6

**4** **Impacts** ..................................................................... 10
   1. Smuggling Prices, Profits Explode ................................. 10
   2. Extortion and Kidnapping ............................................... 13
   3. Official Corruption ......................................................... 16

**5** **Recommendations and Opportunities for Intervention** .......................................................... 19

**Related Content** .................................................. 21

*Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*



# Executive Summary

In 2019, the US Department of Homeland Security (DHS) announced the Migrant Protection Protocols (MPP).[1] What would become known as "remain in Mexico" was the latest in a decades-long effort by successive Republican and Democrat administrations to curb migration by making it increasingly difficult for migrants to enter and stay in the United States.

However, the policies have had numerous unintended consequences, including bolstering criminal organizations along the US-Mexico border. Whereas the smuggling of drugs and weapons used to dominate the cross-border contraband trade, human smuggling has morphed into one of the most lucrative industries for crime groups. It also has made it increasingly dangerous for migrants who face more risks en route and along the US border.

This report aims to highlight the role US policy has played in this transformation, which continues to evolve today. Specifically, it analyzes the ways in which Mexican organized crime groups have become involved in human smuggling as risks rose, prices surged, and migrants began to move through less-traveled corridors. The goal is to inform policymakers who are looking to address irregular migration and combat Mexico's criminal organizations. We also aim to provide relevant stakeholders with opportunities for positive intervention to mitigate this human suffering by targeting the most violent criminal actors.

The findings are based on two years of desktop and field research across the Mexican states of Baja California, Chihuahua, Coahuila, Sonora, and Tamaulipas, where human smuggling is prominent. It includes dozens of in-person and remote interviews with migrants, asylum seekers, US and Mexican prosecutors, security experts, government officials, religious leaders, and migrant advocates, among others. In addition, we analyzed government data on human smuggling investigations and prosecutions, judicial cases, and previous studies on the topic.

---

1   US Department of Homeland Security (DHS), "Migrant Protection Protocols," 24 January 2019.

IFR_AR_015335



# Major Findings

1. The prevention through deterrence policies used by the US government have created an increasingly lucrative black market for human smuggling. Transnational criminal networks have assumed greater control over the movement of people and replaced the personalized, community-based nature of human smuggling that once existed.

2. The US government's immigration policies have provided more opportunities for organized criminal groups to victimize migrants. The policies have, most notably, created a bottleneck along the US-Mexico border where northbound migrants are forced to congregate as they determine whether they are eligible to seek asylum and contemplate alternative ways to enter the country. As a result, they have become highly susceptible to extortion and kidnapping. And over time, restrictive immigration policies have expanded the scope of these lucrative, secondary criminal economies.

3. The US government's immigration policies and the externalization of immigration enforcement to countries like Mexico have expanded the breadth of official corruption. As the US government has increased its reliance on third countries for enforcement and pushed migrants to remain in these countries, officials from these nations have expanded their illegal operations. These include extortion, kidnapping, and human smuggling rackets.

IFR_AR_015336

*Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*



# Background and Context

In 1994, at the behest of the Bill Clinton administration, the United States Border Patrol, as it was known then, began a strategy it termed "prevention through deterrence."[2] The idea was simple: If you make it more difficult for people to cross into the United States, then the number who tried would dwindle. In the years after Border Patrol's announcement, the agency's budget increased steadily, and the number of agents swelled from around 4,300 in 1994 to nearly 20,000 by 2020.[3] They concentrated their efforts around ports of entry and major cities, which increased the number of apprehensions and deportations but also increased the number of migrants moving through perilous, inhospitable terrain. Migrant deaths and disappearances soared.[4]

The new strategy was the beginning of the increased militarization of the border. It was later followed by the creation of the Department of Homeland Security (DHS) in 2002, whose budget swelled to more than $50 billion by 2022.[5] However, the number of migrants being apprehended on the southern border has fluctuated significantly, from around 1.6 million encounters in 2000, to just about a half a million in 2014, and more than 2 million in 2022.[6] This has made it difficult to assess the overall effectiveness of this strategy.

What is clear, however, is the impact this strategy had on the business of irregular migration and the migrants' safety. First, the nature of the trade changed, and the prices rose significantly for migrants and their families. For years, community-based coyote networks provided a valued service, often across generations of migrants and their families. But as risks rose, so did the need for more specialized networks that operated in less-traveled areas. And as the need for infrastructure rose, so did the need for new partners and the

---

2   US Border Patrol, "Border Patrol Strategic Plan 1994 and Beyond," July 1994.

3   National Network for Immigrant and Refugee Rights, "Border Militarization Policy," 2020; American Immigration Council, "The Cost of Immigration Enforcement and Border Security," 20 January 2021.

4   James Verini, "How US Policy Turned the Sonoran Desert Into a Graveyard for Migrants," The New York Times, 18 August 2020.

5   DHS, "Homeland Security Act of 2002," 25 November 2002; DHS, "FY 2022 Budget in Brief," 2022.

6   Washington Office on Latin America (WOLA), "US-Mexico Border Patrol Migrant Encounters," 1960-2023.

IFR_AR_015337

associated fees. This was particularly true at the juncture along the US-Mexico border, the most perilous part of the trip, where separate smuggling networks began charging a premium to cross. Later, larger criminal organizations began to collect fees for passing through their territory. Along the way, ancillary businesses would also emerge around migration, from lodging to transport to camouflage clothing shops.



# Organized Crime Presence and Migration Routes to the US-Mexico Border

insightcrime.org

Caborca Cartel
Gulf Cartel (various factions)
Jalisco Cartel New Generation (CJNG)
Juárez Cartel (various factions)
Northeast Cartel (Zetas faction)
Sinaloa Cartel (various factions)
Zetas (various factions)

— Migration Routes

June 2023

Sources: InSight Crime investigations, interviews with local authorities and migrants, and Lantia Intelligence data

IFR-AR-015338

Second, migrants became increasingly vulnerable and susceptible to victimization. As the coyotes sought new routes, they had to expand their networks. Their new allies ranged from trusted partners to unknown criminal groups. As the distance between the migrants and those who they hired to move them grew, so did the risks. Available data show that since the 1990s, there has been a significant uptick in migrant disappearances and deaths. That uptick is evident in places like Pima County, Arizona, where hundreds of migrants die each year, although advocates say this is a vast undercount.[7] Many others die or disappear on the Mexican side, where there is even less accounting of these tragedies.

Despite these sobering realities, US policy stiffened in recent years with the implementation of MPP and Title 42. Commonly referred to as "remain in Mexico," MPP went into effect in early 2019 and required migrants who requested asylum at or between ports of entry to wait for their immigration court hearings in Mexico.[8] Title 42 was a public health measure established in March 2020 amid the global COVID-19 pandemic that effectively suspended asylum and gave US officials the authority to expel those wishing to seek asylum back to Mexico or their home countries.[9] The MPP program ended in June 2021, and Title 42 remained in effect until May 2023.[10]

Following the end of these programs, US officials subjected migrants to new restrictions under Title 8, a convoluted set of immigration laws that some argue make it even harder for them to seek asylum in the United States.[11] Under Title 8, if non-Mexican migrants who enter the country outside a port of entry do not first request asylum in a third country, such as Mexico, they will now be rejected for asylum, deported, and banned from entering the country for five years.[12] Currently, the only clear way to seek asylum is through a US government telephone application known as CBP One. However, rather than a secure and orderly process, the app works more like a lottery as tens of thousands of migrants enter the system simultaneously in an effort to secure

---

7  Colibrí Center for Human Rights, "Fact Sheet on Migrant Deaths," 17 July 2017.

8  DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," 20 December 2018.

9  Federal Register, "Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes," 24 March 2020.

10  DHS, "DHS Terminates MPP and Continues to Process Individuals Who Were Enrolled in MPP Into the United States to Complete Their Immigration Proceedings," 1 June 2021; DHS, "Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding Immigration Enforcement Efforts," 11 May 2023.

11  DHS, "U.S. Government Announces Sweeping New Actions to Manage Regional Migration," 27 April 2023; DHS, "DHS and DOJ Finalize Rule to Incentivize Use of Lawful Immigration Pathways," 10 May 2023.

12  Ibid.

IFR_AR_015339

one of the few appointments made available each day.[13] What's more, the app only functions for those migrants located in central and northern Mexico.[14]

In the meantime, migrants effectively remain in Mexico or risk entering illegally and getting returned to their countries of origin where they will have to rustle up the money (and the courage) to attempt the journey again. It is not easy. As migrants told us during our research, throughout the trip, officials and criminals in numerous countries lie in wait for their arrival so they can victimize them in various ways. Indeed, with every MPP, Title 42, Title 8, and the policies likely to follow, criminal networks seem to grow stronger. Below, we illustrate how.

––––––––

13   Daniela Dib and Ann Louise Deslandes, "Migrants must overcome a new barrier at the border: The U.S. government's terrible app," Rest of World, 9 March 2023; US Customs and Border Protection (CBP), "CBP Makes Changes to CBP One™ App," 5 May 2023.

14   CBP, "CBP One™ Mobile Application," 22 May 2023.

IFR_AR_015340

*Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*



# Impacts

## 1. Smuggling Prices, Profits Explode

US policies have blocked legal migration pathways and pushed migrants into new, riskier corridors controlled by more sophisticated criminal organizations. Higher risks, more infrastructure, and multi-layered networks have meant higher fees for migrants.

Take the case of Ricardo Montes.[15] Many people he knew from his hometown in Guatemala made the journey to the United States numerous times years earlier for about $5,000. But when he migrated near the end of 2019, smugglers were charging about $10,000.[16] Still, Montes felt like he had little choice. He was facing harassment and threats from local police in Guatemala City, where he lived.

Montes' experience is indicative of the industrialization of migrant smuggling. Since the 1990s, migrant smuggling has gone from intimate "mom-and-pop" operations to possibly a multibillion-dollar industry controlled in large part by organized crime groups.[17] In recent years, DHS made a conservative estimate that criminal organizations earned $500 million annually from migrant smuggling.[18] For its part, the United Nations Office on Drugs and Crime (UNODC) has said that globally, smugglers made between about $5 and $7 billion.[19] As we shall see from Montes' journey, both may be underestimates.

What was once a manageable journey -- though still fraught with serious abuses and dangers -- has metastasized into a gauntlet controlled by vast networks of smugglers, intermediaries, corrupt government officials, and transnational criminal organizations.[20] With access to ports of entry severely limited for migrants and asylum seekers because of US policy, irregular border crossings are practically the only viable option.

---

15  The name of this individual has been changed for security reasons.

16  InSight Crime interview, Guatemalan asylum seeker, 18 April 2023.

17  InSight Crime interview, US-Mexico border researcher at Human Rights Watch, 12 April 2023.

18  Then-Homeland Security Secretary Kirstjen Nielsen, "Homeland Security and Immigration Testimony," 15 May 2018.

19  UNODC, "Global Study on Smuggling of Migrants," 2018.

20  Parker Asmann and Steven Dudley, "Desperation in the Desert: The Industrialization of Migrant Smuggling on the US-Mexico Border," InSight Crime, 5 October 2022.

*Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*



*Smugglers market their services to migrants on social media platforms like TikTok and Telegram*
*(Collage: InSight Crime)*

"It creates a market for people to be able to find ways to cross our border outside of the ports of entry, and that market is being filled by organized crime," said one attorney working with asylum seekers.[21]

In Matamoros, for example, factions of the Gulf Cartel extract profits "from all the migrants that are going through their area," according to one US Homeland Security Investigations special agent.[22] Sometimes these fees are collected directly from the migrants, other times the group targets the organizations that are bringing migrants through their area of control.

Not every trip is the same. Smugglers provide migrants with a menu of options at different price points that depend on the services provided, ranging from a few hundred to a few thousand dollars just for permission to cross the US-

---

21  InSight Crime interview, Rebekah Wolf, Policy Counsel with the Immigration Justice Campaign at the American Immigration Council, 6 April 2023.

22  InSight Crime interview, Homeland Security Investigations (HSI), San Antonio Field Office, Assistant Special Agent in Charge Mark Lippa, 8 May 2023.

IFR_AR_015342

Mexico border, to more than $10,000 for a guided journey to a particular US city.[23] Montes, for example, was on the higher end of that scale and was forced to pay for the trip in three tranches.

First, Montes drove his car from Guatemala's capital city to Gracias a Dios, a small, isolated village in the department of Huehuetenango on the border with the Mexican state of Chiapas. There, he gave his car to the coyote. That would pay for the first leg of the journey to the US-Mexico border. This is common, experts told InSight Crime -- migrants often use their homes, land deeds, and other assets as collateral or to pay smuggling networks.

Montes waited in Gracias a Dios for six days before his handlers picked him up and helped him cross into Mexico. Officials stood by as he crossed, he said. From there, he was moved through a patchwork of safe houses run by individuals that his smuggling network contracted to facilitate his journey through Chiapas to the capital city of Tuxtla Gutiérrez. From there, he boarded a series of vans, cars, and trucks alongside dozens of other migrants. They were stopped several times by Mexican authorities, who collected their own small and large payments for permission to keep moving north. In all, Montes said he would pay about $1,000 in bribes, either directly or through the drivers that often handled paying the officials.

Seventeen days later -- after going through Puebla, Mexico City, and Monterrey -- he arrived in Reynosa, Tamaulipas, at the US-Mexico border. At this point, he had to pay the second tranche of $3,000 to his coyote network, but he was a little worried. Montes knew nothing about his smuggler or the broader network.

> *"[The coyote] was just the one I found on Facebook when I started looking for travel options."*

"It's completely different from how it once was," he explained. "[The coyote] was just the one I found on Facebook when I started looking for travel options."[24] In total, Montes said he interacted with seven different guides along the way who worked for the same network he originally paid in Guatemala.

This is typical of the journey these days and can cause problems. Prices, for instance, can change on a whim. At one point, one of the guides told Montes that the money he paid his smugglers had not arrived. The guide demanded an extra 1,000 pesos from Montes and 24 other migrants they were transporting, or about $1,500 total. As is evident in the next section, danger lurks, especially for those who do not have the extra money. These charges may also include

---

23   InSight Crime interview, US-Mexico border researcher at Human Rights Watch, 12 April 2023.

24   InSight Crime interview, Guatemalan asylum seeker, 18 April 2023.

IFR_AR_015343

extra fees for lodging, food, clothes, or a guide.[25] In some instances, other criminal organizations usurp control over entire groups, then force them to pay significantly more for transport to the United States.[26]

Prices can also vary for the crossing itself. Across Mexican border states like Baja California, Sonora, Coahuila, and Tamaulipas, migrants told us they were charged between $10,000 and $13,000, to be smuggled over the border and transported to certain US cities.[27] Simple permission to cross the border without a guide could incur a significant fee that ranged from $500 to $2,000, or higher depending on the criminal group in charge, on top of whatever the migrant had paid to get to the border. For his part, Montes was lucky, avoiding any extra fees before he crossed. There, in the United States, Montes paid the final tranche of $3,000.

Montes' journey can give us a sense of the market's value. In fiscal year 2022, US authorities encountered just under 2.4 million migrants at the southwest border, a new record.[28] Many of these migrants were encountered more than once, but if we assume that half of them, or 1.2 million, paid $10,000 in smuggling fees and bribes, the market would be worth close to $12 billion.

# 2. Extortion and Kidnapping

US policies like MPP and Title 42 increased the number of migrants residing in dangerous border cities for long periods of time, exposing them to greater risks of extortion and kidnapping.

This was clear to us in the border city of Nuevo Laredo, where kidnappers stalk strategic parts of the city. Outside the airport and at the bus terminals, for instance, paid lookouts target migrants arriving from Monterrey and elsewhere. And near the international bridges, taxi drivers linger to offer rides that lead migrants straight into the hands of kidnappers working with the Northeast Cartel, the dominant group in the region.

In cities like Nuevo Laredo, there is no safe haven. At migrant shelters, for example, kidnappers do informal surveys of the migrants. There, the migrants must have what is known as the clave, or key that confirms they have paid for permission to be in the city and cross the border. Those without this key are kidnapped. Ransoms can climb as high as $10,000, according to one local attorney who has knowledge of cases in the area.[29]

---

25  InSight Crime interview, local religious leader, Altar, Sonora, Mexico, 12 September 2022.

26  Ibid.

27  InSight Crime interviews, Mexican migrants, Altar and Nogales, Sonora, 12 and 14 September 2022.

28  CBP, "Southwest Border Sectors Total Encounters by Fiscal Year," 1960-2020; CBP, "Southwest Land Border Encounters," 2020-2023.

29  InSight Crime interview, independent immigration attorney, 28 February 2023.

IFR_AR_015344

To be sure, migrants have long been extorted and kidnapped en route to and at the border. But US policies greatly expanded the pool of potential victims. Both MPP and Title 42 sent many migrants back to Mexican cities where they have no social or communal ties and organized criminal groups like the Northeast Cartel are dominant. As one immigration attorney put it, the US government is "essentially handing [organized crime groups] victims."[30]



*Graffiti referencing the Northeast Cartel on the streets of Nuevo Laredo, Tamaulipas (Photo: InSight Crime)*

Still, it's difficult to gauge the true scale of the problem. Kidnapping and extortion are two of the most underreported crimes in Mexico.[31] In 2021 and 2022, for example, Mexican officials recorded just 55 cases of migrant kidnappings nationwide, although they reportedly "rescued" more than 2,000 migrants from human smugglers in 2022.[32] In contrast, during that same two-year period, Human Rights First, a non-governmental human rights organization, documented thousands of kidnappings or attempted kidnappings of migrants

---

30  InSight Crime interview, Rebekah Wolf, Policy Counsel with the Immigration Justice Campaign at the American Immigration Council, 6 April 2023.

31  Instituto Nacional de Estadística y Geografía (INEGI), "Encuesta Nacional de Victimización y Percepción sobre Seguridad Pública (ENVIPE)," 2022.

32  Gobierno de México, "Delitos Perpetrados en contra de personas migrantes irregulares en México, serie histórica 2016-2022," 2016-2022; INM, "Rescatan INM e Interpol a 4 mil 549 víctimas de tráfico, trata y delitos conexos," 5 May 2023.

who had been expelled to or stranded in Mexico due to Title 42.[33] In both cases, the numbers -- experts and lawyers told InSight Crime -- were probably far higher.

Nuevo Laredo has arguably the most sophisticated and well-organized migrant kidnapping dynamic of all the US-Mexico border cities, according to migrants, attorneys, and other border researchers interviewed for this investigation.[34] In one case chronicled by Human Rights First, US officials expelled a Guatemalan asylum seeker and her five-year-old son to Nuevo Laredo. A taxi driver picked them up immediately and handed them over to members of the Northeast Cartel. Although the criminal group had kidnapped them once before, its members demanded another $9,000 ransom payment before releasing them.[35]

Another feature of recent US immigration policy that has put migrants at increased risk are so-called "lateral expulsions." In most cases, migrants expelled under Title 42 or Title 8 are brought to the nearest port of entry and forced back into Mexico, which poses its own risks. But in some cases under Title 42, US Customs and Border Protection (CBP) drove or flew migrants to a different part of the border from where they originally crossed and required them to cross back into Mexico.[36] These lateral expulsions put migrants at extreme risk, according to experts, lawyers, and migrants interviewed by InSight Crime. While migrants may have paid one criminal network for permission to cross the border in a certain area, when they are returned to Mexico by CBP at a different point of the border, they no longer have permission to cross.[37] In another case chronicled by Human Rights First, armed men kidnapped one Honduran asylum seeker and her seven-year-old daughter "just blocks from the port of entry" after being expelled to Ciudad Juárez via a lateral expulsion flight.[38]

In sum, advocates say the number of potential extortion and kidnapping victims "increased tremendously" as a result of MPP and Title 42.[39] In fact, some of the criminal proceeds increased in direct proportion with the time migrants spent in these border cities. In Nuevo Laredo, for instance, criminal

---

33  Human Rights First, "Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021," 2021-2022.

34  Ibid.

35  Ibid.

36  American Immigration Council, "A Guide to Title 42 Expulsions at the Border," May 2022.

37  InSight Crime interview, independent immigration attorney, 28 February 2023.

38  Human Rights First, "Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021," 2021-2022.

39  InSight Crime interview, migrant shelter directors, Reynosa, Tamaulipas, Mexico, 9 May 2023.

IFR_AR_015346

actors charged extortion based on how long migrants were in the city. They demanded to review court documents to see when their next hearing was and based the extortion payment accordingly.[40]

## 3. Official Corruption

US immigration policy has for years driven migrants and asylum seekers into increasingly isolated and dangerous migratory paths between ports of entry in which they are afraid of contact not just with organized crime groups, but also authorities.



*A migration checkpoint between Monterrey, Nuevo León, and Nuevo Laredo, Tamaulipas (Photo: InSight Crime)*

Consider the final hour of the 400-kilometer bus trip from Monterrey to Piedras Negras, along the US border. There are at least three government checkpoints on this isolated two-lane highway alone. One is controlled by the Mexican Army, another by a specialized unit of the Coahuila state police, and another by Mexican immigration officials. The checkpoints are notorious. Contact with them brings the threat of detention or deportation. And when InSight Crime passed them, we did not see any security cameras.

This fear and power imbalance creates an "obvious opportunity" for government officials to extort vulnerable migrants in exchange for not being detained, one researcher told us.[41] The many migrants InSight Crime spoke to as part of this investigation said this is exactly what happens. They explained that extortion is present at nearly every step of their journey to the US-Mexico border. This includes paying off local and state police, migration officials, and members of the National Guard. One migrant told InSight Crime that

———

40   InSight Crime interview, former Human Rights First researcher on US-Mexico border, 7 March 2023.

41   InSight Crime interview, Stephanie Brewer, WOLA's Mexico Director, 13 April 2023.

IFR_AR_015347

officials board the bus with a simple message: "C'mon folks, you know the drill."[42] Refusal can lead to the destruction of their transit documents, arrest, or deportation.[43]



*The National Migration Institute's (INM) repatriation building for deported migrants in Matamoros, Tamaulipas (Photo: InSight Crime)*

US policies have made this situation worse. In recent years, the US has enrolled an increasing number of Mexican agencies into their prevention through deterrence efforts, thus multiplying the officials' interactions with vulnerable migrants.[44] Human rights defenders accused local officials of extorting migrants at bus stations and highway checkpoints. In some instances, migrants told InSight Crime, the bus drivers appeared to be part of the schemes. As one expert told us, what this means in practice is that "migrant bodies have targets on them, and it's not even just that they're deportable, but they're also *extortable*."[45]

---

42  InSight Crime interview, Venezuelan asylum seeker, Matamoros, Tamaulipas, Mexico, 12 May 2023.

43  InSight Crime interviews, Venezuelan, Guatemalan, and Honduran asylum seekers, Matamoros, Tamaulipas, Mexico, 9-12 May 2023.

44  Stephanie Leutert et al., "La Implementación y el Legado del Programa Frontera Sur de México," Strauss Center for International Security and Law at the University of Texas at Austin, June 2019.

45  InSight Crime interview, Levi Vonk, author and expert on migration, borders, and violence, 14 April 2023.

IFR_AR_015348

It gets worse. In border cities, migrants have reported being kidnapped by Mexican immigration officials or detained until ransoms are paid.[46] In other cases, immigration officials turned a blind eye as migrants were kidnapped in front of or even from within government facilities.[47] In extreme cases, migrant advocates told InSight Crime that immigration officials and local police transported migrants in government vehicles and handed them to organized crime groups who then held them for ransom.[48]

Along the US-Mexico border, migrants, lawyers, and other advocates cited the state of Coahuila as being one of the most dangerous for migrants with regard to official corruption. "The state is the most organized criminal actor," said one attorney working with families and victims of forced disappearances perpetrated by officials.[49]

———————

46   Luis Chaparro, "Migrants Died In Detention Fire Because They Couldn't Pay $200 Bribe to Be Released," Vice News, 6 April 2023.

47   Human Rights Watch, "DHS OIG Formal Complaint Regarding 'Remain in Mexico,'" 2 June 2020.

48   InSight Crime interview, migrant shelter director, Nuevo Laredo, Tamaulipas, Mexico, 21 February 2023.

49   InSight Crime interview, attorney working with families and victims of forced disappearances, Piedras Negras, Coahuila, Mexico, 23 February 2023.

IFR_AR_015349



**5**

# Recommendations and Opportunities for Intervention

1. **Allocate more resources to expand the CBP One application.**

The CBP One app currently offers just 1,250 appointments per day to apply for, yet there are tens of thousands of migrants waiting in Mexico. As a result, many resort to irregular border crossings increasingly controlled by organized crime groups, which they view as their best chance at entering the country. By expanding CBP One beyond Mexico and dedicating more resources to fixing glitches and improving its functionality, more migrants may be able to access asylum resources, thus reducing their need to remain in Mexico for long periods of time.

2. **Condition a percentage of US security assistance to Mexico on the government ensuring the safety of migrants waiting in that country to seek asylum in the United States.**

Migrants waiting in Mexico are currently under threat not just from organized crime groups but also local police and migration officials. Despite that, very little is being done to safeguard them. Conditioning a percentage of US security aid to Mexico on the government ensuring their protection and safety may push them to do more to root out corruption and combat collusion between officials and crime groups. This would help undermine a key part of how organized crime groups exploit migrants.

3. **Improve available infrastructure and resources at ports of entry and within the United States to process asylum seekers.**

Under international law, the United States is obligated to allow those already in the United States or who arrive at ports of entry to apply for asylum. However, current US policy greatly restricts that access and forces

IFR_AR_015350

people to wait in Mexico and contemplate crossing between ports of entry where there are increased dangers for migrants. Improved infrastructure and resources at ports of entry and within the United States would reduce the risks of extortion and kidnapping that migrants waiting in limbo in Mexico face on a daily basis.

―――――

IFR_AR_015351

# Related Content

Learn more about InSight Crime's in-depth coverage of migration and organized crime. In recent years, we have documented how organized crime groups in Mexico have assumed a greater role in migrant smuggling operations and taken advantage of irregular migration, including through targeted kidnappings.



### Desperation in the Desert: The Industrialization of Migrant Smuggling on the US-Mexico Border

**US-MEXICO BORDER** / 5 OCT 2022

Along the US-Mexico border, the business of smuggling migrants has evolved from a close...

READ HERE >



### Human Smugglers Outsourcing Drivers, Wreaking Havoc on US-Mexico Border

**US-MEXICO BORDER** / 20 SEP 2022

Federal and local authorities in Arizona are sounding the alarm about a rise in the use...

READ HERE >



### With US Policy, Mexico Crime Groups See Double the Opportunity in Northbound Migrants

**HUMAN RIGHTS** / 17 JAN 2022

Reported kidnappings have decreased significantly in Mexico, but in recent years, at least one out...

READ HERE >

IFR_AR_015352



InSight Crime is a nonprofit organization dedicated to the study of the principal threat to national and citizen security in Latin America and the Caribbean: organized crime. For more than a decade, InSight Crime has crossed borders and institutions - as an amalgam of journalism outlet, think tank and academic resource - to deepen the debate and inform on organized crime in the Americas. On-the-ground reporting, careful research and impactful investigations are hallmarks of the organization from the very beginning.

*For more information, visit insightcrime.org*

IFR_AR_015353





Start your search

---

**Migrant Misinfo**         **July 26, 2022**

---

## Inside the World of Misinformation Targeting Migrants on Social Media



**We talked to migrants about their information diets. Here's what we learned.**

Migrants undertaking the perilous journey to the U.S. are overwhelmingly dependent on Facebook and WhatsApp, yet the platforms' owner, Meta, has done little to stop dangerous misinformation targeting them, according to a new survey of migrants headed to the U.S.

IFR_AR_015362

The study, conducted by the Tech Transparency Project (TTP), revealed that migrants were well aware of the myriad ways in which incorrect or deceptive information on social media platforms could make their lives more dangerous. Migrants told TTP that Facebook and WhatsApp connected them with individuals who promised to help them gain entry to the U.S., only to steal their money or abandon them in dangerous situations.

TTP also found an abundance of posts spreading misinformation about immigration law, conditions along the route to the United States, and the opportunities available to migrants to the U.S. Many migrants expressed frustration with the abundance of misinformation on the platforms. "It's difficult because you can't tell what source of information is reliable," one migrant said.

Even so, many migrants fleeing violence or desperate for a better life felt that they had no choice but to wade through the sea of deceptions on social media. "I believe in what people say and whoever leads us [across the border]," one respondent who found a coyote on Facebook said. "I have nothing else to believe in."

As the number of migrants arriving at the U.S. border with Mexico soars (https://www.nbcnews.com/politics/immigration/migrant-arrivals-southern-border-surged-22-year-high-march-rcna24660) to the highest level in decades (https://www.nytimes.com/2022/06/05/us/politics/border-migrants-asylum.html), the role of rumors and misinformation in driving migrants northward has gained (https://www.dhs.gov/news/2022/03/30/fact-sheet-dhs-preparations-potential-increase-migration) increasing attention (https://www.nbcnews.com/now/video/migrants-are-falling-prey-to-social-media-misinformation-about-u-s-mexico-border-140669509646). But we still know surprisingly little about the information environment that these U.S.-bound migrants are immersed in—the sources they trust, how they parse fact from fiction, and the impact of social media on their real-world experiences.

To explore this issue, TTP assembled a team of interviewers to talk with U.S.-bound migrants from Central America about their information consumption, including the social media accounts, pages, and groups they follow. The team spoke with 200 migrants, half of them south of the Mexican border in Guatemala, at the beginning of their journey northward, and half in shelters just south of the U.S.-Mexico border.

We found that migrants depend heavily on Facebook and WhatsApp for guidance about how to get to the U.S. Many said they used the apps to communicate with other migrants or with social service organizations in receiving communities. Others had used the platforms to connect with "coyotes," or smugglers who help undocumented migrants travel to the U.S. But many migrants also embraced false claims made online, like the belief that the borders are open now that the Covid pandemic had eased, or that pregnant women are allowed to enter the U.S. without documentation. Others expressed a general sense that migration is "easier" now—a sentiment not supported by official statistics or other measures.

TTP analysts were often able to identify the origins of these rumors in the Facebook pages, WhatsApp groups, and other social media that migrants told interviewers they relied on for information. On Facebook and WhatsApp, TTP found dozens of false and misleading posts about changes to immigration policy, special rules for parents and pregnant women, or favorable conditions along the migration route.

Migrants are often victims of fraud (https://www.nytimes.com/2018/05/03/nyregion/immigrants-lawyers-defrauded-deportation.html), violent crimes (https://apnews.com/article/shootings-el-paso-texas-mass-shooting-us-news-ap-top-news-immigration-456c0154218a4d378e2fb36cd40b709d), unsafe conditions (https://www.nytimes.com/2019/02/27/us/immigrant-children-sexual-abuse.html), and sexual exploitation (https://vawnet.org/sc/sexual-violence-during-process-immigration) while traveling in their destination countries, and there's growing awareness that misinformation can increase their exposure to these threats. In 2020, for example, Human Rights First documented (https://www.humanrightsfirst.org/sites/default/files/PubliclyReportedMPPAttacks12.15.2020FINAL.pdf) the case of a Honduran asylum seeker who was sexually assaulted in Mexico after responding to an ad for a housekeeper on Facebook.

The recent discovery of a truck carrying the bodies of 46 dead migrants (https://www.reuters.com/world/us/twenty-people-found-dead-truck-san-antonio-local-media-report-2022-06-28/) in San Antonio underscores how important it is that migrants have access to reliable information in order to make safe, informed decisions about their journey.

Our interviews with migrants and review of social media data show that the platforms—especially Facebook—are failing to protect some of the most vulnerable people in the world from misinformation that could defraud them, lead to deportation, or put their lives at risk.

Specifically, the study found that:

- 

IFR_AR_015363

Most participants in the survey relied on online sources for information about their journey or conditions in the U.S. Nearly all traveled with a smartphone or tablet.

- Almost 70% of migrants say they regularly get information from Facebook, more than any source other than word-of-mouth.
- Nearly a quarter of respondents said they used WhatsApp, the messaging app owned by Facebook parent company Meta.
- Respondents told our interviewers that Facebook and WhatsApp had connected them with fraudsters who stole their money, abandoned them in unsafe conditions, or gave them bad information.
- Many migrants told TTP interviewers they had heard misinformation about the ease of travel to the U.S. or special rules that would allow them to enter without documentation.
- A review of social media groups and pages identified by migrants showed an abundance of misinformation. TTP's analysis found dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules, and baseless rumors about changes to immigration law.
- Despite this, Facebook remained popular among migrants. When asked which source of information they trusted the most, word of mouth came first. But Facebook was a close second, with nearly a third of respondents saying they trusted the platform.
- Human rights NGOs along the U.S.-Mexico border appear to use the tech platforms to reach migrants to mitigate the effects of misinformation.
- Still, many migrants never receive that help, and must navigate online fraud and misinformation on their own. More than a dozen respondents had stories of being defrauded by coyotes or other individuals seeking to exploit migrants.
- Many respondents expressed frustration about the prevalence of misinformation targeting migrants. "I don't trust anything" was a common refrain.

For this survey, TTP interviewers asked migrants about how they accessed information, the sources they used and trusted the most, and how rumors or misinformation had affected their lives. The interviewers also asked migrants to name specific social media accounts, pages, or groups that they followed. Analysts joined and followed these online sources and reviewed their contents to get a deeper understanding of the information environment surrounding U.S.-bound migrants. The surveys were conducted in Spanish or in Mayan dialects, and the responses quoted in this report have been translated for an English-speaking audience.

This was not a scientific survey and the participants were not necessarily a representative sample of everyone who travels to the U.S. The survey was not intended to gauge whether social media causes more or less migration. But participants' stories carry useful lessons about the promises and pitfalls of tech platforms for some of the world's most vulnerable people.

This report is the first of a series by TTP that will explore how information online affects the lived experience of migrants in the real world. In the coming weeks, TTP will take you inside social media through the eyes of a migrant traveling toward the U.S. We'll also look at how misinformation in receiving communities affects attitudes toward migrants in Mexico and the United States.

**Connected and Tech-Savvy**

Nearly all of the migrants who spoke to TTP interviewers carried a smartphone or tablet, and regularly used it to access the internet. Smartphones serve as a lifeline for migrants who make long journeys across unfamiliar and often dangerous terrain.

"We all carry a phone so that we are connected in case something bad happens on the road or someone gets lost," one migrant said.

IFR_AR_015364



More than three quarters of respondents told interviewers that they regularly received information from a platform owned by Meta: Facebook, WhatsApp, or Instagram. A handful of migrants also told us that they relied on YouTube, Twitter, or TikTok.

These results transcend age. Survey respondents varied in age from 12 to 58, and we found that older participants were just as likely to carry smartphones and get information from social media as younger ones.

Online social networks appear to connect with real-world social ties. Many respondents told us that they learned about online spaces for migrants through word of mouth and that they have recommended specific social media accounts to other people.

Migrants depend on tech platforms to communicate with their traveling companions, connect with legal and social services, and locate coyotes who can help them cross the border:

> "I found the person who will help me cross the border and enter the United States through a Facebook page."

> "There was a WhatsApp group. … They informed us about the conditions for crossing the border in each country."

> "I discovered this WhatsApp group while in Tapachula. One of the administrators registered me and on that platform they share all kinds of information about both the caravan and the people who provide their services to cross the border."

IFR_AR_015365



Several migrants told interviewers that they had connected with coyotes online. Offers of passage to the U.S. underlined abound (https://www.techtransparencyproject.org/articles/facebook-teems-human-smugglers-luring-migrants) on Facebook (https://www.techtransparencyproject.org/articles/spot-check-facebook-still-haven-human-smuggling). Coyotes advertise directly to migrant-focused Facebook or WhatsApp groups, or in local buy-sell groups, where ads for migration help mingle with postings about motorcycles and used furniture.



IFR_AR_015366

Case 1:24-cv-01702-RC    Document 52-3    Filed 09/27/24    Page 87 of 513

The same content often appears across multiple groups and platforms, like this ad offering a faster trip to the U.S. posted to caravan groups on both Facebook and WhatsApp:



In migrant groups, coyotes often respond to questions about conditions at the border or the status of U.S. immigration law with offers of fake documents or transportation.

IFR_AR_015367



Not all of these advertisements are scams. The services they offer may be illegal, but some of the coyotes or forgers on Facebook likely do provide what they promise. But, as many survey respondents told TTP, people selling coyote services are often fraudsters.

Take the Facebook account for "Alejandra Utis," which advertises coyote services using a profile picture stolen from a travel blogger named Mariel Galán. The ads use stock photos for leisure travel to avoid detection, but make references to the American dream and the amount of time that travelers will be required to walk—revealing that "Alejandra" isn't advertising vacations.

IFR_AR_015368



In another likely scam, a post promoting a widely advertised and since-deleted document-forging account used the logos of Mexican government agencies, in a move seemingly intended to trick migrants seeking government assistance into paying the forger instead.



**Meta Dominates**

More than half of respondents said that they used Facebook or WhatsApp to get information about conditions on their route or in the U.S. After word-of-mouth communication, Facebook was the second most frequent answer to the question, "Which source of information do you trust the most?"

IFR_AR_015369



Migrants told interviewers that information posted on Facebook was "the most real" and that it reflected the experiences of people who had migrated to the U.S. WhatsApp was also popular with migrants because they perceive it as direct communication with people who have personal knowledge about migrating to the U.S.

But the popularity of these platforms also makes them targets for scammers seeking to defraud migrants by infiltrating group accounts. Our interviewers heard numerous stories of migrants who had been deceived by someone they met on Facebook or WhatsApp:

> *"People publish information in Facebook groups that isn't real—they only want to scam people. In August I consulted with someone through a Facebook account, and all of the information that they sent tried to deceive me, nothing more."*

> *"In one of the WhatsApp groups they lied about the ways to travel to the U.S. The things they said weren't true—they just wanted to swindle us or use us as a means of transporting drugs. This happened to a family a month ago. They followed that information and they disappeared. There are rumors that they were kidnapped by drug traffickers but we don't know where they are."*

> *"In the WhatsApp group they don't only share information about the caravan. There are also scammers who indicate that they can help us cross the border but only aim to steal our money."*

> *"Previously I traveled alone and I relied on a Facebook account for support, but they cheated me."*

> *"On Facebook, they promote trips [but] when I looked into it, all of the information they gave me was false."*

Other respondents named specific Facebook accounts that they said had promised safe passage to the U.S., only to take their money and turn them in to immigration authorities.

Facebook and WhatsApp are also rife with misinformation about the ease of travel to or entry into the U.S. In the pages and groups that survey respondents said they followed, TTP found false and misleading posts about points of entry into the U.S. where the authorities decline to deport undocumented migrants, special rules exempting pregnant women or migrants with children, or favorable environmental conditions along popular routes.

It is unclear whether these posts reflect intentional disinformation or simply unwitting misunderstandings, but the effect of these messages a widespread belief that entry to the U.S. is easier than it is—is the same.

IFPR_AR_015370

12/10/22, 9:17 AM
Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 91 of 513
Inside the World of Misinformation Targeting Migrants on Social Media | Tech Transparency Project

In a recent post in a Facebook group for migrants attempting to cross the Rio Grande at Eagle Pass in central Texas, an administrator posted a photo taken from an angle that makes it appear as if the riverbed is completely dry. The same image appeared in a WhatsApp group. In fact, historical data (https://waterdata.usgs.gov/monitoring-location/08458000/#parameterCode=00065&startDT=2022-06-01&endDT=2022-06-08) from the U.S. Geological Survey shows water levels nearing three feet deep on the day of the post and during the week prior.

One respondent said that the photo was "purely a lie." The previous week, authorities recovered the bodies (https://www.youtube.com/watch?v=NV2ZsUH6eEo) of three drowned migrants near the same location.



Some of the false information posted online about environmental conditions appeared to influence survey respondents' decision-making about their own migration attempts. One respondent said that they had been told that it would be easy to cross the desert this spring. Nine other respondents told TTP interviewers that they had decided to migrate now because they heard that it was currently "easier" to travel to or enter the U.S.

Misunderstandings about changes to U.S. immigration law can also contribute to misinformation. On WhatsApp, a cropped image of a news story about Texas Gov. Greg Abbott's immigration policies created the false impression that Texas was no longer deporting migrants.

On Facebook, a poster was told that they would be allowed to enter the U.S. with their children during May and June because Title 42, a policy of immediately expelling migrants on public health grounds first invoked by the Trump administration at the start of the coronavirus pandemic, was set to be repealed.

IFR_AR_015371

Case 1:24-cv-01702-RC　　Document 52-3　　Filed 09/27/24　　Page 92 of 513



The legal machinations surrounding Title 42 are a particularly potent source of confusion and misinformation. The policy, which led to the immediate deportation of most asylum applicants, was originally scheduled to sunset on May 23, leading many migrants to falsely believe that the borders would be opened on that date.



One migrant told a TTP interviewer that it was the best time to migrate "because the borders were opened after Covid." In reality, terminating Title 42 would only change how asylum petitions are processed by allowing for processing and detention in the U.S. (https://www.texastribune.org/2022/04/29/immigration-title-42-biden/) (Title 42 remains in place after a federal judge blocked (https://www.texastribune.org/2022/05/20/title-42-border-judge-ruling-migrants/) the Biden administration from lifting the regulation.)

Misinformation circulating on these platforms often suggested that immigration rules did not apply at certain border crossings. In one exchange in a WhatsApp group, a migrant asked about border crossings where immigration authorities are not enforcing regulations, and was told to go to Ciudad Acuña, a city near an international bridge to Del Rio, Texas.

IFR_AR_015372

12/10/22, 9:17 AM
Inside the World of Disinformation Targeting Migrants on Social Media | Tech Transparency Project
Case 1:24-cv-01702-RC Document 52-3 Filed 09/27/24 Page 93 of 513

U.S. officials have deported (https://www.wola.org/analysis/at-the-busiest-part-of-the-u-s-mexico-border-wola-finds-vulnerable-people-unmet-protection-needs-and-a-wasteful-security-buildup/) or detained (https://www.texastribune.org/2022/04/04/texas-border-operation-imprisons-thousands-accused-only-of-trespassing/) thousands of migrants who crossed into Texas from Acuña within the past year.



Another common rumor held that more lenient rules applied to pregnant women or families with young children. One migrant told a TTP interviewer that they had heard that "they would let you pass" if you were traveling with children. Another said she had chosen to migrate at that time because she was pregnant and wanted to take advantage of "suddenly being allowed to enter the United States."

Another migrant said that her coyote told her that mothers with children would be allowed to pass, and that trusting this information led to her deportation.

On Facebook, migrants asked for clarification or reassurance about these rumors. Respondents told these posters that pregnant women would be allowed to enter depending on how advanced the pregnancy was. In reality, no such contingency applies. In fact, immigration officials have allegedly worked to (https://www.nytimes.com/2020/11/27/us/border-mexico-pregnant-women.html) prevent (https://www.npr.org/2020/02/23/808536155/pregnant-asylum-seekers-barred-from-u-s-entry-for-court-hearings) pregnant asylum seekers from being present in the U.S. when they gave birth.

IFR_AR_015373

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 94 of 513



To be sure, migrants and their advocates also use tech platforms to dispel misinformation and raise awareness of helpful resources. HIAS Mexico, a branch of the international aid NGO Hebrew Immigrant Aid Society, frequently runs Facebook posts urging migrants to avoid common scams and rumors, including misinformation surrounding pregnancy exceptions.



Several migrants in shelters along the U.S.-Mexico border told our interviewers they had used Facebook to connect with reputable NGOs or government agencies that assist migrants attempting to navigate complex immigration laws:

IFR_AR_015374

Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 95 of 513

*"The Facebook page [for the transnational NGO] Al Otro Lado provides information about topics related to political asylum and Title 42."*

*"I found the [Facebook] page for HIAS Mexico, which provides legal services to people under the MPP program, through others in the shelter and decided to follow it."*

*"I follow the Facebook page of the Human Rights Directorate of the Ciudad Juarez Migrant Assistance Office because they are handling my political asylum case."*

Migrants who cited these Facebook accounts told interviewers that shelter employees or NGO workers referred them to the pages. They were fortunate: Migrants who had not yet connected with social welfare organizations were often forced to rely on anonymous internet posts, unscrupulous coyotes, or unfounded rumors, sometimes with devastating consequences.

**The dire consequences of misinformation**

For migrants making the precarious journey to the United States, acting on misinformation had devastating consequences. Participants in this study told interviewers harrowing stories of being deported, abandoned in dangerous terrain, or robbed of their life savings. One migrant at a shelter near the U.S.-Mexico border told an interviewer, "In the shelter you can see many cases of people who in one way or another were deceived and abandoned along the journey."

*"Because of the false information I received from the coyote, I was deported. They deceived me by telling me that they were letting mothers with children pass [through the border], but it wasn't true."*

*"There are coyotes who don't hold up their end of the bargain. They scam people. [Migrants] suffer along the way, because they have to walk in dangerous areas for many days and some get lost."*

*"My husband managed to raise enough money to pay a coyote to cross the border, but unfortunately I was deceived and they just left me to my fate."*

Many migrants expressed frustration that it was impossible to discern fact from misinformation online. One respondent told an interviewer that "everyone lies or manipulates information." But many also told us they feel that they have no choice but to trust what they read and hear.

"We are not safe anywhere … but we go with faith that we will arrive safely," one migrant said.

"I believe in what people say and whoever leads us. I have nothing else to believe in."

---

Tech Transparency Project is a research initiative of Campaign for Accountability, a 501(c)(3) non-profit, nonpartisan watchdog organization that uses research, litigation and aggressive communications to expose how decisions made behind the doors of corporate boardrooms and government offices impact Americans' lives.

IFR_AR_015375

Donate Today (https://secure.donationpay.org/campaignforaccountability/)

IFR_AR_015376



**The Unitarian Universalist Service Committee advances human rights through grassroots collaborations.**

← INITIATIVES

# Tell President Biden: End the Transit Ban, Start a Fair Path to Citizenship

Join the call to action and urge the Biden administration to end the proposed transit ban and start a fair path to citizenship for all migrants.



While President Biden boldly asked Congress to help him "finish the job" with fixing our broken immigration system during his 2023 State of the Union address, he was also making plans to revive a transit ban developed during former President Trump's tenure.

IFR_AR_015380

**ALERT:** The Biden administration has opened a **public comment period** for feedback on the transit ban. **You** can submit a comment denouncing this discriminatory policy. Click **here** to learn more.

The ban, when implemented, will replace the Title 42 policy with an automatic mandate that any person exercising their right to migrate must first apply for asylum in the country they pass through in order to reach the U.S. border. This transit ban will predominantly affect those coming into the United States through the Mexico border from Central and South America.

This will severely limit the amount of people who can apply for asylum in the United States and the Biden administration is attempting to implement the ban by mid-May. People of conscience cannot allow this injustice to move forward.

People migrating through Mexico are at extremely high risk of kidnappings, extortion, murder, rape, human trafficking, and torture at the hands of organized crime and corrupt law enforcement. Indigenous peoples, women, girls, and members of the LGBTQ+ community are especially at risk when in migration. Many people who are migrating are doing so because they are fleeing persecution, violence, and oppression. Their trauma should not be compounded by forcing them to apply for asylum where it is often fundamentally unsafe for them.

Tell the Biden administration that this transit ban is regressive and inequitable and encourage the administration to take positive steps to fix our broken immigration system. *Please customize your email!* The more unique messages the administration receives, the better chance we have of demonstrating a resounding need to dismantle this policy.

IFR_AR_015382

IFR_AR_015383

IFR_AR_015384



## UNHCR — The UN Refugee Agency

# Ecuador
## Monthly Update
N°8 | October 2022

*Las Manes is a spot town where refugees and LGBTQ+ women are welcome.
Photo: UNHCR/Jaime Giménez*

### Figures at a glance

**Population figures**

**74,263** Historical figure of refugees recognized by Ecuador[1]

**58,862** refugees with active cases registered on UNHCR's database[2]

**96%** from neighbouring Colombia

**Our 2022 response in figures**

**336,402** people supported as of the end of October 2022

**22,408** people assisted with cash for basic needs and protection

**2,594** people provided with entrepreneurship or business training

**65,509** people received legal guidance & assistance

**6,245** GBV survivors supported

**38,026** people received hygiene kits

**16,840** people supported with emergency shelter

### Operational context

The regularization process continues with the ongoing registration of Venezuelans nation-wide, the issuance of visas and the registration of people of other nationalities who entered regularly since mid-November (see page 3 for more details).

UNHCR, with the support from IOM and partners, continues hosting mobile brigades across the country to support registration efforts, while doubling communications efforts to reach people with key information through the Estoy Aquí campaign.

Meanwhile, violence continues to push people to seek international protection in Ecuador.

The number of Colombians fleeing violence in some parts of their home country continues increasing each month, many claiming to be facing threats, risks of recruitment and increasing levels of extortions by irregular armed groups.

**35% funded**
30 November 2022

**76.1M required**

- Tightly earmarked
- Earmarked
- Softly earmarked (indicative allocation)
- Unearmarked (indicative allocation)
- Funding gap (indicative)

For more information on funding please visit reporting.unhcr.org/ecuador

[1] Historical figure registered by the government. UNHCR registers active refugee cases in the Lens (as end of September 2022).

1

---

Safety and security in some areas of Ecuador, including refugee-hosting areas, remain a concern, with reports of extortions and threats against small businesses and community leaders. UNHCR and partners continue strengthening their community-based protection response to cater for all their needs.



*Las familias refugiadas en Ecuador necesitan tu apoyo*

**See** *Global funding gap spells catastrophe for millions - Ecuador remains critically underfunded*

Over recent months, funding shortfalls have forced UNHCR, the UN Refugee Agency, to make cuts to its lifesaving aid to refugees and other forcibly displaced people in a number of operations across the world. Ecuador continues to have a USD49 million gap to help forcibly displaced people who have sought safety in the Andean country.

**Donate now.**

### Main populations forced to flee hosted by Ecuador

**Venezuelans**



Venezuelans continue to lead in numbers of arrivals in Ecuador. 39,168 people entered Ecuador in October, with a daily entry average of 1,305 Venezuelans.

**Key figures**

**502,200** Venezuelan refugees and migrants in Ecuador[2]

**73%** estimated to be in an irregular status[2]

**42%** estimated to be between 26 and 35 years old[2]

**23%** estimated to have a higher education degree[2]

**Main needs**

**83%** access to food[2]

**64%** access to housing or shelter[2]

**53%** access to livelihoods or employment[2]

IFR_AR_015631

# HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS

# and GUIDELINES ON INTERNATIONAL PROTECTION

## UNDER THE 1951 CONVENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES

REISSUED
GENEVA, FEBRUARY 2019



**UNHCR**
The UN Refugee Agency

IFR_AR_015808

IFR_AR_015809

# HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS AND GUIDELINES ON INTERNATIONAL PROTECTION

**UNDER THE 1951 CONVENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES**

REISSUED
GENEVA, FEBRUARY 2019



UNHCR
The UN Refugee Agency

IFR_AR_015810

HCR/1P/4/ENG/REV. 4

© 2019 UNHCR.
All rights reserved for all countries.
UNHCR 1979.

IFR_AR_015811

# CONTENTS

|  | Paragraphs | Page |
|---|---|---|
| Foreword ................................................................................................. |  | 9 |

## HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS

| | Paragraphs | Page |
|---|---|---|
| Introduction – International instruments defining the term "refugee" ........................... | 1-27 | 13 |
| A. Early instruments (1921-1946) ........................................................... | 1-4 | 13 |
| B. 1951 Convention relating to the Status of Refuges ..................................... | 5 | 13 |
| C. Protocol relating to the Status of Refugees ........................................... | 6-11 | 13 |
| D. Main provisions of the 1951 Convention and the 1967 Protocol .............................. | 12 | 14 |
| E. Statute of the Office of the United Nations High Commissioner for Refugees .......... | 13-19 | 14 |
| F. Regional instruments relating to refugees ............................................. | 20-23 | 15 |
| G. Asylum and the treatment of refugees ................................................. | 24-27 | 15 |

## PART ONE

| | Paragraphs | Page |
|---|---|---|
| Criteria for the Determination of Refugee Status .................................................. | 28-188 | 17 |
| Chapter I – General Principles .................................................................. | 28-31 | 17 |
| Chapter II – Inclusion Clauses ................................................................. | 32-110 | 18 |
| A. Definitions ................................................................................ | 32-34 | 18 |
| (1) Statutory Refugees ....................................................................... | 32-33 | 18 |
| (2) General definition in the 1951 Convention ............................................. | 34 | 18 |
| B. Interpretation of terms ..................................................................... | 35-110 | 18 |
| (1) "Events occurring before 1 January 1951" .............................................. | 35-36 | 18 |
| (2) "well founded fear of being persecuted" .................................................. | 37-65 | 19 |
| (a) General analysis ......................................................................... | 37-50 | 19 |
| (b) Persecution .............................................................................. | 51-53 | 21 |
| (c) Discrimination .......................................................................... | 54-55 | 21 |
| (d) Punishment ............................................................................... | 56-60 | 21 |
| (e) Consequences of unlawful departure or unauthorized stay outside country of origin ......................................... | 61 | 22 |
| (f) Economic migrants distinguished from refugees ........................................... | 62-64 | 22 |
| (g) Agents of persecution ..................................................................... | 65 | 22 |

IFR_AR_045812

|  | Paragraphs | Page |
|---|---|---|
| (3) "for reasons of race, religion, nationality, membership of a particular social group or political opinion" | 66-86 | 23 |
| (a) General analysis | 66-67 | 23 |
| (b) Race | 68-70 | 23 |
| (c) Religion | 71-73 | 23 |
| (d) Nationality | 74-76 | 24 |
| (e) Membership of a particular social group | 77-79 | 24 |
| (f) Political opinion | 80-86 | 24 |
| (4) "is outside the country of his nationality" | 87-96 | 25 |
| (a) General analysis | 87-93 | 25 |
| (b) Refugees *sur place* | 94-96 | **26** |
| (5) "and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country" | 97-100 | 26 |
| (6) "or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it" | 101-105 | 27 |
| (7) Dual or multiple nationality | 106-107 | 27 |
| (8) Geographical scope | 108-110 | 28 |
| Chapter III – Cessation Clauses | 111-139 | 29 |
| A. General | 111-117 | 29 |
| B. Interpretation of terms | 118-139 | 30 |
| (1) Voluntary re-availment of national protection | 118-125 | 30 |
| (2) Voluntary re-acquisition of nationality | 126-128 | 31 |
| (3) Acquisition of a new nationality and protection | 129-132 | 31 |
| (4) Voluntary re-establishment in the country where persecution was feared | 133-134 | 32 |
| (5) Nationals whose reasons for becoming a refugee have ceased to exist | 135-136 | 32 |
| (6) Stateless persons whose reasons for becoming a refugee have ceased to exist | 137-139 | 33 |
| Chapter IV – Exclusion Clauses | 140-163 | 34 |
| A. General | 140-141 | 34 |
| B. Interpretation of terms | 142-163 | 34 |
| (1) Persons already receiving United Nations protection or assistance | 142-143 | 34 |
| (2) Persons not considered to be in need of international protection | 144-146 | 34 |
| (3) Persons considered not to be deserving of international protection | 147-163 | 35 |

IFR_AR_015813

|  | Paragraphs | Page |
|---|---|---|
| (a) War crimes, etc. | 150 | 35 |
| (b) Common crimes | 151-161 | 36 |
| (c) Acts contrary to the purposes and principles of the United Nations | 162-163 | 37 |
| Chapter V – Special Cases | 164-180 | 38 |
| A. War refugees | 164-166 | 38 |
| B. Deserters and persons avoiding military service | 167-174 | 38 |
| C. Persons having resorted to force or committed acts of violence | 175-180 | 39 |
| Chapter VI – The Principle Of Family Unity | 181-188 | 41 |

## PART TWO

|  | Paragraphs | Page |
|---|---|---|
| Procedures for the Determination of Refugee Status | 189-219 | 42 |
| A. General | 189-194 | 42 |
| B. Establishing the Facts | 195-205 | 43 |
| (1) Principles and methods | 195-202 | 43 |
| (2) Benefit of the doubt | 203-204 | 44 |
| (3) Summary | 205 | 44 |
| C. Cases Giving Rise to Special Problems in Establishing the Facts | 206-219 | 45 |
| (1) Mentally disturbed persons | 206-212 | 45 |
| (2) Unaccompanied minors | 213-219 | 46 |
| Conclusion | 220-223 | 47 |

## ANNEXES

|  | Page |
|---|---|
| Annex I – Excerpt from the Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons | 48 |
| Annex II – 1951 Convention Relating to the Status of Refugees | 50 |
| Annex III – 1967 Protocol Relating to the Status of Refugees | 66 |
| Annex IV – List of States Parties To The 1951 Convention Relating to the Status of Refugees and the 1967 Protocol | 70 |
| Annex V – Excerpt From the Charter of the International Military Tribunal | 74 |
| Annex VI – International Instruments Relating to Article 1 F(a) of the 1951 Convention | 75 |
| Annex VII – Statute of the Office of the United Nations High Commissioner for Refugees | 76 |

IFR_AR_015814

## GUIDELINES ON INTERNATIONAL PROTECTION

GUIDELINES ON INTERNATIONAL PROTECTION NO. 1: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees ................................................................................... 83

GUIDELINES ON INTERNATIONAL PROTECTION NO. 2: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees ........................................................ 93

GUIDELINES ON INTERNATIONAL PROTECTION NO. 3: Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses) ....................................................................................... 99

GUIDELINES ON INTERNATIONAL PROTECTION NO. 4: "Internal Flight or Relocation Alternative" within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees ........................................................... 107

GUIDELINES ON INTERNATIONAL PROTECTION NO. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees ................................... 115

GUIDELINES ON INTERNATIONAL PROTECTION NO. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees .... 123

GUIDELINES ON INTERNATIONAL PROTECTION NO. 7: The application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees to victims of trafficking and persons at risk of being trafficked ...................................................... 133

GUIDELINES ON INTERNATIONAL PROTECTION NO. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees ......... 145

GUIDELINES ON INTERNATIONAL PROTECTION NO. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees ...................... 165

GUIDELINES ON INTERNATIONAL PROTECTION NO. 10: Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees .................................................... 185

GUIDELINES ON INTERNATIONAL PROTECTION NO. 11: Prima Facie Recognition of Refugee Status ....................................................................................... 203

GUIDELINES ON INTERNATIONAL PROTECTION NO. 12: Claims for refugee status related to situations of armed conflict and violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees and the regional refugee definitions .................... 215

GUIDELINES ON INTERNATIONAL PROTECTION No. 13: Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees ......................... 239

INDEX .................................................................................................................... 253

IFR_AR_015815

# FOREWORD

For over 65 years, the 1951 Convention relating to the Status of Refugees (1951 Convention), complemented by its 1967 Protocol, has served as the foundation of the refugee protection regime. It provides a universal code for the treatment of refugees uprooted from their countries as a result of persecution, including serious human rights violations or other forms of serious harm, as well as in the context of violence or armed conflict. Its key elements include: a definition of the term refugee (with provisions for inclusion, exclusion and cessation); a guarantee of protection against *refoulement*; and a set of minimum civil, political, economic, social and cultural rights. Complemented by the General Assembly resolution which created UNHCR, and made it functionally responsible for providing international protection and seeking durable solutions for refugees, as well as regional instruments such as the 1969 OAU Convention governing Specific Aspects of Refugee Problems in Africa, the 1984 Cartagena Declaration on Refugees and the Common European Asylum System, the 1951 Convention and its 1967 Protocol have been lifesaving instruments for some of the world's most vulnerable people.

The centrality of the 1951 Convention and its 1967 Protocol to the refugee protection regime is reinforced in two seminal texts: the 2016 New York Declaration for Refugees and Migrants, and the Global Compact on Refugees, affirmed by the General Assembly in 2018. These offer a meaningful set of common undertakings that have the potential to make a real difference in the lives of refugees and their host communities; notably, in the case of the Compact, by building on and complementing the 1951 Convention and relevant regional instruments through the establishment of more predictable and equitable responsibility-sharing arrangements with countries hosting large numbers of refugees. Creating an architecture of support for the countries most affected is fundamental to improvements in refugee protection and assistance, and a stronger focus on solutions from the outset.

The "Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status" (the Handbook) is issued in accordance with UNHCR's supervisory responsibility under its Statute, the 1951 Convention, its 1967 Protocol and regional instruments. It is intended to guide government officials, judges, practitioners, as well as UNHCR colleagues in applying the refugee definition. The Handbook was first issued in September 1979 at the request of Member States of the Executive Committee of the High Commissioner's Programme. A second edition was released in January 1992, which updated information concerning States Parties to the 1951 Convention and 1967 Protocol, and a third edition was issued in December 2011 on the occasion of the 60th anniversary of the 1951 Convention.

The 1951 Convention has proven to be a living and dynamic instrument, and its interpretation and application has continued to evolve through State practice, UNHCR Executive Committee conclusions, academic literature and judicial decisions at national, regional and international levels. To capture this evolution and in line with its mandate, UNHCR has issued a series of legal positions on specific questions of international refugee law entitled "Guidelines on International Protection".[1] Included in this edition are the thirteen Guidelines developed by the Office between 2002 and 2017. They complement and update the Handbook and should be read in combination with it. Amongst other issues, they illustrate the potential of the 1951 Convention, together with regional instruments, to ensure international protection for persons fleeing a wide range of socio-political events, including:

---

[1] See Goal 1, para 6, second point of the Agenda for Protection, endorsed by the Executive Committee of UNHCR's Programme and welcomed by the General Assembly: UN High Commissioner for Refugees (UNHCR), *Agenda for Protection*, October 2003, Third edition, available at: https://www.refworld.org/docid/4714a1bf2.htm

- armed conflict, which is often rooted in and/or conducted along lines of real or perceived racial, ethnic, religious, political, gender or social group divides (Guidelines on International Protection No. 12);

- persecution on the basis of sexual orientation or gender identity (Guidelines on International Protection No. 9); and

- violence perpetrated by organized gangs, traffickers, and other non-State actors, against which the State is unable or unwilling to protect (including Guidelines on International Protection No. 7 and No. 12).

I trust that this latest edition of the Handbook, together with the accompanying Guidelines, will continue to support the full and inclusive application of the 1951 Convention and regional refugee instruments, and ensure international protection for those who need it worldwide.

**Volker Türk**
Assistant High Commissioner for Refugees (Protection)
UNHCR
Geneva, January 2019

IFR_AR_015817

# HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS

**UNDER THE 1951 CONVENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES**

IFR_AR_015818

IFR_AR_015819

# INTRODUCTION – INTERNATIONAL INSTRUMENTS DEFINING THE TERM "REFUGEE"

## A. EARLY INSTRUMENTS (1921-1946)

1. Early in the twentieth century, the refugee problem became the concern of the international community, which, for humanitarian reasons, began to assume responsibility for protecting and assisting refugees.

2. The pattern of international action on behalf of refugees was established by the League of Nations and led to the adoption of a number of international agreements for their benefit. These instruments are referred to in Article 1 A (1) of the 1951 Convention relating to the Status of Refugees (see paragraph 32 below).

3. The definitions in these instruments relate each category of refugees to their national origin, to the territory that they left and to the lack of diplomatic protection by their former home country. With this type of definition "by categories" interpretation was simple and caused no great difficulty in ascertaining who was a refugee.

4. Although few persons covered by the terms of the early instruments are likely to request a formal determination of refugee status at the present time, such cases could occasionally arise. They are dealt with below in Chapter II, A. Persons who meet the definitions of international instruments prior to the 1951 Convention are usually referred to as "statutory refugees".

## B. 1951 CONVENTION RELATING TO THE STATUS OF REFUGEES

5. Soon after the Second World War, as the refugee problem had not been solved, the need was felt for a new international instrument to define the legal status of refugees. Instead of ad hoc agreements adopted in relation to specific refugee situations, there was a call for an instrument containing a general definition of who was to be considered a refugee. The Convention relating to the Status of Refugees was adopted by a Conference of Plenipotentiaries of the United Nations on 28 July 1951, and entered into force on 21 April 1954. In the following paragraphs it is referred to as "the 1951 Convention". (The text of the 1951 Convention will be found in Annex II.)

## C. PROTOCOL RELATING TO THE STATUS OF REFUGEES

6. According to the general definition contained in the 1951 Convention, a refugee is a person who:

> As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted ... is outside his country of nationality ...

7. The 1951 dateline originated in the wish of Governments, at the time the Convention was adopted, to limit their obligations to refugee situations that were known to exist at that time, or to those which might subsequently arise from events that had already occurred.[1]

8. With the passage of time and the emergence of new refugee situations, the need was increasingly felt to make the provisions of the 1951 Convention applicable to such new refugees. As a result, a Protocol relating to the Status of Refugees was prepared. After consideration by the General Assembly of the United Nations, it was opened for accession on 31 January 1967 and entered into force on 4 October 1967.

IFR_AR_015820

[1] The 1951 Convention also provides for the possibility of introducing a geographic limitation (see paras. 108 to 110 below).

9. By accession to the 1967 Protocol, States undertake to apply the substantive provisions of the 1951 Convention to refugees as defined in the Convention, but without the 1951 dateline. Although related to the Convention in this way, the Protocol is an independent instrument, accession to which is not limited to States parties to the Convention.

10. In the following paragraphs, the 1967 Protocol relating to the Status of Refugees is referred to as "the 1967 Protocol". (The text of the Protocol will be found in Annex III.)

11. At the time of writing, 78 States are parties to the 1951 Convention or to the 1967 Protocol or to both instruments. (A list of the States parties will be found in Annex IV.)

## D. MAIN PROVISIONS OF THE 1951 CONVENTION AND THE 1967 PROTOCOL

12. The 1951 Convention and the 1967 Protocol contain three types of provisions:

(i) Provisions giving the *basic definition* of who is (and who is not) a refugee and who, having been a refugee, has ceased to be one. The discussion and interpretation of these provisions constitute the main body of the present Handbook, intended for the guidance of those whose task it is to determine refugee status.

(ii) Provisions that define the *legal status* of refugees and their rights and duties in their country of refuge. Although these provisions have no influence on the process of determination of refugee status, the authority entrusted with this process should be aware of them, for its decision may indeed have far-reaching effects for the individual or family concerned.

(iii) Other provisions dealing with the *implementation* of the instruments from the administrative and diplomatic standpoint. Article 35 of the 1951 Convention and Article 11 of the 1967 Protocol contain an undertaking by Contracting States to co-operate with the Office of the United Nations High Commissioner for Refugees in the exercise of its functions and, in particular, to facilitate its duty of supervising the application of the provisions of these instruments.

## E. STATUTE OF THE OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES

13. The instruments described above under A-C define the persons who are to be considered refugees and require the parties to accord a certain status to refugees in their respective territories.

14. Pursuant to a decision of the General Assembly, the Office of the United Nations High Commissioner for Refugees ("UNHCR") was established as of 1 January 1951. The Statute of the Office is annexed to Resolution 428 (V), adopted by the General Assembly on 14 December 1950. According to the Statute, the High Commissioner is called upon – *inter alia* – to provide international protection, under the auspices of the United Nations, to refugees falling within the competence of his Office.

15. The Statute contains definitions of those persons to whom the High Commissioner's competence extends, which are very close to, though not identical with, the definition contained in the 1951 Convention. By virtue of these definitions the High Commissioner is competent for refugees irrespective of any dateline[2] or geographic limitation.[3]

16. Thus, a person who meets the criteria of the UNHCR Statute qualifies for the protection of the United Nations provided by the High Commissioner, regardless of whether or not he is in a country that is a party to the 1951 Convention or the 1967 Protocol or whether or not he has been recognized

---

[2] See paras. 35 and 36 below.
[3] See paras. 108 and 110 below.

IFR_AR_015821

by his host country as a refugee under either of these instruments. Such refugees, being within the High Commissioner's mandate, are usually referred to as "mandate refugees".

17. From the foregoing, it will be seen that a person can simultaneously be both a mandate refugee *and* a refugee under the 1951 Convention or the 1967 Protocol. He may, however, be in a country that is not bound by either of these instruments, or he may be excluded from recognition as a Convention refugee by the application of the dateline or the geographic limitation. In such cases he would still qualify for protection by the High Commissioner under the terms of the Statute.

18. The above mentioned Resolution 428 (V) and the Statute of the High Commissioner's Office call for co-operation between Governments and the High Commissioner's Office in dealing with refugee problems. The High Commissioner is designated as the authority charged with providing inter-national protection to refugees, and is required *inter alia* to promote the conclusion and ratification of international conventions for the protection of refugees, and to supervise their application.

19. Such co-operation, combined with his supervisory function, forms the basis for the High Commissioner's fundamental interest in the process of determining refugee status under the 1951 Convention and the 1967 Protocol. The part played by the High Commissioner is reflected, to varying degrees, in the procedures for the determination of refugee status established by a number of Governments.

## F. REGIONAL INSTRUMENTS RELATING TO REFUGEES

20. In addition to the 1951 Convention and the 1967 Protocol, and the Statute of the Office of the United Nations High Commissioner for Refugees, there are a number of regional agreements, conventions and other instruments relating to refugees, particularly in Africa, the Americas and Europe. These regional instruments deal with such matters as the granting of asylum, travel documents and travel facilities, etc. Some also contain a definition of the term "refugee", or of persons entitled to asylum.

21. In Latin America, the problem of diplomatic and territorial asylum is dealt with in a number of regional instruments including the Treaty on International Penal Law, (Montevideo, 1889); the Agreement on Extradition, (Caracas, 1911); the Convention on Asylum, (Havana, 1928); the Convention on Political Asylum, (Montevideo, 1933); the Convention on Diplomatic Asylum, (Caracas, 1954); and the Convention on Territorial Asylum, (Caracas, 1954).

22. A more recent regional instrument is the Convention Governing the Specific Aspects of Refugee Problems in Africa, adopted by the Assembly of Heads of State and Government of the Organization of African Unity on 10 September 1969. This Convention contains a definition of the term "refugee", consisting of two parts: the first part is identical with the definition in the 1967 Protocol (i.e. the definition in the 1951 Convention without the dateline or geographic limitation). The second part applies the term "refugee" to:

> every person who, owing to external aggression, occupation, foreign domination or events seriously disturbing public order in either part or the whole of his country of origin or nationality, is compelled to leave his place of habitual residence in order to seek refuge in another place outside his country of origin or nationality.

23. The present Handbook deals only with the determination of refugee status under the two international instruments of universal scope: the 1951 Convention and the 1967 Protocol.

## G. ASYLUM AND THE TREATMENT OF REFUGEES

24. The Handbook does not deal with questions closely related to the determination of refugee status e.g. the granting of asylum to refugees or the legal treatment of refugees after they have been recognized as such.

IFR_AR_015822

25. Although there are references to asylum in the Final Act of the Conference of Plenipotentiaries as well as in the Preamble to the Convention, the granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol. The High Commissioner has always pleaded for a generous asylum policy in the spirit of the Universal Declaration of Human Rights and the Declaration on Territorial Asylum, adopted by the General Assembly of the United Nations on 10 December 1948 and on 14 December 1967 respectively.

26. With respect to the treatment within the territory of States, this is regulated as regards refugees by the main provisions of the 1951 Convention and 1967 Protocol (see paragraph 12(ii) above). Furthermore, attention should be drawn to Recommendation E contained in the Final Act of the Conference of Plenipotentiaries which adopted the 1951 Convention:

> The Conference
>
> Expresses the hope that the Convention relating to the Status of Refugees will have value as an example exceeding its contractual scope and that all nations will be guided by it in granting so far as possible to persons in their territory as refugees and who would not be covered by the terms of the Convention, the treatment for which it provides.

27. This recommendation enables States to solve such problems as may arise with regard to persons who are not regarded as fully satisfying the criteria of the definition of the term "refugee".

IFR_AR_015823

# PART ONE

**CRITERIA FOR THE DETERMINATION OF REFUGEE STATUS**

## CHAPTER I – GENERAL PRINCIPLES

28. A person is a refugee within the meaning of the 1951 Convention as soon as he fulfils the criteria contained in the definition. This would necessarily occur prior to the time at which his refugee status is formally determined. Recognition of his refugee status does not therefore make him a refugee but declares him to be one. He does not become a refugee because of recognition, but is recognized because he is a refugee.

29. Determination of refugee status is a process which takes place in two stages. Firstly, it is necessary to ascertain the relevant facts of the case. Secondly, the definitions in the 1951 Convention and the 1967 Protocol have to be applied to the facts thus ascertained.

30. The provisions of the 1951 Convention defining who is a refugee consist of three parts, which have been termed respectively "inclusion", "cessation" and "exclusion" clauses.

31. The inclusion clauses define the criteria that a person must satisfy in order to be a refugee. They form the positive basis upon which the determination of refugee status is made. The so-called cessation and exclusion clauses have a negative significance; the former indicate the conditions under which a refugee ceases to be a refugee and the latter enumerate the circumstances in which a person is excluded from the application of the 1951 Convention although meeting the positive criteria of the inclusion clauses.

IFR_AR_015824

# CHAPTER II – INCLUSION CLAUSES

## A. DEFINITIONS

### (1) Statutory Refugees

32. Article 1 A (1) of the 1951 Convention deals with statutory refugees, i.e. persons considered to be refugees under the provisions of international instruments preceding the Convention. This provision states that:

> For the purposes of the present Convention, the term 'refugee' shall apply to any person who:
>
> (1) Has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;
>
> Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugees being accorded to persons who fulfil the conditions of paragraph 2 of this section.

33. The above enumeration is given in order to provide a link with the past and to ensure the continuity of international protection of refugees who became the concern of the international community at various earlier periods. As already indicated (para. 4 above), these instruments have by now lost much of their significance, and a discussion of them here would be of little practical value. However, a person who has been considered a refugee under the terms of any of these instruments is automatically a refugee under the 1951 Convention. Thus, a holder of a so-called "Nansen Passport"[4] or a "Certificate of Eligibility" issued by the International Refugee Organization must be considered a refugee under the 1951 Convention unless one of the cessation clauses has become applicable to his case or he is excluded from the application of the Convention by one of the exclusion clauses. This also applies to a surviving child of a statutory refugee.

### (2) General definition in the 1951 Convention

34. According to Article 1 A (2) of the 1951 Convention the term "refugee" shall apply to any person who:

> As a result of events occurring before 1 January 1951 and owing to well founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

This general definition is discussed in detail below.

## B. INTERPRETATION OF TERMS

### (1) "Events occurring before 1 January 1951"

35. The origin of this 1951 dateline is explained in paragraph 7 of the Introduction. As a result of the 1967 Protocol this dateline has lost much of its practical significance. An interpretation of the word "events" is therefore of interest only in the small number of States parties to the 1951 Convention that are not also party to the 1967 Protocol.[5]

IFR_AR_015825

---

[4] "Nansen Passport": a certificate of identity for use as a travel document, issued to refugees under the provisions of pre-war instruments.
[5] See Annex IV.

18

36. The word "events" is not defined in the 1951 Convention, but was understood to mean "happenings of major importance involving territorial or profound political changes as well as systematic programmes of persecution which are after-effects of earlier changes".[6] The dateline refers to "events" as a result of which, and not to the date on which, a person becomes a refugee, not does it apply to the date on which he left his country. A refugee may have left his country before or after the datelines, provided that his fear of persecution is due to "events" that occurred before the dateline or to after-effects occurring at a later date as a result of such events.[7]

## (2) "well founded fear of being persecuted"

### (a) General analysis

37. The phrase "well-founded fear of being persecuted" is the key phrase of the definition. It reflects the views of its authors as to the main elements of refugee character. It replaces the earlier method of defining refugees by categories (i.e. persons of a certain origin not enjoying the protection of their country) by the general concept of "fear" for a relevant motive. Since fear is subjective, the definition involves a subjective element in the person applying for recognition as a refugee. Determination of refugee status will therefore primarily require an evaluation of the applicant's statements rather than a judgement on the situation prevailing in his country of origin.

38. To the element of fear – a state of mind and a subjective condition – is added the qualification "well-founded". This implies that it is not only the frame of mind of the person concerned that determines his refugee status, but that this frame of mind must be supported by an objective situation. The term "well-founded fear" therefore contains a subjective and an objective element, and in determining whether well-founded fear exists, both elements must be taken into consideration.

39. It may be assumed that, unless he seeks adventure or just wishes to see the world, a person would not normally abandon his home and country without some compelling reason. There may be many reasons that are compelling and understandable, but only one motive has been singled out to denote a refugee. The expression "owing to well-founded fear of being persecuted" – for the reasons stated – by indicating a specific motive automatically makes all other reasons for escape irrelevant to the definition. It rules out such persons as victims of famine or natural disaster, unless they also have well-founded fear of persecution for one of the reasons stated. Such other motives may not, however, be altogether irrelevant to the process of determining refugee status, since all the circumstances need to be taken into account for a proper understanding of the applicant's case.

40. An evaluation of the *subjective element* is inseparable from an assessment of the personality of the applicant, since psychological reactions of different individuals may not be the same in identical conditions. One person may have strong political or religious convictions, the disregard of which would make his life intolerable; another may have no such strong convictions. One person may make an impulsive decision to escape; another may carefully plan his departure.

41. Due to the importance that the definition attaches to the subjective element, an assessment of credibility is indispensable where the case is not sufficiently clear from the facts on record. It will be necessary to take into account the personal and family background of the applicant, his membership of a particular racial, religious, national, social or political group, his own interpretation of his situation, and his personal experiences – in other words, everything that may serve to indicate that the predominant motive for his application is fear. Fear must be reasonable. Exaggerated fear, however, may be well-founded if, in all the circumstances of the case, such a state of mind can be regarded as justified.

42. As regards the objective clement, it is necessary to evaluate the statements made by the applicant. The competent authorities that are called upon to determine refugee status are not required to pass judgement on conditions in the applicant's country of origin. The applicant's statements cannot, however, be considered in the abstract, and must be viewed in the context of the relevant background

---

[6] UN Document E/1618 page 39.
[7] *Loc. cit.*

IFR_AR_015826

19

situation. A knowledge of conditions in the applicant's country of origin –while not a primary objective – is an important element in assessing the applicant's credibility. In general, the applicant's fear should be considered well-founded if he can establish, to a reasonable degree, that his continued stay in his country of origin has become intolerable to him for the reasons stated in the definition, or would for the same reasons be intolerable if he returned there.

43. These considerations need not necessarily be based on the applicant's own personal experience. What, for example, happened to his friends and relatives and other members of the same racial or social group may well show that his fear that sooner or later he also will become a victim of persecution is well-founded. The laws of the country of origin, and particularly the manner in which they are applied, will be relevant. The situation of each person must, however, be assessed on its own merits. In the case of a well-known personality, the possibility of persecution may be greater than in the case of a person in obscurity. All these factors, e.g. a person's character, his background, his influence, his wealth or his outspokenness, may lead to the conclusion that his fear of persecution is "well-founded".

44. While refugee status must normally be determined on an individual basis, situations have also arisen in which entire groups have been displaced under circumstances indicating that members of the group could be considered individually as refugees. In such situations the need to provide assistance is often extremely urgent and it may not be possible for purely practical reasons to carry out an individual determination of refugee status for each member of the group. Recourse has therefore been had to so-called "group determination" of refugee status, whereby each member of the group is regarded *prima facie* (i.e. in the absence of evidence to the contrary) as a refugee.

45. Apart from the situations of the type referred to in the preceding paragraph, an applicant for refugee status must normally show good reason why he individually fears persecution. It may be assumed that a person has well-founded fear of being persecuted if he has already been the victim of persecution for one of the reasons enumerated in the 1951 Convention. However, the word "fear" refers not only to persons who have actually been persecuted, but also to those who wish to avoid a situation entailing the risk of persecution.

46. The expressions "fear of persecution" or even "persecution" are usually foreign to a refugee's normal vocabulary. A refugee will indeed only rarely invoke "fear of persecution" in these terms, though it will often be implicit in his story. Again, while a refugee may have very definite opinions for which he has had to suffer, he may not, for psychological reasons, be able to describe his experiences and situation in political terms.

47. A typical test of the well-foundedness of fear will arise when an applicant is in possession of a valid national passport. It has sometimes been claimed that possession of a passport signifies that the issuing authorities do not intend to persecute the holder, for otherwise they would not have issued a passport to him. Though this may be true in some cases, many persons have used a legal exit from their country as the only means of escape without ever having revealed their political opinions, a knowledge of which might place them in a dangerous situation vis-à-vis the authorities.

48. Possession of a passport cannot therefore always be considered as evidence of loyalty on the part of the holder, or as an indication of the absence of fear. A passport may even be issued to a person who is undesired in his country of origin, with the sole purpose of securing his departure, and there may also be cases where a passport has been obtained surreptitiously. In conclusion, therefore, the mere possession of a valid national passport is no bar to refugee status.

49. If, on the other hand, an applicant, without good reason, insists on retaining a valid passport of a country of whose protection he is allegedly unwilling to avail himself, this may cast doubt on the validity of his claim to have "well-founded fear". Once recognized, a refugee should not normally retain his national passport.

50. There may, however, be exceptional situations in which a person fulfilling the criteria of refugee status may retain his national passport-or be issued with a new one by the authorities of his country of origin under special arrangements. Particularly where such arrangements do not imply that the

IFR_AR_015827

holder of the national passport is free to return to his country without prior permission, they may not be incompatible with refugee status.

### (b) Persecution

51. There is no universally accepted definition of "persecution", and various attempts to formulate such a definition have met with little success. From Article 33 of the 1951 Convention, it may be inferred that a threat to life or freedom on account of race, religion, nationality, political opinion or membership of a particular social group is always persecution. Other serious violations of human rights – for the same reasons – would also constitute persecution.

52. Whether other prejudicial actions or threats would amount to persecution will depend on the circumstances of each case, including the subjective element to which reference has been made in the preceding paragraphs. The subjective character of fear of persecution requires an evaluation of the opinions and feelings of the person concerned. It is also in the light of such opinions and feelings that any actual or anticipated measures against him must necessarily be viewed. Due to variations in the psychological make-up of individuals and in the circumstances of each case, interpretations of what amounts to persecution are bound to vary.

53. In addition, an applicant may have been subjected to various measures not in themselves amounting to persecution (e.g. discrimination in different forms), in some cases combined with other adverse factors (e.g. general atmosphere of insecurity in the country of origin). In such situations, the various elements involved may, if taken together, produce an effect on the mind of the applicant that can reasonably justify a claim to well-founded fear of persecution on "cumulative grounds". Needless to say, it is not possible to lay down a general rule as to what cumulative reasons can give rise to a valid claim to refugee status. This will necessarily depend on all the circumstances, including the particular geographical, historical and ethnological context.

### (c) Discrimination

54. Differences in the treatment of various groups do indeed exist to a greater or lesser extent in many societies. Persons who receive less favourable treatment as a result of such differences are not necessarily victims of persecution. It is only in certain circumstances that discrimination will amount to persecution. This would be so if measures of discrimination lead to consequences of a substantially prejudicial nature for the person concerned, e.g. serious restrictions on his right to earn his livelihood, his right to practise his religion, or his access to normally available educational facilities.

55. Where measures of discrimination are, in themselves, not of a serious character, they may nevertheless give rise to a reasonable fear of persecution if they produce, in the mind of the person concerned, a feeling of apprehension and insecurity as regards his future existence. Whether or not such measures of discrimination in themselves amount to persecution must be determined in the light of all the circumstances. A claim to fear of persecution will of course be stronger where a person has been the victim of a number of discriminatory measures of this type and where there is thus a cumulative element involved.[8]

### (d) Punishment

56. Persecution must be distinguished from punishment for a common law offence. Persons fleeing from prosecution or punishment for such an offence are not normally refugees. It should be recalled that a refugee is a victim – or potential victim – of injustice, not a fugitive from justice.

57. The above distinction may, however, occasionally be obscured. In the first place, a person guilty of a common law offence may be liable to excessive punishment, which may amount to persecution within the meaning of the definition. Moreover, penal prosecution for a reason mentioned in the definition (for example, in respect of "illegal" religious instruction given to a child) may in itself amount to persecution.

IFR_AR_015828

[8] See also para. 53.

58. Secondly, there may be cases in which a person, besides fearing prosecution or punishment for a common law crime, may also have "well founded fear of persecution". In such cases the person concerned is a refugee. It may, however, be necessary to consider whether the crime in question is not of such a serious character as to bring the applicant within the scope of one of the exclusion clauses.[9]

59. In order to determine whether prosecution amounts to persecution, it will also be necessary to refer to the laws of the country concerned, for it is possible for a law not to be in conformity with accepted human rights standards. More often, however, it may not be the law but its application that is discriminatory. Prosecution for an offence against "public order", e.g. for distribution of pamphlets, could for example be a vehicle for the persecution of the individual on the grounds of the political content of the publication.

60. In such cases, due to the obvious difficulty involved in evaluating the laws of another country, national authorities may frequently have to take decisions by using their own national legislation as a yardstick. Moreover, recourse may usefully be had to the principles set out in the various international instruments relating to human rights, in particular the International Covenants on Human Rights, which contain binding commitments for the States parties and are instruments to which many States parties to the 1951 Convention have acceded.

**(e) Consequences of unlawful departure or unauthorized stay outside country of origin**

61. The legislation of certain States imposes severe penalties on nationals who depart from the country in an unlawful manner or remain abroad without authorization. Where there is reason to believe that a person, due to his illegal departure or unauthorized stay abroad is liable to such severe penalties his recognition as a refugee will be justified if it can be shown that his motives for leaving or remaining outside the country are related to the reasons enumerated in Article 1 A (2) of the 1951 Convention (see paragraph 66 below).

**(f) Economic migrants distinguished from refugees**

62. A migrant is a person who, for reasons other than those contained in the definition, voluntarily leaves his country in order to take up residence elsewhere. He may be moved by the desire for change or adventure, or by family or other reasons of a personal nature. If he is moved exclusively by economic considerations, he is an economic migrant and not a refugee.

63. The distinction between an economic migrant and a refugee is, however, sometimes blurred in the same way as the distinction between economic and political measures in an applicant's country of origin is not always clear. Behind economic measures affecting a person's livelihood there may be racial, religious or political aims or intentions directed against a particular group. Where economic measures destroy the economic existence of a particular section of the population (e.g. withdrawal of trading rights from, or discriminatory or excessive taxation of, a specific ethnic or religious group), the victims may according to the circumstances become refugees on leaving the country.

64. Whether the same would apply to victims of general economic measures (i.e. those that are applied to the whole population without discrimination) would depend on the circumstances of the case. Objections to general economic measures are not by themselves good reasons for claiming refugee status. On the other hand, what appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves.

**(g) Agents of persecution**

65. Persecution is normally related to action by the authorities of a country. It may also emanate from sections of the population that do not respect the standards established by the laws of the country

IFR_AR_015829

---

[9] See para. 144 to 156.

concerned. A case in point may be religious intolerance, amounting to persecution, in a country otherwise secular, but where sizeable fractions of the population do not respect the religious beliefs of their neighbours. Where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection.

### (3) "for reasons of race, religion, nationality, membership of a particular social group or political opinion"

#### (a) General analysis

66. In order to be considered a refugee, a person must show well-founded fear of persecution for one of the reasons stated above. It is immaterial whether the persecution arises from any single one of these reasons or from a combination of two or more of them. Often the applicant himself may not be aware of the reasons for the persecution feared. It is not, however, his duty to analyze his case to such an extent as to identify the reasons in detail.

67. It is for the examiner, when investigating the facts of the case, to ascertain the reason or reasons for the persecution feared and to decide whether the definition in the 1951 Convention is met with in this respect. It is evident that the reasons for persecution under these various headings will frequently overlap. Usually there will be more than one clement combined in one person, e.g. a political opponent who belongs to a religious or national group, or both, and the combination of such reasons in his person may be relevant in evaluating his well-founded fear.

#### (b) Race

68. Race, in the present connexion, has to be understood in its widest sense to include all kinds of ethnic groups that are referred to as "races" in common usage. Frequently it will also entail membership of a specific social group of common descent forming a minority within a larger population. Discrimination for reasons of race has found world-wide condemnation as one of the most striking violations of human rights. Racial discrimination, therefore, represents an important element in determining the existence of persecution.

69. Discrimination on racial grounds will frequently amount to persecution in the sense of the 1951 Convention. This will be the case if, as a result of racial discrimination, a person's human dignity is affected to such an extent as to be incompatible with the most elementary and inalienable human rights, or where the disregard of racial barriers is subject to serious consequences.

70. The mere fact of belonging to a certain racial group will normally not be enough to substantiate a claim to refugee status. There may, however, be situations where, due to particular circumstances affecting the group, such membership will in itself be sufficient ground to fear persecution.

#### (c) Religion

71. The Universal Declaration of Human Rights and the Human Rights Covenant proclaim the right to freedom of thought, conscience and religion, which right includes the freedom of a person to change his religion and his freedom to manifest it in public or private, in teaching, practice, worship and observance.

72. Persecution for "reasons of religion" may assume various forms, e.g. prohibition of membership of a religious community, of worship in private or in public, of religious instruction, or serious measures of discrimination imposed on persons because they practise their religion or belong to a particular religious community.

73. Mere membership of a particular religious community will normally not be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground.

IFR_AR_015830

**(d) Nationality**

74. The term "nationality" in this context is not to be understood only as "citizenship". It refers also to membership of an ethnic or linguistic group and may occasionally overlap with the term "race". Persecution for reasons of nationality may consist of adverse attitudes and measures directed against a national (ethnic, linguistic) minority and in certain circumstances the fact of belonging to such a minority may in itself give rise to well-founded fear of persecution.

75. The co-existence within the boundaries of a State of two or more national (ethnic, linguistic) groups may create situations of conflict and also situations of persecution or danger of persecution. It may not always be easy to distinguish between persecution for reasons of nationality and persecution for reasons of political opinion when a conflict between national groups is combined with political movements, particularly where a political movement is identified with a specific "nationality".

76. Whereas in most cases persecution for reason of nationality is feared by persons belonging to a national minority, there have been many cases in various continents where a person belonging to a majority group may fear persecution by a dominant minority.

**(e) Membership of a particular social group**

77. A "particular social group" normally comprises persons of similar background, habits or social status. A claim to fear of persecution under this heading may frequently overlap with a claim to fear of persecution on other grounds, i.e. race, religion or nationality.

78. Membership of such a particular social group may be at the root of persecution because there is no confidence in the group's loyalty to the Government or because the political outlook, antecedents or economic activity of its members, or the very existence of the social group as such, is held to be an obstacle to the Government's policies.

79. Mere membership of a particular social group will not normally be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground to fear persecution.

**(f) Political opinion**

80. Holding political opinions different from those of the Government is not in itself a ground for claiming refugee status, and an applicant must show that he has a fear of persecution for holding such opinions. This presupposes that the applicant holds opinions not tolerated by the authorities, which are critical of their policies or methods. It also presupposes that such opinions have come to the notice of the authorities or are attributed by them to the applicant. The political opinions of a teacher or writer may be more manifest than those of a person in a less exposed position. The relative importance or tenacity of the applicant's opinions – in so far as this can be established from all the circumstances of the case – will also be relevant.

81. While the definition speaks of persecution "for reasons of political opinion" it may not always be possible to establish a causal link between the opinion expressed and the related measures suffered or feared by the applicant. Such measures have only rarely been based expressly on "opinion". More frequently, such measures take the form of sanctions for alleged criminal acts against the ruling power. It will, therefore, be necessary to establish the applicant's political opinion, which is at the root of his behaviour, and the fact that it has led or may lead to the persecution that he claims to fear.

82. As indicated above, persecution "for reasons of political opinion" implies that an applicant holds an opinion that either has been expressed or has come to the attention of the authorities. There may, however, also be situations in which the applicant has not given any expression to his opinions. Due to the strength of his convictions, however, it may be reasonable to assume that his opinions will sooner or later find expression and that the applicant will, as a result, come into conflict with the authorities. Where this can reasonably be assumed, the applicant can be considered to have fear of persecution for reasons of political opinion.

IFR_AR_01583

24

83. An applicant claiming fear of persecution because of political opinion need not show that the authorities of his country of origin knew of his opinions before he left the country. He may have concealed his political opinion and never have suffered any discrimination or persecution. However, the mere fact of refusing to avail himself of the protection of his Government, or a refusal to return, may disclose the applicant's true state of mind and give rise to fear of persecution. In such circumstances the test of well-founded fear would be based on an assessment of the consequences that an applicant having certain political dispositions would have to face if he returned. This applies particularly to the so-called refugee "sur place".[10]

84. Where a person is subject to prosecution or punishment for a political offence, a distinction may have to be drawn according to whether the prosecution is for political *opinion* or for politically-motivated *acts*. If the prosecution pertains to a punishable act committed out of political motives, and if the anticipated punishment is in conformity with the general law of the country concerned, fear of such prosecution will not in itself make the applicant a refugee.

85. Whether a political offender can also be considered a refugee will depend upon various other factors. Prosecution for an offence may, depending upon the circumstances, be a pretext for punishing the offender for his political opinions or the expression thereof. Again, there may be reason to believe that a political offender would be exposed to excessive or arbitrary punishment for the alleged offence. Such excessive or arbitrary punishment will amount to persecution.

86. In determining whether a political offender can be considered a refugee, regard should also be had to the following elements: personality of the applicant, his political opinion, the motive behind the act, the nature of the act committed, the nature of the prosecution and its motives; finally, also, the nature of the law on which the prosecution is based. These elements may go to show that the person concerned has a fear of persecution and not merely a fear of prosecution and punishment – within the law – for an act committed by him.

## (4) "is outside the country of his nationality"

### (a) General analysis

87. In this context, "nationality" refers to "citizenship". The phrase "is outside the country of his nationality" relates to persons who have a nationality, as distinct from stateless persons. In the majority of cases, refugees retain the nationality of their country of origin.

88. It is a general requirement for refugee status that an applicant who has a nationality be outside the country of his nationality. There are no exceptions to this rule. International protection cannot come into play as long as a person is within the territorial jurisdiction of his home country.[11]

89. Where, therefore, an applicant alleges fear of persecution in relation to the country of his nationality, it should be established that he does in fact possess the nationality of that country. There may, however, be uncertainty as to whether a person has a nationality. He may not know himself, or he may wrongly claim to have a particular nationality or to be stateless. Where his nationality cannot be clearly established, his refugee status should be determined in a similar manner to that of a stateless person, i.e. instead of the country of his nationality, the country of his former habitual residence will have to be taken into account. (See paragraphs 101 to 105 below.)

90. As mentioned above, an applicant's well-founded fear of persecution must be in relation to the country of his nationality. As long as he has no fear in relation to the country of his nationality, he can be expected to avail himself of that country's protection. He is not in need of international protection and is therefore not a refugee.

---

[10] See paras. 94 to 96.

[11] In certain countries, particularly in Latin America, there is a custom of "diplomatic asylum", i.e. granting refuge to political fugitives in foreign embassies. While a person thus sheltered may be considered to be outside his country's jurisdiction, he is not outside its territory and cannot therefore be considered under the terms of the 1951 Convention. The former notion of the "extraterritoriality" of embassies has lately been replaced by the term "inviolability" used in the 1961 Vienna Convention on Diplomatic Relations.

91. The fear of being persecuted need not always extend to the *whole* territory of the refugee's country of nationality. Thus in ethnic clashes or in cases of grave disturbances involving civil war conditions, persecution of a specific ethnic or national group may occur in only one part of the country. In such situations, a person will not be excluded from refugee status merely because he could have sought refuge in another part of the same country, if under all the circumstances it would not have been reasonable to expect him to do so.

92. The situation of persons having more than one nationality is dealt with in paragraphs 106 and 107 below.

93. Nationality may be proved by the possession of a national passport. Possession of such a passport creates a *prima facie* presumption that the holder is a national of the country of issue, unless the passport itself states otherwise. A person holding a passport showing him to be a national of the issuing country, but who claims that he does not possess that country's nationality, must substantiate his claim, for example, by showing that the passport is a so-called "passport of convenience" (an apparently regular national passport that is sometimes issued by a national authority to non-nationals). However, a mere assertion by the holder that the passport was issued to him as a matter of convenience for travel purposes only is not sufficient to rebut the presumption of nationality. In certain cases, it might be possible to obtain information from the authority that issued the passport. If such information cannot be obtained, or cannot be obtained within reasonable time, the examiner will have to decide on the credibility of the applicant's assertion in weighing all other elements of his story.

**(b) Refugees *"sur place"***

94. The requirement that a person must be outside his country to be a refugee does not mean that he must necessarily have left that country illegally, or even that he must have left it on account of well-founded fear. He may have decided to ask for recognition of his refugee status after having already been abroad for some time. A person who was not a refugee when he left his country, but who becomes a refugee at a later date, is called a refugee *"sur place"*.

95. A person becomes a refugee *"sur place"* due to circumstances arising in his country of origin during his absence. Diplomats and other officials serving abroad, prisoners of war, students, migrant workers and others have applied for refugee status during their residence abroad and have been recognized as refugees.

96. A person may become a refugee *"sur place"* as a result of his own actions, such as associating with refugees already recognized, or expressing his political views in his country of residence. Whether such actions are sufficient to justify a well-founded fear of persecution must be determined by a careful examination of the circumstances. Regard should be had in particular to whether such actions may have come to the notice of the authorities of the person's country of origin and how they are likely to be viewed by those authorities.

**(5) "and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country"**

97. Unlike the phrase dealt with under (6) below, the present phrase relates to persons who have a nationality. Whether unable or unwilling to avail himself of the protection of his Government, a refugee is always a person who does not enjoy such protection.

98. Being *unable* to avail himself of such protection implies circumstances that are beyond the will of the person concerned. There may, for example, be a state of war, civil war or other grave disturbance, which prevents the country of nationality from extending protection or makes such protection ineffective. Protection by the country of nationality may also have been denied to the applicant. Such denial of protection may confirm or strengthen the applicant's fear of persecution, and may indeed be an element of persecution.

IFR_AR_015833

99. What constitutes a refusal of protection must be determined according to the circumstances of the case. If it appears that the applicant has been denied services (e.g., refusal of a national passport or extension of its validity, or denial of admittance to the home territory) normally accorded to his co-nationals, this may constitute a refusal of protection within the definition.

100. The term *unwilling* refers to refugees who refuse to accept the protection of the Government of the country of their nationality.[12] It is qualified by the phrase "owing to such fear". Where a person is willing to avail himself of the protection of his home country, such willingness would normally be incompatible with a claim that he is outside that country "owing to well-founded fear of persecution". Whenever the protection of the country of nationality is available, and there is no ground based on well-founded fear for refusing it, the person concerned is not in need of international protection and is not a refugee.

### (6) "or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it"

101. This phrase, which relates to stateless refugees, is parallel to the preceding phrase, which concerns refugees who have a nationality. In the case of stateless refugees, the "country of nationality" is replaced by "the country of his former habitual residence", and the expression "unwilling to avail himself of the protection..." is replaced by the words "unwilling to return to it". In the case of a stateless refugee, the question of "availment of protection" of the country of his former habitual residence does not, of course, arise. Moreover, once a stateless person has abandoned the country of his former habitual residence for the reasons indicated in the definition, he is usually unable to return.

102. It will be noted that not all stateless persons are refugees. They must be outside the country of their former habitual residence for the reasons indicated in the definition. Where these reasons do not exist, the stateless person is not a refugee.

103. Such reasons must be examined in relation to the country of "former habitual residence" in regard to which fear is alleged. This was defined by the drafters of the 1951 Convention as "the country in which he had resided and where he had suffered or fears he would suffer persecution if he returned".[13]

104. A stateless person may have more than one country of former habitual residence, and he may have a fear of persecution in relation to more than one of them. The definition does not require that he satisfies the criteria in relation to all of them.

105. Once a stateless person has been determined a refugee in relation to "the country of his former habitual residence", any further change of country of habitual residence will not affect his refugee status.

### (7) Dual or multiple nationality

Article 1 A (2), paragraph 2, of the 1951 Convention:

> In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

106. This clause, which is largely self-explanatory, is intended to exclude from refugee status all persons with dual or multiple nationality who can avail themselves of the protection of at least one of the countries of which they are nationals. Wherever available, national protection takes precedence over international protection.

---

[12] UN Document E/1618, p. 39.
[13] *Loc. cit.*

IFR_AR_015834

107. In examining the case of an applicant with dual or multiple nationality, it is necessary, however, to distinguish between the possession of a nationality in the legal sense and the availability of protection by the country concerned. There will be cases where the applicant has the nationality of a country in regard to which he alleges no fear, but such nationality may be deemed to be ineffective as it does not entail the protection normally granted to nationals. In such circumstances, the possession of the second nationality would not be inconsistent with refugee status. As a rule, there should have been a request for, and a refusal of, protection before it can be established that a given nationality is ineffective. If there is no explicit refusal of protection, absence of a reply within reasonable time may be considered a refusal.

## (8) Geographical scope

108. At the time when the 1951 Convention was drafted, there was a desire by a number of States not to assume obligations the extent of which could not be foreseen. This desire led to the inclusion of the 1951 dateline, to which reference has already been made (paragraphs 35 and 36 above). In response to the wish of certain Governments, the 1951 Convention also gave to Contracting States the possibility of limiting their obligations under the Convention to persons who had become refugees as a result of events occurring in Europe.

109. Accordingly, Article 1 B of the 1951 Convention states that:

> (1) For the purposes of this Convention, the words "events occurring before 1 January 1951" in Article 1, Section A, shall be understood to mean either
>
> (a) "events occurring in Europe before 1 January 1951"; or
>
> (b) "events occurring in Europe and elsewhere before 1 January 1951";
>
> and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purposes of its obligations under this Convention.
>
> (2) Any Contracting State which has adopted alternative (a) may at any time extend its obligations by adopting alternative (b) by means of a notification addressed to the Secretary-General of the United Nations.

110. Of the States parties to the 1951 Convention, at the time of writing 9 still adhere to alternative (a), "events occurring in Europe".[14] While refugees from other parts of the world frequently obtain asylum in some of these countries, they are not normally accorded refugee status under the 1951 Convention.

IFR_AR_015835

---

[14] See Annex IV.

# CHAPTER III – CESSATION CLAUSES

## A. GENERAL

111. The so-called "cessation clauses" (Article 1 C (1) to (6) of the 1951 Convention) spell out the conditions under which a refugee ceases to be a refugee. They are based on the consideration that international protection should not be granted where it is no longer necessary or justified.

112. Once a person's status as a refugee has been determined, it is maintained unless he comes within the terms of one of the cessation clauses.[15] This strict approach towards the determination of refugee status results from the need to provide refugees with the assurance that their status will not be subject to constant review in the light of temporary changes – not of a fundamental character – in the situation prevailing in their country of origin.

113. Article 1 C of the 1951 Convention provides that:

> This Convention shall cease to apply to any person falling under the terms of section A if:
>
> (1) He has voluntarily re-availed himself of the protection of the country of his nationality; or
>
> (2) Having lost his nationality, he has voluntarily re-acquired it; or
>
> (3) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or
>
> (4) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or
>
> (5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
>
> Provided that this paragraph shall not apply to a refugee falling under Section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;
>
> (6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;
>
> Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

114. Of the six cessation clauses, the first four reflect a change in the situation of the refugee that has been brought about by himself, namely:

1. voluntary re-availment of national protection;

2. voluntary re-acquisition of nationality;

3. acquisition of a new nationality;

4. voluntary re-establishment in the country where persecution was feared.

115. The last two cessation clauses, (5) and (6), are based on the consideration that international protection is no longer justified on account of changes in the country where persecution was feared, because the reasons for a person becoming a refugee have ceased to exist.

116. The cessation clauses are negative in character and are exhaustively enumerated. They should therefore be interpreted restrictively, and no other reasons may be adduced by way of analogy to justify the withdrawal of refugee status. Needless to say, if a refugee, for whatever reasons, no longer

---

[15] In some cases refugee status may continue, even though the reasons for such status have evidently ceased to exist. Cf. sub-sections (5) and (6) (paras. 135 to 139 below).

IFR_AR_015836

wishes to be considered a refugee, there will be no call for continuing to grant him refugee status and international protection.

117. Article 1 C does not deal with the cancellation of refugee status. Circumstances may, however, come to light that indicate that a person should never have been recognized as a refugee in the first place; e.g. if it subsequently appears that refugee status was obtained by a misrepresentation of material facts, or that the person concerned possesses another nationality, or that one of the exclusion clauses would have applied to him had all the relevant facts been known. In such cases, the decision by which he was determined to be a refugee will normally be cancelled.

## B. INTERPRETATION OF TERMS

### (1) Voluntary re-availment of national protection

Article 1 C (1) of the 1951 Convention:

> He has voluntarily re-availed himself of the protection of the country of his nationality;

118. This cessation clause refers to a refugee possessing a nationality who remains outside the country of his nationality. (The situation of a refugee who has actually returned to the country of his nationality is governed by the fourth cessation clause, which speaks of a person having "re-established" himself in that country.) A refugee who has voluntarily re-availed himself of national protection is no longer in need of international protection. He has demonstrated that he is no longer "unable or unwilling to avail himself of the protection of the country of his nationality".

119. This cessation clause implies three requirements:

(a) voluntariness: the refugee must act voluntarily;

(b) intention: the refugee must intend by his action to re-avail himself of the protection of the country of his nationality;

(c) re-availment: the refugee must actually obtain such protection.

120. If the refugee does not act voluntarily, he will not cease to be a refugee. If he is instructed by an authority, e.g. of his country of residence, to perform against his will an act that could be interpreted as a re-availment of the protection of the country of his nationality, such as applying to his Consulate for a national passport, he will not cease to be a refugee merely because he obeys such an instruction. He may also be constrained, by circumstances beyond his control, to have recourse to a measure of protection from his country of nationality. He may, for instance, need to apply for a divorce in his home country because no other divorce may have the necessary international recognition. Such an act cannot be considered to be a "voluntary re-availment of protection" and will not deprive a person of refugee status.

121. In determining whether refugee status is lost in these circumstances, a distinction should be drawn between actual re-availment of protection and occasional and incidental contacts with the national authorities. If a refugee applies for and obtains a national passport or its renewal, it will, in the absence of proof to the contrary, be presumed that he intends to avail himself of the protection of the country of his nationality. On the other hand, the acquisition of documents from the national authorities, for which non-nationals would likewise have to apply – such as a birth or marriage certificate – or similar services, cannot be regarded as a re-availment of protection.

122. A refugee requesting protection from the authorities of the country of his nationality has only "re-availed" himself of that protection when his request has actually been granted. The most frequent case of "re-availment of protection" will be where the refugee wishes to return to his country of nationality. He will not cease to be a refugee merely by applying for repatriation. On the other hand,

IFR_AR_019857

obtaining an entry permit or a national passport for the purposes of returning will, in the absence of proof to the contrary, be considered as terminating refugee status.[16] This does not, however, preclude assistance being given to the repatriant – also by UNHCR – in order to facilitate his return.

123. A refugee may have voluntarily obtained a national passport, intending either to avail himself of the protection of his country of origin while staying outside that country, or to return to that country. As stated above, with the receipt of such a document he normally ceases to be a refugee. If he subsequently renounces either intention, his refugee status will need to be determined afresh. He will need to explain why he changed his mind, and to show that there has been no basic change in the conditions that originally made him a refugee.

124. Obtaining a national passport or an extension of its validity may, under certain exceptional conditions, not involve termination of refugee status (see paragraph 120 above). This could for example be the case where the holder of a national passport is not permitted to return to the country of his nationality without specific permission.

125. Where a refugee visits his former home country not with a national passport but, for example, with a travel document issued by his country of residence, he has been considered by certain States to have re-availed himself of the protection of his former home country and to have lost his refugee status under the present cessation clause. Cases of this kind should, however, be judged on their individual merits. Visiting an old or sick parent will have a different bearing on the refugee's relation to his former home country than regular visits to that country spent on holidays or for the purpose of establishing business relations.

## (2) Voluntary re-acquisition of nationality

Article 1 C (2) of the 1951 Convention:

> Having lost his nationality, he has voluntarily re-acquired it;

126. This clause is similar to the preceding one. It applies to cases where a refugee, having lost the nationality of the country in respect of which he was recognized as having well-founded fear of persecution, voluntarily re-acquires such nationality.

127. While under the preceding clause (Article 1 C (1)) a person having a nationality ceases to be a refugee if he re-avails himself of the protection attaching to such nationality, under the present clause (Article 1 C (2)) he loses his refugee status by re-acquiring the nationality previously lost.[17]

128. The re-acquisition of nationality must be voluntary. The granting of nationality by operation of law or by decree does not imply voluntary reacquisition, unless the nationality has been expressly or impliedly accepted. A person does not cease to be a refugee merely because he could have reacquired his former nationality by option, unless this option has actually been exercised. If such former nationality is granted by operation of law, subject to an option to reject, it will be regarded as a voluntary re-acquisition if the refugee, with full knowledge, has not exercised this option; unless he is able to invoke special reasons showing that it was not in fact his intention to re-acquire his former nationality.

## (3) Acquisition of a new nationality and protection

Article 1 C (3) of the 1951 Convention:

> He has acquired a new nationality and enjoys the protection of the country of his new nationality;

---

[16] The above applies to a refugee who is still outside his country. It will be noted that the fourth cessation clause provides that any refugee will cease to be a refugee when he has voluntarily "re-established" himself in his country of nationality or former habitual residence.
[17] In the majority of cases a refugee maintains the nationality of his former home country. Such nationality may be lost by individual or collective measures of deprivation of nationality. Loss of nationality (statelessness) is therefore not necessarily implicit in refugee status.

AR_015838

129. As in the case of the re-acquisition of nationality, this third cessation clause derives from the principle that a person who enjoys national protection is not in need of international protection.

130. The nationality that the refugee acquires is usually that of the country of his residence. A refugee living in one country may, however, in certain cases, acquire the nationality of another country. If he does so, his refugee status will also cease, provided that the new nationality also carries the protection of the country concerned. This requirement results from the phrase "and enjoys the protection of the country of his new nationality".

131. If a person has ceased to be a refugee, having acquired a new nationality, and then claims well-founded fear in relation to the country of his new nationality, this creates a completely new situation and his status must be determined in relation to the country of his new nationality.

132. Where refugee status has terminated through the acquisition of a new nationality, and such new nationality has been lost, depending on the circumstances of such loss, refugee status may be revived.

## (4) Voluntary re-establishment in the country where persecution was feared

Article 1 C (4) of the 1951 Convention:

> He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution;

133. This fourth cessation clause applies both to refugees who have a nationality and to stateless refugees. It relates to refugees who, having returned to their country of origin or previous residence, have not previously ceased to be refugees under the first or second cessation clauses while still in their country of refuge.

134. The clause refers to "voluntary re-establishment". This is to be understood as return to the country of nationality or former habitual residence with a view to permanently residing there. A temporary visit by a refugee to his former home country, not with a national passport but, for example, with a travel document issued by his country of residence, does not constitute "re-establishment" and will not involve loss of refugee status under the present clause.[18]

## (5) Nationals whose reasons for becoming a refugee have ceased to exist

Article 1 C (5) of the 1951 Convention:

> He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
>
> Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;

135. Circumstances" refer to fundamental changes in the country, which can be assumed to remove the basis of the fear of persecution. A mere – possibly transitory – change in the facts surrounding the individual refugee's fear, which does not entail such major changes of circumstances, is not sufficient to make this clause applicable. A refugee's status should not in principle be subject to frequent review to the detriment of his sense of security, which international protection is intended to provide.

136. The second paragraph of this clause contains an exception to the cessation provision contained in the first paragraph. It deals with the special situation where a person may have been subjected to very serious persecution in the past and will not therefore cease to be a refugee, even if fundamental changes have occurred in his country of origin. The reference to Article 1 A (1) indicates that the

IFR_AR_015839

---

[18] See para. 125 above.

exception applies to "statutory refugees". At the time when the 1951 Convention was elaborated, these 'formed the majority of refugees. The exception, however, reflects a more general humanitarian principle, which could also be applied to refugees other than statutory refugees. It is frequently recognized that a person who – or whose family – has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee.

### (6) Stateless persons whose reasons for becoming a refugee have ceased to exist

Article 1 C (6) of the 1951 Convention:

> Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;
>
> Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

137. This sixth and last cessation clause is parallel to the fifth cessation clause, which concerns persons who have a nationality. The present clause deals exclusively with stateless persons who are able to return to the country of their former habitual residence.

138. "Circumstances" should be interpreted in the same way as under the fifth cessation clause.

139. It should be stressed that, apart from the changed circumstances in his country of former habitual residence, the person concerned must be *able* to return there. This, in the case of a stateless person, may not always be possible.

IFR_AR_015840

# CHAPTER IV − EXCLUSION CLAUSES

## A. GENERAL

140. The 1951 Convention, in Sections D, E and F of Article 1, contains provisions whereby persons otherwise having the characteristics of refugees, as defined in Article 1, Section A, are excluded from refugee status. Such persons fall into three groups. The first group (Article 1 D) consists of persons already receiving United Nations protection or assistance; the second group (Article 1 E) deals with persons who are not considered to be in need of international protection; and the third group (Article 1 F) enumerates the categories of persons who are not considered to be deserving of international protection.

141. Normally it will be during the process of determining a person's refugee status that the facts leading to exclusion under these clauses will emerge. It may, however, also happen that facts justifying exclusion will become known only after a person has been recognized as a refugee. In such cases, the exclusion clause will call for a cancellation of the decision previously taken.

## B. INTERPRETATION OF TERMS

### (1) Persons already receiving United Nations protection or assistance

Article 1 D of the 1951 Convention:

> This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.
>
> When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall ipso facto be entitled to the benefits of this Convention.

142. Exclusion under this clause applies to any person who is in receipt of protection or assistance from organs or agencies of the United Nations, other than the United Nations High Commissioner for Refugees. Such protection or assistance was previously given by the former United Nations Korean Reconstruction Agency (UNKRA) and is currently given by the United Nations Relief and Works Agency for Palestine Refugees In the Near East (UNRWA). There could be other similar situations in the future.

143. With regard to refugees from Palestine, it will be noted that UNRWA operates only in certain areas of the Middle East, and it is only there that its protection or assistance are given. Thus, a refugee from Palestine who finds himself outside that area does not enjoy the assistance mentioned and may be considered for determination of his refugee status under the criteria of the 1951 Convention. It should normally be sufficient to establish that the circumstances which originally made him qualify for protection or assistance from UNRWA still persist and that he has neither ceased to be a refugee under one of the cessation clauses nor is excluded from the application of the Convention under one of the exclusion clauses.

### (2) Persons not considered to be in need of international protection

Article 1 E of the 1951 Convention:

> This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country.

IFR_AR_015841

144. This provision relates to persons who might otherwise qualify for refugee status and who have been received in a country where they have been granted most of the rights normally enjoyed by nationals, but not formal citizenship. (They are frequently referred to as "national refugees".) The country that has received them is frequently one where the population is of the same ethnic origin as themselves.[19]

145. There is no precise definition of "rights and obligations" that would constitute a reason for exclusion under this clause. It may, however, be said that the exclusion operates if a person's status is largely assimilated to that of a national of the country. In particular he must, like a national, be fully protected against deportation or expulsion.

146. The clause refers to a person who has "taken residence" in the country concerned. This implies continued residence and not a mere visit. A person who resides outside the country and does not enjoy the diplomatic protection of that country is not affected by the exclusion clause.

## (3) Persons considered not to be deserving of international protection

Article 1 F of the 1951 Convention:

> The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:
>
> (a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
>
> (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
>
> (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

147. The pre-war international instruments that defined various categories of refugees contained no provisions for the exclusion of criminals. It was immediately after the Second World War that for the first time special provisions were drawn up to exclude from the large group of then assisted refugees certain persons who were deemed unworthy of international protection.

148. At the time when the Convention was drafted, the memory of the trials of major war criminals was still very much alive, and there was agreement on the part of States that war criminals should not be protected. There was also a desire on the part of States to deny admission to their territories of criminals who would present a danger to security and public order.

149. The competence to decide whether any of these exclusion clauses are applicable is incumbent upon the Contracting State in whose territory the applicant seeks recognition of his refugee status. For these clauses to apply, it is sufficient to establish that there are "serious reasons for considering" that one of the acts described has been committed. Formal proof of previous penal prosecution is not required. Considering the serious consequences of exclusion for the person concerned, however, the interpretation of these exclusion clauses must be restrictive.

### (a) War crimes, etc.

> (a) he has committed a crime against peace, a war crime or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes.

150. In mentioning crimes against peace, war crimes or crimes against humanity, the Convention refers generally to "international instruments drawn up to make provision in respect of such crimes". There are a considerable number of such instruments dating from the end of the Second World War up to the present time. All of them contain definitions of what constitute "crimes against peace, war

---

[19] In elaborating this exclusion clause, the drafters of the Convention had principally in mind refugees of German extraction having arrived in the Federal Republic of Germany who were recognized as possessing the rights and obligations attaching to German nationality.

IFR_AR_015842

crimes and crimes against humanity". The most comprehensive definition will be found in the 1945 London Agreement and Charter of the International Military tribunal. The definitions contained in the above-mentioned London Agreement and a list of other pertinent instruments are given in Annexes V and VI.

### (b) Common crimes

> (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee.

151. The aim of this exclusion clause is to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime. It also seeks to render due justice to a refugee who has committed a common crime (or crimes) of a less serious nature or has committed a political offence.

152. In determining whether an offence is "non-political" or is, on the contrary, a "political" crime, regard should be given in the first place to its nature and purpose i.e. whether it has been committed out of genuine political motives and not merely for personal reasons or gain. There should also be a close and direct causal link between the crime committed and its alleged political purpose and object. The political element of the offence should also outweigh its common-law character. This would not be the case if the acts committed are grossly out of proportion to the alleged objective. The political nature of the offence is also more difficult to accept if it involves acts of an atrocious nature.

153. Only a crime committed or presumed to have been committed by an applicant "outside the country of refuge prior to his admission to that country as a refugee" is a ground for exclusion. The country outside would normally be the country of origin, but it could also be another country, except the country of refuge where the applicant seeks recognition of his refugee status.

154. A refugee committing a serious crime in the country of refuge is subject to due process of law in that country. In extreme cases, Article 33 paragraph 2 of the Convention permits a refugee's expulsion or return to his former home country if, having been convicted by a final judgement of a "particularly serious" common crime, he constitutes a danger to the community of his country of refuge.

155. What constitutes a "serious" non-political crime for the purposes of this exclusion clause is difficult to define, especially since the term "crime" has different connotations in different legal systems. in some countries the word "crime" denotes only offences of a serious character. In other countries it may comprise anything from petty larceny to murder. In the present context, however, a "serious" crime must be a capital crime or a very grave punishable act. Minor offences punishable by moderate sentences are not grounds for exclusion under Article 1 F (b) even if technically referred to as "crimes" in the penal law of the country concerned.

156. In applying this exclusion clause, it is also necessary to strike a balance between the nature of the offence presumed to have been committed by the applicant and the degree of persecution feared. If a person has well-founded fear of very severe persecution, e.g. persecution endangering his life or freedom, a crime must be very grave in order to exclude him. If the persecution feared is less serious, it will be necessary to have regard to the nature of the crime or crimes presumed to have been committed in order to establish whether the applicant is not in reality a fugitive from justice or whether his criminal character does not outweigh his character as a *bona fide* refugee.

157. In evaluating the nature of the crime presumed to have been committed, all the relevant factors – including any mitigating circumstances – must be taken into account. It is also necessary to have regard to any aggravating circumstances as, for example, the fact that the applicant may already have a criminal record. The fact that an applicant convicted of a serious non-political crime has already served his sentence or has been granted a pardon or has benefited from an amnesty is also relevant. In the latter case, there is a presumption that the exclusion clause is no longer applicable, unless it can be shown that, despite the pardon or amnesty, the applicant's criminal character still predominates.

IFR_AR_015843

158. Considerations similar to those mentioned in the preceding paragraphs will apply when a crime – in the widest sense – has been committed as a means of, or concomitant with, escape from the country where persecution was feared. Such crimes may range from the theft of a means of loco-motion to endangering or taking the lives of innocent people. While for the purposes of the present exclusion clause it may be possible to over-look the fact that a refugee, not finding any other means of escape, may have crashed the border in a stolen car, decisions will be more difficult where he has hijacked an aircraft, i.e. forced its crew, under threat of arms or with actual violence, to change destination in order to bring him to a country of refuge.

159. As regards hijacking, the question has arisen as to whether, if committed in order to escape from persecution, it constitutes a serious non-political crime within the meaning of the present exclusion clause. Governments have considered the unlawful seizure of aircraft on several occasions within the framework of the United Nations, and a number of international conventions have been adopted dealing with the subject. None of these instruments mentions refugees. However, one of the reports leading to the adoption of a resolution on the subject states that "the adoption of the draft Resolution cannot prejudice any international legal rights or duties of States under instruments relating to the status of refugees and stateless persons". Another report states that "the adoption of the draft Resolution cannot prejudice any international legal rights or duties of States with respect to asylum".[20]

160. The various conventions adopted in this connexion[21] deal mainly with the manner in which the perpetrators of such acts have to be treated. They invariably give Contracting States the alternative of extraditing such persons or instituting penal proceedings for the act on their own territory, which implies the right to grant asylum.

161. While there is thus a possibility of granting asylum, the gravity of the persecution of which the offender may have been in fear, and the extent to which such fear is well-founded, will have to be duly considered in determining his possible refugee status under the 1951 Convention. The question of the exclusion under Article 1 F (b) of an applicant who has committed an unlawful seizure of an aircraft will also have to be carefully examined in each individual case.

**(c) Acts contrary to the purposes and principles of the United Nations**

> (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

162. It will be seen that this very generally-worded exclusion clause overlaps with the exclusion clause in Article 1 F (a); for it is evident that a crime against peace, a war crime or a crime against humanity is also an act contrary to the purposes and principles of the United Nations. While Article 1 F (c) does not introduce any specific new element, it is intended to cover in a general way such acts against the purposes and principles of the United Nations that might not be fully covered by the two preceding exclusion clauses. Taken in conjunction with the latter, it has to be assumed, although this is not specifically stated, that the acts covered by the present clause must also be of a criminal nature.

163. The purposes and principles of the United Nations are set out in the Preamble and Articles 1 and 2 of the Charter of the United Nations. They enumerate fundamental principles that should govern the conduct of their members in relation to each other and in relation to the international community as a whole. From this it could be inferred that an individual, in order to have committed an act contrary to these principles, must have been in a position of power in a member State and instrumental to his State's infringing these principles. However, there are hardly any precedents on record for the application of this clause, which, due to its very general character, should be applied with caution.

---

[20] Reports of the Sixth Committee on General Assembly resolutions 2645 (XXV). United Nations document A/8716, and 2551 (XXIV), United Nations document A/7845.

[21] Convention on Offences and Certain Other Acts Committed on Board Aircraft, Tokyo, 14 September 1963. Convention for the Suppression of Unlawful Seizure of Aircraft, the Hague, 16 December 1970. Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Montreal, 23 September 1971.

# CHAPTER V – SPECIAL CASES

## A. WAR REFUGEES

164. Persons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees under the 1951 Convention or 1967 Protocol.[22] They do, however, have the protection provided for in other international instruments, e.g. the Geneva Conventions of 1949 on the Protection of War Victims and the 1977 Protocol additional to the Geneva Conventions of 1949 relating to the protection of Victims of International Armed Conflicts.[23]

165. However, foreign invasion or occupation of all or part of a country can result – and occasionally has resulted – in persecution for one or more of the reasons enumerated in the 1951 Convention. In such cases, refugee status will depend upon whether the applicant is able to show that he has a "well-founded fear of being persecuted" in the occupied territory and, in addition, upon whether or not he is able to avail himself of the protection of his government, or of a protecting power whose duty it is to safeguard the interests of his country during the armed conflict, and whether such protection can be considered to be effective.

166. Protection may not be available if there are no diplomatic relations between the applicant's host country and his country of origin. If the applicant's government is itself in exile, the effectiveness of the protection that it is able to extend may be open to question. Thus, every case has to be judged on its merits, both in respect of well-founded fear of persecution and of the availability of effective protection on the part of the government of the country of origin.

## B. DESERTERS AND PERSONS AVOIDING MILITARY SERVICE

167. In countries where military service is compulsory, failure to perform this duty is frequently punishable by law. Moreover, whether military service is compulsory or not, desertion is invariably considered a criminal offence. The Penalties may vary from country to country, and are not normally regarded as persecution. Fear of prosecution and punishment for desertion or draft-evasion does not in itself constitute well-founded fear of persecution under the definition. Desertion or draft-evasion does not, on the other hand, exclude a person from being a refugee, and a person may be a refugee in addition to being a deserter or draft-evader.

168. A person is clearly not a refugee if his only reason for desertion or draft-evasion is his dislike of military service or fear of combat. He may, however, be a refugee if his desertion or evasion of military service is concomitant with other relevant motives for leaving or remaining outside his country, or if he otherwise has reasons, within the meaning of the definition, to fear persecution.

169. A deserter or draft-evader may also be considered a refugee if it can be shown that he would suffer disproportionately severe punishment for the military offence on account of his race, religion, nationality, membership of a particular social group or political opinion. The same would apply if it can be shown that he has well-founded fear of persecution on these grounds above and beyond the punishment for desertion.

170. There are, however, also cases where the necessity to perform military service may be the sole ground for a claim to refugee status, i.e. when a person can show that the performance of military service would have required his participation in military action contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience.

171. Not every conviction, genuine though it may be, will constitute a sufficient reason for claiming refugee status after desertion or draft-evasion. It is not enough for a person to be in disagreement

---

[22] In respect of Africa, however, see the definition in Article 1 (2) of the OAU Convention concerning the Specific Aspects of Refugee Problems in Africa, quoted in para. 22 above.
[23] See Annex VI, items (6) and (7).

IFR_AR_015845

with his government regarding the political justification for a particular military action. Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft-evasion could, in the light of all other requirements of the definition, in itself be regarded as persecution.

172. Refusal to perform military service may also be based on religious convictions. If an applicant is able to show that his religious convictions are genuine, and that such convictions are not taken into account by the authorities of his country in requiring him to perform military service, he may be able to establish a claim to refugee status. Such a claim would, of course, be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions.

173. The question as to whether objection to performing military service for reasons of conscience can give rise to a valid claim to refugee status should also be considered in the light of more recent developments in this field. An increasing number of States have introduced legislation or administrative regulations whereby persons who can invoke genuine reasons of conscience are exempted from military service, either entirely or subject to their performing alternative (i.e. civilian) service. The introduction of such legislation or administrative regulations has also been the subject of recommendations by international agencies.[24] In the light of these developments, it would be open to Contracting States, to grant refugee status to persons who object to performing military service for genuine reasons of conscience.

174. The genuineness of a person's political, religious or moral convictions, or of his reasons of conscience for objecting to performing military service, will of course need to be established by a thorough investigation of his personality and background. The fact that he may have manifested his views prior to being called to arms, or that he may already have encountered difficulties with the authorities because of his convictions, are relevant considerations. Whether he has been drafted into compulsory service or joined the army as a volunteer may also be indicative of the genuineness of his convictions.

## C. PERSONS HAVING RESORTED TO FORCE OR COMMITTED ACTS OF VIOLENCE

175. Applications for refugee status are frequently made by persons who have used force or committed acts of violence. Such conduct is frequently associated with, or claimed to be associated with, political activities or political opinions. They may be the result of individual initiatives, or may have been committed within the framework of organized groups. The latter may either be clandestine groupings or political cum military organizations that are officially recognized or whose activities are widely acknowledged.[25] Account should also be taken of the fact that the use of force is an aspect of the maintenance of law and order and may – by definition – be lawfully resorted to by the police and armed forces in the exercise of their functions.

176. An application for refugee status by a person having (or presumed to have) used force, or to have committed acts of violence of whatever nature and within whatever context, must in the first place – like any other application – be examined from the standpoint of the inclusion clauses in the 1951 Convention (paragraphs 32-110 above).

177. Where it has been determined that an applicant fulfils the inclusion criteria, the question may arise as to whether, in view of the acts involving the use of force or violence committed by him, he may not be covered by the terms of one or more of the exclusion clauses. These exclusion clauses, which figure in Article 1 F (a) to (c) of the 1951 Convention, have already been examined (paragraphs 147 to 163 above).

---

[24] Cf Recommendation 816 (1977) on the Right of Conscientious Objection to Military Service, adopted at the Parliamentary Assembly of the Council of Europe at its Twenty-ninth Ordinary Session (5-13 October 1977).

[25] A number of liberation movements, which often include an armed wing, have been officially recognized by the General Assembly of the United Nations. Other liberation movements have only been recognized by a limited number of governments. Others again have no official recognition.

IFR_AR_015846

178. The exclusion clause in Article 1 F (a) was originally intended to exclude from refugee status any person in respect of whom there were serious reasons for considering that he has "committed a crime against peace, a war crime, or a crime against humanity" in an official capacity. This exclusion clause is, however, also applicable to persons who have committed such crimes within the framework of various non-governmental groupings, whether officially recognized, clandestine or self-styled.

179. The exclusion clause in Article 1 F (b), which refers to "a serious non-political crime", is normally not relevant to the use of force or to acts of violence committed in an official capacity. The interpretation of this exclusion clause has already been discussed. The exclusion clause in Article 1 F (c) has also been considered. As previously indicated, because of its vague character, it should be applied with caution.

180. It will also be recalled that, due to their nature and the serious consequences of their application to a person in fear of persecution, the exclusion clauses should be applied in a restrictive manner.

IFR_AR_015847

# CHAPTER VI – THE PRINCIPLE OF FAMILY UNITY

181. Beginning with the Universal Declaration of Human Rights, which states that "the family is the natural and fundamental group unit of society and is entitled to protection by society and the State", most international instruments dealing with human rights contain similar provisions for the protection of the unit of a family.

182. The Final Act of the Conference that adopted the 1951 Convention:

> Recommends Governments to take the necessary measures for the protection of the refugee's family, especially with a view to:
>
> (1) Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country.
>
> (2) The protection of refugees who are minors, in particular unaccompanied children and girls, with special reference to guardianship and adoption.[26]

183. The 1951 Convention does not incorporate the principle of family unity in the definition of the term refugee. The above-mentioned Recommendation in the Final Act of the Conference is, however, observed by the majority of States, whether or not parties to the 1951 Convention or to the 1967 Protocol.

184. If the head of a family meets the criteria of the definition, his dependants are normally granted refugee status according to the principle of family unity. It is obvious, however, that formal refugee status should not be granted to a dependant if this is incompatible with his personal legal status. Thus, a dependant member of a refugee family may be a national of the country of asylum or of another country, and may enjoy that country's protection. To grant him refugee status in such circumstances would not be called for.

185. As to which family members may benefit from the principle of family unity, the minimum requirement is the inclusion of the spouse and minor children. In practice, other dependants, such as aged parents of refugees, are normally considered if they are living in the same household. On the other hand, if the head of the family is not a refugee, there is nothing to prevent any one of his dependants, if they can invoke reasons on their own account, from applying for recognition as refugees under the 1951 Convention or the 1967 Protocol. In other words, the principle of family unity operates in favour of dependants, and not against them.

186. The principle of the unity of the family does not only operate where all family members become refugees at the same time. It applies equally to cases where a family unit has been temporarily disrupted through the flight of one or more of its members.

187. Where the unity of a refugee's family is destroyed by divorce, separation or death, dependants who have been granted refugee status on the basis of family unity will retain such refugee status unless they fall within the terms of a cessation clause; or if they do not have reasons other than those of personal convenience for wishing to retain refugee status; or if they themselves no longer wish to be considered as refugees.

188. If the dependant of a refugee falls within the terms of one of the exclusion clauses, refugee status should be denied to him.

IFR_AR_015848

---

[26] See Annex 1.

# PART TWO

**PROCEDURES FOR THE DETERMINATION OF REFUGEE STATUS**

## A. GENERAL

189. It has been seen that the 1951 Convention and the 1967 Protocol define who is a refugee for the purposes of these instruments. It is obvious that, to enable States parties to the Convention and to the Protocol to implement their provisions, refugees have to be identified. Such identification, i.e. the determination of refugee status, although mentioned in the 1951 Convention (cf. Article 9), is not specifically regulated. In particular, the Convention does not indicate what type of procedures are to be adopted for the determination of refugee status. It is therefore left to each Contracting State to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure.

190. It should be recalled that an applicant for refugee status is normally in a particularly vulnerable situation. He finds himself in an alien environment and may experience serious difficulties, technical and psychological, in submitting his case to the authorities of a foreign country, often in a language not his own. His application should therefore be examined within the framework of specially established procedures by qualified personnel having the necessary knowledge and experience, and an understanding of an applicant's particular difficulties and needs.

191. Due to the fact that the matter is not specifically regulated by the 1951 Convention, procedures adopted by States parties to the 1951 Convention and to the 1967 Protocol vary considerably. In a number of countries, refugee status is determined under formal procedures specifically established for this purpose. In other countries, the question of refugee status is considered within the framework of general procedures for the admission of aliens. In yet other countries, refugee status is determined under informal arrangements, or *ad hoc* for specific purposes, such as the issuance of travel documents.

192. In view of this situation and of the unlikelihood that all States bound by the 1951 Convention and the 1967 Protocol could establish identical procedures, the Executive Committee of the High Commissioner's Programme, at its twenty-eighth session in October 1977, recommended that procedures should satisfy certain basic requirements. These basic requirements, which reflect the special situation of the applicant for refugee status, to which reference has been made above, and which would ensure that the applicant is provided with certain essential guarantees, are the following:

IFR_AR_015849

(i) The competent official (e.g., immigration officer or border police officer) to whom the applicant addresses himself at the border or in the territory of a Contracting State should have clear instructions for dealing with cases which might come within the purview of the relevant international instruments. He should be required to act in accordance with the principle of non-refoulement and to refer such cases to a higher authority.

(ii) The applicant should receive the necessary guidance as to the procedure to be followed.

(iii) There should be a clearly identified authority – wherever possible a single central authority – with responsibility for examining requests for refugee status and taking a decision in the first instance.

(iv) The applicant should be given the necessary facilities, including the services of a competent interpreter, for submitting his case to the authorities concerned. Applicants should also be given the opportunity, of which they should be duly informed, to contact a representative of UNHCR.

(v) If the applicant is recognized as a refugee, he should be informed accordingly and issued with documentation certifying his refugee status.

(vi) If the applicant is not recognized, he should be given a reasonable time to appeal for a formal reconsideration of the decision, either to the same or to a different authority, whether administrative or judicial, according to the prevailing system.

(vii) The applicant should be permitted to remain in the country pending a decision on his initial request by the competent authority referred to in paragraph (iii) above, unless it has been established by that authority that his request is clearly abusive. He should also be permitted to remain in the country while an appeal to a higher administrative authority or to the courts is pending.[27]

193. The Executive Committee also expressed the hope that all States parties to the 1951 Convention and the 1967 Protocol that had not yet done so would take appropriate steps to establish such procedures in the near future and give favourable consideration to UNHCR participation in such procedures in appropriate form.

194. Determination of refugee status, which is closely related to questions of asylum and admission, is of concern to the High Commissioner in the exercise of his function to provide international protection for refugees. In a number of countries, the Office of the High Commissioner participates in various forms, in procedures for the determination of refugee status. Such participation is based on Article 35 of the 1951 Convention and the corresponding Article 11 of the 1967 Protocol, which provide for co-operation by the Contracting States with the High Commissioner's Office.


# B. ESTABLISHING THE FACTS


## (1) Principles and methods

195. The relevant facts of the individual case will have to be furnished in the first place by the applicant himself. It will then be up to the person charged with determining his status (the examiner) to assess the validity of any evidence and the credibility of the applicant's statements.

196. It is a general legal principle that the burden of proof lies on the person submitting a claim. Often, however, an applicant may not be able to support his statements by documentary or other proof, and cases in which an applicant can provide evidence of all his statements will be the exception rather than the rule. In most cases a person fleeing from persecution will have arrived with the barest necessities and very frequently even without personal documents. Thus, while the burden of proof in principle rests on the applicant, the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner. Indeed, in some cases, it may be for the examiner to use all the means at his disposal to produce the necessary evidence in support of the application. Even such independent research may not, however, always be successful and there may also be statements that are not susceptible of proof. In such cases, if the applicant's account appears credible, he should, unless there are good reasons to the contrary, be given the benefit of the doubt.

<span style="color:blue">IFR_AR_015850</span>

[27] Official Records of the General Assembly, Thirty second Session, Supplement No. 12 (A/32/12/Add.1), para. 53 (6) (e).

197. The requirement of evidence should thus not be too strictly applied in view of the difficulty of proof inherent in the special situation in which an applicant for refugee status finds himself. Allowance for such possible lack of evidence does not, however, mean that unsupported statements must necessarily be accepted as true if they are inconsistent with the general account put forward by the applicant.

198. A person who, because of his experiences, was in fear of the authorities in his own country may still feel apprehensive vis-à-vis any authority. He may therefore be afraid to speak freely and give a full and accurate account of his case.

199. While an initial interview should normally suffice to bring an applicant's story to light, it may be necessary for the examiner to clarify any apparent inconsistencies and to resolve any contradictions in a further interview, and to find an explanation for any misrepresentation or concealment of material facts. Untrue statements by themselves are not a reason for refusal of refugee status and it is the examiner's responsibility to evaluate such statements in the light of all the circumstances of the case.

200. An examination in depth of the different methods of fact-finding is outside the scope of the present Handbook. It may be mentioned, however, that basic information is frequently given, in the first instance, by completing a standard questionnaire. Such basic information will normally not be sufficient to enable the examiner to reach a decision, and one or more personal interviews will be required. It will be necessary for the examiner to gain the confidence of the applicant in order to assist the latter in putting forward his case and in fully explaining his opinions and feelings. In creating such a climate of confidence it is, of course, of the utmost importance that the applicant's statements will be treated as confidential and that he be so informed.

201. Very frequently the fact-finding process will not be complete until a wide range of circumstances has been ascertained. Taking isolated incidents out of context may be misleading. The cumulative effect of the applicant's experience must be taken into account. Where no single incident stands out above the others, sometimes a small incident may be "the last straw"; and although no single incident may be sufficient, all the incidents related by the applicant taken together, could make his fear "well-founded" (see paragraph 53 above).

202. Since the examiner's conclusion on the facts of the case and his personal impression of the applicant will lead to a decision that affects human lives, he must apply the criteria in a spirit of justice and understanding and his judgement should not, of course, be influenced by the personal consideration that the applicant may be an "undeserving case".

## (2) Benefit of the doubt

203. After the applicant has made a genuine effort to substantiate his story there may still be a lack of evidence for some of his statements. As explained above (paragraph 196), it is hardly possible for a refugee to "prove" every part of his case and, indeed, if this were a requirement the majority of refugees would not be recognized. It is therefore frequently necessary to give the applicant the benefit of the doubt.

204. The benefit of the doubt should, however, only be given when all available evidence has been obtained and checked and when the examiner is satisfied as to the applicant's general credibility. The applicant's statements must be coherent and plausible, and must not run counter to generally known facts.

## (3) Summary

205. The process of ascertaining and evaluating the facts can therefore be summarized as follows:

IFR_AR_015851

(a) The *applicant* should:

(i) Tell the truth and assist the examiner to the full in establishing the facts of his case.

(ii) Make an effort to support his statements by any available evidence and give a satisfactory explanation for any lack of evidence. If necessary he must make an effort to procure additional evidence.

(iii) Supply all pertinent information concerning himself and his past experience in as much detail as is necessary to enable the examiner to establish the relevant facts. He should be asked to give a coherent explanation of all the reasons invoked in support of his application for refugee status and he should answer any questions put to him.

(b) The *examiner* should:

(i) Ensure that the applicant presents his case as fully as possible and with all available evidence.

(ii) Assess the applicant's credibility and evaluate the evidence (if necessary giving the applicant the benefit of the doubt), in order to establish the objective and the subjective elements of the case.

(iii) Relate these elements to the relevant criteria of the 1951 Convention, in order to arrive at a correct conclusion as to the applicant's refugee status.


## C. CASES GIVING RISE TO SPECIAL PROBLEMS IN ESTABLISHING THE FACTS

### (1) Mentally disturbed persons

206. It has been seen that in determining refugee status the subjective element of fear and the objective element of its well-foundedness need to be established.

207. It frequently happens that an examiner is confronted with an applicant having mental or emotional disturbances that impede a normal examination of his case. A mentally disturbed person may, however, be a refugee, and while his claim cannot therefore be disregarded, it will call for different techniques of examination.

208. The examiner should, in such cases, whenever possible, obtain expert medical advice. The medical report should provide information on the nature and degree of mental illness and should assess the applicant's ability to fulfil the requirements normally expected of an applicant in presenting his case (see paragraph 205 (a) above). The conclusions of the medical report will determine the examiner's further approach.

209. This approach has to vary according to the degree of the applicant's affliction and no rigid rules can be laid down. The nature and degree of the applicant's "fear" must also be taken into consideration, since some degree of mental disturbance is frequently found in persons who have been exposed to severe persecution. Where there are indications that the fear expressed by the applicant may not be based on actual experience or may be an exaggerated fear, it may be necessary, in arriving at a decision, to lay greater emphasis on the objective circumstances, rather than on the statements made by the applicant.

210. It will, in any event, be necessary to lighten the burden of proof normally incumbent upon the applicant, and information that cannot easily be obtained from the applicant may have to be sought elsewhere, e.g. from friends, relatives and other persons closely acquainted with the applicant, or from his guardian, if one has been appointed. It may also be necessary to draw certain conclusions from the surrounding circumstances. If, for instance, the applicant belongs to and is in the company of a group of refugees, there is a presumption that he shares their fate and qualifies in the same manner as they do.

211. In examining his application, therefore, it may not be possible to attach the same importance as is normally attached to the subjective element of "fear", which may be less reliable, and it may be necessary to place greater emphasis on the objective situation.

IFR_AR_015852

212. In view of the above considerations, investigation into the refugee status of a mentally disturbed person will, as a rule, have to be more searching than in a "normal" case and will call for a close examination of the applicant's past history and background, using whatever outside sources of information may be available.


## (2) Unaccompanied minors

213. There is no special provision in the 1951 Convention regarding the refugee status of persons under age. The same definition of a refugee applies to all individuals, regardless of their age. When it is necessary to determine the refugee status of a minor, problems may arise due to the difficulty of applying the criteria of "well-founded fear" in his case. If a minor is accompanied by one (or both) of his parents, or another family member on whom he is dependent, who requests refugee status, the minor's own refugee status will be determined according to the principle of family unity (paragraphs 181 to 188 above).

214. The question of whether an unaccompanied minor may qualify for refugee status must be determined in the first instance according to the degree of his mental development and maturity. In the case of children, it will generally be necessary to enrol the services of experts conversant with child mentality. A child – and for that matter, an adolescent – not being legally independent should, if appropriate, have a guardian appointed whose task it would be to promote a decision that will be in the minor's best interests. In the absence of parents or of a legally appointed guardian, it is for the authorities to ensure that the interests of an applicant for refugee status who is a minor are fully safeguarded.

215. Where a minor is no longer a child but an adolescent, it will be easier to determine refugee status as in the case of an adult, although this again will depend upon the actual degree of the adolescent's maturity. It can be assumed that – in the absence of indications to the contrary – a person of 16 or over may be regarded as sufficiently mature to have a well-founded fear of persecution. Minors under 16 years of age may normally be assumed not to be sufficiently mature. They may have fear and a will of their own, but these may not have the same significance as in the case of an adult.

216. It should, however, be stressed that these are only general guidelines and that a minor's mental maturity must normally be determined in the light of his personal, family and cultural background.

217. Where the minor has not reached a sufficient degree of maturity to make it possible to establish well-founded fear in the same way as for an adult, it may be necessary to have greater regard to certain objective factors. Thus, if an unaccompanied minor finds himself in the company of a group of refugees, this may – depending on the circumstances – indicate that the minor is also a refugee.

218. The circumstances of the parents and other family members, including their situation in the minor's country of origin, will have to be taken into account. If there is reason to believe that the parents wish their child to be outside the country of origin on grounds of well-founded fear of persecution, the child himself may be presumed to have such fear.

219. If the will of the parents cannot be ascertained or if such will is in doubt or in conflict with the will of the child, then the examiner, in cooperation with the experts assisting him, will have to come to a decision as to the well-foundedness of the minor's fear on the basis of all the known circumstances, which may call for a liberal application of the benefit of the doubt.

IFR_AR_015853

## CONCLUSION

220. In the present Handbook an attempt has been made to define certain guidelines that, in the experience of UNHCR, have proved useful in determining refugee status for the purposes of the 1951 Convention and the 1967 Protocol relating to the Status of Refugees. In so doing, particular attention has been paid to the definitions of the term "refugee" in these two instruments, and to various problems of interpretation arising out of these definitions. It has also been sought to show how these definitions may be applied in concrete cases and to focus attention on various procedural problems arising in regard to the determination of refugee status.

221. The Office of the High Commissioner is fully aware of the shortcomings inherent in a Handbook of this nature, bearing in mind that it is not possible to encompass every situation in which a person may apply for refugee status. Such situations are manifold and depend upon the infinitely varied conditions prevailing in countries of origin and on the special personal factors relating to the individual applicant.

222. The explanations given have shown that the determination of refugee status is by no means a mechanical and routine process. On the contrary, it calls for specialized knowledge, training and experience and – what is more important – an understanding of the particular situation of the applicant and of the human factors involved.

223. Within the above limits it is hoped that the present Handbook may provide some guidance to those who in their daily work are called upon to determine refugee status.

IFR_AR_015854

# ANNEXES

## ANNEX I

### EXCERPT FROM THE FINAL ACT OF THE UNITED NATIONS CONFERENCE OF PLENIPOTENTIARIES ON THE STATUS OF REFUGEES AND STATELESS PERSONS[28]

### IV

The Conference adopted unanimously the following recommendations:

**A.**

"THE CONFERENCE,

"*Considering* that the issue and recognition of travel documents is necessary to facilitate the movement of refugees, and in particular their resettlement,

"*Urges* Governments which are parties to the Inter-Governmental Agreement on Refugee Travel Documents signed in London 15 October 1946, or which recognize travel documents issued in accordance with the Agreement, to continue to issue or to recognize such travel documents, and to extend the issue of such documents to refugees as defined in article 1 of the Convention relating to the Status of Refugees or to recognize the travel documents so issued to such persons, until they shall have undertaken obligations under article 28 of the said Convention."

**B.**

"THE CONFERENCE,

"*Considering* that the unity of the family, the natural and fundamental group of society, is an essential right of the refugee, and that such unity is constantly threatened, and

"*Noting* with satisfaction that, according to the official commentary of the *ad hoc* Committee on Statelessness and Related Problems the rights granted to a refugee are extended to members of his family,

"*Recommends* Governments to take the necessary measure protection of the refugee's family, especially with a view to:

"(1) Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country,

"(2) The protection of refugees who are minors, in particular unaccompanied children and girls, with special reference to guardianship and adoption."

IFR_AR_015855

---

[28] United Nations Treaty Series, vol. 189, p. 37.

**C.**

"THE CONFERENCE,

"*Considering* that, in the moral, legal and material spheres, refugees need the help of suitable welfare services, especially that of appropriate non-governmental organizations,

"*Recommends* Governments and inter-governmental bodies to facilitate, encourage and sustain the efforts of properly qualified or organizations."

**D.**

"THE CONFERENCE,

"*Considering* that many persons still leave their country of origin for reasons of persecution and are entitled to special protection on account of their position,

"*Recommends* that Governments continue to receive refugees in their territories and that they act in concert in a true spirit of international co-operation in order that these refugees may find asylum and the possibility of resettlement."

**E.**

"THE CONFERENCE,

"*Expresses* the hope that the Convention relating to the Status of Refugees will have value as an example exceeding its contractual scope and that all nations will be guided by it in granting so far as possible to persons in their territory as refugees and who would not be covered by the terms of the Convention, the treatment for which it provides."

IFR_AR_015856

# ANNEX II

**1951 CONVENTION RELATING TO THE STATUS OF REFUGEES[29]**

## PREAMBLE

THE HIGH CONTRACTING PARTIES

*Considering* that the Charter of the United Nations and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,

*Considering* that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavored to assure refugees the widest possible exercise of these fundamental rights and freedoms,

*Considering* that it is desirable to revise and consolidate previous international agreements relating to the status of refugees and to extend the scope of and the protection accorded by such instruments by means of a new agreement,

*Considering* that the grant of asylum may place unduly heavy burdens on certain countries, and that a satisfactory solution of a problem of which the United Nations has recognized the international scope and nature the cannot therefore be achieved without international co-operation,

*Expressing* the wish that all States, recognizing the social and humanitarian nature of the problem of refugees, will do everything within their power to prevent this problem from becoming a cause of tension between States,

*Noting* that the United Nations High Commissioner for Refugees is charged with the task of supervising international conventions providing for the protection of Refugees, and recognizing that the effective co-ordination of measures taken to deal with this problem will depend upon the co-operation of States with the High Commissioner,

*Have agreed as follows:*

## CHAPTER I – GENERAL PROVISIONS

### Article 1

**Definition of the term "Refugee"**

**A.** For the purposes of the present Convention, the term "refugee" shall apply to any person who:

(1) Has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;

Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugee being accorded to persons who fulfil the conditions of paragraph 2 of this section;

IFR_AR_015857

---

[29] United Nations Treaty Series, vol. 189, p. 137.

(2) As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

**B.** (1) For the purposes of this Convention, the words "events occurring before 1 January 1951" in Article 1, Section A, shall be understood to mean either:

(a) "events occurring in Europe before 1 January 1951" or

(b) "events occurring in Europe or elsewhere before 1 January 1951"

and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purpose of its obligations under this Convention.

(2) Any Contracting State which has adopted alternative (a) may at any time extend its obligations by adopting alternative (b) by means of a notification addressed to the Secretary-General of the United Nations.

**C.** This Convention shall cease to apply to any person falling under the terms of Section A if:

(1) He has voluntarily re-availed himself of the protection of the country of his nationality; or

(2) Having lost his nationality, he has voluntarily re-acquired it; or

(3) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or

(4) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or

(5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality.

(6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

**D.** This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.

IFR_AR_015858

When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention.

**E.** This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country.

**F.** The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

(a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

(c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

## Article 2

**General obligations**

Every refugee has duties to the country in which he finds himself, which require in particular that he conform to its laws and regulations as well as to measures taken for the maintenance of public order.

## Article 3

**Non-Discrimination**

The Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin.

## Article 4

**Religion**

The Contracting States shall accord to refugees within their territories treatment at least as favorable as that accorded to their nationals with respect to freedom to practice their religion and freedom as regards the religious education of their children.

## Article 5

**Rights granted apart from this Convention**

Nothing in this Convention shall be deemed to impair any rights and benefits granted by a Contracting State to refugees apart from this Convention.

IFR_AR_015859

## Article 6

**The term "in the same circumstances"**

For the purpose of this Convention, the term "in the same circumstances" implies that any requirements (including requirements as to length and conditions of sojourn or residence) which the particular individual would have to fulfil for the enjoyment of the right in question, if he were not a refugee, must be fulfilled by him, with the exception of requirements which by their nature a refugee is incapable of fulfilling.

## Article 7

**Exemption from reciprocity**

1. Except where this Convention contains more favorable provisions, a Contracting State shall accord to refugees the same treatment as is accorded to aliens generally.

2. After a period of three years' residence, all refugees shall enjoy exemption from legislative reciprocity in the territory of the Contracting States.

3. Each Contracting State shall continue to accord to refugees the rights and benefits to which they were already entitled, in the absence of reciprocity, at the date of entry into force of this Convention for that State.

4. The Contracting States shall consider favorably the possibility of according to refugees, in the absence of reciprocity, rights and benefits beyond those to which they are entitled according to paragraphs 2 and 3, and to extending exemption from reciprocity to refugees who do not fulfil the conditions provided for in paragraphs 2 and 3.

5. The provisions of paragraphs 2 and 3 apply both to the rights and benefits referred to in articles 13, 18, 19, 21 and 22 of this Convention and to rights and benefits for which this Convention does not provide.

## Article 8

**Exemption from exceptional measures**

With regard to exceptional measures which may be taken against the person, property or interests of nationals of a foreign State, the Contracting States shall not apply such measures to a refugee who is formally a national of the said State solely on account of such nationality. Contracting States which, under their legislation, are prevented from applying the general principle expressed in this article, shall, in appropriate cases, grant exemptions in favor of such refugees.

## Article 9

**Provisional measures**

Nothing in this Convention shall prevent a Contracting State, in time of war or other grave and exceptional circumstances, from taking provisionally measures which it considers to be essential to the national security in the case of a particular person, pending a determination by the Contracting State that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security.

IFR_AR_015860

**Article 10**

**Continuity of residence**

1. Where a refugee has been forcibly displaced during the Second World War and removed to the territory of a Contracting State, and is resident there, the period of such enforced sojourn shall be considered to have been lawful residence within that territory.

2. Where a refugee has been forcibly displaced during the Second World War from the territory of a Contracting State and has, prior to the date of entry into force of this Convention, returned thereto for the purpose taking up residence, the period of residence before and after such enforced displacement shall be regarded as one uninterrupted period for any purposes for which uninterrupted residence is required.

**Article 11**

**Refugee seamen**

In the case of refugees regularly serving as crew members on board a ship flying the flag of a Contracting State, that state shall give sympathetic consideration to their establishment on its territory and the issue of travel documents to them on their temporary admissions to its territory particularly with a view to facilitating their establishment in another country.

## CHAPTER II – JURIDICAL STATUS

### Article 12

**Personal status**

1. The personal status of a refugee shall be governed by the law of the country of his domicile or, if he has no domicile, by the law of the country of his residence.

2. Rights previously acquired by a refugee and dependent on personal status, more particularly rights attaching to marriage, shall be respected by a Contracting State, subject to compliance, if this be necessary, with the formalities required by the law of that State, provided that the right in question is one which would have been recognized by the law of that State had he not become a refugee.

### Article 13

**Movable and immovable property**

The Contracting States shall accord to a refugee treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances as regards the acquisition of movable and immovable property and other rights pertaining thereto, and to leases and other contracts relating to movable and immovable property.

### Article 14

**Artistic rights and industrial property**

In respect of the protection of industrial property, such as inventions, designs or models, trade marks, trade names, and of rights in literary, artistic and scientific works, a refugee shall be accorded in the

IFR-AR-015861

54

country in which he has his habitual residence the same protection as is accorded to nationals of that country. In the territory of any other Contracting State, he shall be accorded the same protection as is accorded in that territory to nationals of the country in which he has habitual residence.

## Article 15

**Right of association**

As regards non-political and non-profit-making associations and trade unions the Contracting States shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country, in the same circumstances.

## Article 16

**Access to courts**

1. A refugee shall have free access to the courts of law on the territory of all Contracting States.

2. A refugee shall enjoy in the Contracting State in which he has his habitual residence the same treatment as a national in matters pertaining to access to the Courts, including legal assistance and exemption from *cautio judicatum solvi*.

3. A refugee shall be accorded in the matters referred to in paragraph 2 in countries other than that in which he has his habitual residence the treatment granted to a national of the country of his habitual residence.

## CHAPTER III – GAINFUL EMPLOYMENT

## Article 17

**Wage-earning employment**

1. The Contracting State shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment.

2. In any case, restrictive measures imposed on aliens or the employment of aliens for the protection of the national labour market shall not be applied to a refugee who was already exempt from them at the date of entry into force of this Convention for the Contracting States concerned, or who fulfills one of the following conditions:

(a) He has completed three years residence in the country;

(b) He has a spouse possessing the nationality of the country of residence. A refugee may not invoke the benefits of this provision if he has abandoned his spouse;

(c) He has one or more children possessing the nationality of the country of residence.

3. The Contracting States shall give sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals, and in particular of those refugees who have entered their territory pursuant to programmes of labour recruitment or under immigration schemes.

IFR_AR_015862

### Article 18

**Self-employment**

The Contracting States shall accord to a refugee lawfully in their territory treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances, as regards the right to engage on his own account in agriculture, industry, handicrafts and commerce and to establish commercial and industrial companies.

### Article 19

**Liberal professions**

1. Each Contracting State shall accord to refugees lawfully staying in their territory who hold diplomas recognized by the competent authorities of that State, and who are desirous of practising a liberal profession, treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances.

2. The Contracting States shall use their best endeavours consistently with their laws and constitutions to secure the settlement of such refugees in the territories, other than the metropolitan territory, for whose international relations they are responsible.

## CHAPTER IV – WELFARE

### Article 20

**Rationing**

Where a rationing system exists, which applies to the population at large and regulates the general distribution of products in short supply, refugees shall be accorded the same treatment as nationals.

### Article 21

**Housing**

As regards housing, the Contracting States, in so far as the matter is regulated by laws or regulations or is subject to the control of public authorities, shall accord to refugees lawfully staying in their territory treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances.

### Article 22

**Public education**

1. The Contracting States shall accord to refugees the same treatment as is accorded to nationals with respect to elementary education.

2. The Contracting States shall accord to refugees treatment as favorable as possible, and, in any event, not less favorable than that accorded to aliens generally in the same circumstances, with respect to education other than elementary education and, in particular, as regards access to studies, the recognition of foreign school certificates, diplomas and degrees, the remission of fees and charges and the award of scholarships.

IFR_AR_015863

**Article 23**

**Public relief**

The Contracting States shall accord to refugees lawfully staying in their territory the same treatment with respect to public relief and assistance as is accorded to their nationals.

**Article 24**

**Labour legislation and social security**

1. The Contracting States shall accord to refugees lawfully staying in their territory the same treatment as is accorded to nationals in respect of the following matters:

(a) In so far as such matters are governed by laws or regulations or are subject to the control of administrative authorities: remuneration, including family allowances where these form part of remuneration, hours of work, overtime arrangements, holidays with pay, restrictions on home work, minimum age of employment, apprenticeship and training, women's work and the work of young persons, and the enjoyment of the benefits of collective bargaining;

(b) Social security (legal provisions in respect of employment injury, occupational diseases, maternity, sickness, disability, old age, death, unemployment, family responsibilities and any other contingency which, according to national laws or regulations, is covered by a social security scheme), subject to the following limitations:

(i) There may be appropriate arrangements for the maintenance of acquired rights and rights in course of acquisition;

(ii) National laws or regulations of the country of residence may prescribe special arrangements concerning benefits or portions of benefits which are payable wholly out of public funds, and concerning allowances paid to persons who do not fulfil the contribution conditions prescribed for the award of a normal pension.

2. The right to compensation for the death of a refugee resulting from employment injury or from occupational disease shall not be affected by the fact that the residence of the beneficiary is outside the territory of the Contracting State.

3. The Contracting States shall extend to refugees the benefits of agreements concluded between them, or which may be concluded between them in the future, concerning the maintenance of acquired rights and rights in the process of acquisition in regard to social security, subject only to the conditions which apply to nationals of the States signatory to the agreements in question.

4. The Contracting States will give sympathetic consideration to extending to refugees so far as possible the benefits of similar agreements which may at any time be in force between such Contracting States and non-contracting States.

## CHAPTER V – ADMINISTRATIVE MEASURES

### Article 25

**Administrative assistance**

1. When the exercise of a right by a refugee would normally require the assistance of authorities of a foreign country to whom he cannot have recourse, the Contracting States in whose territory he is residing shall arrange that such assistance be afforded to him by their own authorities or by an international authority.

IFR_AR_015864

2. The authority or authorities mentioned in paragraph 1 shall deliver or cause to be delivered under their supervision to refugees such documents or certifications as would normally be delivered to aliens by or through their national authorities.

3. Documents or certifications so delivered shall stand in the stead of the official instruments delivered to aliens by or through their national authorities, and shall be given credence in the absence of proof to the contrary.

4. Subject to such exceptional treatment as may be granted to indigent persons, fees may be charged for the services mentioned herein, but such fees shall be moderate and commensurate with those charged to nationals for similar services.

5. The provisions of this article shall be without prejudice to articles 27 and 28.

## Article 26

**Freedom of movement**

Each Contracting State shall accord to refugees lawfully in its territory the right to choose their place of residence and to move freely within its territory, subject to any regulations applicable to aliens generally in the same circumstances.

## Article 27

**Identity papers**

The Contracting States shall issue identity papers to any refugee in their territory who does not possess a valid travel document.

## Article 28

**Travel documents**

1. The Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory unless compelling reasons of national security or public order otherwise require, and the provisions of the Schedule to this Convention shall apply with respect to such document. The Contracting States may issue such a travel document to any other refugee in their territory; they shall in particular give sympathetic consideration to the issue of such a travel document to refugees in their territory who are unable to obtain a travel document from the country of their lawful residence.

2. Travel documents issued to refugees under previous international agreements by parties thereto shall be recognized and treated by the Contracting States in the same way as if they had been issued pursuant to this article.

## Article 29

**Fiscal charges**

1. The Contracting States shall not impose upon refugees duties, charges or taxes, of any description whatsoever, other or higher than those which are or may be levied on their nationals in similar situations.

IFR_AR_015865

2. Nothing in the above paragraph shall prevent the application to refugees of the laws and regulations concerning charges in respect of the issue to aliens of administrative documents including identity papers.

## Article 30

**Transfer of assets**

1. A Contracting State shall, in conformity with its laws and regulations permit refugees to transfer assets which they have brought into its territory, to another country where they have been admitted for the purposes of resettlement.

2. A Contracting State shall give sympathetic consideration to the application of refugees for permission to transfer assets wherever they may be and which are necessary for their resettlement in another country to which they have been admitted.

## Article 31

**Refugees unlawfully in the country of refuge**

1. The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

2. The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall only be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country.

## Article 32

**Expulsion**

1. The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.

2. The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, the refugee shall be allowed to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority.

3. The Contracting States shall allow such a refugee a reasonable period within which to seek legal admission into another country. The Contracting States reserve the right to apply during that period such internal measures as they may deem necessary.

## Article 33

**Prohibition of expulsion or return ("refoulement")**

1. No Contracting State shall expel or return (*"refouler"*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

IFR_AR_015866

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

## Article 34

**Naturalization**

The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and cost of such proceedings.

## CHAPTER VI – EXECUTORY AND TRANSITORY PROVISIONS

## Article 35

**Co-operation of the national authorities with the United Nations**

1. The Contracting States undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of this Convention.

2. In order to enable the Office of the High Commissioner or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the Contracting States undertake to provide them in the appropriate form with information and statistical data requested concerning:

(a) the condition of refugees,

(b) the implementation of this Convention, and

(c) laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## Article 36

**Information on national legislation**

The Contracting States shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of this Convention.

## Article 37

**Relation to previous conventions**

Without prejudice to article 28, Paragraph 2, of this Convention, this Convention replaces, as between parties to it, the Arrangements of 5 July 1922, 31 May 1924, 12 May 1926, 30 June 1928 and 30 July 1935, the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 and the Agreement of 15 October 1946.

IFR_AR_015867

## CHAPTER VII – FINAL CLAUSES

### Article 38

**Settlement of disputes**

Any dispute between parties to this Convention relating to its interpretation or application, which cannot be settled by other means, shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

### Article 39

**Signature, ratification and accession**

1. This Convention shall be opened for signature at Geneva on 28 July 1951 shall thereafter be deposited with the Secretary-General of the United Nations. It shall be open for signature at the European office of the United Nations from 28 July to 31 August 1951 and shall be reopened for signature at the Headquarters of the United Nations from 17 September 1951 to 31 December 1952.

2. This Convention shall be open for signature on behalf of all States members of the United Nations and also on behalf of any other State invited to attend the Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons or to which an invitation to sign will have been addressed by the General Assembly. It shall be ratified and the instruments of ratification shall be deposited with the Secretary-General of the United Nations.

3. This Convention shall be open from 28 July 1951 for accession by the States referred to in paragraph 2 of this Article. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

### Article 40

**Territorial application clause**

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the States concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject where necessary for constitutional reasons, to the consent of the governments of such territories.

### Article 41

**Federal clause**

In the case of a Federal or non-unitary State, the following provisions shall apply:

IFR_AR_015868

(a) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of Parties which are not Federal States,

(b) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favorable recommendation, to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment.

(c) A Federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention showing the extent to which effect has been given to that provision by legislative or other action.

## Article 42

### Reservations

1. At the time of signature, ratification or accession, any State may make reservations to articles of the Convention other than to articles 1, 3, 4, 16 (1), 33, 36 to 46 inclusive.

2. Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw the reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

## Article 43

### Entry into force

1. This Convention shall come into force on the ninetieth day following the day of deposit of the sixth instrument of ratification or accession.

2. For each State ratifying or acceding to the Convention after the deposit of the sixth instrument of ratification or accession, the Convention shall enter into force on the ninetieth day following the day of deposit by such State of its instrument of ratification or accession.

## Article 44

### Denunciation

1. Any Contracting State may denounce this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2. Such denunciation shall take effect for the Contracting State concerned one year from the date upon which it is received by the Secretary-General of the United Nations.

3. Any State which has made a declaration or notification under article 40 may, at any time thereafter, by a notification to the Secretary-General of the United Nations, declare that the Convention shall cease to extend to such territory one year after the date of receipt of the notification by the Secretary-General.

IFR_AR_015869

**Article 45**

**Revision**

1. Any Contracting State may request revision of this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2. The General Assembly of the United Nations shall recommend the steps, if any, to be taken in respect of such request.

## Article 46

**Notifications by the Secretary-General of the United Nations**

The Secretary-General of the United Nations shall inform all Members of the United Nations and non-member States referred to in article 39:

(a) of declarations and notifications in accordance with Section B of Article 1;

(b) of signatures, ratifications and accessions in accordance with article 39;

(c) of declarations and notifications in accordance with article 40;

(d) of reservations and withdrawals in accordance with article 42;

(e) of the date on which this Convention will come into force in accordance with article 43;

(f) of denunciations and notifications in accordance with article 44;

(g) of requests for revision in accordance with article 45.

*In faith whereof* the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments,

*Done* at Geneva, this twenty-eighth day of July, one thousand nine hundred and fifty-one, in a single copy, of which the English and French texts are equally authentic and which shall remain deposited in the archives of the United Nations, and certified true copies of which shall be delivered to all Members of the United Nations and to the non-member States referred to in article 39.

## SCHEDULE

**Paragraph 1**

1. The travel document referred to in article 28 of this Convention shall be similar to the specimen annexed hereto.

2. The document shall be made out in at least two languages, one of which shall be in English or French.

**Paragraph 2**

Subject to the regulations obtaining in the country of issue, children may be included in the travel document of a parent or, in exceptional circumstances, of another adult refugee.

IFR_AR_015870

**Paragraph 3**

The fees charged for issue of the document shall not exceed the lowest scale of charges for national passports.

**Paragraph 4**

Save in special or exceptional cases, the document shall be made valid for the largest possible number of countries.

**Paragraph 5**

The document shall have a validity of either one or two years, at the discretion of the issuing authority.

**Paragraph 6**

1. The renewal or extension of the validity of the document is a matter for the authority which issued it, so long as the holder has not established lawful residence in another territory and resides lawfully in the territory of the said authority. The issue of a new document is, under the same conditions, a matter for the authority which issued the former document.

2. Diplomatic or consular authorities, specially authorized for the purpose, shall be empowered to extend, for a period not exceeding six months, the validity of travel documents issued by the Governments.

3. The Contracting States shall give sympathetic consideration to renewing or extending the validity of travel documents or issuing new documents to refugees no longer lawfully resident in their territory who are unable to obtain a travel document from the country of their lawful residence.

**Paragraph 7**

The Contracting States shall recognize the validity of the documents issued in accordance with the provisions of article 28 of this Convention.

**Paragraph 8**

The competent authorities of the country to which the refugee desires to proceed shall, if they are prepared to admit him and if a visa is required, affix a visa on the document of which he is the holder.

**Paragraph 9**

1. The Contracting States undertake to issue transit visas to refugees who have obtained visas for a territory of final destination.

2. The issue of such visas may be refused on grounds which would justify refusal of a visa to any alien.

**Paragraph 10**

The fees for the issue of exit, entry or transit visas shall not exceed the lowest scale of charges for visas on foreign passports.

IFR_AR_015871

**Paragraph 11**

When a refugee has lawfully taken up residence in the territory of another Contracting State, the responsibility for the issue of a new document, under the terms and conditions of article 28, shall be that of the competent authority of that territory, to which the refugee shall be entitled to apply.

**Paragraph 12**

The authority issuing a new document shall withdraw the old document and shall return it to the country of issue, if it is stated in the document that it should be so returned; otherwise it shall withdraw and cancel the document.

**Paragraph 13**

1. Each Contracting State undertakes that the holder of a travel document issued by it in accordance with article 28 of this Convention shall be readmitted to its territory at any time during the period of its validity.

2. Subject to the provisions of the preceding sub-paragraph, a Contracting State may require the holder of the document to comply with such formalities as may be prescribed in regard to exit from or return to its territory.

3. The Contracting States reserve the right, in exceptional cases, or in cases where the refugee's stay is authorized for a specific period, when issuing the document, to limit the period during which the refugee may return to a period of not less than three months.

**Paragraph 14**

Subject only to the terms of paragraph 13, the provisions of this Schedule in no way affect the laws and regulations governing the conditions of admission to, transit through, residence and establishment in, and departure from, the territories of the Contracting States.

**Paragraph 15**

Neither the issue of the document nor the entries made thereon determine or affect the status of the holder, particularly as regards nationality.

**Paragraph 16**

The issue of the document does not in any way entitle the holder to the protection of the diplomatic or consular authorities of the country of issue, and does not confer on these authorities a right of protection.

## ANNEX – SPECIMEN TRAVEL DOCUMENT

[not reproduced here]

IFR_AR_015872

# ANNEX III

**1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES**[30]

*The States Parties* to the present Protocol,

*Considering* that the Convention relating to the Status of Refugees done at Geneva on 28 July 1951 (hereinafter referred to as the Convention) covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

*Considering* that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

*Considering* that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951,

*Have agreed* as follows:

## Article I

### General provision

1. The States Parties to the present Protocol undertake to apply articles 2 to 34 inclusive of the Convention to refugees as hereinafter defined.

2. For the purpose of the present Protocol, the term "refugee" shall, except as regards the application of paragraph 3 of this article, mean any person within the definition of article 1 of the Convention as if the words "As a result of events occurring before 1 January 1951 and…" and the words "… as a result of such events", in article 1 A (2) were omitted.

3. The present Protocol shall be applied by the States Parties hereto without any geographic limitation, save that existing declarations made by States already Parties to the Convention in accordance with article 1 B (1) (a) of the Convention, shall, unless extended under article 1 B (2) thereof, apply also under the present Protocol.

## Article II

### Co-operation of the national authorities with the United Nations

1. The States Parties to the present Protocol undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of the present Protocol.

2. In order to enable the Office of the High Commissioner, or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the States Parties to the present Protocol undertake to provide them with the information and statistical data requested, in the appropriate form, concerning:

(a) The condition of refugees;

IFR_AR_015873

---

[30] United Nations, Treaty Series, vol 606, p. 267.

(b) The implementation of the present Protocol;

(c) Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## Article III

### Information on national legislation

The States Parties to the present Protocol shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of the present Protocol.

## Article IV

### Settlement of disputes

Any dispute between States Parties to the present Protocol which relates to its interpretation or application and which cannot be settled by other means shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

## Article V

### Accession

The present Protocol shall be open for accession on behalf of all States Parties to the Convention and of any other State Member of the United Nations or member of any of the specialized agencies or to which an invitation to accede may have been addressed by the General Assembly of the United Nations. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

## Article VI

### Federal clause

In the case of a Federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of States Parties which are not Federal States;

(b) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment;

(c) A Federal State Party to the present Protocol shall, at the request of any other State Party hereto transmitted through the Secretary General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention to be applied in accordance with article 1, paragraph 1, of the present Protocol, showing the extent to which effect has been given to that provision by legislative or other action.

IFR_AR_015874

### Article VII

**Reservations and Declarations**

1. At the time of accession, any State may make reservations in respect of article IV of the present Protocol and in respect of the application in accordance with article I of the present Protocol of any provisions of the Convention other than those contained in articles 1, 3, 4, 16 (1) and 33 thereof, provided that in the case of a State Party to the Convention reservations made under this article shall not extend to refugees in respect of whom the Convention applies.

2. Reservations made by States Parties to the Convention in accordance with article 42 thereof shall, unless withdrawn, be applicable in relation to their obligations under the present Protocol.

3. Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw such reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

4. Declarations made under article 40, paragraphs 1 and 2, of the Convention by a State Party thereto which accedes to the present Protocol shall be deemed to apply in respect of the present Protocol, unless upon accession a notification to the contrary is addressed by the State Party concerned to the Secretary-General of the United Nations. The provisions of article 40, paragraphs 2 and 3, and of article 44, paragraph 3, of the Convention shall be deemed to apply *mutatis mutandis* to the present Protocol.

### Article VIII

**Entry into force**

1. The present Protocol shall come into force on the day of deposit of the sixth instrument of accession.

2. For each State acceding to the Protocol after the deposit of the sixth instrument of accession, the Protocol shall come into force on the date of deposit by such State of its instrument of accession.

### Article IX

**Denunciation**

1. Any State Party hereto may denounce this Protocol at any time by a notification addressed to the Secretary-General of the United Nations.

2. Such denunciation shall take effect for the State Party concerned one year from the date on which it is received by the Secretary-General of the United Nations.

### Article X

**Notifications by the Secretary-General of the United Nations**

The Secretary-General of the United Nations shall inform the States referred to in article V above of the date of entry into force, accessions, reservations and withdrawals of reservations to and denunciations of the present Protocol, and of declarations and notifications relating hereto.

IFR_AR_015875

**Article XI**

**Deposit in the Archives of the Secretariat of the United Nations**

A copy of the present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, signed by the President of the General Assembly and by the Secretary-General of the United Nations, shall be deposited in the archives of the Secretariat of the United Nations. The Secretary-General will transmit certified copies thereof to all States Members of the United Nations and to the other States referred to in article V above.

IFR_AR_015876

# ANNEX IV

### LIST OF STATES PARTIES TO THE 1951 CONVENTION RELATING TO THE STATUS OF REFUGEES AND THE 1967 PROTOCOL

Date of entry into force:
22 April 1954 (Convention)
4 October 1967 (Protocol)

### As of 10 December 2018

Total number of States Parties to the 1951 Convention: 146
Total number of States Parties to the 1967 Protocol: 147
States Parties to both the Convention and Protocol: 144
States Parties to one or both of these instruments: 149

### States Parties to the 1951 Convention only:

Madagascar and Saint Kitts and Nevis

### States Parties to the 1967 Protocol only:

Cape Verde, United States of America, Venezuela

The dates indicated are the dates of deposit of the instrument of ratification or accession by the respective States Parties with the Secretary-General of the United Nations in New York. In accordance with article 43(2), the Convention enters into force on the ninetieth day after the date of deposit. The Protocol enters into force on the date of deposit (article VIII (2)). Exceptions are indicated below.

| Country[31] | Convention | Protocol |
|---|---|---|
| Afghanistan | 30 Aug 2005 a | 30 Aug 2005 a |
| Albania | 18 Aug 1992 a | 18 Aug 1992 a |
| Algeria | 21 Feb 1963 d | 08 Nov 1967 a |
| Angola | 23 Jun 1981 a | 23 Jun 1981 a |
| Antigua and Barbuda | 07 Sep 1995 a | 07 Sep 1995 a |
| Argentina | 15 Nov 1961 a | 06 Dec 1967 a |
| Armenia | 06 Jul 1993 a | 06 Jul 1993 a |
| Australia | 22 Jan 1954 a | 13 Dec 1973 a |
| Austria | 01 Nov 1954 r | 05 Sep 1973 a |
| Azerbaijan | 12 Feb 1993 a | 12 Feb 1993 a |
| Bahamas | 15 Sep 1993 a | 15 Sep 1993 a |
| Belarus | 23 Aug 2001 a | 23 Aug 2001 a |
| Belgium | 22 Jul 1953 r | 08 Apr 1969 a |
| Belize | 27 Jun 1990 a | 27 Jun 1990 a |
| Benin | 04 Apr 1962 d | 06 Jul 1970 a |
| Bolivia, Plurinational State of | 09 Feb 1982 a | 09 Feb 1982 a |
| Bosnia and Herzegovina | 01 Sep 1993 d | 01 Sep 1993 d |
| Botswana | 06 Jan 1969 a | 06 Jan 1969 a |
| Brazil | 16 Nov 1960 r | 07 Apr 1972 a |
| Bulgaria | 12 May 1993 a | 12 May 1993 a |

---

[31] Notes:
   * Ratification (r), Accession (a), Succession (d).
   ** (C) denotes States Parties to the 1951 Convention only; (P) denotes States Parties to the 1967 Protocol only.

IFR_AR_015877

| Country | Convention | Protocol |
|---|---|---|
| Burkina Faso | 18 Jun 1980 a | 18 Jun 1980 a |
| Burundi | 19 Jul 1963 a | 15 Mar 1971 a |
| Cambodia | 15 Oct 1992 a | 15 Oct 1992 a |
| Cameroon | 23 Oct 1961 d | 19 Sep 1967 a |
| Canada | 04 Jun 1969 a | 04 Jun 1969 a |
| Cape Verde (P) | | 09 Jul 1987 a |
| Central African Republic | 04 Sep 1962 d | 30 Aug 1967 a |
| Chad | 19 Aug 1981 a | 19 Aug 1981 a |
| Chile | 28 Jan 1972 a | 27 Apr 1972 a |
| China | 24 Sep 1982 a | 24 Sep 1982 a |
| Colombia | 10 Oct 1961 r | 04 Mar 1980 a |
| Congo | 15 Oct 1962 d | 10 Jul 1970 a |
| Congo, Democratic Republic of | 19 July 1965 a | 13 Jan 1975 a |
| Costa Rica | 28 Mar 1978 a | 28 Mar 1978 a |
| Côte d'Ivoire | 08 Dec 1961 d | 16 Feb 1970 a |
| Croatia | 12 Oct 1992 d | 12 Oct 1992 d |
| Cyprus | 16 May 1963 d | 09 Jul 1968 a |
| Czech Republic | 11 May 1993 d | 11 May 1993 d |
| Denmark | 04 Dec 1952 r | 29 Jan 1968 a |
| Djibouti | 09 Aug 1977 d | 09 Aug 1977 d |
| Dominica | 17 Feb 1994 a | 17 Feb 1994 a |
| Dominican Republic | 04 Jan 1978 a | 04 Jan 1978 a |
| Ecuador | 17 Aug 1955 a | 06 Mar 1969 a |
| Egypt | 22 May 1981 a | 22 May 1981 a |
| El Salvador | 28 Apr 1983 a | 28 Apr 1983 a |
| Equatorial Guinea | 07 Feb 1986 a | 07 Feb 1986 a |
| Estonia | 10 Apr 1997 a | 10 Apr 1997 a |
| Ethiopia | 10 Nov 1969 a | 10 Nov 1969 a |
| Fiji | 12 Jun 1972 d | 12 Jun 1972 d |
| Finland | 10 Oct 1968 a | 10 Oct 1968 a |
| France | 23 Jun 1954 r | 03 Feb 1971 a |
| Gabon | 27 Apr 1964 a | 28 Aug 1973 a |
| Gambia | 07 Sep 1966 d | 29 Sep 1967 a |
| Georgia | 09 Aug 1999 a | 09 Aug 1999 a |
| Germany | 01 Dec 1953 r | 05 Nov 1969 a |
| Ghana | 18 Mar 1963 a | 30 Aug 1968 a |
| Greece | 05 Apr 1960 r | 07 Aug 1968 a |
| Guatemala | 22 Sep 1983 a | 22 Sep 1983 a |
| Guinea | 28 Dec 1965 d | 16 May 1968 a |
| Guinea-Bissau | 11 Feb 1976 a | 11 Feb 1976 a |
| Haiti | 25 Sep 1984 a | 25 Sep 1984 a |
| Holy See | 15 Mar 1956 r | 08 Jun 1967 a |
| Honduras | 23 Mar 1992 a | 23 Mar 1992 a |
| Hungary | 14 Mar 1989 a | 14 Mar 1989 a |
| Iceland | 30 Nov 1955 a | 26 Apr 1968 a |
| Iran, Islamic Republic of | 28 Jul 1976 a | 28 Jul 1976 a |
| Ireland | 29 Nov 1956 a | 06 Nov 1968 a |
| Israel | 01 Oct 1954 r | 14 Jun 1968 a |
| Italy | 15 Nov 1954 r | 26 Jan 1972 a |
| Jamaica | 30 Jul 1964 d | 30 Oct 1980 a |
| Japan | 03 Oct 1981 a | 01 Jan 1982 a |
| Kazakhstan | 15 Jan 1999 a | 15 Jan 1999 a |
| Kenya | 16 May 1966 a | 13 Nov 1981 a |
| Kyrgyzstan | 08 Oct 1996 a | 08 Oct 1996 a |
| Korea, Republic of | 03 Dec 1992 a | 03 Dec 1992 a |
| Latvia | 31 Jul 1997 a | 31 Jul 1997 a |

IFR_AR_015878

| Country | Convention | Protocol |
|---|---|---|
| Lesotho | 14 May 1981 a | 14 May 1981 a |
| Liberia | 15 Oct 1964 a | 27 Feb 1980 a |
| Liechtenstein | 08 Mar 1957 r | 20 May 1968 a |
| Lithuania | 28 Apr 1997 a | 28 Apr 1997 a |
| Luxembourg | 23 Jul 1953 r | 22 Apr 1971 a |
| Macedonia, The Former Yugoslav Republic of | 18 Jan 1994 d | 18 Jan 1994 d |
| Madagascar (C) | 18 Dec 1967 a | |
| Malawi | 10 Dec 1987 a | 10 Dec 1987 a |
| Mali | 02 Feb 1973 d | 02 Feb 1973 a |
| Malta | 17 Jun 1971 a | 15 Sep 1971 a |
| Mauritania | 05 May 1987 a | 05 May 1987 a |
| Mexico | 07 June 2000 a | 07 June 2000 a |
| Moldova, Republic of | 31 Jan 2002 a | 31 Jan 2002 a |
| Monaco | 18 May 1954 a | 16 June 2010 a |
| Montenegro | 10 Oct 2006 d | 10 Oct 2006 d |
| Morocco | 07 Nov 1956 d | 20 Apr 1971 a |
| Mozambique | 16 Dec 1983 a | 01 May 1989 a |
| Namibia | 17 Feb 1995 a | 17 Feb 1995 a |
| Nauru | 28 June 2011 a | 28 June 2011 a |
| Netherlands | 03 May 1956 r | 29 Nov 1968 a |
| New Zealand | 30 Jun 1960 a | 06 Aug 1973 a |
| Nicaragua | 28 Mar 1980 a | 28 Mar 1980 a |
| Niger | 25 Aug 1961 d | 02 Feb 1970 a |
| Nigeria | 23 Oct 1967 a | 02 May 1968 a |
| Norway | 23 Mar 1953 r | 28 Nov 1967 a |
| Panama | 02 Aug 1978 a | 02 Aug 1978 a |
| Papua New Guinea | 17 Jul 1986 a | 17 Jul 1986 a |
| Paraguay | 01 Apr 1970 a | 01 Apr 1970 a |
| Peru | 21 Dec 1964 a | 15 Sep 1983 a |
| Philippines | 22 Jul 1981 a | 22 Jul 1981 a |
| Poland | 27 Sep 1991 a | 27 Sep 1991 a |
| Portugal | 22 Dec 1960 a | 13 Jul 1976 a |
| Romania | 07 Aug 1991 a | 07 Aug 1991 a |
| Russian Federation | 02 Feb 1993 a | 02 Feb 1993 a |
| Rwanda | 03 Jan 1980 a | 03 Jan 1980 a |
| Saint Kitts and Nevis (C) | 01 Feb 2002 a | |
| Saint Vincent and the Grenadines | 03 Nov 1993 a | 03 Nov 2003 a |
| Samoa | 21 Sep 1988 a | 29 Nov 1994 a |
| Sao Tome and Principe | 01 Feb 1978 a | 01 Feb 1978 a |
| Senegal | 02 May 1963 d | 03 Oct 1967 a |
| Serbia | 12 Mar 2001 d | 12 Mar 2001 d |
| Seychelles | 23 Apr 1980 a | 23 Apr 1980 a |
| Sierra Leone | 22 May 1981 a | 22 May 1981 a |
| Slovakia | 04 Feb 1993 d | 04 Feb 1993 d |
| Slovenia | 06 Jul 1992 d | 06 Jul 1992 d |
| Solomon Islands | 28 Feb 1995 a | 12 Apr 1995 a |
| Somalia | 10 Oct 1978 a | 10 Oct 1978 a |
| South Africa | 12 Jan 1996 a | 12 Jan 1996 a |
| South Sudan | 10 Dec 2018 a | 10 Dec 2018 a |
| Spain | 14 Aug 1978 a | 14 Aug 1978 a |
| Sudan | 22 Feb 1974 a | 23 May 1974 a |
| Suriname | 29 Nov 1978 d | 29 Nov 1978 d |
| Swaziland | 14 Feb 2000 a | 28 Jan 1969 a |
| Sweden | 26 Oct 1954 r | 04 Oct 1967 a |
| Switzerland | 21 Jan 1955 r | 20 May 1968 a |

IFR_AR_00158793

| Country | Convention | Protocol |
|---|---|---|
| Tajikistan | 07 Dec 1993 a | 07 Dec 1993 a |
| Tanzania, United Republic of | 12 May 1964 a | 04 Sep 1968 a |
| Timor-Leste | 07 May 2003 a | 07 May 2003 a |
| Togo | 27 Feb 1962 d | 01 Dec 1969 a |
| Trinidad and Tobago | 10 Nov 2000 a | 10 Nov 2000 a |
| Tunisia | 24 Oct 1957 d | 16 Oct 1968 a |
| Turkey | 30 Mar 1962 r | 31 Jul 1968 a |
| Turkmenistan | 02 Mar 1998 a | 02 Mar 1998 a |
| Tuvalu | 07 Mar 1986 d | 07 Mar 1986 d |
| Uganda | 27 Sep 1976 a | 27 Sep 1976 a |
| Ukraine | 10 Jun 2002 a | 04 Apr 2002 a |
| United Kingdom of Great Britain and Northern Ireland | 11 Mar 1954 r | 04 Sep 1968 a |
| United States of America (P) | | 01 Nov 1968 a |
| Uruguay | 22 Sep 1970 a | 22 Sep 1970 a |
| Venezuela, Bolivarian Republic of (P) | | 19 Sep 1986 a |
| Yemen | 18 Jan 1980 a | 18 Jan 1980 a |
| Zambia | 24 Sep 1969 d | 24 Sep 1969 a |
| Zimbabwe | 25 Aug 1981 a | 25 Aug 1981 a |

**Limitations:**

Article 1 B(1) of the 1951 Convention provides: "For the purposes of this Convention, the words 'events occurring before 1 January 1951' in article 1, Section A, shall be understood to mean either (a) 'events occurring in Europe before 1 January 1951'; or (b) 'events occurring in Europe or elsewhere before 1 January 1951', and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purposes of its obligations under this Convention."

The following States adopted alternative (a), the geographical limitation: Congo, Madagascar, Monaco and Turkey. Turkey expressly maintained its declaration of geographical limitation upon acceding to the 1967 Protocol. Madagascar has not yet acceded to the Protocol.

All other States Parties ratified, acceded or succeeded to the Convention without a geographical limitation by selecting option (b), 'events occurring in Europe or elsewhere before 1 January 1951'.

IFR_AR_015880

# ANNEX V

## EXCERPT FROM THE CHARTER OF THE INTERNATIONAL MILITARY TRIBUNAL[32]

### Article 6

"The Tribunal established by the Agreement referred to in Article 1 hereof for the trial and punishment of the major war criminals of the European Axis countries shall have the power to try and punish persons who, acting in the interests of the European Axis countries, whether as individuals or as members of organisations, committed any of the following crimes.

"The following acts, or any of them, are crimes coming within the jurisdiction of the Tribunal for which there shall be individual responsibility:

(a) *Crimes against peace*: namely, planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing;

(b) *War crimes*: namely, violations of the laws or customs of war. Such violations shall include, but not be limited to, murder, ill-treatment or deportation to slave labour or for any other purpose, of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity;

(c) *Crimes against humanity*: namely, murder, extermination, enslavement, deportation and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.

"Leaders, organisers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan."

---

[32] See "*The Charter and Judgment of the Nürnberg Tribunal: History and Analysis*" Appendix II – United Nations General Assembly International Law Commission 1949 (A/CN.4/5 of 3 March 1949).

IFR_AR_015881

# ANNEX VI

## INTERNATIONAL INSTRUMENTS RELATING TO ARTICLE 1 F(A) OF THE 1951 CONVENTION

The main international instruments which pertain to Article 1 F (a) of the 1951 Convention are as follows:

(1) The London Agreement of 8 August 1945 and Charter of the International Military Tribunal;

(2) Law No. 10 of the Control Council for Germany of 20 December 1945 for the Punishment of Persons Guilty of War Crimes, Crimes against Peace and Crimes against Humanity;

(3) United Nations General Assembly Resolution 3 (1) of 13 February 1946 and 95 (1) of 11 December 1946 which confirm war crimes and crimes against humanity as they are defined in the Charter of the International Military Tribunal of 8 August 1945;

(4) Convention on the Prevention and Punishment of the Crime of Genocide of 9 December 1948 (Article III); (entered into force 12 January 1951);

(5) Geneva Conventions for the protection of victims of war of 12 August 1949 (Convention I for the protection of the wounded, and sick, Articles 3 and 50; Convention II for the protection of wounded, sick and shipwrecked, Articles 3 and 51; Convention III relative to the treatment of prisoners of war, Articles 3 and 130; Convention IV relative to the protection of civilian persons, Articles 3 and 147);

(6) Convention of the Non-Applicability of Statutory Limitations of War Crimes and Crimes against Humanity of 26 November 1968 (entered into force 11 November 1970);

(7) International Convention on the Suppression and Punishment of the Crime of Apartheid of 30 November 1973 (entered into force 18 July 1976);

(8) Additional Protocol of 8 June 1977 to the Geneva Conventions of 12 August 1949 relating to the Protection of Victims of International Armed Conflicts (Article 85 on the repression of breaches of this Protocol);

(9) Additional Protocol of 8 June 1977 to the Geneva Conventions of 12 August 1949 relating to the Protection of Victims of Non-International Armed Conflicts (Additional Protocol II);

(10) Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY Statute) of 25 May 1993;

(11) Statute of the International Criminal Tribunal for Rwanda (ICTR Statute) of 8 November 1994;

(12) Rome Statute of the International Criminal Court (ICC) of 17 July 1998 (entered into force 1 July 2002).

IFR_AR_015882

# ANNEX VII

**STATUTE OF THE OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES**

## CHAPTER I

### General Provisions

1. The United Nations High Commissioner for Refugees, acting under the authority of the General Assembly, shall assume the function of providing international protection, under the auspices of the United Nations, to refugees who fall within the scope of the present Statute and of seeking permanent solutions for the problem of refugees by assisting governments and, subject to the approval of the governments concerned, private organizations to facilitate the voluntary repatriation of such refugees, or their assimilation within new national communities. In the exercise of his functions, more particularly when difficulties arise, and for instance with regard to any controversy concerning the international status of these persons, the High Commissioner shall request the opinion of an advisory committee on refugees if it is created.

2. The work of the High Commissioner shall be of an entirely non-political character; it shall be humanitarian and social and shall relate, as a rule, to groups and categories of refugees,

3. The High Commissioner shall follow policy directives given him by the General Assembly or the Economic and Social Council.

4. The Economic and Social Council may decide, after hearing the views of the High Commissioner on the subject, to establish an advisory committee on refugees, which shall consist of representatives of States Members and States non-members of the United Nations, to be selected by the Council on the basis of their demonstrated interest in and devotion to the solution of the refugee problem.

5. The General Assembly shall review, not later than at its eighth regular session, the arrangements for the Office of the High Commissioner with a view to determining whether the Office should be continued beyond 31 December 1953.

## CHAPTER II

### Functions of the High Commissioner

6. The competence of the High Commissioner shall extend to:

A. (i) Any person who has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;

(ii) Any person who, as a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality or political opinion, is outside the country of his nationality and is unable or, owing to such fear or for reasons other than personal convenience, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear or for reasons other than personal convenience, is unwilling to return to it.

IFR_AR_015883

Decisions as to eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugee being accorded to persons who fulfil the conditions of the present paragraph;

The competence of the High Commissioner shall cease to apply to any person defined in section A above if:

(a) He has voluntarily re-availed himself of the protection of the country of his nationality; or

(b) Having lost his nationality, he has voluntarily reacquired it; or

(c) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or

(d) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or

(e) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, claim grounds other than those of personal convenience for continuing to refuse to avail himself of the protection of the country of his nationality. Reasons of a purely economic character may not be invoked; or

(f) Being a person who has no nationality, he can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist and he is able to return to the country of his former habitual residence, claim grounds other than those of personal convenience for continuing to refuse to return to that country;

B. Any other person who is outside the country of his nationality or, if he has no nationality, the country of his former habitual residence, because he has or had wellfounded fear of persecution by reason of his race, religion, nationality or political opinion and is unable or, because of such fear, is unwilling to avail himself of the protection of the government of the country of his nationality, or, if he has no nationality, to return to the country of his former habitual residence.

7. Provided that the competence of the High Commissioner as defined in paragraph 6 above shall not extend to a person:

(a) Who is a national of more than one country unless he satisfies the provisions of the preceding paragraph in relation to each of the countries of which he is a national; or

(b) Who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country; or

(c) Who continues to receive from other organs or agencies of the United Nations protection or assistance; or

(d) In respect of whom there are serious reasons for considering that he has committed a crime covered by the provisions of treaties of extradition or a crime mentioned in article VI of the London Charter of the International Military Tribunal or by the provisions of article 14, paragraph 2, of the Universal Declaration of Human Rights.[33]

8. The High Commissioner shall provide for the protection of refugees falling under the competence of his Office by:

(a) Promoting the conclusion and ratification of international conventions for the protection of refugees, supervising their application and proposing amendments thereto;

IFR_AR_015884

---

[33] See resolution 217 A (III).

(b) Promoting through special agreements with governments the execution of any measures calculated to improve the situation of refugees and to reduce the number requiring protection;

(c) Assisting governmental and private efforts to promote voluntary repatriation or assimilation within new national communities;

(d) Promoting the admission of refugees, not excluding those in the most destitute categories, to the territories of States;

(e) Endeavouring to obtain permission for refugees to transfer their assets and especially those necessary for their resettlement;

(f) Obtaining from governments information concerning the number and conditions of refugees in their territories and the laws and regulations concerning them;

(g) Keeping in close touch with the governments and inter-governmental organizations concerned;

(h) Establishing contact in such manner as he may think best with private organizations dealing with refugee questions;

(i) Facilitating the co-ordination of the efforts of private organizations concerned with the welfare of refugees.

9. The High Commissioner shall engage in such additional activities, including repatriation and resettlement, as the General Assembly may determine, within the limits of the resources placed at his disposal.

10. The High Commissioner shall administer any funds, public or private, which he receives for assistance to refugees, and shall distribute them among the private and, as appropriate, public agencies which he deems best qualified to administer such assistance. The High Commissioner may reject any offers which he does not consider appropriate or which cannot be utilized. The High Commissioner shall not appeal to governments for funds or make a general appeal, without the prior approval of the General Assembly. The High Commissioner shall include in his annual report a statement of his activities in this field.

11. The High Commissioner shall be entitled to present his views before the General Assembly, the Economic and Social Council and their subsidiary bodies. The High Commissioner shall report annually to the General Assembly through the Economic and Social Council; his report shall be considered as a separate item on the agenda of the General Assembly.

12. The High Commissioner may invite the co-operation of the various specialized agencies.

## CHAPTER III

### Organization and Finances

13. The High Commissioner shall be elected by the General Assembly on the nomination of the Secretary-General. The terms of appointment of the High Commissioner shall be proposed by the Secretary-General and approved by the General Assembly. The High Commissioner shall be elected for a term of three years, from 1 January 1951.

14. The High Commissioner shall appoint, for the same term, a Deputy High Commissioner of a nationality other than his own.

15. (a) Within the limits of the budgetary appropriations provided, the staff of the Office of the High

IFR_AR_015885

Commissioner shall be appointed by the High Commissioner and shall be responsible to him in the exercise of their functions.

(b) Such staff shall be chosen from persons devoted to the purposes of the Office of the High Commissioner.

(c) Their conditions of employment shall be those provided under the staff regulations adopted by the General Assembly and the rules promulgated thereunder by the Secretary-General.

(d) Provision may also be made to permit the employment of personnel without compensation.

16. The High Commissioner shall consult the governments of the countries of residence of refugees as to the need for appointing representatives therein. In any country recognizing such need, there may be appointed a representative approved by the government of that country. Subject to the foregoing, the same representative may serve in more than one country.

17. The High Commissioner and the Secretary-General shall make appropriate arrangements for liaison and consultation on matters of mutual interest.

18. The Secretary-General shall provide the High Commissioner with all necessary facilities within budgetary limitations.

19. The Office of the High Commissioner shall be located in Geneva, Switzerland.

20. The Office of the High Commissioner shall be financed under the budget of the United Nations. Unless the General Assembly subsequently decides otherwise, no expenditure, other than administrative expenditures relating to the functioning of the Office of the High Commissioner, shall be borne on the budget of the United Nations, and all other expenditures relating to the activities of the High Commissioner shall be financed by voluntary contributions.

21. The administration of the Office of the High Commissioner shall be subject to the Financial Regulations of the United Nations and to the financial rules promulgated thereunder by the Secretary-General.

22. Transactions relating to the High Commissioner's funds shall be subject to audit by the United Nations Board of Auditors, provided that the Board may accept audited accounts from the agencies to which funds have been allocated. Administrative arrangements for the custody of such funds and their allocation shall be agreed between the High Commissioner and the Secretary-General in accordance with the Financial Regulations of the United Nations and rules promulgated thereunder by the Secretary-General.

IFR_AR_015886

IFR_AR_015887

# GUIDELINES ON INTERNATIONAL PROTECTION

IFR_AR_015888

IFR_AR_015889



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| | | | |
|---|---|---|---|
| **Distr. GENERAL** | **HCR/GIP/02/01** | **7 May 2002** | **Original: ENGLISH** |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 1:

### Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They further replace UNHCR's Position Paper on Gender-Related Persecution (Geneva, January 2000) and result from the Second Track of the Global Consultations on International Protection process which examined this subject at its expert meeting in San Remo in September 2001.

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

IFR_AR_015890

## I. INTRODUCTION

1. "Gender-related persecution" is a term that has no legal meaning *per se.* Rather, it is used to encompass the range of different claims in which gender is a relevant consideration in the determination of refugee status. These Guidelines specifically focus on the interpretation of the refugee definition contained in Article 1A(2) of the *1951 Convention relating to the Status of Refugees* (hereinafter "1951 Convention") from a gender perspective, as well as propose some procedural practices in order to ensure that proper consideration is given to women claimants in refugee status determination procedures and that the range of gender-related claims are recognised as such.

2. It is an established principle that the refugee definition as a whole should be interpreted with an awareness of possible gender dimensions in order to determine accurately claims to refugee status. This approach has been endorsed by the General Assembly, as well as the Executive Committee of UNHCR's Programme.[1]

3. In order to understand the nature of gender-related persecution, it is essential to define and distinguish between the terms "gender" and "sex". Gender refers to the relationship between women and men based on socially or culturally constructed and defined identities, status, roles and responsibilities that are assigned to one sex or another, while sex is a biological determination. Gender is not static or innate but acquires socially and culturally constructed meaning over time. Gender-related claims may be brought by either women or men, although due to particular types of persecution, they are more commonly brought by women. In some cases, the claimant's sex may bear on the claim in significant ways to which the decision-maker will need to be attentive. In other cases, however, the refugee claim of a female asylum-seeker will have nothing to do with her sex. Gender-related claims have typically encompassed, although are by no means limited to, acts of sexual violence, family/domestic violence, coerced family planning, female genital mutilation, punishment for transgression of social mores, and discrimination against homosexuals.

4. Adopting a gender-sensitive interpretation of the 1951 Convention does not mean that all women are automatically entitled to refugee status. The refugee claimant must establish that he or she has a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion.

## II. SUBSTANTIVE ANALYSIS

### A. Background

5. Historically, the refugee definition has been interpreted through a framework of male experiences, which has meant that many claims of women and of homosexuals, have gone unrecognised. In the past decade, however, the analysis and understanding of sex and gender in the refugee context have advanced substantially in case law, in State practice generally and in academic writing. These developments have run parallel to, and have been assisted by, developments in international human rights law and standards,[2] as well as in related areas of international law, including through jurisprudence of the International Criminal Tribunals for the former Yugoslavia and Rwanda, and the Rome Statute of the International Criminal Court. In this regard, for instance, it should be noted that harmful practices

---

[1] In its Conclusions of October 1999, No. 87 (n), the Executive Committee "not[ed] with appreciation special efforts by States to incorporate gender perspectives into asylum policies, regulations and practices; encourage[d] States, UNHCR and other concerned actors to promote wider acceptance, and inclusion in their protection criteria of the notion that persecution may be gender-related or effected through sexual violence; further encourage[d] UNHCR and other concerned actors to develop, promote and implement guidelines, codes of conduct and training programmes on gender-related refugee issues, in order to support the mainstreaming of a gender perspective and enhance accountability for the implementation of gender policies." See also Executive Committee Conclusions: No. 39, Refugee Women and International Protection, 1985; No. 73, Refugee Protection and Sexual Violence, 1993; No. 77(g), General Conclusion on International Protection, 1995; No. 79(o), General Conclusion on International Protection, 1996; and No. 81(t), General Conclusion on International Protection, 1997.

[2] Useful texts include the Universal Declaration of Human Rights 1948, the International Covenant on Civil and Political Rights 1966, the International Covenant on Economic, Social and Cultural Rights 1966, the Convention on the Political Rights of Women 1953, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment 1984, the Convention on the Rights of the Child 1989, and in particular, the Convention on the Elimination of All Forms of Discrimination Against Women 1979 and the Declaration on the Elimination of Violence Against Women 1993. Relevant regional instruments include the European Convention on Human Rights and Fundamental Freedoms 1950, the American Convention on Human Rights 1969, and the African Charter on Human and Peoples' Rights 1981.

1

in breach of international human rights law and standards cannot be justified on the basis of historical, traditional, religious or cultural grounds.

6. Even though gender is not specifically referenced in the refugee definition, it is widely accepted that it can influence, or dictate, the type of persecution or harm suffered and the reasons for this treatment. The refugee definition, properly interpreted, therefore covers gender-related claims. As such, there is no need to add an additional ground to the 1951 Convention definition.[3]

7. In attempting to apply the criteria of the refugee definition in the course of refugee status determination procedures, it is important to approach the assessment holistically, and have regard to all the relevant circumstances of the case. It is essential to have both a full picture of the asylum-seeker's personality, background and personal experiences, as well as an analysis and up-to-date knowledge of historically, geographically and culturally specific circumstances in the country of origin. Making generalisations about women or men is not helpful and in doing so, critical differences, which may be relevant to a particular case, can be overlooked.

8. The elements of the definition discussed below are those that require a gender-sensitive interpretation. Other criteria (e.g. being outside the country of origin) remain, of course, also directly relevant to the holistic assessment of any claim. Throughout this document, the use of the term "women" includes the girl-child.

## B. Well-founded fear of persecution

9. What amounts to a well-founded fear of persecution will depend on the particular circumstances of each individual case. While female and male applicants may be subjected to the same forms of harm, they may also face forms of persecution specific to their sex. International human rights law and international criminal law clearly identify certain acts as violations of these laws, such as sexual violence, and support their characterisation as serious abuses, amounting to persecution.[4] In this sense, international law can assist decision-makers to determine the persecutory nature of a particular act. There is no doubt that rape and other forms of gender-related violence, such as dowry-related violence, female genital mutilation, domestic violence, and trafficking,[5] are acts which inflict severe pain and suffering – both mental and physical – and which have been used as forms of persecution, whether perpetrated by State or private actors.

10. Assessing a law to be persecutory in and of itself has proven to be material to determining some gender-related claims. This is especially so given the fact that relevant laws may emanate from traditional or cultural norms and practices not necessarily in conformity with international human rights standards. However, as in all cases, a claimant must still establish that he or she has a well-founded fear of being persecuted as a result of that law. This would not be the case, for instance, where a persecutory law continues to exist but is no longer enforced.

11. Even though a particular State may have prohibited a persecutory practice (e.g. female genital mutilation), the State may nevertheless continue to condone or tolerate the practice, or may not be able to stop the practice effectively. In such cases, the practice would still amount to persecution. The fact that a law has been enacted to prohibit or denounce certain persecutory practices will therefore not in itself be sufficient to determine that the individual's claim to refugee status is not valid.

12. Where the penalty or punishment for non-compliance with, or breach of, a policy or law is disproportionately severe and has a gender dimension, it would amount to persecution.[6] Even if the law is one of general applicability, circumstances of punishment or treatment cannot be so severe

[3] See Summary Conclusions – Gender-Related Persecution, Global Consultations on International Protection, San Remo Expert Roundtable, 6-8 September 2001, nos.1 and 3 ("Summary Conclusions – Gender-Related Persecution").
[4] See UNHCR, *Handbook*, para. 51.
[5] See below at para. 18.
[6] Persons fleeing from prosecution or punishment for a common law offence are not normally refugees, however, the distinction may be obscured, in particular, in circumstances of excessive punishment for breach of a legitimate law. See UNHCR, *Handbook*, paras. 56 and 57.

IFR_AR_015892

as to be disproportionate to the objective of the law. Severe punishment for women who, by breaching a law, transgress social mores in a society could, therefore, amount to persecution.

13. Even where underlined laws or policies have justifiable objectives, methods of implementation that lead to consequences of a substantially prejudicial nature for the persons concerned, would amount to persecution. For example, it is widely accepted that family planning constitutes an appropriate response to population pressures. However, implementation of such policies, through the use of forced abortions and sterilisations, would breach fundamental human rights law. Such practices, despite the fact that they may be implemented in the context of a legitimate law, are recognised as serious abuses and considered persecution.

### Discrimination amounting to persecution

14. While it is generally agreed that 'mere' discrimination may not, in the normal course, amount to persecution in and of itself, a pattern of discrimination or less favourable treatment could, on cumulative grounds, amount to persecution and warrant international protection. It would, for instance, amount to persecution if measures of discrimination lead to consequences of a substantially prejudicial nature for the person concerned, e.g. serious restrictions on the right to earn one's livelihood, the right to practice one's religion, or access to available educational facilities.[7]

15. Significant to gender-related claims is also an analysis of forms of discrimination by the State in failing to extend protection to individuals against certain types of harm. If the State, as a matter of policy or practice, does not accord certain rights or protection from serious abuse, then the discrimination in extending protection, which results in serious harm inflicted with impunity, could amount to persecution. Particular cases of domestic violence, or of abuse for reasons of one's differing sexual orientation, could, for example, be analysed in this context.

### Persecution on account of one's sexual orientation

16. Refugee claims based on differing sexual orientation contain a gender element. A claimant's sexuality or sexual practices may be relevant to a refugee claim where he or she has been subject to persecutory (including discriminatory) action on account of his or her sexuality or sexual practices. In many such cases, the claimant has refused to adhere to socially or culturally defined roles or expectations of behaviour attributed to his or her sex. The most common claims involve homosexuals, transsexuals or transvestites, who have faced extreme public hostility, violence, abuse, or severe or cumulative discrimination.

17. Where homosexuality is illegal in a particular society, the imposition of severe criminal penalties for homosexual conduct could amount to persecution, just as it would for refusing to wear the veil by women in some societies. Even where homosexual practices are not criminalised, a claimant could still establish a valid claim where the State condones or tolerates discriminatory practices or harm perpetrated against him or her, or where the State is unable to protect effectively the claimant against such harm.

### Trafficking for the purposes of forced prostitution or sexual exploitation as a form of persecution[8]

18. Some trafficked women or minors may have valid claims to refugee status under the 1951 Convention. The forcible or deceptive recruitment of women or minors for the purposes of forced prostitution or sexual exploitation is a form of gender-related violence or abuse that can even lead to death. It can be considered a form of torture and cruel, inhuman or degrading treatment. It can also impose serious restrictions on a woman's freedom of movement, caused by abduction, incar-

---

[7] See UNHCR, *Handbook*, para. 54.

[8] For the purposes of these Guidelines, "trafficking" is defined as per article 3 of the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children, supplementing the United Nations Convention against Transnational Organised Crime, 2000. Article 3(1) provides that trafficking in persons means "the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs."

**1**

ceration, and/or confiscation of passports or other identify documents. In addition, trafficked women and minors may face serious repercussions after their escape and/or upon return, such as reprisals or retaliation from trafficking rings or individuals, real possibilities of being re-trafficked, severe community or family ostracism, or severe discrimination. In individual cases, being trafficked for the purposes of forced prostitution or sexual exploitation could therefore be the basis for a refugee claim where the State has been unable or unwilling to provide protection against such harm or threats of harm.[9]

**Agents of Persecution**

19. There is scope within the refugee definition to recognise both State and non-State actors of persecution. While persecution is most often perpetrated by the authorities of a country, serious discriminatory or other offensive acts committed by the local populace, or by individuals, can also be considered persecution if such acts are knowingly tolerated by the authorities, or if the authorities refuse, or are unable, to offer effective protection.[10]

## C. The causal link ("for reasons of")

20. The well-founded fear of being persecuted must be related to one or more of the Convention grounds. That is, it must be "for reasons of" race, religion, nationality, membership of a particular social group, or political opinion. The Convention ground must be a relevant contributing factor, though it need not be shown to be the sole, or dominant, cause. In many jurisdictions the causal link ("for reasons of") must be explicitly established (e.g. some Common Law States) while in other States causation is not treated as a separate question for analysis, but is subsumed within the holistic analysis of the refugee definition. In many gender-related claims, the difficult issue for a decision-maker may not be deciding upon the applicable ground, so much as the causal link: that the well-founded fear of being persecuted was for reasons of that ground. Attribution of the Convention ground to the claimant by the State or non-State actor of persecution is sufficient to establish the required causal connection.

21. In cases where there is a risk of being persecuted at the hands of a non-State actor (e.g. husband, partner or other non-State actor) for reasons which are related to one of the Convention grounds, the causal link is established, whether or not the absence of State protection is Convention related. Alternatively, where the risk of being persecuted at the hands of a non-State actor is unrelated to a Convention ground, but the inability or unwillingness of the State to offer protection is for reasons of a Convention ground, the causal link is also established.[11]

## D. Convention grounds

22. Ensuring that a gender-sensitive interpretation is given to each of the Convention grounds is important in determining whether a particular claimant has fulfilled the criteria of the refugee definition. In many cases, claimants may face persecution because of a Convention ground which is attributed or imputed to them. In many societies a woman's political views, race, nationality, religion or social affiliations, for example, are often seen as aligned with relatives or associates or with those of her community.

23. It is also important to be aware that in many gender-related claims, the persecution feared could be for one, or more, of the Convention grounds. For example, a claim for refugee status based on transgression of social or religious norms may be analysed in terms of religion, political opinion or membership of a particular social group. The claimant is not required to identify accurately the reason why he or she has a well-founded fear of being persecuted.

---

[9] Trafficking for other purposes could also amount to persecution in a particular case, depending on the circumstances.
[10] See UNHCR, *Handbook*, para. 65.
[11] See Summary Conclusions – Gender-Related Persecution, no. 6.

IFR_AR_015894

### Race

24. Race for the purposes of the refugee definition has been defined to include all kinds of ethnic groups that are referred to as "races" in common usage.[12] Persecution for reasons of race may be expressed in different ways against men and women. For example, the persecutor may choose to destroy the ethnic identity and/or prosperity of a racial group by killing, maiming or incarcerating the men, while the women may be viewed as propagating the ethnic or racial identity and persecuted in a different way, such as through sexual violence or control of reproduction.

### Religion

25. In certain States, the religion assigns particular roles or behavioural codes to women and men respectively. Where a woman does not fulfil her assigned role or refuses to abide by the codes, and is punished as a consequence, she may have a well-founded fear of being persecuted for reasons of religion. Failure to abide by such codes may be perceived as evidence that a woman holds un-acceptable religious opinions regardless of what she actually believes. A woman may face harm for her particular religious beliefs or practices, or those attributed to her, including her refusal to hold particular beliefs, to practise a prescribed religion or to conform her behaviour in accordance with the teachings of a prescribed religion.

26. There is some overlap between the grounds of religion and political opinion in gender-related claims, especially in the realm of imputed political opinion. While religious tenets require certain kinds of behaviour from a woman, contrary behaviour may be perceived as evidence of an unacceptable political opinion. For example, in certain societies, the role ascribed to women may be attributable to the requirements of the State or official religion. The authorities or other actors of persecution may perceive the failure of a woman to conform to this role as the failure to practice or to hold certain religious beliefs. At the same time, the failure to conform could be interpreted as holding an unacceptable political opinion that threatens the basic structure from which certain political power flows. This is particularly true in societies where there is little separation between religious and State institutions, laws and doctrines.

### Nationality

27. Nationality is not to be understood only as "citizenship". It also refers to membership of an ethnic or linguistic group and may occasionally overlap with the term "race".[13] Although persecution on the grounds of nationality (as with race) is not specific to women or men, in many instances the nature of the persecution takes a gender-specific form, most commonly that of sexual violence directed against women and girls.

### Membership of a Particular Social Group[14]

28. Gender-related claims have often been analysed within the parameters of this ground, making a proper understanding of this term of paramount importance. However, in some cases, the emphasis given to the social group ground has meant that other applicable grounds, such as religion or political opinion, have been over-looked. Therefore, the interpretation given to this ground cannot render the other four Convention grounds superfluous.

29. Thus, a particular social group is a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.

30. It follows that sex can properly be within the ambit of the social group category, with women being a clear example of a social subset defined by innate and immutable characteristics, and who

---

[12] See UNHCR, *Handbook*, para. 68.
[13] See UNHCR, *Handbook*, para. 74.
[14] For more information, see UNHCR's *Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* (HCR/GIP/02/02, 7 May 2002).

IER_AR_015895

are frequently treated differently than men.[15] Their characteristics also identify them as a group in society, subjecting them to different treatment and standards in some countries.[16] Equally, this definition would encompass homosexuals, transsexuals, or transvestites.

31. The size of the group has sometimes been used as a basis for refusing to recognize 'women' generally as a particular social group. This argument has no basis in fact or reason, as the other grounds are not bound by this question of size. There should equally be no requirement that the particular social group be cohesive or that members of it voluntarily associate,[17] or that every member of the group is at risk of persecution.[18] It is well-accepted that it should be possible to identify the group independently of the persecution, however, discrimination or persecution may be a relevant factor in determining the visibility of the group in a particular context.[19]

**Political Opinion**

32. Under this ground, a claimant must show that he or she has a well-founded fear of being persecuted for holding certain political opinions (usually different from those of the Government or parts of the society), or because the holding of such opinions has been attributed to him or her. Political opinion should be understood in the broad sense, to incorporate any opinion on any matter in which the machinery of State, government, society, or policy may be engaged. This may include an opinion as to gender roles. It would also include non-conformist behaviour which leads the persecutor to impute a political opinion to him or her. In this sense, there is not as such an inherently political or an inherently non-political activity, but the context of the case should determine its nature. A claim on the basis of political opinion does, however, presuppose that the claimant holds or is assumed to hold opinions not tolerated by the authorities or society, which are critical of their policies, traditions or methods. It also presupposes that such opinions have come or could come to the notice of the authorities or relevant parts of the society, or are attributed by them to the claimant. It is not always necessary to have expressed such an opinion, or to have already suffered any form of discrimination or persecution. In such cases the test of well-founded fear would be based on an assessment of the consequences that a claimant having certain dispositions would have to face if he or she returned.

33. The image of a political refugee as someone who is fleeing persecution for his or her direct involvement in political activity does not always correspond to the reality of the experiences of women in some societies. Women are less likely than their male counterparts to engage in high profile political activity and are more often involved in 'low level' political activities that reflect dominant gender roles. For example, a woman may work in nursing sick rebel soldiers, in the recruitment of sympathisers, or in the preparation and dissemination of leaflets. Women are also frequently attributed with political opinions of their family or male relatives, and subjected to persecution because of the activities of their male relatives. While this may be analysed in the context of an imputed political opinion, it may also be analysed as being persecution for reasons of her membership of a particular social group, being her "family". These factors need to be taken into account in gender-related claims.

34. Equally important for gender-related claims is to recognise that a woman may not wish to engage in certain activities, such as providing meals to government soldiers, which may be interpreted by the persecutor(s) as holding a contrary political opinion.

---

[15] See Summary Conclusions – Gender-Related Persecution, no. 5.
[16] See also Executive Committee Conclusion No. 39, Refugee Women and International Protection, 1985: "States … are free to adopt the interpretation that women asylum seekers who face harsh or inhuman treatment due to their having transgressed the social mores of the society in which they live may be considered as 'a particular social group' within the meaning of Article 1A(2) of the 1951 United Nations Refugee Convention".
[17] See Summary Conclusions – Membership of a Particular Social Group, Global Consultations on International Protection, San Remo Expert Roundtable, 6-8 September 2001, no. 4 ("Summary Conclusions – Membership of a Particular Social Group").
[18] See Summary Conclusions – Membership of a Particular Social Group, *Ibid.*, no. 7.
[19] See Summary Conclusions – Membership of a Particular Social Group, *Ibid.*, no. 6.

IFR_AR_015896

## III. PROCEDURAL ISSUES[20]

35. Persons raising gender-related refugee claims, and survivors of torture or trauma in particular, require a supportive environment where they can be reassured of the confidentiality of their claim. Some claimants, because of the shame they feel over what has happened to them, or due to trauma, may be reluctant to identify the true extent of the persecution suffered or feared. They may continue to fear persons in authority, or they may fear rejection and/or reprisals from their family and/or community.[21]

36. Against this background, in order to ensure that gender-related claims, of women in particular, are properly considered in the refugee status determination process, the following measures should be borne in mind:

i.   Women asylum-seekers should be interviewed separately, without the presence of male family members, in order to ensure that they have an opportunity to present their case. It should be explained to them that they may have a valid claim in their own right.

ii.  It is essential that women are given information about the status determination process, access to it, as well as legal advice, in a manner and language that she understands.

iii. Claimants should be informed of the choice to have interviewers and interpreters of the same sex as themselves,[22] and they should be provided automatically for women claimants. Interviewers and interpreters should also be aware of and responsive to any cultural or religious sensitivities or personal factors such as age and level of education.

iv.  An open and reassuring environment is often crucial to establishing trust between the interviewer and the claimant, and should help the full disclosure of sometimes sensitive and personal information. The interview room should be arranged in such a way as to encourage discussion, promote confidentiality and to lessen any possibility of perceived power imbalances.

v.   The interviewer should take the time to introduce him/herself and the interpreter to the claimant, explain clearly the roles of each person, and the exact purpose of the interview.[23] The claimant should be assured that his/her claim will be treated in the strictest confidence, and information provided by the claimant will not be provided to members of his/her family. Importantly, the interviewer should explain that he/she is not a trauma counselor.

vi.  The interviewer should remain neutral, compassionate and objective during the interview, and should avoid body language or gestures that may be perceived as intimidating or culturally insensitive or inappropriate. The interviewer should allow the claimant to present his/her claim with minimal interruption.

vii. Both 'open-ended' and specific questions which may help to reveal gender issues relevant to a refugee claim should be incorporated into all asylum interviews. Women who have been involved in indirect political activity or to whom political opinion has been attributed, for example, often do not provide relevant information in interviews due to the male-oriented nature of the questioning. Female claimants may also fail to relate questions that are about 'torture' to the types of harm which they fear (such as rape, sexual abuse, female genital mutilation, 'honour killings', forced marriage, etc.).

---

[20] This Part has benefited from the valuable guidance provided by various States and other actors, including the following guidelines: *Considerations for Asylum Officers Adjudicating Asylum Claims from Women* (Immigration and Naturalization Service, United States, 26 May 1995); *Refugee and Humanitarian Visa Applicants: Guidelines on Gender Issues for Decision Makers* (Department of Immigration and Humanitarian Affairs, Australia, July 1996) (hereinafter "Australian Guidelines on Gender Issues for Decision Makers"); *Guideline 4 on Women Refugee Claimants Fearing Gender-Related Persecution: Update* (Immigration and Refugee Board, Canada, 13 November 1996); *Position on Asylum Seeking and Refugee Women*, (European Council on Refugees and Exiles, December 1997) (hereinafter "ECRE Position on Asylum Seeking and Refugee Women"); *Gender Guidelines for the Determination of Asylum Claims in the UK* (Refugee Women's Legal Group, July 1998) (hereinafter "Refugee Women's Group Gender Guidelines"); *Gender Guidelines for Asylum Determination* (National Consortium on Refugee Affairs, South Africa, 1999); *Asylum Gender Guidelines* (Immigration Appellate Authority, United Kingdom, November 2000); and *Gender-Based Persecution: Guidelines for the investigation and evaluation of the needs of women for protection* (Migration Board, Legal Practice Division, Sweden, 28 March 2001).

[21] See also *Sexual Violence Against Refugees: Guidelines on Prevention and Response* (UNHCR, Geneva, 1995) and *Prevention and Response to Sexual and Gender-Based Violence in Refugee Situations* (Report of Inter-Agency Lessons Learned Conference Proceedings, 27-29 March 2001, Geneva).

[22] See also Executive Committee Conclusion No. 64, Refugee Women and International Protection, 1990, (a) (iii): Provide, wherever necessary, skilled female interviewers in procedures for the determination of refugee status and ensure appropriate access by women asylum-seekers to such procedures, even when accompanied by male family members.

[23] *Ibid.*, para. 3.19.

IFR_AR_015897

90

1

viii. Particularly for victims of sexual violence or other forms of trauma, second and subsequent interviews may be needed in order to establish trust and to obtain all necessary information. In this regard, interviewers should be responsive to the trauma and emotion of claimants and should stop an interview where the claimant is becoming emotionally distressed.

ix. Where it is envisaged that a particular case may give rise to a gender-related claim, adequate preparation is needed, which will also allow a relationship of confidence and trust with the claimant to be developed, as well as allowing the interviewer to ask the right questions and deal with any problems that may arise during an interview.

x. Country of origin information should be collected that has relevance in women's claims, such as the position of women before the law, the political rights of women, the social and economic rights of women, the cultural and social mores of the country and consequences for non-adherence, the prevalence of such harmful traditional practices, the incidence and forms of reported violence against women, the protection available to them, any penalties imposed on those who perpetrate the violence, and the risks that a woman might face on her return to her country of origin after making a claim for refugee status.

xi. The type and level of emotion displayed during the recounting of her experiences should not affect a woman's credibility. Interviewers and decision-makers should understand that cultural differences and trauma play an important and complex role in determining behaviour. For some cases, it may be appropriate to seek objective psychological or medical evidence. It is unnecessary to establish the precise details of the act of rape or sexual assault itself, but events leading up to, and after, the act, the surrounding circumstances and details (such as, use of guns, any words or phrases spoken by the perpetrators, type of assault, where it occurred and how, details of the perpetrators (e.g. soldiers, civilians) etc.) as well as the motivation of the perpetrator may be required. In some circumstances it should be noted that a woman may not be aware of the reasons for her abuse.

xii. Mechanisms for referral to psycho-social counseling and other support services should be made available where necessary. Best practice recommends that trained psycho-social counselors be available to assist the claimant before and after the interview.

**Evidentiary Matters**

37. No documentary proof as such is required in order for the authorities to recognise a refugee claim, however, information on practices in the country of origin may support a particular case. It is important to recognise that in relation to gender-related claims, the usual types of evidence used in other refugee claims may not be as readily available. Statistical data or reports on the incidence of sexual violence may not be available, due to under-reporting of cases, or lack of prosecution. Alternative forms of information might assist, such as the testimonies of other women similarly situated in written reports or oral testimony, of non-governmental or international organisations or other independent research.

IFR_AR_015898

## IV. METHODS OF IMPLEMENTATION

38. Depending on the respective legal traditions, there have been two general approaches taken by States to ensure a gender-sensitive application of refugee law and in particular of the refugee definition. Some States have incorporated legal interpretative guidance and/ or procedural safeguards within legislation itself, while others have preferred to develop policy and legal guidelines on the same for decision-makers. UNHCR encourages States who have not already done so to ensure a gender-sensitive application of refugee law and procedures, and stands ready to assist States in this regard.

IFR_AR_015899



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

**2**

| Distr. GENERAL | HCR/GIP/02/02 | 7 May 2002 | Original: ENGLISH |
| --- | --- | --- | --- |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 2:

**"Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees**

UNHCR issues these Guidelines pursuant to its mandate, as contained in *the Statute of the Office of the United Nations High Commissioner for Refugees*, and Article 35 of the *1951 Convention relating to the Status of Refugees* and/or its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugee*s (re-edited, Geneva, January 1992). They further supersede IOM/132/1989 – FOM/110/1989 Membership of a Particular Social Group (UNHCR, Geneva, 12 December 1989), and result from the Second Track of the Global Consultations on International Protection process which examined this subject at its expert meeting in San Remo in September 2001.

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determinations in the field.

IFR_AR_015900

## I. INTRODUCTION

1. "Membership of a particular social group" is one of the five grounds enumerated in Article 1A(2) of the 1951 *Convention relating to the Status of Refugees* ("1951 Convention"). It is the ground with the least clarity and it is not defined by the 1951 Convention itself. It is being invoked with increasing frequency in refugee status determinations, with States having recognised women, families, tribes, occupational groups, and homosexuals, as constituting a particular social group for the purposes of the 1951 Convention. The evolution of this ground has advanced the understanding of the refugee definition as a whole. These Guidelines provide legal interpretative guidance on assessing claims which assert that a claimant has a well-founded fear of being persecuted for reasons of his or her membership of a particular social group.

2. While the ground needs delimiting – that is, it cannot be interpreted to render the other four Convention grounds superfluous – a proper interpretation must be consistent with the object and purpose of the Convention.[1] Consistent with the language of the Convention, this category cannot be interpreted as a "catch all" that applies to all persons fearing persecution. Thus, to preserve the structure and integrity of the Convention's definition of a refugee, a social group cannot be defined *exclusively* by the fact that it is targeted for persecution (although, as discussed below, persecution may be a relevant element in determining the visibility of a particular social group).

3. There is no "closed list" of what groups may constitute a "particular social group" within the meaning of Article 1A(2). The Convention includes no specific list of social groups, nor does the ratifying history reflect a view that there is a set of identified groups that might qualify under this ground. Rather, the term membership of a particular social group should be read in an evolutionary manner, open to the diverse and changing nature of groups in various societies and evolving international human rights norms.

4. The Convention grounds are not mutually exclusive. An applicant may be eligible for refugee status under more than one of the grounds identified in Article 1A(2).[2] For example, a claimant may allege that she is at risk of persecution because of her refusal to wear traditional clothing. Depending on the particular circumstances of the society, she may be able to establish a claim based on political opinion (if her conduct is viewed by the State as a political statement that it seeks to suppress), religion (if her conduct is based on a religious conviction opposed by the State) or membership in a particular social group.

## II. SUBSTANTIVE ANALYSIS

### A. Summary of State Practice

5. Judicial decisions, regulations, policies, and practices have utilized varying interpretations of what constitutes a social group within the meaning of the 1951 Convention. Two approaches have dominated decision-making in common law jurisdictions.

6. The first, the "protected characteristics" approach (sometimes referred to as an "immutability" approach), examines whether a group is united by an immutable characteristic or by a characteristic that is so fundamental to human dignity that a person should not be compelled to forsake it. An immutable characteristic may be innate (such as sex or ethnicity) or unalterable for other reasons (such as the historical fact of a past association, occupation or status). Human rights norms may help to identify characteristics deemed so fundamental to human dignity that one ought not to be compelled to forego them. A decision-maker adopting this approach would examine whether the asserted group is defined: (1) by an innate, unchangeable characteristic, (2) by a past temporary or voluntary status that

---

[1] See Summary Conclusions – Membership of a Particular Social Group, Global Consultations on International Protection, San Remo Expert Roundtable, 6-8 September 2001, no. 2 ("Summary Conclusions – Membership of a Particular Social Group").

[2] See UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992), paras. 66-67, 77; and see also Summary Conclusions – Membership of a Particular Social Group, no. 3.

IFR_AR_015901

is unchangeable because of its historical permanence, or (3) by a characteristic or association that is so fundamental to human dignity that group members should not be compelled to forsake it. Applying this approach, courts and administrative bodies in a number of jurisdictions have concluded that women, homosexuals, and families, for example, can constitute a particular social group within the meaning of Article 1A(2).

7. The second approach examines whether or not a group shares a common characteristic which makes them a cognizable group or sets them apart from society at large. This has been referred to as the "social perception" approach. Again, women, families and homosexuals have been recognized under this analysis as particular social groups, depending on the circumstances of the society in which they exist.

8. In civil law jurisdictions, the particular social group ground is generally less well developed. Most decision-makers place more emphasis on whether or not a risk of persecution exists than on the standard for defining a particular social group. Nonetheless, both the protected characteristics and the social perception approaches have received mention.

9. Analyses under the two approaches may frequently converge. This is so because groups whose members are targeted based on a common immutable or fundamental characteristic are also often perceived as a social group in their societies. But at times the approaches may reach different results. For example, the social perception standard might recognize as social groups associations based on a characteristic that is neither immutable nor fundamental to human dignity – such as, perhaps, occupation or social class.

## B. UNHCR's Definition

10. Given the varying approaches, and the protection gaps which can result, UNHCR believes that the two approaches ought to be reconciled.

11. The protected characteristics approach may be understood to identify a set of groups that constitute the core of the social perception analysis. Accordingly, it is appropriate to adopt a single standard that incorporates both dominant approaches:

> a particular social group is a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.

12. This definition includes characteristics which are historical and therefore cannot be changed, and those which, though it is possible to change them, ought not to be required to be changed because they are so closely linked to the identity of the person or are an expression of fundamental human rights. It follows that sex can properly be within the ambit of the social group category, with women being a clear example of a social subset defined by innate and immutable characteristics, and who are frequently treated differently to men.[3]

13. If a claimant alleges a social group that is based on a characteristic determined to be neither unalterable or fundamental, further analysis should be undertaken to determine whether the group is nonetheless perceived as a cognizable group in that society. So, for example, if it were determined that owning a shop or participating in a certain occupation in a particular society is neither unchangeable nor a fundamental aspect of human identity, a shopkeeper or members of a particular profession might nonetheless constitute a particular social group if in the society they are recognized as a group which sets them apart.

---

[3] For more information on gender-related claims, see UNHCR's *Guidelines on International Protection: Gender-Related Persecution within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* (HCR/GIP/02/01, 10 May 2002), as well as Summary Conclusions of the Expert Roundtable on Gender-Related Persecution, San Remo, 6-8 September 2001, no. 5.

**The role of persecution**

14. As noted above, a particular social group cannot be defined exclusively by the persecution that members of the group suffer or by a common fear of being persecuted. Nonetheless, persecutory action toward a group may be a relevant factor in determining the visibility of a group in a particular society.[4] To use an example from a widely cited decision, "[W]hile persecutory conduct cannot define the social group, the actions of the persecutors may serve to identify or even cause the creation of a particular social group in society. Left-handed men are not a particular social group. But, if they were persecuted because they were left-handed, they would no doubt quickly become recognizable in their society as a particular social group. Their persecution for being left-handed would create a public perception that they were a particular social group. But it would be the attribute of being left-handed and not the persecutory acts that would identify them as a particular social group."[5]

**No requirement of cohesiveness**

15. It is widely accepted in State practice that an applicant need not show that the members of a particular group know each other or associate with each other as a group. That is, there is no requirement that the group be "cohesive."[6] The relevant inquiry is whether there is a common element that group members share. This is similar to the analysis adopted for the other Convention grounds, where there is no requirement that members of a religion or holders of a political opinion associate together, or belong to a "cohesive" group. Thus women may constitute a particular social group under certain circumstances based on the common characteristic of sex, whether or not they associate with one another based on that shared characteristic.

16. In addition, mere membership of a particular social group will not normally be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground to fear persecution.[7]

**Not all members of the group must be at risk of being persecuted**

17. An applicant need not demonstrate that all members of a particular social group are at risk of persecution in order to establish the existence of a particular social group.[8] As with the other grounds, it is not necessary to establish that all persons in the political party or ethnic group have been singled out for persecution. Certain members of the group may not be at risk if, for example, they hide their shared characteristic, they are not known to the persecutors, or they cooperate with the persecutor.

**Relevance of size**

18. The size of the purported social group is not a relevant criterion in determining whether a particular social group exists within the meaning of Article 1A(2). This is true as well for cases arising under the other Convention grounds. For example, States may seek to suppress religious or political ideologies that are widely shared among members of a particular society – perhaps even by a majority of the population; the fact that large numbers of persons risk persecution cannot be a ground for refusing to extend international protection where it is otherwise appropriate.

19. Cases in a number of jurisdictions have recognized "women" as a particular social group. This does not mean that all women in the society qualify for refugee status. A claimant must still demonstrate a well-founded fear of being persecuted based on her membership in the particular social group, not be within one of the exclusion grounds, and meet other relevant criteria.

---

[4] See Summary Conclusions – Membership of a Particular Social Group, no. 6.
[5] McHugh, J., in *Applicant A v. Minister for Immigration and Ethnic Affairs*, (1997) 190 CLR 225, 264, 142 ALR 331.
[6] See Summary Conclusions – Membership of a Particular Social Group, no. 4.
[7] See UNHCR, *Handbook*, para. 79.
[8] See Summary Conclusions – Membership of a Particular Social Group, no. 7.

IFR_AR_015903

**Non-State actors and the causal link ("for reasons of")**

20. Cases asserting refugee status based on membership of a particular social group frequently involve claimants who face risks of harm at the hands of non-State actors, and which have involved an analysis of the causal link. For example, homosexuals may be victims of violence from private groups; women may risk abuse from their husbands or partners. Under the Convention a person must have a well-founded fear of being persecuted and that fear of being persecuted must be based on one (or more) of the Convention grounds. There is no requirement that the persecutor be a State actor. Where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection.[9]

21. Normally, an applicant will allege that the person inflicting or threatening the harm is acting for one of the reasons identified in the Convention. So, if a non-State actor inflicts or threatens persecution based on a Convention ground and the State is unwilling or unable to protect the claimant, then the causal link has been established. That is, the harm is being visited upon the victim for reasons of a Convention ground.

22. There may also arise situations where a claimant may be unable to show that the harm inflicted or threatened by the non-State actor is related to one of the five grounds. For example, in the situation of domestic abuse, a wife may not always be able to establish that her husband is abusing her based on her membership in a social group, political opinion or other Convention ground. Nonetheless, if the State is unwilling to extend protection based on one of the five grounds, then she may be able to establish a valid claim for refugee status: the harm visited upon her by her husband is based on the State's unwillingness to protect her for reasons of a Convention ground.

23. This reasoning may be summarized as follows. The causal link may be satisfied: (1) where there is a real risk of being persecuted at the hands of a non-State actor for reasons which are related to one of the Convention grounds, whether or not the failure of the State to protect the claimant is Convention related; or (2) where the risk of being persecuted at the hands of a non-State actor is unrelated to a Convention ground, but the inability or unwillingness of the State to offer protection is for a Convention reason.

IFR_AR_015904

---

[9] See UNHCR, *Handbook*, para. 65.

IFR_AR_015905



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/03/03 | 10 February 2003 | Original: ENGLISH |
|---|---|---|---|

**3**

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 3:

## Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses)

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They replace UNHCR's *The Cessation Clauses: Guidelines on their Application* (Geneva, April 1999) in so far as these concern the "ceased circumstances" clauses and result, *inter alia*, from the Second Track of the Global Consultations on International Protection which examined this subject at an expert meeting in Lisbon in May 2001.

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

IFR_AR_015906

## I. INTRODUCTION

1. The *1951 Convention relating to the Status of Refugees* (hereinafter "1951 Convention") recognises that refugee status ends under certain clearly defined conditions. This means that once an individual is determined to be a refugee, their status is maintained unless they fall within the terms of the cessation clauses or their status is cancelled or revoked.[1] Under Article 1C of the 1951 Convention, refugee status may cease either through the actions of the refugee (contained in sub-paragraphs 1 to 4), such as by re-establishment in his or her country of origin,[2] or through fundamental changes in the objective circumstances in the country of origin upon which refugee status was based (sub-paragraphs 5 and 6). The latter are commonly referred to as the "ceased circumstances" or "general cessation" clauses. These Guidelines are concerned only with the latter provisions.

2. Article 1C(5) and (6) provides that the 1951 Convention shall cease to apply to any person falling under the terms of Article 1(A) if:

> (5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
>
> Provided that this paragraph shall not apply to a refugee falling under section A(1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;
>
> (6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence; 141,6
>
> Provided that this paragraph shall not apply to a refugee falling under section A(1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

3. UNHCR or States may issue formal declarations of general cessation of refugee status for a particular refugee caseload.[3] UNHCR has such competence under Article 6A of the Statute of the Office of the High Commissioner for Refugees in conjunction with Article 1C of the 1951 Convention. Due to the fact that large numbers of refugees voluntarily repatriate without an official declaration that conditions in their countries of origin no longer justify international protection, declarations are infrequent. Furthermore, many States Parties grant permanent residence status to refugees in their territories after several years, eventually leading to their integration and naturalisation. Similarly, cessation determinations on an individual basis as well as periodic reviews are rare, in recognition of the "need to respect a basic degree of stability for individual refugees".[4]

4. The grounds identified in the 1951 Convention are exhaustive; that is, no additional grounds would justify a conclusion that international protection is no longer required.[5] Operation of the cessation clauses should, in addition, be distinguished from other decisions that terminate refugee status. Cessation differs from cancellation of refugee status. Cancellation is based on a determination that an individual should not have been recognised as a refugee in the first place. This is, for instance, so where it is established that there was a misrepresentation of material facts essential to the outcome of the determination process or that one of the exclusion clauses would have been applicable had all the relevant facts been known. Cessation also differs from revocation, which may take place if a refugee subsequently engages in conduct coming within the scope of Article 1F(a) or 1F(c).

---

[1] See, UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, (hereinafter "UNHCR, *Handbook*") (1979, Geneva, re-edited Jan. 1992), para. 112. For distinction between cessation and cancellation/revocation see, para. 4 below.
[2] In these Guidelines, "country of origin" is understood to cover both the country of nationality and the country of former habitual residence, the latter in relation to refugees who are stateless. For more on Article 1C(1–4), see UNHCR, "The Cessation Clauses: Guidelines on their Application", April 1999.
[3] See, for example, UNHCR's formal declarations of general cessation: "Applicability of the Cessation Clauses to Refugees from Poland, Czechoslovakia and Hungary", 15 Nov. 1991, "Applicability of Cessation Clauses to Refugees from Chile", 28 March 1994, "Applicability of the Cessation Clauses to Refugees from the Republics of Malawi and Mozambique", 31 Dec. 1996, "Applicability of the Cessation Clauses to Refugees from Bulgaria and Romania", 1 Oct. 1997, "Applicability of the Ceased Circumstances; Cessation Clauses to pre-1991 refugees from Ethiopia", 23 Sept. 1999, and "Declaration of Cessation – Timor Leste", 20 December 2002.
[4] "Summary Conclusions on Cessation of Refugee Status, Global Consultations on International Protection, Lisbon Expert Roundtable, May 2001, no. B (17). See also, UNHCR, *Handbook*, para. 135.
[5] See, amongst others, UNHCR, *Handbook*, para. 116.

IFR_AR_015907

## II. SUBSTANTIVE ANALYSIS

5. The following framework for substantive analysis is drawn from the terms of Article 1C(5) and 1C(6) of the 1951 Convention and takes into account Executive Committee Conclusion No. 69, subsequent legal developments, and State practice.

**3**

### A. GENERAL CONSIDERATIONS

6. When interpreting the cessation clauses, it is important to bear in mind the broad durable solutions context of refugee protection informing the object and purpose of these clauses. Numerous Executive Committee Conclusions affirm that the 1951 Convention and principles of refugee protection look to durable solutions for refugees.[6] Accordingly, cessation practices should be developed in a manner consistent with the goal of durable solutions. Cessation should therefore not result in persons residing in a host State with an uncertain status. It should not result either in persons being compelled to return to a volatile situation, as this would undermine the likelihood of a durable solution and could also cause additional or renewed instability in an otherwise improving situation, thus risking future refugee flows. Acknowledging these considerations ensures refugees do not face involuntary return to situations that might again produce flight and a need for refugee status. It supports the principle that conditions within the country of origin must have changed in a profound and enduring manner before cessation can be applied.

7. Cessation under Article 1C(5) and 1C(6) does not require the consent of or a voluntary act by the refugee. Cessation of refugee status terminates rights that accompany that status. It may bring about the return of the person to the country of origin and may thus break ties to family, social networks and employment in the community in which the refugee has become established. As a result, a premature or insufficiently grounded application of the ceased circumstances clauses can have serious consequences. It is therefore appropriate to interpret the clauses strictly and to ensure that procedures for determining general cessation are fair, clear, and transparent.

### B. ASSESSMENT OF CHANGE OF CIRCUMSTANCES IN THE COUNTRY OF ORIGIN

8. Article 1C(5) and (6) provides for the cessation of a person's refugee status where "the circumstances in connexion with which he [or she] has been recognized as a refugee have ceased to exist". To assist assessment of how and to what extent conditions in the country of origin must have changed before these "ceased circumstances" clauses can be invoked, UNHCR's Executive Committee has developed guidance in the form of Executive Committee Conclusion No. 69 (XLIII) (1992), which reads in part:

> [I]n taking any decision on application of the cessation clauses based on "ceased circumstances", States must carefully assess the fundamental character of the changes in the country of nationality or origin, including the general human rights situation, as well as the particular cause of fear of persecution, in order to make sure in an objective and verifiable way that the situation which justified the granting of refugee status has ceased to exist.
>
> ... [A]n essential element in such assessment by States is the fundamental, stable and durable character of the changes, making use of appropriate information available in this respect, *inter alia*, from relevant specialized bodies, including particularly UNHCR.

9. Key elements relevant to assessment of the extent and durability of change required before it can be said that the circumstances in connection with which refugee status was recognised have ceased to exist are outlined below.

---

[6] See, e.g., Executive Committee Conclusions No. 29 (XXXIV) (1983), No. 50 (XXXIX) (1988), No. 58 (XL) (1989), No. 79 (XLVII) (1996), No. 81 (XLVIII) (1997), No. 85 (XLIX) (1998), No. 87 (L) (1999), No. 89 (L) (2000), and No. 90 (LII) (2001).

IFR_AR_015908

**The fundamental character of change**

10. For cessation to apply, the changes need to be of a fundamental nature, such that the refugee "can no longer … continue to refuse to avail himself of the protection of the country of his nationality" (Article 1C(5)) or, if he has no nationality, is "able to return to the country of his former habitual residence" (Article 1C(6)). Cessation based on "ceased circumstances" therefore only comes into play when changes have taken place which address the causes of displacement which led to the recognition of refugee status.

11. Where indeed a "particular cause of fear of persecution"[7] has been identified, the elimination of that cause carries more weight than a change in other factors. Often, however, circumstances in a country are inter-linked, be these armed conflict, serious violations of human rights, severe discrimination against minorities, or the absence of good governance, with the result that resolution of the one will tend to lead to an improvement in others. All relevant factors must therefore be taken into consideration. An end to hostilities, a complete political change and return to a situation of peace and stability remain the most typical situation in which Article 1C(5) or (6) applies.

12. Large-scale spontaneous repatriation of refugees may be an indicator of changes that are occurring or have occurred in the country of origin. Where the return of former refugees would be likely to generate fresh tension in the country of origin, however, this itself could signal an absence of effective, fundamental change. Similarly, where the particular circumstances leading to flight or to non-return have changed, only to be replaced by different circumstances which may also give rise to refugee status, Article

1C(5) or (6) cannot be invoked.

**The enduring nature of change**

13. Developments which would appear to evidence significant and profound changes should be given time to consolidate before any decision on cessation is made. Occasionally, an evaluation as to whether fundamental changes have taken place on a durable basis can be made after a relatively short time has elapsed. This is so in situations where, for example, the changes are peaceful and take place under a constitutional process, where there are free and fair elections with a real change of government committed to respecting fundamental human rights, and where there is relative political and economic stability in the country.

14. A longer period of time will need to have elapsed before the durability of change can be tested where the changes have taken place violently, for instance, through the overthrow of a regime. Under the latter circumstances, the human rights situation needs to be especially carefully assessed. The process of national reconstruction must be given sufficient time to take hold and any peace arrangements with opposing militant groups must be carefully monitored. This is particularly relevant after conflicts involving different ethnic groups, since progress towards genuine reconciliation has often proven difficult in such cases. Unless national reconciliation clearly starts to take root and real peace is restored, political changes which have occurred may not be firmly established.

**Restoration of protection**

15. In determining whether circumstances have changed so as to justify cessation under Article 1C(5) or (6), another crucial question is whether the refugee can effectively re-avail him- or herself of the protection of his or her own country.[8] Such protection must therefore be effective and available. It requires more than mere physical security or safety. It needs to include the existence of a functioning government and basic administrative structures, as evidenced for instance through a functioning system of law and justice, as well as the existence of adequate infrastructure to enable residents to exercise their rights, including their right to a basic livelihood.

---

[7] See Executive Committee Conclusion No. 69 (XLIII) (1992), para. a.
[8] See Art. 12(4) of the 1966 International Covenant on Civil and Political Rights declaring: "No one shall be arbitrarily deprived of the right to enter his own country" and Human Rights Committee, General Comment No. 27, Article 12 (freedom of movement), 1999.

IFR_AR_015909

16. An important indicator in this respect is the general human rights situation in the country. Factors which have special weight for its assessment are the level of democratic development in the country, including the holding of free and fair elections, adherence to international human rights instruments, and access for independent national or international organisations freely to verify respect for human rights. There is no requirement that the standards of human rights achieved must be exemplary. What matters is that significant improvements have been made, as illustrated at least by respect for the right to life and liberty and the prohibition of torture; marked progress in establishing an independent judiciary, fair trials and access to courts: as well as protection amongst others of the fundamental rights to freedom of expression, association and religion. Important, more specific indicators include declarations of amnesties, the repeal of oppressive laws, and the dismantling of former security services.

## C. PARTIAL CESSATION

17. The 1951 Convention does not preclude cessation declarations for distinct sub-groups of a general refugee population from a specific country, for instance, for refugees fleeing a particular regime but not for those fleeing after that regime was deposed.[9] In contrast, changes in the refugee's country of origin affecting only part of the territory should not, in principle, lead to cessation of refugee status. Refugee status can only come to an end if the basis for persecution is removed without the precondition that the refugee has to return to specific safe parts of the country in order to be free from persecution. Also, not being able to move or to establish oneself freely in the country of origin would indicate that the changes have not been fundamental.

## D. INDIVIDUAL CESSATION

18. A strict interpretation of Article 1C(5) and (6) would allow their application on an individual basis. It reads: "The Convention shall cease to apply to any person [if] ... [h]e can no longer, *because the circumstances in connexion with which he has been recognized as a refugee* have ceased to exist, continue to refuse to avail himself of the protection" of his country of origin (emphasis supplied). Yet Article 1C(5) and (6) have rarely been invoked in individual cases. States have not generally undertaken periodic reviews of individual cases on the basis of fundamental changes in the country of origin. These practices acknowledge that a refugee's sense of stability should be preserved as much as possible. They are also consistent with Article 34 of the 1951 Convention, which urges States "as far as possible [to] facilitate the assimilation and naturalization of refugees". Where the cessation clauses are applied on an individual basis, it should not be done for the purposes of a re-hearing *de novo*.

## E. EXCEPTIONS TO CESSATION

### Continued international protection needs

19. Even when circumstances have generally changed to such an extent that refugee status would no longer be necessary, there may always be the specific circumstances of individual cases that may warrant continued international protection. It has therefore been a general principle that all refugees affected by general cessation must have the possibility, upon request, to have such application in their cases reconsidered on international protection grounds relevant to their individual case.[10]

### "Compelling reasons"

20. Both Article 1C(5) and (6) contain an exception to the cessation provision, allowing a refugee to invoke "compelling reasons arising out of previous persecution" for refusing to re-avail

---

[9] This approach has been taken by UNHCR on one occasion.
[10] Executive Committee, Conclusion No. 69 (XLIII) (1992), para. d.

IFR_AR_015910

himself or herself of the protection of the country of origin. This exception is intended to cover cases where refugees, or their family members, have suffered atrocious forms of persecution and therefore cannot be expected to return to the country of origin or former habitual residence.[11] This might, for example, include "ex-camp or prison detainees, survivors or witnesses of violence against family members, including sexual violence, as well as severely traumatised persons. It is presumed that such persons have suffered grave persecution, including at the hands of elements of the local population, and cannot reasonably be expected to return."[12] Children should also be given special consideration in this regard, as they may often be able to invoke "compelling reasons" for refusing to return to their country of origin.

21. Application of the "compelling reasons" exception is interpreted to extend beyond the actual words of the provision to apply to Article 1A(2) refugees. This reflects a general humanitarian principle that is now well-grounded in State practice.[13]

**Long-term residents**

22. In addition, the Executive Committee, in Conclusion No. 69, recommends that States consider "appropriate arrangements" for persons "who cannot be expected to leave the country of asylum, due to a long stay in that country resulting in strong family, social and economic links". In such situations, countries of asylum are encouraged to provide, and often do provide, the individuals concerned with an alternative residence status, which retains previously acquired rights, though in some instances with refugee status being withdrawn. Adopting this approach for long-settled refugees is not required by the 1951 Convention per se, but it is consistent with the instrument's broad humanitarian purpose and with respect for previously acquired rights, as set out in the aforementioned Executive Committee Conclusion No. 69 and international human rights law standards.[14]


## F. CESSATION AND MASS INFLUX

**Prima facie group determinations under the 1951 Convention**

23. Situations of mass influx frequently involve groups of persons acknowledged as refugees on a group basis because of the readily apparent and objective reasons for flight and circumstances in the country of origin. The immediate impracticality of individual status determinations has led to use of a *prima facie* refugee designation or acceptance for the group.[15] For such groups, the general principles described for cessation are applicable.

**Temporary protection in mass influx situations that include persons covered by the 1951 Convention**

24. Some States have developed "temporary protection" schemes[16] under which assistance and protection against *refoulement* have been extended on a group basis, without either a determination of *prima facie* refugee status for the group or individual status determinations for members of the group. Even though the cessation doctrine does not formally come into play, this form of protection is built upon the 1951 Convention framework and members of the group may well be or include refugees under the Convention. Decisions by States to withdraw temporary protection should therefore be preceded by a thorough evaluation of the changes in the country of origin. Such decisions should also be accompanied by an opportunity for those unwilling to return and requesting international protection to have access to an asylum procedure. In this context, it is also appropriate for States to provide exceptions for individuals with "compelling reasons" arising out of prior persecution.

---

[11] See amongst others, UNHCR, *Handbook*, para. 136.
[12] See UNHCR and UNHCHR Study, "Daunting Prospects Minority Women: Obstacles to their Return and Integration", Sarajevo, Bosnia and Herzegovina, April 2000.
[13] See generally, J. Fitzpatrick and R. Bonoan, "Cessation of Refugee Protection" in *Refugee Protection in International Law: UNHCR's Global Consultations on International Protection*, eds E. Feller, V. Türk and F. Nicholson, (Cambridge University Press, 2003 forthcoming).
[14] See e.g., above footnote 8.
[15] See "Protection of Refugees in Mass Influx Situations: Overall Protection Framework, Global Consultations on International Protection, EC/GC/01/4, 19 Feb. 2001.
[16] See, e.g., the European Union Directive on Temporary Protection, 2001/55/EC, 20 July 2001.

IFR_AR_015911

## III. PROCEDURAL ISSUES

25. As mentioned earlier, a declaration of general cessation has potentially serious consequences for recognised refugees. It acknowledges loss of refugee status and the rights that accompany that status, and it may contemplate the return of persons to their countries of origin. Thus, the following procedural aspects should be observed:

**General considerations**

i.  In making an assessment of the country of origin, States and UNHCR must "make sure in an objective and verifiable way that the situation which justified the granting of refugee status has ceased to exist".[17] As noted above, this assessment should include consideration of a range of factors, including the general human rights situation.

ii.  The burden rests on the country of asylum to demonstrate that there has been a fundamental, stable and durable change in the country of origin and that invocation of Article 1C(5) or (6) is appropriate. There may be instances where certain groups should be excluded from the application of general cessation because they remain at risk of persecution.

iii.  It is important that both the declaration process and implementation plans be consultative and transparent, involving in particular UNHCR, given its supervisory role.[18] NGOs and refugees should also be included in this consultative process. "Go and see" visits to the country of origin could, where feasible, be facilitated to examine conditions there, as well as an examination of the situation of refugees who have already returned voluntarily.

iv.  General cessation declarations should be made public.

v.  Counselling of refugees, information sharing and, if necessary, the provision of assistance to returnees are critical to the successful implementation of general cessation.

vi.  Procedures operationalising a declaration of cessation need to be carried out in a flexible, phased manner, particularly in developing countries hosting large numbers of refugees. There needs to be a certain time lapse between the moment of declaration and implementation, allowing for preparations for return and arrangements for long-term residents with acquired rights.

vii.  Noting the potential impact of a general cessation declaration on refugees and their families, they should be given an opportunity, upon request, to have their case reconsidered on grounds relevant to their individual case, in order to establish whether they come within the terms of the exceptions to cessation.[19] In such cases, however, no action should be taken to withdraw rights of the refugee until a final decision has been taken.

viii.  UNHCR retains a role in assisting the return of persons affected by a declaration of cessation or the integration of those allowed to stay, since they remain under UNHCR's Mandate for a period of grace.

**Post–declaration applications for refugee status**

ix.  A declaration of general cessation cannot serve as an automatic bar to refugee claims, either at the time of a general declaration or subsequent to it. Even though general cessation may have been declared in respect of a particular country, this does not preclude individuals leaving this country from applying for refugee status. For example, even if fundamental changes have occurred in a State, members of identifiable sub-groups – such as those based on ethnicity, religion, race, or political opinion – may still face particular circumstances that

---

[17] This rigorous standard is reflected in Executive Committee Conclusion No. 69 (XLIII) (1992), para. a.
[18] See para. 8(a) of the UNHCR Statute, Article 35 of the 1951 Convention and Article II of the 1967 Protocol as well as in particular the second preambular paragraph of Executive Committee Conclusion No. 69 (XLIII) (1992).
[19] See paras. 19–22 of these Guidelines and Executive Committee Conclusion No. 69 (XLIII) (1992).

IFR_AR_015912

warrant refugee status. Alternatively, a person may have a well-founded fear of persecution by a private person or group that the government is unable or unwilling to control, persecution based on gender being one example.

IFR_AR_015913



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/03/04 | 23 July 2003 | Original: ENGLISH |
|---|---|---|---|

**4**

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 4:

### "Internal Flight or Relocation Alternative" within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, and Article 35 of the *1951 Convention relating to the Status of Refugees* and/or its *1967 Protocol*. These Guidelines supplement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They further supersede UNHCR's Position Paper, *Relocating Internally as a Reasonable Alternative to Seeking Asylum – (The So-Called "Internal Flight Alternative" or "Relocation Principle")* (Geneva, February 1999). They result, *inter alia*, from the Second Track of the Global Consultations on International Protection which examined this subject at its expert meeting in San Remo, Italy, in September 2001 and seek to consolidate appropriate standards and practice on this issue in light of recent developments in State practice.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

IFR_AR_015914

## I. INTRODUCTION

1. Internal flight or relocation alternative is a concept that is increasingly considered by decision-makers in refugee status determination. To date, there has been no consistent approach to this concept and consequently divergent practices have emerged both within and across jurisdictions. Given the differing approaches, these Guidelines are designed to offer decision-makers a more structured approach to analysis of this aspect of refugee status determination.

2. The concept of an internal flight or relocation alternative is not a stand-alone principle of refugee law, nor is it an independent test in the determination of refugee status. A Convention refugee is a person who meets the criteria set out in Article 1A(2) of the *1951 Convention and/or 1967 Protocol relating to the Status of Refugees* (hereinafter "1951 Convention"). These criteria are to be interpreted in a liberal and humanitarian spirit, in accordance with their ordinary meaning, and in light of the object and purpose of the 1951 Convention. The concept of an internal flight or relocation alternative is not explicitly referred to in these criteria. The question of whether the claimant has an internal flight or relocation alternative may, however, arise as part of the refugee status determination process.

3. Some have located the concept of internal flight or relocation alternative in the "well- founded fear of being persecuted" clause of the definition, and others in the "unwilling ... or unable ... to avail himself of the protection of that country" clause. These approaches are not necessarily contradictory, since the definition comprises one holistic test of interrelated elements. How these elements relate, and the importance to be accorded to one or another element, necessarily falls to be determined on the facts of each individual case.[1]

4. International law does not require threatened individuals to exhaust all options within their own country first before seeking asylum; that is, it does not consider asylum to be the last resort. The concept of internal flight or relocation alternative should therefore not be invoked in a manner that would undermine important human rights tenets underlying the international protection regime, namely the right to leave one's country, the right to seek asylum and protection against refoulement. Moreover, since the concept can only arise in the context of an assessment of the refugee claim on its merits, it cannot be used to deny access to refugee status determination procedures. A consideration of internal flight or relocation necessitates regard for the personal circumstances of the individual claimant and the conditions in the country for which the internal flight or relocation alternative is proposed.[2]

5. Consideration of possible internal relocation areas is not relevant for refugees coming under the purview of Article I(2) of the OAU Convention Governing the Specific Aspects of Refugee Problems in Africa 1969. Article I(2) specifically clarifies the definition of a refugee as follows: "every person who, owing to external aggression, occupation, foreign domination or events seriously disturbing public order in either part or the whole of his country of origin or nationality, is compelled to leave his place of habitual residence in order to seek refuge in another place outside his country of origin or nationality".[3]

## II. SUBSTANTIVE ANALYSIS

### A. Part of the holistic assessment of refugee status

6. The 1951 Convention does not require or even suggest that the fear of being persecuted need always extend to the whole territory of the refugee's country of origin.[4] The concept of an internal flight or relocation alternative therefore refers to a specific area of the country where there is no

---

[1] For further details, see UNHCR, "Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees", Geneva, April 2001, (hereafter UNHCR, "Interpreting Article 1"), para. 12.
[2] *Ibid.*, paras. 35–37.
[3] (Emphasis added.) The 1984 *Cartagena Declaration* also specifically refers to Article I(2) of the OAU Refugee Convention.
[4] See UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979, Geneva, re-edited 1992), (hereinafter "UNHCR, *Handbook*"), para. 91.

risk of a well-founded fear of persecution and where, given the particular circumstances of the case, the individual could reasonably be expected to establish him/herself and live a normal life.[5] Consequently, if internal flight or relocation is to be considered in the context of refugee status determination, a particular area must be identified and the claimant provided with an adequate opportunity to respond.

7. In the context of the holistic assessment of a claim to refugee status, in which a well-founded fear of persecution for a Convention reason has been established in some localised part of the country of origin, the assessment of whether or not there is a relocation possibility requires two main sets of analyses, undertaken on the basis of answers to the following sets of questions:

**I.   The Relevance Analysis**

a.   *Is the area of relocation practically, safely, and legally accessible to the individual*? If any of these conditions is not met, consideration of an alternative location within the country would not be relevant.

b.   *Is the agent of persecution the State*? National authorities are presumed to act throughout the country. If they are the feared persecutors, there is a presumption in principle that an internal flight or relocation alternative is not available.

c.   I*s the agent of persecution a non-State agent*? Where there is a risk that the non- State actor will persecute the claimant in the proposed area, then the area will not be an internal flight or relocation alternative. This finding will depend on a determination of whether the persecutor is likely to pursue the claimant to the area and whether State protection from the harm feared is available there.

d.   *Would the claimant be exposed to a risk of being persecuted or other serious harm upon relocation*? This would include the original or any new form of persecution or other serious harm in the area of relocation.

**II.   The Reasonableness Analysis**

a.   *Can the claimant, in the context of the country concerned, lead a relatively normal life without facing undue hardship*? If not, it would not be reasonable to expect the person to move there.

**Scope of assessment**

8. The determination of whether the proposed internal flight or relocation area is an appropriate alternative in the particular case requires an assessment over time, taking into account not only the circumstances that gave rise to the persecution feared, and that prompted flight from the original area, but also whether the proposed area provides a meaningful alternative in the future. The forward-looking assessment is all the more important since, although rejection of status does not automatically determine the course of action to be followed, forcible return may be a consequence.

## B. The relevance analysis

9. The questions outlined in paragraph 7 can be analysed further as follows:

**Is the area of relocation practically, safely, and legally accessible to the individual?**

10. An area is not an internal flight or relocation alternative if there are barriers to reaching the area which are not reasonably surmountable. For example, the claimant should not be required to encounter physical dangers en route to the area such as mine fields, factional fighting, shifting war fronts, banditry or other forms of harassment or exploitation.

IFR_AR_015916

---

[5] For issues concerning the burden of proof in establishing these issues see section III.A below.

11. If the refugee claimant would have to pass through the original area of persecution in order to access the proposed area, that area cannot be considered an internal flight or relocation alternative. Similarly, passage through airports may render access unsafe, especially in cases where the State is the persecutor or where the persecutor is a non- State group in control of the airport.

12. The proposed area must also be legally accessible, that is, the individual must have the legal right to travel there, to enter, and to remain. Uncertain legal status can create pressure to move to unsafe areas, or to the area of original persecution. This issue may require particular attention in the case of stateless persons or those without documentation.

**Is the agent of persecution the State?**

13. The need for an analysis of internal relocation only arises where the fear of being persecuted is limited to a specific part of the country, outside of which the feared harm cannot materialise. In practical terms, this normally excludes cases where the feared persecution emanates from or is condoned or tolerated by State agents, including the official party in one-party States, as these are presumed to exercise authority in all parts of the country.[6] Under such circumstances the person is threatened with persecution countrywide unless exceptionally it is clearly established that the risk of persecution stems from an authority of the State whose power is clearly limited to a specific geographical area or where the State itself only has control over certain parts of the country.[7]

14. Where the risk of being persecuted emanates from local or regional bodies, organs or administrations within a State, it will rarely be necessary to consider potential relocation, as it can generally be presumed that such local or regional bodies derive their authority from the State. The possibility of relocating internally may be relevant only if there is clear evidence that the persecuting authority has no reach outside its own region and that there are particular circumstances to explain the national government's failure to counteract the localised harm.

**Is the agent of persecution a non-State agent?**

15. Where the claimant fears persecution by a non-State agent of persecution, the main inquiries should include an assessment of the motivation of the persecutor, the ability of the persecutor to pursue the claimant in the proposed area, and the protection available to the claimant in that area from State authorities. As with questions involving State protection generally, the latter involves an evaluation of the ability and willingness of the State to protect the claimant from the harm feared. A State may, for instance, have lost effective control over its territory and thus not be able to protect. Laws and mechanisms for the claimant to obtain protection from the State may reflect the State's willingness, but, unless they are given effect in practice, they are not of themselves indicative of the availability of protection. Evidence of the State's inability or unwillingness to protect the claimant in the original persecution area will be relevant. It can be presumed that if the State is unable or unwilling to protect the individual in one part of the country, it may also not be able or willing to extend protection in other areas. This may apply in particular to cases of gender-related persecution.

16. Not all sources of possible protection are tantamount to State protection. For example, if the area is under the control of an international organisation, refugee status should not be denied solely on the assumption that the threatened individual could be protected by that organisation. The facts of the individual case will be particularly important. The general rule is that it is inappropriate to equate the exercise of a certain administrative authority and control over territory by international organisations on a transitional or temporary basis with national protection provided by States. Under international law, international organisations do not have the attributes of a State.

17. Similarly, it is inappropriate to find that the claimant will be protected by a local clan or militia in an area where they are not the recognised authority in that territory and/or where their control over

---

[6] See Summary Conclusions – Internal Protection/Relocation/Flight Alternative, Global Consultations on International Protection, San Remo Expert Roundtable, 6–8 September 2001 (hereinafter "Summary Conclusions – Internal Protection/Relocation/Flight Alternative), para 2; UNHCR, "Interpreting Article 1", paras. 12–13.
[7] See also paras. 16, 17 and 27 of these Guidelines.

IFR_AR_015917

the area may only be temporary. Protection must be effective and of a durable nature: It must be provided by an organised and stable authority exercising full control over the territory and population in question.

**Would the claimant be exposed to a risk of being persecuted or other serious harm upon relocation?**

18. It is not sufficient simply to find that the original agent of persecution has not *yet* established a presence in the proposed area. Rather, there must be reason to believe that the reach of the agent of persecution is likely to remain localised and outside the designated place of internal relocation.

19. Claimants are not expected or required to suppress their political or religious views or other protected characteristics to avoid persecution in the internal flight or relocation area. The relocation alternative must be more than a "safe haven" away from the area of origin.

20. In addition, a person with an established fear of persecution for a 1951 Convention reason in one part of the country cannot be expected to relocate to another area of serious harm. If the claimant would be exposed to a new risk of serious harm, including a serious risk to life, safety, liberty or health, or one of serious discrimination,[8] an internal flight or relocation alternative does not arise, irrespective of whether or not there is a link to one of the Convention grounds.[9] The assessment of new risks would therefore also need to take into account serious harm generally covered under complementary forms of protection.[10]

21. The proposed area is also not an internal flight or relocation alternative if the conditions there are such that the claimant may be compelled to go back to the original area of persecution, or indeed to another part of the country where persecution or other forms of serious harm may be a possibility.

## C. The reasonableness analysis

22. In addition to there not being a fear of persecution in the internal flight or relocation alternative, it must be reasonable in all the circumstances for the claimant to relocate there. This test of "reasonableness" has been adopted by many jurisdictions. It is also referred to as a test of "undue hardship" or "meaningful protection".

23. The "reasonableness test" is a useful legal tool which, while not specifically derived from the language of the 1951 Convention, has proved sufficiently flexible to address the issue of whether or not, in all the circumstances, the particular claimant could reasonably be expected to move to the proposed area to overcome his or her well-founded fear of being persecuted. It is not an analysis based on what a hypothetical "reasonable person" should be expected to do. The question is what is reasonable, both subjectively and objectively, given the individual claimant and the conditions in the proposed internal flight or relocation alternative.

**Can the claimant, in the context of the country concerned, lead a relatively normal life without facing undue hardship?**

24. In answering this question, it is necessary to assess the applicant's personal circumstances, the existence of past persecution, safety and security, respect for human rights, and possibility for economic survival.

---

[8] See UNHCR, *Handbook*, paras. 51–52.
[9] A more general right not to be returned to a country where there is a risk of torture or cruel or inhuman treatment is found, either explicitly or by interpretation, in international human rights instruments. The most prominent are Article 3 of the Convention against Torture 1984, Article 7 of the International Covenant on Civil and Political Rights 1966, and Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms 1950.
[10] See UN docs. EC/50/SC/CRP.18, 9 June 2000 and EC/GC/01/18, 4 September 2001.

IFR_AR_015918

**Personal circumstances**

25. The personal circumstances of an individual should always be given due weight in assessing whether it would be unduly harsh and therefore unreasonable for the person to relocate in the proposed area. Of relevance in making this assessment are factors such as age, sex, health, disability, family situation and relationships, social or other vulnerabilities, ethnic, cultural or religious considerations, political and social links and compatibility, language abilities, educational, professional and work background and opportunities, and any past persecution and its psychological effects. In particular, lack of ethnic or other cultural ties may result in isolation of the individual and even discrimination in communities where close ties of this kind are a dominant feature of daily life. Factors which may not on their own preclude relocation may do so when their cumulative effect is taken into account. Depending on individual circumstances, those factors capable of ensuring the material and psychological well-being of the person, such as the presence of family members or other close social links in the proposed area, may be more important than others.

**Past persecution**

26. Psychological trauma arising out of past persecution may be relevant in determining whether it is reasonable to expect the claimant to relocate in the proposed area. The provision of psychological assessments attesting to the likelihood of further psychological trauma upon return would militate against finding that relocation to the area is a reasonable alternative. In some jurisdictions, the very fact that the individual suffered persecution in the past is sufficient in itself to obviate any need to address the internal relocation issue.

**Safety and security**

27. The claimant must be able to find safety and security and be free from danger and risk of injury. This must be durable, not illusory or unpredictable. In most cases, countries in the grip of armed conflict would not be safe for relocation, especially in light of shifting armed fronts which could suddenly bring insecurity to an area hitherto considered safe. In situations where the proposed internal flight or relocation alternative is under the control of an armed group and/or State-like entity, careful examination must be made of the durability of the situation there and the ability of the controlling entity to provide protection and stability.

**Respect for human rights**

28. Where respect for basic human rights standards, including in particular non-derogable rights, is clearly problematic, the proposed area cannot be considered a reasonable alternative. This does not mean that the deprivation of any civil, political or socio-economic human right in the proposed area will disqualify it from being an internal flight or relocation alternative. Rather, it requires, from a practical perspective, an assessment of whether the rights that will not be respected or protected are fundamental to the individual, such that the deprivation of those rights would be sufficiently harmful to render the area an unreasonable alternative.

**Economic survival**

29. The socio-economic conditions in the proposed area will be relevant in this part of the analysis. If the situation is such that the claimant will be unable to earn a living or to access accommodation, or where medical care cannot be provided or is clearly inadequate, the area may not be a reasonable alternative. It would be unreasonable, including from a human rights perspective, to expect a person to relocate to face economic destitution or existence below at least an adequate level of subsistence. At the other end of the spectrum, a simple lowering of living standards or worsening of economic status may not be sufficient to reject a proposed area as unreasonable. Conditions in the area must be such that a relatively normal life can be led in the context of the country concerned. If, for instance, an individual would be without family links and unable to benefit from an informal social safety net, relocation may not be reasonable, unless the person would otherwise be able to sustain a relatively normal life at more than just a minimum subsistence level.

IFR_AR_015919

30. If the person would be denied access to land, resources and protection in the proposed area because he or she does not belong to the dominant clan, tribe, ethnic, religious and/or cultural group, relocation there would not be reasonable. For example, in many parts of Africa, Asia and elsewhere, common ethnic, tribal, religious and/or cultural factors enable access to land, resources and protection. In such situations, it would not be reasonable to expect someone who does not belong to the dominant group, to take up residence there. A person should also not be required to relocate to areas, such as the slums of an urban area, where they would be required to live in conditions of severe hardship.

## D. Relocation and internally displaced persons

31. The presence of internally displaced persons who are receiving international assistance in one part of the country is not in itself conclusive evidence that it is reasonable for the claimant to relocate there. For example, the standard and quality of life of the internally displaced are often insufficient to support a finding that living in the area would be a reasonable alternative to flight. Moreover, where internal displacement is a result of "ethnic cleansing" policies, denying refugee status on the basis of the internal flight or relocation concept could be interpreted as condoning the resulting situation on the ground and therefore raises additional concerns.

32. The reality is that many thousands of internally displaced persons do not enjoy basic rights and have no opportunity to exercise the right to seek asylum outside their country. Thus, although standards largely agreed by the international community now exist, their implementation is by no means assured in practice. Moreover, the *Guiding Principles on Internal Displacement* specifically affirm in Principle 2(2) that they are not to be interpreted as "restricting, modifying or impairing the provisions of any international human rights or international humanitarian law instrument or rights granted to persons under domestic law" and in particular, they are "without prejudice to the right to seek and enjoy asylum in other countries."[11]

## III. PROCEDURAL ISSUES

### A. Burden of proof

33. The use of the relocation concept should not lead to additional burdens on asylum- seekers. The usual rule must continue to apply, that is, the burden of proving an allegation rests on the one who asserts it. This is consistent with paragraph 196 of the *Handbook* which states that

> ... while the burden of proof in principle rests on the applicant, the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner. Indeed, in some cases, it may be for the examiner to use all the means at his [or her] disposal to produce the necessary evidence in support of the application.

34. On this basis, the decision-maker bears the burden of proof of establishing that an analysis of relocation is relevant to the particular case. If considered relevant, it is up to the party asserting this to identify the proposed area of relocation and provide evidence establishing that it is a reasonable alternative for the individual concerned.

35. Basic rules of procedural fairness require that the asylum-seeker be given clear and adequate notice that such a possibility is under consideration.[12] They also require that the person be given an opportunity to provide arguments why (a) the consideration of an alternative location is not relevant in the case, and (b) if deemed relevant, that the proposed area would be unreasonable.

---

[11] See also W. Kälin, *Guiding Principles on Internal Displacement: Annotations*, Studies in Transnational Legal Policy No. 32, 2000 (The American Society of International Law, The Brookings Institution, Project on Internal Displacement), pp. 8-10.
[12] See Summary Conclusions – Internal Protection/Relocation/Flight Alternative, para. 7.

IFR_AR_015920

## B. Accelerated or admissibility procedures

36. Given the complex and substantive nature of the inquiry, the examination of an internal flight or relocation alternative is not appropriate in accelerated procedures, or in deciding on an individual's admissibility to a full status determination procedure.[13]

## C. Country of origin information

37. While examination of the relevance and reasonableness of a potential internal relocation area always requires an assessment of the individual's own particular circumstances, well-documented, good quality and current information and research on conditions in the country of origin are important components for the purpose of such examination. The usefulness of such information may, however, be limited in cases where the situation in the country of origin is volatile and sudden changes may occur in areas hitherto considered safe. Such changes may not have been recorded by the time the claim is being heard.

## IV. CONCLUSION

38. The concept of internal flight or relocation alternative is not explicitly referred to in the criteria set out in Article 1A(2) of the 1951 Convention. The question of whether the claimant has an internal flight or relocation alternative may, however, arise as part of the holistic determination of refugee status. It is relevant only in certain cases, particularly when the source of persecution emanates from a non-State actor. Even when relevant, its applicability will depend on a full consideration of all the circumstances of the case and the reasonableness of relocation to another area in the country of origin.

---

[13] See Summary Conclusions – Internal Protection/Relocation/Flight Alternative, para. 6; Executive Committee Conclusion No. 87(X50) 1999, para. j; and Note on International Protection, 1999, para. 26 (UN doc. A/AC.96/914, 7 July 1999).

IFR_AR_015921



**United Nations High Commissioner for Refugees**
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/03/05 | 4 September 2003 | Original: ENGLISH |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 5:

**5**

## Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the 1950 *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). These Guidelines summarise the *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees* (4 September 2003) which forms an integral part of UNHCR's position on this issue. They supersede *The Exclusion Clauses: Guidelines on their Application* (UNHCR, Geneva, 1 December 1996) and *Note on the Exclusion Clauses* (UNHCR, Geneva, 30 May 1997), and result, *inter alia*, from the Second Track of the Global Consultations on International Protection process which examined this subject at its expert meeting in Lisbon, Portugal, in May 2001. An update of these Guidelines was also deemed necessary in light of contemporary developments in international law.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

IFR_AR_015922

## I. INTRODUCTION

### A. Background

1. Paragraph 7(d) of the 1950 UNHCR Statute, Article 1F of the 1951 Convention relating to the Status of Refugees (hereinafter "1951 Convention") and Article I(5) of the 1969 Organisation of African Unity (OAU) Convention Governing the Specific Aspects of Refugee Problems in Africa (hereinafter "OAU Convention") all oblige States and UNHCR to deny the benefits of refugee status to certain persons who would otherwise qualify as refugees. These provisions are commonly referred to as "the exclusion clauses". These Guidelines provide a summary of the key issues relating to these provisions – further guidance can be found in UNHCR's Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees (hereinafter "the Background Note"), which forms an integral part of these Guidelines.

2. The rationale for the exclusion clauses, which should be borne in mind when considering their application, is that certain acts are so grave as to render their perpetrators undeserving of international protection as refugees. Their primary purpose is to deprive those guilty of heinous acts, and serious common crimes, of international refugee protection and to ensure that such persons do not abuse the institution of asylum in order to avoid being held legally accountable for their acts. The exclusion clauses must be applied "scrupulously" to protect the integrity of the institution of asylum, as is recognised by UNHCR's Executive Committee in Conclusion No. 82 (XLVIII), 1997. At the same time, given the possible serious consequences of exclusion, it is important to apply them with great caution and only after a full assessment of the individual circumstances of the case. The exclusion clauses should, therefore, always be interpreted in a restrictive manner.

3. The exclusion clauses in the 1951 Convention are exhaustive. This should be kept in mind when interpreting Article I(5) of the OAU Convention which contains almost identical language. Article 1F of the 1951 Convention states that the provisions of that Convention "shall not apply to any person with respect to whom there are serious reasons for considering" that:

> (a)   he [or she] has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
>
> (b)   he [or she] has committed a serious non-political crime outside the country of refuge prior to his [or her] admission to that country as a refugee; or
>
> (c)   he [or she] has been guilty of acts contrary to the purposes and principles of the United Nations.

### B. Relationship with other provisions of the 1951 Convention

4. Article 1F of the 1951 Convention should be distinguished from **Article 1D** which applies to a specific category of persons receiving protection or assistance from organs and agencies of the United Nations other than UNHCR.[1] Article 1F should also be distinguished from **Article 1E** which deals with persons not in need (as opposed to undeserving) of international protection. Moreover the exclusion clauses are not to be confused with **Articles 32 and 33(2)** of the Convention which deal respectively with the expulsion of, and the withdrawal of protection from *refoulement* from, recognised refugees who pose a danger to the host State (for example, because of serious crimes they have committed there). Article 33(2) concerns the future risk that a recognised refugee may pose to the host State.

### C. Temporal scope

5. Articles 1F(a) and 1F(c) are concerned with crimes whenever and wherever they are committed. By contrast, the scope of Article 1F(b) is explicitly limited to crimes committed outside the country of refuge prior to admission to that country as a refugee.

IFR_AR_015923

---

[1] See, UNHCR, "Note on the Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees", October 2002.

**D. Cancellation or revocation on the basis of exclusion**

6. Where facts which would have led to exclusion only come to light after the grant of refugee status, this would justify **cancellation** of refugee status on the grounds of exclusion. The reverse is that information casting doubt on the basis on which an individual has been excluded should lead to reconsideration of eligibility for refugee status. Where a refugee engages in conduct falling within Article 1F(a) or 1F(c), this would trigger the application of the exclusion clauses and the **revocation** of refugee status, provided all the criteria for the application of these clauses are met.

**5**

**E. Responsibility for determination of exclusion**

7. States parties to the 1951 Convention/1967 Protocol and/or OAU Convention and UNHCR need to consider whether the exclusion clauses apply in the context of the determination of refugee status. Paragraph 7(d) of UNHCR's Statute covers similar grounds to Article 1F of the 1951 Convention, although UNHCR officials should be guided by the language of Article 1F, as it represents the later and more specific formulation.

**F. Consequences of exclusion**

8. Although a State is precluded from granting refugee status pursuant to the 1951 Convention or the OAU Convention to an individual it has excluded, it is not otherwise obliged to take any particular course of action. The State concerned can choose to grant the excluded individual stay on other grounds, but obligations under international law may require that the person concerned be criminally prosecuted or extradited. A decision by UNHCR to exclude someone from refugee status means that that individual can no longer receive protection or assistance from the Office.

9. An excluded individual may still be protected against return to a country where he or she is at risk of ill-treatment by virtue of other international instruments. For example, the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment absolutely prohibits the return of an individual to a country where there is a risk that he or she will be subjected to torture. Other international and regional human rights instruments contain similar provisions.[2]

## II. SUBSTANTIVE ANALYSIS

**A. Article 1F(a): Crimes against peace, war crimes and crimes against humanity**

10. Amongst the various international instruments which offer guidance on the scope of these international crimes are the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, the four 1949 Geneva Conventions for the Protection of Victims of War and the two 1977 Additional Protocols, the Statutes of the International Criminal Tribunals for the former Yugoslavia and Rwanda, the 1945 Charter of the International Military Tribunal (the London Charter), and most recently the 1998 Statute of the International Criminal Court which entered into force on 1 July 2002.

11. According to the London Charter a **crime against peace** involves the "planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements, or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing". Given the nature of this crime, it can only be committed by those in a high position of authority representing a State or a State-like entity. In practice, this provision has rarely been invoked.

IFR_AR_015924

---

[2] For further details, see Annex A of the Background Note accompanying these Guidelines.

12. Certain breaches of international humanitarian law constitute **war crimes**.[3] Although such crimes can be committed in both international and non-international armed conflicts, the content of the crimes depends on the nature of the conflict. War crimes cover such acts as wilful killing and torture of civilians, launching indiscriminate attacks on civilians, and wilfully depriving a civilian or a prisoner of war of the rights of fair and regular trial.

13. The distinguishing feature of **crimes against humanity**,[4] which cover acts such as genocide, murder, rape and torture, is that they must be carried out as part of a widespread or systematic attack directed against the civilian population. An isolated act can, however, constitute a crime against humanity if it is part of a coherent system or a series of systematic and repeated acts. Since such crimes can take place in peacetime as well as armed conflict, this is the broadest category under Article 1F(a).

## B. Article 1F(b): Serious non-political crimes

14. This category does not cover minor crimes nor prohibitions on the legitimate exercise of human rights. In determining whether a particular offence is sufficiently serious, international rather than local standards are relevant. The following factors should be taken into account: the nature of the act, the actual harm inflicted, the form of procedure used to prosecute the crime, the nature of the penalty, and whether most jurisdictions would consider it a serious crime. Thus, for example, murder, rape and armed robbery would undoubtedly qualify as serious offences, whereas petty theft would obviously not.

15. A serious crime should be considered **non-political** when other motives (such as personal reasons or gain) are the predominant feature of the specific crime committed. Where no clear link exists between the crime and its alleged political objective or when the act in question is disproportionate to the alleged political objective, non-political motives are predominant.[5] The motivation, context, methods and proportionality of a crime to its objectives are important factors in evaluating its political nature. The fact that a particular crime is designated as non-political in an extradition treaty is of significance, but not conclusive in itself. Egregious acts of violence, such as acts those commonly considered to be of a "terrorist" nature, will almost certainly fail the predominance test, being wholly disproportionate to any political objective. Furthermore, for a crime to be regarded as political in nature, the political objectives should be consistent with human rights principles.

16. Article 1F(b) also requires the crime to have been committed "outside the country of refuge prior to [the individual's] admission to that country as a refugee". Individuals who commit "serious non-political crimes" within the country of refuge are subject to that country's criminal law process and, in the case of particularly grave crimes, to Articles 32 and 33(2) of the 1951 Convention.

## C. Article 1F(c): Acts contrary to the purposes and principles of the United Nations

17. Given the broad, general terms of the purposes and principles of the United Nations, the scope of this category is rather unclear and should therefore be read narrowly. Indeed, it is rarely applied and, in many cases, Article 1F(a) or 1F(b) are anyway likely to apply. Article 1F(c) is only triggered in extreme circumstances by activity which attacks the very basis of the international community's coexistence. Such activity must have an international dimension. Crimes capable of affecting international peace, security and peaceful relations between States, as well as serious and sustained violations of human rights, would fall under this category. Given that Articles 1 and 2 of the United Nations Charter essentially set out the fundamental principles States must uphold in their mutual relations, it would appear that in principle only persons who have been in positions of power in a State or State-like entity would appear capable of committing such acts. In cases involving a terrorist act, a correct application of Article 1F(c) involves an assessment as to the extent to which the act impinges on the international plane – in terms of its gravity, international impact, and implications for international peace and security.

---

[3] For instruments defining war crimes, see Annex B of the Background Note.
[4] For instruments defining crimes against humanity, see Annex C of the Background Note.
[5] See para 152 of the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status*, Geneva, re-edited 1992.

**IFR_AR_015925**

## D. Individual responsibility

18. For exclusion to be justified, individual responsibility must be established in relation to a crime covered by Article 1F. Specific considerations in relation to crimes against peace and acts against the purposes and principles of the UN have been discussed above. In general, individual responsibility flows from the person having committed, or made a substantial contribution to the commission of the criminal act, in the knowledge that his or her act or omission would facilitate the criminal conduct. The individual need not physically have committed the criminal act in question. Instigating, aiding and abetting and participating in a joint criminal enterprise can suffice.

19. The fact that a person was at some point a senior member of a repressive government or a member of an organisation involved in unlawful violence does not in itself entail individual liability for excludable acts. A presumption of responsibility may, however, arise where the individual has remained a member of a government clearly engaged in activities that fall within the scope of Article 1F. Moreover, the purposes, activities and methods of some groups are of a particularly violent nature, with the result that voluntary membership thereof may also raise a presumption of individual responsibility. Caution must be exercised when such a presumption of responsibility arises, to consider issues including the actual activities of the group, its organisational structure, the individual's position in it, and his or her ability to influence significantly its activities, as well as the possible fragmentation of the group. Moreover, such presumptions in the context of asylum proceedings are rebuttable.

20. As for ex-combatants, they should not necessarily be considered excludable, unless of course serious violations of international human rights law and international humanitarian law are reported and indicated in the individual case.

## E. Grounds for rejecting individual responsibility

21. Criminal responsibility can normally only arise where the individual concerned committed the material elements of the offence with knowledge and intent. Where the **mental element** is not satisfied, for example, because of ignorance of a key fact, individual criminal responsibility is not established. In some cases, the individual may not have the mental capacity to be held responsible a crime, for example, because of insanity, mental handicap, involuntary intoxication or, in the case of children, immaturity.

22. Factors generally considered to constitute **defences** to criminal responsibility should be considered. For example, the defence of superior orders will only apply where the individual was legally obliged to obey the order, was unaware of its unlawfulness and the order itself was not manifestly unlawful. As for duress, this applies where the act in question results from the person concerned necessarily and reasonably avoiding a threat of imminent death, or of continuing or imminent serious bodily harm to him- or herself or another person, and the person does not intend to cause greater harm than the one sought to be avoided. Action in self-defence or in defence of others or of property must be both reasonable and proportionate in relation to the threat.

23. Where **expiation** of the crime is considered to have taken place, application of the exclusion clauses may no longer be justified. This may be the case where the individual has served a penal sentence for the crime in question, or perhaps where a significant period of time has elapsed since commission of the offence. Relevant factors would include the seriousness of the offence, the passage of time, and any expression of regret shown by the individual concerned. In considering the effect of any pardon or amnesty, consideration should be given to whether it reflects the democratic will of the relevant country and whether the individual has been held accountable in any other way. Some crimes are, however, so grave and heinous that the application of Article 1F is still considered justified despite the existence of a pardon or amnesty.

IFR_AR_015926

### F. Proportionality considerations

24. The incorporation of a proportionality test when considering exclusion and its consequences provides a useful analytical tool to ensure that the exclusion clauses are applied in a manner consistent with the overriding humanitarian object and purpose of the 1951 Convention. The concept has evolved in particular in relation to Article 1F(b) and represents a fundamental principle of many fields of international law. As with any exception to a human rights guarantee, the exclusion clauses must therefore be applied in a manner proportionate to their objective, so that the gravity of the offence in question is weighed against the consequences of exclusion. Such a proportionality analysis would, however, not normally be required in the case of crimes against peace, crimes against humanity, and acts falling under Article 1F(c), as the acts covered are so heinous. It remains relevant, however, to Article 1F(b) crimes and less serious war crimes under Article 1F(a).

### G. Particular acts and special cases

25. Despite the lack of an internationally agreed definition of **terrorism**,[6] acts commonly considered to be terrorist in nature are likely to fall within the exclusion clauses even though Article 1F is not to be equated with a simple anti-terrorism provision. Consideration of the exclusion clauses is, however, often unnecessary as suspected terrorists may not be eligible for refugee status in the first place, their fear being of legitimate prosecution as opposed to persecution for Convention reasons.

26. Of all the exclusion clauses, Article 1F(b) may be particularly relevant as acts of terrorist violence are likely to be disproportionate to any avowed political objective. Each case will require individual consideration. The fact that an individual is designated on a national or international list of terrorist suspects (or associated with a designated terrorist organisation) should trigger consideration of the exclusion clauses but will not in itself generally constitute sufficient evidence to justify exclusion. Exclusion should not be based on membership of a particular organisation alone, although a presumption of individual responsibility may arise where the organisation is commonly known as notoriously violent and membership is voluntary. In such cases, it is necessary to examine the individual's role and position in the organisation, his or her own activities, as well as related issues as outlined in paragraph 19 above.

27. As acts of **hijacking** will almost certainly qualify as a "serious crime" under Article 1F(b), only the most compelling of circumstances can justify non-exclusion. Acts of **torture** are prohibited under international law. Depending on the context, they will generally lead to exclusion under Article 1F.

28. The exclusion clauses apply in principle to **minors**, but only if they have reached the age of criminal responsibility and possess the mental capacity to be held responsible for the crime in question. Given the vulnerability of children, great care should be exercised in considering exclusion with respect to a minor and defences such as duress should in particular be examined carefully. Where UNHCR conducts refugee status determination under its mandate, all such cases should be referred to Headquarters before a final decision is made.

29. Where the main applicant is excluded from refugee status, the dependants will need to establish their own grounds for refugee status. If the latter are recognised as refugees, the excluded individual is not able to rely on the right to family unity in order to secure protection or assistance as a refugee.

30. The exclusion clauses can also apply in situations of **mass influx**, although in practice the individual screening required may cause operational and practical difficulties. Nevertheless, until such screening can take place, all persons should receive protection and assistance, subject of course to the separation of armed elements from the civilian refugee population.

IFR_AR_015927

---

[6] For instruments pertaining to terrorism, see Annex D of the Background Note.

## III. PROCEDURAL ISSUES

31. Given the grave consequences of exclusion, it is essential that rigorous procedural **safeguards** are built into the exclusion determination procedure. Exclusion decisions should in principle be dealt with in the context of the **regular refugee status determination procedure** and not in either admissibility or accelerated procedures, so that a full factual and legal assessment of the case can be made. The exceptional nature of Article 1F suggests that inclusion should generally be considered before exclusion, but there is no rigid formula. Exclusion may exceptionally be considered without particular reference to inclusion issues (i) where there is an indictment by an international criminal tribunal; (ii) in cases where there is apparent and readily available evidence pointing strongly towards the applicant's involvement in particularly serious crimes, notably in prominent Article 1F(c) cases, and (iii) at the appeal stage in cases where exclusion is the question at issue.

32. **Specialised exclusion units** within the institution responsible for refugee status determination could be set up to handle exclusion cases to ensure that they are dealt with in an expeditious manner. It may be prudent to defer decisions on exclusion until completion of any domestic criminal proceedings, as the latter may have significant implications for the asylum claim. In general, however, the refugee claim must be determined in a final decision before execution of any extradition order.

33. At all times the **confidentiality** of the asylum application should be respected. In exceptional circumstances, contact with the country of origin may be justified on national security grounds, but even then the existence of the asylum application should not be disclosed.

34. The burden of proof with regard to exclusion rests with the State (or UNHCR) and, as in all refugee status determination proceedings, the applicant should be given the benefit of the doubt. Where, however, the individual has been indicted by an international criminal tribunal, or where individual responsibility for actions which give rise to exclusion is presumed, as indicated in paragraph 19 of these Guidelines, the burden of proof is reversed, creating a rebuttable presumption of excludability.

35. In order to satisfy the **standard of proof** under Article 1F, clear and credible evidence is required. It is not necessary for an applicant to have been convicted of the criminal offence, nor does the criminal standard of proof need to be met. Confessions and testimony of witnesses, for example, may suffice if they are reliable. Lack of cooperation by the applicant does not in itself establish guilt for the excludable act in the absence of clear and convincing evidence. Consideration of exclusion may, however, be irrelevant if non-cooperation means that the basics of an asylum claim cannot be established.

36. Exclusion should not be based on **sensitive evidence** that cannot be challenged by the individual concerned. Exceptionally, anonymous evidence (where the source is concealed) may be relied upon but only where this is absolutely necessary to protect the safety of witnesses and the asylum-seeker's ability to challenge the substance of the evidence is not substantially prejudiced. Secret evidence or evidence considered in camera (where the substance is also concealed) should not be relied upon to exclude. Where national security interests are at stake, these may be protected by introducing procedural safeguards which also respect the asylum-seeker's due process rights.

IFR_AR_015928

IFR_AR_015929

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL        HCR/GIP/04/06        28 April 2004        Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 6:

**Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees**

UNHCR issues these Guidelines pursuant to its mandate, as contained in the 1950 *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They are informed, *inter alia*, by a roundtable organised by UNHCR and the Church World Service in Baltimore, Maryland, United States, in October 2002, as well as by an analysis of relevant State practice and international law.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

IFR_AR_015930

## I. INTRODUCTION

1. Claims to refugee status based on religion can be among the most complex. Decision- makers have not always taken a consistent approach, especially when applying the term "religion" contained in the refugee definition of the 1951 Convention relating to the Status of Refugees and when determining what constitutes "persecution" in this context. Religion-based refugee claims may overlap with one or more of the other grounds in the refugee definition or, as can often happen, they may involve post-departure conversions, that is, *sur place* claims. While these Guidelines do not purport to offer a definitive definition of "religion", they provide decision-makers with guiding parameters to facilitate refugee status determination in such cases.

2. The right to freedom of thought, conscience and religion is one of the fundamental rights and free-doms in international human rights law. In determining religion-based claims, it is therefore useful, *inter alia*, to draw on Article 18 of the 1948 Universal Declaration of Human Rights (the "Universal Declaration") and Articles 18 and 27 of the 1966 International Covenant on Civil and Political Rights (the "International Covenant"). Also relevant are the General Comments issued by the Human Rights Committee,[1] the 1981 Declaration on the Elimination of All Forms of Intolerance and Discrimination based on Religion or Belief, the 1992 Declaration on the Rights of Persons belonging to National or Ethnic, Religious and Linguistic Minorities and the body of reports of the Special Rapporteur on Religious Intolerance.[2] These international human rights standards provide guidance in defining the term "religion" also in the context of international refugee law, against which action taken by States to restrict or prohibit certain practices can be examined.

## II. SUBSTANTIVE ANALYSIS

### A. Defining "religion"

3. The refugee definition contained in Article 1A(2) of the 1951 Convention states:

> A. For the purposes of the present Convention, the term "refugee" shall apply to any person who: ...
>
> (2) ... owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

4. The *travaux préparatoires* of the 1951 Convention show that religion-based persecution formed an integral and accepted part of the refugee definition throughout the drafting process. There was, however, no attempt to define the term as such.[3] No universally accepted definition of "religion" ex-ists, but the instruments mentioned in paragraph 2 above certainly inform the interpretation of the term "religion" in the international refugee law context. Its use in the 1951 Convention can therefore be taken to encompass freedom of thought, conscience or belief.[4] As the Human Rights Committee notes, "religion" is "not limited ... to traditional religions or to religions and beliefs with institutional characteristics or practices analogous to those of traditional religions".[5] It also broadly covers acts of failing or refusing to observe a religion or to hold any particular religious belief. The term is not, how-ever, without limits and international human rights law foresees a number of legitimate boundaries on the exercise of religious freedom as outlined in greater detail in paragraphs 15–16 below.

---

[1] See, in particular, Human Rights Committee, General Comment No. 22, adopted 20 July 1993, UN doc. CCPR/C/21/Rev.1/ ADD.4, 27 September 1993.

[2] The latter can be found at http://www.unhchr.ch/huridocda/huridoca.nsf/FramePage/intolerance+En?OpenDocument. Relevant regional instruments include Article 9 of the 1950 European Convention on Human Rights; Article 12 of the 1969 American Convention on Human Rights; Article 8 of the 1981 African Charter on Human and Peoples' Rights.

[3] A key source in States' deliberations was the refugee definition set out in the 1946 Constitution of the International Refugee Organisation (IRO). This included those expressing valid objections to return because of a fear of persecution on grounds of "race, religion, nationality or political opinions". (A fifth ground, membership of a particular social group, was approved later in the negotiating process for the 1951 Convention.)

[4] See, also, UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, Geneva, re-edited 1992 (hereafter "UNHCR Handbook"), para. 71.

[5] Human Rights Committee, General Comment No. 22, above note 1, para. 2.

IFR_AR_015931

5. Claims based on "religion" may involve one or more of the following elements:

a. religion as belief (including non-belief);

b. religion as identity;

c. religion as a way of life.

6. "Belief", in this context, should be interpreted so as to include theistic, nontheistic and atheistic beliefs. Beliefs may take the form of convictions or values about the divine or ultimate reality or the spiritual destiny of humankind. Claimants may also be considered heretics, apostates, schismatic, pagans or superstitious, even by other adherents of their religious tradition and be persecuted for that reason.

**6**

7. "Identity" is less a matter of theological beliefs than membership of a community that observes or is bound together by common beliefs, rituals, traditions, ethnicity, nationality, or ancestry. A claimant may identify with, or have a sense of belonging to, or be identified by others as belonging to, a particular group or community. In many cases, persecutors are likely to target religious groups that are different from their own because they see that religious identity as part of a threat to their own identity or legitimacy.

8. For some individuals, "religion" is a vital aspect of their "way of life" and how they relate, either completely or partially, to the world. Their religion may manifest itself in such activities as the wearing of distinctive clothing or observance of particular religious practices, including observing religious holidays or dietary requirements. Such practices may seem trivial to non-adherents, but may be at the core of the religion for the adherent concerned.

9. Establishing sincerity of belief, identity and/or a certain way of life may not necessarily be relevant in every case.[6] It may not be necessary, for instance, for an individual (or a group) to declare that he or she belongs to a religion, is of a particular religious faith, or adheres to religious practices, where the persecutor imputes or attributes this religion, faith or practice to the individual or group. As is discussed further below in paragraph 31, it may also not be necessary for the claimant to know or understand anything about the religion, if he or she has been identified by others as belonging to that group and fears persecution as a result. An individual (or group) may be persecuted on the basis of religion, even if the individual or other members of the group adamantly deny that their belief, identity and/or way of life constitute a "religion".

10. Similarly, birth into a particular religious community, or a close correlation between race and/or ethnicity on the one hand and religion on the other could preclude the need to enquire into the adherence of an individual to a particular faith or the bona fides of a claim to membership of that community, if adherence to that religion is attributed to the individual.

## B. Well-founded fear of persecution

### a) General

11. The right to freedom of religion includes the freedom to manifest one's religion or belief, either individually or in community with others and in public or private in worship, observance, practice and teaching.[7] The only circumstances under which this freedom may be restricted are set out in Article 18(3) of the International Covenant, as described in paragraphs 15–16 below.

12. Persecution for reasons of religion may therefore take various forms. Depending on the particular circumstances of the case, including the effect on the individual concerned, examples could include prohibition of membership of a religious community, of worship in community with others in public

---

[6] For further analysis of credibility issues, see paras. 28–33 below.
[7] See Universal Declaration, Article 18 and International Covenant, Article 18(1).

IFR_AR_015932

or in private, of religious instruction, or serious measures of discrimination imposed on individuals because they practise their religion, belong to or are identified with a particular religious community, or have changed their faith.[8] Equally, in communities in which a dominant religion exists or where there is a close correlation between the State and religious institutions, discrimination on account of one's failure to adopt the dominant religion or to adhere to its practices, could amount to persecution in a particular case.[9] Persecution may be inter-religious (directed against adherents or communities of different faiths), intra-religious (within the same religion, but between different sects, or among members of the same sect), or a combination of both.[10] The claimant may belong to a religious minority or majority. Religion-based claims may also be made by individuals in marriages of mixed religions.

13. Applying the same standard as for other Convention grounds, religious belief, identity, or way of life can be seen as so fundamental to human identity that one should not be compelled to hide, change or renounce this in order to avoid persecution.[11] Indeed, the Convention would give no protection from persecution for reasons of religion if it was a condition that the person affected must take steps – reasonable or otherwise – to avoid offending the wishes of the persecutors. Bearing witness in words and deeds is often bound up with the existence of religious convictions.[12]

14. Each claim requires examination on its merits on the basis of the individual's situation. Relevant areas of enquiry include the individual profile and personal experiences of the claimant, his or her religious belief, identity and/or way of life, how important this is for the claimant, what effect the restrictions have on the individual, the nature of his or her role and activities within the religion, whether these activities have been or could be brought to the attention of the persecutor and whether they could result in treatment rising to the level of persecution. In this context, the well-founded fear "need not necessarily be based on the applicant's own personal experience". What, for example, happened to the claimant's friends and relatives, other members of the same religious group, that is to say to other similarly situated individuals, "may well show that his [or her] fear that sooner or later he [or she] also will become a victim of persecution is well-founded".[13] Mere membership of a particular religious community will normally not be enough to substantiate a claim to refugee status. As the UNHCR Handbook notes, there may, however, be special circumstances where mere membership suffices, particularly when taking account of the overall political and religious situation in the country of origin, which may indicate a climate of genuine insecurity for the members of the religious community concerned.

### b) Restrictions or limitations on the exercise of religious freedom

15. Article 18(3) of the International Covenant permits restrictions on the "freedom to manifest one's religion or beliefs" if these limits "are prescribed by law and are necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others". As the Human Rights Committee notes: "Limitations may be applied only for those purposes for which they were prescribed and must be directly related and proportionate to the specific need on which they are predicated. Restrictions may not be imposed for discriminatory purposes or applied in a discriminatory manner."[14] In assessing the legitimacy of the restriction or limitation at issue, it is therefore necessary to analyse carefully why and how it was imposed. Permissible restrictions or limitations could include measures to prevent criminal activities (for example, ritual killings), or harmful traditional practices and/or limitations on religious practices injurious to the best interests of the child, as judged by international law standards. Another justifiable, even necessary, restriction could involve the criminalisation of hate speech, including when committed in the name of religion. The

---

[8] UNHCR, *Handbook*, above note 4, para. 72.
[9] In this context, Article 27 of the International Covenant reads: "In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their own language."
[10] Interim Report of the Special Rapporteur on Religious Intolerance, "Implementation of the Declaration on the Elimination of All Forms of Intolerance and of Discrimination based on Religion or Belief", UN doc. A/53/279, 24 August 1998, para. 129.
[11] See also, UNHCR, "Guidelines on International Protection: 'Membership of a particular social group' within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", HCR/GIP/02/02, 7 May 2002, para. 6. Similarly, in internal flight or relocation cases, the claimant should not be expected or required to suppress his or her religious views to avoid persecution in the internal flight or relocation area. See UNHCR, "Guidelines on International Protection: 'Internal Flight or Relocation Alternative' within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", HCR/GIP/03/04, 23 July 2003, paras. 19, 25.
[12] UNHCR, *Handbook*, above note 4, para. 73.
[13] UNHCR, *Handbook*, above note 4, para. 43.
[14] See Human Rights Committee, General Comment No. 22, above note 1, para. 8.

IFR_AR_015933

fact that a restriction on the exercise of a religious freedom finds the support of the majority of the population in the claimant's country of origin and/or is limited to the manifestation of the religion in public is irrelevant.

16. In determining whether restrictions or limitations rise to the level of persecution, the decision-maker must not only take into account international human rights standards, including lawful limitations on the exercise of religious freedom, but also evaluate the breadth of the restriction and the severity of any punishment for noncompliance. The importance or centrality of the practice within the religion and/or to the individual personally is also relevant. The decision-maker should proceed cautiously with such inquiries, taking into account the fact that what may seem trivial to an outsider may be central to the claimant's beliefs. Where the restricted practice is not important to the individual, but important to the religion, then it is unlikely to rise to the level of persecution without additional factors. By contrast, the restricted religious practice may not be so significant to the religion, but may be particularly important to the individual, and could therefore still constitute persecution on the basis of his or her conscience or belief.

## c) Discrimination

17. Religion-based claims often involve discrimination.[15] Even though discrimination for reasons of religion is prohibited under international human rights law, all discrimination does not necessarily rise to the level required for recognition of refugee status. For the purposes of analysing an asylum claim, a distinction should be made between discrimination resulting merely in preferential treatment and discrimination amounting to persecution because, in aggregate or of itself, it seriously restricts the claimant's enjoyment of fundamental human rights. Examples of discrimination amounting to persecution would include, but are not limited to, discrimination with consequences of a substantially prejudicial nature for the person concerned, such as serious restrictions on the right to earn a livelihood, or to access normally available educational institutions and/or health services. This may also be so where economic measures imposed "destroy the economic existence" of a particular religious group.[16]

18. The existence of discriminatory laws will not normally in itself constitute persecution, although they can be an important, even indicative, factor which therefore needs to be taken into account. An assessment of the implementation of such laws and their effect is in any case crucial to establishing persecution. Similarly, the existence of legislation on religious freedom does not of itself mean individuals are protected. In many cases, such legislation may not be implemented in practice or custom or tradition may, for instance, in practice override this.

19. Discrimination may also take the form of restrictions or limitations on religious belief or practice. Restrictions have, for instance, included penalties for converting to a different faith (apostasy) or for proselytising, or for celebrating religious festivals particular to the religion concerned. The compulsory registration of religious groups and the imposition of specific regulations governing them to restrict the exercise of freedom of religion or belief can also have a discriminatory aim or results. Such actions are legitimate only if they are "specified by law, objective, reasonable and transparent and, consequently, if they do not have the aim or the result of creating discrimination".[17]

## d) Forced conversion

20. Forced conversion to a religion is a serious violation of the fundamental human right to freedom of thought, conscience and religion and would often satisfy the objective component of persecution. The claimant would still need to demonstrate a subjective fear that the conversion would be persecutory to him or her personally. Generally, this would be satisfied if the individual held convictions or faith or had a clear identity or way of life in relation to a different religion, or if he or she had chosen to be disassociated from any religious denomination or community. Where a claimant held no particular religious conviction (including one of atheism) nor a clear identification with

---

[15] See generally, UNHCR, *Handbook*, above note 4, paras. 54–55.
[16] UNHCR, *Handbook*, above note 4, paras. 54 and 63.
[17] Special Rapporteur on freedom of religion or belief, interim report annexed to Note by the Secretary-General, "Elimination of All Forms of Religious Intolerance", UN doc. A/58/296, 19 August 2003, paras. 134–35.

IER_AR_015934

a particular religion or religious community before the conversion or threat of conversion, it would be necessary to assess the impact of such a conversion on the individual (for example, it may be an act without correlative personal effects).

### e) Forced compliance or conformity with religious practices

21. Forced compliance with religious practices might, for example, take the form of mandated religious education that is incompatible with the religious convictions, identity or way of life of the child or the child's parents.[18] It might also involve an obligation to attend religious ceremonies or swear an oath of allegiance to a particular religious symbol. In determining whether such forced compliance constitutes persecution, the policies or acts with which the person or group is required to comply, the extent to which they are contrary to the person's belief, identity or way of life and the punishment for non-compliance should be examined. Such forced compliance could rise to the level of persecution if it becomes an intolerable interference with the individual's own religious belief, identity or way of life and/or if non-compliance would result in disproportionate punishment.

22. Forced compliance may also involve the imposition of a particular criminal or civil legal code purported to be based on a religious doctrine to which non-observers might object. Where such a code contains discriminatory substantive or procedural safeguards and especially where it imposes different levels of punishment upon adherents and non-adherents, it could well be regarded as persecutory. Where the law imposes disproportionate punishment for breaches of the law (for example, imprisonment for blasphemy or practising an alternative religion, or death for adultery), whether or not for adherents of the same religion, it would constitute persecution. Such cases are more common where there is limited or no separation between the State and the religion.

23. A specific religious code may be persecutory not just when enforced against non-observers, but also when applied to dissidents within or members of the same faith. The enforcement of anti-blasphemy laws, for example, can often be used to stifle political debate among co-religionists and could constitute persecution on religious and/or political grounds even when enforced against members of the same religion.

## C. Special considerations

### a) Gender

24. Particular attention should be paid to the impact of gender on religion-based refugee claims, as women and men may fear or suffer persecution for reasons of religion in different ways to each other. Clothing requirements, restrictions on movement, harmful traditional practices, or unequal or discriminatory treatment, including subjection to discriminatory laws and/or punishment, may all be relevant.[19] In some countries, young girls are pledged in the name of religion to perform traditional slave duties or to provide sexual services to the clergy or other men. They may also be forced into underage marriages, punished for honour crimes in the name of religion, or subjected to forced genital mutilation for religious reasons. Others are offered to deities and subsequently bought by individuals believing that they will be granted certain wishes. Women are still identified as "witches" in some communities and burned or stoned to death.[20] These practices may be culturally condoned in the claimant's community of origin but still amount to persecution. In addition, individuals may be persecuted because of their marriage or relationship to someone of a different religion than their own.

---

[18] This would be likely also to interfere with the undertaking of States to respect the liberty of parents or legal guardians to ensure the religious and moral education of their children in conformity with their own convictions under Article 18(4) of the International Covenant.

[19] For more information, see UNHCR, "Guidelines on International Protection: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees", HCR/GIP/02/01, 7 May 2002, especially paras. 25–26.

[20] For description of these practices, see "Integration of the Human Rights of Women and the Gender Perspective Violence against Women, Report of the Special Rapporteur on violence against women, its causes and consequences, Ms Radhika Coomaraswamy, submitted in accordance with Commission on Human Rights resolution 2001/49, Cultural practices in the family that are violent towards women", E/CN.4/2002/83, 31 January 2002, available at http://www.unhchr.ch/huridocda/huridoca.nsf/0/42E7191FAE543562C1256BA7004E963C/$File/G0210428.doc?OpenElement; "Droits Civils et Politiques et, Notamment: Intolérance Religieuse", Rapport soumis par M. Abdelfattah Amor, Rapporteur spécial, conformément àla résolution 2001/42 de la Commission des droits de l'homme, Additf: "Étude sur la liberté de religion ou de conviction et la condition de la femme au regard de la religion et des traditions", E/CN.4/2002/73/Add.2, 5 avril 2002, available (only in French) at http://www.unhchr.ch/huridocda/huridoca.nsf/e06a651e08d01e-c0ac1256609004e770b/9fa99a4d3f9eade5c1256b9e00510d71?Open Document&Highlight=2,E%2FCN.4%2F2002%2F73%2FAdd.2.

When, due to the claimant's gender, State actors are unwilling or unable to protect the claimant from such treatment, it should not be mistaken as a private conflict, but should be considered as valid grounds for refugee status.

**b) Conscientious objection**

25. A number of religions or sects within particular religions have abstention from military service as a central tenet and a significant number of religion-based claimants seek protection on the basis of refusal to serve in the military. In countries where military service is compulsory, failure to perform this duty is frequently punishable by law. Moreover, whether military service is compulsory or not, desertion is invariably a criminal offence.[21]

26. Where military service is compulsory, refugee status may be established if the refusal to serve is based on genuine political, religious, or moral convictions, or valid reasons of conscience.[22] Such claims raise the distinction between prosecution and persecution. Prosecution and punishment pursuant to a law of general application is not generally considered to constitute persecution,[23] although there are some notable exceptions. In conscientious objector cases, a law purporting to be of general application may, depending on the circumstances, nonetheless be persecutory where, for instance, it impacts differently on particular groups, where it is applied or enforced in a discriminatory manner, where the punishment itself is excessive or disproportionately severe, or where the military service cannot reasonably be expected to be performed by the individual because of his or her genuine beliefs or religious convictions. Where alternatives to military service, such as community service, are imposed there would not usually be a basis for a claim. Having said this, some forms of community service may be so excessively burdensome as to constitute a form of punishment, or the community service might require the carrying out of acts which clearly also defy the claimant's religious beliefs. In addition, the claimant may be able to establish a claim to refugee status where the refusal to serve in the military is not occasioned by any harsh penalties, but the individual has a well-founded fear of serious harassment, discrimination or violence by other individuals (for example, soldiers, local authorities, or neighbours) for his or her refusal to serve.

## III. PROCEDURAL ISSUES

**a) General**

27. The following are some general points of particular relevance to examining religion-based refuge claims:

a.    Religious practices, traditions or beliefs can be complex and may vary from one branch or sect of a religion to another or from one country or region to another. For this reason, there is a need for reliable, accurate, up-to-date, and country- or region- specific as well as branch- or sect-specific information.

b.    Refugee status determinations based on religion could also benefit from the assistance of independent experts with *particularised* knowledge of the country, region and context of the particular claim and/or the use of corroborating testimony from other adherents of the same faith.

c.    Decision-makers need to be objective and not arrive at conclusions based solely upon their own experiences, even where they may belong to the same religion as the claimant. General assumptions about a particular religion or its adherents should be avoided.

d.    In assessing religion-based claims, decision-makers need to appreciate the frequent interplay between religion and gender, race, ethnicity, cultural norms, identity, way of life and other factors.

---

[21] See generally, UNHCR, *Handbook*, above note 4, paras. 167–74.
[22] UNHCR, *Handbook*, above note 4, para. 170.
[23] UNHCR, *Handbook*, above note 4, para. 55–60.

IFR_AR_015936

e.   In the selection of interviewers and interpreters, there should be sensitivity regarding any cultural, religious or gender aspects that could hinder open communication.[24]

f.   Interviewers should also be aware of the potential for hostile biases toward the claimant by an interpreter, either because he or she shares the same religion or is not of the same religion, or of any potential fear of the same by the claimant, which could adversely affect his or her testimony. As with all refugee claims, it can be critical that interpreters are well-versed in the relevant terminology.

## b) Credibility

28. Credibility is a central issue in religion-based refugee claims. While decision-makers will often find it helpful during research and preparation to list certain issues to cover during an interview, extensive examination or testing of the tenets or knowledge of the claimant's religion may not always be necessary or useful. In any case, knowledge tests need to take account of individual circumstances, particularly since knowledge of a religion may vary considerably depending on the individual's social, economic or educational background and/or his or her age or sex.

29. Experience has shown that it is useful to resort to a narrative form of questioning, including through open-ended questions allowing the claimant to explain the personal significance of the religion to him or her, the practices he or she has engaged in (or has avoided engaging in out of a fear of persecution), or any other factors relevant to the reasons for his or her fear of being persecuted. Information may be elicited about the individual's religious experiences, such as asking him or her to describe in detail how he or she adopted the religion, the place and manner of worship, or the rituals engaged in, the significance of the religion to the person, or the values he or she believes the religion espouses. For example, the individual may not be able to list the Ten Commandments or name the Twelve Imams, but may be able to indicate an understanding of the religion's basic tenets more generally. Eliciting information regarding the individual's religious identity or way of life will often be more appropriate and useful and may even be necessary. It should also be noted that a claimant's detailed knowledge of his or her religion does not necessarily correlate with sincerity of belief.

30. As indicated in paragraph 9 above, individuals may be persecuted on the basis of their religion even though they have little or no substantive knowledge of its tenets or practices. A lack of knowledge may be explained by further research into the particular practices of that religion in the area in question or by an understanding of the subjective and personal aspects of the claimant's case. For instance, the level of repression against a religious group in a society may severely restrict the ability of an individual to study or practise his or her religion. Even when the individual is able to receive religious education in a repressive environment, it may not be from qualified leaders. Women, in particular, are often denied access to religious education. Individuals in geographically remote communities may espouse adherence to a particular religion and face persecution as a result, yet have little knowledge of its formal practices. Over time, communities may adapt particular religious practices or faith to serve their own needs, or combine them with their more traditional practices and beliefs, especially where the religion has been introduced into a community with long-established traditions. For example, the claimant may not be able to distinguish between those practices which are Christian and those which are animist.

31. Less formal knowledge may also be required of someone who obtained a particular religion by birth and who has not widely practised it. No knowledge is required where a particular religious belief or adherence is imputed or attributed to a claimant.

32. Greater knowledge may be expected, however, of individuals asserting they are religious leaders or who have undergone substantial religious instruction. It is not necessary for such teaching or training to conform fully to objectively tested standards, as these may vary from region to region and country to country, but some clarification of their role and the significance of certain practices or rites to the religion would be relevant. Even claimants with a high level of education or schooling in their religion may not have knowledge of teachings and practices of a more complex, formal or obscure nature.

IFR_AR_015937

---

[24] See also, UNHCR, "Guidelines on Gender-Related Persecution", above note 19.

33. Subsequent and additional interviews may be required where certain statements or claims made by the claimant are incompatible with earlier statements or with general understandings of the religious practices of other members of that religion in the area or region in question. Claimants must be given an opportunity to explain any inconsistencies or discrepancies in their story.

### c) Conversion post departure

34. Where individuals convert after their departure from the country of origin, this may have the effect of creating a *sur place* claim.[25] In such situations, particular credibility concerns tend to arise and a rigorous and in depth examination of the circumstances and genuineness of the conversion will be necessary. Issues which the decision-maker will need to assess include the nature of and connection between any religious convictions held in the country of origin and those now held, any disaffection with the religion held in the country of origin, for instance, because of its position on gender issues or sexual orientation, how the claimant came to know about the new religion in the country of asylum, his or her experience of this religion, his or her mental state and the existence of corroborating evidence regarding involvement in and membership of the new religion.

35. Both the specific circumstances in the country of asylum and the individual case may justify additional probing into particular claims. Where, for example, systematic and organised conversions are carried out by local religious groups in the country of asylum for the purposes of accessing resettlement options, and/or where "coaching" or "mentoring" of claimants is commonplace, testing of knowledge is of limited value. Rather, the interviewer needs to ask open questions and try to elicit the motivations for conversion and what effect the conversion has had on the claimant's life. The test remains, however, whether he or she would have a well-founded fear of persecution on a Convention ground if returned. Regard should therefore be had as to whether the conversion may come to the notice of the authorities of the person's country of origin and how this is likely to be viewed by those authorities.[26] Detailed country of origin information is required to determine whether a fear of persecution is objectively well-founded.

36. So-called "self-serving" activities do not create a well-founded fear of persecution on a Convention ground in the claimant's country of origin, if the opportunistic nature of such activities will be apparent to all, including the authorities there, and serious adverse consequences would not result if the person were returned. Under all circumstances, however, consideration must be given as to the consequences of return to the country of origin and any potential harm that might justify refugee status or a complementary form of protection. In the event that the claim is found to be self-serving but the claimant nonetheless has a well-founded fear of persecution on return, international protection is required. Where the opportunistic nature of the action is clearly apparent, however, this could weigh heavily in the balance when considering potential durable solutions that may be available in such cases, as well as, for example, the type of residency status.

---

[25] Such a claim may also arise if a claimant marries someone of another religion in the country of asylum or dedicates his or her children to that other religion there and the country of origin would use this as the basis for persecution.
[26] See UNHCR, *Handbook*, above note 4, para. 96.

IFR_AR_015938

IFR_AR_015939



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/06/07 | 7 April 2006 | Original: ENGLISH |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 7:

**The application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees to victims of trafficking and persons at risk of being trafficked**

UNHCR issues these Guidelines pursuant to its mandate, as contained in the 1950 *Statute of the Office of the United Nations High Commissioner for Refugees* in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They should additionally be read in conjunction with UNHCR's Guidelines on International Protection on gender-related persecution within the context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees (HCR/GIP/02/01) and on "membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees (HCR/ GIP/02/02), both of 7 May 2002.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as for UNHCR staff carrying out refugee status determination in the field.

**7**

IFR_AR_015940

## I. INTRODUCTION

1. Trafficking in persons, the primary objective of which is to gain profit through the exploitation of human beings, is prohibited by international law and criminalized in the national legislation of a growing number of States. Although the range of acts falling within the definition of trafficking varies among national jurisdictions, States have a responsibility to combat trafficking and to protect and assist victims of trafficking.

2. The issue of trafficking has attracted substantial attention in recent years, but it is not a modern phenomenon. Numerous legal instruments dating from the late nineteenth century onwards have sought to address various forms and manifestations of trafficking.[1] These instruments remain in force and are relevant to the contemporary understanding of trafficking and how best to combat it. The 2000 Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children (hereinafter the "Trafficking Protocol")[2] supplementing the 2000 United Nations Convention against Transnational Organized Crime (hereinafter the "Convention against Transnational Crime")[3] provides an international definition of trafficking. This represents a crucial step forward in efforts to combat trafficking and ensure full respect for the rights of individuals affected by trafficking.

3. Trafficking in the context of the sex trade is well documented and primarily affects women and children who are forced into prostitution and other forms of sexual exploitation.[4] Trafficking is not, however, limited to the sex trade or to women. It also includes, at a minimum, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs.[5] Depending on the circumstances, trafficking may constitute a crime against humanity and, in armed conflict, a war crime.[6] A common characteristic of all forms of trafficking is that victims are treated as merchandise, "owned" by their traffickers, with scant regard for their human rights and dignity.

4. In some respects, trafficking in persons resembles the smuggling of migrants, which is the subject of another Protocol to the Convention against Transnational Crime.[7] As with trafficking, the smuggling of migrants often takes place in dangerous and/or degrading conditions involving human rights abuses. It is nevertheless essentially a voluntary act entailing the payment of a fee to the smuggler to provide a specific service. The relationship between the migrant and the smuggler normally ends either with the arrival at the migrant's destination or with the individual being abandoned en route. Victims of trafficking are distinguished from migrants who have been smuggled by the protracted nature of the exploitation they endure, which includes serious and ongoing abuses of their human rights at the hands of their traffickers. Smuggling rings and trafficking rings are nevertheless often closely related, with both preying on the vulnerabilities of people seeking international protection or access to labour markets abroad. Irregular migrants relying on the services of smugglers whom they have willingly contracted may also end up as victims of trafficking, if the services they originally sought metamorphose into abusive and exploitative trafficking scenarios.

5. UNHCR's involvement with the issue of trafficking is essentially twofold. Firstly, the Office has a responsibility to ensure that refugees, asylum-seekers, internally displaced persons (IDPs), stateless persons and other persons of concern do not fall victim to trafficking. Secondly, the Office has a responsibility to ensure that individuals who have been trafficked and who fear being subjected to persecution upon a return to their country of origin, or individuals who fear being trafficked, whose claim to international protection falls within the refugee definition contained in the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees (hereinafter "the 1951 Convention") are recognized as refugees and afforded the corresponding international protection.

---

[1] It has been estimated that between 1815 and 1957 some 300 international agreements were adopted to suppress slavery in its various forms, including for example the 1910 International Convention for the Suppression of the White Slave Traffic, the 1915 Declaration Relative to the Universal Abolition of the Slave Trade, the 1926 Slavery Convention, the 1949 Convention for the Suppression of the Traffick in Persons and of the Exploitation of the Prostitution of Others and the 1956 Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery.

[2] Entered into force on 25 December 2003.

[3] Entered into force on 29 September 2003.

[4] Bearing in mind the prevalence of women and girls amongst the victims of trafficking, gender is a relevant factor in evaluating their claims for refugee status. See further, UNHCR, "Guidelines on International Protection: Gender-related persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees" (hereinafter "UNHCR Guidelines on Gender-Related Persecution"), HCR/GIP/02/01, 7 May 2002, para. 2.

[5] See Article 3(a) of the Trafficking Protocol cited in para. 8 below.

[6] See, for instance, Articles 7(1)(c), 7(1)(g), 7(2)(c) and 8(2)(xxii) of the 1998 Statute of the International Criminal Court A/CONF.183/9 which specifically refer to "enslavement", "sexual slavery" and "enforced prostitution" as crimes against humanity and war crimes.

[7] The 2000 Protocol against the Smuggling of Migrants by Land, Sea and Air (entered into force on 28 January 2004).

ER_AR_015941

6. Not all victims or potential victims of trafficking fall within the scope of the refugee definition. To be recognized as a refugee, all elements of the refugee definition have to be satisfied. These Guidelines are intended to provide guidance on the application of Article 1A(2) of the 1951 Convention to victims or potential victims of trafficking. They also cover issues concerning victims of trafficking arising in the context of the 1954 Convention Relating to the Status of Stateless Persons and the 1961 Convention on the Reduction of Statelessness. The protection of victims or potential victims of trafficking as set out in these Guidelines is additional to and distinct from the protection contemplated by Part II of the Trafficking Protocol.[8]

## II. SUBSTANTIVE ANALYSIS

### a) Definitional issues

7. The primary function of the Convention against Transnational Crime and its supplementary Protocols against Trafficking and Smuggling is crime control. They seek to define criminal activities and guide States as to how best to combat them. In doing so, they nevertheless provide helpful guidance on some aspects of victim protection and therefore constitute a useful starting point for any analysis of international protection needs arising as a result of trafficking.

8. Article 3 of the Trafficking Protocol reads:

> For the purposes of this Protocol:
>
> (a) 'Trafficking in persons' shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability, or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs;
>
> (b) The consent of a victim of trafficking in persons to the intended exploitation set forth in subparagraph (a) of this article shall be irrelevant where any of the means set forth in subparagraph (a) have been used;
>
> (c) The recruitment, transportation, transfer, harbouring or receipt of a child for the purpose of exploitation shall be considered 'trafficking in persons' even if this does not involve any of the means set forth in subparagraph (a) of this article;
>
> (d) 'Child' shall mean any person under eighteen years of age.

9. The Trafficking Protocol thus defines trafficking by three essential and interlinked sets of elements:

The act: recruitment, transportation, transfer, harbouring or receipt of persons;

The means: by threat or use of force or other forms of coercion, abduction, fraud, deception, abuse of power, abuse of a position of vulnerability, or of giving or receiving of payments or benefits to achieve the consent of a person having control over the victim;

The purpose: exploitation of the victim, including, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs.[9]

---

[8] Part II of the Trafficking Protocol concerns the protection of victims of trafficking. It covers areas such as ensuring the protection of privacy and identity of the victims; providing victims with information on relevant court and administrative proceedings, as well as assistance to enable them to present their views and concerns at appropriate stages of criminal proceedings against offenders; providing victims with support for physical, psychological and social recovery; permitting victims to remain in the territory temporarily or permanently; repatriating victims with due regard for their safety; and other measures.

[9] For the purposes of these Guidelines, the Trafficking Protocol definition is used as it represents the current international consensus on the meaning of trafficking. In order to understand the legal meaning of terms used within the Protocol definition fully, it is nevertheless necessary to refer further to other legal instruments, for example, a number of International Labour Organization Conventions, including the 1930 Convention No. 29 on Forced or Compulsory Labour, the 1957 Convention No. 105 on the Abolition of Forced Labour, the 1975 Convention No. 143 on Migrant Workers (Supplementary Provisions) and the 1999 Convention No. 182 on the Worst Forms of Child Labour. These are referred to in the first report of the Special Rapporteur on trafficking in persons, especially women and children, Ms Sigma Huda, E/CN.4/2005/71, 22 December 2004, para. 22. Her second report, entitled "Integration of the Human Rights of Women and a Gender Perspective", E/CN.4/2006/62, 20 February 2006, goes into this issue in further detail in paras. 31-49. The Special Rapporteur was appointed in 2004 pursuant to a new mandate created by the 60th Session of the Commission on Human Rights (Resolution 2004/110).

10. An important aspect of this definition is an understanding of trafficking as a process comprising a number of interrelated actions rather than a single act at a given point in time. Once initial control is secured, victims are generally moved to a place where there is a market for their services, often where they lack language skills and other basic knowledge that would enable them to seek help. While these actions can all take place within one country's borders,[10] they can also take place across borders with the recruitment taking place in one country and the act of receiving the victim and the exploitation taking place in another. Whether or not an international border is crossed, the intention to exploit the individual concerned underpins the entire process.

11. Article 3 of the Trafficking Protocol states that where any of the means set forth in the definition are used, the consent of the victim to the intended exploitation is irrelevant.[11] Where the victim is a child,[12] the question of consent is all the more irrelevant as any recruitment, transportation, transfer, harbouring or receipt of children for the purpose of exploitation is a form of trafficking regardless of the means used.

12. Some victims or potential victims of trafficking may fall within the definition of a refugee contained in Article 1A(2) of the 1951 Convention and may therefore be entitled to international refugee protection. Such a possibility is not least implicit in the saving clause contained in Article 14 of the Trafficking Protocol, which states:

> 1. Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including international humanitarian law and international human rights law and, in particular, where applicable, the 1951 Convention and the 1967 Protocol relating to the Status of Refugees and the principle of *non-refoulement* as contained therein.[13]
>
> 2. The measures set forth in this Protocol shall be interpreted and applied in a way that is not discriminatory to persons on the ground that they are victims of trafficking in persons. The interpretation and application of those measures shall be consistent with internationally recognized principles of non-discrimination.

13. A claim for international protection presented by a victim or potential victim of trafficking can arise in a number of distinct sets of circumstances. The victim may have been trafficked abroad, may have escaped her or his traffickers and may seek the protection of the State where she or he now is. The victim may have been trafficked within national territory, may have escaped from her or his traffickers and have fled abroad in search of international protection. The individual concerned may not have been trafficked but may fear becoming a victim of trafficking and may have fled abroad in search of international protection. In all these instances, the individual concerned must be found to have a "well- founded fear of persecution" linked to one or more of the Convention grounds in order to be recognized as a refugee.

## b) Well-founded fear of persecution

14. What amounts to a well-founded fear of persecution will depend on the particular circumstances of each individual case.[14] Persecution can be considered to involve serious human rights violations, including a threat to life or freedom, as well as other kinds of serious harm or intolerable predicament, as assessed in the light of the opinions, feelings and psychological make-up of the asylum applicant.

---

[10] The Council of Europe Convention on Action against Trafficking in Human Beings, opened for signature in May 2005, addresses the question of trafficking within national borders directly.

[11] Article 3(b) of the Trafficking Protocol. See also, the second report of the Special Rapporteur on trafficking in persons, cited above in footnote 9, paras. 37–43 on the "irrelevance of consent".

[12] Article 3(c) of the Trafficking Protocol follows the 1989 Convention on the Rights of the Child in defining a child as "any person under eighteen years of age".

[13] The Agenda for Protection, A/AC.96/965/Add.1, 2002, Goal 2, Objective 2, calls upon States to ensure that their asylum systems are open to receiving claims from individual victims of trafficking. This interpretation of the Article 14 saving clause as imposing an obligation on States to consider the international protection needs of victims of trafficking is strengthened by paragraph 377 of the Explanatory Report accompanying the Council of Europe Convention. This states in relation to Article 40 of that Convention:

The fact of being a victim of trafficking in human beings cannot preclude the right to seek and enjoy asylum and Parties shall ensure that victims of trafficking have appropriate access to fair and efficient asylum procedures. Parties shall also take whatever steps are necessary to ensure full respect for the principle of *non-refoulement*.

Additionally, the Office of the High Commissioner for Human Rights (OHCHR) "Recommended Principles and Guidelines on Human Rights and Human Trafficking" presented to the Economic and Social Council as an addendum to the report of the United Nations High Commissioner for Human Rights, E/2002/68/Add. 1, 20 May 2002, available at http:www.ohchr.org/english/about/ publications/docs/trafficking.doc, address in Guideline 2.7 the importance of ensuring that procedures and processes are in place for the consideration of asylum claims from trafficked persons (as well as other smuggled asylum-seekers) and that the principle of *non-refoulement* is respected and upheld at all times.

[14] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, re-edited 1992, para. 51 (hereinafter the "UNHCR, *Handbook*").

IFR_AR_015943

15. In this regard, the evolution of international law in criminalizing trafficking can help decision-makers determine the persecutory nature of the various acts associated with trafficking. Asylum claims lodged by victims of trafficking or potential victims of trafficking should thus be examined in detail to establish whether the harm feared as a result of the trafficking experience, or as a result of its anticipation, amounts to persecution in the individual case. Inherent in the trafficking experience are such forms of severe exploitation as abduction, incarceration, rape, sexual enslavement, enforced prostitution, forced labour, removal of organs, physical beatings, starvation, the deprivation of medical treatment. Such acts constitute serious violations of human rights which will generally amount to persecution.

16. In cases where the trafficking experience of the asylum applicant is determined to be a one-off past experience, which is not likely to be repeated, it may still be appropriate to recognize the individual concerned as a refugee if there are compelling reasons arising out of previous persecution, provided the other interrelated elements of the refugee definition are fulfilled. This would include situations where the persecution suffered during the trafficking experience, even if past, was particularly atrocious and the individual is experiencing ongoing traumatic psychological effects which would render return to the country of origin intolerable. In other words, the impact on the individual of the previous persecution continues. The nature of the harm previously suffered will also impact on the opinions, feelings and psychological make-up of the asylum applicant and thus influence the assessment of whether any future harm or predicament feared would amount to persecution in the particular case.

17. Apart from the persecution experienced by individuals in the course of being trafficked, they may face reprisals and/or possible re-trafficking should they be returned to the territory from which they have fled or from which they have been trafficked.[15] For example, the victim's cooperation with the authorities in the country of asylum or the country of origin in investigations may give rise to a risk of harm from the traffickers upon return, particularly if the trafficking has been perpetrated by international trafficking networks. Reprisals at the hands of traffickers could amount to persecution depending on whether the acts feared involve serious human rights violations or other serious harm or intolerable predicament and on an evaluation of their impact on the individual concerned. Reprisals by traffickers could also be inflicted on the victim's family members, which could render a fear of persecution on the part of the victim well-founded, even if she or he has not been subjected directly to such reprisals. In view of the serious human rights violations often involved, as described in paragraph 15 above, re-trafficking would usually amount to persecution.

18. In addition, the victim may also fear ostracism, discrimination or punishment by the family and/or the local community or, in some instances, by the authorities upon return. Such treatment is particularly relevant in the case of those trafficked into prostitution. In the individual case, severe ostracism, discrimination or punishment may rise to the level of persecution, in particular if aggravated by the trauma suffered during, and as a result of, the trafficking process. Where the individual fears such treatment, her or his fear of persecution is distinct from, but no less valid than, the fear of persecution resulting from the continued exposure to the violence involved in trafficking scenarios. Even if the ostracism from, or punishment by, family or community members does not rise to the level of persecution, such rejection by, and isolation from, social support networks may in fact heighten the risk of being re-trafficked or of being exposed to retaliation, which could then give rise to a well-founded fear of persecution.

## c) Women and children victims of trafficking

19. The forcible or deceptive recruitment of women and children for the purposes of forced prostitution or sexual exploitation is a form of gender-related violence, which may constitute persecu-

---

[15] See, "Report of the Working Group on Contemporary Forms of Slavery on its twenty-ninth session", E/CN.4/Sub.2/2004/36, 20 July 2004, Section VII Recommendations adopted at the twenty-ninth session, p. 16, para. 29. This "[c]alls upon all States to ensure that the protection and support of the victims are at the centre of any anti-trafficking policy, and specifically to ensure that: (a) No victim of trafficking is removed from the host country if there is a reasonable likelihood that she will be re-trafficked or subjected to other forms of serious harm, irrespective of whether she decides to cooperate in a prosecution".

tion.[16] Trafficked women and children can be particularly susceptible to serious reprisals by traffickers after their escape and/or upon return, as well as to a real possibility of being re-trafficked or of being subjected to severe family or community ostracism and/or severe discrimination.

20. In certain settings, unaccompanied or separated children,[17] are especially vulnerable to trafficking.[18] Such children may be trafficked for the purposes of irregular adoption. This can occur with or without the knowledge and assent of the child's parents. Traffickers may also choose to target orphans. In assessing the international protection needs of children who have been trafficked, it is essential that the best interest principle be scrupulously applied.[19] All cases involving trafficked children require a careful examination of the possible involvement of family members or caregivers in the actions that set the trafficking in motion.

### d) Agents of persecution

21. There is scope within the refugee definition to recognize both State and non-State agents of persecution. While persecution is often perpetrated by the authorities of a country, it can also be perpetrated by individuals if the persecutory acts are "knowingly tolerated by the authorities or if the authorities refuse, or prove unable to offer effective protection".[20] In most situations involving victims or potential victims of trafficking, the persecutory acts emanate from individuals, that is, traffickers or criminal enterprises or, in some situations, family or community members. Under these circumstances, it is also necessary to examine whether the authorities of the country of origin are able and willing to protect the victim or potential victim upon return.

22. Whether the authorities in the country of origin are able to protect victims or potential victims of trafficking will depend on whether legislative and administrative mechanisms have been put in place to prevent and combat trafficking, as well as to protect and assist the victims and on whether these mechanisms are effectively implemented in practice.[21] Part II of the Trafficking Protocol requires States to take certain steps with regard to the protection of victims of trafficking, which can be of guidance when assessing the adequacy of protection and assistance provided. Measures relate not only to protecting the privacy and identity of victims of trafficking, but also to their physical, psychological and social recovery.[22] Article 8 of the Trafficking Protocol also requires State Parties, which are facilitating the return of their nationals or permanent residents who have been trafficked, to give due regard to the safety of the individuals concerned when accepting them back. The protection measures set out in Part II of the Trafficking Protocol are not exhaustive and should be read in light of other relevant binding and non-binding human rights instruments and guidelines.[23]

23. Many States have not adopted or implemented sufficiently stringent measures to criminalize and prevent trafficking or to meet the needs of victims. Where a State fails to take such reasonable steps

---

[16] See UNHCR Guidelines on Gender-Related Persecution, above footnote 4, para. 18. The Commission on Human Rights also recognized that such violence may constitute persecution for the purposes of the refugee definition, when it urged States "to mainstream a gender perspective into all policies and programmes, including national immigration and asylum policies, regulations and practice, as appropriate, in order to promote and protect the rights of all women and girls, including the consideration of steps to recognize gender-related persecution and violence when assessing grounds for granting refugee status and asylum". See Resolution 2005/41, Elimination of violence against women, 57th meeting, 19 April 2005, operational para. 22.

[17] As indicated in the *Inter-agency Guiding Principles on Unaccompanied and Separated Children*, 2004, "separated children are those separated from both parents, or from their previous legal or customary primary care-giver, but not necessarily from other relatives", while unaccompanied children are "children who have been separated from both parents and other relatives and are not being cared for by an adult who, by law or custom, is responsible for doing so".

[18] There are a number of international instruments which offer specific guidance with respect to the needs and rights of children. These should be given due consideration in assessing the claims of child victims. See, for example, the 1989 Convention on the Rights of the Child, the 2000 Optional Protocol to that Convention, on the sale of children, child prostitution and child pornography, the 1980 Hague Convention No. 28 on the Civil Aspects of International Child Abduction, the 2000 Trafficking Protocol and the 1999 ILO Convention No. 182 on the Prohibition of the Worst Forms of Child Labour. See also, generally, Committee on the Rights of the Child, "General Comment No. 6 (2005) Treatment of Unaccompanied and Separated Children Outside their Country of Origin", CRC/CG/2005/6, 1 Sept. 2005.

[19] See, *UNHCR Guidelines on Formal Determination of the Best Interests of the Child*, provisional release April 2006; UN Children's Fund (UNICEF), "Guidelines for Protection of the Rights of Child Victims of Trafficking", May 2003 and in the process of being updated.

[20] See, UNHCR, *Handbook*, above footnote 14, para. 65; UNHCR, "Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees" (hereinafter "Interpreting Article 1"), April 2001, para. 19; UNHCR Guidelines on Gender-related Persecution, above footnote 4, para. 19.

[21] See Part II of the Trafficking Protocol outlined in footnote 8 above.

[22] *Ibid.*

[23] See, United Nations High Commissioner for Human Rights, "Recommended Principles and Guidelines on Human Rights and Human Trafficking", above footnote 13, which states in Principle No. 2: "States have a responsibility under international law to act with due diligence to prevent trafficking, to investigate and prosecute traffickers and to assist and protect trafficked persons". Numerous instruments of a binding and a non-binding nature highlight the obligation of States to uphold the human rights of victims of trafficking. See, for example, the Council of Europe Convention cited above, footnote 10, the 2002 South Asian Association for Regional Cooperation (SAARC) Convention on Preventing and Combating Trafficking in Women and Children for Prostitution and the 2003 Organization for Security and Cooperation in Europe (OSCE) Action Plan to Combat Trafficking in Human Beings.

as are within its competence to prevent trafficking and provide effective protection and assistance to victims, the fear of persecution of the individual is likely to be well-founded. The mere existence of a law prohibiting trafficking in persons will not of itself be sufficient to exclude the possibility of persecution. If the law exists but is not effectively implemented, or if administrative mechanisms are in place to provide protection and assistance to victims, but the individual concerned is unable to gain access to such mechanisms, the State may be deemed unable to extend protection to the victim, or potential victim, of trafficking.

24. There may also be situations where trafficking activities are *de facto* tolerated or condoned by the authorities or even actively facilitated by corrupt State officials. In these circumstances, the agent of persecution may well be the State itself, which becomes responsible, whether directly or as a result of inaction, for a failure to protect those within its jurisdiction. Whether this is so will depend on the role played by the officials concerned and on whether they are acting in their personal capacity outside the framework of governmental authority or on the basis of the position of authority they occupy within governmental structures supporting or condoning trafficking. In the latter case, the persecutory acts may be deemed to emanate from the State itself.

### e) Place of persecution

25. In order to come within the scope of Article 1A(2) of the 1951 Convention, the applicant must be outside her or his country of origin and, owing to a well-founded fear of persecution, be unable or unwilling to avail her- or himself of the protection of that country. The requirement of being outside one's country does not, however, mean that the individual must have left on account of a well-founded fear of persecution.[24] Where this fear arises after she or he has left the country of origin, she or he would be a refugee *sur place*, providing the other elements in the refugee definition were fulfilled. Thus, while victims of trafficking may not have left their country owing to a well-founded fear of persecution, such a fear may arise after leaving their country of origin. In such cases, it is on this basis that the claim to refugee status should be assessed.

26. Whether the fear of persecution arises before leaving the country of origin or after, the location where the persecution takes place is a crucial aspect in correctly assessing asylum claims made by individuals who have been trafficked. The 1951 Convention requires that the refugee demonstrate a well-founded fear of persecution with regard to her or his country of nationality or habitual residence. Where someone has been trafficked within her or his own country, or fears being trafficked, and escapes to another in search of international protection, the link between the fear of persecution, the motivation for flight and the unwillingness to return is evident and any international protection needs fall to be determined in terms of the threat posed to the individual should she or he be obliged to return to the country of nationality or habitual residence. If no such well-founded fear is established in relation to the country of origin, then it would be appropriate for the State from which asylum has been requested to reject the claim to refugee status.

27. The circumstances in the applicant's country of origin or habitual residence are the main point of reference against which to determine the existence of a well-founded fear of persecution. Nevertheless, even where the exploitation experienced by a victim of trafficking occurs mainly outside the country of origin, this does not preclude the existence of a well-founded fear of persecution in the individual's own country. The trafficking of individuals across international borders gives rise to a complex situation which requires a broad analysis taking into account the various forms of harm that have occurred at different points along the trafficking route. The continuous and interconnected nature of the range of persecutory acts involved in the context of transnational trafficking should be given due consideration. Furthermore, trafficking involves a chain of actors, starting with those responsible for recruitment in the country of origin, through to those who organize and facilitate the transport, transfer and/or sale of victims, through to the final "purchaser". Each of these actors has a vested interest in the trafficking enterprise and could pose a real threat to the victim. Depending on the sophistication of the trafficking rings involved, applicants may thus have experienced and continue to fear harm in a number of locations, including in countries through

IFR_AR_015946

---

[24] See UNHCR, *Handbook*, above footnote 14, para. 94.

which they have transited, the State in which the asylum application is submitted and the country of origin. In such circumstances, the existence of a well-founded fear of persecution is to be evaluated in relation to the country of origin of the applicant.

28. A victim of trafficking who has been determined to be a refugee may additionally fear reprisals, punishment or re-trafficking in the country of asylum. If a refugee is at risk in her or his country of refuge or has particular needs, which cannot be met in the country of asylum, she or he may need to be considered for resettlement to a third country.[25]

### f) The causal link ("for reasons of")

29. To qualify for refugee status, an individual's well-founded fear of persecution must be related to one or more of the Convention grounds, that is, it must be "for reasons of" race, religion, nationality, membership of a particular social group or political opinion. It is sufficient that the Convention ground be a relevant factor contributing to the persecution; it is not necessary that it be the sole, or even dominant, cause. In many jurisdictions, the causal link ("for reasons of") must be explicitly established, while in other States, causation is not treated as a separate question for analysis but is subsumed within the holistic analysis of the refugee definition.[26] In relation to asylum claims involving trafficking, the difficult issue for a decision-maker is likely to be linking the well-founded fear of persecution to a Convention ground. Where the persecutor attributes or imputes a Convention ground to the applicant, this is sufficient to satisfy the causal link.[27]

30. In cases where there is a risk of being persecuted at the hands of a non-State actor for reasons related to one of the Convention grounds, the causal link is established, whether or not the absence of State protection is Convention-related. Alternatively, where a risk of persecution at the hands of a non-State actor is unrelated to a Convention ground, but the inability or unwillingness of the State to offer protection is for reasons of a Convention ground, the causal link is also established.

31. Trafficking in persons is a commercial enterprise, the prime motivation of which is likely to be profit rather than persecution on a Convention ground. In other words, victims are likely to be targeted above all because of their perceived or potential commercial value to the traffickers. This overriding economic motive does not, however, exclude the possibility of Convention-related grounds in the targeting and selection of victims of trafficking. Scenarios in which trafficking can flourish frequently coincide with situations where potential victims may be vulnerable to trafficking precisely as a result of characteristics contained in the 1951 Convention refugee definition. For instance, States where there has been significant social upheaval and/or economic transition or which have been involved in armed conflict resulting in a breakdown in law and order are prone to increased poverty, deprivation and dislocation of the civilian population. Opportunities arise for organized crime to exploit the inability, or lack of will, of law enforcement agencies to maintain law and order, in particular the failure to ensure adequate security for specific or vulnerable groups.

32. Members of a certain race or ethnic group in a given country may be especially vulnerable to trafficking and/or less effectively protected by the authorities of the country of origin. Victims may be targeted on the basis of their ethnicity, nationality, religious or political views in a context where individuals with specific profiles are already more vulnerable to exploitation and abuse of varying forms. Individuals may also be targeted by reason of their belonging to a particular social group. As an example, among children or women generally in a particular society some subsets of children or women may be especially vulnerable to being trafficked and may constitute a social group within the terms of the refugee definition. Thus, even if an individual is not trafficked solely and exclusively for a Convention reason, one or more of these Convention grounds may have been relevant for the trafficker's selection of the particular victim.

---

[25] UNHCR, *Resettlement Handbook*, November 2004 edition, chapter 4.1.
[26] See UNHCR Guidelines on Gender-related Persecution, above footnote 4, para. 20.
[27] See UNHCR "Interpreting Article 1", above footnote 20, para. 25.

IFR_AR_015947

### g) Convention grounds

33. The causal link may be established to any one single Convention ground or to a combination of these grounds. Although a successful claim to refugee status only needs to establish a causal link to one ground, a full analysis of trafficking cases may frequently reveal a number of inter-linked, cumulative grounds.

#### Race

34. For the purposes of the refugee definition, race has been defined as including "all kinds of ethnic groups that are referred to as 'races' in common usage".[28] In situations of armed conflict where there is a deliberate policy of exploitation or victimization of certain racial or ethnic groups, persecution may manifest itself by the trafficking of members of that group. This kind of targeting of victims may occur in conjunction with an economic motivation which above all seeks to obtain financial gain. In the absence of armed conflict, members of one racial group may still be particularly targeted for trafficking for varied ends, if the State is unable or unwilling to protect members of that group. Where trafficking serves the sex trade, women and girls may also be especially targeted as a result of market demands for a particular race (or nationality). As the Special Rapporteur on trafficking has noted, such demand "is often further grounded in social power disparities of race, nationality, caste and colour".[29]

#### Religion

35. Individuals may similarly be targeted by traffickers because they belong to a particular religious community, that is, they may be targeted because their faith or belief identifies them as a member of a vulnerable group in the particular circumstances, if, for instance, the authorities are known not to provide adequate protection to certain religious groups. Again the profit motive may be an overriding factor, but this does not obviate the relevance of religion as a factor in the profiling and selection of victims. Alternatively, trafficking may be the method chosen to persecute members of a particular faith.[30]

#### Nationality

36. Nationality has a wider meaning than citizenship. It can equally refer to membership of an ethnic or linguistic group and may overlap with the term "race".[31] Trafficking may be the method chosen to persecute members of a particular national group in a context where there is inter-ethnic conflict within a State and certain groups enjoy lesser guarantees of protection. Again, even where the primary motive of the trafficker is financial gain, someone's nationality may result in them being more vulnerable to trafficking.

#### Membership of a particular social group[32]

37. Victims and potential victims of trafficking may qualify as refugees where it can be demonstrated that they fear being persecuted for reasons of their membership of a particular social group. In establishing this ground it is not necessary that the members of a particular group know each other or associate with each other as a group. It is, however, necessary[33] that they either share a common characteristic other than their risk of being persecuted or are perceived as a group by society. The shared characteristic will often be one that is innate, unchangeable or otherwise fundamental to identity, conscience or the exercise of one's human rights.[34] Persecutory action against a group may be relevant in heightening the visibility of the group without being its defining characteristic.[35] As with the other Convention grounds, the size of the purported social group is not a relevant

---

[28] UNHCR, *Handbook*, para. 68.

[29] See, Report of the Special Rapporteur, "Integration of the Human Rights of Women and a Gender Perspective", above footnote 9, paras. 48 and 66.

[30] See generally, UNHCR, "Guidelines on International Protection: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees", HCR/GIP/04/06, 28 April 2004

[31] UNHCR, *Handbook*, para. 74.

[32] See generally, UNHCR, "Guidelines on International Protection: Membership of a Particular Social Group within the context of Article 1A(2) of the 1951 Convention and 1967 Protocol relating to the Status of Refugees", HCR/GIP/02/02, 7 May 2002.

[33] *Ibid.*, para. 15.

[34] *Ibid.*, para. 11.

[35] *Ibid.*, para. 14.

IFR_AR_015948

criterion in determining whether a social group exists within the meaning of Article 1A(2).[36] While a claimant must still demonstrate a well-founded fear of being persecuted based on her or his membership of the particular social group, she or he need not demonstrate that all members of the group are at risk of persecution in order to establish the existence of the group.[37]

38. Women are an example of a social subset of individuals who are defined by innate and immutable characteristics and are frequently treated differently to men. As such, they may constitute a particular social group.[38] Factors which may distinguish women as targets for traffickers are generally connected to their vulnerability in certain social settings; therefore certain social subsets of women may also constitute particular social groups. Men or children or certain social subsets of these groups may also be considered as particular social groups. Examples of social subsets of women or children could, depending on the context, be single women, widows, divorced women, illiterate women, separated or unaccompanied children, orphans or street children. The fact of belonging to such a particular social group may be one of the factors contributing to an individual's fear of being subjected to persecution, for example, to sexual exploitation, as a result of being, or fearing being, trafficked.

39. Former victims of trafficking may also be considered as constituting a social group based on the unchangeable, common and historic characteristic of having been trafficked. A society may also, depending on the context, view persons who have been trafficked as a cognizable group within that society. Particular social groups can nevertheless not be defined exclusively by the persecution that members of the group suffer or by a common fear of persecution.[39] It should therefore be noted that it is the past trafficking experience that would constitute one of the elements defining the group in such cases, rather than the future persecution now feared in the form of ostracism, punishment, reprisals or re-trafficking. In such situations, the group would therefore not be defined solely by its fear of future persecution.

**Political opinion**

40. Individuals may be targeted for trafficking because they hold a certain political opinion or are perceived as doing so. Similar considerations apply for the other Convention grounds, that is, individuals may, depending on the circumstances, be targeted because of their actual or perceived political views which make them vulnerable and less likely to enjoy the effective protection of the State.

## III. STATELESSNESS AND TRAFFICKING

41. The 1954 Convention relating to the Status of Stateless Persons and the 1961 Convention on the Reduction of Statelessness establish a legal framework setting out the rights of stateless persons, the obligations of States Parties to avoid actions that would result in statelessness and the steps to be taken to remedy situations of statelessness. The 1954 Convention applies to anyone who is "not considered as a national by any State under the operation of its law",[40] that is, it applies for the benefit of those who are denied citizenship under the laws of any State. The 1961 Convention generally requires States to avoid actions that would result in statelessness and explicitly forbids the deprivation of nationality if this would result in statelessness.[41] This constitutes a prohibition on actions that would cause statelessness, as well as an obligation to avoid situations where statelessness may arise by default or neglect. The only exception to this prohibition is when the nationality was acquired fraudulently.[42]

42. When seeking to assess and address the situation of someone who has been trafficked, it is important to recognize potential implications as regards statelessness. The mere fact of being a

---

[36] *Ibid.*, para. 18.
[37] *Ibid.*, para. 17.
[38] *Ibid.*, para. 12. See also UNHCR Guidelines on Gender-related Persecution, above footnote 4, para. 30.
[39] See UNHCR Guidelines on Membership of a Particular Social Group, above footnote 32, para. 14.
[40] See Article 1(1) of the 1954 Convention.
[41] See Article 8(1) of the 1961 Convention.
[42] In addition to the 1954 and 1961 Statelessness Conventions, other international or regional instruments set out similar principles. See, for instance, the 1965 Convention on the Elimination of All Forms of Racial Discrimination, the 1966 International Covenant on Civil and Political Rights, the 1979 Convention on the Elimination of All Forms of Discrimination Against Women, the 1997 European Convention on Nationality, the 1969 American Convention on Human Rights and the 1990 African Charter on the Rights and Welfare of the Child.

victim of trafficking will not *per se* render someone stateless. Victims of trafficking continue to possess the citizenship they had when they fell under the control of their traffickers. If, however, these traffickers have confiscated their identity documents, as commonly happens as a way of establishing and exerting control over their victims, they may be unable to prove citizenship. This lack of documentation and temporary inability to establish identity is not necessarily unique to victims of trafficking. It should be, and in many cases is, easily overcome with the assistance of the authorities of the State of origin.[43]

43. Everyone has the right to return to their own country.[44] States should extend diplomatic protection to their nationals abroad. This includes facilitating their re-entry into the country, including in the case of victims of trafficking who find themselves abroad. If, however, the State withholds such assistance and fails to supply documentation to enable the individual to return, one practical consequence may be to render the individual effectively stateless.[45] Even if the individuals were not previously considered stateless by their State of nationality, they may find themselves effectively treated as such if they attempt to avail themselves of that State's protection.[46] UNHCR's statelessness mandate may mean it needs to take action to assist individuals in such circumstances.[47]

44. There may also be situations where stateless individuals are trafficked out of their country of habitual residence. The lack of documentation coupled with lack of citizenship may render them unable to secure return to their country of habitual residence. While this alone does not make someone a refugee, the individual concerned may be eligible for refugee status where the refusal of the country of habitual residence to allow re-entry is related to a Convention ground and the inability to return to the country leads to serious harm or a serious violation, or violations, of human rights amounting to persecution.

## IV. PROCEDURAL ISSUES

45. Given the broad range of situations in which trafficking cases come to light and victims of trafficking can be identified, it is important that mechanisms be put in place at the national level to provide for the physical, psychological and social recovery of victims of trafficking. This includes the provision of housing, legal counselling and information, medical, psychological and material assistance, as well as employment, educational and training opportunities in a manner which takes into account the age, gender and special needs of victims of trafficking.[48] It is also necessary to ensure that victims of trafficking have access to fair and efficient asylum procedures as appropriate[49] and to proper legal counselling, if they are to be able to lodge an asylum claim effectively. In view of the complexities of asylum claims presented by victims or potential victims of trafficking, such claims normally require an examination on their merits in regular procedures.

46. In the reception of applicants who claim to have been victims of trafficking, and in interviewing such individuals, it is of utmost importance that a supportive environment be provided so that they can be reassured of the confidentiality of their claim. Providing interviewers of the same sex as the applicant can be particularly important in this respect. Interviewers should also take into consideration that victims who have escaped from their traffickers could be in fear of revealing the real extent of the persecution they have suffered. Some may be traumatized and in need of expert medical and/or psycho-social assistance, as well as expert counselling.

---

[43] In such circumstances, it is necessary to respect principles of confidentiality. These require amongst other things that any contact with the country of origin should not indicate either that the individual concerned has applied for asylum or that she or he has been trafficked.
[44] 1948 Universal Declaration of Human Rights, Article 13(2). See also, Article 12(4) of the International Covenant on Civil and Political Rights, which reads: "No one shall be arbitrarily deprived of the right to enter his own country."
[45] See, Executive Committee Conclusion No. 90 (LII), 2001, paragraph (s), in which the Executive Committee of UNHCR expresses its concern that many victims of trafficking are rendered effectively stateless due to an inability to establish their identity and nationality status.
[46] This is so, despite relevant State obligations contained in the 1961 Convention on the Reduction of Statelessness, in addition to Article 8 of the Trafficking Protocol.
[47] When the 1961 Convention on the Reduction of Statelessness came into force, the UN General Assembly designated UNHCR as the UN body entrusted to act on behalf of stateless persons. Since 1975, General Assembly Resolutions have further detailed UNHCR's responsibilities regarding the prevention of statelessness and the protection of stateless persons.
[48] See Article 6 in Part II of the Trafficking Protocol.
[49] See Agenda for Protection, Goal 2 Objective 2, and the OHCHR, "Recommended Principles and Guidelines on Human Rights and Human Trafficking", above footnote 13, Guideline 2.7, and the Council of Europe Convention, Explanatory Report, para. 377.

IER_AR_015950

47. Such assistance should be provided to victims in an age and gender sensitive manner. Many instances of trafficking, in particular trafficking for the purposes of exploitation of the prostitution of others or other forms of sexual exploitation, are likely to have a disproportionately severe effect on women and children. Such individuals may rightly be considered as victims of gender-related persecution. They will have been subjected in many, if not most, cases to severe breaches of their basic human rights, including inhuman or degrading treatment, and in some instances, torture.

48. Women, in particular, may feel ashamed of what has happened to them or may suffer from trauma caused by sexual abuse and violence, as well as by the circumstances surrounding their escape from their traffickers. In such situations, the fear of their traffickers will be very real. Additionally, they may fear rejection and/or reprisals by their family and/or community which should be taken into account when considering their claims. Against this background and in order to ensure that claims by female victims of trafficking are properly considered in the refugee status determination process, a number of measures should be borne in mind. These have been set out in Part III of UNHCR's Guidelines on International Protection on gender-related persecution and are equally applicable in the context of trafficking-related claims.[50]

49. Children also require special attention in terms of their care, as well as of the assistance to be provided in the presentation of asylum claims. In this context, procedures for the rapid identification of child victims of trafficking need to be established, as do specialized programmes and policies to protect and support child victims, including through the appointment of a guardian, the provision of age-sensitive counselling and tracing efforts which bear in mind the need for confidentiality and a supportive environment. Additional information on the appropriate handling of claims by child victims of trafficking can be found in the UN Children Fund (UNICEF) "Guidelines for the Protection of the Rights of Child Victims of Trafficking",[51] in the "Recommended Principles and Guidelines on Human Rights and Human Trafficking" of the Office of the High Commissioner for Human Rights[52] and General Comment No. 6 of the of the Committee on the Rights of the Child.[53]

50. An additional and specific consideration relates to the importance of avoiding any linkage, whether overt or implied, between the evaluation of the merits of a claim to asylum and the willingness of a victim to give evidence in legal proceedings against her or his traffickers. Providing evidence to help identify and prosecute traffickers can raise specific protection concerns that need to be addressed through specially designed witness protection programmes. The fact that an individual has agreed to provide such evidence will nevertheless not necessarily make her or him a refugee, unless the repercussions feared upon a return to the country of origin rise to the level of persecution and can be linked to one or more of the Convention grounds. Conversely, the fact that a victim of trafficking refuses to provide evidence should not lead to any adverse conclusion with respect to her or his asylum claim.

---

[50] See UNHCR Guidelines on Gender-related Persecution, above footnote 4. Complementary information can be found in World Health Organization, London School of Hygiene and Tropical Medicine and Daphne Programme of the European Commission, *WHO Ethical and Safety Recommendations for Interviewing Trafficked Women*, 2003, available at http://www.who.int/gender/ documents/en/final%20recommendations%2023%20oct.pdf.
[51] See above footnote 19.
[52] See above footnote 13. Guideline 8 addresses special measures for the protection and support of child victims of trafficking.
[53] See above, footnote 18, especially paras. 64–78.

IFR_AR_015951



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

**Distr. GENERAL**        **HCR/GIP/09/08**        **22 September 2009**        **Original: ENGLISH**

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 8:

## Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992).

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

**8**

IFR_AR_015952

## I. INTRODUCTION

1. These Guidelines offer substantive and procedural guidance on carrying out refugee status determination in a child-sensitive manner. They highlight the specific rights and protection needs of children in asylum procedures. Although the definition of a refugee contained in Article 1(A)2 of the 1951 Convention relating to the Status of Refugees and its 1967 Protocol (hereafter "1951 Convention" and "1967 Protocol") applies to all individuals regardless of their age, it has traditionally been interpreted in light of adult experiences. This has meant that many refugee claims made by children have been assessed incorrectly or overlooked altogether.[1]

2. The specific circumstances facing child asylum-seekers as individuals with independent claims to refugee status are not generally well understood. Children may be perceived as part of a family unit rather than as individuals with their own rights and interests. This is explained partly by the subordinate roles, positions and status children still hold in many societies worldwide. The accounts of children are more likely to be examined individually when the children are unaccompanied than when they are accompanied by their families. Even so, their unique experiences of persecution, due to factors such as their age, their level of maturity and development and their dependency on adults have not always been taken into account. Children may not be able to articulate their claims to refugee status in the same way as adults and, therefore, may require special assistance to do so.

3. Global awareness about violence, abuse and discrimination experienced by children is growing,[2] as is reflected in the development of international and regional human rights standards. While these developments have yet to be fully incorporated into refugee status determination processes, many national asylum authorities are increasingly acknowledging that children may have refugee claims in their own right. In *Conclusion on Children at Risk* (2007), UNHCR's Executive Committee underlines the need for children to be recognized as "active subjects of rights" consistent with international law. The Executive Committee also recognized that children may experience child-specific forms and manifestations of persecution.[3]

4. Adopting a child-sensitive interpretation of the 1951 Convention does not mean, of course, that child asylum-seekers are automatically entitled to refugee status. The child applicant must establish that s/he has a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion. As with gender, age is relevant to the entire refugee definition.[4] As noted by the UN Committee on the Rights of the Child, the refugee definition:

> ... must be interpreted in an age and gender-sensitive manner, taking into account the particular motives for, and forms and manifestations of, persecution experienced by children. Persecution of kin; under-age recruitment; trafficking of children for prostitution; and sexual exploitation or subjection to female genital mutilation, are some of the child-specific forms and manifestations of persecution which may justify the granting of refugee status if such acts are related to one of the 1951 Refugee Convention grounds. States should, therefore, give utmost attention to such child-specific forms and manifestations of persecution as well as gender-based violence in national refugee status-determination procedures.[5]

Alongside age, factors such as rights specific to children, a child's stage of development, knowledge and/or memory of conditions in the country of origin, and vulnerability, also need to be considered to ensure an appropriate application of the eligibility criteria for refugee status.[6]

---

[1] UNHCR, *Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum*, Geneva, 1997 (hereafter "UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum*"), http://www.unhcr.org/refworld/docid/3ae6b3360. html, in particular Part 8.

[2] See, for instance, UN General Assembly, Rights of the Child: Note by the Secretary-General, A/61/299, 29 Aug. 2006 (hereafter "UN study on violence against children") http://www.unhcr.org/refworld/docid/453780fe0.html; UN Commission on the Status of Women, The elimination of all forms of discrimination and violence against the girl child, E/CN.6/2007/2, 12 Dec. 2006, http://www. unhcr.org/refworld/docid/46c5b30c0.html; UN General Assembly, Impact of armed conflict on children: Note by the Secretary- General (the "Machel Study"), A/51/306, 26 Aug. 1996, http://www.unhcr.org/refworld/docid/3b00f2d30.html, and the strategic review marking the 10 year anniversary of the Machel Study, UN General Assembly, Report of the Special Representative of the Secretary-General for Children and Armed Conflict, A/62/228, 13 Aug. 2007, http://www.unhcr.org/refworld/docid/47316f602.html.

[3] ExCom, *Conclusion on Children at Risk*, 5 Oct. 2007, No. 107 (LVIII) – 2007, (hereafter "ExCom, Conclusion No. 107"), http://www.unhcr.org/refworld/docid/471897232.html, para. (b)(x)(viii).

[4] UNHCR, *Guidelines on International Protection No. 1: Gender-Related Persecution Within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, 7 May 2002 (hereafter "UNHCR, Guidelines on Gender- Related Persecution"), http://www.unhcr.org/refworld/docid/3d36f1c64.html, paras. 2, 4.

[5] UN Committee on the Rights of the Child, *General Comment No. 6 (2005)-Treatment of Unaccompanied and Separated Children Outside their Country of Origin*, CRC/GC/2005/6, Sep. 2005 (hereafter "CRC, *General Comment No. 6*"), http://www.unhcr.org/refworld/docid/42dd174b4.html, para. 74.

[6] UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum, op cit.*, page 10.

5. A child-sensitive application of the refugee definition would be consistent with the 1989 Convention on the Rights of the Child (hereafter "the CRC").[7] The Committee on the Rights of the Child has identified the following four Articles of the CRC as general principles for its implementation:[8] *Article 2*: the obligation of States to respect and ensure the rights set forth in the Convention to each child within their jurisdiction without discrimination of any kind;[9] *Article 3 (1)*: the best interests of the child as a primary consideration in all actions concerning children;[10] *Article 6*: the child's inherent right to life and States parties' obligation to ensure to the maximum extent possible the survival and development of the child;[11] and *Article 12*: the child's right to express his/her views freely regarding "all matters affecting the child", and that those views be given due weight.[12] These principles inform both the substantive and the procedural aspects of the determination of a child's application for refugee status.

## II. DEFINITIONAL ISSUES

6. These guidelines cover all child asylum-seekers, including accompanied, unaccompanied and separated children, who may have individual claims to refugee status. Each child has the right to make an independent refugee claim, regardless of whether s/he is accompanied or unaccompanied. "Separated children" are children separated from both their parents or from their previous legal or customary primary caregivers but not necessarily from other relatives. In contrast, "unaccompanied children" are children who have been separated from both parents and other relatives and are not being cared for by an adult who, by law or custom, is responsible for doing so.[13]

7. For the purposes of these Guidelines, "children" are defined as all persons below the age of 18 years.[14] Every person under 18 years who is the principal asylum applicant is entitled to child-sensitive procedural safeguards. Lowering the age of childhood or applying restrictive age assessment approaches in order to treat children as adults in asylum procedures may result in violations of their rights under international human rights law. Being young and vulnerable may make a person especially susceptible to persecution. Thus, there may be exceptional cases for which these guidelines are relevant even if the applicant is 18 years of age or slightly older. This may be particularly the case where persecution has hindered the applicant's development and his/her psychological maturity remains comparable to that of a child.[15]

8. Even at a young age, a child may still be considered the principal asylum applicant.[16] The parent, caregiver or other person representing the child will have to assume a greater role in making sure

---

[7] With a near universal ratification, the CRC is the most widely ratified human rights treaty, available at http://www.unhcr.org/refworld/docid/3ae6b38f0.html. The rights contained therein apply to all children within the jurisdiction of the State. For a detailed analysis of the provisions of the CRC, see UNICEF, *Implementation Handbook for the Convention on the Rights of the Child*, fully revised third edition, Sep. 2007 (hereafter "UNICEF, *Implementation Handbook*"). It can be ordered at http://www.unicef.org/publications/index_43110.html.

[8] CRC, *General Comment No. 5 (2003): General Measures of Implementation for the Convention on the Rights of the Child* (Arts. 4, 42 and 44, Para. 6), CRC/GC/2003/5, 3 Oct. 2003 (hereafter "CRC, *General Comment No. 5*"), http://www.unhcr.org/refworld/docid/4538834f11.html, para. 12.

[9] CRC, *General Comment No. 6*, para. 18.

[10] *Ibid.*, paras. 19–22. See also ExCom *Conclusion No. 107*, para. (b)(5), and, on how to conduct "best interests" assessments and determinations, UNHCR, *Guidelines on Determining the Best Interests of the Child*, Geneva, May 2008, http://www.unhcr.org/refworld/docid/48480c342.html.

[11] CRC, *General Comment No. 6*, paras. 23–24.

[12] *Ibid.*, para. 25. See also CRC, *General Comment No. 12 (2009): The right of the child to be heard*, CRC/C/GC/12, 20 July 2009 (hereafter "CRC, *General Comment No. 12*"), http://www.unhcr.org/refworld/docid/4ae562c52.html.

[13] CRC, *General Comment No. 6*, paras. 7–8. See also, UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum, op cit.*, p. 5, paras. 3.1-3.2. See also, UNHCR, UNICEF et al, *Inter-agency Guiding Principles on Unaccompanied and Separated Children*, Geneva, 2004 (hereafter "*Inter-Agency Guiding Principles*"), http://www.unhcr.org/refworld/docid/4113abc14.html, p. 13.

[14] CRC, Art. 1 provides that "a child means every human being below the age of eighteen years unless, under the law applicable to the child, majority is attained earlier." In addition, the EU Council Directive 2004/83/EC of 29 April 2004 on Minimum Standards for the Qualification and Status of Third Country Nationals or Stateless Persons as Refugees or as Persons Who Otherwise Need International Protection and the Content of the Protection Granted, 19 May 2004, 2004/83/EC, http://www.unhcr.org/refworld/docid/4157e75e4.html, provides that "'unaccompanied minors' means third-country nationals or stateless persons below the age of 18, who arrive on the territory of the Member States unaccompanied by an adult responsible for them whether by law or custom, and for as long as they are not effectively taken into the care of such a person; it includes minors who are left unaccompanied after they have entered the territory of the Member States", Art. 2 (i).

[15] The United Kingdom Immigration Appeals Tribunal (now the Asylum and Immigration Tribunal) has held that "[t]o adopt a rigidity however in this respect is in our view to fail to recognize that in many areas of the world even today exact ages and dates of birth are imprecise. It is better to err on the side of generosity"; *Sarjoy Jakitay v. Secretary of State for the Home Department*, Appeal No. 12658 (unreported), U.K. IAT, 15 Nov. 1995. See also, *Decision VA0-02635, VA0-02635*, Canada, Immigration and Refugee Board (hereafter "IRB"), 22 March 2001, http://www.unhcr.org/refworld/docid/4b18dec82.html.

[16] See, for instance, *Chen Shi Hai v. The Minister for Immigration and Multicultural Affairs*, [2000] HCA 19, Australia, High Court, 13 April 2000, http://www.unhcr.org/refworld/docid/3ae6b6df4.html. In this case, which concerned a 3 ½ year-old boy, it was found that "under Australian law the child was entitled to have his own rights determined as that law provides. He is not for all purposes subsumed into the identity and legal rights of his parents", para. 78.

that all relevant aspects of the child's claim are presented.[17] However, the right of children to express their views in all matters affecting them, including to be heard in all judicial and administrative proceedings, also needs to be taken into account.[18] A child claimant, where accompanied by parents, members of an extended family or of the community who by law or custom are responsible for the child, is entitled to appropriate direction and guidance from them in the exercise of his/her rights, in a manner consistent with the evolving capacities of the child.[19] Where the child is the principal asylum-seeker, his/her age and, by implication, level of maturity, psychological development, and ability to articulate certain views or opinions will be an important factor in a decision maker's assessment.

9. Where the parents or the caregiver seek asylum based on a fear of persecution for their child, the child normally will be the principal applicant even when accompanied by his/her parents. In such cases, just as a child can derive refugee status from the recognition of a parent as a refugee, a parent can, *mutatis mutandis*, be granted derivative status based on his/her child's refugee status.[20] In situations where both the parent(s) and the child have their own claims to refugee status, it is preferable that each claim be assessed separately. The introduction of many of the procedural and evidentiary measures enumerated below in Part IV will enhance the visibility of children who perhaps ought to be the principal applicants within their families. Where the child's experiences, nevertheless, are considered part of the parent's claim rather than independently, it is important to consider the claim also from the child's point of view.[21]

# III. SUBSTANTIVE ANALYSIS

## a) Well-founded fear of persecution

10. The term "persecution", though not expressly defined in the 1951 Convention, can be considered to involve serious human rights violations, including a threat to life or freedom, as well as other kinds of serious harm or intolerable situations as assessed with regard to the age, opinions, feelings and psychological make-up of the applicant.[22] Discrimination may amount to persecution in certain situations where the treatment feared or suffered leads to consequences of a substantially prejudicial nature for the child concerned.[23] The principle of the best interests of the child requires that the harm be assessed from the child's perspective. This may include an analysis as to how the child's rights or interests are, or will be, affected by the harm. Ill-treatment which may not rise to the level of persecution in the case of an adult may do so in the case of a child.[24]

11. Both objective and subjective factors are relevant to establish whether or not a child applicant has a well-founded fear of persecution.[25] An accurate assessment requires both an up-to-date analysis and knowledge of child-specific circumstances in the country of origin, including of existing child protection services. Dismissing a child's claim based on the assumption that perpetrators would not take a child's views seriously or consider them a real threat could be erroneous. It may be the case that a child is unable to express fear when this would be expected or, conversely, exaggerates the fear. In

---

[17] See also UNHCR, *Refugee Children: Guidelines on Protection and Care*, Geneva, 1994, http://www.unhcr.org/refworld/docid/3ae6b3470.html, pp. 97–103.

[18] CRC, Art. 12(2); CRC, *General Comment No. 12*, paras. 32, 67, 123.

[19] CRC, Art. 5.

[20] UNHCR, *Guidance Note on Refugee Claims relating to Female Genital Mutilation*, May 2009 (hereafter "UNHCR, *Guidance Note on FGM*"), http://www.unhcr.org/refworld/docid/4a0c28492.html, para. 11. See also UNHCR, ExCom Conclusion on the Protection of the Refugee's Family, No. 88 (L), 1999, http://www.unhcr.org/refworld/docid/3ae68c4340.html, para. (b)(iii).

[21] See, for instance, *EM (Lebanon) (FC) (Appellant) v. Secretary of State for the Home Department (Respondent)*, U.K. House of Lords, 22 Oct. 2008, http://www.unhcr.org/refworld/docid/490058699.html; *Refugee Appeal Nos. 76250 & 76251*, Nos. 76250 & 76251, New Zealand, Refugee Status Appeals Authority (hereafter "RSAA"), 1 Dec. 2008, http://www.unhcr.org/refworld/docid/494f64952.html.

[22] See UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees*, 1979, re-edited, Geneva, Jan. 1992 (hereafter "UNHCR, *Handbook*") http://www.unhcr. org/refworld/docid/3ae6b3314.html, paras. 51–52; UNHCR, *Guidelines on International Protection No. 7: The Application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees to Victims of Trafficking and Persons at Risk of Being Trafficked*, 7 Apr. 2006 (hereafter "UNHCR, *Guidelines on Victims of Trafficking*"), http://www.unhcr.org/refworld/ docid/443679fa4.html, para. 14.

[23] UNHCR, *Handbook*, paras. 54–55.

[24] See, for instance, United States Bureau of Citizenship and Immigration Services, *Guidelines For Children's Asylum Claims*, 10 Dec. 1998 (hereafter the "U.S. Guidelines for Children's Asylum Claims"), http://www.unhcr.org/refworld/docid/3f8ec0574. html, noting that "the harm a child fears or has suffered, however, may be relatively less than that of an adult and still qualify as persecution." See also, *Chen Shi Hai, op. cit.*, where the Court found that "what may possibly be viewed as acceptable enforcement of laws and programmes of general application in the case of the parents may nonetheless be persecution in the case of the child", para. 79.

[25] UNHCR, *Handbook*, paras. 40–43.

IFR_AR_015955

such circumstances, decision makers must make an objective assessment of the risk that the child would face, regardless of that child's fear.[26] This would require consideration of evidence from a wide array of sources, including child-specific country of origin information. When the parent or caregiver of a child has a well-founded fear of persecution for their child, it may be assumed that the child has such a fear, even if s/he does not express or feel that fear.[27]

12. Alongside age, other identity-based, economic and social characteristics of the child, such as family background, class, caste, health, education and income level, may increase the risk of harm, influence the type of persecutory conduct inflicted on the child and exacerbate the effect of the harm on the child. For example, children who are homeless, abandoned or otherwise without parental care may be at increased risk of sexual abuse and exploitation or of being recruited or used by an armed force/ group or criminal gang. Street children, in particular, may be rounded up and detained in degrading conditions or be subjected to other forms of violence, including murder for the purpose of "social cleansing".[28] Children with disabilities may be denied specialist or routine medical treatment or be ostracized by their family or community. Children in what may be viewed as unconventional family situations including, for instance, those born out of wedlock, in violation of coercive family policies,[29] or through rape, may face abuse and severe discrimination. Pregnant girls may be rejected by their families and subject to harassment, violence, forced prostitution or other demeaning work.[30]

**Child-specific rights**

13. A contemporary and child-sensitive understanding of persecution encompasses many types of human rights violations, including violations of child-specific rights. In determining the persecutory character of an act inflicted against a child, it is essential to analyse the standards of the CRC and other relevant international human rights instruments applicable to children.[31] Children are entitled to a range of child-specific rights set forth in the CRC which recognize their young age and dependency and are fundamental to their protection, development and survival. These rights include, but are not limited to, the following: the right not to be separated from parents (Article 9); protection from all forms of physical and mental violence, abuse, neglect, and exploitation (Article 19); protection from traditional practices prejudicial to the health of children (Article 24); a standard of living adequate for the child's development (Article 27); the right not to be detained or imprisoned unless as a measure of last resort (Article 37); and protection from under- age recruitment (Article 38). The CRC also recognizes the right of refugee children and children seeking refugee status to appropriate protection and humanitarian assistance in the enjoyment of applicable rights set forth in the CRC and in other international human rights or humanitarian instruments (Article 22).

14. Children's socio-economic needs are often more compelling than those of adults, particularly due to their dependency on adults and unique developmental needs. Deprivation of economic, social and cultural rights, thus, may be as relevant to the assessment of a child's claim as that of civil and political rights. It is important not to automatically attribute greater significance to certain violations than to others but to assess the overall impact of the harm on the individual child. The violation of one right often may expose the child to other abuses; for example, a denial of the right to education or an adequate standard of living may lead to a heightened risk of other forms

---

[26] See UNHCR, *Handbook*, paras. 217–219. See also *Yusuf v. Canada (Minister of Employment and Immigration)*, [1992] 1 F.C. 629; F.C.J. 1049, Canada, Federal Court, 24 Oct. 1991, http://www.unhcr.org/refworld/docid/403e24e84.html. The Court concluded that "I am loath to believe that a refugee status claim could be dismissed solely on the ground that as the claimant is a young child or a person suffering from a mental disability, s/he was incapable of experiencing fear the reasons for which clearly exist in objective terms.", at 5.

[27] See, for instance, *Canada (Minister of Citizenship and Immigration) v. Patel*, 2008 FC 747, [2009] 2 F.C.R. 196, Canada, Federal Court, 17 June 2008, http://www.unhcr.org/refworld/docid/4a6438952.html, at 32–33.

[28] "Social cleansing" refers to the process of removing an undesirable group from an area and may involve murder, disappearances, violence and other ill-treatment. See, UNICEF, *Implementation Handbook*, pp. 89, 91, 287. See also *Case of the "Street Children" (Villagrán-Morales et al.) v. Guatemala*, Inter-American Court of Human Rights (hereafter "IACtHR"), Judgment of 19 Nov. 1999, http://www.unhcr.org/refworld/docid/4b17bc442.html, paras. 190–191. The Court found that there was a prevailing pattern of violence against street children in Guatemala. Relying on the CRC to interpret Art. 19 of the 1969 American Convention on Human Rights, "Pact of San Jose", Costa Rica (hereafter "ACHR"), http://www.unhcr.org/refworld/docid/3ae6b36510.html, the Court noted that the State had violated their physical, mental, and moral integrity as well as their right to life and also failed to take any measures to prevent them from living in misery, thereby denying them of the minimum conditions for a dignified life.

[29] See further, UNHCR, *Note on Refugee Claims Based on Coercive Family Planning Laws or Policies*, Aug. 2005, http://www.unhcr.org/refworld/docid/4301a9184.html.

[30] UNHCR, *Guidelines on Gender-Related Persecution, op cit*., para. 18.

[31] In the context of Africa, the African Charter on the Rights and Welfare of the Child should also be considered (hereafter "African Charter"), http://www.unhcr.org/refworld/docid/3ae6b38c18.html.

IFR_AR_015956

of harm, including violence and abuse.[32] Moreover, there may be political, racial, gender or religious aims or intentions against a particular group of children or their parents underlying discriminatory measures in the access and enjoyment of ESC rights. As noted by the UN Committee on Economic, Social and Cultural Rights:

> The lack of educational opportunities for children often reinforces their subjection to various other human rights violations. For instance, children who may live in abject poverty and not lead healthy lives are particularly vulnerable to forced labour and other forms of exploitation. Moreover, there is a direct correlation between, for example, primary school enrolment levels for girls and major reductions in child marriages.[33]

### Child-related manifestations of persecution

15. While children may face similar or identical forms of harm as adults, they may experience them differently. Actions or threats that might not reach the threshold of persecution in the case of an adult may amount to persecution in the case of a child because of the mere fact that s/he is a child. Immaturity, vulnerability, undeveloped coping mechanisms and dependency as well as the differing stages of development and hindered capacities may be directly related to how a child experiences or fears harm.[34] Particularly in claims where the harm suffered or feared is more severe than mere harassment but less severe than a threat to life or freedom, the individual circumstances of the child, including his/her age, may be important factors in deciding whether the harm amounts to persecution. To assess accurately the severity of the acts and their impact on a child, it is necessary to examine the details of each case and to adapt the threshold for persecution to that particular child.

16. In the case of a child applicant, psychological harm may be a particularly relevant factor to consider. Children are more likely to be distressed by hostile situations, to believe improbable threats, or to be emotionally affected by unfamiliar circumstances. Memories of traumatic events may linger in a child and put him/her at heightened risk of future harm.

17. Children are also more sensitive to acts that target close relatives. Harm inflicted against members of the child's family can support a well-founded fear in the child. For example, a child who has witnessed violence against, or experienced the disappearance or killing of a parent or other person on whom the child depends, may have a well- founded fear of persecution even if the act was not targeted directly against him/her.[35] Under certain circumstances, for example, the forced separation of a child from his/her parents, due to discriminatory custody laws or the detention of the child's parent(s) could amount to persecution.[36]

### Child-specific forms of persecution

18. Children may also be subjected to specific forms of persecution that are influenced by their age, lack of maturity or vulnerability. The fact that the refugee claimant is a child may be a central factor in the harm inflicted or feared. This may be because the alleged persecution only applies to, or disproportionately affects, children or because specific child rights may be infringed. UNHCR's Executive Committee has recognized that child-specific forms of persecution may include under-age recruitment, child trafficking and female genital mutilation (hereafter "FGM").[37] Other examples include, but are not limited to, family and domestic violence, forced or underage marriage,[38] bonded or hazardous child labour, forced labour,[39]

---

[32] CRC, General Comment No. 5, op cit.., paras. 6–7. See further below at v. Violations of economic, social and cultural rights.

[33] UN Committee on Economic, Social and Cultural Rights (hereafter "CESCR"), General Comment No. 11: Plans of Action for Primary Education (Art. 14 of the Covenant), E/1992/23, 10 May 1999, http://www.unhcr.org/refworld/docid/4538838c0.html, para. 4.

[34] See further Save the Children and UNICEF, The evolving capacities of the child, 2005, http://www.unicef-irc.org/publications/pdf/evolving-eng.pdf.

[35] See, for instance, Cicek v. Turkey, Application No. 67124/01, European Court of Human Rights (hereafter "ECtHR"), 18 Jan. 2005, http://www.unhcr.org/refworld/docid/42d3e7ea4.html, paras. 173–174; Bazorkina v. Russia, Application No. 69481/01, ECtHR, 27 July 2006, http://www.unhcr.org/refworld/docid/44cdf4ef4.html, paras. 140–141.

[36] See EM (Lebanon) (FC) (Appellant) v. Secretary of State for the Home Department (Respondent), op. cit.., Refugee Appeal Nos. 76226 and 76227, Nos. 76226 and 76227, New Zealand, RSAA, 12 Jan. 2009, http://www.unhcr.org/refworld/docid/49a6ac0e2. html, paras. 112–113.

[37] ExCom, Conclusion No. 107, para. (g)(viii).

[38] CRC, Art. 24(3); International Convenant on Civil and Political Rights (hereafter "ICCPR"), http://www.unhcr.org/refworld/ docid/3ae6b3aa0.html, Art. 23; International Covenant on Economic, Social and Cultural Rights, http://www.unhcr.org/refworld/ docid/3ae6b36c0.html, Art. 10; Convention on the Elimination of All Forms of Discrimination Against Women, http://www.unhcr.org/refworld/docid/3ae6b3970.html, Art. 16.

[39] CRC, Arts. 32–36; International Labour Organization, Worst Forms of Child Labour Convention, C182 (hereafter "ILO Convention on the Worst Forms of Child Labour"), http://www.unhcr.org/refworld/docid/3ddb6e0c4.html; Minimum Age Convention, C138, (hereafter "ILO Minimum Age Convention"), http://www.unhcr.org/refworld/docid/421216a34.html, Arts. 2 (3), 2(4).

forced prostitution and child pornography.[40] Such forms of persecution also encompass violations of survival and development rights as well as severe discrimination of children born outside strict family planning rules[41] and of stateless children as a result of loss of nationality and attendant rights. Some of the most common forms of child-specific persecution arising in the context of asylum claims are outlined in greater detail below.

### i. Under-age recruitment

19. There is a growing consensus regarding the ban on the recruitment and use of children below 18 years in armed conflict.[42] International humanitarian law prohibits the recruitment and participation in the hostilities of children under the age of 15 years whether in international[43] or non-international armed conflict.[44] Article 38 of the CRC reiterates State Parties' obligations under international humanitarian law. The Rome Statute of the International Criminal Court classifies as war crimes the enlistment and use of children under the age of 15 years into the armed forces at a time of armed conflict.[45] The Special Court for Sierra Leone has concluded that the recruitment of children under the age of 15 years into the armed forces constitutes a crime under general international law.[46]

20. The Optional Protocol to the CRC on the Involvement of Children in Armed Conflict provides that States parties shall take all feasible measures to ensure that members of their armed forces under the age of 18 years do not take part in hostilities, and ensure that persons under the age of 18 years are not compulsorily recruited into their armed forces.[47] The Optional Protocol contains an absolute prohibition against the recruitment or use, under any circumstances, of children who are less than 18 years old by armed groups that are distinct from the armed forces of a State.[48] It also amends Article 38 of the CRC by raising the minimum age of voluntary recruitment.[49] States also commit to use all feasible measures to prohibit and criminalize under-age recruitment and use of child soldiers by non-State armed groups.[50] The Committee on the Rights of the Child emphasizes that

> … under-age recruitment (including of girls for sexual services or forced marriage with the military) and direct or indirect participation in hostilities constitutes a serious human rights violation and thereby persecution, and should lead to the granting of refugee status where the well-founded fear of such recruitment or participation in hostilities is based on "reasons of race, religion, nationality, membership of a particular social group or political opinion" (article 1A (2),
>
> 1951 Refugee Convention).[51]

21. In UNHCR's view, forced recruitment and recruitment for direct participation in hostilities of a child below the age of 18 years into the armed forces of the State would amount to persecution. The same would apply in situations where a child is at risk of forced re-recruitment or would be punished for having evaded forced recruitment or deserted the State's armed forces. Similarly, the recruitment by a non-State armed group of any child below the age of 18 years would be considered persecution.

---

[40] CRC, Art. 34; Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography, http://www.unhcr.org/refworld/docid/3ae6b38bc.html.

[41] See, for instance, *Xue Yun Zhang v. Gonzales*, No. 01-71623, U.S. Court of Appeals for the 9th Circuit, 26 May 2005, http://www.unhcr.org/refworld/docid/4b17c7082.html; *Chen Shi Hai, op. cit.*

[42] See UNICEF, The Paris Principles and Guidelines on Children Associated With Armed Forces or Armed Groups, Feb. 2007 (hereafter "The Paris Principles"). While not binding, they reflect a strong trend for a complete ban on under-age recruitment. See also UN Security Council resolution 1612 (2005) (on children in armed conflict), 26 July 2005, S/RES/1612, http://www.unhcr.org/refworld/docid/43f308d6c.html, para. 1; 1539 on the protection of children affected by armed conflict, S/RES/1539, 22 Apr. 2004, http://www.unhcr.org/refworld/docid/411236fd4.html.

[43] Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), http://www.unhcr.org/refworld/docid/3ae6b36b4.html, Art. 77(2).

[44] Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), http://www.unhcr.org/refworld/docid/3ae6b37f40.html, Art. 4(3).

[45] UN General Assembly, *Rome Statute of the International Criminal Court*, A/CONF. 183/9, 17 July 1998 (hereafter "ICC Statute"), http://www.unhcr.org/refworld/docid/3ae6b3a84.html, Art. 8 (2) (b) [xxvi] and (e)[vii].

[46] See *Prosecutor v. Sam Hinga Norman*, Case No. SCSL-2004-14-AR72(E), Decision on Preliminary Motion Based on Lack of Jurisdiction (Child Recruitment), 31 May 2004, paras. 52–53; UN Security Council, Report of the Secretary-General on the establishment of a Special Court for Sierra Leone, 4 Oct. 2000, S/2000/915, http://www.unhcr.org/refworld/docid/3ae6afbf4.html, para. 17, which recognized the customary character of the prohibition of child recruitment.

[47] The Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict, http:// www.unhcr.org/refworld/docid/47fdfb180.html, Arts. 1–2. There are currently 127 States Parties to the Optional Protocol. See also the African Charter, which establishes 18 years as the minimum age for all compulsory recruitment, Arts. 2 and 22.2, and the ILO Convention on the Worst Forms of Child Labour, which includes the forced recruitment of children under the age of 18, Arts. 2 and 3(a) in its definition of worst forms of child labor.

[48] Optional Protocol to the CRC on the Involvement of Children in Armed Conflict, Art. 4.

[49] *Ibid.*, Art. 3.

[50] *Ibid.*, Art. 4.

[51] CRC, *General Comment, No. 6*, para. 59. See also para. 58.

IFR_AR_015958

22. Voluntary recruitment of children above the age of 16 years by States is permissible under the Optional Protocol to the CRC on the Involvement of Children in Armed Conflict.[52] However, the recruiting State authorities have to put in place safeguards to ensure that the recruitment is voluntary, that it is undertaken with the informed consent of the parents and that the children who are so recruited are requested to produce satisfactory proof of age prior to their recruitment. In such cases, it is important to assess whether the recruitment was genuinely voluntary, bearing in mind that children are particularly susceptible to abduction, manipulation and force and may be less likely to resist recruitment. They may enlist under duress, in self-defence, to avoid harm to their families, to seek protection against unwanted marriages or sexual abuse within their homes, or to access basic means of survival, such as food and shelter. The families of children may also encourage them to participate in armed conflict, despite the risks and dangers.

23. In addition, children may have a well-founded fear of persecution arising from the treatment they are subjected to, and/or conduct they are required to engage in, by the armed forces or armed group. Boys and girls associated with armed forces or armed groups may be required to serve as cooks, porters, messengers, spies as well as to take direct part in the hostilities. Girls, in particular, may be forced into sexual relations with members of the military.[53] It is also important to bear in mind that children who have been released from the armed forces or group and return to their countries and communities of origin may be in danger of harassment, re-recruitment or retribution, including imprisonment or extra-judicial execution.

### ii. Child trafficking and labour

24. As recognized by several jurisdictions, trafficked children or children who fear being trafficked may have valid claims to refugee status.[54] UNHCR's Guidelines on Victims of Trafficking and Persons at Risk of Being Trafficked are equally applicable to an asylum claim submitted by a child. The particular impact of a trafficking experience on a child and the violations of child-specific rights that may be entailed also need to be taken into account.[55]

25. The trafficking of children occurs for a variety of reasons but all with the same overarching aim to gain profit through the exploitation of human beings.[56] In this context, it is important to bear in mind that any recruitment, transportation, transfer, harbouring or receipt of children for the purpose of exploitation is a form of trafficking regardless of the means used. Whether the child consented to the act or not is, therefore, irrelevant.[57]

26. The trafficking of a child is a serious violation of a range of fundamental rights and, therefore, constitutes persecution. These rights include the right to life, survival and development, the right to protection from all forms of violence, including sexual exploitation and abuse, and the right to protection from child labour and abduction, sale and trafficking, as specifically provided for by Article 35 of the CRC.[58]

27. The impact of reprisals by members of the trafficking network, social exclusion, ostracism and/or discrimination[59] against a child victim of trafficking who is returned to his/her home country needs to be assessed in a child-sensitive manner. For example, a girl who has been trafficked for sexual ex-

---

[52] Optional Protocol to the CRC on the Involvement of Children in Armed Conflict, Art. 3. States Parties are required to raise in years the minimum age for the voluntary recruitment from the age set out in Art. 38, para. 3 of the CRC, hence, from 15 to 16 years.

[53] The Paris Principles define children associated with an armed force or group as follows: "A child associated with an armed force or armed group refers to any person below 18 years of age who is or who has been recruited or used by an armed force or armed group in any capacity, including but not limited to children, boys and girls, used as fighters, cooks, porters, messengers, spies or for sexual purposes. It does not only refer to a child who is taking or has taken a direct part in hostilities." Art. 2.1.

[54] See, for instance, *Ogbeide v. Secretary of State for the Home Department*, No. HX/08391/2002, U.K. IAT, 10 May 2002 (unreported); *Li and Others v. Minister of Citizenship and Immigration*, IMM-932-00, Canada, Federal Court, 11 Dec. 2000, http://www.unhcr.org/refworld/docid/4b18d3682.html.

[55] See UNHCR, *Guidelines on Victims of Trafficking*. See also UNICEF, *Guidelines on the Protection of Child Victims of Trafficking*, Oct. 2006, http://www.unicef.org/ceecis/0610-Unicef_Victims_Guidelines_en.pdf, which make reference to refugee status for children who have been trafficked.

[56] These reasons include, but are not limited to, bonded child labour, debt repayment, sexual exploitation, recruitment by armed forces and groups, and irregular adoption. Girls, in particular, may be trafficked for the purpose of sexual exploitation or arranged marriage while boys may be particularly at risk of being trafficked for various forms of forced labour.

[57] For a definition of the scope of "trafficking", see the following international and regional instruments: Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the UN Convention against Transnational Organized Crime, 15 Nov. 2000, http://www.unhcr.org/refworld/docid/4720706c0.html, in particular Art. 3; Council of Europe Convention on Action against Trafficking in Human Beings, CETS No. 197, 3 May 2005 http://www.unhcr.org/refworld/ docid/43fded544.html.

[58] For a detailed analysis of the human rights framework relating to the trafficking of children, see UNICEF, *Implementation Handbook for CRC*, in particular pp. 531–542.

[59] UNHCR, *Guidelines on Victims of Trafficking, op cit.*, paras. 17–18.

IFR_AR_015959

ploitation may end up being rejected by her family and become a social outcast in her community if returned. A boy, who has been sent away by his parents in the hope and expectation that he will study, work abroad and send remittances back to his family likewise may become excluded from his family if they learn that he has been trafficked into forced labour. Such child victims of trafficking may have very limited possibilities of accessing and enjoying their human rights, including survival rights, if returned to their homes.

28. In asylum cases involving child victims of trafficking, decision makers will need to pay particular attention to indications of possible complicity of the child's parents, other family members or caregivers in arranging the trafficking or consenting to it. In such cases, the State's ability and willingness to protect the child must be assessed carefully. Children at risk of being (re-)trafficked or of serious reprisals should be considered as having a well- founded fear of persecution within the meaning of the refugee definition.

29. In addition to trafficking, other worst forms of labour, such as slavery, debt bondage and other forms of forced labour, as well as the use of children in prostitution, pornography and illicit activities (for example, the drug trade) are prohibited by international law.[60] Such practices represent serious human rights violations and, therefore, would be considered persecution, whether perpetrated independently or as part of a trafficking experience.

30. International law also proscribes labour likely to harm the health, safety or morals of a child, also known as "hazardous work".[61] In determining whether labour is hazardous, the following working conditions need to be considered: work that exposes children to physical or mental violence; work that takes place underground, under water, at dangerous heights or in confined spaces; work that involves dangerous equipment or manual handling of heavy loads; long working hours and unhealthy environments.[62] Labour performed by a child under the minimum age designated for the particular kind of work and deemed likely to inhibit the child's education and full development is also prohibited according to international standards.[63] Such forms of labour could amount to persecution, as assessed according to the particular child's experience, his/her age and other circumstances. Persecution, for example, may arise where a young child is compelled to perform harmful labour that jeopardizes his/her physical and/or mental health and development.

### iii. Female genital mutilation

31. All forms of FGM[64] are considered harmful and violate a range of human rights,[65] as affirmed by international and national jurisprudence and legal doctrine. Many jurisdictions have recognized that FGM involves the infliction of grave harm amounting to persecution.[66] As the practice disproportionately affects the girl child,[67] it can be considered a child-specific form of persecution. For further information about FGM in the context of refugee status determination, see UNHCR Guidance Note on Refugee Claims relating to Female Genital Mutilation.[68]

### iv. Domestic violence against children

32. All violence against children, including physical, psychological and sexual violence, while in the care of parents or others, is prohibited by the CRC.[69] Violence against children may be perpetrated

---

[60] ILO Convention on the Worst Forms of Child Labour, Art. 3 (a–c).
[61] *Ibid.*, Art. 3(d).
[62] *Ibid.*, Art. 3(d). Ibid., Art. 4 in conjunction with ILO Worst Forms of Child Labour Recommendation, 1999, R190, http://www.unhcr.org/refworld/docid/3ddb6ef34.html, at 3 and 4.
[63] ILO Minimum Age Convention, Art. 2.
[64] FGM comprises all procedures involving partial or total removal of the external female genitalia or other injury to the female genital organs for non-medical reasons. See further, OHCHR, UNAIDS et al., *Eliminating Female Genital Mutilation: An Interagency Statement*, Feb. 2008, http://www.unhcr.org/refworld/docid/47c6aa6e2.html.
[65] These include the right to life, to protection from torture, and cruel, inhuman or degrading treatment, to protection from physical and mental violence and the right to the highest attainable standard of health.
[66] See, for instance, *Mlle Diop Aminata*, 164078, Commission des Recours des Réfugiés (hereafter "CRR"), France, 17 July 1991, http://www.unhcr.org/refworld/docid/3ae6b7294.html; *Khadra Hassan Farah, Mahad Dahir Buraleh, Hodan Dahir Buraleh*, Canada, IRB, 10 May 1994, http://www.unhcr.org/refworld/docid/3ae6b70618.html; *In re Fauziya Kasinga*, 3278, U.S. Board of Immigration Appeals (hereafter "BIA"), 13 June 1996, http://www.unhcr.org/refworld/docid/3ae6b6b7718.html.
[67] FGM is mostly carried out on girls up to 15 years of age, although older girls and women may also be subjected to the practice.
[68] UNHCR, *Guidance Note on FGM, op cit.*
[69] CRC, Arts. 19, 37.

IFR_AR_015960

in the private sphere by those who are related to them through blood, intimacy or law.[70] Although it frequently takes place in the name of discipline, it is important to bear in mind that parenting and caring for children, which often demand physical actions and interventions to protect the child, is quite distinct from the deliberate and punitive use of force to cause pain or humiliation.[71] Certain forms of violence, in particular against very young children, may cause permanent harm and even death, although perpetrators may not aim to cause such harm.[72] Violence in the home may have a particularly significant impact on children because they often have no alternative means of support.[73]

33. Some jurisdictions have recognized that certain acts of physical, sexual and mental forms of domestic violence may be considered persecution.[74] Examples of such acts include battering, sexual abuse in the household, incest, harmful traditional practices, crimes committed in the name of honour, early and forced marriages, rape and violence related to commercial sexual exploitation.[75] In some cases, mental violence may be as detrimental to the victim as physical harm and could amount to persecution. Such violence may include serious forms of humiliation, harassment, abuse, the effects of isolation and other practices that cause or may result in psychological harm.[76] Domestic violence may also come within the scope of torture and other cruel, inhuman and degrading treatment or punishment.[77] A minimum level of severity is required for it to constitute persecution. When assessing the level of severity of the harm, a number of factors such as the frequency, patterns, duration and impact on the particular child need to be taken into account. The child's age and dependency on the perpetrator as well as the long-term effects on the physical and psychological development and well-being of the child also need to be considered.

### v. Violations of economic, social and cultural rights

34. The enjoyment of economic, social and cultural rights is central to the child's survival and development.[78] The UN Committee on the Rights of the Child has stated that

> … the right to survival and development can only be implemented in a holistic manner, through the enforcement of all the other provisions of the Convention, including rights to health, adequate nutrition, social security, an adequate standard of living, a healthy and safe environment, education and play.[79]

While the CRC and the 1966 Covenant on Economic, Social and Cultural Rights contemplate the progressive realization of economic, social and cultural rights, these instruments impose various obligations on States Parties which are of immediate effect.[80] These obligations include avoiding taking retrogressive measures, satisfying minimum core elements of each right and ensuring non-discrimination in the enjoyment of these rights.[81]

35. A violation of an economic, social or cultural right may amount to persecution where minimum core elements of that right are not realized. For instance, the denial of a street child's right to an adequate standard of living (including access to food, water and housing) could lead to an intolerable

---

[70] Declaration on the Elimination of Violence Against Women, http://www.unhcr.org/refworld/docid/3b00f25d2c.html, Art. 2(a).

[71] See CRC, *General Comment No. 8 (2006): The Right of the Child to Protection from Corporal Punishment and Other Cruel or Degrading Forms of Punishment (Arts. 19; 28, Para. 2; and 37, inter alia)*, CRC/C/GC/8, 2 Mar. 2007 (hereafter "CRC, *General Comment No. 8*"), http://www.unhcr.org/refworld/docid/460bc7772.html, paras. 13–14, 26.

[72] UN study on violence against children, *op. cit.*, para. 40.

[73] See further UNICEF, *Domestic Violence Against Women and Girls*, Innocenti Digest No. 6, 2000, http://www.unicef-irc.org/publications/pdf/digest6e.pdf.

[74] See UNHCR, *Handbook for the Protection of Women and Girls*, Feb. 2008, http://www.unhcr.org/refworld/docid/47cfc2962.html, pp. 142–144. See also, for instance, *Rosalba Aguirre-Cervantes a.k.a. Maria Esperanza Castillo v. Immigration and Naturalization Service*, U.S. Court of Appeals for the 9th Circuit, 21 Mar. 2001, http://www.unhcr.org/refworld/docid/3f37adc24.html.

[75] UN Commission on Human Rights, Human Rights Resolution 2005/41: Elimination of violence against women, E/CN.4/ RES/2005/41, 19 Apr. 2005, http://www.unhcr.org/refworld/docid/45377c59c.html, para. 5.

[76] CRC, *General Comment No. 8, op cit.*, para. 11. See also UN study on violence against children, *op. cit.*, para. 42; UNICEF, *Domestic Violence Against Women and Girls, op cit.*, pp. 2–4.

[77] CRC, *General Comment No. 8, op cit.*, para. 12; Human Rights Council, Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, A/HRC/7/3, 15 Jan. 2008, http://www.unhcr.org/refworld/docid/47c2c5452. html, paras. 45–49.

[78] CRC, Art. 6.2.

[79] CRC, *General Comment No. 7: Implementing Child Rights in Early Childhood*, CRC/C/GC/7/Rev.1, 20 Sep. 2006 (hereafter "CRC, *General Comment No. 7*") http://www.unhcr.org/refworld/docid/460bc5a62.html, para. 10.

[80] See CESCR, *General Comment No. 3: The Nature of States Parties' Obligations* (Art. 2, Para. 1, of the Covenant), E/1991/23, 14 Dec. 1990, http://www.unhcr.org/refworld/docid/4538838e10.html, para. 1; CRC, *General Comment No. 5*, para. 6.

[81] See UN Commission on Human Rights, Note verbale dated 86/12/05 from the Permanent Mission of the Netherlands to the United Nations Office at Geneva addressed to the Centre for Human Rights ("Limburg Principles"), 8 Jan. 1987, E/CN.4/1987/17 at E.10.21–22, http://www.unhcr.org/refworld/docid/48abd5790.html; International Commission of Jurists, Maastricht Guidelines on Violations of Economic, Social and Cultural Rights, 26 Jan. 1997, http://www.unhcr.org/refworld/docid/48abd5730.html, at II.9 and 11.

predicament which threatens the development and survival of that child. Similarly, a denial of medical treatment, particularly where the child concerned suffers from a life-threatening illness, may amount to persecution.[82] Persecution may also be established through an accumulation of a number of less serious violations.[83] This could, for instance, be the case where children with disabilities or stateless children lack access to birth registration and, as a result, are excluded from education, health care and other services.[84]

36. Measures of discrimination may amount to persecution when they lead to consequences of a substantially prejudicial nature for the child concerned.[85] Children who lack adult care and support, are orphaned, abandoned or rejected by their parents, and are escaping violence in their homes may be particularly affected by such forms of discrimination. While it is clear that not all discriminatory acts leading to the deprivation of economic, social and cultural rights necessarily equate to persecution, it is important to assess the consequences of such acts for each child concerned, now and in the future. For example, bearing in mind the fundamental importance of education and the significant impact a denial of this right may have for the future of a child, serious harm could arise if a child is denied access to education on a systematic basis.[86] Education for girls may not be tolerated by society,[87] or school attendance may become unbearable for the child due to harm experienced on racial or ethnic grounds.[88]

**8**

### b) Agents of persecution

37. In child asylum claims, the agent of persecution is frequently a non-State actor. This may include militarized groups, criminal gangs, parents and other caregivers, community and religious leaders. In such situations, the assessment of the well-foundedness of the fear has to include considerations as to whether or not the State is unable or unwilling to protect the victim.[89] Whether or not the State or its agents have taken sufficient action to protect the child will need to be assessed on a case-by-case basis.

38. The assessment will depend not only on the existence of a legal system that criminalizes and provides sanctions for the persecutory conduct. It also depends on whether or not the authorities ensure that such incidents are effectively investigated and that those responsible are identified and appropriately punished.[90] Hence, the enactment of legislation prohibiting or denouncing a particular persecutory practice against children, in itself, is not sufficient evidence to reject a child's claim to refugee status.[91]

---

[82] See, for instance, *RRT Case No. N94/04178*, N94/04178, Australia, Refugee Review Tribunal (hereafter "RRT"), 10 June 1994, http://www.unhcr.org/refworld/docid/3ae6b6300.html.
[83] UNHCR, *Handbook, para. 53. See also Canada (Citizenship and Immigration) v. Oh*, 2009 FC 506, Canada, Federal Court, 22 May 2009, http://www.unhcr.org/refworld/docid/4a897a1c2.html, at 10.
[84] See *Case of the Yean and Bosico Children v. The Dominican Republic*, IACtHR, 8 Sep. 2005, http://www.unhcr.org/refworld/ docid/44e497d94.html. Two girls of Haitian origin were denied the right to nationality and education because, among other matters, they did not have a birth certificate; *Case of the "Juvenile Reeducation Institute" v. Paraguay*, IACtHR, 2 Sep. 2004, http://www. unhcr.org/refworld/docid/4b17bab62.html. The Court found that failure to provide severely marginalized groups with access to basic health-care services constitutes a violation of the right to life of the ACHR. See also, CRC, General Comment No. 7, para. 25; CRC, *General Comment No. 9 (2006): The Rights of children with disabilities*, CRC/C/GC/9, 27 Feb. 2007 (hereafter "CRC, *General Comment No. 9*"), http://www.unhcr.org/refworld/docid/461b93f72.html, paras. 35–36.
[85] UNHCR, *Handbook*, para. 54.
[86] See *RRT Case No. V95/03256*, [1995] RRTA 2263, Australia, RRT, 9 Oct. 1995, http://www.unhcr.org/refworld/docid/4b17c13a2. html, where the Tribunal found that "discriminatory denial of access to primary education is such a denial of a fundamental human right that it amounts to persecution." at 47.
[87] See *Ali v. Minister of Citizenship and Immigration*, IMM-3404-95, Canada, IRB, 23 Sep. 1996, http://www.unhcr.org/refworld/ docid/4b18e21b2. html, which concerned a 9 year-old girl from Afghanistan. The Court concluded that "Education is a basic human right and I direct the Board to find that she should be found to be a Convention refugee."
[88] Decisions in both Canada and Australia have accepted that bullying and harassment of school children may amount to persecution. See, for instance, *Decision VA1-02828, VA1-02826, VA1-02827 and VA1-02829, VA1-02828, VA1-02826, VA1-02827 and VA1-02829*, Canada, IRB, 27 Feb. 2003, http://www.unhcr.org/refworld/docid/4b18e03d2.html, para. 36; *RRT Case No. N03/46534*, [2003] RRTA 670, Australia, RRT, 17 July 2003, http://www.unhcr.org/refworld/docid/4b17bfd62.html.
[89] See CRC, Art. 3, which imposes a duty on States Parties to ensure the protection and care of children in respect of actions by both State and private actors; ACHR, Arts. 17 and 19; African Charter, Arts. 1(3), 81. See also UNHCR, *Handbook*, para. 65; UNHCR, *Guidelines on Gender-Related Persecution*, para. 19; *Advisory Opinion on Juridical Condition and Human Rights of the Child*, No. OC-17/02, IACtHR, 28 Aug. 2002, http://www.unhcr.org/refworld/docid/4268c57c4.html.
[90] See, for instance, *Velásquez Rodríguez Case*, Series C, No. 4, IACtHR, 29 July 1988, para. 174 http://www.unhcr.org/refworld/docid/40279a9e4. html; M.C. v. Bulgaria, Application No. 39272/98, ECtHR, 3 Dec. 2003, http://www.unhcr.org/refworld/ docid/47b19f492.html. See also UN Committee on the Elimination of Discrimination Against Women, General Recommendations Nos. 19 and 20, adopted at the Eleventh Session, 1992 (contained in Document A/47/38), A/47/38, 1992, http://www.unhcr.org/refworld/docid/453882a422.html, para. 9; UN Commission on Human Rights, The due diligence standard as a tool for the elimination of violence against women: Report of the Special Rapporteur on Violence against Women, Its Causes and Consequences, Yakin Ertürk, E/CN.4/2006/61, 20 Jan. 2006, http://www.unhcr.org/refworld/docid/45377afb0.html.
[91] UNHCR, *Guidelines on Gender-Related Persecution*, para. 11.

39. The child's access to State protection also depends on the ability and willingness of the child's parents, other primary caregiver or guardian to exercise rights and obtain protection on behalf of the child. This may include filing a complaint with the police, administrative authorities or public service institutions. However, not all children will have an adult who can represent them as is the case, for example, where the child is unaccompanied or orphaned, or where a parent, other primary caregiver or guardian is the agent of persecution. It is important to remember that, due to their young age, children may not be able to approach law enforcement officials or articulate their fear or complaint in the same way as adults. Children may be more easily dismissed or not taken seriously by the officials concerned, and the officials themselves may lack the skills necessary to interview and listen to children.

### c) The 1951 Convention grounds

40. As with adult claims to refugee status, it is necessary to establish whether or not the child's well-founded fear of persecution is linked to one or more of the five grounds listed in Article 1A(2) of the 1951 Convention. It is sufficient that the Convention ground be a factor relevant to the persecution, but it is not necessary that it be the sole, or even dominant, cause.

#### Race and nationality or ethnicity

41. Race and nationality or ethnicity is at the source of child asylum claims in many contexts. Policies that deny children of a particular race or ethnicity the right to a nationality or to be registered at birth,[92] or that deny children from particular ethnic groups their right to education or to health services would fall into this category. This Convention ground would apply similarly to policies that aim to remove children from their parents on the basis of particular racial, ethnic or indigenous backgrounds. Systematic targeting of girls belonging to ethnic minorities for rape, trafficking, or recruitment into armed forces or groups also may be analysed within this Convention ground.

#### Religion

42. As with an adult, the religious beliefs of a child or refusal to hold such beliefs may put him/her at risk of persecution. For a Convention ground to be established, it is not necessary that the child be an active practitioner. It is sufficient that the child simply be perceived as holding a certain religious belief or belonging to a sect or religious group, for example, because of the religious beliefs of his/her parents.[93]

43. Children have limited, if any, influence over which religion they belong to or observe, and belonging to a religion can be virtually as innate as one's ethnicity or race. In some countries, religion assigns particular roles or behaviour to children. As a consequence, if a child does not fulfil his/her assigned role or refuses to abide by the religious code and is punished as a consequence, s/he may have a well-founded fear of persecution on the basis of religion.

44. The reasons for persecution related to a child's refusal to adhere to prescribed gender roles may also be analysed under this ground. Girls, in particular, may be affected by persecution on the basis of religion. Adolescent girls may be required to perform traditional slave duties or to provide sexual services. They also may be required to undergo FGM or to be punished for honour crimes in the name of religion.[94] In other contexts, children – both boys and girls – may be specifically targeted to join armed groups or the armed forces of a State in pursuit of religious or related ideologies.

#### Political opinion

45. The application of the Convention ground of "political opinion" is not limited to adult claims. A claim based on political opinion presupposes that the applicant holds, or is assumed to hold, opin-

---

[92] Universal Declaration of Human Rights, http://www.unhcr.org/refworld/docid/3ae6b3712c.html, Art. 15; ICCPR, Arts 24(2) and (3); CRC, Art. 7.
[93] UNHCR, *Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees*, HCR/GIP/04/06, 28 Apr. 2004 (hereafter, "UNHCR, *Guidelines on Religion-Based Persecution*"), http://www.unhcr.org/refworld/docid/4090f9794.html.
[94] *Ibid.*, para. 24.

IFR_AR_015963

ions not tolerated by the authorities or society and that are critical of generally accepted policies, traditions or methods. Whether or not a child is capable of holding a political opinion is a question of fact and is to be determined by assessing the child's level of maturity and development, level of education, and his/her ability to articulate those views. It is important to acknowledge that children can be politically active and hold particular political opinions independently of adults and for which they may fear being persecuted. Many national liberation or protest movements are driven by student activists, including schoolchildren. For example, children may be involved in distributing pamphlets, participating in demonstrations, acting as couriers or engaging in subversive activities.

46. In addition, the views or opinions of adults, such as the parents, may be imputed to their children by the authorities or by non-State actors.[95] This may be the case even if a child is unable to articulate the political views or activities of the parent, including where the parent deliberately withholds such information from the child to protect him/her. In such circumstances, these cases should be analysed not only according to the political opinion ground but also in terms of the ground pertaining to membership of a particular social group (in this case, the "family").

47. The grounds of (imputed) political opinion and religion may frequently overlap in child asylum claims. In certain societies, the role ascribed to women and girls may be attributable to the requirements of the State or official religion. The authorities or other agents of persecution may perceive the failure of a girl to conform to this role as a failure to practice or to hold certain religious beliefs. At the same time, failure to conform could be interpreted as holding an unacceptable political opinion that threatens fundamental power structures. This may be the case particularly in societies where there is little separation between religious and State institutions, laws and doctrines.[96]

**Membership of a particular social group**

48. Children's claims to refugee status most often have been analysed in the context of the Convention ground of "membership of a particular social group", although any of the Convention grounds may be applicable. As stated in UNHCR's Guidelines

> [a] particular social group is a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.[97]

49. Although age, in strict terms, is neither innate nor permanent as it changes continuously, being a child is in effect an immutable characteristic at any given point in time. A child is clearly unable to disassociate him/herself from his/her age in order to avoid the persecution feared.[98] The fact that the child eventually will grow older is irrelevant to the identification of a particular social group, as this is based on the facts as presented in the asylum claim. Being a child is directly relevant to one's identity, both in the eyes of society and from the perspective of the individual child. Many government policies are age-driven or age-related, such as the age for military conscription, the age for sexual consent, the age of marriage, or the age for starting and leaving school. Children also share many general characteristics, such as innocence, relative immaturity, impressionability and evolving capacities. In most societies, children are set apart from adults as they are understood to require special attention or care, and they are referred to by a range of descriptors used to identify or label them, such as "young", "infant", "child", "boy", "girl" or "adolescent". The identification of

---

[95] See *Matter of Timnit Daniel and Simret Daniel*, A70 483 789 & A70 483 774, U.S. BIA, 31 Jan. 2002 (unpublished, non- precedent setting decision). The Court found that the notion "that the respondents were too young to have an actual political opinion is irrelevant; it is enough that the officials believed that they supported the EPLF."

[96] UNHCR, *Guidelines on Gender-Related Persecution, op. cit.* para. 26.

[97] UNHCR, *Guidelines on International Protection No. 2: 'Membership of a Particular Social Group' within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, HCR/GIP/02/02, 7 May 2002, http://www.unhcr.org/refworld/docid/3d36f23f4.html, para. 11.

[98] See *Matter of S-E-G-, et al.*, 24 I&N Dec. 579 (BIA 2008), U.S. BIA, 30 July 2008, http://www.unhcr.org/refworld/ docid/4891da5b2.html, which noted that "we acknowledge that the mutability of age is not within one's control, and that if an individual has been persecuted in the past on account of an age-described particular social group, or faces such persecution at a time when that individual's age places him within the group, a claim for asylum may still be cognizable." (p. 583); *LQ (Age: Immutable Characteristic) Afghanistan v. Secretary of State for the Home Department*, [2008] U.K. AIT 00005, 15 Mar. 2007, http:// www.unhcr.org/refworld/docid/47a04ac32.html, finding that the applicant, "although, assuming he survives, he will in due course cease to be a child, he is immutably a child at the time of assessment" at 6; *Decision V99-02929, V99-02929*, Canada, IRB, 21 Feb. 2000, http://www.unhcr.org/refworld/docid/4b18e5592.html, which found that "[t]he child's vulnerability arises as a result of his status as a minor. His vulnerability as a minor is an innate and unchangeable characteristic, notwithstanding the child will grow into an adult."

social groups also may be assisted by the fact that the children share a common socially-constructed experience, such as being abused, abandoned, impoverished or internally displaced.

50. A range of child groupings, thus, can be the basis of a claim to refugee status under the "membership of a particular social group" ground. Just as "women" have been recognized as a particular social group in several jurisdictions, "children" or a smaller subset of children may also constitute a particular social group.[99] Age and other characteristics may give rise to groups such as "abandoned children",[100] "children with disabilities", "orphans", or children born outside coercive family planning policies or of unauthorized marriages, also referred to as "black children".[101] The applicant's family may also constitute a relevant social group.[102]

51. The applicant's membership in a child-based social group does not necessarily cease to exist merely because his/her childhood ends. The consequences of having previously belonged to such a social group might not end even if the key factor of that identity (that is, the applicant's young age) is no longer applicable. For instance, a past shared experience may be a characteristic that is unchangeable and historic and may support the identification of groups such as "former child soldiers"[103] or "trafficked children" for the purposes of a fear of future persecution.[104]

52. Some of the more prominent social groupings include the following:

i.   **Street children** may be considered a particular social group. Children living and/or working on the streets are among the most visible of all children, often identified by society as social outcasts. They share the common characteristics of their youth and having the street as their home and/or source of livelihood. Especially for children who have grown up in such situations, their way of life is fundamental to their identity and often difficult to change. Many of these children have embraced the term "street children" as it offers them a sense of identity and belonging while they may live and/ or work on the streets for a range of reasons. They also may share past experiences such as domestic violence, sexual abuse, and exploitation or being orphaned or abandoned.[105]

ii.  **Children affected by HIV/AIDS,** including both those who are HIV-positive and those with an HIV-positive parent or other relative, may also be considered a particular social group. The fact of being HIV-positive exists independently of the persecution they may suffer as a consequence of their HIV status. Their status or that of their family may set them apart and, while manageable and/or treatable, their status is by and large unchangeable.[106]

iii. Where children are singled out as a target group for **recruitment or use by an armed force or group,** they may form a particular social group due to the innate and unchangeable nature of their age as well as the fact that they are perceived as a group by the society in which they live. As with adults, a child who evades the draft, deserts or otherwise refuses to become associated with an armed force may be perceived as holding a political opinion in which case the link to the Convention ground of political opinion may also be established.[107]

---

[99] In *In re Fauziya Kasinga, op. cit.*, it was held that "young women" may constitute a particular social group.

[100] In *V97-03500*, Canada, Convention Refugee Determination Division, 31 May 1999, it was accepted that abandoned children in Mexico can be a particular social group. (A summary is available at http://www2.irb-cisr.gc.ca/en/decisions/reflex/index_e. htm?action=article.view&id=1749). See also RRT Case No. 0805331, [2009] RRTA 347, Australia, RRT, 30 April 2009, http://www. unhcr.org/refworld/docid/4a2681692.html, where the Tribunal held that the applicant's (a two-year old child) particular social group was "children of persecuted dissidents".

[101] This has been affirmed in several decisions in Australia. See, for instance, *Chen Shi Hai, op. cit.* and more recently in RRT Case No. 0901642, [2009] RRTA 502, Australia, RRT, 3 June 2009, http://www.unhcr.org/refworld/docid/4a76ddbf2.html.

[102] See *Aguirre-Cervantes, op. cit.*, where the Court found that "[f]amily membership is clearly an immutable characteristic, fundamental to one's identity", and noted that "[t]he undisputed evidence demonstrates that Mr. Aguirre's goal was to dominate and persecute members of his immediate family."

[103] In *Lukwago v. Ashcroft, Attorney General*, 02-1812, U.S. Court of Appeals for the 3rd Circuit, 14 May 2003, http://www.unhcr. org/refworld/docid/47a7078c3.html, the Court found that "membership in the group of former child soldiers who have escaped LRA captivity fits precisely within the BIA's own recognition that a shared past experience may be enough to link members of a 'particular social group'."

[104] UNHCR, *Guidelines on Victims of Trafficking*, para. 39. See also, RRT Case No. N02/42226, [2003] RRTA 615, Australia, RRT, 30 June 2003, http://www.unhcr.org/refworld/docid/4b17c2b02.html, which concerned a young woman from Uzbekistan. The identified group was "Uzbekistani women forced into prostitution abroad who are perceived to have transgressed social mores."

[105] See, for instance, *Matter of B-F-O-*, A78 677 043, U.S. BIA, 6 Nov. 2001 (unpublished, non-precedent decision). The Court found that the applicant, who was an abandoned street child, had a well-founded fear of persecution based on membership in a particular social group. See also, *LQ (Age: Immutable Characteristic) Afghanistan v. Secretary of State for the Home Department, op. cit.* The Tribunal found that the applicant's fear of harm as an orphan and street child "would be as a result of his membership in a part of a group sharing an immutable characteristic and constituting, for the purposes of the Refugee Convention, a particular social group", at 7.

[106] See further, CRC, *General Comment No. 3: HIV/AIDS and the Rights of the Child*, 17 Mar. 2003, http://www.unhcr.org/refworld/docid/4538834e15.html.

[107] UNHCR, *Handbook*, paras. 169–171; UNHCR, *Guidelines on Religion-Based Persecution*, paras. 25–26.

IFR_AR_015965

158

#### d) Internal "flight" or "relocation" alternative

53. An assessment of the issue of internal flight alternative contains two parts: the relevance of such an inquiry, and the reasonableness of any proposed area of internal relocation.[108] The child's best interests inform both the relevance and reasonableness assessments.

54. As in the case of adults, internal relocation is only **relevant** where the applicant can access practically, safely and legally the place of relocation.[109] In particular with regard to gender-based persecution, such as domestic violence and FGM which are typically perpetrated by private actors, the lack of effective State protection in one part of the country may be an indication that the State may also not be able or willing to protect the child in any other part of the country.[110] If the child were to relocate, for example, from a rural to an urban area, the protection risks in the place of re-location would also need to be examined carefully, taking into account the age and coping capacity of the child.

55. In cases where an internal flight or relocation alternative is deemed relevant, a proposed site of internal relocation that may be **reasonable** in the case of an adult may not be reasonable in the case of a child. The "reasonableness test" is one that is applicant-specific and, thus, not related to a hypothetical "reasonable person". Age and the best interests of the child are among the factors to be considered in assessing the viability of a proposed place of internal relocation.[111]

56. Where children are unaccompanied and, therefore, not returning to the country of origin with family members or other adult support, special attention needs to be paid as to whether or not such relocation is reasonable. Internal flight or relocation alternatives, for instance, would not be appropriate in cases where unaccompanied children have no known relatives living in the country of origin and willing to support or care for them and it is proposed that they relocate to live on their own without adequate State care and assistance. What is merely inconvenient for an adult might well constitute undue hardship for a child, particularly in the absence of any friend or relation.[112] Such relocation may violate the human right to life, survival and development, the principle of the best interests of the child, and the right not to be subjected to inhuman treatment.[113]

57. If the only available relocation option is to place the child in institutional care, a proper assessment needs to be conducted of the care, health and educational facilities that would be provided and with regard to the long-term life prospects of adults who were institutionalized as children.[114] The treatment as well as social and cultural perceptions of orphans and other children in institutionalized care needs to be evaluated carefully as such children may be the subject of societal disapproval, prejudice or abuse, thus rendering the proposed site for relocation unreasonable in particular circumstances.

#### e) The application of exclusion clauses to children

58. The exclusion clauses contained in Article 1F of the 1951 Convention provide that certain acts are so grave that they render their perpetrators undeserving of international protection as refu-

---

[108] UNHCR, *Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees*, HCR/GIP/03/04, 23 July 2003, http://www. unhcr.org/refworld/docid/3f2791a44.html.

[109] *Ibid.*, para. 7.

[110] *Ibid.*, para. 15.

[111] *Ibid.*, para. 25. See further factors in the CRC, *General Comment No. 6*, para. 84, on Return to Country of Origin. Although drafted with a different context in mind, these factors are equally relevant to an assessment of an internal flight/relocation alternative.

[112] See, for instance, *Elmi v. Minister of Citizenship and Immigration*, Canada, Federal Court, No. IMM-580-98, 12 Mar. 1999, http://www.unhcr.org/refworld/docid/4b17c5932.html.

[113] CRC, Arts. 3, 6 and 37. See also *Mubilanzila Mayeka and Kaniki Mitunga v. Belgium*, Application No. 13178/03, ECtHR, 12 Oct. 2006, http://www.unhcr.org/refworld/docid/45d5cef72.html, which concerned the return (not internal relocation) of an unaccompanied five-year old girl. The Court was "struck by the failure to provide adequate preparation, supervision and safeguards for her deportation", noting further that such "conditions was bound to cause her extreme anxiety and demonstrated such a total lack of humanity towards someone of her age and in her situation as an unaccompanied minor as to amount to inhuman treatment [violation of article 3 of the European Convention on Human Rights]", paras. 66, 69.

[114] See CRC, *General Comment No. 6*, para. 85. See also *Inter-Agency Guiding Principles, op cit.*, which notes that institutional care is considered a last resort, as "residential institutions can rarely offer the developmental care and support a child requires and often cannot even provide a reasonable standard of protection", p. 46.

gees.[115] Since Article 1F is intended to protect the integrity of asylum, it needs to be applied "scrupulously". As with any exception to human rights guarantees, a restrictive interpretation of the exclusion clauses is required in view of the serious possible consequences of exclusion for the individual.[116] The exclusion clauses are exhaustively enumerated in Article 1F, and no reservations are permitted.[117]

59. In view of the particular circumstances and vulnerabilities of children, the application of the exclusion clauses to children always needs to be exercised with great caution. In the case of young children, the exclusion clauses may not apply at all. Where children are alleged to have committed crimes while their own rights were being violated (for instance while being associated with armed forces or armed groups), it is important to bear in mind that they may be victims of offences against international law and not just perpetrators.[118]

60. Although the exclusion clauses of Article 1F do not distinguish between adults and children, Article 1F can be applied to a child only if s/he has reached the age of criminal responsibility as established by international and/or national law at the time of the commission of the excludable act.[119] Thus, a child below such minimum age cannot be considered responsible for an excludable act.[120] Article 40 of the CRC requires States to establish a minimum age for criminal responsibility, but there is no universally recognized age limit.[121] In different jurisdictions, the minimum age ranges from 7 years to higher ages, such as 16 or 18 years, while the Statutes of the Special Court for Sierra Leone[122] and the International Criminal Court[123] set the cut-off age at 15 years and 18 years respectively.

61. In view of the disparities in establishing a minimum age for criminal responsibility by States and in different jurisdictions, the emotional, mental and intellectual maturity of any child over the relevant national age limit for criminal responsibility would need to be evaluated to determine whether s/he had the mental capacity to be held responsible for a crime within the scope of Article 1F. Such considerations are particularly important where the age limit is lower on the scale but is also relevant if there is no proof of age and it cannot be established that the child is at, or above, the age for criminal responsibility. The younger the child, the greater the presumption that the requisite mental capacity did not exist at the relevant time.

62. As with any exclusion analysis, a three-step analysis needs to be undertaken if there are indications that the child has been involved in conduct which may give rise to exclusion.[124] Such an analysis requires that: (i) the acts in question be assessed against the exclusion grounds, taking into account the nature of the acts as well as the context and all individual circumstances in which they occurred; (ii) it be established in each case that the child committed a crime which is covered by one of the sub-clauses of Article 1F, or that the child participated in the commission of such a crime in a manner

[115] UNHCR's interpretative legal guidance on the substantive and procedural standards for the application of Art. 1F is set out in UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/05, 4 Sep. 2003, (hereafter: "UNHCR, *Guidelines on Exclusion*") http://www.unhcr. org/refworld/docid/3f5857684.html; UNHCR, *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 Sep. 2003, (hereafter "UNHCR, *Background Note on Exclusion*"), http://www. unhcr.org/refworld/docid/3f5857d24.html; UNHCR, *Statement on Article 1F of the 1951 Convention*, July 2009, (hereafter "UNHCR, Statement on Article 1F"), http://www.unhcr.org/refworld/docid/4a5de2992.html; and UNHCR, *Handbook*, paras. 140–163.

[116] UNHCR, *Guidelines on Exclusion*, para. 2; UNHCR *Background Note on Exclusion*, para. 4. UNHCR, *Handbook* para. 149. See also ExCom Conclusions No. 82 (XLVIII), *Safeguarding Asylum*, 17 Oct. 1997, http://www.unhcr.org/refworld/docid/3ae68c958. html, para. (v); No. 102 (LVI) 2005, *General Conclusion on International Protection*, 7 Oct. 2005, http://www.unhcr.org/refworld/ docid/43575ce3e.html, para. (i); No. 103 (LVI), *Conclusion on the Provision on International Protection Including Complementary Forms of Protection*, 7 Oct. 2005, http://www.unhcr.org/refworld/docid/43576e292.html, para. (d).

[117] UNHCR, *Guidelines on Exclusion*, para. 3; UNHCR, *Background Note on Exclusion*, para. 7.

[118] The Paris Principles state: "Children who are accused of crimes under international law allegedly committed while they were associated with armed forces or armed groups should be considered primarily as victims of offences against international law; not only as perpetrators. They must be treated in accordance with international law in a framework of restorative justice and social rehabilitation, consistent with international law which offers children special protection through numerous agreements and principles," para. 3.6. It should also be noted that the prosecutor for the SCSL chose not to prosecute children between the ages of 15 and 18 years given that they themselves were victims of international crimes.

[119] UNHCR, *Guidelines on Exclusion*, para. 28.

[120] UNHCR, *Background Note on Exclusion*, para. 91. If the age of criminal responsibly is higher in the country of origin than in the host country, this should be taken into account in the child's favour.

[121] The Committee on the Rights of the Child urged States not to lower the minimum age to 12 years and noted that a higher age, such as 14 or 16 years, "contributes to a juvenile justice system which [...] deals with children in conflict with the law without resorting to judicial proceedings"; see, CRC, *General Comment No. 10 (2007): Children's Rights in Juvenile Justice*, CRC/C/GC/10, 25 Apr. 2007, http://www.unhcr.org/refworld/docid/4670fca12.html, para. 33. See also UN General Assembly, United Nations Standard Minimum Rules for the Administration of Juvenile Justice ("The Beijing Rules"), A/RES/40/33, 29 Nov. 1985, http://www. unhcr.org/refworld/docid/3b00f2203c.html, which provides that the "beginning of that age should not be fixed at a too low an age level bearing in mind the facts of emotional, mental and intellectual maturity", Art. 4.1.

[122] UN Security Council, Statute of the Special Court for Sierra Leone, 16 Jan. 2002, Art. 7.

[123] ICC Statute, Art. 26.

[124] For further information on exclusion concerning child soldiers, see UNHCR, *Advisory Opinion From the Office of the United Nations High Commissioner for Refugees (UNHCR) Regarding the International Standards for Exclusion From Refugee Status as Applied to Child Soldiers*, 12 Sep. 2005 (hereafter "UNHCR, Advisory Opinion on the Application of Exclusion Clauses to Child Soldiers"), http://www.unhcr.org/refworld/docid/440eda694.html.

which gives rise to criminal liability in accordance with internationally applicable standards; and (iii) it be determined, in cases where individual responsibility is established, whether the consequences of exclusion from refugee status are proportional to the seriousness of the act committed.[125]

63. It is important to undertake a thorough and individualized analysis of all circumstances in each case. In the case of a child, the exclusion analysis needs to take into account not only general exclusion principles but also the rules and principles that address the special status, rights and protection afforded to children under international and national law at all stages of the asylum procedure. In particular, those principles related to the best interest of the child, the mental capacity of children and their ability to understand and consent to acts that they are requested or ordered to undertake need to be considered. A rigorous application of legal and procedural standards of exclusion is also critical.[126]

64. Based on the above, the following considerations are of central importance in the application of the exclusion clauses to acts committed by children:

i.  When determining individual responsibility for excludable acts, the issue of whether or not a child has the necessary **mental state** (or *mens rea*), that is, whether or not the child acted with the requisite mental and knowledge to be held individually responsible for an excludable act, is a central factor in the exclusion analysis. This assessment needs to consider elements such as the child's emotional, mental and intellectual development. It is important to determine whether the child was sufficiently mature to understand the nature and consequences of his/her conduct and, thus, to commit, or participate in, the commission of the crime. Grounds for the absence of the *mens rea* include, for example, severe mental disabilities, involuntary intoxication, or immaturity.

ii. If mental capacity is established, other grounds for **rejecting individual responsibility** need to be examined, notably whether the child acted under duress, coercion, or in defence of self or others. Such factors are of particular relevance when assessing claims made by former child soldiers. Additional factors to consider may include: the age at which the child became involved in the armed forces or group; the reasons for which s/he joined and left the armed forces or group; the length of time s/he was a member; the consequences of refusal to join the group; any forced use of drugs, alcohol or medication; the level of education and understanding of the events in question; and the trauma, abuse or ill-treatment suffered.[127]

iii. Finally, if individual responsibility is established, it needs to be determined whether or not the consequences of exclusion from refugee status are proportional to the seriousness of the act committed.[128] This generally involves a weighing of the gravity of the offence against the degree of persecution feared upon return. If the applicant is likely to face severe persecution, the crime in question needs to be very serious in order to exclude him/her from refugee status. Issues for consideration include any mitigating or aggravating factors relevant to the case. When assessing a child's claim, even if the circumstances do not give rise to a defence, factors such as the age, maturity and vulnerability of the child are important considerations. In the case of child soldiers, such factors include ill-treatment by military personnel and circumstances during service. The consequences and treatment that the child may face upon return (i.e. serious human rights violations as a consequence of having escaped the armed forces or group) also need to be considered.

---

[125] UNHCR, *Statement on Article 1F*, p. 7.
[126] For a detailed analysis on procedural issues regarding exclusion, see UNHCR, *Guidelines on Exclusion*, paras. 31–36 and UNHCR, *Background Note on Exclusion*, paras. 98–113.
[127] Decisions in France have recognized that children who committed offences, which should in principle lead to the application of the exclusion clauses, may be exonerated if they were in particularly vulnerable situations. See, for instance, *459358, M.V.; Exclusion*, CRR, 28 Apr. 2005, http://www.unhcr.org/refworld/docid/43abf5cf4.html; *448119, M.C*, CRR, 28 Jan. 2005, http://www.unhcr.org/refworld/docid/4b17b5d92.html. See also, *MH (Syria) v. Secretary of State for the Home Department; DS (Afghanistan) v. Secretary of State for the Home Department*, [2009] EWCA Civ 226, Court of Appeal (U.K.), 24 Mar. 2009, http://www.unhcr. org/refworld/docid/49ca60ae2.html, para. 3. For detailed guidance on grounds rejecting individual responsibility, see, UNHCR *Guidelines on Exclusion*, paras. 21–24. UNHCR, *Background Note on Exclusion*, paras. 91–73. UNHCR *Advisory Opinion on the Application of Exclusion Clauses to Child Soldiers, op cit*. pp. 10–12.
[128] For detailed guidance on proportionality see UNHCR, *Guidelines on Exclusion*, para. 24; UNHCR, *Background Note on Exclusion*, paras. 76–78.

IFR_AR_015968

## IV. PROCEDURAL AND EVIDENTIARY ISSUES

65. Due to their young age, dependency and relative immaturity, children should enjoy specific procedural and evidentiary safeguards to ensure that fair refugee status determination decisions are reached with respect to their claims.[129] The general measures outlined below set out minimum standards for the treatment of children during the asylum procedure. They do not preclude the application of the detailed guidance provided, for example, in the Action for the Rights of Children Resources Pack,[130] the Inter-Agency Guiding Principles on Unaccompanied and Separated Children and in national guidelines.[131]

66. Claims made by child applicants, whether they are accompanied or not, should normally be processed on a priority basis, as they often will have special protection and assistance needs. Priority processing means reduced waiting periods at each stage of the asylum procedure, including as regards the issuance of a decision on the claim. However, before the start of the procedure, children require sufficient time in which to prepare for and reflect on rendering the account of their experiences. They will need time to build trusting relationships with their guardian and other professional staff and to feel safe and secure. Generally, where the claim of the child is directly related to the claims of accompanying family members or the child is applying for derivative status, it will not be necessary to prioritise the claim of the child unless other considerations suggest that priority processing is appropriate.[132]

67. There is no general rule prescribing in whose name a child's asylum claim ought to be made, especially where the child is particularly young or a claim is based on a parent's fear for their child's safety. This will depend on applicable national regulations. Sufficient flexibility is needed, nevertheless, to allow the name of the principal applicant to be amended during proceedings if, for instance, it emerges that the more appropriate principal applicant is the child rather than the child's parent. This flexibility ensures that administrative technicalities do not unnecessarily prolong the process.[133]

68. For unaccompanied and separated child applicants, efforts need to be made as soon as possible to initiate tracing and family reunification with parents or other family members. There will be exceptions, however, to these priorities where information becomes available suggesting that tracing or reunification could put the parents or other family members in danger, that the child has been subjected to abuse or neglect, and/ or where parents or family members may be implicated or have been involved in their persecution.[134]

69. An independent, qualified guardian needs to be appointed immediately, free of charge in the case of unaccompanied or separated children. Children who are the principal applicants in an asylum procedure are also entitled to a legal representative.[135] Such representatives should be properly trained and should support the child throughout the procedure.

70. The right of children to express their views and to participate in a meaningful way is also important in the context of asylum procedures.[136] A child's own account of his/her experience is often essential

---

[129] The relevant applicable age for children to benefit from the additional procedural safeguards elaborated in this section is the date the child seeks asylum and not the date a decision is reached. This is to be distinguished from the substantive assessment of their refugee claim in which the prospective nature of the inquiry requires that their age at the time of the decision may also be relevant.

[130] Action for the rights of children, *ARC Resource Pack, a capacity building tool for child protection in and after emergencies*, produced by Save the Children, UNHCR, UNICEF, OHCHR, International Rescue Committee and Terre des Hommes, 7 Dec. 2009, http://www.savethechildren.net/arc.

[131] See, for instance, U.K. Asylum Instruction, *Processing an Asylum Application from a Child*, 2 Nov. 2009, http://www.bia.homeoffice.gov.uk/sitecontent/ documents/policyandlaw/asylumprocessguidance/specialcases/guidance/ processingasylumapplication1.pdf?view=Binary; U.K. Border Agency Code of Practice for Keeping Children Safe from Harm, Dec. 2008, http://www.unhcr.org/refworld/docid/4948f8662.html; Finland, Directorate of Immigration, *Guidelines for Interviewing (Separated) Minors*, Mar. 2002, http://www.unhcr.org/refworld/docid/430ae8d72.html; U.S. *Guidelines For Children's Asylum Claims, op cit.*; Canada, IRB, *Guidelines Issued by the Chairperson Pursuant to Section 65(4) of the Immigration Act: Guideline 3 – Child Refugee Claimants: Procedural and Evidentiary Issues*, 30 Sep. 1996, No. 3, http://www.unhcr.org/refworld/docid/3ae6b31d3b.html.

[132] UNHCR, *Procedural Standards for Refugee Status Determination Under UNHCR's Mandate*, 20 Nov. 2003, http://www.unhcr.org/refworld/docid/42d-66dd84.html, pages 3.25, 4.21–4.23.

[133] This is especially relevant in relation to claims, such as FGM or forced marriage, where parents flee with their child in fear for his/her life although the child may not fully comprehend the reason for flight.

[134] Family tracing and reunification have been addressed in a number of ExCom Conclusions, including most recently in ExCom, *Conclusion No. 107*, para. (h)(iii). See also UNHCR, *Guidelines on Determining the Best Interests of the Child, op cit.*; CRC, *General Comment No. 6*, para. 81.

[135] "Guardian" here refers to an independent person with specialized skills who looks after the child's best interests and general well-being. Procedures for the appointment of a guardian must not be less favourable than the existing national administrative or judicial procedures used for appointing guardians for children who are nationals in the country. "Legal representative" refers to a lawyer or other person qualified to provide legal assistance to, and inform, the child in the asylum proceedings and in relation to contacts with the authorities on legal matters. See ExCom, *Conclusion No. 107*, para. (g)(viii). For further details, see CRC, *General Comment No. 6*, paras. 33–38, 69. See also UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum, op cit.*, p. 2 and paras. 4.2, 5.7, 8.3, 8.5.

[136] CRC, Art. 12. The CRC does not set any lower age limit on children's right to express their views freely as it is clear that children can and do form views from a very early age.

IFR_AR_015969

for the identification of his/her individual protection requirements and, in many cases, the child will be the only source of this information. Ensuring that the child has the opportunity to express these views and needs requires the development and integration of safe and child-appropriate procedures and environments that generate trust at all stages of the asylum process. It is important that children be provided with all necessary information in a language and manner they understand about the possible existing options and the consequences arising from them.[137] This includes information about their right to privacy and confidentiality enabling them to express their views without coercion, constraint or fear of retribution.[138]

71. Appropriate communication methods need to be selected for the different stages of the procedure, including the asylum interview, and need to take into account the age, gender, cultural background and maturity of the child as well as the circumstances of the flight and mode of arrival.[139] Useful, non-verbal communication methods for children might include playing, drawing, writing, role-playing, story-telling and singing. Children with disabilities require "whatever mode of communication they need to facilitate expressing their views".[140]

72. Children cannot be expected to provide adult-like accounts of their experiences. They may have difficulty articulating their fear for a range of reasons, including trauma, parental instructions, lack of education, fear of State authorities or persons in positions of power, use of ready-made testimony by smugglers, or fear of reprisals. They may be too young or immature to be able to evaluate what information is important or to interpret what they have witnessed or experienced in a manner that is easily understandable to an adult. Some children may omit or distort vital information or be unable to differentiate the imagined from reality. They also may experience difficulty relating to abstract notions, such as time or distance. Thus, what might constitute a lie in the case of an adult might not necessarily be a lie in the case of a child. It is, therefore, essential that examiners have the necessary training and skills to be able to evaluate accurately the reliability and significance of the child's account.[141] This may require involving experts in interviewing children outside a formal setting or observing children and communicating with them in an environment where they feel safe, for example, in a reception centre.

73. Although the burden of proof usually is shared between the examiner and the applicant in adult claims, it may be necessary for an examiner to assume a greater burden of proof in children's claims, especially if the child concerned is unaccompanied.[142] If the facts of the case cannot be ascertained and/or the child is incapable of fully articulating his/her claim, the examiner needs to make a decision on the basis of all known circumstances, which may call for a liberal application of the benefit of the doubt.[143] Similarly, the child should be given the benefit of the doubt should there be some concern regarding the credibility of parts of his/her claim.[144]

74. Just as country of origin information may be gender-biased to the extent that it is more likely to reflect male as opposed to female experiences, the experiences of children may also be ignored. In addition, children may have only limited knowledge of conditions in the country of origin or may be unable to explain the reasons for their persecution. For these reasons, asylum authorities need to make special efforts to gather relevant country of origin information and other supporting evidence.

75. Age assessments are conducted in cases when a child's age is in doubt and need to be part of a comprehensive assessment that takes into account both the physical appearance and the psychological maturity of the individual.[145] It is important that such assessments are conducted in a safe, child- and gender-sensitive manner with due respect for human dignity. The margin of appreciation inherent to all age-assessment methods needs to be applied in such a manner that,

---

[137] CRC, *General Comment No. 6*, para. 25; CRC, *General Comment No. 12*, paras. 123–124.

[138] CRC, Arts. 13, 17.

[139] Separated Children in Europe Programme, *SCEP Statement of Good Practice*, Third edition, 2004, http://www.unhcr.org/refworld/docid/415450694.html, para. 12.1.3.

[140] CRC, *General Comment No. 9*, para. 32.

[141] ExCom, *Conclusion No. 107*, para. (d).

[142] *Ibid*., para. (g)(viii), which recommends that States develop adapted evidentiary requirements.

[143] UNHCR, *Handbook*, paras. 196, 219.

[144] *Inter-Agency Guiding Principles, op. cit*., p. 61.

[145] ExCom, *Conclusion No. 107*, para. (g)(ix).

IFR_AR_015970

in case of uncertainty, the individual will be considered a child.[146] As age is not calculated in the same way universally or given the same degree of importance, caution needs to be exercised in making adverse inferences of credibility where cultural or country standards appear to lower or raise a child's age. Children need to be given clear information about the purpose and process of the age-assessment procedure in a language they understand. Before an age assessment procedure is carried out, it is important that a qualified independent guardian is appointed to advise the child.

76. In normal circumstances, DNA testing will only be done when authorized by law and with the consent of the individuals to be tested, and all individuals will be provided with a full explanation of the reasons for such testing. In some cases, however, children may not be able to consent due to their age, immaturity, inability to understand what this entails or for other reasons. In such situations, their appointed guardian (in the absence of a family member) will grant or deny consent on their behalf taking into account the views of the child. DNA tests should be used only where other means for verification have proven insufficient. They may prove particularly beneficial in the case of children who are suspected of having been trafficked by individuals claiming to be parents, siblings or other relatives.[147]

77. Decisions need to be communicated to children in a language and in a manner they understand. Children need to be informed of the decision in person, in the presence of their guardian, legal representative, and/or other support person, in a supportive and non-threatening environment. If the decision is negative, particular care will need to be taken in delivering the message to the child and explaining what next steps may be taken in order to avoid or reduce psychological stress or harm.

---

[146] *Ibid.*, para. (g)(ix); UNHCR, *Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum, op cit*, paras. 5.11, 6.
[147] UNHCR, *Note on DNA Testing to Establish Family Relationships in the Refugee Context*, June 2008, http://www.unhcr.org/refworld/docid/48620c2d2.html.

IER_AR_015971



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL      HCR/GIP/12/09      23 October 2012      Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 9:

**Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees**

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* (Reissued, Geneva, 2011). In particular, they should be read in conjunction with *UNHCR's Guidelines on International Protection No.1: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* (May 2002); *UNHCR's Guidelines on International Protection No. 2: "Membership of a Particular Social Group" Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees* (May 2002); and *UNHCR's Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees* (April 2004). They replace *UNHCR's Guidance Note on Refugee Claims relating to Sexual Orientation and Gender Identity* (November 2008).

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision makers and the judiciary, as well as UNHCR staff carrying out refugee status determination under its mandate.

The *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and the Guidelines on International Protection* are available as a compilation at: http://www.unhcr.org/refworld/docid/4f33c8d92.html.

IFR_AR_015972

## I. INTRODUCTION

1. In many parts of the world, individuals experience serious human rights abuses and other forms of persecution due to their actual or perceived sexual orientation and/or gender identity. While persecution of Lesbian, Gay, Bisexual, Transgender and Intersex (hereafter "LGBTI")[1] individuals and those perceived to be LGBTI is not a new phenomenon,[2] there is greater awareness in many countries of asylum that people fleeing persecution for reasons of their sexual orientation and/or gender identity can qualify as refugees under Article 1A(2) of the 1951 Convention relating to the Status of Refugees and/or its 1967 Protocol (hereafter the "1951 Convention").[3] Nevertheless, the application of the refugee definition remains inconsistent in this area.

2. It is widely documented that LGBTI individuals are the targets of killings, sexual and gender-based violence, physical attacks, torture, arbitrary detention, accusations of immoral or deviant behaviour, denial of the rights to assembly, expression and information, and discrimination in employment, health and education in all regions around the world.[4] Many countries maintain severe criminal laws for consensual same-sex relations, a number of which stipulate imprisonment, corporal punishment and/or the death penalty.[5] In these and other countries, the authorities may not be willing or able to protect individuals from abuse and persecution by non-State actors, resulting in impunity for perpetrators and implicit, if not explicit, tolerance of such abuse and persecution.

3. Intersecting factors that may contribute to and compound the effects of violence and discrimination include sex, age, nationality, ethnicity/race, social or economic status and HIV status. Due to these multiple layers of discrimination, LGBTI individuals are often highly marginalized in society and isolated from their communities and families. It is also not uncommon for some individuals to harbour feelings of shame and/or internalized homophobia. Because of these and other factors, they may be inhibited from informing asylum adjudicators that their real fear of persecution relates to their sexual orientation and/or gender identity.

4. The experiences of LGBTI persons vary greatly and are strongly influenced by their cultural, economic, family, political, religious and social environment. The applicant's background may impact the way he or she expresses his or her sexual orientation and/or gender identity, or may explain the reasons why he or she does not live openly as LGBTI. It is important that decisions on LGBTI refugee claims are not based on superficial understandings of the experiences of LGBTI persons, or on erroneous, culturally inappropriate or stereotypical assumptions. These Guidelines provide substantive and procedural guidance on the determination of refugee status of individuals on the basis of their sexual orientation and/or gender identity, with a view to ensuring a proper and harmonized interpretation of the refugee definition in the 1951 Convention.[6]

## II. INTERNATIONAL HUMAN RIGHTS LAW

5. Article 1 of the Universal Declaration of Human Rights provides that "all human beings are born free and equal in dignity and rights", and Article 2 declares that "everyone is entitled to all the rights and freedoms

---

[1] For a discussion of terms, see below at III. Terminology. For the purpose of these Guidelines, "gender identity" also incorporates "intersex".

[2] The 1951 Convention relating to the Status of Refugees was drafted not least as a response to the persecution during World War II, during which intolerance and violence cost the lives of thousands of people with a LGBTI background. See, UNHCR, "Summary Conclusions: Asylum-Seekers and Refugees Seeking Protection on Account of their Sexual Orientation and Gender Identity", November 2010, Expert Roundtable organized by UNHCR, Geneva, Switzerland, 30 September–1 October 2010 (hereafter "UNHCR, Summary Conclusions of Roundtable"), available at: http://www.unhcr.org/refworld/docid/4cff99a42.html, para. 3.

[3] UN General Assembly, Convention Relating to the Status of Refugees, 28 July 1951; Protocol Relating to the Status of Refugees, 31 January 1967.

[4] See, UN Human Rights Council, "Report of the United Nations High Commissioner for Human Rights on Discriminatory Laws and Practices and Acts of Violence against Individuals based on their Sexual Orientation and Gender Identity", 17 November 2011 (hereafter "OHCHR, Report on Sexual Orientation and Gender Identity"), available at: http://www.unhcr.org/refworld/docid/4ef092022.html. For an overview of jurisprudence and doctrine, see also International Commission of Jurists (hereafter "ICJ"), *Sexual Orientation and Gender Identity in Human Rights Law, References to Jurisprudence and Doctrine of the United Nations Human Rights System*, 2010, fourth updated edition, available at: http://www.unhcr.org/refworld/docid/4c627bd82.html; ICJ, *Sexual Orientation and Gender Identity in Human Rights Law, Jurisprudential, Legislative and Doctrinal References from the Council of Europe and the European Union*, October 2007, available at: http://www.unhcr.org/refworld/docid/4a54bbb5d.html; ICJ, *Sexual Orientation and Gender Identity in Human Rights Law: References to Jurisprudence and Doctrine of the Inter-American System*, July 2007, available at: http://www.unhcr.org/refworld/docid/4ad5b83a2.html.

[5] See, International Lesbian, Gay, Bisexual, Trans and Intersex Association, "State-sponsored Homophobia, A World Survey of Laws Prohibiting Same-Sex Activity between Consenting Adults", May 2012, available at: http://old.ilga.org/Statehomophobia/ILGA_State_Sponsored_Homophobia_2012.pdf.

[6] These Guidelines supplement the UNHCR "Guidelines on International Protection No. 1: Gender-Related Persecution Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees", 7 May 2002 (hereafter "UNHCR, Guidelines on Gender-Related Persecution"), available at: http://www.unhcr.org/refworld/docid/3d36f1c64.html

166

set forth in this Declaration".[7] All people, including LGBTI individuals, are entitled to enjoy the protection provided for by international human rights law on the basis of equality and non-discrimination.[8]

6. Although the main international human rights treaties do not explicitly recognize a right to equality on the basis of sexual orientation and/or gender identity,[9] discrimination on these grounds has been held to be prohibited by international human rights law.[10] For example, the proscribed grounds of "sex" and "other status" contained in the non-discrimination clauses of the main international human rights instruments have been accepted as encompassing sexual orientation and gender identity.[11] As respect for fundamental rights as well as the principle of non-discrimination are core aspects of the 1951 Convention and international refugee law,[12] the refugee definition must be interpreted and applied with due regard to them, including the prohibition on discrimination on the basis of sexual orientation and gender identity.

7. The Yogyakarta Principles on the Application of International Human Rights Law in relation to Sexual Orientation and Gender Identity were adopted in 2007 by a group of human rights experts and, although not binding, reflect well-established principles of international law.[13] They set out the human rights protection framework applicable in the context of sexual orientation and/or gender identity. Principle 23 outlines the right to seek and enjoy asylum from persecution related to sexual orientation and/or gender identity:

> Everyone has the right to seek and enjoy in other countries asylum from persecution, including persecution related to sexual orientation or gender identity. A State may not remove, expel or extradite a person to any State where that person may face a well-founded fear of torture, persecution, or any other form of cruel, inhuman or degrading treatment or punishment, on the basis of sexual orientation or gender identity.

## III. TERMINOLOGY

8. These Guidelines are intended to be inclusive of and relevant to the range of claims relating to sexual orientation and/or gender identity. The concepts of sexual orientation and gender identity are outlined in the Yogyakarta Principles and this terminology is also used for the purposes of these Guidelines. Sexual orientation refers to: "each person's capacity for profound emotional, affectional and sexual attraction to, and intimate relations with, individuals of a different gender or the same gender or more than one gender".[14] Gender identity refers to: "each person's deeply felt internal and individual experience of gender, which may or may not correspond with the sex assigned at birth, including the personal sense of the body and other expressions of gender, including dress, speech and mannerisms".[15]

9. Sexual orientation and gender identity are broad concepts which create space for self-identification. Research over several decades has demonstrated that sexual orientation can range along a continuum, including exclusive and non-exclusive attraction to the same or the opposite sex.[16] Gender identity and its expression also take many forms, with some individuals identifying neither as male nor female, or as both. Whether one's sexual orientation is determined

---

[7] UN General Assembly, Universal Declaration of Human Rights, 10 December 1948.

[8] OHCHR, Report on Sexual Orientation and Gender Identity, para. 5.

[9] However, some regional instruments expressly prohibit discrimination on grounds of sexual orientation. See, for example, Charter of Fundamental Rights of the European Union, Article 21, 18 December 2000, and Resolution of the Organization of American States, Human Rights, Sexual Orientation, and Gender Identity, AG/RES. 2721 (XLII-O/12), 4 June 2012.

[10] "[D]iscrimination' as used in the Covenant [on Civil and Political Rights] should be understood to imply any distinction, exclusion, restriction or preference which is based on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status, and which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise by all persons, on an equal footing, of all rights and freedoms.", UN Human Rights Committee, CCPR General Comment No. 18: Non-Discrimination, 10 November 1989, available at: http://www.unhcr.org/refworld/docid/453883fa8.html, para. 7.

[11] The UN Human Rights Committee held in 1994 in the landmark decision *Toonen v. Australia* that the International Covenant on Civil and Political Rights (adopted by the UN General Assembly on 16 December 1966, hereafter "ICCPR") prohibits discrimination on the grounds of sexual orientation, see CCPR/C/50/D/488/1992, 4 April 1994, (hereafter *"Toonen v. Australia"*) available at: http://www.unhcr.org/refworld/docid/48298b8d2.html. This has subsequently been affirmed by several other UN human rights treaty bodies, including also recognition that gender identity is among the prohibited grounds of discrimination. See further, OHCHR, Report on Sexual Orientation and Gender Identity, para. 7.

[12] 1951 Convention, Preambular para. 1, Article 3.

[13] ICJ, Yogyakarta Principles - Principles on the Application of International Human Rights Law in relation to Sexual Orientation and Gender Identity, (hereafter "Yogyakarta Principles"), March 2007, available at: http://www.unhcr.org/refworld/docid/48244e602.html.

[14] Yogyakarta Principles, Preamble.

[15] Ibid.

[16] American Psychological Association, "Sexual Orientation and Homosexuality" (hereafter "APA, Sexual Orientation and Homosexuality"), available at: http://www.apa.org/helpcenter/sexual-orientation.aspx.

IFR_AR_015974

by, *inter alia*, genetic, hormonal, developmental, social, and/or cultural influences (or a combination thereof), most people experience little or no sense of choice about their sexual orientation.[17] While for most people sexual orientation or gender identity are determined at an early age, for others they may continue to evolve across a person's lifetime. Different people realize at different points in their lives that they are LGBTI and their sexual and gender expressions may vary with age, and other social and cultural determinants.[18]

10. Refugee claims based on sexual orientation and/or gender identity often emanate from members of specific sub-groups, that is, lesbian, gay, bisexual, transgender, intersex and queer[19] individuals (usually abbreviated as "LGBT", "LGBTI" or "LGBTIQ"[20]). The experiences of members of these various groups will often be distinct from one another; and, as noted above at paragraph 4, *between* members. It is, therefore, essential that decision makers understand both the context of each refugee claim, as well as individual narratives that do not easily map onto common experiences or labels.[21]

---

**Lesbian**

A *lesbian* is a woman whose enduring physical, romantic and/or emotional attraction is to other women. Lesbians often suffer multiple discrimination due to their gender, their often inferior social and/or economic status, coupled with their sexual orientation. Lesbians are commonly subjected to harm by non-State actors, including acts such as "corrective" rape, retaliatory violence by former partners or husbands, forced marriage, and crimes committed in the name of "honour" by family members. Some lesbian refugee applicants have not had any experiences of past persecution; for example, if they have had few or no lesbian relationships. Lesbians may have had heterosexual relationships, often, but not necessarily, because of social pressures to marry and bear children. They may only later in life enter into a lesbian relationship or identify as lesbian. As in all refugee claims, it is important to ensure that the assessment of her fear of persecution is future-looking and that decisions are not based on stereotypical notions of lesbians.

---

**Gay men**

*Gay* is often used to describe a man whose enduring physical, romantic and/or emotional attraction is to other men, although gay can also be used to describe both gay men and women (lesbians). Gay men numerically dominate sexual orientation and gender identity refugee claims, yet their claims should not be taken as a "template" for other cases on sexual orientation and/or gender identity. Gay men are often more visible than other LGBTI groups in public life in many societies and can become the focus of negative political campaigns. It is important, however, to avoid assumptions that all gay men are public about their sexuality or that all gay men are effeminate. Having defied masculine privilege by adopting roles and characteristics viewed as "feminine", gay men may be viewed as "traitors", whether they are effeminate or not. They could be at particular risk of abuse in prisons, the military[22] and other traditionally male dominated environments and job sites. Some gay men may also have had heterosexual relationships because of societal pressures, including to marry and/or have children.

---

**Bisexual**

*Bisexual* describes an individual who is physically, romantically and/or emotionally attracted to both men and women. The term bisexuality tends to be interpreted and applied inconsistently, often with a too narrow understanding. Bisexuality does not have to involve attraction to both sexes at the same time, nor does it have to involve equal attraction to or number of relationships with both sexes. Bisexuality is a unique identity, which requires an examination in its own right. In some countries persecution may be directed expressly at gay or lesbian conduct, but nevertheless encompass acts of individuals who identify as bisexual. Bisexuals often describe their sexual orientation as "fluid" or "flexible" (see further below at paragraph 47).

---

[17] There is no consensus among scientists about the exact reasons that an individual develops a particular sexual orientation. See, APA, Sexual Orientation and Homosexuality.

[18] *Application No. 76175*, New Zealand Appeals Authority, 30 April 2008, available at: http://www.unhcr.org/refworld/docid/482422f62.html, para. 92.

[19] *Queer* is traditionally a pejorative term, however, it has been appropriated by some LGBT people to describe themselves.

[20] UNHCR has opted to refer to "LGBTI" individuals, which is intended to be inclusive of a wide range of individuals who fear persecution for reasons of their sexual orientation and/or gender identity. See further, UNHCR, *Working with Lesbian, Gay, Bisexual, Transgender & Intersex Persons in Forced Displacement*, 2011, available at: http://www.unhcr.org/refworld/docid/4e6073972.html. For further information on terminology, see, for example, Gay & Lesbian Alliance Against Defamation, "Media Reference Guide: A Resource for Journalists", updated May 2010, available at: http://www.glaad.org/reference.

[21] Considerations relating to each group are also integrated elsewhere in these Guidelines.

[22] See, for example, *RRT Case No. 060931294*, [2006] RRTA 229, Australia, RRTA, 21 December 2006, available at: http://www.unhcr.org/refworld/docid/47a707ebd.html; *MS (Risk – Homosexuality – Military Service) Macedonia v. SSHD*, CG [2002] UKIAT 03308, UK Immigration and Asylum Tribunal, 30 July 2002, available at: http://www.unhcr.org/refworld/docid/46836aba0.html, which found that the "atrocious prison conditions" in the particular country would breach the appellant's rights under the European Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR), Article 3. Lesbians may also be at risk in these environments. See, *Smith v. Minister of Citizenship and Immigration*, 2009 FC 1194, Canada, Federal Court, 20 November 2009, available at: http://www.unhcr.org/refworld/docid/4b3c7b8c2.html.

**Transgender**

*Transgender* describes people whose gender identity and/or gender expression differs from the biological sex they were assigned at birth.[23] Transgender is a gender identity, not a sexual orientation and a transgender individual may be heterosexual, gay, lesbian or bisexual.[24] Transgender individuals dress or act in ways that are often different from what is generally expected by society on the basis of their sex assigned at birth. Also, they may not appear or act in these ways at all times. For example, individuals may choose to express their chosen gender only at certain times in environments where they feel safe. Not fitting within accepted binary perceptions of being male and female, they may be perceived as threatening social norms and values. This non-conformity exposes them to risk of harm. Transgender individuals are often highly marginalized and their claims may reveal experiences of severe physical, psychological and/or sexual violence. When their self-identification and physical appearance do not match the legal sex on official documentation and identity documents, transgender people are at particular risk.[25] The transition to alter one's birth sex is not a one-step process and may involve a range of personal, legal and medical adjustments. Not all transgender individuals choose medical treatment or other steps to help their outward appearance match their internal identity. It is therefore important for decision makers to avoid overemphasis on sex-reassignment surgery.

**Intersex**

The term *intersex* or "disorders of sex development" (DSD)[26] refers to a condition in which an individual is born with reproductive or sexual anatomy and/or chromosome patterns that do not seem to fit typical biological notions of being male or female. These conditions may be apparent at birth, may appear at puberty, or may be discovered only during a medical examination. Individuals with these conditions were previously referred to as "hermaphrodites," however this term is considered outdated and should not be used unless the applicant uses it.[27] An intersex person may identify as male or female, while their sexual orientation may be lesbian, gay, bisexual, or heterosexual.[28] Intersex persons may be subjected to persecution in ways that relate to their atypical anatomy. They may face discrimination and abuse for having a physical disability or medical condition, or for non-conformity with expected bodily appearances of females and males. Some intersex children are not registered at birth by the authorities, which can result in a range of associated risks and denial of their human rights. In some countries, being intersex can be seen as something evil or part of witchcraft and can result in a whole family being targeted for abuse.[29] Similar to transgender individuals, they may risk being harmed during the transition to their chosen gender because, for example, their identification papers do not indicate their chosen gender. People who self-identify as intersex may be viewed by others as transgender, as there may simply be no understanding of the intersex condition in a given culture.

11. Not all applicants will self-identify with the LGBTI terminology and constructs as presented above or may be unaware of these labels. Some may only be able to draw upon (derogatory) terms used by the persecutor. Decision makers therefore need to be cautious about inflexibly applying such labels as this could lead to adverse credibility assessments or failure to recognize a valid claim. For example, bisexuals are often categorized in the adjudication of refugee claims as either gay, lesbian or heterosexual, intersex individuals may not identify as LGBTI at all (they may not see their condition as part of their identity, for example) and men who have sex with men do not always identify as gay. It is also important to be clear about the distinction between sexual orientation and gender identity. They are separate concepts and, as explained above at paragraph 8, they present different aspects of the identity of each person.

---

[23] The term may include, but is not limited to, transsexuals (an older term which originated in the medical and psychological communities), cross-dressers and other gender-variant people. See further, APA, "Answers to Your Questions about Transgender People, Gender Identity and Gender Expression", available at: http://www.apa.org/topics/sexuality/transgender.aspx.

[24] See also, *RRT Case No. 0903346*, [2010] RRTA 41, Australia, Refugee Review Tribunal, 5 February 2010, (hereafter "*RRT Case No. 0903346*") available at: http://www.unhcr.org/refworld/docid/4b8e783f2.html, which concerned a transgender applicant who feared persecution because of her gender identity.

[25] The European Court of Human Rights has established that authorities must legally recognize the altered gender. See, *Goodwin v. United Kingdom*, Application no. 28957/95, European Court of Human Rights, 11 July 2002, available at: http://www.unhcr.org/refworld/docid/4dad9f762.html, finding a violation of the applicant's right to privacy, noting that "the stress and alienation arising from a discordance between the position in society assumed by a post-operative transsexual and the status imposed by law which refuses to recognize the change of gender cannot, in the Court's view, be regarded as a minor inconvenience arising from a formality.", para. 77, and that "Under Article 8 of the Convention in particular, the notion of personal autonomy is an important principle underlying the interpretation of its guarantees, protection is given to the personal sphere of each individual, including the right to establish details of their identity as individual human beings", para. 90. See also Council of Europe Recommendation CM/Rec (2010)5 of the Committee of Ministers to Member States on measures to combat discrimination on grounds of sexual orientation or gender identity, recognizing that "Member states should take appropriate measures to guarantee the full legal recognition of a person's gender reassignment in all areas of life, in particular by making possible the change of name and gender in official documents in a quick, transparent and accessible way.", at 21.

[26] Note that some individuals (and/or their medical records) will just use the name of their particular condition, such as congenital adrenal hyperplasia or androgen insensitivity syndrome, rather than using the term intersex or DSD.

[27] US Citizenship and Immigration Services, "Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender and Intersex (LGBTI) Refugee and Asylum Claims", 27 December 2011 (hereafter "USCIS, Guidance for Adjudicating LGBTI Claims"), available at: http://www.unhcr.org/refworld/docid/4f269cd72.html, p. 13.

[28] See further, Advocates for Informed Choice website: http://aiclegal.org/faq/#whatisintersex.

[29] Jill Schnoebelen, *Witchcraft Allegations, Refugee Protection and Human Rights: A Review of the Evidence*, UNHCR, New Issues in Refugee Research, Research Paper No. 169, January 2009, available at: http://www.unhcr.org/4981ca712.pdf.

IFR_AR_015976

## IV. SUBSTANTIVE ANALYSIS

### A. Background

12. A proper analysis as to whether a LGBTI applicant is a refugee under the 1951 Convention needs to start from the premise that applicants are entitled to live in society as who they are and need not hide that.[30] As affirmed by the position adopted in a number of jurisdictions, sexual orientation and/or gender identity are fundamental aspects of human identity that are either innate or immutable, or that a person should not be required to give up or conceal.[31] While one's sexual orientation and/or gender identity may be revealed by sexual conduct or a sexual act, or by external appearance or dress, it may also be evidenced by a range of other factors, including how the applicant lives in society, or how he or she expresses (or wishes to express) his or her identity.[32]

13. An applicant's sexual orientation and/or gender identity can be relevant to a refugee claim where he or she fears persecutory harm on account of his or her actual or perceived sexual orientation and/or gender identity, which does not, or is seen not to, conform to prevailing political, cultural or social norms. The intersection of gender, sexual orientation and gender identity is an integral part in the assessment of claims raising questions of sexual orientation and/or gender identity. Harm as a result of not conforming to expected gender roles is often a central element in these claims. UNHCR's Guidelines on Gender-Related Persecution recognize that:

> Refugee claims based on differing sexual orientation contain a gender element. A claimant's sexuality or sexual practices may be relevant to a refugee claim where he or she has been subject to persecutory action on account of his or her sexuality or sexual practices. In many such cases, the claimant has refused to adhere to socially or culturally defined roles or expectations of behaviour attributed to his or her sex.[33]

14. The impact of gender is relevant to refugee claims made by both LGBTI men and women.[34] Decision makers need to be attentive to differences in their experiences based on sex/gender. For example, heterosexual or male gay norms or country information may not apply to the experiences of lesbians whose position may, in a given context, be similar to that of other women in her society. Full account needs to be taken of diverse and evolving identities and their expression, the actual circumstances of the individual, and the cultural, legal, political and social context.[35]

15. Societal disapproval of varied sexual identities or their expression is usually more than the simple disapproval of sexual practices. It is often underlined by a reaction to non-compliance with expected cultural, gender and/or social norms and values. The societal norms of who men and women are and how they are supposed to behave are commonly based on hetero-normative standards. Both men and women may be subject to violent acts to make them conform to society's gender roles and/or to intimidate others by setting "an example". Such harm can be "sexualized" as a means of further degrading, objectifying or punishing the victim for his/her sexual orientation or gender identity, but can also take other forms.[36]

---

[30] UNHCR, *HJ (Iran) and HT (Cameroon) v. Secretary of State for the Home Department – Case for the First Intervener (United Nations High Commissioner for Refugees)*, 19 April 2010, (hereafter "UNHCR, *HJ and HT*"), available at: http://www.unhcr.org/refworld/docid/4bd1abbc2.html, para. 1. For a comparison with other Convention grounds, see para. 29 of the submission. See also, *HJ (Iran) and HT (Cameroon) v. Secretary of State for the Home Department*, UK, [2010] UKSC 31, Supreme Court, 7 July 2010 (hereafter "*HJ and HT*"), available at: http://www.unhcr.org/refworld/docid/4c3456752.html.

[31] See, for example, *Canada (Attorney General) v. Ward*, [1993] 2 S.C.R. 689, Canada, Supreme Court, 30 June 1993 (hereafter "*Canada v. Ward*"), available at: http://www.unhcr.org/refworld/docid/3ae6b673c.html; *Geovanni Hernandez-Montiel v. Immigration and Naturalization Service*, US, 225 F.3d 1084, A72-994-275, (9th Cir. 2000), 24 August 2000, available at: http://www.unhcr.org/refworld/docid/3ba9c1119.html, later affirmed by *Morales v. Gonzales*, US, 478 F.3d 972, No. 05-70672, (9th Cir. 2007), 3 January 2007, available at: http://www.unhcr.org/refworld/docid/4829b1452.html; *Appellants S395/2002 and S396/2002 v. Minister for Immigration and Multicultural Affairs*, [2003] HCA 71, Australia, High Court, 9 December 2003 (hereafter "*S395/2002*"), available at: http://www.unhcr.org/refworld/docid/3fd9eca84.html; *Refugee Appeal No. 74665*, New Zealand, Refugee Status Appeals Authority, 7 July 2004 (hereafter "*Refugee Appeal No. 74665*"), available at: http://www.unhcr.org/refworld/docid/42234ca54.html; *HJ and HT*, above footnote 30, paras. 11, 14, 78.

[32] Yogyakarta Principles, Principle 3, affirms that each person's self-defined sexual orientation and gender identity is integral to their personality and is one of the most basic aspects of self-determination, dignity and freedom. See further, *S395/2002*, para. 81; *Matter of Toboso-Alfonso*, US Board of Immigration Appeals, 12 March 1990, (hereafter "*Matter of Toboso-Alfonso*"), available at: http://www.unhcr.org/refworld/docid/3ae6b6b84.html; *Nasser Mustapha Karouni v. Alberto Gonzales, Attorney General*, US, No. 02-72651, (9th Cir. 2005), 7 March 2005 (hereafter "*Karouni*") available at: http://www.unhcr.org/refworld/docid/4721b5c32.html, at III[6]; *Lawrence, et. al. v. Texas*, US Supreme Court, 26 June 2003, available at: http://www.unhcr.org/refworld/docid/3f21381d4.html, which found that "When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring", p. 6.

[33] UNHCR, Guidelines on Gender-Related Persecution, para. 16.

[34] UNHCR, Guidelines on Gender-Related Persecution, para. 3.

[35] UNHCR, Summary Conclusions of Roundtable, para. 5.

[36] UNHCR, Summary Conclusions of Roundtable, paras. 6, 16.

IFR_AR_015977

## B. Well-founded fear of being persecuted

16. The term "persecution", though not expressly defined in the 1951 Convention, can be considered to involve serious human rights violations, including a threat to life or freedom as well as other kinds of serious harm. In addition, lesser forms of harm may cumulatively constitute persecution. What amounts to persecution will depend on the circumstances of the case, including the age, gender, opinions, feelings and psychological make-up of the applicant.[37]

17. Discrimination is a common element in the experiences of many LGBTI individuals. As in other refugee claims, discrimination will amount to persecution where measures of discrimination, individually or cumulatively, lead to consequences of a substantially prejudicial nature for the person concerned.[38] Assessing whether the cumulative effect of such discrimination rises to the level of persecution is to be made by reference to reliable, relevant and up-to-date country of origin information.[39]

18. Not all LGBTI applicants may have experienced persecution in the past (see further below at paragraphs 30-33 on concealment as persecution and at paragraph 57 on *sur place* claims). Past persecution is not a prerequisite to refugee status and in fact, the well-foundedness of the fear of persecution is to be based on the assessment of the predicament that the applicant would have to face if returned to the country of origin.[40] The applicant does not need to show that the authorities knew about his or her sexual orientation and/or gender identity before he or she left the country of origin.[41]

19. Behaviour and activities may relate to a person's orientation or identity in complex ways. It may be expressed or revealed in many subtle or obvious ways, through appearance, speech, behaviour, dress and mannerisms; or not revealed at all in these ways. While a certain activity expressing or revealing a person's sexual orientation and/or gender identity may sometimes be considered trivial, what is at issue is the consequences that would follow such behaviour. In other words, an activity associated with sexual orientation may merely reveal or expose the stigmatized identity, it does not cause or form the basis of the persecution. In UNHCR's view, the distinction between forms of expression that relate to a "core area" of sexual orientation and those that do not, is therefore irrelevant for the purposes of the assessment of the existence of a well-founded fear of persecution.[42]

### Persecution

20. Threats of serious abuse and violence are common in LGBTI claims. Physical, psychological and sexual violence, including rape,[43] would generally meet the threshold level required to establish persecution. Rape in particular has been recognized as a form of torture, leaving "deep psychological scars on the victim".[44] Rape has been identified as being used for such purposes as "intimida-

---

[37] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, HCR/1P/4/ENG/REV. 3 (hereafter "UNHCR, *Handbook*"), paras. 51–53.

[38] *Ibid*, paras. 54–55.

[39] *Molnar v. Canada (Minister of Citizenship and Immigration)*, 2005 FC 98, Canada, Federal Court, 21 January 2005 (hereafter "*Molnar v. Canada*") available at: http://www.unhcr.org/refworld/docid/4fe81df72.html.

[40] See, for example, *Bromfield v. Mukasey*, US, 543 F.3d 1071, 1076-77 (9th Cir. 2008), 15 September 2008, available at: http://www.unhcr.org/refworld/docid/498b08a12.html, *RRT Case No. 1102877*, [2012] RRTA 101, Australia, Refugee Review Tribunal, 23 February 2012, available at: http://www.unhcr.org/refworld/docid/4f8410a52.html, para. 91.

[41] UNHCR, *Handbook*, para. 83.

[42] *Bundesrepublik Deutschland v. Y (C-71/11), Z (C-99/11)*, C-71/11 and C-99/11, CJEU, 5 September 2012, available at: http://www.unhcr.org/refworld/docid/505ace862.html, para. 62; *RT (Zimbabwe) and others v Secretary of State for the Home Department*, [2012] UKSC 38, UK Supreme Court, 25 July 2012, available at: http://www.unhcr.org/refworld/docid/500fdacb2.html, paras. 75–76 (Lord Kerr); *UNHCR Statement on Religious Persecution and the Interpretation of Article 9(1) of the EU Qualification Directive* and UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe)* and *AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) – Case for the Intervener*, 25 May 2012, Case No. 2011/0011, available at: http://www.unhcr.org/refworld/docid/4fc369022.html, para. 12(9).

[43] International criminal tribunals in their jurisprudence have broadened the scope of crimes of sexual violence that can be prosecuted as rape to include oral sex and vaginal or anal penetration through the use of objects or any part of the perpetrator's body. See, for instance, *Prosecutor v. Anto Furundzija (Trial Judgment)*, IT-95-17/1-T, International Criminal Tribunal for the Former Yugoslavia (ICTY), 10 December 1998, available at: http://www.unhcr.org/refworld/docid/40276a8a4.html, para. 185; *Prosecutor v. Dragoljub Kunarac, Radomir Kovac and Zoran Vukovic (Appeal Judgment)*, IT-96-23 & IT-96-23/1-A, ICTY, 12 June 2002, available at: http://www.unhcr.org/refworld/docid/3debaafe4.html, para. 128. See also, International Criminal Court, Elements of Crimes, 2011, available at: http://www.unhcr.org/refworld/docid/4ff5dd7d2.html, Articles 7 (1) (g)-1 and 8(2)(b)(xxii)-1. For refugee-related jurisprudence, see *Ayala v. US Attorney General*, US, No. 09-12113, (11th Cir. 2010), 7 May 2010 (hereafter "*Ayala v. US Attorney General*"), available at: http://www.unhcr.org/refworld/docid/4c6c04942.html, which found that oral rape constituted persecution.

[44] *Aydin v. Turkey*, 57/1996/676/866, Council of Europe, European Court of Human Rights, 25 September 1997, available at: http://www.unhcr.org/refworld/docid/3ae6b7228.html, para. 83. See also, *HS (Homosexuals: Minors, Risk on Return) Iran v. Secretary of State for the Home Department* [2005] UKAIT 00120, UK Asylum and Immigration Tribunal (AIT), 4 August 2005, available at: http://www.unhcr.org/refworld/docid/47fdfafe0.html, recognizing as torture the sexual assault the applicant had been subjected to while in detention, paras. 57; *Arb... v. Conseil du Contentieux des Etrangers, 22 December 2009, available at: http://www.unhcr.org/refworld/docid/4d8b4692f.html, referring to torture and serious violations of the appellant's physical integrity while in prison as constituting persecution.

tion, degradation, humiliation, discrimination, punishment, control or destruction of the person. Like torture, rape is a violation of personal dignity."[45]

21. Many societies, for example, continue to view homosexuality, bisexuality, and/or transgender behaviour or persons, as variously reflecting a disease, a mental illness or moral failing, and they may thus deploy various measures to try to change or alter someone's sexual orientation and/or gender identity. Efforts to change an individual's sexual orientation or gender identity by force or coercion may constitute torture, or inhuman or degrading treatment, and implicate other serious human rights violations, including the rights to liberty and security of person. Examples at the extreme end and which on their face reach the threshold of persecution include forced institutionalization, forced sex-reassignment surgery, forced electroshock therapy and forced drug injection or hormonal therapy.[46] Non-consensual medical and scientific experimentation is also explicitly identified as a form of torture or inhuman or degrading treatment under the International Covenant on Civil and Political Rights.[47] Some intersex individuals may be forced to undergo surgery aimed at "normalcy" and, where it will be applied without their consent, this is likely to amount to persecution. It is also important to distinguish in these cases between surgery necessary to preserve life or health and surgery for cosmetic purposes or social conformity. The assessment needs to focus on whether the surgery or treatment was voluntary and took place with the informed consent of the individual.[48]

22. Detention, including in psychological or medical institutions, on the sole basis of sexual orientation and/or gender identity is considered in breach of the international prohibition against the arbitrary deprivation of liberty and would normally constitute persecution.[49] Moreover, as noted by the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, there is usually a strict hierarchy in detention facilities and those at the bottom of this hierarchy, such as LGBTI detainees, suffer multiple discrimination. Male-to-female transgender prisoners are at particular risk of physical and sexual abuse if placed within the general male prison population.[50] Administrative segregation, or solitary confinement, solely because a person is LGBTI can also result in severe psychological harm.[51]

23. Social norms and values, including so-called family "honour", are usually closely intertwined in the refugee claims of LGBTI individuals. While "mere" disapproval from family or community will not amount to persecution, it may be an important factor in the overall context of the claim. Where family or community disapproval, for example, manifests itself in threats of serious physical violence or even murder by family members or the wider community, committed in the name of "honour", it would clearly be classed as persecution.[52] Other forms of persecution include forced or underage marriage,

---

[45] *The Prosecutor v. Jean-Paul Akayesu (Trial Judgment)*, ICTR-96-4-T, International Criminal Tribunal for Rwanda, 2 September 1998, available at: http://www.unhcr.org/refworld/docid/40278fbb4.html, para. 687.

[46] Yogyakarta Principles, Principle 18: "Notwithstanding any classifications to the contrary, a person's sexual orientation and gender identity are not, in and of themselves, medical conditions and are not to be treated, cured or suppressed". See also, *Alla Konstantinova Pitcherskaia v. Immigration and Naturalization Service*, US, 95-70887, (9th Cir. 1997), 24 June 1997 (hereafter "*Pitcherskaia v. INS*"), available at: http://www.unhcr.org/refworld/docid/4152e0fb26.html.

[47] *ICCPR, Article 7, "… In particular, no one shall be subjected without his free consent to medical or scientific experimentation". As affirmed, for example, by the UN Committee Against Torture and the UN Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, this includes subjecting men suspected of homosexual conduct to non-consensual anal examinations to prove their homosexuality. See further, OHCHR, Report on Sexual Orientation and Gender Identity, para. 37.*

[48] See, UN Committee on the Elimination of Discrimination against Women (CEDAW), *Communication No. 4/2004*, 29 August 2006, CE-DAW/C/36/D/4/2004, available at: http://www.unhcr.org/refworld/docid/4fdb288e2.html, which considered non-consensual sterilization as a violation of women's rights to informed consent and dignity, para. 11.3. In respect of surgery at birth, the best interests of the child is a primary consideration, taking into account the rights and duties of his or her parents, legal guardians, or other individuals legally responsible for him or her (Convention on the Rights of the Child (CRC), Article 3). If sex re-assignment or reconstructive surgery is contemplated only later in childhood, "States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of the child being given due weight in accordance with the age and maturity of the child" (CRC, Article 12(1)).

[49] See, UN Working Group on Arbitrary Detention, Opinions No. 22/2006 on Cameroon and No. 42/2008 on Egypt; A/HRC/16/47, annex, para. 8(e). See also, UNHCR, "Guidelines on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention", 2012, (hereafter "UNHCR, Guidelines on Detention"), available at: http://www.unhcr.org/refworld/docid/503489533b8.html.

[50] OHCHR, Report on Sexual Orientation and Gender Identity, para. 34.

[51] As noted in the UNHCR Guidelines on Detention, "solitary confinement is not an appropriate way to manage or ensure the protection of such individuals", para. 65.

[52] UN Human Rights Committee and the Inter-American Commission on Human Rights have concluded that the inaction of State vis-à-vis death threats constitutes a violation of the right to life. See also, *RRT Case No. 0902671*, [2009] RRTA 1053, Australia, Refugee Review Tribunal, 19 November 2009, available at: http://www.unhcr.org/refworld/docid/4b57016f2.html, which found that the "applicant's chance of facing serious harm, possibly death by honour killing, if he returned to [the country of origin] now or in the reasonably foreseeable future is real and amounts to serious harm...in that it is deliberate or intentional and involves persecution for a Convention reason". See also, *Muckette v. Minister of Citizenship and Immigration*, 2008 FC 1388, Canada, Federal Court, 17 December 2008, available at: http://www.unhcr.org/refworld/docid/4978f2 e2.html. The claim was remanded for reconsideration as the lower instance had "failed to address whether the death threats had a degree of reality to them and in effect dismissed them because no one had attempted to kill the Applicant."

forced pregnancy and/or marital rape (on rape, see above at paragraph 20). In the context of sexual orientation and/or gender identity cases, such forms of persecution are often used as a means of denial or "correcting" non-conformity. Lesbians, bisexual women and transgender persons are at particular risk of such harms owing to pervasive gender inequalities that restrict autonomy in de-cision-making about sexuality, reproduction and family life.[53]

24. LGBTI individuals may also be unable to enjoy fully their human rights in matters of private and family law, including inheritance, custody, visitation rights for children and pension rights.[54] Their rights to freedom of expression, association and assembly may be restricted.[55] They may also be denied a range of economic and social rights, including in relation to housing, education,[56] and health care.[57] Young LGBTI individuals may be prevented from going to school, subjected to harassment and bullying and/or expelled. Community ostracism can have a damaging impact on the mental health of those targeted, especially if such ostracism has lasted for an extended period of time and where it occurs with impunity or disregard. The cumulative effect of such restrictions on the exercise of human rights may constitute persecution in a given case.

25. LGBTI individuals may also experience discrimination in access to and maintenance of em-ployment.[58] Their sexual orientation and/or gender identity may be exposed in the workplace with resulting harassment, demotion or dismissal. For transgender individuals in particular, deprivation of employment, often combined with lack of housing and family support, may frequently force them into sex work, subjecting them to a variety of physical dangers and health risks. While being dismissed from a job generally is not considered persecution, even if discriminatory or unfair, if an individual can demonstrate that his or her LGBTI identity would make it highly improbable to enjoy any kind of gainful employment in the country of origin, this may constitute persecution.[59]

**Laws criminalizing same-sex relations**

26. Many lesbian, gay or bisexual applicants come from countries of origin in which consensual same-sex relations are criminalized. It is well established that such criminal laws are discriminatory and violate international human rights norms.[60] Where persons are at risk of persecution or punish-ment such as by the death penalty, prison terms, or severe corporal punishment, including flogging, their persecutory character is particularly evident.[61]

27. Even if irregularly, rarely or ever enforced, criminal laws prohibiting same-sex relations could lead to an intolerable predicament for an LGB person rising to the level of persecution. Depending on the country context, the criminalization of same-sex relations can create or contribute to an oppressive atmosphere of intolerance and generate a threat of prosecution for having such relations. The existence of such laws can be used for blackmail and extortion purposes by the authorities or non-State actors. They can promote political rhetoric that can expose LGB individuals to risks of persecutory harm. They can also hinder LGB persons from seeking and obtaining State protection.

---

[53] OHCHR, Report on Sexual Orientation and Gender Identity, para. 66.
[54] *Ibid*, paras. 68–70.
[55] *Ibid*, paras. 62–65.
[56] *Ibid*, paras. 58–61.
[57] *Ibid*, paras. 54–57.
[58] *Ibid*, paras. 51–53.
[59] USCIS, Guidance for Adjudicating LGBTI Claims, p. 23. See also, *Kadri v. Mukasey*, US, Nos. 06-2599 & 07-1754, (1st Cir. 2008), 30 September 2008, available at: http://www.unhcr.org/refworld/docid/498b0a212.html. The case was remanded for consideration of the standard for economic persecution, referring to *In re T-Z-*, 24 I & N. Dec. 163 (US Board of Immigration Appeals, 2007), which had found that "'[nonphysical] harm or suffering . . . such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment, or other essentials of life may rise to persecution".
[60] See, for example, *Toonen v. Australia*, above footnote 11, which found that the sodomy law of the territory concerned violated the rights to privacy and equality before the law.
[61] European Union, European Parliament, Directive 2011/95/EU of the European Parliament and of the Council of 13 December 2011 on stand-ards for the qualification of third-country nationals or stateless persons as beneficiaries of international protection, for a uniform status for refugees or for persons eligible for subsidiary protection, and for the content of the protection granted (recast), (hereafter "EU Qualification Directive"), Article 9; COC and Vrije Universiteit Amsterdam, *Fleeing Homophobia, Asylum Claims Related to Sexual Orientation and Gender Identity in Europe*, September 2011 (hereafter "Fleeing Homophobia Report") available at: http://www.unhcr.org/refworld/docid/4ebba7852.html, pp. 22–24. See also *Arrêt n° 50 966*, Belgium, Conseil du Contentieux des Etrangers, 9 November 2010, available at: http://www.unhcr.org/refworld/docid/4dad967f2.html, concerning a lesbian, found that a prison term for homosexual conduct of 1–5 years and fines from 100 000 à 1 500 000 francs CFA and the fact that society was homophobic were sufficient grounds to constitute persecution, see circumstances of flight, para. 5.7.1. Similarly in *Arrêt n° 50 967*, Belgium, Conseil du Contentieux des Etrangers, 9 November 2010, available at: http://www.unhcr.org/refworld/docid/4dad97d92.html, concerning a gay man.

28. Assessing the "well-founded fear of being persecuted" in such cases needs to be fact-based, focusing on both the individual and the contextual circumstances of the case. The legal system in the country concerned, including any relevant legislation, its interpretation, application and actual impact on the applicant needs to be examined.[62] The "fear" element refers not only to persons to whom such laws have already been applied, but also to individuals who wish to avoid the risk of the application of such laws to them. Where the country of origin information does not establish whether or not, or the extent, that the laws are actually enforced, a pervading and generalized climate of homophobia in the country of origin could be evidence indicative that LGBTI persons are nevertheless being persecuted.

29. Even where consensual same-sex relations are not criminalized by specific provisions, laws of general application, for example, public morality or public order laws (loitering, for example) may be selectively applied and enforced against LGBTI individuals in a discriminatory manner, making life intolerable for the claimant, and thus amounting to persecution.[63]

**Concealment of sexual orientation and/or gender identity**

30. LGBTI individuals frequently keep aspects and sometimes large parts of their lives secret. Many will not have lived openly as LGBTI in their country of origin and some may not have had any intimate relationships. Many suppress their sexual orientation and/or gender identity to avoid the severe consequences of discovery, including the risk of incurring harsh criminal penalties, arbitrary house raids, discrimination, societal disapproval, or family exclusion.

31. That an applicant may be able to avoid persecution by concealing or by being "discreet" about his or her sexual orientation or gender identity, or has done so previously, is not a valid reason to deny refugee status. As affirmed by numerous decisions in multiple jurisdictions, a person cannot be denied refugee status based on a requirement that they change or conceal their identity, opinions or characteristics in order to avoid persecution.[64] LGBTI people are as much entitled to freedom of expression and association as others.[65]

32. With this general principle in mind, the question thus to be considered is what predicament the applicant would face if he or she were returned to the country of origin. This requires a fact-specific examination of what may happen if the applicant returns to the country of nationality or habitual residence and whether this amounts to persecution. The question is not, could the applicant, by being discreet, live in that country without attracting adverse consequences. It is important to note that even if applicants may so far have managed to avoid harm through concealment, their circumstances may change over time and secrecy may not be an option for the entirety of their lifetime. The risk of discovery may also not necessarily be confined to their own conduct. There is almost always the possibility of discovery against the person's will, for example, by accident, rumours or growing suspicion.[66] It is also important to recognize that even if LGBTI individuals conceal their sexual orientation or gender identity they may still be at risk of exposure and related harm for not following expected social norms (for example, getting married and having children, for example). The absence of certain expected activities and behaviour identifies a difference between them and other people and may place them at risk of harm.[67]

---

[62] UNHCR, *Handbook*, para. 45.

[63] *RRT Case No. 1102877*, [2012] RRTA 101, Australia, Refugee Review Tribunal, 23 February 2012, available at: http://www.unhcr.org/refworld/docid/4f8410a52.html, paras. 89, 96; *RRT Case No. 071862642*, [2008] RRTA 40, Australia: Refugee Review Tribunal, 19 February 2008, available at: http://www.unhcr.org/refworld/docid/4811a7192.html.

[64] For example, *HJ and HT*, above footnote 30; UNHCR, *HJ and HT*, above footnote 30, paras. 26–33; *S395/2002*, above footnote 31; *Refugee Appeal No. 74665*, above footnote 31; *Karouni*, above footnote 32; *KHO:2012:1*, Finland, Supreme Administrative Court, 13 January 2012, available at: http://www.unhcr.org/refworld/docid/4f3cdf7e2.html. See also, UNHCR, "Guidelines on International Protection No. 2: "Membership of a Particular Social Group" Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees", 7 May 2002, HCR/GIP/02/02 (hereafter "UNHCR, Guidelines on Social Group"), available at: http://www.unhcr.org/refworld/docid/3d36f23f4.html, paras. 6, 12; UNHCR, "Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees", 28 April 2004, HCR/GIP/04/06, (hereafter "UNHCR, Guidelines on Religion"), para. 13; UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe) and AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) - Case for the Intervener*, 25 May 2012, 2011/0011, available at: http://www.unhcr.org/refworld/docid/4fc369022.html, para. 9.

[65] As noted by the UK Supreme Court in *HJ and HT*, above footnote 30: "The underlying rationale of the Convention is ... that people should be able to live freely, without fearing that they may suffer harm of the requisite intensity or duration because they are, say, black, or the descendants of some former dictator, or gay. In the absence of any indication to the contrary, the implication is that they must be free to live openly in this way without fear of persecution. By allowing them to live openly and free from that fear, the receiving state affords them protection which is a surrogate for the protection which their home state should have afforded them", para. 53.

[66] *S395/2002*, above footnote 31, paras. 56–58.

[67] *SW (lesbians - HJ and HT applied) Jamaica v. Secretary of State for the Home Department*, UK, CG [2011] UKUT 00251(IAC), Upper Tribunal (Immigration and Asylum Chamber), 24 June 2011, available at: http://www.unhcr.org/refworld/docid/4e0c3fae2.html.

IFR_AR_015981

33. Being compelled to conceal one's sexual orientation and/or gender identity may also result in significant psychological and other harms. Discriminatory and disapproving attitudes, norms and values may have a serious effect on the mental and physical health of LGBTI individuals[68] and could in particular cases lead to an intolerable predicament amounting to persecution.[69] Feelings of self-denial, anguish, shame, isolation and even self-hatred which may accrue in response an inability to be open about one's sexuality or gender identity are factors to consider, including over the long-term.

**Agents of Persecution**

34. There is scope within the refugee definition to recognize persecution emanating from both State and non-State actors. State persecution may be perpetrated, for example, through the criminalization of consensual same-sex conduct and the enforcement of associated laws, or as a result of harm inflicted by officials of the State or those under the control of the State, such as the police or the military. Individual acts of "rogue" officers may still be considered as State persecution, especially where the officer is a member of the police and other agencies that purport to protect people.[70]

35. In situations where the threat of harm is from non-State actors, persecution is established where the State is unable or unwilling to provide protection against such harm. Non-State actors, including family members, neighbours, or the broader community, may be either directly or indirectly involved in persecutory acts, including intimidation, harassment, domestic violence, or other forms of physical, psychological or sexual violence. In some countries, armed or violent groups, such as paramilitary and rebel groups, as well as criminal gangs and vigilantes, may target LGBTI individuals specifically.[71]

36. In scenarios involving non-State agents of persecution, State protection from the claimed fear has to be available and effective.[72] State protection would normally neither be considered available nor effective, for instance, where the police fail to respond to requests for protection or the authorities refuse to investigate, prosecute or punish (non-State) perpetrators of violence against LGBTI individuals with due diligence.[73] Depending on the situation in the country of origin, laws criminalizing same-sex relations are normally a sign that protection of LGB individuals is not available. Where the country of origin maintains such laws, it would be unreasonable to expect that the applicant first seek State protection against harm based on what is, in the view of the law, a criminal act. In such situations, it should be presumed, in the absence of evidence to the contrary, that the country concerned is unable or unwilling to protect the applicant.[74] As in other types of claims, a claimant does not need to show that he or she approached the authorities for protection before flight. Rather he or she has to establish that the protection was not or unlikely to be available or effective upon return.

37. Where the legal and socio-economic situation of LGBTI people is improving in the country of origin, the availability and effectiveness of State protection needs to be carefully assessed based on reliable and up-to-date country of origin information. The reforms need to be more than merely transitional. Where laws criminalizing same-sex conduct have been repealed or other positive measures have been taken, such reforms may not impact in the immediate or foreseeable future as to how society generally regards people with differing sexual orientation and/or gender iden-

---

[68] Discrimination of LGBTI individuals has been associated with mental health problems. Studies have shown that internalized negative attitudes towards non-heterosexuality in LGB individuals was related to difficulties with self-esteem, depression, psychosocial and psychological distress, physical health, intimacy, social support, relationship quality, and career development. See further, APA, "Practice Guidelines for LGB Clients, Guidelines for Psychological Practice with Lesbian, Gay, and Bisexual Clients" (hereafter "APA, Practice Guidelines for LGB Clients"), available at: http://www.apa.org/pi/lgbt/resources/guidelines.aspx?item=3.

[69] *Pathmakanthan v. Holder*, US, 612 F.3d 618, 623 (7th Cir. 2010), available at: http://www.unhcr.org/refworld/docid/4d249efa2.html.

[70] See *Ayala v. US Attorney General*, above footnote 42. The treatment by a group of police officers (robbery and sexual assault) constituted persecution and was deemed to be on account of the applicant's sexual orientation.

[71] *P.S., a/k/a S.J.P., v. Holder, Attorney General*, US, No. 09-3291, Agency No. A99-473-409, (3rd Cir. 2010), 22 June 2010, available at: http://www.unhcr.org/refworld/docid/4fbf263f2.html, concerned a gay man who was targeted by a non-State armed group. See also, *RRT Case No. N98/22948*, [2000] RRTA 1055, Australia, Refugee Review Tribunal, 2 November 2000, available at: http://www.unhcr.org/refworld/docid/4b7a97fd2.html, which found that the applicant was at risk of persecution at the hands of vigilante groups. The identification of poor gay men as "disposables" put them at risk of "social clean up" operations.

[72] UNHCR, *Handbook*, paras. 97–101; UN Human Rights Committee, General Comment no. 31 [80], The nature of the general legal obligation imposed on States Parties to the Covenant, 26 May 2004, CCPR/C/21/Rev.1/Add.13, available at: http://www.unhcr.org/refworld/docid/478b26ae2.html, paras. 8, 15–16; CEDAW, General Recommendation No. 28 on the Core Obligations of States Parties under Article 2 of the Convention on the Elimination of All Forms of Discrimination against Women, 19 October 2010, CEDAW/C/2010/47/GC.2, available at: http://www.unhcr.org/refworld/docid/4d467ea72.html, para. 36.

[73] See, for example, UK Home Office, "Sexual Orientation Issues in the Asylum Claim", 6 October 2011, available at: http://www.unhcr.org/refworld/docid/4eb8f0982.html, p. 6.

[74] UNHCR, Summary Conclusions of Roundtable, para. 8.

IFR_AR_015982

tity.[75] The existence of certain elements, such as anti-discrimination laws or presence of LGBTI organizations and events, do not necessarily undermine the well-foundedness of the applicant's fear.[76] Societal attitudes may not be in line with the law and prejudice may be entrenched, with a continued risk where the authorities fail to enforce protective laws.[77] A *de facto*, not merely *de jure*, change is required and an analysis of the circumstances of each particular case is essential.

## C. The causal link ("for reasons of")

38. As with other types of refugee claims, the well-founded fear of persecution must be "for reasons of" one or more of the five grounds contained in the refugee definition in Article 1A(2) of the 1951 Convention. The Convention ground should be a contributing factor to the well-founded fear of persecution, though it need not be the sole, or even dominant, cause.

39. Perpetrators may rationalize the violence they inflict on LGBTI individuals by reference to the intention of "correcting", "curing" or "treating" the person.[78] The intent or motive of the persecutor can be a relevant factor to establishing the "causal link" but it is not a prerequisite.[79] There is no need for the persecutor to have a punitive intent to establish the causal link.[80] The focus is on the reasons for the applicant's feared predicament within the overall context of the case, and how he or she would experience the harm rather than on the mind-set of the perpetrator. Nonetheless, where it can be shown that the persecutor attributes or imputes a Convention ground to the applicant, this is sufficient to satisfy the causal link.[81] Where the persecutor is a non-State actor, the causal link may be established either where the non-State actor is likely to harm the LGBTI person for a Convention reason or the State is not likely to protect him or her for a Convention reason.[82]

## D. Convention grounds

40. The five Convention grounds, that is, race, religion, nationality, membership of a particular social group and political opinion, are not mutually exclusive and may overlap. More than one Convention ground may be relevant in a given case. Refugee claims based on sexual orientation and/or gender identity are most commonly recognized under the "membership of a particular social group" ground. Other grounds may though also be relevant depending on the political, religious and cultural context of the claim. For example, LGBTI activists and human rights defenders (or perceived activists/defenders) may have either or both claims based on political opinion or religion if, for example, their advocacy is seen as going against prevailing political or religious views and/or practices.

41. Individuals may be subject to persecution due to their actual or perceived sexual orientation or gender identity. The opinion, belief or membership may be attributed to the applicant by the State or the non-State agent of persecution, even if they are not in fact LGBTI, and based on this perception they may be persecuted as a consequence. For example, women and men who do not fit stereotyped appearances and roles may be perceived as LGBTI. It is not required that they actually be LGBTI.[83]

---

[75] *RRT Case No. 0905785*, [2010] RRTA 150, Australia, Refugee Review Tribunal, 7 March 2010, available at: http://www.unhcr.org/refworld/docid/4c220be62.html, found that the decriminalization of homosexual acts in the particular country was unlikely to have an immediate impact on how people viewed homosexuality, para. 88.

[76] USCIS, Guidance for Adjudicating LGBTI Claims, p. 25. See also *Guerrero v. Canada (Minister of Citizenship and Immigration)*, 2011 FC 860, Canada, Federal Court, 8 July 2011, available at: http://www.unhcr.org/refworld/docid/4fa952572.html, which noted that the presence of many non-governmental organizations that fight against discrimination based on sexual orientation is in itself a telling factor in considering the country conditions.

[77] See, *Judgment No. 616907*, K, France, Cour nationale du droit d'asile, 6 April 2009, summary available at *Contentieux des réfugiés: Jurisprudence du Conseil d'État et de la Cour nationale du droit d'asile – Année 2009*, 26 October 2010, available at: http://www.unhcr.org/refworld/docid/4dad9db02.html, pp. 61–62, which recognized as a refugee a gay man from a particular territory based on the fact that even though a 2004 law banned all discrimination on the basis of sexual orientation those showing their homosexuality in public were regularly subject to harassment and discrimination without being able to avail themselves of the protection of the authorities.

[78] Yogyakarta Principles, Principle 18.

[79] UNHCR, *Handbook*, para. 66.

[80] *Pitcherskaia v. INS*, above footnote 45, found that the requirement on the applicant to prove the punitive intent of the perpetrator was unwarranted.

[81] UNHCR, "Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees", April 2001, available at: http://www.unhcr.org/refworld/docid/3b20a3914.html, para. 19.

[82] UNHCR, Guidelines on Social Group, para. 23.

[83] UNHCR, Guidelines on Gender-Related Persecution, para. 32; UNHCR, *Advisory Opinion by UNHCR to the Tokyo Bar Association Regarding Refugee Claims Based on Sexual Orientation*, 3 September 2004, available at: http://www.unhcr.org/refworld/docid/4551c0d04.html, para. 3; also, *Kwasi Amanfi v. John Ashcroft, Attorney General*, US, No. 01-4477 and 02-1541, (3rd Cir. 2003), 16 May 2008, available at http://www.unhcr.org/refworld/docid/47fdfb2c1a.html, which concerned an applicant who claimed persecution on account of imputed homosexuality.

Transgender individuals often experience harm based on imputed sexual orientation. Partners of transgender individuals may be perceived as gay or lesbian or simply as not conforming to accepted gender roles and behaviour or associating themselves with transgender individuals.

**Religion**

38. Where an individual is viewed as not conforming to the teachings of a particular religion on account of his or her sexual orientation or gender identity, and is subjected to serious harm or punishment as a consequence, he or she may have a well-founded fear of persecution for reasons of religion.[84] The teachings of the world's major religions on sexual orientation and/or gender identity differ and some have also changed over time or in particular contexts, ranging from outright condemnation, including viewing homosexuality as an "abomination", "sin", "disorder" or apostasy, to complete acceptance of diverse sexual orientation and/or gender identity. Non-LGBTI persons may also be subject to persecution for reasons of religion, for example, where they are (wrongly) perceived as LGBTI or where they support or are seen to support them or their rights.

43. Negative attitudes held by religious groups and communities towards LGBTI individuals can be given expression in a range of ways, from discouraging same-sex activity, or transgender behaviour or expression of identity, among adherents to active opposition, including protests, beatings, naming/shaming and "excommunication", or even execution. The religion and political opinion grounds may overlap where religious and State institutions are not clearly separated.[85] Religious organizations may impute opposition to their teachings or governance by LGBTI individuals, whether or not this is the case. LGBTI applicants may continue to profess adherence to a faith in which they have been subject to harm or a threat of harm.

**Membership of a Particular Social Group**

44. The 1951 Convention includes no specific list of particular social groups. Rather, "the term membership of a particular social group should be read in an evolutionary manner, open to the diverse and changing nature of groups in various societies and evolving international human rights norms."[86] UNHCR defines a particular social group as:

> a group of persons who share a common characteristic other than their risk of being persecuted, *or* who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.[87]

45. The two approaches – "protected characteristics" and "social perception" - to identifying "particular social groups" reflected in this definition are *alternative*, not cumulative tests. The "protected characteristics" approach examines whether a group is united *either* by an innate or immutable characteristic *or* by a characteristic that is so fundamental to human dignity that a person should not be compelled to forsake it. The "social perception" approach, on the other hand, examines whether a particular social group shares a common characteristic which makes it cognizable or sets the group's members apart from society at large.

46. Whether applying the "protected characteristics" or "social perception" approach, there is broad acknowledgment that under a correct application of either of these approaches, lesbians,[88] gay men,[89] bisexuals[90] and transgender persons[91] are members of "particular social groups" within

---

[84] UNHCR, Guidelines on Gender-Related Persecution, para. 25. See by analogy, *In Re S-A*, Interim Decision No. 3433, US Board of Immigration Appeals, 27 June 2000, available at: http://www.unhcr.org/refworld/docid/3ae6b6f224.html.

[85] UNHCR, Guidelines on Gender-Related Persecution, para. 26.

[86] UNHCR, Guidelines on Social Group, para. 3.

[87] UNHCR, Guidelines on Social Group, para. 11. Emphasis added.

[88] See, for example, *Pitcherskaia v. INS*, above footnote 45; *Decisions VA0-01624 and VA0-01625 (In Camera)*, Canada, Immigration and Refugee Board, 14 May 2001, available at: http://www.unhcr.org/refworld/docid/48246f092.html; *Islam (A.P.) v. Secretary of State for the Home Department; R v. Immigration Appeal Tribunal and Another, Ex Parte Shah (A.P.)*, UK House of Lords (Judicial Committee), 25 March 1999, available at: http://www.unhcr.org/refworld/docid/3dec8abe4.html, pp. 8–10.

[89] See, for example. *Matter of Toboso-Alfonso*, above footnote 32; *Refugee Appeal No. 1312/93, Re GJ*, New Zealand, Refugee Status Appeals Authority, 30 August 1995, available at: http://www.unhcr.org/refworld/docid/3ae6b6938.html.

[90] See, for example, *VRAW v. Minister for Immigration and Multicultural and Indigenous Affairs*, [2004] FCA 1133, Australia, Federal Court, 3 September 2004, available at: http://www.unhcr.org/refworld/docid/4dada05c2.html; *Decision T98-04159*, Immigration and Refugee Board of Canada, 13 March 2000, available at: http://www.unhcr.org/refworld/docid/4dada1672.html.

[91] See, for example, *RRT Case No. 0903346*, above footnote 24; *CE, SSR, 23 juin 1997, 171858, Ourbih*, 171858, France, Conseil d'Etat, 23 June 1997, available at: http://www.unhcr.org/refworld/docid/3ae6b67c14.html.

IFR_AR_015984

the meaning of the refugee definition.[92] Relatively fewer claims have been made by intersex applicants, but they would also on their face qualify under either approach.

47. Sexual orientation and/or gender identity are considered as innate and immutable characteristics or as characteristics so fundamental to human dignity that the person should not be compelled to forsake them. Where the identity of the applicant is still evolving, they may describe their sexual orientation and/or gender identity as fluid or they may express confusion or uncertainty about their sexuality and/or identity. In both situations, these characteristics are in any event to be considered as fundamental to their evolving identity and rightly within the social group ground.

48. There is no requirement that members of the social group associate with one another, or that they are socially visible, for the purposes of the refugee definition. "Social perception" does not mean to suggest a sense of community or group identification as might exist for members of an organization or association. Thus, members of a social group may not be recognizable even to each other.[93]

49. Decision makers should avoid reliance on stereotypes or assumptions, including visible markers, or a lack thereof. This can be misleading in establishing an applicant's membership of a particular social group. Not all LGBTI individuals look or behave according to stereotypical notions. In addition, although an attribute or characteristic expressed visibly may reinforce a finding that an applicant belongs to an LGBTI social group, it is not a pre-condition for recognition of the group.[94] In fact, a group of individuals may seek to avoid manifesting their characteristics in society precisely to avoid persecution (see above paragraphs30-33).[95] The "social perception" approach requires neither that the common attribute be literally visible to the naked eye nor that the attribute be easily identifiable by the general public.[96] It is furthermore not necessary that particular members of the group or their common characteristics be publicly known in a society. The determination rests simply on whether a group is "cognizable" or "set apart from society" in a more general, abstract sense.

**Political Opinion**

50. The term political opinion should be broadly interpreted to incorporate any opinion on any matter in which the machinery of State, society, or policy may be engaged.[97] It may include an opinion as to gender roles expected in the family or as regards education, work or other aspects of life.[98] The expression of diverse sexual orientation and gender identity can be considered political in certain circumstances, particularly in countries where such non-conformity is viewed as challenging government policy or where it is perceived as threatening prevailing social norms and values. Anti-LGBTI statements could be part of a State's official rhetoric, for example, denying the existence of homosexuality in the country or claiming that gay men and lesbians are not considered part of the national identity.

## E. INTERNAL FLIGHT OR RELOCATION ALTERNATIVE

51. The concept of an internal flight or relocation alternative (IFA) refers to whether it is possible for an individual to be relocated to a specific area of the country where the risk of feared persecution would not be well-founded and where, given the particular circumstances of the case, the individual could reasonably be expected to establish him or herself and live a normal life.[99] Protection would

---

[92] Sexual orientation and/or gender identity has been explicitly included in the refugee definition in some regional and domestic legislation. For instance, the European Union has adopted a definition of particular social group, recognizing that "depending on the circumstances in the country of origin, a particular social group might include a group based on a common characteristic of sexual orientation", EU Qualification Directive, Article 10.

[93] UNHCR, Guidelines on Social Group, paras. 15–16.

[94] *Judgment No. 634565/08015025*, C, France, Cour nationale du droit d'asile, 7 July 2009, summary available at Contentieux des réfugiés: Jurisprudence du Conseil d'État et de la Cour nationale du droit d'asile - Année 2009, 26 October 2010, available at: http://www.unhcr.org/refworld/docid/4dad9db02.html, pp. 58–59, recognizing as a refugee a gay man who had neither claimed nor manifested his homosexuality openly.

[95] UNHCR, *HJ and HT*, above footnote 30, para. 26.

[96] See, for example, UNHCR, *Valdiviezo-Galdamez v. Holder, Attorney General. Brief of the United Nations High Commissioner for Refugees as Amicus Curiae in Support of the Petitioner*, 14 April 2009, available at: http://www.unhcr.org/refworld/docid/49ef25102.html; *Gatimi et al. v. Holder, Attorney General*, No. 08-3197, United States Court of Appeals for the Seventh Circuit, 20 August 2009, available at: http://www.unhcr.org/refworld/docid/4aba40332.html.

[97] *Canada v. Ward*, above footnote 31.

[98] UNHCR, Guidelines on Gender-Related Persecution, para. 32.

[99] See UNHCR, "Guidelines on International Protection No. 4: 'Internal Flight or Relocation Alternative' Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees", 23 July 2003, HCR/GIP/03/04 (hereafter "UNHCR Guidelines on Internal Flight Alternative"), para. 6.

need to be available in a genuine and meaningful way. United Nations agencies, non-governmental organizations, civil society and other non-State actors are not a substitute for State protection.

52. Within the context of the holistic assessment of a claim for refugee status, the assessment of whether or not there is an IFA requires two main analyses: (i) the relevance analysis[100] and (ii) the reasonableness analysis.[101] In considering the relevance and reasonableness of a proposed site of internal flight or relocation, gender considerations must be taken into account.

53. In respect of the relevance analysis, if the country in question criminalizes same-sex relations and enforces the relevant legislation, it will normally be assumed that such laws are applicable in the entire territory. Where the fear of persecution is related to these laws, a consideration of IFA would not be relevant. Laws which do not allow a transgender or intersex individual to access and receive appropriate medical treatment if sought, or to change the gender markers on his or her documents, would also normally be applicable nationwide and should be taken into account when considering the proposed place of relocation.

54. Furthermore, intolerance towards LGBTI individuals tends to exist countrywide in many situations, and therefore an internal flight alternative will often not be available. Relocation is not a relevant alternative if it were to expose the applicant to the original or any new forms of persecution. IFA should not be relied upon where relocation involves (re-)concealment of one's sexual orientation and/or gender identity to be safe (see paragraphs 30-33).[102]

55. Some countries have seen social and political progress which is sometimes localized in urban areas and these locations may in certain circumstances constitute a relocation alternative. In this context, it is important to recall that the decision maker bears the burden of proof of establishing that an analysis of relocation is relevant to the particular case, including identifying the proposed place of relocation and collecting country of origin information about it (see further below at paragraph 66).[103]

56. In determining whether internal flight is reasonable, the decision maker needs to assess whether return to the proposed place of relocation would cause undue hardship, including by examining the applicant's personal circumstances;[104] the existence of past persecution; safety and security; respect for human rights; and possibility for economic survival.[105] The applicant needs to be able to access a minimum level of political, civil and socio-economic rights. Women may have lesser economic opportunities than men, or may be unable to live separately from male family members, and this should be evaluated in the overall context of the case.[106]

## F. SUR PLACE CLAIMS

57. A *sur place* claim arises after arrival in the country of asylum, either as a result of the applicant's activities in the country of asylum or as a consequence of events, which have occurred or are occurring in the applicant's country of origin since their departure.[107] *Sur place* claims may also arise due to changes in the personal identity or gender expression of the applicant after his or her arrival in the country of asylum. It should be noted that some LGBTI applicants may not have identified themselves as LGBTI before the arrival to the country of asylum or may have consciously decided not to act on their sexual orientation or gender identity in their country of origin. Their fear of

---

[100] The elements to be examined under this analysis are the following: Is the area of relocation practically, safely and legally accessible to the individual? Is the agent of persecution a State or non-State agent? Would the claimant be exposed to a risk of being persecuted or other serious harm upon relocation?

[101] The criterion to be examined under this analysis is: Can the claimant lead a relatively normal life without facing undue hardship?

[102] See, for example, *Okoli v. Canada (Minister of Citizenship and Immigration)*, 2009 FC 332, Canada, Federal Court, 31 March 2009, available at: http://www.unhcr.org/refworld/docid/4a5b4bfa2.html, which found that the concealment of an immutable characteristic, that is, the applicant's sexual orientation, was an "impermissible requirement" for the assessment of internal flight alternative, paras. 36–37, 39; *HJ and HT*, above footnote 30. para. 21.

[103] UNHCR, Guidelines on Internal Flight Alternative, paras. 33–34.

[104] *Boer-Sedano v. Gonzales*, US, 418 F.3d 1082, (9th Cir. 2005), 12 August 2005, available at: http://www.unhcr.org/refworld/docid/4821a2ba2.html, found that the applicant's [HIV-positive] health status would make relocation unreasonable.

[105] UNHCR, Guidelines on Internal Flight Alternative, paras. 22–30.

[106] UNHCR, Guidelines on Gender-related Persecution.

[107] UNHCR, *Handbook*, paras. 94, 96.

IFR_AR_015986

persecution may thus arise or find expression whilst they are in the country of asylum, giving rise to a refugee claim *sur place*. Many such claims arise where an LGBTI individual engages in political activism or media work or their sexual orientation is exposed by someone else.

## V. PROCEDURAL ISSUES

**General**

58. LGBTI individuals require a supportive environment throughout the refugee status determination procedure, including pre-screening so that they can present their claims fully and without fear. A safe environment is equally important during consultations with legal representatives.

59. Discrimination, hatred and violence in all its forms can impact detrimentally on the applicant's capacity to present a claim. Some may be deeply affected by feelings of shame, internalized homophobia and trauma, and their capacity to present their case may be greatly diminished as a consequence. Where the applicant is in the process of coming to terms with his or her identity or fears openly expressing his or her sexual orientation and gender identity, he or she may be reluctant to identify the true extent of the persecution suffered or feared.[108] Adverse judgements should not generally be drawn from someone not having declared their sexual orientation or gender identity at the screening phase or in the early stages of the interview. Due to their often complex nature, claims based on sexual orientation and/or gender identity are generally unsuited to accelerated processing or the application of "safe country of origin" concepts.[109]

60. In order to ensure that refugee claims relating to sexual orientation and/or gender identity are properly considered during the refugee status determination process, the following measures should be borne in mind:

i.   An open and reassuring environment is often crucial to establishing trust between the interviewer and applicant and will assist the disclosure of personal and sensitive information. At the beginning of the interview, the interviewer needs to assure the applicant that all aspects of his or her claim will be treated in confidence.[110] Interpreters are also bound by confidentiality.

ii.  Interviewers and decision makers need to maintain an objective approach so that they do not reach conclusions based on stereotypical, inaccurate or inappropriate perceptions of LGBTI individuals. The presence or absence of certain stereotypical behaviours or appearances should not be relied upon to conclude that an applicant possesses or does not possess a given sexual orientation or gender identity.[111] There are no universal characteristics or qualities that typify LGBTI individuals any more than heterosexual individuals. Their life experiences can vary greatly even if they are from the same country.

iii. The interviewer and the interpreter must avoid expressing, whether verbally or through body language, any judgement about the applicant's sexual orientation, gender identity, sexual behaviour or relationship pattern. Interviewers and interpreters who are uncomfortable with diversity of sexual orientation and gender identity may inadvertently display distancing or demeaning body language. Self-awareness and specialized training (see iv.) are therefore critical aspects to a fair status determination.

iv.  Specialized training on the particular aspects of LGBTI refugee claims for decision makers, interviewers, interpreters, advocates and legal representatives is crucial.

---

[108] Some LGBTI applicants may, for instance, change their claims during the process by initially stating that their sexual orientation is imputed to them or making a claim on a ground unrelated to their sexual orientation or gender identity, to eventually expressing that they are LGBTI.
[109] UNHCR, "Statement on the right to an effective remedy in relation to accelerated asylum procedures", 21 May 2010, available at: http://www.unhcr.org/refworld/docid/4bf67fa12.html, paras. 11–12.
[110] UNHCR, Guidelines on Gender-Related Persecution, paras. 35, 36.iv.
[111] This issue has been addressed by a number of US Courts: *Shahinaj v. Gonzales*, 481 F.3d 1027, ( 8th Cir. 2007), 2 April 2007, available at: http://www.unhcr.org/refworld/docid/4821bd462.html; *Razkane v. Holder, Attorney General*, No. 08-9519, (10th Cir. 2009), 21 April 2009, available at: http://www.unhcr.org/refworld/docid/4a5c97042.html; *Todorovic v. US Attorney General*, No. 09-11652, (11th Cir. 2010), 27 September 2010, available at: http://www.unhcr.org/refworld/docid/4cd968902.html.

v. The use of vocabulary that is non-offensive and shows positive disposition towards diversity of sexual orientation and gender identity, particularly in the applicant's own language, is essential.[112] Use of inappropriate terminology can hinder applicants from presenting the actual nature of their fear. The use of offensive terms may be part of the persecution, for example, in acts of bullying or harassment. Even seemingly neutral or scientific terms can have the same effect as pejorative terms. For instance, although widely used, "homosexual" is also considered a derogatory term in some countries.

vi. Specific requests made by applicants in relation to the gender of interviewers or interpreters should be considered favourably. This may assist the applicant to testify as openly as possible about sensitive issues. If the interpreter is from the same country, religion or cultural background, this may heighten the applicant's sense of shame and hinder him or her from fully presenting all the relevant aspects of the claim.

vii. Questioning about incidents of sexual violence needs to be conducted with the same sensitivity as in the case of any other sexual assault victims, whether victims are male or female.[113] Respect for the human dignity of the asylum-seeker should be a guiding principle at all times.[114]

viii. For claims based on sexual orientation and/or gender identity by women, additional safeguards are presented in UNHCR's Guidelines on Gender-Related Persecution.[115] Women asylum-seekers should, for instance, be interviewed separately, without the presence of male family members in order to ensure they have an opportunity to present their case.

ix. Specific procedural safeguards apply in the case of child applicants, including processing on a priority basis and the appointment of a qualified guardian as well as a legal representative.[116]

61. Where an individual seeks asylum in a country where same-sex relations are criminalized, these laws can impede his or her access to asylum procedures or deter the person from mentioning his or her sexual orientation or gender identity within status determination interviews. In such situations, it may be necessary for UNHCR to become directly involved in the case, including by conducting refugee status determination under its mandate.[117]

**Credibility and Establishing the Applicant's Sexual Orientation and/or Gender Identity**

62. Ascertaining the applicant's LGBTI background is essentially an issue of credibility. The assessment of credibility in such cases needs to be undertaken in an individualized and sensitive way. Exploring elements around the applicant's personal perceptions, feelings and experiences of difference, stigma and shame are usually more likely to help the decision maker ascertain the applicant's sexual orientation or gender identity, rather than a focus on sexual practices.[118]

63. Both open-ended and specific questions that are crafted in a non-judgemental manner may allow the applicant to explain his or her claim in a non-confrontational way. Developing a list of questions in preparation of the interview may be helpful, however, it is important to bear in mind that there is no magic formula of questions to ask and no set of "right" answers in response. Useful areas of questioning may include the following:

---

[112] For suggested appropriate terminology, see above at paras. 9–12.

[113] UNHCR, Guidelines on Gender-Related Persecution, para. 36 viii, xi.

[114] UNHCR, "Summary Report, Informal Meeting of Experts on Refugee Claims relating to Sexual Orientation and Gender Identity", 10 September 2011 (hereafter "UNHCR, Summary Report of Informal Meeting of Experts"), available at: http://www.unhcr.org/refworld/docid/4fa910f92.html, para. 34.

[115] UNHCR, Guidelines on Gender-Related Persecution paras. 35–37.

[116] UNHCR, "Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", 22 December 2009, HCR/GIP/09/08, available at: http://www.unhcr.org/refworld/docid/4b2f4f6d2.html, paras. 65–77.

[117] It is generally only where States have not yet acceded to the international refugee instruments, or if they have acceded but have not yet established national procedures, or these procedures are not fully functioning that UNHCR may be called upon to undertake individual refugee status determination and recognize refugees under its mandate. This function, therefore, can be exercised either in a State which is, or a State which is not, a signatory to the international refugee instruments. In these situations, UNHCR conducts refugee status determination for protection purposes (in order to protect refugees from *refoulement* and detention, for example) and/or to facilitate a durable solution. See, for example, UNHCR, *MM (Iran) v. Secretary of State for the Home Department - Written Submission on Behalf of the United Nations High Commissioner for Refugees*, 3 August 2010, C5/2009/2479, available at: http://www.unhcr.org/refworld/docid/4c6aa7db2.html, para. 11.

[118] UNHCR, Summary Report of Informal Meeting of Experts, para. 32.

IFR_AR_015988

i.   Self-identification: Self-identification as a LGBTI person should be taken as an indication of the applicant's sexual orientation and/or gender identity. The social and cultural background of the applicant may affect how the person self-identifies. Some LGB individuals, for example, may harbour deep shame and/or internalized homophobia, leading them to deny their sexual orientation and/or to adopt verbal and physical behaviours in line with heterosexual norms and roles. Applicants from highly intolerant countries may, for instance, not readily identify as LGBTI. This alone should not rule out that the applicant could have a claim based on sexual orientation or gender identity where other indicators are present.

ii.   Childhood: In some cases, before LGBTI individuals come to understand their own identity fully, they may feel "different" as children. When relevant, probing this experience of "difference" can be helpful to establishing the applicant's identity. The core attractions that form the basis for adult sexual orientation may emerge between middle childhood and early adolescence,[119] while some may not experience same-sex attraction until later in life. Likewise, persons may not be aware of their full gender identity until adolescence, early adulthood or later in life, as gender codes in many societies may be less prescriptive or strict during childhood than in (early) adulthood.

iii.   Self-Realization: The expression "coming out" can mean both an LGBTI person's coming to terms with his or her own LGBTI identity and/or the individual communicating his or her identity to others. Questions about both of these "coming out" or self-realization processes may be a useful way to get the applicant talking about his or her identity, including in the country of origin as well as in the country of asylum. Some people know that they are LGBTI for a long time before, for example, they actually pursue relationships with other people, and/or they express their identity openly. Some, for example, may engage in sexual activity (with same-sex and/or other-sex partners) before assigning a clear label to their sexual orientation. Prejudice and discrimination may make it difficult for people to come to terms with their sexual orientation and/or gender identity and it can, therefore, be a slow process.[120]

iv.   Gender identity: The fact that a transgender applicant has not undergone any medical treatment or other steps to help his or her outward appearance match the preferred identity should not be taken as evidence that the person is not transgender. Some transgender people identify with their chosen identity without medical treatment as part of their transition, while others do not have access to such treatment. It may be appropriate to ask questions about any steps that a transgender applicant has taken in his or her transition.

v.   Non-conformity: LGBTI applicants may have grown up in cultures where their sexuality and/or gender identity is shameful or taboo. As a result, they may struggle with their sexual orientation or gender identity at some point in their lives. This may move them away from, or place them in opposition to their families, friends, communities and society in general. Experiences of disapproval and of "being different" or the "other" may result in feelings of shame, stigmatization or isolation.

vi.   Family Relationships: Applicants may or may not have disclosed their sexual orientation and/or gender identity to close family members. Such disclosures may be fraught with difficulty and can lead to violent and abusive reactions by family members. As noted above, an applicant may be married, or divorced and/or have children. These factors by themselves do not mean that the applicant is not LGBTI. Should concerns of the credibility of an applicant who is married arise, it may be appropriate to ask the applicant a few questions surrounding the reasons for marriage. If the applicant is able to provide a consistent and reasonable explanation of why he or she is married and/or has children, the portion of the testimony should be found credible.[121]

vii.   Romantic and Sexual Relationships: The applicant's relationships with and attraction to partners, or their hope to have future relationships, will usually be part of their narrative of LGBTI individuals. Not everyone, however, especially young LGBTI people, will have had romantic or sexual relationships. The fact that an applicant has not had any relationship(s) in the country of origin does not

---

[119] APA, Sexual Orientation and Homosexuality.
[120] APA, Sexual Orientation and Homosexuality.
[121] USCIS, Guidance for Adjudicating LGBTI Claims, pp. 39–40.

IFR_AR_015989

necessarily mean that he or she is not LGBTI. It may rather be an indication that he or she has been seeking to avoid harm. Presuming that the applicant has been involved in a same-sex relationship, decision makers need to be sensitive with regard to questioning about past and current relationships since it involves personal information which the applicant may be reluctant to discuss in an interview setting. Detailed questions about the applicant's sex life should be avoided. It is not an effective method of ascertaining the well-foundedness of the applicant's fear of persecution on account of his or her sexual orientation and/or gender identity. Interviewers and decision makers need to bear in mind that sexual orientation and gender identity are about a person's identity, whether or not that identity is manifested through sexual acts.

viii. Community Relationship: Questions about the applicant's knowledge of LGBTI contacts, groups and activities in the country of origin and asylum may be useful. It is important to note, however, that applicants who were not open about their sexual orientation or gender identity in the country of origin may not have information about LGBTI venues or culture. For example, ignorance of commonly known meeting places and activities for LGBTI groups is not necessarily indicative of the applicant's lack of credibility. Lack of engagement with other members of the LGBTI community in the country of asylum or failure to join LGBTI groups there may be explained by economic factors, geographic location, language and/or cultural barriers, lack of such opportunities, personal choices or a fear of exposure.[122]

ix. Religion: Where the applicant's personal identity is connected with his/her faith, religion and/or belief, this may be helpful to examine as an additional narrative about their sexual orientation or gender identity. The influence of religion in the lives of LGBTI persons can be complex, dynamic, and a source of ambivalence.[123]

**Evidentiary Matters**

64. The applicant's own testimony is the primary and often the only source of evidence, especially where persecution is at the hands of family members or the community. Where there is a lack of country of origin information, the decision maker will have to rely on the applicant's statements alone. Normally, an interview should suffice to bring the applicant's story to light.[124] Applicants should never be expected or asked to bring in documentary or photographic evidence of intimate acts. It would also be inappropriate to expect a couple to be physically demonstrative at an interview as a way to establish their sexual orientation.

65. Medical "testing" of the applicant's sexual orientation is an infringement of basic human rights and must not be used.[125] On the other hand, medical evidence of transition-related surgery, hormonal treatment or biological characteristics (in the case of intersex individuals) may corroborate their personal narrative.

66. Relevant and specific country of origin information on the situation and treatment of LGBTI individuals is often lacking. This should not automatically lead to the conclusion that the applicant's claim is unfounded or that there is no persecution of LGBTI individuals in that country.[126] The extent to which international organizations and other groups are able to monitor and document abuses against LGBTI individuals remain limited in many countries. Increased activism has often been met with attacks on human rights defenders, which impede their ability to document violations. Stigma attached to issues surrounding sexual orientation and/or gender identity also contributes to incidents going unreported. Information can be especially scarce for certain groups, in particular bisexual, lesbian, transgender and intersex people. It is critical to avoid automatically drawing conclusions based on information about one group or another; however, it may serve as an indication of the applicant's situation in certain circumstances.

---

[122] *Essa v. Canada (Minister of Citizenship and Immigration)*, 2011 FC 1493, Canada, Federal Court, 20 December 2011, available at: http://www.unhcr.org/refworld/docid/4f901c392.html, paras. 30–31, found that the Board's insistence on the applicant going to or have knowledge about gay venues in the country of asylum in order to be gay was not reasonable.
[123] APA, Practice Guidelines for LGB Clients.
[124] UNHCR, *Handbook*, paras. 196, 203–204.
[125] See further, "UNHCR's Comments on the Practice of Phallometry in the Czech Republic to Determine the Credibility of Asylum Claims based on Persecution due to Sexual Orientation", April 2011, available at: http://www.unhcr.org/refworld/docid/4daeb07b2.html.
[126] See, for example, *Molnar v. Canada*, above footnote 39.

IFR_AR_015991



**United Nations High Commissioner for Refugees**
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL     HCR/GIP/13/10/Corr. 1.     12 November 2014     Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 10:

**Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees**

UNHCR issues these *Guidelines* pursuant to its mandate, as contained in the Office's Statute, in conjunction with Article 35 of the 1951 Convention relating to the Status of Refugees and Article II of its 1967 Protocol. These Guidelines complement the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* (reissued 2011) and, in particular, are to be read together with UNHCR's *Guidelines on International Protection No. 6: Religion-Based Refugee Claims* and *Guidelines on International Protection No. 8: Child Asylum Claims*. They replace *UNHCR's Position on Certain Types of Draft Evasion* (1991).

The *Guidelines*, the result of broad consultations, provide legal interpretative guidance for governments, legal practitioners, decision makers and the judiciary, as well as UNHCR staff carrying out mandate refugee status determination.

The UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status* and *the Guidelines on International Protection* are available at: http://www.unhcr.org/refworld/docid/4f33c8d92.html.

**10**

IFR_AR_015992

## I. INTRODUCTION

1. The situation of "deserters and persons avoiding military service" is explicitly addressed in *UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* ["*UNHCR Handbook*].[1] Since the publication of the *UNHCR Handbook* there have been considerable developments both in the practice of States and in the restrictions placed on military service by international law. Given these developments, as well as divergences in jurisprudence, UNHCR issues these *Guidelines* with the aim to facilitate a consistent and principled application of the refugee definition in Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees in such cases. These *Guidelines* examine the position of individuals who seek international protection to avoid recruitment by, and service in, State armed forces, as well as forced recruitment by non-State armed groups.

2. These Guidelines address the definition of key terms [Part II], followed by an overview of international legal developments relating to military service [Part III]. Part IV examines the refugee determination criteria as they apply to claims involving military service. Part V considers procedural and evidentiary issues. The *Guidelines* focus on the interpretation of the "inclusion" components of the refugee definition. Exclusion considerations are not addressed, although they may be at issue in such cases, and will need to be properly assessed.[2] Further, issues around maintaining the civilian and humanitarian character of asylum, while often relevant to such claims, are not dealt with in these Guidelines.[3]

## II. TERMINOLOGY

3. For the purpose of these *Guidelines*, these terms are defined as follows:

**Alternative service** refers to service in the public interest performed instead of compulsory military service in the State armed forces by individuals who have a conscientious objection to military service ["conscientious objectors"]. Alternative service may take the form of civilian service outside the armed forces or a non-combatant role in the military.[4] Civilian service can involve, for example, working in State-run health institutions, or voluntary work with charitable organisations either at home or abroad. Non-combatant service in the military would include positions such as cooks or administrative clerks.

**Conscientious objection** to military service refers to an objection to such service which "derives from principles and reasons of conscience, including profound convictions, arising from religious, moral, ethical, humanitarian or similar motives."[5] Such an objection is not confined to **absolute conscientious objectors** [pacifists], that is, those who object to all use of armed force or participation in all wars. It also encompasses those who believe that "the use of force is justified in some circumstances but not in others, and that therefore it is necessary to object in those other cases" [**partial** or **selective objection** to military service].[6] A conscientious objection may develop over time, and thus volunteers may at some stage also raise claims based on conscientious objection, whether absolute or partial.

**Desertion** involves abandoning one's duty or post without permission, or resisting the call up for military duties.[7] Depending on national laws, even someone of draft age who has completed his

---

[1] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugee*, (reissued, Geneva, 2011), ("*UNHCR Handbook*"), available at: http://www.unhcr.org/refworld/pdfid/4f33c8d92.pdf, paras. 167-174.

[2] Reference is made instead to UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/05, 4 September 2003, ("*UNHCR Exclusion Guidelines*"), available at: http://www.unhcr.org/refworld/docid/3f5857684.html.

[3] See, Executive Committee ("ExCom") Conclusion No. 94 (LII), 2002, on the civilian and humanitarian character of asylum, para. (c)(vii).

[4] See, further, for example, UN Human Rights Council, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, A/HRC/23/22, 3 June 2013, available at: http://www.refworld.org/docid/51b5c73c4.html.

[5] See, UN Commission on Human Rights, Resolution 1998/77, "*Conscientious Objection to Military Service*", E/CN.4/RES/1998/77, 22 April 1998, available at: http://www.refworld.org/docid/3b00f0be10.html. The Commission was replaced by the UN Human Rights Council in 2006.

[6] See, UN *Conscientious Objection to Military Service*, E/CN.4/Sub.2/1983/30/Rev.1, 1985 (the "*Eide and Mubanga-Chipoya report*"), available at: http://www.refworld.org/pdfid/5107cd132.pdf, para. 21. See also, paras. 128-135 regarding persecution in the context of conscientious objection to conflicts which violate basic rules of human conduct.

[7] See, European Court of Human Rights, *Feti Demirtaş c. Turquie*, Application no. 5260/07, 17 January 2012, available at http://www.echr.org/refworld/docid/4ff5996d2.html.

JFR_AR_015993

or her national service and has been demobilized, but is still regarded as being subject to national service, may be regarded as a deserter under certain circumstances. Desertion can occur in relation to the police force, gendarmerie or equivalent security services, and is also the term used to apply to deserters from non-State armed groups. Desertion may be for reasons of conscience or for other reasons.

**Draft evasion** occurs when a person does not register for, or does not respond to, a call up or recruitment for compulsory military service. The evasive action may be as a result of the evader fleeing abroad, or may involve, inter alia, returning call up papers to the military authorities. In the latter case, the person may sometimes be described as a draft resister rather than a draft evader, although draft evader is used to cover both scenarios in these *Guidelines*. Draft evasion may also be pre-emptive in the sense that action may be taken in anticipation of the actual demand to register or report for duty. Draft evasion only arises where there is mandatory enrolment in military service ["the draft"]. Draft evasion may be for reasons of conscience or for other reasons.

**Forced recruitment** is the term used in these *Guidelines* to refer to the coerced, compulsory or involuntary recruitment into either a State's armed forces or a non-State armed group.

**Military service** primarily refers to service in a State's armed forces. This may occur in peacetime or during a period of armed conflict, and may be on a voluntary or compulsory basis. Compulsory military service by the State is also known as **conscription** or "**the draft**". Where an individual volunteers to join the State military, it is called **enlistment.**

**Reservists** are individuals who serve in the reserve forces of the State's armed forces. They are not considered to be on active duty, but are required to be available to respond to any call up in an emergency.

4. Where alternatives to compulsory military service are not available, an individual's conscientious objection may be expressed through draft evasion or desertion. However, draft evasion or desertion is not synonymous with conscientious objection as other motivations, such as fear of military service or the conditions of such service may be involved. Conscientious objection, draft evasion and desertion may all take place in peacetime as well as during armed conflict. Moreover, whilst conscientious objection and evasion/desertion tend to arise in relation to conscription, they can also take place where the original decision to join the armed forces was voluntary or the obligation to undertake compulsory military service was initially accepted.[8]


# III. INTERNATIONAL LAW ON MILITARY SERVICE


## A. The Right of States to Require Military Service

5. States have a right of self-defence under both the UN Charter and customary international law.[9] States are entitled to require citizens to perform military service for military purposes;[10] and this does not in itself violate an individual's rights.[11] This is recognized explicitly in human rights provisions concerned with forced labour, such as Article 8 of the 1966 International Covenant on Civil

---

[8] See, for example, UN Commission on Human Rights, Resolution 1998/77, preambular para. see note 5 above.

[9] Article 51, UN Charter. See also, International Court of Justice, *Case concerning the Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) (Merits)*, 27 June 1986, available at: http://www.refworld.org/docid/4023a44d2.html, paras. 187-201.

[10] This does not cover conscription of non-nationals in occupied territories in the context of international armed conflict: see Article 51 of the 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva Convention IV), which states that an "Occupying Power may not compel protected persons to serve in its armed or auxiliary forces." "Protected persons" refers in this context to civilians in the occupied territory who are not nationals of the Occupying Power.

[11] The UN Human Rights Committee ("HRC") has noted this in relation to a complaint of discrimination (Article 26 of the 1966 International Covenant on Civil and Political Rights ("ICCPR")). See, *M.J.G. (name deleted) v. Netherlands*, CCPR/C/32/D/267/1987, 24 March 1988, available at: http://www.unhcr.org/refworld/pdfid/50b8eca22.pdf para. 3.2; see, similarly, the earlier case of *R.T.Z. (name deleted) v. Netherlands*, CCPR/C/31/D/245/1987, 5 November 1987, available at: http://www.unhcr.org/refworld/pdfid/50b8ed122.pdf. That human rights law, including the ICCPR, applies to members of the military as well as to civilians was explicitly stated by the HRC in *Vuolanne v. Finland*, CCPR/C/35/D/265/1987, 2 May 1989, available at: http://www.unhcr.org/refworld/pdfid/50b8ee372.pdf.

and Political Rights ["ICCPR"].[12]States may also impose penalties on persons who desert or avoid military service where their desertion or avoidance is not based on valid reasons of conscience, provided such penalties and the associated procedures comply with international standards.[13]

6. The State's right to compel citizens to undertake military service is not subject to other requirements in international human rights law, as well as international humanitarian and international criminal law[ see Parts III.B. and III.C. below]. In general, for military recruitment and service to be justified it needs to fulfil certain criteria: prescribed by law, implemented in a way that is not arbitrary or discriminatory, the functions and discipline of the recruits must be based on military needs and plans, and be challengeable in a court of law.[14]

7. The position of non-State armed groups is different from that of States, in that only States can require military conscription. International law does not entitle non-State armed groups, whether or not they may be the *de facto* authority over a particular part of the territory, to recruit on a compulsory or forced basis.

## B. The Right to Conscientious Objection against Compulsory Military Service

8. The right to conscientious objection to State military service is a derivative right, based on an interpretation of the right to freedom of thought, conscience and religion contained in Article 18 of the Universal Declaration of Human Rights and Article 18 of the ICCPR. International jurisprudence on this right is evolving. The UN Human Rights Committee's [HRC] case law has shifted from characterizing the right as derived from the right "to manifest" one's religion or belief and thus subject to certain restrictions in Article 18(3),[15] to viewing it as one that "inheres in the right" to freedom of thought, conscience and religion in Article 18(1) itself.[16] This is a significant shift, and has been subject to individual concurring opinions.[17] According to the HRC, the right therefore "entitles the individual to an exemption from compulsory military service if this cannot be reconciled with the individual's religion or beliefs. The right must not be impaired by coercion."[18] The HRC has further clarified that "a State may, if it wishes, compel the objector to undertake a civilian alternative to military service, outside the military sphere and not under military command. The alternative service must not be of a punitive nature. It must be a real service to the community and compatible with respect for human rights."[19] Even in its earlier jurisprudence, where the HRC based its decisions on the right to *manifest* one's religion or belief [found in Article 18(3) read together with 18(1) ICCPR], the State had to demonstrate why such a restriction was "necessary", given that many other countries manage to reconcile the interests of the individual with the interests of the State through the provision of alternative service.[20]

---

[12] Article 8(3)(c)(ii) ICCPR exempts from the prohibition on forced or compulsory labour (found in Article 8(3)(a)), "Any service of a military character and, in countries where conscientious objection is recognized, any national service required by law of conscientious objectors." In addition, Article 2(2) (a) of the 1930 International Labour Organization ("ILO") Convention No. 29: Forced Labour Convention exempts from its prohibition on forced or compulsory labour (Article 1(1)), "any work or service exacted in virtue of compulsory military service laws for work of a purely military character." The reference to "military service laws" indicates that for the exemption to be valid, it must be set out in law. See also, the decisions of the HRC in *Venier and Nicholas v. France*, CCPR/C/69/D/690/1996, 1 August 2000, available at: http://www.unhcr.org/refworld/pdfid/50b8ec0c2.pdf and *Foin v. France*, CCPR/C/67/D/666/1995, 9 November 1999, where the HRC stated that under Article 8 of the ICCPR States may require service of a military character, available at: http://www.unhcr.org/refworld/docid/4a3a3aebf.html, para. 10.3.

[13] On procedures, in the European Court of Human Rights, see *Savda c. Turquie*, Application No. 42730/05,12 June 2012, available at: http://www.refworld.org/docid/4fe9a9bb2.html, see also, *Feti Demirtaş c. Turquie*, see note 7 above.

[14] Inter-American Commission on Human Rights ("IACHR"), "Fourth report on the situation of human rights in Guatemala", OEA/Ser.L/V/II.83, Doc. 16 rev., 1 June 1993, chap. V. See also, IACHR, *Piché Cuca v. Guatemala*, Report No. 36/93, case 10.975, decision on merits, 6 October 1993, indicating that the conscription process must be challengeable in a court of law, available at: http://www.refworld.org/docid/5020dd282.html.

[15] Article 18(3) ICCPR provides certain limitations on the right to manifest one's religion or belief, namely "prescribed by law and (…) necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others." For further analysis, see UNHCR, *Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees*, HCR/GIP/04/06, 28 April 2004, ("*UNHCR Guidelines on Religion-Based Claims*"), available at: http://www.unhcr.org/refworld/docid/4090f9794.html, para. 15. Moreover, unlike other rights in the Covenant, restrictions on the grounds of national security are not permitted at all. As noted by the HRC, "… such restrictions must not impair the very essence of the right in question." See HRC, *Yoon and Choi v. Republic of Korea*, CCPR/C/88/D/1321-1322/2004, 23 January 2007, available at: http://www.unhcr.org/refworld/docid/48abd57dd.html, para. 8.3, and *Eu-min Jung* and *Others v. Republic of Korea*, CCPR/C/98/D/1593-1603/2007, 30 April 2010, available at: http://www.unhcr.org/refworld/pdfid/4c19e0322.pdf, para. 7.4.

[16] See, HRC, *Min-Kyu Jeong et al v. Republic of Korea*, CCPR/C/101/D/1642-1741/2007, 24 April 2011, available at: http://www.unhcr.org/refworld/docid/4ff59b332.html paras. 7.3 - 7.4; *Atasoy and Sarkut v. Turkey*, CCPR/C/104/D/1853-1854/2008, 19 June 2012, available at: http://www.unhcr.org/refworld/docid/4ff5b14c2.html, paras.10.4 - 10.5; and *Jong-nam Kim et al v. Republic of Korea*, CCPR/C/106/D/1786/2008, 1 February 2013, available at: http://www.refworld.org/docid/532a9f1a4.html, paras. 7.4 – 7.5.

[17] See, Individual opinion of Committee member Mr. Gerald L. Neuman, jointly with members Mr. Yuji Iwasawa, Mr. Michael O'Flaherty and Mr. Walter Kaelin (concurring), *Atasoy and Sarkut v. Turkey, ibid.*

[18] *Min-Kyu Jeong at al v. Republic of Korea*, para.7.3; *Atasoy and Sarkut v. Turkey*, para. 10.4. and *Jong-nam Kim et al v. Republic of Korea*, para. 7.4, see note 16 above.

[19] *Ibid.*

[20] See, *Yoon and Choi v. Republic of Korea*, para. 8.4, and *Eu-min Jung and Others v. Republic of Korea*, para. 7.4, see both note 15 above.

IFR_AR_015995

9. Thus a conscientious objector's rights under Article 18 ICCPR will be respected where he or she is (i) exempted from the obligation to undertake military service or (ii) appropriate alternative service is available. In assessing the appropriateness of alternative service, it is generally considered that it needs to be compatible with the reasons for the conscientious objection; of a non-combatant or civilian character; in the public interest; and not punitive.[21] For example, civilian service under civilian administration would be necessary in the cases of individuals who object outright to any association with the military.[22] However, where the objection is specifically to the personal carrying of arms the option of non-combatant service in the military may be appropriate. Many States avoid the difficulty of having to evaluate the sincerity of a claim to conscientious objection by allowing the person a free choice between military and alternative service.[23] In some States recognition of conscientious objection has been granted only to certain religious groups. However, as noted above, this would not be consistent with the scope of the right to freedom of thought, conscience and religion, nor with the prohibition on discrimination.[24]

10. The right to conscientious objection is also reaffirmed in regional instruments, either explicitly or by interpretation,[25] as well as in various international standard setting documents.[26]

11. The right to conscientious objection applies to absolute, partial, or selective objectors [see II.];[27] volunteers as well as conscripts before and after joining the armed forces; during peace time and during armed conflict.[28] It includes objection to military service based on moral, ethical, humanitarian or similar motives.[29]

---

[21] UN Commission on Human Rights resolution 1998/77, para. 4, see note 5 above. See also, note 18 above.

[22] See,, *Min-Kyu Jeong at al v. Republic of Korea*, para.7.3; *Atasoy and Sarkut v. Turkey*, para. 10.4; and *Jong-nam Kim et al v. Republic of Korea*, para. 7.4, note 16 above.

[23] For a general overview of State practice, see, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, see note 4 above. See also, War Resisters' International, *World Survey of Conscription and Conscientious Objection to Military Service*, available at: http://www.wri-irg.org/co/rtba/index.html. With respect to European countries see also the judgment of the European Court of Human Rights in *Bayatyan v. Armenia*, Application No. 23459/03, 7 July 2011, available at: http://www.unhcr.org/refworld/docid/4e2544eff2.html, para. 110.

[24] See, for example, HRC, *General Comment No. 22: The Right to Freedom of Thought, Conscience and Religion (Article 18)*, CCPR/C/21/Rev.1/Add.4, 30 July 1993, available at: http://www.unhcr.org/refworld/pdfid/453883fb22.pdf, stating that "...there shall be no differentiation among conscientious objectors on the basis of the nature of their particular beliefs...", para. 11. With regard to State practice recognizing conscientious objection even when it originates from views outside of those of certain formal religions, see, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, para. 12, see note 4 above. See also, *Brinkhof v. Netherlands*, CCPR/C/48/D/402/1990, 29 July 1993, available at: http://www.unhcr.org/refworld/docid/4a3a3ae913.html.

[25] The right to conscientious objection is explicitly recognized in two regional treaties: 2000 Charter of Fundamental Rights of the European Union, Article 10(2); 2005 Ibero-American Convention on Young People's Rights, Article 12(3). The right is also derived from the right to freedom of thought, conscience and religion in regional human rights treaties, and has been recognized as such by the European Court of Human Rights (see *Bayatyan v. Armenia*, para. 110, note 28 above by *Feti Demirtaş c. Turquie*, note 7 above; *Savda c. Turquie*, note 13 above; and *Tarhan c. Turquie*, Application No. 9078/06, 17 July 2012, available at: http://www.refworld.org/docid/51262a732.html)) and by the IACHR (see *Cristián Daniel Sahli Vera et al. v. Chile*, Case 12.219, Report no. 43/05, 10 March 2005, available at: http://www.unhcr.org/refworld/pdfid/4ff59edc2.pdf; see also the friendly settlement in *Alfredo Díaz Bustos v. Bolivia*, Case 14/04, Report no. 97/05, 27 October 2005, available at: http://www.unhcr.org/refworld/pdfid/4ff59fbc2.pdf, para. 19). See also IACHR, Annual Report, 1997, Chapter VII: Recommendation 10, available at: http://www.unhcr.org/refworld/docid/50b8bd162.html; Council of Europe Parliamentary Assembly, Recommendation 1518 (2001) on the exercise of the right of conscientious objection to military service in Council of Europe Member States, 23 May 2001, available at: http://www.unhcr.org/refworld/docid/5107cf8f2.html; Council of Europe Committee of Ministers, Recommendation No. R (87) 8, 9 April 1987, available at: http://www.unhcr.org/refworld/docid/5069778e2.html; and Council of Europe Committee of Ministers, Recommendation CM/Rec (2010) 4 on human rights of members of the armed forces, 24 February 2010, available at: http://www.unhcr.org/refworld/docid/506979172.html.

[26] See, UN General Assembly resolution, 33/165, 1978 on Status of persons refusing service in military or police forces used to enforce apartheid, available at: http://www.refworld.org/docid/3b00f1ae28.html. See HRC, *General Comment No. 22: The Right to Freedom of Thought, Conscience and Religion (Article 18)*, at para. 11, see note 24 above, as well as the HRC's Concluding Observations on Ukraine, CCPR/CO/73/UKR, 12 November 2001, available at: http://www.unhcr.org/refworld/docid/3cbbeb1c4.html para. 20, and those on Kyrgyzstan, CCPR/CO/69/KGZ, 24 July 2000, available at: http://www.unhcr.org/refworld/docid/507572ef2.html, para. 18. The former UN Commission on Human Rights also affirmed that a right to conscientious objection derives from the right to freedom of thought, conscience and religion (UN Commission on Human Rights Resolution, *Conscientious objection to military service*, E/CN.4/RES/1989/59, 8 March 1989, available at: http://www.unhcr.org/refworld/docid/3b00f0b24.html, reinforced and developed in resolutions E/CN.4/RES/1993/84, 10 March 1993, available at: http://www.unhcr.org/refworld/docid/3b00f1228c.html; E/CN.4/RES/1995/83, 8 March 1995, available at: http://www.unhcr.org/refworld/docid/3b00f0d220.html; E/CN.4/RES/1998/77, see note 5 above, E/CN.4/RES/2000/34, 20 April 2000, available at: http://www.unhcr.org/refworld/docid/3b00efa128.html; E/CN.4/RES/2002/45, 23 April 2002, available at: http://www.unhcr.org/refworld/docid/5107c76c2.html; and E/CN.4/RES/2004/35, 19 April 2004, available at: http://www.unhcr.org/refworld/docid/415be85e4.html). Its successor, the UN Human Rights Council, has endorsed this position in its 2012 resolution on conscientious objection (A/HRC/RES/20/2, 16 July 2012, available at: http://www.unhcr.org/refworld/docid/501661d12.html) and latest in its 2013 resolution (A/HRC/24/L.23, 23 September 2013, available at: http://www.refworld.org/docid/526e3e114.html).

[27] Although the HRC has not discussed partial or selective conscientious objection either in *General Comment No. 22: The Right to Freedom of Thought, Conscience and Religion (Article 18)*, see note 29 above or in its recent decisions on individual complaints, a number of countries do make provision for selective or partial conscientious objectors. See, for example, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, para 47, see note 4 above.

[28] See, Part II on Terminology.

[29] See also *Savda c. Turquie*, para. 96, note 13 above.

IFR_AR_015996

**C. Prohibition on Underage Recruitment and Participation in Hostilities**

12. Explicit safeguards exist to prevent the exposure of children to military service.[30] All recruitment [both compulsory and voluntary] in State armed forces and the participation in hostilities[31] of those under 15 years of age is prohibited under international treaty law.[32] Such recruitment amounts to a war crime.[33] Whether conducted by governments or by non-State armed groups, compulsory recruitment of persons under 18 years of age is also prohibited pursuant to the 2000 Optional Protocol to the 1989 Convention on the Rights of the Child ["CRC"] on the involvement of children in armed conflict ["Optional Protocol to the CRC"].[34] A similar restriction is found in the 1999 International Labour Organization Convention on Worst Forms of Child Labour.[35] The 2000 Optional Protocol to the CRC requires States to "take all feasible measures" to prevent children under the age of 18 taking a "direct part in hostilities" whether as members of its armed forces or other armed groups and prohibits outright any voluntary recruitment of children under 18 years into non-State armed groups.[36] Whilst voluntary enlistment of children of 16 years and above is permitted for State armed forces, the State is obliged to put in place safeguards to ensure, *inter alia*, that any such recruitment is genuinely voluntary.[37] Despite the different age limits set by international law, it is UNHCR's view that forced recruitment and/or direct participation in hostilities of a child below the age of 18 years in the armed forces of the State or by a non-State armed group would amount to persecution.[38] Regional instruments also contain prohibitions on the recruitment and direct participation of children in hostilities.[39]

## IV. SUBSTANTIVE ANALYSIS

### A. Well-founded Fear of Being Persecuted

13. What amounts to a well-founded fear of being persecuted depends on the particular circumstances of the case, including the applicant's background, profile and experiences considered in light of up-to-date country of origin information.[40] It is important to take into account the personal experiences of the applicant, as well as the experiences of others similarly situated, since these may well show that there is a reasonable likelihood that the harm feared by the applicant will materialize sooner or later.[41] The first-tier question to ask is: *What would be the predicament [consequence(s)] for the applicant if returned?* The second-tier question is: *Does that predicament [or consequence(s)] meet the threshold of persecution?* The standard of proof to determine the risk is reasonable likelihood.[42]

---

[30] See, in this regard, UN Security Council, *Resolution 1882 (2009) on children and armed conflict*, S/RES/1882 (2009), 4 August 2009, available at: http://www.unhcr.org/refworld/docid/4a7bdb432.html.
[31] Technically, international humanitarian law distinguishes between non-international armed conflict and international armed conflict in this respect. In non-international armed conflict (Article 4(3)(c), Additional Protocol II to the 1949 Geneva Conventions, relating to the Protection of Victims of Non-International Armed Conflict ("Additional Protocol II")) the prohibition relates to use in hostilities. In international armed conflict (Article 77(2), Additional Protocol I to the 1949 Geneva Conventions, relating to the Protection of International Armed Conflict ("Additional Protocol I")), it is limited to taking direct part in hostilities. The Convention on the Rights of the Child ("CRC") adopts the narrower "direct part in hostilities" standard, see Article 38(2), CRC.
[32] Article 77(2), Additional Protocol I; Article 4(3)(c), Additional Protocol II; Article 38(2) CRC.
[33] See, Article 8(2)(b)(xxvi) and 8(2)(e)(vii) of the 1998 Statute of the International Criminal Court ("ICC Statute") which lists as war crimes "conscripting or enlisting children under the age of fifteen years into the national armed forces or using them to participate actively in hostilities." See also International Criminal Court ("ICC"), *Situation in the Democratic Republic of the Congo, in the case of the Prosecutor v. Thomas Lubanga Dyilo*, ICC-01/04-01/06, 14 March 2012, available at: http://www.unhcr.org/refworld/docid/4f69a2db2.html; Special Court for Sierra Leone ("SCSL"), *Prosecutor v. Issa Hassan Sesay, Morris Kallon and Augustine Gbao (the RUF accused) (Trial judgment)*, Case No. SCSL-04-15-T, 2 March 2009, available at: http://www.unhcr.org/refworld/docid/49b102762.html, at para. 184 (finding that the prohibition on such recruitment is customary international law). Further discussion of what constitutes the war crime of underage recruitment can be found in the SCSL, *Prosecutor v. Charles Ghankay Taylor*, SCSL-03-01-T, 18 May 2012, available at: http://www.unhcr.org/refworld/docid/50589aa92.html.
[34] Articles 2 and 4, 2000 Optional Protocol to the Convention on the Rights of the Child on the involvement of children in armed conflict.
[35] Article 3(a), 1999 ILO Convention No. 182 on Worst Forms of Child Labour.
[36] Articles 1 and 4, 2000 Optional Protocol to CRC.
[37] Article 3, 2000 Optional Protocol to CRC. See also, *UNHCR Guidelines on International Protection No. 8 Child Asylum Claims under Articles 1A(2) and 1(F) of the 1951 Convention and /or 1967 Protocol relating to the Status of Refugees*, HCR/GIP/09/08, 22 December 2009, ("UNHCR Guidelines on Child Asylum Claims"), available at: http://www.unhcr.org/refworld/docid/4b2f4f6d2.html, para. 22.
[38] *UNHCR Guidelines on Child Asylum Claims*, para. 21.
[39] See, Article 22(2), 1990 African Charter on the Rights and Welfare of the Child, and Article 12(3), 2005 Ibero-American Convention on Young People's Rights.
[40] *UNHCR Handbook*, paras. 51-53, see note 1 above.
[41] *UNHCR Handbook*, paras. 42-43, see note 1 above, and *UNHCR Guidelines on Religion-Based Claims*, para. 14, see note 15 above.
[42] See, UNHCR, *Note on the Burden and Standard of Proof*, 16 December 1998, ("Note on the Burden and Standard of Proof"), available at: http://www.refworld.org/docid/3ae6b3338.html, para. 10; UNHCR, *Interpreting Article 1 of the 1951 Convention relating to the Status of Refugees*, April 2001, ("UNHCR Interpreting Article 1"), available at: http://www.unhcr.org/refworld/docid/3b20a3914.html, paras. 16-17.

14. Persecution will be established if the individual is at risk of a threat to life or freedom,[43] other serious human rights violations, or other serious harm.[44] By way of example, disproportionate or arbitrary punishment for refusing to undertake State military service or engage in acts contrary to international law – such as excessive prison terms or corporal punishment – would be a form of persecution. Other human rights at stake in such claims include non-discrimination and the right to a fair trial right, as well as the prohibitions against torture or inhuman treatment, forced labour and enslavement/servitude.[45]

15. In assessing the risk of persecution, it is important to take into account not only the direct consequences of one's refusal to perform military service [for example, prosecution and punishment], but also any negative indirect consequences. Such indirect consequences may derive from non-military and non-State actors, for example, physical violence, severe discrimination and/or harassment by the community. Other forms of punitive retribution for draft evasion or desertion may also be evident in other situations, such as suspension of rights to own land, enrol in school or university, or access social services.[46] These types of harm may amount to persecution if they are sufficiently serious in and of themselves, or if they would cumulatively result in serious restrictions on the applicant's enjoyment of fundamental human rights, making their life intolerable.

16. Claims relating to military service may arise in various situations. This section outlines five common types of claims, albeit with some overlap.

**(i) Objection to State Military Service for Reasons of Conscience [absolute or partial conscientious objectors]**

17. In assessing what kinds of treatment would amount to persecution in cases where the applicant is a conscientious objector [see V. A. below on issues relating to credibility and genuineness of the applicant's conviction(s)], the key issue is whether the national law on military service adequately provides for conscientious objectors, by either: (i) exempting them from military service, or (ii) providing appropriate alternative service. As mentioned in Part III above, States can legitimately require that citizens perform military or alternative service. However, where this is done in a manner that is inconsistent with international law standards, conscription may amount to persecution.

18. In countries where neither exemption nor alternative service is possible, a careful examination of the consequences for the applicant will be needed. For example, where the individual would be forced to undertake military service or participate in hostilities against their conscience, *or* risk being subjected to prosecution and disproportionate or arbitrary punishment for refusing to do so, persecution would arise. Moreover, the threat of such prosecution and punishment, which puts pressure on conscientious objectors to change their conviction, in violation of their right to freedom of thought, conscience or belief, would also meet the threshold of persecution.[47]

19. The persecution threshold would not be met in countries that do not make provision for alternative service, but where the only consequence is a theoretical risk of military service because in practice conscription is not enforced or can be avoided through the payment of an administrative fee.[48] Similarly, where a draft evader is exempted from military service, or where a deserter is offered an honourable discharge, the issue of persecution would not arise, unless other factors are present.

---

[43] Article 33(1), 1951 Convention.
[44] See, *UNHCR Handbook*, para. 51-53, see note 1 above. See also, UNHCR, *Guidelines on International Protection No. 7: The Application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees to Victims of Trafficking and Persons At Risk of Being Trafficked*, HCR/GIP/06/07, 7 April 2006, available at: http://www.unhcr.org/refworld/docid/443679fa4.html, para. 14, and UNHCR Handbook, paras. 54-55, see note 1 above.
[45] See, for example, IACHR, "Fourth report on the situation of human rights in Guatemala", OEA/Ser.L/V/II.83, Doc. 16 rev., 1 June 1993, chap. V.
[46] Concerning the denial of enrolment into school or university see for example, UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Eritrea*, April 2009, available at: http://www.refworld.org/docid/49de06122.html, page 13; regarding suspension of land ownership and denial of access to public services see for example, UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Eritrea*, 20 April 2011, HCR/EG/ERT/11/01, available at: http://www.refworld.org/docid/4dafe0ec2.html, pages 10 and 25 respectively.
[47] See, UN Commission on Human Rights, *Civil and Political Rights, Including the Question of Torture and Detention: Report of the Working Group on Arbitrary Detention*, E/CN.4/2001/14, 20 December 2000, recommendation No. 2, available at: http://www.refworld.org/docid/3b00f54d18.html, paras. 91-94.
[48] Excessive administrative fees designed to deter genuine conscientious objectors from opting for alternative service or which are considered punitive would be considered discriminatory and may on a cumulative basis meet the threshold of persecution.

IFR_AR_015998

20. Where alternative service is available, but punitive in nature and implementation, because of the type of service involved or its disproportionate duration, the issue of persecution may nonetheless be at issue. A disparity in the length of alternative service will not, in itself, be sufficient to meet the threshold of persecution. If, for example, the duration of alternative service is based on objective and reasonable criteria, such as the nature of the specific service concerned, or the need for special training in order to accomplish that service, persecution would not arise.[49] However, where alternative service is merely theoretical, for instance, because the relevant legislative provision has never been implemented; the procedure for requesting alternative service is arbitrary and/or unregulated; or the procedure is open to some but not all, further inquiries need to be undertaken. In cases where the applicant has not availed him or herself of the existing procedures it would be important to understand their reasons for not doing so. If found that the reasons relate to a well-founded fear of being persecuted for publicly expressing his or her convictions, this would need to be factored into the overall analysis.

**(ii) Objection to Military Service in Conflict Contrary to the Basic Rules of Human Conduct**

21. Refugee claims relating to military service may also be expressed as an objection to (i) a particular armed conflict or (ii) the means and methods of warfare [the conduct of a party to a conflict]. The first objection refers to the unlawful use of force [*jus ad bellum*], while the second refers to the means and methods of warfare as regulated by international humanitarian law [*jus in bello*], as well as international human rights and international criminal law.[50] Collectively such objections relate to being forced to participate in conflict activities that are considered by the applicant to be contrary to the basic rules of human conduct.[51] Such objections may be expressed as an objection on the basis of one's conscience, and as such can be dealt with as a case of "conscientious objection" [see (i) above]; however, this will not always be the case. Individuals may, for example, object to participating in military activities because they consider this is required to conform to their military code of conduct, or they may refuse to engage in activities which constitute violations of international humanitarian, criminal or human rights law.

22. Recognizing the right to object on such grounds and to be granted refugee status is consistent with the rationale underlying the exclusion clauses in the 1951 Convention. Articles 1F(a) and 1F(c) exclude from protection individuals in respect of whom there are serious reasons for considering that they have committed crimes against peace, war crimes or crimes against humanity or are guilty of acts contrary to the purposes and principles of the United Nations, and who are therefore considered undeserving of international protection as refugees. The obligation on individuals under international humanitarian law and international criminal law to refrain from certain acts during armed conflict would find reflection in international refugee law in the case of individuals who are at risk of being punished for exercising the restraint expected of them under international law [see paragraph 14]. In this regard, it is important to note the absence of a defence of superior orders which are manifestly unlawful.[52]

*Objection to Participating in an Unlawful Armed Conflict*

23. Where an armed conflict is considered to be unlawful as a matter of international law [in violation of *jus ad bellum*], it is not necessary that the applicant be at risk of incurring individual criminal responsibility if he or she were to participate in the conflict in question, rather the applicant would need to establish that his or her objection is genuine, and that because of his or her objection, there is a risk of persecution. Individual responsibility for a crime of aggression only arises under international law for

---

[49] See the HRC's approach in *Foin v. France*, see note 12 above. See similarly, Richard *Maille v. France*, CCPR/C/69/D/689/1996, 31 July 2000, available at: http://www.unhcr.org/refworld/docid/3f588efd3.html, and *Venier and Nicholas v. France*, see note 12 above.
[50] *Jus ad bellum* refers to the constraints under international law on the use of force, whereas *jus in bello* governs the conduct of the parties to an armed conflict. Traditionally, the latter refers to international humanitarian law but relevant standards are also found in applicable provisions of international human rights law and international criminal law.
[51] See, *UNHCR Handbook*, paras. 170-171, note 1 above. With regard to para. 171: "Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft evasion could, in light of all other requirements of the definition, in itself be regarded as persecution." See also, at a regional level, Council of the European Union, "*Council Directive 2004/83/EC of 29 April 2004 on Minimum Standards for the Qualification and Status of Third Country Nationals or Stateless Persons as Refugees or as Persons who Otherwise Need International Protection and the Content of the Protection Granted*", OJ/L 304/12, 30 Sept. 2004, available at: http://www.unhcr.org/refworld/docid/4157e75e4.html. Article 9(2)(e) which includes as a form of persecution: "[p]rosecution or punishment for refusal to perform military service in a conflict, where performing military service would include crimes or acts falling under the exclusion clauses as set out in Article 12(2)."
[52] See, for example, Article 33, ICC Statute, see note 33 above.

IFR_AR_015999

persons who were in a position of authority in the State in question.[53] Soldiers who enlisted prior to or during the conflict in question may also object as their knowledge of or views concerning the illegality of the use of force evolve.

24. In determining the legality of the conflict in question condemnation by the international community is strong evidence, but not essential for finding that the use of force is in violation of international law. Such pronouncements are not always made, even where objectively an act of aggression has taken place. Thus, a determination of illegality with regard to the use of force needs to be made through the application of the governing rules under international law. The relevant norms are the obligation on States to refrain from the threat or use of force against other States; the right of individual or collective self-defence; and the authorization of the use of force in line with the UN Security Council's powers to maintain peace and security.[54]

25. If the conflict is objectively assessed not to be an unlawful armed conflict under international law, the refugee claim will ordinarily fail unless other factors are present. Likewise, where the legality of the armed conflict is not yet settled under international law, the application may be assessed pursuant to (i) above as a conscientious objector case.

*Objection to the Means and Methods of Warfare* [*Conduct of the Parties*]

26. Where the applicant's objection is to the methods and means employed in an armed conflict [that is, the conduct of the one or more of the parties to the conflict], it is necessary to make an assessment of the reasonable likelihood of the individual being forced to participate in acts that violate standards prescribed by international law. The relevant standards can be found in international humanitarian law [*jus in bello*], international criminal law, as well as international human rights law, as applicable.

27. War crimes and crimes against humanity are serious violations which entail individual responsibility directly under international law [treaty or custom]. Developments in the understanding of the elements of such crimes must be taken into account in determining what kinds of conduct or methods of warfare constitute such crimes.[55] Moreover, when assessing the kinds of acts an individual may be forced to commit in an armed conflict, other violations of international humanitarian law may also be relevant on a cumulative basis. The relevance of international human rights law in international or non-international armed conflict situations is also important to bear in mind.

28. Determining whether there is a reasonable likelihood that the individual would be forced to commit acts or to bear responsibility for such acts which violate the basic rules of human conduct will normally depend on an evaluation of the overall conduct of the conflict in question. Thus, the extent to which breaches of the basic rules of human conduct occur in the conflict will be relevant. However, it is the risk of being compelled to become involved in the act(s), rather than the conflict alone that is at issue, so the individual circumstances of the applicant must thus be examined, bearing in mind the role in which he or she will be engaged.

29. If the applicant is likely to be deployed in a role that excludes exposure to the risk of participating in the act(s) in question – for example, a non-combatant position such as a cook, or logistical or technical support roles only – then a claim of persecution is unlikely to arise without additional factors. Additional factors might include the link between the applicant's logistical or technical support role and the foreseeability of [or contribution to] the commission of crimes in violation of international humanitarian or international criminal law. Further, the applicant's reasons for object-

---

[53] See, for example, International Criminal Court, *Elements of Crimes*, ICC-ASP/1/3 at 108, U.N. Doc. PCNICC/2000/1/Add.2 (2000), Article 8 bis, available at: http://www.unhcr.org/refworld/pdfid/4ff5dd7d2.pdf.

[54] See respectively, Articles 2(4), 51 and 42 UN Charter. See also, UN General Assembly, *Declaration on the Inadmissibility of Intervention and Interference in the Internal Affairs of States*, 9 December 1981, A/RES/36/103, available at: http://www.refworld.org/docid/3b00f478f.html.

[55] For an overview, see UNHCR's *Background Note on Exclusion*, 4 September 2003, available at: http://www.unhcr.org/refworld/docid/3f5857d24.html, paras. 30-32. Examples of war crimes in the context of an international armed conflict are wilful killing of civilians, soldiers hors de combat or prisoners of war; torture; killing or wounding treacherously individuals belonging to the hostile army; intentionally directing attacks against the civilian population; rape; recruitment of children under the age of fifteen years into the armed forces or using them to participate actively in hostilities; and use of poisonous weapons. In a non-international armed conflict, war crimes include intentionally targeting attacks against civilians; killing or wounding treacherously a combatant adversary; rape; recruitment of children under the age of fifteen years into armed forces or groups or using them to participate actively in hostilities.

ing – regardless of the foreseeability or remoteness of the commission of crimes linked to his or her activities – may be sufficient to qualify him or her as a conscientious objector [see (i) above].

30. By contrast, where there is a reasonable likelihood that an individual may not be able to avoid deployment in a combatant role that will expose him or her to the risk of committing illegal acts, his or her fear of being persecuted would be considered well-founded [see paragraph 14]. In some cases the conflict in question may be one that is not generally characterized by violations of international law. However, the individual in question may be a member of a unit whose particular duties mean that it is specifically, or more likely, to be implicated in violations of basic rules of human conduct. In such circumstances there may be a reasonable likelihood that the individual concerned will be forced to commit, for example, war crimes or crimes against humanity. Where options are available to be discharged, reassigned [including to alternative service] or to have an effective remedy against superiors or the military which will be fairly examined and without retribution, the issue of persecution will not arise, unless other factors are present.[56]

### (iii) Conditions of State Military Service

31. In cases involving conditions within the State armed forces, a person is clearly not a refugee if his or her only reason for desertion or draft evasion is a simple dislike of State military service or a fear of combat. However, where the conditions of State military service are so harsh as to amount to persecution the need for international protection would arise.[57] This would be the case, for instance, where the terms or conditions of military service amount to torture or other cruel or inhuman treatment,[58] violate the right to security[59] and integrity of person,[60] or involve forced or compulsory labour,[61] or forms of slavery or servitude [including sexual slavery].[62]

32. Such cases may in particular involve discrimination on the grounds of ethnicity, or gender. Where the ill-treatment feared is carried out within the State armed forces by military personnel, it is necessary to assess whether such practices are systemic and/or in practice authorized, tolerated or condoned by the military hierarchy. An assessment has to be made regarding the availability of redress against such ill-treatment.

33. Under international law the prohibition of "forced or compulsory labour"[63] does not encompass military or alternative service. Nevertheless, where it can be established that compulsory military service is being used to force conscripts to execute public works, and these works are not of a "purely military character" or not exacted in the case of an emergency, and do not constitute a necessity for national defence or a normal civic obligation, such work constitutes forced labour.[64] According to the International Labour Organization, the condition of a "purely military character" is aimed specifically

---

[56] See, for example, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, see note 4 above, concerning the practice in some States of allowing enlisted soldiers to move to a different non-combatant unit if they develop a conscientious objection to a particular conflict or bearing arms altogether, paras. 26-27. Such an option may not be available though for an individual whose objection to a particular conflict is not based on conscientious objection.

[57] See, for example, Lord Justice Laws in obiter dictum "I should emphasise that it is plain (indeed uncontentious) that there are circumstances in which a conscientious objector may rightly claim that punishment for draft evasion would amount to persecution: where the military service to which he is called involves acts, with which he may be associated, which are contrary to basic rules of human conduct; where the conditions of military service are themselves so harsh as to amount to persecution on the facts; where the punishment in question is disproportionately harsh or severe. I am here addressing the case where none of these additional factors is present" in *Yasin Sepet, Erdem Bulbul v. Secretary of State for the Home Department*, C/2777; C/2000/2794, United Kingdom: Court of Appeal (England and Wales), 11 May 2001, available at: http://www.unhcr.org/refworld/docid/3ffbcb024.html, para. 61. See UN Working Group on Arbitrary Detention, Opinion No. 24/2003 (Israel), E/CN.4/2005/6/Add.1, 19 November 2004, available at: http://www.unhcr.org/refworld/pdfid/470b77b10.pdf. Similarly, HRC, General Comment No. 32: Right to equality before courts and tribunals and to a fair trial (Article 14), 23 August 2007, available at: http://www.unhcr.org/refworld/docid/478b2b2f2.html, stating that, "Repeated punishment of conscientious objectors for not having obeyed a renewed order to serve in the military may amount to punishment for the same crime if such subsequent refusal is based on the same constant resolve grounded in reasons of conscience", para. 55; see also UN Commission on Human Rights, Resolution 98/77, para. 5, see note 5 above. Subsequent to the HRC's ruling on Article 18 and a right to conscientious objection in *Yoon and Choi v. Republic of Korea*, see note 15 above, the UN Working Group on Arbitrary Detention has stated that the imprisonment of a conscientious objector for refusing to take up military service constitutes arbitrary detention as it is a violation of the rights guaranteed in Article 18 ICCPR as well as Article 9 ICCPR: Opinion No. 16/2008 (Turkey), A/HRC/10/21/Add.1, 4 February 2009, available at: http://www.unhcr.org/refworld/pdfid/5062b12e2.pdf. See also the European Court of Human Rights that held that the cumulative effect of repeated prosecution and punishment of conscientious objectors for desertion was their "civil death" amounting to degrading treatment in violation of Article 3 of the ECHR. See *Ülke v. Turkey*, Application No. 39437/98, 24 January 2006, available at: http://www.unhcr.org/refworld/docid/4964bd752.html as well as *Savda c. Turquie*, note 13 above and *Tarhan c. Turquie*, note 21 above, and *Feti Demirtaş c. Turquie*, see note 7 above.

[58] See, Article 7 ICCPR.

[59] See, Article 9 ICCPR.

[60] See for an interpretation, Articles 7, 9 and 17 ICCPR.

[61] See, Article 8(3) ICCPR and Article 1(b) of the Abolition of Forced Labour Convention, 1957 (No. 105).

[62] See, Article 8(1) ICCPR and Article 6 of the 1979 Convention on the Elimination of All Forms of Discrimination against Women ("CEDAW").

[63] See, Article 8 ICCPR.

[64] 1930 ILO Convention No. 29 concerning Forced or Compulsory Labour. See also, IACHR, "Fourth report on the situation of human rights in Guatemala", OEA/Ser.L/V/II.83, Doc. 16 rev., 1 June 1993, chap. V.

JFR_AR_016001

at preventing the call up of conscripts for public works.[65] In situations of emergency, which would endanger the existence of the State or well-being of the whole or part of the population, conscripts may nevertheless be called upon to undertake non-military work. The duration and extent of compulsory service, as well as the purposes for which it is used, need to be confined to what is strictly required in the given situation.[66] Using a conscript to gain profit through his or her exploitation [e.g. slavery, sexual slavery, practices similar to slavery, and servitude] is prohibited by international law and criminalized in the national legislation of a growing number of States.

34. As with other refugee claims outlined above (i) - (ii), if the applicant has the possibility of discharge, reassignment [including appropriate alternative service] and/or an effective remedy, without retribution, the issue of persecution will not arise, unless other factors are present.

**(iv) Forced Recruitment and/or Conditions of Service in Non-State Armed Groups**

35. As far as forced recruitment in non-State armed groups is concerned, it is recalled that non-State armed groups are not entitled to recruit by coercion or by force.[67] A person who seeks international protection abroad because of feared forced recruitment, or re-recruitment, by non-State armed groups, may be eligible for refugee status provided the other elements of the refugee definition are established; in particular that the State is unable or unwilling to protect the person against such recruitment [see paragraphs 42-44 and 60-61 below]. Likewise, forced recruitment by non-State groups to carry out non-military works could amount to, *inter alia*, forced labour, servitude and/or enslavement and constitute persecution.[68]

36. Where the applicant would be subjected to conditions of service that constitute serious violations of international humanitarian or international criminal law,[69] serious human rights violations or other serious harm, persecution would arise.[70]

**(v) Unlawful Child Recruitment**

37. Special protection concerns arise where children are at risk of forced recruitment and service.[71] The same is true for children who may have "volunteered" for military activities with the State's armed forces or non-State armed groups. A child's vulnerability and immaturity make him or her particularly susceptible to coerced recruitment and obedience to the State's armed forces or a non-State armed group; this must be taken into account.

38. As outlined at III.C. above, there are important restrictions on the recruitment and participation in hostilities of children under international human rights law and international humanitarian law, whether related to an international or a non-international armed conflict, and relating to both State armed forces and non-State armed groups.[72] Children need to be protected from such violations; as such, a child evading forced recruitment or prosecution and/or punishment or other forms of serious retaliation for desertion would have a well-founded fear of persecution.

39. There may be cases where children "volunteer" under pressure, or are sent to fight by their parents or communities. Such cases can similarly give rise to refugee status. The key question is the likelihood of risk that the child will be recruited and/or forced to fight, and this needs to be assessed on the basis of up-to-date country of origin information, taking into account the child's

---

[65] It has its corollary in Article 1(b) of the Abolition of Forced Labour Convention, 1957 (No. 105), which prohibits the use of forced or compulsory labour "as a method of mobilizing and using labour for purposes of economic development."
[66] ILO, Committee of Experts on the Application of Conventions and Recommendations (CEACR), CEACR: Individual Direct Request concerning Forced Labour Convention, 1930 (No. 29) Eritrea (ratification: 2000), 2010.
[67] See, para 7 above.
[68] See, Article 8(3) ICCPR, Article 1(b) of the Abolition of Forced Labour Convention (No. 105), 1957; Article 8(1) ICCPR; and Article 6 CEDAW.
[69] See, Article 3 common to the four Geneva Conventions of 1949; Article 8, Rome Statute of the ICC (last amended 2010), 17 July 1998, available at: http://www.refworld.org/docid/3ae6b3a84.html.
[70] For example, torture or other cruel, inhuman or degrading treatment or punishment (see Article 7, ICCPR), violations of the right to security (see Article 9 ICCPR) and integrity of person (see for an interpretation Article 7, 9 and 17 ICCPR), forced or compulsory labour (see Article 8(3) ICCPR and Article 1(b) of the Abolition of Forced Labour Convention, 1957 (No. 105)) or forms of slavery (including sexual slavery, see Article 8(1) and Article 6 CEDAW).
[71] *UNHCR Guidelines on Child Asylum Claims*, see note 37 above.
[72] See generally, UN Committee on the Rights of the Child, CRC General Comment No. 6: *Treatment of Unaccompanied and Separated Children Outside their Country of Origin*, ("CRC General Comment No.6"), CRC/GC/2005/6, 1 September 2005, available at: http://www.unhcr.org/refworld/docid/42dd174b4.html, para. 59.

profile and past experiences, as well as the experiences of similarly situated children. Importantly, in refugee claims concerning violations of the restrictions on the recruitment and participation of children in hostilities, there is no additional requirement to consider the issue of conscientious objection.

40. Persecution may also arise from the nature of the treatment the child would be subjected to whilst in the military or armed group. In this respect, it is important to note that in addition to taking an active part in hostilities, children are also used as spies, messengers, porters, servants, slaves [including sex slaves], and/or to lay or clear landmines. Regardless of the function held by the child, they may be exposed to serious or multiple forms of harm, including being put in a position to witness heinous crimes.[73]

41. Persecution may also arise where there is a risk of ill-treatment on return to the country of origin, for example, because of the child's history of being involved with State armed forces or non-State armed groups, whether as a soldier/combatant/fighter or in another role. They may be considered as an "enemy" by respectively the State or the non-State armed group and as a result be at risk of retaliation, including physical attacks, or being ostracized by the community to such an extent that their life is intolerable. In all such cases, special consideration needs to be given to the particular vulnerabilities and best interest of child applicants.[74]

## Agents of Persecution

42. There is scope within the refugee definition to recognize both State and non-State agents of persecution. In countries undergoing civil war, generalized violence, situations of insurgency, or State fragmentation, the threat of forced recruitment often emanates from non-State armed groups. This may result from the State's loss of control over parts of its territory. Alternatively, the State may empower, direct, control or tolerate the activities of non-State armed groups [for example, paramilitary units or private security groups]. The congruity of interests between the State and a non-State armed group involved in forced recruitment may not always be clear. Other non-State actors may also be the perpetrators of persecution in forms other than forced recruitment, for example, through violence and discrimination by family members and neighbours against former child soldiers perceived as having aided the enemy.

43. In all cases involving harm by non-State armed groups and other non-State actors, it is necessary to review the extent to which the State is able and/or willing to provide protection against such harms.

44. Where the refugee claim is based on the risk of being forced to commit acts that violate basic rules of human conduct, it is necessary to examine the extent to which such violations are taking place, as well as the ability and/or willingness of the authorities, in particular the military authorities, to prevent future violations. Isolated breaches of *jus in bello* which are effectively investigated and dealt with by the military authorities will indicate the existence of available and effective State protection. State responses of this nature would involve action being taken against those responsible and measures being put in place to prevent repetition.

45. With respect to ill-treatment by other soldiers, such as serious bullying or hazing, it is necessary to determine whether such acts are condoned by the military authorities and whether effective methods of redress are available through the military system or elsewhere in the State structure.

## Amnesties

46. When a conflict ends, a State may offer amnesties to persons who evaded military service, in particular to conscientious objectors. Such initiatives may guarantee immunity from prosecution or offer official recognition of conscientious objector status, thereby removing the risk of harm associated with such prosecution or punishment. Nevertheless, the impact of an amnesty on an individual's fear of persecution requires careful assessment. Amnesties may not cover all deserters and draft evaders. Moreover, it is necessary to examine whether the protection is effective in practice; whether the individual may still face recruitment into the armed forces; whether he or she may be subjected

---

[73] See, note 70 above; see also *UNHCR Guidelines on Child Asylum Claims*, para. 23, see note 37 above.
[74] *UNHCR Guidelines on Child Asylum Claims*, paras. 4 and 5, see note 37 above, and the CRC General Comment No.6, see note 72 above.

IFR_AR_016003

to other forms of persecution apart from any criminal liability quashed by the amnesty; and/or whether the person is at risk of being targeted by non-State actors – including community groups for being considered a traitor, for example – irrespective of the legislation adopted by the State. In particular, individuals who have witnessed the commission of war crimes or other serious acts, and have deserted as a result, may be able to establish a well-founded fear of persecution under certain circumstances if, for instance, they were required to act as witnesses in criminal proceedings upon return which would expose them to serious harm.

## B. The Convention Grounds

47. As with all claims to refugee status, the well-founded fear of persecution needs to be related to one or more of the grounds specified in the refugee definition in Article 1A(2) of the 1951 Convention; that is, it must be "for reasons of" race, religion, nationality, membership of a particular social group or political opinion. The Convention ground needs only to be a contributing factor to the well-founded fear of persecution; it need not be shown to be the dominant or even the sole cause. Further, one or more of the Convention grounds may be relevant; they are not mutually exclusive and may overlap.

48. The intent or motive of the persecutor can be a relevant factor in establishing the causal link between the fear of persecution and a Convention ground but it is not decisive, not least because it is often difficult to establish.[75] There is no need for the persecutor to have a punitive intent to establish the causal link; the focus is rather on the reasons for the applicant's predicament and how he or she is likely to experience the harm. Even where an individual is treated in the same way as a majority of the population this does not preclude persecution being for reasons of a Convention ground. Similarly, if the persecutor attributes or imputes a Convention ground to the applicant, this is sufficient to satisfy the causal link. Where the persecutor is a non-State armed actor, the causal link is established either where the persecutor harms the applicant for a Convention-related reason, *or* the State does not protect him or her for a Convention-related reason.[76]

### Religion

49. The religion ground is not limited to belief systems ["theistic, non-theistic and atheistic"],[77] but covers also notions of identity, or way of life.[78] It dovetails with Article 18 ICCPR and includes broader considerations of thought and conscience, including moral, ethical, humanitarian or similar views. The religion ground is thus particularly relevant in cases of conscientious objection, including those expressed through draft evasion or desertion, as explained at III.B. With respect to claims by conscientious objectors, the *UNHCR Handbook* states that:

> Refusal to perform military service may also be based on religious convictions. If an applicant is able to show that his religious convictions are genuine, and that such convictions are not taken into account by the authorities of his country in requiring him to perform military service, he may be able to establish a claim to refugee status. Such a claim would, of course, be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions.[79]

50. The religion ground may also be relevant in cases based on military service other than in situations of conscientious objection. Recruits may be subject to detention, ill treatment [such as physical beatings or severe psychological pressure] and serious discrimination on account of their religious beliefs, identity or practices. They may also be pressured to renounce their beliefs and convert.

### Political Opinion

51. The political opinion ground is broader than affiliation with a particular political movement or ideology; it concerns "any opinion on any matter in which the machinery of the State, government,

---

[75] *UNHCR Handbook*, para. 66, see note 1 above.
[76] See, *UNHCR, Guidelines on International Protection No.2: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, HCR/GIP/02/02, 7 May 2002, ("UNHCR Guidelines on Social Group"), available at: http://www.unhcr.org/refworld/docid/3d36f23f4.html, para. 23.
[77] *UNHCR Guidelines on Religion-Based Claims*, para. 6, see note 15 above.
[78] *Ibid*, paras. 4 and 8.
[79] *UNHCR Handbook*, para. 172, see note 1 above.

IFR_AR_016004

society, or policy may be engaged."[80] Moreover, it covers both the holding of an actual political opinion and its expression, political neutrality as well as cases where a political opinion is imputed to the applicant even if he or she does not hold that view.[81] The latter can arise in cases where the State, or a non-State armed group, attributes to the individual a particular political view.

52. Cases involving objection to military service may be decided on the basis that there is a nexus with the political opinion ground in the 1951 Convention. Depending on the facts, an objection to military service - especially objections based on a view that the conflict violates basic rules of human conduct [see IV. A. (ii) above] – may be viewed through the prism of actual or imputed political opinion. In relation to the latter, the authorities may interpret the individual's opposition to participating in a conflict or in act(s) as a manifestation of political disagreement with its policies. The act of desertion or evasion may in itself be, or be perceived to be, an expression of political views.

53. The political opinion ground may be relevant in other circumstances. For instance, a refugee claim by a soldier who becomes aware of and objects to criminal activity being conducted or tolerated by military personnel in the context of a conflict, such as the illicit sale of weapons, extortion of civilians or trafficking of drugs or in persons, and who fears persecution as a result of his or her opposition to such activities, may be considered under the political opinion ground. Whether or not the soldier is a whistle-blower, attempts to flee military service may be perceived by the authorities as evidence of political opposition. Objection to recruitment by non-State armed groups may also be an expression of political opinion.

54. Political opinion may also be the applicable ground in relation to family members of a conscientious objector, draft evader or deserter who is identified by the State or non-State armed group as having an allegiance to a particular political cause. In such cases, persecution may be linked to imputed political opinion, on the basis that the family member is assumed to hold similar views as those ascribed to the conscientious objector, draft evader or deserter. The relevant ground in such cases may also be "family" as a social group [see below paragraph 58].

**Race or Nationality**

55. Race and nationality, in the sense of ethnicity, are often factors in cases connected with military service. The well-founded fear of persecution may be directly based on the applicant's race, for example where conscripts from a particular racial group face harsher conditions than other recruits, or are the only ones actually subject to the draft. Similarly, children may face forced recruitment because they belong to a targeted ethnic group. Cases based on the conditions of military service arising to persecution may also relate to discrimination on the basis of race and/or ethnicity, and could invoke this ground.

**Membership of a Particular Social Group**

56. The 1951 Convention does not include a specific list of particular social groups. Rather, "the term membership of a particular social group should be read in an evolutionary manner, open to the diverse and changing nature of groups in various societies and evolving international human rights norms."[82] UNHCR defines a "particular social group" as:

> A particular social group involves a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.[83]

---

[80] UNHCR, *Guidelines on International Protection No. 1: Guidelines on Gender-Related Persecution Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, HCR/GIP/02/01, 7 May 2002, ("*UNHCR Guidelines on Gender-Related Persecution*"), available at: http://www.unhcr.org/refworld/docid/3d36f1c64.html, para. 32, as adapted from G. Goodwin-Gill, The Refugee in International Law, Clarendon Press 1983, 1st ed., page 31, and latest 3rd ed., Oxford University Press 2007 with J. McAdam, page 87, as also cited in Canada (Attorney General) v. Ward, [1993] 2 S.C.R. 689, Canada: Supreme Court, 30 June 1993, available at: http://www.refworld.org/docid/3ae6b673c.html.
[81] See UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe) and AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) - Case for the Intervener*, 25 May 2012, available at: http://www.unhcr.org/refworld/docid/4fc369022.html, para. 8.
[82] *UNHCR Guidelines on Social Group*, para. 3, see note 81 above.
[83] *Ibid*, para. 11.

IFR_AR_016005

57. The two approaches – "protected characteristics" and "social perception" – to identifying "particular social groups" reflected in this definition are alternative, not cumulative, tests. The "protected characteristics" approach examines whether a group is connected either by an immutable characteristic, or by a characteristic that is so fundamental to human dignity that a person should not be compelled to forsake it. An immutable characteristic "may be innate [such as sex or ethnicity] or unalterable for other reasons [such as the historical fact of a past association, occupation or status]."[84] The "social perception" approach considers whether a particular social group shares a common characteristic which makes it cognizable or sets the group's members apart from society at large. The latter approach does not require that the common characteristic be easily identifiable by the general public, or visible to the naked eye. An applicant need not demonstrate that all members of a particular social group are at risk of persecution in order to establish the existence of a particular social group.[85] Moreover, irrespective of which approach is adopted, a particular social group can arise even where this covers a large number of people.[86] Nevertheless, everyone falling within a particular social group is not necessarily a refugee; a well-founded fear of persecution because of membership of that group is required.

58. Under either of these approaches, "conscientious objectors" are a particular social group given that they share a belief which is fundamental to their identity and that they may also be perceived as a particular group by society. Individuals with common past experience, such as child soldiers, may also constitute a particular social group. This may also be the case for draft evaders or deserters, as both types of applicants share a common characteristic which is unchangeable; a history of avoiding or having evaded military service. In some societies deserters may be perceived as a particular social group given the general attitude towards military service as a mark of loyalty to the country and/or due to the differential treatment of such persons [for example, discrimination in access to employment in the public sector] leading them to be set apart or distinguished as a group. The same may be true for draft evaders. Conscripts may form a social group characterized by their youth, forced insertion into the military corps or their inferior status due to lack of experience and low rank.

59. Women are a particular social group, defined by innate and immutable characteristics and frequently treated differently from men.[87] This may be the relevant ground in claims concerning sexual violence against female soldiers or women or girls forced to act as sex slaves; although this does not preclude the application of other grounds. Girls are a sub-set of this social group. Children are also a particular social group, and this will be a relevant ground in cases concerning fear of forced underage recruitment.[88]

## C. Internal Flight or Relocation Alternative

60. Where the feared persecution emanates from, or is condoned, or tolerated by the State and/or State agents, an internal flight or relocation alternative will generally not be available, as the State actors will be presumed to have control and reach throughout the country. In the case of conscientious objectors to State military service, where the State does not provide for exemption or alternative service, and where the fear of persecution is related to these laws and/or practices and their enforcement, a consideration of an internal flight or relocation alternative [IFA] would not be *relevant* as it can be assumed that the objector would face persecution across the country.[89]

61. Determining whether an IFA is available in cases where the risk of persecution emanates from non-State armed groups, it is necessary to evaluate the ability and/or willingness of the State to protect the applicant from the harm feared. The evaluation needs to take into account whether the State protection is effective and of a durable nature, provided by an organized and

---

[84] *Ibid*, para. 6.
[85] *Ibid*, para. 17.
[86] *Ibid*, paras. 18-19.
[87] *UNHCR Gender-Related Persecution Guidelines*, para. 30, see note 80 above.
[88] *UNHCR Guidelines on Child Asylum Claims*, para. 48 et seq., see note 37 above.
[89] *UNHCR Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" within the Context of Article 1A(2) of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/04, 23 July 2003, ("*UNHCR Internal Flight Guidelines*"), available at: http://www.refworld.org/docid/3f2791a44.html.

stable authority exercising full control over the territory and population in question. In the particular context of non-international armed conflict, special consideration would need to be given to the applicant's profile, and whether he or she was recruited into and/or participated in activities of a non-State armed group considered to be in opposition to the government, and any likely reprisals from the government. It would often be unreasonable to expect former non-State recruits to relocate into government-controlled territory in a situation of an ongoing conflict, especially if the conflict has religious or ethnic dimensions.

# V. PROCEDURAL AND EVIDENTIARY ISSUES

## A. Establishing the Relevant Facts

62. The credibility assessment refers to the process of determining whether, in light of all the information available to the decision maker, the statements of the applicant relating to material elements of the claim can, on balance, be accepted as having been truthfully given for the purpose of determining refugee status eligibility. Where, notwithstanding, an applicant's genuine efforts to provide evidence pertaining to the material facts, there remains some doubt regarding some of the facts alleged by him or her, the benefit of doubt should be given to the applicant in relation to the assertions for which evidentiary proof is lacking once the decision maker is satisfied with the general credibility of the claim.[90]

63. In claims related to military service, reliable and relevant country of origin information, including the extent to which exemption from military service or alternative service are available, the manner in which conscription is enforced, and the treatment of individuals or groups within the military forces of the country of origin, can assist in the evaluation of the truthfulness of the applicant's account and the determination of the forms of treatment and their likelihood he or she may face if returned.[91]

64. Establishing the genuineness and/or the personal significance of an applicant's beliefs, thoughts and/or ethics plays a key role in claims to refugee status based on objection to military service, in particular conscientious objection [see IV. A. (i)-(ii)].[92] The applicant needs to be given the opportunity during the individual interview to explain the personal significance of the reasons behind his or her objection, as well as how these reasons impact on his or her ability to undertake military service. Eliciting information regarding the nature of the reasons espoused, the circumstances in which the applicant has come to adopt them, the manner in which such beliefs conflict with undertaking military service, as well as the importance of the reasons to the applicant's religious or moral/ethical code are appropriate and assist in determining the credibility of the applicant's statements.

65. Where the objection to military service is derived from a formal religion, it may be relevant to elicit information about the individual's religious experiences, such as asking him or her to describe how they adopted the religion, the place and manner of worship, or the rituals engaged in, the significance of the religion to the person, or the values he or she believes the religion espouses, in particular, in relation to the bearing of arms. That said, extensive examination or testing of the tenets or knowledge of the individual's religion may not always be necessary or useful, particularly as such knowledge will vary considerably depending on his or her personal circumstances. A claimant's detailed knowledge of his or her religion does not necessarily correlate with sincerity of belief and vice-versa.

66. Cases involving mistaken beliefs as to a particular religion's views on the bearing of arms occur from time to time. Where mistaken beliefs are at issue, it would need to be established that the applicant, despite the mistaken beliefs, still faces a well-founded fear of persecution for one or more of the Convention grounds.[93]

---

[90] *UNHCR Handbook*, para. 204, see note 1 above.

[91] *UNHCR Handbook*, paras. 196 and 203-204, see note 1 above, and *UNHCR Interpreting Article 1*, para. 10, see note 42 above. Note the *World Survey of Conscription and Conscientious Objection to Military Service*, which provides a country-by-country analysis, see note 28 above.

[92] For a general discussion of credibility issues in claims based on freedom of thought, conscience and religion, see *UNHCR Guidelines on Religion-based Claims*, paras. 28-29, see note 15 above.

[93] *Ibid*, para. 30.

IFR_AR_016007

67. If the claimant is mistaken about the nature of a particular conflict, such as whether the conflict abides by international law, this does not automatically undermine the credibility of the alleged reasons for objecting to military service. The credibility assessment in such situations needs to be conducted in light of the applicant's explanations regarding why involvement in the conflict would be inconsistent with his or her religious or moral beliefs, and the reality of the situation on the ground. Nonetheless, while they may be credible in their objection, where such an objection is based on a false premise, the risk of persecution would not arise unless they face other persecutory consequences for having deserted or evaded military service and a nexus to one of the Convention grounds is established.

68. For those objectors whose reasons for their objection is a matter of thought or conscience [rather than religion], they will not be able to refer to the practices of a religious community or teachings of a religious institution in order to substantiate their assertion. They should, however, be able to articulate the moral or ethical basis for their convictions. This may be based on social or community beliefs or practices, parental beliefs or on philosophical or human rights convictions. Past behaviour and experiences may shed light on their views.

69. In cases involving individuals who volunteered for military service or responded to a call up, and who subsequently desert, it is important to recognize that religious or other beliefs may develop or change over time, as may the circumstances of the military service in question. Thus, adverse judgements as to the credibility of the applicant should not generally be drawn based only on the fact that he or she initially joined the military service voluntarily; the full circumstances surrounding the individual's espoused beliefs and situation need to be carefully examined.

## B. Claims by Children

70. Given their young age, dependency and relative immaturity, special procedural and evidentiary safeguards are required for claims to refugee status by children.[94] In particular, children who spent time as soldiers/combatants/fighters or in a support role to armed groups may be suffering from severe trauma and be intimidated by authority figures. This can affect their ability to present a clearly understandable account of their experiences. Thus, appropriate interviewing techniques are essential during the refugee status determination procedure, as well as the creation of a non-threatening interview environment.

71. In cases concerning children, a greater burden of proof will fall on the decision makers than in other claims to refugee status, especially if the child is unaccompanied.[95] Given their immaturity, children cannot be expected to provide adult-like accounts of their experiences. If the facts of the case cannot be ascertained and/or the child is incapable of fully articulating his or her claim, a decision must be made on the basis of all known circumstances.

72. Age assessments may be particularly important in claims to refugee status based on military service where the age of the applicant is in doubt. This is the case not just with claims regarding conscription but also where a child considers him or herself to have "volunteered", given the limits on voluntary service set by international law [see III.B. above]. Age assessments, which may be part of a comprehensive assessment that takes into account both the physical appearance and the psychological maturity of the individual, are to be conducted in a safe, child- and gender-sensitive manner with due respect for human dignity.[96] Where the assessment is inconclusive, the applicant must be considered a child. Prior to the assessment, an independent guardian should be appointed to advise the child on the purpose and process of the assessment procedure, which needs to be explained clearly in a language that the child understands. DNA testing should, in normal circumstances, only be done if permitted by law and with the informed consent of the relevant individuals.

---

[94] For a full discussion of the minimum safeguards required see *UNHCR Guidelines on Child Asylum Claims*, paras. 65-77, see note 37 above. See also ExCom, *Conclusion on Children at Risk*, No. 107 (LVIII), 5 October 2007, available at: http://www.unhcr.org/refworld/docid/471897232.html, para. g(viii). Whether a claimant is a child for the purposes of such safeguards will depend on the age at the date claim to refugee status is made.

[95] *UNHCR Guidelines on Child Asylum Claims*, para. 73, see note 37 above.

[96] See further, *UNHCR Guidelines on Child Asylum Claims*, paras. 75-76, see note 37 above.

IFR_AR_016008

IFR_AR_016009

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL     HCR/GIP/15/11     24 June 2015     Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 11:

### Prima Facie Recognition of Refugee Status

UNHCR issues these Guidelines pursuant to its mandate, as contained in the Office's Statute, in conjunction with Article 35 of the 1951 Convention relating to the Status of Refugees and Article II of its 1967 Protocol. These Guidelines complement the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (1979, reissued, Geneva, 2011) and the other Guidelines on International Protection.

These Guidelines, having benefited from broad consultation, are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers, as well as UNHCR staff carrying out refugee status determination under its mandate and/or advising governments on the application of a prima facie approach.

The UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and the Guidelines on International Protection are available at: http://www.unhcr.org/refworld/docid/4f33c8d92.html.

Calls for public consultation on future guidelines will be posted at: http://www.unhcr.org/544f59896.html.

**11**

IFR_AR_016010

## I. INTRODUCTION

1. A prima facie approach means the recognition by a State or UNHCR of refugee status on the basis of readily apparent, objective circumstances in the country of origin or, in the case of stateless asylum-seekers, their country of former habitual residence.[1] A prima facie approach acknowledges that those fleeing these circumstances are at risk of harm that brings them within the applicable refugee definition.[2]

2. Although a prima facie approach may be applied within individual refugee status determination procedures (see Part III. D in these Guidelines), it is more often used in group situations, for example where individual status determination is impractical, impossible or unnecessary in large-scale situations. A prima facie approach may also be applied to other examples of group departure, for example, where the refugee character of a group of similarly situated persons is apparent.

3. Recognizing refugee status on a prima facie basis has been a common practice of both States and UNHCR for over 60 years. Despite its common use and the fact that the majority of the world's refugees are recognized on a prima facie basis,[3] there has been limited articulation of uniform standards to guide the practice. These Guidelines explain the legal basis as well as some procedural and evidentiary aspects of applying a prima facie approach. They outline standards of general application by States and by UNHCR, albeit some of those (e.g. legal decrees) are employable only by States. The Guidelines focus on group determination primarily, albeit they touch on how a prima facie approach may be applied in individual procedures at Part III. D.

### A. Definition and description

4. In general, "prima facie" means "at first appearance",[4] or "on the face of it."[5] UNHCR's *Handbook on Procedures and Criteria for Determining Refugee Status* describes group determination on a prima facie basis as follows:

> [s]ituations have […] arisen in which entire groups have been displaced under circumstances indicating that members of the group could be considered individually as refugees. In such situations the need to provide assistance is often extremely urgent and it may not be possible for purely practical reasons to carry out an individual determination of refugee status for each member of the group. Recourse has therefore been had to so-called "group determination" of refugee status, whereby each member of the group is regarded *prima facie* (i.e. in the absence of evidence to the contrary) as a refugee.[6]

5. Refugee status may be recognized on a prima facie basis pursuant to any of the applicable refugee definitions, including:

- Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees (hereinafter "1951 Convention");[7]

- one of the definitions in the regional refugee instruments;[8]

---

[1] UNHCR, "Protection of Refugees in Mass Influx Situations: Overall Protection Framework", 19 February 2001, EC/GC/01/4, available at: http://www.unhcr.org/3ae68f3c24.html, para. 6.
[2] Ivor C. Jackson, "The Refugee Concept in Group Situations" (Martinus Nijhoff, 1999), p. 3.
[3] UNHCR data indicates that in 2012, 1,121,952 refugees were recognized on a group basis and 239,864 were recognized individually. All refugees recognized on a group basis were recognized pursuant to a prima facie approach.
[4] Derived from Latin. "A case in which there is evidence which will suffice to support the allegation made in it, and which will stand unless there is evidence to rebut the allegation": *Osborn's Concise Law Dictionary* (10th edition, Thomson Sweet & Maxwell, 2005).
[5] The Oxford English Dictionary (1st edition 1933, reprinted 1978, online version, available at: http://www.oed.com/view/Entry/151264?redirected-From=prima+facie#eid).
[6] UNHCR, Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, reissued December 2011, HCR/1P/4/ENG/REV.3 (hereafter "UNHCR, *Handbook*"), para. 44.
[7] Prima facie recognition may also apply to Palestinian refugees pursuant to Article 1D of the 1951 Convention, in circumstances where the protection or assistance of UNRWA has ceased.
[8] See, e.g., the extended regional refugee definitions in: Organization of African Unity (African Union), Convention Governing the Specific Aspects of Refugee Problems in Africa, 10 September 1969 (hereafter "OAU Convention"), Art. I(2); Cartagena Declaration on Refugees, adopted at the Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, 22 November 1984 (hereafter "Cartagena Declaration"), Conclusion III(3).

- UNHCR's Statute and refugee mandate as further developed under the authority of the United Nations General Assembly.[9]

The regional refugee definitions were designed to respond, in part, to large-scale arrivals of people fleeing from objective circumstances in their countries of origin, such as conflict, occupation, massive human rights violations, generalised violence or events seriously disturbing public order, and are thus particularly suited to forms of group recognition. While commonly associated with the refugee definition under the 1969 Organization of African Unity (African Union) Convention Governing the Specific Aspects of Refugee Problems in Africa (hereinafter "OAU Convention"),[10] adopting a prima facie approach is not unique to Africa. Whichever instrument is applied, the assessment is based on the readily apparent, objective circumstances in the country of origin or former habitual residence relevant to the applicable refugee definition (II. A).

6. A prima facie approach operates only to recognize refugee status. Decisions to reject require an individual assessment.

## B. Refugee status and applicable rights

7. Each refugee recognized on a prima facie basis benefits from refugee status in the country where such recognition is made, and enjoys the rights contained in the applicable convention/instrument. Prima facie recognition of refugee status is not to be confused with an interim or provisional status, pending subsequent confirmation. Rather, once refugee status has been determined on a prima facie basis, it remains valid in that country unless the conditions for cessation[11] are met, or their status is otherwise cancelled[12] or revoked.[13]

8. Refugees recognized on a prima facie basis should be informed accordingly and issued with documentation certifying their status.[14]

## C. Settings for use and situations where a prima facie approach is appropriate

9. A prima facie approach is particularly suited to situations of large-scale arrivals of refugees. Large-scale situations are characterised by the arrival across an international border of persons in need of international protection in such numbers and at such a rate as to render individual determination of their claims impracticable.[15]

10. A prima facie approach may also be appropriate in relation to groups of similarly situated individuals whose arrival is not on a large-scale, but who share a readily apparent common risk of harm. The characteristics shared by the similarly situated individuals may be, for example, their ethnicity, place of former habitual residence, religion, gender, political background or age, or a combination thereof, which exposes them to risk.

---

[9] UNHCR, "Note on the Mandate of the High Commissioner for Refugees and his Office", October 2013, p. 3, which summarizes UNHCR's mandate for refugees as covering "all persons outside their country of origin for reasons of feared persecution, conflict, generalized violence, or other circumstances that have seriously disturbed public order and who, as a result, require international protection."

[10] OAU Convention, Art. 1.

[11] See UNHCR, "The Cessation Clauses: Guidelines on their Application", 26 April 1999, available at: http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=3c06138c4, para. 2, and UNHCR, "Guidelines on International Protection No. 3: Cessation of Refugee Status under Article 1C (5) and (6)", 10 February 2003, HCR/GIP/03/03, available at: http://www.refworld.org/docid/3e50de6b4.html (hereafter "UNHCR, Cessation Guidelines"), para. 1.

[12] See UNHCR, "Note on the Cancellation of Refugee Status", 22 November 2004, available at: http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=41a5dfd94 (hereafter "UNHCR, Note on Cancellation"), para. 1(i).

[13] See UNHCR, "Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees", 4 September 2003, HCR/GIP/03/05, available at: http://www.unhcr.org/3f7d48514.html (hereafter "UNHCR, Article 1F Exclusion Guidelines"), para. 6.

[14] Executive Committee, (hereafter "ExCom") Conclusion No. 8 (XXVIII), 12 October 1977 on the Determination of Refugee Status, available at: http://www.unhcr.org/3ae68c6e4.html, para (v).

[15] UNHCR, "Guidelines on the Application in Mass Influx Situations of the Exclusion Clauses of Article 1F of the 1951 Convention relating to the Status of Refugees", 7 February 2006, available at: http://www.refworld.org/docid/43f48c0b4.html (hereafter "UNHCR, Mass Influx Exclusion Guidelines"), para. 1. "Large-scale movements" or "large-scale arrivals" are the preferred terms for these Guidelines, although it is noted that other terms are used in other Guidelines, such as "mass influx". There is no scientific number of persons for a situation to qualify as a "large-scale movement" or "large-scale arrival." Rather such a designation is at the discretion of the State of arrival, factoring in such matters as the capacity for registration, processing as well as assistance to respond, also related to the speed and daily or monthly rates of arrivals.

11. A prima facie approach may be employed in urban, rural as well as camp or out-of-camp settings.

12. A prima facie approach may not be appropriate in all of the aforementioned situations, taking into account security, legal or operational factors. Alternative protection responses may be more suited to the situation at hand, such as screening or other procedures (e.g. temporary protection) and, in some circumstances, individual status determination.[16]

## II. SUBSTANTIVE ANALYSIS

### A. Readily apparent, objective circumstances

13. Prima facie recognition is based on readily apparent, objective circumstances in the country of origin or former habitual residence assessed against the refugee definition being applied to that situation.

14. In determining the appropriate instrument pursuant to which to recognize refugee status on a prima facie basis, the 1951 Convention criteria should generally be considered first as the universal and primary legal instrument for refugees, unless there are good reasons for doing otherwise.[17]

15. In respect of the 1951 Convention definition, where there is evidence of persecution against an entire group on account of a 1951 Convention ground, refugee status should be recognized pursuant to the 1951 Convention. An individualized assessment of the element of fear would normally be rendered unnecessary in such circumstances, as being on its face self-evident from the event or situation which precipitated the flight.

16. As for the regional refugee definitions, persons may be alternatively or additionally recognized under the extended refugee definitions in the OAU Convention or the Cartagena Declaration.[18] In such instances, States regularly agree on the "refugee-producing" character of certain situations and apply a prima facie approach.

17. Country information will play an important role in identifying the readily apparent circumstances that underlie a decision to recognize refugee status on a prima facie basis.[19] Such information should be relevant, current and from reliable sources. At the same time, the complexity of events in the country of origin or former habitual residence may result, at least initially, in scant or conflicting information. Because of its international protection mandate, including its supervisory responsibility,[20] field presence and operational activities, UNHCR is often uniquely placed to obtain first-hand information on the causes and motivations of flight. UNHCR has a long established practice of recommending to governments the application of a prima facie approach to given situations. Where information is uncertain or the situation is fluid, other protection responses (such as temporary protection, see II. E. below) may be appropriate in these early stages before activating a prima facie approach

---

[16] Any alternative protection response is without prejudice to and should not undermine the protection regime established by the 1951 Convention or other legal instruments to which the State is a party. See II. E on temporary protection or stay arrangements.

[17] See UNHCR, "Summary Conclusions on International Protection of Persons Fleeing Armed Conflict and Other Situations of Violence; Roundtable 13 and 14 September 2012, Cape Town, South Africa", 20 December 2012, para. 6, available at: http://www.refworld.org/docid/50d32e5e2.html. In the Summary Conclusions, it was noted that some States have adopted different practices: some States have adopted the recommended sequential approach in which an assessment on the basis of the criteria of the 1951 Convention refugee definition precedes the application of one of the extended definitions; other States have adopted a "nature of flight" approach, in which the prevailing situation in the country of origin (for example, an armed conflict) would lead to an initial application of an extended definition, rather than the 1951 Convention refugee definition; and other situations have called for a pragmatic approach, in which an extended definition is applied for reasons of efficiency and ease (para. 31).

[18] See para. 5 of these Guidelines.

[19] See, generally, UNHCR, "Country of Origin Information: Towards Enhanced International Cooperation", February 2004, available at: http://www.refworld.org/docid/403b2522a.html, para 14.

[20] See UNHCR, "Note on the Mandate".

IFR_AR_016013

## B. Evidence to the contrary

18. A prima facie approach, once in place, applies to all persons belonging to the beneficiary class, *unless* there is evidence to the contrary in the individual case. Evidence to the contrary is information related to an individual that suggests that he or she should not be considered as a refugee – either because he or she is not a member of the designated group or, although being a member, should not be determined to be a refugee for other reasons (e.g. exclusion).

19. Examples of evidence to the contrary include, but are not limited to information, that the applicant:

i.    is not from the designated country of origin or former habitual residence or does not possess the shared characteristic underlying the designated group's constitution;

ii.   did not flee during the designated time period;

iii.  left for other, non-protection reasons unrelated to the situation/event in question and has no *sur place* claim;

iv.   has/had taken up residence in the country of asylum and is recognized by the competent authorities as having the rights and obligations attached to the possession of nationality of that country (Article 1E, 1951 Convention);[21]

v.    may fall within the exclusion clauses in Article 1F of the 1951 Convention or of the relevant regional instruments.[22]

20. For reasons of legal certainty, any evidence to the contrary ought to be recorded and assessed as soon as possible after arrival. Such information may come to light, for example, during registration (see III. B. below). Where contrary evidence comes to light during registration, various case management strategies may need to be instituted (see III. B. below). As noted above at paragraph 6, a prima facie approach operates only to recognize refugee status. Decisions to reject require an individual assessment.

21. Contrary evidence that already existed at the time of recognition may only emerge after the recognition of refugee status, in which case cancellation procedures would be initiated.[23]

## C. Dealing with combatants or armed elements

22. Owing to the civilian and humanitarian character of asylum, combatants and other armed elements are not eligible for international protection, until it has been established that they have genuinely and permanently renounced military or armed activities.[24] In the context of large-scale movements as a result of armed conflict, combatants and other armed elements should be identified early and separated from the civilian population through a careful screening mechanism.[25] Even if they have genuinely and permanently renounced their military or armed activities and thus become eligible to apply for refugee status, a full individual examination of their refugee claim is generally required (in particular because of the possible involvement in excludable acts).[26]

---

[21] UNHCR, "Note on the Interpretation of Article 1E of the 1951 Convention relating to the Status of Refugees", March 2009, available at: http://www.refworld.org/pdfid/49c3a3d12.pdf.
[22] UNHCR, "Article 1F Exclusion Guidelines".
[23] See UNHCR, "Note on Cancellation".
[24] ExCom, "Civilian and Humanitarian Character of Asylum", 8 October 2002, Conclusion No. 94 (LIII), available at: http://www.unhcr.org/3dafdd7c4.html, para. (c)(vii) (hereafter "ExCom Conclusion No. 94").
[25] Ibid. para. (c)(iii).
[26] UNHCR, "Article 1F Exclusion Guidelines", para. 15; restated in UNHCR, "Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum" September 2006, available at: http://www.refworld.org/docid/452b9bca2.html, p. 66 (hereafter "UNHCR Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum").

NRC_AR_016014

23. Special procedures would need to be in place for children who formerly took part in armed activities.[27]

24. Civilian family members of combatants can benefit from refugee status on a prima facie basis unless there is evidence to the contrary in the individual case.[28]

## D. Sur place claims

25. Persons who departed their country of origin or former habitual residence prior to the situation/event giving rise to a prima facie approach may also benefit from a declaration of refugee status on a prima facie basis.[29] Should he or she have taken up residence in the country of asylum and be recognized by the competent authorities as having the rights and obligations attached to the possession of nationality of that country, Article 1E of the 1951 Convention may apply (see para. 19).

## E. Relationship with temporary protection or stay arrangements

26. Refugee status on a prima facie basis is to be distinguished from forms of temporary protection or stay arrangements. Such arrangements have a long history as an emergency response to large-scale movements of persons in need of international protection, providing protection from *refoulement* and appropriate treatment in accordance with international human rights standards.[30] They are not intended to substitute for existing protection mechanisms (such as prima facie recognition), and are more commonly applied in non-States parties or as regional approaches to particular crises in regions with few States parties to the relevant international and regional refugee instruments.[31]

27. In certain scenarios, it may be appropriate to apply a temporary protection or stay arrangement, as a prelude to a prima facie approach or at its end, even in States parties to the relevant instruments. In fluid or transitional contexts, such as at the beginning of a crisis where the exact cause and character of the movement is uncertain and hence a decision on prima facie recognition cannot be taken immediately, or at the end of a crisis, when the motivation for ongoing departures may need further assessment, a temporary protection or stay arrangement could be the appropriate response.[32]

## F. Cessation

28. While Articles 1C(1)-(4) apply based on an individual's own actions, the "ceased circumstances" clauses in Article 1C(5)-(6) of the 1951 Convention ("general cessation") are widely activated by States to apply to refugees recognized on a prima facie basis.[33] In respect of the latter, while all recognized refugees who fall within the terms of a declaration of general cessation lose their refugee status automatically once the cessation declaration comes into effect, they must be given the possibility prior to the effective date to apply for an exemption from cessation ("exemption procedures"). Even though the general circumstances may have ceased to exist, a certain number of refugees may continue to have a well-founded fear of persecution either in relation to past or new circumstances, or have compelling reasons arising out of past persecution justifying their continued need for international protection.[34]

---

[27] UNHCR, "Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum", Part 2J; UNHCR, "Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", 22 December 2009, HCR/GIP/09/08 , available at: http://www.refworld.org/docid/4b2f4f6d2.html para. 51; UNHCR, "Guidelines on International Protection No. 10: Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees", 3 December 2013, HCR/GIP/13/10/Corr. 1, available at: http://www.refworld.org/docid/529ee33b4.html, paras. 12, 37–41.
[28] ExCom Conclusion No. 94, para. (c)(vi).
[29] UNHCR, *Handbook*, paras. 94–96.
[30] UNHCR, "Guidelines on Temporary Protection or Stay Arrangements", February 2014, available at: http://www.refworld.org/docid/52fba2404.html (hereafter "UNHCR, Guidelines on Temporary Protection or Stay Arrangements"). The Guidelines identify four situations in which temporary protection or stay arrangements may be appropriate, at para. 9: (i) large-scale arrivals of asylum-seekers or other similar humanitarian crises; (ii) complex or mixed cross-border population movements, including boat arrivals and rescue-at-sea scenarios; (iii) fluid or transitional contexts; or (iv) other exceptional and temporary conditions in the country of origin necessitating international protection and which prevent return in safety and dignity.
[31] UNHCR, "Guidelines on Temporary Protection or Stay Arrangements", paras. 3 and 8.
[32] Ibid., para. 9(iii).
[33] UNHCR, "Cessation Guidelines", para 23.
[34] UNHCR, "Guidelines on Exemption Procedures in respect of Cessation Declarations", December 2011, available at: http://www.refworld.org/docid/4eef5c3a2.html.

IFR_AR_016015

## III. EVIDENTIARY AND PROCEDURAL ASPECTS

29. The decision to adopt a prima facie approach rests on an assessment, by the relevant authority in the country of asylum or, acting under its mandate, by UNHCR, that the readily apparent, objective circumstances in the country of origin or former habitual residence causing persons to leave (or stay outside their country) satisfies the applicable refugee definition. It is standard practice to consult with UNHCR at the activation and ending of a prima facie approach and to strive for regional coherence.

### A. Formal decision regulated by law

30. The decision to adopt a prima facie approach is to be made in accordance with the national legal framework. Different States have adopted various ways to recognize refugee status on this basis, the most common being by decision of the executive, such as the relevant government ministry or by presidential or cabinet decision. It is also possible that such a decision is taken by the parliament or the administrative authority responsible for refugee affairs in the country of asylum carrying out regular refugee status determination. In each case, the entity needs to have the legal authority to do so. The decision may take the form of a published declaration, decree or order (for the purposes of these Guidelines, hereinafter "Decision").[35]

31. The Decision would generally specify the following:

i.    the applicable domestic law that provides the authority for declaring a prima facie approach;

ii.   the title of the 1951 Convention or regional instrument pursuant to which refugee status is recognized, along with the rights and duties accompanying this status;

iii.  a description of the events/circumstances in the country of origin or former habitual residence underlying the Decision, or the characteristics of the class of beneficiaries to whom the approach applies;

iv.   periodic review and modalities of termination.

32. Sample Decisions covering the two distinct situations described in paragraphs 9–10 are attached as Annexes A and B to these Guidelines.

33. In accordance with its mandate, UNHCR has the authority to declare persons to be refugees, based on a prima facie determination. States are required to cooperate with UNHCR in the exercise of its functions to provide international protection and to find solutions, together with Governments and other relevant actors, for refugees.[36]

### B. Identification and registration

34. Registration procedures are key to the application of a prima facie approach and are the principal way in which individuals are identified within group-based processing.[37] Registration procedures aim both to ensure persons are appropriately identified so as to benefit from the prima facie approach as well as to channel those for whom further individualised inquiries may be required.

---

[35] Executive authorities have, at times, decided to recognize refugees on a prima facie basis without issuing a formal Decision and instead have informed UNHCR of such Decision by way of a letter. While UNHCR welcomes being formally notified of the Decision to recognize refugee status on a prima facie basis, this should be in addition to the more formal procedures described in the text at paras. 30–31.
[36] UNHCR, "Note on the Mandate", pp. 3–4. See 1951 Convention, Art. 35; 1967 Protocol, Art. II, as well as Cartagena Declaration, Conclusion II(2); OAU Convention, Art. VIII(1); and Treaty on the Functioning of the European Union, 13 December.
2007, OJ C 115/47 of 9.05.2008, Art. 78 (1) per general reference to 1951 Convention; Declaration 17 of the Treaty of Amsterdam, Declaration on Article 73k of the Treaty establishing the European Community, OJ C 340/134 of 10.11.1997; EU Council Directive 2005/85/EC on minimum standards on procedures in Member States for granting and withdrawing refugee status, OJ L 326/13 of 13.12.2005, Art. 21.
[37] See UNHCR ExCom, "Registration of Refugees and Asylum-Seekers," 5 October 2001, Conclusion No. 91 (LII), available at http://www.unhcr.org/3bd3e1d44.html, para. (a).

11

IER-AR-016016

While noting that the type and extent of data collected will vary depending on the situation,[38] the aim of registration as part of applying a prima facie approach would be to capture sufficient information on the individual and members of his/her family to determine their membership in the beneficiary class. Appropriate questions to identify any contrary evidence, including potentially excludable individuals, should also be included during the registration process.[39] Registration should ordinarily occur as soon as possible after arrival.[40]

35. Where there are indications of evidence to the contrary, persons need to be referred to a more enhanced registration process to gather more information. Where questions remain, the individual needs to be referred to regular refugee status determination procedures to assess adequately issues such as credibility and/or exclusion. In the event that regular status determination procedures are not operational, an assessment of the contrary evidence may need to be delayed, while making sure that the information is clearly recorded within the registration system. This will have the benefit of facilitating a review of eligibility for refugee status or possible cancellation at a later stage, when individual processing becomes feasible and/or operational.[41] In the meantime, such persons should benefit from an alternative form of stay.

## C. Decision to end the prima facie approach and to revert to regular individual status determination

36. A prima facie approach remains appropriate as long as the readily apparent circumstances prevailing in the country of origin or former habitual residence continue to justify a group-based approach to refugee status. The decision to adopt a prima facie approach, therefore, needs to be kept under periodic review, such that the on-going use of the practice is deliberative. Likewise, through registration, the profile of individuals and their reasons for flight can be monitored on a continual basis.

37. When circumstances change, careful consideration of ending the prima facie approach needs to be undertaken. Such reviews are guided by the situation in the country of origin, while recognizing the need for consistency and stability in refugee status approaches.[42]

38. As with the decision to recognize refugee status on a prima facie basis, the decision to end this approach rests with the relevant authority in the country of asylum. The decision to end the prima facie approach is to be communicated in the same manner (that is, via declaration, decree or order) as the initial decision to implement the prima facie approach, stating the end date. It should be made clear in such a decision, as well as through public communication and outreach, that the ending of the prima facie approach does not affect the refugee status of those who have already been recognized under this approach (their status would cease only in accordance with Article 1C of the 1951 Convention, see II. F). Equally, such a decision does not affect the right of asylum-seekers to apply for asylum through individual procedures. The ending of a prima facie approach signals that the asylum system is back to normal, with refugee claims being assessed through individual refugee status determination procedures.

39. A sample of a decision to end the prima facie approach is contained in Annex C.

## D. Prima facie approach within individual procedures

40. Although these Guidelines have focused on the group application of a prima facie approach, a number of States apply prima facie approaches within individual procedures. In the context of indi-

---

[38] UNHCR, "Handbook for Registration", September 2003, available at: http://www.refworld.org/docid/3f967dc14.html, p. 21, 30, 32, 41 and 53 (hereafter "UNHCR, Handbook for Registration"): Registration is a systematic method of identifying, recording, verifying, updating and managing the information on persons with the aim of protecting, documenting and assisting them (if and when necessary). Registration is also a starting and fundamental step for the search of durable solutions.

[39] See UNHCR, "Mass Influx Exclusion Guidelines", paras. 51–53. See II. B of these Guidelines.

[40] UNHCR, "Handbook for Registration", p. 7.

[41] See UNHCR, "Mass Influx Exclusion Guidelines", paras. 54–55.

[42] UNHCR ExCom Conclusion on the Extraterritorial Effect of Refugee Status, No. 12 (XXIX), 17 October 1978, available at: http://www.refworld.org/docid/3ae68c4447.html, para (b).

IFR_AR_016017

vidual procedures, a prima facie approach may also be part of simplified or accelerated processes based on the manifestly founded nature of a class of claims or on a presumption of inclusion.[43] Adopting a prima facie approach in individual procedures operates to provide an "evidentiary benefit"[44] to the applicant in the form of accepting certain objective facts. Refugee status would be provided to those who can establish that they belong to the pre-established "beneficiary class", unless there is evidence to the contrary.

41. Adopting a prima facie approach in individual procedures has many advantages, not least those of fairness and efficiency. In terms of fairness, it allows like cases to be treated alike as far as decision-makers are required to accept certain objective facts relating to the risks present in the country of origin or former habitual residence. In terms of efficiency, such an approach would generally reduce the time needed to hear cases because individuals are required to establish only that he or she (i) is a national of the country of origin or, in the case of stateless asylum-seekers, a former habitual resident, (ii) belongs to the identified group, and/or (iii) the specified time period of the event/situation in question.[45]

11

---

[43] It may also be known as "expedited positive" processing, or similar nomenclature.
[44] This evidentiary benefit was referred to as an "evidentiary shortcut" by J.-F. Durieux, "The Many Faces of "Prima Facie": Group-Based Evidence in Refugee Status Determination" (2008) 25(2) *Refuge* 151.
[45] UNHCR, "Note on Burden and Standard of Proof in Refugee Claims", 16 December 1998, available at: http://www.refworld.org/docid/3ae6b3338.html, para. 8.

IFR_AR_016018

**Annex A: Model Decision to adopt a prima facie approach for a large-scale arrival**

### Declaration of prima facie recognition

IN EXERCISE of the powers conferred by [*domestic law*], the [*relevant authority*] declares as follows:

1. Taking effect as at [*insert date*], any person who fled from [*country of origin*] arriving in [*country of asylum*] on or after [*date*] due to [*circumstances/event*] is recognized as a refugee, pursuant to a prima facie basis.

2. Any person who arrived in [*country of asylum*] from [*country of origin or, in case of stateless asylum-seekers, country of former habitual residence*] prior to [*date*] and is unable or unwilling to return to [*country of origin or former habitual residence*] due to [*circumstances/event*] will also benefit from prima facie recognition as a refugee (recognition *sur place*).

3. Any such persons recognized as refugees pursuant to [*Article 1A(2) of the 1951 Convention/1967 Protocol and/or regional refugee definition*] and [*relevant national law*] shall enjoy the rights and benefits as refugees pursuant to [*the 1951 Convention/regional refugee instrument, as applicable*], and have duties to conform to national laws and regulations.

4. This decision to recognize refugees pursuant to a prima facie approach will be kept under periodic review and remains valid until, after due consideration of country of origin information and consultation with UNHCR, it is terminated by [*formal decision by relevant authority*].

[signature]

[stamp]

[date]

IFR_AR_016019

**Annex B: Model Decision to adopt a prima facie approach for groups of similarly situated persons**

**Declaration on prima facie recognition for [description of the group]**

IN EXERCISE of the powers conferred by [*domestic law*], the [*relevant authority*] declares as follows:

1. Taking effect as at [*insert date*], the following persons shall be recognized as refugees on a prima facie basis:

▪ [*insert description of the group*]

2. Any such persons recognized as refugees pursuant to [*Article 1A(2) of the 1951 Convention/1967 Protocol and/or regional refugee definition*] and [*relevant national law*] shall enjoy the rights and benefits as refugees pursuant to [*the 1951 Convention/regional refugee instrument, as applicable*], and have duties to conform to national laws and regulations.

3. Any decision to recognize refugees on a prima facie basis will be kept under periodic review and will remain valid until, after due consideration of country information and consultation with UNHCR, it is terminated by [*formal decision by relevant authority*].

[signature]

[stamp]

[date]

**11**

IFR_AR_016020

**Annex C: Model decision to terminate a prima facie approach**

**Decision to end the prima facie recognition for [description]**

IN EXERCISE of the powers conferred by [*domestic law*], the [*relevant authority*] declares as follows:

1. Decision *[insert decision number and date]* made by [*relevant authority*] to recognize refugees on a prima facie basis from [*name country of origin/circumstance/event*] is, after due consideration of the current situation in the country of origin and following consultation with UNHCR, terminated in accordance with [*applicable national law*], effective [*insert date*].

2. Nothing in this decision to terminate a prima facie approach removes the right of asylum-seekers to apply for asylum or other forms of international protection within the regular status determination procedures.

3. This decision does not in any way affect the refugee status of those who have been recognized under this approach [*date and number of decision declaring prima facie recognition*]. They continue to be recognized as refugees until their status is ceased in accordance with Article 1C of the 1951 Convention.

[signature]

[stamp]

[date]

IFR_AR_016021



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL    HCR/GIP/16/12    02 December 2016    Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 12:

**Claims for refugee status related to situations of armed conflict and violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees and the regional refugee definitions**

UNHCR issues these Guidelines on International Protection pursuant to its mandate, as contained in, inter alia, the *Statute of the Office of the United Nations High Commissioner for Refugees*, namely paragraph 8(a), in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees*, Article II of its *1967 Protocol*, Article VIII(1) of the *1969 OAU Convention Governing the Specific Aspects of Refugee Problems in Africa*, and Commitment II(e) of the *1984 Cartagena Declaration on Refugees*.

These Guidelines clarify paragraph 164 of the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* and otherwise complement the Handbook. They are to be read in conjunction with UNHCR's other Guidelines on International Protection.

**12**

These Guidelines, having benefited from broad consultations, are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination.

UNHCR's *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* and the *Guidelines on International Protection* are available at: http://www.refworld.org/docid/4f33c8d92.html.

Calls for public consultation on future Guidelines on International Protection will be posted online at: http://www.unhcr.org/544f59896.html.

IFR_AR_016022

**TABLE OF CONTENTS**

I. INTRODUCTION..........................................................................................................218

    A.  Scope and terminology..........................................................................................218

    B.  The relationship between the 1951 Convention/1967 Protocol refugee definition and the regional definitions, and EU subsidiary protection .................................................219

        EU subsidiary protection.....................................................................................220

II. SUBSTANTIVE ANALYSIS OF ARTICLE 1A(2) OF THE 1951 CONVENTION.... 220

    A.  A well-founded fear of being persecuted.............................................................221

        Relevance of international humanitarian and criminal law....................................221

        Relevance of derogations under international human rights law...........................222

        Individual and group-based risks........................................................................222

        Degree of risk .....................................................................................................223

        No differential risk ..............................................................................................223

        Forward-looking assessment of risk ....................................................................224

        Sexual and gender-related persecution ...............................................................224

        Agents of persecution..........................................................................................225

        Refugees sur place...............................................................................................226

    B.  'For reasons of' one or more Convention grounds...................................................226

        'For reasons of' (causal link) ...............................................................................226

        Convention grounds............................................................................................226

    C.  Internal flight or relocation alternative .................................................................228

III. SUBSTANTIVE ANALYSIS OF ARTICLE I(2) OF THE 1969 OAU CONVENTION ........................................................................................................... 229

    A.  Preliminary considerations to guide interpretation................................................229

        Scope of the 1969 OAU Convention definition ..................................................230

    B.  Elements of the 1969 OAU Convention definition.................................................230

        Compelled to leave one's place of habitual residence.........................................230

        Refugees sur place...............................................................................................230

        Situations compelling flight ................................................................................231

    C.  Internal flight or relocation alternative .................................................................232

IFR_AR_016023

**IV. SUBSTANTIVE ANALYSIS OF CONCLUSION III(3) OF THE 1984 CARTAGENA DECLARATION** ..................................................................................**232**

    A.   Preliminary considerations to guide interpretation...................................................... 232

           Scope of the Cartagena refugee definition ............................................................... 233

    B.   Elements of the Cartagena refugee definition .......................................................... 233

           Refugees sur place..................................................................................................... 234

           Circumstances compelling flight................................................................................ 234

           Threat to life, security or freedom ........................................................................... 236

           Gang violence or violence from organized criminal groups...................................... 236

    C.   Internal flight or relocation alternative ..................................................................... 236

**V. PROCEDURAL AND EVIDENTIARY ISSUES**.....................................................**237**

    A.   Approaches to applying the 1951 Convention/1967 Protocol definition and the regional definitions................................................................................................ 237

    B.   Establishing the facts ............................................................................................... 237

           Country of origin information ................................................................................... 237

           Burden of proof ........................................................................................................ 238

**12**

IFR_AR_016024

# I. INTRODUCTION

## A. Scope and terminology

1. Situations of armed conflict and violence are today the major causes of refugee movements. The majority of these situations engender political, religious, ethnic, social, or gender persecution. The 1951 Convention relating to the Status of Refugees[1] and/or its 1967 Protocol[2] (1951 Convention) is directly applicable to civilians displaced by situations of armed conflict and violence.

2. The purpose of these Guidelines is to provide substantive and procedural guidance for assessing claims for refugee status involving situations of armed conflict and violence, and to promote consistency in the application of the 1951 Convention and regional refugee definitions.[3]

3. These Guidelines provide guidance in relation to the inclusion aspects of the refugee definitions in:

- Article 1A(2) of the 1951 Convention and its 1967 Protocol (Part II of these Guidelines),

- Article I(2) of the 1969 OAU Convention Governing the Specific Aspects of Refugee Problems in Africa[4] (1969 OAU Convention) (Part III of these Guidelines), and

- Conclusion III(3) of the 1984 Cartagena Declaration on Refugees (Cartagena Declaration) (Part IV of these Guidelines).[5]

The inclusion of the regional refugee definitions in these Guidelines concern their application to claims for refugee status related to situations of armed conflict and violence and is without prejudice to the application of these definitions to other situations.

4. These Guidelines do not address exclusion[6] or cessation,[7] issues related to the civilian and humanitarian character of asylum,[8] or claims related to military service,[9] for which other guidance is available. These Guidelines also do not deal with prima facie recognition of refugee status, which is covered by Guidelines on International Protection No. 11.[10] However, they do deal with the relationship between the 1951 Convention refugee definition and the regional refugee definitions, including which approaches can be used in applying the various definitions (paragraphs 86 to 88 of these Guidelines). The Guidelines focus on refugee status and do not address specifically subsidiary or complementary forms of international protection.[11]

5. For the purpose of these Guidelines, the phrase "situations of armed conflict and violence" refers to situations that are marked by a material level or spread of violence that affects the civilian popula-

---

[1] *Convention Relating to the Status of Refugees* (28 July 1951) 189 UNTS 137 (1951 Convention), http://www.refworld.org/docid/3be01b964.html.

[2] *Protocol Relating to the Status of Refugees* (31 January 1967) 606 UNTS 267 (1967 Protocol), http://www.refworld.org/docid/3ae6b3ae4.html.

[3] For further information on the background to and reasons for developing these Guidelines, UNHCR, *Summary Conclusions on International Protection of Persons Fleeing Armed Conflict and Other Situations of Violence; Roundtable 13 and 14 September 2012, Cape Town, South Africa*, 20 December 2012, ("UNHCR Cape Town Summary Conclusions"), http://www.refworld.org/docid/50d32e5e2.html.

[4] *OAU Convention Governing the Specific Aspects of Refugee Problems in Africa* (10 September 1969) 1001 UNTS 45 (1969 OAU Convention),http://www.refworld.org/docid/3ae6b36018.html.

[5] *Cartagena Declaration on Refugees*, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, 22 November 1984, (Cartagena Declaration), http://www.refworld.org/docid/3ae6b36ec.html. The 1984 Cartagena Declaration is not a treaty within the meaning of Article 1(a) of the *1969 Vienna Convention on the Law of Treaties* (23 May 1969) 1155 UNTS 331.

[6] UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 September 2003, HCR/GIP/03/05, http://www.refworld.org/docid/3f5857684.html. See also, UNHCR, *Guidelines on the Application in Mass Influx Situations of the Exclusion Clauses of Article 1F of the 1951 Convention relating to the Status of Refugees*, 7 February 2006, http://www.refworld.org/docid/43f48c0b4.html.

[7] UNHCR, *Guidelines on International Protection No. 3: Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses)*, 10 February 2003, HCR/GIP/03/03, http://www.refworld.org/docid/3e50de6b4.html.

[8] EXCOM Conclusion No. 94 (LIII), 2002, para. (c)(viii). UNHCR, *Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum*, September 2006, http://www.refworld.org/docid/452b9bca2.html.

[9] UNHCR, *Guidelines on International Protection No. 10: Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees*, 3 December 2013, HCR/GIP/13/10/Corr. 1, ("UNHCR Military Service Guidelines"), http://www.refworld.org/docid/529ee33b4.html.

[10] UNHCR, *Guidelines on International Protection No. 11: Prima Facie Recognition of Refugee Status*, 24 June 2015, HCR/GIP/15/11, ("UNHCR Prima Facie Recognition Guidelines"), http://www.refworld.org/docid/555c335a4.html.

[11] Paragraph 9 of these Guidelines contains a reference to the relationship between the 1951 Convention and subsidiary protection status under European Union (EU) law.

IFR_AR_016025

tion. Such situations may involve violence between state and non-state actors, including organized gangs,[12] and violence between different groups in society. Further, such situations may include violence between two or more states, between states and non-state armed groups, or between various non-state armed groups. Any particular classification of an armed group, for example as criminal or political, is not necessary or determinative for the purpose of refugee status determination. Further, while in some circumstances situations of armed conflict and violence referred to in these Guidelines may be categorized as an international (IAC)[13] or a non-international (NIAC)[14] armed conflict within the meaning of international humanitarian law (IHL), such categorization is not required for the purpose of refugee status determination.[15] Many situations of armed conflict and violence are not designated as an armed conflict for IHL purposes, yet the means employed and their consequences may be just as violent or harmful. Other labels – such as a situation of generalized[16] or indiscriminate[17] violence – have also been used by decision-makers to describe situations of armed conflict and violence. Regardless of such characterizations, the method of assessing the claim to refugee status is the same – a full and inclusive application of the refugee definition to the situation at hand is required, as is set out in these Guidelines.

## B. The relationship between the 1951 Convention/1967 Protocol refugee definition and the regional definitions, and EU subsidiary protection

6. Regional refugee instruments, such as the 1969 OAU Convention and the Cartagena Declaration, complement the 1951 Convention/1967 Protocol, which remain the universal and primary legal protection instruments for refugees.[18] Each regional instrument incorporates the 1951 Convention definition of a refugee and also elaborates so-called broader refugee criteria (referred to as "regional definitions"). A principal purpose of both the 1969 OAU Convention and the Cartagena Declaration is to provide refugee protection in specific humanitarian situations, including large-scale arrivals of people fleeing specific situations or circumstances in their country of origin.[19]

7. Certain factual scenarios may suggest the relevance and applicability of both the 1951 Convention definition and one of the regional definitions to an individual claim for refugee status and raise questions concerning which definition to apply (see paragraphs 86 to 88 of these Guidelines). In other situations, an individual may be a refugee under one of the regional definitions but not under the 1951 Convention definition, including where no causal link can be established between her or his fear of being persecuted and a Convention ground. In such circumstances, the regional definitions expand the range of individuals eligible to benefit from refugee status.

8. While the two regional definitions differ slightly in wording, the types of situations or circumstances they refer to and are intended to cover can be largely assimilated. Further, although the re-

---

[12] UNHCR, *Guidance Note on Refugee Claims Relating to Victims of Organized Gangs*, 31 March 2010 ("UNHCR Gangs Guidance Note"), http://www.refworld.org/docid/4bb21fa02.html.

[13] Common Article 2(1) of the 1949 Geneva Conventions, including the *Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention)*, 12 August 1949, 75 UNTS 287, http://www.refworld.org/docid/3ae6b36d2.html and Article 1(4) of *Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I)*, 8 June 1977, 1125 UNTS 3, ("Protocol I to the Geneva Conventions"), http://www.refworld.org/docid/3ae6b36b4.html. See also, International Committee of the Red Cross (ICRC), *How is the Term "Armed Conflict" Defined in International Humanitarian Law?*, March 2008, pp 1 to 3, http://www.refworld.org/docid/47e24eda2.html and International Committee of the Red Cross (ICRC), *International humanitarian law and the challenges of contemporary armed conflicts*, October 2016, 32IC/15/11, http://www.refworld.org/docid/58047a764.html.

[14] Common Article 3 of the 1949 Geneva Conventions, including the Fourth Geneva Convention, note 13 above, and Article 1 of *Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II)*, 8 June 1977, 1125 UNTS 609, ("Protocol II to the Geneva Conventions"), http://www.refworld.org/docid/3ae6b37f40.html. See also, International Committee of the Red Cross (ICRC) 2008, note 13 above, pp 3 to 5 and International Committee of the Red Cross (ICRC) 2016, note 13 above.

[15] By analogy, this is the position taken by the Court of Justice of the European Union (CJEU) with regard to the meaning of internal armed conflict in the EU Qualification Directive, in *Aboubacar Diakité v. Commissaire général aux réfugiés et aux apatrides*, C-285/12, European Union: Court of Justice of the European Union, 30 January 2014, para. 23, http://www.refworld.org/docid/52ea51f54.html. The CJEU considered that 'while [IHL] is designed, inter alia, to provide protection for civilian populations in a conflict zone by restricting the effects of wars on persons and property, it does not ... provide for international protection to be granted to certain civilians who are outside both the conflict zone and the territory of the conflicting parties'.

[16] See paragraph 71 to 73 of these Guidelines.

[17] In the European Union, in the context of international protection, the term 'indiscriminate violence' is used in Article 15c of the EU Qualification Directive (recast). According to the CJEU indiscriminate violence 'implies that it may extend to people irrespective of their personal circumstances', in *Elgafaji v. Staatssecretaris van Justitie*, C-465/07, European Union: Court of Justice of the European Union, 17 February 2009, para. 34, http://www.refworld.org/docid/499aaee52.html.

[18] EXCOM Conclusion No. 87 (L) 1999, para. (f) and EXCOM Conclusion No. 89 (LI) 2000. See also, 1967 OAU Convention, note 3 above, ninth preamblular paragraph, referring to the 1951 Convention and the 1967 Protocol as the basic and universal instrument for the protection of refugees.

[19] UNHCR Prima Facie Recognition Guidelines, note 10 above, para. 5.

gional definitions are detailed, neither of the regional instruments was intended to provide an all-encompassing definition for every situation in which persons are compelled to leave their countries of origin and cross an international border. As far as rights are concerned, the 1951 Convention and the regional instruments each recognize a person as a refugee and provide for 1951 Convention rights to be applied.[20] Therefore, in most cases, the particular definition pursuant to which the person is recognized as a refugee will not be of material consequence. For the purposes of legal certainty, however, a proper interpretation of each definition is necessary, with a sequential approach to adjudication being recommended (see paragraphs 86 to 88 of these Guidelines). Decision-makers also need to bear in mind that the regional protection systems are intended to be implemented in a manner that complements and strengthens the 1951 Convention regime.[21]

*EU subsidiary protection*

9. The EU Qualification Directive (recast) provides for subsidiary protection that is complementary to refugee protection envisaged by the 1951 Convention/1967 Protocol.[22] It applies to those who do not qualify as refugees but face a real risk of suffering serious harm, inter alia, when there is a 'serious and individual threat to a civilian's life or person by reason of indiscriminate violence in situations of international or internal armed conflict'.[23] Certain factual situations may give rise to an overlap between the criteria for refugee protection in accordance with the 1951 Convention and subsidiary protection. Because of the primacy of refugee protection and the limitation that subsidiary protection only applies to persons who do not qualify as refugees, claims related to situations of armed conflict and violence must first be assessed in accordance with the criteria for refugee protection. Only when the applicant does not qualify for refugee status, should the claim be assessed in accordance with the criteria for subsidiary protection.[24]

## II. SUBSTANTIVE ANALYSIS OF ARTICLE 1A(2) OF THE 1951 CONVENTION

10. In accordance with the ordinary meaning to be given to the terms and in light of the context as well as the object and purpose of the 1951 Convention,[25] Article 1A(2) applies to persons fleeing situations of armed conflict and violence. In fact, the 1951 Convention definition of a refugee makes no distinction between refugees fleeing peacetime or "wartime" persecution. The analysis required under Article 1A(2) focusses on a well-founded fear of being persecuted for one or more of the Convention grounds. The phrase, 'persons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees under the 1951 Convention or 1967 Protocol', contained in paragraph 164 of the UNHCR Handbook needs to be understood as limited to situations where there is no causal link between a person's well-founded fear of being persecuted and a 1951 Convention ground.

---

[20] The 1969 OAU Convention accepts the rights in the 1951 Convention as applicable to refugees recognized under the 1969 OAU Convention, see 1969 OAU Convention, note 4 above, tenth preambular paragraph and Article VIII(2). See also, M Sharpe, "The 1969 African Refugee Convention: Innovations, Misconceptions, And Omissions", *McGill Law Journal* (2012) 58, p 126 to 145. The Cartagena Declaration also accepts the rights in the 1951 Convention as applicable to refugees recognized in accordance with Conclusion III(3) and also expressly calls upon countries in the region to apply the 1969 American Convention on Human Rights for the treatment of refugees and for countries to acknowledge that reunification of families constitutes a fundamental principle, see Cartagena Declaration, note 5 above, Conclusion III(1), III(8) and III(13).
[21] EXCOM Conclusion No. 89 (LI), 2000 and EXCOM Conclusion No. 103 (LVI), 2005, including para. (b).
[22] European Union: Council of the European Union, *Directive 2011/95/EU of the European Parliament and of the Council of 13 December 2011 on standards for the qualification of third-country nationals or stateless persons as beneficiaries of international protection, for a uniform status for refugees or for persons eligible for subsidiary protection, and for the content of the protection granted (recast)*, 20 December 2011, OJ L 337; December 2011, pp 9-26, preamble, recital 33, http://www.refworld.org/docid/4f197df02.html ("EU Qualification Directive (recast)"). The CJEU acknowledged the two distinct systems of protection in *Salahadin Abdulla and Others v. Bundesrepublik Deutschland*, C-175/08; C-176/08; C-178/08 & C-179/08, European Union: Court of Justice of the European Union, 2 March 2010, para. 78, http://www.refworld.org/docid/4b8e6ea22.html. See also, EXCOM Conclusion No. 103 (LVI), 2005, paras. (b), (i) and (k).
[23] EU Qualification Directive (recast), note 22 above, Article 2(f), according to which a "person eligible for subsidiary protection" means a third-country national or a stateless person who does not qualify as a refugee but in respect of whom substantial grounds have been shown for believing that the person concerned, if returned to his or her country of origin, or in the case of a stateless person, to his or her country of former habitual residence, would face a real risk of suffering serious harm as defined in Article 15, and to whom Article 17(1) and (2) does not apply, and is unable, or, owing to such risk, unwilling to avail himself or herself of the protection of that country'. Serious harm as defined in Article 15 of the EU Qualification Directive (recast) consists of: '(a) the death penalty or execution; or (b) torture or inhuman or degrading treatment or punishment of an applicant in the country of origin; or (c) serious and individual threat to a civilian's life or person by reason of indiscriminate violence in situations of international or internal armed conflict.'
[24] *H. N. v Minister for Justice, Equality and Law Reform, Ireland, Attorney General*, C-604/12, European Union: Court of Justice of the European Union, 8 May 2014, para. 35, http://www.refworld.org/docid/5375e84f4.html. It would be at variance with the Common European Asylum System, the Treaty of the European Union and the 1951 Convention when subsidiary protection criteria would be applied first, because, for example, of the comparatively or perceived easier task of establishing the existence of violence and conflict through generally-available country of origin information than a well-founded fear of being persecuted for one or more Convention grounds.
[25] EXCOM Conclusion No. 103 (LVI), 2005, para. (c).

IFR_AR_016027

## A. A well-founded fear of being persecuted

11. Threats to life or freedom and other serious human rights violations can constitute persecution for the purposes of the 1951 Convention refugee definition.[26] In addition, lesser forms of harm may cumulatively constitute persecution.[27] Discrimination will amount to persecution where the effect leads to a situation that is intolerable or substantially prejudicial to the person concerned.[28] Likewise, conduct amounting to serious violations of IHL can constitute persecution (see paragraphs 14 and 15 of these Guidelines).[29] What amounts to persecution will also depend on the circumstances of the individual, including the age, gender, opinions, health, feelings and psychological make-up of the applicant.[30]

12. The standards mentioned in paragraph 11 above should be applied no differently in the context of persons fleeing situations of armed conflict and violence. No higher level of severity or seriousness of the harm is required for the harm to amount to persecution in situations of armed conflict and violence compared to other situations, nor is it relevant or appropriate to assess whether applicants would be treated any worse than what may ordinarily be "expected" in situations of armed conflict and violence. The overall context of a situation of armed conflict and violence can compound the effect of harms on a person, giving rise in certain circumstances to harm that amounts to persecution. Protracted situations of armed conflict and violence, for example, can have serious deleterious effects on the physical and psychological health of applicants or their personal development, which would need to be evaluated, taking into account their character, background, position in society, age, gender, and other factors.[31]

13. Situations of armed conflict and violence frequently involve exposure to serious human rights violations or other serious harm amounting to persecution. Such persecution could include, but is not limited to, situations of genocide[32] and ethnic cleansing;[33] torture and other forms of inhuman or degrading treatment;[34] rape and other forms of sexual violence;[35] forced recruitment, including of children;[36] arbitrary arrest and detention; hostage taking and enforced or arbitrary disappearances; and a wide range of other forms of serious harm resulting from circumstances mentioned, for example, in paragraphs 18 and 19 of these Guidelines.

*Relevance of international humanitarian and criminal law*

14. Many of the aforementioned human rights violations and other serious harm may also constitute war crimes when committed in the context of and associated with an armed conflict within the meaning of IHL, and/or, crimes against humanity when part of a widespread or systematic attack against a civilian population.[37] Deportations and forcible transfer or displacement, sometimes in the form of ethnic cleansing or genocide, can also amount to war crimes when committed in the context of and associated with an armed conflict within the meaning of IHL, and, crimes against humanity when part of a widespread or systematic attack against a civilian population.[38]

---

[26] UNHCR, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, December 2011, HCR/1P/4/ENG/REV. 3, para. 51, http://www.refworld.org/docid/4f33c8d92.html ("UNHCR Handbook").

[27] *Ibid.*, para. 53.

[28] *Ibid.*, para. 54.

[29] UNHCR, *Expert Meeting on Complementarities between International Refugee Law, International Criminal Law and International Human Rights Law: Summary Conclusions*, July 2011, paras. 13-21, ("UNHCR Arusha Summary Conclusions"), http://www.refworld.org/docid/4e1729d52.html.

[30] UNHCR Handbook, note 26 above, paras. 52 and 55.

[31] *Ibid.*, para. 43. UNHCR, *Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees*, 22 December 2009, HCR/GIP/09/08, para. 10, http://www.refworld.org/docid/4b2f4f6d2.html.

[32] *Convention on the Prevention and Punishment of the Crime of Genocide* (9 December 1948) 78 UNTS 277, http://www.refworld.org/docid/3ae6b3ac0.html. Article 6, *Rome Statute of the International Criminal Court* (1 July 2002) 2187 UNTS 3, ("Rome Statute ICC"), http://www.refworld.org/docid/3ae6b3a84.html.

[33] Ethnic cleansing is defined as 'a purposeful policy designed by one ethnic or religious group to remove by violent and terror-inspiring means the civilian population of another ethnic or religious group from certain geographic areas', UN Security Council, *Report of the Commission of Experts Established Pursuant to United Nations Security Council Resolution 780 (1992)*, 27 May 1994, s/1994/674, http://www.refworld.org/docid/582060704.html.

[34] See, inter alia, Article 7, *International Covenant on Civil and Political Rights* (16 December 1966) 999 UNTS 171, (ICCPR), http://www.refworld.org/docid/3ae6b3aa0.html and *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (10 December 1984) 1465 UNTS 85, http://www.refworld.org/docid/3ae6b3a94.html.

[35] See paragraphs 26 and 27 of these Guidelines.

[36] UNHCR Military Service Guidelines, note 9 above, paras. 35 and 37 to 41 ("unlawful child recruitment").

[37] Rome Statute ICC, note 32 above, Articles 7 and 8.

[38] UNHCR Arusha Summary Conclusions, note 29 above, paras. 9 and 10. Please note that in the context of an international armed conflict within the meaning of IHL, evacuations may take place for security or imperative military reasons in accordance with Article 49 of *Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (First Geneva Convention)*, 12 August 1949, 75 UNTS 31, http://www.refworld.org/docid/3ae6b3694.html. In the context of a non-international armed conflict, see Article 17 of Protocol II to the Geneva Conventions, note 14 above.

221

15. For the purposes of determining refugee status, the existence of violations of IHL can be informative but not determinative of whether conduct amounts to persecution within the meaning of the 1951 Convention. An applicant cannot be expected to establish that there has been the commission of either an IHL violation or an international crime in order for a decision-maker to reach a finding that a particular kind of harm constitutes persecution.[39] Nor are the criteria for the crime against humanity of persecution, as defined in international criminal law,[40] applicable to refugee status determination. International criminal courts and tribunals are primarily concerned with harm committed in the past for the purposes of criminal prosecution; their mandate does not cover the broader humanitarian purpose of providing international protection to civilians. Relying on IHL or international criminal law in their strictest sense to determine refugee status could undermine the international protection objectives of the 1951 Convention, and leave outside its protection persons who face serious threats to their life or freedom.[41] Moreover, even if certain conduct is not prohibited under IHL or international criminal law, it does not change the fact that for international refugee law purposes, such conduct may constitute persecution.[42]

*Relevance of derogations under international human rights law*

16. States parties to relevant human rights treaties may derogate from a limited number of human rights in times of public emergency threatening the life of the nation.[43] Where a lawful state of emergency exists, non-securement of derogable rights may not necessarily constitute persecution if the adopted measures are strictly required by the exigencies of the situation.[44] However, to determine a claim to refugee status by an applicant who has fled such a situation, the overall circumstances of the case need to be assessed. A state of emergency may be unlawful or involve measures that are not strictly required by the exigencies of the situation or involve measures affecting non-derogable rights.

*Individual and group-based risks*

17. In situations of armed conflict and violence, an applicant may be at risk of being singled out or targeted for persecution. Equally, in such situations, entire groups or populations may be at risk of persecution, leaving each member of the group at risk.[45] The fact that many or all members of particular communities are at risk does not undermine the validity of any particular individual's claim.[46] The test is whether an individual's fear of being persecuted is well-founded. At times, the impact of a situation of armed conflict and violence on an entire community, or on civilians more generally, strengthens rather than weakens the well-founded nature of the fear of being persecuted of a particular individual.[47]

---

[39] For example, the requirements of discriminatory intent and that the crime be part of a widespread or systematic attack against a civilian population in international criminal law are not required by international refugee law, see UNHCR Arusha Summary Conclusions, note 29 above, para. 15.

[40] Rome Statute ICC, note 32 above, Article 7(1)(h).

[41] UNHCR Arusha Summary Conclusions, note 29 above, para. 15.

[42] Such conduct may, for example, amount to serious human rights violations. International human rights law does not cease to apply during situations of armed conflict, save in part through the effect of provisions for derogation of the kind to be found, for example, in Article 4 ICCPR, note 34 above. See, *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion*, I.C.J. Reports 1996, p. 226, International Court of Justice (ICJ), 8 July 1996, para. 15, http://www.refworld.org/docid/4b2913d62.html; *Advisory Opinion Concerning Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, International Court of Justice (ICJ), 9 July 2004, para. 106, http://www.refworld.org/docid/414ad9a719.html; and UN Human Rights Committee (HRC), *General comment no. 31 [80], The nature of the general legal obligation imposed on States Parties to the Covenant*, 26 May 2004, CCPR/C/21/Rev.1/Add.13, para. 11, http://www.refworld.org/docid/478b26ae2.html. See also, *AF (Syria)*, [2012] NZIPT 800388, New Zealand: Immigration and Protection Tribunal, 20 December 2012, paras. 45 to 49, http://www.refworld.org/docid/54c127434.html.

[43] ICCPR, note 34 above, Article 4. Also, UN Human Rights Committee (HRC), *CCPR General Comment No. 29: Article 4: Derogations during a State of Emergency*, 31 August 2001, CCPR/C/21/Rev.1/Add.11, ("HRC General Comment 29"), http://www.refworld.org/docid/453883fd1f.html, states may only derogate against specifically identified rights, and can only do so to the extent strictly required by the exigencies of the situation, must be consistent with other obligations under international law and may not be based on or result in discrimination. The measures adopted must be proportionate and of temporary duration, and the relevant human rights body needs to be notified of the derogation. At the regional level, derogation clauses are provided for in Council of Europe, *European Convention for the Protection of Human Rights and Fundamental Freedoms, as amended by Protocols Nos. 11 and 14*, 4 November 1950, ETS 5, Article 15, (ECHR), http://www.refworld.org/docid/3ae6b3b04.html and the Organization of American States (OAS), *American Convention on Human Rights, "Pact of San José", Costa Rica*, 22 November 1969, Article 27, (American Convention on Human Rights), http://www.refworld.org/docid/3ae6b36510.html.

[44] *MS (Coptic Christians) Egypt CG v Secretary of State for the Home Department*, [2013] UKUT 00611 (IAC), United Kingdom: Upper Tribunal (Immigration and Asylum Chamber), 3 December 2013, para. 120, http://www.refworld.org/docid/52a5b86e4.html.

[45] The risk of harm as a result of exceptionally high levels of violence to the general population was addressed by the European Court of Human Rights, in inter alia, *Sufi and Elmi v. United Kingdom*, Applications nos. 8319/07 and 11449/07, Council of Europe: European Court of Human Rights, 28 June 2011, http://www.refworld.org/docid/4e09d29d2.html and *L.M. and Others v. Russia*, Applications nos. 40081/14, 40088/14 and 40127/14, Council of Europe: European Court of Human Rights, 15 October 2015, http://www.refworld.org/docid/561f770f4.html.

[46] UNHCR, *Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees*, April 2001, para. 20, http://www.refworld.org/docid/3b20a3914.html.

[47] According to the European Court of Human Rights: 'in relation to asylum claims based on a well-known general risk, when information about such a risk is freely ascertainable from a wide number of sources, the obligations incumbent on the States under Articles 2 and 3 of the Convention in expulsion cases entail that the authorities carry out an assessment of that risk of their own motion', see: *F.G. v. Sweden*, Application no. 43611/11, Council of Europe: European Court of Human Rights, 23 March 2016, para. 126, http://www.refworld.org/docid/56fd485a4.html.

18. In situations of armed conflict and violence, whole communities may be affected by, and be at risk from, aerial bombardments, the use of cluster munitions, barrel bombs or chemical weapons, artillery or sniper fire, improvised explosive devices, landmines, car bombs or suicide bombers, or siege tactics, for example. The systematic denial of food and medical supplies, the cutting of water supplies and electricity, the destruction of property or the militarization or closure of hospitals and schools may also constitute serious human rights or IHL violations that affect whole communities.[48] Exposure to such actions can amount to persecution within the meaning of Article 1A(2) of the 1951 Convention, either independently or cumulatively.

19. Both the direct and indirect consequences of situations of armed conflict and violence may also constitute persecution, including long-term consequences of these situations, such as demolition of vital infrastructure, insecurity and abject poverty. More specifically, situations of armed conflict and violence may seriously affect the rule of law as well as state and societal structures and support systems. Situations of armed conflict and violence may lead to a full or partial collapse of government institutions and services, political institutions and the police and justice system. Vital services such as water, electricity and sanitation may be disrupted. Increased crime levels; looting and corruption; food insecurity, malnourishment or famine; constraints on access to education and health care; serious economic decline, destruction of livelihoods and poverty may also ensue. These consequences of situations of armed conflict and violence may be sufficiently serious, either independently or cumulatively, to constitute persecution and create a well-founded fear of being persecuted. This is also relevant where the risk of persecution emanates from non-state actors (see paragraphs 28 to 30 of these Guidelines).

20. Other factors to take into account include propaganda that may create or contribute to an oppressive atmosphere of intolerance vis-à-vis one or more groups, and promote or lead to a risk of persecution.[49]

*Degree of risk*

21. A person's fear of persecution is well-founded if it can be established, to a reasonable degree, that her or his continued stay in the country of origin has become, or would become, intolerable.[50] This does not require a probability calculus,[51] based, for example, on the number of people killed, injured or displaced, but requires an analysis of both quantitative and qualitative information assessed against the applicant's circumstances (see paragraphs 89 to 92 of these Guidelines on establishing the facts).

*No differential risk*

22. As mentioned in paragraph 17 of these Guidelines, a person may have a well-founded fear of persecution that is shared by many others, and of a similar or same degree.[52] An applicant fleeing a situation of armed conflict and violence is not required to establish a risk of harm over and above that of others similarly situated (sometimes called a "differential test").[53] No higher level of risk is

**12**

---

[48] Relevant criteria to assess the intensity of a conflict were formulated by the United Kingdom, Asylum and Immigration Tribunal / Immigration Appellate Authority, in: *AM & AM (Armed Conflict: Risk Categories) Somalia v. Secretary of State for the Home Department*, [2008] UKAIT 00091, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 27 January 2009, http://www.refworld.org/docid/4934f7542.html and repeated by the European Court of Human Rights in *Sufi and Elmi v. United Kingdom*, note 45 above, para. 241 and *L.M. and Others v. Russia*, note 45 above, para. 121.

[49] For example, in Rwanda in 1994, Tutsi women were portrayed in Hutu controlled media outlets as 'seductive agents of the enemy', thereby 'articulat[ing] a framework that made the sexual attack of Tutsi women a foreseeable consequence of the role attributed to them', see *The Prosecutor v. Ferdinand Nahimana, Jean-Bosco Barayagwiza, Hassan Ngeze (Judgement and Sentence)*, ICTR-99-52-T, International Criminal Tribunal for Rwanda (ICTR), 3 December 2003, para. 1079, http://www.refworld.org/docid/404468bc2.html.

[50] UNHCR Handbook, note 26 above, para. 42.

[51] *Immigration and Naturalization Service v. Cardoza-Fonseca*, 480 U.S. 421; 107 S. Ct. 1207; 94 L. Ed. 2d 434; 55 U.S.L.W. 4313, United States Supreme Court, 9 March 1987, http://www.refworld.org/docid/3ae6b68d10.html, in dismissing a calculus Stevens J. considered: 'The High Commissioner's analysis of the United Nations' standard is consistent with our own examination of the origins of the Protocol's definition, as well as the conclusions of many scholars who have studied the matter. There is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no "well-founded fear" of the event happening.'

[52] *Surajnarain and Others v. Minister of Citizenship and Immigration*, 2008 FC 1165, Canada: Federal Court, 16 October 2008, para. 17, http://www.refworld.org/docid/497f3bdc2.html.

[53] *Minister for Immigration and Multicultural Affairs v. Haji Ibrahim*, [2000] HCA 55, Australia: High Court, 26 October 2000, http://www.refworld.org/docid/3deb737f7.html, paras. 66 and 70. The 'differential test' test was considered by Lord Lloyd of Berwick in *R v. Secretary of State for the Home Department, Ex parte Adan*, CO/872/98, United Kingdom: House of Lords (Judicial Committee), 2 April 1998, http://www.refworld.org/docid/3ae6b6c914.html. See also *AM & AM (Armed Conflict: Risk Categories) Somalia v. Secretary of State for the Home Department*, note 48 above, para. 72.

223

required to establish a well-founded fear of persecution in situations of armed conflict and violence compared to other situations.

23. Further, some courts have referred to a "differential risk" in order to emphasize the requirement for a causal link between the risk (i.e. well-founded fear of persecution) and the reasons for persecution (i.e. one or more Convention grounds). However, such phrasing can lead to conflation of the risk element with the causal link requirement – addressed in paragraphs 32 and 33 of these Guidelines – and is not in keeping with a proper application of the 1951 Convention definition of a refugee.[54]

*Forward-looking assessment of risk*

24. The 1951 Convention protects those who – at the time of the decision – are at risk of persecution in their country of origin, regardless of whether they have already suffered persecution. A decision on whether a person has a well-founded fear of being persecuted requires a forward-looking assessment of all relevant facts of the case (see paragraphs 89 to 92 of these Guidelines). Absent a relevant change of circumstances, persons having suffered persecution in the past would be assumed to be at continued risk of persecution.[55]

25. When assessing the risk, it is important to take into account the fluctuating character of many contemporary situations of armed conflict and violence. Changing levels of violence or control over territories and populations are common in situations of armed conflict and violence. For example, even if the level of violence at the time of decision-making is relatively low, over time the situation of armed conflict and violence may change, increasing the degree of risk establishing a well-founded fear. There may be reasons for the lower level of violence at a particular moment in time, such as when the parties are regrouping or re-strategizing, or a temporary ceasefire has been agreed. Similarly, even if violence has not yet broken out in a particular part of the country, it may be foreseeable that the violence will spread there, taking into account the overall context and history of the situation of armed conflict and violence, the trajectory and mapping of the violence, the power dynamics at play and other conditions in the applicant's country of origin. The effects of past violence may also still rise to the level of persecution, despite a temporary suspension of hostilities, and need to be assessed carefully. In addition, the implementation of peace and demobilization agreements may lead to new armed actors filling vacuums of power, or to the consolidation of groups composed of former members who have not disarmed and reintegrated into society. This also requires a detailed analysis that constantly evolves in response to local developments in the country of origin.

*Sexual and gender-related persecution*

26. Sexual and gender-based violence, including rape, human trafficking, sexual slavery and conjugal slavery/forced marriage, are common forms of persecution in many situations of armed conflict and violence.[56] Sexual and gender-based violence may be used as an unlawful and criminal tactic, strategy or policy during situations of armed conflict and violence, in order to overwhelm and weaken the adversary directly or indirectly, by victimizing women and girls and/or men and boys.[57] Irrespective of the motivation of the individual perpetrator, sexual and gender-based violence may form part of a deliberate military or political strategy to debase, humiliate, terrorize or destroy civilian populations

[54] *Refugee Appeal No. 71462/99, Tamil and a Citizen of the Democratic Socialist Republic of Sri Lanka v. Refugee Status Branch of the New Zealand Immigration Service,* 71462/99, New Zealand: Refugee Status Appeals Authority, 27 September 1999, http://www.refworld.org/docid/3ae6b73cc.html.

[55] UNHCR Handbook, note 26 above, para. 45.

[56] UNHCR, *Guidelines on International Protection No. 1: Gender-Related Persecution Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees,* 7 May 2002, HCR/GIP/02/01, para. 9, ("UNHCR Gender-Persecution Guidelines"), http://www.refworld.org/docid/3d36f1c64.html. UNHCR, *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees,* 23 October 2012, HCR/GIP/12/01, para. 20, ("UNHCR Sexual-Orientation and/or Gender Identity Guidelines"), http://www.refworld.org/docid/50348afc2.html. Rape, for example, was considered a serious human rights violation constituting persecution in: *SS (Adan – Sexual Violence – UNHCR Letter) Burundi v. Secretary of State for the Home Department,* CG [2004] UKIAT 00290, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 29 October 2004, para. 16, http://www.refworld.org/docid/46836b180.html. UN Secretary-General (UNSG), *Sexual violence in conflict: report of the Secretary-General,* 14 March 2013, A/67/792-S/2013/149, ("UNSG Report sexual violence in conflict"), http://www.refworld.org/docid/5167bd0f4.html.

[57] See, for example, *Prosecutor v. Issa Hassan Sesay, Morris Kallon and Augustine Gbao (the RUF accused) (Trial judgment),* Case No. SCSL-04-15-T, Special Court for Sierra Leone, 2 March 2009, para. 1347, http://www.refworld.org/docid/49b102762.html. *In re B (FC) (Appellant) (2002). Regina v. Special Adjudicator, Ex parte Hoxha (FC),* [2005] UKHL 19, United Kingdom: House of Lords (Judicial Committee), 10 March 2005, para. 30, http://www.refworld.org/docid/423ec7784.html. Security Council, *Security Council resolution 2106 (2013) [on sexual violence in armed conflict],* 24 June 2013, S/RES/2106 (2013), para. 1, http://www.refworld.org/docid/51d6b5e64.html.

in pursuit of broader goals, or rooted in gender-related and other forms of discrimination, thus linking it to one or more of the Convention grounds.[58]

27. For many victims of sexual and gender-based violence, torture and other acts of bodily harm and psychological trauma, the harm may continue long after the initial violent act was committed and the situation of armed conflict and violence has ended. They may be at risk of repeated harm[59] and/or the psychological consequences of their experiences may themselves amount to persecution,[60] in particular when people have suffered from particular egregious harm that makes return to the country of origin intolerable even if there is no future risk of further harm.[61]

*Agents of persecution*

28. In a situation of armed conflict and violence, persecution may emanate from state or non-state actors, and from one or more sides involved in the situation of armed conflict and violence.[62] Refugee status can be warranted in the case of persons at risk of harm from actors on both or all sides of these situations. Agents of persecution may include the state's armed forces, its law enforcement agents or security forces or other state organs or groups, and individuals for whom the state is responsible or whose conduct can be attributed to the state.[63] The state may empower, direct, control, support or tolerate the activities of so-called non-state actors, such that their actions can in some instances be attributable to the state.[64] Agents of persecution also include non-state actors such as paramilitary groups, militias, insurgents, bandits, pirates, criminal gangs or organizations,[65] terrorist organizations, private military or security companies, or other groups or individuals engaging in situations of armed conflict and violence. An analysis of these actors should take into account that their character may shift from one of these categories to another or defy categorization altogether. Non-state actors may also include neighbours, family members and other individuals.

**12**

29. In many situations of armed conflict and violence, the division between state and non-state actors is not always clear, especially as power shifts, situations overlap and alliances change, or where non-state actors penetrate or corrupt state institutions and/or law enforcement agencies or the state's armed forces.[66] The uncertainty during an attempted, ongoing or successful *coup d'état*, for example, can also blur such distinctions. However, it is not crucial to determine precisely from whom the feared harm may emanate; as long as a threat is established, it will be sufficient for determining a well-founded fear of persecution.

30. In cases involving non-state actors or unidentified actors, it is necessary to review the extent to which the state is able and/or willing to provide protection against persecution.[67] The particularities of the situation of armed conflict and violence will be relevant, since the state may be prevented from extending protection to affected populations, for example in cases where it has lost control over its territory and population or where such control is fluid or uncertain. In such situations, the state may also be unwilling to extend protection.

---

[58] UNHCR Cape Town Summary Conclusions, note 3 above, paras. 25 and 26. UNSG Report sexual violence in conflict, note 56 above, para. 5.
[59] *Matter of A-T-*, 25 I&N Dec. 4 (BIA 2009), United States Board of Immigration Appeals, 4 June 2009, http://www.refworld.org/docid/4a293b4a2. html. *Bah v. Y-, Diallo v. Department of Homeland Security, Diallo v. Department of Homeland Security*, 529 F.3d 99, 103 (2d Cir. 2008), United States Court of Appeals for the Second Circuit, 11 June 2008, http://www.refworld.org/docid/48d8a32c2.html.
[60] *In re B (FC) (Appellant) (2002). Regina v. Special Adjudicator, Ex parte Hoxha (FC)*, note 57 above, para. 36, in which Baroness Hale of Richmond considered: '[t]o suffer the insult and indignity of being regarded by one's own community as 'dirty like contaminated' because one has suffered the gross ill-treatment of a particularly brutal and dehumanising rape ... is the sort of cumulative denial of human dignity which ... is quite capable of amounting to persecution.'
[61] *In re Y-T-L-*, 23 I&N Dec. 601 (BIA 2003), United States Board of Immigration Appeals, 22 May 2003, p 607, http://www.refworld.org/docid/40449fa94.html. *Khadija Mohammed v. Alberto R. Gonzales, Attorney General; Khadija Ahmed Mohamed v. Alberto R. Gonzales, Attorney General*, A79-257-632; 03-72265; 03-70803, United States Court of Appeals for the Ninth Circuit, 10 March 2005, pp 3085 to 3086, http://www.refworld.org/docid/423811c04.html. UNHCR, *UNHCR intervention before the House of Lords in the case of Zainab Esther Fornah (Appellant) v. Secretary of State for the Home Department (Respondent)*, 14 June 2006, para. 24(2), http://www.refworld.org/docid/45631a0f4.html.
[62] UNHCR Handbook, note 26 above, para. 65.
[63] International Law Commission, Articles on the Responsibility of States for Internationally Wrongful Acts, *Yearbook of the International Law Commission*, 2001 Vol.II (Part Two), http://www.refworld.org/docid/3ddb8f804.html. See also: UNGA Res. 56/83, 12 December 2001; UNGA Res. 59/35, 2 December 2004; and UNGA Res. 71/133, 13 December 2016. In accordance with Article 10 of the aforementioned Articles, the conduct of an insurrectional movement or other movement shall be considered an act of state under international law, when the movement becomes the new government or when it succeeds in establishing a new state in part of the territory of a pre-existing state or in a territory under its administration.
[64] *Ibid.*, Articles 8 and 9. UNHCR Military Service Guidelines, note 9 above, para. 42.
[65] UNHCR Gangs Guidance Note, note 12 above, para. 4.
[66] See, for example, UNHCR, *Country of Origin Series: Guatemala: Background Paper*, October 2013, RBAMCO/GUA/13/01, p 11, http://www.refworld.org/docid/53832fe84.html.
[67] UNHCR Military Service Guidelines, note 9 above, para. 43.

IFR_AR_016032

*Refugees sur place*

31. A well-founded fear of persecution may arise after an applicant has left her or his country of origin, owing to circumstances arising in the country of origin during the applicant's absence, and/or as a result of her or his own actions after s/he has left the country of origin, making the applicant a refugee *sur place*.[68] In the context of claims for refugee status related to situations of armed conflict and violence, a person may become a refugee *sur place* owing, for example, to the outbreak of a situation of armed conflict and violence, the intensification of a pre-existing but latent situation of armed conflict and violence in her or his country of origin,[69] or because she or he has expressed objections or taken a stance against the situation of armed conflict and violence.

## B. 'For reasons of' one or more Convention grounds

*'For reasons of' (causal link)*

32. The intent or motive of the persecutor can be a relevant factor in establishing the causal link between the fear of persecution and a 1951 Convention ground. However, the intent or motive of the persecutor is not necessary or decisive, not least because it is often difficult to establish,[70] in particular in situations of armed conflict and violence. A causal link may also be established by the strategies, tactics or means and methods of warfare of the persecutor, by the inability or unwillingness of the state to provide protection, or by the effect(s) of the situation of armed conflict and violence. The question to guide decision-makers is: do the reasons for the person's feared predicament, within the overall context of the country, relate to a Convention ground?[71]

33. Situations of armed conflict and violence may be rooted in, motivated or driven by, and/or conducted along lines of race, ethnicity, religion, politics, gender or social group divides, or may impact people based on these factors. In fact, what may appear to be indiscriminate conduct (i.e. conduct whereby the persecutor is not seeking to target particular individuals),[72] may in reality be aimed at whole communities or areas whose inhabitants are actual or perceived supporters of one of the sides in the situation of armed conflict and violence. Rarely are modern-day situations of armed conflict and violence characterised by violence that is not in one way or another aimed at particular populations, or which does not have a disproportionate effect on a particular population, establishing a causal link with one or more of the Convention grounds. Who belongs to or is considered or perceived to be affiliated with, a particular side in a situation of armed conflict and violence, is often interpreted broadly by actors during such situations – and may include a range of people, including family members of fighters as well as all those who belong to the same religious or ethnic groups or reside in particular neighbourhoods, villages or towns. A Convention ground is regularly imputed to groups of people based on their family, community, geographic or other links.[73]

*Convention grounds*

34. The reasons for fearing persecution may be multiple. One or more Convention grounds may be relevant. The grounds are not mutually exclusive and frequently overlap.[74] A Convention ground need only be a contributing factor; it need not be the dominant or the sole cause of the fear of persecution.

35. Situations of armed conflict and violence are regularly rooted in, or driven by, a variety of motives, or have consequences that affect various groups. Situations of armed conflict and violence regularly

---

[68] UNHCR Handbook, note 26 above, para. 94 to 96.
[69] For example, Mozambicans finding themselves in South Africa between 1980 and 1985 could be considered as refugees *sur place*, see *South Africa: Passport Control Instruction No. 20 of 1994 – Guidelines for Refugees Status Determination of Mozambicans in South Africa*, 1994, para. 5 [of the Guidelines] http://www.refworld.org/docid/3ae6b5082c.html.
[70] UNHCR Handbook, note 26 above, para. 66. UNHCR Military Service Guidelines, note 9 above, para. 48.
[71] *Refugee Appeal No. 72635/01*, 72635/01, New Zealand: Refugee Status Appeals Authority, 6 September 2002, para. 168, http://www.refworld.org/docid/402a6ae14.html. J C Hathaway and M Foster, *The Law of Refugee Status* (Cambridge University Press, 2014), p. 376 to 379.
[72] *Elgafaji v. Staatssecretaris van Justitie*, note 17 above, para. 34.
[73] UNHCR, *International Protection Considerations with regard to people fleeing the Syrian Arab Republic, Update IV*, November 2015, para. 17, http://www.refworld.org/docid/5641ef894.html. *Arrest nr. 122 129, 122 129, Belgium: Conseil du Contentieux des Etrangers*, 4 April 2014 (in Dutch, case sheet in English available), http://www.refworld.org/docid/582068524.html.
[74] UNHCR Handbook, note 26 above, para. 67.

IFR_AR_016033

involve a mix of ethnic, religious, societal and political dimensions, with the parties involved operating along ethnic, religious or social lines and pursuing – or perceived to be pursuing – political and/or religious goals.

36. Even where the motives and drivers behind violent or otherwise harmful conduct resulting from, or prevalent in, situations of armed conflict and violence may, at first sight, appear to be criminal or profit-driven, they are regularly interconnected with Convention grounds.[75] For instance, armed groups may set up criminal enterprises to finance an ethnic, religious or political conflict, or the violence of gangs or other armed groups, including for example drug cartels, which is primarily profit-driven, may also have the aim of consolidating or expanding the group's powerbase in society, potentially characterizing the violence as politically motivated.[76] The targeting of individuals, as well as whole areas and populations, often has ethnic, religious and/or political purposes or links.

37. Expressing objections or taking a neutral or indifferent stance to the strategies, tactics or conduct of parties in situations of armed conflict and violence, or refusing to join, support, financially contribute to, take sides or otherwise conform to the norms and customs of the parties involved in the situation may – in the eyes of the persecutor – be considered critical of the political goals of the persecutor, or as deviating from the persecutor's religious or societal norms or practices.[77] Such objections, stances or behaviours may indicate or create the perception in the eyes of the persecutor that the person holds a political opinion or religious (or non-)belief, having an affiliation with or belonging to an ethnic or social group.

38. Persons pursuing certain trades, professions or occupations may be at risk for reasons of, for example, their real or perceived political opinion or religious (or non-)belief.[78] Their activities, role or status within society that follows from, or is associated with, their trade, profession or occupation, may be regarded as a real or perceived opinion on a matter in which the machinery of state, government, society or policy may be engaged,[79] in particular, in a country in conflict. For instance, journalists and other media professionals, and human rights and rule of law defenders, may report factually or critically on the conduct of certain actors, medical professionals treating opposition fighters may be seen as supporting the opposition, humanitarian workers continuing with their humanitarian work may be perceived as assisting the "enemy",[80] and religious leaders may side, or be seen to be siding, with one of the parties.

39. Claims involving gender-related persecution may be analysed under any of the Convention grounds, i.e. in relation to real or perceived political opinion, ethnicity[81] and/or religion or social group (gender).[82]

**12**

---

[75] *Refugee Appeal No. 76289*, No. 76289, New Zealand: Refugee Status Appeals Authority, 8 May 2009, para. 43, http://www.refworld.org/docid/4a2e2a5e2.html. *Emilia Del Socorro Gutierrez Gomez v. Secretary of State for the Home Department*, 00/TH/02257, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 24 November 2000, paras. 43, 44, 50, 51 and 73(XI), http://www.refworld.org/docid/40487df64.html. *Osorio v. Immigration and Naturalization Service*, 18 F.3d 1017: 1994 U.S. App. LEXIS 4170, United States Court of Appeals for the Second Circuit, 7 March 1994, http://www.refworld.org/docid/3ae6b70e7.html.
[76] See, for example, *NS (Social Group – Women – Forced Marriage) Afghanistan v. Secretary of State for the Home Department*, CG [2004] UKIAT 00328, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 30 December 2004, para. 69, http://www.refworld.org/docid/42c928984.html; and *Emilia Del Socorro Gutierrez Gomez v. Secretary of State for the Home Department*, note 75 above, para. 40.
[77] *RT (Zimbabwe) and others v Secretary of State for the Home Department*, [2012] UKSC 38, United Kingdom: Supreme Court, 25 July 2012, para. 42, http://www.refworld.org/docid/500fdacb2.html. UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe) and AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) - Case for the Intervener*, 25 May 2012, 2011/0011, para. 10, http://www.refworld.org/docid/4fc369022.html. *Souad Noune v Secretary of State for the Home Department*, C 2000/2669, United Kingdom: Court of Appeal (England and Wales), 6 December 2000, Schiemann LJ, paras. 8(5) and 28(5), http://www.refworld.org/docid/558bcbad4.html.
[78] M Foster, *The 'Ground with the Least Clarity': A Comparative Study of Jurisprudential Developments relating to 'Membership of a Particular Social Group'*, August 2012, UNHCR PPLA/2012/02, chapter 5.7.3, http://www.refworld.org/docid/4f7d94722.html. *Emilia Del Socorro Gutierrez Gomez v. Secretary of State for the Home Department*, note 75 above, para. 46.
[79] G S Goodwin-Gill and J McAdam, *The Refugee in International Law* (Oxford: Oxford University Press, 2007), p. 87. *Canada (Attorney General) v. Ward*, [1993] 2 S.C.R. 689, Canada: Supreme Court, 30 June 1993, http://www.refworld.org/docid/3ae6b673c.html.
[80] UNHCR, *UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Iraq*, 31 May 2012, HCR/EG/IRQ/12/03, page 20 and 31, http://www.refworld.org/docid/4fc77d522.html.
[81] Real or perceived ethnicity is covered by the Convention grounds race and/or nationality, see, for example, UNHCR Handbook, note 26 above, paras. 68 and 74 and UNHCR Gender-Persecution Guidelines, note 56 above, paras. 24 (race) and 27 (nationality).
[82] UNHCR Gender-Persecution Guidelines, note 56 above, paras. 25 (religion), 28 to 31 (membership of a particular social group) and 34 (political opinion). UNHCR Sexual Orientation and/or Gender Identity Guidelines, note 56 above, paras. 42 and 43 (religion), 44 to 49 (membership of a particular social group), and 50 (political opinion).

HCR APP 016034

## C. Internal flight or relocation alternative

40. The relevance of an internal flight or relocation alternative in situations of armed conflict and violence needs to be carefully assessed. Situations of armed conflict and violence are often characterized by widespread fighting, are frequently fluid, with changing frontlines and/or escalations in violence, and often involve a variety of state and non-state actors, who may not be easily identifiable, operating in diverse geographical areas. Further, such situations often seriously affect state and societal structures and support systems (see paragraph 19 of these Guidelines) creating hardships for the civilian population. The humanitarian situation of civilian populations living in areas affected by situations of armed conflict and violence is often dire, including as a result of blocking supply routes and restrictions on humanitarian aid and freedom of movement. Considering these factors, in many situations of armed conflict and violence, it may neither be relevant nor reasonable to apply an internal flight or relocation alternative.

41. Only when the situation of armed conflict and violence and its impact is geographically limited and confined to a specific part of the country would it be relevant to assess whether an internal flight or relocation alternative exists.[83] In such situations, a careful examination needs to be made of the practical, legal and safe accessibility of the identified alternative area, in particular for the person concerned, and the ability of the state or other entity to provide protection that is effective. Protection must be provided by an organized and stable authority exercising full control over the territory and population in question.[84] It would be inappropriate to equate the exercise of a certain administrative authority and control over territory by international organisations or non-state actors, with national protection provided by a state.[85] Such control is often transitional or temporary and without the range of functions required of a state, including the ability to readmit nationals to the territory or to exercise other basic functions of government. Specifically, non-state entities and bodies do not have the attributes of a state. Their ability to enforce the law is limited. Further, in determining whether the internal flight or relocation alternative is reasonable, a careful assessment needs to be made of the ability of the person to live in safety and security without undue hardship, and for her or his human rights to be protected. In addition, and in particular, the likely spread of the situation of armed conflict and violence into new areas needs to be taken into account (see paragraphs 25 and 40 of these Guidelines).[86] It is not reasonable to expect someone to relocate to a zone of active armed conflict and violence.

42. The presence of internally displaced persons, including those who are receiving international assistance, in one part of the country, is not necessarily evidence of the reasonableness of a proposed internal flight or relocation alternative in that part of the country.[87] Internally displaced persons often do not enjoy basic rights[88] and may face economic destitution or existence below an adequate level of subsistence, which would be evidence of the unreasonableness of the proposed internal flight or relocation alternative.[89] It is also necessary to consider the capacity of local authorities to provide protection against harm, as well as whether human rights, particularly non-derogable rights, are respected.[90] Further, in some situations, internal displacement may be the result of ethnic cleansing policies, or similar, in violation of the prohibitions on forcible transfer and arbitrary displacement under IHL in the context of an armed conflict. In such circumstances, an internal flight or relocation alternative should not be presumed to exist.[91]

43. Equally, "protected zones"[92] or "safe zones"[93] and other similar areas should not necessarily be considered a relevant or reasonable internal flight or relocation alternative. Under IHL, protected

[83] UNHCR Handbook, note 26 above, para. 91. For UNHCR guidance on a proper assessment of an internal flight or relocation alternative, see UNHCR, *Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees*, 23 July 2003, HCR/GIP/03/04, ("UNHCR IFA Guidelines"), http://www.refworld.org/docid/3f2791a44.html.
[84] UNHCR IFA Guidelines, note 83 above, para. 17.
[85] *Ibid.*, paras. 16 and 17.
[86] *Ibid.*, paras. 17 and 27 to 30.
[87] *Ibid.*, para. 31.
[88] *Ibid.*, para. 32.
[89] *Ibid.*, para. 29. See also, *Sufi and Elmi v. United Kingdom*, note 45 above, para. 291.
[90] UNHCR IFA Guidelines, note 83 above, para. 28.
[91] *Ibid.*, para. 31.
[92] The term "protected zones" is the overarching term used by the International Committee of the Red Cross (ICRC) for all relevant zones stipulated in the 1949 Geneva Conventions and Additional Protocol I, and see Rules 35 to 37 of customary IHL, in: J –M Henkaerts and L Doswald-Beck (eds.), *Customary International Law, Volume I: Rules* (Cambridge University Press, 2005), pp. 119-126. The legal bases for establishing protected zones in the context of an armed conflict within the meaning of IHL can be found in Article 23 of the First Geneva Convention, note 38 above, Article 14 (hospital and safety zones and localities) and 15 (neutralized zones) of the Fourth Geneva Convention, note 13 above, and Article 59 (non-defended localities) and 60 (demilitarized zones) of Protocol I to the Geneva Convention, note 13 above.
[93] In a number of instances, the United Nations Security Council has called upon the creation of "safe zones", see, for example, UNSC Res. 787 (1992), 16 November 1992; UNSC Res. 819 (1993), 16 April 1993; UNSC Res. 824 (1993), 6 May 1993; UNSC Res. 918 (1994), 17 May 1994; and UNSC Res. 929 (1994), 22 June 1994.

zones agreed upon by the concerned belligerents are set up as measures to protect the civilian population and other categories of protected persons (for example, the wounded and sick, including wounded and sick combatants/fighters) from the effects of armed conflict. Similarly, "safe zones" and other similar areas established on the basis of United Nations Security Council resolutions, seek to prevent certain areas and persons from falling into enemy hands, even if their establishment and implementation differs from the "protected zones" within the meaning of IHL. Despite the overall objective of these zones and areas, the safety of the people living in such zones and areas may be compromised, as a result of sieges, or attacks against the zone or area and the population therein.

# III. SUBSTANTIVE ANALYSIS OF ARTICLE I(2) OF THE 1969 OAU CONVENTION

44. Article I(1) of the 1969 OAU Convention replicates the 1951 Convention refugee definition contained in Article 1A(2) of the 1951 Convention, as amended by the 1967 Protocol,[94] while Article I(2) offers refugee protection to:

> 'every person who, owing to external aggression, occupation, foreign domination or events seriously disturbing public order in either part or the whole of his country of origin or nationality, is compelled to leave his place of habitual residence in order to seek refuge in another place outside his country of origin or nationality.'

## Preliminary considerations to guide interpretation

45. In applying the 1969 OAU Convention definition, the primacy of the 1951 Convention needs to be borne in mind, given its status as the 'basic and universal instrument' for the protection of refugees.[95] Following the adoption of the 1967 Protocol, which made the 1951 Convention the global instrument for the protection of refugees, the 1969 OAU Convention sought in large part to address the specific challenges facing African countries in responding to refugee crises on the continent.

46. The 1969 OAU Convention is a widely ratified, legally binding instrument,[96] which is protection- and humanitarian-oriented[97] and reflects trans-African solidarity.[98] It specifically reaffirms the importance of the institution of asylum,[99] the principle of *non-refoulement*[100] and non-discrimination,[101] the duties of refugees,[102] and the search for durable solutions, including respect for the voluntary character of repatriation.[103] Cooperation with the African Union and UNHCR is also emphasized,[104] and it calls on all OAU (now African Union) Member States to accede to the 1951 Convention.[105]

---

[94] Contrary to Article 1A(2) of the 1951 Convention, Article I(1) of the 1969 OAU Convention does not include the temporal limitation of having a well-founded fear as a result of 'events occurring before 1 January 1951'; a limitation later removed with the adoption of the 1967 Protocol, Article I(2).

[95] 1969 OAU Convention, note 4 above, ninth preambular paragraph.

[96] To date, the 1969 OAU Convention has been ratified by 46 of the African Union's (AU) 54 Member States. Djibouti, Eritrea, Madagascar, Mauritius, Namibia, Sao Tomé & Principe and Somalia have signed but not ratified or acceded to the 1969 OAU Convention. Only the Saharawi Arab Democratic Republic (SADR) has neither signed nor ratified or acceded to the 1969 OAU Convention. Morocco is a party to the 1969 OAU Convention, but not a Member State of the African Union.

[97] 1969 OAU Convention, note 4 above, second preambular paragraph.

[98] *Ibid.,* eighth preambular paragraph.

[99] *Ibid.,* Article II. A right to seek and obtain asylum is recognized in Article 12(3) of the African Charter on Human and Peoples' Rights, Organization of African Unity (OAU), *African Charter on Human and Peoples' Rights ("Banjul Charter")*, 27 June 1981, CAB/LEG/67/3 rev. 5, 21 I.L.M. 58 (1982), http://www.refworld.org/docid/3ae6b3630.html.

[100] 1969 OAU Convention, note 4 above, Article II(3).

[101] *Ibid.,* Article IV.

[102] *Ibid.,* Article III.

[103] *Ibid.,* Article II(5), referring to a right to reside, to be granted temporary residence, and resettlement. The right to voluntary repatriation is regulated by Article V of the 1969 OAU Convention.

[104] *Ibid.,* eleventh preambular paragraph and Articles VII and VIII.

[105] To date, of the African Union's 54 Member States only the Comoros, Eritrea, Libya, Mauritius and South Sudan have neither signed nor ratified the 1951 Convention or its 1967 Protocol. Madagascar is a party to the 1951 Convention but not to the 1967 Protocol. Congo and the Democratic Republic of Congo continue to recognise the 1951 Convention's geographical limitation. Finally, Cabo Verde is party to the 1967 Protocol but not the 1951 Convention.

*Scope of the 1969 OAU Convention definition*

47. In accordance with the ordinary meaning of the terms, the 1969 OAU Convention definition applies to all persons within the jurisdiction of a State Party and is not limited to persons whose country of origin or nationality is in Africa.

48. Article I(2) of the 1969 OAU Convention is the first refugee definition of its kind to steer away from persecutory conduct towards more generalized or so-called "objectively" identifiable situations. The 1969 OAU definition acknowledges that the compulsion for persons to leave their country may occur not only as a result of the conduct by state or non-state actors in the refugee's country of origin, but also as a result of that government's loss of authority or control due to external aggression, occupation, foreign domination or events seriously disturbing public order.[106] The 1969 OAU definition focuses on situations that compel people to leave their countries in search of safety and sanctuary.

## B. Elements of the 1969 OAU Convention definition

49. Article I(2) of the 1969 OAU Convention protects as refugees persons who (i) are outside their country of origin,[107] (ii) having been compelled to leave their place of habitual residence, (iii) because one or more of the situations listed in the definition exists in their country of origin or nationality. These elements of the 1969 OAU Convention definition are explained below and need to be considered as part of a holistic assessment of a claim for refugee status.

*Compelled to leave one's place of habitual residence*

50. By including the language of "compulsion" in the definition, Article I(2) of the 1969 OAU Convention emphasizes the seriousness of the situation. The verb "to compel" is understood to mean 'to urge irresistibly, to constrain, oblige, force'.[108] Reference to one's 'place of habitual residence' must be understood as part of the compulsion to leave and seek refuge outside one's country of origin or nationality, i.e. the situation must have an impact on the person's place of habitual residence. The 'place of habitual residence' element has no other or separate legal effect. Thus, when the situation in question is sufficiently serious that it is objectively reasonable for a person to leave her or his place of habitual residence and seek refuge in another country, she or he needs to be protected.[109]

51. Article I(2) of the 1969 OAU Convention does not require a personalized or discriminatory threat or risk of harm.[110] Whole groups of persons or an entire population may be affected by the situation and be compelled to leave their places of habitual residence owing to the situation in question. As Article I(2) emphasizes the assessment of the seriousness of the situation in question more than motives for flight or the risk of harm, decision-makers should assess whether flight from the country of origin or nationality is objectively reasonable.

*Refugees sur place*

52. *Sur place* claims are accepted under the 1969 OAU Convention consistent with the interpretation of the 1951 Convention (see paragraph 31 of these Guidelines).

---

[106] J.C. Hathaway, *The Law of Refugee Status* (Butterworths, 1991), 17.

[107] The phrase 'country of origin or nationality' refers to the person's country of nationality, or in the case of stateless persons, the reference to 'country of origin' can be assimilated with 'country of former habitual residence' in Article 1A(2) of the 1951 Convention. To benefit from the 1969 OAU Convention, an applicant needs to be outside her or his country of origin or nationality.

[108] 'compel, v', *The Oxford English Dictionary* 2nd edition, OED online, 2015, Oxford University Press.

[109] *Radjabu v. The Chairperson of the Standing Committee for Refugee Affairs*, 8830/2010, South Africa: High Court, 4 September 2014, para. 6, http://www.refworld.org/docid/540874f94.html. The criterion of 'objectively reasonable to leave' speaks to the ordinary meaning of the word 'compulsion'. According to the Court, compulsion rather than volition is the predominant factor, whereby determining whether a person qualifies for refugee status under the regional definition requires an assessment of the existence of objectively ascertainable circumstances in the person's country of origin corresponding with any of those stipulated in the definition and whether their effect on the person concerned has been such as to force him or her to leave the place where s/he ordinarily resided.

[110] Article I(2) of the 1969 OAU Convention is not ignorant of a risk of harm as is evident from the phrase 'is compelled to leave' in the definition read in conjunction with the principle of *non-refoulement* laid down in Article II(3) of the 1969 OAU Convention, protecting people from being returned to a territory where their life, physical integrity or liberty would be threatened. However, a threat or risk of harm is not a necessary requirement to be granted protection under the regional definition.

*Situations compelling flight*

53. The situations mentioned in Article I(2) of the 1969 OAU Convention are to be given their ordinary meaning in their context and in light of their (protection-oriented) object and purpose.[111] They should also, wherever possible, be interpreted in such a way that they remain relevant and applicable to situations that were not foreseeable when the 1969 OAU Convention was drafted.

54. The situation may be the result of 'external aggression', i.e. aggression through the use of armed force by a state against the sovereignty, territorial integrity or political independence of another state, or in any other manner inconsistent with the Charter of the United Nations.[112] These situations may include armed conflicts fuelled by outside involvement or that have spilled over from neighbouring states, including because of the presence of (members of) the armed forces of another state or incursions by foreign armed groups.

55. Situations of armed conflict and violence may also accompany, or be the result of, 'occupation', i.e. a situation whereby the territory is actually placed under the authority or effective control of a hostile foreign state's armed forces.[113] This may also be the case for other situations not classified as 'occupation' within the meaning of IHL, where armed group(s) from either within or outside the country exercise control over territory.[114] Situations of armed conflict and violence could also accompany, or be the result of, 'foreign domination', i.e. the political, economic or cultural control of a state by (agents of) one or more other states, association of states, or state-governed international organizations.[115]

56. The phrase 'events seriously disturbing public order' should be construed, in line with the 1969 OAU Convention's humanitarian object and purpose, to include events that impact the maintenance of public order (*ordre public*) based on respect for the rule of law and human dignity to such an extent that the life, security and freedom of people are put in danger.[116] The threshold of "serious" refers to public disorder events likely to disrupt the normal functioning of the institutions of the state and affect internal and external security and stability of the state and society. Such events may be categorized as an IAC or NIAC within the meaning of IHL, but may also include events not categorized as an armed conflict within the meaning of IHL, involving violence by or between different groups in society or between the state and non-state actors.[117] The ground of 'events seriously disturbing public order' appears to be the primary element of Article I(2) of the 1969 OAU Convention under which refugee status is determined.[118]

57. A serious disturbance of public order may either be prompted by one-off acts or incidents, or a series of acts or incidents of a systematic or cumulative nature, in response to which the state is either unwilling or unable to provide protection. According to the ordinary meaning of the definition's terms, 'events seriously disturbing public order' may take place in either part or the whole of the country. Situations that have prompted the government to declare a state of emergency may be an important, albeit unnecessary indicator of the ground, although each situation should be assessed individually.[119]

---

[111] EXCOM Conclusion No. 103 (LVI), 2005, para. (c).

[112] United Nations, *Charter of the United Nations*, 24 October 1945, 1 UNTS XVI, Article 2(4) and Chapter VII, ("UN Charter"), http://www.refworld.org/docid/3ae6b3930.html. Article 1 of the UN General Assembly, *Definition of Aggression*, 14 December 1974, A/RES/3314, http://www.refworld.org/docid/3b00f1c57c.html, and Article 3, which includes a non-exhaustive list of acts that qualify as an act of aggression. See also, Article *8bis* of the Rome Statute ICC, note 32 above.

[113] *Hague Convention (IV) Respecting the Laws and Customs of War on Land and Its Annex: Regulations Concerning the Laws and Customs of War on Land*, 18 October 1907, Article 42, http://www.refworld.org/docid/4374cae64.html. See also, *Chiragov and Others v. Armenia*, Application no. 13216/05, Council of Europe: European Court of Human Rights, 16 June 2015, para. 96, http://www.refworld.org/docid/5582d29d4.html.

[114] African Commission on Human and Peoples' Rights, *Statement by the African Commission on the Present Human Rights Situation in Mali*, 18 January 2013, http://www.refworld.org/docid/5108d96a2.html.

[115] Banjul Charter, note 97 above, Article 20(3): 'All peoples shall have the right to the assistance of the States parties to the present Charter in their liberation struggle against foreign domination, be it political, economic or cultural.'

[116] UNHCR, *Persons covered by the OAU Convention Governing the Specific Aspects of Refugee Problems in Africa and the Cartagena Declaration on Refugees (Submitted by the African Group and the Latin American Group)*, 6 April 1992, EC/1992/SCP/CRP.6, http://www.refworld.org/docid/3ae-68cd214.html.

[117] See paragraph 5 of these Guidelines. See also, Article 1(2) Protocol II to the Geneva Conventions, note 14 above.

[118] M Sharpe, 'The 1969 OAU Refugee Convention in the Context of Individual Refugee Status Determination', in V Türk, A Edwards and C Wouters (eds.), *In Flight from Conflict and Violence. UNHCR's Consultations on Refugee Status and Other Forms of International Protection* (Cambridge University Press and UNHCR, forthcoming 2017), 133.

[119] ICCPR, note 34 above, Article 4. Also, HRC General Comment 29, note 43 above.

IFR_AR_016038

58. 'Events seriously disturbing public order' also include situations of generalized violence, i.e. violence that is widespread, affecting large groups of persons or entire populations, serious and/or massive human rights violations, or events characterized by the loss of government control and its inability or unwillingness to protect its population - including situations characterized by repressive and coercive social controls by non-state actors, often pursued through intimidation, harassment and violence.

59. Factual indicators of events seriously disturbing public order include: a declared state of emergency; violations of IHL including war crimes;[120] acts of terrorism; a significant number of people killed, injured or displaced; the closure of schools; a lack of food, medical services and supplies, and other vital services such as water, electricity and sanitation; a change in, or collapse of, government institutions and services, political systems or the police and justice system; the imposition of parallel or informal justice and administrative systems; and/or non-state actors controlling state territory.

## C. Internal flight or relocation alternative

60. The consideration of internal relocation is not generally relevant to the determination of refugee status under Article I(2) of the 1969 OAU Convention.[121] Article I(2) covers both situations that affect either 'part' or 'the whole' of the refugee's territory.[122] As the focus of Article I(2) is on situations that seriously disrupt state and societal structures, people cannot be required to relocate to other parts of the country, even if the situation in these parts may be less disrupted. The only exception would be where the situation is indisputably confined to a particular part of the country or to a particular region or city, and where the state is able and willing to protect its citizens in other areas. Consideration of the likely spread of the situation and the accompanying violence and disorder into other areas would need to be carefully assessed, with a forward-looking perspective.

# IV. SUBSTANTIVE ANALYSIS OF CONCLUSION III(3) OF THE 1984 CARTAGENA DECLARATION

## A. Preliminary considerations to guide interpretation

61. The Cartagena Declaration on Refugees is a regional protection instrument, adopted in 1984 by a group of experts from several Central and South American countries.[123] It resulted from a colloquium on International Protection for Refugees and Displaced Persons in Central America, Mexico and Panama held in Cartagena de Indias, Colombia. Its adoption represented a humanitarian and pragmatic response to the movements of people from conflict and other situations characterized by indiscriminate threats to life, security or freedom. The Cartagena Declaration reaffirms the peaceful, non-political and exclusively humanitarian nature of asylum and the principle of *non-refoulement*; the importance of searching actively for durable solutions; and the necessity of co-ordination and harmonization of universal and regional systems and national efforts.[124]

62. Conclusion III(3) of the Cartagena Declaration recommends to include among refugees:

> 'persons who have fled their country because their lives, security or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order.'[125]

---

[120] Rome Statute ICC, note 32 above, Article 8.
[121] UNHCR IFA Guidelines, note 83 above, para. 5.
[122] *Recueil des décisions (No 2 - 2008)*, Benin: Comité d'éligibilité au statut de réfugié, 2008, p. 97, http://www.refworld.org/docid/563cede14.html. See also, A. Edwards, 'Refugee Status Determination in Africa' (2006) 14 *Afr J Intl Comp L* 227.
[123] Belize, Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama and Venezuela.
[124] See, respectively, Conclusion III(4) on the right to asylum; Conclusion III(5) on the principle of *non-refoulement*; Conclusion III(11) on integration and Conclusion III(12) on voluntary repatriation; and Conclusions III(14) to (17) on co-operation, coordination and harmonization.
[125] The original Spanish text of Conclusion III(3) of the Cartagena Declaration refers to 'seguridad', which is properly translated into English as 'security' rather than 'safety', which is the word used in the Cartagena Declaration, note 5 above.

AR-016039

63. The Cartagena refugee definition has attained a particular standing in the region, not least through its incorporation into national laws and its application in practice.[126] The authority of the Cartagena refugee definition has been reaffirmed by the Inter-American Court of Human Rights (IACrtHR),[127] the San José Declaration on Refugees and Displaced Persons (1994),[128] the Mexico Declaration and Plan of Action to Strengthen International Protection of Refugees in Latin America (2004),[129] the Brasilia Declaration on the Protection of Refugees and Stateless Persons in the Americas (2011)[130] and the Brazil Declaration and Plan of Action (2014).[131]

64. As a protection instrument, the Cartagena Declaration has at its foundation the commitment to ensure the treatment provided by the 1951 Convention to all refugees.[132] It drew inspiration from the 1969 OAU Convention, as well as the doctrine of the Inter-American Commission on Human Rights (IACHR).[133] Its interpretation is to be informed by international and regional law, especially the norms and standards of the 1948 American Declaration of the Rights and Duties of Man,[134] the 1969 American Convention on Human Rights,[135] and the evolving case law of the Inter-American human rights bodies.

65. Furthermore, as a humanitarian- and protection-oriented instrument, the Cartagena Declaration calls for an inclusive, evolving and flexible interpretation of the refugee definition.[136] Where the ordinary meaning is not clear, the text should be given a purposive or teleological interpretation.

*Scope of the Cartagena refugee definition*

66. The Cartagena refugee definition provides international protection to people fleeing the threats resulting from "objectively" identifiable circumstances which have seriously disturbed public order. The circumstances referred to in the Cartagena refugee definition are characterized by the indiscriminate, unpredictable or collective nature of the threats they present to the lif(v)e(s), security or freedom of a person or group of persons, or even to populations at large. The focus of the Cartagena refugee definition is on the exposure of people to the threats inherent in the circumstances referred to.

67. As the Cartagena refugee definition focuses on indiscriminate threats, decision-makers are advised to adopt a consistent approach to persons fleeing similar circumstances in the same country. This contributes towards addressing protection gaps in the region, and to ensuring more consistent outcomes between cases.

## B. Elements of the Cartagena refugee definition

68. The Cartagena refugee definition protects as refugees persons who (i) are outside their country,[137] (ii) because their life, security or freedom has been threatened, (iii) as a result of

---

[126] To date, the Cartagena refugee definition has been incorporated into the national laws of 14 countries: Argentina, Belize, Bolivia, Brazil, Chile, Colombia, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Paraguay, Peru, and Uruguay. In addition, the Constitutional Court of Ecuador has ordered the regional definition to be reinstated in the national legal framework in September 2014: *Sentencia No 002-14-SIN-CC*, Ecuador: Corte Constitucional, 14 August 2014, http://www.refworld.org/docid/578f56084.html.

[127] *Advisory Opinion OC-21/14 of August 19, 2014 requested by the Argentine Republic, the Federative Republic of Brazil, the Republic of Paraguay and the Oriental Republic of Uruguay: Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection*, OC-21/14, Inter-American Court of Human Rights (IACrtHR), 19 August 2014, paras. 76, 77, 79 and 249, http://www.refworld.org/docid/54206c744.html.

[128] *San José Declaration on Refugees and Displaced Persons*, 7 December 1994, http://www.refworld.org/docid/4a54bc3fd.html.

[129] *Mexico Declaration and Plan of Action to Strengthen International Protection of Refugees in Latin America*, 16 November 2004, http://www.refworld.org/docid/424bf6914.html.

[130] *Brasilia Declaration on the Protection of Refugees and Stateless Persons in the Americas*, 11 November 2010, http://www.refworld.org/docid/4cdd44582.html.

[131] *Brazil Declaration and Plan of Action*, 3 December 2014, http://www.refworld.org/docid/5487065b4.html.

[132] Cartagena Declaration, note 5 above, Conclusion III(8). See also Recommendation E of the Final Act of the 1951 United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, 25 July 1951, A/CONF.2/108/Rev.1, http://www.refworld.org/docid/40a8a7394.html.

[133] See the text of Cartagena Declaration, note 5 above, Conclusion III(3).

[134] Inter-American Commission on Human Rights (IACHR), *American Declaration of the Rights and Duties of Man*, 2 May 1948, http://www.refworld.org/docid/3ae6b3710.html.

[135] Cartagena Declaration, note 5 above, Conclusion III(8) and (10) make explicit reference to the 1969 American Convention on Human Rights, note 43 above.

[136] EXCOM Conclusion No. 103 (LVI), 2005, para. (c).

[137] For the purposes of the Cartagena definition, reference to 'their country', in the phrase 'persons who have fled their country' is to be interpreted in line with the 1951 Convention as a person's country of nationality, or, in the case of stateless persons, the country of former habitual residence.

IFR_AR_016040

circumstances referred to in the definition existing in their country. The particular elements of the Cartagena refugee definition are explained below. These elements need to be considered as part of a holistic assessment.

*Refugees sur place*

69. *Sur place* claims are accepted under the Cartagena refugee definition consistent with the interpretation of the 1951 Convention (see paragraph 31 of these Guidelines).

*Circumstances compelling flight*

70. These circumstances referred to in the Cartagena refugee definition include, but are not limited to, generalized violence, foreign aggression, internal conflicts, and massive violation of human rights. Further, other circumstances which have seriously disturbed public order in the country may also result in threats to persons' lives, security or freedom forcing them to flee their country. Guided by the protection purpose of the Cartagena Declaration, the circumstances referred to in the Cartagena refugee definition are to be given their ordinary meaning, wherever possible, and interpreted in an evolutionary way so that they remain relevant to situations not foreseeable when the Cartagena Declaration was drafted.

71. 'Generalized violence' is not a term of art, nor does it have a strict or closed meaning. Adopting a case-by-case approach, the term encompasses situations characterized by violence that is indiscriminate and/or sufficiently widespread to the point of affecting large groups of persons or entire populations. Drawing on international human rights law to determine whether a situation of generalized violence prevails, it would be appropriate to identify factual indicators relating to the number and type of security incidents, as well as the overall level of violence in the country of origin and its effect on civilian populations.[138] Situations of generalized violence include situations involving mass and/or serious violations of human rights or IHL. Generalized violence is established via the intensity or geographic spread of the violence, or through a combination of these.

72. Since 'generalized violence' is not a term found in IHL, it cannot be limited to situations of armed conflict within the meaning of IHL, although it can include these situations if the conditions for applicability of IHL are met. See also paragraph 5 of these Guidelines in relation to the limited relevance of categorizing a situation as an armed conflict under IHL in determining who is a refugee.

73. Situations of generalized violence encompass violence carried out by state or non-state actors. It is the situation on the ground, and the risks that the violence presents, that is at issue.

74. 'Foreign aggression' is understood to be the same as the terms 'aggression', 'war of aggression' and 'act of aggression' as defined under international law, as well as the term 'external aggression' included in the 1969 OAU Convention (see paragraph 54 of these Guidelines).[139] Consistent with the object and purpose of the Cartagena Declaration, foreign aggression can be equated to the crime leading to an IAC within the meaning of IHL,[140] as well as relating to situations not categorized as such under IHL. These situations may include conflicts fuelled by outside involvement or those that have spilled

---

[138] The IACrtHR has considered a situation of generalized and indiscriminate violence in El Salvador in the early 1980s to exist, referring to systematic violence indiscriminately affecting a large number of people over a prolonged period of time. See *The Massacres of El Mozote and nearby places v. El Salvador*, Inter-American Court of Human Rights (IACrtHR), 25 October 2012, paras. 70 and 193, http://www.refworld.org/docid/564ecfee4.html.The Inter-American Commission on Human Rights (IACHR) has referred to similar indicators when describing situations of "widespread violence". These include the following: a) the number of violent incidents as well as the number of victims of those incidents is very high; b) the prevailing violence inflicts heavy suffering among the population; c) violence manifests itself in most egregious forms, such as massacres, torture, mutilation, cruel, inhuman and degrading treatments, summary executions, kidnappings, disappearances of persons and gross breaches to IHL; d) the perpetration of acts of violence is often aimed at causing terror and, eventually, creating a situation such that individuals are left with no option other than flee the area affected; e) violence can emanate from state and non-state agents, and when it emanates from the first, or from others acting at the instigation or with the acquiescence of the state's authorities, the authors enjoy impunity; f) where violence emanates from non-state agents, authorities are unable to effectively control them; and g) the level and extent of violence is such that the normal functioning of society is seriously impaired. See, for example, Inter-American Commission on Human Rights (IACHR), *Report on the Situation of Human Rights in Jamaica*, 10 August 2012, OEA/Ser.L/V/II.144, pp. 5 and 27, http://www.refworld.org/docid/51ff65004.html.

[139] See supra note 112 and *Case Concerning Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States of America); Merits*, International Court of Justice (ICJ), 27 June 1986, http://www.refworld.org/docid/4023a44d2.html.

[140] See, Common Article 2(1) of the 1949 Geneva Conventions, note 13 above, which is applicable to IAC and refers to 'cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting States', and see also Article 1(4) of Protocol I to the Geneva Conventions, note 13 above, which makes further reference to 'armed conflicts in which peoples are fighting against colonial domination and alien occupation and against racist regimes in the exercise of their right of self-determination'.

234

over from neighbouring states, including because of the presence of (members of) the armed forces of another state or incursions by foreign armed groups.

75. 'Internal conflicts' in the Cartagena refugee definition includes NIACs within the meaning of IHL.[141] However, keeping in mind the protection purpose of the Cartagena Declaration, the term 'internal conflicts' extends to internal armed conflicts that are not classified as NIACs within the meaning of IHL. IHL is considered to be informative, though not determinative of whether an internal conflict exists. Similarly, the qualifications made by the parties involved or affected by it are also considered to be informative rather than determinative (see paragraph 5 of these Guidelines).[142] For the purpose of the Cartagena refugee definition, situations that fall below the threshold of a NIAC within the meaning of IHL may be better captured under the ground of 'generalized violence' or 'massive violation of human rights'.

76. To determine whether a situation of 'massive violation of human rights' prevails, reference to the jurisprudence of the IACrtHR is particularly relevant. The term 'massive' refers to the scale or magnitude of the violation, irrespective of the duration, and as such, the violation may be the result of a single event.[143] Where the effects of human rights violations go beyond the actual/direct victims to affect large segments of the population, or even the society as a whole, the situation may also be classified as 'massive violation of human rights'. The elements of planning and organization on the part of the perpetrator – whether a state or non-state actor – can also indicate a situation of 'massive violation of human rights', although they are not a requirement. In the case of non-state actors committing human rights abuses, a situation of 'massive violation of human rights' may exist when the state is either unable or unwilling to protect their citizens by failing to prevent, investigate, prosecute or sanction these violations.[144] In this context, displacement may be an indicator of 'massive violation of human rights' or lead to serious human rights violations. The Cartagena refugee definition makes no distinction between the types of rights that are threatened.

**12**

77. The existence of judgments or provisional measures by the IACrtHR[145] or precautionary measures by the IACHR[146] related to a given situation would be strong evidence that a situation of massive violation of human rights exists. The statements of human rights bodies or courts may also provide relevant indicators. However, such judgments or measures are not required to qualify a situation as one of 'massive violation of human rights'. This is a factual assessment, to be undertaken by the relevant asylum adjudication body, relying on relevant information and evidence, including the applicant's own testimony.

78. Of all the circumstances referred to in the Cartagena refugee definition, 'other circumstances which have seriously disturbed public order' is the least frequently applied by national adjudication bodies when determining refugee claims under the Cartagena refugee definition.[147] The notion of 'public order', while not having a universally accepted definition, can be interpreted in the context of the Cartagena refugee definition as referring to the peace, internal and external security as well

---

[141] See, Common Article 3 of the 1949 Geneva Conventions, note 38 above, Article 1 of Protocol II to the Geneva Convention, note 14 above, and *Prosecutor v. Dusko Tadic aka "Dule"* (Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction), IT-94-1, International Criminal Tribunal for the former Yugoslavia (ICTY), 2 October 1995, para. 70, http://www.refworld.org/docid/47fdfb520.html.
[142] For example, while an UN Security Council designation of a situation as a NIAC within the meaning of IHL would be sufficient for the purposes of the Cartagena refugee definition, such a qualification cannot be a requirement. See also, UNHCR Arusha Summary Conclusion, note 29 above, para. 24.
[143] *Case of the "Las Dos Erres" Massacre v. Guatemala*, Inter-American Court of Human Rights (IACrtHR), 24 November 2009, paras. 73, 79 and 152, http://www.refworld.org/docid/564ed31a4.html; *Río Negro Massacres v. Guatemala*, Inter-American Court of Human Rights (IACrtHR), 4 September 2012, paras. 56, 58-60 and 63, http://www.refworld.org/docid/564ed2714.html.
[144] *González et al. ("Cotton Field") v. Mexico*, Inter-American Court of Human Rights (IACrtHR), 16 November 2009, para. 236, http://www.refworld.org/docid/564ed5341.html.
[145] Provisional measures are an instrument used by the IACrtHR to prevent irreparable harm to the rights and freedoms ensured under the American Convention on Human Rights of persons who are in a situation of extreme gravity and urgency. The measures are ordered ex officio or at the request of a party and result in a protection request to the respondent state of the alleged victim(s). See, American Convention on Human Rights, note 43 above, Article 63(2) and Organization of American States (OAS), *Rules of Procedure of the Inter-American Court of Human Rights*, 16-29 November 2009, Article 27, https://www.cidh.oas.org/Basicos/English/Basic20.Rules%20of%20Procedure%20of%20the%20Court.htm.
[146] Organization of American States (OAS), *Rules of Procedure of the Inter-American Commission on Human Rights*, 1 August 2013, http://www.oas.org/en/iachr/mandate/Basics/rulesiachr.asp, Article 25, establishes that, in serious and urgent situations, the Commission may, on its own initiative or at the request of a party, request that a State adopt precautionary measures to prevent irreparable harm to persons or to the subject matter of the proceedings in connection with a pending petition or case, as well as to persons under the jurisdiction of the State concerned, independently of any pending petition or case.
[147] UNHCR, *Summary Conclusions on the interpretation of the extended refugee definition in the 1984 Cartagena Declaration; roundtable 15 and 16 October 2013, Montevideo, Uruguay*, 7 July 2014, p. 7, http://www.refworld.org/docid/53c52e7d4.html.

IFR_AR_016042

as stability of the state and society, plus the normal functioning of the institutions of the state, based on respect for the rule of law and human dignity. Circumstances seriously disturbing public order can take place in times of armed conflict within the meaning of IHL as well as in peacetime. See also paragraphs 56 to 59 of these Guidelines.

79. In the jurisprudence of the IACrtHR, circumstances seriously disturbing public order have been defined by reference in part to the acts of states derogating from their human rights obligations in cases where a state of emergency has been declared.[148] However, a declaration of a state of emergency should not be seen as a prerequisite for the existence of a circumstance seriously disturbing public order, even though it would ordinarily be indicative of such a situation.

80. The inclusion of the adjective 'other' in 'other circumstances' in the Cartagena refugee definition allows states to grant protection in circumstances beyond those related to the four situations referred to in the Cartagena refugee definition.

*Threat to life, security or freedom*

81. The third element of the Cartagena definition is the link between the circumstance occurring in the country of origin and the threat it poses to the lives, security and freedom of persons residing in the country. The 'threat' or risk element in the definition connotes the possibility of harm being inflicted on a person, a group or a whole population; it does not imply that the harm has actually materialized. The link between the circumstance and the threat should not be interpreted in such a manner as to curtail or restrict unnecessarily the scope of international protection granted to persons fleeing their country, for example by requiring an individualized assessment of the risk to life, security or freedom. In fact, spatial/geographical proximity of the circumstance to the person would suffice to create a threat forcing the person to flee the country.

82. Since the Cartagena refugee definition is oriented towards circumstances that affect groups or whole populations, the focus is not on the personal circumstances of the individual fleeing a danger to her or his life, security or freedom, but rather on the objective circumstances in the country of origin.

83. Reference to persons' lives, security or freedom should be interpreted broadly, encompassing persons' physical and mental integrity, security, freedoms, human dignity and livelihoods, with reference to internationally and regionally recognized human rights.

*Gang violence or violence from organized criminal groups*

84. People fleeing gang violence or violence by organized criminal groups may meet the refugee criteria under the 1951 Convention.[149] People fleeing such violence may also fall under one or more of the circumstances mentioned in the Cartagena refugee definition.

## C. Internal flight or relocation alternative

85. The focus of the Cartagena refugee definition is on situations that seriously disrupt state and societal structures. Under such circumstances, people cannot be required to relocate to other parts of the country, even if the situation in these parts may be less disrupted. The only exception would be where the situation is isolated to a particular part of the country or to a particular region or city, and where the state is able and willing to protect its citizens in those other areas. Consideration of the likely spread of the situation and the accompanying violence and disorder into other areas would need to be carefully assessed, with a forward-looking perspective.

---

[148] American Convention on Human Rights, note 43 above, Article 27(1), allowing states to take derogating measures in time of war, public danger, or other emergency that threatens the independence or security of a State Party. See, *Habeas Corpus in Emergency Situations (Arts. 27(2), 25(1) and 7(6) American Convention on Human Rights)*, OC-8/87, Inter-American Court of Human Rights, 30 January 1987, paras. 19 and 20, https://www.refworld.org/docid/402795714.html.
[149] On the application of the 1951 Convention to such situations, see: UNHCR Gangs Guidance Note, note 12 above.

IFR_AR_016043

## V. PROCEDURAL AND EVIDENTIARY ISSUES

### A. Approaches to applying the 1951 Convention/1967 Protocol definition and the regional definitions

86. The various definitions of a refugee are not mutually exclusive. They each recognize a person as a refugee, thus triggering the standards of treatment foreseen by the 1951 Convention (see paragraph 8 of these Guidelines).

87. In applying the refugee definitions, a sequential approach is preferred, whereby refugee status is initially assessed under the 1951 Convention definition before an assessment is made under the regional definitions if the person is found not to be a refugee under the 1951 Convention. Such an approach underscores the universal character of the definition of a refugee in Article 1A(2) of the 1951 Convention, the primacy of that Convention,[150] and the explicitly complementary character of the regional definitions.[151]

88. However, applying the regional definitions would be more practical and efficient in group situations or in specific regional contexts,[152] as long as the 1951 Convention standards of treatment apply.

### B. Establishing the facts

89. Claims for refugee status related to situations of armed conflict and violence can raise complex factual issues, turning on the particular circumstances of the applicant viewed against the causes, character and impact of the situation of armed conflict and violence. Unless prima facie recognition of refugee status is applied, claims for refugee status should be considered on their individual merits, taking into account up-to-date and relevant country of origin information.

*Country of origin information*

90. Up-to-date, relevant country of origin information is important for understanding the situation of armed conflict and violence and whether the country of origin is experiencing one of the situations or circumstances referred to in the regional definitions.[153]

91. Relevant country of origin information includes both qualitative and quantitative information. Qualitative information is particularly relevant to avoid misunderstandings, stereotyping and generalizations and allows for a deeper understanding of the situation of armed conflict and violence, i.e. of the history and development of the situation, the actors involved, the means and methods of warfare, strategies and tactics used and the effects the situation has on the country and the people caught up in it.[154] Quantitative information related to situations of armed conflict and violence should be used with appropriate caution. Different sources may use diverse methodologies, often depending on their motivation for collecting data, resulting in substantial divergences between sources. While statistical data can provide an indication of the impact of the situation on the population, such data may be inconclusive or unreliable regarding the risk, harm, relevant 1951 Convention ground, and/or causal link between the risk of harm and ground, or situations mentioned in the regional definitions. Statistical information tends to focus on quantifiable features of the situation, such as the number of civilian casualties or the number of displaced persons, and may not capture other forms of harm – caused directly or indirectly by the armed conflict or violence – on persons, state structures or societies.

---

[150] EXCOM Conclusion No. 87 (L) 1999, para. (f); EXCOM Conclusion No. 89 (LI) 2000. See also, 1969 OAU Convention, note 4 above, ninth preambular paragraph, referring to the 1951 Convention/1967 Protocol as the basic and universal instrument for the protection of refugees.
[151] An additional argument for a sequential approach under the 1969 OAU Convention is the structure of Article I, where in paragraph 1 the 1951 Convention refugee definition is replicated before paragraph 2 provides the regional definition.
[152] UNHCR Prima Facie Recognition Guidelines, note 10 above, paras. 2 and 5.
[153] *Radjabu v. The Chairperson of the Standing Committee for Refugee Affairs*, note 107 above, para. 6, according to the Court, determining whether a person qualifies for refugee status under the extended definition requires an assessment of the existence of objective, ascertainable circumstances in the person's country of origin corresponding with any of the circumstances stipulated in the definition.
[154] *Sufi and Elmi v. United Kingdom*, note 45 above, para. 241.

FR_AR_016044

92. In the assessment of claims for refugee status, country of origin information must be relevant to the particular circumstances of the applicant. Obtaining reliable and accurate country of origin information that is specific to the situation of particular groups of applicants, including children,[155] or persons of diverse gender identities and/or sexual orientations,[156] frequently poses significant challenges. Such challenges may be especially pronounced in situations of armed conflict and violence. Similarly, the available country of origin information about situations of armed conflict and violence may not reflect the specific circumstances of women or of men, including the prevalence of gender-specific forms of harm, or take into account the changing composition and conduct of the actors involved.[157] Decision-makers must take due cognizance of this fact. In situations of armed conflict and violence, an absence of country of origin information about the situation of particular groups should not be interpreted as implying that such groups do not face specific threats.

*Burden of proof*

93. While in general the burden of proof lies with the person submitting the claim, the obligation to gather and analyse all relevant facts and supporting evidence is shared between the applicant and the decision-maker.[158] This shared responsibility is particularly important when the country of origin is experiencing a situation of armed conflict and violence, since this makes obtaining information and documentation – in general, as well as in relation to the individual – more difficult.[159] People fleeing such situations are likely to encounter significant problems in giving a detailed account of events demonstrating a need for international protection, and/or in obtaining evidence to substantiate the claim. In these circumstances, it is therefore frequently necessary to give applicants the benefit of the doubt.[160]

[155] UNHCR, *Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees*, 22 December 2009, HCR/GIP/09/08, para. 74, http://www.refworld.org/docid/4b2f4f6d2.html.
[156] UNHCR Gender-Related Persecution Guidelines, note 56 above, para. 37. UNHCR Sexual Orientation and/or Gender Identity Guidelines, note 56 above, para. 66.
[157] UNHCR Cape Town Summary Conclusions, note 3 above, para. 23.
[158] UNHCR Handbook, note 26 above, para. 196. See also, UNHCR, *Beyond Proof, Credibility Assessment in EU Asylum Systems: Full Report*, May 2013, pp. 86-88, http://www.refworld.org/docid/519b1fb54.html.
[159] *Refugee Appeal No. 71462/99, Tamil and a Citizen of the Democratic Socialist Republic of Sri Lanka v. Refugee Status Branch of the New Zealand Immigration Service*, 71462/99, note 54 above, para. 51.
[160] UNHCR Handbook, note 26 above, para. 203.

IFR_AR_016045



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

---

Distr. GENERAL        HCR/GIP/17/13        20 December 2017        Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 13:

### Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the Office's *Statute*, in conjunction with Article 35 of the 1951 *Convention relating to the Status of Refugees* and Article II of its 1967 Protocol, as well as relevant regional instruments. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* (Geneva: UNHCR, 1979; reissued 2011) and other Guidelines on International Protection. They replace the *Revised Note on the Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees*, October 2009, and all prior relevant guidance. By contrast, the *Note on UNHCR's Interpretation of Article 1D of the 1951 Convention relating to the Status of Refugees and Article 12(1)(a) of the EU Qualification Directive in the context of Palestinian refugees seeking international protection*, May 2013, remains applicable.

These Guidelines, having benefited from broad public consultation, are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR personnel carrying out mandate refugee status determination under its mandate.

**13**

These Guidelines have been prepared in close cooperation with the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA").

In light of UNHCR's equality and non-discrimination policies, wherever the original text of an international agreement was drafted in gender-specific language and gender was not in issue, the text needs to be read and understood today as if it applied equally to men and women; for that reason, texts quoted in UNHCR publications reflect this principle through the inclusion of appropriate wording in square brackets.

UNHCR's *Handbook on Procedures and Criteria for Determining Refugee Status* and *Guidelines on International Protection* are available at: http://www.refworld.org/docid/4f33c8d92.html.

Calls for public consultation on future guidelines will be posted at: http://www.unhcr.org/544f59896.html.

IFR_AR_016046

## I. INTRODUCTION

1. Article 1D of the 1951 Convention relating to the Status of Refugees ("1951 Convention")[1] acknowledges that certain categories of refugees may benefit from separate arrangements for their protection or assistance by organs or agencies of the United Nations other than the Office of the United Nations High Commissioner for Refugees ("UNHCR"). At present, Article 1D applies to Palestinian refugees, for whom the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA")[2] was established in order to respond to their situation.[3]

2. Article 1D of the 1951 Convention provides:[4]

> This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.
>
> When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention.[4]

2. Article 1D of the 1951 Convention is often characterised as an "exclusion clause", whereas it has both exclusionary and inclusionary aspects[5] and its two paragraphs are to be read sequentially. In other words, one must first come within the scope of the first paragraph before coming within the second paragraph. Paragraph 1 generally excludes from the protection of the 1951 Convention those Palestinian refugees who are receiving protection or assistance from UNRWA, while paragraph 2 of Article 1D operates to include those very same Palestinian refugees when that protection or assistance has ceased. Once the protection or assistance has ceased (see section II E below), they are entitled *ipso facto* to the benefits of the 1951 Convention. As refugees already recognised by the international community,[6] no separate or additional assessment under Article 1A(2) is required for them to qualify for Convention protection. Claimants need only demonstrate that they fall within the terms of Article 1D.

3. All States parties to the 1951 Convention and/or 1967 Protocol need to ensure that Article 1D is fully incorporated in national law and practice. Fully incorporating this provision in national law and practice is a matter of States parties' obligations under the international refugee instruments.

4. These Guidelines address the interpretation of Article 1D of the 1951 Convention in respect of Palestinian refugees applying for protection under the 1951 Convention *outside* of UNRWA's areas of operation. They provide UNHCR's substantive interpretation of Article 1D (Part II), and also address

---

[1] 1951 *Convention relating to the Status of Refugees* (28 July 1951) 189 UNTS 137 (1951 Convention), http://www.refworld.org/docid/3be01b964.html, and its Protocol Relating to the Status of Refugees (31 January 1967) 606 UNTS 267 (1967 Protocol), http://www.refworld.org/docid/3ae6b3ae4.html.
[2] UN General Assembly Resolution 302 (IV), *Assistance to Palestine Refugees*, 8 December 1949, A/RES/302, created UNRWA, which has responsibilities to provide assistance and protection to Palestinian refugees. The role of UNRWA is also acknowledged by courts: see, for example, *Bolbol v. Bevándorlási és Állampolgársági Hivatal*, ("*Bolbol*"), C-31/09, Court of Justice of the European Union ("CJEU"), 17 June 2010, para. 44, http://www.refworld.org/docid/4c1f62d42.html: "It is not in dispute that UNRWA constitutes one of the organs or agencies of the United Nations other than UNHCR which are referred to in Article 12(1)(a) of the Directive and in Article 1D of the Geneva Convention ...". See also, *AD (Palestine)*, ("*AD Palestine*") [2015] NZIPT 800693-695, New Zealand: Immigration and Protection Tribunal, 23 December 2015, paras 101-116, http://www.refworld.org/docid/56b1bcc24.html.
[3] Prior to the establishment of UNRWA, the United Nations had also established the UN Conciliation Commission for Palestine ("UNCCP") to *inter alia* "facilitate the repatriation, resettlement and economic and social rehabilitation of the refugees and the payment of compensation, and to maintain close relations with the Director of the United Nations Relief for Palestine Refugees, and through him [or her], with the appropriate organs and agencies of the United Nations." UNGA Resolution 194 (III), *Palestine - Progress Report of the United Nations Mediator*, 11 December 1948, A/RES/194, para. 11. By 1951, the UNCCP had informed the General Assembly, and began noting on an annual basis, that it was unable to find a means of achieving progress in the implementation of paragraph 11 of Resolution 194 (III). See, UNCCP, *Progress Report of the United Nations Conciliation Commission for Palestine*, UN Doc. A/1985, 20 November 1951 at paras 79 and 80 for first report, and more recently, Report of the UNCCP, 13 August 2015, A/70/319, Annex; UN General Assembly resolution 69/86.
[4] In these Guidelines, UNHCR refers to the first paragraph of Article 1D as 'Article 1D(1)' and the second paragraph as 'Article 1D(2)'.
[5] The French representative to the Conference of Plenipotentiaries, Mr. Rochefort, stated that "the clause in question was really one which provided for deferred inclusion". Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary of the Third Meeting, 19 November 1951, UN doc. A/Conf.2/SR.3, p. 10. All UN documents are available through the UN Official Document System database at http://www.un.org/en/documents/index.shtml. See also, James Hathaway and Michelle Foster, *The Law of Refugee Status*, (Cambridge: Cambridge University Press, 2nd edn., 2014), 513; and Lex Takkenberg, *The Status of Palestinian Refugees in International Law*, (Oxford: Oxford University Press, 1998), p. 66. See also, Guy Goodwin-Gill and Jane McAdam, who state that Article 1D "should be seen not so much as an 'exclusion clause," but rather as a "contingent inclusion clause". *The Refugee in International Law*, (Oxford: Oxford University Press, 3rd edn., 2007), 153; and Atle Grahl-Madsen, who refers to it as a "suspensive clause", *The Status of Refugees in International Law*, Volume I Refugee Character, A.W. Sijthoff-Leyden, 1966, p. 263.
[6] "[P]alestinian refugees - and there is no doubt but that the displaced Palestinians were considered at all relevant stages to be *refugees* - were regarded, in and out of the United Nations, as belonging to a special category." *Amer Mohammed El-Ali v. The Secretary of State for the Home Department and Daraz v. The Secretary of State for the Home Department (The United Nations High Commissioner for Refugees, Intervener)* ("*El-Ali*"), United Kingdom: Court of Appeal (England and Wales), 26 July 2002, [2002] EWCA Civ 1103, http://www.refworld.org/cases/GBR_CA_CIV,3f278a3a4.html, para. 15.

a number of procedural and evidentiary matters (Part III), drawing on State practice, international and national jurisprudence, as well as the views of leading jurists and academic experts.

## II. ANALYSIS

### A. Object and purpose

5. In interpreting Article 1D, it is appropriate to have regard to its object and purpose and its context, including through recourse to the *travaux préparatoires* of the 1951 Convention and to other contemporaneous international instruments intended to address the questions of protection and institutional responsibility for Palestinian refugees. A broad interpretation is warranted, based on the intention of the parties as expressed in the ordinary meaning of the terms of the treaty, considered in context and in the light of its object and purpose.[7] By applying such, it is clear that Article 1D of the 1951 Convention has two related purposes which guide its interpretation and application. The first purpose is to ensure that Palestinian refugees continue to be recognized as a specific class,[8] and that they continue to receive protection and associated rights, until their position has been definitively settled in accordance with the relevant resolutions of the United Nations General Assembly.[9] This purpose is also reflected in the discussions regarding the drafting of the Statute of the Office of the United Nations High Commissioner for Refugees, in which it was emphasized that Palestinian refugees should continue to be granted special status.[10] It was also recognized as essential that the continuity of protection be ensured[11] for Palestinians as a *sui generis* class of refugees under the 1951 Convention.

6. The second purpose of Article 1D is to avoid duplicating and overlapping competencies between UNHCR and UNRWA. The responsibilities of the two agencies are intended to be complementary.[12] In this regard, it is noted that while UNHCR's mandate is global, its competence "shall not extend to a person ... who continues to receive from other organs or agencies of the United Nations protection or assistance."[13] In contrast, UNRWA has competence in five geographical areas or 'fields' of operation: Jordan, Lebanon, the Syrian Arab Republic, the West Bank (including East Jerusalem) and Gaza.[14] Taken together, these territories constitute UNRWA's areas of operation, in which it provides protection[15] or assistance to a population of over five million Palestinian refugees.[16]

**13**

---

[7] Article 31 of the *Vienna Convention on the Law of Treaties*, 23 May 1969, United Nations, Treaty Series, vol. 1155, p. 331, http://www.refworld.org/docid/3ae6b3a10.html. See also, Ian Brownlie, *Principles of Public International Law*, (Oxford: Oxford University Press, 7th edn., 2008), 631.

[8] "The Article aims, fundamentally, to ensure continued protection of Palestinians as persons whose *refugee character had already been established*". *AD (Palestine)*, para.159, note 2 above. Article 1D was "intended for an existing category of refugees in respect of which the General Assembly had already taken certain action." Takkenberg, note 5 above, 97.

[9] See also, *Mostafa Abed El Karem El Kott and Others v. Bevándorlási és Állampolgársági Hivatal*, C-364/11, European Union: Court of Justice of the European Union, 19 December 2012, ("*El Kott*"), http://www.refworld.org/cases,ECJ,50d2d7b42.html, para 62, where the CJEU affirmed that the objective of Article 1D was to "ensure that Palestinian refugees continue to receive protection, as Palestinian refugees, until their position has been definitely settled ...".

[10] General Assembly, Fifth Session, Official Records, Third Committee, 328th Meeting, 27 November 1950, paras 52, 55 (Mr. Baroody, Saudi Arabia), UN doc. A/C.3/SR.328, available through the UN Official Document System database at http://www.un.org/en/documents/index.html. Also cited in UNHCR's intervention before the Court of Appeal of England and Wales in the case of *El-Ali*, http://www.refworld.org/docid/3d1c73c04.html ("*UNHCR intervention in El-Ali*").

[11] General Assembly, Fifth Session, Official Records, Third Committee, 344th Meeting, 11 December 1950, paras 24-25 (Mr. Baroody, Saudi Arabia); para. 28 (Mr. Lesage, Canada); paras 29-30 (Mr. Davin, New Zealand); para. 39 (Mr. Noriega, Mexico); para. 42 (Mr. Raafat, Egypt), UN doc. A/C.3/SR.344, available through the UN Official Document System database at http://www.un.org/en/documents/index.html. Also cited in *UNHCR intervention in El-Ali*, note (10) above.

[12] See Goodwin Gill and McAdam, note 5 above, 152. The importance of this complementarity is reflected in the current practice of the two agencies. Since 2005, UNHCR and UNRWA have held annual high-level meetings in order to address issues of common concern; and since 2010, a joint working group has been established which remains in regular contact and meets twice per year.

[13] *Statute of the Office of the United Nations High Commissioner for Refugees*, ("Statute"), 14 December 1950, A/RES/428(V), http://www.refworld.org/docid/3ae6b3628.html, paragraphs 1 and 7(c). With regards to the differences between the language of the Statute ("continues to receive") and that of Article 1D ("at present receiving"), UNHCR interprets the phrases as having the same meaning. "For reasons which are not clear (but which may have been dictated by time constraints), the draft Convention refugee definition was not amended to bring it into line with the UNHCR Statute before being sent on to the Conference of Plenipotentiaries." Goodwin-Gill and McAdam, note 5 above, p. 154. See also on the issue of UNHCR's Mandate, UNHCR, *Note on the Mandate of the High Commissioner for Refugees and his Office*, October 2013, http://www.refworld.org/docid/5268c9474.html.

[14] See for example, General Assembly Resolution 58/95 of 17 December 2003 and, more recently, UNGA Resolution 71/91, *Assistance to Palestine refugees: Resolution adopted by the General Assembly*, 22 December 2016, A/RES/71/91: http://www.refworld.org/docid/586cbe334.html.

[15] It is important to note that UNRWA has had a protection mandate from its inception. Nevertheless, the protection function has grown over time and has increased since 2010 with the adoption of a protection policy and the development of protection tools and standards. See UNRWA, Protecting Palestine Refugees, 2015, http://www.refworld.org/docid/5703647f4.html and https://www.unrwa.org/what-we-do/protection. However, UNRWA "does not own, administer or police the camps, as this is the responsibility of the host authorities": https://www.unrwa.org/palestine-refugees. See also note 48 below.

[16] For latest UNRWA figures, see: http://www.unrwa.org/.

IFR_AR_016048

### B. Ratione personae: Personal scope of Article 1D

7. The following groups of persons fall within the personal scope of Article 1D:

**Palestine refugees:** Persons who are "Palestine refugees"[17] within the sense of UN General Assembly Resolution 194 (III) of 11 December 1948[18] and subsequent UN General Assembly Resolutions and who, as a result of the 1948 Arab-Israeli conflict, were displaced from that part of Mandate Palestine which became Israel, and who have been unable to return there.

**Displaced persons:** Persons who are "displaced persons" within the sense of UN General Assembly Resolution 2252 (ES-V) of 4 July 1967 and subsequent UN General Assembly resolutions, and who, as a result of the 1967 conflict, have been displaced from the Palestinian territory occupied by Israel since 1967 and have been unable to return there.[19] It also includes those persons displaced by "subsequent hostilities".[20]

**Descendants:** "Descendants" refers to all persons born to Palestine refugees or displaced persons, as defined above.[21] Based on principles of gender equality and non-discrimination on the basis of sex, as well as the principle of family unity, these descendants, whether they are descended through the male or female line,[22] would be considered to fall within the purview of Article 1D.[23] This includes descendants who were born outside of and who have never resided in UNRWA's areas of operation, where the criteria for the application of Article 1D are met.

8. For the purposes of these Guidelines, the term "Palestinian refugees" is used to encompass "Palestine refugees", "displaced persons" and "descendants" or one or more of these groups, whose position has not been definitively settled in accordance with relevant resolutions of the UN General Assembly.

9. Not all Palestinians fall within the class of Palestinian refugees to whom Article 1D applies.[24] Such cases are to be assessed in the same manner as other claimants for refugee status, under Article 1A(2).

### C. Sequential reading

10. The two paragraphs in Article 1D are to be read jointly and operate sequentially. This means that decision-makers need to assess (i) whether the applicant falls within the class of Palestinians to whom the protection of the 1951 Convention does not apply because he or she "is at present receiving" the protection or assistance of UNRWA; and if so, (ii) whether such an applicant is nonetheless included under the second paragraph owing to the cessation of that protection or assistance.

---

[17] The term "Palestine refugees" has never been expressly defined by the General Assembly. However, for early work on interpreting the term, see UN Doc. W/61/Add.1, *Addendum to Definition of a "Refugee" Under paragraph 11 of the General Assembly Resolution of 11 December 1948*, 29 May 1951 which is to be read with its Note by the Principal Secretary, UN Doc. A/AC.25/W/61, https://unispal.un.org/DPA/DPR/unispal.nsf/0/418E7BC6931616B-485256CAF00647CC7. UNRWA's operational definition of the term "Palestine refugee" for registration purposes has evolved over the years as it was initially a subcategory of persons who were 'in need'. Since 1984 it has been "*persons whose normal place of residence was Palestine during the period 1 June 1946 to 15 May 1948, and who lost both home and means of livelihood as a result of the 1948 conflict.*"

[18] The UN General Assembly resolved in para. 11 of Resolution 194 (III) that "the refugees wishing to return to their homes and live at peace with their neighbours should be permitted to do so at the earliest practicable date" and that "compensation should be paid for the property of those choosing not to return and for loss of or damage to property".

[19] UN General Assembly Resolution 2452 (XXIII) A of 19 December 1968 called for the return of "displaced persons", as reiterated by subsequent UN General Assembly resolutions on an annual basis, https://unispal.un.org/DPA/DPR/unispal.nsf/0/0F32DC9EB80EE553852560DF004F1352. See, also, *Bolbol*, (note 2 above) para. 47: "[I]t cannot be maintained, as an argument against including persons displaced following the 1967 hostilities within the scope of Article 1D of the Geneva Convention, that only those Palestinians who became refugees as a result of the 1948 conflict who were receiving protection or assistance from UNRWA at the time when the original version of the Geneva Convention was concluded in 1951 are covered by Article 1D of that convention […]."

[20] See UN General Assembly Resolution A/RES/37/120, 16 December 1982, which extended UNRWA's mandate to those displaced by subsequent hostilities; http://www.un.org/documents/ga/res/37/a37r120.htm.

[21] UNRWA's *Consolidated Eligibility and Registration Instructions*, 1 January 2009, ("UNRWA's CERI (2009)"), http://www.refworld.org/docid/520cc3634.html, at Part III(A)(1), p. 3, provide that "Palestine Refugees, and descendants of Palestine refugee males, including legally adopted children, are eligible to register for UNRWA services." Descendants of women who are Registered Refugees and are (or were) married to husbands who are not registered refugees are not considered to meet UNRWA's Palestine refugee criteria, but they (including legally adopted children) "are eligible to register to receive UNRWA services", Part II(A)(2).

[22] Including descendants of a Palestine refugee woman and a non-refugee male within the first paragraph of Article 1D of the 1951 Convention is compatible with the principle of non-discrimination on the basis of sex and avoids serious consequences for family unity. Further, the approach adopted in these Guidelines, which recognises descendants of Palestinian refugees, is consistent with UNHCR's general approach to protracted refugee situations in which children born to refugees in exile are registered as refugees until a durable solution has been found.

[23] Some of these descendants may have acquired the nationality of their non-refugee/non-Palestinian parent, hence an individual assessment will be required, which also considers the principle of family unity.

[24] For example, a Palestinian originally from the West Bank, who was never displaced.

IFR_AR_016049

## D. "Exclusion clause" of Article 1D(1): Palestinian refugees receiving or eligible to receive the protection or assistance of UNRWA

11. "Exclusion" from protection under the 1951 Convention pursuant to Article 1D(1) does not mean that persons within the scope of this provision are not to be considered refugees. Quite the contrary, the express intention of the drafters was to provide a separate regime for an entire class of persons already receiving specific benefits from UN organs or agencies. Thus, Article 1D is clearly intended to cover all Palestinian refugees "falling under the mandate of UNRWA, regardless of when, or whether, they are actually registered with that agency, or actually receiving assistance."[25] To interpret Article 1D(1) as an exclusion clause in that sense would be incorrect, as it would ignore the character of Article 1D as a "contingent inclusion clause."[26] It would also be inconsistent with the object and purpose of the 1951 Convention and, in particular, with the aim of Article 1D itself, which is to ensure continuity of protection for a class of persons who are already recognised as refugees by the international community.

12. Moreover, the object and purpose of the 1951 Convention and of its provisions relating to Palestinians require that the words "at present receiving" in the first paragraph of Article 1D are understood to mean (i) "persons who were and/or are now receiving" protection or assistance, or (ii) who are eligible for such protection or assistance. Those Palestinians who are eligible are described at paragraph 8. By capturing both those actually receiving, as well as those eligible to receive the protection or assistance of UNRWA within Article 1D(1), the continuing refugee character of Palestinian refugees is acknowledged, as is their entitlement to protection.

13. In UNHCR's view, it would be incompatible with the object and purpose of Article 1D to remove from its scope those Palestinian refugees who have not accessed UNRWA protection or assistance, despite being eligible, but are nonetheless in need of 1951 Convention protection under the second paragraph in Article 1D.[27] Such a narrow interpretation of the first paragraph of Article 1D would actually result in the denial of protection for many Palestinian refugees, *whose refugee character is already established*, creating gaps in the protection regime.[28]

14. Moreover, similarly situated persons who were displaced as a result of the same conflict would be subject to different treatment depending on whether they availed themselves of assistance or not and depending on where they fled. Some would be examined under Article 1D while others would be examined under Article 1A(2). An interpretation which differentiates these similarly situated persons is "clearly unreasonable and in conflict with the intentions of the drafters."[29]

15. In the same vein, interpreting Article 1D in a way that would not cover those Palestinian refugees who are eligible for UNRWA's protection or assistance would lead to the duplication of mandates in respect of the same refugee population between UNHCR and UNRWA *inside* UNRWA's areas of operation. In UNHCR's view, this same interpretation also guides the interpretation of the provision *outside* UNRWA's areas of operation. Thus, the provision ought to be interpreted in a way that reflects the complementary mandates of the two agencies, both within and outside UNRWA's areas of operation.[30]

16. It would also be incorrect to read Article 1D as applying only to those persons who were Palestinian refugees in 1951.[31] This would run contrary to the intentions of the Convention's drafters,

---

[25] Guy Goodwin Gill and Susan M. Akram, 'Brief Amicus Curiae', *Palestine Yearbook of International Law*, 2000/2001, Vol. XI, 185, at p. 236. See also, *AD (Palestine)*, note 2 above, where the scope of Article 1D was found to encompass persons "who have not in fact availed themselves of protection and assistance which they are otherwise eligible to receive." Para. 160 and see paragraphs 150-153 for a discussion of the difficulties of the "actually availed" approach.
[26] See footnote 5.
[27] This interpretation is distinct from the position taken by the CJEU in *Bolbol*, (note 2 above), where only those who had "actually availed" themselves of that protection or assistance were considered to fall within the first paragraph of Article 1D, based on a "clear reading" of Article 1D (para. 51). For the purposes of how this should be approached and reconciled as a matter of European law, UNHCR notes that Article 3 of the Qualification Directive provides that Member States may introduce or retain more favourable standards for determining who qualifies as a refugee. Member States are thus recommended to adopt the more favourable interpretation put forward by UNHCR, which is more in line with the object and purpose of Article 1D.
[28] See UNHCR, *Note on UNHCR's Interpretation of Article 1D of the 1951 Convention relating to the Status of Refugees and Article 12(1)(a) of the EU Qualification Directive in the context of Palestinian refugees seeking international protection*, May 2013, http://www.refworld.org/docid/518cb8c84.html.
[29] Brenda Goddard, 'UNHCR and the International Protection of Palestinian Refugees', (2009) 28 *Refugee Survey Quarterly*, 475 at 493.
[30] *AD (Palestine)*, note 2 above, para. 159.
[31] The "historical" argument that Article 1D is limited only to those persons who were Palestinian refugees in 1951, accepted by the United Kingdom Court of Appeal in *El-Ali* note 6 above, was rejected by the CJEU in *Bolbol*, note 2 above, paras 47-48. See also the rejection by Advocate General Sharpston, paras 62, 65-68, in her Opinion in *Bolbol*, http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A62009CC0031.

who sought to ensure continuity of protection for the specific class of persons addressed in Article 1D until their position was definitively settled, a need which continues not only for those who were Palestinian refugees in 1951, but also persons who were displaced by the 1967 conflict as well as their descendants. Moreover, it disregards the critical change effected by the 1967 Protocol, which removed the temporal limitation on the 1951 Convention, with the aim, as expressed in the Preamble, of ensuring "equal status" for "all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951."[32]

## E. "Inclusion clause" of Article 1D: the protection or assistance has ceased for any reason

17. Palestinian refugees (see paragraph 8) benefit from 1951 Convention protection under Article 1D(2) when the protection or assistance of UNRWA has ceased. Read in light of its ordinary meaning, considered in context and with due regard to the object and purpose of the 1951 Convention,[33] the phrase "ceased for any reason" is not to be construed restrictively. As noted in jurisprudence, exclusion from the 1951 Convention of Palestinian refugees by way of Article 1D "was intended to be conditional and temporary, not absolute and permanent."[34]

18. The application of the second paragraph of Article 1D is not, however, unlimited.[35] Protection under the 1951 Convention does not extend to those applicants who, being outside an UNRWA area of operation, refuse to (re-)avail themselves of the protection or assistance of UNRWA for reasons of personal convenience.[36] That said, the reasons why one has left an UNRWA area of operation (for example, for work or study purposes, or for protection reasons) is not of itself determinative. What is pivotal is whether the protection or assistance of UNRWA has ceased owing to one or more of the "objective reasons" for leaving or preventing them from (re)availing themselves of UNRWA's protection or assistance as set out in paragraph 22 below (see also paragraph 26ff on *sur place* claims). If a person has no objective reasons for not (re)availing themselves of UNRWA's protection or assistance, then such protection or assistance cannot be regarded or construed as having ceased within the meaning of the second paragraph of Article 1D when a Palestinian refugee can safely enter the UNRWA area of operation.

19. The inclusion assessment needs to be carried out not only having regard to UNRWA's mandate and operations, but also to the circumstances of the individual and to relevant and up-to-date country of origin information (COI).[37]

### Objective reasons bringing the applicant within the second paragraph of Article 1D

20. While the drafters of the 1951 Convention envisaged primarily the application of the second paragraph in the event of the termination of UNRWA's mandate, the phrase "for any reason" is sufficiently broad to include circumstances other than the cessation of UNRWA's mandate. The *travaux préparatoires* of the 1951 Convention confirm this interpretation.[38] Importantly, where the drafters intended to limit the scope of provisions in other parts of the Convention, they did so explicitly and outlined the possible exceptions.[39]

---

[32] 1967 Protocol, preamble, third paragraph, note 1 above. See also, Goodwin-Gill and McAdam, note 5 above, p. 158, footnote 110.

[33] *Vienna Convention on the Law of Treaties*, article 31, note 7 above.

[34] *AD (Palestine)*, note 2 above, para. 99f.

[35] "Mere absence from such an area or a voluntary decision to leave it cannot be regarded as cessation of assistance.", *El Kott*, note 9 above, para. 59.

[36] See, *El Kott*, note 9 above, paras 49-51 and 59-63. See also by way of analogy regarding personal convenience, Statute of the Office of the United Nations High Commissioner for Refugees, paragraphs 6(ii)(e) and (f), note 13 above.

[37] "Country of Origin Information (COI) is information which is used in procedures that assess claims for refugee status or other forms of international protection. COI supports legal advisors and persons making decisions on international protection in their evaluation of: the human rights and security situation; the political situation and the legal framework; cultural aspects and societal attitudes; the humanitarian and economic situation; events and incidents; as well as the geography in claimants' countries of origin (or, in the case of stateless people, countries of former habitual residence) or countries of transit. To qualify as COI it is essential that the source of the information has no vested interest in the outcome of the individual claim for international protection." Austrian Centre for Country of Origin and Asylum Research and Documentation (ACCORD), *Researching Country of Origin Information: Training Manual*, October 2013, http://www.refworld.org/docid/5273a56b4.html.

[38] See for example the statement of the Egyptian delegate, Mr. Raafat, General Assembly, Fifth Session, Official Records, Third Committee, 344th Meeting, 11 December 1950, para. 13, UN doc. A/C.3/SR.344. See also the views of the French delegate, Mr. Rochefort, at the Conference of Plenipotentiaries, Summary of the Second Meeting, 20 July 1951, UN doc. A/CONF.2/SR.2, p. 27. Both documents are available through the UN Official Document System database at http://www.un.org/en/documents/index.html.

[39] For example, the drafters of the 1951 Convention set out, in a clearly limited fashion, the list of grounds on which refugee status may be considered to have ceased under Article 1C of the 1951 Convention. See, *El Kott*, note 9 above, para. 57.

IFR_AR_016051

21. Objective reasons,[40] which bring an applicant within the second paragraph of Article 1D, include:

### (i) Termination of the mandate of UNRWA[41]

a.  The termination of UNRWA's mandate would in principle require a resolution of the United Nations General Assembly. This element would consequently apply to the entire class of Palestinians, rather than particular individuals.

### (ii) Inability of UNRWA to fulfil its protection or assistance mandate

b.  The discontinuation of UNRWA's protection or assistance, which would apply to all Palestinians, would need to be determined to have occurred as a matter of fact, in an area of operations or on a country-wide basis. This might occur if, notwithstanding the continued existence of the agency, it were to become impossible for UNRWA to carry out its mission.[42] Evidence of this circumstance may be established, for example, by a resolution of the United Nations General Assembly, annual reports of UNRWA, statements by UNRWA that it has discontinued its activities, or other evidence brought forward by the applicant.[43]

c.  "Protection or assistance" are alternatives: an applicant is not required to establish that both the protection *and* the assistance of UNRWA have ceased. In relation to the discontinuation of assistance, however, the applicant would need to establish that the assistance pursuant to UNRWA's mandate has ceased.[44]

### (iii) Threat to the applicant's life, physical integrity, security or liberty or other serious protection-related reasons

d.  Palestinian refugees – as refugees already recognized by the international community via various UN General Assembly resolutions – are not required to establish individually that their treatment constitutes persecution within the meaning of Article 1A(2) of the 1951 Convention or that they meet the other requirements of the refugee definition in that paragraph, in order to benefit from Article 1D.[45] That said, a Palestinian refugee at risk of persecution in the sense of Article 1A(2) would clearly fall within the second paragraph of Article 1D.

e.  Beyond this, there is a range of threats that may compel a Palestinian to leave UNRWA's area of operation, with the result that UNRWA's protection and assistance would cease for him or her. In UNHCR's view, both group-based and individualised threats would qualify as circumstances beyond the applicant's control. Examples of group-based threats would include armed conflict or other situations of violence, such as civil unrest, widespread insecurity or events seriously disturbing public order.[46] Threats of a more individualised nature, which could also compel a Palestinian to leave an UNRWA area for reasons beyond his or her control, would include sexual or gender-based violence, torture, inhuman or

---

[40] In *El Kott*, the CJEU considered that "objective reasons" included "reasons beyond the person's control" (i.e. independent of their volition), note 9 above, para. 58. UNHCR considers that there is no significant difference between objective reasons and reasons beyond the person's control, except as noted in paragraphs 26-28 in relation to sur place claims, where the CJEU's judgment needs to be read with particular care as it did not apply to sur place claims.

[41] See note 2 and paragraph 7 above.

[42] *El Kott*, note 9 above, para. 56. The suspension of non-core services for a short period of time would not suffice.

[43] A comparison can be made with the UNCCP, which continues to exist but reports annually to the General Assembly that it is not able to carry out its mandate: see note 3 above.

[44] "Given the long-standing and continuing reality of funding deficits, should UNRWA continue to exist but in fact be unable to provide effective protection or assistance due to a lack of funding, there is no reason in principle why this should also not qualify as a cessation of activities under Article 1D, which expressly contemplates cessation 'for any reason' as activating the inclusion clause". *AD (Palestine)*, note 2 above, para. 172. See also, *El Kott*, note 9 above, paras 63, 65.

[45] See for example the Belgian Conseil du Contentieux des Étrangers, (Council of Alien Law Litigation) decision, which states that the recognition of the refugee status is not based on the existence of a real risk to personal safety, but is automatically granted based on Article 1D given that the person concerned is already a refugee and has demonstrated that he or she can no longer benefit from UNRWA assistance. *Arrêt No. 144 563*, Belgium: Conseil du Contentieux des Étrangers, 30 April 2015, http://www.refworld.org/cases/BEL_CCE,5963b1794.html.

[46] See, UNHCR, *Guidelines on International Protection No. 12: Claims for refugee status related to situations of armed conflict and violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees and the regional refugee definitions*, 2 December 2016, HCR/GIP/16/12, http://www.refworld.org/docid/583595ff4.html.

13

degrading treatment or punishment, human trafficking and exploitation, forced recruitment, severe discrimination,[47] or arbitrary arrest or detention.

f.   Where any of these above-mentioned threats emanate from the authorities, protection under Article 1D would be required. Similarly, where the authorities are unable or unwilling to provide protection against threats emanating from non-State actors, protection under Article 1D(2) would also apply. A case-by-case assessment is necessary to determine the application of Article 1D in these cases.[48]

**(iv) Practical, legal and/or safety barriers preventing an applicant from (re)availing him/herself of the protection or assistance of UNRWA**

g.   Practical barriers include obstacles which prevent access the UNRWA area of operation, for example, because of border closures.

h.   Legal barriers would include absence of documentation allowing the individual to travel to, or transit through, or (re)enter and reside in the relevant UNRWA area of operation. Where the authorities refuse (re)admission or the renewal of travel or other requisite documents, the second paragraph of Article 1D would be satisfied. An applicant would not, however, benefit from protection under the 1951 Convention pursuant to Article 1D(2) if he or she were to seek to frustrate his or her (re)admission and stay by refusing to co-operate, for example, in acquiring documents.[49]

i.   Barriers relating to safety or personal security which prevent (re)availment could include dangers *en route* such as minefields, factional fighting, shifting battle fronts or the threat of other forms of harassment, violence or exploitation, preventing the applicant from being able to return safely. Up-to-date information on the realistic prospect of being able to re-avail oneself of the protection or assistance is required. The feasibility of (re)availment cannot be assessed in the abstract.

j.   Although Article 1D focuses on the cessation of the protection or assistance of UNRWA, the situation in the State in whose jurisdiction UNRWA is operating not only be relevant, but may be determinative of the need for 1951 Convention protection. For example, the host State or authorities – not UNRWA – will control whether a Palestinian refugee will be permitted to (re)enter their territory and (re)establish him/herself there, including whether he or she is able to obtain the necessary legal documentation establishing a right to stay in the State or territory.[50] The risk facing the applicant may emanate, for example, from the authorities directly. These assessments are to be based on reliable and up-to-date information, and special care needs to be exercised where the situation is fluid or unclear.

k.   No State can safely assume that a Palestinian refugee will be able to access the protection or assistance of UNRWA in an area of operation where they have never resided, or other than that in which he or she was formerly residing. As such decision-makers should not assess the lawfulness of return in relation to an UNRWA area of operation to which the individual has no previous connection. That would impose unreasonable and insurmountable obstacles on applicants, and ignore the general workings of the State-based system of international relations and State sovereignty. Moreover, consistent with general principles of international refugee law, the assessment as to whether the protection or assistance of UNRWA has ceased for a person previously resident in an UNRWA area is to be made vis-à-vis the UNRWA area of operation where the applicant was

---

[47] This would often but not always include systematic or a pattern of consistent discrimination. See UNHCR, *Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees*, April 2001, http://www.refworld.org/docid/3b20a3914.html, at para. 17. It also includes measures of discrimination which "lead to consequences of a substantially prejudicial nature [... for example,] serious restrictions on the right to earn a livelihood, the right to practise religion, or access to normally available educational facilities." UNHCR, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, December 2011, HCR/1P/4/ENG/REV. 3, http://www.refworld.org/docid/4f33c8d92.html, ("UNHCR Handbook") para. 54.

[48] The provision of services by UNRWA is not relevant for this assessment. Non-state actors, including international organisations, do not have the attributes of a State, and are not in a position to provide protection and enforce the rule of law in the same fashion as a State.

[49] Article 2 of the 1951 Convention notes that every refugee has duties to the country in which he or she finds himself or herself, which require in particular that he or she conform to its laws and regulations as well as to measures taken for the maintenance of public order.

[50] For example, in relation to the West Bank, the position of the Israeli authorities will be determinative. Likewise, for passage across the border to Gaza from Egypt, permission from Egypt is likely to be required, noting that at some times, the border is closed.

UNHCR_016053

previously residing.[51] The assessment is not to be made against each of UNRWA's areas of operation but to a single UNRWA area of operation.[52]

22. The circumstances listed above are alternative, not conjunctive, such that depending on the case at hand, one or more of the aforementioned circumstances may be present, bringing the applicant within the scope of Article 1D(2).[53] The evidentiary aspects of establishing the existence of the above-mentioned circumstances are dealt with in Part III.

**Personal circumstances of applicant**

23. The personal circumstances of the applicant are relevant to the determination of whether one of the objective reasons exists to justify the application of the second paragraph of Article 1D. Thus, each claim must be determined on its individual merits, enabling consideration of factors that are specific to the applicant.[54] These personal circumstances may include age, sex, gender, sexual orientation and gender identity, health, disability, civil status, family situation and relationships, social or other vulnerabilities, ethnic, cultural or religious considerations, political and social links and compatibility, language abilities, and any past experiences of serious harm and its psychological effects.

**Internal relocation**

24. The protection or assistance of UNRWA will not be considered to have ceased if an individual is able to access and receive protection or assistance from UNRWA elsewhere in the same UNRWA area of operation. For example, if a camp is destroyed by an armed attack and the protection or assistance of UNRWA is as a matter of fact available elsewhere within another part of that country or territory, and the individual has access to that protection or assistance, then the second paragraph of Article 1D would not be satisfied without additional factors. However, it cannot be expected that the applicant relocate (or be returned) to a different country or territory where he or she has no previous connection.[55]

**13**

**Sur place protection needs**

25. A *sur place* claim arises after arrival in the country of asylum, either as a result of the applicant's activities in the country of asylum or as a consequence of events, which have occurred or are occurring in the applicant's country of origin since their departure.[56] The recognition of *sur place* claims of Palestinian refugees under Article 1D is in line with general principles of international refugee law applicable to Article 1 of the 1951 Convention that accept *sur place* refugee claims, recognizing that changes in the country of origin whilst abroad may make them a refugee.[57] For example, should the mandate or activities of UNRWA cease as described in paragraph 22 above while the individual is outside UNRWA's area of operation, she or he would qualify for 1951 Convention protection under Article 1D.

26. Although "ceased for any reason" does not generally include reasons of mere personal convenience for refusing to (re-)avail oneself of the protection or assistance of UNRWA, (as noted in paragraph 19 above),[58] it is not relevant whether the applicant departed in the first place on a

---

[51] See also, *El Kott*, note 9 above, para. 77: "... the person concerned ceases to be a refugee if he is able to return to the UNRWA area of operations in which he was formerly habitually resident because the circumstances which led to that person qualifying as a refugee no longer exist".
[52] This is supported by the language of the CJEU in *El Kott* which repeatedly uses the expression "area of operation" in the singular when referring to the scope of the assessment to be carried out. *El Kott*, note 9 above, paras 49, 50, 55, 58, 61, 62, 63, 64, 65.
[53] While the inclusionary aspects of Article 1D(2) will be established where an applicant has been forced to leave UNRWA's area of operation where his/her personal safety is at serious risk and if it is impossible for UNRWA to guarantee his/her living conditions in accordance with that organization's mission, the applicant is not required to establish both. In *El Kott*, (note 9 above), the CJEU accepted in the context of the facts before it, that such circumstances "will" fall within the second paragraph of Article 1D (para. 65). The CJEU did not however exhaust other circumstances in which such protection or assistance would be considered to have ceased, as this will depend on the case at hand. An interpretation that requires both would lead to perverse results. For example, if an applicant's personal safety is at serious risk, the assistance provided by UNRWA in the form of cash or food rations would be irrelevant to their need for protection.
[54] An exception would be in circumstances where UNRWA has ceased to operate as an agency (see paragraph 22(i) above).
[55] UNHCR, *Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees*, 23 July 2003, HCR/GIP/03/04, http://www.refworld.org/docid/3f2791a44.html.
[56] UNHCR Handbook, note 47 above, paras 94-96.
[57] *Ibid.*. There is no reason to apply a different approach to Palestinian applicants under Article 1D.
[58] This interpretation is closely aligned with State practice which has not generally accepted automatic entitlement to Article 1D by reason simply of being outside an UNRWA area of operation.

IFR_AR_016054

247

voluntary basis from an UNRWA area of operation (for example, for study or work purposes). They are still eligible to benefit from the 1951 Convention pursuant to Article 1D should they meet its criteria.[59] A careful examination of the circumstances in each case would be required.

27. A person may become a refugee *sur place* in a country in which she or he claims asylum, as a result of his or her own actions, such as associating with refugees already recognized, or expressing political views in his or her country of residence.[60] Politically active Palestinian refugees who may attract attention because of their beliefs or activities, and who may even do so at great personal risk to themselves or their families, cannot be required to cease such activities as a precondition for protection under Article 1D; that would undermine the object and purpose of the 1951 Convention overall.[61]

## F. Automatic or "ipso facto" entitlement to the benefits of the 1951 Convention

28. When it is established that UNRWA's protection or assistance has ceased for any of the reasons mentioned in paragraph 22, the Palestinian refugee is automatically or "*ipso facto*" entitled to the benefits of the 1951 Convention,[62] provided Articles 1C, 1E or 1F of the 1951 Convention do not apply [see Parts G, H, and I below].[63] The term "*ipso facto*" would be entirely redundant if the provision merely meant that a Palestinian refugee could apply for international protection in accordance with the general rules and in the same way as all asylum-seekers via Article 1A(2) of the 1951 Convention.[64]

29. The phrase "benefits of this Convention" in the second paragraph of Article 1D refers to the substantive rights contained in Articles 2 to 34 of the 1951 Convention and which are attached to being a refugee, as defined in Article 1 of the 1951 Convention. The term "benefits" cannot mean simply access to asylum procedures for determining refugee status as Article 1 does not itself contain any benefits – it simply defines who *is* and who *is not* entitled to have access to those benefits.[65] This interpretation is also supported by the equally authentic French version of Article 1D, which uses the expression "*bénéficieront de plein droit du régime de cette convention.*" They benefit by operation of law and "as of right" once they fulfil the criteria in Article 1D.[66]

30. Palestinian refugees protected under Article 1D are entitled to receive the same rights, benefits and standards of treatment as other refugees recognized under Articles 1A(1) or 1A(2), so there is no more favourable treatment provided to Article 1D refugees than other refugees. They each enjoy the benefits of the Refugee Convention set out in Articles 2 to 34.[67]

---

[59] *El Kott*, note 9 above, para. 59.

[60] UNHCR Handbook, note 47 above, para. 96.

[61] By analogy with the general position that one cannot be required to conceal or be discreet about a protected characteristic, see *X, Y, Z v Minister voor Immigratie en Asiel* , C-199/12 - C-201/12, European Union: Court of Justice of the European Union, 7 November 2013, http://www.refworld.org/docid/527b94b14.html; UNHCR *Observations in X, Y and Z*, 28 September 2012, http://www.refworld.org/docid/5065c0bd2.html; *Bundesrepublik Deutschland v Y and Z*, Judgment of the Court (Grand Chamber) of 5 September 2012 http://www.refworld.org/pdfid/505ace862.pdf; RT (Zimbabwe) and others v Secretary of State for the Home Department, [2012] UKSC 38, United Kingdom: Supreme Court, 25 July 2012, http://www.refworld.org/docid/500fdacb2.html.

[62] See UNHCR, *Written Intervention before the Court of Justice of the European Union in the case of El Kott*, 27 October 2011, para 4.3, C-364/11, http://www.refworld.org/docid/4eaa95d92.html and UNHCR, *Oral intervention before the Court of Justice of the European Union in the case of El Kott and Others v. Hungary*, 15 May 2012, C-364/11, http://www.refworld.org/docid/4fbd1e112.html, paras 10, 12-14. ("*UNHCR Oral intervention in El Kott*"). UNHCR's views were accepted by the Court in *El Kott*, note 9 above, paras 80-81.

[63] "There can be no doubt that the category of refugees considered in the present Paragraph is subject to the exclusion clauses contained in Article E and F, as well as to the cessation clauses enumerated in Article 1C of the Refugee Convention." Grahl-Madsen, note 5 above, 142.

[64] *UNHCR Oral intervention in El Kott*, note 63 above, para. 13. Although a common interpretation of this provision is that it only entitles the person to be considered under Article 1A(2) and that they must still meet the well-founded fear standard, "this is not the correct interpretation of Art. 1D as read in light of its history and protection purpose. The plain meaning of the term '*ipso facto*' holds that no other criteria need to be used for assessing the situation – they are by the fact of that precondition alone *de jure* refugees under the 1951 Convention and should thereby be entitled to refugee status in any State party to the 1951 Convention." Mutaz M. Qafisheh and Valentina Azarov, 'Article 1D', in A. Zimmermann (ed.), *The 1951 Convention relating to the Status of Refugees and its 1967 Protocol: A Commentary*, (Oxford University Press, 2011), 537-569, at 567.

[65] *Ibid.. UNHCR Oral intervention in El Kott*. This view is supported by the use of the term "benefits" elsewhere in the Refugee Convention, for example in Articles 5 and 7, in a context that can only mean the substantive rights conferred by the Refugee Convention. Nor can the term benefits merely refer to *non-refoulement*.

[66] *El Kott*, note 9 above, paras 70-71. See also, *AD (Palestine)*, note 2 above, para. 192.

[67] See, *UNHCR Oral intervention in El Kott*, para. 16, note 70 above. The discrimination argument was roundly rejected by the CJEU in *El Kott*, note 9 above, para 78.

IFR_AR_016055

## G. Applicability of Article 1C

31. The 1951 Convention will cease to apply under certain conditions, clearly defined in Article 1C.[68] Article 1C applies in principle to Palestinian refugees benefiting from the 1951 Convention on an individual basis. Although a literal interpretation of Article 1C, which explicitly references only refugees recognised under "Article 1A" of the 1951 Convention, would render it inapplicable to Article 1D Palestinian refugees, such an interpretation no longer corresponds to the reality that a number of Palestinian refugees have acquired the nationality and protection of other countries,[69] such that they no longer need the protection of the 1951 Convention. Notwithstanding the special situation of Palestinian refugees provided for by Article 1D, the provisions of Article 1C may be applied, account being taken of the considerable passage of time, changing circumstances, the practice of States, and the fact that many Palestinians have established themselves in other States, often acquiring a new nationality. This interpretation of the 1951 Convention is necessarily without prejudice to the meaning of 'the Palestinian people', as well as to the meaning of the terms 'refugees' and 'displaced persons' as used in various UN General Assembly and UN Security Council Resolutions.

32. Despite the decision by the UN General Assembly in 2012[70] to accord non-member observer State status in the United Nations to Palestine, Article 1D should continue to be interpreted and applied as outlined in these Guidelines and until the situation of Palestinians is definitively settled in accordance with General Assembly resolutions. It is premature to consider that the protection of the 1951 Convention should cease to apply to Palestinian refugees, merely by reason of Palestine having been accorded non-member observer status.

## H. Applicability of Article 1E

33. The fact that some Palestinian refugees have been living in countries where they exercise rights and obligations ordinarily attached to the possession of nationality may render Article 1E[71] applicable to their case. In the case of children and other descendants of Palestinian refugees who may be enjoying rights and obligations identical to those of nationals of another country, consideration of the application of Article 1E of the 1951 Convention would also be required.[72]

34. Historically, States party to the League of Arab States *Protocol for the Treatment of Palestinians in Arab States ("Casablanca Protocol")*[73] have pledged to provide a range of rights on par with their own citizens to Palestinian refugees, but many remain unimplemented in practice. Close scrutiny of the situation on the ground prior to applying Article 1E on the basis of the *Casablanca Protocol* would be required.

---

[68] UNHCR, "The Cessation Clauses: Guidelines on their Application", 26 April 1999, http://www.refworld.org/docid/3c06138c4.html and UNHCR, *Guidelines on International Protection No. 3: Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses)*, 10 February 2003, HCR/GIP/03/03, http://www.refworld.org/docid/3e50de6b4.html.

[69] "A great number of Palestinian refugee residing in Jordan have acquired Jordanian citizenship in accordance with the relevant provisions of the Nationality Law of 4 February 1954. Citizenship has also been obtained by a number of Palestinian refugees residing in Iraq, Kuwait, Lebanon, Saudi Arabia and other countries in the region. As a result of the acquisition of a new nationality such persons are no longer to be considered as refugees for the purpose of the 1951 Convention" [depending on whether the relevant criteria set out in Article 1C paragraph 3 are met]. Takkenberg, note 5 above, 127 (footnotes omitted).

[70] UN General Assembly Resolution 67/19, *Status of Palestine in the United Nations*, 29 November 2012, http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/67/19.

[71] "The Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country." Article 1E, 1951 Convention, note 1 above.

[72] See UNHCR, *Note on the Interpretation of Article 1E of the 1951 Convention relating to the Status of Refugees*, March 2009, http://www.refworld.org/pdfid/49c3a3d12.pdf.

[73] League of Arab States, *Protocol for the Treatment of Palestinians in Arab States ("Casablanca Protocol")*, 11 September 1965, http://www.refworld.org/docid/460a2b252.html. The Casablanca Protocol provides for the right of employment on par with citizen residents, the right to leave and to return. However, it has not been consistently implemented and was weakened in 1991 with resolution 5093 that allows States to implement the Protocol "in accordance with the rules and laws in force in each state". See also, Goddard, note 29 above, 507.

I. Applicability of Article 1F

35. Persons with respect to whom there are serious reasons for considering that they have committed acts within the scope of Article 1F of the 1951 Convention[74] are not entitled to international protection as refugees.[75]

## III. PROCEDURAL AND EVIDENTIARY ISSUES

### A. Individual assessment

36. Although Article 1D recognizes a specific class of refugees receiving the protection or assistance of a United Nations entity other than UNHCR, the application of Article 1D will normally be assessed on an individual basis.[76]

### B. Time of assessment

37. The assessment is whether, at the time the individual claim is considered, the protection or assistance of UNRWA has ceased such that the applicant is unable or unwilling to (re)avail him/herself of that protection or assistance for an objective reason beyond his/her control.

### C. Burden and standard of proof

38. In applications for refugee status or protection, including those under Article 1D, the burden generally rests on the applicant to produce evidence as far as possible to support his or her statements and to substantiate the claim. The applicant is required to give a truthful account of facts relevant to his or her claim so far as these are within his or her own knowledge, and insofar as there is information that is available to him or her and which s/he can reasonably be expected to provide to the decision-maker. A decision-maker shares the duty of ascertaining the facts relevant to the determination.[77]

39. Article 1D requires an examination of whether (i) the applicant falls within the category of Palestinian refugees who is receiving or eligible to receive the protection or assistance of UNRWA and (ii) the protection or assistance of UNRWA has ceased for any reason. These are questions of fact. The decision-maker has a duty to inquire into the matter and to take into account all of the available evidence.

40. The assessment must consider whether, at the time the individual's claim is considered, he or she is unable to or unwilling to (re)avail himself or herself of the protection or assistance of UNRWA for a reason beyond his or her control. Inquiries also need to be made in relation to the circumstances in the State or authority, as well as the applicant's individual circumstances (see paragraphs 22(j) and 25).[78] The burden of proof lies on the decision-making authorities where it is asserted by them that the applicant could relocate internally within the same UNRWA area of

---

[74] Article 1F states that the provisions of the 1951 Convention "shall not apply to any person with respect to whom there are serious reasons for considering that: a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes; b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee; c) he has been guilty of acts contrary to the purposes and principles of the United Nations."

[75] UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 September 2003, HCR/GIP/03/05, http://www.refworld.org/docid/3f5857684.html. See also, *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 September 2003, http://www.refworld.org/docid/3f5857d24.html.

[76] A group-based approach, such as the prima facie recognition of refugee status, may be appropriate in certain circumstances: see UNHCR, *Guidelines on International Protection No. 11: Prima Facie Recognition of Refugee Status*, ("*Prima Facie Guidelines*"), 24 June 2015, HCR/GIP/15/11, http://www.refworld.org/docid/555c335a4.html.

[77] UNHCR Handbook, note 47 above, paras 196-205; UNHCR, *Note on the Burden and Standard of Proof in Refugee Claims*, 16 December 1998, http://www.refworld.org/docid/3ae6b3338.html.

[78] The ability of Palestinian refugees to move from one area of operation to another is contingent upon the recognition or granting of that status by the host government of the receiving area, and the individual circumstances of the Palestinian refugee. This is also the case for a person who was never resident in an UNRWA area of operation.

operation, or absent other factors, be able to enter safely and with appropriate legal documen-
tation per paragraph 22(iv) above.

## UNRWA registration

41. Being registered by UNRWA or possessing UNRWA documentation would serve as conclusive,
albeit not necessary, proof of falling within the scope of Article 1D(1).[79] In the absence of such doc-
umentation or other relevant proof, adjudicators may rely on other evidence to this effect, includ-
ing through, for example, the applicant's own statements, the affidavits of others or the production
of other relevant documentation.[80] Evidence of registration with UNRWA should not, however,
be considered as a necessary precondition to recognition.[81] "Displaced persons" for example, are
not "registered" in UNRWA's registration system, however, UNRWA keeps "due records" of such
persons.[82] Lastly, by definition, a person who, despite being eligible to receive UNRWA protection
and assistance, has not received such, may not be registered nor have such proof. They may nev-
ertheless still fall within Article 1D.

## Evidence of objective reasons bringing the applicant within the second paragraph of Article 1D

42. The evidence in relation to the inclusionary part of the assessment may come from a variety
of sources. The applicant may provide evidence that is relevant in his or her own statements. A
statement by UNRWA that it has discontinued activities in a given area of operation would be clear
evidence that it had done so. Evidence from other sources that UNRWA had discontinued its activ-
ities could also be persuasive. It is important however that the applicant is not required to produce
or point to any such possible statement.[83] If such a requirement were to be imposed, it would place
an undue burden on UNRWA, one which it may not be able to satisfy in every case, owing to, for
example, resources or logistical reasons or those of confidentiality.[84] Finally, the applicant should
not be required to approach UNRWA directly, given the practical difficulties involved.[85] There may
also be circumstances relevant to the particular applicant about which UNRWA would not know
and could not provide relevant information.

## D. Individual Procedures

43. Fair and efficient procedures for the determination of refugee status under the 1951 Conven-
tion need to take particular account of claims relating to Article 1D, with clear identification of the
issues relevant to Palestinians.

44. When requesting asylum, applicants must be given adequate time to exercise their rights, in-
cluding, inter alia, the right to be informed, in a language which they understand, of the procedure
to be followed, of their rights and obligations during the procedure, the possible consequences of
not complying with their obligations and not cooperating with the authorities, the right to receive
the services of an interpreter, to consult in an effective manner a legal adviser or other counsellor.
Access to legal advice is paramount to a fair asylum procedure and often constitutes a prerequisite
to ensure effective access to legal remedies.[86]

---

[79] UNRWA, *CERI*, 2009, Section III.A.1, page 3, note 21 above. The CJEU found that "[w]hile registration with UNRWA is sufficient proof of actually
receiving assistance from it, it has been explained in paragraph 45 above that such assistance can be provided even in the absence of such registra-
tion, in which case the beneficiary must be permitted to adduce evidence of that assistance by other means." *Bolbol*, note 2 above, paras 46 and 52.
[80] Special consideration would need to be given to descendants of Palestinian refugee women married to persons other than Palestine refugees
registered with UNRWA, since they are not under UNRWA's CERI, registered as Palestine refugees but may be otherwise recorded for the purpose
of receiving services. See, note 21 above.
[81] "Registration with UNRWA is of a declaratory nature, confirming rather than establishing that an individual falls under UNRWA's mandate."
Takkenberg, note 5 above, 100.
[82] UNRWA, *CERI*, 2009, Section III.B - "Persons eligible to receive services without being registered in UNRWA's registration system" at page 6,
note 21 above.
[83] Whether protection or assistance has ceased is a matter of fact susceptible of proof in the normal way.
[84] Here an analogy can be made with UNHCR's position regarding information relating to mandate recognition, see submission in *I. A. v. Secretary of
State for the Home Department: Case for the Intervener*, 27 October 2013, United Kingdom Supreme Court, UKSC2012/0157, http://www.refworld.
org/docid/52a098e34.html.
[85] Although verification that a person is a registered "Palestine refugee", or is recorded as receiving UNRWA services, can be sought from UNRWA.
[86] UNHCR, *Public statement in relation to Brahim Samba Diouf v. Ministre du Travail, de l'Emploi et de l'Immigration pending before the Court of Justice of
the European Union*, 21 May 2010, http://www.refworld.org/docid/4bf67fa12.html, paras 12-16.

45. For Palestinians who do not come within the personal scope of Article 1D, an assessment under Article 1A(2) would then normally proceed.

46. Even though protection pursuant to Article 1D is normally carried out in individual procedures, there may be situations in which a group of Palestinian refugees may be recognised on a prima facie basis. For example, where the mandate of UNRWA is terminated in one of UNRWA's areas of operation, or comes to an end for reasons beyond its control, such as an international or non-international armed conflict, they would be considered – as a group – not to be receiving the protection or assistance of UNRWA.[87]

47. Where an applicant raises both a refugee and a statelessness claim, the latter made pursuant to the 1954 *Convention relating to the Status of Stateless Persons*, it is important that each claim is assessed and that both types of status are explicitly recognized.[88]

48. Best State practice ensures that Palestinian refugees recognised under Article 1D are properly recorded and separately registered in national asylum statistics.

## E. Regional refugee instruments

49. Palestinian refugees are, like all other asylum applicants, entitled to apply for refugee status pursuant to any applicable regional refugee instruments, should they be in countries in which these apply.[89]

## F. Refugee status and subsidiary or complementary protection

50. Palestinians found not to fall within the scope of Article 1D could have their claims for protection considered under Article 1A(2). Should they not fall within either provision, they are entitled, like all other asylum applicants, for any national or regional forms of subsidiary or complementary protection; and also to benefit from protection under international human rights law.

---

[87] UNHCR, *Prima Facie Guidelines*, note 82 above.
[88] UNHCR, *Handbook on Protection of Stateless Persons*, 30 June 2014, http://www.refworld.org/docid/53b676aa4.html, para. 78.
[89] See, Organization of African Unity, *Convention Governing the Specific Aspects of Refugee Problems in Africa*, 10 September 1969, 1001 UNTS 45, http://www.refworld.org/docid/3ae6b3618.html; *Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama*, 22 November 1984, http://www.refworld.org/docid/3ae6b36ec.html.

EPA-AR-016059

# INDEX

*The numbers refer to the paragraphs and the letters refer to the Handbook (H) and numbered Guidelines on International Protection (G1 to G13) respectively.*

abandoned, *see* children
abduction, G1:17-18, G7:8-9, 15, G8:22, 26
 child, G8:22
abortion, G1:13
abuse, G1:16, G8:13, 57, 64
 by husbands, G2:20
 child, G8:3, 12, 14, 68
 gender-related, G1:18
 of power, G1:17, G7:8-9
 protection from, G8:15
 reasons for, G1:36
 sexual, G8:26
 sexual orientation-related, G9:1-2, 20, 22
accelerated procedures
 exclusion, G5:31
 internal flight/relocation alternative, G4:36
acquired rights, G3:22
admission
 to territory, H:148, 153, G5:5, 16
 of aliens, H:191
 to refugee status determination procedures, H:194
adoption, H:182, G7:20, G8:25
adultery, disproportionate punishment for, G6:22
Africa
 OAU, *see* Organization of African Unity
 relocation, G4:30
age, G6:28, G8:7
assessment, G8:7, 75, G10:72
 criminal responsibility, *see* criminal responsibility
 factors, G1:36, G4:25, G6:28, G8:2, 8, 12, 15, 30, 33, 64, 71, 76 ,G9:3, G12:12, G10:58
 membership of a particular social group, G8:49-52
 persecution, G8:10, 15, 18, 30
 refugee definition, G8:4
 relocation, G8:54, 55
age-sensitive
 assistance, G7:47
 counselling and tracing, G7:49
 refugee status determination, G8:1, G8:7
agents of persecution, H:65, G1:19- 20, G7:21, G9:34-37, G10:42-45, G12:28-30
 non-State actors, G1:21, G2:20-23, G4:7, 15-17, 38, G7:21, 30, G8:37, G9:35-36, G10:43, G12:30
 State actors, G4:7, 13-14, G7:21, 24, G8:21, G9:34, G12:28
Americas, H: 20-21
amnesty, H:157, G3:16, G5:23, G10:46
armed conflict, H:164-165, G3:11, G4:27, G5:12-13, G7:3, 31, 34, G8:3, G10:61, G11:22, *see* G12, G13:21, 46
 and violence, *see* G12
 child participation in, G8:19-23, 52, 59, G10:12, 37-41, 70-72
armed forces, H:175, G8:12, 19-21, 23, 41, 59, 64, G12:28-29, 54-55
 recruitment by, G8:41G10:5-7, G12:13 *see also* children
armed group, G12:5, 36
Article 1A, *see* refugee definition

IFR_AR_016060

Article 1C, *see* cessation
Article 1D, H:140-141, G5:4, G11:5, G13
Article 1E, *see* exclusion
Article 1F, *see* exclusion
Asia, G4:30
assessment, H:40-41, 83, G1:7-8, 32, G3:8-9, 16, 25, G4:4, 6-8, 15, 20, 25-26, 28, 37, G5:2, 17, 31,
     G6:18, G7:16, G8:7-8, 11, 14, 37-38, 53, 57, 64, G9:13, 18-19, 21, G10:26, G11:5-6, 15, 87,
     G13:36
     age, *see* age assessment
     availability of redress G10:32
     Cartagena Declaration, under, G12:68, 77, 81
     credibility, G9: 62-63, G10: 67
     individual, need for in context of *prima facie* recognition, G11:6, 20, 35
     internal flight or relocation alternatives, G12:41
     OAU Convention, under, G12:49, 51
     *prima facie* recognition, G11:5, 29
     psychological, G4:26, G8:7-8
     risk, G12: 24-25
asylum, H:110, 159, 194,
     authorities, G8:3, 74 , G11:29
     civilian and humanitarian (character), G10:2, G11:22, G12:4, 61
     country of, H:184, G3:22, 25, G7:34-35, G7:28, G11:19, 25, 29, 30, 38
     diplomatic and territorial, H:21
     granting of, H:20, 24-25, 160-161
     institution of, G5:2, G12:46
     interviews, G1:36
     integrity of, G8:58
     persons entitled to, H:20
     procedure(s), G3:24, G5:19, G7:45, G8:63, 65, 66, 69-71, G9:61, G11:38
     right to, G4:32, G9:7
     seeking as a last resort, G4:4
     *sur place*, *see* sur place
asylum-seeker,
     additional burden, G4:33
     cessation of *prima facie* recognition, G11:38
     children, G8:2, 4, 6-9
     female, G1:3, G1:36
     personality, G1:7
     procedural fairness, G4:35, G5:36
     stateless, G11:1, 41
     victims of trafficking, *see* trafficking

belief, G6:6-7, 9, 16, 21, 29-30, 35, G9:41, 63, G10:8, 50, 58, 64-69, G12:37-38
     freedom of, G6:11, 15, G10:18
     *see also* religion
benefit of the doubt, H:196, 203-205, 219, G5:34, G8:73, G12:93
best interests of the child, G6:15, G8:5, 10, 53
burden of proof, H:196, 210, G3:25, G4:33-34, G5:34, G8:73, G9:55, G10:71, G12:93, G13:38-40

cancellation of refugee status, H:117, 141, G3:1, 4, G5:6, G11:21, 35
Caracas, H:21
Cartagena Declaration on Refugees (1984), G11:16, G12:3, 6, 61-85
caste, G7:34, G8:12
causal link
     Convention grounds, G10:48, G12:7, 10, 23, 32-33, 91
          gender-related persecution, G1:20-21, G9:38-39
          non-State actors, G2:20-23

IFR_AR_016061

        political opinion, H:81
        trafficking, G7:29-33
    crime, H:152
cessation, G3, H:30 , G11:7, G12:4, G13:31
        ceased circumstances, H:113, 115, 135, 138, G3, G3:1-2, 7-10, 18, G11:28
        clauses, H:31, 33, 111-116, 118-119, 125, 129, 133, 137-138, 143, 187, G3:1, 4, 8
        compelling reasons, H:113, 135, 137, G3:2, 20-21, 24, G7:16
        declaration of, G3:3, 17, 25
        exceptions, H:88, 136, G3:19-22, 24, G3:25
        fundamental changes/changed conditions, H:135-136, 141, G3:1, 10, 12-13, 15, 18
        general considerations, G3:6-7
        of refugee status, G3
        of UNRWA protection/assistance/mandate, G13:10, 20, 21
        individual, G3:18
        interpretation of, G3:18
        mass influx, G3:23-24
        new nationality, H:113, 129-132
        procedural issues, G3:25
        re-availment, H:118
        re-establishment, H:114, 133, 134, G3:1
        voluntary, H:113-134, G3:7
Charter of the International Military Tribunal (1945), H:150, G5:10-11
children, G8
        abandoned, G8:12, 36, 49-50, 52
        asylum-seekers, G8:2, 4, 6-9
        best interests, *see* best interests of the child
        child-sensitive, G8:1, 4-5, 7, 13, 27, 75
        claims by, G10:70-72
        convention grounds, G8:40-42, 45, 47-48
        country of origin regarding, G12:92
        criminal responsibility, *see* criminal responsibility
        discrimination, *see* discrimination
        exclusion clauses, G5:28, G8:58-64, *see also* exclusion
        family unity, H:182, 185, 213
        fear of persecution, H:213, 215, 218, G8:10-11, 21, 23, 28, 40
                child-related manifestations of persecution, G8:15-17
                child-specific forms of persecution, G8:3-4, 8, 13, 18-36
                sexual orientation and/or gender identity, G9:13
        female genital mutilation, G6:24, G8:31, 44, 54
        girl-child, G1:8, 31, 41, 44
        guidelines, national, G8:65
        identity, G8:12, 49
        intersex, G9:10
        labour, G8: 29-30
        of LGBTI parents, G9:10, 24,
        of Palestinian refugees, G13:33
        particular social group, *see* membership of a particular social group
        pornography, G7:20, G8:18, 29
        pregnant, G8:12
        recruitment, G10:12, 37-41
        religion, *see* religion
        relocation, G8:53-57
        rights, G7:20, G8:5, 13-14, 26, 34-36, 70, 77
        stateless, G8:18, 35
        street, G8:12, 52
        surviving, H:33
        trafficked, G7:2-3, 8, 11, 19-20, 32, 34, 38, 47, 49, G8:24-29, 41-51, 76

IFR_AR_016062

unaccompanied, *see* unaccompanied children
under-age recruitment, G8:4, 13, 18-23, 41, 44, 52, G10:12, 37-41, 55, 59, G12:13
violence against, G1:27, G8:3, 4, 12-14, 17-18, 23, 30, 32-33, 36, 52
    right to protection from, G8:26, 31-32
will of the child, H:219
with disabilities, G8:12, 35, 50, 71
without parental care, G8:12
citizenship, H:74, 87, 144, G1:27, G7:36, 41-42, 44
civil and political rights, G1:36, G4:28, G6:2, G8:14
civilian population, G5:13, 30, G7:31, G11:22, G12:5, 14, 26, 40, 43, 71
civil law, G2:8
coercion, G7:8-9, G8:64, 70, G9:21, G10:8, 35
Committee on the Rights of the Child, G7:20, 49, G8:4-5, 20, 34, 60
common law offence, *see* crimes(s)
compliance, G6:21-22
    non-compliance G1:12, G6:16, 21
concealment, G9:18, 30-33, 54
Conference of Plenipotentiaries, H:5, 25-26
confidentiality, G1:35-6, G5:33, G7:42, 46, G7:49, G8:70, G9:60,
conscientious objection, H:170-174, G6:25-26, G10:3-4, 8-11, 21, 39, 49-50, 64, *see also* religious
    persecution
conscription, G8:49, G10:3-4, 7, 17, 19, 63, 72
Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
    (1984), G1:5, G4:20, G5:9
Convention against Transnational Organized Crime (2000), G7:2, 4, 7, 25
Convention grounds, H: 66-67, G10:47-59, 66, 67, G12:10, 23, 26, 32-39
    contributing factor, G1:20, G7:29, G8:40, *see also* causal link
    cumulative, H:53, G1:14, 23, G7:33
    mutual, G2:4
    sexual orientation, G9:40-41
    *see* race; religion; nationality; membership of a particular group; political opinion
    *see also* children; gender-related persecution
Convention on Action against Trafficking in Human Beings (2005), G7:10
Convention on the Elimination of All Forms of Discrimination Against Women (1979), G1:5
Convention on the Political Rights of Women (1953), G1:5
Convention on the Prevention and Punishment of the Crime of Genocide (1948), G5:10
Convention on the Reduction of Statelessness (1961), G7:6, 41, 43
Convention on the Rights of the Child (1989), G1:5, G7:11, 20, G8:5-8, 12-13, 19-20, 22, 26, 32, 34,
    41, 52, 60, G10:12
Convention Relating to the Status of Stateless Persons (1951), G7:6, 41, G13:47
conversion, *see* religious persecution
counselling
    age-sensitive, G7:49
    legal, G7:45
    of refugees, G3:25
    psycho-social, G1:36, G7:46
country of origin, H:153, 164, 166, G1:8, G4:5-7, 38, G6:34, G7:25-26, G11:25, G12:10, 21, 47-51,
    81-82, G13:25
    assessment of, G3:8, 25, G4:7, G11:41, G12:24-25, G13:19
    authorities of, H:50, 83, 96, G6:35, G7:17, 21-22, 32
    circumstances / conditions / situation in, H:37, 42, 53, 63, 95, 112, 136, 218, G1:7, G3:1, 6,
        8, 17-18, 23-24, G4:37, G6:14-15, G7:27, G8:4, 11, G11:1, 5, 13, 17, 29, 31, 36-37, 41,
        G12:6, 31, 44, 81-82
    contact with, H:121, G5:33
    definition, G3:1
    information, G1:36, 37, G4:37, G6:35, G8:11, 74 , G9:64, 66, G10:13, 39, 63, G12:90-92
    laws, H:43

IFR_AR_016063

LGBTI persons in, G9:25, 28, 30, 32, 36-37, 57, 63,
nationality of, H:87
protection of, H:123, G3:18, 20
return to/re-establishment in, H:133, G3:1, 7, 12, 20, G6:36, G7:5, 16, 50, G8:56, G10:41,
G12:27
"safe country of origin", G9:59
unlawful departure or unauthorized stay outside, H:61
country of refuge/asylum, H:12, 133, 146, 150, 153-154, 158, 184, G5:3, 5, 16, G7:28, G9:57,
G11:19, 25, 29, G13:25
courts, H:192, G2:6, G3:16, G12:15, 23, 77
credibility, H:41-42, 93, 195, 204-205, G1:36, G6:28-33, 34, G8:73, 75, G9:11, 62-63, G10:17, 62,
64, 67, 69, G11:35
crime(s), H:153, 156, 158, G5:5, 21, G7:7, G10:40, G12:19
against humanity, H:146, 149-150, 162, 178, G5:3, 10, 13, 24, G7:3, G10:22, 27, 29, G12:14-15
against peace, H:146, 149-150, 162, 178, G5:3, 10-11, 18, 24, G10:22
by children/minors, G8:59, 62, 64
common, H:56-58, 151-152, 154, G1:12, G5:2, G8:58
expiation of, G5:23
hijacking, H:158-159
honour, G1:36, G6:24, G8:33, 44
motivation, G5:15
nature of, H:156-158,
non-political, H:150, 155, 157, 159, 179, G5:3, 14-16
organized, G7:31
of aggression: G10:22
political, H:151-152, *see also* political opinion
serious, H:154-155, G5:2, 4, 17, 27, 31
terrorist/terrorism, G5:15, 17, 25-26
war, *see* war crimes
criminal responsibility, G5:21
age of, G5:21, 28, G8:60-61
defence/self-defence, G5:22, G8:22
individual, G5:18, 23, G8:62, 64, G10:23
cumulative
Convention grounds, *see* Convention grounds
discrimination, *see* discrimination
effect, H:201, G4:25
element, H:55
persecution: G9: 16-17, 24, G10: 15, G12: 11, 18-19

debt bondage, G8:29
deception, G1:17, G7:8-9
Declaration on Territorial Asylum (1967), H:25
Declaration on the Elimination of All Forms of Intolerance and Discrimination based on Religion or
Belief (1981), G6:2, 12
Declaration on the Elimination of Violence against Women (1993), G1:5, G8:32
Declaration on the Rights of Persons belonging to National or Ethnic, Religious and Linguistic Minor-
ities (1992), G6:2
deportation, H:145, G8:56, G12: 14
derivative status, G8:9, 66
deserter/desertion, H:167-169, 171, G6:25, G10:1, 3-4, 31, 46, 69
as expression of political opinion, G10:51-54
as "particular social group", G10: 58
punishment for, H:167, 169, 171, G6:26, G10:5, 14-15, 18, 38
detention, G8: 17, G9:2, 22, G10:50, G12:13, G13:21
diplomatic, H:12
asylum, H:21, 88

IFR_AR_016064

protection, H:3, 146, G7:43
        relations, H:166
disability/disabilities, G4:25, G13:23
        children with, G8:12, 35, 50, 71
        mental, G8:64
discretion, *see* concealment
discrimination
        children, G7:19, G8:3, 5, 10, 12, 14, 18, 27, 34, 36, G10:42
        cumulative, G1:16, G3:20, G4:35, G12:11
        forms of / measures, H:53-55, 72, G1:14-15, G6:12, G8:36
                political opinion, H:83, G1:32
                racial, H:68-69
                religious, H:72, G6:12, 17, 19, 26
                sexual orientation, G1:3, 16-17
        gender, G1:3, 15, G12:26
        minorities, G3:11
        military service, G10:11, 15, 32, 50, 55, 58
        non-discrimination, H:64, G8:34, G9:5, G10: 14, G12:46
        persecution, as, H:54-55, G1:14-15, 31-32, G2:20, G6:17, G8:10, 36, G9:17, 20, G10:15, G12:11
        sexual orientation, G9:2-3, 6, 10, 17, 20, 22, 25, 30, 37, 59
        trafficking victims, G1:18, G7:18, 19, G8:27
        women, G7:19
discriminatory
        acts/practices, H:65, G1:16, 17, 19, G2:20, G8:36
        application, H:59, G6:15, 16
        laws, G6:18, 24, G8:17, G9:26, 29
        measures, H:55, 63, G6:22, G8:14
        results, G6:19
        treatment, G6:24, G9:25, 33
divorce, H:120, 187, G8:17, G9:63
DNA testing, G8:76, G10:72
domestic abuse, G2:22
domestic violence, G1:3, 9, 15
        children, G8:18, 32, 33, 52, 54
        LGBTI individuals, G9:35
dowry-related violence, G1:9
draft-evader/evasion, *see* deserter/desertion
drugs, G8:64
drug trade, G8:29, G10:53
due process, G5:36
durable solutions, G3:6, G6: 36, G12:46, 61

economic migrants, H:62-64
economic motivation, G7:31, 34
economic, social and cultural rights, children, G8:14, 34, 36
economic survival, G4:24, G9:56
education, G8:30
        access to, G8:35-36
        girls, G8:36
        lack of, G8:72
        level of, G1:36, G6:32, G8:12, 45, 64
        religious, G6:21, 30
        right to, G8:14, 34, 41, G9:2, 24
educational
        background, G4:25, G6:28
        facilities, H:54, G1:14, G6:17, G8:57
        opportunities, G7:45, G8:14

IFR_AR_016065

elections, G3:13, 16
eligibility, certificate of, H:33
element
    armed, G5:30, G11:22
    common, G2:15, G9:17
    Cartagena refugee definition, G12:68, 76, 81
    core, G8:34, 35
    cumulative, H:53, 55
    fear, G9: 28, G11: 15, G12:21, 34
    harm, G9:13
    material, G5:21, G10: 62
    mental, G5:21
    OAU Convention, G12:49-50, 56
    objective, H:38, 42, 205, 206, 211, G8:11
    of refugee definition, H:37, G1:8, G7:6, 16, 25, G10:35
    political, H:64, 152
    risk, G12:23
    subjective, H:37, 38, 40, 41, 52, 206, 211, G8:11
entry permit, H:122
ethnic, G6:12
    clashes, H:91
    cleansing, G4:31, G12:13-14, 42
    considerations, G4:25, 30, G13:23
    conflict, G12:36
    dimensions, G10:61, G12:35
    grounds, G8:36
    group(s), H:63, 68, 74-75, 91, G1:24, 27, G2:17, G3:14, G4:30, G7:32, 34, 36, G8:41, G12:33, 37
        persecution of, H:91, G12:1
    identity, G1:24
    minorities, G6:2, G8:41
    origin, H:144
ethnicity, G2:6, G3:25, G6:7, 10, 27, G7:32, G8:41, 43, G9:3, G10:32, 55, 57, G11:10, G12:33, 39
Europe, H:20, 108
    events occurring in, H:109-110
European Convention on Human Rights and Fundamental Freedoms (1950), G1:5
evidence, H:44, 48, 195-197, 203-205, G1:25-26, 36-37, G3:13, 15, G4:14-15, 31, 33-34, G5:26,
    31, 35-36, G6:34, G7:50, G8:11, 38, 74, G9:28, 36, 64-66, G10:24, 53, 62, G11:4, 15, 18-21,
    24, 34-35, 40, G12:42, 77, 89-93, G13: 38-40, 42
exceptions, G6:26, G8:68, G13:21
    see also cessation
exclusion, G5,
    cancellation, H:117, G3:4, G5:6, G11:21
    clauses, H:31, 33, 117, 140-141, G5:1, 3, G10:22
        Article 1D, H:142-143, G5:4, G13: 11-16
        Article 1E, H:144-146, G5:4, G13:33-34
        Article 1F, H:147-163, 177-179, G3:4, G2:5, G5:1, 3, 4, 18, 23-26, 31, 35, G8:58-64,
            G11:18, G13:35
    children, see children
    consequences, G5:8-9
    crimes, see crimes
    criminals, H:147
    dependent(s), G5:29, H:188
    inclusion before exclusion, H:31, 177, G5:31
    interpretation of exclusion clauses, H:149, 179, G5:2
    mass influx, G5:30
    nature/rationale, H:180, G5:2, G8:58
    prima facie recognition, G11:18-19

IFR_AR_016066

259

    procedural issues, G5:31-36, G8:62-64
    proportionality, G5:15, 24, 26, G8:62, 64
    responsibility, *see* criminal responsibility
    revocation, G5:6
    status determination, H:30, G5:7
    United Nations, *see* United Nations
    women, G2:19
ex-combatants, G5:20
Executive Committee (of UNHCR)
    children, G8:3
    gender, G1:2
    procedure (status determination), H:192-193
Executive Committee Conclusions
    cessation, G3:5, 8, 22, 25
    children, G8:3, 18
    durable solutions, G3:6
    exclusion clauses, G5:2
    internal protection /flight/ relocation alternative, G4:36
    stateless, G7:43
    women, G1:2, 30, 36, G3:5
exploitation, G4:10, G13:21
    children, G7:47, G8:4, 12-14, 25-26, 33, 52
    consent, G7:11
    forms of, G7:15
    labour, G10:33
    sexual, *see* sexual exploitation
    trafficking, G7:1, 4, 8-11, 27, 32, 34, 38, 47, G8:25-26
    vulnerability to, G7:32, G8:12
expression, freedom of, G3:16, G9:24, 31
expulsion, H:145, 154, G5:4
external aggression, H:22, G4:5, G12:44, 48, 54, 74
extradition, H:21, G5:15, 32

fact-finding, H:200-201
family
    background, H:41, 216, 218, G4:25, G7:20, G8:12, 22, 28, 56, G9:4, G13:23
    cessation, H:187, G2:7, 20, 22, 25
    derivative status, H:184-187, G8:66
    descendants, G13:8
    exclusion, H:188, G9:30
    extended, G8:8
    gender roles, G9:50
    law, G9:24
    members, G11:24, 34, G12:33
    of applicant, H:172, G1:36, G2:20, G7:17, G8:8-9, 17
    ostracism / rejection, G1:18, 35, G7:18-19, 48, G8:12, 27
    particular social group, *see* membership of a particular social group
    persecution, H:136, G7:21, G8:18, G9:10, 23, 35, 64, G12:28
    planning, G1:3, 13, G8:18, 50
    political opinion, G10:54
    reasons, H:62
    religious convictions, G10:49
    reunification, G8:68
    support, G3:22, G4:29, G9:25
    tracing, G8:68
    violence, G1:3, G8:18, G9:63, G10:42
family unity

IFR_AR_016067

children, G8:2, H:182, 185
    principle of, H:181-188, 213, G13:7
    protection, H:181-182, G5:29
    right to, H:181
famine, H:39
fear, *see* well-founded fear
female genital mutilation (FGM), G1:3, 9, 11, 36, G6:24, G8:4, 18, 31, 44, 54, 67
force, use of, H:175-177, 179, G1:13, G7:8-9
forced labour, G7:3, 8-9, 15, G8:14, 18, 27, 29, G10:31, 33
forced marriage, G1:36, G8:20, 33, 67
forced recruitment, G8:20-21, G10:3, 12, 42, G13:21
foreign domination, H:22, 165, G4:5
fraud, G1:17, G7:8-9, 41

gender
    armed conflict, relation to, G12:12, 26-27, 33
    dimension, G1:12
    discrimination, G10:32
    element, G1:16, G9:13
    expression, G9:9, 57
    identity, G9:62-63, G12:92, G13:7, 23
    inequalities, G9:23
    guidelines, national, G1:35, 38
    of interviewers/interpreters, G9:60
    markers, G9:53
    related-claims, G1:1, 3, 10, 15, 20, 33, 35-36
    related/based violence, G1:2-3, 9, 16, 18, 36-37, G7:19, 48 G8:3-4, 31, 64, G9:2, G12:27, G13:21
    roles, G1:32-33, G8:44, G9:13, 15, 41, 50
    *see also* sex; women
gender sensitivity/sensitive
    assessments, G8:75, G10:72
    assistance, G7:45, 47
    country of origin information, G8:74
    confidentiality, G1:35
    implementation, G1:38
    interpretation, G1:1-2, 4-6, 8, G8:4
    interviews, G1:36, G6:27, G8:71
    procedural issues, G1:35-37, G3:25
gender-related persecution, G1, G9
    abortion, G1:13
    adultery, disproportionate punishment for, G6:22
    armed conflict, relation to, G12:1, 11, 26-27
    causal link, G1:20-21
    cessation, G3:25
    Convention grounds, G1:22-34, G12:39
    definition, G1:3, G12:11
    dress-codes, G1:17
    evidence, G1:37, G7:50
    failure of State protection, G4:15, G6:24, G8:37, G8:54
    female genital mutilation, *see* female genital mutilation
    harmful traditional practices, *see* harmful traditional practices
    men, G1:3
    nature of, G1:3
    refugee definition, G1:1, 6
    sexual exploitation, *see* sexual exploitation
    sexual orientation, *see* sexual orientation
    sexual violence, *see* sexual violence

IFR_AR_016068

trafficking, *see* trafficking
well-founded fear, *see* well-founder fear
women, G1:1, 3-5, 8, 12, 17-18, 25-27, 30-31, 33, 36, G6:24, 30, G7:3, 19, 32, 34, 38, 47-48,
    *see also*
    membership of a particular social group; trafficking
Geneva Conventions for the Protection of Victims of War (1949), H:164, G5:10
genocide, G5:10, 13, G12:13-14
geographic limitation, H:7, 15, 17, 22
girls, *see* children
grounds, *see* Convention grounds
group, *see* ethnic groups, membership of a particular group, vulnerable groups
guardian(ship)
    child, H:214, G7:49, G8:39, 66, 69, 75-77, G9:60, G10:72
    family unit, H:182
    mentally disturbed persons, H:210


Hague Convention, No. 28 on the Civil Aspects of International Child Abduction (1980), G7:20
harm, G1:6, 9, 15, 17, 18, 25, 36, G2:20, 22, G4:7, 13-20, 28, G5:14, 22, G6:36, G7:14-17, 27, 44,
    G8:10, 14-18, 22, 30, 32, 36, 77
    fear, *see* well-founded fear
    psychological, G8:16, 33
    risk of, G7:17, G8:12, G9:32, G10:46, G11:10, G12:22, 28, 51, 91
harmful traditional practices, G1:5, 36, G6:15, 24, G8:31, 33
hate speech, G6:15
hazardous work, G8:30
health
    access to, G6:17, G8:35, 41, G12:19
    child, G8:12, 13, 30, 57
    factors, G4:25, G8:12, G13:23
    protection of, G6:15
    right to, G8:34, 41, G9:2, 24
    risks to, G4:20, G9:25, 33, G12:12
    sex-reassignment surgery (forced), G9:21
hijacking, H:158-159, G5:27
HIV, G8:52, G9:3
homelessness, G8:12
homosexuality/homosexual, *see* sexual orientation
honour killings/crimes G1:36, G8:44, G9:10, 23
host country, H:16, 166, G7:17, G8:60
housing, G7:45, G8:35, G9:24-25
human dignity, H:69, G2:6, 9, G8:75, G9:45, 47, 60, G10:57, 72, G12:56, 78, 83
humanity, lack of, G8:56
human rights
    abuses of, G9:1
    assessment, G3:8, 13-14, 16, 25
    convictions, G10:68
    defenders G9:40, 66, G12:38
    definition of, G8:31
    denial of, G9:10, 24
    derogation from, G12:16, 79
    enjoyment of, G8:27
    exercise of, G5:14, G6:17, G8:48
    guarantee of, G4:24, G5:24, G8:58, G12:41
    instruments and guidelines, G3:16, G5:9, G7:22
    international law, G1:5, 9, G2:3, G4:20, 32, G6:2, G7:12, G8:7, G9:5-7, G10:5-7, 8, 21, 26-27,
        G12:16, 71, 83, G13:51
    norms, G1:13, G2:3, 6, G6:2, G9:44, G10:56, G11:27

IFR_AR_016069

respect for, G3:16, G4:24, 28, G9:56, G12:42
principles, H:60, G4:4, G5:15
restrictions on, G10:15
standards, H:59, G1:5, 10, G3:16, 22, G4:28, G6:2, 16, G8:3
treaty, G8:5
violations of, H:51, 68, G1:5, 13, G3:11, G5:17, 20, G7:3, 4, 14, 15, 17, 44, 47, 55, G8:7, 10, 13-14, 20, 29, 31, 64, G9:16, 21, 26, 65, G10:14, 36, 38, G11:5, G12:11, 13-14, 18, 58, 62, 70, 75-77
*see also* Universal Declaration of Human Rights
Human Rights Committee, G3:15, G6:2, 4, 15, G10:8
human rights law, G1:13, G3:22
international, G1:5, G6:2, 4
violations of, G5:20,
human trafficking, *see* trafficking

identity
certificate of, H:33
child of, *see* children
documents, G7:42
ethnic, G1:24
national, G9:50
religious, *see* religion
sexual orientation, *see* sexual orientation
immigration officer, H:192
implementation of instruments/laws/standards, H:12, G4:32, G6:18, G8:5, G12:25
impunity, G1:15, G9:2, 24
incarceration, G1:18, G7:15
incest, G8:33
inclusion
clauses, H:30-110, 176, G5:31
Article 1D, G13: 17-19
criteria, H:177
family unit, H:185
gender, G1:2
presumption of, G11: 40,
refugee definition aspects, G10:2, G12:3
individual procedures (refugee status determination), G11:40-41, G13:46
inhuman or degrading treatment, G1:18, G5:9, G7:47, G8:56, G9:7, 21-22, G10:14, 31, G12:13, G13:21
injustice, H:56
insanity, G5:21
institutional care, G8:57
intention, H:63, 119, 123, 128, G8:14, G9:39
of the parties/drafters, G13:5, 11, 14, 16
to exploit, G7:10
inter-ethnic conflict, G7:36
internal flight/relocation alternative, G4
accessibility, G4:10-12
armed conflict, application to, G12:40-43
assessment, G4:6-8
burden of proof, G4:33-35
Cartagena refugee definition, G12:85
children, G8:53-57
concept, G4:1-4
country of origin, G4:37
hardship, G4:24
LGBTI individuals, application to, G9:51-56
non-State actors, G4:15-17, G10:60-61

IFR_AR_016070

OAU Convention refugee definition, G12:60
    presumption, G4:14
    procedures, G4:36
    reasonableness, G4:22-32, G8:55, G13:24
    religious persecution, G6:13
    serious harm, G4:18-21
    state protection, G4:7, 15, 16, G8:54, 56
international agencies, H:173
international community, H:1, 33, 163, 171, G4:32, G5:17, G10:24, G13:2, 11, 21
internally displaced persons (IDPs)
    relocation, G4:31-32, G7:5, G12:42
International Covenant on Civil and Political Rights, H: 60, 71, G1:5, G3:15, G6:2, 11-12, 15, 21, G7:41, 43, G9:21, G10:5, 8, 9, 49
International Covenant on Economic, Social and Cultural Rights, H:60, G1:5, G8:34
International Criminal Court, G1:5, G5:10G8:19, 60
International Criminal Tribunals for the former Yugoslavia and Rwanda, G1:5, G5:10
international criminal law, G1:9, G10:6, 21-22, 26, 36, G12:15
international criminal tribunals, G1:5, G5:10, 31, 34
international human rights law, *see* human rights
international humanitarian law, G4:32, G5:12, 20, G7:12, G8:19, G10:21-22, 26-27, 38, G12:5
International Labour Organization Conventions, G7:9
international law, G1:5, 9, G4:4, 16, G5:8, 24, 27, G6:15, G7:1, 12, 15, 22, G8:3, 19, 29-30, 59, G9:7, G10:1, 5, 7, 12, 14, 17, 23-27, 30, 33, 67, 72
international protection
    Palestinian refugee, G13:2, 28-30
    Cartagena refugee definition, G12:66
    continuity, H:33
    discrimination, G1:14
    eligibility for, G11:22
    from forced recruitment, G10:35
    international courts/tribunals, G12:15
    needs, H:90, 100, G7:7, 20, 26, G11:28, G12:93
    prima facie approach/recognition of, G11:9, 26
    provision of, H:14, G6:36
    regime, G4:4
    scope of, G12:81
    undeserving of, G10:22
    UNHCR, G11:17, 33
    *vs.* national protection, H:106
International Refugee Organization (IRO), H:32-33
international standards, G8:30, G10:5
interpreter(s), H:192, G1:36, G6:27, G9:60, G13:45
interviewer(s), G1:36, G6:27, 35, G7:46, G9:60
invasion, foreign, H:165, *see* also foreign domination; occupation

jurisdiction
    civil law, G2:8
    common law, G1:20, G2:5
    territorial, H:88
jurisprudence, G1:5, G8:31, G10:1, 8, G12:76, 79, G13:4, 17

Latin America, H:21, 88
    *See also* Cartagena Declaration on Refugees (1984)
law and order, H:175, G7:31
League of Nations, H:2
legal representative, G8:69, 77, G9:58, 60
legal advice, G1:36, G13:44

IFR_AR_016071

liberation movements, H:175, G8:45
LGBTI individuals (concept), G9:10
London Agreement and Charter, *see* Charter of the International Military Tribunal

mandate
    country authorities, G11:29
    international criminal courts/tribunals, G12:15
    refugees, H:16-17, G11:33
    refugee status determination, G5:28, G9:61, G11:5
    UNRWA, G13:7, 12, 16, 20-21
        termination of, G13:22, 26, 47
marriage,
    arranged, G8:25
    certificate, H:121
    credibility determinations, G9:63
    child/underage marriage, G8:14, 49, G9:23
    forced, G6:24, G8:18, 33, G9:10, 23, G12:26
    of mixed religions, G6:12, 24
mass influx, G3:23-24, G5:30
medical
    advice, H:208
    assistance, G7:45-46
    care, G4:29
    condition, G9:10
    evidence, G1:36
    experimentation, G9:21
    institutions, G9:22
    professionals, G12:38
    report, H:208
    supplies, G12:18, 59
    testing, G9:65
    treatment, G7:15, G8:12, G9:10, 53, 63
        denial of, G8:35
membership of a particular social group, G2, H:77-79
    age, G8:49, 50, 51, 52
    armed conflict, relation to, G12:33, 37
    characteristics, G1:29, G2:11-13
    children, G7:32, 38, G8:4, 46, 48-52, G8:20, G10:59
    civil law, G2:8
    cohesiveness, no requirement of, G2:15
    contentious objectors, G10:58
    convention grounds, G10:47
    definition of, G2:10, G8:48, G10:56-57
    deserter /draft-evader, H:169
    family, G1:33, G2:1, 6-7, G8:46, 50, 52 , G10:54
    gender-related, G1:28-31, G7:38, G8:14, G10:59, G12:39
    homosexuals, G2:6, 7, 20
    human rights, G1:29, G2:11-12, G7:37, G8:48
    identity, G1:29, G2:11-13, G7:37, G8:48, 51-52
    immutable/unchangeable characteristics, G2:6, 9, 12, 13
    interpretation of, G2:2
    non-State actors, G2:20-23
    occupation, G2:1, 6, 9, 13
    sex, G1:30, G2:6,12, 15
    sexual orientation, G9:40, 44-49
    size, relevance of, G2:18-19
    social class, G2:9

IFR_AR_016072

social perception, G2:7, 8, 9, 13
tribes, G2:1
persecution, role of, G2:2, 14, 17
protected characteristics, G2:6, 8, 11, 12, 13
trafficking, G7:32, 37-39
women, G1:4, 20, 30-31, 33, G2:1, 6-7, 12, 15, 19-20, G7:32, 38, G8:50
mental
    capacity, G5:28, G8:61, 63, 64
    development, H:214, G8:30, 64
    disability, G8:11, 64
    domestic violence, G8:33
    element, G5:21
    harm, see harm
    health, G8:30, G9:24, 33
    illness, G9:21
    integrity, G12:83
    maturity, H:216, G8:61
    state, G7:34,'G8:64
    suffering, G1:9
    violence, G8:13, 30, 33
mentality, H:214
mentally disturbed persons, H:206-212
Mexico, G8:50, G12:61
Mexico Declaration and Plan of Action to Strengthen International Protection of Refugees in Latin
    America (2004), G12:63
Middle East, H:143
migrant(s)
    economic, H:62-64
    smuggling of, G7:4
    workers, H:95
military service, H:167-168, 170, 172-174, G6:25-26, G10
    alternative service, G10:3, 8-9
    compulsory, G10:3, 4, 32
minority/minorities
    discrimination against, G3:11
    ethnic, H:74, G8:41
    national, H:74, 76
    race, H:68
    religious, G6:12
minors, see children
Montevideo, H:21
Montreal, H:160
motivation
    draft evasion/desertion, G10:4
    of flight: G11:17, 27
    of perpetrator/persecutor, G1:36, G4:15, G12:26
movement,
    freedom of, G1:18, G12:40
    of people/refugees (large-scale), G11:22, 26-27, G12:1, 61
multiple grounds, see Convention grounds
murder, H:155, G5:13-14, G8:12, G9:23

Nansen Passport, H:33
national law/legislation, H:60, G7:1, G8:60, 63, G13:3
    Cartagena refugee definition, G12:63
    military service, G10:3, 17, 33
national minority, see minority/minorities

IFR_AR_016073

nationality
    acquisition of, G13:31
    Convention ground, H:74-76, G9:3, 40, G10:47
        children, G8:41
        draft evaders, H:169, G10:58
        gender, G1:4, 20, 22, 27
        trafficking, G7:36
        *vs.* membership of a particular social group, H:77
    country of, H:6, 22, 87-91, 98, 106-107, 113, 118-122, 124, 134, G3:2, 8, 10, G4:5, G7:26, 43,
        G8:4, G9:32, G11:19, 25
    deprivation of, G7:41
    dual or multiple, H:106, 107, 117
    loss of, G8:18
    military service, relation to, G10:55
    new, H:113-114, 129-132
    non-nationals, H:121
    no nationality, *see* stateless
    OAU Convention, G12:44, 47, 49-51
    passport, *see* passport
    re-acquisition of, H:113-114, 126 128
    rights and obligations of, G13: 34
natural disaster, H:39
naturalisation, G3:3
neglect, G7:41, G8:13, 68
nexus, *see* causal link
non-conformity, G9:10, 50, 63
non-derogable rights, G4:28, G12:16, 42
non-discrimination, G7:12, G8:34, G9:5-6, G10:14, G12:46, G13:7
non-governmental organizations (NGOs), G3:25, G9:51,
non-political crimes, *see* crimes, non-political
non-refoulement, *see* refoulement
non-State actor(s), *see* agents of persecution


OAU Convention Governing the Specific Aspects of Refugee Problems in Africa (1969), H:20, 22,
    164, G4:5, G5:1, 3, 7-8, G8:13, G11:5, 16, G12:3, 6, 44-60, 64, 74
objective element, *see* element
occupation, *see also* invasion
    military H:22, 165, G4:5, G11: 5, G12:44, 48, 55
    professional G10:57, G12: 38
one-party States, G4:13
Organization of African Unity, H:22, G11:5
organs, removal of, G1:17, G7:3, 8-9, 15
orphans, G7:20, 38, G8:36, 39, 50, 52, 57
ostracism, G1:18, G7:19, 39, G8:27, G9:24
    fear of, G7:18


Palestine, H:142-143, G13:32
Palestinian refugees, G13:5, 7-9
particular social group, *see* membership of a particular social group
passport
    applying for, H:120-121
    confiscation of, G1:18
    issuing authority, H:93
    Nansen, H:33
    of convenience, H:93
    possession of, H:47-50, 93, 122-125, 134
    refusal of, H:99

IFR_AR_016074

peace, G10:24, G12:78
    arrangements, G3:14, G12:25
    crimes against, *see* crimes
    situation, G3:11
peacetime, G10:3-4, G12:10, 78
penal sentence, G5:23
penalties, H:61, 167, G1:17, 36, G6:19, 26, G9:30, G10:5
persecution
    agent(s) of, *see* agents of persecution
    area/place of, H:91, G4:11-12, 20, G7:25-28
    armed conflict, relation to, *see* G11, G12:12-13, 18
    atrocious forms of, H:136, G3:20, G7:16
    avoidance of, G4:19, G6:13, G9:49
    basis for, G9:19
    cumulative grounds for, *see* cumulative grounds
    definition of, H:51-53, G1:9, G7:14, G6:12, G8:10, G9:16
    emergency situations, in the context of, G12:16
    fear of, *see* well-founded fear
    ender-related, *see* gender-related persecution
    imputed political opinion, G10:54
    past/previous, H:113-115, 135-137, G4:24-26, G7:16, G9:10, 18, 56, G11:28, G12:25
    prima facie, G11: 15
    risk of, G10:15, 23, 67, G12:17, 24-25
    sexual orientation, G9*vs.* punishment, H:56-59
    *vs.* prosecution, G6:26
persecutory laws, G1:10-13
personal circumstances, G4:4, 24-25, G9:56, G10:65, G12:82, G13:23
police, H:17, G8:39, G9:34, 36, G10:3, G12:19, 59
political offence, *see* crime(s)
political opinion, H:80-86
    armed conflict, G12:37-39
    children, G8:4, 45-47
    Convention ground, G9:40, 43, G10:47
    gender, G1:4, 26, 28, 32-34, 36 , G9:50
    imputed, G1:26, 32
    military service, G10:51-54
    no-demonstration of, H:47
    punishment/prosecution for, H:84-86
    sexual orientation, G9:50
    trafficking, G7:40
    under-age recruitment, G8:20, 52
    *vs.* economic motive, H:64
    *vs.* nationality, H:75
political refugee, G1:33
political rights, *see* civil and political rights
pornography, *see* children
poverty, G7:31, G8:14, G12:19
prima facie, *see* G11
    presumption, H:93
    refugee, H:44, G3:23-24, G12:89, G13:46
privacy
    protection of, G7:6, 22
    right to, G8:70
profit motive, G7:1, 31, 35, G8:25
proportionality, *see* exclusion
prosecution
    criminal, G12:15

IFR_AR_016075

fear of, H:58, 167
    for a common law offence, H:56-59, G1:12
    for desertion, *see* desertion
    for political offence, *see* crime(s)
    immunity from, G10:46
    lack of, G1:37
    legitimate, G5:25
    threat/risk of, G9:27, G10:18
    *see also* persecution
prostitution
    child, G7:20, G8:4, 12, 18, 29
    forced, G1:18, G7:3, 15, 19
    trauma, G7:18
    trafficking, G1:18, G7:3, 15, 19, 47
    *see also* sexual exploitation
protection
    absence of, G1:21, G7:30
    ability and/or willingness, G1:15, 17, G2:22-23, G6:24, G7:22, G8:28, 37, G9:35, G10:43,
        G12:30, 32, 41, 57
    access to, G13:24
    adequate, G7:35
    alternative responses, G11:12, 17
    child, *see also* children
        military service/recruitment, G10:37
        needs of, G8:1
        access to, G8:39
        services, G8:11, 66
    complementary forms of, G4:20, G6:36, G13:50
    continuity of, G13: 5, 11, 16
    diplomatic, H:3, 146, 166, G7:43
    effective, H:65, 166, G1:19, G2:20, G7:21, 23, 40
    exclusion from, G5
    family, *see* family; family unity
    guarantees of, G7:36
    internal flight/relocation, *see* internal flight/relocation alternative
    international, *see* international protection
    lack of, H:164
    meaningful, G4:22 national, H:49, 90, 97, 106, 113-114, 118-120, 129-130, G3:2, 10, G4:16
        denial of, H:98-100
        re-availment, *see* re-availment of national protection
        refusal of, H:83
    regional systems, G12:8,
        *see also*, OAU Convention Governing the Specific Aspects of Refugee Problems in Africa (1969)
        *see also*, Cartagena Declaration on Refugees (1984)
    restoration of, G3:15-16
    state, G9:27, 36-37, 51, G10:44, 61 stateless, H:101
    subsidiary, G12:9, G13:50
    temporary, G11:26-27
    United Nations, H:142-143
    witness programmes, G7:50
    *see also* agents of persecution
    Protocol relating to the Status of Refugees (1967), H:9-12, 16-17, 19-20, 22-23, 25-26, 29, 35,
        164, 183, 185, 189, 191-194, 220, G4:2, G5:7, G7:5, G8:1, G11: 5
    Protocol to Prevent, Suppress and Punish Trafficking in Persons (2000), G1:18, G7:2, 6-9, 11-12, 22
public order, H:22, 59, 148, G4:5, G9:29, G11:5, G12:44, 48, 56-59, 62, 66, 70, 78-79, G13:21
punishment, H:56-60
    disproportionate, G1:12, G10:18

IFR_AR_016076

degrading, G9: 7, G13: 21 children, of, G8:33
corporal, G9:2, 26 G10:14
for desertion, *see* desertion
for non-compliance with religious practices, G6:16, 21, 22, 24
for political offence, *see* crime(s)
for refusal to perform military service, G10:13-15
for sexual orientation, *see* sexual orientation
rape (as punishment), G9:20
*see also* prosecution

race, H:68-70
as a compounding factor, G9:3
armed conflict, relation to, G12:33
children, G8:4, 20, 41
draft evaders, H:169, G10:58
gender, G1:24
military service, connection to, G10:55
trafficking, G7:32, 34
religion, G6:10, 27, G8:43
*vs.* membership of a particular social group, H:77
*vs.* nationality, H:74, G1:27, G7:36
rape
armed conflict, G12:13
children born of, G8:12
crimes against humanity, G5:13
domestic violence, G8:33
gender-related violence, G1:9, G12:26
serious non-political crimes, G5:14
sexual orientation, relation to, G9:20
corrective rape, G9: 10,23
systematic targeting, G8:41
trafficking, G7:15,
torture, G1:36
reasonableness test/analysis, G4:7, 8, 22-30, G8:53, 55
of relocation area, G4:37-38, G9:52-54, G12:42 *see also* internal flight/relocation alternative
re-availment of national protection, H:114, 118-125, 127, G3:15
re-establishment in State of origin, H:114, 133-134, G3:1
reconciliation/reconstruction, G3:14
refoulement, H:192, G3:24, G4:4, G5:4, G11:26
refugee definition, H:32, 34, G6:3, G9:1, 6, 34, 38, 46, 48, G10:1-2, 35, 42, 47, G11:1, 5, 13, 29,
G12:2-5, 11, G13:21
by national origin, H:3
regional definitions, G11:5, 16, G12:6-9, 44, 48, 63, 65-70, 75-76, 78, 80, 82, 84-85, 87
refugee flows, G3:6
refugee law, G1:38, G4:2
international refugee law, G6:2, 4, G9:6, G10:22, G12:15, G13:21, 25
legal status of refugees, H:12
legal treatment of refugees, H:24
refugee 'sur place', *see* sur place refugees
regime change, H:136, G3:14, 17
religion
Convention ground, H:71-73
armed conflict, G12:33
conscientious objection/military service, G10:8, 49-50, 65-66,
gender, G1:25-26, G12:39
trafficking, G7:35
children, G8:42-44, 47

IFR_AR_016077

sexual orientation, G9:42-43, 63
definition of, G6:1, 4
identity, G6:7-9, 13, *see* belief
knowledge of, G6:9, 29-32
prima facie approach, G11:10
right to freedom of, H:71, G3:16, G6:2, 11, 20, G6:13
    restrictions on, G6:15-16
religious persecution, G6
    children, G6:16, 21
    conscientious objection, H:170-174, G6:25-26, G10:49-50
    conversion
        forced, G6:20
        motivation, G6:35
        post-departure, G6:1, 34-35
    discrimination, H:54, G2:4, G6:17-19
    forced compliance, G6:21–22
    forms of, H:65, 72, G1:14, G6:12
    gender, G1:22-23, G6:24, 27, 34
    procedural issues, G1:36, G3:25, G6:27-36
relocation alternative, *see* internal protection/flight/relocation alternative
removal of organs, *see* trafficking
repatriation, H:122, G12:46
    application for, H:122
    spontaneous, G3:12
reprisals, G1:18, 35, G7:17, 19, 28, 39, 48, G8:28, G10:61
    fear of, G1:35, G8:72
    *see also* trafficking impact of, G8:27
resettlement, G6:35, G7:28
responsibilities
    criminal, *see* criminal responsibilities
    supervisory, *see* UNHCR
retribution, fear of, G8:23, 70, G10:15, 30, 34
return
    ability to, G13:7, 21
    children, of, G8:23, 27
    consequences of, G1:32, G6:36, G8:64, G10:13, 46, 63
    country of original/nationality, G9:18, 32, G10:41, G12:27
    forcible, G4:8
    generation of tension, G3:12
    lawfulness of, G13:21
    place of relocation, G9:56
    prior permission to, H:50
    precondition of, G3:17
    protection against, G5:9
    refugee definition, H101-105
    right to, G7:43
    victims of trafficking, G7:22, 43
revocation, G3:4, G5:6, G11:7
Rome Statute of the International Criminal Court, G1:5, G8:19

safeguards
    discriminatory, G6:22
    procedural, G1:38, G5:31, 36
        for children, G8:7, 65, G10:12, 70
        for claims based on sexual orientation, G9:60
safety, *see* security
Second World War, H:5, 147, 150

IFR_AR_016078

security
    companies/forces/groups, G10:42, G12:28
    external, G12:56, 78
    failure to ensure, G7:31
    incidents, G12:71
    international, H:148, G5:17
    national, H:148, G5:33, 36
    physical, G3:15, G9:21
    prima facie approach, relation to, G11:12
    relocation, G4:27, 29
    safety and, G3:15, G4:24, 27, G5:36, G7:22, G8:67, G9:56, G10:31, G12:41, G13:21
    sense of, H:135
    services, G3:16, G10:3
    social, G8:34
    threats to, G12:61-62, 66, 68, 70, 81-83, G13:21
separated children, *see* unaccompanied/separated children
servitude, G7:3, 8-9, G10:14, 31, 33, 35
sex
    definition of, G1:3, 5
    factor, as, G4:25, G6:28
    interpreter, of, G1:35, G7:46
    non-discrimination, on the basis of, G13:7
    persecution specific to, G1:9, 16
    reassignment surgery, G9:10, 21
    same-sex, *see* sexual orientation
    slaves, G10:40, 59 *see also* slavery, sexual
    work, G9:25
    *vs.* gender, G1:3
    *see also* membership of a particular social group
sex trade, G7:3, 34
sexual assault, G1:36, G9:60
sexual enslavement, G7:15
sexual exploitation
    children, G8:4, 25-27, 33
    trafficking for the purpose of, G1:18, G7:3, 8, 9, 19, 38, 47
sexual orientation, *see* G9
    gender-related persecution, G1:15-17, G6:34
    homosexuality/homosexual, G1:3, 5, 16-17, 30, G2:1, 6–7, 20, G12:92, G13:23
    *see also* transgender/transsexual/transvestite
sexual services, G6:24, G8:20, 44
sexual violence/abuse, G1:2, 3, 9, 24, 27, 36-37, G3:20, G7:48, G8:12, 22, 33, 52, G9:10, 20, 35, 60, G10:59, G12:13, 26-27, G13:21
Sierra Leone, Special Court, G8:19, 60
slavery, G8:29
    sexual, G10:31, 33, G12:26
    trafficking, G7:2, 3, 9
smuggling, G7:4, 7
social cleansing, G8:12
social exclusion, G8:27
social group, *see* membership of particular social group
social mores, G1:3, 12, 30, 36, G8:51
standard of proof, G5:35, G10:13, G13:38-40
state obligations
    economic, social and cultural rights, G8:34
    exclusion, H:145, G5:8
    international humanitarian law, G8:19
    limitations, H:7, 108

IFR_AR_016079

statelessness, G7:41
state protection, *see* protection
statelessness,
    children, G8:18, 35
    country/countries of former habitual residence, H:104
    deprivation of nationality, G7:41
    lack of documentation, G4:12, G7:42-44
    loss of nationality, H:127
    no nationality, H:101, 137, 139, G3:2, 10
    refugees, H:101-102, 105, 133
        cessation, H:137-139
    relocation, G4:12
    trafficking, G7:41-44
    UNHCR mandate, G7:43-44
status, H:12-13, 77, 131, 145, 184, 195, G1:3, G2:6, G3:1, 3, 6, 22, 25, G4:12, 29, G6:36, G8:2, 52, 63
    conscientious objector, G10:46
    declaratory nature of, H:28
    derivative, *see* derivative status
    economic,G9:3, 10
    "equal status", G13:16
    non-member observer, G13:33
    of Palestinian refugees, G13:5
    provisional, G11:7
statutory refugees, H:4, 32-33, 136
stay arrangements, G11:26-27
sterilization, G1:13
street children, G8:12, 52
subjective element, *see* element
supervisory responsibility, *see* UNHCR
sur place refugees H:83, 94-96, G6:1, G7:25, G9:57, G11:25, G12:31, 52, 69, G13:25-27

temporary protection, G3:23-24, G11:12, 17, 26-27
terrorism/terrorist, *see* crime(s)
theft, H:158, G5:14
thought, conscience and religion, right to freedom of, H:71, G3:16, G6:2, 11, 20, G6:13, G10:8,
    *see* also religion
threat to life or freedom, H:51, G7:14, G8:10, 15, G9:16, G10:14
torture
    acts of, G5:12-13, 27, G8:33
    armed conflict, G12:13, 27
    gender, G1:35-36, G7:47
    forced prostitution or sexual exploitation, G1:18
    right not to be returned to, G4:20, G5:9
    sexual orientation, G9:2, 7, 20-23
    threats of, G13:21
    *see also* Convention Against Torture
    *see also* inhuman or degrading treatment
tracing, G7:49, G8:68
trafficking, G7, G10:53, G12:26, G13:21
    agents of persecution, G7:21-24
    children, G7:3, 19-20, 47, 49, G8:4, 18, 24-30
    consent of victim, G7:11
    convention grounds, G7:6, 29-31, 33-40
    definition of, G7:7-13
    drugs, G10:53
    evidence, provision of, G7:50
    force, use of, G7:8-9

IFR_AR_016080

forms of, G7:3, 15
gender-related violence, G1:19
legal instruments, G7:1-2
medical/psycho-social assistance, G7:46-47, 49
privacy and identity of victim, G7:22
procedural issues, G7:45-49
prostitution, *see* prostitution
Protocol, *see* Protocol to Prevent, Suppress and Punish Trafficking in Persons
removal of organs, G7:3, 8–9, 15
resettlement, G7:28
re-trafficking, G7:17-18, 28
rings, G7:4, 27, G8:27
servitude, G7:3, 8-9
sexual exploitation, *see* sexual exploitation
slavery, G7:2, 3, 9
smuggling, *see* smuggling
stateless, *see* statelessness
State protection, G7:22-24
UNHCR's involvement, G7:5
victims of, G7:5, 12-13, 15-17, 25-26, 49, 50, G8:24, 28
violence, G1:18, G7:18-19, 48
well-founded fear of persecution, *see* well-founded fear
within national borders, G7:10, 13
women, G7:3,19, 32, 34, 38, 47-48
transgender/transsexual/transvestite, G1:16, 30, *see* G9
trauma, G1:35-36, G4:26, G7:16, 18, 48, G8:64, 72, G9:59, G10:70, G12:27
travel documents, H:20, 33, 125, 134, 191
travel facilities, H:20
Treaty on International Penal Law, H:21
tribes, G2:1, G4:30

unaccompanied/separated children
adolescent, H:215
asylum-seekers, G8:6
burden of proof, G8:73, G10:71
guardian, G8:39, 69
refugee status, H:214
relocation, G8:56
victims of trafficking, G7:20
under-age, *see* children
undue hardship, G4:8, 22, 24, G8:56, G9:56, G12:41
United Nations
exclusion clauses, H:140, G5:3-4, G10:22, G11:19
purposes and principles, H:162-163, G5:17
protection or assistance, H:142-143, G5:3
United Nations Children's Fund (UNICEF), G7:20, 49
United Nations Committee on Economic, Social and Cultural Rights, G8:14
United Nations Committee on the Rights of the Child, G7:20, 49, G8:4-5, 20, 34, 60
United Nations High Commissioner for Refugees (UNHCR)
competence, G3:3, G13: 6
establishment, H:14
Executive Committee, *see* Executive Committee
mandate for statelessness, G7:43-44
mandate refugees, *see* mandate
obligations, G5:1
Statute of, H:13-19
supervisory responsibility, H:12, 19, G3:25

IFR_AR_016081

United Nations Korean Reconstruction Agency (UNKRA), H:142
United Nations Relief and Works Agency for Palestine Refugees In The Near East (UNRWA), H:142-143, *See* G13
Universal Declaration of Human Rights (1950)
    asylum, in the spirit of, H:25
    rights and freedoms, H:71, 181, G6:2 G7:43, G8:41, G9:5, G10:8


Vienna Convention on Diplomatic Relations (1961), H:88
victims
    child, G7:27-28, 49, G8:27-28, 33, 37, 59, *see* children
    of assault, G9:60
    of human rights violations, G12:76
    of persecution, H:39, 54, 63
    of sexual violence, G1:36, G12:27
    of trafficking, *see* trafficking
victimization, H:34
violence
    armed conflict and, *see* G12, G13:21
    children, against, *see* children
    domestic, *see* domestic violence
    egregious acts of, G5:15, *see also* crime(s)
    gang violence/violence, from organized criminal groups, G12:84
    gender-related, *see* violence
    generalised, G10:42, G11:5, G12:5, 58, 7-73, 75
    global awareness of, G8:3
    non-State actors, G2:20
    perpetrators of, H:175-179, G1:36, G8:32
    political, H:175
    sexual, *see* sexual violence
    threat of, G13:21
    trafficking, *see* trafficking
    unlawful, G5:19
    witness of, G3:20
voluntary
    *see* cessation
    departure from UNRWA protection, G13:26
    gender reassignment surgery, G9:21
    migration, H:62
    military service, *see* G10
    re-availment of national protection, H:119
vulnerable groups
    children, G8:7, 14
    trafficking, G7:20, 31-32, 35-36, 40


war
    civil, G10:42
    crimes, H:147, 150, 162, 178, G5:3,12, 24, G7:3, G10:12, 22, 30, 46, G12:14, 59
    criminals, H:148
    conscientious objection, *see* G10
    prisoners, H:95
    refugees, H:164-166
    state protection, H:98
warfare, G10:21, G12:32
    methods of, G10:21, 27, G12:91
    objection to means and methods of, G10:26-30
well-founded fear
    armed conflict and violence, G12:11, 17-19, 21-25, 29, 31

IFR_AR_016082

assessment, H:41, 43, 45-49, 52, 55, 58, 66, 96, 209, G4:7, 15, G6:14, 26, G6:29, G7:17, G8:11, 37, 40

burden of proof, H:67

cessation, H:113, 114, 115, 126, 131, 135, G3:8, 11, 25, G11:28

children, H:213, 215, 217, 218, 219, G8:4, 11, 17, 23-24, 28, 37, 43, 72

elements, H:37-38, 39, 42, 206, 211, G6:20, G7:11, G8:11, *see also* element

exaggerated, H:41, 209, G8:11

exclusion, H:156, 158, 161, 180, G5:25, G8:64

gender-related persecution, G1:4, 9, 10, 20, 23, 25, 32, 35, 36, G2:19, G6:24,
     *see also* gender-related persecution

habitual residence, H:103, G7:26, 27

internal protection/flight/relocation alternative, H:91, G4:3, 6, 7, 8, 13, 20, 22-23

membership of a particular social group, H:70, 77, 79, G2:1, 2, 14, 16, 19, 20,G7:37-39, G8:51

military service, G10:20
     child recruitment, G10:38
     desertion/draft-evasion, H:167, 168, 169, G10:46
     race/nationality, G10:55
     religion, G10 66

nationality, H:74, 76, 89, 90, 98, 100, 107, 126, 131, G7:26-27

political opinion, H:80, 82-84, 86, G1:32, G8:45

post-departure, G6:35-36

refugee definition, H:6, 34, G6:3, G8:4, G10:47-48, 57, G12:10-30

sexual orientation, G9:16-19, 28, 38-39, 42

stateless, H:104

sur place, H:94, 96, G7:25

trafficking, G7:5, 11, 17, 18, 23, 25-28, 37, 48, G8:24, 28

war refugees, H:165-166

women, G1

as a particular social group, *see* membership of a particular social group

asylum-seekers, *see* asylum-seeker

gender, *see* gender; gender-related persecution

roles/codes ascribed to, G1:25-26, G8:47

sexual orientation, G9:10, 14-15, 23, 41, 56, 60

social subset, as, G2:12, G7:38

trafficked, *see* trafficking

violence against, G10:59

witches, G6:24

worship, H:71-72, G6:11-12, G10:65


Yogyakarta Principles, G9: 7

IFR_AR_016083

IFR_AR_016084



IFR_AR_016085

# Mixed Movements Official Data

**UNHCR ACNUR**
La Agencia de la ONU para los Refugiados

📍 Darien Province, Panama-Colombia Border

## Context

**March - April 2024**

Darien is Panama's largest and poorest province. Bordering Colombia, the province hosts a 60-mile-deep jungle, the only breaking point of the Pan-American highway, linking the continent from south to north.

Despite being one of the most dangerous jungles in the world, Darien is a transit location for thousands of refugees and migrants, most of them from Venezuela, Ecuador, Haiti, and African and South Asian nations.

Panama's mixed movement crisis has been ongoing for over two years. According to National Migration Service (SNM) statistics, over 900,000 people crossed through this area from 2021 to 2023.



## Key Figures

 **110,008**
Total entries in 2024.

 **36,841**
Total entries in March 2024.

 **62%** Male

 **38%** Female

 **78%** Adult

**22%** Children

*Source: Panama National Migration Service*

**Main Nationalities entering irregularly through Darien from January to March 2024**



| | Jan | Feb | Mar |
|---|---|---|---|
| Venezuela | 21,940 | 24,895 | 23,257 |
| Ecuador | 2,208 | 3,450 | 3,295 |
| Haiti | 3,048 | 1,775 | 2,506 |
| China | 2,911 | 1,562 | 1,885 |
| Colombia | 2,129 | 2,483 | 2,524 |
| Other | 3,765 | 3,001 | 3,374 |
| Total | 36,001 | 37,166 | 36,841 |

**Irregular entries through Darien 2023-2024 (in thousands of people)**





| | 2023 | 2024 |
|---|---|---|
| Jan | 25K | 36K |
| Feb | 25K | 37K |
| Mar | 38K | 37K |
| Apr | 40K | |
| May | 39K | |
| Jun | 30K | |
| Jul | 55K | |
| Aug | 82K | |
| Sep | 75K | |
| Oct | 49K | |
| Nov | 37K | |
| Dec | 25K | |

IFR_AR_016108

# UNHCR Data Collection

UNHCR, the UN Refugee Agency, collects monthly information on the characteristics, vulnerabilities, and protection needs of refugees and migrants who enter Panama through Darien. The information is compiled through individual interviews conducted in Panama's Darien and Chiriquí provinces. The preliminary results presented are indicative and should not be interpreted as representative of the total population of refugees and migrants crossing the border through the Darien jungle.



# Demography

*Sex of interviewed individuals*
 **51%** Male     **49%** Female

*Average age*
 **32** Years

*Travel group composition*
**45% Entire family**
26% Part of the family
5% Unrelated companions
24% Friends
17% Alone

*Documents carried by the family*
**87% National ID**
22% Valid passport
4% Expired passport
9% Birth Certificate
3% Others
**4% None**

**Interviewed individuals by country of origin, last country of residence, and intended country of destination**



*Other nationalities include: Afghanistan, Argentina, Brazil, Cameroon, China, India, and Peru.

IFR_AR_016109

## Respondent profile

**Three in five refugees and migrants were from Venezuela (61%). Fifty-five per-cent of them came directly from Venezuela,** a 15% increase compared to last month, while the remaining 45% came from other countries of residence, mainly Colombia (35%), Chile (8%), and Peru (6%).

Half (51%) had applied for legal status in their previous country of residence, and 19% reported having valid documentation from that country.

Seven in ten (71%) respondents were travelling with family, and one-fifth (21%) reported travelling alone or with unrelated companions. Those travelling with children had an average of 2 children, 36% under five. Four childbirths were registered in the jungle this year.

Among the main reasons for fleeing their country of origin, 61% of respondents cited attacks, threats, and general insecurity; 68% stated that lack of employment or low income motivated their decision, while 49% noted the lack of access to services.

 **64%**
of interviewed individuals left their country of origin/residence less than four weeks ago.

 **2%**
of interviewed individuals reported having the intention to stay in Panama.
*Most are planning to stay for less than one year.*

 **51%***
of interviewed individuals had applied for legal status in another country, prior to their arrival to Panama.
*Out of 53 respondents that had lived in another country.*

 **3%**
of interviewed individuals reported travelling with a survivor of violence in their group (sexual, physical or psychological).
*This figure likely represents an underestimation of these incidents.*

 **9%**
of interviewed individuals reported travelling with pregnant or lactating women.

 **6%**
of respondents reported travelling with someone with a critical or chronic medical condition.

**1%**
of interviewed individuals reported travelling with unaccompanied children in their group.

**25%**
of interviewed individuals reported having a single parent travelling with children in their group.

**2%**
of interviewed individuals reported travelling with a person over the age of 60 in their group.

## Push and pull factors

**Main reasons for leaving country of origin**



**Main reasons for leaving country of residence**

*n = 53*



**Reasons for choosing destination country**



IR_AR_016110

 **3 in 4**

interviewed individuals reported that if they were unable to reach their country of destination, they would wait until allowed to proceed to said country.

 **21%***

of interviewed individuals reported having applied for legal status in their previous country of residence, **and not obtaining it.**

*\*Out of 53 individuals that had lived in a country other than their country of origin for at least 6 months.*

 **54%**

of interviewed individuals reported they would face risks if they had to return to their country of origin/residence.

## Challenges during the journey

 **3 days**

is the average time interviewed individuals spent crossing the Darien jungle (min. 1,5 days and max. 7 days).

 **2 in 5**

experienced mistreatment or abuse during the journey through the jungle.

 **35%**

of interviewed individuals reported being victims of theft, scams or fraud during their journey through the jungle. **Additionally, 17% reported being victim of threats, intimidation, and attacks.**

 **70%**

of interviewed individuals paid a person to guide them through the jungle.

**Situations that affected people the most while crossing the jungle**



Physical insecurity (attacks, drownings, falls). — 61%
Inability to cover essential needs — 36%
Fear of getting lost in the jungle — 23%
Cadavers observation* — 21%
Fear of deportation — 19%

*\*Those who reported seeing cadavers, saw between 1 and 6 cadavers during the seven days prior to data collection.*

## Main needs for the continuation of the journey

**Cash**
There are no official financial service providers in transit communities and the ETRMs. Informal intermediaries leave people exposed to theft and scams.

**Information**
There is a lack of timely and detailed information about the transfer services to Costa Rica, including options for those that cannot pay for the bus and the criteria for assigning humanitarian spaces, managed by the Ombudspersons Office.

**Food**
Free meals provided at the ETRMs do not account for the specific needs of children or people with illnesses.

**Clothes**
There is a lack of clothes and shoes, especially for young children.

**UNHCR Multi Country Office for Belize, Cuba, Panama, Nicaragua and Southern Caribbean**
Data Sources: UNHCR Protection Monitoring, conducted on the 15th and 16th April 2024
Access all our border protection monitoring publications here
Feedback: panpaim@unhcr.org



IFR_AR_016111



**UNHCR ACNUR**
La Agencia de la ONU para los Refugiados

**OPERATIONAL UPDATE**
No. 3 ❙ December 2023

**Little Amal inTijuana.**
**Photo credits: Rodrigo Dardon**

# KEY FIGURES



## ASYLUM & ACCESS TO TERRITORY

A total of **140,982** people applied for asylum in Mexico in 2023 as of 31 December, including **44,239** individual asylum applications from **Haitians,** followed by **41,935** applications from **Hondurans, 18,386** applications from **Cubans, 6,117 from Salvadorans,** and **5,517** applications from **Venezuelans.**



## PROTECTION & RECEPTION CONDITIONS

So far in 2023, **16,869** individuals have been assisted through cash-based interventions and multi-purpose cash grants as part of UNHCR's Humanitarian Assistance Programme.

UNHCR and partners distributed **563,134** non-food items across **89 shelters** in 2023 as of December 2023.

Between July to December 2023, **2,704** people in migratory detention received orientation on their right to request asylum.

During 2023, El Jaguar reached **4,638,394** Facebook users (a monthly average of **386,000** users), registered **7,428,296** visits to its page (a monthly average of **619,000** visits) and its publications generated **331,164** interactions (a monthly average of **28,000** interactions).



## ENSURING SUSTAINABLE INTEGRATION

UNHCR has been working closely with the Ministry of Foreign Affairs to facilitate the access of refugees to the acquisition of Mexican nationality. Since 2022 to date, **846 refugees** have entered their naturalization process with the accompaniment of UNHCR, of which **65%** are Venezuelans, **16%** from El Salvador, **11%** from Honduras, **2%** from Guatemala, **2%** from Cuba, **1%** from Nicaragua and **3%** from other nationalities. Additionally, a significant number of people entered the process on their own. From January 2022 to December 2023, **more than 680 refugees** obtained their naturalization letters, of which **222** were accompanied by UNHCR and its partners.

In 2023, UNHCR conducted **26 relocations** as part of the Local Integration Program and has relocated **more than 35,000 people** since the program's inception in 2016.



## FUNDING

As of 31 October 2023, the Mexico Operation is **50%** funded with **59.85 million USD.**

IFR_AR_016116

# HUMAN MOBILITY AND ASYLUM TRENDS

The number of asylum applications in Mexico surpassed **140,982** since the beginning of the year as of 31 December, 2023. This figure exceeds the total number of claims filed during the same period in 2022 by nearly **19%.** The arrival of people on the move across **southern Mexico** was particularly noticeable at the main entry point into Mexico, the border town of Tapachula in Chiapas. As of October 2023, three southern states of Mexico (Chiapas, Tabasco, and Veracruz) accounted for **72.5% of all claims processed** in the country. In recent months, arrivals grew from **650 individuals** daily to over **1,500-3,000** per day in September and October. Most people from Cuba and Haiti are adults traveling alone (over **67%** for Cuba and more than **82%** for Haiti). On 30 October, more than **3,000 people,** mostly families and children, departed in a **"caravan" from Tapachula.** On 24 December, they moved 40 km over a period of three days, arriving in Huixtla, Chiapas. Most of the persons were Honduran (up to **80-90%**), followed by other Central Americans, Cubans, Venezuelans, and very few Haitians.

Between July and November 2023, **Mexico City** has seen an ever-growing number of asylum claims, Venezuelans being the main nationality, followed by Haitians and Hondurans. From July to December 2023, approximatively **20.5 percent** of all asylum applications in the whole country were filed in Mexico City, which amounts to an estimation of **10,585** asylum claims. UNHCR supported COMAR to reinforce its capacity in Mexico City to implement simplified and more efficient processing measures, and coordinated efforts with local partners to reach the population with the information they need to make well-informed decisions to access protection, their rights or local integration perspectives. UNHCR and its partner Programa

Casa Refugiados (PCR) successfully established a **fast-track for pre-registration and priority reception** in collaboration with COMAR for asylum seekers staying in partner-shelters. This measure contributes to secure access and to reduce waiting time for the asylum procedure to persons in situations of high vulnerability and with specific needs. Shelters in Mexico City continue to be oversaturated at **500%** capacity at the main shelter in the city CAFEMIN and the government Shelter Tláhuac, hosting up to **3,000** people even if built for **150.**

In **Northern Mexico**, several hundred persons arrived by train to Piedras Negras and Ciudad Juarez during September and October to cross the border to the U.S. When numbers peaked and **1,500 people** were waiting for the trains in Coahuila state, the train company Ferromex temporarily suspended the service of trains for several days. As winter approaches, low temperatures are expected to become an increasing challenge for individuals currently living in informal settlements and shelters across the northern border. UNHCR is supporting shelters to improve their reception standards with the delivery of non-food items, such as sleeping mats.

In recent months, Mexico has also experienced an increase in **internal displacement**, generated by a rise in violence perpetrated by criminal groups and land disputes in at least seven states. According to the Mexican Commission for the Defence and Promotion of Human Rights (CMDPDH), over **379,000 people** were displaced in Mexico due to incidents of violence from 2006 to 2021. Based on the NGO's figures, an estimated **30,000 more individuals** are expected to be internally displaced by the end of 2023.



Four refugee children participated in the protocol entrance holding hands with FC Barcelona and Tigres players. Photo credits: Club Tigres

IFR_AR_016117

2

# OPERATIONAL HIGHLIGHTS



UNHCR team in Tapachula, © UNHCR/File



On 22 November, **UNHCR, COMAR and the Mexican Foreign Ministry organized a meeting** to preview the governmental commitments that were to be presented at the Global Refugee Forum (GRF) a few weeks later. Some **30 members** of the diplomatic corps and UN agencies, as well as representatives from Guanajuato, Baja California, Monterrey and Tapachula attended to present the commitments at the state and municipal levels.

At the second GRF in Geneva from 13-15 December, **more than 4,000 participants,** including **300 refugees,** gathered. The Mexican delegation announced **eight commitments at the federal and local levels.** Mexico had a strong presence in nine events, including the participation from the company FEMSA, which has hired **2,800 refugees.** COMAR was represented at events on inclusion and MIRPS, respectively. Representatives from Nuevo León, Guanajuato and the Undersecretary for Migratory Affairs also participated as speakers.



To support young refugees to access higher education in Mexico, UNHCR has implemented **tertiary education program** since more than five years. So far in 2023, UNHCR supported another 120 students, including 32 students who were referred to university programmes by partner DIME. Under the Global **DAFI Programme, 62 students** are being supported in 2023. In September 2023, **ten new scholarships** were granted and during 2023, already **16 DAFI students** have graduated.



**Shelters** across all Mexico continue to operate near or at full capacity, although occupancy rates are constantly in flux. **Informal settlements are widespread,** particularly in cities like Matamoros and Reynosa. Informal settlements raise **grave protection concerns** for the people living there,

including security, access to WASH, overall living conditions, and risk of infectious disease. **UNHCR has contributed to strengthening and improving reception conditions in shelters** by delivering core relief and other non-food items, as well as infrastructure projects. From January to December 2023, UNHCR and partners distributed a total of **9,017** mattresses, bunk beds and mats, **125,401** cleaning and **358,060** personal cleaning/hygiene items, **5,029** kitchen and office equipment and **1,530** clothing items to **89** shelters across the country this year.



UNHCR implemented **the stoplight protection tool in 102 shelters.** Covering more than **14** key protection areas such as Protection, WASH, Health, PSEA, among others, the tool categorizes shelters in green, yellow and red. The results showed that **86.27%** of the shelters were classified as "yellow" or "green" which means they have adequate or optimal protection conditions. **13.73%** of all shelters reviewed have been classified under the "red light" indicating that protection standards need to be worked on. UNHCR prioritizes shelters with yellow or red results to improve their overall reception and protection conditions.



UNHCR continues to provide **capacity-building regarding refugee protection.** Between July-November 2023, UNHCR and partner Scalabrini International Migration Network, delivered **specialized training** for Human Rights Defenders in **36 shelters across the country,** in which shelter personnel received tools to mitigate security risks. To assure a **coordinated response** and jointly strengthen accommodation spaces for persons on the move in Mexico, UNHCR shelters team coordinates a working group with civil society and other UN agencies working with shelters across the country.

IFR_AR_016118

3

## NORTHERN MEXICO

On 6 November, **Little Amal** crossed the border from the U.S. to Mexico through Tijuana, with the support of UNHCR and other UN agencies. Amal was welcomed in Baja California and Tijuana by the Governor of the State and the Mayor of the City. The commitment of State authorities to continue working on the protection and integration of asylum seekers, refugees and IDPs in Baja California, was reflected in the signature of a Memorandum of Understanding with UNHCR, having Amal and refugee children as witnesses of the event.  The events allowed a large-scale sensitization on refugee and migrant issues in Baja California. Amal travelled through Mexico for two weeks during the month of November, visiting **Mexico City, Oaxaca, Tapachula and Ciudad Hidalgo.** Her journey was accompanied by UNHCR throughout and broadly covered by the local press.



Little Amal in Tijuana, Photo credits to: Rodrigo Damon



Four refugee children participated in the protocol entrance holding hands with FC Barcelona and Tigres players. Photo credits: Mayumi Kimura Meguro

## FC BARCELONA AND TIGRES MATCH WITH PARTICIPATION OF REFUGEE CHILDREN

On 1 September, the FC Barcelona and Tigres women's football teams played a match in Monterrey attended by more than **39,500 people** (about twice the seating capacity of Madison Square Garden) – **a historical record in Mexico's women's football.** In collaboration with the FC Barcelona and Tigres football teams, UNHCR coordinated the **participation of four refugee children** during the initial protocol ceremony when both teams entered the field holding hands with the children. All four participants had previously shared with UNHCR they were huge fans of football and both teams. One of the kids even shared that he would not wash his hand for a whole month after receiving this honor. Thanks to a donation of tickets by Tigres, UNHCR also facilitated the **attendance of 80 refugees,** including **26 refugees** who had just relocated to Monterrey through UNHCR local integration program. Throughout the match, the Tigres football players wore UNHCR's blue ribbons in solidarity with refugees, FC Barcelona players had their jerseys with the UNHCR logo, and a UNHCR video was played at the football stadium screen.

IFR_AR_016119

## SOUTHERN MEXICO

The UNHCR Registration team has conducted numerous activities between July and December 2023 to **provide support to the Mexican authorities.** For example, in July, UNHCR **supported the COMAR office in Tenosique** to enable biometric registration, to enhance capacity and train personnel in biometric registration standards. These efforts allowed COMAR to secure the population registration for all asylum seekers to obtain a unique population number (CURP) and their biometric data, easing their access to public services and local integration.

 UNHCR supports COMAR piloting new technologies in Tapachula. For example, through **COMAR Digital´s platform** through which pre-registrations and appointments are digitalized which saves valuable time and resources. Also, **COMAR´s unique case management and database system (SIRE)** simplifies reception and processing of asylum claims. Migration authorities will be able to access the database in the future, to prevent possible refoulement of asylum-seekers.

 UNHCR and the International Rescue Committee (IRC) have trained staff from OXXO, Veterinaria Santa Cruz, Farmacias Yireh, Concesionaria COMEX, Bodega Aurrera, Megacable and other companies in the private sector regarding the possible **labour Inclusion of refugees.**

 In Tapachula, UNHCR held **5 workshops for 169 social workers, nurses and doctors** from health centers and hospitals and staff from Health District VII and Health City Hospital to increase knowledge and improve care for refugees, asylum-seekers and the local community.

 As a result of collaboration with the municipality to improve peaceful coexistence in Tapachula, UNHCR inaugurated a **cinema in Territorio Joven Tapachula with a capacity to receive 40 people.** In Cine Joven, as the community has named it, movie forums are held to address issues of forced displacement with an awareness-raising approach to mitigate conflict in a community with a high presence of people on the move. So far, UNHCR and the municipality organized **4 movie forums** attended by **117** local and refugee youth.

## LEGAL ASSISTANCE

This year, UNHCR has initiated new partnerships with **17 Law Clinics of Mexican universities.** In October, the first national meeting of all legal clinics countrywide and UNHCR was held in the facilities of the Universidad Iberoamericana in Mexico City. This has been a groundbreaking momentum, activating a huge network of legal aid for asylum-seekers and refugees and founding a working group of legal clinics for the first time. Between July and November 2023, **1,516 asylum-seekers** were represented by UNHCR's network of lawyers and **73,110** asylum-seekers and persons with international protection needs received legal advice, orientation or assistance by lawyers and paralegals cooperating with UNHCR.


Regional Judgement Award. Photo credits to:S Uriel Salas


Nationwide first meeting of all law clinics.
Photo credits to: Tiffany Tinoco, Ibero Law Clinic

**On 20 October, UNHCR legal unit participated in the eighth edition of the Regional Judgements Award.** The National Supreme Court of Justice of Mexico won the award with the writ of constitutional protection (amparo) stating the maximum time persons on the move could be held in detention centers. The Court concluded that the established deadlines in the Law for maintaining persons under detention contradicted the maximum constitutional time limit for deprivation of liberty for administrative reasons.

IFR_AR_016120

5



**Participation of the Special Rapporteur for IDPs in the International Meeting on Human Mobility 2023, Photo credits to: Ministry of the Interior of Mexico, 2023.**

## INTERNAL DISPLACEMENT

Between July and December 2023, UNHCR provided **technical assistance on registration of IDPs to the authorities and four federal states of Mexico.** In the state of **Michoacan,** an emergency response was required due to the displacement of around **800 persons** due to clashes between organised crime groups. UNHCR facilitated a training and presented a rapid registration tool allowing for the quick identification of heightened risks. The tool was accepted in September 2023 by the authorities. On the request of the state of **Tamaulipas,** from 11-12 October, UNHCR facilitated a training regarding international standards for the protection of IDPs, including the Protection Information Management Principles and registration standards. The state of **Sinaloa** intends to initiate a registration system of IDPs, a process which UNHCR has been supporting. In the reporting period, the new system could already be implemented in several IDP communities. UNHCR facilitated a training for government officials who will conduct the IDP registration interviews. Technical assistance was also provided to the state of **Chihuahua** to improve the registration process and define the data sets according to their needs and capabilities to respond. The government of Chihuahua aims at having their own registration software, as they are currently using KOBO under a Data Sharing Agreement with UNHCR.

From 11-13 July, the current **Special Rapporteur on the Human Rights of IDPs,** Paula Gaviria Betancur, did an academic visit to Mexico at the request of the Ministry of the Interior of Mexico. The Special Rapporteur participated in the International Meeting on Human Mobility 2023, where she presented the country report derived from her predecessor's 2022 official visit. The Special Rapporteur highlighted that the causes of internal displacement in Mexico are diverse and multifactorial, often caused by organised crime, development

projects, including mining and illegal logging, community and land conflicts as well as climate change and natural disasters. She highlighted that the most affected were indigenous communities and that there was a differentiated impact on women and girls, children and adolescents, relatives of disappeared persons, human rights defenders and journalists, and LGBTIQ+ persons.

On 13 October, UNHCR participated in the session of the **Inter-Institutional Committee for Attention to Forced Displacement in Michoacan.** The local law Initiative on IDPs, a result of seven working groups co-chaired by UNHCR and the Secretariat for Migrants of the State of Michoacán, was approved and will be presented to the State Congress. UNHCR has continuously provided technical assistance to ensure that this initiative is in line with the Guiding Principles on Internal Displacement and other relevant international standards.



**Report on IDPs in Chihuahua, Photo credits to: Government of Chihuahua.**

IFR_AR_016121

From 24 - 26 October, **UNHCR participated in a learning encounter for the Internal Displacement Working Group within the Comprehensive Regional Protection and Solutions Framework (MIRPS) and the Government of Colombia,** held in Bogotá, Colombia with authorities from Mexico, Honduras and El Salvador. The event aimed at exchanging and challenges in protecting internally displaced persons and persons in confinement were shared; experiences and dialogues were also exchanged and will continue in the framework of the MIRPS Working Group on Internal Displacement.

## COMMUNICATION WITH COMMUNITIES (CWC)

Another ongoing challenge for UNHCR is the **provision of information to ensure that individuals can make informed decisions.** **UNHCR's Communications with Communities** team has produced informative materials about asylum procedures in Mexico to give persons on the move the best possibilities to inform themselves. The Helpdesk team handled **35,152** queries from January to December 2023. During 2023, El Jaguar reached **4,638,394** Facebook users (a monthly average of **386,000** users), registered **7,428,296** visits to its page (a monthly average of **619,000** visits) and its publications generated **331,164** interactions (a monthly average of **28,000** interactions).

With the objective of informing and mobilizing the refugee community so that persons on the move can make informed decisions, the **Outreach Volunteers** Program was re-initiated during the reporting period. Refugee volunteers of diverse backgrounds serve as an inter-phase between UNHCR and the communities and help for example to identify protection risks informing mitigation strategies for UNHCR and partners.

**3,200 refugee children and adults laughed with Payasos sin Fronteras (PSF).** As part of the Communication with Communities strategy, PSF performed the "Mexico 2023 Tour" comprising **20** shows in shelters, schools and other community spaces in Mexico City and Tapachula from 9-20 October. The initiative aims at bringing joy to refugee children and adults as well to build resilience.

**The peaceful coexistence project** 'Let's host the opera' seeks to raise awareness about the reality of refugees among the Mexican host community through a musical. The piece they present features forced displacement has reached more than **400** people in its first three presentations.



Clown performance for children in Tlahuac, Mexico City, Photo credits to Juan Sotomayor

IFR_AR_016122

# GENDER-BASED VIOLENCE AND PREVENTION OF SEXUAL EXPLOITATION AND ABUSE



All UNHCR staff in Mexico City, Tapachula, Tijuana, Tenosique, Villahermosa, and Guanajuato, participated in a Training of Trainers workshop on the Prevention of Sexual Exploitation and Abuse in the reporting period. There are upcoming sessions for staff in Monterrey, Saltillo and Aguascalientes. The "I act" strategy was designed for UNHCR personnel to raise awareness of the commitment and obligation to prevent, act and report sexual exploitation and abuse. UNHCR is contributing to disseminating the "All Voices" campaign within the framework of the 16 Days of Activism against Gender-based Violence.

UNHCR is grateful for the support provided by donors who have contributed to this operation as well as those who have contributed to UNHCR programmes with broadly earmarked and unearmarked funds. As of 31 October 2023, UNHCR Mexico is **50%** funded having required **US$119.7 million** to respond to the needs of thousands of asylum-seekers, refugees and those internally displaced in Mexico. Timely funding is urgent to ensure the continuity of our activities.  UNHCR's humanitarian and durable solutions response in Mexico is made possible thanks to the generous support of major donors who have contributed unrestricted funding to UNHCR's global operations, and to donors who have generously contributed directly to UNHCR operations in Mexico.



## SPECIAL THANKS ALL OUR DONORS IN 2023
**(as of 31 October):**

Belgium | Canada | Denmark | European Union | France | Germany | Ireland | Mexico | Norway | Netherlands | Sweden | Switzerland | United Kingdom | United States of America

Private donors Australia | Private donors Germany | Private donors Italy | Private donors Japan | Private donors Mexico | Private donors Republic of Korea | Private donors Spain | Private donors Sweden | Private donors United Kingdom | Private donors United States of America

## CONTACTS

Jelena Hawellek – External Relations
hawellek@unhcr.org

Anouck Bronee – Inter-Agency
bronee@unhcr.org

Uriel Salas Segovia – Government Liaison
salasseg@unhcr.org

Silvia Garduno Garcia – Public Information
garduno@unhcr.org

Isabel Sorela - Donor Relations
sorelazu@unhcr.org

Links: UNHCR Mexico Webpage
Mexico I Global Focus     UNHCR Mexico Twitter
https://data.unhcr.org/en/country/mex

IFR_AR_016123

8

EVEN WHEN THE NEWS IS FREE, JOURNALISM IS NOT. SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.    DONATE

## Migrants rush across US border in final hours before Title 42 expires



A crowd of migrants between the border fences that separate San Diego and Tijuana has risen sharply in the last week. The Biden administration on Thursday will begin denying asylum to migrants who arrive at the U.S.-Mexico border without first applying online or seeking protection in a country they passed through. (May 10)

| Videos | 6 | Photos | 14 |

Read More

BY VALERIE GONZALEZ
Published 11:05 PM EDT, May 11, 2023

MATAMOROS, Mexico (AP) — Migrants rushed across the Mexico border Thursday, racing to enter the U.S. before pandemic-related asylum restrictions are lifted in a shift that threatens to put a historic strain on the nation's beleaguered immigration system.

The imminent end of the rules known as Title 42 stirred fear among migrants that the changes would make it more difficult for them to stay in the U.S. And the Biden administration was dealt a potentially serious legal setback when a federal judge temporarily blocked its attempt to more quickly release migrants when Border Patrol holding stations are full.

With a late-night deadline looming, misinformation and confusion buffeted migrants as they paced the border at the Rio Grande, often unsure of where to go or what to do next.

IFR_AR_016775

At Matamoros, across from Brownsville, Texas, throngs of migrants — some clutching small children — waded across spring river currents, pushed through thickets to confront a border fortified with razor wire. Other migrants settled into shelters in northern Mexico, determined to secure an asylum appointment that can take months to schedule online.

Many migrants were acutely aware of looming policy changes designed to stop illegal crossings and encourage asylum seekers to apply online and consider alternative destinations, including Canada or Spain.

---

**READ MORE**



**Mexico's drug cartels and gangs appear to be playing a wider role in Sunday's elections than before**

---

IFR_AR_016776



**Music Review: Willie Nelson takes it back to Texas, with notes of Mexico, on 'The Border'**



**AP PHOTOS: Mexicans choose between continuity and change in election overshadowed by violence**

"I don't know what's going to happen tomorrow," said Jhoan Daniel Barrios, a former military police officer from Venezuela as he paced with two friends along the the border in Ciudad Juárez, across from El Paso, Texas, looking for a chance to seek refuge in the U.S.

IFR_AR_016777

"We don't have any money left, we don't have food, we don't have a place to stay, the cartel is pursuing us," said Barrios, whose wife was in U.S. custody. "What are we going to do, wait until they kill us?"

Last week, Barrios and his friends entered the U.S. and were expelled. They had little hope of a different result Thursday.

On the U.S. side of the river, many surrendered immediately to authorities and hoped to be released while pursuing their cases in backlogged immigration courts, which takes years.

It was not clear how many migrants were on the move or how long the surge might last. By Thursday evening, the flow seemed to be slowing in some locations, but it was not clear why, or whether crossings would increase again after the coronavirus-related restrictions expire.

A U.S. official reported the Border Patrol stopped some 10,000 migrants on Tuesday — nearly twice the level from March and only slightly below the 11,000 figure that authorities have said is the upper limit of what they expect after Title 42 ends.

More than 27,000 people were in U.S. Customs and Border Protection custody, the official said.

"Our buses are full. Our planes are full," said Pedro Cardenas, a city commissioner in Brownsville, Texas, just north of Matamoros, as recent arrivals headed to locations across the U.S.

President Joe Biden's administration has been [unveiling strict new measures to replace Title 42](#), which since March 2020 has allowed border officials to quickly return asylum seekers back over the border on grounds of preventing the spread of COVID-19.

The new policies crack down on illegal crossings while also setting up legal pathways for migrants who apply online, seek a sponsor and undergo background checks. If successful, the reforms could fundamentally alter how migrants arrive at the U.S.-Mexico border.

IFR_AR_016778

But it will take time to see results. Biden has conceded the border will be chaotic for a while. Immigrant advocacy groups have threatened legal action. And migrants fleeing poverty, gangs and persecution in their homelands are still desperate to reach U.S. soil at any cost.

Many migrants were acutely aware of looming policy changes as they searched Thursday for an opportunity to turn themselves over to U.S. immigration authorities before the 11:59 EDT deadline.

While Title 42 prevented many from seeking asylum, it carried no legal consequences, encouraging repeat attempts. After Thursday, migrants face being barred from entering the U.S. for five years and possible criminal prosecution.

Holding facilities along the border already were far beyond capacity. But late Thursday, U.S. District Judge T. Kent Wetherell, an appointee of President Donald Trump, halted the administration's plan to begin releasing migrants with notices to report to an immigration office in 60 days when holding centers reach 125% capacity, or where people are held an average of 60 hours. The quick releases were to also be triggered when authorities stop 7,000 migrants along the border in a day.

The state of Florida argued the administration's plan was nearly identical to another Biden policy previously voided in federal court. Earlier Thursday, the Justice Department said its new move was a response to an emergency and being prevented from carrying it out "could overwhelm the border and raise serious health and safety risks to noncitizens and immigration officials."

Weatherell blocked the releases for two weeks and scheduled a May 19 hearing on whether to extend his order.

Homeland Security Secretary Alejandro Mayorkas had already warned of more crowded Border Patrol facilities to come.

"I cannot overstate the strain on our personnel and our facilities," he told reporters Thursday.

IFR_AR_016779

Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.

On Wednesday, Homeland Security announced a rule to make it extremely difficult for anyone who travels through another country, like Mexico, or who did not apply online, to qualify for asylum. It also introduced curfews with GPS tracking for families released in the U.S. before initial asylum screenings.

The administration says it is beefing up the removal of migrants found unqualified to stay in the U.S. on flights like those that brought nearly 400 migrants home to Guatemala from the U.S. on Thursday.

Among them was Sheidi Mazariegos, 26, who arrived with her 4-year-old son just eight days after being detained near Brownsville.

"I heard on the news that there was an opportunity to enter, I heard it on the radio, but it was all a lie," she said. Smugglers got her to Matamoros and put the two on a raft. They were quickly apprehended by Border Patrol agents.

Mazariegos said she made the trek because she is poor and hoped to reunite with her sisters living in the U.S.

At the same time, the administration has introduced expansive new legal pathways into the U.S.

Up to 30,000 people a month from Haiti, Cuba, Nicaragua and Venezuela can enter if they apply online with a financial sponsor and enter through an airport. Processing centers are opening in Guatemala, Colombia and elsewhere. Up to 1,000 can enter daily though land crossings with Mexico if they snag an appointment on an online app.

At shelters in northern Mexico, many migrants chose not to rush to the border and waited for existing asylum appointments or hopes of reserving one online.

At the Ágape Misión Mundial shelter in Tijuana, hundreds of migrants bided their time. Daisy Bucia, 37, and her 15-year-old daughter arrived at the shelter over three months ago from Mexico's Michoacán state – fleeing death threats — and have an asylum appointment Saturday in California.

Bucia read on social media that pandemic-era restrictions were ending at the U.S.-Mexico border, but preferred to cross with certainty later.

"What people want more than anything is to confuse you," Bucia said.

———

Associated Press writers Colleen Long and Rebecca Santana in Washington; Christopher Sherman in Mexico City; Gerardo Carrillo in Matamoros, Mexico; Maria Verza in Ciudad Juarez, Mexico; Morgan Lee in Santa Fe, New Mexico; Giovanna Dell'Orto in El Paso; and Elliot Spagat in Tijuana, Mexico, contributed to this report.

ADVERTISEMENT

IFR_AR_016781

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For
non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000

LATIN AMERICA

# Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program

Migrants seeking shelter in the U.S. under Trump administration policy report rising numbers of kidnappings by criminal groups

*By Robbie Whelan*  [Follow]  | *Photographs by Scott Dalton for The Wall Street Journal*

Dec. 28, 2019 5:30 am ET

NUEVO LAREDO, Mexico—Every morning, Lorenzo Ortíz, a Baptist pastor who lives in Texas, drives a 12-seat passenger van packed with food and blankets across the border to pick up migrants who have been dropped off in Mexico and ferry them to shelters.

His mission is to keep the migrants safe from organized crime groups that prowl the streets of this violent Mexican border town. Since the Trump administration began implementing its Migrant Protection Protocols program at the start of 2019—widely known as Remain in Mexico—some 54,000 migrants, mostly from Central America, have been sent back to northern Mexico to wait while their asylum claims are processed. Mexico's government is helping implement it.

But in cities like Nuevo Laredo, migrants are sitting ducks. Over the years, thousands have reported being threatened, extorted or kidnapped by criminal groups, who prey upon asylum seekers at bus stations and other public spaces.



IFR_AR_016862

"Over the last year, it's gotten really bad," Mr. Ortíz said.

A typical scheme involves kidnapping migrants and holding them until a relative in the U.S. wires money, typically thousands of dollars, in ransom money. Gangs have also attacked shelters and even some Mexican clergy members who help migrants.

There have been 636 reported cases of kidnapping, rape, torture and other violent crimes against migrants returned to Mexico under Remain in Mexico, according to Human Rights First, which interviews victims in border cities and advocates for migrants' due process rights. At least 138 of these incidents involved kidnappings of children.

Many more cases of extortion and violence go unreported for fear of retribution. As more migrants are returned to dangerous areas such as Nuevo Laredo under Remain in Mexico, the situation is expected to worsen, the nonprofit Human Rights First said in a recent report.

The Mexican government has played down the violence. Foreign Minister Marcelo Ebrard recently acknowledged kidnapping incidents, but said that "it's not a massive number." Only 20 such cases have been investigated by the government, he added.

The Trump administration has credited the program with deterring migrants from attempting to cross into the U.S. Monthly apprehensions of migrants at the U.S. Southern border have plunged from more than 144,000 in May to 33,500 in November. The Remain in Mexico program was expanded in June.

On a recent visit to the border, acting Department of Homeland Security Secretary Chad Wolf said the program has been a "game-changer" for U.S. Customs and Border Protection officers because it has freed them from having to perform humanitarian duties.



IFR_AR_016863

Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 403 of 513

But Mr. Ortíz's daily commute back and forth over the border highlights what migrants' advocates say is a key element of the program—it isolates migrants not only from the legal counsel they need to argue their asylum claims, but from resources like food, shelter and medical care that are abundant on the U.S. side, but near-nonexistent in Mexico.

"You have all this infrastructure to help feed and clothe and house people set up on this side, in Laredo and Del Rio and Eagle Pass, and then suddenly the administration changes the policy, and you have to send it all to Mexico, because now everyone is on the other side," said Denise LaRock, a Catholic Sister who helps distribute donations to asylum seekers through the nonprofit Interfaith Welcome Coalition. Mexico has been unable to provide enough safe shelter and other resources to migrants.

In Matamoros, another large recipient of asylum seekers under the program across the border from Brownsville, Texas, a tent city of more than 3,000 people has sprung up. Migrants there have complained of overcrowding, unsanitary conditions and insufficient medical treatment. In November, a migrant from El Salvador was murdered in Tijuana, opposite San Diego, while waiting with his wife and two children for an asylum hearing under the Remain in Mexico program.



On a recent, briskly-cold Wednesday, Mr. Ortíz, dressed in a ski vest and a baseball cap with the logo of the U.S. Chaplain International Association, picked up six migrants, including two children aged 8 and 14, at the immigration office in Nuevo Laredo. All were from El Salvador, Guatemala or Honduras, and were returning from legal appointments in the U.S. Hearings take place in makeshift courts set up in tents in Laredo, just across the bridge over the Rio Grande that separates the two cities.

IFR_AR_016864

IFR_AR_016865

At the front door of the office, six young men sat idly around a motorcycle, hats pulled low over their heads, watching the scene unfold, periodically walking up to the church van and peering in. Mr. Ortíz said these men were "hawks" or lookouts for criminal gangs.

"They know who I am, I know who they are," he said. "You have to know everyone to do this work. The cartels respect the church. I've driven all around Nuevo Laredo in this van, full of migrants, and they never mess with me."

At one point two of the lookouts asked the pastor for some food. He gave them two boxes of sandwich cookies. They clapped him on the shoulder, eating the treats as they walked back to their observation post.

Mr. Ortíz, a native of central Mexico, came to the U.S. at age 15 and eventually built a small contracting business in Texas. He became an ordained Baptist minister about a decade ago and three years ago began ministering to migrants full time. This year, he converted several rooms of his home in Laredo, Texas, into a dormitory for migrants and built men's and women's showers in his backyard.



After picking up the migrants, Mr. Ortíz ferried the group to an unmarked safe house with a chain-locked door on a busy street in the center of Nuevo Laredo, Mexico.

Inside, about 90 migrant families crowded into rows of cots set up in a handful of bedrooms and a concrete back patio. Among the Central Americans are also migrants from Peru, Congo, Haiti, Angola and Venezuela.

IFR_AR_016866

Reports of migrant kidnappings have increased since the Remain in Mexico program began, Mr. Ortíz said. In September, armed men stormed the safe house—one of two that the pastor brings migrants to—and detained the shelter's staff for about an hour.

Since then, Mr. Ortíz said, the volunteer staff has stopped allowing migrants to leave the house unaccompanied, even to buy milk for young children at a nearby store.

Rosa Asencio, a schoolteacher fleeing criminal gangs in El Salvador and traveling with her two children ages 4 and 7, was returned to Nuevo Laredo under Remain in Mexico. She says she hasn't been outside the shelter for nearly three weeks. "They can kidnap you anywhere," she said.



María Mazariegos, an Honduran housekeeper, said she was kidnapped along with her 12-year-old daughter Alexandra from the bus station in Nuevo Laredo in September.

Gang members held her in a windowless cinder-block room that bore signs of torture for three days with one meal of tortillas and beans. She was released after her family members in the U.S. convinced her captors that they didn't have the money to pay a ransom.

Then, two weeks later, while she was returning from a court appointment in the U.S., a shelter staff member confirmed, another group tried to kidnap her. An escort from the shelter was able to talk the kidnappers out of it.

She has court hearing under Remain in Mexico rules on Jan. 22, where a judge is expected to decide on her asylum case. If she is rejected, she plans to move to the Mexican city of Saltillo, where she has heard there are more jobs and less violence.

"Just about anywhere is better than here," Ms. Mazariegos added.

IFR_AR_016867

Case 1:24-cv-01702-RC  Document 53-3  Filed 09/27/24  Page 407 of 513

**Write to** Robbie Whelan at robbie.whelan@wsj.com

*Appeared in the December 30, 2019, print edition.*

IFR_AR_016868

FOR OFFICIAL USE ONLY

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Refugee, Asylum, and International Operations Directorate*



**U.S. Citizenship and Immigration Services**

INFORMATION MEMORANDUM

TO:            Jennifer B. Higgins
               Deputy Director

FROM:          Ted Kim, Associate Director                     TED H      Digitally signed
               Refugee, Asylum, and International Operations Directorate   KIM        by TED H KIM
                                                                                      Date: 2024.06.04
                                                                                      11:05:09 -04'00'

DATE:          June 4, 2024

SUBJECT:       **Scheduling of Credible Fear Interviews While the Measures in the
               Securing the Border Interim Final Rule Apply**

---

**Purpose:** To inform you that while the measures in the Securing the Border Interim Final Rule
apply, USCIS will reduce the credible fear (CF) consultation period to a minimum of 4 hours for
all noncitizens who enter across the southern border, are not described in an exception to the
Presidential Proclamation of June 3, 2024, and are processed for expedited removal, as long as
the period falls between 7 a.m. and 7 p.m. local time, starting from the time CBP or ICE provides
the individual with an opportunity to consult – i.e., when the individual is provided access to a
phone – and will deny requests for extensions as unreasonably delaying the process except in
extraordinary circumstances.[1]

**Background:** The Immigration and Nationality Act (INA) authorizes the expedited removal of
certain noncitizens seeking admission who are determined to be inadmissible under certain
grounds of inadmissibility. INA § 235(b)(1). During circumstances in which the measures in
the Securing the Border IFR apply, if noncitizens in expedited removal proceedings manifest a
fear of return, or express an intention to apply for asylum or protection, or express a fear of
return to their country of removal, they are referred to a USCIS asylum officer for a credible fear
interview, INA § 235(b)(1)(A)(ii), *see* new 8 C.F.R. § 235.15(b)(4)(i); and generally will be

---

[1] *See* Section III.D. of the Credible Fear Procedures Manual, which sets forth guidance on such extraordinary
circumstances.

FOR OFFICIAL USE ONLY

FOR OFFICAL USE ONLY

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 2

detained throughout the credible fear screening process, INA § 235(b)(1)(B)(iii)(IV), 8 C.F.R. § 235.3(b)(4)(ii), *see also* new 8 C.F.R. § 235.15(a).

The INA requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to regulations prescribed by [DHS]." INA § 235(b)(1)(B)(iv). Under those regulations, including during circumstances in which the measures in the Securing the Border IFR apply, consultation shall be at no expense to the government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, and […] shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii); *see also* new 8 C.F.R. § 235.15(a). The regulations do not require that the noncitizen be allowed a particular amount of time to consult with the person or persons of their choosing. *Id.*

DHS currently provides a consultation period of at least 24 hours from the time when a noncitizen acknowledges receipt of the M-444, Information About Credible Fear Interview. Noncitizens are not interviewed until 24 hours after CBP or ICE refers a noncitizen to USCIS, unless the noncitizen, at their request, voluntarily waives the consultation period, to provide the noncitizen with the opportunity to consult before the CF interview takes place. This 24-hour consultation period is currently subject to challenge in *M.A. v. Mayorkas*, No. 23-CV-1843 (D.D.C.).

**Considerations:** In recognition that encounter levels are exceeding our capacity to deliver consequences to those encountered at the border in a timely manner due to the limited resources we have available, President Biden issued a Proclamation directing DHS to promptly consider issuing instructions, orders, and regulations to address the circumstances at the border. In response to the Proclamation, DHS and DOJ are issuing an IFR and taking complementary actions.

To support the implementation of these provisions, while the measures in the Securing the Border IFR apply, USCIS will reduce the minimum consultation period for noncitizens subject to the rule to four hours beginning at the time ICE or CBP provides the noncitizen with the opportunity to consult and continuing only during the hours of 7 a.m. and 7 p.m. local time. The 4-hour consultation period is the four hours counted between the hours of 7 a.m. and 7 p.m. local time, such that the four hours counted can be bifurcated and not consecutive. For example, if a noncitizen subject to the 4-hour consultation period is provided access to a phone at 6 p.m., the 4-hour consultation period will constitute: 6 p.m. to 7 p.m. that day and 7 a.m. to 10 a.m. the following day.

As part of a whole-of-DHS approach, this change to the minimum consultation period will support DHS with operationalizing across its components the requirements set forth in the Presidential Proclamation of June 3, 2024 and the Securing the Border IFR. When the conditions at the southern border are such that the suspension and limitation on entry enacted by the Proclamation and the Securing the Border IFR applies, DHS and USCIS's resources are

FOR OFFICAL USE ONLY

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 3

strained, and reasonable attempts must be made to expeditiously conduct expedited removal proceedings for noncitizens arriving during circumstances described in the Presidential Proclamation.  To support expeditious processing, DHS is maximizing the use of expedited removal, and in turn, the number of credible fear screenings that can be conducted.  Lengthy consultation periods, including the 24-hour consultation period, cause credible fear screenings to be delayed, increasing the amount of time noncitizens remain in immigration detention.  Delays in the credible fear screening under such circumstances directly contribute to a situation where DHS's capacity can quickly become overwhelmed.  These factors in circumstances described in the Securing the Border IFR constitute unreasonable delays in the CF process.  Thus, a minimum 4-hour consultation period will support completing expedited removal proceedings at the border in a safe, orderly, and humane manner in order to maximize the number of noncitizens who can be processed during times while the measures in the Securing the Border IFR apply.

The 4-hour consultation period under this guidance will be initiated at the time CBP or ICE provides the individual with an opportunity to consult with a person(s) of the detained noncitizen's choosing– i.e., when the individual is provided access to a phone.  The 4-hour consultation period does not guarantee that a detained noncitizen will be able to reach the person(s) they wish to consult with; however, it does allow sufficient[2] time for individuals to make multiple phone calls and have in-depth conversations.  Although shorter than the period currently in place, the 4-hour consultation period during the above-referenced hours provides noncitizens with an opportunity to consult with a person(s) of their choosing during times when legal service providers are most likely to be available.  The new 4-hour period, like the current 24-hour period, includes Saturdays, Sundays, and holidays.  While USCIS recognizes that it may be more difficult for detained noncitizens to connect with the person(s) they wish to consult on these days, the expediency of the process would be compromised should these days be excluded from the calculation and the inclusion of Saturdays, Sundays, and holidays is also standard practice when the measures in the Securing the Border IFR do not apply.  This shortened consultation period will enable the screening of a majority of migrants on the same day that they are processed, reducing the time such individuals must remain in custody by approximately one day and helping to mitigate overcapacity circumstances which require the release of individuals into immigration proceedings before they receive a credible fear interview.

In addition, as required by statute and regulation, the *Information About Credible Fear Interview Sheet* is provided to the noncitizen prior to the start of the consultation period to inform them of the credible fear interview process, the right to consult with other persons prior to the interview, and the right to seek review by an immigration judge of any negative credible fear determination

---

[2] *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020).  "The Court explained that "asylum seekers shall have access to telephones 'as often as operationally feasible' to 'consult with any person of their choosing, including an attorney', and that '[t]he alien's consultant or attorney may participate in the interview telephonically." *Id*. at 30.  The Court further noted that asylum seekers have an "opportunity to contact an attorney" through an initial one-hour period for telephonic consultation, with "30-minute follow-up as needed[,]" and instructs that "[t]he location for consultation calls must allow sufficient privacy to allow for discussion of confidential matters." *Id.* at 30.  The Court concluded that both provided "a legally sufficient opportunity to consult with others, including a lawyer, before their credible fear interviews or immigration judge review."

FOR OFFICAL USE ONLY

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 4

made by an asylum officer. Noncitizens are also given the opportunity to gain information that they need from their personal property, including contact information, and the EOIR list of free legal service providers is provided in all phone booths in CBP facilities and posted in ICE detention facilities. These practices will continue while the measures in the Securing the Border IFR apply.

The approach described in this memorandum is an internal general policy that USCIS is pursuing in order to effectively implement the measures in the Securing the Border IFR during periods in which it applies, providing for improved procedural efficiency and ensuring appropriate disincentives for irregular migration and strengthening DHS's imposition of consequences. It does not set or modify any binding standard. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

FOR OFFICAL USE ONLY

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 5

**APPENDIX: Legal Background**

As an initial matter, noncitizens seeking entry generally, and those subject to expedited removal more specifically, are entitled only to those due process rights provided by the statute. *See, e.g.*, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[A]n alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted only upon such terms as the United States shall prescribe."); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982). A noncitizen subject to expedited removal under section 235 of the INA, 8 U.S.C. § 1225, is "at the threshold of initial entry [and] cannot claim any greater rights under the Due Process Clause." *Dep't of Homeland Sec. v. Thuraissigiam,* 140 S. Ct. 1959, 1964 (2020).

The expedited removal provision at section 235(b)(1)(B)(iv) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(1)(B)(iv), provides the right for noncitizens in the credible fear process to consult with a person(s) of their choosing prior to their CF interview or any review of the interview, as long as the consultation is at no expense to the government and does not unreasonably delay the process. To implement the statutory provision on consultation, DHS exercised its authority to promulgate the regulation at 8 C.F.R. § 235.3(b)(4)(ii), which provides that noncitizens "shall be given time to contact and consult" such person(s), and a "consultation shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, shall be at no expense to the government, and shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). Neither the statute nor the regulation provides a specific minimum time period in which consultation must occur.

A 24-hour consultation period was the subject of significant litigation in *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020). There, looking at the statutory consultation provisions, together with 8 C.F.R. § 235.3(b)(4)(ii), the Court determined that "[r]ead together, the text of these provisions provide noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained." *Las Americas*, 507 F. Supp. 3d at 25. The Court noted that the procedural rights at this initial stage of the process are necessarily lesser than those further on in the process. *Id*. at 26.

The Court explained that "asylum seekers shall have access to telephones 'as often as operationally feasible' to 'consult with any person of their choosing, including an attorney', and that '[t]he alien's consultant or attorney may participate in the interview telephonically." *Id*. at 30. The Court further noted that asylum seekers have an "opportunity to contact an attorney" through an initial one-hour period for telephonic consultation, with "30-minute follow-up as needed[,]" and instructs that "[t]he location for consultation calls must allow sufficient privacy to allow for discussion of confidential matters." *Id.* at 30. The Court concluded that both provided "a legally sufficient opportunity to consult with others, including a lawyer, before their credible fear interviews or immigration judge review."

442 F.Supp.3d 1
United States District Court, District of Columbia.

L.M.-M., et al., Plaintiffs,

v.

Kenneth T. CUCCINELLI II, in his purported official
capacity as acting Director of U.S. Citizenship
and Immigration Services, et al., Defendants.

Civil Action No. 19-2676 (RDM)
|
Signed 03/01/2020

**Synopsis**

**Background:** Five asylum seekers, namely, two mothers and their three minor daughters who were all Honduran nationals and were subject to expedited removal, and nonprofit legal services organization that assisted immigrants and refugees filed suit against acting Director of United States Citizenship and Immigration Services (USCIS), in his purported official capacity, claiming that he was not lawfully appointed so his asylum directives must be set aside, under Appointments Clause, Federal Vacancies Reform Act (FVRA), Administrative Procedure Act (APA), and as ultra vires, including his written asylum directives that reduced time for asylum seekers to consult with others prior to their credible fear interviews and prohibited asylum officers from granting asylum seekers time extensions to prepare for credible fear interviews as well as his unwritten directive canceling in-person legal orientation process that had allowed asylum seekers to ask questions about their legal rights, and claiming that directives were inconsistent with Immigration Reform and Immigrant Responsibility Act (IIRIRA), FVRA, and APA. Asylum seekers moved for preliminary injunction, and parties cross-moved for partial summary judgment.

**Holdings:** The District Court, Randolph D. Moss, J., held that:

IIRIRA divested statutory jurisdiction only over challenge to unwritten directive;

asylum seekers had standing to pursue challenges to written directives;

acting Director's appointment violated FVRA;

written directives were invalid and would be set aside under FVRA;

written directives were invalid and would be set aside under APA; and

removal orders would be set aside only for five asylum seekers.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Preliminary Injunction; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*6** John T. Lewis, III, Democracy Forward Foundation, Washington, DC, Manoj Govindaiah, Refugee and Immigrant Center for Education and Legal Services, San Antonio, TX, Bradley Jenkins, Catholic Legal Immigration Network, Inc., Silver Spring, MD, for Plaintiffs.

Archith Ramkumar, James Mahoney Burnham, U.S. Department of Justice, Julian Michael Kurz, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

RANDOLPH D. MOSS, United States District Judge

Under the Appointments Clause of Article II of the Constitution, the President must obtain "the Advice and Consent of the Senate" before appointing any principal **\*7** officer of the United States and, unless Congress vests the appointment power in the President, a court, or a department head alone, before appointing any inferior officer as well. U.S. Const., Art. II, § 2, cl. 2. This requirement is "more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam)). By dividing authority between the President and the Senate, the Appointments Clause serves as a check on both branches of government and a means of "promot[ing] ... judicious choice[s] of [persons] for filling the offices of the union." The Federalist No. 76, at 454–59 (C. Rossiter ed. 1961) (A. Hamilton). "The constitutional process of Presidential

appointment and Senate confirmation, however, can take time," raising the prospect that the duties and functions assigned to an office requiring Presidential appointment and Senate confirmation (referred to as a "PAS" office) can go unperformed if the President and Senate "cannot promptly agree on a replacement." *NLRB v. SW General, Inc.,* ––– U.S. ––––, 137 S. Ct. 929, 934–35, 197 L.Ed.2d 263 (2017). Recognizing this reality, Congress has, since the early days of the Republic, authorized "the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation." *Id.* at 934, 137 S.Ct. 929.

The Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3345 *et seq.*, represents the "latest version of that authorization." *SW General, Inc.*, 137 S. Ct. at 934. Subject to exceptions not relevant here, it sets forth the exclusive means of temporarily filling vacancies in PAS offices. The default rule under the FVRA is that the "first assistant" to the vacant office automatically serves as the acting official when a vacancy arises. 5 U.S.C. § 3345(a)(1). That default rule applies unless the President, and only the President, directs that (1) a person who has been confirmed by the Senate to serve in another PAS office or (2) an officer or employee of the agency in question, who has worked for that agency in a senior position for at least 90 of the 365 days preceding the vacancy, "perform the functions and duties of the vacant office temporarily in an acting capacity." *Id.* § 3345(a)(2) and (3). The question presented in this case is whether the acting Director of the United States Citizenship and Immigration Services ("USCIS"), Kenneth Cuccinelli II, was appointed in conformity with the FVRA.

The relevant events began on June 1, 2019, when Lee Francis Cissna, the Senate-confirmed Director of USCIS, resigned, and, as the FVRA prescribes, his "first assistant," Deputy Director Mark Koumans, automatically assumed the post of acting Director. *See* Dkt. 22-1 at 14 (Pls.' SUMF ¶¶ 81–84); Dkt. 17-2 at 5–7, 12 (USCIS order of succession); Dkt. 12-6 at 2 (Monk Decl. ¶ 6). Koumans's tenure, however, was short-lived. Nine days after Director Cissna's resignation, the then-serving acting Secretary of the Department of Homeland Security, Kevin McAleenan, appointed Cuccinelli "to serve as the Principal Deputy Director of [USCIS]," Dkt. 17-4 at 5 (Blackwell Decl., Ex. 1), a position that did not exist prior to Cuccinelli's appointment, *see* Dkt. 17-2 at 12 (Johnson Decl., Ex. 1 at D-1). That same day, acting Secretary McAleenan also revised USCIS's order of succession, designating the newly created position of Principal Deputy Director as "the

First Assistant and most senior successor to the Director of USCIS." Dkt. 17-4 at 7 (Blackwell Decl., Ex. 2). These two changes—both of which occurred after the vacancy **\*8** arose—allowed Cuccinelli to leapfrog Koumans to become USCIS's acting Director.

But neither of these changes was designed to endure. Acting Secretary McAleenan specified that Cuccinelli's appointment as Principal Deputy Director "will remain in effect until the earlier to occur of (1) the appointment of a Director of USCIS by the President of the United States, or (2) the express revocation of this appointment."*Id.* at 5 (Blackwell Decl., Ex. 1). And acting Secretary McAleenan specified that the revised order of succession, which re-designated the Principal Deputy Director position as the "first assistant" to the Director, "will terminate automatically, without further action, upon the appointment of a new Director of USCIS by the President." *Id.* at 7 (Blackwell Decl., Ex.2). In other words, as soon as the vacant office is filled, the status quo will be restored.

On July 2, 2019, three weeks after assuming his new office, Cuccinelli issued a memorandum announcing a revised policy for scheduling credible-fear interviews in expedited removal proceedings. AR 113. Under the revised policy, USCIS (1) reduced the time allotted for asylum seekers to consult with others prior to their credible-fear interviews from 72 or 48 hours to "one full calendar day from the date of arrival at a detention facility," AR 113 ("reduced-time-to-consult directive"), and (2) prohibited asylum officers from granting asylum seekers extensions of time to prepare for their credible-fear interviews, "except in the most extraordinary of circumstances," *id.*; *see also* AR 114 ("prohibition-on-extensions directive"). Although not reflected in the memorandum, Plaintiffs assert that Cuccinelli also cancelled "[t]he in-person [legal] orientation process that was" previously "in place" at the Dilley Detention Center in Dilley, Texas. Dkt. 12-2 at 3–4 (Fluharty Decl. ¶¶ 6–7) ("in-person-orientation directive"). Before its cancellation, according to Plaintiffs, that policy "allowed asylum seekers to ask questions about their legal rights, provided the only means of transmitting information to asylum seekers who cannot read, and facilitated understanding for asylum seekers with special needs, including disabilities or competency issues." Dkt. 12 at 18; *see also* Dkt. 12-2 at 3–4 (Fluharty Decl. ¶¶ 6–7). Taken together, Plaintiffs refer to these revised policies as the "Asylum Directives."

Plaintiffs, five individual native Honduran asylum seekers (two adults and three of their minor children) and the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), a nonprofit organization that provides legal services to refugees, challenge the lawfulness of the Asylum Directives on multiple grounds. First, they allege that Cuccinelli was not lawfully appointed to serve as the acting Director of USCIS and that, as a result, the Asylum Directives must be set aside under the Appointments Clause, the FVRA, 5 U.S.C. § 3348(d)(1), the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and as *ultra vires*. Dkt. 1 at 63–68 (Compl. ¶¶ 225–36). Second, they allege that the Asylum Directives themselves are inconsistent with various statutory and regulatory requirements, including an asylum applicant's statutory right to "consult with a person or persons of the alien's choosing prior to the [credible-fear] interview," 8 U.S.C. § 1225(b)(1)(B)(iv), and the regulatory authority of asylum officers freely to reschedule credible-fear interviews whenever the asylum seeker "is unable to participate effectively ... because of illness, fatigue, or other impediments," 8 C.F.R. § 208.30(d)(1). Dkt. 1 at 57–58 (Compl. ¶¶ 194–97). Third, they contend that the Asylum Directives are arbitrary and capricious because USCIS failed to consider how the Directives harm asylum **\*9** seekers, acted based on "animus toward immigrants" and failed to provide an adequate justification for the policy changes. *Id.* at 58–59 (Compl. ¶¶ 198–204). Fourth, they further allege that USCIS failed to comply with the APA's notice-and-comment and advanced-notice requirements. *Id.* at 59–60 (Compl. ¶¶ 207–08). Fifth, Plaintiffs maintain that the Asylum Directives discriminate against asylum seekers with "trauma-related and other mental impairments" in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*. *Id.* at 60–62 (Compl. ¶¶ 209–18). Finally, they allege that the Asylum Directives violate the First Amendment by interfering with the ability of the individual Plaintiffs and RAICES "to communicate and [to] associate" with one another regarding the individual Plaintiffs' legal rights. *Id.* at 62–63 (Compl. ¶¶ 219–23).

As explained below, the Court is satisfied that at least one Plaintiff has Article III standing and that the Court has statutory jurisdiction over Plaintiffs' challenges to the reduced-time-to-consult and prohibition-on-extensions directives. The Court is not persuaded, however, that it has statutory jurisdiction over Plaintiffs' challenge to the in-person-orientation directive. On the merits, the Court concludes that Cuccinelli was not lawfully appointed to serve as acting Director and that, as a result, he lacked authority to issue the reduced-time-to-consult and prohibition-on-

extensions directives. The remedy for that deficiency, moreover, is compelled by the FVRA and the APA: the Asylum Directives must be set aside. Finally, having reached that conclusion, the Court need not—and does not—reach Plaintiffs' alternative legal challenges.

# I. BACKGROUND

## A. The Expedited Removal System

Congress first introduced the concept of expedited removal when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996. Pub. L. No. 104-208, Div. C, 110 Stat. 3009–546, 3009 (1996) (codified as amended in scattered sections of 8 U.S.C.). Expedited removal procedures allow the Department of Homeland Security ("the Department") to remove a subset of aliens—those arriving at the border and those who recently entered the United States without inspection—with considerably less process than the formal proceedings required to remove other aliens. *See* 8 U.S.C. § 1225(b)(1)(A)(i). IIRIRA, in particular, authorizes the Department to remove aliens subject to expedited removal procedures "without further hearing or review[.]" *Id.* If an alien subject to expedited removal "indicates either an intention to apply for asylum ... or a fear of persecution," however, then the immigration officer is required to "refer the alien for an interview by an asylum officer," *id.* § 1225(b)(1)(A)(ii), who must determine whether the alien has a "credible fear of persecution," *id.* § 1225(b)(1)(B).

IIRIRA sets out procedures that are to be used when an alien is referred to an asylum officer for a credible-fear interview. The alien must be "provide[d] [with] information concerning the asylum interview" and must be allowed to "consult with a person or persons of the alien's choosing prior to the interview," although "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." *Id.* § 1225(b)(1)(B)(iv). If the asylum officer determines that the alien has a credible fear of persecution, "the alien [is] detained for further consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and is typically placed in formal removal proceedings. If the asylum officer determines that the alien does not have a credible fear of persecution, **\*10** "the officer shall order the alien removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

USCIS oversees credible-fear interviews. Although the now-defunct Immigration and Naturalization Service ("INS") once oversaw asylum applications, *see, e.g.*, U.S. Department of Justice, Immigration and Naturalization, Asylum, 39 Fed. Reg. 41,832 (Dec. 3, 1974), the "functions" of adjudicating "asylum and refugee applications" and of "establish[ing] the policies for performing [that] function" were transferred to the Director of USCIS by the Homeland Security Act of 2002, Pub. L. No. 107-296, Subtitle E, 116 Stat. 2195 (codified at 6 U.S.C. § 271 *et seq.*), 6 U.S.C. § 271(a)(3)(A) and (b)(3). Consistent with those authorities, the USCIS Director establishes policies for processing aliens that have been referred to USCIS for a credible-fear determination. *See, e.g.*, USCIS, Policy Memorandum, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-* (July 11, 2018), available at https://tinyurl.com/y6xt6j8l (last accessed March 1, 2020).

**B. Cuccinelli's Appointment**

On June 1, 2019, Lee Francis Cissna resigned as Director of USCIS, creating a vacancy in that PAS position. Dkt. 22-1 at 14 (Pls.' SUMF ¶ 81); Dkt. 26 at 2 (Response to Pls.' SUMF). Under USCIS's order of succession at the time, Deputy Director Mark Koumans served as the Director's "first assistant" and thus, pursuant to the FVRA's default rule, automatically became the acting Director. Dkt. 12-6 at 13 (Monk Decl., Ex. 4). A few days later, on June 6, 2019, the Department's Office of Human Capital & Training sent Kenneth Cuccinelli II a letter "[c]ongratulat[ing] [him] on [his] noncareer Senior Executive Service (SES) appointment as Principal Deputy Director, ES-0301, U.S. Citizenship and Immigration Service," effective on June 10, 2019. Dkt. 17-3 at 5 (Monroe Decl., Ex. 1). Prior to his appointment to that position, Cuccinelli had never been employed by the federal government. Dkt. 12-6 at 9 (Monk Decl., Ex. 2). Although not stated in the letter, it is undisputed that the Principal Deputy Director position did not exist prior to Cuccinelli's appointment. Dkt. 22-1 at 14 (Pls.' SUMF ¶ 85); Dkt. 26 at 2 (Response to Pls.' SUMF). Consistent with the Department's letter, on June 10, 2019, then-acting Secretary McAleenan appointed Cuccinelli "to serve as the Principal Deputy Director of [USCIS]." Dkt. 17-4 at 5 (Blackwell Decl., Ex. 1). The appointment will expire without further action upon "the appointment of a Director of USCIS by the President of the United States." *Id.*

On the same day as Cuccinelli's appointment, acting Secretary McAleenan also issued a memorandum entitled "Amendment to the Order of Succession for [USCIS]." *Id.* at 7 (Blackwell Decl. Ex. 2). The memorandum consists of a single paragraph, which provides as follows:

> Pursuant to Paragraph II.K of Department of Homeland Security ... Delegation No. 0106, *DHS Orders of Succession and Delegations of Authority for Named Positions* (last updated on April 10, 2019), I am exercising my reserved right to re-designate the order of succession for [USCIS] .... I hereby designate the Principal Deputy Director of USCIS as the First Assistant and most senior successor to the Director of USCIS in such order of succession. Annex D of DHS Delegation No. 0106 is hereby modified in accordance with this designation. This designation, and the corresponding modification to Annex D of DHS Delegation No. 0106, will terminate automatically, without further action, **\*11** upon the appointment of a new Director of USCIS by the President. I reserve the right to amend or revoke this designation and such modification at any time.

*Id.* at 7 (Blackwell Decl. Ex. 2). The acting Secretary thus designated the newly created position of Principal Deputy Director as the "first assistant" to the Director for purposes of the FVRA, *see* Dkt. 17-2 at 5–6, 12 (Johnson Decl., Ex. 1), but only until the appointment of a new Director of USCIS by the President, Dkt. 17-4 at 7 (Blackwell Decl., Ex. 2). As a result, on the first day Cuccinelli reported to USCIS for work, he displaced Deputy Director Koumans as the acting Director. *See* Dkt. 12-6 at 9 (Monk Decl., Ex. 2). That appointment—and the parallel designation—will expire when the vacant office is filled. Dkt. 17-4 at 5 (Blackwell Decl., Ex. 1); *id.* at 7 (Blackwell Decl. Ex. 2).

**C. The Asylum Directives**

On July 2, 2019, Cuccinelli sent the acting Secretary of Homeland Security a memorandum notifying him that, "effective July 8, 2019, USCIS [1] is reducing the credible

fear ... consultation period to one full calendar day from the date of arrival at the detention facility ... and [2] will deny requests for extensions, as unreasonably delaying the process, except in the most extraordinary circumstances." AR 113. The memorandum explained that the Immigration and National Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1101 *et seq.*), provides asylum seekers "in the credible fear process" the right "to consult with a person(s) of their choosing, as long as the consultation is at no expense to the government and does not unreasonably delay the process." AR 113. Under the pre-existing policy, those held at Family Residential Centers ("FRCs") were "given 72 hours after arrival at the facility and re-orientation by USCIS to seek and receive consultation," and at all other detention facilities, "single adults [were] generally not interviewed until at least 48 hours after arrival at the detention facility in order to [be able to] seek and receive consultation before the interview [took] place." *Id.*

According to the memorandum, Cuccinelli decided to reduce the credible-fear consultation period, and to limit the availability of extensions to only "the most extraordinary circumstances," for two reasons. *Id.* First, he explained that USCIS had recently "completed revisions to [its] Form M-444, *Information About Credible Fear Interview*," AR 113–14. USCIS gives that form to detainees upon their arrival at a detention facility to comply with its statutory and regulatory obligations to provide asylum seekers subject to expedited removal with "information concerning the asylum interview." 8 U.S.C. § 1225(b)(1)(B)(iv); 8 CFR § 208.30(d)(2); 6 U.S.C. § 271(b)(3) (transferring to the Director responsibility for the function of adjudicating asylum applications). By "using plain language principles in order to provide greater clarity to the alien during the consultation process," AR 113–14, Cuccinelli explained, the revised M-444 form "makes the [credible-fear] process easier for aliens to understand," and thus justifies a shortened consultation period, AR 114. Second, the memorandum asserted, without elaboration, that the policy shifts were also justified because "USCIS must do its part to ensure the processing of aliens is not unduly delayed in light of the situation at the Southwest Border." AR 114. The memorandum's concluding paragraph, repeated both rationales, stating:

> Given the critical need [at the Southwestern border], coupled with the improvements made to the

M-444[,] which makes the [credible-fear] process easier **\*12** for aliens to understand, [the acting USCIS Director has] decided to reduce the timeframe for consultation to one full calendar day at both the FRCs and all other facilities. In practice, this means individuals will have longer than 24 hours to consult depending on when they arrive at the facility. Reducing the time period for consultation could lead to longer delays at a later point in the process for some cases, as USCIS may receive more frequent requests to reschedule interviews. However, USCIS is also establishing a new policy of requiring extraordinary circumstances warranting approval of a request to reschedule so that USCIS can ensure, consistent with the statute, that the consultation period does not unreasonably delay the overall process.

AR 114.

On July 8, 2019, USCIS updated its "Credible Fear Procedures Manual" to reflect the policy changes announced in the memorandum. AR 115–17. The updated manual notes that it is now the policy of "the Asylum Program to allow a minimum of one full calendar day to transpire between the arrival of an alien at a detention site or receipt of initial M-444 (whichever is later) and any credible[-]fear interview." AR 117. It further states that "[i]f USCIS is prepared to proceed with the interview after the consultation period has passed, asylum offices normally will deny requests for extensions of the consultation period, ... except in extraordinary circumstances." *Id.* Finally, the updated manual notes that "[e]xtraordinary circumstances may include, but are not limited to, serious illness or mental or physical disability of the alien, a member of the alien's immediate family, or the alien's consultant, and facility issues that prevent the alien from contacting a consultant." AR 117.

Although not memorialized in the memorandum, or in any other written policy produced in this litigation, Plaintiffs offer evidence that Cuccinelli adopted a third, significant change in policy relating to the ability of asylum seekers to

prepare for their credible-fear interviews. Prior to issuance of the memorandum, "USCIS officials at [the Dilley Detention Center in South Texas] would provide an oral, in-person legal orientation, which allowed asylum seekers to ask questions about their legal rights." Dkt. 12-2 at 3 (Fluharty Decl. ¶ 6). As part of that process:

> [M]others and their minor children watched a video that explained the nature and purpose of the credible[-]fear interview ... and sat down individually with an asylum officer who: (1) provided them with a written copy of Form M-444, (2) asked them if they had any questions regarding the interview process, (3) confirmed which language they speak and understand best, (4) confirmed whether the family prefers to speak with a male or female officer, and (5) provided the family with two copies of Form G-56, which indicated the day and time their interview would take place.

*Id.* According to Plaintiffs, that process "has now been canceled." *Id.* (Fluharty Decl. ¶ 7).

### D. Plaintiffs

Plaintiff L.M.-M. is a Honduran national who, along with her two minor children, Plaintiffs B.M.-M. and V.M.-M, is "currently seeking asylum in the United States." Dkt. 12-3 at 1 (L.M.-M. Decl. ¶ 1). She attests that she fled Honduras because she has been "targeted by the Honduran government" due to her "political opinion" and "because [her] partner and the father of [her] youngest child beat [and] raped" her, "hit [her] daughters," "threatened to harm [her] if [she] ever left **\*13** him, and when [she] did leave him, ... continued to pursue and threaten [her.]." *Id.* at 1–2 (L.M.-M. Decl. ¶ 2). On August 10, 2019, L.M.-M. and her daughters entered the United States and soon thereafter were detained and placed in expedited removal proceedings. *Id.* at 2 (L.M.-M. Decl. ¶ 4).

L.M.-M. and her daughters were detained at two separate facilities before they were transferred to the USCIS "detention center in Dilley, Texas on August 13, 2019." *Id.* The day

after they arrived, L.M.-M. attended a "Know Your Rights presentation" and spoke with a legal assistant from the Dilley Pro Bono Project for less than an hour. *Id.* at 3 (L.M.-M. Decl. ¶ 8). She continued to confer with the legal assistant for about forty-five minutes after dinner, but her appointment was cut short by the guards before she "finished discussing [her] case." *Id.* at 3–4 (L.M.-M. Decl. ¶ 8). That same evening, she was given a "piece of paper" that said she had a meeting scheduled "in the asylum building" at 10:00 a.m. the next morning. *Id.* at 4 (L.M.-M. Decl. ¶ 9). The paper "did not explain what [her] appointment would be about or any other information about the credible[-]fear process." *Id.*

L.M.-M. attests that, at her credible-fear interview the next day, she "was unable to talk about [her] fear of [her] abusive partner." *Id.* at 4 (L.M.-M. Decl. ¶ 10). She also avers that she "was worn out and tired from the exhaustive intake process the day before as well as the many other appointments and meetings [she] had to attend." *Id.* The interviewer determined that L.M.-M. did not have a credible fear of persecution, and that determination was "subsequently affirmed by an Immigration Judge." Dkt. 22-1 at 23 (Pls.' SUMF ¶ 151) (citing Dkt. 22-4 at 1 (Supp. L.M.-M. Decl. ¶ 2)). L.M.-M. and her children are currently subject to orders of expedited removal. *See id.*

Like L.M.-M., Plaintiff M.A.-H. is a Honduran national who, along with her minor daughter, Plaintiff I.M.-A., is seeking asylum in the United States. Dkt. 12-4 at 1 (M.A.-H. Decl. ¶ 1). Plaintiff M.A.-H. attests that she "suffered persecution in Honduras" because she supports the "National Party in Honduras;" that she endured "sexual abuse, rape, and physical abuse" while in Honduras; and that she feared that her daughter, who "ha[d] been stalked by ... MS-13 [gang] members,"[1] "would soon be kidnapped, drugged, and raped" in Honduras. *Id.* at 1–3 (M.A.-H. Decl. ¶¶ 3–9). Upon entering the United States, she and her daughter were detained by immigration officials, placed in expedited removal proceedings, and then transferred to the Dilley Detention Center. *Id.* at 5–6 (M.A.-H. Decl. ¶¶ 16, 22).

M.A.-H. and her daughter "arrived at Dilley on August 21 at 4:00 p.m." *Id.* at 6 (M.A.-H. Decl. ¶ 22). She received neither an M-444 form nor an in-person legal orientation. *Id.* USCIS officials did give her some "documents to sign," which they assured her "were not legal documents." *Id.* She signed the documents even though she was unable to read them, and, because the USCIS officials did not explain what the documents were, she did not understand what she was

signing. *Id.* The next day she attended an orientation about the facility, received a medical examination, and sought a legal appointment—but there were no remaining appointments available that day. *Id.* at 6–7 (M.A.-H. Decl. ¶ 23). "[A]round 7:00 pm that night," M.A.-H received a notice informing her that her credible-fear interview would take place at "8:00 am the next morning." *Id.* at 7 (M.A.-H. Decl. ¶ 23). At 7:30 a.m., M.A.-H. went **\*14** to look for a lawyer, but when she found one, the lawyer told her that there was insufficient "time to prepare [for her credible-fear interview] and that [she] should go and ask for more time in order to obtain legal orientation." *Id.* (M.A.-H. Decl. ¶ 24). M.A.-H. requested "additional time to prepare and "was given 30 minutes." *Id.* (M.A.-H. Decl. ¶ 25). She then returned to the lawyer, who advised her to request 24 hours to prepare, but the asylum officer denied that request and pressed forward with the interview. *Id.* In addition to being denied the opportunity to prepare or to substantively consult with counsel, the short turnaround time between arriving at Dilley and her credible-fear interview prevented M.A.-H. from "sp[eaking] with [her] brother[ ] or son," both of whom had "additional information that would have helped [her] explain the circumstances that caused [her] fear and ... [her] need to leave" Honduras. *Id.* (M.A.-H. Decl. ¶ 24).

Asylum officers determined that M.A.-H. and her minor daughter did not have a credible fear of persecution, and an Immigration Judge affirmed those determinations. Dkt. 22-1 at 27 (Pls.' SUMF ¶ 188) (citing Dkt. 22-5 (Supp. M.A.-H. Decl. ¶ 13)). As a result, like L.M.-M. and her children, M.A.-H. and her daughter are subject to orders of expedited removal. [2] *See id.* M.A.-H. attests that, due to the Asylum Directives, she did not have an adequate opportunity to prepare for her credible-fear interview and that, with additional time to consult, she "would have understood the process better" and "would have been in a better position to describe the threats facing [her] daughter" and the abuse that she herself had suffered. Dkt. 12-4 at 8 (M.A.-H. Decl. ¶ 26).

Plaintiff "RAICES is a ... non-profit organization headquartered in San Antonio, Texas." Dkt. 12-5 at 2 (Meza Decl. ¶ 3). Its stated "mission is to defend the rights of immigrants and refugees, empower individuals, families and communities, and advocate for liberty and justice." *Id.* (Meza Decl. ¶ 4). Although RAICES accepts "cases of clients in detention centers throughout Texas," it serves as "the primary non-profit service provider at" the Karnes County Residential Center in Karnes City, Texas ("Karnes") and "strives to provide free, universal representation through

all phases of the immigration process during detention at Karnes." *Id.* at 2–3 (Meza Decl. ¶¶ 4–7). RAICES serves "between 80–95% of the population at Karnes" by, among other things, "conduct[ing] consultations and intakes, prepar[ing] detainees for their credible[-]fear interviews and represent[ing] detainees at their credible[-]fear interviews," and "appealing negative decisions from their credible[-]fear interviews." *Id.* at 3 (Meza Decl. ¶¶ 6–7).

## E. Procedural Background

The reduced-time-to-consult and prohibition-on-extensions directives took effect on July 8, 2019, *see* AR 113, and 60 days later, on September 6, 2019, the individual Plaintiffs and RAICES brought this suit, Dkt. 1, alleging that (1) Cuccinelli's appointment to serve as acting Director of USCIS was unlawful under both the FVRA and the Appointments Clause and that, as a result, the Asylum Directives are invalid; (2) the Asylum Directives are, in any event, contrary to law, including the statutory requirement that USCIS provide asylum applicants with a meaningful opportunity to "consult with a person or persons **\*15** of the alien's choosing prior to the [credible-fear] interview," 8 U.S.C. § 1225(b)(1)(B) (iv), and the regulatory authority of asylum officers freely to reschedule credible-fear interviews whenever the asylum seeker "is unable to participate effectively ... because of illness, fatigue, or other impediments," 8 C.F.R. § 208.30(d) (1); (3) the Asylum Directives are arbitrary and capricious; (4) USCIS failed to comply with the APA's notice-and-comment and advanced-notice requirements; (5) the Asylum Directives violate the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; and (6) the Asylum Directives violate the First Amendment by interfering with the ability of the individual Plaintiffs and RAICES to communicate and associate regarding the asylum process.

Three weeks after filing their complaint, Plaintiffs moved for a preliminary injunction. Dkt. 12. That motion relies on only four of the claims set forth in the complaint—Plaintiffs' FVRA challenge to Cuccinelli's appointment; their contention that the Asylum Directives violate various statutory and regulatory requirements; their claim that the directives are arbitrary and capricious; and their Rehabilitation Act claim. Dkt. 12 at 12. On December 3, 2019, the Court held a hearing on Plaintiffs' motion for a preliminary injunction. Minute Entry (Dec. 3, 2019). At the hearing, the Court raised the question whether that motion should be treated as an expedited motion for summary judgment, and neither Plaintiffs nor Defendants opposed proceeding in that fashion. Dkt. 24 at 6 (Dec. 3, 2019 Hrg. Tr.). The Court, accordingly,

directed that Plaintiffs' pending motion for a preliminary injunction be treated as a partial motion for summary judgment on counts I, II, IV, and VI of the complaint, *see* Fed. R. Civ. P. 65(a)(2); Minute Order (Jan. 9, 2020), and set a schedule for Plaintiffs' to supplement their submission and for Defendants to respond to Plaintiffs' motion for partial summary judgment, Entry Order (Dec. 3, 2019). Defendants, in turn, cross-moved for partial summary judgment on Counts I and II of the complaint. Dkt. 25 at 8.

## II. ANALYSIS

Before reaching the merits of Plaintiffs' claims, the Court must determine whether it has jurisdiction. *See* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

Defendants assert that the Court lacks jurisdiction for several reasons. First, they argue that neither the individual Plaintiffs nor RAICES has Article III standing. Dkt. 17 at 26–30. Second, they contend that RAICES lacks statutory standing to sue under the INA. *Id.* at 24. Third, they maintain that the Court's statutory jurisdiction is limited to challenges to "written policy directive[s]" and thus does not include Plaintiffs' challenge to the discontinuance of the in-person legal orientation program at the Dilley Detention Center. *Id.* at 25–26. As explained below, the Court agrees with Defendants' final contention—that the Court lacks statutory jurisdiction over Plaintiffs' challenge to the in-person-orientation directive.[3] But with respect to the reduced-time-to-consult and prohibition-on-extensions directives, the Court concludes that the individual Plaintiffs have Article III standing and that those **16** claims fall within the Court's statutory jurisdiction. Finally, having reached that conclusion, the Court need not decide whether RAICES also has standing to pursue those same claims and to seek the same relief. *See* Town of Chester, N.Y. v. Laroe Estates, Inc., ––– U.S. ––––, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017) ("At least one plaintiff must have standing to seek each form of relief requested.").

Because Defendant's Article III standing argument turns in part on the scope of the Court's statutory jurisdiction, the Court begins by addressing Defendants' arguments concerning that issue.

### A. Statutory Jurisdiction

Although their arguments are cast in terms of Article III redressability, Defendants posit that the Court lacks statutory jurisdiction under 8 U.S.C. § 1252(e)—or 28 U.S.C. § 1331—to review an order of expedited removal, except under limited circumstances not present here. Dkt. 17 at 30. That argument rests on the premise that IIRIRA "does not authorize review of a credible-fear determination once an order of expedited removal has issued." *Id.* Plaintiffs disagree and argue instead that asylum seekers subject to expedited removal orders may "challenge the policies by which [their expedited] orders [of removal] were issued." Dkt. 19 at 11. The plain text of the statute and instructive D.C. Circuit precedent confirm that Plaintiffs have the better argument. That conclusion is not a total victory for Plaintiffs, however. Rather, as explained below, Defendants are correct that the Court lacks statutory jurisdiction over one of Plaintiffs' challenges.

IIRIRA expressly contemplates that its expedited removal provision, 8 U.S.C. § 1225(b), and the regulations and policies adopted to implement that provision, might be subject to judicial challenge. The statute thus permits "judicial review of the ... [expedited removal] system" and its implementing regulations and policies, *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1354 (D.C. Cir. 2000) (hereinafter "*AILA*"), but (1) limits the scope of relief available in habeas corpus and (2) channels and sets time limits on systemic challenges to the expedited removal system and the regulations and written guidance that implement it, *see* 8 U.S.C. § 1252(e). Defendants contend that this provision precludes the Court from redressing the individual Plaintiffs' injuries because, "once an order of expedited removal has issued," an alien may obtain judicial review only in limited circumstances not applicable here. Dkt. 17 at 30. That contention fails for several reasons.

The Court's analysis of the meaning IIRIRA's channeling provision is guided by the "familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010). Under that principle, which the courts have "consistently applied to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction," if "a statute is reasonably susceptible to divergent interpretation," courts must "adopt the reading that accords with the traditional understanding[ ]" that "executive determinations are generally subject to judicial review." *Id.* (internal quotations omitted). Here, far from unambiguously foreclosing judicial review, IIRIRA's channeling provision,

§ 1252(e), is best read to permit individual asylum seekers expeditiously to bring systemic challenges to IIRIRA's expedited removal provision and its implementing regulations and policies, even if those individuals are subject to final orders of removal.

**\*17** The Court begins with the text of the statute. *See* *BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 91, 127 S.Ct. 638, 166 L.Ed.2d 494 (2006). Defendants are correct that IIRIRA divests courts of jurisdiction to review "any individual determination or to entertain any other cause of action or claim arising from or relating to the implementation or operation of an order" of expedited removal, except as provided in 8 U.S.C. § 1252(a)(2)(A)(i). It is also true that "no court shall have jurisdiction to review" any "procedures and policies adopted" by USCIS "to implement the" expedited review provisions of the IIRIRA, except as provided in 8 U.S.C. § 1252(e). *Id.* § 1252(a)(2)(A)(iv). Defendants incorrectly assert, however, that § 1252(e) permits this Court to consider only "whether the petitioner is an alien, whether the petitioner was actually ordered removed, or whether the petitioner can provide that he or she was lawfully admitted as a permanent resident, refugees, or asylee." Dkt. 17 at 30. Implicit in Defendants' argument is the suggestion that § 1252(e)(2)—the provision governing "habeas corpus proceedings"—constitutes the exclusive avenue of judicial recourse once the affected person is subject to an order of expedited removal. But that premise ignores the very next paragraph of § 1252(e)—entitled "challenges on validity of the system"—which provides for judicial review of systemic challenges to the expedited removal system and its implementing regulations or written policies.

Section 1252(e)(3) provides, in relevant part:

### (A) In general

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

(i) whether such section, or any regulation issued to implement such section, is constitutional; or

(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

### (B) Deadlines for bringing actions

Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure ... is implemented.

8 U.S.C. § 1252(e)(3).[4] Under § 1252(e)(3), a court has jurisdiction to review "determinations" made in the expedited removal context if three conditions are satisfied: First, the plaintiff must challenge the constitutionality or lawfulness of § 1225(b)—IIRIRA's expedited removal provision—or the constitutionality or lawfulness of "a regulation, written policy directive, written policy guidance, or written procedure" adopted to implement that provision. 8 U.S.C. § 1252(e)(3)(A). Second, the challenge must be "instituted in the United States District Court for the District of **\*18** Columbia." *Id.* Third, the action "must be filed no later than 60 days after the date the challenged section, regulation, directive, guidance, or procedure ... is first implemented." *Id.* § 1252(e)(3)(B).

With one exception discussed below, the individual Plaintiffs' claims satisfy all three conditions. Plaintiffs brought this action in the correct jurisdiction within 60 days of issuance of the Asylum Directives. The directives set forth in the July 2 memorandum were implemented on July 8, 2019, *see* AR 113, and Plaintiffs filed suit in this Court 60 days later, on September 6, 2019. Dkt. 1. The suit also challenges the lawfulness of two "written policy directive[s]," "policy guideline[s]," or "procedure[s]," 8 U.S.C. § 1252(e)(3)(A)(ii)—the reduced-time-to-consult and prohibition-on-extensions directives are memorialized in the July 2 memorandum and are also reflected in USCIS's "Credible Fear Procedures Manual." AR 113–17. Thus, the individual Plaintiffs' claims fall squarely within the plain terms of § 1252(e)(3).

Had Congress intended to close the door to judicial review on aliens who are subject to final orders of expedited removal even when their challenges satisfy the requirements of § 1252(e)(3)—as Defendants contend—it knew how to say so. Section 1252(a)(2)(C), for example, provides that, with an exception not relevant here, "no court shall have jurisdiction to review a final order of removal against an alien who is removable by reason of having committed" certain criminal offenses. 8 U.S.C. § 1252(a)(2)(C). Although Congress provided that "no Court shall have jurisdiction to review ...

any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an [expedited] order of removal," it included an express carve out for claims brought "as provided in [§ 1252(e)]." *Id.* § 1252(a)(2)(i); *see also id.* § 1252(a)(5) (reiterating the carve out for challenges pursuant to 8 U.S.C. § 1252(e)). Thus, the statute expressly contemplates that aliens may seek judicial review of written directives implementing the expedited removal system if the aliens satisfy the conditions set out in § 1252(e). *See AILA*, 199 F.3d at 1360 ("Congress meant to allow litigation challenging the [expedited removal] system by... aliens against whom the [expedited removal] procedures had been applied"). The individual Plaintiffs' challenge is just such an action.

Defendants' contention that § 1252(e) strips the Court of jurisdiction over the individual Plaintiffs' challenge is also is at odds with the D.C. Circuit's decision in *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000), a case that Defendants trumpet in support of their contention that RAICES lacks statutory standing. *See, e.g.*, Dkt. 17 at 23. In *AILA*, the D.C. Circuit addressed a challenge to the expedited removal provision and its implementing regulations by immigrants' rights organizations and by individual aliens on the ground that the statute and regulations violated the constitutional and statutory rights of the individual plaintiffs and of unnamed aliens who might someday be subject to them. 199 F.3d at 1357. The D.C. Circuit affirmed the district court's dismissal of the individual plaintiffs on the ground that they filed suit after the 60-day period established by § 1252(e)(3) had expired. *Id.* That left, then, only the claims of the organizational plaintiffs. As to those claims, the D.C. Circuit rejected the contention that the organizational plaintiffs had standing to sue on behalf of aliens—who, according to the plaintiffs in that case, could not protect their own rights—because "nothing [would] prevent[ ]" "an alien returned to his native country" from bringing a systemic challenge to IIRIRA and its implementing regulations, so long as suit was **\*19** brought within 60 days. *Id.* at 1362–63. But, if Defendants were correct that an alien ordered removed under § 1225(b) may sue only under § 1252(e)(2), that pillar of *AILA* would fall. Indeed, if Defendants were right, it is difficult to imagine when, if ever, anyone could bring a systemic challenge under § 1252(e)(3).

Defendants do advance one persuasive argument, however. That argument takes aim at Plaintiffs' challenge to the portion of the Asylum Directives that, Plaintiffs say, discontinued USCIS's policy of "providing an oral, in-

person legal orientation to those detained at the Dilley Detention Center." *See* Dkt. 1 at 47 (Compl. ¶ 155). As Defendants note, the problem with Plaintiffs' challenge to the in-person-orientation directive is that § 1252(e)(3)(A)(ii) only provides this Court with jurisdiction to review "*written* policy directive[s], *written* policy guideline[s], or *written* procedure[s]," 8 U.S.C. § 1252(e)(3)(A)(ii) (emphasis added), and, according to the declaration of USCIS's Deputy Chief of the Asylum Division, "USCIS has not promulgated, authorized or implemented any *written* policy that there shall not be an in person legal orientation for individuals seeking asylum at the Dilley Family Residential Center or any other location." Dkt. 17-1 at 3 (Caudill-Mirillo Decl. ¶ 4) (emphasis added). The Court "must give effect, if possible, to every ... word of [the] statute," *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotations and citations omitted), and, accordingly, cannot read § 1252(e)(3)(A) to reach "unwritten actions" of USCIS, *see Khan v. Holder*, 608 F.3d 325, 331 (7th Cir. 2010) (observing that § 1252(e)(3) bars review of "unwritten action" and expressing concerns about Congress's decision to immunize unwritten action from judicial review); *American Immigration Lawyers Association v. Reno*, 18 F. Supp. 2d 38, 57–58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (same). That conclusion forecloses Plaintiffs' challenges to the in-person-orientation directive.

## B. Article III Standing

"Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. Const. art. III, § 2, federal courts are without authority" to decide disputes unless the plaintiff has standing—that is, "a personal stake in the outcome of the controversy [sufficient] to warrant [*her*] invocation of federal-court jurisdiction." *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). "[T]he irreducible constitutional minimum of standing contains three elements"—injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotations and citation omitted). Second, causation requires a "causal connection between the injury and the conduct complained of." *Id.* That is, the injury must be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before

the court." *Id.* (citation omitted) (internal quotes omitted). Finally, redressability requires a "likel[ihood], as opposed to mere speculati[on], that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. 2130 (citation omitted) (internal quotes omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements," and the manner and degree **\*20** of proof required varies based on the stage of the ligation. *Id.*

Defendants do not dispute that the Asylum Directives limited the time the individual Plaintiffs had to prepare and to consult before their credible-fear interviews took place. Instead, they argue that the individual Plaintiffs allege a violation of their "procedural" rights—their rights to have an opportunity meaningfully to consult with others and to prepare before their credible-fear interviews—but have failed to show that they have suffered any concrete injury as a result of that alleged procedural violation. *See* Dkt. 17 at 27. In other words, according to Defendants, the individual Plaintiffs "have not offered any tangible proof that the July 2 changes to the consultation period and the standard governing continuances would have had any impact on the outcome of their credible-fear interviews," *id.*, and have therefore failed to "satisfy the traceability [and] redressability" elements of *Lujan*, *id.*

Defendants' argument misunderstands how standing is analyzed in procedural-rights cases. Although every case brought in an Article III court must satisfy the three "irreducible" elements of standing, a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7, 112 S.Ct. 2130. Thus, for example, a person "living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Id.* That scenario, as the Supreme Court has explained, is very different from a case in which the plaintiff does not live near—and has no plans to live near—the hypothetical dam. *Id.*

As a starting point, a party asserting a procedural right must—like any other plaintiff—identify a "particularized" injury resulting from the government's contemplated action. *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc). Here, because the individual Plaintiffs

sought and were denied asylum through allegedly unlawful procedures, they have identified a "particularized" and "concrete" interest. *See Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1502 (D.C. Cir. 1988) (en banc) (observing that individuals suffer an injury in fact if their "asylum claims have been processed in [an] illegal manner"); *see generally Judicial Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 363–66 (D.C. Cir. 2005) (Williams, J., concurring) (explaining that, as a general matter, a "judicially cognizable" interest satisfies *Lujan*'s "injury in fact" requirement). It is difficult to imagine an interest more "particularized" than a person's interest in seeking asylum and avoiding the risk of deportation. *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country.").

The individual Plaintiffs have also satisfied the causation prong of *Lujan*. To establish causation in a procedural-rights case, the plaintiff must establish "two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the **\*21** plaintiff's particularized injury.' " *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). "Importantly, with respect to the first link, the party ... need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result." *Id.* Rather, the plaintiff need establish only "that the procedural step was connected to the substantive result." *Id.* (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002)).

Here, uncontroverted declarations proffered by the individual Plaintiffs establish that the denial of their asserted right to consult and to prepare for their credible-fear interviews was "connected to the substantive result." *Ctr. for Biological Diversity*, 861 F.3d at 184 (citation omitted). As one Plaintiff explains, if she "had more time to prepare for the interview, [she] would have spoken with the Dilley Pro Bono Project and [she] would have understood the process better." Dkt. 12-4 at 8 (M.A.-H. Decl. ¶ 26). She "would have been in a better position to describe the threats facing [her] daughter, which include[d] being kidnapped and trafficked by transnational criminal organizations" and would have been able to speak with her brother or son, both of whom had

"additional information that would have helped [her] explain the circumstances in Honduras that caused [her] fear and [her] need to leave" Honduras. *Id.* (M.A.-H. Decl. ¶¶ 24, 26–27). With respect to the second link, the party seeking to establish standing in a procedural-rights case must "demonstrate a causal connection between the agency action and the alleged injury." *Ctr. for Biological Diversity*, 861 F.3d at 184 (quoting *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007)). That requirement is also easily satisfied here. But for the asylum officers' determinations that the individual Plaintiffs did not have a credible fear of persecution, they would have been "detained for further consideration of [their] application[s] for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).

The individual Plaintiffs' alleged injuries are also redressable under the "relaxed redressability requirement" that applies in procedural-rights cases. *Ctr. for Biological Diversity*, 861 F.3d at 185 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013)). Under that standard, the individual Plaintiffs "need not show that compliance with" the rules that preceded promulgation of the Asylum Directives "would alter the" results of the credible-fear interviews. *Id.* (quoting *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005)). Rather, they need establish only "that a revisitation of" the credible-fear inquiry "*could* reach a different conclusion." *Id.* They have done so. Both of the adult individual Plaintiffs have offered declarations detailing additional, pertinent information that they would like to present and have attested that they did not present this information because the Asylum Directives deprived them of adequate time to confer with others. *See* Dkt. 12-3 at 5 (L.M.-M Decl. ¶ 13); Dkt. 12-4 at 8 (M.A.-H. Decl. ¶ 26). It is possible that, if given another chance, the individual Plaintiffs will fare no better than they did the first time. The Court, however, need decide only whether an asylum officer "could reach a different conclusion" with the additional information, and that undemanding test is satisfied on the present record. [5]

**\*22** Plaintiffs' FVRA challenge adds a twist to the Court's standing analysis. If the Court were to hold that Cuccinelli was appointed in violation of the FVRA, USCIS might reinstate the Asylum Directives under the authority of a properly appointed official. That concern, however, is answered by an array of decisions from the Supreme Court, the D.C. Circuit, and this Court reaching the merits of challenges to actions "taken by ... government official[s] on the ground that the official invalidly [held] office," *Andrade v. Lauer*, 729 F.2d 1475, 1494 (D.C. Cir. 1984) (collecting cases), even when a properly appointed official might have

reimposed the challenged action. Notably, the Supreme Court and the D.C. Circuit reached the merits in *SW General, Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929, a case—like this one—involving a challenge to an appointment under the FVRA. And although those decisions did not expressly address standing, other, similar decision have done so. *See, e.g.*, *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (holding that a bank had standing to challenge the recess appointment of the Director of the Consumer Financial Protection Bureau because the bank was regulated by that agency); *Olympic Fed. Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183, 1188–89 (D.D.C. 1990) (holding that the plaintiff's challenge to the appointment of the agency director and acting director was redressable, even though the plaintiff faced a continuing "threat of government intervention" by other officials).

Even setting this precedent aside, however, any redressability question raised by the individual Plaintiffs' FVRA claim is put to rest by the principle that courts must assume, for purposes of assessing standing, that the Plaintiffs will prevail on the merits. *See* *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179–80 (D.C. Cir. 2015) (observing that a court "must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim," including "that the requested relief would be granted" (internal quotation omitted)). Plaintiffs' FVRA claim does not merely assert that Cuccinelli's appointment was improper. It also posits that, under the FVRA, the directives "shall have no force or effect," 5 U.S.C. § 3348(d)(1), and, that a properly appointment official may not ratify the directives, *see* *id.* § 3348(d)(2), *see* Dkt. 28 at 17–21 (arguing that the FVRA requires vacatur of the Asylum Directives and precludes ratification). If Plaintiffs are right about the FVRA's meaning, as the Court must assume for present purposes, the individual Plaintiffs will likely be entitled to new credible-fear interviews and will be able to take advantage of the additional time to prepare that they have now received. As a result, the individual Plaintiffs' FVRA claims are redressable.

\* \* \*

The Court, accordingly, concludes that it has statutory jurisdiction over the individual Plaintiffs' claims and that they have Article III standing. Having reached that conclusion, the Court need not decide whether RAICES also has standing to pursue those same claims and to seek the same relief. *See* *Town of Chester, N.Y.*, 137 S. Ct. at 1651 ("At least one plaintiff

must have standing to seek each form of relief requested in the complaint."). Should subsequent developments suggest that the scope of relief available to the individual Plaintiffs and RAICES differs, the Court **\*23** can return to the jurisdictional questions regarding RAICES's challenges.

## C. Merits

Plaintiffs challenge the Asylum Directives on a variety of grounds, several of which carry considerable force. [6] The Court need reach only one of those grounds, though, because it is sufficient to resolve the case. That challenge asserts that the Asylum Directives were issued by Cuccinelli in his capacity as acting Director of USCIS; that Cuccinelli was not lawfully appointed to that position under the FVRA and thus lacked the authority to issue the Directives; and that, accordingly, the Directives are invalid and without legal force or effect. As explained below, the Court agrees and will, accordingly, set aside the reduced-time-to-consult and prohibition-on-extensions directives.

### 1. Constitutional and Statutory Framework

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Officers of the United States," unless "the Congress ... by Law vest[s] the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of the Departments." U.S. Const. art. II, § 2, cl. 2. Principal officers, in other words, must be appointed by the President, with the advice and consent of the Senate, and inferior officers must be appointed in that same manner, unless Congress supplants that default rule by vesting the appointment power in the President, a court, or a department head. *Edmond*, 520 U.S. at 660, 117 S.Ct. 1573. Here, the parties do not dispute that the Director of USCIS is an "officer[ ]," and "not mere[ly] [an] employee[ ]" of the agency, *see Lucia v. SEC*, ––– U.S. ––––, 138 S. Ct. 2044, 2052, 201 L.Ed.2d 464 (2018), and they do not contend that Congress specified an alternative appointment process. As a result, the default rule applies, and only the President, with the advice and consent of the Senate, may appoint someone to serve in that position.

The fact that an officer holds a PAS office does not mean, however, that one who performs the duties of that office in an acting capacity is also a PAS officer. The Supreme Court has long recognized that, when a "subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions,

he is not thereby transformed into the superior and permanent official." *United States v. Eaton*, 169 U.S. 331, 343, 18 S.Ct. 374, 42 L.Ed. 767 (1898). Consistent with this understanding, Congress has provided the Executive Branch with the means of filling vacancies in PAS offices on a temporary basis since the earliest days of the Republic. *See SW General, Inc.*, 137 S. Ct. at 935; Thomas A. Berry, S.W. General: *The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 153 (hereinafter "Berry, *Unilateral Appointments*").

Although Congress enacted the first of these laws in 1792, *see* Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281; *see also SW General, Inc.*, 137 S. Ct. at 935 (quoting same), and enacted a series of related laws over the next seven decades, *see, e.g.*, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415; Act of Feb. 20, 1863, ch. 45, 12 Stat. 656, it did not enact the first comprehensive "Vacancies **\*24** Act" until 1868, *SW General, Inc.*, 137 S. Ct. at 935 (citing Act of July 23, 1868, ch. 227, 15 Stat. 168). The 1868 Act "expanded the number of PAS offices that the President could fill with acting officers," and, of particular relevance here, it adopted "a default rule that the 'first or sole assistant ... shall' perform" the functions of the vacant office, "with an exception allowing the President to instead fill the post with a person already serving in a PAS office." *SW General, Inc.*, 137 S. Ct. at 935. Although the Vacancies Act has been "amended several times over the subsequent decades," it has retained the "core structure" established by the 1868 Act. *See* Berry, *Unilateral Appointments*, at 154.

The current iteration of the Vacancies Act, the FVRA, follows that structure. It provides that a vacancy in a PAS office can be filled in one of three ways. First, absent action by the President, "the first assistant to the office of such officer [who has died, resigned, or is otherwise unable to perform the functions and duties of the office] *shall* perform the functions and duties of the office temporarily in an acting capacity," subject to certain limitations. 5 U.S.C. § 3345(a)(1) (emphasis added). Second, "the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office," again subject to certain limitations. *Id.* § 3345(a)(2). Third, "the President (and only the President) may direct an officer or employee of" the agency experiencing the vacancy "to perform the functions and duties of the vacant office," but only if that individual served in a senior position in that agency for at least 90 days "during the 365-day period preceding" the occurrence of the vacancy. [7] *Id.* § 3345(a)(3).

2. *Application of the FVRA to Cuccinelli's Appointment*
The parties agree that the question whether Cuccinelli was lawfully appointed to serve as the acting Director of USCIS is answered, one way or another, by the FVRA. Within that framework, the parties focus their arguments on the question whether, as Plaintiffs contend, *see* Dkt. 12 at 34, the first-assistant default rule applies only to individuals serving as first assistants at the time the vacancy arises or, as Defendants contend, *see* Dkt. 17 at 38, the default rule also applies to individuals first appointed to the position of first assistant after the vacancy in the PAS office arises. That dispute poses a difficult question that the Office of Legal Counsel has answered differently at different times, *compare* 23 Op. O.L.C. 60, 63–64 (1999) ("the better understanding is that you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant"), *with* 25 Op. O.L.C. 177, 179–80 (2001) (rejecting that view), and that the courts have not had the occasion to resolve, *see SW General, Inc.*, 796 F.3d at 76 ("Although we do not decide its meaning today," the default rule "may refer to the person who is serving as first assistant *when the vacancy occurs*"). Now is not the time to resolve that question because Cuccinelli's appointment fails to comply with the FVRA for a more fundamental and clear-cut reason: He never did and never will serve in a subordinate role—that is, as an "assistant"—to any other USCIS official. For this reason alone, Defendants' contention that his appointment satisfies **\*25** the FVRA cannot be squared with the text, structure, or purpose of the FVRA.

The Court starts, as it must, the with the statutory text. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). The FVRA provides in relevant part:

(a) If an officer of an Executive agency ... whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—

(1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;

(2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made

by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or

(3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if—

(A) during the 365-day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and

(B) the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule.

5 U.S.C. § 3345(a). Here, because the acting Secretary—and not the President—directed that Cuccinelli serve as the acting Director, and because he did not hold another PAS position at the time of his designation and had not previously served as an officer or employee of the Department of Homeland Security or USCIS, §§ 3345(a)(2) and (a)(3) are plainly inapt. Plaintiffs' challenge to Cuccinelli's status as acting Director of USCIS, accordingly, rises or falls based on whether Cuccinelli was "the first assistant to the office of [the] officer" who resigned—that is, the office of former-USCIS Director Cissna.

Because the FVRA does not provide a statutory definition of the phrase "first assistant," *see* Federal Vacancies Reform Act of 1998, S. Rep. No. 105-250 at 12 (July 15, 1998) (hereinafter "Senate Report"), the Court must construe that phrase "in accordance with its ordinary or natural meaning," *FDIC v. Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Defendants contend that Cuccinelli's service as acting USCIS Director is lawful "by dint of his appointment as Principal Deputy Director." Dkt. 17 at 46. That argument, however, fails to confront the essential meaning of the word "assistant," which under any plausible construction comprehends a role that is, in some manner and at some time, subordinate to the principal. An "assistant" is "one who acts as a subordinate to another or as an official in a subordinate capacity." *Assistant*, Webster's Third

New International Dictionary **\*26** at 132 (1993). A "first assistant," in turn, is the senior or principal assistant to the official or office at issue—in other words, the assistant who is "foremost in rank" or the "chief" assistant. *First*, Webster's Third New International Dictionary at 856 (1993). Thus, although the "first assistant" holds a rank senior to other "assistants," he remains an "assistant" to the principal. Under that commonsense understanding of the meaning of the default provision, Cuccinelli does not qualify as a "first assistant" because he was assigned the role of principal on day-one and, by design, he never has served and never will serve "in a subordinate capacity" to any other official at USCIS.

Defendants fail to address this fundamental problem with Cuccinelli's designation. Instead, they argue that the default rule does not require that an individual have served as the assistant to the particular PAS *officeholder* who left, thereby creating the vacancy; it is enough, in their view, that the acting official hold an office that is subordinate to the PAS *office*, even if that office was vacant at the time of the acting official assumed the position of "first assistant." Dkt. 17 at 38–39. As noted above, the soundness of that contention is far from settled. But, for present purposes, the Court need not decide that question because, even under Defendants' reading of the statute, Cuccinelli does not hold an office that was or that ever will serve as the "first assistant" to the *office* of the USCIS Director. The office of Principal Deputy Director was created after the vacancy in the office of the Director arose; that office was nominally designated as the office of the "first assistant" to the Director after the vacancy arose; and it will cease to exist as the office of the "first assistant" as soon as the PAS vacancy is filled. *See* Dkt. 17-4 at 5, 7 (Blackwell Decl., Ex. 1, Ex. 2). Cuccinelli may have the title of Principal Deputy Director, and the Department of Homeland Security's order of succession may designate the office of the Principal Deputy Director as the "first assistant" to the Director. But labels— without *any* substance—cannot satisfy the FVRA's default rule under any plausible reading of the statute. [8]

Defendants make a second argument that fails for the same reason. That argument focuses on § 3345(b)(1), which provides as follows:

**(1)** Notwithstanding subsection (a)(1), a person may not serve as an acting officer under this section, if—

**(A)** during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person—

**(i)** did not serve in the position of first assistant to the office of such officer; or

**(ii)** served in the position of first assistant to the office of such office for less than 90 days; and

**(B)** the President submits a nomination of such person to the Senate for appointment to such office.

5 U.S.C. § 3345(b)(1). Subject to an exception not relevant here, this provision prevents a person from serving "as an acting official while nominated to fill the [vacant] office if the person was not the first assistant to the office for at least 90 of the 365 days preceding the vacancy." **\*27** *SW General, Inc.*, 137 S. Ct. at 950 (Sotomayor, J., dissenting).

Defendants contend that § 3345(b)(1) makes sense only if it is possible for someone who is appointed to serve as the first assistant after the vacancy arose to serve in an acting capacity under § 3345(a)(1). Otherwise, Defendants contend, there was no reason for Congress to declare that, "[n]otwithstanding subsection (a)(1)," a first assistant who is nominated by the President to fill the PAS position may not serve as the acting officer if he did not serve as the first assistant "during the 365-day period preceding the date of the" vacancy. *See* Dkt. 17 at 42. That contention reads too much into the "notwithstanding" clause, which is merely a clarifying clause that does not speak to the scope of § 3345(a)(1). *See SW General, Inc.*, 137 S. Ct. at 941 ("The 'notwithstanding' clause simply shows that (b)(1) overrides (a)(1), and nothing more."). But, more importantly, like the preceding argument, even if it were sound it would be unavailing on the facts of this case. That is, even if Defendants were correct, and § 3345(b)(1)(A) implied that the first-assistant default rule found in § 3345(a)(1) includes those chosen to serve as first assistants after the relevant vacancy arose, that would not solve Defendants' difficulty in this case because Cuccinelli was never and will never be the "assistant" to anyone or any office at USCIS—before or after the vacancy arose.

Historical practice can, at times, aid in defining phrases that Congress has used and reused in a series of statutory enactments. Nothing in the historical record of the Vacancies Act, however, counsels in favor of construing the phrase "first assistant" to include those who hold the title of "first assistant" but occupy an office that, in actuality, was not, is not, and never will be subordinate to the principal office. To the contrary, as recently as 1978, the Department of Justice

"interpreted the term 'first assistant' as applying only to officials whose appointment has been specifically provided for by statute," 2 Op. O.L.C. 113, 115 n.5 (citing 19 Op. A.G. 503 (1890); 28 Op. A.G. 95 (1909)); *see also Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203, 209 n.3 (D.C. Cir. 1998)—that is, those who hold an office that Congress created as subordinate to the principal office, *see, e.g.*, 31 U.S.C. § 301 (establishing a Deputy Secretary of the Treasury and providing that the deputy shall carry out the duties and powers of the Secretary "when the office of Secretary is vacant"). To be sure, by the time Congress enacted the FVRA a practice had developed of designating some first assistants by regulation, and Congress was apparently aware of that practice. *See* Senate Report at 12 ("Other departments and agencies have established first assistants by regulation"); *see also* 23 Op. O.L.C. 60, 63 (1999). But those offices, like "first assistant" offices created by statute, existed before the principal office was vacated and continued to exist after that vacancy was filled.

At oral argument, the Court asked counsel for Defendants whether, prior to enactment of the FVRA, there was any example of a person that became the "first assistant" to a PAS office after it became vacant (*i.e.*, a "post-vacancy" first assistant) and thereby assumed the duties of the vacant PAS office. Dkt. 24 at 98–99 (Mot. Hr'g Tr. 98:19–99:4). Defendants answered the Court's question in their supplemental brief, asserting that "the historical record prior to the FVRA's enactment does not reveal a substantial practice of naming post-vacancy first assistants under the Vacancies Act." Dkt. 25 at 18 n.4. The absence of a "substantial practice" is putting it mildly—in fact, Defendants failed to identify a single example of a post-vacancy **\*28** first assistant serving in an acting capacity prior to enactment of the FVRA. That history casts some doubt on whether Congress intended the phrase "first assistant" to encompass those appointed to the first-assistant position after the vacancy arose. But this case goes far beyond that scenario and pushes doubt to disbelief. There is no evidence that at any time prior to Cuccinelli's appointment did Congress or the Executive Branch imagine that an agency could create a new position after a vacancy arose; could then alter the agency's order of succession to treat that new position as the "first assistant" to the vacant office; and could further specify that all would return to its original state once the PAS vacancy was filled.

The structure and purpose of the FVRA further confirm that Cuccinelli was not lawfully designated to serve as the acting Director of USCIS. *See Food Mktg. Inst. v. Argus Leader*

*Media*, —— U.S. ——, 139 S. Ct. 2356, 2364, 204 L.Ed.2d 742 (2019) (court must "careful[ly] examin[e]" the "structure of the law itself"). The operative provisions of the FVRA take the following form: "The general rule is that the first assistant to the vacant office shall [automatically] become the acting officer." *SW General, Inc.*, 137 S. Ct. at 934–35. That default rule controls, except under two strictly defined circumstances. First, "the President (and only the President) may direct" that another PAS official temporarily perform the functions of the vacant office. 5 U.S.C. § 3345(a)(2). That is a limited group of potential designees; it is a group that has already passed the tests of Senate confirmation and presidential appointment; and the President must take personal responsibility for the designation. [9] Second, "the President (and only the President) may direct an officer or employee of" the agency to temporarily perform the functions of the vacant office but only if that "officer or employee" worked at the agency for at least 90 days in the year before the vacancy arose and did so in a senior capacity (payable at least at the GS-15 level). 5 U.S.C. § 3345(a)(3). That is also a limited group; it is a group that is likely to include officials with both experience and seniority; and, again, the President must take personal responsibility for the designation.

Defendants' reading of the FVRA would decimate this carefully crafted framework. The President would be relieved of responsibility and accountability for selecting acting officials, and the universe of those eligible to serve in an acting capacity would be vastly expanded. Except when the first assistant position is fixed by statute, the agency head—or, at times, even a subordinate agency official—could create a new office after the vacancy arose, designate that office as the "first assistant" to the vacant office, and fill the office with nearly anyone, regardless of whether that person had received prior Senate approval through the confirmation process and without regard to her seniority, experience, or tenure. One is left to wonder, if Congress had intended—or even imagined—such a result, why would it have gone to the **\*29** trouble of requiring that "the President (and only the President)" act in order to overcome the default rule and why would it have limited the pool of potential presidential designees to PAS officials and senior officials who had served in the agency at issue for at least 90 days in the year before the vacancy arose?

It is not an answer to say, as Defendants posited at oral argument, *see* Dkt. 24 (Mot. Hr'g Tr. 88:9–17), that paragraphs (a)(2) and (a)(3) have meaning at least as applied to first assistant positions created by statute, thus avoiding the risk of Executive Branch overreaching. Congress enacted the

FVRA, in large part, to "recla[im]" its "Appointments Clause power," *SW General, Inc.*, 796 F.3d at 70, in the face of the long-standing Department of Justice "position that, in many instances, the head of an executive agency had independent authority apart from the Vacancies Act to temporarily fill vacant offices," *SW General, Inc.*, 137 S. Ct. at 935. Congress was concerned, most notably, that the Attorney General and other department heads had made frequent use of organic vesting and delegation statutes to assign the duties of PAS offices to officers and employees, with little or no check from Congress. *See* Senate Report at 3–4. In one case, for example, the Attorney General designated someone "brought in from outside Government to serve as Acting Assistant Attorney General for the Civil Rights Division ..., immediately after the Senate refused to confirm him to that very office." *SW General, Inc.*, 137 S. Ct. at 936. That designation and many others like it prompted Congress to enact the FVRA. *See* Senate Report at 3–4. But that position did not have a statutory first assistant, nor did other offices that Congress pointed to as examples of Executive Branch overreach motivating the FVRA's passage. [10] *See, e.g.*, Senate Report at 3 (discussing the Solicitor General and other positions at the Department of Justice). Simply put, overreaching in filling vacancies for positions that have statutorily designated first assistants was not the primary problem that Congress had in mind. *See* 5 U.S.C. § 3347(a)(1) (authorizing persons to perform the functions and duties of a vacant office if a statute expressly provides for such temporary performance by a particular officer or employee); Senate Report at 15–16.

\* \* \*

For all of these reasons, the Court concludes that Cuccinelli was designated to serve as the acting Director of USCIS in violation of the FVRA.

## C. Remedy

That leaves the question of remedy.

### 1. *Asylum Directives*

The first form of relief that Plaintiffs seek is invalidation of the Asylum Directives, Dkt. 12 at 35—a form of relief that is necessarily circumscribed by the Court's conclusion that it lacks statutory **\*30** jurisdiction to consider Plaintiffs' challenge to the in-person-orientation Directive, *see supra*

Part II.A. In support of this request, Plaintiffs press two arguments, which the Court will consider in turn.

### a. FVRA

Plaintiffs' first argument turns on whether Cuccinelli was performing a "function or duty" of the vacant office—that is, whether the Director's issuance of a written policy governing how USCIS processes credible-fear determinations is a "function or duty" of the USCIS Director office within the meaning of the FVRA. Under the FVRA's vacant-office provision, if a person is not lawfully serving in conformity with the FVRA, "[a]n action taken" by that person "in the performance of any *function or duty* of [the] vacant office ... shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d)(1)–(2) (emphasis added); *but cf. id.* § 3348(e) (exempting certain offices not at issue here). The phrase "function or duty," in turn, is defined as follows:

**(2)** the term "function or duty" means any function or duty of the applicable office that—

**(A)** (i) is established by statute; and

(ii) is required by statute to be performed by the applicable officer (and only that officer); or

**(B)** (i)(I) is established by regulation; and (II) is required by such regulation to be performed by the applicable officer (and only that officer); and

(ii) includes a function or duty to which clause (i)(I) and (II) applies, and the applicable regulation is in effect at any time during the 180-day period preceding the date on which the vacancy occurs.

5 U.S.C. § 3348(a)(2)(A).

Plaintiffs argue that, in issuing the Asylum Directives, Cuccinelli performed a "function" of the USCIS Director office. As Plaintiffs and amicus curiae explain, and as Defendants do not dispute, Cuccinelli promulgated the Directives at issue pursuant to 6 U.S.C. § 271, *see* Dkt. 12 at 35; Dkt. 15 at 25; Dkt. 28 at 18, which assigns to the Director of USCIS the "[f]unctions" of (1) "establish[ing] policies for performing [the] functions ... transferred to the Director" by the Homeland Security Act "or otherwise vested in the Director by law," 6 U.S.C. § 271(a)(3)(A), and (2) "establish[ing] national immigration services policies and priorities," *id.* § 271(a)(3)(D); *see also id.* § 113(a)(1)

(E) (establishing the PAS position of Director of the Bureau of Citizenship and Immigration Services, which was later renamed USCIS). Those functions, accordingly, are assigned by statute to the office of the USCIS Director, and they are not assigned by statute to any other office. In other words, according to Plaintiffs and amicus curiae, the function at issue is assigned by statute to the USCIS Director and only to the USCIS Director.

Although Defendants do not directly contest any of this, *see* Dkt. 25 at 1, 19 (arguing only that the Asylum Directives "could be ratified by another official"); *id.* at 20 (asserting that "relief should be limited to vacatur of the challenged Policies"), they do hint at a potential response in previewing a different argument that they might make at some point in the future. In a single page of their supplemental brief, Defendants assert that, even if the Court concludes that the directives were promulgated without legal authority, they "could be ratified by another official." Dkt. 25 at 19. As Defendants acknowledge, no one has even attempted to ratify the directives and, accordingly, the question of ratification is hypothetical and not ripe for consideration. *Id.* Defendants' ratification argument **\*31** does have some bearing on the question currently before the Court, however, because the same definition of "function or duty" applies both to the provision that renders actions taken by those serving in violation of the FVRA to have "no force or effect" and to the provision that precludes ratification of any such action. *Compare* 5 U.S.C. § 3348(d)(1) *with* *id.* § 3348(d)(2).

Under Defendants' reading of the statute, the phrase "function or duty" includes only "non-delegable duties"—that is, only those duties that are assigned to a single official and that may not be reassigned. *See* Dkt. 25 at 19. From that premise, Defendants then argue, or at least suggest, that no function or duty assigned to *any* Department of Homeland Security official other than the Secretary constitutes a "function or duty" within the meaning of the vacant-office provision of the FVRA. *Id.* That follows, according to Defendants, because the Department's organic statute vests "[a]ll functions of all officers, employees, and organizational units of the Department" in the Secretary, 6 U.S.C. § 112(a)(3), and authorizes the Secretary to delegate any of his "functions to any officer" within the Department," *id.* § 112(b)(1). *See* Dkt. 25 at 19. Put differently, in Defendants' view, the functions assigned to the USCIS Director by the Homeland Security Act are not functions "required ... to be performed by [the USCIS Director] ... *and only that officer*" because the Department's organic statute vests the Secretary with *all* the functions

and duties of the Department. Because similar vesting and delegation statutes can be found throughout the Executive Branch, *see* Dkt. 28 at 19 n.6 (noting that "[e]very cabinet-level department has some version of [the Department's] vesting and delegation statutes"), [11] the logic of this position would cover all (or almost all) departments subject to the FVRA.

In considering these arguments, the Court starts, once again, with the statutory text. *See* *Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 1856, 195 L.Ed.2d 117 (2016). Here, the textual analysis turns on what Congress meant by inserting "and only that office" in both the statutory and regulatory prongs of the definition of "function or duty." On the one hand, that clause could require that the statute or regulation at issue provide that the function or duty at issue is assigned to one particular office, just as the function of establishing policies for performing the functions of USCIS and establishing "national immigration services and polices" is assigned only to the office of the USCIS Director, 6 U.S.C. § 271(a)(3). Or, on the other hand, it could mean that the function may not be reassigned and is not subject to the department head's general vesting-and-delegating authority. This latter reading is the one Defendants advocate. In their view, the vacant office provision of the FVRA applies only in those rare circumstances **\*32** in which the function at issue is not only assigned to a single office but also may not be reassigned. *See* Dkt. 25 at 19. The Court is unpersuaded for two reasons.

First, the vacant-office provision specifies that, "[u]nless an officer or employee is performing the functions and duties" of the vacant office in accordance with the FVRA's appointment requirements, 5 U.S.C. § 3345, its time limitations, *id.* § 3346, and its exclusivity provision, *id.* § 3347, "the office shall remain vacant" and, in the case of a subcabinet office, "only the head of such Executive agency may perform any function or duty of such office." *Id.* § 3348(b). Significantly, this fallback provision presupposes that the head of the department will have authority to discharge the functions and duties of the vacant, subcabinet office. But, if Defendants' understanding of the "functions or duties" of an office were accepted, the fallback would be rendered meaningless. It would apply only to cases, if any, where the relevant subcabinet office is the sole office permitted to perform the "functions or duties" at issue *and* where the department head's vesting-and-delegation authority is insufficient to overcome that exclusive assignment of authority. And, more importantly, unless the vacant-office provision is implausibly read as an affirmative grant of authority otherwise denied to

the department head, the fallback provision would apply only in circumstances where the department head has no authority to perform the functions of the vacant office. In other words, the fallback provision, which requires the department head to perform the functions of the vacant office, would apply only in those circumstances in which the department head lacks statutory authority to perform those functions.

This conundrum is avoided by reading the definition of "functions or duties" and fallback provisions in tandem. "[I]nterpretation of a phrase of uncertain reach" should not be "confined to a single sentence"—or here, two sentences, *see* 5 U.S.C. § 3348(a)(2)(A)(ii) & (B)(i)(II)—"when the text of the whole statute gives instruction as to its meaning," *Maracich v. Spears,* 570 U.S. 48, 65, 133 S.Ct. 2191, 186 L.Ed.2d 275 (2013). Here, any ambiguity in the meaning of "and only that officer" is resolved by reading that phrase in light of the fallback. The inclusion of a fallback in the statutory scheme accords with the fact that agency organic statutes typically vest "[a]ll functions of all officers, employees, and organizational units of the [d]epartment" in the department head, *see, e.g.,* 6 U.S.C. § 112(a)(3); 28 U.S.C. § 509, and mandates that the department head exercise that authority with respect to the "functions and duties" of a vacant office, 5 U.S.C. § 3348(b). It follows that, however narrowly defined, the functions or duties of a subcabinet office must include the duties *specifically* assigned by statute to that office, even if the department's organic statute *generally* vests the department head with *all* functions of the department. That is, the mere fact that a department head is also vested with all functions specifically vested in other department officers and employees cannot, standing alone, defeat the enforcement mechanisms found in the FVRA's vacant-office provision.

A second textual clue supports this same conclusion and further clarifies what the statute allows and what it precludes. In enacting the FVRA, Congress recognized the need for administrative flexibility, *see* Senate Report at 13, and did not withdraw the vesting-and-delegation authority of the Executive Branch departments and agencies. But it also recognized that few PAS positions have "any meaningful statutory duties" and that the duties of these offices are, instead, defined by "internal departmental **\*33** regulations" that "can be changed at will without undergoing the notice and comment process." [12] *Id.* at 18. To avoid circumvention of the vacant-office provision, Congress, accordingly, added a 180-day lookback to the definition of regulatorily assigned functions or duties. *See* 5 U.S.C. § 3348(a)(2)(B)(ii). The lookback provision thus defines the functions or duties of

a vacant office to include those that were established by regulation and are "in effect at any time during the 180-day period preceding the date on which the vacancy occurs." *Id.*

The 180-day regulatory lookback is at odds with Defendants' contention that the statutory definition of "functions or duties" reaches only those duties that the agency may not reassign—that is, those duties that are, in accordance with Defendants' lexicon, "non-delegable." Dkt. 25 at 19. Contrary to Defendants' reading of the statute, the lookback provision contemplates that agencies may and will use their organic authorities to issue rules reassigning duties and that duties subject to that authority may, at least at times, fall within the statutory definition of "functions or duties." What matters under the vacant-office provision is whether the rules—*i.e.*, the delegations and assignments—as they existed "at any time during the 180-day period preceding the date on which the vacancy occurs," 5 U.S.C. § 3348(a)(2)(B)(ii), assigned the functions or duties to the vacant office and "only [to] that office[,]" *id.* § 3348(a)(2). If so, then the statutory definition of "function or duty" is satisfied, and actions taken by a person who is not serving in conformity with the FVRA "in the performance of [that] function or duty" have "no force or effect." 5 U.S.C. § 3348(d).

The only support Defendants offer for their more sweeping "non-delegable" argument is a citation to the D.C. Circuit's decision in *Guedes v. ATF,* 920 F.3d 1 (D.C. Cir. 2019). Dkt. 25 at 19. But the meaning of the vacant-office provision was neither disputed nor decided in *Guedes.* Indeed, neither below nor on appeal did the parties dispute whether the official's appointment satisfied the FVRA, *see* *Guedes v. ATF,* 356 F. Supp. 3d 109, 138 (D.D.C. 2019), nor did the parties contest that, by the time the dispute reached the D.C. Circuit, the challenged rule had been validly ratified by a properly appointed official, *see* *Guedes,* 920 F.3d at 12; *see also* *Bump-Stock-Type Devices,* 84 Fed. Reg. 9,239, 9,240 (Mar. 14, 2019) (ratifying the final rule in dispute in *Guedes*). In any event, the word "non-delegable" appears nowhere in the statute, and instead is found only in the legislative history. *See* Senate Report at 18 ("The functions or duties of the office that can be performed only by the head of the executive agency are therefore defined as the non-delegable functions or duties of the officer as they existed at any point during the 180 days prior to the [vacancy][.]"). But even as used in the legislative history, the word does not have the meaning Defendants assign to it. To the contrary, the Senate Report uses the term in the same breath in which it affirms that the "non-delegable" functions and duties include those assigned

**\*34** by regulation 180 days before the vacancy arose, even if later reassigned. *Id.*

Finally, Defendants' construction of the vacant-office provision is at odds with the statutory purpose of the FVRA. As Plaintiffs note, "[e]very cabinet-level department has some version of [a] vesting and delegation statute[ ]." Dkt. 28 at 19 n.6 (collecting statutory vesting and delegation statutes). It was the pervasive use of those vesting-and-delegation statutes, along with "the lack of an effective enforcement process," that convinced Congress of the need to enact the FVRA. Senate Report at 7. Yet, if Defendants were correct that the mere existence of these vesting-and-delegation statutes (and the absence of an express statutory bar on vesting and delegating a specific function or duty) were sufficient to negate the enforcement mechanisms Congress included in the FVRA, Congress would have done little "to restore [the] constitutionally mandated procedures that must be satisfied before acting officials may serve in positions that require Senate confirmation." Senate Report at 8; *see also U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.").

The Court recognizes that requiring department heads to perform the functions or duties of a vacant office could impose substantial burdens on those who already labor under enormous responsibilities. That choice, however, is not the Court's, but Congress's. Nor is the Executive Branch without tools to address this concern. In most circumstances, departments and agencies can avoid this burden if the first assistant lawfully assumes the acting role pursuant to § 3345(a)(1), or if the President directs that a PAS officer or eligible senior agency official assume that role pursuant to §§ 3345(a)(2) or (a)(3), respectively. When the 210-day clock on service of an acting official nears expiration, moreover, the President can extend the period by submitting a nomination for the vacant PAS office to the Senate. 5 U.S.C. § 3346(a). If that nomination is rejected, withdrawn, or returned, the acting official may serve for another 210 days, and, if a second nomination is submitted, she may continue to serve until that nominee is confirmed or for 210 days after the nomination is rejected, withdrawn, or returned." *Id.* at § 3346(b). Department heads and other officials may also delegate duties to multiple officials, so long as they do so 180 days before the vacancy arises. *Id.* § 3348(a)(2)(B)(ii). The Court's holding, moreover, is a narrow one: the Court merely

concludes that where, as here, a statute assigns a function to a single PAS office, and where, as here, the department head did not reassign that function using his vesting-and-delegation authority or any other authority at least 180 days before the vacancy occurred, that function is a "function or duty" of the vacant PAS office within the meaning of § 3348, and it must be performed either by a properly serving acting official or by the department head.

### b. APA

The Court, in any event, is also persuaded by Plaintiffs' alternative theory—that, because Cuccinelli was exercising the authority of the USCIS Director in violation of the FVRA, the directives were not issued "in accordance with law," and must, accordingly, be set aside under the APA. Dkt. 12 at 35 (quoting 5 U.S.C. § 706(2)(A)). The D.C. Circuit's decision in *SW General, Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015), provides helpful guidance on this point. That case involved a violation **\*35** of the FVRA in the appointment of the acting general counsel of the NLRB. *Id.* at 69. But because the NLRB is expressly exempted from the vacant-office provision of the FVRA, the D.C. Circuit had to determine the consequences of the improper appointment without the aid of that provision. *Id.* at 78. In addressing that question, the Court of Appeals started with the premise that agency action taken without lawful authority is at least voidable, if not void *ab initio.*[13] *Id.* at 79. It then considered whether one of two doctrines might save the action at issue that case.

Under the first such rule, the APA's "rule of prejudicial error," 5 U.S.C. § 706, reviewing courts must consider whether the agency's error affected the outcome. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). "The burden to demonstrate prejudicial error is on the party challenging agency action," but it "is 'not ... a particularly onerous requirement.' " *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 410, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009)). As in *SW General, Inc.*, that rule does not pose a substantial hurdle to Plaintiffs' claim here. 796 F.3d at 80. The Court "cannot be confident that" the same Directives "would have issued under an" acting Director "other than" Cuccinelli. *Id.*

Under the second such rule, the *de facto* officer doctrine, a court may "confer[ ] validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Id.* at 81 (quoting *Ryder v.*

*United States*, 515 U.S. 177, 180, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995)). That doctrine, however, has seen substantial contraction over time and, under governing D.C. Circuit law, collateral attacks on an official's authority are permitted when two requirements are satisfied:

> First, the plaintiff must bring his action at or about the time that the challenged government action is taken. Second, the plaintiff must show that the agency or department involved had had reasonable notice under all of the circumstances of the claimed defect in the official's title to office.

*Id.* at 81–82 (quoting *Andrade v. Lauer*, 729 F.2d 1475, 1499 (D.C. Cir. 1984)). Here, Plaintiffs promptly brought suit within 60 days of the challenge action, and Defendants do not challenge the timeliness of the suit. Moreover, the Department had notice of the claimed defect in Cuccinelli's service as early as June 18, 2019—eight days after Cuccinelli took office and before he issued the Asylum Directives—when the House Committee on the Judiciary sent acting Secretary McAleenan a letter expressing "deep concern" that "Cuccinelli was appointed in a manner that circumvents the [FVRA]." *See* U.S. House of Representatives, Committee on the Judiciary, Letter to Acting Secretary Kevin McAleenan (June. 18, 2019), available at https://tinyurl.com/s9xlzyy (last accessed Feb. 28, 2020). [14] The *de facto* doctrine—which in any event was not raised as a defense, *see* Dkt. 25 at 19 n.5—would thus not pose a barrier to Plaintiffs' challenge.

* * *

Thus, under either theory—application of the FVRA vacant-office provision or general principles of administrative **\*36** law—the reduced-time-to-consult and the prohibition-on-extensions directives "have no force or effect," 5 U.S.C. § 3348(d)(1), and must be "set aside" as action taken "in excess of statutory ... authority," 5 U.S.C. § 706. As Defendants acknowledge binding D.C. Circuit precedent requires that, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated —not that their application to the individual [plaintiffs] is proscribed." Dkt. 25 at 23 n.6 (quoting *Nat'l Mining Ass'n*

*v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). Although Defendants are correct that 8 U.S.C. § 1252(e)(1)(B) divests the Court of jurisdiction to certify a class, Plaintiffs have not asked the Court to do so, and the class action rule has no bearing on the nature of the relief that the Court must provide. To the contrary, the structure of 8 U.S.C. § 1252(e)(3) itself contemplates that courts may issue declaratory judgments relating to the "implementation of" the expedited removal provisions of IIRIRA that affect the interests of those not before the Court; most notably, to expedite resolution of any legal challenges, Congress required all challenges to the validity of new implementing rules or polices be brought within 60 days of their adoption. *Id.* § 1252(e)(3)(B). Defendants are also correct that the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of [the policy's] vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010); *see also OA v. Trump*, 404 F. Supp. 3d 109, 153–54 (D.D.C. 2019). This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy ... [is] sufficient to redress" the plaintiffs' injury. *Monsanto Co.*, 561 U.S. at 165, 130 S.Ct. 2743. Thus, absent the need to take further action, the Court will decline Plaintiffs' request for an injunction and will set aside the two directives at issue.

### 2. *Removal Orders*

Plaintiffs also request that the Court set aside their individual removal orders "as well as those of any asylum seekers who were processed under the Directives but have not yet been removed." Dkt. 28 at 26. Starting with the five remaining individual Plaintiffs, the Court must once again consider the "rule of prejudicial error." 5 U.S.C. § 706. At this point, the question is not simply whether the Directives would have issued in the same form even if Koumans had not been replaced by Cuccinelli as acting Director, but whether the five individual Plaintiffs were prejudiced by the resulting reduced time to consult and to prepare for their credible-fear interviews. Having reviewed Plaintiffs' extensive declarations, and given the minimal burden required to establish prejudicial error, *Jicarilla Apache Nation*, 613 F.3d at 1121 ("If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further."), the Court is convinced that the negative credible-fear determinations that each of the five individual Plaintiffs received must be set aside.

As a practical matter, this also means that their removal orders are deficient. If an alien indicates an intention to apply for asylum, expedited removal requires that an asylum officer conduct a credible-fear interview of any alien seeking asylum, and that has yet to occur here. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). Until a legally sufficient interview occurs, the individual Plaintiffs are not subject to expedited removal. The Court will, accordingly, vacate their negative **\*37** credible-fear determinations (and any removal orders that are premised on those determinations) and will remand their cases to USCIS for further proceedings consistent with this decision.

The Court is unconvinced, however, that it should extend this relief to other asylum seekers who were processed under the defective directives. Those individuals are not parties to this case, nor is this case a class action. This Court's jurisdiction, moreover, is limited to claims brought challenging "determinations" made under the expedited removal provision of IIRIRA within 60 days of promulgation of the allegedly unlawful regulation or policy. 8 U.S.C. § 1252(e)(3). To be sure, the Court has concluded that the two directives are invalid and must be set aside. The consequences of that holding with respect to parties not before the Court, however, lies beyond this Court's jurisdiction. *See id.* § 1252(a)(2) ("[N]o court shall have jurisdiction to review ... any individual determination ... except as provided in subsection (e)"); *see also id.* § 1252(e)(1) ("[N]o court may ... certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized" under 8 U.S.C. § 1252(e)). The Court will,

accordingly, deny Plaintiffs' request to vacate the removal orders—or any negative credible-fear determinations—with respect to those who are not parties to this action.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Plaintiffs' partial motion for summary judgment, Dkt. 29, and **GRANTS** in part and **DENIES** in part Defendants' partial motion for summary judgment, Dkt. 30. The Court concludes that it has jurisdiction over Plaintiffs' challenges to the reduced-time-to-consult and prohibition-on-extensions directives and that it lacks jurisdiction over Plaintiffs' challenge relating to the in-person-orientation directive. The Court also concludes that Cuccinelli was not lawfully appointed to serve as the acting Director of USCIS and that, accordingly, the reduced-time-to-consult and prohibition-on-extensions directives must be set aside as *ultra vires* under both the FVRA, 5 U.S.C. § 3348(d)(1), and the APA, 5 U.S.C. § 706(2)(A). Finally, the Court sets aside the individual Plaintiffs' negative credible-fear determinations and expedited removal orders and remands to USCIS for further proceedings consistent with this decision.

**SO ORDERED.**

**All Citations**

442 F.Supp.3d 1

## Footnotes

1    MS-13 is a transnational criminal organization. *See* Dkt. 12 at 44.

2    Defendants have agreed not to remove any of the named Plaintiffs pending the adjudication of this motion. *See* Dkt. 8.

3    Earlier in the proceeding, Defendants also argued that the claims brought by two additional plaintiffs, S.G.-C and B.O.-G, were moot because their negative credible-fear determinations were overturned. Dkt. 17 at 22. That point was well taken. After oral argument on Plaintiffs' motion for a preliminary injunction, Plaintiffs voluntarily dismissed those Plaintiffs from the case pursuant Federal Rule of Civil Procedure 41(a)(1)(A)(i). Dkt. 23.

4    Although IIRIRA refers to actions taken "by or under the authority of the Attorney General," 8 U.S.C. § 1252(e)(3), those authorities were transferred to the Department of Homeland Security and USCIS following the

creation of those agencies and the reassignment of responsibility for implementing the immigration laws from the INS to the Department of Homeland Security and USCIS. *See, e.g.*, Homeland Security Act of 2002, Public Law 107–296, § 451(b)(3), 116 Stat. 2135, 2196 (transferring "function" of "adjudications of asylum ... applications" from the Commissioner of the INS to the Director of the Bureau of Citizenship and Immigration Services, which eventually became USCIS).

5    Defendants may not rely on the contention that Plaintiffs' claims are not redressable because the individual Plaintiffs are subject to expedited orders of removal. Dkt. 17 at 30. As explained above, Defendants are incorrect —at least with respect to the reduced-time-to-consult and prohibition-on-extensions directives— that § 1252(e) strips this Court of jurisdiction to review the individual Plaintiffs' claims.

6    In light of the Court's conclusion that it lacks statutory jurisdiction to consider Plaintiffs' challenge related to the in-person-orientation directive, the Court will use the phrase "Asylum Directives" to refer only to the reduced-time-to-consult and prohibition-on-extensions directives for the remainder of this opinion.

7    Specifically, the employee must be employed in a position for which the rate of pay "is equal to or greater than the minimum rate of pay payable for a position at GS–15 of the General Schedule." 5 U.S.C. § 3345(a)(3)(B).

8    To borrow from a long-running riff on the television show *The Office*, there may well be a difference between one who serves as "the assistant regional manager" and "the assistant to the regional manager." But either way, that person is, at best, second in command. Here, the acting Secretary created a position that is second in command in name only.

9    *See* Senate Report at 12 ("Under this legislation, when an acting officer is to be designated, as opposed to automatically gaining acting status as a first assistant, only the President may designate an acting officer in a position that requires Senate confirmation."); *id.* at 13 ("This provision allows the President limited flexibility in appointing temporary officers, restricting the pool to persons who have already received Senate confirmation for their current position."); *see also* Administrative Conference of the United States, Acting Agency Officials and Delegations of Authority 1 (Dec. 1, 2019) (noting that there are over 1,200 PAS positions in the Executive Branch), available at https://www.acus.gov/sites/default/files/documents/final-report-acting-agency-officials-12012019.pdf.

10   *See, e.g.*, 28 U.S.C. § 504 ("The President shall appoint in the Department of Justice, by and with the advice and consent of the Senate, a Deputy Attorney General"); Reorganization Plan No. 5 of 1950, § 2 (renaming "The Assistant to the Attorney General" to "Deputy Attorney General"); 28 U.S.C. § 505 ("The President shall appoint in the Department of Justice, by and with the advice and consent of the Senate, a Solicitor General ...."); *id.* § 506 ("The President shall appoint, by and with the advice and consent of the Senate, 11 Assistant Attorneys General ...."); 28 C.F.R. § 0.137(b) (requiring by regulation that the principal deputy in each PAS office within the Department of Justice serve as first assistant and, "[w]here there is no position of [p]rincipal [d]eputy to the PAS office," providing that the Attorney General will designate a first assistant in writing).

11   Plaintiffs support that contention with the following examples: 10 U.S.C. § 113(d) (Department of Defense); 20 U.S.C. §§ 3441, 3347, 3472 (Department of Education); 22 U.S.C. § 2651a(a) (Department of State); 28 U.S.C. § 510 (Department of Justice); 31 U.S.C. § 321(b), (c) (Department of the Treasury); 38 U.S.C. §§ 303, 512 (Department of Veterans Affairs); 42 U.S.C. §§ 3534(a), 3535(d) (Department of Housing and Urban Development); 42 U.S.C. §§ 7151, 7152, 7252 (Department of Energy); 43 U.S.C. § 1457c (Department of the Interior); 49 U.S.C. § 322(b) (Department of Transportation); Reorganization Plan No. 5 of 1950, § 2 (Department of Commerce); Reorganization Plan No. 6 of 1950, § 2 (Department of Labor); Reorganization

Plan No. 2 of 1953, § 4 (Department of Agriculture); Reorganization Plan No. 3 of 1966, § 2 (Department of Health and Human Services). *See* Dkt. 28 at 19 n.6.

12      A delegation of authority to perform defined agency duties may be exempt from the notice-and-comment process as a rule of "agency organization." *See* 5 U.S.C. § 553(b)(A); *Hogg v. United States,* 428 F.2d 274, 280 (6th Cir. 1970) ("We hold that the Administrative Procedure Act does not require that all internal delegations of authority ... be published in order to be effective."); *see generally* Jennifer Nou, *Subdelegating Powers,* 117 Colum. L. Rev. 473, 518–522, 521 (2017) (discussing the regulatory landscape of agency sub-delegations and observing that an agency head may, but need not, subject an internal sub-delegation to notice and comment).

13      Because the NLRB "did not seek certiorari on this issue," the Supreme Court did "not consider it." *SW General, Inc.,* 137 S. Ct. at 938 n.2.

14      Although the June 18, 2019 letter is not in the record, the Court takes judicial notice of that public document pursuant to Federal Rule of Evidence 201(b)(2).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

70 S.Ct. 309
Supreme Court of the United States

UNITED STATES ex rel. KNAUFF

v.

SHAUGHNESSY.

No. 54.
|
Argued Dec. 5, 1949.
|
Decided Jan. 16, 1950.

**Synopsis**

Habeas corpus proceedings by the United States, on the relation of Ellen Knauff, against Edward J. Shaughnessy, Acting Director of Immigration and Naturalization, to determine the right of an alien war bride to enter the United States.

The United States Court of Appeals for the Second Circuit, 173 F.2d 599, affirmed the judgment of the District Court that the Attorney General during the national emergency had the power to bar the relatrix without a hearing, and the relatrix was granted a writ of certiorari.

The Supreme Court, in an opinion by Mr. Justice Minton, affirmed the judgment.

Mr. Justice Jackson, Mr. Justice Black and Mr. Justice Frankfurter, dissented.

**Attorneys and Law Firms**

**\*\*310** Mr. **\*538** Gunther Jacobson, New York City, for petitioner.

Mr. Philip R. Monahan, Washington, D.C., for respondent.

**Opinion**

**\*539** Mr. Justice MINTON delivered the opinion of the Court.

May the United States exclude without hearing, solely upon a finding by the Attorney General that her admission would be prejudicial to the interests of the United States, the alien wife of a citizen who had served honorably in the armed forces of the United States during World War II? The District Court,

for the Southern District of New York held that it could, and **\*\*311** the Court of Appeals for the Second Circuit affirmed. 173 F.2d 599. We granted certiorari to examine the question especially in the light of the War Brides Act of December 28, 1945, 8 U.S.C.A. s 232 et seq., 336 U.S. 966, 69 S.Ct. 941.

Petitioner was born in Germany in 1915. She left Germany and went to Czechoslovakia during the Hitler regime. There she was married and divorced. She went to England in 1939 as a refugee. Thereafter she served with the Royal Air Force efficiently and honorably from January 1, 1943, until May 30, 1946. She then secured civilian employment with the War Department of the United States in Germany. Her work was rated 'very good' and 'excellent.' On February 28, 1948, with the permission of the Commanding General at Frankfurt, Germany, she married Kurt W. Knauff, a naturalized citizen of the United States. He is an honorably discharged United States Army veteran of World War II. He is, as he was at the time of his marriage, a civilian employee of the United States Army at Frankfurt, Germany.

On August 14, 1948, petitioner sought to enter the United States to be naturalized. On that day she was temporarily excluded from the United States and detained at Ellis Island. On October 6, 1948, the Assistant Commissioner of Immigration and Naturalization recommended that she be permanently excluded without a hearing on the ground that her admission would be **\*540** prejudicial to the interests of the United States. On the same day the Attorney General adopted this recommendation and entered a final order of exclusion. To test the right of the Attorney General to exclude her without a hearing for security reasons, habeas corpus proceedings were instituted in the Southern District of New York, based primarily on provisions of the War Brides Act. The District Court dismissed the writ, and the Court of Appeals affirmed.

The authority of the Attorney General to order the exclusion of aliens without a hearing flows from the Act of June 21, 1941, amending s 1 of the Act of May 22, 1918, 55 Stat. 252, 22 U.S.C. s 223, 22 U.S.C.A. s 223.[1] By the 1941 amendment it was provided that the President might, upon finding that the interests of the United States required it, impose additional restrictions and prohibitions on the entry into and departure of eprsons from the United States during the national emergency proclaimed May 27, 1941. Pursuant to this Act of Congress the President on November 14, 1941, issued Proclamation 2523, 55 Stat. 1696, 3 CFR, 1943 Cum.Supp., 270—272. This proclamation recited that the interests of the United States required the imposition of additional restrictions upon the

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 438 of 513

U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)
70 S.Ct. 309, 94 L.Ed. 317

entry into and **\*541** departure of persons from the country and authorized the promulgation of regulations jointly by the Secretary of State and the Attorney General. It was also provided that no alien should be permitted to enter the United States if it were found that such entry would be prejudicial to the interest of the United States. [2]

'(a) For any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe * * *.'

**\*\*312** Pursuant to the authority of this proclamation the Secretary of State and the Attorney General issued regulations governing the entry into and departure of persons from the United States during the national emergency. Subparagraphs (a) to (k) of s 175.53 of these regulations specified the classes of aliens whose entry into the United States was deemed prejudicial to the public interest. Subparagraph (b) of s 175.57 provided that the Attorney General might deny an alien a hearing before a board of inquiry in special cases where he determined that the alien was excludable under the regulations on the basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest. [3]

**\*542** It was under this regulation s 175.57(b) that petitioner was excluded by the Attorney General and denied a hearing. We are asked to pass upon the validity of this action.

At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall prescribe. It must be exercised in accordance with the procedure which the United States provides. Nishimura Ekiu v. United States, 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146; Fong Yue Ting v. United States, 149 U.S. 698, 711, 13 S.Ct. 1016, 1021, 37 L.Ed. 905.

Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power. But there is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255; Fong Yue Ting v. United States, 149 U.S. 698, 713,

13 S.Ct. 1016, 1022, 37 L.Ed. 905. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

**\*543** Thus the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. The action of the executive officer under such authority is final and conclusive. Whatever the rule may be concerning deportation of persons who have gained entry into the United States, it is not within the province of any court, unless expressly **\*\*313** authorized by law, to review the determination of the political branch of the Government to exclude a given alien. Nishimura Ekiu v. United States, 142 U.S. 651, 659-660, 12 S.Ct. 336, 338, 35 L.Ed. 1146; Fong Yue Ting v. United States, 149 U.S. 698, 713-714, 13 S.Ct. 1016, 1022, 37 L.Ed. 905; Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881. Cf. Yamataya v. Fisher, 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721. Normally Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power, e.g., as was done here, for the best interests of the country during a time of national emergency. Executive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent. What was said in Lichter v. United States, 334 U.S. 742, 785, 68 S.Ct. 1294, 1316, 92 L.Ed. 1694, is equally appropriate here:

'It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. * * * Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. 'They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear.' ' '''

**\*544** Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned. Nishimura Ekiu v. United States, supra; Ludecke v. Watkins, supra.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 439 of 513

U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)

70 S.Ct. 309, 94 L.Ed. 317

In the particular circumstances of the instant case the Attorney General, exercising the discretion entrusted to him by Congress and the President, concluded upon the basis of confidential information that the public interest required that petitioner be denied the privilege of entry into the United States. He denied her a hearing on the matter because, is his judgment, the disclosure of the information on which he based that opinion would itself endanger the public security.

We find no substantial merit to petitioner's contention that the regulations were not 'reasonable' as they were required to be by the 1941 Act. We think them reasonable in the circumstances of the period for which they were authorized, namely, the national emergency of World War II. Nor can we agree with petitioner's assertion that Proclamation 2523, see note 2, supra, authorized only the Secretary of State, and not the Attorney General, to order the exclusion of aliens. See Presidential Proclamation 2850 of August 17, 1949, 14 Fed.Reg. 5173, amending and clarifying Proclamation 2523. We reiterate that we are dealing here with a matter of privilege. Petitioner had no vested right of entry which could be the subject of a prohibition against retroactive operation of regulations affecting her status.

It is not disputed that the Attorney General's action was pursuant to the 8 CFR regulations heretofore discussed.[4] However, 22 U.S.C. ss 223, 22 U.S.C.A. s 223,[5] authorizes these special restrictions on the entry of aliens only when the United States is at war or during the existence of the **\*545** national emergency proclaimed May 27, 1941, No. 2487, 50 U.S.C.A.Appendix note preceding section 1.[6] For ordinary times Congress has provided aliens with a hearing. 8 U.S.C. ss 152, 153, 8 U.S.C.A. ss 152, 153. And the contention of petitioner is that she is entitled to the statutory hearing because for purposes of the War Brides Act, within which she comes, the war terminated when the President proclaimed the **\*\*314** cessation of hostilities.[7] She contends that the War Brides Act, applicable portions of which are set out in the margin,[8] discloses a congressional intent that special restrictions on the entry of aliens should cease to apply to war brides upon the cessation of hostilities.

The War Brides Act provides that World War II is the period from December 7, 1941, until the proclaimed termination of hostilities. This has nothing to do with the period for which the regulations here acted under were **\*546** authorized. The beginning and end of the war are defined by the War Brides Act, we assume, for the purpose of ascertaining the period within which citizens must have served in the

armed forces in order for their spouses and children to be entitled to the benefits of the Act. The special procedure followed in this case was authorized not only during the period of actual hostilities but during the entire war and the national emergency proclaimed May 27, 1941. The national emergency has never been terminated. Indeed, a state of war still exists. See Woods v. Cloyd W. Miller Co., 333 U.S. 138, Note 3, 68 S.Ct. 421, 422, 92 L.Ed. 596. Thus, the authority upon which the Attorney General acted remains in force. The Act of June 21, 1941, and the President's proclamations and the regulations thereunder are still a part of the immigration laws.

The War Brides Act does not relieve petitioner of her alien status. Indeed, she sought admission in order to be naturalized and thus to overcome her alien status. The Act relieved her of certain physical, mental, and documentary requirements and of the quota provisions of the immigration laws. But she must, as the Act requires, still be 'otherwise admissible under the immigration laws'. In other words, aside from the enumerated relaxations of the immigration laws she must be treated as any other alien seeking admission. Under the immigration laws and regulations applicable to all aliens seeking entry into the United States during the national emergency, she was excluded by the Attorney General without a hearing. In such a case we have no authority to retry the determination of the Attorney General. Ludecke v. Watkins, 335 U.S. 160, 171—172, 68 S.Ct. 1429, 1434—1435, 92 L.Ed. 1881.

There is nothing in the War Brides Act or its legislative history[9] to indicate that it was the purpose of Congress, **\*547** by partially suspending compliance with certain requirements and the quota provisions of the immigration laws, to relax the security provisions of the immigration laws. There is no indication that Congress intended to **\*\*315** permit members or former members of the armed forces to marry and bring into the United States aliens who the President, acting through the Attorney General in the performance of his sworn duty, found should be denied entry for security reasons. As all other aliens, petitioner had to stand the test of security. This she failed to meet. We find no legal defect in the manner of petitioner's exclusion, and the judgment is affirmed.

Affirmed.

Mr. Justice DOUGLAS and Mr. Justice CLARK took no part in the consideration or decision of this case.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 440 of 513

U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)

70 S.Ct. 309, 94 L.Ed. 317

Mr. Justice FRANKFURTER, dissenting.

If the essence of statutory construction is to find the thought beneath the words, the views expressed by Mr. Justice JACKSON, in which I fully concur, enforce the purpose of Congress. The contrary conclusion substantially frustrates it.

Seventy years ago began the policy of excluding mentally defective aliens from admission into the United States. Thirty years ago it became our settled policy to admit even the most desirable aliens only in accordance with the quota system. By the so-called War Brides Act Congress made inroads upon both these deeply-rooted policies. Act of December 28, 1945, 59 Stat. 659, 8 U.S.C. s 232 et seq., 8 U.S.C.A. s 232 et seq. It lifted the bar against the exclusion even of 'physically and mentally defective aliens.' It did this in favor of 'alien spouses and alien minor children of citizen members who are serving or have served honorably in the armed forces of the United States during World War II.' H.R.Rep.No.1320 and S.Rep.No.860, 79th Cong., 1st Sess. (1945).

 **\*548**  This was a bounty afforded by Congress not to the alien who had become the wife of an American but to the citizen who had honorably served his country. Congress gave this bounty even though a physically or mentally defective person might thereby be added to the population of the United States. Yet it is suggested that the deepest tie that an American soldier could form may be secretly severed on the mere say-so of an official, however well-intentioned. Although five minutes of cross-examination could enable the soldier-husband to dissipate seemingly convincing information affecting the security danger of his wife, that opportunity need not be accorded. And all this, because of the literal reading of the provision of the War Brides Act that the alien spouse, though physically and mentally defective, is to be allowed to join her citizen husband 'if otherwise admissible under the immigration laws'. Upon that phrase is rested the whole structure of Executive regulation based on s 1 of the Act of May 22, 1918, 40 Stat. 559, as amended by the Act of June 21, 1941, 55 Stat. 252, 22 U.S.C. s 223, 22 U.S.C.A. s 223, regarding the summary exclusion, without opportunity for a hearing, of an alien whose entry the Attorney General finds inimical to the public interest. [1]

This is not the way to read such legislation. It is true also of Acts of Congress that 'The letter Killeth.' Legislation should not be read in such a decimating spirit unless the letter of Congress is inexorable. We are reminded from time to time that in enacting legislation Congress is not engaged in a scientific process which takes account of every contingency. Its laws are not to be read as though every i has to be dotted and every t  **\*549**  crossed. The War Brides Act is legislation derived from the dominant regard which American society  **\*\*316**  places upon the family. It is not to be assumed that Congress gave with a bountiful hand but allowed its bounty arbitrarily to be taken away. In framing and passing the War Brides Act, Congress was preoccupied with opening the door to wives acquired by American husbands during service in foreign lands. It opened the door on essentials —wives of American soldiers and perchance mothers of their children were not to run the gauntlet of administrative discretion in determining their physical and mental condition, and were to be deemed nonquota immigrants. Congress ought not to be made to appear to require that they incur the greater hazards of an informer's tale without any opportunity for its refutation, especially since considerations of national security, insofar as they are pertinent, can be amply protected by a hearing in camera. Compare Rule 46 of the Rules of Practice for Admiralty Courts during World War II, 316 U.S. 717; 328 U.S. 882, and see Haydock, Some Evidentiary Problems Posed by Atomic Energy Security Requirements, 61 Harv.L.Rev. 468, 482—83 (1948). An alien's opportunity of entry into the United States is of course a privilege which Congress may grant or withhold. But the crux of the problem before us is whether Congress, having extended the privilege for the benefit not of the alien but of her American husband, left wide open the opportunity ruthlessly to take away what it gave.

A regulation permitting such exclusion by the Attorney General's fiat—in the nature of things that high functionary must largely act on dossiers prepared by others—in the case of an alien claiming entry on his own account is one thing. To construe such regulation to be authorized and to apply in the case of the wife of an honorably  **\*550**  discharged American soldier is quite another thing. Had Congress spoken explicitly we would have to bow to it. Such a substantial contradiction of the congressional beneficence which is at the heart of the War Brides Act ought not to be attributed to Congress by a process of elaborate implication. Especially is this to be avoided when to do so charges Congress with an obviously harsh purpose. Due regard for the whole body of immigration laws and policies makes it singularly appropriate in construing the War Brides Act to be heedful of the admonition that 'The letter killeth.'

Mr. Justice JACKSON, whom Mr. Justice BLACK and Mr. Justice FRANKFURTER join, dissenting.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 441 of 513

**U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)**
70 S.Ct. 309, 94 L.Ed. 317

I do not question the constitutional power of Congress to authorize immigration authorities to turn back from our gates any alien or class of aliens. But I do not find that Congress has authorized an abrupt and brutal exclusion of the wife of an American citizen without a hearing.

Congress held out a promise of liberalized admission to alien brides, taken unto themselves by men serving in or honorably discharged from our armed services abroad, as the Act, set forth in the Court's opinion, indicates. The petitioning husband is honorably discharged and remained in Germany as a civilian employee. Our military authorities abroad required their permission before marriage. The Army in Germany is not without a vigilant and security-conscious intelligence service. This woman was employed by our European Command and her record is not only without blemish, but is highly praised by her superiors. The marriage of this alien woman to this veteran was approved by the Commanding General at Frankfurt-on-Main.

Now this American citizen is told he cannot bring his wife to the United States, but he will not be told why. **\*551** He must abandon his bride to live in his own country or forsake his country to live with his bride.

So he went to court and sought a writ of habeas corpus, which we never tire of citing to Europe as the unanswerable evidence that our free country permits no arbitrary official detention. And the Government tells the Court that not even a court can find out why the girl is excluded. But it says we must find that Congress authorized this treatment of war brides and, even if we cannot get any reasons for **\*\*317** it, we must say it is legal; security requires it.

Security is like liberty in that many are the crimes committed in its name. The menace to the security of this country, be it great as it may, from this girl's admission is as nothing

compared to the menace to free institutions inherent in procedures of this pattern. In the name of security the police state justifies its arbitrary oppressions on evidence that is secret, because security might be prejudiced if it were brought to light in hearings. The plea that evidence of guilt must be secret is adhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected. Cf. In re Oliver, 333 U.S. 257, 268, 68 S.Ct. 499, 505, 92 L.Ed. 682.

I am sure the officials here have acted from a sense of duty, with full belief in their lawful power, and no doubt upon information which, if it stood the test of trial, would justify the order of exclusion. But not even they know whether it would stand this test. And anyway, as I have said before, personal confidence in the officials involved does not excuse a judge for sanctioning a procedure that is dangerously wrong in principle. Dissent in Bowles v. United States, 319 U.S. 33, 37, 63 S.Ct. 912, 914, 87 L.Ed. 1194.

Congress will have to use more explicit language than any yet cited before I will agree that it has authorized an administrative officer to break up the family of an **\*552** American citizen or force him to keep his wife by becoming an exile. Likewise, it will have to be much more explicit before I can agree that it authorized a finding of serious misconduct against the wife of an American citizen without notice of charges, evidence of guilt and a chance to meet it.

I should direct the Attorney General either to produce his evidence justifying exclusion or to admit Mrs. Knauff to the country.

**All Citations**

338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317

## Footnotes

1    'When the United States is at war or during the existence of the national emergency proclaimed by the President on May 27, 1941, or as to aliens whenever there exists a state of war between, or among, two or more states, and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this Act be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful—

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)**

70 S.Ct. 309, 94 L.Ed. 317

2    '(3) After the effective date of the rules and regulations hereinafter authorized, no alien shall enter or attempt to enter the United States unless he is in possession of a valid unexpired permit to enter issued by the Secretary of State, or by an appropriate officer designated by the Secretary of State, or is exempted from obtaining a permit to enter in accordance with the rules and regulations which the Secretary of State, with the concurrence of the Attorney General, is hereby authorized to prescribe in execution of these rules, regulations, and orders.

'No alien shall be permitted to enter the United States if it appears to the satisfaction of the Secretary of State that such entry would be prejudicial to the interests of the United States as provided in the rules and regulations hereinbefore authorized to be prescribed by the Secretary of State, with the concurrence of the Attorney General.' 3 CFR, 1943 Cum.Supp., 271.

3    'In the case of an alien temporarily excluded by an official of the Department of Justice on the ground that he is, or may be excludable under one or more of the categories set forth in s 175.53, no hearing by a board of special inquiry shall be held until after the case is reported to the Attorney General and such a hearing is directed by the Attorney General or his representative. In any special case the alien may be denied a hearing before a board of special inquiry and an appeal from the decision of that board if the Attorney General determines that he is excludable under one of the categories set forth in s 175.53 on the basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest.' 8 CFR, 1945 Supp., s 175.57(b).

4    See note 3, supra.

5    See note 1, supra.

6    And at certain other times not material here.

7    Proclamation 2714 of December 31, 1946, 50 U.S.C.A.Appendix, s 601 note, 3 CFR, 1946 Supp., 77.

8    'That notwithstanding any of the several clauses of section 3 of the Act of February 5, 1917, excluding physically and mentally defective aliens, and notwithstanding the documentary requirements of any of the immigration laws or regulations, Executive orders, or Presidential proclamations issued thereunder, alien spouses or alien children of United States citizens serving in, or having an honorable discharge certificate from the armed forces of the United States during the Second World War shall, if otherwise admissible under the immigration laws and if application for admission is made within three years of the effective date of this Act, be admitted to the United States * * *.

'Sec. 2. Regardless of section 9 of the Immigration Act of 1924, any alien admitted under section 1 of this Act shall be deemed to be a nonquota immigrant as defined in section 4(a) of the Immigration Act of 1924.

'Sec. 5. For the purpose of this Act, the Second World War shall be deemed to have commenced on December 7, 1941, and to have ceased upon the termination of hostilities as declared by the President or by a joint resolution of Congress.' 59 Stat. 659, 8 U.S.C. ss 232—236, 8 U.S.C.A. ss 232—236.

9    See H.R.Rep. No. 1320, 79th Cong., 1st Sess. (1945); S.Rep. No. 860, 79th Cong., 1st Sess. (1945); 91 Cong.Rec. 11738, 12342 (1945).

1    The Attorney General is to act on information that satisfies him, but not only is there no opportunity for a hearing, but the Attorney General can lock in his own bosom the evidence that does satisfy him. 8 C.F.R. ss 175.53, 175.57 (1949).

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

140 S.Ct. 1959
Supreme Court of the United States.

DEPARTMENT OF HOMELAND
SECURITY, et al., Petitioners
v.
Vijayakumar THURAISSIGIAM

No. 19-161
|
Argued March 2, 2020
|
Decided June 25, 2020

**Synopsis**

**Background:** Asylum-seeking alien, a native and citizen of Sri Lanka, filed habeas petition challenging order for his expedited removal. The United States District Court for the Southern District of California, Anthony J. Battaglia, J., 287 F.Supp.3d 1077, granted defendants' motion to dismiss for lack of subject matter jurisdiction. Alien appealed. The United States Court of Appeals for the Ninth Circuit, Tashima, Senior Circuit Judge, 917 F.3d 1097, reversed and remanded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:

federal statute limiting habeas review in expedited-removal proceedings does not violate the Suspension Clause, abrogating *Mnatsakanyan v. U.S. Dept. of Homeland Security,* 2020 WL 1245371, and *Kaur v. Barr,* 2019 WL 4974425, and

alien lacked constitutional procedural due process right to judicial review of negative credible-fear determination, abrogating *U.S. v. Raya-Vaca,* 771 F. 3d 1195.

Reversed and remanded.

Justice Thomas filed a concurring opinion.

Justice Breyer filed an opinion concurring in the judgment, in which Justice Ginsburg joined.

Justice Sotomayor filed a dissenting opinion, in which Justice Kagan joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Dismiss for Lack of Subject Matter Jurisdiction; Petition for Writ of Habeas Corpus.

**West Codenotes**

**Negative Treatment Reconsidered**
Immigration and Nationality Act § 242(e)(2), 8 U.S.C.A. § 1252(e)(2)

**\*\*1961** *Syllabus* [*]

**\*103** The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) provides for the expedited removal of certain "applicants" seeking admission into the United States, whether at a designated port of entry or elsewhere. 8 U.S.C. § 1225(a)(1). An applicant may avoid expedited removal by demonstrating to an asylum officer a "credible fear of persecution," defined as "a significant possibility ... that the alien could establish eligibility for asylum." § 1225(b)(1)(B)(v). An applicant who makes this showing is entitled to "full consideration" of an asylum claim in a standard removal hearing. 8 C.F.R. § 208.30(f). An asylum officer's rejection of a credible-fear claim is reviewed by a supervisor and may then be appealed to an immigration judge. §§ 208.30(e)(8), 1003.42(c), (d)(1). But IIRIRA limits the review that a federal court may conduct on a petition for a writ of habeas corpus. 8 U.S.C. § 1252(e)(2). In particular, courts may not review "the determination" that an applicant lacks a credible fear of persecution. § 1252(a)(2)(A)(iii).

Respondent Vijayakumar Thuraissigiam is a Sri Lankan national who was stopped just 25 yards after crossing the southern border without inspection or an entry document. He was detained for expedited removal. An asylum officer rejected his credible-fear claim, a supervising officer agreed, and an Immigration Judge affirmed. Respondent then filed a federal habeas petition, asserting for the first time a fear of persecution based on his Tamil ethnicity and political views and requesting a new opportunity to apply for asylum. The District Court dismissed the petition, but the Ninth Circuit reversed, holding that, as applied here, § 1252(e)(2) violates the Suspension Clause and the Due Process Clause.

*Held*:

1. As applied here, § 1252(e)(2) does not violate the Suspension Clause. Pp. 1968 – 1981.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 444 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

(a) The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, § 9, cl. 2. This Court has held that, at a minimum, the Clause "protects the writ as it existed in 1789," when the Constitution was adopted. *INS v. St. Cyr*, 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347. Habeas has traditionally provided a means **\*104** to seek release from unlawful detention. Respondent does not seek release from custody, but an additional opportunity to obtain asylum. His claims therefore fall outside the scope of the writ as it existed when the Constitution was adopted. Pp. 1968 – 1971.

(b) Respondent contends that three bodies of case law support his argument that the Suspension Clause guarantees a broader habeas right, but none do. Pp. 1971 – 1981.

(1) Respondent first points to British and American cases decided before or around the Constitution's adoption. All those cases show is that habeas was used to seek release from detention in a variety of circumstances. Respondent argues that some cases show aliens using habeas to remain in a country. But the relief ordered in those cases was simply release; an alien petitioner's ability to remain in the country was due to immigration law, or lack thereof. The relief that a habeas court may order and the collateral consequences of that relief are two entirely different things. Pp. 1971 – 1976.

(2) Although respondent claims to rely on the writ as it existed in 1789, his argument focuses on this Court's decisions during the "finality era," which takes its name from a feature of the Immigration Act of 1891 making certain immigration decisions "final." In *Nishimura Ekiu v. United States*, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146, the Court interpreted the Act to preclude judicial review only of questions of fact. Federal courts otherwise retained authority under the Habeas Corpus Act of 1867 to determine whether an alien was detained in violation of federal law. Thus, when aliens sought habeas relief during the finality era, the Court exercised habeas jurisdiction that was conferred by the habeas statute, not because it was required by the Suspension Clause—which the Court did not mention. Pp. 1975 – 1981.

(3) The Court's more recent decisions in *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41, and *St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347, also do not support respondent's argument. *Boumediene* was not about immigration at all, and *St. Cyr* reaffirmed that the common-

law habeas writ provided a vehicle to challenge detention and could be invoked by aliens already in the country who were held in custody pending deportation. It did not approve respondent's very different attempted use of the writ. Pp. 1980 – 1981.

2. As applied here, § 1252(e)(2) does not violate the Due Process Clause. More than a century of precedent establishes that, for aliens seeking initial entry, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu*, 142 U.S. at 660, 12 S.Ct. 336. Respondent argues that this rule does not apply to him because he succeeded in making it 25 yards into U. S. territory. But the rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U. S. **\*105** soil. An alien who is detained shortly after unlawful entry cannot be said to have "effected an entry." *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653. An alien in respondent's position, therefore, has only those rights regarding admission that Congress has provided by statute. In respondent's case, Congress provided the right to a "determin[ation]" whether he had "a significant possibility" of "establish[ing] eligibility for asylum," and he was given that right. §§ 1225(b)(1)(B)(ii), (v). Pp. 1981 – 1983.

917 F.3d 1097, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a concurring opinion. BREYER, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN, J., joined.

**Attorneys and Law Firms**

Deputy Solicitor General Edwin S. Kneedler for the petitioners.

Lee Gelernt, New York, NY, for the respondent.

Noel J. Francisco, Solicitor General, Joseph H. Hunt, Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Morgan L. Ratner, Assistant to the Solicitor General, Erez Reuveni, Joshua S. Press, Attorneys, Department of Justice, Washington, DC, for the Petitioners.

Cody Wofsy, Stephen B. Kang, Adrienne Harrold, Morgan Russell, Cecillia D. Wang, American Civil Liberties Union

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 445 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

Foundation, San Francisco, CA, Lucas Guttentag, Stanford, CA, David Loy, Sarah Thompson, ACLU Foundation of San, Diego & Imperial Counties, San Diego, CA, Lee Gelernt, Omar C. Jadwat, Jonathan Hafetz, Anand V. Balakrishnan, Celso J. Perez, American Civil Liberties, Union Foundation, New York, NY, David D. Cole, American Civil Liberties, Union Foundation, Washington, DC, for Respondent.

**Opinion**

Justice ALITO delivered the opinion of the Court.

 **\*106  \*\*1963**  Every year, hundreds of thousands of aliens are apprehended at or near the border attempting to enter this country illegally. Many ask for asylum, claiming that they would be persecuted if returned to their home countries. Some of these claims are valid, and by granting asylum, the United States lives up to its ideals and its treaty obligations. Most asylum claims, however, ultimately fail, and some are fraudulent. In 1996, when Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009–546, it crafted a system for weeding out patently meritless claims and expeditiously removing the aliens making such claims from the country. It was Congress's judgment that detaining all asylum seekers until the full-blown removal process is completed would place an unacceptable burden on our immigration system and that releasing them would present an undue risk that they would fail to appear for removal proceedings.

This case concerns the constitutionality of the system Congress devised. Among other things, IIRIRA placed restrictions on the ability of asylum seekers to obtain review under the federal habeas statute, but the United States Court of  **\*107**  Appeals for the Ninth Circuit held that these restrictions are unconstitutional. According to the Ninth Circuit, they unconstitutionally suspend the writ of habeas corpus and violate asylum seekers' right to due process. We now review that decision and reverse.

Respondent's Suspension Clause argument fails because it would extend the writ of habeas corpus far beyond its scope "when the Constitution was drafted and ratified." *Boumediene v. Bush*, 553 U.S. 723, 746, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). Indeed, respondent's use of the writ would have been unrecognizable at that time. Habeas has traditionally been a means to secure *release* from unlawful detention, but respondent invokes the writ to achieve an entirely different end, namely, to obtain additional administrative review of his

asylum claim and ultimately to obtain authorization to stay in this country.

Respondent's due process argument fares no better. While aliens who have  **\*\*1964**  established connections in this country have due process rights in deportation proceedings, the Court long ago held that Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause. See *Nishimura Ekiu v. United States*, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892). Respondent attempted to enter the country illegally and was apprehended just 25 yards from the border. He therefore has no entitlement to procedural rights other than those afforded by statute.

In short, under our precedents, neither the Suspension Clause nor the Due Process Clause of the Fifth Amendment requires any further review of respondent's claims, and IIRIRA's limitations on habeas review are constitutional as applied.

I

A

We begin by briefly outlining the provisions of immigration law that are pertinent to this case. Under those provisions,  **\*108**  several classes of aliens are "inadmissible" and therefore "removable." 8 U.S.C. §§ 1182, 1229a(e)(2)(A). These include aliens who lack a valid entry document "at the time of application for admission." § 1182(a)(7)(A)(i)(I). An alien who arrives at a "port of entry," *i.e.*, a place where an alien may lawfully enter, must apply for admission. An alien like respondent who is caught trying to enter at some other spot is treated the same way. §§ 1225(a)(1), (3).

If an alien is inadmissible, the alien may be removed. The usual removal process involves an evidentiary hearing before an immigration judge, and at that hearing an alien may attempt to show that he or she should not be removed. Among other things, an alien may apply for asylum on the ground that he or she would be persecuted if returned to his or her home country. § 1229a(b)(4); 8 C.F.R. § 1240.11(c) (2020). If that claim is rejected and the alien is ordered removed, the alien can appeal the removal order to the Board of Immigration Appeals and, if that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals. 8 U.S.C. §§ 1229a(c)(5), 1252(a). As of the first quarter

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 446 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

of this fiscal year, there were 1,066,563 pending removal proceedings. See Executive Office for Immigration Review (EOIR), Adjudication Statistics: Pending Cases (Jan. 2020). The average civil appeal takes approximately one year.[1] During the time when removal is being litigated, the alien will either be detained, at considerable expense, or allowed to reside in this country, with the attendant risk that he or she may not later be found. § 1226(a).

Congress addressed these problems by providing more expedited procedures for certain "applicants for admission." **\*109** For these purposes, "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival ...)" is deemed "an applicant for admission." § 1225(a)(1).[2] An applicant is **\*\*1965** subject to expedited removal if, as relevant here, the applicant (1) is inadmissible because he or she lacks a valid entry document; (2) has not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) is among those whom the Secretary of Homeland Security has designated for expedited removal. §§ 1225(b)(1)(A)(i), (iii)(I)–(II).[3] Once "an immigration officer determines" that a designated applicant "is inadmissible," "the officer [must] order the alien removed from the United States without further hearing or review." § 1225(b)(1)(A)(i).

Applicants can avoid expedited removal by claiming asylum. If an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). The point of this screening interview is to determine whether the applicant has a "credible fear of persecution." § 1225(b)(1)(B)(v). The applicant need not show that he or she *is in fact eligible* for asylum—a "credible fear" equates to only a "significant possibility" that the alien would be eligible. *Ibid.* Thus, while eligibility ultimately requires a "well-founded fear of persecution on account of," among other things, "race" or "political opinion," **\*110** §§ 1101(a)(42)(A), 1158(b)(1)(A), all that an alien must show to avoid expedited removal is a "credible fear."[4]

If the asylum officer finds an applicant's asserted fear to be credible,[5] the applicant will receive "full consideration" of his asylum claim in a standard removal hearing. 8 C.F.R. § 208.30(f); see 8 U.S.C. § 1225(b)(1)(B)(ii). If the asylum officer finds that the applicant does not have a credible fear,

a supervisor will review the asylum officer's determination. 8 C.F.R. § 208.30(e)(8). If the supervisor agrees with it, the applicant may appeal to an immigration judge, who can take further evidence and "shall make a de novo determination." §§ 1003.42(c), (d)(1); see 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

An alien subject to expedited removal thus has an opportunity at three levels to obtain an asylum hearing, and the applicant will obtain one unless the asylum officer, a supervisor, and an immigration **\*\*1966** judge all find that the applicant has not asserted a credible fear.

**\*111** Over the last five years, nearly 77% of screenings have resulted in a finding of credible fear.[6] And nearly half the remainder (11% of the total number of screenings) were closed for administrative reasons, including the alien's withdrawal of the claim.[7] As a practical matter, then, the great majority of asylum seekers who fall within the category subject to expedited removal do not receive expedited removal and are instead afforded the same procedural rights as other aliens.

Whether an applicant who raises an asylum claim receives full or only expedited review, the applicant is not entitled to immediate release. Applicants "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." § 1225(b)(1)(B)(iii)(IV). Applicants who are found to have a credible fear may also be detained pending further consideration of their asylum applications. § 1225(b)(1)(B)(ii); see *Jennings* v. *Rodriguez*, 583 U. S. ——, ——, ——, 138 S.Ct. 830, 836–837, 842, 200 L.Ed.2d 122 (2018).[8]


B

The IIRIRA provision at issue in this case, § 1252(e)(2), limits the review that an alien in expedited removal may obtain via a petition for a writ of habeas corpus. That provision allows habeas review of three matters: first, "whether the petitioner is an alien"; second, "whether the petitioner was ordered removed"; and third, whether the petitioner has already been granted entry as a lawful permanent resident, refugee, or asylee. §§ 1252(e)(2)(A)–(C). If the petitioner has such a status, or if a removal order has not "in fact" **\*112** been "issued," § 1252(e)(5), the court may order a removal hearing, § 1252(e)(4)(B).

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 447 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

A major objective of IIRIRA was to "protec[t] the Executive's discretion" from undue interference by the courts; indeed, "that can fairly be said to be the theme of the legislation." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*AAADC*). In accordance with that aim, § 1252(e)(5) provides that "[t]here shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal." And "[n]otwithstanding" any other "habeas corpus provision"—including 28 U.S.C. § 2241—"no court shall have jurisdiction to review" any other "individual determination" or "claim arising from or relating to the implementation or operation of an order of [expedited] removal." § 1252(a)(2)(A)(i). In particular, courts may not review "the determination" that an alien lacks a credible fear of persecution. § 1252(a)(2)(A)(iii); see also §§ 1252(a)(2)(A)(ii), (iv) (other specific limitations).

Even without the added step of judicial review, the credible-fear process and abuses of it can increase the burdens currently "overwhelming our immigration system." 84 Fed. Reg. 33841 (2019). [9] The past decade **\*\*1967** has seen a 1,883% **\*113** increase in credible-fear claims, and in 2018 alone, there were 99,035 claims. See *id.*, at 33838 (data for fiscal years 2008 to 2018). The majority have proved to be meritless. Many applicants found to have a credible fear—about 50% over the same 10-year period—did not pursue asylum. See EOIR, Adjudication Statistics: Rates of Asylum Filings in Cases Originating With a Credible Fear Claim (Nov. 2018); see also 84 Fed. Reg. 33841 (noting that many instead abscond). In 2019, a grant of asylum followed a finding of credible fear just 15% of the time. See EOIR, Asylum Decision Rates in Cases Originating With a Credible Fear Claim (Oct. 2019). Fraudulent asylum claims can also be difficult to detect, [10] especially in a screening process that is designed to be expedited and that is currently handling almost 100,000 claims per year.

The question presented thus has significant consequences for the immigration system. If courts must review credible-fear claims that in the eyes of immigration officials and an immigration judge do not meet the low bar for such claims, expedited removal would augment the burdens on that system. Once a fear is asserted, the process would no longer be expedited.

### **\*114** C

Respondent Vijayakumar Thuraissigiam, a Sri Lankan national, crossed the southern border without inspection or an entry document at around 11 p.m. one night in January 2017. App. 38. A Border Patrol agent stopped him within 25 yards of the border, and the Department detained him for expedited removal. *Id.*, at 37–39, 106; see §§ 1182(a)(7)(A)(i)(I), 1225(b)(1)(A)(ii), and (b)(1)(B)(iii)(IV). He claimed a fear of returning to Sri Lanka because a group of men had once abducted and severely beaten him, but he said that he did not know who the men were, why they had assaulted him, or whether Sri Lankan authorities would protect him in the future. *Id.*, at 80. He also affirmed that he did not fear persecution based on his race, political opinions, or other protected characteristics. *Id.*, at 76–77; see § 1101(a)(42)(A).

**\*\*1968** The asylum officer credited respondent's account of the assault but determined that he lacked a "credible" fear of persecution, as defined by § 1225(b)(1)(B)(v), because he had offered no evidence that could have made him eligible for asylum (or other removal relief). *Id.*, at 83, 87, 89; see § 1158(b)(1)(A). The supervising officer agreed and signed the removal order. *Id.*, at 54, 107. After hearing further testimony from respondent, an Immigration Judge affirmed on *de novo* review and returned the case to the Department for removal. *Id.*, at 97.

Respondent then filed a federal habeas petition. Asserting for the first time a fear of persecution based on his Tamil ethnicity and political views, *id.*, at 12–13, he argued that he "should have passed the credible fear stage," *id.*, at 30. But, he alleged, the immigration officials deprived him of "a meaningful opportunity to establish his claims" and violated credible-fear procedures by failing to probe past his denial of the facts necessary for asylum. *Id.*, at 27, 32. Allegedly they also failed to apply the "correct standard" to his claims—the "significant possibility" standard—despite its repeated appearance in the records of their decisions. **\*115** *Id.*, at 30; see *id.*, at 53, 84–89, 97. Respondent requested "a writ of habeas corpus, an injunction, or a writ of mandamus directing [the Department] to provide [him] a new opportunity to apply for asylum and other applicable forms of relief." *Id.*, at 33. His petition made no mention of release from custody.

The District Court dismissed the petition, holding that §§ 1252(a)(2) and (e)(2) and clear Ninth Circuit case law foreclosed review of the negative credible-fear determination that resulted in respondent's expedited removal order. 287 F.Supp.3d 1077, 1081 (SD Cal. 2018). The court also rejected respondent's argument "that the jurisdictional limitations of

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 448 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

§ 1252(e) violate the Suspension Clause," again relying on Circuit precedent. *Id.*, at 1082–1083.

The Ninth Circuit reversed. It found that our Suspension Clause precedent demands "reference to the writ as it stood in 1789." 917 F.3d 1097, 1111 (2019). But without citing any pre-1789 case about the scope of the writ, the court held that § 1252(e)(2) violates the Suspension Clause. See *id.*, at 1113–1119. The court added that respondent "has procedural due process rights," specifically the right " 'to expedited removal proceedings that conformed to the dictates of due process.' " *Id.*, at 1111, n. 15 (quoting *United States v. Raya-Vaca*, 771 F.3d 1195, 1203 (CA9 2014)). Although the decision applied only to respondent, petitioners across the Circuit have used it to obtain review outside the scope of § 1252(e)(2), and petitioners elsewhere have attempted to follow suit. [11]

**\*116** The Ninth Circuit's decision invalidated the application of an important provision of federal law and conflicted with a decision from another Circuit, see *Castro v. United States Dept. of Homeland Security*, 835 F.3d 422 (CA3 2016). We granted certiorari, 589 U. S. ——, 140 S.Ct. 427, 205 L.Ed.2d 244 (2019).

## II

### A

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas **\*\*1969** Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, § 9, cl. 2. In *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), we wrote that the Clause, at a minimum, "protects the writ as it existed in 1789," when the Constitution was adopted. *Id.*, at 301, 121 S.Ct. 2271 (internal quotation marks omitted). And in this case, respondent agrees that "there is no reason" to consider whether the Clause extends any further. Brief for Respondent 26, n. 12. We therefore proceed on that basis. [12]

### **\*117** B

This principle dooms respondent's Suspension Clause argument, because neither respondent nor his *amici* have shown that the writ of habeas corpus was understood at the time of the adoption of the Constitution to permit a petitioner to claim the right to enter or remain in a country or to obtain administrative review potentially leading to that result. The writ simply provided a means of contesting the lawfulness of restraint and securing release.

In 1768, Blackstone's Commentaries—usually a "satisfactory exposition of the common law of England," *Schick v. United States*, 195 U.S. 65, 69, 24 S.Ct. 826, 49 L.Ed. 99 (1904)—made this clear. Blackstone wrote that habeas was a means to "remov[e] the injury of unjust and illegal confinement." 3 W. Blackstone, Commentaries on the Laws of England 137 (emphasis deleted). Justice Story described the "common law" writ the same way. See 3 Commentaries on the Constitution of the United States § 1333, p. 206 (1833). Habeas, he explained, "is the appropriate remedy to ascertain ... whether any person is rightfully in confinement or not." *Ibid*.

We have often made the same point. See, *e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) ("It is clear ... from the common-law history of the writ ... that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody"); *Wilkinson v. Dotson*, 544 U.S. 74, 79, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005) (similar); *Munaf v. Geren*, 553 U.S. 674, 693, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (similar).

In this case, however, respondent did not ask to be released. [13] Instead, he **\*\*1970** sought entirely different relief: vacatur **\*118** of his "removal order" and "an order directing [the Department] to provide him with a new ... opportunity to apply for asylum and other relief from removal." App. 14 (habeas petition). See also *id.*, at 31 ("a fair procedure to apply for asylum, withholding of removal, and CAT relief"); *id.*, at 14 ("a new, meaningful opportunity to apply for asylum and other relief from removal"). Such relief might fit an injunction or writ of mandamus—which tellingly, his petition also requested, *id.*, at 33—but that relief falls outside the scope of the common-law habeas writ.

Although the historic role of habeas is to secure release from custody, the Ninth Circuit did not suggest that release, at least in the traditional sense of the term, [14] was required. Instead, what it found to be necessary was a "meaningful opportunity" for review of the procedures used in determining that respondent did not have a credible fear of persecution.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 449 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

917 F.3d at 1117. Thus, even according to the Ninth Circuit, respondent's petition did not call for traditional habeas relief.

Not only did respondent fail to seek release, he does not dispute that confinement during the pendency of expedited asylum review, and even during the additional proceedings he seeks, is lawful. Nor could he. It is not disputed that he was apprehended in the very act of attempting to enter this country; that he is inadmissible because he lacks an **\*119** entry document, see §§ 1182(a)(7)(A), 1225(b)(1)(A)(i); and that, under these circumstances, his case qualifies for the expedited review process, including "[m]andatory detention" during his credible-fear review, §§ 1225(b)(1)(B)(ii), (iii) (IV). Moreover, simply releasing him would not provide the right to stay in the country that his petition ultimately seeks. Without a change in status, he would remain subject to arrest, detention, and removal. §§ 1226(a), 1229a(e)(2).

While respondent does not claim an entitlement to release, the Government is happy to release him—provided the release occurs in the cabin of a plane bound for Sri Lanka. That would be the equivalent of the habeas relief Justice Story ordered in a case while riding circuit. He issued a writ requiring the release of a foreign sailor who jumped ship in Boston, but he provided for the sailor to be released into the custody of the master of his ship. *Ex parte D'Olivera*, 7 F.Cas. 853, 854 (No. 3,967) (CC Mass. 1813).

Respondent does not want anything like that. His claim is more reminiscent of the one we rejected in *Munaf*. In that case, American citizens held in U. S. custody in Iraq filed habeas petitions in an effort to block their transfer to Iraqi authorities for criminal prosecution. See 553 U.S. at 692, 128 S.Ct. 2207. Rejecting this use of habeas, we noted that "[h]abeas is at its core a remedy for unlawful executive **\*\*1971** detention" and that what these individuals wanted was not "simple release" but an order requiring them to be brought to this country. *Id.*, at 693, 697, 128 S.Ct. 2207. Claims so far outside the "core" of habeas may not be pursued through habeas. See, *e.g.*, *Skinner v. Switzer*, 562 U.S. 521, 535, n. 13, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011).

Like the habeas petitioners in *Munaf*, respondent does not want "simple release" but, ultimately, the opportunity to remain lawfully in the United States. That he seeks to stay in this country, while the habeas petitioners in *Munaf* asked to be brought here from Iraq, see *post*, at 2002 – 2004 (opinion of SOTOMAYOR, J.), is immaterial. In this case as in *Munaf*, the relief requested falls outside the scope of

the writ as it was understood when the Constitution was adopted. See **\*120** *Castro*, 835 F.3d at 450–451 (Hardiman, J., concurring dubitante) ("Petitioners here seek to alter their status in the United States in the hope of avoiding release to their homelands. That prayer for relief ... dooms the merits of their Suspension Clause argument" (emphasis deleted)).

III

Disputing this conclusion, respondent argues that the Suspension Clause guarantees a broader habeas right. To substantiate this claim, he points to three bodies of case law: British and American cases decided prior to or around the time of the adoption of the Constitution, decisions of this Court during the so-called "finality era" (running from the late 19th century to the mid-20th century), and two of our more recent cases. None of these sources support his argument.

A

Respondent and *amici* supporting his position have done considerable research into the use of habeas before and around the time of the adoption of the Constitution,[15] but they have not unearthed evidence that habeas was then used to obtain anything like what is sought here, namely, authorization for an alien to remain in a country other than his own or to obtain administrative or judicial review leading to that result. All that their research (and the dissent's) shows is that habeas was used to seek release from detention in a variety of circumstances. In fact, respondent and his *amici* do not argue that their cases show anything more. See Brief for Respondent 27 (arguing that habeas was "available" at the founding "to test all forms of physical restraint"); **\*121** Brief for Scholars of the Law of Habeas Corpus as *Amici Curiae* 11 (the "historical record ... demonstrates that the touchstone for access to the writ" was "whether the petitioner challenges control of his person").

Because respondent seeks to use habeas to obtain something far different from simple release, his cause is not aided by the many release cases that he and his *amici* have found. Thus, for present purposes, it is immaterial that habeas was used to seek release from confinement that was imposed for, among other things, contempt of court (see *Bushell's Case*, Vaugh. 135, 124 Eng. Rep. 1006 (C. P. 1670)), debt (see *Hollingshead's Case*, 1 Salk. 351, 91 Eng. Rep. 307 (K. B. 1702); *Rex* v. *Nathan*, 2 Str. 880, 93 Eng. Rep. 914 (K. B.

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

1724)), **1972 medical malpractice (see *Dr. Groenvelt's Case*, 1 Raym. Ld. 213, 91 Eng. Rep. 1038 (K. B. 1702)), failing to pay an assessment for sewers (see *Hetley* v. *Boyer*, Cro. Jac. 336, 79 Eng. Rep. 287 (K. B. 1613)), failure to lend the King money (see *Darnel's Case*, 3 How. St. Tr. 1 (K. B. 1627)), carrying an authorized "dagg," *i.e.*, handgun (see *Gardener's Case*, Cro. Eliz. 821, 78 Eng. Rep. 1048 (K. B. 1600)), "impressment" into military service or involuntary servitude (see *St. Cyr*, 533 U.S. at 302, 121 S.Ct. 2271), or refusing to pay a colonial tax (see Oldham & Wishnie 496). Nor does it matter that common-law courts sometimes ordered or considered ordering release in circumstances that would be beyond the reach of any habeas statute ever enacted by Congress, such as release from private custody. See, *e.g.*, *Rex* v. *Delaval*, 3 Burr. 1434, 1435–1437, 97 Eng. Rep. 913, 914 (K. B. 1763) (release of young woman from "indentures of apprenticeship"); *Rex* v. *Clarkson*, 1 Str. 444, 93 Eng. Rep. 625 (K. B. 1722) (release from boarding school); *Lister's Case*, 8 Mod. 22, 88 Eng. Rep. 17 (K. B. 1721) (release of wife from estranged husband's restraint). What matters is that all these cases are about release from restraint. Accord, *Preiser*, 411 U.S. at 484–485, and nn. 3–5, 93 S.Ct. 1827. [16]

 **\*122** Respondent and his *amici* note that habeas petitioners were sometimes released on the condition that they conform to certain requirements. See Brief for Respondent 30; Legal Historians Brief 18. For example, they cite a case in which a man was released on condition that he treat his wife well and support her, and another in which a man was released on condition that he issue an apology. *Ibid.* But what respondent sought in this case is nothing like that. Respondent does not seek an order releasing him on the condition that he do or refrain from doing something. What he wants—further review of his asylum claim—is not a condition with which he must comply. Equally irrelevant is the practice, discussed in the dissent, of allowing the executive to justify or cure a defect in detention before requiring release. See *post*, at 2001 – 2002. Respondent does not seek this sort of conditional release either, because the legality of his detention is not in question.

Respondent contends that two cases show that habeas could be used to secure the right of a non-citizen to remain in a foreign country, but neither proves his point. His first case, involving a Scot named Murray, is one for which no official report is available for us to review. [17] We could hardly base our decision here on such a decision. [18]

 **\*123** **\*\*1973** His second case, *Somerset* v. *Stewart*, Lofft. 1, 98 Eng. Rep. 499 (K. B. 1772), is celebrated but does not aid respondent. James Somerset was a slave who was "detain[ed]" on a ship bound for Jamaica, and Lord Mansfield famously ordered his release on the ground that his detention as a slave was unlawful in England. *Id.*, at 19, 98 Eng. Rep., at 510. This relief, release from custody, fell within the historic core of habeas, and Lord Mansfield did not order anything else.

It may well be that a collateral consequence of Somerset's release was that he was allowed to remain in England, but if that is so, it was due not to the writ issued by Lord Mansfield, but to English law regarding entitlement to reside in the country. At the time, England had nothing like modern immigration restrictions. As late as 1816, the word "deportation" apparently "was not to be found in any English dictionary." The Use of the Crown's Power of Deportation Under the Aliens Act, 1793–1826, in J. Dinwiddy, Radicalism and Reform in Britain, 1780–1850, p. 150, n. 4 (1992); see also, *e.g.*, Craies, The Right of Aliens To Enter British Territory, 6 L. Q. Rev. 27, 35 (1890) ("England was a complete asylum to the foreigner who did not offend against its laws"); Haycraft, Alien Legislation and the Prerogative of the Crown, 13 L. Q. Rev. 165, 180 (1897) ("There do not appear to have been any transactions in Parliament or in the [Crown's] Privy Council directly affecting [deportation] from the time of Elizabeth [I] to that of George III"). [19]

 **\*124** For a similar reason, respondent cannot find support in early 19th-century American cases in which deserting foreign sailors used habeas to obtain their release from the custody of American officials. In none of the cases involving deserters that have been called to our attention did the court order anything more than simple release from custody. As noted, Justice Story ordered a sailor's release into the custody of his ship's master. See *Ex parte D'Olivera*, 7 F.Cas. at 854. Other decisions, while ordering the release of detained foreign deserters because no statute authorized detention, chafed at having to order even release. See *Case of the Deserters from the British Frigate L'Africaine*, 3 Am. L. J. & Misc. Repertory 132, 135–136 (Md. 1810) (reporting judge's statement "that he never would interfere to prevent" the British consul himself from detaining British deserters); *Case of Hippolyte Dumas*, 2 Am. L. J. & Misc. Repertory 86, 87 (Pa. 1809) (noting "inconvenience" that U. S. law did not discourage desertion of foreign sailors); *Commonwealth v. Holloway*, 1 Serg.&Rawle 392, 396 (Pa. 1815) (opinion of Tilghman, C. J.) (same); *id.*, at 397 (opinion of Yeates,

Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 451 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

J.) (same). These cases thus do not contemplate the quite different relief that respondent asks us to sanction here.

In these cases, as in *Somerset*, it may be that the released petitioners were able to remain in the United States as a collateral consequence of release, but if so, that was due not to the writs ordering their release, but to U. S. immigration law or the lack thereof. These decisions came at a time **\*\*1974** when an "open door to the immigrant was the ... federal policy." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588, n. 15, 72 S.Ct. 512, 96 L.Ed. 586 (1952); see also *St. Cyr*, 533 U.S. at 305, 121 S.Ct. 2271 (first immigration regulation enacted in 1875). So release may have had the side effect of enabling these individuals to remain in this country, but that is beside the point.

The relief that a habeas court may order and the collateral consequences of that relief are two entirely different things. Ordering an individual's release from custody may have the side effect of enabling that person to pursue all sorts of opportunities **\*125** that the law allows. For example, release may enable a qualified surgeon to operate on a patient; a licensed architect may have the opportunity to design a bridge; and a qualified pilot may be able to fly a passenger jet. But a writ of habeas could not be used to compel an applicant to be afforded those opportunities or as a means to obtain a license as a surgeon, architect, or pilot. Similarly, while the release of an alien may give the alien the opportunity to remain in the country if the immigration laws permit, we have no evidence that the writ as it was known in 1789 could be used to require that aliens be permitted to remain in a country other than their own, or as a means to seek that permission.

Respondent's final examples involve international extradition, but these cases are no more pertinent than those already discussed. For one thing, they post-date the founding era. England was not a party to any extradition treaty in 1789, and this country's first extradition treaty was the Jay Treaty of 1794. See 1 J. Moore, Extradition and Interstate Rendition §§ 7, 78, pp. 10, 89 (1891). In any event, extradition cases, similar to the deserter cases, illustrate nothing more than the use of habeas to secure release from custody when not in compliance with the extradition statute and relevant treaties. As noted by a scholar on whose work respondent relies, these cases "examine[d] the lawfulness of magistrates' decisions permitting the executive to detain aliens." Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1003 (1998). In these cases, as in all the others noted above, habeas was used "simply" to seek release from allegedly unlawful detention. *Benson v. McMahon*, 127 U.S. 457, 463, 8 S.Ct. 1240, 32 L.Ed. 234 (1888). See also, *e.g.*, *In re Stupp*, 23 F.Cas. 296, 303, (No. 13563) (CC SDNY 1875). [20]

**\*126** Despite pages of rhetoric, the dissent is unable to cite a single pre-1789 habeas case in which a court ordered relief that **\*\*1975** was anything like what respondent seeks here. The dissent instead contends that "the Suspension Clause inquiry does not require a close (much less precise) factual match with historical habeas precedent," *post*, at 1998, and then discusses cases that are not even close to this one. The dissent reveals the true nature of its argument by suggesting that there are "inherent difficulties [in] a strict originalist approach in the habeas context because of, among other things, the dearth of reasoned habeas decisions at the founding." *Ibid*. But respondent does not ask us to hold that the Suspension Clause guarantees the writ as it might have evolved since the adoption of the Constitution. On the contrary, as noted at the outset of this discussion, he rests his argument on "the writ as it existed in 1789." Brief for Respondent 26, n. 12.

What the dissent merely implies, one concurring opinion states expressly, arguing that the scope of the writ guaranteed by the Suspension Clause "may change 'depending upon the circumstances' " and thus may allow certain aliens to seek relief other than release. *Post*, at 1989 – 1990 (BREYER, J., concurring **\*127** in judgment) (quoting *Boumediene*, 553 U.S. at 779, 128 S.Ct. 2229). But that is not respondent's argument, and as a general rule "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States* v. *Sineneng-Smith*, 590 U. S. ——, ——, 140 S.Ct. 1575, 1579, —— L.Ed.2d —— (2020) (internal quotation marks omitted). In any event, the concurrence's snippets of quotations from *Boumediene* are taken entirely out of context. They relate to the question whether the statutory review procedures for Guantanamo detainees *seeking release from custody* provided an adequate substitute for a habeas petition *seeking release*. See *infra*, at 1980 – 1981. They do not suggest that any habeas writ guaranteed by the Suspension Clause permits a petitioner to obtain relief that goes far beyond the "core" of habeas as "a remedy for unlawful executive detention." *Munaf*, 553 U.S. at 693, 128 S.Ct. 2207. [21]

**\*128**  B

Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 452 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

We now proceed to consider the second body of case law on which respondent relies, decisions of this Court during the **\*\*1976** "finality era," which takes its name from a feature of the Immigration Act of 1891 making certain immigration decisions "final." Although respondent claims that his argument is supported by the "writ as it existed in 1789," Brief for Respondent 26, n. 12, his argument focuses mainly on this body of case law, which began a century later. These cases, he claims, held that "the Suspension Clause mandates a minimum level of judicial review to ensure that the Executive complies with the law in effectuating removal." *Id.*, at 11–12. The Ninth Circuit also relied heavily on these cases and interpreted them to "suggest that the Suspension Clause requires review of legal and mixed questions of law and fact related to removal orders." 917 F.3d at 1117.

This interpretation of the "finality era" cases is badly mistaken. Those decisions were based not on the Suspension Clause but on the habeas statute and the immigration laws then in force. The habeas statute in effect during this time was broad in scope. It authorized the federal courts to review whether a person was being held in custody in violation of any federal law, including immigration laws. Thus, when aliens claimed that they were detained in violation of immigration statutes, the federal courts considered whether immigration authorities had complied with those laws. This, of course, required that the immigration laws be interpreted, and at the start of the finality era, this Court interpreted the 1891 Act's finality provision to block review of only questions of fact. Accordingly, when writs of habeas corpus were sought by aliens who were detained on the ground that they were not entitled to enter this country, the Court considered whether, given the facts found by the immigration **\*129** authorities, the detention was consistent with applicable federal law. But the Court exercised that review because it was authorized to do so by statute. The decisions did not hold that this review was required by the Suspension Clause.

In this country, the habeas authority of federal courts has been addressed by statute from the very beginning. The Judiciary Act of 1789, § 14, 1 Stat. 82, gave the federal courts the power to issue writs of habeas corpus under specified circumstances, but after the Civil War, Congress enacted a much broader statute. That law, the Habeas Corpus Act of 1867, provided that "the several courts of the United States ... shall have power to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." Judiciary Act of Feb. 5, 1867, § 1, 14 Stat. 385. The Act was

"of the most comprehensive character," bringing "within the habeas corpus jurisdiction of every court and of every judge every possible case of privation of liberty contrary" to federal law. *Ex parte McCardle*, 6 Wall. 318, 325–326, 18 L.Ed. 816 (1868). This jurisdiction was "impossible to widen." *Id.*, at 326; see *Fay v. Noia*, 372 U.S. 391, 415, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) (noting the Act's "expansive language" and "imperative tone"). The 1867 statute, unlike the current federal habeas statute, was not subject to restrictions on the issuance of writs in immigration matters, and in *United States v. Jung Ah Lung*, 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888), the Court held that an alien in immigration custody could seek a writ under that statute. *Id.*, at 626, 8 S.Ct. 663. This provided the statutory basis for the writs sought in the finality era cases.

The Immigration Act of 1891, enacted during one of the country's great waves of immigration, required the exclusion of certain categories of aliens and established procedures for determining whether aliens fell within one of those categories. The Act **\*\*1977** required the exclusion of "idiots, insane persons, paupers or persons likely to become a public charge," **\*130** persons with infectious diseases, persons with convictions for certain crimes, some individuals whose passage had been paid for by a third party, and certain laborers. Act of Mar. 3, 1891, ch. 551, § 1, 26 Stat. 1084. Inspection officers were authorized to board arriving vessels and inspect any aliens on board. § 8, *id.*, at 1085. And, in the provision of central importance here, the Act provided that "[a]ll decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." *Ibid*. Later immigration Acts, which remained in effect until 1952,[22] contained similar provisions. See Act of 1894, 28 Stat. 390; Immigration Act of 1907, § 25, 34 Stat. 907; Immigration Act of 1917, § 17, 39 Stat. 887.

The first of the finality era cases, *Nishimura Ekiu v. United States*, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892), required the Court to address the effect of the 1891 Act's finality provision in a habeas case. *Nishimura Ekiu* is the cornerstone of respondent's argument regarding the finality era cases, so the opinion in that case demands close attention.

The case involved an alien who was detained upon arrival based on the immigration inspector's finding that she was liable to become a public charge. Seeking to be released, the

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 453 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

alien applied to the Circuit Court for a writ of habeas corpus and argued that the 1891 Act, if construed to give immigration authorities the "exclusive authority to determine" her right to enter, would violate her constitutional right to the writ of habeas corpus and her right to due process. *Id.*, at 656, 12 S.Ct. 336 (statement of the case). The Circuit Court refused to issue the writ, holding that the determination of **\*131** the inspector of immigration was not subject to review, and the alien then appealed.

This Court upheld the denial of the writ. The Court interpreted the 1891 Act to preclude judicial review only with respect to questions of fact. *Id.*, at 660, 12 S.Ct. 336. And after interpreting the 1891 Act in this way, the Court found that "the act of 1891 is constitutional." *Id.*, at 664, 12 S.Ct. 336.

The Court's narrow interpretation of the 1891 Act's finality provision meant that the federal courts otherwise retained the full authority granted by the Habeas Corpus Act of 1867 to determine whether an alien was detained in violation of federal law. Turning to that question, the Court held that the only procedural rights of an alien seeking to enter the country are those conferred by statute. "As to such persons," the Court explained, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Id.*, at 660, 12 S.Ct. 336. The Court therefore considered whether the procedures set out in the 1891 Act had been followed, and finding no violation, affirmed the denial of the writ. *Id.*, at 661–664, 12 S.Ct. 336. What is critical for present purposes is that the Court did not hold that the Suspension Clause imposed any limitations on the authority of Congress to restrict the issuance of writs of habeas corpus in immigration matters.

Respondent interprets *Nishimura Ekiu* differently. See Brief for Respondent 13–15. As he reads the decision, the Court **\*\*1978** interpreted the 1891 Act to preclude review of *all questions* related to an alien's entitlement to enter the country. Any other interpretation, he contends, would fly in the face of the statutory terms. But, he maintains, the Court held that this limitation violated the Suspension Clause except with respect to questions of fact, and it was for this reason that the Court considered whether the procedures specified by the 1891 Act were followed. In other words, he reads *Nishimura Ekiu* as holding that the 1891 Act's finality **\*132** provision was unconstitutional in most of its applications (*i.e.*, to all questions other than questions of fact).

This interpretation is wrong. The opinion in *Nishimura Ekiu* states unequivocally that "the act of 1891 is constitutional," *id.*, at 664, 12 S.Ct. 336, not that it is constitutional only in part. And if there is any ambiguity in the opinion regarding the Court's interpretation of the finality provision, the later decision in *Gegiow v. Uhl*, 239 U.S. 3, 36 S.Ct. 2, 60 L.Ed. 114 (1915), left no doubt. What *Nishimura Ekiu* meant, *Gegiow* explained, was that the immigration authorities' factual findings were conclusive (as *Gegiow* put it, "[t]he conclusiveness of the decisions of immigration officers ... is conclusiveness upon matters of fact") and therefore, the Court was "not forbidden by the statute to consider" in a habeas proceeding "whether the reasons" for removing an alien "agree with the requirements of the act." 239 U.S. at 9, 36 S.Ct. 2. In light of this interpretation, the *Nishimura Ekiu* Court had no occasion to decide whether the Suspension Clause would have tolerated a broader limitation, and there is not so much as a hint in the opinion that the Court considered this question. Indeed, the opinion never even mentions the Suspension Clause, and it is utterly implausible that the Court would hold *sub silentio* that Congress had violated that provision.

Holding that an Act of Congress unconstitutionally suspends the writ of habeas corpus is momentous. See *Boumediene*, 553 U.S. at 773, 128 S.Ct. 2229 (noting "the care Congress has taken throughout our Nation's history" to avoid suspension). The Justices on the Court at the beginning of the finality era had seen historic occasions when the writ was suspended —during the Civil War by President Lincoln and then by Congress, and later during Reconstruction by President Grant. See *Hamdi v. Rumsfeld*, 542 U.S. 507, 563, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Scalia, J., dissenting) (discussing these events). The suspension of habeas during this era played a prominent role in our constitutional history. See *Ex parte Merryman*, 17 F.Cas. 144, 151–152 (No. 9,487) (CCD Md. 1861) (Taney, C. J.); **\*133** *Ex parte Milligan*, 4 Wall. 2, 116, 131, 18 L.Ed. 281 (1866). (Two of the Justices at the beginning of the finality era were on the Court when *Ex parte Milligan* was decided.) The Justices knew a suspension of the writ when they saw one, and it is impossible to believe that the *Nishimura Ekiu* Court identified another occasion when Congress had suspended the writ and based its decision on the Suspension Clause without even mentioning that provision.

The dissent's interpretation of *Nishimura Ekiu* is different from respondent's. According to the dissent, *Nishimura Ekiu* interpreted the 1891 Act as it did based on the doctrine of constitutional avoidance. See *post*, at 2004 – 2005. This

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 454 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

reading has no support in the Court's opinion, which never mentions the Suspension Clause or the avoidance doctrine and never explains why the Clause would allow Congress to preclude review of factual findings but nothing more. But even if there were some basis for this interpretation, it would not benefit respondent, and that is undoubtedly **\*\*1979** why he has not made the argument. IIRIRA unequivocally bars habeas review of respondent's claims, see § 1252(e)(2), and he does not argue that it can be read any other way. The avoidance doctrine "has no application in the absence of ambiguity." *Warger v. Shauers*, 574 U.S. 40, 50, 135 S.Ct. 521, 190 L.Ed.2d 422 (2014) (internal quotation marks and ellipsis omitted). Thus, if *Nishimura Ekiu*'s interpretation were based on constitutional avoidance, it would still not answer the interpretive question here.

When we look to later finality era cases, any suggestion of a Suspension Clause foundation becomes even less plausible. None of those decisions mention the Suspension Clause or even hint that they are based on that provision, and these omissions are telling. On notable occasions during that time, the writ was suspended—in the Philippines in 1906[23] **\*134** and Hawaii in 1941.[24] During World War II, the Court held that "enemy aliens" could utilize habeas "unless there was suspension of the writ." *In re Yamashita*, 327 U.S. 1, 9, 66 S.Ct. 340, 90 L.Ed. 499 (1946). And the Court invoked the Suspension Clause in holding that the Executive lacked authority to intern a Japanese-American citizen. See *Ex parte Endo*, 323 U.S. 283, 297–299, 65 S.Ct. 208, 89 L.Ed. 243 (1944). If the Justices during that time had thought that the Suspension Clause provided the authority they were exercising in the many cases involving habeas petitions by aliens detained prior to entry, it is hard to believe that this important fact would have escaped mention.

Respondent suggests that *Nishimura Ekiu* cannot have interpreted the 1891 Act's finality provision to apply only to factual questions because the statutory text categorically bars all review. The important question here, however, is *what the Court did* in *Nishimura Ekiu*, not whether its interpretation was correct, and in any event, there was a reasonable basis for the Court's interpretation.

The determinations that the immigration officials were required to make under the 1891 Act were overwhelmingly factual in nature. The determination in Nishimura's case—that she was likely to become a public charge—seems to have been a pure question of fact, and the other grounds for exclusion

under the Act involved questions that were either solely or at least primarily factual in nature.

If we were now called upon to determine the meaning of a provision like the finality provision in the 1891 Act, our precedents would provide the basis for an argument in favor of the interpretation that the *Nishimura Ekiu* Court reached. The presumption in favor of judicial review, see, *e.g.*, *Guerrero-Lasprilla* v. *Barr*, 589 U. S. ——, ——, 140 S.Ct. 1062, 1069–1070, 206 L.Ed.2d 271 (2020); *Nasrallah* v. *Barr*, 590 U. S. ——, —— – ——, 140 S.Ct. 1683, 1690–1692, —— L.Ed.2d —— (2020), could be invoked. So could the rule that "[i]mplications from statutory **\*135** text or legislative history are not sufficient to repeal habeas jurisdiction." *St. Cyr*, 533 U.S. at 299, 121 S.Ct. 2271; accord, *Ex parte Yerger*, 8 Wall. 85, 105, 19 L.Ed. 332 (1869). Thus, respondent's interpretation of the decision in *Nishimura Ekiu* is **\*\*1980** wrong, and the same is true of his understanding of the later finality era cases.

Rather than relying on the Suspension Clause, those cases simply involved the exercise of the authority conferred by the habeas statute then in effect. This was true of *Nishimura Ekiu*, *Gegiow*, and every other finality era case that respondent cites in support of his Suspension Clause argument. See, *e.g.*, *Gonzales v. Williams*, 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317 (1904); *Yee Won v. White*, 256 U.S. 399, 41 S.Ct. 504, 65 L.Ed. 1012 (1921); *Tod v. Waldman*, 266 U.S. 113, 45 S.Ct. 85, 69 L.Ed. 195 (1924); *United States ex rel. Polymeris v. Trudell*, 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291 (1932); *United States ex rel. Johnson v. Shaughnessy*, 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054 (1949); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Some finality era cases presented pure questions of law, while others involved the application of a legal test to particular facts. At least one involved an alien who had entered illegally. See *id.*, at 262, 74 S.Ct. 499. But none was based on the Suspension Clause. No majority opinion even mentioned the Suspension Clause.[25] Indeed, any mention of the Constitution was rare—and unhelpful to respondent's arguments here.[26] And in all the cited cases concerning aliens detained at entry, unlike the case now before us, what was sought—and the only **\*136** relief considered—was release. Indeed, in an early finality era case, the Court took pains to note that it did not "express any opinion" on whether

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 455 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

an alien was entitled to enter. *Lem Moon Sing v. United States*, 158 U.S. 538, 549, 15 S.Ct. 967, 39 L.Ed. 1082 (1895).

Like the dissent, respondent makes much of certain statements in *Heikkila v. Barber*, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953), which he interprets to substantiate his interpretation of *Nishimura Ekiu* and the subsequent entry cases discussed above. But he takes these statements out of context and reads far too much into them. *Heikkila* was not a habeas case, and the question before the Court was whether a deportation order was reviewable under the Administrative Procedure Act (APA). The Court held that the order was not subject to APA review because the Immigration Act of 1917 foreclosed "judicial review"—as opposed to review in habeas. 345 U.S. at 234–235, 73 S.Ct. 603. Nothing in *Heikkila* suggested that the 1891 Act had been found to be partly unconstitutional, and *Heikkila* certainly did not address the scope of the writ of habeas corpus in 1789.

In sum, the Court exercised habeas jurisdiction in the finality era cases because the habeas statute conferred that authority, not because it was required by the Suspension Clause. As a result, these cases cannot support respondent's argument that the writ of habeas corpus as it was understood when the Constitution was **\*\*1981** adopted would have allowed him to claim the right to administrative and judicial review while still in custody.

## C

We come, finally, to the more recent cases on which respondent relies. The most recent, *Boumediene*, is not about immigration at all. It held that suspected foreign terrorists could challenge their detention at the naval base in Guantanamo Bay, Cuba. They had been "apprehended on the battlefield in Afghanistan" and elsewhere, not while crossing the border. 553 U.S. at 734, 128 S.Ct. 2229. They sought only to be released **\*137** from Guantanamo, not to enter this country. See, *e.g.*, Brief for Petitioner Al Odah et al. in *Al Odah* v. *United States*, decided with *Boumediene v. Bush*, O. T. 2007, No. 061196, p. 39 (arguing that "habeas contemplates but one remedy," "release"). And nothing in the Court's discussion of the Suspension Clause suggested that they could have used habeas as a means of gaining entry. Rather, the Court reaffirmed that release is the habeas remedy though not the "exclusive" result of every writ, given that it is often "appropriate" to allow the executive to cure defects in a detention. 553 U.S. at 779, 128 S.Ct. 2229.

Respondent's other recent case is *St. Cyr*, in which the Court's pertinent holding rejected the argument that certain provisions of IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996 that did not refer expressly to habeas should nevertheless be interpreted as stripping the authority conferred by the habeas statute. In refusing to adopt that interpretation, the Court enlisted a quartet of interpretive canons: "the strong presumption in favor of judicial review of administrative action," "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," the rule that a "clear indication" of congressional intent is expected when a proposed interpretation would push "the outer limits of Congress' power," and the canon of constitutional avoidance. 533 U.S. at 298–300, 121 S.Ct. 2271. In connection with this final canon, the Court observed: "Because of [the Suspension] Clause, some 'judicial intervention in deportation cases' is unquestionably 'required by the Constitution.' " *Id.*, at 300, 121 S.Ct. 2271 (quoting *Heikkila*, 345 U.S. at 235, 73 S.Ct. 603).

Respondent pounces on this statement, but like the *Heikkila* statement on which it relies, it does nothing for him. The writ of habeas corpus as it existed at common law provided a vehicle to challenge all manner of detention by government officials, and the Court had long before that the writ could be invoked by aliens already in the country who were held in custody pending deportation. *St. Cyr* reaffirmed **\*138** these propositions, and this statement in *St. Cyr* does not signify approval of respondent's very different attempted use of the writ, which the Court did not consider. [27]

## IV

In addition to his Suspension Clause argument, respondent contends that IIRIRA violates his right to due process by precluding judicial review of his allegedly flawed credible-fear proceeding. Brief for Respondent 38–45. The Ninth Circuit agreed, holding that respondent "had a constitutional right to expedited removal proceedings that conformed to the dictates of due process." 917 F.3d at 1111, n. 15 (internal quotation marks omitted). **\*\*1982** And the Ninth Circuit acknowledged, *ibid.*, that this holding conflicted with the Third Circuit's decision upholding § 1252(e)(2) on the ground that applicants for admission lack due process rights regarding their applications, see *Castro*, 835 F.3d at 445–446. Since due process provided an independent ground for the

Case 1:24-cv-01702-RC     Document 53-3     Filed 09/27/24     Page 456 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

decision below and since respondent urges us to affirm on this ground, it is hard to understand the dissent's argument that the due process issue was not "seriously in dispute below" or that it is somehow improper for us to decide the issue. *Post*, at 2011 – 2012.

Nor is the dissent correct in defending the Ninth Circuit's holding. That holding is contrary to more than a century of precedent. In 1892, the Court wrote that as to "foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu*, 142 U.S. at 660, 12 S.Ct. 336. Since then, the Court has often reiterated this important rule. See, *e.g.*, **\*139** *Knauff*, 338 U.S. at 544, 70 S.Ct. 309 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *Mezei*, 345 U.S. at 212, 73 S.Ct. 625 (same); *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative").

Respondent argues that this rule does not apply to him because he was not taken into custody the instant he attempted to enter the country (as would have been the case had he arrived at a lawful port of entry). Because he succeeded in making it 25 yards into U. S. territory before he was caught, he claims the right to be treated more favorably. The Ninth Circuit agreed with this argument.

We reject it. It disregards the reason for our century-old rule regarding the due process rights of an alien seeking initial entry. That rule rests on fundamental propositions: "[T]he power to admit or exclude aliens is a sovereign prerogative," *id.*, at 32, 103 S.Ct. 321; the Constitution gives "the political department of the government" plenary authority to decide which aliens to admit, *Nishimura Ekiu*, 142 U.S. at 659, 12 S.Ct. 336; and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted, see *Knauff*, 338 U.S. at 544, 70 S.Ct. 309.

This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U. S. soil. When an alien arrives at a port of entry—for example, an international airport—the alien is on U. S. soil, but the alien is not

considered to have entered the country for the purposes of this rule. On the contrary, aliens who arrive at ports of entry —even those paroled elsewhere in the country for years pending removal—are "treated" for due process purposes "as if stopped at the border." *Mezei*, 345 U.S. at 215, 73 S.Ct. 625; see *Leng May Ma v. Barber*, 357 U.S. 185, 188–190, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); *Kaplan v. Tod*, 267 U.S. 228, 230–231, 45 S.Ct. 257, 69 L.Ed. 585 (1925).

 **\*140**  The same must be true of an alien like respondent. As previously noted, an alien who tries to enter the country illegally is treated as an "applicant for admission," § 1225(a)(1), and an alien who is detained shortly after unlawful entry cannot be said to have "effected an entry," **\*\*1983** *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). Like an alien detained after arriving at a port of entry, an alien like respondent is "on the threshold." *Mezei*, 345 U.S. at 212, 73 S.Ct. 625. The rule advocated by respondent and adopted by the Ninth Circuit would undermine the "sovereign prerogative" of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location. *Plasencia*, 459 U.S. at 32, 103 S.Ct. 321.

For these reasons, an alien in respondent's position has only those rights regarding admission that Congress has provided by statute. In respondent's case, Congress provided the right to a "determin[ation]" whether he had "a significant possibility" of "establish[ing] eligibility for asylum," and he was given that right. §§ 1225(b)(1)(B)(ii), (v). Because the Due Process Clause provides nothing more, it does not require review of that determination or how it was made. As applied here, therefore, § 1252(e)(2) does not violate due process. [28]

* * *

Because the Ninth Circuit erred in holding that § 1252(e)(2) violates the Suspension Clause and the Due Process Clause,  **\*141**  we reverse the judgment and remand the case with directions that the application for habeas corpus be dismissed.

*It is so ordered*.

Justice THOMAS, concurring.

I join the Court's opinion, which correctly concludes that respondent's Suspension Clause argument fails because he does not seek a writ of habeas corpus. I write separately to address the original meaning of the Suspension Clause, which guarantees that "[t]he Privilege of the Writ of Habeas Corpus

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 457 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, § 9, cl. 2. The Founders appear to have understood "[t]he Privilege of the Writ of Habeas Corpus" to guarantee freedom from discretionary detention, and a "suspen[sion]" of that privilege likely meant a statute granting the executive the power to detain without bail or trial based on mere suspicion of a crime or dangerousness. Thus, the expedited removal procedure in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–546, is likely not a suspension.[1]

I

The writ of habeas corpus began as a prerogative writ in the Court of King's Bench in the 16th century. J. Baker, An Introduction to English Legal History 157 (5th ed. 2019). Over time, however, it came to be understood both as a right to be free from arbitrary detention and as a procedural writ.

By the end of the 16th century, the English connected the common-law writ of habeas corpus to liberty. Specifically, it was associated with the guarantee in Magna Carta that "[n]o free person (*Nullus* **1984** *liber homo*) shall be taken or imprisoned, or disseised or outlawed or exiled, or in any way **\*142** destroyed ... except by the lawful judgment of his peers or by the law of the land." *Id.*, at 157, n. 76, 506. Perhaps most prominently, Edward Coke wrote in his Institutes that "if a man be taken, or committed to prison *contra legem terrae*, against the Law of the land," then "[h]e may have an *habeas corpus*." The Second Part of the Institutes of the Laws of England 55 (6th ed. 1681). For Coke, and for the many English (and later Americans) who read his work, "the writ was treated as an aspect of the Charter's guaranty." D. Meador, Habeas Corpus and Magna Carta: Dualism of Power and Liberty 22 (1966).

This association between habeas corpus and freedom from discretionary detention deepened after 1679 with the Habeas Corpus Act, also known as An Act for the better secureing the Liberty of the Subject and for Prevention of Imprisonments beyond the Seas. The statute sought to address "great Delayes" in "criminall or supposed criminall Matters." 31 Car. 2, ch. 2. It required an officer served with a writ of habeas corpus to produce the prisoner within three days in "any such criminall or supposed criminall Matters." *Ibid.* It also guaranteed bail to prisoners in cases of felony or high treason if they were not tried within one term of court. *Ibid.* To protect these rights, Parliament created a special statutory

remedy: All writs under the Habeas Corpus Act were marked as issuing pursuant to the statute. *Ibid.*; P. Halliday, Habeas Corpus: From England to Empire 320 (2010).

Parliament passed the Habeas Corpus Act to curb the power of King Charles II, but it nonetheless came to be seen as a protection for liberty, not just an assertion of the powers of Parliament over the Crown. Henry Care, in the 1774 edition of his widely read treatise English Liberties, commented that "before this statute [the common-law writ of habeas corpus] was rendered far less useful than it ought to be, partly by the Judges pretending a power to grant or deny the said writ at their pleasure, in many cases; and especially by the ill practices of Sheriffs and Goalers, by putting the **\*143** prisoner to the charge and trouble of ... a second and third writ, before they would obey the first." 1 English Liberties, or the Free-born Subject's Inheritance 195. The Habeas Corpus Act, he concluded, "provides thus for our liberty." *Id.,* at 198. William Blackstone put it even more sweepingly, writing that the Habeas Corpus Act "is frequently considered as another *magna carta.*" 3 Commentaries on the Laws of England 135 (1770).

II

The Founders inherited this understanding of habeas corpus. And they enshrined it in the Suspension Clause, which they understood to protect a substantive right.

The language of the Suspension Clause evinces this understanding. The Clause itself does not authorize courts to issue writs of habeas corpus. *INS v. St. Cyr,* 533 U.S. 289, 337, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (Scalia, J., dissenting); *Ex parte Bollman,* 4 Cranch 75, 94, 8 U.S. 75, 2 L.Ed. 554 (1807). Nor does it refer simply to the writ of habeas corpus. Rather, it protects the *privilege of* the writ of habeas corpus. The word "privilege" was "used interchangeably with the words 'rights,' 'liberties,' and 'freedoms,' and had been since the time of Blackstone." *McDonald v. Chicago,* 561 U.S. 742, 813, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment). By using this term, the Framers appear to have had a substantive right in mind.

Ratification debates reflect this understanding as well. Future Supreme Court **1985** Justice James Iredell said in the North Carolina convention that, "[b]y the privileges of the *habeas corpus*, no man can be confined without inquiry;

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 458 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

and if it should appear that he has been committed contrary to law, he must be discharged." 4 Debates in the Several State Conventions 171 (J. Elliot ed. 1891). Signer of the Constitution James McHenry told the Maryland House of Delegates that "[p]ublic safety may require a suspension of the Ha[beas] Corpus in cases of necessity: when those cases do not exist, the virtuous Citizen will ever be protected in his opposition **\*144** to power." 11 Documentary History of the Ratification of the Constitution 80, 84 (J. Kaminski et al. eds. 2015) (Documentary History).

This understanding is echoed in statements that the Constitution protects the Habeas Corpus Act, the writ of habeas corpus, or simply "the habeas corpus," all referring to a substantive right. Alexander Hamilton wrote in The Federalist No. 83 that "the *habeas corpus* act" was "provided for in the most ample manner in the plan of the convention." The Federalist No. 83, p. 499 (C. Rossiter ed. 1961). Again in No. 84, he wrote that the Constitution "establish[ed] the writ of *habeas corpus*." *Id.*, No. 84, at 511. In the Pennsylvania ratifying convention, Jasper Yeates said that the Suspension Clause "direct[ed] that the privilege of the *habeas corpus* act shall not be suspended except in times of immediate danger." 2 Documentary History 434–435 (M. Jensen ed. 1976). In Virginia, Governor Edmund Randolph—a signer and future Attorney General—argued that "the habeas corpus is at least on as secure and good a footing as it is in England" because "[t]hat privilege is secured here by the Constitution." 9 *id.*, at 1099 (J. Kaminski & G. Saladino eds. 1990). Luther Martin of Maryland wrote that "the general government is to have a *power* of *suspending* the *habeas corpus act*, in cases of *rebellion* or *invasion*." Genuine Information VIII, reprinted in 15 *id.*, at 434 (J. Kaminski & G. Saladino eds. 1984). In Massachusetts, Theophilius Parsons "made a Loud Speech on the Habeas Corpus act that it will not be in the power of Gov[ern]ment to suspend the act only in time of war." 7 *id.*, at 1813 (J. Kaminski & G. Saladino eds. 2001). Other speakers and writers made similar references. See A. Tyler, Habeas Corpus in Wartime 132–133 (2017) (collecting examples). In sum, it seems that the founding generation viewed the privilege of the writ of habeas corpus as a freedom from arbitrary detention.[2]

**\*145  \*\*1986**  III

The remaining question is what it means for "[t]he Privilege of the Writ of Habeas Corpus" to "be suspended." U. S. Const., Art. I, § 9, cl. 2. At the founding, suspension

was a well-known term that meant "a [t]emporal [s]top of a [m]an's [r]ight." N. Bailey, An Universal Etymological English Dictionary (22d ed. 1770); see *St. Cyr*, 533 U.S. at 337–338, 121 S.Ct. 2271 (Scalia, J., dissenting). In the context of habeas corpus, it appears to have specifically meant a grant of authority to the executive to detain without bail or trial based on suspicion of a crime or dangerousness.

The English understood the term this way. Blackstone called it "the happiness of [the English] constitution" that "the parliament only, or legislative power, ... can authorize the crown, by suspending the *habeas corpus* act for a short and limited time, to imprison suspected persons without giving any reason for so doing." 1 Commentaries on the Laws of England, at 136. Bills known as suspensions granted broad power to detain based on suspicion of a crime. For **\*146** example, in 1777, Lord Germaine introduced a bill " 'to empower his Majesty to secure and detain Persons charged with, or suspected of, the Crime of High Treason committed in North America, or on the High Seas, or the Crime of Piracy.' " 19 W. Cobbett, The Parliamentary History of England 4 (1814). The bill allowed certain prisoners to be detained " 'without bail or mainprize' "[3] and prohibited any " 'judge or justice of peace' " from " 'bail[ing] or try[ing] any such person or persons, ... any law, statute, or usage, to the contrary in any wise notwithstanding.' " *Id.,* at 5. The text contained no mention of the Habeas Corpus Act, but it nevertheless was referred to as a "suspension of the Habeas Corpus Act." *Id.,* at 9–10. As one historian has written, suspensions "were officially acts 'empowering his majesty to apprehend and detain such persons as he shall find cause to suspect' " and to do so " 'without bail or mainprise.' " Halliday, Habeas Corpus, at 248.

Americans shared a similar understanding, as evidenced by the suspensions that States passed during the Revolutionary War. "By their common terms," these suspensions "bestowed authority on state executives to arrest and detain persons preventively based on suspicion of supporting the Crown." Tyler, Habeas Corpus in Wartime, at 111. In 1777, Massachusetts authorized the detention of "any person whom the council shall deem the safety of the Commonwealth requires should be restrained of his personal liberty, or whose enlargement within this state is dangerous thereto" "without bail or mainpri[s][z]e." 1776–1777 Mass. Acts ch. 45, §§ 1, 3, p. 641. Virginia similarly allowed the Governor and council to detain anyone "whom they may have just cause to suspect of disaffection to the independence of the United States or of attachment to their enemies." An act for giving

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 459 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

certain powers to the governor and council, and **\*147** for punishing those who shall oppose the execution of laws, reprinted in 10 W. Hening's Statutes at Large 413–414 (1822). And New York created a board with power "to apprehend and confine or cause to be apprehended or confined ... all persons whose going at large shall in the judgment of the said commissioners or any three of them appear dangerous to the safety of **\*\*1987** this State." An Act appointing commissioners for detecting and defeating conspiracies and declaring their powers (Feb. 5, 1778), 1778 N. Y. Laws ch. 3, pp. 8–9; see also An Act for constituting a Council of Safety (Oct. 11, 1777), 1777 N. J. Laws ch. 40, § 4, p. 85; An Act to Empower the Supreme Executive Council of this Commonwealth to Provide for the Security Thereof in Special Cases Where No Provision Is Already Made by Law (Sept. 6, 1777), ch. 762, § 2, 9 Statutes at Large of Pennsylvania 140 (J. Mitchell & H. Flanders eds. 1903); An Act to punish certain crimes and misdemeanors, and to prevent the growth of toryism, 1777 Md. Laws ch. 20, § 7.[4]

Massachusetts continued using this formula for suspensions under its 1780 Constitution. These suspensions are especially probative because that Constitution contained language similar to the Federal Suspension Clause: "The privilege and benefit of the writ of habeas corpus shall be enjoyed in this Commonwealth in the most free, easy, cheap, expeditious and ample manner; and shall not be suspended by the Legislature, except upon the most urgent and pressing occasions, and for a limited time not exceeding twelve months." Pt. 2, ch. VI, Art. VII. In response to Shays' Rebellion, which gained notoriety across the United States, Massachusetts passed "An Act for Suspending the Privilege of the Writ of Habeas Corpus." It provided that

> **\*148** "the Governor, with the advice and consent of the Council, be and he hereby is authorised and empowered ... to command, and cause to be apprehended, and committed in any Goal, or other safe place, within the Commonwealth, any person or persons whatsoever, whom the Governor and Council, shall deem the safety of the Commonwealth requires should be restrained of their personal liberty, or whose enlargement is dangerous thereto; any Law, Usage or Custom to the contrary notwithstanding." 1786–1787 Mass. Acts ch. 41, p. 102.

The Act also provided that "any Person who shall be apprehended and imprisoned, as aforesaid, shall be continued in imprisonment, without Bail or Mainprize, until he shall be discharged therefrom by order of the Governor, or of the General Court." *Id.,* at 103; see also An Act to Suspend the Privilege of the Writ of Habeas Corpus for Six Months (June 27, 1782), 1782–1783 Mass. Acts ch. 2, pp. 6–7. Thus, in a jurisdiction with an analog to the Suspension Clause, a suspension was a grant of power to detain without bail or trial based on suspicion of a crime or dangerousness.

Although the ratification debates are not especially illuminating on the meaning of a suspension, they provide further support for this understanding. Luther Martin wrote that the Government, upon "suspending the habeas corpus act may *seize* upon the persons of those *advocates of freedom*, who have had *virtue* and *resolution* enough to excite the opposition, and may *imprison* them during their pleasure." Genuine Information VIII, reprinted in 15 Documentary History 434. Another essayist, writing in a Boston newspaper, explained that suspension would allow "the President, or President and Senate, as Congress shall think proper to empower, to take up and confine for any cause, or for any suspicion, or for no cause, perhaps any person, he or they shall think proper. 5 *id.*, at 712 (J. Kaminski & G. Saladino eds. 1998).

**\*149  \*\*1988** In sum, a suspension was not necessarily an express limitation on the availability of the writ of habeas corpus. Rather, it appears to have been a grant of power to detain based on suspicion of a crime or dangerousness without bail or trial.

IV

Under this interpretation, 8 U.S.C. § 1252 likely does not suspend the writ of habeas corpus. To be placed in expedited removal, an immigration officer must "determin[e]" that an alien is "inadmissible." § 1225(b)(1)(A)(i). That determination is based in part on the alien's lack of valid entry documentation and failure to satisfy a 2-year continuous physical presence requirement, not on mere suspicion or dangerousness. §§ 1225(b)(1)(A)(i), (iii)(II); § 1182(a)(7). An alien has the opportunity to avoid expedited removal by demonstrating a "credible fear of persecution." §§ 1225(b)(1)(B)(iii), (v). If the alien is unsuccessful, he may seek "[j]udicial review ... in habeas corpus proceedings" of "whether [he] is an alien;" "whether [he] was ordered removed" under expedited removal; and "whether [he] can prove by a preponderance of the evidence that [he] is an alien lawfully admitted for permanent residence, has been admitted as a refugee ..., or has been granted asylum" and "such status [has not] been terminated." § 1252(e)(2).

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 460 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

This statute bears little resemblance to a suspension as that term was understood at the founding. It does not allow the executive to detain based on mere suspicion of a crime or dangerousness. Rather, it requires a finding that the detainee lacks valid documentation and is not eligible for asylum. It even expressly permits habeas relief for a detainee who does not meet certain criteria for expedited removal.

Some may wish that the Suspension Clause were broader. Perhaps for this reason, our precedents have departed from the original understanding of the Suspension Clause. See, *e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 826–850, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (Scalia, J., dissenting); *St. Cyr*, 533 U.S. at 336–341, 121 S.Ct. 2271 (Scalia, **\*150** J., dissenting). But this understanding does contain an important guarantee of individual liberty by limiting the circumstances in which Congress may give the executive power to detain without bail or trial based on suspicion of a crime or dangerousness. In this case, that guarantee has not been violated.

Justice BREYER, with whom Justice GINSBURG joins, concurring in the judgment.

The statute at issue here, 8 U.S.C. § 1252(e)(2), sets forth strict limits on what claims a noncitizen subject to expedited removal may present in federal habeas corpus proceedings. I agree that enforcing those limits *in this particular case* does not violate the Suspension Clause's constitutional command: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, § 9, cl. 2. But we need not, and should not, go further.

We need not go further because the Government asked us to decide, and we agreed to review, an issue limited to the case before us. The question presented is "whether, *as applied to respondent*, Section 1252(e)(2) is unconstitutional under the Suspension Clause." Pet. for Cert. i (emphasis added). All we must decide is whether, under the Suspension Clause, the statute at issue "is unconstitutional as applied to *this* party, in the circumstances of *this* case." *Chicago v. Morales*, 527 U.S. 41, 74, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Scalia, J., dissenting).

**\*\*1989** Nor should we go further. Addressing more broadly whether the Suspension Clause protects people challenging removal decisions may raise a host of difficult questions in the immigration context. What review might the Suspension Clause assure, say, a person apprehended years after she crossed our borders clandestinely and started a life in this country? Under current law, noncitizens who have lived in the United States for up to two years may be placed in expedited-removal proceedings, see § 1225(b)(1)(A)(iii), **\*151** but Congress might decide to raise that 2-year cap (or remove it altogether). Does the Suspension Clause let Congress close the courthouse doors to a long-term permanent resident facing removal? In *INS* v. *St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), we avoided just that "serious and difficult constitutional issue." *Id.*, at 305, 121 S.Ct. 2271.

Could Congress, for that matter, deny habeas review to someone ordered removed despite claiming to be a natural-born U. S. citizen? The petitioner in *Chin Yow v. United States*, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908), and others have faced that predicament. See also § 1252(e)(2)(A) (permitting, at present, habeas review of citizenship claims). What about foreclosing habeas review of a claim that rogue immigration officials forged the record of a credible-fear interview that, in truth, never happened? Or that such officials denied a refugee asylum based on the dead-wrong legal interpretation that Judaism does not qualify as a "religion" under governing law? Cf. *Tod v. Waldman*, 266 U.S. 113, 119–120, 45 S.Ct. 85, 69 L.Ed. 195 (1924) (observing that immigration officials ignored a Jewish family's claim that they were "refugees" fleeing "religious persecution").

The answers to these and other "difficult questions about the scope of [Suspension Clause] protections" lurk behind the scenes here. *Lozman* v. *Riviera Beach*, 585 U. S. ——, ——, 138 S.Ct. 1945, 1953, 201 L.Ed.2d 342 (2018). I would therefore avoid making statements about the Suspension Clause that sweep beyond the principles needed to decide this case—let alone come to conclusions about the Due Process Clause, a distinct constitutional provision that is not directly at issue here. Compare *ibid.* (concluding that, with narrow grounds for decision available, resolving broader, more difficult questions "must await a different case") with *ante*, at 1969 – 1972 (suggesting that removal is simply not the sort of "restraint" for which the Suspension Clause guarantees a means of "securing release"), and *ante*, at 1981 – 1983 (addressing a separate due process question).

As for the resolution of the dispute before us, Congress, in my view, had the constitutional power to foreclose habeas **\*152** review of the claims that respondent has pressed in this case. Habeas corpus, as we have said, is an "adaptable remedy," and the "precise application and scope" of the

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 461 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

review it guarantees may change "depending upon the circumstances." *Boumediene v. Bush*, 553 U.S. 723, 779, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); see also *id.*, at 813, 128 S.Ct. 2229 (ROBERTS, C. J., dissenting). So where the Suspension Clause applies, the "habeas court's role" may prove more "extensive," or less so, depending on the context at issue. *Id.*, at 780, 128 S.Ct. 2229 (majority opinion). Here, even assuming that the Suspension Clause guarantees respondent some form of habeas review—which is to say, even accepting for argument's sake that the relief respondent seeks *is* "release," contra, *ante*, at 1975—the scope of that constitutionally required review would not extend to his claims. Two features of this case persuade me.

 **1990  *First*, respondent's status suggests that the constitutional floor set by the Suspension Clause here cannot be high. A Border Patrol agent apprehended respondent just 25 yards inside the border. Respondent was placed in expedited removal proceedings shortly thereafter, where he received the same consideration for relief from removal that Congress has afforded persons arriving at the border. Respondent has never lived in, or been lawfully admitted to, the United States.

To my mind, those are among the "circumstances" that inform the "scope" of any habeas review that the Suspension Clause might guarantee respondent. *Boumediene*, 553 U.S. at 779, 128 S.Ct. 2229. He is thus in a materially different position for Suspension Clause purposes than the noncitizens in, for example, *Rowoldt v. Perfetto*, 355 U.S. 115, 78 S.Ct. 180, 2 L.Ed.2d 140 (1957), *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), and *Hansen v. Haff*, 291 U.S. 559, 54 S.Ct. 494, 78 L.Ed. 968 (1934). They had all lived in this country for years. The scope of whatever habeas review the Suspension Clause assures respondent need not be as extensive as it might for someone in that position.

 *153  *Second*, our precedents demonstrate that respondent's claims are of the kind that Congress may, consistent with the Suspension Clause, make unreviewable in habeas proceedings. Even accepting respondent's argument that our "finality era" cases map out a constitutional minimum, see *ante*, at 1975 – 1976, his claims, on the facts presented here, differ significantly from those that we reviewed throughout this period.

To begin, respondent concedes that Congress may eliminate habeas review of factual questions in cases like this one. See, *e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892). He has thus disclaimed the "right to challenge the historical facts" found by immigration officials during his credible-fear process. Tr. of Oral Arg. 44. But even though respondent has framed his two primary claims as asserting legal error, substance belies that label. Both claims are, at their core, challenges to factual findings.

During his credible-fear interview, respondent said that he is an ethnic Tamil from Sri Lanka and that, one day, a group of men abducted him in a van and brutally beat him. App. 67, 70–74. The asylum officer believed respondent's account, *id.*, at 83, which respondent confirmed was his sole basis for seeking relief, *id.*, at 77, 79. The critical question, then, concerned the nature of the attack: Who attacked respondent and why? In written findings, the asylum officer concluded that it was "unknown who these individuals were or why they wanted to harm [respondent]." *Id.*, at 87. Based on those findings, the asylum officer determined that respondent had not established a credible fear of persecution or torture within the meaning of governing law. See *id.*, at 87, 89.

Respondent, to be sure, casts the brunt of his challenge to this adverse credible-fear determination as two claims of legal error. But it is the factual findings underlying that determination that respondent, armed with strong new *factual* evidence, now disputes. See *id.*, at 23–27; Brief for  *154  Professors of Sri Lankan Politics as *Amici Curiae* 7–11; see also *ante*, at 1983, n. 28 (noting that immigration officials may revisit their findings in light of this additional evidence).

Respondent first asserts that the asylum officer failed to apply—or at least misapplied—the applicable legal standard under § 1225(b)(1)(B)(v), which required only a "significant possibility" that respondent  **1991  could establish entitlement to relief from removal. See App. 30–32; Brief for Respondent 6. Respondent also contends that the asylum officer "demonstrated a fatal lack of knowledge" about conditions in Sri Lanka, *id.*, at 7, in violation of provisions requiring that asylum officers consider "other facts as are known to the officer," § 1225(b)(1)(B)(v), and have "had professional training in country conditions," § 1225(b)(1)(E)(i). See App. 24–26, 28–29, 31.

At the heart of both purportedly legal contentions, however, lies a disagreement with immigration officials' findings about the two brute facts underlying their credible-fear

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 462 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

determination—again, the identity of respondent's attackers and their motive for attacking them. Other than his own testimony describing the attack, respondent has pointed to nothing in the administrative record to support either of these claims.

As to his legal-standard claim, respondent does not cite anything affirmatively indicating that immigration officials misidentified or misunderstood the proper legal standard under § 1225(b)(1)(B)(v). Rather, he argues that their credible-fear determination was so egregiously wrong that it simply *must* have rested on such a legal error. See Tr. of Oral Arg. 46–50. But that contention rests on a refusal to accept the facts as found by the immigration officials. Specifically, it rejects their findings that no evidence suggested respondent was attacked by men affiliated with the Sri Lankan Government and motivated by respondent's Tamil ethnicity or (as he now alleges) history of political activism. See App. 87; see also, *e.g.*, *id.*, at 23–26. Respondent's **\*155** quarrel, at bottom, is not with whether settled historical facts satisfy a legal standard, see *Guerrero-Lasprilla* v. *Barr*, 589 U. S. ——, ——, 140 S.Ct. 1062, 1068–1069, 206 L.Ed.2d 271 (2020), but with what the historical facts *are*.

Respondent's country-conditions claim is much the same. Respondent does not cite anything in the administrative record affirmatively indicating that, contrary to §§ 1225(b)(1)(B)(v) and (E)(i), immigration officials, for example, consciously disregarded facts presented or otherwise known to them, or that the asylum officer never received relevant professional training. Instead, respondent offers a similar refrain: The credible-fear determination was so egregiously wrong that immigration officials simply *must* not have known about conditions in Sri Lanka. See Brief for Respondent 7. So this claim, too, boils down to a factual argument that immigration officials should have known who respondents' attackers were and why they attacked him.

Mindful that the "Constitution deals with substance, not shadows," *Salazar* v. *Buono*, 559 U.S. 700, 723, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010) (ROBERTS, C. J., concurring) (internal quotation marks omitted), I accordingly view both claims as factual in nature, notwithstanding respondent's contrary characterization. For that reason, Congress may foreclose habeas review of these claims without running afoul of the Suspension Clause. See, *e.g.*, *Nishimura Ekiu*, 142 U.S. at 660, 12 S.Ct. 336.

The other two claims of error that respondent has pressed assert that immigration officials violated procedures required by law. He first contends that, by not asking additional questions during the credible-fear interview, the asylum officer failed to elicit "all relevant and useful information," in violation of 8 C.F.R. § 208.30(d) (2020). See App. 27, 31. Respondent further alleges that translation problems arose during the interview, in violation of the asylum officer's duty under §§ 208.30(d)(1) and (2) to ensure that respondent **\*\*1992** was "[a]ble to participate effectively" and "ha[d] an understanding of the credible fear determination process." See App. **\*156** 27–28, 31. Though both claims may reasonably be understood as procedural, they may constitutionally be treated as unreviewable—at least under the border-entry circumstances present in this case. See *supra*, at 1989 – 1990.

Respondent's procedural claims are unlike those that we reviewed in habeas proceedings during the finality era. Throughout that period, the procedural claims that we addressed asserted errors that fundamentally undermined the efficacy of process prescribed by law. See *Chin Yow*, 208 U.S. at 11, 28 S.Ct. 201 (observing that a noncitizen could obtain habeas relief on procedural grounds if he was denied "an opportunity to prove his right to enter the country, as the statute meant that he should have"). Many of our finality era cases thus dealt with situations in which immigration officials failed entirely to take obligatory procedural steps.

In *Waldman*, for example, we faulted immigration officials for making "no finding[s]" at all on potentially dispositive issues, including whether the noncitizens were fleeing religious persecution and therefore exempt from a literacy requirement. 266 U.S. at 120, 45 S.Ct. 85. And in *United States ex rel. Johnson v. Shaughnessy*, 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054 (1949), we reversed for procedural error because the noncitizen was denied outright "the independent [medical] review and reexamination" required by then-governing law. *Id.*, at 812, 69 S.Ct. 921; see also *Accardi*, 347 U.S. at 267, 74 S.Ct. 499 (faulting the Attorney General for short-circuiting altogether legally prescribed adjudication procedures by "dictating" an immigration decision himself).

Respondent's procedural claims are different. He does not allege that immigration officials, say, denied him a credible-fear interview or skipped a layer of intra-agency review altogether. Nor do his allegations suggest that the asylum officer's questioning or the interpreter's translation constructively deprived him of the opportunity to establish

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

a credible fear; indeed, he has consistently maintained that the information that *was* elicited more than sufficed. See, *e.g.*, Tr. of Oral Arg. 46–48; cf. *Chin Yow*, 208 U.S. at 13, 28 S.Ct. 201 **\*157** (observing that "the denial of a hearing cannot be established" merely "by proving that the decision was wrong"). Respondent thus contends that the credible-fear process was procedurally defective for reasons that are more technical. He alleges that additional questions would have yielded further "relevant and useful" information and that "communication issues affected the interview" in some way. App. 27.

Respondent's procedural claims consequently concern not the outright denial (or constructive denial) of a process, but the precise way in which the relevant procedures were administered. They raise fine-grained questions of degree —*i.e.*, whether the asylum officer made *sufficiently thorough* efforts to elicit all "relevant and useful information" and whether he took *sufficiently thorough* precautions to ensure that respondent was "[a]ble to participate effectively" in the interview. 8 C.F.R. § 208.30(d).

Reviewing claims hinging on procedural details of this kind would go beyond the traditionally "limited role" that habeas has played in immigration cases similar to this one—even during the finality era. *St. Cyr*, 533 U.S. at 312, 121 S.Ct. 2271. To interpret the Suspension Clause as insisting upon habeas review of these claims would require, by constitutional command, that the habeas court make indeterminate and highly record-intensive judgments on matters of degree. Respondent has not cited, **\*\*1993** and I have not found, any case of ours suggesting that the Suspension Clause demands parsing procedural compliance at so granular a level. Neither, apparently, has the Solicitor General. See Tr. of Oral Arg. 14–15, 23–24; Brief for Petitioners 38.

Together with respondent's status, see *supra*, at 1989 –1990, these characteristics convince me that Congress had the constitutional power to foreclose habeas review of respondent's procedural claims. Recasting those claims as an allegation that respondent's "due process rights were violated by" immigration officials makes no material difference. App. 32. That alternative description changes none of the features that, in **\*158** my view, put respondent's procedural claims beyond the scope of any minimum habeas review that the Suspension Clause might assure him under the circumstances.

\* \* \*

For these reasons, I would hold that, as applied to respondent, § 1252(e)(2)'s limits on habeas review do not violate the Suspension Clause. I would go no further.

Justice SOTOMAYOR, with whom Justice KAGAN joins, dissenting.

The majority declares that the Executive Branch's denial of asylum claims in expedited removal proceedings shall be functionally unreviewable through the writ of habeas corpus, no matter whether the denial is arbitrary or irrational or contrary to governing law. That determination flouts over a century of this Court's practice. In case after case, we have heard claims indistinguishable from those respondent raises here, which fall within the heartland of habeas jurisdiction going directly to the origins of the Great Writ.

The Court thus purges an entire class of legal challenges to executive detention from habeas review, circumscribing that foundational and "stable bulwark of our liberties," 1 W. Blackstone, Commentaries 99 (Am. ed. 1832). By self-imposing this limitation on habeas relief in the absence of a congressional suspension, the Court abdicates its constitutional duty and rejects precedent extending to the foundations of our common law.

Making matters worse, the Court holds that the Constitution's due process protections do not extend to noncitizens like respondent, who challenge the procedures used to determine whether they may seek shelter in this country or whether they may be cast to an unknown fate. The decision deprives them of any means to ensure the integrity of an expedited removal order, an order which, the Court has just held, is not subject to any meaningful judicial oversight as **\*159** to its substance. In doing so, the Court upends settled constitutional law and paves the way toward transforming already summary expedited removal proceedings into arbitrary administrative adjudications.

Today's decision handcuffs the Judiciary's ability to perform its constitutional duty to safeguard individual liberty and dismantles a critical component of the separation of powers. It will leave significant exercises of executive discretion unchecked in the very circumstance where the writ's protections "have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). And it increases the risk of erroneous immigration decisions that contravene governing statutes and treaties.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 464 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

The Court appears to justify its decision by adverting to the burdens of affording robust judicial review of asylum decisions. But our constitutional protections should not hinge on the vicissitudes of the political climate or bend to accommodate burdens on the Judiciary. I respectfully dissent.

**\*\*1994** I

The as-applied challenge here largely turns on how the Court construes respondent's requests for relief. Its descriptions, as well as those of one of the concurrences, skew the essence of these claims. A proper reframing thus is in order.

A

Respondent first advances a straightforward legal question that courts have heard in habeas corpus proceedings in "case after case." *Id.*, at 306, 121 S.Ct. 2271. His habeas petition claimed that an asylum officer and Immigration Judge "appl[ied] an incorrect legal standard" by ordering him removed despite a showing of a significant possibility of credible fear to establish "eligibility for asylum, withholding of removal, and [Convention Against Torture] claims." App. 31–32; see also 8 U.S.C. § 1225(b)(1)(B)(v) (setting standard for credible fear as "a significant possibility, taking into account the ... statements **\*160** made by the alien ... and such other facts as are known to the officer, that the alien could establish eligibility for asylum"). The Government itself has characterized that claim as a challenge to the " 'application of a legal standard to factual determinations ... underlying the Executive's negative credible-fear findings.' " 917 F.3d 1097, 1117, n. 20 (CA9 2019) (case below). At bottom, respondent alleged that he was unlawfully denied admission under governing asylum statutes and regulations.

The Court disagrees, flattening respondent's claim into a mere plea "ultimately to obtain authorization to stay in this country." *Ante*, at 1963; see also *ante*, at 1969 (describing the request as a "right to enter or remain in a country"); *ante*, at 1969 – 1970, n. 14 (framing relief sought as "gaining a right to remain in this country"); *ante*, at 1971 (equating relief with "authorization ... to remain in a country other than his own"). Yet while the Court repeatedly says that respondent seeks nothing more than admission as a matter of grace, its own descriptions of respondent's habeas petition belie its assertions. See, *e.g.*, *ante*, at 1965, n. 5 ("[T]he gravamen of his petition is that [respondent] faces

persecution in Sri Lanka 'because of ' his Tamil ethnicity and political opinions"); *ibid.* (suggesting that the same persecution inquiry governs respondent's Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment claim); *ante*, at 1983, n. 28 (observing that respondent's habeas petition contains factual allegations that resemble documented persecution on the basis of ethnicity or political opinion). Though the Court refuses to admit as much, its descriptions of respondent's arguments illustrate, at bottom, claims that immigration officials legally erred in their review of his asylum application.

In papering over the true nature of respondent's claims, the Court transforms his assertions of legal error in the exercise of executive discretion into a naked demand for executive action. But the distinction between those forms of relief **\*161** makes all the difference. The law has long permitted habeas petitioners to challenge the legality of the exercise of executive power, even if the executive action ultimately sought is discretionary. See *St. Cyr*, 533 U.S. at 307, 121 S.Ct. 2271 (citing cases). That principle has even more force today, where an entire scheme of statutes and regulations cabins the Executive's discretion in evaluating asylum applications. For that reason, the Court's observation that the ultimate "grant of asylum is discretionary" is beside the point. *Ante*, at 1965, n. 4.

For its part, one concurring opinion seems to acknowledge that claims that assert something other than pure factual error may constitutionally require some judicial review. *Ante*, at 1989 – 1991 **\*\* 1995** (BREYER, J., concurring in judgment). It simply determines that respondent's credible-fear claims amount to nothing more than a "disagreement with immigration officials' findings about the two brute facts underlying their credible-fear determination," namely, the identity of his attackers and their motivations. *Ante*, at 1965. It also faults respondent for failing to develop his claims of legal error with citations "indicating that immigration officials misidentified or misunderstood the proper legal standard" or that they "disregarded" or were not properly trained in identifying relevant country conditions. *Ante*, at 1965 – 1966.

But the essence of respondent's petition is that the facts as presented (that he, a Tamil minority in Sri Lanka, was abducted by unidentified men in a van and severely beaten), when considered in light of known country conditions (as required by statute), amount at least to a "significant possibility" that he could show a well-founded fear of persecution. So viewed, respondent's challenge does not

quibble with historic facts, but rather claims that those "settled facts satisfy a legal standard," which this Court has held amounts to a "legal inquiry." *Guerrero-Lasprilla* v. *Barr*, 589 U. S. ——, ——, 140 S.Ct. 1062, 1068–1069, 206 L.Ed.2d 271 (2020). The concurring opinion suggests that any conclusions drawn from the discrete settled facts here could not be "so egregiously wrong" as to amount to legal error. **\*162** *Ante*, at 1965 – 1966. But the ultimate inquiry is simply whether the facts presented satisfy a statutory standard. While this concurring opinion may believe that the facts presented here do not show that respondent is entitled to relief, its view of the merits does not alter the legal nature of respondent's challenge.

### B

Second, respondent contended that the inadequate procedures afforded to him in his removal proceedings violated constitutional due process. Among other things, he asserted that the removal proceedings by design did not provide him a meaningful opportunity to establish his claims, that the translator and asylum officer misunderstood him, and that he was not given a "reasoned explanation" for the decision. App. 27, 32; see also *id.*, at 32 (arguing that "[u]nder constitutionally adequate procedures, [respondent] would have prevailed on his claims"). Again, however, the Court falls short of capturing the procedural relief actually requested. The Court vaguely suggests that respondent merely wanted more cracks at obtaining review of his asylum claims, not that he wanted to challenge the existing expedited removal framework or the process actually performed in his case as constitutionally inadequate. See *ante*, at 1963 (characterizing respondent as asking for "additional administrative review of his asylum claim"); see also *ante*, at 1965, n. 5 (describing petition as seeking "another opportunity to apply for asylum"). That misconstrues respondent's procedural challenges to the expedited removal proceedings, which matters crucially; a constitutional challenge to executive detention is just the sort of claim the common law has long recognized as cognizable in habeas. See generally Part II, *infra*.

One concurring opinion, meanwhile, properly characterizes respondent's claims on this score as "procedural" challenges. *Ante*, at 1991 – 1992 (opinion of BREYER, J.). Yet it concludes that those claims are not reviewable because they do not allege sufficiently serious defects. See *ante*, at 1991 – 1993 (describing **\*163** cognizable claims as

those involving " 'no [factual] finding[s],' " contentions that officials "skipped a layer of intra-review altogether," the "outright denial (or constructive denial) of a process," or an official's "fail[ure] **\*\*1996** entirely to take obligatory procedural steps"). But these are simply distinctions of degree, not of kind. Respondent claimed that officials violated governing asylum regulations and deprived him of due process by conducting an inadequate interview and providing incomplete translation services. It is difficult to see the difference between those claims and the ones that the concurring opinion upholds as cognizable. Cf. *ante*, at 1992 (finding cognizable claims that an official "short-circuit[ed] altogether legally prescribed adjudication procedures by 'dictating' an immigration decision" and that an official deprived a noncitizen of " 'an opportunity to prove his right to enter the country, as the statute meant that he should have' ").

Indeed, the concurring opinion notes that the core question is whether a defect "fundamentally undermined the efficacy of process prescribed by law." *Ante*, at 1992. Respondent's petition plainly posits procedural defects that violate, or at least call into question, the "efficacy of process prescribed by law" and the Constitution. *Ibid.* The concurring opinion might think that respondent is not entitled to additional protections as a matter of law or that the facts do not show he was denied any required process. But conclusions about the merits of respondent's procedural challenges should not foreclose his ability to bring them in the first place.

### C

Finally, the Court asserts that respondent did not specifically seek "release" from custody in what the Court styles as the "traditional" sense of the term as understood in habeas jurisprudence. *Ante*, at 1968, 1969 – 1970; cf. *ante*, at 1970 – 1971 (suggesting that respondent "does not claim an entitlement to release"). Instead, the Court seems to argue that respondent seeks **\*164** only a peculiar form of release: admission into the United States or additional asylum procedures that would allow for admission into the United States. Such a request, the Court implies, is more akin to mandamus and injunctive relief. *Ante*, at 1969 – 1970.

But it is the Court's directionality requirement that bucks tradition. Respondent asks merely to be freed from wrongful executive custody. He asserts that he has a credible fear of persecution, and asylum statutes authorize him to remain in the country if he does. That request is indistinguishable from,

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 466 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

and no less "traditional" than, those long made by noncitizens challenging restraints that prevented them from otherwise entering or remaining in a country not their own. See Part II–B–1, *infra*.

The Court has also never described "release" as the sole remedy of the Great Writ. Nevertheless, respondent's petition is not limited in the way the Court claims. As it acknowledges, *ante*, at 1968, respondent directly asked the District Court to "[i]ssue a writ of habeas corpus" without further limitation on the kind of relief that might entail, App. 33. Respondent also sought "an [o]rder directing [the Government] to show cause why the writ should not be granted" and an order "directing [the Government] to vacate the expedited removal order entered against [him]." *Ibid.* As the petition's plain language indicates, respondent raised a garden-variety plea for habeas relief in whatever form available and appropriate, including, but not limited to, release.

* * *

Fairly characterized, respondent's claims allege legal error (for violations of governing asylum law and for violations of procedural due process) and an open-ended request for habeas relief. It is "uncontroversial" that the writ encompasses such claims. See **1997** *Boumediene v. Bush*, 553 U.S. 723, 779, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (concluding that release is but one form of relief available); see also *St. Cyr.*, 533 U.S. at 302, 304–308, 121 S.Ct. 2271 (citing **165** cases predating the founding to show that the writ could challenge "the erroneous application or interpretation" of relevant law); see also Part II–D, *infra*.

II

Only by recasting respondent's claims and precedents does the Court reach its decision on the merits. By its account, none of our governing cases, recent or centuries old, recognize that the Suspension Clause guards a habeas right to the type of release that respondent allegedly seeks.[1] *Ante*, at 1969 – 1970, n. 14 (finding no evidence that the writ was understood in 1789 to grant relief that would amount to "gaining a right to remain in this country"); *ante*, at 1969 – 1970 (characterizing a " 'meaningful opportunity' " for review of asylum claims as falling outside of traditional notions of release from custody). An overview of cases starting from the colonial period to the present reveals that the Court is incorrect, even accepting its improper framing of respondent's claims.

**166** A

The critical inquiry, the Court contends, is whether respondent's specific requests for relief (namely, admission into the United States or additional asylum procedures allowing for admission into the United States) fall within the scope of the kind of release afforded by the writ as it existed in 1789. *Ante*, at 1968 – 1969, 1969; see also *ante*, at 1968 (criticizing the court below for holding § 1252(e)(2) unconstitutional "without citing any pre-1789 case about the scope of the writ"). This scope, it explains, is what the Suspension Clause protects "at a minimum." *Ante*, at 1969. But as the Court implicitly acknowledges, its inquiry is impossible. The inquiry also runs headlong into precedent, which has never demanded the kind of precise factual match with pre-1789 case law that today's Court demands.

To start, the Court recognizes the pitfalls of relying on pre-1789 cases to establish principles relevant to immigration and asylum: "At the time, England had nothing like modern immigration restrictions." *Ante*, at 1973 ("As late as 1816, the word 'deportation' apparently 'was not to be found in any English dictionary' "). It notes, too, that our cases have repeatedly observed the relative novelty of immigration laws in the early days of this country. *Ante*, at 1973 – 1974 (citing *Harisiades v. Shaughnessy*, 342 U.S. 580, 588, n. 15, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("An open door to the immigrant was the early federal **1998** policy"); *St. Cyr*, 533 U.S. at 305, 121 S.Ct. 2271 (remarking that the first immigration regulation was enacted in 1875)); see also *Demore v. Kim*, 538 U.S. 510, 539, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (O'Connor, J., concurring in part and concurring in judgment) ("Because colonial America imposed few restrictions on immigration, there is little case law prior to that time about the availability of habeas review to challenge temporary detention pending exclusion or deportation").

The Court nevertheless seems to require respondent to engage in an exercise in futility. It demands that respondent unearth cases predating comprehensive federal immigration regulation showing that noncitizens obtained release **167** from federal custody onto national soil. But no federal statutes at that time spoke to the permissibility of their entry in the first instance; the United States lacked a comprehensive asylum regime until the latter half of the 20th century. Despite the limitations inherent in this exercise, the Court appears to insist on a wealth of cases mirroring the precise relief requested at

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 467 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

a granular level; nothing short of that, in the Court's view, would demonstrate that a noncitizen in respondent's position is entitled to the writ. See *ante*, at 1972, n. 18 (dismissing respondent's cited cases on the ground that "[w]hether the founding generation understood habeas relief more broadly than described by Blackstone, Justice Story, and our prior cases ... cannot be settled by a single case or even a few obscure and possibly aberrant cases"); see also Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961 (1998) (noting the inherent difficulties of a strict originalist approach in the habeas context because of, among other things, the dearth of reasoned habeas decisions at the founding).

But this Court has never rigidly demanded a one-to-one match between a habeas petition and a common-law habeas analog. In *St. Cyr*, for example, the Court considered whether a noncitizen with a controlled substance conviction could challenge on habeas the denial of a discretionary waiver of his deportation order. 533 U.S. at 293, 121 S.Ct. 2271. In doing so, the Court did not search high and low for founding-era parallels to waivers of deportation for criminal noncitizens. It simply asked, at a far more general level, whether habeas jurisdiction was historically "invoked on behalf of noncitizens ... in the immigration context" to "challenge Executive ... detention in civil cases." *Id.*, at 302, 305, 121 S.Ct. 2271. That included determining whether "[h]abeas courts ... answered questions of law that arose in the context of discretionary relief " (including questions regarding the allegedly "erroneous application or interpretation of statutes"). *Id.*, at 302, and n. 18, 307, 121 S.Ct. 2271.

   **\*168** *Boumediene* is even clearer that the Suspension Clause inquiry does not require a close (much less precise) factual match with historical habeas precedent. There, the Court concluded that the writ applied to noncitizen detainees held in Guantanamo, 553 U.S. at 771, 128 S.Ct. 2229, despite frankly admitting that a "[d]iligent search by all parties reveal[ed] no certain conclusions" about the relevant scope of the common-law writ in 1789, *id.*, at 746, 128 S.Ct. 2229. Indeed, the Court reasoned that none of the cited cases illustrated whether a "common-law court would or would not have granted ... a petition for a writ of habeas corpus" like that brought by the noncitizen-detainee petitioners, and candidly acknowledged that "the common-law courts simply may not have confronted cases with close parallels." *Id.*, at 746, 752, 128 S.Ct. 2229. But crucially, the Court declined to "infer too **\*\*1999** much, one way or the other, from the lack of historical evidence on

point." *Id.*, at 752, 128 S.Ct. 2229. Instead, it sought to find comparable common-law habeas cases by "analogy." *Id.*, at 748–752, 128 S.Ct. 2229.

There is no squaring the Court's methodology today with *St. Cyr* or *Boumediene*. As those cases show, requiring near-complete equivalence between common-law habeas cases and respondent's habeas claim is out of step with this Court's longstanding approach in immigration cases.

### B

#### 1

Applying the correct (and commonsense) approach to defining the Great Writ's historic scope reveals that respondent's claims have long been recognized in habeas.

Respondent cites *Somerset* v. *Stewart*, Lofft. 1, 98 Eng. Rep. 499 (K. B. 1772), as an example on point. There, Lord Mansfield issued a writ ordering release of a slave bound for Jamaica, holding that there was no basis in English law for "sending ... him over" to another country. *Id.*, at 17–19, 98 Eng. Rep., at 509–510. Thus, the writ issued even though it **\*169** "did not free [the] slave so much as it protected him from deportation." P. Halliday, Habeas Corpus: From England to Empire 175 (2010). *Somerset* establishes the longstanding availability of the writ to challenge the legality of removal and to secure release into a country in which a petitioner sought shelter. Scholarly discussions of *Murray's Case* suggest much of the same. There, the King's Bench granted habeas to allow a nonnative to remain in England and to prevent his removal to Scotland for trial. Halliday, Habeas Corpus, at 236.

The Court dismisses these examples outright. It acknowledges that the petitioner in *Somerset* may have been allowed to remain in England because of his release on habeas, yet declares that this was "due not to the wri[t] ordering [his] release" but rather to the existing state of the law. *Ante*, at 1973 – 1974. But the writ clearly did more than permit the petitioner to disembark from a vessel; it prevented him from being "sen[t] ... over" to Jamaica. Lofft., at 17, 98 Eng. Rep., at 509. What England's immigration laws might have prescribed after the writ's issuance did not bear on the availability of the writ as a means to remain in the country in the first instance.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 468 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

The Court also casts aside the facts of *Murray's Case*, even though was, too, reveal that habeas was used to permit a nonnative detainee to remain in a country. *Ante*, at 1972 – 1973, n. 18. The Court minimizes the decision as "obscure and possibly aberrant." *Ibid*. But given the relative paucity of habeas cases from this era, it is telling that the case serves as another example of the writ being used to allow a noncitizen to remain in England.[2]

**\*170**  The reasoning of *Somerset* and *Murray's Case* carried over to the Colonies, where colonial governments presumed habeas available to noncitizens to secure their residence in a territory. See generally Oldham & Wishnie, The Historical Scope of Habeas Corpus and *INS* v. *St. Cyr*, 16 Geo. Immigration L. J. 485 (2002).  **\*\*2000**  For example, in 1755, British authorities sought to deport French Acadian settlers from Nova Scotia, then under the control of Great Britain, to the American Colonies. *Id.*, at 497. The Governor and Assembly of South Carolina resisted the migrants' arrival and detained them in ships off the coast of Charleston. They recognized, however, that the exclusion could not persist because the migrants would be entitled to avail themselves of habeas corpus. *Id.*, at 498. Ultimately, the Governor released most of the Acadian migrants for resettlement throughout the Colony. *Ibid*.

Founding era courts accepted this view of the writ's scope. Rather than credit these decisions, the Court marches through an assorted selection of cases and throws up its hands, contending that the case law merely reflects a wide range of circumstances for which individuals were deprived of their liberty. See *ante*, at 1971 – 1972. Thus, the Court concludes, the common law simply did not speak to whether individuals could seek "release" that would allow them to enter a country (as opposed to being expelled from it).

At the same time, notwithstanding its professed keen interest in precedent, the Court seems to discount decisions supporting respondent's view that habeas permitted release from custody into the country. At least two other classes of cases demonstrate that the writ was available from around the founding onward to noncitizens who were detained, and wanted to remain, including those who were prevented from entering the United States at all.

**\*171**  First, common-law courts historically granted the writ to discharge deserting foreign sailors found and imprisoned in the United States. In *Commonwealth v. Holloway*, 1 Serg.&Rawle 392 (1815), the Pennsylvania Supreme Court

granted a writ of habeas corpus to a Danish sailor who had deserted his vessel in violation of both an employment contract and Danish law. The court explained that the desertion did not violate any domestic law or treaty, and thus imprisonment was inappropriate. *Id.*, at 396 (opinion of Tilghman, C. J.). By ordering an unconditional discharge and declining to return the noncitizen sailor to the custody of any foreign power, the court used the writ to order a release that authorized a noncitizen to remain in the United States, a country "other than his own." *Ante*, at 1971. The same was true in similar cases that even the Court cites. See *ante*, at 1973 (citing *Case of the Deserters from the British Frigate L'Africaine*, 3 Am. L. J. & Misc. Repertory 132 (Md. 1810) (reporting on a decision discharging deserters); *Case of Hippolyte Dumas*, 2 Am. L. J. & Misc. Repertory 86 (Pa. 1809) (same)).

Curiously, the Court does not contest that the writs in these cases were used to secure the liberty of foreign sailors, and consequently their right to enter the country.[3]  Rather, it remarks that judges at the time "chafed at having to order even release," *ante*, at 1973, which some saw as inconsistent with principles of comity, *Holloway*, 1 Serg.&Rawle at 394. But reluctance is not inability. That those judges followed the law's dictates despite their distaste for the result should give today's Court pause.

The Court seizes on one case where a court ordered a deserting sailor to be returned to his foreign vessel-master. See *ante*, at 1970 – 1971, 1973 (citing **\*172** *Ex parte D'Olivera*, 7 F.Cas. 853, 854 (No. 3,967) (CCD Mass. 1813)). But it reads too much **\*\*2001** into this one decision. In *D'Olivera*, the court held that deserting sailors were unlawfully confined and granted a writ of habeas corpus, but directed that they be discharged to their vessel-master out of "a desire not to encourage desertion among foreign seamen." *Id.*, at 854. As illustrated by other deserter cases *supra*, the kind of results-oriented decisionmaking in *D'Olivera* does not seem to be the norm. The Court's proclamation about how the scope of common-law habeas cannot hinge on a "single case" should have equal force here. *Ante*, at 1972 – 1973 n. 18.

Next, courts routinely granted the writ to release wrongfully detained noncitizens into Territories other than the detainees' "own." Many involved the release of fugitive or former slaves outside their home State. In these cases, courts decided legal questions as to the status of these petitioners. In *Arabas v. Ivers*, 1 Root 92 (Conn. Super. Ct. 1784), for example, a Connecticut court determined that a former slave from New

Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 469 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

York held in local jail on his alleged master's instructions had, in fact, been freed through his service in the Continental Army. The court ordered him discharged "upon the ground that he was a freeman, absolutely manumitted from his master by enlisting and serving in the army." *Id.*, at 93. See also *In re Belt*, 7 N.Y.Leg.Obs. 80 (1848) (granting habeas to discharge an imprisoned fugitive slave whose owner did not timely apply for his return to Maryland); *In re Ralph*, 1 Morris 1 (Iowa 1839) (discharging person from custody on the grounds that he was not a fugitive slave subject to return to Missouri when he had been allowed to travel to the Iowa Territory by his former master); *Commonwealth v. Holloway*, 2 Serg.&Rawle 305 (Pa. 1816) (holding on habeas corpus that a child born in a State to a slave was free); *In re Richardson's Case*, 20 F.Cas. 703, (No. 11778) (CC DC 1837) (ordering prisoner to be discharged in the District of Columbia because warrant was insufficient to establish that he was a runaway slave from Maryland); *Commonwealth v. Griffith*, 19 Mass. 11 (1823)  **\*173**  (contemplating that the status of a freeman seized in Massachusetts as an alleged fugitive from Virginia could be determined on habeas corpus).

The weight of historical evidence demonstrates that common-law courts at and near the founding granted habeas to noncitizen detainees to enter Territories not considered their own, and thus ordered the kind of release that the Court claims falls outside the purview of the common-law writ.

The Court argues that none of this evidence is persuasive because the writ could not be used to compel authorization to enter the United States. *Ante*, at 1973 – 1974. But that analogy is inapt. Perhaps if respondent here sought to use the writ to grant naturalization, the comparison would be closer. But respondent sought only the proper interpretation and application of asylum law (which statutorily permits him to remain if he shows a credible fear of persecution), or in the alternative, release pursuant to the writ (despite being cognizant that he could be denied asylum or rearrested upon release if he were found within the country without legal authorization). But that consequence does not deprive respondent of the ability to invoke the writ in the first instance. See, *e.g.*, *Lewis v. Fullerton*, 22 Va. 15 (1821) (affirming that a judgment on habeas corpus in favor of a slave was not conclusive of her rights but merely permitted release from custody on the record before the court and did not prohibit recapture by a master); *Ralph*, 1 Morris, at 1 (noting that an adjudication that petitioner was not a fugitive only exempted him from fugitive-slave laws but did not prohibit master

**\*\*2002**  from entering Territory to reclaim him on his own accord).

For these reasons, the Court is wrong to dispute that common-law habeas practice encompassed the kind of release respondent seeks here.

2

The Court also appears to contend that respondent sought merely additional procedures in his habeas adjudication and that this kind of relief does not fall within the traditional  **\*174**  scope of the writ. That reflects a misunderstanding of the writ. Habeas courts regularly afforded the state additional opportunities to show that a detention was lawful before ordering what the Court now considers a release outright.

The common-law writ of *habeas corpus ad subjiciendum* evolved into what we know and hail as the "Great Writ." See 3 W. Blackstone, Commentaries on the Laws of England 131 (1768). That writ, at bottom, allowed a court to elicit the cause for an individual's imprisonment and to ensure that he be released, granted bail, or promptly tried. See Oaks, Habeas Corpus in the States—1776–1865, 32 U. Chi. L. Rev. 243, 244 (1965). From its origins, the writ did not require immediate release, but contained procedures that would allow the state to proceed against a detainee. Under the English Habeas Corpus Act of 1679, jailers were ordered to make a "return" to a writ within a designated time period and certify the true causes of imprisonment. *Id.*, at 252–253. Justices of the King's Bench obtained returns that provided full legal accounts justifying detention. Halliday & White, The Suspension Clause: English Text, Imperial Contexts, and American Implications, 94 Va. L. Rev. 575, 599–600 (2008) (Halliday & White). They also examined and were guided by depositions upon which a detention was founded to determine whether to admit a petitioner to bail. Oaks, 32 U. Chi. L. Rev., at 258. Indeed, the King's Bench routinely considered facts not asserted in the return to assist scrutiny of detentions. Halliday & White 610; see also *id.*, at 611 (documenting instances where the court would consider affidavits of testimony beyond what was included in the return).

Moreover, early practice showed that common-law habeas courts routinely held proceedings to determine whether detainees should be discharged immediately or whether the state could subject them to further proceedings, including trial in compliance with proper procedures. See *Ex parte Bollman*,

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 470 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

4 Cranch 75, 125, 8 U.S. 75, 2 L.Ed. 554 (1807) (taking testimony in conjunction with an "inquiry" to determine whether "the accused **\*175** shall be discharged or held to trial"). In *Ex parte Kaine*, 14 F.Cas. 78 (No. 7,597) (CC SDNY 1853), for example, a federal court analyzed whether a petitioner, who had been found guilty of an offense by a commissioner, was subject to extradition. The court passed on questions of law concerning whether the commissioner had the power to adjudicate petitioner's criminality. *Id.*, at 80. Ultimately, the court found that petitioner was "entitled to be discharged from imprisonment" due to defects in the proceedings before the commissioner, but entertained further evidence on whether he could nevertheless be extradited. *Id.*, at 82. Only after finding no additional evidence that would permit extradition did the court order release. *Ibid.*

Similarly, in *Coleman v. Tennessee*, 97 U.S. 509, 24 L.Ed. 1118 (1879), the petitioner had been convicted of a capital offense by a state court, even though he had committed the offense while a soldier in the United States Army. *Id.*, at 510–511. This Court granted habeas on the grounds that the state-court judgment was void but, because the petitioner had also been **\*\*2003** found guilty of murder by a military court, nevertheless turned the prisoner over to the custody of the military for appropriate punishment. *Id.*, at 518–520. Not surprisingly, then, the Court has found that habeas courts may discharge detainees in a manner that would allow defects in a proceeding below to be corrected. *In re Bonner*, 151 U.S. 242, 261, 14 S.Ct. 323, 38 L.Ed. 149 (1894).

These examples confirm that outright habeas release was not always immediately awarded. But they also show that common-law courts understood that relief short of release, such as ordering officials to comply with the law and to correct underlying errors, nevertheless fell within the scope of a request for habeas corpus. [4]

### \*176  3

Despite exalting the value of pre-1789 precedent, the Court's key rationale for why respondent does not seek "release" in the so-called traditional sense rests on an inapposite, contemporary case: *Munaf v. Geren*, 553 U.S. 674, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). [5] *Ante*, at 1970 – 1971. *Munaf*, the Court claims, shows that habeas is not available to seek an order to be brought into this country. *Ante*, at 1970 – 1971. But that case is in a category of its own and has no bearing on respondent's claims here. *Munaf* addressed a one-of-a-

kind scenario involving the transfer of individuals between different sovereigns. There, two United States citizens in Iraq filed habeas petitions seeking to block their transfer to Iraqi authorities after being accused of committing crimes and detained by American-led coalition forces pending investigation and prosecution in Iraqi courts. 553 U.S. at 679–680, 692, 128 S.Ct. 2207. The central question, this Court repeatedly stated, was "whether United States district courts may exercise their habeas jurisdiction to enjoin our Armed Forces from transferring individuals detained within another sovereign's territory to that sovereign's government for criminal prosecution." *Id.*, at 689, 128 S.Ct. 2207; see also *id.*, at 704, 128 S.Ct. 2207.

In concluding that habeas did not extend to the relief sought by the citizens detained in Iraq, the *Munaf* Court relied on cases involving habeas petitions filed to avoid extradition. *Id.*, at 695–696, 128 S.Ct. 2207 (citing *Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957) (*per curiam*), and **\*177** *Neely v. Henkel*, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901)). These decisions, the Court concluded, established that American courts lack habeas jurisdiction to enjoin an extradition or similar transfer to a foreign sovereign exercising a right to prosecution. 553 U.S. at 696–697, 128 S.Ct. 2207. These circumstances, which today's Court overlooks, mean that *Munaf* is more like the extradition cases that the Court deems not **\*\*2004** "pertinent." *Ante*, at 1973 – 1974. [6]

In any event, respondent is not similarly situated to the petitioners in *Munaf*, who sought habeas to thwart removal from the United States in the face of a competing sovereign's **\*178** interests. Mindful that the case implicated "sensitive foreign policy issues in the context of ongoing military operations," the *Munaf* Court observed that granting habeas relief would "interfere with Iraq's sovereign right to punish offenses against its laws committed within its borders." 553 U.S. at 692, 128 S.Ct. 2207 (internal quotation marks omitted); see also *id.*, at 689, 694, 700, 128 S.Ct. 2207. For that reason, it proceeded " 'with the circumspection appropriate when this Court is adjudicating issues inevitably entangled in the conduct of ... international relations.' " *Id.*, at 689, 692, 128 S.Ct. 2207. Here, of course, no foreign sovereign is exercising a similar claim to custody over respondent during an ongoing conflict that would trigger the comity concerns that animated *Munaf*.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 471 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

### C

Next, the Court casually dismisses nearly 70 years of precedent from the finality era, the most relevant historic period for examining judicial review of immigration decisions. It concludes that, in case after case, this Court exercised habeas review over legal questions arising in immigration cases akin to those at issue here, not because the Constitution required it but only because a statute permitted it. *Ante*, at 1975 – 1976. That conclusion is both wrong in its own right and repeats arguments this Court rejected a half century ago when reviewing this same body of cases.

At the turn of the 20th century, immigration to the United States was relatively unrestricted. Public sentiment, however, grew hostile toward many recent entrants, particularly migrant laborers from China. In response, Congress enacted the so-called Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, which prohibited the entry **\*\*2005** of Chinese laborers to the United States. The Scott Act, ch. 1064, 25 Stat. 504, enacted in 1888, forbade reentry of Chinese laborers who had left after previously residing in this country. Although immigration officials routinely denied entry to arriving migrants on the basis of these laws, many of these decisions **\*179** were overturned by federal courts on habeas review. See, *e.g.*, *United States v. Jung Ah Lung*, 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888).

This did not escape Congress' attention. See Select Committee on Immigration & Naturalization, H. R. Rep. No. 4048, 51st Cong., 2d Sess., 273–275 (1891) (documenting rate of reversal of immigration exclusion orders by Federal District Court in San Francisco). Congress responded by enacting the Immigration Act of 1891, which stripped federal courts of their power to review immigration denials: "All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." Act of Mar. 3, 1891, § 8, 26 Stat. 1085. By its terms, that restriction on federal judicial power was not limited to review of some undefined subset of issues, such as questions of law or fact; it made executive immigration decisions final in all respects.

The Court, however, quickly construed the statute in *Nishimura Ekiu v. United States*, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) (*Ekiu*), to preclude only review

of executive factfinding. Having so construed the statute, the Court in *Ekiu*, and in case after case following *Ekiu*, recognized the availability of habeas to review a range of legal and constitutional questions arising in immigration decisions. The crucial question here is whether the finality-era Courts adopted that construction of jurisdiction-stripping statutes because it was simply the correct interpretation of the statute's terms and nothing more or because that construction was constitutionally compelled to ensure the availability of habeas review. The better view is that *Ekiu*'s construction of the 1891 statute was constitutionally compelled.

In *Ekiu*, the Court recognized that a Japanese national was entitled to seek a writ of habeas corpus to review an exclusion decision issued almost immediately upon her arrival to the United States. As the Court notes, *ante*, at 1977, **\*180** the relevant issue in that case was whether the 1891 Act, "if construed as vesting ... exclusive authority" in the Executive to determine a noncitizen's right to enter the United States, violated petitioner's constitutional "right to the writ of *habeas corpus*, which carried with it the right to a determination by the court as to the legality of her detention," 142 U.S. at 656, 12 S.Ct. 336 (statement of the case). That is, the *Ekiu* Court confronted whether construing the 1891 Act as precluding all judicial review of immigration decisions like the exclusion order at issue would violate the constitutional guarantee to habeas.

The Court answered that question by construing the 1891 Act as precluding judicial review only of questions of fact. "An alien immigrant," the Court first held, who is "prevented from landing [in the United States] by any [executive] officer ... and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful." *Id.*, at 660, 12 S.Ct. 336. The Court then explained that it had authority to hear the case (despite Congress' clear elimination of judicial review) because it interpreted the 1891 Act as meaning only that an immigration official's determination of "facts" was final and unreviewable. *Ibid.* (explaining **\*\*2006** that Congress can entrust the final determination of facts to executive officers).

After so articulating the 1891 Act's limits on judicial review, the Court analyzed two challenges to the integrity of the proceedings, neither of which raised questions of historical fact. See *id.*, at 662–663, 12 S.Ct. 336 (considering whether immigration officer's appointment was unconstitutional such that his actions were invalid); *id.*, at 663, 12 S.Ct. 336 (determining whether proceedings were unlawful because the

officer failed to take sworn testimony or make a record of the decision). [7] Although the Court ultimately concluded that those legal and **\*181** constitutional challenges lacked merit, *id.*, at 662–664, 12 S.Ct. 336, what matters is that the Court evaluated the arguments and recognized them as possible grounds for habeas relief.

What, then, can *Ekiu* tell us? Today's Court finds significant that the brief opinion makes no explicit mention of the Suspension Clause. *Ante*, at 1978. This omission, it concludes, can only mean that the *Ekiu* Court did not think that (or had no occasion to consider whether) the Suspension Clause "imposed any limitations on the authority of Congress to restrict the issuance of writs of habeas corpus in immigration matters." *Ante*, at 1977. According to this theory, *Ekiu* concluded that the plain terms of the 1891 Act prohibited judicial review of executive factfinding alone, and nothing more can be said.

But this myopic interpretation ignores many salient facts. To start, the 1891 Act was enacted for the purpose of limiting all judicial review of immigration decisions, not just a subset of factual issues that may arise in those decisions. Further, the plain terms of the statute did not cabin the limitation on judicial review to historical facts found by an immigration officer. *Ekiu*, moreover, evaluated the Act's constitutionality in view of the petitioner's argument that the limitation on judicial review violated the constitutional "right to the writ of *habeas corpus*." 142 U.S. at 656, 12 S.Ct. 336 (statement of the case). These considerations all point in one direction: Even if the *Ekiu* Court did not explicitly hold that the Suspension Clause prohibits Congress from broadly limiting all judicial review in immigration proceedings, it certainly decided the case in a manner that avoided raising this constitutional question. Indeed, faced with a jurisdiction-stripping statute, the only review left for the *Ekiu* Court was that required by the Constitution and, by extension, protected by the guarantee of habeas corpus.

The Court also maintains that *Ekiu* concluded that " 'the act of 1891 is constitutional' " in full, not "only in part." **\*182** *Ante*, at 1977 – 1978 (quoting *Ekiu*, 142 U.S. at 664, 12 S.Ct. 336). Yet as the Court acknowledges, it was only "after interpreting the 1891 Act" as precluding judicial review of questions of fact alone that the *Ekiu* Court deemed it constitutional. *Ante*, at 1977; see also *Ekiu*, 142 U.S. at 664, 12 S.Ct. 336 (concluding that "[t]he result" of its construction is that the 1891 Act "is constitutional"). That cannot mean that *Ekiu* found the 1891 Act constitutional even to the extent

that it prevented all judicial review of immigration decisions, even those brought on habeas. What it can only mean, instead, is that *Ekiu*'s construction of the 1891 Act was an answer to the constitutional question posed by the case: whether and to what extent denying judicial review under the 1891 Act would violate the constitutional "right to the writ of **\*\*2007** *habeas corpus*." 142 U.S. at 656, 12 S.Ct. 336 (statement of the case). [8]

Bolstering this interpretation is that the Court has repeatedly reached the same result when interpreting subsequent statutes purporting to strip federal courts of all jurisdiction over immigration decisions. In *Gegiow v. Uhl*, 239 U.S. 3, 36 S.Ct. 2, 60 L.Ed. 114 (1915), for example, the Court observed that *Ekiu* decided that "[t]he conclusiveness of the decisions of immigration officers under [the 1891 Act]" referred only to "conclusiveness upon matters of fact." 239 U.S. at 9, 36 S.Ct. 2. It relied heavily on *Ekiu* to support its determination that the Immigration Act of 1907, 34 Stat. 898, which also rendered decisions of immigration officers to be "final," § 25, *id.*, at 907, similarly only barred judicial review of questions of fact, 239 U.S. at 9, 36 S.Ct. 2. Indeed, time and again, against a backdrop of statutes purporting to bar all judicial review of executive immigration decisions, this Court has entertained habeas petitions raising **\*183** a host of issues other than historic facts found by immigration authorities. [9]

To be sure, this entrenched line of cases does not directly state that habeas review of immigration decisions is constitutionally compelled. But an alternate understanding of those cases rests on an assumption that is farfetched at best: that, year after year, and in case after case, this Court simply ignored the unambiguous texts of the serial Immigration Acts limiting judicial review altogether. The Court's pattern of hearing habeas cases despite those statutes' contrary mandate reflects that the Court understood habeas review in those cases as not statutorily permitted but constitutionally compelled.

In any event, we need not speculate now about whether the *Ekiu* Court, or the Courts that followed, had the constitutional right to habeas corpus in mind when they interpreted jurisdiction-stripping statutes only to preclude review of historic facts. This Court has already identified **\*184** which view is correct. In *Heikkila v. Barber*, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953), the Court explained that *Ekiu* **\*\*2008** and its progeny had, in fact, construed the finality statutes to avoid serious constitutional questions about Congress' ability to strip federal courts of their habeas

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 473 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

power. As *Heikkila* reiterated, the key question in *Ekiu* (and in later cases analyzing finality statutes) was the extent to which the Constitution allowed Congress to make administrative decisions unreviewable. 345 U.S. at 234, 73 S.Ct. 603. And it concluded that the jurisdiction-stripping immigration statute in that case, a successor to the 1891 Act, "preclud[ed] judicial intervention in deportation cases except insofar as it was required by the Constitution." *Id.*, at 234–235, 73 S.Ct. 603.

*Heikkila* thus settles the matter; during the finality era, this Court either believed that the Constitution required judicial review on habeas of constitutional and legal questions arising in immigration decisions or, at the very least, thought that there was a serious question about whether the Constitution so required. Although the Court tries to minimize that conclusion as not dispositive of the question presented, *ante*, at 29, such a conclusion undoubtedly weighs against finding § 1252(e)(2) constitutional in spite of its broad prohibition on reviewing constitutional and legal questions.

The Court dismisses *Heikkila* and its explanation of the finality-era cases outright. It fixates on the fact that *Heikkila* was not itself a habeas case and instead analyzed whether judicial review of immigration orders was available under the Administrative Procedure Act (APA). *Ante*, at 1980 – 1981. *Heikkila*'s discussion of the APA does not detract from its affirmation that when the language of a jurisdiction-stripping statute precludes all judicial review, the only review that is left is that required by the constitutional guarantee of habeas corpus. 345 U.S. at 235, 73 S.Ct. 603. [10] Most importantly, **\*185** *Heikkila* concluded that APA review was not equivalent to that judicial review. Second, the Court also states that *Heikkila* never interpreted *Ekiu* as having found the 1891 Act "partly unconstitutional." *Ante*, at 1980 – 1981. But there was no need for the *Ekiu* Court to find the 1891 Act unconstitutional in part to construe it as prohibiting only review of historic facts. Instead, as *Heikkila* explained, *Ekiu* reached its decision by exercising constitutional avoidance.

By disregarding *Heikkila*, the Court ignores principles of *stare decisis* to stir up a settled debate. Cf. *Ramos* v. *Louisiana*, 590 U. S. ——, ——, ——, 140 S.Ct. 1390, 1425, 1431–1432, 206 L.Ed.2d 583 (2020) (ALITO, J., dissenting). Perhaps its view is tinted by the fact that it doubts the Suspension Clause could limit Congress' ability to eliminate habeas jurisdiction at all. The Court scoffs at the notion that a limitation on judicial review would have been understood as an unconstitutional suspension of habeas, noting and distinguishing the limited number of occasions that this Court

has found a suspension of the writ of habeas corpus. See *ante*, at 1978 – 1979; but see *ante*, at 1966 – 1967, n. 4 (THOMAS, J., concurring) (noting that historically, suspensions of habeas did not **\*\*2009** necessarily mention the availability of the writ). The references to those major historic moments where this Court has identified a suspension only establish the outer bounds of Congress' suspension powers; it says nothing about whether, and to what extent, more limited restrictions on judicial review might also be found unconstitutional.

Indeed, the Court acknowledges that some thought it an open question during the finality era whether the Suspension **\*186** Clause imposes limits on Congress' ability to limit judicial review. See *ante*, at 1980, n. 25 (quoting Justice Brewer's concurring opinion in *United States ex rel. Turner v. Williams*, 194 U.S. 279, 295, 24 S.Ct. 719, 48 L.Ed. 979 (1904), raising the question). That this question remained unsettled, see n. 1, *supra*, suffices to support the Court's conclusion in *Heikkila*: The finality-era Courts endeavored to construe jurisdiction-stripping statutes to avoid serious constitutional questions about the extent of congressional power to limit judicial review.

At bottom, the better view of the finality-era cases is that they understood the habeas right they sustained to be, or at least likely to be, constitutionally compelled. Certainly the cases do not establish the Court's simplistic view to the contrary: That the finality-era Court entertained habeas petitions only because no statute limited its ability to do so, and no Constitutional provision required otherwise. That reading of precedent disregards significant indications that this Court persistently construed immigration statutes stripping courts of judicial review to avoid depriving noncitizens of constitutional habeas guarantees. Ignoring how past courts wrestled with this issue may make it easier for the Court to announce that there is no unconstitutional suspension today. But by sweeping aside most of our immigration history in service of its conclusion, the Court reopens a question that this Court put to rest decades ago, and now decides it differently. The cost of doing so is enormous. The Court, on its own volition, limits a constitutional protection so respected by our Founding Fathers that they forbade its suspension except in the direst of circumstances.

### D

Not only does the Court cast to one side our finality-era jurisprudence, it skims over recent habeas precedent. Perhaps

Case 1:24-cv-01702-RC Document 53-3 Filed 09/27/24 Page 474 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

that is because these cases undermine today's decision. Indeed, both *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), instruct that eliminating **\*187** judicial review of legal and constitutional questions associated with executive detention, like the expedited-removal statute at issue here does, is unconstitutional.

The Court acknowledges *St. Cyr*'s holding but does not heed it. *St. Cyr* concluded that " '[b]ecause of [the Suspension] Clause some "judicial intervention in deportation cases" is unquestionably "required by the Constitution." ' " *Ante*, at 1981 (quoting 533 U.S. at 300, 121 S.Ct. 2271). This statement affirms what the finality-era cases long suggested: that the Suspension Clause limits Congress' power to restrict judicial review in immigration cases. Nor did *St. Cyr* arrive at this conclusion simply based on canons of statutory construction. The Court spoke of deeper historical principles, affirming repeatedly that "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Id.*, at 301, 121 S.Ct. 2271; see also *id.*, at 305, 121 S.Ct. 2271 ("The writ of habeas corpus has **\*\*2010** always been available to review the legality of Executive detention"). The Court looked to founding era cases to establish that the scope of this guarantee extended to both the "interpretation" and "application" of governing law, including law that guided the exercise of executive discretion. *Id.*, at 302, 121 S.Ct. 2271.

Based on that history, the Court also concluded that "a serious Suspension Clause issue would be presented" by precluding habeas review in the removal context, *id.*, at 305, 121 S.Ct. 2271, even where there was "no dispute" that the Government had the legal authority to detain a noncitizen like St. Cyr, *id.*, at 303, 121 S.Ct. 2271. Thus based on the same principles that the Court purports to apply in this case, the *St. Cyr* Court reached the opposite conclusion: The Suspension Clause likely prevents Congress from eliminating judicial review of discretionary executive action in the deportation context, even when the writ is used to challenge more than the fact of detention itself.

*Boumediene* reprised many of the rules articulated in *St. Cyr*. It first confirmed that the Suspension Clause applied **\*188** to detainees held at Guantanamo Bay, repeating the "uncontroversial" proposition that "the privilege of habeas corpus entitles" an executive detainee to a "meaningful

opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." 553 U.S. at 779, 128 S.Ct. 2229 (quoting *St. Cyr*, 533 U.S. at 302, 121 S.Ct. 2271). Then the Court detailed the writ's remedial scope. It affirmed that one of the "easily identified attributes of any constitutionally adequate habeas corpus proceeding" is that "the habeas court must have the power to order the conditional release of an individual unlawfully detained." 553 U.S. at 779, 128 S.Ct. 2229. Notably, the Court explained that release "need not be the exclusive remedy," reasoning that "common-law habeas corpus was, above all, an adaptable remedy" whose "precise application and scope changed depending upon the circumstances." *Ibid.* (citing 3 W. Blackstone, Commentaries *131). The Court noted that any habeas remedy might be tempered based on the traditional test for procedural adequacy in the due process context and thus could accommodate the "rigor of any earlier proceedings." 553 U.S. at 781, 128 S.Ct. 2229 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

The Court discounts these cases because it objects to the perceived direction of respondent's requested release. *Ante*, at 1980 – 1981 (explaining that *Boumediene* did not suggest that the enemy combatant petitioners were entitled to enter the United States upon release). It similarly contends that respondent's attempted use of the writ is "very different" from that at issue in *St. Cyr. Ante*, at 1981.

Neither rejoinder is sound. *St. Cyr* and *Boumediene* confirm that at minimum, the historic scope of the habeas power guaranteed judicial review of constitutional and legal challenges to executive action. They do not require release as an exclusive remedy, let alone a particular direction of release. Rather, both cases built on the legacy of the finality era where the Court, concerned about the constitutionality of limiting judicial review, unquestionably entertained habeas petitions from arriving migrants who raised the same types **\*189** of questions respondent poses here. See, *e.g., St. Cyr*, 533 U.S. at 307, 121 S.Ct. 2271 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (habeas case attacking the denial of an application for suspension of deportation); see also *id.*, at 268, 74 S.Ct. 499 ("[W]e object to the Board's alleged failure to exercise its own discretion, **\*\*2011** contrary to existing valid regulations" (emphasis deleted))).

As discussed above, respondent requests review of immigration officials' allegedly unlawful interpretation of

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 475 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

governing asylum law, and seeks to test the constitutional adequacy of expedited removal procedures. As a remedy, he requests procedures affording a conditional release, but certainly did not so limit his prayer for relief. His constitutional and legal challenges fall within the heartland of what *St. Cyr* said the common-law writ encompassed, and *Boumediene* confirms he is entitled to additional procedures as a form of conditional habeas relief. These precedents themselves resolve this case.

\* \* \*

The Court wrongly declares that § 1252(e)(2) can preclude habeas review of respondent's constitutional and legal challenges to his asylum proceedings. So too the Court errs in concluding that Congress need not provide a substitute mechanism to supply that review. In so holding, the Court manages to flout precedents governing habeas jurisprudence from three separate eras. Each one shows that respondent is entitled to judicial review of his constitutional and legal claims. Because § 1252(e)(2) excludes his challenges from habeas proceedings, and because the INA does not otherwise provide for meaningful judicial review of the Executive's removal determination, respondent has no effective means of vindicating his right to habeas relief. Quite simply, the Constitution requires more.

III

Although the Court concludes that habeas relief is not available because of the particular kind of release that it **\*190** thinks respondent requests, it also suggests that respondent's unlawful status independently prohibits him from challenging the constitutionality of the expedited removal proceedings. By determining that respondent, a recent unlawful entrant who was apprehended close in time and place to his unauthorized border crossing, has no procedural due process rights to vindicate through his habeas challenge, the Court unnecessarily addresses a constitutional question in a manner contrary to the text of the Constitution and to our precedents.

The Court stretches to reach the issue whether a noncitizen like respondent is entitled to due process protections in relation to removal proceedings, which the court below mentioned only in a footnote and as an aside. See *ante*, at 1981 – 1982 (quoting 917 F.3d at 1111, n. 15). In so doing,

the Court opines on a matter neither necessary to its holding nor seriously in dispute below. [11]

The Court is no more correct on the merits. To be sure, our cases have long held that foreigners who had never come into the United States—those "on the threshold of initial entry"—are not entitled to any due process with respect to their admission. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (citing *Ekiu*, 142 U.S. at 660, 12 S.Ct. 336); see also *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). That follows from this Courts' holdings that the political **\*\*2012** branches of Government have "plenary" sovereign power over regulating the admission of noncitizens to the United States. *Ante*, at 1982 – 1983; see also *Ekiu*, 142 U.S. at 659, 12 S.Ct. 336.

**\*191**  Noncitizens in this country, however, undeniably have due process rights. In *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the Court explained that "[t]he Fourteenth Amendment to the Constitution is not confined to the protection of citizens" but rather applies "to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Id.*, at 369, 6 S.Ct. 1064; *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (reiterating that "once an alien enters the country," he is entitled to due process in his removal proceedings because "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent").

In its early cases, the Court speculated whether a noncitizen could invoke due process protections when he entered the country without permission or had resided here for too brief a period to "have become, in any real sense, a part of our population." *The Japanese Immigrant Case*, 189 U.S. 86, 100, 23 S.Ct. 611, 47 L.Ed. 721 (1903); see also *ante*, at 1981 – 1982 (quoting *Ekiu*, 142 U.S. at 660, 12 S.Ct. 336 (remarking that for those not " 'admitted into the country pursuant to law,' " the procedures afforded by the political branches are all that are due)). But the Court has since determined that presence in the country is the touchstone for at least some level of due process protections. See *Mezei*, 345 U.S. at 212, 73 S.Ct. 625 (explaining that "aliens who have once passed through our gates, even illegally," possess constitutional rights); *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment ... protects every

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 476 of 513
Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

one of these persons .... Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection"). As a noncitizen within the territory of the United States, respondent is entitled to invoke the protections of the Due Process Clause.

In order to reach a contrary conclusion, the Court assumes that those who do not enter the country legally have the same due process rights as those who do not enter the country **\*192** at all. The Court deems that respondent possesses only the rights of noncitizens on the "threshold of initial entry," skirting binding precedent by assuming that individuals like respondent have " 'assimilated to [the] status' " of an arriving noncitizen for purposes of the constitutional analysis. *Mezei*, 345 U.S. at 212, 214, 73 S.Ct. 625. But that relies on a legal fiction. Respondent, of course, was actually within the territorial limits of the United States.

More broadly, by drawing the line for due process at legal admission rather than physical entry, the Court tethers constitutional protections to a noncitizen's legal status as determined under contemporary asylum and immigration law. But the Fifth Amendment, which of course long predated any admissions program, does not contain limits based on immigration status or duration in the country: It applies to "persons" without qualification. *Yick Wo*, 118 U.S. at 369, 6 S.Ct. 1064. The Court has repeatedly affirmed as much long after Congress began regulating entry to the country. *Mathews*, 426 U.S. at 77, 96 S.Ct. 1883; *Zadvydas*, 533 U.S. at 693–694, 121 S.Ct. 2491. The Court lacks any textual basis to craft an exception to this rule, let alone one hinging on dynamic immigration **\*\*2013** laws that may be amended at any time, to redefine when an "entry" occurs. Fundamentally, it is out of step with how this Court has conceived the scope of the Due Process Clause for over a century: Congressional policy in the immigration context does not dictate the scope of the Constitution.

In addition to creating an atextual gap in the Constitution's coverage, the Court's rule lacks any limiting principle. This is not because our case law does not supply one. After all, this Court has long affirmed that noncitizens have due process protections in proceedings to remove them from the country once they have entered. See *id.*, at 693–694, 121 S.Ct. 2491; *Mezei*, 345 U.S. at 212, 73 S.Ct. 625.

Perhaps recognizing the tension between its opinion today and those cases, the Court cabins its holding to individuals who are "in respondent's position." *Ante*, at 1983. Presumably

**\*193** the rule applies to—and only to—individuals found within 25 feet of the border who have entered within the past 24 hours of their apprehension. Where its logic must stop, however, is hard to say. Taken to its extreme, a rule conditioning due process rights on lawful entry would permit Congress to constitutionally eliminate all procedural protections for any noncitizen the Government deems unlawfully admitted and summarily deport them no matter how many decades they have lived here, how settled and integrated they are in their communities, or how many members of their family are U. S. citizens or residents.

This judicially fashioned line-drawing is not administrable, threatens to create arbitrary divisions between noncitizens in this country subject to removal proceedings, and, most important, lacks any basis in the Constitution. Both the Constitution and this Court's cases plainly guarantee due process protections to all "persons" regardless of their immigration status, a guarantee independent of the whims of the political branches. This contrary proclamation by the Court unnecessarily decides a constitutional question in a manner contrary to governing law. [12]

IV

The Court reaches its decision only by downplaying the nature of respondent's claims, ignoring a plethora of common-law immigration cases from a time of relatively open borders, and mischaracterizing the most relevant precedents from this Court. Perhaps to shore up this unstable foundation, **\*194** the Court justifies its decision by pointing to perceived vulnerabilities and abuses in the asylum system. I address the Court's policy concerns briefly.

In some ways, this country's asylum laws have represented the best of our Nation. Unrestricted migration at the founding and later, formal asylum statutes, have served as a beacon to the world, broadcasting the vitality of our institutions and our collective potential. For many who come here fleeing religious, political, or ideological persecution, and for many more who have preceded them, asylum has provided both a form of shelter and a start to a better life. That is not to say that this **\*\*2014** country's asylum policy has always, or ever, had overwhelming support. Indeed, many times in our past, particularly when the Nation's future has appeared uncertain or bleak, members of this country have sought to close our borders rather than open them. See S. Legomsky & C. Rodriguez, Immigration and Refugee Law and Policy 875–

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 477 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

876 (5th ed. 2009) (explaining that restrictionist sentiments in the 1930s were fueled in part by the Great Depression). Yet this country has time and again reaffirmed its commitment to providing sanctuary to those escaping oppression and persecution. Congress and the Executive have repeatedly affirmed that choice in response to serial waves of migration from other countries by enacting and amending asylum laws and regulations. In fact, a centerpiece of respondent's claim is that officials were not following these statutorily enacted procedures.

The volume of asylum claims submitted, pending, and granted has varied over the years, due to factors like changing international migration patterns, the level of resources devoted to processing and adjudicating asylum applications, and amendments to governing immigration laws. See Congressional Research Service, Immigration: U. S. Asylum Policy 25 (Feb. 19, 2019); see also Dept. of Homeland Security, Office of Immigration Statistics, 2018 Yearbook of Immigration Statistics 43 (2019) (Table 16) ("Individuals Granted **\*195** Asylum Affirmatively or Defensively: Fiscal Years 1990 to 2018" (quotation modified)). For the past few years, both new asylum applications and pending applications have steadily increased. Immigration: U. S. Asylum Policy, at 25.

It is universally acknowledged that the asylum regime is under strain. It is also clear that, while the reasons for the large pending caseload are complicated,[13] delays in adjudications are undesirable for a number of reasons. At bottom, when asylum claims are not resolved in a timely fashion, the protracted decisionmaking harms those eligible for protection and undermines the integrity of the regime as a whole. D. Meissner, F. Hipsman, & T. Aleinikoff, Migration Policy Institute, The U. S. Asylum System in Crisis: Charting a Way Forward 4 (Sept. 2018).

But the political branches have numerous tools at their disposal to reform the asylum system, and debates over the best methods of doing so are legion in the Government, in the academy, and in the public sphere.[14] Congress and the **\*196** Executive are thus well equipped to enact a range of measures to reform asylum in a **\*\*2015** number of ways and routinely do so.[15] Indeed, as the Court notes, the expedited removal process at issue here was created by law as one such measure to ease pressures on the immigration system. *Ante,* at 1965 – 1966.

In the face of these policy choices, the role of the Judiciary is minimal, yet crucial: to ensure that laws passed by Congress are consistent with the limits of the Constitution. The Court today ignores its obligation, going out of its way to restrict the scope of the Great Writ and the reach of the Due Process Clause. This may accommodate congressional policy concerns by easing the burdens under which the immigration system currently labors. But it is nothing short of a self-imposed injury to the Judiciary, to the separation of powers, and to the values embodied in the promise of the Great Writ.

Because I disagree with the Court's interpretation of the reach of our Constitution's protections, I respectfully dissent.

### All Citations

591 U.S. 103, 140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843, 2020 Daily Journal D.A.R. 6213, 28 Fla. L. Weekly Fed. S 372

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1     See Administrative Office of the U. S. Courts, Federal Judicial Caseload Statistics, U. S. Courts of Appeals—Median Time Intervals in Months for Civil and Criminal Appeals Terminated on the Merits (2019) (Table B–4A) (time calculated for non-prisoner appeals from the filing of a notice of appeal to the last opinion or final order).

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

2    When respondent entered the country, aliens were treated as applicants for admission if they were "encountered within 14 days of entry without inspection and within 100 air miles of any U. S. international land border." 69 Fed. Reg. 48879 (2004).

3    This authority once belonged to the Attorney General, who is still named in the statute. See 6 U.S.C. § 251(2) (transferring authority over "[t]he detention and removal program" to the Department).

4    A grant of asylum enables an alien to enter the country, but even if an applicant qualifies, an actual grant of asylum is discretionary. § 1158(b)(1)(A).

5    The asylum officer also considers an alien's potential eligibility for withholding of removal under § 1231(b) (3) or relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). 8 C.F.R. §§ 208.30(e)(2)–(3). Respondent's habeas petition alleges that "he can show a significan[t] possibility that he could establish eligibility for asylum, withholding of removal, and CAT claims." App. 31–32. But he says in his petition that he left Sri Lanka "to seek asylum in the United States." *Id.*, at 15. He discusses the criteria only for asylum. *Id.*, at 21; see also Brief for Respondent 4. And he now alleges that he was improperly "denied asylum." *Id.*, at 5. Moreover, the gravamen of his petition is that he faces persecution in Sri Lanka "because of " his Tamil ethnicity and political opinions. App. 13. To obtain withholding or CAT relief on that basis, he would need to show "a greater likelihood of persecution or torture at home than is necessary for asylum." *Moncrieffe v. Holder*, 569 U.S. 184, 187, n. 1, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013). And he would not avoid removal, only removal to Sri Lanka. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(f). We therefore read his petition as it is plainly intended: to seek another opportunity to apply for asylum.

6    See GAO, Immigration: Actions Needed To Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings 13–15, and fig. 2 (GAO–20–250, Feb. 2020).

7    See *id.*, at 16, n. b.

8    The Department may grant temporary parole "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); see also 8 C.F.R. §§ 212.5(b), 235.3(b)(2)(iii), and (4)(ii).

9    References to the factual material in this regulation are not endorsements of the regulation itself. And like the immigration officials in this case, we do not question the basis for respondent's asserted fear. See *infra*, at 1967 – 1968. But we note the Department's view that credible-fear claims can be asserted "in the hope of a lengthy asylum process that will enable [the claimants] to remain in the United States for years ... despite their statutory ineligibility for relief " and that an influx of meritless claims can delay the adjudication of meritorious ones; strain detention capacity and degrade detention conditions; cause the release of many inadmissible aliens into States and localities that must shoulder the resulting costs; divert Department resources from protecting the border; and aggravate "the humanitarian crisis created by human smugglers." 84 Fed. Reg. 33831; see also, *e.g.*, Violent Crime Control and Law Enforcement Act of 1994, § 130010(a)(3)(C), 108 Stat. 2030 (legislative finding of "a drain on limited resources resulting from the high cost of processing frivolous asylum claims"); *Arizona v. United States*, 567 U.S. 387, 397–398, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012); Homeland Security Advisory Council, Final Emergency Interim Report 1, 7–8 (Apr. 16, 2019); Letter from K. Nielsen, Secretary of Homeland Security, to Members of Congress 1–2 (Mar. 28, 2019); GAO, Asylum: Additional Actions Needed To Assess and Address Fraud Risks 24 (GAO–16–50, Dec. 2015) (GAO Fraud Report); Congressional Budget Office, The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments 8–9 (Dec. 2007); Brief for State of Arizona et al. as *Amici Curiae* 9–12.

10    See, *e.g.*, GAO Fraud Report 32–33 (discussing Operation Fiction Writer, a criminal investigation of attorneys and application preparers who counseled asylum seekers to lie about religious persecution and forced abortions); Asylum Fraud: Abusing America's Compassion? Hearing before the Subcommittee on

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

Immigration and Border Security of the House Committee on the Judiciary, 113th Cong., 2d Sess. (2014) (testimony of Louis D. Crocetti, Jr.) (describing study in which 58% of randomly selected asylum applications exhibited indicators of possible fraud and 12% were determined to be fraudulent).

11    See, *e.g.*, *Mnatsakanyan v. United States Dept. of Homeland Security*, 2020 WL 1245371, *5 (SD Cal., Mar. 16, 2020) ("Given the identical claims here as in *Thuraissigiam*, the Court concludes it has jurisdiction over Petitioner's habeas petition under the Suspension Clause"); *Kaur v. Barr*, 2019 WL 4974425, *3 (D Ariz., Oct. 8, 2019) (granting stay of removal in light of the decision below); *Rodrigues v. McAleenan*, 435 F.Supp.3d 731, 734 – 735, 738 – 739 (ND Tex., Jan. 22, 2020) (declining to follow the decision below).

12    The original meaning of the Suspension Clause is the subject of controversy. In *INS* v. *St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), the majority and dissent debated whether the Clause independently guarantees the availability of the writ or simply restricts the temporary withholding of its operation. Compare *id.*, at 300, 121 S.Ct. 2271, with *id.*, at 336–341, 121 S.Ct. 2271 (Scalia, J., dissenting). See also *Ex parte Bollman*, 4 Cranch 75, 95, 2 L.Ed. 554 (1807). We do not revisit that question. Nor do we consider whether the scope of the writ as it existed in 1789 defines the boundary of the constitutional protection to which the *St. Cyr* Court referred, since the writ has never encompassed respondent's claims.

We also do not reconsider whether the common law allowed the issuance of a writ on behalf of an alien who lacked any allegiance to the country. Compare *Boumediene v. Bush*, 553 U.S. 723, 746–747, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (forming "no certain conclusions"), with Brief for Criminal Justice Legal Foundation as *Amicus Curiae* 5–13. See also Hamburger, Beyond Protection, 109 Colum. L. Rev. 1823, 1847 (2009); P. Halliday, Habeas Corpus: From England to Empire 204 (2010) (Halliday).

13    In his brief, respondent states that "he requests an entirely ordinary habeas remedy: conditional release pending a lawful adjudication. J. A. 33." Brief for Respondent 29. Citing the same page, the dissent argues that respondent "asked the district court to '[i]ssue a writ of habeas corpus' without further limitation on the kind of relief that might entail." *Post*, at 1996 (opinion of SOTOMAYOR, J.) (quoting App. 33). However, neither on the cited page nor at any other place in the habeas petition is release, conditional or otherwise, even mentioned. And in any event, as we discuss *infra*, at 1971 – 1975, the critical point is that what he sought in the habeas petition and still seeks—a writ "directing [the Department] to provide [him] a new opportunity to apply for asylum," App. 33—is not a form of relief that was available in habeas at the time of the adoption of the Constitution.

14    Although the Ninth Circuit never mentioned release, its opinion might be read to suggest that gaining a right to remain in this country would constitute a release from the "restraint" of exclusion. See 917 F.3d 1097, 1117 (2019). No evidence has been called to our attention that the writ was understood in 1789 to apply to any comparable form of restraint.

15    Respondent and his *amici* rely primarily on British cases decided before the adoption of the Constitution. "There is widespread agreement that the common-law writ of *habeas corpus* was in operation in all thirteen of the British colonies that rebelled in 1776," but "almost no reported decisio[n] from the period." Oldham & Wishnie, The Historical Scope of Habeas Corpus and *INS* v. *St. Cyr*, 16 Geo. Immigration L. J. 485, 496 (2002) (Oldham & Wishnie) (internal quotation marks omitted).

16    Respondent's *amici* also point out that, during the English Civil War, Parliament created a national religion and a "bewildering array of committees" to manage the war. Brief for Legal Historians as *Amici Curiae* 10 (Legal Historians Brief) (internal quotation marks omitted). They argue that "[h]abeas corpus was readily available to test the legality of their actions." *Ibid.* But according to their source, the challenged actions were "imprisonment orders," including imprisonment of clergymen who refused to conform. Halliday 163–164.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 480 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

17    Respondent cites a secondary source, which in turn cites to the National Archives in London. See Brief for Respondent 27 (citing Halliday 236).

18    Whether the founding generation understood habeas relief more broadly than described by Blackstone, Justice Story, and our prior cases, see *supra*, at 1969, cannot be settled by a single case or even a few obscure and possibly aberrant cases. And in any event, what is said here about Murray's case provides little support for respondent's position. In 1677, we are told, Murray was imprisoned in England so that he could be " 'sent into Scotland' " for a criminal trial, but the King's Bench twice issued a writ of habeas corpus requiring his release. Brief for Respondent 27 (quoting Halliday 236). Putting aside the "delicate" relationship between England and Scotland at the time, *Boumediene*, 553 U.S. at 749, 128 S.Ct. 2229, issuance of a writ to secure the release of a person held in pretrial custody is far afield from what respondent wants here.

19    This regime lasted until after 1789, when the Aliens Act of 1793 authorized justices of the peace to imprison "without bail or mainprize" (*i.e.*, bond) any alien found without a passport, who could then be "sen[t] out of th[e] realm." An Act for Regulating Immigration into Great Britain, 33 Geo. III, ch. 4, §§ 11, 29.

20    *Amici* supporting respondent make an additional argument. They contend that "[i]n eighteenth century practice, the authority of English judges to review habeas petitions was not constrained by past decisions" and that these judges felt free to innovate in order to ensure that justice was done. Legal Historians Brief 5–6. But the role of federal courts under our Constitution is very different from that of those English judges. The English judges "were considered agents of the Crown, designed to assist the King in the exercise of his power." *Boumediene*, 553 U.S. at 740, 128 S.Ct. 2229. The court with primary habeas jurisdiction, after all, was called the King's Bench, on which the King "was theoretically always present." Halliday & White, The Suspension Clause: English Text, Imperial Contexts, and American Implications, 94 Va. L. Rev. 575, 594, 598, and n. 49 (2008). Habeas was an exercise of the King's prerogative "to have an account ... why the liberty of any of his subjects is restrained." 2 J. Story, Commentaries on the Constitution of the United States § 1335, p. 207 (1833); accord, Legal Historians Brief 5–7. In our federal courts, by contrast, the scope of habeas has been tightly regulated by statute, from the Judiciary Act of 1789 to the present day, and precedent is as binding in a habeas case as in any other. See, *e.g.*, *Jenkins* v. *Hutton*, 582 U. S. ——, ——, 137 S.Ct. 1769, 1772, 198 L.Ed.2d 415 (2017) (*per curiam*).

21    This concurrence imagines three horrible possibilities that it fears could come to pass unless we interpret the Suspension Clause to protect the right to some undefined category of relief beyond release from custody. See *post*, at 1989 (opinion of BREYER, J.). But its interpretation is neither necessary nor obviously sufficient to prevent the possibilities it fears. First, if a citizen were detained for deportation, today's opinion would not prevent the citizen from petitioning for release. Second, if respondent's "procedural" claims do not merit habeas review, as the concurrence concludes, *post*, at 1996 – 1997, it is not clear why habeas should help the concurrence's hypothetical alien whose credible-fear claim was rejected based on forged evidence. Both respondent and this hypothetical alien assert procedural irregularities. Does the availability of habeas review depend on a judge's view of the severity of the irregularity asserted? Finally, there is the hypothetical alien denied asylum on the ground that Judaism is not a religion. Such a decision would of course be ridiculous, but why it would not raise a question of "brute fac[t]" that falls outside the concurrence's interpretation of the Suspension Clause, *post*, at 1995, is again not clear.

Whatever may be said about the concurrence's hypotheticals, it is possible to imagine all sorts of abuses not even remotely related to unauthorized executive detention that could be imposed on people in this country if the Constitution allowed Congress to deprive the courts of any jurisdiction to entertain claims regarding such abuses. If that were to happen, it would no doubt be argued that constitutional provisions other than the Suspension Clause guaranteed judicial review. We have no occasion to consider such arguments here.

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 481 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

22    See *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51–52, 75 S.Ct. 591, 99 L.Ed. 868 (1955) (interpreting 1952 Immigration and Nationality Act, 66 Stat. 163, to provide for review of deportation orders).

23    While the Philippines was a Territory, its government suspended habeas to deal with " 'certain organized bands' " of rebels. *Fisher v. Baker*, 203 U.S. 174, 179–181, 27 S.Ct. 135, 51 L.Ed. 142 (1906) (quoting resolution).

24    The Governor of Hawaii suspended habeas, with President Roosevelt's approval, after the attack on Pearl Harbor. See *Duncan v. Kahanamoku*, 327 U.S. 304, 307–308, 324, 66 S.Ct. 606, 90 L.Ed. 688 (1946).

25    In a concurrence in *United States ex rel. Turner v. Williams*, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904), Justice Brewer stated without elaboration and without citing any authority that the Suspension Clause prohibits Congress from "oust[ing] the courts from the duty of inquiry respecting both law and facts" in habeas cases. *Id.*, at 295, 24 S.Ct. 719. No other Justice joined that opinion.

26    In *Fong Yue Ting v. United States*, 149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893), and many other cases, the Court noted that the Constitution gives Congress plenary power to set requirements for admission.

27    The Government notes other distinctions between *St. Cyr* and this case, including that the alien in *St. Cyr* raised a pure question of law, while respondent raises at best a mixed question of law and fact. We have no need to consider these distinctions.

28    Although respondent, during his interviews with immigration officials, does not appear to have provided any information tying the assault he suffered at the hands of those who arrived at his home in a van to persecution on the basis of ethnicity or political opinion, his counseled petition offers details about "white va[n]" attacks against Tamils in Sri Lanka. App. 25–26 (internal quotation marks omitted). As now portrayed, his assault resembles those incidents. Department officials and immigration judges may reopen cases or reconsider decisions, see 8 C.F.R. §§ 103.5(a)(1), (5), and 1003.23(b)(1), and the Executive always has discretion not to remove, see *AAADC*, 525 U.S. at 483–484, 119 S.Ct. 936.

1    I express no view on the question whether respondent is even entitled to the privilege of the writ as an unadmitted alien.

2    None of this is to say that the writ of habeas corpus involved a wide-ranging, ever-changing inquiry. As the Court today reaffirms, "the scope of habeas has been tightly regulated by statute, from the Judiciary Act of 1789 to the present day." *Ante*, at 1074, n. 20. A writ of habeas corpus was "in the nature of a writ of error, to examine the legality of the commitment." *Ex parte Watkins*, 3 Pet. 193, 202, 7 L.Ed. 650 (1830) (Marshall, C. J.). When an executive detained someone without trial, it allowed a court to "examine into [the] validity" of "the reason for" commitment. 3 W. Blackstone, Commentaries on the Laws of England 133 (1770). In cases of detention pursuant to the judgment of a court, "a prisoner seeking a writ of habeas corpus could challenge only the jurisdiction of the court that had rendered the judgment under which he was in custody." *Wright v. West*, 505 U.S. 277, 285, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (opinion of THOMAS, J.). In both contexts, the writ "played only a procedural role: It issued as of right when a prisoner showed probable cause to believe he was being held illegally ... and obligated the warden to file a 'return' identifying the grounds of imprisonment." *Jennings v. Stephens*, 574 U.S. 271, 285, 135 S.Ct. 793, 190 L.Ed.2d 662 (2015) (THOMAS, J., dissenting). When the writ of habeas corpus was granted, it "decided nothing except that there was a case calling for an answer by the gaoler." Goddard, A Note on Habeas Corpus, 65 L. Q. Rev. 30, 34 (1949). "After reviewing the reason so returned, the court could release, bail, or remand the prisoner as appropriate." J. Baker, An Introduction to English Legal History 157 (5th ed. 2019).

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 482 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)
140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

3    Mainprise or mainprize is a "writ ordering the sheriff to take ... security ... for the prisoner's appearance and release the prisoner." Black's Law Dictionary 1142 (11th ed. 2019).

4    It does not appear that it was necessary to expressly mention the availability of the writ in a suspending Act. Some States made express reference to the writ of habeas corpus, see, *e.g.*, ch. 762, § 2, 9 Statutes at Large of Pennsylvania 140, but many did not.

1    The Court wisely declines to explore whether the Suspension Clause independently guarantees the availability of the writ or simply restricts the temporary withholding of its operation, a point of disagreement between the majority and dissent in *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). *Ante*, at 1968 – 1969, n. 12. Justice Scalia, dissenting in *St. Cyr*, wrote that the Suspension Clause "does not guarantee any content to (or even the existence of) the writ of habeas corpus, but merely provides that the writ shall not (except in case of rebellion or invasion) be suspended." 533 U.S. at 337, 121 S.Ct. 2271. But no majority of this Court, at any time, has adopted that theory. Notably, moreover, even Justice Scalia appears to have abandoned his position just three years later in *Hamdi v. Rumsfeld*, 542 U.S. 507, 555–556, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (dissenting opinion) ("The two ideas central to Blackstone's understanding —due process as the right secured, and habeas corpus as the instrument by which due process could be insisted upon by a citizen illegally imprisoned—found expression in the Constitution's Due Process and Suspension Clauses"); see also *id.*, at 558, 124 S.Ct. 2633 ("The writ of habeas corpus was preserved in the Constitution—the only common-law writ to be explicitly mentioned"). Even one concurring opinion seems to recognize that the Suspension Clause "protect[s] a substantive right." *Ante*, at 1985 (opinion of THOMAS, J.).

2    The Court notes "the 'delicate' relationship between England and Scotland at the time" of *Murray's Case*. *Ante*, at 1973, n. 18. Interestingly, the Court does not mention the delicate nature of the relationship between the United States and Iraq in *Munaf v. Geren*, 553 U.S. 674, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), the centerpiece of the Court's argument, even though that case arose during a military conflict. *Ante*, at 1970 – 1971. Nor does it acknowledge the impact that the relationship had on the *Munaf* Court's decision to refrain from issuing the writ. See Part II–B–3, *infra*.

3    Indeed, the Court highlights a striking similarity to the present asylum challenge by observing that the foreign-deserter cases show the "use of habeas to secure release from custody when not in compliance with ... statute[s] and relevant treaties." *Ante*, at 1974.

4    The Court considers irrelevant cases demonstrating that the executive was permitted to cure defects in detention because "the legality of [respondent's] detention is not in question" here. *Ante,* at 1972; see also *ante,* at 1981 (acknowledging that it is "often 'appropriate' to allow the executive to cure defects in a detention" in habeas cases (quoting *Boumediene*, 553 U.S. at 779, 128 S.Ct. 2229)). But as explained in Part I–A, *supra*, that is exactly what respondent questions by arguing that his detention violated governing asylum law.

5    Oddly, the Court embraces *Munaf*—a recent decision involving detainees held outside the territorial limits of the United States who were subject to prosecution by a foreign sovereign—to support its conclusion about the availability of habeas review. Yet at the same time, it dismisses respondent's reliance on *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), outright on the grounds that the case is "not about immigration at all." *Ante*, at 1981, 103 S.Ct. 321.

6    Nor is the Court correct in dismissing common-law extradition precedents as inapposite because they show "nothing more than the use of habeas to secure release from custody." *Ante*, at 1974. Indeed, these extradition cases demonstrate that the common-law writ encompassed exactly the kind of permission to remain in a country that the Court claims falls outside its scope. *Ante*, at 1969, 1970 – 1971. *In re Stupp*, 23 F.Cas. 296, (No. 13563) (CC SDNY 1875), which the Court cites in passing, emphatically affirmed that habeas corpus was available to challenge detention pending extradition: "[T]he great purposes of the writ of habeas corpus can be

Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 483 of 513

Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020)

140 S.Ct. 1959, 207 L.Ed.2d 427, 20 Cal. Daily Op. Serv. 5843...

maintained, as they must be. The court issuing the writ must inquire and adjudge whether the commissioner acquired jurisdiction ... and had before him legal and competent evidence of facts whereon to pass judgment as to the fact of criminality, and did not arbitrarily commit the accused for surrender." *Id.*, at 303. Although the *Stupp* court did not ultimately issue the writ, other courts have. See, *e.g.*, *Ex parte Kaine*, 14 F.Cas. 78, 82 (No. 7,597) (CC SDNY 1853) (granting the writ to a prisoner whose detention was "in consequence of illegality in the proceedings under the [extradition] treaty"); *Pettit v. Walshe*, 194 U.S. 205, 219–220, 24 S.Ct. 657, 48 L.Ed. 938 (1904) (affirming a grant of habeas where a prisoner's detention violated the terms of an extradition treaty with Great Britain); *In re Washburn*, 4 Johns.Ch. 106, 114 (N. Y.Ch. 1819) (granting a habeas petition of a noncitizen after a request for extradition); *People v. Goodhue*, 2 Johns.Ch. 198, 200 (N. Y.Ch. 1816) (releasing prisoner subject to possible interstate extradition). These extradition-related habeas cases show that the writ was undoubtedly used to grant release in the very direction—that is, away from a foreign country and into the United States—that the Court today derides. Indeed, the same scholar the Court cites makes the point that extradition specifically allowed courts to hear challenges to the Executive's ability to "detain aliens for removal to another country at the request of [the] government." Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1003 (1998).

7    These claims are uncannily reminiscent of the kinds of claims respondent advances here. See Parts II–A and II–B, *supra*.

8    The Court also claims that because *Ekiu* stated that the 1891 Act was constitutional, respondent must be wrong that *Ekiu* found the 1891 Act "unconstitutional in most of its applications (*i.e.*, to all questions other than questions of fact)." *Ante*, at 1978. But the point here is not that *Ekiu* actually found the 1891 Act unconstitutional in part; it is that *Ekiu* interpreted the 1891 Act to avoid rendering it unconstitutional in part.

9    See, *e.g.*, *The Japanese Immigrant Case*, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903) (habeas petition filed by noncitizen alleged to have entered unlawfully and apprehended four days after being let on shore); *Gonzales v. Williams*, 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317 (1904) (habeas petition filed by resident of Puerto Rico detained at the port, who claimed that Puerto Rican nationals are United States citizens allowed to enter the mainland as a matter of course); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904) (habeas petition by noncitizen found within the United States 10 days after entry alleging his arrest was unconstitutional); *Chin Yow v. United States*, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908) (habeas petition filed by a Chinese individual with a claim of U. S. citizenship who was detained on a steamship and prohibited from disembarking); *Yee Won v. White*, 256 U.S. 399, 41 S.Ct. 504, 65 L.Ed. 1012 (1921) (habeas petition filed on behalf of noncitizen wife and child denied admission to the United States upon arrival despite claiming legal right to join a family member residing in the country); *Tod v. Waldman*, 266 U.S. 113, 45 S.Ct. 85, 69 L.Ed. 195 (1924) (habeas petition by family fleeing religious persecution in Russia denied entry on the grounds that they were likely to become a public charge); *United States ex rel. Polymeris v. Trudell*, 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291 (1932) (habeas petition filed by residents of Greek ancestry who left the United States and sought reentry after a lengthy trip abroad).

10   Indeed, the Government itself embraced that position in a brief to the Court during that time. Brief for Respondent in *Martinez* v. *Neely*, O. T. 1952, No. 218, p. 19 ("The clear purpose of this [finality] provision was to preclude judicial review of the Attorney General's decisions in alien deportation cases insofar as the Congress could do so under the Constitution"); *id.*, at 33 ("[T]he courts have long recognized" the finality provisions "restric[t] review of deportation orders as far as the Constitution permits"); see also *id.*, at 18 (explaining that the finality provisions "precluded judicial review of deportation orders except for the collateral review in habeas corpus which the Constitution prescribes in cases of personal detention").

11   While the Court contends that the writ of habeas corpus does not allow an individual to "obtain administrative review" or additional procedures, it arrives at this conclusion only in the context of discussing what sorts of "relief " properly qualified as release from custody at common law. *Ante*, at 1963 – 1964, 1970 – 1972

(contrasting request for additional remedies with a "simple" release from custody). To the extent that this discussion necessarily prohibits federal courts from entertaining habeas petitions alleging due process violations in expedited removal proceedings, the Court's separate discussion in Part IV is unnecessary.

12    The Court notes that noncitizens like respondent seeking legal admission lack due process rights " 'regarding [their] application.' " *Ante*, at 1981 – 1982 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)). It does not, however, explain what kinds of challenges are related to one's application and what kinds are not. Presumably a challenge to the length or conditions of confinement pending a hearing before an immigration judge falls outside that class of cases. Because respondent only sought promised asylum procedures, however, today's decision can extend no further than these claims for relief.

13    In 2018 Senate Judiciary Committee hearings, the Director of the Executive Office of Immigration Review identified factors contributing to the backlog of cases, including lengthy hiring times for new immigration judges and the continued use of paper files. See Testimony of James McHenry, Strengthening and Reforming America's Immigration Court System, Hearings before the Subcommittee on Border Security and Immigration of the Senate Committee on the Judiciary, 115th Cong., 2d Sess., 2 (2018). The Court, meanwhile, insinuates that much of the burden on the asylum system can be attributed to frivolous or fraudulent asylum claims. See, *e.g.*, *ante*, at 1963, 1966 – 1967, nn. 9 and 10. But the magnitude of asylum fraud has long been debated. See S. Legomsky & C. Rodriguez, Immigration and Refugee Law and Policy 1034 (5th ed. 2009); Immigration: U. S. Asylum Policy, at 28.

14    See, *e.g.,* GAO, Immigration Courts: Actions Needed To Reduce Case Backlog and Address Long-Standing Management and Operational Challenges (GAO–17–438, June 2017); Uchimiya, A Blackstone's Ratio for Asylum: Fighting Fraud While Preserving Procedural Due Process for Asylum Seekers, 26 Pa. St. Int'l L. Rev. 383 (2007); Martin, Reforming Asylum Adjudication: On Navigating the Coast of Bohemia, 138 U. Pa. L. Rev. 1247 (1990).

15    P. Alvarez & G. Sands, Trump Administration Proposes Sweeping Changes to U. S. Asylum System in New Rule, CNN, June 10, 2020 (online source archived at www.supremecourt.gov).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

507 F.Supp.3d 1
United States District Court, District of Columbia.

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, et al., Plaintiffs,

v.

Chad WOLF, in his official capacity as Acting
Secretary of Homeland Security, et al., Defendants.

No. 19-cv-3640 (KBJ)
|
Signed 11/30/2020

**Synopsis**

**Background:** Legal aid organization and noncitizens brought action against United States Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS), Customs and Border Protection (CBP), Department of Justice (DOJ), and agencies' leaders, challenging policy that noncitizens awaiting credible fear interviews or review of negative credible fear determinations were to be detained in facilities run by CBP, alleging policy violated Administrative Procedure Act (APA), regulatory and statutory access-to-counsel requirement, procedural safeguards of Immigration and Nationality Act (INA) and Convention Against Torture (CAT), and Due Process Clause. Plaintiffs moved and defendants cross-moved for summary judgment. Defendants moved to strike evidence outside administrative record.

**Holdings:** The District Court, Ketanji Brown Jackson, J., held that:

INA provision governing judicial review over challenges to expedited removal system conferred subject matter jurisdiction over claims;

noncitizens had Article III standing to assert claims;

INA did not mandate that noncitizens be afforded greater opportunity to consult with counsel than that available in CBP facilities;

statutory right to counsel in removal proceedings did not apply to expedited removal proceedings;

detention policy was reasonable interpretation of INA and implementing regulations;

INA did not preclude claim that detention policy was adopted in arbitrary and capricious manner under APA; and

DHS provided adequately reasoned basis for adoption of detention policy.

Motion for summary judgment denied; cross-motion for summary judgment granted; motion to strike granted in part and denied in part.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Summary Judgment; Motion to Strike.

**Attorneys and Law Firms**

**\*8**  Arthur B. Spitzer, Scott Michelman, American Civil Liberties Union of the District of Columbia, Washington, DC, Anand Balakrishnan, Pro Hac Vice, American Civil Liberties Union Foundation, New York, NY, Andre Ivan Segura, Pro Hac Vice, Thomas Paul Buser-Clancy, Pro Hac Vice, Kathryn Lynn Huddleston, Pro Hac Vice, American Civil Liberties Union Foundation of Texas, Houston, TX, Bernardo Rafael Cruz, Pro Hac Vice, Brantley Shaw Drake, Pro Hac Vice, American Civil Liberties Union of Texas, El Paso, TX, for Plaintiffs.

Erez Reuveni, Brian Christopher Ward, Courtney Elizabeth Moran, U.S. Department of Justice Office of Immigration Litigation, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KETANJI BROWN JACKSON, United States District Judge

This Court recently discerned an impermissible conflict between parts of a training manual that the United States Citizenship and Immigration Services ("USCIS") issues to assist its asylum officers in making determinations regarding whether or not asylum seekers who are subject to expedited removal have a credible fear of persecution and the terms of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and that statute's implementing regulations. *See Kiakombua v. Wolf*, No. 19-cv-1872, 498 F.Supp.3d 1, 10–11 (D.D.C. 2020). In the instant case, the Court has been similarly called upon to determine the lawfulness of certain other written policies that the Department of Homeland Security ("DHS") has crafted to implement the federal government's statutory process for the evaluation of

asylum requests made by noncitizens who arrive at the U.S. border.[1] In October of 2019, DHS issued two guidance memoranda **\*9** that instituted new programs for faster processing of the asylum requests of individuals who are subject to expedited removal and who have either traveled through another country on their way to the United States or are Mexican nationals. Pursuant to the "Prompt Asylum Claim Review" ("PACR") process and the "Humanitarian Asylum Review Process" ("HARP"), such asylum seekers are afforded only one full calendar day to prepare for the initial screening stage of the statutory asylum application process, known as the credible fear interview. *Cf. Kiakombua*, 498 F.Supp.3d at 11–14 (describing the statutory and regulatory scheme that governs the interview and credible fear evaluation). Moreover, under both PACR and HARP, that one-day timeframe encompasses the statutorily required opportunity to consult with a person of the asylum seeker's choosing, such as an attorney.

Significantly for present purposes, PACR and HARP further establish that noncitizens who are awaiting credible fear interviews, as well as those who have requested an immigration judge's review of a negative credible fear determination, will be detained in facilities that are run by U.S. Customs and Border Protection ("CBP"), rather than in facilities that U.S. Immigration and Customs Enforcement ("ICE") operates, as used to be the case. Plaintiffs Las Americas Immigrant Advocacy Center and ten pseudonymous individuals (collectively, "Plaintiffs") have filed the instant action against DHS, USCIS, CBP, the Department of Justice ("DOJ"), and various leaders of those agencies, in their official capacities (collectively, "Defendants") to challenge this detention-placement policy on the grounds that, due to institution-related constraints, persons who are detained in CBP custody have restricted opportunities to consult with a person of their choosing during the credible fear interview process, as the immigration statutes require. (*See* Am. Compl. ("Compl."), ECF No. 2, ¶ 1.) Plaintiffs' six-count complaint primarily alleges that there is an unlawful inconsistency between the PACR and HARP mandate that such persons be detained in a facility that is not equipped to facilitate interactions between such detained persons and their counsel, on the one hand, and the statutory and regulatory requirement that detained asylum seekers "may consult with a person or persons of [their] choosing prior to" a credible fear interview, 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4), and the fact that such persons have a right to counsel during full removal proceedings, *see* 8 U.S.C. § 1362, on the other. Plaintiffs also

maintain that Defendants' new detention-placement policy was adopted in an arbitrary and capricious fashion in violation of the Administrative Procedure Act ("APA"), and that it deprives asylum seekers of not only the procedural safeguards conferred by the INA and the Convention Against Torture but also their Fifth Amendment due process rights.

Before this Court at present are the parties' cross-motions for summary judgment. (Pls.' Mot. for Summ. J., ECF No. 35; Defs.' Cross-Mot. for Summ. J., ECF No. 49.) Plaintiffs' motion reiterates their core arguments that DHS's policy of placing asylum seekers in CBP custody prior to their credible fear interview violates various statutory rights (*see* Pls.' Mem. in Supp. of Cross-Mot. for Summ. J. ("Pls.' Mot."), ECF No. 35-1, at 10); that the agency's decision making process with respect to the changed detention-placement policy was arbitrary and capricious under **\*10** the APA (*see id.* at 9); and that the resulting asylum-review procedure violates the Due Process Clause (*id.* at 10).[2] Defendants' cross-motion for summary judgment contends, as a threshold matter, that the Court lacks subject-matter jurisdiction over Plaintiffs' claims, that Plaintiffs lack standing, and that Plaintiffs' claims have become moot. (*See* Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF No. 49-1, at 11–12; Defs.' Notice of Suppl. Authority, ECF No. 71, at 1.) Defendants also argue that the detention-placement policy does not violate any statutory or constitutional rights of Plaintiffs, and that the policy resulted from decision making procedures that are consistent with the APA. (*See* Defs.' Mot. at 12.)

As explained below, this Court concludes that Defendants' threshold arguments about the Court's subject-matter jurisdiction, Plaintiffs' standing, and the mootness of the claims in this legal action are baseless, largely for the reasons that the D.C. Circuit recently articulated in *Make the Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ("*MTRNY II*"), and *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020). However, this Court cannot find that the detention-placement policy at issue here transgresses the INA's prescriptions regarding the initial stage of the asylum application process or any other statute or regulation, nor can it conclude that the detention-placement policy was adopted in an arbitrary or capricious manner in violation of the APA. Moreover, given binding case law, the Court must also find that the detention-placement policy at issue here does not violate the Constitution's Due Process Clause. Accordingly, Plaintiffs' motion for summary judgment must be **DENIED**, and Defendants' cross-motion

for summary judgment must be **GRANTED**. A separate Order consistent with this Memorandum Opinion will follow.

## I. BACKGROUND

### A. Overview Of The Procedures Afforded To Asylum Applicants Under Federal Law

The statutory and regulatory scheme that governs the United States government's consideration of asylum applications is described in detail in this Court's Memorandum Opinions in *Kiakombua*, *see* 498 F.Supp.3d at 11–14, and *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 12–21 (D.D.C. 2019) ("*MTRNY I*"), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020). Those descriptions are incorporated into the instant opinion by reference, and the Court will assume general familiarity with their discussion of the applicable legal framework.

As relevant here, the reader is reminded that, as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 302, 110 Stat. 3009-546, 3009-579 (1996), Congress created the process of "expedited removal[,]" which "enables federal immigration officers to slate certain undocumented noncitizens for rapid deportation 'without further hearing or review[.]' " *MTRNY I*, 405 F. Supp. 3d at 10 (quoting 8 U.S.C. § 1225(b)(1)(A)(i)). Congress determined that "rapid removal procedures were 'necessary' because 'thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S.[,]' " *id.* at 15 (citation omitted), and "[e]xisting procedures to deny entry to and to remove **\*11** illegal aliens from the United States" were too "cumbersome and duplicative" to address this influx at the nation's borders, *see id.* at 13 (citation omitted). Consequently, Congress "adopted IIRIRA's expedited removal scheme to substantially shorten and speed up the removal process." *MTRNY II*, 962 F.3d at 618.

With the addition of expedited removal, Congress effectively established a bifurcated set of procedures for determining whether an asylum seeker will be granted authorization to remain in the United States or will be removed. Per the pre-existing formal removal pathway (which applies to most noncitizens who are not already authorized to remain in the United States), the government provides a number of procedural guarantees as an asylum application is being processed, including the right to written notice of the charge of removability, *see* 8 U.S.C. § 1229(a)(1); to a hearing before an immigration judge, *see id.* § 1229a(a)(1); to representation

by counsel, *see id.* § 1229a(b)(4)(A); to examine and cross-examine witnesses and present evidence, *id.* § 1229a(b)(4)(B); to appeal an adverse decision to the Board of Immigration Appeals, *see* 8 C.F.R. §§ 1003.1(b)(3), 1240.15; and to seek judicial review, *see* 8 U.S.C. § 1252(a)(1). Under the expedited removal pathway—which applies to certain limited categories of noncitizens [3]—DHS may remove the individual from the United States "without further hearing or review[,] unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution" in her home country, supporting a claim to withholding of removal. 8 U.S.C. § 1225(b)(1)(A)(i). [4]

The instant case involves this second pathway—*i.e.*, the circumstance in which a noncitizen is deemed presumptively removable without additional process unless the person expresses an intention to apply for asylum or a fear of persecution. Once such a noncitizen "indicates either an intention to apply for asylum ... or a fear of persecution, the [immigration] officer [is required to] refer the alien for an interview by an asylum officer[,]" who must determine whether the individual has a credible "fear of persecution[.]" *Id.* § 1225(b)(1)(A)(ii), (B). This credible fear **\*12** interview allows the government to "quickly identify potentially meritorious claims to protection" while "resolv[ing] frivolous ones with dispatch[,]" *Kiakombua*, 498 F.Supp.3d at 13 (citation omitted), and it is the first stage of a two-stage process for establishing the asylum eligibility of such noncitizens, *see id.* at 37–38, (explaining that the expedited removal scheme subjects noncitizens to "(1) an initial screening to determine whether or not the noncitizen has a credible fear of persecution or torture in their home country (if she does not, she is slated for expedited removal without an additional hearing), and (2) full removal proceedings, during which the noncitizen bears the burden of establishing her eligibility for asylum"). Moreover, making the credible fear determination requires the asylum officer to assess whether "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[,]" 8 U.S.C. § 1225(b)(1)(B)(v), which the Supreme Court has characterized as a "low bar[,]" *Dep't of Homeland Sec. v. Thuraissigiam*, —— U.S. ——, 140 S. Ct. 1959, 1967, 207 L.Ed.2d 427 (2020). By regulation, this credible fear assessment is typically made based solely upon the statements and representations that the noncitizen makes during the interview concerning her experiences in her home country.

*Cf.* 8 C.F.R. § 208.30(d)(4) (providing that a noncitizen "may present other evidence" only "if available").

In addition, and most relevant to the instant case, the governing statute expressly provides that a noncitizen who is eligible for a credible fear interview *must* be held in detention leading up to and throughout that assessment process, *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), and "may consult with a person or persons of [his] choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General[,]" *id.* § 1225(b)(1)(B)(iv). The implementing regulations state that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained," 8 C.F.R. § 235.3(b)(4)(ii), and that "[a]ny person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview[,]" *id.* § 208.30(d)(4).

**B. Prompt Asylum Claim Review ("PACR") And The Humanitarian Asylum Review Process ("HARP")**

Until the summer of 2019, if certain noncitizens—namely, those who arrived at a point of entry at the U.S. border, or those who were encountered within 100 miles of the border after recently entering the United States without inspection —expressed a fear of persecution or an intent to apply for asylum, they were placed in ICE custody pending their credible fear interviews, and they remained in ICE detention up to, and through, the credible fear interview and any review of the asylum officer's negative credible fear determination by an immigration judge. (*See* Compl. ¶ 64.) The facilities that ICE uses to detain asylum seekers allegedly provide detainees with unrestricted access to telephones for contacting legal counsel, private meeting spaces for attorneys to meet with their clients, and an online system for attorneys and others to locate detainees in ICE custody. (*See id.* ¶¶ 74–76, 79.) According to Plaintiffs, such unfettered access to counsel "can assist an asylum seeker in preparing for their [credible fear] **\*13** interview or [immigration judge] review." (*See id.* ¶ 93.)

In July and October of 2019, DHS made two significant changes to its asylum-related policies that allegedly affect an asylum-seeker's ability to prepare for the credible fear interview and her chances of being deemed to have successfully cleared that hurdle. First, on July 16, 2019, the agency promulgated a rule—known as the "Transit Rule"— that prohibited asylum officers from seriously entertaining

the asylum requests of noncitizens who had passed through another country en route to the U.S. border if they did not apply for asylum in the pass-through countries before reaching the United States. (*See id.* ¶ 55 n.5; *see also* Admin. R., ECF No. 35-3, at AR370–86.) Pursuant to the Transit Rule, if an asylum seeker who is subject to expedited removal has not first applied for asylum in a country through which he had traveled prior to his arrival in the United States, the asylum officer is required to make a negative credible fear determination with respect to that person's asylum application. (Compl. ¶ 55 n.5; *see also* Admin. R. at AR376–78.) [5] Mexican nationals are not subject to the Transit Rule, given that they do not pass through another country prior to entering the United States.

Second, in October of 2019, DHS issued the two guidance documents at issue in the instant case in order to implement, *inter alia*, the challenged new policy concerning the circumstances of a noncitizen's pre-interview detention. The first document, which DHS issued on October 7, 2019, instituted PACR as a pilot program in El Paso, Texas, with the purported goal of achieving "more effective processing" of noncitizens who are subject to the Transit Rule. (*See* Defs.' Mot. at 19; Admin. R. at AR640–41.) Asylum seekers identified as "Single Adults" and "Family Unit Aliens" are eligible for PACR, and immigration officers retain discretion as to whether such persons should be placed in the program or be subjected to standard expedited-removal procedures. (*See id.* at AR641, AR644.) For noncitizens who are placed into the PACR program, there is a total timeline of five to seven days for removal, and such persons are required to be detained at CBP facilities during the pendency of the credible fear screening process. (*See id.* at AR641.) In addition, as mentioned above, an asylum seeker in PACR is afforded one full calendar day to prepare for a credible fear interview, to include the time that must be afforded for consultation with a person of the asylum seeker's choosing. (*Id.*) [6] USCIS also undertakes **\*14** to conduct the credible fear interview "immediately" after the 24-hour period, in a private location within the CBP facility, allowing the person with whom the noncitizen has consulted (including his or her attorney) to "participate in the interview telephonically." (*Id.* at AR642.)

The second guidance document, which DHS issued on October 28, 2019, instituted HARP, which is a policy that is substantially similar to PACR but applies only to Mexican nationals. (Defs.' Mot. at 20; *see also* Admin. R. at AR645–47.) Noncitizens who have been "[i]dentified as HARP amenable"—*i.e.*, "Mexican nationals" who "have

been processed for Expedited Removal and have claimed fear of return to their native country"—are "[t]ransferred" to CBP custody, where a "24-[hour] consult period begins[.]" (Admin. R. at AR645.) During that consultation period, asylum seekers in HARP are "given [an] opportunity to contact an attorney ... via [a] phone supplied" by the detention facility, for "initial[ly] 1 hour[,]" with "30-minute follow-up as needed[.]" (*Id.*) And after the "24-hour consult clock" has elapsed, the noncitizen "attend[s] [a] scheduled telephonic USCIS [credible fear] interview." (*Id.*) DHS has now expanded PACR beyond El Paso, Texas—it is currently also in effect in Rio Grande Valley, Texas, and Yuma, Arizona—but HARP remains limited to El Paso. (*See* Defs.' Mot. at 21.)

Notably, there is no dispute that CBP facilities are designed for *short-term* detention—they are set up to hold asylum seekers for up to 72 hours. (*See* Admin. R. at AR618.) As a result, CBP facilities generally lack beds and other living amenities (*see id.* at AR444), and the holding-cell lights are kept on 24 hours a day, seven days a week (*see id.* at AR447). According to Plaintiffs' complaint, CBP facilities also do not permit "in-person" visits with detainees (Compl. ¶¶ 7, 9), and the detained individuals only have access to telephones for "approximately 30 minutes to one hour to call family members or retained counsel, or to call prospective attorneys from a limited list provided by CBP" (*id.* ¶ 8). Plaintiffs allege that "[t]here is no callback number or other means" to return a phone call (*see id.*), and that CBP does not provide a mechanism for attorneys to locate, or otherwise verify the location of, a client detained in CBP custody (*see id.* ¶ 7).

### C. Factual Background

The organizational plaintiff in this case, Las Americas Immigrant Advocacy Center ("Las Americas"), is a non-profit legal aid organization with a mission that "includes providing consultation and legal services to noncitizens detained by the federal government in the El Paso area, including by representing individuals through the credible fear interview process through a staff of four attorneys and three legal assistants." (*Id.* ¶ 30.) Las Americas contends that PACR and HARP have frustrated this mission because the organization's attorneys have been "unable to communicate with prospective clients in PACR and HARP, whether telephonically or in person, prior to their credible fear interview or immigration judge review." (*Id.* ¶ 114.) The ten individual Plaintiffs (four adults and their six children) are asylum seekers who were detained in CBP custody and placed into the PACR or HARP programs during the credible fear

process; each was removed from the United States after an asylum officer found that he or she lacked a credible fear of persecution. (*See* Pls.' Mot. at 18.)

The individual Plaintiffs have submitted a series of declarations that recount the alleged circumstances of their experiences **\*15** during the asylum application process, including the difficulties each Plaintiff, or family, allegedly encountered in trying to contact an attorney in order to prepare for the credible fear interview. For example, Plaintiff A.R.R.D.—who avers that she fled El Salvador with her minor son, Plaintiff L.E.R.D., and arrived in the United States on October 8, 2019—was allegedly given a list of attorneys' phone numbers and thirty minutes to use a phone on October 11, 2019, prior to her credible fear interview. (*See* Decl. of A.R.R.D., Ex. B to Pls.' Mot. for Prelim. Inj., ECF No. 21-5, ¶¶ 10–11, 13.) When no attorneys answered her calls, A.R.R.D. called her sister-in-law. (*Id.* ¶ 13.) A.R.R.D. talked to an asylum officer for four hours over the phone to conduct the credible fear interview on October 13, 2019, while she was still detained in a CBP facility. (*See id.* ¶ 14.) A.R.R.D. avers that she felt she was not prepared for the interview, and that she did not have "a fair chance to explain the danger [she] was fleeing[.]" (*Id.* ¶ 16.) A.R.R.D. further maintains that she had no opportunity to recover from her "grueling trip" and was forced "to sleep on the freezing floor in horrible conditions" prior to her interview. (*Id.*) A.R.R.D. also allegedly had to hold her crying baby during the interview itself, because there was no place to set her baby down or anyone who could help by holding the child. (*Id.* ¶ 17.) A.R.R.D. learned the day after she spoke with the asylum officer that she "had not passed the interview" (*id.* ¶ 19), and she then sought review of her negative credible fear determination from an immigration judge, which was held over the phone on October 17, 2019 (*see id.* ¶ 20). On October 18, 2019, A.R.R.D. was told that she and her son were going to be deported. (*See id.* ¶¶ 25–26.)

Plaintiff A.S.C.R.—A.R.R.D.'s sister, who also fled from El Salvador with her immediate family members—had an allegedly similar experience. (*See* Compl. ¶ 20.) A.S.C.R., Plaintiff K.M.V. (A.S.C.R.'s husband), and their child, Plaintiff F.B.G.C., entered the United States on October 8, 2019. (*See* Suppl. Decl. of A.S.C.R. ("A.S.C.R. Decl."), Ex. S to Pls.' Mot. for Summ. J., ECF No. 35-6, ¶ 9; Decl. of K.M.V., Ex. E to Pls.' Mot. for Prelim. Inj., ECF No. 21-8, ¶ 9.) The family was immediately detained in a CBP facility, where A.S.C.R. and F.B.G.C. were separated from K.M.V. (*See* A.S.C.R. Decl. ¶ 11.) On October 10, 2019, A.S.C.R. was allegedly taken to a room with a phone and

given a list of attorneys and 30 minutes in which to make any calls. (*See id.* ¶ 13.) A.S.C.R. contends that after trying to call two attorneys on the list and receiving no response, she instead called her sister-in-law. (*See id.* ¶ 15.) The next day, an asylum officer conducted a five-hour interview with the family over the phone. (*See id.* ¶ 17.) A.S.C.R. describes the interview as "very confusing" because she thought she would have the opportunity to present her case in person; she had trouble understanding the interpreter's Spanish; and her baby "would not stop crying" which "made it very difficult to concentrate[.]" (*Id.* ¶¶ 17–19.) A.S.C.R. also avers that she "was not adequately prepared" for the interview. (*Id.* ¶ 19.) When A.S.C.R. and K.M.V. learned that they "had not passed the [credible] fear interview[,]" they requested a review of the negative credible fear determination by an immigration judge. (*Id.* ¶ 21.) On October 18, 2019, the family had a call with an immigration judge that lasted approximately "five minutes[,]" at the conclusion of which the judge informed the family that he was affirming the asylum officer's determination. (*Id.* ¶ 22.) Thereafter, the family learned that they would be deported. (*See id.* ¶ 30.)

**\*16** Plaintiff B.G.R. and her four children—Plaintiffs B.C.F.G., D.M.F.G., J.M.F.G., and S.F.G.—left Mexico and entered the United States on November 20, 2019, to seek asylum. (*See* Decl. of B.G.R., Ex. C to Pls.' Mot. for Prelim. Inj., ECF No. 21-6, ¶ 10.) Upon entry, B.G.R. and her children were detained in a CBP facility pursuant to the HARP program. (*See id.* ¶¶ 10, 14.) The next day, B.G.R. was given a phone and a list of attorneys' phone numbers, and was told that she had an hour to make calls. (*See id.* ¶ 15.) B.G.R. attempted to call "several" of the phone numbers, but "no one answered [her] calls[,]" and after being unable to reach any family members, she left the room after "approximately 15 minutes[.]" (*Id.*) On November 22, 2019, B.G.R. had a credible fear interview with an asylum officer, which was conducted over the phone and lasted approximately two hours. (*See id.* ¶¶ 16–17.) B.G.R. was informed that she had "failed [her] interview" the following day (*id.* ¶ 19), and although she was informed that she could appeal to an immigration judge, she was also told that she would have to remain detained during the pendency of her appeal (*id.*). B.G.R. declined to appeal allegedly due to a concern over her children's health in light of the conditions of their detention. (*See id.*)

The individual Plaintiffs contend that by virtue of the detention facilities' constraints on their access to counsel, they were not able to get assistance in preparing for their credible fear interviews, and as a result, they were erroneously found not to have a credible fear of persecution and were removed back to their home countries. (*See* Pls.' Mot. at 19–20.)

### D. Procedural Background

Plaintiffs filed the complaint in the instant case on December 5, 2019, exactly 59 days after DHS issued the PACR memorandum. As noted above, the complaint makes six claims concerning the alleged unlawfulness of PACR and HARP. Claim One, Claim Two, and Claim Three allege that PACR and HARP violate statutory or regulatory provisions that provide either a right to consult with a person of an asylum seeker's choosing or an affirmative right to counsel. (*See* Compl. ¶¶ 200–06 (alleging violations of 8 U.S.C. §§ 1225(b)(1)(B)(iv), 1362; 8 C.F.R. § 208.30(d) (4); and 5 U.S.C. § 555(b)).) Claim Four alleges that, in promulgating PACR and HARP, Defendants acted arbitrarily and capriciously in violation of the APA. (*See id.* ¶¶ 207–08.) Claim Five asserts that PACR and HARP unlawfully frustrate asylum seekers' ability to secure asylum, withholding of removal, or protections under the Convention Against Torture (*see id.* ¶ 209), and Claim Six alleges that PACR and HARP violate asylum seekers' rights under the Due Process Clause of the Fifth Amendment to the United States Constitution (*see id.* ¶¶ 210–13). Plaintiffs seek declaratory and injunctive relief, including an order vacating the individual Plaintiffs' removal orders and an injunction against any application of the PACR and HARP programs. (*See id.*, Prayer for Relief, ¶¶ 1–5.) Plaintiffs also seek relief broadly on behalf of persons who have been subject to PACR and HARP, including an order enjoining Defendants to provide people previously subject to PACR and HARP new credible fear evaluations and requiring that such persons be returned to the United States at no expense. (*See id.* ¶¶ 6–7.)

Plaintiffs originally filed a motion for a preliminary injunction (*see* Pls.' Mot. for Prelim. Inj., ECF No. 21), which the Court converted into an expedited cross-motion for summary judgment by consent of the parties (*see* Joint Proposed Briefing Schedule, ECF No. 25; Min. Order of Jan. 7, 2020). The parties then proceeded to briefing, and their summary judgment motions **\*17** ripened on February 15, 2020. (*See* Pls.' Mot.; Defs.' Mot.; Pls.' Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Reply"), ECF No. 57; Defs.' Reply in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 59.) [7] Along with their cross-motion for summary judgment,

Defendants also filed a motion to strike the attachments to Plaintiffs' motions for a preliminary injunction and for summary judgment, contending that much of the material was extra-record evidence outside of the administrative record. (*See* Defs.' Mot. to Strike, ECF No. 51.)[8] Plaintiffs filed a memorandum in opposition to the motion to strike on February 13, 2020 (*see* Pls.' Opp'n to Mot. to Strike, ECF No. 56), and Defendants filed a reply on February 15, 2020 (*see* Defs.' Reply to Opp'n to Mot. to Strike, ECF No. 58). The Court held a hearing on the parties' motions on February 18, 2020. (*See* Min. Entry of Feb. 18, 2020.)

## II. LEGAL STANDARDS

In the normal course, summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010) (citing Fed. R. Civ. P. 56), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011). A factual dispute is not alone sufficient to bar summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); instead, a dispute must be both material, in that it "might affect the outcome of the suit[,]" *id.* at 248, 106 S.Ct. 2505, and genuine, in that "the **\*18** evidence presents a sufficient disagreement to require submission to a jury[,]" *id.* at 251–52, 106 S.Ct. 2505.

When a plaintiff invokes the APA to seek review of an administrative agency's decision, however, she ordinarily presents a pure question of law, and thus, the standard articulated in Federal Rule of Civil Procedure 56 is inapplicable. *See Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 160 (D.D.C. 2011). Rather, in the APA context, "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117 (D.D.C. 2009) (internal quotation marks and citations omitted). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Wilhelmus*, 796 F. Supp. 2d at 160 (citation omitted).

Summary judgment is also the means by which a district court resolves the dispute "if a plaintiff alleges that an agency has engaged in conduct that directly contravenes a substantive statute that has a cause of action for that violation —such as claims brought under section 1252(e)(3) of the INA for agency conduct that is 'not consistent with applicable provisions of this subchapter [of the INA] or is otherwise in violation of law[.]' " *Kiakombua*, 498 F.Supp.3d at 23 (quoting 8 U.S.C. § 1252(e)(3)(A)(ii)). In that circumstance, the "legal authorities are binding on both the court and the agency, and the court will analyze them to determine which party, if any, is entitled to judgment as a matter of law with respect to the plaintiff's challenge to the agency's administrative action." *Id.*

## III. ANALYSIS

The clear gravamen of Plaintiffs' complaint is that Defendants' policy of detaining noncitizens in facilities run by CBP prior to their credible fear interviews violates the INA, the APA, and the Due Process Clause, because persons detained in CBP custody have limited opportunities to consult with a person of their choosing during the credible fear interview process. (*See* Compl. ¶ 1.) This Court has no doubt that asylum seekers who are faced with difficult detention circumstances such as those that the individual Plaintiffs have recounted are severely limited in their ability to locate and communicate with counsel, and it might well be next to impossible for them to otherwise prepare for the critical credible fear assessment. Unfortunately for Plaintiffs, however, the only question for the Court at this juncture is whether Defendants' decision to place noncitizens who have been designated for expedited removal in such challenging straits contradicts the will of Congress as expressed in applicable statutes or the Constitution? And this Court cannot conclude as much, for the reasons explained fully below.

The short version is that, as this Court has explained elsewhere, when Congress amended the INA to establish expedited removal, it unquestionably intended to permit the government to remove certain noncitizens from the United States expeditiously. *See Kiakombua*, 498 F.Supp.3d at 11–14; *MTRNY I*, 405 F. Supp. 3d at 13–15; *see also MTRNY II*, 962 F.3d at 618. And under the procedures that Congress adopted for the new expedited removal process, persons who are properly designated **\*19** for such treatment are distinguishable *precisely because* persons who fit within the designated expedited removal categories and who lack a credible fear of persecution can be removed from the United States "without further hearing or review" or any

other pre-removal process. 8 U.S.C. § 1225(b)(1)(A)(i); *see also id.* § 1225(b)(1)(B)(iii)(I). It is also clear that Congress intended for the credible fear interview to be a mere initial screening assessment, *see Thuraissigiam*, 140 S. Ct. at 1965, and although interviewees have the right to consult with a person of their choosing prior to being questioned, 8 U.S.C. § 1225(b)(1)(B)(iv), established law plainly provides that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained," 8 C.F.R. § 235.3(b)(4)(ii).

As such, in this Court's view, the statutory scheme that Congress has enacted does not guarantee or necessarily facilitate extensive pre-interview preparation by noncitizens who are subject to expedited removal. Thus, it is not inconsistent with the INA, its regulations, or any other authority that Plaintiffs have identified for DHS to implement a detention-placement policy that indirectly impacts a noncitizen's ability to reach or retain legal counsel prior to the credible fear interview, nor is it arbitrary for the agency to prioritize efficient processing of the asylum requests of noncitizens subject to expedited removal, at the expense of such individuals' ability to build a case for asylum during the initial stage of the process. Moreover, the Supreme Court has long held that noncitizens seeking initial entry to the United States lack due process rights regarding their applications —a conclusion that is binding on the parties and this Court. Consequently, although the Court rejects Defendants' threshold arguments concerning the non-justiciability of Plaintiffs' legal claims, it concludes that Plaintiffs' statutory and constitutional contentions fail on the merits.

**A. Plaintiffs' Claims Are Not Non-Justiciable**

Defendants argue, as a threshold matter, that this Court lacks the power to reach the merits of Plaintiffs' claims for three reasons: (1) because Plaintiffs' challenge to PACR and HARP does not satisfy the jurisdictional requirements of section 1252(e)(3) (*see* Defs.' Mot. at 25), (2) because no Plaintiff has Article III standing (*see id.* at 27–33), and/or (3) because all of the complaint's claims are now moot (*see* Defs.' Notice of Suppl. Authority at 1). The Court disagrees with each of Defendants' contentions for the reasons that follow.

1. The INA Preserves This Court's Subject-Matter Jurisdiction Over Plaintiffs' Challenge

First of all, the weight of authority in this judicial circuit now strongly supports the conclusion that section 1252(e)(3) of the INA preserves this Court's subject-matter jurisdiction over Plaintiffs' claims under section 1331. Specifically, relying on the express terms of section 1252(e)(3), courts in this circuit have found that if a plaintiff is challenging a written policy or procedure that implements the expedited removal statute (section 1225(b)) and brings such challenge in the U.S. District Court for the District of Columbia within the 60-day window that section 1252(e)(3) establishes, there is subject matter jurisdiction to review the plaintiff's claims. *See, e.g., Grace v. Barr*, 965 F.3d 883, 891–94 (D.C. Cir. 2020); *MTRNY II*, 962 F.3d at 623–31; *Kiakombua*, 498 F.Supp.3d at 29–35; *see also* 8 U.S.C. § 1252(e)(3)(A)–(B).

**\*20** That is precisely the kind of challenge that Plaintiffs have brought in the instant case. The complaint clearly assails written policy directives of DHS—both PACR and HARP are memorialized in writing (*see* Admin. R. at AR636–47)—and those directives provide instructions for the implementation of the credible fear process with respect to certain noncitizens detained within CBP facilities. In addition, Plaintiffs filed the instant lawsuit within 60 days of the first implementation of PACR, and they did so in the District Court for the District of Columbia, thereby satisfying all of the statutory criteria. [9]

Moreover, and notably, the D.C. Circuit has now considered —and rejected—each of the primary arguments concerning the absence of subject-matter jurisdiction that Defendants make here. (*See* Defs.' Mot. at 24–27.) Indeed, it is by now well established that there is no legal basis for Defendants' contention that section 1252(e) authorizes judicial review only in a circumstance in which the plaintiff has undergone a "determination" in addition to DHS's implementation of a policy or procedure concerning the expedited removal system. *See MTRNY II*, 962 F.3d at 625–27. The D.C. Circuit has also confirmed that section 1252(a)(2)(A) does not strip the district courts of jurisdiction under section 1331 under the circumstances presented in this case. *See MTRNY II*, 962 F.3d at 624–28; *Grace*, 965 F.3d at 894.

To the extent that Defendants further maintain that PACR and HARP do not qualify as the types of written policies that give rise to subject-matter jurisdiction under section 1252(e)(3) because they "implement" section 1231(g) of Title 8 rather than section 1225(b) (*see* Defs.' Mot. at 26–27), that argument mischaracterizes those policies, and is, therefore, unpersuasive. In section 1231(g) of Title 8, Congress instructs the agency to "arrange for appropriate

places of detention for aliens detained pending removal or a decision on removal[,]" 8 U.S.C. § 1231(g)(1), but it is clear beyond cavil that DHS was undertaking to do much more than that when it crafted PACR and HARP. The memoranda that establish those programs explicitly express the agency's intent to address "the implementation of each removal pathway" that federal law identifies (Admin. R. at AR637), including "outlin[ing] a proof of concept on the more effective processing of aliens amendable [sic] to the [Transit Rule] as a pilot" (*id.* at AR640). What is more, DHS generally clarified that "[i]n order for this pilot to be successful," various DHS sub-agencies must "commit to providing the appropriate resources and guidance necessary to implement the processes" described. (*Id.*)

Thus, the documents that establish these pilot programs unquestionably "outline the ... steps for implementing streamlined procedures" for the efficient processing of noncitizens who are subject to expedited removal (*id.* at AR641) in a manner that relates to section 1225's pre-credible fear interview detention requirement and that therefore gives rise to this Court's subject matter jurisdiction under section 1252(e)(3). *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). And to the particular point that Defendants have raised: the fact that PACR and HARP *also* arguably pertain to section 1231(g) does not divest **\*21** the Court of the authority to consider Plaintiffs' challenge to these written policies under section 1252(e)(3), as Defendants maintain. *Cf. Grace*, 965 F.3d at 892 (rejecting a similar argument that a guidance document did not "implement" section 1225(b) because it pertained to section 1158).

## 2. The Individual Plaintiffs Have Article III Standing

Defendants' standing argument primarily focuses on refuting Las Americas' claim that it has organizational or third-party standing. (*See* Defs.' Reply at 9–13.) But only one plaintiff needs Article III standing in order for a claim to be justiciable. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, ––– U.S. ––––, 140 S. Ct. 2367, 2379 n.6, 207 L.Ed.2d 819 (2020) (concluding that the Third Circuit had "erred by inquiring into [one of the plaintiff's] independent Article III standing[,]" where another plaintiff "clearly had standing to invoke the Third Circuit's appellate jurisdiction, and both [plaintiffs] asked the court" for the same relief). And this Court has little doubt that the individual Plaintiffs here —each of whom was previously detained in CBP custody pursuant to PACR or HARP, and was removed to his or her

home country after an asylum officer found that he or she lacked a credible fear of persecution in the wake of a credible fear interview—have standing to sue, largely for the reasons that the Court explained in *Kiakombua*. *See Kiakombua*, 498 F.Supp.3d at 23–28.

In sum, "it is well established that a plaintiff has standing to bring a claim concerning a procedural injury if she can show that the agency failed to abide by a procedural requirement that was 'designed to protect some threatened concrete interest' of the plaintiff." *Id.* at 24 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The individual Plaintiffs aver that their unlawful placement in CBP custody pursuant to PACR or HARP prevented them from consulting with an attorney and adequately preparing for their credible fear interviews, which purportedly contributed to their negative credible fear determinations and subsequent deportations. (*See, e.g.*, A.R.R.D. Decl. ¶¶ 11–20; A.S.C.R. Decl. ¶¶ 9–22; B.G.R. Decl. ¶¶ 10–19.) Thus, assuming *arguendo* that the INA and its implementing regulations required the individual Plaintiffs to be detained in a facility that permitted them greater access to counsel, as Plaintiffs maintain (*see* Compl. ¶¶ 200–06), the alleged circumstances of the individual Plaintiffs' detention was a procedural violation that provides a sufficient basis to ground their subsequent deportation harm, because there is a substantial connection between the claimed violation and the individual Plaintiffs' removal. *See Kiakombua*, 498 F.Supp.3d at 25 (noting that "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled" need only "show that the procedural step *was connected to* the substantive result" (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002))).

Accordingly, Defendants are mistaken to suggest that there must be "evidence that an attorney could have helped *the specific individual Plaintiffs here*[.]" (Defs.' Reply at 14 (emphasis in original); *see also id.* (insisting that both the individual Plaintiffs from El Salvador and Mexico lacked Article III standing, because the Salvadorans "were categorically ineligible for asylum" and the Mexicans "waived immigration-judge review of their negative credible-fear determination").) This line of reasoning, which sounds in lack of traceability and/or redressability (*see* Defs.' Mot. at 32–33; *see also* Defs.' Reply at 16 (asserting **\*22** that "Plaintiffs ... must show that but for PACR and HARP, their credible-fear interview results would be different")), ignores the alleged *procedural* violation at issue, insofar as it evaluates the injury by assessing whether any of

the individual Plaintiffs could have successfully established that they had a credible fear. Instead, it suffices under the circumstances presented here that asylum seekers have a procedural right to consult with a person of their choosing, *see, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iv), and that such right pertains to Plaintiffs' concrete interest in avoiding removal and potential persecution in their home countries, *see, e.g.*, H.R. Rep. No. 104-469, pt. 1, at 158 (1996) (explaining that, under the credible fear process, "there should be no danger that an alien with a genuine asylum claim will be returned to persecution"); *L.M.-M.*, 442 F. Supp. 3d at 20 ("It is difficult to imagine an interest more 'particularized' than a person's interest in seeking asylum and avoiding the risk of deportation."). Plaintiffs have alleged that, as a result of being held in CBP custody, they were denied this procedural right, which resulted in a negative credible fear determination and deportation. (*See* Pls.' Reply at 14.) Therefore, they have sufficiently identified an alleged procedural violation that relates to their concrete interest in obtaining asylum such that it qualifies as a cognizable injury-in-fact. [10]

The Court also finds that, in addition to demonstrating a connection between the procedural requirement and the substantive result, *see L.M.-M.*, 442 F. Supp. 3d at 20–21, Plaintiffs have done enough to fulfill the traceability requirement of showing a "substantial probability" that the agency action caused the alleged injury, *Ctr. for Biological Diversity v. E.P.A.*, 861 F.3d 174, 184 (D.C. Cir. 2017) (citation omitted). The adult individual Plaintiffs aver that, because they were unable to consult with a person of their choosing (an attorney) prior to their credible fear interviews, they felt unprepared for and confused by the interview that was the basis for their negative credible fear determinations. (*See* A.R.R.D. Decl. ¶¶ 13, 16, 18; A.S.C.R. Decl. ¶¶ 15, 17, 19; B.G.R. Decl. ¶¶ 15, 17.) In addition, the complaint cites statistics that establish that there is a significant reduction in removal outcomes when asylum seekers *are* afforded counsel (*see* Compl. ¶ 102), which provides support for the conclusion that there is a substantial probability that DHS's violation of the consultation right in these Plaintiffs' individual cases contributed to the negative credible fear determinations that led to their subsequent expedited removal. (*See also* Pls.' Mot. at 20–22 (describing how counsel aid asylum seekers in preparing for credible fear interviews).)

It is also reasonably clear that, under the "relaxed redressability requirement[,]" Plaintiffs need only show that the agency's decision *could be* altered as a result of compliance with the procedural requirement. *Ctr. for*

*Biological Diversity*, 861 F.3d at 185 (citation omitted). The individual Plaintiffs' declarations explain the challenges each of them endured when asylum officers interviewed them, including, in particular, their inability to communicate effectively, their confusion that the interview was not being held in person, and their belief that evidence they had **\*23** brought with them was not before the asylum officer during their interview. (*See, e.g.*, A.R.R.D. Decl. ¶¶ 15–16; A.S.C.R. Decl. ¶¶ 17, 19; B.G.R. Decl. ¶ 17.) Thus, it is at least possible that, if the individual Plaintiffs had been able to communicate with counsel ahead of their credible fear interviews, they would have altered their approaches such that the outcome of the interview might have been different, which is all that is required to satisfy the "undemanding" redressability requirement in the context of a legal claim that is brought by a plaintiff whose Article III standing is predicated on a procedural injury. *L.M.-M.*, 442 F. Supp. 3d at 21.

### 3. Defendants Have Not Shown That Plaintiffs' Claims Are Moot

Defendants' mootness argument fares no better. "The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot," *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010), and the mootness contention that Defendants make here hinges on the fact that one aspect of the PACR and HARP programs— the 24-hour consultation policy—has already been set aside, *see L.M.-M.*, 442 F. Supp. 3d at 37, and that DHS has both voluntarily dismissed its appeal in that case and reverted to the prior consultation period of at least 48 hours. (*See* Defs.' Notice of Suppl. Authority at 1.) Defendants argue that, because "the 24-hour consultation policy [that] was a central part of the PACR and HARP programs" is no longer in effect, it is "impossible for this Court to assess the lawfulness of PACR and HARP as challenged in the complaint and presented to the Court in the government's administrative record." (*Id.*; *see also* Defs.' Resp. to Ct.'s Apr. 23, 2020 Min. Order, ECF No. 63, at 5–10.) But Defendants do not adequately explain *why* that is so.

Indeed, Defendants provide no authority for the suggestion that the invalidation of one aspect of an agency's new policy renders challenges to other non-invalidated parts of that agency action moot. And, here, according to Plaintiffs, the 24-hour consultation policy was *not* the "fundamental problem" with PACR and HARP; instead, the core issue is that, "by keeping asylum seekers in CBP facilities, where

communication with the outside world is nearly impossible and inside which no attorney can ever step foot," Defendants have deprived noncitizens of "*any* meaningful opportunity for consultation[,]" allegedly in violation of the law. (Pls.' Resp. to Defs.' Suppl. Br. Pursuant to Ct.'s Apr. 23, 2020 Min. Order, ECF No. 65, at 2–3 (emphasis added).) Thus, in Plaintiffs' view, whether the uncounseled consultation period lasts 24 or 48 hours simply "does not matter" for purposes of Plaintiffs' claim. (*Id.* at 3.)

From the standpoint of evaluating Defendants' mootness argument, this Court agrees. Regardless of the *L.M.-M.* litigation and the agency's voluntary cessation of PACR and HARP's 24-hour consultation requirement, Defendants are apparently still housing certain noncitizens in CBP facilities during the credible fear review process, and Plaintiffs' complaint is challenging *that* detention-related policy on the grounds that it allegedly has detrimental ramifications with respect to access to counsel. (*See* Compl. ¶¶ 73–102.) Consequently, Defendants have not carried their burden of showing that Plaintiffs' claims are moot.

### B. DHS's New Detention-Placement Policy Is Not Inconsistent With Any Provision Of The INA Or Its Implementing Regulations, Nor Does It Violate Any Other Statute Or Convention Concerning Asylum

Finding no threshold impediment to considering Plaintiffs' legal claims, the **\*24** Court now turns to an evaluation of the merits of the claims that Plaintiffs have brought in this case. To start, it is important to reiterate that the policy decision that Plaintiffs are challenging pursuant to 8 U.S.C. § 1252(e)(3) is Defendants' determination that certain noncitizens awaiting credible fear interviews will be detained in CBP custody rather than ICE custody, per the requirements of the pilot programs known as PACR and HARP, and to emphasize that, according to Plaintiffs, this detention-placement decision violates the law in several respects. [11] In this section of the instant Memorandum Opinion, the Court addresses Plaintiffs' claims that housing noncitizens in CBP custody conflicts with the INA and its implementing regulations, as well as other provisions of law concerning the granting of asylum, including the Convention Against Torture. (*See* Compl. ¶¶ 200–06 (First, Second, and Third Claims); *id.* ¶ 209 (Fifth Claim).)

To evaluate these claims properly, the Court must apply two related doctrines of deference to agencies' interpretations of the law. First, to the extent that Plaintiffs are challenging

Defendants' interpretation of certain statutory provisions, the Court asks "whether Congress has directly spoken to the precise question at issue[,] ... for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress[,]" *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and "if the statute is silent or ambiguous with respect to the specific issue, the question for the court [becomes] whether the agency's answer is based on a permissible construction of the statute[,]" *id.* at 843, 104 S.Ct. 2778. If, instead, Plaintiffs are challenging the Defendants' interpretation of the DHS regulations that implement certain statutes, then the Court asks whether the regulation is "genuinely" or "truly" ambiguous, "even after a court has resorted to all the standard tools of interpretation[,]" *Kisor v. Wilkie*, —— U.S. ——, 139 S. Ct. 2400, 2414–15, 204 L.Ed.2d 841 (2019), and if it is, then the general question for the Court becomes whether the agency's interpretation is "reasonable" or "within the zone of ambiguity the court has identified after employing all its interpretive tools[,]" *id.* at 2415–16. If so, the Court must also inquire "into whether the character and context of the agency interpretation entitles it to controlling weight[,]" *id.* at 2416, including whether the agency's interpretation reflects the agency's "fair and considered judgment" or whether it creates "unfair surprise to regulated parties" by "substitut[ing] one view of a rule for another[,]" *id.* at 2417–18 (internal quotation marks and citations omitted).

As explained herein, this Court finds that Congress has not spoken to the detention-placement policy that PACR and HARP adopt, such that there is no direct conflict between that policy and either the **\*25** text of the INA itself or its implementing regulations. Moreover, given Congress's clear intentions when it established the expedited removal scheme, the Court further concludes that the challenged detention-placement policy relies upon a reasonable interpretation of the applicable statutory and regulatory provisions. The Court also finds that the detention-placement determination does not violate any of the provisions of law that "entitle individuals to a meaningful opportunity to apply for asylum, withholding of removal, and CAT relief[.]" (Compl. ¶ 209.) Therefore, summary judgment must be granted in Defendants' favor with respect to the Complaint's First, Second, Third, and Fifth Claims.

### 1. The INA And Its Implementing Regulations Require That Noncitizens Who Are Subject To Expedited Removal

<u>Be Detained, And Congress Has Otherwise Limited Pre-Removal Process With Respect To Such Individuals</u>

As previously explained, the INA and its implementing regulations set out a comprehensive scheme that governs the detention of noncitizens subject to expedited removal and prescribes certain procedural rights to such individuals. First, section 1225(b)(1)(B)(iii)(IV) requires the "[m]andatory detention" of "[a]ny alien subject to [expedited removal] ... pending a final determination of [a] credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); *see also* 8 C.F.R. § 235.3(b)(4)(ii) ("Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained."). Second, section 1225(b)(1)(B)(iv) provides that "[a]n alien who is eligible for [a credible fear] interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General[,]" though "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. §§ 208.30(d)(4) ("The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof," and "[a]ny person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview."), 235.3(b)(4)(ii) ("Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing.") The regulations that implement expedited removal, as referenced in section 1225(b)(1)(B)(iv), further clarify that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained[.]" 8 C.F.R. § 235.3(b)(4)(ii). Read together, the text of these provisions provide noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained.

Critically, this limited right to consultation in accordance with the policy and procedures of the detention facility also arises only during the threshold credible fear screening phase of the expedited removal process. As explained in Part I.A above, "federal immigration law plainly establishes that, for those noncitizens who are designated for expedited

removal[,] ... applying for asylum is a two-stage process[,]" *Kiakombua*, 498 F.Supp.3d at 12, the first of which is specifically intended to **\*26** allow for the rapid identification and removal of noncitizens who do not have credible claims for asylum. At the time that it crafted the expedited removal scheme, Congress was unquestionably concerned about the "thousands of aliens [who were] arriv[ing] in the U.S. at airports each year without valid documents and attempt[ing] to illegally enter the U.S.[,]" and it observed, in particular, that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States [were] cumbersome and duplicative[.]" *MTRNY I*, 405 F. Supp. 3d at 13, 15 (quoting H.R. Rep. No. 104-469, at 107, 158 (1996)) (alterations in original). Consequently, the IIRIRA's expedited removal provisions require certain noncitizens to make a preliminary showing of their potential eligibility for asylum before being placed in full removal proceedings, which "expedite[s] the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States, while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by officers with full professional training in adjudicating asylum claims." *Id.* at 15 (quoting H.R. Rep. No. 104-828, at 209 (1996) (Conf. Rep.)).

The result of this two-step expedited removal system is that noncitizens at the initial screening stage are necessarily granted fewer procedural protections than noncitizens undergoing full removal proceedings. For instance, during formal removal proceedings, noncitizens are given at least 10 days before their first hearing date to secure counsel, *see* 8 U.S.C. § 1229(a)(1)(E), (b)(1), and they "have the privilege of being represented" during those proceedings "by counsel of the alien's choosing[,]" *see id.* §§ 1229a(b)(4)(A), 1362. And the text, structure, and legislative history of IIRIRA's expedited removal provisions make clear that Congress did *not* intend for such procedural safeguards to apply during the initial credible fear stage of the expedited removal process. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 119 (D.D.C. 2019) (noting that expedited removal "affords considerably less process" than formal removal proceedings).

<u>2. The INA Is Silent Regarding Detention Placement With Respect To Noncitizens Who Are Subject To Expedited Removal, And Is At Most Ambiguous With Respect To Consultation, But There Is No Right To Counsel At The Credible Fear Stage</u>

The Court must evaluate Plaintiffs' claim that it violates the INA and its implementing regulations for DHS to place noncitizens who are subject to expedited removal in CBP-run facilities that are not equipped for counsel visits during the credible fear evaluation process with this statutory and regulatory framework in mind. (*See* Compl., Prayer for Relief, ¶ 1 (challenging those aspects of PACR and HARP that "requir[e] that individuals and families remain in CBP custody for the duration of their credible fear proceedings").) Thus, "the precise question at issue" for purposes of the agency-deference doctrines, *see Chevron*, 467 U.S. at 842, 104 S.Ct. 2778, is whether "Congress has directly spoken to" *where* noncitizens subject to expedited removal are to be detained, *see id.* at 842–43, 104 S.Ct. 2778. And there can be no dispute that, despite mandating detention, *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), the statute is silent as to the placement issue. Neither Plaintiffs nor Defendants have identified any statutory text, nor has the Court identified any, that would evince a congressional intent to ensure asylum seekers are detained in any particular facility.

**\*27**  Instead, the statute merely entrusts DHS with specific authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal[,]" *id.* § 1231(g)(1), and if government-run detention facilities "are unavailable[,]" or if other facilities that may be "adapted" for detention or "suitably located for detention" are "unavailable for rental," DHS is authorized to "expend" from specified appropriations "amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention[,]" *id.* This statutory provision evidently relates to "the government's brick and mortar obligations for obtaining facilities in which to detain aliens[,]" *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019), and it plainly falls short of unambiguously requiring asylum seekers to be detained in ICE facilities, rather than CBP facilities. Indeed, if anything, it suggests that Congress was well aware that such noncitizens might be detained in different kinds of facilities, either government owned or otherwise, depending on need and availability.

It appears to be precisely because the INA is silent about detention placement that Plaintiffs have grounded their challenge in another provision of that statute: the requirement that noncitizens who are subject to expedited removal "may consult with a person or persons of the alien's choosing prior to the [credible fear] interview or any review thereof[.]"

8 U.S.C. § 1225(b)(1)(B)(iv). Plaintiffs contend that this "right to access counsel in credible fear proceedings is a right of *meaningful* opportunity to *meaningfully* access counsel" (Pls.' Mot. at 41; *see also* Pls.' Reply at 44–45), which they say requires "in-person access to attorneys or others and regular telephonic access" to counsel (*see* Pls.' Mot. at 46). But after employing the "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, 104 S.Ct. 2778, the Court finds that the statute's right to consult provision is ambiguous, or at least does not unambiguously mandate the specific means of consultation that Plaintiffs propose.

Beginning with the text itself, the INA does not define "consult" or provide any statutory boundaries on what consultation entails. To the extent that divining whether a term is ambiguous comes from the possibility of multiple interpretations, it is clear that "consult" is susceptible to different meanings—that is, consult might mean an in-person meeting between two people, but it might also mean one or more phone calls. The statute's statement that a noncitizen who is eligible for a credible fear interview "may" consult with a person of her choosing is also seemingly ambiguous insofar as it could mean that providing such noncitizen an opportunity for such consultation (such as giving her access to a phone and a list of numbers) suffices, or it could indicate that the noncitizen must be placed in a circumstance in which actual contact with a person of her choosing is assured, as Plaintiffs maintain. And while it is important to "read" the contested provision of a statute, it is crucial to "read on." *MTRNY II*, 962 F.3d at 625 (internal quotation marks, citation, and alteration omitted). Congress did not *just* provide a right to consultation, it provided a right to "consult with a person or persons of the alien's choosing ... *according to regulations prescribed by the Attorney General.*" 8 U.S.C. § 1225(b)(1)(B)(iv) (emphasis added). This additional caveat strongly suggests that Congress intended the agency itself to utilize its expertise to determine the scope of the right to consult that the statute prescribes.

**\*28**  Undaunted, Plaintiffs point to two other statutory mandates that they say unambiguously eliminate DHS's prerogative to detain noncitizens who are awaiting expedited removal in facilities that limit their ability to consult with counsel: (1) the statement in the INA that, "[i]n any removal proceedings before an immigration judge ..., the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose[,]" 8

U.S.C. § 1362, and (2) the APA's requirement that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel[,]" 5 U.S.C. § 555(b). (*See* Pls.' Mot. at 40–41.) These provisions are plainly inapposite during the credible fear stage of expedited removal proceedings, for several reasons.

First of all, section 1362 of the INA expressly pertains only to "removal proceedings before an immigration judge," 8 U.S.C. § 1362, and it is clear from the text of the statute that expedited removal proceedings under section 1225(b) are *not* "removal proceedings" within the meaning of section 1362 of the INA. Indeed, section 1229a of the INA is specifically titled "Removal proceedings[,]" and that section establishes various procedures that are applicable to such a proceeding, including that an immigration judge "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses[,]" *id.* § 1229a(b)(1), and that the noncitizen has the "opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses[,]" *id.* § 1229a(b)(4)(B). None of those procedures are available when an immigration judge is reviewing an asylum officer's negative credible fear determination in the context of the expedited removal scheme. *See id.* § 1225(b)(1)(B)(iii)(III) (providing that "[s]uch review shall include an opportunity for the alien to be heard and questioned by the immigration judge"). Furthermore, nowhere in section 1225(b)—the statutory provision governing expedited removal and the credible fear process—does Congress refer to an immigration judge's review of a negative credible fear determination as a "removal proceeding," even though that phrase is otherwise used liberally throughout the INA. Its conspicuous absence in section 1225(b) is plainly indicative of Congress's intent to distinguish expedited removal processes. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

The text of section 1362 itself further undermines any inference that Congress intended that provision's right to counsel to apply to an immigration judge's review of a negative credible fear determination. Section 1362 provides a right to counsel in "removal proceedings" *and* in "appeal proceedings before the Attorney General from any such

removal proceedings," 8 U.S.C. § 1362, but, in the expedited removal context, there is no right to appeal from an immigration judge's affirmance of a negative credible fear determination, *see id.* § 1225(b)(1)(C). Thus, an immigration judge's review of a negative credible fear determination (which has no appeal mechanism) cannot be the kind of removal proceeding contemplated by section 1362 (which envisions an appeal from the removal proceeding). *See McDonnell v. United States*, ––– U.S. ––––, 136 S. Ct. 2355, 2368, 195 L.Ed.2d 639 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, **\*29** a word is known by the company it keeps." (internal quotation marks and citation omitted)).

Plaintiffs' invocation of the right to counsel in section 555(b) of the APA is similarly unavailing. In *Ardestani v. I.N.S.*, 502 U.S. 129, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991), the Supreme Court reaffirmed its prior holding in *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), that, in enacting the INA, Congress " 'expressly supersede[d]' the hearing provisions of the APA[.]" *Ardestani*, 502 U.S. at 133, 112 S.Ct. 515 (quoting *Marcello*, 349 U.S. at 310, 75 S.Ct. 757). Although those cases assessed the applicability of the APA to traditional removal proceedings, as they were decided before the expedited removal system was introduced (*see* Pls.' Reply at 48), the reasoning of *Ardestani* and *Marcello* is not limited to proceedings in the traditional removal process; instead, *Ardestani* generally explains that "immigration proceedings ... are not governed by the APA[,]" and again, as relevant here, "that the INA 'expressly supersedes' the hearing provisions of the APA[.]" *Ardestani*, 502 U.S. at 133, 112 S.Ct. 515 (quoting *Marcello*, 349 U.S. at 310, 75 S.Ct. 757). Because section 1225(b) is a part of the INA, and because proceedings related to expedited removal under section 1225(b) qualify as immigration proceedings, *Ardestani*'s holding precludes application of the APA's counsel provision in the context of the credible fear evaluation process.

The bottom line is this: despite mandating that noncitizens who are awaiting credible fear assessment must be detained and may consult with a person of their choosing during that detention, the INA does not speak to the issue of *where* such persons are to be housed, nor does it establish that such noncitizens have a right to access counsel prior to the credible fear interview. Therefore, the Court cannot accept Plaintiffs' argument that PACR and HARP's detention-placement policy (which effectively limits access to counsel by housing noncitizens in CBP facilities) conflicts with the

INA and the unambiguous will of Congress as expressed in that statute.

### 3. The PACR And HARP Detention-Placement Policy Is Both Reasonable And Entitled To Deference

Because the applicable provisions of the INA are silent as to where an asylum seeker subject to expedited removal may be detained, and are at most ambiguous as to the scope of the consultation right during the credible fear screening process, the Court next considers whether PACR and HARP's detention-placement policy "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. As explained below, in this Court's view, Defendants' interpretation of the statute to authorize placement in CBP facilities is not unreasonable in light of Congress's clear intent that the expedited removal process be highly truncated and subject to fewer procedural guarantees than formal removal proceedings.

Where the relevant statute is ambiguous or silent on the relevant issue, as is the case with the INA here, the Court looks to the "agency regulations, which are entitled to deference if they resolve the ambiguity in a reasonable manner[,]" and if they, too, are ambiguous, the Court then looks "to the agencies' subsequent interpretation of those regulations." *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 277–78, 129 S.Ct. 2458, 174 L.Ed.2d 193 (2009). "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory **\*30** authority." *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 449 (D.C. Cir. 2016) (emphasis omitted) (quoting *City of Arlington v. F.C.C.*, 569 U.S. 290, 297, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013)); *see also Kisor*, 139 S. Ct. at 2414–15 (interpretations of regulations).

Here, the implementing regulations provide that "the alien shall be given time to contact and consult with any person or persons of his or her choosing" and that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). Under PACR and HARP, an asylum seeker's consultation with a person of his or her choosing is available in accordance with the policies and procedures

of the CBP facilities where noncitizens who are subject to those programs are detained, and while CBP facilities do not allow in-person visitation, consultation is available telephonically. (*See* Admin. R. at AR641 (concerning PACR), AR645 (concerning HARP).) The PACR guidance document specifically states that asylum seekers shall have access to telephones "as often as operationally feasible" to "consult with any person of their choosing, including an attorney" (*id.* at AR641), and that "[t]he alien's consultant or attorney may participate in the interview telephonically" (*id.* at AR642). Similarly, the HARP guidance document requires that asylum seekers have an "opportunity to contact an attorney" through an initial one-hour period for telephonic consultation, with "30-minute follow-up as needed[,]" and instructs that "[t]he location for consultation calls must allow sufficient privacy to allow for discussion of confidential matters." (*Id.* at AR645.) Given the latitude that the INA and its implementing regulations provide, it was reasonable for DHS to conclude that the means of communication with counsel or prospective counsel that are established with the PACR and HARP pilot programs provide noncitizens with a legally sufficient opportunity to consult with others, including a lawyer, before their credible fear interviews or immigration judge review.

Congress's intent in creating the expedited removal system further underscores the reasonableness of the agency's interpretation. Again, Congress imposed the threshold credible fear "screening interview[,]" *Thuraissigiam*, 140 S. Ct. at 1965, to permit the agency to "quickly identify potentially meritorious claims to protection and to resolve frivolous ones with dispatch[,]" *Kiakombua*, 498 F.Supp.3d at 13 (internal quotation marks and citation omitted). The credible fear interview is intended to pose a "low bar" for asylum applicants, *Thuraissigiam*, 140 S. Ct. at 1967; thus, the noncitizen need only demonstrate "a significant possibility" that he or she "could establish eligibility for asylum[,]" 8 U.S.C. § 1225(b)(1)(B)(v), not that "he or she *is in fact eligible* for asylum[,]" *Thuraissigiam*, 140 S. Ct. at 1965. Accordingly, Congress provided for "considerably less process" in expedited removal proceedings than in full removal proceedings, *see O.A.*, 404 F. Supp. 3d at 119, as exemplified by the fact that the statute provides only a limited right during expedited removal to "*consult with* a person or persons of the alien's choosing prior to the [credible fear] interview or any review thereof," *see* 8 U.S.C. § 1225(b)(1)(B)(iv) (emphasis added), whereas noncitizens in full removal proceedings "shall have the privilege of *being represented* ... by counsel of the alien's choosing" at all stages of the removal proceedings, *see id.* § 1229a(b)(4)(A) (emphasis added). And

this clear congressional purpose belies the contention that DHS has exceeded the bounds of its statutory authority in deciding that in-person **\*31** counsel visits are not statutorily mandated and that the telephone access available at CBP facilities satisfies asylum seekers' limited consultation rights under section 1225(b)(1)(B)(iv).

In addition to the substantive reasonableness of the agency's interpretation, the other factors for determining that deference to the agency's interpretation is proper, *see Kisor*, 139 S. Ct. at 2416–18, support deference here. The heads of the DHS subcomponent agencies have attached their names to the PACR and HARP guidance documents, which means that these programs have now been implemented by the relevant subcomponent agencies and qualify as the authoritative position of DHS concerning the detention placement of persons who are selected for those programs. *See id.* at 2416 ("[T]he regulatory interpretation must be ... the agency's 'authoritative' or 'official position[.]' " (citation omitted)). Similarly, PACR and HARP plainly implicate DHS's "substantive expertise" in the enforcement of the immigration laws, *id.* at 2417, particularly in light of Congress's mandate that asylum seekers be detained pending the credible fear process. The PACR and HARP detention-placement policy also reflects DHS's "fair and considered judgment"—it is not a "convenient litigating position" or "*post hoc* rationalization[,]" nor is it based on a "new interpretation" of the governing regulations, *see id.* at 2417–18 (citations and alteration omitted); indeed, the agency has held the view that an asylum seeker's ability to consult is determined based upon the policies and procedures of the detention facility since at least 1997, *see Inspection and Expedited Removal of Aliens*, 62 Fed. Reg. 10,312, 10,356 (Mar. 6, 1997). To be sure, the detention facility for noncitizens who are subject to expedited removal has changed, and thus the scope of the consultation right of such detainees has changed, but DHS has consistently interpreted the agency's statutory and regulatory authority to decide the circumstances under which consultation is to be achieved with respect to noncitizens facing expedited removal. Therefore, under the circumstances presented here, the agency is owed deference with respect to its determination that PACR and HARP satisfy all statutory and regulatory requirements. *See Kisor*, 139 S. Ct. at 2418; *see also United States v. Mead Corp.*, 533 U.S. 218, 229–31, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (discussing similar factors in context of agency interpretations of statutes).

Plaintiffs raise only one other argument as to why PACR and HARP are inconsistent with the INA that requires a brief discussion here. Plaintiffs point out that PACR and HARP do not prescribe a period of consultation *after* a negative credible fear determination and prior to any immigration judge review thereof, and they assert that the INA requires such a period. (*See* Pls.' Reply at 46–47. *But see* Hr'g Tr., ECF No. 62, at 75:8–21 (defense counsel explaining that PACR and HARP both require Form M-444 to be provided to asylum seekers, and that Form M-444 informs asylum seekers of their right to consult prior to any immigration judge review).) The Court observes that the statute does require that asylum seekers have the opportunity to consult with a person of their choosing "prior to the [credible fear] interview or any review thereof," 8 U.S.C. § 1225(b)(1)(B)(iv), and that neither PACR nor HARP expressly mandates a consultation period before the immigration judge review. But it cannot read the *absence* of an express reference to such a consultation period in PACR and HARP as a *prohibition* of such consultation, and only the latter would qualify as a true conflict for **\*32** the purpose of this Court's review. This is because the Court only has the statutory authority to determine whether a *written* policy or procedure is inconsistent with the INA and its implementing regulations, *see id.* § 1252(e)(3)(A)(ii), and to the extent Plaintiffs ask this Court to find the absence of any particular language to be inconsistent with the applicable statutory or regulatory schemes, it appears that the Court lacks jurisdiction to do so, *cf. Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998) ("*AILA I*") (holding that "unwritten" policies are unreviewable), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000). [12]

Thus, although Plaintiffs ask this Court to engraft their conception of "meaningful" consultation onto the statutory text (*see* Pls.' Mot. at 41–44), Congress has broadly entrusted DHS with the operation of the expedited removal system, and has limited the Court's review to a determination of whether any of the agency's written policies that implement the system is inconsistent with the INA. In the absence of any indication in the INA that the meaning of the word "consult" entails more than the availability of a phone and a period of time to make phone calls, the Court discerns no such conflict. Furthermore, given Congress's clear intent to afford noncitizens who are subject to expedited removal fewer procedural rights in order to facilitate the expeditious processing of their asylum claims, the Court cannot find that DHS acted unreasonably when it adopted detention-placement policies that have the effect of restricting counsel access. *Cf. AILA I*, 18 F. Supp. 2d at 56 (noting that the court

"cannot impose upon the Attorney General any obligation to afford more procedures than the governing statute explicitly requires" (citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 524–25, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978))).

### 4. The PACR And HARP Detention-Placement Policy Does Not Violate Any Other Provision Of Law The Plaintiffs Have Identified

The Court is also not persuaded that PACR and HARP's policy of detaining asylum seekers in CBP custody during the credible fear process violates the rights of such individuals to seek relief under the asylum laws, *see* 8 U.S.C. § 1158, statutory withholding of removal, *id.* § 1231(b)(3)(A), and the Convention Against Torture ("CAT"). (*See* Pls.' Mot. at 46–47.) [13] In this regard, Plaintiffs maintain that when Congress created statutory rights to these protections, "it intend[ed] that they be *meaningful*—with a fair process" (*id.* at 46), and Plaintiffs insist that detention in CBP custody, and its constraints on consultation with counsel, deprive asylum seekers of a meaningful opportunity to seek refuge in violation of these provisions of law.

As an initial matter, the Court notes that a grant of asylum under the INA and the "withholding of removal" or CAT "protection against removal" are different legal constructs, and, on its face, the limited **\*33** process available in the expedited removal scheme appears to "refer[ ] only to proceedings to establish eligibility for an affirmative grant of asylum[.]" (Admin. R. at 377 (Transit Rule)); *see also* 8 U.S.C. § 1225(b)(1)(A)(ii) (requiring a credible fear screening interview when a noncitizen "indicates either an intention to apply for asylum under section 1158" or "a fear of persecution"). DHS's regulations suggest that noncitizens in expedited removal proceedings may still raise claims for statutory withholding or CAT protection, regardless of whether they are eligible for asylum, *see* 8 C.F.R. §§ 208.13(c)(1), 208.30(e)(2)–(4), 1208.13(c)(1), 1208.16(a), and Defendants here do not argue otherwise (*see* Defs.' Mot. at 39–41). Therefore, this Court assumes without deciding that noncitizens subject to expedited removal retain the right to apply for statutory withholding of removal and CAT protection, and *that* finding is tantamount to a conclusion that Plaintiffs' claim that PACR and HARP deprive individuals of "a meaningful opportunity to apply for ... withholding of removal, and CAT relief" (Compl. ¶ 209 (Fifth Claim)) fails as a matter of law.

In any event, Plaintiffs do not illuminate the contours of the alleged deprivation of the "meaningful opportunity" to apply for asylum, withholding, and CAT protection (*see id.*), and their claim in this regard otherwise appears to be entirely derivative of Plaintiffs' consultation claims, which the Court has already rejected. That is, other than the right to consult, Plaintiffs have not assailed any DHS actions pursuant to PACR and HARP as a violation of some specified procedural requirement of any of these statutory schemes. [14] And having already provided a lengthy explanation of both why the law does not grant asylum seekers any particular right to access counsel during the credible fear process, and also why PACR and HARP do not violate the right to consult generally, the Court cannot conclude that asylum seekers are nevertheless being effectively denied the right to seek relief under any of these other statutory mechanisms as a result of PACR and HARP.

### C. PACR And HARP Do Not Violate The APA's Reasoned Decisionmaking Requirements

With respect to the claim that the detention-placement policies in PACR and HARP were promulgated in an arbitrary and capricious fashion in violation of the APA (*see* Compl. ¶¶ 207–08 (Fourth Claim)), Plaintiffs argue, *inter alia*, that Defendants failed to "provide any reason for their shift to keeping asylum seekers in CBP custody throughout the credible fear process" (Pls.' Mot. at 23), and did not "acknowledge or explain their departure from keeping asylum seekers in ICE facilities—subject to ICE standards—during that process" (*id.* at 23–24). According to Plaintiffs, Defendants also ignored "the flaws with this plan, namely how it would obliterate asylum seekers' ability to adequately prepare for the credible fear process and effectively prohibit them from meaningfully accessing counsel[.]" (*Id.* at 24). In support of these arguments concerning the alleged unreasonableness of the agency's decision making, Plaintiffs offer evidence outside of the administrative record concerning the conditions of detention in CBP facilities, as well as evidence **\*34** about the policies and procedures for conducting the credible fear process in ICE detention. (*See* Index of Exs. Accompanying Pls.' Mot. for Summ. J., ECF No. 35-4.) Plaintiffs further maintain that the challenged detention-placement decision "is illogical in light of the evidence in the [administrative record]" (Pls.' Mot. at 24), because "the new policy fundamentally misunderstands the purpose of the credible fear process and makes it meaningless" (*id.*).

This Court rejects Defendants' threshold argument that the detention-placement policy is not subject to judicial review under the APA, for the reasons that follow, but concludes that Plaintiffs' arbitrariness claim fails on the merits. And, notably, the Court reached the latter conclusion without relying on Plaintiffs' extra-record evidence, which is not relevant to the legal challenge over administrative action that Plaintiffs are bringing in this case.

1. <u>PACR And HARP Are Reviewable Under The APA</u>

Defendants argue that "if [the INA's] section 1252(e)(3) is what provides Plaintiffs' cause of action, then they cannot separately allege that PACR and HARP are arbitrary and capricious" under the APA. (Defs.' Reply at 25.) This contention fails to account for the well-established principle that there must be a cause of action *for each legal claim* that is asserted in a complaint, and as this Court explained in *Kiakombua*, "section 1252(e)(3) creates a cause of action to review the [challenged policy's] consistency with the INA (as amended) and its implementing regulations[,]" *Kiakombua*, 498 F.Supp.3d at 37 n.13, while an entirely different claim— one that pertains to the alleged unlawfulness of the agency's decision making process—exists, where applicable, under the APA, *see MTRNY I*, 405 F. Supp. 3d at 38–39.

It is certainly true that section 704 of the APA provides a cause of action to challenge only "[a]gency action made reviewable by statute" and/or "final agency action for which there is no other adequate remedy in a court[,]" 5 U.S.C. § 704, and that, if a statute otherwise "define[s] the specific procedures to be followed in reviewing a particular agency's action[,]" the APA should not be construed to create a duplicative cause of action, *see Bowen v. Massachusetts*, 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (explaining that Congress did not intend the APA to "duplicate existing procedures for review of agency action" or "provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures"). But the INA itself creates only a limited cause of action—one that permits a plaintiff to claim that an agency's "written policy directive, written policy guideline, or written procedure" concerning the implementation of the expedited removal scheme "is not consistent with applicable provisions of" the INA, 8 U.S.C. § 1252(e)(3)(A)(ii)—and under the circumstances presented here, there is no "clear and convincing evidence" of any "legislative intent" to preclude non-duplicative legal claims

that would otherwise be available under the APA or any other statute that expressly creates a cause of action, *see Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009) (internal quotation marks and citation omitted). Indeed, section 1252(e)(3) specifically authorizes claims that an agency policy directive, guideline, or procedure concerning expedited removal is "otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(ii); *cf. MTRNY II*, 962 F.3d at 631–34 (holding that APA review of DHS's designation decision pursuant to section 1225(b)(1)(A)(iii)(I) is precluded based on Congress's expressed intent to confer to **\*35** the agency "sole and unreviewable discretion" over that determination, but *not* indicating that section 1252(e)(3) itself generally precludes all claims brought under the APA). Thus, section 1252(e)(3) of the INA appears to make the detention-placement policy in PACR and HARP "reviewable by statute" within the meaning of section 704 of the APA, such that the APA's cause of action to claim unlawful arbitrary decision making is available to Plaintiffs under the circumstances presented here. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (suggesting that "[a]gency action made reviewable by statute" encompasses when review is sought "pursuant to specific authorization in the substantive statute" rather than "the general review provisions of the APA"); *see also MTRNY I*, 405 F. Supp. 3d at 42 (distinguishing between "a challenge to the substantive decision that the agency has made" and a challenge to the agency's "decision making process" (emphasis omitted)).

Defendants' alternative contention that Plaintiffs cannot rely upon the APA cause of action because there is no "final" agency action when it comes to PACR and HARP (Defs.' Mot. at 42) also fails, because section 704's finality requirement is plainly met here. To be final, an agency action (i) "must mark the 'consummation' of the agency's decisionmaking process" such that it is not of "a merely tentative or interlocutory nature"; and (ii) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' " *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted). Defendants are correct to observe that PACR and HARP are "pilot program[s]" (Defs.' Mot. at 42), and that DHS agencies will be required to "work together" to assess these policies' effectiveness, to "adjust resources and procedures as necessary[,]" and to evaluate where a noncitizen should be detained based on "resource and space constraints" (*id.*). But the D.C. Circuit has been clear that "the issuance of a [mere] guideline or guidance may constitute final agency action[,]" *Barrick Goldstrike*

*Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000), and there is no question that the "impact" of PACR and HARP is "sufficiently direct and immediate" that they "directly affect the parties" in this case, *Franklin v. Massachusetts*, 505 U.S. 788, 796–97, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (internal quotation marks and citation omitted). In fact, it is undisputed that the individual Plaintiffs were directly and immediately affected by PACR and HARP: they were detained in CBP custody instead of ICE custody, and were subjected to an expedited timeframe of five to seven days for the completion of their credible fear process. Thus, PACR and HARP unquestionably qualify as "final agency action" for the purpose of section 704 of the APA.

To the extent that Defendants further contend that this Court may not review Plaintiffs' APA claims concerning the detention-placement policy because the PACR and HARP programs constitute "agency action" that is "committed to agency discretion by law" (Defs.' Mot. at 42 (quoting 5 U.S.C. § 701(a)(2))), the Court is not persuaded that is so. Because "immigration officers have discretion on whether to place an alien in PACR and HARP" as a general matter, there is a sense in which the detention-placement policy is committed to agency discretion within the context of each application. (*Id.* at 43.) But the narrow question that arises under that APA exception is whether the "relevant *statute*" that confers discretion to the agency provides so much discretion that a court "would have no meaningful **\*36** standard against which to judge the agency's exercise of discretion." *Dep't of Commerce v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2568, 204 L.Ed.2d 978 (2019) (emphasis added) (internal quotation marks and citation omitted). And Defendants have made no argument that the INA itself provides so much discretion to DHS concerning the placement of detained noncitizens that PACR and HARP are shielded from arbitrary and capricious review. *Cf. MTRNY II*, 962 F.3d at 632 (finding that Congress's grant of authority to the Secretary to designate populations amenable to expedited removal, where "[s]uch designation shall be in the sole and unreviewable discretion of the [Secretary][,]" fell into the discretionary exception to the APA (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(I))). Therefore, this Court sees no good argument for invoking here the exceedingly narrow exception to APA review for agency actions that are committed to agency discretion by law.

### 2. <u>DHS Did Not Issue PACR And HARP In An Arbitrary And Capricious Manner</u>

That said, this Court cannot conclude that Defendants undertook to adopt the challenged detention-placement policy in a manner that violates the APA's reasoned decision making standards, as Plaintiffs claim. (*See* Pls.' Mot. at 23 (citing 5 U.S.C. § 706(2)(A)).) To buttress the contention that PACR and HARP resulted from arbitrary and capricious decision making, Plaintiffs point to various alleged deficiencies in DHS's decision making process—they say, for example, that the agency did not adequately explain the change in its detention policy (*see id.* at 24); Defendants failed to consider the consequences of detaining asylum seekers in CBP custody rather than ICE custody (*see id.* at 24–25), or the particular needs of individuals undergoing the credible fear process (*see id.* at 28–34); PACR and HARP are inconsistent with the record evidence (*see id.* at 36); and these programs are incompatible with the credible fear process itself (*see id.* at 37). This Court finds that these contentions are not supported by the record for the following reasons, and it concludes, to the contrary, that Defendants' new policies were sufficiently reasoned to meet the procedural requirements of the APA.

First of all, the administrative record amply demonstrates that, when determining whether or not a new protocol for expediting the removal of certain noncitizens should be established, "DHS considered the migration crisis along the southwest border, the increase in asylum claims, and the limited resources of ICE detention." (Defs.' Mot. at 44 (citing record evidence of the statistical increase in the number of persons entering the United States along the Southwest border, as well as statistics on the number of persons seeking asylum).) In particular, the record reflects that DHS was seeking to "effectuate removals of amenable aliens" in order to "address the migration crisis along the Southwest Border" (Admin. R. at AR636), and that, because ICE facilities are subject to significant "resource constraints," the agency determined that "detention in an ICE facility" was a "limited tool" for expeditiously processing aliens amenable to removal (*id.* at AR639). [15] The agency also **\*37** noted that it was "extremely challenging to detain family units in an ICE Family Residential Center" because of "a 2015 judicial reinterpretation of" a consent decree (*id.*), which prohibited ICE from detaining family units for longer than 20 days at facilities that are not licensed under state law (*see id.* at AR212–13).

It also appears that PACR was implemented to process the asylum prospects of noncitizens who were subject to the Transit Rule, and that DHS decided that it could do so expeditiously, given that such individuals are barred from asylum eligibility and must meet the higher bar for statutory withholding of removal and CAT protections. (*See id.* at AR640; *see also supra* note 5.) DHS also explained that the goal of PACR and HARP was to expedite the credible fear process for certain asylum seekers and simultaneously reduce resource constraints at ICE facilities. (*See* Defs.' Mot. at 44; *see also* Admin. R. at AR640 (asserting that CBP and ICE can "leverage cross-component field discretion, flexibility, and coordination to account for local conditions and available resources and infrastructure"), AR641 (noting that the El Paso location where PACR was piloted "has a significant volume[,]" and discussing "streamlined procedures" for processing noncitizens subject to PACR).) In this Court's considered judgment, these and other observations are sufficient to demonstrate that DHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks and citation omitted).

Plaintiffs' primary response is that Defendants have nonetheless failed to "acknowledge *the significance* of their shift away from detaining individuals in ICE custody[.]" (Pls.' Mot. at 24 (emphasis added).) In this regard, Plaintiffs insist that ICE facilities have more favorable practices with respect to detained noncitizens—as if it is the ICE procedures from which the agency is now departing (thereby necessitating an explanation as to why DHS is no longer providing those processes). (*See id.* at 25–27.) But as far as this Court can tell, there has been no change concerning the policies and procedures that pertain to persons detained in ICE facilities; instead, as Defendants note, what has changed is the agency's decision to keep some asylum seekers in CBP custody during an accelerated credible fear review process. (*See* Defs.' Mot. at 46.) And, in this Court's view, DHS has provided a rational explanation for *that* change, given the volume of asylum seekers, the agency's resource needs, and the fact that certain noncitizens are not eligible for positive credible fear determinations under the Transit Rule, as explained above. It is also clear that, to the extent that the memoranda that establish PACR and HARP also provide guidance as to how the credible fear process will operate under the institutional constraints of CBP facilities, those

appear to be entirely *new* policies—CBP did not previously have any policies with respect to credible fear interviewees detained in their facilities—so there is no argument that, with respect to these policies, Defendants have departed from prior policies without a sufficiently reasoned explanation.

Thus, when the policy at issue is identified properly, it appears that what Defendants **\*38** have said about the perceived need to detain certain noncitizens in CBP custody, when such persons were previously placed in ICE detention facilities, is sufficient to demonstrate the agency's "awareness that it *is* changing position[,]" which is the minimum that reasoned decision making requires. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). Furthermore, the impact of the changed detention-placement policy on the noncitizens who are placed in the PACR and HARP programs is self-evident under the circumstances presented here—*i.e.*, the agency rationally concluded that detaining certain noncitizens in CBP custody would mean that fewer procedural protections would have to be provided, which, in turn, would result in the faster processing of noncitizens who are slated for expedited removal in the context of a resource-constrained immigration system. (*See* Admin. R. at AR639–40.) The agency nevertheless specifically acknowledged that asylum seekers must be provided both an opportunity to consult with a person of their choosing and a list of attorneys to contact, and it explained that noncitizens in CBP custody would have access to telephones for that purpose (*see* Admin. R. at AR641, AR645). And, unlike prior cases in which agencies were found to have engaged in arbitrary decision making, there is no evidence here that shifting away from the prior policy of detaining such individuals in a facility that provided more and better access to counsel "engendered serious reliance interests[,]" *Fox Television*, 556 U.S. at 515, 129 S.Ct. 1800, at least as far as asylum seekers who are slated for expedited removal are concerned.

Thus, this Court cannot find that Defendants failed to consider the relevant consequences of the detention-placement policy when it promulgated PACR and HARP. (*See* Pls.' Mot. at 24–27.) To the contrary, it appears that more efficient processing of certain noncitizens who are subject to expedited removal *was the entire goal* of the challenged policy, and the agency not only fully articulated that goal, but its objective was consistent with applicable statutory and regulatory requirements, as explained in Part III.B.3, *supra.* Consequently, PACR and HARP's detention-

placement policy cannot be deemed arbitrary and capricious in violation of the APA. [16]

### D. PACR And HARP Do Not Violate Any Due Process Rights Of These Particular Plaintiffs

Plaintiffs' final claim is that PACR and HARP violate noncitizens' "Fifth Amendment procedural due process right to petition the government" for asylum, statutory withholding, and CAT protection. (Pls.' Mot. at 47 (quoting *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989)); **\*39** *see also* Compl. ¶¶ 210–13 (Sixth Claim).) Claims of constitutional violations have a cause of action that derives directly from the Constitution itself, *see McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 490 (D.C. Cir. 2008) ("Inferring a cause of action from the Constitution squares with the 'presum[ption] that justiciable constitutional rights are to be enforced through the courts.' " (citation omitted)), but such a cause of action is not always fully available to every claimant. As relevant here, the Supreme Court recently clarified that, for a noncitizen who is undergoing the credible fear process and has not yet "effected an entry" within the territory of the United States, "the Due Process Clause provides nothing more" than the right, provided under section 1225(b) of the INA, to a " 'determination' [of] whether he had 'a significant possibility' of 'establishing eligibility for asylum[.]' " *Thuraissigiam*, 140 S. Ct. at 1982–83 (original alterations incorporated) (quoting 8 U.S.C. § 1225(b)(1)(B)(ii), (v)). In *Thuraissigiam*, the Court further held that—regardless of whether a noncitizen is "detained shortly after unlawful entry" (for example, "25 yards into U.S. territory"), or is detained "at a port of entry" such as an international airport (which is, technically, U.S. soil), or is first detained at the border and then paroled into the country pending removal—noncitizens who have not "effected an entry" in the United States are only entitled to the process that Congress has afforded them by statute. *Id.*; *see also id.* at 1982 (citing numerous precedents for the proposition that, for aliens seeking entry, due process is what Congress provides, such as *Ekiu v. United States*, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892), *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950), *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953), and *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)).

This means that the only process that was due to the individual Plaintiffs in this case under the Constitution was the process

that Congress has afforded by statute. And that contention brings us back to Plaintiffs' primary claim that PACR and HARP prevent an asylum seeker from meaningful access to counsel in violation of the INA and similar statutes. (*See* Pls.' Reply at 50.) But this Court has already found that PACR and HARP conform with the statutory requirement that asylum seekers have the right to consult, and that Defendants did not unlawfully deprive these Plaintiffs of the requisite evaluation process by detaining them in a facility with limited access to counsel. (*See supra* Parts III.B.2–4.) Accordingly, PACR and HARP do not violate the Fifth Amendment rights of the individual Plaintiffs in the instant case (each of whom was detained upon arrival pending a credible fear assessment pursuant to 8 U.S.C. § 1225(b)). [17]

## IV. CONCLUSION

This Court has reviewed the record and the declarations of the individual Plaintiffs, and is cognizant of the hardships that certain noncitizens who arrive at the southern border seeking asylum face. But Plaintiffs' arguments about the detention-placement policy that DHS has adopted cannot be squared with the manifest purpose of the **\*40** expedited removal scheme, which is to authorize the agency that administers the federal government's immigration laws to make efficient distinctions between noncitizens who have potentially meritorious claims to protection and those who do not. Congress has also given considerable discretion to DHS to implement the expedited removal process, and the fact that DHS previously afforded asylum seekers greater access to counsel than the law requires does not demonstrate that it is unlawful for the agency to scale back such practices in a resource-constrained environment and in the context of a congressional determination that expeditious removal of certain noncitizens is warranted. Thus, as explained herein, this Court cannot find that the detention-placement policy of the PACR and HARP programs is inconsistent with statutory, regulatory, or constitutional requirements, or that it was adopted in an arbitrary and capricious manner in violation of the APA. Accordingly, as set forth in the accompanying Order, Plaintiffs' motion for summary judgment (ECF No. 35) will be **DENIED**, and Defendants' motion for summary judgment (ECF No. 49) will be **GRANTED**.

### All Citations

507 F.Supp.3d 1

### Footnotes

1    This Memorandum Opinion uses the term "noncitizen" in lieu of the term "alien" to refer to "any person who is not a citizen or national of the United States." *Pereira v. Sessions*, ––– U.S. ––––, 138 S. Ct. 2105, 2110 n.1, 201 L.Ed.2d 433 (2018). The latter is commonly used in immigration-related statutes and regulations. *See, e.g.*, 8 U.S.C. § 1101(a)(3).

2    Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

3    As this Court explained in *Kiakombua*, by statute, DHS "has 'sole and unreviewable discretion' to 'designate[ ]' for expedited removal 'any or all' noncitizens who are deemed inadmissible (as defined by sections 1182(a)(6)(C) and (a)(7) of the INA) and who have 'not affirmatively shown' that they have 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility[.]' " *Kiakombua*, 498 F.Supp.3d 12 n.3 (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(I)–(II)). Until recently, the agency "opted to designate for expedited removal only those inadmissible noncitizens who were encountered near the border and had been in the country for no longer than 14 days"; however, "[i]n July of 2019, DHS issued a notice that expands the categories of individuals who are subject to expedited removal, to include all inadmissible noncitizens located 'anywhere in the United States' who have 'not been physically present in the United States continuously for the [preceding] two-year period[.]' " *Id.* (quoting *Designating Aliens for Expedited Removal*, 84 Fed. Reg. 35,409, 35,414 (July 23, 2019)).

4    Although the language of IIRIRA vests authority in "the Attorney General," Congress primarily transferred the INA enforcement functions to the Secretary of Homeland Security in 2002, when DHS was created. *See* Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, § 105, 117 Stat. 11, 531 (codified at 8 U.S.C. § 1103); Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192 (codified at 6 U.S.C. § 251); *see also* 6 U.S.C. § 251 (as amended by Pub. L. No. 114-125, § 802(g)(1)(B)(v)(I), 130 Stat. 122, 212 (2016)); 8 C.F.R. § 2.1. However, the Attorney General retains authority "with respect to all questions of law[.]" 8 U.S.C. § 1103(a)(1).

5    Asylum consideration is effectively precluded through this mechanism, but such a noncitizen may still be eligible for statutory withholding, 8 U.S.C. § 1231(b)(3), or for protection under the Convention Against Torture ("CAT"), *id.* § 1231 note; 8 C.F.R. §§ 208.16–208.18, 1208.16–1208.18, both of which require a finding of "reasonable fear" rather than "credible fear" of persecution, 8 C.F.R. § 208.30(e)(5)(iii). "Reasonable fear" is a significantly higher burden than credible fear; it requires a "reasonable possibility that [an asylum seeker] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that [the alien] would be tortured in the country of removal." *Id.* § 208.31(c).

6    The 24-hour, or one full day, window has been challenged independently, in the context of a different lawsuit filed in this jurisdiction. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 8–9 (D.D.C. 2020). The court in *L.M.-M.* found that the Acting Director of USCIS "was not lawfully appointed to that position under the [Federal Vacancies Reform Act of 1998] and thus lacked the authority to issue the Directive[ ]" that implemented the 24-hour window. *Id.* at 23. The defendants in *L.M.-M.* initially appealed the district court's judgment, but later stipulated to dismiss the appeal voluntarily. *See L.M.-M. v. Cuccinelli*, No. 20-5141, 2020 WL 5358686, at *1 (D.C. Cir. Aug. 25, 2020).

7    Three organizations and one U.S. Senator filed amicus briefs in support of Plaintiffs: Innovation Law Lab (*see* ECF No. 45); American Immigration Council and American Immigration Lawyers Association (*see* ECF No. 46); and Senator Ron Wyden (*see* ECF No. 48).

8    The parties' briefs regarding the motion to strike concern the fact that Plaintiffs have submitted additional materials outside of the administrative record, including declarations from the individual Plaintiffs and documents prescribing standards for ICE detention facilities, in support of their motions for a preliminary injunction and for summary judgment. (*See generally* Exs. A–R to Pls.' Mot. for Prelim. Inj., ECF Nos. 21-2–21-21; Exs. A–C to Pls.' Mot. for Leave to File Under Seal, ECF Nos. 22-1–22-3; Exs. S–W to Pls.' Mot. for Summ. J., ECF Nos. 35-5–35-9.) Plaintiffs assert that this extra-record evidence "is necessary to evaluate Plaintiffs' argument that failing to acknowledge or consider these prior policies and important factors" involving detention in ICE custody "is arbitrary and capricious" under the APA. (Pls.' Opp'n to Defs.' Mot. to Strike, ECF No. 56, at 9.) Plaintiffs also argue that "extra-record evidence is also relevant to numerous issues that are independent of APA analysis[,]" such as "to establish standing, in support of their due process claim, and to show their entitlement to injunctive relief beyond vacatur of the challenged policy." (*Id.*) Defendants have moved to strike these documents because, "[u]nder the APA, the district court's review of merits issues must be based on the record the agency presents to the reviewing court." (Defs.' Mem. in Supp. of Mot. to Strike Evidence Outside of Admin. R., ECF No. 51-1, at 4 (internal quotation marks and citation omitted).) Ultimately, the Court relies only on the individual Plaintiffs' declarations, in conjunction with its analysis of the individual Plaintiffs' Article III standing, which is entirely permissible. *See Sierra Club v. E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002). Moreover, the Court concludes that Plaintiffs' extra-record evidence does not advance their arbitrary-and-capricious claim under the APA, for the reasons explained in footnote 16 (Part III.C.2, *infra*), and thus it has not relied on any such evidence in connection with its evaluation of that argument. Accordingly, Defendants' motion to strike evidence outside of the administrative record is **GRANTED IN PART AND DENIED IN PART**.

9    In response to Defendants' concern that certain aspects of the PACR and HARP program for expedited removals were in place prior to 60 days before the initiation of the lawsuit (*see* Defs.' Mot. at 26), Plaintiffs have clarified that they are not challenging the conditions of confinement or the 24-hour period of consultation prior to the credible fear interview, both of which were implemented prior to the 60-day window (*see* Pls.' Reply at 13).

10   Defendants' insistence that Plaintiffs suffered no procedural injury for standing purposes given that there is no statutory or constitutional right to counsel (*see* Defs.' Reply at 15–16) is unavailing, both because it is does not address the alleged violation of the Plaintiffs' statutory right to consult with a person of their choosing, *see* 8 U.S.C. § 1225(b)(1)(B)(iv), and because denying the alleged procedural violation begs the question of the merits of Plaintiffs' legal claims, which must be assumed at the standing analysis juncture, *see City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003).

11   This clarification is crucial, because Plaintiffs spend a significant portion of their briefing discussing the allegedly superior conditions that detainees are afforded when they are housed in ICE facilities (*see, e.g.*, Pls.' Mot. at 13–17, 24–28); yet, notwithstanding the relative virtues of the ICE housing system, the legal question raised by the claims in Plaintiffs' complaint is whether Defendants' decision to detain noncitizens in CBP custody pending their credible fear review *is unlawful*. This Court's analysis must be confined to *that* determination, despite the perceived benefits of detaining such individuals elsewhere. *Cf. U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674, 697 (D.C. Cir. 2016) (observing that courts "do not inquire as to whether the agency's decision is wise as a policy matter" and "are forbidden from substituting [their] judgment for that of the agency" (internal quotation marks and citation omitted)).

12   Nor can any such conflict determination be made based on the alleged experiences of the individual Plaintiffs who were not provided with an opportunity to consult with anyone prior to the immigration judge's review of the asylum officer's negative credible fear decision (*see* Hr'g Tr. at 80:25–81:2), because, again, in this context, the scope of the Court's authority is limited to the agency's *written* policies and procedures, *see* 8 U.S.C. § 1252(e)(3)(A)(ii).

13    CAT is codified through the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G., tit. XXII, § 2242, 112 Stat. 2681 (*see* 8 U.S.C. § 1231 note), and is implemented through various regulations, *see* 8 C.F.R. §§ 208.16–208.18, 1208.16–1208.18.

14    Plaintiffs' briefs do assert that the "inhumane conditions" of CBP confinement deprive asylum seekers of "meaningful access" to the protections of the asylum laws, statutory withholding of removal, and CAT. (Pls.' Mot. at 47.) But this contention, too, is entirely undeveloped, and Plaintiffs concede that they are not challenging the conditions of confinement. (*See* Pls.' Reply at 13.) Thus, this Court has not considered any such argument.

15    DHS's invocation of "resource constraints" is somewhat oblique, but apparently refers to the greater cost of detaining noncitizens, particularly family units, in ICE detention facilities, and the limited capacity of such facilities. (*See, e.g.*, Admin. R. at AR14) (noting "record increases in particular types of migrants, such as family units, travelling to the border who require significantly more resources to detain and remove"); *id.* at AR211, AR218 (stating that "ICE has finite resources and bed space at" family residential centers, which are "more akin to a dormitory setting[,]" including "suites where each family is housed separately").

16    The Court has reached this conclusion without relying on the extra-record evidence that Plaintiffs have submitted concerning the policies and procedures for conducting the credible fear process in ICE detention, and the conditions of confinement in ICE detention. (*See, e.g.*, Exs. A–R to Pls.' Mot. for Prelim. Inj., ECF Nos. 21-2–21-21; Exs. A–C to Pls.' Mot. for Leave to File Under Seal, ECF Nos. 22-1–22-3; Exs. S–W to Pls.' Mot. for Summ. J., ECF Nos. 35-5–35-9). As the above discussion demonstrates, the detention policies and procedures applicable to ICE facilities are not themselves relevant to this Court's determination of whether PACR and HARP's decision to place noncitizens in CBP custody was the product of arbitrary and capricious decision making, and "it is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *Cf. Hill Dermaceuticals, Inc. v. F.D.A.*, 709 F.3d 44, 47 (D.C. Cir. 2013) (internal quotation marks and citation omitted).

17    The organizational Plaintiff, Las Americas, concedes that it does not have "direct organizational standing" to assert a Fifth Amendment due process claim. (*See* Pls.' Mot. at 48 n.9); *see also Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) ("[P]laintiff organizations do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens subjected to IIRIRA's expedited removal system.").

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

(2) either be translated into a language the noncitizen understands or have a completed interpreter certification. The Asylum Division cannot proceed with a credible fear interview of a noncitizen unless the credible fear referral packet includes a completed Form M-444.

Once the asylum office receives the above forms and verifies that the asylum office has jurisdiction to conduct a credible fear interview and make a credible fear determination, asylum office staff accept the credible fear referral and enter the case into Global. The "Clock-in Date" field on the Entry tab is the date the asylum office receives a complete referral from CBP or ICE. Asylum office staff must enter the credible fear case into Global within one (1) business day of receiving a complete referral packet.

## III.D. ASYLUM OFFICE SCHEDULES INTERVIEW

| **Reviewed, No Substantive Changes since 03/31/2023** | Will be Updated, Changes Pending Review | Finalized Updates |
|---|---|---|
| Sections: | Sections: | Sections: III.D.1.b. |

### 1. Consultation Period (previously titled "48-Hour Hiatus")

It is a policy of the Asylum Program to allow a minimum of 48 hours to transpire between the arrival of an alien at a detention site and any credible fear interview.  This 48-hour period provides an alien an opportunity to rest, collect his or her thoughts, and contact a relative, representative, attorney, or friend whom the alien may want to act as a consultant during the credible fear interview.

If DHS transfers an alien to a new detention site, the 48-hour period begins anew from the alien's arrival at the new detention location.

#### a. Waiver of Consultation Period (previously titled "Waiver of 48-Hour Period")

Although an asylum office must wait at least 48 hours from the alien's arrival at a detention site before interviewing the alien, an alien may, at his or her request, waive the 48-hour period before a credible fear interview.  The asylum office should make every effort to interview the alien as soon as possible after receiving such a request.

If the interview takes place within the 48-hour period, the APSO asks the alien to sign a *Waiver of the 48-Hour Period.* Appendix F: Waiver of the 48-Hour Period.

#### b. Orientation

Before beginning the substantive part of the credible fear interview, the asylum officer must verify that the noncitizen received Form M-444 and understands the credible fear determination process (see 8 CFR 208.30(d)(2)). The asylum officer should remind the noncitizen of the date that they received Form M-444 based on the date the noncitizen signed the form and ask the noncitizen if they have any questions relating to the credible fear process. If the noncitizen indicates that they do not understand the credible fear process, the asylum officer should read verbatim the below explanation to the noncitizen, include the below explanation verbatim in the interview notes, and document in the interview notes that the explanation was read to the noncitizen. The asylum officer does not need to re-

read the full M-444 where there is an M-444 in the referral packet signed by the noncitizen or where there is a notation that the noncitizen refused to sign. Note, the asylum officer must provide and read the full M-444 in cases where the noncitizen is eligible for a credible fear interview following a Safe Third Country Agreement Threshold Screening.

> You have been placed in expedited removal proceedings because the U.S. Department of Homeland Security (DHS) believes that you may not have the right to stay in the United States. However, you indicated that you fear return to your country, so I will interview you for credible fear. At the credible fear interview, I will ask you questions about the reasons you fear return to your country. It is important that you tell me about any harm you may have suffered in the past or any harm you fear in the future. To demonstrate a credible fear of persecution or torture, you must show that you have a credible fear of being persecuted because of your race, religion, nationality, membership in a particular social group or political opinion, or a credible fear of being tortured in your country.

> You may request an officer of a specific gender. You may also ask to speak to me separately from your family. You may have a consultant of your choice with you at your interview, or present telephonically. If you need additional time before your credible fear interview to contact someone, let me know and explain the reason you need more time. I will determine whether your circumstances merit providing you with additional time. DHS will provide an interpreter for the interview if you require one. The interpreter will be sworn to keep the information you discuss confidential. You may request another interpreter if you are not comfortable or if you do not understand them.

> If I determine that you have a credible fear of persecution or torture, you will either receive a charging document for a hearing in immigration court or you will be scheduled for an Asylum Merits Interview with a USCIS asylum officer. At the immigration court hearing or USCIS Asylum Merits Interview, the immigration judge or asylum officer will determine whether to grant you asylum or whether you are eligible for other protection from removal. You will receive information about the date, time, and location of this hearing or interview. If I determine that you do not have a credible fear of persecution or torture, you may ask to have an immigration judge review the negative determination. If you decline this review, or after immigration judge review, you are still found to not have a credible fear of persecution or torture, you may be removed from the United States.

> Do you have any questions about what I just explained?

> Do you understand the credible fear determination process?

The asylum officer should answer questions posed by the noncitizen to ensure understanding of the credible fear process.

If ICE transfers a detained noncitizen who has already been referred to the Asylum Division to a detention facility located in another asylum office's jurisdiction, asylum office personnel at the new asylum office should ensure the noncitizen receives a list of legal service providers for the new location.

Dated: Setpember 27, 2024

Respectfully submitted,

Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

*Attorneys for Plaintiffs*

By: /s/ Matthew E. Price
Matthew E. Price (D.C. Bar # 996158)
Lindsay Harrison (D.C. Bar #977407)
Mary E. Marshall (D.C. Bar #1739058)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*
*lharrison@jenner.com*
*mmarshall@jenner.com*

Melissa Root
Andy Osbourne
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
353 N Clark St, Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*
*aosbourne@jenner.com*

*Attorneys for Organzational Plaintiffs*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

*Attorneys for Plaintiffs*

1

Tamara Goodlette
(D.C. Bar. No. TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.org*

Blaine Bookey*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
*bbookey@uclawsf.edu*

Ashley Alcantara Harris*
David A. Donatti
American Civil Liberties Foundation of Texas
P.O. Box 8306
Houston, TX 77288
T: 713-942-8146
*aharris@aclutx.org*

*Attorneys for Plaintiffs*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street NW
Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

Edith Sanguesa*
Center for Gender and Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
*sanguezaedith@uclawsf.edu*

Robert Pauw*
Center for Gender and Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA  98104
T: 206-682-1080
*rpauw@ghp-law.net*

*Attorneys for Plaintiffs*

*Admitted via certificate of pro bono
representation or pro hac vice*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Senior Counsel*

*Counsel for Defendants*

BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
*Senior Litigation Counsel*

*Counsel for Defendants*

2

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 27, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that Defendants are registered CM/ECF users and that service to Defendants will be accomplished by the CM/ECF system.

/s/     Matthew E. Price
Matthew E. Price

3